# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 3. Petition for Review of Order of a Federal Agency, Board, Commission, or Officer

Name of Federal Agency, Board, Commission, or Officer:

National Labor Relations Board

Date of judgment or order you are challenging: August 29, 2022

Fee paid for petition?   ● Yes   ○ No

**List all Petitioners** *(List **each** party filing the petition. Do not use "et al." or other abbreviations.)*

"International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO"

For immigration cases:

Alien Number(s):

Is petitioner(s) detained?   ○ Yes   ○ No

Has petitioner(s) moved the BIA to reopen?   ○ Yes   ○ No

Has petitioner(s) applied to the district director for an adjustment of status?   ○ Yes   ○ No

Have you filed a previous petition for review from this agency? ○ Yes  ● No

If Yes, what is the prior 9th Circuit case number?

Your mailing address:

8000 East Jefferson Avenue

City: Detroit   State: MI   Zip Code: 48214

Prisoner Inmate or A Number (if applicable):

**Signature**  /s/ Daniel E. Curry   **Date** 9/6/2022

*Complete and file with the attached representation statement and the order being challenged.*
*See, e.g., Circuit Rule 15-4.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

## Representation Statement for Petition for Review

**Petitioner(s)** *(List **each** party filing the petition, do not use "et al." or other abbreviations.)*
Name(s) of party/parties:

"International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO"

Name(s) of counsel (if any):

Schwartz, Steinsapir Dohrmann & Sommers LLP
Margo A. Feinberg
Daniel E. Curry

Address: 6300 Wilshire Blvd., Suite 2000, Los Angeles, CA 90048

Telephone number(s): 323-655-4700

Email(s): margo@ssdslaw.com; dec@ssdslaw.com

Is counsel registered for Electronic Filing in the 9th Circuit?   ● Yes   ○ No

**Respondent(s)** *(List only the names of parties and counsel (if known) who will oppose you in the petition. List separately represented parties separately.)*
Name(s) of party/parties:

National Labor Relations Board

Name(s) of counsel (if any known):

Jennifer Abruzzo, General Counsel of the NLRB;
Micah Jost, NLRB Attorney

Address: 1015 Half Street, SE, Washington, DC 20570

Telephone number(s): (202) 273-1748

Email(s): Micah.Jost@nlrb.gov

*To list additional parties and/or counsel, attach additional pages as necessary.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 3**                    *2*                    *Rev. 12/01/2018*

Case: 22-1480, 09/06/2022, DktEntry: 1.1, Page 3 of 35

# ATTACHMENT

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Tesla, Inc. *and* Michael Sanchez *and* Jonathan Galescu *and* Richard Ortiz *and* International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO.** Cases 32–CA–197020, 32–CA–197058, 32–CA–197091, 32–CA–197197, 32–CA–200530, 32–CA–208614, 32–CA–210879, and 32–CA–220777

August 29, 2022

SUPPLEMENTAL DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS KAPLAN RING, WILCOX, AND PROUTY

In this case, we examine the standard to be applied to evaluate the lawfulness of workplace rules or policies that restrict the display of union insignia by requiring employees to wear uniforms or other designated clothing, implicitly prohibiting employees from substituting union attire for the required uniform or clothing. The Supreme Court of the United States long ago affirmed that employees have a protected right to display union insignia under Section 7 of the National Labor Relations Act. See *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 801–803 & fn. 7 (1945). Thereafter, whenever an employer interfered with its employees' right to display union insignia, it had the burden to show that its interference was justified by special circumstances. If it could not meet that burden, the National Labor Relations Board would find that the employer violated the Act. See, e.g., *Boch Honda*, 362 NLRB 706, 707 (2015), enfd. sub nom. *Boch Imports, Inc. v. NLRB*, 826 F.3d 558 (1st Cir. 2016).

In *Stabilus, Inc.*, the Board stated that "[a]n employer cannot avoid the 'special circumstances' test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia." 355 NLRB 836, 838 (2010). Subsequently, however, a divided Board in *Wal-Mart Stores, Inc.*, 368 NLRB No. 146 (2019), declined to apply the "special circumstances" test to evaluate the lawfulness of an employer's dress code policy that partially restricted the display of union buttons and insignia.[1] As explained below, the Board's decision in *Wal-Mart* upset the proper balance struck by the Supreme Court in *Republic Aviation*, ignored decades of Board precedent

holding that *any* limitation on the display of union insignia is presumptively unlawful regardless of whether an employer permits other related Section 7 activity, and created uncertainty in this previously well-settled area of the law.

Accordingly, we overrule *Wal-Mart* and reaffirm that under *Republic Aviation* and its progeny, when an employer interferes *in any way* with its employees' right to display union insignia, the employer must prove special circumstances that justify its interference. Applying that standard here, we agree with the judge that the Respondent violated Section 8(a)(1) of the Act by maintaining its team-wear policy, which requires employees to wear shirts imprinted with the Respondent's logo and implicitly prohibits employees from substituting any shirt with a logo or emblem, including a shirt bearing union insignia, for the required team wear.

I. PROCEDURAL HISTORY

On September 27, 2019, Administrative Law Judge Amita Baman Tracy issued a decision in this proceeding.[2] The judge found, inter alia, that the Respondent violated Section 8(a)(1) by maintaining its team-wear policy because it failed to establish that the policy is justified by special circumstances under *Republic Aviation*. The Respondent filed exceptions, arguing that the special circumstances test should not apply because its production associates freely and openly display union insignia and are merely prohibited from substituting union shirts for the required team wear.

On February 12, 2021, the Board issued a Notice and Invitation to File Briefs (NIFB), asking the parties and interested amici to address the following questions:

> 1. Does *Stabilus* specify the correct standard to apply when an employer maintains and consistently enforces a nondiscriminatory uniform policy that implicitly allows employees to wear union insignia (buttons, pins, stickers, etc.) on their uniforms?
>
> 2. If *Stabilus* does not specify the correct standard to apply in those circum-

---

[1] Dissenting, then-Member McFerran objected to the Board's failure to apply the special circumstances test. See id., slip op. at 6–12 (dissent).

[2] The Respondent filed exceptions and a supporting brief, the General Counsel and the Charging Parties—Michael Sanchez, Jonathan Galescu, Richard Ortiz, and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO (the Union), collectively—filed answering briefs, and the Respondent filed reply briefs. Additionally, the General Counsel filed limited cross-exceptions and a supporting brief, the Charging Parties filed a brief in support of the General Counsel's limited cross-exceptions, the Respondent filed an answering brief, and the General Counsel filed a reply brief.

stances, what standard should the Board apply?

*Tesla, Inc.*, 370 NLRB No. 88, slip op. at 1 (2021).[3] The Acting General Counsel and the Respondent each filed a responsive brief. American Federation of Labor and Congress of Industrial Organizations (AFL–CIO);[4] Coalition for a Democratic Workplace, Chamber of Commerce of the United States of America, National Federation of Independent Business Small Business Legal Center, Associated Builders and Contractors, Independent Electrical Contractors, National Retail Federation, Retail Industry Leaders Association, and Restaurant Law Center, jointly (CDW); Communication Workers of America, AFL–CIO (CWA); HR Policy Association (HRPA); International Brotherhood of Electrical Workers, Local Union 304 (IBEW Local 304); Service Employees International Union (SEIU); and United Brotherhood of Carpenters and Joiners of America (UBC) each filed amicus briefs. The Charging Parties and the Respondent each filed a reply brief.

On March 25, 2021, the Board issued a decision and order resolving most of the issues in this case. *Tesla, Inc.*, 370 NLRB No. 101 (2021).[5] However, in light of the NIFB, the Board severed and retained for further consideration the question of whether the Respondent violated Section 8(a)(1) by maintaining and enforcing its team-wear policy. Id., slip op. at 1 fn. 3.[6]

The Board has considered the judge's decision and the record in light of the exceptions and briefs and has decided to affirm her rulings, findings,[7] and conclusions regarding that issue and to adopt the recommended Order as modified and set forth in full below.[8] For the reasons

---

[3]  Chairman McFerran opposed the issuance of the NIFB because she saw "no conflict between *Stabilus* and well-established legal principles." Id., slip op. at 1–2 & fn. 1 (dissent).

[4]  The Charging Parties filed a joinder in the brief of the AFL–CIO.

[5]  Judge Tracy's decision is attached to that decision and order and may be accessed there.

[6]  We note that in the original decision in this matter, the Board affirmed, in the absence of exceptions, the judge's dismissal of the related allegations that the Respondent *discriminatorily* enforced the team-wear policy against union supporters. Id., slip op. at 1 & fn. 1.

[7]  The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

[8]  As no party has excepted to the judge's inclusion of an enforcement violation in the conclusions of law and recommended Order, we find that the question of whether the Respondent unlawfully enforced the team-wear policy against employees wearing union shirts is not before us, and we adopt that portion of the judge's order. In addition, we have modified the judge's recommended Order to conform to the Board's standard remedial language and in accordance with our recent

discussed below, we agree with the judge that the Respondent failed to establish special circumstances that justify its team-wear policy's implicit prohibition on employees wearing union shirts and therefore violated Section 8(a)(1) by maintaining the team-wear policy.

## II. BACKGROUND

The Respondent manufactures electric vehicles at its facility in Fremont, California. The vehicles are assembled in General Assembly (GA) by production associates, who install parts in and on the bodies of the vehicles. When an unfinished vehicle enters GA, its paint is cured sufficiently for light touching and general handling but is not cured as completely as when the vehicle is finished.

The Respondent's "General Assembly Expectations" include the following team-wear policy:

> Team Wear: It is mandatory that all Production Associates and Leads wear the assigned team wear.
>
> • On occasion, team wear may be substituted with all black clothing if approved by supervisor.
> • Alternative clothing must be mutilation free, work appropriate and pose no safety risks (no zippers, yoga pants, hoodies with hood up, etc.).[9]

The team-wear policy applies only to employees in GA.

For production associates, team wear consists of black cotton shirts with the Respondent's logo and black cotton pants with no buttons, rivets, or exposed zippers. The Respondent provides newly hired production associates with two pairs of pants, two short-sleeve shirts, two long-sleeve shirts, and a sweater. The shirts and sweater are imprinted with the Respondent's logo. Production leads and supervisors wear red shirts imprinted with the Respondent's logo, while line inspectors wear white shirts imprinted with the Respondent's logo, and they all wear the same black cotton pants as the production associates.

During the Union's organizing campaign in the spring of 2017, employees, including production associates, began wearing black cotton shirts that had a small logo with the Union's campaign slogan—"Driving a Fair Fu-

---

decision in *Paragon Systems, Inc.*, 371 NLRB No. 104 (2022). We shall substitute a new notice to conform to the Order as modified.

[9]  The Respondent's "General Assembly Expectations" originally stated simply that "[t]eam wear is mandatory for all team members and leads." Prior to August 10, 2017, the Respondent orally informed its production associates that, with supervisory permission, they could substitute all-black clothing for team wear. In October 2017, the Respondent formally revised the "General Assembly Expectations" to reflect that change.

TESLA, INC.                                                            3

ture at Tesla"—on the front and a larger logo with that slogan and "UAW" on the back. Before August 2017, production associates regularly wore shirts that were not black or had logos and emblems unrelated to the Respondent. In August 2017, the Respondent began to strictly enforce its team-wear policy by having supervisors and managers audit production associates during startup meetings and "walk the line" to ensure compliance with the team-wear policy. Since then, supervisors and managers have occasionally allowed production associates to wear plain black cotton shirts instead of team-wear shirts or to cover non-Respondent logos and emblems on black shirts with black mutilation-protection tape.

On August 10, 2017, production associate Jayson Henry was wearing a black union shirt when an unidentified production supervisor told Henry that he would be sent home if he wore the union shirt again. Henry asked to see the Respondent's dress code, and Associate Production Manager Topa Ogunniyi gave him a copy of the "General Assembly Expectations." That same day, production associate Sean Jones was also wearing a black union shirt, and Production Supervisor Timothy Fenelon told Jones that he would be sent home if he did not change out of the union shirt because the shirt did not comply with the Respondent's team-wear policy. Jones protested but ultimately changed his shirt. Later that day, Jones complained to Ogunniyi about this incident, and Ogunniyi responded that the policy had changed and that employees could no longer wear shirts with emblems. From that point forward, the Respondent prohibited production associates from wearing the black union shirts in place of team-wear shirts but continued to allow them to wear union stickers on the required team wear.[10]

Production Manager Mario Penera testified that the team-wear policy is intended to aid in the "visual management" of GA and to lower the risk of employees' clothing causing mutilations to the vehicles.[11] Penera described visual management as the ability to easily determine that employees are in their assigned work areas and to distinguish among the different categories of employees in GA based on shirt color. Penera added that requiring production associates to dress in team wear makes it easier for supervisors to verify that employees' clothes do not present a high risk of causing mutilations. Penera testified that he did not know of a black union shirt—or any other non-team-wear shirt with a logo—

causing a mutilation to a vehicle. Production Manager Kyle Martin generally confirmed Penera's testimony regarding the purpose of the team-wear policy. Additionally, Martin testified about a specific incident in which a raised metal emblem on a production associate's shirt caused a mutilation by brushing against a fender, and Martin admitted that he could still visually manage GA if production associates wore plain black shirts. Associate Manager Ogunniyi testified that, to her knowledge, a cotton shirt had never damaged a vehicle and that, although the black union shirt previously worn by production associates does not comply with the team-wear policy, it is not a mutilation risk. Production Supervisor Fenelon also testified that he did not know of any cotton shirt causing a mutilation to a vehicle.

III.  DISCUSSION

A. The Judge's Decision

As discussed above, the judge found that the Respondent violated Section 8(a)(1) by maintaining the team-wear policy. The judge first rejected the Respondent's argument that the standard set forth in *Boeing Co.*, 365 NLRB No. 154 (2017), should be applied to evaluate the lawfulness of the team-wear policy.[12] The judge reasoned that the Board has applied the *Republic Aviation* special circumstances test in cases concerning the right of employees to wear union insignia in the workplace. The judge next rejected the Respondent's argument that the Board has implicitly allowed employers to promulgate and enforce nondiscriminatory uniform rules, stating that "[s]imply because Respondent's rule does not explicitly prohibit the wearing of union insignia does not mean that if the rule is enforced equally, the rule is permitted; the rule still disallows employees to wear union insignia on their clothing in GA." The judge then analyzed whether the Respondent had established special circumstances to justify the team-wear policy's prohibition on employees wearing union attire in place of the required team wear. The judge found that the Respondent failed to establish special circumstances based on its claim that the team-wear policy is intended to prevent

---

[10] The judge found generally that "[e]mployees also wore union . . . hats to work." However, there is no evidence that any production associates wore union hats.

[11] Mutilations include abrasions, buffs, chips, cuts, dents, dings, or scratches to the inside or outside of a vehicle.

[12] Under *Boeing*, if an employer's facially lawful rule or policy, when reasonably interpreted, would potentially interfere with the exercise of employees' Sec. 7 rights, the Board must balance the following two factors: "(i) the nature and extent of the potential impact on NLRA rights, *and* (ii) legitimate justifications associated with the rule." Id., slip op. at 3 (emphasis in original); see also *LA Specialty Produce Co.*, 368 NLRB No. 93, slip op. at 1–3 (2019) (clarifying the *Boeing* standard). Then-Member McFerran objected to the Board's adoption of this standard in *Boeing*. See *Boeing*, 365 NLRB No. 154, slip op. at 29–44 (dissent). The Board recently issued a Notice and Invitation to File Briefs seeking public input on whether the Board should continue to adhere to the standard adopted in *Boeing* and revised in *LA Specialty*. See *Stericycle, Inc.*, 371 NLRB No. 48 (2022).

4                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

mutilations to unfinished vehicles. Specifically, the judge found that the Respondent was prompted to begin to strictly enforce the team-wear policy by an increase in seat mutilations, and that there is no evidence that the black union shirts worn by production associates caused seat mutilations. The judge also found that the Respondent failed to establish special circumstances based on its claim that the team-wear policy is intended to aid in the visual management of GA, because the black union shirts are not substantially different from the black team-wear shirts or the plain black shirts that production associates can wear pursuant to the team-wear policy. Finally, the judge rejected the Respondent's argument that the team-wear policy does not interfere with employees' Section 7 rights because employees can wear union stickers on their team wear.

### B. The Board's Decision in Stabilus

In *Stabilus, Inc.*, the employer maintained a uniform policy that required employees to wear shirts bearing the employer's name. 355 NLRB 836, 837 (2010). During a union campaign, the employer told several employees that they could not wear union shirts. Ibid. The administrative law judge found that the employer unlawfully prohibited employees from wearing union shirts because it failed to establish that this application of its uniform policy was justified by special circumstances under *Republic Aviation*. *Stabilus*, 355 NLRB at 837–838. The employer excepted to that finding, arguing that "nondiscriminatory enforcement of a uniform policy does not violate the Act." Id. at 838.

The *Stabilus* Board found it unnecessary to reach the judge's finding that the employer failed to establish special circumstances because it found that even if the employer had made that showing, its conduct was unlawful for two independent reasons: (1) it "enforced its policy in a selective and overbroad manner against union supporters," and (2) "the policy was applied in a disparate manner to Section 7 activity relative to comparable non-Section 7 activity." Id. at 837. However, the Board still analyzed the applicability of the special circumstances test, noting as follows:

> As the Supreme Court has held, employees have a Section 7 right to wear union insignia on their employer's premises, which may not be infringed, absent a showing of "special circumstances." These protections of Section 7 expression have always extended to articles of clothing, including prounion T-shirts. There is no basis in precedent for treating clothes displaying union insignia as categorically different from other union insignia, such as buttons.

> An employer cannot avoid the "special circumstances" test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia. The Board has consistently applied that test where employers have required employees to wear particular articles of clothing and have correspondingly prohibited them from wearing clothing displaying union insignia. . . . The many Board cases finding that special circumstances existed amply illustrate that there is no need to depart from existing precedent to ensure that employers' legitimate interests, for example, in maintaining a particular public image, are accorded proper weight.

Id. at 838 (internal citations and footnotes omitted).

Former Member Schaumber disagreed that the special circumstances test was applicable in *Stabilus* and instead would have found that the employer lawfully enforced its preexisting uniform policy. Id. at 842 (Member Schaumber, dissenting in part). Member Schaumber considered *Stabilus* to be a "case of first impression" and asserted that the Board had "never held that, where an employer lawfully maintains and consistently enforces a policy requiring employees to wear a company uniform, its employees have a right under Section 7 to disregard the policy and wear union attire in place of the required uniform." Id. at 842–843 & fn. 7. To the contrary, he argued that the Board had instead "implicitly recognized that an employer may promulgate and enforce a nondiscriminatory uniform rule." Id. at 843. Noting that the right to display union insignia is predicated on employees' right to communicate with each other regarding self-organization at the workplace, Member Schaumber maintained that the employer in *Stabilus* had not interfered with its employees' Section 7 rights in that regard because, although employees could not wear union shirts, they were able to display union buttons, pins, and stickers, and other union insignia. Id. at 842, 843. Member Schaumber ultimately concluded as follows:

> [I]n balancing employee and employer rights as required under *Republic Aviation*, supra, a "special circumstances" analysis is inappropriate here. If employees have the right to wear union attire *instead* of a company uniform, the employer's right to promulgate and enforce reasonable, nondiscriminatory apparel rules is negated entirely. Such a result would not strike a balance between employee and employer rights; rather, it would completely submerge the employer's rights. Thus, I would hold that where, as here, an employer maintains and consistently enforces a lawful uniform rule, Section 7 does not guarantee employees

the right to wear union attire in place of the required company uniform.

Id. at 843–844 (internal footnote omitted; emphasis in original).

### C. Positions of the Parties and Amici

The Acting General Counsel, the Charging Parties, CWA, IBEW Local 304, and UBC take the position that *Stabilus* correctly specifies that the *Republic Aviation* special circumstances test applies when an employer maintains and consistently enforces a nondiscriminatory uniform policy. They argue that in those situations, application of the special circumstances test is consistent with Board precedent and strikes an appropriate balance between employees' important Section 7 right to display union insignia and employers' legitimate managerial interests in regulating employee appearance. They contend that application of a less restrictive standard, such as the *Boeing* standard, would not be sufficiently protective of employees' Section 7 right to display union insignia in the workplace and would unnecessarily bring instability to this well-settled area of the law.

The Respondent and CDW contend that *Stabilus* is incorrect in stating that the *Republic Aviation* special circumstances test applies in those situations. They also assert that the portion of *Stabilus* cited in the NIFB was merely dicta and is inconsistent with Board precedent. According to the Respondent and CDW, *Republic Aviation*, when properly interpreted, provides that the Board should apply the special circumstances test when a uniform policy explicitly prohibits the display of union insignia or has been disparately applied against employees displaying union insignia. Citing *Wal-Mart Stores, Inc.*, 368 NLRB No. 146 (2019), they contend that the Board should treat facially neutral, nondiscriminatory uniform rules like any other facially neutral work rule and apply *Boeing* to evaluate them. They further argue that application of the special circumstances test to evaluate the lawfulness of facially neutral, nondiscriminatory uniform rules places an exceptionally high burden on employers and will lead to the invalidation of almost all uniform policies, thereby failing to consider employers' legitimate managerial interests in establishing such rules.[13]

HRPA also takes the position that *Stabilus* is incorrect. It claims that *Republic Aviation* merely established a balancing test to determine the legality of workplace rules and policies and that *Stabilus* and many other

Board decisions have incorrectly substituted "an artificially created 'special circumstances' test that places an exceedingly high and inappropriate burden of proof on employers." HRPA argues that application of the special circumstances test in the situation raised in the NIFB inappropriately subordinates employers' rights to maintain productivity and discipline to the rights of their employees in contravention of the goals and purposes of the Act and the balancing approach established by the Supreme Court in *Republic Aviation*.

The AFL–CIO and SEIU assert that the instant case does not present the circumstances raised in the NIFB. The AFL–CIO argues that because the team-wear policy expressly allows production associates to substitute work-appropriate black clothing for team wear and was interpreted to allow them to wear black union shirts prior to August 2017, the team-wear policy does not inherently preclude the wearing of union clothing. According to the AFL–CIO, there was thus no legal basis for challenging the team-wear policy until the Respondent began to apply it to prohibit production associates from wearing black union shirts in August 2017, and the Respondent had to establish special circumstances to justify applying the team-wear policy in that manner. SEIU argues that the circumstances raised in the NIFB are not present in this case for the following reasons: (1) production associates are not required to wear a company-issued uniform but instead can wear, with their supervisor's permission, either a shirt with the Respondent's logo or an all-black shirt; (2) the Respondent does not consistently apply the team-wear policy, as supervisors have discretion to decide whether production associates wear shirts with the Respondent's logo, and they had interpreted the team-wear policy to allow black union shirts prior to August 2017; and (3) there is no evidence that production associates are implicitly allowed to wear buttons or pins.[14]

### D. Stabilus Correctly Specifies That the Republic Aviation Special Circumstances Test Applies Here

Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C § 157. In Section 1

---

[13] The Respondent argues that the team-wear policy is lawful under *Boeing* because the policy helps it visually manage GA employees and produce mutilation-free vehicles and has only a comparatively slight adverse impact on employees' Sec. 7 right to display union insignia, as employees can wear union stickers and hats.

[14] SEIU asserts that if the Board does reach the issue raised in the NIFB, it should not overrule *Stabilus* but instead should clarify the difference between dress codes, to which the special circumstances test would apply, and uniform requirements, to which it would not, and hold that where an employer establishes special circumstances that justify prohibiting employees from wearing a particular article of union insignia or attire, the employer must inform its employees what forms of union insignia or attire are allowed.

of the Act, Congress explained that it created these new rights for workers because "[e]xperience ha[d] proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce." 29 U.S.C. § 151. Section 8(a)(1) protects these rights by making it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [S]ection 7." 29 U.S.C. § 158(a)(1). As the Supreme Court has approvingly observed, since the earliest days of the Act, "the Board [has] recognized the importance of freedom of communication to the free exercise of organization rights," because "organization rights are not viable in a vacuum; their effectiveness depends in some measure on the ability of employees to learn the advantages and disadvantages of organization from others." *Central Hardware Co. v. NLRB*, 407 U.S. 539, 543 (1972); see also *LeTourneau Co. of Georgia*, 54 NLRB 1253, 1260 (1944) ("It is clear that employees cannot realize the benefits of the right to self-organization guaranteed them by the Act, unless there are adequate avenues of communication open to them whereby they may be informed or advised as to the precise nature of their rights under the Act and of the advantages of self-organization, and may have opportunities for the interchange of ideas necessary to the exercise of their right to self-organization."), revd. 143 F.2d 67 (5th Cir. 1944), revd. sub nom. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945).

In *Republic Aviation Corp. v. NLRB*, the Supreme Court affirmed that "the right of employees to wear union insignia at work has long been recognized as a reasonable and legitimate form of union activity, and the [employer's] curtailment of that right is clearly violative of the Act." 324 U.S. 793, 802–803 & fn. 7 (1945) (internal quotations omitted); see also *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714 (5th Cir. 2018) ("Since the Act's earliest days, it has been recognized that Sec[.] 7 protects the right of employees to wear items—such as buttons, pins, and stickers—relating to terms and conditions of employment (including wages and hours), unionization, and other protected matters."), cert. denied 139 S.Ct. 1259 (2019). The display of union insignia has proven to be a critical form of protected communication, as employees have displayed union insignia in many ways in furtherance of Section 7 rights, including to support organizing campaigns,[15] demonstrate solidarity,[16] and advocate for issues during collective bargaining.[17]

Employees' Section 7 right to display union insignia at work is not absolute, however. As the Supreme Court explained in *Republic Aviation*, the Board must balance "the undisputed right of self-organization assured to employees under the [] Act and the equally undisputed right of employers to maintain discipline in their establishments." 324 U.S. at 797–798 ("[T]hese rights are not unlimited in the sense that they can be exercised without regard to any duty which the existence of rights in others may place upon employer or employee. Opportunity to organize and proper discipline are both essential elements in a balanced society."). *Republic Aviation* established the Board's longstanding approach to balancing these rights: a presumption that any employer limitation on the display of union insignia is invalid, with the burden on the employer to establish special circumstances to justify its action.[18] See *Republic Aviation*, 324 U.S. at 803–804 & fn. 10; see also *Boeing Airplane Co.*, 103 NLRB 1025, 1026 & fn. 4 (1953) (citing *Republic Aviation* to support the proposition that "[i]t has long been recognized that rules such as the foregoing, [including a rule prohibiting union steward and committeemen buttons,] which clearly interfere with employee's concerted activity, are presumptively invalid, in the absence of special circumstances which make them necessary in order to maintain production and discipline"), enfd. 217 F.2d 369 (9th Cir. 1954). As Professors Robert A. Gor-

---

[15] See, e.g., *Malta Construction Co.*, 276 NLRB 1494, 1498 (1985), enfd. 806 F.2d 1009 (11th Cir. 1986); *Mayrath Co.*, 132 NLRB 1628, 1643 (1961), enfd. in relevant part 319 F.2d 424 (7th Cir. 1963).

[16] See, e.g., *Mt. Clemens General Hospital*, 335 NLRB 48, 49 (2001), enfd. 328 F.3d 837 (6th Cir. 2003). See generally Teeter, Jr., *Banning the Buttons: Employer Interference with the Right to Wear Union Insignia in the Workplace*, 80 Ky. L.J. 377, 379 (1992) ("By engaging in this simple act of reaffirmation, [i.e., displaying union insignia,] the worker assures both herself and others that they belong to an entity devoted to protecting their statutory rights, economic interests, and quest for dignity in their work.").

[17] See, e.g., *Escanaba Paper Co.*, 314 NLRB 732, 732 (1994), enfd. sub nom. *NLRB v. Mead Corp.*, 73 F.3d 74 (6th Cir. 1996); *Holladay Park Hospital*, 262 NLRB 278, 278 (1982).

[18] The Board has recognized a narrow exception to this rule for immediate patient care areas in healthcare facilities. As the Board explained in *Healthbridge Management, LLC*, 360 NLRB 937 (2014), enfd. 798 F.3d 1059 (D.C. Cir. 2015):

> In healthcare facilities, . . . the Board and the courts have refined [the special circumstances test] due to concerns about the possibility of disruption to patient care. In nonpatient care areas, restrictions on wearing insignia are presumptively invalid in accordance with the basic rule, and it is the employer's burden to establish special circumstances justifying its action. By contrast, restrictions on wearing insignia in immediate patient care areas are presumptively *valid*.

Id. at 938 (internal citations omitted, emphasis in original). Significantly, however, the presumption of validity does not apply when an employer selectively bans only certain union insignia in immediate patient care areas. Ibid. In those circumstances, the burden remains on the employer to establish special circumstances—specifically, that the ban was "'necessary to avoid disruption of health-care operations or disturbance of patients.'" Ibid. (quoting *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 507 (1978)).

man and Matthew W. Finkin have explained, this approach "reflect[s] a substantive judgment that inhibitions on employee activities on behalf of the union inherently do 'interfere' with and 'restrain' the exercise of their [S]ection 7 rights and that the burden to justify that inhibition should properly lie with the employer when its needs are not immediately obvious." Gorman & Finkin, *Basic Text on Labor Law* § 8.2 (2d ed. 2004).

The Board has treated clothes displaying union insignia the same as union insignia that employees attach to their clothing, such as buttons and pins. See *Great Plains Coca-Cola Bottling Co.*, 311 NLRB 509, 515 (1993). Thus, Section 7's protection of employees' right to display union insignia "extends to prounion T-shirts," and the Board will find that an employer's interference with such a display of union insignia violates the Act unless the employer proves special circumstances that outweigh the employees' right to wear the insignia and that its prohibition is narrowly tailored to address those circumstances. See *Wal-Mart Stores*, 340 NLRB 637, 638 (2003) (citing cases), enfd. in relevant part 400 F.3d 1093 (8th Cir. 2005).[19]

Relatedly, although the Board's discussion of the special circumstances test in *Stabilus* was dicta, the Board correctly stated there that "[a]n employer cannot avoid the 'special circumstances' test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia." 355 NLRB at 838. The Board has consistently applied the *Republic Aviation* special circumstances test when an employer has prohibited an employee from wearing an article of clothing bearing union insignia based on a policy requiring employees to wear certain clothing. For example, in *Great Plains Coca-Cola*, the Board found that an employer violated Section 8(a)(1) where, in the absence of special circumstances, a supervisor told an employee that his union jacket was unacceptable and that only company jackets were allowed. See 311 NLRB at 515. Similarly, in *Meijer, Inc.*, the Board found that, in the absence of special circumstanc-

es, an employer violated Section 8(a)(1) by prohibiting an employee from wearing a jacket with a union logo—instead of the employer-provided freezer jacket that was considered part of the established uniform in the store—in noncustomer areas. See 318 NLRB 50, 52, 56–57 (1995), enfd. 130 F.3d 1209 (6th Cir. 1997). In *Quantum Electric, Inc.*, the Board found that, in the absence of special circumstances, an employer unlawfully discharged an employee for violating its clothing policy—which prohibited employees from wearing clothing with "graphics or printed text other than [employer] approved or issued clothing"—where the employee wore a union shirt and refused to turn it inside out. See 341 NLRB 1270, 1270 fn. 1, 1274, 1277, 1280 (2004). Conversely, on several occasions, the Board has found that employers established special circumstances that justified applying a uniform policy or dress code to prohibit employees from wearing an article of clothing displaying union insignia.[20]

In the present case, the Respondent's team-wear policy allows production associates to wear only black team-wear shirts with the Respondent's logo—or on occasion, with their supervisor's permission, all-black shirts—and thus prohibits them from wearing union shirts in place of the required team wear or other approved shirts. As a result, the team-wear policy interferes with production associates' Section 7 right to display union insignia. Accordingly, under *Republic Aviation* and its progeny, the team-wear policy is presumptively invalid, and the Respondent has the burden to establish special circumstances that justify its interference with production associates' protected right to display union insignia. In other words, *Stabilus* correctly specifies that the present case requires nothing more than the application of the Board's

---

[19] Sec. 7's protection also extends to adornments that are unrelated to a labor organization, but that nonetheless concern employees' terms and conditions of employment. See, e.g., *In-N-Out Burger, Inc.*, 365 NLRB No. 39, slip op. at 5 (2017) ("Fight for $15" pin that supported a campaign to raise the minimum wage to $15 per hour), enfd. 894 F.3d 707 (5th Cir. 2018), cert. denied 139 S.Ct. 1259 (2019); *Medco Health Solutions of Las Vegas, Inc.*, 364 NLRB 1687, 1687, 1689 fn. 4 (2016) (T-shirt bearing slogan, "I don't need a WOW to do my job[,]" where "WOW" referred to company program concerning employee performance and morale); *AT&T*, 362 NLRB 885, 886 & fn. 5 (2015) ("NO ON PROP 32" button that opposed ballot initiative affecting union payroll deductions); *Mt. Clemens General Hospital*, 335 NLRB at 49 (button with line drawn through letters "FOT" to represent silent protest of forced overtime).

[20] See, e.g., *Con-Way Central Express*, 333 NLRB 1073, 1075–1077 (2001) (finding that an employer lawfully suspended two employees for refusing to remove union hats where its interest in maintaining an established public image justified its uniform and appearance policy's prohibition on wearing logos and adornments that were not issued by the employer); *Produce Warehouse of Coram*, 329 NLRB 915, 915–918 (1999) (finding that an employer lawfully discharged an employee for refusing to remove a union hat because its interest in maintaining an established public image justified its uniform policy's requirement that meat and deli department employees wear employer hats only); *Noah's New York Bagels*, 324 NLRB 266, 275 (1997) (finding that an employer lawfully prohibited an employee from wearing on her delivery route the required company shirt with "the added phrase 'If its not Union, its not Kosher'" because it mocked the employer's Kosher policy, which the employer followed strictly and featured prominently on its logo and shirts); *Casa San Miguel*, 320 NLRB 534, 540 (1995) (finding that a nursing home lawfully prohibited an employee from wearing the required uniform—a white smock—that had been altered with a union emblem and message printed on it because it would not have been practical or possible for the employee to wear the altered uniform in nonpatient care areas but change out of it before entering patient care areas, where union-insignia prohibitions are presumptively valid).

8                        DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

longstanding, Supreme Court-approved special circum-
stances test to an employer restriction on the display of
union insignia.[21]

*E.  Our Colleagues' Dissenting Position and the Stabilus
Dissent are Contrary to Republic Aviation*

As discussed above, in *Stabilus*, former Member
Schaumber argued that where an employee attempts to
substitute other attire for attire required by an employ-
er's nondiscriminatory uniform policy or dress code,
application of the *Republic Aviation* special circumstanc-
es test would be inappropriate.  *Stabilus*, 355 NLRB at

---

[21] Contrary to our dissenting colleagues' hyperbolic rhetoric, we do
not hold that "all employer dress codes [are] presumptively unlawful."
To be clear, our decision today does not implicate facially neutral em-
ployer dress codes that do not restrict or limit employees' right to dis-
play union insignia.  Rather, consistent with longstanding Board and
court precedent, our decision today reaffirms that employers may law-
fully maintain facially neutral, nondiscriminatory dress codes and uni-
form policies that implicitly limit or restrict the display of union insig-
nia, so long as they are narrowly tailored to serve a particular, legiti-
mate interest that outweighs the adverse effect on employees' Sec. 7
rights.  See, e.g., *Sam's Club*, 349 NLRB 1007, 1010 (2007) ("[A]n
employer may limit or ban the display or wearing of union insignia at
work if special circumstances exist and if those circumstances outweigh
the adverse effect on employees' Sec[.] 7 rights resulting from the
limitation or ban."); *Albis Plastics*, 335 NLRB 923, 924 (2001) ("In
cases where the employer argues that special circumstances justify a
ban on union insignia, the Board and courts balance the employee's
right to engage in union activities against the employer's right to main-
tain discipline or to achieve other legitimate business objectives, under
the existing circumstances."), enfd. mem. 67 Fed.Appx. 253 (5th Cir.
2003); see also generally infra sec. III.E.3.

Thus, what our dissenting colleagues decry as "unreasonable and
"unwarranted" is, instead, the continued application of the balancing
principle established in *Republic Aviation* to a uniform policy or dress
code that limits or restricts, but does not completely prohibit, employ-
ees' ability to display union insignia.  We can concisely summarize the
basis for applying that standard to such a policy here.  To begin, we
point out that our dissenting colleagues acknowledge that employees
have a protected right to display union insignia under Sec. 7 of the Act.
In fact, they "could not agree more wholeheartedly . . . that displaying
union insignia in the workplace is an important way employees exercise
their rights under Sec[.] 7 of the [ ] Act."  Indeed, Sec. 8(a)(1) of the
Act makes it an unfair labor practice to "interfere with" or "restrain"
employees in the exercise of their Sec. 7 rights.  Plainly, an employer
interferes with and restrains employees in the exercise of their Sec. 7
right to display union insignia by maintaining a uniform policy or dress
code that limits employees' ability to display union insignia even if the
policy does not completely prohibit employees from doing so.  But
such policies are merely presumptively unlawful, rather than categori-
cally unlawful, contrary to what the general prohibitory language of
Sec. 8(a)(1) would suggest, because, as the Supreme Court explained in
*Republic Aviation*, the Board must balance employees' Sec. 7 rights
against the "right of employers to maintain discipline in their estab-
lishments."  324 U.S. at 797–798.  Thus, consistent with *Republic
Aviation* and decades of subsequent Board and court precedent, the
Board affords employers the opportunity to rebut the presumption of
invalidity by establishing special circumstances that justify *any* inter-
ference with employees' Sec. 7 right to display union insignia arising
from uniform policies and dress codes.

843 (Member Schaumber, dissenting in part).  Instead, he
argued that "where . . . an employer maintains and con-
sistently enforces a lawful uniform rule, Section 7 does
not guarantee employees the right to wear union attire in
place of the required company uniform."  Id. at 844.  Our
dissenting colleagues agree with the *Stabilus* dissent.
They would not apply the special circumstances test to
"facially neutral, nondiscriminatory employer dress
codes that [ ] provide a meaningful opportunity to dis-
play union insignia."  Instead, they would hold that such
policies are categorically lawful to maintain and enforce
if they are not discriminatorily promulgated in response
to union activity or disparately enforced against employ-
ees wearing union attire.  We disagree.

To begin, the *Stabilus* dissent erroneously character-
ized the case as one of first impression.  Id. at 843 fn. 7.
However, the Board has consistently applied the special
circumstances test when an employee has attempted to
substitute union attire for attire required by a facially
neutral, nondiscriminatory uniform policy or dress
code.[22]  In fact, in the two cases cited in the *Stabilus* dis-
sent for the proposition that an employer may promulgate
and enforce a nondiscriminatory uniform rule without
showing special circumstances, the Board affirmed the
administrative law judges' application of the special cir-
cumstances test to find that the employers lawfully pro-
hibited employees from substituting uniform shirts al-
tered to display union insignia for the required uniform
shirts.  See *Noah's New York Bagels*, 324 NLRB at 275;
*Casa San Miguel*, 320 NLRB at 540.[23]

---

[22] See supra note 20 and accompanying text.

[23] Our dissenting colleagues claim that we are extending *Republic
Aviation* by applying the special circumstances test to facially neutral,
nondiscriminatory uniform policies and dress codes that restrict em-
ployees' ability to display union insignia.  We reject that contention.
More than 30 years after *Republic Aviation*, the Supreme Court ob-
served that in *Republic Aviation* it had "held that the Board is free to
adopt, in light of its experience, a rule that, absent special circumstanc-
es, a particular employer restriction is presumptively an unreasonable
interference with [Sec.] 7 rights constituting an unfair labor practice
under [Sec.] 8(a)(1)."  *Beth Israel Hospital*, 437 U.S. at 493.  The
Board has long cited *Republic Aviation* to support applying the special
circumstances test to employer restrictions on employees' ability to
display union insignia.  See, e.g., *Boeing*, 103 NLRB at 1026 & fn. 4
(citing *Republic Aviation* to support the proposition that "[i]t has long
been recognized that rules such as the foregoing, [including a rule
prohibiting union steward and committeemen buttons,] which clearly
interfere with employee's concerted activity, are presumptively invalid,
in the absence of special circumstances which make them necessary in
order to maintain production and discipline").  The Board has applied
the special circumstances test to such restrictions for decades with the
approval of reviewing courts.  See, e.g., *In-N-Out Burger*, 894 F.3d at
714–715 ("[I]f an employer can demonstrate special circumstances
sufficient to outweigh [its] employees' Sec[.] 7 interests and legitimize
the regulation of such [protected] insignia, then the right of employees
to wear these items may give way." (internal quotations omitted));
*Boch Imports, Inc. v. NLRB*, 826 F.3d 558, 570–571 (1st Cir. 2016)

TESLA, INC.                                                                 9

More importantly, the standard first proposed by the *Stabilus* dissent and expanded upon by our dissenting colleagues today is fundamentally in conflict with the principles of *Republic Aviation*, as announced and applied by the Supreme Court and the Board for decades, in the following three respects: (1) by essentially asserting that an employer is free to prohibit statutorily protected means of communication among employees so long as some alternative means remains open; (2) by suggesting that an employer restriction on the exercise of Section 7 rights is lawful if it is "nondiscriminatory" and "consistently enforced"; and (3) by effectively rejecting the principle that employees' Section 7 rights and employers'

---

(explaining that "employees are presumptively entitled under Sec[.] 7 to wear union insignia and other attire during work hours" but that "an employer may limit that activity . . . if the employer shows that there are 'special circumstances' that justify the limitations imposed." (internal quotations omitted); *HealthBridge Management, LLC v. NLRB*, 798 F.3d 1059, 1067 (D.C. Cir. 2015) ("Bans on union insignia in the workplace are therefore presumptively invalid, absent a showing by the employer of 'special circumstances' to support the ban."). Thus, if the Board has extended *Republic Aviation*, it did so long before our decision today, and such an extension was well-supported for the reasons discussed in this decision.

Our dissenting colleagues argue that the cases cited above are inapposite because they did not involve "an employer dress code comparable to the team-wear policy at issue in this case." To be clear, as stated above, we cite those cases for the general proposition that the Board, with the approval of reviewing courts, has long applied the "special circumstances" test to employer restrictions on employees' ability to display union insignia. This includes *HealthBridge*, where, contrary to the intimation of the dissent, the court held that substantial evidence in the record supported the Board's finding that the employer failed to demonstrate special circumstances in support of its ban on a particular union button in patient care areas. See 798 F.3d at 1070–1073. The point of these cases is not (and we do not claim) that they involved factual circumstances similar to those of the present case. But they do demonstrate the longstanding use, extension, and approval of the special circumstances test to union insignia cases. Once again, for examples of cases where the Board has applied the special circumstances test to employer restrictions on the display of union insignia resulting from facially neutral, nondiscriminatory uniform policies or dress codes, see supra note 20 and accompanying text.

Our dissenting colleagues also claim that our decision today cannot be reconciled with the court's observation in *Boch Imports* that "different considerations may apply when employers proscribe all adornments, including union adornments, than would apply when employers proscribe only certain types of adornments (for example, 'provocative' adornments), which may, on a case-by-case basis, include union adornments." 826 F.3d at 571. This is weak tea for the dissent. *Boch Imports* simply did not involve the issue at stake here; rather, it involved an employer's proscription of all insignia and adornments. The court did not reach or decide, and had no reason to reach or decide, the specific issue we confront today. The court's "observation" (to quote the dissent) was just that, making clear that the court was deciding only the issue before it. Like the court, if a facial challenge to an employer policy proscribing certain types of adornments, such as provocative adornments, comes before us in a future case, we will determine whether different considerations apply.

---

legitimate interests must be balanced. We consider each of these errors below.

1. Alternative means of communication

The *Stabilus* dissent relied in part on a claim that the employer did not interfere with its employees' right to communicate regarding self-organization at the workplace because employees could display union insignia by means other than a union shirt (such as buttons, pins, and stickers). *Stabilus*, 355 NLRB at 843 (Member Schaumber, dissenting in part). Our dissenting colleagues have gone further and explicitly stated that a facially neutral, nondiscriminatory dress code that requires employees to wear specific apparel "should be lawful as long as the dress code affords employees a meaningful opportunity to display union insignia."[24]

However, an employer is not free to restrict one statutorily protected means of communication among employees, so long as some alternative means remains unrestricted. Indeed, in *Republic Aviation* the employer advanced this very argument, but the Supreme Court's decision leaves it without force. *Republic Aviation* involved an employer that banned only some union buttons but permitted employees to wear others. The Board

---

[24] Our dissenting colleagues have not explained what constitutes "a meaningful opportunity to display union insignia." Given that they have concluded, without any analysis or explanation, that the Respondent's team-wear policy "does not deny production associates meaningful opportunities to display union insignia because they may affix union stickers to their team wear," it appears that under their proposed standard a uniform policy or dress code affords employees a reasonable opportunity to display union insignia if an employer provides one alternative method of its choosing for employees to display union insignia. As they see it, if the policy clears that low bar, it is categorically lawful and can prohibit employees from displaying union insignia in any other manner without the employer having to establish that such restrictions are justified by a legitimate business interest. Indeed, they have stated that they would apply the special circumstances test only to "employer policies that ban union insignia or require employees to wear specific apparel and prohibit pins, buttons, or any other items from being affixed to the required clothing" (internal footnote omitted).

Our dissenting colleagues cite *Caesars Entertainment d/b/a Rio All Suites Hotel & Casino*, 368 NLRB No. 143 (2019), to support their assertion that the Board should apply a "meaningful opportunity" standard in this case and find that the Respondent's team-wear policy is lawful because it provides employees a meaningful opportunity to display union insignia. *Caesars* involved the issue of whether and to what extent employees have a Sec. 7 right to use their employer's work email to communicate with each other for purposes protected by the Act. *Caesars* did not consider, much less purport to modify, longstanding Board and court precedent governing employer restrictions on employees' ability to display union insignia, which is the subject of this decision. We therefore do not find *Caesars* to be instructive here. Then-Member McFerran dissented in *Caesars*. See 368 NLRB No. 143, slip op. at 14–23 (dissent). Members Wilcox and Prouty did not participate in *Caesars* and express no opinion about whether it was correctly decided. We would be open to reconsidering *Caesars* in a future appropriate case.

Case: 22-1480   09/06/2022   DktEntry: 1.1   Page 13 of 35

found that the employer unlawfully discharged three employees for wearing union-steward buttons, even though the employer gave "assurance that employees were free to wear other types of union buttons." *Republic Aviation Corp.*, 51 NLRB 1186, 1188 (1943), enfd. 142 F.2d 193 (2d Cir. 1944), affd. 324 U.S. 793 (1945). On review before the Supreme Court, the employer made the following argument:

> Petitioner freely permitted the wearing of other types of U. A. W. buttons, and there is no showing that the privilege of displaying the steward buttons would have legitimately aided the self-organization of the employees. The Board's failure to perform its required function of balancing the conflicting interests on this issue is underlined by its conclusion that the prohibition was a "curtailment" of the employees' right "to wear union insignia at work".

Brief for Republic Aviation Corporation at 10, *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945) (No. 226), 1944 WL 42256. The Supreme Court adopted the Board's conclusion that the employer violated the Act by prohibiting employees from wearing the union steward buttons and thus implicitly rejected the employer's argument that its toleration of other union buttons made its ban of union-steward buttons lawful. See *Republic Aviation*, 324 U.S. at 802–803 & fn. 7.

Consistent with *Republic Aviation*, the Board has required an employer to establish special circumstances to justify restrictions on employees' right to display union insignia, even if the employer permitted employees to display union insignia in other ways, and has not analyzed whether the employer affords employees "a meaningful opportunity to display union insignia" before applying the special circumstances test in those situations.[25]

<hr/>

[25] See, e.g., *Caterpillar, Inc.*, 321 NLRB 1178, 1180–1181 & fn. 10 (1996) (applying special circumstances test where employer sought to ban the display of only one prunion message), vacated pursuant to settlement by unpublished Order dated Mar. 19, 1998; *Northeast Industrial Service Co.*, 320 NLRB 977, 978–979 (1996) (applying special circumstances test where employer prohibited employees from attaching stickers on company hardhats but "[did] not prohibit employees from wearing union insignia on their work clothes"); *Malta Construction Co.*, 276 NLRB 1494, 1494–1495 (1985) (same); *Holladay Park Hospital*, 262 NLRB 278, 278–279 (1982) (applying special circumstances test where employer prohibited employees from wearing yellow ribbons in support of the union's bargaining position but "permitted [them] to wear another union insignia which it deemed more 'professional'"); *Gray-Syracuse, Inc.*, 170 NLRB 1684, 1687–1689 (1968) (applying special circumstances test where employer prohibited an organizing committee button but allowed a union brooch); *Serv-Air, Inc.*, 161 NLRB 382, 402, 416–417 (1966) (applying special circumstances test where employer limited employees to wearing only one button of their choice), enfd. in relevant part 395 F.2d 557 (10th Cir. 1968), cert. denied 393 U.S. 840 (1968).

Thus, "[u]nder Board law, it is irrelevant that the [employer] allowed employees to wear other union insignia that it deemed acceptable." *Caterpillar*, 321 NLRB at 1181 fn. 10; see also *Page Avjet Corp.*, 275 NLRB 773, 777 (1985) (finding, in the absence of special circumstances, that the employer's "proposal to post photographs of the stewards on the union bulletin board [was] not an acceptable alternative to wearing steward badges" because "in the absence of a justification for the prohibition, there is no need for the [u]nion to accept any alternative").

More generally, it is well established that, consistent with the Act's language, an employer can violate Section 8(a)(1) by interfering with employees' exercise of the Section 7 right to communicate with each other at work, even if alternative means of exercising their rights remain. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with" employees' Section 7 rights. Plainly, it is possible to interfere with the employee exercise of Section 7 rights even without completely preventing that exercise. As the Board has observed, "[i]t certainly does not lie in the mouth of [the employer] to tell the [u]nion, or [the employer's] employees, how to exercise their rights under the Act." *Monarch Machine Tool Co.*, 102 NLRB 1242, 1249 (1953) (rejecting special circumstances argument in support of no-distribution rule that "employees have adequate means of communication with other employees— the [u]nion meeting hall, newspaper announcements, mailing lists, the bulletin boards provided by the [c]ompany"), enfd. 210 F.2d 183 (6th Cir. 1954), cert. denied 347 U.S. 967 (1954). In *Republic Aviation*, the Supreme Court endorsed the Board's determinations in two separate cases that employers had unlawfully prohibited employees from soliciting union membership and distributing union literature on company property, respectively, notwithstanding the absence in either case of "evidence or a finding that the plant's physical location made solicitation away from company property ineffective to reach prospective union members." 324 U.S. at 798–799, 801–803 & fns. 6, 8.

On several subsequent occasions, the Supreme Court has reaffirmed the principle that the availability of alternative means of communication is irrelevant in determining whether an employer has unlawfully interfered with the exercise of employees' Section 7 rights. See, e.g., *Eastex, Inc. v. NLRB*, 437 U.S. 556, 572–574 (1978) (rejecting the employer's argument that "the *Republic Aviation* rule" should not apply to certain types of protected distributions "in the absence of a showing by employees that no alternative channels of communication with fellow employees are available"); *Beth Israel Hos-*

*pital v. NLRB*, 437 U.S. 483, 505 (1978) (observing that "outside of the health-care context, the availability of alternative means of communication is not, with respect to employee organizational activity, a necessary inquiry"); *NLRB v. Magnavox Co. of Tennessee*, 415 U.S. 322, 324–327 (1974) (declining to consider "the availability of alternative channels of communication" where it held that the union could not waive employees' right to distribute union literature on company property). Not surprisingly, decisions of the federal circuit courts are in accord. See, e.g., *Casino Pauma v. NLRB*, 888 F.3d 1066, 1084 (9th Cir. 2018) ("'[I]nquiry into such considerations [of alternative forms of communication] is made only when *nonemployees* are on the employer's property.'" (emphasis and alteration in original) (quoting *ITT Industries, Inc. v. NLRB*, 413 F.3d 64, 76 (D.C. Cir. 2005))). In fact, the United States Court of Appeals for the District of Columbia Circuit has approvingly observed that "[t]he NLRB has consistently ruled that the presence of alternative methods of communication is not relevant in determining the rights of employees." *Helton v. NLRB*, 656 F.2d 883, 896, 897 fn. 71 (D.C. Cir. 1981).

Our dissenting colleagues claim that our decision today is inconsistent with Board precedent regarding solicitation and distribution by employees on company property because we fail to make a distinction between policies that completely prohibit the exercise of Section 7 rights and policies that only limit the exercise of Section 7 rights. They are mistaken. Indeed, it is their proposed "meaningful opportunity" standard that is inconsistent with that precedent.

The Board has long held that a no-solicitation rule that prohibits union solicitation on company property only during working time is presumptively lawful in the absence of evidence that it was promulgated for a discriminatory purpose, while a no-solicitation rule that prohibits union solicitation on company property during nonworking time is unlawful in the absence of evidence that special circumstances make such a rule necessary to maintain production or discipline. See *Our Way, Inc.*, 268 NLRB 394, 394–395 (1983); *Peyton Packing Co.*, 49 NLRB 828, 843–844 (1943), enfd. 142 F.2d 1009 (5th Cir. 1944), cert. denied 323 U.S. 730 (1944); see also *Republic Aviation*, 324 U.S. at 803 & fn. 10 (approving the Board's standard for no-solicitation rules as set forth in *Peyton Packing*). The Board treats no-distribution rules similarly, as such rules are unlawful in the absence of special circumstances if they prohibit employees from distributing union literature in nonwork areas during nonworking time. See *Stoddard-Quirk Mfg. Co.*, 138 NLRB 615, 619–621 (1962). Contrary to our dissenting colleagues' suggestion, the Board does not apply the above standards only when an employer *completely* prohibits solicitation or distribution. For example, an employer is not free to prohibit solicitation during certain nonworking times even if it provides employees a "meaningful opportunity" to engage in solicitation during other nonworking times; instead, the Board will find that any restriction on employees' ability to engage in union solicitation during nonworking times is unlawful in the absence of special circumstances. See, e.g., *Globe Shopping City*, 204 NLRB 663, 665 (1973) (finding that an employer violated Sec. 8(a)(1) by telling an employee that he could engage in solicitation during his lunchbreak but could not do so during his 15-minute coffeebreak); *Exide Alkaline Battery Division of ESB, Inc.*, 177 NLRB 778, 778 (1969) (finding that an employer "unlawfully restricted solicitation" by allowing "solicitation during times when the employees were on scheduled nonwork time such as coffee and lunch breaks, but not when they were on other nonwork time"), enfd. per curiam 423 F.2d 663 (4th Cir. 1970). Likewise, an employer cannot prohibit union distribution in certain nonwork areas during nonworking time merely because it provides a "meaningful opportunity" for union distribution in other nonwork areas during nonworking time. See, e.g., *Aqua-Aston Hospitality, LLC d/b/a Aston Waikiki Beach Hotel and Hotel Renew*, 365 NLRB No. 53, slip op. at 12 fn. 36 (2017) (rejecting the employer's argument that its prohibition on union distribution in its open-air lobby, which the Board determined to be a nonwork area, was lawful because it allowed distribution in alternative nonwork areas during nonworking time), enfd. mem. per curiam Nos. 17–1117, 17–1118, 17–1180, 2018 WL 11416606 (D.C. Cir. Mar. 20, 2018).

Thus, the application of the special circumstances test to employer policies that restrict but do not completely prohibit employees' ability to display union insignia is consistent with Board precedent regarding employee solicitation and distribution. In fact, that precedent supports our decision today because just as employers are not free to restrict employees' ability to engage in union solicitation in the workplace during nonworking time or union distribution in nonwork areas during nonworking time in the absence of special circumstances, employers may not restrict employees' ability to display union insignia in the workplace in the absence of special circumstances.[26] Moreover, application of the special circum-

---

[26] Employees' presumptive right to display union insignia is not limited to nonworking time or nonwork areas because unlike union solicitation or distribution, the display of union insignia does not pose a general risk to production. See infra note 33. A limited exception applies in immediate patient care areas in healthcare facilities. See supra note 18.

stances test to partial restrictions on the display of union insignia is consistent with the Supreme Court's understanding of *Republic Aviation*, as the Court subsequently observed that "*[n]o restriction* may be placed on the employees' right to discuss self-organization among themselves, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline." *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 113 (1956) (emphasis added) (citing *Republic Aviation*, 324 U.S. at 803). We therefore adhere to *Republic Aviation* by requiring an employer to justify through a showing of special circumstances any restriction on the important Section 7 right to display union insignia—a right which allows employees to, in the words of our dissenting colleagues, "communicate their own support for the union and implicitly encourage other employees to join them." Our dissenting colleagues' claim that we "(mis)apply 'the *Republic Aviation* rule' to *every* in-plant display of union insignia" (emphasis in original) is simply without merit.

In sum, the Supreme Court, the federal circuit courts, and the Board have rejected the proposition that an employer's willingness to tolerate the display of some union insignia by its employees gives it a free hand to restrict other protected displays of union insignia. To hold otherwise would effectively treat the display of union insignia as a privilege to be granted by the employer on the terms it chooses rather than as an essential Section 7 right that the employer is required to accommodate. Accordingly, our dissenting colleagues' position that an employer is free effectively to prohibit employees from wearing union clothing or any other item displaying union insignia (forms of protected Section 7 communication)—without any justification—so long as the employer leaves open an alternative method to display union insignia—which they characterize as the employer providing a "meaningful opportunity to display union insignia"—is clearly contrary to *Republic Aviation* and decades of subsequent court and Board precedents.

### 2. Nondiscriminatory and consistently enforced prohibition

Our dissenting colleagues, despite their claim to the contrary, also suggest, just as the *Stabilus* dissent did, that any "nondiscriminatory" and "consistently enforced" uniform policy or dress code that does not completely prohibit the display of union insignia is lawful, regardless of its effect on the exercise of employees' Section 7 rights. See *Stabilus*, 355 NLRB at 843–844 (Member Schaumber, dissenting in part). However, under the Act, it is axiomatic that if employees have a Section 7 right to engage in certain protected activity, an employer is *not* free to prohibit that activity simply because it prohibits

all similar activities by employees, including activities that are not statutorily protected. Thus, in *Republic Aviation*, the Court explicitly rejected the employer's argument that application of its facially neutral no-solicitation rule to employees engaged in union solicitation was not unlawful "because the rule was not discriminatorily applied against union solicitation but was impartially enforced against all solicitors." 324 U.S. at 805; see also *Boch Imports, Inc. v. NLRB*, 826 F.3d 558, 574–575 (1st Cir. 2016) (rejecting an employer's argument that it neither promulgated its dress ban in response to union activity nor enforced it in a discriminatory manner because "while the presence of these circumstances may constitute grounds for invalidating a dress ban, it does not necessarily follow that the absence of these circumstances constitutes a ground for upholding a dress ban" (internal citation and emphasis omitted)); *Texas Instruments Inc. v. NLRB*, 599 F.2d 1067, 1072 (1st Cir. 1979) (explaining that enforcement of an unlawful rule to restrict Sec. 7 activity "could not support a discharge even if the motivation to enforce the rule, a neutral not an anti-union objective, were the employer's only motivation for that discharge"). That an employer's uniform policy or dress code effectively prohibits employees from wearing *all* clothing other than the clothing prescribed by the employer (including, but not limited to, union clothing) does not make the employer's action lawful, any more than an employer's no-solicitation rule is lawful because it bars all solicitation (not just union solicitation) on nonworking time. See, e.g., *Cordúa Restaurants, Inc.*, 368 NLRB No. 43, slip op. at 5 (2019) (finding an employer's no-solicitation rule unlawful because it banned "*all* solicitation on the [employer's] premises regardless of when the solicitation occurs" (emphasis added)), enfd. 985 F.3d 415 (5th Cir. 2021).

### 3. Rejection of balancing principle

The *Stabilus* dissent's primary argument was that "[i]f employees have the right to wear union attire *instead* of a company uniform, the employer's right to promulgate and enforce reasonable, nondiscriminatory apparel rules is negated entirely." 355 NLRB at 843 (Member Schaumber, dissenting in part) (emphasis in original); see also id. at 843 & fn. 7 (asserting that application of the special circumstances test in that context would "completely submerge" and "totally ignore[]" employers' right to establish workplace rules and policies and would thus be contrary to *Republic Aviation*). Our dissenting colleagues similarly claim that our decision today "effectively nullifies the legitimate interests served by employer dress codes." On the contrary, it is the standard first proposed by the *Stabilus* dissent and expanded upon by

our dissenting colleagues today that would abandon the balancing principle established in *Republic Aviation*.

To say that an employer's prerogative must yield to employees' statutory rights—unless special circumstances are shown—is to say only that employer interests and employee rights must be accommodated as required by *Republic Aviation*. As the Board has explained, "[i]n cases where the employer argues that special circumstances justify a ban on union insignia, the Board and courts balance the employee's right to engage in union activities against the employer's right to maintain discipline or to achieve other legitimate business objectives, under the existing circumstances." *Albis Plastics*, 335 NLRB 923, 924 (2001); see also *Sam's Club*, 349 NLRB 1007, 1010 (2007) ("[A]n employer may limit or ban the display or wearing of union insignia at work if special circumstances exist and if those circumstances outweigh the adverse effect on employees' Section 7 rights resulting from the limitation or ban."); *Nordstrom, Inc.*, 264 NLRB 698, 700 (1982) (explaining that in applying the special circumstances test, "the entire circumstances of a particular situation must be examined to balance the potentially conflicting interests of an employee's right to display union insignia and an employer's right to limit or prohibit such display"). In such cases, the employer's prerogative is limited—not, as claimed by the *Stabilus* dissent and our dissenting colleagues, "negated entirely," "completely submerge[d]," "totally ignore[d]," or "effectively nullifie[d]"—just as employees' rights are limited (but not negated or nullified) by the possibility that they may have to yield if special circumstances are shown.

Our dissenting colleagues echo the assertions of the Respondent and amici CDW and HRPA that the special circumstances test places a nearly insurmountable burden on employers to justify uniform policies or dress codes that implicitly limit or restrict the display of union insignia. This view is simply inconsistent with decades of Board experience in applying the special circumstances test. Indeed, contrary to the view adopted by our dissenting colleagues, the Respondent, and supporting amici, the Board has found the existence of special circumstances that justify employer restrictions on union insignia and apparel in many different situations, such as "when their display may jeopardize employee safety, damage machinery or products, exacerbate employee dissension, or unreasonably interfere with a public image that the employer has established, or when necessary to maintain decorum and discipline among employees." *Komatsu America Corp.*, 342 NLRB 649, 650 (2004).[27]

In fact, the Board has previously found that employers established special circumstances that justified prohibiting employees from wearing attire displaying union insignia in place of attire required by a uniform policy or dress code.[28] Thus, the special circumstances test allows employers the opportunity to show that restrictions on employees' display of union insignia that result from uniform policies or dress codes—and would otherwise be unlawful—are justified based on the specific circumstances existing in their workplaces. Further, the special circumstances test appropriately places the burden on the employer because, as the party asserting that employees' Section 7 rights must be restricted to achieve a legitimate business objective, it "logically is in the best position to offer evidence on the point." *Beth Israel Hospital*, 437 U.S. at 502. Accordingly, consistent with Supreme Court precedent, beginning with *Republic Aviation*, the special circumstances test has proven to be an effective balancing approach for accommodating employee rights and employer interests "'with as little destruction of one as is consistent with the maintenance of the other.'" *Beth Israel Hospital*, 437 U.S. at 492 (quoting *Babcock & Wilcox*, 351 U.S. at 112).[29]

_____

with the "Wonderland" ambience that the employer sought to create through a "trendy, distinct, and chic look" for its employees); *Komatsu*, 342 NLRB at 650 (finding that special circumstances justified prohibiting employees from wearing a union shirt because the shirt made "a clear appeal to ethnic prejudices" that was "especially inflammatory and offensive" given the context); *Pathmark Stores*, 342 NLRB 378, 379 (2004) (finding that special circumstances justified prohibiting employees from wearing hats and shirts with the union slogan "Don't Cheat About the Meat!" because "the slogan reasonably threatened to create concern among the [employer's] customers about being cheated"); *Albis Plastics*, 335 NLRB at 925 (finding that special circumstances justified banning employees from attaching unauthorized stickers, including union stickers, to their bump caps because "unauthorized stickers could [have] interfere[d] with the ready visibility of the bump caps and authorized stickers" and compromised the employer's "strategy to promote plant safety"); *Kendall Co.*, 267 NLRB 963, 964–965 (1983) (finding that special circumstances justified prohibiting an employee from wearing a union keychain on his shirt pocket because "employees work[ed] around machinery that ha[d] a series of cams, levers, and gears in which objects [could] become entangled, possibly drawing the employee, as well, into the machine's moving parts"); *Hanes Hosiery, Inc.*, 219 NLRB 338, 347 (1975) (finding that special circumstances justified prohibiting employees from wearing a union pin because the pin could have caused defects in the hosiery produced by the employer); *United Aircraft Corp.*, 134 NLRB 1632, 1633–1635 (1961) (finding that special circumstances justified prohibiting employees from wearing a pin that the union distributed to "loyal" strikers because the employer reasonably feared that the pin would have "promote[d] disorder and engender[ed] further divisiveness between the strikers and nonstrikers" in the immediate aftermath of an acrimonious strike).

[28] See supra note 20 and accompanying text.

[29] We decline to specifically address any hypothetical employer policies discussed by our dissenting colleagues—such as a "blue polo" policy—because they are not raised by the facts of the present case. If

_____

[27] See, e.g., *W San Diego*, 348 NLRB 372, 372–373 (2006) (finding that special circumstances justified prohibiting employees from wearing a union pin in public areas because the pin would have interfered

14                                   DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Ironically, it is the standard first proposed in the *Stabilus* dissent and expanded upon by our dissenting colleagues today that would "negate[]," "submerge," "ignore," and "nullif[y]" one side of the balance—specifically, employees' right to display union insignia through attire when it is addressed by their employer's uniform policy or dress code. Contrary to *Republic Aviation*, this proposed standard would provide no opportunity for the Board to "work[] out an adjustment between the undisputed right of self-organization assured to employees under the [ ] Act and the equally undisputed right of employers to maintain discipline in their establishments." 324 U.S. at 797–798. Instead, an employer's managerial prerogative to establish a uniform policy or dress code would, in all circumstances, override employees' Section 7 right to display union insignia through attire covered by such a policy so long as the employer otherwise provides "a meaningful opportunity to display union insignia."[30]  This proposed standard therefore leaves no room for the Board to assess whether the policy actually furthers any legitimate business interest asserted by the employer and, if so, whether that business interest outweighs employees' Section 7 right to display union insignia.

Neither our dissenting colleagues nor the *Stabilus* dissent cite any particular employer interest or objective that a uniform policy or dress code that implicitly restricts the display of union insignia universally furthers regardless of the specific circumstances in which an employer operates.[31]  To the contrary, the Board's experience in applying the special circumstances test has demonstrated that employers establish restrictions on the display of union insignia to further many different business interests and objectives depending on the specific circumstances in which they operate.[32]  Therefore, the Board is not able to strike a balance between employee rights and employer interests in this context that is generally applicable regardless of the circumstances or that would support the establishment of a categorical rule.[33]  As the Board has

---

a challenge to such a policy were to come before the Board in the future, the employer, regardless of whether its employees are public facing, would have the opportunity to establish, based on the specific circumstances existing in its workplace, special circumstances that justify any restriction on the display of union insignia resulting from the policy. We do note, however, that the Board has never held, as our dissenting colleagues imply, that an employer can only establish special circumstances that fall into one of the categories identified in *Komatsu*, as listed above. Thus, an employer may be able to justify a restriction or limitation on the display of union insignia resulting from a uniform policy or dress code by establishing special circumstances that do not fit neatly into one of those categories—particularly where the Board is presented with a factual situation that it has not had the opportunity to consider in the past. See, e.g., *Wal-Mart Stores, Inc.*, 368 NLRB No. 146, slip op. at 10 fn. 35 (2019) (Member McFerran, dissenting) ("Consistent with the Board's longstanding jurisprudence, an employer always has the opportunity to rebut the General Counsel's showing of a presumptively unlawful restriction by establishing a specific and objective special circumstance to justify its policy. The fact that there is not a 'currently recognized special circumstance' that would encompass a prohibition on a prounion sandwich board or a large button with flashing lights surely would not preclude an employer from presenting a persuasive 'special circumstances' argument with regard to either in the appropriate case.").

[30] As discussed above, based on our dissenting colleagues' application of their proposed standard to the facts of the present case, an employer would satisfy the "meaningful opportunity" requirement by providing an alternative method of its choosing for employees to display union insignia. Thus, as long as an employer allows its employees to display union insignia by, for example, affixing union stickers to their clothing, the employer would not have to provide any justification for maintaining a uniform policy or dress code that effectively prohibits employees from displaying union insignia in any other manner—e.g., through buttons, pins, hats, shirts, vests, scarves, etc.

[31] In attempting to justify their proposed standard, our dissenting colleagues assert that, in general, "legitimate reasons exist for employers to maintain" facially neutral, nondiscriminatory dress codes that provide "a meaningful opportunity to display union insignia." Apparently, they are comfortable foregoing any analysis of the specific circumstances existing in an employer's workplace and, instead, assuming that every such policy serves a legitimate business interest and that it outweighs any restriction on the display of union insignia resulting from the policy so long as the employer allows an alternative method of its choosing for employees to display union insignia. This approach would be plainly inconsistent with *Republic Aviation*'s requirement that the Board balance employees' Sec. 7 rights and employers' legitimate business interests.

[32] See supra notes 20, 27 and accompanying text.

[33] In this respect, uniform policies and dress codes that implicitly restrict or limit the display of union insignia are distinguishable from no-solicitation and no-distribution rules. Cf. *Cordúa Restaurants*, 368 NLRB No. 43, slip op. at 5 ("[R]ules that prohibit solicitation only during working time are presumptively lawful . . . ."); *St. John's Hospital & School of Nursing, Inc.*, 222 NLRB 1150, 1150 (1976) ("Rules prohibiting distribution of literature are presumed valid unless they extend to activities during nonworking time and in nonworking areas."), enf. denied in part 557 F.2d 1368 (10th Cir. 1977). The Board recently observed that the "longstanding precedent governing employer restrictions on solicitation and distribution . . . already strikes a balance between employee rights and employer interests." *Cordúa Restaurants*, 368 NLRB No. 43, slip op. at 5 (internal quotations omitted). As the Board succinctly stated almost 80 years ago, "[w]orking time is for work." *Peyton Packing*, 49 NLRB at 843. Thus, employers may prohibit solicitation, including union solicitation, during working time because it "prompts an immediate response from the individual or individuals being solicited" and is thus highly likely to interfere with productivity. *Wal-Mart*, 340 NLRB 637, 639 (2003); see also *Miller's Discount Dept. Stores*, 198 NLRB 281, 281 (1972) ("A rule prohibiting solicitation during working time] is valid because it is presumed to be directed toward, and to have the effect of, preventing interference with production."), enfd. sub nom. *NLRB v. Daylin, Inc.*, 496 F.2d 484 (6th Cir. 1974). Employers may prohibit distribution during working time *and* in working areas "because it carries the potential of littering the employer's premises," thereby raising "a hazard to production whether it occurs on working time or nonworking time." *Stoddard-Quirk Mfg. Co.*, 138 NLRB 615, 619, 621 (1962). In contrast, as discussed above, uniform policies and dress codes that implicitly restrict or limit the display of union insignia do not generally serve any specific employer interest regardless of the circumstances in which an employer

Case: 22-1480   09/06/2022   DktEntry: 1.1   Page 18 of 35

previously recognized, "it is inherent in *Republic Aviation* that balances will have to be struck case by case; the alternative is simply eliminating the protection of Sec[tion] 7 activity." *Capital Medical Center*, 364 NLRB 887, 890 fn. 12 (2016), enfd. 909 F.3d 427 (D.C. Cir. 2018), cert. denied 139 S.Ct. 1445 (2019). For the reasons discussed above, we find that the Board is not free to choose that alternative.[34]

In sum, contrary to our dissenting colleagues, *Stabilus* correctly specifies that the Board should apply the special circumstances test when a restriction on employees' right to display union insignia has resulted from an employer's nondiscriminatory, consistently enforced uniform policy or dress code. Our dissenting colleagues' proposed holding that employers do not have to provide any justification for such restrictions on the display of union insignia if they otherwise provide employees with a "meaningful opportunity to display union insignia," i.e., an alternative method of the employers' choosing, is contrary to the principles of *Republic Aviation* and decades of Board and court precedent applying those principles.

### F. Application of Boeing Would Be Contrary to Republic Aviation and Wal-Mart Is Therefore Overruled

The Respondent and CDW have argued that the standard established in *Boeing Co.*, 365 NLRB No. 154 (2017), rather than the *Republic Aviation* special circumstances test, applies in this case pursuant to the Board's recent decision in *Wal-Mart Stores, Inc.*, 368 NLRB No. 146 (2019).[35] In *Wal-Mart*, the Board found that

"[w]here . . . the [e]mployer maintains a facially neutral rule that limits the size and/or appearance of union buttons and insignia that employees can wear but does not prohibit them," the Board should apply the *Boeing* standard rather than the *Republic Aviation* special circumstances test. *Wal-Mart*, 368 NLRB No. 146, slip op at 2–3. The Respondent's team-wear policy is essentially a uniform policy and not a size-and-appearance policy. However, the *Wal-Mart* Board made a more general distinction between rules that completely prohibit the display of union insignia (to which the special circumstances test applies) and rules that partially restrict the display of union insignia (to which the *Boeing* standard applies). See *Wal-Mart*, 368 NLRB No. 146, slip op. at 2–3 & fns. 10, 13. Here, while the team-wear policy implicitly prohibits production associates from wearing union shirts in place of the required team-wear shirts and thus partially restricts the display of union insignia, it does not prohibit them from wearing *all* union insignia, as the policy does not restrict employees from wearing union stickers on their team-wear shirts. Therefore, in order to be consistent with *Wal-Mart* the Board would arguably be required to apply the *Boeing* standard rather than the special circumstances test in the present case. For that reason, and because *Wal-Mart* is contrary to *Republic Aviation* and decades of Board and court precedent applying it, we overrule *Wal-Mart* and restore clarity to this area of Board law.[36]

---

operates but instead may further many different legitimate business interests and objectives depending on the context. Therefore, such policies are not conducive to being governed by a similar presumption but instead must be examined on a case-by-case basis.

[34] We also reject HRPA's argument that the Board has incorrectly substituted "an artificially created 'special circumstances' test that places an exceedingly high and inappropriate burden of proof on employers" for the burden that the Supreme Court established in *Republic Aviation* to determine the legality of an employer's workplace rules and policies. As we have demonstrated above, the special circumstances test is a balancing test, and HRPA and others have greatly overstated the burden that it imposes on employers. Further, as discussed above, the Board's application of the special circumstances test to employer policies that restrict employees' right to display union insignia is consistent with *Republic Aviation*. See supra note 23.

[35] The Respondent and CDW have also argued that the Board should apply the *Boeing* standard here because the special circumstances test applies only when a uniform policy or dress code explicitly or outright prohibits the display of union insignia or has been disparately applied against employees displaying union insignia. However, the Board has not applied the special circumstances test only when an employer policy explicitly or outright prohibits the display of union insignia but has also applied it when a facially neutral employer policy would restrict employees' ability to display union insignia. See, e.g., *Long Beach Memorial Medical Center, Inc. d/b/a Long Beach Memorial Medical Center & Miller Children's and Women's Hospital Long Beach*, 366

NLRB No. 66, slip op. at 1 (2018) (applying the special circumstances test where the employer maintained a policy that allowed employees to wear only employer-approved pins and buttons), enfd. mem. 774 Fed.Appx. 1 (D.C. Cir. 2019); *Boch Honda*, 362 NLRB 706, 707–708 (2015) (applying the special circumstances test where the employer maintained a policy that prohibited employees from wearing "pins, insignias, or other message clothing"); *Sam's Club*, 349 NLRB at 1010–1012 (applying the special circumstances test where the employer promulgated a policy that allowed employees to wear only employer-approved badge backers and required them to wear breakaway lanyards). Indeed, an employer *cannot* establish special circumstances to justify a uniform policy or dress code that restricts employees' right to display union insignia if it has disparately applied the policy against employees displaying union insignia. See, e.g., *Stabilus*, 355 NLRB at 837 (finding that even if the employer had established special circumstances to justify its uniform policy, it still violated the Act because "the policy was applied in a disparate manner to Sec[.] 7 activity relative to comparable non-Sec[.] 7 activity"); *Airport 2000 Concessions, LLC*, 346 NLRB 958, 960 (2006) ("[T]he [employer] inconsistently applied its uniform policy and, therefore, cannot use that policy to establish special circumstances."). Accordingly, the Respondent and CDW are mistaken about the situations in which the special circumstances test applies.

[36] Our dissenting colleagues, who were part of the majority in *Wal-Mart*, claim that *Wal-Mart* is irrelevant to the disposition of the present case. Although they may not have intended for *Wal-Mart* to apply in the circumstances of this case, we have shown above that the *Wal-Mart* decision can be interpreted to apply here, and as also noted above, both the Respondent and CDW point to *Wal-Mart* in support of their argu-

16                             DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

As we have painstakingly demonstrated above, for many decades, the Board, consistent with *Republic Aviation*, adhered to the principle that an employer may not limit or ban employees' display of union insignia at work absent a showing that special circumstances exist. The Board's decision in *Wal-Mart* was the first and, to this point, only time that the Board has deviated from that principle by applying the less demanding *Boeing* standard to restrictions on displays of union insignia instead. The *Wal-Mart* Board relied heavily on the mistaken premise that the employer's partial restriction on the display of union insignia in that case presented a novel scenario that fell outside the ambit of *Republic Aviation* and its progeny. As explained in detail above, *Republic Aviation* itself involved only a partial restriction on the display of union insignia, as the employer in that case prohibited employees from wearing a union-steward button but assured them (and the Supreme Court) that they could wear other union buttons. Thereafter, the Board consistently applied the special circumstances test even when employers had only partially restricted employees' ability to display union insignia[37]—until *Wal-Mart*. Thus, the *Wal-Mart* Board ignored decades of Board precedent holding that *any* limitation on the display of union insignia is presumptively unlawful—regardless of whether an employer permits other related Section 7 activity[38]—and essentially adopted as law an argument that the Court *rejected* in *Republic Aviation*, i.e., that an employer's willingness to permit the display of some union insignia warrants a more forgiving assessment of its asserted justification for banning other union insignia.

In a tortured attempt to square its decision with decades of contrary precedent, the *Wal-Mart* Board made a distinction between facial challenges to rules that partially restrict the display of union insignia (to which the

*Boeing* standard applies) and as-applied challenges to the application of such rules to outright ban specific union insignia (to which the special circumstances test applies).[39] See *Wal-Mart*, 368 NLRB No. 146, slip op. at 2–3 & fns. 10, 13. However, the Board had never previously made such a distinction, as it had, up to then, applied the special circumstances test to facial challenges to rules restricting the display of union insignia. See, e.g., *Long Beach Memorial Medical Center*, 366 NLRB No. 66, slip op. at 1; *Boch Honda*, 362 NLRB at 707–708; *Sam's Club*, 349 NLRB at 1010–1012. The Board has declined to make such a distinction between these two types of challenges for good reason. Facial and as-applied challenges are functionally identical in this context, as the guiding principle in both situations is, consistent with *Republic Aviation*, that any limitation on the display of union insignia is presumptively unlawful. The *Wal-Mart* Board attempted to justify its faulty distinction by arguing that in cases involving as-applied challenges, the Board is "able to consider the specific buttons or other insignia that employees were barred from wearing and analyze the impact that those specific buttons or insignia would reasonably have in the particular workplaces involved." 368 NLRB No. 146, slip op. at 2 fn. 10. However, pursuant to *Republic Aviation*, once any limitation on employees' Section 7 right to display union insignia is established, the relevant inquiry is simply whether the employer can establish special circumstances for the limitation; the nature and relative extent of the employer's restriction on the display of union insignia has not been part of that inquiry.

The *Wal-Mart* Board also mischaracterized the nature of the special circumstances test. According to the *Wal-Mart* Board, "determining whether a special circumstance exists justifying a particular insignia ban obviates the need to conduct an open-ended balancing analysis anew in every case. If the prohibition falls within the scope of a recognized special circumstance, it is lawful." Id., slip op. at 2 (internal footnotes omitted). The Board has certainly acknowledged broad categories of cases in which employers established special circumstances that justify restrictions on the display of union insignia. See, e.g., *Komatsu America Corp.*, 342 NLRB 649, 650 (2004) ("The Board has previously found such special circumstances justifying the proscription of union slogans or apparel when their display may jeopardize employee safety, damage machinery or products, exacerbate

---

ment that the Respondent's team-wear policy should be analyzed under *Boeing*. Thus, at the least, *Wal-Mart* unnecessarily confuses the test that should be applied to the important subject of the lawfulness of workplace rules and policies restricting the display of union insignia. By this decision we intend to clarify that test and, accordingly, we find it necessary to address *Wal-Mart* in our decision today.

[37] See supra note 25 and accompanying text.

[38] See, e.g., *Boch Honda*, 362 NLRB at 707 ("[A] rule that *curtails* employees' Sec[.] 7 right to wear union insignia in the workplace must be narrowly tailored to the special circumstances justifying maintenance of the rule, and the employer bears the burden of proving such special circumstances." (emphasis added)); *Albis Plastics*, 335 NLRB 923, 924 (2001) ("The Board has held that, in the absence of 'special circumstances,' an employer's prohibition of or *limitation on* the display of union insignia violates Sec[.] 8(a)(1)." (emphasis added)); *Mayrath Co.*, 132 NLRB 1628, 1629–1630 (1961) ("[R]ules which *interfere* with this right [to wear union insignia] . . . are presumptively invalid in the absence of special circumstances." (emphasis added; internal quotations omitted)).

[39] As discussed above, based on the parties' exceptions, the question of whether the Respondent unlawfully enforced the team-wear policy against employees wearing union shirts is not before us. Thus, we are faced with only a facial challenge to a rule that partially restricts the display of union insignia.

employee dissension, or unreasonably interfere with a public image that the employer has established, or when necessary to maintain decorum and discipline among employees."). However, in cases involving a restriction on the display of union insignia, the Board engages in a rigorous, fact-specific inquiry to determine whether the employer actually established the presence of special circumstances in the context of its workplace. See *Nordstrom*, 264 NLRB at 700 (explaining that in applying the special circumstances test, "the entire circumstances of a particular situation must be examined to balance the potentially conflicting interests of an employee's right to display union insignia and an employer's right to limit or prohibit such display").

Overall, the *Wal-Mart* Board upended the traditional framework in this area of Board law. It shifted to an analysis that plainly tips the balance toward employer interests by requiring that the General Counsel first prove that an employer's partial restriction on the display of union insignia adversely affected employees' Section 7 rights and by holding that an employer may then produce some lesser justification for its conduct. However, the *Wal-Mart* Board cited no union insignia precedent and made no persuasive argument to support the premise that an employer's willingness to tolerate the display of some union insignia gives it more leeway to restrict the display of other union insignia that it considers less favorable and renders that interference with employees' Section 7 rights "less severe." See *Wal-Mart*, 368 NLRB No. 146, slip op. at 2–3. The decision in *Wal-Mart* shares a fundamental defect with the standard proposed by our dissenting colleagues today: it effectively treats the display of union insignia more as a privilege to be granted by the employer on the terms it chooses, rather than as an essential Section 7 right that—pursuant to federal labor law—the employer is required to accommodate absent a showing of special circumstances. Accordingly, the Board's decision in *Wal-Mart* cannot be squared with *Republic Aviation* and its progeny and therefore must be overruled.

While the reasons discussed above, on their own, compel us to overrule *Wal-Mart*, we also overrule it today to restore clarity to what was previously a well-settled area of Board law. Prior to *Wal-Mart*, the standard was straightforward: if an employer interfered with employees' Section 7 right to display union insignia, then it had the burden to establish special circumstances to justify its interference. The *Wal-Mart* Board unnecessarily introduced uncertainty by raising several threshold questions that would need to be answered before determining the standard to apply in a union insignia case. Does an employer's policy prohibit the display of *all*

union insignia, or does it only partially restrict the display of union insignia?[40] If it only partially restricts the display of union insignia, does the case present a facial challenge or an as-applied challenge?

The present case illustrates the potential confusion that can result from the *Wal-Mart* framework. The complaint alleged, among other things, that the Respondent violated Section 8(a)(1) by maintaining the team-wear policy and enforcing it against employees wearing union shirts. As discussed above, the enforcement allegations are not before us because no party raised them on exceptions. Thus, we are presented with only a facial challenge to the team-wear policy. Because the policy is not a total ban on all union insignia, *Wal-Mart* appears to require that we apply the *Boeing* standard. However, if the enforcement allegations were before us on exceptions, we would then be faced with both a facial challenge and an as-applied challenge. In those circumstances, under *Wal-Mart*, would the *Boeing* standard apply to the facial challenge, but the special circumstances test would apply to the as-applied challenge? To avoid such confusion in the future, we reaffirm that, consistent with *Republic Aviation* and decades of precedent applying it, when an employer interferes *in any way* with employees' Section 7 right to display union insignia (whether through buttons, pins, stickers, shirts, hats, or any other accessories or attire), that interference is presumptively unlawful, and the employer has the burden to establish special circumstances that justify its interference.

### G. Today's Overruling of Wal-Mart Will Be Applied Retroactively

"The Board's usual practice is to apply new policies and standards retroactively 'to all pending cases in whatever stage.'" *SNE Enterprises*, 344 NLRB 673, 673 (2005) (citing *Aramark School Services, Inc.*, 337 NLRB 1063, 1063 fn. 1 (2002) (quoting *Deluxe Metal Furniture Co.*, 121 NLRB 995, 1006–1007 (1958))). The Supreme Court has indicated that "the propriety of retroactive application is determined by balancing any ill effects of retroactivity against 'the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles.'" Ibid. (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947)). Pursuant to this principle, the Board will apply a policy change retroactively

---

[40] Relatedly, *Wal-Mart* is not clear regarding what qualifies as a partial restriction on the display of union insignia to which the *Boeing* standard, rather than the special circumstances test, would apply. Does *Wal-Mart* apply narrowly only to size-and-appearance policies like the policies at issue in that case, or does it apply more broadly to any employer policy that restricts the display of union insignia in some manner but leaves open a means by which employees can display union insignia?

unless retroactive application would work a "manifest injustice." Ibid. In making that determination, the Board considers "the reliance of the parties on preexisting law, the effect of retroactivity on accomplishment of the purposes of the Act, and any particular injustice arising from retroactive application." Ibid.

As discussed above, we have not established a new standard or policy in this case but instead have simply reaffirmed that, consistent with *Republic Aviation*, when an employer interferes *in any way* with employees' Section 7 right to display union insignia, that interference is presumptively unlawful, and the employer has the burden to establish special circumstances that justify its interference. However, in doing so, we have overruled *Wal-Mart*, 368 NLRB No. 146, and its implication that the standard established in *Boeing Co.*, 365 NLRB No. 154 (2017), rather than the *Republic Aviation* special circumstances test, should apply to employer policies that only partially restrict employees' ability to display union insignia. We will apply today's overruling of *Wal-Mart* retroactively because doing so will not work a manifest injustice. *Wal-Mart* was decided only 2 years ago, and its scope was unclear. Thus, parties could not yet have relied on it to a significant extent. Regardless, any reliance by parties on *Wal-Mart* is clearly outweighed by the mischief of producing a result that is contrary to well-established Board law by continuing to apply *Wal-Mart*. As discussed above, the *Wal-Mart* decision was contrary to *Republic Aviation* and almost 75 years of Board and court precedent applying it and unnecessarily introduced uncertainty into what was until that point a well-settled area of Board law. Finally, no injustice will arise here from retroactive application because *Wal-Mart* was decided after the judge issued her decision in this case; thus, the Respondent had no opportunity to rely on *Wal-Mart* to its detriment.

### H. The Respondent Did Not Establish Special Circumstances

Pursuant to the Respondent's team-wear policy, production associates are required to wear assigned team wear—i.e., black cotton shirts with the Respondent's logo and black cotton pants with no buttons, rivets, or exposed zippers. On occasion, production associates, with their supervisor's approval, may substitute for team wear all-black clothing that is "mutilation free" and "work appropriate" and that poses no safety risks. Given the specific apparel requirements, the team-wear policy prohibits production associates from substituting any shirt with a logo or emblem, including a shirt bearing

union insignia, for a team-wear shirt.[41] Thus, the team-wear policy restricts production associates' ability to display union insignia, and the Respondent has the burden to establish special circumstances. The Respondent claims that the team-wear policy is justified by special circumstances because it is intended to lower the risk of employees' clothing causing mutilations to the unfinished vehicles and to aid in the visual management of GA. We agree with the judge that the Respondent failed to establish special circumstances on either ground.

As discussed above, an employer can establish special circumstances that justify restrictions on the display of union insignia if their display may cause damage to the employer's products. See, e.g., *Hanes Hosiery*, 219 NLRB 338, 347 (1975) (finding that an employer established special circumstances to justify prohibiting employees from wearing a union pin because the pin could have caused defects in the hosiery produced by the employer). However, the Respondent has not shown that cotton shirts with non-Respondent logos, such as union logos, pose a mutilation risk to the unfinished vehicles in GA.[42] Although production associates regularly wore shirts with logos prior to August 2017, Production Manager Penera, Associate Manager Ogunniyi, and Production Supervisor Fenelon all testified that they did not have any knowledge of a shirt with a logo causing a mu-

---

[41] We reject the Respondent's argument that the team-wear policy does not necessarily prohibit production associates from wearing union-branded apparel because they "are perfectly free to wear all black substitute union branded apparel that is mutilation-free, work appropriate and safe." First, under the team-wear policy, production associates may substitute all-black clothing for team wear only with their supervisor's approval. Second, the Respondent's management officials testified that all-black clothing is team-wear compliant only if it has no logos or emblems. In fact, they specifically testified that a black shirt with the Union's logo on the front and back was not team-wear compliant. Therefore, production associates are not "perfectly free" to substitute union-branded apparel for the required team wear.

Additionally, we do not agree with the AFL–CIO and SEIU that the Respondent interpreted the team-wear policy to allow production associates to wear black union shirts prior to August 2017. Rather, the Respondent did not begin to strictly enforce the team-wear policy until August 2017—and the complaint did not allege that the Respondent's decision to begin to strictly enforce the team-wear policy was in response to its employees' union activity.

[42] Unlike the judge, we have not limited our analysis to whether the Respondent has shown that shirts with logos may cause mutilations to *seats* in the unfinished vehicles. Because the relevant inquiry is whether special circumstances exist to justify the team-wear policy, and not whether the Respondent had a lawful motive in deciding to strictly enforce that policy, the judge erred by limiting her analysis to what she found to be the Respondent's purported motivation for beginning to strictly enforce the team-wear policy (i.e., the increase in seat mutilations in April or May of 2017). See *W San Diego*, 348 NLRB at 375 (finding that where a motive-based violation was not alleged, "[a]ll of the legitimate management concerns served by the prohibition, not just those cited to [the employee], are relevant" to the special circumstances analysis).

tilation to a vehicle. Further, none of them testified how a shirt with a logo might possibly cause a mutilation to a vehicle. To the contrary, Ogunniyi testified that while the black cotton shirt with union logos previously worn by production associates is not team-wear compliant, it is not a mutilation risk. The only evidence of any shirt being involved in a mutilation was Production Manager Martin's testimony that a raised metal emblem on a shirt once caused a mutilation to a vehicle. Thus, at most, the Respondent has shown that it has a legitimate interest in preventing raised metal emblems on shirts from causing mutilations to vehicles. However, the team-wear policy goes far beyond simply prohibiting employees from wearing shirts with metal emblems and therefore is not narrowly tailored to address that concern as required under the special circumstances test. See *Boch Honda*, 362 NLRB 706, 707 (2015) ("[A] rule that curtails employees' Sec[.] 7 right to wear union insignia in the workplace must be narrowly tailored to the special circumstances justifying maintenance of the rule . . . .").[43]

The team-wear policy is also not narrowly tailored to address the Respondent's claimed interest in maintaining visual management in GA, even assuming special circumstances could be established on that basis. Production Manager Martin testified that the Respondent could maintain visual management in GA as long as production associates are wearing black shirts. Martin's testimony is consistent with the fact that the team-wear policy allows production associates to wear, with their supervisor's permission, all-black shirts in place of the team-wear shirts. Therefore, while the Respondent may have a legitimate interest in requiring production associates to wear black shirts (and requiring production leads and line inspectors to wear red and white shirts, respectively), it has not demonstrated special circumstances that justify prohibiting production associates from wearing black union shirts. See *Malta Construction*, 276 NLRB 1494, 1495 (1985) (finding that an employer "failed to prove that its complete prohibition of insignia on its hardhats was necessary to enable it to identify its employees" where a manager testified that he could still identify its

employees' orange hardhats even with union stickers on them).[44]

In sum, the Respondent has failed to establish special circumstances that justify the team-wear policy's implicit prohibition on employees wearing black union shirts. Accordingly, we adopt the judge's finding that the Respondent violated Section 8(a)(1) by maintaining the team-wear policy in its "General Assembly Expectations."

ORDER

The National Labor Relations Board orders that the Respondent, Tesla, Inc., Fremont, California, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining and enforcing an overly broad team-wear policy in its "General Assembly Expectations" that prohibits production associates from wearing black union shirts.

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind the team-wear policy in its "General Assembly Expectations," or revise the team-wear policy to make clear that it does not prohibit production associates from wearing black union shirts.

(b) Notify all current employees that the team-wear policy in its "General Assembly Expectations" has been rescinded, or, if it has been revised, provide them with a copy of the "General Assembly Expectations" with the revised team-wear policy.

(c) Post at its Fremont, California facility copies of the attached notice marked "Appendix."[45]   Copies of the

---

[43] The Respondent has relatedly argued that it would be unduly burdensome to determine daily if each production associate's shirt is mutilation compliant. However, the Respondent's GA managers and supervisors testified that each day they inspect production associates during startup meetings and by walking the line to ensure that their clothing complies with the team-wear policy. Thus, even if special circumstances could be established on this basis, the Respondent has simply not shown that it would be more burdensome to ensure compliance with a narrowly tailored team-wear policy given that it already inspects the production associates daily for team-wear compliance.

[44] The Respondent argues that visual management of GA may be disturbed if production associates are allowed to wear shirts with insignia and employees from outside of GA wear the same union shirts into GA. However, while employees outside of GA are not required to comply with the team-wear policy, there is no evidence that they are *prohibited* from wearing team-wear shirts or plain black shirts. Thus, this risk of interference with visual management is present under the current team-wear policy.

[45] If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notice must be posted within 14 days after service by the Region. If the facility involved in these proceedings is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region. If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at

20                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

notice, on forms provided by the Regional Director for Region 32, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted.  In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means.  The Respondent shall take reasonable steps to ensure that the notices are not altered, defaced, or covered by any other material.  If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since April 25, 2017.

(d)  Within 21 days after service by the Region, file with the Regional Director for Region 32 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C.  August 29, 2022

 

_____
Lauren McFerran,                    Chairman

_____
Gwynne A. Wilcox,                   Member

_____
David M. Prouty,                    Member

(SEAL)        NATIONAL LABOR RELATIONS BOARD

MEMBERS KAPLAN and RING, dissenting.

We could not agree more wholeheartedly with our colleagues that displaying union insignia in the workplace is an important way employees exercise their rights under Section 7 of the National Labor Relations Act.  Employees who display union insignia communicate their own

support for the union and implicitly encourage other employees to join them.  Effective protection of this right is therefore vital to our national labor policy, and the Supreme Court has long so instructed.[1]  It does not follow, however, that to be effective, the protection of this right requires holding any limitation on the display of union insignia, no matter how slight, to be presumptively unlawful.  Here, we part ways with the majority.

For a variety of legitimate reasons, some employers maintain dress codes or require their employees to wear a uniform.  Such policies indirectly prohibit employees from substituting union apparel in place of required clothing.  Tesla's dress code is one such policy.  It requires employees, for legitimate business reasons, to wear employer-issued "team wear" consisting of black cotton shirts imprinted with Tesla's logo and black cotton pants with no buttons, rivets, or exposed zippers.  Without stating so, the uniform policy's requirements prohibit employees from wearing other clothing, including clothing with union insignia.  It does not, however, prohibit employees from displaying union insignia in other ways, such as by attaching to their team wear a sticker with the Union's logo and/or a prounion slogan.

The Supreme Court long ago instructed the Board how such conflicts between employee and employer rights must be resolved.  Neither right, the Court held in *Republic Aviation*, is "unlimited in the sense that [it] can be exercised without regard to any duty which the existence of rights in others may place upon employer or employee.  Opportunity to organize and proper discipline are both essential elements in a balanced society."[2]  Indeed, the Court has repeatedly emphasized that the Board's duty is to strike a "proper balance" between employee and employer rights, and it has described the carrying out of that duty as a "delicate task."[3]  Thus, in formulating an appropriate standard here, the Board must accommodate the rights of both parties, "with as little destruction of one as is consistent with the maintenance of the other."[4]  And "[t]he locus of that accommodation [ ] may fall at

---

[1]  *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945).
[2]  *Republic Aviation Corp. v. NLRB*, 324 U.S. at 798.
[3]  See *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33–34 (1967) (describing the Board's "duty to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy"); *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 229 (1963) (referring to the "delicate task . . . of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing in the light of the Act and its policy the intended consequences upon employee rights against the business ends to be served by the employer's conduct").
[4]  *NLRB v. Babcock & Wilcox*, 351 U.S. 105, 112 (1956).

the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]."  If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

differing points along the spectrum depending on the nature and strength of the respective . . . rights . . . ."[5]

Consistent with these principles, the Board has long held that employer policies that *prohibit* the display of union insignia are presumptively unlawful and must be justified by special circumstances. Over time, Board precedent has evolved a limited set of circumstances that constitute "special circumstances" justifying a ban on union insignia.[6] In practice, the existence of special circumstances is exceedingly difficult for employers to establish—rightly so, given the significant impact of such an outright prohibition on the exercise of Section 7 rights. Today, however, the majority extends the same presumption of unlawfulness and the same stringent "special circumstances" defense standard to *all* employer-apparel policies, including the less restrictive, facially neutral, and nondiscriminatory policy at issue in this case. The result of this holding is that, in effect, no employer may lawfully maintain any dress code unless that employer can demonstrate special circumstances. They take this step for all uniform policies and dress codes, even those that permit the display of many types of union insignia and are thus significantly less restrictive of Section 7 rights than the broad prohibitions on which the special circumstances standard was based and to which it properly applies.

Nothing in the Act suggests that Congress intended to make all employer dress codes presumptively unlawful. No policy of the Act supports the majority's position. Rather, the fundamental point made by the Supreme Court in *Republic Aviation* and repeated in *Babcock* is that the Board, in each case, must strike an *accommodation* between employee rights and legitimate employer interests that ensures "as little destruction of one as is consistent with the maintenance of the other."[7] The majority's decision today fails this test. It effectively nullifies the legitimate interests served by employer dress codes by requiring that employees be permitted to disregard the dress code whenever they wish to substitute an item of union apparel, unless special circumstances are shown, and their reliance on dicta in *Stabilus*[8] is misguided.

The majority's presumption of illegality is also flawed because it treats materially different employer rules as if they were the same. It is self-evident that a rule prohibiting all union insignia has a greater impact on the exercise

of Section 7 rights than a dress code that permits some, but not all, ways of displaying union insignia. A reasonable standard would recognize this fact by requiring a lesser showing to justify lesser restrictions. The majority, however, treats both situations as if they were the same, and therefore fails to engage in reasoned decision-making.[9]

The balancing of rights and interests mandated by the Supreme Court requires the Board to distinguish between employer policies that broadly prohibit union insignia and facially neutral, nondiscriminatory dress codes that require employees to wear specific apparel but do not prohibit the display of union insignia. The former are and should remain presumptively unlawful, and employers who maintain them should continue to shoulder the heavy burden of proving that special circumstances justify them. The latter, in contrast, should be lawful as long as the dress code affords employees a meaningful opportunity to display union insignia. Because the majority rejects this standard and instead adopts a position that is both unreasonable and contrary to Supreme Court precedent, we dissent.

The Board recognized a similar commonsense distinction in *Wal-Mart Stores*, 368 NLRB No. 146 (2019), where it held that a presumption of illegality was not justified, and a special circumstances justification was not required, where an employer "maintains a facially neutral rule that limits the size and/or appearance of union buttons and insignia that employees can wear but does not prohibit them." We participated in *Wal-Mart*, and we adhere to the principles stated there. Accordingly, we also dissent from our colleagues' unjustified overruling of that case.

### Facts

The Respondent manufactures electric vehicles at its facility in Fremont, California. The vehicles are assembled by production associates in the General Assembly (GA) area of the facility. When an unfinished vehicle enters GA, its paint is cured sufficiently for light touching and general handling but is not cured as completely as when the vehicle is finished.

The Respondent's "General Assembly Expectations" include the following team-wear policy:

---

[5]  *Hudgens v. NLRB*, 424 U.S. 507, 522 (1976).

[6]  See, e.g., *United Parcel Service*, 312 NLRB 596, 597 (1993), enf. denied 41 F.3d 1068 (6th Cir. 1994); *Nordstrom, Inc.*, 264 NLRB 698, 700 (1982).

[7]  *NLRB v. Babcock & Wilcox*, 351 U.S. at 112.

[8]  *Stabilus, Inc.*, 355 NLRB 836 (2010).

[9]  See *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational. Courts enforce this principle with regularity when they set aside agency regulations which, though well within the agencies' scope of authority, are not supported by the reasons that the agencies adduce.").

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Team Wear: It is mandatory that all Production Associates and Leads wear the assigned team wear.

- On occasion, team wear may be substituted with all black clothing if approved by supervisor.
- Alternative clothing must be mutilation free, work appropriate and pose no safety risks (no zippers, yoga pants, hoodies with the hood up, etc.).[10]

The team-wear policy applies only to employees in GA. For production associates, team wear consists of black cotton shirts with the Tesla logo and black cotton pants with no buttons, rivets, or exposed zippers. The Respondent provides newly hired production associates with two pairs of pants, two short-sleeve shirts, two long-sleeve shirts, and a sweater; thereafter, they buy team wear from the Respondent's team-wear store in the Fremont facility. Production leads and supervisors wear red shirts, while line inspectors wear white shirts; however, they all wear the same black cotton pants as the production associates.

Before August 2017, the Respondent did not strictly enforce the team-wear policy, and production associates regularly wore shirts that were not black or had logos or emblems other than the Tesla logo. In August 2017, the Respondent began to strictly enforce its team-wear policy by having supervisors and managers audit production associates during startup meetings and "walk the line" to ensure compliance with the team-wear policy. Since that time, supervisors and managers have sometimes allowed production associates to wear plain black cotton shirts instead of team-wear shirts or to cover non-Tesla logos and emblems on black shirts with black mutilation-protection tape. Although production associates are not permitted to wear black union shirts in place of team-wear shirts, they are allowed to wear stickers, including a sticker displaying the Union's logo and campaign slogan, on the required team wear. The judge found generally that "[e]mployees also wore union . . . hats to work." However, there is no evidence that any production associates wore union hats. There is also no evidence that they are prohibited from wearing union hats.

In the spring of 2017, employees, including production associates, began wearing black cotton shirts that had a small union logo with the Union's campaign slogan—

"Driving for a Fair Future at Tesla"—on the front of the shirt and a larger logo with that slogan and "UAW" on the back. Beginning about August 10, 2017, the Respondent enforced its team-wear policy by informing employees that the UAW shirt violated the policy and that they would be sent home if they wore it again. When production associate Sean Jones complained, the Respondent informed Jones that the policy had changed and that employees could no longer wear shirts with emblems.

Production Manager Mario Penera testified that the team-wear policy is intended to lower the risk of employees' clothing causing mutilations of the vehicles and to aid in the visual management of GA.[11] Penera described visual management as the ability to easily determine that employees are in their assigned work area and to differentiate between the different types of employees in GA based on shirt color. Penera added that requiring production associates to wear team wear makes it easier for supervisors to verify that employees' clothes do not have a high risk of causing mutilations. Production Manager Kyle Martin generally confirmed Penera's testimony regarding the purpose of the team-wear policy and specifically testified about an incident where a raised metal emblem on a production associate's shirt caused a mutilation by brushing against a fender.

Background

The judge found that the Respondent violated the Act in several respects, including by maintaining and enforcing the team-wear policy. Because the policy had the effect of restricting the display of union insignia, the judge found that it was presumptively unlawful, and she also found that it was not justified by special circumstances. The judge rejected the Respondent's argument that the team-wear policy does not interfere with employees' Section 7 rights because employees can wear union stickers on their team wear.

The Respondent filed exceptions to the judge's decision. On February 12, 2021, the Board issued a Notice and Invitation to File Briefs (NIFB), asking the parties and interested amici to address whether *Stabilus* was the correct standard to apply when an employer maintains and consistently enforces a nondiscriminatory uniform policy that implicitly allows employees to wear union insignia (buttons, pins, stickers, etc.) on their uniforms, and if not, what standard the Board should apply.

On March 25, 2021, the Board issued a decision and order severing and retaining for further consideration whether the Respondent violated Section 8(a)(1) by

---

[10] The Respondent's "General Assembly Expectations" originally stated simply that "[t]eam wear is mandatory for all team members and leads." Prior to August 10, 2017, the Respondent orally informed its production associates that, with supervisory permission, they could substitute all-black clothing for team wear. In October 2017, the Respondent formally revised the "General Assembly Expectations" to reflect that change.

[11] Mutilations include abrasions, buffs, chips, cuts, dents, dings, or scratches to the inside or outside of a vehicle.

maintaining and enforcing its team-wear policy and resolving most of the other issues in the case. *Tesla, Inc.*, 370 NLRB No. 101 (2021). Notably, the Board affirmed, in the absence of exceptions, the judge's dismissal of allegations that the Respondent *discriminatorily* enforced the team-wear policy against union supporters. Id., slip op. at 1 fn. 1.

### Discussion

### A. Employer Dress Codes

Employer dress codes take many forms. As noted above, the Respondent's dress code requires employees to wear team-wear shirts and pants. Other cases have involved a dress code that prohibited "attire, jewelry, or any aspect of grooming which the Company believes to be unsafe, distracting, unsanitary, not promoting customer good will or the subject of business disruption or complaint,"[12] or clothing displaying statements "that are degrading, confrontational, slanderous, insulting or provocative."[13] It is beyond dispute that employers maintain uniform policies and dress codes for many legitimate reasons, including for employees' safety and security, for production reasons, and to create a sense of esprit de corps. We do not understand the majority to dispute this point.

Some dress codes effectively prohibit the display of any union insignia by requiring employees to wear a specific uniform and prohibiting pins, buttons, or any other items from being affixed to the uniform.[14] Such dress codes are violative of the Act unless justified by special circumstances. Many others, however, do not. Many (if not most) types of union insignia would not be prohibited by dress codes. Because these policies do provide meaningful opportunities for employees to display union insignia, they are qualitatively different from the outright bans. It is therefore wrong to treat the two types of policies as though they were the same.

### B. The Majority's "Presumption of Illegality" Standard Is Unreasonable, and Republic Aviation Does Not Support It

Our colleagues take the position that dress codes and uniform policies that interfere "*in any way*" with employees' right to display union insignia are presumptively unlawful (emphasis in majority opinion).[15] For them, it is immaterial whether, under a uniform policy or dress code, employees retain a meaningful opportunity to display union insignia. They contend that *Republic Aviation* supports their position, but this is simply not the case.[16] As the Board has held, "*Republic Aviation* stands for the twin propositions that employees must have *adequate* avenues of communication in order to meaningfully exercise their Section 7 rights" and that employer rights "must yield to employees' Section 7 rights when necessary to avoid creating an *unreasonable* impediment to the exercise of the right to self-organization."[17] Dress codes under which employees retain meaningful opportunities to display union insignia *do* provide "adequate avenues of communication" and therefore do not create "an *unreasonable* impediment to the exercise of the right to self-organization."[18]

In *Republic Aviation*, the Court considered a set of balanced presumptions developed by the Board for addressing employer rules that *prohibited* solicitation or the distribution of literature on the employer's premises. 324 U.S. at 801–803 & fn. 7.[19] As the Board properly

---

[12] *Burndy, LLC*, 364 NLRB 946, 976 (2016). No exceptions were filed to the judge's dismissal of allegations that the dress code was unlawful. Id. at 946 fn. 3.

[13] *Medco Health Solutions of Las Vegas*, 364 NLRB 1687, 1688 (2016). The Board found that the challenged dress code was unlawful because it had been applied to restrict Sec. 7 activity, but see *AT&T Mobility, LLC*, 370 NLRB No. 121 (2021) (holding that an employer rule is not unlawful to maintain solely because it has been applied to restrict Sec. 7 activity).

[14] See, e.g., *W San Diego*, 348 NLRB 372 (2006) (employees required to wear employer-provided uniform with a small (1/2 inch) "W" pin on the upper left chest; attire policy prohibited all other uniform adornments, including sweatbands, scarves worn as belts, and professional association pins); *United Parcel Service*, supra (employees permitted to wear only UPS-authorized items on uniforms, and union pins were not authorized); *Republic Aviation*, supra (union steward pins categorically prohibited).

[15] Our colleagues take issue with our position that their holding today has the practical effect of rendering *all* dress codes presumptively unlawful. To the contrary, they assert that "employers may lawfully maintain facially neutral, nondiscriminatory dress codes and uniform policies that *implicitly* limit or restrict the display of union insignia, so long as they are narrowly tailored to serve a particular, legitimate interest that outweighs the adverse effect on employees' Section 7 rights." (Emphasis added.) This assertion, of course, proves our point. It is hard to imagine a facially neutral dress code or uniform policy that does not *implicitly* limit or restrict the display of union insignia. Yet, under the majority's analysis, any such dress code can only be lawful if an employer meets its burden to establish special circumstances such that its particular legitimate interest outweighs employees' Sec. 7 rights. Put another way, virtually all dress codes are presumptively unlawful.

[16] In analyzing *Republic Aviation*, we rely on the text of the decision. We do not, as the majority does, rely on an assumption that the Court "implicitly rejected" an argument that was not discussed in the decision.

[17] *Rio All-Suites Hotel*, 368 NLRB No. 143, slip op. at 7 (2019) (internal footnotes and quotation marks omitted; emphasis in original).

[18] Id. (emphasis in original).

[19] Specifically, the Board had determined that rules prohibiting solicitation during working time were presumptively lawful, while rules prohibiting solicitation outside of working time "must be presumed to be an unreasonable impediment to self-organization and therefore discriminatory in the absence of evidence that special circumstances make the rule necessary in order to maintain production or discipline." *Peyton Packing Co.*, 49 NLRB 828, 843 (1943), enfd. 142 F.2d 1009 (5th Cir. 1944). Similarly, the Board had determined that rules that restrict the distribution of literature on nonworking time and in nonworking

recognized, employees cannot realistically self-organize unless there are adequate avenues of communication open to them for the interchange of ideas necessary to the exercise of their right to do so, and a complete prohibition on solicitation and literature distribution in the workplace would necessarily choke off those "avenues of communication" at "the very time and place uniquely appropriate and almost solely available to them therefor."[20]  Based on those findings, the Court agreed  that the Board could properly presume that those prohibitions were unlawful and require that they be justified by special circumstances.  In doing so, however, the Court stressed that the validity of the Board's presumption "depends upon the rationality between what is proved and what is inferred."[21]

Notably, the Court did not have before it either an employer dress code comparable to the team-wear policy at issue in this case, or a Board standard holding that such dress codes are presumptively unlawful regardless of whether they afford adequate "avenues of communication."  The majority's application of the same presumption of illegality to such dress codes is therefore an extension of *Republic Aviation*, not an application of it.[22]  It

is also unwarranted.  As noted above, *Republic Aviation* approved the application of a presumption of illegality to rules prohibiting solicitation and distribution.  In the Court's own words, there was a rational relationship between what was proven—a complete prohibition—and what was inferred—"an unreasonable impediment to self-organization" that was unlawful "in the absence of evidence that special circumstances ma[d]e the rule necessary in order to maintain production or discipline."[23]  Significantly, the majority fails to justify the notion that the same inference is warranted for uniform policies and dress codes that do not impose a complete prohibition but instead provide a meaningful opportunity for employees to wear union insignia.[24]

Our colleagues gain no ground by citing to the portion of *Republic Aviation* addressing the employer's ban on wearing a union steward button.  As the majority notes, the *Republic Aviation* Court upheld the Board's determination that an employer had violated the Act by prohibiting employees from wearing union steward buttons, notwithstanding the employer's protestations that it permitted other union insignia and objected only to this specific button.  But this was an explicit prohibition against displaying a specific union insignia *because* it was a union insignia.  As such, the prohibition was not facially neutral and nondiscriminatory, and therefore it is unlike the policy at issue in this case.[25]  The majority is simply

---

[20] *Republic Aviation*, 324 U.S. at 801 fn. 6 (internal quotation marks omitted).

[21] Id. at 804–805; see also *NLRB v. Baptist Hospital*, 442 U.S. 773, 787 (1979) ("It is, of course, settled law that a presumption adopted and applied by the Board must rest on a sound factual connection between the proved and inferred facts.").

[22] The majority asserts that the Board so extended *Republic Aviation* "long before" today's decision, citing *Boeing Airplane Co.*, 103 NLRB 1025, 1026 & fn. 4 (1953), enfd. 217 F.2d 369 (9th Cir. 1954). But *Boeing* involved a complete ban on union steward buttons and "I am loyal to [Machinists Local] 751" streamers on the premise that there was, at the time, no collective-bargaining agreement in place.  This is comparable to the ban on wearing the union steward button at issue in *Republic Aviation* and distinguishable for the same reasons, discussed below, that the *Republic Aviation* ban is properly to be distinguished. *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714–715 (5th Cir. 2018), cert. denied 139 S.Ct. 1259 (2019), and *Boch Imports, Inc. v. NLRB*, 826 F.3d 558, 570–571 (1st Cir. 2016), also cited by the majority in support of their position, are even less apposite.  Both involved complete bans on union insignia, unlike the dress code at issue here.  Indeed, the *Boch Imports* court specifically observed that "different considerations may apply when employers proscribe all adornments, including union adornments, than would apply when employers proscribe only certain types of adornments (for example, 'provocative' adornments), which may, on a case-by-case basis, include union adornments." 826 F.3d at 571.  The one-size-fits-all standard our colleagues espouse cannot be reconciled with that observation.

*HealthBridge Management, LLC v. NLRB*, 798 F.3d 1059, 1067 (D.C. Cir. 2015), also cited by the majority, is distinguishable for different reasons.  There, the court held that it lacked jurisdiction to consider the employer's challenge to the Board's holding that a ban on

wearing a particular union sticker in patient care areas was presumptively unlawful.  The court's decision did not address on the merits the question at issue in this case.

[23] *Republic Aviation*, 324 U.S. at 804–805.

[24] Our colleagues cite cases holding it presumptively unlawful to permit solicitation during some nonworking time but prohibit it during other nonworking time, or to permit distribution in some nonworking areas but prohibit it in other nonworking areas, and they analogize those cases to this one, even though elsewhere, they say that "uniform policies and dress codes . . . are distinguishable from no-solicitation and no-distribution rules."  Notwithstanding the majority's apples-to-oranges comparison, the plain truth is that our position is perfectly consistent with the Board's long-established standards for solicitation and literature distribution, which not only recognize that partial bans on solicitation and distribution may be lawful, they *presume* so.  Moreover, dress codes are qualitatively different from solicitation and distribution rules because employees cannot realistically don and doff apparel during, for example, working and nonworking time in the same way that solicitation and distribution of literature can be so restricted.  See *Casa San Miguel*, 320 NLRB 534, 540 (1995) (holding that employer lawfully prohibited employee from wearing uniform with prounion message added to the front, recognizing that "[i]t is not practical or possible for an employee when in nonpatient care areas to wear a uniform with a printed prounion emblem and message on the front, and then to change out of that uniform, each time the employee enters a patient care area").

[25] As the Board's NIFB makes clear, this case concerns only the standard to be applied when an employer maintains and consistently enforces a *nondiscriminatory* uniform policy that implicitly allows

wrong to treat those two situations as if they were the same.

The majority argues that a "meaningful opportunity" standard impermissibly considers "alternative means" in a manner that the Supreme Court has rejected.[26] But the cases on which our colleagues rely, like *Republic Aviation*, all involved policies that broadly prohibited Section 7 activity on the employer's premises.[27] The question here is whether the standards applicable to those prohibitions should be extended to employer dress codes that permit meaningful opportunities to display union insignia in the workplace—that is, whether those dress codes also impose "an unreasonable impediment to self-organization."[28] In other words, an adequate analysis of the central issue this case presents must take into account the difference between policies that *prohibit* and policies that *limit* the exercise of Section 7 rights. Our analysis takes that difference into account, while our colleagues' analysis does not. The omission is fatal to their holding, since the Board has been quite clear that "employees are not free to exercise their guaranteed rights in any manner, time, or place they choose. Reasonable encroachments and limitations have been imposed on both employers and employees in order to make effective the purposes of the Act and the guarantees contained therein."[29] By erasing the distinction between a limitation and a prohibition, the majority effectively assumes the answer to the central issue in this case.

Even on their own terms, the cases cited by the majority do not bear the weight our colleagues place on them. In *Eastex, Inc. v. NLRB*, for example, the Court rejected the employer's contention that the distribution in the

workplace of a union newsletter could be prohibited as long as the union could distribute it outside of the workplace.[30] This principle has no application here, where the issue is whether an employer may lawfully require certain attire to be worn in the workplace if it permits union insignia to be displayed on that attire *in the workplace*. Moreover, the *Eastex* Court repeatedly stressed that the employer there "made no attempt to show that its management interests would be prejudiced in any way by the exercise of § 7 rights proposed by its employees here."[31] Of course, an employer's management interests *are* "prejudiced" when employees disregard their employer's dress code and don union apparel instead. Finally, the *Eastex* Court stressed that it was *not* holding "that the *Republic Aviation* rule properly is applied to every in-plant distribution of literature that falls within the protective ambit of § 7," and the Court "confine[d its] holding to the facts of [that] case."[32] Undeterred, our colleagues (mis)apply "the *Republic Aviation* rule" to *every* in-plant display of union insignia.

*NLRB v. Magnavox Co. of Tennessee* is also readily distinguishable. There, the Court rejected the view that a union could lawfully waive the Section 7 right of employees it represented to distribute union literature on nonworking time and in nonworking areas. While the employer argued that those employees had use of a bulletin board, the Court held that this was not an adequate substitute because it was discriminatory.[33] No such considerations are present here. Moreover, the *Magnavox* Court specifically noted that there was no evidence in that case that the restriction on literature distribution was justified by a need to maintain production or discipline, and therefore *Magnavox* did not present an "occasion to balance the availability of alternative channels of communication against a legitimate employer business justification for barring or limiting in-plant communications."[34] The Court thus expressly left open the possible relevance of alternative means in circumstances where, as here, legitimate employer business justifications *are* presented.

---

employees to wear union insignia (buttons, pins, stickers, etc.) on their uniforms" (emphasis added).

[26] See, e.g., *Eastex, Inc. v. NLRB*, 437 U.S. 556, 572–574 (1978) (prohibition on distribution of union newsletter); *Beth Israel Hospital v. NLRB*, 437 U.S. at 507 (rule barring solicitation and distribution of literature in any area of hospital to which patients or visitors have access); *NLRB v. Magnavox Co. of Tennessee*, 415 U.S. 322, 324–327 (1974) (union could not waive employees' right to distribute union literature on company property).

[27] *Monarch Machine Tool Co.*, 102 NLRB 1242 (1953), enfd. 210 F.2d 183 (6th Cir. 1954), cert. denied 347 U.S. 967 (1954), aptly illustrates this point. The majority cites *Monarch Machine Tool* for the proposition that "[i]t certainly does not lie in the mouth of [the employer] to tell the [u]nion, or [the employer's] employees, how to exercise their rights under the Act." Id. at 1249. As our colleagues note, however, the issue there was whether the employer could ban solicitation and distribution of literature within the plant on the grounds that employees had adequate opportunity to do so elsewhere. The issue here, in contrast, is whether an employer may lawfully maintain a dress code under which employees retain a meaningful opportunity to display union insignia *in the workplace*.

[28] *Peyton Packing Co.*, supra, 49 NLRB at 843.

[29] *Monarch Machine Tool Co.*, 102 NLRB at 1248. The majority does not quote this portion of the Board's decision in that case.

[30] *Eastex, Inc. v. NLRB*, 437 U.S. at 574 ("[T]he plant is a particularly appropriate place for the distribution of § 7 material, because it is the one place where [employees] clearly share common interests and where they traditionally seek to persuade fellow workers in matters affecting their union organizational life and other matters related to their status as employees.") (alteration in original; internal quotation marks omitted).

[31] Id. at 572, 573, and 575.

[32] Id. at 574–575.

[33] *NLRB v. Magnavox Co. of Tennessee*, 415 U.S. at 326 ("[T]he bulletin board may be an adequate medium for preserving the status quo and yet not give a union's adversaries equal access to and communication with their fellow employees.") (internal quotation marks omitted).

[34] Id. at 326–327.

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

The potential relevance of alternative means was also recognized by the Court in *Beth Israel Hospital v. NLRB*, 437 U.S. 483 (1978). To be sure, the Court did state there that "the availability of alternative means of communication is not, with respect to employee organizational activity, a necessary inquiry" outside of the health care context.[35] But the specific question presented in the case was whether employees' Section 7 activity could be confined to certain locker rooms and restrooms "not conducive to their exercise."[36] In upholding the Board's determination that those restrictions were presumptively unlawful insofar as they prohibited Section 7 activity in the hospital's cafeteria and coffee shop, the Court held that the presumption was adequately supported by the evidence presented, cautioning once again that the validity of the Board's inferences "depends upon the rationality between what is proved and what is inferred."[37] The majority's presumption that employer dress codes that limit the display of union insignia "*in any way*" are unlawful rests on inferences drawn from completely different facts. Nothing in *Beth Israel* compels the conclusion that those inferences are valid.

### C. The Majority's Special Circumstances Standard Fails to Strike the Appropriate Balance Between Employee and Employer Rights

We also disagree with the majority's contention that the special circumstances standard strikes the appropriate balance between employee and employer rights with respect to uniform policies and dress codes under which employees retain meaningful opportunities to display union insignia in the workplace. Our colleagues posit that this standard satisfies the *Republic Aviation* balancing requirement because it allows for consideration of the nature and extent of an employer's legitimate interests in maintaining a challenged restriction on Section 7 activity. Our colleagues are mistaken, for several reasons.

First, the special circumstances standard is predicated on, and follows from, a prior determination that a particular employer rule is presumptively unlawful. As explained, that presumption is unwarranted in the case of facially neutral, nondiscriminatory dress codes that permit meaningful opportunities to display union insignia in the workplace. The majority's holding requires finding presumptively unlawful legitimate and, in some cases, business-necessitated dress codes. For instance, manufacturing employers, like the Respondent, would presumptively violate the Act by requiring employees to

wear particular clothing, such as a factory jumpsuit, to prevent damage during production because it would prevent employees from wearing union clothing. In an office setting, typical "business casual" dress codes, often established to maintain a level of decorum, would be presumptively unlawful because they would prohibit union t-shirts. Similarly, the majority's approach would make presumptively unlawful relatively common employer policies prohibiting employees from wearing certain clothing—t-shirts, exercise outfits, tube tops or muscle shirts—because the policy would prohibit such attire inscribed with a union-related message. We cannot agree that Congress intended to condemn such rules as presumptively unlawful to maintain, yet that is the inevitable consequence of the majority's decision today.

Second, the special circumstances test places a very heavy burden on employers seeking to justify uniform policies or dress codes. Contrary to the majority, that burden, in practice, will prove nearly insurmountable. The Board has found special circumstances justifying union-insignia bans in very limited circumstances: when their display may jeopardize employee safety, damage machinery or products, exacerbate employee dissension, or unreasonably interfere with a public image that the employer has established,[38] or when necessary to maintain decorum and discipline among employees.[39] Indeed, the Board has emphasized that "the 'special circumstances' exception is narrow."[40] Most uniform policies and dress codes could not be justified under the standard. Take, for example, an employer that requires its employees to wear blue polo shirts with the company logo. Although its employees work on-site at the employer's facility and rarely if ever interact in person with the public on the job, the employer believes the "blue polo" policy maintains an atmosphere of professionalism and mutual respect. Implicitly, this policy prohibits the wearing of union shirts of any kind, and although the employer allows employees to affix buttons, pins, or stickers to the blue polo shirt, including union buttons, pins, and stickers, the majority would find the policy presumptively unlawful because it precludes employees from wearing a t-shirt with a union logo, and the employer violates the Act by maintaining the "blue polo" policy unless it can

---

[35] *Beth Israel Hospital v. NLRB*, 437 U.S. at 505. The Court also indicated that alternative means was a relevant consideration in the health care context.

[36] Id.

[37] Id. at 504 (quoting *Republic Aviation*, 324 U.S. at 805).

[38] *United Parcel Service*, 312 NLRB at 597.

[39] *Komatsu America Corp.*, 342 NLRB 649, 650 (2004).

[40] *E & L Transport Co.*, 331 NLRB 640, 640 fn. 3 (2000). In *E & L Transport*, the Board invalidated a rule prohibiting the wearing of buttons while loading and unloading cars, despite the undisputed risk of damage to the cars, because "the [r]espondent did not impose the general rule for safety or damage control reasons, nor did it inform its drivers of any such reasons. Rather, the [r]espondent's motive for promulgating the rule was to retaliate against employees for their exercise of Section 7 rights. . . ."

establish that the policy is justified by special circumstances. And it cannot do so. Obviously, substituting a union t-shirt in place of the blue polo shirt would not jeopardize employee safety or damage machinery or products. A typical union t-shirt would not exacerbate employee dissension or undermine decorum or discipline—special circumstances that have been found where a particular union insignia is inflammatory, offensive, vulgar, or obscene.[41] Since these employees are not customer- or public-facing, wearing a union t-shirt could not possibly interfere with the employer's public image.

Moreover, where a uniform policy has been upheld under the special circumstances test, the employer had to prove that union insignia would interfere with the public image the employer had established as part of its business plan through consistently enforced appearance rules for its customer-facing employees.[42] For example, in *W San Diego*, a Board majority found that the employer's business plan of creating a "wonderland" atmosphere for patrons of the hotel justified a policy that prohibited all uniform adornments other than a small "W" pin.[43] In *In-N-Out Burger*,[44] on the other hand, the employer's standard white uniforms and other unique features of its business model were found insufficient to justify a restriction on adorning the uniforms with personal buttons under the "public image" prong of the special circumstances standard. As the Board has held in other cases, "a uniform requirement alone is not a special circumstance."[45] While we have no quarrel with that proposition, as a

general matter, in circumstances where the uniform is relied upon to ban all union insignia, we disagree with our colleagues' determination to apply the same standard to policies that preclude substituting union apparel for a required uniform but do not prohibit employees from affixing union insignia to that uniform. We also cannot agree that Congress intended to deny employers any right to establish a dress code for non-customer-facing employees or to require that policies banning all insignia be treated the same as policies that do not. Yet that is the result of the majority's decision today.[46]

### D. Stabilus

Our colleagues place great reliance on flawed dicta in *Stabilus, Inc.*[47]—stating that "[a]n employer cannot avoid the 'special circumstances' test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia"—which they now elevate to the status of Board law. While the majority cites bits and pieces of prior

---

[41] See, e.g., *Leiser Construction, LLC*, 349 NLRB 413, 414–415 (2007) (special circumstances justified prohibition of "a sticker that depicted someone or something urinating on a rat that was apparently designated 'non-union'"); *Komatsu*, supra at 650 (special circumstances justified prohibition of t-shirt that "invoked a highly charged and inflammatory comparison" between the respondent's outsourcing plans and the attack on Pearl Harbor); *Southwestern Bell Telephone Co.*, 200 NLRB 667 (1972) (special circumstances justified prohibition of shirt stating "Ma Bell is a Cheap Mother").

[42] See, e.g., *Con-Way Central Express*, 333 NLRB 1073, 1075–1077 (2001); *Produce Warehouse of Coram*, 329 NLRB 915, 915–918 (1999).

[43] 348 NLRB 372, 372 (2006). Former Member Liebman relevantly dissented.

[44] 365 NLRB No. 39, slip op. at 5 (2017), enfd. 894 F.3d 707 (5th Cir. 2018), cert. denied 139 S.Ct. 1259 (2019).

[45] E.g., *Long Beach Memorial Medical Center, Inc.*, 366 NLRB No 66, slip op. at 3 (2018), enfd. 774 Fed.Appx. 1 (D.C. Cir. 2019).

Notably, the administrative law judge in *In-N-Out Burger* rejected the employer's special circumstances defense on the basis that the employer had failed to demonstrate that it was seeking to create "a customer experience analogous to the alternate reality 'Wonderland' of" the W San Diego Hotel. 365 NLRB No. 39, slip op. at 10. Although Acting Chairman Miscimarra and then-Member McFerran disavowed this aspect of the judge's rationale, Member Pearce did not. Id., slip op. at 1 fn. 2. Thus, there was one vote in *In-N-Out Burger* to limit the "public image" prong of the special circumstances standard to the facts of *W San Diego*.

[46] Although existing categories of special circumstances have been fixed for many years, our colleagues respond that they "may" consider establishing additional special-circumstances justifications in some future case that go beyond those previously recognized by the Board over the last 78 years since *Republic Aviation* was decided. That possibility, of course, will offer little comfort to employers who are now faced with the near-certain risk of facing prosecution under the Act whenever they seek to maintain dress codes.

Member Ring further notes that the majority's application of the special circumstances standard to this case confirms our point. The majority accepts that the Respondent has a legitimate interest in preventing damage to its products and that some types of apparel can damage its vehicles and have damaged them in the past. But they invalidate the team-wear policy all the same, on the grounds that "at most, the Respondent has shown that it has a legitimate interest in preventing raised metal emblems on shirts from causing mutilations to vehicles[, because] the team-wear policy goes far beyond simply prohibiting employees from wearing shirts with metal emblems and therefore is not narrowly tailored to address that concern as required under the special circumstances test." This is not an accommodation of employee rights and legitimate employer interests. Rather, the majority's insistence that the Respondent's team-wear policy—and indeed, any apparel rule that limits "*in any way*" the right to display union insignia—be "narrowly tailored" to achieving an interest the majority deems sufficiently compelling to warrant protection is virtually identical to "strict scrutiny," the most exacting standard of review applied by the courts.

Member Ring also notes that the majority gives even shorter shrift to the Respondent's stated interest in "visual management." They refuse to say whether this interest could ever matter under the special circumstances test, holding instead that "[t]he team-wear policy is . . . not narrowly tailored to address the Respondent's claimed interest in maintaining visual management in GA, *even assuming* special circumstances could be established on that basis" (emphasis added). Thus, the majority leaves employers to guess whether they could even require employees to wear shirts of the same color under their special circumstances test. The majority's insistence that the special circumstances test does not place a "nearly insurmountable" burden on employers rings hollow in these circumstances.

[47] 355 NLRB 836, 838 (2010).

28                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

decisions to support this dicta, those cases do not support our colleagues' position.

In *Stabilus,* the employer maintained a uniform policy that required employees to wear shirts bearing the employer's name. 355 NLRB at 837. During a union campaign, the employer told several employees that they could not wear union shirts instead. Ibid. Although the majority in *Stabilus* decided the case on other grounds, it stated, in dicta, that "[t]here is no basis in precedent for treating clothes displaying union insignia as categorically different from other union insignia, such as buttons," and that "[a]n employer cannot avoid the 'special circumstances' test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia." Id. at 838.[48]

In dissent, former Member Schaumber explained that the "special circumstances" test was inapplicable and that the employer had lawfully enforced its preexisting uniform policy. Id. at 842 (Member Schaumber, dissenting in part). He observed that the Board had "never held that, where an employer lawfully maintains and consistently enforces a policy requiring employees to wear a company uniform, its employees have a right under Section 7 to disregard the policy and wear union attire in place of the required uniform." Id. at 843. To the contrary, the Board had "implicitly recognized that an employer may promulgate and enforce a nondiscriminatory uniform rule." Member Schaumber recognized that the right to wear union insignia is predicated on employees' right to communicate with each other regarding self-organization in the workplace, but he pointed out that the employer in *Stabilus* had not interfered with that right because, although employees could not wear union shirts, they were free to display union buttons, pins, stickers, and other union insignia on their uniforms. Id. at 842, 843. Member Schaumber therefore concluded:

[I]n balancing employee and employer rights as required under *Republic Aviation*, supra, a "special circumstances" analysis is inappropriate here. If employees have the right to wear union attire *instead* of a company uniform, the employer's right to promulgate and enforce reasonable, nondiscriminatory apparel rules is negated entirely. Such a result would not strike a balance between employee and employer rights; rather, it would completely submerge the employer's rights. Thus, I would hold that where, as here, an employer maintains and consistently enforces a lawful uniform rule, Section 7 does not guarantee employees the right to wear union attire in place of the required company uniform.

Id. at 843–844 (internal footnote omitted; emphasis in original). We agree.

Contrary to our colleagues' assertion, Member Schaumber did not suggest in his *Stabilus* dissent—and neither do we in this opinion—that an employer's infringement on the exercise of Section 7 rights, no matter how significant, is lawful so long as it results from the application of a rule that is facially neutral and nondiscriminatory, as well as consistently enforced. Member Schaumber merely acknowledged, as do we, the longstanding principle that an employer's disparate enforcement of an otherwise lawful rule against employees engaged in Section 7 activity independently violates the Act.[49]

*E. Facially Neutral, Nondiscriminatory Employer Dress Codes that Provide a Meaningful Opportunity to Display Union Insignia Should Be Lawful*

Consistent with these observations, we would continue to apply the special circumstances standard to employer policies that ban union insignia[50] or require employees to wear specific apparel and prohibit pins, buttons, or any other items from being affixed to the required clothing. Such policies do not afford employees any meaningful opportunity to display union insignia and are therefore functionally the same. The Board should therefore treat them the same way by requiring a special circumstances justification.

---

[48] Our colleagues claim that certain cases preceding *Stabilus*—including *Great Plains Coca-Cola Bottling Co.*, 311 NLRB 509 (1993), and *Meijer, Inc.*, 318 NLRB 50 (1995), enfd. 130 F.3d 1209 (6th Cir. 1997)—support the *Stabilus* dicta and their holding in this case. For the reasons set forth in detail by former Member Schaumber in his *Stabilus* dissent, we disagree. See 355 NLRB at 843 fn. 5 (Member Schaumber, dissenting in part). But to the extent that *Great Plains Coca-Cola*, *Meijer*, or any other prior Board decision (including, for example, *Quantum Electric, Inc.*, 341 NLRB 1270 (2004)) could be interpreted to support either the *Stabilus* dicta or our colleagues' decision, we believe they were wrongly decided for the reasons discussed herein. In any event, until today, neither the Board nor any court had squarely faced and decided the issue of whether Sec. 7 permits an employee to substitute union attire for a uniform or other clothing required by an employer's nondiscriminatory uniform policy or dress code. See *Stabilus*, 355 NLRB at 843 fn. 7 (Member Schaumber, dissenting in part).

[49] See, e.g., *Seton Co.*, 332 NLRB 979, 979–980 & fn. 5 (2000) (finding that an employer "violated Sec[.] 8(a)(1) of the Act by the disparate enforcement of its no-solicitation/no-distribution rule," which, on its face, lawfully prohibited employees from soliciting on working time and from distributing literature on working time and in work area).

[50] See, e.g., *USF Red Star, Inc.*, 339 NLRB 389, 391 (2003) ("[A] *ban* on wearing union insignia violates the Act unless it is justified by special circumstances.") (emphasis added); *United Parcel Service*, 312 NLRB at 597 ("In the absence of 'special circumstances,' the *prohibition* by an employer against the wearing of union insignia violates Section 8(a)(1) of the Act.") (emphasis added).

We would not, however, apply the special circumstances standard to facially neutral, nondiscriminatory employer dress codes that *do* provide a meaningful opportunity to display union insignia. Because legitimate reasons exist for employers to maintain such policies, and because the impact of such policies on the exercise of the Section 7 right of self-organization is comparatively slight, we would hold that such policies are lawful to maintain.[51] While such policies do limit the ways union insignia may be displayed by precluding the substitution of union apparel for required clothing, "[the Act] does not command that labor organizations as a matter of abstract law, under all circumstances, be protected in the use of every possible means of reaching the minds of individual workers."[52]

[51] See *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. at 33–34 (describing the Board's "duty to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy"); *NLRB v. Erie Resistor Corp.*, 373 U.S. at 229 (referring to the "delicate task . . . of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing in the light of the Act and its policy the intended consequences upon employee rights against the business ends to be served by the employer's conduct").

An employer would still violate the Act by promulgating a uniform policy or dress code in response to union activity or by disparately enforcing its uniform policy or dress code against employees wearing union attire. See, e.g., *E & L Transport Co.*, 331 NLRB 640, 640 (2000) (finding that employer unlawfully promulgated a rule prohibiting employees from wearing union buttons on their work uniforms to "retaliate against employees for their exercise of Section 7 rights"); *Pay 'N Save Corp.*, 247 NLRB 1346, 1346 (1980) (finding that employer violated Sec. 8(a)(1) by disparately enforcing its button policy against employees wearing union buttons), enfd. 641 F.2d 697 (9th Cir. 1981). Thus, we agree with SEIU's statement, in its brief in response to the Notice and Invitation to File Briefs, that "[p]rovided the employer has not implemented the uniform requirement in response to worker organizing, the uniform policy may be enforced, and workers may lawfully be prohibited from substituting a union-issued t-shirt for their uniform shirt."

[52] *NLRB v. United Steelworkers of America, CIO (NuTone, Inc.)*, 357 U.S. 357, 364 (1958).

Our colleagues claim that we have too broadly interpreted their presumption-of-illegality standard as applied to dress codes and uniform policies. Contrary to our colleagues, we have properly taken at face value their statement that "when an employer interferes *in any way* with employees' Section 7 right to display union insignia (whether through buttons, pins, stickers, shirts, hats, or any other accessories or attire), that interference is presumptively unlawful, and the employer has the burden to establish special circumstances that justify its interference." By the mere fact that uniform policies and dress codes require certain attire to be worn, no such policy or dress code can avoid limiting in some way the display of union insignia—with the possible exception of a union employer that *requires* its employees to wear union attire—and so no uniform policy or dress code escapes being deemed presumptively unlawful under the majority's decision. At certain points, our colleagues describe their position as requiring that an employer's dress code must be "narrowly tailored" to achieving an interest they deem sufficiently compelling to warrant protection. But regardless of how

Applying the foregoing principles to the facts of this case, we find that the Respondent lawfully maintained its team-wear policy and lawfully enforced it against employees wearing shirts bearing union insignia in place of the required team wear. The policy does not deny production associates meaningful opportunities to display union insignia because they may affix union stickers to their team wear, and it is facially neutral and nondiscriminatory.[53]

## F. The Majority Compounds Their Erroneous Interpretation of Republic Aviation by Overruling Wal-Mart Stores.

In *Wal-Mart Stores*,[54] the Board held that the employer lawfully maintained policies permitting employees to wear "small, non-distracting logos or graphics . . . no larger than the size of your [employee] name badge." That holding is irrelevant to the disposition of this case, since no restriction on the size of union insignia is present here. That said, *Wal-Mart* does rest on the proposition that the special circumstances standard is inapplicable to a facially neutral rule that recognizes the right of employees to wear union insignia but places reasonable size and/or appearance limits on "logos or graphics." As the Board there explained, "because the infringement on Section 7 rights is less severe [than a rule that completely prohibits insignia], the employer's legitimate justifications for maintaining the restriction do not need to be as compelling for its policy to pass legal muster, and justifications other than the recognized special circumstances may suffice."[55] The majority does not accept the proposition that the extent to which an employer rule restricts

they phrase it, the majority's essential point remains the same: every facially neutral dress code and uniform policy that limits the display of union insignia in any way is presumptively unlawful, requiring the employer to prove special circumstances. And because, as we have shown, proving special circumstances is exceptionally difficult, the result of our colleagues' holding today is that with rare exceptions, uniform policies and dress codes are now unlawful to maintain, period.

[53] As noted above, the Board previously affirmed, in the absence of exceptions, the judge's dismissal of the allegations that the Respondent discriminatorily enforced the team-wear policy against employees wearing union shirts.

The majority asserts that we have set a "low bar" for finding that a "meaningful opportunity" to display union insignia exists here, but they cite no evidence for the notion that the display of union stickers in this workplace would not afford employees with the "adequate avenues for communication" required by our precedent. *Rio All-Suites Hotel*, 368 NLRB No. 143, slip op. at 7. Although Member Ring would not require the Respondent to justify the team-wear policy, the Respondent has explained that it maintains the policy to lower the risk of employees' clothing causing mutilations of the vehicles and to aid in the visual management of GA. Whether or not these justifications would pass muster under the special circumstances standard, Member Ring believes there is no valid basis for the Board to deny their legitimacy.

[54] 368 NLRB No. 146 (2019).

[55] Id., slip op. at 3.

Section 7 activity is a relevant consideration in determining whether the rule is presumptively unlawful, so it is no surprise that they would not accept it in the circumstances presented in *Wal-Mart* either.

We participated in *Wal-Mart*, and we adhere to the holding of that case and the reasoning that supports it. For the reasons explained there and in this decision, nothing in the Act or in *Republic Aviation* requires the Board to hold that any restriction on the display of union insignia, however slight, is presumptively unlawful and must be justified by special circumstances. Indeed, there is no valid justification for treating a rule that bans all union insignia the same as one that does not.[56] There is also no merit in the majority's argument that the *Wal-Mart Stores* Board drew an unwarranted distinction between facial challenges to rules that partially restrict the display of union insignia and as-applied challenges to the application of such rules to outright ban specific union insignia. Here again, the majority faults *Wal-Mart* for not finding that *any* limitation on employees' right to display union insignia requires application of the special circumstances test. As we have explained, however, their position is both unreasonable and inconsistent with *Republic Aviation*.[57]

We also reject the majority's charge that *Wal-Mart* views employees' ability to display union insignia in the workplace as a privilege rather than a right. This is not so. To the contrary, the *Wal-Mart* Board engaged in a proper accommodation between competing rights, as *Republic Aviation* requires. By contrast, our colleagues' approach does not. To the contrary, as the Board aptly observed in *Wal-Mart*, the view that any size and/or appearance limitation on the display of union insignia is presumptively unlawful could have strange results. For example, it would render presumptively unlawful a policy that bars employees, in the presence of customers on a selling floor, from wearing the largest and most distracting union insignia imaginable, such as a pro-union sandwich board or a large button ringed with flashing lights.[58] Nothing in *Republic Aviation* or the Act supports that result.

Conclusion

By any measure, the majority's decision today represents a failure to engage in reasoned decision-making. Simply put, it wrongfully treats unlike things as though they were the same, by applying the same standard to dress codes that do not prohibit employees from displaying union insignia as is applied to employer rules that do. Distorting decades of precedent teaching that employee rights and legitimate employer interests must be balanced in each case "with as little destruction of one as is consistent with the maintenance of the other,"[59] the majority effectively declares illegitimate any employer uniform policy or dress code that prohibits employees from substituting union apparel for required clothing. As shown, virtually all dress codes could be so construed. And the majority similarly places off-limits any rule that limits the size and/or appearance of union insignia.

Today's decision declares that all such dress codes are presumptively unlawful. As such, employees will be free to disregard them by wearing noncomplying union apparel except in "narrow" circumstances that exist in theory but will rarely be found in fact.[60] In other words, an

---

[56] Contrary to the majority, the cases on which they rely on in support of their argument that all infringements on employees' display of union insignia are presumptively unlawful involved total bans, not partial restrictions such as the policies at issue in *Wal-Mart Stores* and this case. See *Long Beach Memorial Medical Center, Inc. d/b/a Long Beach Memorial Medical Center & Miller Children's and Women's Hospital Long Beach*, 366 NLRB No. 66, slip op. at 1–3 (2018) (employer failed to demonstrate special circumstances for total bans on pins, badges, professional certifications, and badge reels not approved by the employer), enfd. mem. 774 Fed.Appx. 1 (D.C. Cir. 2019); *Boch Honda*, 362 NLRB 706, 707 (2015) (employer failed to demonstrate special circumstances for total ban, applicable to employees who have contact with the public, on "wear[ing] pins, insignias, or other message clothing"), enfd. 826 F.3d 558 (1st Cir. 2016); *Albis Plastics*, 335 NLRB 923, 924 (2001) (employer demonstrated special circumstances for total ban on displaying unauthorized stickers, including union stickers, on safety helmets or "bump caps"), enfd. mem. 67 Fed.Appx. 253 (5th Cir. 2003); *Mayrath Co.*, 132 NLRB 1628, 1630 (1961) (employer failed to demonstrate special circumstances to justify ordering employees not to wear union buttons), enfd. in part 319 F.2d 424 (7th Cir. 1963).

[57] The majority has misconstrued the context of the Board's observations in *Wal-Mart Stores* regarding facial challenges and as-applied challenges. An as-applied challenge was not before the Board in *Wal-Mart Stores*. Nonetheless, then-Member McFerran's dissent cited various cases involving as-applied challenges to outright bans. In discussing the distinction between facial and as-applied challenges, the *Wal-Mart* majority correctly observed that the cases the dissent relied on to support her assertion that the Board applies the "special circumstances" standard to partial bans on union insignia did *not* involve facial challenges to a size-and-appearance policy; rather, the cases involved the materially different matter of as-applied challenges to outright bans of specific union insignia. *Wal-Mart Stores*, 368 NLRB No. 146, slip op. at 2 & fn. 10. The majority also reasonably stated that

because the General Counsel had only brought a facial challenge to a size-and-appearance policy, the Board had to assess the policy on its face, not as applied. Id. Contrary to our colleagues, facial and as-applied challenges are not functionally identical. And our colleagues have not supported their argument with any caselaw relating to size and/or appearance restrictions. Rather, the cases they rely on to support their assertion that the Board applies the special circumstances test to partial bans on union insignia do not involve facial challenges to a size-and-appearance policy, like the sole allegation in *Wal-Mart Stores*. Rather, they involved comprehensive prohibitions of all union insignia and/or buttons and pins.

[58] 368 NLRB No. 146, slip op. at 3 fn. 13.

[59] *NLRB v. Babcock & Wilcox*, 351 U.S. at 112.

[60] *E & L Transport Co.*, 331 NLRB at 640 fn. 3.

employer's right to maintain a dress code and insist on compliance with it is now the exception, not the rule—and even the exception may prove illusory.  This cannot be what the Supreme Court in *Republic Aviation* had in mind when it said that "[o]pportunity to organize and proper discipline are both essential elements in a balanced society."[61]  We are confident that it would come as a shock to the 74th Congress to learn that, when it enacted the National Labor Relations Act, it abolished the right of employers to maintain dress codes and uniform policies absent proof of special circumstances, rarely to be found.  Accordingly, we respectfully dissent.

Dated, Washington, D.C.  August 29, 2022

_____

Marvin E. Kaplan,                          Member

_____

John F. Ring,                                  Member

NATIONAL LABOR RELATIONS BOARD
APPENDIX
NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join or assist a union
Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT maintain and enforce an overly broad team-wear policy in our "General Assembly Expectations" that prohibits production associates from wearing black union shirts.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL rescind the team-wear policy in our "General Assembly Expectations," or revise the team-wear policy to make clear that it does not prohibit production associates from wearing black union shirts.

WE WILL notify you that the team-wear policy in our "General Assembly Expectations" has been rescinded, or, if it has been revised, provide you with a copy of our "General Assembly Expectations" with the revised team-wear policy.

TESLA, INC.

The Board's decision can be found at https://www.nlrb.gov/case/32-CA-197020 or by using the QR code below.  Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



---

[61] *Republic Aviation Corp. v. NLRB*, 324 U.S. at 798.

**PROOF OF SERVICE**

LORENA ZAMARRIPA certifies as follows:

I am employed in the County of Los Angeles, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 6300 Wilshire Boulevard, Suite 2000, Los Angeles, California 90048-5268.

On September 6, 2022, I caused the foregoing document(s) described as: **PETITION FOR REVIEW OF ORDER OF A FEDERAL AGENCY, BOARD, COMMISSION, OR OFFICER** be served upon the person(s) shown below:

Jennifer Abruzzo, General Counsel      Michael E. Kenneally, Esq.
Micah Jost, Esq.      Morgan, Lewis & Bockius LLP
National Labor Relations Board      1111 Pennsylvania Avenue, NW
1015 Half Street SE      Washington, DC 20004-2541
Washington, DC 20570

  **X**   **BY OVERNIGHT/NEXT DAY MAIL:** By using UPS Next Day Air service, and causing delivery to be made to UPS courier service in an envelope or package designated by UPS courier service addressed to the person on whom it is to be served.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 6, 2022, at Anaheim, California.

_____
LORENA ZAMARRIPA