OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 32

In the Matter of:

| | |
|---|---|
| Tesla, Inc., | Case Nos.   32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| Michael Sanchez, an individual, | 32-CA-200530 |
| | 32-CA-208614 |
| and | 32-CA-210879 |

Jonathan Galescu, an
individual,

and

Richard Ortiz, an individual,

and

International Union, United
Automobile, Aerospace and
Agricultural Workers of
America, AFL-CIO,

       Charging Party,

_____

_____

Place: Oakland, California

Dates: June 11, 2018

Pages: 1 through 165

Volume: 1

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885

22-60493.13



www.escribers.net | 800-257-0885

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 32**

| | |
|---|---|
| In the Matter of:<br><br>TESLA, INC.,<br><br>and<br><br>INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, AFL-CIO,<br><br>and<br><br>MICHAEL SANCHEZ, AN INDIVIDUAL,<br><br>and<br><br>JONATHAN GALESCU, AN INDIVIDUAL,<br><br>and<br><br>RICHARD ORTIZ, AN INDIVIDUAL. | Case Nos.  32-CA-197020<br>32-CA-197058<br>32-CA-197091<br>32-CA-197197<br>32-CA-200530<br>32-CA-208614<br>32-CA-210879 |

The above-entitled matter came on for hearing, pursuant to notice, before **AMITA BAMAN TRACY**, Administrative Law Judge, at the National Labor Relations Board Region 32, 1301 Clay Street, Suite 300N, Oakland, CA 94612-5224, on **Monday, June 11, 2018, 9:20 a.m.**

escribers
www.escribers.net | 800-257-0885

1                          <u>A P P E A R A N C E S</u>

2     **On behalf of the General Counsel:**

3          **EDRIS W.I. RODRIGUEZ RITCHIE, ESQ.**
           **NOAH J. GARBER, ESQ.**
4          National Labor Relations Board
           1301 Clay Street, Suite 300N
5          Oakland, CA 94612-5224
           Tel. 510-671-3021
6
      **On behalf of the Respondent:**
7
           **MARK S. ROSS, ESQ.**
8          **KEAHN N. MORRIS, ESQ.**
           SHEPPARD MULLIN RICHTER & HAMPTON LLP
9          Four Embarcadero Center
           Seventeenth Floor
10         San Francisco, CA 94111-4109
           Tel. 415-434-9100
11         Fax. 415-434-3947

12    **On behalf of the Charging Parties:**

13         **MARGO A. FEINBERG, ESQ.**
           **DANIEL E. CURRY, ESQ.**
14         **JULIE S. ALARCON, ESQ.**
           SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
15         6300 Wilshire Boulevard, Suite 2000
           Los Angeles, CA 90048
16         Tel. 323-655-4700

17

18

19

20

21

22

23

24

25



1                                     **I N D E X**

2

3  **WITNESS**             **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**   **VOIR DIRE**

4  Susan Reed              44          59                                        53

5  Michael Sanchez        74          131          154           155

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



www.escribers.net | 800-257-0885

1                               **E X H I B I T S**

2

3    **EXHIBIT**                              **IDENTIFIED**        **IN EVIDENCE**

4    **General Counsel:**

5      GC-1(a) through 1(yy)                     9                  9

6      GC-1(zz)                                 18                 18

7      GC-2                                     78                 78

8      GC-3                                    104                104

9      GC-4                                     94                 94

10     GC-5                                    115                115

11     GC-6-001                                120                120

12     GC-6-002                                120                120

13     GC-8                                     91                 91

14     GC-31                                    90                 90

15     GC-36                                    84                 84

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          JUDGE TRACY:  Okay.  So the hearing will be in order.

3    This is a formal trial before the National Labor Relations

4    Board in Tesla, Inc. and Michael Sanchez, an individual, and

5    Jonathan Galescu -- I hope I don't mess that up -- an

6    individual, and Richard Ortiz, an individual, and International

7    Union, United Automobile, Aerospace and Agricultural Workers of

8    America, AFL-CIO, cases 32-CA-197020, 32-CA-197058,

9    32-CA-197091, 32-CA-197097, 32-CA-200530, 32-CA-208614, and

10   32-CA-210879.

11         The Administrative Law Judge presiding is Amita Baman

12   Tracy.  I'm assigned to the San Francisco office of the

13   Division of Judges.  Any communication should be addressed to

14   that office, and any requests for extensions of time should be

15   addressed to the Associate Chief Judge in San Francisco in that

16   office.

17         So will counsel and other representatives of the parties

18   please state their appearance for the record?  We'll start with

19   the General Counsel.

20         MR. RODRIGUEZ RITCHIE:  Edris, E-D-R-I-S, W.I. Rodriguez,

21   common spelling, Ritchie, R-I-T-C-H-I-E, with General Counsel.

22         MR. GARBER:  Noah Garber for the General Counsel.

23         JUDGE TRACY:  And for the Charging Party?

24         MR. GARBER:  For the Charging Parties?

25         JUDGE TRACY:  Parties, yes.



1      MR. GARBER:  Okay, yes.  Okay.  Margo Feinberg, Daniel

2  Curry, and Julie Alarcon of Schwartz, Steinsapir, Dohrmann and

3  Sommers for the International Union, United Automobile,

4  Aerospace and Agricultural Implement Workers, Michael Sanchez,

5  Jonathan Galescu, and Richard Ortiz.

6      JUDGE TRACY:  And then for the respondent.

7      MR. ROSS:  Sure.  I am Mark Ross and Keahn Morris here on

8  behalf of Tesla, Inc.

9      JUDGE TRACY:  Okay.  All right.  So if settlement

10  discussions are desired at any time during the trial, I'll be

11  glad to grant a reasonable recess for that purpose.  Trial

12  developments sometimes change attitudes and make settlement

13  possible.  So at any point during this hearing, if anyone wants

14  some time to make some legitimate discussions about settlement,

15  pleases let me know and I'll grant a reasonable recess for

16  that.  And again, you know, as the trial proceeds, there -- you

17  know, things may change people's minds and so they might want

18  to discuss settlement.  And as I said on our different

19  conference calls, that generally settlement is better for the

20  parties in resolving any kind of issues in the workplace and

21  helping everybody kind of refocus back on the mission of the

22  employer and the employees.

23      So are there any preliminary motions before we go onto the

24  next thing?

25      MR. ROSS:  Yes, Judge.  We have a motion, as you know,



1    less than a week ago, counsel for the General Counsel advised

2    the parties that -- seems like a month ago, but it's only a

3    week ago -- that there was going to be an amendment or there

4    was an amendment to the complaint in this matter of the formal

5    documents -- I've got it -- the formal documents have not been

6    offered at this point in time.  So I'm wondering whether it's

7    premature to raise this issue, but we do have a motion to

8    dismiss the amendments that were announced for the first time

9    last Monday afternoon.

10       JUDGE TRACY:  All right.  So -- well, let's -- then we can

11   go ahead and take care of the formal papers.  So I have them.

12   Everybody has a set of the formal papers?

13       MR. RODRIGUEZ RITCHIE:  No, we don't typically provide

14   sets to the parties of the formal papers.  We provide Your

15   Honor with a copy and we have an original copy to be marked.

16       JUDGE TRACY:  Oh, okay.  I've had hearings where pretty

17   much they always give them to all the parties, but that's fine.

18   So I have that the formal papers here are General Counsel's

19   Exhibits 1(a) through 1(yy).  Are there any objections?

20       MR. ROSS:  Ordinarily we are provided with an index.  So I

21   would ask for the customary index on the copies.

22       JUDGE TRACY:  Do you have the index?

23       MR. RODRIGUEZ RITCHIE:  Sure.

24       MR. ROSS:  Thank you.

25       MR. RODRIGUEZ RITCHIE:  I'm providing a copy of the index

escribers
www.escribers.net | 800-257-0885

1    to counsel for respondent Tesla.

2        MR. ROSS:  And Your Honor, as we mentioned before we went

3    on the record, it is our belief and our position that the

4    various motions -- just -- I'm sorry, petitions that were filed

5    with respect to the subpoenas in this matter deserve a place in

6    the formal documents.  You have indicated a desire not to

7    include them.  We understand that, but we have a standing

8    objection to the completeness of the formal documents in light

9    of those documents not appearing in the formal documents.

10        JUDGE TRACY:  Okay.  And any response in terms of the

11    Respondent's objections to the formal papers, not including the

12    subpoenas and the petitions to revoke and my orders?

13        MR. RODRIGUEZ RITCHIE:  Yeah, for the General Counsel we

14    would oppose including, at least at this time, that type of

15    paperwork in the case handling manual with regards to C case --

16    unfair labor practice proceedings.  It very clearly directs

17    that documents relating to subpoena work should not be included

18    in the formal papers.

19        JUDGE TRACY:  And for the Charging Party?

20        MS. FEINBERG:  We're in concurrence with that, though I

21    think at some appropriate time they may be necessary to become

22    part of the record because there may be continuing disputes,

23    but at this time we agree it doesn't need to be part of the

24    original formal documents.

25        JUDGE TRACY:  Okay.  All right.  So I'm going to overrule



1    the respondent's objections and admit General Counsel's

2    Exhibits 1(a) through 1(yy).

3    **(General Counsel Exhibit Number 1(a) through 1(yy) Received**

4    **into Evidence)**

5        JUDGE TRACY:  As I said before off the record, at this

6    point, you have the subpoenas.  These are all things that

7    happened prior to the hearing, the petitions to revoke, the

8    orders that I issued.  However, obviously at some point, if

9    there continue to be a problem, it may be best at that point to

10   enter in those documents in the record.  But at this point in

11   terms of the formal papers, I'm going to overrule the

12   objection.

13       And so now that we have the formal papers in the record,

14   in terms of your motion, go ahead, please.

15       MR. RODRIGUEZ RITCHIE:  Your Honor, I was going to hand

16   the formal papers to the Court Reporter.

17       JUDGE TRACY:  Oh, sure.  Yeah.

18       MR. RODRIGUEZ RITCHIE:  Here you go.

19       MR. ROSS:  Your Honor, I'm handing you a motion to dismiss

20   the amendment, and we are reaching out to our office and asking

21   that they e-file this at this point in time so --

22       JUDGE TRACY:  Okay.

23       MR. ROSS:  -- it's made a part of the thing that shows up

24   on the Internet.

25       JUDGE TRACY:  Okay.



1      MR. ROSS:  And I don't know that you want to hear argument

2  on it.  The document is fairly explicit, and of course counsel,

3  opposing counsels, have not had an opportunity to review it.

4  So it's probably premature to argue it, but I did want to at

5  least --

6      JUDGE TRACY:  So --

7      MR. ROSS:  -- bring this to your attention now.

8      JUDGE TRACY:  Yeah.  And this is the first time that you

9  all are seeing the motion to dismiss.  Obviously, we spoke

10  about it on the conference call that they intended to do that,

11  but you haven't seen their arguments yet.

12      MR. RODRIGUEZ RITCHIE:  That's correct, Your Honor.

13      JUDGE TRACY:  Correct.  So you know, when is the answer

14  due again to that amendment?

15      MR. RODRIGUEZ RITCHIE:  I believe the 18th of June.

16      JUDGE TRACY:  Okay.  All right.  So what I would suggest

17  is that I'm going to rule on the motion to dismiss later --

18      MR. ROSS:  Fine.

19      JUDGE TRACY:  -- so I have a chance to read it, but also

20  to give the General Counsel and the Charging Parties an

21  opportunity to review the motion.  And in particular,

22  obviously, the complaint is owned by the General Counsel.  And

23  so if you would, when you're ready at some point, hopefully by

24  tomorrow, that if you want to orally argue your opposition to

25  the motion to dismiss, you can do that and we can get that in



1    the record.

2        MR. RODRIGUEZ RITCHIE:  I think we'd ask for more time to

3    provide a written opposition to the motion that we just

4    received this morning at 9:30 in the morning.

5        JUDGE TRACY:  Okay.

6        MR. RODRIGUEZ RITCHIE:  I think we'd also point out that,

7    in light of our concluding on Thursday and resuming at some

8    point thereafter, with this type of motion, there's no need to

9    rule on it now.  We can certainly brief it after we conclude on

10   Thursday and Your Honor can prepare here ruling thereafter.

11       JUDGE TRACY:  Okay.  So you know, let me think about this

12   about what to do.  Because your answer isn't due yet, and so

13   let me think about that and I'll let you guys know when I want

14   the opposition, which I'm assuming is an opposition.  So you

15   know, I'm going to hold off ruling on this motion to dismiss.

16   And the amendment, in particular, is 1(tt) of the General

17   Counsel's exhibits.

18       All right.  Are there any other motions at this time or

19   any other items that we need to discuss?

20       MR. RODRIGUEZ RITCHIE:  Yes, Your Honor.  The counsel from

21   the General Counsel received documents this morning and we'd

22   like an opportunity to review the documents before putting on

23   our witnesses in this case.

24       JUDGE TRACY:  Well, I understand that you also received

25   documents on Friday.  And so I think that --



1      MR. RODRIGUEZ RITCHIE:  Just to correct that, Your Honor,

2  we didn't actually receive documents.  We were provided with an

3  opportunity to look at documents and we were not allowed to

4  take the documents or make copies of the documents.  So we

5  didn't actually receive them.

6      JUDGE TRACY:  All right.  So here's what we'll do.  What

7  we'll do is we are going to switch this hearing room now then.

8  And during all the time that we switch the hearing room, you

9  take that time to review the documents.  And then when we're

10  ready to resume in terms of the court reporter, we'll resume.

11  And then you'll use the breaks and the evenings to go through

12  the documents.  That's for everybody.  All right?

13      Any other motions?

14      MR. RODRIGUEZ RITCHIE:  No, Your Honor.

15      MR. ROSS:  No, ma'am.

16      JUDGE TRACY:  Any sequestration motion?

17      MR. ROSS:  Yes.

18      JUDGE TRACY:  Okay.  All right.  So first I'd like to

19  identify who are the necessary parties.  We'll start with the

20  General Counsel.  Do you have anyone?

21      MR. RODRIGUEZ RITCHIE:  No, Your Honor.

22      JUDGE TRACY:  Okay.

23      MR. RODRIGUEZ RITCHIE:  Just the two counsel.

24      JUDGE TRACY:  Okay.  And for the charging parties, do you

25  have anyone?



www.escribers.net | 800-257-0885

1          MS. FEINBERG:  I have Ms. Reed, who represents the

2    International Union UAW.

3          JUDGE TRACY:  And what's her first name?

4          MS. REED:  Susan.

5          MS. FEINBERG:  Susan Reed.

6          JUDGE TRACY:  Okay.

7          MS. FEINBERG:  And currently Mr. Sanchez, who's one of the

8    charging parties.  He's also present.

9          JUDGE TRACY:  Okay.

10         MS. FEINBERG:  Though some of the Charging Parties, as

11   you've heard, Your Honor, are currently working for Tesla and

12   they have to rotate in, but want to participate and have

13   participated in this process --

14         JUDGE TRACY:  Okay.

15         MS. FEINBERG:  -- throughout.

16         JUDGE TRACY:  Well, all right.  So you know, obviously

17   discriminatees can be -- as this case is about them, can be in

18   terms of necessary parties.  What I would appreciate, since

19   they're not here, is that when they are, you announce them and

20   let us know --

21         MS. FEINBERG:  Of course.

22         JUDGE TRACY:  -- so that we all are clear on that.

23         For the Respondent, do you have any -- a necessary party,

24   like a representative of --

25         MR. ROSS:  Yes, we do.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  -- the company.  Okay.

2      MR. ROSS:  We have Mohamed Yusef, who is deputy general

3  counsel.

4      JUDGE TRACY:  Okay.

5      MR. ROSS:  And Jaime Bodiford, who is also with the

6  general counsel's office.

7      JUDGE TRACY:  Jaime?

8      MS. BODIFORD:  Bodiford.

9      MR. ROSS:  Bodiford.

10      JUDGE TRACY:  All right.  So --

11      MR. ROSS:  I'm sorry.

12      JUDGE TRACY:  Yes.

13      MR. ROSS:  And Jay Sharma, right?

14      MR. SHARMA:  Yes, S-H-A-R-M-A.

15      MR. ROSS:  Who is also with the general counsel's office.

16      JUDGE TRACY:  So if anyone changes for all of the parties,

17  like added -- if they're not here then I don't care, but if

18  anybody gets switched out for anyone, please do let us know.

19      So a sequestration order is being issued in this

20  proceeding.  That means all the persons who are expected to be

21  called as witnesses in this proceeding other than the persons

22  designated as essential to the presentation of a party's case

23  will be required to remain outside the courtroom whenever

24  testimony or other proceedings are taking place.  A limited

25  exception applies to witnesses who are alleged discriminatees



www.escribers.net | 800-257-0885

1    in this matter.  They may be present in the courtroom at all

2    times other than witnesses for the General Counsel or a

3    charging party are giving testimony about the same events about

4    which the alleged discriminatees expect to testify.

5        The sequestration order also prohibits all witnesses from

6    discussing with any other witness or any possible with the

7    testimony he or she has already given or will give.  Likewise,

8    counsel for a party may not disclose to any witness the

9    testimony of any other with.  Counsel may, however, inform his

10    or her own witness of the content of testimony given by any

11    opposing party's witness to prepare to rebut that witness'

12    testimony.  And it's the responsibility of counsel to see that

13    they and their witnesses comply with the sequestration rule.

14        So you all, you know, please monitor that.  This is a long

15    hearing that's going to span the course of months.  Not that

16    the hearing will take that long, but you know, it applies to

17    the whole time period.  I think at this point what we'll do to

18    make sure everyone hears everything, is we'll go off the

19    record.  We'll switch to the hearing room.  It might be a bit

20    of a tight fit, but we'll have to make it work, and then we'll

21    do the opening statements unless you all want to do them now.

22        MR. RODRIGUEZ RITCHIE:  I'm using technology for mine,

23    Your Honor.  So I'd need time to set it up anyway.

24        JUDGE TRACY:  Is it set up for now?

25        MR. RODRIGUEZ RITCHIE:  Well, I have to set it up on my

escribers
www.escribers.net | 800-257-0885

1   computer, but -- and then I'd have to ask you to move a little

2   bit to use the screen behind you.  But if you'd like, we can

3   certainly do that.

4       JUDGE TRACY:  Well, do you need that technology for later

5   today?

6       MR. RODRIGUEZ RITCHIE:  Yeah.

7       JUDGE TRACY:  For today?

8       MR. RODRIGUEZ RITCHIE:  Potentially with a witness, yes.

9       JUDGE TRACY:  Okay.  Well, why don't --

10      MR. RODRIGUEZ RITCHIE:  I just need a couple of minutes to

11  set it up if you want to do it now before we move.

12      MS. FEINBERG:  Yeah.  My concern is, if we're moving in

13  part because of Mister -- just to be respectful of Mr. Ross'

14  hearing, it just seems like we should do opening statements --

15      JUDGE TRACY:  Well, I think it --

16      MS. FEINBERG:  -- when everyone can hear it.

17      JUDGE TRACY:  Like let's be clear too.  I'm also having a

18  tough time hearing.

19      MS. FEINBERG:  All right.  So that's why I'm just

20  saying --

21      JUDGE TRACY:  I'm using the loudest voice I can possibly

22  use.  I could see the --

23      MS. FEINBERG:  So I'm just saying maybe we could do -- we

24  could be in a place where everyone can hear when we do opening

25  statements.  I mean we're already, but it just seems like if

22-60493.29

1   we're going to -- if there's going to be a disruption --

2      JUDGE TRACY:  Yeah, yeah.  And to be fair, I mean, we're

3   all, I think, having trouble hearing, especially when you're

4   looking at me and not each other.  So --

5      MS. FEINBERG:  Yes, exactly.

6      JUDGE TRACY:  -- let's go off the record.  Let's move to

7   the third floor hearing room.

8      MR. GARBER:  The third floor.

9      JUDGE TRACY:  Third floor?

10      MR. RODRIGUEZ RITCHIE:  Yes, A.

11      MR. GARBER:  Yeah, third floor.  If you look at our

12   office, it's directly to the left side, left-hand side.

13      JUDGE TRACY:  To the left, yeah.  And let us know about

14   tomorrow San Francisco.

15      MR. RODRIGUEZ RITCHIE:  Yes.

16      JUDGE TRACY:  Okay.  Thank you.  All right.  We'll go off

17   the record.

18   (Off the record at 9:37 a.m.)

19      JUDGE TRACY:  All right.  So we're back on the record.  I

20   just want to remind everybody that there is a sequestration

21   order in effect.  So at this point, any witnesses that are not

22   identified as necessary parties, they need to go and leave the

23   hearing room.

24      One thing before we do any of the opening statements is

25   that the Respondent had submitted his motion to dismiss.  It



1   needs to be identified for the record so it can be part of the

2   formal papers.  So it will be General Counsel's Exhibit 1(zz).

3   Any objections to the motion to dismiss?

4       MS. FEINBERG:  Coming into the record?  No.

5       JUDGE TRACY:  Okay.

6       MS. FEINBERG:  To the substance, yes.

7       JUDGE TRACY:  All right.  So the General Counsel's Exhibit

8   1(zz) is admitted into evidence.

9   **(General Counsel Exhibit Number 1(zz) Received into Evidence)**

10      JUDGE TRACY:  And so now we can start with the General

11  Counsel's opening statement.

12      MR. RODRIGUEZ RITCHIE:  Prior to that, Your Honor, we --

13      JUDGE TRACY:  Okay.

14      MR. RODRIGUEZ RITCHIE:  -- did have one note on the record

15  that we received a document production that appears to be

16  largely non responsive to our request.  We'll proceed at this

17  time with putting on our opening statement and witnesses, but

18  we do want to make sure Your Honor knows that there may be a

19  dispute later on in terms of responsiveness.  We haven't

20  received any native format, emails that were requested, for

21  example, and it may prejudice the General Counsel's case, and

22  we may be required to recall people to the extent the documents

23  are produced later on that haven't been produced as of today

24  when they were required to be produced.

25      JUDGE TRACY:  So what I would request is that during all



1    of the breaks and all of this that you all keep talking and

2    working out this issue, and obviously bring it to my attention

3    if it hasn't been resolved and if it's an ongoing thing.  And

4    so you know I ask that you do that.

5        MR. RODRIGUEZ RITCHIE:  Sure. Just for the record, I did

6    speak with Mr. Morris during the break moving between rooms

7    about some of the missing information and was told that the

8    search was ongoing.

9        JUDGE TRACY:  Okay.

10       MS. FEINBERG:  Okay.  Thanks.

11       JUDGE TRACY:  Yeah.  So continue talking --

12       MS. FEINBERG:  And --

13       JUDGE TRACY:  -- and then obviously I'm going to urge you

14   continue to keep talking and before getting me involved, but I

15   will get involved if I have to.

16       MS. FEINBERG:  And we echo that with respect to our

17   subpoena, which also the documents aren't identified by

18   request.  So we're busily trying to figure out what's what.

19   But there clearly seems to be some gaps, but we'll continue

20   working.

21       JUDGE TRACY:  Okay.  All right.  Shall we start with your

22   opening statement, please?

23       MR. RODRIGUEZ RITCHIE:  Okay.  Tesla.  Tesla's an auto

24   manufacturer that employs over 30,000 employees with a

25   production facility for vehicles in Fremont, California, and a

eScribers
www.escribers.net | 800-257-0885

1    battery production factory located in Sparks, Nevada, among its

2    many operations.  Tesla's Fremont Boulevard facility is located

3    at 45500 Fremont Boulevard in Fremont, California, and employs

4    over 15,000 employees alone.  The Sparks facility is located in

5    Sparks, Nevada just outside of Reno.

6        Among the vehicles that Tesla produces are the Model S,

7    the Model X, and the Model 3 cars.  Tesla's chief executive

8    officer is Elon Musk, and its human resources operations are

9    run by Ms. Gaby Toledano, chief people officer.

10       Our story begins here in the summer of 2016 when workers

11   of the Tesla Fremont facility began reaching out to the United

12   Auto Workers.  During the summer of 2016, workers began

13   speaking with the organizers, began speaking with each other,

14   and began meeting with each other with one goal in mind:

15   representation by the United Auto Workers of Tesla Fremont.

16       Workers met together during the summer, and ultimately the

17   Driving A Fair Future at Tesla campaign was born.  With the

18   help of the organizers, workers launched a public Facebook

19   campaign, a public website was launched, and workers continued

20   to meet with each other.  In 2016, Tesla, as part of its new

21   hire documents, required employees to sign a confidentiality

22   agreement.

23       Then in the latter part of 2016, Tesla adopted a new

24   confidentiality agreement.  Mark Lipscomb, the then-director of

25   human resources, began emailing employees asking employees to

eSscribers
www.escribers.net | 800-257-0885

1    sign the confidentiality agreement.  He did so on November 2,

2    2016.  He did it again on November 3, 2016.  He did it on

3    November 5th at 9:52, and again 20 minutes later at 10:12 a.m.

4        The new confidentiality agreement Tesla asked employees to

5    sign electronically, but it also asked employees to physically

6    sign the document, holding meetings with employees, telling

7    them that they needed to sign this agreement.  During one of

8    these meetings in November of 2016, one human resource business

9    partner, Mr. David Zwieg, refused to allow an employee to take

10   a picture of the agreement that he had just signed.

11       Now, the General Counsel alleges that several portions of

12   the confidentiality agreement are unlawful.  First, the General

13   Counsel assert that when Tesla told its employees that

14   everything about employees that they work on, learn about, or

15   observe in their work about Tesla is confidential, that that

16   was overly broad.  Second, the General Counsel asserts that

17   when Tesla told its employees that it was never okay to

18   communicate with the media or someone closely related to the

19   media about Tesla, that that was overly broad in violation of

20   Section 8(a)(1) of the Act.

21       Third, the General Counsel asserts that when Tesla told

22   its employees that they could not discuss confidential

23   information with anyone outside of Tesla, that that was an

24   overly broad provision that violates Section 8(a)(1) of the

25   Act.  And fourth, the General Counsel asserts that when Tesla

1  told its employees in 2016 that they could not write about

2  their work in any social media, blog, or book, that that was

3  overly broad in violation of Section 8(a)(1) of the Act.  Tesla

4  also told its employees that if they violated this

5  confidentiality agreement, that they would lose their

6  employment or be subject to possible criminal prosecution.

7      Over the course of 2016 and into the early parts of 2017,

8  the Driving A Fair Future at Tesla campaign continued.  Workers

9  continued meeting with each other, speaking with each other

10  until one employee, Jose Moran, took one giant leap forward.

11  On February the 9th, 2017, Jose Moran published a blog on

12  Medium.com, and when five simple words ignited a campaign:

13  Time for Tesla to listen.

14      Now, on February the 10th, 2017, workers of the Tesla

15  Fremont facility began leafletting in the morning hours of

16  February the 10th.  These workers were on their off-duty time

17  leafletting to off-duty workers in the Tesla parking lot.

18  Workers did this and were approached and had numerous

19  interactions with security guards.  During these interactions

20  with security guards, the guards demanded that the workers show

21  their badges.  Some multiple times within minutes of each

22  other.  And when the workers complied with the request, the

23  guards told them to go home, to leave.  This happened in the

24  back entrance to the Tesla Fremont facility.  It happened at

25  door 1, it happened at door 2, and it happened at door 3.

escribers
www.escribers.net | 800-257-0885

1        In March of 2017, workers began distributing stickers to

2   each other at the Tesla Fremont plant, and workers began

3   distributing business cards to each other telling employees

4   where they could go to get more information about the campaign.

5   Also in March 2016 (sic), a supervisor, Mr. Armando Rodriguez,

6   told employees that they could not distribute to each other

7   things unless they were Tesla approved, and threatened the

8   employees with termination if they continued to distribute

9   matters that were not Tesla approved.

10       In April 2017, workers requested Cal/OSHA 300 logs.  You

11   will hear that Cal/OSHA 300 logs are logs that workers are

12   entitled to request as a matter of right under California state

13   law.  Any worker is allowed to request it, and workers are

14   allowed to share this information with each other and their

15   representatives.

16       When Tesla provided the information to the workers, Tesla

17   slapped confidential on the documents.  When the workers told

18   Tesla that they were confused about the confidential marker,

19   Tesla told them exactly what Tesla was concerned about.  They

20   were concerned that the information would be shared.

21       On May 24, 2017, workers leafleted again at the Tesla

22   Fremont facility.  This time the workers leafleted about

23   injuries at Tesla.  Once again, you'll hear that the workers

24   leafleted on their off-duty time to off-duty workers in the

25   Tesla parking lot.  And once again, the badges were demanded.

22-60493.36



1    And when workers complied, they were told to leave.

2        Also, exactly on May 24, 2017, you'll hear the human

3    resources business partner, Lisa Lipson, an environmental

4    health safety and sustainability specialist, Lauren Holcomb,

5    interrogated two employees, asking them who they had shared

6    information about workplace injuries at Tesla.

7        During this same time, workers were circulating a petition

8    to each other, asking their co-workers to sign the petition,

9    which was about workplace safety concerns and also about

10   unionizing at Tesla.  This petition was delivered to Josh

11   Hedges, Director of Human Resources for Manufacturing, on June

12   the 6th, 2017.  The very next day, on June 7, 2017, workers

13   were summoned by Elon Musk and Gaby Toledano to meet with them

14   to discuss the petition and safety concerns.

15       During this meeting, Ms. Toledano told the employees that

16   nobody at Tesla Fremont wanted a union, and told employees --

17   asked employees, "Why would you want to pay Union dues"?

18   During this same meeting, Mr. Musk offered the employees a role

19   in safety at Tesla.  And Mr. Musk told the employees to give

20   him a chance to address safety concerns, and if he didn't

21   address them, they could have their union.

22       During this same time, over the summer of 2017, workers at

23   the Tesla Fremont facility also were using the Driving a Fair

24   Future at Tesla stickers on their clothing and on their various

25   gear.  You'll hear testimony that the various departments at



1    Tesla, one of which is the general assembly area, now the

2    general assembly area requires that their employees wear Tesla

3    team wear.  100 percent cotton, black shirts, just like the one

4    I'm holding and the one in our PowerPoint.

5        The Tesla team wear policy, which the General Counsel

6    asserts is overly broad, allows employees -- requires employees

7    to wear that, and allows employees to substitute out all black

8    clothing for the Tesla team wear on three conditions:  Tesla

9    requires the general assembly production associates have

10   mutilation free clothing, work appropriate clothing and have

11   the clothing pose no safety risks.

12       Now, in August 2017, at the direction of production unit

13   leader Kyle Martin, manager Tope Ogunniyi and supervisor Tim

14   Fenelon began enforcing the Tesla team wear policy, began

15   telling employees to take their all black cotton shirts off.

16   The shirt that Mr. Fenelon and Ms. Ogunniyi were trying to --

17   were telling employees to take off and threatening employees to

18   send them home if they didn't take off was this shirt.  The

19   Driving a Fair Future at Tesla shirt.  Also an all black shirt,

20   also 100 cotton.

21       Meanwhile, at the Tesla Sparks facility in Sparks, Nevada,

22   supervisor Dave Teston and manager McIndoe, in separate

23   conversations with an employee, separately told an employee

24   that he couldn't wear a union hat, and told the employee that

25   he couldn't discuss concerns with other workers.


22-60493.38

1      On October the 18th, 2017, as the General Counsel alleges,

2   Tesla terminated Richard Ortiz for his protected activities.

3   And October the 19th, 2017, Tesla gave a verbal and a written

4   warning to Jose Moran for his protected activities.

5      Tesla contracts with a company called Workday to provide

6   access to its employees with various features of the Workday

7   system, which includes leaving feedback for employees, sending

8   messages to employees, signing documents, and a directory of

9   sorts, provides employees the ability to search for employees,

10   look at their work pictures, look at their job titles, and look

11   at their chain of command.

12      You'll hear testimony that in a later part of the summer of

13   2017, workers went to the California State Legislature to meet

14   with legislatures about a bill that was pending.  Workers

15   discussed their workplace concerns at Tesla and requested

16   together that the legislature add a provision in the bill that

17   would tie tax incentive rebates to Tesla complying with labor

18   lawyers.

19      On September the 14th, 2017, after other -- after a public

20   hearing was held and Tesla employees went to go testify against

21   these workers, Jose Moran logged onto Workday with his personal

22   phone, using his own log-in credentials to look up employees.

23   Jose Moran took screenshots of the pictures, names, and job

24   titles of these individuals and sent them to Jose Moran -- sent

25   them to Richard Ortiz, who posted two of the screenshots onto

escribers
www.escribers.net | 800-257-0885

1    Facebook with a comment.  Mr. Ortiz posted these onto a private

2    Facebook group made up of Tesla only employees, named Tesla

3    Employees for UAW Representation.  The comment, as Her Honor

4    will hear, was a comment about getting passed over at Tesla.

5    The posting was taken down, and an investigation ensued at

6    Tesla by a newly hired Ricky Gecewich.

7        Mr. Gecewich spoke with these individuals.  Mr. Gecewich

8    was aware of their union activities and their other protected

9    concerted activities, and Mr. Gecewich ultimately terminated

10   Mr. Ortiz and ultimately gave warnings to Mr. Moran for their

11   protected activities.

12       At the conclusion of the hearing and through its post-

13   hearing briefs, the General Counsel will ask Her Honor to find

14   that through all of these actions, Tesla violated

15   Section 8(a)(1) and 8(a)(3) of the Act.

16       JUDGE TRACY:  So Ms. Feinberg, is the Charging Party ready?

17       MS. FEINBERG:  Yep, I'm ready.

18       JUDGE TRACY:  Okay.

19       MS. FEINBERG:  Well, first, Your Honor, thank you to the

20   General Counsel, and I don't want to repeat everything he said.

21   And of course, since I didn't know what he was going to say --

22   I don't have a beautiful PowerPoint like him, so I will proceed

23   the old fashion way.

24       So Your Honor, we believe that this is actually a very

25   simple case in many ways.  I mean, we all know it's unlawful



www.escribers.net | 800-257-0885

1   for an employer to interfere with, restrain, coerce employees

2   in exercise of their rights.  We all know that.  We know that

3   includes participating in meetings or discussing joining the

4   union, distributing and reading and discussing union

5   literature, wearing union buttons and stickers, circulating

6   petitions, joining together, and organizing.  And really that's

7   what this case is about.  They're just the basic, simple things

8   that are protected by the Act.

9       And as the General Counsel's represented, in the summer of

10  2016 a number of workers started to organize and meet with the

11  UAW because they wanted to have their concerns addressed.  And

12  the Company became aware of that.  And soon thereafter, after

13  those efforts started to burgeon, the Company issued this

14  nondisclosure agreement, which also my colleague was kind

15  enough to post on the wall a moment ago.

16      But I would just like to highlight that that agreement

17  really created a chilling effect on the workers, and workers

18  can talk about that, which is they were told not to communicate

19  with the media about anything, they were told not to talk

20  outside the Company about everything, including things related

21  to employees, they were told that this -- to do so was on pain

22  of discipline or discharge, they were told not to write

23  anything on media -- social media or blogs, and they were told

24  that if they did, they should check with management or HR

25  before doing so.  Which, of course, they don't have to if

escribers
www.escribers.net | 800-257-0885

1    they're engaged in protected activity.

2    And also they were asked to do it over and over again.  And

3    so obviously the point was being driven home that violating

4    this or saying anything about Tesla in any way would have

5    serious consequences.

6    Jose Moran, a very brave worker who is employed and has

7    been employed for over five years at Tesla, decided to put out

8    a statement about the conditions in Tesla and why workers

9    should come together.  I should be clear about Mr. Moran and

10   the other workers.  They are not anti-Tesla, no.  They believe

11   in Tesla.  They want Tesla to succeed.  But they want to make

12   sure that it's the best Tesla could be, that they have fair

13   working conditions.  Many of the people in the plant have

14   worked in the auto industry before, they know what safety

15   conditions are, many of them have been safety officers, and

16   they just want to make sure that they are being treated fairly,

17   fair compensation, that they reap the benefit that the Company

18   does.  They work hard.  They're very skilled workers.  And that

19   they should be treated with such respect.  And that was

20   basically what Mr. Moran was saying.

21   In response to the nondisclosure agreement and Mr. Moran's

22   comments, the workers decided to leaflet the plant with a

23   statement that the California assembly had written to Tesla

24   about these very concerns, that they were concerned about this

25   confidentiality agreement, that not only that it violated the



22-60493.42

1    federal law, but it violated California labor law.  And they

2    put Tesla on notice.  And nothing changed.  So the workers took

3    that statement and the statement by Mr. Moran, and they

4    leafleted.

5         But in so doing, they faced additional challenges.  They

6    were surveyed, their badges were photographed over and over

7    again, they were told that they didn't belong on property.

8    They were told to leave.  And I don't know if it was clear to

9    you from the photo, but, you know, this wasn't -- this was

10   happening at the doorways to the plant as people were going in

11   and out at shift change, which is traditional, appropriate

12   conduct by people engaged in trying to communicate with other

13   workers.  And this didn't only affect the workers, who you'll

14   hear from, who were leafleting, but these comments by the

15   security guards and telling them to leave and that they didn't

16   belong there were happening in front of other workers.  So it

17   had an impact in general about whether this is appropriate or

18   not.

19        And once this blog became public, Mr. Moran himself became

20   a target, a target actually not by low-level supervision, not

21   by someone -- even high-level supervision; he became a target

22   by Mr. Elon Musk himself.  And so Mr. Musk went to the media

23   and was reported as saying that Mr. Moran was not an employee

24   of Tesla, that he was an employee of the UAW, and he was doing

25   this at their bidding.  That he was hired into the plant as --

www.escribers.net | 800-257-0885

1    at the UAW's bidding.  But that is not true.  And that when

2    happened then, that it's not true, he is long term -- he'd

3    already been with the plant almost five years at the time.

4        This also created reverberations in the plant because

5    people thought, "What?  Jose?  We like him.  He's a well-

6    respected worker.  What's happening?"  This is significant

7    because, as you'll find out towards the end of this story,

8    Mr. Moran is disciplined, he's targeted, he's called in a

9    number of times.  And so he was the focus of concerns raised

10   by -- raised by Tesla.

11       But despite that, the workers went on.  They leafleted.

12   You'll hear about various workers who leafleted, and what

13   happened to them.  They asked for these OSHA logs, as you heard

14   about, and they were told, rebuffed, and they were -- had to

15   repeatedly request that information before it would become

16   available to them.

17       They were speaking out in a variety of places, in the

18   California legislature and others places.  And they became

19   aware that some of their co-workers were not necessarily with

20   them, and they wanted to talk to them or talk -- and so forth.

21   And so they did talk about it in a private blog, not some -- in

22   a private Facebook, not something open to the public.  And

23   there's nothing really unlawful about the workers talking about

24   that.  And the names that they talked about were people whose

25   names were already open to the public, who themselves had

escribers
www.escribers.net | 800-257-0885

1    identified with Tesla, who itself had put their photos out into

2    the world.

3        And so there was nothing confidential about their

4    identities either.  And yet this was the gotcha moment for

5    Tesla.  And as a result, Mr. Ortiz, who had been one of the

6    people picketing and asking for the safety reports and the

7    like, was terminated for that conduct, that concerted activity

8    and protected activity.  And similarly, Mr. Moran, who you

9    heard of at the beginning, was disciplined.  And so much so --

10       Once again, I'd like to highlight Mr. Musk's targeting of

11   these workers, because in his latest Tweet in May indicated

12   that the only known union person fired was a guy who repeatedly

13   threatened nonunion supporters verbally and on social media,

14   and lied about it.  Which isn't true.  It isn't the reasons he

15   was given.  He was told he was breach -- there was a breach of

16   the confidentiality agreement.  But here it is, Mr. Ortiz

17   publicly identified effectively by Mr. Musk in his Tweets.

18       So what we see is a very heavy-handed antiunion campaign

19   that's affected all levels of the -- of the workers' day-to-day

20   lives.  And as Mr. Rodriguez Ritchie pointed out, so much so

21   that they were told they couldn't wear union T-shirts, they

22   couldn't put up -- couldn't distribute union stickers, they

23   couldn't distribute union cards.  And so there was basically

24   this tone that if you do, there were serious consequences.

25       And so we take this -- all of this very seriously.  We're



1    glad to finally have an opportunity to present this to you.

2    And we look forward to presenting our witnesses.  Thank you.

3        JUDGE TRACY:  All right.  Mr. Ross, are you going to give

4    your opening statement now?

5        MR. ROSS:  Your Honor, I ordinarily don't do an opening

6    statement, but I think given the things I just heard, I'm going

7    to make some preliminary comments, if I may.

8        JUDGE TRACY:  All right.

9        MR. ROSS:  First of all, it is obvious that opening

10   statements, for those who are not lawyers in the room --

11   obviously you are and you know this -- but opening statements

12   are not evidence and they are not fact.  They're accusations.

13   And you know from having heard these cases before, it's one

14   thing to accuse somebody of something, it's something entirely

15   different to prove wrongdoing.

16       The fact of the matter is that Tesla is a company that

17   values its employees, it committed to compliance with the law,

18   and is dedicated to the health and safety of the workplace.

19   That's a fact.

20       And so when I hear what's been said here, I ask myself why

21   is this being said?  And I can only assume -- and I think

22   Ms. Feinberg referred to a gotcha moment, and that's what this

23   trial is; it's a gotcha moment.  Because the fact is, that the

24   UAW has been attempting to organize this Company for some

25   period of time, apparently without much success, and this



1     entire trial is an infomercial in an effort to place Mr. Musk

2     and the Company in a negative light.

3          When you hear the evidence, you will understand what

4     happened in this case as opposed to the accusations that have

5     not been proven.  And we are confident that you will reach an

6     appropriate decision in this matter, and dismiss this case.

7          Now, General Counsel -- and I do applaud him.  I'm most

8     impressed with the presentation he did.  I wish I could do

9     that.  But he has listed a whole litany of alleged violations.

10    But what he has failed to mention -- and I mention this now

11    because I think it's important for this case to have a proper

12    context -- is all of the other allegations that had been

13    leveled against Tesla over the last 14 months, allegations

14    which even this Region found to be without merit and

15    dismissed -- and I don't have a PowerPoint to list all of

16    those, so I'm going to do it in Ms. Feinberg's way, the old

17    fashion way, and I ask you to please bear with me because I

18    think it's important that you have the context of not only the

19    things that they have talked about, but I want you to have a

20    context of what this investigation alleged and this litigation

21    has covered, and the things that are not in front of you.  Why?

22    Because Tesla was exonerated in this.  There was no evidence to

23    support the allegations that the Union made against it.

24         So let me just list, if I may, the various allegations that

25    were leveled against the Company and dismissed.

escribers

www.escribers.net | 800-257-0885

1      MR. RODRIGUEZ RITCHIE:  I think, Your Honor, we would

2  object to that, that it would never come in as evidence into

3  this hearing.  Indeed, there was only one dismissal letter in a

4  matter that isn't even here before you.  So it certainly --

5  though we provide leeway in opening statement, and typically

6  it's about evidence that will be introduced into the record,

7  not about matters that won't be introduced into the record.

8      JUDGE TRACY:  So I'm going to overrule the objection.

9  Again, this is opening statements.  And you all had your

10  chance.  And I also know what is evidence and what isn't in

11  this event.  But I'm going to allow them to do their opening

12  statement as they perceive.  Okay?

13      MR. ROSS:  Thank you, Your Honor.

14      The following had been alleged and dropped or dismissed by

15  the Region.  These are charges that were leveled against Tesla

16  and found to be unsubstantiated, unproved.  On February 9th,

17  2017, the Employer, through Juan Martinez, interrogated an

18  employee regarding the employee's protected concerted

19  activities and/or union activities.  The allegation was

20  dismissed.

21      On February 13th, the Employer, through Juan Martinez,

22  interrogated an employee regarding the employee's protected

23  concerted activity or union activities and made implied

24  promises of benefits to the employee.  That allegation has been

25  dismissed.

22-60493.48

1     MS. FEINBERG:  Excuse me, Your Honor, but these aren't the

2     charges.  I know you're allowing a lot of leeway here, but I

3     don't know what really Mr. Ross is even referring to,

4     because --

5     MR. ROSS:  I'll be happy to explain.

6     MS. FEINBERG:  Okay.

7     MR. ROSS:  I'm reading from letters received from General

8     Counsel, Mr. Rodriguez Ritchie --

9     MS. FEINBERG:  Okay.

10    MR. ROSS:  -- where he lists the allegations that have been

11    made against my client.

12    MS. FEINBERG:  I see.  Well, we're not privy to that.

13    But --

14    MR. ROSS:  Okay.

15    MS. FEINBERG:  -- that's not --

16    JUDGE TRACY:  So there's not --

17    MS. FEINBERG:  Okay.

18    JUDGE TRACY:  -- going to be any cross-talking.

19    MS. FEINBERG:  Okay.  Okay.  Sorry, Your Honor.

20    JUDGE TRACY:  Do you understand?

21    MS. FEINBERG:  Yes, Your Honor.

22    JUDGE TRACY:  So you can address me.  This is their

23    opening.  Let them do it so we with move on.

24    Go ahead --

25    MS. FEINBERG:  Okay.



22-60493.49

1        JUDGE TRACY:  -- please.

2        MR. ROSS:  Thank you, Your Honor.  The Union also

3    complained about Tesla engaging in what it described as a mass

4    layoff of employees at Tesla in order to discourage employees

5    from engaging in Section 7 protected activities or retaliation

6    for engaging in union activities, including the filing of the

7    charges in this matter.  That allegation was dismissed.

8        Additionally, it was alleged that the Company terminated

9    the following individuals in retaliation for engaging in

10   protected concerted activities and your union activities.  The

11   following individuals are Jayson Henry, Juan Guadalupe Reyes,

12   Juan Maldonado, Mike Williams, Tim Cotton, Brandon Hill, Eric

13   Vasquez, Stephen Barbosa.  All of those allegations were

14   dismissed.

15       It's further -- it was further alleged that on or about

16   June 29th and 30th, by Vannick Ly and Lehi Gomez, audited the

17   work of Branton Phillips and provided verbal and written

18   negative feedback in relation -- in retaliation for engaging in

19   protected concerted activities and/or union activities.  That

20   allegation was dismissed.

21       On October 20, 2017, by Paul James giving Jonathan Galescu

22   a negative performance review in retaliation for engaging in

23   protected concerted activities or union activities and/or board

24   activities, including having filed charges with the Board.

25   That allegation was dismissed.



1    In or about August 2017, by Paul James on two occasions

2    creating an impression of surveillance by implying that he had

3    reviewed an employee's notebook.  That allegation was

4    dismissed.

5    In or about July or August 2017, by Tope Ogunniyi -- and

6    I'm sorry if I mispronounced that name -- discriminatory -- I'm

7    sorry.  I withdraw that.

8    On October 2, 2017, by -- I think it's pronounced --

9    Thuy -- T-H-U-Y -- Truong -- T-R-O -- T-R-U-O-N-G -- a verbal

10   and written reprimand of Juan Maldonado for having two late --

11   late ends in retaliation for engaging in protected converted

12   activity and/or union activities.  That allegation was

13   dismissed.

14   In October 2017, terminating Dezzimond Vaughn in

15   retaliation for engaging in protected concerted activities or

16   union activities.  That allegation was dismissed.

17   In connection with each of the above-referenced

18   terminations in October 2017 offering an employee or employees

19   a severance agreement containing an overly broad

20   confidentiality policy and no disparagement policy.  That

21   allegation was dismissed.

22   Within the Section 10(B) period, by Ricky Hofrichter,

23   Jeremie Hansen, and Gregory Slettvet, instructed Tesla security

24   guards to surveil employees engaged in protected concerted

25   activities and/or union activities.  That allegation was


22-60493.51

1    dismissed.

2        On or about July 22 -- by the way, all of those prior

3    allegations that were dismissed occurred allegedly at the

4    Fremont facility.

5        Now we turn to allegations associated with the Nevada --

6    the factory in Nevada.

7        On or about July 22, 2017, by and through supervisors Josh

8    Surgeon and Shawn Gaines, violating Sections 8(a)(3) and (1) of

9    the Act, Charging Party alleges that Surgeon and Gaines issued

10   a warning letter to an employee in retaliation for that

11   employee's protected concerted activities and/or union

12   activities.  That allegation was dismissed.

13       On or about August 24, 2017, by and through supervisor

14   Matthew Stewart, violating Sections 8(a)(1) of the Act,

15   specifically the Charging Party alleges that Stewart was

16   engaged in surveillance of employees and created the impression

17   of surveillance by standing approximately five feet away from

18   two employees working at an auditing station on the model three

19   line.  That allegation was dismissed.

20       On or about August 30, 2017, by and through Tyler Ash,

21   violating Section 8(a)(1) of the Act, specifically the Charging

22   Party alleges that Ash was engaged in surveillance of employees

23   and/or created the impression of surveillance by attending the

24   full orientation training meeting for employees.  That

25   allegation was dismissed.



www.escribers.net | 800-257-0885

1    On or about August 31, 2017, by and through supervisor

2    Tyler Ash, violating Section 8(a)(1) of the Act, specifically

3    the Charging Party Union alleges that Ash was engaged in

4    surveillance of employees and/or created the impression of

5    surveillance by standing approximately 15 feet away from three

6    employees who work on the model three line.  That allegation

7    was dismissed.

8    Since on or about September 8 and continuing to present,

9    the Employer violated Section 8(a)(1), specifically Charging

10   Party alleges the Employer engaged in surveillance of employees

11   and/or created the impression of surveillance by installing

12   cameras with microphones in the work area.  That allegation was

13   dismissed.

14   On or about September 14th, 2017, Matthew Stewart and

15   Roderick Stevens violated Section 8(a)(1), specifically the

16   Charging Party alleges that Stewart and Stevens engaged in

17   surveillance of employees and/or created the impression of

18   surveillance by standing about five feet from two employees

19   working on the model three line.  That allegation was

20   dismissed.

21   And last but not least, on November 2, 2017, by and through

22   supervisors and managers of the Employer, including, but not

23   limited to Dave Teston and Cindie Reneau, violating Sections

24   8(a)(3) and (1), specifically the Union alleges that the

25   Employer issued a lower performance review of an employee in



22-60493.53

1    retaliation for that employee's protected concerted and/or

2    Union activities.  That allegation was dismissed.

3        Now, I appreciate your indulgence here, Your Honor.  You've

4    heard the allegations leveled against us.  I ask you to keep in

5    mind the allegations that were investigated by the Region and

6    dismissed where the Company was found not to have violated the

7    law, and to keep that in context as well as to keep in context

8    with the fact -- and I mention this especially because I think

9    it's important to impress here today -- for them to understand

10   that the Union is engaged in a campaign that is intended to

11   place Mr. Musk and the Company in a negative light because the

12   Union wants to use this proceeding as an infomercial.

13       Now, we have a great thing in this country called the First

14   Amendment.  And I think it's the most important thing in this

15   country.  But I ask everybody, including yourself, to recognize

16   and remember it's one thing to accuse somebody and something

17   entirely different to prove it.

18       As witnessed by the 27 allegations that were leveled

19   against this Company, none of which had merit and which were

20   dismissed, at the end of the evidence in this case, we are

21   confident that you will reach the same conclusions as to the

22   matters that are subject of the complaint in this matter.

23   Thank you very much.

24       JUDGE TRACY:  Thank you.  All right.  So we'll start with

25   our first witness, but let's take a ten-minute break.



www.escribers.net | 800-257-0885

1    MR. RODRIGUEZ RITCHIE:  As just a matter that we'd like to

2    raise on behalf the General Counsel, we were informed by the

3    regional office that there are photographers outside of the

4    hearing room taking photographs of people.  So we'd request

5    that you prohibit the taking of such pictures in light of the

6    fact that it could be intimidating to employee witnesses that

7    are here to provide testimony.

8    JUDGE TRACY:  Well, when we were off the record, there was

9    one person who had a camera, and she came up to me and asked

10    me, and I said there will be no photos taken.  She asked me if

11    there could be photos outside of the room.  I said no.  The

12    thing about it is they're not in this room.  So they're not

13    going to hear me if they're outside of this room.  So I'd just

14    say for the record that there are no photographs to be taken

15    inside and outside of the this hearing room.  I can't control

16    who's outside of the hearing room.  That's not my area.  So if

17    the Region wants to let them know that the Judge has ordered,

18    they can do that.

19    MR. ROSS:  And Your Honor, for the record, we have no idea

20    who these people are, and they are not here on our urging or

21    instance.

22    JUDGE TRACY:  Yeah.

23    MR. ROSS:  Thank you.

24    JUDGE TRACY:  Thank you.  For the record, yes.

25    So the Region can do that, to let them know.  I've already



1    told anyone that I see with a camera.  And I keep saying that

2    there's no recordings of the hearing.  We have an official

3    transcript.  Anyone can pay for that and get that official

4    transcript.  You can take notes.  But there are no photos, no

5    videotaping inside and outside of the hearing room.

6        MR. RODRIGUEZ RITCHIE:  Thank you, Your Honor.

7        JUDGE TRACY:  Okay.  So let's go off the record for

8    about -- it's like 11:05.  I'd say that's a bit fast.  So let's

9    go by that clock.  Let's start at 11:25 with your first

10   witness, and then we'll do that for a bit and then we'll take

11   our lunch break.  Okay.  So we're off the record.

12   (Off the record at 11:06 a.m.)

13       JUDGE TRACY:  Okay.  Go ahead and call your first witness,

14   please.

15       MR. GARBER:  Okay.  The General Counsel calls Ms. Susan

16   Reed.

17       JUDGE TRACY:  Okay.  All right.  Go ahead and raise your

18   right hand, please.

19   Whereupon,

20                          **SUSAN REED**

21   having been duly sworn, was called as a witness herein and was

22   examined and testified as follows:

23       JUDGE TRACY:  Okay.  Go ahead.  Have a seat.  State your

24   name and title for the record.

25       THE WITNESS:  Susan Reed, International representative,

22-60493.56



1    UAW in Ashland.

2         JUDGE TRACY:  Okay.  One second.  Go ahead.

3                    **DIRECT EXAMINATION**

4    Q    BY MR. GARBER:  Ms. Reed, are you currently employed?

5    A    Yes.

6    Q    Where do you work?

7    A    The United Auto Worker's Union.

8    Q    About how long have you worked for the Union?

9    A    About eight years.

10   Q    And what your job title with the Union?

11   A    International representative.

12   Q    Are you familiar with Tesla?

13   A    Yes.

14   Q    And you're familiar with Tesla's Fremont facility?

15   A    Yes.

16   Q    Does the Union currently have a campaign to represent

17   Tesla's employees at the Fremont facility?

18   A    Yes.

19   Q    Did you have a role in that campaign?

20   A    Yes.

21   Q    And what was your role in that campaign?

22   A    I was the lead organizer.

23   Q    Are you still the lead organizer?

24   A    Not currently.

25   Q    About when did that end, your role as the lead organizer?



www.escribers.net | 800-257-0885

1    A    At the end of April I transferred to our education

2    department.

3    Q    April of this year?

4    A    Yes.

5    Q    Okay.  Now as the Union's former leader of the organizing

6    campaign, are you familiar with the organizing activities that

7    went on at Tesla?

8    A    Yes.

9    Q    And as part of this campaign, have you and other

10   representatives met with Tesla's Fremont employees?

11   A    Yes.

12   Q    Around when did the Union start to meet with Tesla's

13   Fremont employees?

14   A    The first time I met with workers at Tesla was in June of

15   2016.  I met with -- the first worker I met with in person was

16   Jose Moran.

17   Q    And on average, while you were the lead organizer, how

18   often did these meetings occur between Union representatives

19   and Tesla employees?

20   A    Pretty regularly, and kind of like building frequency

21   after that point, so often.

22   Q    Would you say daily?

23   A    Probably daily.  It kind of depended on the point of the

24   campaign.  But early on, you know, we're building a network out

25   of workers.  So kind of grew from the very beginning.



1    Q    Sure.  What was the purpose of these meetings?

2    A    I mean, the main purpose was to talk to workers just to

3    kind of hear them, to listen about what was going on at the

4    plant, what they wanted to change, what they liked about

5    working at Tesla.  A lot of people had concerns about health

6    and safety, of course, so we were hearing a ton of stories

7    about injuries that workers had, you know, had happened at the

8    plant.  We had a lot of people coming to us with questions

9    about compensation, favoritism, job promotions.  A lot of even

10   things that people just felt were unfair at the company, and

11   also some things that they liked that they wanted to maintain

12   in the long run.  So you know, we talked to them about all of

13   those issues.  We would talk to them about how collective

14   bargaining can play a role in, you know, addressing these

15   issues.  And also, just kind of a -- a lot of education on

16   their rights.  You know, I want to know my right, obviously, of

17   you know, if they're allowed to speak about the Union, about

18   where they're allowed to distribute flyers, the process, how

19   the Union is formed, all that kind of stuff.

20   Q    Did the Union help establish a voluntary organizing

21   committee among Tesla's Fremont employees?

22   A    Yes.

23   Q    And around when was that created?

24   A    From day one.

25   Q    And again, what was the purpose of this voluntary


www.escribers.net | 800-257-0885

1  organizing committee, to the extent that you haven't already

2  told us?

3  A    Sure.  So the voluntary organizing committee, or we call

4  it VOC a lot.

5  Q    Sure.

6  A    It's essentially, a committee of workers that act as like

7  the leaders or the organizers inside the plant to form the

8  Union.  So we look for people who are well-respected, who are,

9  you know, good workers to be part of the committee to go out

10  and you know, learn about what it means to be a Union and how

11  it works and to go network with and talk to their coworkers.

12  Obviously, you know, as an organizer, I don't have access to go

13  inside the plant, unless the company were to give me that

14  permission.  So the workers then go and they, you know, there's

15  10,000 people to talk to, right.  So the volunteer organizing

16  committee is -- are the people that go and sort of spread the

17  word.

18  Q    Okay.  Now as part of this campaign, in September of 2016,

19  did the Union create a social media page?

20  A    Yes.

21  Q    And what did the Union create?

22  A    We created a Facebook page called, "A Fair Future at

23  Tesla."

24  Q    And is this Facebook page that was created by the Union,

25  was it public or private?



1    A    It's public.

2    Q    And what was the purpose of the Facebook page?

3    A    A place for workers to comment and share information with

4    each other, to post news, things that were going on at the

5    company.

6    Q    And to your knowledge, did Tesla employees post public

7    comments on that page?

8    A    Pretty often.

9    Q    Okay.  As part of the campaign at Tesla, did employees

10   leaflet outside of the Fremont facility?

11   A    Yes.

12   Q    And around when did the leafletting start?

13   A    The -- well, there was some leaflets floating around, not

14   outside the facility, but beforehand, mostly about their rights

15   to form a Union.  But starting in February, after Jose Moran's

16   blog was posted, the very next day, or maybe the same day I

17   guess, there was a flyer that went out with his blog on one

18   side and on the flip side there was a letter from the

19   California Assembly that was addressed to Tesla, you know,

20   about the confidentiality policy because there were a lot of

21   concerns in the plant at that time about the confidentiality

22   policy.  So that was the first flyer that went out and workers

23   passed it out outside the plant.  And then after that, many

24   more times.

25   Q    Okay.  In your estimation, while you were the lead



www.escribers.net | 800-257-0885

1  organizer, about how many times did employees or even reps

2  leaflet outside the facility?

3  A    Probably more than 20.

4  Q    And have Tesla employees distributed Union flyers inside

5  the Fremont facility?

6  A    Yes.  We tell them if they're going to pass it about

7  inside the plant to do it in nonworking areas on nonwork time.

8  Q    And have Union representatives or Tesla employees

9  distributed other materials besides flyers to Tesla employees

10  outside the facility?

11  A    Yes.

12  Q    What other materials were distributed?

13  A    T-shirts, we pass out a lot of those t-shirts that we saw

14  earlier.  There were stickers that went out with a logo on it,

15  business cards, popsicles.

16      MR. ROSS:  I'm sorry, I couldn't hear that.  What was that

17  word?

18      THE WITNESS:  Popsicles.

19      MR. ROSS:  Popsicles.  Popsicles?

20      THE WITNESS:  Yeah.

21      MR. ROSS:  Okay.

22      JUDGE TRACY:  So one thing I would like, I mean, if you

23  can't hear, just -- you know, just sort of object, but it's not

24  really an objection.

25      MR. ROSS:  Sorry about that.



www.escribers.net | 800-257-0885

1       JUDGE TRACY:  That's all right.

2       MR. ROSS:  Sure.  Sure.

3    Q    BY MR. GARBER:  Okay.  So you've told us you were the lead

4    organizer in this campaign until recently, and you obviously,

5    have knowledge or the organizing activities.  So in your

6    estimation, while you were the lead organizer, about how many

7    flyers did the Union distribute to employees during its various

8    leafletting efforts?

9    A    Thousands for sure.  Each time we would make thousands of

10   copies generally, so a lot.

11   Q    Okay.  And again, in your estimation, while you were the

12   lead organizer, about how many t-shirts would you say the Union

13   distributed to Tesla employees?

14   A    Also a lot.  I think the first run of t-shirts was about

15   400 and they were gone in like an hour outside the plant.  So

16   we've since run more t-shirts several more times.

17   Q    And did Tesla employees and Union reps stand outside the

18   entrances with Union posters or banners while you were the lead

19   organizer?

20   A    Uh-huh.  Yes.

21   Q    Was this done at shift change?

22   A    Yes.

23   Q    Are you familiar with someone named Jose Moran?

24   A    Yes.

25   Q    And who's Jose Moran?



1    A    As I mentioned before, Jose is the first worker that I

2    actually met with in person at Tesla.  He's been a member of

3    our volunteer organizing committee and very out front involved

4    in the campaign.

5    Q    Okay.  So you mentioned he's a member of the volunteer

6    organizing committee.  Did he also write posts on the Union's

7    Facebook page you already told us about?

8    A    Yes.

9    Q    And did Mr. Moran leaflet outside Tesla's Fremont

10   facility?

11   A    Yes.

12   Q    To your knowledge, has Mr. Moran ever been employed by the

13   UAW?

14   A    No.

15   Q    Familiar with Elon Musk, the CEO of Tesla, right?

16   A    Yes.

17   Q    And I'm assuming you're also familiar with the social

18   media platform, Twitter?

19   A    Yes.

20   Q    Have you ever read tweets from Mr. Musk's Twitter account

21   that were about the Union or Tesla employees?

22   A    Yes.

23        MR. ROSS:  Objection.  Relevance, as well as hearsay.

24        MR. GARBER:  If I could be given a little leeway, I'm

25   going to get to it.  I'm going to introduce an exhibit that



1    goes to the termination of an employee and the cause of the

2    term -- or the reason behind the termination.

3            MR. ROSS:  I can't know what he's going to offer.

4            MR. GARBER:  That's fine.

5            MR. ROSS:  All I can say is that the question calls for

6    hearsay and it's irrelevant.

7            MR. GARBER:  Well, I asked if she had ever read tweets.

8            JUDGE TRACY:  So I'm going to overrule the objection, but

9    go ahead and tie it up with the complaint, please.

10            MR. GARBER:  Okay.  Sure.

11    Q    BY MR. GARBER:  So I'm going to show you a document marked

12    GC Exhibit 38.

13            MR. ROSS:  GC Exhibit?

14            MR. GARBER:  38.

15            MR. ROSS:  Thank you.

16            MR. GARBER:  Sure.

17    Q    BY MR. GARBER:  Take a look at that and let me know when

18    you're done.

19    A    I'm done.

20    Q    Okay.  Do you recognize this tweet?

21    A    yes.

22    Q    And you've seen it before?

23    A    Yes.

24    Q    Did you see this tweet on or about the date indicated on

25    it, May 20th of 2018?



www.escribers.net | 800-257-0885

1    A    Yes.

2        MR. GARBER:  Okay.  Your Honor, I move to admit this into

3    evidence as General Counsel Exhibit 38.

4        MR. ROSS:  May I voir dire the witness?

5        JUDGE TRACY:  Yes.

6        MR. ROSS:  Thank you.

7                        **VOIR DIRE EXAMINATION**

8    Q    BY MR. ROSS:  Ms. Reed, this tweet, you have to bear with

9    me, I'm very twentieth century.  I don't tweet.  I don't

10   Facebook.  I don't know this stuff, so if I ask a stupid

11   question please, I apologize.  But this tweet that you've

12   identified as General Counsel's Exhibit 38, was that something

13   that was in response to somebody else's tweet?

14   A    It may have -- oh, yeah, it was.  It was replying to the

15   three people at the top there.

16   Q    I see.  And do you know any of those three people?

17       MR. GARBER:  I would object as to relevance.

18       JUDGE TRACY:  Well, this is the -- I'm going to overrule

19   the objection.  Go ahead.

20   Q    BY MR. ROSS:  And do you know any of those three people?

21   A    No.

22   Q    You don't.

23   A    Not personally.

24   Q    Excuse me?

25   A    I said, no, I don't know any of these people personally.


www.escribers.net | 800-257-0885

1    Q    Okay.  And did you see the tweets that Mr. Musk's tweet

2    was in response to?

3    A    I did.

4    Q    You did.

5    A    At the time, uh-huh.

6    Q    Okay.  And do you recall what those tweets said to which

7    he was responding?

8    A    I could guess at it because --

9    Q    No, I don't want you guessing.

10   A    -- I read a lot of tweets that day.  So --

11   Q    I don't want you guessing.

12   A    I know it was in response to people commenting about the

13   campaign and issues workers were raising at the plant.

14   Q    I see.  And if I wanted to see what those tweets were that

15   he was responding to, how would I go get those tweets?

16   A    You would go to Twitter.  And you would -- you could

17   probably make it easy and Google this tweet.  And then go up

18   the chain of replies.

19   Q    Okay.  And were there tweets subsequent to the message

20   that the General Counsel Exhibit 38?

21   A    There were a lot of tweets after that.

22   Q    Lots of tweets.

23   A    Yeah.

24   Q    Okay.

25   A    Before and after about the Union coming out of Elon Musk's



1    account that day.

2    Q    Uh-huh.  Okay.

3         MR. ROSS:  I'm going to object to the exhibit on relevance

4    grounds.

5         MR. GARBER:  I'd respond that in the answer to the

6    complaint, Respondent admits that CO -- or that Elon Musk is

7    the CEO of the company, and he's commenting directly on a

8    terminated employee that is at issue in this case.  And it

9    talks about the reason for his termination, so it's directly

10   relevant to what we're talking about, the section 81 and 83

11   claims.

12        JUDGE TRACY:  You know, I'm going -- and what was the date

13   of this?  May 20th?

14        THE WITNESS:  May 20th, 2018.

15        JUDGE TRACY:  2018.  Okay.  You know, I'm going to

16   overrule the objection and admit General Counsel's Exhibit 38.

17   Yeah.  That's --

18        MR. GARBER:  Okay.  Thank you.  One second, Your Honor.

19        MR. ROSS:  Your Honor, while counsel is conferring, I

20   don't want to belabor the point, but Mr. Musk has not been

21   alleged to have engaged in any substantive wrongful act, except

22   for the amendment, which is subject to our motion and we have

23   not responded to it yet.  So at least as the case is presently

24   postured, we believe that testimony as to Mr. Musk, who has not

25   been shown to have been a participant in whatever may or may



www.escribers.net | 800-257-0885

1    not have happened with respect to this person, is irrelevant.

2        In addition to which anything really pertaining to his

3    personal beliefs, opinions, I believe are not only irrelevant,

4    but in light of the fact that they don't contain any facts --

5    or strike that -- don't contain any threats or promises of the

6    benefit, under section 8C, they can't be evidence of an unfair

7    labor practice.  So on that grounds as well, there's not a

8    promise or a threat in this document.  I believe it's

9    irrelevant and should be stricken.

10       JUDGE TRACY:  yeah.  And you know, and so I -- you know,

11   as I said before, I overruled the objection; however, I do note

12   what your objections are.  For this, in particular, it could

13   be, and I say this that I would renew the objection in the

14   post-hearing brief as well.  This is very early on in this

15   hearing for me to see the connection, as well, with --

16   obviously, we -- I mean, there is a lot yet to happen in this

17   case.  And so that's why I'm allowing it in at this point.  I

18   do note your -- the basis for your objection.  I tend to agree

19   with you, but on the other hand, I am going to allow it at this

20   time.

21       MR. ROSS:  Okay.

22       JUDGE TRACY:  And you can, again, renew it in the brief.

23   But in the end, obviously, we understand that -- I understand

24   what needs to be proven when it comes to these various

25   allegations.  And there can be things that happen externally

22-60493.69



1    and it's really connecting the dots here with, you know, any

2    alleged discrimination or any of these 8(a)(1) allegations.

3       MR. ROSS:  Rather than belabor the point further, would it

4    be appropriate for us to simply take a standing exception or

5    objection to testimony of any mention of Mr. Musk?  Or do you

6    want us to do it on a question-by-question basis?

7       JUDGE TRACY:  I think you're going to have to do it

8    question by questions.

9       MR. ROSS:  All right.  Thank you.

10      JUDGE TRACY:  Yeah.  Okay.  Go ahead, please.

11      MR. GARBER:  If I could just have a minute.  This is going

12   to be very brief.

13      JUDGE TRACY:  Yeah.

14      MR. GARBER:  Just in response because it's going to come

15   up in briefs, there is no 8C issue.  If you look at the last

16   sentence of the brief, it relates directly to the termination

17   of the employee at issue.  It's not an opinion.  It's a reason

18   for termination.  That's all I'll say on that.  I have no

19   further questions for the witness.

20      JUDGE TRACY:  Okay.

21      MS. FEINBERG:  No questions at this time.

22      JUDGE TRACY:  No questions?

23      MS. FEINBERG:  At this time.  I'll wait.  Perhaps --

24      JUDGE TRACY:  Mr. Ross?

25      MR. ROSS:  Yeah, a couple.  Do we have an affidavit for



1     this witness?

2          MR. GARBER:  Yes.

3          THE WITNESS:  Oh, can you take my phone number off.

4          MR. ROSS:  I don't think -- I can't.

5          MS. FEINBERG:  So Your Honor, the question the witness is

6     asking is that when she gave her phone number she gave her

7     personal phone number, went into the affidavit and she didn't

8     want that to become part of the public record.

9          JUDGE TRACY:  So this does not become part of the public

10    record.  This is an affidavit that I'm assuming you gave to the

11    Board during its investigation, correct?

12         MR. GARBER:  Correct.

13         JUDGE TRACY:  And so under our rules and procedures,

14    they've asked for a copy -- not a copy of it, but they've asked

15    to review it.  So they review it, and then they give it back.

16    So your affidavit won't be in this record here.

17         MS. FEINBERG:  Okay.  And there's an understanding her

18    number will not be copied for any other purpose?

19         JUDGE TRACY:  Right.

20         MS. FEINBERG:  Okay.  Thank you.

21         JUDGE TRACY:  Please don't copy her number.

22         MS. FEINBERG:  Thank you.

23         JUDGE TRACY:  How many pages is the affidavit?  Pretty

24    lengthy it looks.

25         MS. FEINBERG:  There's a lot of exhibits.



1      MR. ROSS:  The affidavit itself, Your Honor --

2      MR. GARBER:  Ten.

3      MR. ROSS:  -- is nine pages --

4      JUDGE TRACY:  Okay.

5      MR. ROSS:  -- and then there's --

6      JUDGE TRACY:  So let's go off --

7      MR. ROSS:  -- many exhibits.

8      JUDGE TRACY:  All right.  Let's go off the record.  Let us

9   know when you are ready.

10      MR. ROSS:  Okay.  I tend to be -- not only am I hard of

11   hearing, but I tend to be a slow reader, so I apologize.

12      JUDGE TRACY:  Okay.  So let us know when you're ready.

13   Maybe about 20 minutes?

14      MR. ROSS:  Yeah, that'd be fine.

15      JUDGE TRACY:  Okay.  Fifteen, 20 minutes.

16      MR. ROSS:  Thank you.

17      JUDGE TRACY:  So we're off the record.  You're free to get

18   up.  Just please don't discuss your testimony with anyone until

19   after the close of the hearing, of course.  Okay.  Thank you.

20   (Off the record at 11:39 a.m.)

21      JUDGE TRACY:  Okay.  Mr. Ross, go ahead, please.

22      MR. ROSS:  Thank you, Your Honor.

23                    **CROSS-EXAMINATION**

24   Q    BY MR. ROSS:  Ms. Reed, you said that you were the head

25   organizer for a period of time?



www.escribers.net | 800-257-0885

1    A    Yeah, the lead organizer.

2    Q    Lead organizer.  Thank you.  And you stopped doing that in

3    mid-April of this year?

4    A    End of April, uh-huh.

5    Q    Okay.  And is there a lead organizer now?

6    A    Yeah, there's a team, so --

7    Q    Okay.  When you stopped being the lead organizer, who took

8    over your responsibilities as the lead organizer?

9    A    It was kind of disbursed among different people --

10   Q    How many other people?

11   A    -- many of those responsibilities.  It depended on the

12   task --

13   Q    I see.

14   A    -- that I was responsible for.

15   Q    Okay.

16   A    I knew in advance that I was going to be taking this

17   transfer, so I made sure that it was a smooth transition.

18   Q    Okay.  And would you tell us what a lead organizer's

19   responsibilities and duties are, please?

20   A    Sure.  Well, my responsibility from the very beginning was

21   to really strike the campaign here.  To meet with workers early

22   on and to make sure they understood what to expect.  You know,

23   there were kind of reasonable expectations of what they would

24   have to do as a VOC to go out and talk to their coworkers and

25   to really build a network in the plant to be successful in



1     forming a union.  So I was responsible with them talking with

2     workers and like helping them understand what their role was in

3     the campaign, mentoring them, so they would be able to actually

4     be a functioning union when the campaigns over and they win.

5     And then, you know, mentoring staff, various pieces of the

6     campaign that I was responsible for.

7     Q    Okay.  Was it your responsibility to establish a means or

8     protocol by which workers could reach out to the Union, have

9     contact with the Union?

10    A    Yeah.

11    Q    Okay.  And did that call for workers to be able to reach

12    the organizers by use of emails?

13    A    Did that -- I'm sorry, I didn't understand --

14    Q    Well, did you give them an email address say --

15    A    -- the question.  Do we have an email address?

16    Q    Well, did you give the workers an email address where they

17    could reach out to you and contact you?

18    A    I think there's one printed on the business card, yes.

19    Q    Okay.  Okay.  And the -- does the business card refer to

20    an individual Union representative by name, or is it just a

21    generic business card?

22    A    It's a generic for the campaign.

23    Q    Okay.  Okay.

24         JUDGE TRACY:  And try not to talk over one another.

25    Sorry, it's for the transcript.


www.escribers.net | 800-257-0885

1      MR. ROSS:  No.

2      THE WITNESS:  Oh, I'm sorry.

3      JUDGE TRACY:  It'll get cut off and then it will not make

4  any sense.

5      MR. ROSS:  Okay.

6  Q    BY MR. ROSS:  Okay.  So aside from communicating with the

7  organizers by means of internet address, did you give workers

8  your telephone number?

9  A    Uh-huh.  Yes.

10  Q    Okay.  And during your organizing, did workers communicate

11  with you or with the Union by use of this internet address?

12  A    Are you talking about the email address?

13  Q    Yes.

14  A    The one, the Tesla campaign email address?

15  Q    Well, it's the one that's on the card.

16  A    Not too often.

17  Q    Not too often.

18  A    Some -- I mean, very infrequently.

19  Q    Infrequent.  Okay.  Never?

20  A    I wouldn't say never, no.

21  Q    Okay.

22  A    But not often.

23  Q    Okay.  So the individuals who took over the lead

24  organizer's responsibilities, could you list who they are,

25  please?



1    A    There's several people.  Do you want me to list the entire

2    team of organizers?

3    Q    Well, I'd like you to tell me, you must have been awfully

4    good at what you did --

5    A    Uh-huh.

6    Q    -- because it took many people to replace you.  Let me

7    hear who --

8    A    I would say the primary person responsible in my -- like

9    since I've left is Jorje Hernandez (phonetic).

10        MS. FEINBERG:  Excuse me, I'd like to interject an

11    objection.  All -- she left in April, which is after the period

12    of time of this complaint.  So what does it matter who took

13    over for her afterwards?

14        MR. ROSS:  I'll withdraw the question.  That's fair

15    enough.  I'll withdraw the question.

16        JUDGE TRACY:  Okay.

17    Q    BY MR. ROSS:  Tell me, I think you said that there were

18    other instances after February 10th when there was leafletting

19    outside the plant?

20    A    Yes.

21    Q    And I think you said that occurred on like 20 occasions,

22    more than 20 occasions?

23    A    That's a rough estimate, yes.

24    Q    Okay.  Okay.  And were you present on the property at any

25    time during any of the leafletting?



1    A    I have been before, but not generally.

2    Q    Okay.  You were not there, though, on February 10th, were

3    you?

4    A    No.

5    Q    Okay.  Now I think you said that you told the employees

6    who wanted to distribute stickers and things to people that

7    they shouldn't do that during worktime or in work areas; is

8    that what you told them?

9    A    Yeah.  I said that we always tell them to, if they're

10   going to distribute anything inside the plant that it's in

11   nonworking areas on nonworking time.

12   Q    And that's -- why do you tell them that?

13        MR. GARBER:  Objection.  Relevance.

14        MR. ROSS:  I'll withdraw the question.

15        JUDGE TRACY:  Okay.

16   Q    BY MR. ROSS:  Oh, you said that Mr. Musk said that Mr.

17   Moran worked for the UAW?  Is that what you testified to?

18   A    I don't know if I said that, but yes, he did.

19   Q    Okay.  Did you ever hear Mr. Musk make that statement?

20   A    I never heard him say that.

21   Q    Uh-huh.

22   A    I saw it printed in the newspaper.

23   Q    I'm sorry?

24   A    I saw it printed in the paper.

25   Q    I see.  But you never heard him make that statement.  What



22-60493.77

1    you're testifying to is what you read in the paper?

2    A    Correct.

3    Q    Okay.

4         MR. ROSS:  I'm going to move to strike that testimony as

5    hearsay, Your Honor.  What's reported in the paper doesn't

6    necessarily mean it was said, and it's inadmissible hearsay.

7    Move to strike.

8         JUDGE TRACY:  All right.

9         MR. GARBER:  We would like --

10        MS. FEINBERG:  I mean, it's what she's on notice of, Your

11   Honor.  Which is -- and it is a public statement.

12        MR. ROSS:  That is not relevant, Your Honor.  In so far,

13   it's being offered for a statement they're trying to attribute

14   to the CEO of the company, it's hearsay.  Pure, rank hearsay.

15        MR. GARBER:  It's also the subject of the subpoena, which

16   we have yet to receive.

17        MS. FEINBERG:  So I would -- yes.  We would like to --

18        JUDGE TRACY:  Subject to the subpoena?

19        MR. GARBER:  It's some of the documents that we requested

20   through the subpoena, which we still haven't received from

21   Respondent.  The communications from Mr. Musk to news media

22   outlets.

23        JUDGE TRACY:  Okay.

24        MR. GARBER:  And then what's your --

25        MS. FEINBERG:  That's why we'd like you to wait to reserve

1    because we're waiting on documents.

2        JUDGE TRACY:  Okay.

3        MS. FEINBERG:  Because the quote in the paper is that they

4    received a written communique from Mr. Musk that they're

5    probing from, which is what we're trying to get.

6        JUDGE TRACY:  Okay.  So at this point, I'm going to

7    overrule the objection; however, you know, we'll see what

8    happens in terms of the subpoena and the documents.

9        MR. ROSS:  Well, in so far as the subpoena called for us

10   to produce newspaper articles, it's still hearsay.

11       MS. FEINBERG:  We're not asking for newspaper --

12       MR. ROSS:  So I don't believe that the subpoena is really

13   pertinent to the objection I'm making.  The witness has

14   testified that Elon Musk uttered certain words.  She did not

15   hear those words uttered.

16       JUDGE TRACY:  Right.

17       MR. ROSS:  She is not somebody who is competent to testify

18   to that.

19       MR. GARBER:  I also think that that misstates the

20   testimony.  I don't know that she actually said that --

21       JUDGE TRACY:  And so that is where my difficulty is is

22   that I don't recall her saying that on direct --

23       MS. FEINBERG:  I think it was --

24       JUDGE TRACY:  -- examination.  And we can't go back and

25   really replay it.  however, let me put it to you this way, if



www.escribers.net | 800-257-0885

1    it is certain that the testimony was, and she's just said that

2    she has not heard it herself, she read it, then I agree with

3    you that it is hearsay and that can be, again, addressed in my

4    decision.  The problem I'm having, actually, is thinking did

5    she say that in her direct?

6       MR. ROSS:  They -- well, I did write it down.  And what

7    she said was that Mr. Musk represented that Mr. Moran did not

8    work for -- he really worked for the UAW.  She testified about

9    it in such a way as to suggest that Mr. Musk made that

10   statement.  She's not competent to testify as to the statement

11   he made because she's admitted that she didn't hear him make

12   the statement.  So it is inadmissible hearsay.

13      MS. FEINBERG:  I --

14      JUDGE TRACY:  Yes.  Okay.

15      MR. ROSS:  I've made my point, I don't want to belabor it.

16      JUDGE TRACY:  Yes.  So thank you.

17      MS. FEINBERG:  Okay.  So two points, Your Honor.

18      JUDGE TRACY:  Well, I've heard it.

19      MS. FEINBERG:  Okay.  Okay.  Fine.

20      JUDGE TRACY:  I've heard it.  I don't need anything else.

21      MS. FEINBERG:  All right.  Okay.  Thank you.

22      JUDGE TRACY:  Yeah.  Go ahead, please, Mr. Ross.

23      MR. ROSS:  Thank you.  That's all I have.  Thank you.

24      JUDGE TRACY:  Okay.  Any redirect?

25      MR. GARBER:   No questions from the General Counsel.



1      JUDGE TRACY:  All right.  Well, thank you very much.

2  Please don't discuss your testimony until after the close of

3  the hearing.

4      THE WITNESS:  Okay.

5      JUDGE TRACY:  Okay.  Leave that there and they'll take

6  care of it.  Okay.  So let's go ahead and go off the record for

7  a few things, and then we'll take a lunch break.  And then

8  we'll resume.

9  (Off the record at 12:05 p.m.)

10      JUDGE TRACY:  All right.  So before we go to the General

11  Counsel's next witness, let's discuss a few of the things on

12  the record in terms of outstanding issues.  At the beginning of

13  the start of the hearing there was the motion to dismiss the

14  second amendment to the complaint that was filed by the

15  Respondent.  I note for the record that on June 18th the answer

16  is due and so as a result of that I'm giving the General

17  Counsel and the Charging Party until the close of business June

18  22nd to file any oppositions to that motion to dismiss.

19      Also at that time I will take a look at the Charging

20  Party's opposition to the subpoena, ad testificandum that I've

21  already issued in terms of the order, but I will reconsider it

22  after taking a look at --

23      MS. FEINBERG:  Thank you, Your Honor.

24      JUDGE TRACY:  -- your opposition.  And so then after that,

25  because there is a break in resuming the hearing, I'll issue a

www.escribers.net | 800-257-0885

1     written order about that motion to dismiss.

2          As for tomorrow, the building, as far as we know, is still

3     open, and so I am going to be here early and the sooner

4     everybody can get here, let's say by 8:00 a.m., everyone's

5     here, then we'll start at that time and then we can end a

6     little bit earlier because I guess the significant traffic is

7     anticipated to between 9:00 and 2:00 or 3:00, and so we'll try

8     to do that.  I would avoid -- well, figure out how you're going

9     to get here, but just get here.

10          The third thing is that, of course, I want to note for the

11     record and it's part of the formal papers, that there was the

12     special appeal to the Board about my denial of the video

13     testimony of one of the witnesses.  We're going to wait to hear

14     from that and that will also -- we'll see what happens with

15     that.

16          The other thing that we talked about was the resumption.

17     We've now set aside two more weeks for this hearing.  Hopefully

18     it should be done by that point, so after -- it will end this

19     Thursday about midday, June 7th, and then we will resume this

20     hearing on September 24th, 2018 here in Oakland at 9:00 a.m.

21     We'll be going all week, through the end of the week of

22     September 28th, and then we'll resume, if needed, October 9th

23     in Oakland at 9:00 a.m. through the -- through October 12th.  I

24     can't imagine it going any longer than that.  In fact, it

25     shouldn't even take all those days, but we'll see how it goes

1    and we'll assess as we go along.

2        So how about your next witness?

3        MR. ROSS:  Before we begin with that, Your Honor --

4        JUDGE TRACY:  Oh, yes.

5        MR. ROSS:  -- I have a question I want to --

6        JUDGE TRACY:  Yeah.

7        MR. ROSS:  -- understand something.  During the lunch hour

8    I took a look at General Counsel's complaint and was thinking

9    about the opening that was made and the testimony from Ms. Reed

10   and I want to be sure that everybody -- that I am on the same

11   page as General Counsel.

12       General Counsel highlighted certain language in what he

13   called the second confidentiality agreement as being what the

14   General Counsel's considered to be overbroad language, and I

15   want to make sure that that is the only overbroad language that

16   we're having to confront in this case.

17       JUDGE TRACY:  How about to be clear for the record, you

18   read that -- you understand -- let's be clear about which part

19   is overbroad from the General Counsel and the confidentiality

20   statement.

21       MR. RODRIGUEZ-RITCHIE:  I think we've alleged that in the

22   complaint about it being something more appropriate for

23   briefing later on, but --

24       JUDGE TRACY:  It's not really for briefing.

25       MR. RODRIGUEZ-RITCHIE:  -- we've already alleged that --



1      JUDGE TRACY:  I think it's important to note for

2    everybody's purposes which part of the --

3      MS. FEINBERG:  But it's explicit, Your Honor.

4      JUDGE TRACY:  -- rule is overbroad.  I just want to be

5    clear.  I understand.

6      MR. ROSS:  I'm just asking -- I just want to be given what

7    is plain notice of what's in dispute in the case.

8      JUDGE TRACY:  Yeah.

9      MR. ROSS:  That's all I'm asking.

10     JUDGE TRACY:  So you're saying it was from the second --

11   or the -- the second --

12     MR. ROSS:  Well, counsel for the General Counsel showed

13   you a confidentiality agreement and then he talked about the

14   second confidentiality agreement and it was from --

15     JUDGE TRACY:  Okay.

16     MR. ROSS:  -- that second confidentiality agreement that

17   there were certain lines and phrases highlighted, and I want to

18   be assured that that's -- those are the only texts that are in

19   dispute in this litigation.

20     MR. RODRIGUEZ-RITCHIE:  So my response would be that the

21   allegations pertaining to that are contained in paragraph 7A of

22   the second amended complaint.  Those are the provisions that

23   the General Counsel asserts are unlawful and violate the Act.

24     JUDGE TRACY:  Okay.

25     MR. RODRIGUEZ-RITCHIE:  And nothing --



www.escribers.net | 800-257-0885

1       MS. FEINBERG:  They're on the top of page 6, Your Honor.

2       MR. ROSS:  But no other document -- no -- nothing else

3   pertaining to the confidentiality; is that correct?

4       MR. RODRIGUEZ-RITCHIE:  Just that one that's alleged, Mr.

5   Ross.

6       MR. ROSS:  Thank you.  Okay.

7       MS. FEINBERG:  Could I -- I will -- I mean, we're in an

8   administrative hearing.  We don't know what will come up.  We

9   haven't seen all of the discovery yet, so I can't say that we

10  might not argue something about other things that have been

11  produced, but this is what the complaint is about.

12      JUDGE TRACY:  Yeah, and I understand.  And, you know, your

13  role here -- this is the General Counsel's --

14      MS. FEINBERG:  Yes, I appreciate that.

15      JUDGE TRACY:  -- complaint, and so the theory that I am

16  going to go on in the complaint is what they're -- what

17  they're --

18      MS. FEINGBERG:  Correct.

19      JUDGE TRACY:  -- pushing forward on.  So we're not going

20  to have alternate theories here.

21      MS. FEINBERG:  I didn't --

22      JUDGE TRACY:  And that's all I want to be clear about,

23  too.  Okay.

24      MS. FEINBERG:  I didn't apply that, Your Honor.

25      JUDGE TRACY:  And it is very important --



www.escribers.net | 800-257-0885

1       MS. FEINBERG:  I'm just saying that we are in an

2   administrative hearing and to try to lock someone in to every

3   word of the complaint when things occur and you can amend to

4   proof in administrative hearing, just seems like I -- seemed

5   premature to me, especially since there's still discovery

6   coming.  But as I pointed out, it's on the top of page 6, so I

7   don't disagree.

8       JUDGE TRACY:  Yeah.  So my point, and of course is, you

9   know, it -- obviously the Employer needs to understand as well

10  what they're defending here, but on the other hand, I too, as

11  the Judge, need to know what language it is that's found to be

12  overbroad, and so I just appreciate just being clear about, at

13  this point, what the complaint, which paragraphs we're talking

14  about when you've highlighted two different parts.

15      MR. ROSS:  And the other clarification --

16      JUDGE TRACY:  And that's fine.

17      MR. ROSS:  -- I'm asking for, Your Honor, is I want to be

18  certain that we are simply dealing with a facial validity

19  challenge, that there's no allegation or ascertain that the

20  confidentiality agreement that's at issue in this case, there's

21  no claim that it was rolled out or implemented in response to

22  the Union organizing.

23      JUDGE TRACY:  At this point what is the complaint?   Does

24  the complaint allege anything?

25      MR. RODRIGUEZ-RITCHIE:  If Mr. Ross' question, as I



www.escribers.net | 800-257-0885

1    understand it, is that whether we're pursuing an allegation

2    that it's been promulgated in response to a campaign?  The

3    answer is, no, as Mr. Ross is very well aware.

4        MR. ROSS:  Thank you for that clarification.

5        JUDGE TRACY:  All right.  Your witness.

6        MR. RODRIGUEZ-RITCHIE:  Yes.  The General Counsel calls

7    Michael Sanchez.

8        JUDGE TRACY:  Okay.  And then we have an exhibit up here,

9    so why don't you take that?

10        All right.  Go ahead and raise your right hand, please.

11    Whereupon,

12                        **MICHAEL SANCHEZ**

13    having been duly sworn, was called as a witness herein and was

14    examined and testified as follows:

15        JUDGE TRACY:  Okay.  Go ahead and state your name for the

16    record.

17        THE WITNESS:  Michael Sanchez.

18        JUDGE TRACY:  Okay.  General Counsel, go ahead, please.

19                      **DIRECT EXAMINATION**

20    Q    BY MR. RODRIGUEZ-RITCHIE:  Mr. Sanchez, are you familiar

21    with an entity called Tesla?

22    A    Yes.

23    Q    What is Tesla?

24    A    It's an automotive factory.

25    Q    And what type of automobiles does Tesla work with?



www.escribers.net | 800-257-0885

```
 1    A     All electrical vehicle.

 2    Q     And they manufacture the vehicles?

 3    A     Yes, they do.

 4    Q     Now, do you work for Tesla?

 5    A     Yes.

 6    Q     Do you work at the facility operated by Tesla located at

 7    45500 Fremont Boulevard in Fremont, California?

 8    A     Yes.

 9    Q     Okay.  Mr. Sanchez, from here on out, I'll refer to that

10    as the Tesla Fremont facility, okay?

11    A     Okay.

12    Q     When did you begin working at Tesla Fremont?

13    A     The summer of 2012.

14    Q     And when you began working at Tesla Fremont, did you work

15    directly for Tesla?

16    A     No, I came in as a temp.

17    Q     Who did you work for?

18    A     Volt.

19    Q     Now, at any point since 2012, did you work directly for

20    Tesla?

21    A     Yes.

22    Q     When did your employment directly for Tesla begin?

23    A     About after nine months since I started.

24    Q     And since that time you've been employed directly by

25    Tesla?
```



```
 1    A    Yes.

 2    Q    Are you currently on any type of leave of absence?

 3    A    Yes, I am.

 4    Q    Why?

 5    A    Because I got injured on the job.

 6    Q    Okay.  Do you have any lawsuits pending against Tesla?

 7    A    Yes, I do.

 8    Q    And has the filing of any lawsuits pending against Tesla,

 9    would that affect your ability to tell the truth here today?

10    A    No.

11    Q    Now, on February the 10th, 2017, were you also on a

12    medical leave?

13    A    I'm sorry, could you repeat that?

14    Q    On February the 10th, 2017, were you also on a medical

15    leave?

16    A    Yes.

17    Q    Was that due to a workplace injury as well?

18    A    Yes.

19    Q    Okay.  What was your last position at Tesla?

20    A    Production associate.

21    Q    In what department?

22    A    In general assembly, chassis three.

23    Q    And what is chassis three?

24    A    It's where your -- the vehicles are above you and so

25    you're pretty much working underbody.
```



1    Q    Could you describe in terms of the production process of a

2    vehicle at Tesla where chassis three falls along that process?

3    A    As in your -- as in your department -- I mean, your

4    stations?

5    Q    Right, in relation to general assembly, is it before

6    general assembly or after general assembly?

7    A    It's pretty much towards the end of the line pretty much.

8    You're done to the last three departments before the vehicle is

9    complete.

10    Q    Okay.  I'm going to hand you what's been premarked as

11    General Counsel's Exhibit 2.

12         MR. RODRIGUEZ-RITCHIE:  Handing a copy to counsel for the

13    Charging Party and counsel for Respondent.

14         MS. FEINBERG:  Thank you.

15         MR. RODRIGUEZ-RITCHIE:  It's already been premarked, so

16    I'll hand you a copy and I have a copy for you as well.

17         Madam Court Reporter, do you have an additional copy for

18    the record?

19         JUDGE TRACY:  How many copies do you need?

20         THE COURT REPORTER:  Just one.

21         JUDGE TRACY:  Just one?  So you can either use his in the

22    end or give her some, but we'll figure all that out later.

23         MR. RODRIGUEZ-RITCHIE:  Sure.

24    Q    BY MR. RODRIGUEZ-RITCHIE:  Mr. Sanchez, can you take a

25    look at General Counsel's Exhibit 2 and let me know when you're



1    ready?

2    A     I'm ready.

3    Q     Now, do you recognize General Counsel's Exhibit 2?

4    A     Yes, I do.

5    Q     What is General Counsel's Exhibit 2?

6    A     This is the Tesla Factory in Fremont.

7    Q     And did you take this picture?

8    A     No, I did not.

9    Q     How many times during your employment at Tesla Fremont

10   have you been to the Tesla Fremont facility?

11   A     A lot.

12   Q     About how many times?

13   A     Hundreds.

14   Q     So to the best of your knowledge, does General Counsel's

15   Exhibit 2 accurately depict the layout of the Tesla Fremont

16   facility?

17   A     Yes.

18         MR. RODRIGUEZ-RITCHIE:  Okay.  At this time I'd like to

19   move General Counsel's Exhibit 2 into evidence.

20         JUDGE TRACY:  Any objections?

21         MR. ROSS:  No.

22         JUDGE TRACY:  All right.  So General Counsel's Exhibit 2

23   is admitted into evidence.

24   **(General Counsel Exhibit Number 2 Received into Evidence)**

25         MR. ROSS:  Your Honor, may I ask a -- for a clarifying



www.escribers.net | 800-257-0885

1    question to counsel for the General Counsel?

2        JUDGE TRACY:  Sure.

3        MR. ROSS:  This is a picture of the exterior of the

4    building, not the interior, so --

5        MR. RODRIGUEZ-RITCHIE:  That is correct.

6        MR. ROSS:  So -- so this does not depict interior the

7    building, it's just the exterior?

8        MR. RODRIGUEZ-RITCHIE:  I'll ask the witness.

9        JUDGE TRACY:  Is that correct?

10       MR. RODRIGUEZ-RITCHIE:  Let's clarify.

11   Q    BY MR. RODRIGUEZ-RITCHIE:  Does General Counsel's

12   Exhibit 2 accurately depict the exterior of the facility,

13   including the Tesla parking lot?

14   A    Yes, it does.

15   Q    Okay.

16       JUDGE TRACY:  All right.  So General Counsel's Exhibit 2

17   is admitted into evidence.  I think I already said that, but

18   just to be sure.

19   Q    BY MR. RODRIGUEZ-RITCHIE:  Okay.  Mr. Sanchez, I've used

20   the projector to put up General Counsel's Exhibit 2 and I'm

21   approaching you and handing you a laser pointer that I will ask

22   you to use.  Mr. Sanchez, during your employment at Tesla

23   Fremont, have you ever driven to the Tesla Fremont facility?

24   A    Many, many, many times, yes.

25   Q    Okay.  Have you ever used the entrances to the parking lot



www.escribers.net | 800-257-0885

1    at Tesla Fremont?

2    A    Yes.

3    Q    Okay.  Can you point out using the laser pointer on

4    General Counsel's Exhibit 2 where the entrances are to the

5    Tesla Fremont parking lot?

6    A    Yes, so it's coming from Kato Road, so where is that?  So

7    when you take Kato Road there's an entrance going from that

8    point in.  There's a -- starting from this point, so there's an

9    entrance there, entrance there, entrance there, and there's

10   also another entrance over there.

11   Q    How many entrances did you point out to the Tesla parking

12   lot?

13   A    Four going to the parking lot.

14   Q    Okay.  Have you used each of the entrances into the

15   parking lot before?

16   A    Only three of them.

17   Q    Okay.  At the three that you've used, are there any

18   security guard stations?

19   A    No.

20   Q    Have you ever seen a security guard station at any of the

21   entrances to the Tesla parking lot?

22   A    Not while I was there working.

23   Q    Now, are there any -- besides security guard stations, are

24   there any security guards that are stationed at the entrances

25   to the Tesla parking lot?



1    A    Not while I was active.

2    Q    Have you ever seen a security guard at Tesla?

3    A    Yes.

4    Q    Is there a uniform that security guards wear?

5    A    Yes, they do.

6    Q    Could you describe that?

7    A    Most of the time they're -- I mean, what I've seen is they

8    wear, like black jackets, especially, you know, like in the

9    wintertime.  You see a Tesla logo and it says security

10   underneath it.  And the same thing with the hat.

11   Q    Okay.  So Mr. Sanchez, you were using your hand to point

12   to --

13   A    Where they would have the logo.

14   Q    -- the left portion of your chest.  Are you -- is that

15   where there is a Tesla logo and the word security?

16   A    Yes.

17   Q    Okay.

18        MR. RODRIGUEZ-RITCHIE:  If the record could reflect the

19   witness is pointing to that area of his body?

20   Q    BY MR. RODRIGUEZ-RITCHIE:  Now, do Tesla security guards

21   at Tesla Fremont drive any vehicles?

22   A    Yes, they do.

23   Q    What do the vehicles look like?

24   A    They actually have a Tesla Model S and they also drive the

25   Model X.


22-60493.94

1    Q    Are there any words written on the security vehicles?

2    A    Yes.

3    Q    What?

4    A    It says -- it has the Tesla logo as well as security said

5    underneath it.

6         MR. ROSS:  Said, I'm sorry, I couldn't hear that.

7         THE WITNESS:  It says -- it has a Tesla logo and then

8    underneath that it says security.

9         MR. ROSS:  Thank you.

10    Q    BY MR. RODRIGUEZ-RITCHIE:  Now, during your employment

11    with Tesla, are there any specific places where security guards

12    are stationed?

13    A    Yes, every entrance going into the factory.

14    Q    Are they stationed at the exterior of the entrances or the

15    interior of the entrances?

16    A    The interior.

17    Q    Okay.  Is there a station as such?

18    A    Such as?

19    Q    So is there a particular designated area inside of the

20    facility where the guard is placed?

21    A    Yes, they sit at a podium.

22    Q    Okay.  Now, in during your employment with Tesla, how many

23    guards in your experience are stationed at the podiums?

24    A    There was one every single day I've worked there and

25    it's -- I can't even say how many.  There's just been some -- a



1    lot.

2    Q    Okay.  In your experience, is there ever more than one

3    guard stationed at the security podium in the exterior --

4    interior of the doors, excuse me?

5    A    Only if I see that they're going to swap out.

6    Q    So by swap out, are you referring to switching who's at

7    the station?

8    A    Yes.

9    Q    Okay.  Mr. Sanchez, are you a smoker?

10   A    Yes.

11   Q    And during your employment with Tesla, did you ever take

12   any smoke breaks?

13   A    Yes, I did.

14   Q    How often?

15   A    Probably three times out of the day.

16   Q    Was there a particular area where you took smoke breaks?

17   A    Yes, in the front of the -- well, in the front parking

18   lot.

19   Q    Now, during your employment at Tesla, during the security

20   breaks that you took, how many times were you ever asked to

21   show your badge?

22   A    Only once.

23   Q    During your employment at Tesla, while you were taking

24   your breaks, how many times did a security guard ask you to

25   leave while you were smoking?


www.escribers.net | 800-257-0885

1   A    While I was active, never.

2   Q    All right.  Mr. Sanchez, you can go ahead and turn over

3   General Counsel's Exhibit 2.  Mr. Sanchez, I'm going to hand

4   you what's been premarked as General Counsel's Exhibit 36.

5   Take a look at it and let me know when you're ready.

6        MR. ROSS:  It's premarked?

7        MR. RODRIGUEZ-RITCHIE:  At the bottom right.

8        THE WITNESS:  I'm ready.

9        MR. ROSS:  Oh, I see it.  Okay.  Thank you.

10  Q    BY MR. RODRIGUEZ-RITCHIE:  Mr. Sanchez, do you recognize

11  General Counsel's Exhibit 36?

12  A    Yes, I do.

13  Q    And what do you recognize it to be?

14  A    This is my Tesla badge.

15  Q    Okay.  Does it accurately depict your employee badge as it

16  was in existence on February the 10th, 2017?

17  A    Yeah.

18       MR. RODRIGUEZ-RITCHIE:  Okay.  At this time I'd like to

19  move General Counsel's Exhibit 36 into evidence.

20       JUDGE TRACY:  Any objections?

21       MR. ROSS:  No.

22       JUDGE TRACY:  All right, so General Counsel's Exhibit 36

23  is admitted into evidence.

24  **(General Counsel Exhibit Number 36 Received into Evidence)**

25  Q    BY MR. RODRIGUEZ-RITCHIE:  Okay.  Now, Mr. Sanchez, in



1    your experience working at Tesla, is there any point where you

2    have to show your badge to gain entrance into the Tesla

3    facility?

4    A    Yes.

5    Q    When?

6    A    When you're going to walk into the factory.

7    Q    Okay.  Now, do you show your badge or do you scan it?

8    A    You scan the badge to enter.

9    Q    How do you scan your badge?

10   A    Well, when I was active they had the sensor where you use

11   your badge and that would unlock the door for you to enter.

12   Q    Okay.  And where is the sensor located?

13   A    It was -- sometimes it was on the right side, sometimes it

14   would be on the left in different areas of the entrances.

15   Q    Is it located on the exterior of the entrance?

16   A    The exterior, yes.

17   Q    Now, once you've scanned your badge on the sensor, do you,

18   after that point, have to show your badge?

19   A    No.

20   Q    Are you familiar with an organization called the United

21   Auto Workers?

22   A    Yes.

23   Q    And who are the United Auto Workers?

24   A    It's a union representation for the automotive industry.

25   Q    During your employment, have there been any activities by



www.escribers.net | 800-257-0885

1    Tesla Fremont workers seeking to be represented by the UAW?

2    A    For myself or -- I'm sorry, could you repeat that?

3    Q    Sure.  During your time employed by Tesla, have there been

4    any activities by employees of Tesla Fremont seeking to get

5    representation by the UAW?

6    A    No.  I'm -- as that point -- as I was active?

7    Q    At any point during your employment with Tesla, so that's

8    from 2013 until the present?

9    A    I was -- as of myself being part of the UAW or the UAW

10   being part of?

11   Q    So during your time working for Tesla, so from 2013 until

12   today, have there -- have any employees sought to be

13   represented by the United Auto Workers?

14   A    No, not at that time.

15   Q    Okay.  Now, during your employment with Tesla, have there

16   been any activities by workers with organizers of the United

17   Auto Workers?

18   A    Yes.

19   Q    At Tesla Fremont?

20   A    Yes.

21   Q    Okay.  Have you participated in any such activities?

22   A    Yes.

23   Q    Okay.  When did you first become aware of activities with

24   the United Auto Workers at Tesla Fremont?

25   A    Summer of 2016.



www.escribers.net | 800-257-0885

1    Q    How did you become familiar?

2    A    Someone had shown me that -- that page on Facebook for the

3    UAW, or for -- actually for the Tesla workers and there was a

4    meeting and so I decided to go find out what a union is, you

5    know, all about.

6    Q    Is there -- are you familiar with an organizing committee

7    at Tesla Fremont?

8    A    Yes.

9    Q    And what is the organizing committee called?

10   A    Volunteer organizing committee.

11   Q    Are you part of the volunteer organizing committee?

12   A    Yes, I am.

13   Q    When did you become a member of the volunteer organizing

14   committee?

15   A    As soon as I went to that first meeting, the summer of

16   2016.

17   Q    Okay.  I'm going to hand you what's been marked as General

18   Counsel's Exhibit 31-001 to 31-003.  You can go ahead and turn

19   Exhibit 36 over.  Okay.  Take a look at it and let me know when

20   you're ready.

21   A    I'm ready.

22   Q    Okay.  Do you recognize General Counsel's Exhibit 31?

23   A    Yes, I do.

24   Q    And what do you recognize the document to be?

25   A    This was the worker -- I mean, the confidentiality

22-60493.100



1     agreement that was sent to us by email.

2     Q     Okay.  And I want you to take a look at the top.  There

3     are some words all the way at the top that appear slightly cut

4     off.  Can you read those words?

5     A     Yes.

6     Q     What are they?

7     A     It says, "Important remind, confidentiality agreement due

8     Monday.  Jose Moran."

9     Q     Okay.  Now, are you Jose Moran?

10    A     No, I am not.

11    Q     Did you receive the emails that are part of General

12    Counsel's Exhibit 31?

13    A     Yes, I did.

14    Q     Were they identical to General Counsel's Exhibit 31?

15    A     Yes.

16    Q     Okay.  Were they sent to your @Tesla.com email address?

17    A     Yes.

18    Q     Okay.  Now I want you to take a look at page 3 of General

19    Counsel's Exhibit 31.  Do you see page 3?

20    A     Yes.  Yes.

21    Q     Okay.  Now, page 3 doesn't appear to be an email.  Do you

22    recall whether or not page 3 was attached to any of the emails

23    in 31?

24    A     Yes, it was.  This was an attachment.

25    Q     Now, did you sign General Counsel's Exhibit 31?

22-60493.101



```
1    A    No.

2    Q    Why not?

3    A    I was on leave.

4    Q    Do you recall when you -- well, I want you to take a look

5    at 31-002, towards the center of the page where it says from

6    Mark Lipscomb, Wednesday, November 2nd, 2016.

7    A    Yes.

8    Q    Did you receive that email on or about November 2, 2016?

9    A    Yes, I did.

10   Q    Okay.  Now I want you to take a look at the first page of

11   General Counsel's Exhibit 31 at the bottom where it appears

12   that an email starts and continues to the next page at the

13   bottom where it says from Mark Lipscomb, date, Thursday,

14   November 3rd, 2016; do you see that?

15   A    Yes, I do.

16   Q    Is that an email you received your @Tesla.com email

17   address on or about November 3rd, 2016?

18   A    Yes.

19   Q    Okay.  I want you to take a look just above that where it

20   says from Mark Lipscomb, date, Saturday, November 5th, 2016; do

21   you see that?

22   A    Yes.

23   Q    Is that an email that you received at your @Tesla.com

24   email address on or about November 5th, 2016?

25   A    Yes.
```



1    Q    Okay.  And I want you to take a look up above, it says

2    Mark Lipscomb, Saturday, 11/5/2016 at 10:12 a.m.?

3    A    Yes.  I don't recall this one though going to my email.

4    Q    Do you remember whether or not you received that email?

5    A    I believe so, but I don't think I ever opened that one.

6    I --

7    Q    Do you believe that you received it?

8    A    I received it, but I didn't open it.

9    Q    Okay.

10        MR. RODRIGUEZ-RITCHIE:  At this time I'd move General

11   Counsel's Exhibit 31 into evidence.

12        JUDGE TRACY:  Any objections?

13        MR. ROSS:  May I just take a moment to look at it?  Nope.

14        JUDGE TRACY:  All right.  So General Counsel's Exhibit 31,

15   I guess one to three is admitted into evidence.

16   **(General Counsel Exhibit Number 31 Received into Evidence)**

17   Q    BY MR. RODRIGUEZ-RITCHIE:  Do you recall the day of

18   February the 10th, 2017?

19   A    Yes, I do.

20   Q    And how did you begin your day on February the 10th, 2017?

21   A    I ended up going to the UAW office at 3:30 a.m.

22   Q    Which office are you referring to?

23   A    It's on South Kramer, off of Fremont Boulevard.

24   Q    How far is that office from Tesla's Fremont facility?

25   A    One block.



1    Q    And why did you go to the UAW office?

2    A    To pick up 100 leaflets.

3    Q    Okay.  Mr. Sanchez, I'm going to hand you what's been

4    premarked as General Counsel's Exhibit 8-001 and 8-002.  Take a

5    moment to look at it.  Let me know when you're ready.

6    A    I'm ready.

7    Q    Okay.  Do you recognize General Counsel's Exhibit 8?

8    A    Yes, I do.

9    Q    What is General Counsel's Exhibit A?

10   A    This is the leaflet that I picked up.

11   Q    On February the 10th, 2017?

12   A    Yes.

13        MR. RODRIGUEZ-RITCHIE:  Okay.  And then at this time I'd

14   like to move General Counsel's Exhibit 8 into evidence.

15        JUDGE TRACY:  Any objections?

16        MR. ROSS:  Nope.

17        JUDGE TRACY:  So General Counsel's Exhibit 8-001 to 002 is

18   admitted into evidence.

19   **(General Counsel Exhibit Number 8 Received into Evidence)**

20   Q    BY MR. RODRIGUEZ-RITCHIE:  Now, Mr. Sanchez, after you

21   picked up the flyers that are in General Counsel's Exhibit 8,

22   did you stay at the UAW office?

23   A    No.

24   Q    Where did you go?

25   A    I got in my vehicle and I drove myself to the Tesla



1    parking lot.

2    Q    Now, when you went to the Tesla parking lot, did you

3    actually park in the parking lot?

4    A    Yes, I did.

5    Q    When you went through the entrance to the parking lot were

6    you required to show or scan your badge?

7    A    No.

8    Q    Where did you park?

9    A    I parked by door two.

10   Q    Okay.  Mr. Sanchez, I'm handing you what's been premarked

11   as General Counsel's Exhibit 4.  Take a look at it.  Let me

12   know when you're ready.

13   A    I'm ready.

14   Q    Okay.  Do you recognize General Counsel's Exhibit 4?

15   A    Yes, I do.

16   Q    What do you recognize it to be?

17   A    That is door two.

18   Q    Okay.  Now, did you take this picture?

19   A    No.

20   Q    How many times have you seen door two at Tesla Fremont

21   prior to today?

22   A    Hundreds and hundreds of times.

23   Q    And does General Counsel's Exhibit 4 accurately depict

24   door two as it existed -- the exterior of door two as it

25   existed on February the 10th, 2017?



1    A    Yes.

2         MR. RODRIGUEZ-RITCHIE:  Okay.  Then at this time I'd like

3    to move General Counsel's Exhibit 4 into evidence.

4         JUDGE TRACY:  Any objections?

5         MR. ROSS:  Just a moment, Your Honor.  Nope.

6         JUDGE TRACY:  Okay.  Before I admit it though, could you

7    show me where is door two?  Because I can't tell from this

8    photo.

9         MR. RODRIGUEZ-RITCHIE:  I'm going to project it up and ask

10   him to use a laser pointer.  If you want me to do that now --

11        JUDGE TRACY:  Go ahead and do that now.

12   Q    BY MR. RODRIGUEZ-RITCHIE:  Okay.  Mr. Sanchez, if you

13   could use the laser pointer and show us where door two is in

14   the picture.

15   A    This is considered door two.  The whole thing right here.

16   Those two entrances.

17        MR. RODRIGUEZ-RITCHIE:  Okay.  If the record could reflect

18   that Mr. Sanchez used the laser pointer to circle an area in

19   the center of the picture.

20   Q    BY MR. RODRIGUEZ-RITCHIE:  Mr. Sanchez, how many entrances

21   into door two are there?

22   A    Two.

23   Q    And can you point them out?

24   A    Yes.  You've got this side with the stairs.  And then you

25   have a ramp that you can enter on this side.


www.escribers.net | 800-257-0885

1    MR. RODRIGUEZ-RITCHIE:  Okay.  Now, if the record could

2    reflect that Mr. Sanchez used a laser pointer to point if

3    facing forward door two, stairs on the right side and the ramp

4    entrance on the left side.

5    JUDGE TRACY:  Okay.  All right.  So General Counsel's

6    Exhibit 4 is admitted into evidence.

7    **(General Counsel Exhibit Number 4 Received into Evidence)**

8    Q    BY MR. RODRIGUEZ-RITCHIE:  Now, Mr. Sanchez, when you

9    parked in the parking lot did you stay in your car?

10   A    No.

11   Q    What did you do?

12   A    I stepped out of my vehicle and started walking towards

13   door two.

14   Q    Did you ultimately get to door two?

15   A    Yes.

16   Q    And did you do anything when you got to door two?

17   A    Yes.  I ran into three coworkers.

18   Q    Okay.

19   A    I spoke to them.

20   Q    And when you spoke to them, did you hand them anything?

21   A    Yes, I did.

22   Q    What did you hand them?

23   A    I handed them three leaflets.  One each.

24   Q    And is that the leaflet that's been admitted as General

25   Counsel's Exhibit 8?



www.escribers.net | 800-257-0885

1    A    Yes, it is.

2    Q    Okay.  Now, when you arrived at door two and you spoke

3    with the workers, did you yell at them?

4    A    No.

5    Q    Were you using any sound making devices?

6    A    No.

7    Q    Did you use any sound amplifying devices?

8    A    No.

9    Q    Did you threaten any of the workers?

10   A    No.

11   Q    What was that?

12   A    No.

13   Q    Did you make any physical gestures towards the workers?

14   A    No.

15   Q    Now, besides the individuals that you just testified about

16   that you spoke to and handed out flyers, did you have any

17   encounters with any other people outside of door two?

18   A    I'd seen there was a fourth person.  And --

19   Q    Can you describe the fourth person?

20   A    I realized that he was a security guard.

21   Q    What did he look like?

22   A    He was a young male Latino.

23   Q    Can you describe what the young male Latino was wearing?

24   A    He had a jacket with the Tesla logo as well as it saying

25   security underneath it.



www.escribers.net | 800-257-0885

1    Q    Okay.  Do you know his name?

2    A    No, I do not.

3    Q    Now, did you speak with this young Latino male security

4    guard?

5    A    Yes.

6    Q    And who spoke first?

7    A    The security guard.

8    Q    What did the young male Latino security guard say to you?

9    A    He asked me are you an employee.

10   Q    Okay.  Did you respond?

11   A    Yes.  I said yes, I've been at Tesla for almost five

12   years.

13   Q    Did the young male Latino security guard ask -- say

14   anything else to you?

15   A    Yes.  He said I should leave the premises.

16   Q    Did you respond to him?

17   A    Yes.  I said I'm here within my legal rights.  I'm off the

18   clock and outside the factory.

19   Q    Okay.  Did the young Latino male security guard say

20   anything else to you?

21   A    No.  He just looked at me and he walked back into door

22   two.

23   Q    Now, how long after he spoke to you did he walk into door

24   two?

25   A    It was -- it was pretty brief.  Less than probably about a



www.escribers.net | 800-257-0885

1    three minute span.

2    Q    Okay.  Now, after the young Latino male security guard

3    walked into door two, did you stay at door two?

4    A    Yes, I did.

5    Q    Why did you stay at door two?

6    A    Because there was two more coworkers that came around.

7    Q    Okay.  Did you speak with the two more coworkers?

8    A    Yes, I did.

9    Q    Did you hand them any of the leaflets in General Counsel's

10   Exhibit 8?

11   A    Yes, I did.

12   Q    Now, while you were at door two did you have any other

13   encounters with any security guards?

14   A    Yes, I did.

15   Q    Was it the same male security -- excuse me.  Was it the

16   same young male Latino security guard, or a different guard?

17   A    It was the same one that came out first -- I first

18   encountered.

19   Q    Okay.  Now, at what point did you have a second encounter

20   with the young male Latino security guard?

21   A    Probably five minutes after the second encounter with the

22   young Latino.

23   Q    Now, did your second encounter with the young male Latino

24   security guard begin?

25   A    He came out aggressively saying I need to see your badge.



www.escribers.net | 800-257-0885

1    And --

2    Q    Okay.  Now, in terms of minutes, how long was it between

3    the time when the young male Latino security guard went into

4    door two the first time and when your interaction the second

5    time began with him?

6    A    It was probably less than five minutes overall between

7    that timespan.

8    Q    Now, when the young male Latino security guard asked you

9    for your badge, did you comply with his request?

10   A    Yes, I did.

11   Q    Did you hand him your badge?

12   A    Yes, I did.

13   Q    And did he -- did you say anything to him when you handed

14   him your badge?

15   A    At that point, no.  I just told him -- just said yes to

16   him receiving the badge.

17   Q    Okay.  Now, did the young male Latino security guard do

18   anything with your badge?

19   A    Yes, he did.  He put his -- put my badge in front of his

20   phone and he took a picture of it.

21        MR. RODRIGUEZ-RITCHIE:  Okay.  If the record could reflect

22   that Mr. Sanchez used his left hand to signal his badge and his

23   right hand to show that a phone was placed over top of the

24   badge.

25   Q    BY MR. RODRIGUEZ-RITCHIE:  Now, why do you believe that he



1    took a picture of the badge?

2    A    Because I'd seen a flash and I heard a click.

3    Q    Okay.  Now, after he took the picture of your badge, did

4    he do anything else -- anything else with the badge?

5    A    He handed it back to me.

6    Q    Now, at the time that the security -- that the young male

7    Latino security guard asked you for your badge, were you still

8    handing out the flyer in General Counsel's Exhibit 8?

9    A    Yeah.  I already handed them out.  But yes.

10   Q    Were there employee -- other employees in your area when

11   the young male Latino security guard asked you for your badge?

12   A    It was those two coworkers.

13   Q    Okay.  When the young male Latino security guard handed

14   the badge back to you, did he say anything else to you?

15   A    He told me to leave the premises again.

16   Q    Did you say anything back to him?

17   A    Yes.  I said I'm here within my legal rights, are you

18   taking away my workers' rights?

19   Q    Did the young male Latino security guard say anything else

20   to you?

21   A    He gave me an expression kind of look where it was like

22   what are you -- what are you talking about kind of expression.

23   Q    Now, at this point did the young male Latino security

24   guard stay outside of door two?

25   A    No.  He turned around and went back into door two.


www.escribers.net | 800-257-0885

1    Q    After the young male Latino security guard went back

2    inside of door two, did you stay at door two?

3    A    I was about to walk towards door one but I got -- I heard

4    someone coming out of door two again and asking me -- you know,

5    asked me what are you doing.  So I turned back around.

6    Q    Okay.  And can you describe this person that asked you

7    what you were doing?

8    A    It was another security guard.  It was an older middle

9    eastern security guard male.

10    Q    Okay.  Can you with the laser pointer show us on General

11    Counsel's Exhibit 4 where you were when the second older --

12    excuse me, when this older middle eastern security guard

13    approached you?

14    A    I was about right here.  And he was coming down about

15    right here.

16         MR. RODRIGUEZ-RITCHIE:  Okay.  So if the record can

17    reflect that Mr. Sanchez used the laser pointer to indicate

18    that the security guard was walking down the stair side of door

19    two and he was standing in front of the stair side of door two.

20    Q    BY MR. RODRIGUEZ-RITCHIE:  Now, did you speak with the

21    middle eastern security guard?

22    A    After he had said what -- what are you doing I said I'm

23    handing out -- I'm handing out leaflets.

24    Q    Now, can you describe what the older male security guard

25    was wearing?



www.escribers.net | 800-257-0885

1    A    He was wearing a security jacket with the Tesla logo as

2    well and then also a hat.

3    Q    Did the word security appear on any of his clothing?

4    A    Both the hat and the jacket.

5    Q    Okay.  Is this an individual whose name you know?

6    A    No, I don't.

7    Q    Have you ever seen him before?

8    A    No.

9    Q    Now, after you told the older male security guard that you

10   were handing out the leaflets did he speak back to you?

11   A    Yes.

12   Q    What did he say to you?

13   A    He said, what's this for, a union.

14   Q    Did you respond to him?

15   A    And I said yes.

16   Q    After you said yes, did the older male security guard say

17   anything back to you?

18   A    Yes.  He said unions are worthless, you shouldn't join

19   one.

20   Q    And after he told you that unions are worthless, you

21   shouldn't join one, did you respond to him?

22   A    I said that's your opinion.

23   Q    Okay.  Did you say anything else?

24   A    No.

25   Q    Did he say anything else?



www.escribers.net | 800-257-0885

1    A    He asked for my badge.

2    Q    And did you give him your badge?

3    A    I said sure and handed him my badge.

4    Q    Did he do anything with your badge?

5    A    Yes.  It was like the first encounter.  He put my badge in

6    front of his phone.  And same thing, I'd seen a flash and I

7    heard a click.

8         MR. RODRIGUEZ-RITCHIE:  Okay.  If the record could reflect

9    that once again Mr. Sanchez used his left hand to show where --

10   to signify his employee badge and the right hand over top his

11   left hand to signify a phone on top of his badge.

12   Q    BY MR. RODRIGUEZ-RITCHIE:  Now, how -- why is it that you

13   think he took a picture the second time?

14   A    Because of the flash and the click.

15   Q    Now, did he give the badge back to you?

16   A    Yes, he did.

17   Q    After he gave the badge back to you did you speak with him

18   anymore?

19   A    No.  I started walking towards door one.

20   Q    Okay.  As you were walking towards door one, were you

21   walking with the older middle eastern security guard?

22   A    No.  He was a few steps behind me.  And he actually was

23   following me towards door one.  And I got about two thirds of

24   the way and then he finally decided to turn back to door two.

25   Q    Did you eventually arrive at door one?



www.escribers.net | 800-257-0885

1    A    Yes, I did.

2        JUDGE TRACY:  Let me clarify something about your

3    testimony that you just provided.  So you were testifying about

4    the first security guard that you spoke with.  Was that

5    conversation outside of the building that you didn't enter into

6    door two; is that correct?

7        THE WITNESS:  Correct.

8        JUDGE TRACY:  Okay.  And then the second conversation that

9    you had with the older security guard, that was also outside of

10   door two but the opposite side of the -- of the -- this

11   building that you've described with two entrances?

12       THE WITNESS:  They were both in that area.  I was standing

13   pretty much by the stairs from the beginning.

14       JUDGE TRACY:  Okay.  Thank you.

15   Q    BY MR. RODRIGUEZ-RITCHIE:  Okay.  Mr. Sanchez, you can go

16   ahead and turn over General Counsel's Exhibit 4.  I'm handing

17   you what's been premarked as General Counsel's Exhibit 3.

18   A    I'm ready.

19   Q    Okay.  Mr. Sanchez, do you recognize General Counsel's

20   Exhibit 3?

21   A    Yes, I do.

22   Q    What do you recognize it to be?

23   A    That is door one.

24   Q    Does the picture in General Counsel's Exhibit 3 accurately

25   depict the picture -- or excuse me, accurately depict door one



1    at the Tesla Fremont facility as it existed on February the

2    10th, 2017?  And I should say the exterior of door one.

3    A    Yes.

4        MR. RODRIGUEZ-RITCHIE:  Okay.  At this time I'd like to

5    move General Counsel's Exhibit 3 into evidence.

6        JUDGE TRACY:  Any objections?

7        MR. ROSS:  No.

8        JUDGE TRACY:  And I assume also you'll be doing the same

9    thing in terms of your -- your slide and pointing where the

10   entrance is.

11       MR. RODRIGUEZ-RITCHIE:  Yeah.

12       JUDGE TRACY:  Okay.  Thank you.  So General Counsel's

13   Exhibit door one is admitted into evidence.

14   **(General Counsel Exhibit Number 3 Received into Evidence)**

15   Q    BY MR. RODRIGUEZ-RITCHIE:  Okay.  Mr. Sanchez, I've

16   projected General Counsel's Exhibit 3.  Can you use the laser

17   pointer and tell us which part of the picture is the door --

18   door one in General Counsel's Exhibit 3?

19   A    Yeah.  So this is the stair side where you walk up here to

20   enter here.  And then you can take the ramp going this way to

21   get up -- to enter here.

22       MR. ROSS:  Excuse me, Your Honor, I apologize, is this

23   door one or door three we're talking about?

24       MR. RODRIGUEZ-RITCHIE:  Door one I believe.

25       THE WITNESS:  Door one.



www.escribers.net | 800-257-0885

1      MR. ROSS:  He was referring to it as door three.  So

2   that's why I'm --

3      JUDGE TRACY:  Well, I'm wondering did I misspeak to?

4      MS. FEINBERG:  I think it's Exhibit 3 --

5      JUDGE TRACY:  Let me make sure I -- I --

6      MS. FEINBERG:  -- door one.

7      JUDGE TRACY:  What's that?

8      MS. FEINBERG:  It's because it's Exhibit 3.  But I think

9   he referred to it as door one.

10      MR. ROSS:  Somebody referred to it as door three.  That's

11   why I'm asking the question.

12      JUDGE TRACY:  Yes.  We're all confused, also myself.  So I

13   just want to make sure I admitted General Counsel's Exhibit 3.

14   But I believe you're testifying about door one --

15      THE WITNESS:  Yes.

16      JUDGE TRACY:  -- in 3.  Okay.  Is that --

17      MR. ROSS:  Exhibit 3 is door one?

18      JUDGE TRACY:  Yes.

19      MR. ROSS:  Great.  Thank you.

20      JUDGE TRACY:  Okay.

21      MR. ROSS:  Thank you.

22   Q   BY MR. RODRIGUEZ-RITCHIE:  Okay.  Mr. Sanchez, can you use

23   the laser pointer -- or excuse me.  You've just used the laser

24   pointer to show us where door one is in the picture which was

25   in the center of the picture.  If you're facing door one --



1    just so the record is clear, if you're looking at door one, the

2    left side would be the stair side and the right side would be

3    the ramp side?

4    A    Yes.

5    Q    And both the -- there's an entrance into door one on the

6    stair side in addition to an entrance into door one on the ramp

7    side?

8    A    Yes.

9    Q    Okay.  And earlier when you testified that there was a

10   sensor at the exterior of the doors, can you tell us in

11   relation to here where the sensor would be to badge in?

12   A    It would be about right here at the entrance.  And then

13   same thing on this side.

14   Q    So a sensor on both sides of the exteriors of the stair

15   side entrance and the ramp side entrance?

16   A    Yes.

17   Q    Okay.  Now, when you got to door one on February the 10th,

18   2017, was there anyone else there?

19   A    Yes.  I met with three other VOCs.

20   Q    And who were the three other people that you met up with?

21   A    Richard Ortiz, Jose Moran, and Mike Cotoro (phonetic).

22   Q    And what were they doing?

23   A    They were handing out leaflets.

24   Q    Where were the three VOCs when you got there?

25   A    So Richard Ortiz and Jose Moran met in the middle.  But



www.escribers.net | 800-257-0885

1   then we both -- we had two groups going on.  One on each side.

2   One group for each side.

3   Q    Okay.  So who was on which side?

4   A    Richard Ortiz and Jose Moran were by the ramp.  And Mike

5   Cotoro and myself were by the stairs.

6   Q    Now, while you were at door one did you have any

7   encounters with any security guards?

8   A    Yes, about 20 minutes into my arrival there was some.

9   Q    Where was the security guard or guards when you first

10  noticed them when you were at door one?

11  A    It was actually two security guards in a Tesla vehicle

12  that were driving by.

13  Q    Okay.  Can you describe the vehicle that they were

14  driving?

15  A    It was the Model X vehicle.

16  Q    Did the vehicle have any words or logos?

17  A    It had a Tesla logo with the words appearing underneath it

18  printed on to the door.

19  Q    Okay.  Now, if you can use the laser pointer and show us

20  from where the Tesla security vehicle came and to where it

21  went.

22  A    It was going northbound.  So it was going this way.  And

23  it was pretty much driving towards door two.

24      MR. RODRIGUEZ-RITCHIE:  Okay.  So if the record could

25  reflect that Mr. Sanchez used the laser pointer to point the



www.escribers.net | 800-257-0885

1    direction of the Tesla security vehicle from the bottom of the

2    picture to the top of the picture.

3    Q    BY MR. RODRIGUEZ-RITCHIE:  You testified that there were

4    two security guards in the vehicle?

5    A    Yes.

6    Q    Did you recognize either of the two security guards?

7    A    The passenger.  It was the same young male Latino that I

8    first encountered.

9    Q    Okay.  So since you testified that the vehicle went from

10   the bottom to the top of the picture, can you tell us which

11   side the young Latino male was on in the car?

12   A    The passenger side was on the right side.

13   Q    Was that the side that was closest to you?

14   A    Yes.

15   Q    Okay.  Now, when you saw the young Latino male security

16   guard in the Tesla vehicle, did you see whether or not he was

17   doing anything?

18   A    Yes.  You could see that he was holding his phone and he

19   was aiming at us towards his chest just looking like you know,

20   he was recording us.

21   Q    Okay.  So was the back or the front of his phone facing

22   you?

23   A    The back of his phone was facing us.

24   Q    Now, what time of day was this, Mr. Sanchez?

25   A    This was a little after 4:20.



www.escribers.net | 800-257-0885

1    Q    So how were you able to see the back of the phone being

2    pointed towards you?

3    A    Because in door one there's over lamps.  And they cover

4    pretty much all of -- you could see the light pretty much from

5    this distance because they're above here.  So you could see

6    what was going on inside the vehicle.

7    Q    So the over lamp lighting of door one illuminated the

8    Tesla security vehicle?

9    A    Yes.

10   Q    And I should clarify, when you said 4:20 are you referring

11   to 4:20 a.m. or p.m.?

12   A    A.m.

13   Q    As the Tesla security vehicle drove by, did it stop?

14   A    No.

15   Q    Can you estimate about how fast it drove by?

16   A    It wasn't even going five miles an hour probably.

17   Q    Okay.  Now, after the Tesla security vehicle drove by, did

18   you ever see those two security guards again?

19   A    No, I did not.

20   Q    Okay.  So after your encounter with these two security

21   guards in the Tesla security vehicle, did you have any other

22   encounters with any other security guards?

23   A    Later on.  So about 5 a.m.

24   Q    How many security guards did you have an encounter with at

25   about 5 a.m.?



www.escribers.net | 800-257-0885

1    A    We had one female security guard come out at that time.

2    Q    And when you say that a young female security guard came

3    out, she came out of where?

4    A    Came out of door one.

5    Q    Can you describe her?

6    A    She was wearing a jacket with the Tesla logo saying

7    security on it.

8    Q    Do you know her name?

9    A    No, I don't.

10    Q    Can you tell us -- when you say that she came out of door

11    one, did she come out of the stair side of door one or the ramp

12    side of door one?

13    A    The stair side.

14    Q    That's the side that you were on?

15    A    Yes.

16    Q    Okay.  Now, when she came out of door one did she speak

17    with you?

18    A    She spoke to all of us saying --

19    Q    What did she say?

20    A    She said are you guys employees.

21    Q    And did you answer her?

22    A    We all did.  Said yes and how long we worked there.

23    Q    Now, after you said yes and how long you worked there, did

24    the female security guard say anything back to you?

25    A    Yes.  She said you guys -- you should leave the premises.



www.escribers.net | 800-257-0885

1    Q    Okay.  Did she say anything else after she told you to

2    leave the premises?

3    A    She said what's that.

4         MR. RODRIGUEZ-RITCHIE:  Okay.  If the record could reflect

5    that Mr. Sanchez used his finger to point.

6    Q    BY MR. RODRIGUEZ-RITCHIE:  Did anyone respond to her

7    pointing and saying what's that?

8    A    Both me and Jose said this is for our future.

9    Q    Both of you said that at the same time?

10   A    Simultaneously.

11   Q    Now, after you both said this is for our future, did the

12   security guard continue to speak to you?

13   A    She -- no.  She walked back into door one.

14   Q    Were you able to see her inside of door one?

15   A    No, because we were on the ground and it's above us, so we

16   can't see once they get in there.

17   Q    After your encounter with this female security guard at

18   door one, did you stay at door one?

19   A    Yes.

20   Q    What did you do at door one?

21   A    We continued handing out leaflets to coworkers.

22   Q    Okay.  After your encounter with the female security guard

23   at door one did you have any other encounters with any security

24   guards?

25   A    Yes.  Five minutes later another male security guard came



www.escribers.net | 800-257-0885

1    out.

2    Q    Okay.  So this male security guard, was he different than

3    the other male security guards that you've already testified

4    about?

5    A    Yes.  I hadn't seen him before.

6    Q    Okay.  Can you describe him?

7    A    He had a security jacket as well, the same with the Tesla

8    logo saying security.

9    Q    Okay.  Did this male security guard speak with you?

10   A    Yes.  He told us to leave the premises.

11   Q    Did you respond to him?

12   A    Both Jose and myself said we're here within our legal

13   rights.

14   Q    You both said that?

15   A    Yes.

16   Q    Now, after you both -- you and Jose said we're both --

17   we're here within our legal rights, excuse me, did the security

18   guard say anything else to you?

19   A    He asked for our badges.

20   Q    Did you give him your badges?

21   A    Yes.  We all put our hands up with our badge and he took

22   them individually.

23   Q    Now, after he took your badges did he do anything with

24   your badges?

25   A    Yes.  Each one he took a picture from.



www.escribers.net | 800-257-0885

1    Q    And why is it that you believe he took a picture.

2    A    Because he put his hand up in front -- in front of his

3    phone and you could see the flash and hear a click.

4        MR. RODRIGUEZ-RITCHIE:  Okay.  If the record could reflect

5    that Mr. Sanchez once again used his hands to position -- to

6    demonstrate positioning the badge underneath the phone.

7    Q    BY MR. RODRIGUEZ-RITCHIE:  Now, after this male security

8    guard took the pictures of your badges, did he say anything to

9    you?

10   A    From that point, he just went back into Door 1.

11   Q    After this male security guard went back into Door 1, did

12   you stay at Door 1?

13   A    Yes.  We continued handing out leaflets together until

14   about 5:30 a.m.

15   Q    Okay.  Now, at any point, did the three other individuals

16   you were with -- at any point, did they leave?

17   A    Yes.  Rich Ortiz and Jose Moran had to start their shift

18   at 5:30 -- or get inside to make sure they were on time, so

19   they stopped handing out leaflets and went inside the factory

20   at 5:30 a.m.

21   Q    And what about the other individuals?

22   A    He was with me helping me hand out leaflets until about

23   5:45 a.m. before he had to start his shift.

24   Q    Okay.  Did you ever leave Door 1?

25   A    I continued by myself until about 6:20 a.m.



1    Q    Okay.  And after 6:20 a.m., what did you do?

2    A    I decided to go back to my vehicle and drive towards North

3    Admin where I used to enter before I had to -- before I got put

4    on leave.

5    Q    Okay.  I'm handing you what's been pre-marked as General

6    Counsel's Exhibit 5.

7         JUDGE TRACY:  Let me ask you:  You just testified about

8    the female security guard pointing at something; what was she

9    pointing at?

10        THE WITNESS:  Our leaflets.

11        JUDGE TRACY:  Okay.

12   Q    BY MR. RODRIGUEZ-RITCHIE:  Okay.  Have you taken a look at

13   General Counsel's Exhibit 5?

14   A    Yes.

15   Q    Do you recognize General Counsel's Exhibit 5?

16   A    Yes.  I do.

17   Q    And what do you recognize it to be?

18   A    That is North Admin.

19   Q    Of the Tesla Fremont facility?

20   A    Yes.

21   Q    Does it accurately depict the North Admin entrance area as

22   it existed, to the best of your recollection, on February 10,

23   2017?

24   A    Yes.

25        MR. RODRIGUEZ-RITCHIE:  Okay.  At this time I'd like to



www.escribers.net | 800-257-0885

1    move to admit General Counsel's Exhibit 5 into evidence.

2         JUDGE TRACY:  Any objections?

3         MR. ROSS:  No.

4         JUDGE TRACY:  Okay.  So General Counsel's Exhibit 5 is

5    admitted into evidence.

6    **(General Counsel Exhibit Number 5 Received into Evidence)**

7    Q    BY MR. RODRIGUEZ-RITCHIE:  Mr. Sanchez, if you could use a

8    laser pointer and show us where the North Admin Building is in

9    General Counsel's Exhibit 5?

10   A    This is the North Admin pretty much about right here, all

11   the way around.

12   Q    Okay.  So if the record could reflect that Mr. Sanchez has

13   used the laser pointer to point to encircle the building

14   located in the center of the picture.  Now, Mr. Sanchez, you

15   testified that you drove over to the North Admin area after you

16   left Door 1?

17   A    (No verbal response).

18   Q    Did you park by the North Admin area?

19   A    Yes.  I did.

20   Q    And when you parked there, did you stay in your car?

21   A    No.

22   Q    What did you do?

23   A    I got out of my vehicle and started walking towards North

24   Admin and ran into three coworkers.

25   Q    Okay.  And did you have any interactions with the three



www.escribers.net | 800-257-0885

1    coworkers?

2    A    Yes.  I asked them if they were ready for a change for the

3    future.

4    Q    Did you hand them any documents?

5    A    Yes.  I handed each one of them one of the leaflets.

6    Q    That's a leaflet from General Counsel's Exhibit 8?

7    A    Yes.  It is.

8    Q    Okay.  Now, when you were at the North Admin entrance,

9    were you using any sound-making devices?

10   A    No.

11   Q    Did you use any sound-amplying devices?

12   A    No.

13   Q    Did you threaten anybody?

14   A    No.

15   Q    Did you make any physical gestures towards anybody?

16   A    No.

17   Q    Did you stay at the North Admin building area?

18   A    As soon as I handed out the leaflets, I started walking

19   towards Door 3.

20   Q    Okay.  If you can show us on General Counsel's Exhibit 5

21   --- and I'm going to show you a different exhibit next, but if

22   you can show us from the picture, where is Door 3?

23   A    Door 3 would be way over here.

24   Q    So that if you were facing the North Admin entrance,

25   that's to the left?



www.escribers.net | 800-257-0885

1    A    To that direction.

2        MR. RODRIGUEZ-RITCHIE:  Okay.  I can't recall if I did

3    this already.  Did I move General Counsel's Exhibit 5 into

4    evidence?

5        JUDGE TRACY:  I believe so.  Yes, right?  Sorry, I'm so

6    focused on trying to pay attention to all the doors, but --

7        THE WITNESS:  There's a lot.

8        MR. ROSS:  It's two-sided?

9        MR. RODRIGUEZ-RITCHIE:  Yes.  Your copy is.

10       MR. ROSS:  Hmm?

11       MR. RODRIGUEZ-RITCHIE:  The original one ending in two

12   pages.

13       MR. ROSS:  I see.

14       MR. RODRIGUEZ-RITCHIE:  The one I gave you --

15       MR. ROSS:  Okay.

16       MR. RODRIGUEZ-RITCHIE:  -- is double-sided.

17       MR. ROSS:  All right.  That's fine.

18       MS. FEINBERG:  I just want to tell -- Your Honor, just as

19   a -- I just want to -- so this is Mr. Galescu, who's also a

20   charging party.  Since he just entered the room, I wanted you

21   to know.  He isn't testifying about this day, so.

22       JUDGE TRACY:  Okay.

23       MS. FEINBERG:  But I just wanted you to know.

24       JUDGE TRACY:  I appreciate that.  Thank you.

25   Q    BY MR. RODRIGUEZ-RITCHIE:  Okay, Mr. Sanchez.  I'm going



1    to hand you two pages that have been pre-marked as General

2    Counsel's Exhibit 6-001 and 6-002.

3        Mr. Sanchez, do you recognize 6-001 and 6-002?

4    A    Yes.  I do.

5    Q    And let's start with 6-001; what do you recognize 6-001 to

6    be?

7    A    That's between North Admin going towards the -- to Door 3,

8    and there's a ledge on the -- that side --

9    Q    Okay.

10   A    -- in between that and --

11   Q    I can publish it now, if that would be more helpful.

12   Okay.  So Mr. Sanchez I'm showing General Counsel's Exhibit

13   6-001 which is what you have in front of you.  You testified

14   just now that it shows the area between the North Admin

15   building and Door 3.  Can you show us where Door 3 is in the

16   picture?

17   A    Door 3 would be about right here, in this area.

18   Q    Okay.  So the record will reflect that's the center left

19   area.  And the North Admin building, where is that in the

20   picture?

21   A    That's all this right here.

22   Q    Okay.  So that's to the right top of the picture?  And you

23   testified about a ledge?

24   A    Yes.

25   Q    And where is that in the picture?


www.escribers.net | 800-257-0885

1    A    That would be about right here.

2    Q    Okay.  So that's between Door 3 and the North Admin

3    entrance, correct?

4    A    Correct.

5    Q    Okay.  Now, does General Counsel's Exhibit 6-001

6    accurately depict the area between Door 3 and the North Admin

7    entrance as it existed on February 10, 2017?

8    A    Yes.  It does.

9    Q    Okay.  And I want you to turn then to 6-002.  Take a look

10    at it.  Let me know when you're ready.

11    A    Yes.  I'm ready.

12    Q    Okay.  Do you recognize 6-002?

13    A    Yes.

14    Q    What is 6-002?

15    A    That is Door 3.

16    Q    Okay.  Is it just a zoomed-in picture of Door 3?

17    A    Yes.  It is.

18    Q    Okay.  Can you show us where Door 3 is, in 6-002?

19    A    Once you enter with the ramp, you enter through here, and

20    then if you take the stairs, it goes and enters on this side.

21        MR. RODRIGUEZ-RITCHIE:  So if the record could reflect

22    that Mr. Sanchez has pointed to, if facing Door 3, an entrance

23    on -- with a ramp on the side of Door 3 and an entrance with

24    stairs on the left side of Door 3.

25        Okay.  At this time, I'd like to move General Counsel's



1    Exhibit 6-001 and -002 into evidence.

2        JUDGE TRACY:  Any objections?

3        MR. ROSS:  No.

4        JUDGE TRACY:  All right.  So General Counsel's Exhibit

5    6-001 to 6-002 is admitted into evidence.

6    **(General Counsel Exhibit Number 6-001 and 6-002 Received into**

7    **Evidence)**

8    Q    BY MR. RODRIGUEZ-RITCHIE:  Now, on February 10, 2017, Mr.

9    Sanchez, did you ever go to Door 3?

10   A    Yes.

11   Q    Do you remember about what time you got to Door 3?

12   A    It was about, at that point, it's got to about 6:30 at

13   that point, around there, 6:25.

14   Q    AM?

15   A    AM, 6:30.  AM, around there.

16   Q    Okay.  When you got to Door 3, were you alone?

17   A    Yes.

18   Q    Okay.  And why did you go to Door 3?

19   A    To hand out leaflets and educate my coworkers.

20   Q    Okay.  When you got to Door 3, did you actually leaflet?

21   A    Yes.  I did.

22   Q    Okay.  While you were at Door 3, did -- were you using any

23   sound-making devices?

24   A    No.

25   Q    Any sound-amplifying devices?



1   A    No.

2   Q    Did you threaten anybody at Door 3?

3   A    No.

4   Q    Did you make any physical gestures towards anyone at

5   Door 3?

6   A    No.

7   Q    Okay.  Now, while you were at Door 3, did you have any

8   encounters with any security guards?

9   A    Yes.  About five minutes into my -- when I got there.

10  Q    Okay.  Could you describe the Door 3 security guard?

11  A    Yes.  It was a female security guard who came out of

12  Door 3.

13  Q    Do you know her name?

14  A    No.  I don't.

15  Q    Now, this female security guard at Door 3; is that the

16  same female security guard you testified about earlier?

17  A    No.

18  Q    Now, where was -- and if you could use the laser pointer,

19  where was the -- this female security guard when you first saw

20  her at Door 3?

21  A    She came out of the stair side, right here.

22  Q    Okay.  And where were you?

23  A    I was on the ground right here.

24  Q    In front of the stair side of the stairs?

25  A    Yes.



www.escribers.net | 800-257-0885

1    Q    Okay.  Now, this Door 3 female security guard; did she

2    speak with you?

3    A    Yes.  She asked if I was --

4    Q    What --

5    A    -- an employee.

6    Q    Okay.  And did you answer her question?

7    A    And I said, "Yes.  I've been at Tesla for five years."

8    Q    Did she say anything to you?

9    A    Yeah.  She said I should leave the premises, and right

10   after that, immediately asked for my badge.

11   Q    Did you give her your badge?

12   A    Yes.  I did.  I put my hand up since I was on the ground

13   and she snatched my badge aggressively from my hand, and --

14   Q    Okay.

15   A    -- she took a picture of it.

16   Q    Okay.  How do you know she took a picture?

17   A    I heard the click.

18   Q    Okay.  Can you show us what she did with your badge?

19   A    She had it in front of her -- her phone, and then you

20   heard a click, and then she handed it back to me after that.

21        MR. RODRIGUEZ-RITCHIE:  Okay.  If the record could reflect

22   that Mr. Sanchez used his hands to show his badge being placed

23   underneath the phone, prior to hearing a click.

24   Q    BY MR. RODRIGUEZ-RITCHIE:  Now, did she ever give you your

25   badge back?



www.escribers.net | 800-257-0885

1    A    Yes.  She did.

2    Q    After she gave your badge back, did she stay out on the

3    stair side of Door 3?

4    A    No.

5    Q    Where did she go?

6    A    She walked back into Door 3.

7    Q    After the female security guard walked back into Door 3,

8    did you continue to flyer?

9    A    Just for a few more minutes and then it died down.

10   Q    Did you stay outside of Door 3 after you stopped flyering?

11   A    I -- it was about 6:40, and I decided to go and take a

12   break and go back to my -- my car.

13   Q    Okay.  How long did you stay in your car?

14   A    Until 8:00 a.m., before the next work break came out.

15   Q    Okay.  At around 8:00 a.m., did you get out of your car?

16   A    Yes.  I did.

17   Q    And what, if anything, did you do?

18   A    I walked back to Door 3.

19   Q    And why did you walk back to Door 3?

20   A    Because I knew that people were on their break, and I

21   wanted to help educate them on -- on their rights.

22   Q    Okay.  When you got to Door 3, did you hand out flyers?

23   A    Yes.  I did.

24   Q    How long did you stay at Door 3?

25   A    No more than 10 minutes.



www.escribers.net | 800-257-0885

1    Q    Okay.  And after the 10 minutes, did you leave Door 3?

2    A    Yes.  I did.

3    Q    Where did you go after Door 3?

4    A    I went back to my vehicle and I decided to go to the back

5    of the parking lot where there's a back entrance for the

6    factory, and that's a dirt parking lot.

7    Q    Now, did you ultimately get to the back entrance?

8    A    Yes.  I did.

9    Q    When you got to the back entrance, did you have any

10   interactions with employees?

11   A    Yes.  I did.

12   Q    When you had interactions with the employees, were you

13   using any sound-making devices?

14   A    No.

15   Q    Any sound-amplifying devices?

16   A    No.

17   Q    Did you threaten any of the employees?

18   A    No.

19   Q    Did you make any physical gestures towards them?

20   A    No.

21   Q    Now, when you were at the back entrance, did you go inside

22   of the back door?

23   A    No.

24   Q    Why not?

25   A    They didn't let me get in.



1    Q    Okay.

2    A    They simply did not allow me to get in.

3    Q    Did you try to go into the back door?

4    A    I tried to scan my badge, because I had to go to the

5    bathroom really, really bad at that point, but the --

6    Q    Could you describe to us how you scanned your badge?

7    A    I put my badge against the sensor and it -- since I was on

8    leave, my badge wasn't active.

9    Q    Okay.  Did you try to open the door?

10    A    You -- no.  Once a red light, you're not going to be able

11    to open the door.

12    Q    Okay.  Now, at this -- the back entrance, did you have any

13    encounters with any security guards?

14    A    Yes.  She just asked for my badge so she can try to get me

15    in, so she could call my badge number in with her

16    walkie-talkie.

17    Q    Did you hear her call your badge in?

18    A    I heard my badge number being called.

19    Q    Through what?

20    A    Through the walkie-talkie.

21    Q    Okay.  And where were you when you had this interaction

22    with the security guard?

23    A    I was by the entrance of the factory.

24    Q    By the back entrance?

25    A    The back entrance of the factory.



www.escribers.net | 800-257-0885

1    Q    And was the security guard outside as well?

2    A    Yes.  She was.

3    Q    Okay.  Now, after you heard the security guard announce

4    your badge number, what if anything happened next?

5    A    I was standing there probably about three minutes, and I

6    seen someone was coming out of the back door, and --

7    Q    Now, could you actually describe the security guard that

8    you were having the interaction with outside?

9    A    She was wearing a -- she was a -- a black female security

10    guard with a Tesla logo hat with "Security" on it, and a jacket

11    with the same imprint.

12    Q    Now, you testified that you saw somebody else coming out;

13    can you describe that person?

14    A    Yes.  You could tell that that person was a supervisor for

15    Tesla.

16    Q    And why could you tell that?

17    A    They wear a specific red shirt and -

18    Q    All supervisors at Tesla wear that?

19    A    Yes.

20    Q    Okay.  And did you know this person?

21    A    No.

22    Q    Okay.  The person that you saw -- the "red-shirt

23    supervisor", I'll say -- did you actually speak with this

24    person?

25    A    He spoke to me first.



www.escribers.net | 800-257-0885

1    Q    Okay.  And what did he say?

2    A    He says, "Are you Jose Moran?"

3    Q    Did you answer his question?

4    A    I said, "No, I'm not, but I'm with him."

5    Q    Okay.  Now, after you said that you weren't, but you were

6    with him, did the red-shirt supervisor say anything back to

7    you?

8    A    He said, "You need to leave the premises now."

9    Q    Did you say anything back to him?

10   A    I said, "I'm here within my legal rights.  Are you taking

11   away my worker's rights?"

12   Q    Did he respond to you?

13   A    He did not.

14   Q    Did he do anything?

15   A    Yes.  Right after that, he pulls out his phone

16   aggressively and puts it right near my face, probably no more

17   than six inches.

18   Q    Okay.  Can you describe -- when you say, "Put the phone

19   right near your face," is the front of the phone or the back of

20   the phone facing you?

21   A    The back of the phone was aiming towards my face.

22   Q    Okay.  Did you hear anything come out of the phone?

23   A    Yes.

24   Q    What?

25   A    It was that dial tone like the one that you have on an



www.escribers.net | 800-257-0885

1  iPhone and it has that FaceTime on it, and that was the dial

2  tone you could hear.

3  Q    Okay.  Did you hear anything else after you heard the

4  FaceTime dial tone?

5  A    Yes.  I heard a female voice come out of the -- that

6  phone.

7  Q    And what did the female voice say?

8  A    It says, "Hello, Mr. Sanchez."

9  Q    Did the female voice say anything else to you?

10  A    I responded after that, still kind of stunned, saying,

11  "Hello?"

12  Q    Okay.  Did she say anything back to you?

13  A    She says, "I see that you're on leave of absence."  I see

14  that you got injured.  You should be home resting."

15  Q    Now, the female voice on the phone; did you ever see the

16  front of the phone?

17  A    No.  I did not.

18  Q    Did she announce herself and say her name?

19  A    No.  She did not.

20  Q    Do you know who that female voice was?

21  A    No.

22  Q    Okay.  Now, at this point in time, were you still employed

23  by Tesla?

24  A    Yes.

25  Q    So after she told you you should be home resting, did you



1    respond to her?

2    A    I said, "I'm here within my legal rights.  I'm not going

3    against my restrictions.  I'm not pushing, pulling, or lifting.

4    All I'm doing is handing out flyers."

5    Q    Did the female voice on the phone say anything else to

6    you?

7    A    She says that, "Well, you should -- you should go home and

8    rest.  Can you please leave the premises?"

9    Q    Did you say anything back to her?

10   A    I said, "Absolutely.  I've got to go.  I'll go."

11   Q    And did you actually go?

12   A    Yes.  Because I had to go to the bathroom real bad.

13        MR. RODRIGUEZ-RITCHIE:  Okay.  No further questions.

14        JUDGE TRACY:  Okay.  Ms. Feinberg?

15        MS. FEINBERG:  No.  I have no questions at this time.

16   Thank you.

17        JUDGE TRACY:  Okay.  Mr. Ross?

18        MR. ROSS:  Yeah.  May I see the affidavit, please?

19        JUDGE TRACY:  I'm assuming there's an affidavit?

20        MR. RODRIGUEZ-RITCHIE:  Yes.

21        JUDGE TRACY:  Okay.  Go ahead for the record.  You can

22   announce that you're handing it to him and how many pages this

23   is.

24        MR. ROSS:  And if you have two copies, I'd like to see the

25   two copies, please.



www.escribers.net | 800-257-0885

1      MR. RODRIGUEZ-RITCHIE:  It's underneath the table.

2      JUDGE TRACY:  Okay.  Do you know how many pages it is?

3      MR. RODRIGUEZ-RITCHIE:  I think that's about 11.  One,

4  two, three --

5      JUDGE TRACY:  Would it -- any exhibits?

6      MR. ROSS:  No exhibits.

7      JUDGE TRACY:  Okay.  Handing --

8      MS. FEINBERG:  Around 14, I think.

9      MR. RODRIGUEZ-RITCHIE:  Fifteen pages.  So if the record

10  could reflect, I'm handing two pages to Counsel -- two copies

11  to Counsel.

12  (Counsel confer)

13      JUDGE TRACY:  All right.  So again, let us know when you

14  are ready to resume.  I assume you also might need a little

15  break, a restroom break if anything?

16      MR. ROSS:  That'd be fine.

17      JUDGE TRACY:  So just let us know.  Maybe about 20 minutes

18  or so, but if you need more time, let me know, okay?

19      MR. ROSS:  Will do.  Thank you.

20      JUDGE TRACY:  Let's go off the record.

21  (Off the record at 2:49 p.m.)

22      JUDGE TRACY:  Go ahead please.

23      MR. ROSS:  Yeah.  Could you show that first slide where he

24  had the arrow on the --

25      MR. RODRIGUEZ-RITCHIE:  Do you have that number?


www.escribers.net | 800-257-0885

1      MR. ROSS:  Yeah.  Its number 2.  And does he have the --

2  the laser pointer up there?

3      MR. RODRIGUEZ-RITCHIE:  I don't know.

4      MR. ROSS:  Great.  Perfect.  Okay.  May I proceed?

5      JUDGE TRACY:  Yeah.  Go ahead, please.

6                      **CROSS-EXAMINATION**

7  Q    BY MR. ROSS:  All right.  Mr. Sanchez, the -- on the

8  screen, you've got General Counsel's Exhibit number 2, and

9  you've talked about lots of different doors, and we have photos

10  of areas around the doors, but it's hard to figure out where

11  the doors are in the overall context of the building.  So could

12  you show me, using that laser pointer, exactly where Door

13  number 1 is on General Counsel's Exhibit 2?

14  Q    It would be about right here.

15  Q    That's where Door number -- okay.  So keep pointing.  I'm

16  getting -- so Door number 1 would be?

17  A    Somewhere around here.

18      MR. ROSS:  Okay.  If I may go to the screen for a second?

19      JUDGE TRACY:  Go head.

20  Q    BY MR. ROSS:   Is this Door number 1 right here?

21      MS. FEINBERG:  You're standing in front of it.

22      THE WITNESS:  I can't see.

23  Q    BY MR. ROSS:  Sorry about that.

24  A    I believe that's the Door number 1 right there.

25  Q    Right there?



www.escribers.net | 800-257-0885

1    A     I believe that's the one.

2    Q     Do it again please?  I'm sorry.

3    A     Right there, somewhere around that area.

4    Q     Right here?

5    A     Yeah.  I believe that's -- or is it this one right here?

6          MS. FEINBERG:  Okay.  Could we go back to this, since

7    you're now directly talking to the witness without --

8          MR. ROSS:  Yeah.

9          JUDGE TRACY:  -- us being part of it?

10         MS. FEINBERG:  I just -- okay.  I'll tell you what, why

11   don't -- why don't we do this?  I'll have him conform on my

12   copy which we'll show everybody else so we can conform their

13   copies to where the various doors are.  Maybe that'd be easier.

14         JUDGE TRACY:  Or how about this; it would be great if the

15   parties would enter into a stipulation about where the doors

16   are since they, I assume, have not changed since February 10,

17   2017?

18         MR. ROSS:  I would imagine that's the truth.

19         JUDGE TRACY:  So, you know, you could do the best that you

20   can with him at this point.  I mean, it's kind of a rather

21   fuzzy photo, and what you can do -- and admit it later as a

22   joint exhibit as --

23         MR. ROSS:  That's a good idea.

24         JUDGE TRACY:  -- just something which indicates where the

25   doors are.



www.escribers.net | 800-257-0885

1        MR. ROSS:  That's a good idea.

2        JUDGE TRACY:  So his testimony makes crystal clear sense

3    to everybody.

4        MR. ROSS:  Okay.

5        MS. FEINBERG:  Thank you.

6        MR. ROSS:  We'll do that.  Tell me, could the witness be

7    shown the formal documents, please?

8        MR. RODRIGUEZ-RITCHIE:  And that will be General Counsel's

9    Exhibit 1?

10   Q    BY MR. ROSS:  Yeah.  And Mr. Sanchez, I'd like you to take

11   a look, I believe it's General Counsel's Exhibit 1A which I

12   believe is a charge filed by you; is that right?

13   A    1A?

14   Q    If it's not there, it's amongst the --

15       MR. RODRIGUEZ-RITCHIE:  Can you speak up a little bit, Mr.

16   Ross?

17       MR. ROSS:  Sure.  I said, in General Counsel's Exhibit 1,

18   during the first couple of documents in General Counsel's

19   Exhibit 1 --

20       MS. FEINBERG:  So just so you know, I don't have an index

21   or the list of the General Counsel's exhibits.  I happen to

22   probably have all the charges.

23       MR. ROSS:  Yeah.  So do I.

24       MS. FEINBERG:  But I don't have it, anything, so when you

25   use these numbers, they have --



1        MR. ROSS:  Okay.

2        MS. FEINBERG:  -- very little meaning to me.

3        MR. ROSS:  Okay.

4        JUDGE TRACY:  So make sure, for the General Counsel, that

5   you guys make sure that the Charging Party --

6        MS. FEINBERG:  I mean, I'm happy to --

7        JUDGE TRACY:  -- has her set of indexes, but for this

8   moment, do you mind sharing with her what you --

9        MR. ROSS:  I'll tell you what, yeah.

10       JUDGE TRACY:  -- have there?

11       MR. ROSS:  I'll help you.  It's entitled Case number

12   32-CA-197020.

13       JUDGE TRACY:  And let me also explain the duties in

14   reverse order.  So the bottom will be 1A.

15       THE WITNESS:  Thank you.

16  Q    BY MR. ROSS:  Do you see it?

17  A    I see it now.

18  Q    Great.  Thank you.

19       MS. FEINBERG:  Thank you very much.  Sorry.

20       MR. ROSS:  That's okay.

21       JUDGE TRACY:  Thank you.  The General Counsel's been kind

22   enough to share --

23       JUDGE TRACY:  Do you have that?

24       MS. FEINBERG:  -- a set with me.

25       MS. FEINBERG:  Okay.



www.escribers.net | 800-257-0885

1      MR. ROSS:  Okay.

2      JUDGE TRACY:  Everybody on 1A?

3      MS. FEINBERG:  Thank you.

4      JUDGE TRACY:  Okay.

5      MS. FEINBERG:  Appreciate it.

6   Q    BY MR. ROSS:  Okay.  And Mr. Sanchez --

7      MS. FEINBERG:  Yes.  We'll work together.

8   Q    BY MR. ROSS:  -- on that document?

9   A    Yes.  It is.

10  Q    Okay.  And the second page of that document --

11     MS. FEINBERG:  I don't know which one --

12  Q    BY MR. ROSS:  -- there's an attachment A; do you see that?

13  A    Yes.

14  Q    Okay.  Now, the language that is on Attachment A, is that

15  language that you composed or did somebody else compose that?

16     MR. RODRIGUEZ-RITCHIE:  Objection.  Relevance.

17     MS. FEINBERG:  Objection.  Attorney-client privilege.

18     JUDGE TRACY:  So any response?

19     MR. ROSS:  Yeah.  I want to ask him some questions about

20  it.  So you're telling me I can't ask him questions without a

21  document that he has signed that --

22     MS. FEINBERG:  No.  Nobody said that.

23     MR. ROSS:  -- is purportedly his document?

24     JUDGE TRACY:  Well --

25     MS. FEINBERG:  That wasn't the question.


www.escribers.net | 800-257-0885

1    JUDGE TRACY:  I'd like to first ask:  The first objection

2  was about relevance, so what is the relevance?

3    MR. ROSS:  Well, this is a preliminary question which goes

4  to documents, that may exist with respect to the events of this

5  day, that he may have.  I'd just as soon not share with the

6  witness, my ultimate question I want to ask him.  I'd like to

7  -- this is preliminary to questioning about -- about that.

8    MR. RODRIGUEZ-RITCHIE:  Was a subpoena issued to the

9  witness?

10    MR. ROSS:  There doesn't have to be.  He's testified.

11  He's here answering questions relevant to his testimony.

12    MR. RODRIGUEZ-RITCHIE:  And doc --

13    MS. FEINBERG:  This wasn't --

14    MR. ROSS:  This is relevant to his testimony.

15    MS. FEINBERG:  But this wasn't --

16    MR. RODRIGUEZ-RITCHIE:  And documents in his possession

17  would be irrelevant.

18    MR. ROSS:  Well, this hearing is a long way from being

19  over.  It may be that we're going to be subpoenaing some

20  documents.

21    MS. FEINBERG:  Well, this isn't a discovery process.  This

22  is -- you're supposed to be asking him about his direct exam on

23  cross.

24    MR. ROSS:  Well, we have no discovery in this proceeding.

25  The only --

22-60493.149



1      MS. FEINBERG:  That's correct.

2      MR. ROSS:  -- people who have discovery in this case is

3   the General Counsel.

4      JUDGE TRACY:  So --

5      MS. FEINBERG:  That's right.

6      JUDGE TRACY:  Perhaps we'd like for the witness to leave

7   so you can share with the General Counsel what it is -- and the

8   Charging Party -- what, you know, the intention is behind it?

9      MR. ROSS:  I'll cut to the -- I'll cut to the chase.

10     JUDGE TRACY:  Okay.

11  Q    BY MR. ROSS:  Okay.  Mr. Sanchez, after the events of

12  February 10th, when you were confronted by these security

13  people, did you report that to the Union?

14  A    Yes.  I did.

15  Q    Okay.  And who at the Union did you report it to?

16  A    To Susie Reed.

17  Q    Okay.  And did you give Ms. Reed anything in writing

18  describing what had happened that day?

19     MS. FEINBERG:  Objection.  Attorney-client privilege.

20     MR. ROSS:  There's no attorney-client privilege --

21     MS. FEINBERG:  Well, because --

22     MR. ROSS:  -- from the Union.

23     MS. FEINBERG:  Depends.  You don't -- whatever.  He didn't

24  say who else she -- he provided it to.

25     MR. ROSS:  Well --



www.escribers.net | 800-257-0885

1    MS. FEINBERG:  He --

2    MR. RODRIGUEZ-RITCHIE:  We'd also renew our relevancy

3    objection to that question.

4    JUDGE TRACY:  Okay.  As far as attorney-client privilege,

5    I don't see where that is at this point.  Now, obviously if we

6    then start talking about attorneys that he spoke with that are

7    his attorneys, that is where attorney-client privilege comes

8    in.  I'm not really sure any conversations with the Union --

9    MS. FEINBERG:  I happen to represent Mr. Sanchez, and I

10   represent the UAW, and so --

11   JUDGE TRACY:  Yeah, but that -- that's not what he just

12   testified about.

13   MS. FEINBERG:  I --

14   JUDGE TRACY:  So if we --

15   MS. FEINBERG:  I know, but --

16   JUDGE TRACY:  -- get to that point --

17   MS. FEINBERG:  -- but you're about to ask him what he gave

18   to Ms. Reed, which might be also created for me, so that's what

19   -- I mean, because of the way the question's asked, it's hard

20   to -- I don't want to wait

21   JUDGE TRACY:  Well, I'm going to overrule the objection at

22   this point, because I --

23   MS. FEINBERG:  Okay.

24   JUDGE TRACY:  I still don't see where the attorney-client

25   privilege has come in yet.


www.escribers.net | 800-257-0885

1    MS. FEINBERG:  Okay.  All right.  I'll preserve it.

2    JUDGE TRACY:  And in terms of the relevance; again, you

3    know, this is cross-examination, so there is a little bit of

4    latitude here.  However, we need to focus, again, on the

5    complaints and the amendments, et cetera.  So I am also

6    interested to know where -- how this is at all relevant to this

7    hearing.

8    MR. ROSS:  Well, again, we've heard a lot from the other

9    side about production of documents.  We have not issued

10   subpoenas because, frankly, we don't know who to send subpoenas

11   to and what documents exist.  So since we are going to be

12   spending time together in September and October, we're trying

13   to ascertain what documents, if any, we might want to subpoena.

14   And therefore, I'm asking questions of the witness with respect

15   to that --

16   JUDGE TRACY:  Well, it's --

17   MR. ROSS:  -- and always directly relevant to the

18   testimony he just gave, because we're asking for a note saying

19   -- memorandum saying they have anything that may exist that he

20   participated in the preparation of.  We're not asking for

21   attorney-client documents.  I'll make that clear.  But anything

22   that he may have generated that would chronicle the events of

23   the -- this day, I think we're entitled to.

24   JUDGE TRACY:  So I'm going to sustain the objection

25   because that's not a proper use of the -- the witness's



1    testimony here.  If you want to subpoena his documents,

2    whatever he may have --

3        MR. ROSS:  Well, may --

4        JUDGE TRACY:  -- you -- you're -- I'm certainly happy to

5    issue the subpoena.  They can respond with what they have --

6        MR. ROSS:  Um-hum.

7        JUDGE TRACY:  -- what they don't have, but to use this

8    process to discover what he may or may not have, I'm not going

9    to allow it.

10        MR. ROSS:  Okay.  But what we need to do is to ascertain

11    what documents exist, which is why I'm asking the question.

12        JUDGE TRACY:  So you can, again, do that via subpoena.

13    That's not what --

14        MR. ROSS:  All right.

15        JUDGE TRACY:  -- we're going to do here.

16        MR. ROSS:  That's fine.

17    Q    BY MR. ROSS:  Now, Mr. Sanchez, are you currently an

18    active employee at Tesla?

19    A    Yes.

20    Q    You are?  Okay.  But there were periods of time when you

21    were inactive?

22    A    Well, I'm still on leave of absence, but I'm still an

23    employee.

24    Q    Well, I understand you're still an employee.  You're an

25    employee on a leave of absence?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Okay.  Good.  Okay.  And how many times have you been on a

3    leave of absence from Tesla?

4    A    I was out.  I had two major injuries.

5    Q    Okay.  So would that -- does that mean there would've been

6    two leaves of absence?

7    A    Yes.

8    Q    Okay.  And can you tell us when the first leave of absence

9    was?

10   A    October of 2014.

11   Q    That's when it began?

12   A    That's when the injury occurred.

13   Q    And how long did it -- were you out on a leave of absence?

14   A    I went out on leave after the end of December throughout

15   January.

16   Q    Okay.  So you were injured in October; did not go out on

17   leave until December?

18   A    Yes.

19   Q    And then you were out from December.  Do you remember when

20   in December it was?

21   A    Right before Christmas, before they had a shutdown.

22   Q    Okay.  And you were out for how long?

23   A    Throughout the entire January, returned back in February

24   of 2015.

25   Q    Beginning of February?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    And what -- what year was that?

3    A    2015.

4    Q    Okay.  Okay.  And then the second leave began when?

5    A    September of 2016.

6    Q    And you've been -- and is that when you began the leave,

7    or is that when you suffered the injury?

8    A    I suffered the injury and then I got transferred to

9    another department --

10    Q    Uh-huh.

11    A    -- before I was put on leave.

12    Q    Okay.  And were you required to take leave, or did you

13    choose to take leave?

14    A    No.  I was put in the position where I had no choice but

15    to take the leave of absence.

16    Q    I don't follow you.  Can you explain that?

17    A    Yes.  At this point, my hands were in so much severe pain,

18    I couldn't even lift anything up anymore.

19    Q    Um-hum.

20    A    And they put me in a department where you have to use your

21    hands to lock the center console into the vehicle, and once I

22    used my hand, that pretty much ended anything of whatever job I

23    can do, because my hands couldn't even move anymore.

24    Q    I see.  So that leave began when?

25    A    Pretty much after the 8th of September, I believe.



www.escribers.net | 800-257-0885

1   Q    At what year?

2   A    Of 2016.

3   Q    And you've been on leave ever since?

4   A    No.  Actually, Tesla forced me to come back almost four

5   weeks later.

6   Q    I see.

7   A    Before even getting any results of what was wrong with me.

8   Q    Okay.  And then you went on leave again?

9   A    Once I -- once I was at work, and then I had my MRI and I

10  found two herniated discs in my neck, then I was officially put

11  on leave.

12  Q    Okay.  So you were off work four weeks beginning September

13  of 2016, came back to work?

14  A    For --

15  Q    For how long?

16  A    For about three weeks.

17  Q    And then after -- so that would've been?

18  A    About November, when I officially got put out.

19  Q    Okay.

20  A    Right in the early part of November.

21  Q    So -- so early November of 2016 is when you began your

22  most recent leave and you're still on leave?

23  A    Yes and no, because Tesla forced me to come back again in

24  February of 2017 for four hours.

25  Q    Okay.  And then you -


www.escribers.net | 800-257-0885

1    A    But --

2    Q    -- resumed your leave?

3    A    From that point on, I've been on leave ever since.

4    Q    Okay.  Okay.  Now, Mark Lipscomb, do you know who he is?

5    A    I've never met him, but I know -- I've met -- I've heard

6    about him.

7    Q    Okay.  Have you ever talked with him?

8    A    No.

9    Q    Did you ever talk to him about the documents that you

10   identified as emails that came from him?

11   A    No.  I just received them.

12   Q    Okay.  Were you on leave when those documents issued, or

13   were you back at work?

14   A    I was on leave at that point.

15   Q    Okay.

16   A    Just a few days apart.

17   Q    Okay.  And were you -- when you first saw them, did they

18   come to you from Mr. Lipscomb or did they come to you from Mr.

19   Moran?

20   A    No.  It came straight from Tesla.

21   Q    Tesla.  Okay.

22   A    Not from, you know --

23   Q    So you had access to your email at Tesla while you were on

24   leave?

25   A    Yes.



www.escribers.net | 800-257-0885

1    Q    Okay.  Now, on February 10, you went out to the parking

2    lot at Tesla at about -- between 3:30 and 4:00 in the morning?

3    A    Yes.

4    Q    Yeah?  Okay.  And do you remember what you were wearing

5    that day?

6    A    I mean, I was wearing a pullover sweater because it was

7    freezing.  It was cold.

8    Q    All right.  Dark -- dark sweater?

9    A    Yeah.

10   Q    Okay.  Were you wearing your badge around your neck on a

11   lanyard?

12   A    It's in my wallet.

13   Q    In your wallet, okay.  So you weren't wearing anything at

14   the moment that you spoke to the guards that would've told them

15   this is an employee?  They -- in order to verify your status as

16   an employee, they had to ask you to take your -- your badge out

17   of your wallet?

18   A    Yes.

19        MR. ROSS:  Okay.  Where is the affidavit?  I had one with

20   posits in it.  Thank you.

21   Q    BY MR. ROSS:  Now, you testified before that you were

22   working through a company called Volt for nine months and then

23   became a regular employee of Tesla?

24   A    Yes.

25   Q    Okay.  And were you working in general assembly while you



1    were working through Volt?

2    A    Yes.

3    Q    And then after you became a regular Tesla employee, were

4    you always working in general assembly after that?

5    A    Yes.

6    Q    Okay.  Now, is it correct that when you entered the

7    regular employment of Tesla, you were given a bunch of papers

8    to sign?

9    A    Yes.

10    Q    Okay.  Do you recall what you were asked to sign?

11    A    Honestly?  I was just excited to be a permanent.  I just

12    wanted to be a part of this new future company, so I didn't

13    really read much.  I just signed it and they said I'm an

14    employee -

15    Q    Okay.

16    A    -- of Tesla.

17    Q    Okay.  Good.  Okay.  I understand.  Would it be correct to

18    say that -- that you remember -- whether you signed or not, do

19    you remember being told that the company had trade secrets and

20    that you weren't allowed to take pictures in the factory?

21    A    Yes.

22    Q    And do you remember also being told that you weren't

23    allowed to talk about secrets concerning the vehicles?

24    A    Yes.

25    Q    And that you were not allowed to tell people when vehicles

22-60493.159



1    were coming out?

2    A   Yes.

3    Q   Okay.  Would it be correct also, to say that no one from

4    human resources ever mentioned to you about not being able to

5    talk to employees about wages and working conditions?

6    A   I never heard from HR about any of that before.

7    Q   HR never told you that?

8    A   No.

9    Q   Okay.  By the way, do you know how security guards verify

10    whether an employee badge is valid or not?

11    A   By calling in the badge number.

12    Q   Okay.  And how do you know that?

13    A   Because they called my badge number quite a few times

14    already.

15    Q   I don't follow you.  Will you --

16    A   Because whenever I am out there to hand out flyers to give

17    my coworkers, let them know about their rights, I have a

18    security guard -

19    Q   Okay.

20    A   -- who comes up to me and asks me for my badge.  You hear

21    him call out my badge number on the walkie-talkie.

22    Q   Well, my ques -- I'll ask the question this way as I

23    didn't ask it very well before:  If you're out there coming to

24    work and there's some, not necessarily for the purpose of being

25    out there to handbill, but for the purpose of wanting to gain



www.escribers.net | 800-257-0885

1    access to the building and there's some question as to whether

2    your badge is valid or not; do you know how security guards

3    verify the validity of a badge?

4    A    All I know is like, when I came in, when they forced me to

5    come in that February of 2017 --

6    Q    Um-hum.

7    A    -- my badge wasn't active, so when I tried to enter the

8    building, it wouldn't allow me, but they let me in personally.

9    They called in the badge number, you know, talking to, I'm

10   guessing, to their superior, and I was able to go to my station

11   the first time.

12   Q    I see.  And to get your badge number, they had to see your

13   badge, right?

14   A    Yes.

15   Q    Okay.  Now, we had a young, Hispanic guard.  That was one

16   person you spoke with, right?

17   A    Yes.

18   Q    We had an older, Middle Eastern guard, correct?

19   A    Yes.

20   Q    We had two female guards?

21   A    Yes.  Well, actually three, at the end, and/or four.

22   Q    Okay.  Three female guards.  Any other guards you see that

23   day?

24   A    Yes.  Then there was that fourth male security guard.

25   That was in Door -- Door 1.



www.escribers.net | 800-257-0885

1    Q    Any others?

2    A    And just that supervisor that came out at the end.

3    Q    This is at Door 4?

4    A    Yes.

5    Q    That's what the back door is, Door 4?

6    A    We'll call it Door X, because it doesn't really have its

7    own -- it's not -- doesn't have a Door 3 -- or Door 4 entrance.

8    Q    Okay.  Are -- by the way, are -- these doors, are there

9    signs over them that say, This is Door 1, Door 2, Door 3?

10   A    Yes.

11   Q    Okay.

12   A    Yeah.

13   Q    The one in the back didn't have a -- a door number?

14   A    No.

15   Q    Okay.  Okay.  Now, tell me, have you been shown any photos

16   of the guards that you -- strike that.  Have you been shown any

17   photos for the purpose of identifying which guard you spoke to

18   that day?

19   A    I did see some, but -- yes.

20   Q    And were you successful in identifying who you spoke with

21   that night?

22   A    No.  They -- they didn't resemble who I'd seen.

23   Q    Okay.  The young Latino guard, can you tell us how tall he

24   was?

25   A    He was probably about my height if not just a bit shorter.



www.escribers.net | 800-257-0885

1    Q    Um-hum.  What do you --

2    A    I'm not --

3    Q    What do you think he weighed?

4    A    He weighed maybe, at most, between 190 and 200.

5    Q    Okay.  Do you have a clear memory of the -- the hair color

6    and eye color?

7    A    I mean, the hair color was definitely black, but I could

8    -- I could remember his -- he was -- definitely had a younger

9    face, you know, for being a security guard.

10   Q    Okay.

11   A    He wasn't --

12   Q    By the way, did he have a badge on when you saw him?

13   A    Not a badge.  He had a jacket --

14   Q    Okay.

15   A    -- with the Tesla logo, saying "Security".

16   Q    Did he have a name tag?

17   A    He didn't -- I didn't see it on him.

18   Q    Did you ask him what his name was?

19   A    At that point, this was my first encounter doing these

20   things, so I was still a little nervous to make that kind of --

21   you know, to know that I can do that.

22   Q    Okay.  So you didn't ask him what his name was?

23   A    I did not.

24   Q    Okay.  Did you ask him to see his badge?

25   A    I did not.



www.escribers.net | 800-257-0885

1    Q    You did not, okay.  You see, we'd like to know who you

2    spoke with as much as you'd like to admit -- tell us who you

3    spoke, so I'd like you to tell me what, if anything you can

4    tell me, to help us figure out who you spoke with that night or

5    that morning?

6         MS. FEINBERG:  Objection.  Is it a question?

7         MR. ROSS:  Yeah.

8         MS. FEINBERG:  Okay.

9         MS. FEINBERG:  What --

10        JUDGE TRACY:  So if you could just follow up with a

11   question then?

12   Q    BY MR. ROSS:  Yeah, sure.  The older Middle Eastern

13   gentleman you spoke with; height, weight?

14   A    Short.  I mean, he was short and he was wrinkled.

15   Q    Short and wrinkled.

16   A    And --

17   Q    How old do you think he was?

18   A    He had to be going on -- already to go to his 60s at that

19   point.

20   Q    And when you say "short", what do you mean?

21   A    Short; 5'6", 5'7", the most.

22   Q    Heavyset?

23   A    No.  No.

24   Q    Okay.  And I think you said that one of the females was an

25   African-American woman?



www.escribers.net | 800-257-0885

1    A    The one at the end, yes, in Door X.

2    Q    In Door X, okay.  How about the other two females, what

3    were they?

4    A    Caucasian.

5    Q    The first one; how old do you -- would you say she was?

6    A    If it was, I would say later 30s -- if.  Maybe early 40s,

7    but something like that.

8    Q    Color hair?

9    A    She had -- I didn't really see it because she had her hat

10   on, so.

11   Q    Okay.

12   A    Then a ponytail, so I couldn't tell if it was brown or if

13   it was black.

14   Q    Okay.  Height?

15   A    But it was darker.

16   Q    Can you give me the heights?

17   A    She was above us, so I'm going to go on an estimation of

18   say, 5'6", 5'7".

19   Q    When you say, "She was above you," she was what?

20   A    She was on the stairs and we were on the ground.

21   Q    Okay.  And who was there when you spoke with her?

22   A    All four of the VOCs, including myself, so.

23   Q    So all four were there?

24   A    Yes.

25   Q    Okay.



www.escribers.net | 800-257-0885

 1    A    In Door 1.

 2    Q    And the other Caucasian, where'd you see her?

 3    A    In Door 3.

 4    Q    And could you describe her for me?

 5    A    There, I saw she had a little bit of some gray hair.  You

 6    know, she had like, the salt and pepper look.

 7    Q    Yeah?

 8    A    So that was -- you could tell she was in her mid-age.

 9    Q    Give me an age range from your perspective?

10    A    Probably, if -- at that point, either reached 40 or ready

11    to.

12    Q    Fortyish?

13    A    Yeah.

14    Q    Okay.  By the way, have you ever seen anybody on the Tesla

15    premises who had a red shirt on and wasn't a supervisor?

16    A    Leads will wear similar ones.

17    Q    Um-hum.  Leads are not supervisors, right?

18    A    No.

19    Q    Okay.  And aside from leads and supervisors, has anybody

20    who doesn't work in general assembly, in your experience, ever

21    worn a red shirt to work?

22    A    Not that specific type, no.

23    Q    Not that specific type.  So others have worn red shirts,

24    but you don't think it was specific to a lead or a supervisor?

25    A    No.



www.escribers.net | 800-257-0885

1    Q    Okay.

2    A    They wear -- it's completely -- it defines their position.

3    Q    I see, okay.  Okay.  By the way, when you were working,

4    which shift did you work?

5    A    Second shift.

6    Q    Began at what time, ended at what time?

7    A    6:00 p.m. to 6:00 a.m., six days a week.

8    Q    Six -- how many days a week?

9    A    Six days a week.

10       MR. ROSS:  Just a moment, please.

11   (Counsel confer)

12       MR. ROSS:  That's all I have.  Thank you.

13       JUDGE TRACY:  All right.  Any redirect?

14       MR. RODRIGUEZ-RITCHIE:  If I could just have one moment,

15   please?

16       JUDGE TRACY:  Okay.

17                     **REDIRECT EXAMINATION**

18   Q    BY MR. RODRIGUEZ-RITCHIE:  Mr. Sanchez, during your

19   employment at Tesla, Fremont, did anyone at Tesla ever tell you

20   that you couldn't enter the Tesla facility while on leave, with

21   the exception of February 10, 2017?

22   A    You mean, prior to February 10th?

23   Q    Yes.

24   A    No.

25   Q    And prior to February 10, 2017, did anyone share any



www.escribers.net | 800-257-0885

1    policies with you about not being allowed at the Tesla facility

2    while on a leave?

3    A    No.

4    Q    The events that you've testified about here today occurred

5    in February of 2017, more than 15 months ago; is that correct?

6    A    Yes.

7    Q    Do you remember specifically that each security guard that

8    approached you was wearing security clothing at that -- that

9    identified them as Tesla Security, or came out of cars that

10   said "Security"?

11   A    Yes.

12       MR. RODRIGUEZ-RITCHIE:  Nothing further.

13       JUDGE TRACY:  Any recross?

14       MR. ROSS:  No.

15       JUDGE TRACY:   All right.

16       MR. ROSS:  I just went on.  I missed out.

17   (Counsel confer)

18       MR. ROSS:  Yeah.  I have one other question.

19       JUDGE TRACY:  Okay.

20       MR. ROSS:  Maybe a little bit more.

21                    **RECROSS-EXAMINATION**

22   Q    BY MR. ROSS:  Mr. Sanchez, did you ever leaflet again

23   after February 2010?

24   A    Yes.

25   Q    How many times?



1    A    Many.

2    Q    Many times.

3    A    Many times.

4         MR. ROSS:  Okay.  Thank you.  That's all I have.

5         JUDGE TRACY:  All right.  Please don't discuss your

6    testimony until after the close of the hearing, okay?

7         THE WITNESS:  Yes.

8         JUDGE TRACY:  Thank you so much.

9         MR. ROSS:  Thank you, Mr. Sanchez.

10        JUDGE TRACY:  All right.  It's 3:50.  I think we should go

11   ahead and do your next witness, because they're here.  Is this

12   person planning to come back tomorrow, too?

13        MS. FEINBERG:  Yes.

14        MR. RODRIGUEZ-RITCHIE:  I believe.

15        MS. FEINBERG:  Yes.

16        JUDGE TRACY:  Okay.  So then how about we do the direct,

17   see how that goes, and if it gets too late, then we'll just

18   wait for the cross for tomorrow.

19        MR. ROSS:  Okay.

20        MS. FEINBERG:  Okay.

21        JUDGE TRACY:  Is that --

22        MS. FEINBERG:  That's fine.

23        MR. ROSS:  We --

24        MS. FEINBERG:  Even before then, because -- because every

25   time we have a break, someone's reviewing an affidavit or



www.escribers.net | 800-257-0885

1    something.  We've never had an opportunity to discuss any of

2    the subpoena issues and the questions that we have, so I'm just

3    wondering when we hope to achieve that, because we've -- you

4    told us, Do it on breaks, but there really hasn't been --

5         JUDGE TRACY:  Yeah.

6         MS. FEINBERG:  -- that opportunity, which I understand.

7    So I didn't know if it would be -- if we could end at a

8    particular time today and do it, or whatever.

9         JUDGE TRACY:  Well, that's right.  I mean, so say they

10   take another -- we end at 5:00 or 4:45, an hour or so, just

11   with the direct of this individual, then it'll give you time to

12   review the -- to talk, and then also if you want to let them

13   see the affidavit so they can prepare for tomorrow, or if they

14   want to see it in the morning before they cross him?

15        MS. FEINBERG:  Or do you -- I'm not sure we -- okay, I

16   don't know how long this witness is.  I guess we'll find out.

17        JUDGE TRACY:  I was told that it would be perhaps a little

18   bit less than this one.

19        MR. RODRIGUEZ-RITCHIE:  I'd just note for the record that

20   Mr. Ross has handed me the affidavits back.  We would just

21   oppose to having the affidavits be taken outside of this

22   facility overnight, so we'd be --

23        JUDGE TRACY:  I wasn't saying that.  What I was saying

24   was, if they want to look at the affidavits today and prepare

25   for their cross, keep them here and use them again in the



www.escribers.net | 800-257-0885

1   morning, or if they'd just rather wait until the morning to see

2   them, that's up to you guys, but yes, it doesn't leave this

3   room or this area.

4       MR. RODRIGUEZ-RITCHIE:  Okay.  And I just ask a couple of

5   minutes to go get my exhibits?

6       MR. ROSS:  No.

7       JUDGE TRACY:  Right.

8       MR. RODRIGUEZ-RITCHIE:  Before we start.

9       JUDGE TRACY:  Yes.

10      MR. ROSS:  Before we -- are we going to take a quick break

11  to --

12      JUDGE TRACY:  Yeah.

13      MR. ROSS:  -- use the rest room?

14      JUDGE TRACY:  He needs to get documents.

15      MR. ROSS:  Yeah.  Okay.

16      JUDGE TRACY:  And --

17      MR. ROSS:  But there is this one other housekeeping

18  matter.  We were advised today that General Counsel has

19  subpoenaed individuals; a woman named Tope, whose last name I'm

20  not even going to begin to try to pronounce.

21      MR. RODRIGUEZ-RITCHIE:  Ogunniyi.

22      MR. ROSS:  He - talk to my lawyer.  He'll tell you what it

23  is.

24      JUDGE TRACY:  Okay.

25      MR. ROSS:  And a gentleman by the name of Tim Fenelon.



www.escribers.net | 800-257-0885

1    Fenelon, Fenelon, something like that.

2         MR. RODRIGUEZ-RITCHIE:  I think it's Fenelon.

3         MR. ROSS:  Yeah.  Mr. Fenelon -- we come to find this out

4    today.  Counsel for the General Counsel told us about Fenelon

5    today, and we got contacted by Tope today, telling us that she

6    had been served with a subpoena on Saturday to appear on

7    Wednesday of this week.  She lives in Reno, Nevada.

8         JUDGE TRACY:  Okay.

9         MR. ROSS:  I just want to make General Counsel aware of

10   the fact that A, Mr. Fenelon, having not been served will not

11   be here, notwithstanding the issuance of the subpoena.

12        And Tope, I'm told, will also probably not be here on

13   Wednesday, so for the purpose of making use of Wednesday, I

14   want to let everybody know that there's going to be a hole in

15   the testimony so that they can try to fill that hole.

16        JUDGE TRACY:  So when will they be able to come, Thursday?

17        MR. ROSS:  I haven't talked with Tope.  I have - Fenelon

18   is out of the state.  He's in Michigan right now.

19        JUDGE TRACY:  Okay.  And when is he coming back?

20        MR. ROSS:  Don't know.  Do we know when --

21        MR. RODRIGUEZ-RITCHIE:  I would --

22        MR. ROSS:  He's gone for a month?

23        MR. RODRIGUEZ-RITCHIE:  -- note for the record, Your

24   Honor, the subpoena was actually issued several weeks ago so I

25   don't know that it's correct to suggest that it was actually

escribers
www.escribers.net | 800-257-0885

1    not served until just this past weekend.  I don't know that we

2    will necessarily get to them by that point, but they were

3    served to appear on Wednesday.

4        JUDGE TRACY:  So let me say this:  I think I've said it

5    like, so many times, but all this stuff with the subpoenas and

6    the witnesses, I mean, honestly, that is up for you guys.  I

7    really -- as you can see, I try to be pretty positive and kind

8    of move it along, but really work together.  I mean, we're

9    here.  We want to get this case heard, and so these issues --

10   you know, it's one thing if you're going to say, They're just

11   going to totally ignore it, and then we've got a different

12   issue we've got to deal with.  But the fact is, is that if

13   there's issues with people being out of town or they're not

14   going to be here Wednesday but they could be here Thursday, I

15   mean, work it out unless something comes up where we -- there's

16   just this big problem that I have to deal with.

17       MR. ROSS:  Okay.

18       JUDGE TRACY:  So I mean, whenever it was served, we want

19   to hear from people who are important to this case, so let's

20   work it out.  Let's try to finish this case by the end of

21   September, that second week.  Let's try not to go into October,

22   but if we have to, we have to.  But I'm just hoping that you

23   all can -- can get that worked out.

24       MR. ROSS:  Okay.

25       JUDGE TRACY:  You see my sort of like, Oh my God.  Every


www.escribers.net | 800-257-0885

1    time I hear this, I'm like, Go out the door and figure it out.

2    So let's take a break.  Let's see what we can do to get through

3    the witness.

4         Now, the other thing about it though is if we're meeting

5    tomorrow early -- earlier because of this parade, I'm also okay

6    with stopping now and -- and you guys talking about your

7    documents and dealing with that, and then getting to the next

8    witness tomorrow.  I'm going to go off record, and you guys

9    talk about it.  I don't care, but I do know that the building,

10   it doesn't really close at 6, but it sort of does, where you

11   have to go up and down and go around to get out of here, and

12   that's fine, but you know, I know that you all have a lot of

13   documents that you need to talk about.  We've already seen one

14   thing where it would be great if you could come up with a

15   stipulation on the diagram of this building and where things

16   are.  That would be great.  It would make it easier for, I'm

17   assuming, everybody who's going to be testifying.

18        MR. ROSS:  Yep.

19        JUDGE TRACY:  But I'm also willing to stay here for

20   another hour to hear from this witness.  I hate breaking up

21   testimony, I do, but it happens, and it's the only way to kind

22   of get things rolling.

23        MR. RODRIGUEZ-RITCHIE:  I think it's fine for us to

24   discuss the documents and I think the witness was prepared to

25   be here tomorrow as well, so we would be amenable to that.



www.escribers.net | 800-257-0885

1          JUDGE TRACY:  What does the Charging Party --

2          MS. FEINBERG:  That's fine with us.  We've made

3     arrangements --

4          JUDGE TRACY:  -- Charging Parties feel?

5          MS. FEINBERG:  -- for that particular -- yeah, that's fine

6     with us.

7          JUDGE TRACY:  Okay.

8          MS. FEINBERG:  And it likely would be helpful, I think, to

9     get some of these other matters out of the way.

10          JUDGE TRACY:  Okay.  And how about --

11          MS. FEINBERG:  Thank you.

12          JUDGE TRACY:  -- you guys?

13          MR. ROSS:  It's fine with us.

14          JUDGE TRACY:  Fine?  So let's just then end for today for

15     my presence, and let's aim to start at 8, and it's only because

16     I'm asking you all to come early because of the whole issue

17     with -- and I guess, there was something issued by the Federal

18     Executive Board that tells all the people, the bigwigs around

19     here, what to do, and basically just told them that

20     Oakland-based Federal Offices consider encouraging early

21     arrival and tele work.  So we can't do tele work, but we can

22     early arrive.  So the earlier we can get here closer to 8:00,

23     8:30, great, okay?

24          MR. ROSS:  Okay.

25          JUDGE TRACY:  All right.  Fine?  Good?



www.escribers.net | 800-257-0885

1      MR. RODRIGUEZ-RITCHIE:  Yeah.  I was going to say if Her

2   Honor would like, I can send out letters to Counsel instructing

3   them that they have an appointment here at 8:00 a.m. to maybe

4   facilitate the security line.

5      JUDGE TRACY:  Oh, would that --

6      MS. FEINBERG:  That'd be nice.

7      JUDGE TRACY:  -- help them to get through the line better?

8      MR. RODRIGUEZ-RITCHIE:  I think it'd just get --

9      MS. FEINBERG:  Yeah.  There's an appointment line.

10     MR. RODRIGUEZ-RITCHIE:  Then there's an appointment line,

11  so people -- if you show the security guard that --

12     JUDGE TRACY:  Oh, that's right.  You have your 8:00 a.m.

13  issue.

14     MR. ROSS:  Could you do it for every day of this week?

15     JUDGE TRACY:  Yeah.  To let them all in early.  You

16  decide.  I don't care.  I'm joking.  Just, if tomorrow the

17  sooner you can get them in here?

18     MR. RODRIGUEZ-RITCHIE:  I will email letters that they can

19  print it out for tomorrow.

20     JUDGE TRACY:  Okay.

21     MR. ROSS:  That's be great.

22     JUDGE TRACY:  And you know, when I go down, I might

23  mention it to them.  I don't know if they're the same guys that

24  are in here in the morning, but I'll ask them.

25     MR. RODRIGUEZ-RITCHIE:  I think it might be different


www.escribers.net | 800-257-0885

1     ones, but --

2          JUDGE TRACY:  Okay.

3          MR. RODRIGUEZ-RITCHIE:  I think with the letter, that

4     should be --

5          JUDGE TRACY:  Yeah.  We've had that happen before.  Okay.

6          MR. ROSS:  Thank you, Judge.

7          MR. RODRIGUEZ-RITCHIE:  Thank you.

8          JUDGE TRACY:  See you tomorrow.  Is there anything else?

9     No?

10     **(Whereupon, the hearing in the above-entitled matter was**

11     **recessed at 3:56 p.m. until Tuesday, June 12, 2018 at 8:00**

12     **a.m.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

www.escribers.net | 800-257-0885

1    <u>C E R T I F I C A T I O N</u>

2    This is to certify that the attached proceedings before the

3    National Labor Relations Board (NLRB), Region 32, Case Numbers

4    32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-

5    200530, 32-CA-208614, 32-CA-210879, Tesla, Inc., and Michael

6    Sanchez, and Jonathan Galescu, and Richard Ortiz and

7    International Union, United Automobile, Aerospace and

8    Agricultural Workers of America, AFL-CIO at National Labor

9    Relations Board Region 32, 1301 Clay Street, Suite 300N,

10   Oakland, CA 94612-5224, on Monday, June 11, 2018, 9:20 a.m. was

11   held according to the record, and that this is the original,

12   complete, and true and accurate transcript that has been

13   compared to the reporting or recording, accomplished at the

14   hearing, that the exhibit files have been checked for

15   completeness and no exhibits received in evidence or in the

16   rejected exhibit files are missing.

17

18

19

20   _____

21   BRIDGETTE RAST

22   Official Reporter

23

24

25



OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 32

In the Matter of:

| | |
|---|---|
| Tesla, Inc., | Case Nos.  32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| Michael Sanchez, an individual, | 32-CA-200530 |
| | 32-CA-208614 |
| and | 32-CA-210879 |

Jonathan Galescu, an
individual,

and

Richard Ortiz, an individual,

and

International Union, United
Automobile, Aerospace and
Agricultural Workers of
America, AFL-CIO,

        Charging Party,

_____

_____

Place: Oakland, California

Dates: June 12, 2018

Pages: 166 through 345

Volume: 2

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885


www.escribers.net | 800-257-0885

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 32**

| | |
|---|---|
| In the Matter of: | |
| TESLA, INC., | Case Nos.  32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| INTERNATIONAL UNION, UNITED | 32-CA-200530 |
| AUTOMOBILE, AEROSPACE AND | 32-CA-208614 |
| AGRICULTURAL WORKERS OF | 32-CA-210879 |
| AMERICA, AFL-CIO, | |
| | |
| and | |
| | |
| MICHAEL SANCHEZ, AN INDIVIDUAL, | |
| | |
| and | |
| | |
| JONATHAN GALESCU, AN | |
| INDIVIDUAL, | |
| | |
| and | |
| | |
| RICHARD ORTIZ, AN INDIVIDUAL. | |

The above-entitled matter came on for hearing, pursuant to notice, before **AMITA BAMAN TRACY**, Administrative Law Judge, at the National Labor Relations Board Region 32, 1301 Clay Street, Suite 300N, Oakland, CA 94612-5224, on **Tuesday, June 12, 2018, 8:38 a.m.**

escribers

www.escribers.net | 800-257-0885

 1                    **A P P E A R A N C E S**

 2    **On behalf of the General Counsel:**

 3         **EDRIS W.I. RODRIGUEZ RITCHIE, ESQ.**
          **NOAH J. GARBER, ESQ.**
 4        National Labor Relations Board
          1301 Clay Street, Suite 300N
 5        Oakland, CA 94612-5224
          Tel. 510-671-3021
 6
      **On behalf of the Respondent:**
 7
          **MARK S. ROSS, ESQ.**
 8        **KEAHN N. MORRIS, ESQ.**
          SHEPPARD MULLIN RICHTER & HAMPTON LLP
 9        Four Embarcadero Center
          Seventeenth Floor
10        San Francisco, CA 94111-4109
          Tel. 415-434-9100
11        Fax. 415-434-3947

12    **On behalf of the Charging Parties:**

13        **MARGO A. FEINBERG, ESQ.**
          **DANIEL E. CURRY, ESQ.**
14        **JULIE S. ALARCON, ESQ.**
          SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
15        6300 Wilshire Boulevard, Suite 2000
          Los Angeles, CA 90048
16        Tel. 323-655-4700

17

18

19

20

21

22

23

24

25



1                                   **I N D E X**

2

3    | **WITNESS** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** | **VOIR DIRE** |
     |---|---|---|---|---|---|
4    | Jayson Henry | 180 | 190 | 214 | 217 | |
5    | Michael Williams | 222 | 241 | 271 | 273 | |
6    | Sean Jones | 290 | 299 | | | |
7    | Timothy Cotton | 322 | 331 | | | |
     | | | 332 | | | |
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-60493.182

1                              **E X H I B I T S**

2

3    **EXHIBIT**                                    **IDENTIFIED**    **IN EVIDENCE**

4    **General Counsel:**

5        GC-25                                         181              181

6        GC-34                                         298              298

7        GC-37                                         185              185

8        GC-41                                         182              182

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

www.escribers.net | 800-257-0885

1                       **P R O C E E D I N G S**

2          JUDGE TRACY:  Let's go on the record.  Okay.  All right,

3    before we have the General Counsel's next witness, let's go

4    ahead and put on the record our discussion about the issue with

5    the subpoena.  What I'd like for you to do is just put on the

6    record which ones are outstanding or incomplete.  I'd like for

7    the Union to do the same.  I would like for the Respondent to

8    explain where you're at in the search, and then later today,

9    I'll let you know what I'm thinking about how we just cut this

10   off at some point, and just have a deadline, and move on.  So

11   go ahead, please.

12          MR. RODRIGUEZ-RITCHIE:  Yes.  With regards to the General

13   Counsel's subpoena, initially we'd note that the privileged log

14   does not comply with the subpoena; doesn't lay the proper

15   foundation to establish that attorney work product or attorney-

16   client privilege exists.  There's no identification as to who

17   the individuals are that they're actual attorneys, or with

18   respect to work product, that any of the information was in the

19   course of an attorney's work, particularly as it relates to

20   document created by Lauren Holcomb, May 25th, 2017.

21          The General Counsel notes that Lauren Holcomb is not an

22   attorney, to his understanding, and so asserting

23   attorney-client privilege or work product would be

24   inappropriate as to those particular documents.  We'd also note

25   that we haven't received any electronic data at all.  We've

escribers
www.escribers.net | 800-257-0885

1   only received paper versions of everything that was actually

2   produced to date.  So we'd renew our request to receive the

3   documents in their native format.

4       There has been no production with regards to request

5   number 27, request number 9, request number 10, request number

6   6, request number 20, request number 21, request number 22,

7   request number 23, request number 24, request number 25,

8   request number 26, request number 28 through 30.  As it relates

9   to request number 31, there were some documents provided, but

10  they were not provided in their native format, or different

11  versions of the notes that were produced in response to 31 were

12  also not provided.  We have not received a response to request

13  numbers 32 and 33.

14      It's unclear whether what we received in response to

15  request number 37 and 38 were totally responsive to the

16  request.  We haven't received a response to request numbers 39

17  to 43, and request numbers 53 and 54.

18      MR. CURRY:  And the Charging Parties join in what the

19  General Counsel mentioned regarding the privilege log.  We have

20  been informed who the attorneys are, but beyond that the

21  privilege log is incomplete.  Regarding our subpoena duces

22  tecum requests, we have received -- we've been told we will not

23  receive ESI before the end of this week if not later, and we

24  are very troubled by that.

25      As for what they've produced, it's been incomplete.



www.escribers.net | 800-257-0885

1    Numbers -- request numbers 2 through 6 are incomplete.  Request

2    number 7 we've received nothing.  Request 8 through 10 are

3    incomplete.  Request 12 we've received nothing.  Request number

4    17 is incomplete.  Request number 32 is incomplete.  33 through

5    35 we've received nothing.  Request number 38 through 42 are

6    incomplete, and 47 through 48 are incomplete.

7         MR. MORRIS:  So as I stated when we were off the record,

8    we have provided initial production of documents on Monday

9    including some ESI.  We provided that in a physical form to

10   both counsel for the General Counsel and for the Union.  Prior

11   to that, last Friday, we allowed the counsel for the General

12   Counsel to inspect the physical production that we had compiled

13   thus far.

14        But all this we sought to avoid by requesting these

15   subpoenas in advance.  The region's investigation has been

16   ongoing for over a year now, and as part of that investigation,

17   Respondent provided thousands of documents, and witness

18   affidavits.  So they obviously know what they want to allege in

19   this case, and the documents that they want to rely on.

20        The most recent complaint was issued at the end of March,

21   and immediately following the issuance of that complaint,

22   Respondent requested that the General Counsel send us copies of

23   the subpoena duces tecum they intend to issue.  Instead, they

24   waited until the end of May to serve us with the subpoena

25   giving us approximately two weeks to comply.

eScribers
www.escribers.net | 800-257-0885

1     The requests were so broad, and counsel for the General

2     Counsel refused to identify specific custodians and supervisors

3     that they wanted us to conduct the ESI searches for.  The

4     search terms that they provided for us were approximately 150

5     search terms, and would have required us to conduct searches,

6     some of which for 41,000 employees without regard to the

7     specific custodian.

8     So we attempted to meet and confer with counsel for the

9     General Counsel on numerous occasions.  We did not make much

10    headway, and that forced us to file the petition to revoke.

11    Your Honor recognized that many of the requests were, in fact,

12    overbroad, and required us to conduct extensive ESI searches.

13    We met and conferred following the judge's order on the

14    petition to revoke, and we continued to try to work with

15    counsel for the General Counsel on narrowing these requests.

16    But many of the requests still require extensive ESI searches

17    of thousands and thousands of individuals' emails.  And many of

18    the requests we hadn't gotten an appropriate narrowing and

19    identification of the particular supervisors and managers that

20    we need to conduct searches for.

21    A similar thing happened with the Union in terms of when

22    they issued the subpoena duces tecum.  They issued it at the

23    end of May giving us about the same period of time to comply.

24    We attempted to meet and confer with the Union.  Didn't reach

25    an agreement and that's what led us to filing the petition to



1    revoke.

2         We've met with the Union since Your Honor's order, and

3    we're continuing to work with the Union on trying to narrow the

4    specific requests that you ordered us to meet and confer about.

5    But like the board subpoena, there's still requests that

6    require us to conduct searches of thousands and thousands of

7    emails.

8         With respect to the privilege log, counsel for the General

9    Counsel has never raised any issues about the privilege log

10   until the off the record discussion with Your Honor.  We're

11   happy to meet and confer about that issue.  The Union raised

12   one issue with the privilege log asking for us to identify the

13   specific attorneys, which we did.  And they haven't raised any

14   subsequent issues until they raised it with Your Honor now.

15        With respect to the characterization of incomplete

16   requests, or requests we haven't responded to, we disagree with

17   that assertion, but again, we're continuing to attempt to

18   comply with the subpoena, and we'll endeavor to do so.  And

19   with respect to the references about ESI, we have provided some

20   ESIs so far, but again, the -- a compilation of those documents

21   is ongoing.

22        JUDGE TRACY:  And so you're currently searching, even

23   though you're in the hearing now, someone's still searching,

24   and in terms of so just taking the order that I issued for both

25   subpoenas, you -- for the ones that I said, you know, turn it



1    over, you're still working on that?

2        MR. MORRIS:  Correct.

3        JUDGE TRACY:  Okay.

4        MR. MORRIS:  And we have turned over documents responsive

5    to your order.

6        JUDGE TRACY:  Uh-huh.

7        MR. MORRIS:  But some of those require additional ESI

8    searches which are ongoing, and we're working to do that as

9    quickly as possible.

10       JUDGE TRACY:  Okay.  And then for the General Counsel,

11   what was the date that you issued the subpoena?  I recall from

12   our first conference call that there was some issue about the

13   service.  Do you know the date?

14       MR. RODRIGUEZ-RITCHIE:  It was issued on May 21st and sent

15   via email to Mr. Ross on that day.

16       JUDGE TRACY:  Okay.  And how about for the Union's

17   subpoena.  What was the date that it was issued?

18       MR. CURRY:  It was first issued May 25th.

19       JUDGE TRACY:  Okay.

20       MR. MORRIS:  And, Your Honor, I just note that the board

21   subpoena was actually served on May 24th.  That was the date

22   that it was received.  And I believe the Union's was a couple

23   of days after that.

24       MR. ROSS:  Your Honor, I believe --

25       MS. FEINBERG:  I don't think so.  We didn't put service on

escribers
www.escribers.net | 800-257-0885

1    your service -- that's not accurate, but I don't know that that

2    matters at this point, Your Honor.

3        MR. ROSS:  And, Your Honor, we, as soon as we entered this

4    case, as you may know, we replaced another firm.

5        JUDGE TRACY:  Uh-huh.

6        MR. ROSS:  As soon as we entered the case, I communicated

7    with General Counsel anticipating that the subpoena in this

8    case would be problematic, and urged them to send us the

9    subpoena well in advance of what is the customary two weeks for

10   the very reason that we wanted to address these issues well in

11   advance of the trial.  Unfortunately, our request went

12   unheeded, and notwithstanding our request, we did not get the

13   subpoena until roughly two weeks prior to trial.

14       JUDGE TRACY:  Okay.  So you know, like I said off the

15   record, that I need to think about how to proceed to resolve

16   this issue.  I need you all to keep working on it together.

17   You know, in terms of the privilege log, I mean, it's going to

18   be what is a standard privilege log.  So obviously, if the

19   identity of individuals is missing to identify where that

20   attorney-client privilege exists, you need to do that.

21       I mean, they shouldn't have to come back and tell you we

22   all know who's an attorney here, especially if that person's

23   been identified with a different title.  And obviously, if

24   they're working not as an attorney, I mean, where is the

25   attorney-client privilege?  So you need to, you know, that part



www.escribers.net | 800-257-0885

1    is on you guys about the privilege log.  I'm saying this based

2    upon what I've heard.  I've not seen anything.

3        Keep working on it, and we'll see at the end of today if

4    you can talk some more.  I'm hopeful that you've got your

5    workers behind the scenes there working on the documents, and

6    helping you all to gather these items and letting -- keep

7    relaying to you all what you have.

8        I had also mentioned, off the record, that a lot of this

9    case, as I said before, the animus that needs to be proven is

10    regards to these alleged discriminatory events.  The other

11    items about surveillance, interrogation, et cetera, I mean, a

12    lot of the interesting and the relevant part of the hearing,

13    I'm not saying the documents are not.  They certainly are.  But

14    it's going to be these individuals' testimony.  And so I mean,

15    in the end, that's really what, you know, it's the credibility

16    of the individuals.

17        So yes, there may be a lot of documents existing, but, you

18    know, we've already started, and I want you all to kind of keep

19    focusing on that about what are the elements to prove.  This

20    is -- obviously, there's a lot of interest here in this case, a

21    lot of just different opinions about it.  But in the end, we're

22    now at day two of the hearing.  Let's keep working on it, but

23    at some point you know, you've got to finish the searching and

24    work together.

25        And so let me think about that, because I feel like I have



www.escribers.net | 800-257-0885

1   to now, at this point, just say to you, you know, meet and

2   confer, and whatever you come up with by X date that's it, and

3   then, you know, then we can put the subpoena issues in the

4   record if they've continued to exist.

5        MR. RODRIGUEZ-RITCHIE:  Sure, Your Honor.  I would be

6   remiss if I didn't mention we did meet yesterday to discuss.

7   And one of the requests that I didn't specifically address was

8   regards to the team wear, the shirt, and pants that are issued.

9   Counsel for Respondent did, though they haven't been provided

10  yet, they did mention that they would try to get that to us by

11  tomorrow I believe.

12       MR. ROSS:  Well, Judge, I'm happy to say we have team wear

13  here today.

14       JUDGE TRACY:  Okay.  All right.  So this, you know, let's

15  keep working on it.  Let's get to our witnesses now if you're

16  ready or not?

17       MR. RODRIGUEZ-RITCHIE:  I have just one housekeeping

18  matter.

19       JUDGE TRACY:  Oh, yeah, uh-huh.

20       MR. RODRIGUEZ-RITCHIE:  Just on the record that I made

21  copies of the formal papers from yesterday and I'm providing

22  one --

23       JUDGE TRACY:  Oh, thank you.

24       MR. RODRIGUEZ-RITCHIE:  -- to counsel for Respondent and

25  one to counsel for the Charging Party.  I just note that 1(zz)



www.escribers.net | 800-257-0885

1   is not in this copy since we were provided separately with

2   copies of that.  That's the motion to dismiss that was filed

3   yesterday.

4       MR. ROSS:  Yeah.

5       MR. RODRIGUEZ-RITCHIE:  And the index will be fixed today

6   to add 1(zz) into the index and change the index marker.

7       JUDGE TRACY:  Okay.  And, yeah, and what we also discussed

8   is in our subsequent weeks, we'll just have a supplemental

9   index, let's say, for the -- any of the issues of their

10   opposition that they're going to be filing, you all will be

11   filing next week.  And any orders that are issued in the

12   interim, we'll do that.  And I'd also like a favor of the

13   General Counsel.

14       If you could just print out for me the subpoenas, the

15   petitions to revoke, and my orders, oppositions to actually.

16   All right, shall we get your first witness?

17       MR. GARBER:  Sure.  The General Counsel calls Jayson

18   Henry.

19       JUDGE TRACY:  What's your last name again?

20       THE WITNESS:  Henry.

21       JUDGE TRACY:  Henry?  Okay.  All right, go ahead and raise

22   your right hand, please.

23   Whereupon,

24                     **JAYSON HENRY**

25   having been duly sworn, was called as a witness herein and was


22-60493.193

1  examined and testified as follows:

2      JUDGE TRACY:  Okay.  Go ahead, have a seat, and state your

3  name for the record.

4      THE WITNESS:  My name is Jayson Henry.

5      JUDGE TRACY:  Okay.  Go ahead.

6                            **DIRECT EXAMINATION**

7  Q  BY MR. GARBER:  Mr. Henry, are you currently employed?

8  A  Yes.

9  Q  Where do you work?

10  A  Interior Door Replacement Company.

11  Q  Previously did you work for Tesla?

12  A  Yes.

13  Q  And how long did you work for Tesla?

14  A  Three and a half years.

15  Q  Would that end around October of 2017?

16  A  Yes.

17  Q  And did you work at Tesla's Fremont facility?

18  A  Yeah.

19  Q  What was your last job title when you worked at Tesla?

20  A  Manufacturing technician.

21  Q  What were your job duties as a manufacturing technician?

22  A  I was a body fitter.  So I'd line up the gaps in doors,

23  trunks, and hoods.

24  Q  Did you work in the general assembly area?

25  A  Yes.



www.escribers.net | 800-257-0885

1    Q    Did Tesla terminate your employment?

2    A    Yes.

3    Q    Will that, in any way, affect your testimony today?

4    A    No.

5    Q    You're familiar with the United Auto Workers; is that

6    right?

7    A    Yes.

8    Q    Now when you worked at Tesla's Fremont facility, did you

9    ever wear any UAW shirts to work?

10    A    Yeah.

11    Q    Okay.  I'm going to show you a picture that's been marked

12    as General Counsel Exhibit 25.  Take a look at that picture,

13    and let me know when you're done.

14    A    I'm done.

15    Q    You're done?  Okay.  Do you recognize this picture?

16    A    Yes.

17    Q    Is this the Union shirt that you wore to work at Tesla?

18    A    Yeah.

19    MR. GARBER:  I move to admit this into evidence as General

20    Counsel Exhibit 25.

21    JUDGE TRACY:  Any objections?

22    MR. ROSS:  No.

23    JUDGE TRACY:  All right, so General Counsel's Exhibit 25

24    is admitted into evidence.

25    **(General Counsel Exhibit Number 25 Received into Evidence)**



1    Q    BY MR. GARBER:  When you wore that shirt, were there any

2    materials on the Union shirt that could scratch or harm the

3    cars that you worked on?

4    A    No.

5    Q    Because it's just a cotton shirt?

6    A    Yes.

7    Q    And how often did you wear your Union shirt to work?

8    A    I was only able to wear it once.

9    Q    Did you have a Tesla T-shirt to wear to work also?

10   A    Yes.

11   Q    Okay.  I'm going to show you another picture here.  It's

12   pre-marked as General Counsel Exhibit 41, again, two pages.

13   Take a look at that picture and let me know when you're done.

14   A    Done.

15   Q    Do you recognize that picture?

16   A    Yeah.

17   Q    Is that one of the Tesla shirts that you had to wear to

18   work?

19   A    Yeah.

20       MR. GARBER:  Okay.  I move to admit this into evidence as

21   General Counsel's Exhibit 41.

22       JUDGE TRACY:  Any objections?

23       MR. ROSS:  No.

24       JUDGE TRACY:  All right.  So General Counsel's Exhibit 41

25   is admitted into evidence.



1    **(General Counsel Exhibit Number 41 Received into Evidence)**

2    Q    BY MR. GARBER:   Okay.   I want to direct your attention now

3    to around August through September of 2017.   You worked for

4    Tesla then right?

5    A    Yes.

6    Q    Did you wear any UAW clothes to work then?

7    A    Yes.

8    Q    And what did you wear?

9    A    A Union T-shirt.

10   Q    That Union shirt you wore to work, was it the same one

11   that I just showed you that Exhibit 25?

12   A    Yes, it was.

13   Q    And during that same period of time, we're talking August

14   through September of 2017, did any managers or supervisors make

15   any comments to you about the Union shirt you wore?

16   A    Yeah.

17   Q    And which supervisors talked to you about your Union

18   shirt?

19   A    I don't recall his name, but it was a male.

20   Q    Was it -- it was a male supervisor?

21   A    Yeah.

22   Q    How'd you know it was a supervisor?

23   A    Just the color of the shirt.

24   Q    What color was the shirt?

25   A    Red.



1    Q    And the supervisors wore red shirts?

2    A    Yeah.

3    Q    Okay.  To the best you can remember, and starting with

4    where you were, can you tell us about that conversation between

5    and this male supervisor?

6    A    He just told me that I can't wear the shirt again, and if

7    I wore it again that I'd be sent home.

8    Q    What was your response when he said that to you?

9    A    I requested to see the dress code.

10    Q    So then did another supervisor come and show you the dress

11    code?

12    A    Yes.

13    Q    Which supervisor came to you and showed you the dress

14    code?

15    A    Her name was Tope.

16    Q    Is that Tope Ogunniyi?

17    A    Yeah.

18    Q    And what happened when she approached you with that dress

19    code?

20    A    She basically just handed it to me and --

21    Q    And you looked at it?

22    A    Yeah, just looked -- overlooked it.

23    Q    Now was there anything on your shirt that day that could

24    have scratched or harmed the cars you were working on?

25    A    No.



1    Q    Okay.  I'm now going to show you another document and this

2    one is marked as General Counsel Exhibit 37.  This is a

3    one-page document, there's a front and back to it.  I want to

4    direct your attention to the underlying portion here that says

5    team wear.  So take a look at that and let me know when you're

6    done.

7    A    Okay, done.

8    Q    Is that the dress code that Ms. Ogunniyi showed you

9    previously?

10   A    Yes.

11   Q    I'm sorry?

12   A    Yeah, yes.

13   Q    Yes?  Okay, sorry.  I didn't mean to speak over you.

14   A    Yeah, yeah.

15       MR. GARBER:  So I'll move to admit this into evidence as

16   General Counsel's Exhibit 37.

17       MR. ROSS:  No objection.

18       JUDGE TRACY:  Okay, thank you.  General Counsel's Exhibit

19   37 is admitted in evidence.

20   **(General Counsel Exhibit Number 37 Received into Evidence)**

21   Q    BY MR. GARBER:  So previous to that day that we just

22   talked about, when that supervisor told you you couldn't wear

23   your Union shirt, had you worn non-Tesla T-shirts with pictures

24   or emblems on them to work?

25   A    Yes.



1   Q    What types of pictures or emblems did you wear on your

2   shirt?

3   A    Sports teams, clothing brand --

4        MR. ROSS:  Sorry, I can't hear you, sir.

5        THE WITNESS:  Oh, sports teams, clothing brands, wide

6   variety.

7   Q    BY MR. GARBER:  Okay.  And just so you know, the

8   microphone there --

9   A    Okay.

10  Q    -- doesn't make your voice any louder.

11  A    Yeah.

12  Q    It just records it.  So you've got to speak louder that's

13  all.

14  A    Okay.  All right.

15  Q    Okay.  So you mentioned you wore sports teams, some

16  clothing companies --

17  A    Yeah.

18  Q    -- those were, like, the emblems on your shirts?

19  A    Yep.

20  Q    What were the colors of these shirts that you wore?

21  A    All different colors.

22  Q    Now did any supervisors or managers tell you that you had

23  to change these non-Tesla shirts?

24  A    No.

25  Q    And previous to that day that we just talked about again,



1 hold on one second, previous to that day, did you see other

2 employees in the general assembly wear shirt -- non-Tesla

3 shirts with different pictures or emblems on them?

4 A Yes.

5 Q And what types of emblems or pictures did you see these

6 other general assembly employees wearing?

7 A Sports teams, clothing brands, lifestyle brands.

8 Q And were these shirts that you saw the other general

9 assembly employees wearing, were they all black or different

10 colors?

11 A Different colors.

12 Q And that you know of, did any supervisors or managers ask

13 these other employees to change their non-Tesla shirts?

14 A No.

15 Q Okay, let's go back again to that day we were talking

16 about before, the one where the manager told you you couldn't

17 wear your shirt.  Prior to your conversation with that

18 supervisor, and Ms. Ogunniyi, what were you doing before your

19 shift started?

20 A Handing out Union T-shirts.

21 Q Where were you doing that?

22 A In front of the north admin building.

23 Q And the shirts you were handing out, was it the same one I

24 showed you which is Exhibit 25?

25 A Yes.


22-60493.201

1    Q    Okay, it's that same one I showed you?

2    A    Yeah.

3    Q    Okay.  Now from the time your supervisor told you that you

4  couldn't wear that shirt until you stopped working for Tesla,

5  did you see other employees in the general assembly wearing

6  T-shirts to work with -- or non-Tesla T-shirts to work with,

7  like, different pictures or emblems on them?

8    A    Yes.

9        MR. ROSS:  Objection.  Asked and answered.

10       MR. GARBER:  No, I asked before as previous to August when

11  the manager told him not to, and this is after August until he

12  stopped working for Tesla.

13       MR. ROSS:  Oh, after?  I'm sorry.

14       MR. GARBER:  Yeah.

15       MR. ROSS:  I'm sorry, I misheard you.

16       MR. GARBER:  That's okay.

17    Q    BY MR. GARBER:  So again, so we're talking after that

18  August date until you stopped working for Tesla, did you see

19  other employees in the general assembly wearing non-Tesla

20  T-shirts with different pictures or emblems on them?

21    A    Yes.

22    Q    And the types of pictures or emblems you saw on these

23  shirts were the same ones you've already told us about, sports

24  teams, clothing companies?

25    A    Yes.



www.escribers.net | 800-257-0885

1    Q    And these non-Tesla shirts that these employees were

2    wearing, were they all black, or different colors?

3    A    Different colors.

4    Q    And to the best of your knowledge, did you ever see a

5    manager or supervisor ask these employees to change their shirt

6    or take them off?

7    A    No.

8    Q    Okay.

9        MR. GARBER:  I don't have any further questions for the

10    witness.

11        JUDGE TRACY:  Ms. Feinberg?

12        MS. FEINBERG:  No, not at this time, thank you.

13        JUDGE TRACY:  Okay.  Mr. Ross?

14        MR. ROSS:  May I see the affidavit, please?

15        MR. GARBER:  Sure.

16        JUDGE TRACY:  Okay.

17        MR. RODRIGUEZ-RITCHIE:  And counsel for the General

18    Counsel is providing two copies of an affidavit of Jayson

19    Henry.

20        JUDGE TRACY:  Okay, all right, so let's go ahead and go

21    off --

22        MR. RODRIGUEZ-RITCHIE:  To the counsel.

23        JUDGE TRACY:  Oh.

24        MR. RODRIGUEZ-RITCHIE:  To counsel for Respondent and --

25        MS. FEINBERG:  Okay, thank you, very kind.



www.escribers.net | 800-257-0885

1          MR. RODRIGUEZ-RITCHIE:  Sorry, and a copy to counsel for

2     the Charging Party.

3          MR. GARBER:  She already had it.

4          MS. FEINBERG:  I'm fine.

5          MR. GARBER:  She -- fine I have it.

6          JUDGE TRACY:  Okay.

7          MS. FEINBERG:  Thank you, though.

8          MR. ROSS:  We'll need a couple of minutes.

9          JUDGE TRACY:  Yes, so let's go off the record, please.

10    Mr. Ross, let us know when you're ready.

11         MR. ROSS:  Will do.

12         JUDGE TRACY:  Okay, so and we're off the record.

13    (Off the record at 9:04 a.m.)

14         JUDGE TRACY:  Okay.  Let's go ahead and go back on the

15    record.  All right.  Go ahead, please.

16                          **CROSS-EXAMINATION**

17    Q    BY MR. MORRIS:  You testified that you were employed in

18    the general assembly at Tesla?

19    A    Yes.

20    Q    And was that for the entire period of time that you were

21    employed by Tesla?

22    A    Minus like two weeks, yes.

23    Q    What two weeks was -- were that?

24    A    When I first started there.

25    Q    And general assembly, is that times called final line?



```
 1    A    Yes.

 2    Q    And give me a rough ballpark of how big general assembly

 3    is.  How many acres, how many yards?

 4    A    One hundred yards, 150 yards probably, the size of the

 5    line.  General assembly itself, maybe 500 yards I'd guess.

 6    Q    And there's a lot of employees that work in general

 7    assembly, right?

 8    A    Yeah.

 9    Q    Like over 1000?

10    A    Yeah, I'd say.  Rough.

11    Q    And the cars that come into general assembly, they're

12    already painted, correct?

13    A    Yes.

14    Q    And various parts of the car are then put together in

15    general assembly?

16    A    Yeah.  Before where I worked, yes.

17    Q    And give me some examples of the things that are put onto

18    the car after they're painted.

19    A    After they're painted, headlights, taillights, blinkers,

20    mirrors, trim.  Yeah.

21    Q    Okay.  And the production associates that work in general

22    assembly, they're working in and around cars?

23    A    Yes.

24    Q    And those are freshly painted cars?

25    A    A day-old, two-days old paint, yeah.
```



www.escribers.net | 800-257-0885

1    Q    And in general assembly, there's various protocols in

2    terms of protecting the paint of cars, correct?

3    A    Yeah.  They're covered.  The majority of the cars are

4    covered.

5    Q    And general assembly, I'm assuming there's various

6    different robots in the area?

7    A    Near there, yeah.

8    Q    And you're required to work in and around the robots?

9    A    They're -- they're kind of like walled off.  Like they're

10   in like little plastic rooms.  Yeah.

11   Q    Can you identify any potential hazards working in general

12   assembly?

13   A    Like what type of hazards?  Like safety hazards or --

14   Q    Yeah, potential hazards by virtue of working in that area

15   that you could come into contact with.  Robots or equipment.

16   A    I guess like trip hazards.  Like trip hazards, loud

17   noises.  Really, I mean, the stuff like the robots, it's like

18   far away from you.  It's not really near you.  So other than

19   that, really it's not really -- I don't really understand you

20   then.

21   Q    What about the cars, aren't the cars on the line and the

22   line is moving while you're working on it?

23   A    Yeah, but it's really slow.  It's like a mile an hour

24   maybe, two miles an hour.  Like it doesn't -- it doesn't move

25   fast enough to where -- like if you're not paying attention, it



www.escribers.net | 800-257-0885

1    would -- it would be hard for the car to hit you, you know.

2    Q    What about the different parts that go onto the car?

3    A    Not that I worked with, no.

4    Q    But other production associates in general assembly?

5    A    Yeah.

6         MS. FEINBERG:  Objection.  Foundation.

7    Q    BY MR. MORRIS:  Well, isn't it true that other production

8    associates would come in --

9         JUDGE TRACY:  Well, so what was -- so she had an objection.

10   So what's your response to the foundation?

11   Q    BY MR. MORRIS:  Are you generally familiar with other

12   production associates working in general assembly?

13   A    Not -- not really.  After a certain while, they're pretty

14   far away from you, you know.

15   Q    So do you only have personal knowledge of the specific

16   area that you worked on?

17   A    Generally, yeah, I'd say.

18   Q    And which area was that?

19   A    The final line body fit.

20   Q    And in final line body fit, were there other parts of the

21   car that had to be assembled that --

22   A    Not --

23   Q    -- you'd come into contact with?

24   A    Rarely.  Like a latch every so often.  But the majority of

25   the stuff I worked on was already attached to the car.  It was


www.escribers.net | 800-257-0885

1    just using hand tools to do my job.

2    Q    Okay.  The latch.  What are you referring to?

3    A    Like what the door closes on.  Like a striker or a latch.

4    So what it -- what the -- like what the mechanism grabs onto to

5    lock onto your doors, trunks, liftgates.

6    Q    And what shift did you work?

7    A    First shift.  Day shift.

8    Q    Would you agree that you have to be safety conscience

9    while working in general assembly?

10   A    Yeah.  Um-hum.

11   Q    And you have to comply with the various safety policies

12   and procedures?

13   A    Yes.

14   Q    Are there any prenotification visuals that you're supposed

15   to comply with?

16       MR. GARBER:  Objection.  We're getting pretty far outside

17   the scope of direct.

18       JUDGE TRACY:  And so could you tell me -- well, I mean,

19   there were some questions about, you know, his job here.  So I

20   would, you know, suggest that I'm going to overrule the

21   objection.  However, let's kind of get focused on --

22       MS. FEINBERG:  I --

23       JUDGE TRACY:  -- the --

24       MS. FEINBERG:  Yeah.

25       JUDGE TRACY:  -- where you're getting to.



1       MR. MORRIS:  Okay.

2       MS. FEINBERG:  Okay.  Well, I actually had a foundation

3   objection.  That this last question asked, it's not clear that

4   Mr. Henry's even been exposed to that.  He said some kind of --

5   I don't know.  I can't remember --

6       JUDGE TRACY:  So how about you repeat the question.

7       MS. FEINBERG:  Thank you.

8       MR. MORRIS:  Yeah.

9   Q    BY MR. MORRIS:  In your experience as a production

10  associate, were you ever supposed to conduct safety checks?

11  A    Well, we had like a thing called 5S, and that's like the

12  farthest it really goes for safety checks.  And I was a 5S

13  champion.  So I knew to follow all that stuff.  And other than

14  that, there wasn't really any things you had to follow.  You

15  just showed up -- you just showed up and did your job.  Really

16  there wasn't anything you had to go through to start.

17  Q    In your experience, were there any -- these previsual

18  checks?

19  A    I don't understand the question.

20  Q    Have you heard of the term previsual check?

21  A    No.

22  Q    Okay.

23  A    No.

24  Q    And except for the first couple of weeks that you worked

25  at Tesla, you've already worked in general assembly, right?



1  MS. FEINBERG:  Objection.  Asked and answered.

2  JUDGE TRACY:  Overruled.  Go ahead.

3  THE WITNESS:  Can you repeat the question again?

4  MR. MORRIS:  Yeah.

5  Q   BY MR. MORRIS:  Except for the first couple of weeks that

6  you worked at Tesla, you've always worked at general assembly?

7  A   Yeah.  Yeah.

8  Q   Do you know if there's different supervisors and managers

9  that work in general assembly as opposed to other parts of the

10  factory?

11  A   Like they work in two different departments?  Is that what

12  you're asking?

13  Q   Yeah.

14  A   I -- I'm pretty sure, yeah.  Yeah.

15  Q   And the specific supervisors that supervise you, who are

16  they?

17  A   Who are --

18  MS. FEINBERG:  Objection.  Vague as to time.

19  THE WITNESS:  Who are they, when, and --

20  JUDGE TRACY:  So I'll sustain the objection.

21  THE WITNESS:  Okay.

22  JUDGE TRACY:  If you could specify the time period, please.

23  MR. MORRIS:  Sure.

24  Q   BY MR. MORRIS:  So you testified about this interaction

25  with one of the managers, Tope?



www.escribers.net | 800-257-0885

1   A    Yeah.

2   Q    And what was the time that you testified to?

3   A    When she gave me the dress code?

4   Q    Yeah.  You -- when did she provide you with the dress

5   code?

6   A    In the morning.  I don't really -- yeah.

7   Q    And what month or year?

8   A    I think it was in August.

9   Q    Of 2017?

10  A    Yeah.

11  Q    And who was your supervisor in or around August of 2017?

12  A    I think it was Nicholas Rodriguez or Rogers.

13  Q    And did you have an assistant manager?

14  A    Yeah.

15  Q    Who was that?

16  A    Tope.

17  Q    And what about a production manager?

18  A    I guess, although I really wasn't aware who that was.  I

19  -- yeah.

20  Q    So you didn't know who Tope's boss was?

21  A    No.

22  Q    And aside from Nicholas, no other supervisors in or around

23  that time period?

24  A    Like my direct supervisors?  I mean --

25  Q    Right.



1   A   Yeah, there was a bunch.  I mean, I had -- in three-and-a-

2   half years, I had like 11 or 12 different supervisors.  So I

3   really wouldn't be able to recall all their names.  But there

4   was definitely someone before him.

5   Q   No.  So I'm just asking about this August 2017 time frame.

6   A   No.  I only had one supervisor.  Yeah.  And a lead, but --

7   Q   And who was the lead?

8   A   Devante (phonetic).  Devante Butler.

9   Q   And the leads wear red shirts, correct?

10   A   Yeah.

11   Q   And the same with the supervisors?

12   A   Some supervisors wear red shirts, a majority of them.

13   Q   And I'll ask you to take a look at General Counsel's

14   Exhibit 41.

15   A   Um-hum.

16   Q   You agree that that's Tesla-issued team wear, correct?

17   A   Yeah.  One -- one of the shirts that I was given.

18   Q   And that's the specific phrase that's used, correct, team

19   wear?

20   A   Yeah.  Yeah.

21   Q   And when did you first come to learn of team wear?

22   A   When I started working there.  Three-and-a-half years --

23   Q   And --

24   A   -- ago.

25   Q   -- what were you told?

22-60493.212



1   A    That this is my team wear and -- yeah, pretty much,

2   "Here's two pairs of pants and three shirts.  You work five to

3   six days a week.  So make it work."

4   Q    And you're also required to wear protective equipment,

5   correct?

6   A    Kinda-sorta, yeah.  You have to wear safety glasses and

7   gloves.  But there was other stuff that we didn't really have

8   to wear that it was your choice if you wanted to wear it.

9   Q    But you're required to wear safety glasses?

10  A    And gloves, yeah.

11  Q    And bump caps as well?

12  A    They weren't required.  It was pretty much your preference

13  on how you -- where you worked and how you worked.

14  Q    Okay.  And isn't it true that you were told that team wear

15  was mandatory?

16  A    Yeah, though it was -- team wear was mandatory.  But if

17  you didn't have team wear because you were only given a certain

18  amount, it had to be all black.  That's pretty much what you

19  were told.

20  Q    You don't know whether production associates outside of

21  general assembly are issued team wear, do you?

22  A    Yeah, they are.

23  Q    You know that for a fact?

24  A    Well, I mean, I see it -- everyone wearing it.  Like

25  everyone wears Tesla stuff the majority of the time that I was



www.escribers.net | 800-257-0885

1    there.

2    Q    Could you give me some names of individuals outside of

3    general assembly that wear team wear?

4         MR. GARBER:  Objection.  Relevance.

5         JUDGE TRACY:  Sustained.

6    Q    BY MR. MORRIS:  And if you could turn to General Counsel's

7    Exhibit 37.

8    A    Um-hum.

9    Q    That was the general assembly expectations --

10   A    Yep.

11   Q    -- that you were provided by Tope?

12   A    Um-hum.

13   Q    Had you seen that document --

14        JUDGE TRACY:  And can you say yes or no for the record?

15        THE WITNESS:  Oh.  Yes.

16        JUDGE TRACY:  Thank you.

17        THE WITNESS:  Sorry.

18   Q    BY MR. MORRIS:  Had you seen that document prior to Tope

19   giving that to you?

20   A    Yes.

21   Q    And so you had seen that prior to August of 2017?

22   A    Yes.

23   Q    And who did you get that document from first?

24   A    I don't -- I don't really recall.

25   Q    Do you know when you received that document first?



1    A    No.

2    Q    Was it at the time of hire?

3    A    One at the time of hire, and then a lot of times the --

4    you know, the -- the way we worked would change or something

5    about it would change, so we'd get a different one or we'd get

6    a different variation of it if something was added in, so.

7    Q    And I think you testified that team wear was mandatory,

8    but if you didn't have the team wear, for whatever reason, that

9    you could substitute it for all black clothing?

10   A    Yeah.  Yep.

11   Q    Would you agree that it's -- the team wear helps you

12   identify who is in general assembly and who isn't?

13       MR. GARBER:  Objection.  The witness' opinion is not

14   relevant.

15       JUDGE TRACY:  Sustained.

16   Q    BY MR. MORRIS:  During the time that you were a production

17   associate in general assembly, were you told that if you wore

18   alternative clothing that it had to be mutilation free?

19   A    Yeah.  You can't have a -- you couldn't wear jeans with

20   rivets, you couldn't wear zippers, you know, you couldn't have

21   like a chain hanging out or something like that.  But the

22   majority of the time if it was just a plain T-shirt, it was

23   okay.  Like no buttons and stuff like that.

24   Q    And were you told why it had to be mutilation free?

25   A    Well, to protection the car.  The area we were working in



1    was -- you know, it was an exposed car.  And in some -- in some

2    areas, it was exposed.

3    Q    And in your experience as a production associate, can you

4    see any reason why Tesla might want to have people wear

5    clothing that's mutilation free?

6        MS. FEINBERG:  Objection.  Speculation.

7        JUDGE TRACY:  I'm going to overrule the objection.

8        THE WITNESS:  Can you repeat the question again?

9    Q    BY MR. MORRIS:  Yeah.  In your experience as a production

10   associate, can you see any reason why Tesla would want

11   production associates to wear clothing that's mutilation free?

12   A    Yeah.

13   Q    And could you explain?

14   A    Just because of the paint.  Really that's really the only

15   reason is because the paint.

16   Q    Okay.  You testified to this August interaction with a

17   supervisor regarding team wear?

18   A    Yeah.

19   Q    What supervisor was that?

20   A    I don't -- I don't really recall.  It was -- it was a

21   male, and that's -- that's all I really remember about it, the

22   interaction.

23   Q    What did he look like?

24   A    He was a male.  That's really all I remember, you know.  I

25   mean, like -- like I said, there was high turnover at that



www.escribers.net | 800-257-0885

1   place, so I'd know a supervisor sometimes for a week or two at

2   a time, and then he would get moved to a different department,

3   he'd get let go, whatever.  So it was hard to keep track of who

4   was in charge.

5   Q    Do you recall what ethnicity they were?

6   A    No, I don't.  I really don't.

7   Q    What about their height?

8   A    I really don't remember anything other than that he was a

9   man, he was a supervisor, and he worked at Tesla.

10  Q    And the individual had a red shirt?

11  A    I don't really recall, I mean, no.

12  Q    And during this interaction with the person that you

13  thought was a supervisor, they told you that you weren't team

14  wear compliant, correct?

15  A    They told me that I couldn't wear the shirt again.  And if

16  I wore it again, I'd be sent home.  So I guess they told me I

17  wasn't team care compliant.

18  Q    Do you recall if they used those specific words, you're

19  not team wear compliant?

20  A    No, huh-uh, they didn't.

21  Q    You said you had a conversation with Tope later that day,

22  right?

23  A    Not really a conversation.  Just -- just handed me the --

24  the team wear expectations, the general assembly expectations,

25  and I said okay, and that's it.



www.escribers.net | 800-257-0885

1    Q    Did you bring up the union during this conversation with

2    Tope?

3    A    No.  No.

4    Q    Did Tope bring up the union during this conversation?

5    A    No.

6    Q    On this particular day where you had this interaction with

7    the supervisor and Tope, were any other production associates

8    in general assembly not team wear compliant?

9    A    Yeah.

10    Q    And do you know one way or the other whether a supervisor

11    or a production manager spoke with them about their team wear

12    compliance?

13    A    Not that I'm aware of.

14    Q    Do you ever wear union stickers on your clothing at work?

15    A    Yeah.

16    Q    How often would say you wear union stickers?

17    A    Four or five days a week.  Six days a week if we worked a

18    Saturday.

19    Q    Take a look at General Counsel's Exhibit 25.  Did the

20    stickers have the same logo as any of the ones reflected in

21    General Counsel's Exhibit 25(1) or 25(2)?

22    A    Yeah.  The same one on the front on 25(1).  And then on

23    25(2), it's the same sticker; it is just a yellow color.  It

24    wasn't white and red; it was yellow.

25    Q    And did you see any other production associates in general



www.escribers.net | 800-257-0885

1   assembly wear similar stickers?

2   A    Yes.

3   Q    Have you seen production associates outside of general

4   assembly wearing the shirt that's reflected in General

5   Counsel's Exhibit 25?

6   A    Yeah.

7       MS. FEINBERG:  Objection.  Vague as to time or location.

8       JUDGE TRACY:  Sustained.

9   Q    BY MR. MORRIS:  In or around August of 2017, did you see

10  production associates outside of general assembly wearing a

11  shirt similar to General Counsel's Exhibit 25?

12      MS. FEINBERG:  Again, vague as to location.

13      JUDGE TRACY:  Sustained.

14  Q    BY MR. MORRIS:  The same question but inside the facility?

15  A    Yes.

16  Q    And did you also see those same production associates on

17  working time wearing these same shirts?

18  A    Yes.

19  Q    And this conversation that you testified to with this

20  person that you thought was a supervisor, they didn't

21  discipline you for that interaction, correct?

22  A    No.  It was -- it more felt like a stern warning.  If you

23  like -- if you wear it again, you will be sent home, so don't

24  -- you know, that's kind of what I got from it.  It wasn't

25  punishment or anything like that.  It was a stern warning.



www.escribers.net | 800-257-0885

1    Q    But you weren't sent home that day, were you?

2    A    No.

3    Q    And you testified that you've seen individuals wearing

4    shirts with pictures or logos?

5    A    Yes.

6    Q    What time period were you testifying to?

7    A    The whole three-and-a-half years that I worked there.

8    Q    And you don't know whether they were in general assembly

9    or in any of the other departments at Tesla, correct?

10   A    No, I don't know that.

11   Q    And isn't it true that from time to time production

12   associates would come in from other departments into general

13   assembly, for whatever reason?

14   A    Rarely.  Most of the time if it was, it was an engineer,

15   and they don't -- they don't really have to wear team wear.

16   They could really wear whatever they want.  You really wouldn't

17   have someone coming to do -- like do your job from other

18   department because they -- they wouldn't be familiar with it.

19   Q    I'm not talking about necessarily doing someone's job.

20   But isn't it true that production associates might walk through

21   the general assembly area?

22   A    Yeah.  Occasionally I guess, yeah.

23   Q    And I think you testified that you were terminated by

24   Tesla?

25   A    I was let go for not meeting expectations.



www.escribers.net | 800-257-0885

1    Q    And was a charge filed concerning the termination?

2         MR. GARBER:  Objection.  Relevance.

3         JUDGE TRACY:  Sustained.

4         MR. MORRIS:  Could I make an offer of proof?

5         JUDGE TRACY:  Go ahead.

6         MR. MORRIS:  My understanding is that a charge was filed

7    concerning the termination, and that that charge was dismissed.

8         MS. FEINBERG:  No charges have ever been dismissed in this

9    case.  You could look at the records yourself, Your Honor.

10   They keep repeating that.  They repeated it in their opening

11   argument, they're saying it now.  There have been no charges

12   dismissed.

13        MR. ROSS:  And Your Honor, we urge you to take a look at

14   the attachments to our motion to dismiss where you will find

15   Mr. Rodriguez Ritchie's request for information.  And one of

16   the individuals whose alleged by Charging Party to have been

17   wrongfully terminated in violation of Section 8(A)(3) is the

18   witness.  That charge was dismissed.

19        JUDGE TRACY:  Right.  So --

20        MS. FEINBERG:  What is the relevance of that --

21        JUDGE TRACY:  -- again --

22        MS. FEINBERG:  -- to this case?

23        JUDGE TRACY:  -- I would -- I'm going to sustain the

24   objection, despite the offer of proof as it's not part of this

25   complaint --



1    MR. ROSS:  Okay.

2    JUDGE TRACY:  -- it's not alleged as a violation.  And so,

3    yeah.

4    Q    BY MR. MORRIS:  You testified that there were certain

5    production associates who did not wear black?

6    A    Yes.

7    Q    And I was unclear if you were referring to production

8    associates in general assembly or to outside of the department.

9    A    Just generally -- just generally at Tesla really.  Yeah.

10    Q    Are you aware of any situations where other production

11    associates in general assembly came to work and were not

12    wearing either the team wear or a plain black shirt?

13    A    Yes.

14    Q    And are you aware of any situations where those

15    individuals were told that they needed to change or go home?

16    A    Not that I'm aware of.

17    Q    Do you recall a production associate in general assembly

18    who was wearing a white Yosemite shirt?

19    A    Vaguely.  Vaguely.

20    Q    And do you recall that the Company told him that he needed

21    to change his shirt?

22    MS. FEINBERG:  Objection.  Foundation.  How would he know

23    that?

24    JUDGE TRACY:  Go ahead and lay the foundation.

25    Q    BY MR. MORRIS:  So you testified that you generally recall



1   someone showing up in a white Yosemite shirt.  Could you

2   explain what else you remember about observing that?

3   A    I think it was when my shift was ending, he was wearing

4   like a white Yosemite shirt and it -- like it had something on

5   it.  It wasn't just black.  Like it had like something on it.

6   And they told him that he had to change his shirt, and they

7   made him go buy a shirt from the team store or he was going to

8   get sent home.

9   Q    And do you recall if his name was Taylor?

10  A    I don't really recall, no.

11  Q    And I think you testified that you would frequently wear

12  union stickers on your clothing on working time?

13  A    Yeah.

14  Q    And approximately how many stickers would you have on your

15  person at a given period of time?

16       MR. GARBER:  Objection.  Relevance.

17       JUDGE TRACY:  And what's the relevance?

18       MR. MORRIS:  It's relevant insofar as he was allowed to

19  wear the same union insignia across his body and that no one

20  from management said that he couldn't be doing it.

21       JUDGE TRACY:  Okay.  So --

22       MR. GARBER:  I don't know that there's a difference from

23  wearing 1 sticker and 50 stickers, though.  Is that how many

24  stickers he wore?  Was that -- was that the question?

25       JUDGE TRACY:  Yes, it was.



www.escribers.net | 800-257-0885

1    MR. GARBER:  Yeah.  So again, I don't see the relevance in

2  one sticker versus multiple stickers.

3    JUDGE TRACY:  Well -- and I'll overrule the objection.

4    Go ahead and answer the question.

5    THE WITNESS:  A few.  One on each shoulder, one on the

6  chest.

7  Q    BY MR. MORRIS:  Was there ever a period of time where you

8  reported to Timothy Fenelon?

9  A    Yeah.  Yes.

10  Q    And he was a production supervisor, right?

11  A    Yeah.  He was my last production supervisor.

12  Q    And approximately what dates was he your production

13  supervisor for?

14  A    I guess roughly maybe August to October.  It's just a --

15  that's really just a guess, to be honest, because --

16  Q    And who did Tim Fenelon report to?

17  A    I think Tope.

18  Q    And Tope reported to Kyle Martin, correct?

19  A    Yeah, I guess.  I don't -- I really -- I really don't know

20  past who -- who was in charge of me.  Like I knew them, but I

21  didn't know what their titles were.

22  Q    Okay.  And isn't it true that Kyle Martin reported to an

23  individual named Mario?

24    MS. FEINBERG:  Objection.  Argumentative.  He already has

25  said he doesn't know who --



www.escribers.net | 800-257-0885

1      THE WITNESS:  Yeah.

2      MS. FEINBERG:  -- reported to who and what their titles

3  are.

4      THE WITNESS:  Yeah.

5      MS. FEINBERG:  So why are we belaboring --

6      JUDGE TRACY:  Okay.

7      MS. FEINBERG:  -- this point?

8      JUDGE TRACY:  Sustained.  Sustained.

9      THE WITNESS:  Yeah.

10  Q    BY MR. MORRIS:  So do you recall providing an affidavit to

11  the NLRB?

12  A    Yes.

13  Q    And that was in or around November of 2017?

14  A    Yes.

15  Q    And would you agree that what you provided in your

16  affidavit that was fresh in your mind at that point in time?

17  A    Yeah.

18      MR. GARBER:  Could I approach the witness and show him --

19      JUDGE TRACY:  Yes.

20      MR. GARBER:  -- the affidavit?

21      MR. ROSS:  Can you direct us to which page you're going to

22  show in the affidavit?

23      MR. GARBER:  Sure.  It's page 2, lines 9 through 13.

24      MR. ROSS:  Okay.  Thank you.

25  Q    BY MR. GARBER:  And if you could just take a look at lines



www.escribers.net | 800-257-0885

1    9 through 13.

2    A    Uh-huh.

3    Q    Read that.

4    A    Okay.  Yeah.

5    Q    And does that refresh your recollection of the supervisor

6    management hierarchy?

7    A    Yeah.

8         MR. ROSS:  I would just like to -- sorry to interrupt.

9    I'd just like to object to the whole line of questioning.  I

10   just don't see the relevance in the chain of command here.

11        MR. GARBER:  He's testified to certain interactions in

12   terms of when he was allowed to wear team wear and when he

13   wasn't.  And so the particular managers and supervisors are

14   relevant in terms of enforcement of the team wear policy.

15        JUDGE TRACY:  You know, I'll overrule the objection.  Go

16   ahead.

17   Q    BY MR. GARBER:  So does your affidavit refresh your

18   recollection?

19   A    Yeah.

20   Q    And could you describe what the hierarchy was?

21   A    Well, Timothy was the production supervisor.

22        MS. FEINBERG:  Objection.  The document speaks for itself.

23        JUDGE TRACY:  But the document isn't coming in.

24        MS. FEINBERG:  I see.

25        JUDGE TRACY:  So go ahead, please.



www.escribers.net | 800-257-0085

1    MS. FEINBERG:  Okay.  That's correct.  sorry.

2    THE WITNESS:  Tope is above him.  Kyle's above Tope, and

3    then there's Mario, and then Russell Varone.

4    Q    BY MR. GARBER:  In that hierarchy order?

5    A    Yeah.  Top -- bottom to top.

6    Q    Do you know what job Mario had?

7    A    No.

8    Q    Do you know the dates of employment that Mario was working

9    for Tesla?

10   A    No, I don't.

11   Q    Okay.  Thanks.

12   A    Yeah.

13   Q    Could you take a look at General Counsel's Exhibit 37?

14   A    Yeah.

15   Q    These are the general assembly expectations for general

16   assembly, right?

17   A    Yes.

18   Q    And you don't know whether these apply to any other

19   departments outside of general assembly?

20   A    Well, the only one I'd really know is from body and white,

21   which is where I worked two weeks.  But other than that, I

22   really wouldn't know other department's expectations.

23   Q    Okay.  Thanks.

24   MR. MORRIS:  Nothing further.

25   JUDGE TRACY:  Okay.  Any redirect?



www.escribers.net | 800-257-0885

1        MR. GARBER:  Just a few questions, Your Honor.

2        JUDGE TRACY:  Okay.

3                    **REDIRECT EXAMINATION**

4    Q    BY MR. GARBER:  All right.  Mr. Henry, just a couple

5    questions for you.  So we heard about an employee wearing a

6    white shirt with Yosemite on it.  Was that Yosemite Park?

7    Yosemite Sam?

8    A    Yosemite National Park.

9    Q    Okay.  But it wasn't a flat shirt.

10   A    No.

11   Q    You said there was something raised on it?

12   A    Yeah.  Yeah.

13       JUDGE TRACY:  So wait for the question to be --

14       THE WITNESS:  Okay.  I'm sorry.  I'm sorry.  Yeah.  Yeah.

15       JUDGE TRACY:  It's okay.

16       MS. FEINBERG:  It's not natural.

17       JUDGE TRACY:  It's not like a conversation, unfortunately.

18       THE WITNESS:  Okay.  Yeah.  Yeah.  Yeah.

19   Q    BY MR. GARBER:  I talk fast, it's my fault.

20   A    Yeah.

21   Q    So this Yosemite shirt, it's a white shirt, it says

22   something about Yosemite National Park and the logo on it, it's

23   raised off of the shirt, correct?

24       MR. ROSS:  Objection.  Leading the question -- leading.

25       JUDGE TRACY:  So --



1        MS. FEINBERG:  Well, he's already testified to.

2        MR. GARBER:  He's already testified to.

3        MS. FEINBERG:  He already testified that it was raised.

4        MR. ROSS:  That was suggested to him, and he agreed with

5   the suggestion.

6        MS. FEINBERG:  No, he testified that in response to the

7   questions by the --

8        JUDGE TRACY:  So -- okay.  So --

9        MS. FEINBERG:  -- Tesla's lawyers.

10        JUDGE TRACY:  -- remember my instructions of yesterday.

11        MS. FEINBERG:  Oh, so wait.

12        JUDGE TRACY:  Okay.  The objection is sustained.  Please

13   rephrase the question.

14        MR. GARBER:  Sure.

15   Q    BY MR. GARBER:  Okay.  So this Yosemite shirt, you

16   testified was white.  Was the logo on it, was it raised off the

17   shirt or completely flat?

18   A    As far as I remember, it was raised like --

19   Q    Okay.  And we heard you testify about getting -- about

20   seeing, at some point, this team wear policy before August of

21   2017?

22   A    Yes.

23   Q    Now, nevertheless, before August of 2017, you saw

24   employees in general assembly wearing non-Tesla shirts that

25   were not black; is that right?

22-60493.229



1    A    Yeah.

2         MR. ROSS:  Objection.  Leading.

3         JUDGE TRACY:  So again, I'll sustain the objection.

4         MR. GARBER:  Okay.

5         JUDGE TRACY:  Just --

6         MR. GARBER:  Okay.

7         JUDGE TRACY:  -- ask the question.

8         MR. GARBER:  Okay.

9    Q    BY MR. GARBER:  Prior to August of 2017, did you see

10   employees wearing non-Tesla shirts that were not black?

11   A    Yes.

12   Q    Okay.  And so I want to talk about that day again when you

13   had interaction with your supervisor, who we've already

14   discussed.  After that interaction with that supervisor, did

15   you think that you would be sent home if you wore that shirt

16   again?

17        MR. ROSS:  Objection.  Relevance.

18        MR. GARBER:  I think it's directly relevant to the case.

19   It's the 8(a)(1) allegation and --

20        JUDGE TRACY:  Well, I'm going to sustain the objection.

21   It's what was said to him --

22        MR. GARBER:  Okay.

23        JUDGE TRACY:  -- not what he actually thought about it.

24        MR. GARBER:  Okay.

25        JUDGE TRACY:  Okay.



1    MR. GARBER:  I'll just say that there was testimony about

2    whether he was disciplined and so I would say that it was a

3    threat of discipline.

4    JUDGE TRACY:  Well, he's already testified --

5    MR. GARBER:  Okay.

6    JUDGE TRACY:  -- about what he heard.

7    MS. FEINBERG:  Well -- all right.

8    MR. GARBER:  Okay.  No other questions, Your Honor.

9    JUDGE TRACY:  Okay.

10    MR. ROSS:  Just a moment, if we may?

11    JUDGE TRACY:  Yes.

12                        **RECROSS-EXAMINATION**

13    Q    BY MR. MORRIS:  You were asked some questions about this

14    individual that was wearing a white Yosemite shirt?

15    A    Uh-huh.

16    JUDGE TRACY:  Say yes or no.

17    THE WITNESS:  Oh, yes.

18    Q    BY MR. MORRIS:  How far away were you from that

19    individual?

20    A    Fifteen feet, 20 feet.

21    Q    And do you recall what that employee looked like?

22    A    African-American.

23    Q    Do you remember anything else about them?

24    A    Not really, no.

25    Q    And you were never closer than 15 feet away?


www.escribers.net | 800-257-0885

1    A    No.

2    Q    So you didn't go over there and inspect his shirt, did

3    you?

4    A    No.

5    Q    And what was the individual's name?

6    A    Taylor.

7    Q    Do you remember the last name?

8    A    No.

9    Q    And what part of the line did they work?

10   A    The same job as me, just the shift after me.

11        MR. MORRIS:  And I'd like to show the witness his

12   affidavit again.

13        MR. GARBER:  Which page are we talking about?

14        MR. MORRIS:  Page 8.

15        JUDGE TRACY:  Well, I mean, what's the purpose of showing

16   it to him?  Previously, you showed it to him because there was

17   some deficiencies in his testimony.  So what is it now the

18   purpose of showing it to him?

19        MR. MORRIS:  Yeah.  In his affidavit there's no

20   representation that their -- this white Yosemite shirt that it

21   was raised.

22        JUDGE TRACY:  Okay.  So -- okay.  So that's really not the

23   way that it should be done.  It should be, you know, I have

24   your affidavit.  It's -- but anyway, go ahead and show it to

25   him.  Go ahead.



1       MS. FEINBERG:  All right, then.

2   Q   BY MR. MORRIS:  Would you take a look at lines 10 through

3   13 on page 8?

4   A   Okay.  Yeah.

5   Q   And there's nothing in your affidavit concerning this

6   individual's white shirt having a raised logo, correct?

7   A   Yeah, that's correct.

8   Q   And you agree that the incident was fresher in your mind

9   when you provided the affidavit than it is today?

10  A   Yeah, I'd agree with that.  Yeah.

11  Q   And counsel asked you about individuals wearing non-black

12  shirts in or around August of 2017.

13      MR. GARBER:  No, prior to August.

14  Q   BY MR. MORRIS:  Or prior to August 2017?

15  A   Yes.

16  Q   What were the names of those individuals?

17      MR. GARBER:  Objection.  Relevance.

18      JUDGE TRACY:  Sustained.

19      MR. MORRIS:  Your Honor, I'd like to prove into his

20  credibility.  He's saying that -- he's providing testimony that

21  there was a number of different individuals, but he hasn't

22  provided any authentification (sic) that he has, in fact,

23  observed these people and what they wore.

24      MS. FEINBERG:  He just --

25      MR. GARBER:  I think that it's been said numerous times



www.escribers.net  |  800-257-0885

1    that 10,000 people work there.  I think it's unreasonable to

2    expect him to know the name of every person.  He's testified

3    he's seen these people wear the shirts.  That's what at issue,

4    not the names of the people wearing the shirts.

5        JUDGE TRACY:  So you know, I'll sustain the objection.

6    Yeah.

7    Q    BY MR. GARBER:  You don't know whether those people worked

8    in general assembly or in any of the other departments in the

9    factory, correct?

10   A    They worked near me, yeah.  They worked in GA.  So the

11   people that I saw like next to me and working within my

12   station, yeah.

13       MR. GARBER:  And Your Honor, do you want for me to ask

14   some follow-up questions about names and who those individuals

15   were?

16       JUDGE TRACY:  You know, no, I'm not.  And the reason being

17   is that there is a concern that I have of starting to name

18   other people that might -- that are not anywhere in this

19   complaint, but that were wearing the shirts.  You know, he's

20   got his testimony that he's testified that other people wore

21   them.  You can probe into where they were.  You know, again,

22   I'm only hearing what I'm hearing.  I don't know where the rest

23   of this falls out.  But at this point, I don't find that to be

24   relevant of who was wearing the shirts.

25       MR. MORRIS:  Okay.  Thanks.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  All right.  Anything else?

2      MR. MORRIS:  No, that's it.

3      JUDGE TRACY:  Oh, okay.

4      MR. MORRIS:  Thanks.

5      MR. GARBER:  Just -- I'm sorry, Your Honor.

6      JUDGE TRACY:  Well, no, because we do the --

7      MR. GARBER:  Okay.

8      JUDGE TRACY:  -- direct.

9      MR. GARBER:  Okay.

10     JUDGE TRACY:  That's it.  So thank you very much.

11     THE WITNESS:  Okay.

12     JUDGE TRACY:  And please don't discuss your testimony with

13  anyone until after the close of the hearing which --

14     THE WITNESS:  Okay.

15     JUDGE TRACY:  -- won't come until like October.  So --

16     THE WITNESS:  Okay.  I can go home though?  Right?

17     JUDGE TRACY:  You can talk to them.

18     MR. GARBER:  Yeah.

19     JUDGE TRACY:  Let's go off the record.

20  (Off the record at 10:08 a.m.)

21     JUDGE TRACY:  Okay.  Go ahead and raise your right hand,

22  please.

23  Whereupon,

24              **MICHAEL ALLEN WILLIAMS, JR.**

25  having been duly sworn, was called as a witness herein and was

22-60493.235



1    examined and testified as follows:

2        Okay.  Go ahead and state -- have a seat, and state your

3    name for the record, please.

4        THE WITNESS:  My name is Michael Allen Williams, Jr.

5        JUDGE TRACY:  And you don't have to lean in.  This will

6    pick up your sound.

7        THE WITNESS:  Okay.

8        JUDGE TRACY:  Okay.  Relax.  General Counsel, go ahead,

9    please.

10                    **DIRECT EXAMINATION**

11    Q    BY MR. GARBER:  So Mr. Williams, are you currently

12    employed?

13    A    No.

14    Q    Previously, did you work for Tesla?

15    A    Yes.

16    Q    About how long did you work for Tesla?

17    A    Five years.

18    Q    Did that end around October of 2017?

19    A    Yes.

20    Q    Did you work at Tesla's Fremont, California facility?

21    A    Yes.

22    Q    What was your last job title when you worked at Tesla?

23    A    Welder, level two.

24    Q    Can you explain to us what your job duties were as a level

25    two welder?



www.escribers.net | 800-257-0885

1    A    Yes.  We welded ten various stations; underbody, rub, cub,

2    those are subframes that we put together.

3    Q    And what department did you work in?

4    A    Body and white.

5    Q    Did Tesla terminate your employment?

6    A    Yes.

7    Q    Will that in any way affect your testimony today?

8    A    No.

9    Q    Are you familiar with the United Auto Workers?

10   A    Yes.

11   Q    Did the Union have a voluntary organizing committee while

12   you worked at Tesla?

13   A    Yes.

14   Q    Were you a member?

15   A    Yes.

16   Q    What types of activities did you do as a member of the

17   volunteer organizing committee?

18   A    Attend Union meetings, where my Union shirt on Union

19   Fridays, pass out flyers in the breakroom and at the gym.

20   Q    Because you mentioned that you wore a Union shirt, I'm

21   going to show you a copy of Exhibit 25.

22        MR. GARBER:  Everyone should have a copy.

23   Q    BY MR. GARBER:  Take a look at that; let me know when

24   you're done.

25   A    Yeah.  I'm done.



1    Q    You can just hold onto it for just one second.  Is that

2    the Union shirt that you mentioned that you wore to work on did

3    you say Union Fridays?

4    A    Yes.

5    Q    Okay.  So did you wear it, generally, every Friday?

6    A    Yes.

7    Q    Okay.  I want to direct your attention to around August of

8    2017.  Did any supervisors or managers at Tesla make any

9    comments to you about the Union?

10   A    Yes.

11   Q    Who talked to you about the Union?

12   A    Homer Hunt.

13        MR. ROSS:  Objection.  We're going to move to dismiss the

14   allegations as to Mr. Hunt as being statutorily barred and as

15   to the Board's jurisdiction it's our position that the Board

16   does not have jurisdiction to prosecute this claim for the same

17   reasons as alleged or mentioned in our motion to dismiss the

18   allegations with respect to Mr. Musk and Ms. Toledano, I'm

19   sorry.  There is no operative charge -- valid operative charge

20   with respect to the alleged statements of Mr. Hunt.  Therefore,

21   there is no charge to support the complaint allegation, and

22   therefore, Board does not have jurisdiction over this

23   allegation.

24        MR. GARBER:  I think that that's an argument that could be

25   made in brief, but we should still be allowed to put on our


www.escribers.net | 800-257-0885

1    evidence since we, obviously, take an opposite position to

2    that.

3         JUDGE TRACY:  And so when was this -- have you raised this

4    issue previously?

5         MR. ROSS:  It's alleged in our response where we -- our

6    answer to the complaint where we assert applicable statute of

7    limitations.  This is not something that's been discussed

8    outside that document with General Counsel, but if you, again,

9    I refer you to the various exhibits that were pended to our

10   motion to dismiss encourage -- Judge, please take a look at

11   those documents, and I think you will see that for the same

12   reasons that the allegations as to Mr. Musk and Ms. Toledano

13   are outside the jurisdiction of the Board, so to are the

14   allegations with respect to Homer Hunt.

15        JUDGE TRACY:  And so let me ask you.  So the motion to

16   dismiss, though, was concerning the amendment that was --

17        MR. ROSS:  Correct.

18        JUDGE TRACY:  -- of June 4th?

19        MR. ROSS:  That's correct.

20        JUDGE TRACY:  Okay.  So your position is that in your

21   answer --

22        MR. ROSS:  We assert --

23        JUDGE TRACY:  -- this is what you asserted.

24        MR. ROSS:  -- we asserted 10(b).

25        JUDGE TRACY:  Obviously, the General Counsel's position

escribers

www.escribers.net | 800-257-0885

1    is?

2        MR. GARBER:  To the opposite of that, yes.  That it's

3    timely.

4        JUDGE TRACY:  Okay.  So you know, again, as I'm doing with

5    the other motion to dismiss, although, for that one because it

6    was just recently filed, and I'm allowing an opposition -- in

7    this instance the -- that was one of the affirmative defenses

8    that was raised in an answer.  However, I'm going to, at this

9    point, reserve the ruling on the motion to dismiss for the

10   brief -- for the decision.  And please, during the briefing,

11   raise that issue as your defense.

12       MR. ROSS:  We will, Your Honor.

13       JUDGE TRACY:  Okay.

14       MR. ROSS:  In fact, what we may do, just so we're clear

15   for you and for everybody who's interested, we may end up

16   filing a separate motion to dismiss the allegations.  Apart

17   from the oral motion I'm making right now --

18       JUDGE TRACY:  Uh-huh.

19       MR. ROSS:  -- we may do a written motion to dismiss the

20   allegations with respect to Mr. Hunt so that the law and the

21   arguments and the elements are clear.

22       JUDGE TRACY:  Uh-huh.  And right, I mean, generally, in

23   these affirmative defenses that's usually one of these that's

24   raised.  But I don't believe, but I could be mistaken that it

25   was specifically mentioned that with regard to the allegations

www.escribers.net | 800-257-0885

1   made involving him that that's what the -- the defense was

2   related specifically to him.  What I -- so as I said, I'm going

3   to reserve the ruling on that for the decision.  Put it in the

4   brief.

5        If you feel like filing a separate -- I mean because you

6   haven't yet filed a motion on it.  What you've raised is a

7   defense to it.  So if you feel as though, prior to the

8   briefing, you want to illuminate on that that's fine, but at

9   this point, that was your answer to it.  And so I feel as

10  though you -- sure, if you want to file something, but I'm not

11  sure if the time frame is appropriate.  I mean, I feel like

12  it's just better reserved for your brief --

13       MR. ROSS:  Uh-huh.

14       JUDGE TRACY:  -- and for the decision.  I would also

15  appreciate though, if there are other issues like this that you

16  haven't yet raised beyond the answer that you share that with

17  the General Counsel --

18       MR. ROSS:  Fine.

19       JUDGE TRACY:  -- off the record.

20       MR. ROSS:  All right.  Judge, what I would ask is that the

21  objection I'm lodging at this point in time also be considered

22  as an oral motion to dismiss.

23       JUDGE TRACY:  Okay.

24       MR. ROSS:  In addition to which, as I said, we will

25  probably file a memorandum points and authorities in support of



1      the motion.  And the other thing I would, again, not wanting to

2      interrupt the flow of evidence, is we would like to take a

3      standing objection as to all evidence with respect to Mr. Hunt

4      because we believe it's 10(b) and not within the jurisdiction

5      of the Court.  So is it okay with you if we simply say we're

6      taking a standing objection as to this testimony?  Or do you

7      want me to be interposing objection as to each question that's

8      asked?

9           JUDGE TRACY:  Okay.  So -- again, so with the oral motion,

10     at this point, I'm going to reserve the ruling for the

11     decision.

12          MR. ROSS:  Fine.

13          JUDGE TRACY:  With regarding to the standing objection,

14     point me to the complaint allegation.

15          MR. ROSS:  Sure.

16          JUDGE TRACY:  Because what -- I guess what my point is and

17     what my concern is is that I understand that you're objecting

18     to this entire line of questioning because you feel as though

19     it is barred from this complaint that it's not appropriate,

20     right?  However, if his name comes up again, I don't know, so I

21     can't tell you yes, your objection to anything that comes up

22     with him is part of the standing objection.

23          MR. ROSS:  It appears in paragraph 7S.

24          JUDGE TRACY:  Okay.  And this is which --

25          MR. ROSS:  As to the --



1      JUDGE TRACY:  -- let me -- second --

2      MR. ROSS:  -- as to the March 30 complaint.  I believe

3  it's still 7S in the amended complaint.

4      JUDGE TRACY:  Okay.  Let me just double check here, okay?

5      MS. FEINBERG:  Your Honor --

6      JUDGE TRACY:  Okay.

7      MS. FEINBERG:  -- at an appropriate time, I'd like to ask

8  you a procedural question.

9      JUDGE TRACY:  Okay.  And this is the only time -- for 7S,

10  7S is what you're saying is 10(b)?

11      MR. ROSS:  Yes.

12      JUDGE TRACY:  Okay.  And then obviously, if there are any

13  others, please do talk with them.

14      MR. ROSS:  I'll --

15      JUDGE TRACY:  Okay.  So I -- you know, I would note your

16  standing objection with regard to this allegation.  For the

17  General Counsel --

18      MR. GARBER:  Could I just have a moment --

19      JUDGE TRACY:  -- any --

20      MR. GARBER:  -- to respond?

21      JUDGE TRACY:  Yes.

22      MR. GARBER:  Just very quickly?

23      JUDGE TRACY:  Yes.  But I would also say that if his name

24  comes up again, unrelated to this --

25      MR. ROSS:  I should object.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  -- if appropriate.  I'm not saying you need

2   to.

3      MR. ROSS:  On an objectionable question, but I won't

4   object unnecessarily.

5      JUDGE TRACY:  Okay.

6      MR. GARBER:  I obviously disagree with their position.  I

7   don't oppose the standing objection, just so we don't mess up

8   the flow of evidence.  But I will note that this is covered by

9   Charge 32-CA-208614.

10     JUDGE TRACY:  32-CA-61 --

11     MR. GARBER:  208614.

12     JUDGE TRACY:  6120 --

13     MR. ROSS:  In the original charge or the amended charge?

14     MR. GARBER:  Under Board law it doesn't matter.

15     MR. ROSS:  Okay.

16     MR. GARBER:  It's in the amended.

17     MR. ROSS:  And so the answer is the amended charge or

18   the --

19     MR. GARBER:  I'd have to -- I have the amended in front of

20   me, but as long as the original file charge is timely, an

21   amendment to it doesn't matter.

22     JUDGE TRACY:  Okay.  I'm sorry, the number 612086 --

23     MR. GARBER:  32-CA-208614.

24     JUDGE TRACY:  Oh.  Whoa.  I just totally messed that up.

25     MR. GARBER:  That's okay.



1          JUDGE TRACY:  32-CA-20 --

2          MR. GARBER:  208614.

3          JUDGE TRACY:  Okay.  All right.  Thank you.  And then you

4     had --

5          MS. FEINBERG:  Just a question, Your Honor, because when

6     we had a conference call about this case, you asked us if

7     anyone else had any other motions --

8          JUDGE TRACY:  Yes.

9          MS. FEINBERG:  -- you explicitly asked us that, and this

10    was not mentioned.  And I don't want to be in a situation where

11    we're in a pop-up game.  I've never been -- I've been doing

12    this a long time.  I don't usually have that.  Sometimes

13    something new will come up, but not something that's based on

14    an affirmative defense or something else hasn't been raised.

15    It seems to me if there was a motion to be made, it should have

16    been made.  Or as you suggested, made at the end.  I hope we're

17    not going to see a situation where we're going to have motions

18    being made in the middle of the hearing when you've already

19    offered us the opportunity to make motions.

20          JUDGE TRACY:  And so that's why I said --

21          MS. FEINBERG:  Okay.

22          JUDGE TRACY:  -- you know, obviously, they've listed

23    various affirmative defenses.  Often, you know, you'll see some

24    of that come up, especially when you think about deferral to

25    arbitration.  You'll see some evidence come in about that.



www.escribers.net | 800-257-0885

1     usually, with these issues about the 10(b) that's kind of

2     known.  Specifically, this complaint, obviously, and the

3     various amendments to it are pretty lengthy.  And so there's

4     often discussions, I'm assuming, going on in the background.

5     And then it's done in the briefing.  This is why I've said

6     please, if there are any others that this is your position on

7     them for the Respondent --

8          MR. ROSS:  Sure.

9          JUDGE TRACY:  -- just please communicate that with them.

10          MR. ROSS:  I will.

11          JUDGE TRACY:  Yeah.

12          MR. ROSS:  Let me --

13          MS. FEINBERG:  Where is the affirmative defense?

14          MR. ROSS:  -- state for the record --

15          JUDGE TRACY:  Yeah.

16          MR. ROSS:  -- Your Honor, first of all, we have alleged a

17     10(b) defense so as not to waive this issue.  But I want to

18     make clear for the record that it is our position that it's

19     General Counsel's burden of proof to actually establish that

20     jurisdiction exists and that a timely charge was, in fact,

21     filed with respect to Mr. Hunt.  So I'm not assuming the burden

22     of proving that because that's not my burden.

23          JUDGE TRACY:  Uh-huh.

24          MR. ROSS:  That's a General Counsel's burden.  So as I

25     said, we'll be submitting a memo that will look, remarkably



1    like the memo that you already have in your possession, but it

2    will present the operative law and the facts that support our

3    motion.  But I want to make it clear at the earliest moment

4    that we're not conceding the appropriateness of this testimony.

5        JUDGE TRACY:  Okay.

6        MS. FEINBERG:  And that's what I'm trying to understand.

7    Are you entertaining a new motion during the course of this

8    hearing?  That's what I was trying to understand, Your Honor.

9    You're not -- I thought -- at one point, I thought you were

10   saying you'll wait until the end.

11       JUDGE TRACY:  Oh, yes.  I will.

12       MS. FEINBERG:  But now I hear them saying that they're

13   going to file a motion midstream.

14       JUDGE TRACY:  Well, they can file whatever motion they --

15       MS. FEINBERG:  Okay.  But are you going to expect --

16       JUDGE TRACY:  -- feel like they want to file with their

17   supporting authority.

18       MS. FEINBERG:  Okay.

19       JUDGE TRACY:  I've already said that I'm going to rule --

20       MS. FEINBERG:  Okay, fine.

21       JUDGE TRACY:  -- on all of that in the decision.

22       MS. FEINBERG:  Okay, fine.

23       JUDGE TRACY:  Which is typically what happens, right?

24       MS. FEINBERG:  Okay.  So we'll address it as it comes.

25   Okay.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  The -- and of course, for the General

2    Counsel, you'll have the opportunity, if they do file something

3    in the interim for an opposition, which is, essentially, what

4    you will be putting in your brief.  But -- so again, what I was

5    saying before, though, it's -- you know, we're at the hearing,

6    so please, let's be clear and transparent with one another

7    about what your position is so if they do need to go through

8    some hoops that I may feel unnecessary, like tell me about this

9    charge, I don't -- I might be sitting here thinking what are we

10   doing?

11       But it's already part of the formal papers, right.  So I'm

12   just trying to think about, you know, if they do need to put

13   something on, they need to be aware that they need to do that.

14   okay?

15       MR. ROSS:  That's fine.

16       JUDGE TRACY:  So I appreciate that.  We will, if you file

17   something in the interim --

18       MR. ROSS:  Yes.

19       JUDGE TRACY:  -- then I'll issue an order to show cause.

20   Again, this typically doesn't happen, right?  We would know

21   about it, and we would see it in the briefing, and then we'd

22   deal with it in the decision, but it's fine.  I'm not saying --

23   they've already raised in their affirmative defense.

24       MS. FEINBERG:  Right.

25       JUDGE TRACY:  So it's not as if they're suddenly bringing



www.escribers.net | 800-257-0885

1    up something brand new, except that they're specifically

2    identifying which section of the complaint they feel has a

3    10(b) issue.

4        MS. FEINBERG:  They're churning the case, Your Honor,

5    because now we have to write a -- everyone has to write a brief

6    in the middle of the hearing.  That is not -- that's what I

7    feel is happening.  You're churning a case.  You create extra

8    paperwork.  You create extra filings that don't need to be

9    happening.

10       The case normally has a normal pattern, and so I don't

11   want to be in a situation where all of us, including the

12   General Counsel, are in the situation to have to be constantly

13   running around to deal with whatever assertions Tesla makes

14   that should have been made at the appropriate time, the

15   beginning, or the end of the case.  Obviously, we'll honor

16   whatever you choose to do, but that is my concern.

17       JUDGE TRACY:  Well, here's the point is that if they're

18   going to -- I've told them.  You don't have to file anything in

19   the interim.  It's already -- you've put it now on the record,

20   and you have it in your answer.  If you feel that, for your

21   client that you want to go ahead and issue -- you know, file a

22   memo with the supporting authority, you can.  You can wait

23   until the briefing.  I'll issue an order to show cause and you

24   can say, wait for our brief.

25       MS. FEINBERG:  Okay.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  It doesn't matter because I'm not going to

2    rule on that until the decision.

3      MS. FEINBERG:  Okay.  Thank you, Your Honor.

4      JUDGE TRACY:  But they're making something well-known and

5    clear about their position, which is helpful.  And that's why

6    I'm saying if there are any issues like that, please talk to

7    everybody.

8      MR. ROSS:  Will do.

9      JUDGE TRACY:  So standing objection noted with regard to

10   paragraph 7S of the complaint, amended complaint, second

11   amended complaint, with regard to Hunt --

12     MR. ROSS:  Thank you, Your Honor.

13     JUDGE TRACY:  -- is noted for the record.  No objections

14   to the standing objection --

15     MR. GARBER:  That's fine.

16     JUDGE TRACY:  -- from the General Counsel, from the

17   Charging Party, any standing objections to the standing

18   objections?

19     MS. ALARCON:  No.

20     JUDGE TRACY:  However, if he comes up again that's on you.

21     MR. ROSS:  I won't be shy.

22     JUDGE TRACY:  That's on you.  Okay.  All right.  I'm not

23   sure where we left off with you, expect Homer Hunt.  So

24   continue.

25     MR. GARBER:  Sure.



www.escribers.net | 800-257-0885

1    Q    BY MR. GARBER:  So Mr. Williams, so that was a lot of

2    legal jargon that had absolutely nothing to do with you.  Let's

3    get back to what we were talking about.  August of 2017, you

4    were about to tell us about a conversation with Homer Hunt.

5    Before we get to that, what was Homer Hunt's title at that

6    time?

7    A    Homer Hunt was supervisor of quality control.

8    Q    To the best you can remember, can you tell us what

9    happened in that conversation with Homer Hunt starting with

10   where you were?

11   A    Yes.  I was at main line 140, a welding station, and I

12   seen Homer.  I motioned him over to question him about a lead

13   position I had applied for.  He was going to back me up, or he

14   told me he was going to back me up.  And so that's what I

15   questioned him on, how come I didn't get the position and if he

16   backed me up or not.

17   Q    And then what happened next?

18        MR. ROSS:  I'm sorry, I just didn't hear --

19        THE WITNESS:  Well, he told me I didn't get the position,

20   obviously, somebody else got the position.  Sorry.  He told me

21   I didn't get the position.  Somebody else had got it.  And I

22   asked him if he had backed me up, and he told me it was kind of

23   out of his hands.  He didn't have any control over that.  So

24   that's when I told him that's why we need a Union in here so

25   that the right people are getting put in the right positions.



www.escribers.net | 800-257-0885

1    And that's when he told me the Union's never getting in here.

2    This is Tesla.

3    Q    BY MR. GARBER:  Now I asked you this a little bit before,

4    but I just want to make sure, you obviously didn't get that

5    promotion you were applying for.  Will that affect your

6    testimony in any way today?

7    A    No.

8    Q    In your work as a welder, did you see employees working in

9    the general assembly area?

10    A    Yes.

11    Q    So prior to August of 2017, did you see employees in the

12    general assembly area wearing non-Tesla t-shirts with pictures

13    or emblems on them?

14    A    Yes.

15    Q    What types of non-Tesla t-shirts with pictures or emblems

16    on them did you see them wearing?

17    A    Raiders, 49ers, Warriors, A's, Giants, mostly sports

18    memorabilia.

19    Q    Were these all black shirts or were they different colors?

20    A    All different colors.

21    Q    So the -- would it be safe to say the color -- the shirts

22    you told us about, the sports teams, the shirt -- the color of

23    their shirt was associated with the sports team?

24    A    Yes.

25    Q    So the Warriors shirt would have been what colors?



www.escribers.net | 800-257-0885

1   A    Yellow or blue.

2   Q    49ers?

3   A    Black or red.

4   Q    Raiders?

5   A    Black or silver --

6   Q    Okay.

7   A    -- or maybe white.

8   Q    How often did you see employees in the general assembly

9   area wearing these types of non-Tesla t-shirts --

10  A    Every day.

11  Q    -- prior to -- I'm sorry, prior to August 2017?

12  A    Every day.

13  Q    And after August of 2017, did you see employees in the

14  general assembly continue to wear these types of non-Tesla

15  t-shirts?

16  A    Yes.

17  Q    And these shirts that you saw them wearing, they were some

18  of the ones you've already told us about?

19  A    Yes.

20  Q    Have you ever seen -- or when you at work, I'm sorry --

21  did you ever see a Tesla manager or a supervisor ask an

22  employee to change their non-Tesla T-shirt?

23  A    No.

24  Q    Okay.

25       MR. GARBER:  No other questions.



www.escribers.net | 800-257-0885

1      MR. ROSS:  I'm going to object to the question and move to

2   strike.  Lack of foundation.

3      MS. FEINBERG:  It's what he saw, so.

4      MR. GARBER:  It's what he saw.

5      JUDGE TRACY:  So go ahead and ask the question again,

6   please.

7      MR. GARBER:  Okay.

8   Q    BY MR. GARBER:  In the time that you worked at Tesla, did

9   you ever see a manager or a supervisor ask an employee to

10  change their non-Tesla T-shirt?

11  A    No.

12     JUDGE TRACY:  Okay.  Any more questions?

13     MR. GARBER:  No, that was it.

14     JUDGE TRACY:  Okay.

15     MR. GARBER:  Thank you, Your Honor.

16     JUDGE TRACY:  Okay.

17     Ms. Feinberg?

18     MS. FEINBERG:  Not at this time.  Thank you.

19     JUDGE TRACY:  Okay.  Mr. Ross?

20     MR. ROSS:  Do you have an affidavit for this witness?

21     MR. GARBER:  Sure.

22     MR. RODRIGUEZ-RITCHIE:  The record can reflect that I'm

23  handing two copies of an affidavit to counsel for Respondent.

24     MR. ROSS:  Thank you.

25     JUDGE TRACY:  Okay.



1      MR. ROSS:  Thank you.  If you'd like a moment, please?

2      JUDGE TRACY:  Again, let us know when you are ready to

3  proceed with cross-examination, okay?

4      MR. ROSS:  Will do.

5      JUDGE TRACY:  And we'll go off the record.

6  (Off the record at 10:43 a.m.)

7      JUDGE TRACY:  Okay.  Go ahead, please.

8      MR. ROSS:  Thank you, Your Honor.

9              **CROSS-EXAMINATION**

10  Q  BY MR. ROSS:  Good morning, Mr. Williams.  How are you?

11  A  Good morning.

12  Q  My name's Mark Ross.  I'm the counsel for Tesla.  And I'll

13  ask you a series of questions.  And if there's some reason you

14  don't understand my questions, please let me know, okay?

15  A  Okay.

16  Q  Great.  The Judge, as you heard, asked us to kind of

17  understand -- help to understand -- the various departments and

18  segments of the operations, so let's see if you and I can help

19  her get a clearer picture as to how this place is set up and

20  works.  Okay?

21  A  Yes.

22  Q  Okay.  Now, as I understand it -- and again, correct me if

23  I'm wrong -- there is a department called "stamping"; is that

24  right?

25  A  Yes.



1    Q    Okay.  And in stamping, they take pieces of metal, put

2    them through various types of machinery, presses -- you use

3    robots -- but from there, by that process, sheet metal is

4    transformed into components of the automobile; is that right?

5    Like fenders and --

6    A    I've never worked in --

7         MS. FEINBERG:  Your Honor, I know you -- objection to

8    foundation.

9         JUDGE TRACY:  So lay --

10         MS. FEINBERG:  Objection.  Foundation.

11         JUDGE TRACY:  Please state the objection.

12         MS. FEINBERG:  Foundation.

13         JUDGE TRACY:  Okay.

14         MS. FEINBERG:  I know that you wanted some clarification

15    about parts of the plant.  I'm not so sure this witness is

16    supposed to be able to talk about all plant -- parts of the

17    plant and what everything does, so.

18         MR. ROSS:  He's --

19         JUDGE TRACY:  So again --

20         MS. FEINBERG:  Well, no.  We're asking about the specifics

21    of stamping.  I don't know.

22         JUDGE TRACY:  Yes.  So let me say this; so when -- anybody

23    raises objections, you just need to tell me what's the basis.

24    That's all.

25         MS. FEINBERG:  Yes.  Okay.



www.escribers.net | 800-257-0885

1        JUDGE TRACY:  I don't need any more than that.

2        MS. FEINBERG:  Okay.  Thank you.

3        JUDGE TRACY:  In terms of the foundation, what's your

4   response?

5        MR. ROSS:  Well, I'll ask him if he's familiar with what

6   goes on in stamping.

7        JUDGE TRACY:  Yeah.  I mean I guess also -- yes, I did say

8   during the break -- I don't think I said it on the record -- of

9   what my curiosity is to kind of help place myself.

10       MR. ROSS:  Okay.

11       JUDGE TRACY:  Because he described himself being a welder,

12   level 2.

13       MR. ROSS:  Right.

14       JUDGE TRACY:  And I don't know where that is terms of --

15       MR. ROSS:  Okay.

16       JUDGE TRACY:  -- general assembly or not, or what that

17   means.  However, I just don't know if this is the appropriate

18   witness.  So why don't we find out first, rather than guessing.

19       MR. ROSS:  That's fair.

20       JUDGE TRACY:  Or it may be that is more appropriate to be

21   one of your witnesses who kind of oversees things.

22       MR. ROSS:  Well --

23       JUDGE TRACY:  I don't know.

24       MR. ROSS:  By the time we get into our case, you're going

25   to be -- it's going to be quite some time.  And for the purpose



www.escribers.net | 800-257-0885

1    of trying to help you --

2         JUDGE TRACY:  Well, let's see if he's the --

3         MR. ROSS:  Okay.

4         JUDGE TRACY:  -- he's appropriate to know these things.

5    Q    BY MR. ROSS:  Mr. Williams, have you ever heard of the

6    stamping department?

7    A    Yes.

8    Q    Okay.  And what do you understand occurs in the stamping

9    department?

10   A    Parts are stamped out of metal.  Well, that's far as I can

11   elaborate.  I have never worked in the stamping area.  I've

12   only ever used the bathroom over there.

13   Q    That's fair enough.  Okay.

14        JUDGE TRACY:  You've only used the bathroom over there, is

15   that what you --

16        THE WITNESS:  Yes.

17        JUDGE TRACY:  Okay.

18        MR. ROSS:  Okay.

19   Q    BY MR. ROSS:  And the parts that are stamped in the

20   stamping department go to the body in white department; is that

21   right?

22   A    Yes.  For the most part, yes.

23   Q    Okay.  And that is where you work; is that right?

24   A    Yes.

25   Q    Okay.  And are you familiar with what occurs in the body



1    in white department?

2    A    Various parts of the car are welded -- well, either welded

3    or -- they call it pop riveted together.

4    Q    Pop what?

5    A    A pop rivet.  It's a type of rivet.  It's a pop rivet.

6    Q    Oh, a pop rivet.

7    A    Yeah.

8    Q    Okay.

9    A    Those are what we use to put the car together, pop rivets

10   and welds.  So there's various parts.  There's a cub, there's a

11   rub, there's a fub.  You throw all those together, that makes

12   the sub-frame of the whole car.

13   Q    Okay.  Okay.  And the thing that you did within that

14   process in body in white was weld?

15   A    I welded, yes.

16   Q    Okay.  And --

17        JUDGE TRACY:  And Mr. Ross, you're saying body in white?

18        MR. ROSS:  Body in white.

19        THE WITNESS:  Yes.

20        MR. ROSS:  BIW.

21        JUDGE TRACY:  BIW.

22        MR. ROSS:  Yeah.  That's the area -- that's what it's

23   called.  It's a car manufacturing term called body in white.

24   Q    BY MR. ROSS:  And that's the department you worked in; is

25   that right, sir?


www.escribers.net | 800-257-0885

1    A    Yes.  It just means a car with no paint on it.

2         JUDGE TRACY:  Okay.

3         MR. ROSS:  We do it to confuse the public -- the consumer.

4         JUDGE TRACY:  Okay.

5         MR. ROSS:  Okay.  And the lawyers, I might add.

6         JUDGE TRACY:  I hope I can build a car after this case

7    maybe.

8         MR. ROSS:  Okay.  Well --

9    Q    BY MR. ROSS:  Okay.  Now, after -- it's not yet a car when

10   it leaves body in white.  It's more of a --

11   A    The frame of a car.

12   Q    A frame.  Okay.  Well, after --

13   A    No wheels on it.  No windows.  No door handles.  No

14   windshield.

15   Q    No wheels?

16   A    No wheels.  Just the metal components.

17   Q    Okay.  It's the thing that goes on the top of the car,

18   essentially that lays on top?

19   A    No.  Because this is an aluminum body.  So it's all

20   aluminum.  It's all on conjointed (sic), and it's all one body.

21   Q    Okay.  So the aluminum body, right?  Yes?

22   A    Yes.

23   Q    You have to answer audibly.

24   A    Yes.  Sorry.

25   Q    Otherwise, the lady over here will punch you in the nose.



www.escribers.net | 800-257-0885

1    A    Yes, aluminum body.

2    Q    Well, okay.  Okay.  Okay.  So from body in white, the unit

3    goes to the paint department; is that right?

4    A    I believe it goes to E-Coat first.

5    Q    E-Coat.

6    A    Then paint department.

7    Q    Okay.  And what's E-Coat?

8    A    Electronic coating.

9    Q    And what do they do there?

10   A    They basically dip the car in this -- electronic coating

11   that allows for the car to be grounded and various computer

12   components put on it and not be affected by the metals.

13   Q    Okay.  Okay.  And then after E-Coat, there's the painting?

14   A    I'm pretty sure paint is after E-Coat.  Now, I don't know

15   this process step-by-step from body in white to E-Coat to paint

16   to wherever it goes after that.  I only see as far as I can

17   see, and I can see that it leaves body in white and it goes to

18   E-Coat.  And then from what I know, it knows from E-Coat to

19   paint.  I don't know after that.

20   Q    Okay.  Fair enough.  And then after paint -- and it's

21   probably pretty obvious from the name paint, but is that where

22   the body is painted?

23   A    Yes.

24   Q    Okay.  And that's done in a separate building in the back

25   of the facility called the paint area; is that right?



www.escribers.net | 800-257-0885

1    A    Yes.  Paint shed, yes.

2    Q    Okay.  And then from there, the painted assembly then goes

3    to general assembly?

4    A    I'm not exactly sure, but I believe so.

5    Q    Okay.

6    A    As far as I know.

7    Q    Okay.

8    A    And I don't know if there's any stops in between there.

9         MS. FEINBERG:  Your Honor, the witness has already said he

10   doesn't know where it's going.  He keeps asking the same

11   questions.

12        JUDGE TRACY:  So is that an objection?

13        MS. FEINBERG:  Objection.

14        JUDGE TRACY:  Okay.  Sustained.

15        MS. FEINBERG:  Asked and answered.  Badgering.

16        JUDGE TRACY:  Sustained.  He knows what he knows.

17        MR. ROSS:  Okay.

18   Q    BY MR. ROSS:  But you do know that these car bodies are

19   painted before they get to general assembly, correct?

20   A    Yes, sir.

21   Q    Okay.  All right.

22        MR. ROSS:  I'm trying to help you, Your Honor.

23        JUDGE TRACY:  Thank you.

24   Q    BY MR. ROSS:  Now, you were a welder when you came to work

25   at Tesla?



1   A    No, I wasn't.

2   Q    You were --

3   A    When I came to work at Tesla, I got hired on as an

4   associate.

5   Q    As an associate.

6   A    A production associate.

7   Q    Doing what, sir?

8   A    Loading -- those metal parts that you speak of that come

9   to body in white, unloading those parts into a fixture.

10  Q    Okay.

11  A    And then those parts become a main component, like a fub

12  or a cub or a rub.  And then we load that into another fixture.

13  Q    Okay.

14  A    Then those become one solid unit.

15  Q    Okay.

16  A    Then as it goes down the line we got to put on doors.  We

17  got to put on fenders.  We got to put on all this stuff.

18  Q    Okay.  The pieces are put into the fixture to kind of keep

19  them juxtaposed relative to one another so that the appropriate

20  rivets and welds can be done?

21  A    Yeah.  Correct.

22  Q    Great.  It's a jig, right?

23  A    Yes.

24  Q    Okay.

25       MR. GARBER:  It's -- I'm sorry.  I didn't hear.  It's a



1   what?

2       MR. ROSS:  It's a jig.

3       MR. GARBER:  A jig?

4       MR. ROSS:  Yeah.

5       THE WITNESS:  Yes.

6       MR. ROSS:  It's a -- okay.

7       MR. GARBER:  Great.

8   Q   BY MR. ROSS:  And so where did you learn to weld?

9   A   I actually learned to weld at Owens Concrete and Saw.

10  It's in Emeryville, California.

11  Q   Okay.  So you were trained as a welder before you came to

12  Tesla?

13  A   Yes.

14  Q   Okay.  Did you receive any welding training at Tesla?

15  A   Yes.

16  Q   Okay.  And have you worked as a welder since leaving

17  Tesla?

18  A   No.

19      MS. FEINBERG:  Objection.  Relevancy.

20      JUDGE TRACY:  And the relevance?

21      MR. ROSS:  I'll withdraw the question.

22      JUDGE TRACY:  Thank you.

23  Q   BY MR. ROSS:  Now, just so we're clear on this, Mr.

24  Williams, we have an objection pending as to any testimony

25  about this statement that you say Mr. Hunt made to you.  But I



1    want to ask you some questions about that without waiving our

2    objection to that, okay?  Now, tell me, when you spoke to Mr.

3    Hunt and you said that the decision was out of his hands in

4    terms of this promotion, did he say who made the decision?

5    A    No.

6    Q    Okay.  And did he say that you'd been denied the promotion

7    because of your support for the union?

8         MR. GARBER:  Objection.  Relevance.

9         MR. ROSS:  Withdraw the question.

10   Q    BY MR. ROSS:  Would it be correct to say that when you and

11   Mr. Hunt had this conversation, it was a casual conversation.

12   You were, quote, messing around with each other?

13   A    No.

14   Q    It's not correct?

15   A    That's not correct, no.

16   Q    Okay.

17   A    This was a professional conversation.

18   Q    Okay.

19   A    I was asking about my position as far as getting into this

20   lead position.

21   Q    Okay.  Tell me when -- you gave an affidavit to the

22   National Labor Relations Board in Case Number 208614?

23   A    I'm sorry.  Ask again.

24   Q    Thank you.  Do that again.  If you don't understand my

25   question, tell me.



www.escribers.net | 800-257-0885

1      Okay.  Would it be correct to say that on November 8,

2  2007, you gave an affidavit, a statement, that you signed to

3  Edris W. I. Rodriguez-Ritchie, this gentleman right here

4  sitting to my right?

5      MS. FEINBERG:  I hope you meant 2017, is that -- because

6  that's --

7      JUDGE TRACY:  So again, say it as an objection.

8      MS. FEINBERG:  Objection.  Misstates the date.

9      JUDGE TRACY:  Misstates the date.

10     MS. FEINBERG:  Thank you.

11     JUDGE TRACY:  Yes.  I was going to correct that myself.

12     MR. ROSS:  Sorry.

13     JUDGE TRACY:  2017; is that correct?

14     MR. ROSS:  2017, yes.

15     JUDGE TRACY:  Okay.

16     MR. ROSS:  I'm -- sometimes when my mouth goes faster than

17  my brain.  Sorry, Your Honor.

18     THE WITNESS:  State the question again?

19     MR. ROSS:  Yeah, sure.

20  Q   BY MR. ROSS:  Is it true that you gave a confidential

21  witness affidavit to the gentleman sitting to my right in

22  November of 2017?

23  A   Yes.

24  Q   Okay.  And did you tell him that when you and Mr. Hunt

25  spoke to one another, you and he were messing around?



1    A    No.

2    Q    You didn't tell him that.  Okay.

3         MR. ROSS:  Could the witness be shown his affidavit?

4         JUDGE TRACY:  You guys have two copies.

5         MR. ROSS:  Yeah.  Absolutely.

6         JUDGE TRACY:  So to make it easier, why don't you show him

7    the second copy?

8         MR. ROSS:  Well, we've got notations on our --

9         MR. GARBER:  Oh.  I think I do have another copy.

10        JUDGE TRACY:  Oh, okay.

11        MR. ROSS:  Thank you.

12        MR. GARBER:  Just give me a second here.

13        THE WITNESS:  And where we looking at?  What page?

14        MR. ROSS:  Yeah.  I'll tell you in just a moment.

15   Q    BY MR. ROSS:  Let me ask you this way; is it true that

16   when Mr. Hunt and you spoke, he came by to mess around, or did

17   you believe he came by to mess around?

18        MS. FEINBERG:  Are you asking to look at the affidavit?

19   I'm confused now whether we're re-asking the question or you're

20   asking him to look at the affidavit.

21        MR. ROSS:  No, I'm not asking him to look at the affidavit

22   yet.

23        MS. FEINBERG:  Okay.

24        THE WITNESS:  I don't believe I was messing around, no.

25   There was no messing around about what was happening.



www.escribers.net | 800-257-0885

1    Q    BY MR. ROSS:  Is it true that you believe that when Mr.

2    Hunt came by and spoke to you, he came by to mess around?

3    A    He could have came by to mess around, but I was not

4    messing around is what I'm saying.

5    Q    Okay.

6    A    I was talking in the professional manner, asking him about

7    a position I applied for.

8    Q    Okay.  Did you ever tell anybody that Mr. Hunt came by to

9    mess around?

10   A    I don't think so.

11   Q    You don't think so.  Okay.  Would you look at page 16,

12   line 8, please?

13   A    Page 16, line 8.

14   Q    Beginning of line 8, continuing on to line 9.

15   A    Okay.  Well, I mean I didn't tell nobody that Homer came

16   around to mess with -- nobody -- that Homer came around to

17   mess -- I mean came by to mess around.

18   Q    Okay.

19   A    It says right here; "The position for a lead.  One day we

20   were on the line and Homer came to mess around."

21        That doesn't mean I'm messing around.  I'm talking in a

22   professional manner, asking him about a lead position.

23   Q    All right.  Let me ask you; does the affidavit say:  "One

24   day we were on line and Homer came by to mess around"?

25   A    Okay.  Yeah, the affidavit says that, yes.



www.escribers.net | 800-257-0885

1    Q    Okay.  That's all I have.  Thank you.

2    A    But I wasn't messing around is what I'm telling you.

3    Q    And so, would it be correct to say that when you gave this

4    affidavit to Mr. Rodriguez-Ritchie, your memory was that you

5    believe that Homer came by to talk to you to mess around?

6    A    Yes, that's probably correct.

7    Q    Okay.

8    A    It's been a while now.  I can't keep all this stuff

9    direct.

10    Q    Okay.

11    A    But I do know how the situation happened and what happened

12    in that situation and why it happened.  It was because I asked

13    him a question.  That's what the main subject here is.  I asked

14    him a question about backing me up.

15    Q    Okay.

16        MR. ROSS:  Could the witness be shown General Counsel's

17    Exhibit 37, please?

18    Q    BY MR. ROSS:  Mr. Williams, this a document that's already

19    in evidence, which has been marked as Exhibit -- General

20    Counsel's Exhibit 37-01 and 2.  Have you ever seen that

21    document before?

22    A    Nope.

23    Q    Okay.  And you give it back.

24    A    Can I check it out?

25    Q    Sure.  I just saw a copy.



www.escribers.net | 800-257-0885

1    A    And I've never seen this.  Because there was no mandatory

2    team where -- the whole five years I worked there, period.

3    Ever.

4    Q    Okay.  Thank you.

5         THE WITNESS:  Let me keep it.

6         JUDGE TRACY:  Well, do you have any questions for him

7    about it?

8         MR. ROSS:  I don't.

9         JUDGE TRACY:  Okay.  Then you don't need to keep it.

10        MR. ROSS:  Thank you.

11   Q    BY MR. ROSS:  Now, did you ever work in general assembly?

12   A    I was never assigned to work specifically in general

13   assembly, but we did go to general assembly to --

14   Q    Okay.

15   A    -- correct defects.

16   Q    Okay.  So from time to time, people who work in body in

17   white had occasion to enter the general assembly area?

18   A    Yes.

19   Q    Is that right?

20   A    Yes.

21   Q    Okay.  And to your knowledge, was it also true that

22   individuals from other areas within the company had occasion to

23   enter general assembly other than general assembly people?

24   A    Yes.

25   Q    Now, I showed you this document that you'd never seen



www.escribers.net | 800-257-0885

1   before.  Do I understand correctly that there was no dress code

2   for body in white?

3   A    No, you don't understand correctly.  There was no dress

4   code for the factory at all.

5   Q    Okay.  Okay.

6   A    Body in white, general assembly.  The only ones that have

7   strict dress code is paint.

8   Q    Okay.  But so there were strict dress codes for paint?

9   A    Specific for paint, yes.

10   Q    Okay.  And that was -- do you know why there were strict

11   dress codes for paint?

12   A    Yes.  Because when you work in paint, you can't wear

13   deodorant.  You can't do certain things that you normally do,

14   because it affects the paint.  So they have special zip-up

15   suits.  You know, it's a little jacket.

16   Q    These bunny -- called bunny suits (sic).

17   A    It's a body suit, yeah.  A little body suit that they

18   wear.

19   Q    Okay.

20   A    And it's because, you know, certain things can affect the

21   paint as it's drying or being sprayed or what have you.

22   Q    Okay.  And indeed, in paint, they also wear --

23       JUDGE TRACY:  So Mr. Ross, I am so sorry.  But I'm

24   concerned that you're kind of getting away from the microphone.

25       MR. ROSS:  Oh, I'm sorry.



www.escribers.net | 800-257-0885

1     JUDGE TRACY:  To make sure that she gets your question and

2  what you're saying.

3     MR. ROSS:  I get restless, Your Honor.

4     JUDGE TRACY:  I'm sorry.

5     MR. ROSS:  I am sorry about that.  Thank you.

6  Q    BY MR. ROSS:  In paint, they also wear face masks when

7  they're applying paint?

8  A    I've never been in there to see them apply paint, so I

9  can't say.

10  Q    Okay.  Tell me, are there -- is there any -- I think you

11  mentioned that as a welder you wear a welding apron?

12  A    No.  Welding jacket.

13  Q    Welding jacket.  What's a welding jacket?

14  A    It's a -- I'm trying to think of the material.  I can't

15  think of the material.  I want to say it's a mixture of

16  materials.  I don't know.  But it's flame retardant -- a flame

17  retardant.  So it's a long-sleeve, button right here, button

18  straight up the middle with a collar on jacket.

19  Q    Okay.  And you wear that -- why do you wear a welding

20  jacket when you're welding?

21  A    Oh, to prevent yourself from being burned or caught on

22  fire.

23  Q    Good idea?

24  A    Yeah.

25  Q    Yeah.  Okay.  And is there any other -- can we agree that



www.escribers.net  |  800-257-0885

1    would be considered part of your --

2    A    PPE, yes.

3    Q    PPE.

4    A    Yes, correct.

5    Q    Okay.  And what other PPE is used in building -- or I'm

6    sorry -- body in white?

7    A    Ear plugs.

8    Q    Ear plugs.  What else?

9    A    Kevlar sleeves.

10   Q    Kevlar sleeves?

11   A    Yeah, Kevlar sleeve.  It goes from here to here.

12   Q    And why do you wear Kevlar sleeves?

13   A    The objects we deal with can be sharp.  The metals, they

14   can be sharp.  So you don't want to get cut.

15        And where the Kevlar sleeves, you wear also the same type

16   of gloves.  So it's got grip on it.  You won't cut yourself.

17   Q    Okay.  And why do you wear ear plugs?

18   A    Loud noises, loud -- there's a lot of loud machinery

19   everywhere in the shop, so protect your ears.  Protect your

20   hearing.

21   Q    Is that true throughout the factory?

22   A    Yes.

23   Q    Okay.  Any other PPE in the body in white area?

24   A    Steel toe boots.

25   Q    Steel.  Okay.



1    A    Safety glasses.

2    Q    Because shards of metal might be in the air?

3    A    Yeah.  Anything could be flying, could get blown in

4    where -- an above cap underneath your fitted cap.

5    Q    They keep you from cutting your head?

6    A    Yeah.  It's just a piece of plastic.  It goes inside of

7    your hat.  But if you hit your head on something, it'll protect

8    your head from --

9    Q    Okay.  Okay. By the way, did you ever see any employees

10   wearing baseball caps that said "UAW" on it?

11   A    No.

12   Q    Never saw it.  Did you ever see any employees wearing

13   their personal clothing but with UAW insignia or stickers on

14   it?

15   A    Yes.

16   Q    Okay.  Would it be correct to say -- strike that.

17        Did you ever wear a UAW sticker on your shirt?

18   A    No.  I had a shirt that I wore.  So I wore the shirt from

19   my, you know, representing the union.

20   Q    The UAW shirt?

21   A    Yes.

22        MR. ROSS:  Could the witness be shown General --

23        THE WITNESS:  I already have it.

24        MR. GARBER:  I think he has it in front of him.

25        MR. ROSS:  -- General Counsel's 25.



www.escribers.net | 800-257-0885

1    MR. GARBER:  Yeah.

2    MR. ROSS:  Yeah.

3    Q    BY MR. ROSS:  That's the shirt you wore?

4    A    That's the shirt.

5    Q    Okay.  And you wore the -- you wore that going to and from

6    work -- as your job?

7    A    Yes.  Well, I wore this shirt underneath my welding

8    jacket.  When I'm on the line, of course my welding jacket is

9    covering over this shirt.

10   Q    Okay.  Now, is it correct that in February of 2017, you

11   were outside in Door number 1 at the plant handing out union

12   flyers?

13   A    Yes.

14   Q    And do you remember what those flyers were, what they

15   said?

16   A    No, I don't remember off the top of my head.

17   Q    Okay.

18   MR. ROSS:  Could the witness be --

19   Q    BY MR. ROSS:  Do you still have your affidavit?

20   A    Yeah, I still have it.  Yes.

21   Q    Okay.  Would you please take a look at -- going to the

22   back of the affidavit, what's been identified as Exhibit Number

23   A, please?  It's two pages.  One has the title "Time for a

24   Tesla to listen; and one is "Assembly California Legislature"

25   at the top of the page.



1    A    Got it.

2    Q    Do you see it?

3    A    Yeah.

4    Q    Now, does that refresh your memory in terms of whether

5    that's you handed out that day?

6    A    Yes, I believe so.  That's -- I believe that's the flyer

7    we were handing out.

8    Q    Okay.  And that would have been about 4:00 in the morning,

9    4:30 in the morning?

10    A    Yes.

11    Q    Okay.  And others were present handing out these flyers;

12    is that right?

13    A    Yes.

14    Q    Who else was present?

15    A    I don't know them by name.  Just other pro-union

16    employees.

17    Q    Okay.  Do you know whether one was a guy named Michael

18    Sanchez?

19        MR. GARBER:  Objection, Your Honor.  Well outside the

20    scope of direct in this point.

21        JUDGE TRACY:  Sustained.

22    Q    BY MR. ROSS:  Tell me, when you were out there, is it true

23    that you were never approached by security?

24        MR. GARBER:  Objection.  Same objection.

25        JUDGE TRACY:  Sustained.



www.escribers.net | 800-257-0885

1     MR. ROSS:  I'm going to offer -- make an offer of proof,

2  Your Honor.  This is not our witness.  This is General

3  Counsel's witness.  But there is stuff in the affidavit that

4  plainly contradicts the testimony by Mr. Sanchez.  I think

5  we're allowed to elicit that testimony.

6     It goes to Mr. Sanchez's credibility, as well as its

7  evidence establishing that this witness was not confronted by

8  security, even though he was out there in the same general

9  facility as Mr. Sanchez and not talked to by security.

10     THE WITNESS:  I was not in the same general --

11     JUDGE TRACY:  So hold on.

12     THE WITNESS:  -- vicinity as anybody.

13     JUDGE TRACY:  Excuse me.  Excuse me.  There isn't a

14  question before you, okay?  There is an objection.

15     Go ahead.

16     MR. GARBER:  If I can respond really quick?

17     I don't think that just because he was in the same area as

18  Mr. Sanchez that that somehow contradicts Mr. Sanchez's account

19  or undermines his credibility.

20     MR. ROSS:  Would General Counsel concede --

21     JUDGE TRACY:  Well, and so --

22     MS. FEINBERG:  Then whenever.

23     JUDGE TRACY:  What's that?

24     MS. FEINBERG:  I'm just waiting my turn.

25     JUDGE TRACY:  Okay.  Go ahead.



www.escribers.net | 800-257-0885

1      MS. FEINBERG:  Oh.  Because I also don't think the

2  testimony is that he was next to Mr. Sanchez.  I think he just

3  said he was -- or with him.

4      So I don't know that it contradicts it.  He might have had

5  a different experience.  That doesn't have anything to do with

6  it.

7      I don't think that foundation has been laid.  And I don't

8  think he's the appropriate witness.

9      JUDGE TRACY:  Okay.  So I'm going to overrule the

10  objections to the extent that their -- the purpose of their

11  cross-examination here is for the credibility of a different

12  witness, certainly so.  You can also make their arguments that

13  it doesn't.

14      But I'm going to allow them their opportunity here for

15  that purpose.

16      MR. ROSS:  Thank you, Your Honor.

17      MS. FEINBERG:  All right.  But I think he's

18  mischaracterized the testimony.  So I just want to say that on

19  the record.

20      JUDGE TRACY:  So again, that's what the redirect is for,

21  right?

22      MS. FEINBERG:  Okay.

23      JUDGE TRACY:  Okay.  Go ahead.

24      MR. ROSS:  All right.

25  Q    BY MR. ROSS:  So sir, just to kind of lay the foundation



www.escribers.net | 800-257-0885

1   and set the stage for this, you were outside door number 1 on

2   February 10 at about 4 or 4:30 in the morning handing out the

3   flyer that you've identified, right?

4   A    Yes.

5   Q    Okay.  And is it correct also that there were other people

6   in the area handing out flyers?

7   A    Yes.

8   Q    Is it true that you got there around 4:30 in the morning?

9   A    Yes.

10  Q    And that you stayed there until about 5:10 in the morning?

11  A    Yes.

12  Q    And is it also true that you had no interactions with the

13  security guards that day?

14  A    Yes.

15  Q    And is it also true that as far as you know, no security

16  guard spoke with a group of three -- or two planters down from

17  you, who were also leafletting?

18  A    I can't answer that.

19  Q    Okay.

20  A    Because I'm handing out flyers, so I'm not directly

21  looking at them at all times.  I'm trying to get these flyers

22  out to people too.  So that's another reason why I can't say I

23  was directly next to him, because why would I stand right next

24  to him if we're trying to cover as many people as we can?  I'm

25  a little ways down trying to talk to these people and let them



www.escribers.net | 800-257-0885

1   know about what's going on.

2   Q    All right.  Would you please take a look at page 18,

3   beginning at line 2, continue on to line 4 of your affidavit,

4   please, sir?

5   A    Yes, I see.

6   Q    Yeah.  Now, does that refresh your memory as to whether or

7   not you know whether a security guard spoke with a group of

8   three people two planters down from you, who were also hand

9   billing?

10   A    Yeah.  Like I said, those security guards spoke to the

11   three people two planters down from me, but --

12   Q    Okay.

13   A    -- can I really answer that?

14        JUDGE TRACY:  Can I just --

15        THE WITNESS:  No, I can't, because I'm not down there with

16   them.

17        MR. ROSS:  Okay.  And when you made that --

18        JUDGE TRACY:  Can I just -- I'm sorry --

19        MR. ROSS:  I'm sorry.

20        JUDGE TRACY:  I'm trying to just understand.  Planters?

21        MR. ROSS:  Planters.

22        JUDGE TRACY:  Like --

23        MR. ROSS:  Yeah, like --

24        JUDGE TRACY:  -- planter --

25        MR. ROSS:  -- stuff to put plants in.



www.escribers.net | 800-257-0885

1      THE WITNESS:  With the tree and rocks in it.

2      JUDGE TRACY:  Okay.  Planters.  Okay.  I just could not

3   hear that properly.

4      MR. ROSS:  Planters.  Okay, yeah.

5      JUDGE TRACY:  Okay.  Thank you.

6      MR. ROSS:  Okay.

7   Q    BY MR. ROSS:  And when you made that statement, you were

8   telling the truth?

9   A    Yes.

10  Q    You have no knowledge of that?

11  A    Yes.  I have no knowledge if the security guard talked to

12  them or not.

13  Q    Okay.  You --

14  A    How are you going to ask me that if I told you I'm two

15  planters down doing something else?

16  Q    Okay.

17  A    You know, if the security talked to them, am I on watch

18  for the security guard to talk to them?

19  Q    Okay.  And would it be correct to say also that after you

20  did this hand billing on February 10th, you continued to hand

21  bill inside the plant, in breakrooms and at the gym?

22  A    Yes.

23  Q    And that you also hand billed or handed out Union or UAW

24  stickers and pens out of your locker?

25  A    Yes.



www.escribers.net | 800-257-0885

1    Q    In fact, you handed out knick-knacks, as you called them,

2    pens and stickers pretty much every Friday.  Is that correct?

3    A    Yes.

4         MR. GARBER:  Objection.  Relevance.  We -- I --

5         THE WITNESS:  Union Friday.

6         MR. GARBER:  -- I thought the whole point of his testimony

7    was to go to the credibility of Mr. Sanchez and I think we've

8    exceeded that by far now.

9         JUDGE TRACY:  Yeah.  So sustained.

10   Q    BY MR. ROSS:  I apologize this -- for this, Mr. Williams,

11   but I don't remember whether you testified to this or not.  You

12   no longer work at Tesla, right?

13   A    No.

14   Q    And you were -- your employment was terminated in October

15   of 2017?

16   A    Yes.

17   Q    Okay.  And you were told that your employment was being

18   terminated, because they didn't feel your performance was

19   living up to expectations?

20        MR. GARBER:  Objection, relevance.

21        MS. FEINBERG:  Objection.  Relevancy.  Oh, there you go.

22        MR. ROSS:  Okay.

23        JUDGE TRACY:  Sustained.

24        MR. ROSS:  And for the record, Your Honor, rather than ask

25   the witness the question, I'd like the record to reflect that



www.escribers.net | 800-257-0885

1    Mr. Williams' October, 2017 termination was also the subject of

2    a charge as witnessed by the request for information sent by

3    Mr. Rodriguez-Ritchie referenced before and that this

4    allegation of wrongful termination was likewise dismissed.

5    Thank you very much, Mr. Williams.  I have nothing else.

6        MS. FEINBERG:  Okay.  Your Honor, I would like to speak to

7    this one last time, because no charges were dismissed.  And

8    whatever reason the General Counsel chose or not chose to go on

9    allegations does not mean that anyone was exonerated or

10   anything.  It might mean that there was certain evidence,

11   whatever variety of factors.  And so for Tesla to keep

12   repeating and repeating that the fact that the General Counsel

13   asked for some information and then chose not to necessarily

14   use that information has nothing to do with this case.

15       And we're just going to -- just to harangue and harangue

16   to hear that, because the charges that were filed are the

17   charges that remained.  And there was no dismissal.  I'm

18   particularly aware of that, since I represent the Charging

19   Parties and that's why I take umbrage with that particular

20   representation.

21       JUDGE TRACY:  Yes.

22       MS. FEINBERG:  Thank you.

23       JUDGE TRACY:  Yes.  So Mr. Ross, certainly, you know, you

24   can make the arguments about these things in your brief, if you

25   feel as though that would be necessary, okay.



www.escribers.net | 800-257-0885

1    MR. ROSS:  All right.  If I may confer with Mr. Morris --

2    JUDGE TRACY:  Yeah.

3    MR. ROSS:  -- for just a moment.

4    JUDGE TRACY:  Uh-huh.

5    Q    BY MR. ROSS:  Okay.  Just to be clear on this, Mr.

6    Williams.  The stickers that you wore on your -- I'm sorry.

7    The UAW shirt that you wore, you wore that during work time at

8    Tesla, right?

9    A    No.

10   Q    You did not wear it?

11   A    I couldn't wear it during work time, because during work

12   time, I have to wear my welding jacket.

13   Q    So you took the shirt off?

14   A    No, the shirt stayed on.  I put on my welding jacket.

15   Q    Okay.  But you didn't take it off.  You continued to wear

16   it?

17   A    I continued to wear it, but you couldn't see it, so --

18   Q    Yeah.

19   A    -- it's not like somebody goes oh, look at that guy on the

20   line over there with the Union shirt on, right?

21   Q    And when you took your breaks, you wore the welding

22   jacket?

23   A    No.

24   Q    So you took that off the --

25   A    When I took my breaks, I would take the welding jacket and



www.escribers.net | 800-257-0885

1    all my PPE off, except for my steel toe boots.

2    Q    But you didn't take your shirt off?

3    A    But I didn't take my shirt off, no.

4    Q    And when you went to lunch, you continued to wear the

5    shirt?

6    A    Yes.

7    Q    Okay.  Nothing further.  Thank you.

8         JUDGE TRACY:  Okay.  Any redirect?

9         MR. GARBER:  Just a few questions, Your Honor.

10                    **REDIRECT EXAMINATION**

11   Q    BY MR. GARBER:  Mr. Williams, so we heard a little bit of

12   testimony about leafletting in February with Mr. Sanchez.  Do

13   you remember the exact date that that happened in February, or

14   do you just characterize it happening sometime in February?

15   A    Sometime in February.

16   Q    Do you know, were there -- was there more than one

17   instance of leafletting in February?

18   A    No, I don't.

19   Q    Okay.  Were you with Mr. Sanchez that entire time that you

20   described in February, when you were leafletting?

21   A    I wasn't with Mr. Sanchez.

22   Q    Okay.  Is the paint department part of general assembly?

23   A    No.

24   Q    Is body and white part of general assembly?

25   A    No.



www.escribers.net | 800-257-0885

1    Q    Okay.  Almost done.  Going back to that conversation you

2    had with Homer Hunt.

3         Did you perceive him as being serious when he made that

4    statement to you?

5    A    Yes.

6         MR. ROSS:  Objection.  Relevance.

7         JUDGE TRACY:  Sustained.

8         MR. ROSS:  Thank you.

9    Q    BY MR. GARBER:  What was his demeanor when he made that

10   statement to you?

11   A    He was serious.  He was dead serious.

12   Q    Okay.  No further questions.

13        JUDGE TRACY:  Any Recross?

14        MR. ROSS:  Yeah.

15        MS. FEINBERG:  Oh, wait.  Hello?

16        MR. ROSS:  I'm sorry.  Margo?

17        MS. FEINBERG:  I can't ask one question.

18        JUDGE TRACY:  Yes.

19        MS. FEINBERG:  I've been so disciplined.

20        JUDGE TRACY:  No.  I know, but --

21        MS. FEINBERG:  Just one quick question.

22        JUDGE TRACY:  Go ahead.

23        MS. FEINBERG:  I would like to clarify.

24        JUDGE TRACY:  Go ahead.

25        MS. FEINBERG:  Okay.  Okay.  Thank you.



1                          **RECROSS-EXAMINATION**

2    Q    BY MS. FEINBERG:  Because Mr. Williams, you were test --

3    you were asked a lot of questions about the uniform that you

4    wore when you were welding in body and white department.  Is

5    that right?

6    A    Yes.

7    Q    Okay.  But there are people in body and white who are not

8    welders.  Is that right?

9    A    Yes.

10   Q    And they don't wear that garb.  They wear --

11   A    No.  They don't wear the welding jacket, no.

12   Q    They just can wear a t-shirt and their pants?

13   A    Yes.

14   Q    Okay.  Thank you.

15                          **RECROSS-EXAMINATION**

16   Q    BY MR. ROSS:  Is there no personal protective equipment

17   that people other than welders wear in body and white?

18   A    Yes, there is.

19   Q    What else do they wear, aside from a shirt?

20   A    Kevlar sleeves, goggles, earplugs, bump cap, steel toe

21   boots.

22   Q    Okay.  Okay.

23   A    So the only difference to a welder is his welding

24   jacket --

25   Q    Right.



www.escribers.net  |  800-257-0885

1    A    -- and his welding apparatus, which is a welding helmet

2    and a backpack that has a breather with a tube on it that hooks

3    up to the helmet.

4    Q    Okay.  So you actually wear a helmet when you're welding?

5    A    Yes.

6    Q    Oh, I didn't know that.  Okay.  But if you're not a welder

7    working in body and white, you still wear the Kevlar?

8    A    Yes.  Kevlar sleeves.

9    Q    And that's because you're still a cut hazard?

10   A    Yes.

11   Q    They wear Kevlar in body -- in general assembly?  If you

12   know.

13   A    I -- yes.  Yes.

14   Q    They do?

15   A    I believe so.

16   Q    Okay.  Okay.  Tell me, do you know what other personal

17   protective equipment they wear in general assembly?

18   A    No, I don't.  I just know that they're not as -- you know,

19   they don't have as strict as rules as us.

20   Q    I see.  Okay.  Now, in response to Mr. Garber's

21   questioning about Mr. Sanchez -- and I think you said you

22   weren't with -- didn't see Mr. Sanchez that morning?

23   A    I can't say if I seen him or not.  I don't know who was

24   over there.

25   Q    Okay.

22-60493.288



1    A    I was in my own section passing out flyers where I parked

2    at.

3    Q    Okay.

4    A    So I don't know who was where or you know, who got

5    approached by security.  I know none of that, because I was

6    doing my own section of the parking lot.

7    Q    Okay.  I'm going to show you what I understand to be a

8    picture of door one.  You were at door one, right?

9    A    Yes, I believe it's door one.

10   Q    Okay.

11   A    I can show you.  If you show me the picture, I'll tell you

12   exactly which door it is.

13   Q    Okay.

14        MR. ROSS:  Just bear with me a moment, Your Honor.  I've

15   got to collect --

16        JUDGE TRACY:  Uh-huh.

17        MR. ROSS:  -- my exhibits here and figure out which is

18   which.  Could the witness be shown General Counsel's Exhibit 3,

19   please?  Do you have a --

20        MR. GARBER:  I don't think I have one handy.

21        MR. ROSS:  May I approach?  I'll be happy to show the

22   witness.

23        JUDGE TRACY:  Oh, sure.

24        MR. ROSS:  And may I ask him questions from --

25        JUDGE TRACY:  Yes.



1      MR. ROSS:  All right.  All right.

2  Q    BY MR. ROSS:  Mr. Williams, I'm showing you what's been

3  marked as General Counsel's Exhibit 3.  That's an aerial

4  photograph of what we've been told is door number one.

5  A    Yeah, but see, this door number one -- and over here, you

6  got door number two.  Now, where I park at --

7      MS. FEINBERG:  I'm sorry, but this no use to any of us

8  here.

9      JUDGE TRACY:  So it would be helpful if you would turn on

10  your --

11      MS. FEINBERG:  No, not your fault.

12      JUDGE TRACY:  -- projector, since we have that.  It's --

13  but it probably is not warmed up.

14      MR. RODRIGUEZ-RITCHIE:  I just can't use my computer, if

15  I'm --

16      JUDGE TRACY:  Oh, sorry.

17      MR. RODRIGUEZ-RITCHIE:  -- I'm doing that.

18  Q    BY MR. ROSS:  Well, the question is --

19      MR. RODRIGUEZ-RITCHIE:  But I -- if you give me a minute,

20  I can pull it up.

21      JUDGE TRACY:  Yeah.  I mean, I think it would be helpful

22  here for your questioning, since no one else can see it --

23      MR. ROSS:  I'm happy to have it --

24      JUDGE TRACY:  -- and have the benefit of the --

25      MR. ROSS:  Great.



www.escribers.net | 800-257-0885

1          JUDGE TRACY:  -- that and you know, he can use the

2     pointer.

3          MR. ROSS:  That's great.

4          JUDGE TRACY:  And that way everybody is on the same page.

5     You guys over there have the pointer that he can use?

6          MR. GARBER:  Yes.

7          JUDGE TRACY:  Okay.

8          MR. RODRIGUEZ-RITCHIE:  Sure.  I would just ask if Mr.

9     Ross intends to do this in the future, it would helpful to let

10    me know beforehand, so I can get this all set up.

11         JUDGE TRACY:  I have a feeling that --

12         MR. ROSS:  Well, if you tell me who your witnesses are --

13         JUDGE TRACY:  Yeah.  There --

14         MR. ROSS:  -- I'll tell you whether I'm going to do it or

15    not.

16         MS. FEINBERG:  Well, we just had a half hour break, but

17    anyhow.

18         MR. RODRIGUEZ-RITCHIE:  I'm just going to --

19         JUDGE TRACY:  Okay.  So I'm going to set the tone here.

20    This is what I do not like is all this like little nippy stuff.

21    Cut it out.  This is recross.  He can only anticipate a certain

22    amount here.

23         MS. FEINBERG:  Yes.

24         JUDGE TRACY:  There were questions about the entrance.  We

25    have the benefit of the General Counsel putting together a



www.escribers.net | 800-257-0885

1   really nice slide, so let's use it instead of just this not

2   appropriate demeanor.

3        MR. ROSS:  I apologize, Your Honor.

4        JUDGE TRACY:  I'm not just talking to you.  I'm talking to

5   everybody.  It's a long time --

6        MR. RODRIGUEZ-RITCHIE:  Counsel --

7        JUDGE TRACY:  -- that we're together, and so if we

8   continue like this, we will not be happy.  I could say other

9   things, but I will not.

10       MR. RODRIGUEZ-RITCHIE:  Counsel for the General Counsel is

11  going to approach the witness --

12       JUDGE TRACY:  Thank you.

13       MR. RODRIGUEZ-RITCHIE:  -- and give him a laser pointer.

14  It's just the button with the light at con.

15       THE WITNESS:  Okay.

16       JUDGE TRACY:  Now, you were asking GC Exhibit 3?

17       MR. ROSS:  Yes, ma'am.

18       JUDGE TRACY:  Is that what --

19       MR. ROSS:  That's the one.

20       JUDGE TRACY:  Okay.

21  Q    BY MR. ROSS:  Okay,  Sir, you see projected on the wall

22  General Counsel's Exhibit 3.  And let me ask you.  Does that

23  appear to be an aerial photo of door number one?

24  A    Yeah, it looks like door number one.  Motorcycles in

25  front.  Yep.



www.escribers.net | 800-257-0885

1    Q    Okay.  Okay.  Now, the other employees that you mentioned

2    being -- well, strike that.  Could you use that pointer and

3    show us where you were relative to door number one?

4    A    Where I was is not on here.  I park at the back of this --

5    at the -- parallel to the building, there's a wall back here

6    and I park on that wall at the end of the parking lot.  And I

7    park there, so that nobody parks next to me.

8    Q    Okay.

9    A    They can only park in front or behind me.  So I park on

10   that wall probably opposite of this -- either this one, or the

11   next row of cars, so it'd be down here somewhere.

12        MS. FEINBERG:  Your Honor, could you just --

13        THE WITNESS:  So when I got out of my car with my flyers,

14   I walked this way down to these lower parking -- there's one,

15   two, three, four, five, maybe six more rows of cars down over

16   here.  So when I got out of my car, I went this way to get

17   these cars that are over here.  There was already guys here and

18   here.  Like I said, I don't know who they are.  Can't say who

19   they were.  They were just there.  It's dark outside.  So yeah,

20   I moved down over here to cover this other half of the parking

21   lot.

22   Q    BY MR. ROSS:  Okay.

23        JUDGE TRACY:  And so Mr. Ross, if you could please

24   describe for the record what he just -- how he pointed as the

25   General Counsel did yesterday.



www.escribers.net | 800-257-0885

1      MR. ROSS:  I will try to do that, Your Honor.  The

2   witness, I believe, has indicated looking at the picture that

3   he was actually standing, hand bill -- engaging in the hand

4   billing or leafletting in a space that actually is off the

5   photograph but to the bottom of the frame of the photograph.

6   Q   BY MR. ROSS:  Would that be accurate, sir?

7   A   You're asking me --

8   Q   Yes, I am.

9   A   -- where I was handing flyers?

10   Q   Yeah.

11   A   Yes.

12   Q   Okay.

13   A   And actually, where I was handing flyers, the guys usually

14   like to hang out in these planters, so they catch the guys

15   coming out of their cars, coming around to this door.  Or you

16   go hang out at these planters, catch them coming out of their

17   cars coming to this door.  Like I said, my car is probably at

18   the end of this row here somewhere, so I went this way and hit

19   up the back alleys here.  I don't worry about sitting on a

20   planter trying to hand out flyers.  I go to people as they're

21   getting out of their cars all over this place.

22   Q   Mr. Williams I appreciate your attempt to explain what

23   happened that day.  The problem is that the court reporter has

24   no way of indicating when you say here or there --

25   A   Sorry.



1    Q    -- what you're referring to, so we're going to be -- speak

2    in more exact and concrete terms.  Lawyers are a pain in the

3    neck that way.  I'm sorry about that.

4        JUDGE TRACY:  So let me cut to the chase here.  All right.

5    So what I'm describing here -- and I do not want to do this,

6    but I'm doing it, because it makes it easier for me as I read

7    this later to make sense or to the Board.  So what you just

8    testified to, looking at General Counsel's Exhibit 3.  So I see

9    there there are three planters, as you've described them, where

10   from this photo, you can see the trees kind of sprouting out,

11   since this is an aerial view.  Could you please again describe

12   where you were standing when you were handing out these

13   leaflets?

14       THE WITNESS:  That's what I'm telling you.  I was not just

15   standing in place.

16       JUDGE TRACY:  Okay.

17       THE WITNESS:  Again, from here, you would have another

18   row, right?  If you can imagine this parking lot with a bigger

19   picture, you would have another row of cars here, right?

20       JUDGE TRACY:  And so you're describing --

21       THE WITNESS:  And there would be another row of cars here.

22   And there would be another row and so on and so on.

23       JUDGE TRACY:  And so, again, for the record, we're looking

24   at General Counsel's Exhibit 3.  When you're looking at the

25   photo, from the bottom of the photo, you're describing that you



1    were three rows beyond that of parked cars?

2         THE WITNESS:  About.  Approximate.  Like I said, my car

3    would be either behind this row or this row.  I get out of my

4    car approximately here.  And I just start going down the rows

5    and the aisles.  I stood nowhere in one direct spot, no.

6         JUDGE TRACY:  Okay.

7         THE WITNESS:  I marked around the parking lot.  I walked

8    around.  I seen people getting out of their cars.  I would take

9    a letter to them.

10        MS. FEINBERG:  Is there another exhibit?

11   Q    BY MR. ROSS:  Now, the individual you mentioned being two

12   planters away?

13        MS. FEINBERG:  Exhibit 2, Your Honor.

14   Q    BY MR. ROSS:  Is that right?

15   A    It would be, like I said, either this planter or the

16   planter -- there would be another planter right here at the

17   start of this aisle.

18   Q    Okay.  So that would be -- you'd be referring to either

19   the planter that is opposite what appears to be the ramp

20   leading into door number one or the planter that is off the

21   photo but immediately down from that?

22   A    Yes.

23   Q    Okay.  And you were actually even farther down below.

24   A    I'm a couple rows over here, so like I said, usually

25   they're going to leaflet here and here for this door.  Here and



www.escribers.net | 800-257-0085

1    then about here to this door.  This would be another planter

2    right here.

3    Q    Okay.  Are you aware of an entrance called the -- I think

4    it's called north administration?

5    A    I mean, that's the front office?

6    Q    Well, it's where the people who don't work there go in and

7    out of the building.  Visitors.  You aware of that?

8    A    No.

9    Q    Okay.

10       MR. RODRIGUEZ-RITCHIE:  If I may ask.  Are we done with

11   this exhibit, so I can use my computer?

12       MR. ROSS:  Let me ask this.

13       JUDGE TRACY:  Are you still needing to use the --

14       MR. ROSS:  I may.

15       JUDGE TRACY:  -- projector?

16       MR. ROSS:  I may need it, yeah.

17   Q    BY MR. ROSS:  Are you aware of a place called the lobby at

18   the plant?

19   A    No.

20   Q    Where visitors go in take -- they're not employees.  They

21   are people who are visiting the plant.  Where they enter the

22   plant?

23       MS. FEINBERG:  Objection.  Relevancy.

24       THE WITNESS:  No.

25   Q    BY MR. ROSS:  You're not.  Okay.



www.escribers.net | 800-257-0885

1    MS. FEINBERG:  Objection.  Relevancy.

2    JUDGE TRACY:  Sustained.

3  Q   BY MR. ROSS:  Are you aware of something called the main

4  entrance?

5    MS. FEINBERG:  Same objection.

6    JUDGE TRACY:  I would sustain the objection.

7    MR. ROSS:  Why don't you give us General Counsel's Exhibit

8  2, please.  Could you project that?

9  Q   BY MR. ROSS:  Okay.  This is a larger aerial view of the

10  plant.  And I'm directing your attention.

11    MR. ROSS:  If I may approach the witness.

12    JUDGE TRACY:  Go ahead.

13  Q   BY MR. ROSS:  To this structure here.  Do you see that?

14  A   Yeah.  I think that's what we would call the front office.

15  That's where the office people go in at.

16    MS. FEINBERG:  Same objection.  Relevancy.

17    MR. ROSS:  Okay.

18    JUDGE TRACY:  Sustained.

19    MR. ROSS:  Well Your Honor, I'm trying to understand where

20  this witness was that morning.  And I think it's relevant to

21  where he was and where the other were insofar there's a

22  potential --

23    MS. FEINBERG:  Okay.  So Your Honor --

24    MR. ROSS:  -- conflict in testimony.  And I'm entitled to

25  develop that evidence.  So that's the relevance of it.



www.escribers.net | 800-257-0885

1      MS. FEINBERG:  Well at some point, Your Honor, badgering.

2  He's described that he was six -- three to six rows below where

3  door one is.  I don't know how much more complicated that is.

4  It may not have been on the first picture.  I guess you could

5  ask where that is on this picture, but otherwise, it just seems

6  like he's badgering the witness at this point to just keep

7  going over and over about other doors and other things.  I

8  think he explained where he was.  Said he wasn't at those first

9  three planters.  He was a number of rows down.  And he came to

10  it from below, where he came from his car.  I think he said it

11  five or six times.

12      JUDGE TRACY:  Yeah.  So I mean, I think I've allowed a lot

13  of allowing to find out where he was.  Perhaps there is a

14  different question to be asked at this point.

15      MR. ROSS:  I'll ask a different question.

16      JUDGE TRACY:  But I think he's already described where he

17  was --

18      MR. ROSS:  Okay.

19      JUDGE TRACY:  -- in relation to others.

20      MR. ROSS:  Well, I think he's tried to testify earlier

21  where he was in relation to others, but unfortunately, the

22  photograph that we had was not really suitable for that

23  purpose.  So I'm going to ask him on this photograph that is

24  more suitable, although farther away --

25      JUDGE TRACY:  Yes.



1      MR. ROSS:  -- to tell us where he was and where the others

2    were.

3      THE WITNESS:  I can try.  I might need to get a little

4    closer, so I can actually see what's happening.

5      MR. ROSS:  You can -- as far as I'm concerned --

6      JUDGE TRACY:  You -- you might also look at it this --

7      THE WITNESS:  Okay.  Yeah, this helps, because it says

8    that this right here is door number one, so --

9    Q    BY MR. ROSS:  Why don't you show us on the screen where

10   door number one was?

11   A    From this, it looks like about right there would be door

12   number one.

13   Q    Okay.

14   A    So if that's door number one, they're right out here,

15   right?  These are the one, two, three, four planters there.

16   Like I said, I parked along this wall right here, so my car is

17   either at the back of one of these three aisles right along

18   here.  I get out my car and I start passing out letters here.

19   I mean I do end up at the top of this planter at point, but

20   then I walk back down the aisle.  I don't know if it's this one

21   or this one.  I go back down the aisle.  I come back up an

22   aisle.  I'm working my way around the parking lot.

23   Q    Okay.  And the other persons --

24      MS. FEINBERG:  Do you want him to describe that in words,

25   because I don't -- the record will not reflect that.  All we



1    have is here there and everywhere.  No -- not your fault, Mr.

2    Williams.

3        JUDGE TRACY:  So let me ask, Mr. Ross.  Is -- would that

4    be described as a parking lot in front of building one?

5        MR. ROSS:  It certainly would.

6        JUDGE TRACY:  Okay.  So it seems as though the witness has

7    testified that he walked up and down the parking lot in

8    building one from the back of the parking lot towards the front

9    towards the entrance of building one.

10       MR. ROSS:  Okay.

11       JUDGE TRACY:  Is that correct?

12       THE WITNESS:  Yes.

13       JUDGE TRACY:  Okay.

14       MR. ROSS:  Okay.

15       MS. FEINBERG:  I think it's called door one.

16    Q   BY MR. ROSS:  And as your --

17       JUDGE TRACY:  Door one.  I'm sorry.  Door one.

18       MS. FEINBERG:  Yeah, sorry.  No, that's just -- so it's

19    all consistent.

20    Q   BY MR. ROSS:  And Mr. Williams, in relation to where you

21    were, where were the others?

22    A   Right outside here.  This being door one, so again, one of

23    these four planters is where they would be.

24    Q   Okay.  And were they all standing closely together or were

25    they spread out?



1    A    When I seen them, there was two by the planter and there

2    was a guy walking over with some other guys.  I don't know how

3    many were actually the group, how many were just talking to

4    people in the group.

5    Q    Okay.  That's all I have.  Thank you very much.

6         JUDGE TRACY:  All right.  Thank you very much.  Thank you

7    very much and please don't discuss your testimony until after

8    the close of the hearing --

9         THE WITNESS:  Okay.

10        JUDGE TRACY:  -- which will be a long time from now.

11   Thank you so much.  Let's go ahead and go off the record.

12   (Off the record at 12:09 p.m.)

13        JUDGE TRACY:  All right.  So the first thing before we go

14   to the next witness is we're going to swap out the index.  Is

15   that correct?

16        MR. RODRIGUEZ-RITCHIE:  Yes, Your Honor.

17        JUDGE TRACY:  Okay.

18        MR. RODRIGUEZ-RITCHIE:  So we're swapping out the index,

19   page 3 in particular of the index.  We modified the index to

20   include 1-YY as Respondent's motion to dismiss for lack of

21   jurisdiction dated 6/11/18 --

22        JUDGE TRACY:  Uh-huh.

23        MR. RODRIGUEZ-RITCHIE:  -- and 1-ZZ will now be the index

24   and description of formal documents.  I'm handing a copy of

25   that to --

22-60493.302



1     JUDGE TRACY:  So then what we're going to need to do is

2  relabel that, because already the motion to dismiss is labeled

3  as General Counsel's Exhibit 1(zz).  Is that correct?

4     THE COURT  REPORTER:  Yes.

5     JUDGE TRACY:  Yeah.  So we're going to just swap the

6  numbers.  That's fine.

7     MR. RODRIGUEZ-RITCHIE:  Okay.

8     JUDGE TRACY:  Because it's not been sent to the transcript

9  people yet to officially transcribe.  Is that correct,

10  Bridgette?

11     THE COURT REPORTER:  Yes.

12     JUDGE TRACY:  Can we switch out the number?

13     THE COURT REPORTER:  Sure.

14     JUDGE TRACY:  Okay.  So we're going to relabel these.

15  Then the General Counsel's Exhibit 1(yy) is going to be the

16  motion to dismiss that was submitted yesterday by the

17  Respondent and then General Counsel's Exhibit 1(yy) -- 1(zz)

18  will be the index.  Got that?  Okay.  All right.  And no

19  objections, correct?

20     MR. ROSS:  No objections.

21     MR. GARBER:  No, Your Honor.

22     JUDGE TRACY:  Okay.  And then we also discussed about the

23  exhibits in terms of the photocopies, color copies of those,

24  but we'll do that during another break, once we're certain that

25  we have all copies of them also can get them for the projector.



www.escribers.net | 800-257-0885

1    We'll just swap the color ones out for the black and white

2    ones.  Okay?  All right.  So General Counsel, if you want to

3    call your next witness.

4        MR. GARBER:  Sure.  The General Counsel calls Mr. Sean

5    Jones.

6        MR. ROSS:  Couldn't hear the name.

7        MR. GARBER:  Sean Jones.

8        JUDGE TRACY:  All right.  If you could raise your right

9    hand, please.

10   Whereupon,

11                          **SEAN JONES**

12   having been duly sworn, was called as a witness herein and was

13   examined and testified as follows:

14       JUDGE TRACY:  Okay.  Go ahead.  Have a seat and state your

15   name for the record.  If you could spell your first name,

16   please.

17       THE WITNESS:  Sean Jones, S-E-A-N.

18       JUDGE TRACY:  Okay.  All right.  Go ahead, please.

19                   **DIRECT EXAMINATION**

20   Q    BY MR. GARBER:  Mr. Jones, are you currently employed?

21   A    Yes.

22   Q    Where do you work?

23   A    Calhoun Coffee.

24   Q    Previously did you work at Tesla?

25   A    Yes.



1    Q    About how long did you work for Tesla?

2    A    Almost three years.

3    Q    Did that end around October of 2017?

4    A    Yes.

5    Q    Did you work at Tesla's Fremont facility?

6    A    Yes.

7    Q    What was your last job title when you worked for Tesla?

8    A    Production associate, final line one, two, T2T.

9    Q    And --

10        MR. ROSS:  I'm sorry.  I apologize for interruption.  Your

11   voice trailed off again and I couldn't hear what you said.

12   Could you --

13        THE WITNESS:  Final line one, two, T2T.

14        MR. ROSS:  T2T.  Thank you.

15   Q    BY MR. GARBER:  And what were your job duties in that

16   position?

17   A    I installed the front drive units in the X and the S.

18   Q    What department did you work in at Tesla?

19   A    That would be the assembly line.

20   Q    Is that general assembly?

21   A    Yeah, general assembly.

22   Q    Okay.  Did Tesla terminate your employment?

23   A    Yes.

24   Q    And will that in any way affect your testimony today?

25   A    No.



www.escribers.net | 800-257-0885

1    Q    Are you familiar with the United Auto Workers?

2    A    Yes.

3    Q    When you worked at Tesla's Fremont facility, did you ever

4    wear a Union shirt to work?

5    A    Yes, I did.

6    Q    And when you wore that Union shirt to work, was there

7    anything on it that could scratch or harm the cars you worked

8    on?

9    A    No.

10    Q    I want to direct your attention to around August 10th of

11    2017.  Did you wear your Union shirt to work that day?

12    A    Yes, I did.

13    Q    I'm going to show you a document marked as General

14    Counsel's Exhibit 34, so take a look at that and let me know

15    when you're done.

16        MR. ROSS:  Thank you.

17    Q    BY MR. GARBER:  You've reviewed the picture?

18    A    Oh yes.

19    Q    Okay.  That's okay.  Is that a picture of you wearing your

20    Union shirt to work around August 10th --

21    A    Yes.

22    Q    -- of 2017?

23    A    Yes.

24    Q    Okay.  Thank you.  Did you take that picture of yourself

25    around August 10th?



www.escribers.net | 800-257-0885

1     A     Yes.

2     Q     On August 10th of 2017, did a supervisor say something to

3     you about that Union shirt you wore that day?

4     A     Yes.

5     Q     Who talked to you first about your Union shirt?

6     A     Tim, my line manager.  I don't recall his last name.

7     Q     If I said "Fenelon" does that sound --

8     A     Yeah.  Fenelon.

9     Q     -- right?

10    A     Yes.

11    Q     Okay.  So Supervisor Tim Fenelon.  Do you remember his

12    title at the time?

13    A     He was line manager or -- yeah.

14    Q     To the best you can remember, and starting with where you

15    were at the time, can you tell us about that conversation

16    between you and Supervisor Tim Fenelon?

17    A     After our daily huddle meeting, he pulled  me to the side

18    and said that my shirt was inappropriate and that I would need

19    to change it.

20    Q     Did you ask why?

21    A     Yeah.  I asked him why.  He said, It's not a

22    Tesla-approved shirt.

23    Q     Did he mention anything about shirts with pictures or

24    emblems on them?

25    A     He said -- he said, It has an emblem on it and there are


www.escribers.net | 800-257-0885

1    no more emblems -- the emblem's not accepted on the shirts

2    anymore.

3    Q    So, and I'm sorry, you might've said this; did he tell you

4    to change your shirt?

5    A    Yes.  He told me to change my shirt or I'll be sent home.

6    Q    What did you do as a result of him telling you that?

7    A    I went upstairs to the supply room and got me a new shirt.

8    Q    Now, let -- and so you -- when you say You got a new

9    shirt, did you then --

10   A    I got a regular Tesla shirt, all=black shirt.

11   Q    And you put that shirt on instead?

12   A    Yes.

13   Q    Okay.  Later in the day, did you talk to another manager

14   about being able to wear your Union shirt to work?

15   A    Yes.  I went to Tim's boss, TO, Tope --

16   Q    Is that Tope --

17   A    Something.

18   Q    -- Ogunniyi?

19   A    Yeah.

20   Q    Okay.

21   A    And I asked her -- well, I -- I basically said, Tim

22   threatened to send me home because of a shirt.  And she said,

23   The policies have changed.  And I said, When?  I said, That's

24   bullshit.  I've always wore different shirts.  And she said,

25   The policy changed as of right now and no shirts with emblems



1   on them, no shirts that could scratch a car.  And I'm -- I

2   said, Well, I don't think my shirt would scratch a car because

3   I don't lean over the car.  And she said, Well, basically, you

4   have to change your shirt.  And I said, I did.

5   Q    Okay.  Now, previous to that day, had you worn non-Tesla

6   T-shirts to work with pictures --

7   A    Yes.

8   Q    -- emblems on them?

9        JUDGE TRACY:  So wait for the question to be finished

10  being asked of you and then answer, because we're transcribing

11  this hearing, and so what will happen is, when we go back to

12  read it months from now, it'll cut off Mr. Garber's question

13  and then get your answer, and we don't know what your exactly

14  answering, and also, you might not know what exactly he's

15  asking.  You might think you do, but you -- just wait for him

16  to finish asking, okay?

17  A    Okay.

18       JUDGE TRACY:  All right.

19  Q    BY  MR. GARBER:  So you'd mentioned you'd previously worn

20  shirt -- non-Tesla shirts to work with pictures or emblems.

21  What types of pictures or emblems did you wear on your shirts,

22  to work?

23  A    Maybe Raiders, Warriors, Camaro shirts, stuff like that.

24  Q    And now, besides the incident you just told us about, were

25  there any other times when supervisors or managers asked you to



www.escribers.net | 800-257-0885

1    change your non-Tesla shirt to work?

2    A    No.

3    Q    And previous to August 10th, in the general assembly, did

4    you see other employees at work wearing non-Tesla T-shirts?

5    A    Yes.

6    Q    What types of pictures or emblems did you see on their

7    shirts?

8    A    I saw 49ers, Raiders, just a variety of various stuff.

9    Q    And these shirts that these other employees were wearing

10   you saw, were these shirts all black or different colors?

11   A    All different colors.

12   Q    Did you ever see any supervisors or managers asking them

13   to take off their shirts?

14   A    No.

15   Q    So I want to go to -- we mentioned -- you already told us

16   what happened on August 10th.  I want to go back to just a

17   little bit earlier in that same week.  Did you see any Union

18   representatives or employees passing anything out, in the

19   parking lot?

20   A    Yes.

21   Q    What were they passing out?

22   A    Just T-shirts and stickers.

23   Q    Was it Union T-shirts?

24   A    Yeah.

25   Q    Like the one you had on?



```
 1    A    The shirt I had on, yeah, and the sticker.

 2    Q    So later in August, now, did you have -- or did you attend

 3    like, a huddle-type meeting with your supervisors about the

 4    dress code?

 5    A    Yes.

 6    Q    And was that meeting with Tim Fenelon and Tope Ogunniyi?

 7    A    Yes.

 8    Q    Were other employees present?

 9    A    Yes.

10    Q    About how many employees were there?

11    A    About 25 to 30.

12    Q    Was that your entire like, shift or --

13    A    Yeah.

14    Q    -- final line?

15    A    Yeah.  Final line, yes.

16    Q    Okay.  To the best you can remember, what did -- actually,

17    who lead the meeting for that?

18    A    TO did.

19    Q    Tope?

20    A    Yes.

21    Q    Okay.  So to the best you can remember, can you tell us

22    what she said in that meeting?

23    A    she informed the crew that there'd be no more

24    out-of-uniforms, that everybody had to wear black shirts and --

25    black Tesla shirts and black Tesla pants, and you'll be sent
```



1    home if you -- if you didn't have that uniform on.

2    Q    Now, after that meeting with Tim Fenelon and Tope

3    Ogunniyi, that you just told us about, did you see employees

4    wearing non-Tesla T-shirts with pictures for emblems on them?

5    A    Yes.

6    Q    And the types of shirts you saw were the same as the ones

7    you've already described to us?

8    A    Yes.

9    Q    To you knowledge, did any supervisors or managers ask

10   these employees to change their non-Tesla shirts?

11   A    No.  I don't.

12        MR. GARBER:  I have no further questions.

13        JUDGE TRACY:  Ms. Feinberg?

14        MS. FEINBERG:  No, thank you, at this time.

15        JUDGE TRACY:  Okay.

16        MR. ROSS:  Ready to see the affidavit if there is one.

17        MR. GARBER:  Oh.

18        JUDGE TRACY:  Oh.

19        MR. GARBER:  I'm sorry.  I forgot.  I move to admit

20   Exhibit 34 into evidence.

21        JUDGE TRACY:  Any objections?

22        MR. ROSS:  No.

23        JUDGE TRACY:  All right.  So General Counsel's Exhibit 34

24   is admitted into evidence.

25   **(General Counsel Exhibit Number 34 Received into Evidence)**



1          MR. GARBER:  Yes.

2          JUDGE TRACY:  Affidavit, yes?

3          MR. GARBER:  Sure.

4          JUDGE TRACY:  Okay.

5          MR. ROSS:  Do you have an affidavit, please?

6          JUDGE TRACY:  And so for the record, you handed over two

7     copies --

8          MR. GARBER:  That is correct.

9          JUDGE TRACY:  -- the affidavit?  Okay.

10         MR. ROSS:  Don't you guys make sure affidavit's written?

11         JUDGE TRACY:  So let's go off the record.

12    (Off the record at 1:35 p.m.)

13         MR. ROSS:  Could the witness be shown General Counsel's

14    Exhibit 37, please?  May I hand it to him?

15                         **CROSS-EXAMINATION**

16    Q    BY MR. ROSS:  Mr. Jones, my name is Mark Ross.  I am the

17    attorney representing Tesla in this matter, and I'm going to

18    ask you a series of questions.  And if at any time you don't

19    understand one of my questions, please let me know, okay?

20    A    Yes.

21    Q    Thank you.  Now, you have in front of you a document

22    that's been marked General Counsel's Exhibit 37.  It's a

23    two-page document.  First page has a number 01 on it.  Second

24    age has 02 on it.  Do you have that document in front of you?

25    A    Yes.



```
1    Q    Okay.  Did you ever see this document before?

2    A    No.

3    Q    Never saw it before.  Okay.  Now --

4    A    I --

5    Q    You worked in --

6         MS. FEINBERG:  Could you give him a moment to review it?

7    I think that -- please.

8         JUDGE TRACY:  So again --

9         MS. FEINBERG:  Excuse me.

10        JUDGE TRACY:  -- an objection --

11        MS. FEINBERG:  Objection.

12        JUDGE TRACY:  -- please?

13        MS. FEINBERG:  I'm sorry.  Objection.  Actually, I don't

14   know what the objection for it is, the issue is that the

15   witness has not been given ample opportunity.  Objection.

16   Witness has not been given a full opportunity to review the

17   document before answering.  So if you could give him enough

18   time?

19   Q    BY MR. ROSS:  I'll withdraw -- I will not move on to the

20   next question.  Take as much time as you like --

21        MS. FEINBERG:  Thank you.

22   Q    BY MR. ROSS:  -- Mr. Jones, and tell me whether you've

23   ever seen that document before.

24   A    I really don't recall seeing this.

25   Q    Okay.
```



www.escribers.net | 800-257-0885

1    A    No.  I don't --

2    Q    Okay.

3    A    -- remember this.

4    Q    That's fair.  Did you ever hear that there was something

5    called "General Assembly Expectations"?

6    A    Yes.

7    Q    Okay.  And do you remember when you first heard about

8    that?

9    A    Actually, I don't think it was called "General Assembly

10   Expectations."  I think it was called "S5" when I started.

11   Q    S5?

12   A    Yes.  It was called -- excuse me, "5S".

13   Q    5S?

14   A    They called it "5S".

15   Q    And was that a document?  Was it -- was it --

16   A    No.  It was just a description of things they want you to

17   do as far as keeping the -- the warehouse clean and different

18   goals that they set for an associate and for teams.

19   Q    Okay.

20   A    But as far as assembly expectations, no.  I've never seen

21   this document.

22   Q    Okay.  And you never heard of something called "General

23   Assembly Expectations?"

24   A    No.

25   Q    Okay.  All right.  Now, I think you said that you worked



www.escribers.net | 800-257-0885

1   for Tesla for three years?

2   A    Yes.  Almost three years.

3   Q    Okay.  And during that three-year period, did you work any

4   place other than general assembly -- or final -- what do you

5   call it, final --

6   A    Final line.

7   Q    -- assembly?

8   A    Just in the assembly area.  I started in sub-frames, and

9   then -- I started in -- I started in sub-frames assembly --

10  just assembly area, the beginning of the car.

11  Q    Okay.  Did you ever work in body and white?

12  A    No.

13  Q    Or in stamping?

14  A    No.

15  Q    Okay.  Or painting?

16  A    No.

17  Q    Okay.  And your last job there was -- well, let me ask it

18  this way:  What was the last job you had before you left the

19  company?

20  A    Production associate final line 1, final line 2, T2T.

21  Q    T2T?

22  A    T2T.

23  Q    What's T2T mean?

24  A    It's the area where they install the front -- the front

25  drive units in the S and the X.



www.escribers.net | 800-257-0885

1    Q    Okay.  And was there a time when T2T was part of -- one

2    part of the assembly process and then it was moved to a

3    different place on the assembly process?

4    A    If I recall, when they first started that it was on a

5    different line and then they moved it to final line.

6    Q    Do you remember when that was, around when, if not exactly

7    the date?

8    A    Maybe a year ago or two.  Maybe about two years ago,

9    maybe, they moved it back.

10    Q    About June of 2016?

11    A    I don't recall the date because I didn't -- I didn't work

12    over there when they moved it back.

13    Q    Okay.  And when they moved it, did your immediate

14    supervisor change?

15    A    When I came over there, there was a different supervisor,

16    I believe.

17    Q    Okay.  and then after T2T got moved, did you have a

18    different supervisor?

19    A    Yes.

20    Q    Okay.  Now, your supervisor at the time you left was

21    somebody named Paul?

22    A    Yes.

23    Q    And before Paul, the person to whom you reported was

24    somebody named --

25    A    Tim.



www.escribers.net | 800-257-0885

1  Q    Tim.  Do you remember Paul's last name?

2  A    No.  I don't.

3  Q    Okay.

4  A    I don't recall.

5  Q    But both of them reported to Tope?

6  A    Yes.

7  Q    Now, you testified about a conversation you had with Tim

8  -- is it Fenelon, about -- about the dress code?

9  A    Yes.

10  Q    Remember that testimony?

11  A    Yes.

12  Q    Okay.  And tell me; when you and Tim had this

13  conversation, did Tim actually offer you to -- offer to pay for

14  the change in shirt he wanted you to --

15  A    Yes.

16       MR. GARBER:  Objection.  Relevance.

17       JUDGE TRACY:  Overruled.

18  Q    BY MR. ROSS:  And would it be correct to say that when he

19  told you that you needed to change your shirt and offered to

20  pay -- offered to pay for the shirt, you started laughing and

21  said something to the effect of, This is some -- really some

22  bullshit over a shirt?

23  A    Yes.  I did.

24  Q    Now, on that same day that you had this conversation with

25  Tim, did you see someone wearing a 49er shirt?



```
 1    A    Yes.

 2    Q    And who did that person work for?

 3    A    Tesla.

 4    Q    Who?  What supervisor --

 5    A    I couldn't --

 6    Q    -- did they work for?

 7    A    -- tell you.

 8    Q    Did that person work for Tim?

 9    A    I couldn't tell you.

10    Q    Okay.  Did that person work for Tope?

11    A    I couldn't tell you.

12    Q    Okay.  And on that same day that you had this conversation

13    with Tim, did you see someone wearing a Raiders logo shirt?

14    A    Yes.

15    Q    And did that person work for Tim?

16    A    I couldn't tell you.

17    Q    Work for Tope?

18    A    I don't know.  I couldn't tell you.

19    Q    Who'd that person report to?

20    A    I couldn't tell you.

21    Q    Who is Darwin?  Did you know someone named Darwin, working

22    at the company?

23    A    Yes.  He was a production associate and then became a

24    lead.

25    Q    He was a what?
```



www.escribers.net | 800-257-0885

1    A    He was a production associate on final line 1 and then he

2    became a lead on final line 1.

3    Q    Okay.  And did he work for Mr. Fenelon?

4    A    Yes.  He did.

5    Q    He did.  And it's your testimony that the day that Mr.

6    Fenelon had the conversation with you about needing to go

7    change your shirt and offering you the 20 dollars to go buy the

8    shirt, Darwin was wearing a Nike logo shirt that day?

9    A    Yes.

10    Q    Okay.  Okay.  By the way, when -- when Mr. Fenelon told

11    you you needed to get a compliant shirt, did you point out to

12    him that Why do I have to buy a shirt?  Darwin's wearing a Nike

13    logo shirt?

14        MR. GARBER:  Objection.  Relevance.

15        JUDGE TRACY:  Overruled.

16    Q    BY MR. ROSS:  Did you point that out to him?

17    A    No.  I didn't.

18    Q    Do you know whether Mr. Fenelon was even aware of what

19    Darwin was wearing that day?

20    A    I didn't really ask him.  I was just more upset; Why are

21    you telling me to go change my shirt?

22    Q    Okay.  While you were working in general assembly, did

23    anybody ever talk about the company being concerned about cars

24    being scratched in general assembly

25    A    Yes.



www.escribers.net | 800-257-0885

1    Q    Okay.  Do you remember what was said about that?

2    A    There was concern about mutilations and they didn't want

3    associates that worked on final lines 1, 2, or 3, or anywhere,

4    to wear jeans, and they wanted them to wear aprons.

5    Q    Okay.  Did you ever hear they wanted them to wear black

6    clothing?

7    A    Yes.

8    Q    Okay.  And who'd you hear that from?

9    A    Just different supervisors.

10    Q    Okay.  And did you ever hear -- was that before or after

11    you had this conversation with Mr. Fenelon?

12    A    That was before.

13    Q    Okay.  Did you ever ask any of the supervisors why they

14    wanted people to wear black in general assembly?

15    A    No.  They didn't enforce any -- anything.

16    Q    Okay.  Did you ever ask them why they wanted people to

17    wear black?

18    A    No.  I didn't.

19    Q    Did they ever tell you why they wanted people to wear

20    black?

21    A    No.  They didn't.

22    Q    Okay.  Tell me; did you ever wear UAW stickers on your

23    shirts to work?

24    A    Yes.

25    Q    Did you ever wear UAW stickers on the hat you wore at



1    work?

2    A    Yes.

3    Q    Okay.  Could the witness be shown his affidavit, please?

4    I'll hand it to him if you want.

5        MR. GARBER:  Sure.

6    Q    BY MR. ROSS:  Thank you.  Mr. Jones, you've been handed

7    what's been represented to us as a confidential  witness

8    affidavit that you gave to Mr. Edris W. I. Rodriquez-Ritchie,

9    on February 6, 2018.  And take a look at it and tell me when

10   you're done.

11   A    Which one we look at?

12   Q    Well, I'll tell you; how about looking at Exhibit G?

13   A    Exhibit G.  You said G?

14   Q    G, yes.

15   A    And where can I find that at?

16   Q    At the back.  Towards the back of it.  In fact, I think

17   it's the last page.

18   A    Exhibit G?

19   Q    That's it.

20   A    Okay.

21   Q    Now, is Exhibit G a depiction of the sticker that you wore

22   on your shirt?

23   A    Yes.

24   Q    Okay.  Sir, is it true that in August of 2017, you were

25   among other associates who were handing out leaflets, Union



1    leaflets, at work?

2    A    Excuse me?

3    Q    I said, In August of 2017, were you or did you pass out

4    Union literature?

5    A    No.

6    Q    You did not?

7    A    No.

8    Q    Did you hand out Union literature on the --

9    A    No.

10    Q    -- final line 1 and 2?

11    A    No.

12    Q    Did not?

13    A    Never handed any Union literature out.

14    Q    Did you hand out Union literature while you were on a

15    break?

16    A    Never handed any Union literature out.

17    Q    Never?

18    A    Never.

19    Q    Okay.  Would you please look at page 13, line 14?

20    A    And would you read the text that appears beginning on line

21    14 and ends on line 17?

22    A    "In around August 2017, people from the Union" --

23    Q    You can read it --

24    A    -- "passed out" --

25    Q    -- to yourself.  If you want to read it out loud, you may,



www.escribers.net | 800-257-0885

1    but -- all right.

2    A    Okay.

3    Q    Okay.  Now, I'll ask you again:  Did you hand out Union

4    literature during that period of time?

5    A    It wasn't literature.

6    Q    Oh, okay.

7    A    It was just a flyer that said -- that looked like -- kind

8    of like a sticker.

9    Q    A sticker, okay.

10   A    It was no literature or no nothing.

11   Q    Okay.

12   A    Just a little sticker.

13   Q    Did you consider those stickers flyers?

14   A    No.  I didn't, and they were just like, five or six

15   stickers I gave to other associates that asked me for some.

16   Q    Okay.

17   A    That was it.

18   Q    Okay.  Is that -- is it true that that's the only Union

19   activity you'd --

20   A    Yes.  It is.

21   Q    -- engaged in?  Okay.  Now, Tim Cotton; do you know Tim

22   Cotton?

23   A    Yes.  I do.

24   Q    Do you know Tim Cotton doesn't work at Tesla any longer,

25   you know?



1       MS. FEINBERG:  Objection.  Relevancy.

2       THE WITNESS:  I don't keep up with personal --

3       MS. FEINBERG:  Just --

4       JUDGE TRACY:  So hold on one second, please.  There was an

5   objection.  The relevance.

6       MR. ROSS:  Okay.  Your Honor, there's going to be another

7   witness called by General Counsel, Mr. Cotton.  This question

8   has to do with Mr. Cotton's anticipated testimony and his

9   credibility.  I hate to --

10      JUDGE TRACY:  Well, okay.  That's fine.

11      MR. ROSS:  -- inconvenience --

12      JUDGE TRACY:  So let's keep this limited.

13      MR. ROSS:  It will be.

14      JUDGE TRACY:  Okay.

15      MR. ROSS:  Okay.

16      JUDGE TRACY:  Go ahead, please.  I overrule the Objection.

17  Q    BY MR. ROSS:  Okay.  So tell me, Mr. Jones, you know that

18  Mr. Cotton doesn't work anymore, right?

19  A    Now that you told me.

20  Q    Okay.  Prior to my telling you that, you didn't know that?

21  A    No.  I didn't.

22  Q    Okay.  Is it true that prior to today, you had found out

23  that Mr. Cotton no longer worked at Tesla?

24  A    Prior to today?

25  Q    Yes.


www.escribers.net | 800-257-0885

1  A    No.  I haven't.  I haven't had any contact with Mr.

2  Cotton.

3  Q    Okay.  I understand you haven't had any contact with Mr.

4  Cotton.  Is it true that prior to today, you heard from someone

5  else that Mr. Cotton no longer worked at Tesla?

6      MS. FEINBERG:  Asked and answered.

7      THE WITNESS:  I don't recall.

8      MS. FEINBERG:  Badgering the witness.

9      JUDGE TRACY:  Okay.  This is --

10     MS. FEINBERG:  He's asked it three different ways.  I'm

11  sorry.

12     JUDGE TRACY:  This is cross-examination, so I'm going to

13  overrule the Objection.

14     THE WITNESS:  No.

15  Q    BY MR. ROSS:  Okay.  Is it true that you heard that Mr.

16  Cotton no longer worked at Tesla because of a argument you and

17  he had?

18      MR. GARBER:  Objection.  It's been asked and answered now

19  a number of times.  He's not heard that Mr. Cotton no longer --

20      MR. ROSS:  Didn't say --

21      MR. GARBER:  -- works at Tesla.

22  Q    BY MR. ROSS:  -- doesn't have to do with a question coming

23  from Mr. Cotton, from any source?

24      JUDGE TRACY:  Well, okay.  I -- you know, again, Mr. Ross,

25  kind of let's keep it limited, or you know, use the affidavit



1    to, you know --

2        MR. ROSS:  Okay.

3        JUDGE TRACY:  -- be clear about it.  I mean, I think

4    that's -- it seems like that's what you're reading from?

5        MR. ROSS:  Yep.

6        JUDGE TRACY:  But --

7    Q    BY MR. ROSS:  Is it true, sir, that a couple weeks before

8    you left the company, there was an incident involving yourself

9    and Mr. Cotton?

10       MS. FEINBERG:  Objection.

11       MR. GARBER:  Objection.

12       MS. FEINBERG:  Relevancy.

13       JUDGE TRACY:  Overruled.  Again, part of the problem here

14   is I don't know what's going to happen next, so in anticipation

15   of what could happen later, I'm allowing this, and Mr. Ross

16   knows my instructions to keep it --

17       MS. FEINBERG:  Okay.

18       THE WITNESS:  Yes.

19       JUDGE TRACY:  -- as directed as you can.

20       MS. FEINBERG:  I would --

21       MR. ROSS:  I --

22       MS. FEINBERG:  -- reserve the right to strike at an

23   inappropriate time.

24       JUDGE TRACY:  That's fine.

25       MS. FEINBERG:  Thank you.



www.escribers.net | 800-257-0885

1    Q    BY MR. ROSS:  Okay.  And I think you answered yes, but I

2    don't --

3    A    Yes.

4    Q    -- mean to speak for you, sir.

5    A    Yes.

6    Q    Okay.  And is it also true that after that incident,

7    somebody from human resources came to you to investigate that

8    incident?

9    A    Yes.

10    Q    And is it true that you said, during that interview, I

11    feel like I am in a hostile environment?

12    A    Yes.

13    Q    Is it true that you said to this person, I don't come to

14    work to get threatened?

15    A    Yes.

16    Q    And is it true that before you came here today to testify,

17    you heard from other people that Mr. Cotton had been fired by

18    the company?

19    A    Can you be more specific?

20    Q    Well, is it true --

21    A    I mean, you keep asking me the same question.

22    Q    Yeah, okay.  It's fair.  Is it true that a week after you

23    spoke to the lady from human resources, Tim Cotton was moved to

24    final 1?

25         MS. FEINBERG:  Objection.



www.escribers.net | 800-257-0885

 1          THE WITNESS:  He was already on final 1.

 2     Q     BY MR. ROSS:  Okay.  And is it true that you later found

 3     out from someone, you don't recall who, that Mr. Cotton was let

 4     go?

 5     A     I never found out he was let go.  I was -- found out that

 6     he moved -- he was moved to final 2 -- or back --

 7     Q     I see.

 8     A     Yeah.

 9     Q     I see.

10     A     But I never knew he was let go.

11     Q     No one ever told you that?

12     A     I don't think I was still there at the time.

13     Q     Okay.  I'd like you to look at page 8, line 17A.

14          MS. FEINBERG:  I have an ongoing objection for relevancy,

15     but I want to keep objecting every moment.

16          JUDGE TRACY:  Well --

17          MS. FEINBERG:  Yeah.

18          JUDGE TRACY:  -- you can have a standing objection and

19     then you can, of course, do a motion --

20          MS. FEINBERG:  Okay.

21          JUDGE TRACY:  -- to strike later.

22          MS. FEINBERG:  Thank you.

23          JUDGE TRACY:  I've not heard from Mr. Cotton, so I have no

24     idea what his relevance is to this hearing.

25          MS. FEINBERG:  None.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  And so that obviously --

2    THE WITNESS:  What line did you say?

3    JUDGE TRACY:  -- affects this.

4  Q    BY MR. ROSS:  17 and 18, sir.

5  A    What page?

6  Q    Page 8.

7  A    Page 8.

8  Q    When you've had a chance to review it, let me know.

9  A    17 and 18?

10  Q    Correct.

11  A    Okay.

12  Q    Okay.  Now, looking at that, there's two lines -- there's

13    two lines what's written down there; does that refresh your

14    memory at all?

15  A    Line 17?

16  Q    17 and 18.

17  A    On page --

18  Q    Page 8.

19  A    Page 8.  Okay.

20  Q    Okay.  Now, is it correct, having -- you hadn't looked at

21    page 8, lines 17 and 18, does that refresh your memory?

22  A    No.

23  Q    And is it true --

24  A    It doesn't.

25    JUDGE TRACY:  Let him finish the question, please, okay?



www.escribers.net | 800-257-0885

1    Q    BY MR. ROSS:  And is it true that you later found out from

2    someone, you don't recall who, that Mr. Cotton was let go?

3    A    I don't remember.

4         MR. ROSS:  Okay.  That's fine.  I have nothing else, Your

5    Honor.  Thank you.  Thank you, sir.

6         JUDGE TRACY:  Any redirect?

7         MR. GARBER:  No questions, Your Honor.

8         JUDGE TRACY:  Okay.

9         MS. FEINBERG:  No, thank you.

10        JUDGE TRACY:  All right.

11        MS. FEINBERG:  Thank you.

12        JUDGE TRACY:  Thank you very much.  Please don't discuss

13   your testimony with anyone until after the close of the

14   hearing.

15        THE WITNESS:  I'll never discuss it.  Thank you.

16        JUDGE TRACY:  And let's go off the record.

17   (Off the record at 2:28 p.m.)

18        JUDGE TRACY:  All right.  So we're back on the record.

19   Before we go to the next witness, one thing is that I had

20   requested if we could have color copies of these various Google

21   maps that are general counsel's exhibits.  So for the general

22   counsel, would you go ahead and let us know what you're

23   swapping out, like which are the numbers?

24        MR. RODRIGUEZ RITCHIE:  Yes, Your Honor.  I'm swapping out

25   General Counsel's Exhibits 2, 3, 4, 5, and 6.



www.escribers.net | 800-257-0885

1          JUDGE TRACY:  Okay.

2          MR. RODRIGUEZ RITCHIE:  2 through 5 are one-page exhibits,

3     and 6 is a two-page exhibit.

4          JUDGE TRACY:  All right.

5          MR. RODRIGUEZ RITCHIE:  I've already given the court

6     reporter the color versions.  I'm handing the parties their

7     copies of the color version.

8          JUDGE TRACY:  Okay.  That's great.  And then at some

9     point, if you could upload those into your slides, or however

10    you PowerPoint if it's needed at a later point in this hearing.

11    The color ones might show up a little bit better as well.

12         MR. MORRIS:  Yeah.  Insofar as --

13         JUDGE TRACY:  And make sure you share it with the --

14         MR. MORRIS:  Yeah.

15         JUDGE TRACY:  -- respondent attorney.

16         MR. MORRIS:  Insofar as our exhibits that we might need to

17    project --

18         JUDGE TRACY:  Yes.

19         MR. MORRIS:  -- off of Keahn's thing --

20         JUDGE TRACY:  Uh-huh.

21         MR. MORRIS:  -- I assume we'll get a thumb drive of some

22    kind on exhibits?  Is that --

23         JUDGE TRACY:  I think it sounded like he was going to

24    email them to you and then you would have them in your email to

25    be able to --


www.escribers.net | 800-257-0885

1    MR. GARBER:  All right.  If I could just get the password

2    then.

3    JUDGE TRACY:  I think Mr. Sharma has the password.

4    MR. GARBER:  He does have it?

5    MR. SHARMA:  Yeah.

6    JUDGE TRACY:  Yes, he does.  That's how I got it.  I don't

7    think we have thumb drives anymore, actually.

8    (Telephone rings)

9    (Counsel confer)

10    MS. FEINBERG:  I think they removed it from the side of

11    the computer.

12    JUDGE TRACY:  Well, they won't even give that.

13    MR. GARBER:  No, they had the -- as thumb drives though?

14    JUDGE TRACY:  Well, they won't even give them to us.

15    MR. GARBER:  No, they have prohibited us from using thumb

16    drives now?

17    MS. FEINBERG:  And then there's --

18    JUDGE TRACY:  If you want to call up the witness.

19    MR. RODRIGUEZ RITCHIE:  Oh, so just for the record, so we

20    have a stipulation to replace?

21    JUDGE TRACY:  Yes.  Everybody --

22    MS. FEINBERG:  Thank you.

23    JUDGE TRACY:  -- stipulates to replacing 2, 3, 4, 5, and 6

24    with the color versions of the Google maps?  Is that okay?

25    MS. FEINBERG:  That's lovely.



www.escribers.net | 800-257-0885

1          MR. RODRIGUEZ RITCHIE:  Yes.

2          JUDGE TRACY:  Yes?

3          MR. RODRIGUEZ RITCHIE:  And I'm handing her, her third

4     copy.

5          JUDGE TRACY:  No objections, right?

6          MR. MORRIS:  No objection.

7          JUDGE TRACY:  Okay.

8          MS. FEINBERG:  Colored version.

9          MR. MORRIS:  And Your Honor, let the record reflect I'm

10    delivering to Mr. Rodriguez Ritchie -- he's -- he has

11    subpoenaed a set of team wear.  So here is the team wear.

12         JUDGE TRACY:  Okay.  Thank you.

13         MR. RODRIGUEZ RITCHIE:  It's cold in here.

14         JUDGE TRACY:  I know.

15         MR. RODRIGUEZ RITCHIE:  It is --

16         JUDGE TRACY:  Yes, it is cold in here.

17         MR. RODRIGUEZ RITCHIE:  Just kidding.

18         JUDGE TRACY:  What is your name, please?

19         MR. COTTON:  Timothy Cotton.

20         JUDGE TRACY:  Timothy Cotton?  Okay.  So --

21         THE COURT REPORTER:  I'm sorry, I didn't hear it.

22         JUDGE TRACY:  Timothy Cotton, Cot-ton.  Go ahead and raise

23    your right hand, please.

24    Whereupon,

25                         **TIMOTHY COTTON**



www.escribers.net | 800-257-0885

1    having been duly sworn, was called as a witness herein and was

2    examined and testified as follows:

3          JUDGE TRACY:  Okay.  Go ahead, have a seat.  State your

4    name for the record, and then the general counsel will ask you

5    some questions.

6          THE WITNESS:  Okay.  My name's Timothy Cotton.  Oh, the

7    microphone's not on?

8          JUDGE TRACY:  So no.  The microphone --

9          THE WITNESS:  Oh.

10         JUDGE TRACY:  -- is just to record --

11         THE WITNESS:  Just for show?

12         JUDGE TRACY:  -- your voice.  It doesn't -- not just for

13    show.

14         THE WITNESS:  Oh.

15         JUDGE TRACY:  But it's to record your voice, but it

16    doesn't project.  It's not --

17         THE WITNESS:  Oh, okay.

18         JUDGE TRACY:  -- like that.  So just speak normally.

19    You're fine.

20         THE WITNESS:  Okay.

21         JUDGE TRACY:  Relax.

22         THE WITNESS:  I'm relaxed.

23         JUDGE TRACY:  Okay.

24         THE WITNESS:  Cold, but -- Timothy Cotton.

25         JUDGE TRACY:  Okay.  Go ahead.



www.escribers.net | 800-257-0885

1                         **<u>DIRECT EXAMINATION</u>**

2    Q    BY MR. GARBER:  Thank you for coming in today, Mr. Cotton.

3    I know you've been here all day waiting.  Are you currently

4    employed?

5    A    Yes, I am.

6    Q    Where do you work?

7    A    I work for Propark USA.

8    Q    Previously did you work for Tesla?

9    A    Yes, I did.

10   Q    About how long did you work for Tesla?

11   A    About a year including my temp time.

12   Q    Did that end around --

13        MR. MORRIS:  Including?  I'm sorry, I couldn't hear.

14        THE WITNESS:  Including my temp time.

15        MR. MORRIS:  Thank you.

16   Q    BY MR. GARBER:  Did that end around October of 2017?

17   A    Yeah, October 13, 2017.

18   Q    Did you work at Tesla's Fremont facility?

19   A    Yes, I did.

20   Q    What was your last job title you worked at Tesla?

21   A    Production associate.

22   Q    And what were your job duties as a production associate?

23   A    To put parts on the car.

24   Q    Did you work in general assembly?

25   A    Yes, I did.



1   Q    Did Tesla terminate your employment?

2   A    Yes, they did.

3   Q    Will that in any way affect your testimony today?

4   A    No, it will not.

5   Q    You're familiar with the United Auto Workers?

6   A    Yes, I am.

7   Q    And now I'm going to show you a picture that's been marked

8   as Exhibit 34.

9        MR. GARBER:  Publishing copies of those.

10  Q    BY MR. GARBER:  Take a look at that and let me know when

11  you're done.  Do you recognize the person in the picture?

12  A    Yes, I do.

13  Q    Who is it?

14  A    Sean Jones.

15  Q    And Sean Jones is a former coworker of yours from Tesla?

16  A    Yes, he was.

17  Q    Do you recognize the shirt that he's wearing in that

18  photo?

19  A    Yes, I do.

20  Q    Is that a shirt that the union gave employees?

21  A    Yes, it is.

22  Q    Did you ever wear a shirt like that when you worked at

23  Tesla?

24  A    Yes.

25  Q    When you wore that union shirt when you worked at Tesla,



1    were there any materials on it that could scratch or harm the

2    cars you worked on?

3         MR. MORRIS:  I'm sorry.  I couldn't hear you.  I

4    apologize.

5         MR. GARBER:  I was asking when he wore that union shirt,

6    if there was any materials on it that could scratch or harm the

7    cars that he worked on.

8         THE WITNESS:  No, there was not.

9    Q    BY MR. GARBER:  How often did you wear that t-shirt at

10   Tesla?  The union shirt.

11   A    Probably one time.

12   Q    And that shirt that you wore, was it just a plain cotton

13   shirt?

14   A    The one that was provided by the union?

15   Q    Yeah.

16   A    Yeah.  It had like a patch on it, like --

17   Q    Let me actually -- sorry to cut you off.  Let me show you

18   this Exhibit 25.  This is the -- take a look at that, please.

19   There's two pages to it.

20   A    Yeah.

21   Q    Is that the union shirt?

22   A    Yeah.

23   Q    Okay.  And that was just a cotton shirt?

24   A    Yeah.

25   Q    It was --



www.escribers.net | 800-257-0885

1    A    It was just cotton and like screen print on it, yeah.

2    Q    Okay.  I want to direct your attention to around August

3    10th of 2017.  Did you work at Tesla that day?

4    A    Yes, I did.

5    Q    Do you recall, do you see Sean Jones wearing his union

6    shirt that day?

7    A    Yes.

8    Q    Did you see any managers or supervisors making comments to

9    him about the union shirt he was wearing that day?

10    A    Yes, I did.

11    Q    And which supervisor did you see talk to Sean Jones about

12    his union shirt that day?

13    A    Tim Falwin (phonetic), Felon (phonetic)?

14    Q    That's a supervisor?

15    A    Yes, supervisor.

16    Q    Did you hear what Supervisor Tim Fenelon said to Sean

17    Jones --

18    A    Yes.

19    Q    -- regarding the shirt?

20    A    Yes, I did.

21    Q    To the best that you could remember, can you tell us what

22    you hear?

23    A    To take the shirt off or to go home.

24    Q    And did Sean Jones change his shirt after Tim Fenelon

25    directed him to?



www.escribers.net | 800-257-0885

1    A    Yeah, after he told him about four times he changed -- he

2    got a Tesla shirt.

3    Q    Did you see any other managers talk to Sean Jones that day

4    about the shirt he .was wearing?

5    A    Yes, I did

6    Q    Who did you see talk to Sean Jones also?

7    A    Tope Ogunniyi.

8    Q    And who is that?

9    A    She was associate manager.

10    Q    What did you hear Ms. Ogunniyi say to Sean Jones?

11    A    That he was told to take it off because it was not Tesla

12    approved and we couldn't wear anything that was not Tesla

13    approved.

14    Q    Let's go back to that first conversation you heard between

15    Sean Jones and Tim Fenelon.  About how far away were you when

16    that happened?

17    A    I was probably like 10 feet away.

18    Q    Was it loud where you were?

19    A    No.

20    Q    And the second conversation between Sean Jones and Tope

21    Ogunniyi, about how far away were you at that time?

22    A    Again, like 10 feet.

23    Q    Was it loud --

24    A    Where --

25    Q    I'm sorry.  I cut you off.  Sorry.  Go on.



1    A    We were in our work area so, you know, it was like not

2    that big.  It's probably a third of the size of this room.

3    So --

4    Q    So would you say less than 15 feet away?

5    A    Yeah.

6    Q    Okay.  Was it loud at the time?

7    A    No, it was not.

8    Q    Previous to that day, had you worn non-Tesla shirts with

9    pictures or emblems on them to work?

10   A    Yes, I did.

11   Q    Well, what types of pictures or emblems did you wear on

12   your shirt to work?

13   A    I wore a Warrior shirt, Raiders shirts.  Star Wars was one

14   of my favorite shirts to wear.  Just regular graphic T's.

15   Q    Sure.  Okay.  Now, previous to that day, did you see other

16   employees wearing non-Tesla shirts in the general assembly

17   area?

18   A    Yes, I did.

19   Q    And what types of pictures or emblems did you see these

20   other general assembly employees wearing?

21        MR. MORRIS:  Objection.  He didn't testify that these were

22   general assembly employees that were wearing shirts.  Said he

23   saw other employees wearing t-shirts.  I think that misstates

24   his testimony.

25        JUDGE TRACY:  Well, how about you --



www.escribers.net | 800-257-0885

1      MR. GARBER:  I can reask it.

2      JUDGE TRACY:  -- reask the question --

3      MR. GARBER:  Yeah, that's fine.

4      JUDGE TRACY:  -- please?

5  Q    BY MR. GARBER:  Did you -- previous to that day, did you

6  see other employees in the general assembly wearing non-Tesla

7  shirts with pictures or emblems on them?

8  A    Yes, I did.

9  Q    And what types of shirts did you see them wear?

10  A    I seen combanions (phonetic) wear -- actually wear the

11  union shirts.  Other people wore football jerseys and, you

12  know, shirts like I wore.  Drug paraphernalia on their shirts,

13  just all different kind of shirts.  Whatever you see at Walmart

14  or on the internet, people wore.

15  Q    You said drug paraphernalia.  Did you see like a Cannabis

16  Club type stuff?

17  A    Yeah, Cannabis Clubs, lines like of coke.  There were --

18  Q    You said -- sorry, when you say coke, you mean cocaine?

19  A    Cocaine, yeah.  Like it'd be spelled out coke and like --

20  like powdery.

21  Q    Okay.

22  A    Yeah.

23  Q    And these shirts that you and other employees were wearing

24  in the general assembly, were they all black or were they

25  different colors?



1    A    My -- the Warrior shirt that I wore is blue.  People wore

2    49ers shirts, just all different -- you know, different kind of

3    shirts.  And primarily we stayed away from red shirts because,

4    you know, for -- you know, red shirts and white shirts do have

5    a meaning.  So you know, we stayed away from shirts that had

6    meaning, but other than that, you know, it was just -- if it

7    was a t-shirt, it was fine.

8    Q    Okay.  Now, did you ever see any managers or supervisors

9    ask these employees or yourself to take off these non-Tesla

10    t-shirts?

11    A    Just the -- the one time with Sean.

12    Q    So let's -- we talked about what happened here around

13    August 10th.  Let go back to earlier in August.  Did you see

14    any employees or representatives of the union in the parking

15    lot of the Tesla facility?

16    A    Yes, I -- I did.

17    Q    And were they passing anything out?

18    A    Yeah, they were handing out shirts.  They had like four

19    boxes, four or five boxes of shirts.

20    Q    Was that the -- the shirt they were --

21    A    That --

22    Q    -- passing out was the union shirt that I show you

23    previously?

24    A    Yes.

25    Q    Okay.  Now, later in August of that same year, August

22-60493.343



1    2017, did you attend a meeting with Tesla supervisors about a

2    dress code?

3    A    Yes, I did.

4    Q    Who led that meeting?

5    A    Tope Ogunniyi.

6    Q    And was Tim Fenelon there too?

7    A    Yes, he was.

8    Q    Were other employees there?

9    A    Yes, it was our morning brief.  So it was -- worked on

10    final line 1.  So it was probably about 35 people.  Maybe a

11    little closer to 40.

12    Q    To the best that you can remember, can you tell us about

13    what was said in that meeting about the dress code?

14    A    That we weren't allowed to wear anything that didn't say

15    Tesla or what not Tesla-approved.

16    Q    Did they say anything about shirts with images or patches?

17    A    They just said it had to say Tesla or, you know, was

18    Tesla-approved.

19    Q    And who was doing the talking in that meeting?  Was it Ms.

20    Ogunniyi or Mr. Fenelon?

21    A    It was Ms. Ogunniyi

22    Q    Now, after that meeting in August that you just told us

23    about, did you see other employees in the general assembly

24    wearing non-Tesla t-shirts with pictures or emblems on them?

25    A    Yes, I did.



1    Q    And the types of shirts that you saw these other employees

2    wearing in general assembly, were they similar to what you've

3    already told us?

4    A    Yes, they were.

5    Q    To your knowledge, did you ever see any managers or

6    supervisors ask those employees to change their shirt?

7    A    No.

8         MR. GARBER:  No further questions, Your Honor.

9         MS. FEINBERG:  Oh, I will ask.  Can I ask one question?

10        JUDGE TRACY:  Okay.

11                          **CROSS-EXAMINATION**

12    Q    BY MS. FEINBERG:  Hello.

13    A    Hi.

14    Q    You said that they didn't wear red and white because they

15    had meaning.  Could you just -- so that we're -- all

16    understand, what is the meaning of red or white in the Tesla

17    plant?

18    A    The red shirts are leads and the supervisors in the white

19    shirt is quality control.  So you know, people, you know,

20    don't -- you don't wear red or white unless you earned it.

21    Q    Okay.  Thank you.

22        JUDGE TRACY:  All right.  Mr. Ross.

23        MR. MORRIS:  May we see the affidavit if there is one?

24        MR. GARBER:  Sure.

25        MR. RODRIGUEZ RITCHIE:  Counsel for the General Counsel is



1    handing two copies of an affidavit to counsel for respondent.

2        JUDGE TRACY:  All right.  Let's go off the record.  Let us

3    know when you're ready.

4        MR. MORRIS:  Will do.

5    (Off the record at 3:11 p.m.)

6        JUDGE TRACY:  Whenever you're ready.

7        MR. MORRIS:  I believe that the last witness had my copy

8    of the general assembly expectations and gave it to you

9    thinking it was yours.

10       MR. GARBER:  Oh, that's possible.  This one?

11       MR. MORRIS:  Yeah, that's the document.

12       MR. GARBER:  Yeah.

13       MR. MORRIS:  Thanks.  Thanks.  Could the witness be shown

14   General Counsel's Exhibit 37, please?  Thank you, sir.

15       MR. GARBER:  Uh-huh.

16       MR. MORRIS:  Mr. -- are we on the record?  Okay.

17       JUDGE TRACY:  Yes.

18                    **CROSS-EXAMINATION**

19   Q    BY MR. MORRIS:  Mr. Cotton, my name is Mark Ross.  I'm

20   going to ask you a couple of questions.  I'm Tesla's lawyer.

21   And if you don't understand any of my questions, please let me

22   know.  I'll be happy to rephrase them, okay?

23   A    All right.

24   Q    Thank you.  Now, I've handed you General Counsel's Exhibit

25   37.  It's a two-sided document.  First side is marked 37-01.



1    Second side is 37-02.  You see that?

2    A    Uh-huh.

3    Q    Okay.  And by the way, one of the rules of this game is

4    you have to answer audibly.  And uh-huh --

5    A    Yes.

6    Q    -- or an uh-uh is likely not to be captured by the ladies

7    making a transcript.  So --

8         JUDGE TRACY:  Sir, just say yes or no.

9         THE WITNESS:  Oh, okay.

10   Q    BY MR. MORRIS:  Have to say yes or no.

11   A    All right.

12   Q    Thank you.  So have you had occasion to take a look at

13   General Counsel's Exhibit 37?

14   A    Yes.

15   Q    Okay.  Is today the first time you ever saw that document?

16   A    Yes, it is.

17   Q    It is.  Okay.  Okay.  I'll take it back from you then.

18   Thank you.  Now, did you ever hear anybody refer to general

19   assembly expectations?

20   A    No, I -- no, I haven't.

21   Q    Never heard of that.

22   A    No, I -- no.

23   Q    Okay.  Okay.  During the time that you worked at Tesla,

24   did you have occasion to wear union stickers on your shirts?

25   A    Yes.



www.escribers.net | 800-257-0885

1    Q    And did others have occasion to wear union stickers on

2    their shirt?

3    A    Yes, they did.

4    Q    Now, there was earlier testimony here today by a Mr. Jones

5    who told us about an argument that you and he had.  Do you know

6    what I'm talking about?

7    A    Yes, I do.

8    Q    Okay.  And --

9         MS. FEINBERG:  Objection.  Misstates the testimony.  He

10    said there was --

11        JUDGE TRACY:  Why don't you lay the foundation a little

12    bit better or maybe ask the question a different way.

13        MR. MORRIS:  Sure.

14    Q    BY MR. MORRIS:  Was there a time when you and Mr. Jones

15    had an argument?

16    A    Yes, there was.

17    Q    Do you --

18    A    On multiple occasions.  We're -- we worked 12-hour shifts.

19    So you gotta think we're in close -- close environment.  So

20    tempers and everything.  You got family life, work like, 12

21    hours, two hours to commute to and from work.  So I see these

22    people a majority of my day.  So yeah, we got in arguments.

23    You know, it was quite common in general assembly.

24    Q    Okay.  Was there -- what's the last argument you had with

25    him?



www.escribers.net | 800-257-0885

1      MR. GARBER:  Objection.  Relevance.

2      MS. FEINBERG:  Ditto.

3      JUDGE TRACY:  And what is the relevance?

4      MR. MORRIS:  Well, I'm trying to elicit testimony

5  establishing the witness' bias.

6      MS. FEINBERG:  Towards who?

7      JUDGE TRACY:  Bias about what?

8      MR. MORRIS:  Bias towards the company because he was

9  terminated for what occurred between himself and Mr. Jones, and

10 his sense that that was an unfair termination and therefore he

11 has bias.

12     MR. GARBER:  I would think that would be more plausible if

13 his argument was with Tesla and not with Mr. Jones.  So I don't

14 see how the topic of their argument is relevant.

15     JUDGE TRACY:  So I'll allow a little bit.  I'm going to

16 overrule the --

17     MR. MORRIS:  Okay.

18     JUDGE TRACY:  -- objection.  I'll allow a little bit of

19 this testimony --

20     MR. MORRIS:  Okay.

21     JUDGE TRACY:  -- because that's part of their defense.

22 Q   BY MR. MORRIS:  Okay.  Let me ask you this, Mr. Cotton.

23 And please understand I don't mean to bring up things that

24 are --

25     MS. FEINBERG:  Can I object --



1    Q    -- difficult.

2         MS. FEINBERG:  -- as well, Your Honor?  Because --

3         JUDGE TRACY:  You already did.  You said --

4         MS. FEINBERG:  No, on this --

5         JUDGE TRACY:  -- ditto.

6         MS. FEINBERG:  Oh, that was on the earlier one.  Now you

7    were asking about this, this issue.  Because what I'm saying is

8    I don't understand the bias since we have two witnesses

9    fighting.  They've actually now said almost the same thing.

10   They're not in contradiction.  So what is -- does he have more

11   bias than the other witness?  I don't really understand that.

12        JUDGE TRACY:  So your objection is noted.  I'm going to

13   overrule it --

14        MS. FEINBERG:  Okay.

15        JUDGE TRACY:  -- again because this is part of their

16   response.  And so you may not believe, I may not believe it,

17   but that's their right to do some of this.  So go ahead,

18   please.

19        MR. MORRIS:  Thank you.

20   Q    BY MR. MORRIS:  I want you -- strike that.  At some point

21   in time, did investigators from employee relations come and

22   speak to you about an argument that you and Mr. Jones had with

23   one another?

24   A    Yes, they did.

25   Q    Okay.  And that was what, a week or two after the



www.escribers.net | 800-257-0885

1    argument?

2    A    It was like a week after Sean Jones was fired because he

3    had actually threatened me and picked up a L-gun and tried to

4    hit me with it.  And he got fired, and a week or two later I

5    got fired.  I don't see where -- I -- I liked Tesla.  I liked

6    their mission.  Like they're a green company and everything.

7    So you know, like I want to see the future, you know, my son to

8    not be dying from carbon monoxide poisoning.  So I like their

9    whole mission.  So I don't have anything against Tesla, you

10   know.  It's all business.  I understand.

11   Q    Did somebody named Rose advise you that you were being

12   terminated?

13   A    Yes.

14   Q    And when Rose advised you that you were terminated, did

15   she say the reason we are firing you is because we have

16   witnesses who said that you were the first one to say something

17   about fighting?

18       MS. FEINBERG:  Objection.  Hearsay.

19       JUDGE TRACY:  So I'm going to sustain the objection.

20       MR. MORRIS:  Okay.

21   Q    BY MR. MORRIS:  Well, do you remember, did Rose give you

22   the explanation of why you were being discharged?

23   A    Yeah, she told, but that was a lie.  I felt like it was a

24   lie.

25   Q    In fact, you said that's bullshit and you know it, right?



www.escribers.net | 800-257-0885

1   A    Yeah.  I did because like I won't -- I will admit that I

2   did say that we could fight, but it was after he already said

3   it three, four times to me.  And I said that if you really want

4   to do this, we could change our uniforms and go to McDonalds so

5   that we're not representing the company and we're not on

6   company grounds.  And, you know, I did say that to the

7   investigator unit, and I did tell that to HR, and I did send an

8   email and everything explaining all what happened.  I -- it was

9   two witnesses.  A supervisor watched the whole thing go down,

10  and I still, you know, got fired.  I don't know how they could

11  say that I said it first when like I didn't.  Like I don't say

12  that I didn't, you know, say that we could fight, but that was

13  out of being scared, like, you know, I'm backed up into a wall.

14  And I didn't -- like there's nowhere to run so I did say that.

15  But it was after-the-fact that he said it to me and threatened

16  me --

17  Q    Okay.

18  A    -- with a weapon.

19  Q    And when they -- and when they told you why they were

20  terminating you, you said that's bullshit and you know it, and

21  you still think it's bullshit, right?

22  A    Yeah, but it's business so I really -- you know, I got

23  over it.  Hopefully I -- I thought that Tesla would get over

24  it, but obviously you guys aren't since you're digging through

25  it and like there's some kind of reason that I would try to



1  play any games or anything.  Like I really -- like it doesn't

2  have anything.  Doesn't affect my life.  I don't care.  It's --

3  Q    And then --

4  A    I lived in Antioch.  I was making $18 an hour.  Like

5  commuting was like taking all my money so it was like no point.

6  I was going to leave the company anyway in a couple of months.

7  So it was --

8  Q    Okay.  And is it correct that you were not offered a

9  severance agreement?

10 A    That is correct.

11      MR. MORRIS:  That's all I have of this witness.  Thank you

12 very much.

13 Q    Thank you, sir.

14      JUDGE TRACY:  All right.

15      THE WITNESS:  No problem.

16      JUDGE TRACY:  Any redirect?

17      MR. GARBER:  Nothing, Your Honor.

18      JUDGE TRACY:  Anything?

19      MS. FEINBERG:  No, thank you.

20      JUDGE TRACY:  All right.  Wait, hold on one second.

21      THE WITNESS:  Oh, okay.

22      JUDGE TRACY:  Well, thank you very much.

23      THE WITNESS:  Both sides had their turn, so --

24      JUDGE TRACY:  They did.  They did.  So thank you very

25 much.



www.escribers.net | 800-257-0885

1        THE WITNESS:  Uh-huh.

2        JUDGE TRACY:  Just please don't discuss your testimony

3    until after the close of the hearing.

4        THE WITNESS:  Oh, okay.

5        JUDGE TRACY:  I'm sure that the attorneys will let you

6    know when the hearing has closed.

7        THE WITNESS:  Oh, okay.

8        JUDGE TRACY:  Thank you very much.

9        THE WITNESS:  Oh, no problem.  Thank you.

10        JUDGE TRACY:  Thank you.

11        MR. MORRIS:  Thank you, sir.

12        JUDGE TRACY:  Let's go off the record.

13    (Off the record at 3:45 p.m.)

14        JUDGE TRACY:  Okay.  All right.  So the witness has now

15    left.  Mr. Rodriguez Ritchie, or Ritchie Rodriguez, I'm sorry.

16        MR. RODRIGUEZ RITCHIE:  Yes.

17        JUDGE TRACY:  I keep messing it up.

18        MR. RODRIGUEZ RITCHIE:  Yes.  I just want the record to

19    reflect that counsel for respondent has return two copies of

20    the affidavit of Timothy Cotton.

21        JUDGE TRACY:  All right.  And then Mr. Garber?

22        MR. GARBER:  I would like to renew Ms. Fienberg's

23    objection and motion to strike the testimony of Sean Jones

24    related to his argument with Tim Cotton.  We've now heard from

25    Tim Cotton.  I don't think that any of that is relevant.  The



www.escribers.net | 800-257-0885

1    two witnesses have corroborated each other.

2        JUDGE TRACY:  And any position on the motion --

3        MR. MORRIS:  Sure.

4        JUDGE TRACY:  -- to strike?  Okay.

5        MR. MORRIS:  We think it's relevant to the issue of bias.

6    The witness has testified that he believes that the treatment

7    he received at the hands of the company was, quote, bullshit,

8    close quote.  It's obvious that I'm not unsympathetic to the

9    gentleman, but it's obvious that he thinks he was treated

10    unfairly, and that would be evidence that is material to his

11    bias as a witness.

12        And to the extent that Mr. Jones testified that there was

13    an investigation and that he felt that he was actually being

14    subjected to harassment as a result of what Mr. Cotton did, I

15    think goes to the whole issue of the fact that the company had

16    a basis, in fact, for doing what it did; and that Mr. Cotton

17    obviously disagrees with that belief; and that he has a bias

18    and a motive to testify in a way that might be adverse to the

19    interest of the company.

20        MS. FEINBERG:  I just take a -- nothing here said that

21    the -- justified whether the company did it.  There has not

22    been a thorough investigation of what that fight was about or

23    what the company did.  So Mr. Ross just said that what Mr.

24    Jones said justified Mr. Cotton's dismissal.  I don't even know

25    if we know that that was the factor.  We haven't heard from

eScribers
www.escribers.net | 800-257-0885

1    that.  This has really gone way far afield.  I don't think

2    we're about to litigate who got terminated.  We never even

3    heard -- we heard from one that the other one got terminated,

4    and vice versa.  It just seems really far afield.  We didn't

5    hear from the company about it.

6        JUDGE TRACY:  So --

7        MS. FEINBERG:  I don't think we're litigating that issue.

8        JUDGE TRACY:  No, we're.  And so as --

9        MS. FEINBERG:  But Mr. Ross has made some conclusions

10    based on things that I think aren't actually -- well, aren't

11    supported by the record.

12        JUDGE TRACY:  Okay.  So again, I had said earlier I'm

13    going to deny the motion to strike because, essentially, I

14    mean, this is the respondent's position in terms of attacking

15    these two individuals' credibility.  You can argue it in the

16    brief.  You know, and I obviously need to address everybody's

17    credibility there's -- when there is -- when it's relevant, and

18    it's inconsistent to the, again, pleadings here of the

19    complaint.

20        We're not litigating their fight, or why somebody was

21    fired, or whatever.  That is not, you know -- and but I'll -- I

22    will note that a lot of the testimony he just offered, okay?

23    It wasn't the question that was being asked.

24        MS. FEINBERG:  Uh-huh.

25        JUDGE TRACY:  He offered a lot.  He was able to say his



1    peace, and that's, you know, what it is.  But again, it goes to

2    their arguments about their credibility of these two witnesses,

3    and then you can obviously argue that there is nothing there.

4        MR. GARBER:  Okay.

5        JUDGE TRACY:  Okay?  But, yes, no issue of their firing's

6    is part of this case.

7        You had mentioned that the next witness, which you've sent

8    away, they were going to be longer, right?

9        MR. GARBER:  I believe so, yes.

10       JUDGE TRACY:  Yes.  So it's only 3:50.  However, I think

11   that this is the time where I leave and you all stay in here

12   and --

13       MR. MORRIS:  Actually, I think if you stayed in the room

14   we might make more progress, but --

15       JUDGE TRACY:  Well, I mean, you know, frankly, I don't

16   mind doing that.  We can do it off the record and I can stay

17   and help you all to just get it done.  If you want.  I cringe

18   at that, but I will do it if needed.  I feel like you haven't,

19   though, done a lot with your presence, but I don't mind kind of

20   staying a little bit.  I mean, it's only 3:50.  You can go.  We

21   don't need you.  Anybody's thoughts on that?

22       MR. MORRIS:  Can I speak to --

23       JUDGE TRACY:  Yeah.

24       MR. MORRIS:  -- counsel for a minute?

25       MR. RODRIGUEZ RITCHIE:  Are we still on the record?



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Yes, we're on the record.

2      MR. RODRIGUEZ RITCHIE:  For the general counsel, I think

3   that would be welcomed.

4      MR. MORRIS:  We do too.

5      JUDGE TRACY:  Okay.  All right.  So let's go off the

6   record.

7   **(Whereupon, the hearing in the above-entitled matter was**

8   **recessed at 3:51 p.m. until Wednesday, June 13, 2018 at 8:00**

9   **a.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-60493.358

1                    **C E R T I F I C A T I O N**

2   This is to certify that the attached proceedings before the

3   National Labor Relations Board (NLRB), Region 32, Case Numbers

4   32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-

5   200530, 32-CA-208614, 32-CA-210879, Tesla, Inc., and Michael

6   Sanchez, and Jonathan Galescu, and Richard Ortiz and

7   International Union, United Automobile, Aerospace and

8   Agricultural Workers of America, AFL-CIO at National Labor

9   Relations Board Region 32, 1301 Clay Street, Suite 300N,

10  Oakland, CA 94612-5224, on Tuesday, June 12, 2018, 8:38 a.m.

11  was held according to the record, and that this is the

12  original, complete, and true and accurate transcript that has

13  been compared to the reporting or recording, accomplished at

14  the hearing, that the exhibit files have been checked for

15  completeness and no exhibits received in evidence or in the

16  rejected exhibit files are missing.

17

18

19

20  _____

21                    BRIDGETTE RAST

22                    Official Reporter

23

24

25


22-60493.359

**OFFICIAL REPORT OF PROCEEDINGS**

**BEFORE THE**

**NATIONAL LABOR RELATIONS BOARD**

**REGION 32**

In the Matter of:

| | |
|---|---|
| Tesla, Inc., | Case Nos.   32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| Michael Sanchez, an individual, | 32-CA-200530 |
| | 32-CA-208614 |
| and | 32-CA-210879 |

Jonathan Galescu, an
individual,

and

Richard Ortiz, an individual,

and

International Union, United
Automobile, Aerospace and
Agricultural Workers of
America, AFL-CIO,

        Charging Party,

_____

_____

Place: Oakland, California

Dates: June 13, 2018

Pages: 346 through 551

Volume: 3

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



www.escribers.net | 800-257-0885

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 32**

| | |
|---|---|
| In the Matter of: | |
| TESLA, INC., | Case Nos.  32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| INTERNATIONAL UNION, UNITED | 32-CA-200530 |
| AUTOMOBILE, AEROSPACE AND | 32-CA-208614 |
| AGRICULTURAL WORKERS OF | 32-CA-210879 |
| AMERICA, AFL-CIO, | |
| | |
| and | |
| | |
| MICHAEL SANCHEZ, AN INDIVIDUAL, | |
| | |
| and | |
| | |
| JONATHAN GALESCU, AN | |
| INDIVIDUAL, | |
| | |
| and | |
| | |
| RICHARD ORTIZ, AN INDIVIDUAL. | |

The above-entitled matter came on for hearing, pursuant to notice, before **AMITA BAMAN TRACY**, Administrative Law Judge, at the National Labor Relations Board Region 32, 1301 Clay Street, Suite 300N, Oakland, CA 94612-5224, on **Wednesday, June 13, 2018, 9:30 a.m.**

escribers

www.escribers.net | 800-257-0885

1                          **A P P E A R A N C E S**

2    **On behalf of the General Counsel:**

3          **EDRIS W.I. RODRIGUEZ RITCHIE, ESQ.**
           **NOAH J. GARBER, ESQ.**
4          National Labor Relations Board
           1301 Clay Street, Suite 300N
5          Oakland, CA 94612-5224
           Tel. 510-671-3021
6
     **On behalf of the Respondent:**
7
           **MARK S. ROSS, ESQ.**
8          **KEAHN N. MORRIS, ESQ.**
           SHEPPARD MULLIN RICHTER & HAMPTON LLP
9          Four Embarcadero Center
           Seventeenth Floor
10         San Francisco, CA 94111-4109
           Tel. 415-434-9100
11         Fax. 415-434-3947

12   **On behalf of the Charging Parties:**

13         **MARGO A. FEINBERG, ESQ.**
           **DANIEL E. CURRY, ESQ.**
14         **JULIE S. ALARCON, ESQ.**
           SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
15         6300 Wilshire Boulevard, Suite 2000
           Los Angeles, CA 90048
16         Tel. 323-655-4700

17

18

19

20

21

22

23

24

25



1                                **I N D E X**

2

3    **WITNESS**              **DIRECT**    **CROSS**    **REDIRECT**    **RECROSS**    **VOIR DIRE**

4    Eric Vasquez              351          357          370
                               356
5
     Branton Phillips         379          413
6
     Richard Ortiz            423                                                    501/511
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-60493.363

1                    **E X H I B I T S**

2

3   **EXHIBIT**                                **IDENTIFIED**     **IN EVIDENCE**

4   **General Counsel:**

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---------|------------|-------------|
| GC-9 | 391 | 391 |
| GC-10 | 439 | 439 |
| GC-11 | 439 | 439 |
| GC-12 | 440 | 440 |
| GC-13 | 448 | 448 |
| GC-14 | 448 | 448 |
| GC-15 | 449 | 449 |
| GC-15-0001 | 373 | 373 |
| GC-15-0002 | 373 | 373 |
| GC-16-001 through 003 | 470 | 470 |
| GC-17-001 through 0013 | 471 | 471 |
| GC-18-001 through 216 | 472 | 472 |
| GC-20 | 473 | 474 |
| GC-21 | 474 | 474 |
| GC-22-001 and 002 | 475 | 475 |
| GC-23-001 through 228 | 476 | 476 |
| GC-24-001 and 002 | 477 | 477 |
| GC-26 | 489 | 489 |
| GC-27 | 489 | 489 |
| GC-28 | 513 | 513 |
| GC-35 | 352 | 352 |

22-60493.364

1                    **E X H I B I T S** (CONTINUED)

2

| 3  | **EXHIBIT**                | **IDENTIFIED** | **IN EVIDENCE** |
|----|----------------------------|----------------|-----------------|
| 4  | **General Counsel:**       |                |                 |
| 5  | GC-43-001 through 005      | 505            | 505             |
| 6  | GC-44                      | 537            | 537             |
| 7  | GC-45                      | 491            | 491             |
| 8  | GC-46                      | 494            | 494             |
| 9  | **Joint:**                 |                |                 |
| 10 | J-1                        | 374            | 374             |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

www.escribers.net | 800-257-0885

1                    <u>P R O C E E D I N G S</u>

2         JUDGE TRACY:  Let's go ahead and go on the record.

3         All right.  Raise your right hand, please.

4    Whereupon,

5                         **ERIC VASQUEZ**

6    having been duly sworn, was called as a witness herein and was

7    examined and testified as follows:

8         JUDGE TRACY:  Okay.  Have a seat and state your name for

9    the record, please.

10        THE WITNESS:  Yeah.  My name's Eric Vasquez.

11        JUDGE TRACY:  Okay.  General Counsel, go ahead, please.

12                      **DIRECT EXAMINATION**

13    Q    BY MR. GARBER:  All right.  Mr. Vasquez, are you currently

14    employed?

15    A    Yes.

16    Q    Where do you work?

17    A    UPS.

18    Q    Previously, did you work for Tesla?

19    A    Yes.

20    Q    And how long did you work for Tesla?

21    A    About three years.

22    Q    Did that end around October of 2017?

23    A    Yes.

24    Q    Did you work at Tesla's Fremont facility?

25    A    Yes.



1    Q    What was your last job title when you worked for Tesla?

2    A    I was a quality control.

3    Q    And what were your job duties in that role?

4    A    I would check the parts, make sure they inspect.  And that

5    was pretty much it.

6    Q    Which models did you do that for?

7    A    Model S and Model X.

8    Q    What department did you work in?

9    A    Stamping.

10   Q    Did Tesla terminate your employment?

11   A    Yes.

12   Q    Will that in any way affect your testimony today?

13   A    No.

14   Q    Are you familiar with the United Auto Workers?

15   A    Yes.

16   Q    Did you ever wear a union sticker when you worked at

17   Tesla?

18   A    Yes.

19   Q    When you wore your union stick -- did you wear the -- I'm

20   sorry.  You did wear your union sticker when you worked at

21   Tesla you said?

22   A    Yes.

23   Q    Okay.  Sorry.  When you wore your union sticker at work,

24   did you put it on your hat?

25   A    Yes.



1    Q    Okay.  I'm going to show you a picture that's been marked

2    as Exhibit 35.  Take a look at that and just let me know when

3    you're done.

4    A    Okay.

5    Q    Do you recognize this picture?

6    A    Yes.

7    Q    Is that the sticker that your wore on your hat when your

8    worked at Tesla?

9    A    Yes.

10    Q    Okay.

11         MR. GARBER:  I move to admit this as General Counsel

12    Exhibit 35.

13         JUDGE TRACY:  Any objections?

14         MR. ROSS:  No.

15         JUDGE TRACY:  General Counsel's Exhibit 35 is admitted

16    into evidence.

17    **(General Counsel Exhibit Number 35 Received into Evidence)**

18         MR. GARBER:  Okay.  You can put that with that down there.

19    Q    BY MR. GARBER:  I want to direct your attention to around

20    the spring of 2017.  You worked at Tesla then, right?

21    A    Yes.

22    Q    Did you wear that union sticker on your hat around the

23    spring of 2017?

24    A    Yes.

25    Q    And that's a -- just so we're clear -- that's the one



www.escribers.net | 800-257-0885

1    Exhibit 35 is in front of you?

2    A    That same sticker, yes.

3    Q    Okay.  Did any managers or supervisors make any comments

4    to you about wearing that sticker?

5    A    Yes.

6    Q    And which supervisor talked to you about --

7    A    His name's Arnold.

8    Q    Do you remember his last name?

9    A    Last name?  No.

10   Q    Okay.

11   A    I don't remember.

12        JUDGE TRACY:  And make sure -- just let him finish asking

13   the question --

14        THE WITNESS:  Okay.

15        JUDGE TRACY:  -- before you start answering, okay?

16        THE WITNESS:  Okay.

17        JUDGE TRACY:  Thank you.

18   Q    BY MR. GARBER:  So starting with where you were at the

19   time, can you tell us what happened when the supervisor,

20   Arnold, talked to you about that sticker?

21   A    Yes.  I was getting ready to clock out to go home.  And as

22   I was clocking out, Arnold said watch out with that sticker.

23   They're watching people with that sticker on.

24        MR. ROSS:  I'm sorry.  I couldn't hear you, sir.

25        THE WITNESS:  He said to watch out with the sticker,



1    because they're watching people with the union sticker on, and

2    to make sure you're on point with everything.

3         MR. ROSS:  To make sure what?

4         THE WITNESS:  You're on point.

5         MR. ROSS:  You're on point?

6         THE WITNESS:  Yes.  With everything.

7         MS. FEINBERG:  Can you repeat the part where he was going

8    to direct those inquiries to you?

9         JUDGE TRACY:  Yes.  So if -- I need you to just kind of

10   address me so that way I can have him repeat it, okay?

11        MR. ROSS:  I'm sorry, Your Honor.

12        JUDGE TRACY:  That's all right.  Thank you.

13        MR. GARBER:  So just so you know, Mr. Vasquez, that

14   microphone there, it doesn't make your voice any louder.  It

15   just records you say so.

16        THE WITNESS:  Okay.

17        MR. GARBER:  You've just got to speak up a little bit.

18   That's all.

19   Q    BY MR. GARBER:  Okay.  So you told us what the supervisor,

20   Arnold, told you.  Do you remember his job title at the time?

21   A    He was a supervisor for closures in body in white.

22   Q    Okay.  And you were clocking out when this happened,

23   right?

24   A    Yes.

25   Q    Were you doing anything else at the time that he could



www.escribers.net | 800-257-0885

1    have been referring to besides your sticker?

2    A    No.

3         MR. GARBER:  I don't have any further questions for the

4    witness, Your Honor.

5         MS. FEINBERG:  I'm just concerned, Your Honor, that --

6    well, I guess I could --

7         JUDGE TRACY:  There is no concern.

8         MS. FEINBERG:  You think the record was clear and with all

9    the interruptions?

10        JUDGE TRACY:  Yes.

11        MS. FEINBERG:  Okay.  That's all, my only concern.  I just

12   want to make sure.

13        MR. GARBER:  Yeah.

14        JUDGE TRACY:  You can ask him again if you want.

15        Do you have any questions?

16        MS. FEINBERG:  One second.  Okay.

17                        **DIRECT EXAMINATION**

18   Q    BY MS. FEINBERG:  And Mr. Vasquez, at the time, what -- in

19   the spring, what shift were you working?

20   A    I was working night shift.

21   Q    Night shift.  So the -- this interaction with Arnold would

22   have occurred in the morning when you were getting off shift?

23   A    Yes.

24   Q    Okay.  Thank you.

25        JUDGE TRACY:  Cross-examination?



www.escribers.net | 800-257-0885

1    MR. ROSS:  Yes.  May we see the affidavits he signed?

2    MR. GARBER:  Certainly.

3    JUDGE TRACY:  And so let the record reflect what?

4    MR. GARBER:  That I've -- General Counsel has handed

5 Respondent two copies of Mr. Vasquez's affidavit for review.

6    JUDGE TRACY:  Okay.  All right.  So let's go off the

7 record.

8 (Off the record at 9:36 a.m.)

9    JUDGE TRACY:  Back on the record.  Okay.  Go ahead,

10 please.

11    MR. ROSS:  Thank you.

12          **CROSS-EXAMINATION**

13 Q BY MR. ROSS:  Good morning, Mr. Vasquez.  My name is Mark

14 Ross.  I am Tesla's lawyer.  And I'm going to ask you some

15 questions about your testimony.  If for some reason you don't

16 understand a question, please let me know.  I'll be happy to

17 rephrase it, okay?

18 A Okay.

19 Q Okay.  Now, at the time you had this conversation by

20 the -- I think you said it was the time clock with Arnold, was

21 Arnold your boss?

22 A No.

23 Q Okay.  You had a different boss at that time?

24 A Yes.

25 Q Who was your boss at that time?



www.escribers.net | 800-257-0885

1    A    At the time?

2    Q    Yeah.

3    A    I don't remember.

4    Q    Would it have been Brian Cunningham?

5    A    I don't remember.

6    Q    Was Brian Cunningham ever your boss?

7    A    I don't remember.

8    Q    Okay.  Ever heard of the name Brian Cunningham?

9    A    It sounds familiar, yes.

10   Q    Okay.  And you don't remember Arnold's last name?

11   A    No.

12   Q    Okay.  But at some point in time, Arnold had, in fact,

13   been your immediate supervisor; is that right?

14   A    Yes.

15   Q    And do remember when that was?

16   A    No.

17   Q    You don't.  Would it be correct to say that, at some point

18   in time, Arnold had given you a performance review?

19   A    Yes.

20   Q    And would it be correct also to say that you got twos and

21   threes in that performance review?

22        MR. GARBER:  Objection.  Relevance.

23        MR. ROSS:  It goes to the subsequent conversation that

24   occurred with Arnold.

25        JUDGE TRACY:  I'll overrule the objection.



1    Q    BY MR. ROSS:  Is that a correct statement, sir, or do you

2    want me to restate it?

3    A    I don't remember.

4    Q    You don't remember?

5    A    No.

6    Q    Okay.  Well, let me ask you this.  Do you remember getting

7    a review around December of 2016, a little before Christmas,

8    from Arnold; that sound right?

9    A    I don't remember that, no.

10   Q    Okay.  Do you remember Arnold being your new supervisor

11   around that time?

12   A    Yes.

13   Q    Okay.

14        MR. ROSS:  And could the witness be given his affidavit,

15   please?  I'll give it to him.

16   Q    BY MR. ROSS:  Before we get into that document, Mr.

17   Vasquez, let me see if I can help you remember stuff.  Do you

18   remember that in this review -- strike that.  Do you

19   remember -- you do or do not review -- or you do or you not

20   remember getting a review from Arnold around a little before

21   Christmas, 2016?

22   A    I don't remember, no.

23   Q    Do you remember getting any review from Arnold?

24   A    Yes.

25   Q    Okay.  And do you remember what he told you in the review?



www.escribers.net | 800-257-0885

1   A   I believe he stated to improve my attendance.

2   Q   Uh-huh.

3   A   And I think that was the main one, attendance.

4   Q   Okay.  He gave you a less than satisfactory assessment in

5   terms of attendance, and he said improve that?

6   A   Yes.

7   Q   Okay.  And is it true also that he gave you less than a

8   satisfactory assessment in other areas?  He told you to improve

9   that?

10   A   I don't remember those, no.

11   Q   Okay.  And is it true also that you received no type of

12   bonus or wage increase after that review?

13      MR. GARBER:  Objection.  Relevance.

14      MR. ROSS:  Again, it goes to the context and tone of the

15   conversations he testified to.

16      JUDGE TRACY:  Okay.  I'm going to overrule the objection.

17   Q   BY MR. ROSS:  Is it true you got no increase, no wage

18   increase or bonus, as a result of that review?

19   A   I believe no.

20   Q   You disagree, or you agree that you got no increase?

21   A   I did not get an increase.

22   Q   Did not get an increase.  Okay.  Okay.  Now, this

23   conversation you had with Arnold, do you remember the date of

24   that conversation?

25   A   I do not know -- remember -- no.


www.escribers.net | 800-257-0885

 1    Q    Okay.  Do you remember whether it was before or after

 2   Easter?

 3    A    Easter?

 4    Q    You don't recall?

 5    A    It was in September sometime.

 6    Q    It was in September.  You said during your direct

 7   examination it was sometime during the spring.

 8    A    The spring, yes.

 9    Q    Well, was it September or the spring?

10    A    The spring.

11    Q    Okay.  And was it before or after Easter?

12    A    I don't remember.

13    Q    Uh-huh.  Was it before or after Memorial Day?

14    A    Can you rephrase that -- repeat that?

15    Q    Yeah.  Sure.  I'm trying to figure out when this

16   conversation by the timeclock took place.  You say it was

17   during the spring.  When during the spring was that

18   conversation?

19    A    I don't remember.

20    Q    Okay.  Okay.  Tell me, did you do anything to make a note

21   of or to make a record when that conversation took place?

22    A    No.

23    Q    Uh-huh.  Did you report that conversation to anyone?

24    A    No.

25    Q    Uh-huh.  Do you have any notes of the conversation you say



www.escribers.net | 800-257-0885

1    you had with Arnold?

2    A    No.

3    Q    Okay.  Okay.  So at some point in time, Arnold stopped

4    being your immediate supervise and somebody else became your

5    immediate supervisor?

6    A    Yes.

7    Q    Okay.  And Arnold was not your immediate supervisor when

8    he talked to you?

9    A    No.  At the time, no, he was not.

10    Q    Okay.

11    JUDGE TRACY:  Make sure, again, that you --

12    THE WITNESS:  Okay.  I apologize.

13    JUDGE TRACY:  -- is finished.  Okay.  Thank you.

14    MR. ROSS:  Okay.

15    Q    BY MR. ROSS:  Now, in response to Mr. Garber's

16    questioning, would you describe the entire conversation you had

17    with Arnold at the timeclock?

18    A    Can you rephrase it?  Like, you know --

19    Q    Yeah.  Mr. Garber asked you to tell us what --

20    A    Oh, you want me to repeat that?

21    Q    No.

22    A    Oh.

23    Q    I'm asking you a different question.

24    A    Oh.

25    Q    Okay.  And if you don't understand it -- you're doing a



www.escribers.net | 800-257-0885

1    good job in terms of if you don't understand my questions, tell

2    me.  Mr. Garber asked you to tell us what was said at the

3    timeclock by Arnold, and you did that, right?

4    A    Yes.

5    Q    Now, when you gave your testimony at the questioning of

6    Mr. Garber, did you tell us about the entire conversation with

7    Arnold?

8    A    Yes.  That's all of it.  It was a quick conversation.

9    Q    Was there anything else said by you or him during this

10    conversation?

11    A    No.

12    Q    Nothing?

13    A    No.

14    Q    Is it true that he said nothing to you during that

15    conversation about the sticker on your hat?  He didn't say

16    anything about that; did he?

17    A    Can you rephrase that?

18    Q    Yeah.  Is it true that when Arnold spoke to you at the

19    timeclock, no mention was made by him about the sticker on your

20    hat; was it?  He didn't say anything about the sticker on your

21    hat?

22    A    No, he didn't mention the sticker.  Yes.

23    Q    He did say something about the sticker on your hat?

24    A    Yes.

25    Q    Okay.  And you're just as sure that is the rest of your



1   testimony today?

2   A    Yes.

3   Q    Okay.  Did he say that you needed to make sure you were on

4   point and doing your job and that your attendance was good?

5   A    That's what he said?  Yes, that's --

6   Q    I'm asking you whether that's what he told you.

7   A    Yes, that's what he told me.

8   Q    Okay.  Is it true that he did not mention or point to the

9   sticker on your hat?

10  A    He mentioned sticker.

11  Q    He did mention sticker?

12  A    Yes.

13  Q    Okay.  I'd like to look at your affidavit, please.  You

14  have it in front of you.  And I'd like you to go to page 11.

15  A    Okay.

16  Q    And I'd like you to look at lines 7 through 18 of that

17  page.

18  A    So 7 through 18, right?

19  Q    Line 7 through 18.  And I'd like you to read it to

20  yourself.  You don't have to read it out loud.

21  A    Okay.

22  Q    Just read it to yourself.  And then tell me when you're

23  done.

24  A    Okay.

25  Q    Okay.  And you read through it?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Okay.  Now, does that refresh your memory about whether he

3    said anything about your sticker?

4    A    Can you rephrase that?

5    Q    Yeah.  Having read through your sworn affidavit given to

6    the NLRB, Mr. Garber, on November 2, 2017, does that refresh

7    your memory as to whether or not Arnold made mention of your

8    union sticker?

9    A    I really don't understand what you're asking me, so.

10    Q    Okay.  Let me ask you this; look at line 14, please.

11    A    Okay.

12    Q    And you see the sentence begins with the word "he"; do you

13    see that?

14    A    Yes, I see it.

15    Q    Okay.  And the "he" that's referred to there is Arnold,

16    right?

17    A    Yes.

18    Q    Okay.  And does the affidavit read: "He did not point to

19    the sticker on my hat, but that's what I thought he was

20    referring, because there was nothing else he could have been

21    referring -- or referencing."  Now, is that correct?  Did I

22    read that correctly?

23    A    Yes, you did.

24    Q    And is that, in fact, accurate in terms of what occurred

25    in your conversation with Arnold?



1   A    Can you rephrase it?

2   Q    Yeah.

3   A    The last part?

4   Q    What you said in that sentence; is it true?

5   A    Yes.  He did not point at it, yes.

6   Q    Okay.  And he didn't mention it either; did he?

7   A    No, he didn't mention it.

8   Q    He didn't mention it.  Okay.  Is it true also that

9   managers and supervisors didn't say anything to you about your

10  wearing union insignia, union buttons, union shirts, et cetera?

11  A    Yes.  Arnold said something.

12  Q    Okay.  That one time?

13  A    Yes.

14  Q    Except for that, no one else ever did, right?

15  A    No.

16  Q    That's not true.

17  A    I'm sorry.  What?

18       MS. FEINBERG:  Objection.  Argumentative.  He answered

19  your question.

20       MR. ROSS:  That's fair enough.  I'll restate the question.

21       JUDGE TRACY:  Overruled.

22       Go ahead and ask the question again.

23       MR. ROSS:  Okay.

24  Q    BY MR. ROSS:  Aside from this one instance you say Arnold

25  mentioned the hat --



www.escribers.net | 800-257-0885

1    A    Yes.  Sticker, yes.

2    Q    -- the thing on your hat -- is it true that no other

3    manager or supervisor ever said anything to you about wearing

4    any union buttons, stickers, shirts?  No one ever talked to you

5    about that?

6    A    Besides Arnold?

7    Q    Yes.  Is that a correct statement?

8    A    He's the only one, yes.

9    Q    He's the only one.  No one else did, right?

10   A    No.

11   Q    No one else did?

12   A    Just Arnold.

13   Q    Okay.  He's the only one?

14   A    Yes.

15        MR. GARBER:  Objection.  Asked and answered.

16        MS. FEINBERG:  That's four or five times.

17        JUDGE TRACY:  Okay.  This is cross-examination.  I'm going

18   to overrule it.

19        MS. FEINBERG:  Well, at some point, four to --

20        JUDGE TRACY:  I'm overruling it.

21        MS. FEINBERG:  Okay.

22   Q    BY MR. ROSS:  Okay.  Is it also -- now, I think you said

23   that you worked in stamping?

24   A    Yes.  At the time, yes.

25   Q    At the time?



www.escribers.net | 800-257-0885

1   A    Yes.

2   Q    Okay.  Was there a time when you didn't work in stamping?

3   A    About three months, before I was laid off.

4   Q    Okay.  And aside from that period, was there a time when

5   you didn't in stamping?

6   A    Yes.

7   Q    And where did you work when you were not in stamping?

8   A    Body in white too.

9   Q    Any other place?

10  A    No.

11  Q    Okay.  Now, while you were working in stamping, is it true

12  that you wore a union T-shirt to work every day?

13  A    I want to say every day, with one --

14  Q    You often wore a union T-shirt to work?

15  A    Yes.  Yes.

16  Q    Okay.  And you wore a union sticker on your baseball cap

17  each day?

18  A    Yes.

19  Q    Is it true also you didn't wear anything over your

20  T-shirt -- union T-shirt?

21  A    No.

22  Q    I'm not asking these questions very well, because I think

23  there's a confusing response.  I'll ask it this way; did you

24  wear anything over it the union T-shirt you wore?

25  A    Oh, cover?  Any --



1   Q    Yeah.

2   A    No.

3   Q    And so it was in view?

4   A    Yes.

5   Q    There for everybody to see?

6   A    Yes.

7   Q    And no one ever asked you to take that shirt off, did

8   they?

9   A    No.

10  Q    That was a black T-shirt with a union logo in big red

11  letters, right?

12  A    Yes.

13  Q    In fact, is it true that roughly 20 to 30 employees in

14  stamping wore union shirts or stickers on any given day?

15  A    Yes.

16  Q    And again, this was in stamping?

17  A    Yes.

18  Q    Now, aside from wearing a union sticker on your hat, aside

19  from wearing a union T-shirt at work, you also engaged in

20  passing out flyers, correct?

21  A    Yes.

22  Q    Okay.  And you did this both inside the plant and outside

23  the plant?

24  A    Yes.

25  Q    How many times do you think you did that?



1    A    Three, four times.

2    Q    Okay.  And no one ever, ever talked to you about that; did

3    they?

4    A    No.

5    Q    Nobody reprimanded you?  Nobody disciplined you for doing

6    that; did they?

7    A    No.

8    Q    And you were terminated at Tesla -- your employment was

9    terminated by the company; is that right?

10    A    Yes.

11    Q    That would have been in October?

12    A    Yes.

13    Q    Of last year?

14    A    Yes.

15    Q    Okay.  And that termination was contested by you and the

16    Union in front of the NLRB; is that right?

17         MR. GARBER:  Objection.  Relevance.

18         JUDGE TRACY:  Sustained.

19         MR. ROSS:  Okay.  Just a moment, Your Honor.

20         I have nothing else.  Thank you.

21         JUDGE TRACY:  Okay.

22                    **REDIRECT EXAMINATION**

23    Q    BY MR. GARBER:  Just a quick question for you, Mr.

24    Vasquez.  You talked about wearing your union shirt to work.

25    Was that in general assembly?



www.escribers.net | 800-257-0885

1   A    Yes.

2   Q    You were working in general assembly?  Were you working in

3   general assembly, or a different department?

4   A    I've worn them in both departments.

5        MR. ROSS:  His testimony is he worked in body in white.

6        JUDGE TRACY:  So objection?

7        MR. ROSS:  Yes.  The objection is he's contradicting his

8   testimony.

9        MR. GARBER:  Well, but --

10       JUDGE TRACY:  Well, that's a credibility issue, so.

11  Q    BY MR. GARBER:  What department were you assigned to work

12  in when you were wearing it?

13  A    Body in white too.

14  Q    Okay.  And that's separate from general assembly; is that

15  right?  Body in white, in general, simply are -- they're two

16  different departments?

17  A    Yes.  Yes.

18  Q    Okay.  Thank you?

19       MR. GARBER:  That's all my questions.

20       MS. FEINBERG:  Nothing.

21       JUDGE TRACY:  Any recross?

22       MR. ROSS:  Nope.

23       JUDGE TRACY:  Okay.

24       MR. ROSS:  Thank you, Mr. Vasquez.

25       JUDGE TRACY:  Well, thank you very much.  Please don't



www.escribers.net | 800-257-0885

1    discuss your testimony with anyone until after the close of the

2    hearing.  The attorneys will let you know when the hearing

3    done, which is going to be later this year.

4        THE WITNESS:  Okay.

5        JUDGE TRACY:  Okay?  Thank you so much.

6        THE WITNESS:  Thank you.

7        JUDGE TRACY:  Let's go ahead and go off the record.

8    (Off the record at 10:22 a.m.)

9        JUDGE TRACY:  Okay.  So before we go to the General

10    Counsel's next witness, we've got a few matters to take care

11    of.  So Mr. Rodriguez-Ritchie, go ahead and read in the

12    stipulation.

13        MR. RODRIGUEZ-RITCHIE:  Yes, Your Honor.  The parties are

14    prepared to enter a stipulation as follows.  Respondent asked

15    all employees as a term and condition of employment to sign a

16    confidentiality acknowledgement in October and November, 2016.

17    A copy of those confidentiality acknowledgements are entered

18    into -- will be entered into evidence as General Counsel's

19    Exhibits 15-001, 15-001 and 31-003.  And I'd also --

20        JUDGE TRACY:  And so any objections to the stipulation

21    from the Charging Parties?

22        MS. FEINBERG:  No.

23        JUDGE TRACY:  No objections.  And for the Respondent?

24        MR. ROSS:  No.

25        JUDGE TRACY:  Okay.  All right.  And so obviously we



1    already have one of those exhibits that you referenced in the

2    record.  Which one was that one again?

3        MR. ROSS:  15-001, wasn't it?

4        MR. RODRIGUEZ-RITCHIE:  21-003 is the one that's already

5    received into evidence.

6        JUDGE TRACY:  Uh-huh.

7        MR. RODRIGUEZ-RITCHIE:  I've already provided copies of

8    15-001 and 002 to counsel for Respondent and for the Charging

9    Parties and I'm handing the Court Reporter and Her Honor a copy

10   of each of these as well.

11       JUDGE TRACY:  All right.  So any objections to General

12   Counsel's Exhibits 15-001, 002 entered into evidence?  Any

13   objections?

14       MS. FEINBERG:  Nope.  No objection.

15       JUDGE TRACY:  No.  And for the Respondent?  No objections?

16       MR. ROSS:  No.

17       JUDGE TRACY:  Okay.  So General Counsel's Exhibits 15-001

18   and 002 are admitted into evidence.

19   **(General Counsel Exhibit Number 15-001, 15-002 Received into**

20   **Evidence)**

21       JUDGE TRACY:  And then we have another issue or matter

22   that's come up with the map.  So go ahead.

23       MR. RODRIGUEZ-RITCHIE:  Yes, Your Honor.  At this time,

24   I've marked Joint Exhibit Number 1.  It's a one page color

25   diagram of the Tesla Fremont facility located at 45500 Fremont



www.escribers.net | 800-257-0885

1   Boulevard in Fremont, California.  The diagram outlines the

2   location of the admin building, door one, door two, door three,

3   and the north admin entrance in addition to noting GA, which

4   refers to general assembly, BIW, which refers to body in white

5   and stamping.  I've already provided copies of this joint

6   exhibit to counsel for the Charging Party and counsel for

7   Respondent and now I will give Your Honor a copy and a copy to

8   the Court Reporter.

9        JUDGE TRACY:  All right.  And any objections?

10       MR. ROSS:  No.

11       MS. FEINBERG:  No.

12       JUDGE TRACY:  Okay.  All right.  So now we have a diagram

13  of the building.  All right.  And anything else from the

14  General Counsel?

15       MR. RODRIGUEZ-RITCHIE:  No.

16       JUDGE TRACY:  Okay.  All right.  And then for the

17  Respondent, we had one thing that we needed to take care of,

18  too.

19       MR. ROSS:  Yeah.  We were asking that you --

20       JUDGE TRACY:  Oh yeah.  So -- joint -- I'm sorry.  Joint

21  Exhibit 1 is admitted into evidence.

22  **(Joint Exhibit Number 1 Received into Evidence)**

23       MR. ROSS:  Okay.  I'll let Keahn deal with --

24       JUDGE TRACY:  Yeah.  Go ahead.

25       MR. MORRIS:  Yeah.  So we've identified one document as



1  protected by the attorney-client and work product privilege.

2  It's an email from Lauren Holcomb to Robin Repass (phonetic)

3  Thursday, May 25th, 2017.  The subject is privileged and

4  confidential.  Seeking legal advice EE interviews.  Lauren

5  Holcomb is an EHS representative.  Robin Repass --

6      MR. ROSS:  Tell her what EHS stands --

7      MR. MORRIS:  EHS stands for environmental health and

8  safety.  Robin Repass is -- or was a lawyer, counsel for

9  environmental health, safety and sustainability.  My

10  understanding is that counsel Robin Repass prepared legal

11  advice concerning certain questions that Lauren Holcomb should

12  ask regarding a workplace investigation and that counsel

13  specifically instructed Lauren Holcomb to take notes for her

14  review, so that she could provide further legal advice

15  regarding next steps of the investigation.  So we've asked the

16  Judge to review the document in camera and make a determination

17  whether it's protected by the privileges.

18      JUDGE TRACY:  Okay.  And so the attorney no longer works

19  there, but she was employed by Tesla in-house counsel.  Is that

20  what --

21      MR. MORRIS:  Correct.

22      JUDGE TRACY:  -- her position was?

23      MR. MORRIS:  Yes.

24      JUDGE TRACY:  Okay.  All right.  So there's the one.  And

25  then you have another one.  Is that correct or is that it?



www.escribers.net | 800-257-0885

1      MR. MORRIS:  It's the one document that encapsulates both

2      of the interviews at issue.

3      JUDGE TRACY:  Oh, okay.  Okay.  And this is in re --

4      this -- the reason why this issue has come up, because it is

5      part of a privilege log that was already provided to the

6      General Counsel and to the Charging Parties.  And it's in

7      response to -- potentially in response to a couple of the

8      subpoena requests.  I won't ask you, if you don't know which

9      one that would be, but --

10     MR. MORRIS:  Do you remember off the top of your head?

11     MR. RODRIGUEZ-RITCHIE:  No.

12     JUDGE TRACY:  Yeah.  So that's fine.  It's responsive to

13     the subpoena requests of both parties there, okay?  So what

14     I'll do is I'll take this in camera review.  I'll take a look

15     at it and then -- I think after lunch, I should be able to let

16     you know my ruling on it.  Yeah.  Go ahead.

17     MR. RODRIGUEZ-RITCHIE:  I was just going to clarify, Your

18     Honor.  I don't believe I heard.  In off the record

19     discussions, a representation was also that Ms. Repass was not

20     at the meeting during which these notes were taken, so the

21     document contains things that occurred at a meeting during

22     which he wasn't present.

23     JUDGE TRACY:  Is that correct?

24     MR. MORRIS:  That's correct.

25     JUDGE TRACY:  Okay.  And you know, some of this also might



22-60493.391

1    need to come through in terms of testimony, where someone is

2    going to be testifying, if they are and that's really when you

3    can tell if there's the -- when that attorney-client privilege

4    starts or to be able to testify, sometimes we'll need that

5    from, I'm assuming, Ms. Holcomb, if she's planning to testify.

6    Anything?

7        MR. RODRIGUEZ-RITCHIE:  It was responsive to request

8    number 27.

9        JUDGE TRACY:  Perfect.  And you guys know your request --

10        MS. FEINBERG:  Do you have the number Dan?

11        MR. CURRY:  I do.

12        MS. FEINBERG:  Okay.  Because also -- well, I don't know.

13    Obviously you're going to review it, but we haven't had an

14    opportunity.  I don't know if you want us to provide you any

15    legal support for why would that -- or anything -- okay.  Fine.

16        JUDGE TRACY:  No.  I don't think that I need it.  I think

17    that once I take a look at it, I'll be able to --

18        MS. FEINBERG:  Okay.

19        JUDGE TRACY:  -- give my ruling.  And then of course, if

20    they disagree then they can -- because then I would be saying

21    in terms of the subpoena the document should be turned over.

22    And they can decide what they want to --

23        MS. FEINBERG:  Right.

24        JUDGE TRACY:  -- do with it at that point.  And then the

25    General Counsel can decide what --



www.escribers.net | 800-257-0885

1       MS. FEINBERG:  Okay.

2       JUDGE TRACY:  -- and you can --

3       MS. FEINBERG:  Okay.

4       JUDGE TRACY:  -- decide what you want --

5       MS. FEINBERG:  Okay.

6       JUDGE TRACY:  -- to do.

7       MS. FEINBERG:  Right.  Okay.

8       JUDGE TRACY:  But first step is let me take a look at it.

9  And do you know what it's in response to in terms of your

10  petitions to revoke?

11      MR. CURRY:  Yes.

12      JUDGE TRACY:  Or not petitions.  Subpoenas.

13      MR. CURRY:  Subpoenas.  So the UAW subpoena was request

14  number 33 and 34.

15      JUDGE TRACY:  Okay.  All right.  Thank you.

16      MR. CURRY:  Would you like to see it, Your Honor?

17      JUDGE TRACY:  Yeah.  So I'll take it.  I'm going to keep

18  it with me, take a look at lunch and let you know.  All right.

19  Shall we go to the next witness?  Okay.  So let's go off the

20  record while you get that person.

21  (Off the record at 10:53 a.m.)

22      JUDGE TRACY:  On the record.  You can just stay standing,

23  if you don't mind.  Okay.  All right.  If you could go ahead

24  and raise your right hand, please.

25  Whereupon,



1                          **BRANTON PHILLIPS**

2     having been duly sworn, was called as a witness herein and was

3     examined and testified as follows:

4          JUDGE TRACY:  Okay.  Great.  Have a seat.  State your name

5     and the spelling of your first name for the record, too,

6     please.

7          THE WITNESS:  Sure.  My name is Branton Phillips.  First

8     name spelled B-R-A-N-T-O-N.

9          JUDGE TRACY:  Okay.  General Counsel, go ahead, please.

10                         **DIRECT EXAMINATION**

11     Q     BY MR. RODRIGUEZ-RITCHIE:  Morning, Mr. Phillips.

12     A     Good morning.

13     Q     Where do you work?

14     A     Tesla.

15     Q     Do you work at the Tesla facility located at 45500 Fremont

16     Boulevard in Fremont, California?

17     A     Yes, I do.

18     Q     And Mr. Phillips, from now on I'm going to refer to that

19     as the Tesla Fremont facility.  What is your job at Tesla?

20     A     I'm a material handler.

21     Q     And when did you begin working at Tesla Fremont?

22     A     It was March 31st, 2014.

23     Q     Could you describe what you do as a material handler?

24     A     Basically I bring parts for the cars from point A to point

25     B.



1    Q   In terms of the overall production process at Tesla, can

2    you tell us, as a material handler, do you fall before general

3    assembly or after general assembly?

4    A   It would be in a sense before general assembly, loading

5    parts on the racks for the general assembly to pick up and put

6    along the line.

7    Q   When you load the parts, do you load them into something?

8    A   Yes.

9    Q   Into what?

10    A   They use -- I use carts, so I'm loading bulk parts on the

11    carts and then the carts are going through the line.

12    Q   Mr. Phillips, do you have an employee badge that's

13    assigned to you by Tesla?

14    A   Yes, I do.

15    Q   When did you get the badge?

16    A   When you're first hired.

17    Q   Does your badge have a picture on it?

18    A   Yes.

19    Q   Is the picture of you?

20    A   Yes.

21    Q   Do you remember who took your picture?

22    A   No, I don't actually.

23    Q   Was it someone that worked at Tesla?

24    A   Yes.

25    Q   Does your badge have any words on it?



1  A    It has Tesla and it has my name on there.  And it has my

2  badge numbers, I believe, too.

3  Q    Do you recall whether or not your badge says employee?

4  A    I believe it does.

5  Q    Are you familiar with an organization called the United

6  Auto Workers?

7  A    Yes.

8  Q    Who are the United Auto Workers?

9  A    It's a group that -- people that help -- that are union

10  basically, that work in auto -- for auto workers, agricultural

11  workers and other ones.

12  Q    And have you engaged in any activities at the Tesla

13  Fremont facility connected with the United Auto Workers?

14  A    Yes.

15  Q    Mr. Phillips, have you ever driven to the Tesla Fremont

16  facility?

17  A    Yes.

18  Q    How many times?

19  A    Almost countless.  Every day from Monday through Friday,

20  sometimes Saturdays the last four years.

21  Q    Okay.  Thank you.  Does the Tesla Fremont facility have a

22  parking lot?

23  A    Yes, it does.

24  Q    Is that a parking lot that employees use?

25  A    Yeah.  Yes.



www.escribers.net | 800-257-0885

1   Q    Do you know whether or not nonemployees of Tesla use the

2   Tesla parking lot?

3   A    I -- yeah.  Nonemployees can also use it, too.  Have used

4   it.  I've seen that.

5        MR. ROSS:  Your Honor, I'm sorry.  I couldn't hear the

6   last part of it.

7        JUDGE TRACY:  Could you repeat the last part --

8        THE WITNESS:  Yeah.

9        JUDGE TRACY:  -- of your testimony, please?

10        THE WITNESS:  Yeah.  I have seen nonemployees inside the

11   Tesla parking lot using it.

12   Q    BY MR. RODRIGUEZ-RITCHIE:  Okay.  In order to get access

13   to the Tesla parking lot, do you have to show any

14   identification?

15   A    No.

16   Q    Are there any guard stations at the entrances to the

17   parking lot as far as you remember?

18   A    Yes, there's one.

19   Q    Do you know at which entrance that station is located?

20   A    Through the private drive, it would be where a third gate

21   would be.  It's centered in a spot -- the flags.

22   Q    Okay.  I'm going to show you what's been admitted as Joint

23   Exhibit 1.  Take a look at it and let me know when you're

24   ready.  And actually, I'm going to hand you a laser pointer.

25   A    Okay.  I'm ready.



www.escribers.net | 800-257-0885

1    Q    I'm not ready.  If you could give me one minute, please.

2    Thank you.  It's the wonders of technology.  Okay, Mr.

3    Phillips, do you recognize Joint Exhibit 1?

4    A    Yes, I do.

5    Q    Is that a diagram of the Tesla Fremont Facility where you

6    work at?

7    A    Yes, it is.

8    Q    Okay.  So you just testified that there's a security

9    station at one of the entrances to the parking lot.  Can you

10   show us in Joint Exhibit 1 where that is?

11   A    Okay.  It should be right there.

12   Q    Okay.

13       MR. RODRIGUEZ-RITCHIE:  So if the record could reflect

14   that Mr. Phillips has pointed to an area located just above

15   where the diagram states admin building in terms of the text

16   admin building.

17   Q    BY MR. RODRIGUEZ-RITCHIE:  Are there any other entrances

18   to the  Tesla Fremont parking lot?

19   A    Oh, yes.  There's -- you can go in right there.  This is

20   the entrance right here.  There's one right there.  And then of

21   course you can go in through the guard shack or guard tower.

22   Q    Okay.

23       MR. RODRIGUEZ-RITCHIE:  If the record can reflect that Mr.

24   Phillips has pointed out four entrances to the Tesla parking

25   lot.



1    MR. ROSS:  Your Honor, I apologize for the interruption.

2    Could we go off the record for just one moment, please?

3    JUDGE TRACY:  All right.  Let's go off the record.

4    (Off the record at 11:01 a.m.)

5    JUDGE TRACY:  Go ahead, please.

6    MR. RODRIGUEZ-RITCHIE:  Thank you, Your Honor.

7    Q    BY MR. RODRIGUEZ-RITCHIE:  At any of the other entrances

8    that you've identified to the parking lot, are there guard

9    stations?

10   A    No.

11   Q    Okay.  At the one that you've identified, where there is a

12   guard station, is there a guard in the guard station?

13   A    Yes.

14   Q    Okay.  Now what about the other entrances?  Are there

15   guards located at the other entrances?

16   A    No, there's not.

17   Q    And from the time period of May 24th, 2017 and previous to

18   that -- so before that in time, at what point when you got to

19   the Fremont facility would you typically have your first

20   interaction with a security guard?

21   A    It would be when I am accessing the building actually.

22   Q    Would it be inside or outside of the building?

23   A    It would be the outside door.

24   Q    So for example, maybe if you could give us the door that

25   you use to go into work?



1    A    Sure.  It's this one right here.  And the left side

2    actually.

3    Q    Okay.  So you pointed to door three as it is on Joint

4    Exhibit 3.

5    A    Yes.

6    Q    So typically your first interaction with a security guard

7    would be on the exterior of door three or on the interior of

8    door three?

9    A    It would be on the interior.

10   Q    Okay.

11        JUDGE TRACY:  And just to clarify your question, it was

12   Joint Exhibit 1.

13        MR. RODRIGUEZ-RITCHIE:  Yes.  Thank you.

14   Q    BY MR. RODRIGUEZ-RITCHIE:  Now prior -- the period prior

15   to May 24th, 2017, where did you first use your badge, if at

16   all?

17   A    Right -- actually, right where I was pointing, there would

18   be a door three and they've got a keycard right outside of the

19   double doors to the right of it.  And so I would use my badge

20   to actually enter the facility right there.

21   Q    Okay.

22        MR. RODRIGUEZ-RITCHIE:  So if the record could reflect

23   that Mr. Phillips used his hand to demonstrate putting his

24   badge up to the door.

25   Q    BY MR. RODRIGUEZ-RITCHIE:  And was that up to a sensor at



1    the door?

2    A    Yes.  Little bigger than a wallet and it's got a green or

3    red light on it.

4    Q    Okay.  When you scan your badge -- and I'm referring to

5    the period prior to May 24th, 2017 -- was there any sound that

6    you would hear?

7    A    I believe it would make a beep and then the door would

8    click, so you could enter.

9    Q    Okay.  So at the point of the beep and the click was when

10   you can enter the door?

11   A    Yes.

12        JUDGE TRACY:  Would you mind if you just again use the

13   pointer to show what are the entrance -- not the entrances, but

14   the entrances to the parking lots?

15        THE WITNESS:  Oh.  Okay.  You come in this right there.

16        JUDGE TRACY:  Okay.

17        THE WITNESS:  There's one right here.  And you can drive

18   down one right here.  And there's one right there.

19        JUDGE TRACY:  All right.  So there's four, including the

20   one with the guard stationed at one of the entrance, parking

21   lot entrances?

22        THE WITNESS:  That is correct.  Yeah.

23        JUDGE TRACY:  Okay.  Thank you.

24        THE WITNESS:  Uh-huh.

25   Q    BY MR. RODRIGUEZ-RITCHIE:  Mr. Phillips, do the security



1    guards at Tesla have a particular outfit?

2    A    Yes.

3    Q    Could you describe what that is?

4    A    It's dark pants.  They've got a -- it's a black and red

5    type shirt that they wear.  And then they have a -- will say

6    security written on it along there.  And I believe sometimes

7    they have security caps.

8    Q    Do the guards where -- excuse me -- do the security guards

9    where nametags?

10    MR. ROSS:  I'm sorry.  I couldn't hear.  I'm sorry, Your

11    Honor.  I couldn't hear --

12    Q    BY MR. RODRIGUEZ-RITCHIE:  Do --

13    MR. ROSS:  -- Mr. Rodriguez-Ritchie.

14    Q    BY MR. RODRIGUEZ-RITCHIE:  Do the security guards wear

15    nametags?

16    A    I don't believe they have nametags on, no.

17    Q    Inside -- so I'm speaking the (sic) period of May 24th,

18    2017 and before.  Inside of the doors.  So once you've done

19    through the doors into the facility --

20    A    Uh-huh.

21    Q    -- are there any guard stations there?

22    A    Yes.

23    Q    Where?

24    A    Centered 15, about -- approximately 15 feet in will be a

25    podium.  And there's at least one guard at that podium on each


www.escribers.net | 800-257-0885

1    one of the entrances.

2    Q    How often have you seen the podium?

3    A    Every time that I badge in and enter work.

4    Q    Could you describe what is at the podium?

5    A    The guards are again, at a podium.  They usually have a

6    seat and inside the podium is a laptop that's opened.  And

7    they're directly looking at the laptop and the people when

8    they're walking in.

9    Q    Okay.  Now prior to May 24th, 2017, had anyone at Tesla

10   ever spoken with you about handing out flyers in the parking

11   lot?

12   A    Anybody --

13   Q    Any Tesla supervisors, managers or human resources

14   employees?

15   A    Say the whole question over again --

16   Q    Sure.

17   A    -- so I can get it.

18   Q    Prior to May 24th, 2017 --

19   A    Uh-huh.

20   Q    -- had any manager or supervisors or human resources

21   employees spoken with you about flyering at the Tesla parking

22   lot?

23   A    No.

24   Q    Prior to May 24th, 2017, had any supervisors, managers or

25   human resources employees ever discussed with you any Tesla



1   policies about handing out flyers in the Tesla parking lot?

2   A    No.

3   Q    Prior to May 24th, 2017, had any supervisors, managers or

4   human resources professionals ever discussed any rules about

5   handing out flyers anywhere inside of Tesla?

6   A    No.

7   Q    Mr. Phillips, do you know what Work Day is?

8   A    Yes.

9   Q    All right.  If you'd give me one moment.  What is Work

10  Day?

11  A    It's a -- I would say an application or an appellant

12  designed, along with like your personal record folder is how I

13  can explain it best, I would guess.

14  Q    Has Tesla ever given you access to the Work Day system?

15  A    You at certain times can review another employee.

16  Q    Are you able to use the Work Day system?

17  A    Yes.

18  Q    And Tesla provided you the ability to do that?

19  A    Yes.

20  Q    Prior to the period of October, 2017 -- so before October,

21  2017, did any supervisors, managers or human resources people

22  ever discuss with you what you could use Work Day for?

23  A    No.

24  Q    Prior to October, 2017, did any supervisors, managers or

25  human resources employees ever discuss with you any policies



www.escribers.net | 800-257-0885

1    about using Work Day?

2    A    No, I don't believe so.

3    Q    To your recollection, has anyone at Tesla ever told you

4    that you could only use Work Day for official and legitimate

5    business purposes?

6    A    No.

7    Q    Mr. Phillips, do you recall the day of May 24, 2017?

8    A    Yeah.  Yes.

9    Q    How did you begin your day?

10    A    I started it by driving to the UAW office.

11    Q    And when you say the UAW office, which office are you

12    referring to?

13    A    It's on South Grimmer and --

14    Q    How far is it from the Tesla Fremont facility?

15    A    About a quarter mile or so.  Or less.  Maybe about three

16    street blocks, let's say.

17    Q    Okay.  Why did you go to the UAW office?

18    A    That morning I was going to flier.  Actually, I did flier.

19    Q    And did you pick anything up at the UAW office?

20    A    Yes.

21    Q    What?

22    A    The fliers.

23    Q    Okay.  Okay, Mr. Phillips, I'm handing you what's been

24    pre-marked as General Counsel's Exhibit 9.  It's a one page

25    double-sided document marked 9-001 and 9-002.  Please take a



www.escribers.net | 800-257-0885

1   moment to look at it.  I've provided a copy to the Charging

2   Party and Respondent.  And I'll give Your Honor a copy and a

3   copy for the record.  Have you taken a look at it, Mr.

4   Phillips?

5   A    Yes, I have.

6   Q    All right.  Do you recognize General Counsel's Exhibit 9?

7   A    Yes.

8   Q    What is General Counsel's Exhibit 9?

9   A    These are the fliers that I picked up.

10  Q    On May 24th, 2017?

11  A    Correct.

12  Q    Okay.

13       MR. RODRIGUEZ-RITCHIE:  At this time, I'd like to move

14  General Counsel's Exhibit 9 into evidence.

15       JUDGE TRACY:  Any objections?

16       MR. ROSS:  No.

17       JUDGE TRACY:  General Counsel's Exhibit 9 is admitted into

18  evidence.

19  **(General Counsel Exhibit Number 9 Received into Evidence)**

20  Q    BY MR. RODRIGUEZ-RITCHIE:  Mr. Phillips, after you picked

21  up the fliers at the UAW office, what, if anything, did you do?

22  A    I hopped in my car and I went to the Tesla parking lot.

23  Q    Were you scheduled to work on May 24th, 2017?

24  A    Yes.

25  Q    At about what time?



1    A    I needed to be inside and at my work station by 6:00.

2    Q    Now, what -- about what time did you arrive at the Tesla

3    Fremont parking lot?

4    A    Probably a little past 5:00, little past 5:00 a.m.

5    Q    Mr. Phillips, do you recall what you were wearing when you

6    got to the Tesla Fremont parking lot on May 24, 2017?

7    A    Yeah.  What I normally wear.  Tesla pants.  My work boots,

8    my Tesla shirt and my Tesla cap.

9    Q    Okay.  By Tesla pants, what are you referring to?

10   A    Well, they're part of the uniforms that are given to you

11   by Tesla and they have Tesla on the side of the pockets, so you

12   can actually see --

13   Q    The words Tesla written?

14   A    Yes, white embroider, I guess you would use the word.

15   Q    And when you testified that you were wearing the Tesla

16   shirt, is that a shirt that has the words Tesla written on it?

17   A    Yes.

18   Q    And when you testified that you were wearing a Tesla cap,

19   is that a cap that had the words Tesla on it?

20   A    It is has the insignia for the -- the T.

21   Q    The Tesla logo?

22   A    Yeah, Tesla logo.

23   Q    Did you drive -- excuse me.  Did you park in the Tesla

24   parking lot?

25   A    Yes.



22-60493.407

1    Q    All right.  So you can go ahead and turn back to Joint

2    Exhibit 1.  When you drove to the Tesla parking lot, do you

3    recall where you parked?

4    A    Yes, I believe so.

5    Q    Can you show us where?

6    A    I always come through the first one right there and I'll

7    park right around this area right here.  That's what's open.

8    Q    Okay.

9         MR. RODRIGUEZ-RITCHIE:  So if the record could reflect

10    that Mr. Phillips has used the laser pointer to point to the

11    leftmost entrance on Joint Exhibit 1 of the parking lot and has

12    indicated that he parked around the area in front of door

13    three.

14    Q    BY MR. RODRIGUEZ-RITCHIE:  Now Mr. Phillips, door three,

15    is that known by any other name?

16    A    Yeah.  There was a couple different names.  Before they

17    had -- at that time they had a -- I call it the Iron Man door.

18    So there was an Iron Man figure from the movies.  And that's

19    actually on the side of it when you first walk in.  And back in

20    the day at that same time you're talking, we used to call it

21    door four.

22    Q    Why did you all refer to it as door four?

23    A    We ended up -- again, we were counting doors one, two --

24    this north admin entrance right here, we're using that for door

25    three and then we were calling that door four.



1    Q    Even though it's marked on Joint Exhibit as door three, it

2    was also referred to as door four.

3    A    As door four.

4    Q    Okay.

5    A    Yeah.

6    Q    Thank you.  Now, after you parked, did you stay in your

7    car?

8    A    No.

9    Q    What did you do?

10   A    I grabbed the fliers and I promptly went to door three.

11        MR. ROSS:  Your Honor, just a point of clarification.  A

12   little confusion here, because door three's also called door

13   four.  So for the purpose of the testimony, can we know which

14   door three he's referring to?  The door three, which is also

15   known as door four or the general admin, the admin entrance,

16   which he says is also called door three?  It's a little

17   confusing.

18        JUDGE TRACY:  All right.  So can the parties stipulate

19   that the -- that in terms of his testimony right now, that he

20   is referring to door three as depicted in Joint Exhibit 1?

21        MR. RODRIGUEZ-RITCHIE:  Yes.

22        MR. ROSS:  That's fine.  That's okay.

23        JUDGE TRACY:  That's fine?  Okay.  For the Charging

24   Parties?

25        MS. FEINBERG:  That's fine.



www.escribers.net | 800-257-0885

1        JUDGE TRACY:  Okay.  So I guess my instructions to you are

2   just use the labeling that you see in Joint Exhibit 1 to

3   describe --

4        THE WITNESS:  Perfect.  Yeah.

5        JUDGE TRACY:  -- where you were.  Okay?

6        THE WITNESS:  Uh-huh.

7        JUDGE TRACY:  Thank you.

8   Q    BY MR. RODRIGUEZ-RITCHIE:  Now, on May 24th, 2017, what

9   did you do after you got out of your car?

10  A    I grabbed the flyers and I went to access door three.

11  Q    Okay.  Did you get to door three?

12  A    Yes, I did.

13  Q    And when you got to door three, did you go inside of door

14  three?

15  A    Yes.  I used my employee badge and I entered.

16  Q    By use your employee badge, do you mean you took your

17  badge and scanned it on the sensor outside of door three?

18  A    Correct.

19  Q    Okay.  And after you scanned it, at the sensor of door

20  three, did you actually go through the entrance?

21  A    Yes.

22  Q    Okay.  And when you went through the entrance of door

23  three into the building, what, if anything, happened?

24  A    I went directly up to the podium where the female security

25  guard was and I was able to look down at the laptop and I



1    pointed to my picture.  And I said that's me.

2    Q    Okay.  I want to take you a step back.  Since you're

3    referring to a female security guard.  Do you know this

4    person's name?

5    A    No.

6    Q    This female security guard, could you describe her?

7    A    Shorter, about 5'5" or so.  She was sitting down.

8    Brunette.  Fairly young, 25 to 35 years old.

9    Q    Do you recall what she was wearing?

10   A    Her security outfit.

11   Q    Can you describe that for us?

12   A    Well, what I could see -- she was sitting down -- was her

13   shirt.

14   Q    And what did her shirt look like?

15   A    It was black and it's got red that comes down the sides on

16   it.

17   Q    Did it have any words on it?

18   A    I believe it was inverted, with security over here on this

19   corner.

20   Q    Okay.  So can --

21   A    But I wasn't looking that closely at that.

22   Q    Okay.

23        MR. RODRIGUEZ-RITCHIE:  If the record could reflect that

24   Mr. Branton indicated that the words security were in the left

25   chest area of the female security guard's clothing.



www.escribers.net | 800-257-0885

1   Q   BY MR. RODRIGUEZ-RITCHIE:  Now, you mentioned that you --

2   when you approached her, you saw her computer?

3   A   Uh-huh.

4   Q   And --

5   JUDGE TRACY:  Can you say yes or no?

6   THE WITNESS:  Yes.

7   JUDGE TRACY:  Thank you.

8   Q   BY MR. RODRIGUEZ-RITCHIE:  Did you see anything on her

9   computer?

10  A   Yes.

11  Q   What did you see?

12  A   I saw a number of pictures, badge IDs of myself as well as

13  others that had entered in the last ten seconds, 15 seconds.

14  Q   Now, when you were by the security podium, did you and the

15  female security guard speak?

16  A   Say again, please.

17  Q   Did you and the female security guard speak when you were

18  by the podium?

19  A   Yes.  I spoke to her first.

20  Q   Okay.  And what did you say?

21  A   I had pointed to my picture and I said that's me.  And

22  I'll be handing out fliers.  Or I will be -- something like I

23  will be flyering.

24  Q   Okay.  Did the female security guard say anything back to

25  you?



1    A    Yes.

2    Q    What did she say?

3    A    No, you can't do that.

4    Q    Did you respond to her?

5    A    Yes.

6    Q    What did you say?

7    A    I said something like you better be very careful, miss,

8    the next things you say, because you could have a lawsuit on

9    your hands.

10    Q    Did the female security guard respond to you?

11    A    Not at that point.  Not after I said that.

12    Q    And after you mentioned that she could have a lawsuit on

13    her hands, did you stay at the security podium?

14    A    No.  I promptly turned around and went straight outside to

15    begin flyering.

16    Q    Okay.  Did you actually flier outside of door three?

17    A    Yes.

18    Q    Now, when you were outside of door three, after you began

19    flyering, did you have any encounters with any security guards?

20    A    Yes.

21    Q    At about how long after you went out of door three and

22    began flyering did you have an encounter with a security guard

23    outside?

24    A    Not long.  Less than ten minutes.

25    Q    And was this with a different security guard than the



1    female security guard?

2    A    Yes.

3    Q    Okay.  Could you describe the security guard you had an

4    encounter with outside door three?

5    A    Twenty to 25 year-old short haired brunette, Caucasian or

6    Hispanic.  Beyond that --

7         MR. ROSS:  Your Honor, I'm sorry.  I couldn't hear the

8    last part of his testimony.

9         JUDGE TRACY:  Do you mind if you just repeat your

10   description of the second security guard that you just --

11        THE WITNESS:  Yeah.

12        JUDGE TRACY:  -- that you're describing?

13        THE WITNESS:  Yeah.  He was Caucasian or Hispanic.

14        JUDGE TRACY:  And you said he?

15        THE WITNESS:  He.

16        JUDGE TRACY:  Okay.  Thank you.

17        THE WITNESS:  Was a male, yeah.  He had brown hair,

18   brunette, 20 to 22, young.  And I don't remember if he had any

19   kind of facial hair or not.  It was also dark at that time.

20   Q    BY MR. RODRIGUEZ-RITCHIE:  Okay.  Now, was he wearing

21   anything?

22   A    Yeah.  Yes.

23   Q    Could you describe what he was wearing?

24   A    It was an overcoat.  It was dark -- a dark overcoat, like

25   a derby style.  It was zipped up.  And it was dark.



www.escribers.net | 800-257-0885

1    Q    Did -- anywhere on his clothing, did the word security

2    appear?

3    A    Not on -- not with what he was wearing, no.

4    Q    Okay.  Was he holding anything?

5    A    Yes, he was.

6    Q    What?

7    A    I noticed he was holding a radio in his left hand.

8    Q    Now, do only security guards hold radios?

9         MR. ROSS:  I couldn't hear the question.

10   Q    BY MR. RODRIGUEZ-RITCHIE:  Do only security guards hold

11   radios?

12   A    At the factory, no.

13   Q    Who else holds radios?

14   A    Many leads or people on the line will communicate through

15   walkie-talkies, radios.

16   Q    The individuals that hold radios that you're referring to,

17   do they all hold them outside of the Tesla Fremont --

18   A    No.

19   Q    -- facility?

20   A    No.

21   Q    Do only certain types of individuals hold radios outside

22   of the Tesla Fremont -- so outside of the building?

23   A    Yes.

24   Q    What types of people?

25   A    Just security.



www.escribers.net | 800-257-0885

1    Q    Okay.  Now, did you and this male security guard actually

2    speak?

3    A    He spoke first, yes.

4    Q    And what did this male white or Latino security guard say?

5    A    It was something like, so you're the one with the fliers.

6    Q    Now at this point, is he the only security guard outside?

7    A    Correct.

8    Q    Okay.  Did you respond to his question?

9    A    Yes.

10   Q    What did you say?

11   A    I said yes, I am.

12   Q    Now, when you said yes, I am, did the security guard say

13   anything back to you?

14   A    Yes.

15   Q    What did he say?

16   A    He said something like, "I'm going to do you a favor.

17   Leave right now and you won't be fired."  Or, "I'm going to do

18   you a favor not be fired.  Leave right now."

19        MR. ROSS:  I couldn't hear the testimony.  Repeat it,

20   please.

21        JUDGE TRACY:  Could you just repeat what he said to you,

22   please?

23        THE WITNESS:  Yeah.  He said something like, "I'm going to

24   give you a break.  You can leave right now.  You'll be fired or

25   I'm going to save your job.  Leave right now and you won't be

22-60493.416



1   fired."

2   Q   BY MR. RODRIGUEZ-RITCHIE:  We're just going to ask Mr.

3   Phillips if you can just speak up a little bit more when you

4   give your answers, we'd appreciate that.

5   A   Uh-huh.

6   Q   Thank you.  Now, after he said that to you, did you

7   respond to him?

8   A   Yes, I did.

9   Q   And what did you say?

10  A   I told him something like, "No, no, I'm allowed to do

11  this.  The NLRB allows me to flier here."

12  Q   Okay.  Did the young white or Hispanic male security guard

13  outside respond to you?

14  A   I believe at that point he said, "Give me your badge."

15  Q   Did you give him your badge?

16  A   I did give him my badge.

17  Q   Do you recall whether or not he did anything with your

18  badge?

19  A   The badge that I had at that time, when he looked at it or

20  I look at it, it's blurred, because it's -- well, it's three

21  years old, so it doesn't actually show my face very well on

22  there.

23  Q   Okay.  So when you gave him the badge, did he do anything

24  with your badge?

25  A   He looked at it and he said, "I can't read this."



www.escribers.net | 800-257-0885

1    Q    Okay.  After he said I can't read this, what, if anything,

2    occurred next?

3    A    About this time, I believe a second security guard came

4    into my vision.

5    Q    Okay.  So this second security guard outside of door

6    three --

7    A    Yes.

8    Q    -- is this a totally different security guard or is this

9    the same person from inside of door three?

10   A    Totally different.

11   Q    Okay.  Can you describe this second security guard outside

12   of door three?

13   A    Okay.  Very short, 5'2", 5'3", stocky, almost fat, pudgy,

14   blond hair, slight curls to it.  Yeah.  And Caucasian, I would

15   guess.  Early 20s.

16   Q    Okay, now did you have any interactions with this

17   Caucasian, blond security guard outside of door three?

18   A    No.

19   Q    Okay.  What, if anything, happened after the second

20   security guard appeared outside of door three?

21   A    The first security guard stated again, "You need to leave

22   now."  And at that time, I got worried and I grabbed my cell

23   phone with my right hand.

24   Q    Okay.  Did you do anything with your phone?

25   A    Yeah.  I went ahead with one hand and I called the UAW



www.escribers.net | 800-257-0885

1    office number.

2    Q    Did you speak with anyone on your phone on May 24th when

3    you were outside of door three?

4    A    Yes, I did.

5    Q    Who?

6    A    It -- a female named Amanda.

7    Q    And did this conversation happen over the speakerphone of

8    the cell phone?

9    A    I had -- when I -- after I called, I hit the speaker, so I

10    didn't have to put it to my ear.  And I still had it in my

11    hand.  And that's the way I communicated to her.

12    Q    Okay.  And at the point of your call to Amanda, this was

13    in front of the two security guards outside of door three?

14    A    Correct.  Yes.

15    Q    Okay.  So did anything happen after you made the call to

16    Amanda?

17    A    I communicated to her that they're asking me to leave the

18    property.

19    Q    Okay.  Did she respond to you?

20    A    Yes, she did.

21    Q    What, if anything -- what did she say to you?

22    A    She told me, "Did you tell them that you had the legal

23    right to be there?"

24    Q    Okay.  Did you say anything back to her?

25    A    I said, "Yes, I did and they're still telling me I have to



1    leave."

2    Q    And this is being said over the speaker phone in front of

3    the security -- two security guards outside of door three?

4    A    Correct.

5    Q    Okay.  After you told her that yes, you had told them

6    that, did the conversation with Amanda continue over the

7    speakerphone?

8    A    Yes, it did.  She then said, "Don't be combative.  And if

9    you have to leave, then go up at a stop sign."  And she said

10   ask for their IDs and their badge numbers.

11   Q    Okay.  Now, at any point while you were outside of door

12   three, did you have any interactions with any other security

13   guards besides the two you've already described?

14   A    Finally a third security guard showed up.  It was 10:00,

15   12:00, 2:00 position to me, but I didn't get a full thing of

16   who he was.  I was concerned about the other two in front of

17   me, but he was security also.

18   Q    Okay.  So let's break it down.

19   A    Yeah.

20   Q    Okay, Mr. Phillips.  So you mentioned the 10, 12 and 2, so

21   I -- or 10:00, which security guard was at your 10:00?

22   A    The first one that I interacted with.

23   Q    Okay, so that's the first one you interacted with inside

24   or the first one outside?

25   A    Outside.



1    Q    So this is the white or Hispanic security guard?

2    A    Yes.

3    Q    Okay.  So who was at your 12:00?

4    A    The shorter, stocky security guard.

5    Q    The blond one?

6    A    Yes.

7    Q    Okay.  So then at your 2:00, as you've just described,

8    this is a new security guard that comes out or is it one -- the

9    one from inside?

10   A    No.  It was a new guard that came out.

11   Q    Okay.  So this new guard that came out, do you know the

12   person's name?

13   A    No.

14   Q    Do you recall what the person was wearing?

15   A    No.  Other than he was wearing security -- a -- he was

16   just -- in my eyes, he was security.  I didn't look him up and

17   down as much as the other two.

18   Q    Okay.  And earlier, you testified, I believe, that the --

19   at this point, he's at your 10:00.  So the 10:00 security

20   guard -- so this is a young white or Latino security guard,

21   that he was carrying a radio?

22   A    Yes.

23   Q    Were the -- either of the other two?  So the 12:00 and

24   2:00 guards.  Were either of those carrying radios?

25   A    I don't recall.



www.escribers.net | 800-257-0885

1    Q    Okay.  Do you remember whether or not you heard anything,

2    any sound coming out of the radios?  Of the radio.  Excuse me.

3    A    Security at 10:00, the radio started crackling.  And while

4    I was on the phone with Amanda, he picked it up and I heard him

5    say something like, "He refuses to give me his badge."

6    Q    Was that true?

7    A    No.

8    Q    Okay.  Did you say anything after you heard over the radio

9    he's refusing to give him my (sic) badge?

10    A    I blurted out, "That's not true," something like, "That's

11    not true.  I gave you my badge."

12    Q    Okay.  And at any point during your interaction with these

13    three security guards -- so the 10:00, 12:00 --

14    A    Uh-huh.

15    Q    -- and 2:00, did you --

16    A    2:00.

17    Q    -- see any other security guards?

18    A    There was -- well, in a -- it seemed like a long time, but

19    in a short amount of time, a security -- a Tesla car pulled up

20    25, 30 feet off, still in the aisle and it's a white security

21    car.

22    Q    Okay.  When you say white security car, can you describe

23    what the car looked like?

24    A    At Tesla, they have Model Xs and Model Ss that are white

25    and they have the words in red, security along the door area on



1    both sides of the door.  And they patrol the parking lot

2    sometimes.

3    Q    And this car that you saw on May 24th, it had the word

4    security on it?

5    A    Yes.

6    Q    Okay.  Now, I want to ask you about the 10:00, 12:00 and

7    2:00.  Mr. Phillips, have you ever been a security guard at any

8    point during your life?

9    A    Yes.

10    MR. ROSS:  I couldn't hear the question.  I'm sorry.

11    JUDGE TRACY:  Could you repeat --

12    MR. RODRIGUEZ-RITCHIE:  I'll ask it.  Sure.

13    JUDGE TRACY:  -- again?  Thank you.

14    Q    BY MR. RODRIGUEZ-RITCHIE:  I want to talk about the 10:00,

15    12:00 and 2:00.  And Mr. Phillips, at any point during your

16    life, have you been a security guard?

17    MR. ROSS:  Thank you.

18    THE WITNESS:  Yes, I have, been a licensed security guard.

19    Q    BY MR. RODRIGUEZ-RITCHIE:  For how long?

20    A    About 14 years.

21    Q    Okay.  So in your experience during your time as a

22    licensed security guard, is there any reason why a security

23    guard would -- or security guards would take a 10:00, 12:00 and

24    2:00 formation?

25    MR. ROSS:  Objection.  Objection.  Calls for total



1    speculation and in addition to which it is in the form of a

2    hypothetical question and a terribly incomplete hypothetical

3    question.

4        JUDGE TRACY:  Okay.  So sustained.

5    Q   BY MR. RODRIGUEZ-RITCHIE:  Did you receive any training

6    when you became a security guard?

7    A   Yes, I did.

8        MR. ROSS:  Objection.  Relevance.

9        JUDGE TRACY:  What is the relevance?

10       MR. RODRIGUEZ-RITCHIE:  It's relevant to the

11   reasonableness and to the -- to explain the actions of the

12   security guards as it would be interpreted by a reasonable

13   employee in his shoes.

14       JUDGE TRACY:  I would sustain the objection.

15       MR. RODRIGUEZ-RITCHIE:  Okay.  We can move on.

16   Q   BY MR. RODRIGUEZ-RITCHIE:  When the security vehicle came,

17   did anyone come out of the security vehicle?

18   A   Yes.

19   Q   How many people?

20   A   One.

21   Q   Okay.  And did you have any interactions with the person

22   that came out of the security vehicle?

23   A   He opened the door and he stood up and he spoke to the

24   security guards that were in front of me at the 10:00, 12:00

25   and 2:00 combative positioning.



```
 1   Q    Okay.  So let's take a step back.  So the person that

 2   comes out of the security vehicle, can you describe that

 3   person?

 4   A    He was security, but I recognized that he was a security

 5   lead --

 6   Q    And --

 7   A    -- by the shirt he was wearing.

 8   Q    -- what color shirt was he wearing?

 9   A    They wear a red or almost a reddish orange shirt and you

10   can tell that they're actually leads.

11   Q    Okay.  Did he have the word security -- do you recall

12   whether or not he had the word security on his clothing

13   anywhere?

14   A    That I cannot recall.

15   Q    Okay.  And you said that he spoke with the security

16   guards.  Was that in your presence?

17   A    Yes.

18   Q    Were you able to hear that?

19   A    Please say again.

20   Q    Were you able to hear what he said to those security

21   guards?

22   A    Yes, I was.

23   Q    And what did he say?

24   A    He said, "Is he flyering?"

25   Q    Okay.  Did any of the security guards respond?
```



www.escribers.net | 800-257-0885

1    A    The 10:00 one said, "Yeah, he's got fliers," or something

2    like, "Yeah, he does."

3    Q    Okay.  After the 10:00 security guard said that, did

4    anyone else speak?

5    A    No.

6    Q    Okay.  What, if anything, happened next?

7    A    The lead security guard told the other security guards,

8    "Leave him alone.  He's allowed to do that."

9    Q    Okay.  And after he said, "He's allowed to do that," did

10    your interaction with the guards continue?

11    A    They turned on their heels and were gone within two

12    seconds.

13    Q    That -- so the ones that were gone were the 10:00, 12:00

14    and 2:00?

15    A    Yes.  Yep.

16    Q    And did the guard in the security vehicle stay?

17    A    Yes, he did.

18    Q    For how long?

19    A    At -- I first started flyering, but he was there for a

20    good ten minutes, at least.

21    Q    So while the vehicle security guard, while he was there,

22    were you handing out flyers to employees?

23    A    Yes, I started --

24    Q    And that's the --

25    A    -- flyering again.



www.escribers.net | 800-257-0885

1    Q    -- that's the flier in General Counsel's Exhibit 9?

2    A    Yes.

3    Q    Now, to take you back for a moment to when the 10 -- when

4    you were in the presence of the 10:00 guard, 12:00 and 2:00

5    guards --

6    A    Yes.

7    Q    -- can you describe how far away you were from them?

8    A    Almost exactly two full steps from each of them.

9    Q    Okay.  Why did you stop flyering?

10   A    I -- at which point?

11   Q    On May 24th, 2017.

12   A    When did I stop flyering?

13   Q    Yeah.

14   A    Oh.  About 5:45, 5:00 -- right around then, because I had

15   to go in to work.

16   Q    Okay.  Now, while you were outside of door three flyering,

17   were you using any sound making devices?

18   A    No.

19   Q    Were you using any sound amplifying devices?

20   A    No.

21   Q    Did you threaten any employees while you were outside of

22   door three?

23   A    No.

24   Q    Did you make any physical gestures towards any employees

25   while you were outside of door three?



www.escribers.net | 800-257-0885

1    A    No.

2    Q    Okay.

3         MR. RODRIGUEZ-RITCHIE:  Nothing further.

4         JUDGE TRACY:  Ms. Feinberg?

5         MS. FEINBERG:  No.  Thank you very much.

6         JUDGE TRACY:  Okay.  Mr. Ross?

7         MR. ROSS:  May I see this gentleman's affidavit, please,

8    if there is one?

9         MR. RODRIGUEZ-RITCHIE:  Counsel for the General Counsel is

10   handing counsel for Respondent Tesla two copies of two

11   affidavits.

12        JUDGE TRACY:  All right.  Let's go off the record.

13   (Off the record at 11:42 a.m.)

14        JUDGE TRACY:  Okay.  Go ahead, please.

15        MR. ROSS:  Thank you.

16                       **CROSS-EXAMINATION**

17   Q    BY MR. ROSS:  I would say good morning, Mr. Phillips, but

18   it's afternoon, so good afternoon.  How are you?

19   A    I'm good.

20   Q    Good.  Good.  Sir, my name is Mark Ross.  I am the

21   attorney representing Tesla in this matter and I want to ask

22   you some questions about your testimony.  Have you ever

23   testified before, by the way?

24   A    No.

25   Q    Oh, okay.  Well, lawyers ask questions and witnesses --



www.escribers.net | 800-257-0885

1    you're the witness -- will be asked to answer the question, but

2    if for some reason, you don't understand my question, please

3    let me know and I'll be happy to rephrase the question, okay?

4    A    I will.

5    Q    Fair enough.  Thank you.  Now, in -- on May 24, 2017, you

6    testified that you were working in -- as a material handler.

7    And you explained what you did.  Could you tell me who your

8    immediate supervisor was at that time?

9        MR. RODRIGUEZ-RITCHIE:  Objection.  Misstates testimony.

10    He testified what his current job was, not what his job was --

11        MR. ROSS:  Oh, I stand corrected.

12        MR. RODRIGUEZ-RITCHIE:  -- on May 24 --

13        MR. ROSS:  Apologize.

14    Q    BY MR. ROSS:  As of May 24th, 2017, what was your job?

15    A    Material handler.

16    Q    Okay.  Okay.  And could you tell me who your supervisor

17    was at that time?  If you remember.

18    A    I believe my supervisor was Lehi Gomez.

19    Q    Okay.  Okay.  And as a material handler, you would -- I

20    think you said you would get parts together and put them on

21    carts.  Is that right?

22    A    Correct.

23    Q    And those carts would then be moved where?

24    A    The carts would go to the line, which part of the line,

25    that would mirror that same part that needed to be put on the



www.escribers.net | 800-257-0885

1    car in that one area.

2    Q    Okay.  That would be the general assembly, the line on the

3    general assembly, right?

4    A    Correct.

5    Q    Were you a general assembly employee?

6    A    I was -- I am a production employee.  I do not belong to

7    the general assembly line.

8    Q    Okay.  Okay.  Can you tell me whether -- what department

9    or segment of the operation you were assigned to?

10   A    At that time?

11   Q    Yeah.

12   A    I was in sequencing.  To explain sequencing, this is for

13   the subassembly of a car, the steering shafts, the steering

14   gears, the calipers, the rotors and the hubs.  At that time, I

15   would gather them and have them available for the other

16   material handler to put the right sequence or the right caliper

17   for that sequence car.

18   Q    Okay.  And they would be loaded onto a cart?

19   A    Yes.

20   Q    Okay.  And then the cart would somehow go from where you

21   put the stuff on the cart to the general assembly area?

22   A    That is correct.

23   Q    Okay.  And were those carts moved manually?  Did people

24   push the carts there or were they moved mechanically?

25   A    No.  A machine called -- what we call a tugger, which is



1    just an electric vehicle that you stand up and drive like a

2    motorcycle in a sense.  And you would throttle it with your

3    carts behind to the appropriate spot on the line.  And there it

4    would be taken and switched out with the empty cart.  And you

5    bring back the empties.  And I would do it all over again.

6    Q    Okay.  And you operated the tugger?

7    A    No.

8        MR. RODRIGUEZ-RITCHIE:  I'm going to object as to

9    relevance and exceeds the scope of direct examination.

10       JUDGE TRACY:  Well, what's the relevance?

11       MR. ROSS:  Well, the relevance is I'm trying to understand

12   the job he did.  And this goes to some other issues in this

13   case beyond the scope of his direct examination.  But it is

14   related to other issues in this case.  And I'm about done, for

15   what it's worth.

16       JUDGE TRACY:  All right.  Just keep it brief.

17       MR. ROSS:  Yeah.

18   Q    BY MR. ROSS:  So you operated the tugger, did you enter

19   the general assembly area, operating your tugger?

20   A    No.

21   Q    You would not?

22   A    I would not.  I would be on a -- either a forklift or a

23   reach lift which is a stand-up-operated vehicle, and the

24   material handler that I would bring the parts to would gather

25   them, and he would operate the tugger and bring it to line



1     side.

2     Q    I see, okay.  I see, okay.  That's fair.  Now, so your job

3     was not a general assembly position?

4     A    My job's --

5     Q    It was related to general assembly, but not an actual

6     general assembly position?

7     A    Correct.

8     Q    Okay.  Now, this incident you described in your testimony

9     on May 24th; have you been shown photographs of individuals in

10    an attempt to determine whether -- or determine the identity of

11    people who you spoke to that day?

12         MR. RODRIGUEZ-RITCHIE:   Objection.  The Respondent has

13    not been fully responsive to the General Counsel's document

14    request in the General Counsel's subpoena with regards to this

15    specific request.  We've had discussions about this yesterday.

16    Since the Respondent hasn't been fully responsive, we believe

17    it's not appropriate to question a witness about documents that

18    may or may not have been produced yet to the General Counsel.

19         JUDGE TRACY:  So I'll sustain the objection.

20         MR. ROSS:  Your Honor, we have provided General Counsel

21    with the General Counsel photos of all of the guards who were

22    working at that facility that day.  The question is whether the

23    witnesses didn't testify as to their identity.  I'm just trying

24    to -- he's -- he's offered a physical description of them, and

25    I'm just wanting to find out whether it was for the opportunity



www.escribers.net | 800-257-0885

1 to look at these photographs to identify the individuals he

2 says talked with him that day.

3   JUDGE TRACY:  I understand.  However, I'm going to sustain

4 the objection.

5 Q BY MR. ROSS:  All right.  Now, you testified to

6 handbilling on May 24?

7 A Flyering.

8 Q And that wasn't the first time you'd handbilled, was it,

9 sir?

10 A State that again?

11 Q Yeah.  You handbilled on May 24, right?

12 A You mean, flyering?

13 Q Flyering, yes.

14 A Okay.

15 Q Flyering, okay.  Sorry.

16 A Yes.

17 Q Okay.  And that wasn't the first time you'd flyered

18 before, correct?

19 A Correct.

20 Q Okay.

21 A That was my second time.

22 Q Second time.  And indeed, even after that incident -- or

23 that time on 5/24, there were subsequent times when you flyered

24 as well?

25 A Correct.



1   Q   Okay.

2   A   Yeah.

3   Q   Now, have you replaced the -- the badge that you had on

4   May 24?

5   A   Yes.

6   Q   Okay.  When did you replace it?

7   A   I would be guesstimating.

8   Q   Give me your best estimate, sir.

9   A   I think Nov -- mid-November.

10   Q   Of 2017?

11   A   Yes.

12   Q   Okay.  And why did you replace it?

13   A   I was out on disability.  I had a back operation, and so

14   on leave that long.  Before I could go in, they gave me a new

15   badge.

16   Q   I see.  Did you retain the old badge?

17   A   No.

18   Q   What'd you do with the old badge?

19       MR. RODRIGUEZ-RITCHIE:   Objection.  Relevance.  Whether

20   he's done anything with the badge has no relevance here, in

21   addition to the fact that it appears to be some effort --

22       MR. ROSS:  I couldn't --

23       MR. RODRIGUEZ-RITCHIE:   -- at discovery.

24       MR. ROSS:  -- disagree more, Your Honor.  It's highly

25   relevant.  He's describing an incidence where there may have



www.escribers.net | 800-257-0885

1   been some question in the minds of the security people, whether

2   in fact he was, in fact, an employee.  He displayed a badge

3   that, his testimony is, was it showed a faded image of the

4   individual, and the guard said that he couldn't see the face.

5   He couldn't read it.

6       JUDGE TRACY:  All right.  But so --

7       MS. FEINBERG:  I think it was --

8       JUDGE TRACY:  But the --

9       MS. FEINBERG:  Sorry.

10      JUDGE TRACY:  I have it, but I'm still going to sustain

11  the objection, because then the next question is:  What did you

12  do with it?  I mean, that has nothing to do with the May 24th

13  event.

14  Q   BY MR. ROSS:  Okay. All right.  But you would agree with

15  me that your image, the face, the picture of you on the badge

16  was severely faded; is that right?

17  A   It still operated the fob.

18  Q   Okay.  I understand that.

19  A   But to answer your question; yeah.  It was severely --

20  Q   Okay.

21  A   -- faded.

22  Q   All right.

23      JUDGE TRACY:  And the -- the acronym you just used, what

24  was that?  You said "fob".

25      THE WITNESS:  Just a -- it's just a -- a term, basically,


www.escribers.net | 800-257-0885

1    I'll say that where you've got something that will -- that will

2    badge into something.  It's not really a fob.  A fob for Tesla

3    would be like, a handheld device, electronic.  It's the same

4    kind of a thing; if you put it up to something, it's going to

5    go ahead and scan correctly.  So my badge does scan and I did

6    scan it with the lady and she saw my picture, and I'm sure when

7    she called the security to come look at me outside, they knew.

8        JUDGE TRACY:  I just was wondering what -- what you meant

9    by "fob", but --

10       THE WITNESS:  Probably a misuse of words.

11       JUDGE TRACY:  Okay.

12       THE WITNESS:  Just a -- yeah.

13       JUDGE TRACY:  Thank you.

14   Q    BY MR. ROSS:  Okay.  The female guard at the podium; did

15   you hear her call somebody?

16   A    No.

17   Q    Did you see her pick up the phone as you left?

18   A    No.

19   Q    Okay.  Do you know whether or not she reported you --

20   A    I --

21   Q    -- to anyone?

22   A    -- could not say for sure.

23   Q    Okay.  And by the way, the -- the individual who got out

24   of the white Tesla car, I don't think you -- I don't think that

25   you described that person.  Can you give us a description of



1    that person?

2    A    Tall -- well, slender, a little bit taller than me, more

3    clean cut.  He was blonde -- blonde-haired and wearing the red

4    shirt and --

5    Q    Okay.  And is it true --

6    A    -- Caucasian.

7    Q    Okay.  And is it also true that after he told everybody

8    that they should leave you alone and that you had a right to be

9    there, words to that effect, he said, I'm very sorry, and he

10   apologized?

11   A    He -- he did a number of times.

12        MR. ROSS:  Okay.  Excuse me a moment, Your Honor.

13   (Counsel confer)

14        MR. ROSS:  That's all I have.

15        MR. RODRIGUEZ-RITCHIE:   Yeah.

16        JUDGE TRACY:  Okay.

17        MR. RODRIGUEZ-RITCHIE:   I agree.  Nothing further.

18        JUDGE TRACY:  Nothing further, okay.  I forget if you had

19   a need?

20        MS. FEINBERG:  No.

21        JUDGE TRACY:  No.

22        MS. FEINBERG:  Thank you, though.

23        JUDGE TRACY:  All right.  Well, Thank you very much.

24   Please don't discuss your testimony until after the close of

25   the hearing, okay?



1          THE WITNESS:  (No verbal response).

2          JUDGE TRACY:  All right.  Thank you.  Let's go off the

3     record.

4     (Off the record at 12:42 p.m.)

5          JUDGE TRACY:  Okay.  All right.  If you could go ahead and

6     raise your right hand please?

7     Whereupon,

8                              **RICHARD ORTIZ**

9     having been duly sworn, was called as a witness herein and was

10    examined and testified as follows:

11         JUDGE TRACY:  Okay.  Go ahead, have a seat.

12         THE WITNESS:  Thank you.

13         JUDGE TRACY:  And state your name for the record.

14         THE WITNESS:  Richard Ortiz.

15         JUDGE TRACY:  General Counsel, go ahead, please.

16                           **DIRECT EXAMINATION**

17    Q    BY MR. RODRIGUEZ-RITCHIE:   Good afternoon, Mr. Ortiz.

18    A    Good afternoon.

19    Q    Are you familiar with a company called Tesla?

20    A    I am.

21    Q    What is Tesla?

22    A    It's a auto manufacturer.

23    Q    Do you know where Tesla's located?

24    A    I do.

25    Q    Where?



1   A     Fremont.

2   Q     Do you know about how long Tesla has been located in

3   Fremont?

4   A     I believe since around 2011, somewhere in that

5   neighborhood.

6   Q     Have you ever directly worked for Tesla?

7   A     I have.

8   Q     Was that at Tesla's facility located at 45500 Fremont

9   Boulevard in Fremont, California?

10  A     It was.

11  Q     So from here on out, I'm going to refer to that facility

12  as the Tesla Fremont facility or Tesla Fremont.

13  A     Okay.

14  Q     Okay?  From what dates, approximately, did you work

15  directly for Tesla in Fremont?

16  A     From October, around 5th, of 2017, to October 18, 2018.

17  Q     Are you sure?  I believe we're in June of 2018?

18  A     Yes.  You're right.  I'm sorry.  It was October 5, 2016 to

19  October 18, 2017.

20  Q     Okay.  Now, prior to working directly for Tesla at Tesla

21  Fremont, did you work at Tesla Fremont for a different company?

22  A     I did.

23  Q     For which company?

24  A     For Volt.

25  Q     And what is Volt?



www.escribers.net | 800-257-0885

1    A    It's a temporary agency.

2    Q    When did you work for Volt at Tesla Fremont?

3    A    From December of 2015 to October of 2016.

4    Q    Besides the period of December 2015 to October 2017, at

5    any other point, have you ever worked at the facility that's

6    now operated by Tesla at Tesla Fremont?

7    A    I did.

8    Q    When?

9    A    From March of '92 to May of 2003.

10   Q    And what was the company that operated the facility at

11   that time?

12   A    New United Motor Manufacturing.

13   Q    Is that also known as NUMMI?

14   A    It is.

15   Q    To your knowledge, is there any current affiliation

16   between NUMMI and Tesla?

17   A    Not that I know of.

18   Q    Now, let's talk about your employment directly for Tesla,

19   between, I think you said October 5, 2016 to October 2017; when

20   you began working directly for Tesla in October of 2016, what

21   was your job?

22   A    I was an associate.

23   Q    And in what area did you work in?

24   A    I was in the closures area, in the BIW2 department.

25   Q    BIW --



www.escribers.net | 800-257-0885

1      MR. ROSS:  Your Honor, again, I apologize for the

2  interruption, but I'm having a difficult time hearing the

3  witness.

4      JUDGE TRACY:  If you don't mind speaking up just a little

5  bit, okay?  That would help.

6      THE WITNESS:  Yes.

7      JUDGE TRACY:  Thank you so much.

8      MR. ROSS:  Last testimony, he was an associate in

9  something.  I couldn't make it out.

10     THE WITNESS:  Closures, BIW2.

11     MR. ROSS:  Thank you.

12  Q    BY MR. RODRIGUEZ-RITCHIE:  BIW; what does that refer to?

13  A    Body in white.

14  Q    And what about 2; what does that refer to?

15  A    Line 2.

16  Q    Does 2 refer to a particular shift?

17  A    No.  Two refers to -- S line would be line 1.  Two would

18  be X line.

19  Q    I see.  Thank you.  Could you describe what your job

20  duties were as an associate in BIW2?

21  A    I would load the cells, depending on where I was at, and

22  prep parts.

23  Q    By "cells" what are you referring to?

24  A    The had -- we built parts that went onto the car, and they

25  had different cells depending on which part it was, so you had



www.escribers.net | 800-257-0885

1    a hood cell to make hoods, a door cell to make doors, a fender

2    cell to make fenders.

3    Q    Could you describe the process of how -- generally, of

4    what you did in your daily job in terms of making the part?

5    A     There would be parts, individual components to the line

6    side where we were at.  We'd get them, we'd prep them with

7    rivet nuts or whatever else would go on it, we'd load them into

8    the cell, and then someone else would be loading another part

9    of the cell.  The robot would pick it up as it went around.  It

10   would join and then, in the end, it'd come out a complete unit

11   to be installed.

12   Q    Okay.  Now, BIW2; is that part of the general assembly

13   area?

14   A    I mean, it's a body shop.

15        MR. ROSS:  Again, I --

16        JUDGE TRACY:  And I'm sorry, can I ask you:  When you're

17   saying there -- are you saying cell?

18        THE WITNESS:  Cell.  A cell.  S -- C-E-L-L -- L.

19        JUDGE TRACY:  Okay.

20        THE WITNESS:  Yeah.

21        JUDGE TRACY:  Thank you.

22        THE WITNESS:  Cell.

23        JUDGE TRACY:  Thank you.

24   Q    BY MR. RODRIGUEZ-RITCHIE:   Now, during your entire

25   employment directly for Tesla, did you always work in BIW2?



1  A    No.

2  Q    How long did you work as an associate in BIW2?

3  A    Approximately four months.

4  Q    After those four months, which would be then in the

5  beginning of 2017; is that correct?

6  A    Yes.

7  Q    So after those four months were over, what was your job at

8  Tesla?

9  A    I was assigned to traffic duty, E9 -- pillar E19.

10  Q    What was the reason for your -- if you know, for your

11  being assigned to traffic duty?

12  A    Because I had a work injury and I had restrictions.

13  Q    Could you describe what your job was when you performed

14  the traffic duty work?

15  A    I was -- best way to describe it is, it was -- they had a

16  high-run intersection and I would control traffic -- control

17  traffic there, bring it to where it was manageable.

18  Q    In terms of controlling traffic, are you referring to

19  people traffic or machinery traffic?

20  A    It was people traffic -- pedestrians, and also tugs and

21  forklifts.  It was like a New York City street and you see a

22  traffic cop?  I was a traffic cop.

23  Q    How long did you perform the traffic duties?

24  A    From somewhere in mid-February to mid-July of 2017.

25  Q    Okay.  When you stopped in about mid-July of 2017, were



1    you assigned to a different area?

2    A    I was placed back in my original BIW2.

3    Q    Were your duties in BIW2, at this time in July of 2017,

4    were they the same as before?

5    A    No.  I was -- still had restrictions but they found work

6    that I could do there within my restrictions.

7    Q    By "restrictions", what are you referring to?

8    A    For my injury.

9    Q    I see.  So what were your duties when you went back to

10    BIW2 in July of 2017?

11    A    I was loading the spoiler cell and also, on prepping

12    parts.

13    Q    After you moved in body and -- to BIW2 in July of 2017,

14    was that the last position you held while you were employed

15    directly at Tesla?

16    A    No.  Eventually, my restrictions were lifted and I was

17    placed back into regular rotation.

18    Q    In what area?

19    A    In -- within my same group, BIW2, closures department.

20    Q    Did your job duties change once your restrictions were

21    lifted?

22    A    I was placed back to full duty, so I went right back to

23    what I was doing before; rotating within the group wherever I

24    was needed.

25    Q    Are you familiar with an organization referred to as the



www.escribers.net | 800-257-0885

1     United Auto Workers?

2     A     I am.

3     Q     And who are the United Auto Workers?

4     A     They're a labor union.

5     Q     Have you ever been represented at a workplace by the

6     United Auto Workers?

7     A     I have.

8     Q     When?

9     A     When I was with United Motors Manufacturing.

10     Q     Okay.  Other than when you worked at NUMMI, have you ever

11     been represented by the United Auto Workers at a workplace?

12     A     No.

13     Q     Does the United Auto Workers represent any workers at

14     Tesla Fremont?

15     A     No.

16     Q     During your employment with Tesla, did you ever

17     participate in any activities with the United Auto Workers?

18     A     I did.

19     Q     What was the first activity that you participated in with

20     the UAW while you were employed at Tesla Fremont?

21     A     On or about August of 2016, I attended a meeting off-site

22     in a hotel with them.

23     Q     When you say "with them", who is "the them", is that --

24     A     That was --

25     Q     -- UAW organizers?


www.escribers.net | 800-257-0885

1    A    It was UAW organizers and some Tesla workers.

2    Q    From Tesla Fremont?

3    A    Yes.

4    Q    At the meeting, do you remember whether or not you signed

5    anything?

6    A    I did.

7    Q    And what did you sign?

8    A    I signed a form stating that I would be a part of the

9    Volunteer Organizing Committee.

10    Q    Could you describe for us what the Volunteer Organizing

11    Committee is?

12    A    It's -- when you sign it, you're saying you're a worker,

13    that works in the building, that is volunteering to help

14    organize the plant.

15    Q    At any point, did you actually become a member of the

16    Volunteer Organizing Committee?

17    A    Yes.  That day.

18    Q    Are you still a member of the Volunteer Organizing

19    Committee?

20    A    I am.

21    Q    Now, what types of employees is the Volunteer Organizing

22    Committee seeking to organize at Tesla Fremont?

23    A    Regular employee -- hourly.  You get paid by the hour.

24    Q    Okay.  After the meeting that you've just testified about

25    where you joined the Volunteer Organizing Committee, did you



```
 1    have any other activities with the Volunteer Organizing

 2    Committee?

 3    A    I did.

 4    Q    What was your next activity?

 5    A    Around October of 2016, I met with them at the office.

 6    Q    Which office are you referring to?

 7    A    The one on East Grimmer -- or West Grimmer in Fremont.

 8    Q    Is this --

 9    A    The campaign --

10    Q    Is this an office that's affiliated with the United Auto

11    Workers?

12    A    It's the office that they have now for the Tesla campaign.

13    Q    Okay.  And what was the purpose of your meeting at -- the

14    second meeting at the UAW office?

15    A    It was to meet other organizers that were sent from

16    Detroit to help us, and also meet, because there are VOCs that

17    have not met yet.

18    Q    Okay.  After the second meeting, which happened at the UAW

19    office, did you have any other -- excuse me; what was your next

20    activity with the Volunteer Organizing Committee?

21    A    We met again in late January 2017.

22    Q    And where was this third meeting held?

23    A    Also at the office.

24    Q    What was the purpose of the third meeting?

25    A    To discuss that we were going to flyer the plant and that
```

22-60493.447



1    Jose was going to do a op-ed.

2         MR. ROSS:  Your Honor, I'm sorry.  Tailed -- he tailed off

3    the end.  I couldn't hear the last part of testimony.  Could

4    you repeat it, sir?

5         THE WITNESS:  We met for -- the meet -- the meeting about,

6    we were going to flyer the plant and that Jose Moran was going

7    to place an op-ed somewhere.

8    Q    BY MR. RODRIGUEZ-RITCHIE:   What was your next activity

9    with the United Auto Workers after the January meeting?

10   A    That was in February -- February, when we actually flyered

11   the plant.

12   Q    Are you a member of any Facebook groups related to the

13   organizing campaign?

14   A    I am.

15   Q    How many?

16   A    One.

17   Q    What is the name of that Facebook group, if you can

18   recall?

19   A    It is Fremont Tesla Employees for UAW Representation.

20   Q    Are there any other Facebook groups that are affiliated

21   with the campaign?

22   A    There is.

23   Q    What is the other Facebook group that's affiliated with

24   the campaign?

25   A    Fair Future at Tesla.



1  Q    Okay.  So the first one that you've testified about, the

2  one that you're a member of --

3  A    Um-hum.

4  Q    -- is that one -- do you know who operates that Facebook

5  group?

6  A    Jose Moran and I.

7  Q    Are you an administrator of that Facebook group?

8  A    I am now.

9  Q    Is it a public Facebook group?

10 A    It is not.

11 Q    Is it a private Facebook group?

12 A    It is.

13 Q    And can you describe for us what you mean by "private"?

14 A    By "private", I mean that you have to be a Fremont --

15 Tesla Fremont employee to be a part of it.

16 Q    Does anyone control who joins the group?

17 A    Jose.

18 Q    Okay.  And the second group that you testified about, the

19 Fair Future at Tesla Facebook group, are you an administrator

20 of that group?

21 A    No.

22 Q    Have you ever posted in either Facebook group?

23 A    In both.

24 Q    About what?

25 A    Many different things.



www.escribers.net | 800-257-0885

1    Q    Any postings related to the campaign?

2    A    That -- yes.

3    Q    Okay.  Mr. Ortiz, I'm going to hand you what's been

4    pre-marked as General Counsel's Exhibit 10.  Take a look at it

5    and let me know when you're ready.

6    A    Okay.

7    Q    Okay.  Do you recognize General Counsel's Exhibit 10?

8    A    I do.

9    Q    What is the document?

10   A    This is a document that I -- we sent in to have my --

11   request my file.

12   Q    Now, where it says, "Name" and there's writing there, what

13   does that say?

14   A    "Richard Ortiz".

15   Q    Is that your handwriting?

16   A    It -- it is.

17   Q    And where it says "Mailing Address", is that your address?

18   A    It is.

19   Q    Is this a document -- a request that you made?

20   A    It is.

21   Q    Did you mail this document?

22   A    I did not mail it.

23   Q    Do you recall whether or not you ever received a response

24   after -- to this document, to this request?

25   A    I did.



1    Q    Do you remember when?

2    A    In November of 2018 -- '17.

3    Q    Do you know who mailed this document in General Counsel's

4    Exhibit 10?

5    A    It was mailed right by the office, by the campaign office.

6         MR. ROSS:  Again, Your Honor.  I apologize.  The witness

7    tailed off at the end.  I couldn't hear the end.

8         THE WITNESS:  It was mailed by the campaign office.

9    Q    BY MR. RODRIGUEZ-RITCHIE:   Now, did you receive any

10   documents yourself in response to General Counsel's Exhibit 10?

11   A    I did.

12   Q    To your home address?

13   A    To my home.

14   Q    Okay.  Do you remember who the response was from?

15   A    No.  I don't.  I just received my package.

16   Q    Do you recall whether or not the envelope said "Tesla"?

17   A    Yes.  It was from Tesla.

18   Q    I'm handing what's been pre-marked as General Counsel's

19   Exhibit 11.  It's a four-page document.  Take a moment to look

20   at it.  Let me know when you're ready.

21   A    Okay.  I'm ready.

22   Q    Okay.  General Counsel's Exhibit 11 is a four-page

23   document.  Did you receive this document from Tesla in November

24   of 2017?

25   A    September.



1   Q   My question is; earlier, you testified that you received

2   documents from Tesla in November of 2017 --

3   A   I've --

4   Q   -- was General Counsel's Exhibit 11 part of the documents

5   that you received from Tesla in November of 2017?

6   A   This wasn't the package I requested.

7   Q   Okay.  Now --

8      MR. ROSS:  Again.  I'm sorry.  I couldn't hear.

9      THE WITNESS:  This wasn't the package I requested.

10     MR. ROSS:  It wasn't the package?  Okay.  Thank you.

11   Q   BY MR. ROSS:  Now, prior to receiving it in November of

12   2017, had you ever received this document before?

13   A   I did.

14   Q   Okay.  Do you remember when?

15   A   September of 2016.

16   Q   The document that's in General Counsel's 11; do you know

17   what this document is?

18   A   Yes.  I do.

19   Q   What is it?

20   A   This is my job offer.

21   Q   Okay.  Did you accept your job offer?

22   A   I did.

23     MR. RODRIGUEZ-RITCHIE:  Okay.  At the time, I'd like to

24   move General Counsel's Exhibits 10 and 11 into evidence.

25     JUDGE TRACY:  Any objections?



1        MR. ROSS:  No.

2        MS. FEINBERG:  No.

3        JUDGE TRACY:  I have one concern.  I just would think that

4    it's more appropriate to redact his address and email address

5    on both of these General Counsel's Exhibits 10 and 11, since

6    it's a public record.  Any problems with that?

7        MR. RODRIGUEZ-RITCHIE:   No, Your Honor.

8        MR. ROSS:  None right now.

9        JUDGE TRACY:  For the official one, yeah.

10       MS. FEINBERG:  Yeah.  Thank you.  Okay.

11       JUDGE TRACY:  Any objections --

12       MR. ROSS:  That's fine.

13       JUDGE TRACY:  -- to that?

14       MR. ROSS:  That's fine.

15       JUDGE TRACY:  All right.  So General Counsel's --

16       MR. ROSS:  What --

17       JUDGE TRACY:  Uh-huh?

18       MR. ROSS:  Does everybody's document have some handwritten

19   numbers written in the lower right-hand corner?

20       JUDGE TRACY:  Yes.  I don't know --

21       MR. ROSS:  Okay.

22       JUDGE TRACY:  -- what that is.

23       MR. ROSS:  Okay.

24   (Counsel confer)

25       JUDGE TRACY:  All right.  So General Counsel's Exhibits 10

www.escribers.net | 800-257-0885

1    and 11 are admitted into evidence.

2    **(General Counsel Exhibit Number 10 and 11 Marked for**

3    **Identification)**

4        JUDGE TRACY:  And we'll redact, for the transcript, Mr.

5    Ortiz's address and email addresses.

6        MS. FEINBERG:  Thank you.

7    Q    BY MR. RODRIGUEZ-RITCHIE:  All right, Mr. Ortiz.  I'm

8    going to hand you what's been pre-marked as General Counsel's

9    Exhibit 12.  Take a look at it.  Let me know when you're ready.

10   A    Okay.

11   Q    Okay.  Do you recognize General Counsel's Exhibit 12?

12   A    I do.

13   Q    Now, earlier, you testified that you received a package of

14   documents from Tesla in November of 2017.  Was General

15   Counsel's Exhibit 12 part of the packet that you received?

16   A    It was.

17   Q    In November of 2017 when you received the packet from

18   Tesla, was that the first time that you saw General Counsel's

19   Exhibit 12?

20   A    It was.

21       MR. RODRIGUEZ-RITCHIE:  At the time, I'd like to move

22   General Counsel's Exhibit 12 into evidence.

23       JUDGE TRACY:  Any objections?

24       MR. ROSS:  Just one moment, Your Honor.

25       JUDGE TRACY:  Yep.  I would just like to clarify one



1  thing.  My version is cut off.  At the top of General Counsel's

2  Exhibit 12.  What's the end date?  I have 6/30/2000 --

3      MR. RODRIGUEZ-RITCHIE:    '17.

4      JUDGE TRACY:  '17?  May -- I hope that the -- well, as

5  long as the record reflects that it's June 30, 2017.  And any

6  objections?

7      MR. ROSS:  No.

8      JUDGE TRACY:  Okay.  So General Counsel's Exhibit 12 is

9  admitted into evidence.

10  **(General Counsel Exhibit Number 12 Marked for Identification)**

11  Q    BY MR. RODRIGUEZ-RITCHIE:    Now, during your employment

12  directly for Tesla, did you ever participate in the performance

13  review process?

14  A    I did.

15  Q    How many times?

16  A    I guess I started to once.

17  Q    About when was that?

18  A    It was around -- around June or July of 2017.

19  Q    Okay.  Now, do you remember how it was that you

20  participated in the performance review process?

21  A    I participated in it -- participated in the review process

22  by trying to do my self-review on the Workday program they have

23  there.

24  Q    Can you explain what Workday is?

25  A    It's -- it's an app they have to -- like, a Facebook for



www.escribers.net | 800-257-0885

1    Tesla, and they do -- make our things --

2        MR. ROSS:  I'm sorry.  I couldn't hear the last part.

3    It's like Facebook or?

4        JUDGE TRACY:  Okay.  So -- all right.

5        MR. ROSS:  Yeah.

6        JUDGE TRACY:  If you could just repeat your testimony?

7        THE WITNESS:  Yeah.

8        JUDGE TRACY:  Okay.  And maybe -- this does not amplify

9    your voice.

10       THE WITNESS:  Oh, all right.

11       JUDGE TRACY:  Maybe just kind of --

12       THE WITNESS:  I'll just talk --

13       JUDGE TRACY:  -- sitting up closer to the desk?

14       THE WITNESS:  Yeah.

15       JUDGE TRACY:  That might be helpful by speaking like, when

16   you're more straight up, okay?

17       THE WITNESS:  Okay.

18       JUDGE TRACY:  Yeah.  Just so everybody can hear you in the

19   room.

20       MR. ROSS:  Thank you.

21       JUDGE TRACY:  Thank you.

22       THE WITNESS:  It's an app that we use at Tesla for many

23   different things.  It's like a Facebook for Tesla.

24   Q    BY MR. RODRIGUEZ-RITCHIE:   Okay.  And when you say that

25   you participated in the performance review process through



www.escribers.net | 800-257-0885

1    Workday, do you recall how that happened?

2    A    I received an email stating that we should all fill out

3    our self-reviews and had a certain date to do it by, so I went

4    on and I attempted to do it.

5    Q    Through the Workday system, can you send messages to

6    people?

7    A    I believe so.

8    Q    Now, during your employment at Tesla, prior to the period

9    of September 2017, did anyone ever talk to you about how to use

10   Workday?

11   A    No.

12   Q    Did -- prior to September 2017, did anyone ever talk to

13   you about what Workday was supposed to be used for?

14   A    Yes.

15   Q    Who?

16   A    In orientation, they went over it a little bit.

17   Q    And what -- do you remember who that was?

18   A    I don't know who held orientation.

19   Q    Was it someone from human resources?

20   A    Yes.

21   Q    And what did that person say about Workday?

22   A    That it was there as a tool for us to use to keep

23   communications open.

24   Q    Okay.  Did -- during your employment prior to September of

25   -- prior to Sept 2017, did anyone ever tell you that you could



www.escribers.net | 800-257-0885

1   only use Workday for legitimate and official business purposes?

2   A    I don't recall that.

3   Q    Did you ever use Workday to sign any documents?

4   A    I signed documents electronically at work, but I don't

5   know if it was through the Workday platform.

6   Q    Okay.  Through the Workday platform, can you use that to

7   look someone up?

8   A    I believe you can.

9   Q    If you -- have you ever tried to look someone up through

10  Workday?

11  A    No.

12  Q    Now, if you can go back and take a look at General

13  Counsel's Exhibit 12?

14  A    Um-hum.

15  Q    On General Counsel's Exhibit 12, did you write any of the

16  words in GC's Exhibit 12?

17  A    Under where it says "Employee Evaluation", I did that.

18  Q    Okay.  Any of the other words, are they yours?

19  A    No.  Just those.

20  Q    Do you remember when you wrote the words?  And actually, I

21  should step back for a second.  That would be on GC's

22  Exhibit 12-001 towards the right of the page where it says

23  "Employee Evaluation", those are -- is that what you're saying

24  are your words?

25  A    Yes.



www.escribers.net | 800-257-0885

1   Q    Okay.  Do you remember when you wrote that?

2   A    On or about June of 2017.

3   Q    Do you remember, when you wrote it, what device you were

4   using to write it?

5   A    I was on my phone.

6   Q    What -- is that your personal phone?

7   A    Yes.  It was.

8   Q    Now, if you look at the bottom of GC's Exhibit 12, page 1;

9   again, it says "Employee Evaluation" at the bottom, and then if

10  you turn to page 2, it continues a couple of times, Employee

11  Evaluation, but there's no comment.  Is there a reason why you

12  didn't write anything in those sections?

13  A    Yes.  This -- this -- the comment I did write in the first

14  part; that was for all of that.  You're supposed to -- you're

15  supposed to break it up into different sections and part would

16  be 1, part would be the other, and part being the last one, but

17  I attempted to save it and get back to it later, and it just --

18  instead, it sent it off as official, that I was officially

19  done.  It is not what I tried to do.  I wasn't done with it.

20  Q    Okay.  Thank you.

21  A    Um-hum.

22  Q    Did you ever meet with anyone to discuss General Counsel's

23  Exhibit 12?

24  A    I did.

25  Q    With any supervisors, managers, or human resources



1    officials at Tesla?

2    A    With my supervisor.

3    Q    Okay.  And who was that?

4    A    Arnold Camat.

5    Q    And when did that occur?

6    A    Around June of 2017.

7    Q    Was that at the Tesla Fremont facility?

8    A    It was.

9    Q    And was that just the two of you?

10    A    It was.

11    Q    And who spoke first during that meeting?

12    A    I did.

13    Q    And have -- were you meeting with him for the purpose of

14    discussing this document in General Counsel's Exhibit 12?

15    A    I was.

16    Q    And what did you say to him about it?

17    A    I said, Arnold, I tried to do the self-review and it took

18    -- I -- went and sent without me.  It just -- it filed, and I'm

19    not sure how to pull it back or to -- how -- how to actually

20    work that platform.  If you could help me out, I'd appreciate

21    it.

22    Q    And did Mr. Camat respond to you?

23    A    He did.  He said that he would get back to me.

24    Q    Did he ever get back to you about it?

25    A    No.



1     JUDGE TRACY:  What's his last name again?

2     THE WITNESS:  Camat, C-A-M-A-T, I believe.

3     JUDGE TRACY:  Thank you.

4     THE WITNESS:  You're welcome.

5     Q    BY MR. RODRIGUEZ-RITCHIE:   I'm handing what's been

6     pre-marked as General Counsel's Exhibit 13, a two-page

7     document.  Let me know when you're ready.

8     A    I'm ready.

9     Q    Okay.  Mr. Ortiz, do you recognize General Counsel's

10    Exhibit 13?

11    A    I do.

12    Q    And what do you recognize it to be?

13    A    I recognize it to be a -- another part of my review there

14    I received in November of 2017 with my package -- well, the

15    other paper you gave me.

16    Q    Okay.  Prior to November 2017, had you ever received

17    General Counsel's Exhibit 13?

18    A    I did not.

19    Q    Did you meet with anyone, any supervisors, managers, or

20    human resources individuals at Tesla to discuss General

21    Counsel's Exhibit 13?

22    A    I did not.

23    MR. RODRIGUEZ-RITCHIE:   Okay.  At this time, I'd like to

24    move General Counsel's Exhibit 13 into evidence.

25    JUDGE TRACY:  Any objections?



www.escribers.net | 800-257-0885

1    MR. ROSS:  I have a -- a relevance objection.  I'm -- as

2    to this, as well as the earlier exhibit, I know I didn't --

3    didn't object to the earlier exhibit, but it is our contention

4    that Mr. Ortiz was terminated for performance, so I'm not sure

5    why this is relevant, but I feel I am obliged to raise it.

6        JUDGE TRACY:  Okay.  So what's the relevance?

7        MR. RODRIGUEZ-RITCHIE:   Well, I think we haven't -- in

8    the first instance, we haven't heard what your contention is in

9    terms of what the reason for the termination is.  In the second

10   place, his job -- since he was terminated, it would be

11   inherently relevant what he did was, and what his performance

12   was, while he was employed there.

13       MR. ROSS:  I'm going to withdraw the Objection.  I just --

14       JUDGE TRACY:  Okay.

15       MR. ROSS:  -- question its relevance, but that's fine.

16       JUDGE TRACY:  Okay.  I would just like to know:  What's

17   the -- the date there at the top of 13?

18       MR. RODRIGUEZ-RITCHIE:   Sure.  I believe --

19   unfortunately, the copy I received was cut off.

20       JUDGE TRACY:  Okay.

21       MR. RODRIGUEZ-RITCHIE:   But I believe it's supposed to be

22   7/1/2016 to 6/30/2017.

23       JUDGE TRACY:  Okay.  So it's a year versus the other one

24   is six months?

25       MR. RODRIGUEZ-RITCHIE:   A six-month period, yes.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Okay.  All right.  So that's noted for the

2  record, June 30, 2017 is what has been cut off there, and

3  General Counsel's Exhibit 13 is admitted into evidence.

4      **(General Counsel Exhibit Number 13 Received into Evidence)**

5  Q    BY MR. RODRIGUEZ-RITCHIE:   I'm showing you what's been

6  pre-marked, a one-page document, GC's Exhibit 14.

7  A    I'm ready.

8  Q    Okay.  Do you recognize General Counsel's Exhibit 14?

9  A    I do.

10  Q    Is General Counsel's Exhibit 14 a document that you

11  received in November of 2017 from Tesla?

12  A    It is.

13  Q    Did you alter this document in any way?

14  A    No.

15      MR. RODRIGUEZ-RITCHIE:   At the time, I'd like to move

16  General Counsel's Exhibit 14 into evidence.

17      JUDGE TRACY:  Any objections?

18      MS. FEINBERG:  No.

19      MR. ROSS:  Same question about relevance, but no.

20      MR. RODRIGUEZ-RITCHIE:   Same response.

21      JUDGE TRACY:  Okay.  All right.  So General Counsel's

22  Exhibit 14 is admitted into evidence.

23      **(General Counsel Exhibit Number 14 Received into Evidence)**

24      JUDGE TRACY:  And I'm assuming, as the trial goes on, the

25  relevance of it will be -- become clear, and if it's not,



1      there's the brief.

2          MR. RODRIGUEZ-RITCHIE:   Yes.

3          JUDGE TRACY:  Okay.

4          MR. RODRIGUEZ-RITCHIE:   Your Honor, we can just

5      double-check; did you receive General Counsel's Exhibit 13 into

6      evidence?

7          JUDGE TRACY:  I think I did, yes.

8          MR. RODRIGUEZ-RITCHIE:   Okay.  Sorry about that.

9      Q    BY MR. RODRIGUEZ-RITCHIE:   I'm handing you what's been

10     pre-marked as General Counsel's Exhibit 15.

11     A    I'm ready.

12     Q    Mr. Ortiz, do you recognize General Counsel's Exhibit 15?

13     A    I do.

14     Q    What do you recognize it to be?

15     A    A reminder of the confidentiality agreement.

16     Q    Is this a document that you signed in or about October

17     2016?

18     A    It is.

19         MR. RODRIGUEZ-RITCHIE:   Okay.  At this time, I'd like to

20     move General Counsel's Exhibit 15 into evidence.

21         JUDGE TRACY:  Any objections?

22         MR. ROSS:  No.

23         JUDGE TRACY:  All right.  General Counsel's Exhibit --

24         MS. FEINBERG:  I think it might already be in evidence.

25         JUDGE TRACY:  -- 15 is admitted into evidence.



www.escribers.net | 800-257-0885

1    **(General Counsel Exhibit Number 15 Received into Evidence)**

2    Q    BY MR. RODRIGUEZ-RITCHIE:    Okay, Mr. Ortiz.    Earlier, you

3    testified about an activity, leafleting activity, I believe, in

4    February -- that was going to occur in February of 2017; do you

5    recall that testimony?

6    A    Yes.

7    JUDGE TRACY:    And I guess, just let me note for the record

8    here that there is -- the cell phones need to be turned off or

9    silent, and no videotaping or any recording of the hearing.

10    MS. FEINBERG:    That --

11    JUDGE TRACY:    I haven't said it --

12    MS. FEINBERG:    That always worries me.

13    JUDGE TRACY:    -- in two days, so I'll say it again.

14    MR. RODRIGUEZ-RITCHIE:    Thank you for reminding us.

15    JUDGE TRACY:    Sorry.

16    MR. RODRIGUEZ-RITCHIE:    That's okay.

17    Q    BY MR. RODRIGUEZ-RITCHIE:    Do you recall the date of

18    February 9, 2017?

19    A    I do.

20    Q    Do you recall what your shift was that started on February

21    9, 2017?

22    A    It was the overnight shift.

23    Q    So that means it started on February 9th, and then went

24    over to February 10th?

25    A    Yes.



www.escribers.net | 800-257-0885

1    Q    Okay.  Do you recall about what time you got off work on

2    February 10th?

3    A    Somewhere around 2:30.

4    Q    After you got off work, where did you go?

5    A    I went to the campaign office.

6    Q    Is that the UAW office you testified about earlier?

7    A    It is.

8    Q    Okay.  And when you got to the UAW office what, if

9    anything, did you do?

10   A    Well, I had to wait there for a little while.

11   Q    And why did you wait?

12   A    Because I was the first one there.

13   Q    Were you waiting for anyone in particular or anything in

14   particular?

15   A    I was waiting for the group that was going to be flyering

16   at -- at 4:30, but I got off early, so nobody was there yet.

17   Q    Okay.  How long did you stay at the UAW office?

18   A    Until approximately 4:00, 4:15, maybe.

19   Q    Okay.  Now, you just mentioned a group; what group are you

20   referring to?

21   A    Well, I was waiting for some coworkers, and the -- the

22   organizer, to open the door.

23   Q    Okay.  And after those couple of hours that you waited,

24   where did you go after you left the UAW office?

25   A    I went back to the plant.



www.escribers.net | 800-257-0885

1   Q    Did you go alone?

2   A    No.  I went with Jose Moran.

3   Q    And who is Jose Moran?

4   A    He's a coworker.

5   Q    And how did you get to the Tesla Fremont facility?

6   A    I rode in Jose's vehicle.

7   Q    Were you with anyone else in Mr. Moran's vehicle?

8   A    No.

9   Q    Okay.  When you got to the Tesla Fremont facility, did you

10  park there?

11  A    We did.

12  Q    Where?

13  A    In the parking lot.

14       JUDGE TRACY:  And can I just clarify something?  You --

15  when you're saying "2:30, 4:30", is that all AM?

16       THE WITNESS:  Early morning, yes.

17       JUDGE TRACY:  Okay.

18       THE WITNESS:  Um-hum.

19       JUDGE TRACY:  Thanks.

20  Q    BY MR. RODRIGUEZ-RITCHIE:   So excuse me.  You -- when you

21  got to the Tesla Fremont facility, could you tell us where you

22  parked?

23  A    We parked in a parking lot by Door 1.

24  Q    Why did you park by Door 1?

25  A    Because that's where we were going to flyer.



www.escribers.net | 800-257-0885

1  Q    Did you actually flyer that day?

2  A    I did.

3  Q    Okay.  I'm going to show you what's been admitted as

4  General Counsel's Exhibit 8.  It's a one-page, double-sided

5  document that I handed him.

6  A    Okay.

7  Q    Okay.  Do you -- take a moment.  Let me know when you're

8  ready.

9  A    I'm ready.

10  Q    do you recognize General Counsel's Exhibit 8?

11  A    I do.

12  Q    What is General Counsel's Exhibit 8?

13  A    This is a copy of the flyer that we handed out that day.

14  Q    Now, when you got out of the car and went to Door 1 on

15  February 10th, did you go by yourself to Door 1?

16  A    No.

17  Q    Who did you go to Door 1 with?

18  A    Jose Moran.

19  Q    And when you got to Door 1, did you pass out flyers while

20  you were there?

21  A    We did.

22  Q    When you arrived at Door 1, were there any other employees

23  handing out flyers at the time that you got there?

24  A    No.

25  Q    Okay, Mr. Ortiz.  I'm showing you through a projector



1    what's been received into evidence as General Counsel's

2    Exhibit 3.  Do you recognize General Counsel's Exhibit 3?

3    A    I do.

4    Q    What do you recognize it to be?

5    A    Door number 1.

6    Q    Okay.  I'm going to actually hand you a laser pointer --

7    A    Okay.

8    Q    -- which I'll ask you to use at some point.  Using General

9    Counsel's Exhibit 3, can you show us where you were flyering on

10   February 10, 2017?

11   A    Right there.

12        MR. RODRIGUEZ-RITCHIE:   Okay.  So if the record could

13   reflect that Mr. Ortiz has indicated that he was on the ramp

14   side of Door 1.

15   Q    BY MR. RODRIGUEZ-RITCHIE:   Where was Mr. Moran?

16   A    Right next to me.

17        MR. RODRIGUEZ-RITCHIE:   Okay.  So if the record could

18   reflect that Mr. Ortiz used the laser pointer to show that Mr.

19   Moran was next to him on ramp -- on the ramp side of Door 1.

20   Q    BY MR. RODRIGUEZ-RITCHIE:   Now, at any point while you

21   were flyering outside of Door 1 on February 10th, did any other

22   employees also flyer?

23   A    Yes.

24   Q    Who?

25   A    Michael Sanchez, and another person.  I don't remember his



1    name.

2    Q    Do you remember what the race was of the other person who

3    was flyering?

4    A    I do not.

5    Q    Could you tell us where Mr. Sanchez was flyering, outside

6    of Door 1?

7    A    Right there.

8        MR. RODRIGUEZ-RITCHIE:    Okay.  So if the record could

9    reflect, Mr. Ortiz has pointed to the stair side of Door 1.

10    Q    BY MR. RODRIGUEZ-RITCHIE:    And what about the other

11    person?

12    A    Right next to him.

13        MR. RODRIGUEZ-RITCHIE:    Okay.  If the record could

14    reflect that Mr. Ortiz has pointed also to the stair side, in

15    front of the stair side of Door 1 as the location of the fourth

16    person.

17    Q    BY MR. RODRIGUEZ-RITCHIE:    Now, when you were handing out

18    flyers, outside of Door 1 on February 10th, do you recall

19    whether or not you had any encounters with any security guards?

20    A    We did.

21    Q    About when, if you can recall, was your encounter with a

22    security guard?

23    A    It was approximately 4:45.

24    Q    AM?

25    A    AM.



www.escribers.net | 800-257-0885

1    Q    Okay.  Now, when you had this encounter with the security

2    guard, can you describe how it began?

3    A    Yes.  Me and Jose were standing out front as -- as people

4    started to come in and out of the building for shift change, we

5    were handing flyers out to them and the security guards,

6    because we could see in there very clearly, was watching us,

7    and she came out the door.

8    Q    Of which side?

9    A    Of my side, right there.

10   Q    Okay.  So she came outside of the ramp side of Door 1?

11   A    (No verbal response).

12   Q    Could you describe what the security guard looked like?

13   A    She was a older woman, probably maybe -- not very tall,

14   about 5'3", 5'4".

15   Q    Could you describe what she was wearing?

16   A    She was wearing a hat, a security hat, a security jacket

17   and pants, and a -- a little badge on her thing -- or a little

18   sticker that said "Security" on her jacket.

19   Q    Okay.  Now, prior to that day, February 10, 2017, had you

20   ever seen her before?

21   A    Yes.

22   Q    Where?

23   A    Right there in the Door 1.

24   Q    Inside of Door 1?

25   A    Yes.



www.escribers.net | 800-257-0885

1   Q   Where inside of Door 1?

2   A   At the security desk.

3   Q   When you had seen her before that day, at the security

4   desk, was she working as a security guard at the desk?

5   A   I believe she was.

6   Q   Now, when the -- this female security guard came out from

7   outside -- from the inside of Door 1 to the outside, do you

8   recall whether or not she had anything in her hands?

9   A   She had one of our flyers, the Exhibit 8.  Just a minute,

10   8, yes.

11   Q   Okay.  When she came out of Door 1, the female security

12   guard, did she speak with you?

13   A   She spoke at us.

14   Q   What did she say?

15   A   She told us that we couldn't be there.  We'd have to go.

16   We can't do that.

17   Q   Could you describe the level of her voice?

18   A   She wasn't loud, but she sounded desperate.

19   Q   Did she say anything else to you?

20   A   She said she was going to call someone.  And she was --

21   she had broken English because it was obvious, English wasn't

22   her first language.  But she was really shook up.

23   Q   Okay.  Did -- do you say anything in response to her?

24   A   No.  I just kind of laughed and told Jose, Deal with it.

25   Q   Did Mr. Moran say anything to her?



1 A He told her he was within his rights to do that and that

2 we weren't bothering nobody.

3 Q Okay.  And did the security guard say anything back to Mr.

4 Moran?

5 A Yes.

6 Q What did she say?

7 A She continued speaking really desperately and just

8 repeating that we can't be there and she was going to call

9 somebody, and Jose approached her.

10 Q Okay.  Were you there when Jose approached the security

11 guard?

12 A I stayed where I was.

13 Q Were you able to -- excuse me.  Withdraw that.

14  Did Mr. Moran speak with the security guard?

15 A Yes.  It wasn't very far from me.  He was reiterating that

16 he was within his rights and he was trying to talk to her

17 calmly so she would listen.

18 Q Okay.  Did she say anything back to Mr. Moran?

19 A She said she was going to call somebody.

20 Q Okay.  After she said she was going to call someone, did

21 she stay outside of Door 1?

22 A No.

23 Q Where did she go?

24 A She went back in to the security desk.

25 Q And after she went back in -- into Door 1, did you



www.escribers.net | 800-257-0885

1   continue to flyer outside?

2   A    We did.

3   Q    For how long?

4   A    About five or 10 more minutes.

5   Q    Do you recall, after the female security guard went

6   inside, did you have any other interactions with this female

7   security guard?

8   A    No.

9   Q    Do you remember seeing the female security guard after she

10  went inside?

11  A    Yes.

12  Q    And what did you see -- what, if anything, did you see her

13  doing?

14  A    I seen her on the phone and looking at -- looking at us

15  while talking on the phone.

16  Q    Were you able to hear her speaking?

17  A    No.

18  Q    How do you know she was talking on the phone?

19  A    Because she had the phone receiver in her hand on her ear.

20  Q    Were her lips moving?

21  A    Yes.

22  Q    And at this point, when you're looking at her inside of

23  Door 1 and you see the phone to her ear and her lips moving,

24  are you still flyering outside?

25  A    We are.



www.escribers.net | 800-257-0885

1    Q    Now, at any point while you were flyering after this --

2    after this -- after you see the security guard on the phone,

3    did you have any interactions with any different security

4    guards?

5    A    Yes.

6    Q    And what did the different security guard look like?

7    A    It was a -- a gentleman, probably in his 30s.

8    Q    Okay.  Could you describe him more or is that it?

9    A    Well, he was -- he was what I would consider maybe her

10    superior, because he had a blazer on, looked more professional

11    and why -- he kind of took her post over.

12    Q    And where were you when you first saw this second security

13    guard?

14    A    Standing right there in the same spot.

15    Q    And where was the second security guard?

16    A    Right inside the door there.

17    Q    Inside of Door 1?

18    A    Yes.

19    Q    Okay.  Did you actually speak with him at any point?

20    A    No.

21    Q    Okay.  After you saw the second security guard, the male,

22    inside of Door, did you have any encounters with any other

23    security guards?

24    A    We did.

25    Q    Could you describe the encounter with -- your next



1   encounter with a security guard?

2   A    We had two more security guards come up in vehicles.

3   Q    Okay.  So how far after the female security guard went

4   inside, did you have an encounter with the next security guards

5   in the vehicles?

6   A    Three to five minutes after she went in.

7   Q    Okay.  And let's talk about the vehicles; what did they

8   look like?

9   A    They're Model X, Tesla Model Xs.

10  Q    And did --

11       MR. ROSS:  Again, I -- he tails off at the end.  I

12  couldn't hear it.

13       THE WITNESS:  They were Tesla Model Xs.

14       MR. ROSS:  Xs?

15       THE WITNESS:  Yes.

16       MR. ROSS:  Great.  Thanks.

17  Q    BY MR. RODRIGUEZ-RITCHIE:  Were you outside still, on the

18  ramp side, when you saw the vehicle?

19  A    We were still standing right there.

20  Q    Okay.  And was this two vehicles or one vehicle?

21  A    I recall two vehicles.

22  Q    Okay.  Can you show us on General Counsel's Exhibit 3 from

23  what direction the vehicles came?

24  A    Like this, right here; one in that row and one in this

25  row.



www.escribers.net | 800-257-0885

1       MR. RODRIGUEZ-RITCHIE:   Okay.  So if the record could

2   reflect that the witness has shown that the security vehicles

3   were driving in two separate lanes going towards Door 1.

4   Q   BY MR. RODRIGUEZ-RITCHIE:   Now, did the vehicles stop?

5   A   Yes.

6   Q   Did anyone get out of the vehicles?

7   A   Yes.

8   Q   Okay.  So let's take it one at a time, so let's talk about

9   the first vehicle.

10   A   Okay.

11   Q   How many people got out of the first vehicle?

12   A   One.

13   Q   And can you describe this person?

14   A   Yes.

15   Q   What did the person look like?

16   A   Like a male between 22 and 28, fit.

17   Q   Can you describe what he was wearing?

18   A   It looked like coveralls.

19       MR. ROSS:  I'm sorry.  I couldn't him.

20       THE WITNESS:  They looked -- they appeared to be coveralls

21   with security patches on them.

22   Q   BY MR. RODRIGUEZ-RITCHIE:   By "security patches", could

23   you describe what you mean by the patches?

24   A   A patch that says "Tesla Security".

25   Q   Okay.  And was it just one security guard that came out of



22-60493.477

1    the first vehicle?

2    A    Yes.

3    Q    Okay.  Now, then let's talk about the second vehicle; how

4    many people, if any, came out of the second vehicle?

5    A    One.

6    Q    Okay.  Can you describe that person?

7    A    Yes.  Similar in build and height, but a little darker in

8    the skin.

9    Q    Okay.  Can you describe what he was -- he or she was

10   wearing?

11   A    The same thing.

12   Q    And was this a man or a woman?

13   A    They were both men.

14   Q    Okay.  So by the same thing; was the -- the second vehicle

15   security guard wearing the security patches you've testified

16   about?

17   A    Yes.

18   Q    Okay.  Now, after these two guards got out of their cars,

19   did you have any conversation with them?

20   A    We did.

21   Q    Okay.  Who spoke first?

22   A    They spoke to Jose first.

23   Q    Okay.  Was that in your presence?

24   A    Yes.

25   Q    Okay.  So what did they say to Jose?



1    A    They asked Jose if he worked there.

2    Q    Did Jose say anything back?

3    A    He said, Yes.

4    Q    Okay.  Did Mr. Moran do anything?

5    A    They asked him for his badge.

6    Q    And did Mr. Moran give him his badge?

7    A    He did.

8    Q    Okay.  Did you see whether the security guard did anything

9    with Mr. Moran's badge?

10   A    They looked at it and they, what appeared to be, looked

11   like to be -- phoned it in or radioed it in, to check his

12   number.

13   Q    Did you hear that they radioed it in?

14   A    I heard them -- I heard them talking on the radio and

15   looking at it.  I didn't actually hear the conversation.

16   Q    Okay.  Now, did either of those two security guards speak

17   with you?

18   A    After they were done with Jose, they did.

19   Q    And what did they say to you?

20   A    They asked -- they -- they were -- as they walked up, I

21   pull -- pulled my badge out of my wallet because it was in my

22   wallet, and handed it to them.

23   Q    Okay.  Did you say anything to them when you handed --

24   A    I did.

25   Q    -- them your badge?



www.escribers.net | 800-257-0885

1    A    I said, You may not know who we are, but -- you may not

2    know who I am, but I know who you are.

3    Q    Okay.  Why did you say that?

4    A    Because I joke around a lot.  I can't help myself.  And

5    there's a line that De Niro uses in -- in the movie

6    "Goodfellas", and I saw that as playing that part in the movie,

7    because that's what they were doing, yeah.

8    Q    Did they say anything to you?

9    A    He says, as I was handing him my badge, you already know

10   what I want?  I said, Yes.  Because, you know, I'd seen him

11   asking Jose for his badge.

12   Q    Okay.  Did they do anything with your badge?

13   A    They took a picture of it.

14   Q    Okay.  How do you know they took a picture of it?

15   A    Because I saw them hold the badge up, hold their phone up,

16   and it flashed.

17        MR. RODRIGUEZ-RITCHIE:   Okay.  So if the record could

18   reflect that Mr. Ortiz used his left hand to symbolize his

19   badge, and his right hand to show a phone going on top of his

20   badge.

21   Q    BY MR. RODRIGUEZ-RITCHIE:   Now, after they took a picture

22   of your badge, did they do anything else with your badge?

23   A    He handed it back to me.

24   Q    Okay.  And after the security guard handed the badge back

25   to you, what if anything happened next?



www.escribers.net | 800-257-0885

1    A    They said, Thank you, and they proceeded to walk back

2    towards their vehicles.

3    Q    Okay.  After the security guards walked back to their

4    vehicles, what did you do?

5    A    We continued to flyer.

6    Q    Okay.  Now, while you were flyering on February 10, 2017,

7    did you see any supervisors?

8    A    I did.

9    Q    Who?

10   A    I saw Emanual Garza.

11   Q    And who is Emanual Garza?

12   A    My immediate supervisor.

13   Q    Was he your supervisor on February 10, 2017?

14   A    On that day, he was.

15   Q    Okay.  And did you hand Mr. Garza a flyer?

16   A    I did.

17   Q    And did Mr. Garza speak with you?

18   A    He looked at it, and he looked at me and said, Oh,

19   Richard, you know I can't take this, as management.  If I

20   wanted to, I couldn't take it.

21   Q    Okay.  Did you say anything to him?

22   A    Yes.  I laughed and I said, I know, Manny.  It's all

23   right.  I understand.  Tell your mother I said hi.

24   Q    Why did you say, Tell your mother I said hi?

25   A    I know his mother since high school.



www.escribers.net | 800-257-0885

1    Q    Now, as you were speaking with Mr. Garza, were you still

2    handing out flyers to employees?

3    A    We were.

4    Q    Okay.  Did you say anything to those employees in Mr.

5    Garza's presence?

6    A    Some of them were there.

7    Q    What did you say to them?

8    A    Well, that conversation that just took place --

9    Q    Oh, I see.

10   A    -- happened in front of -- yeah.

11   Q    Mr. Garza, did he stay outside while you were flyering?

12   A    Not long.  He was passing by, but he -- they walk slow,

13   really slow.

14   Q    Okay.  How long after Mr. Garza went inside, did you

15   continue to flyer?

16   A    Oh, Garza was leaving.  He went home.

17   Q    Oh, I'm sorry.

18   A    They --

19   Q    So how long after Mr. Garza left did you continue to

20   flyer?

21   A    Approximately 10 more minutes.

22   Q    Okay.  Now, while you were handing out flyers and having

23   this interaction with Mr. Garza, are the two security vehicles

24   that you testified about earlier, are they still outside?

25   A    Yeah.  They're still sitting there.



1    Q    Okay.  At what point did they leave?

2    A    I left before they left.

3    Q    At what time did you leave?

4    A    About 5:30, maybe.

5    Q    Okay.  And --

6    A    In that neighborhood.

7    Q    -- where did you go when you left?

8    A    I returned back to the UAW campaign office.

9    Q    Mr. Ortiz, I'm handing you what's been pre-marked as

10    General Counsel's Exhibit 16-001 to 16-003.

11    A    Okay.

12    Q    Okay.  Do you recognize General Counsel's Exhibit 16?

13    A    I do.

14    Q    Okay.  And if you look at the document, on the bottom it

15    says, "From Jonathan Galescu"?

16    A    Um-hum.  Yes.

17    Q    Who is that?

18    A    A coworker.

19    Q    From Tesla Fremont?

20    A    Yes.

21    Q    Okay.  And on the CC it says, "Richard Ortiz; is that you?

22    A    It is me.

23    Q    And that email address; was that your @tesla.com email

24    address?

25    A    It was.



www.escribers.net | 800-257-0885

1   Q   Was this an email that you received on or about April 4,

2   2017?

3   A   Yes.  It is.

4   Q   Now, I want you to take a look at the email.  If you look

5   at page 16-003?

6   A   Yes.

7   Q   It says, "Sincerely, Jonathan Galescu, Richard Ortiz"?

8   A   Yes.

9   Q   Did Mr. Galescu send this email on your behalf?

10   A   He did.

11   Q   Okay.  And why did you and Mr. Galescu send gen -- send

12   the email in General Counsel's Exhibit 16?

13   A   Because Jonathan had mentioned to me that he wanted to

14   request these logs, but he was afraid.  He was scared to, so I

15   told  him he could put my name on it if he wanted to.  I -- I

16   was standing there with him.  I was, All right.

17   Q   Okay.  And when you say "these logs", what logs are you

18   referring to?

19   A   The OSHA 300 logs.

20   Q   And what are OSHA 300 logs?

21   A   The records of injuries at Tesla, OSHA-recordable

22   injuries.

23   MR. RODRIGUEZ-RITCHIE:  Okay.  So at this time, I'd like

24   to move General Counsel's Exhibit 16 into evidence.

25   JUDGE TRACY:  Any objections?



1    MR. ROSS:  Just a moment, please.  I'm just making a note

2    of something.  No Objection.

3    JUDGE TRACY:  So General Counsel's Exhibit 16-001 to 003

4    is admitted into evidence.

5    **(General Counsel Exhibit Number 16-001, 16-002 and 16-003**

6    **Received into Evidence)**

7    Q    BY MR. RODRIGUEZ-RITCHIE:    Okay.  Now, Mr. Ortiz, did you

8    ever receive a response to your email in General Counsel's

9    Exhibit 16?

10   A    We did.

11   Q    Okay.  Mr. Ortiz.  I'm handing you what's been pre-marked

12   as General Counsel's Exhibit 17-001 to 17-013.

13   A    Okay.

14   Q    Okay.  Do you recognize General Counsel's Exhibit 17?

15   A    I do.

16   Q    Okay.  And is this an email you received at your

17   @tesla.com email address, on or about April 5, 2017, from David

18   Zweig?

19   A    It is.

20   Q    Did it include all of the pages in General Counsel's

21   Exhibit 17?

22   A    It did.

23   Q    Okay.  Now, I want you to take a look at General Counsel's

24   Exhibit 17, particularly pages 002 to 012.  There's a mark -- a

25   stamp on these that say "Confidential".



www.escribers.net | 800-257-0885

1    A    Okay.

2    Q    Is that -- that stamp, was that in the email that you

3    received?

4    A    Yes.

5    Q    Okay.  And then in page 13, it says "Stamp As Is".  Was

6    that stamp in the version that you received?

7    A    Yes.

8         MR. RODRIGUEZ-RITCHIE:   Okay.  Then at this time, I'd

9    like to move General Counsel's Exhibit 17 into evidence.

10        JUDGE TRACY:  Any objections?

11        MR. ROSS:  No.

12        JUDGE TRACY:  So General Counsel's Exhibit 17-001 to 013

13   is admitted into evidence.

14   **(General Counsel Exhibit Numbers 17-001 through 0013 Received**

15   **into Evidence)**

16   (Counsel confer)

17   Q    BY MR. RODRIGUEZ-RITCHIE:   Okay.  Mr. Ortiz, I'm going to

18   hand you what's been pre-marked as General Counsel's

19   Exhibit 18-001 to 18-216.  Please take a moment to look at the

20   document.

21   A    Okay.  Okay.  I looked at it.

22   Q    Okay.  Do you recognize General Counsel's Exhibit 18?

23   A    I do.

24   Q    And is this an email that you received at your @tesla.com

25   email address from Mr. David Zweig on April 5, 2017?



1   A    Yes.

2   Q    Okay.  I want you to take a look at the pages of General

3   Counsel's Exhibit 18.  They're stamped with the words

4   "Confidential" on them.  Is the version that you received in

5   your email, did they contain the Confidential stamp on them?

6   A    Yes.

7        MR. RODRIGUEZ-RITCHIE:   Okay.  Then at this time, I'd

8   like to move General Counsel's Exhibit 18 into evidence.

9        JUDGE TRACY:  Any objections?

10       MR. ROSS:  No.

11       JUDGE TRACY:  All right.  So General Counsel's Exhibit 18,

12  which is 001-261 (sic), is admitted into evidence -- 216,

13  sorry, not 261.

14  **(General Counsel Exhibit Number 18-001 through 216 Received**

15  **into Evidence)**

16  Q    BY MR. RODRIGUEZ-RITCHIE:   Okay, Mr. Ortiz.  I'm going to

17  hand you, this time, a one-page document marked --

18  A    Thank you.

19  Q    -- General Counsel's Exhibit 20.

20  A    Okay.

21  Q    Okay.  Do you recognize this document?

22  A    I do.

23  Q    Is this an email that you received at your @tesla.com

24  email address on or about April 13, 2017?

25  A    Yes.



1   Q    Okay.  And it says, "From Jonathan Galescu"?

2   A    Yes.  It does.

3   Q    Was this email also about the Cal OSHA 300 logs that you

4   requested?

5   A    Yes.

6        MR. RODRIGUEZ-RITCHIE:   Okay.  The at this time, I'd like

7   to  move General Counsel's Exhibit 20 into evidence.

8        JUDGE TRACY:  Any objections?

9        MR. ROSS:  No.

10        MS. FEINBERG:  No.

11        JUDGE TRACY:  Okay.  So General Counsel's Exhibit is

12   admitted into evidence.

13   **(General Counsel Exhibit Number 20 Received into Evidence)**

14   Q    BY MR. RODRIGUEZ-RITCHIE:   Okay.  I'm going to hand you

15   another one-page document pre-marked as General Counsel's

16   Exhibit 21.

17        MR. ROSS:  Getting exercise.

18        MR. RODRIGUEZ-RITCHIE:   Well, I am, Mr. Ross.  Yes.

19        MS. FEINBERG:  A few of the steps.

20   Q    BY MR. RODRIGUEZ-RITCHIE:   Okay.  Do you recognize

21   General Counsel's Exhibit 21?

22   A    Yes.

23   Q    And what do you recognize it to be?

24   A    Response from Seth Woody.

25   Q    Okay.  Is this an email you received from Mr. Woody on or



www.escribers.net | 800-257-0885

1    about -- on April 14, 2017, to your @tesla.com email address?

2    A    It is.

3        MR. RODRIGUEZ-RITCHIE:    Okay.    Then at this time I'd like

4    to move General Counsel's Exhibit 21 into evidence.

5        JUDGE TRACY:    Any objections.

6        MR. ROSS:    No, ma'am.

7        JUDGE TRACY:    So General Counsel's Exhibit 21 is admitted

8    into evidence.

9    **(General Counsel Exhibit Number 21 Received into Evidence)**

10        MS. FEINBERG:    Thank you.

11    Q    BY MR. RODRIGUEZ-RITCHIE:    Okay.    I'm going to hand you a

12    one-page, double-sided document, Mr. Ortiz, General Counsel's

13    Exhibit 22.    Actually 001 to 002.    Take a look at it.    Let me

14    know when you're ready.

15    A    Okay.

16    Q    Okay.    Do you recognize General Counsel's Exhibit 22?

17    A    I do.

18    Q    Is that an email that you received at your @tesla.com

19    email address on or about April 21, 2017?

20    A    Yes.

21        MR. RODRIGUEZ-RITCHIE:    Okay.    At this time, I'd like to

22    move General Counsel's Exhibit 22 into evidence?

23        JUDGE TRACY:    Any objections?

24        MR. ROSS:    No.

25        JUDGE TRACY:    General Counsel's Exhibit 22-001 to -002 is



1    admitted into evidence.

2    **(General Counsel Exhibit Number 22-001 and 002 Received into**

3    **Evidence)**

4         MS. FEINBERG:  Thank you.

5    Q    BY MR. RODRIGUEZ-RITCHIE:   Okay, Mr. Ortiz.  I'm going to

6    hand you what's been pre-marked as General Counsel

7    Exhibit 23-001 to 23-228.

8    A    Thank you.

9    Q    Take a look at it.  Take your time.  Let me know when

10   you're ready.

11        MR. ROSS:  Thank you.

12        THE WITNESS:  Okay.

13   Q    BY MR. RODRIGUEZ-RITCHIE:   Okay, Mr. Ortiz.  Do you

14   recognize General Counsel's Exhibit 23?

15   A    I do.

16   Q    Is this an email you received from Seth Woody on or -- on

17   April 28, 2017 to your @tesla.com email address?

18   A    Yes.

19   Q    And there are pages 23-002 to 23-228; were those pages

20   attached to the email you received?

21   A    Yes.

22        MR. RODRIGUEZ-RITCHIE:   Okay.  At this time, I'd like to

23   move General Counsel's Exhibit 23 into evidence.

24        JUDGE TRACY:  Any objections?

25        MR. ROSS:  No.



www.escribers.net | 800-257-0885

1        MS. FEINBERG:  None.

2        JUDGE TRACY:  All right.  So General Counsel's

3    Exhibit 23-001 to 228 is admitted into evidence.

4    **(General Counsel Exhibit Number 23-001 through 228 Received**

5    **into Evidence)**

6        JUDGE TRACY:  So can we go off the record one second?

7    (Off the record at 3:09 p.m.)

8        JUDGE TRACY:  Okay.  So previously, just before we went

9    off the record, I had admitted in General Counsel's

10   Exhibit 23-001 to 228.  There were no objections.  However, I

11   raised a concern that I had regarding the privacy of the names

12   of individuals on the unredacted OSHA logs here.  So the

13   parties are going to be considering what they need to do with

14   the attachments; either come up with a stipulation or redact

15   them, the names, what have you.  So at this point, General

16   Counsel's Exhibit 23-001 is admitted into evidence.  The

17   remaining portions of it, we're going to hold off on admitting

18   at this point, in figuring out how best to proceed.  And the

19   parties will let me know once they have spoken.

20       MR. RODRIGUEZ-RITCHIE:   Yes, Your Honor.

21       JUDGE TRACY:  Okay.  Thank you.

22   Q    BY MR. RODRIGUEZ-RITCHIE:   Okay, Mr. Ortiz.  I'm going to

23   hand you one more exhibit, General Counsel's pre-marked

24   Exhibit 24-001 to 2.

25   A    Thank you.  Okay.



www.escribers.net | 800-257-0885

1    Q    Okay, Mr. Ortiz.  Do you recognize General Counsel's

2    Exhibit 24?

3    A    I do.

4    Q    And was this an email that you received at your @tesla.com

5    email address on June 6, 2017, from Jonathan Galescu?

6    A    Yes.

7    Q    Okay.  If you take a look at the second page of General

8    Counsel's Exhibit 24, at the bottom it says, "Thank you

9    Jonathan Galescu, Richard Ortiz"?

10   A    Yes.

11   Q    Okay.  Did Mr. Galescu send this email on your behalf?

12   A    Yes.

13        MR. RODRIGUEZ-RITCHIE:   Okay.  At the time, I'd like to

14   move General Counsel's Exhibit 24 into evidence.

15        JUDGE TRACY:  Any objections.

16        MR. ROSS:  No.

17        JUDGE TRACY:  All right.  So General Counsel's

18   Exhibit 24-001 to 002 is admitted into evidence.

19   **(General Counsel Exhibit Numbers 24-001 and 002 Received into**

20   **Evidence)**

21   Q    BY MR. RODRIGUEZ-RITCHIE:   Mr. Ortiz, did you work on May

22   24, 2017?

23   A    Yes.

24   Q    Do you remember about what time you were scheduled to

25   work?



1    A    I believe it was about 2:30 when I start 10 to 10 at that

2    time.

3        JUDGE TRACY:  Is that AM or PM?

4        THE WITNESS:  That would've been PM.

5    Q    BY MR. RODRIGUEZ-RITCHIE:    Approximately what time did

6    you arrive at the Tesla Fremont facility?

7    A    Approximately -- maybe 1:45, 2:00, in that neighborhood.

8    I was there early.

9    Q    Do you remember why you were there early?

10   A    I was going to hand out some flyers.

11   Q    Prior to going to the Tesla Fremont facility, did you --

12   do you recall whether or not you went to the UAW office?

13   A    I did.

14   Q    Why did you go to the UAW office?

15   A    To pick up some flyers.

16   Q    Okay.  When you were at the UAW office, did you meet with

17   anyone?

18   A    With Michael Sanchez.

19   Q    And who's Michael Sanchez?

20   A    He's a coworker of mine from Tesla.

21   Q    Is he a member of the Volunteer Organizing Committee?

22   A    Yes.

23   Q    And when you got to the Tesla Freemont facility on May

24   24,2017, do you remember where you went?

25   A    I went to Door number 2.



www.escribers.net | 800-257-0885

1    Q    I'm going to hand you what's been admitted as General

2    Counsel's Exhibit 9.  It's a one-page, double-sided document.

3    Take a look at it.  Let me know when you're ready.

4    A    Okay.

5    Q    Do you recognize General Counsel's Exhibit 9?

6    A    I do.

7    Q    And what do you recognize it to be?

8    A    The hi -- the flyer that I was handing out on the day.

9    Q    Okay.  Now, for approximately how long were you handing

10   out the flyer in General Counsel's Exhibit 9?

11   A    From 45 minutes to an hour.

12   Q    After you were done handing out the flyer, what did you

13   do?

14   A    I went in the building and went to work.

15   Q    Okay.  Besides the February 10 and this May 24, 2017

16   events when you flyered, have you ever flyered any other times

17   at Tesla Fremont?

18   A    I have.

19   Q    About how many times?

20   A    Approximately two times more.

21   Q    Okay.  And were those all related to the organizing

22   campaign at Tesla Fremont?

23   A    Yes.  After you began working on May 24, 2017, did you

24   have any interactions with any supervisors or managers?

25   A    I did.



1    Q    With who?

2    A    With several; Juan Martinez walked by, because I was at my

3    post doing traffic duty, and --

4    Q    Did you speak with Mr. Martinez?

5    A    I did.

6    Q    Who -- did you have any interactions with any other

7    supervisors?

8    A    I did.

9    Q    Who else?

10    A    Mario Delarosa.

11         MR. ROSS:  I'm sorry.  I couldn't hear the -- what did he

12    say?  I'm sor -- apologize.

13         JUDGE TRACY:  Would you please repeat the name?

14         THE WITNESS:  Mario De La Rosa (phonetic).

15    Q    BY MR. RODRIGUEZ-RITCHIE:   And who is Mario De La Rosa?

16    A    He was my manager.

17    Q    Do you know anyone named Bobby Rodriguez (phonetic)?

18    A    Yes.  I do.

19    Q    Who is Bobby Rodriguez?

20    A    He was -- to my -- the best of my knowledge, the manager

21    in charge of safety in the paint department.

22    Q    Okay.  Now, on May 24, 2017, did you speak with Mr.

23    Rodriguez?

24    A    I did.

25    Q    Where did that happen?



1    A    In my intersection.

2    Q    And who spoke first?

3    A    They did.

4    Q    Mr. Rodriguez?

5    A    Yes.

6    Q    And what did Mr. Rodriguez say to you?

7    A    As he was going by my intersection, he waved at me and

8    said, Hey, did you get my email?

9    Q    Okay.  Did you respond to him?

10   A    I told him that I did not have access to email at the

11   moment.

12   Q    Do you know what email he was referring to?

13   A    I did not.

14   Q    Did you ever find out what he email he was referring to?

15   A    Yes.  As they passed by going the other way, his secretary

16   explained to me, while sitting there, waiting for her turn to

17   go, that they had sent the email out to all of management and

18   to all of safety regarding my performance at the intersection.

19   Q    Okay.  Now, on May 24, 2017, did you have any interactions

20   with an individual named Lisa Lipson?

21   A    I did.

22   Q    And who is Lisa Lipson?

23   A    She was a -- she's a woman that works in the HR

24   department.

25   Q    Okay.  Do you remember about what time you had an



1    interaction with Ms. Lipson?

2    A    It was about 7:15 to 7:30.

3    Q    Do you recall whether or not she came up to you?

4    A    She did.

5    Q    Did she speak with you?

6    A    She did.

7    Q    What did she say to you?

8    A    As she approached my intersection, she said, Hi, Richard.

9    Can I speak to you?

10    Q    Did you respond to her?

11    A    I did.  I was doing my duties as traffic guard, so I -- I

12    gestured for her to wait a second, and then once I was done

13    with my people passing -- passing by, I approached her.

14    Q    Okay.  Did you say anything to her when you approached

15    her?

16    A    I asked her how I could help her.

17    Q    And did Mr. Lipson respond to you?

18    A    She said she wanted to talk to me about my performance at

19    my intersection.

20    Q    Okay.  Did she say anything else to you?

21    A    She gestured towards the offices that were near where we

22    -- where I was stationed and asked me if we could go over there

23    and speak because the noise level was lower.

24    Q    Okay.  Did you actually go to the office to speak with

25    her?



www.escribers.net | 800-257-0885

1    A    We did.

2    Q    When you spoke with Ms. Lipson on May 24, 2017, was it

3    just the two of you that spoke?

4    A    No.  There was a -- a representative of the safety

5    department there.

6    Q    Do you remember who that was?

7    A    I'm sorry.  I can't recall her name at the moment.

8    Q    Do you recall whether it was an individual named Lauren

9    Holcomb?

10    A    This is her.

11    Q    Now, when you got into the room, did either Ms. Lipson or

12    Ms. Holcomb speak?

13    A    Ms. Lipson spoke first.

14    Q    And what did she say?

15    A    She told me I could sit down, Please have a seat.

16    Q    Okay.  After she asked you to sit down, did she say

17    anything else?

18    A    Yes.  She told me I was doing a good job there.  Then, she

19    immediately asked me about -- she said she wanted to ask me a

20    question about the 300 logs.

21    Q    Did she say anything about the 300 logs?

22    A    She asked me what I did with them.

23    Q    Did you --

24         MR. ROSS:  I couldn't hear the last --

25         THE WITNESS:  She asked what I did with them.


www.escribers.net | 800-257-0885

1   Q    BY MR. RODRIGUEZ-RITCHIE:  Did you respond to her?

2   A    I did.

3   Q    And what did you say to her?

4   A    I told her I didn't do nothing with them.

5   Q    Okay.  Did Ms. Lipson ask you anything else?

6   A    She said you received them, right.

7   Q    Did you answer her question?

8   A    I told her I did.

9   Q    Okay.  Did Ms. Lipson ask you anything else?

10  A    She asked if I knew if anybody else had done anything with

11  them.

12  Q    And did you answer her question?

13  A    I told her no, I don't know if anybody else did anything

14  with them.

15  Q    Okay.  Did Ms. Lipson say anything else during this

16  meeting?

17  A    She asked me if I had access to the Interweb at Tesla.

18  Q    Did you answer --

19       MR. ROSS:  I'm sorry, I couldn't hear it.

20       JUDGE TRACY:  Okay.

21       THE WITNESS:  She asked me if I had access to the Interweb

22  at Tesla.

23  Q    BY MR. RODRIGUEZ-RITCHIE:  Okay.  Did you answer her

24  question?

25  A    I did.



www.escribers.net | 800-257-0885

1    Q    What did you say?

2    A    I explained to her I could barely access my own phone,

3    that my granddaughter has a better time accessing my phone than

4    I did.  And you're asking me if I hacked into a system.  I said

5    I did not.

6    Q    Okay.  Did she ask you any other questions?

7    A    No, but she looked at the other woman and kind of like

8    rolled her eyes and laughed like, yeah, I believe that.

9    Q    And that would be Ms. Holcomb?

10   A    Yes.

11   Q    Okay.  Did Ms. Holcomb say anything during this

12   conversation?

13   A    Yes, she did.

14   Q    What did Ms. Holcomb say?

15   A    Well, after this line of questioning I said, so this is

16   what you brought me here for to ask me about this and not what

17   you had told me about the performance I was doing at my gear

18   station.  And then the safety lady intervened quickly and said,

19   no, Richard, please understand you're doing a great job there

20   and we appreciate what you're doing there.

21   Q    Okay.  During this conversation with Ms. Lipson, did

22   either Ms. Lipson or Ms. Holcomb ask you about Mr. Galescu?

23   A    They did.

24   Q    Who?

25   A    Ms. Lipson.



www.escribers.net | 800-257-0885

1    Q    And what did Ms. Lipson ask you about Mr. Galescu?

2    A    She asked me if I was aware that if I knew if Jonathan had

3    done anything with the 300 logs.

4    Q    And did you answer her question?

5    A    I did.

6    Q    And what did you say?

7    A    I said not in my presence, he did not do anything.  I

8    can't answer to what anybody does out of my presence.

9    Q    Did Ms. Lipson or Ms. Holcomb say anything else during

10   this meeting?

11   A    They said thank you.

12   Q    And at this point was the meeting over?

13   A    Well, I mentioned that this is what you brought me in here

14   for under false pretenses; can I at least get a soda.

15   Q    And did anyone respond to your request for a soda?

16   A    Yes.  They said, yes, you may, Richard; you can have a

17   soda and we understand you are doing a good job at that

18   intersection and it is appreciated.

19   Q    Okay.  And at this point was the meeting over?

20   A    It was.

21   Q    And what did you do after your meeting?

22   A    Well, I -- she said, okay, Richard, you can go back to

23   work.  I said can I get my soda now.  She said, yes, you may.

24   And I returned to my area.

25   Q    Mr. Ortiz, during your employment with Tesla, do you



1  recall whether or not you signed any petitions about your

2  working conditions at Tesla?

3  A    I did.

4  Q    How many?

5  A    I believe three, maybe more.

6  Q    Do you remember when the first one was?

7  A    Yes.

8  Q    About when was the first one?

9  A    Around March or April of 2017.

10 Q    Okay.  Mr. Ortiz, I'm going to hand you what's been pre-

11 marked as General Counsel Exhibit 27.

12 A    Okay.

13 Q    Okay.  Do you recognize General Counsel's Exhibit 27?

14 A    I do.

15 Q    And what do you recognize it to be?

16 A    This is a copy of the petition I signed.

17 Q    And was this the first one you were referring to?

18 A    Yes.

19 Q    Now, General Counsel's Exhibit 27 is blank, correct?

20 A    Yes.

21 Q    Did you actually sign this petition?

22 A    I electronically signed it.

23 Q    And did you keep a copy of your electronic signature?

24 A    No.

25 Q    When was the next petition that you signed during your



1    employment at Tesla?

2    A    Sometime between -- in April or May.

3    Q    Okay.  Do you remember what that was about?

4    A    That was about wages and clarity.

5    Q    Okay.  Mr. Ortiz, I'm going to hand you a one-page

6    document that says "redacted" on it, premarked as General

7    Counsel's Exhibit 26.  Do you recognize General Counsel's

8    Exhibit 26?

9    A    I do.

10   Q    Okay.  Is this a document that you signed?

11   A    It is.

12   Q    And what is this document?

13   A    This is a petition about clarity and wages.

14   Q    This document says "redacted" on it?

15   A    Yes.

16   Q    Is that something that --

17   A    No, that was not on the one I signed.

18   Q    Okay.

19       MR. RODRIGUEZ-RITCHIE:  At this time, I'd like to move

20   General Counsel's Exhibit 26 and 27 into the evidence.

21       General Counsel would note that because there are

22   signatures of employees who have no testimony here today and no

23   relevance to this testimony, he's redacted the names of those

24   employees to protect their identity.

25       JUDGE TRACY:  Any objections?



1    MR. ROSS:  No.

2    JUDGE TRACY:  All right.  General Counsel's Exhibits 26

3    and 27 are admitted into evidence.

4    **(General Counsel Exhibit Number 26 and 27 Received into**

5    **Evidence)**

6    Q    BY MR. RODRIGUEZ-RITCHIE:  Mr. Ortiz, did you do anything

7    with General Counsel's Exhibit 26 after you signed it?

8    A    Yes.

9    MR. ROSS:  26?

10   MR. RODRIGUEZ-RITCHIE:  Yes.

11   Q    BY MR. RODRIGUEZ-RITCHIE:  What did you do with General

12   Counsel's Exhibit 26?

13   A    We took the one I had signed and the ones that other DOCs

14   had signed and put them into a little packet, envelope, and I

15   delivered them to Josh Hodges.

16   Q    And who -- I'm sorry, did you say Hodges or Hedges?

17   A    Hedges, Josh Hedges.

18   Q    And who is Josh Hedges?

19   A    He's, to my knowledge, the head of HR.

20   Q    Okay.  I'm going to hand you what's been pre-marked as

21   General Counsel's Exhibit 45.

22   A    Okay.

23   Q    I's a one-page document.  Take a moment.

24   A    All right.

25   Q    Okay.  Do you recognize General Counsel's Exhibit 45?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    What do you recognize it to be?

3    A    A picture of the group that helped me deliver the package

4    of flyers and the petitions.

5    Q    So earlier when you testified that you delivered General

6    Counsel's Exhibit -- a packet of General Counsel's Exhibit 26

7    with employees' signatures to Josh Hedges, is this a picture of

8    you before you delivered that petition?

9    A    It is.

10    Q    And General Counsel's Exhibit 45 appears to be a posting

11    on a page that says A Fair Future at Tesla.

12    A    It is.

13    Q    Do you remember -- and there's a date on here that says

14    July 21st, 2017?

15    A    There is.

16    Q    Do you recall whether or not you saw this post on or about

17    July 21st, 2017?

18    A    I did.

19    Q    Okay.

20        MR. RODRIGUEZ-RITCHIE:  Then at this time I'd like to move

21    General Counsel's Exhibit 45 into evidence.

22        JUDGE TRACY:  Any objection?

23        MR. ROSS:  I'm questioning the relevance of it.

24        MR. RODRIGUEZ-RITCHIE:  It's PCA and union activities

25    which the General Counsel asserts was the basis of the



1    termination.

2        JUDGE TRACY:  Still relevance objection?

3        MR. ROSS:  Excuse me just a moment.  What?  I'm sorry?

4        JUDGE TRACY:  I said is there still an objection?

5        MR. ROSS:  No, that's fine.

6        JUDGE TRACY:  All right.  So General Counsel's Exhibit 45

7    is admitted into evidence.

8    **(General Counsel Exhibit Number 45 Received into Evidence)**

9    Q    BY MR. RODRIGUEZ-RITCHIE:  Now, Mr. Ortiz, in the summer

10   of 2017, do you recall whether or not you participated in any

11   meetings with California legislators about working conditions

12   at Tesla?

13       MR. ROSS:  I apologize, Your Honor.  Again, I had a hard

14   time hearing Mr. Rodriguez-Ritchie's statement.

15       JUDGE TRACY:  Do you mind if you would please repeat that.

16       MR. RODRIGUEZ-RITCHIE:  No, of course not, Your Honor.

17   Q    BY MR. RODRIGUEZ-RITCHIE:  Mr. Ortiz, in the summer of

18   2017, do you recall whether or not you participated in any

19   meetings with California legislators about your working

20   conditions at Tesla?

21   A    I did.

22   Q    Do you remember with who?

23   A    Many many of them.

24   Q    Okay.  Can you name any of them?

25   A    I can attempt to -- Nancy Skinner, Bob Wieckowski



1    (phonetic), some more, many more.  I can't remember their

2    names.

3    Q    Okay.  And did you meet with them in Sacramento?

4    A    Yes.

5    Q    When you met with them, did you go by yourself?

6    A    No.

7    Q    Who did you go with?

8    A    Several people.

9    Q    Were they other Tesla Fremont workers?

10    A    Some of them.

11    Q    Did you go with any UAW organizers?

12    A    I did.

13    Q    Okay.  Mr. Ortiz, I'm handing you what's been pre-marked

14    as General Counsel's Exhibit 46.  Take a look at it and let me

15    know when you're ready.

16    A    Okay.

17    Q    And now, Mr. Ortiz, do you recognize General Counsel's

18    Exhibit 46?

19    A    Yes.

20    Q    And what is General Counsel's Exhibit 46?

21    A    That's a picture of me and some of my co-workers that were

22    in Sacramento.

23    Q    And these are Tesla Fremont workers?

24    A    Yes.

25    Q    Can you tell me who those workers are that are pictured in



www.escribers.net | 800-257-0885

1  this picture?

2  A    We have myself, Jonathan Galescu, Michael Sanchez and

3  Branton Phillips.

4  Q    I think it would actually be helpful.  Can you go from

5  left to right --

6  A    Left to right.

7  Q    -- and identify all the people in the picture.

8  A    There's Jonathan Galescu, myself, Michael Sanchez and

9  Branton Phillips.

10  Q    Okay.  And there's an individual in the center of the

11  picture; do you know who that is?

12  A    That's Senator Monning.

13  Q    Okay.  Now, earlier you testified that you, in the summer

14  of 2017, you went to meet with California legislators with your

15  Tesla Fremont co-workers.  Is this one of the meetings you were

16  referring to?

17  A    It is.

18  Q    Okay.  And this document, there's a date that says August

19  29th, 2017.  And it appears to be a posting on a page called

20  the Fair Future of Tesla.  Do you recall whether or not you saw

21  this post on or about August 29th, 2017?

22  A    I did see it.

23  Q    Okay.

24      MR. RODRIGUEZ-RITCHIE:  And at this time, I'd like to move

25  General Counsel's Exhibit 46 into evidence.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Any objection?

2      MR. ROSS:  Yeah, I continue to question the relevance of

3   it but anticipating --

4      JUDGE TRACY:  State for the record, please, the relevance.

5      MR. RODRIGUEZ-RITCHIE:  Sure.  The General Counsel has

6   asserted that Tesla terminated Mr. Ortiz for his protected

7   activities and that these are part of the protected activities.

8   And, in fact, we're about to get into exactly why this is

9   particularly relevant to the specific activities that are the

10  reason why Tesla terminated Mr. Ortiz.

11     MR. ROSS:  So if I understand you correctly, it's General

12  Counsel's position that because Mr. Ortiz went to Sacramento

13  and did whatever he did in Sacramento that's why he got

14  terminated?

15     MR. RODRIGUEZ-RITCHIE:  It's the General Counsel's

16  position that Tesla terminated Mr. Ortiz for all of his Section

17  7 activities.

18     MR. ROSS:  Okay.  Again, I think it's a stretch.  I don't

19  think it's relevant but I assume you're going to let in, so.

20     JUDGE TRACY:  So to the extent that there is an objection

21  regarding relevance, I would overrule that objection.

22     MR. ROSS:  Okay.  Thank you.

23     JUDGE TRACY:  And so General Counsel's Exhibit 46 is

24  admitted into evidence.

25     **(General Counsel Exhibit Number 46 Received into Evidence)**



1    Q    BY MR. RODRIGUEZ-RITCHIE:  Now, Mr. Ortiz, what was the

2    reason for your speaking with legislators about your working

3    conditions at Tesla with your co-workers?

4    A    We were in Sacramento speaking to them about -- there was

5    a rebate program that was going to have some new language in it

6    and we were trying to encourage them to make sure the language

7    was -- had some real bite as far as the employer's being fair

8    and responsible because all the conditions we were

9    experiencing, you know, with the safety and the way that the

10    people are afraid to report -- there were injuries.  We

11    wanted -- we were looking for some help anywhere, anyplace we

12    can get it.

13    Q    Okay.  Now, you mentioned that this was in regards to a

14    Bill?

15    A    Yes.

16    Q    Do you know whether or not there were any public hearings

17    about this Bill?

18    A    There were.

19    Q    In relation to when you went to go speak with the

20    legislators, was that before or after you spoke with the

21    legislators?

22    A    It would've been a little bit afterwards.

23    Q    Was this a hearing that you attended?

24    A    I did not.

25    Q    Okay.  Did you ever speak with anyone about the hearing?



```
1    A    I did.

2    Q    With who?

3    A    I spoke with Hanna Brohan (phonetic).

4    Q    And who is Hanna?

5    A    She was the political organizer in Sacramento for the

6    campaign.

7    Q    And what did you speak with her about the Bill?

8    A    Well, I spoke to her about -- I asked her -- I wanted to

9    know how it was going over there.

10   Q    Okay.  Did you speak about the hearing?

11   A    That's what I wanted to know about, yes.

12   Q    Okay.  And what about the hearing did you speak with her

13   about?

14   A    I had contacted her to find out just what was going on.

15   I've never been involved in any of that before, had any

16   interest in any of that before.  So I really didn't know where

17   it was going to go, but.  She told me it was going fine but

18   there was some other employees up there.

19   Q    Did she say what other employees -- actually, I'll

20   withdraw the question.  Did she say whether or not these were

21   Tesla Fremont employees?

22   A    She did.

23   Q    Did Ms. Hanna (sic) correspond with you, at all, about the

24   hearing?

25   A    She did.
```



www.escribers.net | 800-257-0885

1    Q    What was her correspondence about?

2    A    Well, I had asked her who -- if she knew who they were,

3    you know, and she told me no.  But she did send me a reel.

4    Q    Okay.  And did she send you -- excuse me.  You said a

5    reel?

6    A    Yes.

7    Q    As in a video reel?

8    A    I believe that's what it is.  It's just a tape of the

9    whole day.

10   Q    And did she send you a physical tape or a link to the

11   video?

12   A    She sent me a link, I believe it was.

13   Q    And was that via email?

14   A    That was email.

15   Q    Okay.  In the email that she sent to you, was that just

16   sent to you or you and other people?

17   A    Other people.  She had -- when I asked her about it she

18   said, oh, I'm sending this out; I'll add you to the list of

19   people receiving it.

20   Q    Okay.  Were the other people receiving it Tesla Fremont

21   employees?

22   A    I don't know who they were.  I didn't look.

23   Q    Okay.  Now, when you received this link, did you attempt

24   to open it, open the link -- excuse me.

25   A    I did.



www.escribers.net | 800-257-0885

1    Q    And were you able to?

2    A    I was not.

3         MR. ROSS:  I couldn't hear it.

4         THE WITNESS:  No, I was not.

5    Q    BY MR. RODRIGUEZ-RITCHIE:  Did you do anything with the

6    link?

7    A    Well, after several attempts and a lot of frustration, I

8    contacted Hanna again to find out what -- asked if she could

9    enlighten me what I was doing wrong to open it because

10   technology and me don't get along too well.  And she told me

11   what to do.  I was doing that, so -- I had no luck.  So I

12   forwarded it.

13   Q    Okay.  Who did you forward the link to?

14   A    Well, I asked Jose Moran if he thought he could open it.

15   Q    Okay.  And did you actually forward the link to Mr. Moran?

16   A    Yes.  Once he told me he felt he could, I forwarded it to

17   him.

18        MR. RODRIGUEZ-RITCHIE:  Would now be a good time for a

19   break?

20        JUDGE TRACY:  Sure.

21        MR. RODRIGUEZ-RITCHIE:  General Counsel has to take a

22   restroom --

23        JUDGE TRACY:  Let's go off the record.  Ten minutes; is

24   that fine?

25        MR. RODRIGUEZ-RITCHIE:  Thank you.



1    (Off the record at 3:48 p.m.)

2        JUDGE TRACY:  All right.  Go ahead, please.

3    Q    BY MR. RODRIGUEZ-RITCHIE:  Mr. Ortiz, prior to the break

4    we were talking about a video link that you sent to Mr. Moran.

5    A    Yes.

6    Q    Do you recall whether or not you sent that to him via text

7    message?

8    A    No, I forwarded the email to him.

9    Q    Okay.  Did you ever discuss the link with Mr. Moran via

10   text message?

11   A    Yes.

12   Q    Okay.  Mr. Ortiz, I'm going to hand you what's been pre-

13   marked as General Counsel's Exhibit 43-001 to 005.  Please take

14   a look at that.

15   A    Okay.

16   Q    If you can just give me one moment.  Mr. Ortiz, do you

17   recognize General Counsel's Exhibit 43?

18   A    I do.

19   Q    What is General Counsel's Exhibit 43?

20   A    That is a -- what I sent to Jose and what he sent back to

21   me.

22   Q    These text messages, are they about the video link that

23   you just testified about?

24   A    They are.

25   Q    Okay.  Do you remember when you sent these text messages



1    in General Counsel's Exhibit 43?

2    A    On the day of that hearing.

3    Q    Do you remember about when that was?

4    A    Late September, I believe, of 2017.

5         MR. ROSS:  I'm sorry.  I couldn't hear -- late something.

6         THE WITNESS:  September.

7    Q    BY MR. RODRIGUEZ-RITCHIE:  Okay.  Now in the text

8    messages, just so the record is clear, there are bubbles that

9    are on the left side and bubbles that are on the right side.

10   The left side bubbles, are those the text messages you

11   received -- excuse me, that you sent?

12   A    Yes.

13   Q    To Mr. Moran?

14   A    Yes.

15   Q    And the right side bubbles, are those the messages that

16   Mr. Moran sent back to you?

17   A    Yes.

18   Q    Okay.

19        MR. RODRIGUEZ-RITCHIE:  At this time, I'd like to move

20   General Counsel's Exhibit 43 into evidence.

21        JUDGE TRACY:  Any objections?

22        MR. ROSS:  May I look at it for a minute?

23        JUDGE TRACY:  Yes.

24        MR. ROSS:  May I ask some voir dire?

25        JUDGE TRACY:  Yes.



1          **VOIR DIRE EXAMINATION**

2     Q    BY MR. ROSS:  Mr. Ortiz, Counsel for the General Counsel

3     has given you this document, 43-001 through 43-005.  Is this

4     one continuous text string or are these from various different

5     texts?

6     A    This is what I received on my phone from Jose Moran and in

7     concession (sic).

8     Q    Okay.  So this is one -- was it like, for instance, I'm

9     looking at the first blurb or balloon that says "Hanna is

10    sensing me" -- I assume it means sending me -- "a video of the

11    suck asses Tesla has been taking," I assume you mean to

12    Sacramento.  That's you speaking, right?

13    A    Correct.

14    Q    Okay.  Now, was there something from Mr. Moran that

15    preceded that?

16    A    I don't understand your question.

17    Q    Yeah.  Okay.  Well, the text is a series of message (sic)

18    from you to Mr. Moran; is that right?

19    A    Yes.

20    Q    Okay.  And my question to you is is the first entry on the

21    left-hand side, it reads, "Hanna is sensing me a video" and I

22    understand it's a typo -- I type the same way you do.  Tell me,

23    was that the first email in this string or were there -- or was

24    that the first text in this string or were there messages that

25    preceded that?



www.escribers.net | 800-257-0885

1    A    I don't remember.

2    Q    You don't remember.

3    A    No.

4    Q    Oaky.  Okay.

5         MR. RODRIGUEZ-RITCHIE:  I'm going to object to the voir

6    dire to the extent that these are actually documents that were

7    produced by Tesla.  So to the extent that Tesla is attempting

8    to assert that they're not authentic.  These are the very

9    documents Tesla produced.

10        JUDGE TRACY:  Well, I'm thinking actually, based upon this

11   questioning, just kind of if you could ask the witness to

12   explain the order of receipt of these text messages, whether --

13   you know, as you text somebody, you go back and forth and I'm

14   looking at my phone and the latest one is the last one and then

15   there's all the ones from before.  I think there's this

16   question of are these snapshots of text messages -- I mean in

17   the sense of like is it different conversations that are

18   together or is it one conversation.

19        MR. ROSS:  Is it a continuous string as opposed to

20   excerpts.

21        JUDGE TRACY:  Could you please ask that to clarify GC

22   Exhibit 43.

23        MR. RODRIGUEZ-RITCHIE:  Sure.

24                    **DIRECT EXAMINATION** (RESUMED)

25   Q    BY MR. RODRIGUEZ-RITCHIE:  Well, first I'll ask.  Mr.



1    Ortiz, did you take these screenshots of your own phone?

2    A    No.

3    Q    Okay.  So the first text message that says begins with on

4    the first page "Hanna is sensing" --

5    A    Uh-huh.

6    Q    -- that text message?  Is that, to the best of your

7    recollection, is that the first text message on the topic of

8    the video link?

9    A    I believe so.

10    Q    Okay.  And then as the text messages continue, on the

11    first page it starts with -- or excuse me.  On the first page

12    it ends with "one guy maintenance."  Okay?  And then if you

13    turn to the second page, it starts with "one guy maintenance."

14    To the best of your recollection, is page number 002, is that

15    the next -- is that where the text messages from page 1

16    continue?

17    A    Yes, I believe so.

18    Q    Okay.  And if you look at the bottom of page 2, it says --

19    it ends with "Shaun Ives.maintenance tech"; do you see that?

20    A    I do.

21    Q    Okay.  And then on the top of page 3, it starts off with

22    "Shaun Ives maintenance tech"?

23    A    Yes.

24    Q    Okay.  To the best of your recollection, is page 3 the

25    next in the series of messages after page 2?



1    A    It appears to me as though it is.

2    Q    Okay.  So I want you then look at the bottom of page 3

3    where it says "I got one more, it's a female" -- do you see

4    where I'm referring to?

5    A    I do.

6    Q    Okay.  Then look at the top of page 4.  It says "I got one

7    more and it's a female"; do you see what I'm referring to?

8    A    Yes.

9    Q    Okay.  So to the best of your recollection, at the bottom

10    of -- excuse me.  Is page 4 the continuation of text messages

11    after page 3?

12    A    I believe so.

13    Q    Okay.  Now, I want you to look at the bottom of page 4.

14    There's a picture of a female, a woman wearing a scarf?

15    A    I see that.

16    Q    Okay.  Then I want you to look at page 5.

17    A    Okay.

18    Q    Okay.  There's also a picture of the same, who appears to

19    be the same female wearing the same scarf?

20    A    I see that.

21    Q    Okay.  So is page 5 a continuation of page four?

22    A    I believe so.

23    Q    Okay.  To the best of your recollection, were there any

24    other text messages after this on page 5 on the topic of the

25    video link with Mr. Moran?



1    A    No.

2         JUDGE TRACY:  Mr. Ross, does that help in terms of any

3    objections to General Counsel's Exhibit 43?

4         MR. ROSS:  It does.

5         JUDGE TRACY:  So --

6         MR. ROSS:  Well -- it does.

7         JUDGE TRACY:  Okay.  Any objections?

8         MR. ROSS:  No.

9         JUDGE TRACY:  All right.  So General Counsel's Exhibit 43-

10   001 to 005 is admitted into evidence.

11   **(General Counsel Exhibit Number 43-001 to 005 Received into**

12   **Evidence)**

13   Q    BY MR. RODRIGUEZ RITCHIE:  Mr. Ortiz, I want to ask you

14   about General Counsel's Exhibit 43.  If you look starting at

15   page 2.

16   A    Um-hum.

17   Q    There is what appears to be a picture.

18   A    Yes.

19   Q    Do you know what that picture is?

20   A    It's a picture of this person.

21   Q    Is this a picture that you took?

22   A    No.

23   Q    Is this a picture that Mr. Moran sent you?

24   A    Yes.

25   Q    Then I want you to take a look at page 3.  There's what



1    appears to be another picture.

2    A    Okay.

3    Q    That says Travis Pratt.

4    A    Yes.

5    Q    Okay.  Is that a picture that you took?

6    A    No.

7    Q    Is that a picture that Mr. Moran sent you?

8    A    Yes.

9    Q    Okay.  I want you to take a look at page 4.  There's a

10   picture of a female.

11   A    Okay.

12   Q    Is that a picture that you took?

13   A    No.

14   Q    Is that a picture that Mr. Moran sent you?

15   A    Yes.

16   Q    Okay.  And then I want you to take a look at page 5.

17   There's a picture at the top; is that the same picture that's

18   in page 4?

19   A    I believe it to be that.

20   Q    Okay.  So then below that picture, there's another picture

21   that says Jean Osbual, production supervisor general assembly.

22   A    Um-hum.

23   Q    Is that a picture that you took?

24   A    No.

25   Q    Is that a picture that Mr. Moran sent you?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Did you ask Mr. Moran to send you screen shots?

3    A    No.

4    Q    And the screen shots, what were they of?

5    A    That -- them; these people.

6    Q    Who are those people in the screen shots that are in

7    General Counsel's Exhibit 43?

8    A    I believe that they are the people that he saw on the reel

9    that I was sent and I forwarded to him.

10        MR. ROSS:  I'm sorry.  Again, I couldn't hear the Witness.

11    I apologize.

12        JUDGE TRACY:  Would you just repeat what you just said.

13        THE WITNESS:  I believe that those are the individuals

14    that Jose saw when I forwarded him the reel and he looked at

15    it.

16    Q    BY MR. RODRIGUEZ RITCHIE:  This is the reel you testified

17    about earlier that was a video of hearings taking place in

18    Sacramento about the bill you spoke with legislators about?

19    A    Yes.

20    Q    Now, the pictures of the individuals that are in General

21    Counsel's Exhibit 43, did you receive similar pictures from

22    anyone else?

23    A    I did.

24    Q    From who?

25    A    I don't know.



1    Q    Is there a reason why you don't know?

2    A    Yes, because when you get texts, there's -- like you see

3    here, my name is tagged in his text -- Jose's name was tagged,

4    but the other two I received them from, they were not tagged as

5    who they were; I don't have them in my contact list, so when it

6    popped up, I didn't know who they were.

7    Q    Okay.  Did you do anything with the screen shots that you

8    received?

9    A    I did.

10    Q    What did you do with them?

11    A    I posted them on the -- my -- on the fair future -- you

12    know what I mean -- the Fremont employee for UAW representation

13    page.

14    Q    Is that a page that's on Facebook?

15    A    That's the private Facebook page.

16    Q    Is this the Facebook page that you testified about earlier

17    in your testimony?

18    A    Yes.

19    Q    This is the page that you're an administrator of?

20    A    Yes.

21    Q    And is this the page that you testified about that was

22    made up of Tesla Fremont employees?

23    A    Yes.

24    Q    Okay.  I'm going to show you what's been pre-marked as

25    General Counsel's Exhibit 28.  I want you to take a look at it



1    and give me a moment.

2    A    Okay.

3    Q    Now, Mr. Ortiz, do you recognize General Counsel's Exhibit

4    28?

5    A    No.

6    Q    Do you recognize any part of General Counsel's Exhibit 28?

7    A    Yes.

8    Q    Okay.  I'm going to show you with the projector General

9    Counsel's Exhibit 28.  Do you see a laser pointer on -- okay.

10   So if you could show us on General Counsel's Exhibit 28 what's

11   the part that you recognize?

12   A    This part.

13   Q    Okay.  And what is that?

14   A    That's my posting --

15   Q    This is the --

16   A    That part is what I said when I posted it to the Fremont

17   employees -- Fremont Tesla employees for fair -- for union

18   representation.

19   Q    Okay.  So underneath, it says -- in General Counsel's

20   Exhibit -- or I'm sorry, I should start off with at the top of

21   General Counsel's Exhibit 28, it says to Travis Pratt; is that

22   something that you're familiar with?

23   A    No.

24   Q    Okay.  Then underneath, it -- if you see underneath the

25   post that you're referring to, it says, "looks like we got



www.escribers.net | 800-257-0885

1    under some people's skins", smiley face; is that something that

2    you've seen before?

3    A    No.

4    Q    Okay.  And then underneath, it says, "wow, this is on

5    Facebook"; is that something that you're familiar with?

6    A    No.

7    Q    Okay.  Then underneath, it says, "yeah, LOL, I'm pretty

8    sure it's on their fair future at Tesla thing"; is that

9    something you're familiar with?

10   A    No.

11   Q    Okay, so the -- what -- the portion of General Counsel's

12   Exhibit 28 that you're familiar with is what appears to be a

13   picture of the Facebook posting?

14   A    Yes.

15   Q    Okay.  Thank you.

16       MR. RODRIGUEZ RITCHIE:  So at this time, I'd like to move

17   General Counsel's Exhibit 28 into evidence, noting that it's a

18   document produced by Tesla that's maintained, and we can

19   certainly hear testimony on that if Her Honor would prefer

20   through a custodian of records, but I represent it's a document

21   that was maintained by Tesla during the course of its business.

22       JUDGE TRACY:  Any objections?

23       MR. ROSS:  I'd like to voir dire the Witness for a moment,

24   if I may.

25       JUDGE TRACY:  Sure.



www.escribers.net | 800-257-0885

1        **VOIR DIRE EXAMINATION**

2    Q    BY MR. ROSS:  Mr. Ortiz, counsel -- the General Counsel

3    asked you which portions of this page, that is General

4    Counsel's Exhibit 28, you recognize.  And you don't recognize

5    the last three items; the one that begins with "looks like we",

6    "wow", and "LOL, I'm pretty"; those are the things you don't

7    recognize; you do recognize everything else on the page?

8         MS. FEINBERG:  Objection.  Misstates the testimony.

9         JUDGE TRACY:  Well, let him answer.

10        MS. FEINBERG:  Okay.

11   Q    BY MR. ROSS:  Is that correct?

12   A    No, I did not recognize everything else.

13   Q    Okay.  You recognize the pictures?

14   A    Yes.

15   Q    You put the pictures on the website -- or on the Facebook

16   page, right?

17   A    It appears to be those pictures.

18   Q    Did you or didn't you?

19   A    I put some pictures on the website.

20   Q    I'm sorry?

21   A    I put some pictures on the website.

22   Q    You put these pictures on the website?

23   A    I'm not sure I did.

24   Q    Well, if you didn't, who did?

25   A    I'm not sure those are the same ones.


www.escribers.net | 800-257-0885

1    Q    I see.  Did you put pictures of Travis Pratt on -- a

2    picture of Travis Pratt on the website?

3    A    I did.

4    Q    Or on the Facebook page?

5    A    I did.

6    Q    And Shaun Ives; did you put a picture of Shaun Ives on the

7    Facebook page?

8    A    I did.

9    Q    Okay.  You're just saying you don't know whether it's

10   these pictures?

11   A    Correct.

12   Q    I see.  And so you're not saying you don't recognize those

13   pictures, you're just not sure whether you recognize them or

14   not; is that right?

15   A    I'm not sure these are the exact ones I did.

16   Q    I see.  So like I said, you don't -- not sure you

17   recognize it or not; you may, you may not?

18   A    I'm saying I did put some up there of those two

19   individuals, but I'm not sure these are the ones I put.

20   Q    I see.

21        JUDGE TRACY:  So I would say to the General Counsel, if

22   you're not going to agree to -- if you're going to object, is

23   there someone else that can introduce this record since he does

24   not recognize the format of it.  It looks like it was a text

25   message to Travis Pratt --


www.escribers.net | 800-257-0885

1     MR. RODRIGUEZ RITCHIE:  Sure, we can call the custodian of

2     records at Tesla --

3     JUDGE TRACY:  If that's what --

4     MR. RODRIGUEZ RITCHIE:  -- and have them appear if Tesla

5     refuses to agree to admit this document into evidence that it

6     produced to the General Counsel pursuant to its subpoena to

7     Tesla.

8     Q     BY MR. ROSS:  Well, we can agree that the written text

9     above the pictures, that is your work; is that correct?

10    A     Yes.

11    Q     Okay.

12    MR. ROSS:  Could we have just a moment?

13    JUDGE TRACY:  Okay.

14    (Counsel confer)

15    MR. ROSS:  Okay.  We have no objection, Your Honor.

16    JUDGE TRACY:  All right.  So General Counsel's Exhibit 28

17    is admitted into evidence.

18    **(General Counsel Exhibit Number 28 Received into Evidence)**

19                    <u>**DIRECT EXAMINATION**</u> **(RESUMED)**

20    Q     BY MR. RODRIGUEZ RITCHIE:  Now, Mr. Ortiz, you testified

21    that you -- with Mr. Ross --

22    JUDGE TRACY:  And -- but can I just have one little

23    comment about it?

24    MR. RODRIGUEZ RITCHIE:  Sure.

25    JUDGE TRACY:  Okay.  So I understand that there is an



1  issue with -- perhaps there's an issue with in terms of how

2  this would get entered into the record, but I certainly for my

3  benefit, and for the record's benefit, would appreciate at some

4  point this connection with the allegations in the complaint,

5  which I'm sure you're going to be doing.

6      MR. RODRIGUEZ RITCHIE:  We're going to get to that soon.

7      JUDGE TRACY:  Okay.  I just am a bit confused by it.

8      MS. FEINBERG:  It --

9      MR. RODRIGUEZ RITCHIE:  It will come up soon.

10     JUDGE TRACY:  Okay.  Thank you.

11  Q   BY MR. RODRIGUEZ RITCHIE:  Now, Mr. Ortiz, the posting on

12  Facebook that you've testified about -- that you testified you

13  posted on this private Facebook group, do you remember about

14  when you posted it?

15  A   It was on the same day I received the messages from Jose.

16  Q   Okay.  So do you still have General Counsel's Exhibit 43?

17  A   43.  I'm sure I do.

18  Q   It's these text messages, is General Counsel's Exhibit 43.

19  A   Oh, yes, I do right here.

20  Q   Okay.  I want you to look at page 4 of General Counsel's

21  Exhibit 43.

22  A   Okay.

23  Q   There's a date there that says September 14th; is that

24  about when you received the text messages?

25  A   Yes.



1    Q    Is that about when you posted on Facebook?

2    A    Yes.

3    Q    Now, why did you post on Facebook?

4    A    Those words we just looked at in the other one.  And then

5    they --

6    Q    Okay.  And you posted screen shots as well?

7    A    Yes, of the two men.

8    Q    Okay.  And who were those two individuals?

9    A    The ones pictured here, Shaun Ives and Travis Pratt.

10    MS. FEINBERG:  Could the record reflect that he was

11    looking at Exhibit 43, just so it's clear because --

12    JUDGE TRACY:  Yes, I mean, he -- the General --

13    MS. FEINBERG:  Because he has a couple of exhibits in

14    front of him.  Okay.

15    JUDGE TRACY:  Oh, okay, the General Counsel asked him to

16    look at Exhibit 43, but yes, he's testifying from Exhibit 43.

17    MS. FEINBERG:  But then it's -- okay.

18    MR. RODRIGUEZ RITCHIE:  Yes.

19    Q    BY MR. RODRIGUEZ RITCHIE:  Now, after you posted what's

20    marked and -- what's been received in General Counsel's Exhibit

21    28 onto the private Facebook page, did you take it down or did

22    you leave it up?

23    A    I took it down.

24    Q    Why did you take it down?

25    A    Because one of the individuals messaged me on Facebook and



1   stated that maybe calling them names wasn't a good way to

2   start.

3   Q    Do you remember who that was?

4   A    I believe it was Travis.

5   Q    Is that Travis Pratt?

6   A    Nope, it was Shaun Ives actually; I believe it was him.

7   Q    Okay.  Now, did you keep a copy of the Facebook posting

8   that you took down?

9   A    No.

10  Q    So earlier when you testified about General Counsel's

11  Exhibit 28 and that Facebook posting, that's not a copy that

12  you kept after your posting?

13  A    No.

14  Q    Okay.  So after you posted onto Facebook the language

15  that's in General Counsel's Exhibit 28 and the pictures that

16  you've testified about, did you discuss the Facebook posting

17  with anyone at Tesla?

18  A    I did.

19  Q    With who?

20  A    Ricky Gecewich.

21  Q    And who is Mr. Gecewich?

22  A    To the best of my knowledge, he said he's an investigator

23  for Tesla.

24  Q    Okay.  Did Mr. Gecewich contact you?

25  A    He did.



1    Q    How did he contact you?

2    A    I received an email from him.

3    Q    Okay.  And what did the email say?

4    A    It was asking me if I could attend a meeting with him the

5    following day prior to work.

6    Q    And did you meet with Mr. Gecewich?

7    A    I did.

8    Q    Where?

9    A    In the office that was specified in the email.

10   Q    Was it just the two of you?

11   A    It was.

12   Q    When you met with Mr. Gecewich, who spoke first during the

13   meeting?

14   A    Ricky did.

15   Q    And what did Mr. Gecewich say to you?

16   A    He introduced himself, and I introduced myself, and you

17   know, he asked me if we could keep this meeting between us, me

18   and him, and not discuss it with anybody outside of the room.

19   Q    Okay.  After he asked you to keep it between the two of

20   you and not discuss it with anyone else, did Mr. Gecewich

21   continue speaking?

22   A    Oh, yes, we shook hands, and then he continued to talk to

23   me.

24   Q    What did Mr. Gecewich say to you?

25   A    He showed me the pictures that -- the screen shots of my



www.escribers.net | 800-257-0885

1    postings.

2    Q    Was that, to the best of your recollection, what was just

3    admitted as General Counsel's Exhibit 28 with the exception of

4    the text messages?

5    A    Yes.

6    Q    Okay.  After he showed you the Facebook posting, did he

7    ask you anything about it?

8    A    Well, as he was showing them to me, I -- I mean, I got

9    interrupted, so I wanted to apologize for what I said.  You

10   know, it was -- apparently, it bothered the gentleman.  I got a

11   inbox from Facebook; I read it; I took the -- I thought about

12   what he said and I thought maybe he was right, so I removed it

13   as quick as I could.

14   Q    Did Mr. Gecewich say anything back to you?

15   A    He told me that what I said had no bearing on what we were

16   doing -- wanted to talk about it.

17        MR. ROSS:  I'm sorry, I couldn't hear it.

18        THE WITNESS:  He said what I said was irrelevant.  It had

19   no bearing on what we were about to discuss.

20   Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  Now, after Mr. Gecewich

21   said that what you said had no bearing, did Mr. Gecewich say

22   anything else to you?

23   A    He asked me some questions about Work Day.

24   Q    What did he ask you about Work Day?

25   A    He asked me quite a few questions trying to ascertain my



www.escribers.net | 800-257-0885

1    knowledge of what it is, how it works, like that.

2    Q    Do you remember what, specifically, he asked about Work

3    Day?

4    A    He asked me if I knew what it was.

5    Q    And what did you respond to him, if anything?

6    A    I told him, yes, I know what it is.

7    Q    Okay.  Did he ask you anything else about Work Day?

8    A    He asked me if I ever used it?

9    Q    Did you answer his question?

10   A    I told him, I have tried.

11   Q    Okay.  Did Mr. Gecewich ask you anything else?

12   A    He asked me if I could explain that.

13   Q    And did you?

14   A    I did.

15   Q    What did you say to him?

16   A    I told him about my self-review and how that worked out

17   for me.  And about my granddaughter being better at it than me.

18   Q    With your self-review, is that what you testified -- the

19   self-review you testified about earlier?

20   A    Yes.

21   Q    So what, specifically, about the self-review did you talk

22   on?

23   A    Well, I explained to him that -- well, he asked me, had I

24   used it; I said, yes.  And then he asked me to tell him.  So I

25   told him about how I used it, and that I attempted to and it



1    sent -- it just -- I wasn't done with my review and it just

2    went -- and it was admitted as completed, and that's kind of my

3    experience with technology, so like, I really try to avoid it

4    almost.

5    Q    Okay.  Now, you mentioned you said something about your

6    granddaughter?

7    A    Yes, I explained to him during this time that my

8    granddaughter is better at these things than I am.  She can

9    pick up my phone and do things that I didn't even know it did.

10    Q    Okay.  Now, did Mr. Gecewich ask you anything else about

11    Work Day?

12    A    Yes, he asked me what I thought it does; what it actually

13    is.

14    Q    Did you answer his question?

15    A    I did.

16    Q    What did you say to him?

17    A    I told him I'm not really sure what it does.  I know it's

18    a tool that was there for us to use and they say that it's good

19    to know how to use it and I wish I did, but to my knowledge,

20    it's more of a -- the way I see it is like a Facebook for

21    Tesla; the people inside the building.

22    Q    Okay.  Did Mr. Gecewich ask you anything else during this

23    meeting?

24    A    Yes, then he asked me about the -- again, about the photos

25    of the -- my screen shots and what I posted.



1   Q    Okay.  What did he ask you about your Facebook posting?

2   A    Just he asked me where it came from.

3   Q    And did you answer his question?

4   A    I did.

5   Q    What did you say to him?

6   A    I told him I didn't know.

7   Q    Okay.  And did Mr. Gecewich ask you anything else about

8   the Facebook posting?

9   A    He did.

10  Q    What else did he ask you?

11  A    He asked me if I took the screen shots myself.

12  Q    And did you answer his question?

13  A    Yes.

14  Q    What did you answer?

15  A    I told him no, I did not.

16  Q    Okay.  Did Mr. Gecewich ask you anything else about the

17  Facebook posting?

18  A    At that point, he asked me if I was -- I remember signing

19  a document regarding the confidentiality.

20  Q    Okay.  And did you answer his question?

21  A    Yes, I did.

22  Q    What did you say?

23  A    I told him that it's been signed several times.

24  Q    Okay.  Did Mr. Gecewich ask you anything else during this

25  meeting?



www.escribers.net | 800-257-0885

1    A    He asked me about what I thought it meant.

2    Q    Did you answer his question?

3    A    I did.

4    Q    What did you say to Mr. Gecewich?

5    A    I told him I thought it was about protecting trade secrets

6    from -- you know, for Tesla.

7    Q    Okay.  Now, did Mr. Gecewich ask you anything else during

8    the meeting?

9    A    Well, at that point, I said, so I'm being fired?

10   Q    Did Mr. Gecewich say anything after you told him, so I'm

11   being fired?

12   A    He said, why would you say that?

13   Q    Did you answer Mr. Gecewich's question?

14   A    I did.  I said, because you mentioned the confidentiality

15   agreement, and to be honest, it never entered my mind.  That's

16   why I apologized for what I said.  I said, but now that you

17   mention it, I figured you must be firing me because in our

18   orientation, there was an incident where someone had taken a

19   picture inside of the plant, came back into orientation, then I

20   remember management came in and asked if that person was in

21   orientation and they said yes, and they talked -- discussed the

22   fact that she had posted something.  They asked if -- have you

23   guys gone over the confidentiality agreement.  He said, yes.

24   He goes, well, then they have to come with us because we're

25   going to terminate them.



www.escribers.net | 800-257-0885

1    Q    Okay.  Now, did Mr. Gecewich ask you anything else about

2    the screen shots during this meeting?

3    A    He did.

4    Q    What else did he ask you?

5    A    He asked -- asked me again where it came from if I didn't

6    be the one -- if I'm not the one that took it, who took it.

7    Q    And did you answer his question?

8    A    I told him I received it in a text.

9    Q    Okay.  Did Mr. Gecewich ask you anything else about the

10   Facebook posting?

11   A    He asked me who sent it to me; who took -- who I received

12   it from.

13   Q    Did you answer his question?

14   A    I did.

15   Q    What did you say to him?

16   A    I told him I wasn't sure.

17   Q    Okay.  Did Mr. Gecewich ask you any other questions?

18   A    He asked what I meant by I wasn't sure.

19   Q    Did you answer him?

20   A    I did.

21   Q    What did you say to Mr. Gecewich?

22   A    I told him I received it from three different sources and

23   I wasn't sure which one I used it from.

24   Q    And was that the truth?

25   A    No.



1    Q    Okay.  Now, why didn't you tell Mr. Gecewich the truth?

2    A    Because he mentioned the confidentiality agreement.  At

3    that point, like I said, I assumed I was already terminated and

4    I wasn't -- I didn't want to bring no one else into it and have

5    them fired also with me because I was scared.  I was very

6    scared, for myself and for Jose.

7    Q    Did Mr. Gecewich ask you any other questions during this

8    meeting?

9    A    Yes.

10    Q    What else did he ask you?

11    A    He asked me if I was sure I didn't know who sent it to him

12    -- sent it to me.

13    Q    And did you answer his question?

14    A    I did.

15    Q    What did you say to him?

16    A    I said, I don't know.

17    Q    Okay.  After you told Mr. Gecewich that you didn't know,

18    did Mr. Gecewich ask you any other questions?

19    A    No.

20    Q    Did you say anything else to Mr. Gecewich during this

21    meeting?

22    A    Not that I recall.  Because this has me -- I can feel what

23    I felt that day right now, and it's like I was scared to death.

24    Q    Do you remember during this meeting, do you recall whether

25    or not Mr. Gecewich asked you anything about your cell phone?



www.escribers.net | 800-257-0885

1    A    He did.

2    Q    What did Mr. Gecewich ask you about your cell phone?

3    A    When I indicated I didn't know which -- where it came

4    from, he asked me to look at my cell phone; just check it.

5    Q    I'm sorry, I didn't quite catch that.  Mr. Gecewich asked

6    to look at your cell phone?

7    A    He asked me to check my cell phone to see if I could look

8    in my history and see who sent it to me.

9    Q    Did you give him your cell phone?

10    A    I told him that I don't have that phone.

11    Q    At any point during the meeting, did you hand him your

12    cell phone?

13    A    He asked if he could look at the phone; I had it in my

14    hand.

15    Q    Did you actually give it to him?

16    A    I did.

17    Q    Did he look through your phone?

18    A    He did.

19    Q    Okay.  And what did he do when he looked through your

20    phone?

21    A    Well, he was looking through it and he was -- I opened it

22    up -- the screen so it would be opened, not locked.  And as he

23    looked -- he was looking through it and pushing buttons, I

24    explained to him that that was a new phone, so it wouldn't be

25    in there, and even if I had my old phone, they wouldn't be in



1    there either because I delete my messages every couple of days

2    because it just -- it got too full.  I was getting too many at

3    that time.

4    Q    Okay.  And after Mr. Gecewich looked through your phone,

5    did he give it back to you?

6    A    He did.

7    Q    Did Mr. Gecewich ask you anything else after he looked at

8    your phone?

9    A    He asked me why I got a new phone.

10   Q    And did you answer his question?

11   A    I did.

12   Q    And what was your answer?

13   A    I told him because my other one, I had dropped it and it

14   broke.  And I was very bad with phones, this was fifth one in

15   like two months.

16   Q    Did you discuss anything else during your meeting with Mr.

17   Gecewich?

18   A    He asked me where my old phone was.

19   Q    Did you answer him?

20   A    I did.  I told him that when I got my new phone earlier

21   that day, I let them keep it to dispose of it for me; the

22   people I got it from; the store.

23   Q    Okay.  And after you told Mr. Gecewich what happened with

24   your old phone, did the meeting continue?

25   A    At that point, it was pretty much done.



www.escribers.net | 800-257-0885

1    Q    Okay.  So after the meeting was over, did you go back to

2    work?

3    A    I did.

4    Q    At the time that you met with Mr. Gecewich, do you recall

5    what you were wearing?

6    A    I was wearing what I always wear.

7    Q    What was that?

8    A    My boots, my Tesla pants, my UAW shirt, my safety captain

9    -- or my special safety hat I had; it was red, and a pin that

10   said UAW in the middle of that hat.

11   Q    Okay, Mr. Ortiz.  I'm going to show you what's been marked

12   as General Counsel's -- what's been received as General

13   Counsel's Exhibit 25.  Just take a look at that; let me know

14   when you're ready.

15   A    All right.  I'm ready.

16   Q    And do you recognize what's been admitted as General

17   Counsel's Exhibit 25?

18   A    I do.

19   Q    What is that?

20   A    That's one of the shirts that I wore.

21   Q    Okay.  When you testified that you were wearing your UAW

22   shirt when you met with Mr. Gecewich, was it the shirt that's

23   portrayed in General Counsel's Exhibit 25?

24   A    It is.

25   Q    Okay.  You can go ahead and turn up there.  After your



www.escribers.net | 800-257-0885

1    first meeting with Mr. Gecewich, did you have any other

2    meetings with him?

3    A    I did.

4    Q    When was that?

5    A    About two weeks later, maybe a week-and-a-half.

6    Q    Do you recall where you met?

7    A    I met him at the room that was specified to meet him at.

8    Q    And at this second meeting with Mr. Gecewich, who was

9    present?

10    A    Ricky and I.

11    Q    Nobody else?

12    A    No.

13    Q    Okay.  Did Mr. Gecewich begin the meeting?

14    A    He did.

15    Q    What did Mr. Gecewich say?

16    A    He walked in and said hello as usual and asked me once

17    again if I would please, you know, keep it between me and him;

18    if I would still stick to that.  And I said, yes, I would and I

19    shook his hand again.

20    Q    Okay.  After you shook his hand, did Mr. Gecewich say

21    anything?

22    A    He proceeded to tell me his definition of a lie.

23    Q    What did Mr. Gecewich say about a lie?

24    A    I don't remember, sir.

25    Q    Okay.  After he gave a definition about a lie, did Mr.

22-60493.543



1    Gecewich continue speaking?

2    A    He did.

3    Q    What did he say?

4    A    He asked me if I remembered who I got the screenshots

5    from.

6    Q    Okay.  Did you answer him?

7    A    I did.

8    Q    What did you say to him?

9    A    I told him no.

10    Q    And was that the truth?

11    A    No.

12    Q    Why didn't you tell him the truth?

13    A    Because I was scared to death.  I assumed I was fired

14    already.  It was over for me.  And I didn't want to take

15    someone out with me, fired too, because they have a family to

16    take care of.

17    Q    Did Mr. Gecewich ask you anything else during this

18    meeting?

19    A    He asked me about the confidentiality agreement.

20    Q    What did he ask you about the confidentiality agreement?

21    A    If I remember signing it.

22    Q    And did you answer his question?

23    A    I did.

24    Q    What did you say?

25    A    I said yes.


www.escribers.net | 800-257-0885

1    Q    Okay.  And after you said yes, did Mr. Gecewich ask you

2    anything else?

3    A    Actually, I -- I spoke and I told him so I'm fired -- are

4    you going to fire me or are you guys just toying with me.

5    Q    Okay.  Did Mr. Gecewich respond to you?

6    A    He said that wasn't his decision to make.

7    Q    Did Mr. Gecewich ask you anything else about the Facebook

8    posting during this second meeting?

9    A    Nothing new.

10    Q    Okay.  Did Mr. Gecewich during the second meeting mention

11    Jose Moran?

12    A    He did.

13    Q    What did Mr. Gecewich say about Mr. Moran?

14    A    He pointed out to me that Jose Moran had told him that he

15    had sent me those pictures.

16    Q    Okay.  After he said that to you did Mr. Gecewich say

17    anything else, or did you say anything?

18    A    I told him yes, he did.

19    Q    Okay.  Did Mr. Gecewich ask you anything else?

20    A    He asked me then why didn't I tell him that it was Jose

21    that I posted -- that were the ones I posted it from.

22    Q    Did you answer his question?

23    A    I did.

24    Q    What did you say to him?

25    A    I told him I don't know that it was Jose that I chose it



1    from, so I didn't want to point -- say it was someone if I

2    wasn't sure it was him.

3    Q    Okay.  Did Mr. Gecewich ask you anything else during this

4    meeting?

5    A    No.

6    Q    Did you say anything else during this meeting?

7    A    Once again, I just asked him so are you toying with me,

8    you know, are you going to fire me, what's going to happen here

9    because I'd like to know because this is a lot -- it's a lot.

10        MR. ROSS:  The last part of it trailed off.  I couldn't

11   hear it.

12        THE WITNESS:  It's a lot.  It's a lot.

13   Q    BY MR. RODRIGUEZ-RITCHIE:  Did Mr. Gecewich respond to you

14   when you asked him if he was terminating you?

15   A    He said that it wasn't his call.

16   Q    Okay.  At this point was the meeting over?

17   A    Yes, it was.

18   Q    What did you do after the meeting?

19   A    I went back to work.

20   Q    After the second meeting with Mr. Gecewich, did you have

21   any other meetings with him where the Facebook posting came up?

22   A    I did.

23   Q    When?

24   A    On October 18th, 2017.

25   Q    Who was at that meeting?



 1    A    It was me, Twanni (phonetic), my HR rep, and Ricky.

 2    Q    Do you recall where the meeting was?

 3    A    It was in the -- in the north administration building in

 4    one of the rooms that they specified.

 5    Q    And who was the first person to speak at this meeting?

 6    A    My HR rep.

 7    Q    What did she say?

 8    A    She motioned for me to sit down, so I did.  Then she

 9    produced some photographs of the screenshots and asked me if I

10    recognized those.

11    Q    Did you answer her?

12    A    I once again real quickly apologized for what I said.  I

13    said I didn't think it was online but I did receive an email.

14    I took into consideration what he said.  So I removed them as

15    soon as I could.

16    Q    Okay.  Did they ask you anything else about the Facebook

17    postings?

18    A    What she told me was that the -- what I said had no

19    bearing on whether this was going to happen here.  At that

20    point I realized what was going to happen there.  And then

21    Ricky intervened and said you're being fired for violating the

22    confidentiality agreement, you saw it happen before and now

23    it's happening again, that's what happens here.

24    Q    Okay.  After Mr. Gecewich told you you were being

25    terminated did the HR rep say anything?



www.escribers.net | 800-257-0885

1    A    Yes.  Once he stopped and sat down, she handed me a

2    envelope and asked me if I would sign for my last check.

3    Q    And did you sign?

4    A    I did.

5    Q    And after you signed, did the HR rep say anything else to

6    you?

7    A    She started trying to explain to me about COBRA, but I

8    really didn't feel like hearing about it.  So I told her if I

9    signed for my check and you hand it to me can I just kill this

10    and I go because I'm ready to go now.  If I'm terminated I

11    don't need to be here anymore.

12    Q    Okay.  And did you leave at that point?

13    A    She asked me to wait.  She asked me if I had carpooled in

14    as usual.  I said yes, I have, I did.  She said, well, let me

15    call a cab for you and I'll walk you down to the main gate

16    there.

17    Q    Mr. Ortiz, I want to direct you back to General Counsel's

18    Exhibit 25 -- or actually, before we do that, at your second

19    meeting with Mr. Gecewich do you recall what you were wearing?

20    A    This, like I always did.  My hat, my -- my fair future

21    shirt, my Tesla pants, and my boots.

22    Q    Okay.  Was your fair future at Tesla shirt visible while

23    you met with Mr. Gecewich the second time?

24    A    Yes.

25    Q    What about the first time?



1    A    Yes.

2    Q    Okay.  And the fair future Tesla t-shirt, besides these

3    occasions when you wore the shirt when you were at work and had

4    to meet with Mr. Gecewich, had you ever worn it on any other

5    times?

6    A    I wore it three times a week.

7    Q    During what time period?

8    A    I would say from sometime in April or May when we got

9    them, or maybe even July, all the way through.  I always had

10   them.  I always had one on three times a week,

11   Q    That is July of 2017?

12   A    Correct.

13   Q    Okay.  And do you know whether or not the t-shirt that's

14   in General Counsel's Exhibit 25, whether that shirt was ever

15   distributed in the parking lot at Tesla Fremont?

16   A    It was.

17   Q    Did you participate in any of those activities?

18   A    I did.

19   Q    Do you remember about when those were?

20   A    It was in that timeframe.  I believe the first one was

21   sometime in maybe June or July.  I'm not that sure.  I did a

22   lot and I worked nights.

23   Q    Do you remember how many times it was?

24   A    I did it at least twice.  No, I did it three times myself

25   personally with the group.



1 Q Okay.  I'm going to show you what's been premarked as

2 General Counsel's Exhibit 44.  It's two black and white

3 pictures.  Take a look at it and let me know when you're ready.

4 A I'm ready.

5 Q Mr. Ortiz, do you recognize General Counsel's Exhibit 44?

6 A I do.

7 Q And what do you recognize it to be?

8 A A picture of me with my jacket on.

9 Q Now, this -- these two pictures are black and white.

10 A Yes.

11 Q Can you tell us what color the jacket is?

12 A Blue and yellow.

13 Q So is blue the main color and yellow the color of the

14 logo?

15 A Correct.

16 Q And the logo, what is that of?

17 A That is a UAW wheel.

18 Q Did you ever wear this jacket during your employment at

19 Tesla?

20 A I did.

21 Q When?

22 A I wore it inside the plant.  I had it with me most every

23 day because at night I would get off in the wee hours of the

24 morning.  It's cold.  And when it was cold I wore it.

25 Q About how many times, if you can estimate?



1    A    That I took it or that I wore it?

2    Q    I apologize.  I was having two thoughts at the same time.

3    Could -- so I'm going to ask you to indulge me and ask the

4    question again and have you answer it.  Can you estimate about

5    how many times you were the UAW jacket in General Counsel's

6    Exhibit 44 during your employment at Tesla?

7    A    Yes.  This is a guess, but probably 50 to 80 times.

8    Q    From what period to what period?

9    A    From February of 2017 until the day of my termination.

10   Q    Did you wear the jacket with Mr. Gecewich -- did you wear

11   the jacket when Mr. Gecewich interviewed you the first time?

12   A    No.

13   Q    What about the second time?

14   A    No.

15   Q    Did you have it with you when you were terminated?

16   A    I did.

17       MR. RODRIGUEZ-RITCHIE:  At this time the General Counsel

18   has no further questions.

19       JUDGE TRACY:  Has this picture already come in?

20       MR. RODRIGUEZ-RITCHIE:  No.  Well, then at this time the

21   General Counsel would move General Counsel's Exhibit 44 into

22   evidence.

23       JUDGE TRACY:  Any objections?

24       MR. ROSS:  No.

25       JUDGE TRACY:  So I have one question though about it.  And



www.escribers.net | 800-257-0885

1   I was trying to look back.  If -- again, I don't know.  If the

2   color is significant, would the General Counsel print a color

3   copy for everyone?  Most importantly, the record.

4        MR. RODRIGUEZ-RITCHIE:  Yes.  The General Counsel can have

5   that ready tomorrow morning.

6        JUDGE TRACY:  Yeah.  Because I mean, I think your other

7   ones are color copies, aren't they?  Of your --

8        MR. RODRIGUEZ-RITCHIE:  Primarily, yes.

9        JUDGE TRACY:  Of the outfits, right?  So if that has some

10  significance, I don't know, then you should do that.  Because

11  the transcript when it's scanned into the record, as you know,

12  will be color.  Okay.  So --

13       MR. RODRIGUEZ-RITCHIE:  We will do that.

14       JUDGE TRACY:  So General Counsel's Exhibit 44 is admitted

15  into evidence.  And once the color one comes in we can swap

16  those out.  And I would note that if I haven't remarked on that

17  for other photos where color perhaps is significant, then I

18  would suggest that that be done so the record is complete.

19  **(General Counsel Exhibit Number 44 Received into Evidence)**

20       MR. RODRIGUEZ-RITCHIE:  Thank you, Your Honor.

21       JUDGE TRACY:  Okay.  So what we will do -- oh, do you have

22  any --

23       MS. FEINBERG:  Since we're breaking anyhow, I might -- I'm

24  just going to think overnight, if that's okay.

25       JUDGE TRACY:  Okay.



www.escribers.net | 800-257-0885

1        MS. FEINBERG:  Since we're coming back in the morning.

2        JUDGE TRACY:  All right.

3        MS. FEINBERG:  I may or may not for this witness.

4        JUDGE TRACY:  And you haven't really though had too many

5  questions.

6        MS. FEINBERG:  No.  Right.

7        JUDGE TRACY:  So -- okay.  So what we'll do right now is

8  that we will just break for the day in terms of witness

9  testimony and see if Ms. Feinberg has any direct of her own and

10  then you can do the cross.

11        Do you have a question?  I feel like you do.

12        MR. ROSS:  I don't suppose counsel for the General Counsel

13  would let me borrow an affidavit during the evening hours so I

14  can review it and try to save everybody some time tomorrow.

15        JUDGE TRACY:  So here's what I would think -- would the

16  General Counsel be willing to allow Mr. Ross to look at it

17  while he stays here, and it stays here overnight?

18        MR. ROSS:  I'm not staying here overnight.

19        JUDGE TRACY:  No, no.  The document.  Not you.  He -- I

20  meant the document.

21        MR. RODRIGUEZ-RITCHIE:  Counsel for the General Counsel

22  does not have a mattress for you, Mr. Ross.

23        MR. ROSS:  Good.

24        MR. RODRIGUEZ-RITCHIE:  Counsel for the General Counsel is

25  certainly more than happy to do that.  I'm also more than happy



www.escribers.net | 800-257-0885

1    to come early if he'd prefer to do it tomorrow morning.  It --

2    I leave that up to Mr. Ross.

3         MR. ROSS:  How long is the affidavit?

4         JUDGE TRACY:  But I'm assuming your -- your request to --

5         MR. ROSS:  My --

6         JUDGE TRACY:  -- take it out of this building is --

7         MR. ROSS:  My request is may I borrow the affidavit for

8    the evening?  Take it home and read it at home instead of

9    staying here to read it.

10         JUDGE TRACY:  And your response is?

11         MR. RODRIGUEZ-RITCHIE:  We would oppose that.

12         MR. ROSS:  Fine.  Okay.

13         MR. RODRIGUEZ-RITCHIE:  These are Government documents.

14    But I'm more than happy to accommodate Mr. Ross by staying here

15    later or coming early.

16         JUDGE TRACY:  Yeah.  So --

17         MR. ROSS:  How long is the affidavit?

18         MR. RODRIGUEZ-RITCHIE:  They are not as long -- there's a

19    few.  They are not as long as some of the other ones.

20         MR. ROSS:  How many of them are there?

21         MR. RODRIGUEZ-RITCHIE:  Three, I believe.

22         JUDGE TRACY:  So you know, what we still have to do off

23    the record is talk about the subpoena with the Union.  So your

24    presence is actually helpful as it was yesterday.  I do want to

25    talk about this document.



www.escribers.net | 800-257-0885

1      You are free to go for today.  Thank you very much.  You

2   know, just don't discuss your testimony until after the close

3   of the hearing, which will be like October.  But you're free to

4   go home now.  And then come back for 9 a.m.

5      THE WITNESS:  Thank you.

6      JUDGE TRACY:  Okay.  And you can give that -- all that to

7   them.  Yeah.  I would like to talk about this document though.

8   So once we close up for the day, that's when we'll talk about

9   these subpoenaed documents just like we did yesterday.  And so

10   the outstanding things are of course the one where we wanted to

11   either redact or just remove the -- the attachments for -- that

12   OSHA -- so figure that out.  Let's not forget.

13      MR. RODRIGUEZ-RITCHIE:  23.

14      JUDGE TRACY:  Make a list.  Yeah.

15      MR. RODRIGUEZ-RITCHIE:  Yeah, it's GC-23.

16      JUDGE TRACY:  And any color copies that you'd rather have

17   if color is significant.  And then we'll do the subpoena stuff

18   off the record.  But I wanted to talk about this one document.

19   It's a one page, literally, document that the Respondent

20   provided to me to look at it in camera.  So I have some

21   questions about it.  When -- from the Respondent's position,

22   what was the purpose of the investigation?  So essentially what

23   was the purpose -- yeah, I mean, what was the purpose of the

24   investigation?

25      MR. ROSS:  Okay.  I'll let Mr. Morris speak.



www.escribers.net | 800-257-0885

1       MR. MORRIS:  The purpose of the investigation was

2   regarding the CAL OSHA 300 logs and the disclosure of those

3   logs.

4       JUDGE TRACY:  Okay.  And so is there some obligation -- or

5   what sort of process -- was it an internal company

6   investigation, is my first question?

7       MR. MORRIS:  Yes.

8       JUDGE TRACY:  Okay.  And was there some sort of mechanism

9   by which you were required to investigate these alleged

10  disclosures?

11      MR. MORRIS:  I don't know the answer about whether there

12  was a requirement to investigate.  But an investigation was

13  conducted.

14      JUDGE TRACY:  So I guess because I do not -- have not seen

15  the whole case so it's kind of hard to decide what is

16  privileged or not, that's what I'm trying to understand is what

17  was the premise by which the company decided that they needed

18  to investigate it?  Kind of just talk me through the process.

19      MR. MORRIS:  Sure.  So the Employer was concerned that

20  employee medical information was disclosed outside of the

21  individuals who have a right to those OSHA 300 logs.

22      JUDGE TRACY:  Okay.

23      MR. MORRIS:  Which are coworkers and designated

24  representatives under the CAL OSHA regulations.

25      JUDGE TRACY:  Okay.  And is there some repercussion if



www.escribers.net | 800-257-0885

1    that is found to be true?  You don't need to tell me exactly

2    what, but are there?

3         MR. MORRIS:  Yeah, there are from an employer perspective

4    in terms of employee privacy.

5         JUDGE TRACY:  Okay.  And so when Ms. Holcomb went to the

6    in-house counsel, kind of what did she -- what -- she requested

7    them to draft questions?  Or kind of what was her -- you don't

8    have to say what they said, but just what the process.

9         MR. ROSS:  It's hard without compromising the privilege.

10        JUDGE TRACY:  Yeah.  Well, the privilege is kind of the

11   advice.  But sort of what was the process?  Like she said I

12   need help with this, or the in-house counsel said we need to

13   investigate this?

14        MR. MORRIS:  My understanding is that in-house counsel

15   contacted Lauren and Lisa.

16        JUDGE TRACY:  Okay.  And then your position -- I mean, not

17   position, but your -- if she were to testify or if you were to

18   provide an affidavit, it would be that the in-house counsel

19   drafted these questions that they wanted these individuals to

20   ask; is that right?

21        MR. MORRIS:  Yes.  That was their legal advice --

22        JUDGE TRACY:  Okay.

23        MR. MORRIS:  -- to those individuals.

24        JUDGE TRACY:  So you know, I looked at -- there is a case

25   called In Re: Kellogg Brown & Root.  It's 756 F.3d 754.  And

www.escribers.net | 800-257-0885

1   it's DC Circuit 2014.  It's in our bench book too.  And

2   essentially what that says is that the test is what is one of

3   the significant purposes of an internal investigation.  And

4   that was to, as far as I can tell, obtain or provide legal

5   advice.  So this document is privileged.

6        MS. FEINBERG:  Can -- can --

7        JUDGE TRACY:  I mean, the --

8        MS. FEINBERG:  I don't know what -- since we don't know

9   what that document is, could I just speak to the overall thing

10  about what was being sought?  Because since I can't see what

11  that document is and if there's anything that isn't privileged.

12  But first of all, we haven't heard that there was any basis for

13  a suspicion that the law was broken that it would even prompt

14  an investigation, which actually is the unfair labor practice

15  in part.  And the questions themselves were said to the

16  employees.  So how if they're spoken out loud to the employees

17  there could still be privilege?  Once that -- privilege is

18  broken once they're said out loud.  So it seems -- if they were

19  said out loud.  And also, my other question is, if that's the

20  report, which I don't know that it is -- I mean, I myself do

21  investigations.  The report or may not be privileged.  But the

22  notes of an interview are not privileged.

23        JUDGE TRACY:  Well --

24        MS. FEINBERG:  And so does it reflect that there are

25  notes?  Because no notes have been provided to us.  And that


www.escribers.net | 800-257-0885

1    document may tell us whether we have gotten all the documents

2    that we have -- that the General Counsel has asked for.

3        JUDGE TRACY:  Okay.

4        MS. FEINBERG:  So I would say -- so that's what the hub of

5    all -- you know, where we're at.  And so if you can tell by

6    looking at that if there -- if there are other documents from

7    which that is written.  For example, we just -- we were

8    produced documents from Ricky Gecewich, who we've heard about a

9    little bit.  He took notes.  He wrote a report.  All of which

10   has been provided to us.  You can see the process.  So it seems

11   to me that there would also be notes.  If I -- since I'm not

12   psychic, I don't know what's in that thing that they're looking

13   at.  But I'm assuming that if it's a report after she met with

14   the employees, she's saying what she heard.  So what is she

15   basing it on?  Is there a written document of which she's

16   basing that on?  Those I believe are not privileged.

17       JUDGE TRACY:  That's right.  That's right.  So this --

18       MS. FEINBERG:  And so I guess that's what that leads

19   there, which is is there compliance.  Because that's the only

20   thing that they gave in response to that.  But actually, this

21   is all the General Counsel's, so I should give it back to them.

22       JUDGE TRACY:  So basically, in response to your

23   question -- and frankly, yeah, I couldn't -- I don't remember

24   if you --

25       MS. FEINBERG:  Yeah, it's both.  But --



www.escribers.net | 800-257-0885

1     JUDGE TRACY:  -- if you had a subpoena request regarding

2     the same thing.

3     MR. RODRIGUEZ-RITCHIE:  I think also from our perspective

4     though, just to factually correct what was said by counsel for

5     respondent, there's no repercussion for the employer.  We would

6     brief, as you'll see, that these employees are allowed to

7     designate representatives to share this information with.  The

8     very thing that was going on is exactly what the unfair labor

9     practice has happened.  And actually, you know, quite frankly,

10    if it's being suggested that this person is asking and

11    interrogating people at the direction of an in-house counsel,

12    then potentially that person has committed an unfair labor

13    practice as well if they're directing somebody to unlawfully

14    interrogate an employee.  This is exactly what -- if you look

15    at one of the General Counsel's exhibits about the leaflet

16    firing that was going on, this is exactly on that very same

17    day.  This is exactly what's going on.

18    JUDGE TRACY:  Well, so you can elicit all the testimony

19    that you want and make whatever allegations that you want.

20    However, the document as I review it -- and I -- I went to that

21    case.  Take a look at the case.  Take a look at the cases that

22    have come after that.  The investigation was conducted at the

23    direction of in-house attorneys and communications made by and

24    to non-attorneys serving as agents of attorneys, and internal

25    investigations are routinely protected by attorney client



www.escribers.net | 800-257-0885

1    privilege.  That's separate and apart from your unfair labor

2    practice.  You can talk about it.  You can do whatever.  These

3    are communications that went between the agent of the employer

4    and their in-house counsel.

5        MS. FEINBERG:  But not at the unlawful --

6        JUDGE TRACY:  So this document -- so I'm not going to

7    argue it anymore.  You can do whatever you need to do to --

8        MS. FEINBERG:  Yeah, we'd like to brief it.

9        JUDGE TRACY:  -- request this document.  But at this point

10   I am finding that it is protected by attorney client privilege.

11       MS. FEINBERG:  Okay.

12       JUDGE TRACY:  And so it's a protected document.

13       MS. FEINBERG:  Okay.  So we can brief that and we will if

14   necessary.  But can you tell us whether from your reading of

15   that document, that there are other source documents that you

16   believe should be produced?

17       JUDGE TRACY:  So that was the other question.  Aside from

18   this document, did this individual -- which is what to me isn't

19   privileged potentially, make other notes when they interviewed

20   the individuals?  Because that's different.  Okay.  That is

21   different.  When you're interviewing somebody and you're

22   writing notes, those are my notes of my investigation.  My

23   conversation.  However, then when I take my notes and then I

24   say, okay, attorney, you asked -- you wanted me to ask these

25   questions, and here's all -- here's what they said, tell me



1    what I should do, that's protected.  That's what this document

2    is.  Are there any other documents that -- that -- that the

3    people who are mentioned create just as their note taking?

4    Because that is -- that would be something that should be

5    turned over.

6        MR. MORRIS:  My understanding is Lauren and Lisa do not

7    have any specific notes on that.  And that the individual who

8    prepared that email prepared her notes in the draft email that

9    was ultimately sent to counsel.

10        JUDGE TRACY:  Okay.  And so you all are free to ask if

11    they're called to testify, or you can subpoena these managers

12    themselves, and you can ask them, other than your

13    communication -- and you know, nobody wants -- everybody

14    protects attorney client privilege because nobody wants to

15    start poking holes in other people's stuff -- did you take any

16    other notes.  And if the answer is they didn't, they didn't.  I

17    cannot tell from this whether they did or not.

18        MS. FEINBERG:  Okay.  And could the -- would the -- Tesla

19    put -- represent that the reason for -- can they stipulate what

20    the reason for the investigation is as they represented to you

21    so we can put that in the record?  Because I do believe that

22    it's relevant to this case that the purpose of the

23    investigation was because they believed -- they thought that

24    someone had done something unlawful or could have done

25    something unlawful with these logs.  Because -- anyhow, if they



1   would stipulate to that, I think that would also be of

2   relevance to this case.  And I believe that that's what they

3   just said.  And that -- I would appreciate that.

4       MR. ROSS:  I'm not really understanding the question

5   you're asking, Margo.  I apologize.

6       MS. FEINBERG:  You represented to the judge the purpose of

7   the investigation.  And I would like you to stipulate to the

8   purpose of the investigation because she based her ruling in

9   part on what was the premise of the investigation.  And I would

10  like you to stipulate to what it was rather than it just be

11  chatter, so that could go into the record.

12      MR. ROSS:  We've had -- this has been on the record, has

13  it not?

14      JUDGE TRACY:  Yes, it has.

15      MR. ROSS:  Okay.

16      MS. FEINBERG:  Okay.

17      MR. ROSS:  I'm not going to add anything more than what's

18  on the record.

19      MS. FEINBERG:  Okay.  Then we'll go with that I guess.  It

20  seems like it would be easy if they just said it so simply.

21  But we've heard it.

22      JUDGE TRACY:  And certainly as the case goes on you can

23  ask me to look again at the ruling that I have.  But this is

24  all I can say based upon my research of case law and my review

25  of the document.  But I would like for you all to take a look



www.escribers.net | 800-257-0885

1    to make sure that there aren't any notes that these ladies

2    took.  Because if they are called -- and they are probably

3    going to be asked, and they say, oh, yes, in my notebook, that

4    you know will --

5        MR. ROSS:  That will not be good.

6        JUDGE TRACY:  -- create some fireworks around here.

7        MR. ROSS:  Yes, it will.  Yes, it will.

8        JUDGE TRACY:  So here's your document back.  Thank you.

9        We'll meet again at 9 a.m.  Anything else that we should

10   do on the record right now?

11       MR. RODRIGUEZ-RITCHIE:  I just want to double check, Mr.

12   Ross, you're looking to stay afterwards to review the

13   affidavit?  Or are you looking to come in early?

14       MR. ROSS:  No, I think I will come in -- how early can you

15   be here in the morning?

16       MR. RODRIGUEZ-RITCHIE:  I mean, I'll be here pretty early.

17   But I -- the better question is, how early can you get into the

18   building?

19       JUDGE TRACY:  Oh, yeah.  That's right.

20       MR. ROSS:  Well, that may be.  Okay.  So how early can I

21   get in?

22       MR. RODRIGUEZ-RITCHIE:  Which is 8 a.m.

23       MR. ROSS:  Okay.  I'll be here at 8 a.m.

24       MR. RODRIGUEZ-RITCHIE:  I'll be here waiting for you.

25       MR. ROSS:  Great.



www.escribers.net | 800-257-0885

1          JUDGE TRACY:  Okay.

2          MR. ROSS:  Do I go in the other side to get in?

3          MR. RODRIGUEZ-RITCHIE:  No.  8 a.m. is when the building

4     opens.

5          MR. ROSS:  Well, why did we -- why did we need to go in

6     the other side the other day?

7          MR. RODRIGUEZ-RITCHIE:  I have no idea.

8          JUDGE TRACY:  Because after 6 they lock this side.

9     There's no guards.

10         MR. ROSS:  No, I'm talking about going -- we got -- we

11    came in a little bit before 8 a.m. --

12         JUDGE TRACY:  Oh.

13         MR. ROSS:  -- on the other side.

14         JUDGE TRACY:  Oh.

15         MR. ROSS:  So if we can get in on the other side earlier,

16    I was just going to come in on the other side earlier so I

17    can -- I can try to burn through those affidavits.

18         MR. RODRIGUEZ-RITCHIE:  I'll be here pretty early.

19         JUDGE TRACY:  Or if there's a way to get him in earlier at

20    7:30 let's say.  Why don't you two communicate.  Anything else

21    for the record?  No.  Thank you.  Let's go off the record.

22    **(Whereupon, the hearing in the above-entitled matter was**

23    **recessed at 5:11 p.m. until Thursday, June 14, 2018 at 9:00**

24    **a.m.)**

25



1          **C E R T I F I C A T I O N**

2      This is to certify that the attached proceedings before the

3      National Labor Relations Board (NLRB), Region 32, Case Numbers

4      32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-

5      200530, 32-CA-208614, 32-CA-210879, Tesla, Inc., and Michael

6      Sanchez, and Jonathan Galescu, and Richard Ortiz and

7      International Union, United Automobile, Aerospace and

8      Agricultural Workers of America, AFL-CIO at National Labor

9      Relations Board Region 32, 1301 Clay Street, Suite 300N,

10     Oakland, CA 94612-5224, on Wednesday, June 13, 2018, 9:30 a.m.

11     was held according to the record, and that this is the

12     original, complete, and true and accurate transcript that has

13     been compared to the reporting or recording, accomplished at

14     the hearing, that the exhibit files have been checked for

15     completeness and no exhibits received in evidence or in the

16     rejected exhibit files are missing.

17

18

19

20     _____

21     BRIDGETTE RAST

22     Official Reporter

23

24

25


22-60493.566

**OFFICIAL REPORT OF PROCEEDINGS**

**BEFORE THE**

**NATIONAL LABOR RELATIONS BOARD**

**REGION 32**

In the Matter of:

| | |
|---|---|
| Tesla, Inc., | Case Nos.   32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| Michael Sanchez, an individual, | 32-CA-200530 |
| | 32-CA-208614 |
| and | 32-CA-210879 |

Jonathan Galescu, an
individual,

and

Richard Ortiz, an individual,

and

International Union, United
Automobile, Aerospace and
Agricultural Workers of
America, AFL-CIO,

Charging Party,

_____

_____

Place: Oakland, California

Dates: June 14, 2018

Pages: 552 through 660

Volume: 4

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885

22-60493.567

www.escribers.net | 800-257-0885

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 32**

| | |
|---|---|
| In the Matter of: | |
| TESLA, INC., | Case Nos.  32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| INTERNATIONAL UNION, UNITED | 32-CA-200530 |
| AUTOMOBILE, AEROSPACE AND | 32-CA-208614 |
| AGRICULTURAL WORKERS OF | 32-CA-210879 |
| AMERICA, AFL-CIO, | |
| and | |
| MICHAEL SANCHEZ, AN INDIVIDUAL, | |
| and | |
| JONATHAN GALESCU, AN INDIVIDUAL, | |
| and | |
| RICHARD ORTIZ, AN INDIVIDUAL. | |

The above-entitled matter came on for hearing, pursuant to notice, before **AMITA BAMAN TRACY**, Administrative Law Judge, at the National Labor Relations Board Region 32, 1301 Clay Street, Suite 300N, Oakland, CA 94612-5224, on **Thursday, June 14, 2018, 9:28 a.m.**

1                       <u>A P P E A R A N C E S</u>

2      **On behalf of the General Counsel:**

3          **EDRIS W.I. RODRIGUEZ RITCHIE, ESQ.**
           **NOAH J. GARBER, ESQ.**
4          National Labor Relations Board
           1301 Clay Street, Suite 300N
5          Oakland, CA 94612-5224
           Tel. 510-671-3021
6
       **On behalf of the Respondent:**
7
           **MARK S. ROSS, ESQ.**
8          **KEAHN N. MORRIS, ESQ.**
           SHEPPARD MULLIN RICHTER & HAMPTON LLP
9          Four Embarcadero Center
           Seventeenth Floor
10         San Francisco, CA 94111-4109
           Tel. 415-434-9100
11         Fax. 415-434-3947

12     **On behalf of the Charging Parties:**

13         **MARGO A. FEINBERG, ESQ.**
           **DANIEL E. CURRY, ESQ.**
14         **JULIE S. ALARCON, ESQ.**
           SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
15         6300 Wilshire Boulevard, Suite 2000
           Los Angeles, CA 90048
16         Tel. 323-655-4700

17

18

19

20

21

22

23

24

25



1                              <u>I  N  D  E  X</u>

2

3      **WITNESS**              **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**   **VOIR DIRE**

4      Richard Ortiz            555          557

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

eScribers

www.escribers.net | 800-257-0885

1                    P R O C E E D I N G S

2        JUDGE TRACY:  Okay.  All right.  I just want to remind you

3    that you're still testifying under oath today.  Okay.  Thank

4    you.

5        So Ms. Feinberg.

6        MS. FEINBERG:  Okay.

7    Whereupon,

8                        RICHARD ORTIZ

9    having been previously sworn, was called as a witness herein

10   and was examined and testified as follows:

11                   DIRECT EXAMINATION

12   Q    BY MS. FEINBERG:  Good morning, Mr. Ortiz.

13   A    Good morning.

14   Q    Yesterday you testified about General Counsel Exhibit 24

15   about a meeting that you attended with Lisa Lipscomb and Laura

16   Holcomb.  Do you remember that?

17   A    Yes.

18   Q    And do you remember the meeting itself?

19   A    Yes.

20   Q    Okay.  And was anyone else present besides yourself, Ms.

21   Lipscomb, and Ms. Holcomb?

22   A    No.

23   Q    Okay.  And what was the -- were you in a conference room

24   or what was the nature of the place that you were in?

25   A    We were in a room with a table, we sat on one side they



1    sat on the other side.

2    Q    And did someone ask you questions?

3    A    Yes, Laura did.

4    Q    Okay.  And did they have pads out or was anyone writing

5    anything during the course of the meeting?

6    A    They had their laptops out, opened them and then the

7    safety representative was typing.

8    Q    And that would be Laura Holcomb?

9    A    Yes.

10    Q    So she was typing as you were speaking?

11    A    Yes.

12    Q    And at the end of the meeting, did they say anything to

13    you about what they were typing or their computers or anything?

14    A    No.  When it was indicated I could go, they -- Laura

15    slammed her lid down on her laptop real fast so I couldn't see

16    it.  And I kind of indicated, I don't know what it was, but I

17    wouldn't be able to see it anyway without my glasses on, so you

18    are safe.

19    Q    Okay.  And was it your understanding that they were

20    focused on the meeting while they were communicating with you

21    or did they pay attention to the meeting?

22    A    They were paying attention to the meeting on their

23    laptops.

24    Q    Okay.  And did Ms. Lipscomb also do any typing during the

25    course of the meeting?



www.escribers.net | 800-257-0885

1    A    A little bit.

2    Q    Okay.

3         MS. FEINBERG:  I have nothing further.

4         JUDGE TRACY:  Okay.  Thank you.

5         MR. ROSS:  Thank you.

6         JUDGE TRACY:  Go ahead please.

7                   **CROSS-EXAMINATION**

8    Q    BY MR. ROSS:  Good morning, Mr. Ortiz.

9    A    Good morning.

10   Q    I asked you a couple questions during counsel for the

11   General Counsel's examination, but I didn't really introduce

12   myself to you.  My name is Mark Ross and I am the lawyer

13   representing Tesla in this case.  And I'm going to be asking

14   you some questions and if for some reason you don't understand

15   the questions, let me know, I'll be happy to rephrase or

16   explain what I'm asking, okay.

17   A    Okay.

18   Q    Now, I think you said that you requested your personnel

19   file and at some point in time, your personnel file was sent to

20   your home; is that right?

21   A    Yes.

22   Q    Okay.  And you identified certain documents during your

23   examination by Mr. Rodriguez-Ritchie as being included in the

24   packet of documents you received from the company?

25   A    Yes, I did.



www.escribers.net | 800-257-0885

1   Q   Okay.  And one of those documents was the company's offer

2   letter to you?

3   A   Yes.

4   Q   Okay.  And one of the documents was a performance review

5   that you had not received while working there, but one that

6   covered a -- the period ending June of 2017?

7   A   Yes.

8   Q   As well as another document called a supplemental review

9   ending the period June 2017?

10   A   Yes.

11   Q   Okay.  What else was in that packet of documents?

12   A   Many things.  I didn't commit it all to memory, I'd have

13   to look at it.

14   Q   Okay.  Do you still have that packet of documents?

15   A   At home.

16   Q   At home, okay.  Tell me, including that packet of

17   documents, was there something called a confidentiality

18   inventions agreement?

19   A   Yes.

20   Q   There was?  Okay.  That's something else you signed when

21   you joined the company?

22   A   Yes.

23   Q   Okay.  And you joined the company as a regular employee

24   and do I understand in December of 2016?

25       MR. RODRIGUEZ-RITCHIE:  Objection.  Misstates testimony.



www.escribers.net | 800-257-0885

1      MR. ROSS:  Well, I'm asking.

2      JUDGE TRACY:  Sustained.  Or overruled.  I'm sorry.

3   Q   BY MR. ROSS:  You started with the company when?

4   A   In October of '16.

5   Q   Thank you.  I'm sorry, I was mistaken.  And that's when

6   you signed that document or was it before then that you signed

7   the document?

8   A   It was on my orientation.

9   Q   Orientation?

10  A   Yes.

11  Q   Orientation as a regular employee or orientation as an

12  employee working through a vault?

13  A   As a regular employee.

14  Q   Regular employee.  Okay.  Okay.  Now, is it true that you

15  consider yourself an at will employee at Tesla?

16      MS. FEINBERG:  Objection.

17      MR. RODRIGUEZ-RITCHIE:  Objection.  It calls for a legal

18  conclusion.

19      MS. FEINBERG:  Ditto.

20      JUDGE TRACY:  Sustained.

21  Q   BY MR. ROSS:  Well, why don't you take a look at General

22  Counsel's Exhibit 11.

23      MR. ROSS:  Can the witness be given that?

24  Q   BY MR. ROSS:  Now, Mr. Ortiz, you've been handed General

25  Counsel's Exhibit 11.  It's four pages in length and let me ask



www.escribers.net | 800-257-0885

1    you first, this is the offer letter that you received in the

2    packet that was your so-called personnel file from Tesla,

3    correct?

4    A    Yes.

5    Q    And you signed them?

6    A    I did.

7    Q    And you agreed to its terms?

8    A    I signed it.

9    Q    And when you signed it, did you understand that you were

10   indicating that you were agreeing to what it said?

11   A    Yes.

12   Q    Okay.  Thank you.  Now, who is Jonathan Hung?

13   A    He is to the best of my knowledge, a safety

14   representative?

15   Q    Safety representative.  Okay.  Tell me, would he have been

16   somebody who is in the management structure above you during

17   the period that you were working as a traffic person?

18   A    Yes.

19   Q    Okay.  So would he have been somebody who was in a

20   position to review your performance in the middle of 2017?

21   A    Yes.

22   Q    Okay.  And is it your testimony that you never saw this

23   document until after you were terminated?

24   A    Yes.

25        MS. FEINBERG:  I'm sorry, which document are we talking



1    about?

2        MR. ROSS:  General Counsel's Exhibit 12, I'm sorry.  Thank

3    you for that.  And let's show him that.

4        MR. RODRIGUEZ-RITCHIE:  So, Your Honor, I apologize for

5    interrupting Mr. Ross.  I prepared versions that were not as

6    cut off as the ones yesterday of these.  Do you want to agree

7    to switch them out right now or --

8        MR. ROSS:  Let's do the examination first and then we can

9    change them out.

10        MS. FEINBERG:  But there are words missing is why he's

11    suggesting you use his, which I would concur if you're going to

12    ask him about words.

13        MR. ROSS:  That's fine.  That's fine.

14        MR. RODRIGUEZ-RITCHIE:  Which one do you want?

15        MR. ROSS:  I will take them both.

16        MR. RODRIGUEZ-RITCHIE:  Counsel for the General Counsel is

17    providing these copies to the parties and to Her Honor and

18    we'll request a stipulation to replace the General Counsel's

19    Exhibit 12 and 13 with these documents that I'm handing.

20        JUDGE TRACY:  Do the parties agree to replace General

21    Counsel's Exhibits 12 and 13 with the ones that General Counsel

22    is providing to us all now?

23        MR. ROSS:  Sure.

24        JUDGE TRACY:  Okay.  So swap them out.

25        MR. ROSS:  Thank you.  So could the witness be shown



www.escribers.net | 800-257-0885

1    General Counsel's Exhibit 12?

2        MR. RODRIGUEZ-RITCHIE:  I'm handing the witness a copy of

3    General Counsel's Exhibit 12.

4    Q    BY MR. ROSS:  And you said yesterday Mister -- before I

5    get to this, strike that.  So I asked you before whether you'd

6    seen this document without showing it to you.  General

7    Counsel's Exhibit 12, had you seen that while you were employed

8    with the company?

9    A    No.

10   Q    Okay.  But the text that's on the right-hand side under

11   the column employee evaluation rating 5 phenomenal comments.

12   The text that is associated with that entry comments that's

13   your -- the stuff you put in by way of your telephone?

14   A    That's what I put in work day, yes, my attempt to do it.

15   Q    I understand.  And then the document kind of ran away from

16   you and --

17   A    Yeah, it would -- sent.

18   Q    I got sent, okay.  But that is the language that you put

19   on the document?

20   A    Yeah, that is, yes.

21   Q    Okay.  And you entered that language sometime in the

22   middle of June, you think?

23   A    Around that time.  Maybe it was a little bit before that.

24   Q    Okay.  Okay.  Now, was this the first performance review

25   you received while you were at the company?



www.escribers.net | 800-257-0885

1    A    This is the only one I would have received.

2    Q    Okay.  There was no performance review for the year prior?

3    A    No.

4    Q    Okay.  Now, if you'd take a look at General Counsel's

5    Exhibit 13 please and --

6        MR. RODRIGUEZ-RITCHIE:  General Counsel is going to hand

7    the witness General Counsel Exhibit 13.

8    Q    BY MR. ROSS:  You got it?

9    A    Yes.

10    Q    Okay.  And I see this is a document titled 2017

11    supplemental performance review.  I'm wondering if that's cut

12    off as well.  Probably not.  Okay.  And I see it says manager

13    evaluated by Arnold Camet?

14    A    Yes.

15    Q    Okay.  You know Arnold?

16    A    I do.

17    Q    And at some point in time, did you come under Arnold's

18    management or supervision?

19    A    Yes.

20    Q    And around when was that?

21    A    Prior to being on the light duty and after light duty.

22    Q    Okay.  So let's think in terms of after light duty.

23    A    Okay.

24    Q    When did you come under Arnold's management?

25    A    About mid-July when I was returned to my work area.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  And what year was that?

2      THE WITNESS:  2017.

3      JUDGE TRACY:  Thank you,.

4   Q    BY MR. ROSS:  So Arnold would have been a manager or

5   supervisor of yours as of say from mid-July until when?

6   A    Until October 18th, 2017.

7   Q    Until your termination?

8   A    Yes.

9   Q    Okay.  So it would be appropriate and natural for your

10  manager during that period of time to be the one to evaluate

11  your performance as of that time?  Is that right?

12  A    Yes.

13     MS. FEINBERG:  Objection, foundation.

14     MR. ROSS:  Thank you.

15  Q    BY MR. ROSS:  Now, if you would take a look at General

16  Counsel's Exhibit 13 please.  Now, you have in front of you

17  General Counsel's Exhibit 14 and it's a document entitled 1

18  apostrophe H 2017 goals and performance feedback January hyphen

19  June 2017 performance award.  It's dated October 8, 2017, do

20  you see that?

21  A    Yes.

22  Q    Okay.  This is a document that was also included in your

23  personnel file?

24  A    Yes.

25  Q    Okay.  And what did you understand this document to be?



1    A    The performance award.

2    Q    Excuse me, sir?

3    A    The performance award.

4    Q    Okay.  An award for your performance?

5    A    I never went through the process, so I'm not -- I can't

6    really say what it is completely.  I didn't take part in it.

7    Q    Okay.  It shows that your performance rating was

8    consistently strong, correct?

9    A    Yes.

10   Q    Okay.  Tell me when you were terminated, were you told

11   that you were being terminated for poor performance?

12   A    No.

13   Q    Now, prior to October 2017, you had engaged in Union

14   activity in and around the plant?

15   A    I did.

16   Q    Made no secret of it?

17   A    No.

18   Q    Okay, now I think you said you went to a union meeting in

19   January and the topic of the meeting, it was a meeting at the

20   union office over in Grimmer (phonetic).

21        MR. RODRIGUEZ-RITCHIE:  Objection.  Vague as to time, what

22   January of --

23        MR. ROSS:  Thank you.  January 2017.

24        THE WITNESS:  Yes.

25   Q    BY MR. ROSS:  Okay.  And it was a meeting held at the



22-60493.581

1    union office for the purpose of discussing flyering at the

2    plant?

3    A    Yes.

4    Q    Okay.  And this was the first flyering of the plant,

5    wasn't it?

6    A    Yes.

7    Q    And at that meeting, Mr. Moran was present also?

8    A    He was not there with me.

9    Q    Excuse me?

10   A    He was not there.

11   Q    He wasn't there.  But it was discussed at that meeting

12   that Mr. Moran would write an op-ed piece?

13   A    Yes.

14   Q    Who talked about that?

15        MR. RODRIGUEZ-RITCHIE:  Objection.  Relevance.

16        MR. ROSS:  I'll withdraw the question.  Take a look -- if

17   the witness could be shown General Counsel's Exhibit 8.

18        UNIDENTIFIED SPEAKER:  What exhibit?

19        MR. ROSS:  8.

20   (Counsel confer)

21        JUDGE TRACY:  Just use the court reporter's.  It'll make

22   it easier.

23   Q    BY MR. ROSS:  You've got in front of you, sir, General

24   Counsel's Exhibit 8 and the first page is marked 001.  I'm

25   directing your attention to that page.  Is that the op-ed



www.escribers.net | 800-257-0885

1    piece that Mr. Moran wrote?

2    A    Yes.

3    Q    And that is the op-ed piece that you handed out on

4    February 10th, correct?

5    A    Yes.

6    Q    Okay.  Now, I think you said that you and Mr. Moran

7    decided to have two different Facebook pages?

8         MR. RODRIGUEZ-RITCHIE:  Objection.  Misstates the

9    testimony.

10        JUDGE TRACY:  Sustained.

11        MR. ROSS:  I'm sorry?

12        MR. RODRIGUEZ-RITCHIE:  I said objection misstates

13   testimony.

14        MR. ROSS:  It does?

15   Q    BY MR. ROSS:  There were two different Facebook pages,

16   right?

17   A    Yes.

18   Q    One that was called Fair Future at Tesla and the at is the

19   "at" symbol?

20   A    Yes.

21   Q    You are not the administrator of that?

22   A    No.

23   Q    And then there is a second one and my notes -- it's

24   terrible when you can't read your own handwriting.  Would

25   you -- what was that Facebook page called?



www.escribers.net | 800-257-0885

1   A    Fremont Tesla Employees for UAW Representations.

2   Q    Okay.  And you and Mr. Moran were the administrators of

3   that page?

4   A    Yes.

5   Q    Okay.  Who was the administrator of the Fair Future at

6   Tesla page?

7   A    It was the campaign page.

8   Q    Excuse me?

9   A    That is the campaign's page.

10  Q    So that would have been UAW's website or page?

11  A    Yes.

12  Q    And could someone using the Fair Future at Tesla Facebook

13  page access the Fremont Employee Free Union representation

14  page?

15  A    Not to my knowledge.

16  Q    Not to your knowledge.  Okay.  Why were there two websites

17  or -- I keep calling them websites because I don't have a

18  Facebook page, so I don't know how these things work.  Why were

19  there two Facebook pages?

20  A    Jose told me he created a page because he wanted to have a

21  forum that was just for workers that would fall into the

22  bargaining agreement if we had it so we could discuss it

23  opening without UAW, without Tesla, just us the workers, no one

24  pushing our conversations any direction but us being on our own

25  grounds with us only.  No outside forces.



1    Q    All right.  Could members representatives of the Union

2    access the private website or private Facebook page?

3    A    Not to my knowledge.

4    Q    Did they ever?

5    A    Not to my knowledge.

6    Q    Who decided who could and couldn't access that Facebook

7    page?

8    A    First Jose and then Jose and I.

9    Q    Okay.

10        MR. ROSS:  Excuse me, if I may.

11        JUDGE TRACY:  Okay.

12   (Counsel confer)

13   Q    BY MR. ROSS:  Do you know a Mr. Michael Caterra

14   (phonetic)?

15   A    Yes, I do.

16   Q    Was he one of the individuals who was flyering or hand

17   billing outside the Fremont facility on February 10th?

18   A    I believe he was.

19   Q    Okay.  Was he one of the individuals at the door you were

20   at?

21   A    No.

22   Q    Who was with Mr. Sanchez?

23   A    I don't remember.

24   Q    You knew the person, but you can't remember who it was?

25   A    I never met him until that day.



www.escribers.net | 800-257-0885

1    Q    Okay.  Okay.  Now, you testified that on the 10th of

2    February, as you were at the outside the door, you said that an

3    older woman was about 5'3" wearing a hat and jacket with

4    security stickers came out and talked to you?

5    A    Yes.

6    Q    And said this was a person who worked at the podium as you

7    clocked in or walked into the facility?

8    A    Yes.

9    Q    Was this lady a African American?

10    A    No.

11    Q    No.  Tell me, what have you done to find -- to kind of

12    figure out what her name might have been?

13    A    I didn't.

14    Q    You haven't done anything?  Have you looked at anything to

15    identify her?

16    A    No.

17    MR. RODRIGUEZ-RITCHIE:  Objection.  Again, we're getting

18    to the area which is an area of dispute with regards to

19    Respondent's request for -- with regards to the General

20    Counsel's request for production of documents from the

21    Respondent, who has not fully complied with that request.

22    JUDGE TRACY:  Sustained.

23    Q   BY MR. ROSS:  And then you later testified about there

24    being a man in his 30s in a blazer?

25    A    Yes.



www.escribers.net | 800-257-0885

1    Q    Who stood inside the building?

2    A    Yes.

3    Q    Okay.  You said he was in his 30s?

4    A    That would be my guess.

5    Q    Okay.  And -- but you didn't speak with him and he didn't

6    speak with you?

7    A    Correct.

8    Q    Okay.  Your -- could you describe him beyond his age and

9    what he was wearing that day?

10   A    It was a gentleman in his 30s.  Tan.  Not pasty white, but

11   kind of a tan on him.  He had the burgundy blazer that the

12   security guys wear.  He -- I don't know what color pants he had

13   on, because I couldn't see below that level.

14   Q    Well, color hair?

15   A    More of a -- on the darker.  I couldn't say exactly.

16   Q    Darker hair.  Darker side?

17   A    Yeah.  Maybe a little gray on the side there.

18   Q    Tan complected?

19   A    Yeah.

20   Q    Did he appear to be of Middle Eastern extraction (sic)?

21   A    No, he just appeared to be -- have a nice tan.

22   Q    Couldn't year you.

23   A    He looked like he had nice tan.

24   Q    So he could have been Middle Eastern?

25   A    If I had to say, I'd probably say Mexican or white.



www.escribers.net | 800-257-0885

1    Q    Okay.  But he didn't speak to you and you didn't speak to

2    him?

3    A    Correct.

4    Q    By the way, going back to the female guard who came out

5    and spoke with you, have you told us everything that you said

6    to her and she said to you and Mr. Moran?

7    A    I didn't speak with her.

8    Q    Excuse me?

9    A    I did not speak to her.

10   Q    You did not speak to her?  Well, have you told me --

11   us -- everything that Mr. Moran said?

12   A    I told -- I said what I knew -- what I heard him say.

13   Q    Okay.  So you've told everything you've heard said?

14   A    Yeah, everything I know of.

15   Q    Okay.  And by the way, when she came out, you had your

16   employee badge in your wallet, right?

17   A    Yes.

18   Q    And Mr. Moran didn't have his employee badge out either,

19   did he?

20   A    I don't know where he had his.

21   Q    Okay.  He had to pull his out to show it to the guards,

22   who came back later, correct?

23   A    I'm not sure where pull -- where it came from.

24   Q    Okay.  You didn't see it?

25   A    No.  I didn't see him pull it out.



www.escribers.net | 800-257-0885

1    Q    Now, you testified that after the fellow wearing the

2    blazer appeared, thereafter, a vehicle showed -- two vehicles

3    actually showed up, right?

4    A    Yes.

5    Q    Okay.  And they came down different lanes of the parking

6    lot in the direction of the door?

7    A    Correct.

8    Q    And they stopped in the lanes?

9    A    Yes.

10    Q    Facing the door lights on, correct?

11    A    Yes.

12    Q    Okay.  Was dark at that time, right?

13    A    Yes.

14    Q    And have you told everything that was said by the two

15    guards at that time?

16    A    I believe so.

17    Q    And have you told us everything that you said to the

18    guards at that time?

19    A    Yes.

20    Q    And have you told us everything you heard Mr. Moran say to

21    the guards at that time?

22    A    Yes.

23    Q    Okay.  By the way, did you see the guards or other guards

24    speak to Mr. Sanchez?

25    A    I saw those guards that spoke to us speak to Sanchez.



1  Q    Excuse me?

2  A    I saw the guards that spoke to us speak to Sanchez.

3  Q    Okay.  So the guards went from you -- who'd they talk to

4  first, you or Sanchez?

5  A    To us.

6  Q    So from you -- they left you and then walked on the

7  other -- to the other side of the door and spoke to Mr.

8  Sanchez?

9  A    They left us and went to their vehicles for some time.

10  Then from there, they went to Sanchez.

11  Q    Okay.  What'd they do in the vehicle?

12  A    I have no idea.

13  Q    Okay.  How long were they in the vehicle?

14  A    Maybe five minutes.

15  Q    Five minutes.  Okay.  So they talked to you, went back to

16  the vehicle, sat in the vehicle for five minutes and then went

17  to talk to Mr. Sanchez and the other individual?

18  A    They went back to the vehicle and then they went over

19  there.

20  Q    Okay.  Did you overhear what was said between Mr. Sanchez

21  and the guards?

22  A    No.

23  Q    Did not?  By the way, did you ever make any notes of what

24  happened on the 10th of February?

25       MR. RODRIGUEZ-RITCHIE:  Objection.  Relevance.  It seeks



www.escribers.net | 800-257-0885

1     to obtain discovery.

2          JUDGE TRACY:  I'll overrule the objection.

3     Q    BY MR. ROSS:  Did you make any notes of the conversation,

4     sir?

5     A    No.

6     Q    Did you make any kind of written report to anyone --

7          MS. FEINBERG:  Objection.

8     Q    BY MR. ROSS:  -- with respect to what happened at that

9     time?

10         MS. FEINBERG:  Objection to the extent it calls for

11    attorney-client communications.  As you may know, I --

12         MR. ROSS:  I'm sorry.  Could --

13         MS. FEINBERG:  Objection to the extent it calls for

14    attorney-client communications.

15         MR. ROSS:  Other than --

16         MS. FEINBERG:  As you may know, I also represent Mr.

17    Ortiz.

18    Q    BY MR. ROSS:  Well, other than what you may have done at

19    the direction of counsel or as a communication to counsel, did

20    you make any written record of what happened at that time?

21         MR. RODRIGUEZ-RITCHIE:  Same objection.

22         MS. FEINBERG:  Same.

23         JUDGE TRACY:  I'm going to overrule the objection.

24         THE WITNESS:  I'm not sure I understand the question.

25    Q    BY MR. ROSS:  I'm sorry?



```
 1    A    I'm not sure I understand that question.

 2    Q    That's fair.  I can't imagine why you don't.  That's fine.

 3    After you spoke to the guards and finished flyering on the

 4    10th, you went back to the Union office, right?

 5    A    Correct.

 6    Q    Did you tell anybody at the Union office what happened?

 7    A    Yes.

 8    Q    Who'd you tell?

 9    A    Several people.

10    Q    Who?

11    A    Everybody who was in there.

12    Q    Okay.  And did you write anything down, describing what

13    happened at that time?

14         MS. FEINBERG:  Objection to the extent it calls for

15    attorney-client communications.

16         JUDGE TRACY:  If you could rephrase the question, please.

17         MR. ROSS:  Sure.

18    Q    BY MR. ROSS:  By the way, as of February 10th, have you

19    ever met Ms. Feinberg?

20    A    Yes.

21    Q    You have?

22    A    Yeah.

23    Q    Okay.  Tell me when she became your lawyer.

24    A    I don't know when she became my lawyer.

25    Q    Before or after February 10th?
```



1    A    I don't know how to answer that.  I thought she was, I

2    didn't --

3    Q    Well, did you believe she was your lawyer on February

4    10th?

5    A    I did.

6    Q    You did.  Okay.

7         MR. ROSS:  Okay.  Could the witness be shown General

8    Counsel's Exhibit 16, please?

9         THE WITNESS:  Thank you.

10   Q    BY MR. ROSS:  Mr. Ortiz --

11   A    Yes, sir.

12   Q    This document you testified about during General Counsel's

13   questioning of you, it's from Mr. Galescu to a group of people

14   that was cc'd to you.  See that?

15   A    Yes.

16   Q    Okay.  Now, did you compose any of the language that is in

17   this document?

18        MS. FEINBERG:  Objection to the extent it calls for

19   attorney-client communications.

20        MR. ROSS:  I beg your pardon?

21        MS. FEINBERG:  I have an objection to the extent you're

22   asking him anything about attorney-client communications.

23        MR. ROSS:  I'm simply asking him whether he composed any

24   of the wording.  I'm not asking him about any --

25        MS. FEINBERG:  Okay.



www.escribers.net | 800-257-0885

1        MR. ROSS:  -- attorney-client communication.

2        JUDGE TRACY:  Yeah, so overruled.

3        MS. FEINBERG:  Okay.

4        JUDGE TRACY:  But let me give you some instructions, okay?

5        THE WITNESS:  Okay.  Yeah.  So overruled.

6        JUDGE TRACY:  If there was any sort of communications that

7    you had with your attorney regarding any questions, certainly

8    respond to that, saying you know, I spoke to my attorney.  It

9    seems as though some of these questions could lead to attorney-

10   client privilege, but it's hard to know, because we don't know

11   what your answer is.

12       THE WITNESS:  Okay.

13       JUDGE TRACY:  But -- so some sort of in -- I'm giving you

14   that sort of instruction --

15       THE WITNESS:  Okay --

16       JUDGE TRACY:  -- so that way, you're just aware of that.

17   And then of course if there's an objection, just to sort of

18   pause --

19       THE WITNESS:  Yeah.

20       JUDGE TRACY:  -- and wait for the attorneys to make their

21   arguments if they need to.

22       THE WITNESS:  All right.

23       JUDGE TRACY:  Okay.

24       THE WITNESS:  Thank you.

25       MR. ROSS:  Okay.



www.escribers.net | 800-257-0885

1    Q    BY MR. ROSS:  The question I think I asked, which was

2    objected to but overruled was whether you composed or created

3    any of the words in this document.

4    A    I did not.

5    Q    You did not.  Okay.  Did you -- well, let me ask you.  You

6    got a carbon copy or a cc of this -- I know I'm very 20th

7    Century.  You got a cc at your Tesla email address from Mr.

8    Galescu.  Were you surprised when you got this document?

9    A    No.

10    Q    Did you expect to receive this document?

11    A    I did.

12    Q    Had you and he discussed putting this document together

13    before you received it?

14    A    Yes.

15    Q    And -- excuse me.  And whose idea was it to send this to

16    the company?

17    A    Jonathan.

18    Q    Jonathan.  And did Jonathan tell you why he wanted to send

19    it to the company?

20         MS. FEINBERG:  Object to relevancy.  What --

21         JUDGE TRACY:  Overruled.

22         MS. FEINBERG:  Okay.

23         THE WITNESS:  He was -- said he was interested in -- he

24    was talking to me in the parking lot about the interviews and

25    indicated that they were really high and he was thinking about



1    requesting these logs, but he was afraid, so I told him I'd go

2    with him.

3    Q    BY MR. ROSS:  I see.  Do you know if Mr. Galescu composed

4    the wording of this document?

5    A    I do not.

6    Q    Do you know why this document was addressed to somebody

7    named Aleksandra Janevsk?

8    A    I suggested he put her on there, too, because she was our

9    immediate safety representative.

10   Q    Okay.  Did you -- when you say our immediate safety

11   representative, did you and Mr. Galescu work in the same area?

12   A    In the same department.

13   Q    Same department.  And Alexandra was the safety

14   representative assigned to your department?

15   A    To the best of my knowledge.

16   Q    Okay.  And was that her title, safety representative?

17   A    That's how she was introduced to us.

18   Q    I'm sorry?

19   A    That is how she was introduced to us.

20   Q    Was she somebody who was a production associate in body

21   and white?

22   A    No.

23   Q    She was in the safety organization at Tesla?

24   A    From the safety department.

25   Q    Okay.  Did you play any role in deciding who this document



1    would be sent to?

2    A    Besides Aleksandra, no.

3    Q    That would have been Mr. Galescu's decision?

4    A    Yes.

5    Q    Now, I notice in the document that counsel for the General

6    Counsel has put into evidence, General Counsel's Exhibit 16-

7    001, there appears to be a blank space.  See that?

8    A    The whole top part?

9    Q    Yeah.

10    A    Yes.

11    Q    Okay.  Suggesting that perhaps there's either a masking or

12    redaction of what appeared prior to the April 4, 2017 email?

13        MR. RODRIGUEZ-RITCHIE:  Counsel for the General Counsel

14    will object to this line of questioning.  This is how the

15    document was produced by Tesla, pursuant to the subpoena

16    request made by counsel for the General Counsel.

17        MS. FEINBERG:  But if you want to share with us what you

18    had before then, we'd be happy to have it, because that might

19    be relevant.

20        MR. ROSS:  Okay.

21        MS. FEINBERG:  When you -- when someone forwarded it.

22        JUDGE TRACY:  Well, so to the extent there's the

23    objection, I would sustain the objection.  Obviously this is

24    one of these off --

25        MR. ROSS:  I withdraw the question, Your Honor.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  -- the record conversations that could be

2   had about -- often that's what happens, right?  People will say

3   hey, what else is here?  But you guys do it off the record,

4   instead of on the record.

5      MR. ROSS:  Okay.

6      JUDGE TRACY:  But that's fine.

7      MR. ROSS:  Now, General Counsel's Exhibit 20.  Could the

8   witness be shown that?

9      THE WITNESS:  Thank you.

10  Q   BY MR. ROSS:  Mr. Ortiz, you've been shown, given General

11  Counsel Exhibit 20.  It is an email from Mr. Galescu dated

12  April 30 to a David Zwieg cc'd to you.  Subject re: requesting

13  OSHA forms.  You see that?

14  A   Yes.

15  Q   Okay.  Tell me, did you compose any of the words that

16  appear on this piece of paper?

17  A   I did not.

18  Q   You did not.

19      MR. ROSS:  And if the witness could be shown General

20  Counsel's Exhibit 22, please.

21      THE WITNESS:  Thank you.

22  Q   BY MR. ROSS:  You've been given General Counsel Exhibit

23  22.  Two-sided document.  It is an email from Mr. Galescu dated

24  Friday, April 21, 2017 to Seth Woody cc'd to you.  Have you

25  seen that before?



1    A    Yes.

2    Q    Something you received from Mr. Galescu?

3    A    In my email, yes.

4    Q    And same question as before.  Did you compose any of the

5    words that appear in this document?

6    A    I did not.

7    Q    Okay.

8         MR. ROSS:  Could we have General Counsel Exhibit 24,

9    please?

10        THE WITNESS:  Thank you.

11   Q    BY MR. ROSS:  You have a document that's been marked

12   General Counsel Exhibit Number 24.  Two page document.  Appears

13   to be an email from Mr. Galescu to David Zwieg and others cc'd

14   to you.  Subject, personal representatives.  Again, dated June

15   6, 2017.  Have you ever seen that document before?

16   A    Yes.

17   Q    Something you received from Mr. Galescu?

18   A    I did.

19   Q    Is it something that you contributed to or provided any of

20   the text that appears in that document?

21   A    I did not provide the words.

22   Q    Did not provide the words.  Did you play any role in the

23   wording of the document?

24   A    Not in the wording.

25   Q    Not in the wording.  Okay.  By the way, prior to June 6th,



1    2017, had you designated anyone as your personal representative

2    for the purpose of these OSHA laws?

3    A    It was supposed to be done before this.

4    Q    That's -- you're answering a question I didn't answer

5    (sic).

6        MS. FEINBERG:  Objection to the extent it calls for a

7    legal conclusion about what designated means.

8        JUDGE TRACY:  Sustained.

9    Q    BY MR. ROSS:  Tell me, I notice in -- towards the end of

10   this document, it reads, "Our personal representatives are Doug

11   Parker, Executive Director, Work Safe and Susan Reed,

12   international representative, UAW."  Do you see that?

13   A    Yes.

14   Q    Was that the first time you informed the company of who

15   your personal representatives were?

16   A    I believe it was.

17   Q    So when you spoke with Ms. Lipson and Ms. Holcomb on May

18   24, the company was unaware that you had personal

19   representatives, wasn't it?

20       MS. FEINBERG:  Objection.

21       JUDGE TRACY:  Overruled.

22       MS. FEINBERG:  Speculation.

23       JUDGE TRACY:  Overruled.

24       MS. FEINBERG:  Well, from him, he can only say about --

25   you mean, he personally?



1   JUDGE TRACY:  So, I'm o --

2   MS. FEINBERG:  Or he or Mr. Galescu, because we don't

3  know.  So I'm just asking.

4   JUDGE TRACY:  So, I'm overruling the objection, but

5  perhaps you should clarify the question.

6   MR. ROSS:  Sure.

7  Q BY MR. ROSS:  Sir, when you spoke with Lipson and Holcomb

8  on the 24th, did you give them the names of your personal

9  representative?

10 A I did not.

11 Q Did not.  And did. Mr. Galescu tell you that he had given

12 them those names?

13   MS. FEINBERG:  Objection.

14   MR. ROSS:  At the -- his conversation with Lipson on

15 Holcomb on the 24th.

16   THE WITNESS:  He didn't tell me about his conversation.

17 Q BY MR. ROSS:  He never told you about the conversation he

18 had with Lipson and Holcomb on the 24th?

19 A Just that it took place.

20 Q He just told you it took place?

21 A Uh-huh.

22 Q That's all he told you?

23 A Yes.

24 Q Okay.  By the way, what is Work Safe?

25 A It's an organization that does many different things for



www.escribers.net | 800-257-0885

1   workers.

2   Q   Excuse me?

3   A   It's an organization that does many different things for

4   workers.

5   Q   I see.  What things?

6   A   They write reports.  They try to help them in many

7   different ways.

8   Q   Excuse me?

9   A   They aid them in many different ways.  They help them

10   with -- sometimes they write reports.  Sometimes they help with

11   job placement.  Sometimes they help them get lawyers.

12   Q   I see.  When you met with Holcomb and Lipson on the 24th

13   of May, were you aware of Work Safe?

14   A   Yes.

15   Q   And did you mention Work Safe during that conversation you

16   had with those two people?

17   A   I did not.

18   Q   Did not.  What's the first knowledge that you can recall

19   of Work Safe?  When did you first hear about it?

20   A   Prior to the flier.

21   Q   Prior to which flier?

22   A   The flyer we handed on that day?

23   Q   On the 24th?

24   A   Yes.

25   Q   How long prior?



1    A    Maybe a few days.

2    Q    A few days.  And how'd you come to be -- to know about

3    Work Safe?

4    A    Cause I heard they had wrote a report.

5    Q    Excuse me?

6    A    I had heard they had wrote a report.

7    Q    I see.  Who'd you hear that from?

8    A    From the office.

9    Q    From what office?

10    A    The campaign office.

11    Q    The UAW campaign office?

12    A    Yes.

13    Q    Okay.  And prior to that day, you had never heard of Work

14    Safe?

15        MR. RODRIGUEZ-RITCHIE:  Objection.  Vague as to which day.

16    Q    BY MR. ROSS:  Prior to the day you heard about Work Safe

17    at -- from the UAW campaign office, you had never heard of Work

18    Safe?

19    A    I have heard of them.

20    Q    Prior to that?

21    A    Yes.

22    Q    Okay.  How long prior to that?

23    A    I heard the name mentioned many times at that office from

24    the start.

25    Q    I'm sorry.



1    A    I heard that name mentioned many times inside the office

2    from the start.

3    Q    From the start?

4    A    Yes.

5    Q    What do you mean, from the start?

6    A    From the start of our campaign.

7    Q    Okay.  Did you understand that Work Safe was an

8    organization that worked closely with the UAW?

9    A    I understood they were an organization that worked closely

10    with unions.

11    Q    Okay.  And you heard this from people at the UAW?

12    A    It was on posters.

13    Q    By the way, Doug Parker.  You ever meet Mr. Parker?

14    A    I have.

15    Q    How many times?

16    A    Many times.

17    Q    Many times.  What's the first memory of your meeting Mr.

18    Parker?

19    A    Around March or April of 2017.

20    Q    Is Mr. Parker your lawyer?

21    A    No, he is not.

22    Q    Tell me about that first conversation you had with Mr.

23    Parker.

24    A    He was introduced to me.  I said, "Hello, my name is

25    Richard."  He said his name is Parker, Doug Parker.



1    Q    And what else?

2        MR. RODRIGUEZ-RITCHIE:  Objection.  This is all outside of

3    the scope of direct.  And relevancy.

4        JUDGE TRACY:  Well, what is the relevance?

5        MR. ROSS:  Well, he's designated Mr. Parker in this letter

6    and I'm trying to ascertain the nature of the -- and duration,

7    timing of the relationship he had with Mr. Parker and how that

8    relates to these OSHA log 300s.

9        MS. FEINBERG:  Well, it's consistent with OSHA to

10   designate a representative.  What -- I just don't understand

11   how that relates to what we're here for, what is the issue.

12       JUDGE TRACY:  I'm going to overrule the objection,

13   however, I would say in terms of what you're trying to

14   accomplish --

15       MR. ROSS:  Uh-huh.

16       JUDGE TRACY:  -- I understand the relevance of it, but the

17   questions about what's the first conversation is not relevant,

18   I guess.

19       MR. ROSS:  Got it.  Okay.  That's fine.

20   Q    BY MR. ROSS:  By the way, tell me.  Did you ever sign a

21   document designating Mr. Parker as -- or Work Safe as your

22   personal representative?

23       MR. RODRIGUEZ-RITCHIE:  Objection.  Calls for legal

24   conclusion.

25       JUDGE TRACY:  Go ahead and answer the question, please.



1          THE WITNESS:  Yes.

2     Q    BY MR. ROSS:  When was that, sir?

3     A    I don't remember the date.

4     Q    Was it before or after the conversation with Holcomb?

5     A    I don't remember.  I believe it was prior.

6     Q    Prior.  I see.  Do you have a copy of that document?

7     A    I do not.

8     Q    Do you ever go to Work Safe's office?

9          MS. FEINBERG:  Objection.  Relevancy.  He has a right to

10    have a designated entity, so what is the -- I actually don't

11    see the relevancy.  So you said you might have, but objection,

12    relevancy.

13         JUDGE TRACY:  So I'm going to sustain the objection with

14    regards to the last question.

15         MR. ROSS:  Okay.  If I may have a moment.

16         JUDGE TRACY:  Yes.

17    Q    MR. ROSS:  Now, you testified to flyering on May 24; do

18    you remember that?

19    A    Yes.

20    Q    And reviewing my notes -- kind of trying to remember what

21    happened yesterday when Mr. Rodriguez-Ritchie was asking you

22    about that -- I noticed nothing was said -- no questions were

23    asked about any of the security guards that day.

24         MR. RODRIGUEZ-RITCHIE:  Objection.  Is there a question?

25         JUDGE TRACY:  Well, this is cross-examination, okay?



1    So --

2        MR. ROSS:  No.  No it's a preliminary -- it's

3    preliminarily a good question.

4        JUDGE TRACY:  Okay.

5    Q    BY MR. ROSS:  My question to you, sir, is did you speak to

6    security guards on May 24?

7    A    I did.

8    Q    You did.  And tell us what you can recall about the

9    conversations you had with security guards on May 24th.

10   A    I was flyering out in front of the plant, and they asked

11   me if I worked there, asked me for my badge, took a picture of

12   my badge, and then returned it me.

13   Q    Do you remember anything else?

14   A    Not as it pertains to me.

15   Q    What else do you remember of anything you saw involving

16   the security guards that day?

17   A    They were doing some vehicles in front of me.

18   Q    Okay.

19   A    They sat there and waited for a long time in front of me.

20   They -- there was another guard inside the main door there

21   standing there watching us.  One of them spoke to Michael.

22   Q    Okay.  And what did he say to Michael?

23   A    I wasn't paying attention to them.

24   Q    You weren't paying attention?

25   A    Not to them.



www.escribers.net | 800-257-0885

1    Q     Didn't hear any of it?

2    A     No.

3    Q     You're certain of that?

4    A     I heard them -- what they were talking about, yes.

5    Q     You did hear?

6    A     Yes, I did.

7    Q     Tell us what you heard.

8    A     He was asking Michael if he worked there, and Michael gave

9    him his badge.  Michael asking him questions, him returning

10   information to Michael, Michael writing the information down.

11   And then at that, it was time for me to go in.

12   Q     I see.  I see.  What else, if anything, did you hear?

13   A     That's all I can recall at the moment.

14   Q     Okay.  Is it true that the security guards you spoke to

15   that day politely asked you for whether you were an employee?

16   A     They asked me if I was an employee, yes.

17   Q     Okay.  And is it true that they told you that they were

18   asking because they wanted to verify whether you were an

19   employee or not?

20   A     Yes.

21   Q     And you showed them your employee badge, right?

22   A     Yes.

23   Q     And at that point in time, they said thank you very much.

24   We're sorry to bother you, and they left you.

25   A     They said thank you very much and went to Michael.



www.escribers.net | 800-257-0885

1    Q    I beg your pardon?

2    A    They said thank you very much and went to Michael.

3    Q    Okay.  And at that point in time, they went through the

4    same thing with Michael, right?

5    A    He did.  There's only one.

6    Q    He did.

7    A    Yes.

8    Q    Okay.  By the way, this individual who confronted you that

9    day, the security guard, would you describe that person for us?

10   A    He's an older heavy-set gentleman, dark hair, light skin.

11   He speaks good English.

12   Q    Okay.  But he clearly said to you I'm just trying to

13   verify whether you're an employee or not, correct?

14   A    He did not say it to me.

15   Q    He did not say it to you?

16   A    No.

17   Q    He said it to Michael?

18   A    Yes.

19   Q    Did he ask you for your badge?

20   A    He did.

21   Q    Okay.  You didn't ask why he wanted it?

22   A    No.

23   Q    And he didn't tell you why?

24   A    I was already handing it to him.

25   Q    That's a different -- I'm not asking whether you were



1   already handing it to him.  Did he tell you that he was asking

2   it from you in order to verify you were an employee?

3   A    Not to me.

4   Q    And you didn't ask him whether -- why he was asking for

5   it?

6   A    No, I did not.

7   Q    Okay.  And by the way, who from the UAW was in that

8   area out in the parking lot that day?

9         MR. RODRIGUEZ-RITCHIE:  Objection.  Lacks foundation.

10        MR. ROSS:  He can say no one.

11        JUDGE TRACY:  Overruled.

12        THE WITNESS:  Jorge Fernandez.

13   Q    BY MR. ROSS:  And who is Mr. Fernandez?

14   A    He is a representative.  He's the organizer.

15   Q    Okay.  He was not an employee of the company, was he?

16   A    No.

17   Q    Was he out there leafletting, handbilling?

18   A    No.

19   Q    What was he doing?

20   A    He dropped me off, and he was on the phone.

21   Q    Who did the guard talk to first; you or Michael?

22   A    To me.

23   Q    And how far apart were you and Michael?

24   A    About four feet.

25   Q    So let me get this straight.  You and Michael were



1      standing within four feet of each other.  The guard asked

2      Michael if he has an ID.  Michael says yes; is that right?

3      A    At the time the guard walked up and that person went to

4      Michael, we were about four feet.  But I moved back and forth.

5      Q    Okay.  But you heard -- the guard asked Michael do you

6      have an ID?

7      A    Yes.

8      Q    And you heard the guard say can I see it?

9      A    Yes.

10     Q    And you heard Michael say what for?

11     A    Yes.

12     Q    And you heard the guard say so I can verify that you are

13     an employee here and are allowed to be on the premises?

14     A    Yes.

15     Q    And you said the guard talked to you first or second?

16     A    First.

17     Q    Okay.

18          MR. ROSS:  Could the witness be given his statement,

19     please?  And this is the statement dated June 13, 2017.

20          Want me to give it to him?

21     Q    BY MR. ROSS:  Okay.  Now, I'll ask you -- no, I won't ask

22     you.  You have in front of you a confidential witness affidavit

23     in Case Number 32-CA-197091, dated June 13, 2017.  Is this an

24     affidavit that you gave to Mr. Rodriguez-Ritchie?

25     A    It is.



1    Q    Okay.  Now, I'd like you to look at page 8, lines 9 and

2    10, please.

3    A    Okay.

4    Q    Have you had a chance to look at page 8, --

5    A    I have.

6    Q    -- lines 9 and then?

7    A    Yes, sir.

8    Q    So I'll ask you again, who did the guards speak with

9    first; you or Mr. Sanchez?

10   A    Michael.

11   Q    They spoke with Michael first.

12   A    Yes.

13   Q    So you -- memory is refreshed.

14   A    Yes.

15   Q    And now you recall that it was Michael he spoke with

16   first?

17   A    Yes.

18   Q    And you recall that he asked for your badge after he had

19   talked to Michael?

20   A    Yes.

21   Q    And he asked for your badge after you heard him say to

22   Michael I want to verify that you are employees and have a

23   right to be here?

24   A    Yes.

25   Q    Thank you.  So when he asked for your badge, you



www.escribers.net | 800-257-0885

1    understood that he was just attempting to make sure that you

2    were an employee of the company and had a right to be on the

3    premises, right?

4    A    Yes.

5         MR. RODRIGUEZ-RITCHIE:  Objection.

6    Q    BY MR. ROSS:  Thank you.

7         MR. RODRIGUEZ-RITCHIE:  Move to strike.  What he

8    particularly understood -- as Mr. Ross has already objected to

9    the past -- doesn't really matter to this particular

10   allegation, since it's what a reasonable employee in his shoes

11   would have understood.

12        JUDGE TRACY:  Well, true.  I'm going to sustain the

13   objection.  Really, because of the way the question was asked.

14        MR. ROSS:  What was the objection?  And I understand

15   you're sustaining.

16        JUDGE TRACY:  Well, what the objection was, it's not

17   relevant what he thought or --

18        MR. RODRIGUEZ-RITCHIE:  Correct.

19        MR. ROSS:  He's --

20        JUDGE TRACY:  -- the guard -- thought of why the guard

21   wanted it.  And so, my point is that the question that you

22   asked --

23        MR. ROSS:  Your Honor, the --

24        JUDGE TRACY:  I understand what you're trying to ask, so

25   if you want to rephrase the question?



1    MR. ROSS:  Yeah.

2    Q    BY MR. ROSS:  When you showed the guard your badge, why

3    did you think he wanted to see it?

4    A    To verify my employment.

5    Q    Thank you.

6    JUDGE TRACY:  So sustained.

7    The issue is the thinking.  What did you think he -- why

8    he wanted it.

9    MR. ROSS:  Okay.  Judge, we have an allegation here that

10   the things that occurred on the 24th of May, that's a specific

11   8(a)(1) allegation.

12   Now, whether the conversation that took place was unlawful

13   surveillance or an unlawful interrogation, or whether it was a

14   legitimate action permitted by law, is dependent, in part, I

15   believe, not just on the mere utterance of words, but the

16   context within which those words were uttered and what the

17   witness believed those words were intended to accomplish.

18   I believe the company had an absolute legitimate right to

19   determine whether people who were engaging in this activity on

20   its premises had a legal right to be there.  And the --

21   MR. RODRIGUEZ-RITCHIE:  So for that -- excuse me.  I

22   didn't mean to interrupt.

23   MR. ROSS:  Okay.  Well, and let me --

24   JUDGE TRACY:  I was -- here is the issue.  You may call it

25   semantics, but it -- and -- or splitting of hairs -- but there



www.escribers.net | 800-257-0885

1   is a difference in the way that you're asking the question and

2   what the General Counsel's objection is to that -- the form of

3   that question, because of the response it's eliciting.

4       MR. ROSS:  Now I understand he doesn't like the response.

5       JUDGE TRACY:  Go ahead.  Go ahead with what you wanted to

6   say.

7       MR. RODRIGUEZ-RITCHIE:  Thank you.  The General Counsel

8   doesn't assert that there were any unlawful interactions with

9   regards to Mister -- the security guard and Mr. Ortiz, on this

10  occasion on May 24th.  So really there were -- in reality,

11  there's really no relevance to all this questioning, because

12  we're not asserting that these particular interactions were

13  unlawful.

14      MR. ROSS:  Does the General Counsel assert that were there

15  unlawful interactions between security and Mr. Sanchez on the

16  24th?

17      MR. RODRIGUEZ-RITCHIE:  I don't believe there was any

18  testimony from Mr. Sanchez about May 24.

19      JUDGE TRACY:  What's the complaint -- the complaint

20  allegations?

21      MR. RODRIGUEZ-RITCHIE:  There is a complaint allegation

22  regarding unlawful interactions with security guards on May

23  24th, but they do not need them.  We do not assert that they

24  were interactions involving Mr. Ortiz on May --

25      MR. ROSS:  Or Mr. Sanchez?



www.escribers.net | 800-257-0885

1      MR. RODRIGUEZ-RITCHIE:  There has not been any evidence

2  regarding Mr. Sanchez.  He's already testified for counsel for

3  the General Counsel.

4      MR. ROSS:  All right.  I have to go through --

5      MR. RODRIGUEZ-RITCHIE:  His testimony was regarding

6  February.

7      MR. ROSS:  Okay.  I have to go through my notes.  But I

8  have a vague memory of there having been some testimony about

9  what occurred on May 24th with Mr. Sanchez.

10      JUDGE TRACY:  Okay.  I think the testimony, thus far -- I

11  mean the cross that's been -- we've covered --

12      MR. ROSS:  All right.

13      JUDGE TRACY:  -- what you -- this subject area.

14      MR. ROSS:  But -- okay.

15  Q    BY MR. ROSS:  By the way, Mr. Ortiz, did you hear Mr.

16  Sanchez ask the guard for his name and number?

17  A    I heard him ask for his name and employee information,

18  yes.

19  Q    His what?

20  A    His information, his employee number.

21  Q    Okay.  And in fact, did you hear the security guard give

22  Mr. Sanchez his name and number?

23  A    I witnessed what I believed to be them exchanging

24  information.

25  Q    Excuse me?



www.escribers.net | 800-257-0885

1    A    I witnessed what I believed to be them exchanging

2    information.

3    Q    Okay.

4         MR. ROSS:  Just a moment, please.

5    Q    BY MR. ROSS:  Now, you've testified to a conversation you

6    had with Lisa Lipson.  She's -- I understood her to be an HR

7    business partner; is that right?

8    A    Yes.

9    Q    Okay.  Had you had any prior dealings with Mrs. Lipson?

10   A    We say hello.

11   Q    Aside from that?

12   A    No.  Nothing I can recall.

13   Q    And since May 24, have you had any conversations with Lisa

14   Lipson?

15   A    A few.

16   Q    Okay.  Any that you can recall?

17   A    Not really.

18   Q    Not really.

19   A    Not at the moment.

20   Q    Okay.  Any that would relate to this interview you had

21   with her and Holcomb?

22   A    No.  That was the time we talked.

23   Q    I'm sorry?

24   A    That was the time we talked about that.

25   Q    I understand that.  But since then, have you had any



1    conversations with her about that conversation?

2    A    Not about that, no.

3    Q    Okay.  Do you remember what you talked to her about?

4    A    On this day?

5    Q    No.  I didn't ask the question right.  Sorry.  Since May

6    24, the conversation you've had with Lipson, do you have any

7    memory of what you and she talked about?

8    A    No.

9    Q    Now, in your testimony about the conversation you had with

10   Holcomb and Lipson, that was in what room; do you remember?

11   A    It was in the room right by E19 -- pillar (phonetic) E19.

12   Q    Right by pillar -- okay.  Do you remember the name of the

13   room?

14   A    Yeah.  But it has several names.  We -- the guys in my

15   area referred it to as the fishbowl.

16   Q    The --

17   A    Fishbowl.

18   Q    Fishbowl.  Is it called Half Moon Bay?

19   A    No.  I believe that's upstairs.

20   Q    That's upstairs.  Okay.  So this is on the first floor by

21   Pier (sic) 19?

22   A    This would be inside the production area.

23   Q    Okay.  Is it the only room in the area, or are there

24   several rooms in the area?

25   A    Within this area that is partitioned off, there are



1    several little rooms.

2    Q    Okay.

3    A    And offices -- open offices.

4    Q    Okay.  And you say it's in the production area?

5    A    Yes.  In the -- what I would call the middle of the plant.

6    Q    Middle of the plant.

7    A    Approximate

8    Q    Adjacent to what department or area?

9    A    You go in door 2.  You make a sharp left and go toward E19

10   Pillar.  You pass the E19 pillar, and that would be just on 10-

11   3.  On the left-hand side would be the offices in question.

12   You pass that, and you're going to go to the -- what would be

13   the CNC room.  And then on that side, it would be GA, and the

14   other side would be body in white.  And across the other way

15   would be paint.

16   Q    Okay.  Now, have you told us everything that was said by

17   you during that conversation?

18   A    Everything I could think of.

19   Q    Have you told us everything that was said by Holcomb

20   during that conversation?

21   A    I believe so.

22   Q    Have you told us everything that was said by Lipson during

23   that conversation?

24   A    I believe so.

25   Q    Okay.  Can you think of anything you could look at that



1    might refresh your memory of that conversation?

2        MS. FEINBERG:  Of course he's asking you if you can think

3    of anything.

4        JUDGE TRACY:  Really, that's not the appropriate use of

5    the affidavit.

6        THE WITNESS:  Oh.

7        JUDGE TRACY:  So the question -- he had a question for

8    you, instead of looking at the document first.

9        THE WITNESS:  Oh.

10   Q    BY MR. ROSS:  Do you understand my question?

11   A    Can you repeat that, please?

12   Q    Sure.  Can you think of anything you might look at that

13   would refresh your memory about what was said during that

14   conversation?

15   A    Yes.

16   Q    What?

17   A    This affidavit.

18   Q    Okay.  Apart from the affidavit, can you think of anything

19   that would refresh your memory?

20   A    Not that I can think of.

21   Q    Did you communicate the fact that you had this

22   conversation to the Union?

23   A    Yes, I did.

24   Q    How did you communicate it?

25   A    I talked to them.



www.escribers.net | 800-257-0885

1    Q    Okay.  Aside from talking with them, did you communicate

2    it to them in any way?

3         MS. FEINBERG:  Objection to the extent it calls for

4    attorney/client communication.

5         JUDGE TRACY:  So add that qualifier, please.

6         MR. ROSS:  With that qualifier.

7    Q    BY MR. ROSS:  Aside from something that was a

8    communications directed to, or for the purpose of telling

9    counsel what happened, did you have anything in writing to the

10   Union about this conversation?

11   A    I don't understand.  In writing?

12   Q    Yeah.

13   A    I did not -- no.

14   Q    And you say you told the Union about this verbally?

15   A    I did.

16   Q    Okay.  And when did you tell them?

17   A    When I got off of work.

18   Q    Same day?

19   A    Yeah.

20   Q    I see.  And by were you by telephone, or what it in

21   person?

22   A    I just walked over there.

23   Q    You walked over the Union office?

24   A    Yeah.

25   Q    Okay.  And who at the Union did you talk to?



www.escribers.net | 800-257-0885

1    A    I believe I spoke to Fernando and to Susie.

2    Q    Okay.  Was Ms. Feinberg present when you had this

3    conversation?

4    A    Not that day.

5    Q    Not that at that time.

6    A    Right.

7    Q    Okay.  Would you tell me what you said to Susan and

8    Fernando?

9         MS. FEINBERG:  Same objection.  If they're gathering

10   information to communicate to me, or even if I'm on the phone,

11   it's still privileged communication.

12        JUDGE TRACY:  No.

13        MS. FEINBERG:  If I'm on the phone, it is.

14        JUDGE TRACY:  Yes.  So could you ask that, please?

15        MR. ROSS:  Ask what first?

16        MS. FEINBERG:  Because he only asked if she was present.

17        JUDGE TRACY:  Was the attorney on the phone?

18        MR. ROSS:  Okay.  Well, I'm asking about the conversation

19   you had face-to-face with Susan and Fernando at the Union

20   office.  He has already testified that Ms. Feinberg was not

21   present.

22        MS. FEINBERG:  Not physically present.

23        JUDGE TRACY:  So there's an objection.  That would the

24   question of whether she was on the phone --

25        MR. ROSS:  Oh, okay.  I'm sorry.



1    Q    BY MR. ROSS:  Was Ms. Feinberg on the telephone during

2    this conversation?

3    A    No.

4    Q    No.  Okay.  Would you please tell me about what was said

5    by you during this conversation?

6    A    I just told them about the meeting.

7    Q    I see.  What did you tell them?

8    A    What I said in my affidavit.

9    Q    I see.  What else?

10   A    And that I had -- I let Jonathan know they might come see

11   him.

12   Q    You had done what?

13   A    I let Jonathan know that they might come see him.

14   Q    I see.  What else?

15   A    That was it.

16   Q    That was it.

17   A    Yes.

18   Q    Okay.  And were Ms. Reed (phonetic) and Fernando writing

19   things down as you were speaking to them?

20   A    Not --

21        MR. RODRIGUEZ-RITCHIE:  Objection.  Relevance.

22        This isn't -- you know, the General Counsel has an

23   obligation to ensure that these proceedings are not used to

24   harass witnesses.  We have an obligation to ensure the

25   integrity of the proceedings.  And Mr. Ross is attempting to



www.escribers.net | 800-257-0885

1    use the proceedings to obtain discovery from the witness.  If

2    he has something like that, he could have request -- issued a

3    subpoena to the witness, but using this process now, his time

4    here to do that, is an improper use of the proceedings.

5        JUDGE TRACY:  So I'll sustain the objection.

6        MR. ROSS:  Okay.  There are so many affidavits here.  I

7    don't know -- yeah.

8    Q    BY MR. ROSS:  Sir, could you turn to page 12, please?  And

9    actually, page 11.  Start on page 11.  And you're free to

10   review it.

11       But on page 11, spilling over onto page 12, you described

12   the conversation you had with Lipson and Holcomb; do you see

13   that?

14   A    Yes.

15   Q    Okay.  And do you see at the end of the first paragraph

16   that appears on page 12, there is a sentence beginning with the

17   word "My answer was based on my understanding"; do you see

18   that?

19   A    Yes.

20   Q    Okay.  Now, that was -- when you gave this affidavit to

21   Mr. Rodriguez-Ritchie, you were telling him the truth, correct?

22   A    Yes.

23   Q    Okay.  So is it true that when you spoke to Holcomb and

24   Lipson, it was your understanding that they were not asking you

25   whether you would share the report to people not -- strike



www.escribers.net | 800-257-0885

1    that, I'm not asking him right -- that you would not -- they

2    were not asking you whether you had shared the reports with the

3    Union?

4        MS. FEINBERG:  Objection.  Vague.  The whole beginning was

5    like unclear about when he's asking he had that impression.  At

6    the time of the meeting, or at the time he's talking to Mr.

7    Rodriguez-Ritchie?

8        MR. ROSS:  Well, he --

9        JUDGE TRACY:  Okay.  So we'll sustain the objection.

10       If you could just ask the question again, please?

11       MR. ROSS:  Okay.

12   Q    BY MR. ROSS:  It describes your conversation with the --

13   with Holcomb and Lipson.  That's the affidavit does, correct?

14   A    Yes.

15   Q    Okay.  And it's true that at some point in time, Lipson --

16   or Holcomb asked you have you shared the OSHA information with

17   anyone; is that correct?

18   A    Correct.

19   Q    Yes?

20   A    Yes.

21   Q    And you responded no, I have not done anything with the

22   OSHA information?

23   A    Correct.

24   Q    But in reality, you say in the affidavit you had

25   authorized Susan Reed as your representative to receive a copy;



1    is that right?

2    A    I authorized her to be my representative, yes.

3    Q    Okay.  But your answer to Holcomb and Lipson about this

4    was, no, you hadn't, correct?

5    A    No, I hadn't given -- I didn't nothing with them.

6    Q    Excuse me?

7    A    I did not do nothing with them.

8    Q    Okay.  When you had this conversation with Lipson and

9    Holcomb, you had given the information to Ms. Reed, correct?

10   A    I did not give it to Ms. Reed.

11   Q    You knew the information had gone to Ms. Reed, correct?

12   A    I did not know that either.

13   Q    You didn't know that.  You had authorized Ms. Reed to

14   read -- receive the information as your representative,

15   correct?

16   A    I had authorized her to as my representative for

17   everything.

18   Q    Okay.  But you didn't mention Ms. Reed or the Union during

19   this conversation, did you?

20   A    I did not.

21   Q    You did not.  And you did not because you understood you

22   weren't being asked whether you had shared it with the Union,

23   correct?

24   A    I did not because I did not -- I did not share it.

25   Q    I see.  I'm going to direct your attention to lines 3 and



1    4 a page 12.  I'd like you to read that.  There's two lines.

2    A    You want me to read it --

3    Q    You can read --

4    A    -- out loud?

5    Q    -- it to yourself.

6    A    Oh, okay.

7    Q    Not out loud.

8    A    Thank you.  Okay.

9    Q    Okay.  Now, in that two-line passage, you describe why you

10   said what you said to Holcomb and Lipson, right?

11   A    I said that, yes.

12   Q    Okay.  And in that two-line passage, you said, "My answer

13   was based on my understanding that she was asking me whether I

14   shared the reports to other people, not asking me if I had

15   shared it with the Union."  Is that a correct reading of it?

16   A    Yes.

17   Q    Thank you.  Okay.  You testified yesterday to --

18        MR. ROSS:  Let's keep this in order.  22, 23 -- just a

19   moment, Your Honor.

20   Q    BY MR. ROSS:  You testified yesterday to -- you talked

21   about a couple of Facebook pages.

22        MR. RODRIGUEZ RITCHIE:  Objection.  Misstates testimony.

23   He talked about Facebook groups.

24   Q    BY MR. ROSS:  You testified --

25        JUDGE TRACY:  So sustained.



1      MR. ROSS:  General Counsel's Exhibit 45, can the witness be

2   shown that, please?  And while we're at it,    page (sic) 46 as

3   well.

4      THE WITNESS:  Thank you.

5      MR. ROSS:  There you go.

6   Q    BY MR. ROSS:  You have in front of you, Mr. Ortiz,

7   actually two of General Counsel's exhibits.  General Counsel's

8   Exhibit 46 and General Counsel's Exhibit 45.

9   A    Yes.

10  Q    You identified them yesterday?

11  A    Yes.

12  Q    And in 46, you identified the individual standing in the

13  picture that appears on 46.  You said it was Mr. Galescu to the

14  far left, yourself, and then to the right of the gentleman in

15  the middle of the page, it was Mr. Sanchez and then

16  Mr. Phillips; is that right?

17  A    Yes.

18  Q    Okay.  Now, could you do the same with General Counsel's

19  Exhibit 45?  Who are the individuals in that picture?

20  A    Okay.  Starting from the left, I don't know his name but I

21  know I talked to him, then there's myself, and there's Michael

22  Catera.  In the middle behind --

23  Q    Just one moment, please.

24  A    Okay.

25  Q    And then the next person next to you is Mr. Catera?

22-60493.628



```
 1    A    Down in front.  We're just going across --

 2    Q    Right.

 3    A    -- the top part.  Then it will be -- I can't tell in the

 4    picture who that is.  Then way down in front, the small guy is

 5    Thuy.

 6    Q    Okay.

 7    A    I don't know his last name.

 8    Q    Okay.

 9    A    And then there's Jonathan.

10    Q    And then who?

11    A    Jonathan Galescu.

12    Q    The fellow with the sunglasses on?

13    A    Yeah.  The -- the heavyset gentleman behind him.

14    Q    Okay.

15    A    And the other gentleman with the hat would be Michael

16    Sanchez.

17    Q    Thank you.  Okay.  So let's talk about this thing up in

18    Sacramento you testified about yesterday.

19    A    Okay.

20    Q    And by the way, these pages, General Counsel's Exhibit 45

21    and 46, were these on the private Facebook page or the public?

22    A    These were on the Fair Future page.

23    Q    Okay.  That's a UAW's --

24    A    Yes.

25    Q    -- Facebook page?  Okay.  Now, it wasn't clear to me what
```



www.escribers.net | 800-257-0885

1     this thing about Sacramento was.  So I'm going to ask you just

2     a couple of questions about it.  Are you testifying that you

3     and these other gentlemen that appear on page -- or General

4     Counsel's Exhibit 46 went to Sacramento to speak with

5     legislators?

6     A     Yes.

7     Q     Okay.  And that you or somebody appearing on General

8     Counsel's Exhibit 46 actually testified in a hearing before the

9     legislator --

10    A     No.

11    Q     -- legislature?

12    A     Not to my knowledge.

13    Q     Okay.  You didn't testify?

14    A     No.

15    Q     Okay.  But you met with legislatures -- legislators in

16    Sacramento?

17    A     Yes.

18    Q     Okay.  And you went to talk to them about what?

19    A     About some language that was being placed into a -- I'm

20    not sure how the term is, but something about the rebate

21    program that people receive for buying electric cars.

22    Q     I see.  And this was something that was being inserted

23    into this law about rebates?

24    A     I'm not very sharp on what the law -- how -- how it works.

25    I just know what it was about.



www.escribers.net | 800-257-0885

```
1    Q    Okay.  So it was something the UAW wanted to have put in

2    the law?

3    A    It was something we wanted to have.

4    Q    "We" being whom?

5    A    Me and my co-workers.

6    Q    I see.  And the UAW?

7    A    I believe they did.

8    Q    Okay.  And you were there actually with the lobbyist of

9    the UAW?

10   A    We were there with the Fair Future campaign lobbyist.

11   Q    With the --

12   A    Fair Future campaign lobbyist.

13   Q    And that was this Hanna person?

14   A    Yes, it was.

15   Q    And what's her last name?  Dirnbaun (phonetic)?

16   A    Birnbaun.  Birnbaun, as far as I know.

17   Q    Okay.  Do you know how to spell it?

18   A    I have no idea.

19   Q    Okay.  And so all of the individuals on page (sic) 46 were

20   there?

21   A    Yeah.

22   Q    Or General Counsel's 46 were there?

23   A    They were there, yes.

24   Q    Yeah.  They were in Sacramento with you?

25   A    Yes.
```



www.escribers.net | 800-257-0885

1    Q    How many times did you go to Sacramento?

2    A    I've been there several times.

3    Q    For this purpose?

4    A    No.  For other purposes also.

5    Q    Okay.  How many times were you in Sacramento for this

6    purpose?

7    A    Twice, that I recall.

8    Q    Twice.  With the same individuals?

9    A    No.

10   Q    Okay.  Were any individuals in Sacramento with you for

11   this purpose other than those shown on General Counsel's

12   Exhibit 46?

13        MS. FEINBERG:  Which purposes is it for this Exhibit 46?  I

14   don't think he said what purpose it was for 46.  He's --

15        JUDGE TRACY:  Okay.  If there was an objection, it's

16   sustained.

17        MS. FEINBERG:  Objection.  I sustained the objection.

18        MR. ROSS:  Okay.

19   Q    BY MR. ROSS:  Now, at some point in time, you came to find

20   out that there had been some employees that had gone up to

21   Sacramento to speak on behalf of Tesla and in opposition to

22   this legislature, didn't you?

23   A    Yes.

24   Q    And you found out about that from Hanna?

25   A    Yes.



www.escribers.net | 800-257-0885

1  Q    I see.  Did you find out about it from anyone other than

2  Hanna?

3  A    Well, I don't know -- I'm not sure if I understand that.

4  Q    Yeah.  Did anybody else tell you that, that some Tesla

5  people had been up there -- Tesla employees from the production

6  floor --

7  A    No, not --

8  Q    -- testifying against or lobbying against this?

9  A    I received information that they were up there, but it was

10  way after I knew about it.

11  Q    I see.  Or that they had been up there saying that that

12  kind of legislation would be hurtful to the Company because it

13  would penalize Tesla customers?  Did you --

14      MS. FEINBERG:  Objection.  Conjecture.  Where --

15  Q    BY MR. ROSS:  Did you hear that?

16      JUDGE TRACY:  Well, it's cross-examination, so I'm going to

17  overrule the objection.

18  Q    BY MR. ROSS:  Did you hear that?

19  A    No.

20  Q    You didn't hear that.  Did you see anything wrong with

21  Tesla production associates going up to Sacramento lobbying

22  against what you wanted?

23      MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

24      JUDGE TRACY:  Sustained.

25  Q    BY MR. ROSS:  Did it make you mad?



1      MR. RODRIGUEZ RITCHIE:  Objection.

2      MS. FEINBERG:  Objection.  Relevance.

3      JUDGE TRACY:  Sustained.

4   Q    BY MR. ROSS:  Do you know whether Hanna's office is in

5   Sacramento?

6   A    I don't know.

7   Q    And did you say that Hanna sent you some kind of video of

8   these employees from Tesla going up to Sacramento and speaking

9   against what the Union wanted?

10  A    Yes.

11  Q    Okay.  And you couldn't open it, but Mr. Moran could?

12  A    Yes.

13  Q    And she sent you this video to your email address?

14  A    Yes.

15  Q    And was it your personal email address or to your Tesla

16  email address?

17  A    It was my personal email address.

18  Q    I see.  And is that still your email address?

19     MS. FEINBERG:  Objection.  Relevancy.

20     JUDGE TRACY:  Sustained.

21     MR. RODRIGUEZ RITCHIE:  Your Honor, at some point, would it

22  be possible to have a break?

23     JUDGE TRACY:  How much longer?

24     MR. ROSS:  It will be a while.

25     JUDGE TRACY:  Okay.  Let's find a natural breaking point.



1     Okay?

2          MR. ROSS:  Sure.  Actually, now would be a fine time.

3          JUDGE TRACY:  Okay.  Let's take a ten-minute break.

4          Let's go off the record.

5     (Off the record at 11:05 a.m.)

6          MR. ROSS:  Could the witness be shown General Counsel's

7     Exhibit 43, please?

8          THE COURT REPORTER:  Which exhibit?

9          MR. ROSS:  43.  Thank you.

10         THE COURT REPORTER:  Sure.

11    Q    BY MR. ROSS:  Mr. Ortiz, you have in front of you General

12    Counsel General Counsel Exhibit 43.

13    A    Yes.

14    Q    And as I understand it, this information did not come from

15    your telephone, it came from somebody else's phone, right?

16    A    Correct.

17    Q    Okay.  And the phone that you had at the time that you and

18    Mr. Moran exchanged these texts, you no longer have that phone?

19    A    No.

20    Q    When did that phone leave your possession?

21    A    About the day of my first meeting with Ricky.

22    Q    Excuse me?

23    A    On the day of my first meeting with Ricky.

24    Q    The day.  Was it before or after your conversation with

25    Ricky?



www.escribers.net | 800-257-0885

1    A    It is prior.

2    Q    Okay.  How long before the conversation with Ricky did it

3    cease to be in your possession?

4    A    A few hours.

5    Q    A few hours?

6    A    Um-hum.

7    Q    Hmm.

8    JUDGE TRACY:  Can you -- yes or no for the record?

9    THE WITNESS:  Oh.  Yes.

10    MS. FEINBERG:  We're going to have editorialization or just

11    questions?  I don't know if you can hear.  He's like making

12    "hmms" and things like that, which --

13    JUDGE TRACY:  And --

14    MS. FEINBERG:  -- I think is inappropriate.

15    JUDGE TRACY:  Yep.  Okay.  So I've already given these

16    instructions.

17    MS. FEINBERG:  Okay.

18    JUDGE TRACY:  I need you to object, though, please.

19    MS. FEINBERG:  Okay.  Thank you.  But in the --

20    MR. ROSS:  May I ask a question?

21    JUDGE TRACY:  Yes.

22    MR. ROSS:  Okay.

23    Q    BY MR. ROSS:  So it's your testimony that the day of your

24    first conversation with Ricky is the same day that your phone

25    broke?



www.escribers.net | 800-257-0885

 1    A    No.

 2    Q    When did your phone break?

 3    A    A few days prior.

 4    Q    And so for that few-day period, you didn't have a

 5    telephone?

 6    A    I had a phone, but the screen was shattered.

 7    Q    It's --

 8    A    The screen was shattered.

 9    Q    I see.  So you had the phone, it was still working, but

10    the screen was shattered?

11    A    Correct.

12    Q    Okay.  And when did you purchase a new phone?

13         MS. FEINBERG:  Objection.  Relevancy.

14         JUDGE TRACY:  Overruled.

15         THE WITNESS:  The morning before I went to the meeting with

16    Ricky.

17    Q    BY MR. ROSS:  I see.  And where did you purchase it?

18    A    In Newark.

19    Q    Where in Newark?

20    A    At the Metro store.

21    Q    Metro.  Is that a carrier or a --

22    A    It's --

23         MS. FEINBERG:  Objection.  Relevancy.

24         MR. ROSS:  Well, I'm trying to understand --

25         MS. FEINBERG:  I believe it's wandering.



www.escribers.net | 800-257-0885

1     MR. ROSS:  -- where he bought the phone.  It's --

2     MS. FEINBERG:  Why?

3     MR. ROSS:  Because I might subpoena the records.

4     JUDGE TRACY:  So --

5     MS. FEINBERG:  Objection.  Relevancy.  I don't want to get

6  caught up in that.

7     JUDGE TRACY:  I'm going to again overrule the objection.

8     Go ahead, please.

9     MR. ROSS:  Thank you.

10   Q    BY MR. ROSS:  Metro?

11   A    Yes.

12   Q    Is that the phone carrier that you use?

13   A    Yeah.  Metro PCS.

14   Q    Metro -- okay.  And where in Newark did you purchase the

15  new phone?

16     MS. FEINBERG:  I'd like to have a continuing objection.

17  Can I speak to the objection, the relevancy objection?

18     The Company made a decision to terminate Mr. Ortiz.  So

19  what -- I assume they did it based on the information they had.

20  So I don't -- I'm not clear where we're going here about what

21  he did with his phone or didn't do with his phone.  I've never

22  heard any allegation about whether he kept a phone or didn't

23  kept (sic) a phone.  They had records clearly.  These are their

24  documents.  They made a decision.  So what -- where are we

25  going?



www.escribers.net | 800-257-0885

1    MR. RODRIGUEZ RITCHIE:  Counsel will -- for the General

2    Counsel will also object, though on different bases.  We have

3    an obligation to ensure the integrity of these proceedings and

4    to ensure that they're not used for discovery purposes or to

5    harass individuals.

6    Respondent Tesla could have issued a subpoena to request

7    documents or other types of information, which they haven't

8    done apparently, to Mr. Ortiz.  But using this process to try

9    and obtain that type of information is not appropriate.

10    JUDGE TRACY:  And so what is the purpose --

11    MR. ROSS:  Well, the purpose is to --

12    JUDGE TRACY:  -- for your questions?

13    MR. ROSS:  -- get the information with respect to where the

14    phone was disposed of and when it was disposed of.  And we may

15    choose to subpoena records from the carrier.  And it goes to

16    the issue of the witness' credibility.

17    JUDGE TRACY:  Okay.  So --

18    UNIDENTIFIED SPEAKER:  That's pretty funny.

19    JUDGE TRACY:  -- I had -- I understand where you were going

20    with regards to credibility.  It is your prerogative to

21    undermine his credibility as you see fit.  But agreeing with

22    the General Counsel in terms of using it to discover where that

23    would be.  You can issue it -- you can request for myself to

24    issue a subpoena.  I've talked about that --

25    MR. ROSS:  I can --

escribers
www.escribers.net | 800-257-0885

1      JUDGE TRACY:  -- before.

2      MR. ROSS:  I'm sorry.  I couldn't hear you, Your Honor.

3      JUDGE TRACY:  I can issue a subpoena.  You've request --

4  we've had this problem going on, and you had every right before

5  the hearing to do that.  And so you can do one, you know,

6  during these proceedings.  But to question to find out where

7  these documents are to be able to --

8      MR. ROSS:  We're trying to find out where to send the

9  subpoena, Judge.

10      JUDGE TRACY:  Well --

11      MS. FEINBERG:  That's a different --

12      JUDGE TRACY:  -- that's something that you can discuss, you

13  know, off the record.  But in terms of questioning about all of

14  that, that is not relevant to the --

15      MR. ROSS:  Okay.

16      JUDGE TRACY:  -- proceeding.

17      MR. ROSS:  All right.

18  Q    BY MR. ROSS:  Okay.  Looking at General Counsel's

19  Exhibit 43, Mr. Ortiz --

20  A    Um-hum.

21  Q    -- do you have a memory as to whether or not there was any

22  kind of message to you from Mr. Moran prior to the first

23  message that appears on page 001 of General Counsel Exhibit 43?

24      MS. FEINBERG:  Objection.  Vague.  Regarding this topic or

25  ever?



www.escribers.net | 800-257-0885

1    Q    BY MR. ROSS:  Whether there was a bubble or a blurb prior

2    to the one that appears on the top of this page, page 1?

3    A    I don't know.

4    Q    Okay.  Now, I had in my notes from yesterday, and I want

5    to make sure I got it right, you did not ask for these

6    screenshots of these two individuals or these three individuals

7    to be sent to you; is that correct?

8    A    Correct.

9    Q    Okay.  Did you -- before you received them, did you know

10    that these screenshots were going to be made?

11    A    No.

12    Q    I know you said you didn't ask that they be sent to you,

13    but did you ask that screenshots be made?

14    A    No.

15    Q    But they were sent to you by Mr. Moran and at least two

16    other individuals?

17    A    Yes.

18    Q    And you don't know who the other individuals are?

19    A    No.

20        MR. ROSS:  Could the witness be shown his affidavit,

21    please?

22        MR. GARBER:  Which one?

23        MR. RODRIGUEZ RITCHIE:  I just don't -- I don't --

24        MR. ROSS:  Oh, I'm sorry.  You're absolutely right.  It's

25    the affidavit dated 10/26/17.



1      MR. GARBER:  Is that the one he still has or a different

2  one?

3      MR. ROSS:  It's a new one.

4      MR. GARBER:  Okay.  October 2016?

5      MR. ROSS:  Yep.  '16 or '17?

6      MS. FEINBERG:  '17 and 2016, too.

7      MR. ROSS:  October 26, 2017.  This.  That the date.

8      MR. GARBER:  Oh, okay.  That's the other one.  Oh, I have

9  it here.  Sorry.

10      MR. ROSS:  You got it?

11      MR. GARBER:  Yeah.  October 26.

12      MR. ROSS:  Thank you.

13      MR. GARBER:  Sure.

14      MR. ROSS:  Here you go.

15      THE WITNESS:  Thank you.

16      MR. GARBER:  Okay.  Sorry.

17  Q    BY MR. ROSS:  Now, would you look at attachment -- I'm

18  sorry -- Exhibit A, please?  Do you recognize those as the

19  screenshots that were sent to you by Mr. Moran?

20  A    Yes.

21  Q    Okay.  And were identical screenshots sent to you by other

22  people or were there different images or pictures of these

23  individuals?

24  A    They were the same pictures.

25  Q    Identical?



www.escribers.net | 800-257-0885

1    A    They had been cropped.

2    Q    They had been cropped.  Aside from that, identical?

3    A    Yes.

4    Q    Okay.  But the pictures that were sent to you by Mr. Moran

5    were not cropped?

6    A    No.

7    Q    And indeed the pictures that appeared on -- in the post

8    that you put on the private Facebook page, they were not

9    cropped; is that correct?

10    A    Correct.

11    Q    So as you sit here today, can we agree that it was

12    Mr. Moran's pictures that you posted?

13    A    Yes.

14    Q    Now, do I understand that at some point in time you

15    received some kind of message from either Mr. Pratt or Mr. Ives

16    telling you that they objected to your posting their pictures?

17    A    They were telling me that my wording was inappropriate.

18    Q    They didn't say a word about the pictures?

19    A    They said I shouldn't have started off by calling them

20    names.

21    Q    I see.  Did they complain about the posting of their

22    pictures?

23    A    No.

24    Q    They did not.  They did not tell you that they didn't

25    appreciate having their pictures put on the web -- on the



www.escribers.net | 800-257-0885

1    Facebook page?

2    A    I don't recall that.

3    Q    You don't recall that.  Or that they felt threatened or

4    harassed by your putting their pictures on the Facebook page?

5    A    I read the -- the message that I received.  And it started

6    off with the -- about being -- they felt it wasn't right to

7    call them names.  At that point, I agreed in my head, and took

8    them down.  I didn't read the rest of it really.

9    Q    Okay.  And by the way, that was a message you received on

10   your new phone?

11   A    On the phone I had at the time, yes.

12   Q    Okay.  Do you have that phone anymore?

13   A    No.

14   Q    No.  I betcha Apple likes you --

15   A    Yeah.

16   Q    -- right?  Okay.  Now, before you posted these pictures,

17   did you stop to think about whether or not the posting of those

18   pictures might present a problem for anybody?

19   A    No.

20   Q    Did you ever tell anybody that you posted those pictures

21   in the heat of passion?

22   A    I don't understand.

23   Q    Okay.  Did you ever tell anybody that you posted those

24   pictures because you were really, really upset by what these

25   people had done?



```
 1    A    I wasn't upset.

 2    Q    Did you ever tell anybody that?

 3    A    I don't recall.

 4    Q    And you weren't upset?

 5    A    No.

 6    Q    Okay.  You didn't think they were suck asses?

 7    A    Yeah, I thought that.

 8    Q    Okay.  But you weren't upset?

 9    A    Right.

10    Q    Okay.  And I take it you didn't ask for their permission

11    to  post their pictures on the Facebook page, did you?

12    A    No.

13    Q    Or tell them you were going to in advance?

14    A    No.

15    Q    Now, I think you testified that at some point after your

16    post you had a meeting with Ricky Gecewich?

17    A    Yes.  I did.

18    Q    Okay.  How much time passed, do you think, between the

19    post and the meeting with Gecewich?

20    A    I'm guessing approximately a week to a week and a half.

21    Q    Okay.  And prior to meeting with Mr. Gecewich, had you

22    ever met him before?

23    A    No.

24    Q    But you understood that he was an investigator for the

25    company?
```



www.escribers.net | 800-257-0885

```
 1    A    That's what he explained to me when I met him.

 2    Q    Okay.  And did you understand that when he met with you he

 3    was conducting an investigation?

 4    A    Yes.

 5    Q    And did you understand that the purpose of the

 6    investigation was to get the truth?

 7    A    Yes.

 8    Q    Now, during this initial conversation with Mr. Gecewich,

 9    what if anything did he tell you, as to how he came to be doing

10    this investigation?

11    A    He said it was brought to his attention about those pic --

12    the posting, and he was -- he wanted to find out more about it.

13    Q    Okay.  Can you think of any reason why Mr. Gecewich --

14    well, strike that.  You said you had no prior dealings with Mr.

15    Gecewich.  I take it you had no arguments, no disagreements

16    with him prior to this conversation?

17    A    I didn't know he existed.

18    Q    Didn't know he existed, okay.  And during this initial

19    conversation with Mr. Gecewich, you say you had your Union

20    shirt on?

21    A    Yes.

22    Q    And -- but he didn't make any mention of the Union, did

23    he?

24    A    Yes.  He did.

25    Q    He did?
```



1    A    Yes.

2    Q    And that's in your affidavit, sir?

3    A    No.  It's not.

4    Q    No, it's not?  Well an investigation involving your

5    termination, before the NLRB; if he had mentioned the Union,

6    don't you think it would appear in the affidavit?

7         MS. FEINBERG:  Objection.  Argumentative.

8         MR. RITCHIE:  Same objection.

9         MR. ROSS:  Withdraw the question.

10        JUDGE TRACY:  Okay.

11    Q    BY MR. ROSS:  By the way, the affidavit that you have in

12    your hand; what's the date of that affidavit?

13    A    It says June 13th.

14    Q    Oh.

15    A    Or the other one?

16    Q    You've got the wrong affidavit then.  Do you have an

17    affidavit there dated 10/26/17?

18    A    Yes.  That's the first one on this page.

19    Q    Oh, okay.  So that affidavit that you gave -- this is --

20    affidavit that you gave to Mr. Rodriguez-Ritchie on October 26,

21    2017, correct?

22    A    Correct.

23    Q    Eight days after your termination, correct?

24    A    Correct.

25    Q    Your memory was fresh, in terms of what was said in your



www.escribers.net | 800-257-0885

1    conversations with Mr. Gecewich and others, about your

2    termination, correct?

3    A    Correct.

4    Q    Fresher than it is today, correct?

5    A    Correct.

6    Q    Okay.  And yet no mention was made of a Union comment by

7    Mr. Gecewich, is there?

8        MR. RITCHIE:  Objection.  Asked and answered.

9        JUDGE TRACY:  Overruled.

10       MR. ROSS:  It's overruled?

11       JUDGE TRACY:  Yes.

12   Q    BY MR. ROSS:  Okay.  Is it?  No mention of the Union in

13   this?

14   A    Correct.

15   Q    Thank you.

16   (Counsel confer)

17   Q    BY MR. ROSS:  Now, have you told us everything that you

18   and Mr. Gecewich said to one another during this initial

19   conversation?

20   A    That I can remember.

21   Q    Okay.  And have you -- after you had this conversation

22   with Mr. Gecewich, did you inform the Union of this

23   conversation?

24   A    I did not.

25   Q    You did not.  Now, during the conversation with Mr.



www.escribers.net | 800-257-0885

1    Gecewich, he asked you where you got the screenshots, right?

2    A    Correct.

3    Q    You didn't tell him, did you?

4    A    No.

5    Q    You told him you didn't know, right?

6    A    Correct.

7    Q    You did know, didn't you?

8    A    Yes.

9    Q    You lied to him?

10   A    I wasn't truthful.

11   Q    Excuse me?

12   A    I was not truthful.

13   Q    Okay.  You see a difference between not being truthful and

14   lying?

15   A    I don't know how to answer that.  I wasn't --

16   Q    Okay.

17   A    I wasn't truthful with him.

18   Q    Okay.  And you weren't truthful with him even though you

19   knew that the investigation was intended to get the truth,

20   correct?

21   A    I wasn't truthful with him because the confidentiality

22   agreement came up, and I assumed I was already terminated, and

23   that he would've terminated my friend also.

24   Q    I see.  The confidentiality was already brought up in the

25   first meeting?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Okay.  And at that first meeting, you thought you were

3    already fired but you didn't tell the Union about it?

4    A    That's right.

5    Q    Make any notes of the conversation?

6    A    No.

7         MR. RITCHIE:  Objection.  The General Counsel will assert

8    its previous objection that Counsel for Tesla is

9    inappropriately using this process for discovery purposes.

10        Counsel for Respondent requested 20 subpoenas to be issued

11   by the Region -- Regional Office prior to this proceeding

12   beginning.  They didn't issue a subpoena, and now they're

13   attempting to use this questioning to try and obtain

14   information that they're not entitled to obtain, absent a

15   subpoena.

16        MR. ROSS:  If I may respond, Judge?

17        JUDGE TRACY:  Yeah.

18        MR. ROSS:  I'll make a deal with the General Counsel.  We

19   won't ask these questions if the General Counsel doesn't use

20   their subpoena power for discovery purposes.

21        MS. FEINBERG:  Can I --

22        JUDGE TRACY:  Well -

23        MS. FEINBERG:  -- be heard, Your Honor?

24        JUDGE TRACY:  (No verbal response).

25        MS. FEINBERG:  The other reason for this is, I would like

1     to concur with the General Counsel, in addition to which, from

2     the beginning of this hearing, I raised concerns about the fact

3     that the Tesla's lawyers asked to have a continuance of this

4     case right when they knew, generally, when the General Counsel

5     office would -- General Counsel would finish, which would give

6     them now, we've been over two months to then prepare their

7     case,  unlike all of us, who had to prepare their case at the

8     onset, which is -- well, it's -- that's what this is all about.

9     This is about to use the break for discovery.

10          JUDGE TRACY:  Okay.

11          MS. FEINBERG:  I'm just concurring with the General

12     Counsel.

13          JUDGE TRACY:  All right.

14          MS. FEINBERG:  That's what we're seeing here.

15          JUDGE TRACY:  So let me say for the record here; this case

16     has been scheduled since last fall, so it's disingenuous to say

17     that suddenly now you don't have time to prepare.

18          MS. FEINBERG:  I'm not saying me.

19          JUDGE TRACY:  When this case was assigned -- I'm saying in

20     general.

21          MS. FEINBERG:  Oh, okay.

22          JUDGE TRACY:  This case has been --

23          MS. FEINBERG:  I'm prepared.

24          JUDGE TRACY:  -- on/off the calendar.  So eventually, once

25     there was a request for division of judges to have a judge



1    assigned --

2         MS. FEINBERG:  Except --

3         JUDGE TRACY:  -- that's when it gets assigned again, and

4    then we have to work out everybody's schedule.

5         There might've been a short break, but then we have other

6    issues coming up where others are not available.  So to keep

7    talking about this, about the length of time and that they're

8    using it for their purposes; I have no reason to believe that.

9    I'm believing everybody and their various schedules --

10        MS. FEINBERG:  Okay.  Well, let me --

11        JUDGE TRACY:  -- I've never asked for -- I need proof of

12   all of these times --

13        MS. FEINBERG:  Okay.

14        JUDGE TRACY:  -- off.  So to talk about that; I'm tired --

15        MS. FEINBERG:  May -- maybe let me rephrase it.

16        JUDGE TRACY:  -- of hearing about it, but I will say this;

17   they have the right to subpoena, of course, information.  Now,

18   they have every right, and I see that in many hearings, Did you

19   take notes, et cetera.  Now, when it starts probing into where

20   are the notes?  You know, and then you -- there's this concern

21   that is going to be used during this break for subpoena

22   purposes?  Okay, that's -- again, where you all have to talk

23   off the record about this.

24        MS. FEINBERG:  Um-hum.

25        JUDGE TRACY:  Because I can see -- frankly, the biggest



www.escribers.net | 800-257-0885

1    program here is going to be this, and I'm pretty sure that

2    people don't want this happening; is you've got individual

3    charging parties.  Suddenly, all these employers are going to

4    start subpoenaing them for every document that they have -- not

5    just this case, but in the future.

6        And so I just say, be careful about this and let's be

7    transparent.

8        MS. FEINBERG:  Okay.

9        JUDGE TRACY:  Let them ask what they want.  Now, if there

10   is certainly an issue later where they issue some subpoena,

11   which they have every right to do and it happens in long,

12   lengthy cases, we could continue on for the next four weeks of

13   hearing and they could issue a request to subpoena tomorrow.

14       I agree.  I'm not going to allow this process to be used

15   to discover what else could be out there, but they have the

16   right to ask some of these questions, okay?  And if there is --

17       MS. FEINBERG:  Um-hum.

18       JUDGE TRACY:  -- this lack of trust?  You guys talk about

19   it outside the room.  I have no reason to distrust any of you.

20   My job here is to listen to these witnesses and assess their

21   credibility.

22       MS. FEINBERG:  Okay.

23       JUDGE TRACY:  And that's what I'm here for, so all of this

24   is -- I'm tired of it.  The objection is overruled.  Go ahead.

25   Q    BY MR. RITCHIE:  I don't even remember the last question.

1          JUDGE TRACY:  "Did you take notes?"

2     Q    BY MR. RITCHIE:  Did you take notes?

3     A    No.  I did not.

4     Q    Did not, okay.  Now, at some point in time after your

5     initial conversation with Mr. Gecewich, were you contacted by

6     Mr. Moran and told by Mr. Moran that he had been contacted by

7     Mr. Gecewich?

8     A    I don't remember.

9     Q    You don't remember?

10    A    No.

11    Q    Do you remember telling Mr. Gecewich -- you saw Mr.

12    Gecewich, a second time; is that right?

13    A    Yes.

14    Q    Okay.  You actually had a conversation with him about a

15    week or so after the post on your Facebook page, and then a

16    couple, three weeks later, you spoke with him again; is that

17    right?

18    A    Yes.

19    Q    And this was about several days before you were told of

20    your termination, right?

21    A    Yes.

22    Q    Okay.  And do you remember telling him during that

23    conversation that you had talked with Mr. Moran and Mr. Moran

24    had told you that he, Mr. Gecewich, had been -- had talked to

25    Mr. Moran?



```
 1    A    I don't remember that.

 2    Q    Okay.  Do you remember Mr. Moran told you that he had

 3    given Mr. Gecewich the text messages that had gone back and

 4    forth between Mr. Moran and Gecewich -- or between Mr. Moran

 5    and you?

 6    A    I don't remember him ever telling me that.

 7    Q    No?  Okay.  Now, is it true that during this second

 8    conversation you had with Mr. Gecewich, he asked you whether

 9    you had told him the truth --

10    A    Yes.

11    Q    -- during the first conversation you had with him?

12    A    Yes.

13    Q    And do you remember -- how many times did he ask you that?

14    A    Several.

15    Q    And do you remember what you said the first time he asked

16    you that question?

17    A    Not the exact wording.

18    Q    Well, what do you remember of your response, the first

19    time he asked you that question?

20    A    I said, Yes.

21    Q    The first time he asked you that question, you said you

22    had told him the truth?

23    A    Yes.

24    Q    Okay.  And then the second time he asked you that

25    question, what was your response?
```



www.escribers.net | 800-257-0885

```
 1    A    Yes.

 2    Q    And the third time?

 3    A    Yes.

 4    Q    How many times did he ask you?

 5    A    I don't know, but I always told him -- I always told him

 6    I'm telling the truth.

 7    Q    Did you ever tell him that you had not told him the truth?

 8    A    No.

 9    Q    By the way, during that conversation, do you remember

10    saying something to him along the lines of, You were not a

11    snitch?

12    A    Yes.

13    Q    And do you remember telling him that you had -- Where you

14    had grown up, you'd run around with some bad people and you

15    didn't snitch on your friends?

16    A    That's correct.

17    Q    You told him that?

18    A    Yes.  I did.

19    Q    Okay.  That, You'd been a gangbanger?

20    A    I was.

21    Q    And you did tell him that?

22    A    I did.

23    Q    And, You didn't snitch on your friends?

24    A    I don't.

25    Q    You didn't tell him anything about being afraid of telling
```



1   him something because you were concerned about their families?

2   A    No.  I told him, I figured I was already fired, so why

3   should I say anything?

4   Q    I see.  You didn't tell him that?

5   A    I told him that --

6   Q    You didn't say, I don't want to tell you this because I'm

7   concerned about my friends and my -- their families; you didn't

8   say that?

9   A    I don't remember saying that.  I might've.

10  Q    Now, is it correct to say that he told you that it wasn't

11  his decision -- strike that.  You said, Am I fired?  Did he

12  tell you you were fired?

13  A    He said it wasn't his decision to make.

14  Q    Did he say you were fired at that moment?

15  A    Not then.

16  Q    Okay.  Instead, he said, That's not my decision to make,

17  right?

18  A    Correct.

19  Q    Did he tell you whose decision it was to make?

20  A    No.

21  Q    Do you know whose decision it was to make?

22  A    I have no idea.

23  Q    By the way, the first conversation you had with Mr.

24  Gecewich, this is the one in September, how long did that

25  conversation last?


www.escribers.net | 800-257-0885

```
 1    A    About 15 minutes.

 2    Q    And where was it?

 3    A    In the office, because I was told to go to.

 4    Q    In the office where?

 5    A    I was -- I was told to go to.

 6    Q    Where was that?

 7    A    In the North Admin building.

 8    Q    Where in the North Admin building?

 9    A    In the office.  I don't know exactly where.  I went to the

10    office.

11    Q    All right.  Okay.  And the second conversation you had

12    with him?

13    A    Was in the -- a room next to the meeting room I had with

14    Laura Lipson (sic).

15    Q    And how long was that conversation?

16    A    About 15 minutes.

17    Q    So after this second conversation with Mr. Gecewich, you

18    went back to work?

19    A    I did.

20    Q    Now, do you know somebody named ShTawney McIntosh?

21    A    I do.

22    Q    Who's ShTawney?

23    A    She was my HR rep.

24    Q    ShTawney was present at the time you were told of your

25    termination?
```



www.escribers.net | 800-257-0885

 1    A    She was.

 2    Q    Okay.  Tell me, did you and ShTawney ever have any

 3    disagreements or arguments?

 4    A    No.

 5    Q    Can you think of any reason why ShTawney might say

 6    something untruthful about you?

 7    A    No.

 8    Q    Now, I think your testimony yesterday was that ShTawney

 9    told you that you were being terminated because of something

10    involving a confidentiality agreement?

11    A    No.

12    Q    That's not true?

13    A    No.

14    Q    Were you told something about that during that termination

15    meeting?

16    A    Yes.

17    Q    I see.  And who told you that?

18    A    Ricky.

19    Q    Ricky said.  Okay.  Now, could you look at your affidavit,

20    please, the one that is for October 26, 2017?  And I'm going to

21    ask you to go to page 3 and spilling over to page 4.  It goes

22    from line 15 of page 3 to -- through line 9 of page 4.

23    A    Okay.

24    Q    Have you read through that, sir?

25    A    Yes.



1    Q    Okay.  Now, in your affidavit, do you even mention Mr.

2    Gecewich being at your termination interview?

3    A    I do not.

4    Q    You don't.  And in your affidavit, you say that it was

5    ShTawney who made this statement, not Mr. Gecewich, correct?

6    A    I did.

7    Q    And your memory, as of October 26, 2017, was better of

8    what happened that day than it is right now, right?

9    A    Yes.

10    Q    Was Mr. Gecewich at that interview or not?

11    A    He was.

12    Q    But no mention is made in his -- in the affidavit about

13    him being there, right?

14    A    Correct.

15    Q    Tell me, during that interview, did the word "lie" come

16    up?

17    A    I don't remember it.

18    Q    Did the words "lying" come up?

19    A    I don't remember it.

20    Q    Did the words "not telling the truth", come up?

21    A    I don't remember it.

22    Q    Or "untruth" come up?

23    A    I don't remember it.

24    Q    Are you telling us the truth now?

25    A    Yes.



www.escribers.net | 800-257-0885

1    Q    By the way, do you know Natalie Hunter?

2    A    Not that I know of.

3         MR. ROSS:  May I have a moment, please?

4         JUDGE TRACY:  (No verbal response).

5    Q    BY MR. ROSS:  By the way, I think you said that when you

6    spoke with Mr. Gecewich the first time, you said, I'm sorry for

7    what I said?

8    A    Yes.

9    Q    Why were you sorry?

10   A    The -- it -- the guy felt uncomfortable, but I said, I'm

11   sorry it happened, and I took it down.

12   Q    I see.  Did you see that you'd said or done anything to be

13   apologetic for?

14   A    I didn't, but he felt that way.  That's why I'm sorry for

15   him.

16   Q    I see.  So you weren't really sorry, but you were just

17   saying you're sorry?

18   A    No.  I was sorry if he felt that way.  I really was or I

19   wouldn't have took it down.

20   Q    And the conversation you had at the time of your

21   termination, that was where?

22   A    North Admin building.

23   Q    Do you remember where in the North Admin building?

24   A    On the -- on the second floor.

25   Q    And do you remember how long it lasted?



www.escribers.net | 800-257-0885

```
 1    A    About five minutes.

 2    Q    Who else was there aside from the two individuals you've

 3    testified to?

 4    A    Myself.

 5    Q    Anybody else?

 6    A    No.

 7    Q    Okay.  And when they -- after that, did you report your

 8    termination to the Union?

 9    A    After that, yeah.

10    Q    Um-hum.  Who'd you -- who did you report it to?

11    A    Susan Reed.

12    Q    And how'd you report to Susan?

13    A    I texted it to her.

14    Q    Excuse me?

15    A    I texted it to her.

16    Q    On your new phone?

17    A    On the phone, yeah.

18    Q    Um-hum.

19    A    Did you report it to her in any other way?

20    A    I believe, eventually I spoke with her.

21    Q    Excuse me?

22    A    I believe, eventually I spoke with her.

23    Q    Okay.  And in any other way?  Did you give her any written

24    statement, for instance?

25         MS. FEINBERG:  Objection to the extent it calls for
```



1    attorney-client privilege.

2         MR. ROSS:  I'll withdraw that question.  Could we go off

3    the record for a moment, please?

4         JUDGE TRACY:  Let's go off the record.

5    (Off the record at 12:06 p.m.)

6         JUDGE TRACY:  Okay.

7         MR. ROSS:  That's all I have, Your Honor.

8         JUDGE TRACY:  Okay.  Redirect?

9         MR. RITCHIE:  Can I have a moment, please?

10        JUDGE TRACY:  Yes.  Let's go off the record?  Yes?  You

11   need to take time off the record?

12        MR. RITCHIE:  Just two minutes, maybe.

13        JUDGE TRACY:  Okay.  Let's go off the record.

14   (Off the record at 12:07 p.m.)

15        JUDGE TRACY:  Okay.  Go ahead.

16        MR. RITCHIE:  Counsel for the General Counsel has no

17   further questions.

18        JUDGE TRACY:  Okay.  Ms. Feinberg?

19        MS. FEINBERG:  No, thank you.  I'm done.

20        JUDGE TRACY:  All right.  Thank you very much.

21        THE WITNESS:  Um-hum.

22        JUDGE TRACY:  Please don't discuss your testimony with

23   anyone until after the close of the hearing which will be later

24   this year.

25        THE WITNESS:  Okay.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Okay.

2      THE WITNESS:  Thank you.

3      JUDGE TRACY:  Thank you so much.

4      THE WITNESS:  Have a good one.

5      JUDGE TRACY:  You, too.  I think his statements and all

6  that are still up there.

7      MR. RITCHIE:  Oh, yeah.

8      JUDGE TRACY:  Yeah?

9      MR. RITCHIE:  Can we have the statements back from Mr.

10  Ross?

11      MR. ROSS:  Oh, sure.

12      MR. RITCHIE:  I have received three statements back from

13  Mr.  Morris, and I'm receiving three statements from Mr. Ross,

14  and I'm taking back three state -- two statements from the

15  witness.

16      JUDGE TRACY:  And then I think the rest might be back to

17  -- those are for the court --

18      MR. RITCHIE:  Yeah.

19      JUDGE TRACY:  -- reporter.

20      MR. RITCHIE:  Court report exhibits.  Thank you.

21      JUDGE TRACY:  All right.  So as we discussed earlier this

22  week, we're going to resume on September 24th at 9:00 a.m.,

23  back here.

24      And so let me just remind everybody of the next dates.

25  What I'm expecting to see is June 18th, so next Monday, Tesla's


www.escribers.net | 800-257-0885

1    answer to the second amended complaint, which was filed on June

2    4th, I believe.

3        MR. RITCHIE:  The amendment to the second amended

4    complaint.

5        JUDGE TRACY:  Okay.  Amendment to the second amended

6    complaint.  June 22nd, I have, is when, if there are any

7    oppositions to the Motion to Dismiss.  That was filed

8    essentially -- served and filed, actually, on June 11th, by the

9    Respondent, with regards to the second amendment to the

10   second --

11       MR. RITCHIE:  The amendment to the second amendment.

12       MR. ROSS:  The amendment to the second amendment.

13       JUDGE TRACY:  Amendment, yeah.  Okay.

14       MR. ROSS:  We know what you mean.

15       MR. RITCHIE:  Yeah.

16       JUDGE TRACY:  Thereafter, I will rule on that Motion to

17   Dismiss, and I will also, because they seem to slightly

18   overlap, the subpoena for Mr. Musk.  I've already issued that

19   order.  However, there is the opposition that was filed.

20       Yeah?

21       MR. ROSS:  Your Honor, we would ask to be afforded the

22   option to file a reply to the opposition.

23       MS. FEINBERG:  Oh for God's sakes.

24       JUDGE TRACY:  I --

25       MR. ROSS:  If we think it's necessary, we'll ask that we



www.escribers.net | 800-257-0885

1  be afforded an opportunity.  If we don't think it's necessary,

2  we'll promptly inform you that we're not going to.

3      JUDGE TRACY:  All right.  You would have two days after

4  their --

5      MR. ROSS:  Thank you.

6      JUDGE TRACY:  -- actual -- well, I mean, okay.  They've

7  already filed their opposition, so if you're going to file --

8      MR. ROSS:  Are you talking about the opposition to the

9  Motion to Dismiss?  They have not filed --

10      JUDGE TRACY:  Oh.

11      MR. ROSS:  -- an opposition to the Motion to Dismiss.

12      JUDGE TRACY:  I thought you meant to the subpoena.

13      MR. ROSS:  No.  No.  No.  No.

14      JUDGE TRACY:  Okay.  Because they've already filed their

15  opposition.  So if you're going to file any reply, which is it

16  -- I mean, again, as we've discussed earlier, normally, this

17  would happen in the decision, but I'm allowing it just for

18  this.  There was another issue with regard to 10B which I said

19  would be issued in the decision, so if you're going to file any

20  reply to the two oppositions, that would due then by June 26.

21      MR. ROSS:  Thank you.

22      JUDGE TRACY:  Okay.  So if I don't see anything, I'm

23  assuming you're not doing it.

24      MR. ROSS:  Okay.

25      JUDGE TRACY:  What we've been discussing about the



www.escribers.net | 800-257-0885

1    documents; those need to be turned over as soon as possible --

2    you need to be communicating -- they should've been, as I said

3    before, each and every day.  It's a day late, I guess, is what

4    I would say.  And I need for the parties to really be open in

5    their communication and frankness about the responsive

6    documents, what your intention is the week of September 24th if

7    you're unsatisfied with the response.

8        I thought we spent a lot of time narrowing things, what

9    was agreed upon, so I'm hopeful that that resolved these

10   things, but if there's an intention for any request for

11   sanctions or adverse rulings, due to the issues with what was

12   received, I request that the parties really discuss that.  That

13   would also then perhaps necessitate the custodian of records to

14   testify the next go around, but I -- I'm hopeful that that

15   doesn't happen.

16       I know that we'd also discussed having another conference

17   call, so I don't -- I don't have really, my schedule for

18   August, so I don't want to interfere with any other assignments

19   that I have.  So I'm thinking about August 3rd -- Friday,

20   August 3rd.  I'm moving that prior week, so hopefully, I should

21   be fine then, set up to do this.  Does that work or are you

22   coming -- are you on vacation?

23       MR. RITCHIE:  I will be out of the country.

24       JUDGE TRACY:  Okay.  When are you available between your

25   detail and out of the country, or is there no room?



www.escribers.net | 800-257-0885

1      MR. RITCHIE:  I'll be back in the United States on the

2   afternoon of August 12th.  I'm still on vacation, but I'm happy

3   to do the call while I'm --

4      JUDGE TRACY:  When -- how long are you on leave?

5      MR. RITCHIE:  It's just going to be a -- I'm only back the

6   week of the 20th, excuse me, August 20th.

7      JUDGE TRACY:  Okay.  And then you're back on leave again

8   or something?

9      MR. RITCHIE:  Yeah.

10     MR. ROSS:  When does your detail start?

11     JUDGE TRACY:  Soon.

12     MR. ROSS:  Like, tomorrow or?

13     MR. RITCHIE:  No.  In July.

14     JUDGE TRACY:  In July, and so when are you on the detail?

15     MR. RITCHIE:  The whole -- I'll be -- my last day here at

16   the Region is June 28th, and I won't be back to the Region

17   until August 20th due to the detail and vacation.

18     JUDGE TRACY:  Okay.

19     MR. RITCHIE:  But I'm happy to do it during that, because

20   I don't anticipate it would take hours and hours, so.

21     JUDGE TRACY:  Oh, no.  I mean --

22     MR. RITCHIE:  I think it's fine.

23     JUDGE TRACY:  -- I'm assuming Mr. Garber's kind of taking

24   over while you're gone?

25     MR. RITCHIE:  Sure.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  What about if we do it then -- so you're

2    back in the office for a week.  I'd rather you have time to

3    kind of catch up.  Again, I mean, the conference is just a

4    check-in to see, How's it going?  And so perhaps August 24th,

5    which is one month before, would be fine?

6      MR. RITCHIE:  Yes.

7      JUDGE TRACY:  I mean, I don't know why we need it any

8    earlier.  How does that seem?  It's a Friday.

9      MR. ROSS:  It's fine with us.

10      JUDGE TRACY:  August 24th?

11      MS. FEINBERG:  Okay.

12      JUDGE TRACY:  If I somehow have a --

13      MS. FEINBERG:  I guess, I'll make a list.

14      JUDGE TRACY:  -- case assigned to me, I'll let you know

15    that I have to adjust the time to do it during a lunch break or

16    something.  I don't know.  We haven't gotten our assignments

17    yet for that time.  August 24th, 9:00 a.m. work?

18      MR. RITCHIE:  It's fine.

19      JUDGE TRACY:  Okay.  All right.  So I will send my office

20    a thing to set up a meeting with us.

21      The last thing is dealing with the exhibits.  I had

22    requested to swap out some of these that appeared that the

23    color would be helpful for color documents.

24      And then also, there was a stipulation.  Have you all had

25    a chance to look at the stipulation?  And it's regarding



www.escribers.net | 800-257-0885

1    General Counsel's Exhibit 23.

2        MR. ROSS:  I have not.  I've been kind of busy today.

3        JUDGE TRACY:  Okay.  So how about we go -- are we -- are

4    you ready though, to go ahead and swap out the documents --

5        MR. RITCHIE:  With the exception -

6        JUDGE TRACY:  -- with the color?

7        MR. RITCHIE:  -- of the 23.

8        JUDGE TRACY:  Yeah.  Okay.  So let's do that, then we'll

9    go off the record so he can look at 23.  I'm assuming that the

10    Charging Parties have 23 --

11        MS. FEINBERG:  Oh, okay.

12        JUDGE TRACY:  Stipulation for 23?

13        MR. RITCHIE:  Yes.

14        MR. ROSS:  Did you -- did you sign --

15        MR. RITCHIE:  I emailed it, yes.

16        MR. ROSS:  -- this morning?

17        MS. FEINBERG:  What?  You handed me --

18        MR. RITCHIE:  I emailed it to the guardian this morning.

19        MS. FEINBERG:  Oh, okay.  Sorry.  I'll look now.

20        JUDGE TRACY:  The stipulation --

21        MS. FEINBERG:  I -- my -- for some reason --

22        JUDGE TRACY:  -- for 23.

23        MS. FEINBERG:  -- I'm not my --

24        JUDGE TRACY:  Okay.  Go ahead.

25        MR. RITCHIE:  Okay.  So Counsel for the General Counsel's



1    proposing to replace the color version of Exhibit 28.

2         JUDGE TRACY:  Okay.

3         MR. ROSS:  Would you give him that substitute, please?

4    They're in order.

5         UNIDENTIFIED SPEAKER:  Which number is that?

6         MR. ROSS:  28, I think.  It is 28, right?

7         MR. RITCHIE:  Yes.

8         MR. ROSS:  Okay.

9         JUDGE TRACY:  Okay.

10        MR. RITCHIE:  We're proposing to replace the -- what's

11   been admitted as GC-45 with the color version of GC-45.

12        We're also proposing to replace GC-46 with the new GC-46.

13   It's identical except in color.

14        Also proposing to replace an identical GC-43-001 to 005

15   except in color.

16        Also proposing to replace an identical GC-41 except in

17   color.

18        We're also proposing to replace GC-44, identical except in

19   color.

20   (Counsel confer)

21        JUDGE TRACY:  Hey, do you guys mind over there not talking

22   right now, because we're on the record so we can deal with the

23   documents, and then you can?

24        All right.  So any objections to replacing these color

25   documents --


www.escribers.net | 800-257-0885

1          MS. FEINBERG:  No.  Not to that.

2          JUDGE TRACY:  -- with the -- swapping them out?

3          MR. ROSS:  No.

4          JUDGE TRACY:  No problems?  Okay.  Great.  We have them.

5     (Counsel confer)

6          JUDGE TRACY:  That's great.

7          MR. ROSS:  Okay.  Yeah.

8          MS. FEINBERG:  The stip -- I was ready for the stipulation

9     prepared.

10         JUDGE TRACY:  Oh, no.  We're not ready --

11         MS. FEINBERG:  Okay.

12         JUDGE TRACY:  -- for that, because they still need -- you

13    all need to talk off the record.

14         MS. FEINBERG:  Okay.

15         JUDGE TRACY:  You know, I would note that on August 24th,

16    here's the other thing that I'm expecting, is that at that

17    point, because we're only a month out, I'm expecting that

18    everybody's communicated with one another, the witnesses, so

19    that way the witnesses can be released.  We have a better idea

20    of what witnesses will be called.  Hopefully, also by then,

21    this video testimony issue will be resolved.

22         MS. FEINBERG:  We have the --

23         JUDGE TRACY:  Although there's no guarantees, so then

24    you'll need your alternative option of what I -- my order was.

25         But so -- so yeah, so there will be, actually, significant



www.escribers.net | 800-257-0885

1    things to talk about, so just be prepared that frankly, all I'm

2    going to be asking is:  General Counsel, how many more

3    witnesses, how many days?  Make sure you all communicate it,

4    and then, Respondent, at that point, and Charging Parties, is

5    there anybody else that you're calling --

6        MS. FEINBERG:  Um-hum.

7        JUDGE TRACY:  -- that's aside from the General Counsel,

8    which really, again, shouldn't be.  It should be mirrored.

9        MS. FEINBERG:  And try -- that way.

10       JUDGE TRACY:  And then Respondent, how long your Case in

11   Chief will take, and -- so that we have a better idea; are we

12   going to be able to finish in that five days, or do we need

13   more time?  And so we'll talk about that.  We'll talk about,

14   you know, any other issues since we're only a month from the

15   hearing, and then we won't probably have another conference

16   call unless the parties feel like it's needed, okay?

17       MR. ROSS:  Sure.

18       JUDGE TRACY:  All right.  So l let's go off the record and

19   let's talk about the stip -- or you guys talk about the stip

20   until you're ready to introduce it in the record.

21   (Off the record at 12:23 p.m.)

22       JUDGE TRACY:  Okay.  So we're back on the record.  So what

23   we've agreed upon is, it's General Counsel's Exhibit 24?

24       MR. RITCHIE:  3.

25       JUDGE TRACY:  23?  Okay.  Will be -- has already been



1  received into evidence.  However, the court reporter will give

2  it back to you to retain, so that way the General Counsel can

3  redact the names only, of that, the attachments, correct?

4      MR. RITCHIE:  Correct.

5      JUDGE TRACY:  And then we'll -- next time we meet, that'll

6  -- that document will be ready to be put into the official

7  transcript, okay?

8      Everybody okay with that?  Agreed?

9      MR. ROSS:  Yes.

10     JUDGE TRACY:  Yes.  For the Union?

11     MS. FEINBERG:  Yes.

12     JUDGE TRACY:  Okay.

13     MS. FEINBERG:  We do.

14     JUDGE TRACY:  Great.  So anything else?

15     MR. ROSS:  One last thing, and -- the -- during our

16  off-record conversations yesterday, after the hearing, about

17  the subpoena, we talked about the Union's subpoena requests;

18  14, 15, and 35.  And I'll be the first to admit A, my notes

19  weren't perfect and my handwriting is terrible, and frankly, I

20  was very tired, so I would ask to know what it is you're

21  expecting us to do with respect to these three requests, so

22  that we can do what --

23     JUDGE TRACY:  So we can talk about that off the record

24  since we haven't put on the record any of that -- of the

25  subpoena stuff.



www.escribers.net | 800-257-0885

1         MR. ROSS:  Okay.

2         JUDGE TRACY:  So we'll do that right after this.

3         MR. ROSS:  All right.

4         JUDGE TRACY:  Is there anything else for the record?

5         MR. RITCHIE:  No.

6         JUDGE TRACY:  No?  No.  Okay.  So I'll see you all

7   September 24th --

8         MR. ROSS:  Thanks, Judge.

9         JUDGE TRACY:  -- at 9:00 a.m., and we'll go off the

10  record.

11  **(Whereupon, the hearing in the above-entitled matter was**

12  **recessed at 12:35 p.m. until Monday, September 24, 2018 at 9:00**

13  **a.m.)**

14

15

16

17

18

19

20

21

22

23

24

25

www.escribers.net | 800-257-0885

1            C E R T I F I C A T I O N

2   This is to certify that the attached proceedings before the

3   National Labor Relations Board (NLRB), Region 32, Case Numbers

4   32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-

5   200530, 32-CA-208614, 32-CA-210879, Tesla, Inc., and Michael

6   Sanchez, and Jonathan Galescu, and Richard Ortiz and

7   International Union, United Automobile, Aerospace and

8   Agricultural Workers of America, AFL-CIO at National Labor

9   Relations Board Region 32, 1301 Clay Street, Suite 300N,

10  Oakland, CA 94612-5224, on Thursday, June 14, 2018, 9:28 a.m.

11  was held according to the record, and that this is the

12  original, complete, and true and accurate transcript that has

13  been compared to the reporting or recording, accomplished at

14  the hearing, that the exhibit files have been checked for

15  completeness and no exhibits received in evidence or in the

16  rejected exhibit files are missing.

17

18

19

20  _____

21  BRIDGETTE RAST

22  Official Reporter

23

24

25


22-60493.676

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 32

In the Matter of:

| | |
|---|---|
| Tesla, Inc., | Case Nos.  32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| Michael Sanchez, an individual, | 32-CA-200530 |
| | 32-CA-208614 |
| and | 32-CA-210879 |
| | 32-CA-220777 |

Jonathan Galescu, an
individual,

and

Richard Ortiz, an individual,

and

International Union, United
Automobile, Aerospace and
Agricultural Implement Workers
of America, AFL-CIO,

    Charging Party,

_____

_____

Place: Oakland, California

Dates: September 24, 2018

Pages: 661 through 864

Volume: 5

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885

22-60493.677



www.escribers.net | 800-257-0885

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 32**

| | |
|---|---|
| In the Matter of: | |
| TESLA, INC., | Case Nos. 32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| INTERNATIONAL UNION, UNITED | 32-CA-200530 |
| AUTOMOBILE, AEROSPACE AND | 32-CA-208614 |
| AGRICULTURAL IMPLEMENT WORKERS | 32-CA-210879 |
| OF AMERICA, AFL-CIO, | 32-CA-220777 |
| | |
| and | |
| MICHAEL SANCHEZ, AN INDIVIDUAL, | |
| and | |
| JONATHAN GALESCU, AN | |
| INDIVIDUAL, | |
| and | |
| RICHARD ORTIZ, AN INDIVIDUAL. | |

The above-entitled matter came on for hearing, pursuant to

notice, before **AMITA BAMAN TRACY**, Administrative Law Judge, at

the National Labor Relations Board Region 32, 1301 Clay Street,

Suite 300N, Oakland, CA 94612-5224, on **Monday, September 24,**

**2018, 9:11 a.m.**

www.escribers.net | 800-257-0885

1                    A P P E A R A N C E S

2      **On behalf of the General Counsel:**

3          **EDRIS W.I. RODRIGUEZ RITCHIE, ESQ.**
           **NOAH J. GARBER, ESQ.**
4          National Labor Relations Board
           1301 Clay Street, Suite 300N
5          Oakland, CA 94612-5224
           Tel. 510-671-3021
6
       **On behalf of the Respondent:**
7
           **MARK S. ROSS, ESQ.**
8          **KEAHN N. MORRIS, ESQ.**
           SHEPPARD MULLIN RICHTER & HAMPTON LLP
9          Four Embarcadero Center
           Seventeenth Floor
10         San Francisco, CA 94111-4109
           Tel. 415-434-9100
11         Fax. 415-434-3947

12     **On behalf of the Charging Parties:**

13         **MARGO A. FEINBERG, ESQ.**
           **DANIEL E. CURRY, ESQ.**
14         **JULIE S. ALARCON, ESQ.**
           SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
15         6300 Wilshire Boulevard, Suite 2000
           Los Angeles, CA 90048
16         Tel. 323-655-4700

17

18

19

20

21

22

23

24

25



1

**I N D E X**

2

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------|--------|-------|----------|---------|-----------|
| Jose Moran | 668 | 748 | | | 688/709 740 |
| Jonathan Galescu | 831 | | | | |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

eScribers
www.escribers.net | 800-257-0885

1                           **E X H I B I T S**

2

3      **EXHIBIT**                        **IDENTIFIED**      **IN EVIDENCE**

4      **General Counsel:**

5        GC-23                              854                854

6        GC-29                              707                707

7        GC-30 (Page 1 and 2)               711                711

8        GC-30 (Page 3 and 4)               711 (Withdrawn)711

9        GC-32                              689                689

10       GC-33                              841                841

11       GC-39                              680                680

12       GC-40                              684                684

13       GC-42                              737                737

14       GC-48                              861                861

15       GC-56                              747                747

16     **Respondent:**

17       R-1                                789

18

19

20

21

22

23

24

25

www.escribers.net | 800-257-0885

1           **P R O C E E D I N G S**

2           JUDGE TRACY:  So the hearing will be in order.  This is

3      the resumption of Tesla and Michael Sanchez, an individual,

4      Jonathan Galescu, an individual and Richard Ortiz, an

5      individual and International Union, United Automobile,

6      Aerospace and Agricultural Implement Workers of America, AFL-

7      CIO.  And the case numbers, just to be clear are 32-CA-197020,

8      32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-200530, 32-CA-

9      208614, 32-CA-210879, 32-CA-220777.

10          So this is the resumption of a hearing that started the

11     beginning of June.  My name is Amita Tracy, I'm the

12     Administrative Law Judge who will be hearing this case.

13     Previously, we also had a sequestration order in effect.  So we

14     want to make sure that anybody who is set to be testifying in

15     this hearing, absent discriminatees or the things that --

16     individuals that I mentioned previously, should leave the

17     hearing room.  I think, previously, Mr. Ross, your individuals

18     are the ones down here, these two, they're not set to testify,

19     correct?

20          MR. ROSS:  That's correct.

21          JUDGE TRACY:  And what are their names again?

22          MR. ROSS:  I'll let them announce themselves.

23          MS. BODIFORD:  Jamie Bodiford.

24          MS. MOHAMED:  Yusuf Mohamed.

25          JUDGE TRACY:  Okay.  All right.  And for the Respondent we



1    have, just for the record?

2        MR. ROSS:  Mark Ross and Keahn Morris.

3        JUDGE TRACY:  Okay.  And for the General Counsel?

4        MR. RODRIGUEZ RITCHIE:  Edris Rodriguez Ritchie and Noah

5    Garber's not in the room presently, but he will join us

6    shortly.

7        JUDGE TRACY:  And then for the Union?

8        MS. FEINBERG:  Margo Feinberg, Schwartz, Steinsapir,

9    Dohrmann & Sommers, Dan Curry, and Julie Alarcon, who also has

10   stepped out but will be back.

11       JUDGE TRACY:  Okay.  And then your representative?

12       MS. FEINBERG:  And our representative's Susan Reed from

13   UAW.

14       JUDGE TRACY:  All right.  Great.  And then what we

15   discussed off the record --

16       MS. FEINBERG:  And Mr. Galescu, who is a Charging Party is

17   here, but out of respect for your sequestration order, he

18   stepped out.

19       JUDGE TRACY:  Okay.  Great.  And so, you know, again, you

20   guys police that and make sure that we're following these

21   rules.  Let's see, we discussed some other items that is sounds

22   like the General Counsel will take care of tomorrow.  They want

23   to focus on getting the witnesses who are already present to

24   testify.  So I think that that's fine.

25       We talked about formal papers and any other amendments to



1    the complaints that everyone's been -- you've discussed with

2    the Respondent?

3        MR. RODRIGUEZ RITCHIE:   Correct.

4        JUDGE TRACY:  Okay.  All right.  For the General Counsel,

5    go ahead and call your first witness.

6        MR. RODRIGUEZ RITCHIE:  My first witness will be Jose

7    Moran.

8        JUDGE TRACY:  Let's go off the record so you guys can get

9    him.

10    (Off the record at 9:14 a.m.)

11        JUDGE TRACY:  Mr. Moran, if you could stand up, please and

12    raise your right hand.

13    Whereupon,

14                        **JOSE MORAN**

15    having been duly sworn, was called as a witness herein and was

16    examined and testified as follows:

17        JUDGE TRACY:  Go ahead and have a seat and state your name

18    for the record?

19        THE WITNESS:  Jose Moran.

20        JUDGE TRACY:  Okay.  And then let me kind of explain to

21    you that the microphone here will not amplify your voice, it

22    won't make it louder, so you don't need to lean in, but just

23    speak loud enough because we're all kind of spread out in here

24    so everybody can hear you and they're will be minimal

25    interruptions in asking you to repeat what you just said, okay?



1        THE WITNESS:  Okay.

2        JUDGE TRACY:  All right.  Thank you.  General Counsel, go

3   ahead, please.

4        MR. RODRIGUEZ RITCHIE:  Thank you.

5                          **DIRECT EXAMINATION**

6   Q    BY MR. RODRIGUEZ RITCHIE:  Good morning, Mr. Moran?

7   A    Good morning.

8   Q    Are you familiar with a company called, Tesla?

9   A    Yes.

10  Q    What is Tesla?

11  A    Electric car company.

12  Q    Where is Tesla located?

13  A    Fremont, California.

14  Q    Do you currently work at Tesla?

15  A    Yes.

16  Q    Do you work at Tesla's facility located at 45 500 Freemont

17  Boulevard in Fremont, California?

18  A    Yes.

19  Q    Okay.  So from here on in I'm going to refer to that

20  location as the Tesla Fremont facility or Tesla Fremont.  When

21  did you begin working at Tesla Fremont?

22  A    September 2012.

23  Q    Prior to September 2012 had you ever worked at the

24  facility located at 45 500 Fremont Boulevard?

25  A    Yes.



1    Q    When?

2    A    When it used to be United Motors Manufacturing,

3    Incorporated.

4    Q    At that time, did Tesla operate that facility?

5    A    No, it did not.

6    Q    What is your current position at Tesla?

7    A    I am the lead quality inspector for body line three.

8    Q    Can you describe for us what you do, generally, as lead

9    quality inspector?

10    A    I work with about 15 to 20 quality inspectors that do

11    ultrasounds on spot welds.

12         MR. ROSS:  I'm sorry, beg your pardon, sir, but could you

13    keep your voice raised?

14         THE WITNESS:  Yes.

15         MR. ROSS:  Thank you.

16         JUDGE TRACY:  And so go ahead and just ask me to say,

17    Judge, I can't hear.

18         MR. ROSS:  I'm sorry.

19         JUDGE TRACY:  That's fine.

20         THE WITNESS:  I'm the lead quality inspector for body line

21    3.  I work with about 15 to 20 quality inspectors that perform

22    ultrasounds on spot welds.

23    Q    BY MR. MORRIS:  Is there a name for the department that

24    you work in?

25    A    Quality department.



1   Q    What do the quality control associates do that you work

2   with?

3   A    They perform ultrasound testing on spot welds.

4   Q    Could you describe for us in terms of the overall

5   production of a car at Tesla Fremont where your job fits into

6   that?

7   A    We're in the beginning of the process where we build the

8   frame of the underbody.

9   Q    How long have you had this position as a lead quality

10  control person?

11  A    Since August 2017.

12  Q    And prior to August 2017, what was your job at Tesla?

13  A    I was a production associate.

14  Q    What area did you work in as a production associate?

15  A    The special means battery area.

16  Q    What were your job duties as production associate in

17  special means battery area?

18  A    We build out some assemblies for the underbody frame.

19  Q    How long did you have the job in the special means battery

20  group?

21  A    About a year.

22  Q    The work that you do as part of quality control, is that

23  part of the general assembly?

24  A    No, it's not.

25  Q    And what about the production associate position in the



www.escribers.net | 800-257-0885

1     special means batter group, was that part of general assembly?

2     A     No, it's not.

3     Q     In October 2017, who was your supervisor?

4     A     Semisi Umufuke.

5     Q     Is that spelled, S-E --

6           MR. ROSS:  Again, sorry, I apologize, Your Honor, voice is

7     dropping, I'm having a hard time hearing.

8           JUDGE TRACY:  Do you mind if you just please repeat the

9     name of your supervisor?

10          MR. ROSS:  I apologize.

11          THE WITNESS:  Semisi Umufuke.

12    Q     BY MR. RODRIGUEZ RITCHIE:  And for the record is that

13    spelled, S-E-M-I-S-I U-M-U-F-U-K-E?

14    A     Yes.

15    Q     During your employment with Tesla have you used an

16    assistant called Workday?

17    A     Yes.

18    Q     Can you describe to us what Workday is?

19    A     It's a platform where employees can go in there and update

20    their contact information, review performance reviews, give,

21    receive feedback, sign documents sent by the Company.

22    Q     Do you have to login to access Workday?

23    A     Yes.

24    Q     Is the login information provided by Tesla?

25    A     Yes.



1  Q    Can you login using your personal cell phone?

2  A    Yes.

3  Q    What about a personal computer?

4  A    Yes.

5  Q    During your employment prior to October 2017, did anyone

6  every discuss with you any policies about using Workday?

7  A    No.

8  Q    Prior to October 2017, did anyone discuss any limits on

9  using Workday?

10  A    No.

11  Q    Prior to October 2017, did anyone ever tell you that you

12  could only use Workday for legitimate and official business

13  purposes?

14  A    No.

15  Q    Prior to October of 2017, did anyone ever tell you that

16  you could not take screenshots of Workday?

17  A    No.

18  Q    Mr. Moran, do you have a work email address?

19  A    Yes.

20  Q    What is it?

21  A    It's jmoran, M-O-R-A-N, @tesla.com.

22  Q    Mr. Moran, are you familiar with an organization referred

23  to as the United Auto Workers?

24  A    Yes.

25  Q    Who is the United Autoworkers?



1    A    It's a labor union that represents mostly auto workers.

2    Q    Have you ever been represented in the workplace by the

3    UAW?

4    A    Yes.

5    Q    And I should excuse myself, I'll refer to them as the UAW.

6    A    Okay.

7    Q    When?

8    A    When I used to work for NUMMI.

9    Q    Other than when you worked at NUMMI have you ever been

10   represented by the UAW?

11   A    No.

12   Q    When was your first contact with the UAW in 2016?

13   A    July 2016.

14   Q    And what was the nature of the contact?

15   A    It was a meeting.

16   Q    Who was the meeting with?

17   A    It was with Susan Reed and Jorge Fernandez.

18        MR. ROSS:  Your Honor, again, he's dropping off, I

19   apologize, if he could keep his voice elevated?

20        JUDGE TRACY:  Could you just repeat what you just said?

21        MR. ROSS:  I didn't hear the last half of the answer.

22        THE WITNESS:  The meeting was with Susan Reed and Jorge

23   Fernandez.

24        MR. ROSS:  Thank you.

25   Q    BY MR. RODRIGUEZ RITCHIE:  Was it in person?



1   A    Yes.

2   Q    Did any Tesla Fremont employees attend this meeting?

3   A    No.

4   Q    What was the purpose of the meeting?

5   A    We discussed working conditions and ways to improve those

6   working conditions.  We also talked about how Tesla workers can

7   work together with the UAW to organize the workers into forming

8   a union.  I reached out to the UAW, because I used to be a

9   member, I belonged to a union, I used to be a member of UAW

10  Local 2244.

11  Q    Now, after this first meeting, excuse me, in 2016, did you

12  have any other meeting in 2016 about unionizing?

13  A    Yes.

14  Q    When was the next meeting?

15  A    Probably about a couple weeks later.

16  Q    And who was the second meeting with?

17  A    With Susan Reed and Jorge Fernandez.

18  Q    Did any Tesla Fremont employees attend the second meeting?

19  A    Just myself.

20  Q    And what was the purpose of the second meeting?

21  A    Primarily focused on organizing workers to form an

22  organizing campaign and how a union could benefit Tesla

23  workers.

24  Q    Now, in 2016 did you have any activity on social medial

25  pertaining to organizing at Tesla Fremont?



www.escribers.net | 800-257-0885

1   A    yes.

2   Q    What was that?

3   A    I created a Facebook page.

4   Q    And what was the Facebook page called?

5   A    Jose organizer.

6   Q    And why did you create a Facebook page?

7   A    To have a presence on Facebook for meeting organizing

8   purposes and for a way to connect with other fellow coworkers.

9   Q    Do you recall whether or not you created a Facebook group?

10  A    Yes.

11  Q    What was the name of the Facebook group?

12  A    Tesla employees for UAW representation.

13  Q    Does the group still exist?

14  A    Yes.

15  Q    When you created the Facebook group called Tesla employees

16  for UAW representation, what type of Facebook group did you

17  create?

18  A    A private group.

19  Q    And what do you mean by private?

20  A    Where only the administrator can approve requests or

21  friend requests.

22  Q    Is the group still private?

23  A    yes.

24  Q    Did the group ever get made public?

25  A    No.



www.escribers.net | 800-257-0885

1    Q    Are you an administrator of the group?

2    A    Yes.

3    Q    As an administrator, do you control membership to the

4    group?

5    A    Yes.

6    Q    And without naming names of people that are in group, what

7    type of people are members of the Facebook group called Tesla

8    employees for UAW representation.

9    A    Hourly production workers from Tesla.

10   Q    Now, earlier you testified about a second meeting,

11   pertaining to organizing.  After the second meeting, did you

12   have any other meetings in 2016 about organizing at Tesla

13   Fremont?

14   A    Yes.

15   Q    When was the next meeting?

16   A    Close to the end of July 2016.

17   Q    Was the third meeting with Ms. Reed and Mr. Fernandez as

18   well?

19   A    It was only with Jorge Fernandez.

20   Q    Were any Tesla Fremont employees in attendance at this

21   meeting?

22   A    Yes.

23   Q    Did you invite the Tesla Fremont workers?

24   A    Yes.

25   Q    How did you invite them?



1    A    Verbal and through Facebook.

2    Q    Through the Facebook page or the Facebook group?

3    A    Facebook group.

4    Q    Without naming names of employees in attendance, what

5    types of employees did you invite to attend the third meeting?

6    A    Tesla hourly production workers.

7    Q    After this third meeting, were there any other meeting in

8    2016 about organizing?

9    A    Yes.

10    Q    When was the fourth meeting?

11    A    Around August 2016.

12    Q    Were any UAW organizer present at this fourth meeting in

13    August?

14    A    Yes.

15    Q    Who?

16    A    It was Jorge Fernandez and George Nano.

17    Q    Did you invite any Tesla Fremont workers to attend the

18    fourth meeting in August?

19    A    Yes.

20    Q    How?

21    A    Verbally and through the Facebook group.

22    Q    Now, at the fourth meeting that you testified about that

23    occurred in August 2016, did the group make any decisions about

24    the organizing campaign?

25    A    Yes.



1    Q    What?

2    A    We voted on a campaign slogan and a logo.

3    Q    Mr. Moran, would you like some water?

4    A    I'm all right.  I'm okay.  I'm good.

5    Q    Okay.  I'm going to show you a one page document, it's

6    been admitted as General Counsel's Exhibit 35.  I'm showing it

7    to Mr. Ross and Ms. Feinberg.

8        MS. FEINBERG:  Okay.

9    Q    BY MR. RODRIGUEZ RITCHIE:  Take a look at it, let me know

10   when you're ready. Okay.  You recognize General Counsel's

11   Exhibit 35?

12   A    Yes.

13   Q    What is it?

14   A    A picture of the logo and sticker.

15   Q    Okay.  So you just testified that at the August 2016

16   meeting the group decided on a logo and a name for the

17   campaign; is that what's depicted in General Counsel's Exhibit

18   35?

19   A    Yes.

20   Q    And what was the name of the campaign that you decided on?

21   A    Driving For Your Future at Tesla.

22   Q    Okay.  You can go ahead and hand back General Counsel's

23   Exhibit 35.  I'm going to hand you what's been premarked as

24   General Counsel's Exhibit 39.  Take a look at it and let me

25   know when you're ready.



1    A    I'm ready.

2    Q    Do you recognize General Counsel's Exhibit 39?

3    A    The public website for our organizing campaign.

4    Q    And if you look at the top, it says

5    www.fairfuture@tesla.org?

6    A    Yes.

7    Q    Is that the address for the website?

8    A    Yes.

9    Q    Do you remember when this website was launched?

10   A    After the August meeting.

11   Q    There's some pictures in General Counsel's Exhibit 39, the

12   second picture from the left, is that a picture of you?

13   A    Yes.

14   Q    And on the fourth picture from the left, all the way to

15   the right, there's a picture of a man with glasses; do you see

16   that?

17   A    Yes.

18   Q    Do you know who that is?

19   A    Yes.

20   Q    Who is that?

21   A    That's Michael Sanchez.

22   Q    Who is Michael Sanchez?

23   A    He's an employee of Tesla and a member of our organizing

24   committee.

25   Q    Okay.



1    MR. RODRIGUEZ RITCHIE:  So at this time I'd like to move

2    General Counsel's Exhibit 39 into evidence.

3    JUDGE TRACY:  Any objection?

4    MR. ROSS:  I'd like a moment to look at if I may?  I'll

5    save my question for cross, thank you.

6    JUDGE TRACY:  Okay.  So any objections?

7    MR. ROSS:  Oh, no objections.

8    JUDGE TRACY:  All right.  So General Counsel's Exhibit 39

9    is admitted into evidence.

10   **(General Counsel Exhibit Number 39 Received into Evidence)**

11   Q    BY MR. RODRIGUEZ RITCHIE:  You can go ahead and turn that

12   over.  Okay.  I'm going to hand you what's been premarked as

13   General Counsel's Exhibit 40. I'll hand it to the parties.  For

14   the record, General Counsel's Exhibit is a one page picture.

15   It has the words, "Fair Future at Tesla at the top left," and

16   to let me know when you're ready?

17   A    I'm ready.

18   Q    Do you recognize General Counsel's Exhibit 40, Mr. Moran?

19   A    Yes.

20   Q    And what is it?

21   A    This is a public Facebook page for our organizing

22   campaign, A Fair Future At Tesla.

23   Q    Earlier --

24   MR. ROSS:  Your Honor, again, I apologize, I apologize to

25   the witness, I'm having a hard time hearing him, if he could



1   restate his answer, please.

2      JUDGE TRACY:  So what you can do from now on, is just say,

3   you know, call it to my attention and just say could the

4   witness please repeat what he said that's all.

5      MR. ROSS:  Yes that's fine.

6      JUDGE TRACY:  Yeah, if you could just please repeat that,

7   please?  And again, I can hear you guys over here.  I

8   understand it may be frustrating, but I'm going to allow

9   everybody to fairly hear this hearing.

10     MS. FEINBERG:  No, I'm not complaining.  I was wondering

11  -- what I was saying to -- if there was a different for Mr.

12  Ross to sit, I'm not complaining about his concern.

13     JUDGE TRACY:  I'm pretty sure nobody wants to switch

14  spots.  So we're just going to leave it at that.  I just ask

15  you to you just you don't need to apologize, just say, I need

16  the witness to repeat that, okay?  And we're all going to be

17  patient and that's it.

18     MS. FEINBERG:  Patience is fine.  I'm just saying if there

19  was to accommodate it that would be better, but okay.

20     JUDGE TRACY:  Okay.  The only way is really probably to

21  switch spots, which I'm pretty sure nobody there wants to do

22  that.

23     MS. FEINBERG:  Whatever, we don't mind.  Whatever it is.

24     JUDGE TRACY:  I'm sure the General Counsel does.

25     MS. FEINBERG:  Okay.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Go ahead, Mr. Moran, if you could just

2   repeat the last portion or last part of your testimony.  If you

3   need for the General Counsel to repeat it, he can do that.

4      THE WITNESS:  Okay.  Yeah, this is the Facebook page for A

5   Fair Future At Tesla.

6   Q    BY MR. RODRIGUEZ RITCHIE:  Earlier you testified about a

7   Facebook page and group that you created, is that what's

8   depicted in General Counsel's Exhibit 40?

9   A    No, it's not.

10  Q    The name at the top left, Fair Future At Tesla that's the

11  same as the campaign name for the organizing campaign at Tesla

12  Fremont?

13  A    Yes.

14  Q    Okay.  So do you remember when this Facebook group was

15  launched in General Counsel's Exhibit 40?

16  A    Yeah, after the August meeting.

17  Q    Okay.

18      MR. RODRIGUEZ RITCHIE:  At this time I'd like to move

19  General Counsel's Exhibit 40 into evidence?

20      JUDGE TRACY:  Any objections.

21      MR. ROSS:  Yes, relevance.

22      JUDGE TRACY:  Answer the relevance please?

23      MR. RODRIGUEZ RITCHIE:  Sure, it's an organizing campaign.

24  Mr. Moran, particularly, has been alleged to have been a

25  discriminatee based on his protected activities and the union



www.escribers.net | 800-257-0885

1  activities that he engaged in, which, in part, have to do with

2  a Fair Future At Tesla.  IN addition, the discipline that he

3  received was, in part, related to postings on Facebook.

4      MR. ROSS:  Your Honor, maybe I misheard, but I thought he

5  said this was not the private Facebook page?

6      JUDGE TRACY:  So the relevance of the public Facebook page

7  to this proceeding?

8      MR. RODRIGUEZ RITCHIE:  Well as Mr. Ross and Respondent is

9  well aware, one of the documents that he produced, which were

10 notes from the investigation, indicated that this was the

11 Facebook page that the social medial activity occurred on.

12     JUDGE TRACY:  And when you say he, who is that?

13     MR. RODRIGUEZ RITCHIE:  The notes, Mr. Gecewich, indicated

14 that this was the Facebook page that the activity engaged in by

15 Mr. Ortiz and Mr. Moran --

16     MR. ROSS:  Well, I don't --

17     JUDGE TRACY:  Okay.  So again, I'm going to overrule the

18 objection.  I'm going to admit General Counsel's Exhibit 40.

19 Certainly, in the briefing, you can argue again that it's not

20 relevant and then I'll accord it the weight that it should be

21 given.  Okay.

22     MR. ROSS:  Okay.  Your Honor, again, did I understand this

23 is not the private page?

24     JUDGE TRACY:  So Mr. Moran, General Counsel's Exhibit 40

25 that you see here, is that the public Facebook page or the


www.escribers.net | 800-257-0885

1    private Facebook group that you created?

2        THE WITNESS:  This is the public Facebook page for our

3    organizing campaign.

4        MR. ROSS:  Thank you.

5        JUDGE TRACY:  All right.  So General Counsel's Exhibit 40

6    is admitted into evidence.

7    **(General Counsel Exhibit Number 40 Received into Evidence)**

8    Q    BY MR. RODRIGUEZ RITCHIE:   Were you working at Tesla in

9    November of 2016?

10   A    Yes.

11   Q    I'm going to show you what's been admitted as General

12   Counsel's Exhibit 31, it's a three page document. Take a moment

13   to look at is and let me know when you're ready

14       MR. ROSS:  What exhibit?

15       MR. RODRIGUEZ RITCHIE:  31.

16       MR. ROSS:  31.

17       THE WITNESS:  Okay.

18       MR. RODRIGUEZ RITCHIE:  And can I see the document shown

19   to him like that in a volume?

20       MR. RODRIGUEZ RITCHIE:  Sure.

21       MR. ROSS:  Okay.  Do you want it back?  Thank you.

22   Q    BY MR. RODRIGUEZ RITCHIE:  Do you recognize General

23   Counsel's Exhibit 31?

24   A    Yes.

25   Q    And what do you recognize it to be?



1    A    Emails from Mark Lipscomb, regarding the confidentiality

2    agreement.

3    Q    I just note for the record that in house counsel Jay

4    Sharma has entered the room, for Tesla.  If you look at the

5    top, of the first page, of General Counsel's Exhibit 31 there's

6    some cutoff words that say, "important reminder,

7    confidentiality agreement, due Monday, Jose Moran?"

8    A    Yes.

9    Q    Okay are these emails that you received?

10   A    Yes.

11   Q    Okay.  I want to turn your attention to page 2.  Do you

12   see where it says from Mark Lipscomb, date, Wednesday November

13   2, 2016?

14   A    Yes.

15   Q    Is that email that you received to your @tesla.com email

16   address, from Mark Lipscomb on or about November 2, 2016?

17   A    Yes.

18   Q    Okay.  Then I want to turn your attention to the bottom of

19   the first page, where it says, "from, Mark Lipscomb, date,

20   Thursday, November 3, 2016;" do you see that?

21   A    Yes.

22   Q    Is that an email that you received to your @tesla.com

23   email address from Mr. Lipscomb on November 3, 2016?

24   A    Yes.

25   Q    Just about that, it says, "from Mark Lipscomb, Saturday,



1    November 5, 2016 at 9:52 a.m.;" do you see that?

2    A    Yes.

3    Q    Is that an email that you received to your @tesla.com

4    email address on November 5, 2016 at 9:52 a.m.?

5    A    Yes.

6    Q    Now, above that it says, Mark Lipscomb, Sat. 11/5/2016,

7    10:12 a.m.; do you see that?

8    A    Yes.

9    Q    Okay.  Is that an email that you received from your

10   @tesla.com email address from Mark Lipscomb on 11/5/2016 at

11   10:12 a.m.?

12   A    Yes.

13   Q    Okay.  Below that, it says one attachment(s) and it says

14   confidentiality guide.pdf?

15   A    I see that.

16   Q    Okay.  So I want to turn your attention to page 3 of

17   General Counsel's Exhibit 31.  Is what's on page 3 of General

18   Counsel's Exhibit 31 the attachment titled, confidentiality

19   agreement guide.pdf?

20   A    Yes.

21   Q    Did you ever sign this agreement, the confidentiality

22   agreement?

23   A    Yes.

24   Q    Do you remember when?

25   A    Around the first week of November, the first or second



1    week of November.

2    Q    And how did you sign it?

3    A    I signed it through Workday.

4    Q    Earlier, you testified about four meetings about

5    organizing at Tesla Fremont; were there other meetings in 2016

6    about organizing?

7    A    Yes.

8    Q    You can go ahead and turn it over.  All right.  I'm going

9    to hand you what's been premarked as General Counsel's Exhibit

10   32, it's a two page document.  And I'll hand it to the parties.

11   Just take a look at it and let me know when you're ready?

12   A    Okay.

13   Q    Do you recognize General Counsel's Exhibit 32?

14   A    Yes.

15   Q    What is it?

16   A    It's an article that I wrote.

17   Q    And was it posted online anywhere?

18   A    Yes.

19   Q    Where?

20   A    Medium.com.

21   Q    And what is medium.com?

22   A    It's a website where you can post blogs.

23   Q    If you look at the document on page 1, at the top of page

24   1, it says, "Jose Moran," and there's a picture that looks a

25   little fade; is that a picture of you?


www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    And below that it say February 9th; do you see that?

3    A    Yes.

4    Q    Is that when this was posted?

5    A    Yes.

6    Q    Is that February 9, 2017?

7    A    Yes.

8    Q    At this time, I'd like to move General Counsel's Exhibit

9    32 into evidence?

10         JUDGE TRACY:  Any objections?

11         MR. ROSS:  I'd only like to look at it for a moment if I

12    may.

13         JUDGE TRACY:  Okay.

14         MR. ROSS:  May I voir dire the witness?

15         JUDGE TRACY:  Go ahead.

16                    **VOIR DIRE EXAMINATION**

17    Q    BY MR. ROSS:  Good morning, Mr. Moran, how are you?

18    A    Good morning, good, you?

19    Q    The document that was posted on medium.com, was it exactly

20    this document or was it in some other form?

21    A    I don't understand the question.

22    Q    Okay.  I noticed you've got a picture in the upper left-

23    hand corner of this document, what was posted on medium.com,

24    did it have your picture on it?

25    A    Yes.



1    Q    And it was posted by whom?

2    A    By, I believe, Susan Reed.

3    Q    By whom?

4    A    Susan Reed.

5    Q    Thank you, thank you very much.

6         JUDGE TRACY:  Any objections?

7         MR. ROSS:  No.

8         JUDGE TRACY:  So General Counsel's Exhibit 32 is admitted

9    into evidence.

10   **(General Counsel Exhibit Number 32 Received into Evidence)**

11                  **DIRECT EXAMINATION** **(RESUMED)**

12   Q    BY MR. RODRIGUEZ RITCHIE:  Now on February 9, 2017, did

13   you work that day?

14   A    Yes.

15   Q    How did you begin your day on February 9, 2017?

16   A    Before I went to work, I stopped by at the UAW organizing

17   office.

18   Q    And why did you go to the UAW organizing office?

19   A    To pick up some flyers to distribute our work.

20   Q    And I'm going to hand you what's been admitted as General

21   Counsel's Exhibit 8.  It's a two page document, take a look at

22   it, and let me know when you're ready.

23   A    Okay.

24   Q    Is it what's in General Counsel's Exhibit 8 the flyer that

25   you picked up on February 9, 2017?



1    A    Yes.

2    Q    Now, after you went to that UAW office, what if anything

3    did you do next?

4    A    After I picked up the flyers, I drove to work.

5    Q    And when you drove to work, what, if anything did you do?

6    A    I started to distribute these flyers inside the plant.

7    Q    Where did you hand out the flyers?

8    A    I went to like two different breakrooms.

9    Q    Okay.  And when you did this, were you on the clock?

10    A    No, I was not.

11    Q    Had you punched in?

12    A    No.

13    Q    Okay.  Now, let's talk about the first breakroom, do you

14    recall the name of the first breakroom?

15    A    Yes.

16    Q    What was the name?

17    A    It's breakroom next to the battery area.

18    Q    So this battery area breakroom that's located inside the

19    facility, correct?

20    A    Yes.

21    Q    And what is the battery breakroom used for?

22    A    For employees to take their breaks, their lunches.

23    Q    Do Tesla Fremont employees use the battery breakroom to

24    perform their work?

25    A    No, they don't.


www.escribers.net | 800-257-0885

1    Q    Did you hand out flyers or leave flyers?

2    A    I did both.

3    Q    Okay.  And the second breakroom that you went to, what was

4    that breakroom called?

5    A    It's called Stinson Beach Café breakroom.

6    Q    The Stinson Beach breakroom, is that inside the facility?

7    A    Yes.

8    Q    And what is the Stinson Beach breakroom used for?

9    A    For employees to take their breaks, their lunches.

10   Q    Did Tesla Fremont employees use the Stinson Beach

11   breakroom to perform their work?

12   A    No.

13   Q    Did you hand out flyers in the Stinson Beach breakroom or

14   leave flyers?

15   A    I did both.

16   Q    About what time did you finish handing out flyers?

17   A    Oh, about 5:15, 5:20.  I clock in at 5:20.

18   Q    Okay.  And after you finished handing out flyers what did

19   you do?

20   A    I clocked in to go back to work.

21   Q    Do you recall the day of February 10, 2017?

22        JUDGE TRACY:  And, Mr. Moran, before you answer that is

23   that 5:15 a.m. or p.m.?

24        THE WITNESS:  I'm sorry, a.m.

25        JUDGE TRACY:  Thank you.



www.escribers.net | 800-257-0885

1    Q    BY MR. RODRIGUEZ RITCHIE:  Do you recall the day of

2    February 10, 2017?

3    A    Yes.

4    Q    How did you start your day?

5    A    I drove to the UAW organizing office to pick up some

6    flyers.

7    Q    Are those the flyers that are in General Counsel's Exhibit

8    8?

9    A    Yes.

10    Q    After you picked up the flyers did you leave the UAW

11    office?

12    A    Yes.

13    Q    Were you alone when you left?

14    A    No, I was not.

15    Q    Who were you with?

16    A    Richard Ortiz.

17    Q    Where did you go when you left the UAW office?

18    A    Went to park at a parking lot at Tesla factory.

19    Q    Do you remember where you parked at the Tesla factor?

20    A    Yes, by Door 1.

21    Q    Okay.  Mr. Moran, I'm going to hand you what's been

22    admitted as General Counsel's Exhibit 3, which I'm also going

23    to show to Mr. Ross.

24        MR. ROSS:  Thanks.

25    Q    BY MR. RODRIGUEZ RITCHIE:  Am I going to hand you a laser



www.escribers.net | 800-257-0885

1    pointer.  And I'll ask you to use it at some point. Okay.  Do

2    you recognize, General Counsel's Exhibit 3?

3    A    Yes.

4    Q    What is General Counsel's Exhibit 3?

5    A    It's a picture of the parking lot next to Door 1.

6    Q    Is that the same Door 1 that you parked by on February the

7    10th, 2017?

8    A    Yes.

9    Q    Now, about what time did you arrive at the Tesla parking

10   lot?

11   A    About 4:15, 4:30.

12   Q    In the morning?

13   A    Yes, in the morning.

14   Q    Was the sun out?

15   A    No, it was not.

16   Q    When you parked your car by Door 1, did you stay in the

17   car?

18   A    No.

19   Q    What did you do?

20   A    We got off and walked towards the right side of Door 1.

21   Q    Okay.  And if you can use the laser point to show us the

22   area that you walked in by Door 1?

23   A    Right here.

24   Q    Okay.  So if the record could reflect that Mr. Moran has

25   used the laser pointer to point towards the bottom center.  And



www.escribers.net  |  800-257-0885

1    for purposes of the record, if you're looking at Door 1 that

2    would be the right side of Door 1?

3    A    Yes.

4    Q    And is there a ramp or stairs on that side?

5    A    On this side, there's a ramp that goes from here to Door

6    1.

7    Q    Okay.  And then is there also a side with stairs?

8    A    Yes, on the left hand side -- this side has stairs going

9    into inside Door 1.

10   Q    Okay.  And so also clarify the record, even though it's

11   called Door 1, there are two entrances into the door?

12   A    Correct.

13   Q    Okay.  Did Mr. Ortiz go with you to the ramp side of Door

14   1?

15   A    Yes.

16   Q    And when you got to the ramp side of Door 1, what, if

17   anything, did you do?

18   A    We started to pass out the flyers to workers that are

19   coming in and out of the Door 1.

20   Q    Okay.  And when you began passing out the flyers, had you

21   punched in for work yet?

22   A    No, not yet.

23   Q    Was this on your own time?

24   A    Yes.

25   Q    Now, when you got to Door 1, were there any other



1    individuals handing out flyers?

2    A    No.

3    Q    At some point, when you're at Door 1, did you see an

4    individual named Michael Sanchez?

5    A    Yes.

6    Q    About when after you got to Door 1?

7    A    About 10, 15 minutes after.

8    Q    Did you speak with Mr. Sanchez?

9    A    Yes.

10    Q    About what?

11    A    He said, he was actually at Door 2, so he came walking

12    this was, and we talked, and he said he was being harassed over

13    Door 2 by security, so that's why he came over here to help us

14    pass out flyers on the left hand side of the Door 1.

15    Q    Okay.  So if the record could reflect that Mr. Moran has

16    just pointed that Mr. Sanchez came from the top of the picture,

17    walking down past the stair side, to where he was and, I

18    believe, you also indicated with the laser pointer that Mr.

19    Sanchez came to help pass out flyers on the stair side of the

20    picture?

21    MR. ROSS:  Your Honor, I'm going to move to strike the

22    portion of the witness's testimony insofar it pertains to words

23    that Mr. Sanchez uttered.  I think it's irrelevant and it's

24    hearsay.

25    MR. RODRIGUEZ RITCHIE:  We would object.  I think there's



1    two bases there.  It's certainly relevant about allegations at

2    issue here have to do with flyering.  We've already heard

3    testimony from Mr. Sanchez about his interactions with

4    flyering, so it certainly would not be irrelevant testimony.

5    In terms of hearsay, Mr. Sanchez has already testified, it's

6    really just offered to explain what occurred that day as it

7    relates to Mr. Moran.

8        JUDGE TRACY:  So again, I will overrule the objection to

9    strike the testimony there.

10       MR. ROSS:  Okay.

11   Q    BY MR. RODRIGUEZ RITCHIE:  While you were in front of Door

12   1, did you have any interactions with the security guards?

13   A    Yes.

14   Q    How many interactions did you have with security guards?

15   A    Two.

16   Q    Okay.  So let's talk about the first one.  How did the

17   interaction, the first interaction with security guards begin?

18   A    After about 15, 20 minutes they drove up right here in

19   their security cart.

20       MR. ROSS:  Could the witness repeat, I'm sorry?

21       JUDGE TRACY:  Yes, go ahead, please, and repeat that.

22       THE WITNESS:  After about 15, 20 minutes when we started

23   distributing the flyers we saw two security guards get out of

24   the cart about his area, right here.

25   Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  And from where did they



1      -- so the area right here, for the record, Mr. Moran has

2      pointed to an area in front of the ramp side of Door 1.

3          And from where did they drive?

4      A    They came this way.

5      Q    So if the record could reflect that Mr. Moran has pointed

6      that the vehicle came from the bottom of the picture driving up

7      the picture towards the ramp side of Door 1.  Could you

8      describe the vehicle the security guards were driving?

9      A    It was a Tesla vehicle or a Tesla model.

10     Q    Did the vehicle have any words written on it?

11     A    Yes.

12     Q    What were the words?

13     A    Security.

14     Q    How many individuals were in the car?

15     A    Two.

16     Q    Now, after the Tesla security car drove up, did it stop?

17     A    Yes.

18     Q    Do you recall whether or not any of the security guards

19     got out of the car?

20     A    Yes.

21     Q    Did they speak with you?

22     A    Yes.

23     Q    Could you describe the security guards for us?

24     A    Two males, wearing dark clothing.

25     Q    Did their clothing have any words on it?



1    A    Security and Tesla.

2    Q    So the words Tesla and the word security?

3    A    Um-hum.

4    JUDGE TRACY:  Can you yes or no for the record?

5    THE WITNESS:  Yes, yes.

6    Q    BY MR. RODRIGUEZ RITCHIE:  Do you know their names?

7    A    No, I do not.

8    Q    Now, prior -- I'll withdraw that.  During your employment

9    with Tesla how many times have you seen security guards?

10   A    Every day that I go to work.

11   Q    And the outfit that the two security guards were wearing

12   on February 10, 2017 was that consistent with the outfit that

13   you've seen security guards wear every day that you've worked

14   at Tesla?

15   A    Yes.

16   Q    Now, when the security guards spoke with you, did they

17   speak first?

18   A    Yes.

19   Q    What did they say?

20   A    They told us to leave the premises that that we shouldn't

21   be there.

22   MR. ROSS:  Could you repeat, please, I'm sorry.

23   THE WITNESS:  They told us to leave the premises; we

24   shouldn't be there.

25   Q    BY MR. RODRIGUEZ RITCHIE:  And did you respond?



1    A    Yes.

2    Q    What did you say?

3    A    I said, we're employees of Tesla we have every right to

4    distribute flyers.

5    Q    Did either of security guards respond to you?

6    A    Yes.

7    Q    Both or just one?

8    A    Well, one of them did.

9    Q    Okay.  And what did he say?

10    A    He said, he was just there doing his job.

11        MR. ROSS:  Again, I'm sorry, could you repeat, please?

12        JUDGE TRACY:  So go ahead and repeat what you just said,

13    Mr. Moran?

14        THE WITNESS:  One of the security guards said that he's

15    just there to do his job.

16    Q    BY MR. RODRIGUEZ RITCHIE:  Now, at any point during this

17    interaction with the security guards did they ask you for your

18    badge?

19    A    Yes.

20    Q    Did you show your badge to the guard?

21    A    Yes.

22    Q    Did the guard do anything with your badge?

23    A    Yes.

24    Q    What?

25    A    He looked over it and he took a picture of it.



1    Q    At this point, when you're having the interaction with the

2    security guards, was Mr. Ortiz with you?

3    A    Yes.

4    Q    And what about Mr. Sanchez?

5    A    Yes.

6    Q    Were there any other employees handing out flyers?

7    A    There was another individual with Michael Sanchez.

8    Q    Do you recall his name?

9    A    No, I don't.

10   Q    And the four of you were present while the security guards

11   were speaking.

12   A    Yes.

13   Q    Now, you just testified that he asked you for your badge?

14   A    Yes.

15   Q    Did the security guard ask for anyone else's badge?

16   A    Yes.

17   Q    Who?

18   A    Rich Ortiz, Michael Sanchez, and the other individual.

19   Q    Did the security guard do anything with their badges?

20   A    Yes.

21   Q    What?

22   A    He looked them over.

23   Q    Okay.  After the security guard looked at the badges, did

24   the security guard stay there?

25   A    He walked away about four or five feet and was on the



www.escribers.net | 800-257-0885

1    phone.

2    Q    How do you know he was on the phone?

3    A    He had his phone next to his ear.

4    Q    Could you hear his conversation?

5    A    No, I could not.

6    Q    How long did the two security guards stay?

7    A    After that about a few minutes.

8    Q    Were you passing out flyers while the security guards were

9    there?

10   A    Yes.

11   Q    You also testified that there was another interaction with

12   security guards?

13   A    Yes.

14   Q    When did that -- how far after your interaction -- the

15   first interaction ended did the second interaction occur?

16   A    About five to ten minutes after.

17   Q    And what were you doing when the second interaction

18   occurred?

19   A    Rich and I were passing flyers still.

20   Q    When the second interaction happened, how many security

21   guards was that with?

22   A    One.

23   Q    Was it one of the same earlier two or entirely different

24   security guard?

25   A    It's a different security guard.



www.escribers.net | 800-257-0885

1  Q    And how did that second interaction occur?

2  A    She stepped from her podium, inside Door 1, she opened the

3  door on the right side, she probably opened it half way and

4  she --

5  Q    Can you describe what the guard looked like?

6  A    Female.

7  Q    Can you describe what she was wearing?

8  A    Their security clothing, uniform.

9  Q    Did it have any words on it?

10  A    Yes.

11  Q    What?

12  A    Security.

13  Q    Is what she was wearing consistent with the uniform that

14  security guards wear at Tesla based on your experience having

15  worked at Tesla and seeing security guards every day?

16  A    Yes.

17  Q    Now, when she opened the door to Door 1, did she speak

18  with you?

19  A    Yes.

20  Q    What did she say?

21  A    She told that we should leave, you know, we weren't

22  allowed to be there.

23  Q    Did either you or Mr. Ortiz say anything in response?

24  A    Yes.

25  Q    Who?



1    A    I did.

2    Q    What did you say?

3    A    I said, we're Tesla employees and we have every right to

4    be there distributing flyers.

5    Q    Did the female security guard say anything to you?

6    A    Yes.

7    Q    What?

8    A    She said, well, I'm going to have to take down your name.

9    Q    Did you say anything in response to her?

10   A    Yes.

11   Q    What?

12   A    I said, well, I'm going to have to take down your name

13   also.

14   Q    Okay.  After you told her that you'd have to take her name

15   down, did the interaction with the female security guard

16   continue?

17   A    No, it did not.

18   Q    What -- did the female security guard leave?

19   A    Yes, she closed the door and went back to her security

20   podium.

21   Q    And what did you do?

22   A    We just kept distributing flyers, passing them out.

23   Q    Did she ever come out to speak with you again?

24   A    No, she did not.

25   Q    About how much longer did you continue flyering on



1    February the 10th?

2    A    Another 10 to 20 minutes.

3    Q    And why did you only flyer another 10 to 20 minutes?

4    A    My shift was starting.

5    Q    Prior to February 2017 had anyone ever told you that you

6    couldn't hand out flyers in the Tesla parking lot?

7    A    No.

8    Q    Prior to February 2017 had anyone ever discussed any

9    policies about handing out literature in the Tesla parking lot?

10   A    No.

11   Q    To your knowledge, as of February 2017, were you allowed

12   to hand out flyers in the Tesla parking lot?

13   A    Can you repeat the question?

14   Q    To your knowledge, as of February 2017, were you allowed

15   to hand out flyers in the Tesla parking lot?

16   A    Yes.

17   Q    During your employment with Tesla Fremont did you ever

18   sign any petitions about workplace safety?

19   A    Yes.

20   Q    Do you recall when?

21   A    June -- around June.

22   Q    Of what year?

23   A    2017.

24   Q    Here, I'm going to hand you what's been admitted as

25   General Counsel's Exhibit 27. Take a moment and let me know



1    when you're ready?

2    A    I'm ready.

3    Q    Do you recognize General Counsel's Exhibit 27?

4    A    Yes.

5    Q    What is it?

6    A    It's a blank copy of a petition that workers signed.

7    Q    Okay.  Did you actually sign the petition?

8    A    Yes.

9    Q    Did you ask any Tesla Fremont employees to sign the

10    petition?

11    A    Yes.

12    Q    Did you circulate the petition to other employees?

13    A    Yes.

14    Q    After circulating the petition that's in General Counsel's

15    Exhibit 27, did you do anything with the petition?

16    A    Yes.

17    Q    What did you do?

18    A    We delivered the petition to Josh Hedges.

19    Q    And who is Josh Hedges?

20    A    He is the director for HR.

21    Q    Did you do that alone?

22    A    No, I didn't.

23    Q    Who did you do it with, without naming names?

24    A    Tesla employees, members of the organizing committee.

25    Q    Okay.  I'm going to hand you what's been premarked as



1    General Counsel's Exhibit 29.

2        MS. FEINBERG:  Thank you.

3        MR. RODRIGUEZ RITCHIE:  I'm handing a copy to the parties.

4    Q    BY MR. RODRIGUEZ RITCHIE:  I want you to take a look at it

5    and let me know when you're ready.

6    A    I'm ready.

7    Q    You testified that you handed the petition in General

8    Counsel's Exhibit 27 to Mr. Hedges, did you do that in

9    person --

10       MR. ROSS:  27 or 29?

11       MR. RODRIGUEZ RITCHIE:  27.  The petition was --

12       MR. ROSS:  Oh, I'm sorry.

13   Q    BY MR. RODRIGUEZ RITCHIE:  You just testified that you

14   handed the petition in General Counsel's Exhibit 27 to Mr.

15   Hedges; did you do that in person or via email?

16   A    We did both.

17   Q    Okay.  So I want to direct your attention to page 2 of

18   General Counsel's Exhibit 29, at the bottom of page 2, where it

19   says, "from, Jose Moran, date, Tuesday, June 6, 2017.  Dear,

20   Josh Hedge, cc: Elon Musk?"

21   A    Yes.

22   Q    This appears to be an email that continues onto page 3, 4,

23   and 5 is that an email that you sent to Mr. Hedges?

24   A    Yes.

25   Q    And you sent that on June 6, 2017 at 6:38 p.m.?


www.escribers.net | 800-257-0885

1   A    Yes.

2   Q    And your email that you sent that begins at page 29, page

3   2 of General Counsel's Exhibit 29, is that the email with the

4   petition that you've testified about in General Counsel's

5   Exhibit 27?

6   A    Yes.

7   Q    Did you send this email before or after you gave the

8   petition to Mr. Hedges, in person?

9   A    I emailed this after we delivered the petition.

10   Q    Okay.  And I want you to take a look at page 1 of General

11   Counsel's Exhibit 29?

12   A    Yes.

13   Q    Where it says, "from, Josh Hedges, date, June 14, 2017 to

14   Jose Moran, cc: Elon Musk?"

15   A    Yes.

16   Q    Okay.  Is that an email that you received from Mr. Hedges

17   on June 14, 2017 in response to your June 6 email?

18   A    Yes.

19   Q    Okay.  So at this time I'd like to move General Counsel's

20   Exhibit 29 into evidence?

21        JUDGE TRACY:  Any objections?

22        MR. ROSS:  No.

23        JUDGE TRACY:  General Counsel's Exhibit 29 is admitted

24   into evidence. 29 is admitted into evidence.

25   **(General Counsel Exhibit Number 29 Received into Evidence)**


www.escribers.net | 800-257-0885

1    MR. RODRIGUEZ RITCHIE:  And, Your Honor, I would like to

2    take a break at some point.  I have one more exhibit, but I

3    thought I'd do it before doing the break if that's possible?

4    JUDGE TRACY:  Sure, do you know how much longer for this

5    witness that you'll have on direct?

6    MR. RODRIGUEZ RITCHIE:  Probably about 45 minutes.

7    JUDGE TRACY:  Okay.  So how about after this exhibit then

8    we'll take a 10 minute break?

9    MR. RODRIGUEZ RITCHIE:  That's fine.

10    JUDGE TRACY:  Okay.

11    Q    BY MR. RODRIGUEZ RITCHIE:  And I'm going to hand you

12    what's been pre-marked as General Counsel's Exhibit 30.  And

13    I've handed copies to the parties.  And let me know when you're

14    ready.

15    A    I'm ready.

16    Q    Okay.  Do you recognize General Counsel's Exhibit 30?

17    A    Yes.

18    Q    Is that an email that you received from Josh Hedges on

19    June 12th, 2017 to your @tesla.com email address?

20    A    Yes.

21    MR. RODRIGUEZ RITCHIE:  Okay then, at this time I'd like

22    to move to admit General Counsel's Exhibit 30 into evidence.

23    JUDGE TRACY:  Any objections?

24    MR. ROSS:  I have a voir dire, please.

25    JUDGE TRACY:  Go ahead.



### **VOIR DIRE EXAMINATION**

1

2    Q    BY MR. ROSS:  Mr. Moran, the email you received from Mr.

3    Hedges was the first -- essentially the first and second page

4    of General Counsel's Exhibit 30?  This?  The front and the back

5    of it?

6    A    Yes.

7    Q    Okay.  There's a document attached to it; was that

8    attached to the email?  The document entitled Tesla production

9    updates safety: your feedback and the real facts.  Was that

10   attached to the email you received from Mr. Hedges on June 12th

11   at 8:45 in the morning?

12   A    I do not remember.

13   Q    You don't remember?

14   A    I don't recall.

15        MR. ROSS:  Okay.  Then I'm going to object, Your Honor, to

16   the attachment of General Counsel's Exhibit 30-003 to General

17   Counsel's Exhibit 30.

18        MR. RODRIGUEZ RITCHIE:  I believe it was produced by you

19   -- a different version, so if you'd like I can --

20        MR. ROSS:  Well, he's identified the --

21        MR. RODRIGUEZ RITCHIE:  If you can wait for him to finish,

22   please.

23        MS. FEINBERG:  It's the same text, by the way.

24        JUDGE TRACY:  Okay.  Okay.  Okay.

25        MS. FEINBERG:  Oh, okay.  Just so you know, it is the same



www.escribers.net | 800-257-0885

1    text.

2         JUDGE TRACY:  Again --

3         MS. FEINBERG:  Okay.

4         JUDGE TRACY:  I was waiting to hear from the General

5    Counsel.

6         MR. RODRIGUEZ RITCHIE:  So I'm trying to avoid calling

7    your custodian of records to introduce these business records.

8    It was produced by you with the attachment, so if you are --

9    continue to object, we can wait and go through that, but it was

10   a document that you produced with the attachment.

11        MS. FEINBERG:  Can I just point out one thing, please,

12   Your Honor?  Which is that it's the identical text.  I don't

13   know if they have people here.  There's nothing different about

14   the second -- it's just not in email format.  It's literally

15   word-for-word of the same the same thing, so I'm not quite sure

16   what the objection is since it's the exact same thing as Mr.

17   Hedges sent out.

18        MR. ROSS:  The objection is that the Witness authenticated

19   the first two pages of General Counsel's Exhibit 30, but did

20   not authenticate the last page of General Counsel's Exhibit 30.

21   It has been attached by General Counsel in such a way as to

22   suggest that it was an attachment to the email, which the

23   Witness says he doesn't remember.  So I don't think it is

24   proper to attach it to the exhibit, nor do I think that the

25   Witness is competent to authenticate it.



1      JUDGE TRACY:  Okay.  So for the General Counsel, I'm going

2    to sustain their objection.  However, it sounds like their

3    objection is to the General Counsel's Exhibit 30, page 3 --

4      MR. ROSS:  Correct.

5      JUDGE TRACY:  -- and 4.  So you have a choice at this

6    point, you can withdraw pages 3 and 4 of this exhibit and

7    introduce it a different way, or we can put it in the rejected

8    exhibits pile of 30.

9      MR. RODRIGUEZ RITCHIE:  I'll withdraw pages 3 and 4.

10     JUDGE TRACY:  Okay.  So General Counsel's Exhibit 30,

11   pages 1 and 2 are admitted into evidence.  Pages 3 and 4 of

12   General Counsel's Exhibit 4 -- 30, yes -- are withdrawn.

13   **(General Counsel Exhibit Number 30 Pages 1 and 2 Received into**

14   **Evidence)**

15   **(General Counsel Exhibit Number 30 Pages 3 and 4 Withdrawn)**

16     JUDGE TRACY:  And so now let's go ahead and take a ten-

17   minute break.  The clocks are a little off, but let's say

18   10:25, okay?  So let's go ahead and go off the record.  And

19   please don't --

20     MR. ROSS:  Thank you.

21     JUDGE TRACY:  -- discuss your testimony with anyone until

22   after the hearing.

23   (Off the record at 10:14 a.m.)

24     JUDGE TRACY:  Sorry for my tardiness.  Ready to go back on

25   the record?  You ready?  Okay, so let's go ahead and go back on



1   the record.  Okay, go ahead, please.

2                    **DIRECT EXAMINATION (RESUMED)**

3   Q    BY MR. RODRIGUEZ RITCHIE:  Mr. Moran, do you recall the

4   day of June 7th, 2017?

5   A    Yes.

6   Q    Did you work on June the 7th, 2017?

7   A    Yes.

8   Q    Do you remember around what time you started working?

9   A    I started at 5:25 in the morning.

10  Q    Now, on June the 7th, 2017, did you have any interactions

11  with Josh Hedges?

12  A    Yes.

13  Q    About when during your day did you have an interaction

14  with Mr. Hedges?

15  A    During the middle of my shift.

16  Q    How did it happen that you had an interaction with Mr.

17  Hedges?

18  A    A member of management told me that John (sic) Hedges --

19  Josh Hedges wanted to speak with me.

20  Q    Okay.  And when you -- do you remember the name of the

21  person from management?

22  A    No, I don't.

23  Q    When this person from management told you that you wanted

24  -- that you needed to speak with Mr. Hedges, did you say

25  anything back to him or her?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    What?

3    A    That I would like to bring in a witness.

4    Q    And did you bring a witness?

5    A    Yes.

6    Q    Who was that?

7    A    He's a welder for body line 1, Tony Vega.

8    Q    Okay.  And did you meet with Mr. Hedges on June the 7th,

9    2017?

10    A    Yes.

11    Q    Where?

12    A    Near the manager's office.  They called it the Shark Tank.

13    Q    Okay.  And were you with Mr. Vega?

14    A    Yes.

15    Q    Who spoke first when you saw Mr. Hedges?

16    A    Josh Hedges.

17    Q    And what did Mr. Hedges say?

18    A    He just said, good morning, how are you doing, and we

19    shook hands.

20    Q    Did you speak?

21    A    Yes.

22    Q    What did you say?

23    A    I introduced Tony to him.

24    Q    Did Mr. Vega speak?

25    A    No, they just acknowledged each other and that's it.



www.escribers.net  |  800-257-0885

1    Q    Okay.  So after the introductions, did Mr. Hedges say

2    anything else to you?

3    A    Yes, that Elon wanted to meet with me.

4    Q    By Elon, are you referring to Elon Musk?

5    A    Yes.

6    Q    And who is Elon Musk?

7    A    The CEO of Tesla.

8    Q    Okay.  And after Mr. Hedges told you that Elon wanted to

9    speak with you, what, if anything, did you do next?

10   A    We walked about three to five minutes to a conference room

11   at the north end of the factory.

12   Q    Was Mr. Hedges with you when you walked to that conference

13   room?

14   A    Yes, all three of us walked over there.

15   Q    Okay.  And when you got to the conference room, was Mr.

16   Musk there?

17   A    Yes.

18   Q    And was there anyone else with him?

19   A    Yes.

20   Q    Who?

21   A    Gaby Toledano.

22   Q    And who is Gaby Toledano?

23   A    She's the chief people officer.

24   Q    Of Tesla?

25   A    Yes.



1    Q    Did Mr. Hedges stay with you?

2    A    No, he did not.

3    Q    When you were in the conference room, who spoke first?

4    A    Gaby.

5    Q    What did Ms. Toledano say?

6    A    She said, you know, we're here to listen to your concerns,

7    you know --

8         MR. ROSS:  I'm sorry, repeat, please?

9         THE WITNESS:  We're here to listen to your safety

10   concerns.  She acknowledged the petition that we delivered the

11   day prior.

12   Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  Did she continue

13   speaking?

14   A    No.

15   Q    Who spoke next?

16   A    Well, actually, yes, she introduced herself and I

17   introduced Tony to her.  Yeah.

18   Q    Okay.  And after you introduced Mr. Vega to her, who spoke

19   next?

20   A    Elon.

21   Q    And what did Mr. Musk say?

22   A    He asked me to tell him a little bit about my time at

23   Tesla.

24   Q    And did you respond?

25   A    Yes, I did.



www.escribers.net | 800-257-0885

1    Q    What did you say?

2    A    I started -- I told him that I started in September 2012,

3    that I was hired as a production associate, body line 1 under

4    body group.  I mentioned that I was promoted to team lead early

5    2014.  I explained that after I went back to the line as a

6    production associate, how I got hurt in an area that had a lot

7    of safety issues, safety concerns, a lot of people were

8    complaining in that area.  Management never addressed to issue.

9    Q    Did Mr. Vega speak?

10   A    Yes.

11   Q    And what did Mr. Vega say?

12   A    He brought up some concerns that his welding team had.  He

13   talked about how they were being restricted on access to PPE.

14   He talked about concerns about the ventilation masks that they

15   used while they're welding.  He also brought up concerns about

16   the batteries they have to wear on their back; that they're

17   heavy and, you know, working 12 hours, you know, puts a toll on

18   your lower back.  He also mentioned the unfair leveling

19   process.

20        MR. ROSS:  Repeat, please.

21        THE WITNESS:  The last part?

22        JUDGE TRACY:  Yes, please.

23        THE WITNESS:  He talked about the unfair leveling --

24   level-up process.

25        MR. ROSS:  Thank you.


www.escribers.net | 800-257-0885

1    Q    BY MR. RODRIGUEZ RITCHIE:  Now, after Mr. Vega spoke, did

2    anyone else speak?

3    A    Yes.

4    Q    Who?

5    A    I did.

6    Q    What did you say?

7    A    I talked a little bit more about the performance reviews.

8    I brought up the fact that during one of the reviews, I got,

9    you know, almost a perfect score, 4.6, 4.7 out of 5; that I

10   never received a level-up or raise; that I was a little

11   disappointed.  And I mentioned that, you know, that's the

12   reason we want to form a union, we want to have a voice in the

13   plant.

14   Q    Okay.  And after you said that that was the reason why you

15   wanted a union, did either Mr. Musk or Ms. Toledano say

16   anything?

17   A    Yes.

18   Q    Who?

19   A    Elon.

20   Q    And what did Mr. Musk say?

21   A    He said, you know, you don't really have a voice.  The UAW

22   is a second -- like two-class system where UAW is the only one

23   that has a voice and not the workers.

24   Q    Okay.  Did Ms. Toledano say anything?

25   A    Yes.



www.escribers.net | 800-257-0885

1    Q    What did Ms. Toledano say?

2    A    She mentioned that, yeah, they know the performance

3    reviews are not perfect, that they're trying to work upon

4    improving the performance reviews.  She's also said -- she

5    mentioned that, you know, the majority of the workers at Tesla

6    don't want a union and, you know, why do we want to pay for --

7    why do we want to pay union dues?

8    Q    Okay.  After Ms. Toledano spoke, who spoke next?

9    A    I did.

10    Q    What did you say?

11    A    Well, we have every right to form a union.  We do want a

12    voice to work together with the Company to improve working

13    conditions.

14    Q    Did anyone respond to you?

15    A    Tony said something.

16    Q    What did Mr. Vega say?

17    A    He just -- he said, you know, we don't want to hurt Tesla,

18    we want to make Tesla better.

19    Q    Okay.  After Mr. Vega spoke, who spoke next?

20    A    Gaby.

21    Q    What did Ms. Toledano say?

22    A    She mentioned that she -- they have safety committee

23    meetings every week or every other week and that it would be a

24    good idea for us to participate and to raise our safety

25    concerns with the safety reps that go to the meetings.



www.escribers.net | 800-257-0885

1    Q    Did either you or Mr. Vega respond to her?

2    A    We agreed.

3    Q    And after you agreed, did anyone else speak?

4    A    Yes.

5    Q    Who?

6    A    Elon.

7    Q    What did Mr. Musk say?

8    A    He turned to Gaby and said, yeah, let them participate in

9    these meetings.

10   Q    Did anyone else speak during this meeting?

11   A    Yes.

12   Q    Who?

13   A    Elon.

14   Q    What else did Mr. Musk say?

15   A    He said if these safety committee meetings don't work out,

16   then we'll give you your union.

17   Q    After Mr. Musk said if the safety committee meetings don't

18   work out, we'll give you your union, did the meeting continue?

19   A    No, it did not.

20   Q    Did you leave at that point?

21   A    Yes, we left.

22   Q    What did you do?

23   A    Tony and I went back to work.

24   Q    Now, prior to June the 7th, 2017, how many meetings had

25   you had with Mr. Musk?



1    A    Zero.  None.

2    Q    And after June the 7th, 2017, how many meetings have you

3    had with Mr. Musk?

4    A    Zero.  None.

5    Q    Did you ever participate in any safety committee meetings

6    after June the 7th?

7    A    Yes.

8    Q    Approximately how many?

9    A    Between two and four, two and four meetings.

10   Q    And why did you only participate in between two and four

11   meetings?

12   A    We just stopped -- I stopped receiving invites.

13        MR. ROSS:  Objection.  Relevance.

14        JUDGE TRACY:  Overruled.  Go ahead and answer the

15   question, please.

16        THE WITNESS:  Can you repeat the question?  Sorry.

17   Q    BY MR. RODRIGUEZ RITCHIE:  Sure.  Why did you only

18   participate in approximately two to four safety committee

19   meetings?

20   A    Yeah, I just -- we just -- I stopped receiving invites for

21   the safety meetings.

22   Q    And --

23        MR. ROSS:  Repeat, please.

24        JUDGE TRACY:  Could you repeat your answer?

25        THE WITNESS:  I stopped receiving safety -- invites for



1     the safety meetings.

2     Q    BY MR. RODRIGUEZ RITCHIE:   Did Ms. Toledano participate in

3     any of the safety committee meetings that you were a part of?

4     A    She attended one of them.

5     Q    Were other manufacturing and production employees also

6     participating in the safety committee meetings?

7     A    Yes.

8          JUDGE TRACY:  Let me interject and ask you one thing, you

9     mentioned level-up.

10         THE WITNESS:  Yes.

11         JUDGE TRACY:  What does that mean?

12         THE WITNESS:  That means a raise.  Every performance

13    review, you can get a level-up, which is a raise.  It's the

14    same as a raise.

15         JUDGE TRACY:  Okay.  All right.  Thank you.

16    Q    BY MR. RODRIGUEZ RITCHIE:  I'll clarify it a little

17    further.  Are there different levels of particular position at

18    Tesla?

19    A    Yes.

20    Q    And do the different levels correspond to different rates

21    of pay?

22    A    Yes.

23    Q    And is that what you're referring to by the level-up

24    process and moving from one lower level to a higher level up?

25    A    Yes.



www.escribers.net | 800-257-0885

1   Q    Now, the June 7th, 2017 meeting with Mr. Musk and Ms.

2   Toledano, when did you first tell a Board Agent about this

3   meeting?

4   A    May.  May 2018.

5   Q    And why didn't you tell a Board Agent before that?

6   A    They never asked me.

7   Q    Why did you tell a Board Agent in May 2018 about the Musk

8   meeting?

9   A    They brought up the meeting; they asked me about it.

10  Q    Did you provide any affidavits with the Board Agent in

11  connection with an investigation into Tesla?

12  A    Yes.

13  Q    When you met with the Board Agent to provide the

14  affidavit, did the Board Agent ever ask you if you had any

15  meetings with Mr. Musk?

16  A    No.

17  Q    Besides this case, how many other federal investigations

18  have you been a part of?

19  A    None.

20  Q    Earlier in your testimony, you testified about a system

21  called Workday.

22  A    Uh-huh.

23  Q    In September 2017, did you look up any Tesla Fremont

24  workers using Workday?

25  A    Yes.



1    Q    Why?

2    A    I wanted to find out if they were actual Tesla employees.

3    They were speaking in Sacramento against the legislative bill

4    that -- it requires auto makers to be certified as fair and

5    responsible in the treatment of their workers.

6    Q    How do you know that those workers testified about any

7    matters pertaining to the bill?

8    A    I was told by a courier.

9    Q    And who was that?

10    A    Richard Ortiz.

11    Q    Did you watch their testimony about the bill?

12    A    Yes.

13    Q    How did you watch that?

14    A    A video.

15    Q    So I want to talk about how you looked up the workers.

16    Can you tell me how it was that you used Workday to look up the

17    individuals?

18    A    You log into Workday and all you have to do is type in

19    their name on the search box on the homepage of Workday.

20    Q    Where did you get their names?

21    A    From watching the video.

22    Q    And when you looked up the individuals, did you do that on

23    the phone?

24    A    Yes.

25    Q    Was it your personal phone?



1    A    It was my personal phone, yes.

2    Q    And did you log into Workday using your own log in

3    information?

4    A    Yes.

5    Q    Do you remember the names of the people you looked up?

6    A    Yes.

7    Q    What were they?

8    A    Shaun Ives, Travis Pratt, and Jane Osbual.

9    Q    Did you take screen shots of Workday information?

10    A    Yes.

11    Q    Now, when you accessed Workday, did you access any

12    restricted parts of Workday?

13    A    No.

14    Q    Prior to this time in September of 2017, had you ever

15    looked anyone up before on Workday?

16    A    Yes.

17    Q    For example, without naming any names, what type of person

18    had you looked up before?

19    A    Co-workers.

20    Q    Why?

21    A    To compare my level of pay with their -- my seniority with

22    their seniority.

23    Q    And did you do anything with the screen shots?

24    A    Yes.

25    Q    What?



www.escribers.net | 800-257-0885

```
 1    A    I text them to Richard Ortiz.

 2    Q    Okay.  I'm going to show you what's been admitted as

 3    General Counsel's Exhibit 43, which I'm showing to Mr. Ross.

 4         MR. ROSS:  Thank you.

 5    Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  It's a five-page

 6    document.  Take a look at it and let me know when you're ready.

 7    A    Okay.

 8    Q    Do you recognize General Counsel's Exhibit 43?

 9    A    Yes.

10    Q    What is General Counsel's Exhibit 43?

11    A    These are screen shots of text messages between Richard

12    Ortiz and I.

13    Q    Are these screen shots from your phone?

14    A    Yes.

15    Q    And just to clarify for the record, I've handed you a

16    color document.  There's text messages that appear in gray and

17    text messages that appear in green; can you tell us the gray --

18    who sent the gray text messages?

19    A    Richard Ortiz.

20    Q    And the green text messages, who sent those?

21    A    Those are from me.

22    Q    Okay.  And I want you to look at page 2 of General

23    Counsel's Exhibit 43.  There's a picture --

24    A    Yes.

25    Q    -- of a man wearing glasses.
```



```
 1    A    Okay.

 2    Q    Is that one of the screen shots that you testified you

 3    sent to Mr. Ortiz?

 4    A    Yes.

 5    Q    And who was that a screen shot of?

 6    A    Shaun Ives.

 7    Q    Okay.  And I want to direct your attention to page 3.

 8    There's a picture of another man --

 9    A    Yes.

10    Q    -- without glasses; you see that?

11    A    Yes.

12    Q    Okay.  Earlier, you testified about screen shots that you

13    took and sent to Mr. Ortiz, is that one of the screen shots?

14    A    Yes.

15    Q    And who is that of?

16    A    Travis Pratt.

17    Q    Okay.  I want to turn your attention to page 4 of General

18    Counsel's Exhibit 43.  There's a picture of a woman wearing a

19    scarf.

20    A    Yes.

21    Q    And then it continues to page 5, there's another picture

22    that includes the same scarf picture.

23    A    Uh-huh.

24    Q    Earlier, you testified that you sent screen shots to Mr.

25    Ortiz, are those two screen shots that you sent to Mr. Ortiz?
```



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    And those are from Workday?

3    A    Yes.

4    Q    And who is the individual depict (sic) in these two screen

5    shots on pages 4 and 5?

6    A    Jane Osbual.

7        MR. RODRIGUEZ RITCHIE:  For the record, that's

8    O-S-B-U-A-L.

9    Q    BY MR. RODRIGUEZ RITCHIE:  Now, did you tell Mr. Ortiz to

10   do anything with the screen shots?

11   A    No, I did not.

12   Q    After you sent the screen shots to Mr. Ortiz, did the

13   topic of the screen shots come up with anyone at Tesla?

14   A    Yes.

15   Q    With who?

16   A    Rick Gecewich.

17   Q    Do you remember about when that was?

18   A    October 2017.

19   Q    Did you speak with Mr. Gecewich?

20   A    Yes.

21   Q    Were you working when you spoke with him?

22   A    Yes.

23   Q    How did it come to happen that you met with Mr. Gecewich?

24   A    About 8 in the morning, my supervisor told me that HR

25   wanted to meet with me in a certain conference room.



www.escribers.net | 800-257-0885

1    Q    Is that -- was that Ms. Umufuke?

2    A    Yes.

3    Q    And did you actually meet with Mr. Gecewich?

4    A    Yes.

5    Q    Who was present during this meeting?

6    A    It was just myself and Gecewich.

7    Q    Who spoke first during the meeting?

8    A    He did.

9    Q    What did Mr. Gecewich say?

10   A    He introduced himself.  He said he's not with HR, that

11   he's an investigator, he's investigating Workday -- concerning

12   Workday.

13   Q    Okay.  Did Mr. Gecewich say anything else?

14   A    Yes.

15   Q    What?

16   A    He asked me what Work -- what I thought Workday was.

17   Q    Did you answer his question?

18   A    Yes.

19   Q    What did you say?

20   A    I said Workday is a platform where workers can view their

21   feedback, performance reviews, update their contact

22   information, to sign documents sent by the Company.

23   Q    Do you recall whether or not Mr. Gecewich said anything

24   about the meeting being confidential?

25   A    Yes.



www.escribers.net | 800-257-0885

1    Q    What?

2    A    He said, you know, this meeting is confidential between us

3    and the Company and yourself.  This shouldn't get out in

4    public.

5    Q    Now, after you explained what you thought Workday was, did

6    Mr. Gecewich say anything else to you?

7    A    Yes.

8    Q    What did he say?

9    A    He asked me if I thought Workday was an internal or

10   external platform.

11   Q    Did you answer him?

12   A    Yes.

13   Q    What did you say?

14   A    I said I thought it was -- it's an internal platform.

15   Q    Did Mr. Gecewich ask you any other questions about

16   Workday?

17   A    Yes.

18   Q    What?

19   A    He asked me what I use it for.

20   Q    Did you answer him?

21        MR. ROSS:  Repeat, please.

22        JUDGE TRACY:  Could you repeat the question I think.

23        MR. ROSS:  The answer.  Repeat the answer, please.

24        THE WITNESS:  I said I use -- I'm sorry, what was the

25   question again?  Repeat the question.



www.escribers.net | 800-257-0885

1    Q    BY MR. RODRIGUEZ RITCHIE:  Did Mr. Gecewich ask you

2    anything else about Workday?

3    A    Yes.

4    Q    What did he ask you about Workday?

5    A    He asked me what I use Workday for.

6    Q    Did you answer him?

7    A    Yes.

8    Q    What did you say?

9    A    I said to review performance reviews.  I've used it to

10   update my contact information.  I've used it to sign documents

11   electronically that the Company sends.

12   Q    Did Mr. Gecewich ask you anything else during your meeting

13   with him?

14   A    Yes.

15   Q    What?

16   A    If I used Workday for anything else.

17   Q    Did you answer him?

18   A    I said yes.

19   Q    What did you say?

20   A    To search employees, co-workers.

21        MR. ROSS:  Repeat, please.  I'm sorry.

22        THE WITNESS:  To search other employees, co-workers.

23   Q    BY MR. RODRIGUEZ RITCHIE:  Did Mr. Gecewich ask you

24   anything else about you said -- after you said to look up

25   employees that are co-workers?



1   A    Yes.

2   Q    What?

3   A    Why did I search other co-workers.

4   Q    And did you answer him?

5   A    Yes.

6   Q    What did you say?

7   A    I told him to compare, you know, my seniority and my level

8   of pay with them -- with theirs.

9   Q    During your meeting with Mr. Gecewich, did an individual

10  named Richard Ortiz come up?

11  A    Yes.

12  Q    And what about Mr. Ortiz came up during this meeting?

13  A    Rick Gecewich asked me if I knew Richard Ortiz.

14  Q    Did you answer him?

15  A    Yes, I did.

16  Q    What did you say?

17  A    I said Richard Ortiz is a co-worker at Tesla and a member

18  of our organizing committee.

19  Q    During your meeting with Mr. Gecewich, did he ask you

20  about the screen shots?

21  A    Yes.

22  Q    What did he ask about the screen shots?

23  A    He said that he knows that I took screen shots.

24  Q    Okay.  Did Mr. Gecewich say anything else about the screen

25  shots?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    What?

3    A    He asked me why.

4    Q    Did you answer his question?

5    A    Yes.

6    Q    What did you say?

7    A    I told him that I wanted to find out if they were actually

8    employees of the Company.

9    Q    Did Mr. Gecewich ask you anything else during the meeting?

10   A    Yes.

11   Q    What?

12   A    He wanted to find out if I still have that -- the

13   pictures.

14   Q    Did you answer his question?

15   A    Yes.

16   Q    What did you say to him?

17   A    I said I might have.

18   Q    Now, after you told him that you might still have the

19   pictures, did Mr. Gecewich ask you anything else about the

20   screen shots?

21   A    Yes.

22   Q    What?

23   A    He asked me if I could look for them on -- if I could look

24   for the text thread and the pictures on Facebook.

25   Q    And did you?



1    A    Yes.

2    Q    In front of him?

3    A    Yes.

4    Q    Were you able to find the pictures on Facebook?

5    A    No, I could not.

6    Q    Did you tell him that?

7    A    Yes.

8    Q    After you told him you couldn't find the pictures on

9    Facebook, did Mr. Gecewich ask you anything else about the

10   pictures?

11   A    Yes.

12   Q    What?

13   A    He said, maybe, you know, it might be text messages

14   between Richard and I.

15   Q    Did you understand that to mean text messages via cell

16   phone?

17   A    Yes.

18   Q    Did he ask you to look for your -- for the text messages

19   on your phone?

20   A    Yeah, he asked me if I can search my -- that text thread.

21   Q    And did you?

22   A    Yes.

23   Q    Were you able to find it?

24   A    Not at first.  You know, me -- Richard and I communicated

25   almost every day, so that thread was pretty long.  So I was



1    kind of scrolling and trying to find the attachments, those

2    pictures.  I told him it might take a while.  He responded by

3    saying that there's an easier way to view all the attachments

4    sent through a text message.

5    Q    And what did he say about the easier way?

6    A    He said, all you have to do is press on an icon on the

7    text thread.

8    Q    And did you?

9    A    Yes.

10   Q    Were you able to find them?

11   A    Yes.  Once I pressed that icon, all the attachments

12   between Richard and I came up and I did find the pictures.

13   Q    Did you --

14        MR. ROSS:  Repeat, please.  Last sentence.

15        THE WITNESS:  What was I -- the last sentence?

16   Q    BY MR. RODRIGUEZ RITCHIE:  Did you find the pictures --

17        MR. ROSS:  No, the last sentence you --

18        JUDGE TRACY:  So excuse me, again, I understand that

19   you're having difficulty hearing, but then you're also

20   interrupting his testimony so --

21        MR. ROSS:  I -- okay.

22        JUDGE TRACY:  So he's not recalling what he just testified

23   about.

24        MR. ROSS:  Okay.  I --

25        JUDGE TRACY:  So let Mr. Rodriguez Ritchie ask the



www.escribers.net | 800-257-0885

1     question again.

2     Q    BY MR. RODRIGUEZ RITCHIE:  After Mr. Gecewich told you

3     which icon to press and you pressed it, were you able to find

4     the pictures?

5     A    Yes, I was.  Once I pressed the icon, all the attachments

6     between Richard and I popped up.  And I did find the pictures.

7     Q    Did Mr. -- do you recall whether or not Mr. Gecewich asked

8     you to provide him with the pictures after you found them?

9     A    Yes, he said if I -- if he can have a copy of the text

10    thread and the pictures.  He said, you know, I didn't have to,

11    but this would prove, you know, my case that I didn't do

12    anything wrong.

13    Q    And did you provide copies of the text message thread to

14    Mr. Gecewich?

15    A    Yes, I did.

16    Q    Did Mr. Gecewich say anything else about the screen shots?

17    A    He said that -- he asked me if I did anything with them.

18    Q    Did you answer him?

19    A    Yes.

20    Q    What did you say?

21    A    I said that I sent the pictures to Richard Ortiz.

22    Q    Did Mr. Gecewich ask you any other questions during the

23    meeting?

24    A    Yes.

25    Q    What?



```
1    A    He asked me if I did anything else with them.

2    Q    Did you answer?

3    A    Yes.

4    Q    What?

5    A    I said no.

6    Q    Did Mr. Gecewich mention anything about the screen shots

7    being posted anywhere during your meeting with him?

8    A    Yes.

9    Q    What did he say?

10   A    He said the pictures got out somewhere in public.

11   Q    Did he say anything else about the pictures?

12   A    No.

13   Q    At this point, was the meeting over?

14   A    Yes.

15   Q    And what did you do after the meeting?

16   A    I went back to work.

17   Q    After this meeting in October of 2017 with Mr. Gecewich,

18   did you have any other meetings with Mr. Gecewich about the

19   screen shots?

20   A    Yes.

21   Q    I'm going to show you what's been pre-marked as General

22   Counsel's Exhibit 42 and hand it to the parties.  Do you

23   recognize General Counsel's Exhibit 42?

24   A    Yes.

25   Q    What is it?
```



1    A    It's a copy of an email that was sent to me from Ricky

2    Gecewich.

3    Q    And to the top of the email, it says from Ricky Gecewich,

4    and then it says to:  Jose Moran, cc:  Emmy (sic throughout)

5    Cruz, date:  Thursday, October 19th, 5:30 p.m.; do you see

6    that?

7    A    Yes.

8    Q    Is this an email that you received from Mr. Gecewich on

9    Thursday, October 19th?

10   A    Yes.

11   Q    What year was that?

12   A    This was 2017.

13        MR. RODRIGUEZ RITCHIE:  Okay.  Then at this time, I'd like

14   to move General Counsel's Exhibit 42 into evidence.

15        JUDGE TRACY:  Any objections?

16        MR. ROSS:  No.

17        JUDGE TRACY:  All right.  So General Counsel's Exhibit 42

18   is admitted into evidence.

19   **(General Counsel Exhibit Number 42 Received into Evidence)**

20   Q    BY MR. RODRIGUEZ RITCHIE:  If you look at the email, the

21   first line, it says, "I wanted to send you a follow up email to

22   remind you of what we discussed today"; do you see that?

23   A    Yes.

24   Q    Did you meet with Mr. Gecewich on October the 19th before

25   he sent this email?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Was that the meeting you testified about?  The second

3    meeting where the topic of the screen shots came up?

4    A    Yes.

5    Q    Who was present during this meeting on October the 19th?

6    A    It was Rick Gecewich and Emmy Cruz, who is a HR partner.

7    Q    And who spoke during this meeting?

8    A    Ricky Gecewich.

9    Q    Did Ms. Cruz speak?

10   A    No, she did not.

11   Q    And what did Mr. Gecewich say?

12   A    He said this is a -- you know, a follow up to the meeting

13   we had a few weeks ago.  And he mentioned that -- you know,

14   thank you for -- you know, for your honesty in this case and

15   we're just going to give you a warning regarding your use of

16   Workday.

17   Q    Did he say anything about using Workday only for

18   legitimate and official business purposes?

19   A    Yes.

20   Q    What did he say about that?

21   A    He said only use Workday for business purposes, not, you

22   know, personal use.

23   Q    Okay, I'm going to -- you can go ahead and turn that over.

24   I'm going to show you what's been pre-marked as General

25   Counsel's Exhibit 56.  I'm handing it to the parties.  On



1    General Counsel's Exhibit 56 at the top, it says,

2    elonmusk@elonmusk.  The date on the document is 11:44 p.m., 20

3    May of 2018.  Take a look at that and let me know when you're

4    ready.

5    A     Okay.  I'm ready.

6    Q     Do you recognize General Counsel's Exhibit 56?

7    A     Yes.

8    Q     What is it?

9    A     It's a copy of a tweet sent by Elon Musk.

10   Q     Prior to today, have you seen this tweet before?

11   A     Yes.

12   Q     Do you remember when?

13   A     Probably a few days after it was posted.

14   Q     So that would be a few days after May 20th, 2018?

15   A     Yes.

16   Q     And where did you see it?

17   A     On my Twitter account.

18   Q     Did you see it on the account @elonmusk on Twitter?

19   A     Yes.

20         MR. RODRIGUEZ RITCHIE:  Then at this time, I'd like to

21   move General Counsel's Exhibit 56 into evidence.

22         JUDGE TRACY:  Any objections?

23         MR. ROSS:  I'd like to look at it, if I may, for a moment,

24   please?  I'd like some voir dire, please.

25         JUDGE TRACY:  Go ahead.


www.escribers.net | 800-257-0885

1          **VOIR DIRE EXAMINATION**

2   Q    BY MR. ROSS:  Mr. Moran, looking -- first of all, let me

3   make this disclaimer to you, sir.  I know nothing about Twitter

4   or tweets.  I don't have any idea how it works, so you're going

5   to have to help me here.

6   A    I mean, I'll try, but --

7   Q    Okay.  It looks like this an email that was a reply to

8   something that came from a person @dmatkins137 (sic); do you

9   see that?

10       MR. RODRIGUEZ RITCHIE:  Objection.  Misidentifies the

11  testimony of the Witness and the document itself.

12       MR. ROSS:  Is that --

13       JUDGE TRACY:  So it's -- the objection is sustained.  So

14  you had -- you said in your question this is an email, it's --

15       MR. ROSS:  Oh, I'm sorry.  Shows what I know.

16       JUDGE TRACY:  Right.

17       MR. ROSS:  Okay.  This is a tweet, okay?  If I say email,

18  I mean tweet, sorry.

19       JUDGE TRACY:  Okay.

20       MR. ROSS:  I apologize.

21  Q    BY MR. ROSS:  So it appears to be a reply to somebody

22  named, or with the account @dwatkins137; do you see that?

23  A    Yes, I see it.

24  Q    Okay.  Is that your tweet account?

25  A    No, it's not.



www.escribers.net | 800-257-0885

1    Q    Okay.  And it appears also to be a reply to somebody with

2    the name or account @ShayneRanma@NASA, N-A-S-A; do you see

3    that?

4    A    Yes.

5    Q    Is that your tweet account, sir?

6    A    No, it's not.

7    Q    Uh-huh.  Was this a tweet that was sent to you?

8    A    No.

9    Q    Or in response to a tweet that you sent to Mr. Musk?

10   A    No.

11   Q    Okay.  Do you know who dmatkins137 is?

12   A    No, I don't.

13   Q    Have you done any investigation to find out who

14   dmatkins137 is?

15   A    No, I have not.

16   Q    How about ShayneRanma; do you know who that person is?

17   A    No, I don't.

18   Q    Okay.  Did you see the tweets that Mr. Musk was replying

19   to?

20        MR. RODRIGUEZ RITCHIE:  Objection.  Assumes facts not in

21   evidence.

22        MR. ROSS:  It says reply to --

23        JUDGE TRACY:  So -- so --

24        MR. ROSS:  -- I'm asking whether he saw what Mr. Musk was

25   replying to.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  So again, I'm going to sustain the

2    objection.  I mean, the point of this right now is the

3    authentication of the document.

4    MR. ROSS:  Okay.

5    JUDGE TRACY:  And some of your questions are almost cross-

6    examination questions.

7    MR. ROSS:  Okay.  Okay.  We'll come back.  Thank you.

8    JUDGE TRACY:  So any objections?

9    MR. ROSS:  No.

10    JUDGE TRACY:  So --

11    MR. ROSS:  Well, Your Honor --

12    JUDGE TRACY:  Yes.

13    MR. ROSS:  -- I do have an objection to the consolidation

14    of this matter into this case.  The matter which this is

15    relevant to is a matter that was consolidated over objection.

16    I want it made clear on the record that we continue to object

17    at the consolidation.  And indeed, it is our belief that this

18    case is currently before the Board, and that this matter is not

19    a matter over which the --

20    JUDGE TRACY:  So --

21    MR. ROSS:  -- Judge has jurisdiction.  So --

22    JUDGE TRACY:  Right.  So let me say this, that on Friday

23    the Board did rule on your motion to dismiss.

24    MR. ROSS:  Yes, they did.

25    JUDGE TRACY:  Right.  And said -- and denied the motion.



www.escribers.net | 800-257-0885

1   However, certainly in your brief, you can again argue that the

2   -- that it wasn't appropriately before me and I'll deal with it

3   in the brief.

4        MR. ROSS:  Yeah.

5        JUDGE TRACY:  So yeah -- I mean --

6        MR. ROSS:  Yeah.

7        JUDGE TRACY:  -- I've already, I think, ruled on it once,

8   but we'll do it again in --

9        MR. ROSS:  Well, this is not pertinent to that motion to

10  dismiss, Your Honor.

11       JUDGE TRACY:  Yeah, so let me be -- let me remember

12  clearly.  There were a lot of things that happened in this --

13       MR. ROSS:  Yes, indeed.

14       JUDGE TRACY:  That's the danger of allowing you all this

15  many months to stew over things.  The motion to dismiss was

16  about --

17       MR. ROSS:  The motion was to dismiss the charge that was

18  filed relative to this tweet.  That --

19       JUDGE TRACY:  Right.  That was the one that you all filed

20  in --

21       MR. RODRIGUEZ RITCHIE:  The motion to dismiss was

22  regarding an amendment to the third complaint.

23       JUDGE TRACY:  And was --

24       MR. RODRIGUEZ RITCHIE:  It was about dismissing

25  allegations that pertain to a June 7th --



1          JUDGE TRACY:  The meeting?

2          MR. ROSS:  Right.

3          MR. RODRIGUEZ RITCHIE:  -- 2017 meeting.

4          JUDGE TRACY:  Okay.

5          MR. ROSS:  And then on August 23rd, Your Honor,

6    thereabouts, the --

7          JUDGE TRACY:  That's right.

8          MR. ROSS:  -- the Board, or General Counsel I should say,

9    issued a complaint, not a notice of hearing but a complaint, in

10   a wholly new matter --

11         JUDGE TRACY:  That's right.

12         MR. ROSS:  -- to which we replied with a motion for

13   summary judgment.  Now, that motion for summary judgment has

14   not been ruled on by the Board and it is our position, and I

15   tried to make it clear during our off-the-record phone

16   conversations, but during -- we -- and now that we're on the

17   record, I want to make clear that it is our view that that

18   matter is not properly before you at this point in time,

19   notwithstanding your consolidation decision.  We respect the

20   decision; we respectfully disagree with the decision that that

21   matter is now before the Board, the Board has not ruled on our

22   motion for summary judgment, and that this piece of evidence is

23   irrelevant as to those things that are properly before you.

24         I might add also, we also object to this document in so

25   far as it is taken out of context.  It is part of a string -- a

1   tweet string, if you will, and General Counsel has chosen to

2   cherry-pick from that string, and we believe that if you're

3   going to admit this that the entire string deserves a place in

4   the record.  So we're objecting to it also as a partial, or

5   limited, an isolated taken out of context statement, and that

6   the entire string should be made a part of the record as

7   opposed to this one snippet that appears in this string.  So on

8   that basis, we object as well.

9       JUDGE TRACY:  Okay.  General Counsel?  So let me be clear.

10  That's right.  So they're -- we still -- you still have the

11  outstanding motion for summary judgment before the Board, even

12  though the matter was consolidated by me into this proceeding.

13  And it may be at some point that they say it's up the Judge to

14  decide and kick it back.

15      MR. ROSS:  And it may be that they rule on the merits as

16  well.

17      JUDGE TRACY:  Yeah.  Who know?  Who knows?

18      MR. ROSS:  Yeah.

19      JUDGE TRACY:  I would certainly say, though, with the

20  consolidation that there -- I'm going to allow this testimony

21  about that complaint allegation that was allowed --

22      MR. ROSS:  I understand.

23      JUDGE TRACY:  -- that was consolidated into this

24  proceeding, and certainly, you can raise whatever arguments

25  that you wish to make on your case-in-chief, as well as during

www.escribers.net | 800-257-0885

1   your brief -- in your brief.  But with regards to their

2   objection to the document only being Mr. Musk's response,

3   what's your position on that?

4       MR. RODRIGUEZ RITCHIE:  Sure.  I just want to clarify

5   though first.  The General Counsel doesn't issue complaints,

6   issue complaint -- complaints are issued by the Regional

7   Director of the Region.  In so far as there's a completeness

8   objection, frankly, it entirely misunderstands the way Twitter

9   works.  The way Twitter works, when you look at something like

10  this, you only see this document, you don't see other things

11  that he's referring to.  So this tweet that was made by Elon

12  Musk is the entire tweet that he made.

13      JUDGE TRACY:  Uh-huh.

14      MR. RODRIGUEZ RITCHIE:  The other point that he's making

15  really isn't a completeness objection because there -- it isn't

16  as though there's other tweets that are part of this exact

17  tweet that's in General Counsel's Exhibit 56.  This is the

18  entirety of the tweet statement that was made.

19      JUDGE TRACY:  Okay.  So you know, I'm going to overrule

20  the objections with regard to the document.  So General

21  Counsel's Exhibit 56 is admitted into evidence.  However, if

22  certainly on your case-in-chief, you want to bring up who he's

23  replying to and what they said, you can certainly do that.

24      MR. ROSS:  All right.

25      JUDGE TRACY:  Yeah.  I mean -- yeah.  All right, so



1    General Counsel's Exhibit 56 is admitted into evidence.

2    **(General Counsel Exhibit Number 56 Received into Evidence)**

3    MR. RODRIGUEZ RITCHIE:  I have no further questions for

4    Mr. Moran.

5    JUDGE TRACY:  Okay.  All right.  So Mr. Ross?  Oh, I'm

6    sorry, do you all have any questions?

7    MS. FEINBERG:  That's all right.  Not at this time.

8    JUDGE TRACY:  Okay.  Mr. Ross?

9    MR. ROSS:  Yeah.  May we see the Witness's affidavit,

10   please?

11   JUDGE TRACY:  Okay.

12   MR. ROSS:  And if we have two copies, that would be

13   gratefully approved -- we are grateful for that.

14   MR. RODRIGUEZ RITCHIE:  If the record could reflect that

15   I'm handing Mr. Ross two copies of two affidavits.

16   MR. ROSS:  Thanks.

17   JUDGE TRACY:  All right.  So let's go off the record and

18   Mr. Ross, Mr. Morris, let us know when you're ready for the

19   cross-examination.

20   MR. ROSS:  We will, Your Honor.

21   JUDGE TRACY:  Okay.  So we're off the record.

22   (Off the record at 11:22 a.m.)

23   JUDGE TRACY:  Are you ready?  Okay.  All right.  So let's

24   go ahead and go back on the record.

25   MR. ROSS:  Okay.


www.escribers.net | 800-257-0885

1        JUDGE TRACY:  Go ahead.

2                        **CROSS-EXAMINATION**

3    Q    BY MR. ROSS:  Mr. Moran, I have quite a number of

4    questions for you.  You were a production associate in June of

5    2017 when you presented Mr. Hedges with the petition; is that

6    correct?

7    A    Yes.

8    Q    And when you spoke with Mr. Musk; is that correct?

9    A    Yes.

10   Q    And is it correct also that within a couple of months

11   thereafter, you were promoted?

12   A    Yes.

13   Q    Okay.  You were promoted to a lead?

14   A    Yes.

15   Q    Okay.  And did that result in an increase in your pay?

16   A    Yes.

17   Q    So you were -- now, you were -- what level lead were you?

18   A level 1, 2, 3, 4, how -- well, strike that.  How many levels

19   are there of leads?

20   A    Not leads, production associate levels.

21   Q    I see.  How many levels of production associates are

22   there?

23   A    Five.

24   Q    Five, okay.  And when you -- as of June of 2017, what

25   level were you?



1    A    Level 3.

2    Q    Level 3.

3    A    Uh-huh.

4    Q    Okay.  And would it be correct to say that the next level

5    up from a level 3 is a lead?

6    A    No, it's not.

7    Q    It's not correct?

8    A    No.

9    Q    Is it correct to say that a level 4 is a lead?

10   A    No, it's not.

11   Q    Not correct, okay.

12   A    But you would agree, though, that you received a

13   reassignment in August of 2017 and a raise; is that right?

14        MR. RODRIGUEZ RITCHIE:  I'm going to object as to

15   relevance.  There's no assertion regarding raises.  There's no

16   -- as I suspect where you're going with this, there's no

17   assertion that the individual is not a statutory employee.

18        MR. ROSS:  I couldn't understand -- I couldn't hear the

19   objection.  What is the objection?  Relevance?

20        JUDGE TRACY:  Can you restate the objection?

21        MR. RODRIGUEZ RITCHIE:  The objection was as to relevancy.

22   There is nothing in the testimony that makes a raise or his

23   rate of pay relevant to any of the allegations at issue.

24        JUDGE TRACY:  Okay.

25        MR. ROSS:  In so far as there's an allegation that this



1    individual was subjected to adverse treatment because of his

2    protected activities, or his union activities, we're showing

3    that he engaged in these activities in June and two months

4    later, he received a promotion and a raise.  So it goes to --

5         JUDGE TRACY:  So the objection is overruled.

6         MR. ROSS:  Okay.

7    Q    BY MR. ROSS:  So sir, would it be correct to say that you

8    engaged in these activities of speaking -- presenting the

9    petition to Mr. Hedges, emailing the petition to Mr. Hedges,

10   and then engaging Mr. Musk in a conversation, and two months

11   later, you got a promotion and a raise?

12   A    A promotion, yes.

13   Q    A promotion.  And that resulted in an increase in pay, yes

14   or no?

15   A    Yes.

16   Q    Okay.  Now, I'd like you to take a look at -- just a

17   moment, please.  I'm sorry to hold you up here.  I'd like you

18   to look at General Counsel's Exhibit 56.

19        MR. ROSS:  Can I see it?

20        UNIDENTIFIED SPEAKER:  Uh-huh.

21   Q    BY MR. ROSS:  I misspoke.  General Counsel's Exhibit 42.

22   Now, sir, do you have that in front of you?

23   A    Yes.

24   Q    Okay.  Now, this is a document that you received from Mr.

25   Gecewich on October 19 at 5:30 p.m.?



```
 1    A    Yes.

 2    Q    Okay.  It was in follow up to a conversation you had with

 3    Mr. Gecewich and Emmy Cruz earlier in the day?

 4    A    Yes.

 5    Q    Where was that conversation, sir?

 6    A    In a conference room.

 7    Q    Where?  Which one?

 8    A    It was upstairs inside the Tesla factory.

 9    Q    Do you remember the name of it?

10    A    No, I don't.

11    Q    Okay.  Can you be more specific in terms of the location?

12    A    Yes, it's above GA.

13    Q    Okay, above GA?

14    A    Yes.

15    Q    Okay.  Any -- can you be any more specific than that or is

16    that as good as it gets?

17    A    That's the best I can recall right now.

18    Q    Okay, that's fine.  And what time was that conversation,

19    sir?

20    A    I don't recall.

21    Q    Okay.  Well, this email to you from Mr. Gecewich is at

22    5:30 p.m.; what's your memory about how many hours passed

23    between the conversation you had with Mr. Gecewich and Ms. Cruz

24    and your receipt of this email?

25    A    A few hours.
```



1   Q    A few hours, okay.  Okay.  Did you ever tell anybody that

2   you didn't consider this email to be a warning or discipline?

3   A    Can you repeat the question?

4   Q    Sure.  Did you ever tell anybody that you didn't consider

5   this document that is General Counsel's Exhibit 42, the email

6   you received from Mr. Gecewich, you didn't consider it to be a

7   warning or discipline?

8        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  What he

9   considered it to be is not relevant to the instant proceeding.

10       JUDGE TRACY:  So it's sustained.

11       MR. ROSS:  It's sustained?  Okay.

12   Q    BY MR. ROSS:  Now, you testified that you took these

13   screen shots of Mr. Ives and Mr. Pratt and you sent them to Mr.

14   Ortiz by text?

15   A    Yes.

16   Q    Okay.  And that would have happened around when?

17   A    September -- September 2017.

18   Q    When is September, sir?

19   A    When in September?

20   Q    When in September, yes.

21   A    Mid-September.

22   Q    Mid-September?

23   A    Yeah.

24   Q    Okay.  And would it be correct to say that after you did

25   this, later in the year you got a performance review, correct?



1    A    Uh-huh, correct.

2    Q    Was it a good performance review or a bad performance

3    review?

4    A    It was a good.

5    Q    It was good.

6    A    Good.

7    Q    Do you remember what you got?

8    A    To the best of my recollection, I think I got a 3.

9    Q    Would a 4 sound right?

10    A    A 4?

11    Q    Yes.

12    A    Well, I would have to look back.

13    Q    I see.

14    A    Yeah.

15    Q    Would it also be correct to say that you received a bonus

16    of some kind at or around that time?

17    A    For the performance review?  I believe so, yes.

18    Q    Yeah, do you remember how much it was?

19    A    Four thousand, maybe.

20    Q    Okay.

21    A    Yeah.

22    Q    Had you ever received that high a bonus before?

23    A    Not that high.

24    Q    Not that high.  That was the highest bonus you ever got?

25    A    Up to that date, yes.



www.escribers.net | 800-257-0885

1    Q    I see.

2    A    Yes.

3    Q    You've gotten higher bonuses since then, correct?

4    A    Yes.

5    Q    Okay.  We'll come back to Mr. Ortiz and the texts in a

6    couple minutes.  Now, you are -- I'm sorry, my handwriting is

7    terrible and I write in abbreviation, so it's hard for me to

8    read my own handwriting -- but your job is lead quality --

9    A    Inspector.

10   Q    Quality inspector.  Okay.  And I take it that that means

11   that -- and I think you said that 15 to 20 people work under

12   you?

13   A    Yes.

14   Q    And what do you do in that job?

15   A    I work with the quality inspectors.  We monitor their

16   activities.  They do --

17   Q    You monitor what?

18   A    Their activities.

19   Q    You monitor their work?

20   A    Their work.

21   Q    Okay.  And what else do you do?

22   A    At the end of their shift, I enter all the data that they

23   gather from all the -- some assembly, all the UT, and it keeps

24   the information they get throughout the day.

25   Q    Uh-huh.  What else?



1    A    That's it.

2    Q    That's it.

3    A    Uh-huh.

4    Q    Tell me is the lead QC inspector -- what amount of your

5    time is spent actually doing inspection yourself?

6         MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

7         JUDGE TRACY:  The relevance?

8         MR. ROSS:  Sure.  If the witness is a supervisor, he's not

9    protected by Section 8(a)(1).

10        MS. FEINBERG:  Oh, no, no, no, no.

11        MR. RODRIGUEZ RITCHIE:  Respondent hasn't asserted that

12   this individual is a supervisor and to answer it to the

13   complaint.

14        MR. ROSS:  I have not heard his testimony until just now.

15        MS. FEINBERG:  He's a lead person.

16        MR. ROSS:  He has raised all kinds of things in his

17   affidavit that we had no access to it prior to this hearing.

18        So I would like to know what he -- if I come to find out

19   that he's a statutory supervisor, we have a newly discovered

20   defense.  We did not know this until today.

21        MS. FEINBERG:  Can I --

22        MR. ROSS:  I did not know this until today.

23        JUDGE TRACY:  Go ahead.

24        MR. RODRIGUEZ RITCHIE:  Sure.  Respondent employs the

25   individual, so certainly it would know what his duties were.


www.escribers.net | 800-257-0885

1    Certainly, that information would be available to him, and it

2    hasn't been asserted as a defense at this point.

3         So we would renew our objection.

4         JUDGE TRACY:  So I'll sustain the objection.

5         MR. ROSS:  Okay.

6         MS. FEINBERG:  Thank you.

7    Q    BY MR. ROSS:  Now, in February of 2017 when you were

8    working a -- I'll ask you it this way.  What was -- how long

9    was your shift in February, 2017, each day?

10   A    At that time, I was -- February, 2017, I was still on

11   light duty, so about eight hours.

12   Q    Eight hours?

13   A    Eight to ten hours.

14   Q    Okay.  I'm sorry?

15   A    Eight to ten hours.

16   Q    Eight to ten hours?

17   A    Yes.

18   Q    Okay.  When you weren't on light duty, how long was your

19   shift?

20   A    When I wasn't?

21   Q    Yeah.

22   A    Eleven and a half to twelve hours.

23   Q    Okay.  And you would start at about 5:30 in the morning?

24   A    Yes.  5:25 a.m.

25   Q    Okay.  And stop after -- shortly after 5 in the afternoon?



1    A    Yes.  Around 5:30.

2    Q    Okay.  Now, was February 10th, 2017, the only time you

3    engaged in leafleting on behalf of the Union at the plant?

4    A    No, it was not.

5    Q    Okay.  How many times did you engage in leafleting outside

6    the plant?

7    A    More than -- five to ten, five to fifteen times.

8    Q    Five or --

9    A    Five to fifteen times.

10    Q    Five to fifteen times.  Over what period of time?

11    A    A year.

12    Q    Over a year.  Okay.  Any dates stand out in your memory in

13    terms of when you did that?

14         MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

15    Q    BY MR. ROSS:  Did you engage in leafleting on May 25?

16         JUDGE TRACY:  So there was an objection regarding

17    relevance.

18         MR. ROSS:  I'll withdraw the question, Your Honor.

19         JUDGE TRACY:  Okay.

20    Q    BY MR. ROSS:  Did you engage in leafleting on May 25?

21         MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

22         There's no allegations pertaining to leafleting on May 25.

23         MR. ROSS:  I beg your pardon.  He's actually correct.

24         MR. RODRIGUEZ RITCHIE:  And vague as to time.

25         MR. ROSS:  May 24.  I stand corrected.


22-60493.774

1      MR. RODRIGUEZ RITCHIE:  Objection.  Vague as to time.

2      JUDGE TRACY:  May 24th of which year?

3      MR. ROSS:  Of 2017.

4      JUDGE TRACY:  Okay.

5      THE WITNESS:  May 24.  I don't recall.

6    Q    BY MR. ROSS:  Do you remember there being a leaflet handed

7    out, done based on something that came out of a thing called

8    WorkSafe?

9      MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

10     MR. ROSS:  I'm refreshing his memory as to whether he

11   engaged in leafleting on May 24.

12     MR. RODRIGUEZ RITCHIE:  There's no allegations involving

13   this witness with any leafleting on May 24, 2017.

14     MR. ROSS:  Well, that may be as to this witness, but there

15   are allegations as to other witnesses.

16     MR. RODRIGUEZ RITCHIE:  I'd ask that I please not be

17   interrupted when I'm making my objection.

18     JUDGE TRACY:  Okay.  All right.  So I'm going to overrule

19   the objection.

20     Go ahead and answer the question.  You probably need to

21   repeat it.

22   Q    BY MR. ROSS:  Yeah.  Yeah, my question is did you engage

23   in leafleting on May 24 and hand out something that was based

24   upon a publication by an organization called WorkSafe?

25   A    I don't recall if it was May 24th, but I do remember that



1    packet.  And yes, I did pass those out.

2    Q    Okay.  Did you remember where you did that?

3    A    Inside the plant.

4    Q    Inside the plant.  Did you do it outside the plant also?

5    A    I don't remember.

6    Q    Don't remember.

7    A    Yeah.

8    Q    Okay.  Sir, did you ever wear a UAW T-shirt to work?

9    A    Yes.

10   Q    Do you ever wear a UAW hat to work?

11   A    Hat?  No.

12   Q    Do you ever wear UAW stickers?

13   A    Yes.

14   Q    Okay.  Were you required to take the T-shirt off?

15        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

16        JUDGE TRACY:  The relevance?

17        MR. ROSS:  Yeah.  It goes to testimony with respect to the

18   general assembly allegations with respect to team wear.

19        This individual did not work in general assembly.  And the

20   evidence, I believe, will be -- if he's allowed to testify --

21   that he commonly wore UAW T-shirts and commonly displayed UAW

22   stickers, that he worked in areas outside general assembly, and

23   there was no problem with his doing so.

24        MR. RODRIGUEZ RITCHIE:  The allegation pertaining to team

25   wear is specifically the general assembly team wear.  He's



1    already testified he didn't work in general assembly, so it

2    really is not relevant whatever.

3        JUDGE TRACY:  So I'm going to sustain the objection.

4        MR. ROSS:  Well, I'd like to make an offer of proof, and

5    I'd also like to propose a stipulation.

6        The offer of proof would be that individuals outside of

7    the general assembly were permitted, without limitation, to

8    wear UAW insignia, UAW logoed garb, UAW hats, and that they

9    availed themselves of this opportunity on a frequent and

10   regular basis.  That's what the evidence would be if this

11   witness is allowed to testify.

12       In addition to which I would propose that is a factual

13   stipulation.

14       MR. RODRIGUEZ RITCHIE:  Sure.  The problem is it's still

15   not relevant.  Whether people did this outside or not is not

16   relevant to the allegation regarding the general assembly team

17   or policy.  In addition, the statement that we've alleged to be

18   unlawful regarding the policy are of individuals in general

19   assembly.  And so --

20       JUDGE TRACY:  So again, I'm going to sustain the

21   objection.

22       MR. ROSS:  Your Honor?

23       JUDGE TRACY:  Listen.  I'm going to sustain the objection.

24       If there is some evidence that you want to show to show

25   that, you know, I can see where you're going, you could do that

www.escribers.net | 800-257-0885

1   on your direct case in chief.

2       MR. ROSS:  Your Honor, I'd like to say that we're raising

3   this issue with this witness because we believe that the

4   requirements of what goes on in general assembly mandates the

5   use of team wear, that in those areas, outside general

6   assembly, where those requirements do not exist, there is no

7   attempt whatsoever to mandate how individuals are clothed.

8   This witness can testify to that.

9       JUDGE TRACY:  Well, it's not relevant to this witness's

10  testimony and in terms of the complaint allegations thus far.

11      So I'm going to again sustain the objection.

12      You can do that through your case in chief.

13      MR. ROSS:  Okay.  So it's an issue of being beyond the

14  scope is what I'm hearing?

15      JUDGE TRACY:  Well, right.  I mean I --

16      MR. ROSS:  Okay.  That's fine, Your Honor.

17  Q   BY MR. ROSS:  During your testimony, Mr. Moran, you were

18  asked whether anybody ever told you that it was not okay to

19  make screenshots of stuff that appeared in Workday.  Do you

20  remember that testimony?

21  A   Yes.

22      MR. RODRIGUEZ RITCHIE:  Objection.  Misstates the

23  testimony and vague as to time.  And that was -- there was a

24  time frame.

25      MR. ROSS:  I haven't finished with the question, but okay.



1       The witness has indicated he did remember saying that, but

2   that's okay.

3       JUDGE TRACY:  Well, how about clarify the question again,

4   please?

5       MR. ROSS:  Sure.

6   Q   BY MR. ROSS:  Okay.  During the time you worked there, did

7   anybody ever tell you that it was against the Company's rules

8   or policies to take screenshots of stuff that appeared in

9   Workday?

10      MR. RODRIGUEZ RITCHIE:  Same objection.

11      JUDGE TRACY:  Overruled.

12      THE WITNESS:  You're asking me if --

13  Q   BY MR. ROSS:  Did anybody say you can't do that?

14  A   No.

15  Q   Okay.  Did anybody say you can do that?

16  A   You can?

17  Q   Yes.

18  A   No.

19  Q   Did you ever ask anybody whether you could do that?

20  A   No.

21  Q   Okay.  So when you did it, you didn't know whether it was

22  okay or not, did you?

23  A   Correct.

24  Q   But you did know that Workday was for internal use,

25  correct?



www.escribers.net | 800-257-0885

1   A    Yes.

2   Q    And would I be correct in saying that when you took a

3   screenshot of the information you copied and passed it on to

4   Mr. Ortiz, you were not limiting your use of Workday to

5   internal use, were you, sir?

6   A    Correct.

7   Q    Now, prior to the screenshot you sent to Mr. Ortiz, did

8   you contact Mr. Ives or Mr. Pratt and ask him whether it was

9   okay for you to take a screenshot of their photos?

10      MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

11      JUDGE TRACY:  I'll overrule the objection.

12      Go ahead.  Answer the question.

13      THE WITNESS:  Can you repeat the question?

14  Q    BY MR. ROSS:  Yeah.  Did you ask Mr. Pratt for permission

15  to make a copy of this photo?

16  A    No, I did not.

17  Q    Or Mr. Ives?

18  A    No.

19  Q    Prior to this time, had you ever taken a screenshot of

20  anything that appeared on Workday?

21  A    I don't recall.

22  Q    You don't recall?

23  A    No.

24  Q    Can't recall any; is that right?

25  A    I can't recall another time that I took screenshots of



www.escribers.net | 800-257-0885

1   anything on Workday.

2   Q   Okay.  Would it be correct to say that Workday is Tesla's

3   Human Resource information system?  Do you understand it to be

4   that?

5       MS. FEINBERG:  Objection.  Foundation.

6       MR. ROSS:  I'm asking if he knows.

7       MS. FEINBERG:  Well, that's why it's a foundation

8   objection.

9       MR. RODRIGUEZ RITCHIE:  Same objection.  And relevance.

10      JUDGE TRACY:  So I'll overrule the objection.

11      Go ahead.  Answer the question.

12      THE WITNESS:  I know it as a platform where workers can go

13  in there and update the contact for admission of performance

14  reviews, receive and give feedback.  But I do not know what

15  they actually allow without a software engineer on the break

16  desk.

17  Q   BY MR. ROSS:  Okay.  Now, was there a time when you found

18  out that Mr. Ortiz had taken the screenshots you sent him and

19  post them on a Facebook page?

20  A   Repeat the question?

21  Q   Sure.  Was there a time when you found out that Mr. Ortiz

22  had taken the photos that you had sent him by text and that he

23  posted those photos on a Facebook page?

24  A   I did find out afterwards.

25  Q   How'd you find that out?



1    A    I don't recall how I found out.

2    Q    Did you find it out from Mr. Gecewich?

3    A    No.  He -- I asked him -- well, he could have told me.

4    Q    Okay.  So Ricky Gecewich did not tell you that they had

5    been posted on the Facebook page?

6    A    Correct.

7    Q    Okay.  Did you ask Mr. Ortiz?

8    A    No, I did not.

9    Q    Did not.  But somehow you came to find out that these

10   photos found a way onto the public Facebook page, correct?

11        MR. RODRIGUEZ RITCHIE:  Objection.  Argumentative.  Asked

12   and answered.

13        JUDGE TRACY:  Overruled.

14   Q    BY MR. ROSS:  Is that a correct statement, sir?

15   A    Repeat the question?

16   Q    Sure.  Somehow you found out that the photos that you had

17   texted to Mr. Ortiz found a way onto the public Facebook page;

18   is that correct?

19   A    It's not correct.

20   Q    That's not correct.  Well, what part of that is incorrect?

21   A    The pictures were posted on the Facebook private group.

22   Q    They were on a private Facebook page?

23   A    Yes.

24   Q    I see.  Okay.  So you would agree with the statement that

25   it was posted on a Facebook page, correct?



www.escribers.net | 800-257-0885

1    A    Correct.

2    Q    Okay.  Now, did you tell Mr. Ortiz to post those photos on

3    a Facebook page?

4    A    No, I did not.

5    Q    Did Mr. Ortiz tell you that he was going to post them on a

6    Facebook page?

7    A    No, he did not.

8    Q    Have you ever heard the term "doxing" before?  Do you know

9    what doxing is?

10   A    Doxing?

11   Q    Yeah.  D-O-X-I-N-G.

12   A    No, I don't.

13   Q    Okay.  Can you think of any reason why it would have been

14   a bad idea to post those photos on a Facebook page?

15        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

16        JUDGE TRACY:  Sustained.

17        MR. RODRIGUEZ RITCHIE:  Calls for speculation.

18        JUDGE TRACY:  Sustained.

19   Q    BY MR. ROSS:  Can you think of any reason why Mr. Ives or

20   Mr. Pratt might have objected to their being posted on a

21   Facebook page?

22        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Calls for

23   speculation.

24        JUDGE TRACY:  Sustained.

25   Q    BY MR. ROSS:  I'd like you to take a look at General

22-60493.783



www.escribers.net  |  800-257-0885

1    Counsel's Exhibit 31, if you've got it in front of you, sir.

2    Do you have it?

3    A    31?

4    Q    Yes.  It's three pages in length.

5    A    I don't have it.

6    Q    This would have been correspondence you received from Mark

7    Lipscomb -- emails.  You were asked about it during --

8        JUDGE TRACY:  It was already admitted into the evidence

9    last hearing days.

10       MR. ROSS:  Yeah.  It was put into evidence.  And you

11   showed him a copy and testified about it.

12       MR. RODRIGUEZ RITCHIE:  Right.  I'm saying he's saying

13   doesn't have it in front of him.

14       MR. ROSS:  Oh, okay.

15       MR. RODRIGUEZ RITCHIE:  You're asking him about an exhibit

16   he doesn't have.

17       MR. ROSS:  Could he be provided a copy of the exhibit,

18   please?

19       MR. RODRIGUEZ RITCHIE:  Yeah.

20   Q    BY MR. ROSS:  Now, tell me, do you know who Mark Lipscomb

21   is?

22   A    No, I don't.

23   Q    Would it be correct to say that you've never talked to

24   Mark Lipscomb?

25   A    Never?  Correct.



1   Q    Okay.  And these are emails that you received from Mr.

2   Lipscomb on your Tesla -- at your Tesla email address?

3   A    Yes.

4   Q    Okay.  And also included in what Mr. Lipscomb sent you was

5   the document that is General Counsel's Exhibit 31-003?

6   A    Yes.

7   Q    Now, did you ever speak to anyone about why you were being

8   asked to electronically sign this document?

9   A    Can you repeat the question?

10  Q    Sure.  Did you ever ask -- actually, narrow the question.

11  Did you ever talk to your boss about why you were being asked

12  to sign this document?

13  A    No.

14  Q    Did you ever talk to anybody -- strike that.  Did you ever

15  talk to your HR business partner about why you were being asked

16  to sign this document?

17  A    No.

18  Q    Did you ever speak to Josh Hedges about why you were being

19  asked to sign this document?

20  A    No.

21  Q    Ever talk to Elon Musk about why you were being asked to

22  sign this document?

23  A    No.

24  Q    Now, when you went to work at Tesla, part of the

25  onboarding process involved your being given a bunch of



1   documents and being asked to sign them, correct?

2   A    Correct.

3   Q    Okay.  And would it be correct to say that one of those --

4   and there were lots of documents you had to sign; would that be

5   correct?

6   A    That there was -- there were a couple, yes.

7   Q    Yeah.  How many do you think there were?

8   A    Five pages.

9   Q    Okay.  And would it be correct to say that one of those

10  documents that you were required to sign to get hired was a

11  thing called the "Proprietary Information Agreement"?

12  A    I don't recall.

13  Q    You don't recall?

14  A    No.

15  Q    Okay.  When you say you don't recall, you're not saying

16  you weren't required to sign?  You're just saying you don't

17  recall?

18  A    I don't recall what all the papers that I signed.

19  Q    Okay.  Do you remember being required to sign something

20  that said I'll keep the confidences of the Company

21  confidential?

22       MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

23       MR. ROSS:  You want me to respond?

24       JUDGE TRACY:  Yes.

25       MR. ROSS:  Okay.  This document that is General Counsel's



1    31-0003 -- or 003, says that it is a reminder of your

2    confidentiality obligations and a request that people reaffirm

3    their commitment.

4         I want to know if he remembers the commitment he made when

5    he joined the Company to keep things confidential.

6         JUDGE TRACY:  I'll overrule the objection.

7         Go ahead and answer the question, please.

8         THE WITNESS:  Can you repeat the question?

9    Q    BY MR. ROSS:  Sure.  When you came to work to at Tesla,

10   you were required to sign some documents to get hired there,

11   right?  Correct?

12   A    Correct.

13   Q    Okay.  And would it be correct to say that one of the

14   things that you were required to sign and agree to when you

15   came to work there was a document that said you'll keep the

16   confidences on the Company confidential?

17        MR. RODRIGUEZ RITCHIE:  Objection.  Asked and answered.

18        JUDGE TRACY:  Yeah, overruled.

19        Go ahead.

20        THE WITNESS:  I don't recall signing affirm that you're

21   asking about.

22   Q    BY MR. ROSS:  Okay.

23   A    But whenever you get hired at a company, I'm pretty sure

24   you got to sign some confidentiality agreement like that.

25   Q    Okay.



1    A    I just don't recall if I did or not.

2    Q    Okay.  That's fair.

3    A    Yeah.  It was six years ago.

4    Q    Now, I think you said that sometime during the week of

5    November, you went on Workday and you electronically signed the

6    document that is General Counsel's Exhibit 31-003?

7    A    Yes.

8    Q    Okay.  And did you sign -- did you read it before you

9    signed it?

10   A    Yes.

11   Q    Okay.  Did you understand it when you signed it?

12   A    Yes.

13   Q    Did you have any questions about what it meant when you

14   signed it?

15   A    No.

16   Q    Now, you testified that during -- or on February 9th, you

17   took flyers to the plant -- these would be General Counsel 8.

18   I don't know if you have them in front of you or not.

19   A    8.

20   Q    That you went to breakrooms, hand them out in breakrooms

21   and left copies in breakrooms?

22   A    Yes.

23   Q    Okay.  And you did this during your non-work time?

24   A    Correct.

25   Q    Okay.  And the breakroom is a non-work area?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Okay.

3        JUDGE TRACY:  We're going to break in ten minutes for

4    lunch, so just --

5        MR. ROSS:  Break now?

6        JUDGE TRACY:  In ten minutes.

7        MR. ROSS:  I'd just as soon break now, if that's okay with

8    you.

9        JUDGE TRACY:  How much more do you have?

10       MR. ROSS:  Quite a lot.

11       JUDGE TRACY:  Okay.  All right.  So then let's go ahead

12   and -- if this is a good stopping point?

13       MR. ROSS:  It's fine.

14       JUDGE TRACY:  We'll start again at 2.  Okay.

15       All right.  So let's go ahead and go off the record.

16   (Off the record at 12:48 p.m.)

17       JUDGE TRACY:  Okay.  Let's go ahead and go on the record.

18       Okay.  I just want to remind you're still testifying under

19   oath.  Okay?

20       THE WITNESS:  Okay.

21       JUDGE TRACY:  All right.  Go ahead, please.

22       MR. ROSS:  Thank you, Your Honor.

23   Q    BY MR. ROSS:  All right.  Mr. Moran, before we broke for

24   lunch, we were talking about your distributing flyers in

25   breakrooms when you were not on the clock, and you were leaving



www.escribers.net | 800-257-0885

1    things in the breakrooms, which are not work areas; do you

2    remember that?

3    A    Yes.

4    Q    Okay.  And is it correct that you did what you did in the

5    breakroom during non-work times because the Company has a

6    policy that says that employees are free to solicit one another

7    during non-work time in non-work areas?  Is that why you did

8    that?

9         MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

10        MS. FEINBERG:  Objection.  Foundation.

11        MR. ROSS:  Strike that.

12   Q    BY MR. ROSS:  Did you know that the Company has a policy

13   that says that employees are free to leaflet things, distribute

14   things to one another, during non-work time in non-work areas?

15        MR. RODRIGUEZ RITCHIE:  Same objection.

16        JUDGE TRACY:  Overruled.

17        Go ahead.

18        THE WITNESS:  Can you ask the question again?

19   Q    BY MR. ROSS:  Sure.  Did you know that the Company has a

20   policy that allows employees to distribute things to one

21   another, to solicit one another, during non-work time in

22   non-work areas?

23   A    I'm not aware of any policy that --

24   Q    You're not aware of it?

25   A    Yeah.



www.escribers.net | 800-257-0885

1   Q    Okay.  Okay.  Would you be surprised to know that have

2   such a policy?

3        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

4        JUDGE TRACY:  Sustained.

5   Q    BY MR. ROSS:  Tell me, did you any guard ever confront you

6   for handing out leaflets in breakrooms during your non-work

7   time?

8        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

9        It's -- in terms of the relevance, I think it's really

10  broad.  There's only certain specific instances of distribution

11  of materials.

12       And so whether it's on some other dates at some other

13  points and he was confronted is of no relevance to the

14  allegations made in the complaint.

15       MR. ROSS:  Judge, you know, the claim that General Counsel

16  is making is that the Company restrained and coerced employees

17  in February, and later in May, by talking to employees and

18  saying glorious things to them while they were engaged in

19  leafleting.

20       Now, I think we're entitled to develop a record that

21  establishes -- first of all, we contest that version of the

22  facts.  So let's be clear about that.

23       But I think we're also entitled to develop a record to

24  show that the Company had this policy that I just described and

25  that it complied with this policy.



1    JUDGE TRACY:  Yeah.  And so I'm assuming this goes to your

2    defense of this case -- part of your defense, right?

3    MR. ROSS:  It does.

4    JUDGE TRACY:  So I'm going to overrule the objection.

5    So you're going to have to ask the question again.

6    MR. ROSS:  Sure.

7    Q    BY MR. ROSS:  Tell me Mr. Moran, did any guard ever

8    confront you while you were doing what you were doing in the

9    breakroom?

10   A    Not that I recall.

11   Q    Did any supervisor confront you while you were doing that?

12   A    No.

13   Q    Okay.  Did anybody ever give you a warning or a write up

14   for doing what you were doing in the breakroom?

15   A    No.

16   Q    Okay.  Okay.  Let's talk some about what happened on the

17   morning of February 10th, 2017, when you and Mr. Ortiz were

18   outside the plant leafleting.  Is that the time frame and place

19   in line?

20   A    Yes.

21   Q    Okay.  Now, I think you said that you went there before

22   you clocked in for the day?

23   A    Yes.

24   Q    Okay.  And you clock in about 5:25?

25   A    About 5:25.



1    Q    Okay.

2    A    In the morning.

3    Q    And how long were you out there leafleting?

4    A    Forty to 45 minutes.

5    Q    Okay.  And was Mr. Ortiz with you the whole time?

6    A    Yes.

7    Q    Okay.

8    A    After I left to clock in, he stayed with me.  He stayed

9    back in --

10   Q    But he was with you the whole time you were there?

11   A    Yes.  Yes.

12   Q    Okay.  All right.  Now, I think you said that the sun did

13   not come up when you were out there leafleting.  I know there

14   was some illumination out there, but it was pretty dark out

15   there; would you agree with me?

16   A    Yes.

17   Q    Okay.  And were you wearing a coat that day?  A jacket of

18   any kind?  Outerwear?

19   A    I don't remember.

20   Q    Okay.  How about Mr. Ortiz, was he wearing any outerwear?

21   A    I don't recall.

22   Q    How about the guards?  Were they wearing any outerwear?

23   A    I don't remember if they were.

24   Q    Okay.  Was your -- were you wearing a long sleeve shirt?

25   A    Short sleeve.



1    Q    Short sleeve.  In early February in -- at 4:30, 5 o'clock

2    in the morning, you were wearing short sleeves without -- and

3    you don't remember an outer garment of any kind?

4    A    Correct.

5    Q    Okay.  Okay.  Now, you testified that Mr. Sanchez came

6    down to -- strike that.  You were at door 1?

7    A    Yes.

8    Q    And Mr. Sanchez had been at door 2?

9    A    Yes.

10   Q    And you said that Mr. Sanchez came down to you.  And I

11   think your exact words were he had been harassed by a guard and

12   he had come down to door 1 to get away from that.

13   A    Correct.

14   Q    Okay.  Now, you gave the NLRB an affidavit on April 28th,

15   2017.  Do you remember doing that?

16   A    Yes.

17   Q    You gave it to Mr. Rodriguez Ritchie?

18   A    Yes.

19   Q    The gentleman on my right?

20   A    Yes.

21   Q    Okay.  Did you tell him that Mr. Sanchez said he had been

22   harassed, or did you tell him something else?

23   A    Can you repeat the question?

24   Q    Yeah.  Did you tell Mr. Rodriguez Ritchie that when Mr.

25   Sanchez came down, came over to you and Mr. Ortiz, did you say



1    that Mr. Sanchez said he had been harassed, or did you say that

2    he said something else about what the guard had done?

3    A    I -- yeah.  He -- when he came over here, he said he was

4    being harassed by -- he was trying to get away.

5    Q    Was that his exact word, "harassed"?  Do you remember his

6    exact word?

7    A    He was being harassed.  He said he was being asked

8    questions and harassed by security guards at door number 2.

9    Q    Okay.  Did the word harassment or harassed come out of his

10   mouth?

11   A    To the best of my knowledge, yes.

12   Q    It did.  Okay.

13        MR. ROSS:  Could the witness be shown the -- his affidavit

14   of April 28th?  I'd be happy to hand it him if you've got an

15   extra copy of it.

16        In fact, just to save time, you might also read the other

17   affidavit up there as well, please.

18        MR. RODRIGUEZ RITCHIE:  I'm handing the witness an

19   affidavit dated April 28th, 2017, and one dated November 14th,

20   2017.

21        JUDGE TRACY:  You can leave the other one right up here.

22   Q    BY MR. ROSS:  Let's shift gears a second before I ask you

23   questions about that affidavit.

24        Mr. Moran, you testified that -- about this conversation

25   that took place with Mr. Musk in a conference room on, I



1    believe, June 7th; remember that?

2    A    Yes.

3    Q    Okay.  And can you tell me when you first told the NLRB

4    about that conversation?

5    A    Sometime in May, 2018.

6    Q    And can you be more precise than sometime in May?

7    A    End of May.

8    Q    The end of May.  Okay.  And can you tell me where it was

9    that you told the NLRB about this?

10   A    Here at the building.

11   Q    1301 Clay Street here in Oakland?

12   A    Yes.

13   Q    At this building?

14   A    Uh-huh.

15   Q    Okay.  And who did you talk to?

16   A    Edris.

17   Q    Edris.  Okay.  And did you give the NLRB an affidavit, a

18   statement like the ones you have in front of you, with respect

19   to the conversation you say happened with Mr. Musk?

20   A    No, I did not.

21   Q    Who else was present when you met with Edris to tell him

22   about this?

23   A    I don't recall.

24   Q    Do you recall other people being there?

25   A    Yes.



www.escribers.net | 800-257-0885

1  Q    Who?

2  A    Like I said, I don't recall.

3  Q    Okay.  Is there anything you could look at that would

4  refresh your memory about who else was there?

5  A    I'm not sure if I understand your question.

6  Q    Well, let me ask you this, and was counsel was there, Ms.

7  Feinberg?

8  A    No.

9  Q    Was any other union counsel there?  Mr. Curry (phonetic)?

10  A    No.

11  Q    How about representatives from the Union?

12  A    I don't recall.

13  Q    And do you recall there being a conversation about there

14  being a subpoena issued by the Union to Elon Musk?

15       MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

16       JUDGE TRACY:  Sustained.

17       MR. ROSS:  Just a moment, Your Honor.

18  (Counsel confer)

19  Q    BY MR. ROSS:  Okay.  Let's go back to the affidavit that

20  you gave the NLRB on April 28th, 2017.  Correct me if I'm

21  wrong, Mr. Moran, but when you gave this affidavit, you told

22  Mr. Rodriguez Ritchie that Mr. Sanchez said he had been

23  confronted by a guard, not harassed by a guard, correct?

24  A    Yes.

25  Q    In fact, the word "harassment" doesn't appear in your



www.escribers.net | 800-257-0885

1   affidavit, does it?

2   A     Correct.

3   Q     Okay.  And indeed, contrary to what your testimony was

4   earlier, you didn't tell Mr. Rodriguez Ritchie when you gave

5   this affidavit that Mr. Sanchez said he was coming down to door

6   1 to get away from the guard, did you?

7   A     Can you repeat the question?

8   Q     Yeah.  Do you see anything in that affidavit that says

9   that Mr. Sanchez told you I'm coming down to door 1 to get away

10  from the guard?

11  A     Correct.

12  Q     It's not there, is it?

13  A     It's not.

14  Q     Now, you said that these two security guards came up in a

15  car?

16  A     Yes.

17  Q     A white car?

18  A     I don't recall the color.

19  Q     Do you remember the -- you said it was a Tesla.  Do you

20  remember what model it was?

21  A     No, I don't.

22  Q     You're certain they came up in a car?

23  A     Yes.

24  Q     Just as sure as you are certain of everything else you've

25  testified to here today?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Okay.  Do you see anything in that affidavit that mentions

3    them coming up in a car?

4    A    No, it does not.

5    Q    It does not.  Did they come up in a car, sir?

6    A    Yes.

7    Q    Okay.  Now, you say that two individuals got out of the

8    car and but that only one of the two spoke to you; is that

9    right?

10    A    Correct.

11    Q    Okay.  Now, having been out at the plant from time to

12    time, I know that there are guards who work for Tesla, and

13    there are guards who work for a security company that provides

14    contract security to the Company; do you understand that?  Or

15    is that your understanding?

16    A    I do understand that.  I do not -- I did not.

17    Q    I'll restate it.

18    A    Yeah.

19    Q    Do you understand that Tesla contracts with third parties

20    to provide security?

21        MR. RODRIGUEZ RITCHIE:  Objection.  Lacks foundation.

22        JUDGE TRACY:  Sustained.

23        MS. FEINBERG:  And vague as to time.

24        JUDGE TRACY:  Sustained.

25    Q    BY MR. ROSS:  Okay.  As of February, 2017, did you have



1    the understanding that Tesla used a third party security

2    company called "Securitas" to provide guards to the Company?

3         MR. RODRIGUEZ RITCHIE:  Same objection.  And it also

4    assumes facts not in evidence.

5         JUDGE TRACY:  So sustained.

6    Q    BY MR. ROSS:  Okay.  Tell me, guards that stand at gates,

7    or stand at the doors, they wear black and red shirts, right?

8    A    Yes.

9    Q    Okay.  The men you say who got out of that car that night,

10   did they have black and red shirts on?

11        MR. RODRIGUEZ RITCHIE:  Objection.  Misstates testimony.

12        JUDGE TRACY:  I'll overrule the objection.  I think he's

13   asking a question.

14        MR. ROSS:  Yeah.

15        MR. RODRIGUEZ RITCHIE:  Like he said, the testimony was

16   not that it occurred at night.

17        MR. ROSS:  I take it back.

18        JUDGE TRACY:  I'm sorry.  You're right.

19   Q    BY MR. ROSS:  I think 4:30, when it was pitch black out,

20   did the men have red and black shirts on?

21   A    I don't recall.

22   Q    Don't recall.  Now, the two individuals you spoke with who

23   got out of the car, did you know either of them?

24   A    No, I did not.

25   Q    Okay.  Did you ask their names?



1    A    No, I did not.

2    Q    Okay.  You asked the -- you said to the guard who came out

3    of the door later that you were going to get her name.  Why

4    didn't you get the name of the individuals who were talking to

5    you at that time?

6         MR. RODRIGUEZ RITCHIE:  Objection.  Argumentative.

7         JUDGE TRACY:  Overruled.

8         THE WITNESS:  They didn't -- the two guards did not

9    approach me rudely, I would say.

10   Q    BY MR. ROSS:  They were not rude?

11   A    No.

12   Q    Okay.  Why didn't you ask for their names?

13   A    Like I said, they didn't approach me as rude as she did.

14   Q    I see.  That's why you didn't ask their names?

15   A    Yes.

16   Q    Did it occur to you to ask their names?

17   A    No.

18   Q    It didn't.  Okay.  Did both guards talk, or just one?

19   A    To the best of my knowledge, I think just one of them was

20   talking.

21   Q    Just one.

22   A    Yeah.

23   Q    Can you describe that individual for me, please?

24   A    Male.

25   Q    Okay.  Can you be more specific?  How tall?



1  A    Dark clothing.

2  Q    Dark clothing.  Long or short hair?

3  A    I don't recall.

4  Q    Could he be of a particular ethnic group?

5  A    I don't recall that.  I don't.

6  Q    Have you seen that individual since that night?

7  A    No.

8  Q    Okay.

9      MR. ROSS:  May I approach?

10     JUDGE TRACY:  Yes.

11     MR. ROSS:  I've shown that.

12     MR. RODRIGUEZ RITCHIE:  Do you have a copy for us?

13     MR. ROSS:  That's the only copy I have.  And I would be

14 happy to make you a copy.

15     MR. RODRIGUEZ RITCHIE:  I don't --

16     MR. ROSS:  And you've already got a copy in the documents

17 we provided.

18     MR. RODRIGUEZ RITCHIE:  You're required to provide us with

19 a copy of anything you're going to show the witness, which you

20 haven't provided to us.  In addition --

21     MR. ROSS:  Well, then fine.

22     MR. RODRIGUEZ RITCHIE:  Let me please finish what I'm

23 saying.

24     In addition to the fact that you're intending to show him

25 a document that hasn't been authenticated at all, there's no

escribers

www.escribers.net | 800-257-0885

1    foundation for that document.

2        MR. ROSS:  I'm asking him to authentic it.  I'm asking to

3    identify the individual with whom I believe he spoke.

4        MR. RODRIGUEZ RITCHIE:  We don't --

5        MR. ROSS:  And I'll be happy -- if you let me use your

6    Xerox machine -- which I don't have and we're at a distinct

7    disadvantage by virtue of the fact we're having this hearing at

8    the Board, I'll be happy to make you a copy.

9        JUDGE TRACY:  Well, so the copies should have been made

10   ahead of time if you had intended to do this.

11       So since you don't have copies to give to the other

12   parties -- I mean that's part of standard litigation.

13       MR. ROSS:  Your Honor, if I may have a moment and be

14   allowed to use to Board's Xerox machine, I'll be happy to make

15   a copy.

16       JUDGE TRACY:  I mean I can't authorize that.  I can give

17   you a few minutes to make copies, but --

18       MR. ROSS:  Yes, Your Honor.

19       JUDGE TRACY:  But I can't get them to --

20       MR. ROSS:  I can certainly ask Mr. Rodriguez Ritchie for

21   the courtesy of allowing me to Xerox those.

22       JUDGE TRACY:  All right.

23       MR. ROSS:  Okay.  So may I make copies?

24       JUDGE TRACY:  So let's go off the record for five minutes.

25   (Off the record at 2:23 p.m.)



1          JUDGE TRACY:  Are we back on the record?  Okay.

2          Mr. Ross, go ahead, please.

3          MR. ROSS:  Thank you, Your Honor.

4     Q    BY MR. ROSS:  Now, I wasn't clear about your testimony,

5     Mr. Moran.  You said that the guard who spoke to you appeared

6     to be taking a picture of your badge?

7     A    Correct.

8     Q    Okay.  And he did this using a cell phone or a --

9     A    Yes.

10    Q    Okay.  And did he take a picture of the badge of Mr.

11    Ortiz?

12    A    I don't recall if he did.

13    Q    Or Mr. Sanchez?

14    A    I don't recall.

15    Q    Or of the other individual whose name you can't remember?

16    A    I don't remember if he did.

17    Q    All you remember is they took a picture of your badge?

18    A    Yes.

19    Q    Okay.  Now, have you told us everything that was said by

20    the guard to you?

21    A    Yes.

22    Q    And have you told us what was said to you by the guard in

23    the order of which it was said to you by the guard?

24    A    Are you asking me when2 it was -- the way I said it?

25    Q    Yeah.  You've told us that he said a lot of things.  Have



1    you described the conversation as it took place?

2    A    Yes.

3    Q    Just a moment.  Let me ask you, were you shown any photos

4    by General Counsel of individuals who may have been the guards

5    with whom you spoke that night?

6    A    No.

7    Q    Okay.  Now, the individual who you say came out of door 1,

8    I think you said that was the -- it was a woman; is that right?

9    A    Yes.  Yes.

10   Q    I think it was a guard who was assigned to man the door

11   inside the plant; is that right?

12   A    Correct.

13   Q    Okay.  She had a red and black shirt on, didn't she?

14   A    I don't recall if she had red on it, but that was it dark

15   clothing.

16   Q    It was dark.

17   A    Yeah.

18   Q    Okay.  Do you know what her name was?

19   A    No, I don't.

20   Q    Can you describe her aside from just being female?

21   A    No.

22   Q    Was she Caucasian?

23   A    I don't recall what race the female was.

24   Q    Was she?  Color hair.  What color hair did she have?

25   A    I don't recall her hair color.



1    Q    Okay.  And you were aware when she came, kind of hung out

2    of the door and said what she said to you?

3    A    I was on the ramp, at the end of the ramp.

4    Q    You were at the end of the ramp, and she was kind of

5    halfway in and halfway out of the door; is that right?

6    A    Yeah.  Like, I would say that.

7        MR. ROSS:  Okay.  What's the Employer's next in order?

8    I'm sorry.  I just don't recall.  Do we know?

9        THE COURT REPORTER:  I do not see any Employer exhibits on

10    the reporter's list.

11        MR. ROSS:  There are no Employer exhibits?  I just don't

12    recall.

13        THE COURT REPORTER:  No.

14        MR. ROSS:  I don't recall there being any.  So --

15        THE COURT REPORTER:  I don't see any.

16        MR. ROSS:  Okay.  Well, we'll call this one 1.  Is that

17    all right?

18        JUDGE TRACY:  I would go ahead and mark it.

19        THE COURT REPORTER:  And that would be Respondent.

20        MR. ROSS:  Respondent Exhibit 1.

21    **(Respondent Exhibit Number 1 Marked for Identification)**

22        MR. ROSS:  Okay, may I approach the witness, Your Honor?

23        JUDGE TRACY:  Yes.

24        MR. RODRIGUEZ RITCHIE:  Your Honor, the General Counsel

25    would object this, at this time.  This is a document that



www.escribers.net | 800-257-0885

1    should have been produced responsive to the General Counsel's

2    subpoena request.  It wasn't produced until Friday afternoon,

3    though.  It should have been produced at the beginning of this

4    hearing.  In addition, there is no foundation laid for the

5    document.  We continue our objection on that basis, unless

6    Respondent would agree that no adverse inference would be

7    sought due to a failure to identify the person who this

8    document purports to be.

9        MS. FEINBERG:  We'll join in that.

10        MR. ROSS:  Your Honor, the information has been provided

11    to the General Counsel.  There is absolutely no prejudice to

12    General Counsel by my showing the witness this document, and

13    indeed, I can understand where General Counsel would prefer

14    that the witness not have a chance to look at this and identify

15    the individual, but unfortunately, we're here litigating

16    whether something happened, who was involved, and this witness

17    is in a position to identify the individual with whom he says

18    he spoke, who right now is anonymous.

19        JUDGE TRACY:  And so is it true that the document -- this

20    particular what's marked as Respondent's Exhibit 1 was only

21    produced to the General Counsel on Friday?

22        MR. ROSS:  The photo was given to General Counsel before

23    the beginning of the trial.  It did not have the name Williams,

24    David on it, but this photo was given to General Counsel before

25    the trial, the record in this case opened.



www.escribers.net | 800-257-0885

1      MR. RODRIGUEZ RITCHIE:  This is precisely the issue that

2   we had already discussed on the record before where Respondent

3   was ordered to produce the pictures, in addition to the names

4   of the people.  The -- as this version is -- Respondent's

5   Exhibit 1.  That was not produced until Friday afternoon.

6      JUDGE TRACY:  So are you saying that you had the pictures,

7   but you didn't know who they were?

8      MR. RODRIGUEZ RITCHIE:  Correct, and we'd noted that

9   objection on the record before, and Her Honor ordered that the

10  pictures be produced with the names.

11     JUDGE TRACY:  Okay, so at this point, I mean, I'm going to

12  allow the Respondent to ask these questions because I don't

13  know where this is going, honestly, except that I do know what

14  had been discussed before.  I note for the record that you only

15  received the identity of these individuals with the photos this

16  past Friday.  And I'm assuming from what you're saying that,

17  therefore, you are precluded from talking to your witness here

18  about this individual, I'm guessing.  I don't know.  Again, I

19  don't know where this is going, so I'm going to go ahead and

20  allow Mr. Ross to ask these questions.  I'm assuming it's going

21  to start with a simple do you know who this?  Or is this the

22  person?

23     MR. ROSS:  Correct.

24     JUDGE TRACY:  So I'm going to overrule the objections in

25  terms of the witness testifying to the document.  We haven't

1    even gotten to the point of getting it in the record.  So start

2    there.

3         MR. ROSS:  Thank you, Your Honor.

4         JUDGE TRACY:  Start there.

5         MR. ROSS:  May I approach the witness?

6         JUDGE TRACY:  Yes.

7         MR. ROSS:  Okay, Mr. Moran, I hope you don't mind if I

8    stand next to you.

9         THE WITNESS:  Okay.

10   Q    BY MR. ROSS:  I'm showing --

11        JUDGE TRACY:  Well, the problem, again, is going to be the

12   getting the questions in the microphone.

13        MR. ROSS:  Yes.

14        JUDGE TRACY:  As she has trouble hearing you.

15        MR. ROSS:  Okay.  I will leave, and I'll go back and stand

16   by the mic.

17        JUDGE TRACY:  Thank you.

18   Q    BY MR. ROSS:  All right.  Mr. Moran, you have in front of

19   you a document that has been marked as Respondent's Exhibit 1.

20   It is a photograph of an individual named David Williams.  Is

21   that the guard who spoke to you that night?

22   A    I don't recall.

23   Q    You don't recall?

24   A    No.

25   Q    Okay.  That's fine.  Thank you.  Now I'd like you -- I'd



www.escribers.net | 800-257-0885

1   like to talk to you about your conversations with Mr. Gecewich.

2   During these conversations, were you keeping notes?

3   A    No.

4   Q    Okay.  Did you record the conversation in any way?

5   A    No.

6   Q    Let's say, with your cell phone?  Or --

7   A    No.

8   Q    Okay.  Now while you were talking with Mr. Gecewich, he

9   had a laptop computer in front of him, didn't he?

10  A    Yes.

11  Q    Okay, and as you and he spoke, he was typing on that

12  laptop computer, correct?

13  A    Yes.

14  Q    Did you ever see what he typed on that laptop computer?

15  A    No, I didn't.

16  Q    Did you ever ask him what he was typing on the laptop

17  computer?

18  A    No.

19  Q    Did he tell you what he was typing?

20  A    No.

21  Q    Before you met Mr. Gecewich in the middle of September,

22  had you had any prior dealing with Mr. Gecewich?

23  A    No.

24  Q    Had you ever participated in any internal investigations

25  at Tesla?



1    A    No.

2    Q    Now as I understand it, you heard about these two

3    individuals, Pratt and Ives, being in Sacramento from Mr.

4    Ortiz?

5    A    Yes.

6    Q    Okay, and Mr. Ortiz asked you to find out if they were

7    really employees of the Company?

8    A    He asked me to look them up.

9    Q    Okay.  Did he say why he wanted you to look them up?

10   A    He just said that because they were in Sacramento speaking

11   against the bill.

12   Q    I see.  Did he tell you why he wanted you to identify,

13   tell you whether they were employees or not?

14   A    No.

15   Q    Did he ask you to make copies of their photos?

16   A    I don't recall.  I don't think he did.

17   Q    Okay.  Well, tell me, you looked them up on the work day,

18   and you saw their names, that they're really employees of

19   Tesla, right?

20   A    Correct.

21   Q    Okay, and didn't that give you the information he asked

22   you for -- yeah, they work here?

23   A    Yes.

24   Q    Okay.  And yet, you took pictures of their work day page,

25   right?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Why?  You already had the information you needed.  Why did

3    you make screenshots of their faces?

4         MR. RODRIGUEZ RITCHIE:  Objection.  Argumentative.

5         JUDGE TRACY:  Overruled.  Go ahead and answer the

6    question.

7         THE WITNESS:  I don't recall if he asked me for the

8    pictures.  I'd have to look over the text messages again.

9    Q    BY MR. ROSS:  I'm sorry.  I couldn't hear the last part?

10   A    I don't remember if he asked me for the pictures.  I think

11   he did, so that's why I sent them to him.

12   Q    I see.  So the reason you took the pictures was because

13   Mr. Ortiz asked for the pictures?

14   A    To the best of my knowledge, yes.

15   Q    Okay.

16   A    Yeah.

17   Q    If he hadn't have asked, you wouldn't have taken it?

18        MR. RODRIGUEZ RITCHIE:  Objection.  Calls for speculation.

19        MR. ROSS:  Is that right?

20        JUDGE TRACY:  Overruled.

21        THE WITNESS:  Correct.

22   Q    BY MR. ROSS:  Now you testified about the things that were

23   said by you and by Mr. Gecewich during the interview you had

24   with him.

25   A    Um-hum.



www.escribers.net | 800-257-0885

1    Q    Remember that?

2    A    Yes.

3    Q    Okay.  By the way, that conversation with Mr. Gecewich was

4    how long?

5    A    I -- 40 minutes to an hour.

6    Q    Forty minutes to an hour.

7    A    Yeah.

8    Q    Tell me the -- what you said.  That.  What he said and

9    what you said, are those the exact words that you and he said

10   to one another, or is that kind of a summary of what you

11   remember being said?

12   A    It's not what was all discussed.  It's a lot --

13   Q    I'm sorry?

14   A    It wasn't -- the testimony I gave wasn't all that was

15   discussed.

16   Q    Okay.

17   A    It was what I remember, to the best of my knowledge.

18   Q    Okay.  Is it an exact -- in terms of your description of

19   what you remember being discussed, are those the exact words

20   that you said and the exact words that Mr. Gecewich said to

21   you?

22   A    To best -- to my best, the best of my knowledge, yes.

23   Q    Okay.  Now why don't you take a look at the affidavit that

24   you gave to the NLRB on November 14th?  And I'm going direct

25   your attention to pages 6 and 7.  On page 6, beginning of line



1    13 through page 7, line 20.  Why don't you read that to

2    yourself?

3    A    13 to 20?

4    Q    Yeah.  Page 6, line 13 through page 7, line 20.

5    A    Okay.

6    Q    Have you had a chance to read it, sir?

7    A    Yes.

8    Q    All right.  Now when Mr. Rodriguez Ritchie was asking you

9    questions, and I think he -- you were asked, or you said that

10   Ricky said, "Do you know Richard Ortiz?" and you testified,

11   "Yes.  He is a coworker and a member of the Union organizing

12   committee."  Do you remember that testimony?

13   A    Yes.

14   Q    Okay.  Now I'd like you to take a look at page 7, lines 10

15   and 11, and correct me if I'm wrong, but you made no mention of

16   Mr. Ortiz's involvement with the Union when Ricky asked you who

17   he was; isn't that correct?

18   A    Correct.

19   Q    Okay, so when you testified earlier that you told Ricky

20   that Mr. Ortiz was part of the Union, told that to the judge,

21   you were in error, correct?

22   A    Repeat the question.

23   Q    Yeah.  You testified earlier that when Ricky said to you,

24   do you know Ortiz, you said, yeah, I know him.  And what you

25   testified to was you told him -- you told us, I told Gecewich



www.escribers.net | 800-257-0885

1    that Ortiz was a coworker and a member of the Union organizing

2    committee.  You remember that testimony you said today?

3    A    Correct.

4    Q    Okay.  Your affidavit doesn't make any mention of his

5    being part of the Union, does it?

6    A    Correct.

7    Q    Okay.  Now which was right, what you said today or what's

8    in your affidavit?

9         MR. RODRIGUEZ RITCHIE:  Objection.  Argumentative.

10        JUDGE TRACY:  Over --

11        MR. ROSS:  Withdraw the question.

12   Q    BY MR. ROSS:  Now is it correct, also, that you told the

13   NLRB when you gave this affidavit that none of the stuff you

14   had in your affidavit were exact quotes, but they were your

15   best recollection of what was said?

16   A    Correct.

17   Q    Okay.  Has your memory gotten better of what was said

18   since you gave this affidavit?

19   A    After talking about incidents over and over, yes, your

20   recollection comes back.

21   Q    So you have a better memory today than you did on November

22   14th?

23        MS. FEINBERG:  Objection.  Argumentative.

24        JUDGE TRACY:  Overruled.

25        THE WITNESS:  I mean, once you go over and over again, you



1    start to remember little things about --

2    Q    BY MR. ROSS:  Going over and over it with whom?

3    A    Reading the affidavit, going over it with counsel.

4    Q    Which counsel?

5    A    Edris.

6    Q    I see.  So Mr. Rodriguez made you have a better memory; is

7    that right?

8        MR. RODRIGUEZ RITCHIE:  Objection.  Misstates the

9    testimony.  Argumentative.

10       MR. ROSS:  Withdraw the question.

11       MR. RODRIGUEZ RITCHIE:  Harassing.

12   Q    BY MR. ROSS:  Now let me ask you this.

13       MS. FEINBERG:  Ditto.

14   Q    BY MR. ROSS:  When you saw Mr. Gecewich later -- strike

15   that.  Do you remember at the end of your conversation with Mr.

16   Gecewich, the first one you had with him, him thanking you for

17   your honesty?

18   A    Yes.

19   Q    Okay.   That was something counsel -- the General Counsel

20   didn't ask you about.  You remember him saying, thanks for

21   being so honest?

22   A    He said something about thank you for your testimony.

23   Q    Did he say?  Did he thank you for your honesty?

24   A    The first meeting?

25   Q    Yes.



1    A    To the best of my knowledge, yes.

2    Q    Okay.  Now I think you said that you saw him again on

3    October 19th in a conversation that was attended by Mr.

4    Gecewich and Emma Cruz?

5    A    Yes.

6         MR. RODRIGUEZ RITCHIE:  Objection.  Vague as to him.

7         MR. ROSS:  I beg your pardon?

8         JUDGE TRACY:  Him.  Him is referring to Mr. Gecewich?

9         MR. ROSS:  Yes.

10        JUDGE TRACY:  Is that correct?

11        MR. ROSS:  Yeah.

12        JUDGE TRACY:  Okay.

13   Q    BY MR. ROSS:  Did you understand my question, Mr. Moran,

14   or do you want me to state it again?

15   A    Please state it again.

16   Q    Sure.  You met with Mr. Gecewich and Ms. Cruz on October

17   19th, right?

18   A    Yes.

19   Q    Okay, and where was that meeting?

20   A    In a conference room inside the Tesla factory plant.

21   Q    Do you know where?

22   A    It was somewhere upstairs.

23   Q    Somewhere upstairs.

24   A    Um-hum.

25   Q    Would this have been in the north administration building



1    where the meeting took place or in the plant?

2    A    It wasn't -- it wasn't that far.  It was next to GA

3    upstairs.

4    Q    Okay.  Now is it true that during this meeting Mr.

5    Gecewich told you that management respected your honesty in

6    this case?

7    A    Correct.

8    Q    And that because you were being so honest you were only

9    going to get a warning?

10   A    Correct.

11   Q    And that you were being warned to use work day for

12   work-related purposes only?

13   A    Yes.

14   Q    And that you would later receive an email confirming what

15   you and he had talked in that meeting?

16   A    Correct.

17   Q    Okay, and you did, in fact, get that email?

18   A    Yes, I did.

19        MR. ROSS:  Okay.  Does he have General Counsel's 27 in

20   front of him?

21   Q    BY MR. ROSS:  I don't mean to talk about you like you're

22   not here.  Sorry about that, Mr. Moran.  Do you have General

23   Counsel's Exhibit 27?

24   A    Yes.  This.

25   Q    You do have it.  Great.  Thank you.  Now I want to



1    understand what happened here.  As I understand it, you gave --

2    you presented a document to Mr. Hedges that looks like General

3    Counsel's Exhibit 27?

4    A    Repeat the question.

5    Q    Sure.  General Counsel's Exhibit 27.  You gave Mr. Hedges

6    a document consisting of pages that look like General Counsel's

7    Exhibit 27, right?

8    A    Correct.

9    Q    Okay.  And you gave that to him on January 6th?

10   A    It was not January 6th.

11   Q    I misspoke.  June 20 -- June 6th?

12   A    Yes.

13   Q    Okay.  Thank you for the correction.  This would have been

14   the day before you spoke with Mr. Musk?

15   A    Yes.

16   Q    Okay, and what you gave Mr. Hedges consisted of, would you

17   say, 20 pages that look like General Counsel's Exhibit 27?

18   A    Roughly around 20 pages, yes.

19   Q    Okay, and had a bunch of signatures on that document?

20   A    Yes.

21   Q    Okay.  Did -- and all those signatures that you gave to

22   Mr. Hedges, they were signatures that had been signed on the

23   document by the individuals shown on the document; is that

24   right?

25   A    Yes.



1   Q    Okay.  There were no electronic signatures given, were

2   there?

3   A    Hmm.  I don't recall.

4   Q    Don't recall.  Okay.  So you met with Mr. Hedges and then

5   you sent Mr. Hedges an email; is that right?

6   A    Correct.

7   Q    Okay, and the email you sent him had the petition attached

8   to it?

9   A    Those?

10  Q    Yeah.

11  A    No, they do not.

12  Q    Okay.  What was attached to the petition?  Or I'm sorry.

13  What was attached to the email, if anything?

14  A    It was just the article that we -- that I delivered to

15  him.  That we delivered to him.

16  Q    The article.  What article are you talking about?

17  A    A health and safety petition.

18  Q    Is it an exhibit that you have in front of you?

19  A    Yes.

20  Q    What exhibit number is it to?

21  A    It is 29.

22  Q    29.  Well, I'm looking at 29.  I see the email that you

23  sent to Mr. Hedges at 6:38 on June 6th.  I don't see an article

24  that's attached to it.  Is there an article attached to it?

25  A    Exhibit 29-003.



1    Q    Okay.  That's an article?  Or is that what you gave Mr.

2    Hedges before?

3    A    Yes.  We delivered this letter, along with the petitions.

4    Q    Okay.

5    A    Yeah.  On June 6th.

6    Q    So when you met with Mr. Hedges face-to-face and gave him

7    the petition, you also gave him General Counsel's Exhibit

8    29-003 through 29-005?

9    A    Yes.

10    Q    Okay.  And then you emailed that to him, along with the

11    email that begins at the bottom of General Counsel's Exhibit

12    29-002; is that right?

13    A    Yes.

14    Q    Okay.  And the first page of 29-001, do you understand

15    that to be Mr. Hedges' written response to what you emailed to

16    him on June 6th?

17    A    Yes.

18    Q    Is that the only response you received from Mr. Hedges

19    concerning your email to him on June 6th?

20    A    The only response?  Yes.

21    Q    You didn't receive anything between June 6th and June

22    14th?

23    A    Are you talking about a second response?

24    Q    I'm asking you whether between the time you emailed this

25    to Mr. Hedges on June 6th at 6:38 and the time he sent you a



1  response on June 14th at 4:55 in the afternoon, did you receive

2  any response from Mr. Hedges in writing between those two

3  documents?

4  A    If I recall correctly, I believe he did respond a few days

5  after we delivered the petition, stating that he received it

6  and he was going to review it and send me a response.

7  Q    Okay.  Any other response from Mr. Hedges?

8  A    I don't recall.

9  Q    Okay.  All right.  Now Ms. Toledano.  I think you said she

10  was the chief people officer at Tesla?

11  A    Yes.

12  Q    Okay, and do you know when she took on that job?

13  A    Not exactly, no.

14  Q    Do you know how long she'd been in that job before you

15  spoke with her on June 7th?

16  A    Exactly, no.

17  Q    Okay.  Before you spoke with her on June 7th, had you ever

18  talked with her?

19  A    I don't recall.

20  Q    Um-hum.  Had you ever met with her?

21  A    Before June 7th?

22  Q    Um-hum.  Yes.

23  A    I don't think so.

24  Q    I'm sorry?

25  A    I don't think I met her before June 7th.



1    Q    Okay.  And after June 7th, did you have occasion to meet

2    with her?

3    A    Yes.

4    Q    You met with her June 8th, didn't you?

5    A    I believe it was June 8th.  It was --

6    Q    Okay.

7    A    It was at a meeting, yes.

8    Q    And after June 8th, did you meet with her?

9    A    Gaby.  Gaby.  I don't think I did, no.

10   Q    Okay.  Now you met with Mr. Rodriguez Ritchie and those

11   other people who you can't remember and told them about this

12   conversation you had with Mr. Musk and Ms. Toledano.  About a

13   year had passed between the time of the conversation and the

14   time you told the NLRB about this conversation; is that right?

15        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

16        MR. ROSS:  It's preliminary, Your Honor.

17        JUDGE TRACY:  Preliminary?

18        MR. ROSS:  It's preliminary to subsequent questions.

19   Q    BY MR. ROSS:  A year had passed between when you spoke to

20   Mr. Musk and when you told Mr. Rodriguez Ritchie about this,

21   right?

22        JUDGE TRACY:  So --

23        MR. RODRIGUEZ RITCHIE:  Same objection.

24        JUDGE TRACY:  Yeah.  So the objection is overruled.  Go

25   ahead.



1        THE WITNESS:  About less than a year, yes.

2    Q    BY MR. ROSS:  Excuse me?

3    A    About a year, yes.

4    Q    About a year.  Okay.  And during that year your memory of

5    the conversation improved?

6    A    A little bit.

7    Q    A little bit.

8    A    A little bit, yeah.

9    Q    I see.  Again, with the help of General Counsel, the

10   conversation got better?

11       MR. RODRIGUEZ RITCHIE:  Objection.  Argumentative.

12   Assumes facts not in evidence.

13       MR. ROSS:  Withdraw the question.

14   Q    BY MR. ROSS:  Tell me, Mr. Vega -- he was at this meeting?

15   A    Yes.

16   Q    Mr. Vega still work at Tesla?

17   A    Yes.

18   Q    Um-hum.  Have you talked over this conversation with Mr.

19   Vega?

20   A    Yes.

21   Q    When?

22   A    I don't recall.  It was -- this --

23   Q    Before or after you told Mr. Rodriguez Ritchie about the

24   conversation?

25   A    I -- it was maybe in the beginning of the year?

22-60493.824



1    Q    Beginning of the year?

2    A    Yeah.

3    Q    And since then, have you talked to Mr. Vega about the

4    conversation?

5    A    Yes.

6    Q    When?

7    A    We -- I don't recall.  I don't recall.

8    Q    Before or after you spoke with Mr. Rodriguez Ritchie for

9    the first time about this conversation?

10    A    I want to say after.

11    Q    After.

12    A    Yeah.

13    Q    When after?

14    A    I don't.  I don't recall.  Yeah.

15    Q    Um-hum.  How many times have you talked to Mr. Vega about

16    this conversation since you first told the NLRB about it?

17    A    Once.

18    Q    Once.  You and he compared notes during that conversation

19    about what happened?

20    A    We talked about the meeting.

21    Q    Talked about the meeting.

22    A    Yeah.

23    Q    You told him what you remembered; he talked to you about

24    what he remembered?

25    A    Yes.


www.escribers.net | 800-257-0885

1    Q    Okay.  And that's how your memory has gotten better, by

2    talking to Mr. Vega about the conversation?

3    A    No.  We're just sharing notes and what was said in that

4    meeting.

5    Q    Um-hum.  Can you think of anything else that has made your

6    memory of that conversation better, aside from talking to Mr.

7    Vega?

8    A    Yes.

9    Q    What?

10   A    Just thinking about the meeting.

11   Q    Just thinking about it?

12   A    Yes.

13   Q    Anything else?

14   A    No, that's it.

15   Q    That meeting took how long?

16   A    Less than half hour.

17   Q    How much less than a half hour?

18   A    Ten minutes.

19   Q    Ten minutes.  Okay.  It was 10 minutes long or 10 minutes

20   less than a half an hour?

21   A    It was -- the meeting was between 15 and 30 minutes, yeah.

22   Q    Fifteen and 30 minutes.  And have you told us everything

23   that you can recall being said during that meeting?

24   A    Yes.  To the best of -- to my knowledge, yes.  Everything

25   I recalled, yes.



www.escribers.net | 800-257-0885

1    Q    Um-hum.  The words that you say you said in that meeting,

2    all right -- is that an exact description of the words you

3    used?

4    A    Yes.

5    Q    Exact?  You have an exact memory of what was said in that

6    meeting?

7    A    The important detail -- details that surprised me, yes.

8    Q    And the words that you've assigned to Mr. Musk being said,

9    are those the exact words he used?

10   A    Yes.

11   Q    And same with Ms. Toledano?

12   A    Yes.

13   Q    Good.  How about Mr. Vega, same exact words?  The exact

14   words that Mr. Vega spoke -- you've described those?

15   A    They're not exact.  I might have missed a "the" or "and",

16   but yes.

17   Q    Other than that, they're exact?

18   A    Yes.

19   Q    Okay.  And you have this memory, exact words that were

20   said a year after the fact, with no notes, nothing to refresh

21   your memory other than you thought about the conversation, and

22   you talked to Mr. Vega?

23   A    Yes.

24        MR. RODRIGUEZ RITCHIE:  Objection.  Argumentative.

25        MR. ROSS:  Thank you.



www.escribers.net | 800-257-0885

1      MR. RODRIGUEZ RITCHIE:  Harassing.

2      JUDGE TRACY:  Overruled.

3  Q   BY MR. ROSS:  Now as that meeting with Ms. Toledano and

4  Mr. Musk was breaking up, did she say we're going to set up a

5  meeting tomorrow about safety?

6  A   I don't recall her saying that.

7  Q   You don't recall her saying that?

8  A   Correct.

9  Q   But you do recall there was a meeting the next day about

10 safety; is that right?

11 A   Can you repeat the question?

12 Q   Yeah.  You don't recall Ms. Toledano saying we're going to

13 have a meeting tomorrow about safety?

14 A   Right.

15 Q   You do, though, remember that the next day there was a

16 meeting about safety?

17 A   Correct.

18 Q   At 1:00 in the afternoon?

19 A   Correct.

20 Q   Where was it?

21 A   Training room at the north end.

22 Q   Okay.  And by the way, is it correct that as you and Mr.

23 Vega were leaving the room, Ms. Toledano left the room with you

24 and spoke to you in Spanish?

25 A   Hmm.  I don't recall.



www.escribers.net | 800-257-0885

1    Q    Do you speak Spanish?

2    A    Yes.

3    Q    Does Mr. Vega speak Spanish?

4    A    I'm not sure if he does.

5    Q    Okay.  By the way, during -- I know I'm skipping around.

6    I apologize.  It's just something that occurred to me.  Let's

7    talk about your conversation with Mr. Gecewich.  I think you

8    said something to the effect that he had mentioned that the

9    pictures that you had screenshot had gone somewhere?

10        MR. RODRIGUEZ RITCHIE:  Objection.  Vague as to time.

11   There were multiple conversations with Mr. Gecewich.

12        MR. ROSS:  The first conversation.

13        JUDGE TRACY:  So again, I'm going to sustain the

14   objection.  That was the question I was wondering myself.

15   Please clarify which meeting.

16        MR. ROSS:  Yeah, sure.

17   Q    BY MR. ROSS:  You met with Mr. Gecewich, I think you said,

18   in early October; that was your first conversation?

19   A    Correct.

20   Q    Okay, and during that conversation, he mentioned that the

21   screenshot you'd taken had gone somewhere or had been seen

22   somewhere?

23   A    Correct.

24   Q    Okay.  And do you remember asking him whether that was bad

25   or not?



1    A    Yes.

2    Q    Why did you ask him that?

3    A    Because he mentioned they got out somewhere in public, and

4    I just wanted to see if they, you know, if they were posted --

5    you know, in a bad way.

6    Q    Were you worried that it might have been used in a bad

7    way?

8    A    Correct.

9    Q    Okay.  And at the time, you knew Mr. Ortiz had those

10   screenshots, right?

11   A    Correct.

12   Q    Were you worried that Mr. Ortiz might have used those

13   screenshots in a bad way?

14       MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

15       JUDGE TRACY:  Sustained.

16   Q    BY MR. ROSS:  By the way, after you spoke with Mr.

17   Gecewich the first time, did you talk to Mr. Ortiz about your

18   conversations with Mr. Gecewich?

19   A    I don't recall if I did or not.

20   Q    Do you remember him telling you that he had actually

21   posted those photos on a Facebook page?

22   A    Repeat the question.

23   Q    Did Mr. Ortiz tell you that he had taken the screenshots

24   you gave him and posted them on a Facebook page?

25   A    I don't recall him telling me that.



1    Q    But you heard that from someplace?

2    A    Yes.

3         MR. ROSS:  Could we take a five-minute break, please?

4         JUDGE TRACY:  How much longer do you have?

5         MR. ROSS:  About another 15 minutes.

6         JUDGE TRACY:  Okay.  So let's take a five-minute break.

7         MR. ROSS:  Thank you.

8         JUDGE TRACY:  So let's go off the record.

9         THE WITNESS:  I can use the restroom?

10        JUDGE TRACY:  Yes.

11        THE WITNESS:  All right.

12        JUDGE TRACY:  And same instructions.

13        THE WITNESS:  Good.  Yeah.

14        JUDGE TRACY:  Thank you.

15   (Off the record at 3:12 p.m.)

16        JUDGE TRACY:  Let's go ahead and go back on the record.

17        All right.  Go ahead, please.

18        MR. ROSS:  Thank you.

19   Q    BY MR. ROSS:  Mr. Moran, did I understand you to say that

20   you follow Mr. Musk on Twitter?

21   A    I'm not sure if I follow him.

22   Q    Okay.  Well, aside from -- I'll strike that.  Do you have

23   a Twitter account?

24   A    Yes.

25   Q    And could you tell me what your Twitter handle is or



1    Twitter account is --

2    MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

3    MR. ROSS:  -- and name is?

4    JUDGE TRACY:  Sustained.

5    Q    BY MR. ROSS:  Now it's your testimony.  I'd like you to

6    look at General Counsel's Exhibit 56.

7    A    Okay.

8    Q    You got it in front of you?

9    A    Yes.

10   Q    And do I understand you to be testifying that you saw this

11   document several days or a couple days after May 20 using

12   Twitter, your Twitter account?

13   A    Yes.

14   Q    I see.  And if you don't follow Mr. Musk on your Twitter

15   account, how did you come to see that document on your Twitter

16   account?

17   A    I don't recall how I --

18   Q    You can't remember?

19   A    Yeah, I can't remember.

20   Q    Okay.  Tell me, do you recall seeing on your Twitter

21   account an exchange that took place on Twitter on May 22 to the

22   effect of an individual named Eric Brown sent Mr. Musk a tweet,

23   "Hi, Elon.  Why would they lose stock options?  Are you

24   threatening to take away benefits from unionized workers?"

25        To which Mr. Musk responded, "No.  UAW does that.  They



1  want divisiveness and enforcement of two-class wards and

2  commoner system.  That sucks.  U.S. fought War of Independence

3  to get rid of a two-class system.  Managers and workers should

4  be equal with easy movement either way.  Managing sucks

5  between.  Hate doing it so much."

6      Did you see that tweet?

7      MR. RODRIGUEZ RITCHIE:  Objection.  On several bases.

8  First objection that it exceeds the scope of direct.  Second

9  objection is to the relevance of some other tweet on some other

10 day.  Third, if he's going to be asked about a particular

11 document, then he would need to be shown the document to be

12 asked about something contained in the document.

13     JUDGE TRACY:  Okay.

14     MR. ROSS:  Okay, I'll withdraw the question.

15     JUDGE TRACY:  So --

16 Q   BY MR. ROSS:  Did you ever see any other tweets from Mr.

17 Musk, aside from this one?

18     JUDGE TRACY:  And this one is?

19     MR. ROSS:  General Counsel's Exhibit 56.

20     THE WITNESS:  Yes.

21 Q   BY MR. ROSS:  I see.  Did you see any other tweets from

22 Mr. Musk within a two- to three-day period on General Counsel's

23 Exhibit 56?

24 A   Repeat the question.

25 Q   Yes.  Within two to three days after seeing General



1    Counsel's Exhibit 56, did you see any other tweets to or from

2    Mr. Musk?

3        MR. RODRIGUEZ RITCHIE:  I'm going to object again as to

4    relevance.

5        JUDGE TRACY:  Sustained.

6    Q    BY MR. ROSS:  Did someone tell you to look on your Twitter

7    account to see this?

8    A    No.

9    Q    General Counsel Exhibit 56?

10   A    No.

11   Q    You're sure of that?

12   A    Correct.

13   Q    Okay.

14   (Counsel confer)

15       MR. ROSS:  All right.  Could the witness be shown the

16   formal documents?

17       MR. RODRIGUEZ RITCHIE:  I would object to that.  If

18   there's a particular document exhibit that you want to use --

19       MR. ROSS:  Yes, absolutely.

20       MR. RODRIGUEZ RITCHIE:  -- then please identify that, so I

21   can lodge an objection if I want to.

22       MR. ROSS:  Can he be handed, though, the packet of

23   documents, and I will describe to him and to you --

24       MR. RODRIGUEZ RITCHIE:  Why the documents?

25       MR. ROSS:  -- the documents I'm referring to?



1    MR. RODRIGUEZ RITCHIE:  I would object to him being handed

2    a copy of the entirety of the formal papers.

3        JUDGE TRACY:  So the formal papers have been introduced up

4    through certain number from the last four days.  They have not

5    yet been entered into the record in this case for things in

6    between.

7        MR. ROSS:  I understand that.

8        JUDGE TRACY:  So are you?  Which exhibit are you asking?

9        MR. ROSS:  I want to show him some tweets that are in the

10   formal documents, Your Honor.

11       JUDGE TRACY:  Right, so actually refer to them, so we know

12   what to show him.

13       MR. ROSS:  Okay.  If you look at 1-(QQQ), more

14   specifically, 1-(QQQ), Exhibit 2.

15   (Counsel confer)

16       JUDGE TRACY:  So --

17       MR. ROSS:  1-(QQQ).

18       JUDGE TRACY:  Again, 1-(QQQ) has not been entered into

19   this record yet.

20       MR. ROSS:  I understand that.  It's simply to let General

21   Counsel know what I'm referring to, and then I'll -- I guess,

22   I'll mark the document.

23       MR. RODRIGUEZ RITCHIE:  Well, I'd still object on

24   relevancy grounds regarding --

25       MR. ROSS:  I can't?



1      MR. RODRIGUEZ RITCHIE:  I'd still object on relevancy

2   grounds as to this document.

3      JUDGE TRACY:  Okay.  So here's what I'd like to do.  Could

4   you please leave the room?

5      THE WITNESS:  Sure.

6      JUDGE TRACY:  Thank you.

7   (Counsel confer)

8      JUDGE TRACY:  So I just thought, and we're still on the

9   record, if you could just sort of explain what is the point of

10  all this?  Because 1-(QQQ), as I'm looking at it, is your --

11  the declaration that you all submitted in support of the motion

12  for summary judgment.

13     MR. ROSS:  Correct.

14     JUDGE TRACY:  So that obviously is a formal paper because

15  that's a pleading in this proceeding.

16     MR. ROSS:  Correct.

17     JUDGE TRACY:  However, the authenticity of it or anything

18  like that has not been established in this record.  It's in

19  here, and it -- not yet, but it will be because it's a

20  pleading, not because it's authenticated.

21     MR. ROSS:  Well, I'm going to move it into evidence, at

22  this time, Your Honor.  General Counsel Exhibit 1, the formal

23  documents.  I'm asking that they be admitted into the record,

24  at this time.  So a part of the record so there can't be any

25  dispute about whether it's going to be part of the record or

eScribers
www.escribers.net | 800-257-0885

1    not.  As far as the so-called authenticity of it --

2        JUDGE TRACY:  Um-hum.

3        MR. ROSS:  -- if the witness has seen it, I'm going to ask

4    him whether he's seen it before or if he hasn't.  If he has

5    seen it before, fine.  If he hasn't, that's fine.

6        JUDGE TRACY:  Okay, and so what is?  There is this

7    objection that I keep hearing from the General Counsel about

8    relevance.  So what is the relevance of it to this proceeding?

9        MR. ROSS:  The relevance is, is it provides a context

10   within which the tweet that they're basing their complaint

11   upon -- it gives it context.  It provides a complete or a more

12   complete picture of what was said by Mr. Musk with respect to

13   this subject matter, and therefore, it is highly relevant.

14       MR. RODRIGUEZ RITCHIE:  Our position certainly would be

15   the opposite.  We're talking about something that in the first

16   instance, we're talking about a page of another document that

17   there is no way this person would be able to authenticate

18   because this witness has not submitted this declaration in

19   support of this document.  He has no knowledge about a motion

20   for summary judgment that Respondent had filed, so it would

21   never be able to be authenticated by this person, this exhibit,

22   in this document.

23       In the second instance, when a tweet that occurred -- the

24   one I'm looking at -- several days or a few days after the

25   tweet at issue, it really has no bearing with regards to the

escribers
www.escribers.net | 800-257-0885

1     actual tweet at issue.

2          MR. ROSS:  We couldn't --

3          MR. RODRIGUEZ RITCHIE:  It also exceeds the scope of the

4     direct.

5          JUDGE TRACY:  Okay, so here's what we will do.  You don't

6     need to move this in yet.  Let's -- this formal document,

7     1-(QQQ).  It's already been marked.  It's just a matter of

8     procedure of putting it all in.  I'd rather it come in together

9     as one big group.  It's already been marked.  If you want to

10    ask him questions about it, go ahead.  However, I would agree

11    that I'm very dubious of the relevance of it to this

12    proceeding, because also the way that Twitter works is it's

13    not -- as far as I understand, and I'm not technical person

14    either -- it's not like this email chain.  It's various

15    comments, and just I don't know how to describe it.  But if you

16    feel that you want to ask him whether he is aware of it?

17    Again, I don't know the relevance, but to allow you to put on

18    your defense, I'll allow it, but you need to keep it limited.

19         MR. ROSS:  It will be.

20         JUDGE TRACY:  Okay.  So that's how we're going to proceed.

21    You can put your objection again.

22         MR. RODRIGUEZ RITCHIE:  Thank you.

23         JUDGE TRACY:  I mean, we're on the record still.  We're

24    still on the record right now, but when he asks, you can

25    object, state your objection, but that's how we'll proceed to



www.escribers.net | 800-257-0885

1    just get through this, at this point, okay?

2        Would somebody mind going to get him?

3        MR. RODRIGUEZ RITCHIE:  I'll get him.

4        JUDGE TRACY:  So he'll need to see 1-(QQQ).

5        MR. ROSS:  Could he be provided the document, or may I

6    approach him?  And --

7        JUDGE TRACY:  I think that the General Counsel has a copy

8    of --

9        UNIDENTIFIED SPEAKER:  Exhibit 2, 1-(QQQ)?

10       JUDGE TRACY:  It's -- yeah, it's marked at this point as

11   General Counsel's Exhibit 1-(QQQ).  It has not been admitted

12   into evidence yet, but for purposes of identification, if you

13   could please show the witness 1-(QQQ).

14       MR. RODRIGUEZ RITCHIE:  So I'm showing him Exhibit 2

15   that's contained in 1-(QQQ).

16       JUDGE TRACY:  Okay.  Is that what?

17       MR. ROSS:  No, I'm going to have others.  I'm going to ask

18   him about -- in the same exhibit or in the same -- yeah, in the

19   1-(QQQ).

20       JUDGE TRACY:  Okay.  So why don't we start with the first

21   one?

22       MR. ROSS:  That's fine.

23       JUDGE TRACY:  Which is?

24       MR. ROSS:  If he could be shown Exhibit 2, please.

25       JUDGE TRACY:  Okay.



www.escribers.net | 800-257-0885

1      MR. RODRIGUEZ RITCHIE:  Okay, so what I'm handing him is a

2    document.  At the top it says "Eric Brown", and it's dated

3    10:51 a.m. on May 22nd, 2018.

4      JUDGE TRACY:  Okay.  All right.

5      MR. ROSS:  Thank you.

6      JUDGE TRACY:  Go ahead.

7    Q    BY MR. ROSS:  All right.  Mr. Moran, you have in front of

8    you a document that comes from General Counsel's Exhibit

9    1-(QQQ).  It is Exhibit 2 attached to that document.  Have you

10   ever seen any portion of this page?

11      MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

12      MS. FEINBERG:  I share that objection.

13      JUDGE TRACY:  All right.  And then, if you could just

14   state for the record the relevance of --

15      MR. ROSS:  Yeah.  It goes to the context surrounding

16   General Counsel's Exhibit 56, Your Honor.

17      JUDGE TRACY:  Okay.  So I will overrule the objections.

18   Again, I -- as I said before on the record, the relevance is

19   yet to be seen.  However, for the Respondent's defense here,

20   I'm going to allow the questions.

21      So if you could go ahead and answer his question.  You

22   might need it repeated.

23      THE WITNESS:  Yes.

24    Q    BY MR. ROSS:  You've seen this before?

25    A    Can you repeat the question?



1    Q    Oh.  Have you ever seen any portion of this page?

2         MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

3         JUDGE TRACY:  So again, I'm going to overrule the

4    objection.

5         THE WITNESS:  I've seen this tweet.

6    Q    BY MR. ROSS:  You've seen this tweet?

7    A    Yes.

8    Q    The document that is Exhibit 2, you've seen the tweet that

9    Mr. Musk did on May 22?

10   A    Yes.

11   Q    Okay.  And did you see the text that appears immediately

12   above it?

13        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

14        JUDGE TRACY:  Overruled.

15        THE WITNESS:  Yes, I saw that tweet also.

16   Q    BY MR. ROSS:  All right.  And around when did you see that

17   tweet?

18        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

19        JUDGE TRACY:  Overruled.

20        THE WITNESS:  I don't recall.

21        MR. ROSS:  Okay.  Could the witness be shown Exhibit 3 to

22   1-(QQQ)?

23        MR. RODRIGUEZ RITCHIE:  Okay.  So for the record, I'm

24   going to state my objection to him being shown this document on

25   relevancy grounds and on foundation grounds.



1          JUDGE TRACY:  Okay.

2          MR. RODRIGUEZ RITCHIE:  And on him showing him a document,

3     a one-page document, Exhibit 3 to 1-(QQQ).  At the top it says

4     Parker Malloy.

5          JUDGE TRACY:  All right.  So the objection is noted for

6     the record; however, it's overruled.

7          Go ahead and ask your question please, Mr. Ross.

8     Q    BY MR. ROSS:  Yes.  Tell me, Mr. Moran, you have in front

9     of you what is Exhibit 3 to 1-(QQQ), have you ever seen a

10    portion of this page?

11         MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

12         JUDGE TRACY:  Overruled.

13         THE WITNESS:  I've seen this tweet.

14    Q    BY MR. ROSS:  Okay.  And did you see the tweet that came

15    from an individual named Parker Malloy?

16         MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

17         JUDGE TRACY:  Overruled.

18         THE WITNESS:  Can you repeat the question?

19    Q    BY MR. ROSS:  Did you see the tweet that appears at the

20    top of the page of Exhibit 3 from Parker Malloy?

21         MR. RODRIGUEZ RITCHIE:  Same objection.

22         JUDGE TRACY:  Overruled.

23         THE WITNESS:  If I recall correctly, what I seen -- when I

24    saw this tweet, this was right above it.

25    Q    BY MR. ROSS:  Okay.



1    JUDGE TRACY:  And so let the record reflect that the

2    witness is referring to he -- it seems as though he saw Mr.

3    Musk's May 23, 2018, 1:23 p.m. tweet and then also, at the same

4    time, saw this Parker Malloy tweet at the same time.  Is that

5    correct?

6        THE WITNESS:  Right.

7        MR. ROSS:  Okay.  Could the witness be shown Exhibit 4 to

8    1-(QQQ), please?

9        MR. RODRIGUEZ RITCHIE:  And for the record, I'm going to

10   object to the witness being shown this document on relevancy

11   grounds and on foundation grounds.  I'm showing him Exhibit 4

12   from 1-(QQQ), GC's 1(-QQQ), at the top it says Jack Allison

13   date May 23rd.

14       JUDGE TRACY:  All right.  And again, the objection is

15   noted for the record; however, it's overruled.

16       Mr. Ross, go ahead with your question.

17   Q   BY MR. ROSS:  All right.  Sir, you have in front of you

18   what is Exhibit 4 to 1(QQQ), have you ever seen this page?

19       MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

20       JUDGE TRACY:  Overruled.

21       THE WITNESS:  If I recall correctly, I believe I saw this

22   tweet also.

23   Q   BY MR. ROSS:  All right.  Thank you, sir.  Now, I'd like

24   you to take a look at 1-(QQQ), Exhibit 1.

25       MR. ROSS:  Could he be shown that, please?



www.escribers.net | 800-257-0885

1     MR. RODRIGUEZ RITCHIE:  Once again, Counsel for the

2  General Counsel would object on relevance and foundation

3  grounds.

4     I'm showing the witness Exhibit 1 to 1-(QQQ), which at the

5  top states David Atkins.

6     JUDGE TRACY:  Okay.  So the objection is noted for the

7  record.  It's overruled.

8     So Mr. Ross, please ask your question.

9  Q  BY MR. ROSS:  All right.  Now, Mr. Moran, you've been

10  handed Exhibit 1 from General Counsel's exhibit 1-(QQQ), have

11  you ever seen this page before?

12     MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

13     JUDGE TRACY:  Overruled.

14     THE WITNESS:  I saw this tweet also.

15  Q  BY MR. ROSS:  So the tweet that you saw that is Exhibit 1,

16  included the entry made by Mr. Atkins and then Mr. Musk's

17  response; is that correct?

18     MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

19     JUDGE TRACY:  Overruled.

20     THE WITNESS:  I believe you're correct.

21     MR. ROSS:  Okay.  May I have just a moment off the record?

22  I'd like to talk to Mr. Morris for just a moment.

23     JUDGE TRACY:  All right.  So hopefully, this is the end of

24  this.

25     MR. ROSS:  We're near the end of the ordeal.  Yes.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  All right.  So let's go off the record for

2    just a couple of minutes here.

3      MR. ROSS:  Thank you.

4    (Off the record at 3:41 p.m.)

5      JUDGE TRACY:  Okay.  Let's go ahead and go back on the

6    record.

7    Q    BY MR. ROSS:  Mr. Moran --

8      JUDGE TRACY:  Hold on.  Hold on.  Hold on.  Hold on.  All

9    right.  Go ahead.

10   Q    BY MR. ROSS:  Mr. Moran, these tweets that you say you saw

11   that were Exhibits 1 through 4 of General Counsel's Exhibit 1-

12   (QQQ), you saw them as part of a tweet string; isn't that

13   correct?

14     MR. RODRIGUEZ RITCHIE:  Objection.  Relevance, vague, as

15   to string, and lacks foundation.

16     JUDGE TRACY:  Sustained.

17   Q    BY MR. ROSS:  Okay.  One last question.  Is it correct

18   that when you last spoke to Ricky Gecewich and he informed you

19   that the Company appreciated your honesty and that you were

20   going to receive a warning, you told him, I guess it pays to be

21   honest.  Did you tell him that?

22   A    I don't recall.

23   Q    You did know that Mr. Ortiz had been fired when you saw

24   Mr. Gecewich the second time, correct?

25     MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.



1        JUDGE TRACY:  Sustained.

2    Q    BY MR. ROSS:  When you saw Mr. Gecewich the second time,

3    did you know that Mr. Ortiz had been fired for lying during the

4    investigation?

5        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

6        JUDGE TRACY:  Overruled.

7        THE WITNESS:  I don't recall if I knew at that time that

8    he got fired already.

9    Q    BY MR. ROSS:  Okay.  And you don't recall saying I guess

10   it pays to be honest to Mr. Gecewich?

11       MR. RODRIGUEZ RITCHIE:  Objection.  Asked and answered.

12       JUDGE TRACY:  Sustained.

13       MR. ROSS:  Nothing further.

14       JUDGE TRACY:  Okay.

15       MR. RODRIGUEZ RITCHIE:  May I have a moment?

16       JUDGE TRACY:  Yes.  Okay.  Let's go off the record.

17   (Off the record at 3:47 p.m.)

18       JUDGE TRACY:  Mr. Rodriguez, it's to you.

19       MR. RODRIGUEZ RITCHIE:  I have no redirect questions.

20       JUDGE TRACY:  Okay.  And --

21       MS. FEINBERG:  No.  No questions.

22       JUDGE TRACY:  All right.  All right.  Well, thank you very

23   much.  I appreciate your time.  Please don't discuss your

24   testimony with anyone until after the close of this hearing.

25       MR. MORAN:  Okay.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  Okay.

2    MR. MORAN:  Thank you.

3    JUDGE TRACY:  You can leave all those papers there.

4    MR. MORAN:  All right.

5    JUDGE TRACY:  And let's --

6    MR. RODRIGUEZ RITCHIE:  I'd ask for the record that the

7    affidavits be returned to me.

8    JUDGE TRACY:  Okay.  And a couple are up here.

9    MR. RODRIGUEZ RITCHIE:  Yes.

10   JUDGE TRACY:  Okay.

11   MR. ROSS:  Thank you, Mr. Moran.

12   MR. RODRIGUEZ RITCHIE:  And I've been handed four

13   affidavits from Respondent, back into my custody.

14   JUDGE TRACY:  Okay.  All right.  So let's go off the

15   record.

16   (Off the record at 3:49 p.m.)

17   JUDGE TRACY:  All right.  Let's go on the record.

18   If you could go ahead and stand up, please?

19   Could you raise your right hand?

20   Whereupon,

21                    **JONATHAN GALESCU**

22   having been duly sworn, was called as a witness herein and was

23   examined and testified as follows:

24   JUDGE TRACY:  Okay.  Go ahead, have a seat and state your

25   name for the record.



1        MR. GALESCU:  Jonathan Galescu.

2        JUDGE TRACY:  Okay.  So I just have really brief

3   instructions for you, which is that this does not -- this

4   microphone does not amplify your voice.

5        MR. GALESCU:  Okay.

6        JUDGE TRACY:  So relax, it'll pick your voice up.

7   However, because we have a lot of people in the room, acoustics

8   aren't that great, you're going to really have to speak up.

9   There may be occasions where you are asked to repeat your

10  testimony, just to make sure that everyone heard it correctly.

11  Okay?

12       MR. GALESCU:  Okay.

13       JUDGE TRACY:  All right.  Mr. Rodriguez Ritchie, go ahead,

14  please.

15                    **DIRECT EXAMINATION**

16  Q    BY MR. RODRIGUEZ RITCHIE:  Mr. Galescu, are you familiar

17  with a company called Tesla?

18  A    Yes.

19  Q    And what is Tesla?

20  A    Tesla is an electric car company.

21  Q    And where is Tesla located?

22  A    Fremont, California.

23  Q    Do you work for Tesla?

24  A    Yes.

25  Q    Do you work at the Tesla facility located at 45500 Fremont



1    Boulevard in Fremont, California?

2    A    Yes.

3    Q    So from now on, I'll refer to that as the Tesla Freemont

4    facility.  Okay?  What kind of facility does Tesla operate at

5    Tesla Fremont?

6    A    We make electric cars there.

7    Q    And how long have you worked there?

8    A    Four years, next month.

9    Q    What is your job at Tesla Freemont?

10   A    Manufacturing technician.

11   Q    What department is that in?

12   A    I'm in body in white 2.

13   Q    What shift do you work?

14   A    Second.

15   Q    And what are those hours, generally?

16   A    5:50 p.m. to 5:50 a.m.

17   Q    Could you describe your duties at Tesla, generally?

18   A    I do body work, I handle the dent repairs, scratches,

19   broken hardware, welding.

20   Q    In terms of the overall production of a car at Tesla

21   Freemont, where does your job fit into that production?

22   A    We are -- we are EOL, end of line, so we are one of the

23   last few stations that the car goes through before it ships to

24   paint.

25   Q    Is your job part of general assembly?



www.escribers.net | 800-257-0885

1     A     No.

2     Q     As an employee of Tesla do you have access to a system

3     called Workday?

4     A     Yes.

5     Q     What is Workday?

6     A     It's an online portal that we can view our paystubs, view

7     other employees, documents that have been uploaded.

8     Q     Those are documents pertaining to yourself?

9     A     Yes.

10    Q     Did Tesla provide you with login credentials to gain

11    access to Workday?

12    A     Yes.

13    Q     Has anyone ever spoken with you about using Workday?

14    A     No.

15    Q     Have you ever been given any policies regarding using

16    Workday?

17    A     No.

18    Q     Did anyone ever tell you that there were limitations to

19    the use of Workday?

20    A     No.

21    Q     Any supervisors, managers, or HR people ever tell you that

22    you could only use Workday for legitimate and official business

23    purposes?

24    A     No.

25    Q     Are you familiar with an organization referred to as the



1    United Auto Workers?

2    A    Yes.

3    Q    So from here on out, I may refer to them also as the UAW.

4    Okay?  Who was the UAW?

5    A    An organization to help workers form their union.

6    Q    And are you represented as the UAW as your collective

7    bargaining representative in your work at Tesla Freemont?

8    A    No.

9    Q    During your employment with Tesla Freemont did you ever

10   participate in any activities with the UAW?

11   A    Yes.

12   Q    Mr. Galescu, besides the charge that you filed in this

13   case, have you filed any complaints, outside of the National

14   Labor Relations Board, against Tesla?

15   A    Yes.

16   Q    And will they affect your ability to tell the truth here

17   today?

18   A    No.

19   Q    I'm going to show you what's been admitted as General

20   Counsel's Exhibit 31.

21        MR. RODRIGUEZ RITCHIE:  I'm sorry, Mr. Ross, I'm showing

22   you the document.

23        MR. ROSS:  Okay.  Thanks.

24   Q    BY MR. RODRIGUEZ RITCHIE:  Take a moment to look at it and

25   let me know when you're ready.



1    A    All right.

2    Q    I'm going to ask you to look at page 3 of General

3    Counsel's Exhibit 31.

4    A    All right.

5    Q    The document on page 3 of General Counsel's Exhibit 31, do

6    you recognize that document?

7    A    Yes.

8    Q    Did you ever sign this document?

9    A    Yes.

10    Q    How?

11    A    Physically and electronically.

12    Q    Which one did you do first?

13    A    Physically.

14    Q    Do you remember about when you signed it physically?

15    A    On November of 2016.

16    Q    When you signed it, physically, did you meet with any

17    human resources individuals?

18    A    Yes.

19    Q    Who?

20    A    David Zweig.

21    Q    Was anyone else present?

22    A    Yes.

23    Q    Who?

24    A    Another associate, Oscar.

25    Q    Do you know Oscar's last name?



1    A    No.

2    Q    And how did it come to happen that you signed the document

3    in General Counsel's -- page 3 of General Counsel's Exhibit 31

4    with Mr. Zweig?

5    A    It was brought up in a pre-start meeting.  I was in

6    another area doing containments, and when I finally got back to

7    my area, it was brought up to us that who hasn't signed it

8    needs to go over there.  And me and Oscar were the only two

9    that weren't -- that hadn't signed it.

10   Q    And when you say it was brought up, who brought it up?

11   A    My supervisor, Armando Rodriguez.

12   Q    Now, do you recall where you were when you met with Mr.

13   Zweig?

14   A    Yeah, it was in the conference room, the body in white

15   conference room.

16       MR. RODRIGUEZ RITCHIE:  And for the record, Zweig is Z-W-

17   E-I-G.

18   Q    BY MR. RODRIGUEZ RITCHIE:  Now, when you met with Mr.

19   Zweig, did he speak with you about the agreement?

20   A    Yes.

21   Q    What did he say?

22   A    That this is the new confidentiality agreement, and that

23   we're here to sign it, look it over, if you have breached any

24   of this we will give you forgiveness, just write what you had

25   done on the form.  And going forward this -- this is the new



www.escribers.net | 800-257-0885

1    confidentiality agreement.  If you don't choose to sign it, the

2    old one will stay in effect.

3    Q    Did you speak to Mr. Zweig during your meeting with him?

4    A    Yes.

5    Q    What did you say to Mr. Zweig?

6    A    I asked him who he was.  He told me he was the new HR

7    business partner.  And then I asked him about the other two

8    ladies that was in his position, former, and he said they are

9    just no longer with us.

10   Q    Did you sign the agreement when you met with him?

11   A    Yes.

12   Q    Now, after you signed the agreement, what, if anything,

13   did you do next?

14   A    I wanted to take a photo of it for my records.

15   Q    And what do you mean by you wanted to take a picture of

16   it?  Did you do anything?

17   A    Yeah, I went to reach for my phone to pull up the camera

18   and then I was and then I was stopped.

19   Q    Can you show us what you did?

20   A    I basically reached in my pocket, pulled out my phone, and

21   midway I was stopped.

22   Q    And what do you mean by you were stopped?

23   A    They told me I wasn't allowed to take a photo of it and

24   they will update it to our Workday once it's ready.

25   Q    After Mr. Zweig told you that it would be updated when it



1    was ready, did Mr. Zweig say anything else?

2    A    No.

3    Q    Did you say anything else?

4    A    No.

5    Q    At that point was the meeting over?

6    A    Yes.

7    Q    So I want to ask you about the location of the conference

8    room.  Did it have a name?

9    A    It was either Hookey, I think it was Hookey.

10   Q    Is the conference room located inside of the facility?

11   A    Yes.

12   Q    Can you describe the conference room to us?

13   A    So you have the body in white conference room, which is

14   the big office space and then there's two smaller conference

15   rooms, Hookey and something else.  I should know.

16   Q    Is the conference room -- are cars made in the conference

17   room?

18   A    No.

19   Q    And any production equipment, is that located in the

20   conference room?

21   A    No.

22   Q    Any production materials, located in the conference room?

23   A    No.

24   Q    When you tried to take the picture of the document, can

25   you show us in what direction your phone was pointed?



1    A    I was always pointing -- the camera was pointing

2    downwards.

3    Q    And downwards, was on the table?

4    A    Yeah, from my pocket to the table.

5    Q    In the direction that your phone was pointed, were they

6    any production materials or equipment located on the table?

7    A    No.

8    Q    Okay.  Now, you testified that you signed it

9    electronically as well?

10   A    Yes.

11   Q    About when did you do that?

12   A    Probably a week or so later, after we signed it

13   physically.

14   Q    And did anyone ask you to sign it again a week later?

15   A    Yes.

16   Q    Who?

17   A    Armando Rodriguez.

18   Q    And when did he ask you to do that?

19   A    It was brought up again in our pre-start meeting.

20   Q    How many other individuals were in the pre-start meeting?

21   A    About 30

22   Q    Did he just ask you to sign it?

23   A    No, everybody had to resign it.

24   Q    And did you sign it the same day?

25   A    Yes.



www.escribers.net | 800-257-0885

1    Q    And how did you sign it electronically on that day?

2    A    He pulled us one by one to his computer, at column S02, he

3    made us log in to our Workday, he pulled up the document and we

4    had to click to sign it again.

5    Q    After you signed the document electronically, did you go

6    back to work?

7    A    Yes.

8    Q    I'm going to hand you what's been pre-marked as General

9    Counsel's Exhibit 33.  Let me know when you're ready.

10   A    I'm ready.

11   Q    Do you recognize General Counsel's Exhibit 33?

12   A    Yes.

13   Q    What is it?

14   A    It's our business card for a campaign.

15   Q    And have you ever handed out the business card in General

16   Counsel's Exhibit 33?

17   A    Yes.

18   Q    At Tesla Freemont?

19   A    Yes.

20   Q    When did you begin handing these out?

21   A    February or March.

22   Q    Of which year?

23   A    2017.

24   Q    So for demonstrative purposes, I'm going to hold up a

25   business card that's the same as General Counsel's Exhibit 33.



www.escribers.net | 800-257-0885

1    MR. RODRIGUEZ RITCHIE:  Mr. Ross, would you like to take a

2    look at it?

3    MR. ROSS:  You're going to make this an exhibit, or is

4    it -- that's what appears on this, right?

5    MR. RODRIGUEZ RITCHIE:  Yes.

6    MR. ROSS:  Okay.  That's fine.  Thank you.

7    Q    BY MR. RODRIGUEZ RITCHIE:  I just want to be clear for the

8    record, when you say business card, we're referring to the size

9    of a regular business card, about an inch and a half by two

10    inches?

11    A    Yes.

12    Q    Okay.  Thank you.

13    MR. RODRIGUEZ RITCHIE:  At this time I'd like to move

14    General Counsel's Exhibit 33 into evidence.

15    JUDGE TRACY:  Any objections?

16    MR. ROSS:  Relevance?

17    MR. RODRIGUEZ RITCHIE:  He just testified that he was

18    handing these out.  And we're about to get to exactly what this

19    is about, which is about a distribution policy.

20    JUDGE TRACY:  Okay.  So the objection is overruled.

21    General Counsel's Exhibit number 33 is admitted into evidence.

22    **(General Counsel Exhibit Number 33 Received into Evidence)**

23    Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  I'm going to hand you

24    what's been admitted as General Counsel's Exhibit 35.  Do you

25    recognize General Counsel's Exhibit 35?



1    A    Yes.

2    Q    What do you recognize it to be?

3    A    It's our sticker for a campaign.

4    Q    Did you ever hand these stickers out at Tesla Freemont?

5    A    Yes.

6    Q    About when did you begin handing these out?

7    A    February, March.

8    Q    Of which year?

9    A    2017.

10   Q    The business cards in General Counsel's Exhibit 33, who

11   did you hand those out to, without naming names?

12   A    Other associates.

13   Q    And the sticker in General Counsel's Exhibit 35, without

14   naming names, who did you hand those out to?

15   A    Other associates.

16   Q    The exhibit in General Counsel's Exhibit 35, is that the

17   actual size of the sticker?

18   A    On this form?  No.

19        MR. RODRIGUEZ RITCHIE:  I'm holding for demonstrative

20   purposes the actual sticker.  And I'm handing it to you, Mr.

21   Ross.

22        MR. ROSS:  Thank you.

23   Q    BY MR. RODRIGUEZ RITCHIE:  The actual size, for the

24   record, is about one and a half by one and a half inches?

25   A    Yes.



1    Q    And do you recall the day of March 23, 2017?

2    A    Yes.

3    Q    Did you work on that day?

4    A    Yes.

5    Q    In March of 2017, who was you supervisor?

6    A    Armando Rodriguez.

7    Q    During March of 2017, did Armando Rodriguez participate in

8    any pre-start meetings with employees?

9    A    Yes.

10   Q    Can you tell us what a pre-start meeting is?

11   A    Pre-start meeting is just a meeting before shift to talk

12   about safety and production.

13   Q    Is this something that occurs with all the people on your

14   team?

15   A    Yes.

16   Q    Did a pre-start meeting occur on March 23, 2017?

17   A    Yes.

18   Q    About how many production or maintenance employees were

19   there?

20   A    Approximately 30.

21   Q    And was Mr. Armando Rodriguez present on March 23, 2017?

22   A    Yes.

23   Q    Did Mr. Rodriguez speak during the pre-start meeting on

24   March 23, 2017?

25   A    Yes.



1    Q    What did Mr. Rodriguez say?

2    A    He pulled his little black notebook out, and he said

3    stickers, pamphlets, and leaflets that's not approved by Tesla

4    leadership, can be, on the terms, be, basically, grounds of

5    termination.

6    Q    Did Mr. Rodriguez say anything else?

7    A    And it's an act of vandalism.

8    Q    Did any of the other employees say anything during the

9    meeting?

10   A    No.

11   Q    Did you say anything?

12   A    No.

13   Q    Did Mr. Rodriguez say anything else during the pre-start

14   meeting?

15   A    He asked if we had any questions.

16   Q    Did anyone respond?

17   A    No.

18   Q    After the pre-start meeting what, if anything, did you do?

19   A    We all went to work.

20   Q    Earlier you testified about General Counsel's Exhibit 33,

21   having passed those out in February or March of 2017.  Did that

22   begin prior to the pre-start meeting on March 23, 2017?

23   A    Yes.

24   Q    And earlier you also testified about the sticker in

25   General Counsel's Exhibit 35, having handed those out around



1    the same time period.  Was that also -- did that also begin

2    prior to the pre-start meeting on March 23, 2017?

3    A    Yes.

4    Q    Are you familiar with Cal OSHA 300 logs and 300X

5    summaries?

6    A    Yes.

7    Q    Could you describe what that is?

8    A    The OSHA 300 logs is a document that the Employer needs to

9    keep of all sickness and injuries that happens at Tesla.

10   Q    And what are the 300 summaries

11   A    It's a brief description of the employee, the incident,

12   and the location that the injury had -- had occurred.

13   Q    During your employment at Tesla have you ever requested a

14   Cal OSHA 300 logs and summaries?

15   A    Yes.

16   Q    Do you remember about when?

17   A    April.

18   Q    Of which year?

19   A    2017.

20   Q    Did you do them via email?

21   A    Yes.

22   Q    Who did you make the request to?

23   A    HR, HR generalist, Ms. Jannanus (phonetic), I'm sorry, I

24   don't know how to say her last name.  The safety

25   representative, Seth Woody -- no.  It was several people.



www.escribers.net | 800-257-0885

1    Q    Why did you make the request for those logs?

2    A    As an employee there, being injured, and seeing many

3    people getting injured, I wanted to inform our union this was a

4    good tool to help to see what was going on to help combat the

5    injury rate and inform our union.

6    Q    Did you make the request alone?

7    A    No.

8    Q    Who did you make the request with?

9    A    Richard Ortiz.

10   Q    Did you ever receive any responses to your request for the

11   Cal OSHA logs?

12   A    Yes.

13   Q    Was that via email?

14   A    Yes.

15   Q    What is your @tesla.com email address?

16   A    jgalescu@tesla.com.

17   Q    I'm going to show you what's been admitted as General

18   Counsel's Exhibit 16.

19        MR. ROSS:  Thank you.

20   Q    BY MR. RODRIGUEZ RITCHIE:  Take a look at it, let me know

21   when you're ready.

22   A    Yes.

23   Q    Do you recognize General Counsel's Exhibit 16?

24   A    Yes.

25   Q    What do you recognize it to be?



1     A     The email I had sent requesting the OSHA 300 logs.

2     Q     Did you send this from your @tesla.com email address?

3     A     Yes.

4     Q     And you sent this email on April 4, 2017, to Alexandra

5     Junnesco (phonetic), Josh Hedges, Brian Sherman,

6     safety@tesla.com, and hrreply@tesla.com?

7     A     Yes.

8     Q     Why did you send it to those people?

9     A     It was a little unclear who to send it to.

10    Q     If you look at page 3 of the document, underneath

11    sincerely it says Jonathan Galescu, Richard Ortiz?

12    A     Yes.

13    Q     Is this what you were referring to when you testified that

14    you sent the email with Mr. Ortiz?

15    A     Yes.

16    Q     You can go ahead and turn that over.  I want to show you

17    what's been admitted as General Counsel's Exhibit 17.

18          MR. RODRIGUEZ RITCHIE:  Showing Mr. Ross.

19          MR. ROSS:  Thank you.

20    Q     BY MR. RODRIGUEZ RITCHIE:  It's a 13 page document.  You

21    can look at it for a moment.

22    A     All right.

23    Q     Okay.  Do you recognize General Counsel's Exhibit 17?

24    A     Yes.

25    Q     What is it?



1    A    It was a reply back from David Zweig about the OSHA 300

2    logs.

3    Q    And do you recall receiving it on or about April 5, 2017?

4    A    Yes.

5    Q    And did was there an attachment in the email you received?

6    A    Yes.

7    Q    And is that attachment in this exhibit?

8    A    Yes.

9    Q    I want you to take a look at the attachment.  It appears

10   to start on page 2 of General Counsel's Exhibit 17, there's a

11   stamp on each of the pages that says confidential.  Do you see

12   that?

13   A    Yes.

14        MR. MORRIS:  Objection.  Vague and ambiguous.  There's

15   multiple references to confidential, I'm just asking him what

16   he's asking.

17        JUDGE TRACY:  If you could please clarify your question.

18        MR. RODRIGUEZ RITCHIE:  Sure.

19   Q    BY MR. RODRIGUEZ RITCHIE:  So on pages 2 through page 12

20   of General Counsel's Exhibit 17, in the center of the document,

21   slanted sideways, there's what appears to be a stamp with the

22   word, confidential, on the document.  Do you see that?

23   A    Yes.

24   Q    Was that stamp, confidential, the way you received it in

25   the attachment to the email you received?



1    A    Yes.

2    Q    In other words, you didn't add that stamp?

3    A    I did not add it.

4    Q    You can go ahead and turn that over.  I'm going to hand

5    you what's been admitted as General Counsel's Exhibit 18.

6         MR. RODRIGUEZ RITCHIE:  Which I'm showing it to Mr. Ross.

7         MR. ROSS:  Thank you.

8         MR. MORRIS:  Let me see it.

9    Q    BY MR. RODRIGUEZ RITCHIE:  It is a document with 216

10    pages.  Please take a moment to look at that and let me know

11    when you're ready.

12    A    Okay.

13        JUDGE TRACY:  Number 18, is that what you just --

14        MR. RODRIGUEZ RITCHIE:  Right.  General Counsel's Exhibit

15    18.

16        JUDGE TRACY:  Okay.

17    Q    BY MR. RODRIGUEZ RITCHIE:  Are you ready?

18    A    Yes.

19    Q    Okay.  Do you recognize General Counsel's Exhibit 18?

20    A    Yes.

21    Q    What do you recognize it to be?

22    A    The request of the OSHA forms, 300.

23    Q    Okay.  This document, it says, from David Zweig, sent

24    April 5, 2017 to Jonathan Galescu, jgalescu@tesla.com, do you

25    see that?



1    A    Yes.

2    Q    Is this a document you received you received from Mr.

3    Zweig on April 5, 2017?

4    A    Yes.

5    Q    And did it contain the attachment that's also part of

6    General Counsel's Exhibit 18?

7    A    Yes.

8    Q    Okay.  I want you to take a look at pages 2 through 127 of

9    General Counsel's Exhibit 18 and let me know when you've done

10   that.

11   A    Through -- you said 2 to what?

12   Q    127.

13   A    Okay.

14   Q    Okay.  So on pages 2 through 127 of General Counsel's

15   Exhibit 18, there is a slanted stamp that has the word

16   confidential on each of those pages.  Did you see that?

17   A    Yes.

18   Q    Was that confidential stamp on the documents when you

19   received them on April the 5th, 2017?

20   A    Yes.

21   Q    You didn't add the stamp?

22   A    I did not add the stamp.

23   Q    Okay.  You can go ahead and turn that over.  I'm going to

24   show you what's been admitted as General Counsel's Exhibit 20.

25        MR. RODRIGUEZ RITCHIE:  And I'm going to show Mr. Morris



1  General Counsel's Exhibit 20.

2  Q   BY MR. RODRIGUEZ RITCHIE:  Just take a look at it and let

3  me know when you're ready.

4  A   All right.

5  Q   Do you recognize General Counsel's Exhibit 20?

6  A   Yes.

7  Q   Is this an email that you received to your @tesla.com

8  email address?

9  A   No, I sent it.

10  Q   Or excuse me, that you sent from your @tesla.com email

11  address?

12  A   Yes.

13  Q   On or about April 13, 2017?

14  A   Yes.

15  Q   Did you cc Mr. Ortiz on this email?

16  A   Yes.

17  Q   If you look at the bottom it says, "Sincerely, Jonathan

18  Galescu", did you send this email on behalf of Mr. Ortiz as

19  well?

20  A   Yes.

21  Q   Okay.  You can go ahead and turn that over.  I'm going to

22  hand you what's been admitted as General Counsel's Exhibit 21.

23      MR. RODRIGUEZ RITCHIE:  And I'll show Mr. Morris a copy.

24  Q   BY MR. RODRIGUEZ RITCHIE:  Take a look at it and let me

25  know when you're ready.



www.escribers.net | 800-257-0885

1    A    All right.

2    Q    Is this an email that you received on April 14th from Mr.

3    Seth Woody to your @tesla.com email address?

4    A    Yes.

5    Q    Can you tell us who Mr. Seth Woody is?

6    A    He was a former EHS specialist, I think it's senior.  I'm

7    not really sure exactly his job title.

8    Q    What does EHS mean?

9    A    Environmental Health something, something.  I don't know.

10    Q    Do you understand whether or not that pertains to safety?

11    A    There's so many safety emails and chains, it's always been

12    confusing to know what and who to send what and what the

13    acronyms stand for.

14    Q    You can go ahead and turn that around.  Okay.  I'm going

15    to hand you what's been admitted as General Counsel's Exhibit

16    22.

17        MR. RODRIGUEZ RITCHIE:  Showing Mr. Morris.  It's a two

18    page document.

19    Q    BY MR. RODRIGUEZ RITCHIE:  Take a look at it and let me

20    know when you're ready.

21    A    All right.

22    Q    Do you recognize General Counsel's Exhibit 22?

23    A    Yes.

24    Q    What do you recognize it to be?

25    A    An email that I sent to Seth Woody.



1    Q    Did you send it on April 21, 2017?

2    A    Yes.

3    Q    From your @tesla.com email address?

4    A    Yes.

5    Q    You can go ahead and turn that over.  So I'm going to hand

6    you what was tentatively admitted as General Counsel's Exhibit

7    23.

8         JUDGE TRACY:  Whoever has that if you can mute it, whoever

9    keeps getting emails.

10        MR. ROSS:  I'm going to turn it off.  My apologies.

11        JUDGE TRACY:  That's okay.

12    Q    BY MR. RODRIGUEZ RITCHIE:  Pursuant to our discussions

13    last time, I retained a copy of General Counsel's Exhibit 23

14    and redacted the names on General Counsel's Exhibit 23, which I

15    have now.

16        MR. RODRIGUEZ RITCHIE:  I'm happy to show Mr. Morris the

17    prior version and this version first, if you'd like to review

18    that, before my showing it to the witness.

19        JUDGE TRACY:  Yeah.  Go ahead and just make sure that

20    they're --

21        MR. RODRIGUEZ RITCHIE:  I previously sent it to the

22    parties via email.

23        JUDGE TRACY:  Oh, the redacted version?

24        MR. RODRIGUEZ RITCHIE:  Yes.

25        JUDGE TRACY:  Mr. Morris or Mr. Ross, have you had a



1    chance to --

2        MR. MORRIS:  Can we take a quick look, please?  Thanks.

3        MR. RODRIGUEZ RITCHIE:  I'm handing them the redacted

4    version of this.

5        JUDGE TRACY:  Okay.

6        MR. ROSS:  I'm turning this off.  I apologize.

7    (Counsel confer)

8        MR. ROSS:  Okay.  Here you go.

9    Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  Mr. Galescu, so I'm

10   handing you a redacted version of General Counsel's -- what was

11   admitted as General Counsel's Exhibit 23.

12       MR. RODRIGUEZ RITCHIE:  For the record, Counsel for the

13   General Counsel has indicated this redaction with a black box

14   that says redacted.

15       JUDGE TRACY:  All right.  So this is previously admitted

16   or -- we said we would wait and hold off.  So any objections,

17   just to be clear, of General Counsel's Exhibit 23, that's

18   redacted, being admitted into evidence?

19       MR. MORRIS:  No.

20       MS. FEINBERG:  No objections.

21       JUDGE TRACY:  Okay.  So General Counsel's Exhibit 23 is

22   admitted into evidence and I think there's already a place for

23   it, but it was just waiting for the document.

24   **(General Counsel Exhibit Number 23 Received into Evidence)**

25       MR. ROSS:  So that's going to replace the current General



1    Counsel's Exhibit 23?

2         JUDGE TRACY:  It's just a piece of paper that says will be

3    admitted next session.

4         MR. ROSS:  That's fine.

5         JUDGE TRACY:  Yeah.

6    Q    BY MR. RODRIGUEZ RITCHIE:  And Mr. Galescu, do you

7    recognize General Counsel's Exhibit 23?

8    A    Yes.

9    Q    Is that an email you received from Mr. Seth Woody on April

10   28, 2017 to your @tesla.com email address?

11   A    Yes.

12   Q    If you look at the -- every page, except for page 1 of

13   General Counsel's Exhibit 23, were those documents that were

14   attached to General Counsel's Exhibit 23?

15   A    Yes.

16   Q    And with the exception of the names that I've redacted,

17   were those documents as you received them?

18   A    Yes.

19   Q    Okay.  You can go ahead and turn that over.  Do you

20   remember the day of May 24, 2017?

21   A    Yes.

22   Q    Where did you begin your day on May 24th?

23   A    I headed down to our -- to the UAW office that we have

24   located right around Tesla.

25   Q    Why did you go to the UAW office?



1  A    To see the report that we had put together about the --

2  our OSHA 300 logs and pick up flyers.

3  Q    After you picked up flyers, did you leave the UAW office?

4  A    Yes.

5  Q    Where did you go?

6  A    I went to Tesla.

7  Q    And what did you do, if anything, when you got to Tesla.

8  A    I began flyering.

9  Q    Okay.  I'm going to show you what's been admitted as

10  General Counsel's Exhibit 9.

11      MR. RODRIGUEZ RITCHIE:  Showing Mr. Morris.

12  Q    BY MR. RODRIGUEZ RITCHIE:  And when you're ready.

13  A    All right.

14  Q    Do you recognize General Counsel's Exhibit 9?

15  A    Yes.

16  Q    And earlier you testified that you picked up a flyer on

17  May 24, 2017, is that the document that's in General Counsel's

18  Exhibit 9?

19  A    Yes.

20  Q    Did you actually hand out flyers at the Tesla Freemont

21  facility on May 24th?

22  A    Yes.

23  Q    After you were done handing out flyers, what, if anything,

24  did you do?

25  A    I'm sorry, can you repeat that?  I didn't hear.


www.escribers.net | 800-257-0885

1   Q    After you were done handing out the flyers in General

2   Counsel's Exhibit 9, did you begin working?

3   A    Yes.

4   Q    You can go ahead and hand those documents back to me.  On

5   May 24, 2017 did you have any meetings with human resource

6   business partner Eliza Lipson and environmental health and

7   safety and sustainability specialist, Lauren Holcomb?

8   A    Yes.

9   Q    Did that happen at Tesla Freemont?

10  A    Yes.

11  Q    Where at Tesla Freemont did it happen?

12  A    In the body in white conference rooms.

13  Q    And who was present during this meeting?

14  A    Eliza and Lauren.

15  Q    Anyone else?

16  A    No.

17  Q    Okay.  And who spoke first during this meeting?

18  A    Eliza.

19  Q    What did she say?

20  A    She introduced her and Lauren.  She told me that this

21  conversation would not be recorded or videoed.

22  Q    Okay.  After she said that the conversation would not be

23  recorded or videoed, did Ms. Lipscomb say anything else?

24  A    Then she began to ask me a series of questions of the OSHA

25  300 logs.



1    Q    And what did Ms. Lipscomb ask you?

2    A    She asked me do I know anybody who was able to access the

3    OSHA 300 logs outside the system.

4    Q    Did you respond to her?

5    A    I said, no, just the information that was given to me and

6    I'm not answering any more questions without my representative.

7    Q    Okay.  After you told her you weren't answering any more

8    questions without your representative, did Ms. Lipscomb ask you

9    anything else?

10   A    She goes, do you know -- did you or anyone else access the

11   OSHA 300 logs other than the -- outside the system, other than

12   the information we've given you.

13   Q    Did you respond to her?

14   A    I said no, and I'm not answering any more questions

15   without my representative.

16   Q    Okay.  After you said that you weren't answering any

17   questions for the second time, did Ms. Lipscomb ask you

18   anything else?

19   A    She asked me, did you access the OSHA 300 logs outside the

20   system.

21   Q    And did you respond to her?

22   A    I mean, I said no, and I'm not answering any more

23   questions without my representative.

24   Q    After you said you weren't answering any questions without

25   your representative for the third time, did Ms. Lipscomb ask



www.escribers.net | 800-257-0885

1    you anything else?

2    A    She asked me who did I give them to.

3    Q    Did you respond to her?

4    A    I said I'm not answering any more questions.

5    Q    After you said you weren't answering any questions again,

6    did Ms. Lipscomb ask you anything else?

7    A    She asked me who are my representatives.

8    Q    Did you respond to her?

9    A    I replied with, someone outside this building.

10   Q    Did Ms. Lipscomb say anything else during the meeting?

11   A    No, she pretty much wrapped it up.

12   Q    Did you say anything else during the meeting?

13   A    I got up and I asked them for their names, again, and

14   their position.

15   Q    Did they provide them to you?

16   A    Yes.

17   Q    Ms. Holcomb, did she speak during the meeting?

18   A    No.

19   Q    At this point, was the meeting over?

20   A    Yes.

21   Q    What did you do after the meeting?

22   A    I went to go take my break.

23   Q    I'm going to hand you what's been pre-marked as General

24   Counsel's Exhibit 48.  It's a one page document.  Let me know

25   when you're ready.



www.escribers.net | 800-257-0885

1    A    All right.

2    Q    Do you recognize General Counsel's Exhibit 48?

3    A    Yes.

4    Q    Okay.  At the bottom of the text, in the middle of the

5    page, can you see where it says from Jonathan Galescu, sent

6    Thursday, May 25, 2017 to Eliza Lipscomb?

7    A    Yes.

8    Q    Is that an email that you sent to Ms. Lipscomb on or about

9    May 25, 2017?

10   A    Yes.

11   Q    And then just above that it says on May 25, 2017 at 5:08

12   p.m., Eliza Lipscomb, elipscomb@tesla.com wrote, do you see

13   that?

14   A    Yes.

15   Q    Is that a response you received from Ms. Lipscomb on May

16   25, 2017?

17   A    Yes.

18   Q    Okay.  And above that it says from Jonathan Galescu to

19   Eliza Lipscomb; Subject, the meeting we had last night;  Date,

20   Thursday, May 25th, 5:11 p.m.?

21   A    Yes.

22   Q    Is that your response of Thursday, May 25, 2017 to Ms.

23   Lipscomb?

24   A    Yes.

25       MR. RODRIGUEZ RITCHIE:  Okay.  At this time I'd like to



1    move General Counsel's Exhibit 48 into evidence.

2        JUDGE TRACY:  Any objections?

3        MR. MORRIS:  Objection.  Relevance.

4        MR. RODRIGUEZ RITCHIE:  It's a continuation of the subject

5    of the meeting that he had with Ms. Lipscomb and Ms. Holcomb.

6        JUDGE TRACY:  Okay.  So the objection is overruled.

7    General Counsel's Exhibit 48 is admitted into evidence.

8    **(General Counsel Exhibit Number 48 Received into Evidence)**

9    Q    BY MR. RODRIGUEZ RITCHIE:  I want to show you what's been

10   admitted as General Counsel's Exhibit 24.

11   (Judge and witness confer)

12   Q    BY MR. RODRIGUEZ RITCHIE:  I want to show you what's been

13   admitted as General Counsel's Exhibit 24.

14       JUDGE TRACY:  There's some cups here.

15       THE WITNESS:  Oh, that's all right.

16       JUDGE TRACY:  Okay.  Because you get the full service.

17   Q    BY MR. RODRIGUEZ RITCHIE:  And I'm going to hand you

18   what's been admitted as General Counsel's Exhibit 24.  Take a

19   moment to look at this two page document and let me know when

20   you're ready.

21   A    All right.

22   Q    If you look at first page of General Counsel's Exhibit --

23   excuse me.  Do you recognize General Counsel's Exhibit 24?

24   A    Yes.

25   Q    If you look at page -- the first page, at the bottom, of



www.escribers.net | 800-257-0885

1  General Counsel's Exhibit 24, it says, from Jonathan Galescu;

2  Date, Tuesday, June 6, 2017; to David Zweig, Josh Hedges, Seth

3  Wood, Eliza Lipscomb, Lauren Holcomb, cc Richard Ortiz; do you

4  see that?

5  A     Yes.

6  Q     Is that an email you sent from your @tesla.com email

7  address on June 6, 2017?

8  A     Yes.

9  Q     If you look at the second page of General Counsel's

10  Exhibit 24, at the bottom it says, "Thank you, Jonathan

11  Galescu, Richard Ortiz"?

12  A     Yes.

13  Q     Did you send this email on behalf of yourself and Mr.

14  Ortiz?

15  A     Yes.

16  Q     Why did you send this email?

17  A     To inform Eliza and Lauren who are our representatives.

18  Q     To inform them of what?

19  A     That Suzy Reed and Doug Parker were our representatives

20  regarding the OSHA 300 logs.

21         MR. RODRIGUEZ RITCHIE:  I have no further questions for

22  this witness.

23         JUDGE TRACY:  Let's see, Ms. Feinberg, any questions?

24         MS. FEINBERG:  None at this time.

25         JUDGE TRACY:  Okay.  So let's adjourn for today.  Unless



1    you feel -- well he has statements, I'm assuming?

2        MR. RODRIGUEZ RITCHIE:  Yes.

3        JUDGE TRACY:  Okay.  So you guys want to look at those

4    statements the morning?

5        MR. ROSS:  Let me reach out to and renew this tomorrow if

6    I could.

7        JUDGE TRACY:  Okay.  So let's go off the record.

8    **(Whereupon, the hearing in the above-entitled matter was**

9    **recessed at 4:49 p.m. until Tuesday, September 25, 2018 at 9:00**

10   **a.m.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

www.escribers.net | 800-257-0885

1            **C E R T I F I C A T I O N**

2    This is to certify that the attached proceedings before the

3    National Labor Relations Board (NLRB), Region 32, Case Numbers

4    32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-

5    200530, 32-CA-208614, 32-CA-210879, 32-CA-220777 Tesla, Inc.,

6    and Michael Sanchez, and Jonathan Galescu, and Richard Ortiz

7    and International Union, United Automobile, Aerospace and

8    Agricultural Workers of America, AFL-CIO at National Labor

9    Relations Board Region 32, 1301 Clay Street, Suite 300N,

10   Oakland, CA 94612-5224, on Monday, September 24, 2018, 9:11

11   a.m. was held according to the record, and that this is the

12   original, complete, and true and accurate transcript that has

13   been compared to the reporting or recording, accomplished at

14   the hearing, that the exhibit files have been checked for

15   completeness and no exhibits received in evidence or in the

16   rejected exhibit files are missing.

17

18

19   _____

20            DEBORAH GONZALEZ

21            Official Reporter

22

23

24

25


22-60493.881

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 32

In the Matter of:

| | | |
|---|---|---|
| Tesla, Inc., | Case Nos. | 32-CA-197020 |
| | | 32-CA-197058 |
| and | | 32-CA-197091 |
| | | 32-CA-197197 |
| Michael Sanchez, an individual, | | 32-CA-200530 |
| | | 32-CA-208614 |
| and | | 32-CA-210879 |
| | | 32-CA-220777 |
| Jonathan Galescu, an individual, | | |
| and | | |
| Richard Ortiz, an individual, | | |
| and | | |
| International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO, | | |
| Charging Party, | | |

_____

_____

Place: Oakland, California

Dates: September 25, 2018

Pages: 865 through 1090

Volume: 6

OFFICIAL REPORTERS

eScribers, LLC

E-Reporting and E-Transcription

7227 North 16th Street, Suite 207

Phoenix, AZ 85020

(602) 263-0885

22-60493.882



www.escribers.net | 800-257-0885

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 32**

| | |
|---|---|
| In the Matter of: | |
| TESLA, INC., | Case Nos.  32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| INTERNATIONAL UNION, UNITED | 32-CA-200530 |
| AUTOMOBILE, AEROSPACE AND | 32-CA-208614 |
| AGRICULTURAL IMPLEMENT WORKERS | 32-CA-210879 |
| OF AMERICA, AFL-CIO, | 32-CA-220777 |
| and | |
| MICHAEL SANCHEZ, AN INDIVIDUAL, | |
| and | |
| JONATHAN GALESCU, AN INDIVIDUAL, | |
| and | |
| RICHARD ORTIZ, AN INDIVIDUAL. | |

The above-entitled matter came on for hearing, pursuant to notice, before **AMITA BAMAN TRACY**, Administrative Law Judge, at the National Labor Relations Board Region 32, 1301 Clay Street, Suite 300N, Oakland, CA 94612-5224, on **Tuesday, September 25, 2018, 9:46 a.m.**

escribers
www.escribers.net | 800-257-0885

1                    **A P P E A R A N C E S**

2    **On behalf of the General Counsel:**

3         **EDRIS W.I. RODRIGUEZ RITCHIE, ESQ.**
         **NOAH J. GARBER, ESQ.**
4         National Labor Relations Board
         1301 Clay Street, Suite 300N
5         Oakland, CA 94612-5224
         Tel. 510-671-3021
6
     **On behalf of the Respondent:**
7
         **MARK S. ROSS, ESQ.**
8         **KEAHN N. MORRIS, ESQ.**
         SHEPPARD MULLIN RICHTER & HAMPTON LLP
9         Four Embarcadero Center
         Seventeenth Floor
10        San Francisco, CA 94111-4109
         Tel. 415-434-9100
11        Fax. 415-434-3947

12   **On behalf of the Charging Parties:**

13        **MARGO A. FEINBERG, ESQ.**
         **DANIEL E. CURRY, ESQ.**
14        **JULIE S. ALARCON, ESQ.**
         SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
15        6300 Wilshire Boulevard, Suite 2000
         Los Angeles, CA 90048
16        Tel. 323-655-4700

17

18

19

20

21

22

23

24

25



22-60493.884

1

**I N D E X**

2

3     **WITNESS**              **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**   **VOIR DIRE**

4     Gabrielle Toledano   870        955       960          970
                           927                  964
5
      Kevin Wallsten      998
6
      Jonathan Galescu               1032
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

eScribers
www.escribers.net | 800-257-0885

1                          **E X H I B I T S**

2

3   **EXHIBIT**                          **IDENTIFIED**    **IN EVIDENCE**

4   **General Counsel:**

5     GC-1(aaa) to (aaaa)                    994              994

6     GC-52                                  926              926

7     GC-55                                  926              926

8     GC-75                                  975              975

9   **Charging Party:**

10    CP-1                                   943              972

11  **Joint:**

12    J-2                                    982              982

13  **Respondent:**

14    R-2                                   1050

15    R-3                                   1078

16

17

18

19

20

21

22

23

24

25

www.escribers.net | 800-257-0885

1              **P R O C E E D I N G S**

2         JUDGE TRACY:  Let's go ahead and go on the record.  All

3    right.  If you could go ahead and stand up, please.

4         MS. TOLEDANO:  Oh sorry.

5         JUDGE TRACY:  Go ahead and raise your right hand.

6    Whereupon,

7                     **GABRIELLE TOLEDANO**

8    having been duly sworn, was called as a witness herein and was

9    examined and testified as follows:

10        JUDGE TRACY:  Okay.  Go ahead and have a seat and state

11   your name for the record.

12        THE WITNESS:  My name's Gabrielle Toledano.

13        JUDGE TRACY:  Okay.  Mr. Rodriguez Ritchie, go ahead,

14   please.

15        MR. RODRIGUEZ RITCHIE:  Judge, so the counsel for the

16   General Counsel is calling Ms. Toledano pursuant to Rule 611(c)

17   of the Federal Rules of Evidence.

18        MR. ROSS:  Your Honor, we object to that.  This witness

19   has tendered her resignation from Tesla as no active

20   responsibilities or duties any longer.  Has been on family

21   medical leave for an extended period of time.  And we don't

22   think it's appropriate that she be treated as an adverse

23   witness.

24        MR. RODRIGUEZ RITCHIE:  So in response to that, this

25   individual's an admitted 2(11) agent manager of the company.

eScribers
www.escribers.net | 800-257-0885

1    The testimony is about matters that occurred during her

2    employment in her position as chief people officer of the

3    company.  So certainly, she would be an adverse witness.

4        JUDGE TRACY:  All right.  So I'm going to overrule the

5    Respondent's objections and permit the General Counsel to

6    question her pursuant to Rule 611(c) of the Federal Rules of

7    Evidence.  Go ahead.

8                         **DIRECT EXAMINATION**

9    Q    BY MR. RODRIGUEZ RITCHIE:  Good morning, Ms. Toledano.

10   A    Good morning.

11   Q    You're familiar with a company called Tesla?

12   A    Yes.

13   Q    What is Tesla?

14   A    Tesla is a public manufacturing and technology company.

15   Q    And does Tesla manufacture cars?

16   A    Yes.

17   Q    Tesla has a facility located at 45500 Freemont Boulevard

18   in Freemont, California; is that right?

19   A    Yes.

20   Q    So from here on out I'm going to refer to that facility as

21   the Tesla Freemont facility.

22   A    Okay.

23   Q    You began working at Tesla on May 22nd, 2017?

24   A    Correct.

25   Q    When you worked at Tesla, you were employed as the chief



1    people officer?

2    A    Yes.

3    Q    You no longer work for Tesla?

4    A    I am employed by Tesla but have been on a leave of absence

5    and am transitioning out and will be gone, per my resignation,

6    by mid-October.  But I have no duties or responsibilities.

7    Q    Did you resign because Tesla was going to terminate you?

8    A    No.

9         MR. ROSS:  I couldn't her the question, Your Honor.  I'm

10   sorry.

11   Q    BY MR. RODRIGUEZ RITCHIE:  Did you resign because Tesla

12   was going to terminate you?

13   A    No.

14        JUDGE TRACY:  And so let me just also -- this microphone

15   does not amplify your voice.

16        THE WITNESS:  Oh.

17        JUDGE TRACY:  It's just for the recording.

18        THE WITNESS:  Okay.  Oh.

19        JUDGE TRACY:  And so you can relax --

20        THE WITNESS:  Okay.

21        JUDGE TRACY:  -- in terms of how you're sitting.  Yeah,

22   you don't have to lean into it.

23        THE WITNESS:  Okay.

24        JUDGE TRACY:  But also, we are -- it's kind of a big room

25   with a lot of people.  And so to make sure that everybody can



1   hear it, if you could just raise your voice and your project

2   your voice a little bit, okay?

3        THE WITNESS:  Will do.  Yeah.  Sorry about that.

4        JUDGE TRACY:  Thank you.

5        Go ahead.  Sorry.

6   Q    BY MR. RODRIGUEZ RITCHIE:  Have you signed ay agreements

7   with Tesla requiring you not to disparage the company?

8   A    Well, when you start as an employee you have an NDA.  But

9   no, nothing -- a termination agreement or separation agreement,

10  no.

11  Q    Okay.  Were you paid any money to leave the company?

12  A    No.

13  Q    Did you review any documents to prepare for your testimony

14  today?

15  A    I did review some.

16  Q    What did you review?

17  A    I just worked with my lawyer.  And I'm no longer on email,

18  so I reviewed very little.  But --

19  Q    So what documents did you review?

20  A    I reviewed a petition that was not sent to me but later

21  provided to me.  Not very much more.

22  Q    So just the petition?

23  A    I think so.

24  Q    What was --

25  A    I didn't review documents in general.  I just prepared.



1    Q    With homely a petition?

2    A    Well, I saw a petition that was sent not directly to me,

3    but later forwarded to me.  So I did review that.

4    Q    And you didn't review any other document?

5    A    I might -- I looked at a couple of emails.

6    Q    What emails?

7    A    Let's see.  Nothing that stands out.

8    Q    What were the emails about?

9    A    Just refreshing my memory.  Since I'm not on email, I

10   don't have access to the email.  On just reminding me that oh,

11   I had a meeting on June 7th, which I thought was the topic of

12   today.  And reminding me about that meeting and refreshing my

13   memory since it was so long ago.

14   Q    Was it just one email that you reviewed?

15   A    Yeah.  I didn't have -- as I said, I don't have access to

16   emails.  So it was just one email reminding me.

17   Q    Was it an email you wrote?

18   A    No.

19   Q    Who wrote the email?

20   A    It was -- there was an email forwarded to me from Josh

21   Hedges who reports to me.  And it was just refreshing my memory

22   that, you know, that this petition had been sent to him, not

23   me.  And so it was just trying to remind me about, you know,

24   this June 7th meeting that I had on series of events.  But that

25   was really it.



www.escribers.net | 800-257-0885

1    Q    So besides the email forwarded to you from Josh Hedges

2    about a petition, you reviewed no other documents or emails; is

3    that correct?

4    A    Not -- no.

5    Q    No, that's not correct?

6    A    No, no.  I did not.

7    Q    Okay.  Did you meet with your attorney to prepare for

8    your --

9    A    Yes.

10    Q    -- testimony today?

11    A    Yes.

12    Q    How many times?

13    A    Twice in person and then just on the phone yesterday

14    briefly.

15    Q    In total for how long?

16    A    Maybe three hours in total, plus the phone call, probably

17    four.

18    Q    Now, you also met with representatives of Tesla prior to

19    your testimony here today?

20    A    Yes.

21    Q    You met with Mr. Hedges?

22    A    Oh no, I didn't meet with Mr. Hedges.  But we've talked on

23    the phone.  He was one of my direct reports.

24    Q    You also met with Mr. Ross -- Mark Ross?

25         MR. ROSS:  Objection.  If this witness is going to be



1    considered a agent of the company, any conversations she may

2    have had with me are privileged.

3        MR. RODRIGUEZ RITCHIE:  The fact of a conversation

4    occurring is not privileged.

5        JUDGE TRACY:  That's right.  So I'm going to overrule the

6    objection with regard to the fact that if there was a

7    conversation.  However, the contents of any of that

8    conversation would be considered attorney client privilege.

9    And so certainly people stated that.

10       THE WITNESS:  Okay.

11       JUDGE TRACY:  Okay.

12       THE WITNESS:  What was the question?

13   Q    BY MR. RODRIGUEZ RITCHIE:  You met with Mark Ross prior to

14   your testimony here today?

15   A    Yes.

16   Q    How many times?

17   A    Twice.

18   Q    When?

19   A    When?  I believe it was last Thursday and Sunday.

20   Q    How long did you meet with Mr. Ross?

21   A    For about three hours in total.

22   Q    You didn't meet with Mr. Ross last night and Mr. Hedges

23   for dinner?

24   A    No.  I was with my kids for dinner.

25   Q    You didn't meet with Mr. Hedges yesterday?



1   A    No, I did not.

2   Q    Now, when you met with Mr. Ross, you went over your

3   testimony for today?

4        MR. ROSS:  Objection.

5        MR. RODRIGUEZ RITCHIE:  I'm not talking about --

6        MR. ROSS:  It goes to the contents of the conversation

7   between counsel and client.  It's privileged.

8        MR. RODRIGUEZ RITCHIE:  The subject matter of a meeting is

9   not privileged.  The communications in the meeting would be

10  privileged.  But not the subject matter.

11       JUDGE TRACY:  That is technically correct of what you're

12  saying, Mr. Rodriguez Ritchie.  However, I don't see the

13  relevance of what the topic of their discussion was.  So I'm

14  going to sustain the objection.

15       MR. RODRIGUEZ RITCHIE:  Well, if the topic of their

16  discussion was to prepare for her testimony, then certainly

17  there's relevance in terms of her bias for her testimony.

18       JUDGE TRACY:  I mean, again, she spoke with him.  They

19  spoke for three hours.  I'm assuming they spoke about this

20  testimony.  I don't know what else they'd be talking about.  So

21  I'm going to sustain the objection.  And let's just move on.

22       MR. RODRIGUEZ RITCHIE:  Okay.

23  Q    BY MR. RODRIGUEZ RITCHIE:  Now, as the chief people

24  officer at Tesla Freemont, you had responsibilities regarding

25  human relations?


www.escribers.net | 800-257-0885

1   A    Yes.

2   Q    You were the highest ranked person in the area of human

3   relations?

4   A    Correct.

5   Q    Your responsibilities as the chief people officer, you

6   were the chief people officer for all of Tesla employees

7   nationwide?

8   A    Yes.

9   Q    About approximately how many employees is that?

10   A    It's about 40,000 more or less.

11   Q    As the chief people officer, you reported directly to Mr.

12   Elon Musk?

13   A    Correct.

14   Q    And who is Mr. Elon Musk?

15   A    He is the CEO of Tesla.

16   Q    During your employment at Tesla, you had an @tesla.com

17   email address?

18   A    Yes.

19   Q    And that was Gaby@tesla.com?

20   A    Yes.

21       JUDGE TRACY:  So hold on one second.  Could you close that

22   door?  I'm not sure why she put the thing in the door.  I don't

23   see it being locking because I would have --

24       UNIDENTIFIED SPEAKER:  I think it keeps locking on the

25   outside.  So anyone trying to get in, can't get back in.



1    JUDGE TRACY:  Can you ask somebody to -- or maybe there's

2    a button to push on the side.

3    Okay.  Sorry.

4    Q    BY MR. RODRIGUEZ RITCHIE:  And that was your email

5    address, Gaby@tesla.com?

6    A    Yes.

7    Q    You also as a chief people officer had people that

8    directly reported to you?

9    A    Correct.

10    Q    So I want to talk to you about and have you explain that a

11    little bit to me.  You were responsible for the head of the

12    environmental health and safety department?

13    A    Yes.

14    Q    Can you explain what that is?

15    A    So environmental health and safety is a group where we

16    have for example, on my team, safety representatives that work

17    in the factory.  And there was a head of environmental health

18    and safety who reports to me.

19    Q    Okay.  And you weren't involved in the day to day

20    operations then of the EHS department?

21    A    Correct.  I was not involved in the day to day.  I have a

22    vice president I hired, who then reported to me.

23    Q    Okay.  And you were also responsible for the security

24    department?

25    A    Yes.



1    Q    Can you describe what that is?

2    A    Yep.  Just the security worldwide.  Any issues, it's

3    typical it would report to my function at any company.  So just

4    making sure our offices are secure and this kind of thing.

5    Q    So that would include the people that are employed or used

6    as security guards at the Tesla Freemont facility, they fall

7    within the security department?

8    A    They do.  But some are contractors in the security

9    department.

10    Q    Okay.  And you weren't involved with the day to day

11    operations in the security department?

12    A    Not the day to day.  I have a head of security who then as

13    I said, would report to me.

14    Q    You also had the head of the facilities department that

15    was a direct report?

16    A    Yes.

17        MR. ROSS:  I'm sorry, I couldn't hear the question.

18    Q    BY MR. RODRIGUEZ RITCHIE:  You also had the head of the

19    facilities department that was your direct report?

20    A    Correct.

21    Q    And can you describe what the facilities department did?

22    A    Yes.  Initially, I had even construction and manufacturing

23    construction as part of facilities.  But then we moved that to

24    another group.  So generally just office facilities, office

25    managers, making sure that reception and these things were



www.escribers.net | 800-257-0885

1    taken care of.  So I had a head of facilities who also reported

2    to me.  So I had, you know, about 1,400 people in my

3    organization.

4    Q    And you weren't involved in the day to day operations of

5    the facilities department?

6    A    With 1,400 people and 40,000 employees, not the specifics

7    day to day.  Certainly decisions that came to my attention if

8    they had to come to my attention.

9    Q    You also had human resource business solutions reporting

10   to you?

11   A    Well, one of the HR departments was called HR business

12   solutions.  Yeah.

13   Q    And was there a head of that department?

14   A    Yes.

15   Q    And that person directly reported to you?

16   A    Correct.

17   Q    Can you describe what HR business solutions does?

18   A    HR business solutions is another company that's often

19   called HRIS information systems or HR people operations.  So

20   they just do project management.  And all the HR tech help us

21   with the HR technology that a company uses.  So work day, your

22   compensation tools, all of your technology, he or she that runs

23   that department is in charge of some of those decisions.

24   Q    And you weren't involved with the day to day operations of

25   HR business solutions?



www.escribers.net | 800-257-0885

```
1    A    Not the day to day.  No.

2    Q    There is also a recruiting department at Tesla?

3    A    Yes.

4    Q    And the head of recruiting was a direct report to you?

5    A    Correct.

6    Q    Can you explain what recruiting did?

7    A    Sure.  They sourced candidates to hire into the company

8    and brought them into the company to interview.  And hopefully

9    hired great employees.

10   Q    And you weren't involved with the day to day operations of

11   recruiting?

12   A    You know, obviously I made decisions when it needed to

13   come to my attention.  But not the day to day.

14   Q    Okay.  There also was a department called total rewards?

15   A    Correct.

16   Q    Can you explain what total rewards was?

17   A    Total rewards is -- my head of total rewards would manage

18   compensation, benefits for the company.  And have a team that

19   manages compensation and benefits.

20   Q    And you weren't involved with the day to day operations of

21   total rewards?

22   A    Not every decision.  No.

23   Q    There was also the diversity and inclusion department?

24        MR. ROSS:  I'm sorry, I couldn't hear that.

25        MR. RODRIGUEZ RITCHIE:  Diversity and inclusion.
```



www.escribers.net | 800-257-0885

1      MR. ROSS:  Thank you.

2      THE WITNESS:  Yep.

3   Q   BY MR. RODRIGUEZ RITCHIE:  Can you describe what that is?

4   A   I created that function.  And it was -- Felicia had

5   reported to me.  Any training responsibility around diversity

6   and inclusion and our policies related to diversity and

7   inclusion and that kind of thing.

8   Q   You weren't involved in the day to day operations of

9   diversity and inclusion?

10  A   When you say day to day operations, what -- I just want to

11  make sure I'm answering the question correctly.

12  Q   Sure.

13  A   Obviously, I --

14  Q   Just the everyday operations of the person that is the

15  head of D&I, diversity and inclusion.

16  A   Not the day to day everything.  I empowered my team to do

17  their jobs.  And we'd have one on ones with them and get

18  updated.  That kind of thing.

19  Q   There's also Tesla Academy, the performance management?

20  A   Right.

21  Q   Can you describe what that was?

22  A   Well, Tesla Academy was -- I had a head of, I'll call it

23  training and development.  So Tesla Academy was responsible for

24  delivering sales training, service training, any kind of

25  training the employees needed.

22-60493.900



www.escribers.net | 800-257-0885

1     Q    And the head of Tesla Academy was one of your direct

2     reports?

3     A    Correct.

4     Q    And you weren't involved with the everyday operations of

5     the Tesla Academy?

6     A    Not the day to day.

7     Q    Okay.  There was also a unit called employee relations and

8     investigations?

9     A    Yes.

10    Q    Can you describe what that is?

11    A    Yes.  It's a function I created when I got there early on,

12    to handle investigation volume.  And so I had a head of ER and

13    investigations because --

14    Q    And that person directly reported to you?

15    A    Correct.

16    Q    Who was that person?

17    A    Carmen Copher.

18    Q    You also had human resources business partners that --

19    A    Correct.

20    Q    -- reported directly to you?

21    A    Correct.

22    Q    How many?

23    A    I think -- I believe six.  Am I forgetting someone?  I

24    hope not.

25    Q    Okay.  So six?


22-60493.901

1    A    I believe --

2    Q    About?

3    A    I think six.  Um-hum.

4    Q    And can you explain what their function was?

5    A    Sure.  They were what we called employee facing

6    representatives that can be approached by any employee with any

7    concerns.  Or they also roll out programs.  So they roll out

8    compensation programs.  Anything of that sort.  Any

9    communications.  So they're basically the partner that

10   employees receive information about HR issues from, or can go

11   to if they have any kind of complaint.  And if the complaint

12   involved an investigation, then I would pass it to Carmen's

13   team, the employee relations and investigations team.

14   Q    And you weren't involved in the day to day work of the HR

15   VPs; is that right?

16   A    Not the day to day.

17   Q    And just in the interest of completeness, you also had an

18   assistant that reported to you?

19   A    Yes.

20        MR. ROSS:  I couldn't hear the last question.  I'm sorry.

21   Q    BY MR. RODRIGUEZ RITCHIE:  In the interest of

22   completeness, you also had an assistant that reported directly

23   to you?

24        MR. ROSS:  Thank you.

25        THE WITNESS:  Yes.


www.escribers.net | 800-257-0885

1    Q    BY MR. RODRIGUEZ RITCHIE:  Now, before you began as the

2    chief people officer at Tesla Freemont --

3    A    Yes.

4    Q    -- or at Tesla, excuse me, you interviewed for the

5    position?

6    A    Correct.

7    Q    How many interviews did you have?

8         MR. ROSS:  Objection.  Relevance.

9         JUDGE TRACY:  Sustained.

10   Q    BY MR. RODRIGUEZ RITCHIE:  At the time that you interview

11   for your position at Tesla Freemont, you weren't aware that an

12   organizing campaign was going on at Tesla?

13   A    At the time that I interviewed was that?

14   Q    Right.

15   A    No.

16   Q    It never came up during your interviews at Tesla?

17   A    No.

18   Q    You would agree that an organizing campaign at a company

19   the size of Tesla would have effects on all aspects of the

20   workforce at Tesla?

21   A    Not necessarily all aspects.

22   Q    You would agree that an organizing campaign would affect

23   the workforce at a company the size of Tesla?

24   A    Well, part of a company can unionize and another part may

25   not.  So I'm not sure it would affect, you know, all the



1    operations everywhere if it weren't --

2    Q    There would be some effects on the work --

3    A    -- in that geography.

4    Q    There would be some effects on the workforce at Tesla if

5    it were to unionize?

6    A    Sure.  Some effects.

7    Q    And the prospect of an organizing campaign at a company

8    this size of Tesla, that would be a big deal?

9        MR. ROSS:  Objection.  Not only relevance, ambiguity.  Big

10   deal; what does that mean?

11       JUDGE TRACY:  Sustained.

12   Q    BY MR. RODRIGUEZ RITCHIE:  The prospect of an organizing

13   campaign at a company the size of Tesla would be a matter of

14   some import?

15   A    Yes.

16       MR. ROSS:  Objection.  Same relevance -- or same

17   objection.

18       JUDGE TRACY:  Overruled.

19       MR. RODRIGUEZ RITCHIE:  The answer was yes.

20       MR. ROSS:  Importance to who, Your Honor?  What does some

21   importance mean?

22       JUDGE TRACY:  I think his question was some import.

23       MR. RODRIGUEZ RITCHIE:  Yes.

24       JUDGE TRACY:  Some import.  Some import; what does that

25   mean?  And to whom?



www.escribers.net  |  800-257-0885

1    MR. RODRIGUEZ RITCHIE:  If Mr. Ross -- Mr. Ross will have

2    an opportunity to question the witness as well and clarify

3    whatever meaning.

4    MR. ROSS:  I have the opportunity -- I have the

5    opportunity to object to --

6    MR. RODRIGUEZ RITCHIE:  So that can be done.

7    JUDGE TRACY:  Okay.  So we're not going to interrupt one

8    another.  So he's objecting.  Let him finish.  Then you can

9    respond.  Okay.  I've already ruled on the objection.

10    MR. ROSS:  All right.

11    JUDGE TRACY:  Okay.

12    Q    BY MR. RODRIGUEZ RITCHIE:  And as the chief people officer

13    at Tesla Freemont, a response to an organizing campaign, that

14    would necessarily involve you?

15    A    Can you say that again?

16    Q    As the chief people officer at Tesla, a response to an

17    organizing campaign would necessarily involve you?

18    A    A response, meaning --

19    Q    A response from the company to an organizing campaign,

20    that would involve the chief people officer of Tesla?

21    A    I'm not even sure when you say response.  Can you be more

22    specific?

23    Q    Sure.  If there were an organizing campaign at a company

24    like Tesla, the chief people officer would be involved in the

25    way in which the company would respond to employees seeking to



www.escribers.net | 800-257-0885

1    organize at the campaign?

2        MR. ROSS:  Objection.  Calls for a hypothetical.

3        JUDGE TRACY:  Sustained.

4    Q    BY MR. RODRIGUEZ RITCHIE:  Did your duties as chief people

5    officer involve handling matters relating to an organizing

6    campaign at Tesla?

7        MR. ROSS:  I couldn't hear the question.  I'm sorry.

8    Could you repeat it?

9    Q    BY MR. RODRIGUEZ RITCHIE:  Did your duties as chief people

10   officer involve handling a union organizing campaign at Tesla

11   Freemont from -- by employees?

12   A    I was -- I became aware over time that there was a union

13   organizing campaign.  And I would be on group conference calls

14   on the matter.

15   Q    So it'd be fair to say that as chief people officer, part

16   of your duties involved the company's response to a union

17   organizing campaign at Tesla Freemont?

18   A    I'm not sure it was my decision or a response was my

19   responsibility, but I'd be involved in some discussions, not

20   all.

21   Q    Okay.  Prior to beginning at Tesla Freemont, did you

22   discuss your duties as chief people officer with anyone?

23   A    Prior to starting my job at Tesla?

24   Q    Yes.

25   A    Did I discuss my duties?



1    Q    Correct.

2    A    Well, I -- before I started, I didn't.  I mean, I might

3    have told friends I got the job.  Is that what you mean?

4    Q    Did you discuss with anyone at Tesla Freemont --

5    A    Oh.

6    Q    -- what your duties would be as the chief people officer?

7    A    Once I got there, I'm sure I did discuss my

8    responsibilities with employees.

9    Q    Okay.  At the time that you started on May 22nd, 2017, you

10   weren't aware that employees had engaged in union related

11   leafletting on February the 10th, 2017?

12   A    No.

13   Q    And during your first week at Tesla, you had no knowledge

14   of a union organizing campaign occurring at Tesla Freemont?

15   A    Not that I recall.  Not that I recall.  No.

16   Q    And you weren't aware that Tesla employees were flyering

17   at the Tesla parking lot on May 24th, 2017?

18   A    No.

19   Q    You weren't aware that a union organizing campaign was

20   occurring during your second week of employment at Tesla?

21   A    It was my second week, as you stated.  I don't recall

22   being involved in that at that time.  No.

23   Q    Okay.  And you weren't aware that a union organizing

24   campaign was occurring during your third week at Tesla

25   Freemont?



1    A    I'm sure people forwarded things to me in my 1,400 person

2    organization.  I'm not sure how aware and acutely aware I was.

3    I wasn't involved in decisions at that time.  No.

4    Q    So it'd be fair to say during your third week of

5    employment with Tesla, you weren't aware that an organizing

6    campaign was occurring at Tesla Freemont?

7    A    I don't recall exactly the point in time when I became

8    aware.  But there was a point in time -- certainly not in my

9    first two weeks, but later, when I became aware that there were

10   union organizing efforts.

11   Q    And was it within --

12   A    And I became more educated on it.

13   Q    It wasn't within the first three weeks?

14   A    I don't recall the exact timing.

15   Q    Can you approximate when you became aware of the

16   organizing campaign?

17        MR. ROSS:  Asked and answered.  He has asked her several

18   times.  She said she doesn't recall.

19        JUDGE TRACY:  Overruled.  Go ahead.  Ask the question

20   again, please.

21   Q    BY MR. RODRIGUEZ RITCHIE:  Can you tell us about when you

22   became aware of the union organizing campaign at Tesla

23   Freemont?

24   A    I mean, I think I became educated over time what a union

25   organizing campaign was.  Probably not in my second or third



www.escribers.net | 800-257-0885

1    week.  I think I was learning that there were people who had

2    complaints.  I didn't quite understand until later maybe that

3    this was a campaign and you know, everything involved in it.

4    Q    So your testimony now was not within your second or third

5    week.  But my question was actually if you could approximate

6    for us when you became aware of the organizing campaign at

7    Tesla Freemont.

8    A    I don't know when I became aware that it was an organizing

9    campaign exactly.

10    Q    One of your initiatives at Tesla Freemont was making

11    changes to the employee evaluation system?

12    A    Yes.

13        MR. ROSS:  Objection.  Relevance.

14        MR. RODRIGUEZ RITCHIE:  We will get to it.

15        JUDGE TRACY:  Okay.

16        MR. RODRIGUEZ RITCHIE:  If I could just be given some

17    leeway.

18        JUDGE TRACY:  Overruled.

19    Q    BY MR. RODRIGUEZ RITCHIE:  And that was a lengthy process?

20    A    So yeah, performance management is something that happens

21    at Tesla and any company.  So I'll call it performance

22    evaluation -- performance management process.

23    Q    At Tesla, the performance and management -- or the

24    evaluations that occur for production and maintenance employees

25    occurred twice a year?



www.escribers.net | 800-257-0885

1    A    Correct.

2    Q    And so the periods are from January to June and from July

3    to December?

4    A    I think that's approximately correct.

5    Q    And for all other employees at Tesla, they occur annually,

6    correct?

7    A    I believe so.

8    Q    From July to June?

9    A    I think that's correct.  We did often change the periods.

10   Part of what you do in my job is you evaluate these processes

11   and there could be changes, you know, in the time period or

12   when we do it.  Those kinds of things.  But that seems

13   approximately correct.

14   Q    Your initiative to change this performance management

15   system, that occurred in July of 2017 was when you began the

16   process of making those changes?

17        MR. ROSS:  Objection, Your Honor.  You've given him

18   leeway.  There is no relevance to this whatsoever.  It has

19   nothing to do with anything of the substantive allegations in

20   the complaint.  It has to do with dismissed or withdrawn

21   charges.  But it hasn't nothing to do with the matters before

22   you.

23        MR. RODRIGUEZ RITCHIE:  It's actually not being offered

24   for any dismissed matters.  We're going to get there soon.  But

25   the relevancy could also be addressed after I'm done with this.



www.escribers.net | 800-257-0885

1    If you'd like to rule at that point.  But I'm working my way

2    towards where the relevancy is.

3         JUDGE TRACY:  I'm going to overrule the objection for now.

4    But you can renew your objection.

5         MR. ROSS:  Thank you.

6    Q    BY MR. RODRIGUEZ RITCHIE:  The changes to the performance

7    management system, that occurred in July of 2017 about?

8    A    I think we started enhancing the process, adding to the

9    performance management process, certain elements, beginning

10   around July we started working on it.

11   Q    And that was your idea?

12   A    Yes.  I advocated for ensuring that we enhanced the

13   performance review process to include certain elements that had

14   not been prior included.

15   Q    And at the time you had this idea, you weren't aware that

16   the -- that employees were seeking to unionize at Tesla

17   Freemont?

18   A    It was not related to it at all.

19   Q    So you weren't aware that employees were seeking to

20   unionize at Tesla Freemont?

21   A    No.  I don't recall exactly when I became aware and

22   understood what a union campaign organizing situation was.  I

23   don't remember exactly.

24   Q    My question was actually different.

25   A    Okay.


www.escribers.net | 800-257-0885

1    Q    At the time, in July 2017, when the changes were made to

2    the performance management system, you weren't aware that

3    employees were working with the UAW to organize the Tesla

4    Freemont; that's fair?

5    A    That I wasn't aware or that I was?

6    Q    That you were not aware.

7    A    I believe I was aware that there were employees working

8    with UAW.  What I'm not understanding is when it's an official

9    campaign and the language you're using.  But yes, I would

10   assume I was aware around that time that employees raised

11   issues and were working with the UAW.

12   Q    And that was about the first time you became aware --

13   A    I don't --

14   Q    -- of employees working with the UAW?

15   A    No.  Over time, you know, I started getting invited to

16   discussions and calls.  And over time, I became educated on the

17   subject and became aware.  I don't know exactly when I became

18   aware of what.

19   Q    When you made changes to the performance management

20   system, you did so first by meeting with the executive

21   committee at Tesla Freemont?

22   A    I wouldn't say --

23        MR. ROSS:  Objection, Your Honor.  We haven't heard

24   anything relevant yet.  Enough is enough.  The witness has

25   commitments.  We're wasting time.



www.escribers.net | 800-257-0885

1          JUDGE TRACY:  So I understand --

2          MR. ROSS:  Relevance.

3          JUDGE TRACY:  -- your objection.  Again, it's overruled.

4    Yeah, the 611(c) is essentially a cross-examination.  And so

5    often the issue of the relevance does come up.  So I'm asking

6    that you can -- or I'm telling you that you can renew your

7    objection once this subject matter is complete.

8          MR. ROSS:  All right.

9          JUDGE TRACY:  I'm relying upon the General Counsel here to

10   lead us to something that is relevant and connect the dots.  So

11   go ahead.  Again, the objection is overruled.

12   Q    BY MR. RODRIGUEZ RITCHIE:  You met with the executive

13   committee at Tesla to bring up changes to the performance

14   management system?

15   A    As part of the process, I certainly met with the executive

16   team to make sure that they were supportive of my ideas to make

17   the system better.  Yeah.

18   Q    And you did that for the changes to the performance

19   management system?

20   A    Sure.

21   Q    And at that time, when you first had your meeting with the

22   executive committee about making changes to the performance

23   management system, you weren't aware that there was an

24   organizing campaign at Tesla Freemont?

25   A    I may have been aware.  But that -- those changes were



1     completely unrelated to it.  So I'm not following.  I don't

2     remember exactly when I was aware of an organizing campaign.

3     Q    You said you may have been aware at the time you first

4     presented it to the committee.  Are you sure that you were

5     aware?

6     A    Well over time, as I said, I became educated on what was

7     going on within the company on many, many matters, which

8     included that there were employees who were working with UAW

9     and wanted to unionize.  So I learned that over time.  I was

10    not aware early on.

11    Q    My question is not regarding over time.  My question is at

12    the moment that you first presented to the executive committee

13    the changes to performance management, you were not aware of an

14    organizing campaign at Tesla Freemont, correct?

15         MR. ROSS:  I object to the form of the question.  I think

16    he's positing a timeframe and them he's saying you were not

17    aware of something.  I think it's an unintelligible question.

18    The form is improper.  Objection.

19         JUDGE TRACY:  So sustained.

20    Q    BY MR. RODRIGUEZ RITCHIE:  At the time that you met with

21    the executive committee to -- the first time that you met with

22    the executive committee to present new changes to performance

23    management, you had no knowledge of an organizing campaign at

24    Tesla Freemont?

25         MR. ROSS:  Same objection.



www.escribers.net | 800-257-0885

1   JUDGE TRACY:  Overruled.

2   THE WITNESS:  Let's assume at the best of my recollection

3 that by that time I had some idea that employees were working

4 with UAW and wanted to unionize.

5 Q BY MR. RODRIGUEZ RITCHIE:  Okay.  And when did that first

6 meeting occur with the executive committee?

7 A I don't know.

8 Q Was it in July?

9 A I don't recall.

10 Q It would be fair to say that it didn't occur during your

11 first week of employment as chief people officer?

12 A No, it did not.

13 Q And it would be fair to say that it didn't occur during

14 your second week?

15 A Correct.

16 Q And it would also be fair to say it didn't occur during

17 your third week?

18 A I don't believe it did occur in my third week.  No.

19 Q And not during the fourth week?

20 A That I don't know.

21 Q Okay.

22 A It was one of many, many projects.

23 Q Ms. Toledano, you recall giving an affidavit in connection

24 with these matters?

25 A Yes.  With you.



www.escribers.net | 800-257-0885

1   Q   That was with me?

2   A   Yes.

3   Q   And you recall when we met that you were provided a copy

4   of the affidavit to review?

5   A   Yes.

6   Q   And indeed you did review it?

7   A   When we were done that day.  Yeah.  Um-hum.

8   Q   And you made changes to your affidavit?

9   A   Yep.

10  Q   And you also reviewed the affidavit with the attorneys for

11  Tesla?

12  A   At that time?

13  Q   Yes.

14  A   Yeah, at that time.  Um-hum.

15  Q   There were two attorneys present?

16  A   That is true.  Outside counsel.

17  Q   Okay.  And after you reviewed the affidavit, you swore

18  that everything was the truth?

19  A   I believe so.  Yeah.

20  Q   And it was indeed the truth?

21  A   I believe so.  Yeah.

22  Q   Okay.  I'm going to show you an affidavit dated February

23  5th, 2018.  And I'm going to ask you to look at page 4, line 21

24  to 23.  And I'm showing counsel for the two parties what I'm

25  showing the witness.



www.escribers.net | 800-257-0885

1          MR. ROSS:  Could her counsel be given one as well, please?

2     I've got one, so you don't have to --

3          MR. RODRIGUEZ RITCHIE:  Her counsel hasn't requested one.

4          MR. ROSS:  I'll give it to him.

5     Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  I'm going to ask you to

6     take a look at that line; page 4, line 21 through 23.

7     A    Yep.  All right.

8     Q    Can you review that?

9     A    Yep.

10    Q    At the time you gave your affidavit, your testimony was

11    that you were not aware of employees engaging in union

12    activities when you met with the executive committee --

13    A    Right.

14    Q    -- to discuss performance management?

15    A    Right.

16    Q    And that was the truth back then?

17    A    That's why I'm having trouble answering your question.  I

18    don't know the point in time when I became clear on what union

19    activities were, what an organizing campaign was.  And this

20    project had nothing to do with any of that.

21    Q    Your testimony earlier today was that as of today, you had

22    no knowledge of any union activities at the time you met with

23    the executive committee?

24         MR. ROSS:  Objection.  Misstates her testimony.

25         JUDGE TRACY:  Sustained.



1    Q    BY MR. RODRIGUEZ RITCHIE:  Your testimony was that you had

2    no knowledge when you met with the executive committee of any

3    organizing activities at Tesla Freemont?

4         MR. ROSS:  Same objection.

5         JUDGE TRACY:  Sustained.  So you need to restate the

6    question because I'm not sure that she testified to that.

7         MR. ROSS:  And I'm going to renew my objection as to

8    relevance.  We've been at this now for ten minutes.  And

9    there's yet to be a single piece of information that has

10   anything to do with any of the issues before you, Judge.  We're

11   wasting time.

12   Q    BY MR. RODRIGUEZ RITCHIE:  Did you know that the UAW was

13   meeting with employees at the time you met with the executive

14   committee to discuss the performance management for the first

15   time?

16   A    I did not know when the UAW met with employees ever.  I

17   don't -- I wasn't following those meetings, if they occurred.

18   Q    Did you know that employees identified with or supported

19   the UAW at that time?

20        MR. ROSS:  Could you restate the question?  I couldn't

21   hear you.  You're facing away.  What's the question?

22   Q    BY MR. RODRIGUEZ RITCHIE:  Sorry.  Did you know that

23   employees identified with or were supporting the UAW at the

24   time that you met with the executive committee?

25        MR. ROSS:  Objection.  Ambiguous.  Identified; I don't


www.escribers.net | 800-257-0885

1    know what that means.

2        JUDGE TRACY:  Well, I'm going to overrule the objection.

3        THE WITNESS:  So at the time of meeting with the executive

4    committee regarding performance management?

5    Q    BY MR. RODRIGUEZ RITCHIE:  Correct.  Did you know?

6    A    I don't -- this is what I've been trying to say; I don't

7    know the time at which I understood the union activity pieces

8    that were going on.  It was not for the focus for me, believe

9    it or not, in my role early on.  So over time I absolutely

10   started understanding it.  I just don't know what point in time

11   I had an understanding.

12   Q    So my question is about knowledge.  Not about

13   understanding.  So again, at the time that you met with the

14   executive committee, did you have knowledge that employees were

15   meeting with the UAW to organize at Tesla Freemont?

16   A    I did not have knowledge when employees were meeting with

17   the UAW.  When or where.

18   Q    At no point during your employment?

19   A    No one informed me when the UAW would be -- that they were

20   meeting with employees.  I'm --

21   Q    At no point during your employment, no one informed you

22   that people -- that employees were meeting with the UAW?

23   A    I don't think specifically I was informed when the UAW was

24   meeting with employees or --

25   Q    And at no point during your employment were you aware that



www.escribers.net | 800-257-0885

1    employees were working with the UAW to bring the UAW into Tesla

2    Freemont then?

3    A    No.  I answered that earlier that over time -- and I can't

4    tell you exactly when -- I understood that there were some

5    employees that were working with the UAW, which I started to

6    understand what the UAW was.  And I understood that they were

7    working -- that some people were working with the UAW and were

8    interested in unionizing.  Yes, I became aware of that during

9    my employment at Tesla.

10    Q    Okay.  So my question is about the becoming aware.  Not

11    about the understanding.  When did you become aware of those

12    activities?

13    A    I really could not pinpoint a point in time.  Like a

14    certain event or anything like that.  No.  A certain meeting or

15    anything like that.  No.

16    Q    Earlier you testified that you were on numerous calls or

17    meetings where unionizing was discussed at Tesla Freemont?

18    A    There were privileged calls that I eventually would get

19    invited to.  Sometimes attend, sometimes not.  I was one of

20    many people who was invited.  And as I said, when I was able to

21    I did -- would get on the call.  I can't tell you when they

22    started.

23    Q    You can -- it would be fair to say that you don't remember

24    that those occurred your first week at Tesla?

25    A    I don't believe within my first couple weeks.



www.escribers.net | 800-257-0885

1  Q    And they didn't occur during the second week?

2  A    As I said, I don't know when the calls began.  I can

3  imagine I was ramping up on a lot of things.  I think I had

4  about 32 direct reports at that point in time.  So I don't

5  remember.

6  Q    One of your other initiatives at Tesla Freemont, which we

7  very briefly discussed earlier, was the employee relations

8  investigations department?

9  A    Yeah.  That was at Tesla in general worldwide.  So the

10  employee relations group managed any investigation or employees

11  relation investigation that needed investigating across the

12  country.  Not just Freemont factory.

13  Q    You didn't conduct investigations yourself?

14  A    No.

15  Q    It'd be fair to say that you weren't involved in the

16  investigations into employee conduct?

17  A    I was not involved unless it involved -- although I don't

18  remember this happening -- an executive.  Meaning one of Elon's

19  direct reports.  Then I would be involved normally.

20  Q    During your employment as chief people officer, that was

21  the only time that you were involved in investigation when it

22  involved an executive?

23  A    That would be true.  I did not conduct investigations.

24  Was not involved.  No.

25  Q    And you never requested updates regarding investigations?



www.escribers.net | 800-257-0885

 1   A    I did receive updates after the fact.  Not on all

 2   investigations.  But after the fact I would get, you know, what

 3   we call a status type report from Carmen periodically.  And so

 4   after the fact, she would tell me x, y, z happened.

 5   Particularly if it involved a termination I would become aware

 6   after the fact.

 7   Q    You would only become aware after the termination had

 8   occurred?

 9   A    Well, as I said, she rolled up in her status report not

10   every investigation, some investigations.  And it was always

11   after they were closed.  After she had substantiated the

12   investigation or not.  You see what I'm saying?  It wasn't in

13   the middle of the investigation.  It would be when it was over.

14   Q    Are you aware of any employee named Richard Ortiz?

15   A    I've heard of his name.  Yes.

16   Q    You weren't involved in the investigation into his

17   termination?

18   A    I was not.

19   Q    Never received updates regarding that?

20   A    I -- he was in one of those status reports as terminated

21   for lying investigation.  So I do know that.

22   Q    And that was a status report after he was terminated?

23   A    Correct.

24   Q    During the investigation into his conduct, you didn't

25   receive updates?


www.escribers.net | 800-257-0885

1    A    No.

2    Q    You didn't monitor the investigation?

3    A    No.

4    Q    Weren't involved in the investigation at all?

5    A    No.  I was informed once the investigation was done.

6    Q    After the termination occurred?

7    A    I don't know if he was already -- that the decision had

8    been made that he would be terminated.

9    Q    Okay.  Did you --

10   A    But I wasn't -- I can't tell you whether he was actually

11   exited yet or not.  But after the decision, yeah.

12   Q    You didn't make the decision to terminate him?

13   A    No.  No, no, no.

14   Q    You didn't provide any recommendations?

15   A    No.

16   Q    Did you review the investigative report?

17   A    No.

18   Q    Did you review any other documents besides this status

19   update from Carmen?

20        MR. ROSS:  I'm sorry, I couldn't hear the last part of the

21   question.

22   Q    BY MR. RODRIGUEZ RITCHIE:  Did you review any other

23   documents regarding Mr. Ortiz's termination besides the status

24   update?

25   A    I don't recall.



www.escribers.net | 800-257-0885

1      MR. ROSS:  Objection.  It's not a status update.  It was a

2  report of investigations that were done I think.  Or words to

3  that effect.

4      JUDGE TRACY:  So sustain the objection.

5      MR. ROSS:  Objection.

6      JUDGE TRACY:  So if you could just clarify the question

7  again, please.

8      MR. RODRIGUEZ RITCHIE:  Sure.

9  Q    BY MR. RODRIGUEZ RITCHIE:  You didn't -- besides the

10  status report --

11  A    The --

12  Q    Or actually, I'll withdraw that.  The status report that

13  you testified about --

14  A    Yeah.

15  Q    -- was that in writing or verbally?

16  A    So it was a report that would summarize in a short form

17  the results of certain investigations.  Not all.  And I'm

18  sorry, your question was?  Oh was that in writing or -- it was

19  in writing.  Yeah.

20  Q    And --

21      MR. ROSS:  And Your Honor, I'd also like to interject at

22  this point.  Ms. Copher, initially being the head of employee

23  relations, is also an attorney.  And in so far as this post

24  action report involves something that would be related to the

25  giving of advice or performance of legal advice to the company,



www.escribers.net | 800-257-0885

1      I think it may also be privileged.

2           JUDGE TRACY:  Well --

3           MR. ROSS:  So on that basis as well, I'm objecting to

4      these questions.

5           JUDGE TRACY:  Okay.  So let's say this; I don't go for

6      that because when somebody's employed they have to have

7      whatever.  Are they the attorney or are they an investigator?

8      Totally different things.  And so if you get to that point

9      where you feel as though there is advice, then we need a lot

10     more information here --

11          MR. ROSS:  Fine.

12          JUDGE TRACY:  -- before I make some decision that somebody

13     is attorney client privilege.  There's a lot of people here who

14     have law degrees and are attorneys.  That doesn't mean

15     everything that comes out of their mouth --

16          MR. ROSS:  All right.

17          JUDGE TRACY:  -- is privileged.  It depends upon what

18     their function is.  So let's not go down that unless you have

19     to.  So I understand what you're cautioning here, but that's --

20     we haven't even --

21          MR. ROSS:  Fine.

22          JUDGE TRACY:  -- touched the surface of that.

23          MR. ROSS:  Okay.  I just don't want to be presented with a

24     situation where we're called upon to unring the bell, so to

25     speak, because something that is privileged is inadvertently



1    disclosed.  So I just want to raise this with you at this point

2    in time because I'm concerned about stuff that is privileged

3    being disclosed.  But I understand your position.  It's fine.

4    Thank you.

5         MR. RODRIGUEZ RITCHIE:  So I --

6         MS. FEINBERG:  I would just like to be on the record that

7    we have actually raised the question of whether she is an

8    appropriate person because her name shows up on the privilege

9    log.  We believe that she does not function as a lawyer.  Her

10   job description she applied did not include being a lawyer.

11   And so this isn't something new.  The employer has been on

12   notice that we have raised concerns about Ms. Copher

13   functioning as a lawyer.  We don't think that she is one.  And

14   we believe that the documents which she -- they've shielded

15   documents that she has touched.

16        And so this is an issue we have previously raised.  Not to

17   you because you've asked us to try to work it out.  But since

18   it's come up now, I just want you to know that this is not

19   like, you know, news to any of us that this is an issue.

20        JUDGE TRACY:  Okay.  And so again, although I did say that

21   if there is a dispute where everybody --

22        MS. FEINBERG:  Well, there's --

23        JUDGE TRACY:  -- if there's a disagreement when you look

24   at a privilege log of actually is that attorney client

25   privilege and you cannot resolve it, then you do need to bring

escribers
www.escribers.net | 800-257-0885

1   it to me.

2        MS. FEINBERG:  Right.  We were still trying --

3        JUDGE TRACY:  I think that we looked at something like

4   that the last time we met.  I looked at a document and I said

5   it was privileged.  So if it comes to that point, please do let

6   me know.

7        MS. FEINBERG:  We will.  And --

8        JUDGE TRACY:  This witness here, I mean, let's see what

9   she knows.  There's a lot of -- she's high up and seen a lot of

10  things.  I'm not sure how much knowledge she has of exact

11  documents when she wasn't even involved in the decision, as she

12  just testified to.  So I'm not sure what attorney client

13  privilege potentially she could even reveal.  Because a lot of

14  it is, I think, I'm not sure.  You know, so -- but if there is

15  this issue with this individual, then we can deal with it later

16  with Ms. Copher.

17       All right.  Mr. Rodriguez Ritchie, please go ahead.

18  Q    BY MR. RODRIGUEZ RITCHIE:  Besides the status report that

19  Carmen sent you, you didn't review any other documents related

20  to the Mr. Ortiz termination?

21  A    I don't believe so.  No.  Nothing I recall.  No.  I was

22  not involved in the investigation.

23  Q    You never spoke with Mr. Gecewich about the investigation?

24  A    Mr. who?

25  Q    Ricky Gecewich.


www.escribers.net | 800-257-0885

1    A    Oh.  Ricky handled the investigation I recall.  And he

2    closed the loop with me verbally, I believe it was, after.  And

3    before I got -- maybe before I got the status report.  So I was

4    informed by Rickie vernally.  And then I got Carmen's email

5    monthly report.

6    Q    So Ricky Gecewich informed you of what had -- of the

7    conclusion of the investigation?

8    A    The conclusion of the investigation.

9    Q    What did he say to you?

10    A    I don't recall other than we concluded the investigation

11    and the outcome of the investigation.

12    Q    During your time at Tesla Fremont, you participated in a

13    meeting with Mr. Musk and two employees named Jose Moran and

14    Tony Vega?

15    A    Yes.

16    Q    That was on June 7th, 2017?

17    A    Correct.

18    Q    During the meeting, the topic of unions came up?

19    A    No.  Not that I recall.  It was a meeting about safety.

20    Q    So the topic of safety committee meetings came up?

21    A    It was a meeting on safety.  And I believe we talked about

22    the participation safety committees.

23    Q    Okay.

24    A    And various things.

25    Q    And Mr. Musk brought up the safety committee meetings?



1    A    Well, safety committees we have set up in the factory.

2    And employees participate on the safety committees.  So I'm not

3    clear on your question.

4    Q    So during your meeting, the February -- excuse me.  During

5    the June 7th, 2017 meeting, Mr. Musk said something about the

6    safety committees?

7    A    I don't recall exactly Mr. Musk saying necessarily

8    something on safety committees in the meeting.  It's possible

9    we talked about them because we were always encouraging people

10    to participate on the safety committees.

11    Q    And in fact, that was the purpose of the meeting, to get

12    Mr. Moran and Mr. Vega to participate in the safety committees?

13    A    No.

14    Q    What was the purpose of the meeting?

15    A    The purpose of the meeting was to hear directly from Mr.

16    Moran his concerns around safety, because he had made some

17    complaints around safety.  So it was a great meeting where the

18    CEO wanted to hear from him directly.

19    Q    He had delivered a petition about safety to the company?

20    A    Right.  So he evidently had delivered a petition to Mr.

21    Musk and to Mr. Hedges.  And I became aware of that later.  But

22    I was invited to this meeting on safety.

23    Q    And it was Mr. Musk's idea to have a meeting?

24    A    That's my understanding.  Yeah.

25    Q    It wasn't your idea to have a meeting?



www.escribers.net | 800-257-0885

```
 1    A    No.  I was invited to the meeting.

 2    Q    After the meeting, you -- there were -- the safety

 3    committee did meet?

 4    A    After the meeting the safety --

 5    Q    So at some point after June 7th, 2017 --

 6    A    Yeah.

 7    Q    -- there were safety committee meetings that happened?

 8    A    Oh yeah.  I mean, safety committee meetings happen in the

 9    factory all the time.  I had my own meeting the next day.  Is

10    that what you're referring to?

11    Q    That's where I'm about to get to.

12    A    Okay.

13    Q    And that was on June 8th?

14    A    Correct.

15    Q    Who was there?

16    A    Okay.  So June 8th was a follow up to the prior day's

17    meeting, which I called.  Josh and I put it together.  And I

18    brought in my safety representatives from the environment

19    health and safety group.  Seth Woody headed up that function at

20    that time.  He was there, you know, again with his team

21    members.  I invited Josh and his HR representatives that

22    supported people in the factory.  And we -- Josh handled the

23    invitation.  But it was an open invitation to come and talk

24    about any safety concerns so that we could specifically follow

25    up.  So that was my idea.  Yeah, that meeting.
```



www.escribers.net | 800-257-0885

1    Q    Were there employees from production and manufacturing at

2    this June 8th meeting?

3    A    Yes.

4    Q    Mr. Moran was one of them?

5    A    I believe he was there.  It was voluntary; whoever wanted

6    could come.

7    Q    Now, the United Auto Workers, that's an entity you're

8    familiar with?

9    A    Yes, I am now.

10    Q    Okay.  So I may also refer to them as the UAW.

11    A    Thank you.

12    Q    Isn't it true that you considered employees seeking to

13    pull in the UAW at Tesla Freemont as adversaries?

14        MR. ROSS:  Excuse me, I couldn't hear the question.

15    Repeat it, please.

16        JUDGE TRACY:  If you could repeat the question.

17    Q    BY MR. RODRIGUEZ RITCHIE:  Isn't it true that you

18    considered employees seeking to pull in the UAW at Tesla

19    Freemont to be adversaries?

20    A    I did not.

21    Q    You never said that?

22    A    I don't believe I ever said that.

23    Q    Okay.  You never said that you considered Jose Moran an

24    adversary?

25        MR. ROSS:  Couldn't hear it again.  I'm sorry.



1    Q    BY MR. RODRIGUEZ RITCHIE:  You never said that you

2    considered Jose Moran an adversary?

3    A    I don't -- well, sometimes if someone was mean to me or

4    something, I would say they would be an adversary.  So I don't

5    remember a specific case where I called Jose Moran an

6    adversary.  I don't remember.

7    Q    It never happened?

8    A    I don't remember that.  No.

9    Q    On June 12th, 2017, isn't it true that you told Elon Musk

10   that getting employees to be part of the safety team would be

11   an amazing way to turn adversaries?

12   A    So that's a different question.  I may -- if -- I may have

13   said yeah, I think it's always a good idea for people to join

14   the safety committee and get involved.

15   Q    You said it would be an amazing way to turn adversaries;

16   isn't that right?

17   A    Yeah.  If he was against, you know, something, get

18   involve; fix it.  Yeah.

19   Q    And you used the words adversaries?

20   A    I -- okay.

21   Q    Correct?

22   A    I guess I did if you're looking at something.

23   Q    And Mr. Musk agreed with you?

24   A    I don't recall his response.

25   Q    Okay.  You're familiar with someone named Seth Woody?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Who is that?

3    A    Seth was the director of environment health and safety

4    when I got there.

5    Q    And he was in that position in June of 2017?

6    A    Correct.

7    Q    Isn't it true that on June 13th, 2017 you wrote to Mr.

8    Musk and you told him you wanted to promote Jose Moran and

9    other employees to be part of Seth Woody's safety team?

10   A    I don't recall that, but I am supportive of people getting

11   involved in something they think is broken.

12   Q    You never --

13   A    When you say promote, like raise his level --

14   Q    To be part of the safety team?

15   A    I can't remember.

16   Q    To become salaried?

17   A    I can't remember the specifics -- specifics of that.

18   Q    You never said that you wanted to promote Jose Moran and

19   other employees so that they wouldn't be able to advocate for

20   the union if they were part of the safety team?

21   A    I don't recall that, I --

22   Q    Okay.

23   A    I wouldn't say never, I don't recall, but --

24   Q    Okay.

25   A    I can see being an advocate for wanting people to get



1    involved in the safety committee.

2    Q    I want to show you what's been pre-marked as General

3    Counsel's Exhibit 52.  It's a three page document.  Take a

4    moment to look at it, and let me know when you're ready.

5    A    Okay.

6    Q    Okay, do you recognize General Counsel's Exhibit 52?

7    A    Yes.

8    Q    It's an email chain?

9    A    Yep.

10   Q    The top of the email is the -- of the document is the

11   newest email of the chain, correct?

12   A    Um-hum.

13   Q    And at the top it says from Gaby Toledano sent 6/13/2017

14   to --

15   A    Yep.

16   Q    -- Elon Musk?

17   A    Yep.

18   Q    That's an email that you sent to Mr. Musk?

19   A    Yep.

20   Q    Okay, and below that the next email in the chain is from

21   Elon Musk, sent Monday June 12th, 2017 at 10:53 p.m. to Gaby

22   Toledano, do you see that?  On the first page.

23   A    Yeah, yep, yep, yep.  Um-hum.

24   Q    Okay, so that was -- you recall receiving that email?

25   A    Yes.



www.escribers.net | 800-257-0885

1    Q    Okay, and then below that there's an email if you see

2    where it says on June 12th, 2017 at 9:41 p.m. Gaby Toledano,

3    gaby@tesla.com wrote?

4    A    Um-hum.

5    Q    That's an email you sent?

6    A    Yes.

7    Q    And then below that, underneath the word Gaby it says on

8    June 12th, 2017 at 9:20 p.m. Seth Woody wrote.

9    A    Um-hum.

10   Q    That's an email Mr. Woody wrote?

11   A    Okay.  Yeah.

12   Q    And below that there's an email from Elon Musk to Seth

13   Woody on Monday June 12th, 2017?

14   A    Um-hum.

15   Q    That was part of the email chain?

16   A    Yes.

17   Q    Okay, and below it says on June 12th, 2017 at 9 -- 9 p.m.

18   Seth Woody wrote, that was part of the email chain as well?

19   A    Yes.

20   Q    Okay, and underneath that from Elon Musk sent June 12th,

21   2017 at 9:06 p.m. to Seth Woody?

22   A    Yes.

23   Q    Okay, that was part of the email chain as well, correct?

24   A    Yes.

25   Q    Okay, and then lastly it says begin forwarded message from



1    Richard Ortiz date June 12th to Elon Musk.  That was also part

2    of the email chain?

3    A    Yes.

4    Q    And that was forwarding an earlier email it looks like

5    below, from Richard Ortiz June 12th, 2017 to Josh Hedges, that

6    was also part of the email chain, correct?

7    A    Well, it looks like Richard Ortiz wrote Josh, and then --

8    and then Richard forwarded it to Elon.

9    Q    Right, and that was all part of --

10   A    Yes.

11   Q    -- the same --

12   A    Yep.

13   Q    -- emails.

14   A    Yep.

15   Q    Okay, now on June the 12th, 2017 you wrote to Mr. Elon

16   Musk, and you said: "I'm using a way to turn adversaries into

17   those responsible for the problem."  You see that?

18   A    Yep.

19   Q    Do you recall writing that?

20   A    Yep.  I see it now.

21   Q    And you were referring to Jose Moran?

22   A    Right.

23   Q    And other --

24   A    People --

25   Q    -- employees that were seeking to bring in the UAW at



1    Tesla, Fremont?

2    A    I saw it as a positive, they get involved in something

3    they were criticizing.

4    Q    You saw them as adversaries?  That's what you wrote,

5    correct?

6    A    This is what's written here.

7        MR. ROSS:  Objection, right now you're being argumentative

8    with the witness.

9        JUDGE TRACY:  Overruled, overruled.

10   Q    BY MR. RODRIGUEZ RITCHIE:  That's what you wrote, correct?

11   A    That's what I wrote.

12   Q    Okay, and Mr. Musk wrote back to you the same day in fact,

13   and said:  "Exactly."

14   A    That's what I see here.

15   Q    Okay, and then on June the 13th, you wrote about your

16   meeting with Jose Moran and Tony Vega from June the 7th, do you

17   see that?

18   A    Yeah, I was clarifying to Elon who we met with.  I think

19   there was some confusion on his part.

20   Q    Okay, and you referred to Mr. Vega as the better person as

21   he is the most reasonable, but still active -- still connected

22   with the most active to unionize.  You wrote that?

23   A    What you see here, I wrote.

24   Q    Okay, and earlier you testified that you couldn't remember

25   whether you had said -- suggested that individuals be promoted.



www.escribers.net | 800-257-0885

1    I want you to take a look at the email.  It says clearly we

2    could ask all four to join Seth's team and go salary.

3    A    Right.

4    Q    You see that?

5    A    Right.

6    Q    So indeed, you did -- you did suggest that employees

7    should be salaried and join Seth's team?

8    A    I don't know if that means promoted, but yes, you would go

9    -- Seth's team had salaried employees, and so if they wanted to

10    join Seth's team, they would be salaried.  I don't know --

11    promotion is moving your level up.

12    Q    And that would have been a wage increase from their prior

13    position?

14    A    I don't know what their compensation -- you know I can't

15    confirm that.

16    Q    Do salary employees earn more than hourly employees?

17    A    Not necessarily.

18    Q    By their going salary, you thought that they would no

19    longer be able to advocate for the UAW?

20    A    I think if you're part of the safety team, meaning Seth's

21    team not the -- there's safety committees which employees are

22    part of, and so not to be confused.  If you wanted to be part

23    of Seth's safety team, those are salaried employees and then, I

24    don't believe you -- my understand was that you couldn't -- you

25    know, advocate for, correct.



1    Q    And that was why you were suggesting that they should

2    become salaried, not to advocate for the UAW at Tesla, Fremont?

3    A    No, they would be salaried if they were part of the team

4    automatically.

5    Q    And not be able to advocate for the UAW at Tesla, Fremont?

6    A    If they were part of the team, they would not be able to

7    advocate.

8    Q    Okay, and then --

9    A    They'd be part of the solution to safety issues.

10   Q    And indeed that's what you wrote, if they join the safety

11   team, then they would not be considered part of management and

12   not eligible to advocate for a union should they accept those

13   roles.  You wrote that email, correct?

14        MR. ROSS:  Objection, argumentative document speaks for

15   itself.

16        JUDGE TRACY:  Overruled.

17        THE WITNESS:  That's -- yes.

18   Q    BY MR. RODRIGUEZ RITCHIE:  Besides the emails in General

19   Counsel's Exhibit 52, are there other emails between you and

20   Mr. Musk that refer to the UAW?

21   A    I don't know.  There could be.

22   Q    There other emails that refer to unions?

23   A    There could be.

24   Q    Are there other emails that refer to Jose Moran?

25   A    I guess there could be, but I don't know exactly why.  I



 1    never, you know.

 2    Q    There are other emails that refer to Richard Ortiz?

 3    A    Not that I specifically recall.  I don't believe I ever

 4    met Richard Ortiz, but no -- I don't know.  I don't recall

 5    every email.  I haven't been on email since late June.

 6    Q    Okay, I want to ask you a question about the document and

 7    something that you wrote?

 8    A    Um-hum.

 9    Q    If you look at the third line down below Elon --

10    A    Um-hum.

11    Q    -- at the top?

12    A    Um-hum.

13    Q    It has the name Victor Ortiz?

14    A    Yeah.

15    Q    That referred to Richard Ortiz, correct?

16    A    I'm not sure.  There might have been a Victor Ortiz.

17         MR. ROSS:  What are you referring to?  I'm sorry.

18         THE WITNESS:  Oh, because I had a meeting on that

19    Thursday, I remember June 8th, and a lot of people were there.

20         MR. ROSS:  I'm sorry, but I'm not understanding where

21    you're referring her to?

22         MR. RODRIGUEZ RITCHIE:  The third line beneath the name

23    Elon, next --

24         MR. ROSS:  Elon's mentioned, is the --

25         MR. RODRIGUEZ RITCHIE:  -- to Tony.  At the top.



1       MR. ROSS:  At the top, okay.  Thank you.

2       MR. RODRIGUEZ RITCHIE:  Sure.

3       THE WITNESS:  I can't be sure, but there were a lot of

4   people at the meeting, and I don't recall -- I had never met

5   them before, so.

6   Q    BY MR. RODRIGUEZ RITCHIE:  So would it have been referred

7   to whoever, to -- a person with the last name Ortiz that was at

8   the meeting?

9   A    I guess so, yeah.  Yeah.  I think here I'm trying to

10  remind him of -- and I'm also trying to figure out who is who,

11  but there was a guy who was kind of mean to me in that meeting,

12  and that's what I was calling out there.

13  Q    I'm going to show you what's been pre-marked as General

14  Counsel's Exhibit 55.  It's 22 pages, so take a moment to look

15  at it.

16  A    Okay.  Um-hum.

17  Q    Okay, do you recognize General Counsel's Exhibit 55?

18  A    Well, I don't -- it's an email invite, invitation it looks

19  like from a calendar.  Josh's calendar.

20  Q    And you see where it says -- I'm referring to the first

21  page.

22  A    Yeah.

23      MR. ROSS:  I couldn't hear you, I'm sorry.

24      MR. RODRIGUEZ RITCHIE:  I'm referring to the first page.

25      THE WITNESS:  Um-hum.



1    Q    BY MR. RODRIGUEZ RITCHIE:  You see where it says safety

2    meeting?

3    A    Yes.

4    Q    And then it says start 6/8/2017 and then end 6/8/2017, one

5    to two?

6    A    Yep.

7    Q    This is a meeting invite for the safety meeting you

8    referred to that happened on June 8th?

9    A    Correct.

10    Q    This is the one you attended with other production

11    manufacturing employees?  Seth Woody and to HR business

12    partners?

13    A    Yes.

14    Q    The one you testified about earlier?

15    A    Yes.

16    Q    And there's 22 pages in General Counsel's Exhibit 55.

17    A    Um-hum.

18    Q    They -- if you take a moment to look at them they all say

19    safety meeting as a subject, and they all say start end on June

20    8th --

21    A    Yep.

22    Q    -- 2017, one to two?

23    Q    Yep.

24    Q    So these are meeting in by itself for the same meeting --

25    A    Correct.



1   Q   -- on June 8th?

2   A   Correct, it looks.

3   Q   I want you to take a look at page 9 of General Counsel's

4   Exhibit 55, are you on page 9?

5   A   I believe so.

6   Q   Okay.

7   A   Are they marked?  No.

8   Q   At the bottom.

9   A   Oh, I see.  Yeah, I'm on page nine.

10  Q   Okay, it says optional attendees, do you see that?

11  A   Yep.

12  Q   Okay, and if you go in the list of optional attendees, the

13  name Richard Ortiz appears.

14  A   Okay.

15  Q   So in your email, that's in General Counsel's Exhibit --

16  A   Yeah.

17  Q   -- 52, the Victor Ortiz that refers to Richard Ortiz that

18  attended --

19  A   It's possible.

20  Q   -- the meeting?

21  A   Yep, yep.

22  Q   And there's no Victor Ortiz that attended the meeting?

23  A   Well, I don't know if this is all the attendees.  It looks

24  like Josh invited certain people, or certain people said Jose

25  might have told him invite these people.



www.escribers.net | 800-257-0885

1    Q    You don't have a specific memory of an individual named

2    Victor Ortiz attended?

3    A    No, but I don't know a lot of these individuals, so I

4    don't know.

5    Q    Let have one moment.

6        JUDGE TRACY:  Sure.

7        MR. RODRIGUEZ RITCHIE:  Okay, at this time the General

8    Counsel would move General Counsel's Exhibit 52 and 55 into

9    evidence?

10        JUDGE TRACY:  Any objections?

11        MR. ROSS:  No.

12        JUDGE TRACY:  All right.  So General Counsel's Exhibits 52

13    and 55 are admitted into evidence.

14    **(General Counsel Exhibit Number 52 and 55 Received into**

15    **Evidence)**

16        MR. RODRIGUEZ RITCHIE:  I'd ask that the affidavit be

17    returned to me?

18        MR. ROSS:  Well, the affidavit I have is my copy, so

19    Mister --

20        MR. RODRIGUEZ RITCHIE:  It's over here.

21        THE WITNESS:  I already returned mine.

22        MR. ROSS:  Sort of has --

23        MR. RODRIGUEZ RITCHIE:  Okay, and if you do have this --

24        THE WITNESS:  Oh, sorry.

25        JUDGE TRACY:  Any other questions?



www.escribers.net | 800-257-0885

1      MR. RODRIGUEZ RITCHIE:  No.

2      JUDGE TRACY:  Okay, for the union any questions?

3      MS. FEINBERG:  Yes, I do.  Could I just have a couple --

4  just a minute to organize this so it's sufficient?

5      MR. RODRIGUEZ RITCHIE:  Would it be a good time for a

6  restroom break?

7      JUDGE TRACY:  Sure.  Let's take a break, let's go off the

8  record for five, seven minutes.  Just if you could just come

9  back as soon as possible.  Okay?

10     MR. RODRIGUEZ RITCHIE:  Okay.

11     JUDGE TRACY:  Let's go off the record.

12 (Off the record at 11:02 a.m.)

13     JUDGE TRACY:  Okay, so let's go ahead and go back on the

14 record.  Okay.

15     All right, Ms. Feinberg.  Go ahead, please.

16                    **DIRECT EXAMINATION**

17  Q   BY MS. FEINBERG:  Okay, so hello.

18  A   Hello.

19  Q   I'm Margo Feinberg, and I'm counsel for the charging

20 parties, which is the UAW, Michael Sanchez, Jonathan Galescu,

21 and Richard Ortiz.

22  A   Um-hum.

23  Q   So I'm going to ask you a few questions --

24  A   Okay.

25  Q   -- following up on some of the questions the labor board



1    has asked you.  So when you came -- before you came to Tesla,

2    had you ever worked in a setting that had -- where there had

3    been a union?

4    A    Not -- not that -- no.  No, I don't believe so.

5    Q    Or where there had been union organizing campaign?

6    A    Not to my knowledge, no.

7    Q    Okay, and when you -- when you applied for this position,

8    was this a brand new position or one that had already existed

9    at Tesla?

10   A    It had existed prior.

11   Q    Oh, and who had held the position before you?

12   A    Arnnon Geshuri or something?

13   Q    Okay, and -- and had you -- did you discuss the position

14   with him at the time of the transition?

15   A    Not prior taking the job, no.

16   Q    Okay, and then once taking the job did you discuss the

17   things within --

18   A    We discussed a few things, he was transitioning out.

19   Q    Okay, and at any time in the discussions with Arnnon, did

20   the topic of the UAW come up?

21   A    It wasn't an area of focus if it did.  Much of the

22   discussion was around the team I was inheriting, open

23   positions, why I had 32 direct reports.

24   Q    But it did -- it did come up?

25   A    Well, I don't know if it -- I don't recall if it did or



www.escribers.net | 800-257-0885

1    didn't.

2    Q    Okay.

3    A    I do not recall it being an area of focus.

4    Q    Okay, and when you applied for the job, were you

5    interviewed by Mr. Musk?

6    A    Yes.

7    Q    And as part of that, was the discussion of labor -- your

8    experience in labor relations addressed?

9    A    Not once.

10   Q    Okay, and did Mr. Musk raise the issue of the UAW with

11   you?

12   A    No.

13   Q    And did you do any of your own research before like on the

14   internet about Tesla, and its labor relations, and union

15   relations before applying for the job?

16   A    Call me stupid, but I did not do any research on labor

17   relations issues related to Tesla.

18   Q    Okay, and what I realize at some point you met Mr. Jose

19   Moran.  When was the first time that you heard his name?

20   Q    I believe it when I met him, maybe I first hear his name

21   when the -- there was a petition he did on safety I believe it

22   was that was forwarded to me, so maybe that's the first time I

23   heard his name.

24   Q    Okay.

25   A    And then I met him on June 7th.



www.escribers.net | 800-257-0885

1    Q    And were you aware that Mr. Moran had raised issues about

2    safety concerns as early as February of 2017 at the plant?

3    A    No.

4    Q    Were you aware that members of Tesla management had met

5    with him and made promises to him regarding -- addressing

6    issues of safety that he had raised?

7    A    No.

8    Q    Did you know that he had been invited previously to

9    participate in some safety, and that Tesla had never followed

10   up?

11   A    No.

12   Q    Okay, and so when you -- did you ever discuss Jose Moran

13   with Josh Hedges?

14   A    Did I ever discuss Jose --

15   Q    Ever?

16        MR. ROSS:  At any time?

17   Q    BY MS. FEINBERG:  At any time.

18   A    At any time?  I'm sure -- I'm sure I did.  I don't

19   remember the specifics, but --

20        JUDGE TRACY:  Remember, if there isn't an objection, --

21        MR. ROSS:  I'm sorry.

22   Q    BY MS. FEINBERG:  Okay, and do you remember the first time

23   that you and Josh Hedges had just discussed Jose Moran?

24   A    I -- it may have been when he forwarded me a petition that

25   Jose had sent him.



www.escribers.net | 800-257-0885

1   Q    And at that time did Josh Hedges give you any background

2   on Jose Moran?

3   A    Not a lot, not a lot.

4   Q    And then did you do any of your own research about Jose

5   Moran?

6   A    No.  I did not even read the petition at that time.

7   Q    Why?

8   A    Because it was a Tuesday, and I was typically at the

9   office until midnight, because -- in Palo Alto those were Elon

10  Musk days, and back to back meetings usually to around

11  midnight.  And I had at that time probably around 32 direct

12  reports who forwarded a lot of email, so I have subsequently

13  read the petition, but I did not read it at the time.

14  Q    Did you read it before June 8th?

15  A    No.

16  Q    So you were convening a meeting to discuss the concerns,

17  but you didn't read the concerns?

18  A    I was in charge of safety as part of environment health

19  and safety.

20  Q    Um-hum.

21  Q    I -- my responsibility was to address safety concerns just

22  like it's Moran's responsibility to address harassment or

23  discrimination concerns.  So yeah, Josh said he had concerns

24  around safety you know, and Elon was wanting to meet with him,

25  and I was invited to the meeting.


www.escribers.net | 800-257-0885

1    Q   But you were aware that Mr. Moran was an activist with the

2    UAW around safety issues in June of 2017?

3    A   I don't know how much awareness I had, but I knew he had

4    made complaints about safety in that petition because I was

5    told, and it was forwarded to me.

6    Q   Okay, but do you have General Counsel's Exhibit 52?

7       MR. RODRIGUEZ RITCHIE:  I believe the exhibits are not

8    there, but I will  hand them --

9       MS. FEINBERG:  Oh, sorry.

10       MR. RODRIGUEZ RITCHIE:  -- General Counsel's Exhibit 52.

11       MS. FEINBERG:  Thank you.

12       THE WITNESS:  So June --

13       MS. FEINBERG:  I'll just start in the --

14       THE WITNESS:  Well, this is the one you just said.

15       MS. FEINBERG:  Yes, exactly --

16       THE WITNESS:  Okay.

17       MS. FEINBERG:  -- but we're bringing it back to you.

18       THE WITNESS:  Okay.

19    Q   BY MS. FEINBERG:  Because on June 13th you write with

20    respect to Jose Moran, Tony Vega, --

21    A   Yeah.

22    Q   -- what we believe is -- well, we believe is -- well, it's

23    Mr. Ortiz and Jonathan Galescu, you say all four are pro union?

24    A   Yeah.

25    Q   So when did you become aware that all four were pro union?



www.escribers.net | 800-257-0885

1    A    In the -- between I would say probably around June 8th.  I

2    remember the meeting on June 8th, when Mr. Galescu stood up.  I

3    asked Josh after, who was that?  And you know, as I say over

4    time people would start sharing information with me or

5    educating me.  But I was -- there was a moment when they almost

6    you know, brought in security and I said it's okay.  He stood

7    up and kind of -- so you know, I -- I was learning as events

8    would occur for things like that.  So probably around June 8th,

9    and thereafter over time.  I'm not -- I mean I'm not 100

10   percent certain as I said earlier.

11   Q    So when you were talking to Ricky Gecewich about Mr.

12   Ortiz, you were aware that he was the same Mr. Ortiz who you

13   had identified as a union activist?

14   A    When Ricky was telling me the results of the

15   investigation, I was aware.

16   Q    And did you do any of your own research as to the facts

17   regarding Mr. Ortiz's termination?

18   A    No.

19   Q    Okay, do you know why those two individuals whose pictures

20   had been taken on Workday were identified in the first place?

21   A    I'm sorry, whose pictures?

22   Q    You know what --

23   A    Yeah.

24   Q    There were two employees.

25   A    Okay.



www.escribers.net | 800-257-0885

1  Q    I -- I assume that's the issue, right?  There were two

2  employees whose pictures had been taken off of Workday and

3  posted, is that what you understood?  That was a concern?

4  A    I was not involved in the investigation.  I do know Mr.

5  Ortiz -- well, they -- they found that he lied in an

6  investigation.  I don't know if the investigation was

7  specifically about Mr. Ortiz or other people, but he was

8  involved in an investigation and lied, and --

9  Q    And what was the lie?

10  A    I actually don't know what the lie was.  And Carmen's

11  report doesn't even provide that detail.  But it'll say

12  investigation conducted you know, substantiated or not.  But I

13  don't know what --

14  Q    And you never even inquired as to what the lie was?

15  A    He wasn't an executive, I wasn't involved in the

16  investigation, it was not my --

17  Q    You were writing with Elon Musk about him -- about him.

18  Do you write to Elon Musk about many employees?

19  A    Well, this was a top -- we were in discussing, them

20  joining the safety committee.

21  Q    I know, but how often do you write about particular named

22  employees to Mr. Musk?

23  A    On occasion when things -- matters come up.

24  Q    Right.

25  A    In this case --



1    Q    But it's not common.  You have thousands and thousands of

2    employees at that plant.  Isn't it unusual to be actually

3    naming employees in communication with Mr. Musk?

4    A    I don't think so, and here I'm trying to clarify for him,

5    you know.  We met on June 7th with Jose Moran and Tony Vega,

6    not -- I think there was some confusion.  So I'm trying to

7    clarify, and these are the other employees that were at my June

8    8th meeting.

9    Q    But that's not what this memo's about.  This memo is about

10   the fact that you -- that they are union activists, and the

11   memo's about the fact that you think you can move them out of

12   the bargaining unit.  What are you trying to clarify there?

13   A    They complained about safety.  If they became part of the

14   safety team, they would resolve safety issues.

15   Q    What other measures did you take to address their safety

16   concerns?

17   A    A lot.  I mean that was the whole purpose of the June 8th

18   meeting.  Oh, and also after --

19   Q    But what other measures did you --

20        MR. ROSS:  Excuse me.

21        MS. FEINBERG: -- actually take?

22        MR. ROSS:  Excuse me, Your Honor.  The witness is

23   answering the question, Ms. Feinberg is interrupting her mid-

24   sentence.  I think the witness ought to be allowed to finish

25   her sentence.



www.escribers.net | 800-257-0885

1        JUDGE TRACY:  So --

2        MS. FEINBERG:  I think she was tangenting, but okay.  I'll

3    let you --

4        THE WITNESS:  No wait.

5        JUDGE TRACY:  Go ahead and finish what you were saying.

6        THE WITNESS:  You were saying -- what do we do to help

7    resolve safety issues?

8    Q    BY MS. FEINBERG:  No.  The specific issues that were

9    raised by Mr. Moran, Mr. Galescu in the -- in the petition.

10   What -- what steps did you take to address those specific

11   concerns?

12   A    Right.  So first there was a -- Elon wanted to meet with

13   him to hear the concerns directly, and I was invited in.  So

14   the CEO took the time to hear the concerns directly, and

15   respond to certain ideas that Tony in particular, had some

16   really specific equipment ideas.  And Elon was very supportive,

17   so I thought that was a positive meeting.  He also -- Elon

18   committed to weekly safety meetings thereafter with whomever

19   from the factory -- either had been injured, or wanted to be in

20   the meetings.  And so it involved production, people from my

21   safety team, I attended you know, most often.  And so he

22   started having weekly meetings where he would hear specifics,

23   and he would approve certain equipment in budget.  So and then

24   as I say I myself as a follow up to the June 7th meeting

25   volunteered to have a bigger meeting where we would write down



www.escribers.net | 800-257-0885

1    any concerns they -- whoever came into the room had, and we did

2    so and I was pretty tough on my safety team in terms of making

3    sure they followed up on whatever they raised with sincerity,

4    so.

5    Q    And is there any documentation that shows that the issues

6    that were raised were actually addressed?

7    A    Not that I have, but I'm --

8    Q    So for example, Mr. Vega recommended particular equipment.

9    Do you know if that equipment was purchased?

10   A    I don't know specifically. I didn't personally follow up

11   on each action, but the safety team did, and people in

12   production management.

13   Q    And these weekly safety meetings, is that the management

14   safety meetings?

15   A    The -- I don't know what we called them, but Elon added

16   them to his calendar following the June 7th meeting. And they

17   happened weekly on -- typically on Wednesdays, Wednesday

18   afternoons, and it would be manage -- production management,

19   Seth, and a couple members of his team, various people were

20   invited, as well as people from the factory to describe any

21   concerns they had so that Elon could approve budgets or approve

22   equipment.

23   Q    So are you saying that Mr. Musk met with workers from the

24   shop floor on -- on an occasion other than the one that's

25   described in General Counsel 52 regarding safety issues?



www.escribers.net | 800-257-0885

1    A    Yeah, he had weekly meetings, and he would also walk the

2    factory floor frequently, and talk to workers a lot.

3    Q    Okay, and do you know any other meetings in which he was

4    present where Mr. Moran was invited?

5    A    Not specifically Mr. Moran, no.  I'm not -- I don't

6    recall.

7    Q    And how about Mr. Galescu?

8    A    I don't recall a safety meeting -- I would go to the

9    weekly safety meetings that Elon had, I don't recall Mr. Moran

10    or Mr. Galescu specifically.

11    Q    Do recall any members of -- any workers who were present

12    who weren't in supervision or management?

13    A    Well, I didn't -- I'm sure -- yeah, there were -- there

14    were people that were not in management in those meetings.

15    Various people, I didn't know them.  I don't recollect all

16    their names.

17    Q    And how did you know that they weren't there for

18    supervision?

19    A    Because they would speak about -- in some cases having

20    been injured.  And you know, their jobs.  So this was not all

21    management.

22    Q    Okay.  And were there --

23    A    That was the point to the meeting was to hear directly,

24    you wanted to hear directly from people working the line.

25    Q    And are there minutes at those meetings?



1      MR. ROSS:  I'm sorry, I couldn't hear.

2      MS. FEINBERG:  Are there minutes at those meetings --

3      MR. ROSS:  Thank you.

4      MS. FEINBERG:  -- or notes?

5      THE WITNESS:  Not that I have.

6  Q    BY MS. FEINBERG:  Who would have been responsible for

7  that?

8  A    Seth, if anyone would have taken notes in those meetings.

9  Q    And did you speak to Seth Hedges in preparation for your

10  testimony here today?

11  A    Seth Hedges?  You mean --

12  Q    I'm sorry, Josh Hedges.

13  A    I did not --

14  Q    Or Seth Woody, but Josh Hedges is who I meant, so let's

15  start with him.

16  A    Josh and I both spoke about the fact that we have to be

17  involved in this trial, yeah.  Witness, not specifics.  And I

18  was not at dinner with Josh last night.

19  Q    No, but what I'm asking you is did you speak to him on the

20  phone before testifying here today about your testimony?

21  A    We spoke on the phone, and again because it was so long

22  ago, and I haven't been on email you know, he reminded me of

23  you know, Jose Moran had a petition and you didn't receive it,

24  but I told you about it later.  So he just refreshed my memory

25  at a high level.  Okay, wait.  Let me think back and we went at



1   high level that kind of -- maybe --

2   Q    How long was that conversation?

3   A    About five minutes, three to five minutes.

4   Q    And any other workers names were mentioned in that call?

5   A    Possibly Tony Vega, just you know, again going through,

6   then there was the meeting the next day.

7   Q    And it was -- I'm sorry, and was that one call or more

8   than one call?

9   A    One.  One, three to five minutes max.  On a completely

10  different subject, and then we just happened to --

11  Q    What was the other topic?

12  A    It's personal to him, nothing to do with this.  He's one

13  of my direct reports, and my friend.

14  Q    All right.  And Seth Woody?

15  A    Yeah.

16  Q    Have you spoken to him about this proceeding?

17  A    Nope.

18  Q    And have you spoken to Elon Musk about this proceeding?

19  A    Nope.

20  Q    When was the last time you spoke to him?

21  A    The last time I talked to Elon was probably when I left on

22  June 20th or 21st, whatever the date was and told him I was

23  going on -- ask for a leave, which he approved.  End of June.

24  Q    And are you familiar with Michael Sanchez, as employee at

25  Tesla?


www.escribers.net | 800-257-0885

1  A    I don't know Michael -- I don't believe I know a Michael

2  Sanchez.

3  Q    Jayson Henry?

4  A    No.

5  Q    Michael Williams?

6  A    No.

7  Q    Timothy Cotton?

8  A    No.

9  Q    Eric Vasquez?

10  A    No.

11  Q    Branton Phillips?

12  A    I've heard his name.

13  Q    Did you ever meet him?

14  A    He might have been in that June 8th meeting, but as I say

15  I -- I didn't know anyone, so -- but he might have attended

16  that June 8th meeting.

17  Q    And Sean Jones?

18  A    No.

19  Q    And who was your -- you mentioned that you had an

20  assistant, who was that?

21  A    My assistant was Kasha, and she left Tesla --

22  Q    Okay, and --

23  A    -- months ago.

24  Q    -- can you give us her full name?

25  A    Yes, and I'm blanking for some reason.



www.escribers.net | 800-257-0885

1      MR. ROSS:  What's the question?

2      THE WITNESS:  Who my assistant was, I had --

3      JUDGE TRACY:  Well, you don't need to look on your phone.

4  If you don't recall from your memory, then that's fine.

5      THE WITNESS:   I'm blanking.  It's ridiculous.

6      MS. FEINBERG:  Okay, well if in the course of this

7  testimony, if it comes to you --

8      THE WITNESS:  Yeah.

9  Q    BY MS. FEINBERG:  Okay.  Oh, I'm sorry, and when did she

10 leave Tesla?

11 A    She left I think in the beginning of August, or sometime

12 in August.

13 Q    And you said that there were a number of calls that you

14 had listened in to regarding the UAW, I think you referred to

15 them as privileged, on what basis do you say that?

16 A    The attorneys were on the call, and it wasn't necessarily

17 on the UAW, it's just any matters related to labor -- various

18 topics came up.

19 Q    I mean you said --

20 A    It's always led by the GC and the members of his team.

21 Q    So the in-house counsel?

22 A    Yes.

23 Q    And when -- when was the first time you participated in

24 such a call?

25 A    That's -- I don't recall when they started, or when they



1   started inviting me, but I don't recall.  It wasn't my -- my --

2   they weren't my calls.  I was one of many attendees who could

3   or could not join.

4   Q    Okay, and did you say you were involved in the decision to

5   hire this senior manager of labor relations?

6        MR. ROSS:  I couldn't hear the question, I'm sorry.

7   Q    BY MS. FEINBERG:  What is her name?  I believe you said

8   that you hired someone underneath you for labor relations, do

9   you recall that testimony?

10  A    Carmen Copher I -- I -- who is an attorney, who was on the

11  -- who is an in-house attorney.  I transferred her to be my

12  director of -- in the beginning we called it employer relations

13  and labor relations.  And then ultimately we just called it

14  employee relations.

15  Q    Okay.

16  A    Is that what you were --

17  Q    Okay.  I'm going to -- okay.

18       MS. FEINBERG:  So I guess this would be Charging Party 1?

19  **(Charging Party Exhibit Number 1 Marked for Identification)**

20       THE WITNESS:  I'm not sure what this is.

21  Q    BY MS. FEINBERG:  Okay, you can take a moment to --

22  A    Senior manager labor relations.  Oh, this might be a job

23  under Carmen.  I'm not quite sure because I haven't --

24  A    So this isn't the job that Carmen held?

25  A    No.



www.escribers.net | 800-257-0885

1    Q    This is under Carmen?

2    A    This is not the job Carmen held.

3    Q    Okay, and is there a job description for the job Carmen

4    held?

5    A    I'm not sure, she just transferred over -- director of

6    employer relations and labor relations.

7    Q    And did you approve this job description?  Job applicable

8    notice?

9    A    I don't know if I did or not, but I'm assuming this is a

10   job under Carmen.

11   Q    And Carmen was there on June 15th, 2017 in your -- under

12   your direction?

13   A    I can't remember exact transfer date -- that seems pretty

14   quick.  This might have been posted before she was in that job.

15   I can't -- I can't be sure when.

16   Q    And if it was before then, would that been under your

17   direction that this job would have been posted?

18   A    I would recall -- it's certainly not a job that reported

19   to me, so I don't -- being recruiting department posts

20   thousands of jobs, I don't --

21   Q    Okay, but I notice under requirements, the third bullet

22   down, can you read that where it says 10 --

23   A    Knowledge of -- um-hum.

24   Q    Ten years of labor relations experience specifically in

25   leading union organizing campaigns, experience in complex labor



www.escribers.net | 800-257-0885

1    issues required?

2    A    Um-hum.

3    Q    So in June of 2017, was Tesla looking for someone who had

4    that knowledge?

5    A    Sounds like it, yeah.

6    Q    And were you aware of that fact?

7    A    I did not -- not see this posting to my knowledge before.

8    It's not something reported to me, but it -- I don't know, this

9    could have been something the legal department -- let's see

10   where does it say it reports?  Senior manager labor relations

11   -- yeah, I'm not -- I'm not familiar with this particular job.

12   I'm only guessing at this point.  This is not Carmen's job.

13   Q    Okay, and did you have someone in your staff who you

14   turned to with respects to expertise in union organizing

15   campaigns?

16   A    No one in particular on my staff, obviously it wasn't my

17   area of expertise.  So there were others in the company more

18   expert in this area, not -- not -- I believe at some point

19   Carmen hired somebody, whether it was a senior manager or

20   manager who had some experience in this area.

21   Q    Okay, but earlier you were asked some questions about the

22   ramp up of the performance evaluation process?

23   A    Yeah.

24   Q    And when -- when would you say that process actually --

25   when you -- when did you start rolling that out?



1    A    I don't remember -- I mean I -- you know, I -- maybe we

2    started working on it in July or August.  I think the

3    performance evaluation process was in October, but maybe --

4    anyway, it was in the fall, I think.  Which is a very common

5    thing to look at as a head of HR performance management.

6    Q    Okay, and at that time you -- you were aware that there

7    was an organizing campaign going on in Tesla?

8    A    I think at that point I must've been aware.  I was

9    certainly aware people were advocating to unionize.

10    Q    And in your -- in the General Counsel Exhibit 52, you

11    reference moving some people into safety -- to safety

12    positions?

13    A    Um-hum.

14    Q    And so they would be -- be no longer eligible to advocate

15    for a union.  Do you of any other discussions regarding either

16    moving people from their positions into management, or laying

17    them off to achieve that end?

18    A    No, and this would've been voluntary.  We can't force

19    someone to take a job.

20    Q    Right.

21    A    But --

22    Q    Were you -- was it your intention to disclose to them that

23    they no longer could advocate for the union?

24    A    They would have to have been told that.  Once you I think

25    move into management, this is just fact, I think that's the



www.escribers.net | 800-257-0885

1   fact.  You can't -- I don't -- I'm not sure of an answer.  But

2   we would tell them if that were the case.

3   Q    And were there other -- other workers who had raised

4   safety concerns?

5   A    I'm sure.

6   Q    And did you make that same consideration to offer them an

7   opportunity to participate in management?

8   A    People could absolutely apply to work.  In fact, many of

9   our workers on the safety team were prior factory workers.

10  Q    That's not what I'm asking you.  I'm asking you whether

11  you actually asked any other employees who had been outspoken

12  around safety issues to join the management team?

13  A    I'm not sure, maybe Seth did.  Or people on Seth's team

14  would very much wanted people from the factory to be on the

15  safety team, because they knew what to do, and how to address

16  things.

17  Q    Did you recommend any other employee to be promoted unto

18  the safety team, other than the four that are referenced in

19  General Counsel's 52?

20  A    Not that I'm aware of.  Did we even ask them to be on the

21  safety team?

22  Q    I'm asking whether you personally -- you may have made --

23  wrote to anyone recommending that as an idea for anyone other

24  than the four mentioned in General Counsel 52?

25  A    Not that I recall.



1    Q    And when you indicated that the meetings like on June 8th

2    was open to many people, but I'm -- when -- oh, where's General

3    Counsel's 55, does she still have 55?

4         MR. RODRIGUEZ RITCHIE:  No, would you like me to hand?

5         MS. FEINBERG:  Please, thank you for asking.

6         MR. RODRIGUEZ RITCHIE:  Handing over General Counsel's

7    Exhibit 55.

8         THE WITNESS:  Yep.

9    Q    BY MS. FEINBERG:  Okay, so if you look on page -- like the

10   second to last page, 21.

11   A    Um-hum.

12   Q    Which is a start, and it's about the meeting that's going

13   to start in June 8th at one, and it says required attendees, --

14   A    Um-hum.

15   Q    -- and then it says optional attendees.

16   A    Um-hum.

17   Q    So where would there be any -- how -- you indicated that

18   it was open to others.  Are the others you're referring to the

19   optional attendees?

20   A    I'm not sure.  You know, Josh was in charge of sort of

21   getting anyone who wanted to come and share safety concerns.

22   It was a follow up from the Jose meeting the prior day, so most

23   certainly Jose knew he'd be a part of that.  But there were a

24   lot more people than this number represented here, for sure.

25   Q    Was there a sign in sheet?


www.escribers.net | 800-257-0885

1    A    Not that I recall.  It's possible.

2    Q    Okay, so who was Elena Elliot?

3    A    Yeah, look Elena, Kristen (phonetic), Liza, they are part

4    of Josh's team -- HR team.

5    Q    So they are all either supervision or management?

6    A    Not -- not managers.  They were -- yeah, HR people.  HR

7    partners.

8    Q    Okay, okay.  And then what we know are Richard Ortiz,

9    Jonathan Galescu, Tony Vega, do you know Hai Nguyen?

10   A    I don't.

11   Q    Did you know Hai Nguyen was one of the people who

12   presented the petition?

13   A    Not that I recall.  The email came from Jose.  Not to me,

14   but to other people.

15   Q    Okay, do you know Mickey -- Michael Catura?  Or Mickey

16   Catura?

17   A    No.

18   Q    Have you ever heard his name before?

19   A    I -- not that I recall.

20   Q    One moment please.

21   A    Branton, I've heard of for sure.

22   Q    One second, I just have to verify the -- okay, were you

23   aware that there had been charges filed by the -- you -- by

24   certain employees with respect to Tesla prior to the June 8th

25   meeting?



www.escribers.net | 800-257-0885

1    A    Can you say that again?

2    Q    Were you aware that certain employees and the UAW had come

3    to the NLRB, and filed charges regarding incidents that had

4    happened at Tesla prior to your June 8th meeting?

5    A    I don't specifically remember being aware or

6    understanding, if I was made aware by copies, it's possible

7    somebody forwarded an email to me.  But it --

8    Q    Okay.

9    A    In other words, maybe someone on my team forwarded an

10   email to me along with a group of people about something.

11   Whether I read it in this kind of thing -- I just -- was not

12   acutely aware of any of this history.

13   Q    So you never heard the name Michael Catura or Mickey

14   Catura prior to June 8th?

15   A    I don't recall that name.

16   Q    Okay.

17   A    I mean if you ask me who he is, or what he looks like, or

18   what he did, I can't tell you that.

19   Q    Okay, and were you ever briefed on any of the situation

20   regarding leafleting out in front of the plant?

21   A    Those topics would come up on those calls I referred to.

22   Q    Um-hum.  And were names --

23   A    I was a listener.

24   Q    Um-hum, and were names mentioned?

25   A    It's possible names were mentioned for sure, as I say I



www.escribers.net | 800-257-0885

1    was on some of those call when I could make it, I was not on

2    the calls when I couldn't.

3    Q    Okay, so did you know anything about whether Michael

4    Catura had a relationship with the UAW?

5    A    Not that I recall.

6    Q    Okay, and how about Hai Nguyen?

7    A    He sounds more vaguely familiar as a name for sure, and

8    for sure I think I knew that he was.

9    Q    Okay, and how about Branton Phillips?

10   A    Branton I did know, yeah.

11   Q    And Garret Green?

12   A    I don't remember Garrett -- Garrett Green.

13   Q    Okay, and are the rest of the names here starting with

14   Krista Washington people who are with Tesla in -- in a

15   supervisory or management position or confidential position?

16   A    Or HR, I believe so.

17   Q    Okay, so isn't it true that all the workers who are listed

18   here are active with the petition, and active with the UAW?

19   A    I'm not sure about that, because I don't know Jerome, or

20   Garret, or some of these people.  But again there were more --

21   other people also in that meeting for sure.  It was a bigger

22   meeting.  And again it was -- you know, the direction was --

23   Q    I'm sorry, but there's no question before you.

24   A    Okay.

25   Q    As tempting as that -- it's not a natural process.



1    A    Okay, no problem.

2    Q    Sorry about it.

3    A    That's okay.

4    Q    And on the June 7th meeting that you had that you describe

5    in General Counsel Exhibit 52, --

6    A    Um-hum.

7    Q    -- did you take notes of that meeting?

8    A    No.

9    Q    Okay, and the last email on this chain, General Counsel

10   Exhibit 52 ends on June 13 when you're writing to Mr. Musk, --

11   A    Um-hum.

12   Q    -- do you know whether he replied to you?

13        MR. ROSS:  What was the question?  I couldn't hear you.

14        MS. FEINBERG:  Whether he replied to the -- the last email

15   of --

16        MR. ROSS:  Thank you.

17        MS. FEINBERG:  -- the chain on General Counsel Exhibit 52.

18        THE WITNESS:  I don't know if he replied, and I also don't

19   know if we ever asked them to join the safety team.  I mean, I

20   can't remember.

21   Q    BY MS. FEINBERG:  Were you aware that on June 12th, 2017

22   the UAW had filed additional charges against Tesla?  The day

23   that you were writing to Mr. Musk, were you aware during that

24   same time frame that there were additional unfair labor

25   practices charges filed against Mr. Musk that are part of the



1    instant proceeding?

2    A    I don't think -- I might have been FYI'd but I don't

3    specifically remember that, no.

4    Q    And who -- who would be responsible for that within the

5    company?

6    A    Of telling me?

7         MR. ROSS:  Responsible for what?

8         MS. FEINBERG:  For handling the NLRB charges within the

9    company.

10        THE WITNESS:  The legal department.

11   Q    BY MS. FEINBERG:  But are you the person who would be

12   served for the company with those charges?

13   A    Sometimes they would send stuff to Josh.  Or it's possible

14   to me or to Elon, or to all of us.

15   Q    And if they were served on you --

16   A    I would immediately get them to the legal department.

17   Q    But would you take note of what was being served on you?

18   A    Depending on -- depending on what was going on.  But again

19   I saw it as the legal department's follow up specifics.

20   Q    And do you get news clips about things that are happening

21   around Tesla on a regular basis when you were in that position?

22   A    You know, I did not, but some people did.  Sometimes I

23   would track Elon's tweets, so -- but that's it.

24   Q    Why was that?

25   A    Because I wanted to make sure our CEO was not tweeting



www.escribers.net | 800-257-0885

1    dumb stuff.

2    Q    Uh-huh, and you understood that he was tweeting for Tesla

3    when he was tweeting?

4    A    Yeah, I mean it was about the company.  But those -- I

5    didn't otherwise get a feed of information.

6    Q    Okay.

7    A    I'm not on Facebook and things like that.

8    Q    Me neither.  And then if you did see something on Twitter

9    that he posted about the company, did you ever discuss those

10   with him, or write to him about it?

11   A    I really delegated that a lot to our general counsel, or

12   our head of communications.

13   Q    So you might communicate with the general counsel, and ask

14   them to communicate --

15   A    Yeah.

16   Q    -- with Elon Musk?

17   A    Or the head of communications as well.

18   Q    And who was the head of communications?  Or who was at

19   that --

20   A    Sarah -- I'm forgetting everybody at this point, it's

21   ridiculous.  Sarah, you can look her up, but she left --

22   Q    Okay.

23   A    -- the company.

24   Q    She left the company?

25   A    Um-hum.



1    Q    Do you know when approximately she left the company?

2    A    I believe it was in maybe August.

3    Q    And did you write any transition memos to -- when you went

4    on leave regarding the UAW?

5    A    I don't -- I don't think, no.  I don't know.  I didn't

6    write any emails about my transition at all that I'm aware of.

7    I mean.

8    Q    Okay, I think that's all I have at this time, though

9    something could come up after the next examination, but thank

10   you very much.  Thank you.

11   A    Thank you.

12        MR. ROSS:  Ms. Toledano, I know you got a appointment in

13   Palo Alto in an hour and 15 minutes.  Let me take five minutes

14   to ask you a couple of questions.

15        THE WITNESS:  Okay.

16        MR. ROSS:  Okay.

17                       **CROSS-EXAMINATION**

18   Q    BY MR. ROSS:  Seth Woody, he left the company when did he

19   leave the company?

20   A    Seth left, I don't remember the exact month, but I believe

21   it was -- if I had to guess, like towards the end of 2017.

22   Q    Okay, and --

23   A    He resigned.

24   Q    Now let me ask you some questions about the meeting that

25   took place on June 7th.



1    A    Um-hum.

2    Q    That was about what time?

3    A    It was a Wednesday, so I believe it was in the afternoon.

4    In the afternoon, sometime.

5    Q    Midafternoon?

6    A    Midafter -- midafternoon, late afternoon.

7    Q    Okay, and you remember the -- it took place where?

8    A    It took place in the Angel Island conference room, that's

9    where Elon has all his meetings, in the back room.

10    Q    Okay, and during that conversation was you, and who else?

11    A    It was me, Elon Musk, Tony Vega, and Jose Moran.

12    Q    Okay, and during the course of that conversation, was the

13    word -- was the word union mentioned?

14    A    Not that I recall.  The meeting was about safety.

15    Q    Okay, did you tell Mr. Moran and Mr. Vega that no one at

16    Tesla's facility wanted a union, and did you ask a -- did you

17    say that?

18    A    No, no.

19    Q    Did you ask them why would employees want to pay union

20    dues, did you ask them that?

21    A    No, no.

22    Q    Okay, did Mr. Musk talk about the futility of having a

23    union?

24    A    No.  I do not believe --

25    Q    So --



1    A    -- he brought up the word "union".

2    Q    Okay.

3    A    Or any form of the word.

4    Q    Okay.  Tell me, you had a meeting on the next day, June

5    8th --

6    A    Um-hum.

7    Q    -- was anything said about that meeting the next day

8    during that 6/7 meeting?

9    A    I don't recall specifically.  If anything, I might have

10   referenced, you know, Jose and I had a great meeting with Elon

11   yesterday, he really cares about safety.  I did the intro.

12   Q    Well, no, --

13   A    So I don't --

14   Q    -- I'm not --

15   A    -- know.

16   Q    I'm not asking you about the --

17   A    No.

18   Q    -- meeting on the 8th.

19   A    Oh.

20   Q    I'm asking about the meeting on the 7th.

21   A    Okay.

22   Q    Did you talk about having a meeting the next day during

23   the meeting on the 7th?

24   A    Yes.  At the end the meeting, I walked out with Jose and

25   Tony when the meeting was done.  And we walked out together.



www.escribers.net | 800-257-0885

1    And I said I'd love to do a follow-up because I didn't have

2    notes.  You know, there were some specifics that they raised in

3    terms of equipment.  So I said I'm going to have a follow-up

4    meeting.  I'm going to get with Josh and we're going to invite

5    more people and let's get down to very specifics so I can, as

6    part of my job, follow up on any safety concerns.  Yeah.

7    Q    Okay.  And, by the way, you say you walked out of the room

8    with Mr. Vega and with Mr. Moran?

9    A    Correct.

10   Q    Okay.  And as you walked out, do you remember whether you

11   spoke to them in Spanish?

12   A    I think I did.  I -- I would often -- nothing specific

13   other than, you know, (Spanish spoken).

14   Q    Okay.

15   A    It was a good meeting.  I had just met them and I was

16   trying to meet employees, you know.  So --

17   Q    Okay.

18   A    Um-hum.

19   Q    Now, tell me, after this meeting, did you speak with a Mr.

20   Hedges about setting up the meeting --

21   A    Yeah.

22   Q    -- the next day?

23   A    Yeah.

24   Q    Okay.

25   A    I asked Josh, which is why he's doing his calendar



1    invites.

2    Q    Okay.  Now, I think you mentioned that during the meeting

3    on June 8, the next day --

4    A    Um-hum.

5    Q    -- there was somebody who was mean to you?

6    A    Yeah.  Well --

7    Q    Tell us about that?

8    A    It's kind of judgement to say mean.  He just -- he stood

9    up kind of in his -- in the -- in the chair at some point -- I

10   don't know -- towards the end of the meeting, and just said

11   will you resign from your job, you know, if XYZ -- something

12   about if you don't, you know, fix all safety issues and

13   something like that.  And he was kind of worked up, you know,

14   so people kind of stood up and -- and -- and I just -- I said

15   that I shouldn't say it no -- I said, you know, if I'm not

16   successful in my job, I have no problem doing that doing

17   something like --

18   Q    Okay.

19   A    -- that.

20   Q    And was that individual Mr. Galescu.

21   A    Yes.

22   Q    Okay.  One last thing.  I think during the early part of

23   your direct exam you were asked -- you said something about

24   being responsible for the company's workforce nationwide and

25   so -- it was a worldwide --



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    -- obligation or --

3    A    Oh, for sure, yeah, worldwide, global -- a global --

4    Q    Okay.

5    A    -- role.

6    Q    Forty thousand people?

7    A    Yeah, approximately.

8    Q    Okay.  That's all I have.  Thank you very much.

9    A    Yeah.

10        JUDGE TRACY:  Mr. Rodriguez Ritchie?

11                    **REDIRECT EXAMINATION**

12   Q    BY MR. RODRIGUEZ RITCHIE:  The meeting that occurred on

13   June 7, 2017, that was about a year and three months ago?

14   A    Yeah.

15        MR. ROSS:  Sorry, I can't hear the question.

16   Q    BY MR. RODRIGUEZ RITCHIE:  The meeting that occurred on

17   June the 7th, 2017, that was about a year and three months ago?

18   A    Um-hum.

19        JUDGE TRACY:  Can you --

20        MR. RODRIGUEZ RITCHIE:  Correct.

21        JUDGE TRACY:  -- say yes --

22        THE WITNESS:  Yes.

23        JUDGE TRACY:  -- for the record?

24        THE WITNESS:  Oh, sorry.  Yes, yes, yes.

25        MR. RODRIGUEZ RITCHIE:  Thank you.



www.escribers.net | 800-257-0885

1    Q    BY MR. RODRIGUEZ RITCHIE:   And you didn't take any notes

2    at the meeting?

3    A    No.

4    Q    You're not sure about everything that was said during the

5    meeting?

6    A    No.  I -- I -- I'm pretty sure about what was discussed in

7    the meeting, but I didn't take notes.  I didn't know I was

8    going to have a meeting until I got upstairs.

9    Q    You've since discussed that meeting with other

10    individuals?

11    A    Well, legal counsel and -- I never discussed it with Elon.

12    Q    And you prepared to discuss that you spoke in Spanish with

13    employees after the meeting on June the 7th, 2017?

14    A    I often spoke Spanish.  I'm sorry --

15    Q    That was something --

16    A    -- what is your question?

17    Q    -- that you'd prepared to say today?

18    A    I didn't necessarily prepare to say it, but I mentioned it

19    in the past that I often spoke Spanish.

20    Q    And you remember that even though it occurred a year and

21    three months ago?

22    A    Yeah, because I remember walking out with them and --

23    again, I've had to prepare for this session.  So I've been

24    trying to recollect a series of events.  But oh, yeah, I

25    definitely walked out with them and was really excited that we



1    were going to have a follow-up meeting.  And, you know, I saw

2    it as my job to support their concerns.

3    Q    This was the only instance in which you participated in a

4    two-on-two meeting with Mr. Musk and --

5         MR. ROSS:  I couldn't --

6    Q    BY MR. RODRIGUEZ RITCHIE:  -- production --

7         MR. ROSS:  Again, I apologize --

8    Q    BY MR. RODRIGUEZ RITCHIE:  -- and maintenance

9         MR. ROSS:  -- but I can't hear --

10   Q    BY MR. RODRIGUEZ RITCHIE:  -- employees?

11        MR. ROSS:  -- the question.

12        JUDGE TRACY:  So he hasn't even finished the question.

13        MR. ROSS:  Okay.

14        JUDGE TRACY:  So let him finish the question.  So you will

15   need to repeat it.

16   Q    BY MR. RODRIGUEZ RITCHIE:  This was the only instance of a

17   two-on-two meeting involving you and Mr. Musk and production

18   and maintenance employees?

19   A    Yes.  I did not have -- well, I went to the weekly Elon

20   Musk meetings, but it was not two-on-two.

21   Q    Right.  So this was the only --

22   A    Right.

23   Q    -- two--on-two meeting in which you've participated with

24   Mr. Musk --

25   A    Correct.



www.escribers.net | 800-257-0885

1    Q    -- and two production and --

2    A    Yes.

3    Q    -- maintenance --

4    A    Yes.

5    Q    -- employees?  And so earlier in your testimony when you

6    testified about Mr. Musk having meetings with production

7    employees, those were not individual meetings between Mr. Musk

8    and employees?

9    A    They followed the June 7th meeting as part of -- he

10   committed to having weekly meetings similar to the meeting we

11   had had.  And it -- sometimes there would be two factory

12   workers, sometimes there would be three, sometimes there would

13   be one.  So in that sense, yes.  Depending on -- every week we

14   had a different -- different people come in.

15   Q    For the safety committee or that was on -- is that what

16   you're referring to?

17   A    They were safety meetings.  So they were calendared safety

18   meetings -- weekly safety meetings on Wednesday with some

19   members of my safety team, Josh or I would attend or both

20   sometimes, and some production management, but then people who

21   worked on the line.  So sometimes it'd be one person and

22   sometimes it would be two, sometimes three.

23   Q    And those involved Mr. Musk?

24   A    Oh, yeah.

25   Q    Okay.  And besides the safety meetings, there weren't any



1  other meetings with Mr. Musk and production employees?

2  A    Oh, well, he -- oh, no.  He walks the floor all the time

3  and talks to employees all the time.

4  Q    Not individual meetings?

5  A    I -- I don't know.  I don't -- not that I -- I -- I don't

6  know.

7  Q    Not that you're aware of?

8  A    Well, he has meetings all the time, not that I was in,

9  other than these weekly safety meetings.

10 Q    Okay.

11 (Counsel confer)

12     MR. RODRIGUEZ RITCHIE:  Nothing further.

13     MS. FEINBERG:  I have a couple things --

14     JUDGE TRACY:  Go ahead.

15     MS. FEINBERG:  -- that were brought up.

16     Could you show the Witness General Counsel Exhibits 27 and

17 29, please?

18     MS. FEINBERG:  Okay, while he's doing that -- oh, we'll

19 wait for him.  Am I causing trouble?  Oh, okay, thank you.

20     MR. RODRIGUEZ RITCHIE:  Okay, I'm handing the witness

21 General Counsel's Exhibits 27 and 29.

22                    **REDIRECT EXAMINATION**

23 Q    BY MS. FEINBERG:  Okay.  So before you look at them, I

24 believe you testified just now when Mr. Ross was asking you

25 some questions that in the meeting on June 7th the topic was



1    just safety, not the union; is that right?

2    A    That's what I recall.

3    Q    Okay.  So can you now look at General Counsel Exhibit 27?

4    A    Okay.

5    Q    And this is the petition that was provided on June 6th; is

6    it not?

7    A    I don't know.

8    Q    So you didn't review this document in preparation for your

9    testimony?

10    A    No.

11    Q    And can you take a moment now and tell me if you've seen

12    this document before?

13    A    Right -- I -- I can't testify that this was the June 6th

14    decis-- petition, but --

15    Q    Okay.  Can you turn to General Counsel Exhibit 29, and

16    turn to pages 3, 4 and 5?  And this is also dated June 6.  I'm

17    going to represent based on testimony that this is the letter

18    that went with General --

19    A    Okay.

20    Q    -- Counsel Exhibit 27.

21    A    Okay.

22    Q    And on June 6, did you see this letter at the time?  Just

23    the letter to Mr. Hedges, cc to Mr. Musk?

24    A    Yeah, I didn't receive this from Jose Moran, but I later

25    saw it.  Josh forwarded it to a bunch of people at -- at a



1    later point in time.

2    Q    Okay.

3    A    So I did not see it at this time, no.

4    Q    So am I correct to say that the June 7th meeting was in

5    response to concerns that the union -- these workers raised on

6    June 6th and presenting a letter and a petition to the company?

7    That was the point of the meeting?

8    A    That -- my understanding was Elon wanted to follow up with

9    Jose because Jose had written him this.

10   Q    Yes.

11   A    And follow up and -- and talk to him about safety and the

12   concerns.

13   Q    Okay.  So you realize that both of the -- I don't if you

14   had to read --

15   A    Sorry.

16   Q    -- the letter

17   A    No.

18   Q    -- as well.

19   A    No.

20   Q    So take a moment.

21   A    Um-hum.

22        MR. ROSS:  Your Honor, we are referring to the attachment

23   to --

24        MS. FEINBERG:  General Counsel Exhibit 29, pages 3, 4 and

25   5.



www.escribers.net | 800-257-0885

1          MR. ROSS:  Thank you.

2     (Counsel confer)

3     Q     BY MS. FEINBERG:  Okay.  So isn't it true that you and Mr.

4     Musk were aware on June 7th when you met with Mr. Moran and Mr.

5     Vega that, quote, "We believe the best way to improve safety at

6     Tesla is to gain a true voice within the company by forming a

7     union."?  That was the i -- that was the con -- solution that

8     they were proposing to Tesla?

9     A     That was not the subject of the meeting.  I -- I don't

10    know if Elon read this.  He gets a lot of emails so I can't

11    verify he read it.  He did receive it.  I'm aware of that.

12    Q     But he called a meeting about it?  He's the one --

13    A     Yeah.

14    Q     -- who called the meeting?

15    A     Right.  So he called a meeting on safety, so let's assume

16    he read it.  I wasn't there when he read it.  We never

17    discussed it.  So I was called up and invited to attend a

18    meeting on safety concerns, which was part of my job to respond

19    to safety concerns.  So I can only assume he read it.  I guess.

20    Q     So you're saying safe -- the union never came up.  And yet

21    in General Counsel Exhibit 52 you're writing to Mr. Musk about

22    the fact that Mr. Moran -- Mr. Moran and Mr. Vega are union

23    activists and how you can address their concerns by putting

24    them on the safety team.  So I'm still concerned.

25          Are you ask -- saying as you sit here today that the union



22-60493.985

1     issue never came up?  That Mr. Moran or Mr. Vega never raised

2     the issue of the union when they were -- actually had an

3     opportunity to talk to you and Mr. Musk?

4     A     They did not raise the union in that meeting.  And whether

5     they met with him on their own later, I don't know.  But I was

6     invited as the head of environment heal -- health and safety to

7     talk about safety.  I thought it was a great meeting.  And so

8     we had a follow-up meeting the next day.

9     Q     So you were concerned about the safety, but did you ask

10    them to provide you anything in writing about what the safety

11    concerns were?

12    A     Well, that's what we did the next day because the ma --

13    meeting -- I didn't know when I went up there what this meeting

14    was about so I didn't have paperwork for -- prepared.  I sat

15    and listened in the meeting and had a follow-up meeting the

16    next day where -- where we had a specific -- specifics to --

17    (Counsel confer)

18    Q     BY MS. FEINBERG:  Okay.  And in the meeting that you had

19    where other workers were entitled to come on June 8th, did the

20    new topic of the union come up then?

21    A     No.

22    Q     And did someone follow up with you from one of the workers

23    who was there to say that they wanted the union to be involved?

24    A     I would get emp -- emails from employees.  And I always

25    try to be responsive.  I didn't personally handle many of



www.escribers.net | 800-257-0885

1    those.  And so it's possible that an employee wrote me at some

2    point in time about the union.  But nothing specific that I

3    recall from that meeting.  I mean --

4    Q    Okay.  Can you look back at General Counsel 52?  Do you

5    have that --

6    A    Yeah.

7    Q    -- in front of you?

8    A    I think --

9    Q    It's a series of emails that we've gone back and forth

10   about.  And if you look at your message to --

11   A    Yeah.

12   Q    -- Elon Musk --

13   A    Yeah.

14   Q    Okay.  And I'm going to read to you, it says, "All four

15   pro-union John -- Jose, Tony, Jonathan and Victor, Jonathan was

16   the most vocal aggressive in the Thursday meeting.  After the

17   meeting, he wrote me the nice note I forwarded to you last

18   night and responded to me.  But in the meeting, he tried to get

19   me to okay having union organizers --

20   A    Yeah.

21   Q    -- still come in."  So to me that seems to me to imply

22   that he raised the issue of the union.  So are --

23   A    Yeah --

24   Q    -- you still --

25   A    -- he did.



www.escribers.net | 800-257-0885

1    Q    -- saying that the issue of the union was not raised in

2    the June 8th meeting?

3    A    It must have been raised, which I could not remember --

4    Q    Okay.

5    A    -- by Jonathan.

6    Q    And what is it -- what -- where is something that -- did

7    you also forward a note to Mr. Musk from Jonathan Galescu?

8    A    It sounds like I did.  It sounds like --

9    Q    Okay.

10   A    -- Jonathan wrote me a nice note and I forwarded it to

11   Elon saying --

12   Q    Okay.

13   A    -- here's a nice note.

14   Q    Okay.

15   (Counsel confer)

16   Q    BY MS. FEINBERG:  Okay.  I think that's all I have right

17   now.  Thank you.

18        JUDGE TRACY:  Mr. Ross?

19                    **RECROSS-EXAMINATION**

20   Q    BY MR. ROSS:  The note you got from Mr. Galescu, it was an

21   apology?

22   A    I -- I think -- I think it was.  I mean, I think it was --

23   I -- I'm not -- it was a nice note, obviously, that I felt

24   positive valid and I was sharing it with Elon.

25   Q    Did it relate to the way he spoke to you at the meeting?



1    A    I think so.

2    Q    Okay.  That's all I have.  Thank you.

3         JUDGE TRACY:  All right.  Thank you very much.  Please

4    don't discuss your testimony with anyone until after the close

5    of hearing.  Certainly if you want to talk to your attorney

6    it's different than the parties here.  Okay?

7         THE WITNESS:  Um-hum.

8         JUDGE TRACY:  So let's go off the record.

9    (Off the record at 12:05 p.m.)

10        JUDGE TRACY:  We're back on?  Okay.

11        MS. FEINBERG:  I'd just like to move in Charging Party 1.

12        JUDGE TRACY:  Okay.  Any objections?

13        MR. ROSS:  I'd like to look at it just for a moment,

14   please.  She hasn't authenticated it, not really.  We don't

15   know what it is or for what purpose it's being offered.

16        MS. FEINBERG:  Well, I can say what it's being offered

17   for.

18        MR. ROSS:  Okay.

19        MS. FEINBERG:  I mean, it's an official posting by Tesla

20   regarding their position in labor relations.  She testified

21   about whether they were -- whether they had people on staff, or

22   did or didn't know about union organizing campaigns and the

23   like.  And clearly this is in June 14th, 2007, they were

24   posting looking for someone with knowledge of union organizing

25   campaigns and local labor laws and labor laws.  So I think that



www.escribers.net | 800-257-0885

1    it's relevant to her testimony and the hearing in general.

2        JUDGE TRACY:  Okay.  I mean, the relevance of -- it's a

3    little bit not so relevant to me.  However, I overrule the

4    objection and just allow --

5        MS. FEINBERG:  Thank you.

6        JUDGE TRACY:  -- Charging Party's Exhibit 1 into evidence.

7    Okay.

8    **(Charging Party Exhibit Number 2 Received into Evidence)**

9        JUDGE TRACY:  Now, what was the issue that we need to

10   discuss?

11       MR. RODRIGUEZ RITCHIE:  We have just heard testimony from

12   Ms. Toledano introduced, and you've received into evidence an

13   exhibit, an email chain.  Unfortunately, the email chain is

14   responsive to the General Counsel subpoena.  We were informed

15   that -- particularly request 7 and 8 in this subpoena.

16       We were informed that all responsive documents to those

17   requests were produced to us; however, that email was not

18   produced to us.  She's also testified about other emails that

19   would have been responsive to 7 and 8, and those were not

20   produced as well.  So we'd like you to order the Respondent to

21   conduct a search for responsive documents for parts 7 and 8.

22       JUDGE TRACY:  Okay.  And so what were you saying that you

23   did not receive?

24       MR. RODRIGUEZ RITCHIE:  General Counsel's Exhibit 52.

25   That email --



1      JUDGE TRACY:  Okay.

2      MR. RODRIGUEZ RITCHIE:  -- was not produced by Respond --

3  the email chain was not produced by Respondent to the General

4  Counsel.

5      MS. FEINBERG:  As you can see, it has the U.S. -- it says

6  Tesla UAW.  That's because it was produced to us, but not

7  produced to the General Counsel.  Which, of course, surprised

8  all of us.

9      JUDGE TRACY:  So, Mr. Ross, Mr. Morris?

10 (Counsel confer)

11     JUDGE TRACY:  So, if I recall, your request 7 and 8, which

12 I had ordered to, essentially, be reduced in its scope, or any

13 emails or correspondences among different management officials

14 specifically naming the discriminatees; correct?  And so you

15 weren't -- you're saying that the General Counsel never

16 received General Counsel Exhibit 52?  You received this from

17 the Charging Party?

18     MR. RODRIGUEZ RITCHIE:  That's correct.

19     MR. MORRIS:  If I could respond?  I believe in your order

20 you said that the only documents that would be relevant would

21 be with respect to the decision makers as they relate to 8(a)3

22 allegations.

23     And we heard testimony from Gaby Toledano that she was

24 not, in fact, a decision maker.  We conducted a search with

25 respect to 7 and 8 for the decision makers for the specific

escribers
www.escribers.net | 800-257-0885

1    words that General Counsel's identified in 7 and 8.

2    (Counsel confer)

3        JUDGE TRACY:  So that is true.

4        MR. RODRIGUEZ RITCHIE:  We have evidence to suggest that

5    she was, in fact, involved in the termination of Mr. Ortiz.  We

6    haven't gotten to that quite yet.  In any event, I'm prepared

7    to introduce the subpoena and request then that you reconsider

8    your ruling, and that you order the production of responsive

9    documents.

10        JUDGE TRACY:  So you're more than welcome to put the

11    subpoena, and my order stands.  What I had said was with regard

12    to 7 and 8 it was the decision makers and the discrimanitees.

13    So if there is evidence that you produce later that refutes her

14    testimony that she wasn't involved, then that's different.

15        But at this point the decision maker was not Ms. Toledano,

16    but someone else.  But I still don't know who it was.  But as

17    far as the official decision maker, she was not it.  So you can

18    put it in.  I'm not going to --

19        MR. RODRIGUEZ RITCHIE:  Sure.

20        JUDGE TRACY:  -- order them --

21        MR. RODRIGUEZ RITCHIE:  I'm providing --

22        JUDGE TRACY:  -- to do it.

23        MR. RODRIGUEZ RITCHIE:  -- copies to the parties of the

24    subpoena.

25        MS. FEINBERG:  Okay.  But then it raises a question about


www.escribers.net | 800-257-0885

1    our subpoena since we did get it.  And I believe we asked for

2    all documents related to the particular discriminatees.  I

3    don't know that ours was limited or not.

4        JUDGE TRACY:  All right.  So this is General Counsel's

5    Exhibit 75.  Do you also have a copy of my order?

6        MR. RODRIGUEZ RITCHIE:  With my notes.

7        JUDGE TRACY:  So let's get a copy of the order in here

8    because, again, appeal it.  I'm okay with that.  I don't mind.

9        MR. RODRIGUEZ RITCHIE:  I know you --

10        JUDGE TRACY:  So let's do -- so we have General Counsel's

11    Exhibit 75.  Any objections?

12        MR. ROSS:  No.

13        JUDGE TRACY:  Okay.  So General Counsel's Exhibit 75 is

14    admitted into evidence.

15    **(General Counsel Exhibit Number 75 Received into Evidence)**

16        JUDGE TRACY:  And then we will call -- now, again, because

17    normally in my cases everybody just resolves these issues and

18    we never have to put these in.  But I forget, do we need to put

19    it in as my own exhibit or can we put it in as a General

20    Counsel's?  I don't know.

21        Mr. Garber, you probably know.

22        MR. GARBER:  I refute that.  We could do a joint exhibit.

23    If that makes it easier for everyone.

24        JUDGE TRACY:  The joint exhibit of my --

25        MR. GARBER:  Sure.



1    JUDGE TRACY:  -- order?  Okay.  So we'll call that Joint

2   Exhibit 1.  And once we get a copy of it, then we'll put it in.

3   Okay?

4    MR. ROSS:  I think though wasn't there a prior joint

5   exhibit?

6    MR. GARBER:  I agree.

7    MR. RODRIGUEZ RITCHIE:  Yeah, there was a joint --

8    MR. ROSS:  Wasn't there a prior joint exhibit?

9    JUDGE TRACY:  Is there?

10    MR. RODRIGUEZ RITCHIE:  I think it was the diagram of

11   the --

12    MS. FEINBERG:  Is it the company's position that Elon Musk

13   is not a decision maker?  Because he's on this chain so I just

14   want to understand.  Is that their position?  Not just that

15   Gaby Toledano, but that Elon Musk is not a decision maker?

16   Because --

17    MR. ROSS:  Decision maker --

18    MS. FEINBERG:  -- these emails relate to Mr. Musk.  And it

19   seems like there were other emails regarding Mr. Musk and

20   individual employees.  It seems to me if I got an email from

21   Mr. Musk, no matter what position I held in the company, I

22   would take it with much seriousness.  So is their position that

23   we're not entitled to emails regard -- from Mr. Musk regarding

24   the individual discriminates?  I just want to know because --

25    JUDGE TRACY:  So --


www.escribers.net | 800-257-0885

1        MS. FEINBERG:  -- we might want to --

2        JUDGE TRACY:  -- who --

3        MS. FEINBERG:  -- appeal it.  And I feel like she

4   testified about herself, but there's this issue now regarding

5   the scope of this document and the fact that we got it -- sort

6   of interesting that we did get it, the General Counsel didn't

7   get it.

8        And now we find out through her testimony that there are

9   other emails.  There's emails about Mr. Galescu between herself

10  and Mr. Musk.  We don't know if there's commentary on that.  I

11  feel like that's relevant to this case if Mr. Musk and Ms.

12  Toledano are discussing different discriminatees.

13       So I don't understand how their -- what the decision maker

14  means.  But if the CEO of the company is not considered one,

15  that seems very odd to me considering his power to make all

16  decisions for this company.  And he seems to make them both

17  micro and macro.  Going down to the floor and talking to a

18  worker about safety is what she just said, and that he could

19  have it fixed, which seems to make him a decision maker, or at

20  the top of the company making decisions about the corporation.

21       So how emails regarding -- by Mr. Musk to anybody in

22  management regarding the discriminatees are not coming forward

23  under this -- even under your order, Your Honor, is concerning

24  to me.  And it seems to me that it's like hiding the ball.

25  Because --



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  So, you know, here's what we didn't talk

2    about.  A lot of these are 8(a)(1)'s.  They are statements that

3    were made.  Okay?  Animus can only go so far.  And they

4    particularly apply to 8(a)(3), so with regards to the

5    discriminatees and their adverse employment actions.  So that's

6    what I'm focusing on.

7    MS. FEINBERG:  Right.

8    JUDGE TRACY:  And so that's why I limited the scope

9    because you can't just look for all documents that name these

10   individuals because in terms of the relevance to proving each

11   of these different allegations.  Okay?  So let me ask you, who

12   is the decision maker?

13   MR. ROSS:  The decision maker as to Mr. Ortiz and Mr.

14   Moran --

15   JUDGE TRACY:  Yes.

16   MR. ROSS:  -- is that the question?

17   JUDGE TRACY:  Yes.

18   MR. ROSS:  Okay.  The decision maker as to Mr. Ortiz, it

19   was a gentleman by the name -- or is a gentleman named -- by

20   the name of Stephan Graminger.

21   JUDGE TRACY:  Okay.

22   MR. ROSS:  And the decision maker as to Mr. Moran is a

23   person by the name of -- I believe is Brian Cunningham.

24   JUDGE TRACY:  Okay.  So what I had noted in my order --

25   okay -- was, I mean, there can be a lot of talking.  And,



1    again, the company can have whatever position it wants.  It

2    doesn't need to have a union.  It depends upon whether that

3    becomes an unlawful activity.  Okay?

4        So they can have all sorts of discussions.  And my point

5    of this was that we need to focus on the decision makers in

6    terms of your request.  Okay?  I don't recall your request and

7    why you received it.  Frankly, if you got it, great.  I'm not

8    sure why you're making a fuss about it --

9        MS. FEINBERG:  I'm not making a --

10       JUDGE TRACY:  -- now.

11       MS. FEINBERG:  -- but I'm wondering --

12       JUDGE TRACY:  So --

13       MS. FEINBERG:  -- what else it out there, Your Honor.  I'm

14   not complaining about getting it, obviously.

15       JUDGE TRACY:  So my focus on 7 and 8 of the General

16   Counsel was with regard to the decision makers and the

17   discriminatees.  Okay?  So if you have evidence that it

18   warrant -- wasn't these people, they weren't the decision

19   makers, she testified.  Again, that goes to her credibility.

20   She testified she had no idea about it.  She wasn't involved.

21   That's up to me to decide about the credibility.  I'm not going

22   to --

23       MR. RODRIGUEZ RITCHIE:  Sure.  I think at this point we'd

24   just like you to rule because we'll take exceptions to it.  If

25   you're --


www.escribers.net | 800-257-0885

1          JUDGE TRACY:  That's fine.

2          MR. RODRIGUEZ RITCHIE:  -- unwilling to reconsider your

3     decision, then I think we can just move -- do that and then

4     move on.

5          JUDGE TRACY:  Yes.

6          MS. FEINBERG:  Okay.

7          JUDGE TRACY:  So I'm willing to reconsider it unless

8     something comes up where I need to decide differently.  These

9     issues are difficult because, as the judge and as every judge

10    probably says on every call, I'm ruling on these things and I

11    don't even know what this case is about except the complaint in

12    the answer.

13         So I can only do the best that I can at the time.  But I

14    would say that from everything that I've heard thus far, my

15    ruling stands with regards to General Counsel 7 and 8.  For the

16    Charging Party, for your own, you received something in --

17         MS. FEINBERG:  I think it was a responsive to a request.

18         JUDGE TRACY:  -- with responsive to whatever, I don't even

19    remember.

20         MS. FEINBERG:  Okay.  4 I think.

21         JUDGE TRACY:  You received it.  That's great.  You've cut

22    something.  I mean, I don't know what to say about that.  If

23    there is something specific that you're arguing that you didn't

24    receive per the order and my --

25         MS. FEINBERG:  Well, I would like the --



1    JUDGE TRACY: -- order about it --

2    MS. FEINBERG: -- emails about Mr. Galescu, if it's

3    possible to you at least ask them to produce that to us.

4    JUDGE TRACY: Well, did you request that?

5    MS. FEINBERG: Well, I didn't know that specifically, but

6    I asked for it in context. So, obviously, we don't know

7    everything that's being asked for. I could reissue the

8    subpoena and be very specific because now we know it exists.

9    JUDGE TRACY: For that, why don't you discuss that with --

10   MS. FEINBERG: Okay.

11   JUDGE TRACY: -- the Respondent?

12   MS. FEINBERG: Okay. Thank you.

13   JUDGE TRACY: It sounds like he sent an apology and --

14   MS. FEINBERG: Well --

15   JUDGE TRACY: -- which I would assume you all have. And

16   she forwarded it on --

17   MS. FEINBERG: That's a characterization that I'm not sure

18   is accurate so.

19   JUDGE TRACY: Oh, I'm sorry. Not an apology. Whatever.

20   He wrote her a note.

21   MR. ROSS: Can --

22   JUDGE TRACY: So General Counsel's Exhibit -- what did we

23   say --

24   MR. GARBER: Joint Exhibit --

25   JUDGE TRACY: -- 75 is admitted into evidence. And then

22-60493.999



1    we have Joint Exhibit 2.  Now, I don't for some reason have a

2    note of what's Joint Exhibit 1.

3         MR. RODRIGUEZ RITCHIE:  I can --

4         MR. ROSS:  I think it is the -- the --

5         MR. RODRIGUEZ RITCHIE:  It's this.

6         MR. ROSS:  -- the picture of the --

7         JUDGE TRACY:  The map.

8         MR. ROSS:  -- of the map of the facility.

9         MR. RODRIGUEZ RITCHIE:  It's this.

10   (Counsel confer)

11        JUDGE TRACY:  I have that.  I thought it -- you at first

12   had it as your own.

13        MR. ROSS:  It's this document, Judge.

14        JUDGE TRACY:  Okay.  Okay.  So joining to the two will be

15   the order regarding the General Counsel's subpoena.  So Joint

16   Exhibit 2 is admitted into evidence.

17   **(Joint Exhibit Number 2 Received into Evidence)**

18        MR. RODRIGUEZ RITCHIE:  And we'd also like for you to

19   reconsider on the record your instruction that the General

20   Counsel's not entitled to any electronically stored information

21   or documents produced in native format.

22        JUDGE TRACY:  Okay.  So, as I indicated on the conference

23   call, and I also believe that we discussed that first week we

24   were together, but we were off the record, I am not ordering

25   the documents to be produced in their native format.



www.escribers.net | 800-257-0885

 1      That has -- as far as my own research and I have not been

 2   given any indication of that, that has not been what the Board

 3   has authorized before or required before, with the exception

 4   that if there is some document out there that you as the

 5   General Counsel feel has been altered, well, there are other

 6   ways to deal with that, which is to call in the person who

 7   wrote the document to make sure that that is the document as

 8   was originally created.  Or the alternative is to call in the

 9   custodian of records.

10      But to require that every single document be provided in

11   its native format is burdensome to me, and not a requirement of

12   this type of proceeding.

13      MR. RODRIGUEZ RITCHIE:  We would ask you to reconsider

14   that in light of -- and refer you to page 69 of the Benchbook

15   for Administrative Law Judges, which encompasses the Sedona

16   Principles.  The Sedona Principles have been referred to by Her

17   Honor, in her order.  Those principles, indeed, require that

18   electronically stored information be produced.  And other Board

19   cases have adopted the ALJ orders requiring the production of

20   electronically stored information.

21      JUDGE TRACY:  So those documents, as I understand, have

22   been produced.  Okay?  They have been produced.  Have all

23   electronically stored documents -- which is, in this day and

24   age -- I assume that's what most people have are a lot of

25   electronically stored data.  Have those been produced?

eScribers
www.escribers.net | 800-257-0885

1          MR. MORRIS:  Yes.

2          JUDGE TRACY:  Okay.

3          MR. MORRIS:  Based on a reasonable search we produced all

4     nonprivileged documents including electronically stored

5     information in Tesla's possession, custody and control.

6          JUDGE TRACY:  And how did you produce them?

7          MR. MORRIS:  We produced them in TIFF and in PDF format.

8          JUDGE TRACY:  Okay.  And then what else did you do with

9     regard to that?  Did you just email it to the General Counsel?

10    What did you do?

11         MR. MORRIS:  We emailed it to the General Counsel.

12         JUDGE TRACY:  Okay.  And so what is unsatisfactory with

13    the method in which they sent you the documents?

14         MR. RODRIGUEZ RITCHIE:  It's not a correct statement of

15    fact that the electronically stored information was produced.

16    When you send a PDF of a thousand documents, for example, it's

17    as if the doc -- a thousand emails are printed and then scanned

18    into PDF.  It's not sending the actual email.

19         When you refer to electronically stored information,

20    you're referring to the email -- electronic email file as it

21    exists.  For example, as it relates to emails.  The same is

22    true as it relates to, for example, Excel spreadsheets, which

23    were also produced.

24         We're referring to that information that contains the

25    information about the author, the number of times it's been



1    edited.  That type of information is electronically stored

2    information.  That has not been produced.

3        JUDGE TRACY:  And so what is the relevance of this

4    information?

5        MR. RODRIGUEZ RITCHIE:  Sure.  That electronically stored

6    information contains, as I've already mentioned, the author.

7    So, for example, in the case of an author, it would provide

8    counsel for the General Counsel the information on who created

9    a document in the event that a particularly relevant document

10   we would wish to issue a subpoena to have the person testify

11   about a document.  It would contain the information about the

12   date it was created, the number of times is was created.

13       All of that information is relevant to the document in its

14   creation and the use of the document.

15       JUDGE TRACY:  Okay.  So, as I stated previously on the

16   phone call, I'm not ordering that this native format, as you

17   say, needs to be produced.  They produced the documents that

18   were responsive to the subpoena.

19       If there is a particular document in which you feel that

20   it is not -- it's been altered, tampered with, then certainly

21   you have every right to question that.

22       But given the number of requests in this case and the

23   number and scope of documents in contrast to what the

24   allegations are, which are, frankly, testimony of witnesses

25   because that's how credibility is going to be determined here,



1    a lot of this, is just burdensome and overbroad.

2        And that is my decision on that.

3        MR. RODRIGUEZ RITCHIE:  There is one more matter with

4    regards to the subpoena that I would like to make you aware of

5    on the record.

6        There is, I believe, a final dispute regarding the

7    responsiveness to a few requests pertaining to Workday.  I

8    mention that to you only because Mr. Morris and I had a

9    conversation about preparing a stipulation instead of having

10   them produce the custodian of records, we're preparing that.

11       And I was prepared to discuss that with you today.  And if

12   that doesn't get resolved and we're requesting that the

13   custodian of records come tomorrow morning to testify about

14   this search and the documents produced.

15       JUDGE TRACY:  Do you have the stipulation?  Have you

16   presented a stipulation to the Respondent?

17       MR. RODRIGUEZ RITCHIE:  No.  I believe he was going to

18   check to make sure that our discussion of that was acceptable

19   to them.  And my recollection was that we would talk at some

20   point today to get the language down and agree on the language

21   of the stipulation.

22       JUDGE TRACY:  So you, Mr. Morris, have any update for the

23   General Counsel about your discussion?

24       MR. MORRIS:  For sure.  Well, first off, my understanding

25   is that the proposed stipulation would have to do with



1    authenticating documents, not with respect to certain searches

2    that were conducted in response to subpoena requests.  But

3    we're considering the proposal.  And we hope to have an update

4    at some point today.

5        JUDGE TRACY:  Okay.  So if not, then the Custodian of

6    Records needs to come in tomorrow morning.  Okay?

7        MR. MORRIS:  Okay.  Thank you.

8        MS. FEINBERG:  So --

9        JUDGE TRACY:  Yes?

10       MS. FEINBERG:  I wondered when we should -- I'm going to

11   try to talk with him one more time about the privilege log.  I

12   just wanted to flag that in light of some of the testimony that

13   just happened here today and your --

14       JUDGE TRACY:  Yes.

15       MS. FEINBERG:  -- comments.

16       JUDGE TRACY:  And so --

17       MS. FEINBERG:  But I just --

18       JUDGE TRACY:  -- if the --

19       MS. FEINBERG:  -- wanted to say that I'm going to try to

20   discuss it to them in appropriate break, and bring it back to

21   you if we can't resolve it.

22       JUDGE TRACY:  So my position on that, of course, as we

23   discussed while she was testifying --

24       MS. FEINBERG:  Um-hum.

25       JUDGE TRACY:  -- is that if there is the dispute over this



```
1    individual --

2         MS. FEINBERG:  Um-hum.

3         JUDGE TRACY:  -- I need to look at what was her role at

4    the time, was she acting as an in-house counsel or was she

5    acting in a different --

6         MS. FEINBERG:  Okay.

7         JUDGE TRACY:  -- capacity.

8         MS. FEINBERG:  Thank you.

9         JUDGE TRACY:  If she was acting in a different capacity,

10   frankly, I don't know where there's attorney-client privilege.

11   And so that's for you guys to know as well.  So when you have a

12   discussion --

13        MS. FEINBERG:  Um-hum.

14        JUDGE TRACY:  -- you can --

15        MS. FEINBERG:  Perfect.

16        JUDGE TRACY:  -- hopefully, that will give you some --

17        MS. FEINBERG:  Right.

18        JUDGE TRACY:  -- guidance about how to deal with that.

19        MS. FEINBERG:  Thank you.

20        JUDGE TRACY:  Okay?

21        MS. FEINBERG:  Okay.

22        JUDGE TRACY:  Then if, at the last resort, I need to look

23   at some documents -- and some I mean like on a handful -- I

24   will do that and let you know of what I feel is -- whether it's

25   actually attorney-client privilege or not.
```



www.escribers.net | 800-257-0885

1        MS. FEINBERG:  Okay.

2        JUDGE TRACY:  Okay?

3        MS. FEINBERG:  Thank you very much.

4        JUDGE TRACY:  Anything else about that?  Any other --

5        MS. FEINBERG:  No, I just wanted --

6        JUDGE TRACY:  -- issues?

7        MS. FEINBERG:  -- to flag that we're going to try one --

8   give it one more college try, then let you know.

9        JUDGE TRACY:  How about the formal papers?  You ready for

10  that?  Or not yet?

11       MR. GARBER:  Did we not do that yet?

12       JUDGE TRACY:  No.

13  (Counsel confer)

14       JUDGE TRACY:  You ready?

15       MR. GARBER:  Yeah.  Are we on the record?

16       JUDGE TRACY:  Yeah, we're still on the record.

17       MR. GARBER:  Oh, okay.

18       JUDGE TRACY:  Yes.  So would you give them the --

19       MR. GARBER:  They already have it I think.

20       JUDGE TRACY:  They already have it?

21       MR. GARBER:  I thought we gave it to them yesterday.

22       JUDGE TRACY:  So the formal papers --

23       MR. GARBER:  Yeah.

24       JUDGE TRACY:  -- do you have the second set?

25       MR. ROSS:  The second set?  We have the --



www.escribers.net | 800-257-0885

1      MR. GARBER:  From yesterday.

2      MS. FEINBERG:  Yes, I think --

3      JUDGE TRACY:  From --

4      MS. FEINBERG:  -- we have it.

5      JUDGE TRACY:  -- yesterday.

6      MR. ROSS:  The formal papers, yes.  Which, by the way --

7      MR. GARBER:  Yeah.

8      MR. ROSS:  -- are incomplete.

9      JUDGE TRACY:  Okay.  What's missing?

10     MR. ROSS:  What's missing are the attachments to our

11   motion to dismiss.

12     MS. FEINBERG:  I thought that's what he was actually

13   referencing yesterday.

14   (Counsel confer)

15     MR. RODRIGUEZ RITCHIE:  What exhibit number are you

16   referring to?

17     MR. MORRIS:  It's 1(yy).

18   (Counsel confer)

19     MS. FEINBERG:  The affidavit of service?

20     MR. RODRIGUEZ RITCHIE:  This is -- are you referring to

21   the original motion to dismiss?

22     MR. ROSS:  Just one moment, please.  Just one moment.  I'm

23   sorry.

24   (Counsel confer)

25     MR. ROSS:  Could we have a minute?



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Sure.  Let's go off the record.

2  (Off the record at 12:31 p.m.)

3      MR. MORRIS:  It's --

4      JUDGE TRACY:  Hold on one second, one second, one second.

5      MR. MORRIS:  It's the exhibits that are attached to

6  response motion to dismiss.  It's Exhibit 1(yy).

7      JUDGE TRACY:  That was in the last set.  So let's see what

8  the court reporter has.  Isn't that -- these are all --

9      UNIDENTIFIED SPEAKER:  Yeah, it is.

10      MR. GARBER:  Are you saying that the exhibits in that copy

11  in the previous -- the previously submitted formal papers is

12  incomplete?

13      MR. MORRIS:  Right.

14      MR. GARBER:  Okay.

15      JUDGE TRACY:  Can you look -- do you have them?  1(yy)?

16  You don't?

17      Okay.  Anybody have the electronic transcript?

18      MR. RODRIGUEZ RITCHIE:  Yes.

19      JUDGE TRACY:  I do.  Let me see.

20      MS. FEINBERG:  Oh, I have -- the transcript.

21  (Counsel confer)

22      MR. RODRIGUEZ RITCHIE:  It's in the exhibits' volume for

23  1(yy).

24      MR. MORRIS: It is?

25      MR. RODRIGUEZ RITCHIE:  Um-hum.



1      JUDGE TRACY:  Yeah, check it out.  And if there is an

2  error -- but if you look at the electronic copy I see that was

3  here.

4      MR. MORRIS:  Okay.

5      MR. RODRIGUEZ RITCHIE:  It's Exhibit --

6      JUDGE TRACY:  Yeah, I see that --

7      MR. RODRIGUEZ RITCHIE:  -- is L the last one?

8      JUDGE TRACY:  So for 1(yy) what I have in the record

9  that's already in a transcript form -- I have Exhibit A, which

10  is a charge.  I have Exhibit B, which are letters regarding an

11  investigation.  Exhibit C, which is the order consolidating the

12  complaint.  Exhibit D is another charge.  E is another

13  investigation letter.  F is another charge.  G I have --

14  investigation letter.  H is third-quarter consolidating cases.

15  (Counsel confer)

16      JUDGE TRACY:  Yeah.  Exhibit I is here.  Exhibit J, K, L.

17  And I think that's it.  It went through L?

18      MR. MORRIS:  Yes.

19      JUDGE TRACY:  Did it go through L?

20      MR. MORRIS:  Yeah.

21      JUDGE TRACY:  Okay.  So it's here in the official

22  transcript.

23      MR. ROSS:  All right.

24      MR. MORRIS:  Okay.

25      JUDGE TRACY:  Okay?

22-60493.1010



1      MR. ROSS:  Thank you.

2      JUDGE TRACY:  So any issues, though, with the formal

3   papers of General Counsel's Exhibit --

4      MR. GARBER:  1 --

5      JUDGE TRACY:  -- 1(aaa) to --

6      MR. GARBER:  1(aaaa).

7      JUDGE TRACY:  -- 1(aaaa)?

8      MR. ROSS:  It is -- record.  We have no objection to

9   submitting this complaint.  We have no objection to its

10  submission.  I would, however, like to state for the record

11  that it our intention to seek special permission to call Mr.

12  Rodriguez Ritchie as a witness in this case.

13      So between now and the last week of the trial, what I hope

14  is the last week of the trial, we are going to be seeking

15  permission to have him appear as a witness.

16      JUDGE TRACY:  And so whom would you be --

17      MR. ROSS:  It would be --

18      JUDGE TRACY:  -- asking?

19      MR. ROSS:  I guess we'll be seeking special permission

20  from the General Counsel.

21      JUDGE TRACY:  Okay.

22      MS. FEINBERG:  What would be the --

23      JUDGE TRACY:  So I would say if that request was made to

24  myself, I would deny the request.

25      MR. ROSS:  I understand.



www.escribers.net | 800-257-0885

1     JUDGE TRACY:  And so if you want to do that, go ahead.

2     MR. ROSS:  Thank you.

3     JUDGE TRACY:  Okay.  And what would be the reasoning?

4     MR. ROSS:  The reasoning is -- goes to the issue of the --

5  what we consider to be the highly unusual and suspect

6  circumstances surrounding the amendment on June 4th, and the

7  fact that there is absolutely no affidavit.  And with respect

8  to the allegations that are mentioned there, we believe this is

9  an issue that goes to the 10(b) defense that we have asserted

10  as well as to the jurisdiction of the Board to entertain

11  this --

12     JUDGE TRACY:  Um-hum.

13     MR. ROSS:  -- allegation.

14     JUDGE TRACY:  Um-hum.  Right.  And so, I mean, again, any

15  requests to me, it would be denied.

16     MR. ROSS:  I understand that.

17     JUDGE TRACY:  And so do what you need to do.

18     MR. ROSS:  Okay.

19     MR. GARBER:  Can I --

20     JUDGE TRACY:  All right.  So General Counsel's Exhibit --

21  hold on one second --

22     MR. GARBER:  Okay.

23     JUDGE TRACY:  -- 1(aaa) to 1(aaaa) is admitted into

24  evidence.

25     **(General Counsel Exhibit Number 1(aaa) to 1(aaaa) Received into**



www.escribers.net | 800-257-0885

1    **Evidence)**

2    MR. GARBER:  Okay.  I'm just going to note real quick for

3    the record that clearly Mr. Rodriguez Ritchie did not issue

4    complaints.  That that power is only vested with a regional

5    director.  So calling him to testify about that means nothing.

6    He has no decision-making power in that.  There's nothing he

7    can talk about it.

8    JUDGE TRACY:  Thank you.

9    MR. ROSS:  I guess we could also seek special permission

10   to compel the testimony of the Regional Director then.

11   JUDGE TRACY:  Again, you do what you have to do.

12   MR. ROSS:  I will.

13   JUDGE TRACY:  Okay.  Any other issues -- just paperwork

14   that we need to deal with?  Oh, the caption change, yes.  Thank

15   you.

16   (Counsel confer)

17   MR. RODRIGUEZ RITCHIE:  Okay.  At this time counsel for

18   the General Counsel would move to orally amend the caption in

19   the instant case and the reference on page 1 of the third order

20   consolidating cases in second amended complaint to change the

21   name International Union, United Automobile, Aerospace and

22   Agricultural Workers of America, AFL-CIO, to the following:

23   International Union, United Automobile, Aerospace and

24   Agricultural Implement Workers of America, AFL-CIO.

25   JUDGE TRACY:  Okay.  Any objections?

22-60493.1013



1      MR. ROSS:  No.

2      JUDGE TRACY:  Okay.  So General Counsel's motion to amend

3  the complaint is granted.  So now the case caption for one of

4  the Charging Parties will be International Union, United

5  Automobile, Aerospace and Agricultural Implement Workers of

6  America, AFL-CIO.

7      All right.  Anything else?

8      MR. RODRIGUEZ RITCHIE:  Not at this time.

9      JUDGE TRACY:  Okay.  So we'll take a lunch break now.

10  Now, who will be next for you?  Are you going to call Mr.

11  Galescu again or will it be your third witness?

12      MR. RODRIGUEZ RITCHIE:  I'm not sure if Mr. Galescu is --

13  is he here?

14      JUDGE TRACY:  Yes.

15      MR. RODRIGUEZ RITCHIE:  And then I'll have to check on the

16  other one, but --

17      JUDGE TRACY:  Well, I ask this because they still have a

18  lot of this affidavit to go through.

19  (Counsel confer)

20      MR. RODRIGUEZ RITCHIE:  Yeah, okay.  So I think we're

21  going to do the other witness first.  Though I'm happy to stay

22  here if they want to review Mr. Galescu's affidavit during

23  lunch, I can stay here and do that.

24      JUDGE TRACY:  That would be good.  That would be good.

25  Because after this third witness and then Mr. Galescu and the



1    custodian, any other witnesses other than the one that needs to

2    appear in two weeks?

3         MR. RODRIGUEZ RITCHIE:  That's it.

4         JUDGE TRACY:  Okay.  And then you'll be resting your case

5    in chief?

6         MR. RODRIGUEZ RITCHIE:  Yes, ma'am.

7         JUDGE TRACY:  Aside from that person.  Okay.  So I think

8    for expediency purposes -- because I also told you guys, as the

9    Respondent, to be ready tomorrow.  If you could take some time

10   during lunch to review the affidavit, what we'll do is we'll

11   take a lunch break until 2:00.  Okay?  So it's like an hour and

12   20 minutes.  Plenty of time to eat, look at some more of this

13   affidavit.

14        MR. GARBER:  Okay.

15        JUDGE TRACY:  Okay?

16        MR. GARBER:  Yep.

17        JUDGE TRACY:  All right.  So let's go ahead and go off the

18   record.

19   (Off the record at 12:41 p.m.)

20        JUDGE TRACY:  Let's go on the record.

21        UNIDENTIFIED SPEAKER:  Okay.  You can go ahead and --

22        JUDGE TRACY:  Well, hold on.  Sorry.

23        Mr. Rodriguez Ritchie, call your next witness.

24        MR. GARBER:  It'll be me this time, Your Honor.

25        JUDGE TRACY:  Oh.



www.escribers.net | 800-257-0885

1        MR. GARBER:  The General Counsel calls Kevin Wallsten.

2        MR. ROSS:  I'm sorry.  What was the last name?

3        MR. GARBER:  Wallsten.

4        MR. ROSS:  Wallsten?

5        MR. GARBER:  Yeah.

6        MR. ROSS:  Thank you.

7        MR. GARBER:  Um-hum.

8        JUDGE TRACY:  All right.  And, Mr. Wallsten, if you could

9    stand up, please?  Raise your right hand.

10   Whereupon,

11                        **KEVIN WALLSTEN**

12   having been duly sworn, was called as a witness herein and was

13   examined and testified as follows:

14        JUDGE TRACY:  Okay.  Go ahead and have a seat and state

15   your name for the record, please.

16        THE WITNESS:  My name is Kevin Wallsten.

17        JUDGE TRACY:  And so let me give you a few instructions.

18   These microphones will not amplify your voice.  They're just

19   for the recording.  So you can relax.  It'll pick up your

20   voice.  However, we have a big room, lots of people, so if you

21   could just speak up so everyone is able to hear you.  Okay?

22        THE WITNESS:  Um-hum.

23        JUDGE TRACY:  Go ahead, Mr. Garber.

24                       **DIRECT EXAMINATION**

25   Q    BY MR. GARBER:  Professor Wallsten, are you currently



1    employed?

2    A    Yes, I am.

3    Q    Where do you work?

4    A    California State University, Long Beach.

5    Q    And how long have you worked at Cal State, Long Beach?

6    A    A little over 10 years.

7    Q    What's your job title with Cal State, Long Beach?

8    A    I'm an associate professor of political science.

9    Q    Now, before we get into your work at Cal State, can you

10   describe to us your educational background starting with your

11   undergraduate degree?

12   A    Sure.  I received a BA in political science from

13   University of California, Irvine.  I received a master's degree

14   and a Ph.D. in political science from University of California,

15   Berkeley.

16   Q    In obtaining your Ph.D. did you have specific fields of

17   research?

18   A    I did, yeah.  My main area of specialization was American

19   politics.  I focused within American politics on political

20   communication.  And within that, my emphasis was on media and

21   the Internet.

22   Q    And during the course of your education and research to

23   professor, have you performed research into social media

24   platforms such as Twitter?

25   A    Yes, I have.



1    Q    What type of research have you performed regarding

2    Twitter?

3    A    I've performed a lot of research on social media broadly,

4    Twitter in particular.  I've also studied blogging in YouTube.

5    But in the last six years I've published a handful of academic

6    studies of Twitter and presented it at probably half a dozen

7    academic conferences.  My main research that are published so

8    far on Twitter is focused on the relationship between tweets

9    and traditional news coverage.  I've looked at how celebrity

10   news coverage shapes media coverage.  I've looked at how

11   politicians use Twitter.  I've looked at how the structure of

12   communication on Twitter leads to things like political

13   polarization and ideological cocooning.  And I've looked at the

14   effect of Twitter on public opinion.

15   Q    And I imagine you've published some written materials?

16   Just describe -- can you tell us some of those publications?

17   A    Sure.  My most recent publication was entitled "Non-Elite

18   Tweets Rarely Influence Media Coverage."  That was an analysis

19   of how tweets by celebrities and politicians shaped news

20   coverage during the 2012 presidential election campaign.

21       Before that I published a study of how journalists rely on

22   Twitter to find news sources and to discover which issues they

23   should report about.  Also in that paper I spell out a model

24   for assessing the impact of Twitter and sort of empirically

25   assessing how influential different tweets and different



www.escribers.net | 800-257-0885

1   Twitter users are.

2   Q     Have you ever been asked to appear on TV, radio or

3   podcasts to discuss Twitter?

4   A     Yeah.  I'm frequently asked -- frequently asked in the

5   context of election campaigns.  So it's kind of every two

6   years:  2008, 2010, 2012, 2014, 2016.  The 2016 campaign, I was

7   a guest on ABC 7 News in LA about 15 times to talk about social

8   media's influence on that particular election campaign, mostly

9   a discussion of Donald Trump's use of Twitter.

10  Q     Okay.  You've mentioned to us that you're a professor.

11  Since joining Cal State, about how many different courses have

12  you taught approximately?

13  A     I've taught about five different classes.  And I've taught

14  those five classes about 40 times.

15  Q     And have you given lectures about social media platforms

16  such as Twitter?

17  A     Yeah.  I frequently give lectures on Twitter.  Most of

18  those lectures occur in the context of my media and politics

19  class.  There was about six weeks of class material devoted to

20  social media in that course.  About half of those are devoted

21  explicitly to Twitter.  I also teach graduate and senior

22  seminar courses in American election campaigns.  In that class,

23  I devote about two weeks to Twitter, each.  There's a book that

24  I assign that's explicitly about Twitter for that seminar, in

25  my introduction to American government class.  There's normally



www.escribers.net | 800-257-0885

1   about one lecture each semester that's on Twitter, so overall,

2   over the last 10 years, I've given quite a few lectures on

3   Twitter.

4   Q    So if I were to ask you to estimate, about how many

5   lectures would you say you've given that discuss Twitter?

6   A    Oh, I would say about 70.  Probably about a hundred hours

7   of total class time devoted to Twitter.

8   Q    Okay, and do yourself -- do you have a Twitter account?

9   A    I have a number of Twitter accounts that are not my

10  personal Twitter accounts.  I use them for pedagogical

11  purposes.  I use them for classes, so they usually have class

12  names.  I was also the president of the American Political

13  Science Association's section on information technology and

14  politics for a couple years.  In that role, I managed the

15  official Twitter account of that organization.

16  Q    And I'm assuming then, you know how to use Twitter; send

17  out Tweets and read other users' Tweets?

18  A    I do.  Yeah.

19  Q    Now, you've been asked today to testify about Twitter. Are

20  you being compensated for your testimony today?

21  A    I am.

22  Q    Will that influence your testimony in any way?

23  A    No.

24  Q    Did anyone tell you to say anything during your testimony

25  today?



22-60493.1020

1    A    I was instructed to be truthful and honest.

2        MR. ROSS:  I couldn't hear the last entry, your Honor.

3    I'm sorry.

4        THE WITNESS:  Truthful and honest.  Sorry.

5        MR. ROSS:  Thank you.

6    Q    BY MR. GARBER:  Were you ever previously a member of the

7    UAW?

8    A    I think I was.

9    Q    And when was that?

10   A    It would have been when I was at University of California,

11   Berkeley.  I remember the graduate student union beginning when

12   I was there.

13   Q    Are you still a member of the UAW?

14   A    Not as -- no.

15   Q    And would the fact that you were a one-time representative

16   of the UAW, while a doctoral student many years ago, will that

17   affect your testimony today?

18   A    No.

19       MR. GARBER:  Okay.  Your Honor, I now offer Professor

20   Kevin Wallsten as an expert in Twitter.

21       MR. ROSS:  Okay, I'm not sure that it's been established

22   that he's here to test about -- testify about something that

23   requires expert testimony.

24       MR. GARBER:  I think -- yes.  Oh.  Go ahead.

25       MR. ROSS:  So I guess I would ask, before we proceed, I'd

22-60493.1021



1    like some offer from the General Counsel as to what it is about

2    what this Professor Wallsten has to say that's material to this

3    case.

4        MR. GARBER:  He's going to testify to how Tweets work,

5    how -- the viewership of Tweets, how Tweets are viewed on

6    different platforms --

7        MR. ROSS:  The what?  I'm sorry.

8        MR. GARBER:  Hold on.  What?

9        MR. ROSS:  I couldn't hear what you said.  I'm sorry,

10   Noah.

11       MR. GARBER:  He'll testify as to how Twitter works, the

12   viewership of Tweets, how viewership is affected based on the

13   amount of followers that a person has, the spectrum that Tweets

14   can reach.  It all goes to the -- I'm blanking on the charge

15   number.  I'm sure you're aware, though; the most recent charge

16   involving Elon Musk's Tweet.

17       MR. ROSS:  Well, okay.  I --

18       MR. GARBER:  And based on her testimony yesterday, it

19   seems like not everyone has a full understanding of exactly of

20   how Twitter works.

21       MR. ROSS:  Okay, well, I don't think -- believe that this

22   witness is -- there's no question he's a professor and that he

23   studied Twitter, and I'm not taking issue with that, but I

24   don't believe that the things you say he's going to testify

25   about are material to the dispute that presently exists between

escribers
www.escribers.net | 800-257-0885

1  the counsel for the General Counsel and Tesla, and I don't

2  believe that his testimony is appropriate for this matter.  I

3  don't think that -- for instance, I don't believe the Daubert

4  standards have been satisfied to make his testimony

5  appropriate.

6      We are not dealing with a fact-finder who needs to be

7  enlightened about these things.  And as you've said, your

8  Honor, this is all going to be done on the papers that you have

9  received, and I believe this testimony goes far beyond what

10  appears on the documents that have been presented to you for

11  evidence.  So I don't think it's appropriate.

12      MR. GARBER:  If I could -- just one more time.  It'll also

13  goes to Respondent's defense, in which they offered subsequent

14  Tweets that allegedly cured the original unlawful Tweet, and

15  Professor Wallsten will testify as to what the likelihood is

16  that the audience of one Tweet is the same audience of another

17  Tweet.

18      MR. ROSS:  Well, he's not a percipient witness is this

19  case, Judge.

20      MR. GARBER:  But he is an expert in how Tweets are viewed

21  and the likelihood of the Tweet being viewed.

22      MR. ROSS:  And I don't believe that is a material issue in

23  this case.

24      MR. GARBER:  And there was discussion yesterday about

25  Tweet strings, also, as you may recall, and I believe that was



1    misrepresented as to what Tweets are.

2        MS. FEINBERG:  At an inappropriate time, your Honor, if I

3    could be heard?

4        JUDGE TRACY:  Go ahead.

5        MS. FEINBERG:  Okay.  Sorry.  So as I read the -- Tesla's

6    papers, they also make some arguments, though, they provide no

7    legal support or expert support that Mr. Trump's -- Mr.

8    Trump -- that's ironic -- Mr. Musk's -- it's because of the way

9    he just testified -- Mr. Musk's Tweets were private versus

10   personal, and that they weren't really part -- on behalf of

11   Tesla, and that he wasn't Tweeting at the workforce, and so I

12   think we need to understand who -- what it is when someone's on

13   Twitter, when someone liked when Mr. Musk is on Twitter, what

14   that means.

15       I already heard from the professor that there's a

16   distinction between levels of Tweeters, or whatever, and also

17   how it impacts the workplace.  So I believe that it is

18   appropriate in this case.  And as far as I know, there

19   aren't -- haven't been cases before the National Labor

20   Relations Board on this issue, and I think it's important for

21   there to be a record about what Twitter is.  Because even from

22   the questions that we've heard, people ask questions like, what

23   is a reply, which is not an appropriate question; what is a

24   string, not an appropriate question.

25       So we're having conversations without having the necessary



22-60493.1024

1  vocabulary, and I feel like for us to be able to even brief

2  this, or to discuss it appropriately, we should have -- lay the

3  found work for what -- you know, the groundwork for what

4  Twitter is.  So I hope you'll allow us -- you know, help let

5  the General Counsel proceed.

6      Thank you.

7      JUDGE TRACY:  For the General Counsel, did you guys let

8  Respondent know that you planned to call this witness?

9      MR. GARBER:  We did not, but we do have a resume prepared,

10  if they would like to do voir dire.

11      JUDGE TRACY:  I think that that would be appropriate.

12      MR. GARBER:  Okay.

13      MR. ROSS:  I would add, your Honor, that having not been

14  put on notice of this, we are prejudiced.  We are prejudiced

15  because we've been afforded no opportunity to prepare a cross-

16  examination or to educate ourselves with respect to the matters

17  that this witness will testify about.  Your Honor, we haven't

18  been afforded the opportunity to, perhaps, retain a counter-

19  expert, regardless -- assuming that expert testimony is even

20  appropriate for this proceeding.

21      So in that regard, as well, I think it's inappropriate,

22  improper, prejudicial, and I don't believe that this witness

23  should be allowed to opine about things that have absolutely

24  nothing to do with this case.

25      MR. GARBER:  I would just say that we don't have to



1    provide a witness list, that Respondent generally does not know

2    who we are going to call.  We have another week after -- the

3    week after next, until we're going back on the record, so

4    Respondent will have plenty of time to call a witness that they

5    would like.

6        MR. ROSS:  And what happens if we can't retain an expert

7    in that period of time?  What happens if we are unable to find

8    an expert in that period of time?  Your Honor, this is highly

9    unusual.  I know that experts, from time to time, may be used

10   to deal with things that are beyond the ken of a fact-finder.

11   I don't believe you are a fact-finder who need this assistance,

12   and if General Counsel was going to call this person, I believe

13   that the appropriate thing to do would've been to give us ample

14   notice so that we could prepare ourselves for the examination.

15   They've not done that, so we're objecting to this witness.

16       JUDGE TRACY:  So generally, you know, yes.  You're not --

17   you don't have to disclose the witness list.  However, when

18   you're calling an expert witness, generally, you should have

19   afforded the other party an opportunity to be able to call

20   their own witness and to prepare ahead of time for that.  It's

21   not -- I mean, it's very unusual in these cases to call an

22   expert.

23       MR. GARBER:  I would just ask that we don't conflate

24   unusual with improper, too.

25       JUDGE TRACY:  No, but it's also not required, but



www.escribers.net | 800-257-0885

1    generally appropriate that the General Counsel would have let

2    the Respondent know.  So why don't we take about 10 minutes.

3    Let them look at the resume and let me think about this, okay?

4        MS. FEINBERG:  So your Honor, in doing so, I hope you'll

5    also look at their opposition because they raised some -- in

6    the summary judgments --

7        JUDGE TRACY:  Oh, I've seen their --  I have seen their

8    opposition.

9        MS. FEINBERG:  -- their summary judgment motion.  I mean,

10   there's sum --

11       JUDGE TRACY:  I have seen their opposition.  I have seen

12   it.

13       MS. FEINBERG:  Okay, because they raised issues that have

14   to be addressed, and certainly they knew needed to be

15   addressed.

16       JUDGE TRACY:  Um-hum.

17       MS. FEINBERG:  So the surprise element is not genuine.

18       JUDGE TRACY:  I have seen their opposition.

19       MS. FEINBERG:  Okay.

20       JUDGE TRACY:  Yes.  So let's go off the record for about

21   10 minutes.

22   (Off the record at 2:18 p.m.)

23       JUDGE TRACY:  All right, so we took a break because there

24   was -- the General Counsel called in this expert witness.  You

25   know, for the General Counsel to essentially say that you



1   didn't have to disclose the witness list is true, but the whole

2   point of it is to protect witnesses.  This witness didn't need

3   any protection and you have really not given the Respondent an

4   opportunity to prepare for the cross-examination, or to even

5   call their own expert.

6        When you go through the Federal Rules of Evidence, there

7   are many steps that should've been followed that weren't

8   followed here.  But he's here and as you know with judges,

9   we -- I'd rather err on the side of allowing him to testify.  I

10  don't know what relevance, frankly, he's going to have, or what

11  he's going to be adding to this proceeding that I didn't

12  already have.  So I'm going to allow his testimony.  They're

13  going to voir dire him, and then you guys will have the

14  opportunity to call in your own expert, if you wish.

15       And I understand.  It's now a week and a half.  How are

16  you going to get one in a week and a half?  So we're going to

17  just delay this proceeding even longer, because they get the

18  chance to call in their own, if they decide to do so.  So

19  that's the risk that you take.

20       So if you want to take a few minutes to decide whether you

21  actually want to call this expert, do that.  If you feel as

22  though -- that judicial notice can be taken by myself on how

23  Twitter works -- and then, remember, ultimately, the standard

24  is 8(a)(1) and objective statements, okay?  So that's something

25  for you guys to decide, because if they decide that they want

escribers
www.escribers.net | 800-257-0885

1  an expert because you called in an expert, I don't know if this

2  hearing will proceed in a week and a half.

3      MR. ROSS:  And your Honor, if I may, in addition to which,

4  while the -- I'd prefer not to have to voir dire this

5  gentleman, because I don't think it's proper, but I'm certainly

6  willing to do that.  But in terms of cross-examination of this

7  witness -- because I can't be prepared to cross-examine him,

8  having been put on -- not given any notice, what we would be

9  expecting is to have him testify about whatever he has to say,

10  and then he would have to be re-called at a later date, when we

11  could conduct a meaningful investigation.  And it would have to

12  be paid for -- not by us --

13      JUDGE TRACY:  Right.

14      MR. ROSS:  -- but by the party who's calling him.

15      JUDGE TRACY:  That's right.

16      MR. ROSS:  I assume that that would be correct.

17      JUDGE TRACY:  Yes.  That's right.

18      MS. FEINBERG:  Could I just say, your Honor -- and with

19  all due respect, it's not like this was a witness that we knew

20  about at the beginning.  We just -- this witness was called, in

21  part, because of the sudden papers filed by the -- Tesla, which

22  was only 10 days ago, so when you say, we couldn't find a

23  witness in 10 days, actually, that's the position that they put

24  us in.  So I just wanted to say that I wanted to have that as

25  part of the discussion, because yes, it's possible.



www.escribers.net | 800-257-0885

1     And I would also like to point out that the company that

2     we're litigating with is one of the largest technology

3     corporations in the world.  So for them to say, in good faith,

4     that they don't -- can't find someone who's a tech -- Twit --

5     an expert in social media really, sort of, boggles the mind, if

6     we can.

7          But I just want to say that the time frame is not from the

8     beginning of this case.  It's from the arguments that they

9     raised, which prompted us to feel like we needed context and --

10    at least, that's from our perspective.  And so -- which is a

11    very short period of time, because their papers were filed

12    sometime on September 9th, which I think is -- whatever that

13    is.  Not that long ago.

14         JUDGE TRACY:  Um-hum.

15         MS. FEINBERG:  Anyhow, I just -- I'm not disagreeing with

16    some of the things you're saying, in terms of what we may need

17    to do to achieve this.  But I just wanted to put it in context,

18    because I feel like the context of some of it's been lost.

19         JUDGE TRACY:  But you see that I've also been put in a

20    very difficult position as well.  So even if September 9th --

21         MS. FEINBERG:  Yes.

22         JUDGE TRACY:  -- they came up with all of these different

23    defenses -- which, frankly, you could anticipate from the start

24    of this case -- to not tell them then, or even a week ago, is

25    not right.  But under the rules, it's not mandatory that you

escribers
www.escribers.net | 800-257-0885

1    tell them, but it just -- if they say -- and I have to take

2    their word at it -- that we're looking and we're trying to find

3    somebody, but we found someone, but they are not available that

4    week, then we all have to look at our calendars again to figure

5    out when that person is available.

6         MS. FEINBERG:  Okay.

7         JUDGE TRACY:  So, I mean, it is what it is.  So I say, do

8    you need this person?  So if you want to, take a few minutes to

9    decide or you may decide I -- we do.  Let me also ask you.  Did

10   he prepare a report about this particular case?

11        MR. GARBER:  No.

12        JUDGE TRACY:  No.  So his testimony is just based on his

13   experience and how the system works?

14   (Counsel confer)

15        MR. GARBER:  It's beyond -- it's a little beyond that, but

16   there was no report created.

17        JUDGE TRACY:   For this particular matter.

18        MS. FEINBERG:  Not a report.

19        JUDGE TRACY:  Okay.

20        MS. FEINBERG:  There is some work.  A lot of preparation.

21   Not a report.  I don't want to mislead the Judge.  I don't feel

22   comfortable with that.

23        MR. GARBER:  He's done research into the matter leading up

24   to this, where he's reviewed Tweets I believe that is what you

25   are referring to.  Is that what you're referring to?



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  Okay, but if he's prepared anything in

2    preparation for his testimony, that should also be turned over

3    to the General --

4    MS. FEINBERG:  Oh.  No.

5    JUDGE TRACY:  -- to the Respondent.

6    MR. ROSS:  Or if he's relying upon anything for his

7    testimony, we're entitled to that, as well, your Honor.

8    JUDGE TRACY:  That's right.

9    Is there anything like that?  Any --

10    MR. GARBER:  I don't believe so.  No.

11    JUDGE TRACY:  Okay, so let's take a few minutes to decide

12    how you want to proceed.

13    MR. GARBER:  Okay.

14    JUDGE TRACY:  Okay?  Any questions?

15    MR. ROSS:  No.

16    MR. RODRIGUEZ RITCHIE:  Not yet.  No.

17    JUDGE TRACY:  Okay.  All right, so let's go off the

18    record.

19    MR. ROSS:  Thank you.

20    (Off the record at 2:50 p.m.)

21    MR. ROSS:  So what is the deal here?

22    MR. GARBER:  We could -- oh.

23    JUDGE TRACY:  So go ahead.  So -- all right.  Go ahead.

24    MR. GARBER:  So what we could do is, we could call the

25    professor on Tuesday, Thursday, or Friday or -- not next week,

escribers
www.escribers.net | 800-257-0885

1    but the following week, when we resume, do his entire testimony

2    and cross straight through.  That way, give Respondent ample

3    time to prepare for it.  We also have witnesses today to take

4    up the rest of our day, so we won't be wasting time.

5        MR. ROSS:  Well, I want to know what he's going to be

6    called upon to testify about, because otherwise, I have no way

7    of preparing.

8        JUDGE TRACY:  So I think that, in this instance, I mean,

9    you have to go through the Federal Rules of Evidence to, kind

10   of, explain what -- you know, the -- we've already heard now

11   from them about some of his experience.  You have his CV.

12       Maybe we should ask him to leave right now?

13       MR. WALLSTEN:  Sure.

14       JUDGE TRACY:  And then you can talk about -- essentially

15   given offer of proof --

16       MS. FEINBERG:  Do you know where the witness room is down

17   the hall?  If not, Daniel will take you there.

18       MR. ROSS:  And I assume that even though we're being

19   afforded the opportunity to cross him then, we will still have

20   the opportunity to enlist our own expert and we will not be

21   expected to produce that person and have them testify during

22   the next week at trial?

23       JUDGE TRACY:  Okay.  So let's start with the first thing.

24   So you're willing to call him later?

25       MR. GARBER:  Right.



1    JUDGE TRACY:  Okay, and what is -- give me an offer of

2    proof about what -- I mean, I understand that you're going

3    to -- you're trying to qualify him as an expert.  I mean, based

4    upon what I've heard, you know, they're going to do the voir

5    dire.  He is likely an expert in this field.  I don't know.

6    I've not seen a resume, just based upon what I've heard.  And

7    so what would be the purpose of his testimony?

8        The other thing I want you to think about truly, between

9    now and the next time that we meet is, are there any

10   stipulations or is there some other resource where I could take

11   judicial notice of how Twitter works.  Because I'm not sure if

12   it's really necessary.  Because, I mean, also part of it is to

13   provide the fact-finder with information to be able to make a

14   decision.

15       Again, I look at these statements that are alleged to be

16   unlawful, and these are objective.  Nothing has changed about

17   the law about that.

18   MR. GARBER:  Um-hum.

19   JUDGE TRACY:  So I think that's where these discussions

20   should occur with the Respondent's attorneys about, you know,

21   is there some sort of agreement that you all could come up with

22   that would take out the need for Professor Wallsten, and for

23   them to need to call an expert, okay?

24   MR. GARBER:  Okay.

25   JUDGE TRACY:  I mean -- so give us an offer of proof about



1    what --

2        MR. GARBER:  Sure.

3        JUDGE TRACY:  -- he would be testifying about.

4        MR. GARBER:  Professor Wallsten will specifically testify,

5    not only how Twitter works, and he will also define lots of

6    characteristics within Twitter --

7        MR. ROSS:  I'm sorry.  I can't hear you Noah.  I

8    apologize.

9        MR. GARBER:  Sure.  So Professor Wallsten will testify how

10   Twitter works, the characteristics of Twitter, some of the

11   terms that may not be known to everybody.  He will also testify

12   how Tweets are disseminated across various platforms that the

13   Tweet goes out.  It's not just on Twitter.  It goes out in

14   print media, it goes out on -- it'll be on TV, it'll be in the

15   news, and that the viewership of that Tweet is enormous.

16       And this goes to Respondent's defense, which they're

17   essentially arguing <u>Passavant</u>, which they said, hey, we sent

18   out this other Tweet.  That cured his original Tweet, so that's

19   okay, and what he's going to testify to is that the universe of

20   Tweets is so large that you could never, ever calculate that

21   the people who saw the second Tweet -- or the second and third

22   Tweet -- saw the first Tweet; that those universes would never

23   overlap.

24       And he'll also testify that -- about Mr. Musk's Twitter

25   account, what a verified Twitter account is, the number of



www.escribers.net | 800-257-0885

1  followers that he has, that only about 82 people in the world

2  have more followers than Mr. Musk, and that he is one of those

3  followed people on Twitter, so his Tweets reach an even larger

4  audience than almost anyone else on Twitter; and the nature of

5  how his Tweets connect him to Tesla, as well, because there's

6  been -- I believe there was discussion in the papers about his

7  private Twitter account and how he uses that.

8      And we would -- Mr. Wal -- Professor Wallsten will ar --

9  will testify that it's used for Tesla-related purposes, as

10 well -- business purposes.

11     MR. ROSS:  What was that last one?  I'm sorry.

12     MR. GARBER:   That Professor Wallsten will also testify

13 that Mr. Musk, when he Tweets, it's not always for personal

14 purposes; that it's for business purposes as well.

15     JUDGE TRACY:  So then let me ask you.  I mean, now, some

16 of the information that it sounds like you're saying that he

17 would testify about, you know, it is technical.  Are there no

18 Twitter documents or something -- official documents that

19 explain any of this?

20     MR. GARBER:  I would offer a view that probably the

21 Twitter user agreement, but I don't think that that would do

22 the trick.  That would probably explain what a timeline is,

23 what a Twitter handle is, what Twitter followers are, what a

24 reply Tweet or a re-Tweet is.

25     JUDGE TRACY:  Um-hum.

22-60493.1036



1    MR. GARBER:  Things of that nature, but it won't go into

2    the universe of which these Tweets reached.

3    JUDGE TRACY:  And also, my question is -- I mean, isn't

4    the standard the, you know, objective standard of the statement

5    on its face, no matter who saw it, who read it?  I mean, is it

6    really relevant how many people saw it in the universe of the

7    world?

8    MR. GARBER:  It is here, because their defense is a

9    Passavant defense.  They're saying, we've cured it.  We don't

10   need a Board remedy because we sent out these other Tweets and

11   said, no -- no.  This is what it means.  It wasn't that.  It

12   wasn't what you think it meant, and so they're saying that,

13   under Passavant, you have to show that every person who saw the

14   unlawful Tweet saw the allegedly curing Tweets, too.  And

15   that's where he'll testify.

16   If Respondent is willing to stipulate -- I'd have to --

17   we'd have to discuss this a little more, but if they're willing

18   to stipulate that there's no way to calculate the number of

19   people who saw the May 20th Tweet also saw the May 23rd Tweet,

20   and there's no way to know what the overlap is, then we might

21   have something.  But I'd have to discuss that with higher

22   powers.

23   JUDGE TRACY:  Because, like I said before, they've

24   admitted that he made this statement.  They've admitted that

25   this is his Twitter account.



www.escribers.net | 800-257-0885

1    MS. FEINBERG:  Yes and no.

2    JUDGE TRACY:  They have.  I've seen the answer.

3    MR. GARBER:   I don't debate that.  My point is, again, to

4    their defense.  On the <u>Passavant</u>, they have to show that all

5    the people who saw the unlawful Tweet saw the Tweet that

6    allegedly cured the unlawful act.  We would say it didn't cure

7    the unlawful act, but we would also say that not the same pe --

8    it's not the same universe of people who saw it.

9       So a better example of this is -- like, if you were in a

10   hospital.  And let's say I have a captive audience meeting, and

11   I tell everyone in that meeting, if you guys blew your nose,

12   you're going to lose your job and then someone taps my

13   shoulder, oh, no, you can't do that.  And then I immediately

14   say, oh, forget that.  That's wrong.  I've cured it right then

15   and there because all the people that heard me say it

16   originally heard me say, forget it.  It doesn't matter.  I was

17   wrong.

18   JUDGE TRACY:  Um-hum.

19   MR. GARBER:  You can't say that here.  You can't prove

20   that.

21   MR. ROSS:  Your Honor, would it be possible for us to voir

22   dire Professor this afternoon?

23   MS. FEINBERG:  Your Honor -- what?

24   MR. ROSS:  It will help me --

25   JUDGE TRACY:   And so what would be the purpose of that?



1    MR. ROSS:  Purpose would be to, first of all, determine

2    whether, in fact, he is an expert --

3    JUDGE TRACY:  Um-hum.

4    MR. ROSS:  -- as to matters that require his expert

5    testimony.  Additionally, it would help us, since there is no

6    report, to prepare our cross-examination.  So I'm wondering if

7    it would be possible.  They put him on the stand, he's

8    testified about his background, he's provided us with his CV,

9    and what would be customary, in a proceeding where you use an

10   expert, is for us to be afforded the opportunity to voir dire

11   him before he's declared an expert, and I'm going to ask for

12   that opportunity.

13   JUDGE TRACY:  Yes?

14   MR. GARBER:  There are concerns about readiness, and I can

15   appreciate that, and that's why we offered Tuesday, Thursday,

16   and Friday of not next week, but the following week, in which

17   we can do it all at once and it won't take -- if we do it all

18   at once, it will probably not take terribly long.

19   MR. ROSS:  Well, having no report and having no advance

20   notice of what opinions he's going to be offering.  We've just

21   heard things he's going to talk about.  I would like the

22   opportunity to question him about his qualifications and what

23   he's done to prepare to offer his opinions here today, or next

24   week, or week afterwards.

25   MS. FEINBERG:  But he -- if General Counsel had given



1  notice that wouldn't have happened.  They would've just dealt

2  with it as they dealt with it.  And that's what we're trying to

3  cure is the notice, by having him come back.

4      JUDGE TRACY:  Yes.

5      MS. FEINBERG:  So -- and I feel like he -- if he's not

6  being called, he should go and then come back, and whatever --

7  also, Mr. Galescu could get on the stand, which I thought was

8  one of the advantages of this, you know, rearranging.  So I

9  don't know it should be to their -- yeah.

10      JUDGE TRACY:  So here's what we would do, because I do

11  agree with Ms. Feinberg's statement about that.  Let's call him

12  back for the Thursday the --

13      MS. FEINBERG:  11th, I think.

14      JUDGE TRACY:  11th.

15      MR. GARBER:  All right.

16      MS. FEINBERG:  That's fine.

17      JUDGE TRACY:  In the meanwhile, you have his CV.  I'm

18  assuming -- I don't have his CV, but I'm assuming that he has

19  some doc --

20      MS. FEINBERG:  He's written a lot.

21      JUDGE TRACY:  -- written things that meanwhile, you can do

22  you research on him.

23      MR. ROSS:  But can we have a statement for the record,

24  though, your Honor -- I apologize for the interruption.

25      JUDGE TRACY:  Um-hum.



www.escribers.net | 800-257-0885

1    MR. ROSS:  But I don't know where to begin my preparation

2    without knowing the subject of his opinion.  So I would ask for

3    a statement from the counsel for the General Counsel as to the

4    opinion he's being asked to testify about.

5    MR. GARBER:  I think we --

6    JUDGE TRACY:  I thought he just explained that.

7    MR. ROSS:  Well, he said, he's going to talk about this

8    and he's going to talk about that.  He has not actually

9    articulated a specific opinion that this witness is being

10   called upon to provide expert testimony on.

11   MR. GARBER:  I think I did.

12   MR. ROSS:  Now, if -- just a moment, Noah.  I'm -- excuse

13   me.

14   MR. GARBER:  Sure.

15   MR. ROSS:  Your point is well taken.  There are ample

16   things in the media that will tell you how Tweet -- Twitter

17   works.  I'll be reading it and learning myself.  Likewise, in

18   terms of the characteristics of Twitter, I'm sure that there is

19   also ample stuff in the media as to that as well.  So if he's

20   going to be testifying about things that are already in the

21   media, that's not appropriate for expert testimony.

22   If, on the other hand, he's being offered to come in and

23   testify as to something that is beyond what is available to lay

24   readers in the media, I'm entitled to know before he takes the

25   stand -- part of the notice -- what opinion he's being asked to



www.escribers.net | 800-257-0885

1    render.  Because without knowing that, how am I to know how to

2    prepare for his testimony?  He could be coming in here to

3    testify about one thing.  I could be assuming he's coming in to

4    testify about something else.  I have no way of knowing.  I'm

5    denied any notice.  You might as well give me no notice.

6        JUDGE TRACY:  So Mr. Garber,  what -- okay, so obviously,

7    he's going to explain, for the record, how Twitter works, the

8    vocabulary of the terminology, how that platform works, and how

9    it's disseminated, okay?  Are you asking for his opinion in

10   terms of any of the complaint allegations here, as to whether

11   other employees or who would have seen such statements?

12       MR. GARBER:  His opinion will be offered.  His expert

13   opinion will be offered directly to Respondent's defense and

14   I've mentioned Passavant, and for the record, it's Passavant

15   Memorial Area Hospital, 237 NLRB 138 (1978).  So it's --

16       JUDGE TRACY:  And is that -- that case was cited in their

17   motion for summary judgment with the Board?

18       MR. GARBER:  I'd have to double check.  It's the principle

19   that within that case, how you can essentially say that we

20   don't need a Board remedy because we've cured it, so --

21       MR. ROSS:   Passavant did not involve expert testimony.

22       MS. FEINBERG:  That's not what he's saying.

23       JUDGE TRACY:  That -- so --

24       MR. GARBER:  And it was also their defense during the

25   investigation, too.


www.escribers.net | 800-257-0885

1    MR. ROSS:  That still does not require expert testimony.

2    MR. GARBER:  So his expert testimony would go to, again,

3    the universe of people who saw it and how we can never conclude

4    that the universe of people who saw the secondary Tweets saw

5    the first Tweets, such as the Passavant defense is not a viable

6    defense.

7    MR. ROSS:  Judge, I'd like the opportunity to voir dire

8    the gentleman right now, so I have a basis for preparing my

9    cross-examination.

10    JUDGE TRACY:  So again, I think Mr. Garber has just

11    indicated what this witness will be testifying about.

12    MR. ROSS:  May I ask whether there are any other opinions

13    that he'll be asked to offer?

14    JUDGE TRACY:  So Mr. Garber --

15    MR. GARBER:  Yeah?  I didn't hear.

16    JUDGE TRACY:  -- are there any other opinions that he --

17    that Professor Wallsten -- you're going to be asking for him to

18    render?

19    MR. GARBER:  You know, I can go through the different

20    topics that we're going to cover.  We've talked --

21    MR. ROSS:  I'd like to know the opinions that he's being

22    asked to offer.

23    MR. GARBER:  He will also render an opinion on celebrities

24    and people in the public eye on Twitter, how their Tweets have

25    a much larger audience than unknown -- someone like me, who no



www.escribers.net | 800-257-0885

1    one follows, and that the unlawful nature has obviously spread

2    much further.

3         He's not going to offer an opinion about the wording of

4    the Tweet or anything like that.  It's just about who would

5    have seen the Tweet or the universe of people who could have

6    seen both Tweets, and the use of Mr. Musk's Twitter account.

7         JUDGE TRACY:  And what do you mean by the use of his

8    Twitter?

9         MR. GARBER:  That it's more than a personal account that,

10   say, one of us would have.  That it's used to convey Tesla news

11   and things of that nature; that it's been used in the past to

12   discuss breaking news by Tesla, financial news --

13        JUDGE TRACY:  So in other words, you're saying that it is

14   to rebut their defense that this is not his -- Mr. Musk's First

15   Amendment, kind of, personal Twitter, private Twitter account;

16   that this is also, essentially -- again, your argument that

17   he's speaking on behalf of the company officially?

18        MR. GARBER:  Correct.  We had other problems with the

19   First Amendment argument, but, yes.  That is also a factor.

20        MR. ROSS:  He's offering no opinion as to whether it's

21   protected under the First Amendment?

22        MR. GARBER:  No.

23        MR. ROSS:  That's -- I'm right about that; no opinion as

24   to that?

25        MR. GARBER:  Right.  That's right.



www.escribers.net | 800-257-0885

1    MR. ROSS:  And he's offering no opinion as to the

2    lawfulness of the wording?

3    MR. GARBER:  Correct.

4    MR. ROSS:  And he's offering no opinion as to how a person

5    would understand or interpret the wording of the Tweet; is that

6    correct?

7    MR. GARBER:  Correct.

8    JUDGE TRACY:  Any other opinions?

9    MR. GARBER:  Can I have a moment?

10   JUDGE TRACY:  Yes.

11   MR. GARBER:  He'll offer an opinion as to how Twitter is

12   used as a stand-in for press releases and is considered a news

13   source.  That's it.

14   JUDGE TRACY:  Okay.

15   MR. ROSS:  And do I understand, Judge, you will not let us

16   voir dire the gentleman today?

17   JUDGE TRACY:  That's right.

18   MR. ROSS:  All right.  Thank you.

19   JUDGE TRACY:  You have his CV, you have everything that he

20   has written, so you have now time to research him.  You also

21   have, on the record, which opinions the General Counsel intends

22   for him to testify about.

23   If there is anything else that happens between now and

24   then, I expect you to tell Mr. Ross and Mr. Morris --

25   MR. GARBER:  It's understood.


www.escribers.net | 800-257-0885

1    JUDGE TRACY:  -- if there's additional opinions that you

2    intend to ask this professor.

3    MR. GARBER:  Okay.

4    JUDGE TRACY:  You may, Mr. Ross, feel that this individual

5    is adequate, where you may use him as well as a witness.  You

6    may decide that -- that he may be the best one. You know, the

7    goal of the judge here is to hear out the evidence, to weigh

8    the evidence, to hear from the witnesses, and to expeditiously

9    handle this case.

10   Clearly, we began in June and now we're here, and I really

11   do not want to delay it any longer.  If you can't have an

12   expert appear that week, that we're to meet again, and you

13   decide that you don't want to rely upon this professor -- you

14   want to find a different expert, I need to know that week the

15   date --

16   MR. ROSS:  Fine.

17   JUDGE TRACY:  -- for this expert.

18   MR. ROSS:  That's fine.

19   JUDGE TRACY:  Because that will be the end of this

20   hearing, okay?  And then -- then everybody would -- as soon as

21   you find out who this is -- if you decide not to go with this

22   professor, and use him also as a witness, which, hey, they're

23   paying for, so -- you know, I know you all have billions of

24   dollars, but I don't care.  Due process is priceless.  It's

25   true.  You know, everybody's got it.  You need to also give



www.escribers.net | 800-257-0885

1    them the courtesy that I had expected to have happened today --

2        MR. ROSS:  That's fine.

3        JUDGE TRACY:  -- which is, to give them the CV, to tell

4    them -- the General Counsel and the charging parties, you know,

5    what opinions you are requesting from this expert.  I also

6    really hope that you all can -- and I've asked this before.  I

7    don't expect it to happen.  But I have to keep asking that if

8    there's some way that you can come together to determine

9    whether there's stipulations or, perhaps, they didn't -- the

10    Respondent didn't intend to raise this defense that's of

11    significance, which is, you know, that they "cured" or remedied

12    whatever statements that were initially made.

13        Maybe they didn't intend to do that once they delved more

14    into Twitter and all of that.  It could happen, and they might

15    drop that defense where the rest of his testimony could just

16    be, you know, judicial notice of how Twitter works.  I mean,

17    I'm trying to think.  When the first Facebook cases came to the

18    Board -- I don't know.  I didn't look back but I don't know if

19    anybody needed expert witnesses on how Facebook works.

20        And there are cases out there.  I really hate and shudder

21    to think about them, but there are cases with the current

22    President that do involve Twitter that are out there in the

23    universe.  They're not Board cases, but they are Federal Court

24    decisions on Twitter, and they might provide some instruction

25    on how those bodies interpreted Twitter and how it was -- I've

escribers

www.escribers.net | 800-257-0885

1   not, honestly, read any of them, but those could provide some

2   guidance, too.

3        MR. ROSS:  You may get your opportunity.

4        JUDGE TRACY:  Well, I'm trying to figure out a way to make

5   sure that this hearing ends sooner rather than later, because

6   it needs to end for everybody's sake -- everybody's sake.

7        So Thursday the 11th, and if you decide you want somebody

8   else, by the 12th I must know who, when, and it needs to be

9   ASAP.

10       MR. ROSS:  Got it.

11       JUDGE TRACY:  Okay?

12       MR. ROSS:  Yes.

13       JUDGE TRACY:  And I will be available.  I'll make sure

14   that I'm available and work with them to make sure that they're

15   available, okay?

16       MR. ROSS:  Yes.

17       JUDGE TRACY:  Yes.  Would you like to say anything?

18       MR. RODRIGUEZ RITCHIE:  Oh, a lot of things, your Honor.

19       JUDGE TRACY:  On the record?

20       MR. RODRIGUEZ RITCHIE:  Well, I would like a break.

21       JUDGE TRACY:  Oh, yes.  Yes.

22       MR. RODRIGUEZ RITCHIE:  And I just didn't know if we're

23   continuing with Mr. Galescu, are we done with --

24       MS. FEINBERG:  Yes.

25       MR. RODRIGUEZ RITCHIE:  -- the reviewing of the affidavits



1    so --

2        JUDGE TRACY:  Oh, right.

3        MR. RODRIGUEZ RITCHIE:  -- we can proceed, or --

4        MR. ROSS:  Are we done?

5        MS. FEINBERG:  And so can I tell the professor to leave?

6        JUDGE TRACY:  Not yet.

7        MS. FEINBERG:  Okay.

8        JUDGE TRACY:  Wait just a second.

9        MR. ROSS:  We're ready to go.

10       JUDGE TRACY:  You're ready to go for him?  So I would say

11   go ahead and release the professor and have him come back.

12       MS. FEINBERG:  The morning of the 11th?

13       JUDGE TRACY:  Yes.  I'm assuming you've checked with him

14   that he's available.

15       MS. FEINBERG:  I did.  Yes.  That's -- that was part of

16   the plan.

17       JUDGE TRACY:  Okay.  Okay.

18       MS. FEINBERG:  Okay.  Perfect.

19       JUDGE TRACY:  Anything else?

20       MR. RODRIGUEZ RITCHIE:  Just a short break.

21       JUDGE TRACY:  Yes.  Of course.

22       And for the charging party, is there anything else before

23   we move on to Mr. Galescu?

24       MS. FEINBERG:  No.  We're ready. he's ready.

25       JUDGE TRACY:  Okay.  So let's go off the record for --



www.escribers.net | 800-257-0885

1    it's 3:22.  Let's say 3:30, 3:35.  Okay, we're off the record.

2    (Off the record at 3:22 p.m.)

3        MR. ROSS:  I wanted to say that we are going to engage

4    General Counsel as to a possible stipulation that might obviate

5    the necessity of putting the professor on the stand and Mr.

6    Sharma will be reaching out to Counsel for the General Counsel

7    for that notice.

8        JUDGE TRACY:  Thank you.

9        MS. FEINBERG:  Okay.

10       MR. GARBER:  Sounds good.

11       JUDGE TRACY:  All right, so now, we're going to shift back

12   to the Respondent's cross-examination of Mr. Galescu.

13       I just want to remind you that yesterday, I administered

14   an oath to you to testify truthfully in this matter, and you

15   continue to testify under that oath, okay?

16       THE WITNESS:  All right.

17       JUDGE TRACY:  All right, so Mr. Morris?

18       MR. MORRIS:  Yes?

19       JUDGE TRACY:  Go ahead, please.

20   Whereupon,

21                          **JONATHAN GALESCU**

22   having been previously sworn, was called as a witness herein

23   and was examined and testified as follows:

24                          **CROSS-EXAMINATION**

25   Q    BY MR. MORRIS:  Mr. Galescu, what was your position with



www.escribers.net | 800-257-0885

1   Tesla?

2   A   A body repair technician.

3   Q   Have you always held that held that position?

4   A   No.

5   Q   What was your prior position?

6   A   A production associate.

7   JUDGE TRACY:  So we're -- and I'm not sure if I told you

8   this yesterday.  You don't need to lean into this --

9   THE WITNESS:  I just --

10  JUDGE TRACY:  Oh, you're having --

11  THE WITNESS:  It's hard for me to hear --

12  JUDGE TRACY:  Oh, okay.

13  THE WITNESS:  -- from across the room.

14  JUDGE TRACY:  Do you want me to pull back the microphone?

15  I think the problem is that it was so loud in her ears.

16  THE WITNESS:  Sorry.

17  JUDGE TRACY:  It's okay.  So you're trying to hear him?

18  THE WITNESS:  Yeah.

19  JUDGE TRACY:  Okay.  That's fine.  Go ahead.

20  Q   BY MR. MORRIS: And you're a current employee of Tesla?

21  A   Yes.

22  Q   How long have you had the position of body repair?

23  A   They changed our title, 2016, July 4th.

24  Q   So since July 1st, 2016, you've had that position?

25  A   July 4th.


www.escribers.net | 800-257-0885

1    Q    July 4th?  What are your job duties in that position?

2    A    Handle dent repair, repair broken hardware, welding.

3    Q    Any aspect of your job duties include reporting safety

4    issues?

5    A    Not with that job.  No.

6    Q    Any other jobs you've had with Tesla?

7    A    They had appointed me to be the safety coordinator.

8    Q    When did you have that position?

9    A    About the same time.

10   Q    So from July 4th, 2016 to when?

11   A    I don't recall --

12   Q    Can you give me a --

13   A    -- when I stopped.

14   Q    Can you give me approximation?

15   A    I think I did it for about six months -- a year.  I don't

16   recall.

17   Q    So from July 2016 up through January of 2017?

18   A    Possibly.  Yeah.

19   Q    And what were your duties as a safety coordinator?

20   A    They had me come in 30 minutes early and walk the line,

21   bring up any type of safety concerns that I might have found.

22   I would bring those up and then after a while, they stopped

23   that.  And I'd give the pre-start meetings regarding safety and

24   things like that.

25   Q    Did you continue to conduct the pre-start meetings, even



www.escribers.net | 800-257-0885

1   after your duties as the safety coordinator?

2        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

3        MR. MORRIS:  He was asked his duties.  I'm just probing

4   into what he did in his position.

5        MR. RODRIGUEZ RITCHIE:  I think he was asked his duties

6   about a different position and not about a safety coordinator

7   position, and what he did as safety coordinator has no bearing

8   on the matters that he testified about and, in fact, exceeds

9   the scope of the direct examination.

10       MR. MORRIS:  It's also relevant to the alleged protected

11  activities he's engaged in.

12       JUDGE TRACY:  Okay.  So I'm going to overrule the

13  objection.  And go ahead.

14  Q    BY MR. MORRIS:  Did you lead the pre-start meetings, even

15  after your job duties as a safety coordinator ended?

16  A    I don't lead them anymore, but there's times that I do put

17  in my input; not necessarily just about safety, but also about

18  production, how to reduce scrap, and make the line more

19  efficient with everybody.

20  Q    In what period of time were you leading the prestart

21  meetings?

22  A    I was leading the pre-start meetings almost for two years

23  before I said, all right, I've had enough of it.

24  Q    And when did you say you had enough of it?

25  A    I don't remember.



1    Q    Can you give me the year?

2    A    Well, I mean, I still constantly put out my input, but I

3    don't lead them personally.

4    Q    And when did you stop leading those meetings?

5    A    January/February 2017, possibly.

6         MR. MORRIS:  I'd like the witness to be shown General

7    Counsel's Exhibit 16.

8    (Court and court reporter confer)

9         JUDGE TRACY:  And do you guys have a copy of it over

10   there?  Because I think one of the difficulties here is that

11   we've got -- everything is in the transcript now.

12        MR. GARBER:  I may have it.

13   (Counsel confer)

14        MR. ROSS:  May I approach, your Honor?

15        JUDGE TRACY:  Yes.

16   Q    BY MR. MORRIS: And looking at General Counsel's Exhibit

17   16, you testified that you sent this email on April 4th, 2017,

18   correct?

19   A    Yes.

20   Q    How did you determine who to send the email to?

21   A    I was a little unclear who to send it to, so we just -- I

22   sent it to a wide variety.

23   Q    What about the other individuals listed on the email?

24   A    What do you mean?

25   Q    How did you determine to send it to the individuals listed


www.escribers.net | 800-257-0885

1    on the email; on General Counsel's Exhibit 16?

2    A    I figured that was the most logical way to send it.

3    Q    And in your email, you are requesting the OSHA 300 logs

4    and the OSHA 300A summaries, correct?

5    A    Yes.

6    Q    Why did you request the OSHA 300 logs and the OSHA 300A

7    summaries?

8    A    That was a -- something as a individual -- as an employee

9    of Tesla we can request, and wanting to be in -- has been

10    injured myself, and seeing many injuries over the years that

11    I've been there, we were wondering what was going on and

12    wanting to inform our union.  This was a tool to help us to see

13    what was better going on.

14    Q    And what did you plan on doing with the information?

15    A    Sharing it with my representative.

16    Q    That's it?

17    A    Yes.

18    Q    And someone from Tesla responded the very next day,

19    correct?

20    A    Yes.

21    Q    And you actually drafted this email; General Counsel's

22    Exhibit 16, correct?

23    A    No.

24    Q    Who drafted the email?

25         MS. FEINBERG:  Objection.  Attorney-client privilege.



```
1        JUDGE TRACY:  All right, so you don't need to answer that.

2        MR. ROSS:  I couldn't hear the end.  I couldn't hear what

3   you said.

4        JUDGE TRACY:  I said, he does not need to answer that.

5        MR. ROSS:  Thank you.

6        MR. MORRIS:  I'm not permitted to ask him who drafted the

7   email that he sent?

8        JUDGE TRACY:  Well, Ms. Feinberg over here objected,

9   saying that it's attorney-client privilege.

10   Q    BY MR. MORRIS: Did you consult with your attorney

11  regarding this email -- General Counsel's Exhibit 16 -- prior

12  to sending it?

13  A    Yes.

14  Q    Did you consult anyone else?

15  A    Yes.

16  Q    Who else did you consult, except for your attorney?

17  A    My representatives.

18  Q    Being who?

19  A    Susie Reed and Doug Parker.

20  Q    Anyone else?

21  A    Richard Ortiz.

22  Q    And in your conversation with Richard Ortiz, prior to

23  sending this email, what was discussed?

24  A    I'm sorry.  What?

25  Q    Prior to sending this email -- General Counsel's Exhibit
```



www.escribers.net | 800-257-0885

1    16 -- what did you discuss with Richard Ortiz?

2    A    I don't recall.

3        MS. FEINBERG:  Objection, to the extent it calls for

4    attorney-client conversation.  If not, then fine.

5        JUDGE TRACY:  Okay, to the extent it calls for attorney-

6    client privilege, like any conversations with your actual

7    attorney. But I heard the question to be, what did you discuss

8    with Mr. Ortiz; is that correct?

9        MR. MORRIS:  That's correct.

10       JUDGE TRACY:  Okay.

11       THE WITNESS:  I don't recall all the conversations I had

12   with Mr. Ortiz.

13   Q    BY MR. MORRIS:  How many conversations with Richard Ortiz

14   did you have regarding requesting the OSHA 300 logs, prior to

15   sending this email on April 4th, 2017?

16   A    He asked me how many?

17   Q    Yes.

18   A    I don't know how many.

19   Q    Do you recall the conversations you had with Richard Ortiz

20   regarding the OSHA 300 logs, prior to sending this email?

21   A    Yes.

22   Q    And was counsel present for all of those discussions?

23   A    Not all of them.

24   Q    For any of the conversations where counsel was not

25   present, what did you discuss with Richard Ortiz?



www.escribers.net | 800-257-0885

1   MS. FEINBERG:  Again, objection.  Attorney-client

2   privilege, to the extent they're discussing what advice they

3   were given.  If they're discussing other things, then fine.

4   JUDGE TRACY:  Okay.  So I'll just instruct you that if

5   there was -- if you all were discussing advice given, you don't

6   need to disclose that, but if there were other matters that you

7   discussed, including these logs, you may divulge them.  But if

8   it was discussion of what your attorney said to you, then you

9   don't need to disclose that.

10  THE WITNESS:  The only conversation I remember asking

11  Richard without my attorney was, can I cc. you on these emails.

12  Q   BY MR. MORRIS:  And what was his response?

13  A   Yes.

14  Q   Did you say anything else?

15  A   Not that I recall.

16  Q   Did he say anything else?

17  A   Not that I recall.

18  Q   Why did you ask to cc. Richard Ortiz?

19  A   One, I wanted to show that it's not just one individual

20  who's concerned about the injury rates that's going on, and to

21  have a witness, so --

22  Q   I'd like you to take a look at --

23  MR. MORRIS:  Or -- I'd like the witness to be shown

24  General Counsel's Exhibit 17.

25  THE CLERK:  17?



1        MR. MORRIS:  Yes.  With the attachments.

2        THE CLERK:  You want the whole 17?

3        MR. MORRIS:  Yes.

4        THE CLERK:  Sorry about this.

5    Q   BY MR. MORRIS:  And looking at General Counsel's Exhibit

6   17, you testified that this was an email you received on April

7   5th, 2017, correct?

8   A   Yes.

9   Q   And you received it with all those attachments?

10   A   Yes.

11   Q   Did you read the email when you received it?

12   A   Yes.

13   Q   And I'd like to direct your attention to the second

14   paragraph, and there is a reference to Cal Code Regs, Title

15   XIII, Section 14300.35, you see that reference?

16   A   Yes.

17   Q   Did you read those sections of the regulations when you

18   received this email?

19   A   You saying -- are you asking did I look up the -- that

20   code?

21   Q   Yeah, correct.

22   A   No.

23   Q   I'd like to direct your attention to the second page,

24   General Counsel's Exhibit 17-002.  And I'd like to direct your

25   attention to the top box that says, "Attention:  This form



www.escribers.net | 800-257-0885

1  contains information relating to employee health and must be

2  used in a manner that protects confidentiality of employees."

3      You see that reference?

4  A   Yes.

5  Q   Did you read that box when you received this?

6      MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

7      JUDGE TRACY:  Overruled.

8      THE WITNESS: No.

9  Q   BY MR. MORRIS:  And I'd like to direct your attention to

10  the middle of the page on that document.  It has a word saying

11  "Confidential" across in diagonal.  Did you read that when you

12  received the logs?

13  A   Yes.

14  Q   And I direct your attention to the middle of the page.

15  It's under "F", and it says, "Describe injury or illness, parts

16  of body/effect, and objects/substance that directly injured or

17  made person ill." Do you see that part?

18  A   Yes.

19  Q   Did you read that section on the logs?

20      MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

21      JUDGE TRACY:  What's the relevance?

22      MR. ROSS:  It goes to some of the further emails.

23      JUDGE TRACY:  Okay.  Overruled.

24      THE WITNESS:  I glanced over the -- these logs, but I

25  didn't really understand everything fully, so --



www.escribers.net | 800-257-0885

1  Q   BY MR. MORRIS:  And I'd like you to go back to the first

2  page, General Counsel's Exhibit 17-1.  And directing your

3  attention to the second paragraph, it says, "To protect the

4  privacy and confidential health information of injured and ill

5  employees, we have not provided names on the Cal/OSHA 300

6  logs."  Do you see that?

7  A   Yes.

8  Q   Do you have any reason to believe that Tesla was not

9  concerned with the privacy of this information?

10     MS. FEINBERG:  Objection.  Relevancy.

11     MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Calls for

12  speculation.  Lacks foundation.

13     JUDGE TRACY:  Sustained.

14  Q   BY MR. MORRIS:  Has anyone from Tesla told you that they

15  weren't concerned with the privacy of this information?

16     MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

17     JUDGE TRACY:  Sustained.

18     MR. MORRIS:  And so, Your Honor, am I not permitted to ask

19  him questions concerning statements that were made that relate

20  to these emails that were introduced?

21     JUDGE TRACY:  No.  That's -- no.  Just to the two

22  questions that were asked previously.

23     MR. MORRIS:  Okay.

24  Q   BY MR. MORRIS:  After receiving this email, General

25  Counsel's Exhibit 17, did you discuss those documents with



1    anyone else besides your attorney?

2    A    I discussed them with my representative.

3    Q    Anyone else?

4    A    And Rich Ortiz.

5    Q    What'd you discuss with Richard Ortiz?

6    A    I don't remember.

7    (Counsel confer)

8    MR. ROSS:  Your Honor, I'm approaching the witness and

9    providing a copy of General Counsel's Exhibit 20.

10    THE WITNESS:  Thank you.

11    Q    BY MR. MORRIS:  And you previously testified that you

12    received -- or actually you sent this email on April 13th,

13    2017.  Isn't that true?

14    A    Yes.

15    Q    And I direct your attention to the second paragraph of

16    this email.  It begins with, "Federal and state law".  You see

17    that reference?

18    A    Yes.

19    Q    Were you referring to the federal OSHA regulations?

20    A    I don't know how -- whatever the law is that permitted I

21    guess I was referring to.

22    Q    And what law are you referring to?

23    MS. FEINBERG:  Objection.  Document speaks for itself.

24    MR. RODRIGUEZ RITCHIE:  Same objection.

25    JUDGE TRACY:  I'm going to overrule the objection.



www.escribers.net | 800-257-0885

1     Go ahead and answer the question.

2     THE WITNESS:  Can he ask it again?

3     Q    BY MR. MORRIS:  Yeah.  That reference "federal and state

4     law" -- what law were you referring to?

5     A    I guess the one that's quoted right there in the

6     paragraph.

7     Q    Anything else?

8     A    No.

9     Q    And that section that you cited, 29 CFR 1904.35(b)(2)(iv),

10    did you read that section of the statute?

11    MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

12    MS. FEINBERG:  Objection.  Calls for attorney/client

13    conversations.

14    JUDGE TRACY:  I'm going to overrule the objection.  I

15    don't know how that could be attorney/client when she's

16    asking --

17    MS. FEINBERG:  Well, if it was shared -- oh, if he read

18    them by himself, okay.

19    JUDGE TRACY:  -- he's asking if he read it.

20    MS. FEINBERG:  I see.

21    JUDGE TRACY:  Go ahead.

22    MR. RODRIGUEZ RITCHIE:  There was another objection.

23    JUDGE TRACY:  Yeah, and I overruled that one, too.

24    MR. RODRIGUEZ RITCHIE:  Thank you.

25    JUDGE TRACY:  Go ahead.



www.escribers.net | 800-257-0885

1       THE WITNESS:  No, I didn't look it up.

2   Q   BY MR. MORRIS:  Sorry, I didn't hear that.

3   A   I did not look it up.

4   Q   Did you look up any other sections of the California or

5   the CFR or the federal counterpart?

6       MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  The

7   document speaks for itself.

8       JUDGE TRACY:  Again, overruled.

9   Q   BY MR. MORRIS:  Did you look up any federal regulations in

10  or around this time period?

11      MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

12      MS. FEINBERG:  His sentence says "look up" as opposed to

13  "saw counsel for".  I don't know what the relevancy is if he

14  had to look it up himself.

15      JUDGE TRACY:  So this is also cross-examination, so they

16  have the right to ask some questions here as to his knowledge.

17  Okay?  But I think what would help, Mr. Morris, for the record

18  is if you could explain the relevance.

19      MR. MORRIS:  Sure.  In this correspondence going back and

20  forth that was introduced through General Counsel, there's

21  various reference to federal regulations and to state

22  regulations.  And there's certain things that were said and

23  certain responses.  So it all goes into the context of whether

24  certain statements that alleged should be unlawful are in fact

25  lawful under objective standard.



www.escribers.net | 800-257-0885

1     MS. FEINBERG:  What?

2     MR. RODRIGUEZ RITCHIE:  But the problem with that argument

3     is the documents contain whatever they contain.  And whether at

4     some other point extraneously he looked up something has no

5     bearing on what is being said in the document.

6         The allegations at issue refer to written statements back

7     and forth to each other, so him looking up something at some

8     other point has no relevance.

9         MS. FEINBERG:  And he's testified he sent it, meaning he

10    authorized it being sent.  So if he relied on somebody else or

11    someone else to write it, that's his choice.  He's not denying

12    that he authorized the sending of it.

13        JUDGE TRACY:  I thought that he actually sent them.

14        MS. FEINBERG:  Yeah, he did send them.

15        JUDGE TRACY:  Yeah, so I guess I don't understand your --

16        MS. FEINBERG:  I'm saying so I don't know what the issue

17    is.  He's claiming that -- he's taking ownership in them.

18    Whether he crafted them or not -- what is the relevancy of

19    that?  He's taking ownership in the fact that he sent them.

20        And then they speak for themselves, so --

21        JUDGE TRACY:  Again, I'm going to overrule the objection.

22    And maybe we can just sort of get more to the point here.

23    Okay.

24    Q    BY MR. MORRIS:  Did you read any California OSHA

25    regulations or federal OSHA regulations in or around the time



1    period that you received this email?

2    A    No.

3    Q    Did you discuss Cal/OSHA regulations or federal OSHA

4    regulations with Richard Ortiz?

5    A    Not that I recall.

6    Q    And then I'd like to direct your attention to the third

7    paragraph on General Counsel's Exhibit 20.  You said, "Further,

8    I understand that federal and state law permits me to share

9    these documents with my fellow employees, former employees, and

10   authorized representatives, so I'm confused by the confidential

11   label on some of the documents."

12        Why were you confused regarding the confidential label?

13   A    Hasn't it --

14        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

15        JUDGE TRACY:  Overruled.  Go ahead.

16        THE WITNESS:  Well, from my understanding it wasn't

17   supposed to have that on the documents -- the confidential mark

18   and the redacted names.

19   Q    BY MR. MORRIS:  Any other reasons?

20   A    No.

21   (Counsel confer)

22   Q    BY MR. MORRIS:  How'd you form that understanding?

23        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

24        MS. FEINBERG:  Objection to the extent it calls for

25   attorney/client conversation.



1    MR. ROSS:  I'm sorry, I couldn't hear a word you said.

2    MS. FEINBERG:  Objection to the extent it calls for

3    attorney/client conversation.

4    MR. ROSS:  Thank you.

5    JUDGE TRACY:  Okay.  So I'll sustain the objection for

6    that.

7    Q    BY MR. MORRIS:  And you testified that you received the

8    OSHA 300 logs in an unredacted form in or around April 28th,

9    2017, correct?

10   A    Yes.

11   Q    And after receiving those logs, did you discuss those logs

12   with Richard Ortiz?

13   A    Not that I recall.

14   Q    Did you discuss those logs with anyone else?

15   A    With my representatives.

16   Q    Other than your representatives?

17   A    No.

18   MR. MORRIS:  I'd like to show the witness -- what did we

19   leave off on?  Respondent's 2?

20   (Counsel confer)

21   MR. ROSS:  Okay, next in order's 2.

22   MR. MORRIS:  2?

23   MR. ROSS:  That's what I'm told.  There you go.

24   MS. FEINBERG:  Thank you.

25   MR. ROSS:  Um-hum.



1     This needs to be marked I think.

2     **(Respondent Exhibit Number 2 Marked for Identification)**

3     Q    BY MR. MORRIS:  And this document -- Respondent's Exhibit

4     2 -- it's an email, or it looks to be an email exchange between

5     production and Josh Hedges on May 1st, 2017 with the subject,

6     "Update on Safety Initiatives and Progress". Do you remember

7     receiving an email around this time period?

8     MS. FEINBERG:  Receiving this email?

9     MR. MORRIS:  This email, yeah.

10    THE WITNESS:  Possibly I received it.  I might -- I'm sure

11    I have, but I don't recall if I received it.

12    (Counsel confer)

13    Q    BY MR. MORRIS:  Okay.  If you could turn to the second

14    page of this document, specifically the section "OSHA 300 Form

15    Request".  There's two paragraphs.  Do you recall seeing those

16    two paragraphs in an email in or around this time period in May

17    of 2017?

18    A    Did I see this email?  Is that what you're asking?

19    Q    Yeah, those -- seeing an email with those two paragraphs

20    on OSHA 300 Form Request.

21    A    I don't remember seeing this email.

22    Q    Do you recall reading that section on OSHA 300 Form

23    Request?

24    A    I don't remember this email.

25    Q    Oh, don't -- do not remember.  Okay.


www.escribers.net | 800-257-0885

1       And if you could turn to the page marked "Tesla

2  NLRB001956".

3  A    Is it in the same email?

4  Q    It's from Elon Musk to everybody on February 24th, 2017.

5  The third page.

6       MS. FEINBERG:  Why are these in the same document?

7       JUDGE TRACY:  So if you have an objection --

8       MS. FEINBERG:  Objection.  This does not seem like the

9  same source material.

10      Can you just give me a moment to review the document?

11  Because the timing seems various.

12      JUDGE TRACY:  Well, they also haven't moved for it to be

13  admitted yet, so --

14      MS. FEINBERG:  All right, well, Your Honor, are they

15  representing this to be one document or two separate documents?

16  That's what I'm asking.  Because pages 1956 and 1957 don't seem

17  to be connected to the prior page 1955.  So I'm just trying to

18  understand.  And they're from a totally different timeframe.

19  So I'm just --

20      MR. MORRIS:  Well, he said he didn't recall the first

21  email, so I'm not offering that.  But I'm asking some questions

22  about the February 24th email.

23      MS. FEINBERG:  Okay.  But --

24      MR. RODRIGUEZ RITCHIE:  We certainly would object to the

25  relevancy of the February 24th email, and it exceeds the scope



www.escribers.net | 800-257-0885

1   of the direct examination.

2        JUDGE TRACY:  I don't even know what he's asking yet.  So

3   let's give them also some leeway in cross-examination because I

4   don't know what he's asking.  He just started asking questions.

5   So I'm going to overrule the objection at this point because I

6   don't have enough information yet to rule on it.

7        I also don't know why it's in one exhibit number when they

8   are two totally different documents that are not replies or

9   follows-up.  But I'm going to again give you the chance to

10  explain it.

11       MR. MORRIS:  Yeah, they're separate emails, but I'm only

12  asking about this February 24th one.

13  Q    BY MR. MORRIS:  Do you recall receiving this email on

14  February 24th, 2017 from Elon Musk to everybody?

15  A    No.

16  Q    Okay.  You testified that you met with Liza Lipson and

17  Laura (sic) Holcomb on May 24th, 2017, correct?

18       MR. RODRIGUEZ RITCHIE:  Objection.  Misstates testimony.

19  I believe it was Lauren Holcomb.

20  Q    BY MR. MORRIS:  Did you meet with --

21       JUDGE TRACY:  So did you --

22       So sustained.

23  Q    BY MR. MORRIS:  Did you meet with those two individuals on

24  May 24th, 2017.

25       MR. RODRIGUEZ RITCHIE:  Objection.  Vague as to "those two



www.escribers.net | 800-257-0885

1    individuals".

2        JUDGE TRACY:  Could you please --

3        MR. MORRIS:  Sure.

4        JUDGE TRACY:  -- clarify?

5    Q    BY MR. MORRIS:  Did you meet with Liza Lipson and Laura

6    (sic) Holcomb on May 24th, 2017?

7        MR. RODRIGUEZ RITCHIE:  Objection.  Misstates testimony.

8    I --

9        JUDGE TRACY:  Go ahead.

10        MR. RODRIGUEZ RITCHIE:  If I could just state it was

11   Lauren Holcomb, I believe.  Not Laura.

12        MR. MORRIS:  I'm asking him a simple question.  He can

13   respond.

14        MR. RODRIGUEZ RITCHIE:  But the objection was that it

15   misstates testimony.

16        JUDGE TRACY:  Well, it's the name was not pronounced

17   correctly, okay?

18        MR. ROSS:  How can we ground Ms. Holcomb?

19        JUDGE TRACY:  I'm like, oh my God.  It's like 4:00, and

20   I'm just dying here.  Okay, if you could just please --

21        MR. MORRIS:  Sure.

22        JUDGE TRACY:  The name is incorrect, okay?

23   Q    BY MR. MORRIS:  Did you meet with Ms. Holcomb and Ms.

24   Lipson on May 24th, 2017?

25   A    Yes.



www.escribers.net | 800-257-0885

1    Q    And isn't it true that they introduced themselves at the

2    beginning of the meeting?

3    A    Yes.

4    Q    And isn't it true that they explained the purpose of the

5    meeting?

6    A    Yes.

7    Q    And isn't it true that they told you that there was a

8    concern that Tesla employees' health information had been

9    disclosed to third parties?

10    A    No.

11    Q    Your safety concerns were not discussed during that

12    meeting, correct?

13    A    No.

14    Q    And other employees' safety concerns were not discussed

15    during that meeting, correct?

16    A    That's correct.

17    Q    And neither Liza nor Lauren asked you about your safety

18    concerns, correct?

19    A    That's correct.

20    Q    And neither Liza nor Lauren asked you about the safety

21    concerns of other employees, correct?

22    A    That's correct.

23    Q    And the UAW was not discussed during this meeting,

24    correct?

25    A    That's correct.



www.escribers.net | 800-257-0885

1   Q    And neither Liza nor Lauren asked you about the union,

2   correct?

3   A    I'm sorry, say that last part.

4   Q    Neither nor Lauren asked you about the union, correct?

5   A    Correct.

6   Q    And during this meeting with those two individuals,

7   neither of them told you that you couldn't share the OSHA logs

8   with current or former employees, correct?

9   A    What?  Say that again.

10   Q    Lauren and Liza did not tell you that you couldn't share

11   the OSHA 300 logs with current and former employees?

12   A    That's correct.

13   Q    And they didn't tell you that you couldn't share the OSHA

14   logs with your personal representative, correct?

15   A    Correct.

16   Q    And they didn't tell you that you couldn't share the OSHA

17   logs with the union, correct?

18   A    Correct.

19   Q    And neither Liza nor Lauren said that you shouldn't

20   discuss safety concerns with other employees, correct?

21   A    Correct.

22   Q    And neither Liza nor Lauren said that you shouldn't

23   discuss safety concerns with the union, correct?

24   A    Correct.

25   Q    Would you agree that it was a nice meeting with Liza and

22-60493.1073



1    Lauren?

2        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Calls for

3    speculation.

4        JUDGE TRACY:  Sustained.

5    Q    BY MR. MORRIS:  After your meeting with Liza and Lauren on

6    May 24th, 2017, did you discuss that meeting with anyone?

7        MS. FEINBERG:  Objection to the extent it calls for

8    attorney/client conversation.

9        JUDGE TRACY:  All right, so only answer the portion that

10   doesn't concern your discussions with your attorney regarding

11   Mr. Morris's question.

12       THE WITNESS:  Can you ask it again?

13   Q    BY MR. MORRIS:  Yeah.  After that meeting with Liza and

14   Lauren, did you discuss the OSHA 300 logs with anyone?

15       MR. MORRIS:  I'll withdraw that question.

16   Q    BY MR. MORRIS:  Did you discuss the OSHA 300 logs with

17   Richard Ortiz after that meeting?

18   A    Like, directly right after?

19   Q    Any time after.

20   A    I'm sure we discussed it, but I don't recall.

21   Q    You don't recall any specific conversations with Richard

22   Ortiz about the OSHA 300 logs after that meeting in May of

23   2017?

24   A    That's correct.

25   Q    And I'd like you to take a look at General Counsel's 24.



1    MR. ROSS:  Could counsel to the General Counsel provide

2    the witness with a copy of this?  Because mine has writing on

3    it.  Thank you.

4    MS. FEINBERG:  Thank you.

5    MR. RODRIGUEZ RITCHIE:  Handing the witness General

6    Counsel's Exhibit 24.

7    Q    BY MR. MORRIS:  And you testified that you sent this

8    email, which is General Counsel's Exhibit 24, on June 6th,

9    2017, correct?

10   A    Yes.

11   Q    Did anyone else contribute to this email?

12   MS. FEINBERG:  Objection to the extent it calls for

13   attorney/client privilege.

14   JUDGE TRACY:  So again, other than your attorney, did

15   anyone else help you prepare this document?

16   THE WITNESS:  I spoke with my representatives.

17   Q    BY MR. MORRIS:  Anyone else?

18   A    No.

19   Q    And looking at the second page, you say, "Our personal

20   representatives are" -- and then you list two individuals, Doug

21   Parker and Susan Reed. This was the first time that you told

22   Tesla who your personal representatives were, correct?

23   A    Correct.

24   Q    Who's Doug Parker?

25   A    Doug Parker works with Worksafe.



1    Q    Is he an attorney?

2    A    No.

3    Q    How'd you designate him as your personal representative?

4    A    I was introduced to him.

5    Q    When was that?

6         MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

7         MS. FEINBERG:  And Mr. Parker is a lawyer.

8         JUDGE TRACY:  Okay.  So that you could clear up on --

9         MS. FEINBERG:  Okay, sorry.  My mistake.

10        JUDGE TRACY:  -- cross-examination, all right?

11        MS. FEINBERG:  Okay.

12        JUDGE TRACY:  Or redirect, I mean, sorry.

13        MS. FEINBERG:  Okay.

14        JUDGE TRACY:  And what is the relevance?

15        MR. MORRIS:  It goes to his credibility.

16        MS. FEINBERG:  How?

17        JUDGE TRACY:  I'm going to sustain the objection.

18   (Counsel confer)

19   Q    BY MR. MORRIS:  Why did you not tell Tesla who your

20   personal representative was prior to this email on June 6th,

21   2017?

22   A    I wasn't sure.  I'm not sure why I didn't at the time.

23   (Counsel confer)

24   Q    BY MR. MORRIS:  After your meeting with Liza in May of

25   2017, you continued to raise safety concerns to Tesla



www.escribers.net | 800-257-0885

1  management, correct?

2  A    Correct.

3  Q    And you were also a member of the safety team, correct?

4  A    Correct.

5  Q    And you raised safety issues during the meetings with the

6  safety team?

7  A    Yes.

8  Q    And you frequently discussed safety concerns with other

9  employees after that meeting with Liza in May of 2017?

10      MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

11      MR. MORRIS:  It goes to that there was no chill associated

12  with the alleged 8(a)1s.

13      MR. RODRIGUEZ RITCHIE:  The test is an objective test.  It

14  looks to statements that were made.  Whether he has testimony

15  about other people being chilled doesn't affect the inquiry as

16  to whether the statements made were unlawful.

17      JUDGE TRACY:  Sustained.

18  Q    BY MR. MORRIS:  After your meeting with Liza in May or

19  2017, isn't it true that management encouraged you to get

20  involved with the safety team?

21  A    I'm pretty sure they have, but I don't recall.

22  Q    And so is your testimony that you recall management

23  encouraging you to get involved in the safety time?  You're

24  just not sure what the timing was of that?

25  A    They encouraged me prior to all this.  They appointed me



1    to be a safety coordinator.

2    Q    Did they give you any other encouragement besides that?

3    A    Not that I recall.

4    Q    And I'd like to direct your attention to June 8th of 2017.

5    Did you attend a meeting with Gaby Toledano and Josh Hedges?

6         MR. RODRIGUEZ RITCHIE:  Objection.  Exceeds the scope of

7    direct.

8         JUDGE TRACY:  Sustained.

9    Q    BY MR. MORRIS:  Are there flow-downs in the bathroom at

10   Tesla?

11        MR. RODRIGUEZ RITCHIE:  Objection.  Exceeds the scope of

12   direct.  Relevance.

13        MR. MORRIS:  He testified about this alleged conversation

14   with Armando Rodriguez, and it relates to that conversation.

15        JUDGE TRACY:  I'll overrule the objection.

16   Q    BY MR. MORRIS:  Have you seen flow-downs -- or do you know

17   what flow-downs are?

18   A    Go ahead and explain it.

19   Q    Have you seen something posted above the urinals that's

20   used to convey company information to employees?

21   A    Yes.

22   Q    And is that same flow-down also on the stall doors in the

23   bathrooms?

24   A    Yes.

25   Q    Do you recall in March of 2017 that there were stickers



www.escribers.net | 800-257-0885

1   being placed on those flow-downs in the bathroom?

2       MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

3       MR. MORRIS:  It relates to the same conversation with

4   Armando.

5       JUDGE TRACY:  Unfortunately, I can't even remember what he

6   testified.  This is the problem.

7       Any other point of asking him these questions?  Because I

8   don't recall any complaint allegations about that.

9       MR. MORRIS:  There is a complaint allegation related to an

10  alleged conversation involving Armando where the topic of

11  vandalism came up.

12      MR. RODRIGUEZ RITCHIE:  I think that, just for the record,

13  the testimony was about a conversation on March 23rd in which

14  Mr. Rodriguez referred to stickers, pamphlet -- the

15  distribution of stickers, pamphlets, and the leaflets, I think.

16      JUDGE TRACY:  Okay, so what was your question again?  I'm

17  sorry.

18      MR. MORRIS:  I was asking if he was aware of any stickers

19  being placed on these flow-downs in the bathroom and around the

20  March 2017 timeframe.

21      JUDGE TRACY:  Okay.  I'll overrule the objection.

22      Go ahead.

23      THE WITNESS:  Can you specify which bathroom?

24  Q   BY MR. MORRIS:  Are you aware of any bathrooms in the

25  facility in the March 2017 timeframe where stickers were being



1    placed on the flow-downs?

2    A    I heard of it, yes.

3    Q    Heard of it?

4    A    Yeah.

5    Q    Did you see it?

6    A    No.

7    Q    How'd you hear about it?

8         MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

9         JUDGE TRACY:  Overruled.

10        THE WITNESS:  Just by other employees.

11   Q    BY MR. MORRIS:  Did you hear about it during your

12   conversation with Armando in March of 2017?

13   A    No.

14   Q    Isn't it true that vandalism was raised during that

15   conversation?

16   A    Yes.

17   (Counsel confer)

18   Q    BY MR. MORRIS:  And the conversation that you testified to

19   with Armando, that was during a pre-shift?

20   A    The conversation I had with him or the discussion he had

21   with us?

22   Q    The discussion that he had with you in March of 2017.

23   A    A discussion he had with the team?

24   Q    Yeah, during a pre-shift meeting.

25   A    Yes.


www.escribers.net | 800-257-0885

1   Q    You testified about something that he said with respect to

2   vandalism, correct?

3   A    He just mentioned that it's the act of vandalism, passing

4   them out.

5   Q    Okay.  Tell me specifically what Armando said during this

6   conversation.

7   A    Stickers, leaflets, and pamphlets that's not approved by

8   Tesla could be -- passing them out could be a terms of

9   termination and be active vandalism.

10  Q    Were those his exact words?

11  A    Yes.

12  Q    Did he say anything else --

13  A    Sorry --

14  Q    -- on that topic?

15  A    I believe he asked if we had any questions.

16  Q    Anything else?

17  A    Not that I recall.

18  Q    And you're positive those were his exact words?

19  A    Yes.

20       MR. MORRIS:  Could the witness be shown his affidavit?

21  You can provide him with all three of them, but the specific

22  one I want to ask him about is the one in case 197058.

23       JUDGE TRACY:  Which is the date that he signed it?

24       MR. MORRIS:  It's the date of April 27th, 2017.

25       JUDGE TRACY:  Just show him the one right now.  Not all of



1     them.  April 27?

2          MR. MORRIS:  Yep.

3          JUDGE TRACY:  2017?

4          MR. MORRIS:  Yeah.

5          MR. RODRIGUEZ RITCHIE:  All right.  Counsel for the

6     General Counsel is handing the witness one affidavit dated

7     April 27th, 2017.

8     Q    BY MR. MORRIS:  And isn't it true you provided three

9     different affidavits to the NLRB?

10    A    Yes.  Yes.

11    Q    Were your counsel present for all those affidavits?

12    A    Yes.

13    Q    And you were represented by counsel in all three of those?

14    A    Yes.

15    Q    Prior to any of those affidavits, did you come to that

16    session with a pre-prepared affidavit?

17    A    No.

18    Q    And I'd like to direct your attention to page 6,

19    particularly line 3.

20         MR. MORRIS:  Withdraw that.

21    Q    BY MR. MORRIS:  Line 5.  It says, "Armando pulled up a

22    little black book, a pad of paper, and he read from his

23    notebook.  Armando said something like, 'Stickers or leaflets

24    and pamphlets that are not approved by Tesla -- you guys can't

25    pass them out unless it is approved by Tesla.'"



www.escribers.net | 800-257-0885

1    Armando didn't actually use those specific words that you

2    previously testified to, correct?

3    A    I'm sorry?

4    Q    Armando did not use those specific words that you

5    specifically testified to, correct?

6    A    That's what I remember them to be.

7    Q    Why did you use the word "like stickers or leaflets" in

8    your affidavit?

9    A    I don't recall.

10    Q    Did you use that specific word "like" when you were

11    describing it to the Board agent?

12    A    That's what in the script, yes.

13    Q    Isn't it true that Armando said during that same

14    conversation that you could put stickers on your hat, on your

15    clothing, or on yourself.  You just can't put it on Tesla

16    property.  Do you recall him making a statement like that?

17        MS. FEINBERG:  He's nodded.

18    Q    BY MR. MORRIS:  Do you recall him making a statement like

19    that?

20    A    No.

21    Q    And is your testimony that it didn't happen or you don't

22    have a recollection of that?

23    A    I do not recollect that he made that statement.

24    Q    And during the same conversation with Armando, the union

25    was not discussed, correct?



1    A    That's correct.

2    Q    But you are confident though the term "vandalism" was

3    discussed during this meeting with Armando?

4    A    Yes.

5    Q    Are you aware of other situations where there's been

6    vandalism in the bathroom prior to this meeting with Armando?

7    A    Yes.

8    Q    And isn't it true that on occasion the management had

9    taken away radio privileges as a result of this vandalism?

10        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Exceeds

11   the scope of direct.  Calls for speculation.  And lacks

12   foundation.

13        JUDGE TRACY:  Any response?

14        MR. MORRIS:  Sure.  The complaint allegation relates to

15   discriminatory application of these policies.  And I believe

16   there's evidence that the witness can testify to that relates

17   to what occurred prior to this March 2017 conversation.

18        MR. RODRIGUEZ RITCHIE:  I think that doesn't address the

19   objections though.  And in any event that would exceed the

20   scope of the direct examination.

21        JUDGE TRACY:  I'm going to overrule the objection.

22        Go ahead and answer the question.

23   A    Can you ask it again?

24   Q    BY MR. MORRIS:  You testified that you were aware of other

25   scenarios, prior to this meeting with Armando in March 2017,


www.escribers.net | 800-257-0885

1  where there was vandalism to the bathrooms, correct?

2  A    Yes.

3  Q    And isn't it true that you also attended pre-shift

4  meetings with management to discuss those concerns with

5  vandalism?

6       MR. RODRIGUEZ RITCHIE:  Objection.  Assumes facts not in

7  evidence.

8       MR. MORRIS:  It's a question.

9       JUDGE TRACY:  I'll sustain the objection.

10      If you just ask the question -- take some steps back.

11  Q    BY MR. MORRIS:  Did you attend any pre-shift meetings

12  prior to this March 2017 meeting where vandalism was discussed?

13  A    Did I -- did we have discussion about vandalism prior to

14  this one?

15  Q    Yep.

16  A    I only remember one meeting, but I'm pretty sure it was

17  after this one about vandalism.

18  Q    Were you ever told prior to March 2017 that music

19  privileges were going to be taken away because of vandalism to

20  the bathrooms?

21      MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

22      JUDGE TRACY:  Overruled.

23      THE WITNESS:  No.

24  Q    BY MR. MORRIS:  Were you ever told that the radios would

25  be taken away because of vandalism to the bathrooms prior to


22-60493.1085

1    this March 2017 conversation?

2        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

3        JUDGE TRACY:  Overruled.

4        THE WITNESS:  No.

5    Q    BY MR. MORRIS:  Have you ever distributed union stickers?

6    A    Yes.

7    Q    And isn't it true that you were one of the first people to

8    distribute union stickers?

9    A    Yes.

10   Q    And since this meeting that you claimed occurred in March

11   of 2017, have you continued to distribute union stickers?

12       MR. RODRIGUEZ RITCHIE:  Objection.  Argumentative.

13       JUDGE TRACY:  Overruled.

14       MR. RODRIGUEZ RITCHIE:  "That you claimed" -- that's

15   argumentative.

16       JUDGE TRACY:  It's cross-examination.  Overruled.

17       Go ahead.

18       THE WITNESS:  I pass them out occasionally now.

19   Q    BY MR. MORRIS:  Occasionally or frequently?

20   A    When?  Now?

21   Q    After the March 2017 meeting.

22   A    Occasionally.  It's easier to pass out t-shirts.

23   Q    How frequently would you say that you pass out union

24   stickers after this March 2017 meeting?

25       MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.



1       JUDGE TRACY:  What's the relevance?

2       MR. MORRIS:  It relates to the 881 allegation.

3       JUDGE TRACY:  How's that?

4       MR. MORRIS:  That there was absolutely no chill, and that

5  he continued passing out stickers on a regular basis, and that

6  there was no disciplinary action taken or enforcement of some

7  alleged policy.

8       JUDGE TRACY:  So again I'll overrule the objection.

9       Go ahead.

10      THE WITNESS:  I do not pass out the stickers as frequent.

11  Q   BY MR. MORRIS:  And is that because you started passing

12  out union shirts?

13  A   Yes.

14      MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

15      JUDGE TRACY:  Okay, again overruled.

16  Q   BY MR. MORRIS:  Is that because you started passing out

17  union shirts?

18  A   Yes.

19  Q   And how frequently would you say you passed out union

20  shirts?

21      MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

22      JUDGE TRACY:  Overruled.

23      THE WITNESS:  It varies.

24  Q   MR. MORRIS:  Can you provide an approximation?

25  A   It depends how people drop out and when the -- Tesla gets



www.escribers.net | 800-257-0885

1    a new group of new hires in who want to be part of the union

2    movement.

3    Q    You ever do that in the break room?

4    A    Yes.

5         MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

6         JUDGE TRACY:  Overruled.

7    Q    BY MR. MORRIS:  And you testified that you distribute or

8    you have distributed union stickers after March of 2017.  Isn't

9    it true that managers have seen you distributing those

10   stickers?

11        MS. FEINBERG:  Objection.  Conjecture.

12        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Calls for

13   speculation.

14        JUDGE TRACY:  Sustained.

15   Q    BY MR. MORRIS:  Did you tell the Board agent that one of

16   your managers or supervisors had seen you distributing union

17   stickers?

18        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

19        JUDGE TRACY:  Overruled. So go ahead and answer that.

20        THE WITNESS:  I don't know what management's seen what

21   I've done.

22   Q    Did you ever tell the Board agent that after March 2017, a

23   manager saw you handing out union stickers in the break room?

24        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

25        JUDGE TRACY:  Overruled.



www.escribers.net | 800-257-0885

1       THE WITNESS:  I don't recall if I told him that.

2   Q    BY MR. MORRIS:  Did you ever pass out union business cards

3   after this meeting on March of 2017?

4   A    Yes.

5   Q    How frequently would you say you passed them out?

6       MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

7       JUDGE TRACY:  Overruled.  Go ahead.

8       THE WITNESS:  Again, it's those who want to be -- who

9   wants to be part of the union movement.  I'd give it to them,

10  information that they need.

11  Q    BY MR. MORRIS:  Can you provide approximation how often

12  you would do it --

13      MR. RODRIGUEZ RITCHIE:  Objection.

14  Q    BY MR. MORRIS:  -- after March of 2017?

15      MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

16      JUDGE TRACY:  Overruled.

17      THE WITNESS:  Again, it's how quickly Tesla brings in new

18  hires who want to be part of it.  We're always under-staffed.

19  Q    BY MR. MORRIS:  And would you do those same things in the

20  employee break rooms?

21      MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

22      JUDGE TRACY:  Overruled.

23      THE WITNESS:  Yes.

24  Q    BY MR. MORRIS:  And Armando Rodriguez, he's never told you

25  to stop doing any of the things that you just testified to --



www.escribers.net | 800-257-0885

1    either passing out flyers, pamphlets, leaflets, distributing

2    shirts -- after this alleged conversation in March of 2017,

3    correct?

4         MR. RODRIGUEZ RITCHIE:  Objection.  Compound.

5         JUDGE TRACY:  If you could just break up the question,

6    please.

7         MR. MORRIS:  One by one?

8         JUDGE TRACY:  Yes.

9    Q    BY MR. MORRIS:  Armando Rodriguez never told you after

10   March of 2017 that you could not pass out flyers, correct?

11   A    That's correct.

12   Q    And Armando Rodriguez never told you after March of 2017

13   that you couldn't pass out pamphlets, correct?

14   A    That's correct.

15   Q    And the same thing with leaflets, correct?

16   A    Correct.

17   Q    And the same thing with business cards, correct?

18   A    Correct.

19   Q    And the same thing with union shirts, correct?

20   A    Correct.

21   Q    You testified that you signed a confidentiality agreement

22   at the time that you were hired, correct?

23   A    Correct.

24   Q    Do you remember the name of that document?

25   A    The -- other than just being considered the



1    confidentiality agreement?

2        MR. MORRIS:  I'd like the witness to be shown General

3    Counsel's Exhibit 31, and I think I have a copy.

4    (Counsel confer)

5        MR. ROSS:  Could the witness be shown a clean copy of it?

6    Ours has got writing on it.

7        MR. RODRIGUEZ RITCHIE:  Which exhibit?

8        MR. MORRIS:  31.

9        MR. RODRIGUEZ RITCHIE:  Sure, I will extend you that

10   professional courtesy.

11       JUDGE TRACY:  For the next time, please everybody, be sure

12   to have your own set of exhibits to show the witnesses.

13       MR. RODRIGUEZ RITCHIE:  Hand you what is admitted as

14   General Counsel Exhibit 31.

15   Q    BY MR. MORRIS:  And you testified that you received this

16   email in or around November 5th of 2016, correct?

17   A    Yes.

18   Q    And was it your understanding that there were a number of

19   group meetings concerning the confidentiality acknowledgement?

20   A    I'm sorry, what?

21   Q    Were -- was it your understanding that there were a number

22   of group meetings regarding the confidentiality

23   acknowledgement?

24   A    At the time that this was going on, I was not even in my

25   area.  I was doing containments in other parts of the factory,


www.escribers.net | 800-257-0885

1   and I think I found out on, like, the last day they were

2   discussing this.

3   Q    Okay.  And you testified that you had a conversation with

4   Mr. Zwieg regarding the confidentiality acknowledgement?

5   A    Yes.

6   Q    And is it your understanding that there were group

7   meetings that you weren't able to attend prior to your meeting

8   with Mr. Zwieg?

9   A    That I understand -- that I didn't understand that there

10  was group meetings?

11  Q    Yeah, did you know that there were group meetings prior to

12  your meeting with Mr. Zwieg that you weren't able to attend?

13  A    I only found out that day.

14  Q    Okay.  Do you recall Mr. Zwieg telling you that there had

15  been a number of leaks when he discussed the confidentiality

16  acknowledgement with you?

17       MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

18       MR. MORRIS:  He went into what was said during this

19  conversation, and he's alleging it was coercive, so --

20       JUDGE TRACY:  So overruled.

21       Go ahead and answer the question, please.

22       THE WITNESS:  No, he didn't discuss about leaks.

23  Q    BY MR. MORRIS:  And you were given the option to sign,

24  correct?

25  A    Yeah.  Yes, but it didn't sound like I had much of an



1   option.

2   Q    And he provided you with an opportunity to ask questions

3   about the acknowledgement, correct?

4   A    Yeah, I did ask him about -- I did ask him a question, so

5   yes.

6   Q    When did you have that conversation with Mr. Zwieg about

7   the confidentiality acknowledgement?

8   A    In November.

9   Q    What date?

10  A    I don't remember exact date.  November 5th.

11       JUDGE TRACY:  And of what year?

12       THE WITNESS:  2016.

13       JUDGE TRACY:  Thank you.

14  Q    BY MR. MORRIS:  You didn't have any questions about --

15       MR. MORRIS:  Well, withdraw that.

16  Q    BY MR. MORRIS:  You testified that you tried to take a

17  photo for your records of the confidentiality acknowledgement.

18  Do you recall that testimony?

19  A    Yes.

20  Q    And Mr. Zwieg told you that the acknowledgement would be

21  available on Workday, correct?

22  A    Yes.

23  Q    Did you ever check Workday to see if the acknowledgement

24  was up there?

25  A    Yes.



1    Q    How long after your conversation with Mr. Zwieg did you

2    check to see if it was available?

3    A    Probably within a few weeks.

4        MR. MORRIS:  Could the witness be shown his affidavit for

5    208614?  It's dated November 13th, 2017.

6        MR. RODRIGUEZ RITCHIE:  I'm going to ask that the other

7    affidavit be returned to me.

8        So I'm handing Mr. Galescu -- excuse me -- an affidavit

9    dated 11/13/2017.

10   Q    BY MR. MORRIS:  And was this the affidavit that you

11   provided to the Board on November 13th, 2017?

12   A    That's correct.

13   Q    And part of this affidavit concerned your performance

14   review?

15       MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  There's no

16   allegations in the complaint relating to Mr. Galescu's

17   performance review.

18       JUDGE TRACY:  So what's the relevance?

19       MR. MORRIS:  It goes to his bias that there was a charge

20   filed concerning his evaluation and alleged retaliation for

21   union activities, which the General Counsel found that there

22   was no merit to and didn't pursue.

23       JUDGE TRACY:  I'm going to sustain the objection.

24   Q    BY MR. MORRIS:  Counsel asked you some questions whether

25   you had filed any other chargers with any other state or



1    federal agencies.  What other agencies have you filed charges

2    or complaints with?

3    A    The DSL -- DSLE.  DSLE.

4    Q    And isn't it true that you filed a complaint with Cal/OSHA

5    in May of 2017?

6    A    Yes.

7    Q    And that Cal/OSHA complaint concerned the OSHA 300 logs

8    and the summaries, correct?

9         MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

10        JUDGE TRACY:  Overruled.

11        THE WITNESS:  Yes.

12   Q    BY MR. MORRIS:  And it also concerned the meeting that you

13   had with Liza Lipson in May of 2017?

14   A    Yes.

15   Q    And isn't it true that Cal/OSHA informed you that they

16   would not be pursuing your complaint?

17        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

18        JUDGE TRACY:  You guys opened the door for that, so I'm

19   going to overrule the objection.

20        THE WITNESS:  That's correct.

21   Q    BY MR. MORRIS:  And that you were advised that the

22   complaint had no merit and that they would not be issuing a

23   citation?

24        MR. RODRIGUEZ RITCHIE:  Objection.

25        MS. FEINBERG:  To the extent it calls for attorney/client


22-60493.1095

1    privilege.

2        MR. RODRIGUEZ RITCHIE:  Objection.  Again relevance and

3    hearsay.

4        JUDGE TRACY:  Okay.  I'm going to overrule the objection.

5    I think that they're asking what the results were.  That's not

6    attorney/client privilege, sorry.  And --

7        MS. FEINBERG:  I thought they had asked what OSHA told

8    him, and I didn't know that there was -- okay.  I thought they

9    asked what -- "didn't OSHA tell you" --

10       JUDGE TRACY:  Could you ask your question again, please?

11   Q    BY MR. MORRIS:  Yeah.  Were you informed by Cal/OSHA that

12   the complaint had no merit and that they would not be issuing a

13   citation?

14       MR. RODRIGUEZ RITCHIE:  That's hearsay.

15       MS. FEINBERG:  The same objection.

16       JUDGE TRACY:  So I'm going to overrule the objection.

17       THE WITNESS:  That's correct.

18       MR. MORRIS:  Are we on Respondent's 3?

19   **(Respondent Exhibit Number 3 Marked for Identification)**

20       JUDGE TRACY:  Yes.

21       MR. MORRIS:  I didn't offer 2.

22       JUDGE TRACY:  You haven't offered 1 either, but --

23       MR. MORRIS:  What's 1?

24       JUDGE TRACY:  1 was the picture of the guy.

25       MR. ROSS:  Picture of the --



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  The person, whoever he was.

2    MR. MORRIS:  Oh, the security guard.

3    MR. RODRIGUEZ RITCHIE:  It's this one.

4    JUDGE TRACY:  And then 2 -- there was some concerns about

5    2 if you recall.  Because I already can hear the objection now,

6    where it's two different documents.  So -- but you are on 3.

7    MR. MORRIS:  Okay.  Yeah, we're not going to offer 2,

8    so --

9    JUDGE TRACY:  Okay.

10    MR. ROSS:  Although, Your Honor, for the record and for

11    the purpose of answering his question about there being two in

12    one, the first sentence of the first page of Respondent's 2

13    speaks of a follow-up --

14    JUDGE TRACY:  Oh, okay.

15    MR. ROSS:  -- to Elon's email in February, and it appears

16    as though the email that's attached to the document is indeed

17    the email that Mr. Musk --

18    JUDGE TRACY:  Okay.

19    MR. ROSS:  -- issued in February.

20    JUDGE TRACY:  What I'm going to do though is I'm going to

21    hand this back to you guys if you're not attending to -- it's

22    marked, but I don't -- unless it comes in or rejected I don't

23    need it.

24    MR. MORRIS:  Okay.

25    JUDGE TRACY:  And you could decide to put it in later.

22-60493.1097



1    MR. ROSS:  There you go.

2    THE WITNESS:  Thank you, sir.

3    MR. ROSS:  Your Honor.

4    JUDGE TRACY:  Thank you.

5    MR. ROSS:  Sure.

6  Q    BY MR. MORRIS:  And looking at Respondent's Exhibit 3, is

7  this the complaint that you testified to earlier that was filed

8  with Cal/OSHA?

9    MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Hearsay.

10  Lacks foundation.

11    MS. FEINBERG:  Share those same objections.

12    JUDGE TRACY:  What is the relevance?

13    MR. MORRIS:  The relevance is that Cal/OSHA investigated

14  the same allegations that General Counsel is claiming violate

15  the NLRA and did not issue a citation, and found that in fact

16  Tesla had complied with Cal/OSHA regulations in the OSHA

17  responses and also with respect to the interview that was

18  conducted by Liza Lipson in May of 2017.

19    JUDGE TRACY:  Um-hum.  And so isn't that though a

20  different statute that they administer?

21    MR. ROSS:  Actually, it's a --

22    JUDGE TRACY:  Or act.

23    MR. ROSS:  It's a similar statute.  The analogue for

24  Section 8(a)1 or 8(a)3 is Section 11(c) OSHA and Section 6310

25  of the state Labor Code, which is part of the state-approved

1    plan for Cal/OSHA having jurisdiction over workplace health and

2    safety.

3        JUDGE TRACY:  Um-hum.

4        MR. ROSS:  So they are parallel statutes with parallel

5    elements.  And so they are material to our compliance with the

6    OSHA statute.

7        JUDGE TRACY:  But they're not the same.

8        MS. FEINBERG:  Nor was it fully litigated.

9        JUDGE TRACY:  Let me finish.

10       MS. FEINBERG:  Oh, sorry.

11       JUDGE TRACY:  Thank you.  They're not the same.

12       MR. ROSS:  Well, insofar as General Counsel is making

13   assertions that we did certain things in violation of OSHA, for

14   reasons prohibited by the National Labor Relations Act, we

15   believe that this investigation establishes that our conduct

16   was consistent with OSHA.

17       JUDGE TRACY:  And is it also going to your -- some sort of

18   fence that you all have raised?

19       MR. ROSS:  Is it --

20       JUDGE TRACY:  This document and the findings here?

21       MR. ROSS:  Yes.

22       JUDGE TRACY:  So that's your argument that you're making,

23   is that correct?

24       MR. ROSS:  That's an argument we're making.

25       JUDGE TRACY:  One of the arguments, right.



www.escribers.net | 800-257-0885

1    MR. ROSS:  Yes.

2    JUDGE TRACY:  Go ahead.

3    MR. RODRIGUEZ RITCHIE:  The General Counsel has not

4    asserted that there has been a violation of Cal/OSHA.  Indeed,

5    we prosecute violations of the National Labor Relations Act

6    only.

7    Now, this document is a document that appears to be sent

8    from a law firm.  It's not from any governmental entity.  It

9    says at the end, "Sincerely Margo A. Feinberg, Esquire", signed

10    by somebody else.  So the purpose that counsel has offered for

11    this document isn't even reflected in this actual document.

12    JUDGE TRACY:  So -- right.  So in terms of the objection,

13    I sustain the objection with regard to this document.  Okay?

14    On the one hand, I understand your defense here -- one of

15    them -- were the Cal/OSHA findings.  Now, if you're seeking to

16    introduce those findings in written form, put them in.  Move to

17    enter them.  This document though is --

18    MR. ROSS:  Can I see the document?

19    JUDGE TRACY:  -- the attorneys actually that are here --

20    what would it be?

21    MS. FEINBERG:  Submission.

22    JUDGE TRACY:  Their request for an investigation into this

23    matter.  Their letter to Cal/OSHA, along with all of their

24    exhibits.  So this is their request, but it's not Cal/OSHA's

25    documentation.



www.escribers.net | 800-257-0885

1    MR. ROSS:  Your Honor, if I may, just give me one more

2    second.  This document is essentially the analogue to an unfair

3    labor practice charge.  This is the document that was filed

4    with the state agency, triggering an investigation.

5       And as you can see from the face of the document, among

6    other things, there is an allegation with respect to the

7    alleged intimidation of Mr. Galescu and Mr. Ortiz relating to

8    these conversations that took place between Ms. Lipson and Ms.

9    Holcomb.  Sorry, these names drive me crazy.

10       In any event, we believe that this document deserves its

11    place in the record because it is the predicate upon which you

12    will hear later testimony with respect to the outcome of this

13    investigation.  So it's for that purpose that we're asking him

14    whether he's seen the document before, and it's highly relevant

15    to the allegations with respect to the conversation that took

16    place between the two female company representatives and the

17    two individuals.

18       JUDGE TRACY:  So -- sure.  So I will say that I don't see

19    the relevance of it.  I do also respect that that's one of your

20    defenses.  It though may be inappropriate to bring it through

21    this witness.

22       MR. ROSS:  If you --

23       JUDGE TRACY:  Certainly let's see if he could --

24       MR. ROSS:  If he's seen it and can tell us what it is?

25       JUDGE TRACY:  That's right.



www.escribers.net | 800-257-0885

1      MR. ROSS:  That's fine.

2      JUDGE TRACY:  Yeah.

3      MR. ROSS:  Thank you.

4      JUDGE TRACY:  Again, I'll just note for the record that I

5  hear the General Counsel's arguments as well, including the

6  charging party's about the relevance to the proceedings.  I

7  tend to agree, but on the other hand I also have my duty to

8  make sure that the record is fully developed.  And if that is

9  something that the Respondent is relying upon as one of their

10 defenses to this matter and one of the allegations or a few of

11 the allegations, then so be it.  Okay?

12     And again, that can be argued in the briefs.  And again,

13 in the briefs I will note the weight that I give to this

14 document if it comes in at this point.

15     MR. ROSS:  Thank you.

16     MR. RODRIGUEZ RITCHIE:  Could we ask for an offer of proof

17 as to which affirmative defense this goes to?

18     JUDGE TRACY:  Which defense does this go to?  To the

19 allegations of what?

20     MR. ROSS:  It goes to the allegations that are alleged in

21 the complaint with respect to the conversations that took place

22 between Lipson and Holcomb and Mr. Ortiz and Mr. Galescu.

23     JUDGE TRACY:  But so what are you arguing though with

24 offering this into evidence?

25     MR. ROSS:  Well, we're arguing that it is evidence that



www.escribers.net | 800-257-0885

1   there was no intimidation in connection with the conversation,

2   and that indeed -- like I said -- there are analogue provisions

3   of the labor code and fed OSHA -- it's 11(c) fed OSHA, 6310 of

4   the Labor Code -- which prohibit intimidation of employees for

5   engaging in OSHA-related activities.

6       JUDGE TRACY:  Okay.

7       MR. ROSS:  So we believe that there has been an

8   investigation and an administrative determination that these

9   allegations are without merit.  We think they deserve a place

10  in the record.

11      MR. RODRIGUEZ RITCHIE:  There wasn't -- I apologize for

12  having interrupted.  There's no affirmative defense that was

13  pled making that assertion.  That would have been a defense

14  that would have had to have been pled.  Specifically --

15      MR. ROSS:  There is a --

16      MR. RODRIGUEZ RITCHIE:  -- in an answer.

17      MR. ROSS:  There's a denial of the allegation.

18      JUDGE TRACY:  Yeah.  Again, they're telling you now.

19  That's part of what they're doing.  So it's one thing if it

20  suddenly shows up in exceptions, but they're telling you all

21  now there was the denial of it.

22      And frankly, this was kind of brought upon by the

23  questions that were asked previously about if he had filed

24  other complaints.  Because, I don't know, I might have said I

25  don't think it's relevant to this proceeding.  But it was put

www.escribers.net | 800-257-0885

1   on direct. So go ahead and let's see if this is how -- if he

2   can even be the mechanism in which to bring it.

3       MR. ROSS:  Thank you, judge.

4       MR. MORRIS:  Okay.

5   Q   BY MR. MORRIS:  Mr. Galescu, you previously testified that

6   you filed a complaint with Cal/OSHA in May of 2017.  Isn't that

7   true?

8   A   Yes.

9   Q   And directing your attention to the first paragraph of

10  Respondent's Exhibit 3, it says, "Dear Ms. Tatum:  We write to

11  you on behalf of the United Automobile Workers (UAW), Jonathan

12  Galescu, and Richard Ortiz."

13      Have you seen this document, Respondent's Exhibit 3?

14  A   No.

15  Q   You've never seen Respondent's Exhibit 3?

16  A   Not that I recall.

17  Q   But you have filed a complaint with Cal/OSHA?

18  A   Yes.

19  Q   Did you speak with your attorneys about your Cal/OSHA

20  complaint?

21  A   Yes.

22  Q   Was it in or around May 25th, 2017?

23  A   Yes.

24  Q   Did you receive any notices from Cal/OSHA concerning your

25  complaint?



1    MS. FEINBERG:  Objection to the extent it calls for

2    attorney/client communication.

3    JUDGE TRACY:  Yeah, so just you don't need to testify

4    about any attorney/client conversations that you had.  Or

5    attorney conversations that you had.

6    THE WITNESS:  Everything was with my attorney.

7    Q    BY MR. MORRIS:  So there are no documents that you

8    received from Cal/OSHA -- official notices -- other than what

9    your attorney provided you?

10    MR. RODRIGUEZ RITCHIE:  Objection.  Assumes facts not in

11    evidence.  Calls for speculation.

12    MS. FEINBERG:  I assume we're only talking about this --

13    JUDGE TRACY:  Sustained.

14    MS. FEINBERG:  Okay, fine.

15    JUDGE TRACY:  We're talking about this document.

16    MS. FEINBERG:  Yeah.

17    JUDGE TRACY:  Respondent's Exhibit 3.

18    I said the objection was sustained, so --

19    MR. ROSS:  Oh, okay.  Thank you.  I think I'm hard of

20    hearing.

21    MR. MORRIS:  We'll move on.

22    (Counsel confer)

23    JUDGE TRACY:  And then let me offer something else.

24    Again, I'm trying not to be agreeable because I don't know how

25    that's working out here.  But there's also the possibility that



1   you all can discuss this and put it into the record -- allow

2   them to put it into the record.  This is their defense.  You

3   can argue it's irrelevant.  They might argue it's persuasive.

4   Whatever.  If they're trying to get it in, that is something

5   that can be done.

6        Because clearly it was a document that was created by his

7   representatives.  I can see where he maybe didn't see it.  He's

8   not even cc'd on here, but it clearly is something that went to

9   this complaint with Cal/OSHA that is public, okay -- it's out

10  there -- so perhaps that's a possibility, too.

11       MR. ROSS:  If I may, just a moment, Your Honor.

12       JUDGE TRACY:  Just to move along.

13  (Counsel confer)

14       MR. ROSS:  Okay, nothing further.

15       JUDGE TRACY:  Nothing further.  Okay.  I'll put this on

16  the side too, for now.  All right.  Mr. Rodriguez Ritchie?

17       MR. RODRIGUEZ RITCHIE:  If I may have a moment, please.

18       JUDGE TRACY:  Yeah.  Let's go off the record.

19  (Off the record at 4:59 p.m.)

20       JUDGE TRACY:  Okay, go ahead, please.

21       MR. RODRIGUEZ RITCHIE:  We have no further questions.

22       JUDGE TRACY:  Okay.  Ms. Feinberg?

23       MS. FEINBERG:  Nothing at this time, ma'am.

24       JUDGE TRACY:  All right.  Well, thank you very much.

25  Please don't discuss your testimony with anyone until after the

www.escribers.net | 800-257-0885

1  close of this hearing, okay?  But you're free to go or do what

2  you wish.

3      MR. RODRIGUEZ RITCHIE:  I'd just ask on the record that

4  the affidavits be returned to my custody.

5      JUDGE TRACY:  Sure.  There's -- there and then there are

6  some documents up there.  I think they're all yours.

7      MR. RODRIGUEZ RITCHIE:  No, that's theirs.

8      JUDGE TRACY:  That's theirs?

9      MR. RODRIGUEZ RITCHIE:  Yeah.

10      JUDGE TRACY:  Oh, okay.  Yeah.

11  (Counsel confer)

12      MR. RODRIGUEZ RITCHIE:  Are we still on the record?

13      JUDGE TRACY:  Yeah.  So he'll announce that he received

14  them back.

15  (Counsel confer)

16      MR. RODRIGUEZ RITCHIE:  Okay, I've received six affidavits

17  back from Mr. Ross and Mr. Morris.

18      JUDGE TRACY:  Okay.

19      MR. RODRIGUEZ RITCHIE:  Thank you.

20      JUDGE TRACY:  All right.  Anything?

21      MR. ROSS:  No.

22      JUDGE TRACY:  Okay.  So let's go off the record.

23  **(Whereupon, the hearing in the above-entitled matter was**

24  **recessed at 5:02 p.m. until Wednesday, September 26, 2018 at**

25  **9:00 a.m.)**



1    **C E R T I F I C A T I O N**

2    This is to certify that the attached proceedings before the

3    National Labor Relations Board (NLRB), Region 32, Case Numbers

4    32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-

5    200530, 32-CA-208614, 32-CA-210879, 32-CA-220777 Tesla, Inc.,

6    and Michael Sanchez, and Jonathan Galescu, and Richard Ortiz

7    and International Union, United Automobile, Aerospace and

8    Agricultural Implement Workers of America, AFL-CIO at National

9    Labor Relations Board Region 32, 1301 Clay Street, Suite 300N,

10   Oakland, CA 94612-5224, on Tuesday, September 25, 2018, 9:46

11   a.m. was held according to the record, and that this is the

12   original, complete, and true and accurate transcript that has

13   been compared to the reporting or recording, accomplished at

14   the hearing, that the exhibit files have been checked for

15   completeness and no exhibits received in evidence or in the

16   rejected exhibit files are missing.

17

18                        _Deborah Gonzalez_

19

20                        DEBORAH GONZALEZ

21                        Official Reporter

22

23

24

25

22-60493.1108



OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 32

In the Matter of:

| | |
|---|---|
| Tesla, Inc., | Case Nos.  32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| Michael Sanchez, an individual, | 32-CA-200530 |
| | 32-CA-208614 |
| and | 32-CA-210879 |
| | 32-CA-220777 |
| Jonathan Galescu, an individual, | |
| | |
| and | |
| | |
| Richard Ortiz, an individual, | |
| | |
| and | |
| | |
| International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO, | |
| | |
| Charging Party, | |

_____

_____

Place: Oakland, California

Dates: September 26, 2018

Pages: 1091 through 1330

Volume: 7

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885

22-60493.1109



www.escribers.net | 800-257-0885

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 32**

| | |
|---|---|
| In the Matter of: | |
| TESLA, INC., | Case Nos.  32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| INTERNATIONAL UNION, UNITED | 32-CA-200530 |
| AUTOMOBILE, AEROSPACE AND | 32-CA-208614 |
| AGRICULTURAL IMPLEMENT WORKERS | 32-CA-210879 |
| OF AMERICA, AFL-CIO, | 32-CA-220777 |
| | |
| and | |
| | |
| MICHAEL SANCHEZ, AN INDIVIDUAL, | |
| | |
| and | |
| | |
| JONATHAN GALESCU, AN | |
| INDIVIDUAL, | |
| | |
| and | |
| | |
| RICHARD ORTIZ, AN INDIVIDUAL. | |

The above-entitled matter came on for hearing, pursuant to notice, before **AMITA BAMAN TRACY**, Administrative Law Judge, at the National Labor Relations Board Region 32, 1301 Clay Street, Suite 300N, Oakland, CA 94612-5224, on **Wednesday, September 26, 2018, 9:24 a.m.**

www.escribers.net | 800-257-0885

1          A P P E A R A N C E S

2     On behalf of the General Counsel:

3          EDRIS W.I. RODRIGUEZ RITCHIE, ESQ.
           NOAH J. GARBER, ESQ.
4          National Labor Relations Board
           1301 Clay Street, Suite 300N
5          Oakland, CA 94612-5224
           Tel. 510-671-3021
6
      On behalf of the Respondent:
7
           MARK S. ROSS, ESQ.
8          KEAHN N. MORRIS, ESQ.
           SHEPPARD MULLIN RICHTER & HAMPTON LLP
9          Four Embarcadero Center
           Seventeenth Floor
10         San Francisco, CA 94111-4109
           Tel. 415-434-9100
11         Fax. 415-434-3947

12    On behalf of the Charging Parties:

13         MARGO A. FEINBERG, ESQ.
           DANIEL E. CURRY, ESQ.
14         JULIE S. ALARCON, ESQ.
           SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
15         6300 Wilshire Boulevard, Suite 2000
           Los Angeles, CA 90048
16         Tel. 323-655-4700

17

18

19

20

21

22

23

24

25



1

**I N D E X**

2

3

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------|--------|-------|----------|---------|-----------|
| Joshua Hedges | 1111 | 1196 | 1256 | | 1124/1126 |
| | | 1224 | | | 1149/1152 |
| | | | | | 1155/1157 |
| | | | | | 1167/1177 |
| Stephan Graminger | 1262 | 1294 | | | |
| | | 1310 | | | |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-60493.1112

1   **E X H I B I T S**

2

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---|---|---|
| **General Counsel:** | | |
| GC-59 | 1100 | 1100 |
| GC-73 | 1102 | 1102 |
| **Respondent:** | | |
| R-4 | 1117 | 1120 |
| R-5 | 1122 | 1128 |
| R-6 | 1140 | 1140 |
| R-7 | 1140 | 1144 |
| R-8 | 1140 | 1150 |
| R-9 | 1153 | 1153 |
| R-10 | 1159 | 1159 |
| R-11 | 1168 | 1168 |
| R-12 | 1176 | 1176 |
| R-13 | 1176 | 1176 |
| R-14 | 1174 | 1174 |
| R-15 | 1269 | 1287 |

20

21

22

23

24

25



www.escribers.net | 800-257-0885

1                **P R O C E E D I N G S**

2        JUDGE TRACY:  Okay.  So before we -- we're going to take

3    care of some other items.  So if you could first just, for the

4    General Counsel, which -- what are you withdrawing?

5        MR. RODRIGUEZ RITCHIE:  So we are requesting permission to

6    withdraw paragraph 7(m) and paragraph 7(x) and to remove the

7    name Andrew McIndoe from paragraph 5 of the complaint.

8        MR. ROSS:  I'm sorry; I'm going to have to ask if --

9        JUDGE TRACY:  Okay.

10       MR. ROSS:  -- I can look at the complaint as you do this

11   please?

12       JUDGE TRACY:  I'm sorry; I could not hear you.

13       MR. ROSS:  I'm sorry?

14       JUDGE TRACY:  What did you say?

15       MR. ROSS:  I was asking for this -- that to be restated

16   because I want to be looking at the complaint when he does

17   this --

18       JUDGE TRACY:  Okay.

19       MR. ROSS:  -- because I have not committed this complaint

20   to memory and want to know what's still in play and what's not

21   so.

22       JUDGE TRACY:  Okay.

23       MR. ROSS:  7(n) and S?

24       MR. GARBER:  M as in Mary and X as in Xavier.

25       JUDGE TRACY:  Oh, M as in Mary.  Okay.  So withdraw --



1   you're requesting to withdraw paragraph 7(m) as in Mary.  And

2   so to be clear that is the allegation that states on April 28,

3   2017 Respondent by human resources business partner Seth Woody

4   at the Fremont facility attempted to prohibit employees from

5   discussing safety concerns with other employees and/or with the

6   union; is that correct?

7       MR. GARBER:  Correct.

8       JUDGE TRACY:  Okay.  And then the other paragraph is --

9       MR. ROSS:  7(s) as in Sam.

10      JUDGE TRACY:  7(x).

11      MR. RODRIGUEZ RITCHIE:  No.

12      MR. GARBER:  X as in Xavier.

13      MR. ROSS:  Oh, X, X.

14      MR. GARBER:  Yes.

15      JUDGE TRACY:  Okay.  And could -- and I think I believe

16  that I understood that from our conference call last week that

17  you had intended to withdraw 7(x).  Could you just read 7(x)

18  into the record so we're sure what is 7(x)?

19      MR. RODRIGUEZ RITCHIE:  Sure.  On October 21st, 2017

20  Respondent by associate production manager, Andrew McIndoe at

21  the Sparks facility told an employee that the employee should

22  not speak with other employees about workplace concerns.

23      JUDGE TRACY:  Okay.  All right.  I'm assuming that there

24  is no objection to the withdrawal of complaint paragraph 7(m)

25  as in Mary and 7(x), for the charging parties?


www.escribers.net | 800-257-0885

1    MS. FEINBERG:  No.  No objection.

2    JUDGE TRACY:  Okay.  And obviously for the Respondent?

3    MR. ROSS:  We'll agree to that, ma'am.

4    JUDGE TRACY:  So the General Counsel's complaint paragraph

5    7(m) as in Mary and 7(x) are withdrawn.  I accept the withdraw.

6    MR. ROSS:  Anything else you want to withdraw?

7    JUDGE TRACY:  And then the other individual that you're

8    withdrawing or you're removing as an agent or supervisor,

9    correct?

10    MR. RODRIGUEZ RITCHIE:  Right.

11    JUDGE TRACY:  And who is that individual again?  What's

12    his name and if you could give the spelling?

13    MR. RODRIGUEZ RITCHIE:  Sure.  It's --

14    JUDGE TRACY:  Andrew --

15    MR. RODRIGUEZ RITCHIE:  Yeah.  Andrew A-N-D-R-E-W McIndoe

16    M-C-I-N-D-O-E.

17    JUDGE TRACY:  Okay.  All right.  Okay.  So that takes care

18    of that.  I did notice that in the -- one of the complaint

19    paragraphs it does say 5(a).  So take a look at that.  Let me

20    find it.  I had it open yesterday and then I totally forgot

21    to --

22    MR. GARBER:  You're referring to a paragraph that is not

23    there?

24    JUDGE TRACY:  Yeah.

25    MR. GARBER:  Okay.



1    JUDGE TRACY:  Well, it --

2    MR. GARBER:  Or refers to an incorrect paragraph?

3    JUDGE TRACY:  -- it appears to reference the -- a

4    complaint paragraph regarding rules.

5    MR. GARBER:  Uh-huh.

6    JUDGE TRACY:  But -- let me find it.  Yeah.  So take a

7    look at GC Exhibit 1(w) and page 5.  And it's paragraph 7(b).

8    It says, "About late October 2016 or early November 2016,

9    Respondent by human resources business partner David Zwieg, at

10   Respondent's facility during a one-on-one meeting with an

11   employee, prohibited the employee from taking a picture of

12   Respondent's confidentiality agreement described above in

13   paragraph 5(a)."  Paragraph 5(a) is your list of the agents and

14   supervisors.

15   MR. GARBER:  Okay.

16   JUDGE TRACY:  So take a look and then see if you need to

17   amend that.

18   Okay.  And then you ready to talk about the documents?

19   MR. RODRIGUEZ RITCHIE:  Sure.  So we have marked General

20   Counsel's Exhibit 59, a two-page document.  It's an article

21   from Gizmodo that was produced by Respondent in response to our

22   subpoena request.  We would move for the admission of this

23   document.  The document is a self-authenticating document under

24   the federal rules of evidence 906 subparagraph 6.  The Board

25   has held so with regard to similar documents in AZ Electric,



1    282 NLRB No.57 1986.  The statements for their truth that we're

2    seeking to admit are just the statements within the article

3    attributed to Mr. Musk who's the admitted CEO of the company.

4    He's a party opponent so it doesn't fall within hearsay.

5       Indeed the Board has held that statements made by an

6    employer in newspaper articles are admissible under the federal

7    rules of evidence 801(d)(2).  That was in <u>Times Hearst</u>, 356

8    NLRB No. 169.1 (2011) and <u>Dentech Corp.</u>, 294 NLRB No. 83

9    (1989).

10   JUDGE TRACY:  Okay.  So any objections to General

11   Counsel's Exhibit --

12   MR. ROSS:  What's the purpose for which it's being

13   offered, Your Honor?

14   JUDGE TRACY:  Yeah.  So let me just finish what I'm

15   saying.

16   MR. ROSS:  I'm sorry.

17   JUDGE TRACY:  Any objections to --

18   MR. ROSS:  I thought you had finished.

19   JUDGE TRACY:  -- General Counsel's Exhibit 59 --

20   MR. ROSS:  Okay.

21   JUDGE TRACY:  -- being admitted into evidence?  I'm

22   assuming --

23   MR. ROSS:  Yeah, we object.

24   JUDGE TRACY:  -- that they're moving it.  Yes.  So you

25   object.



www.escribers.net | 800-257-0885

1    MR. ROSS:  And we'd like to have the purpose for which

2    it's being offered.

3    JUDGE TRACY:  Okay.  And so what's the relevance?

4    MR. RODRIGUEZ RITCHIE:  Sure.  These statements are

5    statements made by Mr. Musk about Mr. Moran, one of the

6    discriminatees, their animus statements made directly about a

7    named discriminatee in this case.

8    MR. ROSS:  We object to it on relevance.  We object to it

9    on hearsay.

10   JUDGE TRACY:  Okay.  So I will overrule the objection and

11   admit General Counsel's Exhibit 59 into evidence.

12   **(General Counsel Exhibit Number 59 Received into Evidence)**

13   JUDGE TRACY:  Of course, you know, I'll accord it the

14   weight, or the, you know, the credibility of it in the

15   decision.

16   MR. ROSS:  Thank you, Your Honor.

17   JUDGE TRACY:  Okay.  All right.  So that's that one.

18   MR. GARBER:  The next one is GC Exhibit 72 but in speaking

19   with Mr. Morris, they've asked for a little more time to, I

20   guess review other related emails so we can circle back to that

21   one.  And then the next one --

22   JUDGE TRACY:  And so that's true in regards to General

23   Counsel's Exhibit 72 you still need time to decide whether you

24   are objecting or not to its admission?

25   MR. MORRIS:  That's true.



www.escribers.net | 800-257-0885

1        JUDGE TRACY:  Okay.  All right.  So next one.

2        MR. GARBER:  The next one is GC Exhibit 73 we would move

3   into evidence.  We already heard the testimony of Jason Henry.

4   This corroborates his account and we also offer it as evidence

5   of animus that the Respondent was keeping an eye on who had

6   union shirts on.  This was also produced pursuant to the

7   General Counsel's subpoena.

8        JUDGE TRACY:  And did you -- when did you receive this

9   document?  Was it before or after he testified?

10       MR. GARBER:  I believe it was after but he was not

11  included on --

12       JUDGE TRACY:  Okay.

13       MR. GARBER:  -- the email.  So we would have to subpoena

14  one of their supervisors and it seems a little unnecessary to

15  have one of their supervisors come in just to authenticate this

16  one.  They produced it.

17       JUDGE TRACY:  Okay.  And so any objections?

18       MR. MORRIS:  What's the relevance?

19       JUDGE TRACY:  Go ahead.  And say it again.

20       MR. GARBER:  Okay.  It corroborates the account of Jason

21  Henry who we already heard testimony about in regards to the

22  team wear issue.  And we also offer it as evidence of animus in

23  that Respondent is keeping an eye on who's wearing union shirts

24  and not just team wear compliance.

25       MR. MORRIS:  Okay.  Well, with respect to animus that's



www.escribers.net | 800-257-0885

1    not relevant to an 8(a)(1) allegation.  There's also no

2    allegations with respect to surveillance.  And so we would

3    object on relevance grounds.

4        JUDGE TRACY:  Can you tell me which complaint paragraph

5    this goes to?

6        MR. GARBER:  Sure.  7(l) as in Larry and 7(t) as in Tony.

7        JUDGE TRACY:  Okay.  So again, I will overrule the

8    objection to Respondent's objection to General Counsel's

9    Exhibit 73 and admit it into evidence.

10   **(General Counsel Exhibit Number 73 Received into Evidence)**

11       JUDGE TRACY:  Again, it will just go to when determining

12   the credibility of the witness who testified about this

13   because, you know, 7(l) is the rule in the workplace allegedly

14   and then 7(t) is again, 8(a)(1) statements I guess.  And so

15   those don't require animus.  However, you know, in terms of

16   what -- your first comment about corroborating his testimony,

17   you know, I'll allow it for that purpose.  Again, I'll decide

18   in the decision how to, you know, for his credibility.

19       MR. GARBER:  Okay.

20       JUDGE TRACY:  Okay.  All right.  So General Counsel's

21   Exhibit 73 is admitted into evidence.

22       Okay.  And so Mr. Rodriquez Ritchie, what is next for your

23   case in chief?

24       MR. RODRIGUEZ RITCHIE:  We have two more witnesses that we

25   will be putting on, but they will go on the week of the 9th in



www.escribers.net | 800-257-0885

1   addition to some documents that'll likely go in through them,

2   but besides that we're ready to put our case on hold just for

3   those two witnesses.

4        JUDGE TRACY:  Okay.  And so those two witnesses, now we've

5   already discussed the one witness, which I'm also hoping that

6   talking to Respondent's counsel and Mr. Sharma in particular,

7   hopefully you guys can come up with some sort of stipulations

8   perhaps that will alleviate the need for anybody having to call

9   an expert.  So I leave that to you guys, but I believe that

10  yesterday I had said that this individual, the professor would

11  testify on October 11th.

12       MR. RODRIGUEZ RITCHIE:  Correct.

13       MS. FEINBERG:  Correct.

14       JUDGE TRACY:  Okay.  And so that would be first thing in

15  the morning 9:00 a.m.  And he may have to come out of order,

16  but that's sort of how we -- not even out of order, but I'm

17  hopeful that on the 10th someone is finished before we go onto

18  his testimony on the 11th.

19       This other individual that you're intending to call, when

20  are you planning to call that individual?

21       MR. RODRIGUEZ RITCHIE:  We haven't received information

22  from the Employer about when he will be available that week.

23  All we received was that he wasn't available this week and he

24  would be available the week of the 9th when we resume.

25       JUDGE TRACY:  Okay.  And so have -- do you all know when

22-60493.1122



1    he's --

2        MR. ROSS:  It's -- the person that we're referring to

3    Judge, is Ricky Gecewich.

4        JUDGE TRACY:  Okay.

5        MR. ROSS:  Mr. Gecewich I am told began a well-deserved

6    and much needed vacation before we resumed trial.

7        JUDGE TRACY:  Uh-huh.

8        MR. ROSS:  As far as I know there -- he's not concerned

9    because he's not been in the area to receive service.

10       JUDGE TRACY:  And so when will he be back to be served?

11       MR. ROSS:  I honestly do not know when his return date is.

12   I think -- I believe it's on the 1st -- on or about the 1st of

13   October.

14       JUDGE TRACY:  So the Tesla attorney's here.  Well, you

15   are, but in-house.  They should know.

16       MR. ROSS:  In addition of which Mr. Gecewich has left

17   Tesla.

18       JUDGE TRACY:  Okay.  Did you know that?

19       MR. RODRIGUEZ RITCHIE:  No.

20       JUDGE TRACY:  And when did he leave?  Do you know?

21       MR. ROSS:  A couple weeks before -- a week to ten days

22   before the resumption of the trial I believe.

23       JUDGE TRACY:  Okay.

24       MR. ROSS:  I don't know the exact date.

25       JUDGE TRACY:  All right.  Well, I would say to the General



www.escribers.net | 800-257-0885

1   Counsel, if you intend to call him and still want him, you need

2   to make sure that the service has been completed, especially

3   now if I recall what you said earlier this week, it's only

4   Wednesday, but maybe Monday, that you had served him at this

5   facility, but he doesn't work here anymore.

6       MS. FEINBERG:  No.  And his home.

7       MR. RODRIGUEZ RITCHIE:  Correct.  And we sent it to his

8   home address.

9       JUDGE TRACY:  Okay.  So I would say that he should appear.

10  You could put the subpoena notice for October 9th, 9:00 a.m.

11  And make sure that that's -- so we'll take care of him also at

12  9:00 a.m. because then we can reserve the 11th for the experts,

13  one expert, two experts or no experts.  So you know, but

14  that'll be sort of the expert time.  And the 9th at 9:00 a.m.

15  start with him.  And I would work with them to, as far as what

16  they know, to make sure that the service is proper with his

17  last known address.

18      MR. RODRIGUEZ RITCHIE:  Sure.  We'd request now on the

19  record that Tesla provide us with his last known address.

20      JUDGE TRACY:  Yes.  So if you all would provide -- you

21  don't have to do it on the record, but please provide that to

22  them.

23      MR. ROSS:  Your Honor, I certainly want to accommodate the

24  General Counsel.  I'm concerned about the privacy interests of

25  Mr. Gecewich and I loathe to do anything that would result in



1    an invasion of his privacy.  Mr. Rodriguez Ritchie says that he

2    has served him at his home.  I presume that he has found his

3    address and sent it to him.

4        I just -- like I said, I'm concerned about Mr. Gecewich's

5    privacy interests.  He's not authorized me to share that

6    information with anybody.

7        MR. GARBER:  But it's very common for us to subpoena the

8    last known address of former employees and we always get it

9    too.  So we're not going to harass him.  We just want to serve

10   the subpoena and we can even tell you where we serve the

11   subpoena.  You can confirm it if you'd like.

12       MR. ROSS:  You know, I'm glad to hear that there's no

13   intention to harass him, but I can tell you from conversations

14   I've had with Ms. Toledano that she was repeatedly telephoned

15   by Mr. Rodriguez Ritchie and thought as though she was being

16   harassed by the Board so.

17       JUDGE TRACY:  All right.  Well, that's not important here

18   about Mr. Gecewich, however way she may have felt.

19       MS. FEINBERG:  Okay.  Your Honor, he did give --

20       JUDGE TRACY:  Let me finish, please.

21       MS. FEINBERG:  Okay, sorry.

22       JUDGE TRACY:  That's okay.

23       MS. FEINBERG:  Okay.

24       JUDGE TRACY:  I will give you a chance.

25       MS. FEINBERG:  That's fine.  Just --



www.escribers.net | 800-257-0885

1     JUDGE TRACY:  I'm doing actually your work over here.  Not

2  you, but you guys because I'm already speaking up with my own

3  thoughts about it.

4     MS. FEINBERG:  Thank you.

5     JUDGE TRACY:  You know, it is common, as you know, to give

6  them the last known mailing address.  They will confirm with

7  you where they sent it.  If you could just let them know if

8  this correct.  You all serve the subpoena as best as you know

9  and then if he doesn't show up then you ask for an adverse

10  inference, okay?

11     MR. RODRIGUEZ RITCHIE:  Okay.

12     JUDGE TRACY:  That's the way we work.  Or you can go to

13  enforcement.  It's up to you guys too.  And that will delay

14  this again, but you know, it's okay.

15     MR. ROSS:  Well, if it's any consolation, it's our

16  intention, we have subpoenaed Mr. Gecewich also.

17     JUDGE TRACY:  Okay.

18     MR. ROSS:  And it's our intention to call him as a

19  witness.

20     JUDGE TRACY:  Okay.

21     MR. ROSS:  So whether he appears pursuant to General

22  Counsel's subpoena or our subpoena, he's going to appear here.

23  I would ask that since he is part of our case that we be

24  allowed to examine him.  And then Mr. Rodriguez Ritchie can

25  cross-examine him and that would suffice.



www.escribers.net | 800-257-0885

1       JUDGE TRACY:  Well, actually it usually works the other

2   way, right.  As you know, when they're calling him on their

3   case in chief because I have allowed them permission at this

4   point to rest absent these other two witnesses that they've

5   intended to call, they subpoenaed this individual.  He's not

6   available this week.  And rather than just cut this off today

7   and say forget it, I'm not going to hear anybody else's case

8   and we're just going to resume the week of the 9th, I'm

9   allowing them to do that.

10      MR. ROSS:  Okay.

11      JUDGE TRACY:  So they're calling him as a 611(c) witness.

12  So obviously, you know, when you do that you're looking to get

13  some admissions.  And so it's not going to work though if you

14  call him first on your direct, right.

15      MR. ROSS:  They still get admissions from him on cross-

16  examination.

17      JUDGE TRACY:  It works differently; you know that.  So if

18  they want to call him as a 611(c) witness you issue your

19  subpoena, you issue your subpoena and then we'll deal with it

20  if he comes here.  But they -- if they've called him for their

21  case in chief and they've asked me and I've allowed it, they're

22  going to get him first, okay.

23      MR. ROSS:  Okay.

24      JUDGE TRACY:  Okay.  So is there anything else in terms of

25  your case at this point?



1       MR. RODRIGUEZ RITCHIE:  No, Your Honor.

2       JUDGE TRACY:  Okay.  So we're going to put it -- suspend

3   it at this point, your --

4       MR. RODRIGUEZ RITCHIE:  Correct. -

5       JUDGE TRACY:  -- the General Counsel's case in chief for

6   the Charging Parties.

7       MS. FEINBERG:  No.  Not at this time.

8       JUDGE TRACY:  So you're going to --

9       MS. FEINBERG:  And we reserve our right to call witnesses

10  in rebuttal, but we're ready to --

11      JUDGE TRACY:  Right.  So the rebuttal is fine.

12      MS. FEINBERG:  Depending on what happens.

13      JUDGE TRACY:  But are you resting your case in chief?

14      MS. FEINBERG:  Yes.

15      JUDGE TRACY:  So you don't intend to call anybody for your

16  case in chief, correct?

17      MS. FEINBERG:  Right.

18      JUDGE TRACY:  Right, obviously.

19      MS. FEINBERG:  Because we shared the witnesses with the

20  General Counsel.

21      JUDGE TRACY:  Okay, great.  So now it is the Respondent's

22  case in chief.  Your turn.

23      MR. ROSS:  Okay.  We're going to call our first witness.

24  Let me go get him.

25      JUDGE TRACY:  How about we take about a ten-minute break.



www.escribers.net | 800-257-0885

1      MR. ROSS:  You bet.

2      JUDGE TRACY:  Call in the witness; is that all right?

3      MS. FEINBERG:  Can we find out who that is?

4      JUDGE TRACY:  Is there anything else that we need to

5      discuss?

6      MS. FEINBERG:  Just so I can get my papers ready can we

7      find out since it's only ten minutes out who the witness is?

8      JUDGE TRACY:  Yeah.  So Mr. Ross, who is your first

9      witness?

10     MR. ROSS:  Josh Hedges.

11     MS. FEINBERG:  Thank you, all right.

12     JUDGE TRACY:  Okay.  Thank you and let's go off the

13     record.

14     (Off the record at 9:47 a.m.)

15     JUDGE TRACY:  So let's go ahead and go back on the record,

16     okay.  All right.  So for the Respondents now, your case in

17     chief.  And would you call your first witness?

18     MR. ROSS:  Yes.  Our first witness is Josh Hedges.

19     JUDGE TRACY:  Okay.  If you could go ahead and stand up

20     please and raise your right hand.

21     Whereupon,

22                         **JOSHUA HEDGES**

23     having been duly sworn, was called as a witness herein and was

24     examined and testified as follows:

25     JUDGE TRACY:  Okay.  Go ahead, have a seat and state your



1    name for the record.

2         THE WITNESS:  Josh Hedges.

3         JUDGE TRACY:  Okay.  Mr. Ross, go ahead please.

4         MR. ROSS:  Thank you, Judge.

5                    **DIRECT EXAMINATION**

6    Q    BY MR. ROSS:  Good morning, Mr. Hedges.  How are you?

7    A    I'm doing well.  How are you?

8    Q    Good.

9         JUDGE TRACY:  Oh and let me also give you some sort of

10   instructions.  This microphone does not amplify your voice.

11        THE WITNESS:  Okay.

12        JUDGE TRACY:  So you don't need to lean into it.  Just

13   relax about your, you know, as you're speaking.  However, you

14   are going to need to amplify your voice so that way everybody

15   in the room is able to hear you.  The sound quality isn't the

16   best in here.  And I'm going to move this so everyone can see

17   your face.

18        THE WITNESS:  Okay.

19        JUDGE TRACY:  Okay.  There you go.

20        MR. ROSS:  Thank you, Judge.

21   Q    BY MR. ROSS:  By the way, is it Josh or Joshua?

22   A    Joshua.

23   Q    Joshua Hedges, okay.

24   A    Yeah.  But I go by Josh.

25   Q    Okay.  And you presently work for Tesla?



www.escribers.net | 800-257-0885

1   A    I do.

2   Q    As what?

3   A    Senior HR director for production and supply chain.

4   Q    Okay.  Have you tendered your resignation to Tesla?

5   A    I have.

6   Q    Okay.  And when is that effective?

7   A    October 5th.

8   Q    All right.  Any plans or intentions to return to Tesla?

9   A    No plans.

10  Q    Okay.  Now you presently report to whom, sir?

11  A    To Kevin Kassekert.

12  Q    Okay.  For the lady who's doing the transcribing, could

13  you spell that second name, the last name?

14  A    K-E -- what did -- oh, it's Kassekert.  K-A-S-S-E-K-E-R-T

15  I think.

16  Q    Okay.  You think that's -- that's your best guess, is it?

17  A    That's my best guess.

18  Q    Okay.

19  A    Yeah.  I don't have spellcheck on me right now so.

20  Q    All right, okay.  And he is -- he holds what position, if

21  you know?

22  A    VP of people and places.

23  Q    People and what?

24  A    Places.

25  Q    Places.  He's a busy guy.



1  A    Yes.

2  Q    Tell me, before Kevin whose last name that I can't

3  pronounce --

4  A    Kassekert.

5  Q    -- was your boss?

6  A    Uh-huh.

7  Q    Gaby was your boss, Gaby Toledano?

8  A    Yes.

9  Q    And before Gaby you had somebody named Mark Lipscomb as

10  your boss?

11  A    Yes.

12  Q    And we know Gaby was the chief people officer at the

13  company.  What was Mark Lipscomb's title?

14  A    VP of HR.

15  Q    Did Mark Lipscomb report to Elon Musk?

16  A    He did not.

17  Q    To whom did he report?

18  A    Arnnon Geshuri.

19  Q    Okay.  Now in your job who reports s to you?

20  A    I have HR managers and a few senior HR partners.

21  Q    And it's the -- you know, I'm not sure I asked you this.

22  You're a senior director of HR?

23  A    Correct.

24  Q    Responsible for what segment of the business?

25  A    Production and supply chain.



www.escribers.net | 800-257-0885

1    Q    So the HR team that reports to you, they would be in those

2    functional areas?

3    A    Yes.

4    Q    And in 2017 did you have the same group or direct report

5    you have now?

6    A    Mostly the same, yes.

7    Q    Okay.

8    A    Yeah.  Same functions.

9    Q    Okay.  Carmen Copher, what position does she hold?

10   A    Director and counsel for employee relations.

11   Q    Okay.  Is she somebody who reports to you?

12   A    No.

13   Q    Is she somebody who's ever reported to you?

14   A    No.

15   Q    Do you know what the function or mission of employee

16   relations is?

17   A    It's to investigate employee concerns for complaints.

18   Q    Do you know when employee relations was created and by

19   whom?

20   A    It was probably around the June 2017 timeframe by Gaby

21   when she got to Tesla.

22   Q    Okay.  And Gaby got to Tesla in late May?

23   A    Yes.

24   Q    Does employee relations operate under you?

25   A    No.



www.escribers.net | 800-257-0885

1   Q    To whom does Carmen report in her capacity as the head of

2   ER?

3   A    Currently she reports to Kevin.

4   Q    And before Kevin she reported to Gaby?

5   A    Correct.

6   Q    All right.  Do you have any idea of how many employees

7   work for Tesla worldwide?

8   A    A little over 40,000.

9   Q    And during the first half of 2017 how many employees

10  worked for Tesla worldwide?

11       MR. RODRIGUEZ RITCHIE:  Objection, relevance.  The

12  National Labor Relations Board only has jurisdiction over

13  employees in the United States.

14       MR. ROSS:  It's all background, Judge.

15       JUDGE TRACY:  Overruled, that's fine.  Go ahead.  If you

16  could answer the question please.

17       THE WITNESS:  Around 30,000.

18  Q    BY MR. ROSS:  And do you have any idea how many employees

19  now work in Fremont within the jurisdiction of the National

20  Labor Relations Act?

21  A    Around 12,000.

22  Q    And back in first half of 2017 what was that number?

23  A    Eight to 10,000.

24  Q    Okay.  Now directing your attention to the various

25  segments of the production facility at Fremont.



www.escribers.net | 800-257-0885

1   A    Uh-huh.

2   Q    We've been told that there's something called stamping and

3   body in white, there's an area or function called paint and

4   plastics.

5   A    Uh-huh.

6   Q    And that there is an area called general assembly.

7   A    Yes.

8   Q    Okay.  Do you have any idea how many people worked in each

9   of those areas during the first half of 2017?

10  A    Body in white and stamping would be around 1,000.  Paint

11  and plastics, maybe seven to 800.  And then general assembly

12  probably around 3,000.

13  Q    All right.  Now I'm going to -- and then in addition to

14  those individuals who physically work within the factory, the

15  manufacturing floor --

16  A    Uh-huh.

17  Q    -- there are other people who work at the Fremont

18  facility, right?

19  A    Yes.

20  Q    Okay.  And they perform, just tell us general terms what

21  they do.

22  A    They're general and administrative folks, so HR,

23  recruiting.  There are supply chain folks.  There are IT, some

24  sales and service delivery.

25  Q    Is there any engineering?



www.escribers.net | 800-257-0885

1    A    Engineering, yeah.

2    Q    Okay.

3    A    Manufacturing engineering.

4    Q    Okay.  All right.  Now I'm going to show you a document

5    that I'm going to mark as Respondent's 4 I believe.

6        MR. ROSS:  That's next in order, right?  Yes, ma'am?

7    **(Respondent Exhibit Number 4 Marked for Identification)**

8        MR. ROSS:  Thank you.

9        JUDGE TRACY:  Thank you.

10    Q    BY MR. ROSS:  Now you have in front of you a document that

11    has been marked Respondent's Exhibit 4.  And can you tell me if

12    you can identify that document?

13    A    Yes.  It's the employee proprietary information and

14    inventions agreement.

15    Q    Okay.  And this is the proprietary information agreement

16    that was in effect prior to 2016?

17    A    Yes.

18    Q    Now when employees come to work at Tesla are they required

19    to sign this document?

20    A    Yes.

21    Q    Can they get hired by Tesla if they refuse to sign this

22    document?

23    A    No.

24    Q    Are they expected to comply with it --

25    A    Yes.



www.escribers.net | 800-257-0885

1    Q    -- during -- let me finish please.  Are they expected to

2    comply with it while they're employed at Tesla?

3    A    Yes.

4    Q    Is that a condition of their continued employment, that

5    they comply with it?

6    A    Yes.

7         MR. ROSS:  Your Honor, I would offer Respondent's 4 into

8    evidence.

9         JUDGE TRACY:  Any objections?

10        MR. RODRIGUEZ RITCHIE:  If I may have a moment?  What's

11   the relevance of the document?

12        MR. ROSS:  It is -- it goes to the issues relating to the

13   confidentiality acknowledgment that is being attacked on its

14   face by the General Counsel in the complaint.  This is a

15   document that is referred to.  A later witness will testify

16   that this is the document that is referred to in that later

17   document that is the subject of General Counsel's complaint.

18        MR. RODRIGUEZ RITCHIE:  Well, on that we would object

19   because it's not part of that other document at all.  It's not

20   linked in the other document.  It's not -- the word -- the

21   title of this document doesn't even appear in the other

22   document.  So it really wouldn't be relevant.  The reason why

23   you're saying just it's actually not true because it doesn't

24   appear in the other document.

25        MS. FEINBERG:  When you're done.



1         JUDGE TRACY:  Huh?

2         MS. FEINBERG:  Nothing.  I'm waiting for you just to be

3    done.

4         JUDGE TRACY:  Okay.

5         MS. FEINBERG:  Then I'll make my shot.

6         JUDGE TRACY:  You can go ahead.

7         MS. FEINBERG:  Are you done?

8         MR. RODRIGUEZ RITCHIE:  Yeah.

9         MS. FEINBERG:  Okay.  Well, first of all, I didn't really

10   get when this was even created or whatever.  I don't think

11   there's enough foundation about this document that's been laid,

12   or that the individuals that are the discriminatees in this

13   case somehow or other saw this document or signed this

14   document.  I don't know.  I don't think anything -- if you're

15   trying to connect this document there is no foundation laid for

16   this document.

17        And also because it seems like very broad strokes I was

18   going to do it on cross, but he's HR for a particular division.

19   The questions were all about all employees.  I don't know that

20   he knows about all employees.  Just seems to me that it's

21   moving along very quickly without the proper foundation for

22   this document.  I don't know what else is coming.  And the

23   relevancy, I concur with Mr. Rodriguez Ritchie.

24        MR. ROSS:  Judge, the confidentiality acknowledgment

25   that's in dispute here says that it is a reaffirmation of the



1    commitment that people made to the company.  This is the

2    commitment that was in effect that people sign as a condition

3    to hire.  And they can't go work at the company and there will

4    be a witness later who will come in and testify that that is

5    what the document that General Counsel is attacking is

6    referring to.

7        JUDGE TRACY:  Uh-huh, all right.  So you know, I'm going

8    to overrule the objections and allow Respondent's Exhibit 4

9    into evidence.

10   **(Respondent Exhibit Number 4 Received into Evidence)**

11       JUDGE TRACY:  I would also note though that I need more

12   information to show me how it is relevant.  So all of this

13   information that you have provided obviously it's not in the

14   form of testimony.  So I'm expecting it to be linked up.  I

15   understand from his testimony that this has been in effect

16   prior to 2016, but maybe you could clarify some of that.  Is it

17   still in effect, who does it apply to, all of the employees?  I

18   don't know.

19       MR. ROSS:  My understanding is that --

20       JUDGE TRACY:  So again, get it through the witnesses.

21       MR. ROSS:  Okay.

22       JUDGE TRACY:  And if it's not through him then it's going

23   to be somebody else.

24       MR. ROSS:  It'll be --

25       JUDGE TRACY:  Or else once I get left with this decision



1    and this transcript I'm going to say, I don't know what this

2    thing has to do with it.

3         MR. ROSS:  Okay.  It'll be --

4         JUDGE TRACY:  But I'm leaving it up to you guys --

5         MR. ROSS:  Okay.

6         JUDGE TRACY:  -- to show me.

7         MR. ROSS:  I understand.  It'll be through another

8    witness, we'll do that.

9         JUDGE TRACY:  So Respondent's Exhibit 4 is admitted into

10   evidence.  Hearing you all also out, okay.

11        MR. ROSS:  Thank you.  Now I'm going to show the witness

12   what has already been marked and admitted into evidence as

13   General Counsel's 11.  Unfortunately the only copy I have with

14   me has some highlighting on it and I'm going to tell the

15   witness to disregard the highlighting.

16        MS. FEINBERG:  Well, can we see it then?

17        MR. ROSS:  Sure.

18        MR. RODRIGUEZ RITCHIE:  I would object to the witness

19   being shown a document that contains writing or any reference

20   to any particular portion.

21        JUDGE TRACY:  Okay.  Then as I said yesterday, the next

22   time everybody needs to make sure that they have a clean copy.

23   In the meanwhile then do you have a clean copy for them to show

24   this witness?  Got to do it some way.  What is it?  GC Exhibit

25   11?



www.escribers.net | 800-257-0885

1    MR. ROSS:  General Counsel's Exhibit 11, 001 through 004,

2    Your Honor.

3    JUDGE TRACY:  Okay.

4    Q    BY MR. ROSS:  Mr. Hedges, before I get into that document,

5    does Tesla have a standardized offer letter that it makes to

6    production employees?

7    MS. FEINBERG:  Objection, vague as to time.

8    Q    BY MR. ROSS:  As of the period prior to 2017 did it have a

9    form offer letter that it made -- that it used when it made

10   offers of employment to employees?

11   A    Yes.

12   Q    Okay.  I'd like you to look at what's been marked as

13   General Counsel's 11, 1 through 4.  This is one for Mr. Rich

14   Ortiz dated September 27, 2016.  Tell me does this appear to be

15   the form offer letter that Tesla used at that time?

16   A    Yes.

17   Q    All right.  Thank you.  Now I'm going to show you a

18   document that I'm marking Respondent's Exhibit 5.

19   **(Respondent Exhibit Number 5 Marked for Identification)**

20   Q    BY MR. ROSS:  And I'm going to ask you if you recognize.

21   This is how I get my steps.  Do you recognize that document,

22   sir?

23   A    Yes.

24   Q    And what is that document?

25   A    It's the Anti-Handbook Handbook.



1    Q    Okay.   The Anti-Handbook Handbook?

2    A    Yes.

3    Q    Okay.   I know it's entitled Anti-Handbook Handbook, but is

4    this the Tesla employee handbook?

5    A    It is.

6    Q    Okay.   And it's been the Tesla employee handbook for how

7    long to your memory?

8    A    Since before I started at Tesla.

9    Q    Okay.   And you started when, sir?

10    A    December 28th, 2015.

11    Q    All right.   Now can you tell us whether and how this

12    handbook is made available to employees, if at all?

13    A    It's part of your onboarding paperwork that you're sent

14    and you can sign it electronically in workday and it's in there

15    for you to review in your personnel file.

16    Q    Okay.   So it's available to people on workday?

17    A    Yes.

18    Q    And it's part of the onboarding?

19    A    Correct.

20    Q    All right.

21        MR. ROSS:   I would offer Respondent's 5 into evidence at

22    this time, Your Honor.

23        JUDGE TRACY:   Any objections?

24        MR. RODRIGUEZ RITCHIE:   What's the relevance of the

25    document?



1       MR. ROSS:  The document is being offered for the purpose

2    of addressing the terms and conditions of employment that

3    existed at the company at the time and for the purpose of

4    providing the Judge with information as to what people were

5    told as to the rules of -- the expectations were of employees

6    working at Tesla during the material time period.

7       JUDGE TRACY:  Okay.  Any other objections?

8       MS. FEINBERG:  I'd like to take the witness on voir dire.

9    There's nothing that shows the employees signed this or

10   anything so.

11      JUDGE TRACY:  Okay.  So go ahead and do the --

12      MR. RODRIGUEZ RITCHIE:  That was going to be my request

13   too.

14      JUDGE TRACY:  Okay.  Go ahead and voir dire please.

15      MS. FEINBERG:  Do you want it?  Oh, go ahead.  You can go.

16      MR. RODRIGUEZ RITCHIE:  Sure.

17                   **VOIR DIRE EXAMINATION**

18   Q    BY MR. RODRIGUEZ RITCHIE:  So good morning.  We haven't

19   had a chance to meet yet.  My name is Edris Rodriguez Ritchie.

20   I represent the General Counsel in this matter of the National

21   Labor Relations Board.

22      With regard to the Anti-Handbook Handbook, you testified

23   this document, it's something that's given to employees as part

24   of their onboarding?

25   A    Correct.



www.escribers.net | 800-257-0885

1    Q    Are you part of the onboarding process yourself?

2    A    No.

3    Q    And have you logged into every employees' workday account?

4    A    No.

5    Q    So there's no way -- earlier you testified that it's

6    available to every employee on workday --

7    A    Uh-huh.

8    Q    -- correct?

9    MR. ROSS:  You have to answer audibly.

10    JUDGE TRACY:  Okay.  Yes or no for the record.

11    THE WITNESS:  Yes.

12    JUDGE TRACY:  Sorry.

13    Q    BY MR. RODRIGUEZ RITCHIE:  But that information is not

14    based on any personal knowledge that you have that it's

15    actually available to any employee on workday?

16    A    I'm not sure I understand the question.

17    Q    So your testimony that this is available on workday,

18    you're not basing that on having personal knowledge that every

19    single employee at Tesla Fremont has this Anti-Handbook

20    Handbook in their workday account?

21    A    I'm basing that on the fact that that's what happens

22    during onboarding and that's the practice that everybody goes

23    through when they become an employee.

24    Q    And you're -- but you're not a part of every onboarding

25    for every employee at Tesla Fremont?



www.escribers.net | 800-257-0885

1    A    No, I'm not.

2    Q    Okay.

3         MS. FEINBERG:  I have some when you're done.

4         MR. RODRIGUEZ RITCHIE:  Go ahead.

5         MS. FEINBERG:  Okay.

6         MR. RODRIGUEZ RITCHIE:  I'm done.

7         MS. FEINBERG:  Okay, thank you.

8                    **VOIR DIRE EXAMINATION**

9    Q    BY MS. FEINBERG:  Okay.  So this document, Respondent's

10   Exhibit 5 -- oh first of all, hello.  I'm Margo Feinberg.

11   A    Hi.

12   Q    Counsel for the Charging Party.

13   A    Okay.

14   Q    So I don't see any signature on this.  Is this something

15   that the employees have to acknowledge receipt of in some form

16   or fashion?

17   A    Yes.  They acknowledge in workday.

18   Q    Okay.  So they see this electronically or in hard copy?

19   A    Electronically.

20   Q    And is it -- everything that you sign originally that

21   you -- electronically, does it remain in workday?

22   A    It does.

23   Q    And do the workers still have access to see it?

24   A    Yes.

25   Q    Would it be in an employee's personnel file?



1    A    Yes.

2    Q    And when was this document created?

3    A    I don't know.

4    Q    And --

5    A    Prior to my start at Tesla.

6    Q    Okay.  And you said you started in your position in

7    December of 2015 or with Tesla in December 2015?

8    A    With Tesla in December of 2015.

9    Q    And what position was that?

10   A    Senior HR manager for production.

11   Q    Okay.  And did you do onboarding in that position?

12   A    No.

13   Q    Okay.  And then when do you have -- I know this is voir

14   dire but I just want to make sure I understand.  When did you

15   take on the position you hold today?

16   A    I mean, it's a similar position, just --

17   Q    Okay.

18   A    -- higher title.

19   Q    Okay.  And do you know if this document is being used

20   today --

21   A    Yes.

22   Q    -- Respondent's Exhibit 5?  And has it changed any time at

23   all between December 28, 2015 and present?

24   A    Not that I'm aware of.

25   Q    And how would you be made aware of that?



www.escribers.net | 800-257-0885

1    MR. ROSS:  I couldn't hear that question.

2    Q    BY MS. FEINBERG:  How would you be made aware of that?

3    MR. ROSS:  I'm sorry; aware of what?

4    Q    BY MS. FEINBERG:  Any changes.  If there were changes how

5    would you be notified?

6    MR. ROSS:  Thank you.

7    THE WITNESS:  I'm guessing -- I don't know.

8    Q    BY MS. FEINBERG:  Okay.  So do you regularly review the

9    onboarding materials?

10   A    I would review them if they changed.

11   Q    And how does that happen?  How would it come to your

12   attention?

13   A    I would be asked to review it by legal or somebody else in

14   HR.

15   Q    And did you have to sign this document, Respondent's -- I

16   mean, receipt of this document yourself?

17   A    Yes.

18   Q    And so if you looked in your workday today you would see

19   it there?

20   A    Yes, I would.

21   MS. FEINBERG:  Okay.  Nothing further at this time.  Wait,

22   one second.  Okay.  That's the distinction, okay.  Thank you.

23   JUDGE TRACY:  Okay.  So I'm going to overrule the

24   objection and allow Respondent's Exhibit 5 into evidence.

25   **(Respondent Exhibit Number 5 Received into Evidence)**



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  I'm assuming there's still objections.

2  However, Mr. Ross, I think it would be very beneficial if you

3  would lay the foundation for this witness about how he is aware

4  of the onboarding process, what is his role in it.  We

5  understand thus far, I do, of what his role is, or his title,

6  but how would he know the onboarding process?  Is he part of

7  that, all of that?  Lay that foundation because I think this is

8  where a lot of these questions are coming from --

9    MR. ROSS:  Okay.

10    JUDGE TRACY:  -- in terms of objections.  Because I

11  understand that you're trying to make your own defense about

12  this is part of a whole packet, yada-yada-yada, I get it.  But

13  you need to get us there.

14    MR. ROSS:  It's the yada-yada-yada part that I agree with.

15    JUDGE TRACY:  Thank you, okay.  So I mean, I know I tend

16  to try to speed things along too.

17    MR. ROSS:  Yes.  I'm trying to do that too.

18    JUDGE TRACY:  But then we're trying -- then we also have

19  to slow down and get this witness to where you're trying to get

20  him.

21    MR. ROSS:  Okay.

22                **DIRECT EXAMINATION  (RESUMED)**

23  Q    BY MR. ROSS:  Tell me Josh, were you onboarded at the

24  company?

25  A    Yes, I was.

22-60493.1148



1   Q    Okay.  And when you onboarded, why don't you describe for

2   us the process?

3   A    I was sent -- well, first I had to -- you do a background

4   check.  You fill out all the information and you have a

5   background check.  And then once that is cleared you get all of

6   the confidentiality agreement, the Anti-Handbook Handbook, you

7   know, sign up for direct deposit, do all those different

8   things.  And you sign that within your workday and then it

9   remains in workday in your personal documents that you can go

10  and check as an employee whenever you want.

11  Q    Okay.  And was onboarding of new employees a function that

12  fell under your overall supervision?

13  A    No.

14  Q    Who did that?

15  A    The L and D team.

16  Q    The D what?

17  A    Learning and Development team --

18  Q    Okay.

19  A    -- has an onboarding team --

20  Q    Okay.

21  A    -- that's part of it.

22  Q    You said that you would be made aware of changes in the

23  onboarding process.  How and why would you be made aware of

24  the -- on changes in the onboarding process?

25  A    Because I'm part of the HR leadership team and if we



www.escribers.net | 800-257-0885

1    changed any process that would have an effect on employees then

2    we would review it as a team.

3    Q    Okay, okay.  And were you ever told or made aware of a

4    change in the onboarding process that didn't include the Anti-

5    Handbook Handbook being made available to new hires?

6    A    No.

7    Q    And have you actually seen the Anti-Handbook Handbook on

8    workday since your date of hire?

9    A    Yes, I have.

10    Q    Thank you.  Now I'm going to show you a document that I've

11    marked Respondent's Exhibit 6.

12         MR. ROSS:  5 is in evidence, is that correct, Your Honor?

13         JUDGE TRACY:  Yes.

14         MR. ROSS:  Pass that down please.

15    Q    BY MR. ROSS:  And I'm going to ask you if you can identify

16    that document?

17    A    Yes.  It's the code of conduct.

18    Q    Okay.  And is this a document that is available to

19    employees at Tesla?

20    A    Yes.

21    Q    People in the factory have this available to them?

22    A    Yes.

23    Q    Okay.  And how is it made available to them?

24    A    Also through workday in the onboarding --

25    Q    Okay.



www.escribers.net | 800-257-0885

1    A    -- documents.

2    Q    So let's talk about workday for a second, because I

3    think -- I want to understand the function workday plays in

4    terms of documents like this.

5    A    Uh-huh.

6    Q    I'm not quite sure what to call workday.  Is it a portal?

7    A    Yeah.  It's the employee like human resources system.

8    Basically where we keep employee information.

9    Q    I see, okay.  And ways people can access workday for

10    various purposes?

11    MR. RODRIGUEZ RITCHIE:  Objection, vague, leading.

12    MR. ROSS:  Well, okay.

13    Q    BY MR. ROSS:  What do people -- who's able to access

14    workday?

15    A    Every employee is able to access workday.  There's just

16    different restrictions on what they can see depending on their

17    level, title --

18    Q    Okay.

19    A    -- job.

20    Q    Okay.  So if you are a production associate, not

21    management, hourly pay, what is it that you can see on workday?

22    A    You can see your own personal information and then you

23    could search and see other peoples' names and pictures and --

24    Q    Search other people what?

25    A    You could search and see if another person is an employee,


www.escribers.net | 800-257-0885

1    but you can't see all of their information because that's

2    hidden from you as an individual contributor.

3    Q    Okay, okay.  And included in the workday -- strike that.

4    Are company policies, company expectations, do they appear on

5    workday?

6        MR. RODRIGUEZ RITCHIE:  Objection, vague as to company

7    expectation.

8        MR. ROSS:  Yeah.

9        MS. FEINBERG:  Objection, best evidence.

10       MR. ROSS:  For example.

11       JUDGE TRACY:  Sustained, sustained.

12   Q    BY MR. ROSS:  Respondent's Exhibit 6, does that appear on

13   workday?

14   A    Yes.

15       MS. FEINBERG:  Objection, best evidence.

16       JUDGE TRACY:  What do you mean by that?

17       MS. FEINBERG:  Because we could -- they could produce

18   workday, we could see what's on there.  Instead we're taking

19   his word for what actually exists, which is an actual document.

20   So the better thing would be to either produce the document as

21   it appears on workday.  They can do that.  It's a technology

22   company and I feel like we're just -- our information doesn't

23   support some of what they're saying so we're just taking his

24   word.  I think the best thing for a document, especially if

25   it's part of a site is that we actually see it rather than



1    taking someone's word for it.  That's what best evidence is

2    supposed to be.  So that's what I have to say about that.

3    Okay.  Here you go.  Thank you.

4        MR. RODRIGUEZ RITCHIE:  It's also vague as to available to

5    whom.

6        JUDGE TRACY:  Yeah.  So I would say that I sustain the

7    objection as far as the General Counsel's objection.

8        MR. ROSS:  What's the basis for the objection, Your Honor?

9    Because I have a hard time hearing.

10        JUDGE TRACY:  It was vague.

11        MR. RODRIGUEZ RITCHIE:  Right.

12        MR. ROSS:  Okay.

13        JUDGE TRACY:  As to whom -- what did you say?

14        MR. RODRIGUEZ RITCHIE:  Right.  The question was, vague as

15    to available to whom.

16        JUDGE TRACY:  Yes.

17        MR. ROSS:  Fair enough.

18        JUDGE TRACY:  Okay.  And so --

19        MR. ROSS:  I'll restate.

20        JUDGE TRACY:  -- in terms of, you know, the Charging

21    Party's objections, you know, again, that is something if you

22    have information that's contrary to that, that's what cross-

23    examination is for.

24        MS. FEINBERG:  Yes.  I understand that.

25        JUDGE TRACY:  You know, sure.  They could pull out workday

escribers
www.escribers.net | 800-257-0885

1    and we could all look at it, but in the end, we also are

2    limited with the transcript.  So we need these documents to be

3    in here.

4        What I would appreciate though, which I have not heard an

5    objection about, but I think again, as I said before, is how is

6    this witness aware and have the knowledge to establish what is

7    workday, how does it work, how is he the best witness for this?

8        MS. FEINBERG:  Exactly.

9        JUDGE TRACY:  I have not heard that yet.

10       MR. ROSS:  Okay.

11       JUDGE TRACY:  And so --

12       MR. ROSS:  My first --

13       JUDGE TRACY:  -- that's where --

14       MR. ROSS:  It's my first witness, Judge.

15       JUDGE TRACY:  Oh, you've been doing this so long.  You

16   know this.  So anyway, here's the thing.

17       MS. FEINBERG:  You mean like first witness every?

18       JUDGE TRACY:  I just -- that's where I think a lot of

19   this -- you can do what you need --

20       MR. ROSS:  Yeah, sure.

21       JUDGE TRACY:  -- but in the end it's going to be well, you

22   know, what is this?  How does he know?

23       MR. ROSS:  Okay.

24       JUDGE TRACY:  Okay.

25       MR. ROSS:  I want to make it clear.  What we're offering



1    these documents in for is to establish that these are documents

2    setting forth company policy --

3        JUDGE TRACY:  Uh-huh.

4        MR. ROSS:  -- as well as these are documents containing

5    company policy that employees either know of, or should know

6    of, or have a means of knowing.

7        JUDGE TRACY:  Um-hum.

8        MR. ROSS:  Now, he can testify as to the document, he's

9    seen the document before.  He can also testify that the

10    document appears on Workday.

11        JUDGE TRACY:  Okay.

12        MR. ROSS:  And he's also already testified that this is a

13    document that appears on Workday.  So from that standpoint, I

14    can't -- I can't say whether people -- I'll ask the question.

15        JUDGE TRACY:  Well so, go ahead.  Because I think you're

16    about to say what I'm going to say.  Go ahead.

17        MR. ROSS:  Yeah.

18        MR. RODRIGUEZ RITCHIE:  Well, we would object to that

19    basis.  There hasn't been any foundation on any of that,

20    actually, with regards to this witness, that he has knowledge

21    that employees are given this through Workday.  He knows -- the

22    most that he has testified about is that he has a Workday that

23    he has access for himself.  That's it.

24        MR. ROSS:  All right.  I'll ask him further questions.

25        JUDGE TRACY:  And also keep in mind, you know, again, none



www.escribers.net | 800-257-0885

1  of the -- the complaint allegations here, with regards to the

2  rules, they are very limited rules that were alleged to be

3  unlawful.  I'm not sure how all of these other documents are

4  relevant except that, yes, when employees come onboard this

5  company, there are a lot of documents they have to sign, which

6  makes sense.  I'm sure every company has something like this.

7  So you know, how does that -- how is that relevant?  I mean, if

8  it's some sort of defense you're raising that I'm not aware of.

9  I mean -- here, let me say this, typically, when you have a

10  rules case, as you know, and I've seen it in your different

11  pleadings, is they've taken it out of context, so you want to

12  put the whole manual in there.  Or you want to do something

13  like that.  These are different documents that have not been

14  alleged to be unlawful.  And so if it's background, fine.  But

15  and you can say that.

16      MR. ROSS:  It is background, ma'am.

17      JUDGE TRACY:  But if you'd like there to be clear picture

18  of what they're all given, okay, fine.  But so that's where I'm

19  thinking.

20      MR. ROSS:  Okay.  Okay.

21  Q    BY MR. ROSS:  Tell me, Mr. Hedges, as the head of HR for

22  the factory --

23  A    Um-hum.

24  Q    -- does that give you access to other people's Workday?

25  A    Yes.


www.escribers.net | 800-257-0885

1    Q    Okay.  And have you seen Respondent's Exhibit 6 on

2    production employees' Workdays?

3    A    Yes.

4    Q    Okay.  And when somebody is onboarded, is this part of the

5    onboarding process?

6    A    Yes.

7         JUDGE TRACY:  When you're saying this, you're referring

8    to?

9         MR. ROSS:  Respondent's Exhibit 6, yes.

10        JUDGE TRACY:  Thank you.

11        MR. ROSS:  Thank you.

12        MR. RODRIGUEZ RITCHIE:  Objection.  Lacks foundation.  The

13   witness already testified that he's not involved in the

14   onboarding process of employees.

15        MS. FEINBERG:  Yeah, he said it was another team, under a

16   different supervisor.

17        JUDGE TRACY:  Okay.  So let's lay out some questions --

18        MR. ROSS:  Okay.

19        JUDGE TRACY:  -- for --

20   Q    BY MR. ROSS:  How do you that know employees receive this

21   as part of the onboarding process?

22        JUDGE TRACY:  Respondent's Exhibit 6?

23        MR. ROSS:  Respondent's Exhibit 6, yes.

24        JUDGE TRACY:  Yeah, because remember this, we don't know

25   what number goes with this.



www.escribers.net | 800-257-0885

 1    MR. ROSS:  Yes.  I agree with you.  Thank you for catching

 2    me again.  I get sloppy sometimes.

 3        THE WITNESS:  Because it's part of the onboarding

 4    documents that you sign and it's in Workday and I've seen it

 5    there.

 6    Q    BY MR. ROSS:  Okay.  Do employees, when they onboard, when

 7    they receive this, are they expected to sign something that

 8    says --

 9    A    Yes, electronically.

10    Q    They'll sign it electronically, acknowledging receipt of

11    the document?

12    A    Correct.

13    Q    All right.  And have you seen those electronic

14    acknowledgments on the Workdays that you've seen of production

15    employees?

16    A    Yes.

17        MR. ROSS:  All right.  I'd offer Respondent's 6 into

18    evidence, Your Honor.

19        JUDGE TRACY:  All right.  Any objections?

20        MR. RODRIGUEZ RITCHIE:  We still object on relevancy

21    grounds and foundation grounds.

22        JUDGE TRACY:  Okay.

23        MS. FEINBERG:  We share that objection.

24        JUDGE TRACY:  And so for the record, Mr. Ross, what's the

25    relevance to Respondent's Exhibit 6?



www.escribers.net | 800-257-0885

1    MR. ROSS:  The relevance is that it is background to the

2    issues in this case.  There is text in this document that is

3    pertinent to the defense that we will mount with respect to the

4    confidentiality acknowledgement.  It is going to be -- it's

5    preliminary to the testimony of another witness.

6    JUDGE TRACY:  All right.  So the objections are overruled.

7    Respondent's Exhibit 6 is admitted into evidence.

8    **(Respondent Exhibit Number 6 Received into Evidence)**

9    MR. ROSS:  Here you go.

10   JUDGE TRACY:  And now, you haven't marked any of these, so

11   let us know what they should be.

12   MR. ROSS:  This is Respondent's Exhibit 8, I believe, 8.

13   MS. FEINBERG:  Oh, this is mine.

14   MR. RODRIGUEZ RITCHIE:  Yes.  7.

15   JUDGE TRACY:  7.

16   MR. ROSS:  7.  Thank you.  Like I said, Respondent's 7.

17   **(Respondent Exhibit Number 7 and 8 Marked for Identification)**

18   JUDGE TRACY:  And you may want to -- if you could, please,

19   from now on, with all of these, mark all of them, so that no

20   one else gets confused.

21   MR. ROSS:  Sure.

22   JUDGE TRACY:  Because these are your exhibits.

23   MR. ROSS:  Sure.

24   JUDGE TRACY:  Okay?

25   Q   BY MR. ROSS:  Mr. Hedges, I've handed you a document



1    marked Respondent's Exhibit 7.  Can you tell me if you

2    recognize it and if so, what it is?

3         MR. RODRIGUEZ RITCHIE:  Mine is Exhibit 8.

4         MR. ROSS:  That's why I'm -- thank you for that

5    correction.  I'll remark it.

6         MR. RODRIGUEZ RITCHIE:  Thank you.

7         MS. FEINBERG:  Could you just read the first sentence so

8    we make sure we're all looking at the same document?

9         THE WITNESS:  "As a Tesla employee, there are several

10   reasons you need to be familiar with the company's

11   communications policy."

12        MS. FEINBERG:  Thank you.

13        MR. ROSS:  Margo, if you would care to compare what I

14   handed you with what --

15        MS. FEINBERG:  No, no, that's fine.  Just because there

16   was a number change.

17        MR. ROSS:  I'd be happy to do that.

18        MS. FEINBERG:  No, that served the purpose.  Thank you.

19   Q    BY MR. ROSS:  Now, the question is, do you recognize it

20   and if so, what is it?

21   A    I do.  It's the communications policy.

22   Q    Okay.  And is communications policy given to or made

23   available to Tesla Freemont employees?

24   A    Yes.

25   Q    And can you tell me when and how it is made available to



www.escribers.net | 800-257-0885

1     the Tesla Freemont employees?

2     A     It is made available as part of the onboarding materials

3     that are signed in Workday.

4     Q     Okay.  Now, let me ask you, when somebody onboards, do

5     they actually get on Workday and review the documents and --

6     A     Yes.

7     Q     -- electronically sign them?

8           MS. FEINBERG:  Objection.  Leading.

9           JUDGE TRACY:  Overruled.

10    Q     BY MR. ROSS:  And the answer is?

11    A     Yes.

12    Q     Okay.  So the fact that somebody -- and I take it -- well,

13    strike that.  Does a person have to be onboarded in order to go

14    to work at Tesla?

15    A     Yes.

16    Q     Okay.  When you were onboarded at Tesla, did you have to

17    review and sign off on this document?

18          MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

19          JUDGE TRACY:  Sustained.

20    Q     BY MR. ROSS:  And from time to time, when you have

21    accessed employees' Workday, have you seen executed

22    acknowledgments for this document?

23          MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Overbroad

24    and vague.

25          JUDGE TRACY:  Sustained.



1  Q    BY MR. ROSS:  Tell us, how do you know this document is

2  given to employees, made available to them?

3  A    Well, for one, I signed it, it's in my Workday, like I

4  said, it's part of, all of these documents are part of what you

5  sign in onboarding and I have seen in other employee's files

6  that these are in there.

7  Q    Of production employees?

8  A    Yes.

9      MR. ROSS:  I'd offer Respondent's Exhibit 7 into evidence,

10  Your Honor.

11      MR. RODRIGUEZ RITCHIE:  We would object to that on

12  relevance and foundation grounds.

13      MS. FEINBERG:  We share those objections.  Unless, either

14  I'd like to take the witness on voir dire, or I'd ask that you

15  reserve putting this into evidence until after cross-

16  examination.  I think it's up to you, obviously, but I have

17  some serious concerns about it and whether it's relevant and

18  how much time people have to read it, or how they read it, and

19  various other questions.  I can ask them now or --

20      JUDGE TRACY:  Well, again, I think that -- Mr. Ross,

21  what's the relevance here?

22      MR. ROSS:  Your Honor, again, it's being offered as

23  evidence of what the company's published expectations were of

24  the employees.  This is information that is readily available

25  to employees, and we believe employees -- we can't say



1    employees all read it, it's kind of like when you get a

2    mortgage, you don't read the mortgage from the first page.

3        MS. FEINBERG:  Yeah, it's kind of like that.

4        MR. ROSS:  But you've got a lot of documents that you're

5    expected to review, understand, and agree to and indicate that

6    you've done so.  These are documents that people are given when

7    they onboard and they are offered for the purpose of

8    establishing what the company's expectations are, as well as,

9    it relates to the defense that were are mounting as to the

10   confidentiality acknowledgement.

11       JUDGE TRACY:  Okay.  So again, I'll overrule the objection

12   and I'll allow Respondent's Exhibit 7 into evidence.

13   **(Respondent Exhibit Number 7 Received into Evidence)**

14       JUDGE TRACY:  I do have some questions, because I still

15   think that there is this issue.  You probably would be able to

16   do it on cross, but I'm just going to go ahead and ask you.

17       Mr. Hedges, in terms of your role with onboarding, you had

18   already testified that you are not involved in that process; is

19   that correct?

20       THE WITNESS:  That's correct.

21       JUDGE TRACY:  Okay.  So how -- and I understand your

22   title, but what is your involvement with onboarding?

23       THE WITNESS:  Well, I wouldn't have much interaction in

24   the actual process until somebody becomes an employee.  But I

25   am aware of what the process is to be onboarded.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Okay.  So could you tell us, what's the

2   process?

3      THE WITNESS:  Yes.

4      JUDGE TRACY:  And what is the -- but before you tell us

5   what's the process, how do you know, where does your knowledge

6   come from about what's the onboarding process?

7      THE WITNESS:  So I'm part of the HR leadership team, so we

8   would review any changes to the onboarding process, whether it

9   be, like, in the background check process or documents that are

10  signed, or anything like that.  I work collaboratively with the

11  HR leaders, as well as legal, if there's any changes in those

12  types of things.

13     JUDGE TRACY:  And what you just testified about, have you

14  been doing that since you were first hired?

15     THE WITNESS:  Yes.

16     JUDGE TRACY:  Okay.  So how long have you been involved

17  with or have knowledge of the onboarding process?

18     THE WITNESS:  Since I started.

19     JUDGE TRACY:  Okay.  So could you, to help me, for the

20  record, what is the onboarding process for employees?  Not

21  about you, because you're a different type of employee, but for

22  the employees that, let's say you, the production -- what are

23  you --

24     THE WITNESS:  Production associates?

25     JUDGE TRACY:  Tell us how that process works.  If I were



www.escribers.net | 800-257-0885

1    to apply for a job, what do I do?  What happens?

2       THE WITNESS:  You apply for a position, you would get a

3    phone call from a recruiter, you would go through the interview

4    process, you would receive an offer that's dependent on a good

5    background check.  You would fill out information to get your

6    background check cleared and once that is cleared, you are sent

7    onboarding documents before your start date, which you would

8    fill out online and submit those.  And you'd be scheduled for

9    your first day at Tesla, where you would have a full day of

10   onboarding and you'd go through company policies, and

11   practices, and culture, and all that on the first day.  And

12   then the next day, you would go into manufacturing essentials,

13   which is two days long, and you'd go through safety, and basic,

14   you know, manufacturing principles, and then you'd go out to

15   your line by the end of the week.

16      JUDGE TRACY:  And so who does this first day, almost like

17   orientation?  Who does that?

18      THE WITNESS:  First day new hire orientation is done by

19   the learning and development team.  We actually have an

20   onboarding team that, you know, facilitates the class, and does

21   the whole thing.

22      JUDGE TRACY:  And do you supervise that group?

23      THE WITNESS:  I do not.

24      JUDGE TRACY:  Okay.  And all of these documents so far,

25   Respondent's Exhibits 6, 7, 5, these are all found in the



1   employees', or they're supposed to be, in the Workday?

2        THE WITNESS:  Yes, in their Workday personal documents.

3        JUDGE TRACY:  And to show -- tell me -- can you describe

4   for me what I would see if I were -- I was offered the job and

5   I had to go into this electronic system; is that correct?

6        THE WITNESS:  Yes.

7        JUDGE TRACY:  So can you just walk me through what I would

8   see, and what I'm supposed to do with it?

9        THE WITNESS:  Um-hum.  What you would see when you logged

10  in is your picture, your job title, and there's a bar on the

11  left that has your job details, and you can see your start

12  date, and who you report to, and all those types of

13  information.  And then there's a personal section, that has ID

14  and documents, and in that documents section, it has all the

15  things that you've acknowledged or signed, along with, if you

16  had any disciplinary action, those documents would be uploaded

17  in there, that you could also see.  There's a tab for contact

18  information, so your personal contact information, and, like,

19  emergency contact, if anybody needed to do that.  And then

20  there's a performance tab, that would have your previous

21  performance record and all of that, that you could also review.

22       JUDGE TRACY:  So these documents though that have already

23  been admitted, that you've testified to seeing about, would

24  you, as an employee, be signing each one of these through this

25  system?

escribers
www.escribers.net | 800-257-0885

1    THE WITNESS:  Yes.

2    JUDGE TRACY:  Or is it just there and you're expected to

3    read it nobody really knows if you read it?

4    THE WITNESS:  No, you have to acknowledge that you've read

5    it and it has a date of when you received and acknowledged it.

6    JUDGE TRACY:  So you're saying for each one of these, they

7    employees must sign and date?

8    THE WITNESS:  Acknowledge receipt, yes.

9    JUDGE TRACY:  Okay.  Okay.  All right.

10    MS. FEINBERG:  Are we still on the communications policy

11    one?

12    JUDGE TRACY:  No, I'm just talking in general to establish

13    foundation for this individual.

14    MS. FEINBERG:  Okay.  I did have some voir dire questions

15    on that basis.  Or is that too late?

16    JUDGE TRACY:  Yeah, already admitted into evidence, I

17    think, 7.

18    MS. FEINBERG:  Okay.

19    JUDGE TRACY:  So under cross-examination you can do that.

20    MS. FEINBERG:  I'll do that.  No problem.

21    JUDGE TRACY:  Okay.

22    Q    BY MR. ROSS:  Can a person complete onboarding without

23    acknowledging receipt of these various documents?

24    A    No.

25    Q    Okay.  You have in front of you, Respondent's Exhibit 8,



www.escribers.net | 800-257-0885

1  have you seen that before and can you identify it for me?

2  A    Yes, it's an electronic communications policy.

3  Q    Okay.  And is this a document that employees will receive,

4  expected to acknowledge receipt of, as part of their

5  onboarding?

6  A    Yes.

7  Q    Did you receive an acknowledgment when you joined the

8  company?

9       MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

10       MR. ROSS:  I'd offer into evidence at this time, Your

11  Honor.

12       MS. FEINBERG:  Voir dire, please.

13       MR. RODRIGUEZ RITCHIE:  We would object to the receipt of

14  Respondent's 8 on relevance and foundation grounds.

15       MR. ROSS:  I couldn't hear you.

16       MR. RODRIGUEZ RITCHIE:  On relevance and foundation

17  grounds.

18       JUDGE TRACY:  So I'll go first to the charging party and

19  then you can respond.

20       So go ahead.

21              **VOIR DIRE EXAMINATION**

22  Q    BY MS. FEINBERG:  So at the bottom of Respondent's 8, it

23  says something V 2000, it seems to have some version.  Has this

24  gone through many versions of this document?  Do you know if

25  this is the current version, Respondent's 8?



1    A    I'm not -- I do not know.

2    Q    And do you know whether it's been revised through the

3    years?

4    A    I do not.

5        MS. FEINBERG:  Okay.  Then I share the objections of the

6    General Counsel.

7                    **DIRECT EXAMINATION** (RESUMED)

8    Q    BY MR. ROSS:  Is this document something people sign when

9    they join the company?

10   A    Yes.

11   Q    Is this a document that appears on Workday?

12   A    Yes.

13   Q    Have you seen this document in production employees'

14   Workday files when you've gone into them?

15   A    Yes.

16       JUDGE TRACY:  Okay.  So again, I will overrule the

17   objections, so Respondent's Exhibit 8 is admitted into

18   evidence.

19   **(Respondent Exhibit Number 8 Received into Evidence)**

20       JUDGE TRACY:  However, I will note that the -- I'm not,

21   again, sure of the relevance of it, and frankly, based upon the

22   voir dire, the witness is not sure if this has ever changed, if

23   this is the one that's in all of the employees.  So you know,

24   I'll allow it, but, I'm not sure what it's worth at this point.

25   Along with the other ones.  But you know.  You know, the judge



1  is in a tough position, sometimes we have to let things in and

2  that's fine.  You can renew your objection in your brief.

3  Q    BY MR. ROSS:  Here you go.  Mr. Hedges, you have in front

4  of you a document that has been marked Respondent's Exhibit 9.

5  Can you tell me if you can recognize it and if you do, what it

6  is?

7  A    Yes, it's the anti-harassment and discrimination policy.

8  Q    All right.  And is this a document that is provided to

9  employees when they onboard?

10  A    Yes.

11  Q    And is this a document that is available to employees on

12  Workday?

13  A    Yes.

14  Q    And by the way, was this a document that was available to

15  employees on Workday in 2016 and 2017?

16  A    Yes.

17  Q    And is now?

18  A    Yes.

19     MR. ROSS:  I'd offer Respondent's Exhibit 9 into evidence.

20     MS. FEINBERG:  I'd like to take the witness on voir dire.

21     JUDGE TRACY:  Okay.

22     MS. FEINBERG:  Of course, after the General Counsel, if he

23  has anything to say.  I didn't mean to jump the gun.

24     JUDGE TRACY:  And what are your objections for the General

25  Counsel?



www.escribers.net | 800-257-0885

1       MR. RODRIGUEZ RITCHIE:  We would object on relevancy and

2   foundation grounds, particularly on relevancy.  There is no

3   allegations relating to anti-harassment or discrimination at

4   issue here.  There's nothing related to policies regarding that

5   at issue here.  And there really is no relevance.

6       JUDGE TRACY:  Okay.  And the voir dire?

7                    **VOIR DIRE EXAMINATION**

8   Q   BY MS. FEINBERG:  Okay.  Mr. Hedges, do you know when this

9   document was created?

10  A   I do not.

11  Q   And do you know whether it's been modified in any way

12  since you began employment with Tesla?

13  A   I don't know.  I don't recall.

14  Q   Okay.  And are you, yourself, have you participated in

15  sexual harassment training at Tesla?

16  A   Yes.

17  Q   And were you given any documents at that time?

18  A   Yes.

19  Q   And were you given this document?

20  A   This is part of onboarding, this document is.

21  Q   Okay.  But is -- so I'm asking if you were given this

22  document as part of any sexual harassment training?

23  A   No, this is separate and apart from the training.

24  Q   And I'm sorry, I may have asked this.  Do you know if this

25  document has been updated to be consistent with any changes in


www.escribers.net | 800-257-0885

1    California law or Federal law?

2    A    I do not know.

3    JUDGE TRACY:  Okay.  And so what is the relevance?

4    MR. ROSS:  Again, it goes to -- it's background for our

5    defenses with respect to the Ortiz discharge allegation, Your

6    Honor.  You'll notice, even though we're not alleging that Mr.

7    Ortiz sexually harassed anybody, we were doing an investigation

8    of conduct and an employee complained about as harassment and

9    you'll notice on the second page of this document there is a

10   statement that states, the bottom of the page, "The company

11   prohibits employees from hindering our internal investigations

12   and our internal investigation or our internal complaint

13   procedure."  We are of the opinion that Mr. Ortiz lied during

14   internal investigation, and he's admitted that he was

15   untruthful during the internal investigation, and we believe

16   that this document; A, establishes that the company that has a

17   policy that addresses lying, because it is a hindrance of an

18   investigation.  In addition to which it is a document that,

19   presumably, was available to Mr. Ortiz, because he was an

20   employee and onboarded at the company.

21   JUDGE TRACY:  So again, I'm going to overrule the

22   objection and I'll allow Respondent's Exhibit 9 into evidence.

23   **(Respondent Exhibit Number 9 Received into Evidence)**

24   MS. FEINBERG:  Just noted, Your Honor, that it's unclear

25   whether -- what time frame this document existed or doesn't



www.escribers.net | 800-257-0885

1   exist, but okay, I'll deal with it on cross.

2       JUDGE TRACY:  Yeah.

3       MS. FEINBERG:  Yeah.

4       JUDGE TRACY:  Again, that is also something that I've said

5   to address in the brief.

6       MS. FEINBERG:  Um-hum.

7       JUDGE TRACY:  Okay.  Let me also ask you, Mr. Ross, if

8   there are a bunch of these documents that you want in, that

9   you're moving for admission, that are all part of this

10  onboarding.  How many more are there.

11      MR. ROSS:  This is the last.

12      JUDGE TRACY:  Okay, great.  Because I was, like, hey, why

13  don't you just bundle them up, they're going to object and

14  they're in and we can deal with them later.

15      MR. ROSS:  You should have said that before.

16      JUDGE TRACY:  I didn't know.

17  Q    BY MR. ROSS:  Okay.  Mr. Hedges, you have in front of you

18  Respondent's Exhibit 10.  Can you tell me do you recognize it

19  and if so, what is it?

20  A    It's the non-solicitation policy.

21  Q    Okay.  And is this policy, you say it's the non-

22  solicitation policy, it's Tesla's non-solicitation policy?

23  A    Yes.

24  Q    And to your knowledge has this been in place during your

25  entire employment at Tesla?



1   A   Yes.

2   Q   And can you tell me how you first came to know of this

3   document, if you know, if you can remember?

4   A   Part of the onboarding materials.

5   Q   Excuse me?

6   A   Part of the onboarding materials you sign.

7   Q   Okay.  And this is the policy -- strike that.  Is this the

8   policy that has been in effect throughout your employment at

9   the Freemont facility?

10  A   Yes.

11      MR. ROSS:  I'd offer Respondent's 10 into evidence, Your

12  Honor.

13      JUDGE TRACY:  Objections?

14      MR. RODRIGUEZ RITCHIE:  Yes, Your Honor, we would object

15  on relevancy grounds.  This policy is not at issue in this

16  case.  We'd also object on foundation grounds.  And would like

17  to voir dire.

18      JUDGE TRACY:  Go ahead.

19                    **VOIR DIRE EXAMINATION**

20  Q   BY MR. RODRIGUEZ RITCHIE:  Mr. Hedges, did you create this

21  policy?

22  A   I did not.

23  Q   To your knowledge, is this policy, besides part of this

24  onboarding process that you've mentioned, is this given to

25  employees?



1    A    Not that I'm aware of.

2    Q    How many times has it been edited during your employment

3    at Tesla?

4    A    I'm not aware.

5    Q    You're not aware at all that it has been edited or you're

6    not -- you have no knowledge regarding this?

7    A    I have no knowledge of whether it was edited.

8    Q    How many times have you seen this policy before today?

9    A    Several.

10   Q    When was the last time?

11   A    I don't recall, but it's in Workday, and I can go and

12   look, so I know it's there.

13   Q    Was it in 2017, the last time you saw this policy?

14   A    No, I actually looked through my Workday recently and it's

15   in there.

16   Q    And that was the last time you saw it, was when it was in

17   your Workday?

18   A    The last time I -- yes.

19   Q    Okay.  So have you seen whether this is available in other

20   people's Workday?

21   A    It is.

22   Q    In production maintenance employees' Workday?

23   A    Yes.

24   Q    Have you checked every single production and maintenance

25   employee?

22-60493.1175



1   A    No.

2   Q    Okay.  So you don't know whether it's in every single

3   production and maintenance employees' Workday?

4   A    Not from checking, but it's part of the process.

5        MR. RODRIGUEZ RITCHIE:  Okay.  Our objection remains.

6        JUDGE TRACY:  Okay.  And --

7        MS. FEINBERG:  Objections.  I have a couple of voir dire

8   questions.

9        JUDGE TRACY:  Okay.

10                     **VOIR DIRE EXAMINATION**

11  Q    BY MS. FEINBERG:  So you keep saying that you've seen this

12  in Workday, so I just want to understand, if we wanted to see

13  this, are you saying that you have to click somewhere or if you

14  went into your personnel folder, or an employee went into their

15  personnel folder, it would appear?

16  A    Yes, in the personal documents area that I was describing.

17  Q    And would it also show whether you've signed it or not?

18  A    Yes.

19  Q    And did you look to see when you signed this document?

20  A    I -- no.

21  Q    And did you ever personally share this document with

22  anyone?

23  A    No.

24  Q    And to access Workday did you have to access it at the

25  plant?



1        MR. ROSS:  I couldn't hear the question.

2    Q    BY MS. FEINBERG:  To access it do you have to access it at

3    the plant?

4    A    Yes.  Or you have to be VPN into the system.

5    Q    What does that mean?

6    A    It means through a secured network.

7    Q    And does an assembly worker have that access?

8    A    No.

9    Q    So for workers -- workers can see their Workday folder

10   from offsite, but not certain documents?

11   A    No, they would have to -- to get into their Workday, they

12   would need to be on the Tesla network.  We have computers in --

13   in the Answer Bar areas so that they could go and look -- look

14   that up.

15   Q    Oh, so not from their phones?

16   A    Or they -- or their phones.  Yeah.

17   Q    But not offsite?

18   A    Correct.

19   Q    Okay.  And since you said you looked at this on the

20   computer, are these documents, well, specifically, Respondent's

21   10, are they dated in the Workday?

22   A    Yes.

23       MS. FEINBERG:  Okay.  Nothing further right now.

24       JUDGE TRACY:  Okay.  So in response in regarding

25   relevance?



www.escribers.net | 800-257-0885

1    MR. ROSS:  Well, we've heard a lot of testimony about

2    interactions that supposedly took place with employees and

3    security officials, having to do with what, essentially, was

4    distribution, solicitation.  You will hear testimony from other

5    people --

6    JUDGE TRACY:  But in terms of the relevance of the

7    document?

8    MR. ROSS:  The relevance?  This goes to that issue.

9    JUDGE TRACY:  Okay.  All right.  So again, I'll overrule

10   the objections and admit Respondent's Exhibit 10 into evidence.

11   **(Respondent Exhibit Number 10 Received into Evidence)**

12   MR. RODRIGUEZ RITCHIE:  Your Honor, I'd like to take a

13   break at some point soon to use the restroom.

14   JUDGE TRACY:  Yes.

15   MS. FEINBERG:  Me too.

16   JUDGE TRACY:  Is there -- is this a good break point?

17   MR. ROSS:  It's fine.

18   JUDGE TRACY:  Okay.  So let's go off the record for five,

19   ten minutes.  I'm sure you have a lot more with him.  Do you?

20   We can go off the record.

21   (Off the record at 11:05 a.m.)

22   JUDGE TRACY:  Okay.  Let's go ahead and go back on the

23   record.

24   Okay.  Go ahead, please.

25   MR. ROSS:  Thank you, Judge.



1    **DIRECT EXAMINATION (RESUMED)**

2    Q    BY MR. ROSS:  Mr. Hedges, in addition to Workday, does the

3    company have an intranet?

4    A    Yes.

5    Q    Okay.  And can you tell us what the intranet is?

6    A    The intranet is the, like, company webpage that has

7    company news and information, all the policies are available,

8    different -- you can search different departments, different

9    people, all that.

10   Q    Okay.  And is the intranet at Tesla been used throughout

11   your employment at Tesla?

12   A    Yes.

13   Q    Okay.  And the various documents that you've identified

14   this morning, Respondent's Exhibits 4 through 10, are those

15   documents on the intranet?

16   A    Yes, they are.

17        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

18        MR. ROSS:  It goes to the issue of when, whether, and how

19   employees are afforded an opportunity to know about this stuff.

20        JUDGE TRACY:  Okay.  Overruled.

21        MR. ROSS:  Okay.

22   Q    BY MR. ROSS:  And by the way, are people able to access

23   the intranet from the production floor at Tesla?

24        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Calls for

25   speculation.  Lacks foundation.



22-60493.1179

1    JUDGE TRACY:  Okay.  So sustained.

2    MR. ROSS:  I'm sorry?

3    JUDGE TRACY:  Sustained.

4    MR. ROSS:  Okay.

5  Q    BY MR. ROSS:  If an employee wants to gain access to the

6  intranet, a production employee, could they access it?

7    MR. RODRIGUEZ RITCHIE:  Objection.  Calls for speculation.

8  Lacks foundation and relevance.

9    JUDGE TRACY:  Sustained.

10  Q    BY MR. ROSS:  How does one gain access to the intranet to

11  see these personnel policies and procedures?

12    MR. RODRIGUEZ RITCHIE:  Same objection.

13    JUDGE TRACY:  I'm going to overrule the objection.

14    Go ahead.

15  A    They can go to the Answer Bar computers, they can look it

16  up on their phone.  Yeah.

17  Q    BY MR. ROSS:  All right.

18    JUDGE TRACY:  What is the Answer Bar?

19    THE WITNESS:  It's like where you can go ask basic HR

20  questions, reset your password, those kind of things.

21    JUDGE TRACY:  Is --

22    THE WITNESS:  So we have employees there that are, you

23  know, that will help other employees if they have questions

24  about anything and then we have almost like a little computer

25  lab there, so people can, you know, check -- check their



1    Workday, or get on the internet or intranet.

2    Q    BY MR. ROSS:  Okay.  I'm going to show you a document that

3    has been marked as Respondent's Exhibit number 11 and ask you

4    if you can identify that document?

5    A    Yes.

6    Q    Okay.  Can you tell me what that document is?

7    A    The confidentiality acknowledgement.

8    Q    Do you recall when you first came to see this document?

9    A    Maybe September, October of 2016.

10   Q    And do you remember how you first came to see this

11   document?

12   A    I believe Mark sent it to me.  Mark Lips -- I believe Mark

13   Lipscomb sent it to me.

14   Q    Okay.  And Mark Lipscomb was the former vice president of

15   HR?

16   A    Correct.

17   Q    Okay.  And when you got this document from Mr. Lipscomb,

18   was there any communications between you and him about this

19   document?

20   A    Yes.

21   Q    Tell us about that.

22   A    He sent us this -- he sent his direct reports this

23   document and said that we needed to have employees sign and

24   acknowledge the confidentiality nondisclosure agreement that

25   they had signed when they initially started at Tesla.



1    Q    I see.  And did he tell you why this document was being --

2    why the company wanted people to sign this document?

3         MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

4         MS. FEINBERG:  Your Honor, objection.  Oh.  Objection.

5    Relevance.  But also, as I understood the answer, that this was

6    an email, not what he told him.  So then I think we should --

7    then there really is a best evidence.  Where is the email that

8    was communicated to him?  I understood his testimony to be that

9    it was sent to him, not that there was a conversation.  So

10   rather than have him characterize what was said to him, we

11   should see what was said to him.

12        JUDGE TRACY:  Well, if you could just, kind of, ask these

13   questions again to clarify this information.

14   Q    BY MR. ROSS:  Did you have conversations with Mr. Lipscomb

15   about this document?

16   A    I don't recall, specifically, conversations, but I

17   probably did.

18   Q    Okay.  Do you have any memory of his telling you why the

19   company wanted these documents --

20   A    Yes.

21   Q    -- signed?

22   A    Yes.

23   Q    What do you remember him telling you?

24        MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

25        MS. FEINBERG:  And objection vague as to whether he heard



1    this in a conversation or by email, as to the reasoning.

2        JUDGE TRACY:  Okay.  So I'm going to overrule the

3    objection.  It's not hearsay.  He is a party to this.  He's

4    been found to be an agent, or admitted to an agent or a

5    supervisor, I believe, in some of the answers.  And in terms of

6    this issue about his knowledge, if you could just please step

7    back a little bit and lay a little bit more foundation, so it's

8    clear from his testimony, where this knowledge is coming from.

9        MR. ROSS:  I'm sorry.  I couldn't hear.

10        JUDGE TRACY:  Yeah, where the knowledge is coming from.

11    Is it from emails or is it from conversations?

12        MR. ROSS:  Yeah.  Okay.

13        MS. FEINBERG:  Thank you.

14    Q    BY MR. ROSS:  Let me ask you this.  Can you tell me when

15    you first heard from Mr. Lipscomb about needing to get people

16    to sign off on this document?

17        MR. RODRIGUEZ RITCHIE:  Objection.  Assumes facts not in

18    evidence.

19        MS. FEINBERG:  Objection.  Vague, as to heard from.

20        JUDGE TRACY:  Okay.

21        MR. ROSS:  These are preliminary questions, Judge.

22        JUDGE TRACY:  So again, I'll sustain the objection.

23    Let's, you know, I think it's best to just sort of start back

24    over with this document.

25    Q    BY MR. ROSS:  Tell me, did you play any role in the



www.escribers.net | 800-257-0885

1    drafting of this document?

2    A    No, I did not.

3    Q    And tell me, after you received this document from Mr.

4    Lipscomb, did you direct your staff to do anything with it?

5    A    Yes.

6    Q    Tell me what you did?

7    A    I instructed them to have employees sign this and an HR

8    member was supposed to be a witness to the signature.

9    Q    Okay.  So you directed them to have every employee working

10    in the Fremont facility physically sign this and be witnessed

11    by an HR person?

12    A    Correct.

13    Q    And at the time there were 8,000 to 10,000 people working

14    in the Fremont facility?

15    A    Yes.

16    Q    Did you tell the staff what the reason for having people

17    sign the document was?  Why the company wanted them to sign?

18    A    Yes.

19    MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Reason for

20    having people sign is not at issue.

21    JUDGE TRACY:  Overruled.

22    Q    BY MR. ROSS:  And can you tell me what you told them?

23    JUDGE TRACY:  So you can -- he can answer that question.

24    THE WITNESS:  Yes.

25    MR. ROSS:  Yeah, I thought he had answered.



1    MS. FEINBERG:  Okay.  And objection, vague, as to tell.

2    MR. ROSS:  I thought he had answered.

3    MS. FEINBERG:  And it's still unclear to me whether these

4    are oral or written communications.

5    JUDGE TRACY:  Are these oral or written communications?

6    THE WITNESS:  This was a meeting that I had with my team

7    where I told them verbally what we were doing.  Followed up by

8    written.

9    Q    BY MR. ROSS:  Okay.  Tell us what you told your team?

10    MS. FEINBERG:  I'm sorry.  Followed -- I couldn't -- his

11    voice dropped.  Followed up by something he said.

12    THE WITNESS:  By written instruction.

13    MS. FEINBERG:  Thank you.

14    JUDGE TRACY:

15    Q    BY MR. ROSS:  Please tell us what you told your team as to

16    why people were being asked to sign this?

17    A    I told them that we were having information leaks from

18    engineering, you know, things about the product that could

19    damage the company.  And we were asked to make sure everybody

20    remembered the confidentiality agreement that they had signed

21    when they became employees, and acknowledge that -- that they

22    are still abiding by that.

23    Q    Okay.  And how did you know this was the reason that this

24    was why people were being asked to sign this document?

25    A    I was told by Mark.



www.escribers.net | 800-257-0885

1    Q    Did you make the decision to roll this document out to the

2    employees?

3    A    No.

4    Q    But you were involved in the execution of that decision;

5    is that right?

6    A    Correct.

7    Q    And those tasked with rolling out were who?

8    A    The HR partner team.

9         MR. ROSS:  All right.  I would move Respondent's Exhibit

10   11 into evidence at this time.

11        JUDGE TRACY:  Any objections

12        MR. RODRIGUEZ RITCHIE:  I'd like to voir dire.

13        JUDGE TRACY:  Okay.

14                     **VOIR DIRE EXAMINATION**

15   Q    BY MR. RODRIGUEZ RITCHIE:  Mr. Hedges, you testified about

16   what's been marked as Respondent's 11, and there was testimony

17   about this document being rolled out to employees at Tesla

18   Fremont.

19   A    Yes.

20   Q    Was this document also rolled out, at the same time, to

21   all employees of Tesla in the United States?

22   A    Yes.

23   Q    And so employees were required to sign this document all

24   across the United States, of Tesla, Inc.

25   A    Yes.



www.escribers.net | 800-257-0885

1    MR. RODRIGUEZ RITCHIE:  Thank you.

2    JUDGE TRACY:  Any objections.  So from the General

3    Counsel, any objections?

4    MR. RODRIGUEZ RITCHIE:  No.

5    JUDGE TRACY:  Okay.  For the charging parties?

6    MS. FEINBERG:  I'll reserve for cross-examination, but no

7    objection to the document.

8    JUDGE TRACY:  Okay.  So Respondent's Exhibit 11 is

9    admitted into evidence.

10    **(Respondent Exhibit Number 11 Received into Evidence)**

11                    <u>**DIRECT EXAMINATION**</u> **(RESUMED)**

12    Q    BY MR. ROSS:  Were all employees worldwide required to

13    sign?

14    A    Yes.

15    Q    So all 30,000 employees of the company were expected to

16    sign this document?

17    A    Yes.

18    Q    I'm handing you what I've marked as Respondent's Exhibit

19    12, a two page document, it is an email from Mark Lipscomb,

20    dated October 11, 2016; addressed to, among other things, HR

21    leaders.  And then a second page is a document that appears to

22    be a different iteration of Respondent's 11.  Do you see that?

23    A    Yes.

24    Q    Okay.  Is this an email you got from Mr. Lipscomb on

25    October 11, at 6:44 in the afternoon, or at 6:44 in the



1    morning?

2    A    Yes.

3    Q    And is this email something you received from Mr. Lipscomb

4    after Respondent's Exhibit 11?

5    A    Yes.

6    Q    All right.  Now, after you received this email, was the

7    document that is attached to the email, the confidentiality

8    acknowledgement that was used on a going forward basis?

9    A    Yes.

10    MS. FEINBERG:  Objection.  Foundation.

11    JUDGE TRACY:  Is there an objection?

12    MS. FEINBERG:  Foundation.  That this was the one that was

13    used.

14    Q    BY MR. ROSS:  Did you have conversations with your staff

15    and direct them to stop using Respondent's Exhibit 11 and start

16    using the attachment to Respondent's Exhibit 12?

17    A    Yes.

18    Q    Did you play any role in the drafting or the revisions

19    made to Respondent's Exhibit 12's attachment?

20    A    No.

21    Q    Did anybody ever tell you why the revisions were made?

22    A    No.

23    Q    By the way, we talked before about the HR staff being

24    required to get people to physically sign these documents.

25    Tell me, where and when was that expected to takes place?



www.escribers.net | 800-257-0885

1    MR. RODRIGUEZ RITCHIE:  Objection.  Lacks foundation.

2  Q    BY MR. ROSS:  Where did you --

3    JUDGE TRACY:  Overruled.

4    THE WITNESS:  Where did I tell them to do it?

5  Q    BY MR. ROSS:  No.  Where and when were your HR business

6  partners and HR representatives expected to go out and actually

7  have people sign it?  On the work floor, during work time?

8  Tell us how that was supposed to happen?

9  A    Yeah.  So it was supposed to happen during the workday, so

10  24 hours a day, so we would have people just walk down the line

11  and have, you know, make sure people got the opportunity to

12  read it.  We set up some stations where people could come, and

13  read it and sign it with a witness.  We did some teams all at

14  once, where they would come in and kind of file through.  So

15  several different ways to try to get it accomplished.

16  Q    And was that a well-organized process that you had?

17  A    I would say no.

18  Q    Okay.

19  A    We did the best we could.

20  Q    You did the best you could?  And were you able to reach

21  all 30,000 --

22    MR. ROSS:  Strike that.

23  Q    BY MR. ROSS:  Were you able to reach all 8,000 to 10,000

24  individuals working at the Fremont facility during the several

25  days after Mr. Lipscomb told you about this?


www.escribers.net | 800-257-0085

1    A    No.

2    Q    Okay.  In fact, would it be true that there were a number

3    of people -- by the way, were you also supposed to keep a

4    record of who did and who didn't sign or who had signed?

5    A    Yes.

6    Q    Okay.  And did you experience any difficulties in getting

7    people to sign, in terms of logistics, as well as keeping an

8    orderly track of who signed?

9    A    Yes.

10   Q    Okay.

11        JUDGE TRACY:  So I need you to -- I understand some

12   leading questions, but --

13        MR. ROSS:  Okay.  I understand.

14        JUDGE TRACY:  -- it's too many.

15   Q    BY MR. ROSS:  Let me ask you, was there a time --

16        MR. ROSS:  Strike that.

17        Here you go.

18        MS. FEINBERG:  Thank you.

19        MR. ROSS:  Lucky 13.

20   Q    BY MR. ROSS:  Now, Mr. Hedges, you have in front of you an

21   email from Mr. Lipscomb, dated November 2, 2016, it's

22   attachments confidentiality agreement guide pdf.  Do you see

23   that?

24   A    Yes.

25   Q    Okay.  And can you tell us what that document is?



www.escribers.net | 800-257-0885

1    A    Yes.  It's the electronic -- well, it's an email from Mark

2    and then it's the electronic confidentiality acknowledgement

3    that was put into Workday versus being hard copy.

4    Q    Okay.  And what did you understand this document to say?

5         MR. RODRIGUEZ RITCHIE:  Objection.  The document speaks

6    for itself.

7         JUDGE TRACY:  Sustained.

8    Q    BY MR. ROSS:  Tell me, after this document was received,

9    did the confidentiality acknowledgement begin to appear on

10   Workday?

11   A    Yes.

12   Q    And were people encouraged to go on Workday and to execute

13   it?

14        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Vague as

15   to encouraged.

16        JUDGE TRACY:  Sustained.

17   Q    BY MR. ROSS:  Did you direct your --

18        MR. ROSS:  Strike that.

19   Q    BY MR. ROSS:  Tell me, was this an email that went out

20   only to HR staff or was this an email that went out to a

21   broader audience; if you know?

22   A    This went out to a broader audience.

23   Q    Okay.  And to whom did it go?

24   A    All employees.

25   Q    Okay.  And do you know why it went out?



1    A    To let people know why we were having them sign the

2    acknowledgement and that it was because of leaks and give them

3    a time line when to complete it.

4    Q    Was it -- did it have anything to do with problems

5    experienced during the manual signing process?

6         MS. FEINBERG:  Objection.  Foundation.

7         JUDGE TRACY:  Sustained.

8    Q    BY MR. ROSS:  And I'm going to show you a document, I'm

9    marking Respondent's Exhibit 14.

10        MS. FEINBERG:  Thanks.

11   Q    BY MR. ROSS:  And I'll ask you if you recognize this

12   document?

13   A    Yes.

14   Q    What is it?

15   A    It's the electronic version of the acknowledgement that

16   was put in Workday.

17   Q    This was what appeared in Workday after Mark sent that

18   November 2 email?

19   A    Yes.

20        MR. ROSS:  I'd offer Respondent's 14 into evidence, Your

21   Honor.

22        JUDGE TRACY:  Any objections?

23        MR. RODRIGUEZ RITCHIE:  If I could have one moment,

24   please?  No objection.

25        JUDGE TRACY:  Okay.  Any objections?



www.escribers.net | 800-257-0885

1     MS. FEINBERG:  I'm just looking at 14 at the moment.  He

2     has it now.  I have no objection.

3     JUDGE TRACY:  All right.  So Respondent's --

4     MS. FEINBERG:  I think it's already in evidence, by the

5     way.

6     JUDGE TRACY:  It could be.  Respondent's Exhibit 14 is

7     admitted into evidence.

8     **(Respondent Exhibit Number 14 Received into Evidence)**

9     JUDGE TRACY:  And we still have 12 and 13.

10    MR. ROSS:  Okay.  Those have not been admitted?

11    JUDGE TRACY:  No.

12    MR. ROSS:  Okay.  I'd offer and 12 and 13.  12, at this

13    time, Your Honor.

14    JUDGE TRACY:  Okay.  Respondent's -- or any objections to

15    Respondent's Exhibit 12 being admitted into evidence?

16    MR. RODRIGUEZ RITCHIE:  No objection.

17    JUDGE TRACY:  Okay.  Any objections from the Charging

18    Party?

19    (Counsel confer)

20    MS. FEINBERG:  Okay.  I don't know what the relevancy of

21    this is, since this is what they say they asked the workers to

22    sign, but what's the relevancy of it?  I heard he said that

23    they were asked to sign 14.

24    JUDGE TRACY:  I'm not sure if I heard the same thing.

25    MS. FEINBERG:  They said they went onto Workday and signed

www.escribers.net | 800-257-0885

1    14, which is why I didn't object.  And 14 is also part of --

2         MR. ROSS:  We're talking about 12 now?

3         JUDGE TRACY:  We're talking about 12.

4         MS. FEINBERG:  12.  I don't know what the attachment is

5    supposed to represent, but it reads differently.

6         MR. ROSS:  I believe --.

7         MS. FEINBERG:  And I don't know that it was shared with

8    the workers.  It's not what that's -- the testimony is that 14,

9    they went onto Workday.  That's what you were asked to sign.

10        So what is the relevancy of 12?

11        MR. ROSS:  Okay.  12, there was an initial version that is

12   the document that is response to 11.

13        JUDGE TRACY:  Okay.

14        MR. ROSS:  Within a day or so after its first usage, there

15   was a direction from Mr. Lipscomb to use the version that is

16   attached to Respondent's Exhibit 12.  And the testimony I

17   believe was that, indeed, that second version is what was used

18   to get people to sign on a going forward basis.

19        And then in early November, Mr. Lipscomb sent an email out

20   to everybody and asked that they sign it again electronically.

21   And the email that he sent out to everybody is dated November

22   2, and it is Respondent's Exhibit 13.

23        JUDGE TRACY:  Mr. Hedges, so Respondent's Exhibit 12, did

24   employees sign that one -- that version?

25        THE WITNESS:  Yes.

22-60493.1194



1         JUDGE TRACY:  Okay.  Did employees sign Respondent's

2    Exhibit 11?

3         THE WITNESS:  Yes.

4         JUDGE TRACY:  Okay.  And then is Respondent's Exhibit 14

5    the same as Respondent's Exhibit 12?  If you could take a look

6    at both of the documents there?

7         THE WITNESS:  Yes.

8         MS. FEINBERG:  Your Honor, they are not the same.

9         JUDGE TRACY:  12 and 14?

10        MS. FEINBERG:  If you go below the line --

11        JUDGE TRACY:  Uh-huh.

12        MS. FEINBERG:  I mean above the line.  But below the line

13   below the line says -- it has different language; "by signing

14   below"; "by acknowledging"; "if you do not realize", blah,

15   blah, blah.  They don't read the same.

16        JUDGE TRACY:  So Respondent's Exhibit 12 is a paper

17   version that employees were asked to sign; is that correct?

18        THE WITNESS:  That's correct.

19        JUDGE TRACY:  And then Respondent's Exhibit 14 is an

20   electronic version that employees were asked to sign?

21        THE WITNESS:  That's correct.

22        JUDGE TRACY:  So I mean Respondent's Exhibit 12 --

23        I'm overruling the objection.

24        Respondent's Exhibits 12 and 13 are admitted into

25   evidence.



1     **(Respondent Exhibit Number 12 and 13 Received into Evidence)**

2          JUDGE TRACY:  We already have 14 and 11 in.

3          MR. ROSS:  So are all three in?

4          JUDGE TRACY:  Yeah.

5          MR. ROSS:  Thank you.

6     Q     BY MR. ROSS:  Tell me, between --

7          JUDGE TRACY:  I'm sorry.  I didn't even ask the General

8     Counsel.

9          Do you have an objection to Respondent's Exhibits 12 and

10    13 being admitted into evidence, for the record?

11         MR. RODRIGUEZ RITCHIE:  No.  We just wanted to voir dire.

12         JUDGE TRACY:  Oh, I'm sorry.

13         MR. RODRIGUEZ RITCHIE:  Very, very quickly.

14         JUDGE TRACY:  Go ahead.  Sorry.

15                      **VOIR DIRE EXAMINATION**

16    Q     BY MR. RODRIGUEZ RITCHIE:  Respondent's Exhibit 13 that's

17    in front of you, there's no "To" in this email.  Was this email

18    sent to you?

19    A     Yes.

20    Q     Do you know why there's no "To" in the email?

21    A     No.  I mean it might be blind copied to all employees,

22    but -- and it went to everyone.

23    Q     But you remember receiving this email?

24    A     Uh-huh.

25         JUDGE TRACY:  Yes.



1      THE WITNESS:  Yes.  Excuse me.  Sorry.

2      MR. RODRIGUEZ RITCHIE:  No objection.

3      JUDGE TRACY:  Okay.  All right.

4                  **DIRECT EXAMINATION** (RESUMED)

5    Q    BY MR. ROSS:  Now, between October 11, 2016, when you got

6    Respondent's Exhibit 12, and November 2, 2016, when you got

7    Respondent's 13, were you in a position to monitor this

8    progress before making -- in terms of getting people to

9    physically sign these documents and capture who signed them on

10   a record?  Were you able to monitor that?

11   A    Yes.  We were attempting to.

12   Q    You were attempting to?

13   A    Yes.

14   Q    Were you succeeding in accomplishing this?

15   A    No.  It was quite difficult.

16   Q    Why was it quite difficult?

17   A    Because we had paper documents that we needed to keep

18   track of.  We had people on all different kinds of shifts.  It

19   was actually even more difficult out in the field locations to

20   get an HR person or a manager there to get the signature and

21   the witness and then figure out how to upload that into

22   Workday, which is where we keep everything.

23        So it was just a logistical challenge.

24   Q    Okay.  All right.  Let's shift gears here and -- let's

25   shift gears here now, and let me ask you do you know an



1    individual by the name of Travis Pratt?

2    A    Yes, I do.

3    Q    Okay.  And who do you know -- who is Mr. Pratt?

4    A    He's an equipment maintenance technician in Body.

5    Q    Okay.  And tell me, was there a time when Mr. Pratt spoke

6    on the company's behalf with respect to legislation that was

7    pending in Sacramento -- legislation that was being sponsored

8    by the UAW?

9        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

10        JUDGE TRACY:  It's sustained.

11        MR. ROSS:  I'm sorry?

12        JUDGE TRACY:  Sustained.

13        MR. ROSS:  What was the objection?

14        JUDGE TRACY:  Leading.

15    Q    BY MR. ROSS:  Tell me, did Mr. Pratt ever come to you with

16    a complaint?

17    A    Yes, he did.

18    Q    Okay.  Can you tell me what the complaint was about?

19    A    He had -- a friend of his had sent him a screenshot of

20    himself and Sean Ives -- who is another maintenance technician

21    actually in General Assembly -- that appeared to be part of a

22    Facebook post and said something about him being in Sacramento

23    or something for Tesla, and he had -- he sent that to me.

24    Q    Had he, in fact, been in Sacramento prior to his

25    complaining to you?



www.escribers.net | 800-257-0885

1    MR. RODRIGUEZ RITCHIE:  Objection.  It calls -- lacks

2    foundation.

3    JUDGE TRACY:  Sustained.

4    Q    BY MR. ROSS:  Do you know if he was in Sacramento prior to

5    making the complaint?

6    A    Yes.

7    Q    And how do you know that?

8    A    I was there too.

9    Q    Okay.

10   A    And I saw him there.

11   Q    And what did you see and hear Mr. Pratt do in Sacramento?

12   A    He just talked to legislators, walked around to different

13   offices, and he just gave his employee experience at Tesla,

14   which had been positive.  And so he just explained.

15   Q    Okay.  And this was in connection with what, sir?

16   A    With -- I'm not sure I understand.

17   Q    Why did they go to legislator's offices and speak

18   favorably about Tesla?

19   MR. RODRIGUEZ RITCHIE:  Objection.  Leading.  Misstates

20   testimony.  Vague as to "they".

21   JUDGE TRACY:  Okay.  So sustained.

22   Q    BY MR. ROSS:  Did you know that Mr. Pratt was going to be

23   in Sacramento when he was in Sacramento?

24   A    Yes.

25   Q    Okay.  And how did he come to be in Sacramento?



www.escribers.net | 800-257-0885

1    A    Because I talked to him about it beforehand.

2    Q    Okay.  And tell us what you asked him -- what you said to

3    him.

4    A    I asked him to tell me what his employment experience had

5    been like at Tesla, and he said it was good and he'd

6    opportunities for a promotion and we've done some good things

7    at Tesla.  And I said would you be willing to come up to

8    Sacramento and talk to some folks about your experience?  And

9    he said, yes, he'd love to.

10    Q    And why did you want him to go to Sacramento to talk to

11    some folks about his experience at Tesla?

12    A    Because he had a positive experience and there were

13    several others giving, you know, like a negative type of

14    narrative.  And I felt it would be useful to have, you know,

15    somebody from the other side.

16    Q    Was there something going on in Sacramento --

17    A    Yeah.  There was a --

18    Q    -- that concerned you?

19    A    There was a bill to be voted upon.  There was a hearing

20    that week, and so wanted to give some background from Tesla

21    employees.

22    Q    I see.  A bill having to do with what, if you know?

23    A    I believe it was about -- I can't recall exactly what it

24    was about.

25    Q    Okay.  Do you remember if it was a bill being sponsored or



1    encouraged by United Auto Workers against Tesla?

2    A    Yes.

3        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

4    Argumentative.

5        JUDGE TRACY:  Overruled.

6    Q    BY MR. ROSS:  The answer is yes?

7    A    Yes.

8    Q    Okay.  So after -- and it was both Mr. Pratt and Mr. Ives

9    who went to Sacramento to speak on behalf of the company?

10   A    Yes.

11   Q    Okay.  And after they made that trip to Sacramento, you

12   were somehow contacted by Mr. Pratt?

13   A    Yes.

14   Q    How?

15   A    Via text.

16   Q    Okay.  Tell us about that.

17       MS. FEINBERG:  Objection as to evidence.  Can we just see

18   the text?

19       MR. ROSS:  You're asking me to reply?

20       MS. FEINBERG:  Yes.

21       MR. ROSS:  Perfectly capable of saying what the nature of

22   the text was.  I don't think there's a hearsay issue or any

23   best evidence issue.  It's --

24       MS. FEINBERG:  Well, he's about a characterize something

25   that's in writing.  I think we should see what it is.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Was this document subpoenaed?

2      MS. FEINBERG:  I would have to go back to look.  There's

3  so many papers.

4      MR. RODRIGUEZ RITCHIE:  I think it might be in --

5      MS. FEINBERG:  Well, it might have been, because this is

6  what they relied on, in part, for Mr. Ortiz's dismissal, so I

7  would say yes.  But they relied on it, which I believe is where

8  we're going with it.

9      MR. ROSS:  I'll withdraw the question.

10  Q    BY MR. ROSS:  Did you have occasion to speak with Mr.

11  Pratt after you received the text?

12  A    I did.

13  Q    Okay.  Was that in person or by telephone?

14  A    By telephone.

15  Q    And can you tell me when in relation to the receipt of the

16  text did you have this conversation with Mr. Pratt?

17  A    Just minutes after.

18  Q    Okay.  And can you tell us what was said and by whom

19  during the conversation?

20  A    Yes.  He said that he'd received this from a friend.  He's

21  not -- he said he's not on social media very much, but he was

22  surprised to see himself and Shaun on this chat forum or

23  whatever, and that he was kind of afraid that that would happen

24  when he went up to Sacramento, and he, you know, felt kind of

25  targeted by that.  And I said well, I will, you know, pass this



www.escribers.net | 800-257-0885

1   on to Employee Relations, and they might reach out to you to

2   talk about, you know, how this happened and kind of look into

3   it.  And he said that was fine.

4   Q    Okay.  Did you ask him to provide you with a copy of what

5   he had seen?

6   A    He had already sent that to me.  He sent that to me

7   before.

8   Q    Okay.  Now, did you have occasion to talk with Ricky

9   Gecewich about your conversation with Mr. Pratt?

10  A    Yes.

11  Q    And can you tell us when and where that conversation took

12  place?

13  A    It was in the admin area in the Fremont factory.  He sat a

14  couple rows ahead of me.  And I saw him on that Monday morning

15  and just said hey, I've already forwarded this to Carmen, but

16  she'll probably, you know, reach out to you.  Just wanted to

17  give you a heads up about it.

18  Q    Okay.  Did you order him to conduct an investigation?

19  A    No.

20  Q    Did he even report to you at the time?

21  A    No.

22  Q    By the way, is this the first time that you had forwarded

23  complaints to Mr. Gecewich?

24  A    No.

25  Q    Was it the last time you ever forwarded an employee



1    complaint to Mr. Gecewich?

2    A    No.

3    Q    Did you tell Mr. Gecewich that he had to investigate this?

4    A    No.

5    Q    Did you tell Mr. Gecewich that this had anything

6    whatsoever to do with the union?

7    A    No.

8    Q    Or union employees?

9    A    No.

10    Q    Or union supporters?

11    A    No.

12    Q    Did you even tell him what it had to do with?

13    A    I'm sure I told him how to do if -- Travis, he was gone to

14    Sacramento.

15    Q    Okay.  Aside from that?

16    A    No.

17    Q    Now, we've heard testimony from both Mr. Moran and Mr.

18    Ortiz who said that they'd engaged in various union-related

19    conduct on behalf of the union.

20        MR. RODRIGUEZ RITCHIE:  Objection.  This is leading and

21    improper.

22        MR. ROSS:  I haven't even finished the question.

23        JUDGE TRACY:  Well --

24        MR. ROSS:  Let me --

25    Q    BY MR. ROSS:  we've heard testimony from Mr. Moran and


www.escribers.net | 800-257-0885

1    Ortiz about things they did in favor of behalf of the union.

2         MR. RODRIGUEZ RITCHIE:  Same objection.

3         JUDGE TRACY:  Overruled.  Go ahead.

4         MR. ROSS:  Okay.

5    Q    BY MR. ROSS:  Did any of that play any role whatsoever in

6    your referring this complaint to Mr. Gecewich?

7         MS. FEINBERG:  Objection.  Leading.

8         JUDGE TRACY:  Sustained.

9    Q    BY MR. ROSS:  Okay.  Now, when was the next conversation

10   or communication you had with Ricky Gecewich about this

11   complaint?

12   A    It was quite a bit later once he a finished his

13   investigation.  And he called and asked me who should be the

14   decision-maker to look over the evidence that he had from his

15   investigation.

16   Q    Okay.  Did he tell you what his findings were?

17   A    Yes.

18   Q    Did he tell you what his recommendations were?

19   A    Yes.

20   Q    Did he tell you that it involved Moran and Mr. Ortiz?

21   A    Yes.

22   Q    Okay.  Can you tell me what Mr. Gecewich said in terms of

23   his findings and his recommendations relative to Mr. Ortiz?

24        MS. FEINBERG:  Objection.  Relevancy.

25        I thought that this was not the decision-maker.  So what



1    does it matter what he heard?

2        JUDGE TRACY:  Overruled.  Go ahead.

3        THE WITNESS:  Okay.  He said that Mr. Ortiz had lied

4    during the investigation, and therefore, he was recommending

5    termination.

6    Q    BY MR. ROSS:  And can you tell me what he said with

7    respect to Mr. Moran?

8    A    He said that he was forthcoming and honest in the

9    investigation, but he had used the Workday improperly.  So he

10   was just going to recommend a warning.

11   Q    Now, after he told you -- and he told you both his

12   findings and his recommendations.  Did you approve those

13   recommendations?

14   A    I agreed with them.  However, I wasn't the decision-maker.

15   Q    Okay.  Did you tell him who to it talk to without getting

16   a decision?

17   A    Yes.

18   Q    Who did you tell him to talk to?

19   A    To Stephan Graminger, the director of Body.

20   Q    Now, when Mr. Gecewich told you that the investigation

21   involved Moran and Ortiz, you were aware of both of those

22   gentleman, correct?

23   A    Yes.

24   Q    And you knew them to have been employees who, from time to

25   time, had advocated in favor of the union; is that correct?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    And tell me, did that knowledge affect your choice of who

3    Mr. Gecewich should go talk to about getting a decision?

4         MS. FEINBERG:  Objection.  Leading.

5         MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

6         JUDGE TRACY:  Sustained.

7    Q    BY MR. ROSS:  How did you -- why did you tell him to talk

8    to Graminger as opposed to somebody else?

9    A    Because I figured that there would be a little bit more

10   attention paid to this, and I felt like it needed to be

11   somebody at a higher level to make an objective decision.  And

12   so that's why I recommended Stephan.

13   Q    Okay.  Ordinarily, who would have been the decision-maker

14   in a case like this?

15   A    It likely would have been the manager of that department.

16   Q    Ron Martinez?

17   A    Yes.

18   Q    Tell me, during the course of the investigation, between

19   the time you first told Mr. Gecewich about the complaint from

20   Pratt and the time he spoke with you about who to go talk to

21   about his decision, did you have any conversations with Mr.

22   Gecewich about the investigation?

23   A    No.

24   Q    Did you have any communications with him about the

25   investigation?



1    A    No.

2    Q    Did he ask you for any advice during the course of the

3    investigation?

4    A    No.

5    Q    Did you play any role whatsoever in the investigation

6    apart from what you've testified to?

7    A    No.

8    Q    Did you play any -- have any hand in the drafting of the

9    investigator's report?

10   A    No.

11   Q    Or in the investigator's recommendations?

12   A    No.

13   Q    Or in the investigator's findings?

14   A    No.

15       MR. ROSS:  Could I go off the record for just a moment,

16   please?

17       JUDGE TRACY:  Sure.  Let's go off the record for a second.

18   (Off the record at 12:06 p.m.)

19       JUDGE TRACY:  All right.  Let's go back on the record.

20       One second.  Okay.  Go ahead.

21       MR. ROSS:  Okay.

22   Q    BY MR. ROSS:  Mr. Hedges, you said that you told Mr.

23   Gecewich to go talk to somebody who's a little higher in the

24   corporate ladder because of Mr. Moran and Mr. Ortiz being the

25   people who were involved in this thing.



1    A    Uh-huh.

2    Q    Why did you suggest that Ricky should go higher in the --

3    well, I meant -- explain to us what you thought that made

4    sense.

5         MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

6         JUDGE TRACY:  Overruled.

7         THE WITNESS:  I knew that because of their, you know,

8    position with the union, there could be more scrutiny to that

9    decision, and I wanted to make sure that it was somebody who,

10   you know, was comfortable making those types of decisions.  And

11   also that they are little bit farther removed from the day to

12   day situation.

13        And so they, you know, could just look at the facts

14   objectively and make a determination.

15   Q    Okay.

16   (Counsel confer)

17        MR. ROSS:  I have nothing else for this witness at this

18   time, Your Honor.

19        JUDGE TRACY:  So I have a question.

20        So there was testimony earlier.  It was withdrawn.  But I

21   am very -- a little bit confused about what it was that was --

22   there was some text messaging and it was -- which kind of

23   started the ball rolling.

24        THE WITNESS:  Uh-huh.

25        JUDGE TRACY:  And then there was something you guys said



www.escribers.net | 800-257-0085

1    over here -- General Counsel's side -- that it was already into

2    evidence.

3        If it's already in evidence, could you please tell me

4    which exhibit it is?

5        I recall the text message of the discriminatees.  I don't

6    recall this text message that prompted this inquiry.

7        MR. ROSS:  Your Honor, I don't believe that the document

8    that the witness got from Mr. Pratt is in evidence.

9        I think that there is a later iteration of the document

10   that I believe was sent to Mr. Gecewich that is in evidence,

11   but I don't believe what was actually sent to Mr. Hedges is in

12   evidence.  There's something that contains the same

13   information, but I'm not sure it's the same document.

14       MS. FEINBERG:  I don't believe it's in evidence.

15       JUDGE TRACY:  Okay.  So I guess I'd just say that

16   that's -- there was testimony about it.  I don't know what it

17   is though.  I don't even know what it says.  And then it -- it

18   assumed facts in evidence that I don't see.

19       MR. ROSS:  Well, we're going to be proving up all this

20   stuff when I put Mr. Gecewich on the stand.  So there may be an

21   evidentiary hold right now, but it's one that will be filled

22   when Mr. Gecewich takes the stand.

23       JUDGE TRACY:  Okay.  I just have to say that, because it

24   is something that I feel is missing, and I couldn't recall if

25   it was something that was covered in our first week together

22-60493.1210



1    that I overlooked.  I just don't recall this piece of what

2    prompted everything.

3        MS. FEINBERG:  It's not in evidence, Your Honor.

4        JUDGE TRACY:  Okay.  So I'll wait for that then.

5        MR. ROSS:  Okay.

6        JUDGE TRACY:  Okay.  We'll do the cross-examination, but

7    let's take a lunch break.  You guys are done now?

8        MR. ROSS:  We're done.

9        JUDGE TRACY:  Okay.  And I'm assuming you need a little

10   bit more than just 30 minutes.  And then they'll have

11   questions.

12       Okay.  So let's take a lunch break until 1:30, okay?

13       So let's go off the record.

14   (Off the record at 12:12 p.m.)

15       JUDGE TRACY:  Okay.  So before cross-examination, I guess

16   there is a concern by the Charging Party regarding some

17   documents that were not produced pursuant to the subpoena.

18       So if you could just state for the record what you have

19   requested and what you believe, based upon his testimony here

20   of what's missing?

21       MS. FEINBERG:  Okay.  And though it could be more, but

22   yes.

23       JUDGE TRACY:  Okay.

24       MS. FEINBERG:  Okay.  So and I have to say that you know

25   my associate clipped most of the conversation, so I'm going to



1    read from the notes that I have, but.

2        JUDGE TRACY:  Well, I wanted to read the subpoena request.

3        MS. FEINBERG:  Because I -- no, I'm going to read the

4    subpoena first.

5        JUDGE TRACY:  Okay.

6        MS. FEINBERG:  Okay.  So 3(c), we had requested the

7    internal correspondence or messaging sent between Tesla

8    management regarding Mr. Ortiz's termination.

9        And what I -- and I do know that in the conversations we

10   explained that we -- that meant including his direct

11   supervisor, all supervisors up the chain up to Mr. Hedges, Ms.

12   Toledano and Mr. Musk.  And we had identified it as incomplete

13   in our conversations back and forth, but they said it was

14   complete.

15       But what I just heard this witness say was that he sent

16   things to Carmen -- and I'm not sure how to say her name

17   correctly -- but she is like his colleague who's over the

18   investigative unit who's over Mr. Gecewich and that he sent her

19   the text to investigate.

20       MR. ROSS:  He did not say that.  That's a misstatement of

21   what his testimony was.

22       MS. FEINBERG:  All right.  Well, he sent it someone --

23   then he sent it to Ricky Gecewich, so he sent it on.  We don't

24   have it.  Their communications within management, we don't have

25   it.  It's clear we don't have it.  It's not the in record any



www.escribers.net | 800-257-0885

1    communication that triggered this investigation, any --

2         There must have been come communication to the person that

3    we only learned yesterday was the person who oversaw Mr.

4    Ortiz's dismissal.  There must have been some communication to

5    him.  We don't have anything related to that.

6         It seems impossible that he would have made a final

7    decision without getting some written communication to look at

8    and making some suggestion or not suggestion.

9         And then he must have made a decision, because that person

10   also does not appear in Mr. Ortiz's termination.  In fact,

11   until yesterday, we didn't know that he was even involved in

12   the termination decision.  It's assuming he was.

13        JUDGE TRACY:  Okay.

14        MR. ROSS:  Well, he did not testify that he said anything

15   to Copher.  I think he said he mentioned it to Copher and told

16   her about it.  I don't think he said he sent her something.

17        But I, frankly, was busy asking questions and not

18   necessarily listening to the testimony, but I believe I'm

19   accurately describing what he said.

20        But beyond that, the fact that the Union may assume that

21   there must have been some other document doesn't make it so and

22   doesn't establish any prior produced documents that were called

23   for.

24        Now, if there's something else that's specific that the

25   Union feels it's been not given or short-changed, we'll be



www.escribers.net | 800-257-0885

1    happy to address that.  But I'm --

2         MS. FEINBERG:  Well, I --

3         MR. ROSS:  I'm not hearing any identification what it is.

4         JUDGE TRACY:  So --

5         MS. FEINBERG:  Identified what in particular, which is

6    there is a document that according to this witness triggered

7    the investigation.

8         JUDGE TRACY:  Okay.  So --

9         MS. FEINBERG:  It is some document that Mr. Pratt sent him

10   that he then sent on to somebody.  And he actually said that he

11   saw Mr. Gecewich in person and just walked over to him and it

12   did not appear that there were any documents being moved in

13   that conversation.

14        So the inference was that it was emailed on.

15        JUDGE TRACY:  So here's the way to address it.

16        MS. FEINBERG:  Okay.

17        JUDGE TRACY:  Obviously, we don't have the ability really

18   to play it back, and I don't think that that's necessary.  What

19   needs to happen at this point -- because obviously Mr. Ross

20   disagrees with your characterization of the testimony.

21        MS. FEINBERG:  Well, he would.

22        JUDGE TRACY:  Under cross-examination, ask him.

23        MS. FEINBERG:  I will.

24        JUDGE TRACY:  And then you could just say pursuant to the

25   subpoena we want these documents.


www.escribers.net | 800-257-0885

1    MS. FEINBERG:  Okay.  No problem.

2    JUDGE TRACY:  Because those have not been turned over to

3    us.  So let's pinpoint it down as to -- since he's here, what

4    exactly did he create, in what format, so they know what they

5    should have turned over.

6    MS. FEINBERG:  Okay.  I was just -- okay.  I'm happy to do

7    that.  I raised it now because consistent with efforts to try

8    to resolve things up front.

9    JUDGE TRACY:  That's right.  And I --

10   MS. FEINBERG:  But now I'm happy to follow your direction

11   and we'll do it as part of cross.  Thank you.

12   JUDGE TRACY:  That's right.  Okay.

13   Okay.  So let's go ahead and get the witness -- or

14   somebody.

15   All right.  Mr. Hedges, I just want to remind you that

16   you're still testifying under oath that I administered prior to

17   our break.

18   THE WITNESS:  Yes.

19   JUDGE TRACY:  Okay.  Mr. Rodriguez Ritchie, go ahead,

20   please.

21   MR. RODRIGUEZ RITCHIE:  Thank you.

22                        **CROSS-EXAMINATION**

23   Q    BY MR. RODRIGUEZ RITCHIE:  All right.  Mr. Hedges, I

24   didn't quite hear your job title.  Can you remind me of what

25   your job title is?


www.escribers.net | 800-257-0885

1    A    Senior director of HR for production and supply chain.

2    Q    And you began in December of 2015?

3    A    Correct.

4    Q    Prior to your testimony here today, you met with Mr. Ross?

5    A    Yes.

6    Q    How many times?

7    A    A couple times.

8    Q    So more than two?

9    A    Three times.

10   Q    For how long?

11   A    For like two hours apiece.

12   Q    And that was to prepare for your testimony here today?

13        MR. ROSS:  Objection.  Attorney-client privilege.  It

14   comes with the conversation.  It's not a proper question.  I

15   don't think it's proper.  What I might have told him is to why

16   I was meeting with him is privileged.

17        MR. RODRIGUEZ RITCHIE:  I don't think that was the

18   question.

19        MR. ROSS:  You said the purpose of it was it compels him

20   to disclose what I said to him as to why I was meeting with

21   him.  It calls for violation of attorney-client privilege.

22        JUDGE TRACY:  Okay.  So again, I overrule the objection to

23   the extent that the question concerns the general purpose.

24        But I would say to you, Mr. Hedges, if there was some --

25   what exactly or what generally was said to you by your

22-60493.1216



1   attorneys in this matter, those are attorney-client privilege

2   and you don't need to testify about that.  That's attorney-

3   client privilege.

4        THE WITNESS:  Okay.

5        JUDGE TRACY:  However, the form of the question was what

6   was the purpose of the meeting?

7        MR. RODRIGUEZ RITCHIE:  Correct.

8        JUDGE TRACY:  Not -- and so that's a general question.

9   It's not what did you -- what did Mr. Ross say?

10       MR. ROSS:  Okay.  That's fine.

11       JUDGE TRACY:  However, if it was something that you were

12  told by Mr. Ross or Mr. Morris or any of the other attorneys in

13  this matter, then you are not to testify about what they said

14  to you.

15       THE WITNESS:  Okay.

16       JUDGE TRACY:  Okay?

17       THE WITNESS:  Okay.

18       So the purpose of the meeting, I don't think there was a

19  purpose stated on the meeting invite.  Just meet with outside

20  counsel.

21  Q    BY MR. RODRIGUEZ RITCHIE:  The subject matter of your

22  meetings with Mr. Ross was about your testimony here today?

23  A    About whether or not I would testify, yeah.  I would be

24  testifying.  Yeah.

25  Q    Prior to today, you reviewed documents to prepare for your



1    testimony?

2    A    Yes.

3    Q    What documents did you review?

4    A    The documents that he showed me this morning.

5    Q    And only the documents from earlier today?

6         MR. ROSS:  I'm sorry.  I couldn't hear the question.

7    Q    BY MR. RODRIGUEZ RITCHIE:  Only the documents for earlier

8    today.

9    A    And various emails and those kind of things.

10   Q    What other email -- or what emails?

11   A    I don't specific -- I don't know exactly which ones.  The

12   ones that from Mark, for sure.

13   Q    That's Mark Lipscomb?

14   A    Mark Lipscomb.

15   Q    Not Mark Ross?

16   A    Oh, yeah.  That's right.  I'm sorry.  I forgot we're

17   double Marks here.

18   Q    Yes.

19   A    But yeah, from Mark Lipscomb, yes.

20   Q    Okay.  Have you seen any news articles about this case?

21   A    Yes.

22   Q    And you saw them prior to your testimony here today?

23   A    Yes.

24   Q    And they included what people testified about here?

25        MR. ROSS:  I couldn't hear the question.  I'm sorry.



www.escribers.net | 800-257-0885

1   Q    BY MR. RODRIGUEZ RITCHIE:  And those articles included

2   information about what people testified in this trial?

3   A    Whatever was reported that they testified about.

4   Q    Right.  So you remember that you read what other people

5   testified about in this case?

6   A    Uh-huh.  Yes.

7   Q    And that was prior to today?

8   A    Yes.

9   Q    Okay.  Now, you spoke -- you're familiar with an

10  individual named Gaby Toledano?

11  A    Yes, I am.

12  Q    You're friends with her?

13  A    Yes.  She was my manager at Tesla.

14  Q    And you spoke with her prior to your testimony here today?

15  A    Yes.

16  Q    What did you speak with her about?

17  A    Most of the --

18       MR. ROSS:  Objection.  Relevance.  Beyond the scope.

19       JUDGE TRACY:  Overruled.

20       THE WITNESS:  A majority of the conversation was personal

21  between Gaby and I not related to this.

22  Q    BY MR. RODRIGUEZ RITCHIE:  But you spoke about this

23  matter?

24  A    We briefly spoke about that she was going to be

25  testifying.



1  Q    And what did she say to you?

2  A    That, you know, she wasn't excited about testifying.  And

3  we talked about when she asked me to get Jose to come and talk

4  with her and Elon.

5  Q    And that was at a meeting in June of 2017?

6  A    Yes.  Yes.

7  Q    What did you talk specifically about that with Ms.

8  Toledano?

9  A    Just that --

10       MR. ROSS:  Again, Judge, objection.  Beyond the scope.

11  This has got nothing to do with his direct exam.

12       JUDGE TRACY:  I'm going to overrule the objection.

13       THE WITNESS:  Okay.  Just that she had asked me to go get

14  him and bring him up to Angel Island.

15  Q    BY MR. RODRIGUEZ RITCHIE:  What did you say to Ms.

16  Toledano, if anything?

17  A    I said that she had asked me to come and get him and bring

18  him up to Angel Island and that I was essentially the courier

19  to take him up there.

20  Q    And nothing else?

21  A    No.

22  Q    Okay.  Why are you leaving Tesla?

23       MR. ROSS:  Objection.  Relevance.  And it's a violation of

24  privacy.

25       MR. RODRIGUEZ RITCHIE:  It goes to his bias.


www.escribers.net | 800-257-0885

1       JUDGE TRACY:  Sustained.

2   Q   BY MR. RODRIGUEZ RITCHIE:  Were you terminated from Tesla?

3       MR. ROSS:  Objection.  Same grounds.

4       MR. RODRIGUEZ RITCHIE:  It goes to bias.

5       JUDGE TRACY:  Sustained.

6   Q   BY MR. RODRIGUEZ RITCHIE:  We took several breaks during

7   your testimony on direct examination; do you recall that?

8   A   This morning?

9   Q   Yes?

10  A   Yes.

11  Q   And you looked on your phone during those breaks?

12  A   Uh-huh.

13  Q   Did you communicate with anyone during the breaks?

14  A   My wife.

15  Q   Okay.  And was that about your testimony?

16  A   No.  How are you doing this morning?

17  Q   Okay.  Did you receive a severance package from Tesla for

18  leaving the company?

19  A   No.

20  Q   Now, you've served in your capacity for slightly under

21  three years, I think, is that right, at Tesla?

22      MR. ROSS:  I apologize, Your Honor.  I couldn't hear the

23  question.

24  Q   BY MR. RODRIGUEZ RITCHIE:  You served in your capacity as

25  senior director of HR for production and supply for just under



www.escribers.net | 800-257-0885

1    three years, right?

2    A    Yes.

3    Q    And during that time you oversaw investigations?

4    A    Up until the point that we established the Employee

5    Relations function in June of 2017.

6    Q    After that point, did the Employee Relations and

7    Investigations Team only handle the investigations at Tesla?

8         MR. ROSS:  Again, I couldn't hear the question.

9    Q    BY MR. RODRIGUEZ RITCHIE:  After that point, did the

10   Employee Relations and Investigations Team only handle the

11   investigations at Tesla?

12   A    They handled the majority of the investigations, yes.

13   Q    What investigations were not handled by Employee Relations

14   and Investigations?

15   A    More investigations of performance concerns or like basic

16   conflict type stuff that happened.  So something that an HR

17   partner could handle that wasn't necessarily a potential policy

18   violation.

19   Q    During your time with Tesla, have you been the decision-

20   maker in investigations?

21        MR. ROSS:  Again, I apologize, but I couldn't hear the

22   witness -- or I couldn't hear the question.

23   Q    BY MR. RODRIGUEZ RITCHIE:  During your time with Tesla,

24   have you been a decision-maker in an investigation?

25   A    I am somebody who would recommend, but then the business



www.escribers.net | 800-257-0885

1    would be the final decision-maker.

2    Q    What do you mean by the "business"?

3    A    So the business leader that the employee is under, the HR

4    person or the investigator would recommend based on the

5    investigation what the action should be.  But I wouldn't be the

6    one who made that final call.

7    Q    So you would just be a recommender, and then someone else

8    would make the final decision?

9    A    Correct.

10   Q    You would agree that during your time at Tesla, there were

11   investigations that you were not a part of that you're aware

12   of?

13   A    Yes.

14   Q    And would those investigations that you weren't involved

15   in, you were never approached by investigator about the

16   investigation?

17       MR. ROSS:  If he was never involved in the investigations

18   itself --

19       JUDGE TRACY:  So objection?

20       MR. ROSS:  Yes, it is objection.

21       JUDGE TRACY:  As to?

22       MR. ROSS:  It's an objection to the form of the question.

23       JUDGE TRACY:  If you could just restate the question?  I'm

24   sorry.  Because I also didn't hear the last part of what your

25   question was actually.



www.escribers.net | 800-257-0885

1  Q    BY MR. RODRIGUEZ RITCHIE:   So in instances where there

2  were investigations at Tesla where you weren't a recommender,

3  you weren't involved in any other aspect of the investigation,

4  correct?

5  A    Yes.  I might hear about it just because of my role, but

6  I'm not always asked to weigh in on it.

7  Q    So the investigator wouldn't come to you and ask for your

8  opinion?

9  A    No.

10 Q    Wouldn't ask you if you agreed with the investigation?

11 A    Only if it -- if it was in my area, yes.  If it was

12 outside of the supply chain and production, then no.

13 Q    And besides that, if you weren't an individual

14 recommending, you wouldn't otherwise offer your opinion

15 regarding an investigation?

16 A    Not unless I was asked.

17 Q    Now, you spoke -- or you testified about speaking with an

18 individual -- I believe his name was Travis Pratt -- regarding

19 a Facebook posting in September of 2017?

20 A    Uh-huh.  Yes.

21 Q    By this point in September, 2017, you were aware that Jose

22 Moran was an active union organizer, weren't you?

23 A    Yes.

24 Q    And you were aware that Mr. Moran had brought safety

25 concerns to your attention with his co-workers?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    And that he had brought safety concerns to Mr. Musk's

3    attention?

4    A    Yes.

5    Q    And you were also aware that Richard Ortiz was an active

6    union organizer?

7    A    Yes.

8    Q    And that he had participated in safety committee meetings?

9    A    I'm not aware that he participated in safety committee

10   meetings.

11   Q    You were aware that he was involved in activities with

12   United Auto Workers at Tesla Fremont?

13   A    Yes.

14   Q    And that he was doing so with other co-workers at Tesla

15   Fremont?

16   A    Yes.

17   Q    And you were aware that Mr. Ortiz had, along with another

18   employee, requested Cal/OSHA 300 logs?

19   A    Yes.

20   Q    And 300 in summaries?

21   A    Yes.

22   Q    Now, you're familiar with a Facebook page called "Fair

23   Future" at Tesla?

24   A    Yes.

25   Q    And you know that's a Facebook page that's about an



1    organizing campaign at Tesla Fremont?

2    A    Yes.

3    Q    And it's a campaign that's affiliated with the United Auto

4    Workers?

5    A    Yes.

6    Q    You've been on this page prior -- you had been on that

7    page prior to September, 2017?

8    A    Yes.

9    Q    And monitored the activity on the page?

10   A    Not monitored.

11   Q    How many times had you been on the Facebook page prior to

12   September, 2017?

13   A    I don't know.

14   Q    More than five times?

15   A    Yes.

16   Q    More than ten times?

17   A    Yes.

18   Q    More than 20 times?

19   A    I don't know.  No, I don't think so.

20   Q    Now, you testified during direct examination that you

21   didn't order Mr. Gecewich to conduct an investigation.

22   A    Correct.

23   Q    You were aware that Mr. Gecewich was part of the Employee

24   Relations and Investigations Team?

25   A    Yes.



www.escribers.net | 800-257-0885

1  Q    And you were aware of that at the time you spoke with him

2  in September, 2017?

3  A    Yes.

4  Q    And the Employee Relations and Investigations Team

5  conducts investigations?

6  A    Yes.

7  Q    And you knew that in September, 2017?

8  A    Yes.

9  Q    And you met with Mr. Gecewich to talk about a Facebook

10 posting?

11 A    I met with him to talk about the complaint that I

12 received.

13 Q    And the complaint was about something that was posted on

14 Facebook?

15 A    Correct.

16 Q    It wasn't a social visit?

17 A    No.

18      MR. ROSS:  It wasn't what?

19 Q    BY MR. RODRIGUEZ RITCHIE:  A social visit, correct?

20      MR. ROSS:  Okay.

21      THE WITNESS:  Correct.

22 Q    BY MR. RODRIGUEZ RITCHIE:  And so you knew when you spoke

23 with Mr. Gecewich, a member of the Employee Relations and

24 Investigations Team, that he would proceed to conduct an

25 investigation into the complaint, right?


www.escribers.net | 800-257-0885

1    A    Not always.  Sometimes they do not investigate.  I just

2    pass along the complaint and either him or Carmen would

3    determine how far they're going to go with the investigation.

4    Q    So it would be correct to say that when you met with him,

5    you were meeting with him so that a decision about an

6    investigation could be made?

7    A    Yeah.  Let him know that I had received this complaint.

8    And if he chooses to move forward with the investigation,

9    here's the information.

10   Q    But you knew it was likely that an investigation would

11   happen if you gave it to him, right?

12   A    Yeah.  I knew he'd look into it.

13   Q    Yeah.  Now, without your speaking to Mr. Gecewich, it

14   would be correct to say that an investigation into the Facebook

15   posting wouldn't have occurred?

16       MR. ROSS:  Objection.  A complete hypothetical.  There's

17   no way he can testify as to that.

18       JUDGE TRACY:  Sustained.

19   Q    BY MR. RODRIGUEZ RITCHIE:  At the -- in September of 2017,

20   the Employee Relations and Investigations Team, that was the

21   only team at Tesla that conducted investigations into these

22   types of matters?

23   A    Yes.

24       MR. ROSS:  Into what?  I couldn't hear the last part of

25   the question.


www.escribers.net | 800-257-0885

1   MR. RODRIGUEZ RITCHIE:  Into these types of matters.

2   MR. ROSS:  Vague and ambiguous "these types of matters".

3   JUDGE TRACY:  Sustained.

4   Q   BY MR. RODRIGUEZ RITCHIE:  The Employee Relations and

5   Investigations Team, in September of 2017, that would be the

6   only team that would conduct an investigation into the Facebook

7   posting; is that right?

8   MR. ROSS:  Objection.

9   JUDGE TRACY:  Overruled.

10  Go ahead.

11  THE WITNESS:  Yes.

12  MR. ROSS:  All right.

13  Q   BY MR. RODRIGUEZ RITCHIE:  So without going to speak with

14  Mr. Gecewich, no other union at Tesla Fremont would have

15  conducted an investigation into this matter; is that right?

16  A   Well, I'd already reported it to Carmen, who --

17  Q   Is the head of Employee Relations and Investigations?

18  A   -- is the head of Employee Relations, yeah, so.

19  Q   So without reporting it to Carmen, no other union at Tesla

20  Fremont would have conducted an investigation; is that right?

21  A   To my knowledge, yeah.

22  Q   Now, you testified about taking two individuals to

23  Sacramento, Mr. Travis Pratt and Shaun Ives, correct?

24  A   Yes.

25  Q   And that was about a bill that you testified was being



1    supported by the United Auto Workers?

2    A    Yes.

3    Q    And you were aware that Tesla employees were also

4    supporting the bill with the United Auto Workers?

5    A    Yes.

6    Q    And you were aware of that prior to going with Mr. Pratt

7    and Mr. Ives?

8    A    Yes.

9    Q    The reason why you took Mr. Pratt and Mr. Ives, that was

10   to counter the testimony of the other -- of the Tesla Fremont

11   workers that were testifying in favor of the bill, right?

12   A    To offer a different perspective.

13   Q    Right.  Indeed, I think you testified that you picked them

14   because they didn't have any "negative experiences"; is that

15   right?

16   A    They said they had a positive experience at Tesla.

17   Q    And it's fair to say that you perceived that Tesla Fremont

18   employees that testified in favor of the bill to be going

19   against Tesla's interest?

20   A    I perceived them to just have a different experience.

21   Q    You perceived them to have a negative experience if they

22   work at Tesla, didn't you?

23   A    Uh-huh.  Yes.

24   Q    And a negative experience about their working conditions

25   at Tesla?



www.escribers.net | 800-257-0885

1    MR. ROSS:  I'm sorry.  I couldn't hear the last question.

2    Q    BY MR. RODRIGUEZ RITCHIE:  And a negative experience about

3    their working conditions at Tesla?

4    A    Yes.

5    Q    Now, did you make the decision to take Mr. Pratt and Mr.

6    Ives to Sacramento?

7    A    Yes.

8    Q    Did anyone ask you to bring them?

9    A    Yes.

10   Q    Who?

11   A    They didn't ask for them specifically, but asked if there

12   were employees that would want to come up to Sacramento, and

13   that was Gaby.  I believe he asked.  Yeah.

14   Q    And just so the record is clear, we're referring to Gaby

15   Toledano, right?

16   A    Correct.

17   Q    Now, when you discussed with Mr. Pratt a posting on

18   Facebook, was that done via text message?

19   A    He sent me the text with the screenshot in it, and I said

20   do you have a second to talk?  I texted him back that, and then

21   talked to him on the phone.

22   Q    After you texted him whether he had a second to talk, did

23   you text him anything else?

24   A    Not that I recall.

25   Q    And you spoke to him for how long?



1    A    Five minutes.  Ten minutes the most.

2    Q    The text message he sent you, can you tell me what he said

3    in his text message?

4    A    He said that somebody had sent -- a friend of his had sent

5    that to him.  I can't remember exactly what he said.  But in

6    the course of the conversation he said he was afraid that

7    something like that would have happened.

8    Q    And was -- did he also send you the -- a picture of the

9    Facebook posting in this screenshot?

10        MR. ROSS:  I'm sorry.  I couldn't hear.  I'm sorry.

11    Q    BY MR. RODRIGUEZ RITCHIE:  A picture of the Facebook

12    posting in this screenshot?

13    A    Yes, he did.

14    Q    Did he say anything else besides being scared?

15    A    Said he, you know, felt like he was targeted and that --

16    was afraid that that was going to happen.

17    Q    Did you share this text message with anyone?

18    A    Yes, I did.

19    Q    With who?

20    A    I sent it to Carmen Copher and Jaime Bodiford.

21    Q    Did you give the text messages -- these text messages to

22    Mr. Gecewich as well?

23    A    I do not believe I did.

24    Q    Did you give him any text messages?

25    A    No.



www.escribers.net | 800-257-0885

1    Q    When you spoke with Mr. Pratt regarding the Facebook

2    posting, he told you it was on a union page?

3    A    He said it was on a Facebook page.  I don't recall if he

4    said it was on a union page or not.

5    Q    Did he tell you what Facebook page it was on?

6    A    No.

7    Q    All he said it was on a Facebook page?

8    A    This was posted on a Facebook page.  He said he wasn't

9    into social media, so he didn't even see it, that a friend had

10   seen it.

11   Q    I'm going to show you what's been admitted as General

12   Counsel's Exhibit 28.

13        Let me know when you're ready.

14   A    I'm ready.

15   Q    Okay.  You recognize General Counsel's Exhibit 28, right?

16   A    Yes.

17   Q    General Counsel's Exhibit 28, those are text messages

18   between you and Mr. Pratt?

19   A    Yes.

20   Q    And that's the Facebook posting that Mr. Pratt sent to

21   you?

22   A    Yes.

23        MS. FEINBERG:  I'm sorry.  Are you saying that these

24   messages are between him and Mr. Pratt, or this is the what the

25   photo of what Mr. Pratt sent him?  Or I guess -- sorry.  It



22-60493.1233

1    wasn't clear to me what this was, so I apologize.  I'll wait

2    for cross-examination.

3         MR. RODRIGUEZ RITCHIE:  Sure.  And I'll clarify.

4    Q    BY MR. RODRIGUEZ RITCHIE:  General Counsel's Exhibit 28,

5    you see at the top it says "To Travis Pratt"?

6    A    Yes.

7    Q    Okay.  And what's in General Counsel's Exhibit 28, that's

8    a screenshot from your phone, right?

9    A    Yes.

10   Q    And so on the left-hand side there's messages, and those

11   are messages that Mr. Pratt sent to you?

12   A    Correct.

13   Q    And there's -- this is a color image.  And so there's a

14   message at the bottom in green.  That's a message you sent?

15   A    Yes.

16   Q    Okay.  And there's a picture -- what appears to be a

17   picture in General Counsel's Exhibit 28 that says "Richard

18   Sancho Ortiz" and there's text below that?

19   A    Yes.

20   Q    Do you see that?

21   A    I see that.

22   Q    Okay.  So that's the Facebook posting that you're

23   referring to that Mr. Pratt sent you, right?

24   A    Yes.

25   Q    Okay.  Now, if you see below that, it says, "Looks like



1    they got under some people's skin"?

2    A    Uh-huh.

3    Q    Okay.  And there's an emoticon, right?

4    A    Uh-huh.

5    Q    And that's a smiley face?

6         JUDGE TRACY:  Yes or no.

7         THE WITNESS:  Yes.  Excuse me.

8         JUDGE TRACY:  Thank you.

9    Q    BY MR. RODRIGUEZ RITCHIE:  And that's a smiley face?

10   A    Yes.

11   Q    Okay.  That doesn't mean someone is scared, right?

12        MR. ROSS:  Objection.  He has no way he can know what was

13   meant --

14        MR. RODRIGUEZ RITCHIE:  The text --

15        MR. ROSS:  -- by the person who put a smiley face.

16        JUDGE TRACY:  Sustained.

17   Q    BY MR. RODRIGUEZ RITCHIE:  You've used emoticons before in

18   your text messaging?

19   A    Yes.

20   Q    Okay.  And the happy face -- there is a different scared

21   emoticon, is that right?

22   A    I'm not familiar with all emoticons, but I'm sure there

23   is.

24   Q    Okay.  And when you testified earlier that Mr. Pratt told

25   you he was scared, that testimony wasn't in reference to the



www.escribers.net | 800-257-0885

1    smiley face, right?

2    A    No, that was in reference to our conversation.

3    Q    Okay.  And then earlier you testified that you didn't know

4    what Facebook page it was on.  I want you to take a look at the

5    bottom of his text message.  It says, "I'm pretty sure it's on

6    their Fair Future at Tesla thing."

7    A    Um-hum.

8    Q    Okay.  That "Fair Future at Tesla thing", that refers to a

9    Facebook page, right?

10   A    I would think so, yes.

11   Q    And that refers to a union-organizing Facebook page at

12   Tesla-Fremont?

13   A    Yes.

14   Q    Okay.  And "LOL" -- can you explain -- do you know what

15   that means?

16        MR. ROSS:  Is this a statement that he made, or is this a

17   statement that Mr. Pratt made?

18        JUDGE TRACY:  So if you could just clarify.  You went

19   through it before but just to be clear about the -- what's in

20   green, who wrote that?  Or who supposedly wrote what's in green

21   and who supposedly wrote what's in gray?

22        MR. RODRIGUEZ RITCHIE:  Sure.

23        JUDGE TRACY:  Thank you.

24   Q    BY MR. RODRIGUEZ RITCHIE:  I think we went over that a

25   little bit, but there's a color picture, right?



1   A    Um-hum.

2   Q    So there is messages in gray and messages in green.  Do

3   you see that?

4   A    Yes.

5   Q    Okay.  The messages in gray, those are messages that Mr.

6   Pratt wrote --

7   A    Yes.

8   Q    -- correct?  Okay.  And those are on the left-hand side of

9   the picture in General Counsel's Exhibit 28?

10  A    Yes.

11  Q    And there's one message in green.  Do you see that?

12  A    Yes.

13  Q    And that's what you wrote?

14  A    Yes.

15  Q    Okay.  So "LOL", do you know what means?

16  A    Yes.

17  Q    What does that mean?

18  A    Laugh out loud.

19  Q    That doesn't mean scared, correct?

20  A    No.

21       JUDGE TRACY:  Let me ask you.  This is General Counsel's

22  Exhibit 28.  It seems as though the last line was cut off.  Is

23  that how you received the document from the Respondent?

24       MR. RODRIGUEZ RITCHIE:  That is how I received it, and I'm

25  just about to ask about that.



www.escribers.net | 800-257-0885

1       JUDGE TRACY:  Okay.  Thank you.

2   Q    BY MR. RODRIGUEZ RITCHIE:  If you look at the bottom of

3   General Counsel's Exhibit 28, it looks like a message was cut

4   off.

5   A    Um-hum.

6   Q    Did you take more -- were there more text messages below

7   this?

8   A    I'm sure that Travis and I texted beyond that, but this is

9   what I sent over to Carmen and Jaime.

10  Q    Okay.  You didn't keep your other text messages with Mr.

11  Pratt?

12  A    No.

13  Q    Why not?

14  A    Well, since then I've gotten a new phone, and my

15  computer's been stolen.  So I don't -- I don't have --

16  Q    The phone that this text string was from -- but I'm

17  referring to your phone --

18  A    Okay.

19  Q    -- was that a Tesla company phone?

20  A    Yes.

21  Q    Was that phone backed up?

22  A    Likely, yeah.

23  Q    Has anyone -- what did you do with the phone?

24  (Counsel confer)

25      THE WITNESS:  Gave it back to IT.



www.escribers.net | 800-257-0885

1    Q    BY MR. RODRIGUEZ RITCHIE:  When?

2    A    I think I was eligible for an upgrade sometime before this

3    summer.  It might have been in the spring at some point.

4    Q    Of 2018?

5    A    Yes.

6    Q    You spoke with Ms. Toledano about the complaint regarding

7    Mr. Ortiz's Facebook posting, didn't you?

8    A    When this happened?

9    Q    At any point.  You've spoken with Ms. Toledano about the

10    complaint?

11    A    I don't recall speaking to her about it.

12    Q    Never?

13    A    I mean, I -- I may have, but I don't -- I don't remember.

14    Q    Who else have you spoken with about this complaint, the

15    Facebook message complaint?

16        MR. ROSS:  Which complaint are you referring to?  You're

17    talking about the thing is it --

18        MR. RODRIGUEZ RITCHIE:  The Facebook message --

19        JUDGE TRACY:  So objection?

20        MR. ROSS:  Objection.  Vague and ambiguous.  I don't know

21    what "this complaint" --

22        MR. RODRIGUEZ RITCHIE:  I'll --

23        MR. ROSS:  -- is pertinent to.

24        JUDGE TRACY:  Okay.

25        MR. RODRIGUEZ RITCHIE:  I'll clarify the question.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  Thank you.

2    Q    BY MR. RODRIGUEZ RITCHIE:  Who else did you speak with

3    regarding the screenshot that you received from Mr. Pratt

4    that's in General Counsel's Exhibit 28?

5    A    Ricky, Carmen, and Jaime.

6    Q    Anyone else?

7    A    Probably ShTawney McIntosh at the end when she had to be

8    in the termination.  And potentially Alaynna Elliot, who was

9    ShTawney's manager.

10   Q    And ShTawney McIntosh, that's a Human Resources business

11   partner?

12        MR. ROSS:  Couldn't hear the question, sorry.

13   Q    BY MR. RODRIGUEZ RITCHIE:  ShTawney McIntosh, that's a

14   Human Resource business partner, correct?

15   A    Correct.

16   Q    For purposes of the record, can you spell her name if you

17   know?

18   A    No, I can't.  No.  I'll write it down later.

19        MR. ROSS:  For that -- for the --

20        JUDGE TRACY:  We'll get it later.

21        MR. ROSS:  I think I can give it to you actually.

22        JUDGE TRACY:  We'll get it --

23        MR. ROSS:  I think it's --

24        JUDGE TRACY:  It's fine.  We'll get it off the record.

25        MR. ROSS:  Okay.


www.escribers.net | 800-257-0885

1    Q    BY MR. RODRIGUEZ RITCHIE:  Now, you testified that you

2    weren't the decision-maker into the termination of Mr. Ortiz?

3    A    That's correct.

4    Q    Or the suspension -- excuse me, or the warning that Mr.

5    Moran received?

6    A    Correct.

7    Q    But you were consulted prior to the implementation of

8    those decisions by Mr. Gecewich?

9    A    He made me aware when he asked who should be the decision-

10   maker for that, yeah.

11   Q    At that point, Mr. Gecewich had concluded his

12   investigation?

13   A    Correct.

14   Q    And he spoke to you about the investigation?

15   A    Yes.

16   Q    And he spoke to you about his recommendations?

17   A    Yes.

18   Q    And you agreed with them?

19   A    Yes.

20   Q    And you told him you agreed with them?

21   A    Yes.

22   Q    Okay.

23   (Counsel confer)

24        MR. RODRIGUEZ RITCHIE:  I have no further questions.

25        JUDGE TRACY:  Let me ask you before we go to the Charging



www.escribers.net | 800-257-0885

1    Party here for their questions, but looking at General

2    Counsel's Exhibit 28, which you have in front of you, do you

3    know the last line of that text message?

4         THE WITNESS:  No.

5         JUDGE TRACY:  Okay.  And then also I'm trying to just

6    visualize your place -- your position in the company.

7         THE WITNESS:  Yeah.

8         JUDGE TRACY:  So you said again you were senior HR for

9    supply chain --

10         THE WITNESS:  Yeah.

11         JUDGE TRACY:  -- and --

12         THE WITNESS:  Production.

13         JUDGE TRACY:  -- production.

14         THE WITNESS:  Yes.

15         JUDGE TRACY:  And so Mr. Ortiz, was he part of who you

16    would have -- I don't know, was he part of the supply chain

17    group?

18         THE WITNESS:  So he's part of the Fremont factory, part of

19    production.  So I had all of the HR business partners that were

20    responsible for the Fremont factory production, as well as

21    global supply chain.

22         JUDGE TRACY:  Okay, so he's sort of --

23         THE WITNESS:  The Fremont factory.

24         JUDGE TRACY:  He's one of the employees under that

25    umbrella?



www.escribers.net | 800-257-0885

1    THE WITNESS:  Yes.

2    JUDGE TRACY:  And then how about Mr. Ortiz?

3    THE WITNESS:  Yes.

4    JUDGE TRACY:  Or Mr. Moran?

5    THE WITNESS:  Yes.

6    JUDGE TRACY:  Who did I say?  Both of them.

7    THE WITNESS:  Both of them, yes.

8    JUDGE TRACY:  Okay.  All right.  And then how about Mr.

9    Pratt?

10    THE WITNESS:  Same.

11    JUDGE TRACY:  Okay.  And then the other one, Shaun Ives?

12    THE WITNESS:  Yep.

13    JUDGE TRACY:  Okay.

14    THE WITNESS:  He's -- yeah.  So he's in that employee

15    population.

16    JUDGE TRACY:  Okay.

17    THE WITNESS:  Yeah.

18    JUDGE TRACY:  Okay.  Thank you.

19    THE WITNESS:  Yep.

20    JUDGE TRACY:  Ms. Feinberg, do you need a couple minutes?

21    MS. FEINBERG:  I'm one for going forward.  Let's go.

22    JUDGE TRACY:  Okay.

23                          **CROSS-EXAMINATION**

24    Q    BY MS. FEINBERG:  Hello.

25    A    Hi.



1    Q    So are you on LinkedIn by any chance?

2         MR. ROSS:  Couldn't hear the question, I'm sorry.

3    Q    BY MS. FEINBERG:  Are you on LinkedIn?  LinkedIn?

4    A    Yes.

5    Q    Yes.  And do you have your picture and your title with

6    Tesla on there?

7    A    Yes.

8    Q    And is there any prohibition for people who work for Tesla

9    pushing their photos and their titles on LinkedIn?

10   A    No.

11   Q    Okay.  And so when Mr. Pratt came to you about his

12   concern, what was his concern?

13   A    His concern was that his picture and his information from

14   a Tesla system was put on Facebook because of him going to --

15   Q    Um-hum.

16   A    -- Sacramento.

17   Q    And when he went to Sacramento, did he testify publicly in

18   a hearing?

19   A    No, he actually didn't.

20   Q    Are you sure of that?

21   A    At the time that he went that Monday, he just -- we just

22   walked along to legislative offices.

23   Q    I understand when he went with you, but are you aware of

24   the fact that he actually went and testified publicly and

25   that's how he was identified?



www.escribers.net | 800-257-0885

1   A    No.

2   Q    No, you're not aware of that fact?

3   A    Not aware of that.

4   Q    It's possible, but you just don't know?

5   A    Yeah, I don't know.

6   Q    Okay.  And do you know that his face and his title is

7   already in the public sphere as being part of LinkedIn -- that

8   he has posted himself publicly?

9   A    I haven't seen his LinkedIn.

10  Q    Okay.  And how about Mr. Ives?  Are you aware that his

11  name and title with Tesla is already in the public sphere?

12  A    I am not aware.

13  Q    And there's no prohibition on that?

14  A    No.

15  Q    So what would your concern about his identity being

16  public -- since he had gone to Sacramento, spoken to people

17  publicly, identified himself with Tesla, and was already public

18  about his employment with Tesla -- what is the privacy

19  interest?

20  A    My --

21       MR. ROSS:  Objection.  He didn't testify that there was --

22  he was concerned about the photo.  He said that Mr. Pratt

23  expressed --

24       JUDGE TRACY:  Okay, so I sustain the objection.

25       MS. FEINBERG:  Okay.



www.escribers.net | 800-257-0885

```
1        JUDGE TRACY:  If you could rephrase the question, please.

2        MS. FEINBERG:  Yes.  Okay, fine.

3   Q    BY MS. FEINBERG:  Did you think that he had a legitimate

4   concern?

5   A    Yes.

6   Q    And so the reason you thought he had a legitimate concern

7   is that you thought he had a privacy interest in his face and

8   name?

9   A    No.  More that he felt -- felt targeted by another

10  employee.  And when --

11  Q    And what was the -- and was the sole targeting the actual

12  language that appears on General Counsel's Exhibit 28?

13  A    Yes.

14       MR. ROSS:  You can't let him -- objection.  He can't speak

15  to what Mr. Pratt's state of mind was as to what he felt was

16  the problem.

17       MS. FEINBERG:  Well, he can --

18       MR. ROSS:  He can only testify --

19       JUDGE TRACY:  I think --

20       MR. ROSS:  Objection.  He can only testify as to what Mr.

21  Pratt said.  That's all he can testify to, so --

22       JUDGE TRACY:  Okay.  I'll make a point.

23       MR. ROSS:  I object to the questions the party asked him

24  to state what Mr. Pratt's state of mind was.

25       JUDGE TRACY:  Okay.
```



www.escribers.net | 800-257-0885

1   MR. ROSS:  He can always testify as to what Mr. Pratt

2   said.

3   MS. FEINBERG:  I'm happy to rephrase it.  No problem.

4   JUDGE TRACY:  Rephrase the question.

5   MS. FEINBERG:  No problem.  No problem whatsoever.

6   Q   BY MS. FEINBERG:  Other than this, did Mr. Pratt provide

7   any other information about being targeted other than this

8   Facebook page, General Counsel 28?

9   A   Just that.

10  Q   Okay.  So the targeting was the fact that his face was put

11  up there --

12  A   Um-hum.

13  Q   -- and these words about him going up speaking --

14  MR. ROSS:  Objection.  Misstates his testimony.

15  MS. FEINBERG:  He just said --

16  MR. ROSS:  It also --

17  MS. FEINBERG:  Can I even --

18  MR. ROSS:  -- assumes facts not in evidence.

19  JUDGE TRACY:  Okay.  So I'm going to overrule the

20  objection.

21  MS. FEINBERG:  I got lost, so I'll have to start over

22  anyhow.

23  JUDGE TRACY:  Please ask the question.  Yes.

24  MS. FEINBERG:  No worries.  No worries.  Okay.

25  Q   BY MS. FEINBERG:  And you said you spoke to Mr. Pratt for



```
1    five minutes --

2    A    Um-hum.

3    Q    -- or thereabout, is that right?

4    A    Yes.

5    Q    And by the time you spoke to him, he had already forwarded

6    to you General Counsel's 28, is that right?

7    A    Yes.

8    Q    Okay.  And did you take notes of the conversation that you

9    had with Mr. Pratt?

10   A    I did not.

11   Q    And did he tell you that there was another employee who

12   had a concern?

13   A    Not that I'm aware of.

14   Q    Okay.  And who was Shaun Ives?

15   A    He's also an equipment maintenance technician in general

16   assembly.

17   Q    And did he ever raise any concerns to you about his photo

18   appearing on a Facebook page?

19   A    Not to me.

20   Q    Okay.  And did Mr. Pratt ask you to take any particular

21   action?

22   A    I let him know that I would report it to ER and asked him

23   if he was okay with that.  And he said yes.

24   Q    Okay.  That's what you did, but what did he ask?  My

25   question is, did he ask you to take any action?
```



www.escribers.net | 800-257-0885

1    A    He reported it to me, and then my position -- it's my

2    practice to take that and report it and have it investigated.

3    So he didn't have any expectation other than reporting it to me

4    and letting me know --

5    Q    So --

6    A    -- that he felt this way.

7    Q    Right.  But he came to you because you had asked him to go

8    to Sacramento --

9         MR. ROSS:  Objection.

10   Q    BY MS. FEINBERG:  -- is that right?

11        MR. ROSS:  He cannot know what was the reason for Mr.

12   Pratt reaching out to him.  All he knows is he reached out to

13   him.

14        JUDGE TRACY:  Sustained.

15        MS. FEINBERG:  Okay.

16   Q    BY MS. FEINBERG:  Aren't you the person who asked Mr.

17   Pratt to go to Sacramento?

18        MR. ROSS:  I couldn't hear the question.

19   Q    BY MS. FEINBERG:  Are you the person who asked Mr. Pratt

20   to go to Sacramento?

21   A    Yes.

22   Q    And did he say that he felt that this Facebook page was a

23   product of him going to Sacramento?

24        When he talked to you, he talked to you for five minutes,

25   you said.



www.escribers.net | 800-257-0885

1   A    Yeah.  Yeah.  Yes, he did.

2   Q    And the reason that you passed this on to the

3   investigative unit -- did you find anything improper on the

4   Facebook page?

5   A    I didn't look --

6        MR. ROSS:  Objection.  Vague and ambiguous.  "Improper".

7   Q    BY MS. FEINBERG:  Did --

8        JUDGE TRACY:  Could you please ask the question again.

9        MS. FEINBERG:  Okay, I'll rephrase it.

10  Q    BY MS. FEINBERG:  Based on what was shared with you, did

11  you find anything improper that prompted you to feel that an

12  investigation was necessary?

13       MR. ROSS:  I'm sorry, I couldn't hear the question.

14       MS. FEINBERG:  Excuse me.

15       JUDGE TRACY:  Could you please ask the question again?

16       MS. FEINBERG:  I'll try.

17  Q    BY MS. FEINBERG:  Based on what was before your General

18  Counsel Exhibit 28, was there anything that you believed

19  warranted investigation?

20  A    Yes.

21  Q    And what was it about General Counsel 28 that warranted

22  investigation?

23  A    That Travis felt harassed and targeted by another

24  employee.  And so it's up to me when I get a complaint like

25  that to make sure that it's fully investigated.



www.escribers.net | 800-257-0885

1    Q    But I asked you whether there was anything on General

2    Counsel 28 that made you feel that way, not what he said to

3    you.

4    A    Oh.

5         MR. ROSS:  Ask --

6    Q    BY MS. FEINBERG:  Was there anything when you read this --

7         MR. ROSS:  Go ahead.  Finish the question.

8         MS. FEINBERG:  Let me -- I have a right to reframe the

9    question, right?

10        JUDGE TRACY:  Yes.  Yes.

11        MS. FEINBERG:  Because he answered a little bit different

12   question, which happens.

13   Q    BY MS. FEINBERG:  So what I'm asking you is, with respect

14   to this document, is there anything on the face of the document

15   that you believe needed investigation?

16        MR. ROSS:  Exclusive -- Your Honor, just for clarity

17   purposes -- exclusive of what Mr. Pratt may have said in

18   connection with this document.  It's only on the face of the

19   document the question is directed.

20        Is that correct?

21        MS. FEINBERG:  That was the question.  I think he

22   understood the question.

23        MR. ROSS:  All right.

24        JUDGE TRACY:  Yes.

25        MR. ROSS:  That's fine.



www.escribers.net | 800-257-0885

1    THE WITNESS:  Yeah, based on the text that I got, I felt

2    it warranted more discussion with Travis to -- to see what

3    needed to happen.

4    Q    BY MS. FEINBERG:  Okay.  And did Mr. Pratt say he had any

5    conversations with Mr. Ortiz?

6    A    No.

7    Q    Did he say he had reached out to Mr. Ortiz?

8    A    No.

9    Q    Do you know whether he reached out to Mr. Ortiz?

10   A    No, I don't.

11   Q    So when they conducted the investigation, did anyone ever

12   share with you anything about what Mr. Ortiz did with respect

13   to this Facebook page?

14   A    No.

15   Q    Okay.  Do you know how long it appeared on Facebook?

16   A    No, I don't.

17   Q    Do you know whether it even appeared on the Fair Future at

18   Tesla?

19   A    No, I don't.

20   Q    Okay.  Did you go look it up?  Did you go to Fair Future

21   at Tesla at the time to see if it was posted there?

22   A    No.

23   Q    And is there anything on this document that asks any

24   worker to take any action towards Mr. Pratt?

25        MR. ROSS:  I'm sorry, I couldn't hear the question.



www.escribers.net | 800-257-0885

1    Q    BY MS. FEINBERG:   Is there anything on this document,

2    General Counsel Exhibit 28, that asks anybody to take any

3    action towards Mr. Pratt?

4    A    Not that I see.

5    Q    Did he ever see what the threatening conduct was?

6    A    No.

7    Q    And as I understand it, there's some communication where

8    you forwarded this General Counsel Exhibit 28 to Carmen, is

9    that right?

10   A    That's correct.

11   Q    And Carmen is the person who oversees Mr. Gecewich?

12   A    Yes.

13   Q    So did you expect, when you sent it to Carmen, for her to

14   take responsibility for this matter?

15   A    Yes.

16   Q    So why then did you contact Mr. Gecewich, since he doesn't

17   report to you?

18   A    Just because he sits right in front of me, and I was just

19   giving him a heads up.  I normally do when investigations are

20   happening.

21   Q    And how long did you talk to Mr. Gecewich?

22   A    Five minutes, if that.

23   Q    So if it's only about one piece of paper, what is the

24   heads -- what did you discuss for five minutes?

25   A    Well, five minutes tops.  I just went over and said, hey,



www.escribers.net | 800-257-0885

1    that I sent this to Carmen this weekend, so she might reach out

2    to you.   Just letting you know.

3    Q    Okay.  And did you give him a copy of that at the time?

4    A    I don't think I did.  I think I said that Carmen already

5    has it, so she'd reach out to him.

6    Q    And did you explain what it was about?

7    A    Yes.

8    Q    And did you say who Mr. Ortiz was?

9    A    I don't recall.

10   Q    He didn't say anything about Mr. Ortiz?

11   A    Not that I'm aware of.

12   Q    And did you explain what Mr. Pratt and Mr. Ives were doing

13   in Sacramento?

14   A    Yes.

15   Q    And did you say whether Mr. Ortiz was on the opposite

16   position of them in Sacramento?

17   A    I -- I don't recall what I said about it.

18   Q    Did you say that there was a threat involved?

19   A    I said that Travis sent this to me.  He felt that he was

20   targeted for going up to Sacramento, and so I forwarded it to

21   Carmen so we could look into it.

22   Q    So he said he was targeted.  He never said he was

23   threatened?

24   A    Targeted or threatened, I'm -- I'm not sure.  Kind of

25   harassed.



www.escribers.net | 800-257-0885

1    Q    So do you remember exactly what he said to you?  Which

2    word he used --

3    A    I don't.

4    Q    -- targeted, threatened, or harassed?

5    A    I do not remember which word he used.

6    Q    And did you expect that once you hand over a matter to

7    Carmen that then she will take care of it?

8    A    Yes.

9    Q    And so why then did Mr. Gecewich come back to you to

10   discuss the case?

11   A    To close it out.

12       MR. ROSS:  Objection.  How can he know why Mr. Gecewich

13   did what he did without -- except insofar as Mr. Gecewich --

14       JUDGE TRACY:  Sustained.

15       MS. FEINBERG:  Okay.

16       MR. ROSS:  -- may have said.

17       JUDGE TRACY:  Sustained.

18       MS. FEINBERG:  Okay.

19       MR. ROSS:  This is why I'm coming to see you.

20       JUDGE TRACY:  Okay, sustained.

21       MR. ROSS:  Thank you.

22   Q    BY MS. FEINBERG:  Okay, so Mr. Gecewich did come to talk

23   to you about the investigation?

24   A    At -- at the end he called me.

25   Q    Oh, he called you?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    And then did you say, "Oh, no need to talk to me.  You

3    just report to Carmen"?

4    A    No, because he was wondering who the decision-maker in the

5    business would be.  And that's where I come back into the

6    picture to make sure that he talks to the right business

7    leaders.

8    Q    I see.  But he did tell you the outcome?

9    A    He did.

10   Q    And he said that Mr. Ortiz had lied?

11   A    He did.

12   Q    And did he tell you what the lie was?

13   A    Yes.

14   Q    And what was the lie?

15   A    That he knew where he got this information from.

16   Q    Um-hum.

17   A    Who had sent it to him.

18   Q    And so he said that the lie was that Mr. Ortiz knew that

19   the information came from Mr. Moran, and that he and Mr. Moran

20   had had conversations?

21   A    Um-hum.

22   Q    Yes?

23   A    Yes.

24   Q    And did you know whether the -- and you're in HR, right?

25   A    That's correct.



www.escribers.net | 800-257-0885

1    Q    Do you have any experience in labor relations?  Any

2    classes or anything?

3    A    Yes.

4    Q    Okay, any understanding of collective bargaining?

5    A    Yes.

6    Q    Okay.  And did you know whether Mr. Moran and Mr. Ortiz

7    were currently engaged in concerted activity at that time?

8         MR. ROSS:  Objection.  Vague and ambiguous.

9         JUDGE TRACY:  Sustained.

10   Q    BY MS. FEINBERG:  Do you know if they were working

11   together for the interest of other workers, or so they

12   believed?

13        MR. ROSS:  Again, same objection.

14        JUDGE TRACY:  Overruled.

15        MR. ROSS:  No timeframe, judge.

16        MS. FEINBERG:  Well, he said he had numerous contacts

17   with -- he knew who they were, he knew they were union

18   activists, he knew they had gone to Sacramento.

19   Q    BY MS. FEINBERG:  So did you know --

20        MR. ROSS:  It's also asked and answered.  He's already

21   said he knew that they had engaged in this conduct.

22        JUDGE TRACY:  So --

23        MS. FEINBERG:  Okay.

24        JUDGE TRACY:  -- if you could just clarify the time

25   period --



1      MS. FEINBERG:  Okay.

2      JUDGE TRACY:  -- in which you're asking this question,

3    okay?

4    Q    BY MS. FEINBERG:  At the time that Mr. Gecewich told you

5    that he had lied --

6    A    Um-hum.

7    Q    -- and said that the lie was about some conversation that

8    two union activists had had between each other, were you aware

9    that they were talking about things that related to working

10   conditions?

11   A    Yes.

12   Q    And did you say to Mr. Gecewich, you should see counsel

13   about that?

14   A    I did not.

15   Q    Okay.  And did that raise any concerns for you that the

16   lie related to a conversation between two workers who were

17   union activists who were discussing matters related to the

18   workplace?

19   A    It did not.

20   Q    Then why then did you not send it back to the regular

21   supervisor who oversaw Mr. Ortiz?

22   A    Because as I said previously, I wanted to make sure that

23   it was somebody at a -- at a higher level.

24   Q    Because he was a union activist?

25   A    Yes.



www.escribers.net | 800-257-0885

1    Q    So you knew he was a union activist, and you sent it up

2    the chain.  But it didn't make you question whether the

3    investigation had any flaws because of he was a union activist,

4    is that right?

5    A    That's correct.

6    Q    And did you have any conversations with Mr. Musk about the

7    termination of Mr. Ortiz --

8    A    I --

9    Q    -- at any time?

10   A    I did not.

11   Q    Were you aware that Mr. Musk tweeted about Mr. Ortiz's

12   termination?

13   A    No, I was not.

14   Q    Was Mr. Ortiz found to have threatened anyone?

15   A    I don't know.

16   Q    But you said you knew the outcome of the investigation.

17   A    The outcome of the investigation was that he had lied

18   during the investigation.  But I never saw the report, so I

19   don't know what else was in there.

20   Q    But -- okay.  So as far as you know, there was no finding

21   that he threatened anyone?

22   A    I'm not aware either way.

23   Q    And so as you sit here today, have you ever seen the

24   report regarding Mr. Ortiz's termination?

25   A    No, I have not.


www.escribers.net | 800-257-0885

1   Q   And you said that you sent this over to a Stephen (sic) --

2   I'd never heard his name before -- oh yeah, Stephen (sic)

3   Graminger, is that right?

4   A   Stephan Graminger.

5   Q   Oh, Stephan --

6   A   Yep.

7   Q   Okay, didn't do his name justice.  Stephan Graminger?

8   A   Yes.

9   Q   And who was he?

10  A   He was the director of body -- Body in White.

11  Q   Okay.  And do you know whether he had ever met Mr. Ortiz

12  at the time of his termination?

13  A   I don't know if he did or not.

14  Q   Do you know whether he spoke to Mr. Ortiz in any form --

15  fashion -- regarding his termination?

16  A   I don't believe he did.

17  Q   Do you know if it was ever disclosed to Mr. Ortiz that Mr.

18  Graminger was the decision-maker?

19  A   I do not know.

20  Q   Do you know what job Mr. Ortiz held -- what position he

21  held at the time of his termination?

22      MR. ROSS:  Who is he?

23      MS. FEINBERG:  Mr. Ortiz.  That's who I said.

24      MR. ROSS:  Oh, I'm sorry.  Thank you.

25      THE WITNESS:  Production associate.

22-60493.1260



1  Q    BY MS. FEINBERG:   Okay.   Do you know whether he was on

2  light duty?

3  A    I do not know.

4  Q    And did you speak to Mr. Graminger about the fact that

5  this matter was being sent over to him --

6  A    No.

7  Q    -- the termination of Mr. -- or yes, the decision about

8  the termination of Mr. Ortiz?

9  A    No.

10  Q    And did he ever talk to you after he made the decision,

11  assuming he did?

12  A    No.

13  Q    And did Mr. Gecewich ever come back to you after he spoke

14  to Mr. -- if he did speak to Mr. Graminger?

15  A    No.

16  Q    How did you learn that Mr. Ortiz was terminated?

17  A    I think ShTawney -- I knew the day that it was going to

18  happen and that ShTawney and Ricky were the ones in the

19  conversation.

20  Q    And what is ShTawney's position there?

21  A    Human resources business partner.

22  Q    And she -- that's a she?

23  A    Yes.

24  Q    She reports to you?

25  A    No.



www.escribers.net | 800-257-0885

1    Q    Who does she report to?

2    A    She reported to Alaynna Elliot.

3    Q    And does Alaynna Elliot report to you?

4    A    Yes.

5    Q    Okay.  So indirectly --

6    A    Yes.

7    Q    -- she reports to you?  Okay.

8         And who told you that Mr. Ortiz was being terminated?

9    A    I believe Ricky did.

10   Q    Okay.  And when was that?

11   A    Whatever day that it happened, I guess.

12   Q    Okay.  And was that in person or by phone?

13   A    By phone, I think.

14   Q    And did he say why he was calling you?

15   A    Make me aware.

16   Q    And other than telling you that he was making you aware of

17   the fact that Mr. Ortiz was terminated, did he give you any

18   other information regarding Mr. Ortiz's termination?

19        MR. ROSS:  I'm sorry, could you re-state the question?

20   Couldn't hear it.

21   Q    BY MS. FEINBERG:  Other than telling you that Mr. Ortiz

22   was being terminated, did he give you any other information

23   regarding Mr. Ortiz's termination?

24   A    No.

25   Q    Did he tell you whether he had spoken to Mr. Graminger?



www.escribers.net | 800-257-0885

1    A    I don't recall him --

2    Q    Did you ever get any written communication from Mr.

3    Graminger approving the dismissal?

4    A    No.

5    Q    Did you ever see any written document that approved the

6    dismissal by someone?

7    A    No.

8    Q    Doesn't usually someone have to sign off on a dismissal of

9    an employee?

10   A    Well, I -- I wasn't in the decision-making process, so I

11   don't --

12   Q    I know, but you've testified you have a pretty high-up

13   position over --

14   A    Yeah.

15   Q    -- people who get dismissed.  So --

16   A    There's not --

17   Q    I'm assuming --

18   A    There --

19   Q    -- you might know.

20   A    Yeah, there doesn't have to be, like, a signature or

21   anything when they close out -- close out the investigative

22   report.

23   Q    There doesn't have to be someone in particular who

24   approves the dismissal?

25   A    Yeah, so Stephan would have approved it, and Ricky would


www.escribers.net | 800-257-0885

1    have put in his report that he talked to Stephan on a certain

2    date and whether or not Stephan had approved.  But Stephan

3    wouldn't have signed anything.

4    Q    And you're just telling me a practice because I think --

5    A    I'm telling you a practice, yes.

6    Q    Right, because you didn't see the report --

7    A    Correct.

8    Q    -- was your testimony.

9    A    Yes.

10   Q    And how often are people terminated at Tesla?

11        MR. ROSS:  Excuse me, can you repeat your question?

12   Q    BY MS. FEINBERG:  How often are production employees

13   terminated at Tesla?

14        MR. ROSS:  Objection.  Relevance and also vague and

15   ambiguous.

16        JUDGE TRACY:  I'll overrule the objection.  However, if

17   you could just narrow the scope of the question, please.

18        MS. FEINBERG:  Okay.

19   Q    BY MS. FEINBERG:  During the six months on either side of

20   when Mr. Ortiz was terminated, on a monthly basis how often are

21   people terminated there in production?

22   A    In production?  I mean, the involuntary turnover can be

23   ten percent annualized per year.

24   Q    And of those ten percent, how many of them are brought to

25   your personal attention?



1   A    Maybe less than five.

2   Q    And what would prompt some -- why would those five be

3   brought to your attention?

4   A    We escalate and make sure that somebody else has eyes on

5   an investigation.  So even if it's for attendance or anything,

6   go through the steps that we took.  Make sure another manager

7   has -- has seen and approved and signed off.  So that's a

8   normal practice.

9   Q    So you need two managers to sign off on a dismissal?

10  A    No, with -- if it's, like, an attendance policy violation

11  or something like that.  Or if it's through the ER team, then I

12  might see some of the cases.

13  Q    So just go back.  So you never saw the video of Mr. Ives

14  and Mr. Pratt testifying in Sacramento, is that correct --

15  A    Correct.

16  Q    -- just to make sure?  Okay.

17       And so were they paid on Tesla payroll when they went up

18  to Sacramento?

19       MR. ROSS:  Objection.  Relevance.

20       MS. FEINBERG:  I want to know if they're being harassed

21  for their work or for some outside activity.

22       MR. ROSS:  Still relevance.

23       MS. FEINBERG:  Quote/unquote harassed.

24       JUDGE TRACY:  Sustained.

25  Q    BY MS. FEINBERG:  Well, can I ask if they were on work



www.escribers.net | 800-257-0885

1    time when they went to Sacramento with you?

2        MR. ROSS:  Same objection.

3        JUDGE TRACY:  Overruled.

4        THE WITNESS:  I believe they were on work time.

5    Q    BY MS. FEINBERG:  Thank you.  And Tesla uses a number of

6    temporary employees, is that right?

7    A    Yes.

8    Q    And you went through a lot of testimony about Respondent's

9    Exhibit 4 through 14, I believe.  Do temporary employees have

10   to sign that they received these exhibits?  And if it varies

11   from exhibit then you can tell me that.

12   A    I believe so.

13   Q    And so those temporary employees, they're not in Workday,

14   are they?

15   A    They are in Workday.

16   Q    I see.  What percentage in 2017 were there temporary

17   employees?

18       MR. ROSS:  Objection.  Relevance.

19       JUDGE TRACY:  What's the relevance?

20       MS. FEINBERG:  I'm trying to understand the onboarding

21   process a little bit more, so it's just some background.

22       JUDGE TRACY:  I'm going to sustain the objection.

23       MS. FEINBERG:  Okay.

24   Q    BY MS. FEINBERG:  Did the temporary employees go through

25   the same onboarding process?


www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Okay.  And if someone goes from being a temporary employee

3    to a permanent employee -- that happens, right?

4    A    Yes.

5    Q    In fact, that's a normal pathway to permanent status?

6    A    Yes.

7    Q    Okay.  So earlier you testified that oftentimes when

8    people are hired, they're recruited and then they're reviewed

9    and then they're hired.  That's one way, yes?

10   A    Yes.

11   Q    And then another way is that they're brought in through a

12   temporary agency, they prove their mettle, and then they're

13   hired?

14   A    Correct.

15   Q    Okay.  And so if someone comes in through a temporary

16   agency, are they onboarded when they become permanent or at the

17   beginning?

18   A    Well, they would kind of go through two onboardings.

19   Q    Okay.

20   A    One as a temporary employee to get into the system, and

21   then they would go through Tesla onboarding when they're hired

22   as a fulltime employee.

23   Q    And the Tesla onboarding that you described earlier

24   sounded like it was for new employees.  Is the Tesla onboarding

25   different when you're going from being a temp to a permanent?



www.escribers.net | 800-257-0885

1    A    I'm -- I'm not sure.

2    Q    Do you know how long an employee has to review all the

3    onboarding documents?  If you know.

4    A    I don't know.

5    Q    And are these documents only -- even when you're

6    onboarding -- you can just see them online, or are you handed a

7    paper copy as well?

8    A    They're online.

9    Q    And can an employee get a hard copy of them if they

10   request at the time of hire?  If you know.

11   A    I -- I don't know.

12   Q    And I know you said that Exhibits R-4 through 14 could be

13   found on Workday, but it's not clear to me -- can they be found

14   in someone's actual personnel file?

15   A    It's in their Workday personnel file.  So in their

16   personal documents, it will show all the things that they have

17   acknowledged and the date and time in which they acknowledged

18   it.  And they could go in there and print that out if they

19   wanted to.

20   Q    Okay, so if you go into your -- this section, you can see

21   what you've acknowledged.

22   A    Um-hum.

23   Q    And then how would you actually get to the document that

24   you signed or that you approved?

25   A    It's -- it's in a PDF form that you can click on.  And it



www.escribers.net | 800-257-0885

1    will show up, and you can print that if you want to.

2    Q    Now, do you have any responsibility over personnel files?

3    A    No.

4    Q    And you mentioned something about the intranet and that

5    you could access certain things through the intranet.  Can you

6    explain -- were you talking about that these general policies

7    are also on some kind of general internal Tesla website?

8    A    Yes.

9    Q    And are there different tiers for access for that website?

10   A    No.  Any employee can get on to the intranet.

11   Q    And where do you have to be to do that?

12   A    On the Tesla network.

13   Q    Oh, this is the new age.  Where do you physically have to

14   be?

15   A    In the factory or at one of the other Tesla locations.

16   Q    Okay.  And to access Workday where can you be physically?

17   A    In the factory or a Tesla location.

18   Q    And have you ever heard that there are any concerns that

19   things disappear from people's personnel files on the

20   Workday -- they can no longer access them?

21       MR. ROSS:  I'm sorry, I couldn't hear the question.

22       MS. FEINBERG:  Whether anyone has brought to his attention

23   a concern that sometimes something appears in the personnel

24   file on Workday and then later it no longer appears.

25   Q    BY MS. FEINBERG:  Have you ever heard that?



1    A    No.

2    Q    Does Mr. Musk sign hiring letters for employees?

3    A    His signature's on it, yes.

4    Q    Does that mean that effectively he's approved those hires?

5    A    Effectively.

6    Q    Oh, and do you know who was present during Mr. Ortiz's

7    actual dismissal meeting, if there was one?

8    A    I think it was Ricky Gecewich and ShTawney McIntosh.

9    Q    And do you know whether notes were taken of that meeting?

10   A    I do not know.

11   Q    One moment, please.  In preparation for the hearing today,

12   did you review Respondent's Exhibit 4?

13        MR. ROSS:  I'm sorry, I couldn't hear the question well

14   because --

15   Q    BY MS. FEINBERG:  In preparation for the hearing today,

16   did you review Respondent's Exhibit 4?

17   A    The proprietary information?

18   Q    That's what it says at the top of it, yeah.

19   A    I didn't review it.  I mean, I -- I saw it.  I didn't read

20   through it.

21   Q    Okay.  Did you have an opportunity to see if this version

22   matches the version you have in Workday?

23   A    No.

24   Q    And do you know whether this has changed at all since you

25   came to work for Tesla?



www.escribers.net | 800-257-0885

1    A    I -- I don't know.

2    Q    Okay.  And with respect to Respondent's Exhibit 5, the

3    Anti-Handbook Handbook, did you have an opportunity to review

4    that in preparation for your testimony today?

5    A    I didn't review it.

6    Q    Okay.  And do you know whether this is a mirror image of

7    the one that appears in your Workday?

8    A    I think that it is, but I haven't checked.

9    Q    Okay.  And with respect to Respondent's Exhibit 6, same --

10   did you review this in preparation for your testimony here

11   today?

12   A    No.

13   Q    Okay.  And did you have an opportunity to find out -- to

14   compare this whatever appears in your Workday?

15   A    No.

16   Q    And with respect to Respondent's Exhibit 7, isn't it true

17   that this is an updated communications policy that was

18   developed somewhere during the course of your tenure with

19   Tesla?

20   A    I'm not sure.  I don't know.

21   Q    Okay, so you're not sure whether there was more than one

22   communications policy --

23   A    No.

24   Q    -- that employees were asked to sign from 2016 to present?

25   A    No.



www.escribers.net | 800-257-0885

1   Q    And did you have a chance to see whether Respondent's

2   Exhibit 7 mirrors whatever's in your personnel file?

3   A    No.

4   Q    Did you look to see whether you had electronically signed

5   any or all of these documents?

6   A    Yes.

7   Q    And when did you check that?

8   A    Yesterday.

9   Q    Okay.  But when you checked it, you didn't press the PDF

10  link?

11  A    No.

12  Q    And with respect to Respondent's Exhibit 8, I'm going to

13  assume you -- well, let me just ask you.  You didn't compare

14  this to what's in your Workday?

15  A    No, I didn't.

16  Q    And the same would be true for 9?

17  A    Yes.

18  Q    And Respondent's Exhibit 10, does this appear in your

19  Workday?

20  A    I didn't check, but I believe that it does.

21  Q    Okay.  Do you know whether you signed something saying

22  that you received this document?

23  A    Yes.

24  Q    Do you know whether other employees were asked to?

25  A    Yes.



www.escribers.net | 800-257-0885

1    Q    Do you know -- it appears from Respondent's Exhibit 11

2    through 14 that there was a flurry of communications regarding

3    confidentiality agreements.

4    A    Um-hum.

5    Q    If you know, what prompted this flurry of communications

6    on this topic?

7    A    Leaks from engineering.

8    Q    And when did those leaks occur?

9    A    Around that time.

10   Q    When?

11   A    October of 2016.

12   Q    Okay.  And was that something that would have been read

13   about in the newspaper or anything?

14   A    Possibly.

15   Q    Is there any way to verify that that's when the leaks were

16   occurring?  Is there any document or anything that we could

17   look at that would tell us that that's what prompted this?

18   A    I believe it says so in Mark's email that we looked at.

19        I don't know which one that is.

20   Q    I don't see where he says that there -- I think in the

21   document itself it says there were recent leaks --

22   A    Oh.  Oh, okay.

23   Q    -- but I don't see what -- so -- was there a predecessor

24   to Respondent's Exhibit 11?

25   A    No.



www.escribers.net | 800-257-0885

1    Q    Okay.  And did you ever see any document that spelled out

2    what these alleged leaks were?

3    A    Not to my knowledge.  They were in engineering.

4    Q    How do you know that?

5    A    Mark told me via email.

6    Q    And does that email still exist, do you believe?

7    A    I believe so.

8    Q    Okay.  Was anyone disciplined as a result of those leaks?

9    A    I believe so.

10   Q    Okay.

11        MS. FEINBERG:  Okay, I have nothing further at this time.

12        Thank you very much.

13        THE WITNESS:  Thank you.

14        JUDGE TRACY:  Let me just ask you a really quick question.

15        General Counsel's Exhibit 28 -- again that -- not

16   Facebook, but the text-messaging string.

17        THE WITNESS:  Yes.

18        JUDGE TRACY:  The first message is, I guess, the

19   screenshot of the Facebook page.  And then covering some of the

20   writing is, I guess, a picture of someone.  Maybe Mr. Pratt or

21   his child.  And it says, "Travis Pratt" -- it's in purple --

22   "Copy thanks."

23        Is that part of the text messaging, or was that -- if you

24   know -- or the screenshot of the Facebook page on there?  I

25   don't know.


www.escribers.net | 800-257-0885

1      THE WITNESS:  It's part of the screenshot he sent me.  So

2  it was already -- it was on that when he sent it to me.  It

3  must have been part of his -- the screenshot he took or if the

4  other person took.

5      JUDGE TRACY:  Okay.  So you don't know what the "Copy

6  thanks" means?

7      THE WITNESS:  No.  No.

8      JUDGE TRACY:  It wasn't directed to you?

9      THE WITNESS:  It wasn't part of our --

10      JUDGE TRACY:  Oh, okay.

11      THE WITNESS:  No, it wasn't part of our communication.

12      JUDGE TRACY:  Okay.  Okay.

13      THE WITNESS:  Yeah.

14      JUDGE TRACY:  Thank you.

15      THE WITNESS:  Okay.

16      JUDGE TRACY:  Mr. Ross?

17      MR. ROSS:  Just a couple of questions, judge.

18                    **REDIRECT EXAMINATION**

19  Q    BY MR. ROSS:  I think you said that it was -- you thought

20  it might have been Gaby who suggested that people might go up

21  to Sacramento.

22      Was it Gaby or was it somebody named Sarah O'Brien?

23  A    Sarah was on the phone as well, so it could have been --

24  it could have been her.

25  Q    And Sarah was who?



www.escribers.net | 800-257-0885

1    A    VP of communications.

2    Q    Okay.  Now, when an employee is terminated, can the HR

3    business partner be the one who closes out their employment?

4    A    Within Workday?

5    Q    No.  I'm saying, in this case Mr. Ortiz was terminated,

6    right?

7    A    Um-hum.

8    Q    The HR business partner who was involved in that

9    termination was ShTawney McIntosh?

10   A    Yes.

11   Q    But could Ms. McIntosh be the one who closed out his

12   employment file?

13   A    No, it's -- it's the manager who makes a decision.

14   Q    Okay.  Now, you've been talking about personnel file.

15   Does the company maintain a paper hard copy personnel file on

16   people?

17   A    No.

18   Q    Where is the personnel file located?

19   A    In Workday.

20   Q    In Workday.  So Workday is the personnel file?

21   A    That's the personnel file, yes.

22   Q    Okay.  Now, you were asked whether Mr. Musk signed the

23   offer letter.  Does Mr. Musk sign every offer letter that goes

24   out to people who are going to be hired?

25   A    No, he does not.



1  Q    Is it a pre-printed signature that appears on it?

2  A    Yes, it is.

3  Q    Does he interview them or speak to them before they're

4  hired?

5  A    No.

6  Q    Okay.

7       MR. ROSS:  That's all I have.  Thank you.

8       JUDGE TRACY:  Mr. Rodriguez Ritchie?

9       MR. RODRIGUEZ RITCHIE:  No re-cross.

10      JUDGE TRACY:  Okay.

11      MS. FEINBERG:  I'm good.

12      JUDGE TRACY:  Ms. Feinberg?

13      MS. FEINBERG:  Thank you, no.

14      JUDGE TRACY:  Okay.  Thank you very much.

15      THE WITNESS:  Thank you.

16      JUDGE TRACY:  You are done.

17      THE WITNESS:  Okay, thanks.

18      JUDGE TRACY:  Please don't discuss your testimony with

19  anyone until after the close of the hearing.

20      THE WITNESS:  Okay.

21      JUDGE TRACY:  Okay?  And that'll be sometime in October,

22  we hope.

23      THE WITNESS:  Okay.  Thank you.

24      JUDGE TRACY:  Thank you so much.  Let's go off the record.

25      MR. RODRIGUEZ RITCHIE:  We --



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  Oh, we don't want to go off the record?

2    MR. RODRIGUEZ RITCHIE:  I want to ask something on the

3    record but when the witness leaves.

4    JUDGE TRACY:  Okay.  Okay.  Is it quick or let's --

5    MR. RODRIGUEZ RITCHIE:  I think so.

6    JUDGE TRACY:  Okay, so let's -- can you just wait outside

7    for just a moment?

8    UNIDENTIFIED SPEAKER:  Yes.

9    JUDGE TRACY:  Yeah, thank you.

10   Let's go back on the record.  Or are we still on?  Okay,

11   good.

12   So go ahead.

13   MR. RODRIGUEZ RITCHIE:  We earlier had a discussion about

14   Mr. Gecewich and his address, and we provided the address to

15   counsel for Tesla that we served the subpoena on.  And I think

16   we're still waiting for confirmation.  But I'd just like to

17   request your permission to issue a new subpoena with a new date

18   in the event Mr. Gecewich needs that for a subsequent employer.

19   I thought I'd just take care of that now.

20   JUDGE TRACY:  Yes.  It's granted.

21   MR. RODRIGUEZ RITCHIE:  Thank you.

22   JUDGE TRACY:  So you guys take care of the paperwork for

23   it, but I approve it.

24   MR. RODRIGUEZ RITCHIE:  Thank you.

25   JUDGE TRACY:  Do you need anything else from me?



www.escribers.net | 800-257-0885

1     MR. RODRIGUEZ RITCHIE:  No.

2     JUDGE TRACY:  Okay.  It is approved.

3     MR. ROSS:  Now, are we going to keep going, or are we

4     taking a break?

5     JUDGE TRACY:  Oh, no.  We're taking a break, but he just

6     wanted to mention that on the record before we --

7     MR. ROSS:  The reason I'm asking, I've had a witness who

8     has been waiting here all day.  He's a third party witness.

9     I'd like to get him on and hopefully off today.  He's got

10    nothing to do with the company.

11    JUDGE TRACY:  Okay.  So who is this person?

12    MR. ROSS:  It's Mr. Graminger.

13    MS. FEINBERG:  Mr. --

14    JUDGE TRACY:  Oh, the one that's been mentioned --

15    MR. ROSS:  Yes.

16    JUDGE TRACY:  -- that we can't spell.

17    MR. ROSS:  Correct.

18    MS. FEINBERG:  He has nothing to do with the company?

19    Well, I don't think that's an accurate assessment, but okay.

20    JUDGE TRACY:  Well, I'm assuming he's no longer employed

21    with the company.

22    MR. ROSS:  That's correct.

23    MS. FEINBERG:  That's a different thing.

24    JUDGE TRACY:  Let's take -- it's about 2:53.  If we could

25    begin at 3:10, would that be enough time?

22-60493.1279



1    MR. ROSS:  Enough time for what, judge?

2    JUDGE TRACY:  For you then to begin at 3:10 with him.

3    MR. ROSS:  Oh, that's fine.

4    JUDGE TRACY:  Okay.

5    MR. ROSS:  I just want to make sure he gets done today.  I

6    don't want to have him come back as far as --

7    JUDGE TRACY:  Okay.  So then it's on you to speed up the

8    direct.

9    MR. ROSS:  Well, okay.  That's fine.

10   JUDGE TRACY:  Or you may have Mr. Morris do it.

11   MR. ROSS:  I'll talk to Mr. Morris.

12   JUDGE TRACY:  Okay.  Let's go off the record until 3:10.

13   (Off the record at 2:54 p.m.)

14   JUDGE TRACY:  Let's go ahead and go back on the record.

15   Mr. Ross, call your next witness, please.

16   MR. ROSS:  Yes.  We would call Stephan Graminger.

17   JUDGE TRACY:  Okay.

18   MR. ROSS:  I did pronounce it correctly, right?

19   THE WITNESS:  Perfect.

20   MR. ROSS:  Okay, good.

21   JUDGE TRACY:  Okay.

22   THE WITNESS:  Best I ever heard in the USA.

23   JUDGE TRACY:  If you don't mind, please stand up.

24   THE WITNESS:  Yes.

25   JUDGE TRACY:  Raise your right hand.



www.escribers.net | 800-257-0885

1       THE WITNESS:  Yes.

2       JUDGE TRACY:  And you can look at me.  Okay.

3    Whereupon,

4                        **STEPHAN GRAMINGER**

5    having been duly sworn, was called as a witness herein and was

6    examined and testified as follows:

7       JUDGE TRACY:  Okay.  Go ahead and have a seat, and state

8    your name for the record.  And go ahead for the record -- put

9    the spelling in, too.

10      THE WITNESS:  Okay.

11      JUDGE TRACY:  Okay?  Thank you.

12      THE WITNESS:  Good afternoon, ladies and gentlemen.  My

13   name is Stephan Graminger.

14      JUDGE TRACY:  And how do you spell your first and last

15   name?

16      THE WITNESS:  First name, S-T-E-P-H-A-N.  Last name,

17   G-R-A-M-I-N-G-E-R.

18      JUDGE TRACY:  Okay.  Mr. Ross, go ahead, please.

19      MR. ROSS:  Thank you, judge.

20                        **DIRECT EXAMINATION**

21   Q    BY MR. ROSS:  Mr. Graminger, are you appearing here today

22   pursuant to a subpoena?

23   A    Yes.

24   Q    Sir?

25   A    Yes.


22-60493.1281

1    Q    Yes.  Okay.

2         JUDGE TRACY:  Oh, and then let me give you a few

3    instructions -- okay -- I've been giving to everyone.

4         This microphone does not amplify your voice or make it

5    louder for anyone here.  It's just for the recording.  So you

6    can relax.  You don't need to lean into it.

7         THE WITNESS:  Okay.

8         JUDGE TRACY:  However, we have a big room here with a lot

9    of people, and so to make sure that everybody can hear your

10   testimony and you're not having to repeat yourself, if you

11   could just speak with a raised voice so everyone can hear you.

12        THE WITNESS:  Got it.

13        JUDGE TRACY:  Okay.  And then also no "um-hum", "um".

14        THE WITNESS:  I try to avoid it.

15        JUDGE TRACY:  Say yes or no.

16        THE WITNESS:  Okay.  Yes.

17        JUDGE TRACY:  Thank you.

18        THE WITNESS:  Okay.

19        JUDGE TRACY:  Okay.

20        MR. ROSS:  Thanks, judge.

21        THE WITNESS:  Got it.

22   Q    BY MR. ROSS:  Mr. Graminger, are you unemployed?

23   A    Yes.

24   Q    And did you work at Tesla?

25   A    Yes.



www.escribers.net | 800-257-0885

1    Q    And from when to when did you work at Tesla?

2    A    I started 1st of August 2017, and my contract ended 5th of

3    September 2018.

4    Q    All right.  Your employment is over at Tesla?

5    A    Yes, my employment is over.

6    Q    Are you presently receiving any form of severance or

7    compensation from Tesla?

8    A    No, not anymore.

9    Q    And while you were at Tesla, were you the director of body

10   manufacturing?

11   A    Yes, I was.

12   Q    And that included body in white?

13   A    Body in White, Model S, X, and 3.

14   Q    Okay.  Body in White and what?

15   A    For the Model S, X, and 3.

16   Q    Okay, and those are two different Tesla models, Model S --

17   A    Yes.

18   Q    -- and Model X?

19   A    Yes, exactly.

20        MS. FEINBERG:  And 3.

21        JUDGE TRACY:  And what was the last part?

22        THE WITNESS:  And Model 3.

23   Q    BY MR. ROSS:  And Model 3.

24   A    Yes.

25   Q    All right.  Now, I've asked you to appear here today to



1    testify with respect to the termination of a former Tesla

2    employee by the name of Richard Ortiz.

3    A    Yes.

4    Q    And are you the person who made the decision to terminate

5    Mr. Ortiz?

6    A    Yes.

7    Q    Now, your boss at Tesla -- your immediate superior -- was

8    a gentleman by the name of Peter Hochholdinger?

9    A    Hoholdinger.

10   Q    Like I said.

11   A    Yes.

12   Q    Okay.  And what position did Mr. H hold?

13   A    VP of production.  Vice president of production.

14   Q    Okay.  And did he recruit you to come to work at Tesla?

15   A    Yes.

16   Q    And you were working where at the time?

17   A    At Audi.

18   Q    Where?

19   A    Hungary.

20   Q    Hungary.

21   A    It was some kind of transition phase for Audi.  It was

22   shut in Hungary.

23   Q    Now -- just one moment, please.  Before you made the

24   decision to terminate Mr. Ortiz, did you have any prior

25   conversations or dealings with him?



1    A    No.  Not that I'm aware of.

2         MR. RODRIGUEZ RITCHIE:  I'm sorry.  I didn't --

3         THE WITNESS:  Not that I'm --

4         MR. RODRIGUEZ RITCHIE:  -- didn't hear --

5         THE WITNESS:  -- I'm --

6         MR. RODRIGUEZ RITCHIE:  -- what you said.

7         THE WITNESS:  -- aware of.

8         MR. RODRIGUEZ RITCHIE:  Sorry.

9    Q    BY MR. ROSS:  Did you ever have any conversations with

10   your boss, Mister -- I'll mispronounce it -- Hochholdinger

11   about Mr. Ortiz?

12   A    No.

13   Q    Or about the United Auto Workers?

14   A    No.

15   Q    Did you ever have any conversations with Elon Musk?

16   A    No.

17   Q    Or with Gaby Toledano?

18   A    No.

19   Q    Or Josh Hedges?

20   A    No.

21   Q    Do you know a person by the name of Ricky Gecewich?

22   A    Yes, I know him.

23   Q    And can you tell us -- and have you ever talked to Mr.

24   Gecewich?

25   A    Yes, I have talked to him.



www.escribers.net | 800-257-0885

1   Q    And can you tell us when you first spoke with Mr.

2   Gecewich?

3   A    Middle of October 2017.  Ricky was the guy presenting an

4   investigation to us and --

5   Q    Okay.

6   A    -- I've never seen him before.

7   Q    Okay.  Now, tell me when you spoke with Mr. Gecewich --

8   did you speak with Mr. Gecewich just once?

9   A    On a professional basis, yes.  Maybe small talk afterwards

10  if we met --

11  Q    Yeah.

12  A    -- if you say hello.

13  Q    Aside from the small talk.

14  A    Besides from the small talk, I think only once.

15  Q    Okay.

16  A    I remember once.

17  Q    And this would have been in the middle of October?

18  A    Yes, middle of October 2017.

19  Q    Okay.  And that conversation took place where, sir?

20  A    It is -- it was placed in the Shark Tank.  That's where

21  all the engineers and the shop leaders of body shop are

22  located.

23  Q    Shark Tank?

24  A    Shark Tank.  It's called so because it's big glass front

25  and that's why they call it Shark Tank.



www.escribers.net | 800-257-0885

1    Q    Okay.  And that's where?  In Body in White?

2    A    That's Body in White, yeah.  That's close to the shop

3    floor of Body in White.

4    Q    Okay.  And do you recall what time of day that

5    conversation took place?

6    A    Late afternoon.  That's what I recall.

7    Q    And aside from you and Mr. Gecewich, who else was in

8    attendance of that conversation?

9    A    My HR partner, ShTawney McIntosh.  And from Model S and X,

10   Juan Martinez.

11   Q    I'm sorry.  The name is?

12   A    Juan Martinez, Martinez.

13   Q    Now, just a moment.

14   (Counsel confer)

15       MR. ROSS:  Just one moment, Your Honor.

16   (Counsel confer)

17       MR. ROSS:  I'm having a hard time finding an exhibit,

18   Judge.  Sorry.  All right.

19   (Counsel confer)

20   Q    BY MR. ROSS:  Tell me how you came to have a meeting in

21   the Shark Tank late afternoon in the middle of October 2017

22   with the individuals you've named to talk about Mr. Ortiz?

23   A    There was a email from my HR partner, ShTawney McIntosh,

24   asking me for a short-term meeting as soon as possible.  I

25   think it was maybe one day or half a day before the meeting.



1   So it was quite urgent.

2   Q    All right.

3        MR. ROSS:  And our next in order is 15; is that correct?

4        MR. MORRIS:  Yeah, 15.

5        **(Respondent Exhibit Number 15 Received into Evidence)**

6   (Counsel confer)

7        MS. FEINBERG:  Your Honor, just as a point of reference,

8   this is the kind of document that is responsive to our

9   subpoena, 3-C, that we never got.  So I'm just highlighting it

10  as we go along.  I feel that they should need to go back and

11  look for the documents because this document is just such an

12  example.

13       MR. ROSS:  May I proceed?

14       JUDGE TRACY:  No, because now I have a question again

15  about the subpoenas.  I said that I didn't want to hear any

16  more about it.  And what I did say was that if I find out that

17  there are documents that were not turned over that were

18  responsive to the subpoena request, that at that point that

19  they could ask for what sort of -- whatever sort of sanctions

20  that they would like that I would consider later in the

21  decision.  So 3-C, Ms. Feinberg --

22       MS. FEINBERG:  I don't believe I signed -- I mean, I'm

23  happy to look through my things, but --

24       JUDGE TRACY:  Double check to make sure you didn't get

25  it --



1    MS. FEINBERG:  And it's --

2    JUDGE TRACY:  -- because --

3    MS. FEINBERG:  -- there is a -- this one isn't marked, but

4    I don't recall it because, as I said --

5    JUDGE TRACY:  Here's the thing, here's the thing.  You can

6    highlight it all you want, but I'm not going to do anything

7    with it unless you ask me to do something.

8    MS. FEINBERG:  I am -- okay --

9    JUDGE TRACY:  So check it out.

10   MS. FEINBERG:  I'm just going through the binders just one

11   last time and then I will confirm.  Okay?  How's that?

12   JUDGE TRACY:  That's fine.

13   MS. FEINBERG:  Just so we -- but I have no recollection of

14   it.  And I am looking for anything with Mr. Graminger's name,

15   but we will take one more --

16   JUDGE TRACY:  So what --

17   MS. FEINBERG:  -- scroll through --

18   JUDGE TRACY:  Go ahead and --

19   MS. FEINBERG:  -- if you want to proceed.

20   JUDGE TRACY:  And let -- go ahead and ask him questions,

21   but, again, I hope that they find it.  Go ahead.

22   MR. ROSS:  All right.

23   Q    BY MR. ROSS:  Mr. Graminger, you have in front of you a

24   document that has been marked Respondent's Exhibit 15.  It

25   appears to be two emails.  One from ShTawney McIntosh addressed



1   to you, Juan Martinez, with a cc to Mr. Gecewich.  The subject:

2   Your Investigation Recommendation Conversation.  Do you

3   recognize that document?

4   A    Yes.

5   Q    And is that an email you got from Ms. McIntosh on that

6   date at that time?

7   A    Yes.

8   Q    Okay.  I noticed, by the way, the email makes absolutely

9   no reference to Mr. Ortiz.

10  A    Correctly.

11  Q    Okay.  And the top of the document appears to be an email

12  from you to Ms. McIntosh, Mr. Martinez and to Mr. Gecewich.

13  "Please go on as discussed.  Peter is aware of it.  Thanks,

14  Steven (sic)."  Is that an email that you sent out at 5:45 on

15  10/17/2017?

16  A    Yes.

17       MR. ROSS:  We would offer Respondent's 15 into evidence,

18  Your Honor.

19       MR. RODRIGUEZ RITCHIE:  We would object, Your Honor.  That

20  document is responsive to Subpoena Request 37 and 38.  And it

21  was not produced to the General Counsel or submitted to the

22  General Counsel subpoena.

23       MS. FEINBERG:  Similarly, as I articulated, we do not have

24  this document.  It would have been responsive to the Charging

25  Party's 3-C.



1       JUDGE TRACY:  And which ones are yours?

2       MR. RODRIGUEZ RITCHIE:  37 and 38.

3       JUDGE TRACY:  Okay.  And for the Respondent -- let's

4  see -- where's 37 and 38?  Look -- we've already read 3-C into

5  the record.  Obviously, we do have your subpoena in the record,

6  but -- what is 37 and 38?

7       MS. FEINBERG:  I'd just like to say, Your Honor, from our

8  perspective, I can't speak for the General Counsel, I think

9  there is a problem of things coming in that we haven't seen,

10  but I actually would like to see what -- my goal is to see

11  what's there.  So if there are other -- you can direct them to

12  produce everything that's there.  That's an -- I understand

13  that there also is an interest in not having things come in we

14  haven't seen, but somewhere we have to have balance.

15       JUDGE TRACY:  So for the Respondent, how do you respond to

16  this?  I read 37 and 38.  And 37 this specifically mentions --

17  not 37, 38 -- about the termination of Richard Ortiz on or

18  about -- or around October 19th, 2017.  So why wasn't this

19  document produced?

20       MR. MORRIS:  So with respect to Subpoena Request 37 and 38

21  for the board subpoena, that's specifically related to

22  documents that were relied on in the decision to actually

23  terminate Mr. Ortiz.  And Tesla conducted a reasonable search

24  and produced all nonprivileged documents.

25       With respect to the Union's request, that one apparently



www.escribers.net | 800-257-0885

1   relates to emails that were exchanged by the decision makers

2   that reference Mr. Ortiz.  And this email, Respondent's Exhibit

3   15, doesn't, in fact, reference Mr. Ortiz.

4        JUDGE TRACY:  Okay.  But, I mean -- let's see.  Okay?

5        MS. FEINBERG:  But they're introducing it --

6        JUDGE TRACY:  38 --

7        MS. FEINBERG:  -- for that purpose.

8        JUDGE TRACY:  38 says "documents reflecting all

9   information, but including, but not limited to, witness

10  statements, video recordings, investigatory interviews,

11  investigatory notes, written memorializations of conversations,

12  incident reports."  I mean, anything that has to do with the

13  termination of Richard Ortiz.

14       I mean, this, obviously, even though his name isn't on

15  here, you were able to figure out it's connected to his

16  termination.  You should have turned it over.

17       So, like I said before on the phone call, I -- I -- I -- I

18  just want to know what you guys want me to do, and then I will

19  make the decision in the decision.  We can let it in, and then

20  later you can ask for it to be excluded, adverse inference,

21  whatever you want.  It should have been turned over.

22       MS. FEINBERG:  Okay.  Well, what we really would like -- I

23  mean, that's one thing, that's General Counsel.  But this

24  combined with some other things makes me ask you to direct them

25  to do an additional search, especially since we're coming back

escribers
www.escribers.net | 800-257-0885

1    not on this week, but in a week from now.  And it appears that

2    there's some --

3         JUDGE TRACY:  So --

4         MS. FEINBERG:  Because some things --

5         JUDGE TRACY:  I -- I -- I --

6         MS. FEINBERG:  -- maybe they came across later, but their

7    application continues, right?  So even if they found it

8    somewhere along the way -- come on, we'll all --

9         JUDGE TRACY:  Well --

10        MS. FEINBERG:  -- set here.

11        JUDGE TRACY:  -- sure.  I mean, I keep saying the same

12   thing though:  keep looking, keep looking.  Obviously, it's --

13        MS. FEINBERG:  Right.  No, I'm not saying --

14        JUDGE TRACY:  -- not working.

15        MS. FEINBERG:  Yeah.

16        JUDGE TRACY:  So I guess the thing about it is they seem

17   to be open at least for the Charging Parties, I have not given

18   the General Counsel a chance to speak, but based upon, again, a

19   reminder that this is the type -- Respondent's Exhibit 15 is

20   exactly the type of document that's responsive to 38, in

21   particular, and in 3-C.

22        Take a look again to make sure you've turned everything

23   over.  And, in fact, look at all the things that you've

24   prepared as exhibits, and if you intend to use exhibits, make

25   sure that they've seen them --

22-60493.1293



1    MR. ROSS:  All right, Your Honor.

2    JUDGE TRACY:  -- so that way they can say hey, look, it

3    looks like there was some other conversation.  Is that --

4    what's that about?

5    MR. ROSS:  But let me say this.  From the beginning, we

6    have made it clear to you that we consider these subpoenas to

7    be extremely difficult to comply with to the absolute nth

8    degree.  We have spent hundreds of dollars, and I can't tell

9    you how many thousands of dollars have been spent trying to

10   comply with these subpoenas.

11   Now, if this is, in fact, a document that is responsive to

12   these requests -- and by the way, we don't necessarily agree

13   with your statement that you believe that they are.  I

14   understand you believe they are.  We may take issue with that.

15   But I can tell you that we conducted reasonable search, we

16   have done everything we reasonably could to be compliant with

17   these subpoenas at great trouble and great expense.

18   Now, this document is hardly what I consider to be a

19   bombshell or a revelation or a document that alters the party's

20   positions or their defenses in this case.  If it was not

21   produced, I can only say it appears to have been something that

22   might have been inadvertently omitted.

23   JUDGE TRACY:  So I --

24   MS. FEINBERG:  Can we ask the Witness to leave because I

25   would like to raise something that why it is significant, and I

22-60493.1294



1    don't know if it's clear why it's significant?  But I would

2    like not to say it in front of the witness, if that's possible.

3         JUDGE TRACY:  And would you please step out?

4         THE WITNESS:  Okay.

5         JUDGE TRACY:  It's not personal.  Not just yet.

6         THE WITNESS:  I --

7         JUDGE TRACY:  Just kidding.

8         THE WITNESS:  I didn't think you it was.

9         MS. FEINBERG:  Your Honor, it --

10        JUDGE TRACY:  Well --

11        MS. FEINBERG:  Okay, I'll wait --

12        JUDGE TRACY:  -- hold on --

13        MS. FEINBERG:  -- till he's gone.  I'm sorry.

14        JUDGE TRACY:  -- one second.

15        MS. FEINBERG:  Sure, sure.

16        JUDGE TRACY:  I hear what you're saying; however, I'm not

17   sympathetic to it because you've had these since May.  That

18   first week of the hearing I truly was irritated because you had

19   received them so late.  It is now the end of September, and

20   there have been so many conversations about this, so much time

21   spent also on my end of helping out with this process.

22        So I understand the frustration about it; however, to say

23   that this document is not responsive I think is incorrect.  And

24   you can certainly, in the brief, disagree with me.

25        At this point no one's asked me to do anything yet, but



www.escribers.net | 800-257-0885

1    what I'm also saying is that -- that -- the -- the -- the -- at

2    least the Charging Party keeps asking me to ask you to look

3    again, and I'm like -- I keep asking you to look again, but at

4    some point it's got to end.

5        MR. ROSS:  Okay.  I agree.

6        JUDGE TRACY:  And so the first step to me which is logical

7    is anything that you've created that you want to use, make sure

8    that they've seen them.  If -- if -- if they are responsive to

9    one of the --

10       MR. ROSS:  Yeah, I --

11       JUDGE TRACY:  -- requests.

12       MR. ROSS:  And what I'm saying is we did not read these

13   requests as calling for this document.

14       JUDGE TRACY:  Okay.

15       MR. ROSS:  Okay?  Now, you may say we should have --

16       JUDGE TRACY:  Yeah.

17       MR. ROSS:  -- but we honestly did not.

18       JUDGE TRACY:  Okay.

19       MR. ROSS:  So that explains why it was not produced.

20       JUDGE TRACY:  And I guess here's the other key thing about

21   this.  Just because his name isn't on here, does not mean --

22   well, there was some sort of suggestion of that, that somehow

23   Mr. Ortiz's name is not on here and so we don't need to produce

24   it.  At least 37 and 38 when it comes to Mr. Moran and Mr.

25   Ortiz does not say we want any documents with their names on

www.escribers.net | 800-257-0885

1    it.

2        Now, I recall that there was the one request from last

3    week that we discussed, and I had limited it in terms of the

4    discriminatees and the decision makers that were involved

5    there.  And certainly when you were looking for the search

6    terms, I was also trying to be understanding of these broad

7    search terms, and at least if these individuals' names were on

8    there.  However, 37 and 38 are different.

9        MR. ROSS:  Okay.  Okay.  I understand what you're saying.

10   And I don't want to belabor the point.

11       MS. FEINBERG:  I do.

12       MR. ROSS:  But I would ask you to understand that the

13   methodologies used to comply with subpoenas like this is

14   imperfect.

15       JUDGE TRACY:  I mean --

16       MR. ROSS:  And --

17       MS. FEINBERG:  Can I --

18       MR. ROSS:  And it is probable what happened here was a

19   search was conducted with the word Ortiz.  And you will see the

20   word Ortiz does not appear in this document.  So when the

21   search was run, the document was not flagged.  Now, I -- I --

22   I -- I apologized to counsel, I apologized to you.

23       Again, I don't want to belabor the point, I'm just telling

24   you that we did what we believed we were required to do.  We

25   did a reasonable investigation.  Like I said, we spent hundreds

escribers
www.escribers.net | 800-257-0885

1    of hours and I shudder to think how many dollars were spent

2    doing this.

3         JUDGE TRACY:  Yeah, I --

4         MS. FEINBERG:  I'm not shuddering --

5         JUDGE TRACY:  -- wonder myself.

6         MS. FEINBERG:  -- about that.

7         JUDGE TRACY:  But the thing about it -- I'm going to allow

8    you to speak.

9         MS. FEINBERG:  Okay, fine.

10        JUDGE TRACY:  Okay.  And I know that you also, Mr. Ross,

11   had said you know, this document is -- in your opinion -- not

12   quite so significant.  However, the concern it does raise for

13   me is if there's this document, what else is out there?

14        MR. ROSS:  Well, I understand that.

15        JUDGE TRACY:  And so that's why I'm saying take a look at

16   what you -- because --

17        MR. ROSS:  We will do that.

18        JUDGE TRACY:  -- you -- you -- you have done your, as you

19   say -- and, again, in this process I'm trusting all of you to

20   do what you're supposed to do as to the best of your abilities.

21   Okay?

22        And I have to have a certain degree of trust that I have

23   in all of you in doing this.  But, on the other hand, your

24   litigation track of how you're going to defend yourselves seems

25   like it went on a different course where you did find things.



www.escribers.net | 800-257-0885

1  And then you have to ask yourself, and you know this, hey,

2  wait.  I found this.  Did we turn this over?  That's all I'm

3  asking you to do --

4       MR. ROSS:  Yeah.

5       JUDGE TRACY:  -- at this point --

6       MR. ROSS:  All right.

7       JUDGE TRACY:  -- because that's to make sure that -- just

8  as much as yesterday I was irritated with this surprise, this

9  kind of thing is also not correct at this stage.

10       MR. ROSS:  I understand.

11       JUDGE TRACY:  So go ahead --

12       MS. FEINBERG:  Okay, I'd like to say --

13       JUDGE TRACY:  -- Ms. --

14       MS. FEINBERG:  -- a couple of things.  First of all, I've

15  handled many a dismissal case, and when you do one, you search

16  the files of the people who were involved.  And if you had

17  searched the files of either ShTawney McIntosh or Stephan

18  Graminger or Ricky Gecewich, this document would have appeared.

19       So I don't know about all that voodoo about electronic

20  searches.  This is just old-fashioned, you look for the

21  person's files.  But the part that concerns me, which is why I

22  asked the Witness to leave, is that the prior witness testified

23  that the reason that he sent it to Mr. Graminger is that he

24  didn't want Juan Martinez, who was the direct manager,

25  involved.  And this document shows that Juan Martinez was



1    involved.

2        And if I had had this document I would have cross-examined

3    the last witness about that, because something is wrong with

4    that story.  And so I feel that we actually are prejudiced

5    because what he testified to is different than what actually

6    happened.  And that to me is significant.

7        JUDGE TRACY:  And, again, that's --

8        MS. FEINBERG:  And who made -- the decision makers were,

9    and why they sent it to certain people, and not to have people

10   who are involved when you have a person who knew Richard Ortiz

11   well who was his manager, and they said they sent it to someone

12   so that there wasn't someone who knew Richard Ortiz involved,

13   and then he is involved, to me raises serious questions.  And

14   the fact it was kept back, is not a sup -- it's not so

15   innocent.  It's not so innocent, and so I'm trying to think

16   of -- it's all just happened --

17       JUDGE TRACY:  Um-hum.

18       MS. FEINBERG:  --what is the appropriate thing.  But there

19   has to be some negative consequences to the last witness's

20   testimony in light of this being withheld.

21       JUDGE TRACY:  Okay.  And so, again, what you can do is in

22   the brief you can put that out there, or if you come up with

23   what you're requesting --

24       MS. FEINBERG:  I don't think that that --

25       JUDGE TRACY:  -- you can put it --



www.escribers.net | 800-257-0885

1      MS. FEINBERG:  -- will --

2      JUDGE TRACY:  -- on the record.  And, again, the other

3  possibility is -- again, I'm the person who will be reviewing

4  this transcript and looking.  And that's my job is to pull out

5  inconsistencies/consistencies.  And so this is one of the

6  things that could be used --

7      MS. FEINBERG:  Um-hum.

8      JUDGE TRACY:  -- for credibility.

9      MS. FEINBERG:  No, I'll just say --

10     JUDGE TRACY:  Okay?

11     MS. FEINBERG:  -- I'll argue it, but we're in this

12  situation.  That's why when Edris said don't put it in, I'm

13  thinking well, but maybe we do because it shows -- what it does

14  show is that there's -- and how many consistencies with the

15  prior witness's testimony.  And so, therefore, I would like it

16  before you, even though documents that aren't produced to us

17  really shouldn't be coming in.  It is a bind that we've been

18  put in because of this situation.  So we need some note on

19  that.

20     JUDGE TRACY:  Okay.

21     MS. FEINBERG:  Sorry if there's --

22     JUDGE TRACY:  And I'm not giving you a chance to --

23     MS. FEINBERG:  -- but there you have it.

24     JUDGE TRACY:  -- speak.  There you go.

25     MR. RODRIGUEZ RITCHIE:  Thank you.  Our objection has to



www.escribers.net | 800-257-0885

1  do with the fact that it wasn't produced.  I think as long as

2  Your Honor is prepared to let us in briefing request an adverse

3  inference or sanctions regarding this document, then I think we

4  have -- at least at this late stage, be prepared to continue.

5       Though I do think it's appropriate to request a break

6  right now, and an instruction that they look at the documents

7  they intend to use with this Witness to see if they're

8  responsive to these, and turn them over right at this moment.

9       MR. ROSS:  There are no other documents we intend to use

10  with this Witness.

11       JUDGE TRACY:  Okay.

12       MR. RODRIGUEZ RITCHIE:  I do also continue to be concerned

13  about the representations that were made by counsel or Tesla

14  regarding their production.  Frankly, I think it's a little

15  disingenuous to suggest that a reasonable search was done,

16  particularly at this stage for such an obviously responsive

17  document.

18       JUDGE TRACY:  Okay.  So all of this is on the record --

19       MS. FEINBERG:  Thank you.

20       JUDGE TRACY:  -- and so you haven't moved for admission of

21  this document?

22       MR. ROSS:  I haven't yet.

23       JUDGE TRACY:  Okay.  So once you do that, if you intend to

24  do this -- because now it's out there.  If you don't do it they

25  could decide to do it.  At that point when you make your



1    objections, go ahead and just, basically, indicate to me that

2    you feel it's responsive to which subpoena request, and how you

3    intend to make a request to me because I'm not ready yet to

4    issue any sanctions or anything like that at this point.  I --

5    I -- I -- I'm just not ready yet.  I'm -- I'm -- I'm -- I'm

6    ready in the decision.  I'm not ready yet at this point.  Okay?

7         But, again, I do ask you, beyond this Witness, to look

8    through the other documents that you intend to make sure that

9    you have turned them over.

10        MR. ROSS:  We will.  Thank you, Judge.

11        JUDGE TRACY:  Okay.  Shall we call him back?  Ready for

12   him to come back?

13        MR. ROSS:  Okay.  I'll get him.

14        JUDGE TRACY:  Is he coming back?

15        MR. RODRIGUEZ RITCHIE:  He is coming back, but we can

16   proceed.

17        JUDGE TRACY:  Oh, okay.

18        MS. FEINBERG:  Oh, Noah?  We upset him.  No, he got stuck

19   between the two of us.  Poor thing.  He went to wash his ears

20   out.

21        MR. ROSS:  Okay.

22   Q    BY MR. ROSS:  So, Mr. Graminger, before you were asked to

23   step out of the room we were discussing Respondent's Exhibit

24   15.  And I honestly don't recall whether you did or didn't

25   identify this document.  So I'm going to ask you.  If you did,



www.escribers.net | 800-257-0885

1    I apologize.  I'll ask you again.  If you didn't, I'm going to

2    ask you to identify the document.

3    A    I identified it and it was sent by me, yes.

4    Q    Okay.  So the bottom went to you from ShTawney; the top is

5    you responding back to ShTawney and others?

6    A    Yes.

7    Q    All right.  Thank you.

8         MR. ROSS:  Just because I'll forget to do it later, Your

9    Honor, I'm going to offer Respondent's Exhibit 15 into evidence

10   at this time.

11        JUDGE TRACY:  Okay.  Any objections?

12        MR. RODRIGUEZ RITCHIE:  Yes.

13        JUDGE TRACY:  Okay.

14        MR. RODRIGUEZ RITCHIE:  This document is responsive, we

15   believe, to General Counsel's Subpoena Request 37 and 38.  We

16   would like to reserve the right in briefing to request

17   sanctions and/or an adverse inference regarding the failure to

18   produce this document prior to today.

19        JUDGE TRACY:  Okay.  And Ms. Feinberg?

20        MS. FEINBERG:  We similarly have an objection regarding

21   this document in that it's -- it was -- should have been

22   responsive to Charging Party's request 3-C.  We would like to

23   reserve actually the right to request appropriate action before

24   this hearing is over.  We're going to reflect on that.

25        JUDGE TRACY:  Okay.



1    MS. FEINBERG:  Because the Witness is back in the room I'm

2    not going to repeat all the things I've already said on the

3    record --

4    JUDGE TRACY:  Okay.

5    MS. FEINBERG:  -- regarding our concerns about this

6    document.

7    JUDGE TRACY:  Okay.

8    MS. FEINBERG:  But we do believe that this document should

9    have been produced and that we are prejudiced by the fact that

10   it was not.

11   JUDGE TRACY:  Okay.  All right.  So at this point I'm only

12   overruling the objections just to the extent that the document

13   is -- it is relevant to this proceeding, although no one

14   objected those grounds.  However, the issue of any sanctions,

15   any adverse inferences I certainly will consider those.

16   And certainly for the Respondent you can make the argument

17   that it isn't responsive to these very subpoena requests, but,

18   as I said before, please make another search for any documents

19   that are responsive and, in particular, of course, any

20   documents you're intending to --

21   MR. ROSS:  We shall, Your Honor.

22   JUDGE TRACY:  -- to turn over.  But even beyond that, this

23   is the type of document, in my opinion, is responsive.  And so

24   make sure that you turn those over.

25   MR. ROSS:  We shall.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  Okay.

2    MR. ROSS:  Yes.

3    JUDGE TRACY:  Okay.  Go ahead, please.

4    MR. ROSS:  So is it admit --

5    JUDGE TRACY:  I --

6    MR. ROSS:  -- is the document --

7    JUDGE TRACY:  Yeah.  So Respondent's Exhibit 15 is

8    admitted into evidence.

9    **(Respondent Exhibit Number 15 Received into Evidence)**

10   MR. ROSS:  Thank you, Judge.

11   Q   BY MR. ROSS:  All right.  So, Mr. Graminger, did you meet

12   with Ms. McIntosh, Mr. Gecewich and Mr. Martinez later in the

13   day that you received the email from Ms. McIntosh?

14   A   Yes, I did.

15   Q   And I think you said it was late afternoon.  Can you be

16   more precise than that?

17   A   Something around 4:40, 4:30ish.

18   Q   Okay.  And you said it was in the Shark Tank.  Why don't

19   you tell us, as best you can recall, what was said and by whom

20   during that conversation?

21   MR. RODRIGUEZ RITCHIE:  Objection.  Calls for a narrative.

22   JUDGE TRACY:  Overruled.  Go ahead.

23   THE WITNESS:  As far as I recalled, as mentioned, it was

24   Sha -- ma -- ShTawney McIntosh --

25   Q   BY MR. ROSS:  Yeah, speak up because I --



1    A    -- our HR partner, ShTawney McIntosh, Ricky, which I met

2    the first time, and the shop leader, Juan Martinez.  And Ricky

3    Gecewich internal investigation presented us an investigation

4    he conducted.  What I can recall, he talked about two guys.

5    One of them Richard Ortiz, which was a employee of which -- he

6    was employed in Model S or X.

7         And he reported in this investigate -- investigation about

8    two main things.  One is that these two guys leaked some

9    internal information out of work today including some telephone

10   number and personal information, and posted it on Facebook.

11   And when this issue popped up and they made the investigation,

12   Richard -- Richard Ortiz lied to Ricky in this investigation.

13   Q    You remember anything else that was said during that

14   conversation?

15   A    After going through the facts, Ricky's recommendation was

16   based on the Tesla policy to terminate Richard Ortiz because

17   of -- he was lying in this -- during this investigation.

18   Q    Okay.  Okay.  And he only spoke to you with respect to Mr.

19   Ortiz.  He didn't speak to about Mr. Moran; is that correct?

20   A    Yes.

21   Q    Okay.  Mr. Moran did not work in your area; Mr. Ortiz did?

22   A    I don't know.

23   Q    Okay.  Now, do you remember anything else that was said

24   during that conversation?

25   A    Well, after Ricky gave his recommendation, I questioned



www.escribers.net | 800-257-0885

1   because I wanted to fully understand the case.  So, for

2   example, I questioned -- what I still remember, I questioned

3   proof of posting -- Richard Ortiz -- the posting which was made

4   on Facebook.  And I still remember, Ricky showed me a picture

5   of a screenshot showing the internal information posted on

6   Facebook.  So this was the main thing I questioned.  I wanted

7   proof for this.  And I questioned a few other things.  I still

8   remember -- well, I still remember I wanted to fully understand

9   the case, and that I didn't have any blind spot because I think

10  it's important to get a full picture.  After I understood the

11  case full, I was asked by Ricky if I will follow the

12  recommendation or not.

13  Q    All right.  And what else -- what happened then?

14  A    Well, I was, like, new at this time, so my gut feeling

15  told me it's a sensitive case, so I wanted to talk to my boss,

16  PH.  And I only wanted to get maybe some confirmation if they

17  have considered other cases similar -- or similar cases like

18  this in the past so that I knew that I considered everything

19  which has to be considered in this case.

20  Q    Okay.  So what happened then?

21  A    Shortly after this meeting was finished --

22  Q    Let me start -- let me stop you there.

23  A    Yes.

24  Q    Did you make a decision at that meeting?

25  A    No, not in this meeting.



1   Q    Excuse me?

2   A    Not in this meeting.  I didn't --

3   Q    Not in this --

4   A    -- make it in --

5   Q    -- meeting.

6   A    -- this meeting.

7   Q    Okay.  So tell me what happened then.

8   A    So I went to Peter.  It was in North Edmond I could catch

9   him.  And I just told Peter, "Peter, I just came out of a

10  meeting.  It was a internal investigation.  It's involving

11  Richard Ortiz, a member of the union."  And I asked Peter if he

12  knows anything about it.  Peter was not aware.  I -- if Peter

13  was aware of this investigation or not.  So I told Peter that

14  if he's aware if -- there may be some pushback.

15      And second thing I asked Peter, "Peter, just from your

16  experience, can you please tell me have there been in your time

17  similar cases?  If a suspect lies in an investigation this is

18  according to Tesla policy that he gets terminated?"  And Peter

19  told me there were similar cases like this, and it's according

20  to the personnel policy that if somebody's lying gets

21  terminated.

22  Q    Okay.  So what happened then?

23  A    Well -- but it was super clear for me, nothing I could

24  identify I should have forgotten to ask.  And then I went back

25  to my desk and shot the email "please go on as discussed.



www.escribers.net | 800-257-0885

1    Peter is aware of it.  Thanks, Stephan."

2    Q    Okay.  Now, before you attended this meeting with Mr.

3    Gecewich, I think you said that you had never knowingly had any

4    interaction/conversation/meeting with Mr. Ortiz?

5    A    Yes.

6    Q    Okay.  Did you have any knowledge of Mr. Ortiz before you

7    came into this meeting with Mr. Gecewich?

8    A    I remembered the name because I took a look -- a brief

9    look on the website.  I think it's called A Fair Future For

10   Tesla, right?

11   Q    Right.

12   A    And the Facebook posts.  And I still remember this way.

13   Q    Okay.  So after you received -- strike that.  So during

14   this meeting with Mr. Gecewich, ShTawney McIntosh, Mr.

15   Martinez, you knew that this involved Mr. Ortiz and you knew

16   that Mr. Ortiz was in some way active in the union; that

17   correct?

18   A    Yes.

19   Q    Okay.  Was the fact that he was an active union person

20   discussed during your meeting with Mr. Gecewich?

21   A    No.

22   Q    Did you base the decision you made -- strike that.  Was

23   the fact that -- strike that.  Was Mr. Gecewich's -- strike

24   that.  I'm having a hard time with this one.  Was Mr. Ortiz's

25   union activity -- did that play any role whatsoever in the



www.escribers.net | 800-257-0885

1    decision you made to terminate Mr. Ortiz?

2    A    No, not at all.

3    Q    Okay.  Now, before you met with Mr. Gecewich on October 17

4    at about 4 or 4:30 in the afternoon in the Shark Tank, did you

5    have any discussions with Mr. Gecewich -- not face-to-face

6    because I know it was the first time you ever met him -- any

7    phone calls, any emails, any electronic communications with him

8    about this investigation?

9    A    No.

10    Q    In fact, when you walked into the meeting, had he told you

11    what this meeting was about?

12    A    No.

13    Q    Had Ms. McIntosh told you what this meeting was about?

14    A    No.

15         MR. ROSS:  Can we go off the record for a moment?

16         JUDGE TRACY:  Yeah, I have one thing that I want to raise

17    with the parties.  I believe that his name just came up

18    yesterday first time?

19         MS. FEINBERG:  That's the first time for us.

20         MR. ROSS:  Well --

21         JUDGE TRACY:  He -- I -- I'm asking --

22         MR. ROSS:  His name was mentioned in affidavits to the

23    board, Your Honor.

24         MS. FEINBERG:  That --

25         JUDGE TRACY:  Okay.



1    MS. FEINBERG:  That may be.

2    JUDGE TRACY:  And I could be mistaken, but I do not have

3    what his supervisory or agent status is in this complaint.

4    MR. ROSS:  We'll stipulate he's a statutory supervisor.

5    JUDGE TRACY:  Thank you.  Because I don't see it in here.

6    Okay.  Thank you.

7    MR. ROSS:  You're welcome.  May I have a --

8    JUDGE TRACY:  Obviously, you all agree with the

9    stipulation?

10    MS. FEINBERG:  That's true.

11    MR. RODRIGUEZ RITCHIE:  Yes.

12    JUDGE TRACY:  Okay.

13    MR. ROSS:  May I have a moment to --

14    JUDGE TRACY:  Yeah.

15    MR. ROSS:  -- consult with --

16    JUDGE TRACY:  Let's go off the record.

17    (Off the record at 3:57 p.m.)

18    JUDGE TRACY:  Okay.  Go ahead now.

19    MR. ROSS:  Thank you, Judge.

20    Q    BY MR. ROSS:  One thing I forgot to ask you about before,

21    by the way, when you met with Mr. Gecewich and he told you that

22    Mr. Ortiz was lying during an investigation and that he, Mr.

23    Gecewich, was recommending termination, did you ask him whether

24    similarly situated cases had been treated in the same way?

25    A    I'm quite sure I did.



www.escribers.net | 800-257-0885

1    Q    Okay.  And do you remember what his response was?

2    A    Yes.

3    Q    What was his response?

4    A    Yes, there were similar cases.

5    Q    Did you have any reason to disbelieve him?

6    A    No.

7         MR. ROSS:  I have nothing else of this Witness, Your

8    Honor.

9         JUDGE TRACY:  Okay.  Mr. Rodriguez Ritchie, are you ready?

10        MR. RODRIGUEZ RITCHIE:  We would like some time.

11        JUDGE TRACY:  Okay.  How many minutes do you think?

12        MR. RODRIGUEZ RITCHIE:  I would like 15 minutes.

13        JUDGE TRACY:  Okay.  We need to finish him though today.

14        MR. RODRIGUEZ RITCHIE:  I can stay.

15        JUDGE TRACY:  Okay.  No.  I'm just saying he needs to be

16   done today.  Okay?

17        MS. FEINBERG:  I'm staying, too.

18        JUDGE TRACY:  Okay.  That's fine.  All right.  Let's go

19   off the record.

20   (Off the record at 4:00 p.m.)

21        JUDGE TRACY:  Okay.  Let's go ahead and go back on the

22   record.  Mr. Rodriguez Ritchie?

23                          **CROSS-EXAMINATION**

24   Q    BY MR. RODRIGUEZ RITCHIE:  Hi, Mr. Graminger.  My name is

25   Edris Rodriguez Ritchie.  I represent the General Counsel of



1    the National Labor Relations Board in this case.  I should

2    thank you for being patient with us all day.  I understand

3    you've been waiting all day.  This isn't the first day that you

4    met Mark Ross?

5    A    No --

6    Q    You --

7    A    -- we met before.

8    Q    Okay.  How many times?

9    A    Excluding today, two times.

10   Q    Okay.  And the purpose of your meeting with Mark Ross

11   before was to prepare for your testimony here today?

12   A    Sorry.  Could you --

13   Q    The purpose of your meeting with Mr. Ross was to prepare

14   for your testimony here today?

15   A    He wanted to hear my opinion.

16   Q    And it was to prepare for your testimony here today?

17   A    Prepare?  I try to catch if I -- if I got the right sense

18   of what you're trying to ask me.  Can you rephrase it, please?

19   Q    Your meeting was about your testimony here today?

20   A    No, it was not about my testimony.

21   Q    So your opinion was about other matters not related to

22   your testimony here today?

23   A    He asked me -- I'm still trying to catch the right sense.

24   I tried to rephrase it with my words.  So --

25   Q    Okay.  When you say he asked --

22-60493.1314



1    A    Yeah.

2    Q    -- it was about your opinion?

3    A    Yes.

4    Q    That opinion was about what you testified here today,

5    right?

6    A    It was about the happenings what I still remember -- what

7    I recall.

8    Q    Regarding the termination of Mr. Ortiz?

9    A    Regarding the termination of Mr. Ortiz.

10   Q    And the discipline action taken against Mr. Moran?

11   A    I don't recall Mr. Moran.  I recall a second guy, but I

12   don't know -- I don't recall him in this specific --

13   Q    Okay.  How long did you meet with Mr. Ross?

14   A    I think the first meeting was about 45 minutes, and the

15   second meeting about one hour.

16   Q    And did you review any documents to prepare for your

17   testimony here today?

18   A    No.

19   Q    Besides Mr. Ross, have you discussed the subject matter of

20   your testimony here today with anyone else prior to testifying?

21        MR. ROSS:  I apologize.  I couldn't hear the question.

22   Q    BY MR. RODRIGUEZ RITCHIE:  Besides Mr. Ross, have you

23   discussed the subject matter of your testimony here today with

24   anyone else?

25   A    I still remember the first meeting brief information



1    this -- sorry, I don't recall your name.  The guy sitting next

2    to Mr. Ross.

3    Q    Keahn Morris.  Okay.  Okay.

4         MR. ROSS:  Now, for the record, Your Honor, when we first

5    had conversations with Mr. Graminger, he was employed by Tesla,

6    and that conversation is covered by the attorney-client

7    privilege.

8         THE WITNESS:  Yes.

9         JUDGE TRACY:  Right.  So any questions -- and you might

10   hear objections stating attorney-client privilege, but in your

11   responses you don't need to be testifying and saying what Mr.

12   Ross or Mr. Morris or any other attorney in that attorney

13   function said to you and that -- those conversations.

14        THE WITNESS:  Okay.

15        JUDGE TRACY:  Okay?

16        THE WITNESS:  Got it.

17        MR. ROSS:  Or what he said to them.

18        JUDGE TRACY:  That's right.  That's why I said

19   conversations.

20        MR. ROSS:  Thanks.

21   Q    BY MR. RODRIGUEZ RITCHIE:  How many times did you meet

22   with Mr. Morris?

23   A    One time, excluding today.

24   Q    You met with him today?

25        MR. ROSS:  Right now.



www.escribers.net | 800-257-0885

1       THE WITNESS:  Right now.

2   Q   BY MR. RODRIGUEZ RITCHIE:  Okay.  Thank you.

3       JUDGE TRACY:  Okay.

4   Q   BY MR. RODRIGUEZ RITCHIE:  Earlier in your testimony you

5   testified about a Facebook page called A Fair Future At Tesla?

6   A   Yes.

7   Q   Do you understand that to be a Facebook page that's about

8   an organizing campaign at the Tesla Fremont facility?

9   A   What I know, there are about two websites to make it

10  specific.  One is a Facebook page and one is the Fair Future

11  For Tesla.  It's a website in the Facebook page, right?

12  Q   So what you testified about was that about A Fair Future

13  As Tesla Facebook page or A Fair Future At Tesla website?

14  A   I cannot specify what information was on this site.

15  Q   Okay.  But you understand both of them to be related to an

16  organizing campaign?

17  A   Yes.

18  Q   And that organizing campaign is at the Tesla Fremont

19  facility?

20  A   Yes.

21  Q   Now, earlier you testified that there were policies at

22  Tesla about lying, right?

23  A   Yes.

24  Q   What policies are those?  What are they called?

25  A   I don't know in detail.



1    Q    When did you review those policies?

2    A    I didn't review them.

3    Q    Are they on Workday anywhere?

4    A    Not that I recall.

5    Q    When you testified that you had reviewed policies

6    regarding lying in connection with Mr. Ortiz's termination,

7    what policies were you referring to?

8        MR. ROSS:  Objection.  Misstates his testimony.  He didn't

9    say he reviewed policies with respect to lying.

10       JUDGE TRACY:  Okay.  Let's rephrase the question, please.

11   Q    BY MR. RODRIGUEZ RITCHIE:  In connection with the

12   termination of Mr. Ortiz prior to making your decision that Mr.

13   Ortiz should be terminated, did you review any policies

14   regarding lying.

15   A    No.

16   Q    At that time were you aware of any policies at Tesla about

17   that prohibited lying during an investigation?

18   A    Nothing specific.

19   Q    Okay.  Now, I want to ask you about a meeting that you

20   testified about on October the 17, 2017.

21   A    Yes.

22   Q    You testified that there was an individual named Juan

23   Martinez, right?

24   A    Yes.

25   Q    And can you tell us who Juan Martinez is?



www.escribers.net | 800-257-0885

1   A    He's the shop leader for Models S and X.

2   Q    He is not a business leader?

3   A    What's the difference between a shop leader and a business

4   leader?

5   Q    Is there a difference between the shop leader and --

6   A    I -- I -- I don't know.  I -- I call them shop leaders.

7   We have Body Shop S and X, and we have Body Shop Model 3.  And

8   that's what I call it shop leader.

9   Q    Are --

10  A    So he's the responsible manager.

11  Q    Are there any individuals employed at Tesla named

12  business -- with the title of business leader, as far as you're

13  aware?

14  A    No, I don't recall.

15  Q    Okay.  Now, during the meeting -- and that was with

16  ShTawney McIntosh, Ricky Gecewich and Juan Martinez, Mr.

17  Gecewich presented his investigate -- what he had done during

18  his investigation?

19  A    Yes.

20  Q    And there was a report that Mr. Gecewich generated --

21  A    Yes.

22  Q    -- as part of the investigation?  Prior to the start of

23  the meeting, did you review the report?

24  A    No.

25  Q    You reviewed the report during the meeting?


22-60493.1319

1    A    Yes.

2    Q    The whole report?

3    A    Yes.

4    Q    Did Mr. Gecewich -- strike that.  Mr. Gecewich went over

5    the report with you during the meeting --

6    A    Yes.

7    Q    -- right?  All the contents of the report?

8    A    Yes.

9    Q    And during this meeting where the report was discussed,

10   the UAW wasn't mentioned at all?

11   A    No.

12   Q    It wasn't brought up?

13   A    No.

14   Q    No reference to unions at all?

15   A    No.

16   Q    You also testified that during the meeting there was a

17   discussion with Mr. Gecewich about other cases of action taken

18   during investigations?

19   A    I just asked the question if there are similar cases and

20   the other cases are handled the same or were handled the same.

21   Q    So your words were are there similar cases and where they

22   handled the same?

23   A    Were there similar cases in the past.

24   Q    And were they handled the same?

25   A    About lying, yes.



www.escribers.net | 800-257-0885

1    Q    Specifically you didn't discuss any details about any

2    other cases?

3    A    No.

4    Q    You don't recall that Mr. Gecewich brought up an instance

5    of someone being terminated for cocaine use at Tesla?

6    A    Not that I don't recall.

7    Q    You don't recall that Mr. Gecewich discussed someone being

8    terminated for misusing a company car?

9    A    Specific in this meeting, I don't recall it.

10   Q    And he didn't go over someone having been terminated for

11   lying during an investigation into their use of razor blades

12   and drug paraphernalia in vehicles?

13   A    Not specific in this meeting.  I don't recall it.

14   Q    Okay.  Thank you.  Now, you relied on Mr. Gecewich's

15   recommendation when you made your decision; is that right?

16   A    Yes.

17   Q    You didn't conduct your own investigation?

18   A    No.

19   Q    You didn't speak to Mr. Ortiz yourself?

20   A    No.

21   Q    And when you say you relied on him, you relied on his

22   presentation to you during the meeting?

23   A    Yes.

24   Q    And the report that he generated?

25   A    Exactly.



www.escribers.net | 800-257-0885

1  Q    You also during the meeting reviewed a Facebook posting

2  that Mr. Gecewich showed to you?

3  A    I asked about the Facebook posting he mentioned.  And he

4  showed me a paper with the Facebook post.

5  Q    So you saw the actual post?

6  A    I saw the actual posting.

7  Q    And in what you saw there was no mention of the union?

8  A    No.

9  Q    Unions?  UAW?

10  A    No.

11  Q    A Fair Future At Tesla?

12  A    I -- I re --

13  Q    No mention of A Fair Future At Tesla?

14  A    Not that I don't recall.

15  Q    I want to show you what's been premarked as General

16  Counsel's --

17  A    Okay.

18  Q    -- Exhibit 62.  Take a moment and let me know when you're

19  ready.

20  A    Okay.

21  Q    You ready?

22  A    Yeah.

23  Q    Okay.  Earlier you testified that you went -- reviewed a

24  report during the meeting with Mr. Gecewich?

25  A    Yes.



1    Q    What's in General Counsel's Exhibit -- what's in General

2    Counsel's Exhibit 62, that's the report you were referring to

3    in your testimony, correct?

4    A    I think so.  I had it for five -- or for 15 minutes in my

5    hand.  I think so.

6    Q    To your knowledge is this the only report that was

7    generated of regarding -- by Mr. Gecewich regarding Mr. Ortiz's

8    termination?

9    A    To my knowledge, yes.

10   Q    Okay.  Where there any other pages that were attached to

11   this report that you don't see here today?

12   A    I don't recall.

13   Q    Okay.  I want you to look at the second page of this

14   document.

15   A    Yes.

16   Q    If you look at line 3 --

17   A    Yes.

18   Q    -- he's -- line 2, excuse me, in the middle.  It says,

19   "Jose said he was asked to verify if these employees were

20   actual Tesla employees by a United Auto Workers'

21   representative."  You see that?

22   A    Sorry.  One more time, please?

23   Q    You see where it says -- it's the third paragraph --

24   A    Okay.

25   Q    -- at the top.



www.escribers.net | 800-257-0885

1   A     Yeah, I got it.

2   Q     Okay.  The second line in the middle, "Jose said he was

3   asked to verify if these employees were actual Tesla employees

4   by a United Auto Workers' representative.  You see that?

5   A     Yes, I see it.

6   Q     Okay.  So, in fact, the United Auto Workers, that was

7   discussed during your meeting with Mr. Gecewich; wasn't it?

8   A     Looks like it, yes.

9   Q     Okay.  So your earlier testimony that it wasn't; that was

10  wrong?

11  A     I didn't recall it.

12  Q     Okay.  Okay.  I'm going to show you what's been admitted

13  as General Counsel's Exhibit 28.  You can go ahead and put

14  that --

15  A     Yes.

16  Q     -- exhibit down.  Take a moment and look at that, and let

17  me know when you're ready.

18  A     Yes.

19  Q     Okay.  You recognize General Counsel's Exhibit 28, right?

20  A     What I recognize I'll show you like this now.  That's the

21  picture I have in my mind.  That's what I recognize.  That's

22  the screenshot out of Workday.  That's everything I recognize.

23  Q     Oh, okay.  So let's find a way for the record to reflect

24  this.

25  A     That -- that's the way it is.



www.escribers.net | 800-257-0885

1    Q    Why don't you hand it to me and I can read the part that

2    you're saying you recognize?

3         JUDGE TRACY:  Well, I mean, it looks like the Witness is

4    testifying to just the first portion of the -- the first -- the

5    screenshot that's there on Joint -- General Counsel's Exhibit

6    28, not the actual text message, but the way that it sounds

7    like, and the way he's folded up the paper -- the exhibit is

8    that he just saw it in the meeting.

9         Are you testifying that you only saw the picture --

10        THE WITNESS:  I test --

11        JUDGE TRACY:  -- or the words, too, that are above that?

12        THE WITNESS:  I -- I testified maybe he showed me this

13   homepage.  I don't recall he showed me.  That's why I remember

14   it.  That's the screenshot of the Workday.  That's what you had

15   every day in front of you that's why I state recall this

16   picture.  I don't recall if there was any text or not.

17   Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  So I think if the record

18   can reflect in General Counsel's Exhibit 28 that there's a

19   picture in General Counsel's Exhibit 28 and on the picture

20   there's two other pictures.  And so the testimony that -- I'll

21   describe that the two other pictures it's a picture of two

22   different males, right?  And that's the part that you recall as

23   you sit here today.

24   A    Yes.

25   Q    Okay.  Don't recall that you saw any of the other text of



1    this document.

2    A    No, I don't recall.

3    Q    Okay.  Now, when you reviewed the report with Mr. Gecewich

4    during the October 17th meeting with him, you talked about

5    something being posted on a Facebook group?

6    A    Yes.

7    Q    And, indeed, he said that was a Facebook group called the

8    Fair Future at Tesla?

9    A    He may have mentioned it but I don't recall.

10   Q    Okay.  Do you recall that he mentioned that it was a

11   union-related Facebook group?

12   A    He may have mentioned it.  I don't recall.

13   Q    You recall that he mentioned that what was posted on there

14   was something that he received from another employee?

15   A    I don't recall where he got his information from.

16   Q    You recall that during the meeting -- do you recall that

17   during the meeting Mr. Gecewich told you that the reason for

18   the recommendation was that Mr. Ortiz had lied about where he

19   had gotten the information from?

20   A    That's the only reason, yes.

21   Q    And Mr. Gecewich's recommendation was not that Mr. Ortiz

22   should be terminated because he had harassed someone?

23   A    No.

24   Q    It wasn't because he had bullied someone?

25   A    Sorry, one more time.



1   Q    Mr. Gecewich's recommendation to you regarding Mr. Ortiz's

2   termination, that wasn't because he had bullied anyone.

3   A    No.

4   Q    Only for lying.

5   A    Only for lying.

6   Q    And your decision to terminate him was based solely on

7   your belief that an unknown policy existed at Tesla regarding

8   lying and that he had violated this policy --

9        MR. ROSS:  Objection.

10       MR. RODRIGUEZ RITCHIE:  -- is that right?

11       MR. ROSS:  Argumentative question.

12       JUDGE TRACY:  Overruled.

13       THE WITNESS:  Yes.

14   Q   BY MR. RODRIGUEZ RITCHIE:  Okay. And prior to accepting

15   the recommendation and making the termination decision, you

16   didn't go look to see if there were, in fact, any policies

17   regarding lying at Tesla; is that right?

18   A    I didn't look, no.

19   Q    You just accepted Mr. Gecewich's recommendation.

20   A    And the confirmation of the HR partner.

21   Q    And that was ShTawney McIntosh.

22   A    ShTawney McIntosh.

23   Q    Okay.  She didn't show you any policies about lying,

24   right?

25   A    No.



www.escribers.net | 800-257-0885

1    Q    You also testified about a meeting with Peter?

2    A    Yes.

3    Q    And that's Peter who?

4    A    Peter Hochholdinger.

5    Q    Okay.  As my colleague did, I'll refer to him to as Mr. H.

6    A    Whatever you call him.

7    Q    Okay.  Mr. H, what position does he hold?

8    A    His title, Vice President of Production.

9    Q    And why did you go consult with him?

10    A    First, as mentioned before, my gut feeling told me it's a

11    sensitive case and that's why I wanted to give him a heads-up

12    so he's knows if something pops up, first thing; and second

13    thing, I also wanted to ask his opinion about his experience

14    out of the past regarding the policy --

15    Q    And your gut feeling regarding this, that was because

16    there were two employees that had engaged in activity together?

17    A    What kind of activity?

18    Q    Your gut feeling, this feeling that you testified that you

19    received when you reviewed this case, that was because it

20    involved two employees, right?

21    A    Yes.

22    Q    And it was because it involved two employees that were

23    engaging in activities together, right?

24    A    Yes.

25    Q    And those activities were the Facebook posting.



www.escribers.net | 800-257-0885

1   A    Exactly.

2   Q    Now, when you met with Mr. H, you didn't discuss any other

3   individuals that had been terminated for lying?

4   A    No.

5   Q    Are you aware --

6   A    I don't recall it.  Sorry, I don't recall it.

7   Q    Okay.  Are you aware of any other specific individuals,

8   names of individuals, who were terminated for lying?

9   A    No, I don't recall it.

10  Q    You did discuss with Mr. H that Mr. Ortiz was a union

11  supporter?

12  A    I may have mentioned it but it was not the focus of this

13  discussion.

14  Q    But you brought it up.

15  A    I may have mentioned it.  I don't recall it.

16  Q    That's why it was a sensitive topic because he was a union

17  supporter?

18  A    Yes.

19  (Counsel confer)

20      MR. RODRIGUEZ RITCHIE:  I have nothing further.

21      JUDGE TRACY:  All right.  Ms. Feinberg.

22      MS. FEINBERG:  Yes, I do.

23                          **CROSS-EXAMINATION**

24  Q    BY MS. FEINBERG:  Hello.

25  A    Hi.



www.escribers.net | 800-257-0885

1    Q    I am Margo Feinberg.  I represent the Charging Parties.

2         JUDGE TRACY:  And make sure you speak up over there.

3         MS. FEINBERG:  Okay, I will.

4    Q    BY MS. FEINBERG:  Yes.  And can you lean back so you're

5    not in the wall between me and Mark and all of that.  Thank

6    you. Okay.  So I'm going to ask you about -- first, I'm going

7    to ask you about -- first, I'm going to ask you about what's

8    been marked or it's in evidence as Respondent's Exhibit 15.

9    It's an email that's titled "ER investigation recommendation

10   conversation."  Do you have that in front of you?  That's the

11   one.

12   A    Yes.

13   Q    Okay.  So when you received this on October 17th at 11:23

14   a.m., was this the first you knew about your involvement in

15   this investigation?

16   A    Yes.

17   Q    Okay.  So were you involved, at all, in the decision to

18   include Juan Martinez in this meeting?

19   A    No.

20   Q    Okay.  And but you knew who Juan Martinez was.

21   A    Yes.

22   Q    Okay.  And did Juan Martinez actually come to the meeting?

23   A    As far as I recall, yes.

24   Q    Okay.  And do you recall whether he spoke?

25   A    No, I don't recall.



1    Q    Okay.  Did you ask him any questions about Richard Ortiz

2    or any of the other employees -- Mr. Pratt or Mr. Ives?

3    A    In this meeting?

4    Q    Yes.

5    A    No, not in this meeting.

6    Q    Oh, at any time had you spoken to Mr. Martinez about Mr.

7    Ortiz?

8    A    Yes.

9    Q    Before this meeting?  Sometime before October of 2017?

10   A    I just go through my mind, sorry.

11   Q    Well, if you want to use the framework.  Before Mr. Ortiz

12   was terminated, had you ever discussed Mr. Ortiz with Mr.

13   Martinez?

14   A    The name may have been mentioned but I don't recall any

15   specific issue or any specific discussion about him.

16   Q    Okay.  And if someone is on light duty who's under your

17   indirect or whatever, under Mr. Martinez's supervision, would

18   that come to your attention?

19   A    No.  Only in really severe cases.  There are about 150,

20   100 light cases.  In the Body Shop, there's a few thousand

21   employees.

22   Q    Okay.  And did you walk the floor of the body shop?

23   A    Yes.

24   Q    And did you ever see a picture of Mr. Ortiz?  Because I

25   think you said you looked at A Fair Future on Tesla so I was



1   wondering if you had seen his picture.

2   A    I'm quite sure I've seen it but if you ask me to recall

3   it, no.

4   Q    Well, I'm asking you therefore you when you walked the

5   floor, did you ever see him on the floor?

6   A    I may have seen him but I didn't recognize him then.

7   Q    Okay.  And why was it that you were looking at the Fair

8   Future in Tesla website or Facebook page?  You said you looked

9   at both.

10  A    Well, the answer is quite simple.

11  Q    Okay.

12  A    I also follow, for example, the union, the union -- sorry

13  -- rephrase.  The efforts to make UAW and why because I'm still

14  a member of the union in Germany and I still pay my membership

15  fees -- I'm interested in it.

16  Q    Okay.

17  A    And that's why I took a look.

18  Q    Okay.  Good.  I got that.  So when Mr. Gecewich shared his

19  investigation report with you, did he explain to you anything

20  about why Mr. Moran and Mr. Ortiz were interested in Mr. Ives

21  and Mr. Pratt?  Like why they wanted to see their pictures?

22  A    I'm sure he explained me the reason but I still remember

23  there was a reason but I don't recall the reason.

24  Q    Okay.  Did you know that Mr. Pratt and Mr. Ives had gone

25  to Sacramento to testify against a bill in which Mr. Ortiz and



www.escribers.net | 800-257-0885

1    Mr. Moran were on the other side of?

2    A    It sounds familiar but I don't recall it before, if I know

3    of this meeting.

4    Q    Okay.  And you testified that someone had posted a

5    telephone number but in the document that I see, I don't see

6    any telephone number posted.  So is that a -- are you in error

7    or did someone tell you that?

8    A    I thought I have seen a telephone number then I'm in

9    error.  This is the first page, I'm in error.

10   Q    Okay.  And are you on LinkedIn?

11   A    Yes, I am.

12   Q    Okay.  And there's no prohibition by Tesla to post your

13   photo and your job title at Tesla on LinkedIn.  That's not

14   private information -- your name and your job title?

15   A    I don't --

16   Q    And your photo?

17   A    -- know if there is any policy like this.  I don't do it.

18   Q    Okay.  And do you know whether Mr. Pratt and Mr. Ives were

19   also already in the public eye by having posted on LinkedIn?

20   A    I don't know.

21   Q    Okay.  So do you know whether the information that was

22   posted on Facebook was actually private information?

23   A    What is private information?  I have a completely

24   different understanding of private information as you have, so

25   what's --



www.escribers.net | 800-257-0885

1    Q    I see.

2    A    No, that's what it is.

3    Q    Okay.

4    A    What is private information?

5    Q    Do you know that if I went on the Internet, I could find

6    Mr. Ross?

7    A    I don't know if you could find him.

8    Q    On LinkedIn, for example.

9    A    If he doesn't want to share, it's private for him.  Maybe

10   he wants to share.  I don't know.

11   Q    Okay.

12   A    I have to take a look.

13   Q    All right.  But if he had posted on LinkedIn then it would

14   be for any for us to see.

15   A    No.  He has some privacy settings where you can --

16   Q    I see.  Okay.

17   A    -- prohibit --

18   Q    Okay.  We won't debate that part.

19   A    -- that somebody else see your information.

20   Q    Okay.  Do you know whether --

21   A    I did it.

22   Q    Did you ask Mr. Gecewich whether he had done any

23   investigation as to whether Mr. Ives and Mr. Pratt were

24   already -- their name and their face were already in the

25   public, you know, already publicly accessible?



www.escribers.net | 800-257-0885

1    A    I didn't ask him this.

2    Q    Okay.  And did you know that the reason that employees

3    were looking up Mr. Ives and Mr. Pratt is because their faces

4    and their names appeared in a public video regarding testimony

5    in Sacramento?

6    A    I don't know anything about this.

7    Q    Okay.  Did you ask anyone what exactly this Facebook

8    posting was about, what was the concern on the Facebook

9    posting?

10    A    I would have to read again through the investigation.

11    Q    Okay.  And, well it says, "These guys have been in

12    Sacramento saying we're lying about how things are at Tesla

13    management."  That's what Mr. Ortiz says.  Did you ask Mr.

14    Gecewich what that was about?

15    A    I'm sorry, one more time.  Can you tell me the

16    paragraph --

17    Q    Okay.  And I think you said you did see the words above

18    the photos in the post -- oh, I'm sorry.

19    A    This one, yeah.

20    Q    I'm sorry.  Sorry, sorry.  General Counsel Exhibit 28.

21    A    Uh-huh.

22    Q    And it begins with "these guys" meaning Mr. Pratt and Mr.

23    Ives, as I understand it though Mr. Ives' name doesn't even

24    appear.  "These guys have been in Sacramento saying we're lying

25    about how things are at Tesla management."  Did you ask what



www.escribers.net | 800-257-0885

1   that was about?

2       MR. ROSS:  Objection.

3   Q   BY MS. FEINBERG:  -- with Mr. Gecewich?

4       MR. ROSS:  He's testified that he didn't remember seeing

5   it.

6       JUDGE TRACY:  Sustained.

7       MS. FEINBERG:  Well, but maybe now I can refresh his --

8   we're on cross.  Can I ask him if he --

9       MR. ROSS:  Well, ask him if it refreshes his --

10      JUDGE TRACY:  Well, you're saying what he testified to.

11  He previously testified --

12      MS. FEINBERG:  No, no.  I'm asking him --

13      JUDGE TRACY:  -- that he had not seen that language.

14      MS. FEINBERG:  I'm asking him whether he asked him about

15  this sentence.

16      JUDGE TRACY:  How can he ask him when he's testified --

17      MS. FEINBERG:  Because once now --

18      JUDGE TRACY:  -- that he --

19      MS. FEINBERG:  -- that I'm pointing it out, it might

20  refresh his recollection.  He said he didn't -- he said for

21  sure he knew he saw those two photos and he didn't know if he

22  saw the whole thing.  That's what I heard him say.

23      JUDGE TRACY:  Just ask the question a different way,

24  please.

25  Q   BY MS. FEINBERG:  Did the topic of the fact that Mr. Ives



www.escribers.net | 800-257-0885

1    and Mr. Pratt had gone to Sacramento to talk about Tesla come

2    up in the discussion with Mr. Gecewich?

3        MR. ROSS:  I think this has been asked and answered, Your

4    Honor.

5        JUDGE TRACY:  Well, I'm going to allow it.  Go ahead,

6    please.

7        THE WITNESS:  If -- if I see this, I recall it.

8    Q    BY MS. FEINBERG:  You do recall it.

9    A    I recall reading this text.

10   Q    Okay.

11   A    I read it --

12   Q    Okay.

13   A    -- and the few phrases, I'll say yes.

14   Q    Okay.

15   A    Similar to what is stored in my mind.

16   Q    That's --

17   A    And I can connect them.

18   Q    That's the nature of refreshing people's recollection.

19        So now that you do recall it, do you remember if those

20   words were discussed in the meeting?

21   A    What kind of words?  One more time, please.

22   Q    In other words, was there any discussion about the fact

23   that Mr. Ortiz was raising concerns that Mr. Pratt and Mr. Ives

24   had been in Sacramento?  Do you remember any discussion about

25   that?


www.escribers.net | 800-257-0885

```
 1    A    I don't recall it.  What I recall is especially the phrase

 2    "Tesla management."  That's what's stuck in my mind.

 3    Q    I see.

 4         Does Travis Pratt report to you?

 5    A    No.

 6    Q    And --

 7    A    Not directly technically.

 8    Q    Okay.  Do you know him?

 9    A    Not that I'm aware of.

10    Q    And Shaun Ives, do you know him?

11    A    Not that I'm aware of.

12    Q    Okay.

13    (Counsel confer)

14    Q    BY MS. FEINBERG:  And you were shown a document of an

15    investigation report by the General Counsel which is --

16    somewhere.  62?  And -- okay, I have -- okay.  And do you have

17    that in front of you -- 62?  It begins with "confident" --

18    well, it begins with "Employee relations investigation report"?

19    A    Okay, got it.

20    Q    Okay.  So at the time that you saw this, was it a

21    different -- did it look just like this or was it some version

22    of this?  And you can take your time to look at it.

23    A    All the clear -- investigation reports look the same.

24    Q    Okay.

25    A    So if you ask me how about specific details, if they are
```



www.escribers.net | 800-257-0885

1   similar to what I've seen, in this meeting, so I can't confirm.

2   Q    Okay.  The reason I'm asking you is on page 3 of the

3   document, at the top, it says on October 17th, you agreed with

4   the recommendation of the termination of employment for

5   Richard.  So I assume that wasn't on the document at the time

6   you saw it in the meeting.  It was something added.

7   A    I guess.  I think so.

8   Q    Okay.  And then when it was added, does anyone ever send

9   you a final copy?

10  A    No.

11  Q    And did you sign anything to say that you approved of the

12  termination?

13  A    No.

14  Q    Did you send any -- oh, so is the email where you say,

15  "Please go on as discussed," is that -- what do those words --

16  what did you intend those words to mean on Respondent's 15

17  where it says --

18  A    The --

19  Q    Yeah.

20  A    Sorry.

21  Q    Go ahead.

22  A    The discussion was of -- and the recommendation was about

23  terminating and my words mean "please go on as discussed" with

24  the recommendation to terminate him.

25  Q    Okay.  And when it says, "Peter is aware of it," that was



 1    reflecting that you had spoken to your superior so he was in

 2    the loop.

 3    A    Exactly.  Only that he's in the loop, yes.

 4    Q    And do you know whether he ever saw the investigative

 5    report?

 6    A    I don't know.

 7    Q    Investigator's report?

 8         And what did you understand the lie to be?

 9    A    The lie about taking information and posting it.

10    Q    Not that the lie was that who the source of the

11    information just that there was a lie about posting it?

12    A    There was a lie about -- I was not in the meeting with

13    Ortiz when he was questioned so I cannot confirm 100 percent

14    what he lied about.

15    Q    Okay.  But when you approved it, which you had to.

16    A    Yes.

17    Q    I mean you were asked to and you did.

18    A    Yes.

19    Q    What did you understand the lie to be?

20    A    I understood the lie to be that Richard Ortiz was aware of

21    who got the information out of Workday and who posted it.

22    Q    And that he had lied about who posted it?

23    A    About who took out the information out of Workday and who

24    posted it.

25    Q    Okay.  And do you know where it was posted?


www.escribers.net | 800-257-0885

1    A    As far as I know in some public -- on a website which is

2    public -- sorry, I have to rephrase my words.

3    Q    Take your time.

4    A    Not a internal website but a website everybody on the

5    public could access --

6    Q    And who told you that?

7    A    I was Facebook.

8    Q    And who told you it was something that anybody could

9    access?  Because earlier you were explaining to me that there

10   were various ways that you can control who can see things.

11   A    On LinkedIn.

12   Q    And you're saying that this was open to the public?

13   A    This was open to the public.

14   Q    And who told you that?

15   A    That was my assumption.  All of the investigation

16   report --

17   Q    Okay.  So if I told you, as we sit here today, that it was

18   on a private UAW -- private web page, private Facebook page,

19   you wouldn't know that to be true or not, would you?

20   A    Again, what is private?  It depends on the privacy

21   settings he has there.  I don't know.

22   Q    So you don't know.

23   A    There are different levels.

24   Q    Right.  So did you ask that question?

25   A    About privacy levels, no, I didn't ask.



1    Q    Okay.  And do you know how long the posting was actually

2    up?

3    A    No.

4    Q    And did you ask that question?

5    A    It was unspecifically answered.

6    Q    Unspecifically answered?  What does that mean?

7    A    I didn't have a clear understanding of how long it was on

8    there.  And if it was mentioned, I'm sorry, I don't recall it.

9    It was barely effect -- not the length of the posting.

10   Q    And have you been involved in other -- during that, I

11   guess it's a little over a year that you worked for Tesla, have

12   you been involved in other termination decisions of people at

13   the level that Mr. Ortiz was at?

14   A    I have worked other decisions like this, yes.

15   Q    You have?

16   A    Yes.

17   Q    How many?

18   A    I at least recall two but if you ask me for the names, I

19   don't know anymore.

20   Q    Okay.  And did -- I might not be doing her name justice

21   either -- but ShTawney.  Did she speak in the course of the

22   meeting on the 17th?

23   A    Sorry.  Can you rephrase it, please?

24   Q    Did ShTawney speak in the meeting --

25   A    Yes.



www.escribers.net | 800-257-0885

1    Q    -- on the 17th.  I understand that you spoke --

2    A    Yes.

3    Q    -- and Mr. Gecewich spoke.  And did ShTawney also speak

4    and make any comments during the course of the meeting?

5    A    Yes.

6    Q    Okay.  And do you recall what she said, if anything?

7    A    Well, my specific question to ShTawney was to if she can

8    confirm the policy we discussed.

9    Q    And did you ever ask if they had asked Mr. Ortiz why he

10   didn't want to disclose where he got the documents, the

11   information from?

12   A    No.

13   Q    And was ShTawney also making a recommendation in support

14   of the termination, if you recall?

15   A    Not that I recall.

16   Q    And other than Peter H. and the people who were in this

17   meeting, did you ever -- and, of course, the lawyers that you

18   mentioned today -- have you ever discussed the termination of

19   Richard Ortiz with anyone else?

20   A    No.

21   Q    Do you know whether Richard Ortiz was aware of the fact

22   that you were given the position to make the decision regarding

23   his termination?

24        MR. ROSS:  Could you restate.  I couldn't hear. I'm sorry.

25   Q    BY MS. FEINBERG:  Do you know whether Richard Ortiz was



1    aware of the fact that you had approved his termination?

2    A    Maybe somebody told him.  I don't know.

3        MS. FEINBERG:  I have nothing further at this time.

4        JUDGE TRACY:  Mr. Ross.

5        MR. ROSS:  Just one moment, Your Honor.

6        JUDGE TRACY:  Okay.

7    (Counsel confer)

8        MR. ROSS:  Nothing, Your Honor.

9        JUDGE TRACY:  Okay.  I just want to ask, for the record,

10   General Counsel's Exhibit 62 is just marked.  It has not been

11   admitted into evidence or a motion to be admitted into

12   evidence.  Are you going to do that at this time?

13       MR. RODRIGUEZ RITCHIE:  Not at this time but we may do so

14   at a later time.

15       JUDGE TRACY:  Okay.  Okay.  Well, thank you very much.

16   And please don't discuss your testimony until after the close

17   of the hearing.  But you're free to go.  You can leave all the

18   documents there.

19       THE WITNESS:  Okay.

20       JUDGE TRACY:  And thank you so much.

21       THE WITNESS:  Thank you very much.

22       JUDGE TRACY:  Thank you.

23       THE WITNESS:  Have a good day.

24       JUDGE TRACY:  Thank you.

25       Okay.  So --



www.escribers.net | 800-257-0885

1       MR. ROSS:  Stephan, will you give me a minute.  I'll see

2   you out there.

3       THE COURT REPORTER:  Off --

4       JUDGE TRACY:  Yes, we're still on the record.

5       MR. GARBER:  Coming back to the subpoena issue in Requests

6   41 and 43 to the General Counsel's subpoena, we requested

7   documents relating to disciplines essentially to similarly

8   situ7ated employees.  The witness just testified to that.  So

9   we'd like to know are there any disciplines within the relevant

10  time period as defined in the subpoena because it appears that

11  the witness just testified that he reviewed or was made aware

12  of similar instances when an employee was terminated for lying.

13      JUDGE TRACY:  Did you receive any documents in response to

14  that request?

15      MR. GARBER:  I don't we believe we did.

16      MR. MORRIS:  My understanding is documents were produced

17  in response to that request.

18      MR. GARBER:  We'll double-check and we'll come back with

19  --  do you remember the date stamps?

20      MR. MORRIS:  Uh --

21      MR. GARBER:  Roughly?

22      MR. MORRIS:  I think it includes but not limited to

23  NLRB3071 through 3092.

24      MR. GARBER:  And those are regarding lying?

25      MR. MORRIS:  They're responsive to those specific requests



www.escribers.net | 800-257-0885

1    that you just listed off --

2    JUDGE TRACY:  Okay.

3    MR. MORRIS:  -- 41 and 43.

4    MR. GARBER:  Okay.  We'll look.

5    JUDGE TRACY:  So take a look again and come back tomorrow

6    if you don't have them because, obviously, he did testify that

7    there were disciplinary actions that he was involved in, at

8    least two or two.

9    MR. ROSS:  He didn't testify that -- he said there were

10   others that he was involved in.  He didn't say there were

11   others that involved lying and an investigation.

12   MS. FEINBERG:  He said that Peter said that.

13   MR. ROSS:  There were -- I believe he said that Peter said

14   there had been some other occasions and I believe that he said

15   that he had been told that there were such cases.  But he

16   wasn't involved in those other cases.

17   JUDGE TRACY:  Okay.  And that's fine whatever he testified

18   to but their request --

19   MR. ROSS:  Yeah.

20   JUDGE TRACY:  -- is different --

21   MR. ROSS:  I understand.

22   JUDGE TRACY:  -- from that and they are requesting these,

23   so.

24   You take a look and then, for the record, then we can go

25   back on the record tomorrow and put that on the record that



www.escribers.net | 800-257-0885

1  they turned over thing (sic) that's responsive and, certainly,

2  he testifies to something and then they've not produced that

3  that you put it in the brief.  Right?  So just to be clear

4  about that.

5      What about General Counsel's Exhibit 72.  You guys were

6  working on a stipulation or something.  Are you still working

7  on it?

8      MR. ROSS:  Well, we haven't had time to have the

9  conversation.

10      JUDGE TRACY:  Okay.  So, again, we can do that tomorrow,

11  as well.  If you want to take the time to figure that out now.

12      MR. ROSS:  Sure.

13      JUDGE TRACY:  I am wondering -- and we can -- we'll start

14  again tomorrow at 9 a.m. with your next witness.  And who do

15  you intend to call for tomorrow?

16      MR. ROSS:  Who is it?

17      JUDGE TRACY:  At 9.

18      MR. ROSS:  Is it Mario -- Mario Penera.

19      JUDGE TRACY:  Who's that?

20      MR. ROSS:  Mario Penera.

21      JUDGE TRACY:  Mario Penera.  Okay.

22      Okay.  So we'll start at 9 a.m. with him.

23      Of course, if we have some of these subpoena things, we'll

24  put those on the record first because you're going to take a

25  look.



www.escribers.net | 800-257-0885

1     And then, also, this stipulation or what have you of what

2     you're working out with regards to General Counsel's Exhibit

3     72.

4     And, again, you guys are -- you've committed to looking

5     through the documents that you already have along with making

6     sure that you've provided responsive documents to all of their

7     subpoena requests that I've ordered that need to be turned

8     over.

9     Okay?  Anything else for the record?

10    MR. RODRIGUEZ RITCHIE:  No.

11    MR. ROSS:  No.

12    JUDGE TRACY:  No.

13    Okay.  So let's go off the record.

14    **(Whereupon, the hearing in the above-entitled matter was**

15    **recessed at 4:57 p.m. until Thursday, September 27, 2018 at**

16    **9:00 a.m.)**

17

18

19

20

21

22

23

24

25

eScribers
www.escribers.net | 800-257-0885

1      **C E R T I F I C A T I O N**

2      This is to certify that the attached proceedings before the

3      National Labor Relations Board (NLRB), Region 32, Case Numbers

4      32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-

5      200530, 32-CA-208614, 32-CA-210879, 32-CA-220777 Tesla, Inc.,

6      and Michael Sanchez, and Jonathan Galescu, and Richard Ortiz

7      and International Union, United Automobile, Aerospace and

8      Agricultural Workers of America, AFL-CIO at National Labor

9      Relations Board Region 32, 1301 Clay Street, Suite 300N,

10     Oakland, CA 94612-5224, on Wednesday, September 26, 2018, 9:24

11     a.m. was held according to the record, and that this is the

12     original, complete, and true and accurate transcript that has

13     been compared to the reporting or recording, accomplished at

14     the hearing, that the exhibit files have been checked for

15     completeness and no exhibits received in evidence or in the

16     rejected exhibit files are missing.

17

18

19                        _Deborah Gonzalez_

20                        DEBORAH GONZALEZ

21                        Official Reporter

22

23

24

25



www.escribers.net | 800-257-0885

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 32

In the Matter of:

| | | |
|---|---|---|
| Tesla, Inc., | Case Nos. | 32-CA-197020 |
| | | 32-CA-197058 |
| and | | 32-CA-197091 |
| | | 32-CA-197197 |
| Michael Sanchez, an individual, | | 32-CA-200530 |
| | | 32-CA-208614 |
| and | | 32-CA-210879 |
| | | 32-CA-220777 |

Jonathan Galescu, an
individual,

and

Richard Ortiz, an individual,

and

International Union, United
Automobile, Aerospace and
Agricultural Implement Workers
of America, AFL-CIO,

Charging Party,

_____

_____

Place: Oakland, California

Dates: September 27, 2018

Pages: 1331 through 1565

Volume: 8

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



www.escribers.net | 800-257-0885

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 32**

| | |
|---|---|
| In the Matter of:<br><br>TESLA, INC.,<br><br>and<br><br>INTERNATIONAL UNION, UNITED<br>AUTOMOBILE, AEROSPACE AND<br>AGRICULTURAL IMPLEMENT WORKERS<br>OF AMERICA, AFL-CIO,<br><br>and<br><br>MICHAEL SANCHEZ, AN INDIVIDUAL,<br><br>and<br><br>JONATHAN GALESCU, AN<br>INDIVIDUAL,<br><br>and<br><br>RICHARD ORTIZ, AN INDIVIDUAL. | Case Nos.  32-CA-197020<br>32-CA-197058<br>32-CA-197091<br>32-CA-197197<br>32-CA-200530<br>32-CA-208614<br>32-CA-210879<br>32-CA-220777 |

The above-entitled matter came on for hearing, pursuant to notice, before **AMITA BAMAN TRACY**, Administrative Law Judge, at the National Labor Relations Board Region 32, 1301 Clay Street, Suite 300N, Oakland, CA 94612-5224, on **Thursday, September 27, 2018, 9:11 a.m.**

eScribers
www.escribers.net | 800-257-0885

1                          A P P E A R A N C E S

2    **On behalf of the General Counsel:**

3         **EDRIS W.I. RODRIGUEZ RITCHIE, ESQ.**
          **NOAH J. GARBER, ESQ.**
4         National Labor Relations Board
          1301 Clay Street, Suite 300N
5         Oakland, CA 94612-5224
          Tel. 510-671-3021
6
     **On behalf of the Respondent:**
7
          **MARK S. ROSS, ESQ.**
8         **KEAHN N. MORRIS, ESQ.**
          SHEPPARD MULLIN RICHTER & HAMPTON LLP
9         Four Embarcadero Center
          Seventeenth Floor
10        San Francisco, CA 94111-4109
          Tel. 415-434-9100
11        Fax. 415-434-3947

12   **On behalf of the Charging Parties:**

13        **MARGO A. FEINBERG, ESQ.**
          **DANIEL E. CURRY, ESQ.**
14        **JULIE S. ALARCON, ESQ.**
          SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
15        6300 Wilshire Boulevard, Suite 2000
          Los Angeles, CA 90048
16        Tel. 323-655-4700

17

18

19

20

21

22

23

24

25



www.escribers.net | 800-257-0885

1                                    **I N D E X**

2

3 | **WITNESS** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** | **VOIR DIRE** |
|---|---|---|---|---|---|
4 | Mario Penera | 1336 | 1390 | 1410 | 1412 | 1383 |
| | | 1404 | | | |
5 | | | | | | |
| Jeremie Hansen | 1418 | 1525 | 1544 | 1551 | 1454/1479 |
6 | | | 1526 | | 1553 | 1493/1495 |
| | | | | | 1500/1512 |
7 | | | | | | 1520/1521 |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



www.escribers.net | 800-257-0885

1

<u>**E X H I B I T S**</u>

2

3    <u>**EXHIBIT**</u>                            <u>**IDENTIFIED**</u>    <u>**IN EVIDENCE**</u>

4    **Respondent:**

5      R-16                                    1349          1389

6      R-17                                    1379          1386

7      R-18                                    !387          1388

8      R-19                                    1455          1455

9      R-20                                    1476          1476

10     R-21                                    1482          1482

11     R-22                                    1496          1496

12     R-24                                    1510          1510

13     R-25                                    1519          1519

14     R-26                                    1524          1524

15

16

17

18

19

20

21

22

23

24

25

22-60493.1354



1    <u>**P R O C E E D I N G S**</u>

2    JUDGE TRACY:  Okay.  Mr. Ross, if you could call your next

3    witness, please.

4    MR. ROSS:  Mr. Morris is going to do the honors.

5    JUDGE TRACY:  Okay.  Mr. Morris, please call your next

6    witness.

7    MR. MORRIS:  It's Mario Penera.

8    JUDGE TRACY:  Mario?

9    MR. MORRIS:  Penera.

10   JUDGE TRACY:  Penera.  Okay.

11   If you could go ahead and stand up, please.  Okay.  And if

12   you could raise your right hand.

13   Whereupon,

14                    <u>**MARIO PENERA**</u>

15   having been duly sworn, was called as a witness herein and was

16   examined and testified as follows:

17   JUDGE TRACY:  Okay.  Have a seat.  And state your name and

18   the spelling of your last name, please, for the record.

19   THE WITNESS:  Yes.  It's not the bread company.

20   JUDGE TRACY:  Oh, okay.  I see.

21   THE WITNESS:  My name is Mario Penera.  My last name is

22   P-E-N-E-R-A.

23   JUDGE TRACY:  Okay.  And just a few instructions.  The --

24   this microphone does not amplify your voice, it doesn't make it

25   louder, it's just for the recording.  So you can --



www.escribers.net | 800-257-0885

1    THE WITNESS:  Okay.

2    JUDGE TRACY:  -- relax.  You don't need to lean into it.

3  However, we have a bigger room with a lot of people, and so

4  sometimes sound doesn't travel very well.  So if you could just

5  please speak up --

6    THE WITNESS:  Okay.

7    JUDGE TRACY:  -- when you're answering the questions.  They

8  may ask you to repeat it or ask me to tell you to repeat it

9  because they didn't hear you.  So please just bear with us.

10    THE WITNESS:  Okay.

11    JUDGE TRACY:  Okay.  Go ahead, Mr. Morris.

12                    **DIRECT EXAMINATION**

13  Q    BY MR. MORRIS:  Mario, where are you employed?

14  A    I work for Tesla.

15  Q    And is that at the Fremont factory?

16  A    That is correct.

17  Q    And that's located at 45500 Fremont Boulevard?

18  A    Yes.

19  Q    Okay.  And I'll just refer to that as the Fremont factory.

20  How long have you been employed by Tesla?

21  A    I've been employed with Tesla for five-and-a-half years.

22  Q    And so that would be roughly 2012?

23  A    Yes.  In November of 2012 I was hired.

24  Q    Okay.  And prior to your work at Tesla, have you been

25  employed by any other auto manufacturers?


www.escribers.net | 800-257-0885

1   A    I have.  I was previously employed by Toyota and also by

2   NUMMI.

3   Q    Okay.  And where were those facilities located?

4   A    For both of those facilities, I was working at the same

5   address in Fremont, California.

6   Q    The same address as the Tesla facility?

7   A    Correct.

8   Q    And what were your positions working at NUMMI?

9   A    At NUMMI, I started as an assembly worker on the

10  production line.  I also held positions as a team leader, pilot

11  member, and a supervisor.

12  Q    Okay.  And in terms of your work at Tesla, you said you

13  started in roughly 2012.  What was the position that you

14  started at?

15  A    I was hired as a production supervisor.

16  Q    For any particular department or line?

17  A    For General Assembly.

18  Q    And how long did you have that position for?

19  A    I was a supervisor for roughly two years.

20  Q    And what position did you have after that?

21  A    I was promoted to associate manager of production.

22  Q    And any particular department or line?

23  A    That was the powertrain department in general -- I mean,

24  for Tesla.

25  Q    And the powertrain, that's not associated with the General

22-60493.1357



1    Assembly, correct?

2    A    Correct.

3    Q    And how long did you have that position, associate manager

4    for powertrain?

5    A    Approximately two years.

6    Q    And what position did you have after that?

7    A    After that, I was asked to return to General Assembly, and

8    took the position as production manager.

9    Q    Okay.  And approximately when was that?

10    A    That was in May of 2016.

11    Q    And for General Assembly, was that for the Model S and X?

12    A    Correct.

13    Q    Not for the Model 3?

14    A    Correct.

15    Q    And how long did you have that position for?

16    A    I was promoted to senior manager of the same department

17    earlier this year.

18    Q    Okay.  Approximately when was that?

19    A    Approximately February.

20    Q    Okay.  And so going back to the time period that you were

21    the production manager for General Assembly, could you describe

22    what your general job duties were?

23    A    In May 2016, when I accepted the role as manager, I also

24    accepted that I would go to the second shift and predominantly

25    work on the second shift.  The biggest thing that I had to



www.escribers.net | 800-257-0885

1 accomplish, or the challenge, was to level up the leaders

2 throughout the shop on second shift.  So I spent approximately

3 one year on the second shift.

4 Q Okay.  And then after that one year, what did you do after

5 that?

6 A After the one year, I came to the first shift and began

7 working with the team that was already there.

8 Q Okay.  And for that first approximately year that you were

9 working the second shift, who was the production manager on the

10 shift first?

11 A That was Keith Milano.

12 Q Okay.  And when you first took that position approximately

13 in May of 2016, who were you reporting to?

14 A I was reporting to Russell Varone.

15 Q And did that change at any point?

16 A That changed in 2017 when Russell left the company.

17 Q Okay.  And who did you report to after Russell left?

18 A I reported to Peter Hochholdinger.  I hope I said that

19 right.

20 Q Okay.  And do you know who Mario (sic) reported to?

21 A Mario or --

22 MR. ROSS:  Mario?

23 THE WITNESS:  -- Keith?

24 MR. MORRIS:  Keith.

25 THE WITNESS:  Well, before Russell left -- one of the



1    reasons that I came to first shift was that Keith Milano was

2    moving over to the Model 3 program.  So at that point, the

3    Model 3 program reported to Russell, and I reported to Peter.

4    Q    BY MR. MORRIS:  Okay.  And do you recall who Russell

5    reported to?

6    A    Russell reported to Peter.

7         MR. ROSS:  I couldn't hear.

8         THE WITNESS:  Russell reported to Peter.

9    Q    BY MR. MORRIS:  And who did Peter report to, if you know?

10   A    Peter reported to Elon.

11   Q    Okay.  And for that approximately one year that you were

12   working the second shift, what other job classifications or

13   positions reported up to you?

14   A    The associate managers of the second shift reported

15   directly to me, and they also had supervisors reported up to

16   them, and all of the production associates and leads.

17   Q    Okay.  And what about when you moved to the first shift,

18   did that change at all?

19   A    When I went to the first shift, then both shifts reported

20   to me.

21   Q    Okay.  And what about in terms of positions that reported

22   to you after you took over for second shift?

23   A    It was the same positions, but on both shifts.  So

24   basically double.

25   Q    Okay.  What does Tesla do or manufacture in Fremont?



1   A    We manufacture a lot of products.  We manufacture -- the

2   main one being vehicles, electric vehicles.  We manufacture

3   charging stations, Superchargers, and different components.  We

4   also manufacture all of the -- the main subcomponents for the

5   vehicle.

6   Q    And what do those include?

7   A    So the subcomponents that would normally be purchased by

8   another OEM would be like the electric motor, the charging

9   system, the battery packs, the touchscreen that goes into the

10  vehicle.

11  Q    Okay.  And in terms of the cars that you manufacture, what

12  are the cars that you manufacture?

13  A    Tesla manufactures Model S, Model X, and the Model 3.

14  Q    Okay.  And do you recall when the Model S started being

15  manufactured?

16  A    It was -- started manufacturing before I was there.  I'm

17  going to say probably early 2012.

18  Q    And what about the X?

19  A    The X, I would say late 2015, is my guess.

20  Q    And do you know when the Model 3 was manufactured?

21  A    I would say late 2000- -- or early 2017.  Somewhere around

22  there.

23  Q    Okay.  And in terms of the manufacturing process, so you

24  manufacture parts there, an entire car is assembled, and a

25  completed car is finished at the end of that procedure?



www.escribers.net | 800-257-0885

1    A    That's correct.

2    Q    Do you have any idea how big the facility is in Fremont,

3    the manufacturing facility?

4    A    I think the main building should be somewhere around

5    5 million square feet.

6    Q    And I'd like to walk through the specific manufacturing

7    process of the Model S and X --

8    A    Okay.

9    Q    -- in and around 2017.  First off, you referred to

10    powertrain.  What is a powertrain?

11    A    So the powertrain is a department that manufactures the

12    components.  So when I worked there, I supervised the stator

13    rotor and the electric motor assembly.  And in that department,

14    what they do is they bring in raw material, raw copper, copper

15    wires, a bunch of different things, and everything is

16    manufactured from scratch --

17    Q    Okay.

18    A    -- you can say.

19    Q    And where is powertrain in the facility?

20    A    Powertrain is located on the second floor of the main

21    building.

22    Q    Do you know what production control is?

23    A    Production control is the team that manages the warehouses

24    and brings parts to the line.

25    Q    What do you mean by that, bring parts to the line?



www.escribers.net | 800-257-0885

1    A    So every line, every assembly process has parts racks next

2    to it that feed parts to the associates.  The production

3    control team members would either bring them over on a forklift

4    or a tugger with a dolly, and they would load the -- the parts

5    onto the racks.

6    Q    Okay.  And the job classification or position that does

7    that, is that known as the material handler?

8    A    That is correct.

9    Q    What about the stamping press center, do you know what

10   that is?

11   A    Yes.

12   Q    What is that?

13   A    Stamping press center, we bring in coils of aluminum for

14   the Model S and X.  That aluminum is cut into blanks, and those

15   blanks are used to load into the stamping presses which create

16   the body panels, doors, liftgates, hoods for the vehicle.

17   Q    Okay.  Anything else happen in stamping or the press

18   center?

19   A    Besides the stamping, I mean they -- we have some laser

20   machines, and cut holes and things like that.  That is my

21   limited knowledge of stamping --

22   Q    Okay.

23   A    -- but --

24   Q    And what happens after stamping in the press center?

25   A    So stamping, they'll load their finished stamped parts



www.escribers.net | 800-257-0885

1     into racks.  Those racks will go into the warehouse, and that's

2     where the material handlers would pick them up to take them to

3     the next department.

4     Q    Okay.  And what's the next department?

5     A    The next department is body-in-white --

6     Q    Okay.

7     A    -- or also referred to as body shop.

8     Q    Is also referred to as body assembly sometimes, too?

9     A    Correct.

10    Q    And what occurs there?

11    A    They'll take the -- they'll take all the stamped

12    components and other components that we purchased from

13    suppliers and they'll begin the welding process to create the

14    skeleton of the vehicle.

15    Q    Okay.  And do you know what the Model S and X are

16    primarily made from?

17    A    They're primarily made from aluminum.

18    Q    And then what happens next after body-in-white?

19    A    Once body-in-white completes the assembly, puts on all the

20    fenders, hoods, liftgates, the -- the vehicles are transported

21    to the paint system on a dolly.

22    Q    Okay.  And the paint system, is that a separate department

23    from body-in-white?

24    A    Correct.

25    Q    Okay.  And what occurs there?



1   A    Once the -- once paint receives the body, they'll send it

2   through a chemical bath called e-coat for protection, corrosion

3   protection.  And once that's done, it will go through an oven

4   to cure.  After that's done, it will go through the painting

5   process.  Once -- once the vehicle's painted, it will go

6   through another oven to help -- to begin the curing process of

7   the paint.  And it will go through inspections, touch-ups, and

8   then they will be loaded into a scheduled bank or a bank of

9   painted cars ready to go to the next department.

10  Q    Okay.  And what is the next department?

11  A    The next department would be General Assembly.

12  Q    Okay.  And that's sometimes referred to as GA?

13  A    Correct.

14  Q    Is it also referred to as final assembly sometimes?

15  A    Also correct.

16  Q    Okay.  And what is General Assembly?

17  A    So General Assembly is where -- if you look at a wheel,

18  it's kind of like the hub, right?  All the departments that

19  create parts throughout the factory, everything comes to

20  General Assembly.  And you will take a painted body with

21  nothing in it, and you will add the wiring harnesses, you will

22  add the subcomponents, you'll add the interior, the seats, the

23  drivetrain, the battery pack, the suspension.  I mean, it --

24  everything that's on there beside the painted body is put onto

25  the vehicle or assembled to the vehicle in General Assembly.



www.escribers.net | 800-257-0885

1   So at the end of general assembly, you have a completed vehicle

2   that is driven off the assembly line.

3   Q    Okay.  And approximately how many production employees are

4   in General Assembly currently?

5   A    Currently I have 480 production associates and leads per

6   shift.

7   Q    And what about the middle of 2017, do you recall

8   approximately?

9   A    The middle of 2017, there was probably 550 a shift.

10  Q    With how many shifts?

11  A    Two shifts.

12  Q    Okay.  Were there ever three shifts?

13  A    Yes.

14  Q    And approximately how many production associates were

15  working all three shifts?

16  A    On the three shifts, there was 1,800 total.  600 per

17  shift.

18  Q    Okay.  And General Assembly, that's a separate department

19  from press, paint, powertrain, and the other departments you

20  mentioned?

21  A    Correct.

22  Q    And they have different production teams and management

23  teams?

24  A    Correct.

25  Q    How is the skeleton of the scar, the body of the car,



1    delivered to the assembly line in General Assembly?

2    A    The vehicle's delivered.  It's on an overhead carrier

3    system.  So the first station in General Assembly is a robot

4    seal.  A giant robot will pick up the vehicle from the carrier,

5    the carrier will exit from the vehicle, and then the robot will

6    place that vehicle onto an AGV, automated guided vehicle, and

7    the first part of the assembly is done on that AGV.

8    Q    Okay.  And the first part of assembly, is that called

9    anything?

10   A    That's Trim 05.

11        MR. ROSS:  I'm sorry?  It's called?

12        THE WITNESS:  Trim 05.

13   Q    BY MR. MORRIS:  Okay.  And once the car -- not the car --

14   the body of the car is transferred there, what occurs?

15   A    The beginning parts of it is to try to protect the vehicle

16   as much as possible.  So when the vehicle comes from Paint,

17   paint is still not fully cured, right?  It's cured enough for

18   light touching and general handling, but it's not cured -- it's

19   not robust as it would be when the customer receives it.  So we

20   put on fender covers, we put on protectors over the door, and

21   generally try to -- the high traffic areas or the areas that

22   are susceptible to mutilations, we try to protect those.

23   Q    Okay.  And are there any parts or things that are

24   installed to the body at this stage?

25   A    A lot of the things that we're doing are things that will



1   be hidden, like plugs, stickers, different small components to

2   the vehicle.

3   Q    Okay.  Any other things installed at that point in the

4   process?

5   A    Wire harnesses, we install liftgate struts on the -- for

6   the liftgate, we install the rods and the hinge things for

7   the -- the hood of the vehicle, we install silencer pads,

8   various other small components.

9   Q    Okay.  And what are the production employees doing on

10  Trim 05?

11  A    They're installing those -- those components.  So besides

12  those smaller components and things that will be not accessible

13  to the customer, they also are assembling -- the rear door of

14  the Model X is removed from the vehicle and there's a separate

15  set assembly of that rear door.  So they are installing the

16  internal components in the vehicle, which -- such as the

17  window, the motor for the window, some censors for the vehicle

18  safety systems.

19  Q    Okay.  And approximately how many production associates

20  are in Trim 05 at any given moment?

21  A    Approximately 100.

22  Q    Okay.  I have an exhibit -- I think we left off --

23       MR. ROSS:  Respondent's 15.

24       MR. MORRIS:  15?

25       THE COURT REPORTER:  16.


www.escribers.net | 800-257-0885

1    MR. ROSS:  That's next in order, right, 16?

2    THE COURT REPORTER:  16 is next.

3    MR. ROSS:  Yep.

4    MR. MORRIS:  16?

5    **(Respondent Exhibit Number 16 Marked for Identification)**

6    Q    BY MR. MORRIS:  Mario, could you tell me what Respondent's

7    Exhibit 16 appears to be?

8    A    This looks like a bird's-eye view of the General Assembly

9    department.

10   Q    Okay.  And does this accurately reflect what generally

11   assembly looks like currently?

12   A    Correct.

13   Q    And you referred to Trim 05.  Do you see that on

14   Respondent's Exhibit 16?

15   A    I do.

16   Q    And I'd like you to mark the exhibit TL5 on the diagram,

17   and then show the rest of the --

18   A    All right.

19   Q    -- hearing --

20   JUDGE TRACY:  So you're going to have to then show the

21   parties --

22   MR. MORRIS:  Yeah.  And then we can make --

23   JUDGE TRACY:  -- what he's marking.

24   MR. MORRIS:  -- a copy at one of the breaks.

25   THE WITNESS:  You want me to show that one?



1       MR. MORRIS:  Yeah.

2       JUDGE TRACY:  If you could hold it up and point to where

3   you have marked --

4       MR. GARBER:  Could we pass it around maybe?

5       JUDGE TRACY:  Yeah.  That would be fine.

6       MR. GARBER:  Thanks.

7       JUDGE TRACY:  So assuming this is going -- you're going

8   move to have this admitted into evidence, is there a better

9   copy of it, a color copy?

10      MR. MORRIS:  Unfortunately I don't think we're going to be

11  able to provide something that's clearer than this.

12      JUDGE TRACY:  Yeah?

13      MR. MORRIS:  Yeah.

14      JUDGE TRACY:  Why is that?  This is it?

15      MR. MORRIS:  Well, part of the reason is some of this

16  information concerns proprietary business information --

17      JUDGE TRACY:  Right.

18      MR. MORRIS:  -- and if any further details were provided,

19  then we would be forced to reveal some of that information.

20      JUDGE TRACY:  Right.  But I guess -- I mean, yeah, it has

21  not been moved to be admitted, but I guess the problem that I

22  foresee happening is you're going to move to admit it, but it

23  really at this point is -- especially the lower right corner

24  has so many lines and just -- it's -- when it's scanned in, it

25  might not show up as great.  So it might, in the end, just be



www.escribers.net | 800-257-0885

1   this like fuzzy looking diagram that really doesn't quite help

2   as much.  But I mean, if that's what it is, that's what it is.

3        May I see where you marked so I can --

4        THE WITNESS:  Yes.

5        JUDGE TRACY:  -- mark my own?

6        I also think that what you should be doing actually is --

7   so you have Respondent's Exhibit 16.  So I would label that as

8   page 1.  Make a copy of this that he's marked as page 2 of

9   Respondent's Exhibit 16 so that way the record really reflects

10  what it looks like without his markings and then another set,

11  like page 2 of it, that has his markings.  Okay?

12       MR. MORRIS:  Okay.  Sure.

13       JUDGE TRACY:  Okay.  Sorry.

14       MR. MORRIS:  Yeah.

15       JUDGE TRACY:  Go ahead.

16  Q    BY MR. MORRIS:  Okay.  What happens after Trim 05?

17  A    The vehicle's lifted off of the AGV by another robot, and

18  then it's reinstalled to an overhead carrier.

19  Q    Okay.  And what happens next?

20  A    From that overhead carrier, there are approximately six

21  production processes that work on the vehicle while it's on

22  that overhead carrier.

23  Q    And is that area referred to anything --

24  A    It --

25  Q    -- where those processes are occurring?



www.escribers.net | 800-257-0885

1    A    It's called MOT.

2    Q    Okay.  M --

3        MR. ROSS:  It's T, as in Tom?

4        THE WITNESS:  Yes.

5    Q    BY MR. MORRIS:  And what are the six different processes

6    that you described?

7    A    They're installing some brake lines, they're installing

8    air lines for the air suspension, a couple of other pads and

9    components under the vehicle.

10    Q    Okay.  And what are the production associates doing in

11    that area?

12    A    They are installing those components.

13    Q    And approximately how many production associates can be --

14    A    Approximately --

15    Q    -- in that area?

16    A    -- six.

17    Q    Okay.

18        MS. FEINBERG:  I'm sorry.

19        MR. ROSS:  How many?

20        MS. FEINBERG:  I didn't hear you.

21        MR. GARBER:  What was that?  I didn't --

22        THE WITNESS:  Six.

23        MR. GARBER:  Thank you.

24        MR. ROSS:  Did you say six?  Yeah.

25        MS. FEINBERG:  And I'm sorry.  Are these answers per shift?

escribers
www.escribers.net | 800-257-0885

1      THE WITNESS:  Yes.

2      MS. FEINBERG:  Thank you.  Sorry.

3   Q    BY MR. MORRIS:  And could you mark the exhibit MOT?  And

4   could you hold that up for the rest of the room, please?

5   A    Yeah.  I'm sorry.

6      MR. GARBER:  Hold it so I can see it first.

7      JUDGE TRACY:  Okay.  There you go.

8      MR. GARBER:  Thank you.  Thanks.

9      THE WITNESS:  Thank you.

10      MR. MORRIS:  May I proceed?

11      JUDGE TRACY:  Yes.

12   Q    BY MR. MORRIS:  What happens after MOT?

13   A    After MOT, the vehicle is again picked up by a robot and

14   is lowered onto a slat conveyor.  And that is Trim 1.

15   Q    Okay.  And what happens in Trim 1?

16   A    In Trim 1, they're (sic) continue to install some

17   components, they install tail lamps, more wire harnesses, they

18   remove -- any doors that are on the vehicle are removed.  At

19   that point, also in Trim 1, they install the roof, either the

20   paneled roof or a solid glass roof are installed.

21   Q    Okay.  And what are the production associates doing in

22   that area?

23   A    They're performing installations or installing components

24   or removing doors.

25   Q    Okay.  And how many production associates can be in Trim 1



22-60493.1373

1    during a given shift?

2    A    There's about 40.

3    Q    Okay.  And for Trim 1, could you mark that T1 on the

4    exhibit, please.  And what happens after Trim 1?

5    A    So from Trim 1, the doors that are removed, the doors are

6    loaded onto door carriers, that overhead system, and they're

7    transported over to the door line where the doors are fully

8    assembled.

9    Q    And what happens after that?

10    A    After that, after the doors are fully assembled, that's

11    loaded into an overhead bank system that holds all the doors.

12    Those doors will be re-mated to the vehicle on the final line.

13    The vehicles itself (sic), after Trim 1, they get switched over

14    by two more robots to the other conveyor, which is called

15    Trim 2.

16    Q    Okay.  And what occurs in Trim 2?

17    A    Trim 2, more components are installed such as battery

18    charging system, seat belts, the HVAC unit, some brake -- more

19    brake components, brake pedals, accelerator pedal, things of

20    that nature.

21    Q    Okay.  And what are the production associates doing in

22    that area?

23    A    They are installing these components in the vehicle.

24    Q    And how many production associates can be in that area in

25    a given shift?



1    A     About 40.

2    Q     Okay.  And if you can mark T2 for Trim 2 on the exhibit,

3    please.  And what happens after T2?

4    A     After T2, the vehicle is lifted again into an overhead

5    carrier.  The overhead carrier feeds into a small production

6    line of six associates.  And that area is called T2T.  In that

7    area, they install the front drive unit, the front --

8         MR. ROSS:  The front --

9         THE WITNESS:  -- electric motor.  It's installed --

10        MR. ROSS:  I'm sorry.  I couldn't hear it.  The front --

11        THE WITNESS:  The front electric motor gets installed in

12   that area along with some other under body components.

13   Q     BY MR. MORRIS:  Okay.  And what are the production

14   associates doing in that area?

15   A     They're installing the components.

16   Q     Okay.  And how many production associates can be on a

17   shift in that particular area at a given moment?

18   A     Approximately six.

19   Q     Okay.  And what happens after trim line 3 (sic)?

20   A     All those vehicles are still in the overhead --

21        MR. ROSS:  He said T2T.

22        THE WITNESS:  -- bank.

23        MR. ROSS:  It was T2T, the last one.

24        MR. MORRIS:  It was?

25        THE WITNESS:  T2T.



1        MR. ROSS:   T2T.

2   Q    BY MR. MORRIS:  So we're talking about T2T, correct?

3   A    Correct.

4   Q    Okay.  And you were about to say something.

5   A    So after they leave T2T, they're still -- they're fed into

6   our largest overhead bank, and they're -- they get loaded in

7   there, and they're ready for the next production area.

8   Q    And what is the next production area?

9   A    The next production area is Trim 3.

10  Q    Okay.  And what occurs in Trim 3?

11  A    In Trim 3, they install some smaller components.  Major

12  components installed there would be the rear struts, the

13  instrument panel, windshield glass, and rear glass are

14  installed in that area.

15  Q    And what are the production associates doing there?

16  A    They're installing these components.

17  Q    And how many production associates can be on a shift at a

18  given moment?

19  A    There's about 30.

20  Q    Okay.  And what happens after Trim 3?

21  A    After Trim 3, the vehicle is picked up from the conveyor

22  and placed on an overhead carrier, and it goes to Chassis 1

23  Q    It goes to where?

24  A    Chassis 1.

25  Q    Okay.  And could you mark on the exhibit T2T for T2T, and



www.escribers.net | 800-257-0885

1    then also T3 for Trim 3?

2        JUDGE TRACY:  You also want to put a color copy of that

3    version, because he's writing in blue pen.  So that way, again,

4    in the transcript it's going to -- you're going to be able to

5    see it better because -- I mean, the -- obviously the

6    handwriting you can see, but the drawing a line around you

7    probably won't be able to see very well, assuming you're going

8    to move to admit it.

9        MR. MORRIS:  Okay.

10   Q    BY MR. MORRIS:  And you've referenced or used the term

11   conveyor for the different trim lines.  Is that a moving

12   conveyor?

13   A    Yes.

14   Q    What happens in Chassis Line 1?

15   A    Chassis Line 1, they install the rear suspension, the

16   front suspension, and the rear motor, and the battery pack.

17   Q    Okay.  And what are production associates doing on Chassis

18   Line 1?

19   A    They're installing these components.

20   Q    And how many production associates are in Chassis Line 1

21   during a given --

22   A    Approximately --

23   Q    -- shift?

24   A    -- 14.

25   Q    And what happens after Chassis Line 1?



1    A    After Chassis Line 1, the vehicle goes into an overhead

2    carrier, and then it comes to Chassis 2.  At the beginning of

3    Chassis 2, there's another robot that will take the vehicle

4    from the overhead carrier and place it on the slat conveyor.

5    Q    Okay.  And what happens after that?

6    A    After that, the associates will begin installing the

7    internal components, besides the instrument panel that was

8    already installed.  And now these are most of the customer-

9    facing components.  So they install the carpet, they install

10   the center console, they start installing interior trim pieces,

11   seals, they install the frames for the seats, the rear bumper

12   or fascia, as it's referred to, and the front bumper and fascia

13   are also installed in this area.

14   Q    Okay.  And how many production associates are in Chassis

15   Line 1 during a shift?

16   A    There's about 40.

17   Q    Okay.  And what happens after Chassis Line 1?

18        MR. ROSS:  2.

19        THE WITNESS:  3.

20   Q    BY MR. MORRIS:  2?

21   A    After Chassis Line 2, there's a Chassis Line 2b, which is

22   installing the same type of components.  So on that whole

23   conveyor, there's probably 60 people.

24        MR. ROSS:  6-0?

25        THE WITNESS:  6-0, yes.



www.escribers.net | 800-257-0885

1    Q    BY MR. MORRIS:  And what are the production associates

2    doing there?

3    A    They're installing components in the vehicle.  That's also

4    where we start loading the software to the vehicle and testing

5    vacuum for brakes.

6    Q    Okay.  And what happens next?

7    A    After that, it gets lifted by another robot into the

8    overhead conveyor.  It stays in that overhead carrier, and it

9    goes to Chassis 3.

10   Q    Okay.  And what happens in Chassis 3?

11   A    Chassis 3, they finish securing the battery pack, they

12   install all the underbody trim, plastic parts underneath for

13   aerodynamics.

14   Q    Okay.

15   A    They also -- this is also where the wheels and tires are

16   installed to the vehicle.

17   Q    Okay.  And what are the production associates doing there?

18   A    They are installing those components.

19   Q    And how many production associates are on Chassis Line 3

20   for a shift?

21   A    It's approximately 20.

22   Q    Okay.  And if you could mark Chassis Line 1, 2, and 3 as

23   C1, C2, C3 on the diagram, please?

24        MR. GARBER:  Could we just clarify, Your Honor, is C2b part

25   of Chassis 2 or is that a different area?



1    MR. MORRIS:  I'm sorry.  I didn't hear you.  Say it again.

2    MR. GARBER:  C2b is actually a part of -- the witness could

3    mark it down maybe.  But is C2b part of Chassis 2 or is that

4    like a separate area?

5    MR. MORRIS:  Let's ask the witness.

6    Q    BY MR. MORRIS:  Mario, could you help explain?

7    A    They have -- they have two different supervisors, so --

8    JUDGE TRACY:  But the question is, is that you've testified

9    about Chassis Line 2, you've also testified about C2b.  Is C2b

10   physically contained within Chassis Line 2 or is it --

11   THE WITNESS:  They're --

12   JUDGE TRACY:  -- next to it or something like that?

13   THE WITNESS:  They're on the same conveyor.

14   JUDGE TRACY:  So when you mark this, is that -- is Chassis

15   Line 2 going to be Chassis Line 2 including the 2b portion of

16   it?

17   THE WITNESS:  Yes.

18   MR. GARBER:  Okay.  Thank you.

19   JUDGE TRACY:  Okay.  So I'll just note here that I'm

20   looking at this Respondent's Exhibit 16 that you've marked.

21   And so you have C1, you have marked C2a, and you've marked C2b.

22   So is that because -- I didn't hear about C2a --

23   THE WITNESS:  It was just --

24   JUDGE TRACY:  -- did I?

25   THE WITNESS:  -- referred to as C2 --



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  Okay.

2    THE WITNESS:  -- but --

3    JUDGE TRACY:  But it's broken up into two pieces?

4    THE WITNESS:  Yes.  It's two different leaders for that

5    area.

6    JUDGE TRACY:  And then where --

7    THE WITNESS:  The associates that work in C2a do not work

8    in C2b.

9    JUDGE TRACY:  And then where about -- where is C3?

10    THE WITNESS:  Oh, yeah.

11    JUDGE TRACY:  Could you mark that?

12    THE WITNESS:  I'm sorry.

13    JUDGE TRACY:  Oh, I'm sorry.  I didn't finish looking.

14    MR. ROSS:  Judge, can we open up the door and get some air

15    in here?  It's pretty warm.

16    JUDGE TRACY:  Yeah.  That's fine.  They can adjust it, too.

17    You can ask them to --

18    MR. ROSS:  I may ask that that --

19    JUDGE TRACY:  -- adjust it.

20    MR. ROSS:  -- be done.

21    JUDGE TRACY:  And then somebody just needs to go get me a

22    sweater.  But if it starts getting noisy, we'll have to close

23    it.  But if you don't mind asking to have them turn it down,

24    and ask them for a sweater.  I'm kidding, but I might be

25    freezing.



www.escribers.net | 800-257-0885

1       Okay.  When you guys are ready.

2       And while we're waiting for the parties to look at what

3   you've marked, could you clarify again for me what is your

4   current role?  The picture that you've been marking,

5   Respondent's -- it's marked as Respondent's Exhibit 16, that

6   picture is a picture of General Assembly?

7       THE WITNESS:  General Assembly --

8       JUDGE TRACY:  Okay.

9       THE WITNESS:  -- SX.

10       JUDGE TRACY:  What's that?

11       THE WITNESS:  SX.

12       JUDGE TRACY:  And what does that mean?

13       THE WITNESS:  Model S, Model X is what's being produced on

14   that line.

15       JUDGE TRACY:  Okay.  And so you -- and what is your role?

16       THE WITNESS:  I am the senior leader for that role.  So my

17   title is Senior Production Manager.

18       JUDGE TRACY:  And so in terms of General Assembly SX, do

19   you oversee the entire area or --

20       THE WITNESS:  That's correct.

21       JUDGE TRACY:  You're part of the chain of command, I guess,

22   there?

23       THE WITNESS:  Yes.

24       JUDGE TRACY:  Okay.  And how long have you had that job?

25       THE WITNESS:  I've been -- with that responsibility and



www.escribers.net | 800-257-0885

1    ownership, since 2016.

2         JUDGE TRACY:  And what --

3         THE WITNESS:  With the --

4         JUDGE TRACY:  -- part of 2016?

5         THE WITNESS:  May 2016.

6         JUDGE TRACY:  Okay.  And then prior to May of 2016 --

7         THE WITNESS:  I --

8         JUDGE TRACY:  -- what was your job.

9         THE WITNESS:  I was an Associate Manager in a different

10   department.

11        JUDGE TRACY:  Within General Assembly?

12        THE WITNESS:  No.

13        JUDGE TRACY:  No.  A different --

14        THE WITNESS:  A different department.

15        JUDGE TRACY:  Okay.  So nothing that you've -- that's been

16   depicted in Respondent's Exhibit 16 you had a role overseeing

17   prior to May of 2016?  You didn't have a role in anything

18   that's in Respondent's Exhibit 16?

19        THE WITNESS:  Correct.

20        JUDGE TRACY:  Okay.

21        MS. FEINBERG:  Okay.  I think I got that.

22        JUDGE TRACY:  Go ahead.

23   Q    BY MR. MORRIS:  Okay.  So what happens after Chassis Line

24   3?

25   A    After Chassis Line 3, the vehicle now has its wheels and



1  tires on it.  The robot lifts it off the overhead carrier and

2  places it onto a flat conveyor.  So now the vehicle is sitting

3  as it is -- as the customer will receive it.

4  Q    Okay.  And what happens next?

5  A    The final interior components are installed, such as

6  seats, more interior panels.  There's some work done in the

7  trunk.  Some of the trunk pieces, some things on the tailgate.

8  The vehicle's filled with brake fluid and coolants and AC

9  stuff.  And the seats, interior, the front portion of the

10 vehicle, which is called the frunk, is installed.

11 Q    Okay.  Anything else installed there?

12 A    The doors that -- the doors that we talked about being

13 removed previous and assembled, those are now reassembled to

14 the vehicle.  So now the vehicles have all doors installed.

15 There is a small team from another department that works on

16 that line as well, and they will do the final fitting of the

17 vehicle, make sure the doors, everything matches up, nice lines

18 on the vehicle.  Door panels are installed to the doors.  And

19 then we have a couple of associates that will look for fit

20 function, quality issues on the assembly line.  And then we

21 have operators that will drive the vehicle off and hand it off

22 to the next department.

23 Q    Okay.  And going back to the seats, how are they

24 specifically installed?

25 A    The seats, they have what's called the end effector.



www.escribers.net | 800-257-0885

1   So --

2       MR. ROSS:  Called what?

3       THE WITNESS:  End effector.

4       MR. ROSS:  Thank you.

5       THE WITNESS:  So it's a component that's built to insert

6   into the seat.  It's lifted up either by a pneumatic hoist or

7   an electric hoist, and it's lifted up.  And the intention is

8   for zero balance so that the associate can guide that seat into

9   the vehicle.

10  Q   BY MR. MORRIS:  Okay.  And how many production associates

11  are working in Final Line during a shift?

12  A   So final line is split up into three areas, similar to

13  Chassis 2.  Right?  There's a Final 1, a Final 2, and a

14  Final 3.  And it's approximately 90 associates.

15      MR. GARBER:  I'm sorry.  Could you repeat that?  9-0 or --

16      THE WITNESS:  9-0.

17      MR. GARBER:  Okay.

18      THE WITNESS:  Sorry.

19      MR. GARBER:  Thank you.

20  Q   BY MR. MORRIS:  Okay.  And could you mark Final 1,

21  Final 2, Final 3 as F1, F2, F3?

22      MR. GARBER:  Could we just have a little clarification?

23  Between F3 --

24      JUDGE TRACY:  You're going to need to stand by a

25  microphone.



www.escribers.net | 800-257-0885

1    MR. GARBER:  All right.  Between what's marked as F3 and

2  T2T, there is another rectangle.  Is that like -- and again, is

3  that part of the T2T or is that part of F3 or is that something

4  separate?

5    JUDGE TRACY:  Just to make this faster, why don't you go

6  ahead and ask him.

7    MR. GARBER:  Okay.  So there's this portion right there.

8  Is that --

9    THE WITNESS:  That's F2.

10    MR. GARBER:  That's F2?

11    THE WITNESS:  Yes.

12    MR. GARBER:  All right.  Thanks.

13    JUDGE TRACY:  So go ahead and show them what you -- what

14  the witness testified about, Mr. Garber.

15    MR. GARBER:  Okay.

16    JUDGE TRACY:  Show Mr. Morris and Mr. Ross.

17    MR. GARBER:  Just this portion between F3 and T2T --

18    MR. MORRIS:  Um-hum.

19    MR. GARBER:  -- I guess is F2, and that's what I was unsure

20  about.

21    MR. MORRIS:  Okay.  Thanks.

22    MR. GARBER:  So -- yeah.

23    THE WITNESS:  Yeah.  To clarify, T2T is overhead in that

24  area.  So Final 2 runs --

25    MR. GARBER:  Okay.



www.escribers.net | 800-257-0885

1    THE WITNESS:  -- completely in the --

2    MR. GARBER:  Thanks.

3    Q    BY MR. MORRIS:  Okay.  And the different chassis lines

4    that you mentioned, of those moving conveyors?

5    A    Correct.

6    Q    And what about for Final Line?

7    A    That's also moving.

8    Q    Okay.  And after Final Line, what happens next?

9    A    The vehicle is handed over to the next department, which

10    is called End of Line.

11    Q    And what happens there?

12    A    That will go through a brake and roll system, test

13    diagnostics, wheel assignment.  They'll test out the charging

14    system.  The final -- the final steering wheel air bag is

15    installed.  Once it goes through that test, the vehicle will

16    then be put onto another slat conveyor or it's called a shower

17    line, and they will test for water leaks.  And after that, and

18    it's handed off to the next department, which would be the

19    inspection.

20    Q    Okay.  And is End of Line considered part of General

21    Assembly?

22    A    No.

23    Q    It's a separate department?

24    A    Correct.

25    Q    And inspection is a separate department?



1    A    Correct.

2    Q    And what happens in inspection?

3    A    Inspection, they will be looking for all the customer-

4    facing issues that may concern a customer.  So they'll look for

5    fit and finish, mutilations, dings, dents, dirt, function,

6    ensure that all the components and the vehicle functions as

7    designed.

8        MR. ROSS:  I'm going to give him some throat lozenges.  We

9    thought you can use these.

10       THE WITNESS:  Thank you.

11       JUDGE TRACY:  He may not want them, though.  You don't have

12   to take it if you don't want to.

13       THE WITNESS:  Okay.  All right.

14   Q    BY MR. MORRIS:  And I may have asked you this, but

15   inspection, that's separate and apart from General Assembly?

16   A    That is correct.

17   Q    Okay.  Do you know what the approximate cost is of a

18   Model S?  Retail cost?

19   A    I would guess, based on all the different variation,

20   that's it's approximately at least 100,000.

21   Q    Do you know the approximate retail cost for the Model X?

22   A    Again, the middle of the road is probably 110, 120.

23   Q    Okay.  Do the production associates in General Assembly

24   receive any unique training?

25   A    Yes.  So they -- they receive a whole week of onboarding,



 1   which includes classroom, they receive two days of hands-on

 2   training, some mock vehicles or vehicles for training, there

 3   they'll learn how to handle torque tools, air guns, they'll

 4   also learn how to treat an unfinished vehicle.

 5   Q    And what do you mean by that, treat an unfinished vehicle?

 6   A    Well, as earlier stated, the paint is not fully cured.  So

 7   it is very susceptible by any minor bumps or abrasions, for

 8   mutilations --

 9   Q    Okay.

10   A    -- dents, dings, imperfections on the paint.  So basically

11   the way that we treat -- or we train is that you treat that

12   vehicle like it's still wet.  It's --

13   Q    Is there any special clothing required of production

14   associates in General Assembly?

15   A    Yes.

16   Q    And what is that?

17   A    So all --

18        MS. FEINBERG:  Objection.  Vague as to time.

19        JUDGE TRACY:  If you can clarify the question, please.

20        MR. MORRIS:  Sure.

21   Q    BY MR. MORRIS:  In 2017, the middle of 2017?

22   A    Yes.  There's special clothing required.  So --

23   Q    And what is that special clothing?

24   A    All associates at the time of their onboarding, they're

25   provided team wear.



www.escribers.net | 800-257-0885

1    Q    And what is team wear?

2    A    Team wear is shirts, pants, clothing that the Team Wear

3    department has researched and found the appropriate clothing

4    that would provide the least amount of risk if made contact

5    with the vehicle.

6    Q    Okay.  And could you describe what the current version of

7    the team wear is?

8    A    The current version of the team wear is a black shirt, a

9    gray stripe on the front that says Tesla.  It's a T-shirt --

10   cotton T-shirt.  And then the pants are black pants that say

11   Tesla on the side.

12   Q    Okay.  And how long has that been the team wear for

13   approximately?

14   A    Approximately since 2016.

15   Q    Okay.  And were there any other prior versions of the team

16   wear?

17   A    Yes.  There's different iterations of the team wear.

18   There's been red shirts, there's been black shirts as official

19   team wear.  But that's only -- the team wear that I already

20   described is for associates -- production associates only.

21   Q    Okay.

22        MR. RODRIGUEZ RITCHIE:  Your Honor, I'm not sure how long

23   this is going to go.  I was just wondering if we could have a

24   very short break.

25        JUDGE TRACY:  Sure.



22-60493.1390

1    Is this a good breaking point --

2    MR. MORRIS:  Sure.

3    JUDGE TRACY:  -- or do you have --

4    MR. MORRIS:  No.  This is fine.

5    JUDGE TRACY:  -- a few more questions to end this section

6    or --

7    MR. MORRIS:  No.  We can stop now.  This is fine.

8    JUDGE TRACY:  And how many more minutes do you think for

9    him do you have?

10    MR. MORRIS:  Maybe a half hour or so.

11    JUDGE TRACY:  Okay.  So let's go off the record for about

12    ten minutes.  Okay?

13    MR. RODRIGUEZ RITCHIE:  Thanks.

14    JUDGE TRACY:  All right.

15    (Off the record at 10:11 a.m.)

16    JUDGE TRACY:  Okay.  Mr. Morris, if you could continue,

17    please.

18    MR. MORRIS:  Okay.

19    Q    BY MR. MORRIS:  Mario, I'm not sure if it was clear.  You

20    said that approximately in May of 2016, you became the

21    Production Manager for General Assembly SX second shift, and

22    Keith Milano was the Production Manager for the first shift?

23    A    That's correct.

24    Q    Who did Keith report to?

25    A    He reported to Russell Varone.



www.escribers.net | 800-257-0885

1   Q    Okay.  And when Keith went over to Model 3, who did he

2   report to after that?

3   A    He also reported to Russell Varone.

4   Q    Okay.  So before we took the break, we were talking about

5   team wear for production associates.  Is there team wear for

6   any other job classifications in General Assembly?

7   A    Yes, there is.

8   Q    And what is that?

9   A    There's specified team wear for production leads,

10  production supervisors, in line inspectors, and maintenance

11  techs.

12  Q    Okay.  And what is the team wear for production leads?

13  A    Production leads where a red Tesla shirt.  It has a black

14  stripe down the front.

15  Q    And how long has that been the assigned team wear?

16  A    That was the assigned team wear when I arrived in May of

17  2016.

18  Q    Okay.  And what about the assigned team wear for

19  production supervisors?

20  A    Supervisors also where the red shirt.

21  Q    And how long has that been the case for?

22  A    They were wearing the red shirts when I arrived in May of

23  2016.

24  Q    Okay.  And then what about the assigned team wear for in

25  line inspectors?



www.escribers.net | 800-257-0885

1   A    In line inspectors wear the same shirt, but in white.

2   Q    And how long has that been the case for?

3   A    That was in place when I arrived to the department in

4   2016.

5   Q    Okay.  And aside from assigned team wear for production

6   associates, is there any other special clothing?

7   A    PPE, safety glasses, safety shoes.  We also require a bump

8   cap, and gloves are required when handling any material.

9   Q    Okay.  And you used the phrase mutilation.  What is a

10  mutilation in General Assembly?

11  A    A mutilation would a dent or a ding or a scratch on any of

12  the vehicle.

13  Q    And how can that impact the manufacturing flow?

14  A    Well, at times, you may have to stop and address it.  At

15  times, the vehicles will off-line.  Now, the off-line repair

16  team will have vehicles that they have to fix and repaint.

17  Q    Okay.  And do production associates have any obligations

18  in terms of identifying mutilations on the line?

19  A    Yeah.  We ask them if they see something, if they can let

20  us know right away.  That way we can try to find the root cause

21  of the mutilation.  Right?  Obviously $100,000 vehicles, you

22  don't want imperfections on it, but also because the

23  mutilations are a quality issue and it costs additional costs

24  to repair them, we want to find the root cause and stop it

25  before it keeps going.



eScribers

www.escribers.net | 800-257-0885

1 Q Okay.  And what can cause a mutilation defect in General

2 Assembly?

3 A Lots of things can cause mutilations.  Right?  We have

4 equipment and tools.  So we have some things that we do to

5 protect equipment and tools, make sure that they're not causing

6 mutilations.  Parts themselves can cause mutilations.  And then

7 also things that people may have on them, rings, watches, pants

8 that have rivets on them, keys hanging from their belt loop,

9 bulky, sharp things in their pockets.  So there's a lot of

10 things, a lot of risks that would create mutilations on the

11 vehicles.

12 Q Okay.  Any other reasons?

13 A You mean --

14 Q Any other things that can cause a mutilation in General

15 Assembly that you can think of off the top of your head?

16 A No.  Just people, equipment, and material.

17 Q Okay.  Can the failure to wear team wear cause a

18 mutilation?

19 A Well, yes, it can cause mutilation.

20 Q Okay.  Are there any other mutilation protections?

21 A We do provide things such as watch covers or ring covers

22 or belt buckle covers, if somebody chooses to wear those.

23 Q And are those mutilation protections required if someone

24 chooses to wear those things?

25 A Yes.

22-60493.1394



1    Q    And in terms of team wear, how does that relate to

2    mutilation protection?

3    A    Well, for me, team wear -- providing team wear and

4    requiring team wear is just reducing the risk factor to

5    mutilations.  For me, the bigger thing with team wear is visual

6    management of the shop.  So as we discussed, it's a 5 million

7    square foot facility.  Somewhere around 10,000 people walking

8    through the plant every day.  For me, that's how I know as a

9    manager who should be there, who shouldn't be there.  All

10   right?  But it also makes it easier for the supervisor.  Right?

11   They have 30 to 40 associates that they have to manage every

12   day.  It's easy for them to manage, hey, you guys look like a

13   team, but also it's how we verify that the clothing that

14   they're wearing provides the least amount of risk to the

15   vehicle.  So it's easy if everyone -- to scan 30, 40 people

16   rather than having to check 30, 40 people individually to see

17   if their pants are going to be too abrasive, to see if their

18   shirt has any mutilation risk on it.

19   Q    Okay.  And in terms of visual management, the there any

20   distinction between production associates and the other job

21   classifications that work in General Assembly?

22   A    Absolutely.

23   Q    And could you tell us about that?

24   A    Yeah.  So if I take the perspective of an associate, I

25   just started work, I just started working here, I know right



www.escribers.net | 800-257-0885

1   away if I see the person in the red shirt, I can ask them for

2   help.  That person in the red shirt should be the one that is

3   facilitating everybody, but it's -- it's -- it's visual

4   management of the shop.  If I'm walking through the area and I

5   see something that needs to be addressed or I need to talk to

6   somebody about something going on in a certain line, I know

7   immediately who I can go to.  Also, the in line inspectors or

8   other quality people that are seeing a defect coming from an

9   area, they know exactly who they can talk to.  Right?  This --

10  right?  There's thousands of people in there.  It's hard to

11  know everybody by name.  And because we have the visual

12  management in the shop, it's very easy to identify.

13  Q    Okay.  You mentioned team wear as being a prevention for

14  mutilations.  If someone doesn't wear team wear, is that

15  necessarily going to cause a mutilation?

16  A    It's not necessarily going to cause it, but it's going to

17  provide a higher risk of causing a mutilation.

18  Q    And did you participate in the drafting or revision of the

19  team wear expectations in the time that you've been employed at

20  Tesla?

21  A    Yes.

22  Q    And what is the purpose of the team wear expectations?

23  A    The purpose of the team wear expectations is to make sure

24  that everybody understands their role in providing the best

25  vehicle to our customer.  Right?  So whether it's the safety



1    aspect, the quality aspect, the cost aspect, everybody has a

2    role, and part of that role is wearing the proper team wear.

3    Q    Okay.  And the different things that you've identified, is

4    that SPQRC?

5    A    That's correct.

6        MR. GARBER:  Objection.

7    Q    BY MR. MORRIS:  And what does that stand for?

8        MR. GARBER:  Well, never mind.  Go ahead.  Sorry.

9        THE WITNESS:  Safety, people, rate, quality, and cost

10   (sic).

11   Q    BY MR. MORRIS:  And how does team wear relate to safety?

12   A    Team wear can relate to safety just by knowing that

13   everybody has the right clothing and team wear.  Right?  It's

14   not going to -- it's not too long, it's not too baggy, it's not

15   going to get caught in equipment or tools.  Also, in the event

16   of an evacuation, it helps to identify people, make sure

17   they're in the right area.  So if they're in my department,

18   they're going to have their team wear on.  And someone that

19   shows up in an evacuation area that doesn't have team wear on,

20   we can help them find their correct department.  As far as the

21   quality, again, this is a huge factor in eliminating or

22   reducing the risk of mutilations.  Right?  So mutilations will

23   cause quality issues, what leads to cost issues.  More cost to

24   produce the vehicle.

25   Q    Okay.  Any other reasons why team wear is associated with

22-60493.1397



1   safety, people, quality, rate, and cost that you can think of?

2   A    Those are the major reasons.

3   Q    Okay.  What about visual management?

4   A    Well, visual management, we already spoke of.  But

5   again -- right?  Everybody -- there's thousands of people in

6   there.  We don't allow -- right?  If you're not in the -- or

7   certified to be on the line, then you're probably being paid to

8   be somewhere else.  But also it's a lot of people there.  Can't

9   have extra people on the line.  It creates other safety hazards

10  and distracted workers and -- which could lead to more quality

11  or safety issues.

12  Q    Okay.  Are there ever times where production associates

13  that do not work in General Assembly some in to General

14  Assembly?

15  A    Yes.

16  Q    And what type of situations are those?

17  A    One of example would be the -- the body-in-white fit team

18  that we talked -- we mentioned earlier.  It's a smaller team of

19  associates that don't report to me, but they work on the final

20  assembly line providing the final fit and finish of the

21  vehicle.

22  Q    Anyone else that you can think of?

23  A    It could be anyone from engineers.  We have vendors that

24  work on site.  We have some vendors, contractors that work

25  refinishing or remanufacturing parts or things such as that



eScribers
www.escribers.net | 800-257-0885

1    nature.

2    Q    And what about material handlers?

3    A    Material handlers also will step into the line to deliver

4    the parts.

5    Q    And do you know if material handlers have mandatory team

6    wear?

7    A    They do not.

8    Q    Okay.  I'd like to show you an exhibit that we can mark as

9    Respondent's 17.

10    **(Respondent Exhibit Number 17 Marked for Identification)**

11    Q    BY MR. MORRIS:  And do you recognize this document?

12    A    I do.

13    Q    Could you tell us what this document is?

14    A    I believe this to be the revision of the General Assembly

15    expectations that was handed out in 2016.

16    Q    Okay.  And do you recall approximately when this was

17    disseminated?

18    A    I don't remember the exact month, but I do know it was

19    shortly after I came to General Assembly.

20    Q    So the summer of 2016?

21    A    Correct.

22    Q    And directing your attention to the first page, the

23    section mutilation protection, is that section the section that

24    addresses team wear?

25    A    Yes.



1    Q    And did you have any involvement in rolling out this

2    document, Respondent's Exhibit 17?

3    A    I did.

4    Q    And what was your role or involvement?

5    A    This was developed by Keith Milano.  He sent it out in an

6    email, and I forwarded the email to my direct reports and asked

7    them to ensure that they get them out to all the associates.

8    Q    Okay.  And do you recall how long -- well, do you recall

9    if this -- the General Assembly expectations was revised?

10   A    Since this revision?

11   Q    Yeah.

12   A    Yes.

13   Q    Do you recall approximately when that was?

14   A    I do not.

15   Q    Do you know if it was sometime in 2017?

16   A    It could be, yeah.

17   Q    And after this General Assembly expectations was rolled

18   out, what would happen if a production associate didn't comply

19   with the expectations?

20   A    They were talked to by their supervisors, given feedback.

21   The direction was to find out why they don't have it, and then

22   try to help them resolve that.

23   Q    Okay.  And how do you know that?

24   A    Because that is how I coached by managers.

25   Q    And were you responsible for enforcing or did you rely on



1    your individual managers and supervisors?

2    A    The supervisors and managers are responsible for

3    enforcing.

4    Q    Okay.  And what would happen if a production associate was

5    not in team wear?  What was the directive that you give?

6    A    To find out why, try to help them resolve why they

7    wouldn't do it.  If they weren't -- if it was just a matter

8    that they didn't want to comply, then they would have to follow

9    up with the correct actions.  So at that point, I would expect

10   the supervisor to contact their HR rep and try to come up with

11   the best solution.

12   Q    Okay.  And so you essentially relied on your individual

13   supervisors and managers to provide the appropriate corrective

14   action?

15   A    Yes.

16        MR. GARBER:  Objection.  Leading.

17        JUDGE TRACY:  Sustained.

18   Q    BY MR. MORRIS:  Do you have any understanding of the

19   corrective action that managers and supervisors took?

20   A    I know that they could provide Workday feedback to the

21   associate, which is -- Workday feedback to be positive or

22   constructive, but it's not disciplinary.  Workday feedback

23   could be a note that, hey, Johnny did not wear his team wear

24   today.

25   Q    Did you ever give approval to substitute all black



1    clothing instead of assigned team wear?

2    A    I did.

3    Q    And could you tell us why?

4    A    It was during the time -- we were ramping up for the

5    Model 3 production team.  At that time, we were onboarding

6    multitudes of people, not only for General Assembly, Model 3,

7    but also across the whole plant, and team wear was having a

8    bunch of issues keeping up with the supply and demand of team

9    wear.  So I did not want it to be punitive if somebody didn't

10    have their team wear, so I provided them an alternative, hey,

11    your -- your pants size is back ordered?  Okay.  You can

12    substitute for this.  Which is why in the revision it says on

13    occasion, the plain black shirt or the plain black pants could

14    be substituted.  But it wasn't a just if you want to, so.

15    Q    Okay.  And the revision you're referring to is the

16    modification to Respondent's Exhibit 17, not the one that

17    you're looking at?

18    A    Correct.

19    Q    And what was the rationale behind choosing all black as

20    opposed to some other color?

21    A    Because it matched pretty close to the team wear.

22    Q    Okay.  And did you give any directives to your managers or

23    supervisor (sic) concerning the all-black clothing substitute?

24    A    Yes.  They -- they are part of the discussion.  Right?  So

25    as you -- at that point, we're really trying to ensure that



www.escribers.net | 800-257-0885

1    everybody had team wear.  And as supervisors and managers came

2    up and expressed what the challenges were, then we agreed to

3    make a temporary exception.

4    Q    Okay.

5         MR. MORRIS:  I'd offer Respondent's Exhibit 17.

6         JUDGE TRACY:  Any objections?

7         MR. GARBER:  Can I just have a quick voir dire?

8         JUDGE TRACY:  Okay.

9                        **VOIR DIRE EXAMINATION**

10   Q    BY MR. GARBER:  You mentioned, or maybe I misheard you,

11   that this is a revision; is that right?  Or is this --

12   A    To my --

13   Q    -- the final version?

14   A    -- understanding, this is the first General Assembly

15   expectation after I came to that department.  I don't know what

16   was there before, so I can't speak to whether it was a revision

17   or a whole new expectation.

18   Q    But the version that you have in front of you that's

19   Respondent's 17, that was in effect when you came to that area?

20   A    No.

21   Q    It was not?

22   A    It was not.

23        MR. GARBER:  Okay.  Then I would object as to relevance if

24   it wasn't in effect at the time period.

25        JUDGE TRACY:  Okay.  So I'm going to intercede here,



1  because some of this -- what you relayed there is not what I

2  heard.

3       Let me ask you, this Respondent's Exhibit 17, when was that

4  created?

5       THE WITNESS:  In the summer of 2016.

6       JUDGE TRACY:  After you began?

7       THE WITNESS:  Correct.

8       JUDGE TRACY:  Okay.  And then I think you also testified

9  that there was some later revision of this Respondent's

10 Exhibit 17?

11      THE WITNESS:  Yes.

12      JUDGE TRACY:  Yes.  Do you know when that was.

13      THE WITNESS:  I don't remember the exact month or date.

14      JUDGE TRACY:  Okay.

15      THE WITNESS:  I know it was after this.

16      JUDGE TRACY:  And is that what you were testifying about

17 where you said, on occasion --

18      THE WITNESS:  Yes.

19      JUDGE TRACY:  -- the team wear could be substituted?

20      THE WITNESS:  Correct.

21      JUDGE TRACY:  Okay.  But that's not in Respondent's

22 Exhibit 17?

23      THE WITNESS:  No.

24      JUDGE TRACY:  It was later incorporated in some other

25 version of this Respondent's Exhibit 17.



1       THE WITNESS:  Yes.

2       JUDGE TRACY:  While you were still working there?

3       THE WITNESS:  Correct.

4       JUDGE TRACY:  Okay.

5       MR. GARBER:  I guess if I could just ask another question.

6   I'm unclear.

7   Q    BY MR. GARBER:  Was -- this version that's in front of

8   you, was this ever in effect and employees had to follow it?

9   A    Is this in effect?

10  Q    Yes.

11  A    Yes, it was.

12  Q    It was.  Okay.

13      JUDGE TRACY:  But you don't know when a new version

14  replaced this one?

15      THE WITNESS:  Yes, I -- I don't remember the exact month

16  and -- and date, but I do know that this exhibit, R-17, was

17  replaced with another set of expectations.

18      JUDGE TRACY:  So you do -- what -- and when -- around

19  what -- when was that?

20      THE WITNESS:  I would probably say 2017.

21      JUDGE TRACY:  Okay.  But you don't know what month or --

22      THE WITNESS:  (No verbal response).

23      JUDGE TRACY:  No.

24      THE WITNESS:  No.  I don't remember.

25      JUDGE TRACY:  Okay.



www.escribers.net | 800-257-0885

1    Q    BY MR. GARBER:  Just so I'm clear -- just to clarify, so

2    we're talking summer of 2016 to sometime in 2017 is when this

3    was in effect; is that right?

4    A    Yes.

5    Q    Okay.

6         JUDGE TRACY:  Okay.  So any objections?

7         MR. GARBER:  No.

8         JUDGE TRACY:  No?

9         Ms. Feinberg, any objections to Respondent's Exhibit 17?

10        MS. FEINBERG:  No, the way -- no.

11        JUDGE TRACY:  Okay.  All right.  So Respondent's 17 is

12   admitted into evidence.

13   **(Respondent Exhibit Number 17 Received into Evidence)**

14        MR. MORRIS:  Okay.  And I'd like to show the witness

15   General Counsel Exhibit 37.

16                    **DIRECT EXAMINATION  (RESUMED)**

17   Q    BY MR. MORRIS:  And do you recognize this document?

18   A    I do.

19   Q    And was this the revised 2017 General Assembly

20   expectations?

21   A    Yes.

22   Q    And directing your attention to the section on safety on

23   the first page, it's the third bullet, it says team wear,

24   and --

25   A    Okay.



1  Q    -- the second line is, on occasion, team wear may be

2  substituted with all black clothing if approved by a

3  supervisor, is that the language that you were referring to

4  earlier in your testimony?

5  A    Yes.

6  Q    Okay.  And I think you testified that you weren't certain

7  when exactly this was rolled out in 2017?

8  A    That's correct.

9  Q    Do you recall when the conversations initially began

10  concerning revising the 2016 General Assembly expectations?

11  A    I do not recall.

12  Q    Okay.

13      MR. MORRIS:  Okay.  I'd like to mark another exhibit

14  Respondent's 18.

15  **(Respondent Exhibit Number 18 Marked for Identification)**

16  Q    BY MR. MORRIS:  In taking a look at this document,

17  Respondent's Exhibit 18, it appears to be an email that was

18  sent by you with an attachment.  Does that refresh your memory

19  in when -- in terms of when the revised General Assembly

20  expectations was rolled out?

21  A    Yes.

22  Q    And was that in or about October of 2017?

23  A    That's correct.

24  Q    And this attachment was attached to the email on the first

25  page?

22-60493.1407



1    A    Yes.

2         MR. MORRIS:  I'd offer Respondent's Exhibit 18 any

3    objections?

4         MR. GARBER:  No.

5         MS. FEINBERG:  No.

6         JUDGE TRACY:  Okay.  So Respondent's Exhibit 18 is admitted

7    into evidence.

8    **(Respondent Exhibit Number 18 Received into Evidence)**

9    Q    BY MR. MORRIS:  Okay.  And after this was rolled out,

10   Respondent's Exhibit 18, the revised policy, were your

11   expectations any different than under the prior policy in terms

12   of team wear?

13   A    No.

14   Q    And so -- okay.

15        MR. MORRIS:  Withdraw that.

16   Q    BY MR. MORRIS:  Have you seen production associates

17   wearing union stickers on their team wear in General Assembly?

18   A    Yes.

19   Q    And do you recall how long you've seen production

20   associates wearing those stickers?

21   A    It's been a while.  At least a year.

22   Q    So sometime in 2017?

23   A    Correct.

24   Q    Can you provide a more specific time period?

25   A    Maybe summer.



1   Q    Okay.  And are stickers permitted on the team wear in

2   General Assembly?

3   A    Yes.

4   Q    Have you ever told someone that they couldn't wear a union

5   sticker on their team wear?

6   A    No.

7   Q    Have you ever told your management team or your

8   supervisors that production associates couldn't wear stickers

9   on their team wear?

10  A    No.

11  Q    Okay.

12       MR. MORRIS:  And so I haven't offered Respondent's

13  Exhibit 16, but I'd like to.  I know you want me to make

14  copies, and we can do that after the break.

15       JUDGE TRACY:  So you're moving for admission of

16  Respondent's Exhibit 16, page 1, and then do you intend to

17  provide page 2, a color copy of what the witness here has

18  marked?

19       MR. MORRIS:  Yep.

20       JUDGE TRACY:  Okay.  Any objections?

21       MR. GARBER:  No.

22       MS. FEINBERG:  No.

23       JUDGE TRACY:  Okay.  So Respondent's Exhibit 16, page 1 and

24  page 2, are admitted into evidence.  Page 2 will be provided

25  soon.



1  **(Respondent Exhibit Number 16 (pages 1 and 2) Received into**

2  **Evidence)**

3       MR. MORRIS:  That's it.

4       JUDGE TRACY:  Okay.

5       MR. MORRIS:  Thank you.

6       JUDGE TRACY:  Okay.  Mr. Garber, do you need a break?

7       MR. GARBER:  Yes, please.

8       JUDGE TRACY:  Okay.  Let's go off the record.

9  (Off the record at 10:51 a.m.)

10      JUDGE TRACY:  Okay.  Mr. Garber.

11                    <u>CROSS-EXAMINATION</u>

12  Q    BY MR. GARBER:  Hi, Mr. Penera.

13  A    Hello.

14  Q    My name is Noah.  I work for the NLRB.  I'm just going to

15  ask you a few questions just to clarify some things.  Before I

16  go into kind of my substantive questions, just a few background

17  questions.  Did you meet with Mr. Morris prior to today to go

18  over your testimony?

19  A    Yes.

20  Q    About how many times?  Do you remember?

21  A    Twice.

22  Q    How long would you say each meeting was?

23  A    An hour.

24  Q    An hour each?

25  A    Yeah.



www.escribers.net | 800-257-0885

1  Q    Okay.  Were you shown any documents as part of that

2  preparation?

3  A    Yes.

4  Q    What documents did you see?

5  A    Documents that were submitted already.

6  Q    The ones that have --

7  A    That we reviewed --

8  Q    Okay.

9  A    -- yes.

10 Q    Were there any other documents that were not shown to you

11 when you were testifying?

12 A    No.

13 Q    Okay.  You testified I believe that the facility is

14 enormous, 5 million square feet; is that right?

15 A    Yes.

16 Q    How big roughly in square feet is the General Assembly?

17 A    I don't know.  I can't even -- it's huge.  It's huge.

18 Q    Can you give an estimate?

19 A    It takes me -- well, an estimate, it takes me five minutes

20 to walk across without interruption.  But it's pretty big.

21 Q    So from one end to one end, it takes about five minutes?

22 A    Yes.

23 Q    Okay.  About how many supervisors and leads are there in

24 General Assembly?

25 A    There are 14 supervisors and 71 leads per shift.

22-60493.1411



1    Q    Per shift?

2    A    Yes.

3    Q    And there's, you said, two shifts a day?

4    A    Two shifts currently --

5    Q    Okay.

6    A    -- yes.

7    Q    And you said this obviously is a big area.  So you don't

8    know eyes on your supervisors and leads at all times, correct?

9    A    That is correct.

10   Q    I'd like to talk to you a little bit about the team wear

11   policy.  You mentioned part of the its purpose is that visual

12   management is important, right?

13   A    That's correct.

14   Q    So the black T-shirt for the employees in GA, that's

15   important, right?

16   A    Correct.

17   Q    And that's -- that purpose, the black shirts, that's for

18   other employees to be able to identify them; is that right?

19   For other employees in General Assembly to be able to identify

20   who else works in General Assembly and what their role is?

21   A    It's for everybody to identify who works in that

22   department.

23   Q    Okay.  So that's for people who -- the importance of that

24   visual management, I guess is what I'm trying to ask, that is

25   for the people who work at Tesla and not for outsiders; is that



1    right?

2    A    It's for both.

3    Q    So how often are -- do outsiders come into the General

4    Assembly?

5    A    Every day.

6    Q    About how many on an average day?

7    A    Well, there's the contractors and subcontractors that work

8    in the building, there's tours that happen throughout the day.

9    Q    Does the team wear policy apply to them?

10   A    Team wear --

11   MR. MORRIS:  Objection.  Vague and ambiguous.

12   Q    BY MR. GARBER:  Does the team wear apply to the people

13   that we've been referring to as outsiders, people not employed

14   by Tesla, who come in on a daily basis?

15   A    No.

16   Q    Are there employees in --

17   MR. GARBER:  Strike that.

18   Q    BY MR. GARBER:  There are obviously employees in General

19   Assembly who are touching the cars, as you've described at

20   length in terms of how they build the cars, they put the

21   different pieces inside it, correct?

22   A    Yes.

23   Q    They're physically touching the cars?  Are there also

24   employees in the General Assembly who are just operating

25   machinery but not actually touching cars?



1    A    No.

2    Q    So everyone's touching cars at some point?

3    A    Yes.

4    Q    Okay.  When an employee in General Assembly first starts,

5    they get to choose the size of their clothing; is that correct?

6    A    Yes.

7    Q    Quality control employees, do -- they do not work in

8    General Assembly, right?

9    A    We have in line quality people that work in General

10   Assembly.

11   Q    They spend their entire shift in General Assembly?

12   A    Yes.

13   Q    Does the team wear policy apply to them?

14   A    Yes.

15   Q    Are there other quality control employees who are not

16   considered part of the General Assembly?

17   A    Yes, there are.

18   Q    Do they pass through General Assembly on occasion?

19   A    Yes.

20   Q    And for those quality control employees that pass through

21   General Assembly, does it team wear policy apply to them?

22   A    If they come in contact with the vehicle, yes.

23   Q    So only if they're actually working in that area?

24   A    Correct.

25   Q    But if they're just walking through, it does not apply to


www.escribers.net | 800-257-0885

1    them?

2    A    Correct.

3    Q    Okay.  I'm going to show you on document that's already in

4    evidence.  It's marked as Exhibit 41.  Just take a look at that

5    for me.  Do you recognize the shirt in that picture?

6    A    Yes.

7    Q    That's one of the iterations of team wear; is that right?

8    A    Correct.

9    Q    And that's just a black T-shirt with a screen print on it;

10   is that right?

11   A    I'm not sure how the image was put on there.

12   Q    But it has the Tesla logo on it?

13   A    It has the Tesla logo and it has the silhouette of the

14   vehicle, yes.

15   Q    Right.  That's on the front and back of the shirt, right?

16   A    Correct.

17   Q    Okay.

18        JUDGE TRACY:  I'm sorry.  I didn't hear the second part.

19   It has the silver --

20        THE WITNESS:  The silhouette --

21        JUDGE TRACY:  Oh, silhouette.

22        THE WITNESS:  -- of the vehicle.

23        JUDGE TRACY:  Okay.

24        THE WITNESS:  Um-hum.

25   Q    BY MR. GARBER:  So that's obviously team wear compliant,


www.escribers.net | 800-257-0085

1    right, because that is the assigned team wear?

2    A    Correct.

3    Q    And also under the team wear policy, a plain black T-shirt

4    with no logos on it is acceptable, right?

5         MR. MORRIS:  Objection.  Vague as to which policy.

6         MR. GARBER:  I thought I mentioned team wear policy, but if

7    I didn't, I'm referring to team wear policy.

8         JUDGE TRACY:  Overruled.

9         MR. GARBER:  I can be -- I can say it again.

10   Q    BY MR. GARBER:  So under the team wear policy, a plain

11   black T-shirt with no logos on it is acceptable, correct?

12   A    Upon exception.  Right?  Occasionally.

13   Q    Okay.

14   A    Not as a general practice.

15   Q    Sure.  But a T-shirt that is not a Tesla assigned T-shirt

16   with a logo on it is not team wear compliant, correct?

17   A    That's correct.

18   Q    Okay.  I'm going to show you another picture already in

19   evidence.  It's General Counsel's Exhibit 25.  Just take a look

20   at that for me also, please.  Have you seen that shirt before?

21   A    Yes.

22   Q    You've seen employees where this around the Tesla factory;

23   is that right?

24   A    That's correct.

25   Q    There's nothing on this shirt that would pose a mutilation



1   risk; is that correct?

2   A    I can't answer that.

3   Q    Well, you said you've seen it in the facility.

4   A    Well, yeah.  I answered the question.  You said have I

5   seen it in the facility.  I said yes.

6   Q    So what could cause mutilation risk on that T-shirt then?

7   A    I haven't analyzed the shirt or had it tested or evaluated

8   for any mutilation compliance.

9   Q    What's the process of analyzing a T-shirt for mutilation

10  compliance?

11  A    I'm not sure.  I do not work for Team Wear.  So I can't

12  answer.

13  Q    Do you know, is there a process for testing T-shirts for

14  mutilation compliance?

15  A    I'm assuming that we do.

16  Q    Well, don't assume.  Just do you know?  Yes or no.

17  A    I do not know.

18  Q    Okay.  This shirt is not team wear compliant, correct?

19  A    That's correct.

20  Q    And that's because of the logos on it?  It is not a Tesla

21  shirt although it's black, correct?

22  A    It's not -- it's because it's not approved team wear.

23  Q    An employee working in General Assembly that is not team

24  wear compliant could receive a coaching; is that right?

25  A    That's correct.



www.escribers.net | 800-257-0885

1   Q    Are you -- step back a second.  Can you tell us about your

2   day-to-day duties then?  I know you do a lot of stuff.  You

3   testified to your vast knowledge of this facility.  Can you

4   just tell us broadly what you do on a day-to-day basis?

5   A    Currently a lot of it is meetings.  I don't want to say

6   boring, but -- no.  It's a lot of meetings, strategy, coaching,

7   report outs.  I can probably say five to ten percent of my time

8   is on the actual production floor.

9   Q    Okay.  You are made aware when this is damage to a car in

10  the General Assembly; is that right?

11  A    Not specifically.

12  Q    Would it be reported up to you?

13  A    It would be reported through our reporting systems.

14  Q    So you would see then statistics overall as to how many

15  cars have not damaged in a certain period of time, but not a

16  specific incident; is that right then?

17  A    That's correct.

18  Q    Okay.  To your knowledge, how many Tesla cars have been

19  damaged where the damage was directly linked to an employee

20  wearing one of these Union T-shirts that's exhibit -- in

21  Exhibit 25?

22  A    I don't have any knowledge of that.

23  Q    To your knowledge, how many Tesla cars have been damaged

24  where the damages were directly linked to employee wearing a T-

25  shirt with a logo on it that's not team wear compliant?



www.escribers.net | 800-257-0885

1  A    I don't have any knowledge of that.

2  Q    To your knowledge, has Tesla ever received complaints from

3  customers that the car they purchased was damaged by a T-shirt

4  that they wore inside the car?

5  A    No.  I don't have any knowledge of that.

6  Q    Again, I understand you do a lot of stuff on a daily

7  basis.  Can you tell us about how many levels of supervision

8  there are between you and the workers in General Assembly?

9  A    There's the workers, there's production lead, production

10  supervisor, production associate manager, and a production

11  manager.

12  Q    Okay.  So you are familiar then with the general duties of

13  the leads and the supervisors?

14  A    That's correct.

15  Q    Now, if employees don't follow the directive of a lead on

16  the floor, could they be subject to discipline?

17  A    No.

18  Q    They would not?  So they can ignore a lead's orders?

19  A    They can't ignore, but it's up to the supervisor to

20  provide discipline, not the lead.

21  Q    Sure.  Let me rephrase that.  If they -- and I should have

22  said this at the outset.  But if you don't understand anything

23  I say, just tell me and I'll ask it better.

24       If an employee does not follow the directive of their lead,

25  could that lead do discipline at a later point?



1    A    No.  That sounded like the same question.  The leads do

2    not --

3    Q    I'm not asking --

4    A    -- discipline.

5    Q    -- who does -- who issues discipline.  I'm saying, if you

6    do not follow the directive of your lead, could a supervisor

7    then issue discipline to that employee for not following the

8    directive of the lead?

9        MR. MORRIS:  Objection.  Vague and ambiguous.

10        THE WITNESS:  Yeah.

11        JUDGE TRACY:  I'm going to overrule the objection.

12    However, I think that you should maybe break it up.

13        MR. GARBER:  Okay.

14        JUDGE TRACY:  Perhaps that might make it --

15        MR. GARBER:  Sure.

16        JUDGE TRACY:  -- clearer.

17        MR. GARBER:  Okay.

18    Q    BY MR. GARBER:  There are leads in General Assembly,

19    right?

20    A    Correct.

21    Q    Okay.  The leads are above the General Assembly employees,

22    correct, in terms of supervisory and management and the

23    hierarchy of --

24    A    Yes.

25    Q    -- authority?  Okay.  If an employee does not follow



www.escribers.net | 800-257-0885

1    instructions that's given to them by their lead like, you need

2    to wear your team wear T-shirt, if that employee does not

3    follow that instruction, could they be disciplined later on

4    down the line for not following that instruction?

5        MR. MORRIS:  Objection.  Lacks foundation.  Calls for --

6        MR. GARBER:  Well, he's already testified he's --

7        MR. MORRIS:  -- speculation.

8        MR. GARBER:  -- on -- he is pretty much the highest person

9    there.  He understands the duties of leads and supervisors.

10        JUDGE TRACY:  Overruled.

11        MS. FEINBERG:  Don't worry.  I can ask it again.

12        THE WITNESS:  No.  No.  The answer is no.

13    Q    BY MR. GARBER:  No.  So employees can ignore --

14    A    The -- the employee would not be disciplined for not

15    listening to the lead.  The employee would be disciplined for

16    not following one of the policies.

17    Q    Do leads -- leads do enforce policies, though, correct?

18    This would tell --

19    A    No.

20    Q    They do not?

21    A    They do not.

22    Q    Leads never tell employees they have to be team wear

23    compliant?

24    A    It's -- it's a teamwork thing.  It's, hey, man, can you

25    put on your glasses?  Hey, can you do this?  They don't have



www.escribers.net | 800-257-0885

1    discipline or authority over the associate.

2    Q    So when you say it's a teamwork thing, so leads then would

3    tell an employee, you need to be team wear compliant?

4    A    Yeah.

5    Q    Okay.  So leads do tell employees that they have to follow

6    policies in general?  They wouldn't -- they would tell

7    employees that, right?

8    A    They would remind their employees if there's something

9    they need to fix or change.

10   Q    And if an employee did not follow that reminder or they

11   did not fix whatever needed to be changed, as you said, per the

12   lead's instruction, could they be disciplined for that by a

13   supervisor?

14        MR. MORRIS:  Objection.  Relevance.  I mean, is the General

15   Counsel contending that the leads are statutory supervisors?

16        JUDGE TRACY:  What's the --

17        MR. GARBER:  No.

18        JUDGE TRACY:  -- relevance?

19        MR. GARBER:  There's -- the relevance is that there was

20   testimony that leads and supervisors both wear red shirts in

21   GA.  And since there was also previous testimony that unknown

22   red shirt supervisors don't enforce the team wear policy, we're

23   trying to figure out the authority of leads, and if they are

24   not supervisors but agents.

25        MR. MORRIS:  Well, first off, that's not alleged in the



1    complaint.  It's specific in terms of a red shirt supervisor,

2    not a red shirt lead.

3    Q   BY MR. GARBER:  So the leads then we've been talking about

4    just in a general sense, like they communicate policies to

5    employees on behalf of Tesla; is that right?

6        MR. MORRIS:  Same objection.

7        JUDGE TRACY:  I'll overrule the objection.

8        THE WITNESS:  Can you repeat the question?

9        MR. GARBER:  Sure.

10    Q   BY MR. GARBER:  Do the -- the leads communicate Tesla

11    policies to employees; is that correct?

12    A   Yes.

13    Q   Okay.  So when we were talking about team wear before, you

14    said that there is the exception -- or, well, the team wear

15    policy says that there's an exception for just plain black

16    shirts; is that right?

17    A   On occasion.

18    Q   Right.  Who makes that determination that the black shirts

19    is acceptable variant on occasion?

20    A   As stated in the policy, the supervisor.

21    Q   So it's up to the supervisor as to how often that's

22    acceptable?

23    A   Well, it's only acceptable if the correct team wear is not

24    available.

25    Q   Okay.  How does the --



www.escribers.net | 800-257-0885

1    MR. GARBER:  Strike that.

2    Okay.  Nothing further, Your Honor.

3    JUDGE TRACY:  Ms. Feinberg?

4    MS. FEINBERG:  Yeah.  I have a couple of questions.

5    **CROSS-EXAMINATION**

6    Q    BY MS. FEINBERG:  Hello.

7    A    Hello.

8    Q    I'm Margo Feinberg.  I represent the Charging Party.  I

9    just want to verify a few names with you to -- who I believe

10    are under your report.  So do you know someone named Celina

11    Cabasos (phonetic)?

12    A    Yes.

13    Q    Is she a supervisor?

14    A    Yes.

15    MR. MORRIS:  Objection.  Relevance.

16    MS. FEINBERG:  Well, could you give me some leeway because

17    I may need some of this for rebuttal?  I'm just trying to

18    confirm some names of people who are under his report.

19    JUDGE TRACY:  Overruled.

20    Q    BY MS. FEINBERG:  Is she a supervisor?

21    A    Yes.

22    Q    And Alfonso Franko, are you familiar with him?

23    MR. MORRIS:  Objection.  Relevance.

24    MS. FEINBERG:  Same.

25    JUDGE TRACY:  Overruled.



1     MR. MORRIS:  You have these people alleged as statutory

2     supervisors who are alleged to have done anything unlawful in

3     the complaint.

4     JUDGE TRACY:  Well, let's -- I'm going to be --

5     MS. FEINBERG:  They're credibility --

6     JUDGE TRACY:  -- clear --

7     MS. FEINBERG:  -- issues.

8     JUDGE TRACY:  -- about this, that in this complaint there

9     are some unknown people.  And so I'm going to allow it just to

10     identify some potential people.  I don't know where this is

11     going --

12     MS. FEINBERG:  Okay.

13     JUDGE TRACY:  -- so I'm going to overrule it.  Go ahead.

14     MS. FEINBERG:  Thank you.

15     Q     BY MS. FEINBERG:  Alfonso Franko, is he --

16     A     Yes, he is.

17     Q     -- a manager under your --

18     A     Yes.

19     Q     Okay.  Yes, he is?

20     A     Yes.

21     Q     And is there an assistant manager in that same line of

22     chain of command named Sergio?

23     A     Correct.

24     Q     Okay.  And are they currently working for Tesla?

25     A     Yes.



www.escribers.net | 800-257-0885

1   Q    Okay.  And do you know Tope -- I'm not going to do her

2   name justice --

3   A    Ogunniyi.

4   Q    Yes.  Correct?

5   A    Yes.

6   Q    And does she report to you?

7   A    She does not.

8   Q    Oh.  Did she -- was she -- oh, who does she report to, if

9   you know?

10  A    I do not know.

11  Q    Okay.  On the document I'm looking at, I'll just represent

12  that in 2017 it says that she was an Associate Manager in

13  General Assembly, and I thought that all of General Assembly

14  was under you.  So can you explain -- does that refresh your

15  recollection that -- if she was an Associate Manager under you

16  in General Assembly in August of 2017?

17       MR. MORRIS:  Objection.  Vague and ambiguous.

18       If you want to refresh his memory, then show him the

19  document.

20       MS. FEINBERG:  Okay.  Well, I'm just giving him some

21  information.

22  Q    BY MS. FEINBERG:  Do you -- in August of 2017, were you

23  the overall person for both shifts one and two?

24  A    Yes.

25  Q    Okay.  So if someone was an associate manager of General



www.escribers.net | 800-257-0885

1   Assembly at that time, they were somewhere in the report to

2   you?

3   A    That's correct.

4   Q    Okay.  So if Tope Ogunniyi held that position, she was

5   under your line of supervision?

6   A    Yes.

7   Q    And you do know her?

8   A    Yes.

9   Q    Okay.  And do you know Kyle Martin?

10  A    Yes.

11  Q    And who is he?

12  A    He used to be one of my managers.

13  Q    Okay.  And so is -- do you know if -- okay.  He used to be

14  one of your managers.  In General Assembly?

15  A    Correct.

16  Q    And you said something to the effect of something like

17  people could wear alternate clothing, black clothing, in lieu

18  of team wear if -- under certain circumstances.  And how would

19  anyone know what those circumstances were?  Like are people

20  questioned?  Do they have to fill out a form?  How would you

21  know?

22  A    If somebody came -- it was mostly for newer associates.

23  Q    Um-hum.

24  A    We would get an email from the Team Wear department

25  stating, hey, their size is backordered, and then we can make



1    an exception.

2    Q    Okay.  But if someone was on the line wearing an all black

3    T-shirt, would someone go up to them and say, do you qualify

4    for an exception, or you just would move on?

5    A    I would expect that the supervisor would talk to them and

6    ask them what happened to their team wear.

7    Q    And is there anything in writing that gives that direction

8    to the supervisors --

9    A    No.

10   Q    -- to check?  Okay.  Thank you.  And there was a lot of

11   discussion about all the parts, moving parts and that in

12   General Assembly, so I think I got most of it.  But are there

13   material handlers in General Assembly?

14   A    There's material handlers that work throughout General

15   Assembly, but are not part of General Assembly.

16   Q    I see.  And do they have to wear team wear?

17   A    No.

18   Q    Okay.  And do they have any physical contact with a car?

19   A    No.

20   Q    Okay.  And not even the doors or anything like that?

21   A    No.

22   Q    Okay.  Bumpers?  Anything like that?  Any other exterior

23   part of the car?

24   A    No.

25   Q    I believe you already answered that.  Okay.  And prior to



1    you testifying here today, there was some testimony about

2    people -- that there were quite a number of temporary workers

3    in the plant.  And I think you mentioned that as well; is that

4    correct?

5    A    That's correct.

6    Q    Okay.  And are the temporary workers issued team wear?

7    A    Yes.

8    Q    Okay.  And that's when they first begin or when does

9    that --

10    A    Yes.

11    Q    -- happen?

12    A    When they first begin.

13    Q    Okay.  And how many shirts is a worker given?

14    A    To the best of my recollection, it's four.

15    Q    Four shirts?

16    A    Correct.

17    Q    And that's both for permanent and temporary workers?

18    A    As far as I know, yes.

19    Q    Okay.  And those are all the same shirt?

20    A    They have -- they have option of shirts.  Short sleeve or

21    long sleeve.

22    Q    And then in General Assembly, what is the normal number of

23    days a worker works in the course of a week?

24    A    Normally five days.

25    Q    Five days.  And how many hours in a given day?

22-60493.1429



1    A    Between eight and ten.

2    Q    Okay.  And when you said they're given four shirts, is

3    that like when they first start or can you -- or how does that

4    work?

5    A    When they first start.

6    Q    Okay.  And then I -- so the people working long hours, do

7    they get replacement shirts as part of the Company policy?

8    A    Absolutely.

9    Q    Okay.  And how does that work?

10   A    If they bring a worn or a damaged shirt, if they bring it

11   to Team Wear, Team Wear will give them a new one.

12   Q    Okay.

13        MS. FEINBERG:  Okay.  I have nothing further at this time.

14        JUDGE TRACY:  Mr. Morris?

15        MR. MORRIS:  Can I have a quick minute to confer with my

16   colleague?

17        JUDGE TRACY:  Sure.  Let's go off the record.

18   (Off the record at 11:37 a.m.)

19        MR. MORRIS:  Okay.  Just a couple of quick questions.

20        JUDGE TRACY:  Hold on one second.  Ready?

21        MS. FEINBERG:  Um-hum.

22        JUDGE TRACY:  Go ahead.

23                          **REDIRECT EXAMINATION**

24   Q    BY MR. MORRIS:  You referenced MOT.  Does that stand for

25   anything?



www.escribers.net | 800-257-0885

1   A     It does, but I don't remember --

2   Q     Okay.

3   A     -- what it is.

4   Q     In terms of the managers or supervisors inspecting for

5   compliance with the team wear expectations, do you have any

6   expectations for the supervisors in how -- in terms of how they

7   actually conduct those inspections?

8   A     Absolutely.

9   Q     And what are those?

10  A     They're to be facilitators and coaches, not tyrants.

11  Right?  So I would expect a supervisor, if they see something

12  that's out of compliance, whether it's team wear or anything

13  else, to approach us, oh, shit, and ask them how they can help

14  them, and figure out how to resolve whatever the issue is.

15  Q     Okay.  And you mentioned the all-black clothing substitute

16  on occasion?

17  A     Yes.

18  Q     How does that relate to mutilation protection?

19  A     An all black T-shirt is basically ensuring that it matches

20  pretty close to the team wear, but that there's no logos or --

21  or embroidery or rhinestones or whatever on it, that, hey, it's

22  easy to -- again, we're -- what I want is the supervisors to be

23  successful to ensure that this large group of people are

24  compliant and our risk is minimal when it comes to how we treat

25  our vehicles.



www.escribers.net | 800-257-0885

1    Q    Okay.

2         MR. MORRIS:  Nothing further.

3         JUDGE TRACY:  All right.  Mr. Garber?

4         MR. GARBER:  Just very quickly.

5                     **RECROSS-EXAMINATION**

6    Q    BY MR. GARBER:  So only a -- excuse me.  Only a manager or

7    supervisor would have the authority to send an employee home if

8    they were not team wear compliant; is that right?

9    A    Yes.

10   Q    Okay.  Thank you.

11        JUDGE TRACY:  Ms. Feinberg?

12        MS. FEINBERG:  No.  Nothing further.

13        JUDGE TRACY:  All right.

14        MS. FEINBERG:  Thank you.

15        JUDGE TRACY:  Thank you very much.  You're --

16        THE WITNESS:  Yeah.

17        JUDGE TRACY:  -- done.  Please don't discuss your testimony

18   with anyone, though, until after the close of this hearing.

19   Okay?

20        THE WITNESS:  All right.

21        JUDGE TRACY:  Thank you.

22        THE WITNESS:  Do you want me to leave these things here?

23        JUDGE TRACY:  Yeah, you can just leave them there.

24        THE WITNESS:  Okay.

25        MR. GARBER:  Thank you.



1    JUDGE TRACY:  Okay.  I think you guys had also said your

2    next witness is lengthy, correct?

3    MR. ROSS:  It could be lengthy.

4    JUDGE TRACY:  Okay.  So it is 11:42 or 5, depending on what

5    clock you use.  Let's take a break until 1:00.

6    MS. FEINBERG:  Okay.  Because I need to know what's going

7    on in the word.  So thank you.

8    JUDGE TRACY:  Let's take a break until 1:00, and then we'll

9    do --

10   MR. ROSS:  One moment, Your Honor.  I've been told that our

11   next witness has a personal issue, and we were hoping to get

12   him on and off as quickly as possible because of this personal

13   thing.  Apparently his dad's in the hospital or something

14   having to do with that.  So I'll be -- if you want to say let's

15   break now, we'll break now, but we'd really like to do whatever

16   we can to expedite his testimony, because I think he wants to

17   be --

18   JUDGE TRACY:  Right.  What's his name?

19   MR. ROSS:  Jeremie's dad is in the hospital?

20   UNIDENTIFIED SPEAKER:  Um-hum.

21   MR. ROSS:  Jeremie Hansen.

22   JUDGE TRACY:  I don't know, again, who that is.

23   Oh, I -- we're still on the record.  I had one thing that I

24   was hoping you all would stipulate to, that this individual is

25   a supervisor under the Act, is that correct, Mr. Mario Penera?



www.escribers.net | 800-257-0885

1       MR. MORRIS:  Yeah, we will.

2       JUDGE TRACY:  Okay.

3       MR. GARBER:  Yes.

4       JUDGE TRACY:  So stipulated.

5       UNIDENTIFIED SPEAKER:  If he isn't who is, right?

6       JUDGE TRACY:  Well, because you have this long list of

7  people --

8       UNIDENTIFIED SPEAKER:  Yeah, yeah.

9       JUDGE TRACY:  -- that they've admitted to.

10      UNIDENTIFIED SPEAKER:  Yeah.

11      JUDGE TRACY:  There's one person that -- who becomes an

12  issue, you know, that you all need to prove because they've

13  denied.  I don't think they've ever amended that, unless they

14  end up doing that.

15      I just don't know who this next person is, so I have no

16  idea how long they would be.

17      MR. ROSS:  So -- well, I'm just --

18      JUDGE TRACY:  Do --

19      MR. ROSS:  -- expressing --

20      JUDGE TRACY:  I --

21      MR. ROSS:  -- the preference.

22      JUDGE TRACY:  I do understand.  I mean, it's one of those

23  where --

24      MS. FEINBERG:  Well, could he give us an estimate of what

25  his direct is so we could --



www.escribers.net | 800-257-0885

1    MR. ROSS:  It's going to relate to the security guard

2    issue.

3    JUDGE TRACY:  Okay.  So that's going to take some time.

4    MR. GARBER:  About how long -- do you guys have an estimate

5    of time roughly?

6    MR. ROSS:  At least a half hour, maybe for longer.

7    JUDGE TRACY:  Um-hum.  So --

8    MS. FEINBERG:  Someone's going to be here anyway.

9    JUDGE TRACY:  -- I still say let's take a break at (sic)

10    1:00, and then we'll get him --

11    MR. ROSS:  Break at 1:00 or --

12    JUDGE TRACY:  -- through.

13    MR. ROSS:  -- break until 1:00?

14    JUDGE TRACY:  Break until 1:00.

15    MR. ROSS:  Thank you.  Okay.

16    JUDGE TRACY:  If everybody comes back at 12:45 and wants to

17    begin, fine.  I'm just going to grab something ask sit here.

18    So if you guys want to start at 12:45 and you have had adequate

19    time, then we can begin.  But I will say 1:00 at the latest.

20    Okay?

21    MR. ROSS:  All right.

22    JUDGE TRACY:  And that way we can put him on.

23    You have somebody after that as well, correct?

24    MR. ROSS:  We do.

25    JUDGE TRACY:  How many more today?



www.escribers.net | 800-257-0885

1    MR. ROSS:  We've got two after him.

2    JUDGE TRACY:  Okay.

3    MR. ROSS:  That I --

4    JUDGE TRACY:  That's --

5    MR. ROSS:  -- suspect to be a day's worth.

6    JUDGE TRACY:  Yeah, yeah.  I just don't know -- it depends

7    on if we'll get to those other -- the -- well, of course, one

8    more.  I don't know about your third one.  But let's see.  I

9    have no idea --

10    MR. ROSS:  Yeah.  You have to be --

11    JUDGE TRACY:  -- who's --

12    MR. ROSS:  -- optimistic in this.

13    JUDGE TRACY:  -- testifying.

14    Yeah.  No.  It's better for them to be waiting than for us

15    to be waiting here.

16    MR. ROSS:  Okay.

17    JUDGE TRACY:  Okay?

18    MR. ROSS:  Yep.

19    JUDGE TRACY:  So let's go off the record until 1:00 at the

20    latest.

21    MR. ROSS:  All right.

22    JUDGE TRACY:  Okay?

23    MR. ROSS:  Thanks, Judge.

24    (Off the record at 11:45 a.m.)

25    JUDGE TRACY:  Okay.  So Mr. Ross, your next witness?

22-60493.1436



1     MR. ROSS:  Thank you, Your Honor.  We call Jeremie Hansen.

2     JUDGE TRACY:  If you could stand up, please.  Okay.  And if

3     you could raise your right hand.

4     MR. HANSEN:  Okay.

5     Whereupon,

6                              **JEREMIE HANSEN**

7     having been duly sworn, was called as a witness herein and was

8     examined and testified as follows:

9     JUDGE TRACY:  Okay.  Go ahead have a seat, and state your

10    name for the record, please.

11    THE WITNESS:  So my name is Jeremie Hansen.

12    JUDGE TRACY:  And how do you spell your last name?

13    THE WITNESS:  H-A-N-S-E-N.

14    JUDGE TRACY:  Okay.  And so let me give you a little bit of

15    instructions.  The microphones here do not amplify your voice.

16    So they don't make them louder.  So you don't need to lean into

17    them.  They'll pick up your voice quite fine.  However, you're

18    going to -- you will need to speak up so -- to make sure that

19    everybody in the room can hear you, because --

20    THE WITNESS:  Okay.

21    JUDGE TRACY:  -- it doesn't project your voice.  There may

22    be occasions where one of the attorneys doesn't hear your

23    response, so we may ask you just to repeat what you said.

24    Okay?  And if you don't understand what -- a question, just

25    ask -- say you don't understand.  Okay?



www.escribers.net | 800-257-0885

1         THE WITNESS:  Okay.  Thank you.

2         JUDGE TRACY:  All right.  Mr. Ross?

3         MR. ROSS:  Okay.  Thank you, Your Honor.

4                        **DIRECT EXAMINATION**

5    Q    BY MR. ROSS:  Jeremie, would you spell for the court

6    reporter your first name, because it's an unusual spelling?

7    A    Yeah.  My first name is J-E-R-E-M-I-E.

8    Q    All right.  Thank you.  And you work for Tesla?

9    A    Yes, I do.

10   Q    And could you tell us what your current title or job

11   duties -- job --

12   A    So --

13   Q    -- position is?

14   A    -- my current title and job position is a Project Manager

15   and Security Systems Specialist.

16   Q    Okay.  And can you tell us -- what did you do in that

17   capacity?

18   A    So in that capacity, I basically help lay out and position

19   security systems as well as troubleshoot existing security

20   systems, access control systems, card access systems, camera

21   systems, systems of that nature.

22   Q    All right.  Thank you.

23        JUDGE TRACY:  By the way, were you guys able to make copies

24   to put into the record of R-16?

25        MR. MORRIS:  We did not.  We could do it after this



www.escribers.net | 800-257-0885

1   witness, if you'd like.

2        JUDGE TRACY:  Okay.  That's fine.  I just think you're

3   about to show him something, so --

4        MR. ROSS:  But I wanted to -- I'm just going to show him

5   Respondent 16, and the color will not matter.  There's a --

6        MR. MORRIS:  There's one up there, too.

7        MR. ROSS:  There's a copy --

8        JUDGE TRACY:  No.  We took everything away.

9        MR. ROSS:  Okay.  Well --

10       MS. FEINBERG:  I'm sorry.  Are they showing a blank 16 or

11  the marked 16?

12       MR. ROSS:  I'm sorry?

13       JUDGE TRACY:  Which version are you --

14       MR. ROSS:  Respondent's --

15       JUDGE TRACY:  -- showing.

16       MR. ROSS:  -- 16.  This is called --

17       JUDGE TRACY:  Okay.

18       MR. ROSS:  Just a moment.

19       JUDGE TRACY:  I think I've not heard an objection, but sort

20  of an objection.  So I need you to show him the --

21       MR. ROSS:  The uncolor.

22       JUDGE TRACY:  -- unrevised one or the --

23       MR. ROSS:  Yeah.  The monochromatic one?

24       JUDGE TRACY:  Yes.

25       MR. ROSS:  That's fine.

22-60493.1439



1        MR. MORRIS:  Can we use the court reporter's copy?

2        JUDGE TRACY:  Yes, we can.

3        Can we use the court reporter's copy, Respondent's --

4        THE COURT REPORTER:  I don't --

5        JUDGE TRACY:  -- 16?

6        THE COURT REPORTER:  I don't --

7        JUDGE TRACY:  You didn't receive one?

8        THE COURT REPORTER:  I don't have one of the color.

9        JUDGE TRACY:  Not of the color, but the one that doesn't

10  have anything on it.

11        THE COURT REPORTER:  (No audible response)

12        JUDGE TRACY:  Yes.

13        MR. ROSS:  Thank you very much.

14        MR. RODRIGUEZ RITCHIE:  And Your Honor, there is a matter

15  that I'd like to raise with regards to this witness, but I

16  think it would be appropriate to do so outside the presence of

17  the witness.

18        JUDGE TRACY:  Should we have done that then first?

19        MR. RODRIGUEZ RITCHIE:  I wasn't aware of it first.

20        JUDGE TRACY:  Okay.  Do we need to do it now or after?

21        MR. RODRIGUEZ RITCHIE:  Yes.

22        JUDGE TRACY:  Okay.  Could I ask you to please step

23  outside?

24        THE WITNESS:  No problem.

25        JUDGE TRACY:  Sorry.  Okay.



www.escribers.net | 800-257-0885

1   MR. RODRIGUEZ RITCHIE:  So we've had this discussion

2   numerous times already about a production of a list of pictures

3   with names of security guards pursuant to the General Counsel's

4   subpoena.  We weren't provided with that until last Friday

5   afternoon with the names on top of the pictures.  This

6   individual's one of those people.  And I would object to his

7   testimony and would like to reserve the right to ask for some

8   sanction or inference in light of the fact that we weren't

9   aware that this individual person's name and picture pursuant

10  to that subpoena request was the same person.

11      JUDGE TRACY:  Do you have any response to that?

12      MR. ROSS:  Yes.

13      JUDGE TRACY:  Okay.

14      MR. ROSS:  First of all, the picture of in gentleman was

15  provided to the Board before the beginning of the hearing, and

16  his name was.  It just didn't have his name on the picture.

17      JUDGE TRACY:  So -- I'm sorry.

18      MR. ROSS:  And --

19      JUDGE TRACY:  So what you're saying is that prior to the

20  start of the hearing, provided a picture of this --

21      MR. ROSS:  Of Mr. --

22      JUDGE TRACY:  -- gentleman?

23      MR. ROSS:  Of Mr. Hansen.

24      JUDGE TRACY:  And you provided a name, but you didn't

25  correlate the name with the picture?



1       MR. ROSS:  Correct.

2       JUDGE TRACY:  Okay.

3       MR. ROSS:  In addition to which, before we resumed, a

4   picture of this individual along with his name --

5       JUDGE TRACY:  Um-hum.

6       MR. ROSS:  -- on the picture was provided to counsel for

7   the General Counsel.

8       JUDGE TRACY:  Okay.

9       MR. ROSS:  And the fact of the matter is that -- so we

10  think we've -- and we're in substantial compliance with the

11  company.

12      JUDGE TRACY:  Okay.

13      MR. ROSS:  Secondly, whether or not we gave them a picture

14  with his name on it or not has nothing to do with whether or

15  not we ought to be allowed to put him on as a witness to

16  testify as to the facts in the case.

17      JUDGE TRACY:  Okay.

18      MR. RODRIGUEZ RITCHIE:  What I'm asking for is just to be

19  allowed to argue later on and request later on, to the extent

20  appropriate, any appropriate action to be taken in light of the

21  late production, that -- it is correct that the picture with

22  the name was provided before the resumption of this week's

23  hearing, however it was done Friday afternoon.  We've already

24  had this discussion in other context.  It should have been

25  provided before we had -- over the course of the summer.  Had



www.escribers.net | 800-257-0885

1    numerous conversations about this, that subpoena request, and I

2    asked -- we had a conversation with them and brought up that it

3    hadn't been produced prior to that, and still they waited until

4    Friday afternoon, prior to the start of this week, to produce

5    that information.

6         JUDGE TRACY:   Okay.   So you know, I'll note that for

7    record.   And you certainly may reserve the right to do so in

8    your post-hearing brief.   I would say, though, that the -- the

9    issue of providing the document, I don't see how that's related

10   to them calling him as a witness unless somehow you make some

11   argument that connects the two, where somehow you've been

12   prejudiced by --

13        MS. FEINBERG:   Well --

14        JUDGE TRACY:   -- their calling him as a witness, aside from

15   the fact that you didn't have his identity with his picture

16   until last Friday.   I'm not seeing it.   But again, part of you

17   requesting this, which is fine -- and again, decide, you know,

18   in the brief or you can, after hearing his testimony, make the

19   request.   I've already said I will make these rulings on this

20   type of matter in the brief.   But I am having a hard time

21   seeing the connection between the two.   I just will say that

22   for my own -- to be up front with you about that.   Okay?

23        MR. RODRIGUEZ RITCHIE:   Sure.   I think for us, we'd just

24   like to preserve the record.   He's here and --

25        JUDGE TRACY:   Um-hum.

22-60493.1443



www.escribers.net | 800-257-0885

1    MR. RODRIGUEZ RITCHIE:  -- he's been waiting here all day.

2    So I think --

3    JUDGE TRACY:  Yeah.  That's fine.

4    MR. RODRIGUEZ RITCHIE:  -- it's appropriate to just put

5    that on the record and --

6    JUDGE TRACY:  That's fine.

7    MR. RODRIGUEZ RITCHIE:  -- state that objection and --

8    JUDGE TRACY:  Okay.  Ms. Feinberg, you were going to --

9    MS. FEINBERG:  Um-hum.

10    JUDGE TRACY:  -- say something.

11    MS. FEINBERG:  Only in terms of the prejudice, which is

12    that the reason we needed the name and the picture, you know,

13    in part, is so that we could do our own due diligence, talk to

14    people who might have seen him --

15    JUDGE TRACY:  Sure.

16    MS. FEINBERG:  -- might have heard his name.  And that's

17    why when we subpoenaed this, it's months and months ago, so to

18    have -- so that we could have the time to do it.  We had

19    another day of hearing.  We asked for the stuff over the

20    summer.  To get things on Friday -- clearly if he's here as a

21    witness, I'm going to tell you -- it's a guess -- that they

22    knew his name before Friday connected to his picture.

23    Anyhow, just in case you were trying to ask what impact it

24    has.  It does have impact on us being able to do our due

25    diligence, which might affect cross.  But let's see.



1     JUDGE TRACY:  Let's see.  I mean, I would note to that --

2     MS. FEINBERG:  Yeah.

3     JUDGE TRACY:  -- that you did have the pictures and you had

4     the names.  So certainly you could have done your own --

5     MS. FEINBERG:  We did --

6     JUDGE TRACY:  -- backwards way of --

7     MS. FEINBERG:  Yes.

8     JUDGE TRACY:  -- doing it, of showing whoever you needed

9     the pictures to see if that was the person who spoke to them in

10    the parking lot.  I'm assuming that's where this is going.

11    So -- or maybe it's not.  I mean, again, right, I don't know --

12    MS. FEINBERG:  Okay.

13    JUDGE TRACY:  -- what's going to happen.

14    MS. FEINBERG:  Okay.

15    JUDGE TRACY:  But I --

16    MS. FEINBERG:  Let's see.

17    JUDGE TRACY:  But I would note it --

18    MS. FEINBERG:  I don't think we had --

19    JUDGE TRACY:  -- for the --

20    MS. FEINBERG:  -- the names until recently.  But anyhow,

21    he's going to testify.  It's fine.  You were just curious why

22    we were concerned, and I just thought I'd say it.  We're ready

23    to move on.

24    JUDGE TRACY:  Right.  And that's all I'm saying, to be

25    up-front of what I initial thoughts --



www.escribers.net | 800-257-0885

1     MS. FEINBERG:  Okay.

2     JUDGE TRACY:  -- are about it without having --

3     MS. FEINBERG:  Um-hum.

4     JUDGE TRACY:  -- thought about it until now.  Okay?  That's

5     all I'm saying.  Go ahead and --

6     MR. ROSS:  Should he --

7     JUDGE TRACY:  -- call him back, please.

8     MR. ROSS:  -- resume the stand?

9     JUDGE TRACY:  Yes.

10    MR. ROSS:  Thank you.

11    Thank you, Your Honor.

12    JUDGE TRACY:  Thank you.

13    Q    BY MR. ROSS:  So Jeremie, you testified that you're a

14    Project Manager and Security System Specialist at the present

15    time?

16    A    Correct.  Yes.

17    Q    Okay.  And what do you do in that job?

18    A    So it's my responsibility to help lay out the security

19    systems as well as troubleshooting security systems.  That

20    includes the access control systems, camera systems, and

21    similar systems.  So we would basically help determine where to

22    put a particular piece of equipment or a device in the security

23    system, how far back to where we're going to need to connect it

24    into the existing system.

25    Q    Okay.  And as part of your duties, is that -- have you had



www.escribers.net | 800-257-0885

1  occasion to become familiar with the structure of the facility?

2  A    Yes.  That's one of the -- the things that we need to do.

3  We need to know where various IDF locations are and the general

4  layout of the facility, be able to navigate around.

5  Q    Okay.  Now, you have in front of you a document that's in

6  evidence already as Respondent Exhibit 16.  And this is a

7  depiction of the General Assembly area.  And I noticed that

8  there is kind of a cross-hatching that appears over this map.

9  Do you know what that cross-hatching is?

10     MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

11     JUDGE TRACY:  Overruled.  Go ahead.

12     THE WITNESS:  Yeah.  That would appear to be the layout of

13  the columns.  The facility is set up in a grid pattern,

14  essentially, as far as the building support columns, and those

15  columns are all labeled and numbered very particularly to allow

16  you to identify where in the facility -- it's a -- it's a very

17  regular pattern, for the most part, throughout the entire

18  facility.

19  Q    BY MR. ROSS:  And is this also a fairly regular distance

20  that exists between those columns?

21  A    Yes.  Typically it's 45 feet -- approximately 45 feet

22  between the columns.

23  Q    Okay.  So if one wanted to try to figure out the square

24  footage of the area depicted on this document, one could do it

25  by looking at the number of columns, times it by 45, and that



www.escribers.net | 800-257-0885

1    would allow you to figure out the length --

2    A     That would get you --

3    Q     -- and the width?

4    A     -- the approximate sides and distance, yes.

5    Q     All right.  Thank you.

6          JUDGE TRACY:  Could you please show me what you're talking

7    about, the columns?

8          THE WITNESS:  So this grid pattern, each intersection of

9    these lines would be a physical support column.  They're set up

10   in basically lines running north to south and west to east in

11   the facility.  If you look at the top left corner, you'll

12   notice that there's a series of letters going down and the

13   numbers go across.  Each of those columns is labeled based on

14   the grid pattern.  It -- it's basically a navigation aid inside

15   the facility to know where a particular location or piece of

16   equipment is located inside the facility.

17         So to give an example --

18         JUDGE TRACY:  So that -- that's good.  That's good.

19         THE WITNESS:  Okay.

20         JUDGE TRACY:  Do you all understand over here --

21         MS. FEINBERG:  Um-hum.

22         JUDGE TRACY:  -- Charging Party?

23         I guess why I'm -- I was confused is, based on our last

24   witness, Respondent's Exhibit 16 I thought was -- I guess for

25   better -- I'm not sure if this is the right terminology, but



1    one-dimensional.  But it looks like it's kind of made one-

2    dimensional but it really is like a three dimensional figure

3    put flat --

4        MR. ROSS:  Well --

5        JUDGE TRACY:  -- on a piece --

6        MR. ROSS:  I --

7        JUDGE TRACY:  -- of paper.

8        MR. ROSS:  I think it is --

9        JUDGE TRACY:  Is that right?

10       MR. ROSS:  I think it is a one-dimensional document,

11   although --

12       JUDGE TRACY:  Yes.

13       MR. ROSS:  -- I think --

14       JUDGE TRACY:  Well, yes.

15       MR. ROSS:  -- the witness testified that T2T --

16       MR. GARBER:  Right.

17       MS. FEINBERG:  That's right.

18       MR. ROSS:  -- is on an elevated place.  So like T2T --

19       JUDGE TRACY:  Okay.

20       MR. ROSS:  -- is --

21       MR. GARBER:  Yes.

22       MR. ROSS:  -- apparently elevated over --

23       MR. GARBER:  F2 I think.

24       MS. FEINBERG:  F --

25       MR. ROSS:  -- F2.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  Okay.  I get it now.  Okay.

2    MR. ROSS:  But this is -- basically it's a -- looking down

3    at the floor --

4    JUDGE TRACY:  Okay.

5    MR. ROSS:  -- plan.

6    JUDGE TRACY:  Okay.

7    MR. ROSS:  Okay?

8    JUDGE TRACY:  Now I see.  Thank you.

9    MR. ROSS:  All right.

10    Q    BY MR. ROSS:  Now, tell me, how long have you worked for

11    Tesla?

12    A    So as a direct employee, I have worked for Tesla since

13    2012.  And previously, I had worked there at the Fremont

14    factory site for two additional years, since 2010, as a

15    contractor with Allied Barton.

16    Q    Okay.  Allied Barton, when you began work there, was --

17    what do they do on the premises?

18    A    Allied Barton was the contract security labor services.

19    Q    I see.  And at some point in time, did their contract get

20    terminated?

21    A    Yes.  The security services were switched I believe in

22    2013, if I recall correctly, from Allied Barton to a new

23    contract with another company called Securitas.

24    Q    Okay.  And tell me, when you began your direct employment

25    with Tesla, what job did you have?



www.escribers.net | 800-257-0885

1    A    Well, when I began directly with Tesla, it was a security

2    supervisor position, Security Operations Supervisor.

3    Q    And after that, what was your job?

4    A    I was promoted to Security Operations Manager.

5    Q    And is that the last job you had before your current

6    position?

7    A    Correct.

8    Q    Okay.  And when did you leave the Security Operations

9    Manager's position?

10    A    I left that position in August of 2018.

11    Q    And were you the Security Operations Manager in February

12    of 2017?

13    A    Yes, I was.

14    Q    Also in May of 2017?

15    A    Yes, I was.

16    Q    Now, during that time period, who was your immediate boss?

17    A    Greg Slettvet.

18    Q    And what was Mr. Slettvet's title?

19    A    He was the senior security manager.

20    Q    And what were his general areas of the responsibility?

21    A    So he was in charge of the overall security operations for

22    Tesla.  Essentially worldwide at the time.

23    Q    Now, is the -- and you worked at the Fremont manufacturing

24    facility?

25    A    Correct.  I was the operations manager in charge of



www.escribers.net | 800-257-0885

1    operations at the Fremont facility.

2    Q    Okay.  That's 45500 --

3    A    45500 Fremont Boulevard, yes.

4    Q    All right.  Okay.  So for ease of reference, we'll just

5    refer to it as the Fremont facility.  Okay?  Tell me, is that

6    facility open to the general public?

7    A    No.  It is considered a secure facility.  It is not open

8    to the general public.

9    Q    Okay.  And do you know why it's not open to the general

10   public?

11   A    We have a lot of heavy machinery, confidential

12   information, side production processes.  So both for safety

13   reasons and to protect the Company's production processes and

14   the secrets that go into that.  That's why it's not open to the

15   general public.

16   Q    Okay.  It's open to the employees, though?

17   A    Yes, it is open to the employees.

18   Q    And it's open to persons who are coming to the plant to do

19   business with Tesla?

20   A    Yes, it is open to those individuals coming to do business

21   directly with Tesla.

22   Q    Okay.  Now, employees are given access badges; is that

23   correct?

24   A    Yes, employees will receive an access badge that will

25   allow them access unescorted typically to the facility.


www.escribers.net | 800-257-0885

1  Q    Will anybody else get a badge that allows them to do so?

2  A    Approved contractors and vendors may also receive a badge.

3  There's an entire process for that.  But that would be the only

4  other group.

5  Q    Okay.  If you're not within one of those two groups, how

6  does one who is there to do business with Tesla get access to

7  the plant?

8  A    There's specific check-in procedures for visitors that are

9  coming in or for the people that have been invited for the

10  tours.  They must check in at a specific location where they

11  will receive a paper badge, and they'll be escorted by either

12  their point of contact or the tour group leader that's a Tesla

13  employee.  Or if it's a delivery of material, again, there's a

14  check-in -- a specific check-in process for that.

15  Q    Okay.  And for those who are not badged, these are

16  individuals there to do business with Tesla, you said they went

17  through some kind of check-in procedure?

18  A    Yes.  They would be directed to our main lobby where they

19  would then go up and check in to the visitor system, which at

20  the time would be an electronic kiosk.  They'd sign in, they'd

21  put their name, their company, their purpose for their visit,

22  who their contact was, they would read over and sign electronic

23  an NDA, and then they would receive a paper badge with that

24  basic information on it, and their contact would be required to

25  come pick them up and escort them from that entry point both



1    inside the facility and then also back out through the

2    facility.  At no time would they be left completely unattended.

3    Q    Okay.  And those who are not there to do business with

4    Tesla, could they badge in the same way?

5    A    If they did not have business with Tesla, no.  There are

6    no contact to escort them and they'd be asked to leave.

7    Q    Okay.  Would they be considered trespassers?

8    A    Yes, they would be.

9    Q    Okay.  And as trespassers, they'd be asked to leave the

10    building?

11    A    They would be asked to leave the building and the private

12    property surrounding the building.

13    Q    So both the inside of the building as well as the exterior

14    of the building?

15    A    The exterior is all considered private property.

16    Q    All right.  Now, I'm going to show you -- well, before I

17    do show you anything, I'm going to ask you, do you know if

18    Tesla has a policy with respect to solicitation or distribution

19    on Company premises?

20    A    Yes, they do.

21    Q    Okay.  I'm going to show you a document that's already in

22    evidence as Respondent's Exhibit 10.

23        MR. RODRIGUEZ RITCHIE:  Oh, can I see what you're showing

24    him?

25        MR. ROSS:  Oh, sure.  I'm sorry.  You've got that.



www.escribers.net | 800-257-0885

1    MR. RODRIGUEZ RITCHIE:  Oh, I think I asked to see what

2    the --

3    MR. ROSS:  Oh, of course.

4    Q    BY MR. ROSS:  And let me ask you, is that the Company's

5    policy with respect to solicitation?

6    A    Yes, this does appear to be that.  I can't swear I've seen

7    it in this exact form, but the wording all matches my

8    recollection of the --

9    Q    Okay.

10   A    -- policy.

11   Q    All right.  And tell me, do you have any idea how long

12   that's been the Company's policy?

13   A    As far as I can recall, that's been the Company's policy

14   always.

15   Q    All right.  Now, we talked a moment ago about the

16   employees being badged.  I'd like to talk to you about the

17   importance of badging and how badges are used.  Could you tell

18   us what the employee badges are used for?

19   A    Yeah.  The employee badges are used to allow the employee

20   access to the facility as well as once inside the facility,

21   they are also used as part of the time clock and attendance

22   keeping systems.  They are used in the safety vending machines.

23   An employee uses their badge to scan and receive say safety

24   glasses or earplugs.  And they are also used outside the

25   facility for the transportation system, to gain access to the



1   Company shuttles that run back and forth to the BART station

2   and other various commuter and interoffice locations.

3   Q    Okay.  Tell me, if there's a question as to whether

4   somebody is an employee or not, are they ever used to identify

5   an individual as an employee?

6   A    Yes.  Absolutely.  That's the default.

7   Q    Okay.  Without a badge, can a person access the building?

8   A    Not without attempting to deliberately get around the

9   security procedures.

10  Q    Okay.  So when an employee wants to enter the building,

11  how is the badge used to gain access?

12  A    So the badges use a radio frequency system.  An employee

13  will approach the entry point and put his badge up to the

14  reader.  The badge then interacts with the reader via a radio

15  frequency that reads the badge.  It then consults or accesses

16  the control system to determine if that badge is -- it's active

17  and good and whether to allow the person access.  If everything

18  is good and correct and checks out, it releases a mechanism to

19  open the door of the turnstile or whatever the -- the means of

20  access is.

21  Q    Okay.  And is there anybody at that door monitoring people

22  coming in and out?

23  A    So all of our regular entrances will have a security guard

24  that will be monitoring traffic as they come through.  The

25  typical employee -- pedestrian entrances, that guard has a



www.escribers.net | 800-257-0885

1    workstation where they'll monitor people as they scan in, they

2    can see them on their screen, and a picture will flash up

3    displaying the picture of the person who badged in.

4    Q    Okay.  You talked about a picture.  Does the badge itself

5    have a person's picture on it?

6    A    Yes.  The regular badges will have the person's picture

7    that had that badge assigned to them.

8    Q    Okay.  And the picture that appears on the badge, is that

9    the same picture that appears on a workday?

10   A    Correct.  Yes.  It's the picture that gets taken on

11   typically their first day on the job when their badges are

12   printed up and then given to them during orientation.

13   Q    Now, you testified that the guard at the entrance, you

14   call him a door guard, has a laptop or a workstation of some

15   kind in front of them and that when a person badges in, that

16   person's image will appear on the screen of the door guard; is

17   that correct?

18   A    Correct.  Yes.

19   Q    Okay.  And that's done so that the guard can compare a

20   person on the screen against a person --

21        MS. FEINBERG:  Objection.  Leading.

22   Q    BY MR. ROSS:  -- who's walking past them?

23        JUDGE TRACY:  Sustained.

24        MR. ROSS:  All right.

25   Q    BY MR. ROSS:  Tell me, why does that information appear on



www.escribers.net | 800-257-0885

1    the screen?

2        MR. RODRIGUEZ RITCHIE:  Objection.  Vague as to

3    information.

4        JUDGE TRACY:  Sustained.

5        MR. ROSS:  Okay.

6    Q    BY MR. ROSS:  Tell me, a person scans in and there it

7    is -- appears an image on the door guard's workstation?

8        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

9        JUDGE TRACY:  Sustained.

10   Q    BY MR. ROSS:  Is a door guard responsible for comparing

11   information on their door screen against people who are

12   entering the building?

13       MR. RODRIGUEZ RITCHIE:  Objection.  Leading.  Lacks

14   foundation.

15   Q    BY MR. ROSS:  In 2017 --

16       JUDGE TRACY:  Sustained.  Yeah.

17   Q    BY MR. ROSS:  -- is that the responsibility of the door

18   guard?

19       MR. RODRIGUEZ RITCHIE:  Objection.  Lacks foundation.

20   Leading.  Vague as to "that."

21       JUDGE TRACY:  So sustained.

22       MR. ROSS:  Okay.

23   Q    BY MR. ROSS:  What's the function of the door guard?

24       MR. RODRIGUEZ RITCHIE:  Objection.  Vague as to time.

25   Q    BY MR. ROSS:  As of 2017, February 10th, 2017, and May 24,



www.escribers.net | 800-257-0885

1    2017, what was the function of a door guard?

2        MR. RODRIGUEZ RITCHIE:  Objection.  Lacks foundation.

3        JUDGE TRACY:  Overruled.

4        THE WITNESS:  The door guard's job and position was to make

5    sure that only those with an active and valid badge gained

6    access to the interior of the facility.

7        MR. ROSS:  Okay.

8        THE WITNESS:  And in order to facilitate that, they had

9    that workstation that would allow them to make sure.  So that

10   they could physically see the badge scans as people scanned in,

11   and that they could compare the picture that came up on the

12   screen to the person actually walking in to make sure it was

13   that person.

14   Q    Okay.  Now, as of that same time frame, the first half of

15   2017, was that official comparison to be made by the door guard

16   always practicable or possible?

17       MR. RODRIGUEZ RITCHIE:  Objection.  Leading.  Calls for

18   speculation.

19       JUDGE TRACY:  Sustained.

20   Q    BY MR. ROSS:  Do you know of any reason that might have

21   been a problem for the door guard?

22       MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

23       MS. FEINBERG:  Objection.  Vague.

24       MR. ROSS:  Strike that.

25   Q    BY MR. ROSS:  Tell me, in December of 2017, were doors --



www.escribers.net | 800-257-0085

1    turnstiles installed at the doors used by employees as they

2    entered the property?

3          MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

4          MR. ROSS:  There will be a connection.  The connection will

5    be drawn, Your Honor.

6          JUDGE TRACY:  Okay.  So I'll overrule the objection.

7    There's a little bit too much leading testimony -- I mean,

8    questions here.  And it's very difficult to assess someone's --

9          MR. ROSS:  Okay.  I understand.

10         JUDGE TRACY:  Credibility when it's just yes-and-no

11   answers.

12         MR. ROSS:  All right.

13   Q    BY MR. ROSS:  The question is, were turnstiles installed

14   in December of 2017 at the entrances used by employees entering

15   the facility?

16   A    Yes, turnstiles were installed at all of the major

17   pedestrian entrances to better control entrance.

18   Q    Okay.  And why did you find it necessary to install

19   turnstiles?

20         MR. RODRIGUEZ RITCHIE:  Objection.  Assumes facts not in

21   evidence, leading, lacks foundation.

22         JUDGE TRACY:  Sustained.

23   Q    BY MR. ROSS:  Why did you elect to install turnstiles?

24         MS. FEINBERG:  Objection.  Foundation.

25         MR. RODRIGUEZ RITCHIE:  Objection.  Same objections.



www.escribers.net | 800-257-0885

1    Q    BY MR. ROSS:  Why were turnstiles installed, if you know?

2    A    The turnstiles were installed because we were having

3    issues controlling access with the existing door hardware.  We

4    were finding that at high traffic time periods, it was not

5    always possible for security guards to adequately control

6    access to the facility.

7    Q    How so?

8    A    The pictures on the screen as people badged in, when you

9    had a very large influx of people at say shift change, tended

10    to recycle too fast for the guards to adequately monitor them

11    and make sure that the person coming in was actually that

12    person.  And we also had some trouble with people attempting to

13    be polite and holding a door open, which would allow someone to

14    enter without actually physically scanning a badge.

15    Q    And if somebody didn't badge in, if they just came through

16    a door that was open, would their image appear on the

17    workstation of the door guard?

18    A    No.  There would be no scan.  So the system would not

19    recognize it.

20    Q    Now --

21        MR. ROSS:  What's the Employer's next in order?

22        THE COURT REPORTER:  17.

23        JUDGE TRACY:  Mr. Ross, I need a little bit more -- and

24    perhaps I missed it, but I understand Mr. Hansen's title, but

25    what is his relationship to the security guards?

22-60493.1461



1    MR. ROSS:  That's a fair question, and I forgot to ask that

2    question.  Thank you for --

3    JUDGE TRACY:  I think that's where --

4    MR. ROSS:  -- reminding me.

5    JUDGE TRACY:  -- a lot of their foundation objections --

6    MR. ROSS:  Okay.

7    JUDGE TRACY:  -- are coming from.

8    MS. FEINBERG:  Correct.  Thank you, Your Honor.

9    Q   BY MR. ROSS:  Tell us what your job duties were in that

10   capacity at that time.

11   A   So as the operations manager, I was in charge with the

12   overall operations of the security department, such as making

13   sure that we had adequate guard staff that we were receiving

14   from the contract agency, and that the contract agency was

15   training guards to the appropriate level that we'd asked for as

16   well as overseeing just the equipment and material used by the

17   security department.

18   Q   Okay.  And did you interface with the management of

19   Securitas who was on site?

20   A   Correct.  Yes.  The --

21   Q   Who was that?

22   A   The security account manager, is how they termed it, was

23   Ian McEwen, and he reported directly to me.

24   Q   Okay.  And the individuals who were Securitas people, who

25   did they report to?



www.escribers.net | 800-257-0885

1    A    They all would have reported to Ian.

2    Q    Okay.  And the Tesla employed security staff members, who

3    would they have reported to at the time?

4    A    The Tesla internal staff would have reported either to

5    myself or the fire operations manager, depending.

6    Q    Okay.  Who was that?

7    A    Brian Preston.

8    Q    Okay.

9        JUDGE TRACY:  And then what was his role with regards to

10    setting up security here.

11        MR. ROSS:  Sure.

12    Q    BY MR. ROSS:  Tell us what your job duties and

13    responsibilities were in that position.

14    A    So as a Security Operations Manager, in addition to

15    overseeing that we have the correct resources in place, one of

16    the things, as I mentioned, to also checkup on the training

17    that Securitas was providing to the officers.  I would also

18    checkup on the officers myself just to make sure that they were

19    following their duties and responsibilities that we, Tesla, had

20    laid out for our security department.  So I would physically

21    check on the officers both day shift, swing shift, grave shift

22    periodically.  And I would also be responsible to help push out

23    any changes or adjustments in our security posture that may be

24    needed.

25    Q    Were you responsible -- having responsibilities for



1    enforcing Company policy relative to security?

2    A    Yes.  That was -- one of the aspects of the security

3    department was enforcing the Company policies in place --

4    Q    Okay.

5    A    -- on various things.  But all security related

6    enforcement.

7    Q    Okay.

8         MR. ROSS:  Is there anything else you'd like to know,

9    Judge?

10        JUDGE TRACY:  No.  But I'd just like a lot less leading

11   questions.

12        MR. ROSS:  Okay.  I'm sorry about that.

13   Q    BY MR. ROSS:  Now, you have in front of you a document

14   that has been marked for identification as Respondent's

15   Exhibit 19.  Have you seen that document before, and can you

16   tell us what it is?

17   A    Yes.  Actually I've seen this document a lot.  This would

18   be the basic standard operating procedures that was put

19   together for our badging operations team, the supervisor, which

20   reported to me, and it details the basic instructions on how

21   they're supposed to set up badges, how to activate, deactivate

22   who is allowed to get a badge, what the requirements are.  All

23   of that would have been included in this document.

24   Q    Okay.  Directing your attention to the fourth page, the

25   bottom of the fourth page, mention is made of inactive badges.



1    Do you see that?

2    A    Yes.

3    Q    Okay.  While you were in this job of the -- what was the

4    title again?

5    A    Security Operations Manager.

6    Q    Yeah.  While you were in that position, were people's

7    badges from time to time deactivated?

8    A    Yes.  They would be deactivated on a number of

9    circumstances.  These would range from -- the system would

10   actually automatically deactivate if they were not used within

11   a specific time period.  Even if the badge nominally was still

12   belonging to an active employee or someone, if it wasn't used,

13   it would be deactivated as a safety precaution.  Badges would

14   also be deactivated if they were reported lost or stolen, or in

15   certain circumstances, they'd be deactivated per request from

16   HR medical due to employees being on some sort of medical leave

17   or something of that nature.

18   Q    Okay.

19   A    Employees or contractors.

20   Q    If a person's employment with the Company ended, would

21   their badge be deactivated?

22   A    Yes.  Their badge would be deactivated once we received

23   notification from HR that they were no longer an employee.

24   Q    Okay.  Now, a person whose badge had been deactivated

25   because they were on medical leave, how would they gain access



www.escribers.net | 800-257-0885

1    to the property?  If they couldn't badge in, how would they go

2    about entering the property, the building?

3    A    They would be --

4        MR. RODRIGUEZ RITCHIE:  Objection.  Calls for speculation.

5        JUDGE TRACY:  Overruled.  Go ahead.

6        THE WITNESS:  They would be directed to go to the main

7    lobby and check in with their contact, usually someone from HR

8    medical, who would meet them from there and typically escort in

9    that case.

10   Q    BY MR. ROSS:  Okay.  And when they return to work, would

11   their badge be reactivated?

12   A    Yes.  The badge would be reactivated once we receive

13   instructions to do so either from, again, HR medical, depending

14   on the nature of the deactivation.

15   Q    Now, you testified before that Mr. Slettvet was your boss.

16   Tell me, did you and Mr. Slettvet ever have any conversations

17   about how employees who wanted to leaflet on Company property

18   outside the building should be treated?

19       MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Vague as to

20   time.

21   Q    BY MR. ROSS:  Prior to February of 2017, did you have such

22   conversations with Mr. Slettvet?

23   A    Yes.  That particular conversation would have come up

24   periodically just detailing, especially with the new guard

25   staff turnover and changeover, just to make sure new staff were



www.escribers.net | 800-257-0885

1    being kept up to date.  So yes, it's -- it's definitely

2    something that was discussed.

3    Q    Okay.  And was that information ever communicated by you

4    to staff reporting to you?

5        MR. RODRIGUEZ RITCHIE:  Objection.  Vague as to "that

6    information."

7    Q    BY MR. ROSS:  Information that Mr. Slettvet told you

8    before February of 2017, did you ever direct people working

9    under you to follow the directions of Mr. Slettvet?

10       MR. RODRIGUEZ RITCHIE:  Same objection.

11       JUDGE TRACY:  Sustained.

12   Q    BY MR. ROSS:  What did Mr. Slettvet tell you?

13       MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

14       JUDGE TRACY:  Well, who is Mr. Slettvet?  Could you --

15       MR. ROSS:  Slettvet --

16       JUDGE TRACY:  -- establish --

17       MR. ROSS:  -- is his boss.

18       JUDGE TRACY:  -- him, please?

19       MR. ROSS:  Greg Slettvet was the senior --

20       JUDGE TRACY:  Ask it to this witness.

21       MR. ROSS:  Oh.  I'm sorry.

22   Q    BY MR. ROSS:  You've told us already, but who is

23   Mr. Slettvet at this time?

24   A    Mr. Greg Slettvet was the senior security manager that I

25   reported to.



www.escribers.net | 800-257-0885

1    Q    And responsible for security where?

2    A    He was responsible for security globally.

3    Q    Okay.  Now, when you spoke to Mr. Slettvet prior to

4    October of 2017 -- I'm sorry -- February of 2017, what did he

5    tell you about employees and leafleting on the exterior of the

6    building?

7         MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.  Leading.

8         JUDGE TRACY:  Overruled.

9         THE WITNESS:  So the conversations I had with Greg prior to

10   that date would have been to allow employees, so long as they

11   were engaged in this activity on nonwork hours and not

12   interrupting or causing a -- either a disturbance or a safety

13   hazard, to allow it in those nonworker areas, and as long as

14   they were not on work time, so long as it was just the

15   employees.

16   Q    BY MR. ROSS:  Okay.  Now, did you ever pass this

17   information you just testified to on to the Tesla security

18   people who worked and reported to you?

19        MR. RODRIGUEZ RITCHIE:  Objection.  Vague as to Tesla

20   security people.

21        JUDGE TRACY:  I'm going to sustain the objection, but

22   really more to the form of the question.  Again, this is just

23   too much leading.  Like, what did you do with this information?

24        MR. ROSS:  That's fair enough.  Okay.  That's a fair

25   question.



1    Q    BY MR. ROSS:  What did you do with that information?

2    A    So typically, as with any information that I got from my

3    manager that he specifically asked to make sure it got passed

4    out to the rest of the staff, I would communicate that out.

5    Typically I would communicate it to the contract security

6    services manager with a request to make sure that that got

7    pushed out to the contract officers as well directly by their

8    supervisor staff.  I would also typically have direct

9    conversations with all of my internal personnel just to make

10   sure that they also received it.  And periodically reminders

11   would be sent via email as well reminding them of those

12   policies or procedures, especially if we had changeover or

13   people were promoted or moved to new positions that perhaps

14   they didn't previously hold.  And that went really for any

15   policy or procedure.

16   Q    Including the solicitation policy --

17        MR. RODRIGUEZ RITCHIE:  Move to strike --

18   Q    BY MR. ROSS:  -- we talked about before?

19        MR. RODRIGUEZ RITCHIE:  -- as nonresponsive.  The question

20   was what did he do with that information, not what did -- was

21   his typical practice on disseminating information.

22        JUDGE TRACY:  So sustained.

23   Q    BY MR. ROSS:  So are you --

24   A    So to answer that --

25        JUDGE TRACY:  So you just wait for --

22-60493.1469



1    THE WITNESS:  Understood.

2    JUDGE TRACY:  -- the attorneys' questions or my own.

3    His answer here -- or his response was, typically I did.

4    The question was what did he do with the information after

5    speaking with Mr. --

6    MR. ROSS:  Slettvet.

7    JUDGE TRACY:  -- Slettvet.

8    MR. ROSS:  Okay.  Do you want me to --

9    JUDGE TRACY:  That's the appropriate --

10   MR. ROSS:  Okay.

11   Q    BY MR. ROSS:  Would you answer --

12   JUDGE TRACY:  That was the question you had asked --

13   MR. ROSS:  Yes.

14   JUDGE TRACY:  -- but he didn't answer that.

15   MR. ROSS:  Okay.

16   Q    BY MR. ROSS:  Could you answer that question, please?

17   A    So that information, I spoke directly with the internal

18   staff that reported to me, all of them, and communicated it to

19   them as well as communicating with the contract account manager

20   to make sure that that was also communicated through him and

21   his subordinates to the contract staff.

22   Q    All right.  Now, was there ever a time when you spoke with

23   Mr. Slettvet and he spoke to you about how to deal with

24   employees who wanted to engage in leafleting with respect to

25   the Union?


www.escribers.net | 800-257-0885

1    MR. RODRIGUEZ RITCHIE:  Objection.  Leading.  Vague.

2    JUDGE TRACY:  Sustained.

3    Q    BY MR. ROSS:  Was the subject ever discussed with

4    Mr. Slettvet in terms of what was the appropriate means or way

5    to deal with employees who wanted to engage in leafleting on

6    behalf of the Union on Company premises?

7    MR. RODRIGUEZ RITCHIE:  Same objection.

8    JUDGE TRACY:  Overruled.  If you could just answer the

9    question.

10    THE WITNESS:  Yes, that was discussed.

11    Q    BY MR. ROSS:  And tell me, if you can recall, what's your

12    first memory of that conversation -- of those conversations?

13    A    The first memory that I am certain of would have been in

14    February of 2017.

15    Q    Okay.  And since then, how many times do you think you had

16    conversations like that with Mr. Slettvet?

17    MS. FEINBERG:  Objection.  Vague.

18    JUDGE TRACY:  Sustained.

19    Q    BY MR. ROSS:  Okay.  Tell me, do you know what a passdown

20    is within the context of security operations at Tesla?  Have

21    you ever heard the term?

22    MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Vague.

23    JUDGE TRACY:  What's the relevance?

24    MR. ROSS:  The relevance is, Your Honor, there's going to

25    be a document that is a so-called passdown that describes the



1    conversations.  It is essentially a record of the conversations

2    that this witness has testified to.  It's corroborative and

3    supportive of his testimony.  And it's a business record.

4        MS. FEINBERG:  So what --

5        JUDGE TRACY:  Is there an objection?

6        MS. FEINBERG:  Oh, yes.  I actually feel that he's trying

7    to educate the witness.  He could have just shown him the

8    document, asked him some questions.  I feel that there's a lot

9    of this both leading and now with -- if this isn't leading,

10    it's educating a witness, which is not an appropriate way to do

11    cross -- to do direct examination.

12        JUDGE TRACY:  Well --

13        MS. FEINBERG:  And the last --

14        JUDGE TRACY:  Um-hum.

15        MS. FEINBERG:  But whatever.

16        JUDGE TRACY:  Okay.  Yeah?

17        MR. RODRIGUEZ RITCHIE:  We'd also object as to relevance.

18    Why there's some conversation that was had at some point,

19    there's no allegations in the complaint pertaining to some --

20    to conversations about policies.  And they are two very

21    specific allegations regarding the topical matter on very

22    specific dates, not in general on general dates.

23        JUDGE TRACY:  And so -- you know, I'm going to overrule the

24    objection.  I will allow the questions, but the relevance has

25    yet to be proven.



www.escribers.net | 800-257-0885

1    MR. ROSS:  Okay.  Well, the relevance will be established.

2    JUDGE TRACY:  Okay.

3    MR. ROSS:  Okay.

4    JUDGE TRACY:  Again, to the complaint --

5    MR. ROSS:  Yes.

6    JUDGE TRACY:  -- allegations here.

7    MR. ROSS:  Absolutely.

8    Q    BY MR. ROSS:  Tell me, what is a passdown?

9    A    A passdown is a log or a piece of information that is

10   passed on to the oncoming supervisor or shift that details any

11   additional information that the next oncoming shift needs to be

12   aware of on previous incidents or any new instructions or

13   reminders that were given out to pass on to all additional

14   staff.

15   Q    So when one shift is ending, another shift is beginning,

16   it's kind of passing the baton between shifts?

17   A    Correct.  That's -- hence the term passdown.

18   Q    Okay.

19   MR. ROSS:  Your Honor, while I'm marking the other

20   document, I'm going to move Respondent's Exhibit 19 into

21   evidence.

22   JUDGE TRACY:  Any objections?

23   MR. RODRIGUEZ RITCHIE:  I'd like to voir dire.

24   JUDGE TRACY:  Sure.

25                    **VOIR DIRE EXAMINATION**



1    Q    BY MR. RODRIGUEZ RITCHIE:  Mr. Hansen, we haven't had the

2    pleasure of meeting before, so I thought I'd let you know my

3    name is Edris Rodriguez Ritchie.  I represent the General

4    Counsel of the National Labor Relations Board.

5        You testified about the document that's been marked as

6    Respondent's Exhibit 19?

7    A    Correct.

8    Q    Do you have that in front of you?

9        MR. ROSS:  He doesn't I don't believe.

10       Or do you?

11       THE WITNESS:  I do.  I believe you dropped --

12       MR. ROSS:  Okay.

13   Q    BY MR. RODRIGUEZ RITCHIE:  When was this document created?

14   A    Well, the document's been revised.  If you're asking when

15   the original document was created --

16   Q    No.  I'm asking when this version of -- that's in

17   Respondent's Exhibit 19, when was this document created?

18   A    If I recall correctly, this document was revised in 2014 I

19   believe.

20   Q    And since 2014, it hasn't been revised at all?

21   A    There has been no major revision that I'm aware of.

22   Q    My question was, has it been revised at all?

23   A    I am not aware of revisions.

24   Q    To what's in Respondent's 19?

25   A    Correct.



www.escribers.net | 800-257-0885

1    Q    This document in Respondent's 19, is this something that

2    was provided to employees at Tesla Fremont?

3    A    This would have been provided to internal security staff.

4    Q    Both Tesla security staff and Tesla contract staff?

5    A    Primarily Tesla internal staff, but some contract staff,

6    if they were working in the badging office.

7    Q    And this was in effect on February the 10th, 2017?

8    A    Yes.

9    Q    And May 24th, 2017?

10    A    Yes.

11    MR. RODRIGUEZ RITCHIE:  Okay.  No further questions.

12    JUDGE TRACY:  Any objections?

13    MR. RODRIGUEZ RITCHIE:  I'd still object on relevancy

14    grounds.

15    JUDGE TRACY:  Okay.  And Ms. Feinberg, any objections?

16    MS. FEINBERG:  No.  I'll just deal with it on cross.  Thank

17    you.

18    JUDGE TRACY:  All right.  So I'll overrule the objection.

19    I'm not sure either of the relevancy, but I'm sure it will come

20    up later --

21    MR. ROSS:  Okay.

22    JUDGE TRACY:  -- or even in the brief.  So Respondent's

23    Exhibit 19 is admitted into evidence.

24    **(Respondent Exhibit Number 19 Received into Evidence)**

25    MR. ROSS:  Thank you, Your Honor.



1     **DIRECT EXAMINATION** (RESUMED)

2     Q    BY MR. ROSS:  By the way, did the badging office report to

3     you in your job?

4     A    The badging supervisor, yes.

5     Q    Okay.  All right.  The passdown that we were talking

6     about, that's something that was -- was that routine?

7     A    Yes.

8     Q    Okay.  Now, I'm going to show you what's been marked as

9     Respondent's Exhibit 20.  And it is -- there are two emails --

10    actually several emails.  All of which are entitled Tesla

11    passdown week ending Friday, 2/10/17.  But I'm directing your

12    attention to the first page, the complete email from Ian McEwen

13    to Samuel Ali and the email from Samuel Ali to David Connolly

14    and various people that begins on the first page and spills

15    over to the second page.

16         First of all, we've identified Mr. McEwen as the account

17    manager or account supervisor for Securitas?

18    A    Yes.  It's the -- now you have me confused.

19         MR. RODRIGUEZ RITCHIE:  Your Honor, I would object to using

20    this version of this document.  It looks to be a whole email

21    chain, and the second page looks -- the document doesn't appear

22    to be complete.  It appears to be cutting off something at the

23    bottom of the second page.

24         JUDGE TRACY:  Okay.  So why don't you deal with that once

25    they move for it to be admitted into evidence.  Okay?



www.escribers.net | 800-257-0885

1       MR. RODRIGUEZ RITCHIE:  Okay.

2   Q   BY MR. ROSS:  So Mr. McEwen was whom at this time?

3   A   He was the account manager for Securitas.

4   Q   Right.  And Mr. Ali, who is Mr. Ali -- Samuel Ali, at this

5   time?

6   A   Samuel Ali would have been the Securitas grave shift

7   supervisor.

8   Q   What shift?

9   A   Grave shift.  Grave shift --

10  Q   Okay.

11  A   -- typically being from 11 at night to 7 in the morning.

12  Q   Okay.  And who is David Connolly?

13  A   David Connolly was the swing shift supervisor at the time.

14  Swing shift being from 3 in the afternoon to 11 at flight.

15      MS. FEINBERG:  I'm sorry.  For who?  Well --

16      MR. ROSS:  I'm sorry?

17      MS. FEINBERG:  It's still not clear who -- the first two I

18  got were with Securitas.  The last one, it's not clear with

19  whom.  So --

20      JUDGE TRACY:  I'm not sure if --

21      MS. FEINBERG:  -- if you could clarify --

22      JUDGE TRACY:  -- he's asked yet.

23  Q   BY MR. ROSS:  Connolly worked for Securitas; is that

24  right?

25  A   Yes.  He was the Securitas swing shift supervisor.


www.escribers.net | 800-257-0885

1   Q   Okay.  And Ali worked for Securitas?

2   A   Correct.  Ali was the grave shift Securitas supervisor.

3   Q   Okay.  And who was Nanette Jacoby?

4   A   She was the branch manager for Securitas that assisted

5   that particular account for them as far as administration --

6   Q   Okay.

7   A   -- and scheduling.

8   Q   And Angel Kobus, do you know what that person was?

9   A   Yes.  He was Nanette's assistant.

10   Q   All right.  Now, is Securitas still operating as the

11   contractor at Tesla?

12      MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

13      JUDGE TRACY:  What's the relevance?

14      MR. ROSS:  It's preliminary to establishing why none of

15   these individuals are available to us at this time, Your Honor.

16      MS. FEINBERG:  Well, did they get subpoenas?

17      JUDGE TRACY:  I'll overrule the objection.  Go ahead.

18   Q   BY MR. ROSS:  Would you answer the question, please?

19   A   Securitas was replaced by Tesla with a different security

20   agency in July of 2018.

21   Q   Okay.  But as of February 10th, the individuals we've

22   named filled the Securitas positions you've described; is that

23   right?

24   A   Correct.

25   Q   Okay.  And in your experience, these passdowns are



www.escribers.net | 800-257-0885

1    customary?  This is typically what's done from one shift to the

2    next?

3         MS. FEINBERG:  Objection.  Foundation.  I thought he was

4    testifying earlier about passdowns within the employees of

5    Tesla.  But this is not a -- these -- none of these people are

6    Tesla documents -- Tesla employees, nor is there any indication

7    that this even shared with Tesla.  There's no Tesla person on

8    this email chain.

9         MR. ROSS:  I'll --

10        MR. RODRIGUEZ RITCHIE:  It's also leading.

11        MR. ROSS:  I'll address that.

12   Q    BY MR. ROSS:  Was it your understanding or did you have an

13   understanding as to whether passdown was used between shifts by

14   Securitas while it was working at Tesla?

15        MS. FEINBERG:  Objection.  Foundation.

16        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

17        JUDGE TRACY:  Okay.  Sustained.

18        MR. ROSS:  I'm going to ask -- I'll ask him how he knows

19   after he's established that he has knowledge.

20        JUDGE TRACY:  The -- I sustained the objection.  You just

21   need to roll it back a bit?

22        MR. ROSS:  Excuse me?

23        JUDGE TRACY:  You need to come back a bit, set up the

24   foundation about passdowns and how they were used.  I mean, it

25   goes to your case, as you say --



www.escribers.net | 800-257-0085

1     MR. ROSS:  True.

2     JUDGE TRACY:  -- so we need to make -- connect things up

3     here.

4     MR. ROSS:  Okay.

5  Q   BY MR. ROSS:  Do you know how --

6     MR. ROSS:  Strike that.

7  Q   BY MR. ROSS:  Securitas provided services to Tesla on a

8  7-day-a-week, 24-hour-day basis?

9     MS. FEINBERG:  Objection.  Leading.

10    MR. RODRIGUEZ RITCHIE:  Vague as to time.

11    JUDGE TRACY:  Okay.

12  Q   BY MR. ROSS:  As of February of 2017?

13    MS. FEINBERG:  My objection still stands.

14    JUDGE TRACY:  I'm going to overrule the objection.  Let's

15  just move this on.  Here, go ahead.

16    THE WITNESS:  Yes, Securitas --

17    MR. ROSS:  Okay.

18    THE WITNESS:  -- provided contract security labor 24 hours

19  a day, 7 days a week.

20  Q   BY MR. ROSS:  Okay.  And how many shifts did Securitas

21  maintain during that period?

22  A   There were three eight-hour shifts, is how the day was

23  broken up.

24  Q   Okay.  And I think it's already in the record, but out of

25  an abundance of caution, tell us what the shifts were and what



1    times they corresponded to.

2    A    Day shift corresponded to 7 in the morning to 3 in the

3    afternoon, swing shift was 3 in the afternoon to 11 at night,

4    grave shift was 11 at night to 7 in the morning.

5    Q    Okay.  And did Tesla --

6    MR. ROSS:  Strike that.

7    Q    BY MR. ROSS:  Did Securitas have particular individuals

8    responsible for supervising or managing those various shifts?

9    A    Yes, they did.

10   Q    Okay.

11   A    They had a shift supervisor.

12   Q    Okay.  And who were the shift supervisors who were

13   responsible for those shifts at that time, February 10th, 2017?

14   A    So the day shift would have been overseen directly by the

15   account manager, Ian McEwen, the grave shift would have been

16   overseen by Sam Ali, and the swing shift by David Connolly.

17   Q    Okay.  And was any device or practice maintained to let

18   one shift know what had occurred during the prior shift or what

19   they might be called upon to do in the next shift?

20   MS. FEINBERG:  Objection.

21   MR. RODRIGUEZ RITCHIE:  Objection.

22   MS. FEINBERG:  Foundation.

23   MR. RODRIGUEZ RITCHIE:  Leading and compound.

24   MS. FEINBERG:  Sorry.  I stepped on you.

25   JUDGE TRACY:  Sustained.



1    MS. FEINBERG:  Your Honor, can I just ask, it appears that

2    what's happening here is we're trying to get information about

3    Securitas from a witness who doesn't work for Securitas, that

4    document that's only internal to Securitas.  I'm not really

5    clear where -- it just seems like we're spending a lot of time

6    trying to get someplace where we're not going to get there.

7    The person who wrote this still exists.  He's alive.  Could

8    have been subpoenaed.  I just looked him up.  I feel like this

9    is -- we're trying to wedge something into someone who -- I

10   don't even know where this document came from, but that --

11   there's been no connection.

12       MR. ROSS:  Well, actually we're trying to finish this

13   hearing in this century, Your Honor.

14       MS. FEINBERG:  Well --

15       JUDGE TRACY:  Well, let me ask --

16       MS. FEINBERG:  -- you could have prepared.

17       JUDGE TRACY:  -- you, though --

18       MR. ROSS:  This is a -- it's clearly a document that was

19   established in the normal course of business.  It was a

20   business record.

21       MS. FEINBERG:  Of who?

22       MR. ROSS:  It is true, it is not a Tesla document, but it

23   is also apparent on the face of the document that it is an

24   authentic business record.  It wasn't created for the purpose

25   of this litigation.  It was simply a message that went from Sam



1   Ali to the persons going into the next shift.  It was a

2   passdown from Ali to the next shift.

3       JUDGE TRACY:  So let me ask you, though, to -- just to cut

4   to the chase in terms of -- you know, there are several

5   complaint allegations that we all know about.  What was your

6   affirmative defense?  What is your defense?  Because that would

7   help me to understand --

8       MR. ROSS:  Sure.

9       JUDGE TRACY:  -- what is --

10      MR. ROSS:  Our --

11      JUDGE TRACY:  -- maybe not relevant to their case is,

12  right, but it -- but it's important to your case.  I just don't

13  know where this is going.  I think in my head I kind of do --

14      MR. ROSS:  Okay.

15      JUDGE TRACY:  -- but I don't want to assume things.

16      MR. ROSS:  Okay.  The answer is, A --

17      JUDGE TRACY:  And if we need to have him leave, we can do

18  that.

19      MR. ROSS:  Well, if you want him to leave, I'll be happy --

20      JUDGE TRACY:  I don't know if what you're trying to elicit

21  is --

22      MR. ROSS:  Okay.

23      JUDGE TRACY:  -- through his testimony --

24      MR. ROSS:  Could we --

25      JUDGE TRACY:  -- to prove something.



1    MR. ROSS:  Could we ask him to step outside?

2    JUDGE TRACY:  Yes.

3    Could you step outside again --

4    THE WITNESS:  Yes.

5    JUDGE TRACY:  -- please?  I will say, Ms. Feinberg, my

6    concern right now at this point isn't that he doesn't work for

7    Securitas.  He was a supervisor.  He oversaw --

8    MS. FEINBERG:  I understand that.

9    JUDGE TRACY:  -- all that, et cetera.  My bigger concern,

10   which is why we constantly keep getting objections, which is

11   foundation and on leading, which I've talked to you about, and

12   the leading at some point, I would say, you know, often if it's

13   so much leading, it's very hard to assess somebody's

14   credibility.

15   MR. ROSS:  I understand that.

16   JUDGE TRACY:  Right?  You get that.  So at some point to

17   move it along, I'm just going to overrule the objection and

18   just answer the question.  But just know it's hard for me to

19   assess things when things aren't coming out of his mouth except

20   yes and no.  But going to what defense you're raising.  In

21   terms of the leafleting --

22   MR. ROSS:  Well --

23   JUDGE TRACY:  -- let me -- what is it?

24   MR. ROSS:  Okay.  Well, first of all, there's going to be a

25   factual dispute as to whether or not the conduct that has been

eScribers
www.escribers.net | 800-257-0885

1   presented by General Counsel occurred.  So there's going to be

2   that issue.

3       JUDGE TRACY:  Sure.  Okay.

4       MR. ROSS:  In addition to which, we want to put into

5   evidence that establishes what the Company's policy was --

6       JUDGE TRACY:  Um-hum.

7       MR. ROSS:  -- we want to establish that the Company gave

8   very clear direction to its own employees as well as to the

9   employees of the contractor as to what our policy was and that

10  our policy was to be followed.

11      JUDGE TRACY:  Okay.

12      MR. ROSS:  We believe that that is evidence that is

13  corroborative of our position that the conduct complained of

14  did not occur.  And insofar as there is going later to be a

15  dispute or an alleged dispute as to whether or not Tesla did,

16  in fact, have a policy or whether Tesla directed the contractor

17  to comply with that policy, this -- these -- this passdown that

18  exists between Mr. McEwen, who's been identified as the account

19  manager for Securitas, clearly confirms that he received

20  directions from Slettvet.  If you look at the email of 2/10

21  from McEwen to Ali, Connolly, Jacoby, and Kobus, paragraph

22  nine, for the Union representatives that are on site, Greg has

23  asked that we identify them only.  At this time, we are not to

24  interfere.  They are employees and can be on site.  We advised

25  this morning that he would be speaking to Arnon to see that HR

escribers
www.escribers.net | 800-257-0885

1    wants -- or what HR wants to do.  No update yet.

2        But the point is this shows that Mr. Slettvet gave

3    direction to leave the people alone.  In addition to which,

4    there is an email, paragraph number two on February 10th from

5    Mr. Ali to McEwen and et al. confirming that there had been

6    activity that night during his shift, that they Union

7    supporters ended up being employees.  So it was an awkward

8    situation.  This entry will be consistent with the testimony

9    you will hear from other witnesses about what occurred that

10   night.

11       So we're putting this in --

12       JUDGE TRACY:  So -- um-hum.

13       MR. ROSS:  -- as background to substantiate the factual

14   defense we're going to be offering.

15       JUDGE TRACY:  Okay.  And so I'm assuming your defense at

16   that point is that you just let them do what they needed to do

17   and that's it --

18       MR. ROSS:  We --

19       JUDGE TRACY:  -- or is it also that, you know, these were

20   contractors, so we gave them our rule and then they maybe

21   didn't follow it --

22       MR. ROSS:  Our --

23       JUDGE TRACY:  -- and we didn't have control?  I mean, is

24   that what you're trying to say.

25       MR. ROSS:  Well, there are multiple defenses.  A, it didn't



www.escribers.net | 800-257-0885

1   happen, and B, if it did happen, we don't think we're

2   responsible for the actions of a third party.

3      JUDGE TRACY:  But this document also -- didn't he -- I

4   mean, he might know about passdowns, but he's not anywhere on

5   this document.

6      MR. ROSS:  No, he is not, but he is familiar with the

7   practice of passdowns.  And on the document on its face, we

8   believe, is a self-authenticating document.

9      Now, I don't want to belabor the point.  In other words --

10     JUDGE TRACY:  And -- but also, if you recall from a little

11  bit earlier, which I said to raise later, is that it doesn't

12  even appear to be complete.

13     MR. ROSS:  Well, I disagree.  It is complete insofar as it

14  pertains to the entries that were made on or about the date of

15  February 10.  The ones that precede this, you may recall that a

16  request was made for materials having to do with security

17  during the time frame for a period prior to February 10th.

18  This is basically the -- an excerpt taken from a larger

19  document.  But this is complete insofar as it pertains to what

20  occurred on February 10th.

21     And again, I don't want to belabor the point.  I think

22  we've beaten this horse to death enough.  I'm going to offer it

23  into evidence.  If you choose to admit it, that's fine; if you

24  choose to reject it, we're going to ask that it goes in the

25  rejected exhibit file.


22-60493.1487

1        MR. RODRIGUEZ RITCHIE:  May I be heard?

2        JUDGE TRACY:  Go ahead.  Yeah.

3        MR. RODRIGUEZ RITCHIE:  Yeah.

4        MS. FEINBERG:  It's not an admission.  It's hearsay.

5        MR. RODRIGUEZ RITCHIE:  We certainly would object to the

6    receipt of Respondent's 20 into the record.  It's not a self-

7    authenticating document.  It's not even a business record

8    that's maintained in the ordinary course of business of Tesla.

9    This witness -- though we haven't I think heard quite this yet,

10   but he can't even I think authenticate this document.  It

11   doesn't even appear to be complete.  I understand the

12   representations made by counsel, but the fact is, as he

13   admitted, it's not a complete document.

14        In addition to the fact that this testimony really doesn't

15   tend to show any fact in dispute.  There's a dispute, I

16   suppose, as to what occurred on February the 10th --

17        JUDGE TRACY:  Um-hum.

18        MR. RODRIGUEZ RITCHIE:  -- and as to what occurred on May

19   24th --

20        JUDGE TRACY:  Um-hum.

21        MR. RODRIGUEZ RITCHIE:  -- but that a policy existed or

22   that someone may have been told that a policy exists doesn't

23   tend to show that something occurred on February the 10th or it

24   didn't occur on February the 10th, for example.

25        MR. ROSS:  Judge --



1       JUDGE TRACY:  Right.  So --

2       MS. FEINBERG:  Can I just --

3       JUDGE TRACY:  -- I mean, I guess --

4       MS. FEINBERG:  -- add, also --

5       JUDGE TRACY:  I guess -- here, this is what we just --

6       MS. FEINBERG:  Oh.

7       JUDGE TRACY:  -- need to do:  This is their defense, put it

8    on, and then again in the briefs, you just argue that it's not

9    relevant.  And they're going to say, hey, it is actually very

10   important here about our policy that we set forth.

11      MR. ROSS:  And --

12      MS. FEINBERG:  Okay.  But this is not -- this is a hearsay

13   document.  This isn't a document where Greg is writing to

14   Securitas saying, here's what the need to do.  This is some

15   version, not a direct quote, which where -- what I had heard

16   Mr. Ross say is they're going to rely on this document to say

17   that they did the proper thing in giving notice.  But we don't

18   know that.  We don't -- from this document.  And we --

19      JUDGE TRACY:  And who is Greg?

20      MS. FEINBERG:  I assume --

21      MR. ROSS:  Mr. Slettvet.

22      MS. FEINBERG:  -- Greg is Mr. Slettvet --

23      JUDGE TRACY:  Oh.

24      MS. FEINBERG:  -- but I don't know that either.  I'm just

25   guessing that.  I only -- the only reason I know that is that



www.escribers.net | 800-257-0885

1    Mr. Ross said that when he was speaking.

2        JUDGE TRACY:  Okay.

3        MS. FEINBERG:  But it doesn't -- there's no --

4        JUDGE TRACY:  Okay.

5        MS. FEINBERG:  -- way to know that otherwise.

6        MR. ROSS:  Your Honor --

7        MS. FEINBERG:  I just heard him say it, so I --

8        MR. ROSS:  -- listen, you're --

9        MS. FEINBERG:  -- gave him the benefit --

10       MR. ROSS:  -- going to --

11       MS. FEINBERG:  -- of the doubt on that one.

12       MR. ROSS:  -- you're going to do whatever you're going to

13   do with the document, but --

14       JUDGE TRACY:  Yeah.

15       MR. ROSS:  -- I want to make it clear how grossly unfair

16   these claims are.  We have nothing but alias allegations

17   directed at people who are not people that we employed, who no

18   longer -- we have no longer any contact with them.  This is

19   stuff that occurred long ago.  Rather than proceed to trial

20   when we could have actually had access to people, the General

21   Counsel sat on these allegations and kept postponing the

22   hearing in this case to the point --

23       MS. FEINBERG:  I don't --

24       MR. ROSS:  -- of where we are now prejudiced in our ability

25   to mount a defense because why?  These people are complete



www.escribers.net | 800-257-0885

1   strangers to us, always have been.  They are not our employees.

2   We do not have information as to where they live and how to

3   contact them.  Securitas is no longer our contractor.  Yes, we

4   could subpoena them and we could try to track them down, but

5   you know, at some point in time, since we've never had anybody

6   identify, it would mean having to track down dozens of

7   individuals and say, tell me, where were you at 4:30 in the

8   morning on --

9       JUDGE TRACY:  So --

10      MS. FEINBERG:  Can I --

11      JUDGE TRACY:  I mean, I understand. I don't want to hear --

12      MS. FEINBERG:  Okay.

13      JUDGE TRACY:  -- anymore about it.  We're going to call him

14  back.  I would say, though, that I, for the record, just have

15  to disagree with --

16      MR. ROSS:  Okay.

17      JUDGE TRACY:  -- you're characterization, because, yes,

18  these charges were filed a long time ago.  Obviously, though,

19  when the charge is filed, that's when you start your

20  investigation to find out what happened here, what's -- you

21  know, what you could say.  I mean, these are very distinct

22  allegations of February 10th, May 24th.  It seems to me it will

23  be pretty easy to go in to figure out who's working that night

24  and ask them was it Securitas, was it your own employees?  I

25  mean --



www.escribers.net | 800-257-0885

1    MR. ROSS:  Well --

2    JUDGE TRACY:  -- there's many different ways that it can be

3    done.

4    MR. ROSS:  I --

5    JUDGE TRACY:  My concern -- and that's the past.  Okay?

6    And I understood even with the prior pleadings in this before

7    it even went to hearing, you all came in -- there's no

8    attorneys here, there were other attorneys, and that you hadn't

9    had time to look into what was happening.  That was back in

10    May.  And so we've now had the full summer to kind of continue

11    with this process.

12       But regardless of that, we are here today.  Okay?  What I'm

13    saying is I just keep hearing objection after objection.  The

14    way to cure some of it is the leading parts.  And they're going

15    to argue that relevance -- I'm wanting to know from you all

16    what is your defense so I'm --

17    MR. ROSS:  Okay.

18    JUDGE TRACY:  -- clear so I know what --

19    MR. ROSS:  Yeah.

20    JUDGE TRACY:  -- to allow in.  Because I'm not going to

21    preclude you from putting in your defense?

22    MR. ROSS:  Okay.  I --

23    JUDGE TRACY:  I just wanted to know what --

24    MR. ROSS:  And --

25    JUDGE TRACY:  -- it was.


www.escribers.net | 800-257-0885

1      MR. ROSS:  And I think -- I think our defense, to the

2   extent we're able to marshal evidence at this late stage --

3      JUDGE TRACY:  That's fine.

4      MR. ROSS:  -- having done what we consider to be a

5   reasonable investigation, but doing it in a very handicap way,

6   given the lateness of this hearing --

7      JUDGE TRACY:  Sure.

8      MR. ROSS:  -- is that it didn't happen.

9      JUDGE TRACY:  Okay.

10      MR. ROSS:  Okay?  And we believe this is consistent with

11   the testimony you're going to hear from this witness --

12      JUDGE TRACY:  Okay.

13      MR. ROSS:  -- and other witnesses.  We think it deserves a

14   place in the record.

15      JUDGE TRACY:  Sure.

16      MR. ROSS:  If you want to put it in -- we think it should

17   be in.  If you want to exclude it, that's fine.  We'll just ask

18   that it be put in the rejected exhibit file.

19      JUDGE TRACY:  And that's fine.  So let's call him back, you

20   know, so we can finish hearing from him.

21      MR. ROSS:  Okay.

22      JUDGE TRACY:  For the record, you all can object for the

23   record.

24      MS. FEINBERG:  Okay.

25      JUDGE TRACY:  Okay?



www.escribers.net | 800-257-0885

1    MS. FEINBERG:  Because -- okay.

2    JUDGE TRACY:  In the end --

3    MS. FEINBERG:  I know you don't like me to respond to all

4    this lateness stuff.  And I've --

5    JUDGE TRACY:  Well --

6    MS. FEINBERG:  -- so good.  This whole --

7    JUDGE TRACY:  -- I --

8    MS. FEINBERG:  -- week I've never said one thing that you

9    were going to -- yea for me.  But come on?  I could find all

10   these people right now while sitting here.

11   JUDGE TRACY:  Okay.

12   MR. ROSS:  Well, why don't you do that --

13   JUDGE TRACY:  Thank you so much --

14   MR. ROSS:  -- and we'll be glad to subpoena them.

15   JUDGE TRACY:  Thank --

16   MS. FEINBERG:  Okay.  Ian McEwen is working for Google

17   still listed.  So you could find him there.

18   JUDGE TRACY:  Okay.  I apologize.

19   THE WITNESS:  That's okay.  I totally understand.

20   JUDGE TRACY:  Don't take it personally.

21   All right.  Go ahead, please.

22   MR. ROSS:  Yeah.  Our -- Your Honor, we're going to offer

23   Respondent's 20 into evidence.

24   JUDGE TRACY:  Okay.  Any objections?

25   MR. RODRIGUEZ RITCHIE:  Yes.  Do I need to restate them or

eScribers
www.escribers.net | 800-257-0885

1   can that stay the same objections as --

2        JUDGE TRACY:  Well, they -- I would state them again --

3        MR. RODRIGUEZ RITCHIE:  Okay.

4        JUDGE TRACY:  -- please.

5        MR. RODRIGUEZ RITCHIE:  So we'd object in the first

6   instance to the relevancy of this document.  We'd object on the

7   basis that it lacks foundation.  We'd object that it's a

8   hearsay document.

9        JUDGE TRACY:  Okay.

10       MS. FEINBERG:  I share those same objections.

11       JUDGE TRACY:  Okay.

12       MR. RODRIGUEZ RITCHIE:  And completeness.

13       JUDGE TRACY:  Okay.  And so --

14       MS. FEINBERG:  On that, too.

15       JUDGE TRACY:  -- Mr. Hansen, this Respondent's Exhibit 20,

16  have you seen this document before?

17       THE WITNESS:  I have not seen this specific document

18  outside of preparation.

19       JUDGE TRACY:  Okay.  Well, you know, I will say I'm going

20  to reluctantly overrule the objections.  I'm going to allow in

21  Respondent's Exhibit 20.  At the very least, it shows an

22  example of what is a passdown.  But I'm giving the Respondent

23  the opportunity to have it in the record, argue it as they wish

24  as to its relevance in the proceeding.  And I would also note

25  that in the decision, I'll be noting what weight I give it.



www.escribers.net | 800-257-0885

1    Okay?

2       So Respondent's Exhibit 20 is admitted into evidence.

3    **(Respondent Exhibit Number 20 Received into Evidence)**

4       MR. ROSS:  Thank you, Your Honor.

5    Q    BY MR. ROSS:  Now, Mr. Hansen, you told us about a

6    conversation you had with Mr. Slettvet in February about how to

7    deal with employees who wanted to leaflet.  Tell me, was

8    anybody else present when you spoke with Mr. Slettvet about

9    this?

10   A    Yes.

11   Q    Who else was present?

12   A    Ian McEwen would have been present.

13   Q    Okay.  And did Mr. Slettvet give you or Mr. McEwen any

14   directions as to what to do with that information?

15   A    Yes.  It is --

16   Q    Tell us what he told you and Mr. McEwen?

17   A    His directions --

18      MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

19      MR. ROSS:  It's not being offered of the -- for the truth

20   of the statement as much as it's being offered for the purpose

21   of establishing what was said to these two individuals who

22   presumably carried out the direction of Mr. Slettvet.

23      JUDGE TRACY:  But isn't Mr. Slettvet also a 2(11)

24   supervisor under --

25      MR. ROSS:  He is.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  -- the Act?

2    MR. ROSS:  He is.

3    JUDGE TRACY:  Okay.  So he's essentially a party opponent

4    in this case.  So I'm going to overrule the objection.  Go

5    ahead.

6    THE WITNESS:  So Greg would have instructed -- well, he did

7    instruct both of us to make sure that the policy and procedures

8    were communicated to our staff, the internal and the contract.

9    Q    BY MR. ROSS:  Okay.  And in terms of your staff, did you

10   carry out Mr. Slettvet's directive?

11   MR. RODRIGUEZ RITCHIE:  Objection.  Leading.  Vague as to

12   "carry out."

13   JUDGE TRACY:  Sustained.

14   Q    BY MR. ROSS:  What did you do with it after he told you

15   that?

16   A    After he instructed me to make sure that it was

17   communicated, I did exactly that.  I communicated with the day

18   shift and the swing shift that day, and spoke directly with the

19   grave shift the next morning to make sure that they all

20   remembered the policy and to make sure that it was being put in

21   place correctly.

22   Q    All right.  Do you know if that directive was ever put

23   into writing?

24   MR. RODRIGUEZ RITCHIE:  Objection.  Vague.

25   Q    BY MR. ROSS:  The direction that Mr. Slettvet gave you as



1  to how to deal with employees of when to engage in leafleting

2  on Company premises but outside the building, did he ever put

3  that in writing?

4  A    Yes, he did.

5  Q    Okay.

6       JUDGE TRACY:  Let's take a five-minute break real quick.

7  You can keep passing it out.

8       Let's go off the record for five minutes.

9  (Off the record at 2:21 p.m.)

10      JUDGE TRACY:  Okay.  Go ahead, please.

11      MR. ROSS:  Sure.

12 Q    BY MR. ROSS:  Mr. Hansen, you have in front of you a

13 document that has been marked Respondent's 21.  It's an email

14 from Gregory Slettvet to security hyphen all, and you are one

15 of the individuals cc'd on the document.  It's dated Friday,

16 September 15 at 2017 (sic).  Have you seen that document

17 before?

18 A    Yes.

19 Q    And can you tell me -- you received this document from

20 Mr. Slettvet?

21 A    Yes.

22 Q    Okay.

23      MR. ROSS:  I'd offer this into evidence, Your Honor.

24      JUDGE TRACY:  Any objections?

25      MR. RODRIGUEZ RITCHIE:  Yes, Your Honor.  We'd object on



1  relevancy grounds.

2      JUDGE TRACY:  Okay.  Any objections from the --

3      MS. FEINBERG:  That -- well, I just feel like the

4  testimony's misleading because there is from a different time

5  frame from the predecessor questions before we took a break.

6  So -- maybe I could take the witness on voir dire on this

7  document.  I don't know if that's the best way to do it.

8      JUDGE TRACY:  Go ahead.

9      MS. FEINBERG:  All right.

10                    **VOIR DIRE EXAMINATION**

11  Q    BY MS. FEINBERG:  Hello.  Earlier you --

12      JUDGE TRACY:  You're going to have to speak up --

13      MS. FEINBERG:  Okay.

14      JUDGE TRACY:  -- I'm going to tell you.

15  Q    BY MS. FEINBERG:  You had a -- you had a -- you said that

16  you had a conversation with Mr. McEwen and Mr. Slettvet about

17  certain policies regarding the parking lots; is that right?

18  Or --

19  A    Not necessarily regarding the parking lots, but regarding

20  solicitation and similar activity in the parking lots and the

21  grounds of the facility, yes.

22  Q    Including union activity?

23  A    It would have covered all solicitation.

24  Q    Right.  But was the topic of union activity discussed?

25  A    Yes, that would have been a topic that would have been



www.escribers.net | 800-257-0885

1   covered in some of those conversations.

2   Q    Okay.  So there were multiple conversations?

3   A    Yes.  Over the course of my employment, there would be

4   multiple conversations on the subject.

5   Q    Where Mr. McEwen was present?

6   A    He wouldn't have been present for all of them, but he

7   would have been present for many of them.

8   Q    Okay.  The reason I'm having a hard time following this is

9   that I thought that you were asked about a particular

10   conversation, and then was there a directive put in writing by

11   Mr. Slettvet.  And it was my understanding that there was a

12   conversation in February.  So was there a directive given to --

13   by Mr. Slettvet in February?

14   A    There was a verbal directive in February.

15   Q    And were there any other directives from Mr. Slettvet

16   between February and Respondent's Exhibit 21?

17   A    As far --

18   Q    On this topic?

19   A    As far as I can recall, I don't believe I can particular

20   out specific dates, but it is a topic that came up

21   periodically.  I know the conversation happened in February.

22   There was a very specific conversation in February because it

23   stuck in my memory.

24   Q    Okay.  But I'm asking if there's anything else in writing

25   other than Respondent's 21?



www.escribers.net | 800-257-0885

1    A    Outside of this document?

2    Q    Yes.

3    A    As far as I know, no.

4         MS. FEINBERG:  Okay.  Well, I have a relevancy objection as

5    well then.

6         JUDGE TRACY:  Okay.  So --

7         MR. RODRIGUEZ RITCHIE:  I'd also object, Your Honor -- I'm

8    sorry for not saying this before.  It's not a complete

9    document.  On the document it says attachments, image 001.gif,

10   and there's no image attached to this document.

11        JUDGE TRACY:  Okay.  Mr. Morris, do you know what this

12   image is that's attached?

13        MR. ROSS:  Oh, I'm sorry.  You really should direct this to

14   me.

15        JUDGE TRACY:  Oh, I just thought he was the document guy,

16   but --

17        MR. ROSS:  He is the document guy, but this is my exhibit.

18        JUDGE TRACY:  Okay.

19        MR. ROSS:  And to be honest with you, I can't recall what

20   the attachment was.  I apologize.  But I just don't remember.

21        JUDGE TRACY:  Well, I'm going to overrule the objection and

22   allow Respondent's Exhibit 21.  Again, I don't want to assume

23   anything, but usually these .gifs are the Tesla -- or whatever

24   logo is -- he had at the bottom.  That's usually what these

25   attachments are, are the logo.  It's not a PDF or something



1     like that.  That would seem to be quite significant or a .doc,

2     DOC.  This is a .gif, which is usually a picture.

3          But what I would say is if you all could look and see what

4     is the .gif to ensure that for completeness --

5          MR. ROSS:  Sure.

6          JUDGE TRACY:  -- we have the document with the attachment.

7     My guess is that's what it is, is the logo, picture logo, which

8     is usually what it is.  But you know, regardless, I'm going to

9     allow Respondent's Exhibit 21.  But if you could look for one

10    that we could substitute with the attachment.

11         MR. ROSS:  Will do, Your Honor.

12         JUDGE TRACY:  Okay.

13    **(Respondent Exhibit Number 21 Received into Evidence)**

14         MR. ROSS:  Okay.  Thank you.

15                    <u>**DIRECT EXAMINATION**</u>  **(RESUMED)**

16    Q    BY MR. ROSS:  Now, we know who Securitas was at the time.

17    Could you tell me the -- what do the -- and we know that

18    Securitas provided people to provide security services at

19    Tesla.  What did those Securitas employees do at Tesla?

20         MR. RODRIGUEZ RITCHIE:  Objection.  Vague as to the item

21    period.

22         JUDGE TRACY:  Sustained.

23         MR. ROSS:  Okay.

24    Q    BY MR. ROSS:  In February of 2010 --

25         MS. FEINBERG:  2010?



1    Q    BY MR. ROSS:  -- what functions did Securitas provided

2    guards perform at Tesla --

3         MR. RODRIGUEZ RITCHIE:  Objection.

4    Q    BY MR. ROSS:  -- at the Fremont facility?

5         MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  I think the

6    year that was used was 2010.

7         MR. ROSS:  Did I say 2000- -- I'm --

8         MS. FEINBERG:  Yeah.

9         MR. ROSS:  -- mistaken.

10   Q    BY MR. ROSS:  In February -- on February 10th, 2017 --

11        MR. ROSS:  Thank you, Edris.

12        MR. RODRIGUEZ RITCHIE:  Um-hum.

13   Q    BY MR. ROSS:  -- what jobs, what functions did the

14   Securitas provided employees perform at Tesla?

15   A    The contract security guards provided all of the door

16   staff, the guards that were physically stationed at the

17   entrances to the facility, both the rear yard area and the

18   interior of the actual buildings.  And they also provided the

19   majority of the mobile patrol staff, the staff that would be

20   physically roaming and patrolling the grounds either on foot, a

21   golf cart, or in a vehicle.  And they would have provided a few

22   personnel for the security operation center and badging, but

23   those would mostly have been internal.

24   Q    Okay.  Now, you say that Securitas provided some people

25   who worked in the control room?



www.escribers.net | 800-257-0885

1  A    Yes, they did provide a few.

2  Q    Okay.  What's the control room, and what goes on there?

3  A    The control room or security operation center, the terms

4  are basically interchangeable, is essentially the headquarters

5  for the security department on site.  The staff inside monitor

6  radio communications, phone communications, emergency lines,

7  the access control systems, door alarms, fire systems, the --

8  they also handle after hours badging, and there's one other

9  system I'm drawing a blank on right now.  But essentially it

10 monitors all the security operations on site.

11 Q    All right.  And in addition to those people provided by

12 Securitas in the control room, who else worked in the control

13 room at this time?

14 A    That would have been internal staff.  The specific people

15 working would have been a relatively small number.  As far as I

16 can recall, it would have been about approximately ten people

17 or so.

18 Q    And these were all control -- these were all Tesla

19 employed security personnel?

20 A    They -- as far as I can recall at that time, I believe

21 they were all internal.

22 Q    Okay.  Now, could you tell us where on the property the

23 control room is located?

24 A    The control room is located approximately -- centrally

25 located on the west side of the facility in the first floor of



www.escribers.net | 800-257-0885

1    the administration building, which is physically attached to

2    the main factory.

3    Q    Adjacent to the administration building?

4    A    It's actually physically inside the administration

5    building.

6    Q    All right.

7    A    The southeast corner of the building.

8    Q    All right.  Now, door guards, I think the name is somewhat

9    self-defining, but tell us what the duties of the door guards

10   were.

11   A    So the door guards' primary responsibility is access

12   control to the facility.  It's to make sure all personnel that

13   are entering have a valid badge and are allowed to be inside

14   the facility and that they scan in, they have their badges.

15   And their secondary responsibility is, when there's limited

16   traffic, to just maintain a visible security presence and watch

17   the area around their post for security related incidents.

18   Q    Okay.  Do you know if they were under any orders with

19   respect to leaving their posts?

20        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.  Vague.

21        MR. ROSS:  I'm asking if he knows.

22        JUDGE TRACY:  Overruled.

23        THE WITNESS:  Yes.

24        MR. ROSS:  Okay.

25        THE WITNESS:  The door guards were expected to be at their



1    posts at all times unless they were relieved of duty.

2        MR. ROSS:  All right.  22.

3        MR. GARBER:  22?

4    Q    BY MR. ROSS:  Now, before I get to the document that I've

5    handed you, let me ask you this:  The individual -- what was

6    the job title of the person or persons who worked in the

7    control room in February of 2017?

8    A    Typically we just called them control room operators.

9    Q    Okay.  And what were the duties of the control room

10    operator?

11    A    They monitored the various systems that I had previously

12    discussed, fire alarm, door access, control -- CCTV.  And also,

13    as previously mentioned, they handle radio traffic, phone

14    traffic, reports coming in from the facilities.  They would get

15    these reports, document them as part of their job, and if

16    necessary, dispatch security personnel to investigate or

17    otherwise handle an incident.

18    Q    Okay.  And when you say document reports that came in,

19    what do you mean by that?

20    A    So we have a system that's used to record incidents as

21    they come in as well as to set up reports that are generated

22    internally for the security department for particular

23    incidents.  It's called a CAD RIMS, or Computer Assisted

24    Dispatch Report Information Management System.  So they will

25    get a call in, whether it be by radio or by phone.  If it's an



www.escribers.net | 800-257-0885

1   incident that is supposed to be documented, they create an

2   incident in this computerized system, enter in certain

3   information, such as anomaly who the call -- caller was, if

4   they can be identified, the approximate locations of the

5   incident, and the system will date and time stamp the incident

6   to provide a record.  And then they will add additional

7   comments into that incident as they get more information.  And

8   then, depending on the outcome of the incident, will then

9   document basically what was the resolution of the incident.

10  Q    Okay.  Now, do you recognize Respondent's Exhibit 22?  Do

11  you know what it is?

12  A    Yes.  This is the incident report from, based on the

13  incident number, February 10th.  I do recall looking over and

14  reading this incident report.

15  Q    Okay.  And from looking at -- and this report -- I want to

16  be sure I got this straight -- the entries were made on a

17  computer and if a written copy or a written copy of the entries

18  that are made on the computer need to be put in a hard copy,

19  how is that done?

20  A    The system will allow you to look up any incident that had

21  been previously generated.  You can look it up via date.  Every

22  incident has its unique number.  That number is located -- for

23  these reports, it's located up at the top, and it consists of

24  multiple digits.  The first few digits are the year, the second

25  two are the month, the third section of two digits is the date,



www.escribers.net | 800-257-0885

1  and the last three digits are the particular incident number

2  for that particular day.

3  Q    Okay.  So in this particular case, 17 would refer to 2017,

4  the 02 and the number for this incident report would be a

5  reference of February, the 10 that next follows would be for

6  the tenth of February, 2017, and then the 006 that follows

7  would suggest that this was the sixth incident report for that

8  night or for that day?

9  A    That is correct.  This would have been the sixth incident

10  that day.

11  Q    Okay.  Does the document reflect who was the control room

12  operator who received this call?

13  A    Yes.  It identifies that person as Bo Dork.  All of the

14  operators have their own unique log-ins for that reason.

15  Q    Okay.  And does the document reflect when the call was

16  received?

17  A    Yes.  Under incident times.  That would have been when the

18  control room operator first took the call and created the

19  incident to begin recording it.

20  Q    Okay.  Does the document indicate who the caller was who

21  called in to Mr. Dork?

22  A    In this case, yes.  It identifies the person as Natalie

23  Hunter.

24  Q    Okay.  And you know who Ms. Hunter was and what she was

25  doing?

22-60493.1508



1    A    Yes.  Natalie would have been one of the door guards.

2    Q    Okay.  And Natalie was a Securitas employee?

3    A    Yes, she was.

4    Q    Does she still work at Tesla?

5    A    I honestly don't know.

6    Q    Okay.  Now, I note -- there's a box here.  It says,

7    primary unit U27.  Do you see that?

8    A    Yes.

9    Q    Okay.  What does that U27 reference to?

10   A    So the unit numbers in the system are set up in advance,

11   and they refer to a particular security position that then is

12   available to be dispatched to various locations.  The primary

13   unit here being unit 27, based on the system, would have been a

14   supervisor unit, as we had a specific section of units that

15   were marked for supervisor units.  That would have been unit 25

16   to unit 29, if I recall correctly.  And the system records the

17   primary unit as the first unit that's anomaly dispatched or

18   reports that they're going to investigate.

19   Q    Okay.  And I see down below, towards the middle of the

20   page, there's a reference to Officer Gary Ono, "U27, Ono,

21   comma, Gary."  Do you see that?

22   A    Yes.

23   Q    Tell me what that entry means.

24   A    So as I mentioned, the U27 refers to unit, but not

25   necessarily a distinct person.  A person is usually attached to

22-60493.1509



1    the unit.  So in this case, the report's identifying it is unit

2    27 and that Officer Gary Ono was anomaly attached to that unit

3    number at the time.

4    Q    Okay.  Tell me, on February 10th, 2017, was Gary Ono still

5    working at the Tesla property?

6    A    No.  He had actually just left and been replaced by Sam

7    Ali.

8    Q    Okay.  So can you tell us how Mr. Ono's name would have

9    come to appear on this document if he was no longer working

10   there, could not have taken this call?

11        MR. RODRIGUEZ RITCHIE:  Objection.  Lacks foundation.

12   Calls for speculation.

13        JUDGE TRACY:  I'm going to sustain the objection.

14   Could you just --

15        MR. ROSS:  Sure.

16        JUDGE TRACY:  -- go back through -- I missed -- I did not

17   understand what the -- I guess because his answer was sort of

18   unexpected to me.  Could you just go back over that and --

19        MR. ROSS:  Sure.

20        JUDGE TRACY:  -- explain it a little bit more to this

21   witness?

22        MR. ROSS:  Sure.  Sure.

23   Q    BY MR. ROSS:  Was Gary Ono the person who had unit 27 on

24   this night, designation unit 27?

25        MS. FEINBERG:  Objection.  Foundation.

22-60493.1510



1    JUDGE TRACY:  So sustained.  So --

2    Q    BY MR. ROSS:  Do you know if Gary Ono was the person who

3    held the designation U27 on February 10th, 2017 at 4:23 and 3

4    seconds in the morning?  Do you know if that was Mr. Ono's unit

5    designation?

6    A    That was no longer his active unit designation.

7    Q    Was he employed on the property on this night?

8    A    No, he was not.

9    Q    Okay.  Do -- and when did he leave relative to

10   February 10th?

11   A    It was pretty recent to that date.

12   Q    Okay.

13   A    There was a changeover in supervisors.

14   Q    Okay.  So who was unit 27 on February 10, 2017 at 4:23 in

15   the morning?

16        MS. FEINBERG:  Objection.  Foundation.

17        JUDGE TRACY:  Sustained -- overruled.  I'm sorry.

18        Go ahead and answer the question.

19        THE WITNESS:  As I recall, it was Sam Ali, who had replaced

20   him as the grave shift supervisor.  He took his unit number.

21   Q    BY MR. ROSS:  Okay.  Tell me, have you ever used this

22   computer system to record incidents?

23   A    Yes, I have.

24   Q    Okay.  And when you type in the unit number, do you have

25   to type in the name of the individual who corresponds to the



1    unit number?

2    A    No.  As the operator, it's autofilled in.

3    Q    Okay.

4         JUDGE TRACY:  And the call taker space, what was your

5    testimony about that?  Who is Bo Dork, people -- I didn't -- I

6    also didn't understand that part.

7         THE WITNESS:  So the call taker would have been the person

8    that was signed into the system to physically take and create

9    that call incident.

10        JUDGE TRACY:  And where does that call taker work?

11        THE WITNESS:  In the control center.

12        JUDGE TRACY:  Okay.  And this is the actual name of that

13   person?

14        THE WITNESS:  Correct.

15        JUDGE TRACY:  Okay.

16        MR. ROSS:  Actually Bo is a particular name, Your Honor.  I

17   think his actual name is --

18        JUDGE TRACY:  Well ask him --

19        MR. ROSS:  -- I'm --

20        JUDGE TRACY:  Ask him.

21   Q    BY MR. ROSS:  Do you know what Bo's actual name is?

22   A    You know, I almost always refer to him as Bo.

23   Q    Okay.

24   A    I --

25        JUDGE TRACY:  Okay.



www.escribers.net | 800-257-0885

1    THE WITNESS:  I believe it's Boroon (phonetic).

2    MR. ROSS:  I think you're right.

3    JUDGE TRACY:  Okay.

4    Q   BY MR. ROSS:  Was February 10th, 2017, at roughly 4:30 in

5    the morning, the first time that there had been Union

6    leafleting out at the plant?

7    MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  And

8    foundation.

9    JUDGE TRACY:  Sustained for the foundation part.

10   Q   BY MR. ROSS:  Do you know if it was the first time?

11   A   As far as I can recall with Tesla, I believe it was.

12   Q   Thank you.

13   MR. ROSS:  Your Honor, I'm going to offer Respondent's 22

14   into evidence.

15   JUDGE TRACY:  Any objections?

16   MR. RODRIGUEZ RITCHIE:  I'd like to voir dire.

17   JUDGE TRACY:  Sure.

18                    **VOIR DIRE EXAMINATION**

19   Q   BY MR. RODRIGUEZ RITCHIE:  The document that's been marked

20   as Respondent's 22, this is not a document that you created, is

21   it?

22   MR. ROSS:  I couldn't hear the question.  I'm sorry.

23   Q   BY MR. RODRIGUEZ RITCHIE:  The document that's marked in

24   Respondent's Exhibit 22, that's -- this is not a document that

25   you created; is that right?



www.escribers.net | 800-257-0885

1    A    Correct.

2    Q    And it's not a document that you maintain?

3    A    Can you -- I don't understand that.

4    Q    It -- are you responsible for maintaining the CAD system

5    at Tesla?

6    A    The -- by maintaining it, you mean -- I'm -- I'm afraid I

7    still don't quite understand.

8    Q    Do you have any responsibility for the CAD system?

9    A    Not directly, no.

10    Q    Okay.  If you look at the document where it says unit

11    times --

12        MR. ROSS:  Where it says what?

13    Q    BY MR. RODRIGUEZ RITCHIE:  -- towards the middle --

14        MR. ROSS:  I'm sorry.  I can't --

15    Q    BY MR. RODRIGUEZ RITCHIE:  -- unit times --

16        MR. ROSS:  Unit time.

17    Q    BY MR. RODRIGUEZ RITCHIE:  -- towards the middle and then

18    underneath, it says U27.  Do you see that?

19    A    Yes.

20    Q    Okay.  So I want you all the way to the right.  It looks

21    like there's either something cut off or an I and something

22    below.  Do you see that?

23    A    I do.

24    Q    Do you -- is that something that was cut off or is it just

25    an I and a half letter beneath it?

22-60493.1514



1    A    I -- I'm not sure.  I would assume that it might be

2    partially cut off.  From my recollection, that may be -- that

3    would be disposition and then additional time.  But that is

4    recollection.  I'm not 100 percent sure.

5    Q    Do you know if there's anything else in this document that

6    was cut off?

7    A    Not that I can think of.

8    Q    Okay.

9        MR. RODRIGUEZ RITCHIE:  No objection.

10       MS. FEINBERG:  I -- just a quick voir dire.

11                    **VOIR DIRE EXAMINATION**

12   Q    BY MS. FEINBERG:  So I understand you didn't create this

13   document.  But was this document shared with you at the time,

14   in February of 2017?

15   A    If by shared with me -- perhaps you can clarify.

16   Q    Okay.  Did you review this document in February of 2017?

17   A    I do recall looking at the incident at some point in

18   February.

19   Q    Okay.  And for what purpose?

20   A    General review of what occurred.

21   Q    Okay.  And the entries on here, like where it says,

22   "Union's collecting signatures," who input that?

23   A    That would have been the operators in the control center.

24   Q    And did you ever question anyone about the content of this

25   document?



www.escribers.net | 800-257-0885

1   A    I did discuss the incident with the control room

2   operators.  I don't know if that answers your question in terms

3   of questioning them.

4   Q    And would that include Natalie Hunter, or who would that

5   have been?

6   A    No.  That would have included the call takers and the

7   supervisor.

8        JUDGE TRACY:  Any objections?

9        MS. FEINBERG:  Not at this time.  I don't understand it,

10  but I'll figure it out with the cross.

11                   **DIRECT EXAMINATION  (RESUMED)**

12  Q    BY MR. ROSS:  You say you talked to the call taker and the

13  supervisor.

14       JUDGE TRACY:  So -- hold on.

15       So Respondent's Exhibit 22 is admitted into evidence,

16  **(Respondent Exhibit Number 22 Received into Evidence)**

17       MR. ROSS:  Thank you, Judge.

18  Q    BY MR. ROSS:  You say you talked to the call taker and the

19  supervisor.  The call taker was who?

20  A    The call taker was Bo Dork.

21  Q    And who was the supervisor you spoke with?

22  A    That was Sam Ali.

23  Q    And could you tell us what Mr. Ali told you?

24       MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

25       JUDGE TRACY:  Sustained.



www.escribers.net | 800-257-0885

1          MR. ROSS:  All right.

2      Q    BY MR. ROSS:  Now, Mr. Hansen, you have in front of you a

3  document that's been marked Respondent Exhibit 23.  It is

4  entitled, "Tesla Fire and Security CAD Incident Report.  Number

5  170524003."  Do you know what that document is?

6      A    Yes.  It would be an incident report for May 24th, 2017.

7  The third incident report for that date.  And again, it's

8  another printout of the incident from the computer system.

9      Q    Okay.  In this particular case, who was the call taker?

10     A    The call taker was Felipe De La Cruz.

11     Q    And it appears as though Mr. De La Cruz called himself

12  because it says, "Caller name, Felipe De La Cruz."  Do you know

13  anything about that?

14     A    I can guess, but that's what it would be.

15     Q    I don't want you guessing.  Can you explain that?  If you

16  can't, you can't.  We'll ask Mr. De La Cruz about that.  Okay.

17     A    Yeah.

18     Q    Now, I noticed that there is a box called dispositions.

19  In this computer system that the control room operator uses,

20  are there fields of information you make entries into?

21     A    Correct.  Yes.

22     Q    So like is there a field of information that refers to

23  dispositions?

24     A    Yes.  They have a series of preset dispositions that they

25  can select from when they close an incident out to indicate



1    sort of what the final disposition of the incident, i.e., how

2    it was left.

3    Q    Okay.  And in this particular case, the disposition is,

4    checks okay?

5    A    Correct, yes.

6    Q    Do you know what that means, checks okay?

7    A    Yeah.  Checks okay indicates that the incident was

8    investigated and no additional action needed to be taken,

9    everything literally checked okay.

10   Q    Okay.  Now, I notice in the incidents comment mention is

11   made of a Michael Catura with a number, Branton Phillips with a

12   number, Jose Moran with a number.  Do you know how those

13   entries came to be in the -- entered into the field called

14   incident comments?

15   A    Yeah.  Incident comments would be filled in by the

16   operator.  They enter information on the incident in the

17   incident comment section.

18   Q    Okay.  Likewise, there is an entry, "Nonemployees also

19   passing out flyers."  Do you know how that entry came to be put

20   in the field called incident comments?

21   A    That would also have been entered by the operator.

22   Q    Okay.  That would have been Mr. De La Cruz?

23   A    Yes.

24   Q    Now, in the bottom of the form or bottom of the page,

25   there's a field, time, hash tag, and event.  Do you see that


www.escribers.net | 800-257-0885

1    towards the bottom?

2    A    Yes.

3    Q    Okay.  And who would have made the entries here?

4    A    So the time and hash tag are autogenerated by the system.

5    When the operator enters a comment or makes a change or

6    something of that nature, it gets -- it will be time stamped

7    there and you'll have an incident comment or change record

8    number.  The event is -- could be generated by the system in

9    the sense that when the incidents are originally created, that

10   very first line is always generated by the system.  These other

11   lines all look like they were also generated by the system.

12   But you can have the operator add certain specific comments.

13   Q    So the entry for item number three at 5:34, "Incident

14   comments change," was that the -- an entry made by the system

15   or would that have been one made manually?

16   A    No.  That's an automated --

17   Q    And what does that mean?

18   A    It indicates that the operator changed the incident

19   comments from what was initially put down to whatever they were

20   after that, which is presumably right here.

21   Q    Okay.  And would those earlier comments be overwritten?

22   A    Yes.

23   Q    Is there any way to find or recapture the text that was

24   overwritten?

25   A    Not that I'm aware of.


www.escribers.net | 800-257-0885

1    Q    All right.  And you -- what do you -- what do you

2    understand this incident report to be a report of?

3    A    My understanding from this is that they had some personnel

4    handing out flyers, soliciting, they would have been

5    investigated, some would have been employees, some were

6    identified as not employees.  The fact that it's marked as

7    checks okay, indicates that they followed their standard

8    procedure and there were no unusual circumstances for the

9    incidents to be recorded further.

10   Q    Okay.

11        MR. ROSS:  I'm going to offer Respondent's 23 into

12   evidence, Your Honor.

13        JUDGE TRACY:  Any objections?

14        MR. RODRIGUEZ RITCHIE:  Likely, but I'd like to voir dire

15   first.

16        JUDGE TRACY:  Okay.

17                    **VOIR DIRE EXAMINATION**

18   Q    BY MR. RODRIGUEZ RITCHIE:  If you look at the document in

19   Respondent's Exhibit 23, this is not -- none of the entries in

20   this document were put in there by you, correct?

21   A    Correct.

22   Q    And again, I want you to take a look in the middle of the

23   page.  It says, unit times.  And then all the way to the right,

24   it looks like there's an I.  That's something that was cut off?

25   A    Yes.



www.escribers.net | 800-257-0885

1   Q   Okay.  And you don't know what was there before?

2   A   Not off of my immediate recollection.  Like I said, I

3   believe it's disposition, but I could be --

4   Q   But you don't --

5   A   -- mistaken.

6   Q   -- know -- looking at this document, you don't know what

7   was there before?

8   A   No.  I don't recall that specific detail.

9   Q   Okay.  And you don't know -- you testified about the

10  comment -- incident comments changed.  You don't know how this

11  document was changed, right?

12  A   I do not know what would have been in the incident comment

13  prior to that.  The way the system works is when the incident

14  comments are changed, that middle box, the system will

15  automatically note that and time stamp it, but it does not

16  indicate what the previous comments were or what the specific

17  change was, just that they were changed.

18  Q   Does the document indicate where the incident occurred?

19  A   The document does indicate that it occurred at the Fremont

20  facility.  It doesn't specify further than that, though.  And

21  that's at the location up above.

22  Q   And the document underneath where it says, time, to the

23  first time entry, 5:24:37, does that mean that that's the first

24  time that somebody went into the CAD system and initiated

25  typing into this report?



1   A    No.  The -- if you look at the incident times, the

2   received is when they actually created and started typing into

3   it.

4   Q    So what does the incident initiated mean?

5       MR. ROSS:  I couldn't hear the question.  I'm sorry.

6   Q    BY MR. RODRIGUEZ RITCHIE:  What does incident initiated at

7   Tesla -- so the first time entry at the bottom -- what does

8   that mean?

9   A    That means at that point they had entered all of the

10  information the system requires must be entered before it will

11  allow you to potentially dispatch a unit, if that's so done.

12  Q    And the system is automatically putting that time --

13  A    Yes.

14  Q    -- stamp?

15  A    It's -- it's auto time stamping it.  Again, if you look at

16  the incident times, that little box in the middle, received is

17  when the system actually time stamps that they physically

18  opened up and began entering the information into the incident.

19  Created is when the incident -- when they had entered all the

20  bare minimum information the system absolutely requires.

21      MR. RODRIGUEZ RITCHIE:  I'd still object on completeness

22  grounds.

23      JUDGE TRACY:  And what do you mean?

24      MR. RODRIGUEZ RITCHIE:  The document is not a complete

25  document.  The document has been cut off.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Okay.

2      MR. RODRIGUEZ RITCHIE:  We have no way of knowing what was

3   in this document in the portions that were cut off.

4      JUDGE TRACY:  And any objections?

5      MS. FEINBERG:  Well, I'll share that objection.

6      JUDGE TRACY:  Okay.  So in terms of Respondent's

7   Exhibit 23, do you have a version that doesn't have the -- that

8   corner cut off.

9      MR. ROSS:  This is the document that was provided to us by

10   the client, Your Honor.

11      JUDGE TRACY:  Well, can the client get you --

12      MR. ROSS:  I'm sure --

13      JUDGE TRACY:  -- one that's --

14      MR. ROSS:  -- we can generate a page that is not cut off.

15      JUDGE TRACY:  Okay.  So I would --

16      MS. FEINBERG:  For both of these.

17      JUDGE TRACY:  I'm going to reserve my ruling on

18   Respondent's Exhibit 23 --

19      MR. ROSS:  All right.

20      JUDGE TRACY:  -- until you're able to ask them to give you

21   one that isn't cut off.

22      MR. ROSS:  That's fine.

23      JUDGE TRACY:  So we'll just hold that to the side.

24      MS. FEINBERG:  And could they give us one that's not cut

25   off for 22 as well even though --



1    JUDGE TRACY:  Is 22 cut off as well?

2    MS. FEINBERG:  That was the original --

3    MR. RODRIGUEZ RITCHIE:  Yes.

4    MS. FEINBERG:  -- question --

5    MR. ROSS:  And we'll --

6    MS. FEINBERG:  -- posed by Mr. Rodriguez Ritchie.

7    MR. ROSS:  -- too.

8    JUDGE TRACY:  Okay.

9    MR. ROSS:  We'll do that too.

10    JUDGE TRACY:  Thanks.  Okay.  Go ahead, please.

11                  **DIRECT EXAMINATION** (RESUMED)

12    Q    BY MR. ROSS:  Okay.  By the way, before I go onto the next

13    document, did I ask you to find out who the door guard was at

14    door three at 5:30 in the morning on May 24?

15    MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

16    MR. ROSS:  It's did I ask that information.

17    JUDGE TRACY:  Yeah.  Overrule.  Go ahead.

18    THE WITNESS:  Yes, you did ask if we could determine,

19    specifically the security department, if we could determine who

20    the specific guard was at that post at that time.

21    Q    BY MR. ROSS:  Okay.  And were you able to ascertain who

22    that person was?

23    A    Unfortunately, no.

24    Q    Why not?

25    A    We did not have the schedules that were created by



1  Securitas for their shift.  We knew roughly which guards were

2  on duty -- well, we knew exactly which guards were on duty, but

3  we didn't know who was on duty at what specific post as the

4  shift schedules were created and maintained by Securitas.

5  Those schedules would have been kept by Sam Ali, the grave

6  shift supervisor at the time.

7  Q    Okay.  Thank you.  Here you go.  Now, Mr. Hansen, you have

8  in front of you Respondent's Exhibit No. 24.  It too is a CAD

9  incident report, number 170524095.  Tell me if you can

10  recognize that document.

11  A    Yes, I definitely recognize that document.

12  Q    All right.  And here you were the call taker; is that

13  right?

14  A    That is correct.  I was.

15  Q    Okay.  And you made the entries in the computer system

16  that are reflected on this document?

17  A    Correct.

18  Q    Okay.  Tell us what happened here.

19  A    In this particular incident, I received a call from one of

20  our units out in the field.  Edward 1, who is Marty Quiroz.  He

21  reported that there were some personnel soliciting in the

22  parking lot, and that he had made contact and determined that

23  they were an employee, and just wanted to make sure that

24  everything was good and had been checked and that we didn't

25  need to have anyone else check the person.



1    Q    Okay.  And there is an entry made in the incident comments

2    field.  "Michael Sanchez handing out flyers around 1400."

3    That's 2 in the afternoon, right?

4    A    Correct.

5    Q    Okay.  And did you make those entries?

6    A    I entered that into the incident comments, yes, when

7    creating the incident.

8    Q    Okay.  And how did you come by that information?

9    A    Marty Quiroz told me directly.

10   Q    Okay.  And likewise, there is an entry, item number two in

11   the time hash tag event, space, 16:41:37, hash tag number two,

12   "E1 confirmed Tesla employee allowed to hand out flyers."  Is

13   that an entry you made, sir?

14   A    Correct.

15   Q    Okay.  And why did you make that entry?

16   A    I was recording that Edward 1, i.e., Marty Quiroz, that

17   unit number, had confirmed that it was a Tesla employee, and

18   that as search, he was allowed to hand out flyers in the area

19   he was in.

20   Q    Okay.

21        MR. RODRIGUEZ RITCHIE:  I'm going to object to this entire

22   line of questioning.  There's no allegations that the General

23   Counsel contends were unlawful with regards to any interactions

24   involving Michael Sanchez on May 24, 2017.

25        JUDGE TRACY:  Okay.



www.escribers.net | 800-257-0885

1    MR. ROSS:  A, I haven't offered it yet, but I'm going to.

2    But we believe that -- part of our defense is to show that, in

3    fact, there was compliance with the directions of Company

4    policy and the directions of Mr. Slettvet.  Apparently the fact

5    that the Union is not complaining about this, we believe that

6    this gentleman, Mr. Sanchez, was treated just like everybody

7    else who is the subject of the charges, and we believe that

8    this evidence goes to the fact that there was no violations of

9    the factual matters.  It basically shows -- it's evidence of

10   the consistent pattern of behavior on the part of the Company.

11       MR. RODRIGUEZ RITCHIE:  That -- we object --

12       MS. FEINBERG:  Your Honor --

13       MR. RODRIGUEZ RITCHIE:  -- to that because that's actually

14   an improper purpose.  There's no relevance to that.  That's

15   like saying, I can't steal candy on 364 days of the year, and

16   so that means that on the one day that I did steal candy, I

17   didn't steal candy.

18       MS. FEINBERG:  But moreover, this doesn't tell you what

19   conversation this security person had with Mr. Sanchez.  This

20   just tells you what they chose to write down.  We don't have

21   the person who interacted with Mr. Sanchez.  So I don't even

22   see how that tells us that they followed or didn't follow the

23   directions.  It says what they -- you know, they might not have

24   thrown him out, but it doesn't tell you whether they -- what

25   their interaction was, which most of the testimony on the days

escribers
www.escribers.net | 800-257-0885

1    that were in issue, it had to do with the interaction, and

2    these documents don't tell you that.

3        JUDGE TRACY: Okay.  So I'm going to overrule the objection

4    and allow Respondent's Exhibit 24.  You guys are making

5    arguments that belong in your brief.

6        MS. FEINBERG:  Okay.  Well, I'm just talking about the

7    relevancy of these documents.  But we appreciate that,

8    Your Honor.

9        JUDGE TRACY:  Well, I mean, that's what it is.  That's

10   their defense.  I mean, yeah.  I mean, you can keep objecting.

11   Of course you have to.  But I also have an obligation to allow

12   the entire record to be developed along with their defense.

13   Q    BY MR. ROSS:  Now, did I ask you to review your records to

14   determine whether there were any other CAD incident reports

15   with respect to Union leafleting during the first six months of

16   2017?

17       MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Hearsay.

18       MR. ROSS:  Your Honor, it's consistent with our position

19   that the Company had a policy, the Company's policy was

20   followed, there are incident reports that show compliance with

21   that policy.

22       JUDGE TRACY:  Okay.  I'm going to overrule the objection.

23   Again, I understand that that's your defense.  If you have a

24   bunch them to put in, you may as well move to put them in all

25   at once.  But the --



www.escribers.net | 800-257-0885

1    MR. ROSS:  I have two --

2    JUDGE TRACY:  -- other --

3    MR. ROSS:  -- to put in.

4    JUDGE TRACY:  Did you move for 24?

5    MR. ROSS:  I did not.

6    JUDGE TRACY:  I don't --

7    MR. ROSS:  I'm going to offer Respondent's 24, but it

8    suffers from the same issue of the document being cut off.  So

9    I was planning to get a more complete copy from the client and

10   provide that to you.  But --

11   JUDGE TRACY:  Right.  So --

12   MR. ROSS:  -- we'd offer Respondent's 24.

13   JUDGE TRACY:  Um-hum.  And any objections?

14   MR. RODRIGUEZ RITCHIE:  Yes, Your Honor.  It's not

15   relevant, it's hearsay.  Indeed, the witness testified that

16   though he put in the information in there, he actually obtained

17   that information from someone else who is not here testifying.

18   It's also not a complete document.

19   JUDGE TRACY:  Okay.

20   MS. FEINBERG:  I'll join in that.

21   JUDGE TRACY:  Okay.  So again, I'm going to overrule the

22   objection and allow Respondent's Exhibit 24.  However, you

23   know, along with 23 and 22, I'm going to allow -- admit all of

24   those documents into evidence.  However, they do need to be

25   replaced with a complete version.  If somehow you can't find a



1   complete version, then we need to revisit this issue.

2   **(Respondent Exhibit Number 24 Received into Evidence)**

3       MR. ROSS:  I understand.

4   Q    BY MR. ROSS:  Okay.  Now, Mr. Hansen, you have in front of

5   you Respondent's Exhibit No. 25, which I'm happy to report is a

6   complete document.  Is this a CAD incident report that you

7   provided to me recently?

8   A    Yes, it is.

9   Q    Okay.  And did you review the CAD incident reports in

10  response to a request I made asking you to come up with other

11  reports pertaining to leafleting that might have occurred at

12  Tesla during the first six months of 2017?

13  A    Yes, I did.

14  Q    Okay.  Now, Respondent's Exhibit 25, you've seen that; is

15  that correct?  Is that one of the CAD reports you found?

16  A    Correct, it is.

17  Q    Okay.  And I noticed in the upper right-hand corner

18  there's a time stamp 9:19:28.  Do you see that?

19  A    Yeah.

20  Q    Okay.  Is that the date of the incident or is that the

21  date that you found it and printed it?

22  A    That would be the date it was found and printed.

23  Q    Okay.  And the date of the incident is 2/22/17?

24  A    For R-25, yes.

25  Q    Okay.  Now, the call taker was an Anthony Gonzalez.  Do



1    you know who Anthony Gonzalez was?

2    A    Yes.  He --

3    Q    Who was Anthony?

4    A    -- would have been on -- I'm sorry.  Anthony Gonzalez was

5    a swing shift control room operator.

6    Q    Okay.  It doesn't indicate the caller name.  Disposition

7    says, "Report taken, comma, report taken."  What does that

8    mean, if you know?

9    A    That indicates that additional information was entered on

10    this, and an additional internal security report would have

11    been generated on the incident.

12    Q    Okay.  And the unit times officer entries that appear

13    towards the middle of the page, I see a U68, a U47, and then an

14    FPD.  I don't know if that's an I or a 1.  Do you know what

15    those notations pertain to?

16    A    Yes.  They would have pertained to additional security

17    units dispatched for the particular incident.  Based on this,

18    U68 would have been an office that was immediately on scene.

19    And U47 was dispatched and did drive over there.  The FPD1

20    would have referred to a Fremont police unit.

21    Q    Okay.  And if you drop down to the columns entitled time,

22    hash tag, and event, I'm directing your attention to hash tag

23    item number five.  It reads, "Per Greg, PD has been called due

24    to Union rep Ben Rivera (phonetic) is refusing to leave."  Do

25    you know what that's a reference to?


www.escribers.net | 800-257-0885

1    A    Yes.  That would refer to our standard policy of if

2    someone's trespassing and refuse to leave, to call police.

3    Q    Okay.  And from the looks of this document, can you tell

4    where this incident transpired?

5    A    The location on this one was specifically set to alpha

6    gate, or A gate, which is one of the primary entrances into the

7    facility in the rear.  It's both a vehicle entrance and a

8    pedestrian entrance.

9    Q    Okay.  And that would have been private property or public

10    property?

11    A    That would definitely have been private property.

12        MR. ROSS:  And I'm offering Respondent's 25 into evidence

13    at this time, Your Honor.

14        JUDGE TRACY:  Any objections?

15        MS. FEINBERG:  Yes.

16        MR. RODRIGUEZ RITCHIE:  Yes.  And I'd like to voir dire.

17        MS. FEINBERG:  Me too.

18        JUDGE TRACY:  Go ahead.

19              **VOIR DIRE EXAMINATION**

20    Q    BY MR. RODRIGUEZ RITCHIE:  Again, the document that's in

21    Respondent's Exhibit 25, you didn't yourself enter anything in

22    there?

23    A    No.

24    Q    So you just testified about hash tag number five where it

25    says, "Per Greg, PD has been called due to Union rep" -- do you



1    see that?

2    A    Yes.

3    Q    That's not something you put in there?

4    A    No.

5    Q    You have no way of knowing whether that's accurate?

6    A    Outside of this report?

7    Q    That's correct.

8    A    I -- I guess that would be an assumption on my part, that

9    they actually did what they said they did.

10   Q    Okay.  And then we were just talking about other CAD

11   incident report documents.  So for example, 24.  Do you have

12   that one in front of you?

13   A    Yes.

14   Q    The format looks a little bit different in 24 and 25?

15   A    Yes.

16   Q    Did the format of the incident reports change between May

17   and September 2018?

18   A    No, not to my knowledge.  The only thing that may have

19   changed would have been the specific -- how the file types were

20   exported.

21   Q    So if you look at, for example, 24, earlier we talked

22   about information missing.  And if you look at 25, I'm just

23   wondering -- in 24, for example, the first line, it stops at

24   cross-streets.  Do you see that?

25   A    Yes.



www.escribers.net | 800-257-0885

1   Q    And then in 25, there is the cross-streets, but then

2   there's other information that says city, and below that,

3   dispatcher.  Is that information that was cut off, for example,

4   in 24?  I'm just trying to understand whether that's the

5   information that was removed or cut off.

6   A    So this would be -- how do I want to answer this?  This

7   would be something of an assumption on my part.  I'm assuming

8   this was just a formatting error on how the files were

9   exported.

10      MR. RODRIGUEZ RITCHIE:  Okay.  Well --

11      JUDGE TRACY:  So I would say this:  In terms of 22, 23, 24,

12   because they do look different than 25 and 26, where it looks

13   like one is a landscape portrait that -- or a landscape that

14   was printed out, and one's a portrait, to me, is what I'm

15   thinking, could you go back and check to see?  Because this --

16   22, 23, 24, it looks like there's a lot more because of the way

17   it was printed out versus 25 and 26 look to have been printed

18   out in a different way, right, landscape versus portrait?  So

19   there appears to be potentially a lot more missing in 22, 23,

20   24 than previously thought before we saw 25 and 26.

21      MR. ROSS:  Yeah.  We'll --

22      JUDGE TRACY:  That's one -- that's the concern I raised

23   about those.  And then what else?

24      MR. RODRIGUEZ RITCHIE:  Sure.  So again, hearsay.  And we'd

25   also -- particular relevance.  There are no allegations



www.escribers.net | 800-257-0885

1     pertaining to September 9th (sic) to flyering or leafleting on

2     September 19, 2018.

3          JUDGE TRACY:  Ms. Feinberg?

4          MS. FEINBERG:  Are we speaking of 25?

5          JUDGE TRACY:  25 right now.

6          MS. FEINBERG:  Okay.  Right.  So I have a relevancy

7     objection, a hearsay objection.  I don't know that he does --

8     can't authenticate the information that's here.  I assume it's

9     being presented based on the information that's here, otherwise

10    it's just a form.  So I don't know how it can be relevant or

11    authenticated for the truth.  I think it's being presented for

12    the truth that -- which I have reason to believe is not

13    accurate, by the way.  But he's not the witness I can ask that

14    of that.  So that sort of begs -- that sort of highlights the

15    question.

16         JUDGE TRACY:  So with regards to Respondent's Exhibit 25,

17    okay, I understood the initial sort of reasoning behind 22, 23,

18    24 was that your defense, look, you acted consistently with

19    your policy, I don't know what 25 has to do with anything --

20         MR. ROSS:  Well --

21         JUDGE TRACY:  -- because it's this guy -- if it's true, if

22    you're going to believe what's written here, he's a Union rep?

23    I mean, I don't know what that has to do with --

24         MR. ROSS:  Okay.

25         JUDGE TRACY:  -- the employees.



www.escribers.net | 800-257-0885

1    MR. ROSS:  Well, A, Your Honor, it shows that there were --

2    there was other activity ongoing where apparently -- and

3    nobody's complained about it, which would be evidence to

4    suggest that the Company complied with its policies and that

5    those policies were compliant with the law for the simple

6    reason that if they weren't, I guarantee you you would have had

7    a charge on it.  In addition to which, it's offered to

8    establish that the Company had a legitimate reason for

9    monitoring the identities of individuals unknown to them who

10   were engaging in conduct on its private property.

11       The evidence thus far is that the employees who have

12   testified were simply people who were standing outside the

13   building at 4, 5 in the morning.  They didn't know who the

14   guards were.  I suggest to you that, likewise, the guards

15   should know who they were.  They needed to ascertain whether

16   they were employees or not --

17       MS. FEINBERG:  What's that got to do with this?

18       JUDGE TRACY:  Okay.

19       MR. ROSS:  -- before they could decide whether or not to

20   let them continue to do what they were doing or ask them to

21   leave.

22       JUDGE TRACY:  So let me ask you, you have 25 and of course,

23   you're going to elicit some testimony about 26.  Are these the

24   only two that you have --

25       MR. ROSS:  These are the only two that we have -- that this



1   gentleman has been able to find beyond the ones that --

2        JUDGE TRACY:  Okay.

3        MR. ROSS:  -- we have produced.

4        JUDGE TRACY:  So again, I have a real concern with a

5   relevance of it.  I really -- you know, I -- you -- I

6   understood for some of these, but for 25 I really don't.  But

7   again, to -- it's just a couple more pages, putting it in.

8        MS. FEINBERG:  Well, can I make an offer of proof that

9   there is no Union rep named Ben Rivera?  Because that's the

10  point, we don't have anybody -- since he's not the person who

11  created this document, who has the information, we don't even

12  have a place where we can even discredit this document.  And

13  that is why this document should not come in if it's coming in

14  to show that some Union rep was there and this happened and

15  they treated this person in such and such a way, because we

16  have reason to believe that it isn't true.  Ms. Reed supervises

17  this -- all the staff there.  There is no such person.

18       JUDGE TRACY:  Okay.  But again --

19       MS. FEINBERG:  So this, again, shouldn't come in through

20  this witness.

21       JUDGE TRACY:  Well, I'm going to allow it, like I said.

22       MS. FEINBERG:  Okay.  And I did also want to correct the

23  fact that not every unfair (sic) do we file with the Board.

24       JUDGE TRACY:  Sure.

25       MS. FEINBERG:  So just the fact that --



1       JUDGE TRACY:  Sure.  I mean --

2       MS. FEINBERG:  Mr. Ross said that just because it

3   happened -- it didn't happen, that we didn't -- we would have

4   filed an unfair, and unfortunately, otherwise, we'd be spending

5   our lives at the Board.  That isn't true.  So I just wanted

6   to --

7       JUDGE TRACY:  So I mean --

8       MS. FEINBERG:  -- correct the record.

9       JUDGE TRACY:  -- would say for the record at this point I

10  do not see the relevance of Respondent's Exhibit 25.  Okay?  So

11  you don't even need to get into credibility if I don't even

12  think --

13      MS. FEINBERG:  Yeah.  Okay.

14      JUDGE TRACY:  -- it's worthwhile --

15      MS. FEINBERG:  Well, that's fine.

16      JUDGE TRACY:  -- for this record.  However, this is their

17  defense, and I need to have a complete record so when I do look

18  at everything -- their job is to persuade me just as much as

19  your job is.  My job also is to complete a record for the

20  Board, because this will be appealed no matter what I decide.

21  So --

22      MS. FEINBERG:  Well, that's -- that's what the record's for

23  as well.

24      JUDGE TRACY:  It's not that many pages.  I'm going to allow

25  them to put it in for what it's worth.  And that's -- in the



www.escribers.net | 800-257-0885

1    end, what we decide here, I, of what's worth more than the

2    other stuff.  You know, if you want -- on rebuttal, you can do

3    what you will with this.

4        Anyway, Respondent's --

5        MS. FEINBERG:  Okay.

6        JUDGE TRACY:  -- Exhibit 25 is admitted into evidence.

7    **(Respondent Exhibit Number 25 Received into Evidence)**

8        MR. ROSS:  Thank you, Judge.

9                    <u>**DIRECT EXAMINATION**</u> **(RESUMED)**

10   Q    BY MR. ROSS:  And last but not least, you have in front of

11   you, sir, Respondent's Exhibit 26.  Again, this is a document

12   you have found and sent to me recently pursuant to my request

13   for any other instances that involved possible Union leafleting

14   during the first six months of 2017, correct?

15   A    Correct.

16   Q    Okay.  And this pertains to an event that -- an incident

17   that is dated 6/27/2017, also done by call taker Anthony

18   Gonzalez?

19   A    Correct.

20   Q    Okay.  And what appears here is a report that was

21   generated by the CAD RIMS, I think you called it --

22   A    Yeah.

23   Q    -- that -- the entries that were made by Mr. Gonzalez on

24   6/27/2017?

25   A    Yes.



1    Q    All right.

2    MR. ROSS:  I'm going to offer Respondent's 26 into

3    evidence.

4    MS. FEINBERG:  I'd like to --

5    MR. RODRIGUEZ RITCHIE:  I'd like to voir dire.

6    MS. FEINBERG:  Okay.  Go ahead.

7    JUDGE TRACY:  Go ahead.

8    MR. RODRIGUEZ RITCHIE:  I'll be quick.  I promise.

9    **VOIR DIRE EXAMINATION**

10    Q    BY MR. RODRIGUEZ RITCHIE:  With regards to Respondent's

11    Exhibit 26, you didn't yourself make any of the entries in this

12    document?

13    A    Correct, I did not make any of the entries in this

14    document.

15    Q    When was the first time you looked at this document?

16    A    That I recall, just recently, when I was doing a review,

17    as asked for any additional incidents.

18    Q    Okay.

19    MR. RODRIGUEZ RITCHIE:  We'd continue our objections to

20    these lines of questions and the document on relevancy grounds.

21    There's no allegations with regards to leafleting on September

22    the 19th, 2018.  In addition, to the fact that the document is

23    hearsay --

24    MR. ROSS:  It is not --

25    MR. RODRIGUEZ RITCHIE:  -- and there has not been



1    sufficient foundation laid for any hearsay exceptions.

2         MR. ROSS:  It is not a record in which describes something

3    that occurred in -- on September 19th, 2018.  It's a document

4    that describes events that occurred on 6/27/2017.

5         MR. RODRIGUEZ RITCHIE:  Excuse me.  I stand corrected.  You

6    are correct --

7         MR. ROSS:  Thank you.

8         MR. RODRIGUEZ RITCHIE:  -- Mr. Ross.  I do at times --

9         MR. ROSS:  You're listening to me --

10        MR. RODRIGUEZ RITCHIE:  I will --

11        MR. ROSS:  -- too much.

12        MR. RODRIGUEZ RITCHIE:  -- give you that, yes.  Thank you

13   for correcting me.

14        Nonetheless, my objection remains --

15        JUDGE TRACY:  Okay.

16        MR. RODRIGUEZ RITCHIE:  -- the same.

17        MS. FEINBERG:  I have a quick question.

18                    **VOIR DIRE EXAMINATION**

19   Q    BY MS. FEINBERG:  So excuse me, but if you would turn --

20   I -- maybe I don't understand this document, but it begins at

21   1706 where it says, incident initiated, and then it's closed at

22   2256.  Does -- what was happening between 1706 and 2256?  Is

23   there -- are they observing Mr. Ochoa and Mr. Sanchez, or

24   what's happening there?

25   A    I would be unable to answer that without speculating.



www.escribers.net | 800-257-0885

1    Q    Okay.  So this document doesn't tell you when they

2    actually interacted with Mr. Sanchez and Mr. Ochoa?

3    A    The incident creation time would indicate that of the

4    start of the time, but not necessarily the end of the time.

5         MS. FEINBERG:  Okay.  Then --

6         JUDGE TRACY:  So what's your objection?  Do you join

7    theirs?

8         MS. FEINBERG:  Yes.

9         JUDGE TRACY:  Okay.

10        MS. FEINBERG:  I --

11        JUDGE TRACY:  So what is --

12        MS. FEINBERG:  I have this --

13        JUDGE TRACY:  -- relevance --

14        MS. FEINBERG:  I'm going to object because they don't tell

15   you what is --

16        MR. ROSS:  Um-hum.

17        MS. FEINBERG:  What's at issue is what were the

18   interactions.  We know that there were interactions.  In some

19   ways this confirms that there were interactions between

20   security and Union members.  We knew that.  And thank you, yes,

21   you've confirmed that.  But what actually happened, these

22   documents don't tell, and I don't know what the relevancy is.

23   But there you have it.

24        JUDGE TRACY:  And so --

25        MR. ROSS:  Okay.



1          JUDGE TRACY:  -- what's the relevance for this?

2          MR. ROSS:  Your Honor, you're going to hear testimony from

3     individuals who had actual interactions with the people you've

4     heard already from the counsel --

5          JUDGE TRACY:  Okay.

6          MR. ROSS:  -- for the General Counsel.

7          JUDGE TRACY:  Um-hum.

8          MR. ROSS:  You have to make a decision about who's telling

9     the truth --

10         JUDGE TRACY:  Right.

11         MR. ROSS:  -- and who's worthy of credence.  We believe our

12    people are worthy of credence.  And one thing that we would ask

13    you to consider is that what they're going testify to in terms

14    of what they did relative to these individuals counsel for the

15    General Counsel has put on, it's wholly consistent with the

16    other things that occurred during these events.  In other

17    words, these individuals who interacted with the employees,

18    were made aware of and knew what the Company's policies were

19    with respect to solicitation, that employees who were doing

20    something on their own time and outside the building in nonwork

21    areas, were free to do that.  They also knew, though, that

22    insofar as you had strangers who were coming on the property --

23         JUDGE TRACY:  Um-hum.

24         MR. ROSS:  -- and engaging in similar conduct, that was

25    something that was not permissible under Company policy, and



www.escribers.net | 800-257-0885

1      it's not protected by the National Labor Relations Act.

2          And therefore, they went up to these individuals, who were

3      strangers to them, ascertained whether they were  employees or

4      not, and if they were, they were left alone.  These documents

5      suggest a pattern of conduct that's consistent with that.  If,

6      on the other hand, they found that the individuals who were

7      engaging in this activity were not employees, that, in fact,

8      they were trespassers, they were asked to leave.  These

9      documents support the proof you're going to hear from our other

10     witnesses.  And that's why we're offering it.

11         JUDGE TRACY:  All right.  So I'm going to overrule the

12     objections and I'll allow Respondent's Exhibit 26.

13     **(Respondent Exhibit Number 26 Received into Evidence)**

14         MR. ROSS:  Thank you.  I have nothing else of this witness.

15         JUDGE TRACY:  Okay.  Cross-examination.  But do you need

16     some time?

17         MR. RODRIGUEZ RITCHIE:  And a break, yes.

18         JUDGE TRACY:  Yeah.  So let's see --

19         MR. RODRIGUEZ RITCHIE:  Yeah.  If -- sorry.

20         JUDGE TRACY:  It's --

21         MR. RODRIGUEZ RITCHIE:  I'm sorry.

22         JUDGE TRACY:  Oh, it's 3:40.  So let's take a break until

23     3:50.  Ten minutes.  Okay?

24         All right.  Let's go off the record.

25     (Off the record at 3:40 p.m.)


www.escribers.net | 800-257-0885

1     JUDGE TRACY:  Okay.  Mr. Rodriguez Ritchie, please.

2                      **CROSS-EXAMINATION**

3    Q    BY MR. RODRIGUEZ RITCHIE:  Mr. Hansen, what was your job

4    title on February the 10th, 2017?

5    A    My job title would have been Security Operations Manager.

6    Q    In that role, you were not one of the individuals who you

7    testified about earlier who I think were the door staff?

8    A    Correct.  I would not have been manning a door post.  Our

9    door -- I would not have been a door guard.  And I would not

10   have been one of the mobile patrols.

11   Q    And the same is true for May the 24th, 2017?

12   A    Correct.

13   Q    You didn't have any interactions -- personal interactions

14   with any employee -- Tesla employees at Tesla Fremont who were

15   engaged in handing out papers on February the 10th, 2017?

16   A    No, I did not have any interactions directly.

17   Q    And you didn't have any interactions with any employees

18   who were engaged in handing out papers at the Tesla Fremont

19   parking out on May 24th, 2017?

20   A    I didn't personally engage them.  I did speak with, I

21   believe it was mentioned, the one officer that did, but that's

22   it.

23   Q    That was what you talked about -- that was Mr. Quiroz?

24   A    Correct.  Yes.

25   Q    But you didn't yourself speak with any of the employees



www.escribers.net | 800-257-0885

1    that were leafleting on May 24th, 2017?

2    A     That's correct, I did not speak with any --

3    Q     And you --

4    A     -- of them directly.

5    Q     -- didn't observe what they were doing?

6    A     I did not observe them directly, no.

7    Q     Okay.

8          MR. RODRIGUEZ RITCHIE:  No further questions.

9          MS. FEINBERG:  Oh, he wasn't kidding.  Okay then.  I'll

10   just keep going.

11                        **CROSS-EXAMINATION**

12   Q     BY MS. FEINBERG:  Hello.

13   A     Hello.

14   Q     So I do have a few questions.  Okay.  With respect to

15   Respondent's Exhibit 21, do you have that?

16   A     I do, yes.

17   Q     Okay.  And you weren't the author of this document?

18   A     Correct, I was not.

19   Q     So you were one of the recipients?

20   A     Yes.

21   Q     And do you know whether anyone other than the names who

22   are copied here on Respondent's 21 received this document?

23   A     I'm unsure of the specifics for security all.

24   Q     I see.

25   A     I -- I do know that would have been for just internal



www.escribers.net | 800-257-0885

1    personnel, though.

2    Q    Okay.  And are all the other people listed under cc's

3    internal?

4    A    Yes.

5    Q    And I might have asked you this on voir dire, but now

6    we're on cross, so I just want to follow up a little bit.

7    Other than this document, R-21, do you know of any other

8    communications from Mr. Slettvet on this topic of union

9    activities?

10   A    Not that I've been able to physically find.

11   Q    Okay.  And what did you -- what did -- so recently, maybe

12   in preparation for your testimony, you made some efforts to

13   find some documents; is that right?

14   A    Correct.

15   Q    Okay.  And what did you -- what process did you go about

16   to like find communications from Mr. Slettvet?

17   A    Searching through all of my emails for the time period.

18   Q    Okay.  And the time period that you were looking through

19   what was period?

20   A    That would have been the first six months of 2017.

21   Q    Okay.  And then I'm going to draw your attention to

22   Respondent's Exhibit 20.  And am I correct to say that all the

23   people on this document are all people who are employed or were

24   employed by Securitas; is that right?

25   A    Correct.



1    Q    Okay.  And did you ever go out and observe any

2    interactions between the Securitas employees and Tesla

3    employees?

4         MR. ROSS:  I didn't hear --

5    Q    BY MS. FEINBERG:  Did you ever go out --

6         MR. ROSS:  -- the question.  I'm sorry.

7    Q    BY MS. FEINBERG:  -- and monitor their interaction?

8         MR. ROSS:  I'm sorry.  I couldn't hear the question.  Could

9    you repeat it?

10   Q    BY MS. FEINBERG:  Did you ever go out and personally

11   monitor the interactions between Securitas employees and Tesla

12   employees?

13   A    In terms of --

14   Q    For any purpose.

15   A    Just any -- just any purpose?  Yes.

16   Q    And what was the context of that?

17   A    So again, as part of the operations manager, one of the

18   things I would do is I would go out and check up on officers at

19   their various posts and just ensure that they were performing

20   their duties as set out by the policies set in place for those

21   posts.

22   Q    But did you ever observe any Securitas employees

23   interacting with Tesla employees who were engaged in union

24   activities?

25   A    Not directly.



www.escribers.net | 800-257-0885

1    Q    Well, that -- so you never observed them, right?

2    A    I never observed them directly, no.

3    Q    Okay.  Well, did you observe them through a camera?  What

4    do you mean?  What is indirectly?  I'm assuming directly means

5    you talked to them?

6    A    Directly as in I was physically present in the area

7    watching the interaction or interacting directly with the

8    employees, is how I mean that.

9    Q    Okay.  And did you get to watch them in any other form

10   interacting with --

11   A    Not --

12   Q    -- Union -- workers who were engaged in union activities?

13   A    I did witness via some camera a protest.  I don't know if

14   that meets -- matches your criteria.

15   Q    And why were you observing that protest?

16   A    It was causing a disruption at the site.

17   Q    Okay.  And where are cameras located so that you can see

18   such things?

19   A    So we do have cameras located primarily to observe the

20   entrances and the parking lots, but it's not complete coverage

21   but it does cover the -- all of the primary entrances.

22   Q    And can you turn to Respondent's Exhibit 22?

23        MR. ROSS:  I'm sorry.  I couldn't hear the question.

24        MS. FEINBERG:  Exhibit -- Respondent's 22.

25        THE WITNESS:  Okay.



www.escribers.net | 800-257-0885

1    Q    BY MS. FEINBERG:  Okay.  So as I understand it, Sam Ali

2    was assigned to car U27 and was dispatched by -- I'm not sure.

3    By Bo Dork or by Natalie Hunter?  Somebody dispatched him?

4    A    That would have been my Bo Dork.

5    Q    Okay.

6    A    And yeah, either he was dispatched directly or as the

7    incident was reported, he would have report to Bo and said,

8    hey, I'll go investigate further.

9    Q    Oh.  So people are listening on a channel as things are

10    reported?  You mean other people --

11    A    Right.  If it comes in via radio.  There's -- it could

12    come in radio, it come in phone call.  There's multiple ways

13    incidents can be reported.

14    Q    Okay.  And is it correct to say, if I'm reading this

15    correctly at the bottom where it says time, that from 4:23 to

16    at least -- to 4:40, that car U27 was on site where -- outside

17    the door where the workers were passing out flyers?

18    A    So what that would indicate is that from 4:26 --

19    Q    4:26, okay.

20    A    -- the primary unit would have indicated that they were on

21    scene or investigating.

22    Q    Um-hum.

23    A    And at 4:40, when indicated closed, that typically occurs

24    when they report back to end the incident and indicate that

25    they're finished.



www.escribers.net | 800-257-0885

1   Q    Okay.  And how do you know or can you tell from these

2   documents if there's more than one person in a car?

3   A    You can't.

4   Q    But there are occasions where there is more than one

5   person in a car?

6   A    There may be occasions where you have additional officers

7   with that unit or in that area.

8   Q    Okay.  So if someone said a car pulled up and there were

9   two officers, that's possible?

10  A    That is possible, yes.

11  Q    Okay.  And the security guards or employees who are

12  employed directly by Tesla, could you remind me what they wear?

13  A    They would have worn very similar, if not identical,

14  uniforms depending on -- well, they would have been the same

15  if -- for any officer in the same position.  So for example --

16  Q    The same as Securitas you mean?

17  A    Yes.

18  Q    Oh, I see.  So if I'm an employee and I see someone in

19  Tesla security garb, I can't tell the difference as whether

20  they're -- who they're employed by; is that right?

21  A    Correct.  They're all in the same security uniform.

22  Q    Okay.  Is there a difference in the uniform, what people

23  wear, when they're the -- behind the desk as opposed to if

24  they're in a mobile unit?

25  A    No.



1  Q    Okay.  If -- are there supervisors -- security supervisors

2  on site as well from Securitas?

3  A    Yes.  The --

4  Q    Okay.

5  A    There's a security supervisor on site.

6  Q    And does that person, do you know, dress any differently

7  or --

8  A    No.  Same uniform.

9  Q    Okay.  And can you describe it again?

10 A    So the uniforms at the time would have been either --

11 depending.  The fire team wore slightly different uniforms.

12 But --

13 Q    Okay.

14 A    -- black shirt that identifies them clearly as, over the

15 right breast, Tesla fire and security.  They may have had a

16 pullover, but again, black with Tesla fire and security printed

17 on it over the -- right or left breast?  Over the breast.  The

18 door guards and the mobile patrols would have worn a black-and-

19 red Polo, again, with Tesla security on the breast.  And the

20 uniform jacket was a black jacket, again, with Tesla security

21 over the breast.

22 Q    Okay.  And is it correct to say that the security,

23 regardless of whether they're employed by Securitas or Tesla,

24 there are both men and women security guards?

25 A    Correct.



www.escribers.net | 800-257-0885

1    Q    And people of different ethnic backgrounds?

2    A    Correct.

3    Q    And one second.  I was trying to find the one from -- that

4    related -- oh.  And so on February -- oh, can you turn to R-22

5    again --

6    A    Yes.

7    Q    -- please?  And I believe you said that Sam Ali was with

8    U27.  Do you know if he was with anyone else that night or --

9    if you know?

10   A    I would not know that.

11   Q    Okay.  And do you know whether there was another car out

12   that -- is there more -- is it possible to have more than one

13   car out?

14   A    Yes, at any given time, there are more than a single

15   mobile unit.

16   Q    Okay.

17   A    There's typically at least three mobile units patrolling

18   the parking lots, and additional mobile units on foot.

19   Q    Okay.  I'm going to take a stab at this one.  And the

20   mobile units they're driving are Teslas?

21   A    Mostly, yes.

22   Q    Mostly, yes?  Okay.

23   A    We -- we do have one -- again, it's security marked.

24   Q    Yes.

25   A    There is a white Frontier that is security marked that's



www.escribers.net | 800-257-0885

1    used to deploy barricades.

2    Q    Okay.

3    A    They don't all fit in a Tesla.

4    Q    Okay.  And this is relevant, otherwise I wouldn't be

5    asking it -- or I think it's relevant.  Do you know the

6    ethnicity of Mr. Sam Ali?

7    A    I would have to guess.

8    Q    Okay.  Could you just describe him for me then?  Like

9    tall, short, fat, thin, whatever.

10   A    Yeah.  He is medium to short as far as height, thin build,

11   dark complexion, and black hair that is close cut to his skull.

12   Q    Okay.  And I'm going to assume that the employees who work

13   for Tesla, you keep records of when they work, right, just like

14   for the production employees and the security employees, you

15   keep records?  If someone --

16   A    Time clocks, yes.

17   Q    Right.  So you would have the ability to look up all the

18   security people who were working for Tesla directly on

19   February 10th?

20   A    Yes.

21   Q    Okay.  And did Securitas provide you with a list of who

22   was on your site for each given day or each given week?

23   A    We would have had an overall schedule of who was anomaly

24   scheduled.  It is possible there might have been last minute

25   substitutions for call-off or sickness.  But we would have had



1     an overall.

2     Q     Okay.  And I also didn't understand this.  The people who

3     drive the cars, are they all the Securitas or that's also -- or

4     is that a mix?

5     A     To my recollection at the time, they were --

6     Q     Yes, at the time.

7     A     -- all Securitas.

8     Q     And thank you for that correction -- or clarification.

9           Do you know if any of the officers who were out taking

10    these CAD incident reports took photographs of any sort?

11    A     I do not know.

12    Q     If there was any documentation, like a photo, that went

13    with a CAD incident report, where would it be maintained?

14    A     If there was a photo, it may have been up loaded but

15    probably not, depending on the circumstances.

16    Q     Okay.  And as I understand it from -- at least from the --

17    Respondent's 21, what Mr. Slettvet is saying in September of

18    2017, that if you run into someone, you can ask them to see

19    if -- if someone's engaging in activity, you could ask to see

20    their badge?  Is that your understanding?

21    A     Yes.

22    Q     Okay.  And do you know whether there was any direction one

23    way or another of whether photos should be taken of people's

24    badges?

25    A     I don't believe any specific direction one way or the



1    other on whether photos would be allowed or should be taken or

2    should not be taken.

3    Q    And did you ever have any conversation with anyone in

4    security about taking photos of people's security badges?

5    A    No.   There was no conversation about taking photos of

6    security badges.

7    Q    And once -- and was there any discussion about, once you

8    verified that someone was an employee, whether there was a

9    necessity to record the fact that a particular employee was

10   engaged in union activity?

11   A    There was never any direction on whether that was --

12   specifically was supposed to be recorded or anything -- the

13   direction was simply once they're confirmed employees, they're

14   allowed.   No further action needs to be taken as far as kicking

15   them off site or allowing them or whatever.   It's just they

16   were allowed as long as they were following the policy.

17   Q    So can you turn to Respondent's Exhibit 23?

18   A    Okay.

19   Q    And did you say that Felipe De La Cruz is an employee of

20   Tesla?

21   A    Yes.

22   Q    And did you ever speak to him about verifying people's

23   identification if they were leafleting personally?

24   A    Yes.

25   Q    When did you speak to him?


www.escribers.net | 800-257-0885

1   A    I would have spoken with him as per Greg's direction on

2   February 10th.

3   Q    Um-hum.

4   A    Well, he was grave shit, so I may have spoken with him on

5   the morning of February 11th.

6   Q    Okay.  And did you see report R-23 on or about the time --

7   on or about May 24th, 2017?

8        MR. ROSS:  I'm sorry.  I couldn't hear the question.

9        MS. FEINBERG:  Whether he saw Respondent's 23 sometime in

10  May, on or about May 24th, 2017.

11       THE WITNESS:  Did I see that?

12       MS. FEINBERG:  Yes.  That document, R-23.  The one filled

13  out by --

14       THE WITNESS:  Yes.

15       MS. FEINBERG:  -- Mr. De La Cruz.

16       THE WITNESS:  I've seen the report since then.  I may not

17  have necessarily seen it that day.

18  Q    BY MS. FEINBERG:  Okay.  But you saw it within a -- within

19  that month or so?

20  A    Most likely, yes.

21  Q    Okay.  And did you notice that he had recorded employees'

22  names and badge numbers on the report?

23  A    In passing.

24  Q    Okay.  And did you tell him it wasn't necessary to record

25  that on an incident report because the people had a right to be



1   there; all he had to do was verify that they had a badge -- a

2   valid badge?

3   A    At the time I discussed with him was just verifying the

4   employee was an actual employee and active.

5   Q    Right.  But you were keeping track of the people who were

6   engaged in union activity.  Did you ever talk to him about the

7   fact that there was no need to keep track of who was engaged in

8   union activity?

9   A    Once that information comes in, we'll have the operators -

10  - and this may be speculation --

11  Q    Um-hum.

12  A    -- but a lot of the operators will just enter the

13  information in so that they have a record there so that it can

14  be referred to in case it's needed later.  If it's not, it's

15  not needed and it's not considered.

16  Q    But if the employees have a right to leaflet and they

17  showed their badge, why would their names show up in a report

18  at all?

19  A    Because the operators aren't sure that they are active

20  employees when that information first comes in.  They have to

21  cross-reference and check.  Just because someone has a badge

22  doesn't necessarily mean that they're actually still an active

23  employee.  We do have -- or we have had and still have

24  personnel that are terminated or let go from the Company where

25  the badge is not recovered.  And we have had incidents where



www.escribers.net | 800-257-0885

1    people have attempted to create fake badges or even steal other

2    people's badges.

3    Q    Um-hum.  And when did you first become aware of Mr. Jose

4    Moran?  Do you know him?

5    A    As far -- in --

6    Q    Do you know who he is?

7    A    -- what records?  I assume he's an employee.

8    Q    Yeah.  Have you ever seen him or heard anything about him?

9    A    I am aware that -- I believe he was involved in some of

10    the incidents, but that's the extent.

11    Q    Okay.  So engaging in union activity is considered an

12    incident?

13    A    It's an incident in the sense that they have people that

14    are present that they may not know who they are, whether

15    they're an employee or a person that's not an employee and

16    doesn't have a right to be on.  So as much, when that's called

17    in, especially with newer personnel, security guards that may

18    not recognize everyone -- you have a lot of people on site, and

19    the security guards won't recognize every single employee --

20    that information gets called in as, hey, there's something

21    going on out here.  Can we investigate?

22    Q    Okay.  But can't you just scan someone's badge right there

23    by the door to see if it's a valid badge?  Why do they have be

24    called in?  I understood that there were -- you even said -- I

25    forget the name or the word for it, but some kind of thing



www.escribers.net | 800-257-0885

1    where the badge talks to the --

2    A    It has to be in close proximity to the reader --

3    Q    Right.  And isn't there a --

4    A    -- in order for --

5    Q    -- reader by every entrance to the building?

6    A    Just by scanning it on the reader --

7    Q    Yes.

8    A    -- the guard that is investigating from the exterior --

9    Q    Um-hum.

10   A    -- may not be able to see that.  They can't tell just from

11   looking at the reader.  The guard inside the --

12   Q    If the door --

13   A    -- door --

14   Q    Doesn't the door then open?

15        MR. ROSS:  Excuse me.  Could he --

16        MS. FEINBERG:  Okay.

17        MR. ROSS:  -- be allowed to finish his response?

18        MS. FEINBERG:  Yeah.  Sure.

19        MR. ROSS:  You're talking over the witness.  Thank you.

20        THE WITNESS:  So if the personnel are out in the parking

21   lot --

22        MS. FEINBERG:  Um-hum.

23        THE WITNESS:  -- distributing flyers, the officers, if they

24   were to do as you suggest, would have to require that person to

25   come with them -- because they may not be directly outside the



1   door -- over to a location that has a card reader to scan in.

2   Q   BY MS. FEINBERG:  Okay.  And do you know where these

3   people -- where Mr. Moran was when he was out passing out

4   leaflets?

5   A   I do not specifically recall, no.

6   Q   Okay.  And do you know whether these CAD incidents reports

7   were shared with anyone else inside Tesla besides the security

8   detail?

9   A   So only security has access to the system.  None of the

10  other departments have direct access.  To my knowledge, these

11  incidents were not shared with anyone until there was a request

12  from legal to pull these incidents.

13  Q   In relation to this case or in relation to something else?

14      MR. ROSS:  I couldn't hear the question.

15      MS. FEINBERG:  Well, I don't know if he's going to be

16  allowed to answer the question.

17      JUDGE TRACY:  Go ahead and ask.

18      MS. FEINBERG:  Okay.

19  Q   BY MS. FEINBERG:  In relation to this case or in relation

20  to something else?

21  A   As far as these incidents?

22  Q   Pulling them.

23  A   It -- for this case.

24  Q   Okay.  Do you know who Arnon is?

25  A   Can you provide the last name?



1  Q   I would, but it's not listed in the document.  So can you

2  look at Respondent's Exhibit 20?  It might not be -- and turn

3  to paragraph nine.  And there's a reference to Arnon.

4  A   It would be speculation --

5  Q   Okay.  Well --

6  A   -- but I would assume that would refer to the HR VP at the

7  time.

8  Q   Of Tesla?

9  A   Yes.

10  Q   Okay.  So the HR VP of Tesla was in contact with

11  Securitas, as far as you know?

12  A   As far as I'm aware, no, he would not have been in direct

13  contact.  He was Greg Slettvet's direct boss.

14  Q   Oh, so the way that you read this is that Slettvet's going

15  to talk to Arnon and then get back to them?  Is that how you --

16  A   That's how I would read this.

17  Q   That's -- I'm not -- we don't know, but that's how you

18  read it?

19  A   Yes.

20  Q   Okay.  And do you know whether Arnon ever gave any

21  direction to be shared with Securitas?

22  A   That I would not know.

23  Q   But -- okay.  One moment.  You mentioned something about

24  sending reminders to your staff by email of policies and

25  procedures.  Was that something you also looked for when you



1    went -- when you prepared for this case?

2        MR. ROSS:  Objection.  I don't think that's a correct

3    statement of what his earlier testimony was.

4        MS. FEINBERG:  Well, I'm reading --

5        JUDGE TRACY:  So --

6        MS. FEINBERG:  -- my notes.  I don't know.  Sorry.

7        MR. ROSS:  I don't have a --

8        JUDGE TRACY:  Actually I don't recall either.  There was a

9    little bit of confusion about that, I thought, because we had

10   him go over his testimony and couple of times actually on this

11   subject.  So why don't we clear that up --

12       MS. FEINBERG:  Okay.

13       JUDGE TRACY:  -- Ms. Feinberg.

14       MS. FEINBERG:  Okay.  I'll take one step back to see if

15   what I think is true -- okay.

16       JUDGE TRACY:  That's right.

17   Q    BY MS. FEINBERG:  I was -- I think there was some

18   questions about you communicating to your -- to the staff about

19   what the policies were.  And so what I'm asking is, did you --

20   in preparation for today or at any time, did you look through

21   your email to see if you communicated with them via email

22   regarding various Company policies that applied to security as

23   they interacted with Tesla employees?

24   A    Excuse me.  As I recall, I believe I did look through my

25   emails for the time period in question --



1   Q    Um-hum.

2   A    -- which would be the first six months of 2017.  I don't

3   recall finding anything specifically on that exact subject.

4   Q    Okay.  Thank you.

5        MS. FEINBERG:  Okay.  I have nothing further -- oh, wait.

6   One second.

7        JUDGE TRACY:  Um-hum.

8   Q    BY MS. FEINBERG:  Okay.  I understood that you reported to

9   Mr. Slettvet, and Mr. Slettvet might have reached out to Arnon.

10  Was there anyone else other than Mr. Slettvet in high level

11  Tesla management that you dealt directly with regarding the

12  union activities?  Ms. Toledano, Mr. Hedges, anyone else?

13  A    No.  I would have dealt directly with Greg Slettvet.

14  Q    Okay.  Thank you.

15       JUDGE TRACY:  Mr. Ross?

16       MR. ROSS:  Yeah.

17                    **<u>REDIRECT EXAMINATION</u>**

18  Q    BY MR. ROSS:  Are you familiar with a thing called the

19  Lenel System?

20  A    Yes.  The Lenel System is our access control system.

21  Q    Okay.  And tell me what role, if any, the Lenel System

22  played in connection with determining whether individuals who

23  were engaging in handling were or were not employees of the

24  Company?

25  A    So the Lenel System is how we determine if someone has



www.escribers.net | 800-257-0885

1    access to the facilities.  We look up to confirm whether their

2    badge is active or inactive in the Lenel System.  That system,

3    if a person is deactivated, the badge is turned off.  Usually

4    if it's a separation or a termination, it's specifically listed

5    as such, and there will be a note in the profile to indicate

6    that they're, you know, no longer an employee.  It's sort of

7    the default way the control room will double-check and look up

8    to see if someone's an active employee or not.

9    Q    Okay.  And in terms of any of the individuals who

10   responded to any of the incidents that were called in, what

11   role, if any, would the control room play in determining

12   whether the leafleters were or were not employees?

13        MR. RODRIGUEZ RITCHIE:  Objection.  Vague.

14        JUDGE TRACY:  Sustained.

15   Q    BY MR. ROSS:  I noticed, for instance, that in the case of

16   Respondent's Exhibit 24, mention is made -- 23, mention is made

17   of a Michael Catera, Branton Phillips, and Juan Moran, and then

18   parentheses there are numbers following them.  Would the

19   control room customarily get this information from the person

20   on site and then run those numbers through the Lenel System?

21        MR. RODRIGUEZ RITCHIE:  Objection.  Misstates the document.

22   It refers to Jose Moran.  And calls for speculation.

23        MS. FEINBERG:  Leading.

24        JUDGE TRACY:  Sustained.

25        MR. ROSS:  Okay.



www.escribers.net | 800-257-0885

1    Q    BY MR. ROSS:  Tell us how a person's status as an actual

2    employee would be determined from the field.  How that would

3    take place?

4        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Vague and

5    ambiguous as to actual employee.

6        JUDGE TRACY:  Well, if -- could you clarify the question,

7    please?

8        MR. ROSS:  Yeah.  Your Honor, I'm -- we've got evidence of

9    an interaction between guards and leafleters in General

10   Counsel's case.

11       JUDGE TRACY:  Um-hum.

12       MR. ROSS:  The question is -- and we also have evidence

13   that the guards sought the employees' credentials, their

14   badges.  And the question is, after those badges were shown to

15   the guards that were on site --

16       JUDGE TRACY:  Right.

17       MR. ROSS:  -- what was done with that information.

18       JUDGE TRACY:  Right.  So I think that the question, though,

19   was that it was that -- primarily that -- the question was

20   vague and unclear.  So I said, ask it again to clarify, being

21   very --

22       MR. ROSS:  Okay.

23       JUDGE TRACY:  -- specific.  I mean, kind of what you just

24   said.

25   Q    BY MR. ROSS:  When someone has to determine whether or



1    not -- a guard has to determine whether or not an individual

2    is, in fact, an employee -- you mentioned from time to time

3    there were fake badges, from time to time you had -- I think

4    you said situations where -- of somebody using an expired

5    badge.  Now, how would you determine whether something was a

6    real badge, an authorized, current badge as opposed to a phony

7    badge?  How would that be done, sir?

8    A    So the personnel in the field would need to physically see

9    the badge.  They'll confirm typically a couple of pieces of

10   information off of that badge that are present, the name, the

11   picture, and they'll check the badge number that's on the back.

12   In some cases, they may even take a photo just to make sure

13   that they get a clear image of the badge number.  And that

14   information is given to the control room that then takes that

15   information, pulls up their profile in Lenel based off of that

16   badge number so that they confirm that, A, it's actually the

17   right person -- because we have had people try to use someone

18   else's badge -- so that way they can confirm the name matches

19   the profile in the system, the picture matches, in the event

20   that a photo is sent in, and that the badge number is an active

21   badge and not a terminated or fake badge.

22   Q    Okay.  So in order for the control room operator to run of

23   Lenel search, what information do they need?

24   A    The bare minimum information that they must receive from

25   the guard in the field is the name of the person that is on the



www.escribers.net | 800-257-0885

1    badge as it appears on the badge and the badge number.

2    Q    All right.  Now, I want to be sure I got this straight.

3    The fire and safety team wear black shirts and black pants?

4    A    Yes.  Black T-shirts with red fire and security, and black

5    pants are standard for all security personnel.

6    Q    Okay.  Those that are operating cars or roving wear black-

7    and-red Polo shirts?

8    A    Yes.  They would wear -- primarily it's mostly black, but

9    it has red highlights, especially under the arms.

10    Q    Okay.  Now, you also made mention of from time to time you

11    looked at video of things?

12    A    Correct.  There is a video system at the site.  And it

13    doesn't cover every single square inch, but an effort is made

14    to make sure that we have the perimeter of the premises covered

15    because, again, it is a secure facility.  We kind of need to

16    know what's going on in the perimeter and around the entrances.

17    Q    Okay.  And the data that's collected in that video system,

18    what's done with it?

19    A    The video sits in the system for -- typically between 10

20    and 14 days is the usual.  And if there's no specific request

21    to, say, video, it gets overwritten.

22    Q    Okay.  That was the practice that existed during the first

23    half of 2017?

24    A    Yes, it was.

25    Q    That was the practice that existed before the first half



www.escribers.net | 800-257-0885

1   of 2017?

2   A    Correct.  Yes.  That practice has not changed.

3   Q    Now, you mentioned a disruptive protest that took place on

4   site.  Do you remember that testimony?

5   A    Yes, I recall that testimony.

6   Q    And approximately when was that?

7       MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

8       MR. ROSS:  Do you want a response?

9       JUDGE TRACY:  Yes.

10      MR. ROSS:  Okay.  I think that it pertains to the

11  challenges that the security system, security people, staff at

12  this Company are faced with in terms of dealing with the Union.

13  And I think it's background that would be supportive of their

14  taking steps, on one hand to ensure that employees are allowed

15  to engage in this conduct as per Company policy, but that

16  conduct by strangers who have no business to transact with

17  Tesla is damaging to the Company's business and disruptive of

18  its business --

19      MS. FEINBERG:  This is a speech, Your Honor.  This has

20  nothing to do with this witness.

21      MR. ROSS:  Well --

22      MS. FEINBERG:  There's been so much speechifying today that

23  my head's ready to explode.

24      MR. ROSS:  Well, let me --

25      MS. FEINBERG:  This is --



www.escribers.net | 800-257-0885

1    MR. ROSS:  -- keep it on.  Maybe --

2    MS. FEINBERG:  Every question can't be an argument.  Either

3    with -- you know, anyhow.  We're never going to end this case

4    if that's how it's going to be.  This is not about --

5    JUDGE TRACY:  So I'm going to sustain the objection.

6    MR. ROSS:  Fine.

7    MS. FEINBERG:  Sorry.  And late in the day.

8    Q    BY MR. ROSS:  Okay.  Tell me about the fake badges that

9    you experienced.

10    MS. FEINBERG:  Objection.  Misstates testimony.  I think he

11    said they were invalid badges or outdated badges.  I never

12    heard him say they were fake badges.

13    MR. ROSS:  No.  Actually he used the exact phrase; fake

14    badges.

15    JUDGE TRACY:  Yes.  So --

16    Q    BY MR. ROSS:  Tell us about that, sir.

17    JUDGE TRACY:  I'll overrule the objection.  Go ahead.

18    THE WITNESS:  So the fake badges are when we've encountered

19    someone's attempted to create the appearance of a badge and use

20    it to gain access to the facility, particularly in areas when

21    there's a large rush of people coming through into the

22    facility.  But typically it's the printing of either the -- the

23    back or an attempt to make a copy of the front that's then

24    displayed in a such a way so that it gives the appearance of

25    being a badge as someone enters the facility, usually trying to

escribers

www.escribers.net | 800-257-0885

1    sneak in with a group of other employees.

2        MR. ROSS:  I see.  Okay.  That's all I have.  Thank you.

3        MR. RODRIGUEZ RITCHIE:  I have --

4        MS. FEINBERG:  I --

5        MR. RODRIGUEZ RITCHIE:  -- some redirect (sic).

6        MS. FEINBERG:  Oh, you mean --

7        MR. RODRIGUEZ RITCHIE:  Or recross.  Excuse me.

8        JUDGE TRACY:  Recross.  Go ahead, please.

9                    **RECROSS-EXAMINATION**

10   Q    BY MR. RODRIGUEZ RITCHIE:  You testified on redirect about

11   a system called the Lenel System.  Can you spell that?

12   A    Yes.  It's L-E-N-E-L.

13   Q    Okay.  And that was the system that's used for verifying

14   someone's badge?

15   A    It's the access control system, yes.  It's what the

16   control room typically uses to confirm that a badge is active

17   and belongs to an employee and who it says they are.

18   Q    February the 10th, 2017, once someone is badge -- once an

19   employee's badge is verified, it's correct that the practice

20   wouldn't be to tell the employee to leave the premises?

21       MR. ROSS:  I couldn't hear the question.  I'm sorry.  Is --

22   Q    BY MR. RODRIGUEZ RITCHIE:  On February the 10th, 2017, it

23   would be correct to say that once an employee's badge is

24   verified, the practice at Tesla Fremont would not be to tell

25   the employee to leave the premises; is that right?



1    A    The correct policy is once they're confirmed to be an

2    active employee, they should be allowed as long as they are

3    doing so in a -- a safe manner and not unsafe or in work

4    environment, i.e., following the Company policy.

5    Q    Now, you also just testified about fake badges.  I want

6    you to take a look at Respondent's Exhibit 23.

7    A    Okay.

8    Q    It's a CAD incident report for May 24th, 2017?

9    A    Yes.

10   Q    There's no mention on this report about any fake badges

11   being used on that date?

12        MR. ROSS:  We'll stipulate --

13        MR. RODRIGUEZ RITCHIE:  All right.

14        MR. ROSS:  -- to that.

15        THE WITNESS:  So you're asking is there anything to

16   indicate a fake badge was in use?

17        MR. RODRIGUEZ RITCHIE:  Right.  On May 24th, 2017.

18        THE WITNESS:  There's nothing in that report to indicate

19   that there was a fake badge.

20   Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  I want you to take a

21   look at Respondent's Exhibit 22.  It's CAD incident report for

22   February 10, 2017, right?

23   A    Correct.

24   Q    There's nothing on this report to indicate that fake

25   badges were used on that date, correct?



www.escribers.net | 800-257-0885

1   A   Not in this report.

2   Q   Okay.  And I want you to look at Respondent's 24, a CAD

3   report for May 24th, 2017.

4   A   Yes.

5   Q   There's nothing to -- in this report to indicate that fake

6   badges were used on May 24, 2017 by these employees, correct?

7   A   No, there was no record.

8       MR. RODRIGUEZ RITCHIE:  Okay.  Nothing further.

9       JUDGE TRACY:  Okay.  Ms. --

10      MS. FEINBERG:  Just --

11      JUDGE TRACY:  -- Feinberg?

12      MS. FEINBERG:  Yeah, I have a couple because --

13                      **RECROSS-EXAMINATION**

14  Q   BY MS. FEINBERG:  I had asked you earlier that if they

15  took -- some -- if a guard took a photo, whether it would be

16  preserved.  And then I heard Mr. Ross say that -- in response

17  to answering Mr. Ross' question, you said there might be an

18  occasion where someone actually sends the photo to the control

19  center.  If the photo is sent to the control center, would it

20  be recorded on the CAD incident report?

21  A   Not necessarily.

22  Q   So would it be maintained somehow?

23  A   Again, not necessarily.  Photos are usually only saved and

24  maintained in the CAD system in the event that the incident

25  needs to be escalated further.  And evidently they didn't need



1    to be escalated any further, if there were any photos for this.

2    Q   So -- because I -- are they -- is there a way to text them

3    in or email them in, or how do they get -- if they were going

4    to send any documentation, how does the information get from

5    the security guard to the control center?

6    A   It would be somewhere speculation, but the ways that I

7    have seen in the past --

8    Q   Yeah.

9    A   -- has been just sending it as a text or, in some cases,

10   they may email if they're set up with email on their cell

11   phone.

12   Q   And I have one more question about Respondent's

13   Exhibit 22.  It says, the incident type.  At the top, it says

14   trespass, and --

15   A   Yes.

16   Q   -- then at the bottom it says, change info to trespass?

17       MR. ROSS:  Which -- I apologize, Margo.  Which document --

18       MS. FEINBERG:  Respondent's 22.

19       MR. ROSS:  22?

20       MS. FEINBERG:  Um-hum.

21       MR. ROSS:  Thank you.

22       THE WITNESS:  Yes.

23   Q   BY MS. FEINBERG:  And do you know why -- well, do we even

24   know who these people -- who the -- who was involved in handing

25   out these flyers on February 10th in -- as reported in this


www.escribers.net | 800-257-0885

1  document, R-22?

2  A    In this incident, it doesn't indicate whether they were

3  all confirmed to be employees or not.

4  Q    Okay.  And why would it have been changed?  What does it

5  mean when it says it was changed from info to trespass?

6  A    So the incident type, just in terms of recordkeeping and

7  tracking of that.  The system, again, it has a number of fields

8  where the operators have a choice on what to set, but only the

9  choices that are offered by the system.

10 Q    So this officer determined that the two people outside of

11 door two were trespassing; is that correct?

12     MR. ROSS:  I couldn't hear the question.  I'm sorry.

13 Q    BY MS. FEINBERG:  This officer determined that the two

14 people handing out flyers outside door two on February 10th,

15 2017, somewhere around 4:26, were trespassing?

16 A    May I make a correction?

17 Q    Sure.

18 A    Okay.

19 Q    That -- you're supposed to answer the question.  So yes --

20 A    The --

21 Q    -- of course.

22 A    The incident doesn't specify that there were only two

23 people involved in this.

24 Q    Oh, I'm sorry.  There are two people outside door two.  I

25 put the 2 in the wrong place.  That there are people outside



www.escribers.net | 800-257-0885

1    door two?  So excuse me.

2    A    Correct.

3    Q    Okay.  But --

4    A    So again, this is somewhat speculation on my part, based

5    on the fact that it was changed to trespassing, I would assume

6    at least some of the people in this were not employees, but

7    that's speculation.

8    Q    I would say that is, because -- do you have any

9    information as to who those people were?

10   A    Not in this particular incident report.

11   Q    Okay.  And were the police called?

12   A    The police would only be called if they refused to leave.

13   Q    Okay.  And do you know why this particular -- why Sam Ali

14   didn't verify who the people were?

15   A    Again, that would be speculation to my part.  I can

16   speculate, but it is speculation.

17   Q    Okay.  So you don't really have any firsthand knowledge of

18   this incident?

19   A    Of that particular incident, no.  Again, I was not

20   physically present.

21   Q    Okay.  One moment.  I'm -- you were saying that people who

22   were on site -- you were making a determination that it was

23   private property.  But isn't there a showroom on site, on the

24   Tesla premises inside the gates?  You can drive through and

25   see -- to go to a showroom?



www.escribers.net | 800-257-0885

1    A    So there is a showroom --

2    Q    Um-hum.

3    A    -- and those people coming in for the activity are

4    specifically directed there by security staff.  If those people

5    are found wandering elsewhere on the premises even though they

6    are not necessarily inside the building but are still on the

7    property, again, they're directed to go either to the showroom,

8    if that's what they are here for, i.e., business with Tesla --

9    Q    Um-hum.

10    A    -- or they're asked to leave if they are simply loitering.

11    Q    Okay.  But they are members of the public who can drive

12    onto the premises to go to the showroom?  You don't need any --

13    A    I --

14    Q    Do you have to show anything?

15    A    I'm not 100 percent sure on that.  My understanding is

16    that the showroom was typically appointment invitation,

17    usually, especially for the tours.  They may have had people

18    show up.  But again, those people would have been directed

19    specifically to the showroom.  And again, if found elsewhere

20    outside that specific point, would have been asked to leave.

21    Q    And are there food trucks on -- inside the parking lot?

22    A    Only food trucks that are invited by Tesla.

23    Q    Okay.  And can people drop off friends or family who are

24    going to work there by driving through the parking lot and

25    looping back through?



www.escribers.net | 800-257-0885

1   A    They're allowed to drop off.  But again, if they're found

2   to be loitering, they will be asked to leave.

3   Q    Okay.  Thank you.

4        JUDGE TRACY:  All right.  Thank you very much.  Please

5   don't discuss your testimony --

6        THE WITNESS:  Yep.

7        JUDGE TRACY:  -- with anyone until after the close of the

8   hearing.  You can leave the documents right there.  Thank you.

9        THE WITNESS:  Thank you.

10       JUDGE TRACY:  Okay.  Let's --

11       MS. FEINBERG:  Thank you.

12       JUDGE TRACY:  Have you guys come up with anything with

13  regards to the stipulation?

14       MR. RODRIGUEZ RITCHIE:  Which one?

15       JUDGE TRACY:  You had -- or there was some discussion still

16  of General Counsel's Exhibit 72.

17       MR. GARBER:  We have not.  We haven't come to an agreement.

18  Keahn -- Mr. Morris sent me an email.  I think there's some

19  confidentiality concerns related to it.  But I'll discuss that

20  with him.

21       JUDGE TRACY:  Okay.  And 62 we still haven't gotten in?

22  General Counsel's --

23       MR. GARBER:  62?

24       JUDGE TRACY:  Is that right?  Or did we?  I can't --

25       MR. RODRIGUEZ RITCHIE:  You know, I think that's right.


www.escribers.net | 800-257-0885

1    MR. GARBER:  62?

2    MR. RODRIGUEZ RITCHIE:  62.

3    MR. GARBER:  62 is not in, that's correct.

4    MR. RODRIGUEZ RITCHIE:  That's correct.

5    JUDGE TRACY:  You're going to get it through somebody else,

6    right?

7    MR. RODRIGUEZ RITCHIE:  I'm not sure yet.  I would move

8    to --

9    JUDGE TRACY:  Okay.

10   MR. RODRIGUEZ RITCHIE:  -- admit it.

11   JUDGE TRACY:  And then in terms of the replacement

12   documents, would you be able to provide those tomorrow -- by

13   tomorrow so that --

14   MR. ROSS:  I --

15   JUDGE TRACY:  -- way --

16   MR. ROSS:  -- would hope so.  If not, first thing on the

17   9th we'll have replacements.

18   JUDGE TRACY:  Well, the problem is going to be with the

19   transcript.  So I'd rather have a blank space in the transcript

20   instead of putting in these --

21   MR. ROSS:  Yeah.

22   JUDGE TRACY:  -- ones that are incorrect.  Sign of like

23   what happened last time where --

24   MR. ROSS:  Yeah.

25   JUDGE TRACY:  -- we needed to redact the documents and we



www.escribers.net | 800-257-0885

1    put in --

2        MR. ROSS:  The problem is it's very late in the day and --

3    what I may be able to do is ask Jeremie to -- when he goes to

4    the plant, I presume, tomorrow morning, to make copies and

5    email them to me, and we'll print them out here and put them in

6    the record.

7        JUDGE TRACY:  Okay.

8        MR. RODRIGUEZ RITCHIE:  There's also the other -- the map

9    exhibit that we --

10       JUDGE TRACY:  Yeah.  Right.

11       MR. RODRIGUEZ RITCHIE:  -- need to clean --

12       JUDGE TRACY:  Right.  We need the copy of that, too.

13       MR. MORRIS:  Yeah.  Would it be possible to bring that with

14   me and bring a copy tomorrow?

15       JUDGE TRACY:  That's fine.

16       MR. MORRIS:  Okay.

17       JUDGE TRACY:  That was what?  I'm just writing my notes so

18   I don't forget.  That was 16, R-16.  Okay.

19       Okay.  And we're still on the record actually.

20       MS. FEINBERG:  Oh, I was trying to avoid having to bring

21   you back into one more discovery thing, so.

22       JUDGE TRACY:  That's fine.  Please don't.

23       MS. FEINBERG:  Okay, then we don't need -- okay.  That's --

24   all right then.  See, it was worth it.

25       JUDGE TRACY:  Okay.  Clearly now it's 4:50.



www.escribers.net | 800-257-0885

1       You have to leave by 5:00, no later, or 5:15 really?

2       MR. GARBER:   How -- my understanding is Arnold's is a very

3   discreet issue.  How long do you think?

4       MR. MORRIS:  What's that?

5       MS. FEINBERG:  My understanding is that Arnold will -- is a

6   fairly discreet issue.  How long would you anticipate his

7   direct to be?

8       MR. MORRIS:  15, 20 minutes.

9       JUDGE TRACY:  He can't come back at all tomorrow --

10      MR. MORRIS:  No.

11      JUDGE TRACY:  -- just for a little bit?

12      MR. MORRIS:  I don't believe so.  I mean, it's no issue for

13  us to bring him back the other week --

14      MR. GARBER:  Yeah.

15      MS. FEINBERG:  Okay.

16      MR. MORRIS:  -- if it's going to accommodate your schedule.

17      JUDGE TRACY:  You can't be late?

18      MR. GARBER:  Yeah, I mean -- yeah, my wife's working, so --

19      JUDGE TRACY:  Okay.

20      MR. GARBER:  Yeah.

21      JUDGE TRACY:  So -- and then the other witness is a longer

22  one.  I'll be honest, I'm tired.  This has been a long week.

23      MR. ROSS:  Really?

24      JUDGE TRACY:  I'd rather just start back at 9 tomorrow --

25      MR. MORRIS:  Let's start fresh.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  -- with our lengthier guy.

2    MS. FEINBERG:  Okay.

3    JUDGE TRACY:  I mean, I feel bad that they've been waiting,

4    but this is just what happens.

5    MR. ROSS:  Well, we'll tell them --

6    JUDGE TRACY:  It's 4:50, and I -- and I've tried every day

7    this week to sort of end around 5:00 because, like I said, it's

8    a marathon.

9    How many more witnesses do you have?  So let -- we just

10   sort of have to recap.  We have the two.  And now --

11   MR. MORRIS:  Yeah.

12   JUDGE TRACY:  Yeah, two for the General Counsel.  Let's

13   just assume we have the expert and this other individual.

14   MS. FEINBERG:  Yep.

15   JUDGE TRACY:  And then for you all, we have the two -- the

16   other two that were supposed to be today.  And how many more

17   witnesses do you have?

18   MR. ROSS:  Quite a number.  I can't give you a definitive

19   count.  If you'd let me tell you tomorrow morning, I'll be

20   happy to tell you tomorrow morning.

21   JUDGE TRACY:  Well, I'm just trying to figure out -- yeah,

22   I'm just trying to figure out -- like I really hope that we can

23   end the next week after, but I don't know.

24   MR. ROSS:  Well, that's our hope, too.

25   JUDGE TRACY:  Okay.


www.escribers.net | 800-257-0885

1      MR. ROSS:  I don't --

2      JUDGE TRACY:  But if you come back and say I have 20

3  witnesses, and I'm like, yeah, no, we're not going to be able

4  to do it.  But --

5      MR. ROSS:  Well, believe me, we want to move this thing

6  badly.

7      JUDGE TRACY:  Okay.

8      MR. ROSS:  Worse than you do.

9      JUDGE TRACY:  Okay.  Because you also have people who keep

10  leaving, no offense, but it's like you need to capture them

11  before they go.  So --

12      MR. ROSS:  That's General Counsel's theory.  They're just

13  going to keep litigating this case until we have nobody left at

14  all.

15      JUDGE TRACY:  Well, you know -- hey, it is --

16      UNIDENTIFIED SPEAKER:  Just hold onto your --

17      JUDGE TRACY:  -- what it is.  That means it's a good market

18  around here.  And you know, that's what happens tech -- you

19  know, tech companies kind of, I hear, people who move around.

20      Anyway.  Yes?  Do you want to say something?

21      MR. RODRIGUEZ RITCHIE:  I was just going to say if we have

22  an estimate tomorrow morning of a substantial number of

23  witnesses, it might be a good idea then to bring -- everybody

24  bring their calendars --

25      JUDGE TRACY:  Oh, yeah, yeah, yeah.



www.escribers.net | 800-257-0885

1       MR. RODRIGUEZ RITCHIE:  -- so that way --

2       MR. ROSS:  Let me ask you this Edris:  In terms of the good

3   doctor, is it Wallsten?

4       MR. RODRIGUEZ RITCHIE:  Um-hum.

5       MS. FEINBERG:  Um-hum.

6       MR. ROSS:  How long do you think his direct's going to be?

7       UNIDENTIFIED SPEAKER:  Well, I thought we're --

8       MR. GARBER:  Yeah.  Jay and I are trying to -- are we on

9   the record still?

10      THE COURT REPORTER:  Yeah.

11      JUDGE TRACY:  Yes, but we can go off the record.

12      Let's go off the record.

13      **(Whereupon, the hearing in the above-entitled matter was**

14      **recessed at 4:51 p.m. until Friday, September 28, 2018 at 9:00**

15      **a.m.)**

16

17

18

19

20

21

22

23

24

25

escribers
www.escribers.net | 800-257-0885

1    **C E R T I F I C A T I O N**

2    This is to certify that the attached proceedings before the

3    National Labor Relations Board (NLRB), Region 32, Case Numbers

4    32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-

5    200530, 32-CA-208614, 32-CA-210879, 32-CA-220777 Tesla, Inc.,

6    and Michael Sanchez, and Jonathan Galescu, and Richard Ortiz

7    and International Union, United Automobile, Aerospace and

8    Agricultural Workers of America, AFL-CIO at National Labor

9    Relations Board Region 32, 1301 Clay Street, Suite 300N,

10   Oakland, CA 94612-5224, on Thursday, September 27, 2018, 9:11

11   a.m. was held according to the record, and that this is the

12   original, complete, and true and accurate transcript that has

13   been compared to the reporting or recording, accomplished at

14   the hearing, that the exhibit files have been checked for

15   completeness and no exhibits received in evidence or in the

16   rejected exhibit files are missing.

17

18

19                        _Deborah Gonzalez_

20                        DEBORAH GONZALEZ

21                        Official Reporter

22

23

24

25



www.escribers.net | 800-257-0885

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 32

In the Matter of:

| | |
|---|---|
| Tesla, Inc., | Case Nos.  32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| Michael Sanchez, an individual, | 32-CA-200530 |
| | 32-CA-208614 |
| and | 32-CA-210879 |
| | 32-CA-220777 |
| Jonathan Galescu, an individual, | |
| | |
| and | |
| | |
| Richard Ortiz, an individual, | |
| | |
| and | |
| | |
| International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO, | |
| | |
| Charging Party, | |

_____


_____


Place: Oakland, California

Dates: September 28, 2018

Pages: 1566 through 1767

Volume: 9

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885

22-60493.1586



www.escribers.net | 800-257-0885

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 32**

| | |
|---|---|
| In the Matter of: | |
| TESLA, INC., | Case Nos.  32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| INTERNATIONAL UNION, UNITED | 32-CA-200530 |
| AUTOMOBILE, AEROSPACE AND | 32-CA-208614 |
| AGRICULTURAL IMPLEMENT WORKERS | 32-CA-210879 |
| OF AMERICA, AFL-CIO, | 32-CA-220777 |
| and | |
| MICHAEL SANCHEZ, AN INDIVIDUAL, | |
| and | |
| JONATHAN GALESCU, AN INDIVIDUAL, | |
| and | |
| RICHARD ORTIZ, AN INDIVIDUAL. | |

The above-entitled matter came on for hearing, pursuant to notice, before **AMITA BAMAN TRACY**, Administrative Law Judge, at the National Labor Relations Board Region 32, 1301 Clay Street, Suite 300N, Oakland, CA 94612-5224, on **Friday, September 28, 2018, 9:17 a.m.**

www.escribers.net | 800-257-0885

1           <u>A P P E A R A N C E S</u>

2      **On behalf of the General Counsel:**

3           **EDRIS W.I. RODRIGUEZ RITCHIE, ESQ.**
           **NOAH J. GARBER, ESQ.**
4           National Labor Relations Board
           1301 Clay Street, Suite 300N
5           Oakland, CA 94612-5224
           Tel. 510-671-3021
6
       **On behalf of the Respondent:**
7
           **MARK S. ROSS, ESQ.**
8           **KEAHN N. MORRIS, ESQ.**
           SHEPPARD MULLIN RICHTER & HAMPTON LLP
9           Four Embarcadero Center
           Seventeenth Floor
10          San Francisco, CA 94111-4109
           Tel. 415-434-9100
11          Fax. 415-434-3947

12     **On behalf of the Charging Parties:**

13          **MARGO A. FEINBERG, ESQ.**
           **DANIEL E. CURRY, ESQ.**
14          **JULIE S. ALARCON, ESQ.**
           SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
15          6300 Wilshire Boulevard, Suite 2000
           Los Angeles, CA 90048
16          Tel. 323-655-4700

17

18

19

20

21

22

23

24

25



1

<u>I N D E X</u>

2

3

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------|--------|-------|----------|---------|-----------|
| Kyle Martin | 1591 | 1639 1650 | 1673 | | 1606/161 1628 |
| Matt Lee | 1676 | 1688 | | | |
| David Rios | 1695 | 1744 | 1754 | | |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



www.escribers.net | 800-257-0885

1

**E X H I B I T S**

2

3    **EXHIBIT**                                    **IDENTIFIED**      **IN EVIDENCE**

4    **General Counsel:**

5       GC-77                                        1673              1673

6    **Respondent:**

7       R-16                                         1675              1675

8       R-22                                         1692              1692

9       R-23                                         1692              1692

10      R-24                                         1692              1692

11      R-27                                         1603              1607

12      R-28                                         1608              1621

13      R-29                                         1622              1626

14      R-30                                         1626              1630

15      R-31                                         1630              1637

16      R-32                                         1681              1681

17      R-33                                         1705              1705

18      R-34                                         1734              1734

19   **Charging Party:**

20      CP-2                                         1663              1671

21

22

23

24

25

eScribers

www.escribers.net  |  800-257-0885

1      <u>P R O C E E D I N G S</u>

2      JUDGE TRACY:  Okay.  So prior to going on the record, we

3      had some discussions about the next week that we've already

4      scheduled for hearing, the week of October 9th.  It's a

5      four-day week.  According to Respondent you believe that you

6      have another dozen witnesses or so?

7      MR. ROSS:  Right.

8      JUDGE TRACY:  Okay.  And I will say, if I start seeing

9      some duplication, I'm going to cut some of it off, you know?

10     MR. ROSS:  That's fine.

11     JUDGE TRACY:  They need to be testifying about different

12     things.  There is this concern about the expert witness who we

13     have scheduled to appear on October 11th.  Of course, the

14     Respondent has a copy of the individual CV.  However, during

15     off the record discussions, Mr. Ross indicated that in terms of

16     preparation for this witness, although on the record, we put

17     what the expert would be asked, what his opinions would be,

18     what you all would ask what his opinion is, Respondent does not

19     know what that opinion will be.

20     Which, if you know, the other day, what we spoke about was

21     my thoughts, which were that you do have every right to obtain

22     an expert; however, this expert may be a valid expert for

23     Respondent as well.  I don't know.  But I had also indicated

24     that, I'm trying to remember, but that if you decide that

25     you're going to call another expert, we need to know who that



www.escribers.net | 800-257-0885

1    expert is, and have a date set by October 11th and 12th of that

2    week, whatever that Friday is of the end of the week.  So that

3    way, we know that if we need to come back, it would be just for

4    the limited purpose of the expert, and then, of course, the

5    rebuttal testimony, if there's any of that.

6        I'm hoping to avoid it all because the parties have also

7    been talking about any stipulations.  But if there aren't any

8    stipulations, I would agree that although this doctor has not

9    rendered a report, which is what we've asked, there is an

10   opinion that he's going to be offering.  And the Respondent

11   should know what that opinion is.

12       And so, because all this is going to do is just delay this

13   case even more and more and more if we're just -- you all are

14   not just upfront with them.  So they can prepare for the

15   cross-examination.  Some of the, also, portions of his

16   testimony that I didn't -- that, obviously, we've not heard

17   from him, but some of that also can be obtained not through an

18   expert but just through some other documentation about the way

19   that Twitter functions.

20       I had also said, you know, take a look at some court cases

21   and other similar matters, not in this forum, NLRB, but there

22   are district court.  There are other bodies who have addressed

23   Twitter.  You might find a lot of information that way as well.

24       So I'm assuming, Mr. Garber, that you know what the

25   opinion is of this doctor?


22-60493.1592

1    MR. GARBER:  Yes, and -- well, first of all, Mr. Sharma

2    and I have been in discussions, and we've talked about exhibits

3    that'll be used and there's some language in the works that's

4    being looked at right now by people within the region, and

5    we'll include the Union in that conversation.  I think we went

6    over, I thought a great deal, that the witness would testify to

7    and his opinions last time on the record.

8        As to requiring an affidavit from him, if there's

9    something specific that Respondent can cite to with regard to

10   the Daubert principles, then I'm more than happy to look at it.

11   I don't know that it's specifically applicable to an NLRB

12   proceeding, but I will look at it and we will act accordingly.

13       JUDGE TRACY:  So normally in these proceedings, okay, in

14   all the other big cases, McDonalds, et cetera, McDonalds,

15   right, they wanted -- the Respondent wanted to use an expert,

16   and the General Counsel pushed back.  In all of these

17   instances, there are generally reports, or notice of intent, of

18   what the witness will be testifying about.  You've already said

19   what you're going to be asking.

20       But it's also going to be in any typical report, or some

21   sort of document that's created, what that opinion is.  I guess

22   I don't understand.  We are too late in this process to just

23   keep playing around and not being upfront with them.  I'm tired

24   of it, because at some point I could just say, I don't need an

25   expert.  Denied.

escribers
www.escribers.net | 800-257-0885

1     So I'm telling you that you need to either come up with a

2     stipulation, or by next week, you need to give them some

3     documentation of what the witness will be testifying about.

4     Not just about, but also what his opinion will be.

5          MR. GARBER:  Okay.

6          JUDGE TRACY:  And so --

7          MR. ROSS:  And, Your Honor --

8          JUDGE TRACY:  -- I would say that if you consider this to

9     be Friday, by next Wednesday.  And then, once you have that,

10    Mr. Ross, if it comes to that, then you need to quickly find

11    somebody else, or use this guy.  I don't know.  I --

12         MR. ROSS:  Well, I'll do what I can, Judge, I promise you

13    that.

14         JUDGE TRACY:  Yeah.

15         MR. ROSS:  I have no interest in going beyond the 12th in

16    this case.  Zero.  If I may, I would ask not only to know what

17    the witness' opinions will be that he'll testify to, or he'll

18    offer from the witness stand, but I'm also asking to know the

19    facts upon which he's basing the opinion.  Because, again, in

20    those cases where you use experts, typically, in a court

21    setting, there are procedures for how one goes about designated

22    experts.

23         People are afforded discovery which we don't have in these

24    proceedings of what a -- of experts.  So in order for me to

25    have a fair shot at effectively cross-examining this man, I



www.escribers.net | 800-257-0885

1    need not only to know what his opinion is, but I also need to

2    know the basis for those opinions, the factual bases for.  So I

3    would ask that I be provided that information by next Wednesday

4    as well.

5        MS. FEINBERG:  Your Honor, could I address this?  I've

6    been in many administrative proceedings.  Most of my career is

7    about administrative proceedings though I practice before the

8    federal bench.  In administrative proceedings what Mr. Ross is

9    talking about does not happen.  I have cross-examined many

10   expert witnesses who the other side has called.  I've been

11   given the CV.  I do my research.  I read their papers.  I

12   cross-examine the witness.

13       So this -- I don't think that there's a legal basis for

14   him injecting some kind of federal court standard which

15   involves discovery and that whole process of depositions and

16   the like into this proceeding.  So and I should say, from my

17   understanding of what this witness is, the whole point was,

18   actually in some ways, as a courtesy to the judge, and to the

19   NLRB, that there be a foundation of information so it's not --

20   people aren't just guessing about how Twitter works.

21       Not trying to be disrespectful, but to have a foundation

22   of information.  So it's not as much about opinion, about did

23   so-and-so do this, or this person's going to earn so much money

24   like an expert -- like an economic expert witness.  It's to

25   give information about how this process works.  And in this

escribers

www.escribers.net | 800-257-0885

1    case, true also, how this particular CEO uses Twitter, or has

2    used Twitter.

3        But it's being painted, sort of, in a different way.  I

4    think the whole point was just to educate you in that -- you

5    and the NLRB, and I know you're saying that there may be other

6    cases out there.  But as far as we know, there aren't other

7    NLRB cases out there, and that we feel it's, well, right?

8        JUDGE TRACY:  I mean there aren't, but the NLRB is not

9    just a single body.  Can look at --

10       MS. FEINBERG:  No, it isn't.  Yes, it can but --

11       JUDGE TRACY:  -- other sources.

12       MS. FEINBERG:  -- there aren't -- Twitter is a very new

13   concept.  There isn't a lot out there.  We've looked.  And so

14   we're trying to be responsible to make sure that all the

15   information is in the record.  And I think -- and it's not just

16   about what you know, because I'm not saying you might -- you

17   may have a lot of knowledge about it, but it's about what's in

18   the record.  And, ultimately, what the board, because I have a

19   sense about this case, this case isn't going to end here, will

20   have when it's making its decisions, what will be in the

21   record.

22       JUDGE TRACY:  Right.

23       MS. FEINBERG:  And so we have to have some -- I understand

24   you're saying maybe we could look to some treatises or some

25   other material, but it seems to me there has to be something in



www.escribers.net | 800-257-0885

1  the record that gives us some understanding.  Because I can

2  just say that from the questioning that's happened, there isn't

3  an understanding.  The questions that have been asked show a

4  lack of understanding, or an understanding and then an effort

5  to obscure what -- how Twitter works, one way or the other.

6  The questions don't reflect how Twitter works.

7       JUDGE TRACY:  Uh-huh.

8       MS. FEINBERG:  Questions about replies, questions about

9  postings, questions about a lot of things just don't match how

10  it works, or how I understand it works.  And that's why you

11  already heard him say we helped retain him.  We felt that it

12  was necessary for the Court to just have some basic

13  information.  We're not trying -- that's it.  It's not -- that

14  was the idea that you would have some information, and the

15  board would ultimately have some information, because it is a

16  new social media relatively.

17       Anyhow, just wanted to say that, it's not -- there's no

18  trick involved.  It actually was meant to be a courtesy from

19  our perspective to provide it.

20       JUDGE TRACY:  So but let me ask you, though, I mean the --

21  he's not just testifying about how Twitter works and how

22  replies work.  You're also asking his opinion about who sees

23  the post.  I mean, it's more than just a mechanical --

24       MS. FEINBERG:  Uh-huh.  Yes.

25       JUDGE TRACY:  -- like this is Twitter.  Here's how it



www.escribers.net | 800-257-0885

1    works, which is why I said if that's all you need him for,

2    there has got to be something where I can take judicial notice

3    of Twitter.  I mean, I likened it to Facebook.  I don't think

4    the board has ever been educated with an expert witness on

5    Facebook.

6         MS. FEINBERG:  Well --

7         JUDGE TRACY:  I'm not saying that it doesn't have to be

8    done here, but what I'm saying is that, you know, there are

9    certain things, email systems, has the board ever had an expert

10   about email?  I don't know.

11        MS. FEINBERG:  Maybe they did, or maybe the person -- they

12   had a technology person from the employer who was involved to

13   explain those systems.  I can't speak to that, but I can also

14   say that I watch the senate hearings on Facebook.  And I'll

15   tell you that a lot of people don't know how it works.

16        So and so, I'm not going to assume that the board knows

17   how any of these things work, no disrespect to them.  I'm

18   trying to be -- we're trying to be respectful to them so that

19   they have the materials that they need.  And with -- and maybe

20   how many posts someone has and where it disseminates and all

21   that stuff, yes, there is an opinion about that because you

22   have to understand that, but an expert can understand the

23   stream of where those things could wind up, or should wind up.

24        JUDGE TRACY:  And so the other courtesy, though, that is

25   offered to the judge is the notice of intention of using an



www.escribers.net | 800-257-0885

1   expert.  What they would be testifying about, what is the basis

2   for their testimony, and why it's actually needed.

3        MS. FEINBERG:  Okay.

4        JUDGE TRACY:  I was never given that here.

5        MS. FEINBERG:  Okay.  Well --

6        JUDGE TRACY:  You all just sprung this guy on me, and on

7   the Respondent.  And so now we're trying to quickly address

8   this.

9        MS. FEINBERG:  Okay.

10       JUDGE TRACY:  So I'm allowing you to have the expert based

11  upon just basically what you've told me, and I'm asking you to

12  be transparent with the Respondent about what he's going to

13  testify about, what he's going to say, what he's relying upon.

14  If he's just relying upon his knowledge based upon his studies,

15  his -- then that's what he's relying upon.  I mean --

16       MS. FEINBERG:  Uh-huh.

17       JUDGE TRACY:  -- you know, I am imagining he has this

18  wealth of knowledge because he studied it, he's taught the

19  classes.  He's familiar with the platform, and so he's going to

20  testify about that.  And that's all it is, because what's going

21  to happen, I can see it now, that they're going to come back

22  and say, hmm, okay.  Well, now we need time to prepare.  So now

23  we need more time.

24       Now we need time to get an expert.  And again, you know, I

25  also have an interest, and it's my duty to ensure that the



www.escribers.net | 800-257-0885

1   record contains exactly what it needs, and it doesn't take any

2   longer than it has to.  Because I imagine the record will

3   close, then you'll have briefs.  You're going to do the briefs

4   in 35 days?  I doubt it.

5       And so then you're looking at a decision that is getting

6   delayed and delayed.  And so that's all I'm saying.  So if

7   that's what they need to feel that they can proceed -- because

8   part of it is not just educating me and the board.  It sounds

9   like you want to educate the Respondent.

10      MS. FEINBERG:  Sure.

11      JUDGE TRACY:  Sure.  So give them the info so they can

12  prepare.

13      MS. FEINBERG:  Okay.  Okay.

14      JUDGE TRACY:  So but aside from all of that, I'm also

15  hoping that the stipulation will address a lot of these issues.

16  And so I mean, yes, I'm not going to ask you to step in, but I

17  wanted to know from Mr. Garber how is that going, I guess?  You

18  explained where you're at.

19      MR. GARBER:  Right.

20      JUDGE TRACY:  So now do you all feel that you can get this

21  done quickly?

22      MR. GARBER:  You've asked Wednesday.  We'll have something

23  Wednesday one way or another.

24      MR. ROSS:  You'll have something when?  I'm sorry?

25      MR. GARBER:  Wednesday.  The judge asked for Wednesday.



www.escribers.net | 800-257-0885

1    Wednesday is when we will have something, one way or another.

2        MR. SHARMA:  We can get a draft of --

3        MR. GARBER:  Yeah.  Yes, we --

4        MR. SHARMA:  -- over the weekend that'd be great.

5        MR. GARBER:  Yeah.  You'll have something today.

6        MR. SHARMA:  That'd be great.

7        MR. GARBER:  Everyone will have, and so will the Union if

8    subject to approval by the regional director.

9        JUDGE TRACY:  Anything else?

10       MR. ROSS:  No, ma'am.

11       JUDGE TRACY:  Okay.  But also be clear that if you decide

12   that you're going to have an expert, be upfront.  Give them the

13   notice of expert.

14       MR. ROSS:  What's good for the goose is good --

15       JUDGE TRACY:  When the expert -- yes.

16       MR. ROSS:  -- for the gander, Judge.

17       JUDGE TRACY:  What they're going to testify about, et

18   cetera.  Okay?

19       MR. ROSS:  Got it.

20       MR. RODRIGUEZ RITCHIE:  What they're going to opine upon.

21       JUDGE TRACY:  What's that?

22       MR. RODRIGUEZ RITCHIE:  What they're going to opine upon.

23       JUDGE TRACY:  What it's based upon, exactly what I've

24   ordered them to do --

25       MR. RODRIGUEZ RITCHIE:  What it's going to be based upon,

www.escribers.net | 800-257-0885

1    their CV --

2    JUDGE TRACY:  -- you do the same.  Okay?

3    MR. ROSS:  Yep.

4    MR. RODRIGUEZ RITCHIE:  Well, in light of also something

5    that was said off the record, the 12 additional witnesses, I

6    just want to make sure that we're prepared to finish the -- on

7    the 12th and if not then I'd like --

8    MR. ROSS:  Finish what?  I'm sorry.

9    MR. RODRIGUEZ RITCHIE:  -- us to schedule some additional

10   dates now to have them held.

11   JUDGE TRACY:  Yeah.

12   MR. RODRIGUEZ RITCHIE:  I don't know if we want to go off

13   the record to do that?

14   JUDGE TRACY:  Well, we -- okay.  So I hope everybody has

15   their calendar.  Let's take a look at the calendars and during

16   the break, go ahead and tell me what weeks you're available.

17   MR. ROSS:  Is this something we deal with now, Judge, or

18   shouldn't we deal with it during the next break?

19   JUDGE TRACY:  We can deal with it during the next break.

20   MR. ROSS:  Okay.

21   JUDGE TRACY:  Like I'm looking at the week of October

22   29th, the week of November 5th, November 13th, I mean, I can do

23   any of those weeks just not the week of the 22nd.  They kindly

24   didn't assign me any cases because they said this one is so

25   big.  But I'm like might not still be done.  So take a look at



www.escribers.net | 800-257-0885

1     your calendars about that.

2          And then, as we said before, we're still working on the

3     exhibits.  They're looking for 22 through 24.  We're going to

4     get a color copy of R-16-2.  Formal papers you can do next with

5     just the addition of the one document, although this is why I

6     said wait till next time because then you will need to put in

7     this thing that you create, if needed, Wednesday.

8          If it's a stipulation, it's a stipulation.

9          MR. GARBER:  Right.

10         JUDGE TRACY:  And that can just be put into the record as

11    a joint exhibit once you get to it.  So okay.  Are we ready for

12    your next witness?  Is there anything else before we actually

13    go back to the witnesses?

14         MR. ROSS:  I have nothing.

15         MR. GARBER:  No.

16         JUDGE TRACY:  No?  Ms. Feinberg, anything else?

17         MS. FEINBERG:  No.  I mean, I haven't seen the

18    stipulation, and I didn't know if it was going to say something

19    like if called blah, blah, blah.  Because, if so, we would, of

20    course, need the time to have the expert look at it to see if

21    that was accurate or not.  So I don't know what it is.  So I'm

22    just saying just in terms of the timeframe.  We'll reach out to

23    him and see if he's available early in the week if that's

24    what's going to be necessary.

25         JUDGE TRACY:  Okay.


www.escribers.net | 800-257-0885

1    MS. FEINBERG:  I didn't know since I haven't seen it.

2    JUDGE TRACY:  Okay.

3    MS. FEINBERG:  Don't know.

4    JUDGE TRACY:  I'm sure they just need to get their first

5    step.

6    MS. FEINBERG:  No, no, I understand that.

7    JUDGE TRACY:  And so they --

8    MS. FEINBERG:  But I'm just saying there may be this extra

9    player in the mix.

10    JUDGE TRACY:  Okay.  Yeah.  And so there is nothing out

11    there to explain this platform?

12    MS. FEINBERG:  I once bought my husband Twitter for

13    Dummies, but I don't that will do it.

14    JUDGE TRACY:  There's nothing?

15    MR. RODRIGUEZ RITCHIE:  I don't believe that there's

16    anything that would be useful to us for the purposes that we

17    need it for.

18    JUDGE TRACY:  Uh-huh.

19    MR. RODRIGUEZ RITCHIE:  And for developing the record in

20    the way that it should be developed.  I think it's a little

21    confusing.  Even I've used Twitter for --

22    JUDGE TRACY:  Uh-huh.

23    MR. RODRIGUEZ RITCHIE:  -- a number of years and I still

24    find it confusing for -- particularly in terms of addressing

25    the argument that the Respondent made during the investigation

www.escribers.net | 800-257-0885

1    and during its papers.  I'm not aware of a document that would

2    address those things.

3         JUDGE TRACY:  But let me ask you, though, if the -- it

4    sounded like, from the other day, the main focus of why you

5    feel that you need an expert in this case is the Respondent's

6    argument that the post-work cured.  Is that really the real

7    reason?  Because other than that, I mean, to me it's kind of

8    like just statements that are made just like you have 8(a)(1)

9    statements made in the workplace.  This is just akin to that.

10        Is the reasoning because of their introduction of the

11   other Twitter posts making an argument that they -- that he

12   fixed what he said?  I don't know.  I mean, I don't -- you

13   know, go ahead.

14        MR. GARBER:  Yeah.  It's not so much -- he's obviously not

15   going to opine about whether what was said was, you know, cured

16   or fixed.  That's more of a legal definition.

17        JUDGE TRACY:  Okay.  Right.

18        MR. GARBER:  It's more about the universe of people who

19   saw --

20        JUDGE TRACY:  Uh-huh.

21        MR. GARBER:  -- the first tweet saw the subsequent tweets.

22        JUDGE TRACY:  Okay.

23        MR. GARBER:  Such that it could be cured even if the

24   language did cure it, if you follow what I'm saying.

25        JUDGE TRACY:  But what if they drop -- I'm not saying that



1    they will, but what if they just said, no, that's not what

2    we're arguing.

3        MR. GARBER:  There's also the issue as to how Mr. Musk

4    uses his Twitter account and how it's a de facto announcement

5    on behalf of Tesla.

6        MR. ROSS:  And I understand --

7        MR. GARBER:  Even though it's a personal account.

8        MR. ROSS:  -- and understand, Judge, if that's what he's

9    being called to testify about, he's not talked to Elon Musk.

10   He doesn't know Elon Musk.  So what you're going to have is

11   nothing more than a factually unsubstantiated rank opinion, a

12   negative opinion, as to how Elon Musk uses it.  And I don't

13   think that's a proper subject for an expert testimony because

14   an expert is supposed to have a factual basis for the opinion

15   on which he bases his opinion.

16       MS. FEINBERG:  Oh, for God's sakes.

17       JUDGE TRACY:  So here's the thing.  For some of that, I

18   don't need an expert.  I told you before there are other

19   decisions.  There are decisions about bigtime users of Twitter.

20   There are things that happened yesterday that talk about this

21   issue, okay?

22       So there are things out there.  That's what I'm trying to

23   suggest to you all that there are things out there.  And so --

24       MR. RODRIGUEZ RITCHIE:  I think in addition to that, there

25   was, as you heard, during some cross-examination of Mr. Moran,

22-60493.1606

1    questions about what it means when you put at -- when something

2    is a tweet versus a reply tweet.

3         JUDGE TRACY:  Uh-huh.

4         MR. RODRIGUEZ RITCHIE:  What it means when something is at

5    and whether that string of tweets is -- does that appear in

6    response to something --

7         JUDGE TRACY:  Yeah.

8         MR. RODRIGUEZ RITCHIE:  -- or is it an independent matter.

9    And I think those are -- would be extremely helpful to develop

10   in the record, particularly for the Board rule.

11        JUDGE TRACY:  Okay.

12        MR. RODRIGUEZ RITCHIE:  With all due respect to the board

13   members, I'm not sure that that's something that is necessarily

14   something they can take easy judicial notice of.

15        JUDGE TRACY:  Okay.  I'm just making a comment about the

16   other portion of what Mr. Ross raised which is there are Board

17   decisions, they're not Twitter, but there are Board decisions

18   about some management people making statements, and, you know,

19   companies trying to distance themselves from it.  And there are

20   Board decisions about that.  So yes, yes, this is a new way of

21   communicating, but there are things that are analogous to it.

22        I mean, that's just the nature of law, right?  All I'm

23   saying is that this has become, obviously, a hot issue that I'm

24   trying to figure out alternative ways to get at what the record

25   needs without causing, one, more time on the record, and just



www.escribers.net | 800-257-0885

1    kind of moving it along.  That's all I'm saying.

2        MS. FEINBERG:  So I would like to speak to this, Your

3    Honor.  As you know, we actually subpoenaed Elon Musk because

4    Mr. Ross is saying he's the best person to address what his

5    Twitter account means and you denied that.  Now, we made that

6    request before the consolidation of this most recent charge.

7        If you're willing to consider that, we're willing to

8    support you, but so we can't have it both ways.  The best

9    person to explain what he meant is Elon Musk, but you're not

10   allowing us to have Elon Musk.  Okay?  We've accepted that.

11       So we have to have some understanding.  And to have an

12   understanding of what his Twitters mean, you have to have an

13   understanding of what he does on Twitter.  So we -- the idea of

14   having an expert who's reviewed his Twitter account, who can

15   talk about that, otherwise if -- are they going to stipulate

16   that his entire Twitter account can come into the record?

17       The cases you're talking about regarding President Trump,

18   I hate to say that, but anyhow, regarding him, in those cases

19   involving where he was, excuse me, limiting people coming into

20   the country and the like those Twitters, they put in the whole

21   history.  There was a whole history of Twitters.  It wasn't

22   just like one isolated thing.  And they could take judicial

23   notice of him because he was the president of the United

24   States.

25       So I just feel like either we have to be able to make a



www.escribers.net | 800-257-0885

1    record one way or another, through the people who tweeted it,

2    through the Twitter record, or through an expert.  But somehow

3    or other, we should be able to make that record.  This is part

4    of the case.  The complaint was issued by the labor board about

5    it, and I heard what you said about that maybe it's no

6    different from our view.  It isn't actually any different than

7    saying it in the workplace or not.

8         But that is not what they argued.  One of the reasons that

9    we believe there's a necessity for a witness has, in part, to

10   do with what the company filed in their summary judgment papers

11   and in their motion to the pa -- because we didn't -- they are

12   arguing that he's not speaking for Tesla.  They are arguing

13   that it's just free speech.  They are arguing those things.

14        We have to be able to counter those arguments, unless you

15   think there's going to be dismissed because they are on their

16   face, which we cannot take a chance that that will happen.  So

17   we have a right to make a record to address the arguments

18   they're making.  And we are trying --

19        JUDGE TRACY:  So --

20        MS. FEINBERG:  -- to make that record in conjunction with

21   the General Counsel.  And that was what we understood the

22   General Counsel, in part, was also trying to address.

23        JUDGE TRACY:  Uh-huh, yes.  So again, let's get back to

24   the next witness, but I just have one --

25        MS. FEINBERG:  Okay.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  -- comment to make.  I didn't hear from Mr.

2    Garber that this witness is going to testify about what the

3    Twitter posts meant.

4    MS. FEINBERG:  Uh-huh.

5    JUDGE TRACY:  That is not --

6    MS. FEINBERG:  No.

7    JUDGE TRACY:  -- that's an objective standard --

8    MS. FEINBERG:  Yes.

9    JUDGE TRACY:  -- that's what I heard you say.  It's just

10   more about the functioning of how these messages are

11   transmitted et cetera.

12   MS. FEINBERG:  And how Mr. Musk uses Twitter.  I did hear

13   him say that which is different than what he says on Twi -- not

14   these particular words, how they're interpreted.

15   JUDGE TRACY:  Yeah.

16   MS. FEINBERG:  But if he's writing 1,000 times on behalf

17   of the company, the company's doing this, the company's doing

18   that, then it's harder for him to argue, or it's impossible,

19   from my perspective, for him to argue he's not speaking for

20   Tesla.  So and we did hear them argue, which I'm still

21   astounded by and I'm going to address at a different point

22   soon, but that he isn't even a decision-maker, whatever.

23       And there is a tweet here where he's tweeting about Mr.

24   Ortiz and Mr. Ortiz's dismissal.  So it seems to me we have to

25   be able to bring all these things together and what he's -- not


www.escribers.net | 800-257-0885

1    all the things he says, but what he's talking about, if he's

2    talking on behalf of the company, then we have a right to put

3    that into the record.

4        JUDGE TRACY:  Okay.  Thank you.

5        MS. FEINBERG:  Thank you.

6        JUDGE TRACY:  Next witness.

7        MR. ROSS:  Next victim.

8        JUDGE TRACY:  What's the name?

9        MR. ROSS:  Kyle Martin.

10       JUDGE TRACY:  Okay.  Let's go off the record so you can

11   get him.  If you need to take a quick five-minute break before

12   we begin our next guy?

13   (Off the record at 9:44 a.m.)

14       JUDGE TRACY:  Okay.  So let's go ahead and go back on the

15   record.  Okay.  If you could raise your right hand, please?

16   Whereupon,

17                              **KYLE MARTIN**

18   having been duly sworn, was called as a witness herein and was

19   examined and testified as follows:

20       JUDGE TRACY:  Go ahead, have a seat, and state your name

21   for the record.

22       THE WITNESS:  My name is Kyle Martin.

23       JUDGE TRACY:  Okay.  And so let me just sort of give you

24   some instructions here.  This microphone does not amplify your

25   voice.  It does not make it louder.



1          THE WITNESS:  Okay.

2          JUDGE TRACY:  So I need you -- it just is for the

3    recording of this hearing.  And I need you just to speak up

4    loudly so everybody in the room can hear you.

5          THE WITNESS:  Okay.

6          JUDGE TRACY:  You may be asked to repeat your answer if

7    someone wasn't able to hear you properly, and if you don't

8    understand a question that's asked of you, go ahead and let the

9    person who's asking the questions know that.

10         THE WITNESS:  Understood.

11         JUDGE TRACY:  And then here's some water, too.

12         THE WITNESS:  Thank you.

13         JUDGE TRACY:  Go ahead, Mr. Ross, Mr. Morris.

14         MR. MORRIS:  Mr. Morris, yeah.

15                        **DIRECT EXAMINATION**

16    Q    BY MR. MORRIS:  Hi, Kyle.

17    A    Morning.

18    Q    Where do you work?

19    A    I work at Tesla Motors.

20    Q    And is that at the Fremont factory?

21    A    Yes, sir.

22    Q    How long have you been employed by Tesla?

23    A    I've been in there since August 2012.

24    Q    And what position did you start at?

25    A    I started as a temp associate.


www.escribers.net | 800-257-0885

1   Q   Okay.  And how long did you have that position for

2   roughly?

3   A   Roughly a few months, became a permanent associate around

4   November of that same year.

5   Q   Did you have any positions after that?

6   A   Yes, I did.

7   Q   Could you tell me what the first one after that was?

8   A   It was the following June in which I became a team lead.

9   Q   And was that in 2012 approximately?

10  A   It would have been 2013.

11  Q   2013.  And did you have any positions after that?

12  A   Yes, I did.

13  Q   What was that?

14  A   After -- about a year or so after I became a team lead, I

15  was then promoted to a supervisor roughly around the October

16  range of 2014.

17  Q   Okay.  And was that in a particular department at the

18  factory?

19  A   Yes, it was in general assembly.

20  Q   And how long did you have that position for roughly?

21  A   Roughly right about two years when around October 2016 I

22  was promoted to associate manager.

23  Q   Okay.  And that was still in general assembly?

24  A   Yes, sir.

25  Q   And how long did you have that position for?



www.escribers.net | 800-257-0885

1    A    Not very long.  Within about a month or so, right around

2    Thanksgiving going into December, I was then promoted to a

3    business unit leader.

4    Q    Okay.  And that was still in general assembly?

5    A    Yes, sir.

6    Q    And when you were an associate manager, or assistant

7    manager, who did you report to?

8    A    I reported to Mario Penera.

9    Q    And then, what about when you became the business unit

10   leader?  Who did you report to?

11   A    At first, Russell Varone, and then Mario Penera.

12   Q    Okay.  And could you describe what lead to you becoming a

13   business unit leader?

14   A    There was -- right around that Thanksgiving timeframe

15   there was a big organizational change.  They wanted to try and

16   focus on a lot more of a deep dive to safety people, quality,

17   rate, and cost.  So they divided the general assembly line up

18   into six business units.  So when I first became a business

19   unit leader, I had trim 05.

20   Q    Okay.

21        MR. ROSS:  I couldn't hear the last part.

22        THE WITNESS:  When I first became the business unit

23   leader, I had trim 05.

24        MR. ROSS:  Trim 05.

25   Q    BY MR. MORRIS:  And how long were you a business unit



www.escribers.net | 800-257-0885

1   leader for?

2   A    Roughly up until about a year, and then they changed our

3   title to production manager.  I went from terminal 50 to final

4   line and when I went to final line is when I became a

5   production manager.

6   Q    And do you recall approximately when that was, when you

7   went to final line and became a production manager?

8   A    It would have been roughly April 2017.

9   Q    Okay.  And is that your current position?

10  A    No, sir.

11  Q    What's your current position?

12  A    I'm currently the production manager for general assembly

13  4.

14  Q    Okay.  And could you tell me what your job duties were as

15  a business unit leader?

16  A    We had our metrics of safety, people, quality, rate, and

17  cost, and our objectives were to more of a deep dive into those

18  objectives.  And safety was just not just the safety of the

19  associates, you know, focusing on proper team wear, proper PPE,

20  safety shoes, safety glasses, but also wanted to know of safety

21  prevention trending.  And going into the people, the people

22  development plans, right?  How we encourage a growth culture.

23      Quality, not just the average everyday kind of defects

24  that may happen on a vehicle, but promoting the overall quality

25  of the vehicle, whether that's working with cross-functional



www.escribers.net | 800-257-0885

1   parties for design changes, things to improve the overall

2   quality.  And then rate, you had your metric goals, your daily

3   targets, your monthly targets, and your quarterlies.  And we

4   wanted to pursue those goals, remove roadblocks from those,

5   especially the systemic ones that hit us every day.

6        And then cost, that was going to be more of a dive into,

7   like, labor hours, overtime, and then, of course, like scrap

8   material.  Want to know where the company was sending them.

9   Q    Okay.  And are those different metrics, safety, people,

10  quality, rate, cost, that's also known as SPQRC?

11  A    Yes, that's known as SPQRC.

12  Q    Okay.  And how did you try to meet those objectives in

13  terms of managing your team?

14  A    I had a team underneath me.  I had an associate manager

15  for each shift, had supervisors for each shift.  I had a

16  process engineer.  I had a quality engineer, and I had an

17  engineering, excuse me, an equipment engineering engineer.

18  Excuse me.  Each one of those, we would meet daily.  Cover over

19  basically what the previous shift was, what are our plans of

20  actions, what are we going to do moving forward.  Any

21  interruptions that would escalate up to me, if it was a high

22  hit, whether it was downtime with height on quality, then we

23  then come with a plan of action to move forward from there.

24  Q    Okay.  And how did your job duties compare when you became

25  the production manager?



www.escribers.net | 800-257-0885

1    A    It actually stayed the same when I was in general assembly

2    SX.  I just have the final line instead of trim 05.  And then

3    final line is a little bit more intense because that's where

4    all the vehicles come together, kind of funnels together.  So

5    there's a little bit more of a cross-functional support that

6    you have to engage to promote the quality and rate of the

7    vehicle.

8    Q    Okay.  And did anything change as it relates to managing

9    your team when you became the production manager?

10   A    No.  Nothing changed.  I did get a new staff because when

11   I took over the final line, it was different associate

12   managers, different supervisors.  The trim 05 stayed in the

13   trim 05.

14   Q    Okay.  You mentioned the word team wear.  What is team

15   wear?

16   A    Team wear is what our associates, team leads, and

17   supervisors are all required to wear.  It's a visual management

18   system as well as safety, not just for the associates, but for

19   the vehicle as well.  And each one has a role.

20   Q    Okay.  And what is the assigned team wear for associates

21   in general assembly?

22   A    For associates it's going to be a Tesla T-shirt, Tesla

23   pants, you're going to have your safety shoes.  This also would

24   include PPE, your safety glasses, bump caps.

25   Q    Okay.  And what color is the assigned team wear for the

22-60493.1617



1    production associates?

2    A    For production associates it's all black.

3    Q    And what is the assigned team wear for team leads in

4    general assembly?

5    A    Team leads and supervisors have red polos, but everything

6    else was the same.

7    Q    Okay.  So they're also required to wear PPE?

8    A    Uh-huh.

9         JUDGE TRACY:  Say yes or no for the record.

10        THE WITNESS:  Oh, excuse me, yes.

11   Q    BY MR. MORRIS:  And then, did you also mention quality?

12   A    Yes.

13   Q    And what's the assigned team wear for quality in general

14   assembly?

15   A    Quality would have a white polo.

16   Q    Okay.  What is a mutilation in general assembly?

17   A    A mutilation can be a scratch, a buff, a chip, whether

18   it's within the paint or a trim piece of the vehicle.

19   Q    Okay.  And can a mutilation have any impact to the

20   manufacturing flow of operations?

21   A    Yes, it can.

22   Q    Could you describe that?

23   A    Yeah, if we had a mutilation, say, on the paint of the

24   body itself, it's going to have to go into a paint repair after

25   the vehicle has left general assembly, which then could take



www.escribers.net | 800-257-0885

1    several hours to rectify before it could continue on to the

2    customer.

3    Q    Okay.  And do production associates have any obligations

4    in terms of identifying mutilations that are occurring on the

5    line?

6    A    Yes, they do.

7    Q    And what are those obligations?

8    A    They want to raise their hand.  Let their team lead know,

9    flag down a supervisor, especially if they find incoming

10   mutilations.  They want to identify those things so we can find

11   a way to make that better.

12   Q    Okay.  And have you communicated that to your team as well

13   as production associates?

14   A    I would have communicated it to my team, and then the team

15   would have communicated it to their associates.

16   Q    Okay.  And so would your team include supervisors and

17   assistant managers?

18   A    Associate managers.

19   Q    Associate managers.  And what can cause a mutilation in

20   general assembly?

21   A    Anything unfortunately.  So if you have too many things in

22   your apron pockets, if you have a tool sticking out of your

23   back pocket, if you're not in the appropriate team wear like

24   jeans, they have the rivets on them.  Sometimes T-shirts have,

25   like, raised emblems on them or they have, like, a -- like the



www.escribers.net | 800-257-0885

1  Gucci T-shirts, they have the gold emblem on them.  If you're

2  brushing up against the vehicle it can scratch the paint.

3  Tooling, tooling can as well if the tooling doesn't have the

4  production around the tooling head piece, as it's rotating, it

5  can scratch the side IP.  There's a lot of things that can

6  create a mutilation.

7  Q    Okay.  And then aside from team wear, are there any other

8  mutilation protections that production associates are required

9  to wear in general assembly?

10  A    Yes.  If they have a belt, they need a belt cover.  If

11  they're wearing a ring, they need a ring cover.  If they're

12  wearing a watch, they need a watch cover.

13  Q    Okay.  And could you tell me how wearing team wear relates

14  to preventing mutilations?

15  A    Team wear relates to preventing mutilations with, again,

16  if the associate doesn't have the assigned team wear, the team

17  wear that we've designed, or I shouldn't we designed, but we've

18  chosen has been mutilation protection.  It's just a soft cotton

19  material, or like the canvas pants.  If they're not wearing

20  that, they have, like, the jeans, the rivets.  A lot of the

21  times when they're putting on cars on the car, they could

22  tending to lean on the vehicle.  Those rivets can scratch the

23  paint.  You know, it's our way of preventing mutilations.

24  Q    Okay.  And if someone is not in team wear, is that

25  necessarily going to cause a mutilation to the vehicle?



www.escribers.net | 800-257-0885

1    A    It's not necessarily going to cause a mutilation to the

2    vehicle, but we want to do things that we can to prevent it as

3    a whole.

4    Q    Okay.  And I'd like to direct your attention to the spring

5    of 2017.

6    A    Okay.

7    Q    Do you recall any mutilations occurring in general

8    assembly in and around that time period?

9    A    Yes, I just came over to the final line, and one of the

10    highest issues that we were having was mutilations.

11    Q    Okay.  And was that associated with a particular model?

12    A    Actually, it was with both models.

13    Q    S and X?

14    A    Yes, sir.

15    Q    Okay.  And do you recall how you became aware of the

16    issue?

17    A    It spiked up quick on our dashboard of live GA that

18    documents our defects.  And then we have a quick lineside

19    meeting with Mario Penera, Russell Varone, my associate manager

20    John McGinn and myself.

21    Q    Okay.  And do you recall what was discussed that meeting?

22    A    It was really just trying to understand where these

23    mutilations had come from, why did they spike so quickly?  Why,

24    you know, what are we going to do about it to prevent these

25    moving forward, and just how do we create a quick action plan.



1   Q    Okay.  And how serious did you consider it at the time?

2   A    I considered it serious.

3   Q    And could you explain why?

4   A    Because you have a seat mutilation it requires the seat to

5   be replaced, has a high expensive cost even though we do build

6   the seats in-house, it still is expensive.  And then because it

7   was happening at such a high rate, so many per day, it was,

8   again, interrupting flow of getting those customers to the

9   cars, or, excuse me, getting the cars to the customers.

10  Q    Okay.  Did you know at the time that you had this meeting

11  what was actually causing mutilations to the seats?

12  A    No, we did not.

13       JUDGE TRACY:  And I'm sorry, what is the time period is

14  that you are testifying about?

15       THE WITNESS:  It should be roughly around April to May

16  2017.

17       JUDGE TRACY:  Okay.

18  Q    BY MR. MORRIS:  Did you have any ideas of what might be

19  causing the mutilations at that time?

20       MR. GARBER:  Objection.  Calls for speculation.

21       JUDGE TRACY:  Sustained.

22  Q    BY MR. MORRIS:  Was it discussed during that meeting with

23  the management team of what were the potential causes of the

24  mutilations?

25       MR. GARBER:  Objection.



1    MS. FEINBERG:  Objection.  Misstates the test -- oh.

2    MR. GARBER:  Again speculation.

3    MS. FEINBERG:  Go ahead.

4    MR. GARBER:  The witness, I believe, already testified

5    that they don't -- they couldn't what it was.

6    JUDGE TRACY:  Sustained.

7    MS. FEINBERG:  Thank you.

8    MR. MORRIS:  Well, he testified that he didn't

9    specifically know but he wasn't asked the question what was

10   discussed during the meeting about the potential causes.  It's

11   background for the next couple of questions.

12   JUDGE TRACY:  Just ask it a different way, please.

13   MR. ROSS:  I couldn't hear you, Judge.

14   JUDGE TRACY:  Ask it in a different way.

15   Q    BY MR. MORRIS:  Do you recall if there was anything

16   discussed between the managers at that time concerning the

17   causes of the mutilations?

18   A    Yes.

19   Q    And what do you recall?

20   A    We recall -- I recall we went over incoming material.  We

21   went over tooling.  We went over team wear.  We went over also

22   how the associates were in the line, if they're working ahead,

23   placements in the line, how are they treating the material when

24   they're installing it.  We went over a few things.

25   Q    Okay.  And did you guys make any determinations concerning



www.escribers.net | 800-257-0885

1    what to do next?

2    A    At that time, the associate manager, John McGinn, he

3    wanted to take this project on, and so he had a few ideas of

4    what to do.  And then he basically started just a general audit

5    that would cover those things we discussed.

6    Q    Okay.  And did you have any understanding of what would

7    happen next in terms of the audit?

8    A    The audit would then pretty much be executed by the

9    supervisors, John McGinn kind of gave the orders of what we

10   wanted to see which was basically a daily trend of the defects

11   or the mutilations of the seats.  And then what were the

12   actions that we were taking.

13   Q    Okay.  And did you provide any instructions to your

14   associate managers or your supervisors concerning the audits?

15   A    Actually, I did not.  John took the lead on that one.  He

16   is an associate manager, fully capable, and, you know, we

17   trusted his judgment.

18   Q    Okay.

19        MR. MORRIS:  What's -- where did we leave off in terms of

20   exhibits?

21        THE COURT REPORTER:  The next one is 27.

22        MR. MORRIS:  27.  I'm marking exhibit, Respondent's

23   Exhibit 27.

24   **(Respondent Exhibit Number 27 Marked for Identification)**

25        MS. FEINBERG:  Thank you.



www.escribers.net | 800-257-0885

1         MR. GARBER:  Thank you.

2    Q    BY MR. MORRIS:  And do you recognize Respondent's Exhibit

3    27?

4    A    Yes.

5    Q    And directing your attention to the middle of the page, it

6    looks like an email from John McGinn on April 19th, 2017?

7    A    Uh-huh, yes, excuse me.

8    Q    Did you receive that email?

9    A    Yes, I did.

10   Q    And how can you determine that from this document?

11   A    When you look at the "to" line there's a distribution list

12   that says DL-assembly-functional leaders.

13   Q    Uh-huh.

14   A    And that was the distribution list that I was a part of.

15   Q    Okay.  And in that group were the rest of the functional

16   leaders --

17   A    Yes.

18   Q    -- the other five?

19   A    There's -- at that time there were five, and then Mario

20   Penera became the senior leader -- senior leader, excuse me.

21   Q    Okay.  And then what about the group to the left of that,

22   DL assembly associate managers?

23   A    That would have been all the associates managers between

24   the shifts.

25   Q    Okay.  And then what about the group to the right, Dl



1    assembly supervisors, what would that include?

2    A    That would be all the supervisors between the shifts.

3    Q    And what about EOL management, what would that include?

4    A    That would be the end of line team where the car goes

5    after it leaves general assembly.  That would be the management

6    team.

7    Q    Okay.  And then could you describe what this email is in

8    reference to?

9    A    This email is in reference to this line-side meeting that

10   Russell, Mario, John, and I had, and he's reaching out to the

11   team letting them know what we want to try to do help prevent

12   team mutilations.

13   Q    Okay.  And there's a reference notes from today's meeting

14   attached.  Do you know what that's in reference to?

15   A    That's in reference to the line-side meeting.

16   Q    Okay.  And is that in reference to the information that's

17   contained immediately below the text of John's email?

18   A    Yes.

19   Q    And so the reference in the middle that says MX second

20   row, seat back cover mutilations, final line functional tests

21   EOL, ensure associate tech tool mutilation protection

22   discipline, was that discussed during that meeting?

23   A    Yes.

24   Q    And then, looking at the top of that document,

25   Respondent's Exhibit 27, it appears to be a forwarded email



1    from Andy Mead on April 19th, 2017, do you see that?

2    A    Yes.

3    Q    Do you know what that's in reference to?

4    A    That's replying to John's email, but he is sending it to

5    his specific supervisors that are on his shift for final line.

6    Q    Okay.  And there's a reference to auditing GA for team

7    wear and mutilation protection.  Do you know what that's in

8    reference to?

9    A    That's in reference to what John was going to launch with

10   the audit that was going to go over all the things we discussed

11   line side.

12   Q    Okay.

13        MR. MORRIS:  I'd offer Respondent's Exhibit 27.

14        JUDGE TRACY:  Any objections?

15        MR. GARBER:  One second, Your Honor.

16   (Counsel confer)

17              **VOIR DIRE EXAMINATION**

18   Q    BY MR. GARBER:  Just one question for the witness about

19   where it says RAM under the first email on the first page, it

20   says, thanks, RAM?  What's the -- what is that?

21   A    Those are the associates manager's initials.  His full

22   name is Richard Andy Mead.  But he goes by Andy.

23   Q    Okay.

24        MR. GARBER:  No objection, Your Honor.

25        JUDGE TRACY:  All right.  Any objections?



1      MS. FEINBERG:  No.  I'll address them at cross, thank you.

2      JUDGE TRACY:  Okay.  All right.  So Respondent's Exhibit

3  27 is admitted into evidence.

4  **(Respondent Exhibit Number 27 Received into Evidence)**

5             <u>DIRECT EXAMINATION</u> **(RESUMED)**

6  Q  BY MR. MORRIS:  Okay.  After this meeting you described,

7  what was your role in terms of the auditing?

8  A  I was more of the escalation.  If it would continue to

9  spike, it would get escalated up to me, but typically the

10  supervisors would handle the day to day.  They sent out their

11  daily report that was shared between the two shifts.  I would

12  review it.  If things looked like it was going the wrong

13  direction, I would probably intervene, but other than that, I

14  trusted the supervisors to do what they needed to do.

15  Q  Okay.  And did you have periodic meetings with your

16  management team concerning the audits?

17  A  Yes.  We had a weekly staff meeting.  At that time this

18  mutilation action became one of our top five controllables

19  (sic), and so it was discussed each week.

20  Q  Okay.  Top five controllables what are you -- what is that

21  referring to?  What do you mean by that?

22  A  That's referring to what we feel that we could control

23  within production.  So there are top five controllable defects.

24  Having mutilation, we feel that we could control those things,

25  right?  There are some design issues within the vehicle that,



1    you know, prevent maybe a trim piece from sitting

2    appropriately, but when it's considered a controllable, we have

3    to have actions in place that rectify those.

4    Q    Okay.

5        MR. MORRIS:  We can mark the next exhibit, Respondent's

6    28.

7    **(Respondent Exhibit Number 28 Marked for Identification)**

8        THE WITNESS:  Thank you.

9    Q    BY MR. MORRIS:  And looking at the first page of that

10   document, do you recognize Respondent's Exhibit 28?

11   A    Yes.

12   Q    And it looks like an email from Timothy Fenelon to a

13   number of individuals including your name?

14   A    Yes.

15   Q    And it was sent on June 2nd, 2017?

16   A    Yes.

17   Q    And then it also referenced an attachment copy of top five

18   issue resolution tracker.  Do you know what that's in reference

19   to?

20   A    That's in reference to our top five controllable issues.

21   Q    Okay.  And then what about the reference to the tracker,

22   could you describe what that's in reference to?

23   A    Can you rephrase that, please?

24   Q    Yeah.  It references a tracker.  What is the tracker

25   referring to?



www.escribers.net | 800-257-0885

1   A    The tracker's going to be the audit.

2   Q    And could you tell me how the tracking or the auditing was

3   being done?

4   A    They would look for several items.  They would look for

5   tooling protection.  They'd look for proper, you know, the

6   appropriate team wear, PPE, the proper Tesla pants, watch

7   covers, ring covers.  They'd look for associates that would may

8   be working out of pitch or working ahead.  They'd look at

9   incoming material, and again, just general handling of how they

10  would install the seats.  They look at all aspects.

11  Q    Okay.  And the document that's attached to this email, do

12  you know what that document is?

13  A    That's going to be the five controllables.

14  Q    Okay.  And was that an Excel document, or what was the

15  document?

16  A    It was an Excel document.

17  Q    And how frequently was the data being input --

18  A    At the time --

19  Q    -- into the document?

20  A    -- oh, excuse me.  At the launch of the document it was

21  daily.

22  Q    And would the document then be updated on a daily basis?

23  A    Yes, by shift as well.

24  Q    Okay.  And was that information communicated to you?

25  A    Yes.



www.escribers.net | 800-257-0885

1    Q    How frequently was that information communicated to you?

2    A    It was part of their shift pass-downs between shifts in

3    which I would be included on that.

4    Q    So on a daily basis?

5    A    Yes, sir.

6    Q    And this was for final line, correct?

7    A    Yes, sir.

8    Q    What does the car or the body of the car look like when it

9    comes to final line?

10   A    It has almost everything except for some carpet pieces,

11   some seats, doors, it's the final touches of trim, and fit and

12   finish.

13   Q    Okay.  And how many shifts were there on final line?

14   A    At the launch of this audit there was three.

15   Q    Okay.  And going back to the first page, there's a number

16   of different individuals listed on the "to" line.  Could you

17   provide their positions if you remember them?

18   A    Andy Mead would have been an AM.  Dick Hendrickson would

19   have been a supervisor.  Gerardo Murillo would have been a

20   supervisor.  John McGinn would have been an AM.  I, myself,

21   Kyle Martin.  Michael Murphy would have been a supervisor.

22   Paul Poland would have been a supervisor.  Saan Saephanh would

23   have been an AM.  Christian Corona would have been a team lead.

24   Isaias Garcia would have been a team lead.  Ken Neves would

25   have been a team lead.  Liou Saephanh would have been a team



www.escribers.net | 800-257-0885

1   lead.  Prescilo, excuse me, Gagarin would have been a team

2   lead.  Richard Hilario would have been a team lead, and Salina

3   Caravosa or Cavazos would have been a team lead.

4   Q    Okay.  And then turning back to the attachment, where does

5   all the information in the attachment come from?

6   A    It gets manually entered in by the supervisor.

7   Q    Okay.  And the information that's entered into that

8   document, where does that come from?

9   A    They would pull that data from live GA.

10   Q    Could you tell me what live GA is?

11   A    Live GA is a dashboard that we use to track and trend all

12   of our defects and mutilations.

13   Q    Okay.  And is that tracked by shift?

14   A    Yes.

15   Q    Besides the information from live GA, are there any other

16   sources of the information for the data in the spreadsheets?

17   A    Yes.  It would have been through their line-side audits,

18   inspecting tooling, incoming material, team wear, associate

19   behavior.

20   Q    Okay.  And looking at the first page of the attachment; is

21   this for the week of May 8th, 2017?

22   A    Yes.

23   Q    And could you tell me what row 3 number of issues reported

24   is in reference to?

25   A    Yes, the number of seat mutilations that were reported.



www.escribers.net | 800-257-0885

1   Q    So for Monday it would be 12, Tuesday 13, Wednesday 10?

2   A    Yes.

3   Q    And then what about for row 4, it says actions taken.

4   Could you tell me what that's in reference to?

5   A    That would have been what either the supervisor or the

6   team leads would have audited.

7   Q    And what about for row 5, results achieved observed.

8   Could you tell me what that's in reference to?

9   A    That would have been to the successes or the things that

10  they observed during those audits.

11  Q    Okay.  So like, for instance, on Monday, it says observed

12  corrected two associates for team ware and tooling compliance.

13  Do you know what that's in reference to?

14  A    It would be in reference that they would have found the

15  associates out of standard team wear, and would have found the

16  tooling not adequate with appropriate protection.

17  Q    Okay.  And that would be information that a supervisor

18  would have inputted into the document?

19  A    Yes, sir.

20  Q    And what about the next row, row 6, next actions,

21  escalations needed include action owners.  What's that in

22  reference to?

23  A    That's going to be what was your response to the things

24  that were observed or audited.

25  Q    Okay.  And then, for instance, on that Monday it says



www.escribers.net | 800-257-0885

1    continue to conduct audits to raise awareness and develop

2    culture-supervisors.  Do you know what that's in reference to?

3    A    That's referencing to continuing their daily audits with

4    the seat mutilations.  Raising the awareness to the associates,

5    like, how this can happen with the tooling, how this can happen

6    within the appropriate team wear.  Developing the culture also

7    is like making sure that the associates ensure to are working

8    pitch, working ahead can cause them to overlap each other which

9    makes mistakes.

10   Q    Okay.  And then, what about row 7, daily a.m. update

11   complete, question mark.  What's that in reference to?

12   A    That's well the a.m. -- well the a.m. updated with the

13   audit.

14   Q    And what about row 8, counterparts updated?

15   A    Yes, and I would --

16   Q    Do you know what that's --

17   A    Oh, excuse me.

18   Q    Do you know what that's in reference to?

19   A    Yes, that would be in reference to when they send each --

20   at the end of each shift, part of their passdown.

21   Q    And then what about row 10, it says additional notes.

22   What is that in reference to?

23   A    That would be in there was any additional notes worthy to

24   add into the audit.

25   Q    Okay.  And there looks to be a description, 5/8/17


www.escribers.net | 800-257-0885

1    observed associates Mike and Bob not in team wear.  Verbal

2    coaching conducted with workday follow-up.  Do you know what

3    that's in reference to?

4    A    That would be the supervisor taking action on finding an

5    associate out of compliance.

6    Q    Okay.  So the supervisor would have inputted that data?

7    A    Yes.

8    Q    Okay.  And then if you could turn to the next page in the

9    attachment.  I'm assuming the various rows mean the same thing

10   for this page, correct?

11   A    Yes sir.

12   Q    It looks to be a second week of May 8th, 2017.  Could you

13   tell me what the difference is between the first page in the

14   attachment and the second page?

15   A    The differences would be the shifts.

16   Q    Okay.  And if you could turn to the third page of the

17   attachment, it's marked the week of 5/15/17.  Could you tell me

18   what this slide is in reference to?

19   A    This would be the following week of the same controllable

20   audits.

21   Q    Okay.  And same meaning for the various rows, correct?

22   A    Yes sir.

23   Q    And then what about for the following page?

24   A    Appears this would --

25   Q    I guess the page after that.  It's Bate stamped TESLANLRB



www.escribers.net | 800-257-0885

1     002057?

2     A     Yes.

3          MR. GARBER:  I'm sorry, could you repeat the last

4     question?  I just didn't hear yours.

5          MR. MORRIS:  Yeah.  I was looking at the page, it's marked

6     TESLANLRB 002057.

7          MR. GARBER:  Ah, okay.  Thanks.

8     Q     BY MR. MORRIS:  Could you tell me what this slide is in

9     reference to?

10    A     This would be the opposite shift's audit of the same week.

11    Q     Okay.  And what about turning to TESLANLRB 002061?  Could

12    you tell me what that slide is in reference to?

13    A     This would be a continuation of the audit throughout May.

14    Q     Okay.  And so looking at the beginning of the tracking for

15    the week of May 8th, and comparing it throughout the weeks,

16    could you tell me what was occurring with respect to the number

17    of seat mutilations?

18    A     We were seeing a decrease in seat mutilations.

19    Q     And do you have any explanation or for why that happened?

20    A     When you typically focus on an action item, it has a

21    tendency to improve.  The things that we were putting in place,

22    the audits of the tooling, making sure the associates were

23    working within pitch, appropriate team wear, incoming material,

24    feeding that incoming material if mutilated back to the

25    suppliers -- those are all things and efforts to improve the

22-60493.1636



1    overall quality of the vehicle.

2    Q    Okay.  And we already went over the week of May 8th, but

3    what steps were being taken to reduce the number of mutilations

4    for the week of May 15th?

5    A    It would have been the same as the week -- as week 8,

6    excuse me.

7    Q    Okay, and what about the following week?

8    A    Same thing.

9         MR. MORRIS:  I'd offer Respondent's 28.

10        JUDGE TRACY:  Any objections?

11        MR. GARBER:  I would object as to hearsay, as Mr. Martin

12   did not input all the information in here.  It sounds like it

13   was inputted by other supervisors.  I would also object as to

14   vague, it references team wear, violation for lack of a better

15   word, but team wear is a broad policy that goes to pants,

16   shirts, and other items that might be worn.

17        JUDGE TRACY:  Okay.  Any objections?

18        MS. FEINBERG:  Similarly, I don't know -- since we don't

19   know what caused the mutilations, I don't know what the

20   relevancy of this is.  There's no reference to team wear

21   violations caused any mutilations.  I actually don't even know,

22   as we sit here, what the mutilations were -- were they big,

23   were they little, were they gashes -- we've never heard.  So I

24   don't know what the relevancy of this is, if team wear even --

25   whatever, as we know, team wear could also be covering up --

escribers

www.escribers.net | 800-257-0885

1        JUDGE TRACY:  Okay, okay.

2        MS. FEINBERG:  -- your buckle, or --

3        JUDGE TRACY:  So what we're going to need to do to speed

4    this case along, and I'm telling everybody, just to state your

5    objection --

6        MS. FEINBERG:  Um-hum.

7        JUDGE TRACY:  -- what the reason is, and then I'll rule.

8        MS. FEINBERG:  Okay.

9        JUDGE TRACY:  So again, I note the objections for the

10   record though, however I'm going to overrule the objections and

11   allow Respondent's Exhibit 28.

12       MS. FEINBERG:  Okay.

13       JUDGE TRACY:  Again it goes to the credibility of the --

14       MS. FEINBERG:  Okay.

15       JUDGE TRACY:  -- the weight of the evidence here.

16       MS. FEINBERG:  Can I just ask -- I may have missed this,

17   though I thought I was paying attention, what is the redaction

18   nature on this?

19       JUDGE TRACY:  So why don't you ask in --

20       MS. FEINBERG:  Oh, okay.

21       JUDGE TRACY:  -- voir dire?  Go ahead.

22       MS. FEINBERG:  Because I didn't know if maybe I'd missed

23   it, or something.

24       JUDGE TRACY:  No.

25       MS. FEINBERG:  Okay.  Okay.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  You did not.  Go ahead.

2    MS. FEINBERG:  Okay, good.  Thank you.

3                      **VOIR DIRE EXAMINATION**

4    Q    BY MS. FEINBERG:  Okay, so on this document -- Hi, I'm

5    Margo Feinberg, counsel for the charging parties.  So on this

6    document, Respondent's Exhibit 28, there are a number of places

7    where it's completely blacked out.  Do you know what was under

8    there that was blacked out?

9    A    I cannot recall.

10   Q    Were you the person who blacked it out?

11   A    No.

12   Q    And, like take for example page 2059, or whatever -- like,

13   it says TESLANLRB 2059.  Week of May 15th.  Wasn't the nature

14   of the information on this Excel spreadsheet supposed to be the

15   same kind of information that would have been on 2057?

16   A    It would have been a top five controllable.

17   Q    Yeah.

18   A    So maybe not necessarily related to the seat mutilation,

19   it could have been to another defect that wouldn't be related

20   to the seat mutilation.

21   Q    But you don't know, since you --

22   A    I don't recall.

23   Q    Okay.  Because the topic also is blacked out.  Is that

24   right where it would say seat mutilation on the page that I

25   asked you to look at, 20 --



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Okay.  And how about on the first page of Respondent's

3    Exhibit 28, it says next steps and then there's a big black

4    bar.  Did you put this redact black bar here?

5    A    One second please.

6    Q    Sure, sure.  Of course.

7    A    No, I did not.

8    Q    And do you know what it once said, before it was blacked

9    out?  You don't have to tell me right this second, but do you

10   know what it said?

11   A    I do not recall.

12       MS. FEINBERG:  Okay Your Honor, well I have an objection

13   to this document, because it seems to be incomplete.  Both on

14   the first page and on what was Bate stamped 2056, 2058, 2059,

15   2062.  I don't know actually if this is -- 2063.  I don't know

16   if this is how the NLRB got it or not.  From our perspective,

17   it's incomplete.

18       JUDGE TRACY:  Okay, so as I said, I'm going to overrule

19   the objection and allow Respondent's Exhibit 28.  Is there an

20   explanation for the redaction, what that's about?

21       MR. MORRIS:  Yeah, he testified that there's top five

22   issue resolution tracker, the mutilations being one of the

23   five.  The other four have nothing to do with mutilations, so

24   that information relates to confidential information that's not

25   public, and so we have redacted that information.  If Your



1    Honor's concerned about it, we can provide the unredacted form

2    for you to review in camera.

3        JUDGE TRACY:  No, that's not needed.  If it's just the

4    mutilation, that's fine.

5        MR. RODRIGUEZ RITCHIE:  I would just note that there was a

6    dispute before between us regarding these redactions that were

7    used, just so that you're aware of what happened.  We were --

8    Counsel for the General Counsel was provided an opportunity to

9    review the documents in their unredacted form.

10       JUDGE TRACY:  Okay.

11       MR. RODRIGUEZ RITCHIE:  Which we did, at their office.  We

12   weren't provided an opportunity to make copies of that or do

13   anything else with them, so though there's some that were

14   redacted that we would probably object to, because we don't

15   think that those were confidential information or proprietary

16   secrets.  I just thought I'd let you know, we were provided

17   with an opportunity to review unredacted versions of some of

18   these documents.

19       JUDGE TRACY:  So again, I'm glad that you stated that for

20   the record.  The arguments that have been raised about 28, you

21   know, with relevance in terms of mutilations, team wear --

22   yeah, the document isn't specific.  I have no idea what caused

23   the mutilation.  However, again, this is going towards their

24   support of their defense, so I'm going to allow it.  But again,

25   I don't know, and this document doesn't say that.  But this is



www.escribers.net | 800-257-0885

1    their defense --

2        MS. FEINBERG:  I understand.

3        JUDGE TRACY:  -- so that's what they want to put in, and

4    it's relevant, so Respondent's Exhibit 28 is admitted into

5    evidence.

6    **(Respondent Exhibit Number 28 Received into Evidence)**

7        MR. GARBER:  If this is an okay pausing point for Mr.

8    Morris, if we could just have a restroom break.

9        JUDGE TRACY:  Oh, sure.  Okay.  Is this a good --

10       MR. GARBER:  If this is a good --

11       JUDGE TRACY:  -- point.

12       MR. MORRIS:  Sure.  This is fine.

13       MR. GARBER:  Is that okay?  Okay.

14       JUDGE TRACY:  How many more minutes with him?

15       MR. MORRIS:  Maybe a half hour.

16       JUDGE TRACY:  Okay.  All right, let's take a break for

17   five to --

18       MR. GARBER:  Yeah.

19       JUDGE TRACY:  -- ten minutes at most.  Let's go off the

20   record.

21   (Off the record at 10:30 a.m.)

22       JUDGE TRACY:  Okay.  Mr. Morris, go ahead please.

23       MR. MORRIS:  Thanks.

24                  **DIRECT EXAMINATION** **(RESUMED)**

25   Q    BY MR. MORRIS:  Looking at Respondent's Exhibit 28 again,



www.escribers.net | 800-257-0885

1    that's the June 2nd, 2017 email.

2    A    Yes.

3    Q    Did the auditing continue after this email?

4    A    Yes.

5    Q    And for how long of a period did the auditing continue?

6    A    Majority of the summer.  We stopped sometime in September.

7    Q    Okay.

8        MR. MORRIS:  We can mark the next exhibit Respondent's 29.

9    **(Respondent Exhibit Number 29 Marked for Identification)**

10       MR. GARBER:  Thanks.

11       MS. FEINBERG:  Thank you.

12       MR. CURRY:  Thank you.

13   Q    BY MR. MORRIS:  Okay, can you tell me what this document

14   is?

15   A    It's an email exchange between John McGinn, myself, and

16   Chris Sookhai, who was my quality engineer for Final Line.

17   Q    Okay.  And looking at the top of that email, it looks like

18   an email from John McGinn, on May 25th, 2017.  He references

19   your focus, cooperation, and execution is paying off.  Do you

20   have any idea what he's referencing?

21   A    To the improvement in the quality.

22   Q    And I think, to the top five controllables?

23   A    Yes sir.

24   Q    Okay.  And could you turn to the attachment?  Was this the

25   PowerPoint that was attached to John McGinn's email?



1    A    Yes sir.

2    Q    And, looking at the first page of that attachment, it has

3    FLJ controllables.  Do you know what that represents?

4    A    That is a chart trend of our five issues.

5    Q    And do you know what bar is in reference to the seat

6    mutilations?

7    A    It's going to be the first one on the left of each date,

8    the all black one.

9    Q    Okay.  So, for instance on the May 8th date, it's the

10    farthest to the left?

11    A    Yes.

12    Q    Okay.  And then what about the page after that on the

13    attachment, stamped 2051?

14    A    This was the list of the five controllables.

15    Q    Okay.  And what did you do with this email and the

16    attachment, if anything?

17    A    This is what I presented out to Elon biweekly, showing him

18    the progress in the quality in Final Line.

19    Q    Okay.  And why were you presenting that out?

20    A    As a functional leader, or at the time production manager,

21    this was showing Elon the efforts that we're making, it was

22    making an overall improvement to the quality of the vehicle.

23    Q    Okay.  And then, could you describe -- on that same page,

24    2051 -- there's a column, what corrective action taken.  What

25    is that in reference to?



www.escribers.net | 800-257-0885

1    A    That's going to be, basically, the seat mutilations and

2    then the actions that we did to improve that.

3    Q    Okay.  And there's the one next to seat mutilations, do

4    you know what that's in reference to?

5    A    That's in reference to being the first issue of the top

6    five.

7    Q    Okay.  So it was the top of the five issues?

8    A    Yes.

9    Q    And then, do you know what the owner is in reference to?

10   A    That was going to be, FL stands for Final Line, and then

11   AMs stands for Associate Managers.

12   Q    And what about ETA?

13   A    That was when the date of the action was taken, which

14   would be continued or enclosed.

15   Q    Okay.  And what about occurrences?

16   A    Occurrences is going to be the number of issues found

17   between each week.

18   Q    Okay.  So that would be the number of mutilations?

19   A    Yes sir.

20   Q    And then there's a reference to percentage change, 55

21   percent decrease.  What's that in reference to?

22   A    That is a reference to a decrease in the mutilations from

23   week over week -- or, from the previous week, excuse me.

24   Q    Okay.  And what is the status in reference to?

25   A    Status is that the issue is still around, is still



www.escribers.net | 800-257-0885

1    relevant, is still open.

2    Q    Okay.  And going back to the first section, under seats

3    mutilations, there's a reference to actions taken, and then a

4    number of items listed.  Is it your understanding that those

5    actions were in fact taken?

6    A    Yes.

7    Q    And then there's a reference to long-term, and something

8    under that says, additional seat covers ordered, will install

9    at 901 Page and leave installed until FG.

10   A    Yes.

11   Q    What's that in reference to?

12   A    That was the long-term plan to prevent seat mutilations.

13   To help those out.  It would cover the seat --

14   Q    Okay.

15   A    -- completely.

16        MR. MORRIS:  I'd offer Respondent's 29.

17        JUDGE TRACY:  Any objections?

18        MR. GARBER:  In light of what Your Honor said before, very

19   briefly for the record, I object as to hearsay, again regarding

20   the data in the document.  Relevance, as to we don't know,

21   there's no evidence as to what caused the mutilations.  I've

22   just renew my objections from 28 and apply to 29.

23        JUDGE TRACY:  Okay.

24        MS. FEINBERG:  The same.

25        JUDGE TRACY:  Okay.  All right.  So again, Respondent's



1   Exhibit -- I overruled the objections and admit Respondent's

2   Exhibit 29 into evidence.

3   **(Respondent Exhibit Number 29 Received into Evidence)**

4       There was something that I wasn't clear about when Mr.

5   Morris asked you -- the first block there on the second page of

6   this document is seats mutilations.

7       THE WITNESS:  Um-hum.

8       JUDGE TRACY:  Is that just a list, or -- what is the one?

9   Is the one have any significance here?

10      THE WITNESS:  Yeah, it's the number of the severity.  And

11  then, so one being the highest issue on Final Line, two being

12  the second-highest controllable, three being the next

13  controllable, and so forth.

14      JUDGE TRACY:  Okay.

15      MR. MORRIS:  And we can mark the next exhibit Respondent's

16  30.

17  **(Respondent Exhibit Number 30 Marked for Identification)**

18  Q   BY MR. MORRIS:  And could you describe what this document

19  is?

20  A   This is a email from Chris Sookhai, the quality engineer,

21  to Tim Fenelon, with myself in the CC.

22  Q   Okay.  And who is Chris?

23  A   Chris was my quality engineer for Final Line.

24  Q   Okay.  And was the attachment attached to the email?

25  A   This is the -- the updated version of the previous



www.escribers.net | 800-257-0885

1   attachment for the top five controllables.

2   Q   Okay.  And did you do anything with this information?

3   A   No, this is what I would present to Elon on the biweekly

4   basis to show an improvement of our quality.

5   Q   Okay.  And then looking at page 1976, could you describe

6   what bar is in reference to the seat mutilations?

7   A   It is the black bar.

8   Q   It's the black bar on the left?

9   A   Yes sir.

10  Q   And is -- do you know what the right bar means, if

11  anything?

12  A   I do not recall at this time.

13  Q   Okay.  And then if you could turn to page 1977, please.

14  A   I'm assuming the different columns have the same meaning

15  as Respondent's 29?

16  A   Yes sir.

17  Q   And then there's a reference under the occurrences,

18  there's a percentage change of 30.25 decrease.

19  A   Yes sir.  It's an improvement week over week.

20  Q   Okay.

21      MR. MORRIS:  I'd offer Respondent's 30.

22      MS. FEINBERG:  I'd like to take the witness on voir dire,

23  Your Honor.

24      JUDGE TRACY:  Sure, but let's get to --

25      MS. FEINBERG:  Okay.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  Mr. Garber first.

2    MR. GARBER:  I just renew my objection as to 28, 29, and

3    ask you apply it to 30.

4    JUDGE TRACY:  Okay.  And --

5    MS. FEINBERG:  Okay.

6    JUDGE TRACY:  -- and then go ahead, please.

7    MS. FEINBERG:  Okay.

8                    **VOIR DIRE EXAMINATION**

9    Q    BY MS. FEINBERG:  I think to be able to ask my questions

10   I'd like you to have both Respondent's Exhibit 29 and 30 in

11   front of you, and turn to the pages 2051 and 1977.  The one

12   that begins with what, slash, corrective action.  Do you have

13   those?

14   A    Yes.

15   Q    Okay.  So with respect to Respondent's Exhibit 30, it

16   appears to me that the box entitled seat, slash, mutilation

17   reads exactly the same on both documents.  Am I seeing that

18   correctly?

19   A    Yes.

20   Q    Okay, so are we to understand that on Respondent's Exhibit

21   30, are these new incidents that occurred between the time

22   frame of June 2nd, 2017, which is the Respondent's Exhibit 29,

23   and June 10th, 2017, which is Respondent's Exhibit 30, or is

24   that just a copy and paste into this document?

25   A    It's a reoccurrence.



1   Q    There's something new happened?

2   A    No, no.  It's a reoccurring action that we do, we go week

3   day over day.

4   Q    So from Respondent's Exhibit 30, can we tell if actually

5   any mutilations occurred, if any of these action items were

6   taken during that period of time?

7   A    These actions would have been taken, and mutilations have

8   occurred.

9   Q    So even though it's the exact same wording, how would we

10   know that something actually happened during this period of

11   time?

12   A    If you look under the occurrences.

13   Q    Yeah?

14   A    The dates would explain the number of occurrences.

15   Q    Right, but it doesn't tell you whether someone was

16   dismissed for noncompliance or there were write-ups.  Are you

17   saying that you know for sure, during this period of time, that

18   there were write-ups and a dismissal of an employee for non-

19   compliance?

20   A    This is --

21   Q    Between June 2nd --

22        JUDGE TRACY:  So again, this is getting into cross-

23   examination.

24        MS. FEINBERG:  Okay.  Well, to me -- okay.  Just trying to

25   understand what this document is, Your Honor.  It doesn't seem



1    to be what it purports to be.  So I have an objection both on

2    relevancy.

3        JUDGE TRACY:  All right.  So again, I'll overrule the

4    objection and allow Respondent's Exhibit 30 into evidence.

5    **(Respondent Exhibit Number 30 Received into Evidence)**

6        MR. MORRIS:  Okay.  You can mark the next one Respondent's

7    31.

8    **(Respondent Exhibit Number 31 Marked for Identification)**

9        MR. GARBER:  Thank you.

10       MR. CURRY:  Thank you.

11                    <u>**DIRECT EXAMINATION**</u> **(RESUMED)**

12   Q    BY MR. MORRIS:  And could you tell me what Respondent's 31

13   is?

14   A    It's an email from my process engineer, who ended up

15   taking over the role of Chris Sookhai's, doing both process and

16   quality.  Sent to myself, Tope Ogunniyi, who was the AM that

17   replaced John McGinn, Saan Saephanh, and Andy Mead.

18   Q    Okay.  And there's a reference to the issues that have

19   been closed out.  Could you describe what that's in reference

20   to?

21   A    Seat mutilations.

22   Q    And do you know what the "closed out" is in reference to?

23   A    That we'd taken the occurrence rate down to a minimal

24   level, that was no longer making it a top five controllable.

25   Q    Okay.  And then could you take a look at page 1 of the



1    attachment?  And I'm assuming the different columns have the

2    same meaning as Respondent's 29 and 30?

3    A    Yes sir.

4    Q    And there's a additional reference under what corrective

5    action, trialed seat covers from 901 Page 6/20, implementation

6    6/21 10:30 a.m.  Do you know what that's in reference to?

7    A    That's in reference to the seat covers, which was the

8    long-term goal.  To protect the seats.

9    Q    Okay.  And do you know what the percentage change was --

10   A    In --

11   Q    -- with respect --

12   A    Excuse me.

13   Q    For this week that it was delivered?

14   A    One hundred percent decrease.

15   Q    Okay.  And then the status reflects that it's closed?

16   A    Yes sir.

17   Q    Did seat mutilations, or any mutilations, continue after

18   this was closed out?

19   A    Yes, they did.

20   Q    And did the auditing continue?

21   A    Yes.

22   Q    How long did the auditing continue?

23   A    Roughly around, I would say, September.  But then it was

24   then passed off to the process engineering techs, who would

25   perform a weekly audit.



www.escribers.net | 800-257-0885

1    Q    Okay.  And just because it was closed out, did that mean

2    that the monitoring for team wear compliance changed?

3         MS. FEINBERG:  Objection.  Leading.

4         THE WITNESS:  No.

5         JUDGE TRACY:  Sustained.

6    Q    BY MR. MORRIS:  Do you know if -- did you continue to

7    monitor team wear compliance after the date of this email?

8    A    Yes.

9    Q    And how did you go about doing so?

10   A    The supervisors were tasked to walk their lines each day

11   at the start of the shift, and after lunch as well.  It's a

12   time for them to also speak with the associates, do a quick

13   check-in, as well as evaluating their PVD (phonetic) in team

14   wear.  AMs would also do a daily walk, and I myself would do a

15   daily walk.

16   Q    Okay.  And did you provide any instruction or guidance to

17   your AMs or supervisors?

18   A    Just to continue the same accountability around team --

19   excuse me, around team wear.

20   Q    Okay.  And was this throughout the entire period of the

21   auditing?

22   A    Yes.

23   Q    Did you have any expectations for your supervisors and AMs

24   in terms of holding people to compliance for the team wear

25   policy?



1    A    We would try to allow them to, at least for the first

2    occurrence or second occurrence, to fix it.  So, if an example

3    would be, they did not come in with their safety shoes, we gave

4    them the opportunity to change them out to the appropriate

5    safety shoes.  Same thing with the Tesla team wear, though the

6    more occurrences that would happen with an individual

7    associate, the more accountable they would have became.

8    Q    Okay.  Were there any situations where you personally saw

9    someone that wasn't in team wear?

10   A    Yes.

11   Q    And did you do anything about it?

12   A    I instructed my AM to correct the behavior.

13   Q    Okay.  And did you have any understanding of whether your

14   supervisors and managers were holding people to compliance with

15   the team wear policy?

16   A    A brief understanding.  Typically that wouldn't escalate

17   up to my level, but I do know that they were holding people

18   accountable.

19   Q    Okay.  And how do you know that?

20   A    If there was a approval from -- a write-up from HR,

21   typically it would be screened through the associate manager or

22   myself, along with a supervisor.

23   Q    Okay.  But you did have discussions with your supervisors

24   and AMs when you saw that people were not compliant with --

25   A    Yes.



1    Q    -- the team wear policy?

2         MR. GARBER:  Objection.  Leading.

3         JUDGE TRACY:  Sustained.

4    Q    BY MR. MORRIS:  Did you have any conversations with your

5    AMs and supervisors about production associates not being in

6    compliance with the team wear policy?

7    A    Yes.

8    Q    And that was -- did you have any of those conversations

9    throughout 2017?

10   A    Yes.

11   Q    Okay.  Did you ever give approval to wear all black

12   clothing instead of the assigned team wear?

13   A    On an occasion, as an exception.

14   Q    And why was that?

15   A    There have been times where the team wear store did not

16   have the appropriate sizes, or an item may have been on

17   backorder.

18   Q    Okay.

19   A    Allowing them the opportunity to get the appropriate team

20   wear.

21        MR. MORRIS:  Give me one minute to find an exhibit,

22   please.  I'd like to show the witness General Counsel's Exhibit

23   73.

24        MR. GARBER:  Okay.

25        MR. MORRIS:  You mind if I look over his shoulder real



1    quick?

2    Q    BY MR. MORRIS:  Okay, and directing your attention to the

3    middle of the email, there appears to be an email from you to

4    Tope on August 10th, 2017, and you said, how many had UAW

5    shirts, question mark.  And that's all of Final Line, question

6    mark.  Why did you ask that question?

7    A    It gives me a pulse for the shop.  It lets me know where

8    my supervisors are at, with the development of their

9    associates.  If I have an associate on my line that feels that

10   they have to seek some type of outside counsel or

11   representation, it means that my supervisors aren't doing what

12   they need to do to engage the associates.

13   Q    Okay.  Did you tell Tope that she should enforce the team

14   wear policy so that people couldn't wear union shirts?

15        MR. GARBER:  Objection.  Leading.

16        MS. FEINBERG:  Thank you.

17        JUDGE TRACY:  Sustained.

18   Q    BY MR. MORRIS:  Did you have any conversations with Tope

19   in or around that time period concerning people wearing union

20   shirts?

21   A    No.

22   Q    Do you have any idea why Tope sent you that email?

23   A    It would have been after I'd walked the line, would have

24   seen associates out of team wear compliance.  And I would have

25   shot her a text or maybe passed by, said hey, we have



1    associates that are out of compliance, please correct the

2    behavior.

3    Q    And this was during the time of the auditing?

4    A    Yes.

5    Q    Are production associates in general assembly allowed to

6    put stickers on their team wear?

7    A    Yes.

8    Q    And has that always been the case?

9    A    Yes.

10    Q    Have you seen people wearing a sticker with the UAW logo

11    on it in general assembly?

12    A    Yes.

13    Q    Have you ever told someone that that wasn't appropriate,

14    or it wasn't allowed?

15    A    No.

16    Q    Are you aware of any situations where a supervisor or

17    manager has told someone that the union sticker wasn't allowed?

18        MS. FEINBERG:  Objection.  Leading.

19        JUDGE TRACY:  Sustained.  Leading, is what she said it

20    was --

21        MS. FEINBERG:  Thank you.

22        JUDGE TRACY:  -- kind of hard --

23    Q    BY MR. MORRIS:  Have you ever heard of a manager doing

24    that or saying that?

25        MS. FEINBERG:  Objection.  Vague.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Sustained.

2      MR. MORRIS:  As to the vagueness?

3      JUDGE TRACY:  Doing that.

4   Q   BY MR. MORRIS:  Oh.  Telling someone that they couldn't

5   wear a UAW sticker?

6   A   No.

7      MR. MORRIS:  I'd offer Respondent's 30.

8      JUDGE TRACY:  31?

9      MR. MORRIS:  31, sorry.  Thanks.

10     JUDGE TRACY:  Any objections?

11     MR. GARBER:  Just apply my previous objections to 28, 29,

12  30, to 31.

13     JUDGE TRACY:  Okay.

14     MS. FEINBERG:  Same.

15     JUDGE TRACY:  Same, all right.  So again, the objections

16  are overruled.  Respondent's Exhibit 31 is admitted into

17  evidence.

18  **(Respondent Exhibit Number 31 Received into Evidence)**

19  Q   BY MR. MORRIS:  Okay.  Going back to the audits in 2017,

20  you referenced that eventually it was closed out in September

21  of 2017.  Was management ever able to figure out what the

22  ultimate cause was of the seat mutilations?

23  A   There were multiple causes.

24  Q   Could you explain, please?

25  A   Tooling -- sometimes the associate would not apply the


www.escribers.net | 800-257-0885

1    tooling cover for it, the rotation of the spindle of the tool

2    can scratch the seat.  The behavior of the associates getting

3    in and out of the cars, if they had the tools out of their back

4    pocket.  Sometimes they use a plastic spoon, use this to

5    install trim pieces, that brushing up against the seat can

6    cause mutilation.  If the associate was wearing jeans, having

7    rivets on the jeans brushing up against the seat -- we've seen

8    a lot of different things that have contributed to the

9    mutilations.  All of that was part of the audit, of why we try

10   to rectify those items.

11   Q    Okay.

12        MR. MORRIS:  Nothing further.

13        JUDGE TRACY:  Okay.  Mr. Garber.

14        MR. GARBER:  Yes.  Could I have -- it's 11:08, could I

15   have until 11:20, please?

16        JUDGE TRACY:  Okay.  All right.

17        MR. GARBER:  Thank you.

18        JUDGE TRACY:  Let's go off the record until 11:20.

19        And Ms. Feinberg, if you could use that time to prepare as

20   well.

21        MS. FEINBERG:  You can assume that I will too.

22        JUDGE TRACY:  Thank you.

23        MS. FEINBERG:  But thank you.

24   (Off the record at 11:08 a.m.)

25        JUDGE TRACY:  Okay.



www.escribers.net  |  800-257-0885

 1                    **CROSS-EXAMINATION**

 2    Q    BY MR. GARBER:  Hi Mr. Martin, my name's Noah.  I work for

 3    the National Labor Relations Board.  I'm just going to ask you

 4    a few questions today, okay?  If you don't understand any of my

 5    questions as we're talking, by all means just tell me, I'll try

 6    to say it a better way.  Okay?

 7    A    Thank you.

 8    Q    Did you meet with Mr. Morris to prepare your testimony

 9    today?

10    A    We did have a conversation.

11    Q    About how many conversations did you have?

12    A    It was two conversations.

13    Q    About how long would you say were those conversations?

14    A    One was really brief, one was about an hour or so.

15    Q    And were you shown any documents during those

16    conversations?

17    A    Yes.

18    Q    Were those the documents that you were shown today?

19    A    Yes.

20    Q    Were there any documents that you were shown during those

21    conversations that you were not shown today?

22    A    No.

23    Q    Okay.  Just so I can understand the General Assembly a

24    little better, can you tell me where you are in the layers of

25    supervision, in terms of the job titles that are below you?



www.escribers.net | 800-257-0885

1  A    Currently?

2  Q    Yes, please.

3  A    Currently I'm the production manager for General Assembly

4  4.  Underneath me is a shift leader, which would be McGinn, is

5  on second shift, General Assembly 4.  On night shift as well,

6  is Andy Mead.  I do not have an AM currently on first shift.

7  Below that leadership would be the supervisors -- I have seven

8  supervisors on second shift and four supervisors on first

9  shift.  And then beneath that we have the team leads between

10  each shift, and then the associates.

11  Q    And when you said "AM", is that associate manager?

12  A    Yes sir.

13  Q    Okay.  And the previous associate manager, was that Tope

14  Ogunniyi?

15  A    Yes.  For -- but that was not for GA4.

16  Q    Oh okay.

17  A    That's for Final Line.

18  Q    Which is still in General Assembly, though, right?

19  A    Yes.  But they're two different general assemblies.

20  Q    Okay.  Thank you.  You were shown a number of exhibits.

21  Do you still have them in front of you?  28, 29, 30, and 31?

22  A    Yes.

23  Q    Okay.  Looking at Respondent's 28, if you could please

24  turn to the second page, it's the one that's marked 2053.

25  A    Yes.



www.escribers.net | 800-257-0885

1    Q    You have that ready?  Okay.  In column 5b, where it

2    references the correction for team wear, do you see that?

3    A    Yes.

4    Q    Now you don't know what the team wear violation was there,

5    correct?

6    A    Based off the data, I do not.

7    Q    Okay.  And the data that's contained in Respondent's

8    Exhibit 28, that only applies to seats, correct?

9    A    Yes.

10   Q    Okay.  You can put that one down for now, thank you.  And

11   if you could turn to Respondent's Exhibit 29, please.

12   A    Yes.

13   Q    If you could again look at the third page, it's marked as

14   2051 in the bottom right corner.

15   A    2051.

16   Q    Yeah.  And if you look at box, well it's marked 1 and it's

17   under the what corrective action, or what, slash, corrective

18   action.

19   A    Yes.

20   Q    And it references mutilations occurring in seat processes.

21   Again, you don't know the cause of that mutilation, correct?

22   A    There were multiple causes.

23   Q    But you don't know the specific cause.

24   A    Yes.

25   Q    You couldn't identify one cause?

22-60493.1662



1    A    We've identified a few.

2    Q    Were they T-shirts that caused the mutilations?

3    A    T-shirts, no.

4    Q    Okay.  And again, the data that's contained in these

5    graphs and this table, that only applies to the seats and the

6    cars, correct?

7    A    What are you referencing?

8    Q    I'm sorry.  The graph that's on 2050 and then the

9    mutilations occurring in seats in process on 2051.

10   A    The graph would be five issues total, with seats being one

11   of them.

12   Q    Okay.  And then as regards to the page marked 2051, that's

13   only referencing seats?

14   A    For the one that's shown, yes.

15   Q    Okay.  You can put that one down for now.  And if you

16   could turn to Respondent's 30, please.  If you look at the

17   second page, again with the bar graph.

18   A    Yes.

19   Q    The only portion we can tell, that's the -- only applies

20   to seat mutilations, correct?  Not the car mutilations?

21   A    The one that's on the far left would be applied --

22   Q    Right.

23   A    -- to the seat mutilations.

24   Q    And again, if you could look at the next page, it's 1977,

25   where it says in the first box, mutilations occurring in seat



www.escribers.net | 800-257-0885

1  process.  This is only discussing mutilations to the seats and

2  not the outside body of the car or any other part of the car,

3  right?

4  A    No, it's just to the seats.

5  Q    Okay.  Thank you.  You can put that one down.  And finally

6  if you could look at Respondent's 31, and turn to the first

7  page of the attachment, 1555.

8       MR. MORRIS:  Which one are you on?  Sorry.

9       MR. GARBER:  Sure, it's the attachment to Respondent's 31,

10  it's 001555.

11       MR. MORRIS:  Thanks.

12       MR. GARBER:  Yeah.

13       MR. MORRIS:  Got it.

14       MR. GARBER:  I think I asked him too many questions for

15  it.

16  Q    BY MR. GARBER:  Again, where it says mutilations occurring

17  in seat process, this is only in regards to mutilations to the

18  seats themselves, not the outside portion of the car or any

19  other portion of the car, correct?

20  A    It's to the seat mutilations.

21  Q    Okay.  You can put that one down, thank you.  Do you have

22  the GC Exhibit 73 in front of you also?

23  A    Yes.

24  Q    The email -- it's a chain of emails that Mr. Morris asked

25  you about.  Now, before you testified as to why you wrote the



www.escribers.net | 800-257-0885

1    August 10th, 2017 email at 1:31 p.m., how many had UAW shirts.

2    A    Yes.

3    Q    You said that you needed to know the pulse of the shop, is

4    that right?

5    A    Yes.

6    Q    Okay.  So keeping track of who a union supporter is, is

7    considered the pulse of the shop?

8    A    No.

9    Q    Okay, so tell me, how does that -- tell me what the pulse

10   of the shop is, then.

11   A    The pulse of the shop is the engagement of the overall

12   team.

13   Q    So knowing who's wearing a union shirt helps you know how

14   engaged the team is?

15   A    Someone wearing a union shirt, like I said before, if they

16   have to seek outside counsel or guidance or representation, it

17   lets me know that my supervisor that's in charge of that area

18   isn't giving the full attention to the associates that's

19   needed.

20   Q    So if someone has a union shirt on, they need more

21   guidance or more attention?

22   A    No, it means that their needs aren't being met, so they

23   feel like they have to seek outside guidance.

24   Q    So that's why you wanted to keep track of it, then?  To

25   see who needs more guidance?



1    A    It lets me know where my supervisors are at.

2    Q    Okay, so, just so I'm clear, you wanted to know how many

3    people had union shirts on because that would tell you who

4    needs more guidance or support, and that tells you where your

5    supervisors are at?

6         MR. MORRIS:  Objection.  Vague and ambiguous.

7         JUDGE TRACY:  Overruled.

8         MR. MORRIS:  And compound.

9         JUDGE TRACY:  Overruled, overruled.

10        THE WITNESS:  So, it lets me know if my supervisors are

11   engaging the teams appropriately.  If the associates have

12   concerns, if the associates need things, are my supervisors

13   answering those questions, answering those concerns, supporting

14   the associates in the need to do their day-to-day job.

15   Q    BY MR. GARBER:  Because if they're not being supported

16   enough, then they would support the union?

17   A    I wouldn't say that.

18   Q    Under the team wear policy, you said that it's okay on

19   occasion to wear plain black shirts; is that right?

20   A    Yes sir.

21   Q    And that wearing of black shirts, other than the assigned

22   Tesla team wear, doesn't hinder their ability to do their work,

23   correct?

24   A    It was just an all black T-shirt.

25   Q    But that was -- my question, let me clear it up.  So an



1    employee can wear an all black shirt on occasion, instead of

2    their assigned Tesla team wear, and so wearing a shirt other

3    than their assigned Tesla shirt does not hinder their ability

4    to do their work.

5        MR. MORRIS:  Objection.

6        THE WITNESS:  It depends.

7        MR. MORRIS:  Objection.  Vague and ambiguous, as to

8    hindered work.

9        JUDGE TRACY:  I'll sustain the objection.  Maybe break it

10   down a little bit more.

11       MR. GARBER:  Okay.

12   Q    BY MR. GARBER:  You told us, obviously, before, that on

13   occasion employees can wear a plain black shirt instead of

14   their assigned Tesla T-shirt, right?

15   A    Um-hum.

16       JUDGE TRACY:  Say yes or no for the record.

17       THE WITNESS:  Oh, excuse me.  Yes.

18   Q    BY MR. GARBER:  And part of that, I believe you said, goes

19   to visual management, right?

20   A    Yes.

21   Q    Okay.  So wearing a black shirt other than the assigned

22   Tesla shirt, you can still conduct this visual management,

23   correct?

24   A    No.

25   Q    You cannot?

22-60493.1667



1   A    If they have a yellow shirt on --

2   Q    I think you misheard me, I'm sorry.  So if you're wearing

3   a plain black shirt other than the assigned Tesla shirt, so

4   we're just talking about a black T-shirt --

5   A    Just a plain black shirt.

6   Q    Yeah.  You can still conduct your visual management?

7   A    Yes.

8   Q    Okay.  And a black T-shirt with no buttons or objects on

9   it, that would be considered mutilation-free, correct?

10  A    Yes.

11  Q    Hold on one second please.  So it's reported to you, or --

12  let's back up.  You're aware of the statistics of cars that

13  have mutilations -- or, mutilations that's caused to cars that

14  are coming out?

15  A    We have a view of the data about, roughly, about how many

16  cars have mutilations.

17  Q    Okay, so you're familiar with that data?

18  A    Um-hum.

19  Q    Okay.

20  JUDGE TRACY:  Can you say yes or no, I'm sorry.

21  THE WITNESS:  Yes.

22  JUDGE TRACY:  Thank you.

23  Q    BY MR. GARBER:  Approximately how many Tesla cars were

24  damaged, where that damage was directly related to employees

25  wearing a T-shirt with a logo on it?



1   A    I don't have that data.

2   Q    So, you're not sure?

3   A    I do not know.

4   Q    Okay.  Do you know of any?

5   A    I have seen where they've had the little emblem on their

6   T-shirt, it's a metal emblem with the Gucci emblem, they were

7   brushed against the side of the fender, created a mutilation.

8   Q    Oh, okay.  But that was metal.

9   A    Um-hum.

10  Q    Okay.

11  A    But it wasn't Tesla team wear.

12  Q    Sure.  What about a shirt with a logo on it, but the

13  logo's not raised.  It's not metal.

14  A    I wouldn't know what the material of that logo would be

15  made out of, I couldn't answer that.

16  Q    Are you familiar with a supervisor who I believe works

17  under you, Gerardo Murillo?

18  A    Formerly.  Yeah, he works for me.

19  Q    Formerly, okay.  When did he work under you?

20  A    Around the 2017 time-frame.

21  Q    2017, okay.

22  A    When I took over Final Line.

23  Q    I'm going to show you a document that's been marked as GC

24  Exhibit 77.

25  A    Thank you.

22-60493.1669



1   Q    Take a look at that, if you will, and let me know when

2   you're done.

3        MR. ROSS:  What document is that?

4        MR. GARBER:  It's GC-77

5   Q    BY MR. GARBER:  Let me know when you're done looking at

6   it.

7   A    Okay.

8        MR. GARBER:  Yeah, I'm sorry.  The marking is in the top

9   left corner.  The GC stamp mark is in the top left corner.

10       THE WITNESS:  Okay.

11  Q    BY MR. GARBER:  Is this a text conversation between you

12  and Gerardo?

13  A    No.

14  Q    You've never seen this before?

15  A    I don't recall.

16  Q    Okay.  You can turn that one over then, thank you.  Does

17  Gerardo still work there?  At Tesla?

18  A    No.

19  Q    He does not?

20  A    No.

21  Q    Do you know roughly when his employment ended?

22  A    I do not.

23  Q    Did he work there in August of 2017, do you know?

24       MR. MORRIS:  Objection as to relevance concerning this

25  individual.



www.escribers.net | 800-257-0885

1      MR. GARBER:  There's a complaint allegation involving

2   Jayson Henry being spoken to by a supervisor who I believe is a

3   subordinate of Mr. Martin.

4      JUDGE TRACY:  Okay.  So overruled.

5      MR. MORRIS:  Is there an allegation related to Gerardo,

6   concerning statements that were made?

7      MR. GARBER:  The supervisor's unnamed.  So we're trying to

8   -- and we've heard, obviously, complaints about unnamed

9   supervisors.  So we're trying to alleviate that.

10     JUDGE TRACY:  Okay.  So overruled.

11  Q    BY MR. GARBER:  Do you recall, did Gerardo -- did he work

12  for Tesla approximately around August of 2017?

13  A    I believe so.

14  Q    Okay.

15     MR. GARBER:  No further questions, Your Honor.

16     JUDGE TRACY:  Okay.  Ms. Feinberg?

17     MS. FEINBERG:  Yep.

18                       **CROSS-EXAMINATION**

19  Q    BY MS. FEINBERG:  So first, these documents -- R-30, 29,

20  28, these are all about the Final Line; is that right?

21  A    Yes.

22  Q    Okay.  And who was the person directly responsible for the

23  Final Line, under you?

24  A    Under me, between the shifts we would have had John McGinn

25  for a brief period, then John McGinn went to the Model 3 line,



1    which then was replaced by Tope Ogunniyi.  We had Andy Mead,

2    and then Saan Saephanh.  They would have been the AMs, and then

3    beneath them --

4    Q    What was the last one, I'm sorry, Sam?

5    A    Saan, S-A-N (sic), Saephanh.

6    Q    Okay.  And you indicated that if there was an HR action

7    regarding team wear within your jurisdiction, that you would be

8    notified; is that right?

9    A    Be all HR actions.

10   Q    Okay.  And so did you ever see an HR action for someone

11   being dismissed for noncompliance with team wear?

12       MR. MORRIS:  Objection.  Vague and ambiguous as to "HR

13   action".

14       JUDGE TRACY:  Sustained.

15       MS. FEINBERG:  I believe I'm actually using his words, but

16   okay.

17   Q    BY MS. FEINBERG:  On Exhibit 30, page 1977, it says

18   "actions taken: enforce team wear write-ups and dismissal for

19   noncompliance".  Do you see that?

20   A    Let me turn to the document please.

21   Q    Sure.

22   A    And which page are you referencing?

23   Q    It's the one with the box, 1977.

24   A    Okay.  Ask the question again?

25   Q    Do you see where it says, "actions taken: enforce team


www.escribers.net | 800-257-0885

1    wear write-ups and dismissal for noncompliance"?

2    A    Yes.

3    Q    Okay, and I believe you were asked whether you had any

4    notice of such actions; is that right?

5    A    Yes.

6    Q    And how would you have notice of those actions?

7    A    It would have been an email chain.

8    Q    From who?

9    A    It could have been from any one of the leadership teams,

10   supervisors, just for any form of accountability.

11   Q    So if someone was dismissed for, as it states here,

12   someone was dismissed for noncompliance.  Would you be notified

13   of that?

14   A    Yes.

15   Q    And do you know of anybody being dismissed for team wear

16   violation?

17   A    There's been a few.  I typically didn't dive into who,

18   they just more or less would be within the passing of an email.

19   Q    All right.  And do you know the nature of the violation?

20   A    The dismissal for team wear?

21   Q    Yes.

22   A    Because if they didn't have the appropriate team wear, and

23   it's been more than one occurrence, we would send the associate

24   home for the day.

25   Q    Okay, but here it's -- well, what did you understand the



22-60493.1673

1    word "dismissal" to mean?

2    A    You -- you asked about dismissal?

3    Q    Yes.  So I think, maybe, we're not speaking the same

4    language.  So I'm asking you, when it says here, "dismissal",

5    what do you believe -- what do you understand -- since this is

6    your chart, what do you understand that word to mean?

7    A    It is when they would have dismissed the associate for the

8    day.

9    Q    I see.  So it doesn't mean that someone was dismissed from

10    their employment?

11    A    No.

12    Q    Okay.  And I'm still unclear.  When there's a muti --

13    you're concerned about mutilations of the seats, what actually

14    has been happening to the seats that prompted you to monitor

15    actions with respect to possible mutilation?

16    A    We were receiving a lot of mutilations found in EOL -- end

17    of line.

18    Q    Right, but what is a mutilation?

19    A    Scratch, abrasion, gauge, chip.

20    Q    Okay, so what I understood you say is that you learned

21    that those were happening from people having belt buckles not

22    covered, tools in their pockets, and bringing a tool into a car

23    unprotected; is that correct?

24    A    As well as incoming mutilations from the supplier.

25    Q    Oh, I see.  So sometimes, they arrive mutilated?

22-60493.1674



1    A    Um-hum.

2    Q    You have to say yes or no, as unnatural as that is.

3    A    Oh.  Excuse me.  Yes.

4    Q    Okay.  Okay, because on the -- so where -- is there some

5    data that shows how many of these seats were coming in pre-

6    mutilated before they even got to your final line?

7    A    I would need to know which page to look.

8    Q    All right, well, let -- for example -- well, let's just go

9    back to -- well, let's just take 31.  But then you look at

10   Issue Description.  It says, "Mutilations occurring on seats in

11   process."  So this -- is this not looking at mutilations that

12   were coming in already mutila -- car seats that were already

13   coming in mutilated?

14   Q    For this document?

15   A    Yes.

16   A    No.

17   Q    Okay, but for when you look at the -- hold on.  If you

18   look at the --

19   (Counsel confer)

20        MS. FEINBERG:  Hold on a second.

21   Q    BY MS. FEINBERG:  All right, so for examp -- so could you

22   look at Responder's Exhibit 30?  And if you could look at the

23   second page where there's a chart?

24        MR. MORRIS:  Which one are you looking at?

25        MS. FEINBERG:  Second page of Exhibit 30.



www.escribers.net | 800-257-0885

1      MR. MORRIS:  Thanks.

2  Q    BY MS. FEINBERG:  What mutilations does this -- seat

3  mutilations does this chart cover?

4  A    Seat -- seat mutilations.

5  Q    Okay, but are they seat mutilations -- would they include

6  ones that arrived in the final line?

7  A    They would include all seat mutilations.

8  Q    Okay, and I gather from your testimony, and also, if you

9  look at the Respondent's Exhibit 30, on page -- the one that's

10  marked 1555 -- three fives -- it says --

11  A    I'm sorry.  What -- which?

12  Q    It says, Exhibit 30 -- 31.  I'm sorry.  My mistake.  31.

13  A    And then which page?

14  Q    On the -- well, it's the second page, but it's marked

15  1555; one and then three fives.  And see it says here, "Trial

16  seat covers from 9/01 page 6/20 implementation, 6/21, 10:30

17  a.m.  Does that means that starting on June 20th of 2017, you

18  started putting seat covers on the seats, so that to protect

19  the seats from mutilation?

20  A    Yeah.  On June 20th, we trialed it.

21  Q    And does that mean you continued the trial through --

22  A    June 21st, we would have implemented it.

23  Q    Okay, and on June 21st -- so from then on, in July and

24  August, the seat covers would be on?

25  A    Um-hum.



www.escribers.net | 800-257-0885

1    Q    Yes?

2    A    Yes.

3    Q    Okay.  And did you ever talk to Elon Musk about the

4    concern about team wear?  Because I heard you said you were

5    sending him reports.

6    A    We would meet with him biweekly and we would discuss our

7    quality impertinence.

8    Q    And did you ever discuss union tee-shirts with Mr. Musk?

9    A    No.

10   Q    Did you ever discuss team wear with Mr. Musk?

11   A    Only on actions taken.

12   Q    What does that mean?

13   A    Meaning, when we discussed seat mutilations, some of the

14   actions that were taken was we were enforcing team wear

15   compliance.

16   Q    Okay, and did you ever send Mr. Musk any emails regarding

17   team wear?

18   A    No.

19   Q    And can you turn to Joint General Counsel's Exhibit 73?

20   A    Yes.

21   Q    And are you familiar with the employees who are listed in

22   the email at the bottom of this page, August 10th, 2017 at 1:05

23   p.m. from Tope to you?  Are you familiar with these names?

24   A    Vaguely.

25   Q    And do you know what line they worked on?



1    A    They would have worked on the final line.

2    Q    Okay, and how do you know that?

3    A    Because the response came from Tope, who was the AM for

4    final line.  She would not have looked at another line.

5    Q    And did you ever have a conversation with Tope regarding

6    the contents or the subject matter that exists in General

7    Counsel's 73?

8    A    What do you mean?

9    Q    Other than the email back and forth, did you ever actually

10   talk to her about this same subject matter?

11   A    We've had discussions of team wear.

12   Q    Okay, but did you have a discussion with her regarding

13   people wearing UAW shirts?

14   A    Brief discussions, yes.

15   Q    Okay, and was that just with you and Tope or you and Tope

16   and someone else?

17   A    It'd be Tope and I.  That or the counterparts, like, Andy

18   Mead or Sam Xiaphong (phonetic).  We kept it on a manager

19   level.

20   Q    Okay, and do you recall how many conversations you had

21   with Tope regarding union tee-shirts?

22   A    I do not.

23   Q    And do you remember when the first one was?

24   A    I do not recall.

25   Q    Do you remember when workers started wearing union tee-



www.escribers.net | 800-257-0885

1    shirts?

2    A    I do not recall.

3    Q    Do you recall whether it was on August 10th, 2017?

4    A    I do not recall.

5    Q    And what did you say to Tope regarding union tee-shirts in

6    this first conver -- in the first time you spoke to her?

7    A    The conversation was long ago.  I don't remember the exact

8    details.

9    Q    But you remember having it?

10    A    We discussed what the engagement is, how are they feeling,

11    are the supervisors taking care of the associates.

12    Q    Okay, and can you explain a little bit more about that?

13    What does it mean, "what the engagement is"?

14    MR. MORRIS:  Objection.  Relevance.

15    JUDGE TRACY:  Overruled.

16    MS. FEINBERG:  Thank you.

17    THE WITNESS:  It's the -- it's their -- their engagement;

18    are -- are they -- are they happy that they're here, are they

19    engaged into the line, are their needs being met, is there a

20    development plan for them.

21    Q    BY MS. FEINBERG:  Okay, so did you ever say to Tope that

22    if people are supporting the union, it means that they're not

23    happy with the company?

24    A    No.

25    Q    But you did say that their needs are not being met?



www.escribers.net | 800-257-0885

1   A    It doesn't mean that they're not particularly happy.  It

2   just means that there's things that they feel that they're not

3   receiving.

4   Q    All right, and have you ever been in a union?

5   A    No.

6   Q    And did you ever talk to any of these workers about their

7   decision to wear union tee-shirts?

8   A    Myself?  No.

9   Q    And did you ever look at the website of fairfutureattesla?

10       MR. MORRIS:  Objection.  Relevance.

11       JUDGE TRACY:  Overruled.

12       THE WITNESS:  I have not.

13   Q    BY MS. FEINBERG:  And other than Tope, who else did you

14   say you spoke to about union tee-shirts?

15   A    It would've been team wear as a whole, with that being

16   part of it.

17   Q    And who else would that include?

18   A    Andy Mead, Sam Xiaphong (phonetic).

19   Q    And did you give any direction, with regard to the union

20   tee-shirts, to Andy Mead?  If you recall.

21   A    It'd be the same thing I would have given Tope.

22   Q    And that direction was?

23   A    Would be to see how the associates feeling, are their

24   needs being met.

25   Q    Okay, and turning back to Respondent's Exhibit 73 -- I



1    mean, I'm sorry -- General Counsel's Exhibit 73.

2    A    Um-hum.

3    Q    At 1:33, she writes, "Only Jayson had the shirt on.  Yes.

4    From 310 to 10.  I walked it back."  Do you know what "Yes.

5    From 310 to 10.  I walked it back" means?

6    A    The stations.  Filing the stations 10 through 310.

7    Q    And so she's telling you that when she went back, the only

8    person who was wearing a union tee-shirt is Jayson Henry?

9    A    She's saying out the names below, from the previous email,

10   Jayson was, and she answered my question of, "And that's all

11   the final line", meaning she walked the entire line.

12   Q    Then did you have any other conversations with her

13   regarding Jayson Henry?  If you recall.

14   A    Not that I can recall.

15   Q    Do you know Jayson Henry?

16   A    Vaguely.

17   Q    What does that mean?

18   A    He was one of the body fitters on the final line.

19   Q    Have you ever had any interactions with him yourself?

20   A    A few.

21   Q    And what would be the cause of that?

22   A    Typically, just during my walk and talks; saying hi to the

23   associates, asking how they're doing.

24   Q    And it's true that you said that the pol --

25        MS. FEINBERG:  One second.  Let me get it for you.



1    (Counsel confer)

2        MS. FEINBERG:  One second.  I just have to find a document

3    that came in yesterday.

4    (Counsel confer)

5    Q    BY MS. FEINBERG:  Have you ever seen anything in writing

6    that said, what were the rea -- what would be the -- excuse me.

7    Let me start that over.  Have you ever seen anything in writing

8    that said if a worker wanted to wear a black tee-shirt, what

9    would be the basis for them being allowed to wear one?

10   A    No.

11   Q    So do you know whether any communication was given to

12   employees, telling them under what circumstances they could

13   substitute a black tee-shirt?

14   A    We had updated the GA expectations --

15   Q    Yes?

16   A    -- when it discussed the team wear -- discussed the team

17   wear and I believe it said something along the lines of, on

18   occasion, or as exception by the supervisor, they would allow

19   all-black attire.

20   Q    Okay, and do you remember saying something to the effect

21   of, "We've already stated on several occasions verbally that

22   our team wear policy is us allowing them to wear all-black, no

23   logos.  It was a kind gesture from us in cases of situations

24   where they were unable to do laundry, still waiting on back-

25   order clothing, or whatever the case may be"?



www.escribers.net | 800-257-0885

1    MR. MORRIS:  Objection.  Vague and ambiguous.

2    MS. FEINBERG:  Vague and ambiguous?  I'm reading a quote

3    and I'm asking if he ever said it.

4    MR. MORRIS:  Well, why don't you show it to him?

5    JUDGE TRACY:  And so --

6    MS. FEINBERG:  I don't have to do it that way.

7    JUDGE TRACY:  Right.  So overruled.

8  Q    BY MS. FEINBERG:  I can repeat if that's -- because of the

9    interruption, but it's up to you, if you recall.

10  A    Can you repeat it, please?

11  Q    Sure.  "We have already stated on several occasions

12    verbally that our team wear policy is us allowing them to wear

13    all-black, no logos.  It was a kind gesture from us in case of

14    situations where they were unable to do laundry, still waiting

15    on back-order of clothing, or whatever the case may be."

16    Because we have stated -- do you remember ever saying -- ever

17    writing that?

18  A    Vaguely.

19  Q    Okay, and then do you remember words to this effect,

20    "Because we have stated this as an expectation, shop-wide,

21    several times, it is completely allowed to be a standard

22    without having to be written in policy"?

23  A    Yes.

24    MS. FEINBERG:  Okay.  Let's mark this next, your Honor.

25  Q    BY MS. FEINBERG:  And that's true, right?



1    A    Yeah.

2    (Court and counsel confer)

3         MS. FEINBERG:  So marking as Charging Party 2; is that

4    right?

5         THE CLERK:  Yes.

6         MS. FEINBERG:  Okay.  Thank you.

7    **(Charging Party Exhibit Number 2 Marked for Identification)**

8         MS. FEINBERG:  I didn't write it on the exhibit.  Should I

9    take it back and write it on there?  It's okay for now?  Okay.

10         MS. FEINBERG:  Can you please review that, Mr. Martin, and

11    then let me know when you've completed reviewing it?

12         THE WITNESS:  Okay.

13    (Counsel confer)

14         THE WITNESS:  Okay.

15    Q    BY MS. FEINBERG:  Okay.  So earlier, when Mr. Garber was

16    asking you some questions, you testified about a supervisor

17    named Gerardo Murillo who is --

18    A    Um-hum.

19    Q    -- he had shown you a text message.  Is this Gerardo

20    Murillo, at the bottom of Charging Party's 2, that same

21    supervisor?

22    A    Yes.

23    Q    Okay, and so does this document refresh your recollection

24    that you were aware that that Mr. Murillo was asking some

25    questions about the team wear policy?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Okay, and did you ever --

3    (Counsel confer)

4    Q    BY MS. FEINBERG:  Did you -- so I'm gathering that you --

5    from this email, Charging Party 2, it's correct to say that you

6    received the email from Mr. Murillo and then had a conversation

7    with Mario about the topic?

8    A    Yes.

9    Q    And do you recall now, looking at this, that this was the

10    day that the union had started distributing tee-shirts, and

11    there were union tee-shirts throughout the plant?

12    A    I do not recall.

13    Q    Okay, so do you know what prompted this email chain?

14    A    I don't recall.

15    Q    And were you in any discussions within the company

16    management about changing the team wear policy, as a result of

17    this email?

18        MR. MORRIS:  Objection.  Vague and ambiguous.

19    Q    BY MS. FEINBERG:  Okay, it says, "We do have new and

20    improved guidelines that will address team wear more than just

21    a one-liner, but that's still in development."  Were you part

22    of that development?

23    A    No.

24    Q    Do you know who was?

25    A    Not to my knowledge.  I would only assume.



www.escribers.net | 800-257-0885

1   Q    And other -- did you share this information -- the

2   information that Mario had shared with you -- with anyone else,

3   other than Mr. Murillo and Tope Ogunniyi -- well, Tope?

4   A    Share what, exactly?

5   Q    Mario had shared with you his position.  Did you share

6   that with your other supervisors?

7        MR. MORRIS:  Objection.  Vague, ambiguous.

8        MS. FEINBERG:  Okay.  In the -- in the --

9        JUDGE TRACY:  Overruled.

10       MS. FEINBERG:  Okay.  Thank you.

11       THE WITNESS:  So you're asking, did I ever share what I

12  stated to Gerardo with other supervisor and AMs?

13  Q    BY MS. FEINBERG:  Yes.

14  A    Yes.

15  Q    And who else did you share it with?

16  A    I couldn't recall.

17  Q    Okay, and how did you share it?

18  A    It would be somewhere along the same lines that we have

19  here.

20  Q    Okay, did you have inquiries from people other than

21  Gerardo about the team wear in August of 2017?

22  A    Not that I can recall.

23  Q    And yesterday, we heard some testimony that there's final

24  line 1, 2, and 3; is that accurate?

25  A    Yes.



www.escribers.net | 800-257-0885

1    Q    And does Tope supervise all of final line, or just one

2    portion of it?

3    A    Tope is the associate manager.

4    Q    Oh, so she's -- so does that cover the whole line?

5    A    Um-hum.

6    Q    Yes?

7    A    Yes.  Thank you.

8    Q    And going back to General Counsel's Exhibit 73, I see that

9    you asked Tope how many people had UAW shirts on.  Did you make

10   that request of others?

11       MR. MORRIS:  Objection.  Relevance.

12       JUDGE TRACY:  Overruled.

13       THE WITNESS:  I can't recall.

14   Q    BY MS. FEINBERG:  Why did you specifically ask her, then,

15   about the UAW shirts?

16   A    I don't recall.  It's been a long time.

17   Q    In preparation for your testimony here today, did you

18   review any emails?

19   A    No.  Just the documents that have been shown.

20   Q    So you didn't yourself -- didn't go into your email to

21   look for anything?

22   A    No.

23   Q    And did you ever talk to your associate managers or

24   supervisors about workers wearing union stickers?

25   A    Say that again.



www.escribers.net | 800-257-0885

1    Q    Did you ever talk to your supervisors or associate

2    managers -- anyone under your -- in management, but under your

3    supervision -- about workers wearing union stickers?

4    A    I believe so.

5    Q    And what was the -- how often did that occur?

6    A    Maybe it had been only once or twice.

7    Q    And do you recall generally when that occurred?

8    A    I don't know.

9    Q    And do you recall what prompted you to initiate that

10   conversation?

11   A    I did not initiate the conversation.

12   Q    Oh.  Do you remember what did initiate that conversation?

13   A    They asked if the stickers were okay.

14   Q    And who asked you that?

15   A    It would've been one of the supervisors.  I can't recall.

16   Q    Do you remember what line they were on?

17   A    It would've been final line.

18   Q    And did you respond in writing or verbally?

19   A    Verbally.

20   Q    And do you recall what you said?

21   A    I believe something along the lines of, the stickers are

22   okay.

23   Q    Did you say anything else about your concerns if people

24   are showing an affinity for the union?

25   A    Not that I recall.



www.escribers.net | 800-257-0885

1    Q    And were you involved the evaluation of Jayson Henry?

2    MR. ROSS:  I didn't hear the question.

3    MS. FEINBERG:  Was he involved in the evaluation of Jayson

4    Henry.

5    MR. MORRIS:  Objection.  Relevance.

6    JUDGE TRACY:  What's the relevance?

7    MS. FEINBERG:  There's some concerns regarding comments

8    stated to Mr. Henry regarding his union activity, and I'm just

9    trying to understand the line control regarding Mr. Henry.

10    MR. MORRIS:  There's --

11    MS. FEINBERG:  And there's -- they tried to dispute his

12    credibility, based on why he was let go from the company, and I

13    think I have a right to know what -- if there was any other

14    information regarding that, since they asked him -- Mr.

15    Henry -- about those questions.  They opened the door to it.

16    JUDGE TRACY:  All right.  So I'll overrule the objection.

17    MS. FEINBERG:  I'm not going too far.

18    THE WITNESS:  Can you ask the question one more time,

19    please?

20    Q    BY MS. FEINBERG:  Did you have anything to do with the

21    evaluation of Mr. Henry?

22    A    It would've been done by the supervisor.

23    Q    And did you have any role in evaluating that or approving

24    it?

25    A    No.  I trust the supervisors for their judgment.



www.escribers.net | 800-257-0885

1   Q    Okay, and did you have any role in anything related to his

2   separation from the company?

3   A    I was asked to do the separation.

4   Q    And what does that mean?

5        MR. MORRIS:  Objection.  Relevance -- this line of

6   questioning.

7        JUDGE TRACY:  Overruled.

8        MR. MORRIS:  How is the termination relevant?

9        MS. FEINBERG:  Then you shouldn't have asked him about it.

10       JUDGE TRACY:  Well, it's overruled.

11       MR. MORRIS:  I didn't ask him about it.

12       MS. FEINBERG:  You asked Mr. Henry about it.

13       JUDGE TRACY:  Overruled.

14       THE WITNESS:  Ask the question again, please.

15       MS. FEINBERG:  Sorry.  That was inappropriate of me.  I'll

16  go through you in the future.  My apologies.

17  Q    BY MS. FEINBERG:  What was your role in the separation of

18  Mr. Henry?

19  A    They had me deliver the separation notice.

20  Q    And other than that, did you have any other role in his

21  separation?

22  A    No.

23  Q    And did you communicate anything to Mr. Henry at the time

24  of his separation?

25  A    I went over just a brief description of why we were



1    separating him with the company.  It was two -- I believe

2    two -- two back-to-back reviews that were low-performance.

3    Q    And did he raise any concerns with you?

4    A    He actually became abrupt and wanted to just know where --

5    where does he sign, where does he walk out.  He didn't allow us

6    to really finish the conversation.

7    Q    And you remember that?

8    A    Yes.

9    Q    And do you have any notes of that?

10   A    No.

11   Q    All right, and how many other -- were you letting a lot of

12   people go at the time Mr. Henry was let go?

13   A    During that time frame, there was.

14   Q    Okay, and you were personally involved in a number of

15   those?

16   A    Just delivering the message.

17   Q    And were you responsible for delivering the message for

18   everyone in a general assembly?

19        MR. MORRIS:  Objection.  Relevance.

20        JUDGE TRACY:  Sustained.

21   Q    BY MS. FEINBERG:  And did you receive any other emails or

22   phone calls or texts where your supervisor identified to you

23   people who had either Union stickers or Union T-shirts?

24   A    Not that I recall.

25   Q    And were there any other kinds of T-shirts or logos that


www.escribers.net | 800-257-0885

1    would ever raise concerns for you that your supervision should

2    be on the alert about engagement?

3    A     Yes.

4    Q     What kind?

5    A     Especially the graphic ones that have crude language on

6    it, some paraphernalia.  There was one time actually I had seen

7    it associated with a T-shirt that had a pot leaf on it.  That's

8    a concern.

9         MS. FEINBERG:  Okay, I have nothing further at this time.

10   Wait, did everything get in?  Wait, can I move Charging Party's

11   2 into evidence, please?

12        JUDGE TRACY:  Any objections?

13        MR. MORRIS:  No.

14        JUDGE TRACY:  Okay, so Charging Party's Exhibit 2 is

15   admitted into evidence.

16   **(Charging Party Exhibit Number 2 Received into Evidence)**

17        MR. GARBER:  I forgot to move in General Counsel's Exhibit

18   77 also.

19        JUDGE TRACY:  Okay.

20        MR. MORRIS:  I'm going to object.  There's been no

21   authentication.  He didn't testify to anything on this exhibit.

22        MR. GARBER:  And I offer it for corroboration of the

23   testimony of Jayson Henry who previously testified that an

24   unknown supervisor who came up to him in around August told him

25   that he couldn't wear his Union shirt; he would be sent home



1    and then Tope comes over in a dress code essentially.

2    According to GC Exhibit 73 on August 10th, Ms. Ogunniyi emails

3    Mr. Martin saying that she just spoke with Jayson Henry about

4    team wear.  This text message is dated August 10th with the

5    name Gerardo.  We now know Gerardo Murillo is a supervisor with

6    the Employer, and this was produced pursuant to the General

7    Counsel's subpoena.  We just received this on September 21st.

8        MS. FEINBERG:  It's also the same date as this Charging

9    Party --

10       MR. GARBER:  It's also the same date as Charging Party 2.

11       JUDGE TRACY:  But based upon this exhibit, whose

12   handwriting or -- not handwriting, whose text message is on

13   the -- in the darker color?

14       MR. GARBER:  That we don't know, but again --

15       JUDGE TRACY:  You don't know, okay, and then whose is the

16   lighter color?

17       MR. GARBER:  That's Gerardo.

18       JUDGE TRACY:  Gerardo, okay.

19       MR. GARBER:  Yes.

20       MR. MORRIS:  How do we know that?  How do we know that?

21   We haven't had anyone testify to any of this.

22       MS. FEINBERG:  His name.  It says Gerardo M., whatever.

23       MR. GARBER:  I would ask that you just take judicial

24   notice of that in text messages the person whose phone it is

25   their messages on the left side.



1      JUDGE TRACY:  Okay, all right, so I'm going to overrule

2      the objection and allow Respondent -- or General Counsel's

3      Exhibit 77 into evidence.

4      **(General Counsel Exhibit Number 77 Received into Evidence)**

5      JUDGE TRACY:  Okay, Mr. Morris.

6      MR. MORRIS:  Yeah, I just had a couple of clarifying

7      questions.

8                        **REDIRECT EXAMINATION**

9      Q    BY MR. MORRIS:  You used the term visual management?

10     A    Yes, sir.

11     Q    In reference to the team wear.  Could you explain what you

12     mean by visual management?

13     A    It gives us a quick overview of the shop or your specific

14     line, all right.  The associates, when they're working the

15     line, they're in the all black team wear.  The team leads,

16     they're in the red polos.  Supervisors are in the red polos.

17     The quality associates, they're in the white polos.  There's a

18     lot of traffic that goes through.  We have tours that go

19     through the line.  There's other lines that people have to

20     actually have to walk through the general assembly line to get

21     to their having the team or policy in place with the visual

22     management.  It lets you know that people are where they're

23     supposed to be, and also lets you know if there's somebody

24     there that's not supposed to be.

25     Q    Okay, and what types of positions would come into general



www.escribers.net | 800-257-0885

1   assembly that are people that are not a part of general

2   assembly?

3   A    It could be end of line technicians.  It could Power Train

4   associates who work upstairs.  It could be the engineers,

5   process quality or quality, or even the tours themselves.

6   Q    Okay, and if someone is in a Union shirt, is there any way

7   to tell if they're actually supposed to be in general assembly?

8        MR. GARBER:  Objection.  Calls for speculation.

9        JUDGE TRACY:  Overruled.  Go ahead.

10       THE WITNESS:  No, you can't tell if they're within general

11  assembly or not.

12       MR. MORRIS:  Okay, nothing further.

13       JUDGE TRACY:  Mr. Garber?

14       MR. GARBER:  No.

15       JUDGE TRACY:  Okay, Ms. Feinberg?

16       MS. FEINBERG:  No, I think we're good.

17       JUDGE TRACY:  Okay, all right, thank you very much.

18       THE WITNESS:  Thank you.

19       JUDGE TRACY:  Please don't discuss your testimony with

20  anyone until after the close of the hearing.

21       THE WITNESS:  Yes, ma'am.

22       JUDGE TRACY:  Okay, thank you.  You can leave all the

23  papers there.

24       THE WITNESS:  Okay, thank you.

25       JUDGE TRACY:  Okay, let's go ahead and go off the record.



1    It's about 12:15, 12:20 according to that thing.  How about we

2    start back at 1:10?

3    (Off the record at 12:16 p.m.)

4        JUDGE TRACY:  Okay, so before we go to the next witness,

5    we've received now Respondent's Exhibit 16, page 2, the color

6    copy of that.  So just to be clear, Respondent's Exhibit 16,

7    page 1, is the original without any handwriting, and page 2 is

8    the color copy with handwriting, and those are both admitted

9    into evidence.

10   **(Respondent Exhibit Number 16 Received into Evidence)**

11       JUDGE TRACY:  All right, we'll wait.  We'll still hold off

12   on all these other questions that we have, but, in the

13   meanwhile, Mr. Morris, your next witness.

14       MR. MORRIS:  Matt Lee.

15       JUDGE TRACY:  If you could stand up please, and raise your

16   right hand.

17   Whereupon,

18                          **MATTHEW LEE**

19   having been duly sworn, was called as a witness herein and was

20   examined and testified as follows:

21       JUDGE TRACY:  Okay, have a seat, and state your name for

22   the record.

23       THE WITNESS:  Matthew Lee.

24       JUDGE TRACY:  All right, so let me give you some

25   instructions.  This microphone does not amplify your voice.



www.escribers.net | 800-257-0885

1   It's just for the recording of this hearing.  So all I need you

2   to do is just speak loudly so everybody in the room is able to

3   hear you.  You may be asked to repeat your testimony if in case

4   someone doesn't hear it, and if you don't understand a

5   question, just say that you don't understand, okay?

6        THE WITNESS:  Okay.

7        JUDGE TRACY:  Mr. Morris.

8                        **DIRECT EXAMINATION**

9   Q    BY MR. MORRIS:  Matt, where are you employed?

10  A    Tesla.

11  Q    And what is your position with Tesla?

12  A    Sure, my position is senior manager for occupational

13  health.

14  Q    How long have you been employed by Tesla?

15  A    I've been employed with Tesla for two years.

16  Q    Okay, have you always held the same title?

17  A    No.

18  Q    What was the other title that you held?

19  A    Initially when I started two years ago, I was associate

20  EHS manager.

21  Q    Okay, and could you describe what your job duties are

22  currently?

23  A    Yes, as senior manager for occupational health, I manage

24  our occupational health initiatives which include our

25  industrial hygiene programs, our medical surveillance programs,



1    and our injury care management programs.

2    Q    Okay, and what about in your prior role?

3    A    In my prior role, I managed the environmental health and

4    safety staff for the factory departments in Fremont.

5    Q    Okay, was there a time where you were filling in in an

6    interim capacity?

7    A    That's correct, and that's the role I had just mentioned.

8    I was the interim lead for EH&S or environmental health and

9    safety for the factory.

10    Q    Okay, I'd like to show you an exhibit.  I think we're on

11    32.

12        MR. GARBER:  I think you're right.

13    (Counsel confer)

14    Q    BY MR. MORRIS:  And looking at R-32, could you tell me

15    what this document is?

16    A    Yes, this --

17        MR. RODRIGUEZ RITCHIE:  Your Honor, we object to the

18    relevance of any line of questioning regarding this document.

19        JUDGE TRACY:  And so, what's the relevance?

20        MR. MORRIS:  The relevance is we heard testimony from Mr.

21    Galescu that he filed a complaint with Cal/OSHA.  The complaint

22    concerns OSHA 300 log requests, as well as the confidential

23    watermark that was put on the response to that request.  The

24    complaint also concerned the same interviews that allegedly

25    occurred in May of 2017 after there was a concern that employee



22-60493.1698

1    medical information had been disclosed to third parties, and to

2    my understanding, that Cal/OSHA conducted an investigation and

3    found that there was no merit to those allegations, and that

4    the Employer acted consistent with Federal OSHA and Cal/OSHA.

5        MS. FEINBERG:  Your Honor, that is an inaccurate

6    representation.  If we're going to make representations, since

7    I was on the other side of this, I believe Cal/OSHA determined

8    was that by the time the case was processed, that some of these

9    matters had been cured.  It's just not the same thing, and I

10   don't understand the relevancy unless you're putting in calling

11   Cal/OSHA, but I know what they represented to me.

12       MR. RODRIGUEZ RITCHIE:  It would be --

13       MS. FEINBERG:  So I feel like that proves the irrelevancy

14   because there's nothing in this case about the timely matter,

15   you know, and fares related to those issues that are listed in

16   the first paragraph -- the second paragraph there.

17       MR. RODRIGUEZ RITCHIE:  It would be our position that

18   whether something complied with the state law or state

19   regulation has nothing to do necessarily with whether the

20   National Labor Relations Act was violated, whether they really

21   would have no bearing on that.  The laws are separate.  The

22   standards are likely different, and so for that reason, we'd

23   object on relevancy grounds.

24       MR. MORRIS:  And I'd like to clarify.  The complaint was

25   not only with respect to Cal/OSHA, but it was also with respect



1    to Federal OSHA.

2        MS. FEINBERG:  Well, in California, Cal/OSHA handles all

3    OSHA complaints.

4        JUDGE TRACY:  Okay, so --

5        MS. FEINBERG:  So are the Agency responsible for it.  So

6    it's the same difference.  I don't see how it could be

7    relevant, but I apologize, Your Honor.

8        JUDGE TRACY:  So but what is the relevance to this

9    complaint?

10        MR. MORRIS:  It's relevant insofar as Cal/OSHA found that

11    the Employer acted consistently when it provided the response

12    to the OSHA 300 requests, and that it acted consistently with

13    respect to those meetings.

14        JUDGE TRACY:  Well, I guess, the issue though here is that

15    the allegations in the complaint are that the National Labor

16    Relations Act was violated, not the Cal/OSHA or the OSHA

17    regulations were violated.  They don't, you know, deal with

18    that.  I don't deal with that either.  If you feel that you

19    want to put this in the record just simply to show what

20    happened, I don't see the relevance to the proceeding --

21        MR. MORRIS:  If I may add one thing, Your Honor?  It's

22    relevant to our defense concerning those two allegations

23    related to the OSHA 300 logs, and it's relevant to our defense

24    because there are privacy concerns that have to be taken into

25    account because of Federal and Cal/OSHA regulations --



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  All right, so --

2      MR. MORRIS:  -- and it's relevant to that.

3      JUDGE TRACY:  Yeah, so, you know, again, again, you're

4  going to dispute that that, I mean, that defense does not hold

5  up.  This is the defense that they're raising, and so for me to

6  have a complete record, I don't care what in the end happened

7  with the Cal/OSHA part.  The fact is this could have also been

8  done by stipulations if there were some, you know, filings --

9      MS. FEINBERG:  Your Honor, our concern is that this is

10  just the beginning of the process.  Are we about to spend an

11  hour reliving the whole OSHA process because this only puts

12  them on notice that the Union had filed that they were not

13  produced in a timely fashion and that data was redacted or

14  changed which, by the way, that was the subject of the unfair

15  and that was certainly the unlikely -- maybe some of the facts

16  related to that.  So I don't know what -- how this is relevant

17  unless they're going to try to show a whole line of things, and

18  then maybe we should ask this witness to leave before all that

19  conversation takes place.

20      JUDGE TRACY:  No, I mean, I'm going to allow it.  Again, I

21  have an obligation to develop the record here.  If they're

22  going to argue that look, we had to do this.  I've seen this in

23  other cases too.  I will say, by the way, we were required to

24  do it.  Under HIPAA, I've seen that.  So this is the same

25  thing.  So I'm going to allow it.  I don't want to get into

escribers
www.escribers.net | 800-257-0885

1  this whole line of what did OSHA do and the whole process.

2  Just put in the very basics of what you all did, and then move

3  on, please.

4      MR. MORRIS:  That's my intention.

5      JUDGE TRACY:  Thank you.  So that -- yes?

6      MR. RODRIGUEZ RITCHIE:  I would just request to just have

7  a standing objection on relevancy just to speed up this

8  afternoon so I don't object each time on relevancy grounds.

9      JUDGE TRACY:  Yes, and again, this is something that you

10  put in your brief, right?

11      MR. RODRIGUEZ RITCHIE:  Thank you.

12      MS. FEINBERG:  I feel the record ultimately way incomplete

13  unless we then might having to litigate this issue because

14  you're not going to see how OSHA works.  You're not going to

15  see the outcome in a way that --

16      JUDGE TRACY:  But I just already said I don't care how

17  Cal/OSHA works.

18      MS. FEINBERG:  Okay, but you're allowing this in.  All

19  right, Your Honor, I will have a continuing objection as well.

20      JUDGE TRACY:  That's fine.  So the objection is overruled.

21  Respondent's Exhibit 32 is admitted into evidence.

22  **(Respondent Exhibit Number 32 Received into Evidence)**

23      JUDGE TRACY:  I'm instructing you though, Mr. Morris, that

24  I understand that this is your defense.  So I'm going to allow

25  it to that extent.  However, I do not want to hear about the

escribers
www.escribers.net | 800-257-0885

1    whole OSHA process and what happened, how, you know.  I

2    understand you need to get a record in here so that way when

3    you write your briefs, you have something to refer to, okay?

4         MR. MORRIS:  It's going to be very brief.

5         JUDGE TRACY:  Thank you.  You probably forgot the

6    question, as I did, so.

7         THE WITNESS:  Yeah, can you repeat the question?

8    Q    BY MR. MORRIS:  Looking at Respondent's 32, do you

9    recognize this document?

10   A    I do.

11   Q    And could you describe what this document is?

12   A    Yes, it's a notification from Cal/OSHA that they had

13   received a complaint and have requested that we investigate the

14   alleged complaint or hazardous condition.

15   Q    Okay, and it looks like it's from Kelly Tatum.  Do you

16   know who that is?

17   A    I do.

18   Q    Can you explain who that is?

19   A    Kelly Tatum is one of the compliance officers and was the

20   acting district manager for the enforcements district.

21   Q    And that's for Cal/OSHA?

22   A    Correct.

23   Q    Did Cal/OSHA conduct an inspection concerning this

24   complaint?

25        MR. RODRIGUEZ RITCHIE:  Objection.  Lacks foundation.



1     JUDGE TRACY:  Sustained.

2     Q    BY MR. MORRIS:  Do you know whether Cal/OSHA conducted an

3     inspection concerning this complaint?

4     A    I do.

5     Q    And did they conduct an inspection?

6     A    Yes.

7     Q    After an inspection was conducted, did you have any

8     communications or conversations with anyone from Cal/OSHA?

9     A    Sorry, can you repeat that?

10    Q    Yeah, did you have any conversations with anyone from

11    Cal/OSHA concerning their complaint after the inspection?

12    A    After this inspection, yes.

13    Q    And could you explain to me what the conversations

14    included?

15         MS. FEINBERG:  Objection.  Hearsay.

16         MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

17         JUDGE TRACY:  Sustained.

18         THE WITNESS:  Yes.

19         JUDGE TRACY:  So you're not supposed to answer.

20         THE WITNESS:  I'm sorry.

21    Q    BY MR. MORRIS:  Can you tell me -- well, first off, was

22    this conversation with Kelly Tatum?

23    A    Yes.

24    Q    Did Kelly Tatum tell you anything with respect to the

25    complaint referenced in Respondent's 32?



1     MS. FEINBERG:  Objection.  Vague, leading.

2     MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

3     JUDGE TRACY:  Sustained.

4     MR. MORRIS:  As to which objection?

5     JUDGE TRACY:  To the question that you just posed that it

6  was leading.

7     MR. ROSS:  Well, go ahead.  I'm sorry.

8  Q   BY MR. MORRIS:  What, if anything, did Kelly Tatum tell

9  you concerning the complaint referenced in Respondent's 32?

10     MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

11     JUDGE TRACY:  Sustained.

12     MR. MORRIS:  I think it could come in as a statement of a

13  public official.

14     JUDGE TRACY:  Oh, no.  Sustained.

15  (Counsel confer)

16  Q   BY MR. MORRIS:  Was a citation issued concerning the

17  complaint identified in Respondent's 32?

18     MR. RODRIGUEZ RITCHIE:  Objection.  Lacks foundation.

19     MS. FEINBERG:  Objection.  I don't know if I still have my

20  relevancy objection there.

21     JUDGE TRACY:  Sustained.

22     MR. MORRIS:  As to foundation?

23     JUDGE TRACY:  Right, because you're jumping from this

24  letter to something else which is what he just testified about.

25     MS. FEINBERG:  And, Your Honor, I --



1    JUDGE TRACY:  So here's the thing.  I understand what

2    you're trying to put in.  It's like what happened next?  What

3    did you all do?  What was the outcome?  There you have it.

4    Then we can get on with it.

5    MS. FEINBERG:  Okay, Your Honor, but I would like to state

6    on the record the fact that Bodiford did or didn't issue a

7    complaint does not mean whether there is or isn't a

8    violation --

9    JUDGE TRACY:  I understand that --

10    MS. FEINBERG:  Okay, so then that's the inference that

11    they're trying to draw.  So I'm going to let the relevancy --

12    JUDGE TRACY:  Sure, but again, I'm going to fact find it

13    and then decide it.

14    MS. FEINBERG:  Fine, okay.

15    JUDGE TRACY:  I get it.  I get it, but they need to put in

16    what they can that isn't hearsay --

17    MS. FEINBERG:  Okay.

18    JUDGE TRACY:  -- into this record to just take care of

19    this piece.

20    MS. FEINBERG:  Fine.

21    Q    BY MR. MORRIS:  Did you receive any formal letters from

22    Cal/OSHA concerning this complaint, other than Respondent's

23    Exhibit 32?

24    MR. RODRIGUEZ RITCHIE:  Objection.  Vague as to formal.

25    JUDGE TRACY:  Overruled.  Go ahead.



1    THE WITNESS:  No.

2    Q    BY MR. MORRIS:  Did you have any conversations with the

3    district manager concerning this complaint?

4    MR. RODRIGUEZ RITCHIE:  Objection to the extent it calls

5    for hearsay.

6    JUDGE TRACY:  Overruled.  He can't say what, just did you.

7    Thank you.

8    THE WITNESS:  Yes, I did.

9    Q    BY MR. MORRIS:  Can you tell me what was discussed during

10    that conversation?

11    MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

12    MS. FEINBERG:  The same objection.

13    JUDGE TRACY:  Sustained.

14    MR. MORRIS:  I think it could come in as a hearsay

15    exception insofar as there is no official letter from Cal/OSHA.

16    If there's an absence of public record, then that is a hearsay

17    exception.

18    MR. RODRIGUEZ RITCHIE:  Even if that were applicable, this

19    witness -- there's no foundation that that would even apply

20    here.

21    JUDGE TRACY:  Yeah, I'll sustain the objection.

22    MR. MORRIS:  On the hearsay grounds?

23    JUDGE TRACY:  Yes.

24    Q    BY MR. MORRIS:  In preparation for today, did you conduct

25    a search for any letters or documents from Cal/OSHA concerning



1    the complaint referenced in Respondent's Exhibit 32?

2    A    Yes.

3    Q    And were you able to find any letters from Cal/OSHA

4    concerning that complaint?

5    A    The only letter I would have seen that was an official

6    correspondence from Cal/OSHA on this case would be this

7    complaint letter.

8    Q    Okay, and to your knowledge, so to your knowledge, there's

9    no additional letters from Cal/OSHA that were sent to Tesla

10   concerning the complaint referenced in Respondent's Exhibit 32?

11   A    There's no -- there's no official correspondence from

12   Cal/OSHA with respect to this particular complaint letter.

13   Q    Okay, and so going back to this conversation with the

14   district manager, what was discussed concerning that complaint?

15        MR. RODRIGUEZ RITCHIE:  Objection.

16        MS. FEINBERG:  Hearsay.

17        JUDGE TRACY:  Okay, I'm going to keep getting an objection

18   which I agree with.  So I'm going to sustain the objection.

19   After you had this conversation with the district manager, what

20   did you do?

21        THE WITNESS:  After the conversation --

22        JUDGE TRACY:  Yes --

23        THE WITNESS:  -- I had with respect to this letter?

24        JUDGE TRACY:  Yes, Ms. Tatum.

25        THE WITNESS:  Yes, so after the -- after I received the



1    conversation or after I had the conversation with Kelly Tatum,

2    I updated our files to close this case out as not having any

3    violations and being closed by Cal/OSHA.

4    Q    BY MR. MORRIS:  And is it your understanding that the

5    complaint referenced in Respondent's Exhibit 32 has been

6    closed?

7    A    Yes.

8         MR. MORRIS:  Okay, nothing further.

9         JUDGE TRACY:  Mr. Rodriguez Ritchie or Mr. Garber?

10   (Counsel confer)

11        MR. RODRIGUEZ RITCHIE:  No questions.

12        JUDGE TRACY:  Okay, Ms. Feinberg?

13        MS. FEINBERG:  I just want to get some clarification.

14                      **CROSS-EXAMINATION**

15   Q    BY MS. FEINBERG:  Were you involved in the original

16   production of the 300 logs that were requested by Mr. Galescu

17   and Mr. Ortiz?

18   A    No.

19   Q    And so were you -- none of them, any incarnation of those

20   logs you weren't involved in?

21   A    For those specific employees?

22   Q    Yes.

23   A    No.

24   Q    Okay, and were you involved -- were you aware that there

25   were -- did you ever see the responses that were sent to Mr.



1   Galescu and Mr. Ortiz?

2   A    I did not.

3   Q    Were you the person responsible for handling the response

4   to Respondent's Exhibit 32?

5   A    No, I was not.

6   Q    Did you see the response that Tesla sent to OSHA with

7   respect to Respondent's number 32?

8   A    Yes, I did.

9   Q    But you weren't the one who handled it?

10  A    That's correct.

11  Q    But you didn't see the OSHA logs that were sent to Mr.

12  Galescu or Mr. Ortiz at that time?

13  A    No, not at the time that they were sent to the employees

14  who had requested them.

15  Q    Okay, did you see them at any time?

16       MR. MORRIS:  Objection.  Relevance.

17       JUDGE TRACY:  Overruled.  Go ahead.

18       THE WITNESS:  Yes, I think I saw them as part of the

19  response to this complaint after it was sent to Cal/OSHA.

20  Q    BY MS. FEINBERG:  Okay, and so you were aware of the fact

21  that Tesla gave various incarnations of letters -- of responses

22  to Mr. Galescu and Mr. Ortiz; that they gave a response to Mr.

23  Galescu and Mr. Ortiz asked for more information; and they gave

24  another response and so forth?

25  A    I don't know how many responses they would have given to



www.escribers.net | 800-257-0885

1    the employees.

2    Q    Okay, do you know that there was more than one?

3    A    Yes.

4    Q    More than two?

5    A    No.

6    Q    Okay, and did you post this letter, Respondent's Exhibit

7    32?

8         MR. MORRIS:  Objection.  Relevance.

9         MS. FEINBERG:  Well, you put this in as what happened.  So

10   I'm just trying to understand if he complied with it.

11        MR. MORRIS:  The same objection.

12        JUDGE TRACY:  Sustained.

13        MS. FEINBERG:  Okay, I don't believe it was -- okay,

14   nothing further.

15        JUDGE TRACY:  Have you moved for admission for this

16   document?

17        MR. MORRIS:  I think you admitted it, didn't you?

18        JUDGE TRACY:  Did I?

19        MS. FEINBERG:  No.

20        JUDGE TRACY:  No --

21        MR. MORRIS:  Okay.

22        JUDGE TRACY:  -- We argued about it.  Any objections to

23   Respondent's Exhibit 32?

24        MR. RODRIGUEZ RITCHIE:  Yes, Your Honor.

25        MS. FEINBERG:  Yes.



1    MR. RODRIGUEZ RITCHIE:  It's our position that this

2    document lacks relevance.  It lacks foundation and it's a

3    hearsay document.

4        JUDGE TRACY:  Okay.

5        MS. FEINBERG:  I'd share those objections.

6        JUDGE TRACY:  All right, great.  So Respondent's Exhibit

7    32 -- those objections are overruled, and Respondent's Exhibit

8    32 is admitted into evidence.  Any other questions?

9        MR. MORRIS:  No.

10       JUDGE TRACY:  Okay, thank you very much.

11       THE WITNESS:  Thank you.

12       JUDGE TRACY:  Please don't discuss your testimony with

13   anyone until after the close of the hearing in this matter

14   which will be sometime later.

15       THE WITNESS:  Understood.

16       JUDGE TRACY:  Thank you.

17       THE WITNESS:  Thank you.

18       JUDGE TRACY:  Let's go off the record, and you can leave

19   that paper there.  They'll take it back.

20       THE WITNESS:  Okay, thank you.

21   (Off the record at 1:40 p.m.)

22       JUDGE TRACY:  Go ahead and go on the record.  Okay, before

23   we go to Respondent's next witness, let's just state for the

24   record that we were waiting on Respondent's Exhibits 22, 23, 24

25   for a better version of them because there were some items that



www.escribers.net | 800-257-0885

1  were -- appeared to be cut off.  We received additional copies,

2  but they don't seem to contain the same information, although

3  it appears to be the same documents for each from this --

4  generated from the same system.  So what the parties have

5  agreed to is that Respondent's Exhibit 22, the original that

6  came in, will be page 1, and we're adding a page 2 which is

7  another page, and the same goes for 23 and 24.  So Respondent's

8  Exhibits 22, pages 1 through 2, Respondent's Exhibit 23, pages

9  1 and 2, and Respondent's Exhibit 24, pages 1 and 2, are now

10  admitted into evidence.

11  **(Respondent Exhibit Number 22, 23 and 24 Received into**

12  **Evidence)**

13      JUDGE TRACY:  And I --

14      MR. ROSS:  And, Your Honor, as to Respondent's 21 I

15  conferred with Mr. Rodriguez Ritchie.  I informed him, as I've

16  been informed, that the so-called attachment to that document

17  is, in fact, the company logo.  I've told him that I'll provide

18  him with that attachment between now and the resumption of the

19  next hearing.

20      JUDGE TRACY:  Okay, great.  Thank you.  Also, what I have

21  said was that we'll deal with the formal papers, any additions

22  to them the next time, the week of October 9th, and also while

23  we were off, so that we will after today, and I think this is

24  your last witness today, the hearing will resume on October 9th

25  in Oakland at 9 a.m. and will continue all week, so October



1    10th, 11th, 12th until about 5 p.m. that day.  Hopefully, that

2    will be it, but if needed, the parties have set aside another

3    three days, which are the days of November 14th, 15th and 16th,

4    same place, Oakland.  So hopefully, we won't need them, but

5    everybody could just mark those down in your calendar.

6        Also, when we resume, the first witness on October 9th at

7    9 a.m. will be Mr. Gecewich, and then, again, October 11th at 9

8    a.m. will begin with the expert, if needed, for the General

9    Counsel, and also, by next Wednesday, October 3rd, the General

10   Counsel has agreed to provide the Respondent with a notice of

11   intention of the expert witness' testimony, essentially what

12   that witness will be testifying about and what, if anything,

13   they will render, that person will render.  This is if a

14   stipulation is not reached by that point.

15       MR. ROSS:  And, Your Honor, I assume that that will also

16   include a recitation of the facts upon which the opinion is

17   based because that's what I understood you said before.

18       JUDGE TRACY:  Well, I thought actually what we spoke about

19   before was your question was where -- what are they basing

20   their evidence upon, and I thought that you meant by that like

21   where are they getting their knowledge from.

22       MR. ROSS:  Well --

23       JUDGE TRACY:  I mean the facts are the facts that have

24   already been admitted into evidence.  So I'm not quite sure --

25       MR. ROSS:  If they stray from all the evidence that's



1   already in the record, I think I'm entitled to know that.

2       JUDGE TRACY:  Well, I don't feel so, but --

3       MS. FEINBERG:  I think what we give you a rule.

4       MR. GARBER:  I would disagree with it.  I think we're kind

5   of beating a dead horse.  I think we're working on it, and

6   we'll get there.

7       JUDGE TRACY:  Yeah, okay.  All right, Mr. Ross, you're

8   going to do the next witness?

9       MR. ROSS:  I am.

10      JUDGE TRACY:  Okay --

11      MR. ROSS:  I am.

12      JUDGE TRACY:  -- if you could call your next witness.

13      MR. ROSS:  Yes, he's in the witness stand now.  His name

14  is David Rios.

15      JUDGE TRACY:  Okay, if you could stand up please for me,

16  and raise your right hand.

17  Whereupon,

18                         **DAVID RIOS**

19  having been duly sworn, was called as a witness herein and was

20  examined and testified as follows:

21      JUDGE TRACY:  Okay, go ahead and have a seat.  State your

22  name for the record.

23      THE WITNESS:  David Rios.

24      JUDGE TRACY:  Okay, and so, let me give you a few

25  instructions.  This microphone does not amplify your voice.  It



1   doesn't make it louder.  It's just for recording purposes.  So

2   speak loudly so that everybody in the room can hear you.  You

3   may be asked to repeat your testimony if someone didn't hear

4   you, and if you don't understand a question that's being asked

5   of you, please feel free to say that you don't understand,

6   okay?

7        THE WITNESS:  Okay.

8        MR. ROSS:  Well, can you instruct him also what to do if

9   there's an objection.

10       JUDGE TRACY:  Oh, yes, okay.  So if there is an objection,

11  just wait for me to rule on it.  I'll say something about

12  whether you can answer it or not --

13       THE WITNESS:  Okay.

14       JUDGE TRACY:  -- but you can look to me to see if you

15  should be answering it, okay?

16       THE WITNESS:  Okay.

17       JUDGE TRACY:  Mr. Ross, go ahead, please.

18       MR. ROSS:  Thank you.  Thank you, Your Honor.

19                        **DIRECT EXAMINATION**

20  Q    BY MR. ROSS:  Mr. Rios, you work at Tesla?

21  A    Yes.

22  Q    And what position do you hold at Tesla?

23  A    Protection associate.

24  Q    Assigned to any particular area or segment of the company?

25  A    No.



www.escribers.net | 800-257-0885

1    Q    Let me ask you this.  Are you assigned to fire and safety?

2    A    Yes.

3    Q    Okay, and how long have you worked at Tesla?

4    A    Four years, and one year as a contractor, three years as

5    an employee.

6    Q    Okay, and when you say as a contractor, you were working

7    for a contractor --

8    A    Security.

9    Q    -- at Tesla?

10   A    Yes.

11   Q    Who was that contractor?

12   A    Securitas.

13   Q    Okay, and what year was it that you were working at Tesla

14   for Securitas?

15   A    2014.

16   Q    2014, okay.  And could you tell us what your general job

17   duties are as a protection associate assigned to fire and

18   safety?

19   A    On a daily basis, we are to check for any -- for fire

20   extinguishers, the monthly tasks for all the fire systems we

21   have, annual systems or annual tests for any of the fire

22   systems as well.

23   Q    Okay, now, that's your job right now.  Was that your job

24   in February of 2017?

25   A    Yeah.



www.escribers.net | 800-257-0885

1   Q    And where do you perform those job duties?

2   A    Anywhere in the factory we do it.  We have a monthly list

3   or a yearly list that we have, and then whatever the specific

4   area is, that's where I go for the month or for the day if were

5   to do the task.

6   Q    Okay, is there ever a call for you to be doing work in the

7   control room?

8   A    Yes.

9   Q    Okay, and who is your immediate boss now?

10  A    I'm sorry.

11  Q    Who is your immediate boss?  Who's your --

12  A    Brian Preston.

13  Q    And what's Mr. Preston's title?

14  A    Associate manager.

15  Q    Of anything in particular?

16  A    Security.

17  Q    Okay, and who was your boss in February 2017?

18  A    Brian Preston.

19       MR. ROSS:  All right, just one moment, Your Honor.  I'm

20  having a slight document malfunction here.

21  Q    BY MR. ROSS:  I'm showing the witness Respondent Exhibit

22  22, the first page.

23       MR. RODRIGUEZ RITCHIE:  You said Respondent's 22?

24       MR. ROSS:  Respondent's 22, yep.

25  Q    BY MR. ROSS:  Now, Mr. Rios, you have in front of you a



22-60493.1718

1    document that's been marked R or Respondent's 22.  It is titled

2    Tesla Fire & Security CAD Incident Report numbers 170210006,

3    dated 2/10/17, at 4:20.  Do you recognize that document?

4    A    Yes.

5    Q    What is it?

6    A    It's a basic -- it's -- that pops up on your computer when

7    somebody is calling and you want to document down in our

8    system.

9    Q    Okay, you're going to have raise your voice up then.  I'm

10   sorry.

11   A    It's a basic incident for anything that happens, and it's

12   a basic call tape that we put in our system that we want to

13   keep track of.

14   Q    Okay, do you know where you were when this call came into

15   the control room?

16   A    I was in the control room.

17   Q    Did the call come into you personally, sir?

18   A    No.

19   Q    Do you know who received the call?

20   A    Yes.

21   Q    Who?

22   A    Bo Dork.

23   Q    And Mr. Dork was what that night, what position was he

24   performing?

25   A    He's the control room dispatcher.



www.escribers.net | 800-257-0885

1  Q    Now, when the call came in, do you remember how the call

2  came in?  Was it by telephone, by --

3  A    It was by telephone.

4  Q    By telephone, and can you tell me did you hear what was

5  said by the person calling Mr. Dork?

6  A    No, I did not.

7  Q    Did you hear Mr. Dork's side of the conversation?

8  A    No, I did not.

9  Q    Tell me, how did you happen to be in the control room

10 working there that night?

11 A    Well, we were short on staff and I earlier did to cover

12 the shift.

13 Q    Okay, and after Respondent's Exhibit 22 came in, after Mr.

14 Dork received that call from Ms. Hunter, I think who's

15 mentioned in the document, did you have occasion to go out to

16 door 2?

17 A    Yeah.

18 Q    Okay, and do you remember how you got there?

19 A    I walked.

20 Q    So you were not in a vehicle?

21 A    No, I was not.

22 Q    And can you tell me how long it took you to go from the

23 control room to the area outside door 1 on the outside of the

24 building?

25 A    About a minute.



www.escribers.net | 800-257-0885

1    Q    And can you tell us when you got there, tell us what did

2    you see when you arrived on the scene?

3    A    I seen Securitas guard, Samuel Noakes.

4    Q    I'm sorry.

5    A    I seen Securitas guard, Samuel Noakes, talking to a man

6    outside.

7    Q    Okay, did you hear any part of the conversation that was

8    taking place between Mr. Noakes and this man?

9    A    Yes.

10   Q    Okay, would you tell us what you heard said and by whom?

11        MS. FEINBERG:  Objection.

12        MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

13        MS. FEINBERG:  Objection.  Foundation.

14        JUDGE TRACY:  Lay the foundation, please.

15        MR. ROSS:  He's testified that he personally heard what

16   was being said.  So I'm asking him to repeat, tell us, what

17   words he heard said as he approached these two individuals.

18        MS. FEINBERG:  I don't think that's a question of

19   foundation.

20        MR. RODRIGUEZ RITCHIE:  It's still hearsay.

21        MS. FEINBERG:  They don't know the who, the exact where,

22   the other people.  That's what to me is the foundation of the

23   conversation.

24        MR. ROSS:  Well, we'll find that out pretty shortly, Your

25   Honor.



www.escribers.net | 800-257-0885

1    MS. FEINBERG:  Well, that's what foundation is.

2    JUDGE TRACY:  Right, so set up the conversation --

3    MR. ROSS:  Well, the problem is is that when he heard

4    these conversations, he knew who Noakes was, but he didn't know

5    who the other individual was.

6    MS. FEINBERG:  Could we not have Mr. Ross also testify --

7    JUDGE TRACY:  So again though, I think the issue with the

8    foundational part is, you know, where was he, how far away was

9    he --

10   MR. ROSS:  That's fair enough.

11   JUDGE TRACY:  -- all of that to establish, then what

12   conversation occurred --

13   MR. ROSS:  Okay, that's fine.

14   JUDGE TRACY:  -- and, of course, you'll get another

15   objection that it's hearsay, but we'll get there.

16   MR. ROSS:  Okay.

17   MS. FEINBERG:  Thank you.

18   Q    BY MR. ROSS:  So when you got on the scene, I think you

19   said you saw Securitas guard by the name of Sam Noakes --

20   A    Yes.

21   Q    -- talking to a man?

22   A    Yes.

23   MR. ROSS:  By the way, what's the Employer's next in

24   order?

25   MR. GARBER:  33.



www.escribers.net | 800-257-0885

1    MS. FEINBERG:  Does yours have handwriting on the top?

2    MR. ROSS:  Excuse me?

3    MS. FEINBERG:  I just can't tell if this is meant to be

4    there or not.  There's some like faint wording on the top.  I

5    was trying to understand if that's supposed to be on there.

6    MR. ROSS:  I think I probably gave you the copy I put the

7    glat -- on.  So I'll give you a clean copy.

8    MS. FEINBERG:  That's fine.  I just wanted to make sure if

9    I had the right one.

10   MR. ROSS:  Thank you.

11   MS. FEINBERG:  Thank you.

12   Q    BY MR. ROSS:  So, Mr. Rios, I've handed you a document.

13   It's a photograph and marked Respondent's Exhibit 33.  It's got

14   a number imprinted on the photograph Tesla NRNB000861.  Do you

15   see that?

16   A    Yeah.

17   Q    Okay, do you recognize the person shown in this document?

18   A    Yeah.

19   Q    Who is it?

20   A    Sam Noakes.

21   Q    Sam Noakes, all right.  Now, you said that as you -- when

22   you arrived on the scene, you saw Mr. Noakes talking to this

23   man.  From what direction were you approaching there at?

24   A    Probably the north side of him, from the north.

25   Q    Okay, and you said that you heard words being exchanged



1    between the two.  Can you tell us about how far away from them

2    you were when you heard those words?

3    A    I was right there next to them.

4    Q    You were what?

5    A    I was next to them.

6    Q    Right next to them.  Within 10 feet?

7    A    A little less than that, yeah.

8    Q    A little less than 10 feet, okay.  And would you tell us

9    what you heard said and by whom when you were approaching?

10   A    When I walked --

11        MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

12        JUDGE TRACY:  Mr. Ross?

13        MR. ROSS:  Yes, ma'am.

14        JUDGE TRACY:  The hearsay objection.

15        MR. ROSS:  He is a percipient witness to an event which we

16   believe or the prior witnesses for the Board testified to.  So

17   this is offered for the purpose of controverting the testimony

18   that's already before you.

19        JUDGE TRACY:  So, you know, I'm going to overrule the

20   objection.  At this point, it appears to be hearsay, but,

21   again, what I've noticed all along in this complaint is that on

22   both sides there are these issues of not identifying people,

23   and I think I gave a little bit of leeway also in that portion

24   of your case with regards to who these individuals spoke with,

25   and we didn't know who they were, and in this regard too, I'm

22-60493.1724



1    not sure who is the other person.  I don't think any of us know

2    at this point.  So I'm going to allow the testimony.  You can

3    certainly in the brief argue again if this is hearsay, and it

4    should not be considered.

5         MS. FEINBERG:  He just offered that he was using it to

6    controvert one of the witnesses.  So I guess somebody --

7         MR. ROSS:  Yeah, that's -- it's being offered to

8    controvert the testimony of Mr. Sanchez.

9         JUDGE TRACY:  I'm going to allow it.  Go ahead.

10        MR. ROSS:  Okay.

11   Q    BY MR. ROSS:  So please tell us what you heard being said

12   as you were approaching these men and you were about 10 feet

13   away?

14   A    I heard Sam Noakes say to the man that the unions were no

15   good, and the unions didn't do nothing for him.

16   Q    Okay --

17        MR. RODRIGUEZ RITCHIE:  I'm sorry.  I didn't catch that.

18        THE WITNESS:  I'm sorry.  I heard Sam Noakes say to the

19   man that the unions were no good, and the unions did not do

20   anything for him.

21   Q    BY MR. ROSS:  Do you remember whether Mr. Noakes mentioned

22   that he had been in a union?

23   A    No.

24   Q    Tell me, is that all you can recall hearing said as you

25   approached Noakes and this man?



www.escribers.net  |  800-257-0885

1    A    Yes.

2        MR. ROSS:  Your Honor, I'm going to offer Respondent's

3    Exhibit 33 into evidence.

4        JUDGE TRACY:  Any objections to Exhibit 33?

5        MR. RODRIGUEZ RITCHIE:  I don't have any objections as

6    such.  I would -- the same problem with the copy, and do we

7    have a better picture of this.  I guess I would just for

8    purposes of the record.

9        JUDGE TRACY:  Any other like color copy of this,

10    Respondent's Exhibit 33, or anything better?

11        MR. ROSS:  I may be able to find a color copy, but I don't

12    have it with me now, Judge.  It's certainly a legible picture.

13    I mean there's nothing illegible that matters.

14        JUDGE TRACY:  Yeah.

15    (Counsel confer)

16        JUDGE TRACY:  You know, they'll look for a better copy,

17    but this may be it.  So any objections?

18        MR. RODRIGUEZ RITCHIE:  No objection.

19        JUDGE TRACY:  Okay, Ms. Feinberg?

20        MS. FEINBERG:  No, I think -- no, I guess not.

21        JUDGE TRACY:  So Respondent's Exhibit 33 is admitted into

22    evidence.

23    **(Respondent Exhibit Number 33 Received into Evidence)**

24    Q    BY MR. ROSS:  By the way, can you tell us where Mr. Noakes

25    and this man were standing when you arrived on the scene?

22-60493.1726



1    A    Outside of door 2.

2    Q    Okay, tell me, can you be more precise than that?

3         MR. ROSS:  You might want to come up and stand by it, I

4    think.

5         JUDGE TRACY:  Let me ask you, is it too much trouble to

6    turn that projector on and use that?  It's just the way that

7    this will go is everybody will be huddled around him to try to

8    see what he's pointing at versus Mr. Rodriguez Ritchie had

9    kindly agreed the other day to kind of make this available.

10        MR. ROSS:  That would be fine.  I don't have the slider.

11   Do you have the slider door 2?

12        MR. RODRIGUEZ RITCHIE:  It would be on the surround.  You

13   know I come prepared.

14        MR. ROSS:  I know you do.

15        JUDGE TRACY:  Isn't it already in evidence?

16        MR. ROSS:  It is, but --

17        JUDGE TRACY:  I mean, isn't what you're showing him --

18   which exhibit is it?

19        MR. ROSS:  I'm trying to show him Joint Exhibit 1.

20        JUDGE TRACY:  Yeah, so they have that.

21        MR. ROSS:  Okay.

22        JUDGE TRACY:  And then do you have your pointer?  Thank

23   you.

24        MS. FEINBERG:  What are all these things?

25        JUDGE TRACY:  He said Joint Exhibit 1.

22-60493.1727



1      MR. RODRIGUEZ RITCHIE:  I'm handing the witness the

2   pointer.

3      MR. ROSS:  And I honestly don't recall which of the

4   exhibits was door 2.  So I'll have to count on you.

5      JUDGE TRACY:  I thought you were using Joint Exhibit 1.

6      MR. ROSS:  We can use Joint Exhibit 1.  That's fine.

7      JUDGE TRACY:  I mean, that's what you were about to

8   show --

9      MR. ROSS:  Yes, that's fine.  If you could put Joint

10  Exhibit 1, that would be great.

11     JUDGE TRACY:  In the meanwhile, do we have the correct

12  spelling of Mr. Noakes' last name?

13     THE WITNESS:  N-O-A-K-E-S.

14     JUDGE TRACY:  N-O-A-K-E-S.

15     MR. ROSS:  Can you make it any larger?  Is that as big as

16  you can make it?  Okay.

17     COURT REPORTER:  You need to be by a mic.  So there or

18  over there.

19  Q    BY MR. ROSS:  All right, so, Mr. Rios --

20  A    Yeah.

21  Q    -- you have in front of you projected on the wall a

22  document that is already in evidence that's labelled, marked

23  Joint Exhibit 1, and it is -- what essentially is a map, if you

24  will, of the Fremont facility.  I see door 2 labelled south of

25  the north administration building.  Do you see that?



www.escribers.net | 800-257-0885

1    A    Yeah.

2    Q    Okay, and using the laser pointer, could you show us where

3    Mr. Noakes and this man were standing when you approached them?

4    A    It would be right here, like right in south of -- it's a

5    little bit bigger from the picture, but it's like right there

6    on the edge outside of door 2.

7    Q    Okay, would the record please reflect that he pointed the

8    laser on what appears to be the right or southern side of door

9    number 2 but outside door number 2 in either the parking lot or

10   in the roadway in front of door number 2.  Is that accurate,

11   sir?

12   A    Yes.

13   Q    All right, now tell me when you --

14        JUDGE TRACY:  So, I'm sorry though.  Which was it?  Was it

15   the parking lot or the --

16        THE WITNESS:  Oh, it's outside the parking lot, yeah.

17        JUDGE TRACY:  Outside in the parking lot?

18        THE WITNESS:  Well, there's a gap between the door and the

19   parking lot.  So yeah, it was outside.

20        JUDGE TRACY:  What do you mean by a gap?

21        THE WITNESS:  Well, there's a roadway then the parking

22   lot.

23        JUDGE TRACY:  Oh, like just where cars are --

24        THE WITNESS:  Driving by, yeah.

25        JUDGE TRACY:  -- drive by?



www.escribers.net | 800-257-0885

1        THE WITNESS:  Yeah, sorry.

2    Q    BY MR. ROSS:  Were they standing in the parking lot or in

3    the roadway between the parking lot and the door?

4    A    The roadway.

5    Q    The roadway, okay.  Now, when you entered -- when you came

6    into the area, did you see any Tesla security cars in the area?

7    A    No, I did not.

8    Q    Okay, so you were testifying before that you walked up to

9    Mr. Noakes and the man he was talking to --

10   A    Um-hum.

11   Q    -- Can you tell us what you were wearing when you went out

12   to door number 2 on the morning on the 10th?

13   A    I was wearing a black hoodie and black BDU pants.

14   Q    Black hoodie?

15   A    Black hoodie and black BDU pants.

16   Q    BDU pants?

17   A    No, that's the style of the pants.

18   Q    Oh, okay, and the hoodie you were wearing is the hoodie

19   you have on now?

20   A    Yes.

21   Q    Okay, and did it have the red Tesla name with fire and

22   security underneath it?

23   A    Yeah.

24   Q    Okay, now did you speak with the man that Mr. Noakes was

25   talking to?



1    A    Yes.

2    Q    And why don't you tell us what about that?

3    A    Right when I walked up, he handed me a flyer and asked me

4    if I was being treated fairly by Tesla.

5    Q    Okay, now, I'm going to show you what has been marked as

6    General Counsel's Exhibit, and it's in evidence as General

7    Counsel's Exhibit 8.  It's a two-sided document.  I'd like you

8    to look at it, please.

9         MR. RODRIGUEZ RITCHIE:  Can we see what he's been shown?

10        MR. ROSS:  No, we can.

11        MR. RODRIGUEZ RITCHIE:  Okay, thank you.

12        MR. ROSS:  Sure.

13   Q    BY MR. ROSS:  When you had a chance to look it over, let

14   me know.

15   A    Okay.

16   Q    Have you looked at it?

17   A    Yeah.

18   Q    Okay, and tell me, is that the document that this man was

19   handing out that morning?

20   A    Yeah.

21   Q    Okay, and you said that he asked you what?

22   A    If I was being treated by -- if I think I was being

23   treated fairly by Tesla.

24   Q    Okay, and after he said this to you, what did you do?

25   A    I did not respond to the question.


www.escribers.net | 800-257-0885

1   Q    Okay, did you read the document?

2   A    Yeah, I looked at it.

3   Q    Okay, and after you read the document, did you say

4   anything to the man?

5   A    I asked him if he was the one that wrote this, wrote the

6   letter.

7   Q    Okay, and did he reply?

8   A    Yes.

9   Q    Tell me what he said.

10  A    He said he did not write it, and the man that did was at

11  door 1.

12  Q    Now before the morning of February 10, 2017, had you ever

13  been involved in any kind of leafleting at the plant?

14  A    No, I have not.

15  Q    And as you read that document that you were handed, did

16  you recognize that it might have something to do with the

17  Union?

18  A    Yes.

19       MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

20       JUDGE TRACY:  Sustained.

21  Q    BY MR. ROSS:  Well, let me ask you this.  Prior to

22  February 10th, 2017, had you had any prior experience dealing

23  with leaflets having to do with leafleting at the property

24  having to do with the Union?

25  A    No.



1    MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

2    JUDGE TRACY:  Sustained.  So again, just wait for --

3    THE WITNESS:  I'm sorry.

4    JUDGE TRACY:  -- the ruling, okay?

5    THE WITNESS:  Okay.

6    Q    BY MR. ROSS:  Now, while you were at door 2, did you have

7    an opportunity to examine the man's badge to determine if he

8    was an employer or not?

9    A    No, I did not.

10    Q    How come?

11    A    I wasn't given a chance.

12    Q    I'm sorry.

13    A    I wasn't given a chance to.

14    Q    What do you mean?

15    A    He started walking towards door 1.

16    Q    I see.

17    Q    And while you were at door 2, did you have a chance to ask

18    him his name?

19    A    No, I did not.

20    Q    While you were at door 2, did he tell you his name?

21    A    No, he didn't.

22    Q    While you were at door 2, did you identify yourself as

23    being somebody from security?

24    A    No, I didn't.

25    Q    All right.  So he hands you the document, says something:



www.escribers.net | 800-257-0885

1    do you think you're being treated fairly?  You read the

2    document; you ask him if he wrote it; he says, no, the guy down

3    at door 1 wrote it.  He starts heading in the direction.

4        JUDGE TRACY:  So what's the question?  I need the

5    question.

6        MR. ROSS:  Okay.

7    Q    BY MR. ROSS:  Well, after the gentleman began to move in

8    the direction of door 1, did you telephone anybody?

9    A    Yes, I did.

10   Q    And can you tell me who you telephoned?

11   A    The manager of security, Greg Slettvet.

12   Q    Okay.  And can you tell us, why did you call Mr. Slettvet?

13   A    I wanted to let him know what was going on, since he's

14   the -- the head of security, and I wanted to know what to do

15   forward with that.

16   Q    Had you ever dealt with something like this before?

17   A    No, I have not.

18       MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

19       JUDGE TRACY:  I'm sorry; I missed the question.

20       MR. RODRIGUEZ RITCHIE:  Had you ever dealt with something

21   like this before?

22       MS. FEINBERG:  Something --

23       MR. ROSS:  And this --

24       JUDGE TRACY:  Oh, okay, yes, that's sustained.

25   Q    BY MR. ROSS:  Tell me, when you say you telephoned



www.escribers.net | 800-257-0885

1    Mr. Slettvet, did you go in the building to call him?  How did

2    you call him?

3    A    I called him on my cell phone.

4    Q    Okay.  And where did you call him?

5    A    Outside the door 2.

6    Q    Okay.  What number did you call him at?

7    A    I don't know his number by heart.

8    Q    Do you know whether it was a cell number, his personal

9    cell number?

10   A    His work -- I believe it's his work number.

11   Q    I'm sorry?

12   A    His work cell.

13   Q    Okay.  And this was about what time?

14   A    About 4:30.

15   Q    Kind of early in the morning to call the head of security,

16   isn't it?

17   A    Yeah.

18   Q    Okay.  Were you able to reach Mr. Slettvet on the phone?

19   A    Yes, I did.

20   Q    And could you tell us what was said during that

21   conversation?

22        MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

23        JUDGE TRACY:  Who is Mr. Slettvet?

24        MR. ROSS:  Slettvet is the senior manager of security for

25   the entire company.


www.escribers.net | 800-257-0885

1    JUDGE TRACY:  Okay.  So he's a supervisor --

2    MR. ROSS:  Yes, he is.

3    JUDGE TRACY:  -- under the Act?  So I'll overrule the

4    objection.

5    Q    BY MR. ROSS:  Okay.  Tell us what happened in your call

6    with Mr. Slettvet.

7    A    I had let him know what was going on, and I had asked for

8    further direction.  And he had told me if -- if I knew if they

9    were employees or not, and I said no, not yet.  And he asked me

10    to find out if they're employees, document everything, and make

11    sure that if they're not employees, to let them know that

12    they're trespassing, and they would have to leave.

13    Q    All right.  And after your phone call with Mr. Slettvet,

14    what did you do?

15    A    I walked down to door 1.

16    Q    And can you tell us what you saw as you approached door

17    number 1?

18    A    On the south side of door 1, I saw two guys sitting on a

19    rail.

20    Q    Okay.  And did you see the man you had talked to at door 2

21    anywhere in the vicinity?

22    A    Yes.

23    Q    Where was he at this time?

24    A    He was about three feet away from me.

25    Q    He was what?



www.escribers.net | 800-257-0885

1    A    Three feet away from me.

2    Q    Okay, so you were coming behind him?

3    A    Yeah.

4         MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

5         JUDGE TRACY:  Sustained.

6    Q    BY MR. ROSS:  Tell me, did you speak with these three men?

7    A    Yes.

8    Q    Can you tell me who spoke first?

9         MS. FEINBERG:  Objection.  Foundation.  It's not clear if

10   it's all one conversation or what.

11        JUDGE TRACY:  Sustained.

12   Q    BY MR. ROSS:  Tell us, as best you can recall, what was

13   said at the beginning of this conversation and by whom?

14        MS. FEINBERG:  Same objection.  It's not clear this is all

15   one conversation.  People are walking --

16        JUDGE TRACY:  So can you just establish -- lay a little

17   bit more foundation --

18        MR. ROSS:  Sure.  Sure.

19        JUDGE TRACY:  -- before we get to --

20        MR. ROSS:  Get that laser thing --

21        JUDGE TRACY:  -- conversation?

22        MR. ROSS:  -- fired up.

23   Q    BY MR. ROSS:  And do you see door number 1 --

24   A    Yeah.

25   Q    -- on Joint Exhibit 1?



www.escribers.net  |  800-257-0885

1    A    Yes.

2    Q    Okay.  And could you point out to everybody in this room

3    where door number 1 is on Joint Exhibit 1?  Okay.  And you said

4    that you saw two men doing something by a rail?

5    A    They were sitting on the rail on the south side.

6    Q    Okay.  Show us where they were sitting, please.

7    A    Kind of right about there.

8    Q    Okay.  And let the record reflect that he lased the space

9    to the right-hand, or south side, of door number 1.  And where

10   was the gentleman who had left door number 2 and headed towards

11   door number 1 at this time?  Will you show us?

12   A    Uh-huh.  Right in the same area, about -- it's, like,

13   right about there.  It's hard to tell in the photo.

14   Q    I'm sorry?

15   A    It's hard to tell in the photo the exact location, because

16   it's condensed and not an actual.

17   Q    Okay.  So did you approach the men or any of the men?

18   A    Yes.

19   Q    Were they separate when you approached, or were they

20   together?

21   A    Together.

22   Q    Okay.  And did you engage them in a conversation?

23   A    Yes.

24        JUDGE TRACY:  So again, what I had said previously, in

25   terms of me assessing his credibility, it's very hard to do



1    that when they're leading questions versus more open-ended --

2        MR. ROSS:  These -- I thought you wanted a foundation

3    laid, Judge, and I'm trying to lay a foundation.

4        JUDGE TRACY:  Sure, but a lot of it is also asking yes or

5    no or simple, one-word responses.

6        MR. ROSS:  Okay.  Okay.

7    Q    BY MR. ROSS:  Tell me, did you engage any of these

8    individuals in a conversation?

9    A    Yes.

10   Q    Who did you engage?

11   A    I don't know the exact person, specific.

12   Q    Do you know him by name -- at that moment, did you know

13   him by name?

14   A    No, I did not know him by name, no.

15   Q    Did you engage all of them, one of them, two of them; how

16   many --

17   A    I talked to them as a group.

18   Q    I see.  I see.  And can you tell us what was said in that

19   conversation?

20   A    I said that if they weren't employees, that they'd be

21   asked to leave, but if they were employees, to show me their

22   badges.

23   Q    I'm sorry; I couldn't hear you.

24   A    If they were -- I -- I let them know if they weren't

25   employees, that they --



1     Q     If they were or were not?

2     A     Were not employees, that they would be asked to leave, but

3     that if they were, that they -- they would need to show me

4     their employee badges.

5     Q     Okay.  And after you said this, what, if anything -- did

6     anybody respond?  I'll ask it that way.

7     A     I don't recall in who specifically responded to me.

8     Q     Do you remember what the response was that came from them?

9     A     No.

10    Q     Did they tell you they were or weren't employees?

11    A     They told me they were employees.

12    Q     Okay.  And after they said they were employees, what did

13    you say, if anything?

14    A     I asked them to show me their badges to verify that they

15    were employees.

16    Q     Okay.  And what happened then?

17    A     They gave me their badges -- all three of them gave me

18    their badges.

19    Q     Okay.  And when you say they gave you their badges, where

20    were their badges?

21    A     They were getting them out from their wallet and pockets.

22    Q     Okay.  So they got them out of their pockets or wallets

23    and handed them to you?

24    A     Yes.

25    Q     And did you look at the badges?



1    A    Yes.

2    Q    And what did you do then?

3    A    I took pictures of all three badges that they were -- that

4    they gave me.

5    Q    Okay.  And can you tell us why you took photos of the

6    badges?

7    A    Because I have to document everything.

8    Q    Okay.  Were you told to photograph the badges?

9    A    No, I was not.

10   Q    Whose decision was it to take pictures of the badges?

11   A    Mine.

12   Q    Okay.  And when you say you were told to document, who

13   told you to document?

14   A    Greg Slettvet.

15   Q    Did Mr. Slettvet tell you to take photos of the badges?

16   A    No, he did not.

17        MS. FEINBERG:  Objection.  Leading.

18        THE WITNESS:  Okay.  I'll slow down.  Sorry.

19        JUDGE TRACY:  Sustained.

20        THE WITNESS:  I'll wait five seconds.  Sorry.

21   Q    BY MR. ROSS:  Now you say it was you who decided to take

22   pictures of the badges?  And why did you take the badges --

23   pictures of the badges?

24   A    To keep the record of it.

25   Q    Okay.  After you took pictures of the badges, what



1    happened then?

2    A    I gave them back their badges.

3    Q    And then what?

4    A    I let them be after that.

5    Q    Did you leave the scene at that point?

6    A    Yeah.

7    Q    Tell me, approximately what time did you leave door number

8    1?

9    A    I left that at approximately about 5:00.

10    Q    And as you were leaving the area of door number 1, do you

11    recall if you called in to the control room to report that you

12    were leaving the area?

13        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

14        JUDGE TRACY:  Sustained.

15    Q    BY MR. ROSS:  By the way, there's been testimony that

16    there were actually four men engaging in leafleting outside

17    door number 1 at about the time you were down there --

18        MR. RODRIGUEZ RITCHIE:  Your Honor, I'm going to object to

19    that.  The --

20        MR. ROSS:  I haven't finished the question, Your Honor.

21        MR. RODRIGUEZ RITCHIE:  Yeah, but you're --

22        JUDGE TRACY:  So I sustain the objection.  It's to the

23    form of the question.

24        MR. ROSS:  All right.

25    Q    BY MR. ROSS:  Did you see four men engaging in leafleting



www.escribers.net | 800-257-0885

1    at door number 1 that night, or that morning?

2        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.  Assumes

3    facts not in evidence.

4        JUDGE TRACY:  Sustained.

5    Q    BY MR. ROSS:  How many people were at that door that

6    morning that you were -- door number 1?  February 10th, 20 --

7    A    Other than myself?

8    Q    Other than yourself.

9    A    Three.

10   Q    Okay.  All right.  I'm going to show you --

11       MR. ROSS:  Next in order?

12       MS. GONZALEZ:  34.

13       MR. ROSS:  34.  It's late on a Friday afternoon.

14   Q    BY MR. ROSS:  Now Mr. Rios, you have in front of you a

15   document that's been marked Respondent's Exhibit 34.  It

16   appears to be an email coming from Fremont control room to

17   Gregory Slettvet, dated 2-10-2017, at 6:52 a.m., and at the

18   lower right-hand corner, you'll see that it is designated

19   Tesla-NLRB-002904; do you see that?

20   A    Yeah.

21   Q    Yes?

22   A    Um-hum.

23   Q    You have to answer audibly.

24       JUDGE TRACY:  Say yes or no for the record.

25       THE WITNESS:  Yes.



www.escribers.net | 800-257-0885

1        JUDGE TRACY:  Thank you.

2    Q    BY MR. ROSS:  Thank you.

3    A    Sorry.

4    Q    Lawyers don't talk like normal people, so.  Can you tell

5    me, do you recognize this document?

6    A    Yeah.

7    Q    And tell me what it is.

8    A    It's an email I sent from the control room to Greg.

9    Q    Okay.  And when did you send this to -- I see the time,

10   but let me ask you this, where were you when you sent this to

11   Mr. Slettvet?

12   A    I was in the control room.

13   Q    And why did you send it to Mr. Slettvet?

14   A    Because he asked me to document everything.

15   Q    Okay.

16       MR. ROSS:  I'm going to offer Respondent's 34 into

17   evidence, Your Honor.

18       JUDGE TRACY:  Any objections?

19       MR. RODRIGUEZ RITCHIE:  I'm going to object that it's a

20   hearsay document.

21       MR. ROSS:  I'm sorry, you're going to object --

22       MR. RODRIGUEZ RITCHIE:  It's a hearsay document.  The

23   foundation hasn't been established that it qualifies for a

24   hearsay exception.  It's being offered for its truth.

25       MS. FEINBERG:  Well, that's why we don't -- what is it



1    being offered for?

2    MR. ROSS:  It's been objected to as hearsay, and is there

3    any other basis for the objection?

4    JUDGE TRACY:  And that it's not been established to be a

5    business record?

6    MR. RODRIGUEZ RITCHIE:  Right.  Assuming that's the

7    hearsay exception you believe that it qualifies for, but other

8    than that, it's hearsay.

9    MS. FEINBERG:  That's why I was asking what it was being

10    offered for; for its truth or for the fact that it got written,

11    or what?

12    JUDGE TRACY:  So why is it being offered, Mr. Ross?

13    MR. ROSS:  Well, it's being offered, a) as evidence

14    establishing/corroborating what he, in fact, has testified he

15    did that morning and why he did it.

16    MS. FEINBERG:  And why he did it?

17    JUDGE TRACY:  Okay, so the General Counsel and Charging

18    Party's objections to Respondent's Exhibit 34 are overruled,

19    and so I will admit Respondent's Exhibit 34 into evidence.

20    **(Respondent Exhibit Number 34 Received into Evidence)**

21    Q    BY MR. ROSS:  All right.  Now --

22    (Counsel confer)

23    Q    BY MR. ROSS:  Sir, you have in front of you Respondent's

24    Exhibit 35.

25    **(Respondent Exhibit Number 35 Marked for Identification)**



www.escribers.net | 800-257-0885

1    Can you tell us, do you recognize that document?

2    A    Yes.

3    Q    Okay.  And did you author that document?

4    A    Yes.

5         MS. FEINBERG:  Is there something that's authored here?

6    Q    BY MR. ROSS:  And it is an email from you to the Fremont

7    control room, with a cc to Mr. Slettvet, dated 2-10-2017, at

8    12:37 p.m.  It has designated Tesla-NLRB-003047.  Did -- tell

9    us, did you send this?

10   A    Yes.

11   Q    And from where did you send it?

12   A    My cell phone.

13   Q    Okay.  And I see you sent it after noon on the 10th.  Why

14   did you send it at that time, as opposed to before?

15   A    I may have forgotten to send it at -- at that specific

16   time.

17   Q    And why did you send it at all?

18   A    Because Greg asked me to document and to get everything to

19   him.

20   Q    Okay.

21        MR. ROSS:  Your Honor, I would offer --

22   Q    BY MR. ROSS:  And by the way, attached to the first page

23   of this document are attachments, beginning with NLRB, Tesla-

24   NLRB-003048, -49, -50, -51, -52, and -53.  See that?

25   A    Yeah.



1    Q    What are those documents, if you know, sir?

2    A    Pictures of the badges.

3    Q    Excuse me?

4    A    Pictures of the badges.

5    Q    Are these the pictures you took that morning?

6    A    Yes.

7    Q    All right.

8         MR. ROSS:  I'd offer Respondent's 35 into evidence.

9         JUDGE TRACY:  Any objections?

10        MR. RODRIGUEZ RITCHIE:  I'm not sure that this is a

11   complete document.  In the email there is -- on the attachment

12   section, I count 12 files that appear to be --

13        MR. ROSS:  Count what?

14        MR. RODRIGUEZ RITCHIE:  There -- there's 12 separate

15   semicolon-named files in this document.  But I guess I can voir

16   dire on that with him.

17        JUDGE TRACY:  Yeah, do that.

18                    **VOIR DIRE EXAMINATION**

19   Q    BY MR. RODRIGUEZ RITCHIE:  Good afternoon.

20   A    Hi.

21   Q    I'm -- so my name is Edris Rodriguez Ritchie; I represent

22   the General Counsel of the National Labor Relations Board.

23   A    Okay.

24   Q    If you take a look at Respondent's Exhibit 35 in front of

25   you --



www.escribers.net | 800-257-0885

1   A    Yeah.

2   Q    Do you see the attachments?

3   A    Yeah.

4   Q    Those were all the attachments that were attached to the

5   email that you sent?

6   A    Yeah.

7   Q    And that email was sent from your personal phone?

8   A    Yes.

9   Q    If you look at the section that says attachments, there's

10  12 different files attached here.

11  A    That's -- with the iPhone, there's always, like, an extra

12  thing that always sends.  There's nothing in the attachment.

13  Q    So which ones are the extra ones that are not attachments?

14  A    The -- the ones that say ATT001, then 002, 03.  All the

15  ones that have the ATT are the extra things that comes with it.

16  There's nothing in there.  All the -- image, that means that

17  image is sent, but there was nothing -- I didn't put no text or

18  anything in the email I put each picture.

19  Q    Do you know that for sure, or --

20  A    Yes.

21  Q    Okay.  So you're not just assuming --

22  A    No.

23  Q    -- that based on prior experience with sending messages

24  from your phone?

25  A    No.  That -- that's just from exactly how the iPhone sends



www.escribers.net | 800-257-0885

1    the pictures.

2    Q    And so you just took these six pictures?

3    A    Yeah.

4         JUDGE TRACY:  So any objections?

5         MR. RODRIGUEZ RITCHIE:  No objection.

6         JUDGE TRACY:  Ms. Feinberg?

7         MS. FEINBERG:  No.  I now have cross, but no objections.

8         JUDGE TRACY:  Okay.  All right.  So Respondent's Exhibit

9    35 is admitted into evidence.

10   **(Respondent Exhibit Number 35 Received into Evidence)**

11   Q    BY MR. ROSS:  All right.  Tell me, sir, you were talking

12   about Sam Noakes before.  Sam Noakes would have worked for

13   Securitas.  Who was Mr. Noakes's immediate boss this night, or

14   this morning, I should say, on February 10?

15        MS. FEINBERG:  Objection.  Foundation.

16        JUDGE TRACY:  Sustained.

17   Q    BY MR. ROSS:  Do you know who he reported to?

18   A    Yes.

19   Q    Who?

20   A    At the -- he was on day shift, so his boss was Ian

21   McIrwin, -Ewen.

22   Q    Was he working night shift, filling in for somebody else?

23   A    Yes.

24   Q    And that night, or that morning, who was his boss?

25   A    Samuel Ali.



1    Q    Samuel?

2    A    Ali.

3    Q    Ali.  Okay.  Now Samuel Ali, did you see him at door 2?

4    A    I did not.

5    Q    Did you see him at door 3?  I'm sorry, door 1?

6    A    I did not.

7    Q    All right.

8         MR. RODRIGUEZ RITCHIE:  Mark --

9         MR. ROSS:  Doesn't --

10        MR. RODRIGUEZ RITCHIE:  -- it has your writing on it.

11        MR. ROSS:  There you go.

12        MS. FEINBERG:  Thank you.

13        MR. RODRIGUEZ RITCHIE:  Thanks.

14    Q    BY MR. ROSS:  Now Mr. Rios, you have in front of you a

15   document -- photograph that has been marked Respondent's

16   Exhibit 36.

17   **(Respondent Exhibit Number 36 Marked for Identification)**

18   Who's the -- and it's got a stamp on it, Tesla-NLRB-00832.  Do

19   you recognize the person in that photo?

20    A    Yes.

21    Q    Who is it?

22    A    Sam Ali.

23        MR. ROSS:  Offering Respondent's 36 into evidence.

24        JUDGE TRACY:  Any objections?

25        MR. RODRIGUEZ RITCHIE:  We would object to the extent that



1    this document was ordered produced with the individual's name

2    on it --

3         MR. ROSS:  I'm sorry, Edris, I can't hear you.

4         MR. RODRIGUEZ RITCHIE:  This document was ordered produced

5    with the individual's name on it and was not produced as such

6    September 21st, 2018.

7         JUDGE TRACY:  Okay.  Any objections?

8         MS. FEINBERG:  No.  I mean, no.

9         JUDGE TRACY:  Yeah.  Again, we've -- I've talked about

10   this before.  So I'll note the objection for the record, and

11   it's overruled.  Respondent's Exhibit 36 is admitted into

12   evidence.

13   **(Respondent Exhibit Number 36 Received into Evidence)**

14        MR. ROSS:  It's admitted, Your Honor?

15        JUDGE TRACY:  Yes.

16        MR. ROSS:  Thank you.

17   Q    BY MR. ROSS:  Now at any time on February 10, 2017 --

18   strike that.  I think you have in front of you Respondent's 34;

19   could you take a look at that?

20        MR. RODRIGUEZ RITCHIE:  Did you say 34?

21        MR. ROSS:  34.

22   Q    BY MR. ROSS:  Got it?

23   A    Yeah, yes.

24   Q    And in there, in that document you identify certain

25   individuals, along with what appear to be their badge or



1    employee numbers; do you see that?

2    A    Yes.

3    Q    Okay.  And the three individuals who you identified are

4    who?

5    A    Do you want me to read the names?

6    Q    Yeah.

7    A    Michael Sanchez, Richard Ortiz, and Jose Moran.

8    Q    All right.  Now at any time during any of your

9    conversations with Mr. Sanchez, did you tell him that he had to

10   leave the premises?

11   A    No.

12   Q    In any of the conversations you had with Mr. Ortiz that

13   day, did you tell him he had to leave the premises?

14        MS. FEINBERG:  Objection.  Leading.

15        MR. RODRIGUEZ RITCHIE:  He's leading.

16        JUDGE TRACY:  Sustained.

17        MS. FEINBERG:  Took me a moment to get there.

18   Q    BY MR. ROSS:  Did you tell any of the three men they could

19   not hand out leaflets on company property?

20        MR. RODRIGUEZ RITCHIE:  Leading.

21        MS. FEINBERG:  Same objection.

22        JUDGE TRACY:  Sustained.

23        MS. FEINBERG:  I believe, Your Honor, he's already

24   testified about what he said to these gentlemen, so is he

25   trying to --



www.escribers.net | 800-257-0885

1    MR. ROSS:  All right.

2    MS. FEINBERG:  -- discredit his own witness?

3    MR. ROSS:  That's all I have for this witness.  Thank you.

4    MS. FEINBERG:  Okay.

5    JUDGE TRACY:  All right.  Who -- Mr. Rodriguez Ritchie?

6    Ms. Feinberg, do you need a few minutes?

7    JUDGE TRACY:  Yes?

8    MR. RODRIGUEZ RITCHIE:  Yes.

9    JUDGE TRACY:  Okay.  How many minutes, do you think?

10    MR. RODRIGUEZ RITCHIE:  Not very much; I'm just going to

11   use the restroom.

12    JUDGE TRACY:  Okay.  All right.  So 5, 10-minute break, at

13   most.  Let's go off the record.

14   (Off the record at 3:12 p.m.)

15    JUDGE TRACY:  Let's go ahead and go on the record.  Okay.

16   Go ahead, please.

17                    **CROSS-EXAMINATION**

18   Q    BY MR. RODRIGUEZ RITCHIE:  Good afternoon, again, Mr.

19   Rios.  You're a current employee at Tesla?

20   A    Yeah.

21   Q    Are you on working time right now?

22   A    No.

23   Q    Did you meet with any individual prior to your testimony

24   here today?

25   A    Like, before this?


www.escribers.net | 800-257-0885

1    Q    Um-hum.

2    A    Like, today?

3    Q    Yeah.

4    A    No.

5    Q    No attorneys for Tesla?

6    A    Well, what do you mean, like, right before I --

7    Q    Did you meet with any of the attorneys for Tesla?

8    A    Oh, yeah.

9    Q    And that was to prepare for your testimony here today?

10   A    Yes.

11   Q    How many times?

12   A    Today, once.

13   Q    That was today?

14   A    Yeah.

15   Q    I see that you're wearing a sweater.

16   A    Um-hum.

17   Q    It's a black sweater?

18   A    Um-hum.

19   Q    And it has the --

20        JUDGE TRACY:  Yes or no, please.

21        THE WITNESS:  Yes.  Sorry.  Sorry.

22   Q    BY MR. RODRIGUEZ RITCHIE:  And it has the word "security"

23   on it?

24   A    Yes.

25   Q    Earlier in your testimony, you testified about wanting to



1    document the matters that happened on February 10th, 2017; do

2    you recall that?

3    A    Yes.

4    Q    Indeed, that's why you wrote one of the emails that you

5    testified earlier, Respondent's Exhibit 34?

6    A    Yes.

7    Q    That was -- the purpose of that was to document what

8    happened on February 10th, 2017?

9    A    Yes.

10   Q    And the purpose of Respondent's Exhibit 35, that was also

11   to document what had occurred on February 10th, 2017?

12   A    Yes.

13   Q    And that was because Mr. Slettvet asked you to document

14   things?

15   A    Yes.

16   Q    You -- on that day, the reason why you were documenting

17   things was because flyering was going on; is that right?

18   A    No.

19   Q    What was the reason why you were documenting?

20   A    I was asked to document, well, the situation.

21   Q    And that was the flyering that was happening?

22   A    Yeah, sorry.

23   Q    And the flyering that was occurring, you understood that

24   to be flyering related to the United Auto Workers?

25        MR. ROSS:  I'm sorry, I couldn't hear you, Edris.



www.escribers.net | 800-257-0885

1    Q    BY MR. RODRIGUEZ RITCHIE:  The flyering that was occurring

2    on February 10th, 2017, you understood that to be flyering

3    related to the United Auto Workers?

4    A    Not before I got there.

5    Q    But once you got there, you understood that to be related

6    to organizing?

7    A    Yeah.

8    Q    And to the United Auto Workers?

9    A    Yeah.

10   Q    I want to ask you a couple questions about Respondent's

11   Exhibit 22; do you have that in front of you?

12   A    No.

13   Q    It's an incident report.

14   A    Oh, that.  Yeah.  Thanks.  Yeah.

15   Q    Okay, so that was something from the date of February

16   10th, 2017?

17   A    Yeah.

18   Q    And you testified that you recognize this document?

19   A    Yeah.

20   Q    And this is about the flyering that took place on February

21   10th, 2017?

22   A    Yeah.

23   Q    And it's about people passing out flyers at door 2?

24   A    Yeah.

25   Q    And you remember that happening?  That there were people



1  outside of door 2?

2  A    Yeah.

3  Q    And the people were passing out flyers?

4  A    Yeah.

5      MR. ROSS:  I couldn't hear the last one; what was it?

6      MR. RODRIGUEZ RITCHIE:  And the people were passing out

7  flyers?

8      MR. ROSS:  Yeah, thanks.

9  Q    BY MR. RODRIGUEZ RITCHIE:  And that's a correct statement?

10 A    Yeah.

11 Q    At the time that you went -- or you testified about having

12 an interaction with someone at -- outside of door 2, right?

13 A    Yeah.

14 Q    And at that time, when you had this interaction, that was

15 with someone that was handing out flyers at door 2?

16 A    Yes.

17 Q    And when you had the interaction with him outside of door

18 2, you didn't know who he was?

19 A    No, I did not.

20 Q    It wasn't until you got to door 1 that you found out who

21 the door 2 person was?

22 A    Yes.

23 Q    Do you have Respondent's Exhibit 35 in front of you?

24 A    Yes.

25 Q    So there's a series of six pictures; do you see those?



www.escribers.net | 800-257-0085

1   A    Yeah.

2   Q    Okay.  So I'm going to ask you about the first two, which

3   have the Bates numbers 3048 and 3049; do you see those?

4   A    Yes.

5   Q    3049, that's the back side of 3048; is that correct?

6   A    Yeah.

7   Q    And then I want you to turn to 3051 -- 50 and 51.  That

8   photo -- 51 is the back side of -50; is that right?

9   A    No.

10  Q    What is 51 the back side of?

11  A    52.

12  Q    So 50, is there a back side to 50?

13  A    53.

14  Q    Now when you wrote -- and if you could turn to

15  Respondent's Exhibit 34.

16  A    Um-hum.

17  Q    When you wrote Respondent's Exhibit 34, that was the same

18  day that the event occurred?

19       MR. ROSS:  Again, could you repeat it?

20  Q    BY MR. RODRIGUEZ RITCHIE:  When you wrote Respondent's

21  Exhibit 34, that was the same day that the event occurred?

22  A    Yes.

23  Q    And it was fresh in your memory then?

24  A    Yes.

25  Q    When you wrote Respondent's Exhibit 34, you didn't say in



1    Respondent's Exhibit 34 that there were people handing out

2    flyers at door 2; isn't that right?

3        MR. ROSS:  The document speaks for itself.  Objection.

4        JUDGE TRACY:  Sustained.

5    Q    BY MR. RODRIGUEZ RITCHIE:  If you look at line 1 of the

6    document, do you see where it says, "at approximately 04:23

7    hours, door 2 had stated there was someone handing out flyers

8    outside"?

9    A    Yeah.

10   Q    Okay, so that's not accurate?  There were multiple people

11   handing out flyers?

12   A    There was one person.

13   Q    Okay, so earlier in your testimony when you testified with

14   regards to Respondent's Exhibit 22 and that there were people

15   handing out flyers, that wasn't correct testimony then; is that

16   right?

17   A    It was one person handing out flyers.

18   Q    So that wasn't correct testimony, then, correct?

19   A    Yeah.

20   Q    Now in your testimony with Mr. Ross, you testified that

21   Mr. Sanchez, when he was at door 1, he didn't tell you his

22   name; do you remember that testimony?

23       MR. ROSS:  Again, I'm sorry, Edris, you're facing that

24   way, and I can't hear you.

25   Q    BY MR. RODRIGUEZ RITCHIE:  Earlier in your testimony with


www.escribers.net | 800-257-0885

1    Mr. Ross, you testified that when Mr. Sanchez was at door 2, he

2    didn't tell you his name; do you remember that testimony?

3    A    No, he did not.

4    Q    But you didn't write down, when you sent your email that's

5    in Respondent's Exhibit 34, you didn't say that Mr. Sanchez

6    hadn't told you her name -- his name; isn't that right?

7    A    Yes.

8    Q    And earlier in your testimony, you testified that Mr.

9    Sanchez, when you were outside of door 2, told you -- asked you

10   if you thought you were being treated fairly; do you remember

11   that?

12   A    Yes.

13   Q    You didn't write that down in your email that's in

14   Respondent's Exhibit 34; isn't that right?

15   A    Yes.

16   Q    Now you also stated that when you were out -- you

17   testified earlier that when you were outside of door 2, you

18   telephoned someone; do you recall that testimony?

19   A    Yeah.

20   Q    And you didn't put that down in your email in Respondent's

21   Exhibit 34; isn't that right?

22   A    Yeah.

23   Q    Indeed, you testified that you had telephoned Mr.

24   Slettvet?

25   A    Yes.



www.escribers.net | 800-257-0885

1    Q    And that was not put in your email that's in Respondent's

2    Exhibit 34?

3    A    Yes.

4    Q    You also testified about Respondent Exhibit 35, the

5    pictures.

6    A    Um-hum.

7    Q    Now you also didn't put in your email that you had taken

8    pictures when you were outside of door 1; isn't that right?

9    A    Yeah.

10    Q    And earlier in your testimony, you testified that you told

11    to the employees outside of door 1 that they could stay if they

12    were employees; do you remember that testimony?

13    A    Yes.

14    Q    And that's not something that you wrote in your email

15    that's in Respondent's Exhibit 34?

16    A    No, it's not.

17    Q    You testified that you left at some point in the morning

18    from door 1?

19    A    Yeah.

20    Q    You didn't write down the time that you left?

21    A    No, I did not.

22    Q    And that was even though Mr. Slettvet had asked you to

23    document the occurrence?

24    A    What do you mean?

25    Q    You never bothered to write down any of that other



22-60493.1761

www.escribers.net | 800-257-0885

1    information in Respondent's Exhibit 34, even though Mr.

2    Slettvet had asked you to document what was occurring; isn't

3    that right?

4    A    Yeah.

5    Q    Now when you got to door 1, and you saw the three

6    employees -- you testified that you only saw three employees at

7    door 1?

8    A    Yes.

9    Q    Tell me, what time do the shifts -- well, actually, let me

10   take a step back.  On February 10th, 2017, do you have any

11   knowledge as to what time the start and stop times of shifts

12   were around the morning time?

13   A    For what department?  All of them are different.

14   Q    For any department?

15   A    All of them vary; it depends where they work.

16   Q    Well, let me ask you a different way.  Door 1, that's a

17   door that's used by employees?

18   A    And contractors.

19   Q    And employees and contractors go in and out?

20   A    Yes.

21   Q    In your experience working at Tesla for four years, during

22   the time of 6:52 a.m., around that time --

23   A    Um-hum.

24   Q    Or actually, excuse me, around the time of 4:23 to

25   5 a.m. --



1    A    Um-hum.

2    Q    -- that door is being used by employees to go in and out

3    of the facility?

4    A    Yes.

5    Q    So isn't it true that there were other employees around

6    door 1 that were going in and out of the facility when you saw

7    the three individuals flyering?

8    A    I don't recall.

9    Q    You don't recall any other employee going in and out of

10   door 1 --

11   A    No, I don't.

12   Q    -- when you saw those three people?

13   A    No, I didn't.

14   Q    Not one?

15   A    No.

16   Q    Now you testified about a process that you used with the

17   three individuals at door 1 with --

18        MR. ROSS:  I couldn't hear the question; I'm sorry.

19   Q    BY MR. RODRIGUEZ RITCHIE:  You testified about a process

20   that you used with the individuals outside of door 1, whereby

21   you asked them for their badges, and they showed them to you,

22   and you took the picture?

23   A    Yes.

24   Q    And the purpose of that was to verify that they were

25   employees?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    And that was how you verified that they were employees, by

3    looking at their badges?

4    A    Yes.

5    Q    After you saw their badges, you didn't call that in

6    anywhere to verify that they were actual employees?

7    A    Not that I can recall.

8    Q    Because that wasn't necessary?

9    A    It is, but I do not recall if I did or not.

10   Q    And you didn't find it necessary on February 10th, by --

11        MR. ROSS:  He's asked and answered twice; he said he

12   doesn't recall.

13        MR. RODRIGUEZ RITCHIE:  Actually, I only asked --

14        MR. ROSS:  He's arguing with the witness.

15        JUDGE TRACY:  Overruled.  Go ahead.

16   Q    BY MR. RODRIGUEZ RITCHIE:  You didn't find that necessary

17   on February 10th, 2017, to call it in to verify that they were

18   employees?

19   A    I do not recall if I did or did not.

20   Q    Because you believed that they were employees of Tesla

21   Fremont?

22   A    No.

23   Q    You didn't believe they were Tesla at Fremont employees on

24   February 10th?

25   A    Oh, yeah.



22-60493.1764

1    Q    Okay.

2    A    Sorry.

3         MR. RODRIGUEZ RITCHIE:  No further questions.

4         JUDGE TRACY:  Ms. Feinberg?

5                    **CROSS-EXAMINATION**

6    Q    BY MS. FEINBERG:  Hi.

7    A    Hi.

8    Q    Oh, psyche.  I thought I was done.  Okay.  Have a sip of

9    water.  Okay.  So I'm Margo Feinberg; I represent the UAW and

10   the Charging Party, so I'll just ask you a few more questions.

11   A    Yes.

12   Q    Okay.  So can you go back to Respondent's Exhibit 22?

13   It's that CAD incident report?

14   A    Yes.

15   Q    Okay.  I'm just trying to understand the process.  So --

16   because I don't see your name on here -- so somebody called the

17   control room.  Can you tell from this who called the control

18   room?

19   A    Natalie Hunter.

20   Q    Okay.  And where was Natalie -- do you know where Natalie

21   Hunter was when she called the control room?

22   A    Yes.

23   Q    Where was she?

24   A    She was the door 2 guard.

25   Q    The door 2 guard.  And did you speak to Natalie Hunter?



1   A    No, I did not.

2   Q    Okay, so she spoke to Bo Dork?

3   A    Yes.

4   Q    And did somebody ask you to go down to door -- what --

5   door 2?

6   A    No.

7   Q    Okay.  So why did you go to door 2?

8   A    I don't recall the reason why I went.

9   Q    Oh.  Did you -- okay, so this call -- am I correct to say

10  the call came in at around -- well, not just around, it's

11  pretty exact in here, 4:22:26?

12  A    Just about it.

13  Q    Okay.  And how long after that did you appear at door 2?

14  A    How long was I there?

15  Q    Yeah -- what -- no, from the time it got called in to the

16  control room --

17  A    Um-hum.

18  Q    -- which is at around 4:22 or 4 something, you then have

19  to get from the control room -- you weren't -- you were in the

20  control room at the time --

21  A    Yeah.

22  Q    -- yes?  So you had to get from the control room to door

23  2?

24  A    Um-hum.

25  Q    How long does that take to get from the control room to

22-60493.1766



1    door 2?

2    A    About a minute, depending on how fast you walk.

3    Q    Oh, it's close?

4    A    Yeah.

5    Q    Okay.  And -- okay.  So then you arrived at the door area

6    at around, whatever, 4:23 or 4:24?

7    A    Yeah.

8    Q    Okay.  And you mentioned that you saw a gentleman, whose

9    picture is shown in Exhibit 33, when you got there?

10   A    Yes.

11   Q    Okay.  And did you know him from before, the -- Mr.

12   Noakes?

13   A    Yes.

14   Q    And how did you know him from before?

15   A    I worked with him.

16   Q    So you worked with him when he was at Securitas?

17   A    When I was with Securitas.

18   Q    I mean, when you were both at Securitas, actually?

19   A    Yes.

20   Q    And other than overhearing the conversation he had, which

21   I'm going to ask about in a minute, did you have any direct

22   conversation with him on that morning?

23   A    Not that I can recall, no.

24   Q    And do you know what his station was that morning, like,

25   what he was supposed to be doing that morning?



1    A    No, I do not.

2    Q    And do you know whether he is one of the security officers

3    who drives a car?

4    A    For the morning shift.

5    Q    And do you know -- did you ever drive a car when you were

6    with Securitas at Tesla?

7    A    Yes.

8    Q    And sometimes was there more than one person in a car?

9    A    No.

10   Q    And is Mr. Ali on site at Tesla some of the time?

11   A    Yes.

12   Q    Did you see Mr. Ali on the morning of February 10th?

13   A    Not that I recall.

14   Q    Okay.  Mr. Rodriguez Ritchie asked you a bunch of

15   questions about Respondent's Exhibit 34, on what you wrote

16   down, so I'm going to ask you, is there a reason that you

17   didn't write down what you heard Mr. Noakes say to Mr. Sanchez?

18   A    Repeat -- repeat the question; I'm sorry.

19   Q    You heard Mr. Noakes say something to Mr. Sanchez --

20   A    Yes.

21   Q    -- is that right?

22   A    Yeah.

23   Q    And is there a reason -- did you write that down

24   somewhere?

25   A    No.



www.escribers.net | 800-257-0085

1   Q   Okay.  But you remember it as we sit here today?

2   A   Yes.

3   Q   And is there a reason that you didn't share with Mr. --

4   well, that you didn't share in writing with Mr. Slettvet what

5   Mr. Noakes said?

6   A   Not that I can recall at that time, no.

7   Q   Okay.  And when you spoke to Mr. Slettvet on the phone,

8   did you tell him that Sam Noakes had been there when you

9   arrived?

10  A   No.

11  Q   And did you tell him anything about what Mr. Noakes had

12  said to Mr. Sanchez?

13  A   No, I did not.

14  Q   Did Mr. Noakes continue to work in security after that

15  day, after February 10th?

16  A   Yeah.

17  Q   And does he still work for Securitas, to your knowledge?

18  A   Not to my knowledge.

19  Q   Okay.  And as I understood your testimony, you didn't ask

20  Mr. Sanchez his name until you got -- until he got to door 1;

21  is that right?

22  A   Yeah.

23  Q   Okay.  So he didn't refuse to give you any information,

24  it's just that you didn't ask him that --

25  A   Yeah.



1   Q      -- until you met at the next location?

2   A      Yeah.

3   Q      Is that right?

4   A      Yeah.

5   Q      And why did you follow him to door 1?

6   A      Because he told me the guy that wrote the flyers handed

7   out was there.

8   Q      And why did you feel the need to talk to the guy who wrote

9   the flyer, or see the guy who wrote the flyer?

10  A      To gather that information for Greg.

11  Q      Okay.  And had you seen the flyer that said that the guy

12  who wrote it was an employee of Tesla?

13  A      On -- on the letter?

14  Q      Yes.

15  A      Not that I can recall without looking at it.

16  Q      And did you -- okay, I want to be clear about this.  You

17  spoke to Mr. Slettvet before you got -- sometime before the

18  time you arrived at door 1 -- I mean door 2, and when you got

19  to door 1?

20  A      Yeah.

21  Q      And the call in from Natalie Hunter, as I understand it,

22  was that there were people passing out flyers; is that right?

23  A      Yes.

24  Q      Okay.  So to me, passing out flyers means that there are

25  people to hand the flyers to?



www.escribers.net | 800-257-0885

1  A    Yes.

2  Q    So did you see people receiving flyers?

3  A    Not that I saw with my own eyes.

4  Q    Okay.  So when you got there, that wasn't happening?

5  A    But I got one.  So, I mean, if you want to put it that

6  way.

7  Q    Okay.  Did you ever talk to Natalie Hunter about what she

8  saw?

9  A    No.

10  Q    And according to Respondent's Exhibit 34, when you got to

11  door 1, you found Richard Ortiz and Jose Moran handing out

12  flyers?

13  A    Yes.

14  Q    So there were workers that they were handing the flyers

15  to?  That you saw?

16  A    Not that I can recall.

17  Q    Well, what did you mean when you wrote that they were

18  handing out flyers?

19  A    I can't remember exactly from that date.

20  Q    Okay.  Do you know if anybody else was around when you

21  were taking their photo?  The photo of their pass -- or their

22  ID?

23  A    Not that I can remember.

24  Q    And they were cooperative in handing you their ID?

25  A    Yes.



www.escribers.net | 800-257-0885

1   Q    And did they say anything to you --

2   A    Not that I --

3   Q    -- about why they were there?  Mr. -- well, did Mr. Moran

4   say anything to you?

5   A    Not that I can remember.

6   Q    And did you identify Mr. Moran as the person who was, had

7   written the flyer?

8   A    Yeah.

9   Q    And did you tell that to Mr. Slettvet at some point?

10  A    Not that I can recall.

11  Q    And with respect to Exhibit 35, the photos, Respondent's

12  Exhibit 35, did someone ask you to send these photos to them?

13  A    Greg did.  Greg did.

14  Q    Greg did.  And I see that also Jeremie Hansen is listed on

15  this.  Who is he?

16  A    He was another supervisor, manager, for security, as well.

17  Q    And did you ever speak to him about the events of February

18  10th?

19  A    No, just Greg.

20  Q    And after this event, were you given any other training or

21  information about what to do if you saw a union -- saw workers

22  who were engaged in union activity?

23  A    What do you mean by that?

24  Q    Did Mr. Slettvet give you any more instructions about if

25  you saw a union member -- a worker engaged in union activity --



www.escribers.net | 800-257-0885

1    handing out flyers, or something -- what you were supposed to

2    do -- after that day?

3    A    Just to leave them alone.

4    Q    When did he tell you that?

5    A    I don't remember the exact date.

6    Q    Did he tell you that you had to continue to verify their

7    employment?

8    A    No.

9    Q    Now I want -- I'm sorry to bother you about this one more

10   time, but could you go back to Respondent's Exhibit 22?

11   A    Yeah.

12   Q    Okay.  At the top it says, under incident type, it says,

13   "trespass - trespasser".

14   A    Uh-huh.  Yes.

15   Q    And at the bottom -- the one -- you have one that looks

16   like this, right?

17   A    Yeah.

18   Q    Okay.  There's been some variations, so I just want to

19   make sure.  On the bottom it says, "incident type changed from

20   info. to trespass."  What does that mean, if you know?

21   A    It -- the -- there's just different types of incidents

22   that are in the system that we have, and that just means

23   from -- from just being regular information, someone had

24   changed it to trespassing.

25   Q    Okay, but the people involved were employees of the, of



1    Tesla, so why would some -- well, first of all, let me ask you

2    this:  are you the person who input this entry, incident type

3    changed from info. to trespass?

4    A    I was not.

5    Q    Okay.  And were you -- well, is any of this information

6    that's on Respondent's 22 input by you?

7    A    No.

8    Q    And of any of it based on the information that you

9    electronically relate?

10    MR. ROSS:  Objection.  If he didn't make the entries, how

11    can he know what the information's based upon?

12    JUDGE TRACY:  Well, sustained.

13    MS. FEINBERG:  Okay.

14    Q    BY MS. FEINBERG:  Did you ever tell Bo Dork that people

15    were collecting signatures?

16    A    No.

17    Q    And do you recall what Mr. Moran was wearing that night?

18    A    No.

19    Q    And do recall what Mr. Ortiz was wearing that night?

20    A    No.

21    Q    And how about Mr. Sanchez?

22    A    No.

23    Q    Okay.  And do you recall what Mr. Noakes would have been

24    wearing, or was wearing?  Not just guessing, but what he was

25    wearing?



www.escribers.net | 800-257-0885

1    A    Yeah.

2    Q    And you recall that specifically?

3    A    Um-hum.  Yes.

4    Q    And what was he wearing?

5    A    A black bomber jacket and a red and black polo, with a

6    Tesla hat.

7    Q    And does that identi- -- is there something on there that

8    says "security"?

9    A    On both the jacket and the shirt there is a -- Tesla

10   security on there.

11   Q    Okay.  And the car that's -- that the security drive, are

12   they identified in any way?

13   A    Yes.

14   Q    And how are they identified?

15   A    There's a -- at that time, there was stickers on the --

16   the driver and passenger sides with security on there.

17        MS. FEINBERG:  Okay, I have nothing further.  Thank you.

18        JUDGE TRACY:  Okay.  Mr. Ross?

19        MR. ROSS:  Yeah.

20                      **REDIRECT EXAMINATION**

21   Q    BY MR. ROSS:  I just want to make sure it's clear.  Mr.

22   Noakes, does he still work at Tesla?

23   A    Not to my knowledge, no.

24   Q    Okay.  And --

25        MR. ROSS:  That's all I have, Your Honor.



www.escribers.net | 800-257-0885

1     JUDGE TRACY:  Okay.  Mr. Rodriguez Ritchie?

2     MR. RODRIGUEZ RITCHIE:  No.

3     JUDGE TRACY:  Ms. Feinberg?

4     MS. FEINBERG:  How could I?

5     JUDGE TRACY:  Okay.

6     MR. ROSS:  Now, Your Honor, before the witness leaves the

7     stand, I want to make an offer of proof.

8     JUDGE TRACY:  For what?

9     MR. ROSS:  Well, I was asking the witness a series of

10    questions to try to elicit specific denial --

11    MS. FEINBERG:  Wait.  Before this goes on, should this

12    witness be on the stand if it's going to be something --

13    MR. RODRIGUEZ RITCHIE:  Regarding his --

14    MR. ROSS:  Well, he can leave the room or he can sit

15    there; it doesn't matter to me.  If you're going to maintain --

16    JUDGE TRACY:  Well, I guess I'm confused now.  He's

17    finished testifying, so what would the offer of proof be for at

18    this point?

19    MR. ROSS:  Well -- can I ask him to step out, please?

20    JUDGE TRACY:  Yes.  Go ahead.

21    MS. FEINBERG:  I'd just like to say we've all finished our

22    cross.

23    THE WITNESS:  Do I just stand outside the door?

24    MS. FEINBERG:  Our cross and our opportunity for recross.

25    JUDGE TRACY:  Just stand right outside.



1    THE WITNESS:  Okay.

2    MR. ROSS:  Don't go too far.

3    THE WITNESS:  All right.

4    MR. ROSS:  Are we on the record?

5    JUDGE TRACY:  Well, we've been on the record.

6    MS. GONZALEZ:  Oh, yeah.

7    MR. ROSS:  Okay.  During his direct, I was attempting to

8    elicit specific denials from him with respect to things that

9    were supposedly said during his interaction with these

10    individuals, Mr. Sanchez, Mr. Ortiz, and Mr. Moran.  You

11    characterized those as leading questions.  Honestly, I

12    respectfully differ with you in terms of whether those were

13    leading questions or not.  And I can tell you, I don't want to

14    hear from General Counsel in his brief that nobody made a

15    specific denial as to alleged statements made by Messrs. Moran,

16    Ortiz, or Sanchez.  So for the purpose of dotting that "i" and

17    crossing that "t", I've sought to elicit those.

18    JUDGE TRACY:  Yeah, but let me say this:  there -- that

19    does not -- it should not be done as leading questions.  I

20    mean, you're setting up the witness, then.  The way it's done

21    with your direct witness is:  What was said?  Was there

22    anything else?  I mean, that's part of it.  You exhaust their

23    memory before you even go there, if you need to go there.  That

24    wasn't even done.  So then to start just asking direct -- sure,

25    anybody can just say, yes, no, yes, no.  How do I, as the fact

eScribers
www.escribers.net | 800-257-0885

1    finder, assess anyone's credibility?  You've got to first

2    exhaust their memory and go through all of that.

3         MR. ROSS:  Okay.  Again, my purpose is not to aggravate

4    you or pick a fight with you.

5         JUDGE TRACY:  No, I'm just saying that --

6         MR. ROSS:  So, I mean, I'll put him back on the stand and

7    ask him if he recalls anything else, but by saying he doesn't

8    recall anything else, he kind of self-cancels out the

9    possibility that he can make a specific denial.

10        MS. FEINBERG:  Well, Your Honor, I object --

11        MR. ROSS:  If he doesn't --

12        MS. FEINBERG:  -- to that anyhow.

13        MR. ROSS:  Excuse me.

14        MS. FEINBERG:  We've all exhausted our --

15        MR. ROSS:  Excuse me.

16        MS. FEINBERG:  No.

17        MR. ROSS:  If I ask him, do you remember anything else, by

18   definition, he can't make a specific denial, because he doesn't

19   remember anything else.  So --

20        MS. FEINBERG:  Well, there you go.

21        MR. ROSS:  -- I've been practicing in this area for a few

22   years.  I've tried a few cases, and I can't remember a case why

23   I was not allowed to elicit a specific denial.  Now -- nor have

24   I ever been told -- and again, it's your courtroom; it's your

25   decision to make, and I'll respect that.  But as you've said



www.escribers.net | 800-257-0885

1   before, you know, if you don't agree, make an, you know, appeal

2   it.  I'd like just to make a record, so as it's clear on the

3   record, that we've attempted to get specific denials from him,

4   and were not afforded that opportunity.  That's all I want to

5   do.

6       JUDGE TRACY:  And that's fine.

7       MR. ROSS:  Okay.

8       JUDGE TRACY:  I'm not going to call him back, because he,

9   I mean, I need to still release him.

10      MR. ROSS:  Yes.

11      JUDGE TRACY:  But, you know, we went through the direct,

12  the cross, the redirect, and the recross.  I mean, yes, you can

13  appeal it and say that you didn't get to ask him these things.

14      MR. ROSS:  Okay.

15      JUDGE TRACY:  I would say that, again, when I'm looking at

16  the briefs, and I'm reading the briefs, and I'm looking at the

17  transcripts, it's one thing to say, if one party says, you

18  know, they were never asked this, and so therefore, you know,

19  you've got to assume something.  You know, it's --

20      MR. ROSS:  Honestly, Judge, I don't want belabor the

21  point.  I understand --

22      JUDGE TRACY:  I mean, I --

23      MR. ROSS:  -- you've ruled, and I accept it.

24      JUDGE TRACY:  Yeah, I mean --

25      MR. ROSS:  I accept it.

22-60493.1779



1    JUDGE TRACY:  -- I'm just saying that just asking those

2    kind of statements:  did you say this, yes or no?  I don't

3    know, I don't see the value of it when you're assessing

4    someone's credibility.

5    MR. ROSS:  Okay.

6    JUDGE TRACY:  Now you've made, though, your point across

7    to the General Counsel and to the Charging Parties of what you

8    were trying to do.  But again, if you've asked him, did you say

9    anything else --

10   MR. ROSS:  I just want to perfect the record --

11   JUDGE TRACY:  Yeah.

12   MR. ROSS:  -- on this point, if I may.

13   JUDGE TRACY:  That's fine.

14   MR. ROSS:  And I mean no disrespect.

15   JUDGE TRACY:  No.

16   MR. ROSS:  I'd just like you to understand that.

17   JUDGE TRACY:  Yeah.

18   MR. ROSS:  All right.

19   JUDGE TRACY:  So.

20   MR. ROSS:  So should I release him?

21   JUDGE TRACY:  Well, let me release him.

22   MR. ROSS:  You want to release him?

23   JUDGE TRACY:  Yeah, so I can tell him don't talk about --

24   MR. ROSS:  Should I bring him back in?

25   JUDGE TRACY:  -- this, and duh, duh, duh, duh.

22-60493.1780



1       MR. ROSS:  Okay.  Come on back in.

2       JUDGE TRACY:  So we're all done here.  We like our

3    dramatic moments.  So just please don't discuss your testimony

4    with anyone until after the close of the hearing, which will be

5    some time from now.  Okay?

6       THE WITNESS:  Okay.

7       JUDGE TRACY:  I thank you for your time.

8       THE WITNESS:  Well --

9       JUDGE TRACY:  Okay?

10      THE WITNESS:  Okay.  Thank you.

11      MS. FEINBERG:  He's like, hooray, I thought I was going to

12   have to look at Respondent's 22 again.

13      JUDGE TRACY:  We're still on the record?

14      MS. GONZALEZ:  Yes.

15      JUDGE TRACY:  Okay.  So at this point, Mr. Ross, you all

16   don't have any other witnesses for today; is that correct?

17      MR. ROSS:  That's correct, Your Honor.

18      JUDGE TRACY:  Okay.  So we'll resume at 9 a.m. on October

19   9th, same place, with the layout that we've described before.

20   We don't have to go through it again.

21      MR. ROSS:  Your Honor, if I may, you know, consistent with

22   the colloquy we had off the record, I would like to make an

23   offer of proof.

24      JUDGE TRACY:  Oh, it was on the record.

25      MR. ROSS:  Oh, it was on the record?



1      JUDGE TRACY:  Yeah, we were on the record for the whole

2      time.

3      MR. ROSS:  Well, okay, I'm not sure that it was specific

4      enough, and if I may, I'd like to be more precise --

5      JUDGE TRACY:  Go ahead.

6      MR. ROSS:  -- and detailed.

7      JUDGE TRACY:  Sure.

8      MR. ROSS:  And I appreciate it.  Thank you very much.  We

9      are offering the following:  we asked -- we sought to obtain

10     specific denials from Mr. Rios with respect to certain alleged

11     statements that he made to Mr. Sanchez, Mr. Ortiz, and/or Mr.

12     Moran.  And the Judge sustained objections with respect to our

13     questions, I believe on the theory that it was a leading

14     question.  And in light of that, we're going to offer the

15     following -- offer to prove the following:  that if Mr. Rios

16     had been permitted to respond to these questions, he would have

17     testified that at no time did he ever tell Mr. Sanchez, on

18     February 10th, 2017, that he, Mr. Sanchez, had to leave the

19     premises or that he could not hand out leaflets on company

20     property on his own time.

21     He would further have testified to that same effect with

22     respect to Mr. Ortiz, and he would have testified similarly as

23     to Mr. Moran.  He would also have testified that what he did

24     tell these individuals was that while nonemployees could not

25     engage in leafleting of the facility, he told them that



www.escribers.net | 800-257-0885

1   employees were free to do so in nonwork areas during nonwork

2   time.  And that is our offer of proof.

3        JUDGE TRACY:  Okay.

4        MR. RODRIGUEZ RITCHIE:  I would just like to be heard, for

5   the record, that that entirely mischaracterizes the testimony

6   that did actually happen.  It also mischaracterizes the

7   objection.  Respondent had ample opportunity to elicit

8   testimony from the witness.  The problem with what had occurred

9   was, in part, that the questions were leading.  It wasn't as

10  though Respondent was prevented from asking any questions at

11  all.  He -- Respondent was prevented from asking questions that

12  were, for example, leading and therefore improper as to form.

13       JUDGE TRACY:  Anything else?

14       MS. FEINBERG:  I would echo that.  In addition, I do

15  believe that, yeah, some of the characterization of what was

16  said was not accurate, but I guess the record will speak to

17  that.  And there were open-ended -- there were some open-ended

18  questions, where information could have been given, and

19  obviously this witness either did or didn't have the memory for

20  that.  So I think this is a hail-Mary of some sort, but is not

21  based on what the record is or should be.

22       JUDGE TRACY:  Okay.  So as I said before, when we were

23  still on the record, but you know, in terms of calling back

24  this witness for the purpose of asking specific denials, I

25  don't think that that's appropriate at this point.  My rulings

escribers

www.escribers.net | 800-257-0885

1    stand.  And again, the record speaks for itself.  That's

2    already been stated.  And, you know, the credibility of the

3    witnesses will be weighed.  Okay?

4        MR. ROSS:  Thank you, Judge.

5        JUDGE TRACY:  Okay.  Is there anything else before we go

6    off the record, October 9th?  Nothing else?

7        MR. RODRIGUEZ RITCHIE:  No.

8        JUDGE TRACY:  Okay.  Did you, Ms. Court Reporter, have any

9    documents, anything that you're missing, or we've put in the

10   proper pieces, and --

11       MS. GONZALEZ:  Nothing's missing; I'm just going to return

12   GC-72.

13       JUDGE TRACY:  Okay.  All right.

14       MR. GARBER:  62?

15       JUDGE TRACY:  62.

16       MR. RODRIGUEZ RITCHIE:  62 or 72?

17       MS. GONZALEZ:  72.

18       MR. GARBER:  I think it's 62.

19       MS. GONZALEZ:  I already returned 72.

20       JUDGE TRACY:  We had 72 as well.

21       MR. GARBER:  Oh, you're right.  You're right.  Yeah.

22       JUDGE TRACY:  72 is what you all were working on.

23       MR. GARBER:  Yeah.  That's right.

24       JUDGE TRACY:  And 62 -- okay.

25       MR. ROSS:  Before we all take off --



www.escribers.net | 800-257-0885

1       JUDGE TRACY:  I wanted to -- are we -- we're still on the

2   record, though.

3       MR. ROSS:  Oh, are we?

4       JUDGE TRACY:  Yes, but we can go off the record.

5       MR. ROSS:  Our concern is, we need to know the status with

6   the stipulation with respect to General Counsel's 62, because

7   if we have a stipulation --

8       MR. GARBER:  It's 72.

9       JUDGE TRACY:  72.  72.

10      MR. ROSS:  Oh, is it 72?

11      MR. GARBER:  Yeah.

12      MR. ROSS:  If we have a stipulation, the good news is is

13  that might shorten this trial a little bit.

14      JUDGE TRACY:  Okay.

15      MR. ROSS:  If we don't have the stipulation, we need to

16  know that sooner rather than later, so that we can arrange

17  accordingly.

18      JUDGE TRACY:  And so what's the status of the stipulation?

19      MR. GARBER:  When we're done today, Edris and I are going

20  to talk, and we'll probably let you know today.

21      JUDGE TRACY:  Okay.  All right.

22      MR. ROSS:  Thank you.

23      MR. GARBER:  Um-hum.

24      JUDGE TRACY:  Could you all just let me know somehow?

25      MR. GARBER:  Um-hum.



1    JUDGE TRACY:  I hate inviting that, because I don't want

2  people to start sending me emails.  But if you've reach a

3  stipulation, and it affects, Mr. Ross, your -- the estimate for

4  the length of time or the number of witnesses, let's say, I

5  would just appreciate knowing that.

6    MR. ROSS:  Absolutely.

7    JUDGE TRACY:  So then I would know the likelihood of

8  needing that extra week in, or three days, in November.

9    MR. ROSS:  I will do that, Judge.

10    JUDGE TRACY:  Just send me an email with everybody on it.

11    MR. ROSS:  We send it to you in care of --

12    JUDGE TRACY:  Put her on it, but just send it to me.

13    MR. ROSS:  It's just, well, I don't know that we have your

14  email.

15    JUDGE TRACY:  Oh, okay.

16    MR. RODRIGUEZ RITCHIE:  We can send the email.

17    MR. GARBER:  Yeah.

18    JUDGE TRACY:  Yeah.  And then they'll have it through the

19  NLRB's, like, thing -- Outlook.  But put her on it, too.  She

20  might ask me.

21    MR. GARBER:  Who?

22    JUDGE TRACY:  My -- Van (phonetic).

23    MR. RODRIGUEZ RITCHIE:  Van.

24    JUDGE TRACY:  Van.

25    MR. GARBER:  Oh Van.  Oh, okay.


www.escribers.net | 800-257-0885

1    JUDGE TRACY:  Yeah.  Okay.  Anything else?  All right.

2    Let's go off the record.

3    **(Whereupon, the hearing in the above-entitled matter was**

4    **recessed at 4:01 p.m. until Tuesday, October 9, 2018 at 9:00**

5    **a.m.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

www.escribers.net | 800-257-0885

1          **C E R T I F I C A T I O N**

2     This is to certify that the attached proceedings before the

3     National Labor Relations Board (NLRB), Region 32, Case Numbers

4     32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-

5     200530, 32-CA-208614, 32-CA-210879, 32-CA-220777 Tesla, Inc.,

6     and Michael Sanchez, and Jonathan Galescu, and Richard Ortiz

7     and International Union, United Automobile, Aerospace and

8     Agricultural Workers of America, AFL-CIO at National Labor

9     Relations Board Region 32, 1301 Clay Street, Suite 300N,

10    Oakland, CA 94612-5224, on Friday, September 28, 2018, 9:17

11    a.m. was held according to the record, and that this is the

12    original, complete, and true and accurate transcript that has

13    been compared to the reporting or recording, accomplished at

14    the hearing, that the exhibit files have been checked for

15    completeness and no exhibits received in evidence or in the

16    rejected exhibit files are missing.

17

18

19                    _Deborah Gonzalez_

20                    DEBORAH GONZALEZ

21                    Official Reporter

22

23

24

25


www.escribers.net | 800-257-0885

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 32

In the Matter of:

| | | |
|---|---|---|
| Tesla, Inc., | Case Nos. | 32-CA-197020 |
| | | 32-CA-197058 |
| and | | 32-CA-197091 |
| | | 32-CA-197197 |
| Michael Sanchez, an individual, | | 32-CA-200530 |
| | | 32-CA-208614 |
| and | | 32-CA-210879 |
| | | 32-CA-220777 |

Jonathan Galescu, an individual,

and

Richard Ortiz, an individual,

and

International Union, United
Automobile, Aerospace and
Agricultural Implement Workers
of America, AFL-CIO,

Charging Party,

_____

_____

Place: Oakland, California

Dates: October 9, 2018

Pages: 1768 through 1978

Volume: 10

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885

22-60493.1789



**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 32**

| | |
|---|---|
| In the Matter of: | |
| TESLA, INC., | Case Nos.  32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| INTERNATIONAL UNION, UNITED | 32-CA-200530 |
| AUTOMOBILE, AEROSPACE AND | 32-CA-208614 |
| AGRICULTURAL IMPLEMENT WORKERS | 32-CA-210879 |
| OF AMERICA, AFL-CIO, | 32-CA-220777 |
| and | |
| MICHAEL SANCHEZ, AN INDIVIDUAL, | |
| and | |
| JONATHAN GALESCU, AN INDIVIDUAL, | |
| and | |
| RICHARD ORTIZ, AN INDIVIDUAL. | |

The above-entitled matter came on for hearing, pursuant to notice, before **AMITA BAMAN TRACY**, Administrative Law Judge, at the National Labor Relations Board Region 32, 1301 Clay Street, Suite 300N, Oakland, CA 94612-5224, on **Tuesday, October 9, 2018, 9:11 a.m.**

22-60493.1790

1                    <u>A P P E A R A N C E S</u>

2      **On behalf of the General Counsel:**

3           **EDRIS W.I. RODRIGUEZ RITCHIE, ESQ.**
            **NOAH J. GARBER, ESQ.**
4           National Labor Relations Board
            1301 Clay Street, Suite 300N
5           Oakland, CA 94612-5224
            Tel. 510-671-3021
6
       **On behalf of the Respondent:**
7
            **MARK S. ROSS, ESQ.**
8           **KEAHN N. MORRIS, ESQ.**
            SHEPPARD MULLIN RICHTER & HAMPTON LLP
9           Four Embarcadero Center
            Seventeenth Floor
10          San Francisco, CA 94111-4109
            Tel. 415-434-9100
11          Fax. 415-434-3947

12     **On behalf of the Charging Parties:**

13          **MARGO A. FEINBERG, ESQ.**
            **DANIEL E. CURRY, ESQ.**
14          **JULIE S. ALARCON, ESQ.**
            SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
15          6300 Wilshire Boulevard, Suite 2000
            Los Angeles, CA 90048
16          Tel. 323-655-4700

17

18

19

20

21

22

23

24

25



1                          <u>I</u> <u>N</u> <u>D</u> <u>E</u> <u>X</u>

2

3     **WITNESS**          **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**   **VOIR DIRE**

4     Ricky Gecewich        1781      1882

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-60493.1792



1              **E X H I B I T S**

2

3    **EXHIBIT**                          **IDENTIFIED**        **IN EVIDENCE**

4    **General Counsel:**

5      GC-1(bbbb) to (eeee)                  1772               1772

6      GC-56                                 1773               1773

7      GC-62                                 1881               1881

8      GC-63                                 1812               1812

9      GC-64                                 1819               1819

10     GC-65                                 1826               1826

11     GC-67                                 1841               1841

12     GC-68                                 1846               1846

13     GC-69                                 1774               1774

14     GC-70                                 1865               1865

15     GC-72                                 1773               1773

16     GC-79                                 1872               1872

17     GC-80                                 1814               1814

18     GC-81                                 1878               1878

19     GC-82                                 1871               1871

20     GC-83                                 1878               1878

21   **Joint:**

22     J-3                                   1773               1773

23     J-4                                   1774               1774

24   **Charging Party:**

25     CP-3                                1956 (Rejected 1960


22-60493.1793

1       <u>P R O C E E D I N G S</u>

2       JUDGE TRACY:  So we're back on the record.  And so we'll

3       start with the General Counsel with the formal papers, the

4       additions, and stipulations.

5       MR. RODRIGUEZ RITCHIE:  Yes.  Counsel for the General

6       Counsel would offer an amended Exhibit 1.  This is an

7       additional continuation of index and description of formal

8       documents.  The additional documents being 1(bbbb) through

9       1(eeee), with 1 quadruple (e) being the index and description

10      of these additional formal documents.  We've provided a copy to

11      all the parties for their review.

12      JUDGE TRACY:  Okay.  Any objections?

13      MR. ROSS:  Yes -- no.

14      JUDGE TRACY:  Okay.  All right.  So General Counsel's

15      Exhibit -- it's not really an amendment.  I'll just state it's

16      a continuation.  1 quadruple (b) to quadruple (e) is admitted

17      into evidence.

18      **(General Counsel Exhibit Number 1(bbbb) through (eeee) Received**

19      **into Evidence)**

20      MR. RODRIGUEZ RITCHIE:  Thank you.

21      JUDGE TRACY:  Okay.

22      MR. GARBER:  The parties have also reached a number of

23      stipulations.  I'm not going to read them into the record

24      because they're lengthy.  The first one has been reduced to

25      writing as Joint Exhibit 3-1 through 3-3, and incorporates



www.escribers.net | 800-257-0885

1    General Counsel's Exhibit 72.

2        JUDGE TRACY:  Okay.

3        MR. GARBER:  The parties have already been shown this also.

4    And this relates to the testimony of an individual by the name

5    of Dave Teston.

6        JUDGE TRACY:  Has GC Exhibit 72 come in yet?

7        MR. GARBER:  No, not yet.

8        JUDGE TRACY:  No.  Okay.  But that's part of --

9        MR. GARBER:  It is, yes.  It's incorporated within the

10   stipulation.  So we'd move Joint Exhibit 3 and GC Exhibit 72

11   into evidence.

12       JUDGE TRACY:  Okay.

13       MR. ROSS:  We're examining the stip.  Just give us a

14   moment, please.

15       JUDGE TRACY:  Okay.  Sure.

16       MR. ROSS:  All right.

17       JUDGE TRACY:  Any objections?

18       MR. ROSS:  No objection, Your Honor.

19       JUDGE TRACY:  All right.  Any objections?

20       MS. FEINBERG:  No objection.

21       JUDGE TRACY:  So Joint exhibit -- I'm sorry --

22       MR. GARBER:  3?

23       JUDGE TRACY:  Yeah.  Joint Exhibit 3 is admitted into

24   evidence, and General Counsel Exhibit 72, which is incorporated

25   into Joint Exhibit 3, is also admitted into evidence.



1    **(Joint Exhibit Number 3 Received into Evidence)**

2    **(General Counsel Exhibit Number 72 Received into Evidence)**

3         JUDGE TRACY:  Okay.  Go ahead.

4         MR. GARBER:  And the next one is Joint Exhibit 4-1 through

5    4-2, relating to Twitter, which incorporates Exhibits GC-56 and

6    GC-69-1 through 69-3.

7         MR. ROSS:  Are we on the record, Your Honor?

8         JUDGE TRACY:  Yes.

9         MR. ROSS:  Could we go off for just one moment?

10        JUDGE TRACY:  Oh, sure.  Let's go off the record.

11   (Off the record at 9:16 a.m.)

12        JUDGE TRACY:  Okay.  All right.  And so at this point, if

13   you want to move those --

14        MR. GARBER:  Sure.

15        JUDGE TRACY:  -- into the record.

16        MR. GARBER:  Yeah, I move into evidence Joint Exhibit 4 and

17   related exhibits, GC Exhibit 56 and 69.

18        JUDGE TRACY:  Okay.  Any objections?

19        MR. ROSS:  Nope.

20        JUDGE TRACY:  Okay.  And any objections here --

21        MS. FEINBERG:  No.  Thank you.

22        JUDGE TRACY:  -- Charging Party?  Okay.  So Joint Exhibit 4

23   along with General Counsel's Exhibits 56 and 69 are admitted

24   into evidence.

25   **(Joint Exhibit Number 4 Received into Evidence)**



www.escribers.net | 800-257-0885

1    **(General Counsel Exhibit Number 56 and 69 Received into**

2    **Evidence)**

3    JUDGE TRACY:  And then any other matters that we should

4    take care of before -- as we discussed last time, we're going

5    to go back to the General Counsel's case in chief at this point

6    with the witness that received a subpoena to appear today.

7    MR. RODRIGUEZ RITCHIE:  Correct.  We also just want to note

8    for the record that we received late last week additional

9    documents produced relevant to the termination and suspension

10    allegations.  I'm raising it now because it might come up with

11    this witness.  And it is continually concerning that we're

12    receiving production, and particularly regarding these kinds of

13    documents.

14    MR. MORRIS:  Sure.  I can speak to that.  There was an

15    issue that came up the last time we met with one of the

16    exhibits, Respondent's Exhibit, I think it was, 15.  And that

17    exhibit didn't come up in our reasonable search efforts because

18    the name Richard Ortiz or Jose Moran were not used in that

19    particular email.  So while Tesla has conducted a reasonable

20    search, we did, based on your direction, conduct an additional

21    search.

22    What we did was essentially look at every single email for

23    the decision-making group over a period of time.  And you can't

24    use search terms because it's not going to come up with those

25    types of emails.  So it was a total of approximately 18,000

eScribers

www.escribers.net | 800-257-0885

1    emails, and it only turned up 30 pages of arguably responsive

2    emails, which are completely innocuous.  But nevertheless, we

3    have produced those emails.

4        And I'll just note that it took over a week of total

5    attorney time conducting that search.  And we produced those

6    documents as soon as practicable.

7        JUDGE TRACY:  Okay.  All right.  You can --

8        MS. FEINBERG:  Well, can we address it now or later?

9        JUDGE TRACY:  I mean, there's really nothing to address.

10   I --

11       MS. FEINBERG:  Okay.  Because this --

12       JUDGE TRACY:  I --

13       MS. FEINBERG:  I just want to say that this is related to

14   this issue that you had said we could address, which is that

15   there was documents that came up after Josh had just testified.

16   These are similar kinds of documents which relate to the

17   testimony he gave about who was involved in the decision and

18   how he made those decisions to who to include.

19       And I disagree with counsel for Tesla in that there are

20   different ways to do a search.  If you're looking for the

21   documents related to someone's who's been disciplined, you just

22   don't do an electronic search, you contact the people who made

23   the decisions.  And these documents either came from ShTawney

24   or Gecewich or Hedges, anyone of those people, or -- what's the

25   last guy who didn't make the -- anyhow, the point is, they



www.escribers.net | 800-257-0885

1    could have just looked in their own folders and been there.

2    They don't have to look through 18,000 emails to find what is

3    related to this.  There should have been folders on that.

4         So we have concerns because obviously these are documents

5    that relate to the decision-making process of the termination

6    of Mr. Ortiz.  So the fact that they're coming in after people

7    have already testified is of concern to us.  And you did say we

8    could address that.  So I'll address it more later, but I

9    didn't want to just let it lie as it is because I don't think

10   that that was accurate about what took place.

11        JUDGE TRACY:  Well, I mean, I guess the -- what occurred, I

12   think it -- I'm looking at Respondent's Exhibit 15.

13        And so thank you for looking again for the documents.

14        I guess what I would say to the General Counsel and to the

15   Charging Parties, is, you know, if you're requesting some sort

16   of adverse inference, or what have you, at whatever point in

17   time you feel is appropriate, you can ask for them.  Like I

18   said --

19        MS. FEINBERG:  Um-hum.

20        JUDGE TRACY:  -- I'm going to make those decisions in the

21   final decision --

22        MS. FEINBERG:  Um-hum.

23        JUDGE TRACY:  -- of this case.  Certainly if there is a

24   document that you're going to have difficulty getting because

25   the witness has already testified, then if you want to talk to

escribers
www.escribers.net | 800-257-0885

1   the Respondent about getting it in, something, or just call

2   back that witness.  I mean, it adds more length to the case,

3   but if you have to do that, then you have to do that if the

4   Respondent is not willing to argue that, you know, that the

5   witness isn't appropriate to testify about such a document or

6   just allow you to put it into the record.  That's just kind of

7   one thought that I had, speaking, not really knowing what the

8   documents say.  So --

9        MS. FEINBERG:  All right.

10       JUDGE TRACY:  -- you've made your argument.  So just now --

11       MS. FEINBERG:  Yeah.

12       JUDGE TRACY:  -- tell me what you want to do, okay,

13  whenever the time comes up.

14       MR. RODRIGUEZ RITCHIE:  Thank you.

15       MS. FEINBERG:  Okay.  Thank you.

16       JUDGE TRACY:  Anything else before we get the witness?

17       Nope?  Okay.

18       MR. RODRIGUEZ RITCHIE:  No.

19       JUDGE TRACY:  All right.  So let's go off the record so you

20  can bring in this next witness.

21  (Off the record at 9:32 a.m.)

22       JUDGE TRACY:  All right.  Mr. Rodriguez Ritchie, if you'll

23  call your next witness.

24       MR. RODRIGUEZ RITCHIE:  The General Counsel calls Ricky

25  Gecewich.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  All right.  If you could raise your right

2    hand --

3    MR. GECEWICH:  Yeah.

4    JUDGE TRACY:  -- please.

5    Whereupon,

6    **<u>RICKY GECEWICH</u>**

7    having been duly sworn, was called as a witness herein and was

8    examined and testified as follows:

9    JUDGE TRACY:  Okay.  Go ahead and have a seat.  State your

10    name for the record.

11    THE WITNESS:  My name is Ricky Gecewich.

12    JUDGE TRACY:  Okay.  And so let me give you a few

13    instructions.

14    THE WITNESS:  Okay.

15    JUDGE TRACY:  There's some water up here, if you need it.

16    THE WITNESS:  Okay.

17    JUDGE TRACY:  The microphone there is not going to make

18    your voice any louder for anyone else in the room; it's just

19    for the purposes of recording the hearing.  However, I do need

20    you to -- you seem to have a lower voice.  And you may be

21    nervous.  Relax --

22    THE WITNESS:  Um-hum.

23    JUDGE TRACY:  -- as best as you can.  But if you could just

24    speak a little bit louder so that way everybody in the room can

25    hear you.  And that will minimize the need for you to have to



1    repeat some of your testimony, because that can happen if one

2    of these different attorneys doesn't hear your response.

3         THE WITNESS:  Sure.

4         JUDGE TRACY:  Okay?

5         THE WITNESS:  Okay.

6         JUDGE TRACY:  And if there's an objection, just wait for me

7    to rule on it to see whether you should answer that or not.

8         THE WITNESS:  Okay.

9         JUDGE TRACY:  Yeah.  I think that's it.

10        THE WITNESS:  Okay.  Your Honor, if can ask, I am getting

11   over --

12        JUDGE TRACY:  Okay.

13        THE WITNESS:  -- like a -- like a cold situation.  So --

14        JUDGE TRACY:  Okay.

15        THE WITNESS:  -- I may ask, if -- if available, if I can

16   take a break every once in a while.

17        JUDGE TRACY:  Sure.

18        THE WITNESS:  But I will try and like be as loud as

19   possible.

20        JUDGE TRACY:  Okay.

21        THE WITNESS:  So --

22        JUDGE TRACY:  No problem.

23        THE WITNESS:  Okay.

24        JUDGE TRACY:  No problem.  That's fair.

25        THE WITNESS:  All right.

22-60493.1802



1    JUDGE TRACY:  Thank you.

2    THE WITNESS:  Thank you so much.

3    JUDGE TRACY:  Thank you.  All right.  Go ahead.

4                    **DIRECT EXAMINATION**

5    Q    BY MR. RODRIGUEZ RITCHIE:  Good morning, Mr. Gecewich.  I

6    represent -- my name is Edris Rodriguez Ritchie, and I

7    represent the General Counsel of the National Labor Relations

8    Board in this matter.  You -- do you currently work at Tesla?

9    A    I do not.

10   Q    You began working at Tesla in about May 2017; is that

11   right?

12   A    Yes.

13   Q    And then when was your last day at Tesla?

14        MR. ROSS:  I couldn't hear the question.

15   Q    BY MR. RODRIGUEZ RITCHIE:  When was your last day at

16   Tesla?

17   A    My last day at Tesla was September the 13th of 2018.

18   Q    And you were -- when you worked at Tesla, you were an

19   Employee Relations Partner, correct?

20   A    Yes, I was an Employee Relations Partner.

21   Q    And that was part of the employee relations and

22   investigations testimony at Tesla?

23   A    Yes.

24   Q    Okay.

25        MR. ROSS:  Your Honor, I apologize for the interruption.



1   I'm assuming that counsel is going to treat Mr. Gecewich as an

2   adverse witness and interrogate him with leading questions.

3   For the record, we want to object to that.

4       JUDGE TRACY:  So I'm assuming at some point, as he did with

5   the other witness that was a 611(c), he will request that.

6       MR. ROSS:  Okay.

7       JUDGE TRACY:  Is that correct?

8       He just hasn't gotten to that point yet.

9       MR. RODRIGUEZ RITCHIE:  Sure.  I will actually go ahead and

10  do it now.  I don't --

11      JUDGE TRACY:  Okay.

12      MR. RODRIGUEZ RITCHIE:  Counsel for the General Counsel

13  would request permission to pursue, pursuant to Federal Rules

14  of Evidence 611(c) with this witness, an admitted 2(11).

15      JUDGE TRACY:  Okay.

16      MR. ROSS:  And Your --

17      JUDGE TRACY:  Any objections?

18      MR. ROSS:  And we do object as a -- he's not any longer

19  with Tesla.  And he's a percipient witness, but his interests

20  are not aligned with the Company's.  And we think it's improper

21  for him to be examined in this fashion.

22      JUDGE TRACY:  Um-hum.  And for the Charging Party, any

23  thoughts on that?

24      MS. FEINBERG:  Well, we think his interests are aligned

25  with the Company because they're relying on his testimony to



1    support the termination of Mr. Ortiz.  So if that isn't true,

2    that would be an interesting stip to enter into.  But other

3    than that, it seems to me that the termination of Mr. Ortiz was

4    based on the investigation of Mr. Gecewich, as Tesla presents.

5        JUDGE TRACY:  Okay.

6        MS. FEINBERG:  So I don't see like -- I'm not following.

7        JUDGE TRACY:

8        MR. ROSS:  Your Honor, he's --

9        JUDGE TRACY:  Yes?

10       MR. ROSS:  -- appearing here pursuant to General Counsel's

11   subpoena.  He's not here -- we have subpoenaed him.

12       JUDGE TRACY:  Okay.

13       MR. ROSS:  And it was our intention to call him as our

14   case.  But he's here pursuant to General Counsel's subpoena.

15   He's a third-party witness, no question.  But when he worked

16   for us, his interests were aligned with us.  He hasn't worked

17   for us since September 13th.  He doesn't work for us now.  He's

18   a percipient witness, not an adverse witness.

19       JUDGE TRACY:  Okay.  And so I'll overrule the objection and

20   allow the General Counsel to proceed under Rule 611(c) as

21   during the relevant time period he was an agent of the

22   Respondent.

23       Go ahead, please.

24       MR. ROSS:  And we would ask a standing objection to all

25   leading questions (sic).



www.escribers.net | 800-257-0885

1       JUDGE TRACY:  Sure.

2       MR. ROSS:  Thank you.

3   Q    BY MR. RODRIGUEZ RITCHIE:  You just heard Mr. Mark Ross,

4   counsel for Tesla, speak?  You heard that?

5   A    I did.

6   Q    And you have met Mr. Ross before today, haven't you?

7   A    Yes, I have.

8   Q    Indeed you met with him today, this morning, prior to your

9   testimony?

10  A    Yes, I did.

11  Q    And that was to prepare for your testimony here today?

12      MR. ROSS:  Objection, Your Honor.  Attorney-client

13  privilege.  It was with his counsel.  And we are -- met with

14  him pursuant to a common interest joint defense agreement.

15  It's privileged communications to the purpose of the

16  conversation.

17      JUDGE TRACY:  I'm sorry.  I didn't hear what you --

18      MR. ROSS:  Yeah.

19      JUDGE TRACY:  -- just said.

20      MR. ROSS:  I'm objecting as an invasion of the attorney-

21  client privilege.  While he's not with the Company any longer,

22  he's represented by counsel.  We have a common interest joint

23  defense agreement with Mr. Gecewich and his attorney.  And

24  whatever conversations I may have had with Mr. Gecewich,

25  whether it be this morning or any other time since he's left

www.escribers.net | 800-257-0885

1    the Company or pursuant to that agreement, it's a privileged

2    communication.  Objection.

3        MR. RODRIGUEZ RITCHIE:  I think that's actually counter to

4    the argument that was just made with regards to 611(c).

5    Notwithstanding that, the purpose was subjective.  The meeting

6    wouldn't be subject to attorney-client privilege.

7        JUDGE TRACY:  So yeah.  I will overrule the objection with

8    regards to the subject of the meeting.  However, if there's

9    any -- you don't need to be, because of attorney-client

10   privilege --

11       THE WITNESS:  Um-hum.

12       JUDGE TRACY:  Let me ask you, was your personal attorney

13   present during this conversation?

14       THE WITNESS:  He was.

15       JUDGE TRACY:  Okay.  So any specifics of what was discussed

16   during this meeting, what was said during this meeting, you do

17   not need to divulge that.

18       THE WITNESS:  Um-hum.

19       JUDGE TRACY:  Just the subject matter of the meeting is --

20       THE WITNESS:  So the high level subject matter, but not the

21   specifics?

22       JUDGE TRACY:  Not the specifics.

23       THE WITNESS:  Got it.  Thank you.

24   Q    BY MR. RODRIGUEZ RITCHIE:  So the purpose of your meeting

25   this morning was to prepare for your testimony here today?



www.escribers.net | 800-257-0885

1   A    Yes.

2   Q    And how many times before today have you met with an

3   attorney for Tesla to prepare for your testimony here today?

4   A    Two or three times.

5   Q    For how long were each of the meetings?

6   A    From what I recall, between two and four hours each.

7   Q    Did you review any documents to prepare for your testimony

8   here today?

9   A    I did.

10  Q    What documents?

11  A    I had reviewed the affidavit that we had prepared

12  together, me -- me and you, and I had also reviewed my

13  investigations notes.

14  Q    Those were notes that you created?

15  A    Yes, those were notes that I created.

16  Q    And no other documents were reviewed to prepare for your

17  testimony --

18  A    No --

19  Q    -- here today?

20  A    -- other documents.

21  Q    And that was, "No other documents," just for the record?

22  A    I apologize.  No other documents.

23  JUDGE TRACY:  Sorry.  So what happens --

24  THE WITNESS:  Speaking over --

25  JUDGE TRACY:  -- of course --



1        THE WITNESS:  -- him, right.

2        JUDGE TRACY:  Yeah.  And so when --

3        THE WITNESS:  Sorry.

4        JUDGE TRACY:  -- the transcript comes, it will be cut off

5   and not clearly reflect what question was asked and what your

6   answer was.

7        THE WITNESS:  All right.  Thank you.

8   Q    BY MR. RODRIGUEZ RITCHIE:  Besides attorneys for Tesla and

9   your own attorney, did you speak with anyone regarding the

10  subject matter of your testimony today?

11  A    No, I did not.

12  Q    You didn't speak with Gaby Toledano?

13  A    No, I did not.

14  Q    You didn't speak with Josh Hedges?

15  A    No, I did not.

16  Q    Is Tesla paying for your attorney?

17  A    I'm not paying for my attorney.

18  Q    Okay.  Now, when you joined the employee relations and

19  investigations team in 2017, you were the first member of that

20  team; is that --

21  A    Yes, I was.

22  Q    And can you describe for us what the -- can you describe

23  for us what the employee relations and investigations team is

24  at Tesla?

25  A    Yes.  It's an investigations team that looks into



www.escribers.net | 800-257-0885

1    employee-related concerns.

2    Q    And conducts investigations?

3    A    Yeah.  Yes.  By looking into them and conduct

4    investigations into their concerns.

5    Q    Can you tell us what your job duties were as an Employee

6    Relations Partner in the employee relations and investigations

7    team?

8    A    Of course.  Yeah.  To investigate employee concerns, to

9    meet with employees that either have concerns and conduct

10    intakes with them, to conduct any witness interviews, gather

11    any information related to those concerns, and meet with

12    anybody that is possibly accused to have done something that's

13    a violation of one of our policies, draft documentation, and

14    provide recommendations to business leaders on the findings of

15    our review or investigation.

16    Q    And prior to your work at Tesla conducting investigations,

17    you were an investigator at other workplaces, correct?

18    A    Yes.  I was an investigator prior to being at Tesla.

19    Q    And so you were a federal criminal investigator for the

20    U.S. Air Force?

21    A    I was a federal criminal investigator for the --

22    Q    Where you --

23    A    -- U.S. Air Force.

24    Q    Where you conducted felony investigations into harassment

25    discrimination and retaliation?



1    A    Amongst other things, yes.  Some -- some of the

2    investigations we ran were into those matters as well as other

3    felony level crimes, so.

4    Q    And you also were an investigator at Google for three-and-

5    a-half years?

6    A    I was at Google for three-and-a-half years.  And during

7    that time at Google, I did investigations for about two and a

8    half of those years.

9    Q    During your time at Tesla, it would be safe to say that

10    you conducted at least several hundred investigations?

11    A    Yeah.  During my time at Tesla, probably over 100

12    investigations.

13    Q    So I want to talk to you about the investigation process

14    at Tesla.  You don't yourself as an Employee Relations Partner

15    initiate an investigation without a complaint?

16        MR. ROSS:  I'm sorry.  I couldn't hear the question.

17    Q    BY MR. RODRIGUEZ RITCHIE:  You don't yourself as an

18    Employee Relations Partner initiate a complaint -- or excuse

19    me -- initiate an investigation?

20    A    I think I want to understand the question a bit better.

21    Are you saying I -- yeah, I don't --

22    Q    So -- okay.  Let me step back a little bit.

23    A    I apologize.  I'm sorry.

24    Q    No.  No worries.

25    A    So --



22-60493.1811

1    Q    The employee relations and investigations team, that's a

2    unit that employees go to to make complaints?

3    A    To sort of clarify, it's -- employee relations and

4    investigations is -- is an investigations unit.  Complaints can

5    come through all different areas directly or otherwise to

6    employee relations.

7    Q    So you don't go out and just talk to employees about

8    matters that you're seek to go investigate; someone would

9    come -- a complaint would come to you before you would speak to

10    people; is that right?

11    A    So to further clarify, sometimes we will get concerns that

12    come directly to us and then sometimes we'll get concerns that

13    come through a supervisor, a business leader, an HR Partner.

14    All of those concerns are taken seriously, and then we

15    determine whether or not we are going to investigate those

16    concerns.  I -- I hope that helps.

17    Q    Yes.  Thank you.  When you conduct an investigation -- or

18    I should say when you conducted investigations at Tesla, you

19    would agree that it was important to speak to all the

20    witnesses?

21    A    I would agree that it's important to be thorough in your

22    investigation.  It's not necessary in some cases to speak with

23    every single witness in an investigation.

24    Q    And you're thorough in your investigations?

25    A    Yes, I believe so.



1   Q    You took notes of all your investigations -- of interviews

2   during your investigations?

3   A    Yes.  It was my practice to take notes during my

4   investigations.

5   Q    And written notes or typed notes?

6   A    They were always typed notes.

7   Q    And would you take notes during your conversation with a

8   person or afterwards?

9   A    I would -- as a matter of practice, I would take notes

10  while I was communicating with somebody.  So if I was gathering

11  information from them, I would have my computer out and take

12  notes at that time.

13  Q    And were they edited thereafter?

14  A    Maybe for some clarification, but nothing substantial.

15  Q    You would agree with me that one of the purposes of

16  conducting an investigation, and particularly a thorough

17  investigation, would be to understand all the context of what

18  happened?

19  A    I would agree the context is important in investigations.

20  Q    And that helps you understand whether a violation actually

21  occurred?

22  A    That is a component of understanding whether or not a

23  violation has occurred, yes.

24  Q    After you have completed your investigation, and I think

25  you testified a little bit about this, you write a report?

22-60493.1813



1   A    Yeah.  Like I previously discussed, as part of our

2   investigations process, we gather all the information, conduct

3   all interviews, and then we draft and put together a -- a

4   report to document what we found.

5   Q    And in a case where you conducted the investigation, it

6   would be what you found?

7        MR. ROSS:  I couldn't hear the question.  I'm sorry.

8   Q    BY MR. RODRIGUEZ RITCHIE:  In a case where you conducted

9   the investigation, the report would be what you found during

10  your investigation?

11  A    Yes.

12  Q    And your reports that you wrote while you were an

13  investigator at Tesla, they contained recommendations?

14  A    Yes, they did.

15  Q    And your recommendations were adopted by people?

16  A    Our recommendations were delivered to business leaders

17  that were responsible for making the final determination of --

18  of what they wanted to do in these matters.

19  Q    The recommendations were you made, that could include

20  getting -- taking no action?

21  A    Yes.

22  Q    And it also included verbal warnings for an employee?

23  A    Yes.

24  Q    Written warnings?

25  A    Yes.



1    Q    Suspensions?

2    A    I'm sure it could have included a suspension.

3    Q    And --

4    A    There were no cases where I had recommended a suspension

5    of an employee.

6    Q    And terminations?

7    A    Yes.

8    Q    Now, a written warning, that's something that's put into

9    an employee's Workday file?

10   A    Yes.  Like a written warning from their HR Partner or

11   manager, yes.

12   Q    And a verbal warning as well?

13   A    I'm actually not sure what HR partners do to document

14   verbal warnings.

15   Q    You've never asked an HR person to document somebody's

16   verbal warning in their Workday file?

17   A    There have been cases when I have asked them to do that,

18   but I don't know if we're talking generally about all

19   investigations.  I don't know if every single verbal warning is

20   documented in a Workday file.

21   Q    You're familiar with an individual named Jose Moran?

22   A    Yes, I am.

23   Q    In his case, you're familiar that he received a warning?

24   A    Yes, I am.

25   Q    But you didn't ask that the warning be put in his Workday



1    file?

2    A    I recommended that Jose receive a verbal warning with a

3    written follow-up, and I can't recall whether or not I asked

4    the HR Partner to put it in the Workday file or just keep it in

5    an email.

6    Q    What would be the reason why you would ask someone to put

7    it in their Workday file?

8    A    I think to reference it later in the event that the same

9    behavior came up.

10   Q    Now, in making recommendations for further action

11   regarding an individual after an investigation is completed,

12   that recommendation for action, that gets given to the

13   individual supervisor?

14       MR. ROSS:  I couldn't hear you.  I'm sorry.

15       MR. RODRIGUEZ RITCHIE:  Sure.

16   Q    BY MR. RODRIGUEZ RITCHIE:  In making recommendations after

17   you've completed your report, so recommendations for further

18   action, those recommendations are given to the employee's

19   supervisor?

20   A    Those recommendations are given to the appropriate

21   business leader, and it varies based on the recommended action.

22   Q    So the business leader's not a supervisor?

23   A    The business leader is within the management chain, but it

24   can be a different level of like a manager, depending on what

25   the recommendation is.



1    MR. ROSS:  Your Honor, just for the record --

2    JUDGE TRACY:  Is there an objection?

3    MR. ROSS:  Well, there is an objection.  The question is

4    vague and ambiguous insofar as counsel is using the word

5    supervisor.  Whether it's in a statutory sense of 2(11)

6    definition versus a more generic definition of the supervisor,

7    I think the question is vague and ambiguous.  We will --

8    JUDGE TRACY:  So if you could --

9    MR. ROSS:  -- stip -- we --

10    JUDGE TRACY:  So if you could clarify the question.

11    But what would you stipulate to?

12    MR. ROSS:  I was going to say we would stipulate that

13    individuals in the higher levels of the management chain would

14    be statutory supervisors.  But I think the way the question was

15    asked, it was vague and ambiguous and confusing because it

16    wasn't clear to me whether it -- he was asking for him to agree

17    that they were a statutory supervisor or whether they were the

18    person's immediate supervisor.  That's the question I got.

19    MS. FEINBERG:  I think it was vague and ambiguous because

20    witness actually --

21    JUDGE TRACY:  Okay.

22    MS. FEINBERG:  -- the distinction, Your Honor.  His answer

23    shows you that he understood the question and distinguished it.

24    If anyone listened to his answer, he distinguished between

25    business leaders --

22-60493.1817



1  JUDGE TRACY:  Okay.  So --

2  MS. FEINBERG:  -- and direct supervisors, so.

3  JUDGE TRACY:  All right.  So let's just clarify the

4  question that you're asking, please.

5  As far as the stipulation, you guys can talk about that,

6  but don't know what the higher levels of --

7  MR. ROSS:  That's fine.

8  JUDGE TRACY:  -- the management are.  I wish that there was

9  an org chart.  Hey, that would help, wouldn't it?

10  But anyway --

11  MR. RODRIGUEZ RITCHIE:  I agree.  It would have helped.

12  JUDGE TRACY:  -- go ahead and -- if you could just please

13  clarify the question.

14  MR. RODRIGUEZ RITCHIE:  Sure.

15  Q    BY MR. RODRIGUEZ RITCHIE:  The recommendation contained in

16  the reports that you created --

17  A    Um-hum.

18  Q    -- after an investigation, you testified that that is

19  given by you to the appropriate business leader?

20  A    Yes.

21  Q    And so the appropriate business leader, I just want to

22  understand what that means.

23  A    Okay.

24  Q    So that is someone that could be a supervisor?

25  A    Yes, it could be a supervisor.



www.escribers.net | 800-257-0885

1    Q    And by supervisor, that's somebody who would make the

2    decision to terminate the individual?

3    A    Yeah.  So if I'm able to explain, in areas where there's a

4    recommendation of termination, it had been a practice of ours

5    to go to a director level or above if a termination is

6    recommended.

7    Q    And who's the director level?

8    A    So in -- in which case?

9    Q    Who would be a director level person --

10    A    Oh, I --

11    Q    -- as opposed to somebody that's a lower level --

12    A    Yeah.  Sure.

13    Q    -- manager?

14    A    So anybody with the title of like director.  So like

15    director of this organization.  So like one of our more senior

16    managers.

17    Q    In termination cases?

18    A    Yes, in termination cases.

19    Q    Now, after your investigation is closed, so just the final

20    processes, do you communicate with the person that made a

21    complaint?

22    A    The reporting party, yes.

23    Q    And you just tell them that the case is closed?

24    A    Very general discussion.  The case is closed.

25    Q    And nothing else, correct?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    You don't investigate the motivations that a person may

3    have for making a complaint?

4    A    I think that's a bit overly broad.  You know, people come

5    forward for many different reasons, and if we find through the

6    course of our investigation there's a certain reason why they

7    came forward, that's something we would look into.

8    Q    So only if you thought during the course of an

9    investigation that the reason why someone complained was an

10    issue would you ever then look into the reason for the

11    complaint?

12    A    I believe it's always part of the investigation's process

13    to understand why somebody came forward.  If -- if I understand

14    your question correctly, you're asking me in only some cases do

15    we look into their motivation versus others --

16    Q    So I think I just heard you say, it's always part of the

17    process to understand why someone made a complaint?  That's

18    correct?

19    A    Yeah.  I think for an investigation's process, you should

20    understand why a complaint has come forward.

21    Q    And you did that in every case?

22    A    It's part of an intake.  So when you meet with somebody

23    that has made a complaint, it's part of an intake to understand

24    like what's your concern, you know, why are you coming forward

25    with this, all those things.


www.escribers.net | 800-257-0885

1   Q    And you did that in every investigation, correct?

2   A    If I conducted the intake, yes.

3   Q    Okay.  So only if you conducted an intake, not if you --

4   not if the complaint went to someone else?

5   A    Not if the intake was conducted by somebody else.  So an

6   intake had been -- just to further clarify, an intake can

7   happen in various ways.

8   Q    Um-hum.

9   A    Like an HR Partner can do an intake, another investigator

10  on our team can do an intake, and I may have enough information

11  from their notes to not have to do, you know, a second or a

12  third intake with the same person.

13  Q    So only where you conducted an intake would you ever

14  bother, in terms of the process part of an investigation, to

15  understand why someone was making a complaint.  Fair to say?

16  A    Yeah.

17  Q    Yes or no?

18  A    I don't think it's bothersome.  But yes, I would -- I

19  would understand why they came forward with the concern.

20  Q    Only where you conducted an intake?

21  A    Yes.

22  Q    Thank you.

23  A    Yeah.

24  Q    Now, you -- during your employment at Tesla, you conducted

25  an investigation into the conduct of two employees named Jose


www.escribers.net | 800-257-0885

1    Moran and Richard Ortiz regarding things they did together?  Do

2    you remember that?

3    A    I do remember that.

4    Q    And that conduct related to a posting on Facebook?

5    A    It was regarding posting Workday profile photos to

6    Facebook.

7    Q    Regarding a Facebook posting; is that right?

8    A    Yeah.  It was a component of it, is a Facebook posting.

9    Q    So I want to talk about that investigation --

10    A    Yep.

11    Q    -- a little bit, or a lot a bit.  You -- that -- the

12    Facebook posting came to your attention because you spoke with

13    someone named Josh Hedges about it?

14    A    Yes.

15    Q    And before Mr. Hedges spoke with you, you had no knowledge

16    of the Facebook posting?

17    A    I did not.

18    Q    You didn't know who Richard Ortiz was before Mr. Hedges

19    spoke to you about the Facebook posting?

20    A    I did not.

21    Q    You didn't know that Mr. Ortiz had engaged in any

22    activities with the Union?

23    A    I did not.

24    Q    Or with his other co-workers about working conditions?

25    A    I did not.



www.escribers.net | 800-257-0885

1    Q    Now, Mr. Hedges came to talk to you on September the 19th,

2    2017.  Do you remember that?

3    A    Yeah.  I -- I don't have the report right in front me.

4    But -- so in date perspective, I don't know if it was

5    September 19th, but if that's what documented, yes.

6    Q    You remember it was in September of 2017?

7    A    Oh, yes.  Yeah.

8    Q    Okay.  Now, he came to talk to you and talked to you about

9    a text message?

10   A    Yes.

11   Q    And it was a text message he received from someone named

12   Travis Pratt?

13   A    Sorry.  Yes.

14   Q    That took a -- it's okay if you need to take a break --

15   A    No.

16   Q    -- to drink some water.

17   A    Okay.  Thank you.

18        MR. ROSS:  Just don't breathe on anybody.

19        THE WITNESS:  I am trying to stay away from all --

20   everybody.

21        UNIDENTIFIED SPEAKER:  I heard you got a flu shot, so it

22   doesn't matter.

23        MS. FEINBERG:  Now we understand what the flu shot --

24        MR. ROSS:  We'll give a surgical mask you can wear.

25        THE WITNESS:  So I feel well quarantined right here, just



1   so you know.

2   Q    BY MR. RODRIGUEZ RITCHIE:  And you didn't take any notes

3   of your conversation with Mr. Hedges that day?

4   A    I did not.

5   Q    When Mr. Hedges came to talk to you, he showed you a

6   screenshot of the Facebook posting?

7   A    He showed me his phone, which did have a screenshot of

8   the -- the Facebook posting in it.

9   Q    And he showed you the text messages that he received from

10  Mr. Pratt?

11  A    Yes, he did.

12  Q    And he gave you a copy of that?

13  A    Yes, he did.

14  Q    I'm going to show you what's been admitted as General

15  Counsel's Exhibit 28.  Just take a look at that for a minute,

16  and let me know when you're ready.

17  A    I'm ready.

18  Q    Okay.  You recognize General Counsel's Exhibit 28, don't

19  you?

20  A    I do.

21  Q    And that's the text messages that Mr. Hedges showed you on

22  that date in September?

23  A    From what I remember, yes, but I believe a copy that I

24  have ends with the speech bubble where it says, "Wow, this is

25  on Facebook?"


www.escribers.net | 800-257-0885

1  Q    Do you remember that there were more text messages that he

2  showed you on that day?

3  A    Beyond this piece right here?

4  Q    Correct.

5  A    No, I don't.  I don't remember that.

6  Q    Now, Mr. Hedges, he talked to you for a few minutes about

7  the post?

8  A    Very briefly.

9  Q    He told you it was posted on a Facebook page?

10 A    From -- from what I recall, he -- you know, when he shared

11 this with me, it was clear that it was from a Facebook page.

12 Q    And Mr. Hedges also told you that Travis Pratt had sent

13 this picture in General Counsel's Exhibit 28, the one that

14 starts with Richard saying Joe Ortiz at the top?

15 A    Yes.  Josh had just told me that Travis Pratt had shared

16 this with him.

17 Q    And Mr. Hedges, he brought this to you because he knows

18 that you're part of the employee relations and investigations

19 team?

20     MR. ROSS:  Objection.  Calls for speculation.  He can't

21 know what Josh Hedges' state of mind was.

22     JUDGE TRACY:  Sustained.

23 Q    BY MR. RODRIGUEZ RITCHIE:  Have you ever discussed your

24 job title with Mr. Hedges prior to this date?

25     MR. ROSS:  Could I hear the question again?  I'm sorry.



www.escribers.net | 800-257-0885

1    Q    BY MR. RODRIGUEZ RITCHIE:  Have you ever discussed your

2    job title with Mr. Hedges prior to this date?

3    A    Yes.

4    Q    And so, to your knowledge, he was aware that you're an

5    Employee Relations Partner and part of the employee relations

6    and investigations team?

7        MR. ROSS:  Objection.  Again, it calls for speculation on

8    the part of the witness.  He can't know what Josh Hedges'

9    knowledge or awareness was.

10        MR. RODRIGUEZ RITCHIE:  Sure he can.  If he told him, he

11    would know.

12        MR. ROSS:  He didn't say he did.

13        JUDGE TRACY:  I'm going to overrule the objection.

14        Go ahead.

15        THE WITNESS:  Yeah.  I mean, Josh Hedges knew what my title

16    was.

17    Q    BY MR. RODRIGUEZ RITCHIE:  And that you conducted

18    investigations?

19        MR. ROSS:  That's -- the same --

20    Q    BY MR. RODRIGUEZ RITCHIE:  Have you ever --

21        MR. ROSS:  -- objection as before.

22        JUDGE TRACY:  Overruled.

23        THE WITNESS:  Yes, he knows that part of my role in

24    employee relations was to do investigations.

25    Q    BY MR. RODRIGUEZ RITCHIE:  Now, at the time of this -- of



www.escribers.net | 800-257-0885

1    your conversation with Mr. Hedges, your -- your conversation

2    with Mr. Hedges, that didn't include anything about honesty?

3    A    I'm sorry.  Can you restate that?

4    Q    And at the time of your conversation with Mr. Hedges, you

5    didn't discuss anything related to honesty or lying; is that

6    right?

7    A    No.

8    Q    Okay.  And after you spoke with Mr. Hedges in September of

9    2017, you then spoke with Mr. Pratt?

10   A    Yes, I did.

11   Q    Okay.  And you talked with Mr. Pratt over the telephone?

12   A    Yes, I did.

13   Q    And you took notes during your conversation with him?

14   A    Yes, I did.

15   Q    You typed them?

16   A    Yes.

17   Q    Did you edit them after you typed them?

18   A    Not that I can recall.

19   Q    Okay.  When you spoke with Mr. Pratt, you talked about the

20   text messages and the screenshot that Mr. Hedges had shared

21   with you?

22   A    Yes.

23   Q    And Mr. Pratt, he told you about Josh asking him to go up

24   to Sacramento to testify?

25   A    I don't recall Travis Pratt saying that Josh Hedges had



1   asked him to go to Sacramento and -- and testify.  What I do

2   recall is Travis Pratt alluding to something about Sacramento,

3   not getting into the details about it.

4   Q    And you didn't ask him about the details?

5   A    I did not.

6   Q    Now, Mr. Pratt, during your conversation with him, he told

7   you that he sent the messages to Mr. Hedges?

8   A    Yes, he did.

9   Q    And he told you he had received them from another

10  employee?

11       MR. ROSS:  I couldn't hear the question.  Sorry.

12  Q    BY MR. RODRIGUEZ RITCHIE:  And he told you that he had

13  received the screenshot that he sent to Mr. Hedges from another

14  employee?

15  A    Yes.

16  Q    And that was Bryan Kostich?

17  A    Yes.

18  Q    Okay.  Now, during your conversation with Mr. Pratt,

19  Mr. Pratt told you that it was on a Facebook page called Fair

20  Future at Tesla?

21  A    He did say that.

22  Q    Okay.  And Fair Future at Tesla, that's a Union page?

23  A    At the time I did not know that.

24  Q    You didn't know at the time that you spoke with Mr. Pratt

25  it was a Union page?



www.escribers.net | 800-257-0885

1    A    No, I did not.

2    Q    You had never heard that term before, Fair Future at

3    Tesla?

4    A    No, I had not.

5    Q    You had no knowledge of any petitions that employees had

6    signed under the Fair Future at Tesla name; is that right?

7    A    Under the Fair Future name, no.  I knew generally there

8    was like a unionization thing going on, but I didn't know, you

9    know, that they had a Facebook page and what that Facebook page

10   was called.  It wasn't within the scope of my role.  Like --

11   yeah --

12   Q    And you weren't --

13   A    -- so.

14   Q    -- aware of any petitions that employees had signed,

15   correct?

16   A    No, I -- I wasn't aware of any specific petitions or

17   anything like that.

18   Q    Okay.  Thank you.  Now, Mr. Pratt, in your conversation

19   with him, he told me you he thought the information in the

20   screenshots was inappropriate because Richard wrote information

21   about how much money employees were making at Tesla; is that

22   correct?

23   A    Yeah.  He felt really like singled out, and he thought it

24   was inappropriate that not only was all this data about how

25   much -- Richard speculating on how much he made was in there as



1    well as like his name and picture.  So he felt very

2    uncomfortable about that.

3    Q    Sure.  And Travis Pratt, oh, he also told you that the

4    post was inappropriate because Richard wrote a comment about

5    people sucking up at Tesla?

6    A    Without having my notes in front of me, I can't

7    specifically recall, but it sounds familiar.

8    Q    And after your conversation with Mr. Pratt, he sent you

9    the screenshot of a message that he sent to Mr. Ortiz?  Do you

10   remember that?

11   A    Yeah.  So Travis, when he understood that this was out

12   there, sent a direct message to Richard and then shared that --

13   a screenshot of that message with me.

14   Q    Now, during your conversation with Mr. Pratt, you didn't

15   ask Mr. Pratt about his Workday usage, did you?

16       MR. ROSS:  I couldn't hear you.  I'm sorry.

17   Q    BY MR. RODRIGUEZ RITCHIE:  During your conversation with

18   Mr. Pratt, you didn't ask about his Workday usage, you did?

19   A    No.

20   Q    You didn't ask about whether the information that was

21   posted on Facebook, whether that was shared elsewhere?

22   A    Whether this posting had been shared with somebody else?

23   Is that what you're --

24   Q    Whether the information contained in the posting that's in

25   General Counsel's Exhibit 28 --



```
1   A    Um-hum.

2   Q    -- you didn't ask him whether that information was

3   publicly available anywhere else?

4   A    No, I didn't ask him that.

5   Q    And you didn't ask Mr. Pratt about how he used Workday?

6   A    No.  I -- I think I just answered that.  But like, no, I

7   did not ask Mr. Pratt on -- you know, how he uses Workday.

8   Q    I'm going to show you what's been premarked as General

9   Counsel's Exhibit 63.  It's a two-page document.

10  A    Just so I -- just keep all these documents up here?

11  Q    Yes, please.

12  A    Okay.  Thanks.

13  Q    Probably other --

14  A    I wasn't sure.

15  Q    -- people will ask you about them.

16  A    Okay.  Okay.

17  Q    Okay.  You recognize General Counsel's Exhibit 63; is that

18  right?

19  A    Yes, I do.

20  Q    And on the top it says, "Intake with Travis Pratt"?

21  A    Yes.

22  Q    This is a document that you wrote?

23  A    Yes, it is.

24  Q    These are -- earlier in your testimony you referred to

25  taking notes during your conversation with Mr. Pratt.  Are
```



www.escribers.net | 800-257-0885

1   these the notes that you were referring to?

2   A    Yes, these are those notes.

3   Q    Okay.  Now, on the top it says, "Intake with Travis

4   Pratt," and that's because this is an intake?

5   A    Yes.

6   Q    And then the fourth line with text, so beneath date

7   September 19th, 2017 --

8   A    Yes.

9   Q    -- do you see where it says, "Confidentiality and

10  Nonretaliation"?

11  A    Yep.

12  Q    That's what the subject of the investigation was at this

13  point?

14  A    No.  Those were just standard admonitions that we give in

15  every conversation about our stance on keeping this matter

16  confidential while we look into these matters, as well as

17  Tesla's policy on nonretaliation.

18  Q    And what was it that you said about confidentiality?

19  A    Generally we tell people that we take concerns seriously

20  and that we ask for their partnership in keeping these matters

21  confidential while we look into them for the purpose of, you

22  know, not leaving the conversation influencing other witnesses

23  so that we can, you know, thoroughly look into something and

24  that we can get an unbiased look into it.

25  Q    So you tell the workers and you told Mr. Pratt, according

22-60493.1832



1   to your notes, that he's not allowed to discuss the

2   investigation with anyone else?

3   A    For the purposes of not biasing other witnesses.

4   Q    But you told him that --

5   A    And so we give them the opportunity, if they'd like to,

6   they can speak with their supervisor, they could speak with

7   their HR Partner, and we give them avenues to speak with

8   others, so.

9   Q    But -- so you tell the workers that they're not allowed to

10  discuss with other workers or anyone else that's not a manager

11  or a supervisor the investigation?  That's correct?

12  A    We tell them we recommend that they do not, correct.

13  Q    Okay.  And you told that to Mr. Pratt?

14  A    Yes.

15       MR. RODRIGUEZ RITCHIE:  I move General Counsel's Exhibit 63

16  into evidence.

17       JUDGE TRACY:  Any objections?

18       MR. ROSS:  Yes.  It's hearsay, and there's a lot of stuff

19  on this document that could be taken out of context and

20  misrepresented or mischaracterized.  I don't think the witness

21  can be asked about what was said and has to explain the notes.

22  But the notes themselves at this juncture I think are hearsay.

23       JUDGE TRACY:  Any response to that?

24       MR. RODRIGUEZ RITCHIE:  Yes, Your Honor.  They're not

25  hearsay.  They were created by an individual at the time or


www.escribers.net | 800-257-0885

1  near the time that he interviewed this person.  He just

2  testified that they are his notes, that he did, in fact, create

3  it.  In addition, he's an admitted agent supervisor of the

4  Employer, so they wouldn't be hearsay as to my intent to offer

5  them.

6      MS. FEINBERG:  And it is.  Well, he said it's his

7  practice -- his business practice, whenever he interviews

8  anyone, to have his computer out and take simultaneous notes as

9  part of his investigation.  So it seems to me it's part and

10  parcel of the business record of the investigation.

11      JUDGE TRACY:  So the objection is overruled.  General

12  Counsel's Exhibit 63 is admitted into evidence.

13  **(General Counsel Exhibit Number 63 Received into Evidence)**

14      JUDGE TRACY:  And certainly if there are concerns regarding

15  things taken out of context, you certainly on your direct

16  examination of this witness, which I assume you're planning to

17  do, you can clarify that.

18      MR. ROSS:  Fine.

19      JUDGE TRACY:  Okay?

20      MR. ROSS:  Thank you.

21      JUDGE TRACY:  So General Counsel's Exhibit 63 is admitted

22  into evidence.

23  Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  Mr. Gecewich, I'm going

24  to hand you what's been premarked as General Counsel's

25  Exhibit 80.  It's a three-page document.



1    A    Thank you.

2    Q    Just take a moment to look at it, and let me know when

3    you're ready.

4    A    Yes, I'm ready.

5    Q    All right.  You recognize the emails that are on General

6    Counsel's Exhibit 80?

7    A    Yeah.

8    Q    So this is an email chain with a picture on the third page

9    of General Counsel's Exhibit 80; is that correct?

10    A    Yes, it is.

11    Q    Okay.  So if you look at the top, it says, "From Travis

12    Pratt to Ricky Gecewich.  Sent 9/19/2017.

13    Attachmentsscreenshots_20170914-22411.eng" (sic)?

14    A    Yes.

15    Q    Okay.  That was an attachment that was attached to that

16    email at the top?

17    A    Yes.

18    Q    And that's a document that's on the third page of General

19    Counsel's Exhibit 80?

20    A    Yes.

21    Q    And the other emails were also emails to and from

22    Mr. Travis Pratt and yourself?

23    A    Yes, they are.

24    Q    Okay.

25        MR. RODRIGUEZ RITCHIE:  And at this time, I'd like to move



www.escribers.net | 800-257-0885

1    General Counsel Exhibit 80 into evidence.

2         JUDGE TRACY:  Any objections?

3         MR. ROSS:  Nope.

4         JUDGE TRACY:  Okay.  All right.  So General Counsel's

5    Exhibit 80 is admitted into evidence.

6    **(General Counsel Exhibit Number 80 Received into Evidence)**

7    Q    BY MR. RODRIGUEZ RITCHIE:  Now, after you spoke with

8    Mr. Pratt, you spoke with Mr. Kostich; is that correct?

9    A    Yes, I did.

10   Q    Okay.  So that was also in September of 2017?

11   A    Yes.

12   Q    Do you remember the date?

13   A    I don't specifically remember the date, but I do remember

14   it being I think a day after I spoke with Travis.

15   Q    Okay.  And that -- your conversation with Mr. Kostich --

16   and I should state for the record Kostich, that's K-O-S-T-I-C-

17   H?

18   A    Yes, I believe so.  I'm sorry.  Yes.  I -- I believe

19   that's the way you spell his name.

20   Q    But your conversation with Mr. Kostich, that was as part

21   of your investigation process into the Travis Pratt allegation?

22   A    Yes.

23        JUDGE TRACY:  And could you just, for the record --

24        THE WITNESS:  Yeah.

25        JUDGE TRACY:  -- who is Mr. Kostich?



www.escribers.net | 800-257-0885

1      THE WITNESS:  So Bryan Kostich is another employee at

2    Tesla.  I don't know his exact title, but Bryan Kostich is the

3    person that told Travis Pratt that this was out on a Facebook

4    page.  And so that's why I spoke to him, to understand, you

5    know, how he came across this or if he had any additional

6    information.

7    Q    BY MR. RODRIGUEZ RITCHIE:  And you took notes during your

8    conversation with Mr. Kostich?

9    A    Yes, I did.

10   Q    And you typed those notes?

11   A    Yes, I did.

12   Q    You didn't handwrite them?

13   A    No, I did not.

14   Q    And you took them while you were speaking with him?

15   A    Yes, I did.

16   Q    Did -- and you didn't edit them afterwards?

17   A    Not that I can recall.

18   Q    Okay.  Now, during your conversation with Mr. Kostich,

19   Mr. Kostich talked to you about Jose Moran?

20   A    No, he did not.

21   Q    He didn't talk to you about a Facebook page called Jose

22   Organizer?

23   A    He did talk to me about a Jose Organizer Facebook page.

24   Q    And you understand that to be a Facebook page that's

25   linked to an individual named Jose Moran?



1    A    I do not.

2    Q    You don't?

3    A    No.

4    Q    And you never looked that up to see who it was?

5    A    No, I did not look that up.

6    Q    Mr. Kostich also told you that someone named Jose

7    Organizer was pushing employees to join a Facebook group called

8    Tesla Employees for Union Access?

9    A    Bryan told me he -- that Jose Organizer reached out to him

10    to join this Facebook group.

11    Q    He told you about it during your meeting with Mr. Kostich,

12    correct?

13    A    Yes, Bryan told me that.

14    Q    Okay.  Now, you didn't go onto Facebook to look for the

15    post at this point?

16    A    No.

17    Q    And it didn't occur to you to go on to see what type of

18    Facebook page this was posted on?

19    A    No.

20    Q    You didn't think it was important to see what the privacy

21    settings were on of the Facebook group?

22    A    I did not.

23    Q    And at this point in your investigation, you had no idea

24    still yet that Mr. Ortiz was involved in any union activities?

25    A    At this point in my conversation with Bryan Kostich, I



www.escribers.net | 800-257-0885

1   started to learn more about that this could have been related

2   to the Union.

3   Q   And this was the first time where you had any knowledge

4   that Richard Ortiz had involvement with the Union; is that

5   right?

6   A   Yeah, this is when I started to recognize that.

7   Q   Okay.  So you didn't recognize it before when Mr. Pratt

8   told you it was on a page called Fair Future at Tesla?

9   A   No, I didn't.

10  Q   Okay.  And you didn't know at this point that Mr. Ortiz

11  had engaged in workplace complaints regarding working

12  conditions?

13  A   No, not at all.

14  Q   You didn't talk -- during your conversation with

15  Mr. Kostich, you didn't ask him about his Workday use?

16  A   No, I did not.

17  Q   And you didn't ask him -- actually I'm going to show you

18  what's been premarked as General Counsel's Exhibit 64.  It's a

19  three-page document.  Just please take a moment to look at it,

20  and let me know when you're ready.

21  A   Okay.  I'm ready.

22  Q   Okay.  So you recognize General Counsel's Exhibit 64?

23  A   Yes, I do.

24  Q   Those are the notes that you wrote during your

25  conversation with Mr. Kostich on September 20th, 2017?



www.escribers.net | 800-257-0885

1    A    Yes, these are my notes.

2    Q    Now, I want to ask you -- again, at the top it says,

3    "Intake with Bryan Kostich"?

4    A    Yes.

5    Q    And that's because you consider this an intake?

6    A    Yes.

7    Q    And then the fourth line down where it says,

8    "Confidentiality" --

9    A    Yes.

10   Q    -- that's because you told Mr. Kostich that the

11   conversation required an investigation, that he couldn't

12   discuss that with other employees?

13   A    Yes.  Just like I explained previously, gave him the same

14   admonitions that he shouldn't discuss this with others so that

15   he doesn't bias their opinion or perception of these events.

16   Q    And then below that it says, "Nonretaliation," and that's

17   because you gave him an admonition that -- about

18   nonretaliation?

19   A    Yeah.  So we cover -- you know, Tesla has a firm policy

20   against retaliation.  You're not to retaliate against nobody

21   nor are you supposed to feel like somebody's retaliating

22   against you for raising concerns.

23   Q    And you said that to Mr. Kostich?

24   A    Yes, I did.

25   Q    And no other admonitions to him?

22-60493.1840



1    A    We also tell them, you know, the expectation in these

2    conversations is honesty.  And that goes during this whole

3    conversation that we're having at the beginning.

4    Q    Oh, but you didn't put that admonition in the document?

5    A    No.

6    Q    Even though you -- as you sit here today, you recall that

7    that's what you said?

8    A    Yes, because I say it every time.

9         MR. RODRIGUEZ RITCHIE:  At this time, I would move General

10   Counsel's Exhibit 64 into evidence.

11        JUDGE TRACY:  Any objections?

12        MR. ROSS:  Same as before, Your Honor.  Hearsay.

13        JUDGE TRACY:  All right.

14        MR. RODRIGUEZ RITCHIE:  Same response.

15        JUDGE TRACY:  All right.  So again the objection is

16   overruled, and General Counsel's Exhibit 64 is admitted into

17   evidence.  I assume that the objections that were noted with

18   regard to General Counsel's Exhibit 63 is what -- the

19   objections that the Respondent has.

20   **(General Counsel Exhibit Number 64 Received into Evidence)**

21   Q    BY MR. RODRIGUEZ RITCHIE:  So after you spoke with

22   Mr. Kostich, you also spoke with Mr. Ortiz during the course of

23   this investigation?

24   A    Yes, I did.

25   Q    Okay.  And I want to ask you about that.  You took notes



1     during your conversation with Mr. Ortiz?

2     A     Yes.

3     Q     That was on or about September 21st, 2017?

4     A     Yes.  It would have been the day I believe after I spoke

5     with Bryan.  And if I spoke with Bryan on the 20th, it would

6     have been on the 21st.

7     Q     And you took your notes during your conversation with him?

8     A     Yes.

9     Q     Did you edit them afterwards?

10    A     Not that I can recall.

11    Q     Now, at this point, when you spoke with Mr. Ortiz, you

12    were already aware that this was regarding a Union related

13    matter?

14    A     Yeah.  I can explain.  Well, after I spoke with Bryan

15    Kostich, I was aware that this had something to do or this page

16    had something to do with the Union.  So by the time I was

17    speaking to Richard, I knew the posting was surrounding

18    something about the Union.

19    Q     You -- in your conversation with Mr. Ortiz, you discussed

20    the Facebook posting that he made?

21    A     Yes.

22    Q     You showed it to him?

23    A     Yes, I did show it to him.

24    Q     But you showed him a redacted version?

25    A     Yes, I did show him a redacted version.



www.escribers.net | 800-257-0885

1    Q    So the document, if you can look at General Counsel's

2    Exhibit 28, that's not the version you showed him?

3    A    No, no, this is not the version that I showed him.

4    Q    And how did you redact?

5    A    So -- so the difference between the -- the document I

6    showed Richard and what's in this exhibit, I only showed

7    Richard -- it's kind of hard to -- I only showed Richard the

8    section which would have been the screenshot of the Facebook

9    post.  So this top piece right here, he didn't see these --

10   these text messages between Travis and Josh.  And then the --

11   the other thing that I redacted, there's a little speech bubble

12   here, so there's like a little -- it looks like a kid laying on

13   someone's shoulder, I blocked that piece out, as well as like

14   this little bubble where it says, Travis Pratt copy, thanks," I

15   blocked that out as well.

16   Q    Okay.  So just so the record is clear --

17   A    Sorry.

18   Q    No.  That's okay.

19        -- what Mr. Ortiz was shown starts -- if you look at

20   General Counsel's Exhibit 28, so it starts --

21   A    Um-hum.

22   Q    -- where it says, "about discussion, photos, events," that

23   line --

24   A    Yes.

25   Q    -- right?  And then it ends just above where it says,


www.escribers.net | 800-257-0885

1    "Looks like we got under some people's skin, smiley face"?

2    A    Yeah.  Just right above --

3    Q    So above --

4    A    -- that.

5    Q    -- that?  Right.  Okay.

6    A    Right.

7    Q    And then you also redacted on the document, it says,

8    "Travis Pratt" -- colon -- "copy, thanks," you redacted that,

9    and then the picture next to it?

10   A    Yes, I did.

11   Q    Okay.  And you saved a copy of what you showed him?

12   A    Yes, I did.

13   Q    And what did you do with it?

14   A    Oh, what did I do with the saved version of that?

15   Q    Yeah.

16   A    It's in the investigations file.

17   Q    Was it provided to Tesla's attorneys?

18   A    I believe I gave them everything that was in this, so yes.

19   Q    When did you give it to them?

20   A    I don't remember the specific date, but I recall people

21   asking for all the documents.  All the documents were uploaded

22   to our investigations database as well as a shared shoulder.

23   Q    Was it before June of this year?

24        MR. ROSS:  I couldn't hear the question.  I'm sorry.

25   Q    BY MR. RODRIGUEZ RITCHIE:  Was it before June of this

22-60493.1844



1    year?

2    A    Yeah, I'm sure it was.  I can't give you a specific date.

3    But they had access to everything I had access to.

4    Q    Okay.  Thank you.  Now, during your conversation with

5    Mr. Ortiz, he admitted that he made that Facebook posting,

6    didn't he?

7    A    Yes, Richard said he made this posting.

8    Q    He just didn't tell you who he got the screenshots from?

9        MR. ROSS:  I couldn't hear you.  I'm sorry.

10   Q    BY MR. RODRIGUEZ RITCHIE:  He just didn't tell you who he

11   got the screenshots from?

12   A    Correct.

13   Q    And at this point, you still hadn't gone onto the Facebook

14   group page to look at it?

15   A    Yeah.  To -- to clarify, I never went onto the Facebook

16   page.

17   Q    Oh, okay.  You never found out who were members of this

18   group?

19   A    No.

20   Q    Okay.  I'm going to show you what's been premarked as

21   General Counsel's Exhibit 65.  That's General Counsel

22   Exhibit 65.  Take a moment to look at that.

23   A    Okay.  I'm ready.

24   Q    All right.  You recognize General Counsel Exhibit 65?

25   A    Yes, I do.



1  Q    Those are your notes that you testified you took during

2  your conversation with Mr. Ortiz on September 21st, 2017?

3  A    Yes, they are.

4  Q    Thank you.  And at the top it says, "Interview, Richard

5  Ortiz"?

6  A    Yes.

7  Q    It doesn't contain the words intake, correct?

8  A    Correct.

9  Q    And that's because this wasn't an intake at this point?

10  A    Correct.

11  Q    Now, if you go down to the fourth line, it says,

12  "Confidentiality"?

13  A    Yes.

14  Q    Is that there because you told Mr. Ortiz that the

15  investigation needed to remain confidential?

16  A    The same as I do with everybody else.  I gave him the same

17  standard admonitions, yes.

18  Q    Okay.  And you told Mr. Ortiz that the investigation had

19  to remain confidential; is that correct?

20  A    While we looked into the matter, yes, so that he didn't

21  bias any other people and so that I can get, you know, a look

22  into what's going on here.

23  Q    And underneath it says, "Nonretaliation"?

24  A    Yes, nonretaliation.

25  Q    And you gave an admonition regarding nonretaliation to



1    Mr. Ortiz?

2    A    Yes.

3    Q    Okay.  Now, at this point in the investigation, the

4    investigation wasn't about honesty?

5    A    No, it was not.

6    Q    Okay.

7        MR. RODRIGUEZ RITCHIE:  And at this time, I'd like to move

8    General Counsel's Exhibit 65 into evidence.

9        JUDGE TRACY:  Any objections?

10       MR. ROSS:  Yes.  The same objection as before.

11       MR. RODRIGUEZ RITCHIE:  Same as --

12       JUDGE TRACY:  With regard to the -- of the prior two

13   admitted documents of the intake --

14       MR. ROSS:  Yes.

15       JUDGE TRACY:  -- notes of Mr. Gecewich?

16       MR. ROSS:  Yes.  Hearsay.

17       JUDGE TRACY:  And then, Mr. Rodriguez Ritchie, same --

18       MR. RODRIGUEZ RITCHIE:  Same response.

19       JUDGE TRACY:  -- response?

20       MS. FEINBERG:  Same response.

21       JUDGE TRACY:  Same response?

22       MS. FEINBERG:  Thank you, Your Honor.

23       JUDGE TRACY:  All right.  So I'm going to overrule the

24   objections again, and General Counsel Exhibit 65 is admitted

25   into evidence.


www.escribers.net | 800-257-0885

1   **(General Counsel Exhibit Number 65 Received into Evidence)**

2   Q   BY MR. RODRIGUEZ RITCHIE:  I did also want to ask you,

3   Mr. Gecewich, earlier you testified about reviewing documents

4   to prepare for your testimony.  That included General Counsel's

5   Exhibit 63; is that right?

6   A   One second.  63?  Oh, yeah.  Yes.

7   Q   And General Counsel's Exhibit 64?

8   A   Yes.

9   Q   And General Counsel's Exhibit 65?

10  A   Yes.

11  Q   Okay.  Now, I want to ask you a little bit about Workday.

12  A   Okay.

13  Q   Workday -- you're familiar with the system called Workday?

14  A   Yes, I am.

15  Q   And that's used at Tesla?

16  A   Yes.

17  Q   But Tesla doesn't own Workday?

18  A   Workday's its own company.  They're a provider of ours.

19  Q   And so Tesla, as far as you're aware, uses their services

20  for certain functions at Tesla?

21  A   From what I understand, yes.

22  Q   The investigation into the conduct of Jose Moran and

23  Richard Ortiz, as part of that, you looked into Workday?

24      MR. ROSS:  Could you restate it?  I'm sorry I couldn't hear

25  you.



www.escribers.net | 800-257-0885

1    Q    BY MR. RODRIGUEZ RITCHIE:   The investigation into the

2    conduct of Mr. Moran and Mr. Ortiz, that -- as part of your

3    investigation, you looked at the access of those employees to

4    Workday?

5    A    Like their data logs and like how --

6    Q    Right.

7    A    -- they access system?   Yes.

8    Q    Now, Tesla doesn't monitor the usage of employees on a

9    regular basis of Workday; is that correct?

10   A    Like a proactive monitoring --

11   Q    Right.

12   A    -- of the system?   Not that I'm aware of.

13   Q    And as far as you're aware, Tesla doesn't have access to

14   the sign-in, sign-out information of workers itself?

15   A    Right.   That's held at Workday, from what I understand.

16   Q    And so a request would have to be made of Workday to

17   obtain that information?

18   A    Yes.

19   Q    And that's indeed what happened here, correct?

20   A    Yes, it is.

21   Q    So somebody at Tesla contacted Workday to get the sign-in,

22   sign-out information of employees?

23   A    Yes.

24   Q    And that wasn't you?

25   A    No, that was not me.


www.escribers.net | 800-257-0885

1    Q    That was someone named Raj Nanda?

2    A    Correct.

3    Q    And who is he?

4    A    So -- so it's actually a she.

5    Q    Oh.  Who is she?  Thank you.

6    A    Raj, I don't recall her specific title because it's been a

7    very long time since I've communicated with her.  But she was

8    like a systems admin analyst person.  She was responsible for

9    the relationship between Workday and Tesla.

10   Q    So now going back to this particular investigation

11   regarding Jose Moran and Richard Ortiz --

12   A    Um-hum.

13   Q    -- you requested the sign-in, sign-out information in this

14   case?

15   A    Yes, I did.

16   Q    And the reason for that was because you wanted to see who

17   had accessed the profiles of Travis Pratt?

18   A    I'm sorry.  Can you restate the question.

19   Q    That's okay.

20   A    That threw me off.

21       MR. RODRIGUEZ RITCHIE:  I'll just note for the record,

22   because I don't know if you saw this, the witness hit his

23   elbow.

24       THE WITNESS:  So --

25       MR. ROSS:  The witness what?


www.escribers.net | 800-257-0885

1    MR. RODRIGUEZ RITCHIE:  Hit his elbow.

2    THE WITNESS:  I hit my elbow --

3    MR. ROSS:  Oh.

4    THE WITNESS:  -- and it -- so.

5    Q    BY MR. RODRIGUEZ RITCHIE:  You requested the information

6    from Workday of who accessed the profile of Travis Pratt?

7    A    Yes, I did.

8    Q    And someone else named Shaun Ives?

9    A    Yes.

10   Q    And who is Shaun Ives?

11   A    Shaun Ives is the other individual that's pictured in the

12   screenshot of the Facebook posting.

13   Q    In General Counsel's Exhibit 28?

14   A    Yes, 28.

15   Q    Okay.  And when you sought Ms. Nanda's help to obtain this

16   information, you did ultimately receive the information?

17   A    Yes, I did.

18   Q    And that was via email, correct?

19   A    Yes, it was via email.

20   Q    Okay.  I'm going to show you what's been premarked as

21   General Counsel's Exhibit 81.

22   A    Thank you.

23   Q    Just take a moment to look at it.

24   A    Okay.

25   Q    Okay.  So you recognize General Counsel Exhibit 81?



www.escribers.net | 800-257-0885

1    A    I do.

2    Q    And that's 81.  It's a five-page document of email chains?

3    A    Yes.

4    Q    So these are emails that you were either recipient or

5    sender of?

6    A    Correct.

7    Q    So I want to direct your attention to page 4 of General

8    Counsel's Exhibit 81.

9    A    Okay.

10   Q    And at the bottom --

11   A    Um-hum.

12   Q    -- the email that starts there from Ricky Gecewich, sent

13   Friday, September 22nd, 2017 at 10:38 a.m. to Raj Nanda --

14   A    Yes.

15   Q    -- okay, so that email, you recognize it?

16   A    I do.

17   Q    And that was a request that you sent Ms. Nanda seeking the

18   Workday -- seeking a list of anyone who accessed the Workday

19   pages between September 10th and September 16th --

20   A    Yes.

21   Q    -- of those two individuals listed, correct?

22   A    Correct.

23   Q    And that was because at -- you were only concerned with

24   this point regarding the Workday access between 10th -- between

25   September 10th and September 16, 2017?



www.escribers.net | 800-257-0885

1   A    Those specific dates come from -- you can't make a request

2   overly broad to like a system like Workday or else it might

3   take even longer.  So you want to be as thoughtful as possible

4   like how you bracket like how much time you ask for.  And so I

5   bracketed that based off of I knew the Facebook posting was up

6   during a certain period of time, and to see if there was

7   anybody that had looked into the system during that time

8   period, you know, a couple days before and a couple of days

9   after.

10  Q    And that was because, at least here, the only information

11  necessary regarding Workday usage was between those dates?

12  A    So -- I'm sorry.  The only information --

13  Q    So you requested the Workday access information --

14  A    Um-hum.

15  Q    -- only for the dates between September 10th and September

16  16, right?

17  A    Correct.  Yeah.

18  Q    And that's because that's all that was necessary?

19  A    To not be overly broad in my request.

20  Q    And that's all you needed at that point as part of your

21  investigation?

22  A    Yes.

23  Q    And do you -- I want you to take a look at the second

24  page.  At the bottom, do you see it says, "From Ricky Gecewich,

25  Friday, October 6, 2017, 12:58 p.m."?


www.escribers.net | 800-257-0885

1   A   The second page?

2   Q   Or excuse me.  Actually the third page.

3   A   Okay.

4   Q   About a third of the way down --

5   A   Okay.

6   Q   -- it says on, "October 6, 2017 at 11:53 a.m. Raj Nanda

7   wrote"?

8   A   Yes, I do see that.

9   Q   Okay.  And so this is what you got in response in terms of

10  who accessed those profiles between those dates?

11  A   Correct.

12  Q   Okay.  You can go ahead and turn that over.  Now, after

13  you received the information from Mister -- Ms. Nanda -- excuse

14  me --

15  A   No problem.

16  Q   -- you spoke with someone named Jose Moran?

17  A   Yes.

18  Q   And that was as part of the investigation?

19  A   Yes.

20  Q   And you took notes during your conversation with

21  Mr. Moran?

22  A   Yes, I did.

23  Q   Those were typed notes?

24  A   Yes, they were.

25  Q   And those were notes that you took during the



1    conversation?

2    A    Yes.

3    Q    You didn't edit them afterwards?

4    A    Not that I can recall.

5    Q    Okay.  So during your conversation with Mr. Moran,

6    Mr. Moran admitted that he obtained screenshots?

7    A    He admitted that he took screenshots, yes.

8    Q    And that he gave those to Mr. Ortiz?

9    A    Yes, he told me that.

10    Q    You remember that you asked Mr. Moran about Workday?

11    A    Yes, I do remember having that discussion with him.

12    Q    And you asked him about his use of Workday?

13    A    Yes.

14    Q    How he used it?

15    A    Yes.

16    Q    And why he used it?

17    A    Yes.

18    Q    And Mr. Moran answered your questions?

19    A    Yes, he did.

20    Q    He, in fact, told you that he used Workday to look other

21    people up?

22    A    Yes.

23    Q    That he used it to check their level of pay?

24    A    No.  So -- sorry.  What he described was he used it to

25    look up people's job titles, which may have had like a



1    numerical indicator on it.  I just want to be really clear.

2    Level of pay is not available to employees.  Like I can't look

3    into somebody else's, if I don't have access, and see their

4    actual level of pay.  I can see their job title, which might

5    have a number.  And he used the system to understand if that

6    number was, you know, their level.

7    Q    And he told you that?

8    A    He did tell me that, yes.

9    Q    And you -- he told you that it was about understanding how

10   people are compensated at Tesla?

11        MR. ROSS:  I couldn't hear the question.  I'm sorry.

12   Q    BY MR. RODRIGUEZ RITCHIE:  He told you that it was about

13   understanding how people are compensated at Tesla?

14   A    That's what he was trying to understand, yes.

15   Q    And you asked him about why he looked up Mr. Pratt?

16   A    I did.

17   Q    And Mr. Ives?

18   A    Yes.

19   Q    Now, you already knew from your email from Mr. (sic) Nanda

20   that he --

21   A    Ms.

22   Q    -- Ms. Nanda, excuse me, that he -- that Mr. Moran had

23   looked up Mr. Pratt and Mr. Ives?

24   A    Yes, I knew that.

25   Q    But you asked him anyway?



1    A    Yes.

2    Q    And Mr. Moran told you that he was looking people up

3    because of testimony that had happened in Sacramento?

4    A    I can't recall specifically if he said there was

5    testimony.  What I do remember is that he said something about

6    these people had been up to Sacramento and that he was made

7    aware that they were antiunion in some way, and he was asked to

8    then look up and verify whether or not they were actual

9    employees of Tesla.

10    Q    You didn't think to ask what had occurred in Sacramento?

11    A    No, I didn't.

12    Q    And never bothered to find out what --

13    A    No.

14    Q    -- Sacramento was about?

15    A    No.

16    Q    You also talked about the UAW during your conversation

17    with Mr. Moran?

18    A    Yeah.  He brought up the UAW.

19    Q    And the UAW, that the United Auto Workers?

20    A    From my understanding, yes.

21    Q    A union, correct?

22    A    Yeah.

23    Q    And you talked about Mr. Moran using Workday as part of

24    the organizing campaign at Tesla Fremont?

25        MR. ROSS:  I couldn't hear your question.  I'm sorry.



1    Q    BY MR. RODRIGUEZ RITCHIE:   And you talked about Mr. Moran

2    using Workday as part of the organizing campaign at Tesla

3    Fremont?

4    A    I don't recall having a specific -- like that specific

5    conversation, like are you using this system as a tool for a

6    unionization or organizing campaign.   What I recall him

7    specifically saying was that he used this at the request of a

8    UAW representative to verify whether or not these were

9    employees.

10   Q    And during your conversation with Mr. Moran, you

11   specifically discussed the Facebook posting that's in General

12   Counsel's Exhibit 28?

13   A    I don't recall specifically discussing the Facebook

14   posting with Jose, you know, the --

15   Q    You didn't show it to him?

16   A    -- the -- I don't recall showing it to him.   I recall

17   asking him a lot of questions about his use of Workday and

18   whether or not he'd accessed these Workday accounts.

19   Q    You didn't ask him whether he had seen the Facebook

20   posting?

21   A    Not that I can recall, no.

22   Q    You didn't ask him any details about the privacy settings

23   of a Facebook group?

24   A    No.

25   Q    You didn't think it was important to ask him what a Fair



1     Future at Tesla Facebook group was about?

2     A     No.

3     Q     You didn't think it was important to ask him what Tesla

4     Employees for UAW Representation Facebook group was about?

5     A     No.

6     Q     You did, however, ask Mr. Moran to go through his Facebook

7     when you met with him.  Do you recall that?

8     A     Yes, I do.

9     Q     And he did that in front of you?

10    A     Yes, he did.

11    Q     And he went through his Facebook messages at your request

12    in front of you?

13    A     Yes.

14    Q     And at this point, you were aware that Mr. Moran had been

15    engaged in union activities?

16    A     Yeah.  I mean, he made me aware that he was communicating

17    with a UAW representative.  So yes.

18    Q     Indeed you were familiar with Mr. Moran before you started

19    working at Tesla.  Do you remember that?

20         MR. ROSS:  Before -- I'm sorry.  I couldn't hear the

21    question.

22    Q     BY MR. RODRIGUEZ RITCHIE:  Before you started working at

23    Tesla, you were familiar with Mr. Moran?

24    A     I had seen Jose Moran's like name on an article.  But

25    familiar with him like would I be able to point him out, did I



1    know who the guy was, no.

2    Q    You had seen his name before in an article?

3    A    Yeah.  Probably like one time before.

4    Q    Before you started in May 2017?

5    A    Yes.

6    Q    Okay.  Now, during your conversation with Mr. Moran, you

7    also asked him to look at his phone?

8    A    Yes, I did.

9    Q    And you asked him for -- to look for text messages on his

10   phone?

11   A    Yeah.  So he had reviewed the Facebook -- his Facebook

12   page and his Facebook messages because he believed that he had

13   sent a direct message to Richard Ortiz with these screenshots.

14   When he couldn't find it there, he had offered that, look,

15   maybe I sent him a text, and then he showed me his text

16   messages between Richard and him.

17   Q    Because you asked him to show them to you?

18   A    Yeah, as part of the conversation, like where --

19   Q    Okay.

20   A    -- did these come from.

21   Q    And he sent them to you?

22   A    He did, yeah.

23        THE WITNESS:  Can I request a break in like 10 or

24   15 minutes just --

25        MR. RODRIGUEZ RITCHIE:  I actually would like a break now,


www.escribers.net | 800-257-0885

1   so.

2       THE WITNESS:  Oh, okay.  Perfect.  Can me and Edris request

3   a break?  So -- so --

4       JUDGE TRACY:  Yes, we can take a break.  It says it's

5   10:50.  That clock's a little fast, so we'll just go by that

6   one.  Let's take a ten-minute break until about, let's say,

7   11:07.  We also need to take a break at 11:50 or so, and that's

8   when we'll take our lunch break --

9       THE WITNESS:  Okay.

10      JUDGE TRACY:  -- due to a couple of phone calls that are

11  unrelated to this case that are scheduled.

12      So let's go ahead and take a ten-minute break until about

13  11:07.

14      So we can go off the record.

15  (Off the record at 10:51 a.m.)

16      JUDGE TRACY:  All right.  Mr. Rodriguez Ritchie, go ahead.

17  Q   BY MR. RODRIGUEZ RITCHIE:  I'm going to hand you,

18  Mr. Gecewich, what's been premarked as General Counsel's

19  Exhibit 67.

20  A   Thank you.

21  Q   Just take a moment, and let me know when you're ready.

22  A   Okay.

23  Q   Do you recognize General Counsel Exhibit 67?

24  A   I do.

25  Q   Earlier you testified about a conversation with Mr. Jose



www.escribers.net | 800-257-0885

1   Moran?

2   A    Yes.

3   Q    These are the notes in -- what's in General Counsel

4   Exhibit 67 are the notes that you took during your conversation

5   with Mr. Moran?

6   A    Yes, these are my notes from that conversation.

7   Q    And if you look at the stop, it says, "Interview with Jose

8   Moran"?

9   A    Yes.

10  Q    It doesn't use the words intake, correct?

11  A    Correct.

12  Q    And then the fourth line down, it says, "Confidentiality"?

13  A    Yes.

14  Q    And that's because -- that's listed in your notes because

15  you told Mr. Moran that the investigation had to remain

16  confidential?

17  A    Yes.

18  Q    There's also the words nonretaliation?

19  A    Yes.

20  Q    And then there's also the word honesty?

21  A    Yes.

22  Q    And that doesn't appear in the other exhibits of your

23  notes --

24  A    Correct.

25  Q    -- correct?  But it does in this case?


www.escribers.net | 800-257-0885

1   A    Yes.

2   Q    Okay.

3        MR. RODRIGUEZ RITCHIE:  At this time, I'd like to move

4   General Counsel Exhibit 67 into evidence.

5        JUDGE TRACY:  Any objections?

6        MR. ROSS:  Yes.  Hearsay.

7        JUDGE TRACY:  Okay.

8        MR. RODRIGUEZ RITCHIE:  The same response as the prior

9   ones.

10       MS. FEINBERG:  The same for us, Your Honor, with respect to

11  what we said for 64 and, yeah, 63.

12       JUDGE TRACY:  Okay.  63, right?

13       All right.  So again, the objection's overruled.  General

14  Counsel's Exhibit 67 is admitted into evidence.

15  **(General Counsel Exhibit Number 67 Received into Evidence)**

16       MR. ROSS:  And Judge, could you state for the record the

17  basis upon which the document's being admitted.

18       JUDGE TRACY:  Um-hum.  And so I'm overruling the objection

19  with regards to the fact that, as Mr. Gecewich testified, these

20  were notes that he took in the course of his investigation, and

21  in terms of being business records, that that's an exception to

22  the hearsay rule.

23       MR. ROSS:  All right.  Thank you.

24  Q    BY MR. RODRIGUEZ RITCHIE:  Now, after you spoke with

25  Mr. Moran, you spoke with Mr. Ortiz, correct?



1   A     Yes.

2   Q     And that was also on October 12th, 2017?

3   A     Yes, it was.

4   Q     And during this meeting with Mr. Ortiz, you confronted him

5   about the Facebook post?

6        MR. ROSS:  I couldn't hear the question.  I'm sorry.

7   Q     BY MR. RODRIGUEZ RITCHIE:  And during this meeting with

8   Mr. Ortiz, you confronted him about the Facebook post?

9   A     Yeah.  We continued our discussion about the Facebook

10  posting.

11  Q     And Mr. Ortiz told you that Mr. Moran sent him

12  screenshots?

13  A     He eventually told me that Jose sent him those

14  screenshots.

15  Q     He told you during the meeting that Mr. Moran sent him the

16  screenshots --

17  A     Yeah.

18  Q     -- correct?

19  A     Yes.

20  Q     And he also told you that he was trying to protect Jose

21  Moran?

22  A     He told me it was a symptom of his upbringing, that you

23  don't bring other people into these types of matters --

24  Q     And you --

25  A     -- and that's --



1   Q    -- understood that?

2   A    -- he didn't -- I'm sorry?

3        MR. ROSS:  Excuse me.  He was answering his question.  He

4   was interrupted.

5        JUDGE TRACY:  Yeah.  So --

6        MR. RODRIGUEZ RITCHIE:  It wasn't intentional.

7        JUDGE TRACY:  But let's redo that part and let -- go ahead

8   and ask the question and let him finish before you ask your

9   next one.  Okay?

10       MR. RODRIGUEZ RITCHIE:  Sure.  Thank you.  Although I

11  believe the words are supposed to be objection.

12  Q    BY MR. RODRIGUEZ RITCHIE:  Mr. Moran -- or Mr. Ortiz told

13  you that he was trying to protect Jose Moran?

14  A    From what I recall of the conversation, he said as a

15  symptom of his upbringing that he didn't necessarily talk to

16  law enforcement or investigators, and that's why he didn't

17  share Jose's name previously.

18  Q    You understood that to mean that he was trying to protect

19  Jose Moran, did you not?

20  A    I understood that to believe that he didn't want to share

21  that piece of information.  He wasn't as explicit as like, I

22  wanted to protect this guy, but I knew that I wasn't supposed

23  to talk.

24  Q    You didn't understand that to mean that he was trying to

25  protect another co-worker who he had engaged in activities



www.escribers.net | 800-257-0885

1  with?

2  A    I mean, I'm sure you could draw that conclusion, but I

3  don't know what was in Richard Ortiz' mind what he made --

4  Q    No.

5  A    -- that --

6  Q    I'm asking that's what you understood it to be.  That's

7  what you understood him to be saying essentially, that he was

8  trying to protect his co-worker who he had engaged in those

9  activities with?  That's what you --

10  A    Sure.

11  Q    -- understood, correct?

12  A    Sure.  So if he says -- and I just want to be super clear

13  here.  He's talking about how like it is not in -- within his

14  habits to talk to investigators or law enforcement, or whatever

15  that is, and that's why he didn't bring the information up.  So

16  in an effort to protect Jose, yes.

17  Q    And you took notes during your conversation with

18  Mr. Ortiz?

19  A    Yes.

20  Q    And those were typewritten notes that you took during the

21  conversation?

22  A    Yes, they were.

23  Q    I'm going to hand you what's been premarked as General

24  Counsel's Exhibit 68.  Just take a moment to look at that, and

25  let me know when you're ready.



www.escribers.net | 800-257-0885

1   A    Thank you.  Okay.

2   Q    Okay.  And you recognize General Counsel's Exhibit 68, a

3   six-page document?

4   A    Yes.

5   Q    And earlier you testified about notes that you took during

6   your October 12th, 2017 conversation with Mr. Ortiz.  And those

7   are the notes in General Counsel's Exhibit 68, correct?

8   A    Yes, they are.

9   Q    Okay.  And at the top, do you see where it says,

10  "Interview with Richard Ortiz"?

11  A    Yes.

12  Q    It doesn't use the words intake"?

13  A    Correct.

14  Q    And then the fourth line down, it says, "Confidentiality?"

15  A    Yes.

16  Q    And that notation is there because you told Richard Ortiz

17  that the investigation was confidential and he couldn't share

18  that with his co-workers?

19  A    Yes.

20  Q    Then the third line down -- or right beneath that it says,

21  "Nonretaliation," and then beneath that it says,  "Honesty"?

22  A    Yes.

23  Q    And that word honesty doesn't appear in your notes from

24  your conversations with Mr. Kostich or Mr. Pratt, correct?

25  A    It does that.



www.escribers.net | 800-257-0885

1    MR. RODRIGUEZ RITCHIE:  Okay.  At this time, I'd like to

2  move General Counsel Exhibit 68 into evidence.

3    JUDGE TRACY:  Any objections?

4    MR. ROSS:  Yes.  Hearsay.

5    JUDGE TRACY:  Okay.

6    MS. FEINBERG:  The same response, Your Honor, as to the

7  other document.

8    MR. RODRIGUEZ RITCHIE:  The same response.

9    JUDGE TRACY:  And so again, I overrule the objection, and

10  allow General Counsel's Exhibit 68 -- or admit General

11  Counsel's 68 into evidence.  And the same reasoning.

12  **(General Counsel Exhibit Number 68 Received into Evidence)**

13    MR. ROSS:  Thank you, Your Honor.

14  Q    BY MR. RODRIGUEZ RITCHIE:  Now, after you met with

15  Mr. Ortiz, you generated a report, you wrote a report?

16  A    Yes, I wrote a report after --

17  Q    And that --

18  A    -- I met with him.

19  Q    -- report contained your conclusions and what occurred

20  during the investigation?

21  A    Yes.

22  Q    And you had a meeting with individuals about the report?

23  A    Yes, I did.

24  Q    Now, when you drafted the report, you met with in-house

25  counsel for Tesla regarding the report?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    And that was before you sent it out to anyone outside of

3    the legal team?

4        MR. ROSS:  Objection, Your Honor.  First of all, it assumes

5    that he did send it out to somebody beyond the legal team, in

6    addition to which, I don't want him to be disclosing those

7    things which are covered by the attorney-client privilege.

8        JUDGE TRACY:  Okay.  So I'm overruling the objection, but

9    I'll give the instructions to the witness.  But also, this is,

10   you know, cross-examination (sic), and so certainly the witness

11   can clarify what happened or -- in response to the General

12   Counsel's question.

13       So again, as I've said earlier --

14       THE WITNESS:  Um-hum.

15       JUDGE TRACY:  -- if there are any conversations that you

16   had with the in-house counsel in this matter, you don't need to

17   testify or disclose --

18       THE WITNESS:  Um-hum.

19       JUDGE TRACY:  -- those conversations.  Okay?

20       THE WITNESS:  Okay.

21       JUDGE TRACY:  The words that were said during those --

22       THE WITNESS:  Okay.

23       JUDGE TRACY:  -- conversations.  I don't think that this

24   question, though, is covered by any attorney-client privilege.

25   So --


www.escribers.net | 800-257-0885

1      THE WITNESS:  Okay.

2      JUDGE TRACY:  -- you can certainly ask to repeat the

3   question.

4      THE WITNESS:  Yes.

5      MR. RODRIGUEZ RITCHIE:  I'm going to actually take a step

6   back.

7   Q   BY MR. RODRIGUEZ RITCHIE:  After you drafted the report,

8   you met with a group of individuals to discuss the report and

9   the recommendations contained in the report, correct?

10  A   After I drafted the report --

11  Q   Yes.

12  A   -- I met with in-house counsel.

13  Q   But you also, after you met with in-house counsel, met

14  with someone named ShTawney McIntosh?

15  A   Yes.  After it had gone through in-house counsel.

16  Q   In that meeting with Ms. McIntosh, that was also with

17  Stephan Graminger?

18  A   Yes.

19  Q   And with a business leader?

20  A   Yeah.  So to clarify, so the meeting with ShTawney

21  McIntosh was the HR Partner.  And if you recall what I had

22  described earlier, you know, when we do our reports, we have a

23  recommendation.  And so after we align the report with in-house

24  counsel, we move to the next step, which was to meet with the

25  HR Partner and the business leader -- the acting business



www.escribers.net | 800-257-0885

1   leader.  So the decision-maker in this case was Stephan

2   Graminger or Graminger (phonetic).  I don't remember how

3   exactly to say his name.  And there was another more senior

4   supervisor in the room or more senior manager in the room.  I

5   can't recall his name.

6   Q    Okay.  But that person wasn't the decision-maker?  The

7   other person whose name you can't recall, that wasn't the

8   decision-maker?

9   A    No.  Stephan was the decision-maker in this case.

10  Q    Okay.  And earlier I asked you questions about the

11  report --

12  A    Um-hum.

13  Q    -- and whether that -- you had discussed the -- whether

14  you had given that report to Tesla's in-house counsel before or

15  after you met with individuals.  So just so that I'm clear --

16  A    Um-hum.

17  Q    -- the report that you drafted you gave to Tesla's in-

18  house counsel before you met with Mr. Graminger and

19  Ms. McIntosh?

20  A    Yeah.  So it's part of the normal process.

21  Q    And do you recall that person's name?

22  A    The in-house counsel?

23  Q    Yes.

24  A    Yes.

25  Q    Who?



www.escribers.net | 800-257-0885

1   A   Jaime Bodiford.

2   Q   And she's sitting in the room here today, isn't she?

3   A   She is.

4   Q   Can you point her out?

5   A   I -- I can.  Jaime's right there.

6       MR. RODRIGUEZ RITCHIE:  Okay.  If the record could reflect

7   that the witness has identified Ms. Bodiford.

8   Q   BY MR. RODRIGUEZ RITCHIE:  Now, your report, that had

9   recommendations for further action regarding Jose Moran; is

10  that right?

11  A   I'm sorry.  That was --

12  Q   That --

13  A   -- a question?

14  Q   Yeah.

15  A   Okay.

16  Q   The report that you generated at the conclusion of this

17  investigation, that --

18  A   Um-hum.

19  Q   -- had a recommendation for action to be taken with

20  regards to Mr. Moran?

21  A   I believe so, yes.

22  Q   And also action with regards to Mr. Ortiz, correct?

23  A   Yes.

24  Q   And when you made your recommendation for action involving

25  these two individuals, your recommendation was based on your



1    assessment of this case, correct?

2    A    Correct.  Yeah.

3    Q    And it was made based on your looking at similar cases?

4    A    Yeah.  It's -- part of it is looking at similar cases and

5    what have we done in those cases, as well as, you know, what

6    are the unique facts of this case.

7    Q    When you met with Stephan Graminger, ShTawney McIntosh and

8    the other person whose name you don't recall, you --

9    A    Do --

10    Q    -- discussed the report?

11    A    Yes.  Do we have the name of that person so we can stop

12    saying like, the other person?

13    Q    Well, as you sit here --

14    A    Okay.

15    Q    -- today, you don't recall who that is?

16    A    I can't remember off the top of my head, no.

17    Q    Okay.

18    A    So --

19    Q    That's okay.  But we'll --

20    A    Okay.

21    Q    -- just refer --

22    A    Sorry.  I didn't want to --

23    Q    -- to the person as --

24    A    -- confuse --

25    Q    -- person number four in the meeting.



www.escribers.net | 800-257-0885

1    A    Okay.

2    Q    How about that?  Now, you went over the report during the

3    meeting?

4    A    Yes, I did.

5    Q    Do you remember the date of the meeting?

6    A    So I recall drafting the report on a Friday, and then

7    offering it to in-house counsel for review the -- the following

8    Monday or Tuesday.  So likely that Wednesday.

9    Q    The week after October 12th?

10    A    Yeah, the week after October 13th.  So you know -- so the

11    week of the -- the 16th.  So probably -- without having the

12    document in front of me, I think it was like the 17th or 18th

13    of October that I would have met with ShTawney McIntosh,

14    Stephan Graminger, and this other person.

15    Q    Okay.  Now I want to talk to you about the conversation or

16    the meeting that happened with the four of you.  Now, during

17    the meeting, you talked about the other cases -- similar cases

18    that you had considered as part of your recommendation.  Do you

19    remember that?

20    A    I do.

21    Q    And you remember you talked about one case in particular?

22    A    Yes, I do.

23    Q    And that was a case involving a vice president at

24    SolarCity?

25    A    Yes.



www.escribers.net | 800-257-0885

1    Q    So for purposes of this proceeding, I'm just going to

2    refer to the person as an employee, not by the person's name.

3    Okay?

4    A    Thank you.

5    Q    And so you discussed during this meeting with

6    Mr. Graminger that this vice president of SolarCity, this

7    employee, had been terminated after an investigation?

8    A    Yes.

9    Q    Do you remember that you talked about that the person was

10   terminated for lying about his use of a company vehicle?

11   A    Yeah.  I can't remember the specific conversation, but

12   that employee was terminated for lying through the course of an

13   investigation.

14   Q    And you remember the lying was about there being cocaine

15   residue in the car?

16   A    It was about the ownership of that -- those drugs and drug

17   paraphernalia.

18   Q    And it was also about empty liquor bottles being found in

19   the car.  Do you remember that?

20   A    There were a lot of things in the car.

21   Q    And he also lied about his relationship with another

22   employee --

23   A    Yes.

24   Q    -- correct?  And that was the only other case that you

25   discussed of another individual being terminated for lying



www.escribers.net | 800-257-0885

1   during your conversation with Mr. Graminger, Ms. McIntosh, and

2   this other fourth person?

3   A    From what I recall, yes, that is the only other case I

4   discussed specifically with them.

5   Q    During this meeting, you don't recall that -- union

6   activities were not discussed during the meeting?

7   A    So what I recall from the meeting, and the reason -- just

8   to add some more clarification to why there are all these

9   people and this other person that I can't remember his name,

10  Stephan was a much more --

11       MR. RODRIGUEZ RITCHIE:  So I'm going to move to strike as

12  nonresponsive.

13  Q    BY MR. RODRIGUEZ RITCHIE:  My question --

14       MR. ROSS:  I'm sorry.  He was in the middle of an answer

15  and he was interrupted.  I object.

16       MR. RODRIGUEZ RITCHIE:  Sure.  My question was, do you

17  recall that union activities were discussed?  So he just said

18  he wants to clarify, but that has nothing to do with my

19  question.

20       MR. ROSS:  Well, I think he was answering your question.

21       JUDGE TRACY:  Well, okay.  So I'm going to overrule the

22  objection.

23       But you know, if you could just please answer the question.

24  And certainly if there is a need to clarify --

25       THE WITNESS:  Um-hum.

22-60493.1876



1    JUDGE TRACY:  -- something, Mr. Ross or Mr. Morris will --

2    THE WITNESS:  Yeah.

3    JUDGE TRACY:  -- do that.  Okay?

4    THE WITNESS:  I appreciate it, Your Honor.

5    JUDGE TRACY:  But if there's some --

6    THE WITNESS:  Yeah.

7    JUDGE TRACY:  -- where you don't understand the question,

8    you certainly may --

9    THE WITNESS:  Um-hum.

10    JUDGE TRACY:  -- let the General Counsel know that you

11    don't understand or --

12    THE WITNESS:  Yeah.

13    JUDGE TRACY:  -- you know -- but at this point, you need to

14    just answer the question.

15    THE WITNESS:  Of -- of -- of course.  Yeah.

16    JUDGE TRACY:  Okay.

17    THE WITNESS:  I think I'm using clarify in the wrong sense.

18    So your question is?

19    Q    BY MR. RODRIGUEZ RITCHIE:  My question is, you didn't

20    discuss during the meeting with Mr. Graminger and Ms. McIntosh

21    and the fourth person, you didn't discuss union activities

22    having occurred during that meeting?

23    A    I didn't discuss it, but the other guy brought up the fact

24    that Richard might have been involved in a union.

25    Q    So someone else discussed it?



1   A    Yes.  The other person that I can't recall his name.

2   Q    And at that point, you didn't have knowledge that

3   Mr. Ortiz was involved in union activity?

4   A    No.  I -- I did.  We talked about that.  Richard had

5   brought that up previously, as well as Jose.

6   Q    You remember -- I think you brought this up -- providing

7   an affidavit in connection with these cases?

8   A    I do remember that.

9   Q    And you remember that when you provided an affidavit, you

10  were under subpoena?

11  A    I don't recall receiving a subpoena for that affidavit,

12  but I would imagine I was under subpoena for that.

13  Q    And you recall that when you provided the affidavit, you

14  were given a copy to review?

15  A    Yes.

16  Q    And after you reviewed the copy, you did so with Tesla's

17  attorney who was present during the affidavit?

18  A    Yes.

19  Q    And do you remember that you made handwritten changes to

20  the document?

21  A    I do remember that.

22  Q    And you remember that after you made the changes, you

23  raised your right hand and swore that you told the truth?

24  A    I do recall that.

25  Q    And you did tell the truth?

22-60493.1878



1   A    I did tell the truth.

2   Q    Okay.  Now, I'm going to hand you a document dated

3   January 8th, 2018, "Confidential Witness Affidavit of

4   Mr. Gecewich," and I'm going to ask you to look at page 15,

5   line 18 to 19 and your handwritten comment contained there.

6   A    Can you give me the -- the line prompts again, please?

7   Q    Sure.  18 to 19.  Right where it says, "During this

8   meeting."

9   A    Yep.  I've reviewed that.

10  Q    Okay.  Now, when you provided your affidavit, you

11  testified that you had no knowledge of Richard Ortiz' union

12  activities at the time of this meeting.  Do you remember that

13  testimony?

14  A    Correct.

15  Q    And you handwrote that into that affidavit in your --

16  A    I did.

17  Q    -- own writing?

18  A    I did.

19  Q    Okay.  And now you've testified that, in fact, you did

20  have knowledge at the time of the meeting that you had -- that

21  Mr. Ortiz had engaged in union activities?

22  A    Yeah.  This was directly in response to whether or not I

23  knew of his safety concerns that he had brought up, signing of

24  union cards and things of that nature.

25  Q    Your testimony here today now is that you did, in fact,



1    have knowledge of Mr. Ortiz' union activities during this

2    meeting, is it not?

3    A    Yeah.

4    Q    And that's not the same as your testimony you gave in a

5    sworn affidavit to a Board agent in connection with these

6    proceedings; is that correct?

7    A    That's correct.

8    Q    Thank you.

9         MR. RODRIGUEZ RITCHIE:  I'd ask for the affidavits to be

10   returned to me at this time.

11        MS. FEINBERG:  Oh, sorry.

12   Q    BY MR. RODRIGUEZ RITCHIE:  Now, as a member of the

13   employee relations and investigations team, and you didn't

14   investigate union activities of employees at Tesla; is that

15   correct?

16   A    No, I did not.

17   Q    And indeed, it would be unusual for you to receive reports

18   of employees' union activities?  You'd agree with that?

19   A    I'd agree with that.

20   Q    And it would be unusual -- if workers were contacting

21   Mr. Elon Musk about complaints about the workplace, it would be

22   unusual for you to receive that, correct?

23   A    If workers contacted Elon Musk about concerns in the

24   workplace, it would be strange for me to get those complaints,

25   also.



www.escribers.net | 800-257-0885

1   Q    Right.

2   A    I think if I understand the question correctly, it

3   wouldn't be that strange.  Like sometimes we did receive

4   concerns from employees that might have directly emailed him,

5   and then they'd be filtered down to our team to look into.

6   Q    Thank you.  I'm going to hand you what's been premarked as

7   General Counsel's Exhibit 70, which I'm going to tell you has a

8   lot of black boxes with a lot of redacted that I have added in

9   to protect the names of the individuals listed.  But I have an

10  unredacted copy, if you'd like to look at that.  But these are

11  the names of employees.  They're documents that were produced

12  by Tesla to us, and they have them in their original.

13       MS. FEINBERG:  So the entries -- you missed one place.

14       JUDGE TRACY:  Well --

15       MS. FEINBERG:  You missed one place there.  Page 18.  Can

16  we --

17       JUDGE TRACY:  So if you're going to have the witness,

18  though, testify about a particular document, I want him to be

19  looking at the one that's going to be admitted into evidence,

20  not the one -- or motion to be admitted into evidence, not the

21  one that is unredacted that isn't going to be offered into

22  evidence.

23       MR. RODRIGUEZ RITCHIE:  Sure.  No.  That's fine.  I just

24  meant in case the parties wanted to verify --

25       JUDGE TRACY:  Okay.



www.escribers.net | 800-257-0885

1      MR. RODRIGUEZ RITCHIE:  -- that it's the same.

2      JUDGE TRACY:  And certainly that's up to --

3      MS. FEINBERG:  Okay.  But I do have --

4      JUDGE TRACY:  -- Respondent there.

5      MS. FEINBERG:  Well, I'm concerned about this page that has

6  people's names on it.  Since you went to the trouble that --

7      MR. RODRIGUEZ RITCHIE:  Sure.  It looks like --

8      MS. FEINBERG:  -- of not having people's names --

9      MR. RODRIGUEZ RITCHIE:  -- I have --

10     MS. FEINBERG:  -- on it.

11     MR. RODRIGUEZ RITCHIE:  -- missed a page in my redaction.

12     THE WITNESS:  Do you want me to just not look at a certain

13  page?

14     MS. FEINBERG:  I'm less concerned about that --

15     THE WITNESS:  Oh, okay.

16     MS. FEINBERG:  -- you know, since you're not working

17  there --

18     THE WITNESS:  So okay.

19     MS. FEINBERG:  -- though I am concerned --

20     MR. ROSS:  She's point --

21     MS. FEINBERG:  Yeah, they know it.

22     MR. ROSS:  I think she might --

23     MS. FEINBERG:  Yeah, we just had one for the record.  I

24  don't really care that they see it.  You know, it's about the -

25  -


www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Okay.

2      MS. FEINBERG:  -- record, Your Honor.

3      JUDGE TRACY:  Okay.  All right.  That's fine.

4      MS. FEINBERG:  We can fix it so it's not permanently in the

5      record.  Obviously they've seen it since --

6      JUDGE TRACY:  Well, so --

7      MS. FEINBERG:  -- it's subpoenaed.

8      JUDGE TRACY:  -- how this would work actually is it would

9      be an objection.  Okay?

10     MS. FEINBERG:  Okay.

11     JUDGE TRACY:  So once it's --

12     MS. FEINBERG:  Sorry.

13     JUDGE TRACY:  -- offered in.

14     MS. FEINBERG:  I didn't know --

15     JUDGE TRACY:  So let's just take care of that instead of --

16     MS. FEINBERG:  Okay.  Fine.

17     JUDGE TRACY:  -- just --

18  Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  So take a moment to look

19  at that.

20  A    There are multiple numbers here.  Okay.  So 7, 8, 9.  Got

21  it.

22  Q    It goes Exhibit 70-001 to 062.

23  A    Okay.

24  Q    And each one is the same, just a different redacted --

25  A    Okay.


www.escribers.net | 800-257-0885

1    Q    Okay.  You know who Tori Tanaka is?

2    A    I do.

3    Q    Who is that?

4    A    Tori Tanaka is -- used to be an HR Partner at Tesla.

5    Q    And so this email, if you look at the top of first -- of

6    the first page of General Counsel's Exhibit 70, it's an email

7    where Ms. Tanaka is forwarding the email below to you?

8    A    Yes.

9    Q    And you remember you received this email?

10   A    I mean, if she sent it to me, I received it.  I don't

11   recall specifically this email.

12   Q    "Ricky Gecewich."  This email is to your work email

13   address, isn't it?

14   A    Um-hum.

15        MR. ROSS:  I couldn't hear the question.

16        JUDGE TRACY:  Go ahead.  If you could repeat the question,

17   please.

18        MR. RODRIGUEZ RITCHIE:  Sure.

19   Q    BY MR. RODRIGUEZ RITCHIE:  This email was sent to your

20   work email?

21   A    Yes.  I've never received any emails to personal account

22   at Tesla --

23   Q    Okay.  So --

24   A    -- so.

25   Q    -- you have no reason to believe that you didn't receive



1   this email?

2   A    Right, I have no reason to believe I didn't --

3   Q    Okay.

4   A    -- receive this.

5   Q    And if you look up the attachments --

6   A    Um-hum.

7   Q    -- at the top of page 1, it says, "wewanttoknow.pdf"?

8   A    Yes.

9   Q    And pages 3 to 62 have the title "wewanttoknow" on them?

10  A    Yes.

11  Q    Okay.  So that PDF was attached to the email that you

12  received, wasn't it?

13  A    Yeah, I can't say for certain, but yes.

14  Q    Okay.  And if you look at the bottom, for example, of

15  General Counsel Exhibit 70, it says, "Driving a Fair Future at

16  Tesla"?

17  A    On page number 2?  Is that where you're at?

18  Q    Oh, I'm sorry.  Page 3.

19  A    70-003?

20  Q    Yes.

21  A    Okay.

22  Q    Thank you.

23  A    Yeah.

24  Q    And it says, "fairfutureattesla.org"?

25  A    Yes.



www.escribers.net | 800-257-0885

1    Q    Okay.

2         MR. ROSS:  Where are you referring?  I'm sorry.  Oh, I say

3    it.  Thank you.

4         MR. RODRIGUEZ RITCHIE:  At the bottom of page --

5         MR. ROSS:  Yep.  Yeah, yeah.  I see it.

6         MR. RODRIGUEZ RITCHIE:  -- 70-003.

7         MR. ROSS:  That's -- thank you.

8    Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  And if you look at page

9    70-002 --

10   A    Yes.

11   Q    -- do you see in the middle there's a list of names?

12   A    Yes.

13   Q    And it says "Richard Ortiz" on the first line, third from

14   the left?

15   A    Yes.

16   Q    Okay.  And then on the very last line of page 2, it says,

17   "On behalf of the Tesla UAW volunteer organizing committees"?

18   A    Yep.  I see that.

19   Q    And the date of this email is -- of the email that you

20   received from Ms. Tanaka is July 20th, 2017?

21   A    Yes.

22        MR. RODRIGUEZ RITCHIE:  Okay.  At this time, I'd like to

23   move General Counsel's Exhibit 70 into evidence.

24        JUDGE TRACY:  Any objections?

25        MR. ROSS:  Nope



1    MS. FEINBERG:  They're all mixed around.

2    MR. RODRIGUEZ RITCHIE:  With the caveat, just so the

3    parties are aware, that it looks like I missed redacting the

4    names of individuals on one of the pages, which I will --

5    MS. FEINBERG:  Correct.

6    MR. RODRIGUEZ RITCHIE:  -- do during the lunch break.

7    And --

8    JUDGE TRACY:  And which page number is that?

9    MR. RODRIGUEZ RITCHIE:  70-018.

10    MR. ROSS:  70 dash --

11    MR. GARBER:  018.

12    MR. ROSS:  Thank you.

13    JUDGE TRACY:  Is there another page?

14    MR. GARBER:  That's it.  Okay.

15    JUDGE TRACY:  Okay.  So all right.  So what we'll do is --

16    General Counsel's Exhibit 70 is admitted into evidence.

17    However, the official copy that's going to go to the court

18    reporter, please make sure that you've redacted page 18, and

19    make sure you show it to the Charging -- Respondent, sorry,

20    before it's put into the --

21    MR. ROSS:  Your --

22    JUDGE TRACY:  -- given to the court reporter.

23    **(General Counsel Exhibit Number 70 Received into Evidence)**

24    MR. ROSS:  Your Honor, I would ask that if this is going to

25    be admitted into evidence, I'd like a statement or a



1  representation from counsel for the General Counsel as to the

2  total number of individuals who signed this document.

3      MS. FEINBERG:  What is inaccurate?

4      MR. ROSS:  I'd also like a representation as to where the

5  page that bears Mr. Ortiz' signature was in the document,

6  whether it was the first document, as shown in this document,

7  or whether it was a document that was interleaved somewhere in

8  this packet of documents, because, frankly, I don't know

9  whether this is, in fact, a true and correct copy of what was

10  sent by Ms. Tanaka or whether the page has been put first by

11  General Counsel -- counsel for the General Counsel.  I'd like

12  to see the original document that was produced.

13      JUDGE TRACY:  All right.  So with regard to the first

14  request, I'm going to overrule your request.  There is no need

15  for Respondent to know how many individuals, and it's not

16  pertinent to this record of how many individuals signed the

17  petition or what was redacted.

18      With regard to the second question about where in the

19  order, I'm guessing, of the PDF, if you could please just show

20  them the original, which I'm assuming you received from them,

21  but show them the original to make sure that -- to ensure that

22  the order in which this is being admitted into evidence of the

23  exhibits, that page numbers is in the proper order.

24      MR. RODRIGUEZ RITCHIE:  Sure.  I did receive -- I didn't

25  receive them in their original format.  I received them in


www.escribers.net | 800-257-0885

1    individual picture documents, which I'm happy to review with

2    them.  They're also Bates numbered --

3         MS. FEINBERG:  By them.

4         MR. RODRIGUEZ RITCHIE:  -- by them.

5         JUDGE TRACY:  Okay.

6         MR. RODRIGUEZ RITCHIE:  So --

7         MS. FEINBERG:  And --

8         JUDGE TRACY:  But just make sure to show them, if you

9    could, please.

10        MR. RODRIGUEZ RITCHIE:  Yes.  Of course.

11        MS. FEINBERG:  Okay.  Because if the concern is Mr. --

12    Mr. Ortiz' name appears on the first page, his name appears

13    typed on the second page.  You don't even have to get to the

14    rest.  But these are Bates stamped by the Company in order --

15        JUDGE TRACY:  Right.  So --

16        MS. FEINBERG:  -- and they appear to be --

17        JUDGE TRACY:  -- what their --

18        MS. FEINBERG:  -- in order.

19        JUDGE TRACY:  -- concern is -- what Mr. Ross' -- not -- I'm

20    not -- I'm using the wrong word -- not concerned, but the

21    question is, is in which -- did his signature appear on that

22    first page -- of page 3 or did it come later on in the --

23        MS. FEINBERG:  I don't know.

24        JUDGE TRACY:  -- PDF.  So just show them the original,

25    please.  Okay?



1    MS. FEINBERG:  All right.

2    JUDGE TRACY:  So General Counsel's Exhibit 70 is admitted

3    into evidence.  Okay.

4    Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  And if you go back to

5    page 2 to the last line, the, on behalf of Tesla UAW volunteer

6    organizing committee --

7    A    Yes.

8    Q    -- you didn't understand that to mean that Mr. Ortiz was

9    involved with other co-workers about their union -- about a

10   unionizing campaign at Tesla?

11   A    You know, as -- as I sit here today, I mean, it seems like

12   he's a part of this group.  I can't recall reviewing this

13   email, and under what context I received this from Tori.

14   Q    Okay.  You can go ahead and put that down.

15   A    Okay.  Did you need this one back because it's redacted?

16   Or just hold onto this one?

17   Q    You can leave it there.

18   A    Okay.

19   Q    Now, do you still have General Counsel's Exhibit 28?

20   A    Yes.

21   Q    Okay.  Do you see where it says, "Looks like we got under

22   some people's skin" with a smiley face?

23   A    I do see that.

24   Q    Okay.  You never asked Mr. Pratt what he meant by that?

25   A    Not that I can recall, no.



www.escribers.net | 800-257-0885

1    Q    You never asked Mr. Pratt what he meant by a smiley face?

2    A    No.

3    Q    You never asked Mr. Hedges what he meant by the, "Wow,

4    this is on Facebook"?

5    A    Not that I can recall, no.

6    Q    And you never asked Mr. Pratt what he meant by the, "Yeah,

7    LOL, I'm pretty it's on their Fair Future at Tesla thing"?

8    A    So if you recall, when you asked me about this the first

9    time, I don't remember anything under, "Wow, this is on

10    Facebook," receiving that from Josh Hedges.

11    Q    So you never asked him about that, correct?

12    A    Well, no, because I wouldn't have received that --

13    Q    Okay.

14    A    -- exhibit.

15    Q    You never asked Mr. Hedges to preserve his text messages?

16    A    No, I didn't.

17    Q    Now I'm going to show you what's been premarked as General

18    Counsel's Exhibit 82.

19    JUDGE TRACY:  How many more minutes do you have?

20    MR. RODRIGUEZ RITCHIE:  I'm trying to speed it up because

21    you have to some calls.

22    JUDGE TRACY:  Well, I can move mine to 12:15, because she

23    also --

24    MS. FEINBERG:  Mine's at --

25    JUDGE TRACY:  -- has --



1    MS. FEINBERG:  -- 12:15.

2    JUDGE TRACY:  -- one at 12:15.  So I can -- okay.

3    MR. RODRIGUEZ RITCHIE:  And I think we'll be done.

4    JUDGE TRACY:  Yeah.  It's like 11:52.  So another minute

5    minutes.  I'll just send an email to move it.

6    Q    BY MR. RODRIGUEZ RITCHIE:  So take a look at 82, and let

7    me know when you're ready.

8    A    Yep.  I've reviewed it.

9    Q    Okay.  You recognize General Counsel's Exhibit 82?

10   A    I do.

11   Q    Okay.  Those are emails from you to Ms. Emee Cruz and vice

12   versa?

13   A    Yes.

14   Q    And who is Emee Cruz?

15   A    Emee Cruz was the HR Partner responsible for I believe the

16   organization that was called Quality at the time.

17   Q    Okay.  And in this email chain, it also contains an email

18   that you sent to Jose Moran after you met with him on the 19th

19   of October 2017?

20   A    Yes.

21   MR. RODRIGUEZ RITCHIE:  Okay.  At this time, I'd like move

22   General Counsel's Exhibit 82 into evidence.

23   JUDGE TRACY:  Any objections?

24   MR. ROSS:  Nope.

25   JUDGE TRACY:  All right.  So General Counsel's Exhibit 82



1    is admitted into evidence.

2    **(General Counsel Exhibit Number 82 Received into Evidence)**

3    Q    BY MR. RODRIGUEZ RITCHIE:  And I'm going to hand you what

4    has been premarked as General Counsel's Exhibit 79.

5    A    Thank you.

6    Q    So it's a 100-page document.

7    A    Yes.

8    Q    Okay.  Do you recognize this document?

9    A    I do.

10    Q    What do you recognize it to be?

11    A    It appears to be the access logs to Workday from the user

12    account Jose Moran.

13    Q    And there -- it's an email chain that contains emails to

14    and from you and Raj Nanda?

15    A    Yes.

16    Q    And the most recent one in this email chain at the top of

17    the first page is from October the 6th, 2017?

18    A    Yes.

19    Q    And if you look at that, it says, "Attachments, sign-on

20    history for jmoran.xlsx"?

21    A    I see that.

22    Q    Okay.  That was the spreadsheet that was attached to the

23    most recent email?

24    A    Correct.

25    Q    And that's the spreadsheet that starts on page 5 of



www.escribers.net | 800-257-0885

1    General Counsel's Exhibit 79?

2    A    Yes.

3    Q    Okay.  Now, you remember looking at this spreadsheet

4    during the course of your investigation?

5    A    I do recall looking at this, yes.

6    Q    Okay.  This spreadsheet contains the sign on, sign off for

7    more than just September, doesn't it?

8    A    It does.

9    Q    Okay.  It contains Mr. Moran's entire Workday usage for

10   several years?

11   A    Yes.

12        MR. RODRIGUEZ RITCHIE:  Okay.  At this time, I'd like to

13   move General Counsel's Exhibit 79 into evidence.

14        JUDGE TRACY:  Any objections?

15        MR. ROSS:  No.

16        JUDGE TRACY:  All right.  So General Counsel's Exhibit 79

17   is admitted into evidence.

18   **(General Counsel Exhibit Number 79 Received into Evidence)**

19   Q    BY MR. RODRIGUEZ RITCHIE:  Also, Ms. Gaby Toledano, do you

20   know who she is?

21   A    I do.

22   Q    Who is she?  Who was she at --

23   A    At the time --

24   Q    -- Tesla?  Excuse me.

25   A    At the time, she was the Chief People Officer at Tesla.



1    Q    And when you say, "at the time," you're referring to at

2    the time of this investigation?

3    A    During the time that I was there at Tesla and during the

4    time of this investigation, yes.

5    Q    Okay.  Now, Ms. Toledano, you provided her with updates as

6    part of this investigation?

7    A    I can't recall if I did provide her updates as part of

8    this investigation.  I know as practice, once a month we do

9    provide updates of our investigations to Gaby.

10   Q    She was monitoring this particular investigation, wasn't

11   she?

12        MR. ROSS:  I couldn't hear the question.

13   Q    BY MR. RODRIGUEZ RITCHIE:  She was monitoring this

14   particular investigation, wasn't she?

15   A    Not that I can recall, no.

16   Q    Okay.  I want you to take a look at General Counsel's

17   Exhibit 79.

18   A    Yep.

19   Q    At the bottom of page 2 --

20   A    Okay.

21   Q    -- you see from Ricky Gecewich sent, there's a September

22   28, 2017?

23   A    Yep.

24   Q    Okay.  If you look at the text of the email, it says,

25   "Please be aware this case is being closely monitored by Gaby,



1    and I'm providing updates as they come in."

2    A    Yep.

3    Q    Do you see that?

4    A    I wrote that.

5    Q    Okay.  Now, you just testified that you only provided

6    updates to her regarding this case once a month?

7    A    Regarding all of our cases once a month, yes.

8    Q    And your recollection just now was that you would have

9    only provided updates once a month in this particular case?

10   A    Yeah, I didn't provide her updates on an ongoing basis in

11   this particular case.

12   Q    But your email on September 28, 2017, it says, "I'm

13   providing updates as they come in"?

14   A    Totally.

15   Q    Okay.  And you wrote that?

16   A    I did write that.

17   Q    And that was true?

18   A    That is not true that I was providing updates there.

19   Q    You just wrote that in September of 2017?

20   A    Yeah.  So Raj --

21   Q    Okay.

22   A    -- Nanda -- were you going to cut me off there or did you

23   want more?  So --

24   Q    Well, I think that was all my question.

25   A    Okay.



www.escribers.net | 800-257-0885

1    Q    You also -- on the line above that it says that the, "case

2    is being closely monitored by Gaby."  Do you see that?

3    A    Yeah.

4    Q    So she, in --

5    A    I did write that.

6    Q    -- fact, was monitoring the case?

7    A    She was not monitoring the case, to my knowledge.

8    Q    Oh, you just wrote that?

9    A    I just wrote that.

10   Q    Even though it wasn't true?

11   A    Correct.

12   Q    Okay.  And above that, October the 4th, 2017 --

13   A    Yes.

14   Q    -- "when sent, Wednesday, October 4, 2017, 9:46 a.m." --

15   A    Yep.

16   Q    -- ""to Leonard Dandurand"?

17   A    Yep.

18   Q    -- "cc, Raj Nanda"?

19   A    Yep.

20   Q    You know Leonard Dandurand, don't you?

21   A    I think --

22        MR. ROSS:  I couldn't hear you.

23   Q    BY MR. RODRIGUEZ RITCHIE:  You know Leonard Dandurand,

24   don't you?

25   A    I think Leonard was Raj's boss.  So I added him back into



www.escribers.net | 800-257-0885

1     the email chain.

2     Q    He works at Tesla, and worked there at the time of this

3     investigation?

4     A    I mean, yes, I've sent him an email.

5     Q    And he works --

6     A    So yes, he worked there.

7     Q    -- with Gaby Toledano?

8     A    Yes.

9     Q    Yeah.  Now, on October the 4th, 2017, do you see where it

10    says, "This sensitive request is almost two weeks old at this

11    point, and we should update Gaby and team shortly"?  Do you see

12    that?

13    A    Yes.

14    Q    And that's because you were updating Gaby regarding this?

15    A    I was not updating Gaby.

16    Q    So that email -- you wrote that email, correct?

17    A    I did.

18    Q    And it wasn't true?

19    A    That's not true.

20    Q    Okay.  Can you take a look at General Counsel's

21    Exhibit 81?

22    A    Got it.

23    Q    Now, the warning that Mr. Moran received, that was on

24    October 19th, 2017, correct?

25         MR. ROSS:  We're at document what?



22-60493.1898

1      MR. RODRIGUEZ RITCHIE:  81.

2      MR. ROSS:  And just a moment, please.  Okay.  Thank you.

3      THE WITNESS:  I believe so, yeah.

4  Q    BY MR. RODRIGUEZ RITCHIE:  Now, General Counsel's

5  Exhibit 81, that you previously testified about, if you see at

6  the -- the second from the top email from Raj Nanda, October

7  24, 2017, "We just received the logs for J. Moran"?

8  A    Yes.

9  Q    Okay.  And then above that, you responded, "Thanks, Raj"?

10 A    Yes.

11 Q    Now, at this point, the investigation had concluded,

12 hadn't it?

13 A    Um-hum.  Yes.

14 Q    So there would be no reason for you to be, on

15 October 21st -- 24th, 2017, looking into the Workday usage of

16 Mr. Moran, correct?

17 A    No.

18 Q    Okay.  Thank you.  Now, lastly, I want to show you General

19 Counsel's Exhibit 83.

20 A    Thank you.

21 Q    Just let me know when you're ready.

22     MR. RODRIGUEZ RITCHIE:  And while he's doing that, I'd like

23 to move General Counsel Exhibit 81 into evidence.

24     JUDGE TRACY:  Any objections?

25     MR. ROSS:  Nope.



www.escribers.net | 800-257-0885

1     JUDGE TRACY:  All right.  General Counsel's Exhibit 81 is

2  admitted into evidence.

3  **(General Counsel Exhibit Number 81 Received into Evidence)**

4     THE WITNESS:  Okay.

5  Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  You recognize General

6  Counsel Exhibit 83?

7  A    Yes.

8  Q    They're emails between and you Mr. Travis Pratt?

9  A    Yes.

10  Q    And the last one is October 19, 2017?

11  A    Correct.

12  Q    Okay.  And that's an email from you to Mr. Pratt regarding

13  the investigation?

14  A    Yes.

15     MR. RODRIGUEZ RITCHIE:  Okay.  At this time, I'd like to

16  move General Counsel's Exhibit 83 into evidence.

17     JUDGE TRACY:  Any objections?

18     MR. ROSS:  Nope.

19     JUDGE TRACY:  All right.  So General Counsel's Exhibit 83

20  is admitted into evidence.

21  **(General Counsel Exhibit Number 83 Received into Evidence)**

22  Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  Now, I want to ask you,

23  as of January 2018, this was the only case that you were aware

24  regarding the Workday use of employees?

25     MR. ROSS:  Excuse me.  I couldn't hear the question.



www.escribers.net | 800-257-0885

1    Q    BY MR. RODRIGUEZ RITCHIE:  As of January 2018, this was

2    the only case that you were aware of regarding the Workday use

3    of employees?

4    A    At Tesla, yes.

5    Q    Yes.  And at the time of the investigation, you weren't

6    aware of any Tesla policy that required employees to be

7    truthful during an investigation?

8    A    Like a specific policy that said --

9    Q    Correct.  That was --

10   A    -- "be" -- "be honest in investigations" policy?  No.

11   Q    There was no written policy at Tesla requiring that an

12   employee be truthful during an investigation, that's correct?

13   A    Correct.

14   Q    And there were no policies regarding -- that you were

15   aware of, regarding Workday being used for legitimate and

16   official business purposes only?

17   A    That I'm aware of, no.

18   Q    And lastly, Mr. Ortiz, his termination, that was based on

19   the fact that he lied during the investigation in connection

20   with the activities that he engaged in with Jose Moran; is that

21   correct?

22   A    Yes.  That he lied in the investigation, correct.

23   Q    I'm going to show you what I've already provided to the

24   parties as General Counsel's Exhibit 62.

25        MR. RODRIGUEZ RITCHIE:  This was an exhibit that we did not



www.escribers.net | 800-257-0885

1    move into evidence.

2        THE WITNESS:  Yeah.  Thank you.

3        MR. ROSS:  Excuse me.  Can I see a copy of --

4        MR. RODRIGUEZ RITCHIE:  Oh.

5        MR. ROSS:  -- the material shown?  62 or 52?

6        MR. RODRIGUEZ RITCHIE:  62.

7        MR. ROSS:  6-2?

8        MR. RODRIGUEZ RITCHIE:  Yes.

9        MR. ROSS:  Thank you.

10        MS. FEINBERG:  That's correct.  I have to take a look at

11    the dates.  I have it.

12        THE WITNESS:  Okay.

13    Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  Do you recognize General

14    Counsel's Exhibit 62?

15    A    Yes.

16    Q    That -- earlier you testified about a report in connection

17    with the investigation into conduct of Jose Moran and Richard

18    Ortiz.  And General Counsel's 62, that's the report that you

19    wrote, correct?

20    A    Yes, it is.

21    Q    And that's a report that was discussed in the meeting with

22    Mr. Graminger, the fourth person, and Ms. McIntosh, correct?

23    A    Yes, it is.

24        MR. RODRIGUEZ RITCHIE:  Okay.  Then at this time, I'd like

25    to move General Counsel's Exhibit 62 into evidence.



1   JUDGE TRACY:  Any objections?

2   MR. ROSS:  Nope.

3   JUDGE TRACY:  All right.  So General Counsel's Exhibit 62

4   is admitted into evidence.

5   **(General Counsel Exhibit Number 62 Received into Evidence)**

6   MR. RODRIGUEZ RITCHIE:  No further questions.

7   JUDGE TRACY:  Okay.  All right.  So we'll go next to the

8   Charging Parties as a 611(c) --

9   MS. FEINBERG:  Okay.

10   JUDGE TRACY:  -- adverse --

11   MS. FEINBERG:  All right.  But we only have --

12   JUDGE TRACY:  -- witness.  Oh, yeah.

13   MS. FEINBERG:  -- five minutes for a phone call.  And I

14   need to review the affidavit.  So how would you like to

15   proceed?  I mean, I have questions.  I would like a little bit

16   of time to --

17   JUDGE TRACY:  Okay.

18   MS. FEINBERG:  I -- I'm fairly organized, as is my

19   practice, but --

20   JUDGE TRACY:  Okay.  Well, let's go off the record.

21   (Off the record at 12:07 p.m.)

22   JUDGE TRACY:  All right.  So the Charging Party has

23   requested to see the affidavit of Mr. Gecewich.  And so under

24   -- I'm looking at my benchbook here.  And so basically there

25   has been a decision by a prior judge allowing such review by



1    the Charging Party when they're preparing to question the

2    witness under 611(c).  So if the General Counsel could hand

3    over the affidavit for the Charging Party.

4        MR. RODRIGUEZ RITCHIE:  If the record could reflect that

5    we're handing over two copies of the affidavit for Ricky

6    Gecewich.

7        JUDGE TRACY:  Okay.

8        MS. FEINBERG:  That's good.

9        JUDGE TRACY:  All right.  And so we'll resume between 1:20

10   and 1:30.  So we'll just go ahead and go off the record.

11   (Off the record at 12:09 p.m.)

12       JUDGE TRACY:  Mr. Gecewich, I just want to remind you that

13   you're still going to be testifying under oath.  Okay?

14       THE WITNESS:  Okay.

15       JUDGE TRACY:  All right.

16       THE WITNESS:  Thank you.

17       JUDGE TRACY:  Ms. Feinberg, go ahead, please.

18                        **CROSS-EXAMINATION**

19   Q    BY MS. FEINBERG:  Mr. Gecewich, my name's Margo Feinberg.

20   I'm counsel for the Charging Parties in this case, including

21   the UAW and Mr. Ortiz, Mr. Galescu, and Mr. Sanchez.  I have

22   some questions I'm going to be asking you about your testimony

23   here today, and the events that took place at Tesla.

24       So when you were first hired at Tesla, what was the

25   position that you applied for?



1    A    The position that I applied for was I think -- I can't

2    remember the job title, but it was Employee Relations Partner

3    or something to that effect.

4    Q    Okay.  And do you have any training in the field of

5    employee relations?

6    A    Yeah, I have training.  So in my role as an Employee

7    Relations Partner, it's investigations, and I do have training

8    in investigations.

9    Q    Right.  I understand that you have training in

10   investigations.

11   A    Um-hum.

12   Q    I heard a little bit about that.  But do you have training

13   in the fields of employee relations and things in the workplace

14   as opposed to in another context?

15   A    Oh, yeah.

16   Q    Yes?

17   A    Yeah.

18   Q    And how did you obtain that training?

19   A    I had obtained that training through different training

20   courses that I attended during my time at Google as well as

21   different trainings courses that I attended while I was at

22   Tesla.

23   Q    Okay.  And did any of the training that you had regarding

24   employee relations relate to union activity in the workplace?

25   A    I believe I did attend some training regarding union

22-60493.1905



1    activity in the workplace.

2    Q    And where were you employed when you took that training?

3    A    At Tesla.

4    Q    Okay.  And how was it you came to take that training?

5    A    I can't recall --

6         MR. ROSS:  Objection.  Relevance, Your Honor.

7         MS. FEINBERG:  I'm sorry.  What?  I couldn't hear what he

8    said.  It's the reversal.

9         JUDGE TRACY:  He said relevance.

10        MR. ROSS:  In addition to which, insofar as the training

11   may have been administered by counsel, it is legal advice.

12   So --

13        MS. FEINBERG:  Oh, for goodness' --

14        MR. ROSS:  -- I'm going to --

15        MS. FEINBERG:  -- sakes.

16        MR. ROSS:  -- object on that basis as well.

17        MS. FEINBERG:  Now all training is privileged?  Okay.

18        JUDGE TRACY:  I'm going to overrule the objection.  Yeah,

19   I'm going to overrule the objection.  There's no privileged

20   communication --

21        MR. ROSS:  Your Honor --

22        JUDGE TRACY:  -- regarding -- no.  I mean, I --

23        MR. ROSS:  If I may be heard on this, please?  If the

24   training that he received was done by counsel, it is a form of

25   legal advice.  So any training he may receive from counsel,



www.escribers.net | 800-257-0885

1      would be a privileged communication.

2          MS. FEINBERG:  Well, at this point, I haven't asked --

3          MR. ROSS:  It's --

4          MS. FEINBERG:  -- about --

5          MR. ROSS:  It's --

6          MS. FEINBERG:  -- the substance of any training.  So this

7      all seems very premature --

8          MR. ROSS:  Well, since --

9          MS. FEINBERG:  -- Your Honor.

10         MR. ROSS:  -- I haven't finished my sentence, I'd like to

11     be allowed to say what I have to say for the record.

12         So I would ask, Your Honor, that there be some kind of

13     preliminary questioning to determine whether or not this

14     training was done by an attorney.  If it was, then it would

15     seem to me it would be in the form of legal advice, and it

16     would be privileged.  If it was not done by an attorney, have

17     at it.  Although I do think it's irrelevant.

18         MS. FEINBERG:  I haven't even gotten there yet.  I was

19     asking preliminary questions when I was cut off, Your Honor.

20     So I'm happy to proceed.

21         JUDGE TRACY:  Yeah.  So again, I'm going to overrule the

22     objection.  However, I would note that, you know, we have not

23     gotten to the point where the question that was asked was what

24     training, what did they say in the training, who gave the

25     training.  It was simply, did you attend training and who



www.escribers.net | 800-257-0885

1    provided the training, as I recall the questions.

2         MS. FEINBERG:  It wasn't even --

3         JUDGE TRACY:  So I'm going to overrule the objection that

4    we don't have anything that -- it coming close to attorney-

5    client privilege.  I would also really disagree that training

6    is somehow advice.  So -- but we're not even there yet.

7         Ms. Feinberg, I guess, I would say to you let's steer

8    clear --

9         MS. FEINBERG:  I'll --

10        JUDGE TRACY:  -- of that stuff.

11        MS. FEINBERG:  I'll proceed --

12        JUDGE TRACY:  I'm also --

13        MS. FEINBERG:  -- slowly.

14        JUDGE TRACY:  -- sort of wondering the relevance of it.

15   But you know, because --

16        MS. FEINBERG:  I'll make it --

17        JUDGE TRACY:  -- this is essentially akin to cross-

18   examination, you're treating him as an adverse witness --

19        MS. FEINBERG:  I am.

20        JUDGE TRACY:  -- I'm going to allow that.  But it may be

21   best to --

22        MS. FEINBERG:  Okay.

23        JUDGE TRACY:  -- get to the point and --

24        MS. FEINBERG:  I'm --

25        JUDGE TRACY:  -- move along.

22-60493.1908



www.escribers.net | 800-257-0885

1    MS. FEINBERG:  I'm trying to --

2    JUDGE TRACY:  Yes.

3    MS. FEINBERG:  -- do it.

4    JUDGE TRACY:  Thank you.

5    MS. FEINBERG:  Okay.

6    Q    BY MS. FEINBERG:  So just to reframe it, I believe that

7    you said that you had some training regarding union activity

8    or -- and while you were at Tesla.  And the question I would

9    like to know is, how -- who directed you to take that training?

10   A    I can't recall specifically who directed me to the

11   training.  I may have received an email, hey, there's a

12   training session, or somebody would have said, you know, go to

13   this training.  I can't recall who that was.

14   Q    Okay.

15   A    I apologize.

16   Q    And who do you directly -- who did you directly report to

17   while at Tesla?

18   A    Carmen Copher.

19   Q    And what is her position there?

20   A    Director and Counsel of Employee Relations.

21   Q    And do you know who she reports to?

22   A    She reported to Gaby Toledano at the time.

23   Q    Okay.  And did the training regarding union activity

24   relate to your job in any way?

25   A    Yeah, I would say it did.



www.escribers.net | 800-257-0885

1    Q    And in what way?

2    A    They discussed the different kinds of protected activities

3    and the things that we should be mindful of during

4    investigations.  So yes.

5    Q    Okay.  And when did you have that training?

6    A    Goodness.  I can't recall.

7    Q    Well, let's just say this:  You had this investigation

8    regarding this Facebook posting?

9    A    Um-hum.

10    Q    So do you remember whether the training was before or

11    after that?  So before or after September of 2017?

12    A    I cannot specifically recall.  It would have been

13    definitely in 2017.  I don't recall having that training in

14    2018.

15    Q    Okay.

16    A    And I can't recall whether or not it was before or after.

17    Q    So you were aware that in your investigations you had to

18    be sensitive of the fact that you're -- when investigating

19    things, that you might be touching on things that were

20    protected activity?

21    A    Yes.

22    Q    And you said that you, you know, reviewed a variety of

23    complaints that came to your attention.  And I'm still not

24    clear how they could come to your attention.  So do they come

25    through Carmen Copher, and then she directs you to investigate



www.escribers.net | 800-257-0885

1    something, or other than that, how would they come to you?

2    A    So what's the mechanism for which --

3    Q    Yes.

4    A    -- like cases come to us?  Yeah.  So they can come a bunch

5    of different ways.  We can get direct emails from like HR

6    Partners, people could directly email or communicate with like

7    our integrity line or we could get emails from other business

8    leaders that knew of the existence of our team.  I was part of

9    an email account that could review some of those cases.  So I

10   could see them when they came in to that alias.  And that's how

11   we were made aware of things.

12   Q    Okay.  So if an employee had a particular concern about

13   something happening on the work floor or something like that,

14   they wouldn't go directly to you, they would go through some

15   other business partner before coming to you?

16   A    Yeah.  From the way I understand it, typically they would

17   go to like -- like their HR Partner or maybe to their

18   supervisor or manager, and then that person would bring them to

19   their HR Partner.  At which point, that HR Partner would bring

20   it to our attention if it was something --

21   Q    Okay.

22   A    -- that they felt, you know, maybe needed to be

23   investigated.

24   Q    And when the HR Partner would bring you -- generally when

25   the HR would bring a matter to your attention to investigate,

22-60493.1911



1    would they tell you what the nature of the issue was that you

2    were to investigate?

3    A    Like would they define --

4    Q    Define --

5    A    -- this is this --

6    Q    -- the concern.

7    A    -- kind of case?

8    Q    Yes.

9    A    No, they wouldn't do that.  They would -- in their

10   process, they were responsible for doing intakes with their

11   employees.  So having the relationship with the employees and

12   understanding what that employee's concerns were generally, and

13   then escalating that information to us.  From what I recall,

14   they never really defined like, this is this type of case, or,

15   this is this type of case.  They would just say, hey, I met

16   with an employee.  This is what I learned from them.  I'm

17   sharing it with you guys in the event that you'd like to

18   investigate.

19   Q    Okay.

20   A    So --

21   Q    And sometimes they would ask you to investigate things

22   where they thought something was wrong, the business partners?

23        MR. ROSS:  I'm sorry.  I couldn't hear the question.

24   Q    BY MS. FEINBERG:  Sometimes when you would investigate

25   something, it was because the business partner would say,



www.escribers.net | 800-257-0885

1  something's happening, whatever it is, and we would like you to

2  investigate because we believe there's some violation of policy

3  or something's wrong?

4      MR. ROSS:  Objection.  Vague and ambiguous.  Partial

5  hypothetical.  Object to the form of the question.

6      JUDGE TRACY:  Overruled.

7      Go ahead.

8      THE WITNESS:  Yeah.  They -- I want to make sure I'm clear

9  here.  Like they wouldn't say, you investigate this.  Like they

10  didn't direct investigations.  Their responsibility was to make

11  us aware that they had met with somebody and that -- that maybe

12  something was going on.  We ultimately made the determination,

13  is this something that the employee relations group would look

14  into or is it something that maybe an HR Partner could look

15  into.

16  Q   BY MS. FEINBERG:  Okay.  So at some point, Mr. Hedges came

17  to you.  And what was his direct -- what is the direct

18  reporting relationship between you and Mr. Hedges?

19  A   There's not one.

20  Q   Okay.  So what is -- had he ever come to you with a

21  concern before?

22  A   Yeah, Josh has come to me previously with concerns.

23  Q   And have you ever investigated any concern that he brought

24  to you prior to the one regarding the Facebook page?

25  A   I believe I did, yeah.



1    Q    What was the nature of that?

2    A    I said I believe I did because thinking about the way it

3    was set up and where I was sitting, Josh from time to time

4    would say, hey, we got an email.  You know, somebody feels like

5    this is going on -- and I can't think of a specific example --

6    I want to give that to you guys, and maybe it's something you

7    might want to investigate.  I'm trying hard to think about like

8    a specific instance, but that is one escalations of pass.  Josh

9    being an HR director, he could also escalate concerns through

10   this like employee relations in box.

11   Q    Okay.  And would it be normal for him to come to you or to

12   Carmen, or could he go to anybody he chose, if you know?

13   A    He typically would go to like that email alias.  Or if he

14   saw one of us, either me or Carmen, he might just -- you know,

15   if he saw us, he would come over and -- and say, hey, I'm aware

16   of this.  And the guidance to him would be either share the

17   documents with us directly or, you know, if you have a second,

18   just jot it down and send it to the employees relations' in

19   box.

20   Q    Okay.  So with respect to the complaint that we're talking

21   about today or the concern that we're talking today regarding

22   the Facebook posting, did that go through the employee

23   relations' in box?

24   A    That did not.

25   Q    And do you know why not?



www.escribers.net | 800-257-0885

1   A    I don't know why Josh didn't send it to that.  By the time

2   Josh spoke to me, I had all the information that Josh had.  So

3   I just, you know, reached out to Travis Pratt to have a

4   conversation with him.

5   Q    I'm sorry.  I didn't understand that.  At the time Josh

6   wrote to you, you had all the information?

7   A    The -- no.  So the way that Josh presented the information

8   to me, by the time like I met with him or he shared it to me, I

9   had all the information I needed.  So I guess what I'm trying

10  to describe to you --

11  Q    Okay.  Let me ask you a question.  That was me thinking.

12  A    Okay.

13  Q    You have to wait until I finish thinking.  But I'm --

14  A    Oh.  I'm very sorry.

15  Q    You might be a --

16  A    So --

17  Q    -- mind reader.  You're an investigator.  But give me a

18  shot.  Okay.  So --

19  A    Oh, I'm sorry.

20  Q    Okay.

21  A    I didn't mean to come off way.  I sorry.

22  Q    No, no, no.  You're cool.  You're cool.

23  A    Okay.

24  Q    Let's just keep going.  But sometimes -- even though I'm

25  usually rapid fire, sometimes I actually pause.



www.escribers.net | 800-257-0885

1       Okay.  So Josh had just approached you with some

2   information, is that right?

3   A    Yes.

4   Q    Okay.  And that was in person?

5   A    Yes.

6   Q    Do you remember where that happened?

7   A    Yeah.  It was in the north admin building in the general

8   HR desk area.

9   Q    Okay.  And do you recall how long you spoke to him?

10  A    Probably less than two minutes, but --

11  Q    And did you take any notes of that conversation?

12  A    I did not.

13  Q    And did he give you any directive?

14  A    Josh did not direct me to do anything.

15  Q    What did he -- did he ask you to do anything?

16  A    Josh presented the screenshots to me, and then said

17  something to the effect of, from what I can recall, like, maybe

18  this is something you guys will look into.  And that's when I

19  asked him, you know, to forward the screenshot to me.

20  Q    And did he tell you how he -- the screenshots had come to

21  his -- into his possession?

22  A    Yeah, I believe so.  I mean, I think I was made aware that

23  Travis Pratt had directly messaged Josh Hedges.

24  Q    And did you -- did he say one way or another whether

25  Travis Pratt had a concern?


www.escribers.net | 800-257-0885

1   A    I can't recall specifically, but it seemed as if it was

2   concerning enough that it was escalated to an HR director.  So

3   I implied yes.

4   Q    Okay.  Did Mr. Hedges say that he had a concern?

5   A    Not that I can recall.

6   Q    But he brought it to your attention, so you assumed he had

7   a concern?

8   A    Sure.

9   Q    And then the screenshot that was shared with you -- do you

10  have General Counsel Exhibit 28?

11  A    Once second.  Got it.

12  Q    Did it include the words, "Looks like we got under

13  someone's skin," smiley face?

14  A    Yes.

15  Q    And did -- do you know who was the author of those words?

16  A    Yeah.  I believe that that's Travis Pratt that wrote that

17  to Josh Hedges.

18  Q    Okay.  And other than that, is there anything that Travis

19  Pratt writes on here that indicates anything about what he

20  thinks about the posting?

21  A    No, there's not.

22  Q    Okay.  And did you ever ask Mr. Hedges what he -- since

23  this was directed to him, what he thought "Looks like we got

24  under some people's skin" meant?

25  A    No.



1   Q    And did you read the posting at the time you received it?

2   A    Oh, yeah, I --

3   Q    Okay.

4   A    -- read this screenshot.

5   Q    And did you read it while you were standing there with

6   Mr. Hedges?

7   A    Maybe.  Yeah.

8   Q    Okay.  And it begins with, "These guys been in Sacramento

9   saying we're lying about how things are at Tesla management."

10  Did you ask him -- Mr. Hedges, did you ask Mr. Hedges anything

11  about these guys going to Sacramento?

12  A    Not that I can recall, no.

13  Q    At any time, did you ever ask him about it?

14  A    To Josh Hedges?

15  Q    Yes.

16  A    Not that I can recall, no.

17  Q    Were you aware of the fact that Mr. Hedges had asked those

18  gentlemen to go to Sacramento on Tesla's behalf?

19  A    That Josh Hedges asked this --

20  Q    Yes.

21  A    -- group to go there?  No, I was not aware that he gave

22  that directive.

23  Q    Did you ever ask anyone how they happened to go to

24  Sacramento?

25  A    Did I ever ask anyone how --



1   Q    Like --

2   A    -- they --

3   Q    -- Mr. Pratt or Mr. Ives, why they went to Sacramento?

4   A    Not that I can recall, no.

5   Q    Okay.  But that's the content of the Facebook page, about

6   them going to Sacramento?

7   A    Yes.

8   Q    Okay.  And when you looked at who had accessed Mr. Pratt's

9   Workday, you became aware of the fact that on September 10th,

10  it was Mr. Hedges who had accessed Mr. Pratt's Facebook --

11  Workday on several occasions, were you not?

12  A    Is that one of the exhibits here?

13  Q    Yeah.  Let me tell you.  There's a short version and a

14  long version.  Yeah.  It's -- oh, it's in two places.  But look

15  at Joint -- General Counsel Exhibit 81.

16  A    81?

17  Q    And then if you'll look at page 3 of that exhibit.

18  A    Okay.  One second.  Okay.

19  Q    Okay.  And so am I correct in reading that on

20  September 10th -- in the middle of the page -- "On

21  September 10th, Josh Hedges reviewed the Workday of Travis

22  Pratt, and then on that same day, he reviewed the Workday of

23  Shaun Ives, then he went back and reviewed Travis Pratt"?  Is

24  that correct?

25  A    Yeah.  Um-hum.



www.escribers.net | 800-257-0885

1    Q    And did you -- when you -- and you received this -- the

2    fact that he had reviewed this on or about October -- well, on

3    or about October 6th, 2017, before you concluded your

4    investigation; is that right?

5    A    Correct.

6    Q    And did you ever ask Mr. Hedges why he was looking at

7    Mr. Pratt and Mr. Ives' Workday page?

8    A    No.

9    Q    Okay.  So did anyone ever tell you that Mr. Ives and

10   Mr. Pratt went to Sacramento to testify on behalf of Tesla?

11   A    Did anybody tell me that these two went to Sacramento to

12   testify.  I believe, if I can recall correctly, it came up from

13   one of them that they had gone to Sacramento.  The content of

14   that and who they were meeting I don't recall coming up in the

15   conversation because --

16   Q    And --

17   A    -- it wasn't the focus of what I was looking into.

18   Q    Why not?

19   A    It wasn't the focus of why they went to Sacramento.  The

20   focus was to look into why these Workday screenshots were

21   released.

22   Q    But I believe when Mr. -- when Edris asked you some

23   questions, he asked you whether the context of an investigation

24   is important.  And I believe you said, yes.

25   A    Context is important.



www.escribers.net | 800-257-0885

1  Q    So were you aware that -- well, didn't Jose Moran tell you

2  that these two gentlemen, Mr. Pratt and Mr. Ives, had been seen

3  in Sacramento testifying against the workers at Tesla and that

4  he was -- he wanted to know if they were really Tesla

5  employees?

6  A    I do recall him telling me that, yes.

7  Q    Right.  So you were aware that he was interested in these

8  two gentlemen because of his own activities on behalf of the

9  Union?

10  A    Yeah, about what he shared with me.

11  Q    And were you aware that these gentlemen -- that there was

12  an actual tape of them testifying in a public hearing in

13  Sacramento?

14  A    No.

15  Q    Okay.  And are you -- were you concerned about the fact

16  that their -- that -- how much that -- this figure of $130,000

17  being earned by one of these gentlemen was posted, were you

18  concerned about that?

19  A    I was not.

20  Q    So you didn't believe that to be a private matter?

21  A    Again, the focus of the investigation were the Workday

22  screenshots.

23  Q    Okay.  Were you aware if the -- Mr. Pratt or -- Mr. Pratt

24  had ever posted his photo and his position at Tesla on any

25  other public screen?



1   A    His Workday photo landing page?  I'm not aware that he

2   ever posted that anywhere else.

3   Q    Okay.  Are you aware that he had posted his photo and his

4   position at Tesla on a public social media page?

5   A    Oh, I -- I don't know.

6   Q    Okay.  So did you believe that his photo and his position

7   at Tesla was a private matter?

8   A    I believe that the Tesla information contained within

9   Workday is a private matter.

10  Q    Right.  But the only information that's revealed here --

11  well, actually from Mr. Pratt, it's his name, his position, and

12  his photo; is that right?  Because that's the only information

13  revealed from Workday.  Is there any other information besides

14  his photo and his --

15  A    It's --

16  Q    -- job title?

17  A    It's also the user interface and the --

18  Q    Where's the user interface?

19  A    I mean, this -- I'm sorry.  I'm looking at Exhibit 28.

20  Q    Yes.

21  A    So the two pictures that are attached.

22  Q    Yes.

23  A    So the blue and the circle with his photo with the little

24  Tesla logo on top with the little thought bubble or the little

25  bubble off to the side showing what user access did as well as


www.escribers.net | 800-257-0885

1    wd5.myworkday.com is all user interface to an internal Tesla

2    system.

3    Q    But there's nothing confidential in that.  I mean, how

4    would I -- I couldn't access that if I wanted to, could I?

5    A    Correct.  That is private to Tesla.  You as a non-Tesla

6    person could not access that information.

7    Q    Right.  So what is the confidential information here?

8    Because if Mr. Pratt name is known, his photo is out in the

9    world, what is the confidential information that's on Workday

10   that is released?

11       MR. ROSS:  Your Honor, objection.  Assumes facts not in

12   evidence that his photo is out in the world.  There's no

13   evidence to that affect.  In addition to which, there is a

14   difference between a person choosing to place their own photo

15   in the public --

16       JUDGE TRACY:  So that --

17       MR. ROSS:  -- ser --

18       JUDGE TRACY:  Again, that's an argument.  So I have your

19   objection.  Again, I'm going to overrule the objection.

20       MS. FEINBERG:  I'm going to keep moving --

21       JUDGE TRACY:  Go ahead.

22       MS. FEINBERG:  Okay.

23   Q    BY MS. FEINBERG:  And with respect to Mr. Ives, there's

24   nothing here that actually tells you that is Mr. Ives, is

25   there?



1    A    In that photo, no, there is not.

2    Q    So nothing publicly was released that this is Mr. Ives on

3    this posting?

4    A    Correct.

5    Q    Okay.  And -- okay.  And did Mr. Ives ever express any

6    concerns to you?

7    A    I never spoke with Mr. Ives.

8    Q    And why not?

9    A    Because I had the information from Travis Pratt and Bryan

10   Kostich --

11   Q    But --

12   A    -- to understand where these came from.

13   Q    Okay.  But what is it you were investigating?

14   A    I was investigating the release of these Workday photos to

15   a public Facebook page.

16   Q    Okay.  And how do you know that this was a public Facebook

17   page?

18   A    Because somebody came across it.  So it wasn't private

19   enough or they wouldn't have come across it.

20   Q    Did Mr. Kostich, is his name, explain to you how he was

21   invited to this Facebook page?

22   A    He did.

23   Q    Okay.  And to be invited to a Facebook page, doesn't that

24   mean that there's a privacy setting?

25   A    Sure, there can be a privacy setting to it.



1  Q    Okay.  And did you understand -- did you ever ask him

2  what -- who controlled that particular Facebook page on which

3  he was invited?

4  A    Not that I can recall, no.

5  Q    And didn't he, in fact, tell you that Jose Moran was

6  trying to get workers at Tesla to participate in this Facebook

7  page to talk about their concerns?

8  A    He did not tell me that.

9  Q    What did he tell you?

10 A    He told me that a person or an account by the name of Jose

11 Organizer --

12 Q    Um-hum.

13 A    -- had asked him to join this group several months prior.

14 Q    Okay.  And by --

15 A    A year prior.

16 Q    And by Jose Organizer, you understood that to be someone

17 who would be interested in organizing at Tesla?  You understood

18 organizer to be mean Union organizer, didn't you?

19 A    At the time I spoke with Bryan Kostich, yeah.

20 Q    Okay.  So I'm still -- did Mr. Pratt say his -- ever say

21 to you his concern was that his photo from Workday was made

22 public?  Did he ever say that was his concern?

23 A    He felt that it was inappropriate that not only his photo

24 but some of this information was released, that it made him

25 feel singled out, it made him uncomfortable by that.  And so



www.escribers.net | 800-257-0885

1   what -- to me, what he was describing is that he felt like he

2   was being singled out or harassed or maybe even cyberbullied.

3   And so I felt it appropriate to look into it a little bit

4   further.

5   Q    Okay.  But did he ever say that it was because it was

6   this -- that he was concerned that his photo had been public --

7   made public?

8   A    His concern was everything here.  So everything in this

9   screenshot --

10  Q    Okay.  So if his concern was everything, can you tell me

11  again why you didn't look into the question of his salary being

12  posted?

13  A    Because I, from an internal like perspective, wasn't

14  concerned with another employee talking about somebody making a

15  certain amount of money.  From my perspective, I understood

16  that might be protected, so why does it matter to me?  What I

17  cared about were these Workday profile photos being shared

18  externally.

19  Q    And again, what is private about the Workday photo?

20  A    Again, it's -- it's Tesla information.  The general person

21  would not be able to log onto this, and therefore would not be

22  able to get into our system and share this with other people.

23  Q    And -- okay.  And when you look at -- can you look at

24  Joint -- Counsel Exhibit 63 (sic)?

25       MR. ROSS:  What number, Margo?


www.escribers.net | 800-257-0885

1       MS. FEINBERG:  63.

2       MR. ROSS:  Thank you.

3       JUDGE TRACY:  General Counsel's?

4       MS. FEINBERG:  Yes.

5    Q    BY MS. FEINBERG:  It's the -- it begins with, "Intake with

6    Travis Pratt." And can you read -- and do you have that in

7    front of you?

8    A    Yes.

9    Q    And the last sentence of this document says, "I sent the

10   photo to Josh Moore (sic) as we were getting a rise out of

11   people"?

12   A    Um-hum.

13   Q    Is that what he told you?

14   A    That's what he told me.

15   Q    Right.  So he -- that's what he was concerned about?  I

16   mean, he wasn't concerned about anything.  He just wanted Josh

17   to know that him going to Sacramento had met its objective.  He

18   was getting people upset.  Is that true?

19   A    I can't tell you what he felt like.  I can tell you what

20   he told me.

21   Q    Right.  And then did you ask him what he meant by that

22   then?

23   A    There's no note there, so no.

24   Q    Okay.  And in fact, isn't that the same comment

25   effectively that he wrote when he wrote to Josh in Joint --



1  Counsel Exhibit 28 (sic), "It looks like we got under some

2  people's skin," smiley face?  And did you ever ask him what he

3  meant by that?

4  A    No, I did not.

5  Q    And were you aware that when he went to Sacramento, he

6  spoke his name publicly before a budget committee and also said

7  how much he earned at Tesla?

8  A    So like I described before, I don't know the context of

9  what they talked about in Sacramento.  I knew generally, after

10  I had met with both of these gentlemen, that they had gone to

11  Sacramento.

12  Q    Um-hum.  And did it -- would it matter to you one way or

13  another whether they had injected their own public identity and

14  workplace matters into the conversation, that if they were the

15  ones who had begun the conversation, would that have mattered

16  to you?

17  A    That they had injected their workplace photos or --

18  Q    No.  Just --

19  A    -- their Workday photos?

20  Q    -- that they injected themselves, their -- the fact that

21  they worked at Tesla, how much they get paid, what their face

22  looked like by presenting themselves, would that have mattered

23  to you in the course of your investigation?

24  A    Would that have mattered to me.  No.

25  Q    When did you first talk to Gaby Toledano about this



1   Facebook posting, Joint Counsel -- General Counsel Exhibit 28?

2   A    I can't say that I recall ever talking to Gaby Toledano

3   about this workplace --

4   Q    Okay.  When did you ever email Gaby Toledano about General

5   Counsel Exhibit 28?

6   A    If I did email Gaby about this, it would have been on like

7   our monthly updates to all the cases that we were running.

8   Q    Gaby Toledano testified she's in regular -- there are

9   regular meetings where labor issues come up.  Are you -- do you

10  participate in those calls or meetings?

11  A    I do not.

12  Q    When did you next talk to Josh Hedges about this matter

13  after the original day when he presented it to you?

14  A    I can't recall specifically.  The -- the other time that I

15  do remember talking to Josh Hedges was when I concluded my

16  investigation and I was trying to determine which business

17  leader would be appropriate as the decision-maker, and I

18  remember proposing my thoughts to Josh.

19  Q    And who did you propose?

20  A    Yeah.  So the standard practice was that director level

21  and above -- and I -- I think I talked about this earlier --

22  director level and above would be the decision-maker on any

23  termination cases or recommendations of termination.  From what

24  I remember, Stephan Graminger was not a director.  He might

25  have been a senior manager.  And so in some cases, we would



1   say, oh, you go to the next person up.  The next person up

2   being Peter Hochholdinger, who was the Senior Vice President at

3   the time of all of manufacturing.  My proposal to Josh was, I

4   think we could go to Stephan as the most senior manager in that

5   department.  And from I remember of that conversation, he

6   agreed with that.

7   Q    So are you saying that when you spoke to Josh Hedges, you

8   proposed -- you thought it should have been Peter Hochholdinger

9   and then -- but then you proposed it being Stephan Graminger?

10  A    So typically our practice -- and I think I just explained

11  this, but I'll do I think a better job --

12  Q    Well, let me just --

13  A    So --

14  Q    I'm asking you if you're the one who gave those names, not

15  Josh Hedges.  That you went to him and said, I was thinking

16  about sending it to Peter, but considering Stephan's next tier

17  down, I'm going to go to him?  Are you saying that was your

18  idea?

19  A    Yeah, because there was no director in that chain.

20  Q    And what, if anything, did he reply?

21       MR. ROSS:  I couldn't hear the question.  I'm sorry.

22  Q    BY MS. FEINBERG:  What, if anything, did Josh Hedges

23  reply?

24  A    From what I recall, he agreed that Stephan would be the

25  appropriate person and it would be fine to go to him.



www.escribers.net | 800-257-0885

1    Q    And had you ever worked with Stephan in any other

2    investigation?

3    A    Not that I can recall, but he did run a lot of

4    investigations.  But I can't recall specifically having worked

5    with Stephan.

6    Q    Can you turn to General Counsel Exhibit 65, please?  It

7    says, "Interview of Richard Ortiz, September 21st, 2017."  Do

8    you have that?

9    A    One second.

10   Q    Sure.

11   A    I've got it.

12   Q    Okay.  And as I recall your testimony, these were notes

13   that you took on their type -- on your computer as you were

14   interviewing Mr. Ortiz on September 21st?

15   A    They were.

16   Q    Okay.  Actually before I do that, I want to go back.  You

17   don't have to look at it.  But I believe you testified that

18   when you interviewed Mr. Pratt, you did it by phone; is that

19   right?

20   A    I did.

21   Q    And why is that?

22   A    Travis Pratt was not on shift at the time, so I just

23   called him on the phone.

24   Q    And did ask him if he could come in to meet with you?

25   A    No.



1    Q    Okay.  And do you, as an investigator, believe that you

2    can get as much information and determine credibility when

3    you're interviewing someone by phone as opposed to in person?

4    A    Yes.  I'm sorry.  What was that face for?  Was that the

5    wrong answer to you?  I don't --

6    Q    I don't know.

7    A    I just don't --

8    Q    That's --

9    A    -- want to --

10   Q    That's a --

11   A    -- misinterpret my (sic) --

12   Q    You can give whatever --

13   A    -- faces that are being sent --

14   Q    You know --

15   A    -- my way.  I'm sorry.

16   Q    I'm not -- whatever.  You can answer -- you should be

17   telling the truth.  And that's all that matters?

18        MR. ROSS:  Why don't we restate the question so he

19   understands it and has a --

20        MS. FEINBERG:  He already answered the question.

21        JUDGE TRACY:  Yeah.

22        MS. FEINBERG:  There's nothing --

23        JUDGE TRACY:  So --

24        MS. FEINBERG:  He says.

25        JUDGE TRACY:  -- again, you know, you just need to answer



www.escribers.net | 800-257-0885

1    the question --

2    THE WITNESS:  Yeah.

3    JUDGE TRACY:  -- that's being asked of you.

4    MS. FEINBERG:  Okay.

5    JUDGE TRACY:  Okay?

6    THE WITNESS:  Thank you, Judge.

7    Q    BY MS. FEINBERG:  And Mr. Kostich, did you interview him

8    in person or by phone?

9    A    I spoke with Mr. Kostich on the phone as well.

10   Q    And is there a reason that you didn't interview him in

11   person?

12   A    Again, I believe at the time, Bryan Kostich was also off

13   shift, so I spoke with him on the phone.

14   Q    So is your testimony that Travis Pratt works in the

15   evenings at the time?

16   A    At the time that I reached out to him, he wasn't available

17   in the factory.  So I don't know what schedule he was on or if

18   he was on an alternate work schedule.  But he wasn't available

19   in person.

20   Q    And would that same be true for Mr. Kostich?

21   A    Yes.

22   Q    And did Mr. Pratt tell you that he had sent a message to

23   Mr. Ortiz saying he was unhappy with the posting?

24   A    I'm sorry.  Can you restate the question?

25   Q    Did Mr. Pratt tell you that he had sent a message to



www.escribers.net | 800-257-0885

1    Mr. Ortiz telling him he was unhappy with the posting?

2    A    Yes, he did.

3    Q    And did he also tell you that Mr. Ortiz immediately took

4    the posting down?

5    A    I can't remember the specifics, but he did tell me that

6    Richard Ortiz took the posting down or he was made aware that

7    the posting had been taken down.

8    Q    So at the time that you were doing the investigation, the

9    posting was no longer up?

10    A    Correct.

11    Q    All right.  So going back to Joint -- General Counsel's

12    Exhibit 65, you said you have that in front of you; is that

13    right?

14    A    Yes, I do.

15    Q    Okay.  Can you turn to where it says -- page 2?  It's

16    General Counsel's 65, 2.

17    A    Okay.

18    Q    And somewhere in the middle here it says, "Handing T-

19    shirts."

20    A    Um-hum.

21    Q    Can you tell me what that refers to?

22    A    From what I recall, Richard was describing that he was in

23    a parking lot handing out T-shirts, and that some other

24    employee was rude toward him for doing so, that that person

25    needed parking and maybe he was getting in the way.  That's



www.escribers.net | 800-257-0885

1   what that's in regard to.

2   Q    And the T-shirts he was handing out were Union T-shirts?

3   A    Not that I can recall specifically.  I don't think he got

4   into those specifics with me.

5   Q    You didn't understand them to be Union T-shirts?

6   A    Richard Ortiz never told me they were Union T-shirts.

7   Q    And did he tell you who the person was who was -- what is

8   the point of these notes here?  What is this about?

9   A    During a part of the conversation, Richard shared this

10  piece with me to let me know that he had previously raised a

11  concern about an employee being rude toward him, and that his

12  HR Partner, ShTawney, and one of his managers, Manny

13  (phonetic), had took care of it previously.  So it just came

14  up, something that he presented to me.

15  Q    And did you ever check with ShTawney about any of that?

16  A    Not that I can recall.

17  Q    And you interviewed Mr. Ortiz on September 21st; is that

18  right?

19  A    Yes.

20  Q    Okay.  And can you turn to General Counsel's Exhibit 70?

21  It's kind of a thick document.

22  A    Yeah.  Thank you.  Got it.

23       MR. ROSS:  What number is it?

24       MS. FEINBERG:  70.

25       MR. ROSS:  7-0?



www.escribers.net | 800-257-0885

1     MS. FEINBERG:  Yes.

2  Q    BY MS. FEINBERG:  And it's correct to say that you

3  received this on July 20th, 2017, the day before you

4  interviewed Mr. Ortiz?

5  A    No.

6  Q    I mean, July --

7  A    No.

8  Q    -- 20.  I'm sorry.  July.  I misspoke.

9  A    Yes, I -- it looks like I received this on July 20 of

10  2017.

11  Q    Okay.  And I'm sorry.  And you interviewed Mr. Ortiz a few

12  months later on September 21st?

13  A    In September --

14  Q    Okay.

15  A    -- yeah.

16  Q    So you were aware that he was active in the Union going

17  back to July of 2017?

18  A    I was not aware of that.

19  Q    Were you aware that there were charges filed with the

20  National Labor Relations Board prior to you interviewing

21  Mr. Ortiz?

22  A    No, I was not.

23  Q    And by the time you had finished without -- by the time

24  you had finished your investigation, were you aware of that?

25  A    No, I was not.



www.escribers.net | 800-257-0885

1    Q    Did Mr. Moran tell you that he and Mr. Ortiz were active

2    in the Union together?

3    A    I believe so, yes.

4    Q    Okay.  So is the only reason Mr. Ortiz was terminated

5    because he lied to you about who had sent him the pictures?

6    A    Yes.  He had lied during the investigation.

7    Q    Okay.  And by the end of the investigation, he had told

8    you the truth?

9    A    Yes.

10   Q    Okay.  So what -- was there -- if you already knew he had

11   lied by the time you started the second meeting, why did you

12   even hold the second meeting?

13   A    Why --

14   Q    Wasn't the purpose of -- let me rephrase it.  Wasn't the

15   purpose of the second meeting to give him an opportunity to

16   tell you the truth?

17   A    It was.

18   Q    All right.  And then he did tell you the truth?

19   A    He did.

20   Q    All right.  And still you recommended his dismissal?

21   A    Yes.

22   Q    Okay.  And what is it that he -- so the only thing he lied

23   about was -- am I -- I want to make sure I understand it.  His

24   sole lie was that he said he didn't know who sent him the

25   face -- the Workday pictures when they were sent to him by Jose



1    Moran; is that correct?

2    A    Correct.

3    Q    And how is Tesla harmed by that?

4    A    So like we talk about with everybody, we do talk about

5    honesty.  And I gave Richard Ortiz several opportunities to be

6    honest during our conversation.  At which point he decided not

7    to be during our first conversation.  The last time I spoke

8    with him, he did, to your point, admit to lying to me the first

9    time.  And while we don't have a specific policy -- and I think

10   I talked about this -- about like,

11   youshouldn'tlieinaninvestigation.policy.com in our internal

12   website, there are other policies that speak to employees'

13   responsibility to be honest with us.

14   Q    Um-hum.

15   A    And from our perspective, specifically from my

16   perspective, it devalues, you know, internal investigations if

17   employees aren't honest with us.  You know, we should treat

18   each other well and with respect, and that includes being

19   honest.  And I -- and I believe that.  And I believe that

20   beyond Tesla, I think everywhere --

21   Q    Um-hum.

22   A    -- so.

23   Q    But he was honest with you before the investigation was

24   over?  Just answer yes or no.  Don't -- was he honest with you

25   before the investigation was over?

22-60493.1938


www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Yes.  And that didn't mitigate anything for you?

3    A    No.

4    Q    And did you tell Mr. Graminger that Mr. Ortiz was honest

5    with you in the final stages of the investigation?

6    A    Oh, yes.

7    Q    How did you tell him that?

8    A    I had shared with him what we found, and that during my

9    last conversation with Richard, he finally admitted that Jose

10    had sent him these photographs.

11    Q    Okay.  And what did you actually share with Mr. Graminger?

12    Did you actually share a document with him?

13    A    I recall having a document at the meeting.  I didn't email

14    it to him.  It was there for review.  And we discussed the

15    document.

16    Q    So it can't be the document that we have here because the

17    document we have here is one which is after you've already met

18    with Mr. Graminger.  So is there a version of the document that

19    you shared with Mr. Graminger?

20    A    Which document are you referencing?  Do you have the

21    number so I can look at it?

22    Q    62.

23    MR. ROSS:  52?

24    MR. GARBER:  62.

25    MR. ROSS:  6-2?

22-60493.1939



1       MR. GARBER:  6-2.

2       MR. ROSS:  Thank you.

3       MR. GARBER:  Um-hum.

4   Q    BY MS. FEINBERG:  Do you have 62 in front of you?

5   A    Yes, I do.

6   Q    Okay.  And that isn't the document that you shared with

7   Mr. Graminger, is it?

8   A    This is the document that I discussed with and shared with

9   Mr. Stephan Graminger.

10  Q    It was completed?

11  A    Yes.

12  Q    Because at the time that you met with him, I thought that

13  no decision had been made.  I thought you were going to him to

14  ask for a decision.

15  A    Yeah.

16  Q    And that report seems to imply that there was a decision

17  that's already been made.

18  A    So this document has a recommendation for next steps.  The

19  only things that were added to this document after my meeting

20  with Stephan Graminger were the chronology of the closeouts and

21  what actual actions were taken.

22  Q    Right.  So that isn't the document that he saw.  So do you

23  have a copy of the document, the version that he saw?

24  A    Oh, so I -- I understand.  So what you're saying is

25  because October 18th and 19th would not have been on the



www.escribers.net | 800-257-0885

1    document, I don't have a version of that, what those would have

2    said at that point were pending and just empty.

3    Q    And are you saying you gave him a copy to retain?

4    A    He did not retain a copy of this.

5    Q    And how long did he have to review it?

6    A    I would say our meeting lasted maybe a half hour or so,

7    20 minutes --

8    Q    And --

9    A    -- to a half hour.

10   Q    -- did you see him read it?

11   A    I can't recall specifically if he picked it up and read

12   it.

13   Q    Did you take notes of that meeting?

14   A    I did not.

15   Q    And did he make a decision at that meeting?

16   A    Stephan told me that it was his intent that he was going

17   to take the action as recommended but that he wanted to check

18   in with his boss Peter.

19   Q    And did he say why he wanted to check with Peter?

20   A    Yeah.  So if you recall, there was another guy in the

21   meeting that had brought up that Jose might -- or I'm sorry --

22   that Richard Ortiz might be a Union guy, and Stephan was

23   motivated to talk to his boss Peter just to make him aware of

24   the fact that he was going to move forward with the

25   termination.



www.escribers.net | 800-257-0885

1    Q    And when the other individual told -- said in the meeting

2    that Richard was a Union guy, did you share any more

3    information about what you knew in that respect?

4    A    No, I did not.

5    Q    And did Graminger indicate that that was actually a

6    concern of his?

7    A    What he shared with me, not -- not that it was a concern,

8    but he just wanted to give his boss a heads up because he knew

9    that a person that was a Union guy -- he was going to go

10   forward with the termination on that guy.

11   Q    Did the person who had lied about the drugs and alcohol in

12   his car ever admit during the course of the investigation that

13   he had lied?

14   A    Yes, he did.

15   Q    And did he -- was he also fired for having drugs and

16   alcohol in his car?

17   A    He was fired for lying.

18   Q    And not for the other offenses?

19   A    No.  They were not his.

20   Q    They were not his drugs and alcohol?

21   A    No, they were not.

22   Q    And were there any consequences to Tesla for having those

23   products on site?

24   A    Were there any consequences --

25   Q    Well, I assume the --



www.escribers.net | 800-257-0885

1    A    -- that --

2    Q    -- drugs and alcohol were on Tesla's property; is that

3    correct?

4    A    They were within a car that was in our fleet of vehicles.

5    Q    Oh.  Okay.  So then they weren't only on your property,

6    they were actually in a Tesla car -- in a Tesla owned car --

7    Tesla controlled car?

8    A    Yeah.

9    Q    Which put Tesla at risk -- at exposure?

10   A    Yes.

11   Q    Did you ever talk to Mr. Musk about the termination of

12   Richard Ortiz?

13   A    No.

14   Q    Were you aware that he Tweeted about it?

15       MR. ROSS:  I'm sorry.  I couldn't hear that.

16   Q    BY MS. FEINBERG:  Were you aware that he Tweeted about it?

17   A    I was not aware of that.

18   Q    Do you follow him on Twitter?

19   A    I don't think so.  Maybe.

20   Q    Are you on LinkedIn?

21   A    I am on LinkedIn.

22   Q    And did you look on LinkedIn to see whether Mr. Pratt was

23   on LinkedIn?

24   A    No.

25   Q    Or that Mr. Ives was on LinkedIn?



1    A    No.

2    Q    Are you aware that they posted their photos and their job

3    titles with Tesla on LinkedIn?

4    A    I'm not aware that they posted that on LinkedIn.

5    Q    But you would have access to that?

6    A    I would have access to their LinkedIn accounts?

7    Q    Yes.

8    A    I would imagine if their privacy settings were set a

9    certain way, yeah, just like anybody else would.  Yes.

10    Q    And is there anything that limits an employee from posting

11    their photo and their job title and their job description while

12    working for Tesla on LinkedIn?

13    A    Not that I'm aware of.

14    Q    And was Mr. Kostich the -- did he say that he had any --

15    was he the cause of the complaint?

16        MR. ROSS:  I couldn't hear the question.

17        THE WITNESS:  Yeah.  I'm --

18        MR. ROSS:  I'm sorry.

19    Q    BY MS. FEINBERG:  Did he initiate the complaint?  Did

20    Mr. Kostich initiate the complaint?

21    A    From what I understand, Travis Pratt initiated the

22    complaint.

23    Q    Okay.  So is there a reason that you wrote to Mr. Kostich

24    about the outcome of the complaint?

25    A    So anybody that we speak with that is a complainant and


www.escribers.net | 800-257-0885

1    sometimes a witness, too, we will close out with them.  Bryan

2    Kostich did believe that this was inappropriate, and so I sent

3    him an email and let him know that we looked into the concerns.

4    Q    And what did Mr. Kostich think was inappropriate?

5    A    I can review my notes.

6    Q    All right.  But he thought it was inappropriate to post

7    the salary and some of this other information, right?  And you

8    didn't even investigate that.

9    A    He felt that it was, in his words, inappropriate or

10   disgusting that this was out there.

11   Q    And what is the "this"?

12   A    This entire posting.

13   Q    Right.

14   A    So the content, you know.  We've talked about that.  You

15   know, the salary and all those things as well as these folks'

16   photographs.

17   Q    Right.  But you -- did you ever tell him that you didn't

18   investigate the full scope of what he felt was disgusting?

19   A    No.

20   Q    So you're the investigator, and you can set the scope of

21   the investigation; is that correct?

22   A    Yes.

23   Q    Okay.  So if a business leader sends you something and

24   says they want you to investigate -- they have these concerns,

25   ten concerns, you can decide you're only going to investigate



www.escribers.net | 800-257-0885

1    one concern?

2    A    Yes.

3    Q    And did you ever discuss this particular investigation

4    with your supervisor?

5    A    Not that I can recall.  Not -- and if I did, it would have

6    been with counsel.

7    Q    And did you have a draft of the report before you met with

8    counsel?

9    A    Like at the end of the investigation?  Is that what we're

10   talking about?

11   Q    No.  You said that even before you went to meet with

12   Mister -- before you met with Mr. Graminger that you had

13   written a report, and then you went and met with counsel.  So

14   was there a report that you had written, your own version of a

15   report --

16   A    Oh, yeah.  So --

17   Q    -- before you met with counsel?

18   A    So it's part of the process.  And I think I described this

19   earlier.  Like as part of the process, we would draft up the

20   report and then go through counsel for any advice or to align

21   our recommendations.

22   Q    And do you have a copy of the report that you wrote

23   yourself without counsel input?

24   A    I do not.

25   Q    But it would have been on your computer?



www.escribers.net | 800-257-0885

1    A    I mean, it would have been -- so it would have been a

2    version of this document.  So these are live documents.  So as

3    you update it --

4    Q    Um-hum.  And so other -- who's -- who concluded that

5    investigating the posting of a Workday photo was worthy of

6    investigating?

7    A    I did.

8    Q    But you also concluded that the actual posting of the

9    Workday photo was -- the only consequence was -- that the

10   appropriate consequence was a reprimand, an oral reprimand?

11   A    Yes.  You're talking about in the case of Jose?

12   Q    Yes.

13   A    Yes.

14   Q    Well, did you ever investigate anybody else's use of

15   Workday?

16   A    At Tesla?

17   Q    Yes.

18   A    No.  But previously, yes.

19   Q    And did you ever investigate whether there were any

20   specific policies that Mr. Moran was violating?

21   A    Not that I can recall, no.

22   Q    And isn't it your job to determine whether a person is

23   violating a company policy?  Isn't that within the scope of

24   that responsibilities?

25   A    Yes.



1   Q    Okay.  But you couldn't -- is it that you couldn't find

2   any policy Mr. Moran was (sic) violated or that you didn't look

3   for any policy that he was violating?

4   A    In posting or in sharing --

5   Q    Yes.

6   A    -- those Workday photos?  Yeah.  So I think it's helpful

7   to understand, you know, we have general policies about how we

8   treat each other.  So like our antihandbook handbook.  And you

9   know, treat each other well, don't be a jerk, all of those

10  things.  And then also we have like our antiharassment

11  discrimination policies.  To your specific question, are there

12  any policies in regard to, you know, using Workday or accessing

13  Workday and business systems, there are components of our

14  internal systems and email use policies that speak to only

15  using the systems for official purposes.  And that's something

16  that you could reference in this case.

17  Q    And did you reference it?

18       MR. RODRIGUEZ RITCHIE:  Move to strike as nonresponsive.

19       MS. FEINBERG:  Okay.

20       JUDGE TRACY:  Sustained.

21       MS. FEINBERG:  Okay.

22  Q    BY MS. FEINBERG:  Okay.  We moved to strike, so I'm not

23  going to ask the follow-up question.  But Mr. Moran wasn't

24  accused of -- wasn't disciplined for harassment of another

25  employee, was he?



www.escribers.net | 800-257-0885

```
1   A    No.

2   Q    And are the photos that people have of themselves on

3   Workday the same photos they have on their badges?

4   A    These are their official Tesla security photos, yes.

5   Q    So these same photos that were posted, they're walking

6   around the plant all day with that photo on?

7   A    They are.

8   Q    Okay.  And I may have asked you this, but just to be

9   clear, were you aware that the only people who accessed that

10  Facebook page that these were posted on for several days was

11  one that was only for Tesla workers?

12  A    That the -- that the Facebook page was only for Tesla

13  workers?

14  Q    Yes.

15  A    I was not aware of who had access to that.

16  Q    And why didn't you ask?

17  A    Why didn't I ask who --

18  Q    Didn't it matter --

19  A    -- had --

20  Q    -- to you how --

21  A    No.

22  Q    Didn't it matter to you how it was disseminated?

23  A    So why didn't I ask who had access to the Facebook page?

24  Q    Yes.

25  A    Because I didn't feel I needed to ask.  An employee came
```



www.escribers.net | 800-257-0885

1    across the information and felt uncomfortable by the fact this

2    was posted to it, and that's what I was looking into.

3    Q    And when you make the recommendation to terminate someone,

4    do you take other factors into consideration other than the

5    thing that you're investigating?  How long they've worked

6    there, their work product, their performance, do you take any

7    of those things into consideration?

8    A    Do I take those matters into consideration?

9    Q    Well, you're making the recommendation --

10    A    Yeah.

11    Q    -- so yes.

12    A    I do not.

13    Q    And then how do you make a recommendation about

14    terminating someone's employment without taking that into

15    consider egg?

16    A    So that component of it comes from the HR Partner and the

17    business leader.  And so that's why we have the meeting with

18    them.  They're there to discuss --

19    Q    But you told me Mr. Graminger never even knew who Richard

20    Ortiz was, so how would he make that evaluation?  If you didn't

21    bring that information --

22    A    Yeah.

23    Q    -- to him, how was he supposed to know whether Richard

24    Ortiz was a good employee or not if you didn't bring that

25    information to him since you told me he didn't even know who he



www.escribers.net | 800-257-0885

1    was?

2    A    So ShTawney McIntosh knew who he was as well as that other

3    person that was in the room.  That's why that person was

4    invited, because he actually knew Richard Ortiz.

5    Q    And did ShTawney McIntosh in the meeting discuss anything

6    about Mr. Ortiz?

7    A    Not that I can recall, no.

8    Q    And did you ask her to share any information with

9    Mr. Graminger?

10    A    All of these meetings that we have, we set --

11    Q    In that, um-hum.

12    A    -- we set the understanding for everybody that like that's

13    the HR Partner's role as well as anybody from the business that

14    could provide that information.

15    Q    And you told that to Mr. Graminger?

16    A    In the group setting, yes.

17    Q    What did you say?

18    A    That when we have those meetings --

19    Q    No, no.  What did you say to him?

20    A    What did I say to --

21    Q    Him about --

22    A    -- Stephan?

23    Q    -- what other people's roles were going to be in that

24    meeting.

25    A    Yeah.  I -- I was just describing that.  I told him and



www.escribers.net | 800-257-0885

1    everybody else in that meeting that, you know, HR is here to

2    talk about the work performance and what this employee is like

3    as well as anybody else.  So that extra person that was invited

4    actually knew of that department and Richard as an employee.

5    Q    Um-hum.  And he actually said nice things about Richard?

6    A    From what I recall, that extra person made some good

7    comments about him.

8    Q    Right.  But it didn't change your recommendation?

9    A    No.

10   Q    And your recommendation had already been approved by legal

11   before getting input from the people who actually knew Richard

12   Ortiz as an employee?

13   A    Yes.  It was aligned with legal.

14   Q    Okay.  And do you know whether they knew anything about

15   his work performance?

16   A    I can't speak to what legal knew or didn't know about his

17   work performance.

18   Q    Okay.  So basically it was a foregone conclusion before

19   hearing anything more about Richard Ortiz when you wrote your

20   report?  When you issued your report, it was basically everyone

21   was going to say, yes, it was a foregone conclusion?

22       MR. ROSS:  Objection.  It's argumentative.  It assumes that

23   the witness is able to state what was Mr. Graminger's state of

24   mind.

25       JUDGE TRACY:  Overruled.  This is essentially -- you know,



1  he's an adverse witness, so the questions are under that.

2      So go ahead and answer the question, please.

3      THE WITNESS:  Sure.  Thank you.

4      Can I just have the question again after that?

5  Q    BY MS. FEINBERG:  When the report was written and approved

6  by legal, you understood that effectively it was all factors

7  had been considered and that recommendation was what was going

8  to management for a yes-or-no decision?

9  A    Correct.  Yes.

10 Q    Right.  And in this email of -- which is in Joint Counsel

11 Exhibit 81, you referenced getting information so that you

12 could conclude that, "as soon as possible, I need these records

13 to determine any action or next steps"?

14     JUDGE TRACY:  And let's just be clear, you're referring to

15 General Counsel's --

16     MS. FEINBERG:  I'm sorry.  Joint Counsel's -- I'm sorry.

17     JUDGE TRACY:  -- Joint -- General Counsel's --

18     MS. FEINBERG:  I'm sorry.  I keep saying Joint.  General

19 Counsel -- thank you.

20 Q    BY MS. FEINBERG:  GC Exhibit 81, page 4.

21 A    One second.  Okay.  I've got the document.  Which -- what

22 are we looking at?

23 Q    Okay.  So on the top of page 4, you're writing to -- oh,

24 page 4, you're writing to Raj Nanda saying that you need the

25 records regarding Jose Moran as soon as possible, is that



22-60493.1953

1    right, so that you can determine next steps?  Am I

2    understanding that?

3    A    So you're talking about the communication from me to Raj

4    Nanda on October 3rd, 2017 at 10:44 a.m.?

5    Q    Correct.

6    A    "Please provide an update.  We would like to conclude this

7    investigation as soon as possible, and we'll need these records

8    to determine any action or next steps."  Yes.

9    Q    But as of October 3rd, 2017 Mr. Moran had already told you

10   that he took the pictures off of Workday.  So what was -- what

11   is it that you needed?  He had already told you.  Why were you

12   review -- why were you continuing to review his Workday?  What

13   were you looking for?  Were you doing a broader investigation

14   of Mister -- let me -- okay.  What were you looking for?

15   A    Who took the pictures out of Workday.

16   Q    But Mr. Moran already told you he did.

17   A    On October 3rd?

18   Q    He told you on the --

19        MR. ROSS:  The 12th.

20        JUDGE TRACY:  So again --

21        MS. FEINBERG:  Okay.  Let me see.

22        JUDGE TRACY:  -- there is no objection here.

23        MS. FEINBERG:  Okay.  Hold on one moment.

24        JUDGE TRACY:  Okay.

25        MR. ROSS:  She's misstating the testimony, Your Honor.



1      MS. FEINBERG:  Okay.  One second.

2      JUDGE TRACY:  Well, that's --

3      MS. FEINBERG:  I may have the date wrong.  One second.

4    Okay.  That may be me.  Hold on one moment.

5      Okay.  My mistake.  Okay.

6    Q    BY MS. FEINBERG:  When did you actually get the report

7    back from -- oh, I see.  October 6th.  Was that when you

8    learned that Mr. Moran had accessed it on September 14th?

9    A    Yeah.  So the first time that I was made aware that Jose

10   Moran had accessed these Workday records --

11   Q    Um-hum.

12   A    -- was on October 6, 2017.

13   Q    Why were you looking at Mister -- why did you believe it

14   was Mr. Moran who had taken the photos in the first place?

15   A    So I didn't know that it was him that took them in the

16   first place, and that's why I had requested the records.  And

17   once I got the record and I could see who accessed those

18   different things, I could see in --

19   Q    Okay.

20   A    -- Workday --

21   Q    Um-hum.

22   A    -- his picture bubble, and then that picture bubble

23   matched what the screenshots had on them.

24   Q    I see.  I think the question I really meant to ask you --

25   hold on.  Where is the thing with the whole --



www.escribers.net | 800-257-0885

1    So once you had that information, why did you then ask to

2    see a larger swath of Mr. Moran's Workday -- once you already

3    knew that he had looked at Travis -- that he had looked at

4    those, if he -- once you already knew, based on General Counsel

5    Exhibit 81, page 3, that he had looked at Travis Pratt and

6    Shaun Ives on September 14th, why did you feel the need to have

7    a full run of his Workday profile?

8    A    Yeah.  So to understand whether or not there was more to

9    this.  Like maybe he accessed other records.  And I wanted to

10   understand which records he might have accessed and why.  I

11   knew that I was going to speak with him and I wanted to

12   understand it a little bit better.

13   Q    So you were exploring whether he had done other things?

14   I'm trying to understand.  So you had broadened the scope of

15   the investigation with respect to Mr. Moran?

16   A    Yeah.  So I considered these Workday profile photos or the

17   screenshots in Workday to be sensitive, and I knew that two of

18   these had been released.  What I didn't know, were there other

19   things that had been released, other Workday accounts that had

20   been accessed, and I was exploring that.

21   Q    And -- okay.  So that -- now you've used the word.  So you

22   considered these photos to be sensitive?  Is that the word that

23   you would use?

24   A    Yeah.

25   Q    I mean, that's the word you used.  And did anyone else



www.escribers.net | 800-257-0885

1    tell you that they were sensitive?

2    A    Did anybody tell me that Workday profile photos are

3    sensitive?

4    Q    Just the -- yeah, just that.

5    A    No.

6    Q    Okay.  And what makes them sensitive?

7    A    I mean, they're only accessible through a log-on.  They're

8    protected, our own information.  You can't go on there, anybody

9    in this courtroom I don't think can go on there with a Workday

10   log-on and see this internal system.

11   Q    But I could Google Shaun Ives or Travis Pratt myself and I

12   could see them.  Not there, but I could see who (sic) they look

13   like.  So what makes them sensitive?  Their photos are in the

14   -- or if they're so -- if their photos are already in --

15   A    Yeah.

16   Q    -- the world and they're walking around with them and

17   they're going to testify in Sacramento and whatever, what makes

18   those photos sensitive?

19   A    Um-hum.  Yeah.  What makes those sensitive in comparison

20   to them just walking around in the world or a Google search for

21   their name is like this is an official photo that was taken at

22   Tesla they aren't expected to have released elsewhere.  It's an

23   internal data system.

24   Q    So are you aware that Mr. Ives posted the exact same photo

25   on his LinkedIn page, the exact same photo?



www.escribers.net | 800-257-0885

1   A    I'm not aware of that.

2   Q    Okay.  And did you ever ask Mr. Ives or Mr. Pratt whether

3   their photos were out there in the world in any other context?

4   A    I did not.

5   Q    No.  That's because neither of them actually expressed any

6   concerns about their photos.  They were concerned about the

7   content, but not the photos; isn't that right?

8        MR. ROSS:  Objection.  The witness can't state what their

9   concerns were.  He can --

10       MS. FEINBERG:  He interviewed --

11       MR. ROSS:  -- only testify as to what they said.

12       MS. FEINBERG:  Okay.

13  Q    BY MS. FEINBERG:  They never --

14       JUDGE TRACY:  Again --

15       MS. FEINBERG:  Okay.

16       JUDGE TRACY:  -- I'm going to overrule the objection.

17       MS. FEINBERG:  Thank you.

18       JUDGE TRACY:  Go ahead.

19       THE WITNESS:  Can you -- can you restate that or --

20  Q    BY MS. FEINBERG:  Mr. Pratt's main concern was what was

21  being -- if he had a concern at all, though, because, to me, he

22  may not have even had a concern, but what he was sharing was

23  the overall -- the dialogue that was posted and was

24  Mr. Kostich's concern was was also what was being said; isn't

25  that right?  What was being said?



www.escribers.net | 800-257-0885

1   A   What was being said is -- like all of it together is also

2   the screenshots.

3   Q   Right.

4   A   Right.

5   Q   But you didn't look -- I just want to be clear.  You

6   didn't look into anything else about what was being said, and

7   -- is that right?

8   A   Right.  Yeah.  And --

9   Q   Okay.

10   A   -- I've -- I've said that.

11   Q   But you testified that you have anti -- that had -- that

12   harassing or retaliating a fellow employee violates Company

13   policy; was that right?

14   A   That if employees harass each other --

15   Q   Yes.

16   A   -- it's a violation of Company policy?  Yeah.

17   Q   I thought I heard you say that.

18   A   Yeah.  That's --

19   Q   Okay.  So isn't that the issue that came to you?

20   A   Isn't that the issue that came to me?

21   Q   Isn't that the issue that Mr. Kostich said, that this

22   employee felt -- that he felt that they were harassing this

23   worker?

24   A   What he was describing to me sounded like harassment --

25   Q   Um-hum.



www.escribers.net | 800-257-0885

```
1    A    -- sounded like bullying or picking on or singling out --

2    Q    So why didn't you --

3    A    -- and that's why --

4    Q    -- look into it?

5    A    -- looked into that matter.

6    Q    But you didn't look into it.  You only looked into the

7    Workday issue.

8    A    And the Workday --

9    Q    And isn't the reason that you didn't look into --

10   A    So --

11   JUDGE TRACY:  So let --

12   THE WITNESS:  I'm sorry.

13   JUDGE TRACY:  Let him --

14   MS. FEINBERG:  Okay.  Sorry.

15   THE WITNESS:  So --

16   JUDGE TRACY:  -- finish his answer.  Let him finish his

17   answer.  You guys are kind of --

18   MS. FEINBERG:  Okay.  Sorry.

19   JUDGE TRACY:  -- speaking over each other.

20   MS. FEINBERG:  Okay.  Sorry.  Yes.  I --

21   Q    BY MS. FEINBERG:  You didn't look into the issue of the

22   bullying and harassing, you only looked into the Workday issue?

23   The Workday -- posting Workday photos; is that right?

24   A    Yes, which is a component of bullying or singling out --

25   Q    Right.
```



www.escribers.net | 800-257-0885

1    A    -- behavior.

2    Q    But you didn't look into the words or where it was posted

3    and who had seen it and whether what was said was true or not?

4    You didn't look into any of that?

5    A    No.

6    Q    No.  And why is that?

7    A    Because it wasn't of my concern.  I understood -- like I

8    had previously discussed with you, I understand parts of that

9    could have been protected.  So I wasn't focused on that piece.

10    I was focused on the Workday profile photos.

11    Q    Right.  So you knew that part of this conversation was

12    protected activity?  That's what you just said, right?

13    A    Yeah.

14    Q    Okay.  And you knew that from the moment you started down

15    this path of talking to Mr. Ortiz and Mr. Moran?  Soon after.

16    You understood that this conversation and what was posted could

17    have been protected activity?

18    A    I understood that a component of this could have been

19    protected, yes.

20    Q    Okay.  And did you ever explain that to Mr. Graminger?

21    A    Did I ever explain that to Mr. Graminger.  Which parts

22    were protected or not?

23    Q    Yes.

24    A    No.

25    Q    Okay.  So you isolated -- you tried to pull out a piece



www.escribers.net | 800-257-0885

1    that you thought might not be protected; is that right?

2    A    I focused on a piece that could have been a violation of

3    our usage --

4    Q    Right.  And my --

5    A    -- of the system.

6    Q    Okay.  And that you -- but if you thought that that usage

7    was protected, you wouldn't have pursued it?

8    A    I mean, in a hypothetical world, I don't understand, you

9    know, what case this would have been.

10    Q    Well, you told me that harassment could violate Company

11    policy, but you didn't pursue that because you thought it was

12    protected; is that right?

13    A    I didn't pursue the whole like dollar amount and, you

14    know, these people are signing up, because I understood

15    components of that could have been protected.

16    Q    Right.  But you did pursue Workday and the posting of the

17    Workday photos on a union website, but you didn't consider that

18    protected?  And was that -- is that right?

19    A    Yeah.

20    Q    Okay.  And was -- okay.

21        MS. FEINBERG:  One moment, please.

22    Q    BY MS. FEINBERG:  Are you currently being paid for your

23    time here today?

24    A    I think there was some reimbursement form that I got in my

25    subpoena.



1  Q    Oh.  Other than -- I see.  But are you being paid by

2  Tesla?

3  A    No.

4  Q    Okay.  And when did you leave Tesla?

5  A    On the 13th of September I believe.

6  Q    And were you terminated by Tesla?

7  A    No.

8  Q    And have you spoken to Gaby Toledano since leaving Tesla?

9  A    I have not.

10  Q    And when I say speak, have you communicated with her in

11  any way?

12  A    No, I have not.

13  Q    And you indicated that you weren't paying the counsel fees

14  here for -- here today?

15      MR. ROSS:  I'm sorry.  I couldn't hear the question.

16  Q    BY MS. FEINBERG:  You indicated that you personally

17  weren't paying for your counsel that's here today.  Do you know

18  who is?

19  A    The way I understand it is Tesla's paying for that person.

20  Q    And when you were meeting with Mr. Moran, you asked him to

21  show you his phone and his Facebook postings?

22  A    I did, yes.

23  Q    Okay.  And at that point that you asked him, hadn't he

24  already admitted that he had taken the photos and shared them

25  with Mr. Ortiz?



1   A    He did.

2   Q    Oh.  So why did you need to see his phone?

3   A    To corroborate his statements.

4   Q    But he was admitting it.  Why --

5   A    Yeah.

6   Q    -- did you need to corroborate an admission?

7   A    To make sure he was being forthcoming and completely

8   honest with me.

9   Q    Okay.  And when you looked at his Facebook page, didn't

10  you see that it was a union Facebook page?

11  A    I didn't actually look at his Facebook page.  He looked

12  through I think his like direct messaging, so like Facebook

13  Messenger, and found that he didn't have any messages -- or he

14  told me he didn't have any messages between him and Richard

15  Ortiz.  And then he said, well, maybe it's on text, and that's

16  when he pulled up his text string with Richard.

17  Q    And so you were asking him to reveal to you communications

18  he had with other employees?

19  A    Specific to sharing these Workday profile photos, yes.

20  Q    Well, specific to the posting?  Did you distinguish for

21  him that you were asking only about the photos as opposed to

22  the fact that he had -- as opposed to the full posting, which

23  is General Counsel Exhibit 28?

24  A    Yeah.  So I never shared this Exhibit 28 with him.  We

25  talked specifically about the screenshots.  And we didn't talk



1    about the -- the posting.

2    Q    What did you show him?

3    A    What did I show him?  I asked him if he had accessed these

4    records, and he said, yes, and then he showed me in his text

5    message string the photos -- or the -- the copies.

6    Q    I'm sorry.  When you said "these," you must have used --

7    A    Yeah.

8    Q    -- something other than the word "these" or he wouldn't

9    have known what you were talking about.  So what did you -- did

10   you show him something?

11   A    So one second.  I think I can point you in the right

12   direction.  So Exhibit 67, when I asked him -- I asked him if

13   he had ever accessed the accounts of Shaun Ives and Travis

14   Pratt on Workday, and he said, yes, and then he had indicated

15   to me that he took screenshots from those profile landing

16   pages.  Those are the -- those screenshots of the landing pages

17   are the screenshots that appear in Exhibit Number 28 at the

18   bottom.  I never showed Jose Exhibit Number 28 or any portion

19   of 28.

20   Q    Why not?  Isn't that --

21   A    Because I was focused on him accessing the Workday

22   profile.  I wasn't looking into him for posting them to

23   Facebook.

24   Q    But the photo that's posted doesn't even have Mr. Ives

25   name on it.  Did you tell him that it had been posted without



1   Mr. Ives name on it?

2   A    So I didn't actually reveal to him that something had been

3   posted.  And it was one of his concerns at the end that

4   something might have happened with these photographs that he

5   shared.

6   Q    Well, what did you tell him you were meeting with him for?

7   A    So we talked about access to the system.  So access to

8   Workday.  So that's what I told him we were meeting about.

9        MS. FEINBERG:  One moment, please.

10       MR. RODRIGUEZ RITCHIE:  Your Honor, I would like a rest

11   room break --

12       MS. FEINBERG:  Okay.

13       MR. RODRIGUEZ RITCHIE:  -- at some point soon.

14       JUDGE TRACY:  How much longer?

15       MS. FEINBERG:  Maybe a couple minutes.  Maybe it would be

16   good, and then I could just regroup in case there's anything

17   more and then finish up --

18       JUDGE TRACY:  Okay.

19       MS. FEINBERG:  -- if that makes sense.

20       JUDGE TRACY:  All right.  Let's --

21       MS. FEINBERG:  I'll use the time wisely.

22       JUDGE TRACY:  Let's take a quick break, just like five

23   minutes, just -- you know, because after Ms. Feinberg is done,

24   I'm assuming you guys will need a break.  So we'll take a

25   longer break at that time.  Okay?



1     So let's go off the record for a couple of minutes.

2     (Off the record at 2:44 p.m.)

3     JUDGE TRACY:  Okay.  Go ahead, please.

4     Q    BY MS. FEINBERG:  Okay.  I would like to call your

5     attention to General Counsel Exhibit 67, page 4, please.

6     A    Okay.  I'm there.

7     Q    Okay.  And these are notes that you took based on your

8     conversation with Mr. Moran; is that correct?

9     A    Correct.

10    Q    Okay.  So Mr. Moran did tell you that he knew that

11    Mr. Pratt and Mr. Ives were in Sacramento giving some speech at

12    a board meeting?

13    A    Yes.

14    Q    And that it could have been -- okay.  And --

15    MR. ROSS:  I'm sorry.  I couldn't hear that.

16    MS. FEINBERG:  I don't know that there's a question.

17    Q    BY MS. FEINBERG:  And that he was trying to figure out who

18    they were to make sure that if they were representing

19    themselves as employees, that they really were; is that right?

20    A    Yes, that he was asked to verify that they were actually

21    employees of Tesla.

22    Q    Okay.  And you asked him what he did with the information;

23    is that right?

24    A    I did.

25    Q    And he told you that he shared it with other Union



1   supporters or --

2   A    correct.

3   Q    And do you understand that to be protected activity?

4   A    I do not.

5   Q    Okay.  And how did you -- how did -- did you conclude that

6   on your own or are you telling me something that someone shared

7   with you?

8   A    How did I conclude that sharing these Workday screenshots

9   was not protected activity?  I conclude that --

10  Q    That talking to --

11  A    -- on my own.

12  Q    -- other Union supporters about the screenshots, wasn't

13  that union activity?

14  A    I'm sorry.  The door was like --

15  Q    Okay.

16  A    -- going, so.

17  Q    It says he talked -- that, "What did you do with the

18  information?"  And he said, "I talked to other Union supporters

19  about the information he found on Workday."  Is that

20  protected -- did you understand that to be protected activity?

21  A    Like talking to them about people --

22  Q    That he had --

23  A    -- that are --

24  Q    -- seen these guys on Workday and he had verified that

25  they were workers there?

22-60493.1968



1    A    I did not.

2    Q    Okay.  And you -- and the fact that he told others that

3    they were maintenance techs and he had verified that in

4    Workday, was that protected activity?

5    A    From my understanding, no.

6    Q    And where did you get that understanding?

7    A    Because he had accessed an internal system to verify these

8    things.

9    Q    To verify that the people who were representing themselves

10    as workers were really workers?

11    A    Yep.

12    Q    In the course of a union campaign?

13    A    At the request of an external party, yes.

14    Q    So originally Mr. Moran told you he didn't remember if he

15    shared them; is that right?  On the bottom of page 4.

16    A    The bottom of page 4?

17    Q    Right.  He said, "I don't remember if I shared them;" is

18    that right?

19    A    Correct.

20    Q    And that wasn't true?

21    A    No, that wasn't true because he did share them.

22    Q    Right.  And then on the next page, later in the

23    investigation, he tells you that he did share them?  He says,

24    "Yes, I sent the screenshots to Richard Ortiz"?

25    A    Yeah, later in the same conversation he said, "I sent



www.escribers.net | 800-257-0885

1   these to Richard Ortiz."

2   Q    Okay.  So at first blush, he didn't tell it to you quite

3   straight, but then with some more information, he told you the

4   truth?

5   A    Yes.

6   Q    Okay.  And that was okay with you?

7   A    Yes.

8   Q    And do you have any role in investigating safety concerns?

9        MR. ROSS:  I couldn't hear the question.  I'm sorry.

10  Q    BY MS. FEINBERG:  Do you have any role in investigating

11  safety concerns?

12  A    I do not.

13  Q    And do you have any role in investigating team wear

14  concerns?

15  A    I do not.

16       MS. FEINBERG:  One moment, please.

17  Q    BY MS. FEINBERG:  And you testified that at some point you

18  saw a letter that Mister -- a public letter that Mr. Moran had

19  written about his concerns about Tesla?

20  A    I had seen an article written about him writing a letter

21  or a blog post.

22  Q    Okay.  And when did you see that?

23  A    I believe it was prior to me even coming to Tesla.

24  Q    And did you ever discuss it with anyone at Tesla?

25  A    Not that I can recall, no.



www.escribers.net | 800-257-0885

1      MS. FEINBERG:  One moment, please.

2   Q    BY MS. FEINBERG:  Can you turn to --

3      MS. FEINBERG:  Oh, can you show him General Counsel

4   Exhibit 43?  Or do I need to have -- I don't have copies of

5   that.  Mine's written on actually is the problem.  Sorry.

6      MR. RODRIGUEZ RITCHIE:  I'm handing the witness General

7   Counsel's Exhibit 43.

8      THE WITNESS:  Thank you.

9      MR. RODRIGUEZ RITCHIE:  Um-hum.

10      MS. FEINBERG:  Thank you.

11   Q    BY MS. FEINBERG:  And can you just take a moment to look

12   at this?

13   A    Okay.

14   Q    And are -- is this Exhibit 43 something that Mr. Moran

15   showed you when you met with him on --

16   A    A part of it is, yes.

17   Q    And how do you know which part of it?  Did you -- did he

18   -- did you ask him to forward it to you?

19   A    Jose Moran shared some screenshots of this text exchange

20   between him and Richard Ortiz.

21   Q    Um-hum.

22   A    That's how he shared it.

23   Q    And do you have what he shared with you?  Are you saying

24   he didn't share all of Exhibit 43?

25   A    Correct, he did not share all of Exhibit 43.  I can't



www.escribers.net | 800-257-0885

1    recall specifically where he started, but it was at the line --

2    somewhere around the line of, "One guy, maintenance.  I'm still

3    trying to listen."  And then the last would have been, "The

4    photograph of this woman, Jean Osbual."

5    Q    And have you ever seen these exhibits -- Exhibit 43 before

6    today?

7    A    In its entirety --

8    Q    Yes.

9    A    -- no.  No.

10    Q    And I'm sorry, did you ask Mr. Moran for his phone or you

11    just asked him to forward you something?

12    A    I just asked him to take screenshots of what he shared

13    with Richard Ortiz.  So I didn't hold onto his phone.

14    Q    And in the -- did you get the page which has Travis

15    Pratt's picture on it, 43-03?

16    A    Yes.  So on -- on page 3?

17    Q    Um-hum.

18    A    Yes.

19    Q    And where it says, "He said he made $130,000 last year,"

20    did you ask Mr. Moran where it was that Mr. Pratt had said

21    that?

22    A    I had not.

23    Q    Okay.  And why not?

24    A    Because, again, what I was focusing on is what these --

25    you know, how these Workday profile photos were shared, and not



1    the content of the -- the posting.  So the $130,000 a year.

2    Q   So you didn't care where Mister -- that Mr. Pratt had

3    actually said publicly that he had made that much money?

4    A   No.

5    Q   Or you didn't care whether he had or hadn't said it

6    publicly?

7    A   No.

8    Q   And when you received the document from Mr. Hedges, did it

9    have something about a Fair Future at Tesla on it?

10    A   The document, can you tell me which one you're

11    referencing?

12    Q   Well, no.  I'm not asking you to look at the document.

13    I'm asking you, when you received information from Mr. Hedges,

14    do you remember reference to a Fair Future at Tesla?

15    A   So Exhibit 28, I recall ending at, "Wow, this is on

16    Facebook"?

17    Q   Okay.  So even though I asked you not to look at the

18    document --

19    A   Yes.

20    Q   -- you just did.

21    MS. FEINBERG:  So let the record reflect that to be the

22    case.

23    Q   BY MS. FEINBERG:  Okay.  I'm not asking you whether it's

24    on the document.  I'm asking you whether you remember any

25    reference in the conversation with Mr. Hedges to a Fair Future



1    at Tesla?

2    A    Okay.  I understand your question.  And no, there was no

3    reference to a Fair Future at Tesla in our conversation.

4    Q    And how about when you spoke to Mr. Pratt?

5    A    When I spoke to Mr. Pratt on the phone, I do recall him

6    bringing up that it was on a Fair Future or a Fair Future page

7    or something like that.

8    Q    And did you ever go over the Fair Future page?

9    A    I did not.

10   Q    Why not?

11   A    Because, again, I had the screenshot of what had occurred.

12   I didn't need to go to the page.

13   Q    Well, how did you know the screenshot was valid or had

14   been posted?  If all you had was a screenshot, how do you know

15   it wasn't just made up and sent to someone?

16   A    Because later --

17   Q    Didn't you feel the -- hmm?

18   A    Because later Richard said, "Yeah, I posted that."

19   Q    Yeah.  Okay.  But when you began your investigation,

20   didn't you feel the need to look to see -- okay.  Because

21   Richard told you so, you didn't feel you needed to go further;

22   is that right?

23   A    Yeah.  If Richard has his name on here and he said, "Yes,

24   I posted that" --

25   Q    Okay.  But when Mr. Moran told you that he had taken the


www.escribers.net | 800-257-0885

1     photos, you felt the need for him to verify it?

2     A     Yeah.

3     Q     Okay.  And have you -- do you work in the Tesla -- did you

4     work in the Tesla building?

5     A     Oh, yes.

6     Q     And when you ever came to work, did you ever see people

7     out there flyering?

8     A     Did I ever see people doing that?  No.

9     Q     Were you aware it was happening?

10     A     I was aware it was happening.

11     Q     And how did you become aware of it?

12     A     I think people would talk about, hey, you know, they're

13     handing out flyers.

14     Q     Okay.  And did you ever see any of them?

15     A     Any of the flyers?

16     Q     Yes.

17     A     Not that I can recall, no.

18          MS. FEINBERG:  One moment please.  I'm almost done.

19     Q     BY MS. FEINBERG:  Can you look at Joint -- General Counsel

20     Exhibit 70?

21     A     Yes.

22     Q     Okay.  And do you have that before you?

23     A     Yep, it's in front of me.

24     Q     Okay.  And who is Tori Tanaka?

25     A     As I explained before, Tori was one of the HR Partners at


www.escribers.net | 800-257-0885

1    the factory.

2    Q    Okay.  And she sent this directly to you?

3    A    She did.

4    Q    Okay.  So this isn't a group email, she sent it directly

5    to you, am I correct in --

6    A    Yes.

7    Q    Okay.  And do you know why she sent it directly to you?

8    A    I do not.

9    Q    And did you ever talk to her about it?

10    A    Not that I can recall.

11    Q    Did you receive other -- do you recall receiving other

12    communications regarding the Union?

13    A    No, not that I can recall.

14    Q    And did you ever see a response by the Company to General

15    Counsel Exhibit 70?

16    A    No, I don't recall a response to this, Exhibit 70.

17    Q    And is Tori Tanaka still employed by Tesla, to your

18    knowledge?

19        MR. ROSS:  I'm sorry.  I couldn't hear the question.

20    Q    BY MS. FEINBERG:  Is Tori Tanaka still employed at Tesla,

21    to your knowledge?

22    A    To my knowledge, no, she is not.

23    Q    Okay.  And who is the -- well, who replaced her?

24    A    Oh, I -- I don't know.

25    Q    Oh.  When did she leave, if you know?



www.escribers.net | 800-257-0885

1    A    I -- I -- yeah, I -- I don't know off the top of my head.

2    Q    Before you left?

3    A    She did leave before I left.  So I can't recall who took

4    over her position.

5    Q    Okay.  And she's one of a number of HR managers?

6    A    She's an HR Partner.

7    Q    An HR Partner?

8    A    Yeah.  She wasn't management group.  Yeah, she's one of

9    several.

10   Q    And who were the others at the time?

11   A    Oh, goodness.  I can try -- try and give you as many as I

12   know.

13   Q    But what is your working relationship with Tori Tanaka, is

14   what I'm trying to understand?  Was she the HR manager that you

15   related to?  Or you related to all the different HR managers?

16   A    Yeah.  So for my role, I worked with all of the HR

17   Partners in the Company.

18   Q    And did you attend any meetings where General Counsel

19   Exhibit 70 was discussed?

20   A    No.

21       MS. FEINBERG:  One moment.  I'm almost done, or I may be

22   done.

23       JUDGE TRACY:  Are you going to mark these?

24       MS. FEINBERG:  Yeah.  As one.  I mean, as the next in

25   order.  As one document the next in order.



www.escribers.net | 800-257-0885

1     JUDGE TRACY:  Well, so I need you to mark them.

2     MS. FEINBERG:  Oh, I'm sorry.  That's what you meant.  Hold

3     on a minute.  There was a discussion, but --

4     Okay.  You're marking your own?  That's -- feel free

5     MR. ROSS:  Okay.  What number are we marking it?

6     MS. FEINBERG:  Are we on Charging Party 2 or 3?

7     JUDGE TRACY:  3.

8     MS. FEINBERG:  3.

9     **(Charging Party Exhibit Number 3 Marked for Identification)**

10    Q    BY MS. FEINBERG:  Okay.  You indicated earlier that you

11    use LinkedIn?

12    A    I indicated earlier that I'm a LinkedIn.

13    Q    Well, I assume if you're on LinkedIn, you know how to use

14    it?

15    A    I -- yes.

16    Q    Okay.  Well, let me ask you this:  Do you recognize this

17    person -- is this a photo of Shaun Ives?

18    A    Yes.

19    Q    Okay.  And is this the same photo of Shaun Ives that

20    exists on the Tesla page?

21    A    It's the same photo that appears on Exhibit 28, yes.

22    Q    Okay.  So -- and that picture -- does Tesla take the

23    pictures of the person when they work there?  Do you come in

24    and you have your picture taken?

25    A    Yes, I believe so.



1    Q    Okay.  But an individual's allowed to use the photo

2    outside of the Tesla for their own purposes?  Like he can take

3    a photo of his card and publish the photo?

4    A    Yeah, if it's his own photo.

5    Q    Okay.  So there's no proprietary interest in the photo

6    itself taken by -- even though Tesla took it?

7    A    Correct.

8    Q    And as far as you know, is this the position that Mr. Ives

9    held at Tesla, Equipment Engineering Technician?

10   A    I -- yeah, I can't recall what his specific position was.

11   Q    And as far as you know, there's nothing against the Tesla

12   policy for him to post the information that's listed in

13   Charging Party Exhibit 3?

14   A    So his job experience and everything like -- else that's

15   included here?

16   Q    Yes.

17   A    From my understanding, no, there's no policy against him

18   doing that.

19        MS. FEINBERG:  Okay.  I'd like to move Charging Party

20   Exhibit 3 into evidence.

21        JUDGE TRACY:  Any objections?

22        MR. ROSS:  Yeah.  Relevance.  It wasn't part of the

23   investigation.  It has nothing to do with the case.

24        JUDGE TRACY:  What's the relevance?

25        MS. FEINBERG:  Okay.  Well, Your Honor, they're saying that



1  there's some kind of sensitive use to these photos, but -- and

2  the fact that they put this photo out in the public.  But

3  Mr. Ives himself put this exact same photo and his job and the

4  fact that he works at Tesla into the public eye.  So what is

5  the proprietary or sensitive use if it's already out there?

6  And he himself had no concern about putting his name or his

7  title --

8      JUDGE TRACY:  Well, I understand that --

9      MR. RODRIGUEZ RITCHIE:  I --

10      JUDGE TRACY:  -- yeah.

11      MS. FEINBERG:  So anyhow, that's the relevancy.

12      JUDGE TRACY:  Go ahead.

13      MR. RODRIGUEZ RITCHIE:  So I would certainly say that it is

14  relevant.  The credibility and substance of the investigation

15  is certainly relevant to this case, and the testimony --

16      MS. FEINBERG:  That's --

17      MR. RODRIGUEZ RITCHIE:  -- of the witness here.  So even

18  just for that purpose it would be relevant.

19      JUDGE TRACY:  You know, at this point, I'm going to sustain

20  the objection and reject Charging Party's --

21      MS. FEINBERG:  All right.

22      JUDGE TRACY:  -- Exhibit 3.

23      MS. FEINBERG:  Is it for relevancy or because --

24      JUDGE TRACY:  We can --

25      MS. FEINBERG:  -- of the way I'm coming in --



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  Can I --

2    MS. FEINBERG:  Oh, I'm sorry.

3    JUDGE TRACY:  -- finish?

4    MS. FEINBERG:  Oh, I'm sorry.  So sorry.  So sorry.

5    JUDGE TRACY:  Let me finish.

6    MS. FEINBERG:  Um-hum.

7    JUDGE TRACY:  So at this point, it's going to go in the

8    rejected exhibits pile.  And the reason for that is that I

9    heard a lot of testimony -- again, all of this goes to the

10   credibility of the witness, the Respondent's case, the

11   Respondent's arguments about why they terminated this

12   individual.  And recall, we had this conversation also about

13   what standard is going to be used.  Okay?  That's one thing out

14   there.  But the other thing is this never came up during the

15   investigation, this Charging Party's Exhibit 3, or Union 3.

16   The witness has testified that he never even looked at this.

17   So I don't know how it's relevant to going back to the decision

18   to terminate this individual.

19      Sure, you can make whatever argument you want to make about

20   the truthfulness of their reasoning.  Again, we're looking at

21   different standards here, as I had talked to you all about last

22   time, which is what are you going to be arguing, what standard,

23   what law.  So that's why I'm going to say right now that it's

24   going to go into the rejected exhibits pile, 3, Union

25   Exhibit 3.  And you can certainly in the briefs argue that I

escribers

www.escribers.net | 800-257-0885

1    need to reconsider my decision on that.  But at this point,

2    it's starting to get far off from the focus of this matter of

3    why the individual was terminated.

4        MR. RODRIGUEZ RITCHIE:  Well, I would just like to note for

5    the record that though I understand your position, the actual

6    picture used in the document is a picture that was at issue

7    during the course of the investigation.  So at a minimum, the

8    picture itself of the person's profile on the first page of the

9    document should be admitted.

10       JUDGE TRACY:  So again, it's going to go in the rejected

11   exhibits pile.

12   **(Charging Party Exhibit Number 3 Rejected)**

13       MS. FEINBERG:  Okay.

14       JUDGE TRACY:  All right?

15       MS. FEINBERG:  All right.  I'll address it later,

16   obviously.

17       Okay.  I have nothing more at this time.

18       JUDGE TRACY:  Okay.  All right.  It's 3:15.

19       MR. ROSS:  Excuse me?

20       JUDGE TRACY:  I said it is 3:15.

21       How long do you need to prepare?  Because I'm assuming that

22   you want to go ahead and -- you had intend -- you had also

23   issued a subpoena to this witness.

24       MR. ROSS:  Right.

25       JUDGE TRACY:  And so you kind of do your direct at this



 1    point as well with this witness --

 2        MR. ROSS:  That's my plan.

 3        JUDGE TRACY:  -- correct?  So you're not sure if we'll even

 4    finish today with him considering --

 5        MR. ROSS:  No.

 6        JUDGE TRACY:  -- I don't know how long you're planning --

 7        MR. ROSS:  Yeah.

 8        JUDGE TRACY:  -- to be.

 9        MR. ROSS:  Well --

10        JUDGE TRACY:  So how many minutes would you like right now

11    to prepare?  Fifteen minutes?

12        MR. ROSS:  I'm ready to proceed right now, Judge.

13        JUDGE TRACY:  Oh, right now?

14        MR. ROSS:  Yeah.

15        JUDGE TRACY:  Okay.

16        THE WITNESS:  Sorry.  Can --

17        JUDGE TRACY:  Oh, do you need a break?

18        THE WITNESS:  -- I take a break, because I didn't last

19    time?  Because it was super quick --

20        JUDGE TRACY:  Okay.

21        THE WITNESS:  -- I didn't use the rest room.

22        JUDGE TRACY:  Okay.  Sure.  Sure.

23        THE WITNESS:  So --

24        JUDGE TRACY:  And I had said that we would get a longer

25    break.


www.escribers.net | 800-257-0885

1       MR. ROSS:  And my colleague wants to talk to me anyway, so.

2       JUDGE TRACY:  Okay.  So let's take a break until 3:30.

3       MR. RODRIGUEZ RITCHIE:  Can I just -- before we go off --

4       JUDGE TRACY:  Yes.

5       MR. RODRIGUEZ RITCHIE:  I received the two copies back of

6   the affidavit --

7       JUDGE TRACY:  Okay.  Thank you.

8       MR. RODRIGUEZ RITCHIE:  -- from the Charging Party.

9       JUDGE TRACY:  All right.  So we'll --

10      MR. ROSS:  Thank God for that.

11      JUDGE TRACY:  -- go off the record.

12  (Off the record at 3:16 p.m.)

13      JUDGE TRACY:  Okay.  So before we end for the day and we

14  deal with the case in chief of the General Counsel and the

15  Charging Parties, I'd first like to address General Counsel's

16  exhibit -- which one was it with the redaction?

17      MR. RODRIGUEZ RITCHIE:  70.

18      JUDGE TRACY:  -- 70.  Previously, based on my notes, we --

19  I had admitted that document into evidence absent the redaction

20  of page 18.

21      So for the General Counsel, do you all have page 18

22  redacted now to give to the court reporter?

23      MR. RODRIGUEZ RITCHIE:  Yes.

24      JUDGE TRACY:  Okay.  Now --

25      MR. RODRIGUEZ RITCHIE:  And I provided copies for the



1    parties as well.

2        JUDGE TRACY:  Okay.  Now, Mr. Ross, you had also off the

3    record raised some concerns with regards to General Counsel's

4    70 inasmuch as the number of individuals who had signed the

5    document with regard to General Counsel's Exhibit 70; is that

6    correct?

7        MR. ROSS:  That's true, sir (sic), yeah.

8        JUDGE TRACY:  And so then the parties off the record would

9    agree -- they would stipulate that General Counsel's Exhibit 70

10   reflects --

11       How many signatures?

12       MR. GARBER:  367.  Sorry.

13       MR. RODRIGUEZ RITCHIE:  Yes, approximately 367 that were

14   redacted by counsel for the General Counsel.

15       JUDGE TRACY:  Okay.  So General Counsel's Exhibit 70

16   reflects approximately 3 -- how many?  6 -- of --

17       MR. RODRIGUEZ RITCHIE:  367.

18       JUDGE TRACY:  -- 367 signatures -- including Mr. Ortiz?

19       MR. RODRIGUEZ RITCHIE:  Correct.

20       JUDGE TRACY:  -- that were reflected in General Counsel

21   Exhibit 70.  Would everybody stipulate to that?

22       The General Counsel?

23       MS. FEINBERG:  Yes.

24       MR. RODRIGUEZ RITCHIE:  Yeah.

25       MS. FEINBERG:  Oh, we stipulated.  I mean, in light of the

escribers

www.escribers.net | 800-257-0885

1   fact that you've overruled the relevancy objection, yes, to the

2   number.

3       MR. ROSS:  Yes.

4       JUDGE TRACY:  Yes.  Okay.  Again, I'll just summarize the

5   off-the-record discussion.  There was an argument -- and also I

6   had previously indicated that the number was not relevant to me

7   about how many individuals signed General Counsel's Exhibit 70

8   that were all attached there.  However, Mr. Ross, if you could

9   just summarize for the record why it's important, the relevance

10  that you're making, for the number of individuals who signed

11  the document.

12      MR. ROSS:  Yes.  Your Honor, the number shows that

13  Mr. Ortiz was one among many who signed the document.  And it's

14  for the purpose of countering the anticipated arguments that

15  counsel for the General Counsel and Union will make that

16  somehow Mr. Gecewich is in receipt of this document, I've put

17  him on notice of Mr. Ortiz' Union or protected concerted

18  activity, it's -- he's one of so many that he gets lost in the

19  clutter of the document, and we're trying to establish that.

20      JUDGE TRACY:  Right.  And so based upon --

21      MS. FEINBERG:  Okay.

22      JUDGE TRACY:  If you could just make it brief.

23      MS. FEINBERG:  Well, I'm just saying that misstates the

24  document because his name appears as one of just a few people

25  who the document is emailed to, and his name appears on the



1    second page as part of the voluntary organizing committee.  So

2    you actually never even have to look at all the signatures.

3    The point is, the first and second page put you on notice that

4    Mr. Ortiz is one of the leaders of the -- this campaign.

5        JUDGE TRACY:  Right.  And so again, for the purposes of due

6    process in allowing the Respondent to raise and put into the

7    record, in their briefs, and argument about their defense, I'm

8    going to allow the number of who signed General Counsel's

9    Exhibit 70 into the record --

10       MR. RODRIGUEZ RITCHIE:  I just wanted --

11       JUDGE TRACY:  -- which was just stipulated.

12       MR. RODRIGUEZ RITCHIE:  -- to note --

13       JUDGE TRACY:  Yeah.

14       MR. RODRIGUEZ RITCHIE:  -- for the record that the counsel

15   for the General Counsel would also share the relevancy

16   objection, though we did personally count --

17       JUDGE TRACY:  Okay.

18       MR. RODRIGUEZ RITCHIE:  -- the number.

19       JUDGE TRACY:  All right.  Thank you.

20       Okay.  Now, we'll go to Mr. Rodriguez Ritchie.  Are you all

21   ready to rest your case in chief?

22       MR. RODRIGUEZ RITCHIE:  There's a couple of matters that we

23   wanted to mention on the record before doing that.  First, we'd

24   like to request that you take notice of the attorney that

25   appeared today to represent Mr. Gecewich was the same attorney

escribers

www.escribers.net | 800-257-0885

1    that appeared to represent Ms. Toledano.

2        JUDGE TRACY:  Okay.

3        MR. RODRIGUEZ RITCHIE:  We wanted to note for the record

4    that --

5        JUDGE TRACY:  And what's his name again?  I forgot.  I

6    don't have his --

7        MR. ROSS:  Adrian Sawyer.

8        JUDGE TRACY:  What's his name?

9        MR. ROSS:  Adrian Sawyer.

10        JUDGE TRACY:  Okay.  All right.

11        MR. RODRIGUEZ RITCHIE:  Of the law firm of Kerr &

12    Wagstaffe.

13        JUDGE TRACY:  Okay.

14        MR. RODRIGUEZ RITCHIE:  We also wanted to note for the

15    record, as we had previously done in off-the-record

16    discussions, that given Mr. Gecewich's testimony, we may at

17    some point move to request permission to amend the complaint to

18    add an allegation pertaining to his conversations with

19    individuals about confidentiality in investigations.

20        JUDGE TRACY:  Okay.

21        MR. RODRIGUEZ RITCHIE:  We'd also --

22        JUDGE TRACY:  And I would ask, as a courtesy to the

23    Respondent, that if, in fact, you intend to do that, that you

24    discuss that with them.  Okay?  And then just take a look at

25    the case law about making such amendments or requesting



1    motioning for them at this stage of the case.  So just take a

2    look at that so you're ready to argue why I should grant the

3    amendment.  Okay?  But also if you decide to do so, please let

4    them know before we go on the record.

5         What's next?

6         MR. RODRIGUEZ RITCHIE:  Yes.  With regards to the subpoenas

7    with -- from the General Counsel that have been entered into --

8    and received into evidence, and Her Honor's ruling, we'd like

9    to discuss again the request and Her Honor's ruling with

10   regards to electronically stored information, particularly as

11   it relates to Mr. Gecewich, his testimony, who testified that

12   the documents were maintained, and particularly as it relates

13   to General Counsel's Exhibit 62, that these documents were

14   maintained in live format, meaning that they get erased over

15   each other.

16        This is precisely the reason why counsel for the General

17   Counsel requested electronically stored information, so that

18   we'd be able to obtain that type of information prior to the

19   testimony.  Particularly as it to that document, we weren't --

20   there were no drafts or other versions of that particular

21   document produced.  And so we'd ask that you order that an

22   additional search be conducted for that.

23        And in addition to that, that the electronically stored

24   information with regards to General Counsel's Exhibit 62 be

25   produced.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  All right.  And so, yes, based upon the

2    testimony that I heard today as well, I would order the

3    Respondent to take a look for -- and search in particular for

4    General Counsel's Exhibit 62 for the electronically stored

5    versions of that -- this report, and turn that over to the

6    General Counsel ASAP.  And also to be -- to search for any

7    prior versions or any versions, frankly, of General Counsel's

8    Exhibit 62, and turn those over to the General Counsel as well

9    per the subpoena.

10    As I had -- and so that ruling in terms of metadata and the

11    native format is -- I'm not going to open it up to the entire

12    record here, entire set of documents, but in particular it

13    would be General Counsel's Exhibit 62.  But my ruling stands

14    for all the remaining documents.  As I said, if there were

15    particular documents or there were some testimony that

16    suggested that there were other versions or that the versions

17    had been altered, then I would reconsider it.  So we've heard

18    something about that for General Counsel's Exhibit 62, and

19    that's why I'm ordering that those need -- that search needs to

20    be conducted, and turned over of those documents.

21    And then next?

22    MR. RODRIGUEZ RITCHIE:  Lastly, with regards to request

23    number 7 and 8 of the General Counsel's subpoena duces tecum,

24    those were requests involving communications referencing

25    several terms, including the Union and UAW.  In any event, we



1    have already discussed this on a prior occasion on the record.

2    We'd like to renew the request, particularly as it relates to

3    Ms. Toledano and her documents, particularly in light of

4    General Counsel's Exhibit 81, which was received into evidence.

5    That indicates that Ms. Toledano participated in the

6    investigation into the conduct of the two discriminatees at

7    issue here.

8      JUDGE TRACY:  Okay.  And as I understand, the Charging

9    Party also has a subpoena request that mirrors the General

10    Counsel's 7 and 8.

11      MS. FEINBERG:  Right.

12      JUDGE TRACY:  Which number was that?

13      MS. FEINBERG:  3 and 4, because --

14      JUDGE TRACY:  3 and --

15      MS. FEINBERG:  They may not have originally been identical,

16    but then we agreed to make our mirror each other.

17      JUDGE TRACY:  Okay.  And so again, I would agree with the

18    General Counsel that at this point, now, it appears, based upon

19    General Counsel's Exhibit 81, that Ms. Toledano may have been

20    involved in the discipline of Mr. Ortiz and Mr. Moran.  And so

21    I'm ordering the Respondent to search again for any documents

22    concerning Ms. Toledano with her involvement or lack thereof in

23    the discipline of the two individuals.  Okay?

24      MR. ROSS:  Okay.

25      JUDGE TRACY:  And again the documents need to be turned



1    over ASAP.

2         Anything else?

3         MR. RODRIGUEZ RITCHIE:  That's all, Your Honor.

4         JUDGE TRACY:  Okay.  And so at this point, do you rest your

5    case in chief absent these other documents, the motion --

6    potential motion?

7         MR. RODRIGUEZ RITCHIE:  Yes, Your Honor.

8         JUDGE TRACY:  Okay.  And then for -- Ms. Feinberg.

9         MS. FEINBERG:  So there was one item that we're trying to

10   resolve, you know, collectively which relates to the --

11        Is he -- okay.

12        JUDGE TRACY:  No.  Go ahead.

13        MS. FEINBERG:  Okay.  Fine.  Which relates to the testimony

14   that was given by Mr. Pratt and Mr. Ives in Sacramento before

15   this -- the budget committee.  And we would like to present the

16   actual testimony there.  So I think, as I understood it, we are

17   to transcribe it.  We are going to share a copy of the link,

18   because it's a video, which is a document -- I mean, it's a

19   video created by the State of California.  So we're going to

20   share that with counsel for Tesla and the General Counsel.

21   Hopefully we can reach some agreement about what is the best

22   format to put it into the record.

23        JUDGE TRACY:  Okay.  And so absent that, you are resting

24   your case in chief as well?

25        MS. FEINBERG:  Yes.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  Okay.  And so with regard to that issue --

2    again, I wish it was brought up previously, but it's fine --

3    what we had discussed off the record was that you need to share

4    the link right now --

5    MS. FEINBERG:  Um-hum.  Yeah.

6    JUDGE TRACY:  -- with Respondent --

7    MS. FEINBERG:  How to do it.

8    JUDGE TRACY:  -- and the General Counsel.  And if you

9    could, please, in that link, direct them to which portions you

10   feel are relevant to this matter and which portions you are --

11   you intend to transcribe, because it would be beneficial if the

12   parties could reach a stipulation on it.  That would be

13   obviously the best-case scenario because in -- I know that

14   there is a way -- and I guess I would have you all talk about

15   it off the record about there is a way for these recordings,

16   the video recordings, to be put in the record along with the

17   transcripts that go with them.  And the transcript -- I don't

18   know how lengthy this is.  The transcript doesn't need to be

19   the entire proceeding.  It could just be the relevant portion

20   that -- and stipulation.  You could direct that the focus is

21   on, you know, minutes two through whatever you have.  So if you

22   all could just work on that.  First -- the first step is

23   sharing with them the link.

24   MR. ROSS:  If I may, Your Honor, I'm wondering if there's

25   already an official transcript of the hearing.



1    JUDGE TRACY:  There could be.

2    MR. ROSS:  Because if there is, it would save everybody a

3    lot of trouble.

4    MS. FEINBERG:  I don't --

5    JUDGE TRACY:  Sure.

6    MS. FEINBERG:  I don't know of an official transcript.  I

7    only know of the official recording.

8    JUDGE TRACY:  Okay.

9    MS. FEINBERG:  But we could inquire of the State of

10   California if there is.  I don't know --

11   JUDGE TRACY:  Okay.

12   MS. FEINBERG:  -- that there is.

13   JUDGE TRACY:  Okay.  Yeah.

14   MR. RODRIGUEZ RITCHIE:  I was just --

15   JUDGE TRACY:  Go ahead.

16   MR. RODRIGUEZ RITCHIE:  -- going to say, to my knowledge, I

17   don't know that there is an official transcript.  It is

18   maintained as a public record by the State of California, the

19   video.

20   MR. ROSS:  Have you seen the video?

21   MR. RODRIGUEZ RITCHIE:  Yes.

22   MR. ROSS:  Okay.

23   JUDGE TRACY:  Okay.  So just, please, share this, and

24   then -- and let them know.  I mean, we've -- we're kind of

25   pressing time here to get this stuff in the record.



1    MS. FEINBERG:  Okay.

2    JUDGE TRACY:  And I'm sorry --

3    MS. FEINBERG:  Now, of course, they can't --

4    JUDGE TRACY:  -- we sort of --

5    MS. FEINBERG:  -- put anything --

6    JUDGE TRACY:  -- broke off without kind of finishing up our

7    witness here.  But for the General Counsel, you've completed

8    your 611(c) examination of Mr. Gecewich, correct?

9    MR. RODRIGUEZ RITCHIE:  Correct.  But I think we had just a

10   little tiny bit of redirect, but I'm sure the topics will come

11   up --

12   JUDGE TRACY:  Um-hum.

13   MR. RODRIGUEZ RITCHIE:  -- when he comes back.

14   JUDGE TRACY:  And Ms. Feinberg, you had completed your

15   611(c) examination of Mr. Gecewich, correct.

16   MS. FEINBERG:  Yes, subject --

17   JUDGE TRACY:  Okay.

18   MS. FEINBERG:  -- of course, to cross when he called on

19   direct.  But yes, for this purpose.

20   JUDGE TRACY:  Right.  And so essentially where the parties

21   have left off, because of the lengthy amount of his testimony,

22   he's going to come back again on Thursday --

23   MR. ROSS:  Correct.

24   JUDGE TRACY:  -- and at that point, under subpoena, he's

25   going to be testifying.  And so you'll be calling him on your



1    case in chief, which you had intended to do anyway, correct?

2        MR. ROSS:  Yes.

3        JUDGE TRACY:  Okay.  And so we'll resume again at 9 a.m.

4    tomorrow with your next witness in your case in chief.  And

5    we'll just go a little bit longer each day to see -- as much as

6    we can to get this case wrapped up.  Okay?

7        Anything else?

8        MR. MORRIS:  Your Honor, can I ask a couple of clarifying

9    questions about your order?

10        JUDGE TRACY:  Sure.

11        MR. MORRIS:  With respect to your order on the search for

12    Gaby Toledano's emails, if we understand your order, you want

13    us to conduct a search of emails concerning Gaby Toledano's

14    alleged involvement in the discipline for Jose Moran and the

15    termination for Richard Ortiz?

16        JUDGE TRACY:  Yes.

17        MR. MORRIS:  And I'm assuming we can use the search terms

18    Richard Ortiz and Jose Moran when we conduct those searches?

19        JUDGE TRACY:  Yes, although they might not be mentioned,

20    those individuals might not be mentioned, because if -- I'm

21    looking at General Counsel's Exhibit 81.  You know, sure, you

22    might find Jose Moran, but then you see Gaby.  And so I guess

23    my suggestion to you is the events that took place here with

24    regard to the -- when did -- essentially at the beginning of

25    September, right?



1    When did Mr. Hedges began -- or when did this all start

2    where they were starting to investigate this?

3        MR. RODRIGUEZ RITCHIE:  In mid-September.

4        JUDGE TRACY:  Mid-September.  So I'd say start September 1,

5    2017 in searching.  And I would also say, though, as we learned

6    before, that there have been implications of these individuals

7    and they actually haven't been named.  And so I think you're

8    going to have to do a deeper search.  But if you're limiting

9    the time period to September and October of 2017, that's a two-

10   month span of time to be able to look through.  And in

11   particular, did Mr. Gecewich communicate with her?  He might

12   not have used these individuals' names.  But if it's true or

13   not true that he was letting her know, there is some indication

14   that there may have been as such.

15       Yes?

16       MR. RODRIGUEZ RITCHIE:  I just want to note for the record

17   the requests were not limited to emails.  They were for

18   internal Company communications.  And so our request would not

19   be that it be limited to just emails to the --

20       JUDGE TRACY:  Okay.

21       MR. RODRIGUEZ RITCHIE:  -- extent that other platforms are

22   being used to message, to communicate with each other.  So

23   just, for example, Skype, which is used at Tesla, those should

24   be searched as well.  The requests also weren't limited -- the

25   requests in 7 and 8 had different time frames.  So we'd just

escribers
www.escribers.net | 800-257-0885

1    note for the record that that time frame was January 1st, 2016,

2    and it was a request in addition to those things to request on

3    certain terms that were included in 7 and 8.

4         JUDGE TRACY:  Right.  But at this point, I would say this:

5    You know, certainly you can ask for whatever you want, but I'm

6    ordering them to look again.  And based upon this document and

7    the real critical time period, it's September and October of

8    2017.  You can disagree with me, but to really kind of get this

9    thing going -- and it's not just going to be emails.  I mean,

10   all I've received are emails basically or text messages.  But

11   if there's some other platforms in which the managers would

12   communicate, I don't know, but you need to take a look at all

13   of that.  Okay?

14        MR. MORRIS:  And Your Honor, if we're not permitted just to

15   use the search terms Richard Ortiz and Jose Moran, I would

16   suspect over that two-month period, then that's going to be

17   tens of thousands of emails.  Is it possible to limit it to her

18   correspondence with the decision-makers?

19        JUDGE TRACY:  You know, I'm not going to tell you how to do

20   the search.  Do the search how you need to do the search, but

21   -- I don't imagine it being that difficult, but you know, you

22   -- I'm not going to limit that.

23        And what was another -- did you have any other questions

24   about --

25        MR. MORRIS:  No.



www.escribers.net | 800-257-0885

```
 1          JUDGE TRACY:  No.  Okay.

 2          All right.  Anything else?

 3          MR. RODRIGUEZ RITCHIE:  No, Your Honor.

 4          JUDGE TRACY:  No.  Okay.

 5          And then you guys are still working on some other

 6     stipulation that has something to do with something later that

 7     will come in?

 8          MR. GARBER:  Um-hum.

 9          JUDGE TRACY:  Okay.

10          MR. GARBER:  Correct.

11          JUDGE TRACY:  All right.  So --

12          MS. FEINBERG:  Um-hum.  I haven't looked at that yet.

13          JUDGE TRACY:  All right.  Great.  So I'll see you guys --

14     see, we made it -- we kept pushing ourselves to 4:45.  I'll saw

15     you all tomorrow at 9 a.m.

16          MR. ROSS:  Thanks, Judge.

17          JUDGE TRACY:  Okay.  Let's go off the record.

18     **(Whereupon, the hearing in the above-entitled matter was**

19     **recessed at 4:41 p.m. until Wednesday, October 10, 2018 at 9:00**

20     **a.m.)**

21

22

23

24

25
```

escribers
www.escribers.net | 800-257-0885

1      <u>C E R T I F I C A T I O N</u>

2      This is to certify that the attached proceedings before the

3      National Labor Relations Board (NLRB), Region 32, Case Numbers

4      32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-

5      200530, 32-CA-208614, 32-CA-210879, 32-CA-220777 Tesla, Inc.,

6      and Michael Sanchez, and Jonathan Galescu, and Richard Ortiz

7      and International Union, United Automobile, Aerospace and

8      Agricultural Workers of America, AFL-CIO at National Labor

9      Relations Board Region 32, 1301 Clay Street, Suite 300N,

10     Oakland, CA 94612-5224, on Tuesday, October 9, 2018, 9:11 a.m.

11     was held according to the record, and that this is the

12     original, complete, and true and accurate transcript that has

13     been compared to the reporting or recording, accomplished at

14     the hearing, that the exhibit files have been checked for

15     completeness and no exhibits received in evidence or in the

16     rejected exhibit files are missing.

17

18                        _Deborah Gonzalez_

19

20                        DEBORAH GONZALEZ

21                        Official Reporter

22

23

24

25

22-60493.2000



OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 32

In the Matter of:

| | |
|---|---|
| Tesla, Inc., | Case Nos.   32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| Michael Sanchez, an individual, | 32-CA-200530 |
| | 32-CA-208614 |
| and | 32-CA-210879 |
| | 32-CA-220777 |
| Jonathan Galescu, an individual, | |
| and | |
| Richard Ortiz, an individual, | |
| and | |
| International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO, | |

Charging Party,

_____

_____

Place: Oakland, California

Dates: October 10, 2018

Pages: 1979 through 2168

Volume: 11

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



www.escribers.net | 800-257-0885

## UNITED STATES OF AMERICA

### BEFORE THE NATIONAL LABOR RELATIONS BOARD

### REGION 32

| | |
|---|---|
| In the Matter of: | |
| TESLA, INC., | Case Nos.  32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| INTERNATIONAL UNION, UNITED | 32-CA-200530 |
| AUTOMOBILE, AEROSPACE AND | 32-CA-208614 |
| AGRICULTURAL IMPLEMENT WORKERS | 32-CA-210879 |
| OF AMERICA, AFL-CIO, | 32-CA-220777 |
| and | |
| MICHAEL SANCHEZ, AN INDIVIDUAL, | |
| and | |
| JONATHAN GALESCU, AN INDIVIDUAL, | |
| and | |
| RICHARD ORTIZ, AN INDIVIDUAL. | |

The above-entitled matter came on for hearing, pursuant to notice, before **AMITA BAMAN TRACY**, Administrative Law Judge, at the National Labor Relations Board Region 32, 1301 Clay Street, Suite 300N, Oakland, CA 94612-5224, on **Wednesday, October 10, 2018, 9:06 a.m.**

22-60493.2002

1              <u>A P P E A R A N C E S</u>

2     **On behalf of the General Counsel:**

3             **EDRIS W.I. RODRIGUEZ RITCHIE, ESQ.**
              **NOAH J. GARBER, ESQ.**
4             National Labor Relations Board
              1301 Clay Street, Suite 300N
5             Oakland, CA 94612-5224
              Tel. 510-671-3021
6
      **On behalf of the Respondent:**
7
              **MARK S. ROSS, ESQ.**
8             **KEAHN N. MORRIS, ESQ.**
              SHEPPARD MULLIN RICHTER & HAMPTON LLP
9             Four Embarcadero Center
              Seventeenth Floor
10            San Francisco, CA 94111-4109
              Tel. 415-434-9100
11            Fax. 415-434-3947

12    **On behalf of the Charging Parties:**

13            **MARGO A. FEINBERG, ESQ.**
              **DANIEL E. CURRY, ESQ.**
14            **JULIE S. ALARCON, ESQ.**
              SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
15            6300 Wilshire Boulevard, Suite 2000
              Los Angeles, CA 90048
16            Tel. 323-655-4700

17

18

19

20

21

22

23

24

25



1

<u>I N D E X</u>

2

3 | **WITNESS** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** | **VOIR DIRE** |
|---|---|---|---|---|---|
| 4 Jonathan Chang | 1983 | 2045<br>2047 | | | 2037 |
| 5 ShTawney McIntosh | 2063 | 2067 | | | |
| 6 Annalisa Heisen | 2071 | 2087<br>2090 | | | 2083 |
| 8 Homer Jerome Hunt | 2096 | 2105<br>2107 | | | |
| 9 Arnold Camat | 2114 | 2119<br>2122 | | | |
| 11 Armando Rodriguez | 2132 | 2145<br>2155 | | | |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

escribers
www.escribers.net | 800-257-0885

1

**E X H I B I T S**

2

3    **EXHIBIT**                                    **IDENTIFIED**    **IN EVIDENCE**

4    **Respondent:**

5        R-37                                          2007              2012

6        R-38                                          2014              2014

7        R-39                                          2023              2023

8        R-40                                          2023              2023

9        R-42                                          2043              2043

10       R-43                                          2084              2084

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

escribers
www.escribers.net | 800-257-0885

1      <u>P R O C E E D I N G S</u>

2      JUDGE TRACY:  Okay.  If you could stand up, please?

3      MR. CHANG:  Sure.

4      JUDGE TRACY:  Go ahead and raise your right hand.

5      Whereupon,

6                       **JONATHAN CHANG**

7      having been duly sworn, was called as a witness herein and was

8      examined and testified as follows:

9      JUDGE TRACY:  Okay.  Go ahead, have a seat, and state your

10     name for the record.

11     THE WITNESS:  My name is Jonathan Chang.

12     JUDGE TRACY:  Okay.  And so let me give you just a few

13     quick instructions.  This microphone does not amplify your

14     voice.  It's just for the recording of the hearing.  So you

15     don't need to lean into it.  Just relax.  But I do need you to

16     speak up when you're testifying so everybody in the room can

17     hear you so we can minimize the number of times you need to

18     repeat your testimony.

19     THE WITNESS:  You bet.

20     JUDGE TRACY:  If there's an objection, just wait for me to

21     rule on it whether you should answer it or not.  And yeah,

22     that's it.  Go ahead, Mr. Ross.

23     MR. ROSS:  Thank you, Judge.

24                     **DIRECT EXAMINATION**

25     Q    BY MR. ROSS:  Good morning, Jonathan.

22-60493.2006



1   A   Good morning.

2   Q   You work for Tesla?

3   A   I do.

4   Q   And what's your position at Tesla?

5   A   I'm the Vice President of Legal.

6   Q   Does that make you the general counsel of Tesla?

7   A   No.

8   Q   Who is that?

9   A   That's Todd Maron.  He's my boss.

10  Q   Okay.  You are a lawyer, though, right?

11  A   I am, yes.

12  Q   Okay.  And you're licensed to practice here in California?

13  A   Yes.

14  Q   And how long have you been a member of the California Bar?

15  A   Since -- since 2006.  So 12 years.

16  Q   Okay.  And --

17  A   Almost 12 years.

18  Q   And could you describe for us briefly your duties as the

19  Vice President of Legal at Tesla, please?

20  A   It spans in various areas.  I mean, the primary one is

21  legal advice, and it spans a whole bunch of legal disciplines

22  really.  Sometimes related to employment, mainly focuses on

23  sales and distribution, marketing.  Just really host of issues,

24  given my leadership position within the legal department.  It

25  also -- I think more than just the legal department.  It also



1    spans across the business and within the operations.  We like

2    to think of the legal department -- it's an in-house legal

3    department, but it's not specifically just for legal; it's also

4    highly integrated within the business itself.  So I'm often

5    advising and strategizing with the business of Tesla, its

6    executives and leadership all on how to set up its operations

7    and things like that, all the way down to, you know, things on

8    the line that could need improvement.  Right?  And -- and not

9    just from a legal basis, just from a common sense business

10    perspective.

11    Q    Okay.  So then you're like a businessman with a legal

12    degree?

13    A    Yeah.

14    Q    Okay.

15    A    Which is kind of my draw.  I think the draw that I had to

16    go in house is that it wouldn't just be doing what you do.

17    Q    You don't want to do what I do --

18    A    No.

19    Q    -- believe me.  And how long have you been with Tesla?

20    A    With Tesla, seven-and-a-half years.  Since April of 2011.

21    Q    Okay.  And tell me, before you joined Tesla, what did you

22    do for a living?

23    A    I was a lawyer.  Well, I was many things.  How far back do

24    you want me to go?

25    Q    Well, what did you do after college?



1    A    After college.  So I graduated from Cal, up the street, in

2    1999 as an engineer, a mechanical engineer.  I worked as an

3    engineer for several years in the harvest space.  I started a

4    company, a karaoke company -- device company.  It's not --

5    not -- I wasn't a good singer, so I couldn't perform or

6    anything.  But it was a tech company.  I worked at a hedge fund

7    for -- down in L.A. before going to law school.

8        I went to law school in Los Angeles at USC.  I got my law

9    degree, my MBA as well.  Came out and I work on the a law firm,

10   Latham & Watkins for three-and-a-half to four years.  I think

11   three years, nine months.  Something like that.  And then went

12   out to be general counsel, director of corporate development at

13   a company called Lithium Technologies, also up the street in

14   Emeryville.

15   Q    And then Tesla?

16   A    And then Tesla.

17   Q    Okay.  And tell us, what is Tesla?

18   A    It's everything.  Wow.  It's so much.  They -- Tesla is

19   the company I work for.  I think it's an amazing brand.  And

20   what -- what drew me first to it was really the vehicles that

21   we make.  And at the time, in 2011, it was just the Roadster.

22   Tesla to me was a client first.  When I started at Latham &

23   Watkins, they were one of my first clients just as a junior

24   associate, and they were just a start-up at the time and we

25   were doing their private fund-raisings, their venture rounds,



1    and things like that.

2    Q    Okay.

3    A    But it's grown to be so much more.  Like since -- you

4    know, the vehicles -- what attracted me to the vehicles was

5    cars generally, but also all the technology involved in it.

6    The high performance aspects of it, the range aspects of it,

7    the electric vehicle aspects of it.  That's what Tesla's

8    primarily known for is being a developer, manufacturer of

9    electric vehicles.  Over the years at Tesla, it's grown quite a

10   bit.  Our mission has changed from accelerating the world's --

11   the advent of sustainable transport to accelerating the advent

12   of sustainable energy.  And so really I think it's fulfilling,

13   a much broader vision, a larger vision of how we think the

14   world should be with respect to sustainable energy.  And it --

15   and it means more than just vehicles now.  Vehicles is kind of

16   what we're known for.  I think it's what consumers look to and

17   they find interesting.  But the other part of the business is

18   our energy side of the business, which is energy storage,

19   solar, charging.  I mean, there's -- there's so much

20   involved --

21   Q    Let me --

22   A    -- within Tesla itself.

23   Q    Witnesses have testified it's -- I don't want to say it's

24   just a car company, but it's primarily a car company.  Do you

25   agree with that?

22-60493.2010



1       MR. RODRIGUEZ RITCHIE:  Objection.  Leading.  And in

2   addition, as to form regarding what other witnesses have

3   testified.

4       MR. ROSS:  There's an objection.

5       THE WITNESS:  Sorry.  Yeah.

6       JUDGE TRACY:  Yeah.

7       THE WITNESS:  I should let you rule.

8       JUDGE TRACY:  So I'll overrule the objection.

9       MR. ROSS:  Thank you, Judge.

10      JUDGE TRACY:  If -- but I will say this:  I'm -- I -- this

11  is very interesting.

12      THE WITNESS:  Um-hum.

13      JUDGE TRACY:  I just am wondering the relevance to this

14  case.  So if we could kind of move along to --

15      MR. ROSS:  Sure.

16      JUDGE TRACY:  -- the -- I'm not sure.

17      MR. ROSS:  Well --

18      JUDGE TRACY:  Okay?  So go ahead and just through him.  You

19  don't need to tell me.

20      MR. ROSS:  Okay.

21      JUDGE TRACY:  I'm just sort of waiting because it's

22  interesting, but I don't know what --

23      MR. ROSS:  Well, we --

24      JUDGE TRACY:  -- it has to do --

25      MR. ROSS:  -- don't want you to be bored.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  -- with the case.  Yeah.

2      MR. ROSS:  Okay.

3      JUDGE TRACY:  Okay.

4      THE WITNESS:  We'll make the more enchanting.

5  Q    BY MR. ROSS:  So my question was --

6  A    Yeah.

7  Q    -- is it just a car company or is it something more than

8  just a car company?

9  A    I've never thought of it as just a car company, I don't

10 think.  I don't think it is just a car company.  I mean, we

11 have various different lines of businesses that expand beyond

12 just being a car company.  When I first came out Cal, you know,

13 I looked at job opportunities at NUMMI, I looked at job

14 opportunities at Ford.  To me, those are car companies, right,

15 and they're not -- and -- and in going through the rounds and

16 everything, the invention pace is slow, the technology pace is

17 slow.  Tesla is much more than that.  I think -- I think

18 they're more than just a car company.  They're a pioneer in

19 technology, leading to the best performing cars that are out

20 there.

21     You -- you look at these cars and -- and you see doors and

22 you see windows and tires, and you think, okay, they're just a

23 car company.  But take a look under -- under the -- under the

24 metal, and I think you'll see something very different.

25 People, a lot of times I think liken us to the Apple of the --

22-60493.2012



1    of the car industry.  And -- and we've been leading that --

2    that whole charge, right, like sparking innovation and

3    technology, within that industry that was rather stagnant

4    before Tesla arrived.  And now there's -- all these other

5    companies are catching on now and developing their own electric

6    vehicle programs, even their battery storage programs, as -- as

7    an aside, basically following in the footsteps of Tesla.

8        MR. RODRIGUEZ RITCHIE:  I move to strike as nonresponsive.

9        JUDGE TRACY:  I'm going to overrule the objection.  Just --

10       MS. FEINBERG:  Okay.  But, Your Honor, a lot of this is

11   really irrelevant and not necessarily true.  So then we're

12   stuck with this.  Do we -- do you want us to counter this, if

13   this is true or not?  So I really feel like it would be good if

14   the testimony was relevant to this case.

15       JUDGE TRACY:  Um-hum.  And so --

16       MS. FEINBERG:  So then --

17       JUDGE TRACY:  I --

18       MS. FEINBERG:  -- we got put in this position of having to

19   like accept it for what it is without -- so I don't know.

20       JUDGE TRACY:  So you know, I've been very patient --

21       MS. FEINBERG:  Um-hum.

22       JUDGE TRACY:  -- with everybody here, and I'm starting to

23   get irritated because, you know, I've given you guys a chance

24   to put your case on for the General Counsel and the

25   Charging Parties.



1    MS. FEINBERG:  Yep.

2    JUDGE TRACY:  So let them do their job of putting their

3    case on.  I don't know where this is going.  I --

4    MS. FEINBERG:  That's --

5    JUDGE TRACY:  -- often didn't know where you guys were

6    going, but I let you do what you need to do.  I've already said

7    that I'm not sure of the relevance, and it may be, you know,

8    best to sort of move along.  I'm not sure of what the point is,

9    but I'm allowing some of this to occur so you can develop the

10    record as well.

11    MR. ROSS:  Thank you, Judge.

12    JUDGE TRACY:  So let's give everybody the courtesy of

13    putting their case on.  But being mindful that, you know, we

14    need to speed it along and get to what's the focus of his

15    testimony.

16    MR. ROSS:  All right.

17    JUDGE TRACY:  Thank you.

18    MR. ROSS:  Yep.

19    Q    BY MR. ROSS:  Tell me, is the technology that Tesla

20    utilizes typical of other auto manufacturers?

21    MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

22    MS. FEINBERG:  Same objection.

23    JUDGE TRACY:  And so what is the relevance?

24    MR. ROSS:  Judge, you're going to hear testimony from this

25    witness about there being leaks of nonpublic business sensitive

22-60493.2014


www.escribers.net | 800-257-0885

1    information to the media and to competitors.

2        JUDGE TRACY:  Okay.  All right.  So I'm going to overrule

3    the objection.

4        Go ahead.

5        THE WITNESS:  I'm sorry.  Can you repeat the question?

6        MR. ROSS:  Yeah.

7    Q    BY MR. ROSS:  The technology that Tesla uses say to

8    manufacture its cars, is it typical of the technology you find

9    in Fords or Sure (phonetic) or General Motors or Chrysler, Fiat

10   or competitors?

11       MR. RODRIGUEZ RITCHIE:  Your Honor, the --

12       MS. FEINBERG:  Objection.  Foundation.

13       MR. RODRIGUEZ RITCHIE:  The same objection.  There's no

14   foundation that this individual has any knowledge regarding any

15   other company that produces automobiles.

16       JUDGE TRACY:  If you could just restate --

17       MR. ROSS:  Sure.

18       JUDGE TRACY:  -- the question.

19   Q    BY MR. ROSS:  In your work as the Vice President of Legal

20   working with various other teams on various projects within

21   Tesla, do you come to find out what your competitors are doing?

22   A    Yes, I do.

23   Q    Okay.  And so would you have knowledge about what they do

24   in relationship to the knowledge of what Tesla does in terms of

25   technology for its products?



1    A    Yes.

2         MR. RODRIGUEZ RITCHIE:  Objection.  Leading.  Vague.

3         JUDGE TRACY:  Overruled.

4         MR. ROSS:  Okay.

5         THE WITNESS:  Yes, I would.

6    Q    BY MR. ROSS:  Is the technology that Tesla utilizes the

7    same, different?  How does it compare to the technology used by

8    your competitors?

9    A    Different.  I like to say better.  I think the -- the

10   primary difference that people focus on is that Tesla makes

11   electric vehicles.  So it's all powered by batteries and

12   electricity.  It's a charging network that's different than

13   what OEMs use.  Now, there's more and more companies out there

14   that are building electric vehicles, including some of the

15   traditional ones.

16        But, yeah, it's still a very different -- Tesla also led --

17   I think leads the way in -- in -- in driver -- the -- the

18   entertainment system, basically the user experience within the

19   vehicle itself.  It's the first car to have its touchscreen in

20   there.  It's a -- I don't know if you've ever sat in a Model S,

21   3, or X, but they have these big, giant touchscreens that other

22   manufacturers are having these push-button things.  So it is a

23   leader in -- in this kind of technology.  It's also the first

24   car out there to have some level of autonomy within its

25   vehicles with its autopilot technologies.  So its -- its -- its



1    technology I'll say is at the -- at the forefront of its

2    competitors.

3    Q    Um-hum.  Do the competitors of Tesla typically have cars

4    that relate to specific model years?

5        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Lacks

6    foundation.  Leading.

7        JUDGE TRACY:  Sustained.

8        MR. ROSS:  Okay.

9    Q    BY MR. ROSS:  Let me ask you, how does Tesla's -- how does

10   Tesla approach obsolescence, and how does that compare with the

11   approach of its competitors?

12       MR. RODRIGUEZ RITCHIE:  Objection.  Leading and compound.

13       MS. FEINBERG:  Objection.  Foundation.  That he knows how

14   other companies deal with obsolescence other than -- yeah,

15   that's --

16       JUDGE TRACY:  Do you mind if you can leave the room --

17       THE WITNESS:  You bet.

18       JUDGE TRACY:  -- please?

19   (The witness exits the hearing room)

20       JUDGE TRACY:  Would you please, Mr. Ross, just as an offer

21   of proof, what is the --

22       MR. ROSS:  Sure.

23       JUDGE TRACY:  -- purpose of his testimony?

24       MR. ROSS:  Yeah.  The purpose of the testimony is to

25   basically set the table for the sequence of events that pertain

1    to the confidentiality acknowledgment that is at issue in this

2    case.  Tesla is not just another car company.  It is a

3    technology company that happens to be different from every

4    other automobile and technology company in the world.  And it

5    has information that is not public that it wishes to keep out

6    of the public domain until it is ready for -- to share it with

7    the public.  Sometimes it never wants to share it with the

8    public.

9        JUDGE TRACY:  Right.  And so are -- so the focus of his --

10    what you're trying to get to is the allegations about the

11    rules; is that correct?

12        MR. ROSS:  The substance of what I'm trying to get to is to

13    explain to you and to the Board --

14        JUDGE TRACY:  Um-hum.

15        MR. ROSS:  -- why this confidentiality acknowledgment was

16    needed.

17        JUDGE TRACY:  Okay.

18        MR. ROSS:  What purpose it was being utilized to serve.

19    And this is all background relevant to that issue, and we're

20    trying to create a record as to this, much as a record was

21    created in the Boeing decision, Your Honor.

22        JUDGE TRACY:  And so you all just keep objecting over here.

23    Okay?  And under Boeing, they have the right to put this

24    evidence in, of the purpose behind the rule.  We -- I'm trying

25    to move this case along.  You know, at some point it's

22-60493.2018



1    really -- if you don't feel it's relevant, you know, don't ask

2    him anything about it, move on, and argue in the briefs it

3    doesn't matter.  We're taking and wasting a lot of time.  Just

4    every witness just -- you know, it's -- at least at this point

5    I'm getting really annoyed.  Let them put their case on.  They

6    have the right to do it.  I'm not saying don't object anymore,

7    but every single question?

8        For this witness, though, please direct him, and let's get

9    to the point here.

10       MR. ROSS:  Judge, I'm happy to direct him, but I -- you

11   know, I've been chided for asking leading questions.  So I'm

12   trying to be directive without leading him.  I feel like

13   whatever question I ask, I'm getting an objection.

14       JUDGE TRACY:  So my concern with your questions is the

15   leading portion of them, right?  I'd rather you ask direct

16   open-ended questions rather than leading.

17       MR. ROSS:  All right.

18       JUDGE TRACY:  Okay?

19       MR. ROSS:  Yep.

20       JUDGE TRACY:  This witness, I believe that you've laid the

21   foundation for his experience.  He's been there seven-and-a-

22   half years, he's been involved with all this, he's the VP of

23   Legal and he's been involved with the technology.  Is he your

24   witness to explain the purpose behind the rule?

25       MR. ROSS:  He is.

22-60493.2019



1       JUDGE TRACY:  Okay.  So I'm going to allow it.  You can

2   object, whatever you want.  I'm going to keep probably

3   overruling them because I need to just get his testimony into

4   this record.  You can ask him questions on cross or not.  But

5   again, if you look at Boeing, the Employer has the right to

6   explain why it has its rule.

7       MR. RODRIGUEZ RITCHIE:  But the Employer doesn't have the

8   right to ask questions that lack foundation, they don't have

9   the right to ask questions that are leading, they don't have

10  the right to ask questions that are compound.  I think I only

11  made one relevancy objection so far.  But there's an issue with

12  the form of the question as well.  It's not just a matter of

13  relevancy.

14      MS. FEINBERG:  It -- I mean, at this point, it feels like

15  it's an -- if they want to talk about Tesla, that's fine, but

16  the questions also are about -- all about all the rest the auto

17  industry, and that's where I don't see where he's laid a

18  foundation for that.  And if he wants to talk about Tesla, have

19  at it.  And they don't need to talk about the rest of the auto

20  industry to talk about what their interests are.  It seems more

21  like an advertisement than what it's about.

22      So I'm sure Ford would come here and say the same about

23  their technologies and their things and GM.  So it just -- that

24  part just seemed -- that's the part that I'm objecting to.

25  It's like, how does this compare to other people's sense of



www.escribers.net | 800-257-0885

1    obsolescence?  Which we don't really know that he's researched

2    any other auto company.

3        So let them promote Tesla or whatever the heck they want to

4    do.  But my foundation part is when he's starts like making

5    these contrasts.  I don't know if they're true or not, and I

6    don't know that he knows that.  And so that's where I'm -- the

7    foundation objections come, Your Honor.

8        JUDGE TRACY:  Okay.  So for --

9        MR. ROSS:  Judge, if I --

10        JUDGE TRACY:  I would say, Mr. Ross, please with the

11    leading.  And I've had this kind of commentary to you for --

12        MR. ROSS:  Right.

13        JUDGE TRACY:  -- other witnesses, too.

14        With regard to compound, limit the question.

15        MR. ROSS:  I will.

16        JUDGE TRACY:  And also in terms of foundation, this is

17    their witness.  So in terms of what is Tesla doing and why it

18    then needed -- had the need to create this rule, the purpose

19    behind it, let's focus on that.  You know, I would agree that

20    some of the testimony was about how great the product is.

21    That's great.  I mean --

22        MR. ROSS:  Judge --

23        JUDGE TRACY:  -- fine.

24        MR. ROSS:  -- what we're trying to explain to you and to

25    the Board --



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Yeah.

2      MR. ROSS:  -- is why -- this document issue.

3      JUDGE TRACY:  Um-hum.

4      MR. ROSS:  Tesla is unique in many respects, and it is a

5  uniqueness that it treys (sic) on that it wishes to protect.

6  For instance --

7      JUDGE TRACY:  Well, but I total -- I understand that.  But,

8  you know, every rules case, there is always these -- the

9  purpose that's explained, right, you know.  And in these, you

10  know, other companies, everybody has proprietary interests,

11  things like that.  The focus should be on what the Respondent

12  needs to do, of what they needed to do --

13      MR. ROSS:  That's what --

14      JUDGE TRACY:  -- versus --

15      MR. ROSS:  -- I'm trying to establish.

16      JUDGE TRACY:  -- comparing to everybody else.

17      MR. ROSS:  That's --

18      JUDGE TRACY:  So let's focus the questions on -- you know,

19  it's already been established in the record that there is a

20  technology that is very important to its product.  And so let's

21  just sort of move on with that.  Because --

22      MR. ROSS:  Again, I don't mean to belabor the point, but --

23      JUDGE TRACY:  Um-hum.

24      MR. ROSS:  -- Judge, I want you to understand that if

25  nonpublic business sensitive information is leaked, it has

22-60493.2022



1  potential to be very damaging to the Company.  Now --

2      JUDGE TRACY:  And that's fine.  And so get that through the

3  witness.

4      MR. ROSS:  And what I want you to understand is why it is

5  damaging to the business.  How different this company is

6  relative to other companies and how different their products

7  are to other companies.  You open up the hood of a Tesla,

8  you're not going to find a motor.

9      JUDGE TRACY:  Well, I understand that, but, you know, to

10  compare it to other companies, it's --

11      MR. ROSS:  Well --

12      JUDGE TRACY:  -- not -- you know, it is what it is.  I

13  mean, did they -- are you saying that they made the rule, and

14  if they didn't have the technology, GM and these other

15  companies don't have that same rule?  I'm pretty sure if I go

16  to their handbooks, they probably have --

17      MR. ROSS:  Well --

18      JUDGE TRACY:  -- similar rules.  So my point is is I'm not

19  deciding about the other companies.  I'm deciding about the

20  rule in this case.  And so if we could just -- so we can move

21  this along so you can establish --

22      MR. ROSS:  Okay.

23      JUDGE TRACY:  -- your record, focus the witness'

24  testimony -- questions on how the Company has a need for the

25  rule, and there you have it.



www.escribers.net | 800-257-0885

1     MR. ROSS:  Okay.

2     JUDGE TRACY:  And that's where the argument comes and

3     everything.

4     MR. ROSS:  I understand.  I'll just saying this --

5     JUDGE TRACY:  Okay.

6     MR. ROSS:  -- I just urge you to look at the handbook of

7     the Company, because you're going to find it to be unlike any

8     other handbook you have ever seen in any case --

9     JUDGE TRACY:  That may be, but it --

10     MR. ROSS:  -- because it's the company that's different

11     from any I bet you've ever had in a case.

12     JUDGE TRACY:  I'm sure, but --

13     MR. ROSS:  Let me get the witness.

14     JUDGE TRACY:  -- you know, again, I'm just looking at this

15     handbook.

16     MR. ROSS:  Are we -- we're on the record?

17     JUDGE TRACY:  We've been on the --

18     MR. ROSS:  Okay.

19     JUDGE TRACY:  -- record --

20     MR. ROSS:  Okay.

21     JUDGE TRACY:  -- yes.

22     MR. ROSS:  Thank you.

23     Q     BY MR. ROSS:  Jonathan, how does Tesla use to -- use the

24     Internet to maintain the currency of its automobiles?

25     A     All of our -- all of our vehicles are -- are connected



22-60493.2024

1    through, you know, 4G, LTE or 3G.  So through the cell

2    networks.

3    Q    You're going to have to speak up.

4    A    All of our vehicles are connected through the cell

5    networks.  So just like your cell phone is.  And -- and also

6    through WiFi at home or at your office.  So when -- when we

7    have updates to the vehicles, they get pushed out.  Just like

8    your phone getting a new update.  And it has improvements, it

9    has UI updates, new features are added.  In many ways, I think

10   these cars are -- and they're often referred to it -- it's not

11   just me saying it or Tesla saying it -- but in many ways, our

12   cars are computers on wheels --

13   Q    Okay.

14   A    -- that get updated -- updated quite frequently.

15   Q    And does Tesla assign model years to its automobiles?

16   A    It does not, no.  The cars will have birth years, like

17   basically when they came off the line, but there's no model

18   years associated with it.

19   Q    Um-hum.  Tell me, the parts that go into a Tesla, where do

20   they come from?

21   A    The parts, they come from many places.  I think one way

22   that it's different from many other manufacturers, you have

23   some of the other OEM manufacturers, the Toyotas of the world,

24   Hondas, Fords, GMs, they're often viewed today I think as

25   assemblers, where they bring in a bunch of parts from all



www.escribers.net | 800-257-0885

1  different second tier -- first-tier, second-tier suppliers, and

2  then assemble that vehicle and -- and slap a GM or Toyota brand

3  on it.

4      I spoke a little bit about Tesla being kind of the pioneer

5  in all these technologies.  And -- and I think what that means

6  is that Tesla is much more vertically integrated than many of

7  the other manufacturers, and that means we buy less from

8  suppliers.  We still have suppliers, of course.  You need

9  suppliers for raw materials, more common items like tires,

10  wheels, the glass on the windows, raw steel.  But also Tesla is

11  very much vertically integrated in the sense that -- I mean,

12  we -- it -- it started because we wanted to develop something,

13  and there were no suppliers for that.  So like an electric

14  motor, the batteries involved in our vehicles, the touchscreen

15  involved, like who -- most manufacturers would go to a first-

16  tier, second-tier supplier, like Sony and say, hey, I need a

17  radio that fits within my car.  Tesla wanted to big touchscreen

18  and nobody would make it for us.  So we -- we ended up making

19  it ourselves.  So much of the technology within the vehicle

20  itself.  And because it's built ground up as an electric

21  vehicle -- where an -- a true electric vehicle had never

22  existed before is built and manufactured within Tesla itself.

23  Q    All right.  Now, I'm going to show you a document that is

24  already in evidence, and it's Respondent's Exhibit 11.

25      MR. RODRIGUEZ RITCHIE:  Can you please show us first?



www.escribers.net | 800-257-0885

1    Thanks.

2        THE WITNESS:  Thank you, counselor.

3    Q    BY MR. ROSS:  And tell me if you can identify that

4    document.

5    A    Yes.  It's a -- it's a document that we asked all

6    employees to sign back in 2016.

7    Q    Okay.  And were you involved in the preparation or

8    drafting of that document?

9    A    Yes, I was.

10   Q    Tell us around when you started working on that.

11   A    We started working on this document and some of its

12   precursors as well in September of 2016.  So early September.

13   Q    Okay.  And can you tell me why you started working on this

14   document at that time?

15   A    I think like many Silicon Valley or tech companies, we

16   have a media spotlight on us, and what that means is we also

17   have a lot of leaks.  And around this time, as Tesla -- you

18   know, we've -- we've -- our brand has began to build to Model S

19   and Model X around the 2016 time frame, the Model 3 program is

20   just getting up to speed, there's a lot of questions in -- in

21   the public about Tesla and whether it's going to make it,

22   whether it's going to be able to manufacture the Model 3,

23   whether it's going to deliver on its vehicles, what are its new

24   features that are upcoming, because we are constantly pushing

25   new features to cars.  And so all of this information is out

22-60493.2027



1    there, people want to know, and they get leaked.

2        I think around -- around 2016, September of 2016, we've

3    kind of had this bubbling up of many leaks where it's -- it's

4    almost as if, you know, you have another leak and you're like,

5    geez another one, like -- and then -- and then another one

6    follows that and another one follows that.  And so there was

7    a -- there was a decision made that we have to make sure our

8    employees understand the need for confidentiality, given the

9    climate, the -- the media climate and attention with --

10   attention focused on Tesla.  And this document was intended to

11   be a reminder of that.

12   Q    Okay.  Now, you've used the word leak several times in --

13   A    Um-hum.

14   Q    -- your last answer.  Tell us what you mean by leaks.

15   What do you mean by that?

16   A    Like I said, it was kind of a bubbling up of many

17   different kinds of leaks.  So the types of leaks that we're

18   talking about, some have to do -- some pretty obvious ones, I

19   think, like -- like product features, right, like what's --

20   what's upcoming in Tesla?  Is the model -- the next model, the

21   new hardware change, going to change that it allows for

22   autonomous driving vehicles or autopilot features?  That's

23   closely held within Tesla because it's an upcoming feature.

24   There's other -- there's other leaks.  Technical information.

25   Right?  So technical drawings of Tesla's, for example.  So



www.escribers.net | 800-257-0885

1    high -- like highly-traced secret proprietary type information

2    that our competitors shouldn't be having.  There's business

3    related information, pricing information, financial position

4    information that gets leaked.  Employee information could get

5    leaked.  Customer information can get leaked as well.  So

6    there's a lot of this -- there's just a lot of information and

7    things within Tesla that -- that folks are just -- seem to be

8    interested in.

9    Q    Do any of the leaks involve internal memos or emails?

10        MR. RODRIGUEZ RITCHIE:  Leading.

11        JUDGE TRACY:  Sustained.

12   Q    BY MR. ROSS:  Can you think of any other leaks?

13   A    The -- the -- I think the leaks will take a couple of

14   forms.  Sometimes they're rumors.  Right?  And -- and those, we

15   can just no comment on.  So like a product -- a new product

16   feature.  Tesla's thinking about doing X, Y, Z in their cars,

17   right, with no substantiation within it.  It becomes just a

18   rumor.  Those have their own dangers associated with it, but

19   they get more serious when they're tagged on with like a photo

20   of a picture of a rendering of a drawing of a clay model of our

21   next vehicle, something like that, something that's closely

22   guarded within our design studio, for example.  And then it

23   goes on beyond when -- when documents are leaked, whether it's

24   financial documents or emails.

25   Q    Okay.  Now, did you -- were you directed by anybody to

22-60493.2029



1    prepare this document?

2    A    Yeah.  My boss, the general counsel.

3    Q    Okay.  And who else was involved in the drafting of the

4    document aside from yourself, sir?

5    A    Tom Maron is the general counsel.  Yusef Mohamad is our

6    deputy general counsel of employment.  Lynn Miller another

7    attorney, deputy general counsel at Tesla.  And then Carmen

8    Copher as well.

9    Q    All right.

10    A    She's on the HR side.  She may have been an attorney at

11    the time.  I'm not -- I can't remember.

12    Q    Excuse me?

13    A    Carmen Copher, she may have been an attorney at the time.

14    Q    Okay.  Do you know whether --

15        MR. ROSS:  Strike that.

16        What is the Employer's next in order?

17        THE COURT REPORTER:  37.

18        MR. ROSS:  Excuse me?

19        THE COURT REPORTER:  37.

20        MR. ROSS:  37.  Thank you.

21    **(Respondent Exhibit Number 37 Marked for Identification)**

22    Q    BY MR. ROSS:  You have in front of you a document that has

23    been marked Respondent's Exhibit 37.  Do you recognize that

24    document?

25    A    Yes, I do.



www.escribers.net | 800-257-0885

1    Q    Okay.  Could you tell us it -- tell us what it is.

2    A    It's an email from our -- our CEO, Elon Musk, to all

3    employees.

4    Q    Okay.  And can you tell us what role, if any, this

5    document played in your generation of Respondent's Exhibit 11,

6    the confidentiality acknowledgment?

7    A    It was -- I don't know if you'd call it the tipping point,

8    the turning point, but it was kinds of the -- the -- the event.

9    So this email got leaked to the press I think in its entirety

10    and was posted up in -- in -- in an article in the media.  And

11    it spoke to Tesla's financial situation and whatnot.  And so,

12    well, we had this bubbling of leaks already with product

13    related stuff and all that, it's just kind of the -- the -- the

14    precipitous moment where it was -- where we said, okay, enough

15    is enough.  Now we have this serious leak.  Now people are

16    actually posting emails, internal emails of Elon's up on the

17    website.  We should remind folks about the seriousness of this.

18    Q    Okay.  Tell me, did this find its way into the press, in

19    document?

20    A    This email?

21    Q    Yeah.

22    A    Yes, it did.

23    Q    Okay.  Now, I noticed -- while I'm thinking about it --

24    You've got Respondent Exhibit 38 in front of you?

25    A    Um-hum.  Yeah.



www.escribers.net | 800-257-0885

1    Q    What is that?

2    A    This is a media article on Bloomberg which basically

3    reprints word or word the email that Elon had sent --

4    Q    Okay.

5    A    -- to Tesla employees.

6    Q    Now, and again, what role, if any, did these documents

7    play in the drafting of that, Respondent's Exhibit 11?

8    A    It was another leak, and serious one at that since it was

9    an entire email that -- that's leaked out now.  It's not just a

10   rumor that's being spread.  That someone -- actually  cutting

11   and pasting or taking a picture of a full email and sending it

12   out to the media.

13   Q    Okay.

14   A    So that -- this -- this article then triggered an effort

15   to figure out how to best remind employees of their

16   obligations -- their confidentiality obligations to Tesla.

17   Q    Okay.  Could you tell me what nonpublic business sensitive

18   information, if any, is found in Respondent's Exhibit 37?

19   A    In the email?

20   Q    Yes.

21   A    I think the -- to kind of sum it up, it speaks to Tesla's

22   financial position toward the end of the quarter, its

23   likelihood of positive financial numbers, including

24   profitability and cash flow, it speaks to our production

25   numbers for the quarter, and it speaks to our financial plans



1    in the upcoming quarter.

2    Q    Okay.  And I noticed, by the way, this is an email

3    addressed to the employeesattesla.com.  Is that all of the

4    employees of the Company?

5    A    That's all employees, correct.

6    Q    Okay.  And was it common for such all employee emails to

7    issue?

8    A    I couldn't say common.  It's not like it happens every day

9    or every week.  Maybe every few weeks we'll get an email --

10   Q    Okay.

11   A    -- from somebody, whether it's HR sending an all-employee

12   email or Elon.

13   Q    Okay.  And tell me, why is such companywide emails issued?

14   A    Why?

15   Q    Yeah.

16   A    Communication.  The -- the way that Tesla is -- and this

17   may be different from some other companies -- it's certainly

18   different from some of the companies I've worked at -- is we're

19   incredibly transparent.  Transparent in the public in many

20   ways, but more importantly I think transparent within Tesla

21   itself.  I've been there a long time, so I've seen Tesla kind

22   of grow up.  I've known Tesla since 2006, which it was just

23   100 -- 120 employees.  When I joined, it was about 1,000

24   employees.  Now we're at upwards of 40,000 employees.  But

25   through that time -- I think one of the things that's great



1    about Tesla is the culture of Tesla is that it's really family.

2         JUDGE TRACY:  So what I need you to do, though --

3         THE DEFENDANT:  To do?

4         JUDGE TRACY:  -- if you don't --

5         THE WITNESS:  Yeah.

6         JUDGE TRACY:  -- mind, is just please answer the

7    question --

8         THE WITNESS:  Yeah.

9         JUDGE TRACY:  -- and then that's it.  Okay?

10        THE WITNESS:  Okay.

11        MR. ROSS:  Okay.

12        JUDGE TRACY:  Thank you.

13        THE WITNESS:  You bet.  So it's -- really for communication

14   purposes that Elon would send an email to everybody is just to

15   make sure everyone's aligned, galvanized on what the mission

16   is, and that we're all rowing the boat in the same direction.

17   Q    BY MR. ROSS:  I see.  So this email went out to 30,000

18   people.  It contained this sensitive information.  I noticed

19   that there is no confidential or personal and confidential or

20   business confidential stamp on it.  Do you know why that is?

21   A    I -- I don't know why that is.  It's not common that I see

22   those stamps on internal documents.

23   Q    Do you know why that is?

24   A    We consider them to be confidential by their nature.

25   Q    Okay.  And tell me, is there anything that you're aware of

22-60493.2034



1   that --

2       MR. ROSS:  Strike that.

3       THE WITNESS:  There's something you said --

4   Q   BY MR. ROSS:  When you say they're "confidential by their

5   nature," what do you mean by that?

6   A   Internal emails --

7   Q   Yeah.

8   A   -- are -- should be presumed to be confidential.

9       MR. ROSS:  Now, by the way, I'm going to offer Respondent's

10  37 into evidence at this time, Your Honor.

11      JUDGE TRACY:  Any objections?

12      MR. RODRIGUEZ RITCHIE:  No objection to 37.

13      MS. FEINBERG:  I wanted to voir dire, but I'll wait for

14  cross.

15      JUDGE TRACY:  Okay.  So General -- Respondent's Exhibit 37

16  is admitted into evidence.

17  **(Respondent Exhibit Number 37 Received into Evidence)**

18      MR. ROSS:  And we're also offering Respondent's 38.

19      JUDGE TRACY:  Okay.  Any objections?

20      MR. RODRIGUEZ RITCHIE:  Yes.  This is a hearsay document.

21      MR. ROSS:  I couldn't hear you.  I'm sorry.

22      MR. RODRIGUEZ RITCHIE:  It's a hearsay document.  The

23  foundation wasn't established as to any hearsay objection.  And

24  I'd also object as to relevance.

25      MS. FEINBERG:  I'll join in that.



www.escribers.net | 800-257-0885

```
 1        MR. ROSS:  He's identified it as the article --

 2        JUDGE TRACY:  Well, if -- I'm going to overrule the

 3   objections.  However, could you just lay a little bit of

 4   foundation with some questions as to how he became aware of

 5   that --

 6        MR. ROSS:  Yeah.

 7        JUDGE TRACY:  -- document?

 8        MR. ROSS:  Sure.

 9        JUDGE TRACY:  Okay?

10        MR. ROSS:  Sure.  That's fine.

11        JUDGE TRACY:  And then I will put it into evidence.

12        MR. ROSS:  All right.

13   Q    BY MR. ROSS:  Jonathan, take a look at Respondent's 38.

14   How do you know that's the document that appeared in Bloombergs

15   (sic throughout)?

16   A    It says it at the bottom of the document, first -- first

17   off.

18   Q    Yeah.

19   A    I read the article when it first came out, when it was

20   first published.  Yeah.

21   Q    So you saw the article in Bloombergs or read it on

22   Bloombergs?

23   A    Yes.

24   Q    Okay.

25   A    Back in '16.
```



www.escribers.net | 800-257-0885

1    Q    And this is what you read back in September of 2016?

2    A    Yes.

3    Q    All right.

4         JUDGE TRACY:  All right.  So Respondent's Exhibit 38 is

5    admitted into evidence.

6    **(Respondent Exhibit Number 38 Received into Evidence)**

7         MR. ROSS:  Okay.

8    Q    BY MR. ROSS:  Tell me, did Tesla attempt to find out how

9    this leak occurred -- strike that.  Who was responsible for

10   this leak?

11   A    Yes.

12   Q    And were you successful in finding out?

13   A    No.

14   Q    And you've testified before about their being other leaks.

15   But this was not the first time that Tesla's had suffered the

16   leak of nonpublic business sensitive information; is that

17   right?

18   A    That's correct.

19   Q    Now, how do leaks of information like this and the leaks

20   that preceded it, how does that ruin the Company?

21   A    A myriad of ways.  So if -- I'll try to structure it.  But

22   if you think of it as what type of leak it is, if it's like a

23   product leak or a new feature leak coming out, it could -- it

24   could dissuade people from buying your car.  They're going to

25   wait until that new feature has come out.  If it's just a



1   rumor, people may assume that it's coming out in the next few

2   weeks when in reality it's coming out in a few months or never

3   coming out.  And it makes people wait and not -- not purchase

4   the vehicles.  So our revenue would decline and the business

5   would suffer as a result of it.  If it's technological leak,

6   drawings, proprietary information, trade secret type

7   information about our technology, it could get into the hands

8   of our competitors.  Competitors could use it to compete

9   against us, and we would lose whatever head start we had in

10  terms of our technology.  That's the same with the product

11  features.  Right?  They could -- they could start -- folks

12  always have their eyes on Tesla and they're -- they're looking

13  at Tesla, what's next?  It would be the leader of what's next

14  in vehicle technology.  And they could get a jump start on --

15  on copying us or -- or trying to compete against us.

16      Other leaks like this, like the -- the email that Elon had

17  sent out, you get false headlines.  Right?  You get headlines

18  in the media that -- that -- that say Tesla's in a precarious

19  situation, they spin it the wrong way, and folks are looking

20  at -- they use it as click bait that's what they're doing.  You

21  review it, you see the headlines and you see Tesla's

22  struggling.  Elon Musk tries to rally his troops to -- you

23  know, to -- to perform for -- for a Q3.  You just get a lot of

24  rumors started that way.

25      If -- if product launches are set out too early -- we have



www.escribers.net | 800-257-0885

1    whole teams that are working hard on making sure product

2    launches are successful.  They come out with a surprise, they

3    come out with a big bang.  And when they're leaked into the

4    public, it deflates that.  You have -- you have entire teams

5    that are working hard on this and -- and now we don't get the

6    first shot at it, at announcing it.  So it denigrates their

7    work.

8         There's customer information that can get leaked.  Right?

9    And if customer personal information is leaked, it devalues our

10   brand.  People think that we don't have the secure protocols in

11   place in -- in guarding customer information.  The same with

12   employee information, if we don't have safeguards for employee

13   information, if -- if they leak, if employee personal

14   information leaks and gets out there, then it's bad for the

15   brand, it's bad for Tesla, it's bad for the employees.

16        I think lastly is the -- more on the employee side of

17   things, is kind of the skills that they have and how our org

18   chart is set up.  We also hold that to be confidential because

19   of competition for people and talent.  It's cutthroat.  It's

20   Silicon Valley.  There's -- there's a lot of big tech companies

21   that are trying to do what we do, and -- and -- and trying to

22   chase down our people to -- to -- to do it.  You know, the org

23   chart and employee information gets out there and they're able

24   to dissect what our organization looks like and -- and slowly

25   pick it apart for talent.



www.escribers.net | 800-257-0885

1    Q     Tell me, are there any SEC concerns with leaks?

2    A     Yeah.  There's --

3          MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

4          JUDGE TRACY:  Overruled.

5          Go ahead.

6          THE WITNESS:  The -- and I was just thinking of it,

7    counselor.  But the -- you know, this -- emails like this,

8    right, there are -- so we can have SEC concerns.  As a

9    corporate attorney, there -- you have to do everything in full

10   disclosure.  We're a public company.  So when you do do -- when

11   you do make financial disclosure, material disclosures about

12   your performance to the company, it needs to be done in a fair

13   way publicly, a full disclosure to all investors.  And so when

14   a -- when a document like this leaks outside of the Company,

15   there's certainly some -- some issues with disclosure.

16   Q    BY MR. ROSS:  Okay.  Now, before this particular leak,

17   this -- what do we call it -- what did we call it -- the third-

18   quarter rally leak we'll call it --

19   A     Sure.

20   Q     -- before this third-quarter rally leak occurred --

21         JUDGE TRACY:  Well, why don't you refer actually to the

22   exhibit so that way the record --

23         MR. ROSS:  Oh, okay.

24         JUDGE TRACY:  -- reflects what you're --

25         MR. ROSS:  Okay.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  -- directing the witness --

2    MR. ROSS:  Okay.

3    JUDGE TRACY:  -- to.

4  Q    BY MR. ROSS:  Before Respondent's 37, what had the Company

5  done to combat -- what had the Company done prior to this to

6  combat leaks?

7    MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  And

8  leading.

9    MR. ROSS:  I'm asking him to explain the Company's prior

10  activities in an attempt to deal with leaks.  This evidence

11  goes to the culmination, which is --

12    JUDGE TRACY:  Okay.  So I'm going to overrule the

13  objection.

14    MR. ROSS:  All right.

15    THE WITNESS:  It starts with the policies that we have in

16  place.  When people first join, they sign a Proprietary

17  Information Invention Assignment Agreement.  That captures

18  their confidentiality obligations.  It's written in our

19  policies, employee handbooks, media policies.  There's all

20  kinds of policies involved.  More than that, more than, you

21  know, the normal legal documents associated with employees,

22  there's also constant reminders.  Every time -- not -- I won't

23  say every time, but when there are serious leaks, we'll

24  oftentimes see a reminder either from a department head where

25  the leak may have originated from to their group of employees



www.escribers.net | 800-257-0885

1    reminding them that this stuff is confidential and it hurts the

2    Company when -- when information like this leaks out, nonpublic

3    business sensitive information leaks out, and sometimes you'll

4    see it from Todd Maron, our general counsel, where he'll send a

5    companywide email reminding folks, hey, that leak that just

6    happened is not okay and it's -- it's -- and -- and we'll be

7    investigating it and taking all necessary precautions so -- to

8    make sure it doesn't happen again, and then prosecuting the --

9    the offender.

10   Q    BY MR. ROSS:  Okay.  Well -- okay.  You said before that

11   you attempted to find out where Respondent's -- who was

12   responsible for the leaking Respondent 37.  I take it -- in the

13   case of prior leaks, had there been other attempts to find out

14   who was responsible for the leaks?

15   A    Yeah.  Yes.  Particularly when it involves like a leaked

16   email, there is usually a trail, like a technology trail

17   somewhere.  I'm not an investigator, so I can't speak to all of

18   that.  But we do have an IT team that -- that dives into these

19   leaks to see if they can locate the source of them, whether

20   it's a -- metadata or whatnot.

21       There's been other instances where we've had former

22   employees take information, basically download drives,

23   terabytes of data, and take it with them that our IT team

24   tracks down and we're able to locate it and pinpoint it.

25   Q    Okay.  Those prior investigations to find out the source

22-60493.2042



1   of leaks, were they typically successful or unsuccessful?

2   A    I mean, if you're keeping a scoreboard, I guess or -- I

3   think we were -- I would say we were unsuccessful in most

4   instances.

5   Q    Um-hum.

6   A    There are some instances which we are able to pin down the

7   source of the leaks, and in some instances even criminally

8   prosecute them.

9   Q    Okay.  And where you were able to track down the source of

10  the leak, what did the Company do?

11  A    It will investigate thoroughly.  If it finds that there

12  was an actual leak, there's mal-intent behind it, all this kind

13  of stuff, all the bad stuff, that employee will be terminated.

14  And then all the evidence that we've gathered, we typically

15  pass it to public officials, whether it's FBI, the police, and

16  sometimes they're criminally prosecuted as a result of it.

17  Q    Do you remember any instances with that happening, where

18  you referred it to --

19  A    I do.  I --

20  Q    -- the authorities?

21  A    There's -- there's one that sticks into my mind because

22  this guy had gone to -- this former employee had gone to

23  Canada.  He left the Company, but he had data with him,

24  technical data about our vehicles, employee data, reviews of

25  his -- of his manager's team.  He had I think spoofed access to

22-60493.2043



1    his manager's email -- so he had -- still had access to his --

2    his manager's email, hacked into it -- and was leaking things

3    to the -- to the media.  And we located the source of the leak.

4    So we identified who it was.  Questioned him about it.  We had

5    authorities actually go and question him about it in his home

6    in -- in Canada.  And he was flying in for -- I can't remember

7    if it was his wedding or a friend's wedding, but he was flying

8    back into the States, and the FBI picked him up at the airport.

9    Had him arrested.

10    Q    All right.

11    A    That one sticks pretty clear in my mind.  There's been

12    other instances, too, but --

13    Q    All right.  Now, you made mention that one of the things

14    the Company had done prior to issuing Respondent's Exhibit 11

15    was from time to time sending out reminders to people --

16    A    Yes.

17    Q    -- about the need for confidentiality and the need not to

18    engage in leaks.  You have in front of you Respondent's

19    Exhibit 39.  Do you recognize that document?

20    A    Yes.

21    Q    And tell us what it is.

22    A    It's an email from my boss, our general -- Tesla's general

23    counsel, Todd Maron, sent to everybody reminding them that

24    leaks are not okay.

25    Q    Now, do you know who Mark Lipscomb is?



1     A     Yes.

2     Q     Who is Mr. Lipscomb?

3     A     He was our former -- I think he was eventually promoted to

4     VP.  But former VP of HR.

5     Q     Okay.  You have in front of you Respondent's Exhibit 40.

6     Can you tell me what that -- if you --

7           MR. ROSS:  Strike that.

8     Q     BY MR. ROSS:  Do you recognize that document?

9     A     Yes.

10    Q     And what is it?

11    A     Another email from Mark Lipscomb to all employees at Tesla

12    again reminding them about the importance of confidentiality.

13    Q     Okay.

14          MR. ROSS:  Your Honor, I'd offer Respondent's 39 into

15    evidence at this time.

16          JUDGE TRACY:  Any objections?

17          MR. RODRIGUEZ RITCHIE:  As to relevancy.

18          MS. FEINBERG:  I would say this is the confidentiality

19    about the car itself, which I don't think is really that --

20          MR. ROSS:  I'm sorry.  I can't hear you.

21          MS. FEINBERG:  It seems to me this is about --

22    confidentiality about the technology of the car, which I don't

23    really think is at issue.  The rules that are in question

24    aren't about the technology of the car.

25          JUDGE TRACY:  All right.  So again, I'll overrule the



www.escribers.net | 800-257-0885

1    objection and allow Respondent's Exhibit 39 into evidence.

2    **(Respondent Exhibit Number 39 Received into Evidence)**

3        MR. ROSS:  And I'm offering Respondent's 40 also,

4    Your Honor.

5        JUDGE TRACY:  Any objections?

6        MS. FEINBERG:  The same objection.

7        MR. RODRIGUEZ RITCHIE:  The same.

8        JUDGE TRACY:  All right.  Again, I'm going to overrule the

9    objection and allow Respondent's Exhibit 40.  I would note,

10   though, that -- make sure in your briefs that you point that

11   out.  Okay?

12       MS. FEINBERG:  Yes.  Thank you.

13   **(Respondent Exhibit Number 40 Received into Evidence)**

14   Q    BY MR. ROSS:  Now, tell me, Mr. Chang, you made mention

15   before of documents you had employees sign addressing the issue

16   of confidentiality?

17   A    Yes.

18   Q    Okay.  What documents are you talking about?

19   A    I think the primary one I'm thinking of is the Proprietary

20   Information Invention Assignment Agreement, what we call the

21   PIIA.  And that's the one that addresses -- when you first --

22   it's an onboarding document when you first start as an employee

23   at Tesla, and it details your confidentiality obligations to

24   the Company in addition to other obligations.

25   Q    I see.



www.escribers.net | 800-257-0885

1     JUDGE TRACY:  What number is it?

2     MR. ROSS:  Respondent's 4.

3     JUDGE TRACY:  Oh.

4  Q    BY MR. ROSS:  I'm going to show you Respondent's

5  Exhibit 4, and ask you if you can identify that document.

6  A    I'm sorry.  What was the question, Mark?

7  Q    The question is, do you recognize it?

8  A    Yes.

9  Q    What is it?

10  A    It's the -- it's Tesla's employee Proprietary Information

11  and Inventions Agreement.

12  Q    All right.  That's the onboarding document?

13  A    Yes.  That was the document I was referring to.

14  Q    Okay.  Now, when you were in the midst of drafting

15  Respondent's 11, did you look at Respondent's Exhibit 4?

16     MS. FEINBERG:  Leading.  Objection.  Leading.

17     JUDGE TRACY:  Sustained.

18  Q    BY MR. ROSS:  Okay.  Let me -- before we get to this,

19  could you tell us what the purpose of Respondent's Exhibit 4

20  is?

21  A    The purpose of -- there's two.  One is to establish

22  confidentiality obligation between the employee and Tesla, and

23  then the second is to assign the works that are made, the

24  inventions made as a result of your employment of the Company

25  will belong to the Company.



www.escribers.net | 800-257-0885

1    Q    Okay.

2    A    That's the inventions agreement portion.

3    Q    And at the risk of asking for an obvious answer, I'll ask

4    you nonetheless, why do you care about confidentiality?

5    A    For all the consequences of not having confidentiality

6    that we spoke with before.  It's -- it's vital to the business.

7    Q    All right.  And while you were in the midst of drafting

8    Respondent's Exhibit 11, did you look at Respondent's

9    Exhibit 4?

10    MS. FEINBERG:  Objection.  Leading.  Could we just find out

11    what he relied on to make --

12    MR. ROSS:  Sure.

13    MS. FEINBERG:  -- Exhibit 11?

14    JUDGE TRACY:  Okay.  Sustained.

15    Q    BY MR. ROSS:  What did you rely on in doing --

16    MS. FEINBERG:  For, if anything --

17    Q    BY MR. ROSS:  -- Respondent's --

18    MR. ROSS:  Nope.  I want to help you, Margo.

19    JUDGE TRACY:  Sustained.

20    Q    BY MR. ROSS:  What did you -- what documents, if any, did

21    you look at in the preparation of Respondent's Exhibit 11?

22    A    I looked at the PIIA, so Respondent's 4, the other

23    policies that we had as well, and I think a prior agreement

24    that -- that was drafted as well -- I believe Mr. Mohamad had

25    pulled together -- which was also heavily based on the PIIA



www.escribers.net | 800-257-0885

1    here.

2    Q    Um-hum.  And did you find the PIAA -- or PIIA deficient in

3    any respect?

4    A    No.

5         JUDGE TRACY:  And how much longer with this witness?

6         MR. ROSS:  You're asking --

7         JUDGE TRACY:  Yeah.  So for -- if we need to take a break

8    now or --

9         MR. ROSS:  A break's fine.

10        JUDGE TRACY:  How much longer with him, though?

11        MR. ROSS:  I think he's going to be at least another half

12   hour.

13        JUDGE TRACY:  Okay.  Let's take a break for about five,

14   seven minutes, a quick rest room break.  Okay?

15        Let's go off the record.

16   (Off the record at 10:10 a.m.)

17        JUDGE TRACY:  All right.  Go ahead, please.

18        MR. ROSS:  Thank you.

19   Q    BY MR. ROSS:  The PIIA --

20   A    Yes.

21   Q    -- Respondent's 4, that is part of the onboarding process?

22   A    Correct.

23   Q    Along with what other -- strike that.  It's how long?  How

24   many pages?

25   A    It's four pages, but the fourth one is really an exhibit.



www.escribers.net | 800-257-0885

1    So --

2    Q    Okay.

3    A    -- we'll call it three.

4    Q    And it talks in terms of -- it makes reference to statutes

5    of various types; is that right?

6    A    Yes.

7    Q    Okay.

8    A    It quotes substatutes, yeah.

9    Q    Okay.  Tell me, did you -- when you drafted -- when you

10   drafted Respondent's Exhibit 11, did you take into

11   consideration how people were presented with that document and

12   what that document was to them?

13        MS. FEINBERG:  Objection.

14        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

15        MS. FEINBERG:  The same.

16        JUDGE TRACY:  Sustained.

17   Q    BY MR. ROSS:  Respondent's Exhibit 11 is a one-page

18   document, four paragraphs.  Why --

19   A    Correct --

20   Q    Why is it so short?  And why is it in that format?

21   A    It -- it wasn't intended to be a full agreement.  It was

22   intended to be a reaffirmation, a reminder to our employees of

23   their already existing obligations with Tesla.

24   Q    Okay.

25   A    Well, our -- the intention is -- so the direction that I



www.escribers.net | 800-257-0885

1    got from my boss, our general counsel Todd, was, please take

2    the obligations the PIIA basically and our policies and dilute

3    it down.  Make it very common nonlegalese, easily

4    understandable so we can remind our employees of what their

5    obligations are, and have --

6    Q    Okay.

7    A    -- them renew their vows, if you will.

8    Q    Okay.  And the -- I think you said that there are other

9    documents that -- there are other documents that the Company

10   had available to the employees that kind of reiterated or

11   reminded people of a need for confidentiality; is that correct?

12   A    Correct.  Other policies and just general reminder emails

13   that -- that you've --

14   Q    Okay.

15   A    -- shown me already.

16   Q    And do you remember what those documents were?

17   A    We have a media policy that speaks to some of the topics.

18   I think our employee handbook speaks to some of it.  There's

19   one I can't think of the title of it.  It might be like a

20   business ethics and --

21   Q    Okay.  Do you remember any others?

22   A    No.

23   Q    Okay.  Do you remember a thing called the Code of Business

24   Conduct and Ethics?

25   A    That was the one I was thinking of when I said business



www.escribers.net | 800-257-0885

1    ethics.  And --

2    Q    Okay.

3    A    -- there's a code of conduct, too.

4    Q    And do you remember any others?

5    A    No.

6    Q    Tell me, was there a document called a Technology Systems

7    and Electronic Communications Policy one?

8    A    Yes.  Yeah.

9    Q    Okay.

10   A    And I think that dealt with devices and emails and --

11   Q    Okay.

12   A    Yeah.

13   Q    Now, over what period of time did you work on the drafting

14   of Respondent's Exhibit 11?

15   A    It would have been between September, when we had first

16   started it, and when it was sent out, so early -- through early

17   October.  It was a period of about a month.

18   Q    Okay.

19   A    And more heavily so toward the latter part of that month.

20   Q    Okay.  And was there something that happened in early

21   October that caused the acceleration of the publication of that

22   document?

23        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

24        JUDGE TRACY:  Sustained.

25   Q    BY MR. ROSS:  Okay.  Tell me why you ended up publishing


www.escribers.net | 800-257-0885

1     that document when you did in October?

2     A     I had mentioned before just kind of this culmination of

3     leaks that we've had, and then there was an effort underway.

4     That's when me and the rest -- some of the other folks on the

5     legal team sat down and talked through what we could do to

6     remind employees of -- of their obligations.  The -- and it was

7     just kind of bubbling up.  It wasn't like super high priority.

8     We had another leak in October.  I think it was an email leak.

9     Another email leak, other than Elon's email leak, that went out

10    to the public.  And I think the general thinking across

11    Tesla -- because it's not everyone that's responsible for the

12    leak -- is, again, like really, we can't control these --

13    control these leaks?  That precipitated -- it was kind of the

14    straw that broke the camel's back.  It said, let's get this

15    out.  Let's do something.  We've got to do something more

16    serious and get people to really acknowledge their -- their

17    obligations to Tesla.

18    Q     Okay.  Tell me, was the document in final form when this

19    October leak occurred?

20          MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

21          JUDGE TRACY:  Sustained.

22    Q     BY MR. ROSS:  Do you remember what the leak pertained to?

23          MR. RODRIGUEZ RITCHIE:  Objection.  Vague as to, "the

24    leak."

25          JUDGE TRACY:  Sustained.



www.escribers.net | 800-257-0885

1    MR. ROSS:  I'm sorry?

2    JUDGE TRACY:  So you're just saying, what was the leak?  So

3    if you --

4    MR. ROSS:  Yeah.  I'm --

5    JUDGE TRACY:  -- could put --

6    MR. ROSS:  -- asking him what --

7    JUDGE TRACY:  -- context --

8    MR. ROSS:  -- the leak pertained to that occurred in

9    October that caused the --

10   JUDGE TRACY:  That is the proper question.

11   MR. ROSS:  Okay.

12   THE WITNESS:  I think it was the -- it was an email about

13   discounting cars sent to the sales team.

14   Q    BY MR. ROSS:  Okay.  Do you remember where it appeared?

15   MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

16   MR. ROSS:  I'll withdraw --

17   JUDGE TRACY:  Sustained.

18   MR. ROSS:  -- the question.

19   JUDGE TRACY:  Thank you.

20   THE WITNESS:  I don't think this was Bloomberg.

21   JUDGE TRACY:  There -- so sustained.

22   THE WITNESS:  Oh, sorry.  I'm sorry.

23   MR. ROSS:  No problem.

24   MS. FEINBERG:  Yeah.  He wants a --

25   THE WITNESS:  It's a --



www.escribers.net | 800-257-0885

1          MS. FEINBERG:  He's wants a reaction.

2     Q    BY MR. ROSS:  I'm showing you Respondent's Exhibit 41.

3     A    Yeah.

4     Q    Can you tell me what that document is, if you -- strike

5     that.  Do you recognize that document?

6     A    Yes --

7     Q    Okay.

8     A    -- I do.

9     Q    And do you know -- tell us what it is.

10    A    It's an article on CNN Tech describing and quoting from an

11    email that Elon had sent to his sales team.

12    Q    Okay.  Look at the second page.  Does the email actually

13    appear in the document?

14    A    Yes, it does.

15    Q    Okay.  And did you consider this email to be nonpublic

16    business sensitive information?

17         MS. FEINBERG:  I'm sorry.  I'm just reading this document

18    that I was just handed.  I don't know where this email is

19    that's in here.  Is a Twitter in the middle of this document?

20    Is there something I'm not -- could somebody just point out

21    what it is that is referenced?

22         MR. ROSS:  On the second page.

23         MS. FEINBERG:  I'm looking at the second page.

24         MR. ROSS:  You don't see on the second page an email from

25    Elon Musk.



www.escribers.net | 800-257-0885

1     MS. FEINBERG:  I'm not sure that's an email.  It looks like

2     a -- it looks --

3     JUDGE TRACY:  So again --

4     MS. FEINBERG:  It looks like a Tweet.

5     JUDGE TRACY:  -- through the witness, please work through

6     the witness to explain this document.  Although it's just a

7     news report.

8     Q    BY MR. ROSS:  Okay.  Do you see a document on the second

9     page that is communications from Mr. Musk?

10    A    Yes, I do.

11    Q    Okay.  And do you see -- did you consider the subject of

12    this article to contain nonpublic -- otherwise nonpublic

13    business sensitive information?

14    MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

15    JUDGE TRACY:  Sustained.  So like I said before, the big

16    problem that I'm having is all of the leading questions.  I

17    cannot assess his credibility when it's yes and no and you're

18    directing him to what you want him to testify about.  I've said

19    this many --

20    MR. ROSS:  Okay.

21    JUDGE TRACY:  -- many times.

22    MR. ROSS:  All right.  That's fine.  I understand,

23    Your Honor.

24    Q    BY MR. ROSS:  Is this the email precipitated the

25    publication, Respondent's Exhibit 11?



1      MS. FEINBERG:  Objection.  Vague.  That's where I'm --

2      where I was having a problem in the first place.  I don't know

3      what "this" is because there's several things on this page.  So

4      could we at least find the words or something?  Because I don't

5      know what "this" is.  I never was able to find anything --

6      Q    BY MR. ROSS:  Is Respondent's 41 the article that

7      precipitated the publication or the issuance of Respondent's

8      Exhibit 11?

9      MS. FEINBERG:  Objection.  Leading.

10     JUDGE TRACY:  I'll overrule it.

11     Just go ahead and answer it.

12     THE WITNESS:  Can you repeat the question?

13     MR. ROSS:  Yeah.

14     Q    BY MR. ROSS:  Tell me, what connection, if any, existed

15     between the publication of Respondent Exhibit 41 and the

16     publication of Respondent's Exhibit 11, the confidentiality

17     acknowledgment?

18     A    There was -- there was a leak of some of our pricing

19     practices in another email of Elon's, and it's kind of --

20     again, it's one of these -- again, it's bubbling over now,

21     right, all these leaks that are happening.  And it was just

22     another one.  But at the same time, it was the -- it was that

23     last straw.

24     Q    Is this the last straw that caused that document to be

25     issued?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Okay.

3    A    I think it was issued --

4         MR. ROSS:  I'm going to offer --

5         THE WITNESS:  -- shortly -- like the day after --

6         MR. ROSS:  Okay.

7         THE WITNESS:  -- or the day of even.

8         MR. ROSS:  I'm going to offer Respondent's Exhibit 41 into

9    evidence, Your Honor.

10        JUDGE TRACY:  Any objections?

11        MS. FEINBERG:  I'd like to take the witness on voir dire.

12   I -- even --

13        JUDGE TRACY:  Okay.  But first --

14        MS. FEINBERG:  -- as I sit here --

15        JUDGE TRACY:  -- can I please start --

16        MS. FEINBERG:  Oh, sorry.

17        JUDGE TRACY:  -- with the --

18        MS. FEINBERG:  Sorry.  General Counsel.

19        JUDGE TRACY:  -- General Counsel?

20        MS. FEINBERG:  Sorry.  Sorry.

21        MR. RODRIGUEZ RITCHIE:  Yes, would object a relevancy

22   grounds, we'd object as to hearsay, we'd also object on the

23   basis that the document is barely readable in portions of the

24   document.  So in that regard, we don't believe it's what it

25   purports to be.



www.escribers.net | 800-257-0885

1        JUDGE TRACY:  Yeah.  So with regard to --

2        MS. FEINBERG:  Thank you.

3        JUDGE TRACY:  -- the second page, and being able to read

4    the document, I too agree that if you are relying upon whatever

5    is in the middle part of this page, I cannot read it either.

6    So do you all have a better copy of it?

7        MR. ROSS:  We'll get a better copy if one's available,

8    Judge.  We printed it out off of the Internet, and this was the

9    best quality we could get.

10       JUDGE TRACY:  Well, you can often print without all the ads

11   on the side.  But --

12       MR. ROSS:  Okay.  We'll --

13       JUDGE TRACY:  -- take a look at that.

14       MR. ROSS:  We'll do that.

15       JUDGE TRACY:  And then for the Charging Party, what are

16   the --

17       MS. FEINBERG:  Well --

18       JUDGE TRACY:  -- objections?

19       MS. FEINBERG:  -- I share the same objections.  And it's

20   still unclear to me, because I can't figure it out, that

21   they're actually was --

22       JUDGE TRACY:  So why don't --

23       MS. FEINBERG:  -- an email.

24       JUDGE TRACY:  So --

25       MS. FEINBERG:  Okay.  So I --



www.escribers.net | 800-257-0885

1     JUDGE TRACY:  -- could you please --

2     MS. FEINBERG:  Same objections.

3     JUDGE TRACY:  -- do some voir dire, please.

4     MS. FEINBERG:  Okay.

5     JUDGE TRACY:  Thank you.

6     MS. FEINBERG:  Thank you.

7              **VOIR DIRE EXAMINATION**

8     Q   BY MS. FEINBERG:  Okay.  Do you have Respondent's 41

9   before you?

10    A   Yes.

11    Q   Okay.  And can you tell me, what is the text of the email

12   that is copied into this -- that is -- that was made public?

13   Can we see it in this document?

14    A   Do you want me to read it?  Or try --

15    Q   I just --

16    A   -- try to read it?

17    Q   -- want you to direct me to it.  Because I see little

18   bubbles that appear to be to Twitters, so -- or to Twit --

19   Tweets.

20    A   So it's --

21    Q   So I was wondering if there's something that you can tell

22   is an email from the text of this article.  Not that you happen

23   to know.  But from which article, can you tell that this --

24   there's an email being released here?

25    A   I cannot.



22-60493.2060

1    Q    Okay.

2    A    Well, I mean, I could guess at it, but I can't --

3    Q    Okay.  But you believe --

4    A    I'm not for sure.

5    Q    -- there's some emails embedded in here somewhere?

6    A    I do.  I think it's that first portion starting with,

7    "Congratulations, plus a reminder regarding the Tesla same fair

8    price to all principle."

9    Q    Okay.  But that little symbol, that's not an -- with a

10    little E and the M, that's Mr. Musk's -- what is that?

11    A    That -- that actually makes me think that it is an email.

12    That's what we see in -- in Microsoft Outlook, for example, it

13    would --

14    Q    Right.

15    A    -- show up like that.

16    Q    But that would be his email handle?

17    A    Right, because --

18    Q    So how do you know --

19    A    -- because it's from --

20    Q    -- who this went to?

21    A    I don't.

22    Q    Okay.

23    A    I can't tell.

24    Q    So you don't know if he even sent -- if he sent it outside

25    the Company?  You can't tell that from this?



www.escribers.net | 800-257-0885

1    A    I can't.

2         MS. FEINBERG:  Okay.  Then I -- without going further, I

3    would like to -- okay.  I do have one more question.

4         THE WITNESS:  Um-hum.

5    Q    BY MS. FEINBERG:  Below the box where you said it some

6    text, the tiny print that I used my magnifying glass to read --

7    A    Yeah.

8    Q    -- there -- that -- the next one where it says, "Elon

9    Musk," is that his -- do you believe that's his Twitter --

10   A    Yes --

11   Q    -- account?

12   A    -- I do.

13   Q    And as -- it seems that you're somewhat tech savvy, so I'm

14   going to ask you this --

15   A    Not so much, but you can -- you can try.

16   Q    Okay.  Yeah, yeah.  Okay.  So is the -- did -- was it your

17   understanding that the small print above Mr. Musk's Twitter

18   handle is what he himself Tweeted and then responded,

19   "Corrective action taken"?

20   A    I'm not sure.

21   Q    Okay.

22   A    I shouldn't -- I'm not a big Twitter user.

23   Q    Okay.  Well, I have.

24   A    Yeah.

25   Q    And there you have it.  So it's just amusing because we


www.escribers.net | 800-257-0885

were going to have Twitter experts. So it's proven that none of us could quite get that.

MS. FEINBERG: Anyhow, all that being said, Your Honor, I don't feel this document is relevant, and I don't -- it's not clear that it proves the point that it appears Mr. Ross is trying to make. But --

JUDGE TRACY: So I'm not going to rule on this document at this point because we need to get a better version --

MR. ROSS: Okay.

JUDGE TRACY: -- of it. So we're just going to put it on the side right now.

MR. ROSS: Okay.

JUDGE TRACY: Try to get a better version. As I understand it -- and frankly, you may decide, if you can't find a better version, to withdraw the document, because, I mean, it is what it is and that's what --

MR. ROSS: That's fine.

JUDGE TRACY: -- set up the release of Respondent's 11.

MR. ROSS: Okay.

**DIRECT EXAMINATION (RESUMED)**

Q BY MR. ROSS: Tell me, Respondent's Exhibit 11, do you know if there was ever a change made to it?

A Yeah, there was a change made I think following the first implementation of it.

Q Okay. Do you recall how soon after the first

eScribers www.escribers.net | 800-257-0885

1    implementation a change was made?

2    A    I don't know the exact timeline.  I think it was a matter

3    of days.

4    Q    Okay.  And did you sign Respondent's Exhibit 11?

5    A    Did I sign it?

6    Q    Yeah.  Did you --

7    A    As an employee?

8    Q    As an employee?

9    A    Yeah, I acknowledged it.  Yes.

10   Q    Okay.  And did you later sign it again when it was put on

11   Workday?

12   A    Yes.

13   Q    All right.  Now --

14        JUDGE TRACY:  Can you identify that for the record, please?

15        MR. ROSS:  Yes.  I'm going to show the witness General

16   Counsel Exhibit 8-002.

17   Q    BY MR. ROSS:  You have in front of you a document that's

18   been marked General Counsel's Exhibit 8-002.  Do you recognize

19   that document?

20   A    Yes, I do.

21   Q    What is it?

22   A    A letter from California Assemblyman.

23   Q    Excuse me?

24   A    A letter from California Assemblyman.

25   Q    Addressing what, sir?



1    A    Addressing, I believe it was, this.  Respondent's 11.

2    Q    Okay.  Do you know if the Company ever replied to that

3    letter?

4    A    We did.

5         MR. ROSS:  42?

6         THE COURT REPORTER:  Yes.

7    Q    BY MR. ROSS:  Do you have in front of you Respondent's

8    Exhibit 42?

9    A    Yes.

10   Q    Do you recognize that document?

11   A    Yes, I do.

12   Q    What is it?

13   A    It's a letter to the Assemblyman that wrote GC Exhibit 8-

14   002.  Tesla's response to that letter, written by Todd Maron,

15   our general counsel.

16   Q    Okay.  And tell me, did you receive that letter in or

17   about January of 2017?

18   A    Yeah.  I think I may have seen an early draft of it.  I

19   did see the final after it had been sent.  I do recall that.

20   Q    All right.

21        MR. ROSS:  I'm going to offer Respondent's 42 into

22   evidence, Your Honor.

23        JUDGE TRACY:  Any objections?

24        MR. RODRIGUEZ RITCHIE:  Yes, Your Honor.  I don't think the

25   foundation has been properly laid that it's not a hearsay



1    document.  And relevancy.

2        MS. FEINBERG:  I have a relevancy objection as well.

3        MR. ROSS:  Well --

4        MS. FEINBERG:  I don't think it's --

5        MR. ROSS:  -- first of all, it is an explanation as to the

6    Company's purpose and reason for issuing the confidentiality

7    acknowledgment.  Additionally, it is responsive to what is in

8    evidence already as Respondent's Exhibit 8-002.

9        JUDGE TRACY:  Okay.  So I'm going to overrule the objection

10   and allow Respondent's Exhibit 42 into evidence.

11   **(Respondent Exhibit Number 42 Received into Evidence)**

12       MS. FEINBERG:  Can I just say one thing for the record,

13   Your Honor?

14       JUDGE TRACY:  Sure.

15       MS. FEINBERG:  Okay.  Well, Respondent's Exhibit 8 is in

16   the record because it was a leaflet handed out by workers.  It

17   wasn't put in -- that was the context of that document.  And as

18   far as I could tell, this document was never shared with the

19   workers.  So just as a point of references.  Mr. Ross said that

20   it's responsive.  I don't know what responsive means, but it

21   wasn't responsive to the people who were circulating it.  Thank

22   you.

23   Q    BY MR. ROSS:  Tell me, sir, in looking at Respondent's

24   Exhibit 11, do you see anything in that document that precludes

25   employees who sign it from discussing their wages, hours, and



www.escribers.net | 800-257-0885

1    working conditions with one another?

2         MS. FEINBERG:  Objection.  Calls for a legal -- go ahead.

3    You're first.

4         MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Leading.

5    Calls for a legal conclusion.

6         MS. FEINBERG:  I share --

7         JUDGE TRACY:  Okay.

8         MS. FEINBERG:  -- those objections.

9         JUDGE TRACY:  Sustained.

10   Q    BY MR. ROSS:  Or anything that precludes employees from

11   sharing such information with persons outside the Company?

12        MR. RODRIGUEZ RITCHIE:  Same objection.

13        MS. FEINBERG:  Same.

14        JUDGE TRACY:  Sustained.

15   Q    BY MR. ROSS:  Or --

16        MR. ROSS:  That's all I have of this witness.  Thank you.

17        JUDGE TRACY:  Okay.

18        MR. GARBER:  Just a few minutes.

19        JUDGE TRACY:  A few minutes?

20        MR. GARBER:  Yep.

21        JUDGE TRACY:  All right.  Let's go off the record for a

22   couple of minutes.

23   (Off the record at 10:45 a.m.)

24        JUDGE TRACY:  Okay.  Mr. Garber.

25        MR. GARBER:  Sure.



1          **CROSS-EXAMINATION**

2     Q    BY MR. GARBER:  Hi, Mr. Chang.  My name's Noah.

3     A    Counselor.

4     Q    I'm just going to ask you a few questions today.  I

5     represent the General Counsel in this matter.  As I'm asking

6     you questions, if you don't understand any of my questions,

7     feel free to let me know, and I'll rephrase them.  Okay?

8     A    Sure.

9     Q    You testified before about a number of leaks that

10    occurred.  Did Tesla ever conduct any economic studies to

11    establish the actual economic harm that resulted from those

12    leaks?

13    A    No, not that I'm aware of.

14    Q    Do you have Respondent's 37 in front of you still, the

15    email, from Elon Musk?

16    A    Let me see.

17    Q    I know you have a lot of documents in front of you.

18    A    Yeah, I got it here.

19    Q    Okay.  So just to confirm your testimony, the leak of

20    that, in part, led to the decision to draft the confidentiality

21    acknowledgment, which is Respondent's 11?

22    A    Yeah.  It was a culmination of things, kind of a bubbling

23    up.

24    Q    But that was part of it?

25    A    It was part of it, yes.



1    Q    Okay.

2    A    Yeah.

3    MS. FEINBERG:  Between --

4    MR. GARBER:  And Respondent's --

5    MS. FEINBERG:  37.

6    MR. GARBER:  37.

7    Q    BY MR. GARBER:  And that's because also, as you noted,

8    internal emails are considered confidential in their nature?

9    A    Yeah.

10    Q    Do you also have in front of you still Respondent's 42?

11    A    Which one is that?

12    Q    That is the CNN article.

13    A    I have 42 as --

14    Q    Oh, I'm sorry.

15    A    -- the letter --

16    Q    I'm sorry.  41.  It's --

17    A    Yep.

18    Q    -- the one with the steering wheel on it.

19    A    Yes, I have it.

20    Q    Okay.  Could you flip to the second page of that?

21    A    Sure.

22    Q    I'm directing your attention to the middle portion above

23    the Tweet.  I know it's hard to read.

24    A    Um-hum.

25    Q    Had you seen that email previous to today?



```
1    A    I think I saw it in the article --

2    Q    Okay.

3    A    -- or -- or in these reports.  Similar articles.

4    Q    Sure.  And again, it's difficult to read.  It's --

5    A    I don't think I received it, though.

6    Q    You didn't receive it.  Okay.

7    A    Yeah.

8    Q    The issue in that email is that it relates to employees'

9    practice of selling cars or discounts to cars?

10   A    Correct.

11   Q    Okay.

12        MR. GARBER:  That's all the questions I have, Your Honor.

13        JUDGE TRACY:  Ms. Feinberg?

14        MS. FEINBERG:  Okay.
```

<div align="center">

**CROSS-EXAMINATION**

</div>

```
16   Q    BY MS. FEINBERG:  So -- okay.  You indicated that there

17   was a directive given to you by -- I forgot his name -- Todd

18   Maron to develop a confidentiality agreement; is that right?

19   A    Not a --

20   Q    To --

21   A    -- confidentiality agreement.

22   Q    No.  To develop this, R-11?

23   A    Yes.  Correct.

24   Q    Okay.  And was that directive in writing?

25   A    I think it was -- I'm not sure.  We communicate in so many
```



www.escribers.net | 800-257-0885

1     different ways.  It was probably verbally, and I may have

2     gotten an email about it.

3     Q     Did you review any documents in preparation for your

4     testimony here today?

5     A     I did.

6     Q     Okay.  And other than the documents that are before you,

7     did you review any other documents?

8     A     The -- some -- some email correspondence around the time.

9     Q     And do you have that with you?

10     A     I do not.

11     Q     And can you identify what email correspondence you

12     reviewed?

13     A     I can't.  I didn't take note of it.

14     Q     What was it that you were looking for?

15     A     Refreshing my memory on the drafting of this document,

16     R-11.

17     Q     And for what period of time were you looking?

18     A     Right around the time of this document.  So it would have

19     been the fall -- late summer, fall of '16.

20     Q     And how did you go about looking?  I assume you get a lot

21     of email in light of your job.  So how did you go about

22     searching for emails that you used to refresh your recollection

23     for today?

24     A     Primarily around key terms.  Confidentiality and I do tend

25     this remember off the top of my head, when looking at this doc,



1    the people that were involved.  So names of folks, including

2    the ones I listed before, Yusef, Lynn, Todd, Carmen.  And those

3    all were part of the search strings.

4    Q    Okay.  And did you -- okay.  And were there any meetings

5    between those people to discuss R-11?

6    A    Yes.

7    Q    And did you take any notes of these meetings?

8    A    No, not that I recall.

9    Q    Did anyone?

10   A    I don't -- I don't know.

11   Q    Did you see anyone taking notes?

12   A    Not that I recall.

13   Q    What were the purpose of the meetings?

14   A    The purpose of the meeting was to brainstorm on how we can

15   remind folks of their confidentiality obligations; things such

16   as do we write another email, like the ones you've seen, how we

17   can be -- make sure that everyone understands it, and what's

18   the best communication method to do so.

19   Q    And now is your testimony that R-37 was a concern that

20   wanted you -- that prompted you to renew the confidentiality

21   commitment of the workers?

22   A    Yeah, it was one of --

23        MR. ROSS:  I'm sorry.  I couldn't hear the question.

24        MS. FEINBERG:  Should I repeat it?

25        JUDGE TRACY:  Yes, please.



1    Q    BY MS. FEINBERG:  It was the -- is it the testimony -- is

2    it your testimony that R-37 -- the content of the R-37 -- or

3    the distribution of R-37 is what prompted you to have the

4    workers renew their confidentiality commitment?

5    A    It's one of the pieces, yeah.  Again, this is -- it's a

6    building up of this.  Right?  And I think around this time, in

7    '16, there were a lot of eyes on Tesla and a lot of leaks

8    around that time.

9    Q    And do you know whether any of the information in -- well,

10   let me state it this way:  Was Mr. Musk also writing about some

11   of these same concerns that are in R-37 to -- and -- to the

12   public?

13   A    Was -- I'm sorry.  I don't quite understand the question.

14   Q    Was he publicly commenting on some of these very same

15   items, Mr. Musk?

16   A    He -- I mean, he would state things in earnings calls,

17   investor letters, and things like that.  But as far as the -- I

18   don't recall anything as far as -- he wouldn't be forecasting

19   late in the quarter how our quarter would be turning out.

20   Q    Are you sure about that?

21   A    I'm not certain, no.

22   Q    Did you ever look to see what he was saying publicly at

23   the time?

24   A    No, I didn't.

25   Q    And this R-37 went out to over 30,000 people?



www.escribers.net | 800-257-0885

1   A   I'm sorry.  On the -- on the last question, did I ever

2   look to see if I was saying at the time.  Did you mean when I

3   was --

4   Q   No.

5   A   -- refreshing my --

6   Q   Look to see --

7   A   -- memory on stuff?

8   Q   -- what Mr. Musk -- no.  At any time.  To see what

9   Mr. Musk was saying about --

10  A   Oh --

11  Q   -- these --

12  A   -- I'm constantly following Tesla -- like Tesla views.

13  Q   Right.  And do you recall one way or another, though?

14  A   I don't recall one way or another whether he was speaking

15  about --

16  Q   Okay.

17  A   -- how our quarter was looking.

18  Q   And with respect to -- R-37, did that go out to -- did you

19  say about $30,000?

20  A   I don't know that I used that number.  I mean, employee --

21  the employees at Tesla is an email alias that goes out to all

22  employees.  Not including contractors.

23  Q   And does it go out to facilities other than Fremont?

24  A   Yes.  I just don't know -- at the time, I don't think --

25  I'm not sure that we had 30,000 employees then.



www.escribers.net | 800-257-0885

1    Q    Okay.  And were you involved in the writing of R-37?

2    A    No.

3    Q    So ERM is Mr. Musk?

4    A    Correct.

5    Q    Okay.  And do you know whether this document was reviewed

6    by anybody, R-37?

7    A    I do not.

8    Q    And am I correct to say there's nothing on the face of

9    this letter -- this email from Mr. Musk that indicates that

10   it's to be maintained in a confidential fashion?

11   A    Not on this printout.  But I don't know if this printout

12   is complete or not, though.  I can't tell.

13   Q    Well, when you did your preparation for today, did you

14   find one that indicated it was confidential?

15   A    I wasn't paying attention to those, to the footers or

16   anything like that.

17   Q    And is it correct to say that you don't know who released

18   R-37 to Bloomberg?

19   A    I don't.

20   Q    Right.  So do --

21   A    And we never locate -- we never found out.

22   Q    Right.  It could have been someone in management?

23   A    It could have been, yes.

24   Q    And can you look to R-41?

25   A    Which document is that?



www.escribers.net | 800-257-0885

1  Q    I'm sorry.  That's the article with the little steering

2  wheel at the top.

3  A    Okay.

4  Q    Okay.  And I started to ask you a little -- a few of these

5  questions on voir dire, but --

6  A    Yeah.

7  Q    -- I would like to come back to this.  Because -- and you

8  can correct me if I'm wrong.  But as I read this article --

9  A    Um-hum.

10  Q    -- if I read the first four paragraphs, it says, "Musk

11  sent an email to Tesla workers Wednesday."

12  A    Um-hum.

13  Q    And then it says, "Lamenting," blah-blah-blah.  But then

14  it says, "Musk shared a screenshot of the note on Twitter

15  Wednesday."  Which, if I read this, it sounds like he sent an

16  email and then he Tweeted it, is what I thought was happening

17  on the second page.  Do you read this -- is that -- do you

18  believe that's a correct reading of this document?

19  A    I see that.  I see that area, yeah.

20  Q    Did you ever talk to Mr. Musk about whether he was the one

21  who released this information?

22  A    No, I didn't.

23  Q    Is there anything that prohibits him from releasing any of

24  these -- the emails that he sends out to the workers?

25  A    I mean, our normal policies.  But he does make decisions



www.escribers.net | 800-257-0885

1    on when to disclose things.

2    Q    Okay.  And you said that you had some concerns about if

3    things are confidential, they also -- might have to be released

4    to the SEC.  But if something's being released by Tesla to

5    30,000 workers and it's of that scope, that kind of --

6    A    Um-hum.

7    Q    -- information would have to be released to investors as

8    well?  That's not the nature of the confidential information

9    you could keep to yourselves, is it?

10   A    I -- I think it is.  Like the culture of Tesla is -- is

11   one of family and trust for employees.

12   Q    Right.  But if it's the nature of information about the

13   future of the Company, and you're sending it out to 30,000

14   people, don't you believe that you also have an obligation to

15   other people related to Tesla, your investors, to know that

16   information?

17   A    No, not -- not when it's to your employees that have

18   confidentiality restrictions in place and obligations in place.

19   Q    All right.  And why would a maintenance worker at Tesla

20   need to know about the earnings for the -- at that -- for like

21   the third-quarter rally?  Why would you need to share that

22   information with them?

23   A    Yeah.  It's context.  Right?  Like to -- to run a company

24   and to make sure that everything is aligned and that we're all

25   focused on the same thing --

22-60493.2077



1    Q    Um-hum.

2    A    -- and rowing the boat that same direction, everyone

3    should know.  And it's transparency also.  I think for myself,

4    for my team, for employees that I talk to, people want to know

5    what's going on, and they want to know what the top priorities

6    of the Companies (sic) are and why.

7    Q    And did you think that R-4, the proprietary information

8    document --

9    A    Um-hum.

10   Q    -- covered the topics that were of concern to you?

11   A    Yes.

12   Q    And do you believe that R-11 has a broader scope than R-4?

13   A    R-11.  Has a -- has a broader than --

14   Q    R-4.

15   A    -- R-4?  No.  I mean, I can tell you that my process in

16   even developing R-11, the directive was take 4, and that's one

17   of our policies, and dilute it down, make it easily readable,

18   plain English, nonlegalese, short, easily understandable by

19   nonlawyers, because this kind of sucks, like it --

20   Q    You're referring to --

21        JUDGE TRACY:  You're referring to --

22   Q    BY MS. FEINBERG:  -- R-4?

23   A    To -- I'm referring to R-4, which is the -- this long and

24   it has a lot of legalese in there and capital letters and you

25   know, definitions.  It's a lot of legalese.  And they call it

22-60493.2078



1  legalese because it's hard to understand.

2  Q    Right.  But sometimes when you --

3  A    So R-11 was that it be simple.

4  Q    Okay.

5  A    Yeah.

6  Q    And therefore, it's not -- doesn't -- it's different than

7  R-4?  It's not using the same words?  It's just like taking

8  parts of R-4?

9  A    No.

10  Q    It's --

11  A    Right.

12  Q    -- using broader language that you hope to encompass --

13  A    I wouldn't call it broader language.  It's different

14  language.

15  Q    Um-hum.  And are you the author of R-11?

16  A    Yes.

17  Q    And who else was it reviewed by?

18  A    Our general counsel, Todd Maron, the other folks that were

19  working on it as well that I named before.  Do you want me to

20  go through their names again?

21  Q    Please.

22  A    Yusef Mohamad, Lynn Miller, Todd Maron, I mentioned, and

23  Carmen Copher.

24  Q    And Carmen at the time, you said she -- what role did she

25  play?



www.escribers.net | 800-257-0885

```
1    A    I'm actually not sure.  She -- so I don't know when she

2    made that switch, the exact timing, and how it relates to the

3    fall of '16.  But she used to be an attorney on our legal team

4    and then made a switch.  She's -- she's on the HR team now.

5    I'm not sure when she made that switch, though.

6    Q    Did you say that you were involved in a response to

7    General Counsel's 8?  Do you still have that there?

8    A    General Counsel 8.  The assembly letter -- letter

9    assembly --

10   Q    Yeah.

11   A    -- yeah --

12   Q    And when you saw it, did you see it in that format which

13   has -- which was a flyer with things on both sides?

14   A    I don't -- I don't recall the, "Time for Tesla to listen."

15   That's --

16   Q    Did you ever see that?  That other side, time for Tesla --

17   A    I don't recall that.

18   Q    You don't recall ever seeing anything by Jose Moran

19   regarding concerns at Tesla?

20   A    The -- the name's ringing a bell, but I don't recall

21   seeing anything.

22   Q    Do you ever remember Mr. Musk Tweeting out about him?

23        MR. ROSS:  Your Honor --

24        THE WITNESS:  Tweeting --

25        MR. ROSS:  Your Honor, this is beyond the scope.
```



www.escribers.net | 800-257-0885

1    Objection.

2        JUDGE TRACY:  Well, this is the --

3        MS. FEINBERG:  Well, you're the one who showed him General

4    Counsel 8.  I mean, this --

5        MR. ROSS:  I know I showed him --

6        MS. FEINBERG:  Well, you did --

7        MR. ROSS:  -- the letter from the --

8        MS. FEINBERG:  You did --

9        MR. ROSS:  -- assembly.  I did not show him --

10       JUDGE TRACY:  So again, what did I say about the

11    objections --

12       MS. FEINBERG:  Sorry.

13       JUDGE TRACY:  -- and responding?

14       MR. ROSS:  I have an objection.  Beyond the scope.

15       JUDGE TRACY:  Okay.  So I'm going to overrule the

16    objection.  The way that the witness was shown the General

17    Counsel's Exhibit 8, on the back of it is a -- or on the front

18    of it, I guess, is a different letter.  And so I'm going to

19    allow the questions.

20       THE WITNESS:  I'm sorry.  What was the question?

21    Q    BY MS. FEINBERG:  Did you -- the last question was -- I

22    was trying to find out whether you had seen the, "Time for

23    Tesla to listen," which is the second page of General Counsel

24    8.  And you were saying you couldn't remember.  So I was asking

25    you whether you remembered Mr. Musk responding about it on



1    Twitter.

2    A    No.  I don't even -- I don't -- the -- the name rings a

3    bell, Jose Moran, for some reason, but I don't recall this

4    letter or any response that we made to it -- or Elon made to

5    it, whether by Twitter or otherwise.

6    Q    And did you ever speak to anybody in the California

7    legislature about the first page of General Counsel 8?

8    A    Not specifically.  I --

9    Q    What does that mean?

10   A    In -- in part of my job, I do speak to the legislature at

11   different times, but nothing about this specific letter or the

12   NDA related to it.

13       MR. ROSS:  Which -- just to be clear, what were you

14   referring to when you pointed?  That --

15       JUDGE TRACY:  So objection.  The question is vague.

16       So will you please --

17       MS. FEINBERG:  I think I was --

18       JUDGE TRACY:  -- clarify --

19       MS. FEINBERG:  -- actually it wasn't -- I don't think it

20   was that the question was vague.  I think it was that he was

21   saying that the witness said, "this letter," and it wasn't

22   clear what he was saying.

23       MR. ROSS:  Well, it is --

24       MS. FEINBERG:  So I think he was saying it's the second

25   page of --



```
1    Q    BY MS. FEINBERG:  Do you mean General Counsel 8?

2         MS. FEINBERG:  I think that's how it was --

3         THE WITNESS:  I mean --

4         MS. FEINBERG:  -- transpired.

5         THE WITNESS:  -- this, 02 -- 002.

6         MS. FEINBERG:  Thank you.  00 --

7         THE WITNESS:  2.

8         MR. GARBER:  8-002.

9    Q    BY MS. FEINBERG:  8-002?

10   A    Yes.

11   Q    Thank you.  Okay.  Thank you.  That's what I -- okay.

12   A    So what I meant to say, when answering your question, was

13   I may have spoken -- I speak to the legislature as times just

14   about Tesla, labor practices, things like that, but never about

15   this particular letter or the topic here, or any -- I don't

16   recognize any of these individuals specifically.

17        JUDGE TRACY:  And you're referring to General Counsel's

18   Exhibit 8 --

19        THE WITNESS:  8 --

20        JUDGE TRACY:  -- 002?

21        THE WITNESS:  Correct.

22        JUDGE TRACY:  Thank you.

23   Q    BY MS. FEINBERG:  And were you aware that there was

24   organizing going on -- oh, no.  When did you become aware that

25   there was organizing going on?
```



www.escribers.net | 800-257-0885

1      MR. ROSS:  Objection. Beyond the scope.

2      JUDGE TRACY:  Sustained.

3      MS. FEINBERG:  Well, I believe he just testified that he

4  talked to legislatures about labor concerns.

5      MR. ROSS:  I couldn't hear what the comment was.

6      JUDGE TRACY:  No.  Sustained.

7      MS. FEINBERG:  Okay.  I'm just saying.  One moment, please.

8  Q    BY MS. FEINBERG:  And did you say that -- were the earlier

9  drafts of R-11 that you reviewed in preparation for today?

10 A    There were.  I don't know that I -- I don't know how you

11 define review.  I didn't really like study them.  I know they

12 were like earlier drafts of it.

13 Q    Okay.

14 A    Yeah.  So like as far as what differences, changes were

15 made between, you know, the first draft and what was actually

16 published, I don't -- I don't recall.

17 Q    You don't recall?

18 A    Yeah.

19     MS. FEINBERG:  One moment, please.

20     Okay.  I have nothing further at this time.

21     MR. ROSS:  Nothing.

22     JUDGE TRACY:  Anything further?

23     MR. ROSS:  Nope.

24     JUDGE TRACY:  Thank you.

25     All right.  Thank you very much.

22-60493.2084



1          THE WITNESS:  Thank you, Your Honor.

2          JUDGE TRACY:  Please don't discuss your testimony until

3     after the close of the hearing.

4          THE WITNESS:  Sure.

5          JUDGE TRACY:  Thank you.  You can leave all the documents

6     there.  You're free to go.

7          THE WITNESS:  Thank you so much.

8          MR. ROSS:  May we take a ten-minute break, please?

9          JUDGE TRACY:  Well, let's go off the record.

10    (Off the record at 11:21 a.m.)

11         JUDGE TRACY:  Okay.  If you could please stand up, please,

12    and raise your right hand?

13    Whereupon,

14                        **SHTAWNEY MCINTOSH**

15    having been duly sworn, was called as a witness herein and was

16    examined and testified as follows:

17         JUDGE TRACY:  Okay.  Go ahead and have a seat, and state

18    your name for the record.

19         THE WITNESS:  ShTawney McIntosh.

20         JUDGE TRACY:  Okay.  And then just a few instructions.

21    Essentially the microphone here does not amplify your voice.

22    It's just for the record.  So you don't need to lean into it.

23    However, you will need to speak loud enough so everybody in the

24    room can hear your testimony, which hopefully will minimize the

25    number of times you need to repeat your testimony.  If there's

1   an objection, wait for me to rule on it as to whether you can

2   answer the question or not.  Okay?

3       THE WITNESS:  Okay.

4       JUDGE TRACY:  All right.  Thank you so much.

5       Go ahead, please.

6       MR. ROSS:  Thank you, Judge.

7                    **DIRECT EXAMINATION**

8   Q    BY MR. ROSS:  Ms. McIntosh, do you work for Tesla?

9   A    I do.

10  Q    And what's your current job?

11  A    I am a senior HR Partner covering sales and delivery in

12  Southern California.

13  Q    Okay.  And was there a time when you were an HR business

14  partner in the Fremont plant?

15  A    Yes.

16  Q    And were you a -- an HR business partner in the Fremont

17  plant in October of 2017?

18  A    Yes, I was.

19  Q    Okay.  And were you the HR business partner for Body-in-

20  White?

21  A    Yes.

22  Q    And do you know Richard Ortiz?

23  A    Yes.

24  Q    He was an employee who worked in Body-in-White?

25  A    Yes.



www.escribers.net | 800-257-0885

1  Q    Okay.  And were you present when Mr. Ortiz was told of his

2  termination from the Company?

3  A    Yes.

4       MR. RODRIGUEZ RITCHIE:  Objection.  Lacks foundation.

5       JUDGE TRACY:  Sustained.

6       THE WITNESS:  Yes.

7       MR. ROSS:  It's a foundational question --

8       THE WITNESS:  Oh.

9       MR. ROSS:  -- Judge.  I'm trying to establish she was

10 present at the termination interview with Mr. Ortiz.  How can a

11 foundational question lack foundation?  I'm asking her, were

12 you there at the time of the conversation.

13      MR. RODRIGUEZ RITCHIE:  So I can respond just to cut to the

14 chase.  You haven't -- there hasn't been foundation that she's

15 aware that he was terminated, those kinds of questions, so.

16 Q    BY MR. ROSS:  Was Mr. Ortiz terminated?

17 A    Yes.

18 Q    Okay.  Were you there when he was told he was being

19 terminated?

20 A    Yes.

21 Q    Okay.  And where was this conversation?

22 A    It was held at the factory.

23 Q    Where at the factory?

24 A    A conference room on the second floor.  I'm not sure of

25 the name.


www.escribers.net | 800-257-0885

1    Q    The second floor.  Can you be more precise than that?

2    A    The second floor of the admin building.  So the front of

3    the factory.

4    Q    Okay.  And do you recall what time of day this

5    conversation was?

6    A    I don't recall the exact time, but afternoon.  Maybe

7    around 4:00 or 5:00 maybe.

8    Q    Okay.  And where did this take place?  In the conference

9    room?

10   A    Correct.

11   Q    Okay.  And was it just you and Mr. Ortiz or was anybody

12   else there?

13   A    It was another person.  Ricky Gecewich, I believe is how

14   you pronounce it.  The ER representative.

15   Q    Okay.  And why don't you tell us as best as you can recall

16   what was said and by whom during this conversation.

17        MR. RODRIGUEZ RITCHIE:  Objection.  Calls for a narrative.

18        JUDGE TRACY:  I will sustain the objection.  If we could

19   just --

20        MR. ROSS:  I'll --

21        JUDGE TRACY:  -- because it will be -- there could be some

22   objections in between.  So just --

23        MR. ROSS:  Sure.

24        JUDGE TRACY:  -- being a little bit more --

25        MR. ROSS:  Okay.



1      JUDGE TRACY:  -- methodical --

2      MR. ROSS:  Okay.

3   Q   BY MR. ROSS:  How did the conversation begin?

4   A   From what I recall, Ricky started the conversation.  He

5   did a closeout follow-up with Richard.  So it started with

6   Ricky speaking to him, and then it ended with me walking

7   through the termination process.

8   Q   Okay.  Well, when you say it started with Ricky doing a --

9   a what?  A closeout?

10  A   Yes.

11  Q   Okay.  Try to tell us what was said during this closeout.

12  A   Ricky advised Richard that the investigation that he -- he

13  was looking into was closed.  He advised Richard that he was

14  found to be dishonest during the process, and that he had

15  recommended termination because of the --

16  Q   Okay.  Do you remember anything else that was said?

17  A   Not from Ricky.

18  Q   Excuse me?

19  A   Not from Ricky.

20  Q   Well, do you remember anything that was said by Mr. Ortiz?

21  A   For sure Richard was asked did he have any questions.  He

22  didn't.  And then I went into the exit situation.  So going

23  over benefits and COBRA and things like that.  The conversation

24  lasted about five to ten minutes, and then it was over.

25  Q   Did you hear Mr. Ortiz deny being dishonest?



www.escribers.net | 800-257-0885

1      MR. RODRIGUEZ RITCHIE:  Objection.

2      MS. FEINBERG:  Objection.

3      MR. RODRIGUEZ RITCHIE:  Leading.

4      JUDGE TRACY:  Sustained.

5  Q    BY MR. ROSS:  Was the subject of the Union mentioned

6  during the course of the termination interview?

7  A    No.

8      MR. ROSS:  Excuse me just a moment.

9      Okay.  That's all I have, Your Honor.

10     JUDGE TRACY:  Okay.  Mr. Rodriguez Ritchie?

11     MR. RODRIGUEZ RITCHIE:  If I can just have a minute or two?

12     JUDGE TRACY:  Okay.  Let's go off the record for just kind

13  of preparing for the cross-examination.  So I'll give him a

14  couple of minutes.

15  (Off the record at 11:36 a.m.)

16     JUDGE TRACY:  Okay.  Mr. Rodriguez Ritchie?

17     MR. RODRIGUEZ RITCHIE:  No questions.

18     JUDGE TRACY:  Okay.  Ms. Feinberg?

19     MS. FEINBERG:  Okay.  I have a couple.

20                    **CROSS-EXAMINATION**

21  Q    BY MS. FEINBERG:  Hi.  I'm Margo Feinberg.  I'm counsel

22  for the Charging Parties.  Just a few questions of you.

23     So you said you knew Richard Ortiz.  How did you know him?

24  A    He was one of the employees that I supported.

25  Q    What does that mean?



1    A    I was the HR business partner for Body-in-White.  He was a

2    part of the Body-in-White team.

3    Q    And had you had interactions with him before that day when

4    he was terminated?

5    A    Interactions such as what?

6    Q    Had you talked to him, met with him, anything like that?

7    A    Yes.

8    Q    Okay.  And did you know that he was active in the Union?

9    A    Yes.

10    Q    And when did you become aware of that?

11    A    I don't recall when.  It was common knowledge.  He wore

12    shirts.

13    Q    Okay.  Was he wearing a Union shirt or jacket in the

14    meeting where he was being discharged, if you --

15    A    I don't recall.

16    Q    And did you do anything to prepare for the meeting?

17    A    I printed the exit documentation.

18    Q    Whatever you did.  Exit --

19    A    No.  That's what I did.

20    Q    Oh, that's what you did.  And at the time of the meeting

21    was the decision had already been made to terminate him?

22    A    Correct.

23    Q    And had you been in a meeting before with Mr. Gecewich

24    where an employee had been terminated?

25         MR. ROSS:  I couldn't hear the question.  I'm sorry.



www.escribers.net | 800-257-0885

1    Q   BY MS. FEINBERG:  Had you been in a meeting previously

2    where an employee had been terminated where Mr. Gecewich had

3    participated?

4    A   No.

5    Q   Do you know why he was -- why he was participating in this

6    meeting then?

7    A   I have been in meetings where a representative from the ER

8    team has been a part of the exit.  So this was the

9    investigation that he did.  So he was a part of this one.

10    Q   Okay.  And in the course of the meeting, you said that

11    Mr. Gecewich said that he had been found to be dishonest in the

12    process.  Was it stated what the dishonesty was?

13    A   I believe he had mentioned Richard not being forthcoming

14    about some images or where the images came from.

15    Q   That's it?

16    A   That's it.

17    MS. FEINBERG:  I have nothing further of this witness, but

18    thank you.

19    JUDGE TRACY:  Mr. Ross?

20    MR. ROSS:  Nope.  Nothing else.

21    JUDGE TRACY:  Thank you so much.  We'll go off the record.

22    And please don't discuss your testimony until after the

23    close of the hearing.  Okay?  Thank you.

24    (Off the record at 11:40 a.m.)

25    JUDGE TRACY:  If you could go ahead and stand up, please?



1        MS. HEISEN:  Sure.

2        JUDGE TRACY:  And raise your right hand.

3    Whereupon,

4                        **ANNALISA HEISEN**

5    having been duly sworn, was called as a witness herein and was

6    examined and testified as follows:

7        JUDGE TRACY:  Okay.  Go ahead and have a seat, and state

8    your name for the record.

9        THE WITNESS:  Annalisa Heisen.

10       JUDGE TRACY:  Okay.  And so let me give you a few

11   instructions.

12       THE WITNESS:  Sure.

13       JUDGE TRACY:  This microphone here does not amplify your

14   voice.  It's just for the recording.  So you don't need to lean

15   into it.  It will capture your voice.  Just relax.  But I do

16   need you to speak up so that everybody in the room can hear

17   your answers, and that will especially help so it will minimize

18   the need for you to repeat your answer.  There's water here.

19   And if there's an objection, just wait for me to rule on it

20   about whether you can answer or not.

21       THE WITNESS:  Okay.

22       JUDGE TRACY:  And if you are confused or anything like

23   that, just say that you don't understand.

24       THE WITNESS:  Sure.

25       JUDGE TRACY:  Okay?



www.escribers.net | 800-257-0885

```
1         Go ahead, please.
2                    DIRECT EXAMINATION
3    Q    BY MR. MORRIS:  Annalisa, hi.  Where are you employed?
4    A    Tesla.
5    Q    And what's your position there?
6    A    I'm an Employee Relations Partner.
7    Q    And how long have you had that position for?
8    A    I've been in that position for just over a year.
9    Q    And what was your prior position?
10   A    I was an HR Partner.
11   Q    And how long did you have that position for?
12   A    Almost a year.
13   Q    And what was your position prior to HR Partner?
14   A    Well, I was an associate version of an HR Partner, and
15   then became full HR Partner during that almost year period.
16   Q    Okay.  And so going back to October of 2016, what was your
17   position then?
18   A    At that point, I was an Associate HR Partner.
19   Q    Okay.  And could you generally describe what your job
20   duties were as an Associate HR Partner?
21   A    Sure.  So I was responsible for partnering with my
22   assigned departments, which was paint and plastics in the
23   manufacturing part of the business.  And we partnered with the
24   business leaders on a daily to weekly basis, kind of just
25   depending on what was going on.  We would work on large
```



www.escribers.net | 800-257-0885

1      projects like performance reviews, promotion cycle, our

2      employee engagement project.  Those sorts of things.

3      Q    Okay.  And approximately how many employees -- production

4      employees were in paint and plastics in --

5      A    At that time --

6      Q    -- that time frame?

7      A    Yeah.  Approximately 800 to 1,000 I would say.  Estimate.

8      Q    Okay.  And who were you reporting to at that time?

9      A    Krista Washington was my direct manager.

10     Q    And still the same time period in October of 2016, did you

11     have any role or participate in the roll out of the

12     confidentiality acknowledgment?

13     A    I did.

14     Q    And what was your role?

15     A    So my role was to go basically partner with -- with senior

16     managers in the paint and plastics departments, and -- and go

17     and actually physically obtain the -- the signatures.  So we

18     would -- we would go out and take these papers, speak to

19     different employees about the paper, and then ask them to sign

20     it.  So I was the one actually carrying that out.

21     Q    Okay.

22          MR. MORRIS:  And I'd like to show the witness an exhibit

23     that's in evidence as Respondent's 11.

24     Q    BY MR. MORRIS:  And is this the confidentiality

25     acknowledgment you referenced?



```
 1    A    Yes.

 2    Q    And do you recall how many versions there were of the

 3    confidentiality acknowledgment?

 4    A    I recall two versions of it.

 5    Q    Okay.

 6         MR. MORRIS:  And I'd like to show the witness also

 7    Respondent's 12.

 8         UNIDENTIFIED SPEAKER:  What one?

 9         MR. MORRIS:  12.

10         MR. RODRIGUEZ RITCHIE:  12.  Oh, okay.  Thank you.

11    Q    BY MR. MORRIS:  And do you recognize Respondent's 12?

12    A    I do, yeah.

13    Q    And could you describe what that document is?

14    A    It's an email from Mark Lipscomb that's updating the first

15    version of the confidentiality acknowledgment and providing the

16    updated version.

17    Q    Okay.  Could you tell me, were there any meetings with

18    other representatives from HR concerning the confidentiality

19    acknowledgment?

20    A    Other than Mark?

21    Q    Group meetings.

22    A    Sure.  So for the roll out of this kind of project, if you

23    will, we had a team meeting for the manufacturing HR Partners.

24    Josh Hedges head that.  And it was sort of explaining what this

25    project was and why -- why we were seeking this information.
```



1        JUDGE TRACY:  And just before that last question, you

2    were -- I think you put your hand on one of the exhibits in

3    regards to the first version.  And so what was the first

4    version?  Is it in front of you?

5        THE WITNESS:  Yes.

6        JUDGE TRACY:  And what is it?  Is it -- which exhibit?

7        THE WITNESS:  It's 11.

8        JUDGE TRACY:  Respondent's Exhibit 11?

9        THE WITNESS:  Respondent's 11.

10       JUDGE TRACY:  R-11 is --

11       THE WITNESS:  Um-hum.

12       JUDGE TRACY:  -- what it says?

13       THE WITNESS:  Yeah.

14       JUDGE TRACY:  Okay.  Thank you.

15   Q    BY MR. MORRIS:  And the meeting with Josh Hedges, do you

16   recall who all was in attendance or what positions were in

17   attendance for that meeting?

18   A    What I recall is -- is other HR Partners, like myself,

19   were there.  It was our manufacturing team.  So similar to my

20   being in charge of paint and plastics, we had other -- other

21   departments HR representatives there.

22   Q    Okay.  And do you recall what Josh Hedges said concerning

23   the confidentiality acknowledgment?

24       MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

25       JUDGE TRACY:  Overruled.



1      Go ahead.

2      THE WITNESS:  As far as -- as what he said, I think that --

3      that it was pretty clear that this was related to a recent,

4      pretty -- pretty heavily covered information leak that had

5      happened, and that this confidentiality acknowledgment was --

6      was -- like this ask was happening basically as a response to

7      that to remind people about the -- the confidentiality ask that

8      they have.

9      Q    BY MR. MORRIS:  Okay.  And did Josh Hedges say anything

10     else concerning the confidentiality acknowledgment during that

11     meeting?

12     MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

13     JUDGE TRACY:  Overruled.

14     Go ahead.

15     THE WITNESS:  Not specifically that I can recall.

16     Q    BY MR. MORRIS:  Do you recall whether Josh Hedges

17     described the next steps in the process?

18     A    Yeah.  So -- so the ask would have been for us to -- to go

19     to those departments that we oversee and kind of execute this.

20     So taking the actual paperwork, setting the meetings to meet

21     with different employees so that we could let them know what

22     was going on, let them see the document, and -- and obtain

23     signatures.

24     JUDGE TRACY:  And when you -- you keep saying "the ask."

25     What is that?  I'm sorry.



1      THE WITNESS:  Sorry.  That -- so -- so what we were tasked

2  with.

3      JUDGE TRACY:  Okay.

4      THE WITNESS:  Yeah.

5  Q    BY MR. MORRIS:  Okay.  And after that meeting with Josh

6  Hedges, what did you do next with respect to the roll out of

7  the acknowledgment?

8  A    I met with the senior leadership from those two

9  departments.  We had -- basically the -- the directors of -- of

10  paints and plastics, met with them, let them know kind of what

11  was going on, and to ask that they help facilitate this or --

12  or help make sure that we're able to get out and meet with the

13  different employees.

14  Q    Okay.

15      JUDGE TRACY:  So can I just ask a point of clarification

16  that I might have missed?  When you're talking about this

17  meeting, when was this meeting?

18      THE WITNESS:  This meeting I have was on Monday,

19  October 9th.

20      JUDGE TRACY:  And so which version -- because you were

21  shown two versions.

22      THE WITNESS:  Um-hum.

23      JUDGE TRACY:  Which version -- when you're saying "the

24  acknowledgment," which version did you present to the employees

25  or were you asked to do?



www.escribers.net | 800-257-0885

1      THE WITNESS:  Yeah.  So we -- we were initially asked for

2   this first -- this first version of it.

3      JUDGE TRACY:  Respondent's 11?

4      THE WITNESS:  Yes.

5      JUDGE TRACY:  Okay.

6      THE WITNESS:  And then the next day I believe this -- this

7   came out, this Respondent's 12.  And so we pretty immediately

8   switched that out.  And that was the one that we used and --

9   and took to employees.

10      JUDGE TRACY:  Respondent's 12?

11      THE WITNESS:  12.

12      JUDGE TRACY:  Okay.  Thank you.

13   Q    BY MR. MORRIS:  And so after you spoke with the senior

14   leaders concerning the confidentiality acknowledgment, you

15   started to go into it, but when did you do next in terms of the

16   roll out?

17   A    I planned time to meet with different shifts.  So we have

18   different shifts for each factory line or area who take care of

19   that so they're not all there at the same time.  And so I would

20   actually go out into the factory line and have the different

21   employees who were in that area at that time kind of gather

22   around, and speak with them about -- about the acknowledgment.

23   Q    Okay.  And when did you first start meeting with employees

24   concerning the confidentiality acknowledgment?

25   A    Tuesday.  This Tuesday, the 11th, it looks like.



www.escribers.net | 800-257-0885

1    Q    Okay.  And approximately how many meetings did you have

2    with Production Associates concerning the confidentiality

3    acknowledgment?

4    A    I would estimate between 20 and 30 of these different

5    meetings meeting with different groups.

6    Q    And over what period of time starting on October 11th?

7    A    Through the end of that week.

8    Q    And do you recall how many meetings you had during that

9    time period?

10   A    Between -- between 20 and 30 during that time period.

11   Q    Oh, okay.  Gotcha.  And how many employees were present

12   for each of those meetings?

13   A    They varied in size, just depending on -- on that shift

14   and area that I was speaking to.  So I would say between 20 and

15   40.

16   Q    And those meetings were all with employees in the paint

17   and plastics department?

18   A    Correct.

19   Q    And could you describe what you said during these

20   meetings?

21   A    Sure.  So it wasn't -- it wasn't scripted, but I did

22   generally say the same thing for each of these presentations.

23   And I would just go to that group, ask them to gather around,

24   and I'd introduce myself, let them know that I was the HR

25   Partner for that area, and then say something along the lines



1    of -- of, as you know, there was -- there was a pretty major

2    leak that happened late last week, or something along those

3    lines.  And because of that, we just want to make sure that --

4    that you all remember that we, initially when you were hired

5    here, had a confidentiality agreement that you would have

6    signed on onboarding as far as basically articulating that

7    they're not able to share proprietary information.  That is not

8    public.  It hasn't been released.

9         So I would explain to them this is a reiteration of that,

10   hand it out to them, let them read that, ask questions if they

11   had them.  I think that examples that I -- that I would go into

12   in the different conversations were specifically regarding

13   forwarding work emails to outside email addresses that had

14   proprietary information.  So new features, for example, or

15   release dates, those sorts of things, just to make sure people

16   understood that that would fall under that umbrella.

17   Q    Okay.  Do you recall providing any other examples of what

18   would be considered a breach of the confidentiality

19   requirement?

20   A    Yeah.  I think that we also talked about photos and

21   videos, those types of things, people taking those within the

22   work environment or of the products.  We -- we wanted to make

23   sure people understood that -- that sharing those and

24   recording -- making those types of recordings would also

25   potentially be a breach of that.



www.escribers.net | 800-257-0885

1    Q    Okay.  And this meetings that you described, those were

2    happening on the production floor in paint and plastics?

3    A    Yeah.  A good amount of them were.  Sometimes in the

4    office of the paint and plastics building as well.

5    Q    Okay.  Do you recall any questions from associates

6    concerning the confidentiality acknowledgment during those

7    meetings?

8    A    Not specifically.

9    Q    Of the groups of employees that you met with in paint and

10   plastics, did any of the employees choose not to sign the

11   confidentiality acknowledgment?

12   A    Not that I recall.

13   Q    And aside from the meetings that you had with the

14   individuals in paint and plastics, did you have any other

15   meetings with employees concerning the confidentiality

16   acknowledgment?

17   A    I did, yes.

18   Q    And could you describe what those meetings were?

19   A    Yeah.  So the HR Partners in addition to overseeing

20   their -- their fixed departments, we had different

21   representatives cycle through at our cafeteria Answer Bar,

22   and -- and obtain signatures from people who were there at the

23   cafeteria at that time.

24   Q    Okay.  And what types of classifications or job titles

25   were coming into that area to the Answer Bar?



www.escribers.net | 800-257-0885

1    A    It could be anybody because it was a shared cafeteria

2    area.

3    Q    Okay.  And what did you tell employees concerning the

4    confidentiality acknowledgment during those meetings?

5    A    The same information that I shared with people when you

6    were in the -- in the paint and plastics department.

7    Q    Okay.

8         MR. MORRIS:  Where did we leave off for exhibits?

9         MR. GARBER:  42.

10        THE COURT REPORTER:  The next one is 43.

11        MR. MORRIS:  Thank you.  And I'd like to show the witness

12   an exhibit we've marked as Respondent's 43.

13   Q    BY MR. MORRIS:  And do you recognize Respondent's 43?

14   A    I do.

15   Q    And could you tell me what this document is?

16   A    Yes.  This is an email from Josh Hedges to different

17   department heads or senior leadership.  And then the -- the HR

18   team is cc'd on there.  It's regarding a -- a flowdown message.

19   Q    Okay.  And I see in the "to" line there's a group HR  VP

20   Production.  Actually it's on the cc line.  HR VP Production.

21   A    Um-hum.

22   Q    Were you a member of that group?

23   A    Yes.

24   Q    And did you receive this email on October 12th, 2016?

25   A    I did.



1    Q   And the word flowdown message, or that term, what does

2    that mean?

3    A   Yeah.  So flowdowns are done daily.  And what that is is

4    information that's provided to senior leaders about different

5    updates for the factory.  They could be related to production

6    or other projects that are ongoing.  That information is

7    provided to those senior leaders and then they're asked to take

8    that information and flow it down or cascade it down to

9    different leadership throughout the factory so that that

10    information can get dispersed.

11    Q   Okay.  And I'd like to direct your attention to the last

12    paragraph of the email.  It says, "Please cascade this message

13    to your leaders so we can work together to knock this out by

14    Friday."  Do you have any idea what the reference to "cascade

15    this message" is referring to?

16    A   Yeah.  What I -- what I described about the senior leaders

17    taking the information and -- and giving it to other leadership

18    who report in to them.

19    Q   Okay.  And the senior leaders, are they the individuals

20    that are on the "to" line of the email?

21    A   Correct.

22    MR. MORRIS:  I'd offer Respondent's 43.

23    JUDGE TRACY:  Any objections?

24    MR. RODRIGUEZ RITCHIE:  I'd like to voir dire.

25    JUDGE TRACY:  Go ahead.



1                    **VOIR DIRE EXAMINATION**

2     Q    BY MR. RODRIGUEZ RITCHIE:  My name is Edris

3     Rodriguez Ritchie.  I represent the General Counsel of the

4     National Labor Relations Board in this matter.

5         If you take a look at the document at the top, do you see

6     where it says, "From Josh Hedges," and then all the way at the

7     bottom there's attachments, and then it's the string of letters

8     and numbers?  Do you see that?

9     A    Ah, yes.

10    Q    You understand that to mean a document was attached to

11    this email?

12    A    It's -- it's possible that it was, or it could be

13    something in the signature.  Sometimes those -- those load as

14    attachments, that png.

15    Q    But you don't remember?

16    A    I don't recall, no.

17        MR. RODRIGUEZ RITCHIE:  Then I'd object to the receipt of

18    this document.

19        JUDGE TRACY:  Okay.  Any objections?

20        MS. FEINBERG:  I -- I have -- I'll share the same

21    objection.  Not to mention Mr. Hedges was here.  It seems like

22    he should have been the one to authenticate it.  But, anyhow, I

23    share that same objection.

24        JUDGE TRACY:  And so again, I think we've had this with one

25    other document.  Mr. Morris, if you could please show the



1    General Counsel and the Charging Parties the actual document

2    itself.  Again, I feel as though it's likely to have been just

3    an icon since it's .png.  I don't know what that stands for.

4    But if you could just show them that to confirm that there

5    isn't a document attached to it.

6        But in the meanwhile, I'll overrule Respondent's exhibit --

7    overrule the objections and allow Respondent's Exhibit 43 into

8    evidence.  And that's -- that is with the caveat that you're

9    going to find this document and show them the actual document

10   with what the attachment is.  Okay?

11       MR. MORRIS:  Okay.  Thanks, Your Honor.

12   **(Respondent Exhibit Number 43 Received into Evidence)**

13       JUDGE TRACY:  And certainly if you have troubles with that,

14   you guys let me know that you have not seen the real document.

15       MR. RODRIGUEZ RITCHIE:  Yes, Your Honor.

16       MR. MORRIS:  And I'd like to show the witness Respondent's

17   13.

18                    **DIRECT EXAMINATION** **(RESUMED)**

19   Q    BY MR. MORRIS:  Do you recognize Respondent's 13?

20   A    I do.

21   Q    And did you receive this email on or about November 2nd,

22   2016?

23   A    I did.

24   Q    And could you describe what the document is?

25   A    Yes.  It is an email from Mark Lipscomb.  And he's


www.escribers.net | 800-257-0885

1    basically introducing an electronic version of the

2    confidentiality acknowledgment.  So it's basically after we --

3    we got these wet signatures or these -- these hard copy

4    signatures, we rolled out this E-sign electronic version of

5    this in Workday, and this is him explaining that and asking

6    that we -- that we complete this gathering of the electronic

7    signatures.

8    Q    Okay.  And do you know why the electronic signatures were

9    requested?

10    A    Yeah.  My understanding is that, given the scale and how

11    many people were -- were needing to sign this document, we

12    realized that just the size of the task of -- of trying to

13    upload all of these and get these linked into employee files

14    was -- was just operationally too complicated, and then the

15    idea was to switch it to these E-signatures which could be

16    automatically included.

17    Q    Okay.  And did you have any role in getting management or

18    employees to electronically sign the confidentiality

19    acknowledgment?

20    A    What I recall is just talking to those same senior leaders

21    in those departments and reminding them to ask supervisors to

22    remind employees that that document was there, it was sitting

23    in their -- in their Workday account needing to be E-signed.

24    So that's all I recall is asking them to get that information

25    out.



www.escribers.net | 800-257-0885

1    Q    Okay.  And there's a reference to Workday on this

2    document, Respondent's 13?

3    A    Um-hum.

4    Q    Did you have any understanding of whether the

5    acknowledgment was available to review on Workday?

6    A    Yes, it was.

7    Q    And prior to obtaining the electronic signatures, did you

8    tell associates anything with respect to obtaining copies of

9    the physical document that they had been provided?

10    MR. RODRIGUEZ RITCHIE:  Objection.  Vague.

11    JUDGE TRACY:  If you could just restate the question,

12    please.

13    MR. MORRIS:  Yeah.

14    Q    BY MR. MORRIS:  So going back to the meetings that you had

15    with Production Associates in the group meetings, did you tell

16    those associates anything with respect to being able to obtain

17    a copy of the acknowledgment?

18    MR. RODRIGUEZ RITCHIE:  Objection.  Vague.

19    JUDGE TRACY:  Overruled.

20    Go ahead.

21    THE WITNESS:  So we didn't have that as part of the general

22    announcement, but if people said that they wanted a copy or --

23    or asked on a one-off basis, I would take their name and -- and

24    let them know that we would provide it to them, in the -- in

25    the coming days, get them a copy of that at their request.


www.escribers.net | 800-257-0085

1      MR. MORRIS:  Okay.  Nothing further.

2      JUDGE TRACY:  General Counsel?

3      MR. RODRIGUEZ RITCHIE:  Yes.  I'll be brief.

4                     **CROSS-EXAMINATION**

5    Q    BY MR. RODRIGUEZ RITCHIE:  You testified about meetings

6    that you had with employees with regards to Respondent's

7    Exhibit 11 so that they would sign the agreements.  Do you

8    recall that testimony?

9    A    The meetings that I had were for Respondent's 12, the

10   second --

11   Q    Oh.

12   A    -- version.

13   Q    Excuse me.  Do you recall how many meetings you had?

14   A    It was approximately 20 to 30 meetings.

15   Q    And so you testified about things that you said during

16   those meetings.  Your testimony was just generally what you can

17   recall over the course of all those meetings that you said; is

18   that right?

19   A    Correct.  It was --

20   Q    So it's not --

21   A    It's high level.  Not exact wording.

22   Q    So you don't remember specifically what you said at each

23   one of those meetings; is that right?

24   A    Not exact wording at each one, no.

25   Q    Okay.  And then you were also present during Answer Bar



1    meetings with employees about signing the confidentiality

2    agreement?

3    A    Correct.

4    Q    And how many of those did you participate in?

5    A    Those were -- were -- some of them were group meetings,

6    some of them were individual.  It's a walk-up Answer Bar.  So

7    it depended on --

8    Q    So --

9    A    -- on how many people --

10    Q    -- can you provide me with an estimate of how many

11    instances you spoke with people at the Answer Bar regarding

12    signing the agreement?

13    A    My estimate would be that -- that I met with about 100

14    individuals in different sized groups or individually at the

15    Answer Bar.

16    Q    Okay.  And so your testimony about things that were said

17    during those interactions, that wasn't testimony about any

18    specific instance, it was just generally what you can recall

19    over the 100 times that you met with people; is that right?

20    A    Can you rephrase the question?

21    Q    So the testimony I believe you gave about -- I think what

22    you said was the same information that you provided to these

23    100 or so people at the Answer Bar, that same information you

24    don't remember specifically what you said to each one of those

25    people or people that -- persons or people that came to you on



1    those 100 instances; is that right?

2    A    Correct.  Not over the 100 different instances.

3    Q    And then you also testified about the electronic

4    signature, about speaking with business leaders about their

5    talking to employees about signing the confidentiality

6    agreement electronically.  Do you recall that?

7    A    (No verbal response).

8    Q    You weren't --

9    JUDGE TRACY:  Could you say yes or no for --

10   THE WITNESS:  Yes.

11   JUDGE TRACY:  -- for the record?

12   THE WITNESS:  Sorry.  Yeah.

13   Q    BY MR. RODRIGUEZ RITCHIE:  You weren't present when those

14   business leaders spoke with employees about signing it

15   electronically, correct?

16   A    As far as reminding employees that the E-signature was

17   available?

18   Q    Right.  I think what you said was that you spoke with

19   business leaders about their talking to their employees about

20   signing the confidentiality agreement electronically.

21   A    Reminding them -- yeah, reminding them about it, that they

22   weren't giving the same talking points that had already been

23   delivered to the groups.

24   Q    So I just want to clarify.  Your conversation was just

25   with the business leaders?  So it wasn't with the actual



1    employees signing the document?

2    A    Right, regarding the E-signatures.

3    Q    Okay.  And then you testified about Workday and about your

4    understanding of -- that the confidentiality agreement was

5    available on Workday?

6    A    Yes.

7    Q    You haven't checked every single employee's Workday

8    information at Tesla?

9    A    No.  I'm basing that on the fact that it was available.

10   I -- I was also asked to sign that.  Everybody in the company

11   was.  So --

12   Q    So it's based --

13   A    -- it was available --

14   Q    -- on the fact that it was available to you?

15   A    In my account, yeah.

16   Q    But -- so you don't actually know for a fact whether it

17   was available to every single employee at Tesla; is that right?

18   A    That's my understanding of it, but no, I don't.

19   Q    Okay.  Thank you.

20   A    Um-hum.

21   JUDGE TRACY:  Ms. Feinberg?

22   MS. FEINBERG:  I just have a couple of questions.

23                    **CROSS-EXAMINATION**

24   Q    BY MS. FEINBERG:  Hello.  I'm Margo Feinberg.

25   A    Hi there.



1    Q    Counsel for the Charging Parties.  So as I understand it,

2    you were involved in people signing Respondent's Exhibit 12; is

3    that right?

4    A    Correct.

5    Q    Okay.  And at the very bottom there's like a little

6    sentence that says, "If you do not realize the severity of the

7    consequences, Tesla will be providing a one-time complete

8    forgiveness of responsibility provided that you fully disclose

9    all significant confidentiality violations below."

10        Do you see that?

11   A    Um-hum.

12   Q    And I didn't hear you --

13        JUDGE TRACY:  Say yes or no, if you know.

14        THE WITNESS:  Yes.  Yes.

15        MS. FEINBERG:  Okay.

16   Q    BY MS. FEINBERG:  And did you explain that to people in

17   the meetings that you were holding?

18   A    What I recall is if people asked questions about that, we

19   would just kind of reiterate what's written there.  There was

20   not really any additional explanation beyond that.

21   Q    So when you made your presentation at the beginning about

22   the document, you didn't highlight that component, that people

23   had to effectively come clean now or forever hold their peace,

24   kind of thing?

25   A    We didn't highlight it.  I provided the document for


www.escribers.net | 800-257-0885

1    everybody to -- to read over at that time.

2    Q    Okay.  And did you highlight any language in the document?

3    A    Specifically the -- the examples of -- that are -- that

4    are written there.  Right?  So like forwarding work emails that

5    contain proprietary information, photos and videos of that and

6    new products, those sorts of things, I would highlight those as

7    examples.

8    Q    And how about the sentence that says, "This includes

9    information about products, features, pricing, customers',

10   suppliers', employees' financial information and anything

11   similar"?  In the middle of the second paragraph.  Did you read

12   that out loud or --

13   A    I -- I didn't read it out loud, no.

14   Q    Okay.  And did you reference that section at all?

15   A    The section that the -- that that --

16   Q    That that sentence is --

17   A    -- wording is included in?

18   Q    Right.

19   A    I mean, the pieces as far as sharing anything that aren't

20   already public information?

21   Q    Um-hum.  Actually I'm just trying to understand.  And how

22   long did the people have to read this before they were to sign

23   it?

24   A    As long as they needed to.

25   Q    And so were they being pulled off the line to sign this?



www.escribers.net | 800-257-0885

1    A    The group was pulled around kind of in a -- a group

2    meeting format --

3    Q    Um-hum.

4    A    -- which is common for -- for people working in -- in that

5    particular environment --

6    Q    Um-hum.

7    A    -- and they were -- they were asked to give full attention

8    during that meeting period.

9    Q    Okay.  And so you didn't read it.  So they were asked to

10   read it during that meeting period and --

11   A    Correct.

12   Q    -- then sign it?

13   A    Correct.

14   Q    And how long a period of time was that?

15   A    It varied, but I would say between 10 and 15 minutes,

16   depending on how long people took, if they had questions, those

17   sorts of things.

18   Q    And was this document provided in Spanish or in any other

19   language?

20   A    I don't recall.  I don't recall that.

21   Q    Okay.  Do you remember if anyone asked for a translation?

22   A    No, not that I recall.

23   Q    And did anyone ask you what the recent leaks were during

24   the course of these meetings that are referenced in the first

25   sentence of Respondent's Exhibit 12, page 2?



1    A    Not that I recall.

2    Q    And did you give any examples?

3    A    Can you rephrase the question?

4    Q    Were you give -- did you give any examples of what the,

5    quote, unquote, "recent leaks of confidential Tesla

6    information" were?

7    A    From what I recall, this was -- this was well-known.

8    People --

9    Q    That's --

10    A    -- the people I was speaking to were familiar with what it

11    was.  But no, I didn't know go into any detail.

12    Q    And the people you were talking to were workers?

13    A    Correct.  Yeah.

14         MS. FEINBERG:  Okay.  I have nothing further.

15         JUDGE TRACY:  Mr. Morris?

16         MR. MORRIS:  Nothing further.

17         JUDGE TRACY:  Okay.  Thank you very much.

18         THE WITNESS:  Thank you.

19         JUDGE TRACY:  Please don't discuss your testimony until

20    after the close of the hearing.

21         THE WITNESS:  Sure.

22         JUDGE TRACY:  Okay?  You can leave everything right there.

23         THE WITNESS:  Okay.

24         JUDGE TRACY:  Let's go off the record.

25    (Off the record at 1:34 p.m.)



1      JUDGE TRACY:  Okay.  If you could go ahead and stand up,

2   please?

3      MR. HUNT:  Oh.

4      JUDGE TRACY:  And -- oop.  Let's first remove the documents

5   up here.

6      MR. MORRIS:  Thank you.

7      JUDGE TRACY:  Okay.  And raise your right hand.

8   Whereupon,

9                       **HOMER JEROME HUNT**

10   having been duly sworn, was called as a witness herein and was

11   examined and testified as follows:

12      JUDGE TRACY:  Okay.  Go ahead and have a seat, and state

13   your name for the record.

14      THE WITNESS:  My name's Homer Jerome Hunt.

15      JUDGE TRACY:  What's your name?

16      THE WITNESS:  Homer Jerome Hunt.

17      JUDGE TRACY:  Okay.  And so let me give you a few

18   instructions.  This microphone here does not make your voice

19   louder; it's just for the recording.  So you don't need to lean

20   into it.  It will --

21      THE WITNESS:  Oh.

22      JUDGE TRACY:  -- capture your sound.  So you can relax.

23      THE WITNESS:  Oh, okay.

24      JUDGE TRACY:  But you will need to speak up so everybody in

25   the room can hear you when you answer the questions, and so



1    that way we have fewer needs for you to repeat your testimony.

2         THE WITNESS:  Okay.

3         JUDGE TRACY:  Also, if you don't understand the question

4    that's being asked of you, please feel free to say that you

5    don't understand.  And then if there is an objection to a

6    question, wait for me to tell you if you can answer or not.

7    Okay?

8         THE WITNESS:  Okay.

9         JUDGE TRACY:  All right.  Go ahead.

10                        **DIRECT EXAMINATION**

11   Q    BY MR. MORRIS:  Homer, where are you employed?

12   A    Tesla Motors.

13   Q    And how long have you been employed there?

14   A    Since 2012.  But a Tesla employee, 2013.

15   Q    Okay.  And starting in 2013, what was your position?

16   A    A regular associate.

17   Q    Was that in Body-in-White?

18   A    Body-in-White, yes.

19   Q    And how long did you have that position for?

20   A    From a temp or -- from 2012 to 2014, I was an associate.

21   Q    Okay.  And then what was the next position that you held?

22   A    I applied for a team lead in Quality Control.

23   Q    And approximately when did you receive that position?

24   A    In 2015.

25   Q    And what was your position after Quality Control lead?



1    A    I became a supervisor in March of 2016.

2    Q    And what department was that in?

3    A    Also Body-in-White.

4    Q    And how long were you a supervisor in Body-in-White from

5    March 2016 onwards?

6    A    Well, I'm still -- well, in Body-in-White?

7    Q    Yeah.

8    A    2016 to 2000- -- January 2017.

9    Q    Okay.  And then beginning in January of 2017, did your

10    position switch at all?

11    A    Yeah.  Body-in-White, Quality Control.

12    Q    Okay.  So from March 2016 through January of 2017, you

13    were a supervisors in Body-in-White, and then beginning January

14    of 2017 to the present, you are a supervisors in Quality?

15    A    Correct.

16    Q    And what were your job duties as a supervisor in Body-in-

17    White?

18    A    Make sure we meet our efficiencies, stagger our breaks and

19    lunches.  Kronos.  We'd work through breaks, we'd work through

20    lunches.  Manage.  I think I had probably like 38 people that I

21    supervised then.  Pretty much it was my first time being in a

22    supervisor role, so I depended on most of my leads or whatever.

23    But it was -- it's been okay so far.

24    Q    Okay.  And you said approximately 30 or so people that you

25    supervised?



www.escribers.net | 800-257-0885

1    A    About 35 or --

2    Q    Thirty-five?

3    A    Yeah.

4    Q    And what types of job positions or titles did you

5    supervise?

6    A    I had about ten welders.  Everything else was off == as

7    to -- we -- we worked in Under Body.  So we built all the

8    undercarriage of the car.  So we had about 32 processes, so.

9    Q    Okay.  And prior to being employed at Tesla, did you ever

10    work out of the same facility in Fremont, California?

11    A    Yes.  I worked NUMMI from 1993 until we closed.

12    Q    And what was your position there?

13    A    Just a team lead.

14    Q    Were you a member of the UAW?

15    A    I -- yes, I was.

16    Q    Was there ever a time period where you directly supervised

17    an employee named Michael Williams?

18    A    Yes.

19    Q    And what period of time was that?

20    A    First of August until the end of December, 31st, 1st,

21    somewhere around there, of 2016.

22    Q    Okay.  So August 2016 through December 2016?

23    A    Correct.

24    Q    And that was the same time period that you were in Body-

25    in-White, right?



www.escribers.net | 800-257-0885

1 A Right.  Well, when you say Body-in-White, just to clarify,

2 Body-in-White has Under Body, Body Side, Quality.  And so Body-

3 in-White -- I'm still in Body-in-White, but I'm in Body-in-

4 White Quality.  So Body-in-White Under Body.

5 Q Under Body?

6 A That's -- I work there.  Under Body.

7 Q And how would you describe Mr. Williams' conduct during

8 the time period that you supervised him?

9 MS. FEINBERG:  Objection.

10 MR. GARBER:  Objection.  Relevance.

11 MS. FEINBERG:  Objection.  Vague.

12 JUDGE TRACY:  Okay.

13 MR. MORRIS:  It's background to a later alleged

14 conversation --

15 MS. FEINBERG:  Well, the question --

16 MR. MORRIS:  -- that involves this individual.

17 MR. GARBER:  The allegation -- if I can respond.  The

18 allegation relates to 8(a)(1) statement, not his behavior or

19 his conduct.

20 MS. FEINBERG:  And the word conduct is so overbroad.  It's

21 not like he's asking what particular -- his performance, his

22 conduct, and what that means.

23 JUDGE TRACY:  If you could clarify the question, please.

24 MR. MORRIS:  Okay.

25 Q BY MR. MORRIS:  During this time that you supervised



1    Mr. Williams, how would you describe the interactions between

2    you and him?

3        MR. GARBER:  Same objection.

4        MS. FEINBERG:  Same.

5        JUDGE TRACY:  Sustained.

6    Q    BY MR. MORRIS:  Did you ever discipline Mr. Williams?

7    A    Yes.

8    Q    And what was he disciplined for?

9    A    Disrupting our morning meetings.

10   Q    And could you elaborate in terms of disrupting the morning

11   meetings?

12       MR. GARBER:  Objection.  Relevance.

13       MS. FEINBERG:  Same objection.

14       JUDGE TRACY:  Sustained.

15   Q    BY MR. MORRIS:  During the time period that you supervised

16   Mr. Williams, did you ever get in any verbal altercations with

17   that gentleman?

18   A    Yes.

19   Q    And could you describe what those altercations were?

20       MS. FEINBERG:  Objection.  Relevancy.

21       MR. MORRIS:  I promise --

22       JUDGE TRACY:  What's --

23       MR. MORRIS:  -- we'll get there.

24       JUDGE TRACY:  What's the relevance?

25       MR. MORRIS:  It's background to the alleged conversation at



1    issue in the complaint, and it explains what was said and

2    was -- what was not said during that conversation.

3         JUDGE TRACY:  Well, you know, if it's an 8(a)(1)

4    allegation, it's going to be, you know, objective.  So I'm not

5    sure what's the relevance of the background here.

6         So again, I'm going to sustained the objection.

7         MR. MORRIS:  Okay.  I'll circle back to it.

8    Q    BY MR. MORRIS:  Did you --

9         JUDGE TRACY:  And give me one second.  I just -- you know,

10   we've kind of jumped around in this case, so I need to find

11   the -- find this -- just give me one second myself to keep up.

12        MR. GARBER:  If you're looking for the complaint --

13        JUDGE TRACY:  Yes.

14        MR. GARBER:  -- it's 7(s).

15        JUDGE TRACY:  7(s)?

16        MR. GARBER:  Yeah.

17        JUDGE TRACY:  Okay.  Thank you.

18        MR. GARBER:  Sure.

19        JUDGE TRACY:  Yeah.  Go ahead now, please.

20        MR. MORRIS:  Okay.

21   Q    BY MR. MORRIS:  So you testified that you supervised him

22   from August 2016 up through December of 2016.  Do you recall

23   having any interactions with Mr. Williams after the time period

24   that you supervised him?

25   A    No.



www.escribers.net | 800-257-0885

1  Q    Do you recall any interactions where Mr. Williams

2  approached you after the time period that you supervised him?

3  A    Yes.

4  Q    And could you describe that for us?  What occurred during

5  that interaction?

6  A    Really it wasn't an interaction.  It was more of a -- a

7  yelling contest.

8  Q    And walk me through what happened at the beginning of that

9  interaction.

10  A    We had a lead position open in Under Body.  At this time,

11  I was no longer his supervisor.  It's been like eight months.

12  He had another supervisor.  So he approached me into my area,

13  and started, why did they give a nonwelder the position?

14  And -- and everybody is full of MS, and dah-dah-dah-dah-dah.

15  And -- and that's part -- pretty much as far as it went.

16  Because from the period that I stopped being his supervisor

17  until present, we didn't have any interaction at all.  Breaks,

18  lunches, nothing, so.

19  Q    Okay.  And that interaction where he approached you about

20  this welding position, what was his demeanor like when he

21  approached you?

22      MR. GARBER:  Objection.  Relevance.

23      MS. FEINBERG:  Same objection.

24      JUDGE TRACY:  Sustained.

25  Q    BY MR. MORRIS:  What was the tone of his voice when he


www.escribers.net | 800-257-0885

1    approached you?

2        MR. GARBER:  Same objection.

3        MS. FEINBERG:  Same.

4        JUDGE TRACY:  Sustained.

5    Q    BY MR. MORRIS:  What did he say, to the best of your

6    recollection, when he approach -- when he approached you that

7    day?

8    A    Word for word?

9        MS. FEINBERG:  Objection.  Relevancy.

10       JUDGE TRACY:  Overruled.  Go ahead.

11   Q    BY MR. MORRIS:  Not -- describe for us what he said, to

12   the best of your recollection, when he approached you that day.

13   A    We have an associate.  He used to be a welder.  It wasn't

14   a welder.  So he's -- he's a heavy-set gentleman.  So he came

15   and said, how did you guys -- he said, you guys -- because he

16   always included me as being a part of management, and I'd say

17   I'm a supervisor.  He said, you guys gave that F -- fat FF the

18   welding position.  He wasn't even a welder.  You guys are f'd

19   up, dah-dah-dah-dah-dah.  And pretty much that's -- I just

20   listened to him vent to me about not getting the position.

21   Because I -- I think he had went out for the position or

22   something like that.

23   Q    When you're saying -- using the word F, was he saying F or

24   was he using some other word?

25   A    No.  He was using the regular word.



1          MR. GARBER:  Objection.  Relevance.

2          JUDGE TRACY:  I'll overrule the objection.

3          Go ahead.

4          THE WITNESS:  It was saying fat MF, so.

5     Q    BY MR. MORRIS:  And he was actually saying the words as

6     opposed to abbreviations?

7     A    Correct.

8     Q    Did you say anything in response to the things that he

9     said during that --

10    A    No, because that's all he was always looking for is to --

11    to bully -- to bully somebody.  So there was always very little

12    interaction with him.

13    Q    But you didn't say anything in response?

14    A    No.

15         MS. FEINBERG:  I'd like to move to strike the part where it

16    was an editorial as opposed to what his response was.

17         JUDGE TRACY:  I'm going to overrule it.  That's fine.

18    Q    BY MR. MORRIS:  Did the Union ever come up during that

19    conversation with him?

20    A    No.

21    Q    Had you ever discussed the Union with Mr. Williams?

22    A    No.

23    Q    And why did you not respond to Mr. Williams when he

24    approached you that day?

25    A    Because we had had several conversations when -- I was



1    going to go to HR because he was calling me Uncle Tom and I was

2    S'ing -- upper management.  He was just always vulgar, so I

3    just ignored him.  So that's how I know we never had any kind

4    of interactions.  At the time, I'm the only black supervisor

5    that was over there, so if anything would happen, they would

6    come and try to vent to me, but -- so.  Yeah, we had no kind of

7    relationship at all.

8         MS. FEINBERG:  Objection.  Nonresponsive.

9         JUDGE TRACY:  Overruled.

10   Q    BY MR. MORRIS:  Did you ever tell Mr. Williams, quote,

11   "The Union is never getting in here.  This is Tesla"?

12   A    No, I did not.

13        MR. MORRIS:  Nothing further.

14        JUDGE TRACY:  All right.  Oh, do you?  Okay.  Mr. Garber?

15        MR. GARBER:  I do some work.  Could we have a minute?

16        JUDGE TRACY:  Yes.

17        Okay.  Let's go off the record.

18   (Off the record at 2:07 p.m.)

19        JUDGE TRACY:  Okay.  Go ahead.

20                       **CROSS-EXAMINATION**

21   Q    BY MR. GARBER:  Hello, sir.

22   A    How are you doing?

23   Q    My name's Noah.  I represent the General Counsel, the

24   NLRB, in this case.  I just have a few questions to ask you.

25   Okay?  If at any time you don't understand a question I'm



www.escribers.net | 800-257-0885

1  asking, just let me know and I'll rephrase it.  All right?

2  A    Okay.

3  Q    So I want to talk to you a little bit about that

4  conversation you had -- that you just testified about with

5  Michael Williams.  You characterized it as a yelling contest,

6  right?

7  A    Um-hum.

8  Q    So that was after --

9  JUDGE TRACY:  So I need you to say yes or no --

10  THE WITNESS:  Oh, yes.

11  JUDGE TRACY:  -- for the record.  Thank you.

12  THE WITNESS:  Yes.

13  Q    BY MR. GARBER:  And that was after -- you said it was

14  after December of 2016, right?

15  A    Yes.

16  Q    Okay.  And Mr. Morris asked you what was said in that

17  conversation, and you kind of questioned him as saying, "Word

18  for word?"  So you don't remember specifically everything that

19  was said, correct?

20  A    No.

21  Q    Did you issue Mr. Williams discipline after that

22  conversation?

23  A    No.

24  Q    Was he disciplined as a result of that conversation?

25  A    No.


www.escribers.net | 800-257-0885

1    Q    And in that conversation, as you characterized it, he was

2    mad because he didn't get a promotion, right?

3    A    Correct.

4         MR. GARBER:  No further questions.

5         JUDGE TRACY:  Ms. Feinberg?

6         MS. FEINBERG:  I have a few.

7         JUDGE TRACY:  Um-hum.

8                          **CROSS-EXAMINATION**

9    Q    BY MS. FEINBERG:  Hello.  My name's Margo Feinberg.  I'm

10   counsel --

11   A    How are you doing?

12   Q    -- for the Charging Parties.  So this conversation that

13   you're testifying about, was anyone else present.

14   A    I don't believe so.

15   Q    So it wasn't on the line?

16   A    I don't work on the line.

17   Q    But does he?

18   A    He approached me.

19   Q    Right.

20   A    We work about 100 yards away from each other.  So he

21   approached me.

22   Q    And where were you standing?

23   A    My desk is nowhere near where he works.  So he approached

24   me where I was.

25   Q    Right.  And that's all I'm asking you.  I'm not asking --



1    A    Oh.

2    Q    So I'm asking where he approached you.

3    A    I was at my -- in QC, Quality Control.

4    Q    And is it your testimony that no one else was present?

5    A    No.

6    Q    And do you know someone name Phil Munoz?

7    A    Phil Munoz?

8    Q    Yes.

9    A    Yes.

10   Q    And do you recall whether he was present?

11   A    No, I don't believe so.

12   Q    Are you sure?

13   A    I'm pretty sure.

14   Q    Did Mr. Williams say to you that he was hoping that you

15   were going to support him for the lead position?

16   A    There's no way I could have supported him.

17   Q    I'm not asking you that.

18   A    No.

19   Q    So wait.  I know --

20   A    No.

21   Q    -- this is difficult --

22   A    Just --

23        JUDGE TRACY:  So --

24   Q    BY MS. FEINBERG:  -- and it's obviously --

25   A    No.


www.escribers.net | 800-257-0885

1    Q    -- natural, but please --

2         JUDGE TRACY:  So --

3    Q    BY MS. FEINBERG:  -- answer the question that I'm asking

4    you.

5    A    Okay.

6         JUDGE TRACY:  So let me kind of step in here.  So we're

7    going to create a transcript after this.  And  so --

8         THE WITNESS:  Um-hum.

9         JUDGE TRACY:  -- everything will be typed out.  And so as a

10   result, you can't -- neither one of you can talk over one

11   another or else --

12        THE WITNESS:  Oh, on or about.

13        JUDGE TRACY:  -- the transcript will be kind of messed up.

14        THE WITNESS:  Okay.

15        JUDGE TRACY:  So wait for the question and then you can

16   respond when she finished.  And vice versa.

17        THE WITNESS:  Okay.

18        JUDGE TRACY:  Okay?

19   Q    BY MS. FEINBERG:  And do you know whether he had applied

20   for a lead position?

21   A    I was told he did.

22   Q    And who were you told by?

23   A    I can't recall.

24   Q    And did Mr. Williams tell you before that he was going to

25   apply?


www.escribers.net | 800-257-0885

1    A    He might have.

2    Q    Okay.  And did he ask for your support?

3    A    No, I don't recall he asked for my support.

4    Q    And do you know whether he got an interview for the lead

5    position?

6    A    No, I do not.

7    Q    And at the time he approached you, was he concerned that

8    the lead position had gone to someone else?

9    A    Okay.  I -- I didn't understand the question.

10    Q    You said that he approached you to talk to you.  What was

11    he approaching you about?  I thought you said he -- let me

12    rephrase it.  You said he approached you because he felt you

13    hadn't supported him for the lead position?

14    A    He approached me -- he didn't approach to talk to me.  He

15    approached yelling at me that they gave the lead position to

16    somebody else.

17    Q    And did you ever report that conversation that you had

18    with Mr. Williams to anyone at the time?

19    A    No.

20    Q    And did you review anything before you testified here

21    today?

22    A    No.

23    Q    Did you ever write anything about that incident?

24    A    No.

25    Q    And when was the first time you told anyone about that



1      interaction?

2      A     I don't think I told anybody about it.

3      Q     Well, you're here today, so I'm going to assume at some

4      point you told somebody.

5      A     I told somebody or somebody mentioned it to me, because at

6      first I didn't really recall.

7      Q     Who approached you?

8      A     My counsel.

9      Q     So the first person to approach you -- did Victor Facha

10     approach you?

11     A     Victor Facha?

12     Q     Did any of the supervisors who you work with approach you?

13     A     No.

14     Q     And when you say some counsel approached you, who was

15     that?

16     A     Sitting right here at the table.

17     Q     The person who just questioned you?

18     A     Yes.

19     Q     Did someone ask you to leave the plant to go talk to

20     counsel?

21     A     No.

22     Q     Oh.  So where did you meet with counsel?

23     A     At the plant.

24     Q     And did you know at the time that you went to meet with

25     counsel, that there -- this proceeding was happening?



www.escribers.net | 800-257-0885

1   A    No.

2   Q    And did Mr. Williams ever say anything to you about the

3   UAW?

4   A    No.

5   Q    Did he ever say anything to you about fairness?

6   A    No.

7   Q    About seniority?

8   A    No.

9   Q    And are you familiar with Main Line number 140?

10  A    Yes.

11  Q    And who -- did Mr. Williams work there?

12  A    Yes.

13  Q    And did you walk by that line as part of your job?

14  A    No.

15  Q    I'm talking about, I'm sorry, in the fall of 2017.

16  A    You -- you -- yeah, you could pass it, but not -- it's not

17  part of my job.

18  Q    But you walk by there to get to where you're going?

19  A    No, you don't have to walk there to get where I'm going.

20  It's an enclosed box.  So you would have to go in there.  You

21  don't walk by.  It's -- it's a welding box.  So they have

22  plastic up.  So you have to go in there.

23  Q    Okay.

24  A    You don't walk by it.

25  Q    But you walk by the box in which they're in?



www.escribers.net | 800-257-0885

 1    A    They're in there.  A curtain.  So you have to go inside if

 2    you want to have interaction with them.  For safety reasons.

 3         MS. FEINBERG:  Okay.  I have nothing further at this time.

 4         JUDGE TRACY:  Mr. Morris?

 5         MR. MORRIS:  Nothing further.

 6         JUDGE TRACY:  Okay.  All right.  Thank you very much.

 7         THE WITNESS:  Okay.

 8         JUDGE TRACY:  Thank you very much.

 9         THE WITNESS:  Okay.

10         JUDGE TRACY:  Please don't discuss your testimony with

11    anyone else until after the close of the hearing.

12         THE WITNESS:  Okay.

13         JUDGE TRACY:  Okay?  Thank you so much.

14         THE WITNESS:  Okay.

15         JUDGE TRACY:  Let's go off the record.

16    (Off the record at 2:22 p.m.)

17         JUDGE TRACY:  Okay.  If you could stand up, please, for me,

18    and raise your right hand?

19    Whereupon,

20                          **ARNOLD CAMAT**

21    having been duly sworn, was called as a witness herein and was

22    examined and testified as follows:

23         JUDGE TRACY:  Okay.  Have a seat.  State your name for the

24    record.

25         THE WITNESS:  Arnold Camat.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  Okay.  And so let me give you a few

2    instructions.  There's water, if you need it.  Also, this is to

3    record your voice for a transcript later.  It's going to pick

4    up your voice, so you don't need to --

5    THE WITNESS:  Oh.

6    JUDGE TRACY:  -- lean into it.  Just relax.  However, we

7    have a lot of people in the room kind of spread out, so if you

8    could just speak up loud enough so everybody can hear your

9    testimony so we can minimize the number of times that we need

10   you to repeat what you just said.  If there are any objections,

11   wait for me to rule on them before -- to let you know whether

12   you can answer the question or not.  Wait for the question to

13   be finished being asked before you answer.  Again, because

14   we're having a transcript and so we don't -- it will get cut

15   off when you read it later.  Okay.

16   MR. MORRIS:  Okay?

17                    **DIRECT EXAMINATION**

18   Q    BY MR. MORRIS:  Arnold, where are you employed?

19   A    Tesla.

20   Q    And how long have you been employed by Tesla?

21   A    I've been employed over four-and-a-half years.

22   Q    Okay.  And when you started with Tesla, what was your

23   position?

24   A    I was a Quality Production Associate.

25   Q    And how long did you have that position for?



www.escribers.net | 800-257-0885

1    A    I had that -- I held that position from March 2014 to

2    October 2014.

3    Q    And then what position did you have after that?

4    A    I was Quality Team Leader for -- for Production.

5    Q    Okay.  And how long did you have that position for?

6    A    I'd say from the middle of October 2014 to July 2016.

7    Q    Okay.  And beginning in July 2016, what was your position?

8    A    Beginning in July 2016, I was a Production Supervisor for

9    Body Shop.

10   Q    And from what date to what date did you hold that position

11   approximately?

12   A    Approximately from -- I'd say like the middle of July 2016

13   to maybe the beginning of February 2018.

14   Q    Okay.  And that was always in the Body Shop?

15   A    That is correct.

16   Q    And what was your -- what were your primary duties as a

17   supervisor?

18   A    Just to ensure that the workers were being safe, we were

19   tracking and monitoring all of our down time, parts shortages,

20   and ensure that we met our daily production targets.

21   Q    Okay.  Was there ever a period of time that you directly

22   supervised Eric Vasquez?

23   A    Yes.

24   Q    And approximately what period of time did you supervise

25   him?



1    A    I want to say July 2016th (sic) all the way up until March

2    2017.

3    Q    Okay.  And did Eric Vasquez have any performance issues

4    during the time that you supervised him?

5        MR. GARBER:  Objection.  Relevance.

6        JUDGE TRACY:  Sustained.

7    Q    BY MR. MORRIS:  Do you recall any substantive conversation

8    with Mr. Vasquez during the time period that you supervised

9    him?

10   A    Conversations that we had were purely on his attendance.

11   Q    Okay.  And tell me what you recall concerning those

12   conversations.

13   A    Eric Vasquez was coming in late to work.  So before we do

14   any type of disciplinary action, we kind of do a -- a coaching,

15   then we transition to a verbal, and then we go -- then we

16   escalate it further if we need to.

17   Q    Okay.  And do you recall if there was any disciplinary

18   action issued to him for attendance?

19       MR. GARBER:  Objection.  Relevance.

20       MS. FEINBERG:  Same objection.

21       MR. MORRIS:  It just goes to the time period at issue with

22   the allegation.

23       JUDGE TRACY:  I'm not sure I understand that --

24       MR. MORRIS:  It's --

25       JUDGE TRACY:  -- so --



www.escribers.net | 800-257-0885

1    MR. MORRIS:  -- just some lead up and some background to

2    the conversation at issue in this case with the supervisor.

3    JUDGE TRACY:  Um-hum.  Just -- if you could just ask the

4    question again -- or rephrase the question, please.

5    Q    BY MR. MORRIS:  Do you recall if you issued any

6    disciplinary action to Mr. Vasquez for attendance issues?

7    MR. GARBER:  Same.

8    MS. FEINBERG:  Same.  Same objection.

9    JUDGE TRACY:  I'll overrule it for the purposes of getting

10    the witness to the point that's relevant to the case.

11    Q    BY MR. MORRIS:  Could you answer the question?

12    A    Yes.  I gave him a written warning for his attendance.

13    Q    And do you recall approximately when you issued that to

14    him?

15    A    I'd say beginning -- or the middle of March 2017.

16    Q    Okay.  And at some point you stopped supervising

17    Mr. Vasquez.  Why was that?

18    A    I stopped supervising him because he got -- he had

19    received his written warning with me and we thought it would be

20    best between me and Eric to transition him over to Quality

21    where they started a little bit later.  Because during the time

22    that he was with me, the start time was 5:25.  So we came

23    together and discussed that he could start later with a

24    different department within the same area, which is 5:55.  So I

25    kind of worked with him to have him transition to a later



1    start -- start time.

2    Q    Okay.  And was that a joint decision for him to move to

3    Quality?

4    A    Yeah.

5    Q    And he moved sometime in March of 2017 you think?

6    A    Yeah.

7    Q    Did you have any substantive conversations with

8    Mr. Vasquez after the date that he transitioned to Quality?

9    A    No.

10    Q    Have you ever discussed the Union with Mr. Vasquez?

11    A    No.

12    Q    Have you ever seen Mr. Vasquez wearing a Union shirt or a

13    Union hat?

14    A    Not that I recall, no.

15    Q    Did you ever tell Mr. Vasquez, quote, "They're watching

16    people with am Union sticker"?

17    A    No.

18         MR. MORRIS:  Nothing further.

19         MR. GARBER:  Just a minute, please.

20         JUDGE TRACY:  Okay.  Let's go off the record for a minute.

21    If you need that or --

22         MR. GARBER:  Oh, yeah, please.

23         JUDGE TRACY:  Okay.

24    (Off the record at 2:56 p.m.)

25         JUDGE TRACY:  Okay.  So of your cross-examination, if you



1    just want to at least propose a stipulation regarding his

2    supervisory status.

3         MR. GARBER:  Sure.  We propose stipulating that, the

4    current one, is Arnold Camat is a statutory supervisor within

5    the meaning of the Act.

6         MR. MORRIS:  So stipulated.

7         JUDGE TRACY:  All right.

8         MR. GARBER:  Okay.

9         JUDGE TRACY:  Thank you.

10        Go ahead.

11                    **CROSS-EXAMINATION**

12   Q    BY MR. GARBER:  Hi, Mr. Camat.

13   A    Hi.

14   Q    My name's Noah.  I represent the General Counsel, the

15   NLRB, in this case.  I'm just going to ask you a couple of

16   questions.

17   A    Okay.

18   Q    Okay?

19   A    Um-hum.

20   Q    If at any time you don't understand a question that I ask

21   you, just let me know.  I'll rephrase it.  All right?

22        This will be brief.  Just a few questions about -- a couple

23   of follow-up questions about what you just testified to

24   regarding Eric Vasquez.  Okay?

25        You mentioned that you issued him a written warning.  That



1    was attendance related, correct?

2    A    Yeah.

3    Q    Okay.  So you had conversations with him with attendance?

4    A    Correct.

5    Q    And those conversations, at least one of them, it occurred

6    near the time clock; is that right?

7    A    I don't recall it being near a time clock.  Every time we

8    talk to an associate, we kind of bring them away from the

9    production line and we kind of do a one-on-one.

10    Q    Is it possible that one of them occurred near the time

11    clock?

12    A    What occurred?

13    Q    Is it possible that one of the conversation you had with

14    him about attendance occurred near the time clock?

15    A    No.  No.

16    Q    Did you have any conversations with him near the time

17    clock that --

18    A    No.

19    Q    -- you recall?

20    A    No.

21    Q    How many -- about how many times would you say you spoke

22    to him about his attendance issues?

23    A    One, two, three -- I'd say about three times.

24    Q    And in any of those conversations, was he wearing Union

25    stickers?



```
 1    A    I don't recall.  I don't recall.

 2    Q    Do you keep notes from any of those conversations?

 3    A    If I did, it would have -- it would have -- have been

 4    documented in the -- we use a portal called Workday, which we

 5    document like any type of feedback there.  So if there was

 6    documentation, I would have documented it in that.

 7    Q    Okay.  You don't recall if you did, but if there was --

 8    A    No, I don't.

 9    Q    -- it would have been in Workday?

10    A    Correct.

11    Q    Okay.  Is it your practice when discussing an attendance

12    issue with an employee to document it in --

13    A    Yes.

14    Q    -- Workday?

15         JUDGE TRACY:  Sir, remember, wait for him to finish asking

16    the question.

17         THE WITNESS:  Oh, sorry.

18         JUDGE TRACY:  Okay?

19         THE WITNESS:  Sorry.  All right.

20         JUDGE TRACY:  If you could just respond to that again.  I

21    think your --

22         THE WITNESS:  Yes.

23         JUDGE TRACY:  -- answer was "yes."

24         THE WITNESS:  Yes.

25         JUDGE TRACY:  Just I want to be sure that the record --
```



www.escribers.net | 800-257-0885

1      THE WITNESS:  Yeah.

2      JUDGE TRACY:  -- is clear.

3      THE WITNESS:  Sorry.

4      MR. GARBER:  Okay.  Nothing further.

5      JUDGE TRACY:  Okay.  Ms. Feinberg?

6      MS. FEINBERG:  I just have a few.

7                        **CROSS-EXAMINATION**

8  Q    BY MS. FEINBERG:  First of all -- hello.

9  A    Hello.

10 Q    I'm Margo Feinberg.  I represent the Charging Parties.  I

11 just have a few questions.  Did you review any documents before

12 testifying here today to prepare for your testimony?

13 A    Yes.

14 Q    And what were they?

15 A    Eric Vasquez' written warning.

16 Q    And did you have that in your possession or did someone

17 give that to you?

18 A    I had that on my work laptop.

19 Q    On your?

20 A    Work laptop.

21 Q    And other than reviewing that warning that you found in

22 your work laptop, did you review any other documents?

23 A    No.

24 Q    And did you ever write anything else down that you recall

25 about Eric Vasquez?



www.escribers.net | 800-257-0885

 1    A    No.

 2    Q    And I'm sorry, what was -- when did you cease being his

 3    supervisor?  I believe you gave a date for that?

 4    A    Yeah.  Sometime in March 2017.

 5    Q    Okay.  And did you see him at any time after you were his

 6    supervisor -- after you ceased being his supervisor?

 7    A    Yes.

 8    Q    And did you notice whether he was wearing any Union

 9    stickers?

10    A    No, I don't recall.

11    Q    So he may have been, you just don't recall right now?

12    A    Yeah, I just don't -- yeah, I don't recall him wearing

13    that.

14    Q    And how about Union T-shirts?

15    A    I don't recall.

16    Q    And in the job that he had, or would -- if he was wearing

17    T-shirt, would you be able to see it or it would be covered up?

18    A    I would be able to see it.

19    Q    I just to be clear.  So on know occasion did you see

20    Mr. Vasquez wearing Union stickers?

21    A    I don't recall him wearing --

22    Q    Okay.  And on no occasion do you recall seeing him wearing

23    a Union T-shirt?

24    A    I don't recall.

25         MS. FEINBERG:  Okay.  I have nothing further.

22-60493.2146



1     JUDGE TRACY:  Mr. Morris?

2     MR. MORRIS:  Nope.

3     JUDGE TRACY:  Okay.  Thank you very much.  Please don't

4     discuss your testimony with anyone until after the close of the

5     hearing.

6     THE WITNESS:  Okay.

7     JUDGE TRACY:  All right?  Thank you.

8     THE WITNESS:  Thank you.

9     JUDGE TRACY:  You can leave.

10    THE WITNESS:  Oh, okay.

11    JUDGE TRACY:  Um-hum.  Let's go off the record.

12    (Off the record at 3:07 p.m.)

13    JUDGE TRACY:  Okay.  While we're waiting for this next

14    witness, we had an off-the-record discussion about the two

15    orders that I spoke about yesterday.  The first one being the

16    various versions, if they exist, regarding General Counsel's

17    Exhibit 62.  Based upon these off-the-record discussions, the

18    Respondent has found that there are various versions of the

19    General Counsel's Exhibit 62.  However, there is a concern that

20    some of these versions have attorney-client privilege, because,

21    based upon the Respondent's kind of offering here, Mr. Gecewich

22    created one version.  That version then was sent to counsel for

23    review.  There were some reviews made -- or some comments

24    added, and then thereafter Mr. Gecewich created another version

25    of the document, which was then shown to Mr. Graminger at that

1     meeting.

2         So at this point, the Respondent is willing to turn over

3     the versions of General Counsel's Exhibit 62 that it does not

4     name attorney-client privilege.  And I, though, will review in

5     camera the versions that Respondent alleges are attorney-client

6     privilege to confirm or not confirm that those are indeed

7     attorney-client privilege.  The General Counsel has requested

8     the metadata for that series of documents, and the actual

9     electronic versions of it.  Based upon that, the Respondent

10     will be turning over to the General Counsel a log which shows

11     when the document was created and any time anyone went into it.

12         And for my purposes with regard to the subpoena request

13     that is sufficient, the General Counsel disagrees and wants the

14     metadata, so the actual electronically stored document, turned

15     over, at this point, I'm not willing to entertain that, you

16     know, renewal of the subpoena.  And if the time and the dates

17     are given for the versions of this General Counsel Exhibit 62,

18     I feel that that is sufficient and responsive to the subpoena

19     request.

20         With regard to the second order, which was regarding

21     Ms. Toledano's involvement with the two discriminatees here,

22     the Respondent's indicated that they are looking, they continue

23     to look for any responsive documents, but have not yet found

24     any, but they continue to look.  The search the not complete.

25         And finally, there is still an issue with regard to the



www.escribers.net | 800-257-0885

1    Charging Parties' subpoena.

2        And that is in regard to which subpoena request?

3        MS. FEINBERG:  Number 16.

4        JUDGE TRACY:  Number 16.

5        MS. FEINBERG:  And there's 18.

6        JUDGE TRACY:  Okay.

7        MS. FEINBERG:  And 19 and 20.

8        JUDGE TRACY:  Okay.

9        MS. FEINBERG:  16, 18, 19, and 20.

10       JUDGE TRACY:  Okay.  And so if you could just very

11   briefly --

12       MS. FEINBERG:  I will.

13       JUDGE TRACY:  -- for the record --

14       MS. FEINBERG:  Thank you.

15       JUDGE TRACY:  -- explain what --

16       MS. FEINBERG:  Okay.

17       JUDGE TRACY:  -- your -- I've already ruled on it, but --

18       MS. FEINBERG:  Yes.

19       JUDGE TRACY:  -- what you're requesting?

20       MS. FEINBERG:  Okay.  At the -- prior to this hearing, we

21   requested certain documents from the Company regarding

22   communications, scripts, terminations all related to the

23   confidentiality policy.  And those requests, the initial date

24   that we sought them for was from January 1st, 2016 to the

25   present.  And with all due respect, Your Honor, you denied our

escribers
www.escribers.net | 800-257-0885

1    request -- you ruled in response to their motion to quash that

2    those four items were deemed irrelevant, and therefore, that's

3    what happened.  And we, you know, accepted that.

4        But then in the course of the proceeding, now that Tesla's

5    putting on its case, they have presented certain documents that

6    fall -- and testimony to indicate that people were terminated

7    for confidentiality, that there were communications during this

8    period of time that went out to workers regarding

9    confidentiality.  And so the documents actual do exist that

10   meet this criteria, and they're using those documents, it

11   appears to us, as a defense.  And so we just wanted to renew

12   our request because it is -- we anticipated that and we would

13   like to see the full picture.  Instead we get, you know, cherry

14   picking by the Company.  And so we're just renewing our

15   request.

16       JUDGE TRACY:  Um-hum.

17       MS. FEINBERG:  And that's where we're at.

18       JUDGE TRACY:  And in particular, I -- again, based upon

19   off-the-record discussions, your concern had to do with

20   Respondent's Exhibits 39 and 40, which you felt were responsive

21   to those subpoena requests.

22       MS. FEINBERG:  Yes, that --

23       JUDGE TRACY:  Is that correct?

24       MS. FEINBERG:  -- and -- yes.  And also the testimony of

25   the last witness who said -- I'm sorry -- the Vice President of



www.escribers.net | 800-257-0885

1    Legal --

2         JUDGE TRACY:  Yeah.

3         MS. FEINBERG:  -- Mr. Jonathan Chang -- right?

4         MR. GARBER:    Chang.

5         MS. FEINBERG:  Chang.  Yeah.  Who also said that people

6    were disciplined or discharged, you know, for -- which Is one

7    of the requests -- for the conduct in breach of the

8    confidentiality agreement.

9         JUDGE TRACY:  Okay.  And so again, you know, I stand by my

10   prior ruling --

11        MS. FEINBERG:  Okay.

12        JUDGE TRACY:  -- that -- granted the petition to revoke on

13   those subpoena requests, because I don't find it actually to be

14   relevant to this proceeding.  However, in the interest of

15   permitting the Respondent to be able to put in their defense --

16   and frankly, I think it was their background leading up to the

17   acknowledgment of why they presented Respondent Exhibit 39 and

18   40 along with the testimony of the witness -- I allowed that to

19   allow their due process rights, but, you know, I stand by my

20   prior ruling that it really isn't relevant, so.  But you have

21   that for the record.

22        Okay.  So when will you have copies of the document to

23   review and the copies that you're going to go ahead and turn

24   over to them?

25        MR. ROSS:  I have to talk to Jaime about that right now.



1      JUDGE TRACY:  Okay.  So let's go off the record.  It is

2    4:15, so let's see if Mr. Rodriguez is here.

3      MR. MORRIS:  He's here.

4      JUDGE TRACY:  Oh, he is.  Okay.  So perhaps we can go ahead

5    and start with him.

6      MR. ROSS:  Before we --

7      JUDGE TRACY:  Um-hum.

8      MR. ROSS:  -- leave this subject, Judge, we've got

9    Mr. Gecewich coming here at 9:00 tomorrow morning.

10     JUDGE TRACY:  Yeah.

11     MR. ROSS:  I'm assuming that we can get the copies made

12   this afternoon, and we'll have them distributed to people,

13   et cetera.  If you wanted him to resume the stand as a 611(c)

14   witness, you want him here at 9:00 tomorrow, because I have to

15   call his counsel and tell him.

16     JUDGE TRACY:  Yeah.  I thought he was coming at 9:00.

17     MR. ROSS:  He is coming at 9:00.

18     JUDGE TRACY:  Yeah.  So let --

19     MR. ROSS:  But --

20     JUDGE TRACY:  But I don't know if they are -- they -- I

21   don't think they know until they look at the documents whether

22   they want to, you know --

23     MR. ROSS:  Okay.

24     JUDGE TRACY:  -- call him back as a 611(c) or if they're

25   going to just deal with him on cross-examination.



www.escribers.net | 800-257-0885

1      MR. ROSS:  All right.

2      JUDGE TRACY:  I don't know.  They probably cannot tell you

3  that until they look at the document.  I will say this:  Is

4  that I will decide tonight, I'll look at it tonight, and -- and

5  let you all know first thing in the morning about whether the

6  attorney-client privilege is appropriate.

7      MS. FEINBERG:  It's going to take you --

8      JUDGE TRACY:  Yeah.

9      But if you could -- yeah.  So anyway, let's give them the

10  copies --

11      MR. ROSS:  Sure.

12      JUDGE TRACY:  -- of it that you --

13      MR. ROSS:  Okay.

14      JUDGE TRACY:  -- don't have issues with.  And then we'll

15  also call Mr. Rodriguez.

16      MR. ROSS:  Okay.  I'd like to step out and talk to Jaime

17  about the --

18      JUDGE TRACY:  Sure.

19      MR. ROSS:  -- logistics of --

20      JUDGE TRACY:  Sure.

21      MR. ROSS:  -- of the --

22      JUDGE TRACY:  Okay.  Let's go off the record.

23  (Off the record at 4:15 p.m.)

24      JUDGE TRACY:  Okay.  If you could stand up, please?

25      MR. RODRIGUEZ:  Yeah.

22-60493.2153



 1      JUDGE TRACY:  And raise your right hand.  And you can look

 2  at me.

 3      MR. RODRIGUEZ:  Okay.

 4  Whereupon,

 5                      **ARMANDO RODRIGUEZ**

 6  having been duly sworn, was called as a witness herein and was

 7  examined and testified as follows:

 8      JUDGE TRACY:  Okay.  Have a seat.  State your name for the

 9  record.

10      THE WITNESS:  Armando Rodriguez.

11      JUDGE TRACY:  Okay.  And so let me give you some

12  instructions.  You have a microphone in front of you.  That's

13  to record your voice.  You can relax.  You don't need to lean

14  into it.  It will capture your voice.  Just please speak loud

15  enough so everybody in the room can hear you so we can minimize

16  the number of times we need to ask you to repeat your

17  testimony.  If there's a question that you don't understand,

18  just say that you don't understand what the question is so

19  if -- the attorney can ask the question again or restate the

20  question.  If there's an objection, wait for me to rule on it

21  to decide whether you can -- to determine whether you can

22  answer the question or not.  If you need water, we have it

23  right here.  Okay?

24      THE WITNESS:  Okay.

25      JUDGE TRACY:  Okay.



1      THE WITNESS:  Sounds good.  Oh, there's some right here.

2      JUDGE TRACY:  You're going to have to push the button.

3      THE WITNESS:  All right.

4      JUDGE TRACY:  All right.  Mr. Morris.

5      MR. MORRIS:  Okay.  Thanks.

6                    **DIRECT EXAMINATION**

7      Q    BY MR. MORRIS:  Thanks, Armando, for coming here on your

8      day off from Stockton.  I appreciate it.  Where do you work?

9      A    At Tesla Motors.

10     Q    And how long have you worked there for?

11     A    Five years.

12     Q    When you started there, what was your position?

13     A    Production Associate.

14     Q    Okay.  And at some point were you promoted?

15     A    Yes.

16     Q    Was that to the Team Lead position?

17     A    Correct.

18     Q    And when did that occur?

19     A    I want to say about a year, year and a half into -- after

20     being a Production Associate.

21     Q    Okay.  So sometime in 2014?

22     A    Correct.

23     Q    And were you promoted after you were a lead?

24     A    Correct.

25     Q    And what position was that?



www.escribers.net | 800-257-0885

1    A    Supervisor.

2    Q    Do you recall approximately when you were promoted?

3    A    I want to say another -- a year after being a Team Lead.

4    Q    So sometime in 2015?

5    A    Yeah, somewhere around there.  '15, '16,

6    Q    And were you a supervisor in any particular department?

7    A    I started with Model X.

8    Q    And did that change at some point?

9    A    Yes.

10   Q    What did that change to?

11   A    I went to Model 3 next.  So I went to another -- a whole

12   other department.

13   Q    Okay.  And do you recall when that occurred --

14   A    I want to say --

15   Q    -- approximately?

16   A    -- about six -- six months ago now.

17   Q    So in March of 2017, you would have been a Production

18   Supervisor for Body-in-White, Model X?

19   A    Correct.

20   Q    And what were your job duties in that position?

21   A    Managing timecards, making sure everybody was safe, you

22   know, passing down any -- any vital information that, you know,

23   I get from my managers, just overseeing the production quality,

24   the efficiencies, checking the body work.

25   Q    Okay.  And in this March 2017 time frame, approximately



www.escribers.net | 800-257-0885

1    how many people did you supervise?

2    A    I want to say between 25 and 28 people.

3    Q    And during the time that you were a Production Supervisor

4    for Model X, did you ever hold preshift meetings?

5    A    Every day, for the most -- every -- for -- every day for

6    the most part.

7    Q    Okay.  And could you describe what preshift meetings are?

8    A    At the -- at the beginning -- beginning of the shift,

9    within those five minutes, we either discuss -- we're going to

10   discuss any -- any safety incidents that happened within the

11   factory itself that we pass down within Body-in-White, either

12   being Model S or X, any -- any like -- any information that

13   Tesla's passing down with -- just saying with -- because we

14   have a flowdown.  So basically they're talking about either

15   efficiency, how well we're doing within -- within the quarter,

16   any safety concerns or -- or how well we're doing with safety,

17   passing that information or any -- any information that I get

18   from other departments; hey, we had a little incident, you

19   know, discuss it with the team so that way they're aware of it.

20   And just any -- any -- any quality issues that we had for the

21   previous shift or something that we have to keep out for how

22   well we were running the previous shift.

23   Q    Okay.  And who typically attends these preshift meetings?

24   A    My team itself.  Myself, my team leads, my safety

25   coordinators, and then, of course, the team itself.



1    Q    And the team, is that the Production Associates?

2    A    Correct.

3    Q    And you mentioned a term flowdown.  Are there flowdowns in

4    the bathroom?

5    A    Correct.  There's -- there -- there's flow -- there's like

6    monthly flowdowns that they have there.

7    Q    Okay.  And could you tell us what a flowdown is in a

8    bathroom?

9    A    Basically it's information that Tesla's providing

10   basically with either -- at that month, hey, our -- our stock

11   options are going to open up, or, hey, we're going to have a

12   car meeting.  We're going to have am -- your benefits are going

13   to reopen up again.  Hey, remember to apply.  What else?  Of

14   course our quarterly number is, hey, this quarter, we did

15   really well, or, you know, this is what our goal is for the

16   next month.  So just -- just general information that Tesla

17   provides so that -- so that the whole factory knows what's

18   going on.

19   Q    Okay.  And could you --

20        JUDGE TRACY:  And so I'm sorry.  Are you saying bathrooms?

21        MR. MORRIS:  Bathrooms, yeah.  Or rest rooms.

22        THE WITNESS:  Bathrooms.

23        JUDGE TRACY:  There are flowdowns in the bathrooms?

24        MR. MORRIS:  Well --

25        THE WITNESS:  Yeah.  At the --



1      MR. MORRIS:  I can get him to describe --

2      JUDGE TRACY:  Can you clarify that --

3      MR. MORRIS:  -- what they are.  Yeah.

4      JUDGE TRACY:  -- please?  Yes.  I can just --

5  Q    BY MR. MORRIS:  Could you describe what the flowdown is

6  physically?

7  A    It's just --

8      MR. ROSS:  It's -- we're not talking about plumbing.

9      THE WITNESS:  It's --

10      JUDGE TRACY:  Okay.

11      THE WITNESS:  It's just a sheet -- basically a piece of

12  paper.  So it will be --

13      JUDGE TRACY:  Oh, okay.

14      THE WITNESS:  -- on the -- on the -- by the urinal.  Each

15  stall has like a little -- you know, you have a little -- a

16  curly folder or something.

17      JUDGE TRACY:  Okay.

18      THE WITNESS:  They'll post it up, and then you'll be able

19  to read it while -- while using the rest room.

20      JUDGE TRACY:  Okay.

21      MR. MORRIS:  Okay.

22  Q    BY MR. MORRIS:  And it's Company information that's posted

23  on the flowdowns?

24  A    Correct.

25  Q    Have you ever observed personal information being posted



1    on that?

2    A    No.

3    Q    And directing your attention to March 2017, did you

4    observe any vandalism in the bathrooms that you used?

5    A    Yes.

6         MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

7         JUDGE TRACY:  Sustained.  Ask the question a different way,

8    please.

9    Q    BY MR. MORRIS:  Did you observe anything out of the

10   ordinary in the bathrooms that you used in March of 2017?

11        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

12        JUDGE TRACY:  Overruled.

13        Go ahead.

14        THE WITNESS:  Yes.

15   Q    BY MR. MORRIS:  And could you describe what you observed?

16   A    Stickers.  UA -- UA -- UAW stickers --

17   Q    And --

18   A    -- on the -- on the stalls and even on the -- on the

19   actual flowdown, on the outside of it.

20   Q    And for what period of time did you observe the stickers

21   on the bathroom and particularly on the flowdowns?

22   A    For about a week or two.

23   Q    Okay.

24   A    Like -- and like you saw a little bit of it.  Like I just

25   saw maybe like one, and then it just kind of led up to having

22-60493.2160



1   like maybe two or three, and it kind of just led up -- within

2   that week or two, it kind of got -- it progressed a little bit

3   more.

4   Q    Okay.  And did the topic of --

5        MR. MORRIS:  Well, I'm going to withdraw that question.

6   Q    BY MR. MORRIS:  Did you have any preshift meetings in or

7   around that time period about that issue?

8   A    Yes.

9   Q    And could you describe, to the best of your recollection,

10  what you recall from that preshift meeting on that issue?

11  A    Just on that issue?  I just -- I -- I mentioned to the

12  group that -- you know, that vandalism isn't tolerated at

13  Tesla, we can't -- we can't be defacing Tesla property,

14  especially with literature that's not Tesla approved.  I

15  basically told the team like if you -- if you guys want to put

16  it on your person, put it on your hat, put it on your shirt,

17  it's all -- all that's allowable, but we just can't post stuff

18  on the wall because it's considered vandalism, and -- and doing

19  so could -- a disciplinary action could -- could -- it could

20  lead to disciplinary action if you're caught vandalizing Tesla

21  property.

22  Q    Okay.  Do you recall anything else that was discussed

23  during that preshift on vandalism?

24  A    That was -- that was pretty much it.  It was pretty

25  straightforward, and nobody asked any questions.



www.escribers.net | 800-257-0885

1    Q    Okay.  And how many employees were present for that

2    preshift approximately?

3    A    Twenty-five to the 28 that I -- that I said that I

4    managed.

5    Q    Did anything come up regarding business cards during that

6    preshift?

7    A    Negative.

8    Q    Did you tell employees that they couldn't pass around

9    pamphlets during that preshift?

10    A    No.

11    Q    And after this preshift in March of 2017, did you ever

12    observe Production Associates in your area wearing a Union

13    sticker on their hat?

14    A    Yes.

15        MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

16        JUDGE TRACY:  Overruled.

17        Go ahead.

18        THE WITNESS:  Yes.

19    Q    BY MR. MORRIS:  Could you describe how frequently that

20    occurred?

21    A    Before the meeting, it -- it was -- the people had it on

22    there, but it -- it got -- it progressed after that meeting.

23    Even after the meeting, it just started progressing little by

24    little.  You know, more people started wearing it.  So even

25    of -- out of my group, other groups that work around me had



1    started wearing the -- started wearing the sticker.

2    Q    Okay.  Did you ever tell anyone that they couldn't wear

3    the Union sticker on their hat?

4    A    No.

5    Q    And prior to the vandalism that you described in March of

6    2017, had you ever observed any other vandalism in the

7    bathrooms?

8         MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

9         JUDGE TRACY:  Overruled.

10        Go ahead.

11        THE WITNESS:  Yes.

12   Q    BY MR. MORRIS:  Could you give an example of what you

13   observed?

14   A    Profanity only -- on the bathroom -- on the bathroom

15   stalls.

16   Q    And were you present for any meetings where supervisors or

17   managers addressed that issue with employees?

18        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

19        JUDGE TRACY:  Sustained.

20   Q    BY MR. MORRIS:  Do you know if anything was done as a

21   result of that prior vandalism?

22        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.  Vague as to

23   "that prior vandalism."

24        JUDGE TRACY:  Overruled.

25        Go ahead.



www.escribers.net | 800-257-0885

1     THE WITNESS:  So can you repeat the question one more time?

2     MR. MORRIS:  Yeah.

3  Q    BY MR. MORRIS:  You referenced that you had observed prior

4  vandalism prior to March of 2017.  Do you know if anything was

5  done to address the vandalism?

6  A    Yeah.  We would have -- either of the managers would have

7  a -- you know, a stand-up with everybody, have a conversation

8  with -- with everybody about it, you know, saying it's

9  unprofessional, we can't have stuff like that.  And most --

10 most of the time, they would just say -- you know, cut the

11 personal radios out, you know, just kind of just say, no more

12 radios for a while.  And that's about it.

13 Q    And what do you mean by "no more radios"?

14 A    They would just -- they would just -- since, you know,

15 they would allow radios playing, they just say, hey, turn the

16 radios off.  Any personal radios, just go ahead and let's just

17 shut them down.  You know, just kind of -- just like kind of, I

18 guess, ease things out.  So they would just turn the radios

19 off.  Have everybody just shut their radios off.  No music

20 allowed during work production hours.

21 Q    Okay.  And do you recall if anything was said during those

22 meetings concerning vandalism?

23    MR. RODRIGUEZ RITCHIE:  Objection.  Vague as to "those

24 meetings."  And leading.

25    JUDGE TRACY:  Sustained.


www.escribers.net | 800-257-0885

1  Q    BY MR. MORRIS:  Do you recall any specific meetings prior

2  to March of 2017 where vandalism was addressed with the

3  Production Associates?

4  A    Yes.

5  Q    And who else was present for that meeting that you can

6  recall?

7  A    Managers -- ANs, managers of like -- have actually had --

8  where HR's actually been present at -- at -- you know, during

9  those meetings.

10  Q    Okay.  And were Production Associates present for those?

11  A    Yes.

12  Q    And the particular one that you're thinking of, who was

13  the manager that was present for that?

14  A    Mike --

15       MR. RODRIGUEZ RITCHIE:  Objection.

16       THE WITNESS:  -- Swindell.

17       MR. RODRIGUEZ RITCHIE:  Leading.

18       JUDGE TRACY:  Overruled.

19  Q    BY MR. MORRIS:  And do you recall what, if anything, Mike

20  Swindell said during that meeting?

21  A    Just that, you know, vandalism isn't allowed here at

22  Tesla.  It's -- it's childish.  This is a place of business.

23  We can't -- we can't be doing this.  You know, we can't be

24  defacing property like that, basically.  That just won't be

25  tolerated.  Just pretty much straightforward.



1    Q    Okay.

2    A    Just it won't be tolerated.  And if you get caught, you

3    know, it could lead to -- to termination.

4    Q    And approximately when was that meeting where Mr. Swindell

5    addressed the Production Associates?

6    A    This particular one, I want to say after March.  But after

7    sometime in March.  So I want to say sometime in September.

8    October, September maybe.

9    Q    Okay.  And the vandalism at issue --

10    JUDGE TRACY:  Of which year?

11    THE WITNESS:  Of 2017.

12    JUDGE TRACY:  Thank you.

13    Q    BY MR. MORRIS:  Okay.  And the vandalism was to one of the

14    bathrooms?

15    A    Correct.

16    Q    And do you recall what the vandalism was?

17    A    F Mike Swindell, you know.  I don't know.  They didn't

18    really show me the -- part of it was just F Mike Swindell, dah-

19    dah-dah.  Probably some other stuff going on in there.

20    Q    Okay.  After the March 2017 preshift meeting that you

21    talked about, did you ever observe Production Associates

22    passing out flyers?

23    MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.

24    JUDGE TRACY:  What is the relevance?

25    MR. MORRIS:  It goes to the alleged statement that was made



www.escribers.net | 800-257-0885

1  which an employee said he made during a preshift meeting,

2  saying that --

3      JUDGE TRACY:  Yeah.  But that -- whether they did it

4  afterwards has -- is not relevant.  So I'm going to sustain the

5  objection.

6      MR. MORRIS:  Could I make an offer of proof then?

7      JUDGE TRACY:  Go ahead.

8      MR. RODRIGUEZ RITCHIE:  Well, I would object to that only

9  to the extent that the offer of proof could be coaching the

10  witness.

11      MR. MORRIS:  I could ask him.

12      JUDGE TRACY:  Ask him what?

13      MR. MORRIS:  If he's observed any people passing out

14  pamphlets -- Union pamphlets after this March 2017 preshift.

15      JUDGE TRACY:  Okay.  You know what, to get this going, I'm

16  going to overrule the objection.  I don't see the relevance of

17  it, but go ahead.

18      THE WITNESS:  Yes.

19  Q    BY MR. MORRIS:  Did you ever tell any of them that they

20  couldn't be passing out the flyers?

21  A    No.

22      MR. RODRIGUEZ RITCHIE:  Objection.  Relevancy.

23      JUDGE TRACY:  Okay.  Overruled.

24      MR. MORRIS:  Okay.  Nothing further.  Thanks.

25      JUDGE TRACY:  Okay.  General Counsel, are you ready?



www.escribers.net | 800-257-0885

1      MR. RODRIGUEZ RITCHIE:  Yes.

2                          **CROSS-EXAMINATION**

3      Q    BY MR. RODRIGUEZ RITCHIE:  Mr. Rodriguez, my name is Edris

4   Rodriguez Ritchie.  I represent the General Counsel of the

5   National Labor Relations Board.

6           You and I have met before, correct?

7      A    Correct.  Yeah.

8      Q    And that was when you provided an affidavit to me --

9      A    Um-hum.

10      Q    -- in connection with this case?

11      A    Yes.

12      Q    And you remember when you provided that affidavit you were

13   provided with a copy of the affidavit to review?

14      A    Yes.

15      Q    And you did that with Tesla's attorneys?

16      A    Yes.

17      Q    And after you reviewed it, you raised your right hand and

18   swore that you told the truth?

19      A    Yes.

20      Q    And you did tell the truth --

21      A    Yes.

22      Q    -- correct?  Okay.  Now, I just have a couple of questions

23   for you.  You testified that you work for Tesla Motors.  So I

24   just want to be clear.  You're referring where you work as

25   45500 Fremont Boulevard in Fremont, California?



1    A    Correct.

2    Q    Okay.  You are familiar with the black books used at

3    Tesla --

4         MR. MORRIS:  Objection.

5    Q    BY MR. RODRIGUEZ RITCHIE:  -- for taking notes?

6         MR. MORRIS:  Objection.  Vague and ambiguous.

7         JUDGE TRACY:  Overruled.

8         Go ahead.

9         THE WITNESS:  Oh.  Yes.  The little just notebook?

10        MR. RODRIGUEZ RITCHIE:  Yeah.

11        THE WITNESS:  Just the little -- yeah.  Just basically a

12   notepad.

13   Q    BY MR. RODRIGUEZ RITCHIE:  And you have a black notebook

14   that you use, correct?

15   A    Yes.

16   Q    And you used -- in March of 2017, you had a black book

17   then?

18   A    I believe so, yes.

19   Q    And it's -- you used that to write things related to Tesla

20   in it?

21   A    Yeah.

22   Q    And on March 23rd, 2017, when you had that prestart

23   meeting that you testified about, you had a black book with you

24   then?

25   A    During the meeting?



www.escribers.net | 800-257-0885

1     Q     Yeah.

2     A     No.

3     Q     You never wrote notes about what you were going to say?

4     A     Not that day, no.

5     Q     Not that day?

6     A     No.

7     Q     At any day prior, did you write notes about what you said

8     during the March 23rd, 2017 --

9     A     No.

10     Q     -- meeting?  Afterwards, you didn't?

11     A     No.

12     Q     Okay.  Did you keep notes of any other meetings?

13     A     Usually that -- yes.  What you're saying, yes.  But what

14     you're asking me is like what -- usually when I use that

15     notebook, it's just like if I have a -- a lot of stuff to

16     present.  That's when I usually write it down.  Hey, we have

17     this -- this is what's going on today, this is what's going on.

18     On that particular day, I didn't have a bunch of information.

19     That's why I didn't probably write it down in the thing because

20     I had it in my mind.  Right?  Some days --

21     Q     Um-hum.

22     A     -- are more information than others, so.

23     Q     So you don't remember ever writing -- reading anything

24     from your black book --

25     A     On that day, no.



www.escribers.net | 800-257-0885

1    Q    -- on that day?  "No," correct?

2    A    No.

3    Q    Okay.

4         JUDGE TRACY:  Okay.  And just let them finish asking you

5    the question before you answer for the purposes of the

6    recording and the transcript.  Okay?

7         THE WITNESS:  I gotcha.  Yes.

8    Q    BY MR. RODRIGUEZ RITCHIE:  Now, you testified about what

9    you described as vandalism that you had seen in the weeks prior

10   to March 23rd, 2017?  Do you remember that?

11   A    Yes.

12   Q    And what was the nature of what you had seen?

13   A    Stickers on the wall.

14   Q    And that was about -- in the total time prior to

15   March 23rd, 2017, you saw about five to six stickers in total

16   on the wall?

17   A    Something like that, yeah.

18   Q    Okay.  And that was just in one bathroom?

19   A    That was just in our -- yeah.  Our bathroom in that area,

20   yes.

21   Q    Okay.  And they were on the wall?

22   A    On -- on the wall and where the flowdowns are at with the

23   urinals, and inside the stalls.

24   Q    Okay.  So inside the stall.  Like the wall of the stall?

25   A    Correct.  At least the -- the one I was using that day,



1    correct.

2    Q    Okay.  So you would agree with me, the bathroom, that was

3    still usable?

4    A    Correct.

5    Q    Okay.  So when you say vandalism, you don't mean that the

6    bathroom was destroyed?

7    A    No.

8    Q    And you don't mean that you couldn't use number one in the

9    bathroom?

10    A    No.

11    Q    And by number one, I'm referring to pee.

12    A    Correct.

13    Q    Okay?  You also don't mean that you couldn't use number

14    two or poop?

15    A    Correct.

16    Q    Okay.  And you could still flush the toilet?

17    A    Correct.

18    Q    And you could still wash your hands?

19    A    Correct.

20    Q    And it wasn't on the mirrors?

21    A    Correct.

22    Q    Just on the stalls?

23    A    Correct.

24    Q    Okay.  Now, you never conducted any form of economic

25    analysis to figure out what the cost would be of any vandalism



1    to the Company?

2        MR. MORRIS:  Objection.  Relevance.

3        JUDGE TRACY:  Sustained.

4    Q   BY MR. RODRIGUEZ RITCHIE:  You don't know whether the

5    stickers on the wall resulted in any cost to the Company; is

6    that correct?

7        MR. MORRIS:  Objection.  Relevance.

8        JUDGE TRACY:  Sustained.

9    Q   BY MR. RODRIGUEZ RITCHIE:  The stickers, they were removed

10   immediately?

11   A   Yes.

12   Q   You testified about prior -- a prior occur did you

13   understand of vandalism revolve -- involving the F word and

14   someone's name.  Do you recall that?

15   A   There's been plenty of times, but, yes.

16   Q   And so that was vandalism because it was offensive to have

17   the word -- the F word --

18   A   Well --

19   Q   -- correct?

20   A   Yes.

21   Q   Okay.  So I want to show you what's been admitted as

22   General Counsel's Exhibit 35.  Can you take a look at that, and

23   let me know when you're ready?

24   A   Okay.

25   Q   Okay.  You recognize General Counsel's Exhibit 35,



1    correct?

2    A    Yes.

3    Q    And that's the sticker that you saw before March 23rd,

4    2017, correct?

5    A    Correct.

6    Q    Now, there's nothing about that sticker that's offensive,

7    correct?

8    A    No.

9    Q    And you didn't make the determination at the time that the

10    sticker was offensive --

11    A    Yes.

12    Q    -- correct?  Okay.  And there's nothing childish about the

13    sticker; is that correct?

14    A    No.

15    Q    You testified earlier about a prior instance where you

16    prevented employees from listening to music due to vandalism

17    that you had seen in the bathroom?

18    A    Well, yeah.  Not me personally.  It comes from the

19    manager, but --

20    Q    Oh.  That someone else did?

21    A    Yes.  This is a manager -- this is a manager's approval,

22    so.

23    Q    And you were made aware of that?

24    A    Yeah.  They let us all know.  The manager let's all of us

25    know, hey, due to the vandalism, turn -- turn the radios off.



1    Q    Okay.  So on March 23rd, 2017 related to your observing

2    these particular stickers, you didn't order that music be

3    turned off?

4    A    No.  That -- that --

5    Q    That's correct?

6    A    I don't recall, to be honest with you.

7    Q    Oh.  You don't recall either way whether you did that?

8    A    If they -- if they shut the music off, I don't recall.

9    Q    You yourself are not aware of anyone ordering the music to

10   be shut off as a result of the UAW stickers; that's correct?

11   A    Yeah, I don't.

12   Q    Okay.  I'm going to show you what's been admitted as

13   General Counsel's Exhibit 33.  Take a look at that for a

14   moment, and let me know when you've read it.

15   A    Okay.

16   Q    Okay.  You recognize General Counsel's Exhibit --

17   A    Correct.

18   Q    -- 33?  And that's a business card?

19   A    Correct.

20   Q    Okay.  So there's nothing about the business card that

21   would vandalize any property at Tesla; is that correct?

22   A    Correct.

23   Q    Okay.  And there's nothing about passing out Union-related

24   leaflets by itself that would vandalize Tesla property; is that

25   correct?



1    A    Correct.

2    Q    Now, what you had as -- the stickers that you testified

3    that you observed, the five to six stickers, on the walls in

4    the bathroom at Tesla, you didn't document that anywhere; is

5    that correct?

6    A    No.

7    Q    Did you meet anyone to prepare for your -- meet with

8    anyone to prepare for your testimony here today?

9    A    Yes.

10    Q    Who?

11    A    The gentleman right here.

12    Q    Which gentleman?

13    THE WITNESS:  I'm sorry.  I forgot your name.

14    MR. MORRIS:  Mr. Morris.

15    THE WITNESS:  Mr. Morris.

16    MR. RODRIGUEZ RITCHIE:  Okay.  If the record could

17    identify -- could reflect that the witness has identified

18    Mr. Morris.

19    Q    BY MR. RODRIGUEZ RITCHIE:  And how many times did you meet

20    with him?

21    A    Twice.

22    Q    For how long?

23    A    30 minutes.

24    Q    And when did you meet with him?

25    A    It was -- I met yesterday.  We met yesterday.



www.escribers.net | 800-257-0885

1        THE WITNESS:  Was it yesterday or the day before?

2   Q    BY MR. RODRIGUEZ RITCHIE:  To the best of your

3   recollection, do you recall when you met with him?

4   A    Yesterday, and I want to say the last time I was here

5   was -- I want to say a week before, because you guys -- I -- I

6   was called in, but I guess I did not get a chance to make it

7   in.  So -- so, what, a week --

8   Q    Okay.

9   A    -- and a half ago.

10  Q    Did you review any documents in preparation for your

11  testimony?

12  A    My affidavit.

13  Q    Any other documents?

14  A    No.

15  Q    Did you speak with anyone else regarding your testimony

16  here today?

17  A    No.

18       MR. RODRIGUEZ RITCHIE:  Nothing further.

19       JUDGE TRACY:  Ms. Feinberg?

20       MS. FEINBERG:  Yes, Your Honor.

21       Can I see the affidavit, please?

22       MR. RODRIGUEZ RITCHIE:  Oh, yes.

23       If the record could reflect that I'm handing Ms. Feinberg

24  two affidavit copies.

25       JUDGE TRACY:  How many pages is it?



1      MR. RODRIGUEZ RITCHIE:  It's very short.

2      JUDGE TRACY:  Oh.

3      MR. RODRIGUEZ RITCHIE:  Just --

4      MS. FEINBERG:  And I'm a fast reader.

5      MR. RODRIGUEZ RITCHIE:  -- five -- four-and-a-half pages.

6      JUDGE TRACY:  Okay.  So let's go off the record.

7   (Off the record at 4:53 p.m.)

8      JUDGE TRACY:  Okay.  Go ahead, Ms. Feinberg.

9      MS. FEINBERG:  Okay.

10                    **CROSS-EXAMINATION**

11   Q    BY MS. FEINBERG:  Hello, Mr. Rodriguez.  My name is Margo

12   Feinberg.  I'm counsel to the Charging Parties.  I just have a

13   few questions for you.

14       You said that you use a little black book to keep

15   information for when you're going to report out to preshift

16   meeting on longer topics; is that right?

17   A    Correct.

18   Q    And did you look at that book in preparation for your

19   testimony today?

20   A    I -- I don't know.

21   Q    You don't know if you looked at it or --

22   A    No, I don't.  I don't have -- I don't have it with me, so

23   no.

24   Q    Okay.  And do you remember the other things that you

25   discussed at the preshift meeting on the day that you discussed



22-60493.2178

1    vandalism and stickers?

2    A    No.

3    Q    Okay.  So how do you know that there weren't a lot of

4    other topics that day?

5    A    Because -- I -- I really can't answer that question, to be

6    honest with you.

7    Q    Yeah.  Because you don't really remember everything that

8    happened that day?

9    A    Well -- so no.

10   Q    Okay.  But it's your practice if you have -- if you want

11   to remember all the things you want to tell to the workers in

12   the morning -- or it's not the morning really.  You're --

13   A    It's afternoon.

14   Q    Afternoon.  Right.  A different shift.  You're -- then you

15   write a few things down, you pull it out so you make sure

16   you've shared with them the things you -- you covered the

17   things you intended to cover?

18   A    Correct.

19   Q    And was there some reference to the word not -- hold on a

20   second.  I want to make sure I say it correctly as you used it.

21        MS. FEINBERG:  Everything's handing me something.  Such a

22   nice -- very supportive group.

23   Q    BY MS. FEINBERG:  Literature that's not Tesla approved.

24   Do you remember using that phrase?

25   A    I believe so.



www.escribers.net | 800-257-0885

1    Q    And what was the distinction between -- if it's vandalism,

2    whether it's Tesla approved or not?

3    A    Well, basically it's -- it's being sticked (sic) up.

4    Right?  It's a sticker.  Right?  So it's -- it's not -- nothing

5    that Tesla says, hey, go ahead and -- go ahead and put it up,

6    especially where -- where we're reading the flowdown.  Right?

7    If it's covering the flowdown and we're not able to get it off,

8    then basically it's vandalism.  Right?  It's not -- it's not

9    Tesla approved.

10    Q    Okay.  But if there was a sticker that said -- that was

11    produced by Tesla, would that have been okay?

12    A    Well, that's their -- that's their -- that's their logos.

13    Right?  That's their -- that's their product.

14    Q    And I believe you said that the stickers that you saw were

15    removed the next day.  So I assume they were easily removed --

16    A    I -- I --

17    Q    -- is that correct?

18    A    I don't recall that.  I don't recall being -- them being

19    removed.  I just know sometimes they -- sometimes it might take

20    a day or two, depending on how -- how quick the -- the

21    facilities group responds to it.

22    Q    Okay.  Did anyone ever tell you specifically they had any

23    difficulty removing the sticker?

24    A    No.

25    Q    And if you were talking about stickers, why would you --



22-60493.2180

1    why was the reference -- did you use the reference to

2    literature?  What was the -- what was that about?

3    A    Tesla literature, I don't -- to be honest with you, I

4    don't recall using Tesla literature.  I just said -- I think it

5    was just Tesla approved -- just anything that's not Tesla

6    approved I believe.  I don't remember saying literature, to be

7    honest.

8    Q    Did you use any word other than sticker?

9    A    I don't recall.  I just -- yeah, I don't -- I don't

10   recall.  Just about the sticker part.

11   Q    And did you discuss the fact that you were going to make

12   these remarks with anyone in management before you made them?

13   A    I spoke to Arnold Camat.

14   Q    And who is he in relation to you?

15   A    He was my counter -- like one of my counterparts, one of

16   the countersupervisors in the -- in the other group.

17   Q    And when did you speak to him?

18   A    Right before the preshift meeting I believe.

19   Q    And was it his idea for you to make remarks to the workers

20   about the stickers?

21   A    I don't know if it was just his idea.  I think we just

22   kind of both agreed upon it.  Like, hey, are you going -- we're

23   going to just mention it to the group about just vandalism in

24   general, just, hey, it's not approved.  Right?  So it was just

25   kind of like, hey, are you going to mention to your group about



www.escribers.net | 800-257-0885

1   that vandalism?  He said, yes.  I said I was going to do the

2   same.

3   Q    And when you say "not approved," what did you mean by

4   that?

5   A    Well, just like with -- with any news.  If -- stickers are

6   not approved, you know, profanity is not approved, just --

7   just -- just vandalism in general.  Just, hey, it's not -- it's

8   not tolerated.  We're -- you know, it just needs to stop, so.

9   Q    Um-hum.  And were you saying this because you had seen

10  Union stickers?

11  A    At that point, yes.

12  Q    And did you mention that when you were talking to the

13  workers?

14  A    Not necessarily -- not necessarily about that.  Just

15  what -- I think we just mentioned about vandalism.  But at the

16  same time, any sticker -- any sticker that's not Tesla

17  approved, it -- it can't happen because it's considered

18  vandalism.

19  Q    Okay.

20  A    And that's when -- that's when we -- I mentioned, you can

21  put it on your -- if it's that's sticker itself, you can put it

22  on your hat or you can put it on your person.  Just we can't

23  put it on Tesla property because it's considered defacing Tesla

24  property.

25  Q    So when you said you could put it on your hat or you could



1    put it on your person, you were discussing the Union stickers?

2    A    At that moment, yeah.  For that particular thing, yes.

3    Q    Okay.  So in the meeting, you discussed the Union

4    stickers?

5    A    Correct.

6        MS. FEINBERG:  Okay.  I have nothing further of this

7    witness.  But thank you.

8        JUDGE TRACY:  Okay.  Mr. Morris?

9        MR. MORRIS:  No.

10       JUDGE TRACY:  Okay.  Thank you very much.  And please don't

11   discuss your testimony until after the close of the hearing.

12       THE WITNESS:  Okay.

13       JUDGE TRACY:  You can leave -- do you want --

14       THE WITNESS:  I'll take this.

15       JUDGE TRACY:  Yeah.  I don't -- you don't have any

16   documents.  Okay.

17       THE WITNESS:  Okay.

18       JUDGE TRACY:  I wasn't sure.

19       THE WITNESS:  All right.  Right here?  These?

20       JUDGE TRACY:  Oh, okay.

21       MR. MORRIS:  Thank you.

22       JUDGE TRACY:  Yeah.  I didn't see --

23       THE WITNESS:  All right.  You guys have a great day.

24       JUDGE TRACY:  Thank you --

25       MR. MORRIS:  Okay.  Thanks.



www.escribers.net | 800-257-0885

1          JUDGE TRACY:  -- so much.

2          UNIDENTIFIED SPEAKER:  Thank you.

3          MR. ROSS:  Thanks for coming in.

4          MR. MORRIS:  Thanks, Armando.  I appreciate it.

5          MR. RODRIGUEZ RITCHIE:  I don't think I noted this on the

6     record, that Ms. Feinberg returned the two affidavits.

7          JUDGE TRACY:  Yeah.  Okay.

8          MS. FEINBERG:  I think it's --

9          JUDGE TRACY:  Okay.  And so we're still waiting for her to

10    come back?

11         MR. ROSS:  Waiting for Jaime to come back with copies.

12         JUDGE TRACY:  Okay.  So let's go ahead and go off the

13    record.

14    (Off the record at 5:03 p.m.)

15         JUDGE TRACY:  Okay.  So Mr. Ross, go ahead.

16         MR. ROSS:  Yes, ma'am.

17         JUDGE TRACY:  This is --

18         MR. ROSS:  Okay.  So we have been able to print out the

19    documents that we discovered this morning.  As I mentioned

20    before, we believe portion of them are privileged and then a

21    portion of them are not.  We have made copies of the documents

22    which we do not believe are privileged.  We have copies for the

23    Board and for the Union, which I'm giving to them now.

24         And then, Judge, as to the documents that we are asserting

25    privilege as to -- we have compiled a packet of those



www.escribers.net | 800-257-0885

1    documents, by the way, in which we're going to give to you for

2    in camera review during the evening hour.  What you have on --

3    in this packet -- in both -- in all of the packets you've got

4    is what's called a version history.  It describes and lists the

5    various versions of the document.  It lists the date of the

6    modification, and then it also shows the name of the person who

7    was involved in the modification.  If so, there's not an

8    identification of the modifier.

9        JUDGE TRACY:  And I'm sorry.  What again was the exhibit

10   number of his report?

11       MR. GARBER:  62.

12       JUDGE TRACY:  General Counsel?

13       MR. GARBER:  Yes.

14       JUDGE TRACY:  Okay.

15       MR. ROSS:  62, wasn't it?

16       MR. GARBER:  Yes.

17       MR. RODRIGUEZ RITCHIE:  Yeah.

18       JUDGE TRACY:  Okay.

19       MR. ROSS:  So let me give you that.

20       JUDGE TRACY:  All right.  So I have received the unredacted

21   version with -- but you've indicated what you feel is the

22   attorney-client privilege?

23       MR. ROSS:  Yes.  And --

24       JUDGE TRACY:  Okay.

25       MR. ROSS:  -- with the exception of the first document in



1    the packet that you've got, I think the basis for our assertion

2    is going to be pretty self-evident.

3        JUDGE TRACY:  Yeah.

4        MR. ROSS:  The first document, which I believe is version

5    nine, if you look at the --

6        JUDGE TRACY:  Okay.

7        MR. ROSS:  -- cover sheets, the -- you'll see that that was

8    a document that is -- a document that was handled by

9    Ms. Bodiford.

10        JUDGE TRACY:  But -- okay.  So this version history, where

11    did it come from?  Is it printed directly from the Microsoft

12    365?

13        MR. ROSS:  I believe it was.

14        MS. BODIFORD:  It's a screenshot.

15        MR. ROSS:  Yes?

16        JUDGE TRACY:  It's a  --

17        MS. BODIFORD:  It's a screenshot of that --

18        JUDGE TRACY:  Okay.

19        MS. BODIFORD:  -- of the version.

20        JUDGE TRACY:  Okay.  And so then what I'm looking at at the

21    bottom right corner, that reflects the versions that are on the

22    left -- the column --

23        MR. ROSS:  Correct.

24        JUDGE TRACY:  -- they kind of match up?

25        MR. ROSS:  Correct.

22-60493.2186



1      JUDGE TRACY:  And the version that I have received, do I

2  have all of it?

3      MR. ROSS:  You do.

4      JUDGE TRACY:  No?

5      MR. ROSS:  No.  You have all the ones that we're asserting

6  the privilege as to.  Do you want to see an entire -- all --

7      JUDGE TRACY:  Yeah.  If you can give me also then a set of

8  what you've given them, that way --

9      MR. ROSS:  I'd be happy --

10      JUDGE TRACY:  I can just see that --

11      MR. ROSS:  Well, what we can do is give you a complete set.

12      JUDGE TRACY:  Well, just give me like what you've handed to

13  them so then I'll keep them separate and I'll put my --

14      MR. ROSS:  That --

15      JUDGE TRACY:  -- Post-it Notes --

16      MR. ROSS:  That will be fine.

17      JUDGE TRACY:  -- so I don't get confused --

18      MR. ROSS:  We'll gladly do that.

19      JUDGE TRACY:  -- about that.

20      MR. ROSS:  We'll gladly do that.

21      JUDGE TRACY:  Yes?

22      MR. RODRIGUEZ RITCHIE:  Do you have a copy of it?

23      MR. ROSS:  A copy of?

24      MR. RODRIGUEZ RITCHIE:  What you gave me.  I was just going

25  to offer to go make -- run a copy.



www.escribers.net | 800-257-0885

1        MR. ROSS:  Thank you.  But no.  We --

2        JUDGE TRACY:  Okay.

3        MR. ROSS:  We've contributed to Kinkos and made --

4        JUDGE TRACY:  All right.

5        MR. ROSS:  -- all the copies.

6        JUDGE TRACY:  So I'll take a look at this tonight, and let

7   you know what I say tomorrow about the in camera review of

8   these documents.  And you guys take a look.  And hopeful that

9   this puts to rest this version problem.  Any --

10       MR. MORRIS:  And on response 43 --

11       JUDGE TRACY:  Yes.

12       MR. ROSS:  -- I was able to confirm that there is no

13  attachment.  It's in reference to the image that's a question

14  mark at the bottom of the document, which is the Tesla logo.

15       JUDGE TRACY:  Can you show them --

16       MR. MORRIS:  Sure.

17       JUDGE TRACY:  -- with the --

18       MR. MORRIS:  Yep.

19       JUDGE TRACY:  And then where the --

20       MR. ROSS:  This is what's been given to the Board --

21       JUDGE TRACY:  Okay.

22       MR. ROSS:  -- and to the Union, Your Honor.

23       JUDGE TRACY:  Great.  Thank you.

24       Okay.  Anything else for today?

25       MR. ROSS:  No.



1    JUDGE TRACY:  No?

2    MR. RODRIGUEZ RITCHIE:  And Ms. Feinberg too has to see it.

3    JUDGE TRACY:  Yes.  Mr. Morris, why don't you go ahead and

4    forward that email to --

5    MR. MORRIS:  Sure.  Will do.

6    JUDGE TRACY:  -- both -- so Ms. Feinberg --

7    MS. FEINBERG:  Yes.

8    JUDGE TRACY:  -- R-43, there was the question regarding the

9    attachment.

10    MS. FEINBERG:  Yes.

11    JUDGE TRACY:  And it is the Tesla logo, but Mr. Morris is

12    going to forward to you and Mr. Rodriguez Ritchie --

13    MS. FEINBERG:  An electronic copy.

14    JUDGE TRACY:  -- the copy so you can see that.

15    MS. FEINBERG:  All right.  Thank you.

16    JUDGE TRACY:  Okay?

17    MS. FEINBERG:  I appreciate that.

18    JUDGE TRACY:  All right.  I think we're good for today,

19    correct?

20    MR. GARBER:  Yes.

21    JUDGE TRACY:  Anything else?  Okay.  Until tomorrow.  See

22    you at 9 a.m.

23    MR. ROSS:  I can't wait.

24    JUDGE TRACY:  You can't wait.  Two days to go.

25    MR. ROSS:  From your lips to --

22-60493.2189



1        JUDGE TRACY:  I know.  Well, there -- we're checking --

2        We can go off the record.

3    **(Whereupon, the hearing in the above-entitled matter was**

4    **recessed at 5:38 p.m. until Thursday, October 11, 2018 at 9:00**

5    **a.m.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

www.escribers.net | 800-257-0885

1      **C E R T I F I C A T I O N**

2      This is to certify that the attached proceedings before the

3      National Labor Relations Board (NLRB), Region 32, Case Numbers

4      32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-

5      200530, 32-CA-208614, 32-CA-210879, 32-CA-220777 Tesla, Inc.,

6      and Michael Sanchez, and Jonathan Galescu, and Richard Ortiz

7      and International Union, United Automobile, Aerospace and

8      Agricultural Workers of America, AFL-CIO at National Labor

9      Relations Board Region 32, 1301 Clay Street, Suite 300N,

10     Oakland, CA 94612-5224, on Wednesday, October 10, 2018, 9:06

11     a.m. was held according to the record, and that this is the

12     original, complete, and true and accurate transcript that has

13     been compared to the reporting or recording, accomplished at

14     the hearing, that the exhibit files have been checked for

15     completeness and no exhibits received in evidence or in the

16     rejected exhibit files are missing.

17

18                                     _Deborah Gonzalez_

19     _____

20                                     DEBORAH GONZALEZ

21                                     Official Reporter

22

23

24

25



22-60493.2191

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 32

In the Matter of:

| | |
|---|---|
| Tesla, Inc., | Case Nos.  32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| Michael Sanchez, an individual, | 32-CA-200530 |
| | 32-CA-208614 |
| and | 32-CA-210879 |
| | 32-CA-220777 |
| Jonathan Galescu, an individual, | |
| | |
| and | |
| | |
| Richard Ortiz, an individual, | |
| | |
| and | |
| | |
| International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO, | |
| | |
| Charging Party, | |

_____

_____

Place: Oakland, California

Dates: October 11, 2018

Pages: 2169 through 2385

Volume: 12

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



www.escribers.net | 800-257-0885

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

### REGION 32

| | |
|---|---|
| In the Matter of: | |
| TESLA, INC., | Case Nos.  32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| INTERNATIONAL UNION, UNITED | 32-CA-200530 |
| AUTOMOBILE, AEROSPACE AND | 32-CA-208614 |
| AGRICULTURAL IMPLEMENT WORKERS | 32-CA-210879 |
| OF AMERICA, AFL-CIO, | 32-CA-220777 |
| and | |
| MICHAEL SANCHEZ, AN INDIVIDUAL, | |
| and | |
| JONATHAN GALESCU, AN INDIVIDUAL, | |
| and | |
| RICHARD ORTIZ, AN INDIVIDUAL. | |

The above-entitled matter came on for hearing, pursuant to notice, before **AMITA BAMAN TRACY**, Administrative Law Judge, at the National Labor Relations Board Region 32, 1301 Clay Street, Suite 300N, Oakland, CA 94612-5224, on **Thursday, October 11, 2018, 10:31 a.m.**

eScribers

www.escribers.net | 800-257-0885

1                        A P P E A R A N C E S

2    **On behalf of the General Counsel:**

3        **EDRIS W.I. RODRIGUEZ RITCHIE, ESQ.**
         **NOAH J. GARBER, ESQ.**
4        National Labor Relations Board
         1301 Clay Street, Suite 300N
5        Oakland, CA 94612-5224
         Tel. 510-671-3021
6
     **On behalf of the Respondent:**
7
         **MARK S. ROSS, ESQ.**
8        **KEAHN N. MORRIS, ESQ.**
         SHEPPARD MULLIN RICHTER & HAMPTON LLP
9        Four Embarcadero Center
         Seventeenth Floor
10       San Francisco, CA 94111-4109
         Tel. 415-434-9100
11       Fax. 415-434-3947

12   **On behalf of the Charging Parties:**

13       **MARGO A. FEINBERG, ESQ.**
         **DANIEL E. CURRY, ESQ.**
14       **JULIE S. ALARCON, ESQ.**
         SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
15       6300 Wilshire Boulevard, Suite 2000
         Los Angeles, CA 90048
16       Tel. 323-655-4700

17

18

19

20

21

22

23

24

25



1                                    **I N D E X**

2

3   **WITNESS**            **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**   **VOIR DIRE**

4   Ricky Gecewich                                  2177
                                                    2192
5
    Ricky Gecewich       2212        2314
6                                    2324

7   Liza Lipson          2348        2359                                        2355
                                     2371
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

eScribers
www.escribers.net | 800-257-0885

1                                    **E X H I B I T S**

2

3      **EXHIBIT**                            **IDENTIFIED**      **IN EVIDENCE**

4      **General Counsel:**

5        GC-53                                   2371              2371

6        GC-85                                   2191              2191

7        GC-86                                   2191              2191

8        GC-97                                   2191              2191

9      **Charging Party:**

10       CP-4                                    2211              2211

11       CP-5                                    2211              2211

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-60493.2196

1          **P R O C E E D I N G S**

2          JUDGE TRACY:  Okay.  So we're back on the record, and

3     we're going to discuss before we go on -- back on to Mr.

4     Gecewich, which I understand that the General Counsel and the

5     Charging Parties intend to call him back as a 611(c) witness.

6     And then we will get to the Respondent's direct of Mr.

7     Gecewich.

8          Last night I reviewed, in camera, the alleged attorney-

9     client privilege documents related to the investigation report

10    that Mr. Gecewich created.  As he testified, there were other

11    iterations of it, and based upon the subpoena request of both

12    parties, the General Counsel and the Charging Parties, I

13    ordered that the Respondent look to see if these other

14    iterations existed.

15         They in fact did.  However, there were a few documents

16    that were alleged to the attorney-client privilege.

17    Specifically, there were -- let's see -- two, four, six

18    versions -- that were alleged to be as such.  I reviewed the

19    documents, and clearly the -- I think the record has

20    established before that Ms. Bodiford is an in-house counsel, so

21    there's no question there regarding her status.  So any advice

22    related to these documents is attorney-client privilege.

23    We also discussed, though, off the record, the issue with

24    Carmen Copher.  And she holds the position of head of employee

25    relations and investigations along with counsel.  I did raise



1    concerns about whether, at the time of October 2017, she was

2    holding -- wearing the hat of a director versus in-house

3    counsel.  However, I have looked at her signature line, and as

4    the parties discussed off the record, she worked in both

5    purposes.  She was acting as an attorney, as well as the head

6    of employee relations and investigations.  And so based upon

7    both Ms. Bodiford and Ms. Copher, that would -- any comments,

8    advice that they had provided regarding these documents would

9    be protected by attorney-client privilege.

10    There was also an issue where there were five documents

11    that were not turned over to the General Counsel and the

12    Charging Parties that Mr. Gecewich modified, according to this

13    version history.  And Respondent has redacted those documents.

14    There was a disagreement over whether some of the comments, as

15    related to specific sections, if those sections should have

16    been redacted, and the General Counsel can put it on the record

17    of how they disagree with me, but I agree that the redaction

18    would be appropriate for when the comments that were made by

19    the attorneys there, related to specific sections that

20    highlight, which was part of their commentary which the

21    attorneys highlighted themselves and then attached comments to.

22    All of that should be redacted.

23    So is there any issues that the General Counsel or the

24    Charging Parties want to put on the record?

25    MR. RODRIGUEZ RITCHIE:  Just that we disagree with the

22-60493.2198



1  contention.  As you've already articulated that portions of it

2  written by Mr. Gecewich will be redacted.

3     JUDGE TRACY:  Okay.  All right.  And so basically, if

4  there is an objection to that, I would overrule it again,

5  because I found as in my in-camera inspection showed me that

6  the highlight was performed by the attorney when they attached

7  the comments.  And so you need to -- in my view, you need to

8  redact the highlighted portion of that document.  So --

9     MR. RODRIGUEZ RITCHIE:  I think what was represented to me

10  was that not that it was a highlighted portion, was that it was

11  a comment surrounding text to -- I think I would disagree

12  that -- as I understand what the document looked like -- I

13  looked at the document.  It was not that it was highlighted but

14  just that as comments are made using Microsoft Word -- when you

15  make a comment about a sentence, for example, the sentences

16  turned a different color to refer to the comment.

17     JUDGE TRACY:  And like I said, it was -- I disagree with

18  that, that the highlight was -- the highlight was actually put

19  in by the attorney with the comment attached, versus the other

20  sections, where there was just a comment attached without

21  highlighting.  There was no redaction of the text next to the

22  comment.  So we'll just leave it at that for the record.

23     Anything else from the Charging Parties?

24     MS. FEINBERG:  Not on this topic.

25     JUDGE TRACY:  Okay.  So I'm going to turn over both the



1   attorney-client privilege documents and the non-privilege

2   documents.  I put my in-labels on them so I wouldn't get

3   confused.

4       MR. ROSS:  Thank you, Judge.

5       JUDGE TRACY:  And let's go ahead now to Mr. Gecewich.  If

6   there are any other -- I know that you guys have a stipulation

7   out there floating.  We'll deal with that --

8       MR. RODRIGUEZ RITCHIE:  Yes.

9       JUDGE TRACY:  -- another time.  And let's go off the

10  record so we can get him.

11  (Off the record at 10:37 a.m.)

12      JUDGE TRACY:  Okay.  Go ahead and have a seat.

13      So Mr. Gecewich, I administered an oath to you, and so

14  you're still testifying under that oath, okay?

15      THE WITNESS:  Okay.  Thank you.

16      JUDGE TRACY:  All right.  Now, as I understand it,

17  previously you were questioned as a 611(c), so as an adverse

18  witness by the General Counsel of the Charging Parties.  They

19  would like to continue that examination.  And then we'll move

20  over to the Tesla's attorneys.  Okay?

21      THE WITNESS:  Thank you, Your Honor.  Just if I may, I'm

22  still not feeling super well.

23      JUDGE TRACY:  Okay.

24      THE WITNESS:  So I'm good on breaks right now, but I may

25  ask for one as we get through this.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  That's fine.

2      THE WITNESS:  And I'm good on water too.

3      JUDGE TRACY:  There's some water.

4      THE WITNESS:  So --

5      JUDGE TRACY:  Okay.

6      THE WITNESS:  Thank you.

7      JUDGE TRACY:  All right.  Mr. Rodriguez Ritchie.

8   Whereupon,

9                         **RICKY GECEWICH**

10  having been previously sworn, was called as a witness herein

11  and was examined and testified as follows:

12                    **REDIRECT EXAMINATION**

13  Q    BY MR. RODRIGUEZ RITCHIE:  Good morning, again, Mr.

14  Gecewich.

15  A    Good morning.

16  Q    I'll try and be as brief as I can.  You're here today,

17  represented by an attorney, the same attorney that was here on

18  Tuesday; is that right?

19  A    Yes, that's correct.

20  Q    And that's the same person that Tesla is paying for?

21  A    That's the same person that I'm not paying for, yes.

22  Q    And you testified on Tuesday that Tesla was paying for

23  that attorney?

24  A    To my understanding.

25  Q    Yeah.  And that's still the case, correct?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Did you review any documents to prepare for your testimony

3    here today?

4    A    I did.

5    Q    What did you review?

6    A    I just reviewed my notes late last night.

7    Q    And which notes are those?

8    A    The notes that I testified previously that I reviewed.

9    Q    So that was your notes regarding your conversations with

10   Mr. Pratt, Mr. Kostich, Mr. Moran, and Mr. Ortiz?

11   A    Yes, those are the notes.

12   Q    Okay.  Did you meet with any attorneys for Tesla between

13   Tuesday and today?

14   A    I did not.

15   Q    I'm going to hand you a document -- that has been

16   premarked as General Counsel's Exhibit 85.  It's a document --

17   I'm going to represent to you -- that was produced by Tesla

18   recently in connection with this matter.  The document -- if

19   you look at it at the top, it says "version history".  I'll

20   represent to you that Tesla has indicated this is the version

21   history of a employee relations investigation report that you

22   previously testified about.  And I'll hand you General

23   Counsel's Exhibit 62, which is the investigation report.

24   A    Thank you.

25   Q    Thank you.  Have you taken a look at General Counsel's



1    Exhibit 85?

2    A    Yes, I have.

3    Q    Okay.  So -- and I'll ask you first, though, about General

4    Counsel's Exhibit 62.  You recall in your testimony on Tuesday,

5    you testified that that was a live document?

6    A    Yes, I remember that.

7    Q    And what you meant by that was that it had been edited

8    over the course of the document's history?

9    A    Correct.

10    Q    And not just by you; by other people?

11    A    Correct.

12    Q    So if you can take a look at General Counsel's Exhibit 85?

13    So it's a three-page document.  On the first page, it says

14    "Version 26.0", and then it goes all the way down to the third

15    page, Version 1.0.  And if you look at the document, it has

16    modified dates and modified by next to each of the versions?

17    A    Yes.

18    Q    It's your understanding that these are all the times

19    that -- where it says Ricky Gecewich, that you modified the

20    document in General Counsel's Exhibit 62?

21    A    Yes.

22    Q    And then where it says Jaime Bodiford, it's your

23    understanding that you weren't the one that modified that

24    particular verse; is that correct?

25    A    Correct.  That the different user that modified, it would



www.escribers.net | 800-257-0885

1    be the name on the document.

2    Q    And so where it says Carmen Copher, that's not a version

3    that you modified; is that right?

4    A    Correct.

5    Q    Okay.  So the first version of General Counsel's Exhibit

6    62, that was first created on October 12, 2017?

7    A    According to Exhibit 85, yes.

8    Q    Okay.  I'm going to hand you what's been pre-marked as

9    General Counsel's Exhibit 87.

10   A    Thank you.

11   (Counsel confer)

12   Q    BY MR. RODRIGUEZ RITCHIE:  And one of General Counsel's

13   Exhibit 85.  And so the document I've handed you, if you look

14   at the bottom right, it says V.4.  I'm going to represent to

15   you that this was a document that was produced by Tesla, and

16   upon information and belief that V.4 corresponds to 4.0 on

17   General Counsel's Exhibit 85?

18   A    Okay.

19   Q    You recognize General Counsel's Exhibit 87?

20   A    Yeah, I recognize it's a draft version of this report.

21   Q    And it's a draft that you wrote?

22   A    Yes, and it's V.4, according to Exhibit 85, that would be

23   something that I edited.

24   Q    And that would be something you edited on October 13th,

25   2017?



www.escribers.net | 800-257-0885

1   A    Correct.

2   Q    If you take a look at the -- this version of the document,

3   you see the title where it says "Summary and Analysis of

4   Findings"?  On the first page.

5   A    I do.

6   Q    And I want you to take a look at the second line under

7   that title heading, the first sentence in the second line that

8   starts with "Travis was concerned, based on the content of the

9   message", and that continues for two more lines; do you see

10  that?

11  A    Yes.

12  Q    The information that you -- that information that you put

13  in the report, that came from Mr. Pratt himself?

14  A    Correct.

15  Q    I'm going to hand you General Counsel's Exhibit 63.

16       MR. ROSS:  Oh, okay.

17       MR. RODRIGUEZ RITCHIE:  We've already provided copies --

18  Q    BY MR. RODRIGUEZ RITCHIE:  So this has been admitted.  It

19  says, "Intake with Travis Pratt"?

20  A    Yeah.  Thank you.

21  Q    Okay.  So the words Workday don't appear in your notes

22  from your conversation with Mr. Pratt; is that correct?

23  A    That's correct.

24  Q    This is General Counsel's Exhibit 63?

25  A    That's correct.


www.escribers.net | 800-257-0885

1    Q    Okay.  So Mr. Pratt -- he didn't actually express that

2    concern to you?

3    A    He did.

4    Q    You just didn't put it in your notes?

5    A    It was part of our conversation.

6    Q    But you didn't put it in your notes?

7    A    No, it's not in my notes.

8    Q    Okay.  And he also didn't say that he understood Workday

9    to be an internal Tesla HR system; is that right?

10    A    He did.

11    Q    But you didn't put that in your notes?

12    A    I did not.

13    Q    Okay.  You can go ahead and turn that over.

14    A    I'm sorry.  Turn that in?

15    Q    Over.

16    A    Oh, okay.

17    Q    Just over.  Someone else may ask you about it, so.

18    A    Okay.  Thank you.

19    Q    If you go back to General Counsel's Exhibit 87, I just

20    want to confirm one very brief point where you say ER

21    throughout the report?

22         MR. ROSS:  I'm sorry.  I couldn't hear that.

23    Q    BY MR. RODRIGUEZ RITCHIE:  When you say ER throughout the

24    report, that refers to employee relations?

25    A    Yeah.



1      MR. ROSS:  Where are you referring?  I apologize.  I'm not
2  understanding what --
3      MR. RODRIGUEZ RITCHIE:  Oh.  So for example, if you look
4  at the first page of General Counsel's Exhibit 87, where it
5  says executive summary --
6      MR. ROSS:  Yes.
7      MR. RODRIGUEZ RITCHIE:  -- and beneath that it says
8  "employee relation (ER)"?
9      MR. ROSS:  I see ER.
10      MR. RODRIGUEZ RITCHIE:  Okay.
11      MR. ROSS:  There are many references to ER.
12      MR. RODRIGUEZ RITCHIE:  Right.
13  Q    BY MR. RODRIGUEZ RITCHIE:  And so my question is, those
14  references to ER, that refers to employee relations; is that
15  right?
16  A    Yeah.  So the first time that I say employee relations and
17  put in brackets "ER".  Beyond that, every time I said "ER", it
18  refers to employee relations.
19  Q    And that refers to you, specifically, in employee
20  relations as the investigator?
21  A    Yes.
22  Q    Then it doesn't refer to Josh Hedges?
23  A    No, it does not.
24  Q    Okay.  So if you look at Version 4 that's in General
25  Counsel's Exhibit 87, it says, "ER received a concern from

22-60493.2207



1    Travis Pratt"; isn't it true that Mr. Hedges is the one that

2    received the concern?

3    A    Mr. Hedges did receive a concern from Travis Pratt.

4    Q    And he brought it to your attention?

5    A    Josh Hedges or Travis Pratt?

6    Q    Right.  Mr. Hedges brought it to your attention?

7    A    Oh.  Josh Hedges did bring that to my attention.

8    Q    Okay.  Mr. Pratt himself didn't reach out to you until you

9    reached out to him?

10   A    I reached out to Mr. Pratt --

11   Q    Okay.

12   A    -- and he shared his concern.

13   Q    Okay.  Thank you.  I'm going to hand you what's been pre-

14   marked as General Counsel's Exhibit 86.

15        MR. ROSS:  Page 6?

16        MR. RODRIGUEZ RITCHIE:  Yes.

17        MR. ROSS:  Thank you.

18   Q    BY MR. RODRIGUEZ RITCHIE:  Just take a moment to look at

19   that.

20   A    Okay.

21   Q    Okay.  You recognize General Counsel's Exhibit 86?

22   A    I do.

23   Q    Okay.  In General Counsel's Exhibit 86, it says at the

24   bottom right of the first page, "V.8".  You understand that to

25   be the eighth version of your document that was previously



www.escribers.net | 800-257-0885

1   admitted as General Counsel's Exhibit 62?

2   A   Yeah.  This was pulled from 8.0, just like this document,

3   that would be the eighth version of it.

4   Q   Okay.  I want you to take a look on the second page of

5   General Counsel's Exhibit 86.  At the top, looks -- it's a new

6   paragraph.  And then four lines down from the top, it says,

7   "This time frame corresponds to when these three Tesla

8   employees went to Sacramento, California to speak with State

9   legislatures about their experiences at Tesla"?

10  A   Correct.

11  Q   Okay.  So that was deleted in your final report, wasn't

12  it?

13  A   One second.  Let me let you know.  The final report being

14  Exhibit 62 --

15  Q   62.

16  A   -- correct?  It looks like it was, yes.

17  Q   Okay.  And you deleted that?

18  A   I can't recall who deleted that.

19  Q   Okay.  But you wrote the document in General Counsel's

20  Exhibit 86, correct?

21  A   Yes.  This version of the document was drafted by me.

22  Q   Okay.  So earlier in your testimony, on Tuesday, you

23  testified that you didn't know that the employees at issue had

24  gone to Sacramento to testify what the State legislature's

25  about, specifically their experiences at Tesla; that's what you



www.escribers.net | 800-257-0885

1    testified.

2         MR. ROSS:  Okay.  I'm sorry.  I couldn't hear the

3    question.

4    Q    BY MR. RODRIGUEZ RITCHIE:  Earlier in your testimony on

5    Tuesday, you testified that you didn't know that the employees

6    had gone to Sacramento specifically to speak with the State

7    legislatures about their experiences at Tesla; do you recall

8    that testimony?

9         MR. ROSS:  I object to the question.  It mischaracterizes

10   his earlier testimony.  In addition to which, it is vague and

11   ambiguous in terms of a failure to assign a particular time

12   frame as to when he did or didn't have knowledge of something.

13        JUDGE TRACY:  I'm going to overrule the objection.  But I

14   would like -- maybe you could rephrase the question.

15   Q    BY MR. RODRIGUEZ RITCHIE:  You testified this past Tuesday

16   here; do you recall that?

17   A    Yes, I do.

18   Q    Okay.  And you recall that you testified about employees,

19   Travis Pratt and Shaun Ives; do you remember that?

20   A    I do recall that.

21   Q    And conversations that you had with them in connection

22   with an investigation and the conduct of Jose Moran and Richard

23   Ortiz?

24   A    Yes.

25   Q    Okay.  And you remember that in your testimony on Tuesday,



www.escribers.net | 800-257-0885

1    you testified that you weren't aware of the purpose of their

2    going to Sacramento?

3    A    The purpose of Shaun Ives and Travis Pratt going to

4    Sacramento --

5    Q    Correct.

6    A    -- when I spoke with them?  Yes, I was unaware of their

7    purpose, and I didn't question them on their purpose of going

8    to Sac --

9    Q    Okay.  So take a look at General Counsel's Exhibit 86.

10    And it says there that these three employees went to Sacramento

11    to speak with State legislatures about their experiences at

12    Tesla?

13    A    Yes.

14    Q    Okay.  So you did know what the purpose of their going to

15    Sacramento was?

16    A    At the conclusion of my investigation, I knew what the

17    purpose was.  That was shared with me throughout the course of

18    the investigation.

19    Q    And this document was written when?

20    A    This is Version 8.0, and according to Exhibit 85, 8.0 was

21    drafted on October 13 -- so at the conclusion of all my witness

22    interviews.

23    Q    Okay.  But you deleted that sentence from your final

24    report, didn't you?

25    A    Yes.



1    Q    Okay.  You didn't think the context of that was important?

2    A    Like I just described, I don't know who deleted that and

3    why it's not there.  But to answer your question specifically,

4    no, I don't think that context is necessary.

5    Q    But you do think that the context of an investigation is

6    important?

7    A    It can be, yes.

8    Q    Isn't it always important to know all the details

9    surrounding something that occurred that you're investigating?

10    MR. ROSS:  Objection, Your Honor.  Argumentative.

11    JUDGE TRACY:  Overruled.

12    THE WITNESS:  I'm sorry.  Can I get that question again?

13    Q    BY MR. RODRIGUEZ RITCHIE:  Sure.  Isn't it important when

14    you investigating a case to know all of the context?

15    MR. ROSS:  In addition to which, Your Honor, I'm objecting

16    it as being vague and ambiguous.  Use of the word "important"

17    has no definition in the question.  Objection.

18    JUDGE TRACY:  No -- I'll sustain it to the form of the

19    question, in the sense that this -- clarify the question or

20    rephrase it or step -- roll it through, slowly.

21    Q    BY MR. RODRIGUEZ RITCHIE:  You testified previously that,

22    as an investigator, and given your numerous years of experience

23    as an investigator, the context in an investigation, that's

24    important; do you recall that?

25    A    The context can be important, yes.



www.escribers.net | 800-257-0885

1    Q    It is important in an investigation to figure out what

2    happened, isn't it?

3         MR. ROSS:  For the second time, Your Honor, we all

4    stipulate context is important.

5         JUDGE TRACY:  I'm going to overrule it.

6         MR. ROSS:  Thank you.

7         JUDGE TRACY:  Go ahead.

8         THE WITNESS:  Sorry.  Can I get that again?

9    Q    BY MR. RODRIGUEZ RITCHIE:  So it is important, the

10   context, in every investigation that you conduct?

11   A    Yes.  Context is important.

12   Q    Okay.  And they're going -- these employees that you

13   reference in your prior version, they're going to go testify

14   about their experiences at Tesla to their working conditions --

15   that's an important detail, isn't it?

16        MR. ROSS:  Your Honor, same objection as before.  It's

17   vague and ambiguous.

18        JUDGE TRACY:  Overruled.

19        THE WITNESS:  Sure.  It can be important.

20   Q    BY MR. RODRIGUEZ RITCHIE:  It could be, but it is -- in

21   this particular case -- it is an important detail, isn't it?

22   A    In this particular case, focus on the workday screenshots,

23   them going to Sacramento was not important in my report and

24   therefore was deleted.

25   Q    But it was important enough for you to include it in



www.escribers.net | 800-257-0885

1    Version 8 of your document, wasn't it?

2    A    In a draft of my document, yes.

3    Q    Yeah.  Okay.  If you look at this version of your

4    document -- so I'm referring to General Counsel's Exhibit 86,

5    there's a reference in several places, the first of which I

6    think is on page 2, the second line of the first paragraph to

7    someone -- I think in that line it says "Jeal Osbual", but that

8    may be a typo, I think; it may be Jean.  Do you see that?

9    A    I do see that.

10   Q    Okay.  So that was someone whose Workday profile was also

11   accessed?

12   A    Correct.

13   Q    Okay.  But the investigation, as you've articulated, that

14   was about people -- in part about looking into someone's

15   Workday access?

16   A    I'm sorry.

17   Q    The investigation at issue here with regards to Mr. Moran

18   and Mr. Ortiz that, initially, as you testified, that was about

19   accessing Workday?

20   A    Correct.

21   Q    Okay.  But in your final report, you didn't think it was

22   important to include this third person whose Workday profile

23   was also accessed; isn't that true?

24   A    Let me review the Exhibit 52.  One second.

25   From a brief review, it doesn't appear Jean's name is in the



www.escribers.net | 800-257-0885

1    final report.

2    Q    And that's because this wasn't really about Workday, was

3    it?

4    A    No, this was about Workday access.

5    Q    But you didn't include the access into Ms. Jean Osbual in

6    the final report?

7    A    A screenshot of Jean's profile wasn't released externally.

8    Q    But it was accessed, wasn't it, by Mr. Moran?

9    A    And that's documented in my notes.

10   Q    And you didn't include that in your final report?

11   A    I did not.

12        MR. RODRIGUEZ RITCHIE:  Nothing further.

13        MS. FEINBERG:  Okay, I have a few -- yes?  A few things?

14        JUDGE TRACY:  Yes, go ahead.

15        MS. FEINBERG:  Okay.  That's okay.  I have to mark these.

16        JUDGE TRACY:  Oh, yes.  We didn't put these in.

17        MR. RODRIGUEZ RITCHIE:  So I'd move to admit General

18   Counsel's Exhibits 85, 86, and 87.

19        JUDGE TRACY:  Any objections?

20        MR. ROSS:  Nope.

21        JUDGE TRACY:  All right.  So General Counsel's Exhibits

22   85, 86, and 87 are admitted into evidence.

23        **(General Counsel Exhibit Number 85, 86, 87 Received into**

24        **Evidence)**

25        MS. FEINBERG:  Okay.  Just reorganizing a little so we can



www.escribers.net | 800-257-0885

1    mark the documents and I can keep going.  Okay.  So let's go.

2                         **REDIRECT-EXAMINATION**

3    Q    BY MS. FEINBERG:  Do you still have General Counsel's

4    Exhibit 63 in front of you?

5    A    Yes, I do.

6    Q    And I believe you testified that you took these notes

7    while talking to Mr. Pratt?

8    A    Correct.

9    Q    Okay.  And that they reflected the conversation?

10   A    Yes.

11   Q    And what is -- is there anything missing from this

12   document?

13   A    Let me just clarify there's a component of that's missing.

14   Q    And how do you remember that today, since this occurred on

15   September 19th, 2017 --

16   A    This --

17   Q    -- that that's component is missing?

18   A    Because Travis Pratt also provided me a screenshot of the

19   Workday profile photos.

20   Q    I don't have an email that says that.  I believe that -- I

21   thought it was provided to you by Mr. Hedges, and that Mr.

22   Pratt provided you the note that he sent to Mr. Ortiz.

23   A    Maybe I'm confused.

24   Q    Okay.  And do you remember any words that -- as you sit

25   here today, that Mr. Pratt said about Workday?



1    A    I remember us talking about Workday.

2    Q    Okay.  And you're not confusing him with Mr. Kostich;

3    you're talking about Mr. Pratt?

4    A    From what I recall, Mr. Pratt was talking about Workday --

5    Q    And why were you --

6    A    -- in discussing this matter.

7    Q    Okay.  And why would you have excluded anything from your

8    notes?

9    A    I can't recall why --

10    Q    Okay.

11    A    -- I would've excluded that.

12    Q    But when you finished your conversation with Mr. Pratt,

13    you thought the key issue was Workday?

14    A    Yes.

15    Q    And is there any reason that you didn't go back and modify

16    your notes to reflect the most what you thought was the key

17    issue, since this was the record that you were going to rely on

18    and in fact, did rely on as an exhibit in the report?

19    A    I didn't reference an exhibit of my notes in the report.

20    Q    Well, at the end of the report it showed -- it has

21    attachments.  It does.  It says investigative procedure on the

22    last page of the report.

23    A    Investigative procedure is a chronology, and those are not

24    attachments or exhibits to the report.

25    Q    Well, they have live links.



www.escribers.net | 800-257-0885

1    A    Those live links direct you to a Workday page, so it can

2    show you how long that employee has been there.

3    Q    I see.  But the -- so the people reviewing this report

4    didn't have your notes?

5    A    The people reviewing this report could have had access to

6    my notes.

7    Q    All right.  Did Mr. Graminger have access to your notes?

8    A    I thought we were discussing the people reviewing my

9    report in Exhibit 85, so the people that --

10   Q    I see.

11   A    -- were working on the live document could have had those

12   notes.

13   Q    And how would they have had access to them?

14   A    So they would have had access to them from an

15   administrative perspective, in a shared folder or in our case

16   management system.

17   Q    And do you know whether they ever accessed those notes?

18   A    I can't speak for who accessed what.

19   Q    And do you still have General Counsel Exhibit 87?

20   A    I do.

21   Q    And when you began this report, you -- this is one of the

22   early versions of your report.  I mean, when you began this

23   investigation -- this is one of the early versions of your

24   report; is that right?

25   A    Yeah.  It looks like this is the fourth of 26 versions of



www.escribers.net | 800-257-0885

1    the report.

2    Q    Okay.  And were you concerned about any particular policy

3    that was violated in doing this investigation?

4    A    Was I concerned about any specific policy --

5    Q    Um-hum.

6    A    -- at Version 4 in the report of --

7    Q    Yeah, at the time you were writing this.  Yeah.

8    A    It doesn't appear that this is completed, so I can't speak

9    for what parts I pulled into the report yet.

10   Q    I'm asking you at the time you wrote this whether you had

11   concerns about any particular policy.

12   A    I think at any point in an investigation you're thinking

13   about policies, so yes.

14   Q    Okay.  And is there any reason why you didn't reflect any

15   particular policy on the face of the report as you were writing

16   it, at the inception or near the inception?

17   A    Yeah, so this is a not-final report, so it's still being

18   drafted, so that's why there's no policy referenced in this

19   version of the report.

20   Q    But there are other key facts, so -- is that your practice

21   to put those things in later or what?

22   A    I mean, clearly it was my practice to put things in up to

23   22 other versions of this report, yes.

24   Q    Okay.  And it says -- so the allegation you were

25   researching was the second bullet down, description of the



1    allegation; is that correct?

2         MR. ROSS:  I didn't hear the question.  Again, please.

3         MS. FEINBERG:  Was the allegation that he was

4    investigating, the second bullet down, description of the

5    allegation?

6         MR. ROSS:  What are you referring to?

7         MS. FEINBERG:  We're still talking about General Counsel

8    Exhibit 87.  We haven't moved from there.

9         MR. ROSS:  The second bullet?

10        MS. FEINBERG:  It says, "description of the allegation".

11   Q    BY MS. FEINBERG:  Is that what you were investigating, the

12   description of the allegation?

13   A    Yeah.

14   Q    Okay.  And it says here that the screenshots included

15   pictures, full name, and business title of both Travis and

16   Shaun; is that what it says?

17   A    Yes.

18   Q    And is that true?

19   A    Yeah.

20   Q    Okay.  And can you turn to General Counsel Exhibit 28.

21        MS. FEINBERG:  Is that before the witness or do we have

22   to -- or could someone provide it to him?

23   Q    BY MS. FEINBERG:  But before you have it, you went through

24   many renditions of this document.  I assume you checked it

25   against the information that you have before you; is that



www.escribers.net | 800-257-0885

1    correct?

2    A    To the best of my knowledge, yes.

3    Q    I mean, that was your objective.  Your objective was to

4    write the truth on the face of this document?

5    A    Yes, my objective is to write the truth on this document.

6    Q    Okay.  That's good.

7         MR. RODRIGUEZ RITCHIE:  I'm handing the witness General

8    Counsel's Exhibit 28.

9         THE WITNESS:  Thank you.

10   Q    BY MS. FEINBERG:  Okay.  And is this the screenshot -- I

11   believe you said the box near the top with the two pictures and

12   the words above it was what you had before you when you were

13   doing your investigation?

14   A    Everything -- I think I clarified this last time.

15   Q    Um-hum.

16   A    So in Exhibit 28, the components of this that I don't have

17   or that I was not provided were the last line, where it says,

18   "Yeah, LOL", and then it goes on.

19   Q    Okay.

20   A    So everything about that is what I had.

21   Q    So can you tell me where on this document it says Shaun

22   Ives' name?

23   A    It doesn't appear to be on this document.

24   Q    Okay.  And can you tell me where on this document it shows

25   Shaun Ives' title?



www.escribers.net | 800-257-0885

1    A    It does not appear to be on this document.

2    Q    Okay.  And yet, that's what you wrote in every rendition

3    of your report; isn't that true, including the final report?

4    A    It appears there's a mistake in the report.

5    Q    Okay.  And did you ever show the document itself to Mr.

6    Graminger, who was making the decision?  I'm sorry.  Did you

7    ever show General Counsel's Exhibit 28 to Mr. Graminger?

8    A    The Exhibit 28 to Mr. Graminger?  I can't recall if I did.

9    Q    Okay.  So he was relying on what you presented to him as

10   the truth of the investigation?

11        MR. ROSS:  Objection.  He can't testify as to what Mr.

12   Graminger was relying on.  He can only testify as to what he

13   showed him.

14        MS. FEINBERG:  Okay.  I'll rephrase it then.

15        JUDGE TRACY:  Thank you.

16   Q    BY MS. FEINBERG:  He was relying on what you shared with

17   him that day?

18   A    Yes.  Mr. Stephan Graminger was relying on what I shared

19   with him during our conversation.

20   Q    And you did not share General Counsel Exhibit 28?

21   A    Not that I can recall.

22   Q    Okay.  And my colleague from General Counsel's office

23   pointed out that in an earlier version of this process,

24   including in General Counsel's Exhibit 86, you included

25   language which indicated that the two gentlemen who appear in



1    General Counsel Exhibit 28 had gone to Sacramento to speak with

2    state legislatures about their experiences at Tesla; is that

3    right?

4    A    That's correct, what I just testified to.

5    Q    Okay.  But in the document -- now I will show it to you.

6    One moment.

7    (Counsel confer)

8    Q    BY MS. FEINBERG:  Okay.  But the real thing I want to ask

9    is, do you also have General Counsel's Exhibit -- yeah, here it

10   is.

11      MS. FEINBERG:  Oh, and I actually did have one more copy.

12   Anybody else need a copy?

13   Q    BY MS. FEINBERG:  Do you have before you General Counsel's

14   Exhibit 85, the one with all the time stamps?

15   A    Yeah.  Yes, I do.

16   Q    Okay.  So I just want to make sure.  I think I've achieved

17   this, which is I've handed you Charging Party Exhibit 4, which

18   is Version 21.  So as I read this, I just want to make sure you

19   agree that that would be the version that you had on October

20   17th, 2017?

21   A    I just want to clarify that you said you think you have

22   this -- this is Version 21 on this?

23   Q    Oh, I'm sorry.  It says Version 21.  Yes --

24   A    It --

25   Q    -- it was provided by the company --



www.escribers.net | 800-257-0885

 1    A    Okay.

 2    Q    -- as Exhibit --

 3    A    Okay.

 4    Q    -- Version 21.

 5    A    Got it.

 6    Q    So it's been represented as Version 21 --

 7    A    Okay.

 8    Q    -- along with the version history.

 9    A    Okay.

10    Q    So what I would like to know is was Version -- so and you

11    met with Mr. Graminger and two other people on October 17th --

12    and I'm not going to do her name justice -- ShTawney and -- and

13    Juan Martinez?  Or maybe you don't remember his name.

14    A    I can't recall the other person's name.

15    Q    Okay.  Right.  Okay.  A person --

16    A    Maybe it was Juan Martinez.

17    Q    A person perhaps called Juan Martinez on October 17th,

18    2017.  So is Version 21 what you shared with Mr. Graminger?

19    A    Yeah, it's possible.

20    Q    Okay.  So --

21    A    If those dates align, yes, it was --

22    Q    You met with him on the 17th.  And is it correct to say

23    that when you met with him you took the most recent version to

24    go and meet with him?

25    A    Yes, that would be accurate.



www.escribers.net | 800-257-0885

1  Q    Okay.  And is it correct to say that there is no reference

2  to the fact that Mr. Pratt and Mr. Ives had gone to Sacramento

3  in charging party Exhibit 4, Version 21?

4       MS. FEINBERG:  Oh, and we have these, too.

5       THE WITNESS:  After a brief review, no, that's -- that's

6  not in this -- this version of the report, just like it's not

7  in the finalized version of the report.

8  Q    BY MS. FEINBERG:  All right.  And did you ever share that

9  information about the fact that Mr. Pratt and Mr. Ives had gone

10  to Sacramento to testify on behalf of Tesla with the decision-

11  maker, Mr. Graminger?

12  A    From what I recall, the conversation, the only person that

13  brought up something regard to the Union was the person I

14  Wasn't aware of and who you represent as maybe Juan.  There was

15  a brief mention of that, so no mention of Sacramento.

16  Q    Okay.  And it is true that when -- that you met with Mr.

17  Ortiz two times?  Oh, yeah -- I'm sorry.

18  A    I actually met with Mr. Ortiz three times.

19  Q    Thank you.  I misspoke.  You met with him two times in the

20  course of the investigation, before you finalized your report?

21  A    I met with him three times during the course of the

22  investigation.

23  Q    Do you include his termination as one of those times?

24  A    Including his termination, that would be four times during

25  the course of the investigation.



www.escribers.net | 800-257-0885

1    Q    Okay.  Well, we have two -- copies of two sets of notes of

2    your interview of Mr. Ortiz.  So one was on September 21st and

3    one is on October 12th.  Are you saying you met with him a

4    third time?

5    A    I met with him a couple of days after the first time, when

6    he had brought some concerns up that I wanted to understand

7    better.

8    Q    And were those concerns regarding the issue of General

9    Counsel Exhibit 28?

10   A    No.  They were separate and apart from that.

11   Q    Okay.

12   A    Those were concerns that Mr. Ortiz had that he wanted to

13   make somebody aware of.

14   Q    Okay.  So with respect to the allegations in Charging

15   Party 4, you met with Mr. Ortiz two times before he was

16   terminated?

17   A    Specific to this --

18   Q    Yes.

19   A    Yes.

20   Q    Okay.  And the second time you met with him, it was so he

21   could clarify anything he wanted to clarify?

22   A    Every time I met with him, he had the opportunity to

23   clarify anything he needed to clarify.  So he could've

24   clarified the second time when he raised concerns, and he

25   could've clarified the third time, when I specifically asked



www.escribers.net | 800-257-0885

1    him about the Workday screenshots.

2    Q    Okay.  Well, I'm just using your words, which is on

3    charging party 4, page 2.  It says, "In an effort to clarify

4    his earlier statements, understand why he previously withheld

5    this information, you met with him"?

6    A    Yes.

7    Q    And in that meeting, you indicate that he then disclosed

8    that he had gotten the documents from Mr. Moran?

9    A    Yes.

10   Q    Okay.  And is there any reason why that information isn't

11   included in the executive summary which was then provided to

12   Mr. Graminger as part of Charging Party Exhibit 4?

13   A    From my understanding, it is.

14   Q    Where does it say that he came -- that he --

15   A    Saying that Richard Ortiz knowingly mislead employee

16   relations and lied to protect the source of Workday

17   screenshots.

18   Q    Yes.  That's not the question I'm asking you.  I'm asking

19   you where, on the bottom of page -- near the bottom of page 2,

20   you indicate that Richard told you that Mr. Moran had given it

21   to you?  So he actually, in the course of it, had been honest

22   and said, yes, I gave it to you; he changed his position?

23   A    Ah.  In admitting me to the second time, he also admits to

24   lying to me the first time, so that's why it's included in

25   executive summary.


www.escribers.net | 800-257-0885

1  Q    Well, the first time he said he didn't know, and then he

2  was more forthcoming the second time; isn't that correct?

3  A    He was more forthcoming the second time, yes.

4  Q    Okay.  And did you -- and is there a reason that isn't in

5  the executive summary?

6  A    That specific verbiage, there's not a reason that that's

7  not in there.

8  Q    So if you had already drawn your conclusion based on the

9  first meeting, why even have the second meeting?  If what

10 you're saying is what he said in the first meeting was enough

11 to terminate him, why hold a second meeting to give him the

12 opportunity to clarify?

13 A    I think everybody should have the opportunity to share

14 their full story, and I didn't have the full story the first

15 time, at which point, it gave him the opportunity to do so.

16 Q    And he did?

17 A    And he shared what it was.  Was there any other context

18 that it might have been missing?  It didn't appear that he

19 wanted to share anything else.

20 Q    And you handed a copy of Charging Party Exhibit 4 to Mr.

21 Graminger during the course of your meeting with him?

22 A    I do recall -- I think what I testified previously --

23 there was a version of the report in the meeting with us.

24 Q    How many copies?

25 A    From what I recall, probably one.



www.escribers.net | 800-257-0885

1    Q    And what -- okay.  There's four people.  There's one copy.

2    You were there for how many minutes?

3    A    I can't recall specifically.  Again, this is over a year

4    ago.  But it was likely a half-hour meeting.

5    Q    Okay.  And during the course of that meeting, did you see

6    Mr. Graminger read Charging Party Exhibit 4?

7    A    Not that I can recall with Mr. Graminger --

8    Q    Did you hand him a copy of Charging Party Exhibit 4?

9    A    I can't recall physically what I did in the meeting.

10   Q    I believe I asked you this, but I just want to make sure:

11   were there any notes taken of that meeting with the four of you

12   on October 17th with Mr. Graminger?

13   A    Yeah, I can't remember if that's been asked previously.

14   I -- I don't believe there were any notes taken during that

15   meeting.

16   Q    And did anyone read Charging Party Exhibit 4 out loud

17   during the course of the meeting on October 17th?

18   A    I can't recall anybody reading, word-for-word, this

19   Charging Party Exhibit 4 out loud.

20   Q    So do you recall giving your own version of Charging Party

21   Exhibit 4, verbally ,in the course of the meeting on October

22   17th?

23   A    I recall discussing the concerns and the summary of our

24   findings, yes.

25   Q    And the summaries would be what's in the executive



1  summary?

2  A    Most likely, yes.

3  Q    One minute, please.  And going back to General Counsel

4  Exhibit 87, where it says, "This time frame responds to when

5  these three TESLA employees went to Sacramento to speak with

6  state legislatures about their experience in Tesla", do you see

7  that?

8  A    That's on the second page --

9  Q    Yes.

10  A    -- near the top of --

11  Q    Yes.

12  A    -- Exhibit 87?  Yes.

13  Q    How did you know what time frame it was that these workers

14  went to Sacramento?

15  A    There -- there were references to Sacramento in some of

16  the conversations that I had with the employees throughout my

17  investigation.  So I knew that that had just occurred.

18  Q    Did Mr. Hedges tell you about it?

19  A    Not that I can recall.

20  Q    Did you ever verify what time frame it was that these

21  employees had gone to Sacramento?

22  A    From what I recall on the notes that I reviewed, it was a

23  few days before this was brought forward as a concern.

24  Q    And was that from anyone other than Mr. Moran?

25  A    Yeah.  Without reviewing my notes right now, from that --

22-60493.2230



1    I can't recall specifically who all brought that up.  But I do

2    recall it being a part of the conversations.

3    Q    Okay.  And did Mr. Pratt ever tell you he'd been to

4    Sacramento?

5    A    It's -- yeah, again, without reviewing Mr. Pratt's --

6    Q    Well, you have that there -- General Counsel's Exhibit 63.

7    A    Oh, thank you.

8         As part of Exhibit 63, it looks like he did, yes.

9    Q    Where does it say that?

10   A    On the first line, "as contacted by Josh about going up to

11   Sacramento".

12   Q    Okay.  And then did you ever verify with Josh whether that

13   was true?

14   A    I'm sorry -- whether that was true?

15   Q    Yeah, that Josh had contacted him about going up to

16   Sacramento.

17   A    I did not.

18   Q    Okay.  And did you ever ask Mr. Pratt when he had gone to

19   Sacramento?

20   A    He brought up that he had just returned from there.

21   Q    Okay.  And so you realized that these workers who had gone

22   to Sacramento actually not just to talk about their experiences

23   at Tesla but at the request of Tesla?

24   A    That's what it sounds like.

25   Q    Okay.  And is there a reason that you didn't include that

22-60493.2231



1    in your initial version of the report, that they had gone there

2    at the request of Tesla?

3    A    Is there a reason I didn't --

4    Q    Yeah.

5    A    -- include that in my report?  No.

6    Q    And did you ever ask Mr. Pratt if he had ever publicly

7    identified himself as working for Tesla?

8    A    I did not ask him that.

9    Q    And did you ever ask him if he had ever publicly

10   identified how much he earned while working at Tesla?

11   A    No.  I recall us, I think, talking about this previously,

12   but no, I didn't ask him that question.

13   Q    But you knew that he had a concern about what was on

14   General Counsel Exhibit 28?

15   A    Yes, I did.

16   Q    And did you walk through the wording of General Counsel

17   Exhibit 28 with Mr. Pratt?

18   A    Word for word, not that I can recall, no.

19   Q    Okay.  I -- you need a minute?

20   A    I'm good.  Thank you.

21        MR. ROSS:  I couldn't hear what you said over the cough.

22   I'm sorry.

23        THE WITNESS:  She didn't start, so -- she stopped.

24        MS. FEINBERG:  I asked if you needed a minute is what I

25   asked.



1        MR. ROSS:  Thank you.

2        MS. FEINBERG:  And I have these cough drops here if you

3    need them.

4        THE WITNESS:  I see them.  Thank you so much for --

5        MS. FEINBERG:  Okay.

6        THE WITNESS:  -- offering those cough drops.

7        MS. FEINBERG:  Okay.  Anyhow, let me know if you do,

8    but --

9    Q    BY MS. FEINBERG:  On Charging Party Exhibit 4, the last

10   sentence of the description of the allegation now reads -- go

11   ahead and read it previously, "This investigation was initiated

12   to determine if proprietary business systems for access for

13   nonbusiness purposes"; is that right, is that what it says

14   there?

15   A    Yes, that's what it says there.

16   Q    Okay.  And who instructed you to put that there?

17   A    No one instructed me to put that there.

18   Q    Okay.  And if that was the purpose of the investigation,

19   why did that not appear on General Counsel's Exhibit 86?

20   A    Again, General Counsel's Exhibit 86 is a draft version of

21   the finalized reports.  This is Version number 8 of a total of

22   26 versions.  Version number 21 seems to be the closest to the

23   final, final version of the document.  That's the only reason I

24   can think of why that doesn't appear on a much older version.

25   Q    Now I have to mark something else that I -- but it's this



1    blank version 20 --

2        MS. FEINBERG:  Can I have a moment off the record so we

3    can just make copies?  Sorry.  This is a earlier version that I

4    didn't know was going to be needed.

5        JUDGE TRACY:  Okay.  Let's go off the record for a few

6    minutes.

7        MS. FEINBERG:  Thank you.

8      (Off the record at 11:26 a.m.)

9        JUDGE TRACY:  Let's go ahead and go back on the record.

10   Go ahead.

11   Q    BY MS. FEINBERG:  Okay, so you have before you what's been

12   marked as Charging Party Exhibit 5, pages 1 and 2.  Is that

13   before you?

14   A    It is.

15   Q    Okay, and are you familiar with this document?

16   A    Yes.

17   Q    Okay, so is this a template which your department used

18   before developing an investigative report?

19   A    It looks like a really old template, yes.

20   Q    You see where it says "Version 2"?

21   A    Yes.

22   Q    Okay, so if you look at General Counsel Exhibit 85.

23   A    Correct.

24   Q    Okay, and you can look at Version 2?

25   A    Yep.



1    Q    Okay, so I'll represent to you that this was the early

2    incarnation of what became your report.  Is that how you

3    understand it?

4    A    Yeah.

5    Q    Okay, so you worked off of this template?

6    A    Yes.

7    Q    In creating -- in creating the investigative report?

8    A    Yes.

9    Q    Okay.  Okay.

10       MS. FEINBERG:  I would like to move Charging Party Exhibit

11   4 and 5 into evidence.

12       JUDGE TRACY:  Any objections?

13       MR. ROSS:  No.

14       JUDGE TRACY:  Charging Party's Exhibits 4 and 5 are

15   admitted into evidence.

16   **(Charging Party Exhibit Number 4 and 5 Received into Evidence)**

17       MR. ROSS:  85 is that, is that correct, Your Honor?  GC-

18   85?

19       JUDGE TRACY:  I think so, yes.

20       MR. ROSS:  Yes?

21       JUDGE TRACY:  Yes.

22       MR. ROSS:  Thank you, Your Honor.

23       MS. FEINBERG:  Oh, I'm done.

24       JUDGE TRACY:  Oh.

25       MS. FEINBERG:  I'm sorry.  I thought you understood.



www.escribers.net | 800-257-0885

1  That's why I moved them in.  I didn't notice you were waiting

2  for me.  My apologies.  I thought he had maybe said, so here

3  I'm just going on in my own little world.  Yes, I am done.

4      JUDGE TRACY:  Okay.  All right.  Are you guys ready for --

5      MR. ROSS:  If I may just have a moment.

6      JUDGE TRACY:  Yes, so you'll be calling Mr. Gecewich on

7  your direct case in chief?

8      MR. ROSS:  Right.

9      JUDGE TRACY:  Okay.  So let's go ahead and go off the

10  record.  How many minutes do you think you'll need?

11      MR. ROSS:  For his direct?

12      JUDGE TRACY:  No, to prepare?

13      MR. ROSS:  Just two minutes.

14      JUDGE TRACY:  Okay.

15  (Off the record at 11:35 a.m.)

16      JUDGE TRACY:  Go back on the record.

17      MR. ROSS:  Thank you.

18      JUDGE TRACY:  Okay, all right, Mr. Ross, go ahead.

19      MR. ROSS:  Thank you, Your Honor.

20              **DIRECT EXAMINATION**

21  Q   BY MR. ROSS:  Thank you, Your Honor.  Good morning, Ricky,

22  how are you?

23  A   I don't feel very great.

24  Q   Okay.

25  A   Physically.  Emotionally, I'm fine.



www.escribers.net | 800-257-0885

1  Q    Good.  Happy to hear that.

2  A    Thank you.

3  Q    That's something.  Thank you for being here again today.

4  I appreciate it.

5  A    Okay.

6  Q    I'd like you to take a look -- by the way I have -- I'd

7  like the record to reflect that I left on my witness area some

8  documents that are already in evidence that I'm going to be

9  examining the witness about.  I put them up there simply for

10  ease of reference, but it's nothing that's not in the record

11  already.  I'll be asking him questions about some of that

12  stuff.  They are banded together with a rubber band.  I'm not

13  going to ask you about that stuff now.

14  A    Okay.

15  Q    I'm going to be asking about the documents that he's just

16  reviewed with counsel for the General Counsel -- Union's

17  counsel, but in the interest of letting everybody know what's

18  going on, I --

19       JUDGE TRACY:  So why don't you put the documents that are

20  rubber banded right up here, face down.

21       THE WITNESS:  Okay.

22       JUDGE TRACY:  Thank you.

23  Q    BY MR. ROSS:  Thank you.  Now, Ricky, I'd like you to look

24  at General Counsel's Exhibit 85, please.

25  A    Okay, I've got that document.



1    Q    Have you ever seen that document before today?

2    A    No, I have not seen this document before today.

3    Q    Okay.  Do you have any understanding or knowledge as to

4    what that document is?

5    A    I would --

6    Q    I don't want you guessing, I'm just asking --

7    A    No.

8    Q    -- you whether you do or don't know.

9    A    Yeah, I mean, sorry I'm not trying to be difficult, but I

10   think it's probably just the version history of the live

11   document.  So the different drafts of it.

12   Q    Okay, and I think Ms. Feinberg asked you about a template.

13   A    Yes.

14   Q    Okay, tell me how a template figured into the drafting of

15   the investigative reports.

16   A    It's pretty simple.  When you open up a blank document,

17   and you just copy and paste a template into the version

18   history.  So I think it's Charging Party Exhibit 5.  It makes

19   sense to me, that's why it would be version two.  Version one

20   would be a blank piece of paper, and then version two would be

21   a copy and paste into that.

22   Q    I see.  Okay, and so in looking at General Counsel's

23   Exhibit 85, page 3, I see two entries on October 12, 2017.

24   Based on what you just testified to, can you tell us what

25   version one and version two were?



1    A    Version one, since I don't have it in front of me, I

2    assume it's a blank document that the newly formed piece of

3    data, I guess.  And then version two would be Charging Party

4    Exhibit 5, that's how it's been represented to me.  So it's the

5    copy and paste of the report template.

6    Q    All right.  Your Honor, I'd like the record to reflect

7    that the first page that was provided to opposing parties,

8    pursuant to your order, version one is in fact a blank page.

9         JUDGE TRACY:  Well, just put it in the record.

10         MR. ROSS:  Okay, that's fine.

11    Q    BY MR. ROSS:  Now, would you please take a look at, sorry

12    to be slow here, Charging Party's Exhibit 4.  And take a look

13    at General Counsel's Exhibit 5.  It's only -- if you can

14    recall, tell us the date of creation of Charging Party Exhibit

15    4, please.  Yes, Charging Party Exhibit 4.

16         JUDGE TRACY:  I need you to clarify what was the General

17    Counsel Exhibit number?

18         MR. ROSS:  Yes, General Counsel Exhibit 85.

19         JUDGE TRACY:  85.

20    Q    BY MR. ROSS:  Which is the version history. Comparing

21    Charging Party's Exhibit 4 against that document.  Can you tell

22    us when Charging Party's Exhibit 4 was created?

23    A    According to General Counsel Exhibit 85, Charging Party

24    Exhibit 4 was created on or updated on October 17th, 2017.

25    Q    Okay.  Now, if you would please take a look at the last


www.escribers.net | 800-257-0885

1    page of Charging Party's Exhibit 4.  Are you there?

2    A    I am.

3    Q    Okay.  Now, there are a -- there's a heading,

4    "Investigative Procedure" followed by a series of entries that

5    have bullets at the beginning of each line; do you see that?

6    A    I do see that.

7    Q    Okay, and I noticed that the last several bullets have the

8    word "pending" --

9    A    Yeah.

10   Q    -- immediately after the bullet.  Do you see that?

11   A    Yes, I do.

12   Q    Okay.  Tell us what -- and you put "pending" on this

13   document; is that correct?

14   A    That's correct.

15   Q    And when you put the word pending, what does that word

16   pending mean?

17   A    It can mean either that step hadn't been completed, or it

18   just hasn't been updated in the final version of this document.

19   Q    Okay, and in subsequent versions or integrations of this

20   document, because we know there are some subsequent ones, those

21   various entries that are shown as pending on Charging Party's

22   4-3, are those filled in?

23   A    In the -- in the previous versions?

24   Q    No, the subsequent versions.

25   A    Oh, after this version?



www.escribers.net | 800-257-0885

1    Q    Yeah.

2    A    Yes.

3    Q    Okay, and can you tell us how and when those entries were

4    made?

5         MR. RODRIGUEZ RITCHIE:  I'm going to object.  The question

6    is vague.

7         MR. ROSS:  Okay, I'm going to withdraw the question.

8         JUDGE TRACY:  Okay.

9    Q    BY MR. ROSS:  Let's, let's instead take a look at General

10   Counsel's -- I'm sorry, yes, General Counsel's Exhibit 62.

11   Keep Charging Party's 4 in front of you.  And take a look at

12   General Counsel's Exhibit 62.

13   A    Okay.

14   Q    Now, comparing the last pages of both documents, there are

15   certain lines in Charging Party's Exhibit 4 that read pending

16   and then in General Counsel's Exhibit 62, the last page there's

17   no reference to pending, instead the various bullets are dates

18   and text next to them.  Can you explain to us how and why the

19   draft was modified as exists in General Counsel's Exhibit 62?

20   A    Yeah, the draft would be modified again when those things

21   were completed, and dates would be added to reference when that

22   was completed, or when that specific step was completed.

23   Q    Okay.  By the way, I think you referred to this as a

24   living document?  Or a live document?

25   A    I don't know what Microsoft calls it, but it's like a 365



www.escribers.net | 800-257-0885

1    Live document for collaboration.  It's a collaboration tool.

2    Q    Okay.

3    A    I'm not a sales person for Microsoft.

4    Q    Tell me, you're looking at -- look at General Counsel

5    Exhibit 85 again, please.

6    A    I'm looking at it.

7    Q    Okay.  Now, do you recall whether you prepared the

8    document that was ultimately General Counsel's Exhibit 62 in

9    one sitting, or whether different times you worked on the

10   document?

11   A    Well, looking at General Counsel's Exhibit 85, I worked on

12   it throughout the course of several days.

13   (Counsel confer)

14   Q    BY MR. ROSS:  Okay, you were in mid-sentence.

15   A    No problem.  Can you repeat the question so I am answering

16   the right thing.

17   Q    Yeah.  Looking at General Counsel Exhibit 85, can you tell

18   from that whether you had prepared this document in one

19   sitting, or was there more than one sitting?

20   A    I prepared this document over several days and updated it

21   over several days.

22   Q    Okay.  Tell me, during this period of time, was this the

23   only case you were working on?

24   A    It was not.

25   Q    Okay.  Let me ask you, the notes that you took of your



1    conversations with Mr. Pratt, are they a verbatim description

2    of everything you and he said to one another when you spoke to

3    him?

4    A    My notes are not verbatim.

5    Q    Okay.  Is there a recording, audio recording, video

6    recording, some verbatim document or media that records the

7    entirety of your conversation with Mr. Pratt?

8    A    There is not.

9    Q    Do you have memories of the conversation with Mr. Pratt,

10   that are not reflected in your notes?

11   A    I do.

12        MR. ROSS:  Your Honor, this might be an appropriate time

13   to move for lunch.

14        JUDGE TRACY:  Okay, so we'll start at 1:00 then.

15        MR. ROSS:  That's fine.

16        JUDGE TRACY:  Okay.  Let's go off the record, but we do

17   need to finish him today.

18        THE WITNESS:  Yes, please.

19        MR. ROSS:  You're not kidding.  Absolutely agree.

20        JUDGE TRACY:  Okay.  All good.  1:00.  So shorter break

21   today.

22   (Off the record at 11:54 a.m.)

23        JUDGE TRACY:  Okay, let's go on the record.  Go ahead,

24   please.

25        MR. ROSS:  Thank you, Your Honor.


www.escribers.net | 800-257-0885

1    Q    BY MR. ROSS:  Ricky, the earlier questioning of you has

2    kind of covered a lot of things that I had planned on covering

3    with you, and kind of stolen a little bit of my thunder, so I'm

4    not going to go into a lot of preliminaries with you, but I do

5    want to get some information about your background.  Before you

6    were an internal investigator in the private sector, what did

7    you do in the area of investigation?

8    A    Before moving to like Google and Tesla?

9    Q    Correct.

10   A    Yeah.  So I was a federal criminal investigator for the

11   U.S. Air Force.

12   Q    Okay, and how long did you do that?

13   A    I did that for 11 years.

14   Q    11 years, okay.  And then when did you go to Google?

15   A    To Google, my goodness.  Either 2013 or 2014.

16   Q    Okay, and you were an internal investigator there?

17   A    Yes, I was.

18   Q    And we know that you worked for Tesla, and then left

19   Tesla, and now you're where?

20   A    Currently at Pinterest.

21   Q    Pinterest.  What is Pinterest?

22   A    It's a visual discovery engine.  It helps you do the

23   things that you're proud of doing.

24   Q    How new age.  And what do you do there to make people feel

25   good about themselves?



www.escribers.net | 800-257-0885

```
 1    A    I also do internal investigations for them as well.

 2    Q    Okay.  Okay.

 3         JUDGE TRACY:  And certainly, of course, if there's parts

 4    that he's already been questioned on for a whole day --

 5         MR. ROSS:  I'm not going to cover everything.

 6         JUDGE TRACY:  -- we don't need to cover them, so you don't

 7    -- if they're not in dispute.

 8         MR. ROSS:  Right.

 9         JUDGE TRACY:  Yes.

10         MR. ROSS:  Right, right, right.

11         JUDGE TRACY:  Thank you.  Thank you.

12    Q    BY MR. ROSS:  All right.  Could the witness be given that

13    stack of documents that I put on the --

14         JUDGE TRACY:  Well, what about which exhibit?

15         MR. ROSS:  Well, I'm going to be asking him questions

16    about all of those exhibits at some point.

17         JUDGE TRACY:  Well, we'll do it one at a time.

18    Q    BY MR. ROSS:  That's fine.  That's fine.  So if the

19    witness could be shown Respondent's -- I'm sorry, General

20    Counsel's Exhibit 80, please.

21    A    Thank you.

22    Q    Now, Mr. Gecewich, you have in front of you what has been

23    marked and is evidence as Respondent's -- General Counsel's

24    Exhibit 80-1001 through 1003.

25    A    Okay.
```



www.escribers.net | 800-257-0885

1     Q     Okay.  I'm directing your attention to the first two pages

2     of that exhibit.

3     A     Okay.

4     Q     And can you tell me, this is a string of emails between

5     you and Mr. Pratt?

6     A     Yes, it is.

7     Q     Okay, and the first of the emails between you and Mr.

8     Pratt appears where in this document?

9     A     It's on the second page.  It starts from Rickey Gecewich

10    sent Tuesday, September 19th, 2017.

11    Q     Okay, and the last or most recent message between yourself

12    and Mr. Pratt appears where in General Counsel's Exhibit 80?

13    A     Yeah, so it's on the first page at the very top is the

14    most recent message.

15    Q     Okay, now going to the second page, your first

16    communications with Mr. Pratt, had you had any contact with Mr.

17    Pratt, before you sent this email to him?

18         MR. RODRIGUEZ RITCHIE:  Vague as to this email.

19    Q     BY MR. ROSS:  This email being the email from Ricky

20    Gecewich to Travis Pratt, sent Tuesday, September 19th, 2017 at

21    12:56:07 p.m.?

22    A     I have not --

23         JUDGE TRACY:  And as reflected in General Counsel's

24    Exhibit 80-002?

25         MR. ROSS:  Correct.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Okay.  Thank you.

2      THE WITNESS:  I had not had any communication with him

3   prior to this.

4   Q    BY MR. ROSS:  Okay.  You didn't know Mr. Pratt before

5   this?

6   A    I did not.

7   Q    Okay, and looking at this document, General Counsel's

8   Exhibit 80, can you ascertain whether and when you spoke with

9   Mr. Pratt on September 19th, 2017?

10  A    Based on the communication string, it looks like I called

11  him on the phone sometime mid to late afternoon on September

12  19th, 2017.

13  Q    Okay, and what in the email string leads you to that

14  conclusion?

15  A    On the first page of General Counsel Exhibit 80-001, at

16  the bottom, Travis replied to me and said that he was off work,

17  but that he would be available for a call.  The very next entry

18  that I responded to him about two minutes later was that I

19  could call him in 10 to 15 minutes.  And then he responded,

20  "Perfect."

21  Q    Okay, is any portion of General Counsel Exhibit 80 a

22  message you received after you spoke with Mr. Pratt?

23  A    Yes.  So during our conversation I asked him for the

24  message he had sent to Richard Ortiz. And so the -- at the top

25  of General Counsel Exhibit 080-001 is him -- Travis Pratt



www.escribers.net | 800-257-0885

1   sending me, "Attached is the message I sent to Richard, in

2   response to his post," that I had requested from him.

3   Q   All right.  Thank you.  Put that document down.  Now, I'd

4   like you to take a look at General Counsel's Exhibit 63,

5   please.  This is a two-page document, 63-001 and 002.

6   A   Okay.

7   Q   Okay, and I believe you previously identified this

8   document as notes you took during a conversation you had with

9   Mr. Pratt?

10  A   Yes, they are.

11  Q   Okay.  Now, is this a complete description of the

12  conversation, word for word, in its entirety, the conversation

13  you had with Mr. Pratt --

14      MR. RODRIGUEZ RITCHIE:  Objection, leading.

15  Q   BY MR. ROSS: on September 19, 2017 at approximately four

16  after 4:30 in the afternoon?

17      MR. RODRIGUEZ RITCHIE:  Objection, leading.

18      JUDGE TRACY:  Sustained.  Sustained.

19  Q   BY MR. ROSS:  Okay.  Tell me --

20      JUDGE TRACY:  So I have to say this again.  The leading

21  questions really affect my ability --

22      MR. ROSS:  All right, Your Honor.

23      JUDGE TRACY:  -- to determine the credibility of any

24  witness when they're not testifying from their memory, but just

25  from yes or no, based upon the question.



www.escribers.net | 800-257-0885

1          MR. ROSS:  Okay.

2     Q   BY MR. ROSS:  Mr. Gecewich, these notes, I'm having a hard

3     time understanding what these notes say and reflect.  Could you

4     walk us through the document and tell us what you meant by the

5     various entries you made here.  What was said and why you wrote

6     it down the way you did.

7          MR. RODRIGUEZ RITCHIE:  Objection.  Calls for a narrative,

8     compound.

9          JUDGE TRACY:  Overruled.  Go ahead, please.

10         THE WITNESS:  So these notes are -- I took these during my

11    conversation with Travis. And I can certainly walk you through,

12    you know, trying not to go line by line, but -- so I'd reached

13    out to Travis on the phone and told him that I'd been contacted

14    and had been shared the screenshot of the Facebook message.

15    And understood that there was something about that, that he

16    might have been concerned about.  And then Travis described to

17    me how he had been contacted about going up to Sacramento. And

18    that when he got back from Sacramento, one of his friends on an

19    AWS, an alternate work schedule, so working inside the factor,

20    outside of, you know, Travis's hours, saw a posting on a Fair

21    Future Tesla website, or post bulletin board.  That very same

22    night that he had returned from Sacramento.  Travis indicated

23    that he didn't see any replies to that. Or anything like that,

24    but understood it to be personally attacking toward him and

25    other people.  And he felt that that was inappropriate.



1        And that he had heard of this guy, Richard, Richard Ortiz,

2   but not anything other than work-related stuff.  I guess they

3   might have come into contact with each other.  Travis's role,

4   it appears from these notes was as a maintenance technician to

5   come and fix certain items in the factory, so he would see

6   different stations.

7        Travis indicated to me that he had sent Richard a direct

8   message.  That he felt the message was both agitated and

9   professional because he was uncomfortable with the fact that

10  this posting had been made.  So he wanted to let Richard know

11  about that, and how he felt about it.  And he summarized what

12  the message was, you know, say what you will behind closed

13  doors.  That he's a level two technician and wishes the best of

14  luck.  Travis also told me that the other person in the

15  photographs was a gentleman by the name of Shaun.  Shaun Ives.

16  And that he might have connected with Shaun and that it was --

17  that Shaun wasn't happy about that -- the posting.  So all of

18  this conversation was central to the screen shot that I had

19  received of the Facebook posting and I asked at the end of the

20  conversation if Travis would send me another screen shot that

21  he didn't have already, which was his direct message to

22  Richard, in response to the initial post.

23       MR. RODRIGUEZ RITCHIE:  Your Honor, I would request that

24  the record reflect the witness's answer to this question was

25  provided by reading from the document.



www.escribers.net | 800-257-0885

1   JUDGE TRACY:  In other words, you're saying that he is

2 looking at General Counsel Exhibit 63 as he is responding?

3   MR. RODRIGUEZ RITCHIE:  Correct.

4   JUDGE TRACY:  Okay, yes.

5 Q BY MR. ROSS:  Tell me this reference "Saw it on Fair

6 Future at Tesla," did you know what Fair Future at Tesla was

7 when you made this note?

8 A At this time when I made this note, I did not.

9 Q Okay, and going back to General Counsel's Exhibit 80, is

10 the email at the top of the first page of General Counsel's 80

11 and the attachment what Mr. Pratt sent to you, after you

12 concluded the conversation?

13 A I believe you're referencing General Counsel Exhibit 80-

14 003, that is the attachment that Travis Pratt provided to me,

15 which was his direct message to Richard Ortiz.

16 Q All right.  Now, you didn't mention him by name in your

17 description of the conversation you had with Pratt.  But was

18 somebody by the name of Bryan Kostich mentioned during this

19 conversation you had with Mr. Pratt?

20   MR. RODRIGUEZ RITCHIE:  Objection, leading.

21   JUDGE TRACY:  Sustained.

22   MS. FEINBERG:  And objection, misstates the testimony.

23   JUDGE TRACY:  Sustained.

24 Q BY MR. ROSS:  Okay.  Did you speak with somebody named

25 Bryan Kostich after this?



1   A    Yes, I did.

2   Q    And why did you call Bryan Kostich?

3   A    Travis indicated to me that Bryan Kostich was the person

4   that was working the alternative work schedule at Tesla, and

5   that came across this Facebook posting.

6   Q    All right.  And I -- looking at General Counsel's Exhibit

7   63-001, there is an entry Brian Kostich, Thursday night, after

8   I got back from last night, further indent.  Not sure if Bryan

9   got any flack for this, since banned him from the page, as

10   well.  Do you see that?

11   A    I do see that.

12   Q    Okay, tell me what was said -- what that note is in

13   reference to?  What was said in the conversation reflecting

14   that note?

15   A    From what I recall, this was Travis Pratt telling me that

16   Bryan Kostich had come across this Facebook posting Thursday

17   night when Travis had just returned from his meeting in

18   Sacramento.  And that he's not sure that by Bryan  coming

19   across this, if he got any flack or if he was  targeted in any

20   way.  But he heard from Bryan that he had been banned,

21   potentially, from this group.

22   Q    All right.  Okay.  By the way, in looking at General

23   Counsel's Exhibit 63-002 --

24   A    I'm sorry, which number?

25   Q    Sure.  In looking at General Counsel's Exhibit 63-002,



1    there appears to be a phrase or a sentence highlighted Thursday

2    -- night when I came back is when this was posted, I think.  Do

3    you see that highlighting?

4    A    Yes, I do see that.

5    Q    Okay, can you tell me who did that highlighting?

6    A    That highlighting would have come from me.

7    Q    And can you tell us when you did the highlight?

8    A    I can't tell you when I did that highlighting.

9    Q    Can you tell us why you did the highlighting?

10   A    It would likely have been to just recall specific things

11   from the notes, as I was either drafting a report or drafting

12   an outline for a future conversation.

13   Q    All right.  Now, I'd like to -- you can put down General

14   Counsel's Exhibit 63, and would you please pick up General

15   Counsel's Exhibit 64?  Now, before I ask you a question about

16   General Counsel's Exhibit 64, I got one other question about

17   63.  I'm sorry about that.

18   A    Okay.

19   Q    I noticed that 63 top of the page reads, "Intake with

20   Travis Pratt."  Do you see that?

21   A    Yes.

22   Q    And can you tell us what you use the word intake.

23   A    You know it was an intake of a concern that I had been

24   made aware of, so trying to understand what that would have

25   been.



1    Q    Okay.  Had you begun your investigation at this point?

2    A    Had I completed an investigation at this point?

3    Q    Had you begun your investigation at this point?

4    A    I wouldn't say that I had begun an investigation at this

5    point, I'm still gathering information.  And so that's why I

6    was taking an intake to understand what data points were out

7    there.

8    Q    Gathering information for what purpose?

9    A    Potentially to move to an investigation.

10    Q    Okay.  All right.  I'd like you to take a look at General

11    Counsel's Exhibit 64 and I'd like you to do the same thing with

12    General Counsel's Exhibit 64, that you did with 63.  Take us

13    through the conversation and explain what the phrase entries,

14    and notations you made on this document.  I mean how they

15    relate to that conversation.

16         MR. RODRIGUEZ RITCHIE:  Objection.  Calls for a narrative.

17         JUDGE TRACY:  Overruled.

18         THE WITNESS:  So I recall talking to Bryan Kostich on the

19    phone on September 20th.  And he described to me that he had

20    come across a Facebook posting that was on a page that he was

21    asked to join about a year and a half ago, from a profile named

22    Jose Organizer.  Bryan was aware that this Jose Organizer

23    account was organizing some sort of union related activity and

24    joined the group about a year and a half ago.  And as he was

25    scrolling through his feed, that night when he saw the photos



 1    of Travis Pratt and Shaun Ives, he recognized Travis and Shaun

 2    because he had previously worked with them, and he became upset

 3    by the fact that what he felt, you know, this was inappropriate

 4    and shouldn't have been up there.

 5        He was particularly upset about the fact they were talking

 6    about wages and how much people make.  And he didn't believe

 7    that that was something that people should get ahold of and be

 8    made available to others.   And that when he flagged -- so he

 9    shared this -- because he knew Travis Platt, he shared this

10    Facebook posting directly with Travis.  And that within about

11    six hours of it being posted, from what he recalls that it was

12    -- when he had flagged that.  So it hadn't been up there for

13    quite some time.  It had only been up there for about a quarter

14    of the day.

15        Bryan described to me that he believed this was posted by

16    a guy named Richard Ortiz.  That he had never personally

17    interacted with Richard, but that he had heard from others that

18    he's not a great person.  But also, in the same vein, holds

19    himself to a high standard at work, and believes that he does

20    the best job there.  Bryan also relayed to me that he believed

21    that the comments themselves were inappropriate, and it was

22    completely out of pocket and disgusting.  When I further tried

23    to explore what that meant, he shared with me that not only was

24    it the conversation about the money and how these people are

25    kissing ass to make this money, but also, you know, when he

www.escribers.net | 800-257-0885

1  realized these were work day profiles, he felt that that was

2  also inappropriate.

3      I asked him, because Travis had indicated to me whether or

4  not he had been blocked, or banned, or kicked out this group,

5  and he told me that he had not, but that there did -- it did

6  start a thread where people were saying something to the effect

7  of banned, ban 2017, #banned, in his direction.  So he felt

8  that he was pointed out for flagging this as inappropriate.

9  Let me see.  Yeah, and he, you know, at the very end, to

10  capture how he really felt about it --

11 Q    BY MR. ROSS:  I'm sorry.

12 A    At the very end to capture how he really felt about this,

13  he said the thing that pushed him over and made him realize

14  that this was 100 percent wrong, and quite disgusting, was that

15  there were these workday screen shots from a work day mobile

16  UI, so user interface, posted to the Facebook group.

17      MR. RODRIGUEZ RITCHIE:  I'd like the record to reflect

18  that the witness's answer was provided by reading from the

19  document in front of him.

20      JUDGE TRACY:  Yes, so General Counsel's Exhibit 64.

21  Noted.

22 Q    BY MR. ROSS:  Okay, have you finished your description of

23  the conversation?

24 A    Yes, I have finished my description.

25 Q    Okay, let's go back to the reference to Jose Organizer.



1    Did -- did Mr. Kostich mention Jose Moran by name during this

2    conversation?

3    A    He did not.

4    Q    Okay.  Did you ask him who Jose Organizer was?

5    A    I did not.

6    Q    When you had this conversation with Mr. Kostich, did you

7    know that Mr. Moran was using the moniker Jose Organizer?

8    A    I did not.

9    Q    Okay, and again, referencing the top of General Counsel's

10   Exhibit 64, you refer to this as an intake with Mr. Kostich?

11   A    Correct.

12   Q    Okay, and why did you call it an intake?

13   A    Again, trying to understand what the concerns were.  And I

14   understood from Travis Pratt that Bryan Kostich had come across

15   this and flagged it to him, so also might have felt like this

16   was concerning behavior.

17   Q    Okay.

18   A    And that's why I labeled it as an intake.

19   Q    And what was the purpose of doing an intake?

20   A    To determine whether or not there was further

21   investigation needed into this.

22   Q    I'm sorry.

23   A    To determine whether or not there was further

24   investigation needed into this matter.

25   Q    And did you reach a conclusion about that?



1    A    At this point, I believe yes, this is when I moved more

2    into the investigation scope of looking into this matter.

3    Q    Okay, and can you tell us why you concluded that an

4    investigation was appropriate at this point?

5    A    Yeah, because I had come to the person that came across

6    the actual documentation on Facebook, so the person that saw

7    the behavior and then flagged the behavior.  In which he had

8    described to me that, you know, these workday profiles were

9    posted on the Facebook page.  He saw them, he flagged them, he

10   felt that they were inappropriate.  And also for the fact that

11   some of the behavior that started to pop up with the singling

12   out and banning, and pointing, could have potentially been some

13   sort of bullying behavior, or harassing behavior.  So I felt it

14   was appropriate to look into that further.

15   Q    Okay, tell me, is the use of information appearing in a

16   workday -- strike that.  Did you consider possible use of

17   workday information for purpose of bullying to be an

18   appropriate use of the workday information?

19        MR. RODRIGUEZ RITCHIE:  Objection, leading.

20        MS. FEINBERG:  Objection, leading.

21        JUDGE TRACY:  Sustained.  Also assumes facts not in

22   evidence, but okay.

23   Q    BY MR. ROSS:  Now, you told us why you thought there was

24   a basis for proceeding with further investigation.  In your

25   prior experience as an investigator, have you ever been



1    presented with a similar case involving images of workers in

2    the workplace?

3    A    Yes, I have.

4    Q    And where was that?

5    A    That case happened at Google.

6    Q    Okay.

7         MR. RODRIGUEZ RITCHIE:  I'm going to object to the

8    relevance of this line of questioning.

9         MR. ROSS:  Your Honor, insofar as this information served

10   as a basis for his decision to proceed with an investigation, I

11   think it's highly relevant.

12        JUDGE TRACY:  I'm going to sustain the objection.  What

13   happened at Google doesn't matter what happens here.

14        MR. ROSS:  I understand.

15        MS. FEINBERG:  Especially since we know that Tesla is such

16   a unique place.  Sorry, I couldn't stop myself.

17        JUDGE TRACY:  Go ahead, please.

18        MR. ROSS:  I understand your ruling.  Let me say to you

19   that maybe it would be useful if the witness stepped out of the

20   room for a minute.  I don't want to -- I want to explain this

21   to you, and I frankly don't want him to hear what I'm saying.

22        JUDGE TRACY:  Go ahead, please.

23        Okay, so I've already ruled on it, but go ahead for the

24   record.

25        MR. ROSS:  Yeah, sure.


www.escribers.net | 800-257-0885

1    JUDGE TRACY:  What's the basis.

2    MR. ROSS:  The witness will testify that while he was at

3    Google he was presented with a similar case, where employees'

4    photos were posted -- photos from work were posted on the

5    internet and that following the posting of these photos, was a

6    pattern of actionable harassment directed at the individuals

7    shown in the picture.  He would further testify that it is this

8    memory of this experience, and given the early stage of this

9    case, where he was about to begin his investigation was

10   something that factored into his thinking with respect to

11   whether or not to proceed with an investigation and how to

12   proceed with the investigation.

13   JUDGE TRACY:  So then --

14   MR. ROSS:  So this goes to his state of mind and explains

15   his actions, Judge.

16   JUDGE TRACY:  But I would say again it's sustained.  The

17   basis for his state of mind is irrelevant.  He conducted an

18   investigation and he proceeded from there.  Unless you're

19   planning to bring in all the evidence from Google, so that they

20   can compare it and say it's not.  I'm not getting into that.

21   MR. ROSS:  Okay.  Well, then I would ask that the comments

22   I just made be considered an offer of proof.

23   JUDGE TRACY:  Go ahead.  And again, the objection is

24   sustained.

25   MR. ROSS:  Yeah, yeah, well --



1    MS. FEINBERG:  Well, are we still on the record?

2    MR. ROSS:  I simply --

3    JUDGE TRACY:  Yeah, we're still on the record.

4    MR. ROSS:  Yeah, and my offer of proof with respect to

5    this line of questioning and this witness would be --

6    JUDGE TRACY:  I thought you just did that.

7    MR. ROSS:  Well, I thought you wanted me to restate it.

8    JUDGE TRACY:  No.

9    MR. ROSS:  Okay.  The other --

10    JUDGE TRACY:  It's on the record.

11    MR. ROSS:  Okay.

12    JUDGE TRACY:  And I said that my decision still stands.

13    MR. ROSS:  I understood.  The other fact I would add, Your

14    Honor, is that the photo that was posted on the internet at

15    Google, was a workday photo.  In other words --

16    MS. FEINBERG:  Oh, my gosh.

17    MR. ROSS:  -- the photo that happened, that was used, or

18    which was resulted in the harassment act, at Google, was in

19    fact a photo taken from the same platform, same HRIS as used at

20    Tesla, because I guess workday is used in multiple work area,

21    work places in the valley.  And it was the seemingly same

22    parallels that he saw between what he had experienced at Google

23    and had investigated at Google, and what was developing and

24    emerging at Tesla at this time, that caused him, in part, to

25    want to proceed with an investigation.  And that's our offer of



www.escribers.net | 800-257-0885

1    proof.

2        JUDGE TRACY:  Go ahead, Mr. Rodriguez Ritchie, what's your

3    response to that?

4        MR. RODRIGUEZ RITCHIE:  Well, my response is that it's

5    entirely irrelevant to these proceedings what some -- what

6    investigation, if any, occurred at some other entirely

7    different third party employer.  It's -- Your Honor has a duty

8    to control the proceedings and the presentation of evidence.  I

9    agree with Your Honor's ruling.

10       JUDGE TRACY:  Anything you want to add?

11       MS. FEINBERG:  No, I mean well, all I have to say that

12   once again what we have is a little snippet, and so that's why

13   I think I agree with you, Your Honor, because what we don't

14   know is those people's names -- faces were in the public eye,

15   we don't know what they were harassed for, we don't know how it

16   happened.  We don't know if it was a union website, we don't

17   know if they testified.  I mean there's no connection, so I

18   don't really -- so, anyhow, thank you.

19       JUDGE TRACY:  So again, I'll sustain the objection.  I'll

20   note that he's already testified at length about his great deal

21   of experience as an investigator.  So I would assume that there

22   is some, you know, thought process that goes on.  Regardless of

23   what the thought process was, he decided to investigate the

24   matter.  And that's where we're at.  So all of this information

25   about what happened someplace else is not relevant.



www.escribers.net | 800-257-0885

1      MR. ROSS:  Well, Your Honor, I understand your ruling,

2   accept your ruling, but I think central to this case is Mr.

3   Gecewich's state of mind in terms of what he did, and why he

4   did it.  And this evidence all goes to that central issue.

5   Now, if General Counsel's prepared to say that they're not

6   going to make an issue as to why Mr. Gecewich did what he did,

7   and not attempt to impute some inappropriate motive or reason

8   to his actions in this case, I would agree with you that it is

9   irrelevant.

10      But since this case is all about what Mr. Gecewich did and

11   why he did it, I think it's highly relevant.

12      JUDGE TRACY:  I don't think that this case is only just

13   about that, but I'm going to at this point sustain the

14   objection.

15      MR. ROSS:  Thank you, I understand.  Let me go get him.

16      MR. RODRIGUEZ RITCHIE:  Since we've already taken a break,

17   I just wanted to let you know that --

18      JUDGE TRACY:  We're not on a break.

19      MR. RODRIGUEZ RITCHIE:  Or, I'm sorry a break from

20   dismiss, the General Counsel Exhibit 80 has somebody's phone

21   number on the bottom.

22      JUDGE TRACY:  Oh, okay, so we'll take care of that.

23      MR. RODRIGUEZ RITCHIE:  I've already redacted it.

24      JUDGE TRACY:  Oh, you're going to substitute a copy?

25      MR. RODRIGUEZ RITCHIE:  Just redacting a person's phone



www.escribers.net | 800-257-0885

1   number, since it's --

2      JUDGE TRACY:  Sure.  Just remind me when we get to a point

3   to do it.  Okay.  Go ahead.

4      MR. ROSS:  Thank you.

5   Q   BY MR. ROSS:  All right, Mr. Gecewich, you testified that

6   you decided an investigation was necessary after conducting the

7   intake.  What was the first thing you did to conduct that

8   investigation?

9   A   I met with Richard Ortiz.

10  Q   All right.  Now, do you remember where and when you spoke

11  with Mr. Ortiz?

12  A   I met with Richard Ortiz, if I recall correctly on the day

13  after I spoke with Bryan Kostich, so September 21st, and I

14  would have met with him in like the administrative offices in

15  the front of the factory in a conference room.

16  Q   Morning or afternoon?

17  A   I can't specifically recall.  He was on shift, so whatever

18  time on shift he was there.

19  Q   Okay, my understanding is he worked late shift.  Would

20  that refresh your memory at all?

21     MR. RODRIGUEZ RITCHIE:  Objection.  That's a leading

22  question.

23     MR. ROSS:  Withdraw the question.

24  Q   BY MR. ROSS:  Tell me -- I'd like you to look at General

25  Counsel's Exhibit 70, please.

22-60493.2264



1    A    Okay.

2    Q    Do you have it in front of you?

3    A    I do.

4    Q    Okay, now this is in evidence already.  This is a document

5    that was used during your earlier examination by Mr. Rodriguez

6    Ritchie.  Can you tell me do you know Tori Tanaka sent you this

7    document?

8    A    I do not.

9    Q    Before yesterday, or day before yesterday, when you were

10   presented this by Mr. Rodriguez Ritchie, did you have any

11   memory of receiving this document from Ms. Tanaka?

12   A    No.

13   Q    And in fact, aside from the fact it's sitting in front of

14   you, do you have any memory now of receiving it from Ms.

15   Tanaka?

16   A    Only other than it looks like it was sent to me.  That's

17   the only, you know, as it was presented to me yesterday, and --

18   or the other day, and, you know, looking at it now, it's the

19   only memory I have of this document.

20   Q    Uh-huh.  Do you have any memory of ever reading this

21   document?

22   A    I do not.

23   Q    You are seeing Mr. Richard Ortiz's name and signature

24   among the more than 300 plus individuals on this document.

25        MR. RODRIGUEZ RITCHIE:  Objection, leading.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  Sustained.

2    Q    BY MR. ROSS:  Did your receipt of this document play any

3    role whatsoever in the investigation you conducted?

4    A    Not at all.

5         MS. FEINBERG:  Motion to strike, because I missed that

6    leading thing, Your Honor, so I apologize.  But that question

7    was clearly leading, so, I don't know if it's too late to

8    inject my objection.

9         JUDGE TRACY:  Yeah, I'll just overrule it.

10        MS. FEINBERG:  Okay, well, I think you noticed it.  I hope

11   you did.

12   Q    BY MR. ROSS:  Now, when you spoke with Mr. Ortiz on the

13   21st, at that point, what had occurred to inform you of the

14   facts in this case?   In other words, who had you talked to,

15   what documents have you seen?

16   A    So the documents that I'd seen up to this point were the

17   original text message string screen shot from Josh Hedges.  The

18   screen shot of the direct message that Travis Pratt had sent to

19   Richard Ortiz.  I had met with Travis Pratt, and I had met with

20   Bryan Kostich.

21   Q    Okay, and based on that information, had you drawn any

22   conclusions about whether Mr. Ortiz was sympathetic to the

23   union?

24        MR. RODRIGUEZ RITCHIE:  Objection, leading.

25        JUDGE TRACY:  Sustained.



1    Q    BY MR. ROSS:  Tell me, what role, if any, did Mr. Ortiz's

2    feeling with respect to the union, play in your investigation?

3    A    It didn't.

4    Q    How come?

5    A    I didn't care, like about it.  I don't know how to answer

6    that question.

7    Q    Was it something that you saw as being connected to what

8    you were investigating?

9         MS. FEINBERG:  Your Honor, to the extent that he's asking

10   -- I feel like this answer to these questions, are really the

11   questions for you and not for him.  And so maybe it's the way

12   that it's phrased.  But whether the union activity played a

13   role or not is really -- is the issue before you, not for this

14   witness to say one way or I guess you could say what he did --

15        JUDGE TRACY:  Well --

16        MS. FEINBERG:  -- but -- so I'm just -- I'm concerned

17   about the way the question's phrased because to me it called

18   for a legal conclusion as not just a factual question.  So I

19   just wanted to state that on the record, so it was clear.

20        MR. ROSS:  Your Honor?

21        JUDGE TRACY:  So if you could rephrase the question, okay.

22        MR. ROSS:  Well, if I may, Your Honor.  I --

23        JUDGE TRACY:  I know what you're trying to ask him, so you

24   can just ask him because you want to be able to have the record

25   made of what he considered.  So you can ask him.



www.escribers.net | 800-257-0885

1  Q    BY MR. ROSS:  Did you take him to --

2       MR. ROSS:  Fine.

3  Q    BY MR. ROSS:  As you conducted this investigation did you

4  take into consideration Mr. Ortiz's feelings with respect to

5  the Union?

6  A    I did not.

7  Q    Or his so-called activities on behalf of the Union?

8       MR. RODRIGUEZ RITCHIE:  Objection.  Argumentative.

9       JUDGE TRACY:  Um-hum.

10      MR. RODRIGUEZ RITCHIE:  So-called, that's argumentative.

11      JUDGE TRACY:  Just rephrase the question, please.

12 Q    BY MR. ROSS:  Or his activities on behalf of the Union?

13 A    No.

14 Q    Why not?

15 A    Again, what I was looking into were these Workday profile

16 photos.  I don't care what cause your stoked on whether that's

17 a Union or Black Lives Matter, or anything other than that like

18 that has nothing to do with our internal pages being like put

19 out there for other people to look at.  So --

20 Q    Okay.  This conversation you had with Mr. Ortiz on

21 September 21, do you have any memory as to how long that

22 conversation took?

23 A    I can't recall specifically but likely between a half hour

24 and an hour.

25 Q    All right.  And would you please take a look at -- by the



www.escribers.net | 800-257-0885

1    way, the conversation you had with Mr. Ortiz in the North

2    Administration building on the 21st, who was present at that

3    conversation aside from yourself and Mr. Ortiz?

4    A    That was it.

5    Q    All right.  What I'd like you to do please is take a look

6    at General Counsel's Exhibit 65, please.

7    A    Thank you.

8    Q    And I would like you to take us through the conversation

9    you had with Mr. Ortiz on this occasion and explain the various

10   entries appearing on General Counsel's Exhibit 65.

11        MR. RODRIGUEZ RITCHIE:  Objection.  Calls for a narrative.

12        JUDGE TRACY:  Overruled.  Go ahead, please.

13        THE WITNESS:  So I met with Richard Ortiz.  It was just me

14   and him.  I met him on September 21st, 2017.  Started the

15   discussion trying to understand how he used Workday as a system

16   and whether or not he had access to that system.  He explained

17   that he would use Workday on his phone to look into things such

18   as anytime feedback which is a component of that system.  It

19   helps employees provide areas of improvement, positive

20   reinforcement, teamwork, things like that so Richard would use

21   it in that sense.  He did explain to me while he's describing

22   his usage of that --

23        MS. FEINBERG:  I'm sorry, Your Honor.  Because this is

24   narrative I don't know where to inject but it seems like

25   there's a combination of like editorialization and what was


www.escribers.net | 800-257-0885

1    said.  He was just describing how Workday is and it wasn't

2    clear to me that that's what was -- certainly not what was said

3    by Mr. Ortiz.  I'm sure those weren't his words so it's a

4    little bit confusing.  So if you could --

5         JUDGE TRACY:  Um-hum.

6         MS. FEINBERG:  -- give direction to the Witness and what

7    we only want is what's said; is that correct?

8         JUDGE TRACY:  So the question to you was --

9         THE WITNESS:  Um-hum.

10        JUDGE TRACY:  From Mr. Ross was basically walk us through

11   this conversation.

12        THE WITNESS:  Okay.

13        JUDGE TRACY:  Okay.  What was said by you and by Mr.

14   Ortiz?

15        THE WITNESS:  Okay.  Fine, thank you.

16        JUDGE TRACY:  Which would explain the notes --

17        MR. ROSS:  Correct.

18        THE WITNESS:  Got it.

19        JUDGE TRACY:  -- of GC-65.

20        MS. FEINBERG:  Thank you.

21        JUDGE TRACY:  Thank you.

22        THE WITNESS:  So I'll go from the notes.  Richard Ortiz

23   said that he goes on Workday using his phone.  He looks up

24   things such as any time feedback.  It took him three days at

25   one point to get into that system that he worked with Paul



1    James and Arnold to get access to the system.  He also

2    described how he uses the company Wi-Fi to do so and he hasn't

3    been able to use it outside of the Wi-Fi situation at the

4    Company.

5        That he had never shared anything from Workday externally.

6    He shies away from the system as much as possible.  Any system

7    really he shies away from it because he always forgets his

8    passwords and doesn't understand how technology works.  He

9    described that Workday to him was somewhat of a work Facebook

10   but that nobody uses it and that it was new to him and he's not

11   completely sure of what it is.

12       After describing that it was for any time feedback he

13   said -- I asked him whether or not he's ever taken screenshots

14   from the system, he said screenshots, no, but he did receive

15   screenshots from somebody else and that they were sent to him.

16   On the second page so GC 65002 at the top of the page he

17   described that the screenshots were a name and a face and that

18   he figured it was from Workday judging by how the screenshots

19   appeared to him and that he believed that the system was open

20   like a Facebook type system.  That those messages have come to

21   him in text.

22       I asked him who they came from, he said he did not

23   remember, and that he had received the text messages after the

24   talk in Sacramento so the talk in Sac is the talk in

25   Sacramento.  That he had received only two screenshots and that

22-60493.2271



1    he did his own thing with him and that he wishes he could

2    remember where he got the screenshots from and that he gets so

3    much crap that he deletes all the text messages from his phone

4    every couple of days because text messages fill up his phone

5    where it's not useful.

6        He didn't pay much attention to the screenshots when he

7    received them.  He said that once he had posted the screenshots

8    to Facebook that he -- so Travis Pratt sent me a message and he

9    took down -- and that Richard took it down right away after he

10   received the message from Travis Pratt because he believed that

11   Travis Pratt was correct that it shouldn't be on Facebook.

12       And then Richard Ortiz describes a point where he felt

13   disrespected in the workplace where he came across an employee

14   that needed parking.  When Richard was handing out t-shirts the

15   employee was rude to him and there was a component of it that

16   that employee was rude to him on Facebook and that he only

17   asked for parking and the two of them got into a rude

18   discussion.  Richard said that he escalated that concern to

19   Manny as one of his managers or supervisors and also ShTawney

20   who was his HR partner and they both took care of that previous

21   case quickly and well.

22       Richard then again said that he deleted the posting that

23   he made with the screenshots of Workday right after Travis

24   Pratt reached out to him.  He said that -- Richard said that he

25   posted the statement as well as the screenshots and then about

22-60493.2272



1    two or three later he took it down.  So between breaks is when

2    he did this so one break he put it up, the next break he took

3    it down.  Richard said that he felt bad about doing this

4    because he realized that if this had happened to him that he

5    wouldn't like it and he tries to treat others how he would want

6    to be treated and that he remembers there's a lot of kids in

7    the factory now so a lot of younger folks in the factory now

8    and that he needs to handle them and their sensitivities.

9        And then Richard recognized that, you know, the things you

10   see on the internet can make people unhappy and that people are

11   nuts on the internet and that words can matter in how you're

12   communicating to people.  Richard said that he didn't think it

13   was really anything with what he did and that Travis Pratt told

14   him it was name-calling.  And that Travis Pratt might've been

15   uncomfortable because he said something about the dollar amount

16   on the Facebook page and then Richard said that he wanted to

17   make a statement for my records and for the notes that I was

18   taking that he doesn't do these types of things, that he

19   doesn't break the rules, he respects the workplace.

20       Now that he knew what this was that he wouldn't have done

21   this so in the future he's not going to do this and that he

22   took a picture and he posted it in the heat of the moment.

23   That he was unhappy with what was going on so that's why he

24   posted it and he's being as honest as he can be.  And that he

25   wanted to make it very clear to me that he never asked for

escribers
www.escribers.net | 800-257-0885

1    these screenshots that they just came to him.

2        MR. RODRIGUEZ RITCHIE:  I'd like the record to reflect the

3    Witness read directly from the document during the entirety of

4    his answer.

5        JUDGE TRACY:  Well, I'm going to overrule that

6    characterization I would say.  Again, the question was and what

7    it appeared to have been was that the Witness, Mr. Gecewich was

8    reviewing General Counsel's Exhibit 65 and reading from it but

9    also describing the conversation as I clarified in the question

10   which was what he said, Mr. Gecewich, and what Mr. Ortiz said

11   during this conversation.

12       MR. ROSS:  Continue?

13       JUDGE TRACY:  Go ahead.

14       MR. ROSS:  Okay.

15   Q   BY MR. ROSS:  Tell me, sir, how many times did you ask him

16   where he got the screenshots from during this conversation?

17       MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

18       JUDGE TRACY:  Overruled.

19       THE WITNESS:  There were multiple times in this

20   conversation that I asked him where he got the screenshots from

21   just based on some of his responses.  I felt that he needed to

22   be more clear on where he received these.

23       MR. ROSS:  Okay.

24       THE WITNESS:  So if I had to guess three or four times I

25   asked him where he got the screenshots from.



www.escribers.net | 800-257-0885

1          MR. ROSS:  Okay.

2     Q    BY MR. ROSS:  And when he said -- and when you asked him

3     what was his response?

4     A    His response was that his telephone fills up with text

5     messages and so he has to delete them -- he has to delete the

6     text messages often and so I kept trying to understand what

7     that meant and where he could've received these from.

8     Q    I see.  And when he said he couldn't recall is that what

9     he said?  I can't remember where I got these screenshots?

10    A    Yeah, he said he couldn't remember and that he gets lots

11    of text messages and that he deletes lots of text messages, so

12    he couldn't tell me, and he was being as honest as he could in

13    that conversation.

14    Q    Okay.  And when he made the statement to you several times

15    over he couldn't remember where he came by the screenshots, did

16    you believe him?

17    A    I did not.

18    Q    Okay.  And please tell us why you didn't believe him.

19    A    So during the conversation I had a redacted version of the

20    Facebook posting on the table in front of him and the way the

21    Workday user interface works is there's a little bubble in the

22    corner that has he accessed it and there's a picture in that

23    bubble.  So the entire time he's describing this there's a

24    picture looking at him for who sent this to him.  And on top of

25    that, the idea that text messages were filling up his phone



1   seemed unreasonable to me.  I also at the time was living in

2   2017 and, you know, I haven't had to ever delete a phone and I

3   get a lot of text messages also just because of text messages

4   so.

5   Q   Okay.  Now, I'm going to show you what has been -- it was

6   evidence already as General Counsel's Exhibit 28.

7        MS. FEINBERG:  Thank you.

8   Q   BY MR. ROSS:  And I think you were asked questions about

9   this document previously.  Is this a document you showed to Mr.

10  Ortiz during your conversation?

11  A   So this is -- a portion of General Counsel's Exhibit 28 is

12  what I showed to him.  I only showed him what would be the

13  screenshot of and blown up of the Facebook posting so beginning

14  where it says about discussion photos, events, files, and album

15  and ending right about where it says looks like we got under

16  some people's skins.  In addition to that, I'm sorry.

17  Q   Go ahead, finish.

18  A   In addition to that I also did redact this little -- about

19  a third of the way down the page there's a purple box that says

20  Travis Pratt copy thanks with a circle with it looks like a

21  young person sleeping, I redacted that little bubble as well

22  Travis Pratt copy thanks.

23  Q   Okay.  Tell me did -- does General Counsel's Exhibit 28

24  show the face of the individual who sent this document to Mr.

25  Ortiz?



www.escribers.net | 800-257-0885

1    A    It does.

2    Q    Okay.  And can you point out on the document where that

3    face appears?

4    A    Sure.  So to describe where it appears if on the Facebook

5    posting right in the area where it says Travis Pratt and you

6    see a picture of Shaun Ives with his glasses on up in the upper

7    right-hand corner of each of those there's a little circle with

8    a face on it.  And again, when I shared this with Richard Ortiz

9    this was a full page version of this and blown up.

10    Q    And the individual appearing, is it a circle?

11    A    It is a circle.  It's hard to tell on this copy.  It looks

12    like a rectangle with bottom rounded edges but it's --

13    Q    All right.

14    A    -- in a circle.

15    Q    Now, when you showed this to Mr. Ortiz you say you showed

16    him a blown up version?

17    A    Yes, I did.

18    Q    So the image in that circle is enlarged?

19    A    It was.

20    Q    And tell me when you spoke with Mr. Ortiz on the 21st did

21    you know who the person was in that circle?

22    A    No, I did not.

23    Q    Okay.  Was that circle visible for Mr. Ortiz to see as you

24    were talking to him about the screenshots?

25    A    Yes, it was.

22-60493.2277



1    Q    Okay.  And as we sit here today do you know who that

2    person is in that circle?

3    A    I do now, yes.

4    Q    And who is it?  Who do you understand it to be?

5    A    That is Jose Moran.

6    Q    Jose Moran?  So when you spoke with Mr. Ortiz on the 21st

7    of September you asked him where the screenshot came from, on

8    the document was a picture of Moran?

9    A    Yes.

10        MR. RODRIGUEZ RITCHIE:  Your Honor, we want to note an

11   objection for the record that --

12        MR. ROSS:  I'll take that.

13        MR. RODRIGUEZ RITCHIE:  -- there's been testimony

14   regarding a redacted document that's a different version.  That

15   document was not produced to the General Counsel pursuant to

16   the General Counsel's subpoena.

17        MS. FEINBERG:  I don't know if we're talking about the

18   same document, but I just heard testimony about an enlarged

19   document which I've never seen which I think would be relevant

20   that there was a document shown to Mr. Ortiz on the day.  That

21   would certainly be within the course of documents we asked for

22   regarding these -- investigation and that's the first I've ever

23   heard, you know, whatever Mr. Moran's face being on this.

24        JUDGE TRACY:  So let's go off the record.

25   (Off the record at 2:00 p.m.)



1        JUDGE TRACY:  Okay.  Go ahead.

2        MR. ROSS:  Thank you, Your Honor.

3    Q    BY MR. ROSS:  Mr. Gecewich, I'm going to show you an

4    affidavit that you gave to Mr. Rodriguez Ritchie in case number

5    32-CA-2081614 on January the 8, 2018 and I'm directing your

6    attention to page 7, line 2.

7        MR. RODRIGUEZ RITCHIE:  We would object to the use of the

8    affidavit in this one.  It's not a proper way to use the

9    affidavit.

10   Q    BY MR. ROSS:  As well as to Exhibit C, attached thereto.

11       MS. FEINBERG:  I would have the same objection.

12       JUDGE TRACY:  Okay.  There is an objection.  Could you

13   state the objection properly before, so I can get it on the

14   record?

15       MR. RODRIGUEZ RITCHIE:  Sure.  That it's not the proper

16   use of an affidavit.

17       MS. FEINBERG:  I don't think that -- because there's

18   no -- it's not like he forgot something, or he contradicted

19   himself, and I would once again say, I've yet to see that

20   affidavit so if it's about to be shown to the Witness --

21       MR. ROSS:  You know what --

22       MS. FEINBERG:  -- I'd like to see it.

23       JUDGE TRACY:  Right.

24       MS. FEINBERG:  But I agree -- if he wants to copy that

25   photo and show him the photo I guess he has a right to do that,



1    but I don't understand the role of the affidavit in this

2    process.

3         MR. ROSS:  Well, it's, you know --

4         JUDGE TRACY:  So I'm going to sustain the objection.

5         MR. ROSS:  All right.

6         JUDGE TRACY:  Okay?

7         MR. ROSS:  Yeah.

8         THE WITNESS:  Can I have some water, please?  I got

9    sidetracked.

10   Q    BY MR. ROSS:  Tell me, you said you asked Mr. Ortiz

11   several times to tell you where the screenshots came from.  Why

12   did you ask him for that several times?

13   A    Like I described before I didn't believe that he was

14   telling me the whole story, so I wanted to make sure I was

15   giving him the opportunity to tell me everything that they knew

16   about the screenshots.

17   Q    And why'd you care about where the screenshots came from?

18   A    I cared because if somebody is -- in what he was

19   describing to me just blindly sending Workday screenshots I

20   needed to understand is there a source for more screenshots

21   being sent to more people.  It was Tesla data and I wanted to

22   be protective of that system and that data.

23   Q    Did you have any concerns about the use of that data?

24        JUDGE TRACY:  So again --

25        MS. FEINBERG:  That's leading.


www.escribers.net | 800-257-0885

1        JUDGE TRACY:  -- it's leading.  Sustained.

2        MS. FEINBERG:  Sorry.  Got there.

3    Q    BY MR. ROSS:  Was there any other reason you asked him for

4    the source of the screenshots?

5    A    Other than to determine whether or not these were being

6    sent to other people and used in ways that they shouldn't have

7    been used, not that I can think of off the top of my head.

8    Q    Okay.  Now, in your notes of the conversation, you

9    describe a conversation -- a portion of the conversation

10   concerning needed parking.  It's on the second page of the

11   notes.

12       MR. RODRIGUEZ RITCHIE:  Of General Counsel's Exhibit 65?

13       MR. ROSS:  Yes.

14       THE WITNESS:  Yes.

15   Q    BY MR. ROSS:  Can you tell us how that subject came up?

16   A    Mr. Ortiz brought up that subject after he was talking

17   about how people treat each other.  So just prior to that he

18   said that Travis Pratt had sent him this message on Facebook

19   and told him to take it down because it wasn't appropriate.

20   And Richard agreed with Travis, took down the posting, and then

21   described how there had been a previous situation where he felt

22   like he was being treated in a not kind manner, somebody was

23   rude to him.  And so he was trying to draw parallels between

24   those two.

25   Q    Okay.  And he makes reference to handing t-shirts.



1    Handing out t-shirts?

2    A    Yes.

3    Q    Okay.  And did you ask him whether he was handing Union t-

4    shirts?

5    A    No, I did not.

6    Q    Okay.  Is there a reason you didn't?

7    A    No, no reason I didn't.

8    Q    During the course of this conversation did you bring up

9    the subject of the Union?

10   A    I did not.

11   Q    And I think you said also that he mentioned something

12   about posting things in the heat of the moment?

13   A    Yes.

14   Q    And tell me did you ask him what he meant by doing

15   something in the heat of the moment?

16   A    I did not because he described in a sense that he was

17   agitated so he was describing why he posted this and so I felt

18   he described it fairly enough without having to further

19   clarify.

20   Q    All right.  When he made reference to t-shirts did you

21   suspect he was talking about Union t-shirts?

22   A    I did not.

23        MS. FEINBERG:  Objection.  Oh, okay.  I initiate a pause

24   to just say objection, leading, because that was -- so I'd like

25   to at least be on the record since I didn't act fast enough.



www.escribers.net | 800-257-0885

1    JUDGE TRACY:  Sustained.

2    Q    BY MR. ROSS:  Tell me again, General Counsel's Exhibit 65

3    has a series of or it could be highlighted entries.  Can you

4    tell me who did that highlighting?

5    A    I did those highlights on this document.

6    Q    And why'd you do the highlighting?

7    A    So typically I'll do highlights in documents to remember

8    points when drafting either outlines or reports.

9    Q    Okay.  Okay.  After you concluded your first meeting with

10   Mr. Ortiz what is the next thing that you did in connection

11   with the I'll call it the Pratt complaint?

12   A    Because Richard Ortiz couldn't tell me where these Workday

13   profile photos had come from or these screenshots had come from

14   I had worked with our systems analytics section to request

15   access logs to Workday.  I knew they came from somewhere

16   because I knew in the UI there was a picture of somebody that I

17   didn't know and so I wanted to understand who might've accessed

18   these pages and shared it with Richard.

19   Q    Okay.  And why'd you want to know that?

20   A    Again, because in my conversation with Richard it didn't

21   seem like he had any further information where those came from

22   or didn't want to share that information with me.  So I needed

23   to understand if this was part of a much larger concern or if

24   it was just these two-day Workday profile photos that were

25   being shared around.



www.escribers.net | 800-257-0885

1    Q    Okay.  I'd like you to take a look at General Counsel's

2    Exhibit 79, please.  Tell me when you got it.

3    A    I've got it.

4    Q    Okay.  Now, the first four pages of this exhibit is going

5    to be an email string and then attached to it for the next 90

6    some odd pages or matrices and various entries, I'm not going

7    to ask you questions about the matrices.  I do want to ask you

8    some questions about the email string.  Okay?

9    A    Okay.

10    Q    Now, looking at General Counsel's Exhibit 79, 1 through 4,

11    can you tell us where the email string begins?

12    A    So the email string begins on General Counsel Exhibit 79-

13    004 where it starts four lines in.  It says from Ricky

14    Gecewich, sent Friday, September 22nd, 2017, at 10:11 a.m., to

15    Leonard -- Leonard Dan.

16    Q    A request -- it says from, I'm assuming you meant for --

17    assistance from employer relations.  It's good to know somebody

18    else types the way I do.  But what's that entry mean?

19    A    Yeah, I mean, that subject line appears to have a typo in

20    it.  It should say request for assistance from employer

21    relations.  It was a request to Leonard's systems

22    administration team that owns the relationship between Tesla

23    and Workday to do a search of our Workday logs.

24    Q    And Mr. Dandurand, who is he?

25    A    I can't recall specifically what his title was, but from


www.escribers.net | 800-257-0885

1    what I can recall, he was one of the leaders in the systems

2    analytics teams.

3    Q    All right.  And Mr. Dandurand's response to this email

4    appears where in this document?

5    A    So at the very top of that page is the content of his

6    response.  The headers to his response are at the bottom of

7    Exhibit 79-003, where it says, from Leonard Dandurand, sent

8    Friday, September 22nd, 2017.  And his message to me is at the

9    top of General Counsel Exhibit 79-004.

10   Q    All right.  So his response to you -- you sent your out --

11       JUDGE TRACY:  So Mr. Ross, you've covered -- we've been

12   through this document.  It's in the record.  So if you have

13   specific questions about it?

14       MR. ROSS:  I do.

15       JUDGE TRACY:  You know, because they've kind of gone

16   through it.

17       MR. ROSS:  No, I do have questions about it, Your Honor.

18       JUDGE TRACY:  Yes.  So please, do.

19       MR. ROSS:  Okay.

20       JUDGE TRACY:  Get to those.

21   Q    BY MR. ROSS:  Now had you ever made requests for similar

22   information from Workday before?

23   A    Yes, I have.

24   Q    Okay.  And in your experience, when you'd made prior

25   requests for this type of information, what was the turnaround



1    time on getting information back?

2         MS. FEINBERG:  Objection --

3         MR. RODRIGUEZ RITCHIE:  Objection --

4         MS. FEINBERG:  -- go ahead.  You first.

5         MR. RODRIGUEZ RITCHIE:  Objection.  Lacks foundation.

6    Vague and relevance, particularly in light of the

7    representations about Workday and other context.

8         MS. FEINBERG:  Well, and the turnaround --

9         JUDGE TRACY:  So I -- you know, I would say that I would

10   sustain the objection in the sense like let's limit the --

11   let's narrow the scope of the question.

12        MR. ROSS:  Sure.

13   Q    BY MR. ROSS:  Had you ever sought this kind of information

14   in connect with other internal investigations you conduct?

15        MR. RODRIGUEZ RITCHIE:  Same objection.

16        JUDGE TRACY:  And again, sustained at this company?

17   That's where the objection comes from.

18        MR. ROSS:  Well, Your Honor --

19        MS. FEINBERG:  Well, that and the scope.

20        MR. ROSS:  -- again --

21        JUDGE TRACY:  Go ahead.

22        MR. ROSS:  -- again, we're being asked to explain our

23   actions.  There are some statements in the subsequent emails

24   that we want to explain.  In order to give you the context

25   within which those subsequent emails were made, we need to give



1    you some background to explain why it is certain text appears

2    in these emails.

3         MS. FEINBERG:  So why don't you just ask him that?

4         JUDGE TRACY:  Well, I guess I can handle this.

5         MS. FEINBERG:  Oh, sorry.  Sorry.

6         JUDGE TRACY:  So the -- we had discussions previously,

7    without the presence of the witness, and there is a concern

8    that I want to limit the testimony here to his role and

9    possession while he was at Tesla.

10        MR. ROSS:  Okay.

11        JUDGE TRACY:  So that's all I'm asking you to do is to

12   limit the questioning to his work while he is at Tesla.

13        MR. ROSS:  Okay.  I'll ask it this way.

14   Q    BY MR. ROSS:  Mr. Gecewich, did you receive a timely

15   response to your request for information?

16        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

17        JUDGE TRACY:  Sustained.

18   Q    BY MR. ROSS:  Were you satisfied with the service you

19   received from Raj Nanda?

20        MR. RODRIGUEZ RITCHIE:  Objection.  Vague and leading.

21        JUDGE TRACY:  Sustained.

22   Q    BY MR. ROSS:  Now long did it take you to get information

23   from Raj Nanda in response to your request?

24   A    It appears to take about two weeks to get an answer from

25   Raj Nanda.



www.escribers.net | 800-257-0885

1    Q    Okay.  And in your experience, did this type of

2    information retrievable typically take two weeks?

3        MS. FEINBERG:  Objection.  Foundation.  Objection.  Vague.

4    I don't know what this type of information was.

5        MR. ROSS:  The information that --

6        MS. FEINBERG:  Maybe he asked for 100 entries --

7        JUDGE TRACY:  Okay.  So --

8        MS. FEINBERG:  -- before, maybe he asked for 3.

9        JUDGE TRACY:  Okay.

10        MS. FEINBERG:  We don't know.

11        JUDGE TRACY:  Sustained.

12    Q    BY MR. ROSS:  All right.  I'd like you to take a look at

13    page -- or General Counsel's Exhibit 79-002.

14    A    Okay.

15    Q    That's an email -- I'm directing your attention to an

16    email from you to Raj Nanda dated September 28, 2017, at 12:58

17    p.m., subject, ER request Workday logs.  Do you see that?

18    A    Yes.

19    Q    And if you look at the second sentence of that email, it

20    reads, "Please be aware, this case is being closely monitored

21    by Gaby and I am providing updates as they come in."  Do you

22    see that?

23    A    Yes, I do.

24    Q    Okay.  Now tell me when you sent this email to Raj Nanda

25    who's Ms. Nanda?  Is that -- she's a woman?



1    A    Yes.

2    Q    Okay.  In fact, were you having communications with Gaby

3    Toledano about this case?

4    A    I was not.

5         MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

6         JUDGE TRACY:  Sustained.

7    Q    BY MR. ROSS:  Is it a truthful statement that the case was

8    being closely monitored by Gaby?

9         MR. RODRIGUEZ RITCHIE:  Objection.  Leading and lacks

10   foundation.

11        JUDGE TRACY:  Sustained.

12   Q    BY MR. ROSS:  Did you provide Gaby Toledano with updates

13   on this case, the investigation of the pride complaint during

14   the course of that investigation?

15        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

16        MS. FEINBERG:  Objection to the characterization of the

17   pride complaint since it started by Mr. Hedges.

18        MR. ROSS:  Your Honor, this is becoming cock ask.

19        MS. FEINBERG:  Yes, it is.

20        MR. ROSS:  The other side is allowed to put in innuendo

21   and suggest things with emails.  We're trying to explain the

22   context within which the email was made.  The witness, again, I

23   don't want to say what the witness is going to testify to,

24   but --

25        JUDGE TRACY:  But let me say this.  I understand your



www.escribers.net | 800-257-0885

1     frustration.  However, the objections are to leading.  There

2     are ways to ask without them being leading.  As I said before,

3     it is incredibly difficult for me to decide credibility when

4     the witness's responses are yes and no.

5          MR. ROSS:  All right.  I'll restate it.

6     Q    BY MR. ROSS:  Sir, could you explain to us the email that

7     you sent to Raj Nanda on September 28, 2017, at 12:58 p.m.?

8          MR. RODRIGUEZ RITCHIE:  Objection.  The document speaks

9     for itself.

10         MS. FEINBERG:  Agreed.

11         JUDGE TRACY:  Go ahead and answer the question.  I'm going

12    to overrule it.  Go ahead.

13         THE WITNESS:  Thank you.  I hadn't received a response

14    from Raj in six days, so I was following up with her.  And in

15    attempt to motivate her, told her that this was closely being

16    monitored by somebody that would be, essentially, her

17    second-level manager.  I knew at the time Leonard had reported

18    to Gaby.  So because Leonard had passed me to Raj and Raj

19    wasn't being responsive, I felt a need to escalate this.  And

20    the way that I did that was saying hey, this is being

21    monitored.  Let's like move on this, to get a more timely

22    response from her.

23    Q    BY MR. ROSS:  I see.  Was it a truthful statement you made

24    to Ms. Nanda in that conversation or that email?

25    A    No, it was not.



www.escribers.net | 800-257-0885

1   Q    Okay.  And was the email that you sent Ms. Nanda an email

2   sent to her while you were under oath to tell the truth?

3   A    It was not.

4   Q    Okay.  And tell me, as you sit here today, on the witness

5   stand --

6   A    I'm sorry, can you start again?  There was a lot of

7   discussion over here.

8   Q    As you sit here today, on the witness stand, testifying

9   under oath, were you communicating with Gaby Toledano while you

10  were conducting this investigation about this investigation?

11  A    I was not.

12  Q    Okay.  To your knowledge was she closely monitoring the

13  investigation?

14  A    She was not.

15       MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

16       JUDGE TRACY:  Overruled.

17  Q    BY MR. ROSS:  Were you providing her regular or irregular,

18  any updates, about this investigation?

19       MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

20       JUDGE TRACY:  Overruled.

21       Go ahead.

22       THE WITNESS:  I think I described previously, the only

23  thing I can recall is that Gaby Toledano had received monthly

24  updates on all of our cases.  That's the only time this case

25  would have popped up and she would have been made aware of



1    this.  I can't tell you at which point over the months she was

2    made aware of this, but I was not communicating with her, from

3    what I remember, in a way that I described to Raj Nanda.

4    Q    BY MR. ROSS:  Okay.  Now I'd like you to -- let's see,

5    this email where you invoke Gaby's name is dated September

6    28th, then there's a subsequent email from you to Ms. Nanda on

7    October 3 between the 3rd of October and the 20th of September,

8    had you received the requested information from her?

9    A    Can you bracket those dates again?  What were those dates?

10    Q    Yeah.  Between September 28 when you used Gaby's name in

11    the conver -- the email to Raj Nanda about request of Workday

12    logs, and the next time you communicated with her by email,

13    October 3, did she give you the information you requested?

14    A    She did not.

15    Q    Okay.  So the next entry is one dated October 4 to

16    Mr. Dandurand, who was Ms. Nanda's boss, right?

17    A    Correct.

18    Q    Okay.  And there you, again, say, "This sense of request

19    is almost two weeks old at this point, and we should update

20    Gaby and team shortly."  Tell me, did you update Gaby as to

21    this investigation before you advised Mr. Ortiz of his

22    termination?

23         MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

24         JUDGE TRACY:  Sustained.  No, you're not to answer that.

25         THE WITNESS:  Oh.  Thank you.  Thank you.



www.escribers.net | 800-257-0885

1    Q    BY MR. ROSS:  All right.  Now looking at page 1 of General

2    Counsel's Exhibit 79 there is an email from Ms. Nanda.  It

3    doesn't make it clear who is the recipient of it, or who it's

4    directed to, but it appears you are the recipient.  It refers

5    to, Hi, Ricky.  Do you remember getting this email?

6    A    If you're referencing October 6th at 11:53 a.m.?

7    Q    Yeah.

8    A    Yes.

9    Q    All right.  And then thereafter, a little over an hour

10   later, you sent back an email to Ms. Nanda?

11   A    Yes.

12   Q    And why'd you do that?

13   A    To, again, further understand the usage of -- that Jose

14   Moran had been -- it indicated that he had accessed both Shaun

15   Ives and Travis Pratt's Workday accounts.  And to better

16   understand, you know, what his usage of the system was if he

17   had access to other accounts.

18   Q    So you sought this information for what purpose?

19   A    I mean, it says in the email to understand his overall

20   pattern of use.

21   Q    Why did that matter?

22   A    Again, and I think I've explained this before, but going

23   back to it, you know, we had an instance where there were two

24   Workday profile photos that were released.  And I wanted to

25   understand are there more out there floating around.  From what


www.escribers.net | 800-257-0885

1    I understood at this point, somebody had blindly received a

2    text message with Workday profile photos.  And I wanted to

3    understand are there other Workday profiles being circulated

4    somewhere else.

5    Q    I see.  And then Ms. Nanda replied at 2:37, later that

6    day?

7    A    Yes.

8    Q    Okay.  Could you look at General Counsel's Exhibit 81,

9    please?

10    A    Which number?  81?

11    Q    Yes.

12        MR. RODRIGUEZ RITCHIE:  Could we have a break at some

13    point soon?

14        JUDGE TRACY:  Do you want to come to a breaking point?

15        MR. ROSS:  Let me finish with this, and then we'll stop.

16        JUDGE TRACY:  Okay.

17        MR. ROSS:  Let me finish with these documents, please.

18        JUDGE TRACY:  All of these?

19        MR. ROSS:  No, no, no.

20        JUDGE TRACY:  Oh, sorry.

21        MR. ROSS:  I'm just talking about the Raj Nanda documents.

22        JUDGE TRACY:  Oh, sure.

23    Q    BY MR. ROSS:  You have in front of you General Counsel's

24    Exhibit 81, which there seems to be an email thread, some of

25    which seems to overlap with the email thread that is General



1    Counsel's 79.  Do you see that?

2    A    Yes.

3    Q    Okay.  Now the overlap appears to end on General Counsel's

4    Exhibit 81-002.  79 ended at an email response from Ms. Nanda

5    October 6th at 2:37 p.m.  And that same email appears towards

6    the bottom of page 2, and then there is a series of emails

7    subsequent to October 6 at 2017.  I'd like you to explain those

8    emails, please.

9    A    On Exhibit 81?

10   Q    Yes, beginning toward the middle third of the page

11   starting at October 6, 2017, at 3:43, from you to Raj?

12       MR. RODRIGUEZ RITCHIE:  Objection.  Calls for narrative

13   and vague.

14       JUDGE TRACY:  Can you restate the question, please?

15       MR. ROSS:  Sure.  Sure.

16   Q    BY MR. ROSS:  You sent an email to Ms. Nanda on October

17   6th, 2017 at 3:43.  Was that in response to anything?

18   A    Yes, that's in response to the Exhibit 79, the attachment

19   that would have been included in Exhibit 79.  So the almost

20   hundred pages of data logs I was attempting to narrow the scope

21   of the September usage from Jose Moran.

22   Q    Okay.  And could you please walk us through the subsequent

23   emails?  Explain the string?

24   A    So on October 6th, 2017, I asked her, please provide in

25   this format what the usage was.  And then asked her if she had



1    any updates on the request on October 11th, 2017.  She then

2    responded to me on October 11th and said that she was working

3    with the Workday team and their representative to get the

4    information.  I responded back to her on the same day, October

5    11, 2017 that I appreciated it.  This was all to make sure I

6    had any -- if there was any more information I needed.

7        On October 13th, 2017, Raj Nanda sent me a message said

8    she got an update that there were approximately 40 sessions

9    that Jose Moran had accessed Workday.  So a session is a logon.

10   And then on October 24th, Raj Nanda said that she had received

11   the logs for Jose Moran or user J. Moran, and then some sort of

12   serial number, and then I responded on October 24th, "Thanks,

13   Raj."

14   Q    Okay.

15        MR. ROSS:  This would be a good time for a break, Your

16   Honor.

17        JUDGE TRACY:  Okay.  Let's go off the record for about ten

18   minutes.

19        So please don't discuss your testimony with anyone until

20   after the proceeding.

21        THE WITNESS:  Okay.

22        JUDGE TRACY:  Thank you.

23   (Off the record at 2:32 p.m.)

24        JUDGE TRACY:  Let's go on the record.  Okay.  Oh, sorry.

25   Go ahead.

22-60493.2296



1          MR. ROSS:  Thanks, Judge.

2     Q     BY MR. ROSS:  So, Mr. Gecewich, at some point in time, did

3     you figure out who took the screenshots that appeared on that

4     Facebook pace?

5     A     Yes.

6     Q     Okay.

7     A     I did.

8     Q     And you determined that how, please?

9     A     I determined that through the access logs that I had

10    received from Raj Nanda, General Counsel Exhibit 079-001, entry

11    at October 6th, 2017, at 11:53 a.m.  That was her confirmation

12    of who had accessed those two specific records of Shaun Ives

13    and Travis Pratt, and Jose Moran was listed as the only person,

14    outside of HR, that had accessed those two profiles.  I then,

15    once I received that, looked at Jose Moran's Workday profile

16    photo and recognized that was the photo that appeared in the

17    bubble, on the screenshots, from Facebook.

18    Q     Okay.  Was this the first time that you ever used that

19    technique to determine the identity of somebody who accessed a

20    document?

21          MR. RODRIGUEZ RITCHIE:  Objection.  Leading.  Vague.

22          JUDGE TRACY:  Sustained.

23          MS. FEINBERG:  Objection.  He's not the one who used the

24    technique

25          MR. ROSS:  Okay.  All right.



www.escribers.net | 800-257-0885

1    Q    BY MR. ROSS:  And who did you conclude was the person who

2    took the screenshots?

3    A    Again, like I just described, Jose Moran.

4    Q    And did you speak with Mr. Moran after making that

5    determination?

6    A    I did.

7    Q    And can you tell us when and where you had that

8    conversation?

9    A    Shortly after I received the confirmation from Raj Nanda

10   on who had accessed this, I don't recall the specific date in

11   this pile of documents that's in my report, but I met with

12   Mr. Jose Moran in the administrative section or the

13   administrative area of the Fremont factory and the conference

14   room, just me and him alone.

15   Q    Okay.  Do you recall when that conversation took place?

16   A    Off the top of my head, no.  But if I can review one of

17   these exhibits, I can tell you exactly the date.

18   Q    Sure.  Go ahead.

19        MR. RODRIGUEZ RITCHIE:  Your Honor, I'd request that the

20   record -- or I'd request that the witness be asked about a

21   specific exhibit, rather than being asked to look at a pile of

22   exhibits.

23        MR. ROSS:  I'm not asking him to look at a pile of

24   exhibits.

25        JUDGE TRACY:  Yeah.  So if you can stop looking right now.



1          THE WITNESS:  I'm sorry.

2          JUDGE TRACY:  So obviously, you know the proper way to

3     refresh someone's memory.

4          MR. ROSS:  All right.

5     Q     BY MR. ROSS:  Let me ask you I would like you to take a

6     look at General Counsel's Exhibit 67, please.  And it is a --

7     appears to be a five-page document.  Do you recognize that

8     document?

9     A     I still haven't found it yet in this pile.  Give me a

10    second.

11         JUDGE TRACY:  Here.

12         THE WITNESS:  Thank you very much.

13         JUDGE TRACY:  I'm only doing this to move this along, as

14    you know.  Please don't think that I'm going to keep --

15         MS. FEINBERG:  Just tell it what it is that you handed

16    him, though, maybe.

17         JUDGE TRACY:  Oh, she asked him to look at GC-67.

18         MS. FEINBERG:  But that's cool what you did.

19         JUDGE TRACY:  Which is the -- I have kept the stack

20    that --

21         MS. FEINBERG:  Okay.  Thank you.  I didn't hear the

22    number.

23         JUDGE TRACY:  -- they needed him to testify about.

24         MS. FEINBERG:  Yeah, yeah.  No, I just didn't hear the

25    number.


www.escribers.net | 800-257-0885

1     MR. ROSS:  I have another copy of it if you want to --

2     JUDGE TRACY:  No, it's --

3     MS. FEINBERG:  I just hadn't heard the number.

4     JUDGE TRACY:  -- this is your set that you left here.

5     MR. ROSS:  Right.  I did.

6     JUDGE TRACY:  But I could gather the discomfort and

7     objections we would be receiving if we left the whole pile

8     there.

9     MR. ROSS:  Okay.

10    JUDGE TRACY:  This is why I took them on the side.  But

11    for the record, I don't normally do this.  But because we're at

12    day 12, I just want to --

13    MR. ROSS:  Thank you.

14    JUDGE TRACY:  -- just help us out.  But it's GC67.

15    THE WITNESS:  Thank you.

16  Q   BY MR. ROSS:  Do you recognize?

17  A   Yes, I recognize this.

18  Q   What do you recognize it to be?

19  A   I recognize this to be my notes from the meeting on

20    October 12th with Jose Moran.

21  Q   Okay.  And in -- one, two, three, four, five -- sixth line

22    down, you'll see the phrase, honesty.  Could you place that

23    text on the page?

24  A   Yes, these are my notes I wrote that on this page.

25  Q   And that notation, honesty, doesn't appear in the earlier



www.escribers.net | 800-257-0885

1    notes of your conversation with Mr. Ortiz.  Can you tell us why

2    you put honesty on this page?

3        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

4        JUDGE TRACY:  Overruled.

5        Go ahead.

6        THE WITNESS:  From what I recall during this time period,

7    we were moving to a different template for notetaking and

8    outlining.  And so that's why there's a disparity between the

9    older notes and the ones starting sometime in October.

10   Q    BY MR. ROSS:  Okay.  Now as in the earlier instances of

11   asking you to tell us what you said and what Mr. Moran said,

12   I'd like you to kind of review with us what was said during the

13   conversation by you and him and explain your notes as you go

14   through the conversation.

15   A    Okay.  I met with Jose --

16       MR. RODRIGUEZ RITCHIE:  Objection.  Calls for narrative.

17       JUDGE TRACY:  Okay.  So I'm going to overrule the

18   objection.  And please, as the instructions that I gave you

19   previously, just again, to move this along, and to be clear,

20   please, at this point, testify about what you said, what

21   Mr. Moran said, as you look at General Counsel's Exhibit 67.

22       THE WITNESS:  Okay.  Thank you.  So I met with Jose Moran

23   on October 12th, 2017.  I said -- I covered confidentiality,

24   told him that this matter was confidential, sensitive in

25   nature, and that we asked for his partnership in keeping this



1    confidential so that he wouldn't bias anybody else that we

2    might speak with.  That we would keep the matter confidential

3    and only share on a strict need-to-know-basis.

4         I told him Tesla had a firm policy about retaliation.

5    That he's not to retaliate against anybody that raised

6    concerns, nor is he to feel that he's retaliated against.  In

7    the event that he felt retaliated against, he should share that

8    information with his HR partner or a member of Tesla's

9    supervision or management team.

10        I also told him that the expectation of this conversation

11   was honesty.  And then I asked him if he was familiar with the

12   Workday system.  He responded -- his responses are indicated by

13   bullet points.  So his response was it was a platform where

14   workers can view their reviews and documents for feedback.  I

15   asked him can you explain what it's used for.  He said he gives

16   feedbacks and prints his own documents such as proof of salary,

17   feedback with people that he works with and their work

18   performance.

19        It's an area where he can update his contact information,

20   look at his own level and his own pay.  I asked him, do you

21   consider Workday an internal or external Tesla site or system.

22   He responded, it's internal in his mind, and it's useful only

23   to the company and note externally.  He -- I asked him, do you

24   think the information is for business use only, he responded by

25   saying the documents, his own personal documents, such as his

www.escribers.net | 800-257-0885

1     salary, can be shared externally if he needs to get something.

2         His example that he gave was when providing credit

3     applications, proof of employment, or proof of pay, he can go

4     into the system and use his own information in that way.  He

5     said other things like the confidentiality agreements,

6     business -- are business related, and that he doesn't think

7     that those should be shared externally.

8         I asked him, do you think the information itself is

9     confidential.  He responded by saying his own profile -- that

10    he only has access to his own profile and he doesn't have

11    access to anyone else's private information.  That no one

12    should see his salary or address or his tax forms or anything

13    particular to his own information.

14        I asked him, do you think external people should have

15    access to any information found in Workday.  He responded by

16    saying if an outside source asked for this, no, they shouldn't

17    be able to get a login.  That they shouldn't be able to gather

18    information to share, and that that shouldn't be allowed.

19    Speaking of external sources, he also said that no, we

20    shouldn't be sharing other profiles with outside people.  And

21    that they shouldn't be able to ask somebody internally to

22    look into to another account.  On GC -- moving now to GC

23    Exhibit 067-002, that's how the page he continued his response

24    by saying that the external people shouldn't be able to request

25    details of other employee counts or profiles.



www.escribers.net | 800-257-0885

1    I then asked him how to uses Workday in his role.  He

2    responded by saying he uses it once or twice a week, maybe

3    more, and then I asked him to clarify what purpose he used it

4    for and he again said that it was to provide feedback on

5    employees, look at his own record and update information and

6    review his own profile.

7    I asked him, do you access it on your phone or on a

8    computer.  Jose responded by saying that he accesses it on both

9    his phone and his computer, but he didn't think that a computer

10   outside of Tesla network can have access, so if you weren't on

11   the internal network, that you couldn't access it.  I asked him

12   how often in September did he access this, and I knew in

13   brackets that he had about 14 sessions in September and he said

14   about 10 times he accessed it.  For what purpose -- I asked him

15   what purposes he used it, and again he said, same I have

16   explained before, providing feedback, checking his own level

17   and pay rates, checking titles, that's it.  He did say that he

18   checked other people's titles to see how they might be paid and

19   he gave examples of looking at different employees that he came

20   across and how they might be indicated as QC1, QC2, QC3, and

21   suggesting that those QC number indicators might align with

22   their level of pay.

23   He said that he's not able to see actual dollar amount of

24   how much they're paid, he can only see their title, but he

25   might be able to turn it -- determine if they are higher level


www.escribers.net | 800-257-0885

1    based on their job title and therefore might be paid more.  He

2    said he checked in on this on several people that he'd come

3    across and that he understood lots of workers don't know how to

4    use Workday.  They know it exists, but they don't really know

5    the purpose of it.  And he said that there's also things in

6    there that he -- he's not quite aware of in Workday.

7        I asked him did he ever access accounts of employees that

8    were not on his own team, so people that, you know, he didn't

9    provide direct feedback with or work directly with.  He paused

10   for a second and said, if they weren't in my group or team, he

11   asked to clarify the question, and I said, yeah, if they're not

12   working directly with you or you haven't come in contact with

13   them, and that's when, again, he described -- he had searched

14   other people to see their titles and their levels or their

15   title levels, their QC1 or QI1, QI2, QI3.

16       Moving now to the top of General Counsel Exhibit 067-003.

17   He's continuing to describe how different job -- he was telling

18   me how different job titles might align to different pay, so he

19   said --

20   Q    BY MR. ROSS:  Mr. Gecewich, let me interrupt you there for

21   a minute.  I don't want to read your notes out loud.  I want

22   you to tell us what happened in the conversation, what you

23   said, what Mr. Moran said and explain the entries.  Now I

24   understand you're trying to explain the entries, but I want you

25   to actually describe the conversation, as opposed to simply


www.escribers.net | 800-257-0885

1    reading notes.  If you could do that, please.

2    A    Yeah, I can do that.  This is -- I think I'm doing that.

3    I'll try better.  So at the top of GC Exhibit 67-003, the

4    question that I had asked Jose Moran was, you know, outside of

5    his team who had he looked in Workday for, and he had

6    described, you know, comparing different titles with pay rates

7    and said that he knew certain people in certain jobs and they

8    received different pay rates and they had different titles.

9        JUDGE TRACY:  You know, let me just intervene here.

10    Perhaps if there's a specific question you have about a note

11    that he made, you can ask him that.  I mean, this is pretty

12    extensive, the notes.  I think that previously when he was

13    testifying, he was repeating what was said, but he was adding

14    things.  Like, for example, the dot, dot, dot, he testified he

15    paused.

16        MR. ROSS:  Um-hum.

17        JUDGE TRACY:  That's not written there, but that's what

18    happened according to Mr. Gecewich.  So this is pretty lengthy

19    compared to the other one, so if there's a specific question --

20        MR. ROSS:  Sure.

21        JUDGE TRACY:  -- or if you want to break it down, to

22    yield --

23        MR. ROSS:  That's fine.

24        JUDGE TRACY:  -- something that isn't reflected in the

25    document, let's do that --



www.escribers.net | 800-257-0885

1    MR. ROSS:  That's fair.

2    JUDGE TRACY:  -- so we can move it --

3    MR. ROSS:  Yeah.

4    JUDGE TRACY:  -- along.

5    MR. ROSS:  Of course.

6    Q    BY MR. ROSS:  Mr. Gecewich, it appears on page 67-002, you

7    asked him, do you ever access accounts for employees that are

8    not on your team and you were explaining to us his answer on --

9    I interrupted you and Judge made her comments.  Looking at page

10   67-003, middle of the page, you asked what essentially is the

11   same question over and over, a second time, have you ever

12   accessed a profile of employees that are not on your team.  Do

13   you see that?  He has to --

14   A    Yes.

15   Q    -- the bottom of page --

16   A    I do.

17   Q    -- 2 and then towards the middle of page 3.  Do you see

18   that?

19   A    Yes.  I asked him that question several times and he kept

20   coming back to this idea of -- to compare names and pay rates.

21   Q    Why'd you ask him that same question a couple of times?

22   A    To see if he would bring up these other people that he'd

23   accessed, so specifically Shaun Ives and Travis Pratt, who I

24   knew he had accessed based on the Workday logs.

25   Q    Okay.  And when you were asking him this question over and



1  over again, did he bring up or mention either Ives or Pratt?

2  A    He did not initially bring up those, I had to bring those

3  names up.

4  Q    Okay.  Okay.  And after he -- so tell us how you raised

5  the name Ives and Pratt, how did this happen during this

6  conversation?

7       MR. RODRIGUEZ RITCHIE:  Objection, compound.

8       JUDGE TRACY:  Overruled.  Overruled.

9       Go ahead.

10      THE WITNESS:  I had asked him several times if he had

11  accessed people outside of his team.  He didn't share with me

12  that he'd accessed Shaun Ives and Travis Pratt.  I'm in the

13  habit of not bringing up names unless somebody else brings them

14  up first, to be protective of people that might've raised

15  concerns.  So when he wasn't giving that information and I knew

16  he had done that, I asked him very directly, did he access

17  Shaun Ives, did he access Travis Pratt, did he access anyone

18  else.

19  Q    BY MR. ROSS:  Okay.  And how did he respond when you asked

20  him these questions directly?

21  A    As indicated in the notes and General Counsel Exhibit 067,

22  he responded immediately, yes, I accessed that account, yes, I

23  accessed that account.  And when I asked him if he accessed any

24  other accounts other than Travis Pratt and Shaun Ives, he said

25  there was another girl, a supervisor, and he had shared that



1    screenshot to -- and this is the first time that Jose Moran

2    told me he had taken screenshots, and that he had shared them.

3    Q    Okay.  And what do you remember next thing that was said

4    by you and/or him?

5    A    Once he indicated that he had accessed these accounts and

6    taken screenshots, I wanted to understand why.  And Jose Moran

7    told me that he heard that they were anti-union, and this is at

8    the bottom of General Counsel Exhibit 67-003, why did you

9    access these accounts.  Jose Moran explained that he had heard

10   that they were anti-union, he was told that they went to

11   Sacramento to give a speech against the union, that he

12   specifically wasn't there, but a representative from the UAW

13   told him that they were up there in Sacramento doing some

14   speech at a board meeting.  And that he was asked by that UAW

15   representative to verify whether or not these were actual

16   employees of Tesla.  And because he had accessed the work, that

17   he was able to personally confirm who these people were, to

18   make sure that they weren't lying about who they were saying

19   they were, particularly to these people in Sacramento.

20         Jose Moran also told me that, in this kind of campaign,

21   you have to be on your toes and that these people may not be

22   who they were saying that they were.

23         He then described how he needs to know every anti-union

24   person within the factory, and it's good to know the percentage

25   in each department.  And Workday helped him to der -- determine



www.escribers.net | 800-257-0885

1    these people's identity and their pictures and their titles and

2    what departments they were in specifically, that they were

3    maintenance technicians.

4    Q    Okay.  What was the next thing that you or he said to one

5    another, if you can recall?

6    A    To ensure that I understood the full scope of his use of

7    Workday and the screenshots that he shared, I asked him if

8    there any other accounts that he accessed in this manner.  And

9    this is on this -- in the center part of General Counsel

10   Exhibit 067-004.  And he indicated no, the UAW representative

11   would tell me only these names, and that he had searched

12   Workday within one or two-day period of getting those names,

13   and then provided that information back to them, that these

14   were actual employees.

15   Q    Okay.  Now as of the time he said this, had he already

16   told you that he had taken screenshots of people's pictures?

17   A    When I --

18        MR. RODRIGUEZ RITCHIE:  Objection, leading.

19        JUDGE TRACY:  Overruled.  Go ahead.

20        THE WITNESS:  Yeah, well, like I had just described, when

21   I directly asked him whether or not he had accessed Shaun Ives,

22   Travis Pratt, or anybody else's profile, that's when he first

23   indicated to me that he had taken screenshots of those

24   profiles.

25   Q    BY MR. ROSS:  I see.  Did he tell you that he couldn't



www.escribers.net | 800-257-0885

1    verify that they were employees without taking those

2    screenshots?

3    A    He did not.

4    Q    Did he offer any explanation as to why he took those

5    screenshots?

6         MR. RODRIGUEZ RITCHIE:  Objection, leading.

7         MS. FEINBERG:  Objection, asked and answered.

8         UNIDENTIFIED SPEAKER:  No, it's --

9         JUDGE TRACY:  Sustained.

10   Q    BY MR. ROSS:  Did he say that the UAW representative who

11   asked him to verify the identity of these individuals, asked

12   him to make screenshots of the people?

13        MR. RODRIGUEZ RITCHIE:  Objection, leading.

14        JUDGE TRACY:  Sustained.

15   (Counsel confer)

16   Q    BY MR. ROSS:  Did he tell you why he took screenshots of

17   the individuals?

18        MS. FEINBERG:  Objection, asked and answered.

19        MR. ROSS:  That has not been asked and answered.

20   Testimony is, he was asked, did he verify their identity as

21   employees.  He has not offered any testimony at this point as

22   to why the screenshots were taken.

23        MS. FEINBERG:  Okay, but he has testified that -- what

24   happened in this conversation is on this piece of paper, and

25   he's gone through this piece of paper, so --



1          MR. ROSS:  And he said, I took screenshots, but he didn't

2     say why he took screenshots.

3          JUDGE TRACY:  Okay.  I'm just going to overrule the

4     objection.

5          Go ahead, please.

6          THE WITNESS:  Mr. Moran didn't offer up why he took the

7     screenshots, he just indicated to me that he took them.  He

8     indicated to me that the direction was to verify whether or not

9     these are employees and I didn't explore why he specifically

10    took the screenshots.

11    Q    BY MR. ROSS:  Did he say that he couldn't verify them

12    without taking their screenshots?

13         MS. FEINBERG:  Objection, asked and answered.

14         JUDGE TRACY:  Sustained.

15    Q    BY MR. ROSS:  Okay, after he told you that he had been

16    tasked with verifying whether these people were genuine Tesla

17    employees and not imposters, what was the next thing that was

18    said?

19         MR. RODRIGUEZ RITCHIE:  Objection, misstates testimony.

20         JUDGE TRACY:  Rephrase the question, please.

21         MR. ROSS:  Yeah.

22    Q    BY MR. ROSS:  What was the next thing that was said

23    after --

24         JUDGE TRACY:  Finish the question, I'm sorry.

25    Q    BY MR. ROSS:  What was the next thing that you and/or Mr.



1     Moran said to one another?

2     A     So, again, on General Counsel Exhibit 67-004, I asked,

3     because I knew Jose Moran had told me he took the screenshots.

4     I asked him, you know, what did you do with this information.

5     He indicated to me -- he told me that he talked to other union

6     supporters about it, that he verified that they were in

7     Workday, that they had been, that they were maintenance

8     technicians, that there was a sense that other maintenance

9     people were against the union.  I asked him specifically,

10    because he only brought it up the one time, whether or not he

11    took the screenshots and he said, I did take the screenshots

12    from Workday, and then he pulled back and said, I don't

13    remember if I actually shared them with anybody.  I asked him

14    if he had shared them on Facebook with anybody in any way.  He

15    said, I can look on my Facebook to see if I shared them there,

16    but he would have to go on his computer, at which point I said,

17    you know, do you have Facebook loaded on your phone, is there a

18    way you could check there to see if you had shared or posted

19    them on Facebook in any way.  And I asked him if he had shared

20    these screenshots directly with Richard Ortiz and moving to

21    General Counsel Exhibit 067-005, he said, yes, I sent the

22    screenshots to him.  So he was describing Richard Ortiz.  I

23    don't know what he did with those pictures.  He said that I

24    just verified who they were, I didn't tell Richard what to do

25    with the screenshots that I shared with him.  And he said that



1     him and Richard were friends on Facebook and that Richard knows

2     who he is and that he can look up his text conversation or his

3     message thread with Richard and that it'd be clear that Richard

4     would know who he was.

5          And I asked him to further clarify how they know each

6     other and asked him, have you met Richard in person before.

7     Jose said, yes, they've met before and that if Richard says he

8     didn't know who sent him these messages, he was probably

9     protecting me and that we all know each other, indicating him

10    and Jose, they know each other -- or Jose and Richard know each

11    other.  I said, do you communicate with Richard via text or

12    Facebook.  He said that he's communicated with him both ways.

13    I was trying to understand which avenue these Workdays profile

14    photos were shared on before they were posted, he said he used

15    both, the text and Facebook, but mostly his messages between

16    Richard Ortiz were on Facebook, and that he offered up that he

17    could show me the thread of the conversation and some of the

18    comments between us had bad words and he wanted to make sure

19    that I was okay with that.  I told him I didn't mind.  He then

20    took out his phone and he was looking at his -- so in

21    parentheses in the middle of General Counsel Exhibit 67-005,

22    there's a series of parentheses.

23          This is when Jose pulled out his phone and was looking

24    through his Facebook account and indicated to me or told me

25    that he didn't have any direct messages with Richard since



1    September 6th, 2017, so he thought that maybe these were shared

2    via text message.  He then looked at his text messages between

3    Richard and he said, yes, I sent them on text.  He then showed

4    those screenshots directly to me and included in those were the

5    screenshots of Jean Osbual and Travis Pratt and Shaun Ives.

6         He said that -- this is toward the bottom two-thirds part

7    of General Counsel Exhibit 067-005.  He said that when he sent

8    the message, Richard knew who he was because Richard had asked

9    Jose to meet him the next day after he had received the text

10   message.  Jose said he couldn't meet at the time, because he --

11   because he was working and that he believed that he texted

12   Richard enough for Richard to know who he was.  I then told --

13   because he was showing me his telephone and I said, you know,

14   you can send those screenshots if you're comfortable.  Jose

15   agreed to send the screenshots and the conversation, and the

16   very last thing he said to me -- because I hadn't told him at

17   any point that these were posted to Facebook, he said, I know

18   you can't probably tell me due to confidentiality of this

19   investigation, but were these really -- and were these people

20   threatened in any way.  He seemed genuine that maybe this had

21   caused something.

22        That was the end of my conversation with Jose.

23   Q    All right.  Tell me when you began the conversation with

24   Jose, did you tell him who you were and why you were there to

25   talk to him?

22-60493.2315



1    A    Yes.

2    Q    Tell me what you told him.

3    A    I told Jose what I tell everybody.  I tell him that I was

4    part of the employer's relations team, that I was looking into

5    concerns that were raised, and that I would get into the

6    specifics of those concerns, but I wanted to understand some

7    things high level and we would get to what I was looking into

8    through the course of our conversation.

9    Q    Um-hum.  Do you identify yourself as an investigator in

10    employee relations?

11    A    I tell people as, you know, part of employee relations, we

12    do workplace investigations.

13    Q    And that you were conducting a workplace investigation?

14        MS. FEINBERG:  Objection, leading.

15        JUDGE TRACY:  Sustained.

16    Q    BY MR. ROSS:  All right.  Now prior to meeting with Mr.

17    Moran, did you have any prior dealings or interactions with

18    him?

19    A    I did not.

20    Q    And did you have any knowledge of who he was?

21    A    I did not.

22    Q    Did you have any prior knowledge of any of the activities

23    he engaged in on behalf of the union?

24        MR. RODRIGUEZ RITCHIE:  Objection, vague.

25        MS. FEINBERG:  Objection, foundation because he didn't


www.escribers.net | 800-257-0885

1    even know who he was.

2        JUDGE TRACY:  Sustained.

3    Q    BY MR. ROSS:  Now at some point in time, did it become

4    apparent to you that Mr. Moran was a supporter of the union?

5    A    Yes.

6    Q    Okay.  And tell me, what effect, if any, did that

7    knowledge have on the investigation you conducted?

8        MR. RODRIGUEZ RITCHIE:  Objection, leading.

9        MS. FEINBERG:  Again -- oh, go ahead.

10       MR. RODRIGUEZ RITCHIE:  Leading.

11       MS. FEINBERG:  And again, I believe that's the question

12   for you.

13       JUDGE TRACY:  Yeah, overruled.

14       Go ahead.

15       THE WITNESS:  It didn't have any impact on this

16   investigation.

17   Q    BY MR. ROSS:  And why do you say that?

18   A    Because I think I've described this before, I didn't care.

19   What I was looking into was, there's this Workday profile

20   photos that are screenshots that are attached to a page and it

21   makes the people uncomfortable, it was company data, it's put

22   out there, and I don't care what you're interested in and what

23   are the things that you think, you know, will help you or

24   others or support people, it doesn't matter.  What matters was,

25   is Workday profile photos were released externally, that's what



www.escribers.net | 800-257-0885

1     I was looking into.  I could care less if this guy was part of

2     this or part of something else, it didn't matter.

3     Q    Okay.  And how long did this conversation last?

4     A    I can't recall specifically, but somewhere between a half

5     hour and an hour.

6     Q    And after you spoke with Mr. Moran, did you have a further

7     conversation with Mr. Ortiz?

8     A    I did.

9     Q    And can you tell me when and where that subsequent

10    conversation took place?

11    A    I met with Richard Ortiz the very same day when he came on

12    shift, so a few hours after I met with Jose Moran.  I met with

13    him back in a conference that's central -- kind of central in

14    the factory, it's in an area called Galaxy, and it was just me

15    and him in the conference room.

16    Q    Okay.  Now between your conversation with Mr. Moran on the

17    12th -- strike that.  In the conversation you had with Mr.

18    Ortiz after you talked with Mr. Moran, was that the same day or

19    different day?

20    A    It was the same day.

21    Q    Same day?  And between those two conversations, one with

22    Moran on the 12th and one with Mr. Ortiz on the 12th, did you

23    consult with counsel about the case, get their advice?

24    A    From what I recall, I believe I did have a conversation

25    with counsel that day.



www.escribers.net | 800-257-0885

1    Q    Okay.  All right, I'd like you to take a look at General

2    Counsel's Exhibit 68, please.

3         MR. RODRIGUEZ RITCHIE:  You said which number?

4         MR. ROSS:  68.

5         MR. RODRIGUEZ RITCHIE:  Thank you.

6    Q    BY MR. ROSS:  And I'd like you to describe for us the

7    conversation you had with Mr. Ortiz, and I don't want you

8    reading the notes.  You seem kind of fatigued at this point,

9    but I'm going to ask you to try to keep your energy up, and I'm

10   going to ask you to describe the conversation that you had with

11   Mr. Ortiz on October 12th in that conference room you

12   mentioned.

13        MR. RODRIGUEZ RITCHIE:  I'm going to object to the first

14   part of that as coaching.

15        JUDGE TRACY:  So I --

16        MS. FEINBERG:  Also a narrative.

17        JUDGE TRACY:  -- I am going to say that these documents

18   already into evidence, they speak for themselves.  If there is

19   a specific question that you have, let's focus on that.

20        MR. ROSS:  Okay.

21        JUDGE TRACY:  To just be mindful of the time certainly,

22   and I --

23        MR. ROSS:  Sure.

24        JUDGE TRACY:  -- want you to have the time that you need,

25   but also I think it's already been evident that it's kind of



1  difficult to not repeat what's being said when he's looking at

2  the document to testify or --

3      MR. ROSS:  All right.

4      JUDGE TRACY:  -- what happened during the conversation.

5  Q   BY MR. ROSS:  Well, I'll tell you what then, let's put

6  away General Counsel Exhibit 68 for the moment, and I'd like to

7  tell me what was said by you during this conversation and what

8  was said by Mr. Ortiz during this conversation.

9  A   So from what I can recall of the conversation, I told

10 Richard Ortiz that I was meeting with him again to see if he

11 could clarify anything or provide any further information in

12 regards to concerns I was looking into previously.  I made it

13 clear to him that those concerns were the Workday profile

14 photos posted to the Facebook page, at which point Richard

15 Ortiz indicated to me that he had just had prior to coming on

16 shift a phone conversation with Jose Moran, that Jose Moran had

17 reached out to him and told him that I had met with Jose Moran.

18 Richard Ortiz asked me, do you know, Ricky, like what's going

19 on here, and seemed concerned with the -- you know, what was

20 happening.

21     Richard told me that he couldn't share a lot with Jose and

22 it was at my direction that he couldn't share a lot, so he

23 indicated to me that he wanted to preserve the confidentiality

24 of the investigation.  But now, after having had the

25 conversation with Jose Moran, that he felt that he can now



1    recall that it was 85 percent likely that Jose Moran had shared

2    the screenshots of the Workday profile photos with him.

3        I said, thank you, you know, like can you describe to me

4    who the other 15 percent of people could have been or, you

5    know, who else could've sent you these profile photos.  He said

6    then that he couldn't think of anybody specifically, but he

7    does recall receiving a text message from Jose Moran with those

8    Workday profile photos, and that there might've been some other

9    text messages copy and paste of what Jose had previously shared

10    with him.

11        Because Richard wasn't 100 percent certain of, you know,

12    who had sent this to him, I kept trying to ask him, is this it,

13    is there anybody else this could be, and he kept coming back to

14    Jose being the person that sent him these profiles photos.

15    Richard then also told me that he previously didn't tell me

16    that because he was scared to lose his job and that it was part

17    of his upbringing, that you're not to tell on other people or

18    bring them into something.

19        So at that point, because he kept telling me it was Jose,

20    but maybe it was somebody else, I drew two lines on a -- on a

21    whiteboard in the conference room.  I told him one line

22    indicates this conversation here, and one line indicates the

23    conversation that we had last time about this matter, why don't

24    you mark on the first line the conversation we're having right

25    now how honest are you being with me that Jose shared this with

1    you.  And he drew a mark on it and he said 114 percent honest,

2    I'm telling you the truth right now.  I said, thank you, you

3    know, what is -- in our last conversation how honest were you

4    with me.  He indicated -- he drew a line on the -- he drew a

5    line on that chart and he said, I was 95 percent honest with

6    you.  And I said, thanks, like, what were you leaving out last

7    time.  And he said that it was Jose that shared the screenshots

8    and he did that because he was scared for his own job.  I

9    clarified with him whether or not he -- I told him he was going

10   to lose his job, I explained to him what the process was, he

11   said, no, you never told me I was going to lose my job, you

12   explained the process, you told me what was going on here, you

13   actually helped me think that this place isn't a bunch of bean

14   counters and you actually cared.  I said okay.

15        And then that's off the top of my head what I can remember

16   from that conversation.

17   Q    All right.  Tell me, did Mr. Ortiz admit to you that he

18   had not been truthful with you?

19   A    Yes, he did.

20   Q    Tell me, at the same that he was telling you he had not

21   been entirely truthful with you, did he say things to mitigate

22   or explain away why he had not been truthful to you -- with

23   you?

24        MR. RODRIGUEZ RITCHIE:  Objection, misstates testimony,

25   leading.



www.escribers.net | 800-257-0885

1      MR. ROSS:  I couldn't hear the objection.

2      MS. FEINBERG:  Objection, vague.

3      MR. RODRIGUEZ RITCHIE:  Misstates testimony and leading.

4      MS. FEINBERG:  And vague.

5      JUDGE TRACY:  Okay, sustained.

6      MR. ROSS:  Okay.

7   (Counsel confer)

8   Q    BY MR. ROSS:  I'd like you to take a look at General

9   Counsel Exhibit 68.

10  A    Got it.

11  Q    Okay.  And these are notes that you took as you and Mr.

12  Ortiz spoke on the 12 of October?

13  A    Yes, they are.

14  Q    And you took these notes as you and he were speaking with

15  one another?

16      MS. FEINBERG:  Objection, leading.

17  Q    BY MR. ROSS:  How did you take the notes?

18  A    So these are the notes as is part of my practice, is the

19  notes that I would take while talking to anybody I'm

20  communicating with.  So when I was meeting with Richard Ortiz,

21  these are the notes that I made while I was talking to him.

22  Q    Okay.

23  (Counsel confer)

24  Q    BY MR. ROSS:  And you make reference to drawing a line on

25  something.  What did you draw a line on during your



1    conversation with Mr. Ortiz?

2        MR. RODRIGUEZ RITCHIE:  Objection, leading.

3        MR. ROSS:  I'm trying to understand his testimony, Your

4    Honor.  He made reference to draw a line --

5        JUDGE TRACY:  He -- he's --

6        MR. ROSS:  -- on something and --

7        JUDGE TRACY:  -- he testi --

8        MR. ROSS:  -- he talked about percentages.

9        JUDGE TRACY:  -- he testified he put the line on a

10   whiteboard --

11       MS. FEINBERG:  Um-hum.

12       JUDGE TRACY:  -- correct?

13       THE WITNESS:  That's correct.

14       MR. ROSS:  Okay.

15       JUDGE TRACY:  Oh.

16   Q   BY MR. ROSS:  And why did you do that?

17   A   As --

18       MS. FEINBERG:  Asked and answered.

19       THE WITNESS:  -- as I pre -- yeah.

20       MS. FEINBERG:  He has answered in the document that's --

21   Q   BY MR. ROSS:  Okay, tell me, in General Counsel's Exhibit

22   68, do you see the notation that would reflect the

23   conversations you had with Mr. Ortiz about the line?

24   A   That would be on General Counsel Exhibit 68-005 at the top

25   where it says Charts, and there's a black line on this and it


www.escribers.net | 800-257-0885

1    describes what happened.

2    Q    All right.  And he's -- looking at page 005, second

3    bullet, Richard marked the line on last convo -- that's in

4    quotes, last convo, and indicated somewhere around 95 percent

5    honest, do you see that?

6    A    Yes.

7    Q    And when he made that statement about being 99 (sic)

8    percent honest with you, then the first conversation, did you

9    believe that be a true statement?

10   A    He indicated it was 95 percent honest.

11        MR. RODRIGUEZ RITCHIE:  Objection, he misstates the

12   document.

13        THE WITNESS:  Sorry.

14   Q    BY MR. ROSS:  Did you believe that to be --

15        JUDGE TRACY:  So --

16   Q    BY MR. ROSS:  -- a truthful --

17        MS. FEINBERG:  That's incorrect.

18        JUDGE TRACY:  -- so I'm sorry, the question --

19        MR. ROSS:  The question was --

20        JUDGE TRACY:  No, your question was 99 percent honest --

21        MR. ROSS:  Oh, I'm sorry --

22        JUDGE TRACY:  -- the document --

23        MR. ROSS:  -- I misspoke.

24        JUDGE TRACY:  -- says 95 percent, but I --

25        MR. ROSS:  But --



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  -- also think, let me say this, he's already

2   testified about this just based upon the questions you just

3   asked previously.

4      MR. ROSS:  All right.  All right, excuse me.

5   Q   BY MR. ROSS:  Tell me, during the course of the interview

6   you had with Mr. Ortiz on October 12th, did he make reference

7   to having previously been a gang banger?

8   A   Yes, he did.

9   Q   And did he explain -- strike that.  Did he say that that

10  had something to do with his failure to tell you where the

11  screenshots had come there from during the first interview?

12     MR. RODRIGUEZ RITCHIE:  Objection, leading.

13  Q   BY MR. ROSS:  Well, how did the word gang banger come up?

14  That's -- explain that, please.

15     MR. RODRIGUEZ RITCHIE:  Objection, relevance.

16     JUDGE TRACY:  So I'm going to sustain the objection,

17  because again -- I sustain the objection.  It's --

18     MR. ROSS:  All right.

19     JUDGE TRACY:  -- already here on Exhibit 68-003.

20  Q   BY MR. ROSS:  All right, tell me after you conducted the

21  interview with Mr. Ortiz on the 12th, what was the next thing

22  you did in the investigation of the complaint?

23  A   After I completed my conversation with Richard Ortiz, I

24  started drafting my investigation report.

25  Q   All right.  And --



1   (Counsel confer)

2   Q   BY MR. ROSS:  Strike that.  And we know from prior

3   testimony that you reviewed that draft of counsel.  Do you

4   recall when that report was in -- strike that.  At some point

5   in time, did you share that report with Mr. Graminger?

6       MR. RODRIGUEZ RITCHIE:  Objection, vague as to that

7   report.  There were numerous versions --

8       MR. ROSS:  They were investigated --

9       JUDGE TRACY:  So let's re -- let's rephrase the --

10      MR. ROSS:  Yep.

11      JUDGE TRACY:  -- re --

12      MR. ROSS:  It's --

13      JUDGE TRACY:  -- rephrase the question --

14      MR. ROSS:  Sure.

15      JUDGE TRACY:  -- thank you.

16   Q   BY MR. ROSS:  At some point in time, did you share an

17   investigative report with Mr. Graminger?

18   A   Yes, I did.

19   Q   Okay.  And the investigative report that you shared with

20   Mr. Graminger, can you tell us when that was?

21   A   Again, without reviewing the report for the chronology of

22   when I had my conversation and alliance on my recommendation

23   with the business leader, Stephan Graminger, it was after my

24   conversation with Richard Ortiz and after I'd already aligned

25   with counsel.  And that report was made available to Stephan



1    Graminger in the conversation I had with him, ShTawney

2    McIntosh, and this other person that I still can't remember

3    their name.

4    Q    All right.

5    (Counsel confer)

6    Q    BY MR. ROSS:  And aside from consulting with counsel about

7    the report, did you review the draft investigative report with

8    anybody else before you presented it to Mr. Graminger?

9        MR. RODRIGUEZ RITCHIE:  Objection, vague as to the draft,

10   there were, again, numerous drafts testified to.

11       JUDGE TRACY:  So sustained.

12   Q    BY MR. ROSS:  Aside from counsel, did anyone else provide

13   you with any input in terms of the report, what it said, what

14   the findings were?

15       MR. RODRIGUEZ RITCHIE:  Same objection, which report?

16       MS. FEINBERG:  Compound.

17       JUDGE TRACY:  Overruled.

18       Go ahead.

19       THE WITNESS:  Aside from counsel?

20   Q    BY MR. ROSS:  Yes.

21   A    Not that I'm aware of, no.

22   Q    Okay.

23   (Counsel confer)

24   Q    BY MR. ROSS:  Okay, you -- I think you've already

25   testified about the conversation you had with Mr. Graminger,



1  Juan Martinez, who you don't remember his name, and ShTawney

2  McIntosh about your recommendation, so I'm not going to ask you

3  about that.  But I do want to ask you whether you were present

4  when Mr. Ortiz was informed that he was going to be terminated.

5      MS. FEINBERG:  It's like --

6      THE WITNESS:  I'm --

7      MS. FEINBERG:  -- saying he asked him about this very

8  thing, I can't even remember.  If it was earl --

9      JUDGE TRACY:  Okay, so what's your objection.

10     MS. FEINBERG:  Objection, asked and answered.

11     JUDGE TRACY:  Okay, I'm going to overrule the objection.

12     Just please answer the question.

13  Q  BY MR. ROSS:  Do you remember --

14     MS. FEINBERG:  Okay.

15  Q  BY MR. ROSS:  -- the question?

16  A  Yes, I remember the question.  I was present when ShTawney

17  McIntosh met with Richard Ortiz.

18  Q  Okay.  Okay, and can you tell us what was said and by whom

19  during that conversation with Mr. Ortiz?

20  A  Yes.

21  Q  Tell us, please.

22  A  So we met with Richard Ortiz in one of the admin -- north

23  admin airy -- area conference rooms.  When we entered the room,

24  I told Richard Ortiz that I was there to close out with him

25  with the findings and next steps on our investigation, like I



1   had promised him during the course of the investigation I

2   would.  I describe to him that we found that he had lied

3   through the course of an official investigation and that based

4   on what his business leader wanted to do, we were -- they were

5   going to be terminating him at this point.  At which point,

6   ShTawney McIntosh transitioned over and started speaking and

7   shared with Richard Ortiz his, like, medical benefits

8   information and all the administrative documents in regard to a

9   termination.  I asked Richard Ortiz if he had any questions; he

10  did not and he asked me like a work belt thing he had been

11  given by Tesla and I left the room.

12  Q    All right.

13  (Counsel confer)

14  Q    BY MR. ROSS:  Now in your employee relations investigative

15  report, General Counsel's Exhibit 62, you made a recommendation

16  with respect to action followed up by Jose Moran.  Do you see

17  that?  General Counsel Exhibit 62.

18  A    Yes, that's on General Counsel Exhibit 62-002 under the

19  hearing, Recommended Actions.

20  Q    Okay.  Now, tell us what you based that recommendation on.

21  A    I based that recommendation on the fact that Jose

22  indicated to me in our conversation that he didn't have an

23  official business purpose to access Workday and use it in the

24  manner of which he did, and that recommendation came from us so

25  that we could remind him of what official business purposes



1   would be for the tool.

2   Q   Okay.

3   A   And -- yeah.

4   Q   And tell me, again, this -- here the caption or title of

5   the section of General Counsel Exhibit 62 is Recommended

6   Actions.  Did you make this recommendation to anybody in

7   particular?

8   A   Yes, I did.  As indicated on General Counsel Exhibit 62-

9   002, I met with Brian Cunningham, who was an associate manager

10  within the quality organization, so one of the managers within

11  the department that Jose Moran worked in.  Brian Cunningham

12  agreed with the recommendation and both me and the HR partner

13  went and delivered the verbal coaching with a written follow

14  up.

15  Q   All right.  And did you and Ms. Cruz mee -- actually meet

16  with Mr. Moran?

17  A   So the HR partner at the time was Emmy (sic) Cruz, and we

18  both met with Jose Moran to close out with him like I had told

19  him when I was looking at the concerns I would follow up with

20  him and provide an update at the end of our investigation.

21  Yes, we both met with him.

22  Q   Okay.  Can you recall what you, Mr. Moran, Ms. Cruz said

23  to one another during this conversation?

24      MR. RODRIGUEZ RITCHIE:  Objection, calls for narrative.

25      JUDGE TRACY:  Sustained.



www.escribers.net | 800-257-0885

1    Q    BY MR. ROSS:  Did you tell Mr. Moran what the decision was

2    with respect to the investigation?

3         MR. RODRIGUEZ RITCHIE:  Objection, leading.

4         JUDGE TRACY:  Sustaining (sic).

5    Q    Tell us what was said during this conversation with Mr.

6    Moran and Ms. Cruz and yourself.

7         MR. RODRIGUEZ RITCHIE:  Objection, calls for narrative.

8         JUDGE TRACY:  Sustained.  So again, we need to break down

9    this conversation.

10        MR. ROSS:  Okay.

11   Q    BY MR. ROSS:  How did the conversation begin?

12   A    We met with Jose Moran in a conference room in the north

13   admin area of the Fremont factory; me, Emmy Cruz and Jose Moran

14   were there.  I, again, introduced myself and told him that, as

15   I promised him, I would follow up with him on the outcome of

16   our investigation.  He sat down, we all sat down, and then I

17   described to him that we found through the course of our

18   investigation that he had accessed Workday for other than

19   business purposes, that he's to be reminded only to use it for

20   business-related matters.  So giving feedback to others, the

21   intent of what the program is supposed to be used for, and that

22   I would be sending him a follow-up email so that he could have

23   that for his reference later.  And I asked him if he had any

24   questions, he said he did not.  And as I was leaving the room

25   and Emmy was getting up to leave, Jose Moran told me, I guess



22-60493.2332

1    it pays to be honest, and then we left.  I didn't respond to

2    that, we just left.

3    Q    All right.

4         MR. ROSS:  And could the witness be shown General

5    Counsel's Exhibit 82, please?

6    (Counsel confer)

7    Q    BY MR. ROSS:  You have in front of you, Mr. Gecewich,

8    General Counsel's Exhibit 82, the lower half of which contains

9    an email from you to Mr. Moran, CC'd Emmy Cruz.  Do you

10   recognize that email?

11   A    Yes, I do.

12   Q    And what is that email?

13   A    This is -- the bottom half of the email is the written

14   follow up that I sent to Jose Moran with Emmy Cruz as the HR

15   partner courtesy copied.  And then the continuation of that

16   email as you move up is Emmy Cruz indicating to me that she had

17   placed it in Jose Moran's Workday profile --

18   Q    All right.

19   A    -- for his access.

20   Q    And I noticed the -- in the email that you sent to Mr.

21   Moran, there is a sentence, a concluding sentence, "Thank you

22   for your honesty and partnership throughout this process."  You

23   see that?

24   A    I do.

25   Q    And tell us why you said that?



1    A    Number one, because I like to be polite to people and I

2    think it's appropriate to recognize when people are honest and

3    helpful; and number two, because from our perspective, Jose was

4    helpful and helped us understand the extent of how many Workday

5    profiles were accessed and what the usage of those were.  So

6    that's why I put it on there.

7    Q    All right.

8         MR. ROSS:  I have nothing else, thank you.

9         JUDGE TRACY:  Are you ready or you need a few minutes?

10        MR. RODRIGUEZ RITCHIE:  I have to use the restroom.

11        JUDGE TRACY:  Oh, sure.

12        MR. RODRIGUEZ RITCHIE:  So I think --

13        JUDGE TRACY:  Sounds like --

14        MR. RODRIGUEZ RITCHIE:  -- we need a --

15        JUDGE TRACY:  -- he does, too.

16        MR. RODRIGUEZ RITCHIE:  -- break, but I think there was

17   also a request to review an affidavit.

18        JUDGE TRACY:  Oh, sure.  Okay.  So let's --

19        MS. FEINBERG:  And there is that --

20        JUDGE TRACY:  -- go off the record.

21        MS. FEINBERG:  -- and that --

22        JUDGE TRACY:  Ah.  You need something on the record?

23        MS. FEINBERG:  I just -- I don't know if it's better to

24   take -- first of all, are we going to see the communications

25   with Gaby, because this would be good to see them if we're



1    getting them --

2         JUDGE TRACY:  Oh, yeah, that's right.

3         MS. FEINBERG:  -- which I believe you ordered --

4         JUDGE TRACY:  That's right.

5         MS. FEINBERG:  -- before this witness left.

6         JUDGE TRACY:  So let's stay on the record.  As part of --

7    well, one, go ahead and would you like the affidavit, is

8    that --

9         MS. FEINBERG:  Yes, I would.

10        JUDGE TRACY:  -- what you're asking?

11        MS. FEINBERG:  Yes, I --

12        JUDGE TRACY:  So go ahead and announce that.

13        MR. RODRIGUEZ RITCHIE:  All right, I'm providing two

14   copies --

15        MS. FEINBERG:  And I have another issue that arose from

16   one of the documents that was requested that I don't know if I

17   want to do in the first place, so -- about -- it's a totality.

18   I could do it through cross and then come to it, or give you it

19   itself, either way.

20        JUDGE TRACY:  Well, what I would prefer actually of all of

21   those options is another option I'm going to tell you, which is

22   to talk to them about it first.

23        MS. FEINBERG:  Okay, I will.

24        JUDGE TRACY:  About that.  But in the meanwhile, go ahead.

25        MR. RODRIGUEZ RITCHIE:  I'm providing two copies of a



www.escribers.net | 800-257-0885

1    January 8th, 2018-dated affidavit of Ricky Gecewich.

2        JUDGE TRACY:  Okay.  Now, as you recall from Tuesday, what

3    we spoke about was looking through the emails -- or not just

4    emails, but any communications with Ms. Toledano.  How has

5    that -- have you finished?

6        MR. MORRIS:  Yeah, it has been completed this afternoon,

7    thousands of emails were reviewed and spent attorney time

8    reviewing it overnight.

9        JUDGE TRACY:  That's fine, okay.

10       MR. MORRIS:  But it has --

11       JUDGE TRACY:  I get it.

12       MR. MORRIS:  -- completed.

13       JUDGE TRACY:  And?

14       MR. MORRIS:  And nothing to produce.

15       JUDGE TRACY:  Okay.  So that's on the record, there's

16   nothing to produce.  Okay.

17       Ms. Feinberg, this other issue, talk to them about it

18   first, if you --

19       MS. FEINBERG:  Okay.

20       JUDGE TRACY:  -- would, please.

21       MS. FEINBERG:  Yep.

22       JUDGE TRACY:  The impact of that, let me ask you, is --

23   because you also still need to look at the affidavit.

24       MS. FEINBERG:  Yeah, yeah, I can do it quickly.

25       JUDGE TRACY:  The impact where you said that you would



1    look at it on cross and would that impact anything with --

2    which has to do with this witness?

3         MS. FEINBERG:  The thing that I want to ask him about?

4         JUDGE TRACY:  Yeah.

5         MS. FEINBERG:  Yes, it has to do with the General Counsel

6    Exhibit 81, page 3.

7         JUDGE TRACY:  Okay.  So let's go off the record.  You're

8    free to get up for the moment --

9         UNIDENTIFIED SPEAKER:  Thanks.

10        JUDGE TRACY:  -- use the restroom.  Maybe about -- come

11   back in like 10 minutes, you know -- tell you -- yeah.

12        UNIDENTIFIED SPEAKER:  Let's go like this.

13        JUDGE TRACY:  Yeah.

14   (Off the record at 3:42 p.m.)

15        JUDGE TRACY:  Okay.  So before we go to the General

16   Counsel's cross-examination, I just want to note for the record

17   that during the break, the General Counsel has requested to

18   substitute General Counsel's Exhibit 80 due to a private phone

19   number that appears on the bottom of the page.  There are no

20   objections to that, so we're going to redact -- put the

21   redacted version of General Counsel's Exhibit 80 into evidence.

22        Mr. Rodriguez Ritchie, please go ahead.

23        MR. RODRIGUEZ RITCHIE:  Can we go off the record?

24        JUDGE TRACY:  Okay, let's go off the record.

25   (Off the record at 4:04 p.m.)



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Actually there's a few spots of General

2  Counsel's Exhibit 80 that have the phone number, the private

3  phone number of one of the individuals there, so off the record

4  the General Counsel will redact all those portions, show the

5  parties, and as long as everybody's satisfied, that redacted

6  version will go into the record.

7      Mr. Rodriguez Ritchie, please, go ahead.

8                        **CROSS-EXAMINATION**

9  Q    BY MR. RODRIGUEZ RITCHIE:  Mr. Gecewich, you testified

10 during the direct examination with Mr. Ross about a document

11 that was shown on September the 21st, 2017 to Mr. Ortiz.  Do

12 you recall that testimony?

13 A    Yes, I do.

14 Q    And the document was a picture that you testified had been

15 redacted?

16 A    Correct.

17 Q    And that was redacted by you?

18 A    Yes, it was.

19 Q    Do you have in front of you General Counsel's Exhibit 28?

20 A    Give me one second.

21     MR. ROSS:  I don't think he does, because he was looking

22 at my copy.

23     THE WITNESS:  Yes, I do have General Counsel Exhibit 28.

24 Q    BY MR. RODRIGUEZ RITCHIE:  All right then.  So what you --

25 your testimony, just to clarify for the record, the redacted



1    document you are referring to is not General Counsel's Exhibit

2    28.

3    A    It is not.

4    Q    Okay.  And that -- the redacted document that you

5    testified about, that was not a document that was part of your

6    affidavit in connection with this case?

7         MR. ROSS:  Can he be shown the affidavit, please?

8         JUDGE TRACY:  Well, before --

9         MS. FEINBERG:  No.

10        JUDGE TRACY:  -- he's shown that, he needs to answer the

11   question, so if there's an objection, it's overruled.

12        Go ahead, please.

13        THE WITNESS:  No, it was not part of the affidavit.  I

14   recall you boxing and redacting in pen what I was describing

15   when I was giving the affidavit.

16        MR. RODRIGUEZ RITCHIE:  So just for the record, I think

17   this clarifies the issue with the document not being produced.

18        JUDGE TRACY:  So, again, that's your testimony.  So now

19   why don't you go ahead and show him the affidavit, just to

20   clear it up for the record?

21   (Counsel confer)

22   Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  Well, I'm going to show

23   you a copy of your affidavit dated January -- 2018, and I'm --

24   actually I'm going to first direct your attention to page 7

25   line 2 here to as Exhibit C.



www.escribers.net | 800-257-0885

1    A    Yes, I see that.

2    Q    Okay.  So when you provided the affidavit, do you recall

3    that you testified that you marked up the document in Exhibit C

4    of your affidavit?

5    A    Yes, I did.

6    Q    Okay.  I thought I heard you just testify that the Board

7    agent redacted the document.

8    A    Yes, when we were discussing it, you marked this document

9    and this affidavit to describe what I was describing to you.

10    Q    Okay.  If you look at your affidavit, it says, "Attached

11    here to as Exhibit C is a copy of Exhibit A that I have marked

12    up to show what I showed Richard Ortiz, which was a redacted

13    form of Exhibit A."  That you redacted the document, not the

14    Board agent.

15    A    From what I recall, you drew a box around that and

16    scribbled out the Travis Pratt thing as I was describing what I

17    had redacted in Microsoft PowerPoint at my office.

18    Q    Okay.

19    (Counsel confer)

20    Q    BY MR. RODRIGUEZ RITCHIE:  And take a look at Exhibit C to

21    the affidavit.

22    A    Okay.

23    (Counsel confer)

24    Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  Now, Exhibit C, that's

25    not the actual document that you showed to Mr. Ortiz on



1    September the 21st, 2017; is that correct?

2    A    That's correct.

3    Q    No.  And indeed, at the time of your affidavit on January

4    8th, 2018, you still had in your possession the document that

5    you actually showed to Mr. Ortiz on September 21st, 2017?

6    A    Yes, it would've been in the file.

7    Q    And indeed you testified, I still have a redacted form of

8    the screenshot in my possession -- that's what you testified?

9    A    Yes.

10    Q    Okay.

11    JUDGE TRACY:  May I see that, since I don't have a copy?

12    UNIDENTIFIED SPEAKER:  Yeah.

13    MR. RODRIGUEZ RITCHIE:  I can provide copy of Exhibit --

14    JUDGE TRACY:  Is this one --

15    MR. RODRIGUEZ RITCHIE:  -- C.

16    JUDGE TRACY:  -- is this?

17    (Counsel confer)

18    JUDGE TRACY:  Mr. Rodriguez Ritchie, you are referring to

19    Exhibit C?

20    MR. RODRIGUEZ RITCHIE:  C, to his affidavit.

21    JUDGE TRACY:  To his affidavit?

22    (Counsel confer)

23    JUDGE TRACY:  Okay, thank you.

24    THE WITNESS:  Thank you.

25    Q    BY MR. RODRIGUEZ RITCHIE:  Now you can go ahead and turn



1   over your affidavit.

2   A    Okay, thank you.

3   Q    You testified on direct with Mr. Ross that when you -- at

4   the beginning of your conversation with Jose Moran on October

5   the 12th, 2017, that you informed him that he needed to be

6   honest during the course of the investigation?

7   A    Yes.

8   Q    And that was what you put on your notes, the admonition

9   regarding honesty?

10  A    Yes.

11  Q    Isn't it true that when you provided your affidavit, your

12  sworn affidavit to a Board agent, that you didn't say that

13  that's what you told him at the beginning of your conversation?

14  A    Without reviewing that, I can't tell you what's in the

15  affidavit.

16  Q    Okay, so go ahead and take a look at page 9, lines 10.

17  A    Okay.

18  Q    Okay.  You began your meeting with him by asking him what

19  he uses Workday for?

20       MR. ROSS:  That's not what --

21  Q    BY MR. RODRIGUEZ RITCHIE:  That's what you testified --

22       MR. ROSS:  -- the affidavit says, Your Honor.

23       JUDGE TRACY:  Okay.  Is there an objection?

24       MR. ROSS:  Yes.  Misstates what the evidence says.

25  (Counsel confer)



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Could you clarify for the record or reread

2   into the record what exactly you're reading from, which

3   section, and read that sentence into the record as you just

4   did?

5      MR. RODRIGUEZ RITCHIE:  Sure.

6   Q    BY MR. RODRIGUEZ RITCHIE:  Page 9 of your January 8th,

7   2018 affidavit at line 10, okay, you testified on October 12th,

8   2017, "I spoke with Jose Moran."

9   A    Yep, I see that.

10  Q    Okay.  You also testified that it was just the two of you

11  in the room at a conference room at Tesla, Inc.?

12  A    That --

13  Q    And you testified --

14  A    -- yes.

15  Q    -- I did not audio or video record this conversation.  And

16  then you continued by testifying, "I asked him what he uses

17  Workday for, and Moran told me that he uses Workday for his

18  personnel information to look at his job title, to gather his

19  financial information", in parentheses, "Pay information",

20  close paren.  See that?

21  A    Yes, I do.

22  Q    Okay.  You didn't testify that you began that conversation

23  by giving him an admonition about honesty.

24  A    It appears that that's not captured in the summary here.

25  Q    Okay.  And the affidavit continues on with your testimony

22-60493.2343



1    regarding your conversation with Jose Moran on October the

2    12th, 2017.  And nowhere in your testimony did you provide him

3    with an admonition that he needed to be honest with you; is

4    that correct?

5    A    From what I'm reading briefly here, it doesn't have that

6    admonition in there.

7    Q    Okay.  Thank you.  You testified about Ms. Raj Nanda.  You

8    remember that testimony?

9    A    Yes.

10   Q    And Ms. Raj Nanda works for Tesla, correct?

11   A    I can't tell you she currently works for Tesla --

12   Q    At the time of this investigation in September 2017, she

13   worked for Tesla, correct?

14   A    Yes, she does.

15   Q    She didn't work for Workday?

16   A    No, Raj Nanda did not work for Workday.

17   Q    Okay.  And at the time of this investigation, Ms. Toledano

18   also didn't work for Workday; is that correct?

19   A    No.

20   Q    Now when you provided an affidavit to the Board agent in

21   this case, you also testified about a conversation you had with

22   Mr. Richard Ortiz on -- also on October the 12th, 2017?

23   A    Yes.

24   Q    Okay.  And in your testimony with Mr. Ross, you testified

25   that at the beginning of that conversation, as it was your



1    practice, you also informed Mr. Ortiz that he needed to be

2    honest in the investigation?

3    A    Yes.

4    Q    Now when you provided the sworn affidavit to the Board

5    agent, you didn't testify that you told him at the beginning of

6    the conversation that he needed to be honest during that

7    meeting; is that --

8    A    But without --

9    Q    -- right?

10   A    -- reading that section of the affidavit, I can't tell you

11   what was in the affidavit.

12   Q    Sure.  But it starts at page 11, line 15.

13   A    Okay, thank you.  Okay.

14   Q    Okay, do you see where it says, "Later on October 12th,

15   2017, I met with Richard Ortiz for the second meeting"?

16   A    Yep.

17   Q    Okay.  Can you go ahead and review that paragraph?

18   A    Okay.

19   Q    Okay.  Now, does that refresh your recollection that you

20   did not testify to the board agent under sworn testimony that

21   at the beginning of your meeting you informed Mr. Ortiz that he

22   needed to be honest during the investigation?

23   A    That was not part of my testimony.

24   Q    Thank you.  Do you have General Counsel's Exhibit 62 in

25   front of you?



1     MR. ROSS:  What number?

2     MR. RODRIGUEZ RITCHIE:  62.  That would be the final

3  investigation.

4     THE WITNESS:  Yes, I've got it.

5  Q    BY MR. RODRIGUEZ RITCHIE:  If you look at page 2 of the

6  final investigation report under recommendation actions, do you

7  see where it says, "On October 19th, 2017, Brian Cunningham,

8  associate manager quality", that line?

9  A    Yes, I see that.

10  Q    You met with Mr. Cunningham regarding this investigation?

11  A    Yes, I did.

12  Q    Okay.  Now when you provided your January 8th, 2018

13  affidavit in connection with this investigation, isn't it true

14  that you didn't testify about any meetings with Mr. Cunningham?

15  A    I can't recall if I testified to that in the affidavit.

16  Q    Sure.  Take a moment to look at your affidavit and see if

17  that refreshes your recollection that you didn't provide any

18  testimony regarding any meetings with Mr. Cunningham.

19  A    Okay, thank you.  After a brief review of pages 16 and 17

20  of the affidavit where chronologically that would fit, it

21  doesn't appear that that is part of testimony.

22  Q    Okay.  So it's correct that when you provided a sworn

23  affidavit to a Board agent in connection with this case, you

24  didn't provide any testimony regarding any meeting with Mr.

25  Cunningham, that's correct?

22-60493.2346



1    A    That's correct.

2    Q    Okay.  And if you look at the -- just above that on page

3    2 --

4    A    Which exhibit is that?

5    Q    Oh, I'm sorry, Exhibit 62.  Thank you.

6    A    All right, thank you.

7    Q    It says, "ER recommends a verbal warning with written

8    follow up for Jose."

9    A    Yes, I see that.

10   Q    And that was because you gave him a written warning -- a

11   verbal warning, excuse me?

12   A    That's because that's what the recommendation was, it was

13   a verbal warning with a written follow up.

14   Q    Okay.  And I want you to take a look at page 1 of Exhibit

15   62.  At the top it says, Executive Summary.  Four lines down,

16   it says, "ER recommends a written warning be delivered to Jose

17   Moran."

18   A    Okay.

19   Q    Okay, so which was it, a verbal warning or a written

20   warning?

21   A    Yeah, it was a verbal warning with a written follow up.

22   Q    And that's not what's on line 4 for General Cou -- of page

23   1 of General Counsel's Exhibit 62; is that correct?

24   A    Correct.

25   Q    Okay.  And Mr. Gecewich, you testified about a few



1  instances during the course of this investigation.  Were you

2  provided information that was not truthful, were you terminated

3  from your employment at Tesla for not providing truthful

4  information during the course of your investigation?

5  A    No, I was not.

6      MR. RODRIGUEZ RITCHIE:  No further questions.

7      JUDGE TRACY:  Ms. Feinberg?

8      MS. FEINBERG:  Yep.  I'm in a binder.  Okay, cool.

9                     **CROSS-EXAMINATION**

10  Q    BY MS. FEINBERG:  Okay.  Could you please turn to General

11  Counsel Exhibit 81?  Is that still somewhere --

12  A    I'm check --

13  Q    -- in the vicinity?  It's a --

14  A    A large stack.

15  Q    -- it's the email chain to Raj Nanda, if that helps you.

16  A    Yeah.  Is it the -- like the really thick one?

17  Q    No.

18  A    No, it's not.  Okay.  I got it, I got it.

19  Q    No, actually, the beginning of that reads the same.  Okay.

20  A    So 81?

21  Q    81, please.

22  A    I got it.

23  Q    Okay.  And can -- but before you look at it, let me ask

24  you something.  Did you ever talk to Raj Nanda on the phone?

25  A    I can't recall specifically if I talked to Raj Nanda on



1    the phone.  I do recall meeting with Raj Nanda at a certain

2    point.

3    Q    Oh, when did you meet with Raj Nanda?

4    A    At some point through the request of this record.

5    Q    Before or after October 6th?

6    A    It would've been after I requested the records from her to

7    describe what I was looking for.

8    Q    Okay.  And was anyone else present in that conversation?

9    A    No, it was just me and Raj Nanda at her offices at 901

10   Page.

11   Q    And did you take notes of the meeting with Raj Nanda?

12   A    I did not.

13   Q    And do you remember how long after you -- well, do you

14   remember approximately what date it was -- and you can use this

15   document to refresh your recollection, what date it was that

16   you met with Raj Nanda?

17   A    No, I can't recall.  I know that it would've been just

18   after I had requested -- the initial request.

19   Q    Did you ever discuss Richard Ortiz with Raj Nanda?

20   A    No, I did not.

21   Q    You never mentioned her -- his name to her?

22        MR. ROSS:  I couldn't hear the question.

23   Q    BY MS. FEINBERG:  You never mentioned his name to her?

24   A    Not that I can recall, no.

25   Q    Okay.  And do you know whether anyone else was talking to



22-60493.2349

1    Raj Nanda about this investigation?

2    A    Oh, I don't know who would've been talking to Raj Nanda.

3    I'm the only one that was doing the investigation, so --

4    Q    Okay, then.  So can you turn to page 3 of General Counsel

5    Exhibit 81, please?  And I'd like you -- draw your attention to

6    the middle of the page.  It says, "On October 6th, 2017 at

7    11:53 a.m., Raj Nanda wrote", and then it says, privileged, it

8    doesn't have the normal to and from, like it doesn't show that

9    it's to you.  Do you know why that is -- why it says privileged

10    there?

11    A    Raj Nanda generated this, so I don't know why she put

12    that.

13    Q    Okay, but was this received by you?  Because it doesn't

14    show that it went to you.  I mean, it's addressed to you in the

15    body of it, but it doesn't show that it went --

16    A    Um-hum.

17    Q    -- to you.

18    A    Yeah, not that I am aware.

19    Q    Okay.  And then do you see this name, Tim Kye?

20    A    I do.

21    Q    All right, and Tim Kye is not someone in the -- is not

22    someone in management; is that right?

23    A    Yeah, I don't know his role as a technician, whether or

24    not that's a manager designation or not.

25    Q    Okay.  And do you know who K. Washington is?  Krista



www.escribers.net | 800-257-0885

1    Washington, do you know who she is?

2    A    Yes, I do.

3    Q    Who is she?

4    A    She's an HR manager.

5    Q    Okay.  And do you know why she was looking at Travis Pratt

6    or Shaun Ives profile on Workday on September 14th?

7    A    No, I do not.

8    Q    Okay.  And then do you see in the sentence before, it

9    says, "Comment:  Hi Raj."?  It says, "User R. I. Ortiz did not

10    view the profile pages during this time."  Do you see it says

11    that there?

12    A    I do see that.

13    Q    And is it still your testimony that you never discussed

14    Richard Ortiz with Raj Nanda?

15    A    It appears maybe I must've or it must've come up.

16    Q    Well, I'm not asking you to guess.

17    A    No.

18    Q    Because we don't know that someone else was talking to

19    her, so I'm asking you whether you --

20    A    Yeah.

21    Q    -- I'm not asking you to guess, whether you had any

22    conversations with Raj Nanda re -- as you sit here today, and

23    then if that refresh your recollection, whether you,

24    personally, recall ever having a conversation with Raj Nanda

25    regarding Richard Ortiz?



www.escribers.net | 800-257-0885

1   A    Like I just testified, I was the only one in charge of

2   this investigation, running this investigation, so I would've

3   been the only one to know of Richard Ortiz posting this.  So

4   this refreshes my memory that I might have discussed with her

5   this username to see whether or not that had accessed these

6   files.

7   Q    So by October 6, you hadn't discussed this with Ms.

8   Copher?

9        MR. ROSS:  Objection, he's -- she's asking for contents of

10  conversations with counsel, attorney-client privilege.

11       MS. FEINBERG:  I'm just asking if he discussed it, I'd

12  have to ask him what they said.

13       JUDGE TRACY:  Yes, so I'm going to overrule the objection.

14  However, you know, the question is a yes or no, but if there's

15  any discussion of what she said to you or what you said in

16  response to what she said, you do not need to testify about

17  that.

18       THE WITNESS:  Okay.

19       JUDGE TRACY:  Okay?

20  Q    BY MS. FEINBERG:  By October 6, 2017, had you discussed

21  this investigation with Ms. Copher?

22  A    Yes, it's likely.

23  Q    Okay.  And Mr. Hedges was also aware of this

24  investigation?

25       MR. ROSS:  Objection, speculation, calls for speculation



www.escribers.net | 800-257-0885

1    as to --

2         MS. FEINBERG:  Okay.

3         MR. ROSS:  -- Mr. Hedges --

4    Q    BY MS. FEINBERG:  To your knowledge -- which is what I

5    should have said, but was inferred, but I'll say it aloud, to

6    your knowledge, was Mr. Hedges involved in the investigation at

7    any -- in any form?

8    A    Given the fact Josh had just had shared the initial

9    documentation with me --

10   Q    Um-hum.

11   A    -- to my knowledge, he would've been aware.

12   Q    Okay.  And I believe you said that -- who was the person

13   Raj Nanda refers to?  Maybe that's on a different document.

14   Kevin --

15        MR. ROSS:  I couldn't hear the clai -- I couldn't hear

16   her.

17   Q    BY MS. FEINBERG:  Is it Kevin?

18        MR. ROSS:  Could -- I'm sorry, I couldn't hear you.

19        MS. FEINBERG:  Oh, Leonard, right.

20        JUDGE TRACY:  She's trying to figure out her question.

21        MS. FEINBERG:  Leonard --

22        MR. ROSS:  Oh --

23        MS. FEINBERG:  -- right.

24        MR. ROSS:  -- okay.  Sorry.

25        MS. FEINBERG:  Okay.



1    Q    BY MS. FEINBERG:  You mentioned a gentleman named Leonard

2    who Raj reports to; is that right?

3    A    Yes.

4    Q    Okay.  And Ra -- and Leonard reports to Gab -- at that

5    time, reported to Gaby Toledano?

6    A    From what I recall, yes.

7    Q    Okay.  And you wrote to him and told him that Gaby was

8    interested in this matter?

9    A    He was on an email chain where that was in the email

10   chain, yes.

11   (Counsel confer)

12   Q    BY MS. FEINBERG:  Well, I believe you wrote to him

13   directly to that.  Can you look at General Counsel Exhibit 79?

14        MR. ROSS:  Which one?

15        MS. FEINBERG:  79.

16        THE WITNESS:  Okay.

17   Q    BY MS. FEINBERG:  And if you can turn to General Counsel

18   Exhibit 79 page 2.  And if you need a moment, take it.

19   A    We're good.

20   Q    Okay.

21   A    All right, got it.

22   Q    And it says, "Hi Leonard", then it's, "Regards, Ricky."

23   Do you see that in the middle of the page, October 4th, 2017 at

24   9:46 a.m.?

25   A    Yes, I see that.



1   Q    Okay, and that was you writing directly to Leonard?

2   A    Yes.

3   Q    And you knew that at that time that Leonard reported

4   directly to Gaby?

5   A    Correct.

6   Q    And do you have any information one way or another as to

7   whether Leonard discussed this matter with Gaby Toledano?  If

8   you have any information.  If you don't -- just if you have any

9   information.

10   A    I don't have any information regarding that.

11   Q    Okay.  And what was the urgency to this matter that you

12   felt that you had to keep writing and writing and, according to

13   you, invoke the name of Gaby Toledano?

14   A    What's the urgency in this matter?

15   Q    Yeah, why did you have to invoke her name falsely, if

16   that's what your testimony is, what was so urgent that you

17   would have to invoke the -- Gaby Toledano's name?

18   A    I think I testified to this earlier, but I tried to be as

19   kind as possible to people, and I think the investigation's

20   process inherently is very stressful.  Richard Ortiz, I had

21   talked to him, he was able to provide me any additional

22   information, he knew I was looking into something.  So in order

23   to expedite the matter and understand where this came from, I

24   think it was appropriate to, like, keep this ball rolling and

25   say, hey, like, these bosses need to get involved to get this



www.escribers.net | 800-257-0885

1   to move.

2   Q    You did it as a courtesy to Richard Ortiz?

3   A    Yeah.

4   Q    Okay.  And you said that you met with some lawyer

5   between -- and I'm not asking you what you said, but you met

6   with a lawyer between meeting with Jose Moran on the 12th and

7   then meeting with Richard Ortiz on the 12th; is that correct?

8   A    That's correct.

9   Q    And who initiated those meetings?

10  A    What do you mean, like who started --

11  Q    What was the --

12  A    -- that conversation?

13  Q    Yeah.  Like, did you meet on that -- this topic?

14  A    Yeah.

15  Q    Okay.  And who was the lawyer that you met with?

16  A    It was Jaime Bodiford.

17  Q    And I heard you say that -- said I -- my -- right, sorry,

18  understood this, because it's also the leading question, I

19  believe at the time, so I think it's still in the record.  But

20  I believe you said that at some point the template for

21  investigations changed; is that right?

22  A    I didn't say the template for investigational change, no.

23  Q    That the template for which used the -- for the

24  investigative reports changed?

25  A    I didn't testify that the template for investigative



1    reports changed.

2    Q    Did you ever say that at some point the template included

3    the word honesty?

4    A    So you're speaking to the template for how we draft our

5    notes and what our notes are like?

6    Q    Yes.  Yes.

7    A    Okay, so that's not the investigative report.  So yes, the

8    way that we took notes and the template for those notes and

9    outlines the change sometime through the course of this messy

10   issue.

11   Q    And so is there a model template for the notes?  Was there

12   a model template for notes, much like there was a model

13   template for the investigative report?

14   A    From what I recall, up to that point there wasn't and then

15   there was.

16   Q    Oh, and when did the model template was created?

17   A    I think I testified to this previously, but at some --

18   Q    Okay.

19   A    -- point during --

20   Q    I know it's tempting --

21   A    -- the middle of all this.

22   Q    In the middle of this?

23   A    Yeah.

24   Q    Um-hum.  And who generated that?

25   A    I think it was a collective decision from all the employer



www.escribers.net | 800-257-0885

1    relations partners.

2    Q    So the template changed to include something about honesty

3    in the middle of this investigation; is that what you're

4    saying?

5    A    Yeah.

6    Q    Okay.  And would that -- when you wrote your notes, would

7    that, if we look back at earlier versions of your notes, would

8    it show much like when we did the investigative report that

9    template?  Do you actually work off of that template?

10    A    Like is there a copy, paste template, is that what you're

11    asking?

12    Q    Well, when we look at the investigative report, it looks

13    like it starts with a template about what an investigative

14    report looks like, factual obligations, you know, all of that.

15    A    Um-hum.

16    Q    And then you input the information, you keep inputting

17    information and it changes.  So I'm asking you, with respect to

18    notes of an interview --

19    A    Um-hum.

20    Q    -- I believe that's what termed that interview template?

21    A    Correct.

22    Q    What -- do you work off of that template?  Do you, like,

23    have that template up and then were working off of that

24    document?

25    A    No, no, I think we're misunderstanding each other here.



www.escribers.net | 800-257-0885

1    So there is a standardized template for, you know, who was in

2    the interview, what's the date, what the interview actually is,

3    and then the admonitions, and then questions you're going to

4    ask with bullet points.  And those bullet points indicating the

5    notes.

6    Q    Okay.  And where would -- where is that document?  Where

7    is that found?

8    A    It's created for each investigation.

9    Q    Right, but you're -- but you said it's a template.  To me

10   a template means that there's a model somewhere, housed

11   somewhere.  Is there a model hou -- I mean, you said this model

12   changed in the course of this investigation to include honesty,

13   so where is that housed?  Is that housed on your -- on the

14   employee-relations server, where is that housed?  Or where was

15   it housed when you were there, of course?

16   A    Yeah.  Again, I think we're misunders -- there's no copy

17   and paste template for that.  There's a way that you take notes

18   that had changed from how we previously took notes.

19   Q    I don't hear -- were there instructions that you were to

20   include those things?

21   A    Yeah.

22   Q    Some -- right.

23   A    Yeah, yeah, yeah.

24   Q    So where were the --

25   A    So --

22-60493.2359



1    Q    -- instructions?

2    A    I mean, they're verbal instructions, that's how we're

3    changing the way we take notes.  So if you look at previous --

4    Q    But it was universal for --

5    JUDGE TRACY:  So let him --

6    MS. FEINBERG:  Oh, I'm sorry.

7    JUDGE TRACY:  -- finish.

8    JUDGE TRACY:  Sorry, sorry.

9    Q    BY MS. FEINBERG:  Go ahead, sorry, sorry.  Continue.

10   A    Thank you.  So if you look at previous notes, there were

11   just responses from who we were talking to, and what we moved

12   to was more standardized process of an outline, plus responses

13   to the questions, plus responses.  And that's what I'm

14   discussing with you.

15   Q    And was there something in writing that indicated that?

16   That indicated this new system?

17   A    In writing?  Not that I can recall.

18   Q    Like an email, a temp -- anything?

19   A    Not that I can recall.  I think it came out of a

20   discussion amongst the entire team.

21   Q    And who was on that team?

22   A    At the time of this investigation?

23   Q    Yes, of course, at the time of the change occurred.

24   A    It was me -- was this September of 2017?

25   Q    Yep.



www.escribers.net | 800-257-0885

1    A    It was me, I think Benita Patel, Natalie Depew, Annalisa

2    Heisen.  I don't think anybody else was on the team at that

3    time, so there were four people on the team, all directed to --

4    the director of that team, Carmen Copher.

5    Q    And was she in that meeting?

6    A    I can't recall who specifically was all sitting in that

7    meeting, but it was a very small team.

8    Q    And were there notes of that meeting?

9    A    Not that I can recall, no.

10    Q    And yet you were all supposed to do something uniform

11    going forward?

12    A    Absolutely.

13    Q    And who was it that suggested that there be this honesty

14    component in the document at that time?

15    A    I can't recall.

16    Q    Do you recall how it came up?

17    A    No, I don't.

18    Q    You understood from the very beginning that General

19    Counsel Exhibit 28 was something that had been posted on a

20    union website, isn't that -- a union Facebook page, isn't that

21    correct?

22        MR. ROSS:  Objection to the word for phrase -- very

23    beginning, vague, and ambiguous.

24        JUDGE TRACY:  Sustained.

25        MS. FEINBERG:  Okay.



1    Q    BY MS. FEINBERG:  You understand at the time that you were

2    given General Counsel Exhibit 28 that this document was

3    something that had been posted on a union website -- union

4    Facebook page?

5    A    Clarify the very beginning of when --

6    Q    When you were given joint counsel --

7         JUDGE TRACY:  General Counsel.

8    Q    BY MS. FEINBERG:  -- when you were given this by General

9    Cou -- Jesus.  When you were given General Counsel Exhibit 28,

10   you were aware that this was something that had been posted on

11   a union Facebook page.

12   A    When I was given this, no, I was not made aware of that.

13   It was only after I met with Bryan Kostich that it was clear

14   that this was from the union account or Facebook page or

15   something like that.

16   Q    And what did you belie -- where did you believe this was

17   posted when you first received it?

18        MR. ROSS:  What was the question?

19        MS. FEINBERG:  Where did he believe this was posted when

20   he first -- when Mr. Hedges first handed it to him?

21        MR. ROSS:  I'm sorry, I can't -- I'm having a hard time

22   hearing you, I'm sorry.

23   Q    BY MS. FEINBERG:  Where did you believe this was posted

24   when Mr. Hedges first gave this to you?

25        MR. ROSS:  Thank you.



1       THE WITNESS:  Yeah, I believed it was posted on a Facebook

2  account somewhere.

3  Q   BY MS. FEINBERG:  Okay.  And when you saw it, were you

4  able to identify whose face was on -- was on General Counsel

5  Exhibit 28 as the person who had pulled up the Workday?

6  A   I testified earlier, no, I don't know all 30,000

7  employees, so I won't --

8  Q   No --

9  A   -- be able to tell --

10  Q   -- I'm asking if --

11  A   -- whose face that is.

12  Q   -- you could even identif --

13     JUDGE TRACY:  So --

14  Q   BY MS. FEINBERG:  -- if you could even --

15     JUDGE TRACY:  -- ma'am, make sure --

16     MS. FEINBERG:  Okay, okay.  Don't --

17     JUDGE TRACY:  -- because this --

18     MS. FEINBERG:  -- let you finish.

19     JUDGE TRACY:  -- transcript is --

20     MS. FEINBERG:  Sorry.

21     JUDGE TRACY:  -- going to be messed up.

22     MS. FEINBERG:  Yep.

23     JUDGE TRACY:  Let him finish and then you can ask.

24  Q   BY MS. FEINBERG:  Okay, so --

25     JUDGE TRACY:  Are you finished -- I'm sorry, with your --


www.escribers.net | 800-257-0885

1       THE WITNESS:  I'm finished, thank you.

2       JUDGE TRACY:  -- testimony?

3   Q    BY MS. FEINBERG:  So what you're saying -- I just want to

4   be clear, so it's clear.  You're saying you didn't necessarily

5   recognize whose face it was, but what I -- is that right?  You

6   didn't recognize whose face it was?

7   A    So we're talking about the same face --

8   Q    Yes.

9   A    -- whose face are we talking about?

10  Q    The little teen -- the little face above Mr. Pratt and Mr.

11  Ives.

12  A    Correct, I did not know whose face that was when I

13  received this document.

14  Q    And could you even recognize that that -- any -- like,

15  could you even recognize that face?  Like, could you not

16  recognize -- could you iden -- could you make out a face there?

17  A    Yes.

18  Q    And is -- and did you ask Mr. Pratt if he could recognize

19  that face?

20  A    I did not.

21  Q    Why not?

22  A    I don't know, I did not.

23  Q    Did you ask Mr. Ives if he could recognize that face?

24  A    No, I did not.

25  Q    But you were -- but they were concerned about someone



1    posting this and that was the face that had posted it, who was

2    taking the picture?

3         MR. ROSS:  Objection, Your Honor, argumentative.

4         JUDGE TRACY:  Overruled.

5         Go ahead.

6         THE WITNESS:  I knew who had posted this, Richard Ortiz

7    had posted this.

8    Q    BY MS. FEINBERG:  No, but who had taken -- you're

9    concerned, as I understood it, was that someone had taken a

10   photo on Workday, and so this photo, I learned today, you

11   believed identified who that person was; is that right?

12   A    That's correct.

13   Q    Right.  So you spoke to Mr. Pratt.  Did you say, Mr.

14   Pratt, you sent this photo to me, can you tell me, who is the

15   person who took the picture on --

16        MR. ROSS:  Your Honor --

17   Q    BY MS. FEINBERG:  -- that day?

18        MR. ROSS:  -- this question was asked and answered three

19   minutes ago.

20        MS. FEINBERG:  No, it --

21        JUDGE TRACY:  Overruled.  No, it was not.  Overruled.

22        Go ahead.

23   Q    BY MS. FEINBERG:  Did you ask Mr. Pratt who was the person

24   who is identified here who took this pho -- who took the photo

25   on Workday?



www.escribers.net | 800-257-0885

1    A    No, I did not.

2    Q    Did you contact Mr. Ives at all?

3    A    No, I did not.

4    Q    So you didn't ask him who this photo was of?

5    A    No, I did not.

6    Q    And you did speak to Mr. Kostich?

7    A    Yes, I did.

8    Q    And he was concerned about this posting, according to your

9    testimony?  He had some concerns about the posting?

10   A    Yes.

11   Q    And he told you that he thought the posting was by

12   someone -- on a website run by Jose Organizer; is that right?

13   A    He did not say that the posting was made by Jose

14   Organizer.

15   Q    No, I didn't ask you that.  Was it on a Facebook page

16   which had been initiated by Jose Organiz -- Jose Organizer?

17   A    That's not what I testified to.

18   Q    What did -- was the connection between Jose Organizer and

19   this Facebook page?

20   A    As I previously discussed, Bryan Kostich, about a year and

21   a half prior to this, was reached out to by a person named Jose

22   Organizer that pointed him in the direction of this Facebook

23   page.

24   Q    And did you ask Bryan why he joined the Facebook page?

25   A    I did not.



1   Q   Did you ask him who else was on the Facebook page?

2   A   No, I did not.

3   Q   So did -- I -- earlier, yesterday or whatever day you were

4   here, I did ask you if you had some understanding of concerted

5   activity; is that right?

6   A   Yes.

7   Q   Okay.  And did you ask anyone whether this was a

8   conversation just amongst workers at Tesla?

9   A   No, I did not.

10   Q   Okay.  And did you ask Mr. Kostich, who supposedly had

11   this concern, whether he could recognize the person who had

12   taken this picture?

13   A   No, I did not.

14   Q   And why not?

15   A   Because I did not.

16   Q   But you were -- your whole goal in this investigation was

17   to determine who that person was.  You were bugging Raj Nanda,

18   you were calling Leonard, you were using Gaby's name, why

19   didn't you ask the people who actually had the photo?

20   A   I did.

21   Q   No, you did not ask -- you didn't ask Travis Pratt, did

22   you?

23   A   I asked Richard Ortiz, who had the photo, posted the

24   photo.

25   Q   Right, but did you ask Travis Pratt, who had the concern?



www.escribers.net | 800-257-0885

1    A    No, I did not.

2    Q    And you didn't ask Shaun Ives anything?

3    A    Again, I didn't meet with --

4    Q    Right.

5    A    -- or talk to Shaun Ives.

6    Q    Right, and you didn't ask Mr. Kostich?

7    A    No, I did not.

8    (Counsel confer)

9    Q    BY MS. FEINBERG:  And is it correct to say that from your

10    investigation, the posting of General Counsel Exhibit 28 was

11    maybe somewhere between three to six hours?

12    A    From what I understand from what I learned.

13    Q    Yes, that's right.  Yes --

14    A    From --

15    Q    -- okay.

16    A    -- what I understand, from what I learned in this

17    investigation.

18    Q    And were you still employed at Tesla in May of 2018?

19    A    Yes, I was.

20         MS. FEINBERG:  Can you show the witness General Counsel

21    Exhibit 38 --

22         MR. ROSS:  General Counsel's Exhibit what?

23         THE WITNESS:  38.

24         MS. FEINBERG:  38.

25    (Counsel confer)


www.escribers.net | 800-257-0885

1       MR. RODRIGUEZ RITCHIE:  Okay, I'm handing the witness

2    what's been admitted as General Counsel's Exhibit 38.

3    Q    BY MS. FEINBERG:  Have you ever seen General Counsel

4    Exhibit 38 before?  Take a moment to review.

5    A    I've read it.  No, I have not.

6    Q    Okay.  Did anyone contact you in May of 2018 to ask you

7    about whether the information regarding Mr. Ortiz's dismissal

8    had been released to the public?

9    A    No.

10   Q    And this statement here regarding the person being fired

11   who repeatedly threatened nonunion supporters verbally and on

12   social media and lied about it, is that true?

13       MR. ROSS:  Objection, the -- it's not his document,

14   there's no reference to Mr. Ortiz, counsel is assuming it's a

15   reference to Mr. Ortiz.

16       MS. FEINBERG:  No, I'm ask -- I'm on cross.

17       JUDGE TRACY:  So I'm going to overrule the objection to

18   the extent he knows.  If you could restate the question.

19   Q    BY MS. FEINBERG:  It's right, Mis -- it's true that Mr.

20   Ortiz was only fired for lying on the first day of the

21   investigation -- first day that you interviewed him in the

22   investigation; is that right?

23   A    That's true.

24   Q    All right.  And he didn't lie on the second day you

25   interviewed him?



1   A    Or the third day.

2   Q    Or the third day.  Okay.  And he wasn't fired for

3   threatening other workers?

4   A    Mr. Ortiz wasn't fired for threatening other workers?

5   Q    That's right.

6   A    Not that I'm aware of.

7        MS. FEINBERG:  Okay.  I think I'm almost done.  Okay.  I'm

8   done.  Thank you.

9        JUDGE TRACY:  Mr. Ross?

10       MR. ROSS:  Could I have a moment to talk to Mr. Morris?

11       JUDGE TRACY:  Okay.  Let's go off the record.

12       MR. ROSS:  Thank you.

13   (Off the record at 4:47 p.m.)

14       JUDGE TRACY:  Okay.  Mr. Ross?

15       MR. ROSS:  No further questions.

16       JUDGE TRACY:  Okay.  Oh but on the record, the

17   affidavits --

18       MR. RODRIGUEZ RITCHIE:  Oh yes.  I've received two copies

19   from counsel for the Charging Parties of an affidavit of Ricky

20   Gecewich, dated January 8th, 2018.

21       JUDGE TRACY:  Okay.  Great.

22       All right.  Thank you very much.  You're done.

23       THE WITNESS:  Thank you.

24       JUDGE TRACY:  Please don't discuss your testimony with

25   anyone until after the close of this hearing, which will be



www.escribers.net | 800-257-0885

1   some time from now, maybe.

2         THE WITNESS:  How am I made aware of that?  Is there a

3   letter that goes to me or --

4         JUDGE TRACY:  No letter.  Just don't talk about it

5   until --

6         THE WITNESS:  -- a card, a greeting from somebody?

7         JUDGE TRACY:  -- somebody says you can talk about it.

8         MR. ROSS:  And don't breathe on anybody.

9         JUDGE TRACY:  Yeah.  Don't talk about it.  So thank you

10  very much.  You can leave all the documents there.  Okay.

11        THE WITNESS:  Yep.  Thanks.

12        JUDGE TRACY:  All right.  We're off the record.  Good luck

13  with Pinterest.

14        THE WITNESS:  Thanks.  Everybody use Pinterest.

15  (Off the record at 4:56 p.m.)

16        JUDGE TRACY:  If you could stand up, please, for me.

17        MS. LIPSON:  Yes.  Sure.

18        JUDGE TRACY:  And raise your right hand.

19  Whereupon,

20                          **LIZA LIPSON**

21  having been duly sworn, was called as a witness herein and was

22  examined and testified as follows:

23        JUDGE TRACY:  Okay.  Have a seat.  State your name for the

24  record.

25        THE WITNESS:  Liza Lipson.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Okay.  So let me give you a few

2  instructions.  This microphone here is for recording your

3  voice, because afterwards we create a transcript.  So you don't

4  need to lean into it.  It's going to capture your sound.

5      THE WITNESS:  Okay.

6      JUDGE TRACY:  Just relax about that.  However, I do need

7  you to speak up so that everybody in the room can hear you so

8  we can minimize the number of times you need to repeat your

9  testimony.  I have water here.  If there are objections, wait

10  for me to rule on them to decide -- to decide whether your

11  should answer the question or not.

12      THE WITNESS:  Okay.

13      JUDGE TRACY:  And the other big thing is wait for the

14  question to finish being asked before you answer.  And they

15  know to do the same.  Okay.

16      THE WITNESS:  Got it.

17      JUDGE TRACY:  And if you don't understand something, just

18  say.

19      THE WITNESS:  Okay.

20      JUDGE TRACY:  Okay.  Mr. Morris?

21      MR. MORRIS:  Yep.

22      JUDGE TRACY:  Okay.

23                    **DIRECT EXAMINATION**

24  Q    BY MR. MORRIS:  Hi, Liza.

25  A    Hi.



1    Q    Where are you employed?

2    A    Would you repeat the question?

3    Q    Where are you employed?

4    A    Currently?

5    Q    Yeah.

6    A    23andMe.

7    Q    Okay.  And who was your previous employer?

8    A    Tesla.

9    Q    And what dates approximately were you employed by Tesla?

10   A    November 2015 through September 2018.

11   Q    What was your position with Tesla?

12   A    HR partner.

13   Q    And could you describe your general job duties as HR

14   partner?

15   A    Yeah.  I partnered very closely with business leaders and

16   the business to help with any matter that revolved the

17   employees of the company.  And I was specifically focused on

18   production for the majority of my time with Tesla.  Towards the

19   end, I switched over to support sales service and delivery.

20   Q    Okay.  And who did you report to?

21   A    Josh Hedges for approximately two and a half years.  And

22   then I transitioned into sales service and delivery.  I

23   reported to Chauncey Hill.

24        MR. MORRIS:  Okay.  And I'd like to show the witness an

25   exhibit that was already marked as Respondent's 2, but it



1    wasn't offered into evidence.

2    (Counsel confer)

3    Q    BY MR. MORRIS:  And Liza, taking a look at that document,

4    which is marked as Respondent's 2, it appears to be an email

5    from Josh Hedges on May 1st, 2017, to production.  Do you

6    recall receiving this email?

7    A    Yes.

8    Q    And there's -- on the attachment line, it says, safe fair

9    fun -- or safe fair and fun.msg.  Is the second email beginning

10   with 1956 at the bottom right, was that the email that was

11   attached to the May 1st email?

12   A    Yep.  That's correct.

13   Q    And I'd like to direct your attention to the second page,

14   Bates stamped 1954.  Particularly, the section on OSHA 300 form

15   request.  Do you see that section?

16   A    I do.

17   Q    Did you meet with any production employees concerning the

18   OSHA 300 forms?

19   A    Yes, I did.

20   Q    How many production employees did you meet with?

21   A    I met with two.

22   Q    And which employees were they?

23   A    Richard Ortiz and Jonathan Galescu.

24   Q    And do you recall approximately when those meetings were?

25   A    Yes.  It was towards the end of May 20 something.



www.escribers.net | 800-257-0885

1   Q    Okay.  And prior to those meetings -- did you speak with

2   anyone prior to conducting those meetings, other than

3   conversations involving counsel?

4   A    Josh, my boss at the time.

5   Q    And was counsel present for that conversation?

6   A    Yes.

7   Q    In terms of those meetings with Richard Ortiz and Jonathan

8   Galescu, who did you meet with first?

9   A    I met with Ortiz first.

10  Q    And who was present for that meeting?

11  A    It was myself and then Lauren Holcomb, who was a member of

12  our safety team.

13  Q    Where did the meeting take place?

14  A    In the production area we have conference rooms that are

15  called the galaxy.  So it was in one of the conference rooms in

16  the galaxy area.

17  Q    Okay.  And how were you able to find Richard Ortiz prior

18  to the meeting?

19  A    So he was acting as a crossing guard, or a safety rep.  So

20  he was very visible in the middle of the factory.  It was very

21  close to where the conference room was.  And so I would walk

22  past that intersection many times a day.  And so I knew exactly

23  where he was.

24  Q    Okay.  And did you speak with him in that intersection

25  prior to the meeting?



www.escribers.net | 800-257-0885

1    A    I did.

2    Q    What do you recall from that conversation?

3    A    I said hello and asked if he had a couple minutes to chat.

4    And he said now?  And I said yes.  And so we walked over to the

5    conference room.

6    Q    Okay.  And once you got to the conference room, how did

7    the meeting begin?

8    A    I thanked him for his time.  And I introduced myself as an

9    HR partner.  And I let Lauren introduce herself as part of the

10    safety team.  And I explained the purpose of the meeting was to

11    talk about some personal medical information of our employees

12    that we believed had been sent externally.  And I stated that

13    we did not consent to be recorded.  He said he understood.  And

14    I asked a couple open ended questions about his knowledge of

15    the OSHA 300 logs.  And that was it.

16    Q    Okay.  And do you recall if he had a response to your

17    questions?

18    A    Yeah.  So he responded quickly and said no, I -- you know,

19    that's really Jonathan who's asking for that information, I

20    just told him that he could put my name on the emails that he

21    was sending requesting the information.

22    Q    Okay.  Do you recall anything else that you said to him

23    during that meeting?

24    A    Nothing particularly.  I asked a couple open ended

25    questions.  And he stated the same thing, that, you know, he

22-60493.2376



1   really had very knowledge of it, but Jonathan was the one

2   requesting the information.

3   Q    Okay.  Do you recall any other questions that you asked

4   during that meeting?

5   A    No.

6   Q    And did Richard Ortiz say anything else during that

7   meeting that you can recall?

8   A    No.

9   Q    Did the Union ever come up during that meeting?

10  A    No.

11  Q    And how did the meeting conclude?

12  A    I thanked him for his time and said he was free to return

13  back to work.

14  Q    And you met with Jonathan Galescu later that day?

15  A    That's correct.

16  Q    And who was present for that meeting?

17  A    It was the same.  It was me, Lauren from our safety team,

18  and Jonathan.

19  Q    Okay.  And where did that meeting occur?

20  A    It was in the body and white area, which is the department

21  that he was working in.  They have an office area that's a

22  glass room and it's called the shark tank.  So there are a

23  couple conference rooms within the shark tank.  And so it was

24  one of the conference rooms in there.

25  Q    Okay.  And did you speak with Jonathan Galescu prior to



www.escribers.net | 800-257-0885

1    the meeting about attending the meeting?

2    A    No.  I did not.

3    Q    How did you know to come to the meeting?

4    A    His supervisor had helped organize him coming to chat with

5    us.

6    Q    Okay.  And could you tell me how the meeting began?

7    A    Yes.  Very similar to Richard Ortiz's.  I thanked him for

8    his time.  Introduced myself.  Lauren introduced herself.

9    Explained the purpose of the meeting about the concern of

10   employees' personal medical information that had potentially

11   been released.  Stated I did not consent to be recorded.  And

12   began with a couple open ended questions about his knowledge of

13   the OSHA 300 logs.

14   Q    Okay.  Do you recall anything else during that meeting?

15   A    He responded.  Once I asked my first question, he stated

16   that he would like a representative present.  And I asked the

17   question in a different way, a different open ended question.

18   He repeated the same thing, that he would like a representative

19   present.  I could tell we weren't going to get very far.  And

20   so the meeting concluded very shortly after that.

21   Q    Okay.  Did you ask him who his representative was during

22   that meeting?

23   A    I don't recall.

24   Q    Did he tell you who his representative was during that

25   meeting?



www.escribers.net | 800-257-0885

1    A     No.

2    Q     Did the Union ever come up during that meeting?

3    A     No.

4    Q     Do you recall anything else at this time concerning the

5    meeting?

6    A     No.

7    Q     Okay.  And how did it conclude?

8    A     Similar to Richard Ortiz, I thanked him for his time and

9    told him he was okay to go back to work.

10   Q     Okay.  Following your meetings with Jonathan Galescu and

11   Richard Ortiz, did you communicate with anyone about those

12   meetings, aside from counsel?

13   A     No.

14         MR. MORRIS:  I'd offer Respondent's 2.

15         JUDGE TRACY:  Any objections?

16         MR. RODRIGUEZ RITCHIE:  Can I voir dire, please?

17         JUDGE TRACY:  Yes.  Go ahead.

18                    **VOIR DIRE EXAMINATION**

19   Q     BY MR. RODRIGUEZ RITCHIE:  So Ms. Lipson, my name is Edris

20   Rodriguez Ritchie.  I represent the General Counsel of the

21   National Labor Relations Board in these proceedings.  Do you

22   have Respondent's Exhibit 2 in front of you?

23   A     I do.

24   Q     This email, it says it's from production at the top?

25   A     Um-hum.



www.escribers.net | 800-257-0885

1    Q    That's not you; is that correct?

2    A    No.

3    Q    Okay.  And then it says Josh Hedges.  And that's not you

4    either?

5    A    That's correct.  That's not me.

6    Q    Okay.  How many emails did you receive during the course

7    of your employment at Tesla from anyone at you @tesla.com email

8    address?

9    A    I have no idea.  A very, very large number.

10   Q    Okay.  So how do you know that you actually received this

11   email if it says it was sent to Josh Hedges?

12   A    So it's a very common practice when we're sending emails

13   to very large populations to send it to yourself, and then to

14   blind copy the people who are receiving the email.

15   Q    So you don't actually recall, it would be fair to say,

16   that you received this specific email on February -- on May the

17   1st, 2017?

18   A    I do recall receiving this email.

19   Q    You have a specific memory of this particular email?

20   A    Yes.

21   Q    And you remember that you didn't -- that this was bcc'ed

22   to you?

23   A    Yes.

24        MR. RODRIGUEZ RITCHIE:  I could make a relevancy

25   objection.  But --



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Any objections?

2      MS. FEINBERG:  Yeah.  I'm not sure what -- is this coming

3  in for what?  Is it coming in for the truth of it?  Or that

4  this -- that it was an internal document?  What is the -- yeah,

5  the relevance?  I have a relevancy objection.

6      JUDGE TRACY:  What's the relevance?

7      MR. MORRIS:  Yeah.  It goes to our defense concerning the

8  interview with respect to the OSHA logs.  And it was -- the

9  statement concerning the OSHA 300 form request was a statement

10  that was sent to production employees.

11      MS. FEINBERG:  I didn't hear her say that she wrote or

12  authorized this document.  So I'm still -- his answer to this

13  question -- I mean, Mr. Hedges was here.  I don't think they

14  asked him about it.  And we don't know who wrote it.  Maybe I

15  should take a round of voir dire.

16      MR. RODRIGUEZ RITCHIE:  I mean, I think the point is that

17  the applicable test would be whatever was said during that

18  conversation.  And so whether some email existed at some other

19  point prior that wasn't part of the conversation, doesn't go to

20  the actual --

21      MS. FEINBERG:  Well, it also doesn't show that this

22  went -- that the first two pages, went to anybody other than

23  Mr. Hedges.  You don't know that any worker received it?

24      MR. MORRIS:  Yeah.  My understanding is it was sent to all

25  production employees plant wide.



www.escribers.net | 800-257-0885

1    MS. FEINBERG:  Well, it says it's from -- well, no.

2    There's no one who's testified to that.

3    JUDGE TRACY:  Yeah.  This should've come in through

4    Hedges.  But I'm just to overrule the objection.  I'll allow a

5    response to Exhibit 2 into evidence.  You certainly in the

6    briefs can argue that it's --

7    MS. FEINBERG:  Okay.  But you're not taking --

8    JUDGE TRACY:  -- not relevant.

9    MS. FEINBERG:  -- the testimony of counsel for Tesla as to

10   who it went to, right?  We don't know.  The record is that we

11   don't know.

12   JUDGE TRACY:  I just see that it says from production --

13   MS. FEINBERG:  Okay.  Thank you.

14   JUDGE TRACY:  -- to Josh Hedges.  I guess --

15   MS. FEINBERG:  I just want to say, because there was a

16   representation made, and we don't necessarily agree one way or

17   another.

18   JUDGE TRACY:  So General Counsel -- Respondent's Exhibit 2

19   is admitted into evidence.

20   **(Respondent Exhibit Number 2 Received into Evidence)**

21                    <u>**DIRECT EXAMINATION**</u> **(RESUMED)**

22   Q    BY MR. MORRIS:  Liza, do you have any understanding of

23   whether this email was sent to all production employees?

24   A    It would have been.

25   MR. MORRIS:  Okay.  Nothing further.



22-60493.2382

1      JUDGE TRACY:  I'm not sure --

2      MR. RODRIGUEZ RITCHIE:  Okay.  We're ready.

3      JUDGE TRACY:  Go ahead.  We're still on the record.

4      MR. RODRIGUEZ RITCHIE:  Oh.

5                        **CROSS-EXAMINATION**

6      Q    BY MR. RODRIGUEZ RITCHIE:  You just testified that you had

7      an understanding that Respondent's Exhibit 2 was sent to

8      production employees?

9      A    That's right.

10     Q    And the email, can you tell me where it shows that it was

11     sent to production employees?

12     A    It would have been blind copied sent to production

13     employees.

14     Q    You don't know that for sure?

15     A    It was a common practice.

16     Q    But you don't know that this specific email was sent to

17     production employees; is that right?

18     A    I recall it going to production employees.

19     Q    Do you check every production employee's email address?

20     A    No, I do not.

21     Q    Okay.  So you don't actually know whether it did actually

22     go to all production employees, fair?  That's a fair statement?

23     A    Fair.

24     Q    Okay.  Now, you testified about a conversation that you

25     had with Mr. Ortiz, and then a separate one that you had with



1    Mr. Galescu.  Is it correct the one with Mr. Ortiz, that

2    occurred first?

3    A    That's correct.

4    Q    Okay.  What was the time of day that that occurred?

5    A    It was in the early evening.  If I had to guess, 7 or so

6    p.m.

7    Q    And the conversation with Mr. Galescu?

8    A    That one was also in the evening.  I would guess roughly 8

9    p.m.

10   Q    Now, you spoke with Mr. Ortiz with Ms. Lauren Holcomb; is

11   that right?

12   A    That's correct.

13   Q    What's Ms. Holcomb's job title at the time?

14   A    She was a senior EHS specialist.

15   Q    What does EHS stand for?

16   A    Environmental health and safety.

17   Q    Thank you.  Sometimes it gets confusing when you use

18   acronyms.  Now, during your conversation with Mr. Ortiz, did

19   you take notes?

20   A    I did not.

21   Q    And Ms. Holcomb, she took notes?

22   A    She did.

23   Q    Okay.  And did you see the notes after she took them?

24   A    I did not.

25   Q    And during the conversation with Mr. Galescu, did you take



1    notes?

2    A    I did not.

3    Q    Did Ms. Holcomb take notes?

4    A    She did.

5    Q    Okay.  Did you see her notes after she took them?

6    A    No, I did not.

7    Q    Do you know what Ms. Holcomb did with the notes that she

8    took during the conversation with Mr. Ortiz?

9    A    I believe they were sent to counsel.

10   Q    Okay.  And do you know what Ms. Holcomb did with the notes

11   that she took during her conversation with Mr. Galescu?

12   A    Similarly, I believe they were sent to counsel.

13   Q    Now, when you met with Mr. Ortiz, someone had asked you to

14   meet with him; is that right?

15       MR. MORRIS:  Objection to the extent it involves attorney

16   client privileged communications.

17       JUDGE TRACY:  So the instructions I will give you are that

18   if there are any conversations that you had with the attorneys

19   for Tesla with regard to questions that are posed to you, you

20   don't need to answer that.

21       THE WITNESS:  Okay.

22       JUDGE TRACY:  However, this is not asking what was said.

23   It's a preliminary question.  So the objection is overruled.

24   And go ahead.  But you're going to have to ask it again I'm

25   sure.



1   Q    BY MR. RODRIGUEZ RITCHIE:  Someone asked you to meet with

2   Mr. Ortiz when you met with him in May of 2017?

3   A    That's correct.

4   Q    And who was that?

5   A    My boss, Josh Hedges.

6        JUDGE TRACY:  What's -- your boss who?

7        THE WITNESS:  Josh.

8   Q    BY MR. RODRIGUEZ RITCHIE:  And when did he ask you to meet

9   with Mr. Ortiz?

10  A    It was the same day that I met with them.  It was just

11  earlier in the afternoon.

12  Q    At what time?

13  A    I'm not positive.  It was early afternoon.

14  Q    And when Mr. Hedges spoke with you about meeting with Mr.

15  Ortiz, was that in person or over the phone or via email?

16  A    It was in person.

17  Q    Okay.  And was anyone else present?

18  A    Yes.

19  Q    Who?

20  A    A member of Tesla counsel.

21  Q    Oh I see.  Okay.  So I'm not asking you about what that

22  person said, just so I'm clear.  Besides this conversation with

23  Mr. Hedges and counsel, you didn't speak with anyone else about

24  meeting with Mr. Ortiz in May of 2017?

25  A    No.



www.escribers.net | 800-257-0885

1    Q    And the same is true with regards to Mr. Galescu?

2    A    That's correct.

3    Q    Okay.  Now, why did you meet with Mr. Ortiz in May of

4    2017?

5    A    To discuss the concern of employee personal information

6    that had been shared externally.

7    Q    What concern was that?

8    A    That employees' personal information was shared outside of

9    the company.

10   Q    How did you come to find out -- or why did you think that

11   information had been shared externally?

12   A    From the OSHA 300 logs.

13   Q    Did someone tell you information had been shared

14   externally?

15        MR. MORRIS:  Objection to the extent it involves attorney

16   client communications.

17        JUDGE TRACY:  Again, the same instructions.

18        THE WITNESS:  So it did involve conversation with counsel.

19        JUDGE TRACY:  Well, that wasn't the question.  The

20   question was -- repeat it, please.

21   Q    BY MR. RODRIGUEZ RITCHIE:  Did someone tell you that

22   information from the California 300 logs had been shared

23   externally?

24   A    Yes.

25   Q    Who?



```
1          JUDGE TRACY:  So you can say who, but not what they said

2     to you.

3          THE WITNESS:  Okay.  Counsel.

4     Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  So besides -- oh and I'm

5     sorry, what's the name of the counsel?

6          JUDGE TRACY:  That is okay.

7          THE WITNESS:  Okay.  Robin Repass.

8     Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  And that's a woman?

9     A    Correct.

10    Q    Okay.  So besides this conversation with Ms. Repass, you

11    had no knowledge that information from the Cal OSHA 300 logs

12    had been shared externally?

13    A    That's correct.

14    Q    Okay.  And tell me at the time this occurred, what was

15    your familiarity with Cal OSHA 300 logs?

16    A    Minimal.

17    Q    Are you aware that employees are legally allowed to share

18    the documents externally?

19    A    Yes.

20    Q    And not withstanding that, you still asked Mr. Ortiz who

21    he had shared the documents with?

22    A    That's correct.

23    Q    Okay.  And notwithstanding that, you still asked Mr.

24    Galescu who he had shared the documents with?

25    A    That's correct.
```



www.escribers.net | 800-257-0885

1    Q    Okay.  And what you were interested in was who the

2    information had been shared with?

3    A    That's correct.

4    Q    Okay.  And you're not familiar with any other reason why

5    Mr. Ortiz or Mr. Galescu were spoken to regarding the Cal OSHA

6    300 logs?

7    A    No.

8    Q    And you had involvement at Tesla with other requests for

9    Cal OSHA 300 logs?

10   A    Not that I can recall.

11   Q    Were you aware that other individuals have requested Cal

12   OSHA 300 logs at Tesla?

13        MR. MORRIS:  Objection.  Relevance.

14        JUDGE TRACY:  The relevance?

15        MR. RODRIGUEZ RITCHIE:  Sure.  There was testimony

16   elicited regarding a conversation on sharing Cal OSHA 300 logs

17   externally.  So I'm trying to find out whether anyone --

18   whether she had knowledge of anyone else sharing or even

19   requesting these documents.

20        JUDGE TRACY:  Okay.  So it's overruled.  Go ahead.

21        THE WITNESS:  Would you repeat the question?

22   Q    BY MR. RODRIGUEZ RITCHIE:  Sure.  I know, sometimes when

23   there's a lot, it can get confusing.  You were aware that other

24   people have requested the Cal OSHA 300 logs?

25   A    I was not aware.



www.escribers.net | 800-257-0885

1  Q    Had no knowledge of any other production employees also

2  requesting the logs?

3  A    That's correct.  I had no knowledge.

4  Q    Okay.  Now, the date that you met with Mr. Ortiz and Mr.

5  Galescu, that was the same day?

6  A    Yes.  That's correct.

7  Q    That was also the day that employees at Tesla Fremont; do

8  you remember that?

9        MR. MORRIS:  Objection.  Lack of foundation.

10  Q   BY MR. RODRIGUEZ RITCHIE:  During the --

11       MR. RODRIGUEZ RITCHIE:  I'll step back a little bit.

12       JUDGE TRACY:  Thank you.

13  Q   BY MR. RODRIGUEZ RITCHIE:  During the course of your

14  employment at Tesla Fremont, you were informed that employees

15  from Tesla Fremont passed out leaflets in the Tesla parking

16  lot?

17       MR. MORRIS:  Objection.  Relevance and beyond the scope.

18       MR. RODRIGUEZ RITCHIE:  We're going to get to the day of

19  this conversation and the reasons for the conversation.  So --

20       MR. MORRIS:  Same objections.

21       JUDGE TRACY:  I sustain the objection.

22  Q   BY MR. RODRIGUEZ RITCHIE:  Okay.  I'm going to show you

23  what's been pre-marked as General Counsel's Exhibit 53.

24       JUDGE TRACY:  Has it come in?  No?

25       MR. RODRIGUEZ RITCHIE:  No.


www.escribers.net | 800-257-0885

1          JUDGE TRACY:  Okay.

2          MR. RODRIGUEZ RITCHIE:  Did I say admitted?

3          JUDGE TRACY:  No.  You said pre-marked, but I get

4     confused.

5     Q    BY MR. RODRIGUEZ RITCHIE:  Okay.  Take a moment to look at

6     that.  It's a three page document -- four page document, excuse

7     me.  You ready?

8     A    Yes.

9     Q    Okay.  You've taken a look at General Counsel's Exhibit

10    53?

11    A    Yes.

12    Q    Okay.  At the top it says from Tori Tanaka.  Do you know

13    who that is?

14    A    I do.

15    Q    Who is that?

16    A    She was one of the HR partners who worked on my team.

17    Q    Okay.  And then beneath that --

18         JUDGE TRACY:  I'm sorry, worked on where?

19         THE WITNESS:  On my team.

20    Q    BY MR. RODRIGUEZ RITCHIE:  And beneath that it says to

21    Liza Lipson; do you see that?

22    A    I do.

23    Q    And that's you, correct?

24    A    Correct.

25    Q    And the date of this email was May 24th, 2017; is that



www.escribers.net | 800-257-0885

1    right?

2    A    Correct.

3    Q    Okay.  And it was sent on -- at 6:26:33 a.m.?

4    A    Correct.

5    Q    Okay.  And it says, subject, union activity this a.m.,

6    right?

7    A    Correct.

8    Q    Okay.  And you remember receiving this email on May 24th,

9    2017?

10   A    Yes.

11   Q    Okay.  And then it says attachments, img_0098.jpeg.  And

12   then a series of other attachments.  Do you see that?

13   A    I do.

14   Q    Okay.  Now, those attachments are also part of General

15   Counsel's Exhibit 53, correct?

16   A    Correct.

17   Q    Okay.  So you remember on May -- oh.  Earlier, I believe

18   you testified that the conversations with Mr. Ortiz and Mr.

19   Galescu occurred in May 2017?

20   A    That's correct.

21   Q    Okay.  Do you remember that they occurred on May 24th,

22   2017?

23   A    I don't recall.

24   Q    But I believe you testified it was in the 20s; is that

25   right?

22-60493.2392



1    A    That's right.

2    Q    Okay.  So this -- if the conversation had occurred with

3    Mr. Galescu and Mr. Ortiz, you would've -- on the 24th, you

4    would've received this email prior to speaking with them; is

5    that right?

6         MR. MORRIS:  Objection.  Vague and ambiguous.  Calls --

7         JUDGE TRACY:  Overruled.

8         MR. MORRIS:  -- for speculation.

9         JUDGE TRACY:  Overruled.  Go ahead.

10        THE WITNESS:  Would you repeat the question?

11   Q    BY MR. RODRIGUEZ RITCHIE:  So if the conversation had

12   occurred on May 24th, 2017, you would have received this email

13   at 6:26 a.m., before you spoke with Mr. Ortiz and Mr. Galescu;

14   is that right?

15   A    That's correct.

16   Q    Okay.  Now I want you to take a look at page 3 of General

17   Counsel's Exhibit 53, and 4.  So page 3 and 4, those are

18   pictures that Ms. Tanaka attached in the email to you, correct?

19   A    It appears so.

20   Q    Okay.  And Ms. Tanaka, on May 24th, 2017, she told you

21   that these had -- that pages 3 and 4, that those had been

22   distributed outside on Tesla property?

23   A    That's correct.

24   Q    Okay.  And that it had been that morning?

25   A    That's correct.

22-60493.2393



1   Q    Okay.  And then if you look at page 3 of General Counsel's

2   Exhibit 53, it looks like a picture of a crumpled up piece of

3   paper; is that correct?

4   A    That's correct.

5   Q    Okay.  If you look at the piece of paper on page 3 of

6   General Counsel's Exhibit 53, there's -- underneath where it

7   says the truth about injuries at Tesla.  There's a couple of

8   paragraphs.  And so I want to direct your attention to the

9   third paragraph where it's talking about OSHA form 300.

10  A    I see where you are.

11  Q    And 300A.  Okay.  Now, when you met with Mr. Ortiz to

12  discuss the Cal OSHA 300 logs, those are the same types of logs

13  that you were talking to him about; is that correct?

14  A    That's correct.

15  Q    Okay.  And when you met with Mr. Galescu, those are also

16  the same kind of logs that you were talking about; is that

17  right?

18  A    That's correct.

19  Q    And when you received the email in General Counsel's

20  Exhibit 53, you understood that this was about union related

21  activity, the leafletting; is that right?

22  A    That is correct.

23       MR. RODRIGUEZ RITCHIE:  No further questions.

24       Oh I'd like to move to admit General Counsel's Exhibit 53.

25       JUDGE TRACY:  Any objections?



www.escribers.net | 800-257-0885

 1        MR. MORRIS:  As to relevance.

 2        JUDGE TRACY:  Just if you could explain for the record the

 3    relevance.

 4        MR. RODRIGUEZ RITCHIE:  Sure.  The witness has testified

 5    about conversations that she had with two individuals, though

 6    she couldn't remember the exact date.  There's separate

 7    evidence that this occurred on the same date.

 8        JUDGE TRACY:  So the objection --

 9        MR. ROSS:  I have an objection to this document.

10        JUDGE TRACY:  What?  Nothing else?

11        MR. ROSS:  I'm sorry.

12        JUDGE TRACY:  I didn't know if you were saying something.

13        MR. ROSS:  No, I was saying something to --

14        JUDGE TRACY:  Okay.  So the objection is overruled and

15    General Counsel's Exhibit 53 is admitted into evidence.

16    **(General Counsel Exhibit Number 53 Received into Evidence)**

17        MS. FEINBERG:  So me?

18        JUDGE TRACY:  I'm not sure.

19        Are you done?

20        MS. FEINBERG:  I thought he said -- sorry.

21        MR. RODRIGUEZ RITCHIE:  Yes, I'm done.

22        JUDGE TRACY:  Okay.  Go ahead, please.

23                        **CROSS-EXAMINATION**

24    Q    BY MS. FEINBERG:  Okay.  Hello.  My name is --

25        JUDGE TRACY:  Oh I had one question.



www.escribers.net | 800-257-0885

1      MS. FEINBERG:  Oh, please.

2      JUDGE TRACY:  What is PC?

3      THE WITNESS:  Production control.

4      JUDGE TRACY:  Production --

5      THE WITNESS:  It's one of the departments.

6      JUDGE TRACY:  And that was one of your departments?

7      THE WITNESS:  That's correct.

8      JUDGE TRACY:  Okay.  Thank you.

9      Go ahead.

10     Q    BY MS. FEINBERG:  Okay.  Before you met with Mr. Ortiz in

11     May of 2017, had you ever met him before?

12     A    Yes.

13     Q    And what was the context in which you met him before?

14     A    I was the HR partner for the department that he worked in.

15     So I met many of the employees.

16     Q    Had you ever had an actual conversation with him before?

17     A    I don't recall specifically but it's likely.

18     Q    Okay.  But you knew he was -- where to find him, that he

19     was the crossing guard; is that right?

20     A    That's right.

21     Q    So you knew he was on light duty?  That was something you

22     knew?

23     A    Yes.

24     Q    And had you ever seen him wear any kind of union stickers

25     or t-shirts before you met with him?



www.escribers.net | 800-257-0885

1   A    Not particularly.

2   Q    Had you ever heard that he was -- had you ever any

3   conversations where his name came up in the context of the

4   union?

5   A    No.

6   Q    Did you know anything about his role with the union?

7   A    No.

8   Q    But you knew he had asked for the OSHA 300 logs?

9   A    That's correct.

10  Q    So you knew he was working with another worker to get

11  information about his working conditions?

12  A    That's correct.

13  Q    And had you ever met Jonathan Galescu before that day in

14  May when you interviewed him?

15  A    I believe so.

16  Q    And what was the context of that?

17  A    Similarly, as the HR partner for the department, I met

18  many of the employees.

19  Q    And did you ever see him in any union t-shirts or with

20  stickers or anything?

21  A    Not particularly.

22  Q    I don't know what that means exactly.

23  A    It doesn't stand out.  So no.

24  Q    Do you have any responsibility for enforcing OSHA at the

25  Tesla plant?



www.escribers.net | 800-257-0885

1    A    No.

2    Q    So do you know why you were tasked with being the

3    interviewer for these meetings?

4        MR. MORRIS:  Objection.  Calls for speculation.

5        JUDGE TRACY:  Sustained.  Clarify the question, please.

6        MS. FEINBERG:  Okay.  I'll try again.

7        MR. RODRIGUEZ RITCHIE:  Well, the question was do you

8    know, so it doesn't call for speculation if you're asking if

9    you know.

10        JUDGE TRACY:  Okay.  But you can clarify the question,

11    please.

12        MS. FEINBERG:  Okay.

13    Q    BY MS. FEINBERG:  Had you been involved in any OSHA

14    related matters prior to the date that you met with Mr. Ortiz

15    or Mr. Galescu?

16    A    No.

17    Q    And the person that -- the other person in the room, what

18    was her name?

19    A    Lauren Holcomb.

20    Q    And what was her job with the company?

21    A    She was a senior environmental health and safety

22    specialist.

23    Q    And did she say anything in the meeting with Mr. Ortiz?

24    A    The only thing she would have said was an introduction of

25    her name and her role.


www.escribers.net | 800-257-0885

1    Q    So she didn't talk at all about OSHA logs or what they

2    were used for or anything?

3    A    No.

4    Q    And did you say that she was taking notes in the meeting?

5    A    She was.

6    Q    And was that on a computer?

7    A    It was.

8    Q    And did she share those notes with you?

9    A    I'm sorry, would you repeat that?

10   Q    Did she share those notes with you?

11   A    She did not.

12   Q    And did you and she discuss the fact that she would be

13   taking notes?

14   A    Yes.

15   Q    And what did you say -- what was discussed about the

16   purpose of taking notes?

17   A    Just to have notes of the meeting.

18   Q    What was her role in the meeting?  In her meeting with Mr.

19   Ortiz, what was -- since you were asking the questions, what

20   was her role in the meeting?

21   A    A note taker and a witness.

22   Q    And what did you need a witness for?

23   A    To take notes.

24   Q    And Mr. Galescu asked you for a representative; is that

25   right?



www.escribers.net | 800-257-0885

1   A    That's correct.

2   Q    And I believe General Counsel asked you if you were aware

3   that under OSHA you're entitled to a representative.  Are --

4   were you aware of that?

5   A    No.

6   Q    And when he asked for a representative, did Lauren Holcomb

7   say anything?

8   A    She did not.

9   Q    And was there any complaint that prompted this meeting?

10  A    No.

11  Q    So the meeting was generated by Tesla -- by Tesla's

12  management?

13  A    That's correct.

14  Q    And did you have a script of what you were to ask in the

15  course of that meeting?

16  A    No.

17  Q    What did you and -- what was your purpose in having a

18  meeting with Mr. Ortiz?

19  A    To gain a better understanding if he had been involved

20  with the sharing of employee personal medical information.

21  Q    To who?

22  A    That was part of it, to find out to who.

23  Q    So you were asking him if he had shared it with other

24  employees; is that right?  That was within the scope of what

25  you were asking him?



www.escribers.net | 800-257-0885

1    A    Correct.  Not other employees specifically, but to anyone.

2    Q    Which also -- but it could've --

3    A    Which could've included employees.

4    Q    Do you know whether any personal medical information had

5    been shared -- actual personal medical information, as opposed

6    to the OSHA 300 logs, per se whether any personal medical

7    information had been shared?

8    A    I don't know.

9    Q    And had you seen the Cal OSHA 300 logs before entering

10    that room?

11    A    No.

12    Q    And did you -- okay.  And you didn't have a copy of the

13    logs when you met with Mr. Ortiz?

14    A    I did not.

15    Q    Or with Mr. Galescu?

16    A    I did not.

17    Q    And I see with General Counsel Exhibit 53, that Ms. Tanaka

18    was writing to you about some union activity that was happening

19    on May 24th; is that right?

20    A    That's right.

21    Q    And had -- was this a common occurrence that information

22    regarding union activity would be shared with you?

23    A    I was Tori's manager, so in that sense, yes.

24    Q    So had she shared with you information about union

25    activity prior to May 24th?



1          MR. MORRIS:  Objection.  Relevance.

2          MS. FEINBERG:  I'm still trying to --

3          JUDGE TRACY:  Overruled.

4          MS. FEINBERG:  Okay.  Thank you.

5          JUDGE TRACY:  Go ahead.

6          THE WITNESS:  Would you repeat the question?

7     Q    BY MS. FEINBERG:  Sure.  Had she shared -- had Tori Tanaka

8     shared with you information about union activity at the plant

9     prior to May 24th, 2017?

10    A    I don't recall.

11    Q    And who else reported to you, if anyone?

12    A    I'm trying to think.  Rose Sanson was another partner.

13    I'm not sure specifically at this time if she was on my team

14    though.

15    Q    Okay.  And had you ever discussed Richard Ortiz with

16    anyone, other than that one meeting that you had with counsel,

17    I'm not asking about that meeting -- had you ever discussed

18    Richard Ortiz with anyone in management prior to late May of

19    2017?

20    A    I don't recall.

21    Q    And what about had you ever discussed Jonathan Galescu in

22    the same context with anyone in management prior to late May of

23    2017?

24    A    I don't recall.

25    Q    And did Mr. Galescu say he was going to record the



www.escribers.net | 800-257-0885

1   meeting?

2   A    No.  I stated I did not consent to it being recorded.

3   Q    Oh.  And do you -- why did you say that?

4   A    As a general practice.

5   Q    And you have Respondent's 2 still there?

6   A    I do.

7   Q    And do you know who is the author of the first three pages

8   of this document?

9   A    I don't know.

10  Q    Were there any meetings where this document was discussed

11  where you were present?

12  A    I don't recall.

13  Q    But you do recall getting it?

14  A    Correct.

15  Q    And do you know Peter Hochholdinger?  Do you know him?

16  A    I do.

17  Q    And did you ever discuss Respondent's Exhibit 2 with him?

18  A    I did not.

19  Q    And on the bottom of page 2 -- Respondent's 2, it states,

20  we believe this request -- well, somewhere -- I'm sorry --

21  three quarters of the way down the page it says, we believe

22  this request, meaning for the 300 logs, is intended to

23  ultimately make this information public, despite our efforts to

24  protect your privacy.  Do you see that sentence?

25  A    Are you in the OSHA 300 section?  I'm sorry, where are


www.escribers.net | 800-257-0885

1    you?

2    Q    Yes, I am exactly.  It says, we want to provide advance --

3    A    Oh yes.

4    Q    -- notice to employees --

5    A    I see.

6    Q    -- as we believe this request is intended to ultimately

7    make the information public despite our efforts to protect your

8    privacy.

9    A    I see that.

10   Q    And did you ever discuss that sentence with anyone in

11   Tesla?

12   A    Not that I recall.

13   Q    And when you went into that meeting with Mr. Ortiz, did

14   you believe it was his intent to make the information public?

15        MR. MORRIS:  Objection.  Relevance.

16        MS. FEINBERG:  Well, he's the one who requested it.  And

17   they're questioning him about it, so --

18        JUDGE TRACY:  I'm going to sustain the objection.  But

19   more to the -- I just need you to rephrase the question.

20        MS. FEINBERG:  Okay.  I'll try again.

21   Q    BY MS. FEINBERG:  Were you aware who had requested the

22   OSHA 300 logs in May of 2017?

23   A    The two individuals that I spoke with.

24   Q    Okay.  And when you meant to meet with Mr. Ortiz, you

25   meant to meet with him because you had a concern that he had



1    released some information?

2    A    That's correct.

3    Q    And what was the basis for that?

4    A    To find out and get a better understanding of his

5    involvement with it.

6    Q    Right.  But what was the basis for your concern that he

7    had released it?

8        MR. MORRIS:  Objection to the extent it involves attorney

9    client communications.

10       MS. FEINBERG:  Okay.

11       JUDGE TRACY:  So again, you don't need to answer that --

12   what was said to you if there was an attorney counsel for

13   Tesla --

14       THE WITNESS:  Sure.

15       JUDGE TRACY:  -- that was part of that conversation.

16       THE WITNESS:  Okay.  Would you repeat the question?

17   Q    BY MS. FEINBERG:  What was your basis for having a concern

18   that Mr. Ortiz might have released the OSHA 300 logs?

19   A    Just that it had been shared with me that they were

20   potentially released.

21   Q    And were you aware that he could have shared it with a

22   lawful representative?

23   A    I was aware.

24   Q    And did you give any admonitions to Mr. Ortiz during the

25   course of that meeting about what he could or couldn't do?



 1    A    I'm sorry, I don't understand.

 2    Q    Did you give him any instructions about what he could or

 3    couldn't do with the OSHA 300 logs?

 4    A    No.  Do you mind going back?  I may have misunderstood the

 5    question you asked previous to the most recent one.

 6    Q    I'll try.

 7    A    Okay.  Thanks.

 8    Q    Okay.  I believe I was asking you why you had -- when you

 9    went into the meeting, if you had a concern about Mr. Ortiz

10    releasing this information to the public, and where that came

11    from if you had that concern.

12    A    That's correct.

13    Q    Yes.

14    A    I didn't know who he had released it to.  It was just a

15    concern that they had potentially been released.

16    Q    And why answers the email at safety@tesla.com?

17    A    That would be our safety team.

18    Q    Okay.  And do you know whether they received any concerns

19    in response to Respondent Exhibit 2?

20    A    I don't know.

21         MS. FEINBERG:  Okay.  One second.  Okay.  I have nothing

22    further.

23         JUDGE TRACY:  Mr. Morris?

24         MR. MORRIS:  No.

25         JUDGE TRACY:  Okay.  Thank you very much.


www.escribers.net | 800-257-0885

1          THE WITNESS:  Thank you.

2          JUDGE TRACY:  Please don't discuss your testimony with

3     anyone until after the close of the hearing.

4          THE WITNESS:  Okay.  Thank you.

5          JUDGE TRACY:  Thank you.  And you can leave everything up

6     there.  Okay.

7          It is now 5:55.

8          MR. RODRIGUEZ RITCHIE:  Yes.  We have a matter -- I have a

9     matter I'd like to raise.

10          JUDGE TRACY:  Okay.

11          MR. RODRIGUEZ RITCHIE:  So we previously raised this

12     several times, regarding our subpoena.  Particularly with

13     regards to this conversation -- these two conversations that

14     infer that the person has just testified about.  Okay.  This

15     was discussed -- if you recall, in camera you reviewed a script

16     that was sent by in house counsel for Tesla that was

17     purportedly used in this conversation.

18          Well, we requested notes to be produced to us from this

19     conversation.  And as I recall it, you specifically indicated

20     that if notes had been taken during this conversation with

21     these two employees, that they should be produced to us.  And

22     we haven't received any notes that were taken by Ms. Holcomb

23     during this conversation.  And we have testimony from multiple

24     individuals now that notes were taken by Ms. Holcomb.

25          MR. MORRIS:  That's, I think, not my understanding of what

22-60493.2407



1   you directed us to do.  First off, my understanding is the

2   notes were taken in a draft email at the direction of counsel

3   and you reviewed the notes and determined that in fact the

4   notes contained in that email were in fact a privileged

5   communication.  And you reviewed that in camera.

6        JUDGE TRACY:  Okay.  So this is my old agedness, I guess,

7   even though I'm not that old.  I remember look at -- let me

8   look.  Do you remember what day of the hearing it was?  I mean,

9   what I heard -- and we're not on the record right now --

10       **(Whereupon, the hearing in the above-entitled matter was**

11       **recessed at 5:57 p.m. until Friday, October 12, 2018 at 9:00**

12       **a.m.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

escribers
www.escribers.net | 800-257-0885

1        **C E R T I F I C A T I O N**

2        This is to certify that the attached proceedings before the

3        National Labor Relations Board (NLRB), Region 32, Case Numbers

4        32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-

5        200530, 32-CA-208614, 32-CA-210879, 32-CA-220777 Tesla, Inc.,

6        and Michael Sanchez, and Jonathan Galescu, and Richard Ortiz

7        and International Union, United Automobile, Aerospace and

8        Agricultural Workers of America, AFL-CIO at National Labor

9        Relations Board Region 32, 1301 Clay Street, Suite 300N,

10       Oakland, CA 94612-5224, on Thursday, October 11, 2018, 10:31

11       a.m. was held according to the record, and that this is the

12       original, complete, and true and accurate transcript that has

13       been compared to the reporting or recording, accomplished at

14       the hearing, that the exhibit files have been checked for

15       completeness and no exhibits received in evidence or in the

16       rejected exhibit files are missing.

17

18                                    _Deborah Gonzalez_

19

20                                    DEBORAH GONZALEZ

21                                    Official Reporter

22

23

24

25

22-60493.2409



## OFFICIAL REPORT OF PROCEEDINGS

## BEFORE THE

## NATIONAL LABOR RELATIONS BOARD

### REGION 32

In the Matter of:

| | |
|---|---|
| Tesla, Inc., | Case Nos.  32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| Michael Sanchez, an individual, | 32-CA-200530 |
| | 32-CA-208614 |
| and | 32-CA-210879 |
| | 32-CA-220777 |

Jonathan Galescu, an
individual,

and

Richard Ortiz, an individual,

and

International Union, United
Automobile, Aerospace and
Agricultural Implement Workers
of America, AFL-CIO,

                    Charging Party,

        _____

        _____

Place: Oakland, California

Dates: October 12, 2018

Pages: 2386 through 2596

Volume: 13

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



www.escribers.net | 800-257-0885

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 32**

| | |
|---|---|
| In the Matter of: | |
| TESLA, INC., | Case Nos. 32-CA-197020 |
| | 32-CA-197058 |
| and | 32-CA-197091 |
| | 32-CA-197197 |
| INTERNATIONAL UNION, UNITED | 32-CA-200530 |
| AUTOMOBILE, AEROSPACE AND | 32-CA-208614 |
| AGRICULTURAL IMPLEMENT WORKERS | 32-CA-210879 |
| OF AMERICA, AFL-CIO, | 32-CA-220777 |
| and | |
| MICHAEL SANCHEZ, AN INDIVIDUAL, | |
| and | |
| JONATHAN GALESCU, AN INDIVIDUAL, | |
| and | |
| RICHARD ORTIZ, AN INDIVIDUAL. | |

The above-entitled matter came on for hearing, pursuant to notice, before **AMITA BAMAN TRACY**, Administrative Law Judge, at the National Labor Relations Board Region 32, 1301 Clay Street, Suite 300N, Oakland, CA 94612-5224, on **Friday, October 12, 2018, 9:05 a.m.**

1                    **A P P E A R A N C E S**

2    **On behalf of the General Counsel:**

3         **EDRIS W.I. RODRIGUEZ RITCHIE, ESQ.**
          **NOAH J. GARBER, ESQ.**
4         National Labor Relations Board
          1301 Clay Street, Suite 300N
5         Oakland, CA 94612-5224
          Tel. 510-671-3021
6
     **On behalf of the Respondent:**
7
          **MARK S. ROSS, ESQ.**
8         **KEAHN N. MORRIS, ESQ.**
          SHEPPARD MULLIN RICHTER & HAMPTON LLP
9         Four Embarcadero Center
          Seventeenth Floor
10        San Francisco, CA 94111-4109
          Tel. 415-434-9100
11        Fax. 415-434-3947

12   **On behalf of the Charging Parties:**

13        **MARGO A. FEINBERG, ESQ.**
          **DANIEL E. CURRY, ESQ.**
14        **JULIE S. ALARCON, ESQ.**
          SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
15        6300 Wilshire Boulevard, Suite 2000
          Los Angeles, CA 90048
16        Tel. 323-655-4700

17

18

19

20

21

22

23

24

25

22-60493.2412



1

<u>I N D E X</u>

2

3

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------|--------|-------|----------|---------|-----------|
| Timothy M. Fenelon | 2393 | 2410<br>2417 | 2418 | | |
| Felipe De La Cruz | 2421 | 2456<br>2462 | | | 2445 |
| Ranjodh Singh | 2473 | 2480 | | | |
| Topa Ogunniyi | 2521 | 2537<br>2548 | 2563 | | |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-60493.2413

1                              <u>E X H I B I T S</u>

2     <u>EXHIBIT</u>                              <u>IDENTIFIED</u>     <u>IN EVIDENCE</u>

3     **General Counsel:**

4       GC-1(bbbb) through (eeee)            2491          2491

5       GC-1(ffff) through (mmmm)            2491          2491

6       GC-89                               2576          2576

7       GC-91                               2577          2577

8       GC-92-002 through 004               2562          2562

9     **Respondent:**

10      R-3                                 2518          2518

11      R-41                                2503          2503

12      R-44                                2448          2448

13      R-45(a) through (i)                 2483          2486

14      R-46                                2490          2504

15      R-47                            2490 (Rejected)2505

16    **Charging Party:**

17      CP-6                                2498          2498

18      CP-7                                2500          2503

19      CP-8(a)                             2580          2580

20      CP-8(b)                             2583          2583

21      CP-8(c)                             2585          2585

22      CP-8(d)                             2586          2586

23      CP-8(e) and (f)                     2587          2587

24      CP-9                                2510          2513

25      CP-10                               2515          2515

22-60493.2414

1          <u>P R O C E E D I N G S</u>

2          JUDGE TRACY:  Okay.  Before we begin with the witness'

3     testimony, last night, I reviewed the transcript from day 3 to

4     refresh my memory of what I reviewed in terms of the alleged

5     attorney client privilege for the notes from the meetings with

6     Mr. Ortiz and Mr. Galescu.  And then this morning, Respondent

7     has provided me what I reviewed previously on day three, along

8     with an email, a word document that was the notes that Ms.

9     Holcomb took during the meeting.  Is that correct?

10          MR. MORRIS:  That's correct.

11          JUDGE TRACY:  Okay.  And so reviewing the two different --

12     the two documents, and based upon the testimony of Ms. Lipson

13     yesterday, it is my view that the email to the attorney, Ms.

14     Robin Repass, is attorney client privilege.  However, the notes

15     that were created during the meeting are not.  Based upon the

16     testimony, there's no indication that there was a script

17     provided to the -- Ms. Lipson and Ms. Holcomb.  And in fact,

18     Ms. Holcomb didn't ask any questions.  It was only Ms. Lipson

19     and so the notes need to be turned over.

20          So do you have copies of those?

21          MR. MORRIS:  I do, yeah.

22          JUDGE TRACY:  Okay.  And then you can take both of these

23     back.  Okay.  So are we ready for any other matters, such as

24     stips, the Sacramento hearing?

25          MS. FEINBERG:  They have the transcripts.  I don't know if



1   they've had any issues with the transcripts.  We're now just

2   putting it into a stip, so we can send it over, but are there

3   any concerns about the transcript itself?

4       MR. MORRIS:  I have to get back to you.  Mr. Ross is

5   taking the lead on that.

6       MS. FEINBERG:  Okay.

7       MR. MORRIS:  He's not present right now.

8       MS. FEINBERG:  Okay.  So the only thing I'm working on is

9   just to put it all in one --

10      JUDGE TRACY:  Uh-huh.

11      MS. FEINBERG:  -- please.  But we're waiting to hear about

12  the wording.  They were going to just look to see if what we

13  wrote -- if the transcript matched the tape.  We gave them that

14  chance.

15      JUDGE TRACY:  Yeah.  And I'm not going to speak on his

16  behalf, but it sounded like Mr. Ross was alright with it, but

17  let's wait for him --

18      MS. FEINBERG:  Okay.

19      JUDGE TRACY:  -- to come back about that.  The other thing

20  I noted was we needed to redact the one exhibit with all the

21  other phone numbers?

22      MR. GARBER:  I don't know.  I'll say it'll be done

23  shortly.

24      JUDGE TRACY:  All right.  And then the final thing was 41,

25  Respondent's 41.

22-60493.2416



www.escribers.net | 800-257-0885

1      MR. MORRIS:  Which one was that?

2      JUDGE TRACY:  That was the CNN article.  So you can put it

3  in, move it in or you can -- because we were waiting for better

4  copies of it.

5      MR. MORRIS:  Right.

6      JUDGE TRACY:  Or you can take it back.  Whatever.

7      MR. MORRIS:  Okay.

8      JUDGE TRACY:  So I'm just trying to keep track of all the

9  little things here.  The final thing, I think was the things

10  for the formal papers.  So hopefully we can get those in this

11  record by the end of the day.

12      MR. GARBER:  That's being worked on also.

13      JUDGE TRACY:  Okay.  Great.  All right.  So let's go off

14  the record, so then we can start with Fenelon.

15  (Off the record at 9:09 a.m.)

16      JUDGE TRACY:  Okay.  Let's go on the record.  Okay.  If

17  you go ahead and stand up please and raise your right hand.

18  Whereupon,

19                    **TIMOTHY M. FENELON**

20  having been duly sworn, was called as a witness herein and was

21  examined and testified as follows:

22      JUDGE TRACY:  Okay.  Go ahead, have a seat and state your

23  name for the record.

24      THE WITNESS:  Timothy M. Fenelon.

25      JUDGE TRACY:  Okay.  And so let me give you really brief

22-60493.2417



1    instructions.  There's water right in here, if you need it.

2    The other thing is that this microphone is for recording your

3    sound.  You can relax.  You don't need to lean into it.  It'll

4    capture your voice.  However, there's a lot of people in the

5    room.  They're kind of spread out, so please speak loudly, so

6    everyone can hear your testimony, so you don't need to repeat

7    yourself as many times as perhaps we might need.

8         If there is an objection, wait for me to rule on it, to

9    see whether you should answer it or not.  Wait for the question

10   to be finished being asked before you answer, so we can have a

11   proper transcript.  And if you don't understand something,

12   please say I don't understand.  Okay?

13        THE WITNESS:  Okay.

14        JUDGE TRACY:  All right.  Thank you very much.  Mr.

15   Morris.

16        MR. MORRIS:  Thanks.

17                        **DIRECT EXAMINATION**

18   Q    BY MR. MORRIS:  Hi, Tim.

19   A    Hi.

20   Q    Where are you employed?

21   A    Right now I'm employed the TSM Corporation in Auburn

22   Hills, Michigan.

23   Q    Okay.  And at some point, were you employed by Tesla?

24   A    Yes, I was.

25   Q    What dates approximately were you employed by Tesla for?

22-60493.2418



1   A    May 2017, and I put in my resignation at the beginning of

2   September, 2018.

3   Q    Okay.  And are you here today pursuant to a subpoena?

4   A    Yes.

5   Q    When you first started at Tesla, what was your position?

6   A    Production supervisor on Final Line 1.

7   Q    And did that change during the period of time that you

8   worked at Tesla?

9   A    Yes.  I had multiple positions.  One at Final Line 1,

10  Final Line 1 and 2.  Then I want to Final Line 3.  Then I was

11  in TT -- or I mean, MOT and subframe for a period of time.  And

12  then I was in Sparks, Nevada at the Gigafactory for six to

13  eight weeks.  They loaned me up there to help with some

14  productivity issues.  And then when I came back, I was the

15  acting associate manager in Model 3.

16  Q    Okay.  And when did you go to Sparks, approximately?

17  A    I believe February of 2018.

18  Q    Okay.  And then when did you come back to the Fremont

19  facility?

20  A    I want to say May.

21  Q    Of 2018?

22  A    Yes.

23  Q    And so from May of 2017 up to the time that you left for

24  Sparks, all of those positions were in general assembly?

25  A    Yes.



www.escribers.net | 800-257-0885

1    Q    Could you describe your general job duties as a production

2    supervisor in general assembly?

3    A    It was the day to day operations of my area of assignment.

4    And it was essentially everything from SPQRC metrics that

5    involved in running the day-to-day business.  Primarily my job

6    was to take care of any of the needs that the associates had

7    and make sure that, you know, we were following the company

8    policies and procedures and reacting, you know, accordingly, to

9    conditions that change.

10    Q    Okay.  And you mentioned SPQRC format.  What does that

11    mean?

12    A    Safety, People, Quality, Rate and Cost.

13    Q    Okay.  And in terms of safety, how did that relate to your

14    job duties?

15    A    Each day I would have to ensure that the employees were in

16    the proper PPE.  I would have to verify line conditions for any

17    kind of hazards.  I would verify that they were using any and

18    all ergonomic equipment correctly.  You know, any indicators,

19    injuries, that type of thing, I would have to make sure were

20    processed correctly through the nurse or the clinic and

21    followed up upon and then put in permanent corrective actions

22    for any kind of safety issues.

23    Q    Okay.  And then what about people for SPQRC?  How did that

24    relate to your job duties?

25    A    I would make sure that the people were trained and

22-60493.2420



1   assigned to the correct jobs, make sure that people's

2   attendance records were correct.  Make sure that people were in

3   compliance with -- and it kind of links to quality mutilation

4   and team wear.  Make sure that they were following the right

5   standards on that.  Any, you know, included in people, we try

6   to do a recognition once per week, you know, because that's

7   important to the folks for morale.  And make sure that pretty

8   much everything they needed, that I took care of from a people

9   standpoint.

10  Q    Okay.  And what about in terms of rate?  How did that

11  relate to your job duties?

12  A    On rate we would have a certain tack time that we were

13  supposed to meet, like per vehicle and each pitch where an

14  operator worked or even a machine, I would validate that they

15  were all running at the cycle time and if they were not, try to

16  figure out what was wrong and try to solve that for them.  We

17  also would do continuous improvement projects called OPLs,

18  trying to improve the rate or get the rate up to where it

19  should be.  Rate, meaning the cycle time of each pitch.

20  Q    Okay.  And what about for costs?  How did that relate to

21  your job duties?

22  A    Mainly around purchase materials, any kind of overtime

23  authorization, industrial supplies, monitor that to make sure

24  that you know, with somebody that we weren't getting out of

25  control with any kind of costs.  Make sure that I was running



www.escribers.net | 800-257-0885

1    to the prescribed headcount that we were supposed to, that I

2    wasn't working any extra people, or if I was, had a plan to get

3    rid of them.

4    Q    Okay.  And during the time that you were a production

5    supervisor in general assembly, who did you report to?

6    A    I reported, started off reporting to John McGinn, when I

7    first got hired.  John McGinn then left to go to Mile 3 and we

8    didn't have an associate manager for a brief period of time, so

9    I reported directly to Kyle Martin.  Then Tope came onboard as

10   our associate manager and I reported to her.  When I

11   transferred to MOT and subframe, I reported to Rob Lewis as an

12   associate manager and Trey Farmer as the unit leader.

13        When I was in Sparks, I really just didn't have anybody.

14   I just reported to Mario Penera back at Tesla, because I was,

15   you know, loaned.  And then when I returned reported to Al

16   Franko in Model 3.

17   Q    Okay.  And you said you initially were reporting to John

18   McGinn, until you left for Model 3, so he left the SX line and

19   then went to the Model 3 line?

20   A    Yes.

21   Q    Do you recall approximately when he left to go to Model 3?

22   A    I want to say what I recall is about a month after I

23   started, so it would be sometime around the June, 2017

24   timeframe.

25   Q    Okay.  And do you recall approximately how long Kyle



www.escribers.net | 800-257-0885

1    Martin was your manager?

2    A    I want to -- if I recall correctly, about three to four

3    weeks.

4    Q    Okay.  And then what about for Tope?

5    A    Oh.  She was from I would say June -- July, middle of

6    June, beginning of July, 2017 through the time that I went to

7    MOT & subframe.

8    Q    Okay.  Which was approximately when?

9    A    Maybe -- I don't recall exactly, but I would say November,

10   2017, sometime around there.

11   Q    Okay.  And the time period that you were supervisor for

12   general assembly in Fremont --

13   A    Uh-huh.

14   Q    -- approximately how many associates reported to you?

15   A    Somewhere between 30 and when I had Final Line 2 -- Final

16   Line 1 and 2, I'm not sure the exact number, but probably 50.

17   Q    Okay.  And aside from production associates, any other

18   positions report to you?

19   A    Team leads.

20   Q    How many team leads reported to you?

21   A    Between four and six.

22   Q    Okay.  And you mentioned the word teamwear?

23   A    Uh-huh.

24   Q    What was the teamwear, assigned teamwear for production

25   associates when you first started?



www.escribers.net | 800-257-0885

1    A    When I first started, Louise Mendez, the person that I

2    replaced, explained the teamwear policy to me and that was, the

3    way I understood it, black pants.  Mutilation-free black pants

4    issued by Tesla and a black Tesla t-shirt or a black t-shirt

5    with no logo on it.

6    Q    Okay.

7    A    That was on the first day that I worked there.

8    Q    And what was the assigned teamwear for the leads in your

9    area?

10   A    Red Tesla like drive fit polo shirt with a black stripe on

11   it and the same black mutilation-free pants.  Oh, and a black

12   hat.  We had to wear a black hat.

13   Q    Okay.  And you mentioned mutilation-free.  What does

14   mutilation mean?

15   A    Mutilation is damage to a vehicle.  A mutilation could

16   occur on the paint.  A mutilation could occur on the seats.  A

17   mutilation can occur on a dash -- an IP.  Anything on your

18   person that could damage a vehicle.  Badge hanger.  We had to

19   make sure that people didn't have their badge hanging in the

20   front.  Tools in your pockets that could be poking through your

21   pocket.  Buttons, zippers, rivets on blue jeans.  You know,

22   things like that.  Anything that could damage a vehicle.  A

23   mutilation would be considered a -- you know, a damage to a

24   vehicle, any kind of I want to say just scratch, dent, cut.

25   Q    Okay.  And aside from the teamwear, are there other


www.escribers.net | 800-257-0885

1    required mutilation preventions that associates are required to

2    wear?

3    A    Yes.  If you were going to wear -- like I used to wear a

4    ring cover.  If you're going to wear your wedding ring, you had

5    to wear a ring cover.  If you were going to wear a watch, you

6    had to wear a watch cover.  You couldn't have your -- like if

7    you wore a necklace, you couldn't have it on the outside of the

8    shirt.  You couldn't -- there were -- we actually have a

9    mutilation kit available in a vending machine that you could

10    get that included a ring cover and a watch cover.

11    Q    Okay.

12    A    And then on certain tools, like an impact gun, we would

13    coat it with like a plastic on the rough edges, so when it

14    would spin, it wouldn't risk damaging anything.  We rubber

15    coated tools the employees used.  So there were several things

16    that can -- you know, were meant to prevent mutilations.

17    Q    Okay.  And is teamwear mandatory?

18    A    Yes.  In general assembly, it was.

19    Q    Okay.  Did you have any role in ensuring compliance of

20    production associates in teamwear?

21    A    Every single day, I would do the same thing.  After my

22    startup meeting -- we would have a five minute startup meeting,

23    which included, you know, stretching.  And I would take

24    attendance during that time.  I would review the associates to

25    make sure that they had on the right teamwear.  Shortly



www.escribers.net | 800-257-0885

1    thereafter, I would also walk and literally say good morning

2    and shake the hand of every single one of my associates.  And

3    during that time, I was auditing for teamwear and personal

4    protective equipment, meaning gloves and safety glasses and the

5    right shoes.  And I did that every single day.

6    Q    Okay.  And you did that during the startup meeting?

7    A    I would do it both.  I would do it during the startup

8    meeting, because some people would be coming in late and they

9    would still have on like maybe a coat or a sweatshirt.  They

10   would make it right at the start of the shift.  So if I would

11   say something during the startup meeting, like off to the side,

12   if I saw it.  But then also, I would then walk the entire line

13   after.

14   Q    Okay.  And if you saw someone that was not in teamwear,

15   what would you typically do?

16   A    I would let them know that they were not in teamwear

17   compliance.  If teamwear was open, I would let them know that

18   they had to go to teamwear to get the right teamwear.  Or if

19   they had something that they could correct themselves, if they

20   had, say, a t-shirt in their car or a sweatshirt in their car,

21   that they were able to go get that.  And if they didn't want to

22   do either one of those, then the only other option was to have

23   them clock out for the day and go get the right teamwear and

24   come back.

25   Q    Okay.  Can you think of -- during the time that you were



www.escribers.net | 800-257-0885

1   in general assembly in Fremont, can you think of any occasions

2   where you actually had conversations with production associates

3   about not being in teamwear compliance?

4   A    Yeah, I can think of multiple times.

5   Q    Okay.  Could you provide me with some examples?

6   A    Sure.  Some examples that I remember was I had an incident

7   with an associate named -- I think his name's Jesus Rodriguez,

8   was wearing a Fastenal t-shirt.  It was a black t-shirt that

9   said Fastenal on the front.  I informed him that he wasn't in

10  teamwear compliance and that he was going to have to take that

11  off and put on the right teamwear.  He argued that Fastenal had

12  issued the t-shirts at work and I said that you know, I'm

13  sorry.  It's not in teamwear compliance.  I need you to change.

14  And he did.  Another gentleman, Tommy --

15  Q    Before we get on to that, I want to ask you a few more

16  questions about that.

17  A    Uh-huh.

18  Q    The Fastenal shirt, what is Fastenal?

19  A    Fastenal is -- well, at the time, they were onsite.  Now

20  they're across the street.  It's a company that provides our

21  industrial materials.  So if I needed, say, some tools, I would

22  go to Fastenal.  It at that time was out behind the building.

23  I would get approval from my manager.  I would go to Fastenal

24  and I could get tools that the associates needed and bring them

25  back to the line.



 1   Q    Okay.  And do you recall what the shirt said or was the

 2   Fastenal logo on the shirt, the black shirt?

 3   A    It was.  It was a black t-shirt with Fastenal across the

 4   front and I remember it may have had a blue stripe underneath

 5   the Fastenal or a blue or orange stripe.

 6   Q    Okay.  And do you recall when you observed that,

 7   approximately?

 8   A    I don't remember exactly.  It was sometime during the

 9   summer.

10   Q    Of?

11   A    Of 2017.

12   Q    Okay.  Do you recall anyone else, aside from that

13   individual that you just referenced?

14   A    Yeah.  I had another instance with someone named Joseph

15   Moore.  He had on a Straight Out of Final Line t-shirt.  It's a

16   play on the Straight out of Compton.  Somebody had sold them in

17   the plant.  I told him that he was not in teamwear compliance

18   and I needed him to change.  He again lodged the argument that

19   he purchased it at work.  I said, well, you're not in teamwear

20   compliance.  I said I'm going to need you to change.  I believe

21   he took it off and put on a black sweatshirt.  I had another

22   associate, Tommy Nguyen, who had a Fastenal t-shirt on.

23   Q    Okay.  And before we get to Tommy, do you recall what

24   color the shirt was that Joseph Moore had on?

25   A    It was black with a white Straight out of Final Line



1    written just like the Straight out of Compton logo on the

2    front.

3    Q    And do you recall when that was, approximately?

4    A    I want to say that was in the summer as well.  I don't

5    recall exactly.

6    Q    In 2017?

7    A    Yes.

8    Q    And then you started to talk about Tommy?

9    A    Yeah.  Tommy Nguyen was -- actually, he had on a Fastenal

10   t-shirt, the same Fastenal t-shirt as Jesus.  And I informed

11   him of the same thing, that he was not in teamwear compliance.

12   He also wanted to argue that he was given the shirt at work.  I

13   let him know of the teamwear standards and he had to go -- he

14   went and got a teamwear t-shirt, either from his car or

15   upstairs and put it on.

16   Q    Okay.  And was that the same black shirt with the white

17   logo?

18   A    Yes.  It was a black shirt with a white Fastenal logo and

19   some color of stripe, either blue or orange.

20   Q    Okay.  And approximately when was that incident?

21   A    That is -- I don't recall the exact date.  It was most

22   likely summer of 2017.

23   Q    Okay.  Do you recall anyone else?

24   A    Yeah.  I had an incident with an employee named Sean

25   Jones.  He was wearing a non-teamwear shirt and it had a logo



www.escribers.net | 800-257-0885

1    on the front.  I think it said Tesla UAW and on the back said

2    UAW.  I walked up to Sean Jones and let him know that he was

3    not in teamwear compliance.  He wanted to argue with me that

4    the reason I was making him take it off is because it said the

5    UAW on it.  And I informed him.  I said no, you're actually not

6    in teamwear compliance and I needed him to go upstairs to get a

7    t-shirt.  I actually tried giving him $20 of my own money, so

8    he would go buy a t-shirt, because I'm not trying send people

9    home.  I'm not trying to -- I just want people to be in

10   compliance with the rules.

11   Q    And so you offered to purchase a teamwear shirt for him?

12   A    Yes, I did.  The t-shirts are -- I think they were $10.

13   Q    Okay.  And what happened next after that?

14   A    He walked off and went upstairs to teamwear.  I later saw

15   Sean come down the stairs with the black teamwear bags that --

16   you get a bag when you buy a shirt.  And he handed my $20 and

17   he said, "I didn't need your money, but thank you."  And he

18   went back to work with the appropriate t-shirt on.

19   Q    Okay.  Do you recall anything else about that

20   conversation?

21   A    He said that -- let me back up.  When he said that I was

22   making him take it off, because it said the UAW, he said, "I

23   see people wearing these t-shirts all the time."

24        And I said, "Well, those people don't work in general

25   assembly.  These are the general assembly teamwear



www.escribers.net | 800-257-0885

1    expectations."  I said, "Therefore, you know, I need you to go

2    get in the proper teamwear."

3    Q    Okay.

4    A    And that was -- and I offered him the money.  He took the

5    money, went upstairs, got his t-shirt, came down and gave me my

6    money back.

7    Q    Okay.  Do you recall anything else about that

8    conversation?

9    A    That's all I recall.

10    Q    Okay.  Any other individuals that you spoke with about

11    teamwear compliance?

12    A    Yeah.  I think there -- Franklin Ramos.  It was a weekend,

13    because I actually had on a black t-shirt.  And -- with a -- an

14    undershirt underneath it and Frank had on a sweater and he was

15    sweating.  He looked like he was really in distress.  So

16    honestly, I took off my own black t-shirt and gave it to him,

17    so he would be in compliance and be comfortable working on the

18    line.  You know, just -- he didn't have any money and I didn't

19    have any money and teamwear wasn't open, seeing as it was a

20    weekend and so I gave my own shirt to wear, so he would be in

21    compliance.

22    Q    Okay.  And do you recall what the sweater looked like?

23    A    It was -- I want to say it was like a -- it was really

24    thick wool sweater.  It was like kind of a brownish gray.  And

25    I -- he had on like a black tank top underneath, which a tank

22-60493.2431



1    top isn't allowed on multipole levels, you know, safety and

2    teamwear.  So mainly it was a safety issue, that he couldn't

3    work in a tank top or the sweater.  He was overheating.  So

4    I -- yeah, I just took my shirt off and gave it to him.

5    Q    Okay.  And do you recall when that was approximately?

6    A    That had to be late summer, 2017, because it was very hot.

7    Q    Okay.  Any other people you spoke with about teamwear

8    compliance?

9    A    I had, let's say, Juan Garcia, I think his last name is,

10   was wearing -- he came in and he was wearing a black shirt with

11   a white stripe across the front and it was a Nike shirt.  I

12   didn't have any money and I'm pretty sure teamwear wasn't open,

13   so I allowed him to put a piece of black felt tape across that,

14   so it would be a solid black t-shirt.

15   Q    Okay.  Was the tape for mutilation protection?

16   A    Yes, it was.

17   Q    And do you recall approximately when that incident or

18   conversation was?

19   A    Summer, 2017.

20   Q    Okay.  Do you recall any of the other individuals you

21   spoke with about teamwear compliance?

22   A    The only one I can recall is when I was in subframe and

23   MOT, I was alerted by Trey Farmer, our unit leader, that I had

24   an associate wearing a cranberry colored sweatshirt, which you

25   know, alarmed me, because I checked everyone and I didn't



1    understand how that happened.  So it -- what it was was the

2    individual had come in late and wasn't at the startup meeting

3    and he wasn't there when I had audited.  So I went immediately

4    and talked to the individual.  And he had his black t-shirt on

5    underneath and he took the cranberry sweatshirt off and he was

6    in compliance.

7    Q    Okay.  And do you recall when that conversation was

8    approximately?

9    A    That would have been fall, 2017, maybe later in the year.

10   I'm not sure the exact date.

11   Q    Okay.  Any other individuals that you can recall speaking

12   to?

13   A    Not that I can recall.  I mean, I'm sure there was, but --

14   Q    Okay.  Did you ever speak with Jason Henry about teamwear

15   compliance?

16   A    No, I never spoke to Jason Henry about teamwear

17   compliance.

18   Q    Were employees allowed to wear union stickers on their

19   teamwear in general assembly?

20   A    Yes.  The stickers were not part of the general assembly

21   expectations.

22   Q    Okay.  And in 2017, did you ever observe people wearing a

23   union sticker on their teamwear?

24   A    All the time.

25   Q    Did you ever tell anyone that you observed that they



1    couldn't wear the sticker?

2    A    No.

3    Q    Were you ever told by your manager that you personally as

4    a supervisor would be held accountable if production associates

5    weren't in teamwear?

6    A    Yes.

7    Q    And could you describe what you recall?

8    A    Yeah.  I'm fairly certain it would be -- it was a text

9    sent from Tope saying that if people aren't in teamwear

10   compliance or we're not holding the associates accountable for

11   the teamwear expectations, then the supervisor would be held

12   accountable.  And the way it was presented was people coming in

13   the building without teamwear on and I disagreed with that,

14   because I can't control what people had on before I do -- you

15   know, before the startup meeting.  I just didn't care for the

16   way it was presented to me, so I argued about that a little

17   bit.

18   Q    Okay.  And could you explain that a little bit more?  What

19   do you mean by it's not in your control?

20   A    I don't have control over what people show up in.  I do

21   have control over what people work in.  So if someone comes in

22   wearing, you know, a hoodie or something that's not allowed and

23   we haven't started work yet, then I can't do anything about it.

24   But when we start work, when their shift begins and they're

25   getting paid, then the expectations are enforced.



www.escribers.net | 800-257-0885

1    Q   Okay.  And how would you enforce those expectations?

2    A   At the startup meeting, I would audit my employees the

3    best I could and then shortly thereafter, like I said, every

4    single day I worked there, I walked down the line and said good

5    morning and shook the hand of every one of my employees and at

6    that time was auditing for teamwear and PPE.

7    Q   Okay.

8    MR. MORRIS:  Nothing further.

9    JUDGE TRACY:  Mr. Garber?

10    MR. GARBER:  Charging Party has requested an affidavit and

11    I'm presenting -- there's two affidavits.  There's two copies.

12    The first one -- and two copies of the second one.

13    MS. FEINBERG:  Thank you.

14    MR. GARBER:  Sure.  Can we go off the record for a minute?

15    JUDGE TRACY:  Let's go off the record for a minute.

16    (Off the record at 9:40 a.m.)

17    JUDGE TRACY:  Let's go ahead and go back on the record.

18    Okay.  Go ahead, please.

19                   **CROSS-EXAMINATION**

20    Q   BY MR. GARBER:  Hi, Mr. Fenelon.  My name is Noah Garber.

21    I represent the General Counsel, the NLRB in this case.  I'm

22    just going to ask you a few questions, okay?  If at any time

23    you don't understand what I'm asking you, just feel free to say

24    so and I'll try to rephrase it, okay?

25    A   Okay.



1    Q    Good.  Okay.  So you testified quite a bit about teamwear

2    right?

3         JUDGE TRACY:  If you can say yes or no.

4         THE WITNESS:  Oh, yes.

5         MR. GARBER:  I'm showing the witness a document already in

6    evidence.  It's Exhibit 41.

7    Q    BY MR. GARBER:  Do you recognize that?

8    A    Yes, I've seen these around.

9    Q    It's a shirt that's teamwear compliant at Tesla?

10   A    Yes.

11   Q    Okay.  I'm going to show you a couple other shirts now,

12   the first of which I'm going to represent to you was provided

13   to Counsel for the General Counsel as part of a subpoena to

14   Tesla.  For the record, I'm holding up a sweatshirt, size 5XL.

15   It's black.  It's got the Tesla T logo on the front.  It says

16   red Tesla on the back.  Do you remember this?

17   A    Yes.

18   Q    That's teamwear compliant, right?

19   A    Yes.

20   Q    Okay.  I'll show you another shirt.  Again, I'll represent

21   to you that this was provided as part of subpoena to General

22   Counsel.  For the record, this is a cotton shirt.  It's a size

23   5X.  Cotton t-shirt.  It says Tesla on the front.  Gray stripe.

24   Got a Tesla logo on the back, the T.  Do you recognize that?

25   A    Yes.



www.escribers.net | 800-257-0885

1    Q    And that's teamwear compliant, right?

2    A    Yes.

3    Q    Common to all these shirts, they're black.  Is that right?

4    A    Yes.

5    Q    They say Tesla?

6    A    Yes.

7    Q    They're cotton?

8    A    Yes.

9    Q    Okay.

10   A    And they're all issued by the company.

11   Q    Okay.  A plain black shirt with no logos on it is teamwear

12   compliant.  Is that right?

13   A    Yes.

14   Q    And plain cotton t-shirt, a black t-shirt with no buttons

15   or objects on it would be considered mutilation-free.  Is that

16   correct?

17   A    Yes.

18   Q    Forgive me for a moment.  Mr. Morris covered a lot of what

19   I was going to talk about.  Employees who worked in general

20   assembly, if they're not teamwear compliant, they could get a

21   coaching.  Is that right?

22   A    They would get coaching, but they would also have to

23   change --

24   Q    Right.

25   A    -- what they're wearing.  Part of that coaching would be



www.escribers.net | 800-257-0885

1    correcting the noncompliance.

2    Q    Okay.  Do -- did you -- when you were working in general

3    assembly, did you ever see tours go through the general

4    assembly with individuals who were not employed by Tesla?

5    A    Multiple day -- multiple times per day.

6    Q    Did they go through other parts of the plant, too,

7    besides, general assembly?

8    A    I don't know, because I only worked in general assembly.

9    Q    Okay.

10   A    I never saw one in Model 3.

11   Q    You never -- I'm sorry.  I didn't hear you.

12   A    When I worked in Model 3, I never saw one in Model 3.

13   Q    Okay.  When you saw the tours go through general assembly,

14   could you see them exiting the building afterwards?

15   A    No.

16   Q    You just don't know where they went afterwards?

17   A    No.  They would come down one side of the line, come down

18   through the middle and I would see them on the other side --

19   Q    Okay.

20   A    -- of -- training through turn two.

21   Q    Okay.  To your knowledge, teamwear doesn't apply to the

22   other parts of the facility outside of general assembly?

23   A    I -- it was the general assembly expectation, but I don't

24   know what they were doing in the other areas.

25   Q    Okay.



www.escribers.net | 800-257-0885

1    A    They may have had their own expectations.

2    Q    You testified about a conversation you had with Sean

3    Jones.

4    A    Yeah.

5    Q    You remember that?

6    A    Yep.

7    Q    That was around the summer of 2017.  Is that right?

8    A    As I recall.

9    Q    And that was about him not being teamwear compliant, as

10    you mentioned, correct?

11    A    Right.

12    Q    Okay.  And the shirt he was wearing that day was the t-

13    shirt with the union logo on it?

14    A    Yes.

15    Q    And you told us, he'd had to change his shirt that day to

16    be teamwear compliant, correct?

17    A    Uh-huh.

18         JUDGE TRACY:  Can you say yes or no for the record,

19    please?

20         THE WITNESS:  Yes.

21    Q    BY MR. GARBER:  Now, when you told us about that

22    conversation, I believe in response to when Mr. Jones said that

23    he'd seen people wearing that union shirt all the time, you

24    were not in general assembly.  Is that right?

25    A    I said those employees don't work in general assembly.


www.escribers.net | 800-257-0885

1  Q    Yeah.  I'm sorry.  Those employees did not work in general

2  assembly.  Do you recall giving an affidavit as part of the

3  investigation into this case?

4  A    Yes, I do.

5  Q    And in that affidavit, you read it, raised your right

6  hand, swore to tell the truth, signed it?

7  A    Correct.

8  Q    Okay.

9       MR. GARBER:  I'm now going to show the witness a copy of

10  his affidavit dated January 29th, 2018.

11  Q    BY MR. GARBER:  I'm going to direct your attention to page

12  7.  I already have it for you here.

13       MR. GARBER:  Mr. Morris, page 7.

14  Q    BY MR. GARBER:  Could you read from line 11 on page 7 to

15  line 4 on page 8.  And let me know when you're finished.  Thank

16  you.

17  A    Okay.

18  Q    And on that portion of the affidavit that you just read,

19  that doesn't reference what you just told us, that the other

20  employees that Sean Jones was referring to outside of general

21  assembly, correct?

22  A    No, it doesn't.

23  Q    Okay.  You can put that down for me.  Thank you.  Just a

24  few background questions for you.  You -- I know you worked in

25  general assembly.  About how many employees worked in general



www.escribers.net | 800-257-0885

1    assembly when you were there, roughly?

2    A    I have no idea.  I'd say it's got to be over 300.

3    Q    And I think you mentioned this, but if you could just

4    refresh my memory.  About how many did you supervise?

5    A    Between 30 and 50 at a time.

6    Q    And when you conducted the -- you had a term for it.  Your

7    morning meetings.  I'm sorry.

8    A    Startup meeting?

9    Q    Startup meeting.  Thank you.  When you conducted your

10   startup meeting, that was just to the folks who were under you,

11   correct?

12   A    Correct.

13   Q    Okay.  Did you ever speak to employees who were not

14   teamwear compliant, where you didn't know the names of those

15   employees?

16   A    Not that I can recall.

17   Q    So you just stuck to whoever was on your team,

18   essentially?

19   A    In the event that I did see someone in another line, I

20   would talk to their supervisor.  I wouldn't talk to the

21   employees --

22   Q    Okay.

23   A    -- directly.

24   Q    Okay.  Just one moment please.  To your knowledge, has a

25   cotton t-shirt alone ever caused damage to any part of a Tesla



www.escribers.net | 800-257-0885

1    car in general assembly?

2    A    Not to my knowledge.  I've never looked into it, though.

3    Q    When you spoke to employees about being teamwear

4    compliant, did you keep notes of those conversations?

5    A    No.

6         MR. GARBER:  No further questions, Your Honor.

7         JUDGE TRACY:  Okay.  Ms. Feinberg?

8         MS. FEINBERG:  I just need a minute.

9         MR. GARBER:  I can take the affidavit back, unless you're

10   going to use it.

11        MS. FEINBERG:  I don't think I'm going to use it.

12        JUDGE TRACY:  Okay.  Let's go off the record.

13   (Off the record at 9:56 a.m.)

14        JUDGE TRACY:  Okay.  Go ahead.

15                    **CROSS-EXAMINATION**

16   Q    BY MS. FEINBERG:  Hi.  I'm Margo Feinberg.  I'm counsel

17   for the Charging Party.  I just have a question or two.  So you

18   indicated that the day you spoke to Jason Henry, he was already

19   on the line when you spoke to him about his shirt?

20   A    I did not speak to Jason Henry about his shirt.

21   Q    Oh, you didn't speak to him at all?

22   A    No.

23   Q    And you never saw him with a shirt -- with a t-shirt on?

24   A    I saw Jason Henry with stickers on his shirt.  That was

25   all I've ever seen --



www.escribers.net | 800-257-0885

1    Q    Okay.

2    A    -- Jason Henry with.

3    Q    And did anyone ever talk to you about Jason Henry wearing

4    teamwear?

5    A    No.

6    Q    Okay.

7         MS. FEINBERG:  I have no further questions.

8         JUDGE TRACY:  Mr. Morris?

9         MR. MORRIS:  Yeah.  Just a couple clarifying questions.

10                    **REDIRECT EXAMINATION**

11    Q    BY MR. MORRIS:  Counsel asked you about tours that go

12    through general assembly?

13    A    Uh-huh.

14         JUDGE TRACY:  Say yes or no.

15         THE WITNESS:  Yes.

16    Q    BY MR. MORRIS:  The people that are on the tours, are they

17    on a tram?

18    A    Yes.

19    Q    Do you know if they're allowed to leave the tram?

20    A    They are not.

21    Q    And the tram, is that on a pathway?

22    A    Yes.

23    Q    Is it separate from where the actual production associates

24    are?

25    A    It comes down -- it used to come down the aisle behind the



1    final line and it would turn around somewhere and come back.

2    There was definitely a tour route.

3    Q    And --

4    A    You could see the associates working from the tour --

5    Q    Okay.

6    A    -- but it would not interfere with the associates.

7    Q    And are there any lines that separate the path from some

8    of the areas in general assembly?

9    A    Oh, of course.  There's line markings around all of the

10   assembly processes.  And inside of the -- I want to say they're

11   white.  Inside of the white line is the associate's work area.

12   And then there's an aisle that's open that is where the tours,

13   material handling in general -- general people walk, because we

14   discourage people from walking along the process, because it

15   interferes with the associates.

16   Q    Okay.  That' all.

17        JUDGE TRACY:  Mr. Garber?

18        MR. GARBER:  No questions.  Thank you.

19        JUDGE TRACY:  Ms. Feinberg?

20        MS. FEINBERG:  No.

21        MR. GARBER:  I will note that Ms. Feinberg and Mr. Morris

22   returned the affidavits.

23        JUDGE TRACY:  Okay.  All right.  Well, Thank you very

24   much.

25        THE WITNESS:  Thank you.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Please don't discuss your testimony with

2  anyone until after the close of the hearing.

3      THE WITNESS:  Okay.

4      JUDGE TRACY:  Okay.  Thank you.

5      THE WITNESS:  Thank you.  Let's go off the record.

6  (Off the record at 10:00 a.m.)

7      JUDGE TRACY:  Let's go ahead and go on the record.  Okay.

8  Go ahead and stand, please.  And raise your right hand.

9  Whereupon,

10                    **FELIPE DE LA CRUZ**

11  having been duly sworn, was called as a witness herein and was

12  examined and testified as follows:

13      JUDGE TRACY:  Okay.  Have a seat.  State your name for the

14  record.

15      THE WITNESS:  Felipe.

16      JUDGE TRACY:  And your last name?

17      THE WITNESS:  De La Cruz.

18      JUDGE TRACY:  Okay.  So let me give you a few instructions

19  here.  The microphone here is to record your voice.  You don't

20  need to lean into it.  It'll capture your sound, so relax about

21  that.

22      THE WITNESS:  Okay.

23      JUDGE TRACY:  However, you will need to speak loud enough

24  so everybody in the room can hear you.  Also so that way we're

25  not having to ask you to repeat your testimony.  There's water



1  right here.  The other thing is when the questions are being

2  asked, wait for the question to finish being asked before you

3  answer, because we're creating a transcript of this hearing

4  afterwards, so it doesn't get cut off.

5      If there's a question that you don't understand, let the

6  attorneys know that you don't understand.  And you need to give

7  verbal response, so yes and no, instead of nodding your head or

8  uh-huh, okay?

9      THE WITNESS:  Yes.

10     JUDGE TRACY:  Okay.  All right.  Thank you.  Go ahead.

11     MR. ROSS:  Thank you, Judge.

12                    **DIRECT EXAMINATION**

13  Q   BY MR. ROSS:  Good morning, Mr. De La Cruz.  You work for

14  Tesla?

15  A   Yes.

16  Q   As what?

17  A   As a security operations center.

18  Q   Operator?

19  A   Yeah, I'm an operator.

20  Q   All right.  And how long have you -- and that's at the

21  Fremont facility?

22  A   Yes.

23  Q   And how long have you worked for -- worked at the Fremont

24  facility?

25  A   For four years now.



www.escribers.net | 800-257-0885

1    Q    And are you actually an employee of Tesla at the present

2    time or are you an employee of Tesla at the present time or are

3    you an employee of a contractor?

4    A    I'm -- I started four years ago as a contractor.  I've

5    been working in-house at Tesla for two years.

6    Q    All right.  Okay.  Now, you said that you're a security

7    operations operator.  Is that your title?

8    A    Yeah, I'm an operator for GSOP.

9    Q    Okay.  Is that the same thing as control room?

10   A    Yes.

11   Q    Okay.  And tell us what is done in the control room.

12   A    We're pretty much a conduit of information.  We dispatch

13   for emergencies.  We answer emails.  We assist with badging.

14   Q    Okay.  What do you typically do as a security operations

15   or control room operator?

16   A    What I just mentioned.

17   Q    Okay.  Now back in May of 2017, who was your immediate

18   supervisor?

19   A    Jeremie Hansen.

20   Q    And at that time, what was Mr. Hansen's position?

21   A    He was the associate manager of security.

22   Q    Okay.  All right.  I'm going to show you a document

23   marked --

24        MS. FEINBERG:  23(a).

25   Q    BY MR. ROSS:  -- 23(a).  You have in front of you a



1   document, which is in evidence as Respondent's Exhibit 23(a)

2   and (b).  Tell me, have you ever seen that document before?

3   A   Yes.

4   Q   And what do you understand that document to be?

5   A   Generated incident report.

6   Q   Okay.  Tell me, what role, if any, did you play in the

7   generation of that document?

8   A   I created it.

9   Q   You created it.  All right.  And could you tell us what

10   caused you to create this document?

11   A   Yeah.  We got a report of information happening in the

12   general areas between north admin and door 3 and so we sent a

13   vehicle patrol to investigate.

14   Q   Okay.  Tell me, from whom did you receive work of that

15   activity?

16   A   Fred Harkness.

17   Q   And Mr. Harkness was who at this time?

18   A   He's a security guard.  He was a security guard.

19   Q   Okay.  Working for Tesla or on the payroll of Securitas?

20   A   Securitas.

21   Q   All right.  And can you tell what time you received this

22   call from Mr. Harkness?

23   A   Approximately 5:19 in the morning.

24   Q   And can you tell what time you created or began the input

25   of this document?

22-60493.2448



1    A    At 5:21.

2    Q    All right.  Now, after you received this word from Mr.

3    Harkness, what'd you do?

4    A    I dispatched vehicle patrols to the scene to investigate.

5    Q    Okay.  And do you recall who it was that you dispatched to

6    investigate this situation?

7    A    Unit 123, Singh.

8    Q    All right.  Can you try to pronounce Mr. Singh's first

9    name, please?

10    A    Ranjodh.

11    Q    Ranjodh.  Okay.  We'll call him Mr. Singh.

12    A    Yes.

13    Q    Okay.  And you dispatched Unit 123 to the scene using

14    what?  How did you do that?

15    A    Our radios, walkie-talkies.

16    Q    Okay.  Is this a walkie-talkie that was specific to

17    security or was it a walkie-talkie that was available to people

18    outside security?

19    A    No.  It was specific to security.

20    Q    Okay.

21    A    We had it over a security private channel.

22    Q    All right.  Okay.  And after -- tell us what happened

23    after you dispatched Mr. Singh.

24    A    We got a call from Mr. Singh letting us know that he was

25    on scene.



1    Q    Okay.  And then what happened?

2    A    I had advised him to gather up his in -- as much

3    information as possible and to give us a phone call back once

4    he received the information.

5    Q    Okay.  And did he call you back?

6    A    Yes, he did.

7    Q    Okay.  And when he called you back, tell us what Mr. Singh

8    told you.

9        MS. FEINBERG:  Objection.  Hearsay.

10       MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

11       MS. FEINBERG:  Oh.  We're getting good at this.

12       JUDGE TRACY:  Sustained.

13       THE WITNESS:  Sorry.  Can you repeat the question?

14   Q    BY MR. ROSS:  Yeah.  Well, there's been an objection,

15   so --

16       MR. ROSS:  Your Honor, this testimony that I'm trying to

17   elicit from the witness is basically testimony that pertains to

18   entries made on this document, explains the entries that were

19   made on the document.  And while I suppose it is technically

20   hearsay, I think it is permissible testimony for the purpose of

21   explaining why he made the entries on the document, so I'm

22   offering it for that purpose.

23       I'm not necessarily offering it for the purpose of

24   establishing the truth of the statements Mr. Singh made as much

25   as I'm offering it for the purpose of background and explaining

22-60493.2450



1     the entries that appear on this document.

2          JUDGE TRACY:  I still sustain the objection.  I mean,

3     there's a way to have him explain the entries --

4          MR. ROSS:  All right.

5          JUDGE TRACY:  -- versus --

6          MR. ROSS:  That's fair.

7          JUDGE TRACY:  -- the hearsay testimony.

8          MR. ROSS:  That's fine.

9     Q    BY MR. ROSS:  Tell me, take a look at Respondent's Exhibit

10    23, please.  And there is a place or a box entitled, incident

11    comments.  Do you see that?

12    A    Yes.

13    Q    That's on 23(a) and it also appears on 23(b), which is a

14    different iteration or version of 23(a).  Did you make those

15    entries?

16    A    Yes, I did.

17    Q    Okay.  And can you tell us how you came to make those

18    entries?

19    A    I'm sorry.  I don't understand the question.

20         MR. RODRIGUEZ RITCHIE:  Objection.  Vague as to those

21    entries.

22    Q    BY MR. ROSS:  How you came to --

23         JUDGE TRACY:  So I'm going to sustain the objection.  How

24    about, you know, you just -- instead of a lot of testimony,

25    where they can object when they need to, if needed, just sort


www.escribers.net | 800-257-0885

1    of break down --

2        MR. ROSS:  Fine.

3        JUDGE TRACY:  -- your questioning.

4        MR. ROSS:  That's fair enough.

5    Q    BY MR. ROSS:  Tell me.  There's an entry, Michael Catura

6    (35176).  You see that?

7    A    Yes.

8    Q    Okay.  Why'd you make that entry on this document?

9    A    That is one of the reported persons who was out handing

10   fliers.

11   Q    I see.  And who reported this to you?

12   A    Mr. Singh.

13   Q    Mr. Singh.  And there is an entry for Branton Phillips

14   (17480).  Why'd you make that entry?

15   A    He's also one of the associates that were on scene.

16   Q    And that was reported to you how?

17   A    Through Mr. Singh.

18   Q    By the way, are you certain it was Mr. Singh who you

19   dispatched that morning?

20   A    Yes.

21   Q    Hundred percent sure?

22   A    A hundred percent sure.

23   Q    Okay.  There's an entry, Jose Moran (34810).  Tell us how

24   you came to make that entry and why you made that.

25   A    That was also one of the persons that was mentioned by Mr.

22-60493.2452



1    Singh.

2    Q    Okay.  Now, if you drop down further, you'll see an entry,

3    nonemployees also passing out flyers.  Do you see that?

4    A    Yes.

5    Q    Okay.  Tell us how and why you came to make that entry.

6         MR. RODRIGUEZ RITCHIE:  Objection.  Compound.

7         JUDGE TRACY:  Sustained.

8    Q    BY MR. ROSS:  Why did you make that entry?

9    A    It was information that we just inputted at the time to --

10   as a reminder that there was also non-associates that were out

11   there passing out flyers.

12   Q    Okay.  And how did you come to know that?  If you recall.

13   A    I'm sorry.  I don't recall.

14   Q    Okay.  Let me ask you this.  Do you recall Mr. Singh

15   telling you that there was an individual with the other

16   three --

17        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

18        JUDGE TRACY:  Sustained.

19        MR. ROSS:  I haven't finished my question.

20        MS. FEINBERG:  Well, we know where you're going.

21        MR. ROSS:  May I state my question, please, for the

22   record?

23        MS. FEINBERG:  The whole point of leading --

24        MR. RODRIGUEZ RITCHIE:  Then we'd object that it's

25   coaching.



1       MS. FEINBERG:  -- is that you're coaching the witness.

2       JUDGE TRACY:  This is the problem I've been having with

3   this is -- it's the leading and then the next question when

4   you're asked to correct the question has already sort of

5   given --

6       MR. ROSS:  Okay.

7       JUDGE TRACY:  -- them the answer.

8       MR. ROSS:  I'll try to address it in a different way.

9   Q    BY MR. ROSS:  Did you give any direction to Mr. Singh when

10  he called?

11  A    Just to get information.

12  Q    Okay.  That was when he was on the scene.  Get the

13  information?

14  A    Yes.

15  Q    Okay.  Then he called back again?

16  A    Yes.

17  Q    And did you give him any direction during that second

18  conversation?

19  A    Not that I can recall.

20  Q    Okay.

21      MR. ROSS:  Again, this is for the purpose of refreshing

22  recollection, Your Honor.

23  Q    BY MR. ROSS:  Do you recall giving him any direction as to

24  how to deal with nonemployees?

25      MR. RODRIGUEZ RITCHIE:  Objection.  Leading.


eScribers
www.escribers.net | 800-257-0885

1        MS. FEINBERG:  Same objection.

2        JUDGE TRACY:  You know, I'm going to overrule it.  Again,

3    it goes to the weight of the evidence here in terms of the

4    credibility of this witness along with just all of that, so

5    just go ahead.

6        THE WITNESS:  Can you repeat the question, please?

7    Q    BY MR. ROSS:  Yes.  Did you give him in this subsequent

8    conversation you had with Mr. Singh, where he gave you the

9    names and numbers of these individuals, did you give him any

10   directions as to how to deal with nonemployees?

11   A    We had asked him to -- he -- I told him to ask them to

12   leave.

13   Q    I'm sorry?

14   A    We asked them to leave.

15   Q    You told who to ask him to leave?

16   A    Mr. Singh.

17   Q    Excuse me?

18   A    We asked Mr. Singh to ask them to leave.

19   Q    When you say you told Mr. Singh to ask him to leave --

20   A    That's --

21   Q    -- who's the him you're referring to?

22        MR. RODRIGUEZ RITCHIE:  Objection.  Misstates testimony.

23        JUDGE TRACY:  Yeah.  So --

24        MS. FEINBERG:  We --

25        JUDGE TRACY:  Go ahead and provide your answer again.



www.escribers.net | 800-257-0885

1       THE WITNESS:  I'm sorry.  Can you ask one more time?

2       MR. ROSS:  Sure.

3   Q   BY MR. ROSS:  My question to you was in this conversation

4   you had with Mr. Singh, did you give him any directions as to

5   how to deal with nonemployees?

6       MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

7       MS. FEINBERG:  Same objection.

8       JUDGE TRACY:  Again, I'm going to overrule it, based on

9   what I said before.  Go ahead, please.

10      THE WITNESS:  We just asked them to leave the property.

11  Q   BY MR. ROSS:  Okay.  Okay.

12  A   Them being any associates that didn't have information for

13  us.

14  Q   Did Mr. Singh tell you that there was somebody who was not

15  sharing their names or producing their badges?

16  A   Yes.

17      MR. RODRIGUEZ RITCHIE:  Objection.  Leading and hearsay.

18      JUDGE TRACY:  Sustained.

19  Q   BY MR. ROSS:  Did you have a subsequent conversation with

20  Mr. Singh?

21  A   Can you rephrase the question?

22  Q   Yeah.  You spoke to Mr. Singh when he got on the scene.

23  You spoke to Mr. Singh a second time.  Was there a third

24  conversation you had with Mr. Singh?

25  A   Yes.



1    Q    Okay.  Strike that.  By the way, going back to the second

2    conversation.  Did Mr. -- I think you said that the names

3    Catura, Phillips and Moran came from Mr. Singh.

4    A    Uh-huh.

5    Q    What'd you do with that information?

6    A    Documented it.

7    Q    Okay.  Did you -- when you say document, what did you do

8    with the information?

9    A    I input it in RIMS, so it would come up as a report.

10   Q    Okay.  And did you do anything to verify their status as

11   employees?

12   A    Yes.

13   Q    Tell us what you did.

14   A    We ran their badge numbers through Lenel.

15   Q    Okay.  And what's Lenel?

16   A    Lenel is our badge system.

17   Q    Okay.  Why did you do that?

18   A    Lenel --

19        MS. FEINBERG:  Object to foundation.  He keeps using the

20   word we, which makes me thing that there's some foundation

21   missing about who's actually involved in these conversations.

22        MR. ROSS:  Fair enough.

23        MS. FEINBERG:  Unless it's just a way that people talk,

24   but he's repeatedly said we did this, we did that.

25        MR. ROSS:  That's fine.


www.escribers.net | 800-257-0885

1    Q    BY MR. ROSS:  Did you personally run it through Lenel?

2    A    Yes.

3    Q    Okay.  And were the individuals verified by the Lenel

4    system as employees?

5    A    Yes.

6    Q    Okay.  So we have the first conversation with Singh, where

7    he's on the scene, second where he calls in three names.  Did

8    he report how many people were out there when he called in with

9    three names?

10   A    Yes.

11   Q    How many?

12   A    Four.

13   Q    Did he identify that fourth person?

14   A    No, he did not.

15   Q    Do you know why he didn't?

16        MS. FEINBERG:  Objection.  Conjecture.

17        JUDGE TRACY:  Sustained.

18        MR. ROSS:  I'm asking if it he knows.

19        MS. FEINBERG:  That's not what you actually asked him.

20        JUDGE TRACY:  Sustained.

21   Q    BY MR. ROSS:  All right.  So after the second conversation

22   with Mr. Singh when he was outside, did he call back a third

23   time?

24   A    Yes, he did.

25   Q    Okay.  Tell us about that conversation.



1    A    He called us back to let us know that there was a person

2    who was refusing to give up any kind of information.

3        MR. RODRIGUEZ RITCHIE:  Hearsay.

4        MR. ROSS:  Excuse me?

5        MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

6        JUDGE TRACY:  Sustained.

7    Q    BY MR. ROSS:  Did you give Mr. Singh any instructions or

8    did he ask for any instructions -- strike that.  Did Mr. Singh

9    ask you for instructions during that third conversation?

10       MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay and leading.

11       JUDGE TRACY:  Well, I'm going to sustain it for the

12   leading part.

13       MR. ROSS:  Your Honor, I have to tell you I'm simply

14   trying recount the conversation.  I'm being precluded from

15   asking for the conversation and then I've got to be doing it

16   piecemeal.  I'm sorry.  I've been practicing in this area for

17   over 45 years and frankly, I've never had my ability to

18   interrogate a witness and to examine as to the events that

19   occurred in this case, what explains the entries on a document.

20       JUDGE TRACY:  So again, I think we've had this

21   conversation before.

22       MR. ROSS:  Yep.

23       JUDGE TRACY:  The biggest problem with the questioning

24   here is that it is completely leading, most of it.  And there

25   is this hearsay conversation.  Certainly you could have called

1  the other person, but you chose not to.  That's fine.

2     MR. ROSS:  Well --

3     JUDGE TRACY:  But the point of it is, if this witness is

4  testifying that he made the entries, you can just simply ask

5  him why he made the entries.  You made this entry.  Why did you

6  put that?  There are so many ways and you've been doing this

7  long --

8     MR. ROSS:  All right.

9     JUDGE TRACY:  -- enough to know --

10     MR. ROSS:  Okay.

11     JUDGE TRACY:  -- that they are leading questions, so I

12  have a hard time believing that this is the first time anyone

13  has ever said these are leading.  I just can't believe it.

14     MR. ROSS:  Well, Judge, okay, I really don't want to

15  belabor the point.

16  Q   BY MR. ROSS:  Tell me, the notation, "Non-employees also

17  passing out flyers," was that in any way related to the

18  conversations you had with Mr. Singh?

19     MR. RODRIGUEZ RITCHIE:  Objection.  Leading.  Lacks

20  foundation.

21     JUDGE TRACY:  So to move this along, I'm just going to

22  overrule it.  Again, you are more than welcome to address the

23  credibility of all of this in your briefs, but if you want to

24  finish today, let's just get it going.  I've already made my

25  point.  It really affects anybody's memory, when they're not

escribers

www.escribers.net | 800-257-0885

1    testifying from their own memory.

2        MS. FEINBERG:  At this point I don't even know what the

3    relevancy is, Your Honor.

4        MR. ROSS:  Well, I'm trying to elicit his own memory, Your

5    Honor, but I'm being deprived the opportunity of --

6        MS. FEINBERG:  Because you --

7        MR. ROSS:  -- eliciting that.  That's the problem.  That's

8    exactly the problem.

9        MS. FEINBERG:  Because he wasn't a percipient witness.

10   Maybe that -- that maybe is your problem.

11       JUDGE TRACY:  So go ahead.  You're going to have to repeat

12   the question.

13       MR. ROSS:  Sure.

14   Q    BY MR. ROSS:  Did what Mr. Singh told you over the

15   telephone in any way relate to the entry, "Nonemployees also

16   passing out flyers?"

17   A    Yes.

18   Q    During your conversation with Mr. Singh, did Mr. Singh ask

19   for directions as to how to deal with nonemployees passing out

20   flyers?

21       MR. RODRIGUEZ RITCHIE:  Leading and hearsay.

22       JUDGE TRACY:  Yes.  Overruled.

23       THE WITNESS:  Yes.

24   Q    BY MR. ROSS:  And tell us what instructions or directions

25   you gave him.



www.escribers.net | 800-257-0885

1    A    I asked him to stand by while I got instructions from my

2    boss.

3    Q    All right.  So after this third conversation you had with

4    Mr. Singh, what did you do?

5    A    I gave my boss, Greg Slettvet, a phone call.

6    Q    Okay.  And tell us, did Mr. -- did you ask Mr. Slettvet

7    for instructions?

8    A    Yes, I did.

9    Q    Did he give you instructions?

10    A    Yes, he did.

11    Q    Tell us what you asked him and what he told you.

12        MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

13        MS. FEINBERG:  Same objection.

14        JUDGE TRACY:  Overruled.  I think we've already

15    established that his individual was a manager or supervisor.  I

16    thought we had --

17        MR. ROSS:  The evidence is --

18        JUDGE TRACY:  -- at some point.

19        MR. ROSS:  -- he is Mr. Hansen's superior.

20        JUDGE TRACY:  So I'll just allow it.  Again, when we get

21    to the brief, if you've seen every ALJ decision, they've got

22    footnotes about this is hearsay.  I'm not crediting it.  I'm

23    not saying that at this point, but what my point is is that you

24    can make your record.  I already know what I need to do in

25    terms of some of this testimony, which is hearsay, admittedly



1    so, you know?  Hey.  Just let's just get the record done,

2    please.

3    Q    BY MR. ROSS:  Do you remember the question?

4    A    Yes.  Can you repeat the question, please?

5    Q    Yeah, sure.  Tell us what you asked Mr. Slettvet and what

6    Mr. Slettvet told you.

7    A    I had asked Greg that we had some associates that were

8    refusing to give us some information and what we should do with

9    them.  And he had advised us to just let them hand out the

10   flyers and he would advise me what we should do with them.

11   Q    Okay.  And after you spoke with Mr. Slettvet did you again

12   speak with Mr. Singh?

13   A    Yes.

14   Q    Tell us about that conversation.

15   A    Singh had gave us a phone call back and let us know that

16   the associate had willingly left the property.

17   Q    All right.  When you say the associate, are you talking

18   about an employee who had left or are you talking about a

19   nonemployee?

20        MS. FEINBERG:  Objection, he doesn't --

21        MR. RODRIGUEZ RITCHIE:  Leading.

22        MS. FEINBERG:  Objection.  Now we're asking him based

23   on --

24        JUDGE TRACY:  Sustained.

25        MS. FEINBERG:  Okay.  I don't even know what to say.



www.escribers.net | 800-257-0885

1    Thank you.

2    Q    BY MR. ROSS:  What did Mr. Singh tell you?

3         MS. FEINBERG:  Objection.  Hearsay.  I think we've gotten

4    whatever you're going to get out of this.

5         JUDGE TRACY:  And -- overruled, but again, the weight of

6    the evidence will be decided in the decision.

7    Q    BY MR. ROSS:  Mr. De La Cruz, what did Mr. Singh tell you?

8    A    That the fourth person had left site (sic).

9    Q    All right.  Now, this, Respondent Exhibit 23 pertains to

10   an event that occurred on May 24, 2017.  Prior to that date,

11   had you been instructed on how to address on-premises union

12   leafletting?

13        MR. RODRIGUEZ RITCHIE:  Objection.  Relevancy.

14        JUDGE TRACY:  Sustained.

15   Q    BY MR. ROSS:  Do you know if guards had been instructed on

16   how to deal with on-premises union leafletting?

17        MR. RODRIGUEZ RITCHIE:  Same objection.

18        JUDGE TRACY:  Overruled.  Go ahead.

19   Q    BY MR. ROSS:  Answer the question.

20   A    Can you --

21   Q    Yes.

22   A    -- ask the question again?

23   Q    Prior to May 24 -- do you know whether prior to May 24,

24   guards had been instructed on how to handle on-premises union

25   leafletting?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    And how do you know that?  Were you instructed on that?

3    A    Yes, I was.

4    Q    Okay.  And by whom were you instructed?

5        MS. FEINBERG:  I don't know what to say.  He's

6    interrupting before he's even answered to give him a leading

7    question.

8        JUDGE TRACY:  So the objection?

9        MS. FEINBERG:  Objection.  Leading.  Interrupting the

10   witness.  I mean, he was paused and then he just answered.

11       JUDGE TRACY:  Okay.

12       MS. FEINBERG:  I don't even know what the objection is.

13   It's improper behavior by opposing counsel.

14       JUDGE TRACY:  Okay.  Just start over again, please.

15   Q    BY MR. ROSS:  The question was, I think you testified that

16   you received instruction prior to May 24.  How on premises did

17   you know leafletting was to be treated and from whom did you

18   receive that instruction?

19   A    From Jeremie.

20   Q    Okay.  And were you the only one, to your knowledge, who

21   got that instruction or was that instruction given to others?

22       MS. FEINBERG:  Objection.  Foundation.

23       JUDGE TRACY:  Sustained.  How about we can focus his

24   testimony on what he knows, what he received.

25       MR. ROSS:  Sure.



1      JUDGE TRACY:  And what the instructions were.

2   Q   BY MR. ROSS:  Do you know --

3      JUDGE TRACY:  I think that'll move this thing along.

4      MR. ROSS:  Yeah, that's fine.

5   Q   BY MR. ROSS:  Do you know whether Mr. Hansen instructed

6   others on how to address on premises union leafletting?

7   A   Yes.

8   Q   Okay.  And you know that how?

9   A   I was there when he informed them.

10  Q   All right.  And can you tell us what instructions you

11  received from Mr. Hansen about this?

12  A   I'm sorry.  Can you re-ask the question?

13  Q   What did he tell you to do?  How did he tell you to handle

14  on-premises union leafletting?

15  A   To verify that they were active employees or not.

16  Q   Okay.  And if they were active employees, what were you

17  supposed to do?

18     MS. FEINBERG:  Objection.  Leading.  He's just supposed to

19  be telling what he was told --

20     JUDGE TRACY:  Okay.  Overruled.--

21     MS. FEINBERG:  -- not --

22     JUDGE TRACY:  Overruled.  Go ahead.

23     THE WITNESS:  Can you re-ask the question, please?

24  Q   BY MR. ROSS:  Yeah.  And if you -- you were supposed to

25  determine whether they were active employees or not.  If they



www.escribers.net | 800-257-0885

1  were active employees, what were you instructed to do at that

2  point?

3  A    To leave them alone.

4  Q    Okay.  And if they were not active employees or they

5  failed to establish themselves at active employees, what were

6  you instructed to do?

7  A    Ask them to leave.

8  Q    And you heard Mister -- strike that.  You said you heard

9  Mr. Hansen instruct others as to this.  Did you hear any

10 difference in the instructions they gave you as opposed to the

11 instruction they gave others?

12 A    No.

13 Q    And what's your first memory of him giving you this

14 instruction?  When did he do it?

15 A    I'm sorry.  I don't recall.

16 Q    Okay.  That's fair.  But it was before May 24th?

17 A    Yes.

18 Q    Did Mr. Hansen instruct you on how you would determine --

19 or to -- how you were to determine whether a person was an

20 employee or not?

21 A    Yes.

22 Q    Tell us what he told you.

23 A    To run their badge and verify that they were an employee.

24 Q    And when you say run a badge, what does that mean, run a

25 badge?



www.escribers.net | 800-257-0885

1   A    Our badges have badge numbers on the back that can verify

2   who the person is or help verify who the person is.

3   Q    Okay.  And after -- so you look at the badge.  What do you

4   do with that information?

5   A    I'm sorry.  I don't understand the question.

6   Q    Okay.  You were told to determine whether somebody's an

7   employee or not, you're supposed to do -- supposed to ask for

8   their badge?

9   A    Yes.

10  Q    Okay.  And after the badge is obtained, are you supposed

11  to do anything with that information, aside from looking at the

12  badge?

13  A    Just document.

14  Q    Excuse me?

15  A    Just document.

16  Q    Document.  What if a person doesn't have a badge?  What

17  happens then?

18       MS. FEINBERG:  Objection.  Is that something that --

19       JUDGE TRACY:  Sustained.

20       MS. FEINBERG:  Okay.

21  Q    BY MR. ROSS:  Did Mr. Hansen instruct you as to what to do

22  in the event that a person did not have a badge, but they had a

23  number, gave an employee number?

24  A    To receive other sources of information to verify if they

25  were an employee or not.



www.escribers.net | 800-257-0885

1    Q    Okay.  And then what, if anything?

2    A    We would run their badge, their badge number.

3    Q    Okay.  And alternative -- I think you used the phrase

4    alternative documentation.  What alternative documentation are

5    you talking about?

6    A    Their full name, their title, the department and their

7    superior.

8    Q    All right.  And if they provided that information and the

9    information checked out, what were you instructed to do?

10   A    Leave them alone.

11   Q    All right.  Mr. De La Cruz, you have in front of you a

12   document that has been marked Respondent's Exhibit 44.  It is

13   an email from Fremont Control Room to Gregory Slettvet, the CC,

14   to Jeremie Hansen dated 5/24/2017 at 6:01 a.m.  Subject UAW

15   activity.  Do you recognize that document?

16   A    Yes, I do.

17   Q    Okay.  Did you author that document?

18   A    Yes, I did.

19   Q    Okay.  And what -- tell us why you sent that document to

20   Mr. Slettvet.

21   A    He needed the information sent to him as well.

22   Q    Excuse me?

23   A    He needed the information sent to him as well.

24   Q    Okay.  I notice on the last line of that document, the

25   sentence reads, "We've created a ticket for it, added the names



1    of employees handing out fliers.  Do you see that?"

2    A    Yes.

3    Q    Okay.  What is that so-called ticket that you were

4    referring to?

5    A    The CAD incident report.

6    Q    Respondent's 23?

7    A    Yes.

8    Q    Thank you.  Now --

9        MR. ROSS:  I'm going to offer Respondent's 44 into

10   evidence, Your Honor.

11       JUDGE TRACY:  Any objections?

12       MS. FEINBERG:  It's coming in to -- oh, sorry.  You first.

13       MR. RODRIGUEZ RITCHIE:  Can I voir dire very quickly?

14       JUDGE TRACY:  Yes.

15                   **VOIR DIRE EXAMINATION**

16   Q    BY MR. RODRIGUEZ RITCHIE:  Hello, Mr. De La Cruz.  My name

17   is Edris Rodriguez Ritchie.  I represent the General Counsel at

18   the National Labor Relations Board.  You said you authored this

19   document, Respondent's 44?

20   A    Yes.

21   Q    At the top it says from Fremont Control Room?

22   A    Yes.

23   Q    That's your email address that Tesla has assigned to you?

24   A    No.  At the time, it was our email as a whole for Fremont

25   Control Room.



www.escribers.net | 800-257-0885

1    Q    And how many people use that email address?

2    A    It's invalid now.

3    Q    At the time, in May 24th, 2017, how many people used that

4    email address?

5    A    Eight people.

6    Q    Do you remember who?

7    A    I can't give you all the names.  We changed and there were

8    certain people who were there and certain people who are not

9    anymore.

10   Q    Okay.  So you don't remember who those eight people were

11   that used the Fremont Control Room email address on May 24th,

12   2017.  That's correct?

13   A    Yes.

14   Q    But you recall that on this day, you wrote this particular

15   email?

16   A    Yes.

17   Q    Okay.

18        MR. RODRIGUEZ RITCHIE:  No objection.

19        JUDGE TRACY:  Ms. Feinberg?

20        MS. FEINBERG:  If it's coming in to show that this is the

21   email he sent, I don't have a problem.  If it's coming in for

22   the truth of it, then I would like you to wait -- reserve 'til

23   cross-examination.

24        JUDGE TRACY:  What is the purpose of the email?

25        MR. ROSS:  It is documentation with respect to the events



www.escribers.net | 800-257-0885

1    of the day.  It's also documentation that was forwarded to the

2    management describing the events of the day.

3         MS. FEINBERG:  That's why I --

4         MR. ROSS:  It is not unlike the incident report itself,

5    Your Honor.  It's a business record.

6         MS. FEINBERG:  Well, I'd like to speak to that, or I --

7         JUDGE TRACY:  Go ahead.

8         MS. FEINBERG:  Okay.  Because it says, "We asked the non-

9    Tesla people to leave."  I don't believe he's indicated he's

10   been out there.  We didn't know -- first of all, I didn't even

11   know that there were people.  We don't know who those are.  So

12   this seems to me this is coming in for the truth.  That's why

13   I'm asking you to wait for cross, because don't know that

14   that's true or not.  And now there's different information here

15   that we've heard nothing about --

16        JUDGE TRACY:  So wouldn't that be just --

17        MS. FEINBERG:  -- about unit --

18        JUDGE TRACY:  -- cross-examination for the credibility?

19        MS. FEINBERG:  Right.  And that's why I was asking if it's

20   coming in for the truth of it.  It's coming in as a business

21   record that this is what he sent Mr. Slettvet, I don't have an

22   objection.  If it's coming in for the truth of the matter, then

23   I have an objection.  And that was why --

24        JUDGE TRACY:  Yeah.

25        MS. FEINBERG:  -- I raised the question.  On cross, I can



1   deal with that, but I wanted to know why it was being

2   presented.  And then I heard Mr. Ross say it was an accurate

3   account of what happened that day and that's why I have a

4   problem with it.

5       JUDGE TRACY:  Okay.  So I'm going to overruled the

6   objection on Respondent's Exhibit 44 into evidence.

7   **(Respondent Exhibit Number 44 Received into Evidence)**

8       MS. FEINBERG:  Okay.

9                     <u>DIRECT EXAMINATION</u> (RESUMED)

10  Q   BY MR. ROSS:  By the way, you described a last

11  conversation with Mr. Singh.  Was Respondent's Exhibit 44 sent

12  to Mr. Slettvet before or after that last conversation with Mr.

13  Singh?

14      MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

15      JUDGE TRACY:  Sustained.

16  Q   BY MR. ROSS:  When in your relationship to your last

17  conversation was this sent to Mr. Slettvet, Respondent's

18  Exhibit 44?

19  A   After my conversation with Singh.

20  Q   All right.  Tell me.  In your four years, four plus years

21  at Tesla, have you been involved in any instances, where

22  individuals sought to gain access to the interior of the

23  building with the use of counterfeit or doctored badges?

24      MR. RODRIGUEZ RITCHIE:  Objection.  Leading.  Relevance.

25      MS. FEINBERG:  Objection.  Foundation.



www.escribers.net | 800-257-0885

```
 1          JUDGE TRACY:  Sustained.

 2     Q    BY MR. ROSS:  Are you aware of such instances?

 3          MR. RODRIGUEZ RITCHIE:  Same objection.

 4          MS. FEINBERG:  Same objection.

 5          MR. RODRIGUEZ RITCHIE:  And vague.

 6          JUDGE TRACY:  I'm going to sustain the objection.

 7          MR. ROSS:  All right.  That's fine.  Your Honor, I'm going

 8     to make an offer of proof as to this.  And I understand you've

 9     ruled and that's fine.

10          JUDGE TRACY:  Then he needs to leave.

11          MR. MORRIS:  What's the ruling, though?

12          MR. ROSS:  She sustained the objection.

13          MR. MORRIS:  On which?

14          JUDGE TRACY:  On the second question.  I already sustained

15     the objection on the first question.  And so you're just trying

16     to use the first question to have him answer the second

17     question.  So it's sustained both times.

18          MR. ROSS:  All right.

19          JUDGE TRACY:  I mean, the --

20          MR. ROSS:  Okay.

21          MR. MORRIS:  I was just unclear on which --

22          MR. ROSS:  All right.

23          MR. MORRIS:  -- objection.

24          MR. ROSS:  Okay.

25          JUDGE TRACY:  Both.
```



www.escribers.net | 800-257-0885

1    Q    BY MR. ROSS:  Are you aware of any instances in which

2    individuals sought to gain access to the interior of the plant

3    by use of counterfeit or doctored security badges?

4        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.  Relevance.

5    Vague.

6        MS. FEINBERG:  Foundation.  I don't know that he could

7    know such things.

8        JUDGE TRACY:  Well, I'm going to overrule the objection.

9    Go ahead.

10   Q    BY MR. ROSS:  You may answer, please.

11   A    Yes.

12   Q    Okay.  Were you personally involved in those instances?

13       MS. FEINBERG:  Objection.  Vague.

14       JUDGE TRACY:  Overruled.

15   Q    BY MR. ROSS:  You may answer.

16   A    Yes.

17   Q    Okay.  And can you tell us about those instances that --

18   in which you were personally involved?

19       MR. RODRIGUEZ RITCHIE:  Objection.  Vague.

20       JUDGE TRACY:  So, if you're going to ask him questions,

21   ask him about one of them, not just --

22       MR. ROSS:  All right.

23       JUDGE TRACY:  -- some big --

24       MR. ROSS:  Okay.

25       JUDGE TRACY:  -- bunch of testimony.



1    Q    BY MR. ROSS:  Tell me, do you recall any specific instance

2    of this happening?

3    A    A day, I can't tell you, but there have been several

4    occasions.

5    Q    Okay.  Well let's -- we don't need dates.  What we do

6    need, though, is for you to tell us -- the Judge has asked us

7    to break out of the multiple instances this may have happened

8    specific instances.  So tell us about the first instance that

9    you recall of this happening.

10    MR. RODRIGUEZ RITCHIE:  I'm going to object to relevancy.

11    There's a comment made about we don't need dates, but to the

12    extent we're talking about things that happened after this

13    incident, why would that be relevant?

14    JUDGE TRACY:  So --

15    Q    BY MR. ROSS:  If you were -- have a specific date in mind,

16    tell us.  But what' I'm trying to elicit here from you sir, is

17    to explain to us --

18    JUDGE TRACY:  So you can ask him specifically, were there

19    any incidents that occurred prior to May 24th, 2017.  Because

20    again, you're going to be filled with this -- we're just

21    filling the record with stuff that I don't know what to do with

22    this stuff --

23    MR. ROSS:  All right.

24    JUDGE TRACY:  -- because it has no bearing at this

25    point --



www.escribers.net | 800-257-0885

1    MR. ROSS:  All right.

2    JUDGE TRACY:  -- on this case.

3    MR. ROSS:  All right.  Okay.

4    Q    BY MR. ROSS:  Prior to May 24, were you involved in any

5    instances in which individuals sought to gain access to the

6    plant by use of counterfeit or doctored security measures?

7    A    Yes.

8    Q    Okay.  And how many times do you think that happened, in

9    which you were involved?

10   A    Multiple times.  I can't give you an exact number.

11   Q    Multiple times.  Okay.  Can you describe for me the

12   specific instance in which that happened?

13   A    Can you re-ask the question, please?

14   Q    Yeah.  Can you describe for me a specific instance in

15   which someone sought to gain access to the interior of the

16   plant by use of counterfeit or doctored badges prior to May 24?

17   A    Can you rephrase the question?

18   Q    Sure.  Could you give me -- you said you have been

19   involved in multiple instances of people gaining access --

20   seeking to gain access by use of counterfeit or doctored badges

21   prior to May 24th.  And I'm asking you to describe for us any

22   specific instance in which that happened, which you were

23   personally involved.

24   MR. RODRIGUEZ RITCHIE:  Objection.  Misstates testimony.

25   JUDGE TRACY:  Overruled.  Go ahead.

22-60493.2477



1          THE WITNESS:  We had a person trying to enter the building

2     with a fake laminated badge.

3     Q    BY MR. ROSS:  A what?

4     A    Fake laminated badge.

5     Q    When you say fake laminated badge, what do you mean?

6     A    It wa -- the badge didn't belong to him.

7     Q    And when you say it was laminated, what -- I'm not

8     understanding.  What does that mean?  It was laminated.

9     A    There was like a film that was over the badge to make it

10    appear to be a real badge, like it belonged to him.

11    Q    Okay.  And what, if anything was --

12         MS. FEINBERG:  Your Honor, I really have no understanding

13    where the relevance --

14         JUDGE TRACY:  So, if there's an objection --

15         MS. FEINBERG:  Objection.  Relevancy to this whole line.

16    What does it matter if someone tried to enter the building?

17    This case isn't about someone trying to enter the building.  If

18    they --

19         JUDGE TRACY:  So --

20         MS. FEINBERG:  -- what is -- I understand there's some

21    issue about maybe in the parking lot, but these ca -- this is

22    not about the parking lot.  This is about the --

23         JUDGE TRACY:  So let me --

24         MS. FEINBERG:  -- at the door, so I --

25         JUDGE TRACY:  Yeah.



www.escribers.net | 800-257-0085

1          MS. FEINBERG:  -- don't really know what the connection

2     is, but I -- I mean, we want to finish.  It just seems like

3     some of the testimony should be relevant.

4          JUDGE TRACY:  I will tell you what.  I'm not going to

5     finish today, if --

6          MS. FEINBERG:  Okay.

7          JUDGE TRACY:  -- it's going at this rate.

8          MS. FEINBERG:  Okay.  Well, I'm not trying to be

9     disruptive, but --

10         JUDGE TRACY:  And I'm going to do what I need to do as my

11    job.

12         MS. FEINBERG:  Okay.  I respect that.

13         JUDGE TRACY:  But I would say that at this point,

14    certainly I've said this before, this perhaps goes to some

15    defense that they're raising that I don't know.  Some argument

16    that they're going to make in their brief.  And if it has no

17    relevance, then we just don't need to talk about it.  I mean,

18    if it's not important to the allegations here of what you're

19    arguing, then who cares?  My point is let's just get this in,

20    okay?

21         MS. FEINBERG:  Okay.

22         JUDGE TRACY:  I understand.  I have seen the complaint.  I

23    know what it's about.  So if this is something that they're

24    claiming, let them just put it in, make your objections for the

25    record and certainly in the brief, you can point out all of



1    these things that you're arguing right here and there.

2    Q    BY MR. ROSS:  Tell me.  The photo that appears on an

3    employee badge, is that their workday photo?

4         MR. RODRIGUEZ RITCHIE:  Objection.  Lacks foundation.

5    Q    BY MR. ROSS:  Do you have a --

6         JUDGE TRACY:  Sustained.

7    Q    BY MR. ROSS:  -- employee badge?

8    A    Yes, I do.

9    Q    Is it your workday photo that appears on that badge?

10   A    Yes, it is.

11   Q    Okay.  And in those instances where you said there was a

12   laminate over a counterfeit or doctored badge, what was

13   underneath that laminate?

14   A    It was a temp badge.

15   Q    Okay.  And you said it was a what badge?

16   A    A temporary badge.

17   Q    With a photo?

18   A    Yes.

19   Q    And was that a workday photo?

20   A    I do not know.

21   Q    Okay.  And is this the only instance where use of

22   counterfeit or doctored badges were used prior to May 24 in an

23   attempt to access the plant?

24        MR. RODRIGUEZ RITCHIE:  Objection.  Leading.

25        JUDGE TRACY:  Sustained.



www.escribers.net | 800-257-0885

1    Q     BY MR. ROSS:  I have nothing else.  Thank you.

2          JUDGE TRACY:  Mr. Rodriguez Ritchie, are you doing it or?

3          MR. RODRIGUEZ RITCHIE:  Yes.

4          JUDGE TRACY:  Do you need a moment?

5          MR. RODRIGUEZ RITCHIE:  Just very -- like 30 seconds.

6          JUDGE TRACY:  Okay.

7          MR. RODRIGUEZ RITCHIE:  Okay.

8          JUDGE TRACY:  Go ahead.  We're still on the record.

9                         **CROSS-EXAMINATION**

10   Q     BY MR. RODRIGUEZ RITCHIE:  Mr. De La Cruz, your job in May

11   of 2017, that was security operations operator?

12   A     Yes.

13   Q     So you weren't a security guard that patrolled the

14   facility?

15   A     No.

16   Q     Okay.  And you were just testifying about instances or one

17   instance that you recalled prior to May 24th, 2017 about

18   somebody trying to gain access to the facility?

19   A     Yes.

20   Q     That was about someone trying to get into the facility?

21   A     Yes.

22   Q     So trying to use a badge at some entry point to go inside

23   of the actual building?

24   A     Yes.

25   Q     Okay.  So it wasn't about anybody being in the parking lot


22-60493.2481

1    or passing out flyers.  Is that right?

2    A    Yes.

3    Q    Do you have Respondent's Exhibit 23 in front of you?

4    A    Yes.

5    Q    Okay.  So this is a document that you say you created?

6    A    Yes.

7    Q    Is that right?  And this was based off reporting that you

8    were receiving from someone named Mr. Singh?

9    A    Yes.

10   Q    Who is -- was a security guard on May 24th, 2017?  You

11   didn't personally observe any of the events described in

12   Respondent's Exhibit 23.  Is that right?

13   A    Yes.

14   Q    You did personally observe?

15   A    No, I did not.

16   Q    Okay.  Thank you.  Now, in your testimony, you testified

17   that after you spoke with Mr. Singh the first time, you

18   dispatched vehicle -- or excuse me -- before you spoke with Mr.

19   Singh, you --

20        MR. ROSS:  I couldn't hear the question.  I'm sorry.

21   Q    BY MR. RODRIGUEZ RITCHIE:  -- dispatched vehicles?

22   A    Vehicle patrols, yes.

23   Q    And one of those was Mr. Singh?

24   A    Yes.

25   Q    And were there other people that you dispatched?



www.escribers.net | 800-257-0885

1   A    Yes.

2   Q    How many?

3   A    Two.

4   Q    And what were their names?

5   A    I'm sorry.  I don't know.  The security personnel over

6   there changes a lot and from now 'til then, I don't remember

7   the other two.

8   Q    Did they report anything to you?

9   A    No.

10  Q    Okay.  Now, in Respondent's Exhibit 23, that doesn't say

11  anywhere that you dispatched anyone to the scene.  Is that

12  right?

13  A    Yes.

14  Q    And you said that Mr. Singh reported to you that there

15  were four associates handing out flyers?

16  A    Yes.

17  Q    Okay.  But the name of the fourth person -- the fourth

18  associate, that doesn't appear in Respondent's Exhibit 23?

19  A    Yes.

20  Q    Okay.  You also testified about some -- temporary badge, I

21  think?

22  A    Yes.

23  Q    So Tesla has a procedure to allow someone access to Tesla

24  proper -- an employee access to the Tesla property when they

25  don't have a badge with them.  Is that right?



1   A    Yes.

2   Q    So all you'd have to do is get their name, job title,

3   department and their supervisor and then they'd be allowed onto

4   the facility?

5   A    Yes.

6   Q    So if someone provided that information and you verified

7   that they were an employee, the correct procedure would be to

8   allow them to be on the property?

9   A    Yes.

10  Q    So it wouldn't be to tell them to leave?

11  A    Yes.

12  Q    Do you have Respondent's Exhibit 44 in front of you?

13  A    Yes.

14  Q    You sent the email in Respondent's Exhibit 44 to Mr.

15  Slettvet, because he had asked you to report union activity to

16  him.  Is that right?

17  A    Yes.

18  Q    And that's because Mr. Slettvet was interested in

19  monitoring --

20       MR. ROSS:  Objection.

21  Q    BY MR. RODRIGUEZ RITCHIE:  -- union activity.

22       MR. ROSS:  Calls for speculation.

23       JUDGE TRACY:  Overruled.

24       THE WITNESS:  Can you ask the question --

25  Q    BY MR. RODRIGUEZ RITCHIE:  That's be -- sure.  That's



1  because Mr. Slettvet was interested in monitoring the union

2  activity at the Tesla Fremont facility?

3  A    Yes.

4  Q    Okay.  And when I -- I think this was a little unclear and

5  I just added to it by saying the Tesla Fremont facility, but

6  we're referring to the facility located at 45500 Fremont

7  Boulevard in Fremont, California, correct?

8  A    Yes.

9  Q    Okay.  Now, if you look at Respondent's Exhibit 44, you

10  wrote we in several instances, but it's correct that you

11  weren't part of the observing of anyone flyering on May 24th,

12  2017.  That's right?

13  A    Yes.

14  Q    So when you said we, you didn't actually mean we.

15  A    Can you re-ask the question?

16  Q    So when you wrote we -- so for example, we have quite a

17  few people handing fliers outside of the doors, that wasn't --

18  the we in there is somebody else.  That's not --

19  A    We as security as a whole.

20  Q    Okay.  And so that includes these two other people.  So it

21  includes Mr. Singh --

22  A    Yes.

23  Q    -- in the we and you?

24  A    Yes.

25  Q    And the two other people that -- whose names you don't



www.escribers.net | 800-257-0885

1  remember, that you say were also dispatched on May 24th, 2017?

2  A    Yes.

3  Q    Okay.  And as part of your job as a security operations

4  operator, you're familiar with Tesla's policies regarding

5  employee access to Tesla property?

6  A    Yes.

7  Q    So if a security guard -- if an employee verified by

8  showing their badge to a security guard that they were an

9  employee, Tesla policy is that they can distribute leaflets in

10  the parking lot, for example?

11  A    Yes.

12  Q    Okay.  So they wouldn't -- a security guard is not

13  supposed to ask somebody to leave?

14  A    Yes.

15  Q    During the timeframe of May, 2017, was it your practice to

16  document every instance of individuals leafletting on behalf of

17  the Union?

18  A    Yes.

19  Q    And why was that?

20  A    Sorry.  Can you re-ask the question?

21  Q    And why was that?  Why was it your practice to document

22  all individuals handing out union related leaflets in the Tesla

23  parking lot?

24  A    It's our practice to document everything, so anything that

25  the officers, you know, report to us, we document it.



1   Q   So you always document every time an employee verifies

2   that they're an employee of Tesla?

3   A   If there's an incident that requires it, yes.

4   Q   But you don't document when every employee goes in and

5   out.  That's not something that's documented?

6   A   No.

7   Q   Okay.  So here it's being documented, the incident that's

8   being documented is that employees are handing out fliers that

9   are union related, right?

10   A   Yes.

11   Q   Okay.  Thank you.  Nothing further.

12        JUDGE TRACY:  Ms. Feinberg.

13        MS. FEINBERG:  Yeah.  I have just a few.

14                  **CROSS-EXAMINATION**

15   Q   BY MS. FEINBERG:  Hi, my name's Margo Feinberg.  I

16   represent the Charging Parties.  I'm going to ask you a few

17   questions.  So as I understand your testimony right now, you

18   don't remember the other two individuals who -- the security

19   guards who were dispatched on the morning of May 24th, and yet

20   you remember Mr. Singh.  Did someone remind you of Mr. Singh's

21   name before you testified here today?

22   A   No.

23   Q   Did you look at any other documentation to remember Mr.

24   Mr. Singh?

25   A   No.


www.escribers.net | 800-257-0885

1    Q    Then how are you 100 percent sure that it's Mr. Singh?

2    A    He's been our go-to vehicle patrol since he's been there.

3    Q    And how long is that?

4    A    About a year and a half.

5    Q    And is he still employed by Tesla?

6    A    He's a contractor for Tesla.

7    Q    Okay.  So he works what -- and what contractor is that?

8    A    U.S. Security Associates, I believe they're called.

9    Q    And is that who he worked for in May of 2017, if you know?

10   A    No.  He worked for Securitas.

11   Q    Okay.  So he worked for Securitas and then changed over to

12   the new contractor?

13   A    Yes.

14   Q    And he still is servicing Tesla as far as you know?

15   A    Yes.

16   Q    And did you talk to him about your testimony before

17   testifying here today?

18   A    No.

19   Q    Did you review your testimony with anyone before

20   testifying here today?

21   A    Can you re-ask the question?

22   Q    Did you talk to anyone before coming to testify here today

23   about what you were going to talk about?

24   A    Yes.

25   Q    And who was that?



```
 1    A    Mr. Mark --

 2         MR. ROSS:  Mark Ross.

 3    Q    BY MS. FEINBERG:  And did you look at any documents?

 4    A    Yes.

 5    Q    Anything other than Exhibit 24 and 44?

 6    A    No.

 7    Q    I mean 23.  23 and 44.  No?

 8    A    No.

 9    Q    And when was the meeting that you had with Mr. Slettvet,

10    where he gave you instructions about leafletting?

11    A    I didn't have a meeting with him.

12    Q    Oh.  I thought you said that he gave some instructions to

13    a group of you.

14    A    He did.

15    Q    Okay.  And how did he give those instructions to you?

16    A    Via email.

17    Q    Oh.  And do you have that email?

18    A    I do not.

19    Q    And when was the last time you saw that email?

20    A    Around the time of the union activity.

21    Q    Was that May or before May?

22    A    It was before May.

23    Q    And so when you said others got it as well, you just meant

24    other people were on the email stream?

25    A    Yes.
```



www.escribers.net | 800-257-0885

1    Q    And how do you know that other people got the email?

2    A    We conversed about it as soon as we got the email.

3    Q    And who was that that conversed about the email?

4    A    The other security operations officer at --

5    Q    Oh.  Can you tell me to the best of your recollection who

6    that would be?

7    A    You need names?

8    Q    That's what I'm asking you.  Yes.  Thank you.

9    A    Angelina, Adrian, Brianna, Brian, Anthony, Robert and

10    someone is was there.  I don't recall who it was.

11    Q    And are all these people people who have the same position

12    as you?

13    A    Yes.

14    Q    So did any of those people actually go out into the

15    parking lot or out to -- out -- leave the control room?

16    A    No.

17    Q    So they were all in the control room?

18    A    Yes.

19    Q    And did you see any other -- I know you don't remember

20    exactly when you got the email from Mr. Slettvet, but did you

21    get more than one on that topic?

22    A    Not that I can recall.

23    Q    And I know you spoke to Mr. Slettvet on May 24th, 2017.

24    Did you have any other conversations with him about union

25    leaflitters?



www.escribers.net | 800-257-0885

1    A    No.

2    Q    Okay.  And in looking at Respondent's Exhibit 44, do you

3    have that?

4    A    Yes.

5    Q    You're the author of this document?

6    A    Yes.

7    Q    So when it says we, it's because you speak in what we call

8    the royal we, meaning everybody?  Like we means security.  Is

9    that what you're saying?

10    A    Yes.

11    Q    Okay.  So just to confirm.  The first sentence says, "We

12    have quite a few people handing out fliers outside of the

13    doors.  That means -- in that sentence, it -- in that phrase,

14    it means Tesla does?

15    A    Yes.

16    Q    Okay.  And then some of them are employees and some of

17    them are not.  How do you know that?

18    A    This email was sent after we verified the people who were

19    part of the investigation.

20    Q    Okay.  But you yourself never saw any -- never had any

21    interaction with the people in the parking lot?

22    A    Correct.

23    Q    Okay.  And was there any name that you were given to

24    verify that didn't turn out to be an employee?

25    A    No.



www.escribers.net | 800-257-0885

1    Q    And when it says, "We asked the non-Tesla people," that

2    didn't mean you.  That meant whoever was out there in the

3    parking lot?

4    A    Correct.

5    Q    And you believe that to be Mr. Singh?

6    A    Yes.

7    Q    Okay.  And then it says, "We still and in that have all,"

8    and I assume that we meaning, means Tesla, yes?

9    A    Yes.

10    Q    Okay.  "All have -- have all VPs and freelance units

11    patrolling the parking lot."  And how many VPs and freelance

12    units are available to Tesla that were out that morning?

13    A    A total of six.  There was three vehicle patrols and three

14    freelance.

15    Q    Okay.  What is a -- can you -- okay.  What is a vehicle?

16    A vehicle patrol, I'm going to guess involves someone being in

17    a vehicle?

18    A    Yes.

19    Q    And how many security guards are in any given -- in the

20    veh -- were in the vehicles, per vehicle, that morning, if you

21    know?

22    A    I'm sorry.  Can you --

23    Q    In other words, does a vehicle patrol include one security

24    guard or two or three?

25    A    It's just one.



www.escribers.net | 800-257-0885

1  Q    Okay.  And so there were three vehicle patrols out.  And

2  what does freelance unit mean?

3  A    They respond to any available calls that we make as far as

4  locker and locks, bathroom breaks.

5  Q    Right.  But are they in a car or in -- or on foot?

6  A    Oh, they're on foot.  They're on foot.

7  Q    So sometimes freelance units are inside the building and

8  sometimes they're outside the building?

9  A    Yes.

10  Q    And on this occasion, they were outside the building?

11  A    Yes.

12  Q    So how many freelance units were outside the building on

13  the morning of May 24th?

14  A    Three.

15  Q    And that's because you instructed the three vehicle

16  patrols and the three freelance units to patrol, because there

17  was union leafletting going on?

18  A    Yes.

19  Q    And where does it say -- or if it does, on Respondent's

20  Exhibit 23, that you initiated a request for patrolling of the

21  parking lots?

22  A    I'm sorry.  Can you re-ask the question?

23  Q    Does it say -- if I'm reviewing Respondent's 23 --

24  A    Uh-huh.

25  Q    -- the incident report or twen -- yeah, 23, does there --



1    is there anything on here that would let me know that you

2    initiated patrolling of the parking lots?  Of the outside of

3    the building, the perimeter of the building?

4    A    I'm sorry.  I still don't understand the question.

5    Q    Okay.  You told me that you asked those vehicle patrols

6    and freelance units to go into the parking lot, because there

7    was union activity.  Is that right?

8    A    Yes.

9    Q    Okay.  Is there anything on this document, Respondent's

10   23, that tells me that you did that?

11   A    No.

12   Q    Okay.  And did you record that fact anywhere?

13   A    No.

14   Q    So when you ask a -- in the regular course of business,

15   when you ask for a vehicle patrol to do something, it isn't

16   necessarily recorded?

17   A    Just the incident.

18   Q    So does what the word incident mean to you?

19   A    Any event that gets reported to us.

20   Q    Okay.  So you're the one who sent Mr. Singh out.  So who

21   reported something to you, so that you would send Mr. Singh

22   out?

23   A    Fred Harkness.

24   Q    And who is Fred Harkness?

25   A    He was one of the freelance at the time.



1    Q    And does his -- and did you speak to him before testifying

2    here today?

3    A    No.

4    Q    Okay.  And does he still work for Tesla or Securitas or --

5    A    No.

6    Q    -- U.S. -- okay.

7    A    No.

8    Q    Okay.  And when did he leave the employ of the company or

9    when -- the service of the company?

10   A    I don't know.

11   Q    Okay.  And how did -- what did Mr. -- so did Mr. Harkness

12   call you?

13   A    Not personally, but he made a radio -- call over the radio

14   informing us that there was union activity in the parking lot.

15   Q    And based on that, you did what?

16   A    Dispatched.

17   Q    So that's when you dispatched the vehicle patrol and the

18   freelance units?

19   A    Yes.

20   Q    And then the only -- and then Mr. Singh met some people

21   and called you?

22   A    Yes.

23   Q    And when you dispatched the three vehicle units and --

24   vehicle patrols and freelance units, did you give them any

25   instructions?



www.escribers.net | 800-257-0885

1      MR. ROSS:  Could hear the question.

2    Q    BY MS. FEINBERG:  When you dispatched the vehicle patrols

3    and freelance units on the morning of May 24th, when you

4    dispatched them, did you give them any instructions?

5    A    To patrol the parking lots.

6    Q    And anything else?

7    A    Just look out for union activity.

8    Q    Anything else?

9    A    That's all.

10   Q    And going back to Respondent's 44.  Did someone instruct

11   you to send Respondent's 44?

12   A    To send the email?

13   Q    Yeah.

14   A    Greg had instructed me to send him an email.

15       MS. FEINBERG:  I have nothing further.

16       JUDGE TRACY:  Mr. Ross?

17       MR. ROSS:  Nothing.

18       JUDGE TRACY:  All right.  Thank you very much.  Please

19   don't discuss your testimony with anyone until after the close

20   of the hearing.

21       THE WITNESS:  Will do.

22       JUDGE TRACY:  Thank you.

23       JUDGE TRACY:  Okay.  Let's go off the record.

24   (Off the record at 11:24 a.m.)

25       JUDGE TRACY:  Okay.  If you could up please, for me.

22-60493.2496



1    Raise your right hand.  Right hand.  Yes.  And then kind of

2    turn to me.

3    Whereupon,

4                          **RANDJODH SINGH**

5    having been duly sworn, was called as a witness herein and was

6    examined and testified as follows:

7        JUDGE TRACY:  Okay.  Go ahead.  Have a seat.  And then let

8    me give you some instructions.  There's water here, if you need

9    it.  This microphone is for recording your sound, so you don't

10   need to lean into it.  Just relax.

11       THE WITNESS:  Okay.

12       JUDGE TRACY:  You're going to be asked a lot of questions

13   or maybe not very many questions.  But you're asked questions.

14   And please wait for the question to be finished being asked to

15   you before you start answering.  If you don't understand a

16   question, just say that you don't understand.  If there is an

17   objection, let me decide whether you can answer it or not

18   before you do that.  But you will have to speak loud enough so

19   that everybody in the room can hear you.  Okay?

20       THE WITNESS: All right.

21       JUDGE TRACY:  Okay?  All right.  You seem soft-spoken, so

22   you're just really going to have to speak --

23       THE WITNESS:  Yeah.  Okay.  Sorry.

24       JUDGE TRACY:  -- loudly, okay?

25       THE WITNESS:  All right.

22-60493.2497



1      JUDGE TRACY:  All right.  Mr. Ross?

2      MR. ROSS:  Yes.  Thank you.

3      JUDGE TRACY:  Okay.

4                  **DIRECT EXAMINATION**

5    Q   BY MR. ROSS:  Sir, I'm sorry.  I will mispronounce your --

6      JUDGE TRACY:  Oh.  And I'm sorry.  State your name for the

7    record?

8      THE WITNESS:  Hi.  Name is Ranjodh Singh.

9      JUDGE TRACY:  Okay.  Thank you.  Go ahead.

10   Q   BY MR. ROSS:  And for the record, sir, I'm not going to

11   try pronounce your first name.  I mean no disrespect, I'm just

12   not --

13   A   That's fine.

14   Q   Could you --

15   A   I understand.

16   Q   Could you spell it for me, please?

17   A   Sure.  It's R-A-N-J-O-D-H and then Singh, S-I-N-G-H.

18   Q   All right.  Thank you, sir.  I'll call you Singh.

19   A   All right.  That works.

20   Q   All right.  Singh, where do you work?

21   A   Tesla factory.

22   Q   Okay.  And what do you do there?

23   A   I am a vehicle patrol.

24   Q   A what?  Veh --

25   A   A vehicle patrol.

22-60493.2498



1    Q    All right.  And do you work directly for Tesla or do you

2    work for a contractor?

3    A    I work as a contractor.

4    Q    Okay.  And what is the name of that contractor?

5    A    It's U.S. Security Associates.

6    Q    Okay.  And how long have you worked for U.S.?

7    A    Since two months.  Well, it was Securitas before, so we

8    actually -- the U.S. Security takeover, so I turned to U.S.

9    Security.

10   Q    So you moved from Securitas to U.S. Security?

11   A    Yes.

12   Q    Okay.  And how long did -- and you worked for Securitas at

13   the Tesla facility in Fremont.  Is that right?

14   A    Yes.

15   Q    And how long did you work for Securitas --

16   A    Well --

17   Q    -- at the Fremont facility?

18   A    -- I started March, 2017.

19   Q    All right.  Can you hear me okay?

20       THE COURT REPORTER:  Too close.

21       MR. ROSS:  Too close.  Okay.  Thank you.

22   Q    BY MR. ROSS:  And were you always a vehicle patrol person

23   at the Fremont facility?

24   A    No.  I used to be gate guy, so I used to be on gates a lot

25   of the time, breakers, doors.  So it depends on the supervisor,



www.escribers.net | 800-257-0885

1    where he wanted to put me as.  So after working with Tesla, six

2    months after, they put me as a vehicle patrol.

3    Q   I see.  Okay.  Tell me, you -- in May of 2017, what were

4    your normal work hours and work days?

5    A   It was -- well, Sunday to Thursday.

6    Q   Sunday to Thursday?

7    A   Yes.

8    Q   And can you tell me what hours you worked?

9    A   11:00 p.m. to 7:30 in the morning.

10    Q   All right.  Okay.  Okay.  And at that time, were you a

11    person who worked out of a vehicle or you were a person who

12    provided security in some other capacity?

13    A   Well, I can say I was -- at that time, I wasn't a vehicle

14    patrol.  I was breaker, doors, gates.

15    Q   Okay.

16    A   Yeah.

17    Q   All right.  Now -- and by the way, did you have a unit

18    number?

19    A   Yes.

20    Q   What --

21    A   It's 123.

22    Q   123.  All right.  Now, we've heard testimony from a

23    witness in this case, Felipe De La Cruz --

24    MR. RODRIGUEZ RITCHIE:  Objection.  It's not proper to

25    talk about another witness' testimony.



1     MR. ROSS:  Strike that.

2     JUDGE TRACY:  Sustained.

3  Q   BY MR. ROSS:  Tell me -- I'm going to show you a document.

4  Before I show you the document, actually, let me ask you this.

5  From time to time, as a security associate working at Tesla

6  either for Securitas or U.S., have you had occasion to speak to

7  individuals, who were leafletting outside the plant?

8     MR. RODRIGUEZ RITCHIE:  Objection.  Relevance.  Overbroad.

9     THE WITNESS:  All right.

10     JUDGE TRACY:  Sustained.  Sustained.

11  Q   BY MR. ROSS:  Let me direct your attention to May of 2017

12  and ask you if you can recall ever speaking with individuals

13  outside the plant, who were engaging in leafletting?

14  A   Well, a couple of times, like on the parking lot -- not

15  the -- you can say outside the property or in the parking lot,

16  inside the plant.  If base call us -- control -- SSEs calls us

17  to do something, we have to go there and then check it.  If

18  they're asking for the -- to ask a person a badge (sic), then

19  yeah.

20  Q   I see.  And this case has to do with an incident that

21  occurred on the morning of May 24, 2017.  Do you have a memory

22  of being dispatched to speak to people?

23  A   I don't remember.

24  Q   You don't remember?

25  A   Huh-uh.



1    Q    Okay.  And when you say you don't remember, what do you

2    mean by you don't remember?

3    A    Well, we have to deal with a lot of -- couple things.  So

4    you guys are talking about a year before -- year and a half --

5    well, as -- so I don't remember like, you know, all the numbers

6    or actually -- so I don't remember that time that I did it,

7    so --

8    Q    Okay.  Tell me, when you went to work at Tesla initially

9    or prior to May of 2017, were you ever given any instructions

10   as to how to deal with individuals who were outside the plant

11   leafletting?

12       MR. RODRIGUEZ RITCHIE:  Objection.  Leading.  Relevance.

13       JUDGE TRACY:  Overruled.  Go ahead.

14       THE WITNESS:  Okay.  Yes.  They gave us --

15   Q    BY MR. ROSS:  Okay.  And from whom did you receive those

16   instructions, if you recall?

17   A    From our supervisor.

18   Q    And who was that?

19   A    It was Sam Ali that time.

20   Q    Sam Ali?

21   A    Yeah.

22   Q    Okay.  Okay.  And what instructions did you receive from

23   Mr. Ali?

24   A    Well, the instruction was --

25       MS. FEINBERG:  Objection.  Foundation.  Objection.

22-60493.2502



1    Hearsay.  Sam Ali is not an employee of Tesla as far as I

2    understand.

3         MR. ROSS:  No, actually he's a -- he was the account

4    representative of Securitas.  He was this gentleman's immediate

5    report and he interfaced with Mr. Hansen.  That's the testimony

6    to date, Your Honor.

7         MS. FEINBERG:  Right.  That's why it's hearsay.

8         MR. RODRIGUEZ RITCHIE:  And that's hearsay.

9         JUDGE TRACY:  Could you re-ask the question?  Rephrase it?

10        MR. ROSS:  Sure.

11        JUDGE TRACY:  The question.

12        MR. ROSS:  Sure.

13   Q    BY MR. ROSS:  Mr. Ali was your supervisor?

14   A    Yes.

15   Q    He was a Securitas supervisor?

16   A    Yes.

17   Q    And you're saying that he gave you instructions as to how

18   to deal with individuals engaging in leafletting outside the

19   plant?

20   A    Yes.

21   Q    Okay.  And was this in person?  Was it in writing?  How

22   did he communicate these instructions?

23   A    It was in person.

24   Q    In person.  Okay.  And when Mr. Ali gave you these

25   instructions, was it just you and Mr. Ali talking or were there



1    other's present?

2    A    Well, at that time, it was me and then there was another

3    guy who recently joined the Tesla security from Securitas.

4    Q    Okay.  Was this -- when was this in relation to when you

5    started, I think you said in March?  Was this when you began or

6    was it later than that?

7    A    Well, when I began --

8    Q    Okay.

9    A    -- this started.

10    Q    Okay.  So Mr. Ali spoke to you about this.  What did he

11    tell you in terms of the instructions?

12         MR. RODRIGUEZ RITCHIE:  Objection.  Hearsay.

13         MS. FEINBERG:  Same.

14         JUDGE TRACY:  Sustained.

15         MR. RODRIGUEZ RITCHIE:  And relevance.

16         JUDGE TRACY:  What instructions were you provided?

17         THE WITNESS:  Well, it was the -- if -- about the flyer

18    and the union activities.  If it's happening, then the base

19    call, we have to go and check it out.  If they're a Tesla

20    employee, or I can say go there and then ask if they're a Tesla

21    employee or not.  If they're saying yes, then we ask for the

22    badge, because we don't know if they're an active employee,

23    they're terminated.  We don't know.  So we have to ask for the

24    badge and give the badge number and the name to the SOCs.

25         JUDGE TRACY:  To the who?



1          THE WITNESS:  SOC, a base control room.

2          JUDGE TRACY:  Oh, okay.

3          THE WITNESS:  Because they have -- they --

4          MR. ROSS:  That's the control, the operations control

5     room --

6          THE WITNESS:  Yeah.

7          MR. ROSS:  -- Your Honor.

8          THE WITNESS:  So they're going to check if they're an

9     active employee or terminated.  If they're terminated, they

10    can't be seen on the property.  If they're active employee,

11    they're good to go.  They're -- whatever they are doing, they

12    have a right.

13         JUDGE TRACY:  Any other instructions about the leafleting?

14         THE COURT REPORTER:  Object again as to hearsay.

15         JUDGE TRACY:  Overruled.

16         THE WITNESS:  Okay.  So if they're not employed or they're

17    saying -- if they refuse to give me the badge, this is also --

18    can -- they're not an employee.  That's why they're refusing to

19    give a badge.  This is a Tesla policy that if security asking

20    for a badge, they have to give the badge.  If they're refusing

21    it -- or any ID.  So they have to leave the property.

22         MR. ROSS:  Nothing else, Your Honor.

23         JUDGE TRACY:  All right, Mr. Rodriguez Ritchie.

24                         **CROSS-EXAMINATION**

25    Q    BY MR. RODRIGUEZ RITCHIE:  During the time of May, 2017,



1    you testified you were working at Tesla at that time?

2    A    Yes.

3    Q    And just so that we're clear, that's at 45500 Fremont

4    Boulevard in Fremont, California?

5    A    Yes.

6    Q    So during that time, you were -- that was not the

7    timeframe that you were doing vehicle patrol.  Is that right?

8    A    Yes.

9    Q    But you're still familiar with the policies that you just

10   testified about regarding employees gaining access to Tesla

11   property?

12   A    Yes.

13   Q    Once an employee verifies that they are an employee, they

14   would be allowed to leaflet on Tesla property?

15   A    Yes.

16   Q    So if an employee were told to leave the premises after

17   they verified that they were an employee, that would not be

18   consistent with Tesla property.  Is that right?

19   A    Yes.

20   Q    And one way to verify that an employee is an employee is

21   by having -- when the employee scans his badge at the entrance

22   to the a door?

23   A    No.  If they're outside the door, they're in the parking

24   lot, there is no scanner.

25   Q    No.  So when someone goes through a door, in order to open



1     the door, they scan their badge?

2     A     Uh-huh.

3     Q     And that verifies that they're an employee?

4     A     Yes.

5     Q     Okay.  Thank you.

6           MR. RODRIGUEZ RITCHIE:  Nothing further.

7           JUDGE TRACY:  Ms. Feinberg?

8           MS. FEINBERG:  No, nothing.

9           JUDGE TRACY:  Okay.  Mr. Ross?

10          MR. ROSS:  Nothing else.

11          JUDGE TRACY:  All right.  Thank you very much.  Please

12    don't discuss your testimony until after the close of the

13    hearing.

14          THE WITNESS:  Sure.

15          JUDGE TRACY:  Okay.

16          MR. ROSS:  Thank you, Mr. Singh.

17          THE WITNESS:  No problem.

18          MR. ROSS:  Appreciate it.  All right.

19          JUDGE TRACY:  All right.  Is your -- let's go off the

20    record.

21    (Off the record at 11:38 a.m.)

22          JUDGE TRACY:  Okay.  We're on the record.  So before we go

23    to the next witness, there is a stipulation that the parties

24    have been working on.  But before we do that, we need to enter

25    another notice of appearance in this case.  And go ahead.



www.escribers.net | 800-257-0885

1    MR. SHARMA:  Yeah.  Jay Sharma, S-H-A-R-M-A, in-house

2    counsel for Tesla.

3    JUDGE TRACY:  Okay.  All right.  Thank you.  So Mr.

4    Sharma, if you want to go ahead and enter in the stipulation.

5    MR. SHARMA:  Sure.  Thank you, Your Honor.  The parties

6    have agreed to stipulate to nine media articles.

7    JUDGE TRACY:  Uh-huh.

8    MR. SHARMA:  And they will be marked Respondent --

9    MR. GARBER:  45?

10    MR. SHARMA:  -- 45.  We suggest 45(a) through --

11    JUDGE TRACY:  A through --

12    MR. SHARMA:  -- I'm counting.  Sorry.  (a), (b), (c), (d),

13    (e), (f), (g) and (h).

14    JUDGE TRACY:  Okay.

15    MR. SHARMA:  (i).  I'm sorry.  (i).

16    JUDGE TRACY:  Okay.

17    MS. ALARCON:  So Respondent's 45(a) through 45(i).

18    **(Respondent Exhibit Number 45(a) through (i) Marked for**

19    **Identification)**

20    MS. FEINBERG:  So in this stack you gave me -- oh, we're

21    on the record.  Oh, I see.

22    MR. SHARMA:  And for the record, I ordered them all in the

23    same order, so each article that will go into evidence, the

24    parties have in the same order that we're putting it in.

25    MS. FEINBERG:  Could you -- but somehow I -- but then I



1    would have two copies of one of them.

2        JUDGE TRACY:  So how about this.  We'll take care of your

3    confusion once we get off the record.

4        MS. FEINBERG:  Okay.  Fine.  Fine.

5        JUDGE TRACY:  Let's just put these in.

6        MS. FEINBERG:  Thank you.

7        JUDGE TRACY:  So these are media articles.  Do you have a

8    copy for me?

9        MR. SHARMA:  Yes.

10        JUDGE TRACY:  Okay, good.

11        MR. SHARMA:  And Your Honor, the purpose of these

12    documents is that the tweet that's at issue from Elon Musk from

13    May 20th of 2018 --

14        JUDGE TRACY:  Uh-huh.

15        MR. SHARMA:  -- and the -- these articles show that that

16    tweet, as well as Tesla issued a media statement, were both

17    widely reported.  And these articles are illustrative of the

18    reporting on those issues.

19        JUDGE TRACY:  Okay.  And so basically this was a

20    stipulation that the parties entered into.  There is no written

21    stipulation, though, correct?

22        MR. SHARMA:  Correct.

23        JUDGE TRACY:  Okay.  And this is lieu of having expert

24    testimony?

25        MR. GARBER:  No.

22-60493.2509



1          MS. FEINBERG:  No, no.

2          JUDGE TRACY:  Oh no.  This is different.

3          MR. GARBER:  It's just to move things along.

4          JUDGE TRACY:  We already have that.

5          MR. GARBER:  It's to move things along, so that no one has

6     to come in and say --

7          MS. FEINBERG:  It was in lieu of Tesla's communications

8     person coming, because they didn't issue a written release.

9     When people -- as I understand it, if there was a media inquiry

10    in response to the tweet, Tesla would respond --

11         JUDGE TRACY:  Okay.

12         MS. FEINBERG:  -- with a particular statement.

13         JUDGE TRACY:  Okay.

14         MS. FEINBERG:  And these articles incorporate that

15    statement.

16         JUDGE TRACY:  Okay.  That's --

17         MS. FEINBERG:  And so it was a way for them to show that

18    the statement made it out into the world.  It's not the full

19    universe of the coverage of the tweet.  It's not maybe the full

20    universe of the coverage of the response, but it's a grouping

21    that wanted to put in and there it is.

22         JUDGE TRACY:  Okay.

23         MS. FEINBERG:  We were agreeing.

24         JUDGE TRACY:  Okay.

25         MS. FEINBERG:  That it's not relevant, but okay.



www.escribers.net | 800-257-0885

1      JUDGE TRACY:  Okay.  That's fine.  But it goes to your

2  case?

3      MR. SHARMA:  Yes.

4      JUDGE TRACY:  Your defense?

5      MR. SHARMA:  Yes, Your Honor.

6      JUDGE TRACY:  Okay.  That's fine.  So any objections to --

7  it's not -- so I guess it's not really a stipulation, but any

8  objection to Respondent's 45(a) through (i)?

9      MR. GARBER:  I only note that I don't find it relevant,

10  but that I don't object to it -- to them going into the record.

11      JUDGE TRACY:  Okay.  And for the Charging Parties?

12      MS. FEINBERG:  I also don't find them relevant to the

13  extent they covered this case.  Even -- some of these cover

14  them before the case started.  You know, I just feel like

15  that's not necessarily appropriate, but they are what they

16  purport to be.

17      JUDGE TRACY:  Okay.

18      MS. FEINBERG:  So I don't have any objection to that.

19      JUDGE TRACY:  All right.  So the objections are noted for

20  the record and Respondent's Exhibits 45(a) through (i) are

21  admitted into evidence.

22      **(Respondent Exhibit Number 45(a) through (i) Received into**

23      **Evidence)**

24      MR. SHARMA:  Thank you, Your Honor.  Actually, Ms.

25  Feinberg had indicated there are two additional documents, also



1    media reports.  She -- that Charging Parties objected to them,

2    because they discussed -- part of the articles discuss witness

3    at trial.  They also discuss the May 20th tweet, Mr. Musk's

4    tweet and our media statement response.  So we would also like

5    to have those go into evidence.  So they're a through -- 45(a)

6    through (i), but we would also like Your Honor to take judicial

7    notice of them, if the parties cannot stipulate to their

8    authenticity.

9         MS. FEINBERG:  I could -- do you want me to speak to that?

10        JUDGE TRACY:  Yes.

11        MS. FEINBERG:  I mean, I just may want to.  Okay.  So

12   obviously this is from -- you know, from the first day of this

13   hearing there was a lot of press here.  Since then, there's

14   continued to be.  Or press covers other press.  But I don't

15   think press coverage of this trial itself is appropriate to go

16   to the Board or to you.  I think you're going to make your own

17   assessments.

18        And so these two articles Mr. Sharma's talking about now

19   are coverage based on what was happening in this court -- in

20   this hearing room about the tweet, about what people said.  And

21   they did their own coverage.  And so I don't feel like that's

22   appropriate to have coverage of this hearing as part of a hit

23   record of this hearing.  I just don't see that.  I've never

24   been in that experience before.  But -- well, as it is, we're

25   supposed to be somewhat sequestered.  It seems a little


www.escribers.net | 800-257-0885

1    peculiar.

2         JUDGE TRACY:  And then Mr. Garber, any thoughts on that?

3         MR. GARBER:  To be honest, I was actually sorting through

4    the exhibit.  I'm missing one, but we can sort that out later.

5    As long as there's a complete copy of it.  Well -- I'm sorry.

6         JUDGE TRACY:  So the issue was that there are two

7    additional medial articles that the Respondent is seeking to --

8         MR. GARBER:  Uh-huh.

9         JUDGE TRACY:  -- enter into evidence.  And that's not

10   included in 45(a) through (i) --

11        MR. GARBER:  Uh-huh.

12        JUDGE TRACY:  -- which the Charging Party has objections

13   to, which is why -- like real objections to, because they cover

14   this hearing.  And so I was asking for -- on the record, your

15   thoughts about that.

16        MR. GARBER:  Again, I don't think it's relevant.  I agree

17   with the Charging Parties, but I understand you have a duty to

18   fill the record and move these along, so I --

19        JUDGE TRACY:  Well, so where's what I'd like --

20        MR. GARBER:  -- I object --

21        MS. FEINBERG:  I just want to say it's covering the

22   testimony of Jose Moran.

23        JUDGE TRACY:  Okay.

24        MS. FEINBERG:  I mean, to you think that that's

25   appropriate for you or the Board to be hearing what the news



www.escribers.net | 800-257-0885

1    says about the test of Jose Moran?

2        JUDGE TRACY:  So, could you do this?  Could you number

3    them as 44 and -- no, not 44.

4        MR. ROSS:  Not 44.

5        MR. RODRIGUEZ RITCHIE:  The first set --

6        JUDGE TRACY:  I've got it.  Hold on.  46.

7        MR. RODRIGUEZ RITCHIE:  -- 45.  The next set would be 46.

8        JUDGE TRACY:  46 and 47.  If you could do that for me.

9    And I will take a look at those.  And if you're seeking to move

10    those into evidence, if I do decide not to include them, then

11    you can have them in the rejected exhibits pile. But let me

12    take a look at them over a little break that we'll take now

13    maybe.  I would note that if the purpose of these is because it

14    references the tweet that's at issue and you already have 45(a)

15    through (i) that covers it without also covering the hearing.

16        I'm not sure if the additions -- since you've already

17    agreed that it isn't the entire universe of all of the media

18    statements out there, how that would be -- you know, it

19    wouldn't tip the scales towards something that is unpersuasive

20    in this hearing and would frankly just a bit prejudicial to

21    have the slant of the media in here about the hearing.  Not

22    about the tweet, but this hearing.  So let me take a look at

23    them.

24        MR. SHARMA:  Okay.  Thank you, Your Honor.

25        JUDGE TRACY:  Okay.  So that's 46 and 47.  And is there


www.escribers.net | 800-257-0885

1    anything else that --

2         MR. GARBER:  It's not 46.  Sorry.

3         JUDGE TRACY:  45 --

4         MR. GARBER:  Not 47.  There's no 47 yet.

5         THE COURT REPORTER:  No.  46, 47.

6         JUDGE TRACY:  Yes, 46 and 47.

7    **(Respondent Exhibit Number 46 and 47 Marked for Identification)**

8         MR. GARBER:  Okay.

9         JUDGE TRACY:  So Respondent's Exhibits 45(a) through (i),

10   if I have not made it clear, are admitted into evidence.

11        MR. SHARMA:  Thank you, Your Honor.

12        JUDGE TRACY:  And you guys are still looking over the

13   transcript and audio.

14        MR. ROSS:  We are.  We'll be prepared to respond after

15   lunch.

16        JUDGE TRACY:  Okay.  We already now have the formal

17   papers, so let me have those entered into evidence.  So if I

18   could just get a copy of the index.  Or just let me read it.

19        MR. RODRIGUEZ RITCHIE:  We -- I made additional copies

20   anyway.  Do you want me to get them?

21        MR. ROSS:  Could she have a statement from the General

22   Counsel as to why these documents did not find their way into

23   the formal documents until we pointed out their omission

24   yesterday?

25        MR. RODRIGUEZ RITCHIE:  I don't believe that's necessary.



1    MR. ROSS:  It may not be necessary, but we'd nonetheless

2    request such a statement.

3    MR. RODRIGUEZ RITCHIE:  Sure, but Mr. Ross does not have

4    the ability to order me to provide any statements.

5    MR. ROSS:  Okay.

6    JUDGE TRACY:  So the formal papers are -- the General

7    Counsel, as they create them.  And so I'm not going to get into

8    why they weren't already in there.  There are a lot of

9    documents in this case and some arguably are separate filings

10   that were not related to this case until I consolidated them.

11   And so there could be this argument made that it isn't properly

12   in this case.

13   I err on the side of including more, even though frankly

14   the Board can look at whatever they want to look at, because

15   these are filings before the Board.  So let's just put them

16   into the record.  All right, so I have received for the formal

17   papers, Exhibits 1(bbbb) to 1(eeee).  And are there any

18   objections to entering those into evidence?

19   MS. FEINBERG:  No.

20   JUDGE TRACY:  No.  Any objections?

21   MR. ROSS:  No.

22   JUDGE TRACY:  Okay.  So General Counsel's -- any

23   objections?

24   MR. GARBER:  No.

25   JUDGE TRACY:  Okay.  Thank you.  So General Counsel's

22-60493.2516



1   Exhibits 1(bbbb) through 1(eeee) are admitted into evidence.

2   **(General Counsel Exhibit Number 1(bbbb) - 1(eeee) Received into**

3   **Evidence)**

4       JUDGE TRACY:  Okay.  So that's done.  And 41, Respondent's

5   41.  Is there something more?  Or is --

6       MS. FEINBERG:  I have one little thing.

7       MR. ROSS:  Judge, on that document --

8       JUDGE TRACY:  Hold on one second, please.  Let's go off

9   the record.

10  (Off the record at 11:57 a.m.)

11      JUDGE TRACY:  Okay.  So we're back on the record.  I made

12  an error.  I had already admitted all of those other formal

13  papers, so now these are the correct formal papers, so this is

14  General Counsel's Exhibits 1(ffff) to 1(mmmm) that is admitted

15  into evidence.

16  **(General Counsel Exhibit Number 1(ffff) - 1(mmmm)  Received**

17  **into Evidence)**

18      JUDGE TRACY:  Okay.  Now we can go off the record.

19  (Off the record at 12:00 p.m.)

20      JUDGE TRACY:  All right.  So something else that I need to

21  correct is that off the record, there was a realization that

22  General -- or Respondent's Exhibit 45 was mis-lettered.  So

23  it's actually -- I'm admitted into evidence Respondent's

24  Exhibit 45(a) through (h).

25      Okay.  So now again, we'll go off the record.



www.escribers.net | 800-257-0885

1    (Off the record at 12:03 p.m.)

2     JUDGE TRACY:  All right.  Okay.  All right.  So the first

3    thing that we'll take care of is the General Counsel's motion

4    to amend the complaint.  Go ahead.

5     MR. GARBER:  Thanks.  So having received authorization

6    from the Office of the General Counsel, Counsel for General

7    Counsel moves to orally amend the complaint in this matter to

8    add paragraph 7(z), as in zebra, which reads, "On multiple days

9    in September and October of 2017, Respondent by employee

10   relations partner, Ricky Gecewich, at the Fremont facility

11   during multiple meetings with employees promulgated an overly

12   broad confidentiality policy by prohibiting employees from

13   discussing workplace investigations that directly related to

14   employees' terms and conditions of employment, including

15   discipline."

16     I direct Your Honor's attention to Amglo Kemlite

17   Laboratories 360 NLRB No. 51.  It's a 2014 decision.  There the

18   Board ruled that the judge erred in denying the General

19   Counsel's motion on the last day of the three-day hearing to

20   amend a complaint to add an 8(a)(1) threat, as the Respondent

21   did not object to the testimony at the time it was adduced, had

22   an opportunity to examine the individual that made the remark

23   and the motion amending the complaint contained a similar

24   violation.

25     This was also enforced by the Seventh Circuit at 833 F.3d



1   824 in 2016.

2       MS. FEINBERG:  Yes.

3       JUDGE TRACY:  Assuming you join the motion.

4       MS. FEINBERG:  I do.  And just say that I don't think it's

5   uncommon in an administrative proceeding to be able to amend

6   according to proof.  This particular testimony came in through

7   a witness who was here longer than any other witness, spoke at

8   length about his conversations with the employees on this

9   particular topic.

10      There was ample opportunity to cross-examine him when he

11  came as the General Counsel's witness, as he came as Mr. Ross'

12  witness.  And while the amendment is coming in now, before the

13  witness retook the stand, the General Counsel's representative

14  indicated he was going to try to amend the -- and so I don't

15  think that there's any prejudice to Tesla.

16      JUDGE TRACY:  Very briefly.

17      MR. ROSS:  Your Honor, we object, because we believe that

18  at this late stage in the proceeding, it's inappropriate,

19  improper and prejudicial that -- for this amendment to be made.

20  And while it is true that the union -- I'm sorry, the General

21  Counsel.  I get them mixed up sometimes.  While the General

22  Counsel did, in fact, inform us that there was the possibility

23  of that amendment, it was not an amendment that was made while

24  Mr. Gecewich was on the stand and it would have been premature

25  for us to examine him about something that was not yet in

22-60493.2519



1    dispute.

2    We're not going to litigate something that's not before

3    you.  When a witness is on the stand, we can't be expected to

4    know what the General Counsel is going to do 20 minutes before

5    we may conclude our case.  So we think it's prejudicial and

6    we're objecting to the amendment.

7    JUDGE TRACY:  All right.  So as I've indicated before --

8    MR. ROSS:  Uh-huh.

9    JUDGE TRACY:  -- you know, I've taken a -- I've thought

10   about this.  I've thought about this actually previously, when

11   you indicated, for the General Counsel, that you thought you

12   may do this.  I'm denying your motion to amend the complaint at

13   this point.  I rely upon -- which is in the bench book, that

14   Rogen Brothers Sanitation, where -- 362 NLRB No. 61, where the

15   Administrative Law Judge has discretion.

16   And the reason for this is that although there isn't sort

17   of a surprise, and it was based upon what you heard in his

18   testimony, it wasn't fully litigated, because at that time,

19   there wasn't the -- the motion to amend wasn't made.  In fact,

20   if I recall correctly, Tuesday was the day.  He was called back

21   a couple days later.  I can understand if you had sought to

22   amend it before he testified again, but he didn't and this is

23   the last day, hopefully, of this hearing.

24   My other big concern is that clearly, based upon his

25   testimony, there was an investigation that involved him.  There

escribers
www.escribers.net | 800-257-0885

1    was an affidavit taken.  There was considerable questioning

2    into his role.  And so you could use that for some other

3    purposes, I suppose, but at this point, to amend the complaint

4    to include this allegation, I'm denying that.

5        MS. FEINBERG:  Okay.  I know you hate this, Your Honor,

6    but could I just say one thing in response to what Mr. Ross

7    said and --

8        JUDGE TRACY:  Sure.

9        MS. FEINBERG:  Okay.  Just so the record's clear.  I

10   don't -- since we all sat through this, Mr. Gecewich was asked

11   about the conversations where these statements were made over

12   and over again.  He was asked to explain over and again every

13   single thing he said.  He was asked to read his notes.  What

14   else could be elicited, or could be put on, that could be a

15   defense by Tesla?  The issue in this charge that they're trying

16   to -- the section they're trying to amend are statements he

17   said in meetings of which he has testified about numerous times

18   and has been asked, exhaustively -- and I say exhaustively --

19   about every single word he said and how he said it.  So I don't

20   really see how they're prejudice because what else could they

21   have done but ask him the questions that they've already asked

22   him?

23       JUDGE TRACY:  Um-hum.

24       MS. FEINBERG:  So I understand your position, but I would

25   ask you to reconsider because this is -- it is our right -- it



1    is the General Counsel's right to amend to proof, and the proof

2    is what he said and they were given ample opportunity to

3    examine him about what was said in those meetings.  So they are

4    not harmed.  This is the most extensive -- because he was

5    called twice -- extensive testimony you could ever have a

6    witness.  His notes were put in, he was asked what his notes

7    meant and so forth.  So you lived through it, I don't need to

8    continue on, but it doesn't seem that -- what else could be

9    elicited but what he said, since the charge, the actual

10   allegation is what he said?

11       JUDGE TRACY:  Sure.  And so, again, like I said before,

12   I'm going to deny the motion to amend based upon what I said

13   previously.  So there's that.

14       MS. FEINBERG:  Okay.

15       JUDGE TRACY:  Now --

16       MS. FEINBERG:  So I didn't number these yet.

17       JUDGE TRACY:  No, first --

18       MS. FEINBERG:  Or you're asking me to give them to you?

19       JUDGE TRACY:  First --

20       MS. FEINBERG:  Okay.

21       JUDGE TRACY:  -- let's deal with your subpoena.

22       MS. FEINBERG:  Okay, yes.

23       JUDGE TRACY:  You wanted to -- because there has been

24   considerable subpoena issues going back and forth in this

25   matter.  And in the event that there is an issue where I need



1    to reference the subpoena, the General Counsel's subpoena has

2    already been entered into evidence in this case, and the

3    Charging Party wants to put theirs in the record as well.  So

4    that would be, I'm guessing, Charging Party's Exhibit 6.

5         MS. FEINBERG:  Yes, please.

6    **(Charging Party Exhibit Number 6 Marked for Identification)**

7         JUDGE TRACY:  Okay.

8         MS. FEINBERG:  And I've given everybody a copy.

9         JUDGE TRACY:  And any objections to that?

10        UNIDENTIFIED SPEAKER:  No.

11        MR. MORRIS:  We would --

12        UNIDENTIFIED SPEAKER:  Oh, sorry.

13        JUDGE TRACY:  Go ahead.

14        MR. MORRIS:  We would object as to relevance.

15        JUDGE TRACY:  All right.  And so, again, the objection is

16   overruled.  I don't think, at this point, it's relevant as far

17   as what's happened in the course of this.  We've had a lot of

18   issues with it.  Over time they have, I thought, been resolved,

19   but perhaps some haven't.  I mean, I know I have indicated, at

20   various points, you know, argue in your brief if there are

21   sanctions or what have you that you're requesting.  To be safe,

22   we'll put Charging Party's Exhibit 6 into evidence.

23   **(Charging Party Exhibit Number 6 Received into Evidence)**

24        MS. FEINBERG:  I think we should, yes, Your Honor, because

25   we did read part of into the record.


www.escribers.net | 800-257-0885

1      JUDGE TRACY:  That's right.

2      MS. FEINBERG:  We discussed it on the record, and I feel

3  for a complete record, the document should be there.

4      JUDGE TRACY:  Okay.  So what we'll do is, I'm ready to let

5  you all know about 47 and 46, but he's not here, so I'll wait

6  for Mr. Sharma to come back.

7      MS. FEINBERG:  Okay and --

8      JUDGE TRACY:  And then what else?

9      MR. MORRIS:  And before we move on --

10      MS. FEINBERG:  The transcripts.

11      MR. MORRIS:  -- I'm assuming if the subpoena is coming in,

12  then your order on the petition to revoke would also come in,

13  correct?

14      JUDGE TRACY:  Oh, yeah, goodness.  Okay, so do we have

15  that?  Do we have the copies of the order?

16      MS. FEINBERG:  I --

17      JUDGE TRACY:  Because I think we did that, right, with

18  your General Counsel's ones?

19      MR. RODRIGUEZ RITCHIE:  Yes.

20      JUDGE TRACY:  We put the orders in?  So let's --

21      MS. FEINBERG:  Okay.

22      JUDGE TRACY:  -- during a break or some point get in,

23  you're right, the order.  Thank you.

24      MS. FEINBERG:  Then, of course, there was other

25  conversations, but okay.



www.escribers.net | 800-257-0885

1          MR. GARBER:  Do you have a copy of it?

2          MS. FEINBERG:  I think Julie has it one of those many

3    binders behind us.

4          JUDGE TRACY:  What did we put in before?  Tell me what --

5    let me look at my notes.  What did we put in?

6          MR. GARBER:  You're right.

7          JUDGE TRACY:  We put in the subpoena.

8          MR. RODRIGUEZ RITCHIE:  And your order.

9          JUDGE TRACY:  And the order.

10         MS. FEINBERG:  Okay.  That's why you were asking me that.

11         JUDGE TRACY:  Okay, so --

12         MS. FEINBERG:  We didn't discuss as much, but okay.

13         JUDGE TRACY:  Yeah, I'm sorry.

14         MS. FEINBERG:  We can --

15         JUDGE TRACY:  We should've done that.  Let's put in the

16   order.  So we'll get that.

17         MS. FEINBERG:  Okay --

18         JUDGE TRACY:  And that'll be labeled as Charging Party's

19   Exhibit 7.

20   **(Charging Party Exhibit Number 7 Marked for Identification)**

21         JUDGE TRACY:  It just kind of goes together.

22         MS. FEINBERG:  Yeah, sure.

23         JUDGE TRACY:  And we'll wait for Mr. Sharma to discuss 47

24   and 46.  41, are you ready to do, Respondent's 41?

25         MR. ROSS:  Yes, Judge.  Try as we might, we tried to get



www.escribers.net | 800-257-0885

1    better copies and the internet is not cooperation and so I

2    think we are just going to have to live with the current --

3        JUDGE TRACY:  With the one that you've already provided?

4        MR. ROSS:  Correct.

5        JUDGE TRACY:  Okay.  So --

6        MR. ROSS:  That's the same one.

7        MS. FEINBERG:  Sure as hell hope so.

8        MR. ROSS:  It is the same one.

9        MS. FEINBERG:  I got you a good copy.

10       MR. ROSS:  Oh, I misspoke.

11       JUDGE TRACY:  I'm like, we are on the record.

12       MR. ROSS:  Oh, my goodness.

13       JUDGE TRACY:  Okay.  So shall we hold off on 41?

14       MR. ROSS:  Sure.

15       JUDGE TRACY:  Still?  Okay.

16       MR. ROSS:  Please.

17       JUDGE TRACY:  All right, so we'll hold off those two and

18   okay, so let's go off the record.

19   (Off the record at 1:20 p.m.)

20       JUDGE TRACY:  Okay.  So we're back on the record.  At this

21   point, Respondent is moving for Respondent's Exhibit 41 to be

22   entered into evidence.  Any objections?

23       MR. RODRIGUEZ RITCHIE:  Yes, Your Honor.  As we previously

24   had noted, we object to the relevancy of the document and we

25   also object to the document as portions of the document are



1    unreadable.

2    JUDGE TRACY:  Okay.  And I believe -- what is the Charging

3    Party's position?

4    MS. FEINBERG:  Well, I share the General Counsel's

5    concern, however, Your Honor, I hate to part with them, but

6    there's been so much testimony by the vice president of legal,

7    Mr. Chang, about this document that I think, for the record to

8    make any sense, it has to be part of the record.

9    JUDGE TRACY:  Okay.

10    MS. FEINBERG:  What weight it's given, I think, is, you

11    know, questionable, and we may even argue that it proves the

12    opposite of what they're trying to present.

13    JUDGE TRACY:  Okay.  And so, in terms of the readability,

14    to address that very briefly for the record, your efforts to

15    try to find another version, or a more legible copy of that,

16    right?  That was --

17    MR. ROSS:  We sought to do that --

18    JUDGE TRACY:  -- unsuccessful.

19    MR. ROSS:  -- but were not successful in getting a more

20    legible one.  I'll grant you that it is not the most readily

21    readable text I've ever seen.  It is readable.

22    JUDGE TRACY:  Okay.  So I'm going to overrule objections

23    to Respondent's Exhibit 41 and admit it into evidence, but I

24    will note that it is -- I mean, the first page is clear.  The

25    second page of it, especially what's in the little box is



www.escribers.net | 800-257-0885

1   unclear and, frankly, once it gets scanned in, I don't know

2   what it will show, however, as Ms. Feinberg said, there was a

3   lot of testimony about it and it would only make sense that

4   he -- the reader can see what this person was testifying about.

5   So Respondent's Exhibit 41 is admitted into evidence.

6   **(Respondent Exhibit Number 41 Received into Evidence)**

7          MS. FEINBERG:  Transcripts.

8          JUDGE TRACY:  Again, I'm going to hold off 46 and 47.

9   Let's go off the record again.

10   (Off the record at 1:24 p.m.)

11          JUDGE TRACY:  Okay, so we're back on the record.  What I

12   have also received is what's labeled as Charging Party's

13   Exhibit 7, which is the order regarding the subpoena, the

14   Charging Party's subpoena.  So that's CP-7.  Any objections to

15   allowing that into evidence?

16          MR. MORRIS:  Which one is that?

17          JUDGE TRACY:  This is my order regarding the Charging

18   Party's subpoena.

19          MR. MORRIS:  No.

20          JUDGE TRACY:  And?

21          MS. FEINBERG:  Obviously not.

22          JUDGE TRACY:  So Charging Party's Exhibit 7 is admitted

23   into evidence.

24   **(Charging Party Exhibit Number 7 Received into Evidence)**

25          JUDGE TRACY:  And then let's talk about Respondent's 46



1    and 47.  I said that I would review them.  I have done that.

2    With Respondent's 46, let me first say, Respondent's 46 is a

3    May 24th article, and it talks about the -- well, the title of

4    it's "Musk, Stock Option, Tweet Violated US Labor Law, UAW

5    Alleges."  Any objections to that document being moved into

6    evidence?

7        MR. GARBER:  We object as to relevance, but not as to its

8    authenticity.

9        JUDGE TRACY:  Okay.

10       MS. FEINBERG:  Same.

11       JUDGE TRACY:  All right.  So I'm going to overrule the

12   objection and Respondent's Exhibit 46 are admitted into

13   evidence.

14   **(Respondent Exhibit Number 46 Received into Evidence)**

15       JUDGE TRACY:  Again, the relevance of it I will -- sure

16   I'll be educated on that in the briefs.

17       Now, with regards to Respondent's Exhibit 47 -- did I just

18   misspeak?  Respondent's 46 is admitted into evidence.  47, that

19   one is a September 24th, 2018 article where this is a summary

20   of, or a characterization of the testimony that was already

21   provided in the second week of the hearing in this matter.  And

22   so, again, the Respondent's moving this into evidence and I

23   want to hear if there are any objections to it.

24       MR. GARBER:  Same objection.  Oh no, 47, I'm sorry.

25       JUDGE TRACY:  47.

22-60493.2529



1    MR. GARBER:  47 we're putting into the rejected exhibits

2    pile.

3    JUDGE TRACY:  Well, right, but I'm on the record now, so

4    we need to kind of get through all this --

5    MR. GARBER:  Oh, I'm sorry.  Yeah, we object as to the

6    relevance of it.

7    MS. FEINBERG:  We object to relevance and also the

8    prejudicial nature of it.  It doesn't seem appropriate that

9    coverage of this hearing while someone is sitting -- should be

10   going into the record.  The record is the record and that's

11   what should be before the Board and yourself.

12   JUDGE TRACY:  All right.  And so, again, in this instance,

13   for Respondent's 47, I agree with the objections and so I

14   sustain the objections.  And Respondent's 47 will go into the

15   rejected exhibits pile.

16   **(Respondent Exhibit Number 47 Rejected)**

17   JUDGE TRACY:  Finally, we discussed there was the issue of

18   the Sacramento hearing and a proposed stipulation that the

19   parties could not agree to.  And because you could not agree to

20   that -- again, we had off-the-record discussions about how the

21   Charging Party is seeking to introduce that into the record.

22   So Ms. Feinberg?

23   MS. FEINBERG:  Okay.  So at this time, what we would like

24   to introduce into the record is a USB drive, which contains the

25   testimony at the Senate Budget and Fiscal Review Committee



1    hearing held on September 13, 2017.  That's of course the State

2    of California, if that wasn't clear.  Which could be found at a

3    link which maybe we'll put on a piece of paper and attach to

4    the USB thing, just the link, or not, I don't know, because

5    it's hard to read the link into the record.  But if you want me

6    to give it a shot, I could, which is better.  And then,

7    similarly, the USB drive also contains testimony given at the

8    California State Assembly Budget Committee held on the hearing

9    on September 14th, 2017.

10       And in the first instance, we are drawing the Board's

11   attention to the testimony of Paula Tree, who introduces, and

12   then the testimony of Travis Pratt and Shaun Ives.  Testimony

13   in the Senate hearing begins at 51.21 and Mr. Pratt's testimony

14   begins at -- it runs consecutively and his testimony begins at

15   52.07 of that proceeding.

16       And then with respect to the California State Assembly

17   Budget Committee, the testimony begins, for Paula Tree, at

18   52.37, Shaun Ives begins at 53.18, and Travis Pratt begins at

19   54.13.  And so we're asking to take judicial notice of that,

20   and for the convenience of yourself and anyone else who wants

21   to look at it, we will attach a transcript to our briefs.

22       JUDGE TRACY:  Okay.  And so let me ask you.  You mentioned

23   three individuals?

24       MS. FEINBERG:  The reason we included --

25       JUDGE TRACY:  So I've heard of the two.

22-60493.2531



1      MS. FEINBERG:  The reason we included the third originally

2    is that she's the person who says, hello, we're here today and

3    we have the following two people.

4      JUDGE TRACY:  And who is this person?

5      MS. FEINBERG:  I believe she's a lobbyist for Tesla, but

6    she's the one who actually says their names and introduces them

7    into the record.  So everything is -- Paula Tree is her --

8      JUDGE TRACY:  Paula Tree?

9      MS. FEINBERG:  Uh-hum.

10      JUDGE TRACY:  And is she -- not her testimony, but her

11    announcement, her voice, is on both hearings?

12      MS. FEINBERG:  Yes, it's both, right before they testify.

13    But we're giving you -- the USB contains the whole hearing.

14      JUDGE TRACY:  So --

15      MS. FEINBERG:  I just was highlighting that because that's

16    how you'll know that you're getting to the part where they're

17    about to testify.

18      JUDGE TRACY:  Okay.  And what number is the USB drive?  I

19    guess it'll be after your other documents.

20      MS. FEINBERG:  So I made all my other documents that

21    I'm -- Charging Party 8(a) through (h).

22      JUDGE TRACY:  Oh, okay, so this could be 9.

23      MS. FEINBERG:  This could be 9.

24      JUDGE TRACY:  So this is Charging Party 9 and let me say

25    this.  What I think would be helpful, for the record, is if, as



1    another exhibit or 9 -- yeah, just do it as a 10, is put on a

2    piece of paper the actual links, like --

3    **(Charging Party Exhibit Number 9 Marked for Identification)**

4         MS. FEINBERG:  The date and the link --

5         JUDGE TRACY:  -- the actual URL --

6         MS. FEINBERG:  -- the date and the link.

7         JUDGE TRACY:  Is it URL?

8         MS. FEINBERG:  Yes.

9         JUDGE TRACY:  The actual --

10        MS. FEINBERG:  Um-hum.

11        JUDGE TRACY:  -- links for --

12        MS. FEINBERG:  Yes.

13        JUDGE TRACY:  -- both or however way so that way that can

14   be as an exhibit.

15        MS. FEINBERG:  Um-hum.

16        JUDGE TRACY:  In the record here.

17        MS. FEINBERG:  That's fine.  And that way you'll know that

18   it's also an official document because it will show that it's

19   Cal --

20        JUDGE TRACY:  Yeah.

21        MS. FEINBERG:  By the link.

22        JUDGE TRACY:  Okay.

23        MS. FEINBERG:  So we will do that.

24        JUDGE TRACY:  All right.  So are there any objections

25   to -- obviously, there's me taking judicial notice, which I


www.escribers.net | 800-257-0885

1   will do, but any objections to the USB drive coming into

2   evidence?

3        MR. ROSS:  I will be provided with a copy of the USB

4   drive?

5        MS. FEINBERG:  I have one for everybody.

6        JUDGE TRACY:  Yes.

7        MS. FEINBERG:  You can pick your color.

8        MR. ROSS:  Okay.

9        JUDGE TRACY:  Okay?

10        MR. ROSS:  Thank you.  Yes, we object as being incomplete.

11   As I said while we were off the record, we were perfectly

12   willing to stipulate to the admission of this information, if

13   it was contextualized, which the proffer made by the Union does

14   not provide that appropriate context.

15        We would, however, ask the judge to take official notice

16   of an article entitled, "Tesla Labor Battle Over "Fair and

17   Responsible Workplace" Could Affect Taxpayer Rebates."  It

18   appears in a publication called, "Cleantechnica.com."  It

19   appears at cleantechnica.com/2018/07/01/tesla-labor-battle-

20   over-fair-and-responsible-workplace-could-affect-taxpayer-

21   rebates/.

22        And we would ask that if the Judge is inclined to give

23   weight to the information that the Union is offering by way of

24   this USB, that this Cleantechnica article be used as

25   contextualizing the testimony that was offered by the



1   individuals who are the subject of the complaints in this case.

2       JUDGE TRACY:  So --

3       MR. RODRIGUEZ RITCHIE:  Can we be heard?

4       JUDGE TRACY:  Okay.

5       MR. RODRIGUEZ RITCHIE:  Well, we would object to the

6   request for judicial notice of this particular article that has

7   not been marked as an exhibit.  It's entirely inappropriate to

8   take judicial notice of someone else's contextualization of a

9   public hearing.

10      The public hearing, the reason why that's appropriate to

11  take judicial notice of is it's a public hearing.  This is some

12  random person interpreting what they believed happened at the

13  hearing, so we do not believe that the Federal Rules of

14  Evidence have been complied with and so we would object to that

15  request.

16      JUDGE TRACY:  So I would sustain your objection.

17      MS. FEINBERG:  Okay.

18      JUDGE TRACY:  Here's the thing though.  What I am willing

19  to take judicial notice of, which would be helpful to this

20  record, is these individuals were testifying at a budget

21  hearing, but they were testifying in particular about a

22  specific bill.  What was the bill number?

23      MR. ROSS:  My understanding --

24      JUDGE TRACY:  I can take judicial notice of the bill

25  number.



1        MR. ROSS:  Yes.  My understanding is that they were

2    testifying in opposition to, I believe it was AB 109 and AB

3    134.

4        JUDGE TRACY:  Can you please confirm that?

5        MR. RODRIGUEZ RITCHIE:  You said AB 109 and what was the

6    other one?

7        MR. ROSS:  I believe so and indeed I --

8        JUDGE TRACY:  And 134.

9        MR. ROSS:  And I would also -- yes, and I believe that

10    will be reflected in the --

11        JUDGE TRACY:  In the hearing?

12        MR. ROSS:  -- USB.

13        JUDGE TRACY:  Okay.  That's great.  I mean, that's really

14    the context that's needed.

15        MS. FEINBERG:  You know, just so it's accurate.  The way

16    that the California Legislature -- sometimes they work on

17    bills.

18        JUDGE TRACY:  Okay.

19        MS. FEINBERG:  And they also vote on their budget, and

20    sometimes in the context of the budget, there are writers that

21    have substance.

22        JUDGE TRACY:  Okay, right, right.

23        MS. FEINBERG:  So in this case, I believe that the

24    testimony -- that's why you're before a budget committee, was

25    actually on the budget act.  And then there was, I think, Mr.



www.escribers.net | 800-257-0885

1    Ross referenced AB 134, which was the follow-up bill actually

2    later that then implemented it.

3         JUDGE TRACY:  But so were these two individuals --

4         MS. FEINBERG:  They were on the budget act --

5         JUDGE TRACY:  -- on September --

6         MS. FEINBERG:  -- of 2017.

7         JUDGE TRACY:  Yeah, but September -- what was the date you

8    all said that they testified?  This --

9         MS. FEINBERG:  In 2017.

10        JUDGE TRACY:  September of 2017.

11        MS. FEINBERG:  The 13th and 14th.

12        JUDGE TRACY:  Right, 13th and 14th of 2017.  Is the

13   subject matter -- it's not really the subject matter.  But what

14   they were testifying about, as it relates to budget.

15        MS. FEINBERG:  Um-hum.

16        JUDGE TRACY:  Was that both AB 109 and 134?

17        MS. FEINBERG:  I don't know about -- I'd have to check on

18   AB 109.  It is ultimately as amended by AB 134.

19        JUDGE TRACY:  Okay.  So just confirm that because that is

20   what I will take judicial notice of.

21        MR. ROSS:  Okay.

22        JUDGE TRACY:  Because obviously, when you read the bill,

23   then you know what the bill is about, and then you get the

24   context of it by listening and reading -- well, we have no

25   transcript to read, that's fine, but listening to the audio of

www.escribers.net | 800-257-0885

1    what they were doing.  But really, most important, this just

2    provides background because it sort of is what lead up to --

3        MR. ROSS:  Sure.

4        JUDGE TRACY:  -- these various interactions.

5        MR. ROSS:  Right.

6        JUDGE TRACY:  So yeah.  Okay.  So and any objections for

7    the General Counsel about the Charging Party's Exhibit 9?  This

8    is this.

9        MR. GARBER:  USB?

10       JUDGE TRACY:  Yeah.

11       MR. GARBER:  No.

12       JUDGE TRACY:  All right.  So Charging Party's -- I'm going

13   to overrule the objection.  Well, I don't know.  Did you have

14   an objection Charging Party 9?

15       MR. ROSS:  I do.  It lacks context.

16       JUDGE TRACY:  Okay.  So I'm going to overrule the

17   objection to Charging Party's 9 and admit it into evidence, but

18   I also want to put into the record, just because I would have

19   no idea where to search for the link for this actual audio,

20   where the hearing would be.  If we could just put in the record

21   just something that would indicate where these are.

22   **(Charging Party Exhibit Number 9 Received into Evidence)**

23       MS. FEINBERG:  Oh, right.  So on the record but we'll also

24   put it on a piece of paper, is that what you're saying?

25       JUDGE TRACY:  I'm saying that this piece of paper --



1      MS. FEINBERG:  Should have the --

2      JUDGE TRACY:  -- could be Charging Party's Exhibit 10 --

3      MS. FEINBERG:  We'll do it.

4      JUDGE TRACY:  -- which is just the --

5      MS. FEINBERG:  Yes.

6      JUDGE TRACY:  -- URL --

7      MS. FEINBERG:  We're prepared to do it.  Okay.

8      JUDGE TRACY:  -- thing.  Okay?  The bills are easily

9  found, but if you want to have a link and put that in, I'm fine

10  with that, too.

11      MR. ROSS:  Okay.

12      JUDGE TRACY:  Okay?

13      MR. ROSS:  Yep.

14      JUDGE TRACY:  Okay, so I think that's it for now.  So

15  let's go off the record.

16      MS. FEINBERG:  So they should provide us the bills --

17      JUDGE TRACY:  Yeah, yeah.

18      MS. FEINBERG:  -- if that's what they want.

19      JUDGE TRACY:  Well, they're going to do the link to it.

20      MS. FEINBERG:  The links to the bills?

21      JUDGE TRACY:  Yes.

22      MR. ROSS:  Yeah.

23      MS. FEINBERG:  I'm not spending the time to research the

24  bills.

25      JUDGE TRACY:  No, they're going to do that.



www.escribers.net | 800-257-0885

1    (Off the record at 1:59 p.m.)

2    JUDGE TRACY:  Okay, so we're back on the record.  I was

3    handed Charging Part's Exhibit 10, which is the actual links to

4    the two hearings.  Any objections to Charging Party's Exhibit

5    10?

6    MR. RODRIGUEZ RITCHIE:  No.

7    JUDGE TRACY:  Do you have 10?

8    MR. ROSS:  We have no objection to that.

9    JUDGE TRACY:  Okay.

10    MR. ROSS:  Well, we have the same objection to it that we

11    articulated before, with respect to the USB.

12    JUDGE TRACY:  Okay.

13    MR. ROSS:  But we don't have any additional objections.

14    JUDGE TRACY:  Okay.  All right.  So again, the objections

15    are overruled, but like said, I would welcome your ABA links.

16    And Charging Party's Exhibit 10 is admitted into evidence.

17    **(Charging Party Exhibit Number 10 Received into Evidence)**

18    JUDGE TRACY:  And then, finally, at this point, we have

19    also the Respondent is moving something in.  So go ahead, Mr.

20    Morris.

21    MR. MORRIS:  Yeah.  We'd like to move into evidence what's

22    been marked as Respondent's Exhibit 3, which is a May 25th,

23    2017 letter from Ms. Feinberg's office concerning the Cal/OSHA

24    complaint that was filed on behalf of the UAW, Jonathan

25    Galescu, and Richard Ortiz.



1          JUDGE TRACY:  Any objections?

2          MS. FEINBERG:  You just said I should go first or no?

3          JUDGE TRACY:  Go ahead.

4          MS. FEINBERG:  You were kidding?

5          MR. RODRIGUEZ RITCHIE:  Go ahead.

6          MS. FEINBERG:  Well, first of all, you ruled on this

7    already, so I guess they tried to get this in in an earlier

8    portion of the hearing and then he pulled it back, or maybe he

9    pulled it back based on some comments you made.  But this

10   document has already been discussed in this hearing and at that

11   time we contended that it was irrelevant.  What happens before

12   Cal/OSHA is not relevant --

13         JUDGE TRACY:  Oh, yeah.

14         MS. FEINBERG:  -- to this proceeding.  To take it is to

15   take it out of context.  We do not feel it is appropriate to

16   relitigate that case here.  So I don't know how this particular

17   document helps the record without understanding what other

18   pieces of it, and so we don't think that it's relevant to this

19   case.  So that's why we don't think it belongs in the record,

20   otherwise known as irrelevant.

21         MR. RODRIGUEZ RITCHIE:  So we would object to the document

22   on several bases.  We do not believe that this document is

23   relevant to any of the allegations contained in the complaint.

24   We also don't believe that it's what it had been represented to

25   be.  The document is not what it purports to be.  In addition



1    to that, it would be hearsay for us.

2        JUDGE TRACY:  Okay.

3        MR. RODRIGUEZ RITCHIE:  So we would object.

4        MS. FEINBERG:  That is true.  I thought it was represented

5    originally that it was about -- well, a, that it's a complaint,

6    but also the topic of it is a little bit different than was

7    what is in issue.

8        JUDGE TRACY:  Okay.  And so what is the relevance?

9        MR. MORRIS:  The relevance is to the allegations that

10   pertain to the OSHA 300 logs.  There was testimony that a

11   Cal/OSHA complaint was, in fact, filed.  There was no citation

12   issued by Cal/OSHA and this is, in fact, that Cal/OSHA

13   complaint which alleges that the confidentiality watermark is

14   somehow unlawful under federal and Cal/OSHA regulations.  And

15   so we think it's relevant to those allegations.

16       In addition, it's not hearsay.  It could be admitted as a

17   statement by a party.

18       JUDGE TRACY:  So --

19       MS. FEINBERG:  And this is the exact reason, Your Honor,

20   because Cal/OSHA does not issue if a matter is cured and by the

21   time, as you know, the history of the Cal/OSHA logs in this

22   case, the eight week -- the workers continued to request and

23   request and request for Tesla to comply with the law, and

24   ultimately, they did, and Cal/OSHA does not spend its resources

25   to go after cases where the things have been cured.  So now



www.escribers.net | 800-257-0885

1    I've had to say that on the record, which is exactly what we're

2    trying to avoid, which is we're not trying to litigate a

3    Cal/OSHA case before you.

4         JUDGE TRACY:  So let me say this.  What I recall

5    previously is that there was testimony of trying to -- there

6    were these conversations that Mr. Hedges had with Cal/OSHA and

7    I feel that that's where there was hearsay that came in about

8    that.

9         I would say this though.  I'm going to overrule the

10   objections and allow Respondent's Exhibit 3 into evidence.

11   **(Respondent Exhibit Number 3 Received into Evidence)**

12        JUDGE TRACY:  Again, you certainly, in the briefs, can

13   argue that they're not relevant.  Okay?  I mean, again, I'm not

14   here to --

15        MS. FEINBERG:  I know, because otherwise I have to --

16        JUDGE TRACY:  -- litigate --

17        MS. FEINBERG:  -- call myself as a witness to tell you

18   what --

19        JUDGE TRACY:  No, I'm not here to --

20        MS. FEINBERG:  -- Cal/OSHA told me, which is ridiculous.

21        JUDGE TRACY:  I'm not here to resolve Cal/OSHA logs.

22        MS. FEINBERG:  Okay.  No.

23        JUDGE TRACY:  But if this is just sort of a more --

24        MS. FEINBERG:  Well, then I --

25        JUDGE TRACY:  -- part of what happened here, with that



1    tangent of this, fine.  You know, again, the relevance of it

2    they're going to have to prove in their brief and --

3         MS. FEINBERG:  All right.  So can I at least say what I

4    said to you as an offer of proof?

5         JUDGE TRACY:  Yes.

6         MS. FEINBERG:  Which is, if I was called as a witness, I

7    would say Cal/OSHA told me that once matters are cured, they

8    close the case and that is what happened --

9         JUDGE TRACY:  Okay.

10        MS. FEINBERG:  -- because it had been cured.

11        JUDGE TRACY:  Okay.

12        MR. ROSS:  Well, there's absolutely no evidence that

13   that's exactly what Cal/OSHA did in this case, and --

14        MS. FEINBERG:  That's why I'm making --

15        MR. ROSS:  And --

16        MS. FEINBERG:  That's why I would like to say that if

17   called, that's what I would say.

18        MR. ROSS:  Well --

19        MS. FEINBERG:  That's all I'm offering to say.

20        MR. ROSS:  Well, that may be what you're offering, but I

21   don't think you're competent to speak for Cal/OSHA.

22        MS. FEINBERG:  I'm offering to speak for myself.

23        MR. ROSS:  Okay.

24        JUDGE TRACY:  So Mr. Ross, let's -- to resolve this issue,

25   I'm admitting Respondent's Exhibit 3 into evidence.  If



1    anything, this just provides some sort of background as to

2    where some of these things went.  What's relevant though is the

3    conversations of these employees with their -- the allegations

4    in this complaint, not whether Cal/OSHA found a violation or

5    not.

6         MS. FEINBERG:  Okay.

7         JUDGE TRACY:  So Respondent's Exhibit 3 is admitted into

8    evidence.

9         MS. FEINBERG:  Okay.

10        JUDGE TRACY:  And let's see.  Okay, let's go off the

11   record again.

12   (Off the record at 2:06 p.m.)

13        JUDGE TRACY:  Let's go on the record.  You can stand up,

14   please.  Thank you.  Raise your right hand.

15   Whereupon,

16                        **TOPA OGUNNIYI**

17   having been duly sworn, was called as a witness herein and was

18   examined and testified as follows:

19        THE WITNESS:  Yes.

20        JUDGE TRACY:  Okay.  Have a seat and state your name for

21   the record, please.

22        THE WITNESS:  Sure.  Topa Ogunniyi.

23        JUDGE TRACY:  Okay.  And so let me give you some

24   instructions.  Basically, the microphone is here to record your

25   voice, but it doesn't amplify your voice, so I just need you to



1    speak loudly so everybody in the room can hear you.

2         THE WITNESS:  Okay.

3         JUDGE TRACY:  So we don't have to ask you to repeat your

4    testimony.  I have water up here, but your other drink is fine.

5    Also, wait for the question to finish being asked before you

6    answer so that way the transcript clearly reflects the question

7    and answer.  I need verbal response, no --

8         THE WITNESS:  Head nod.

9         JUDGE TRACY:  -- um-hum or things like that.  Yes or no.

10   And then if there's something that you don't understand, please

11   feel free to say that you don't understand.

12        THE WITNESS:  Okay.

13        JUDGE TRACY:  Okay?

14        THE WITNESS:  Yep.

15        JUDGE TRACY:  Mr. Morris, go ahead.

16        MR. MORRIS:  Thanks.

17                    **DIRECT EXAMINATION**

18   Q    BY MR. MORRIS:  Topa, where do you work?

19   A    Tesla.

20   Q    How long have you worked there for?

21   A    I've worked there for 16 months.

22   Q    Okay.  And was that starting in approximately June of

23   2017?

24   A    That's correct.

25   Q    What's your current position?

22-60493.2546



1    A    I'm a production manager at the Gigafactory in Sparks,

2    Nevada.

3    Q    Okay.  And going back to June 2017, were you working in

4    the Fremont factory?

5    A    That's correct.

6    Q    And approximately what period of time did you work in the

7    Fremont factory for?

8    A    June 5th, 2017 to June 5th, 2018.

9    Q    And what was your position there?

10   A    I was an associate manager on general assembly on the

11   final line, SX, general assembly SX.

12   Q    Okay.  And who were you reporting to?

13   A    I reported to Kyle Martin.

14   Q    Could you describe your general job duties?

15   A    Day to day, just monitoring production performance,

16   ensuring that the associates are safe, quality -- doing quality

17   work, and then also the performance management of the

18   supervisors and leads.

19   Q    Okay.  And when you first started in June of 2017, was

20   there any ramp-up period for you?

21   A    A learning curve, yes, yes.  I would say, initially, my --

22   the first 30 or 45 days, approximately.

23   Q    Okay.  And what did that ramp-up period consist of?

24   A    During that time, I would spend -- so I was on first

25   shift.  The hours were six to two at that time, so I would



1    spend time with the second shift a.m. and the third shift a.m.

2    I would adjust my schedule so that I could spend time learning

3    from them, understanding what my expectations were, and then

4    how to be good at my job.

5    Q    Okay.  And during that time period that you were in

6    Fremont, what positions did you supervise or manage?  Like,

7    what job classifications?

8    A    As far as in the -- the people that reported to me?

9    Q    Yeah.

10   A    Okay.  Supervisors, leads, and then production associates.

11   Q    And approximately how many production associates reported

12   to you?

13   A    This is an -- we'll say anywhere between 150 to 170.

14   Q    And what about leads?

15   A    Oh, this I know.  Leads we had about 16.

16   Q    Okay.  And approximately how many supervisors?

17   A    So that varied.  In that period, I initially started with

18   two and then at different points I would have three or four,

19   but the most was four at a time.

20   Q    Okay.  And when you first started, who were the

21   supervisors?

22   A    The first two I had were Timothy Fenelon and then Paul

23   Poland.

24   Q    Okay.  And for what period of time did you just have two,

25   if you can recall?



www.escribers.net | 800-257-0885

1    A    Maybe -- maybe approximately a month, a month and a half,

2    and then I inherited Gerardo Rio.

3    Q    Okay.

4    A    That was a third one.

5    Q    And do you recall when you gained a fourth supervisor?

6    A    It was -- Gerardo and Nick -- it was either Gerardo and

7    Nick for like a period of time, but I -- I don't recall.  But

8    it was like a short period of time that they all were on the

9    same shift with me.

10    Q    Okay.  No problem.  Was there assigned teamwear when you

11    started in June of 2017?

12    A    Yes.

13    Q    And what was the teamwear for production associates?

14    A    We received -- well, so we received pants, two pairs of

15    pants and five shirts, two short sleeves -- sorry, three short

16    sleeves and two long sleeves.

17    Q    Okay.

18    A    And a sweater.

19    Q    And could you describe what they looked like for

20    production associates?

21    A    Sure.  The pants were -- they weren't like jeans, they

22    were materials that -- I know you had pockets, but no zippers

23    or -- aside from the zipper to zip the pants up.  Nothing that

24    could like scratch the car, and the shirts were just all black

25    shirts with a gray band across that said Tesla and maybe like a



www.escribers.net | 800-257-0885

1    Tesla T on the back.

2    Q    Okay.  And what color were the pants?

3    A    They were also black.

4    Q    Okay.

5    A    The Tesla logo was in white.

6    Q    And what about for the team leads?  What was the assigned

7    teamwear?

8    A    The leads and supervisors wore a red polo shirt with a

9    black stripe down the left side.

10   Q    Okay.  And what type of pants?

11   A    Same.  The same pants.

12   Q    As the production associates?

13   A    Correct.

14   Q    Okay.  And aside from the teamwear, were production

15   associates supposed to wear any other mutilation protection?

16   A    Yes.  So if they had watches, we had the watchband cover.

17   Wedding rings, we had the wedding ring cover for that.  In

18   addition to your belt, there was a belt cover to cover the

19   buckle part of your belt.

20   Q    Okay.  And after being hired in June of 2017, did you ever

21   receive any instructions concerning teamwear?

22   A    I'm -- I'm -- the question is not clear.

23   Q    Sure.  Did you receive any instructions from your manager,

24   Kyle Martin, at any point, concerning teamwear and teamwear

25   compliance?



www.escribers.net | 800-257-0885

1    A    Like -- from when I started to -- yes, like there would be

2    times we'd be asked to ensure that our associates were in

3    proper teamwear.

4    Q    Okay.  And when's the first conversation you can recall

5    where Kyle Martin provided you some instructions on teamwear

6    compliance?

7    A    I couldn't give you like a -- a definite date.

8    Q    Okay.  Do you recall a conversation with Kyle Martin in

9    August of 2017?

10    A    Yes.

11        MR. GARBER:  Objection.  Leading.  She already said she

12    couldn't recall the date.

13        JUDGE TRACY:  Sustained.

14    Q    BY MR. MORRIS:  You said you couldn't recall, I thought,

15    the first date.  Do you recall any dates, approximate dates, of

16    when you had a conversation with Kyle Martin on teamwear?

17    A    I do.

18    Q    And could you describe when that first memory is for you?

19    A    Clarify.  I don't remember the first date.  Like, this is

20    something that we get asked often, but I do remember the date

21    in August that I was asked about the teamwear.

22    Q    Okay.

23    A    Okay.

24    Q    And tell me about how that conversation began.

25    A    We have a daily area meeting, a DAM meeting, that the



1  supervisors, myself, and Kyle will attend from time to time,

2  and this is the meeting where we strategize about what we're

3  going to do for the day, as far as in areas of focus and our

4  previous performance from the day before.  During that meeting,

5  one of the directives was that we needed to walk our line and

6  ensure that all associates were in proper Tesla teamwear.  In

7  the event that they weren't, we would give them like the pardon

8  for that day, but by Friday -- so that day was a Thursday.  By

9  Friday, they would need to be in teamwear or they would have to

10 be sent home.

11 Q    Okay.  And who provided those instructions?

12 A    Kyle Martin.

13 Q    But this wasn't the first time that Kyle gave you

14 instructions on teamwear?

15 A    No.

16 Q    Do you recall anything else about that conversation with

17 Kyle?

18 A    That day?

19 Q    Yeah.

20 A    That -- aside from what I said, like walking our lines and

21 ensuring our associates were in teamwear.  That was --

22 Q    Okay.

23 A    For that period.

24 Q    And after he provided that instruction, do you recall what

25 you did next?



www.escribers.net | 800-257-0885

1   A    Yes.  So relay the message to the team, then we -- we

2   normally communicate via text message or phone, so just

3   ensuring that each supervisor was walking their section of the

4   line to check for compliance, and then I then did a walk on the

5   line to check for compliance as well.

6   Q    Okay.  And when you did that walk to check for compliance,

7   did you observe any people that were not in teamwear that day?

8   A    I did, yes.

9   Q    And who did you observe first, if you can recall?

10  A    As far as in -- like a name?

11  Q    Yeah.

12  A    Or an individual?  So I started from the further end of my

13  line.  The first individual that I spoke to, his name was

14  Chanthuon Keo and he wasn't wearing the proper pants.

15  Q    Okay.  And do you recall what he had on?

16  A    Cargo pants, green, like, military -- like, the olive

17  green cargo pants.

18  Q    And do you recall what you said to him, if anything?

19  A    Yes.  I told him that he didn't have the proper teamwear,

20  the expectation was to be in the issued Tesla teamwear and,

21  starting tomorrow, if he did not have that on, tomorrow meaning

22  that Friday, he would need to be sent home.

23  Q    Okay.  Did you see anyone else that day not have teamwear

24  on?

25  A    Yeah, there were other associates on the line I spoke to.



1    Q    And who else do you recall speaking with?

2    A    There was -- there was several.  I spoke to Chanthuon.  I

3    spoke to Xavier or Terrance, he was a quality tech.  I spoke to

4    Jason.  I spoke to a Darla (phonetic).  I spoke to Juan Garcia.

5    I spoke to Devin (phonetic), I believe.  I -- there were

6    several other associates that I spoke to.  I'm drawing blanks

7    on some of their names right now.

8    Q    Okay, no problem.  You mentioned Terrance --

9    A    Yes.

10    Q    -- that you spoke with?  What's Terrance's last name, if

11    you can remember?

12    A    I -- I don't recall.  His real name is Xavier, he just

13    went by Terrance, but I don't recall his last name.

14    Q    Okay.  And do you recall the conversation with him?

15    A    I do.  I had the same conversation as I had with Chanthuon

16    Keo.  I said that, you know, you weren't in proper teamwear.

17    He didn't have -- he had a shirt on with some logo, but it

18    wasn't the Tesla shirt.  And I told him if he didn't have the

19    proper teamwear on, he would be sent home the following day.

20    And I had to reach out to his supervisor because he's not an

21    associate on final line, he was a quality technician.

22    Q    Okay.  And do you recall what color his shirt was?

23    A    It was a black shirt.

24    Q    And you mentioned Darla.  Do you recall Darla's last name?

25    A    It started with a P, I can't remember, sorry.



www.escribers.net | 800-257-0885

1    Q    Okay.  And do you recall what about she was wearing was

2    not compliant?

3    A    She had a black shirt.  It wasn't a Tesla shirt, but she

4    had a black shirt with a picture on it, I'm not sure.

5    Q    Okay.  And do you recall that conversation?

6    A    Same conversation.  Do you want me to repeat it?

7    Q    The same conversation in terms of what?

8    A    As I've had with Jason -- I'm sorry, as I had with

9    Chanthuon and Terrance or Xavier.

10   Q    Okay.  And I think you also mentioned Devin?

11   A    Yes.

12   Q    And do you recall Devin's last name?

13   A    Yes-say or Yas-see.

14   Q    And what did you speak to him about?

15   A    Not being in compliance with teamwear.  He didn't have the

16   proper shirt on as well.

17   Q    Do you recall what the shirt was?

18   A    No, that I don't remember.

19   Q    Okay.  And did you speak with someone named Juan?

20   A    Garcia, yes.

21   Q    And what do you recall about that -- observing that?

22   A    Juan -- so Juan had a black shirt on, but he had like a

23   sport logo on his, and I was just communicating to him and just

24   letting him know that the same thing that I told the other

25   associates on the line, you're not in proper teamwear,



1    effective tomorrow, if you don't have the proper teamwear on

2    you will be sent home.

3    Q    Okay.  Did you also speak with Chad?

4    A    Chad, yes.

5    Q    And what do you recall observing of Chad?

6    A    Same thing.  He didn't have the proper teamwear on as

7    well.

8    Q    And do you recall what was non-compliant?

9    A    I can't say if it was his shirt or pants, sorry.

10    Q    Okay.  And then I think you also mentioned Jason Henry?

11    A    Yes.

12    Q    What do you recall about that interaction with Jason Henry

13    that day?

14    A    Okay.  So I walked up to Jason and I started to talk to

15    him about the teamwear, and he had been the third individual --

16    that was the third person I had stopped to talk to that day.

17    And he -- when I was talking to him about his teamwear, he was

18    like, well, Topa, you're just stopping me because of the shirt

19    that I have on.  And I said, no, Jason, I've talked to two

20    other associates prior to you.  And then he then asked me for

21    the teamwear policy, so I had to go get that for him.  Once I

22    gave that to him and he read where it said, hey, you need to be

23    in your Tesla teamwear, he didn't have anything to say after

24    that.  And then the conversation was done, but --

25    Q    Okay.  And when you first approached Jason, do you recall

22-60493.2556



1    what you said to him?

2    A    Same thing as I said to everyone else, Jason, you know,

3    you're not in the proper Tesla teamwear.  He didn't have the

4    right shirt on.  And I said, effective tomorrow we need

5    everyone in their Tesla teamwear, and if not, they will be sent

6    home.

7    Q    Okay.  Do you recall what his shirt was?

8    A    He had -- he also had a black shirt with an image on it.

9    It was the -- I -- I can't describe the picture, but it was --

10   it was -- it had some like Tesla words on it, I couldn't get

11   it.

12   Q    Okay.  Do you recall if the shirt had a reference to the

13   UAW or a union?

14   A    I believe so, yes.

15   Q    And you testified that he asked to see a copy of the

16   policy?

17   A    Yes.

18   Q    And at some point, you provided it to him?

19   A    I did.

20   Q    Was you providing him the policy, was that in the same

21   initial conversation or a later conversation?

22   A    I had it -- I didn't have it right then and there.  I went

23   to look for it, so I had to come back and give it to him and

24   show him.

25   Q    Okay.  And once you provided, or showed him a copy of the



1    policy, did he say anything else?

2    A    No.  He read it, he saw where it said and he was like,

3    okay.

4    Q    Do you recall anything else about that conversation or

5    those two conversations with Jason Henry that day?

6    A    That was it.

7    Q    Did you speak with Sean Jones regarding teamwear that day?

8    A    No, I did not.

9    Q    So you didn't tell Sean Jones to take off his shirt

10   because it was not teamwear compliant?

11   A    I didn't --

12       MR. GARBER:  Objection.  Leading.

13       JUDGE TRACY:  Sustained.

14   Q    BY MR. MORRIS:  Of the individuals that you spoke with

15   that day, how many of them, if you can recall, had a shirt that

16   had some sort of UAW or union logo on it?

17   A    Jason was the only one.

18   Q    And after the date that we've been talking about, in

19   August of 2017, what was your practice for insuring compliance

20   with the teamwear expectations?

21   A    Every day that they -- my supervisors, I had them do an

22   audit.  They did a PP audit and a teamwear audit, just to

23   ensure that we had individuals with the right PPE on, the steel

24   toes, their safety glasses, the gloves, in addition to their

25   Tesla teamwear.



www.escribers.net | 800-257-0885

1    Q     And did you have any understanding of whether your

2    supervisors were enforcing those audits or conducting them?

3          MS. FEINBERG:  Objection.  Foundation.

4          JUDGE TRACY:  Overruled.  Go ahead.

5          THE WITNESS:  Okay.  So repeat the question.

6    Q     BY MR. MORRIS:  Yeah, sure.  Did you have any

7    understanding of whether your supervisors were actually

8    conducting the audits?

9    A     They would have to report to me.  So via text message,

10   they would do a check.  Like they would put, PPE check,

11   teamwear check, and then if anybody was in non-compliance for

12   anything, their actions would -- would follow.  And every now

13   and then I would do like a layered audit and I would walk

14   through and check myself.

15   Q     Okay.  And in terms of what you just said, a layered

16   audit, what do you mean by that?

17   A     Well, initially, my supervisors would do an audit.  And

18   then a layered audit is I would do another layer of an audit,

19   or my manager would do a layer of an audit, or his boss would

20   do a layer of an audit, looking for the same things, just

21   walking through your line, checking to ensure that your

22   associates had the right -- or they were wearing steel toes,

23   their safety glasses, gloves, and proper teamwear.

24   Q     Okay.  And did you ever give approval to have someone wear

25   all black t-shirt instead of the assigned teamwear?



1    A    I did.

2    Q    And why'd you do that?

3    A    Several reasons.  In the event that if they didn't have

4    their teamwear, it would just be a neutral, all black shirt,

5    and some days our teamwear office wasn't open, so Wal-Mart was

6    the closest thing and they could buy an all-black shirt so they

7    could still stay on the line and work.

8    Q    Okay.  Did you ever give approval to put mutilation

9    protection tape on top of a logo that was a black shirt?

10   A    I did, yes.

11   Q    And why did you ever do that?

12   A    So that it was -- one, to be fair, right?  If we're

13   allowing individuals to wear the all black shirt, I didn't know

14   what the material was for the logo, so it would enable it to

15   just be an all-black shirt, just initially looking through it,

16   when we did our layer audit.  And it would prevent it from

17   scratching the cars, depending on the material of their shirt.

18   Q    Okay.  During that time that you were in general assembly

19   in Fremont, were production associates allowed to wear union

20   stickers on their teamwear?

21   A    Yes.

22   Q    And had you seen employees, production associates in

23   general assembly wearing a union sticker on their teamwear.

24   A    General assembly SX, yes.

25   Q    And how frequently would that occur?



1    A    I -- are you like -- would they have it every day?  I

2    noticed it.  It's not something that I paid attention to, like,

3    daily, but I did notice like people had stickers on their

4    shirts or their hats.

5    Q    Okay.  Did you ever tell anyone that they couldn't wear

6    the union sticker on their teamwear?

7    A    No.

8    Q    Prior to August of 2017, did you ever see or observe any

9    production associates wearing a shirt with a union logo or a

10   UAW logo?

11   A    Prior to that, yes.

12   Q    And can you recall approximately how long before August of

13   2017 you observed that?

14   A    This -- those shirts like -- so the shirts, they were -- I

15   started in June, so I've noticed it, like, I would say maybe a

16   little after I had started.  I wasn't too familiar with what it

17   was, but I did notice like the different shirts, yes.

18   Q    And so is your testimony that it was shortly after you

19   were hired?

20   A    Yes, shortly after I was hired, yes.  Sorry.

21   Q    And when you first observed it, did you know what it was

22   in reference to?

23   A    No.  I just saw a black shirt, like, I don't know what the

24   UAW is.  I don't --

25        MR. MORRIS:  Okay, nothing further.

22-60493.2561



```
 1            JUDGE TRACY:  Mr. Garber?

 2            MR. GARBER:  Sure.  If I could have just a couple minutes,

 3       please.

 4            JUDGE TRACY:  Oh, okay.  We'll go off the record.  Just a

 5       moment, okay?

 6            THE WITNESS:  Got it.

 7       (Off the record at 2:44 p.m.)

 8            JUDGE TRACY:  Okay, Mr. Garber.

 9                          CROSS-EXAMINATION

10       Q    BY MR. GARBER:  Hi, Ms. Ogunniyi, am I saying that right?

11       A    That's correct.

12       Q    Okay.

13       A    Thank you.

14       Q    My name's Noah.  I represent the General Counsel of the

15       NLRB in this case.  I'm just going to ask you some follow-up

16       questions about what you just told us.  If at any time you have

17       trouble understanding what I'm asking, just let me know and

18       I'll rephrase it for you.

19       A    Okay.

20       Q    Okay?  Before you testified about someone named -- I think

21       their name was Terrance but they go by Xavier, or is it Xavier

22       and they go by Terrance.

23       A    Xavier and they go by Terrance.

24       Q    Okay.  And they are a quality tech; is that right?

25       A    That's correct.
```



1    Q    Do quality techs work in the general assembly?

2    A    They work -- have a different leadership group.

3    Q    Okay.  But they are assigned to work in general assembly?

4    A    Correct.

5    Q    Okay.  I'm going to show you a document that's already in

6    evidence as -- it's been already marked as General Counsel's

7    Exhibit 77.  Just take a look at that and let me know when

8    you're done.

9    A    Okay.

10   Q    Thank you.  You mentioned there was a supervisor named

11   Gerardo or Gerardo.

12   A    Gerardo, yes.

13   Q    Gerardo, yeah.  Is this Exhibit 77, is that a text message

14   between you and Gerardo?

15   A    Yes.

16   Q    Okay.

17        MR. GARBER:  Your Honor, we put this into evidence before

18   as black and white.  We have color copies if you want to sub

19   those out.

20        JUDGE TRACY:  Yeah, that's probably better.

21        MR. GARBER:  Okay.

22        JUDGE TRACY:  If you have those.

23        MR. GARBER:  Yeah.

24        JUDGE TRACY:  Okay.

25        MR. GARBER:  We can do that afterwards.



1    JUDGE TRACY:  Yeah.  It's already been admitted in.

2    MR. GARBER:  Yes.

3    MS. FEINBERG:  77?

4    JUDGE TRACY:  Yes.

5  Q    BY MR. GARBER:  Okay, some questions for you about

6  teamwear.

7  A    Okay.

8  Q    A plain black shirt with no logos on it is teamwear

9  compliant; is that right?

10  A    Yes.

11  Q    And presumably then, a plain black shirt doesn't hinder

12  someone in GA, in general assembly, their ability to do work?

13    JUDGE TRACY:  Can you say it --

14    THE WITNESS:  Yes, sorry.

15    JUDGE TRACY:  Thank you.  Sorry, I didn't hear that.

16    THE WITNESS:  Yeah.

17  Q    BY MR. GARBER:  So a black shirt with like no buttons or

18  objects on it would be considered mutilation free; is that

19  right?

20  A    Solid plain black t-shirt?

21  Q    Yeah.

22  A    Correct, yes.

23  Q    Okay, I'm going to show you a picture of a shirt.

24  A    Okay.

25  Q    It's already in evidence.  It's Exhibit 25.  Take a look


www.escribers.net | 800-257-0885

1    at that and let me know when you're done.

2    A    Done.

3    Q    You can hold onto it.

4    A    Okay.

5    Q    You recognize that shirt in that picture?

6    A    Yes.

7    Q    That's the -- the union shirt that I think you testified

8    about, that you'd seen some employees wearing?

9        MR. MORRIS:  Objection.  Lack of -- withdraw the

10    objection.

11        MR. GARBER:  What's that?

12        JUDGE TRACY:  He withdraws the objection.

13        MR. GARBER:  Oh, okay.

14    Q    BY MR. GARBER:  And looking at that picture, there's

15    nothing on that shirt that would pose a mutilation risk; is

16    that correct?

17    A    Just ask it one more time.

18    Q    Sure.

19    A    I'm just trying to understand like --

20    Q    Looking at that shirt --

21    A    Right.

22    Q    -- that union shirt you saw people wearing --

23    A    Right.

24    Q    -- that shirt does not pose a mutilation risk, right?

25    A    It's just -- it doesn't.  It's a violation of our policy,



1    so it just has logos on it so we would have to cover the logo.

2    Q    Okay.

3    A    Yeah.

4    Q    But the shirt itself isn't a mutilation risk, it just

5    doesn't comply with teamwear?

6    A    Correct.

7    Q    Okay.  And an employee that works in general assembly, if

8    they're not compliant with teamwear, they could get a coaching

9    discipline?

10   A    There were several options.  There were they can go

11   upstairs to teamwear --

12   Q    Um-hum.

13   A    -- and get a shirt.  They can, depending on the

14   supervisor, go to Wal-Mart and get an all-black t-shirt, or

15   they can go home.

16   Q    If they went home, no pay, I'm assuming?

17   A    That's a good question.  I'm not -- not sure.

18   Q    Okay.  Are you familiar -- do you recall when you were in

19   general assembly at Tesla Fremont, did you see tours with

20   people who did not work at Tesla go through the general

21   assembly?

22       MR. MORRIS:  Objection.  Vague and ambiguous as to go

23   through.

24       JUDGE TRACY:  Okay.  Restate the question, please.

25       MR. GARBER:  Sure.



www.escribers.net | 800-257-0885

1    Q    BY MS. FEINBERG:  When you were working at Tesla Fremont,

2    did you witness tours visiting -- tours of people who do not

3    work at Tesla Fremont visit the general assembly area?

4    A    Yes.

5    Q    How often were those tours, would you estimate?

6    A    Ideally, daily, maybe two times, three times a day.

7    Q    Did they go to other parts of the plant also?

8    A    I'm not sure where --

9    Q    Okay.

10   A    -- the tour. I know they were in general assembly though.

11   Q    Okay.

12   A    SX.

13   Q    And so you saw them come into general assembly and then

14   you saw them leave?  You don't know where they went after that?

15   A    No, they would -- their tour would come through my line.

16   Q    Okay.

17   A    So I think that was like the end of their tour because I'm

18   at the end so they would leave.

19   Q    And they were on some type of tram or train?

20   A    Yeah.  Like a -- yeah.  Like dolly type thing, like --

21   Q    Did they ever get out of that?

22   A    No.

23   Q    Okay.  So they weren't allowed out?

24   A    No.

25   Q    Okay.  How close did they get to the employee -- you know,



1    the employees actually doing the work in general assembly?

2    A    The path that the tram would travel was about maybe I

3    would say anywhere between ten and 15 feet away from the line.

4    Q    Okay, thanks.

5    A    You're welcome.

6    Q    And one of the reasons for teamwear, Tesla wants to

7    present uniformity in its uniforms, correct?

8    A    Correct.

9    Q    And in GA it's the blackness of that shirt that presents

10   uniformity?

11   A    I'm thinking it's the --

12   Q    I shouldn't say black because it's not the tint of the

13   black shirt, it's the fact that it's a black shirt, right?

14   That's what gives the shirts uniformity?

15   A    Well, it's a Tesla shirt, but it's a -- yeah.

16   Q    But you could also wear just a plain black shirt too?

17   A    Correct.

18   Q    Okay.  And I'm going to show you what's been marked as

19   General Counsel Exhibit 41.  Just take a quick look at that.

20   A    Okay.

21   Q    You recognize that as a teamwear shirt; is that right?

22   When you were at Tesla Fremont?

23   A    These are newer.

24   Q    Okay.

25   A    Yeah.  This wasn't the original shirt.  This is -- because



1    they hand these out at Gigafactory now.  So these are newer.

2    This is a new --

3    Q    Okay.

4    A    -- teamwear shirt.

5    Q    Okay.

6    A    Yeah.

7    Q    Did you ever see that at Tesla Fremont when you were

8    there?

9    A    As I was leaving --

10    Q    Okay.

11    A    -- the last month, yes.

12    Q    I'm going to show you, I'll represent to you that this was

13    given -- or this was provided to the NLRB as part of a subpoena

14    to Tesla.  For the record it's a 5XL t-shirt, cotton t-shirt.

15    It says Tesla on the front.  Did you see this worn at Tesla

16    Fremont?

17    A    That's our teamwear shirt, yes.

18    Q    That is, okay.

19        MR. GARBER:  And for the record this is just a black t-

20    shirt, it says Tesla on the front, gray stripe and with an

21    outline of -- in black of the word Tesla.

22        JUDGE TRACY:  Do we not have a picture of that one in the

23    record?

24        MR. GARBER:  I can put one in.  We can do that in the

25    break.  We don't have a picture of this one or the --



www.escribers.net | 800-257-0885

1          JUDGE TRACY:  Okay.

2          MR. GARBER:  -- the next one but I'll --

3          JUDGE TRACY:  It -- well, it would just be helpful I --

4          MR. GARBER:  Yeah.

5          JUDGE TRACY:  -- would think since we don't have t-shirts

6     handed out with the transcript.

7          MR. GARBER:  Right.  Unless you want one.  You can have

8     this one.

9     Q    BY MR. GARBER:  I'm going to show you this sweatshirt too.

10    Black sweatshirt, again very large with a white embroidered

11    Tesla symbol on the front.  The back it says red Tesla, or it's

12    in red embroidery, it says Tesla.  Do you recognize this one?

13    A    I do.

14    Q    Okay.  That was part of teamwear at Tesla Fremont too?

15    A    Yes.

16    Q    Okay.  And common to all those shirts is they're all

17    black, right?  They're all cotton?

18    A    Well, they're issued -- they're also issued by Tesla.

19    Q    Okay.

20    A    So these are issued.

21    Q    You mentioned Kyle Martin was your supervisor in August of

22    2017; is that right?

23    A    My manager, yes.

24    Q    Your manager, yeah.  And in August he instructed you to

25    check employees for teamwear compliance; that's right?



www.escribers.net | 800-257-0885

1     A     Yes.

2     Q     Okay.  And that's when you started doing this daily

3     teamwear check to ensure compliance?

4     A     After that, yes.

5     Q     Okay.

6     A     After that.

7     Q     You told us about some of the employees that you spoke to

8     about teamwear compliance.  Did you keep any notes from those

9     conversations?

10    A     Not notes from the conversations, no.  Just spoke to them.

11    Q     Okay.  You told us about the -- some of the names of the

12    employees.  Did you speak to more employees than the ones you

13    named to us?

14    A     I spoke to a total of nine employees that day.

15    Q     Nine, okay.

16    A     Yes.

17    Q     Nine on the same day in August?

18    A     Same day, yes.

19    Q     Okay.  On that same day in August do you recall that

20    people were passing anything out outside of the Tesla Fremont

21    plant?

22    A     I got there early in the morning so no.

23    Q     Okay.  So you didn't see anyone passing out shirts or

24    anything outside?

25    A     No.


www.escribers.net | 800-257-0885

1    Q    Okay.

2    A    It was dark when I -- like normally I'm there at like

3    4:00, 4:30.

4    Q    In the morning?

5    A    Yes.

6    Q    Okay.

7    A    So --

8    Q    Were you aware that that was going on in that time period?

9    A    No.

10    Q    And to your knowledge a cotton t-shirt alone has never

11    caused damage to a Tesla car?

12        MR. MORRIS:  Objection, lack of foundation.

13    Q    BY MR. GARBER:  Are you familiar with --

14        JUDGE TRACY:  Overruled.

15    Q    BY MR. GARBER:  I can restate the question.  To your

16    knowledge a cotton t-shirt alone has never caused damage to a

17    Tesla car?

18    A    I would say yes.

19    Q    Yes, it has or --

20    A    It has not, sorry.

21    Q    It did not, okay.  That's okay.  Just bear with me one

22    moment here.

23    (Counsel confer)

24    Q    BY MR. GARBER:  Did we ever get a stipulation that

25    Supervisor Gerardo Mario; is that his last name?



1    A    Rio.

2    Q    Rio.

3         MR. GARBER:  That he's a statutory supervisor.

4         JUDGE TRACY:  I have no idea.

5         MR. MORRIS:  We did, yeah.

6         MR. GARBER:  We did.

7         JUDGE TRACY:  Did we?

8         MR. MORRIS:  We did.

9         MR. GARBER:  Okay.

10        JUDGE TRACY:  Let's just be clear.  Would the parties

11   stipulate that Gerardo --

12        MR. GARBER:  Gerardo Rio.

13        JUDGE TRACY:  -- is a statutory supervisor?

14        MR. MORRIS:  Yes.

15        MR. GARBER:  Okay.

16        JUDGE TRACY:  Okay.

17        MR. GARBER:  Thank you.

18        JUDGE TRACY:  Thank you.  I'm not sure.

19        MR. GARBER:  It's been a long three months.  No further

20   questions, Your Honor.  Thank you.

21        THE WITNESS:  You're welcome.

22        JUDGE TRACY:  Ms. Feinberg.

23        MS. FEINBERG:  Okay.

24                        **CROSS-EXAMINATION**

25    Q    BY MS. FEINBERG:  Hello.  My name's Margo Feinberg.  I'm

22-60493.2573



1    counsel for the Charging Parties.  I'm going to ask you a few

2    questions.

3    A    Okay.

4    Q    So did you review anything before you testified here

5    today?

6    A    I don't --

7    Q    Any documents?  Did you look at anything before you

8    testified?

9    A    Today, no.  I haven't looked at anything.

10    Q    Or since you were supposed to be here yesterday did you

11    read anything yesterday?

12    A    I didn't read anything yesterday.

13    Q    No, okay.

14    A    No.

15    Q    So all the names that you gave us you didn't refresh

16    anything to remember those names, you just remembered those

17    names?

18    A    Yeah.  I can't remember all nine, but I was walking back

19    like as I did it that day, but I can't remember all nine.

20    Q    Okay.  And was that day the one that you're talking about,

21    the day that Mr. Martin had given you instructions to start,

22    you know, start this process of walking the line --

23    A    He --

24    Q    -- and reporting?  Was -- what -- the day that you're

25    remembering all these people --



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    -- was that the beginning of this process where you were

3    going to go out and tell people, this is it, you've got to

4    comply, I'll give you 24 hours to do it?

5         MR. MORRIS:  Objection, vague and ambiguous.

6         JUDGE TRACY:  Overruled.

7         MR. MORRIS:  Compound.

8         JUDGE TRACY:  Overruled, go ahead.

9         THE WITNESS:  That day, yes.

10   Q    BY MS. FEINBERG:  Okay.  And was that -- that conversation

11   with Mr. Martin, was that in person or -- when he gave you

12   those instructions?

13   A    That day when he gave us those instructions it was during

14   our daily morning meeting.

15   Q    Okay.  And what time does that all happen?

16   A    We would like to do it at 8:00 once the shift starts, but

17   based on how production is running we change the time, but we

18   try to set it to 8:00.

19   Q    Okay.  And was the topic of the UAW mentioned by Mr.

20   Martin or anyone in the meeting that you had with Mr. Martin?

21   A    In the morning, no.

22   Q    Okay.  And then did you have any further conversations

23   with Mr. Martin about teamwear during the course of that day?

24   A    Yes.  He followed up to see if -- so he had asked me to

25   walk the line and then he followed up to see if I had done it.



www.escribers.net | 800-257-0885

1    Q    Okay.  And when he -- how did he follow up with you?

2    A    That day he asked me to send him a list of all the names

3    that I talked to of the individuals that were in noncompliance.

4    Q    And he asked that verbally, or by email, or how?

5    A    I sent an email.

6    Q    You sent an email?

7    A    Yes, ma'am.

8    Q    You sent email in response to an oral request?

9    A    No.  I believe he emailed me and I replied back to the

10   email.

11   Q    Okay.  And did you review that email before testifying

12   here today?

13   A    No.  I didn't review anything.

14   Q    Okay.

15   (Counsel confer)

16        MS. FEINBERG:  I'm going to show the witness General

17   Counsel Exhibit 73 when I can -- one moment please.

18        THE WITNESS:  No worries.

19        MR. GARBER:  I don't have another -- I'm looking for it

20   but I don't see it.

21        MS. FEINBERG:  I wrote on mine.

22        MR. GARBER:  Do -- Mr. Morris, do you by any chance have a

23   copy of Exhibit 73.

24        MS. FEINBERG:  73?

25        MR. GARBER:  Without any hand --



1    MS. FEINBERG:  Mine's written on.  That's why --

2    MR. GARBER:  -- handwriting that's on it.

3    MS. FEINBERG:  -- I can't use mine.

4    MR. MORRIS:  Give me a couple of seconds.

5    MR. GARBER:  Thank you.

6    MS. FEINBERG:  Thank you.

7    MR. MORRIS:  Yeah.  I've got one.

8    MR. GARBER:  Thank you.

9    MR. MORRIS:  No problem.

10   MR. GARBER:  We'll bring it back.

11   MR. MORRIS:  Thank you.

12   MR. GARBER:  Did you want me to give it to the --

13   MS. FEINBERG:  That'd be very kind of you.

14   THE WITNESS:  Thank you.

15   MS. FEINBERG:  Thank you.  Thanks.

16   Q    BY MS. FEINBERG:  Okay.  So you have before you General

17   Counsel Exhibit 73.  You see that on -- okay.  Is it just --

18   it's just one page, right?

19   A    Yeah.  Just one page.

20   Q    Oh, okay.

21   A    Yeah.  I want to make sure there was nothing else on it.

22   Q    Okay.  No.  I just couldn't see, okay.  And earlier you

23   testified that you sent a list to Mr. Martin of people you had

24   spoken to.  Is the bottom of this email that -- the document

25   you're referring to?



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Okay.  So on August 10th you sent Mr. Martin a list of

3    people you had spoken to.  And that's the same day where you

4    had that meeting at 8:00 in the morning about enforcing the

5    teamwear rules; is that right?

6    A    That's correct.

7    Q    Okay.  And then Mr. Martin replies to you, right?  "How

8    many UAW shirts and that's all the final line?"  Do you know --

9    had you had any discussions with him prior to receiving this

10   email about UAW shirts?

11   A    No, ma'am.

12   Q    Okay.  And what does he mean -- well, what did you

13   understand him to mean when he said, "and that's all the final

14   line?"

15   A    The line is 31 pictures line.  So he wanted to at least

16   what I took from this was, did I walk my entire line.  Are

17   those all the individuals on my line that were in

18   noncompliance.

19   Q    Okay.  And he wanted to know of those, the reason if any

20   of them who were out of compliance were wearing UAW shirts?

21       MR. MORRIS:  Objection, calls for speculation.

22       JUDGE TRACY:  Sustained.

23       MS. FEINBERG:  Okay.

24   Q    BY MS. FEINBERG:  And what did you understand when -- from

25   the phrase, "and how many had UAW shirts"?



1    A    I just answered the question, like how many of them, how

2    many that were noncompliance had their shirt on.

3    Q    Okay.  And you responded "Only Jason had the shirt on"; is

4    that right?

5    A    Yes, I did.

6    Q    So on that day August 10th, 2017 you did tell him that

7    Jason Henry was wearing a union shirt?

8    A    Yes.

9    Q    Okay.  And then did you ever have any other conversations

10    with Mr. Martin about union shirts?

11    A    On that day?

12    Q    Let's start with that day.

13    A    After -- like this was sent at 1:33.  I think we had

14    our -- no.  I think we had like the follow up to this and then

15    that was the end of it to ensure that everyone next day would

16    be in compliance.

17    Q    And were you aware that that was the day that workers in

18    the plant were giving out UAW shirts?

19    A    I was not aware.

20    Q    And did you give an affidavit to the National Labor

21    Relations Board on -- one second.  I have to get the date.

22        MR. GARBER:  January 18th.

23    Q    BY MS. FEINBERG:  January 18th, 2018, did you give a

24    statement to the Labor Board on that day?

25    A    I was here.

22-60493.2579



1    Q    Yes.  And when you gave the statement you understood that

2    you were giving the statement, you were being -- you were to be

3    truthful?

4    A    Yes, ma'am.

5    Q    And to give the best recollection that you had?

6    A    Yes.

7    Q    And that you in fact when you signed it you agreed that if

8    there were any changes or anything else came to you that you

9    would notify the labor board, yes?

10   A    Yes.

11   Q    Okay, okay.

12        MS. FEINBERG:  I'd like to --

13   (Counsel confer)

14   Q    BY MS. FEINBERG:  You can see it's getting near the end.

15   I'm going to ask you to hold this a minute.

16   A    Okay.

17   Q    I'm going to direct you to something to look at.

18        MR. MORRIS:  Which one are you looking at?

19        MS. FEINBERG:  I'm looking at her affidavit and I'm asking

20   her to look at page 7.

21        MR. MORRIS:  Which affidavit?

22        MS. FEINBERG:  I didn't know she gave more than one.  I

23   only got one from her.

24        MR. GARBER:  Do you have it, or do you need it?

25        MR. MORRIS:  Okay.  The 208614, yeah.



1     MS. FEINBERG:  Is there another -- more than one?  Oh,

2  okay.

3     MR. GARBER:  Don't think so.

4  Q    BY MS. FEINBERG:  Okay.  And I'll refer you to the top of

5  page -- well, line 6 on --

6  A    Line 6, okay.

7  Q    -- 6 and through 8.

8  A    Okay.

9  Q    And it says, "I then stopped to Jason Henry", I assume

10  that means I stopped to talk to Jason Henry.  And it says,

11  "Jason didn't have Tesla proof shirt on.  He did not have the

12  union shirt in Exhibit B on, but I don't remember what he had

13  except that it wasn't a Tesla shirt.  I told him the same thing

14  as I told Terrance above.  Jason asked for the policy stating

15  this and I handed that over to him."  Now that you have General

16  Counsel Exhibit 73 --

17  A    Uh-huh.

18  Q    -- in front of you can you tell me whether this -- that

19  this statement in your affidavit is accurate?

20  A    That --

21     MR. MORRIS:  Objection, misstates what's contained in the

22  affidavit.

23     MS. FEINBERG:  I just read from --

24     MR. MORRIS:  Counsel added -- you also added your

25  editorialization of some of the statements in the affidavit.

22-60493.2581



1        JUDGE TRACY:  If you could just --

2        MS. FEINBERG:  No, I didn't.

3        JUDGE TRACY:  -- just restate the question to be clear for

4    the record please.

5        MS. FEINBERG:  I asked her now that she has General

6    Counsel's Exhibit 73 before her whether that changes her --

7        MR. MORRIS:  I'm just asking you to --

8        MS. FEINBERG:  If you would stop talking then I would ask

9    my question.  That's what you've asked so I'm going to do it.

10   Q    BY MS. FEINBERG:  Do you have the affidavit before you?

11   A    Yes, ma'am.

12   Q    Do you have page 7?

13   A    I do.

14   Q    Okay.  And on page 7 you said, "He did not have the union

15   shirt", and it's -- do you see that?

16   A    Uh-huh.

17   Q    Yes?  You have to say yes or no, sorry.

18   A    Yes, I'm sorry.  I'm sorry.

19   Q    That's okay, that's okay.  And then in General Counsel

20   Exhibit 73 you say to Mr. Martin that Jason had a UAW shirt on?

21   A    That's correct.

22   Q    Okay.  So which is true?

23   A    They're both true.  So there are multiple union shirts and

24   asked me if it had the union shirt in Exhibit B.  He did not

25   have the shirt in Exhibit B on.  He had a different shirt on.



www.escribers.net | 800-257-0885

1    Q    Well, but then -- and going back to affidavit number --

2    the affidavit page 7, line 7 it says, "I don't remember what he

3    had except that it wasn't a Tesla shirt."  So now I'd like to

4    know, are you saying now that you knew it was a UAW shirt and

5    you didn't tell the General Counsel that?

6    A    No.  So Keahn asked me earlier about the UAW shirts.

7    Again, there's several shirts that were out at our facility.

8    They asked that day was it the shirt in Exhibit B and I was

9    answering that.  It wasn't that shirt but I do know he had one

10    on.  I couldn't describe the shirt to you, but he did have a

11    UAW shirt on that day.

12    Q    Okay.  But it says here, "I don't remember what he had

13    except it wasn't a Tesla shirt."

14    A    Agreed.

15    Q    Okay.  So you don't remember what it was, but today you

16    remember that it's a UAW shirt?

17    A    I'm guessing when I was -- not guessing.

18    Q    I don't want you to guess.

19    A    Exactly.  When I was answering Edris it was just, was it

20    this shirt and I said no.  I don't remember.  But I knew it

21    wasn't a Tesla shirt but it was a UAW shirt based on this email

22    that I sent.

23    Q    Well, you know you came down to the Labor Board to talk

24    about activity regarding the UAW; isn't that right?

25    A    That's correct.  But that date was in January --


www.escribers.net | 800-257-0885

1    Q    And you knew --

2         MR. MORRIS:  Objection, let her finish.

3         MS. FEINBERG:  I was still --

4         JUDGE TRACY:  So she was still testifying.

5         MS. FEINBERG:  Okay, sorry.

6         JUDGE TRACY:  Okay.  Let her finish answering.

7         THE WITNESS:  That date was in January and that happened

8    in August.  So I'm not going to remember everything like

9    vividly, but --

10   Q    BY MS. FEINBERG:  Uh-huh.

11   A    -- I gave the best -- it said to the best of my

12   recollection and that's what I did.

13   Q    But I asked you if you reviewed anything for your

14   testimony today and somehow or other now you remember every

15   person you spoke to including Jason Henry.  So what is the

16   explanation for that if you didn't review something and yet you

17   weren't honest or you didn't give all the information correctly

18   to the Labor Board back in January?

19        MR. MORRIS:  Objection, misstates your questions and her

20   answers earlier in the testimony.

21        JUDGE TRACY:  So I think to resolve this you have

22   redirect, okay.

23        THE WITNESS:  Do you want me to answer?

24        JUDGE TRACY:  Go ahead, yes.

25        THE WITNESS:  So I didn't name everybody.  I named most



1    people.  I do have -- I mean, I deal with people daily right.

2    So I do remember names, but again, I think it's as far as like

3    the shirt, I'm not going to remember the images of the shirt.

4    And I'm not going to sit here and lie.  This email did say that

5    that's what he wore so that email is at that point it was

6    accurate, right.  So I wouldn't remember that in January.  So

7    what I remembered in January is what I testified to.

8    Q    BY MS. FEINBERG:  Okay.  So now that you've read General

9    Counsel's 73 and you see that Mr. Martin was asking you about

10   UAW shirts does that refresh your recollection that in the

11   meeting that morning he had talked to you about looking for UAW

12   shirts?

13   A    That, he did not talk to us about that in the morning in

14   that meeting.  This is what he asked me when I did my check.

15   He said, how many wear UAW shirts and is that all the final

16   line.  So I don't think those two are tied together.  In the

17   morning he just said, walk your line.  Ensure that everyone's

18   in teamwear compliance.

19   Q    Okay.  And as you sit here today do you remember what Mr.

20   Henry said to you?

21   A    Jason asked me, Jason said to me, when I stopped by and

22   talked to Jason his initial feedback to me was I was only

23   stopping him because of the shirt he had on.

24   Q    Okay.  And is there a reason you didn't tell that to the

25   Labor Board?  Just let the record reflect that she's reviewing



www.escribers.net | 800-257-0885

1  her affidavit, which I don't have a problem with, but since the

2  record might know that otherwise.

3  A    I don't know why.  I don't know why that wasn't said, but

4  I communicated this that day.

5  Q    Okay.

6  A    And it says it right here at line 10.  "Jason did tell me

7  that he was being called out because of the shirt he had on."

8  Q    Right.  But you didn't say what the shirt was.  Did you

9  say he was called out because he was wearing a union shirt?

10  Did you tell the Labor Board that he was being called out

11  because it was a union shirt?

12  A    That's not -- it's not stated here so I don't --

13  Q    No.  In fact, what's stated there is that he wasn't

14  wearing a UAW shirt?

15  A    It doesn't say -- I just said I don't remember.  I never

16  said he wasn't wearing it.  I said I don't remember, he didn't

17  have one on.

18  Q    Okay.

19      MS. FEINBERG:  I have nothing further.  Here's your

20  affidavit back.

21      JUDGE TRACY:  Mr. Morris.

22      MR. MORRIS:  Could I just have a couple minutes to go off

23  the record?

24      MR. GARBER:  Before we go off the record we have pictures

25  of the shirts that I just showed Ms. Ogunniyi.  They're the



1    shirts I just showed her if you'll want to stipulate those into

2    the record.  I can show you copies of them.

3        MR. ROSS:  Tell me, do you have a copy -- or strike that.

4    Do you have the actual UAW shirt from what your photos were

5    made?

6        MR. GARBER:  Do we have one?  It's somewhere.

7        MR. ROSS:  We'd like to see the actual shirt please.

8    Thank you.

9        MR. GARBER:  These are the new ones.  The -- putting those

10   into the record?

11       MR. MORRIS:  The pictures?

12       MR. GARBER:  Yeah.

13       MR. MORRIS:  Yeah.

14       MR. GARBER:  Okay.  So I -- get near a microphone, sorry.

15   I'm going to move into evidence General Counsel's Exhibit 92-

16   001 through 92-004.  I'll represent those are the pictures of

17   the t-shirts I showed to Ms. Ogunniyi.

18       JUDGE TRACY:  Any objections?

19       MR. MORRIS:  No.

20       JUDGE TRACY:  Okay, all right.  So General Counsel's

21   Exhibit's 92-001 to 004 are admitted into evidence.

22       **(General Counsel Exhibit Number 92-001 to 92-004 Received into**

23       **Evidence)**

24       JUDGE TRACY:  Okay.  And you needed a moment?

25       MR. MORRIS:  Yeah, please.



1    JUDGE TRACY:  Okay.  Let's go off the record.

2   (Off the record at 3:17 p.m.)

3    JUDGE TRACY:  Let's go on the record.  Just we have jobs

4   to do right.  Go ahead.  We're on the record.  Okay.  Mr.

5   Morris, go ahead.

6    MR. MORRIS:  Yeah.

7                    **REDIRECT EXAMINATION**

8   Q    BY MR. MORRIS:  You testified that there was a period of

9   time where you supervised an individual named -- or you managed

10  a supervisor named Gerardo?

11  A    That's correct.

12  Q    He's no longer working at Tesla, correct?

13  A    I don't know.

14  Q    Did you have any role in drafting the actual language of

15  the general assembly expectations?

16  A    No.  I did not.

17  Q    Okay.

18   MR. MORRIS:  Nothing further for this witness, but I would

19  like to introduce the shirt that was provided to us, the

20  driving a fair future at Tesla t-shirt into evidence.

21   JUDGE TRACY:  But it is, isn't it?

22   MR. ROSS:  A picture of it is, the actual shirt is not in

23  evidence.

24   MS. FEINBERG:  But that's true for all the Tesla shirts

25  too.



1      MR. GARBER:  Yeah.  I don't see the -- we don't have

2    enough for everyone to get one with the record.  I don't see

3    what the purpose of needing an actual physical shirt is.

4      JUDGE TRACY:  Yeah.

5      MR. MORRIS:  Well --

6      MR. GARBER:  It's demonstrative where we already have a

7    picture in evidence.

8      MR. MORRIS:  We've had -- counsel for the General Counsel

9    has introduced the assigned teamwear.  There was one teamwear

10    that was provided and it was introduced into the record.  And

11    that's the one version or versions of the teamwear that's in

12    the record right now.  And so we think that this shirt should

13    be in the record because the actual logo itself has a different

14    feel.  And if you compare that to the Tesla assigned teamwear,

15    one is a scratchy --

16      MS. FEINBERG:  That's not --

17      MR. MORRIS:  -- logo whereas the other one is a soft

18    cotton.

19      MR. ROSS:  It's embroidered.

20      MS. FEINBERG:  Well, it's not --

21      MR. MORRIS:  And we think it is --

22      MR. RODRIGUEZ RITCHIE:  Well, I would like to note for the

23    record that --

24      MR. MORRIS:  -- we think it is relevant.

25      MR. RODRIGUEZ RITCHIE:  -- as a matter of professional



1    courtesy I was asked if they could borrow the shirt.  I

2    explicitly told them that it could not leave this room.  It is

3    a shirt that's in my possession.  So I will not agree to have

4    the shirt be used for that purpose.

5         MS. FEINBERG:  Because the point that they did not

6    subpoena that shirt, they -- we -- I understand the Board

7    subpoenaed the other ones, but the fabric version of no shirt

8    is in the record.

9         JUDGE TRACY:  So --

10        MS. FEINBERG:  The only thing that's in the record are

11   paper versions.

12        JUDGE TRACY:  -- I would say --

13        MR. GARBER:  Are we on the record?  I'm sorry.

14        JUDGE TRACY:  Oh, yes.

15        MR. GARBER:  Okay.

16        JUDGE TRACY:  That -- no.  It is not coming into the

17   record.  There is nothing to even put in the rejected exhibits

18   pile.  The thing about it before of why I requested the last

19   two to be photographed was because now I've had two witnesses

20   today testify about them okay.  Now I don't think that you want

21   me and the Board to be feeling these shirts to make our

22   decision about what is rough and what isn't.  You've had no

23   testimony --

24        MR. ROSS:  Actually, we do.  We do.

25        JUDGE TRACY:  No.  You've had no testimony about that.



www.escribers.net | 800-257-0885

1      MR. ROSS:  Your Honor --

2      MS. FEINBERG:  In fact, the testimony's been the opposite.

3   That no t-shirts have ever harmed a car has been all the

4   testimony.

5      MR. ROSS:  Your Honor, this is important.

6      JUDGE TRACY:  Well, then you --

7      MR. ROSS:  This is thread.  This is thread on the --

8      MS. FEINBERG:  Oh my god.

9      MR. ROSS:  -- Tesla teamwear shirt.  It is not an adhesive

10  attached to the document, it is soft cut thread.  This --

11     JUDGE TRACY:  So this is not testimony.

12     MS. FEINBERG:  Okay.  Unless you're a witness about

13  mutilation --

14     JUDGE TRACY:  So this isn't --

15     MS. FEINBERG:  -- I would like you to ask him to stop

16  because --

17     JUDGE TRACY:  This isn't --

18     MS. FEINBERG:  -- it's BS.

19     JUDGE TRACY:  This isn't testimony, okay.  At all.  It's

20  got to come through as testimony from a witness about the feel.

21  If that's what you want in the record it's not going to be a

22  subjective evaluation of the way a shirt feels.

23     MR. ROSS:  Judge --

24     JUDGE TRACY:  So you can do it through testimony.

25     MR. ROSS:  Okay.  The witness has testified it was



1    embroidered.  That's her testimony.

2        JUDGE TRACY:  Okay, that's it.

3        MS. FEINBERG:  I don't think she testified to that.

4        MR. ROSS:  Oh, she absolutely did.

5        MS. FEINBERG:  No, she didn't.  She testified --

6        MR. ROSS:  She absolutely did.

7        MS. FEINBERG:  -- that was the shirt.  I know, the record

8    is what it is and you elicited the testimony.  So you should

9    have been paying attention.  So let's go.  He was finished with

10   this witness.  Can we move on?

11       MR. GARBER:  I'd also note that the witness has been in

12   the room for this entire conversation as to what Mr. Ross wants

13   the witness to testify to.

14       MR. ROSS:  And Your Honor, we're offering that shirt into

15   evidence.  If you're going to reject it I understand, but we're

16   nonetheless offering it into evidence.

17       MS. FEINBERG:  But you don't even have a copy to offer

18   into evidence.

19       MR. ROSS:  Yeah, we don't.

20       MS. FEINBERG:  And you never subpoenaed one.

21       MR. ROSS:  But I suspect the Charging Party and the

22   General Counsel if they want or are not afraid to have it put

23   into evidence can provide ample copies to the parties so it can

24   find its way into the evidence.

25       MS. FEINBERG:  Well, if I had been subpoenaed at the



www.escribers.net | 800-257-0885

1    beginning of this hearing like everything else I wanted I might

2    have -- I would have complied if the judge had asked me to.

3         MR. ROSS:  Okay.

4         MS. FEINBERG:  But no one did.  And so no.  At this late

5    date, no.  It's not about courtesy.  The courtesy should have

6    been extended the front end.

7         MR. ROSS:  I'm not asking for courtesy.  I'm simply trying

8    to put into evidence --

9         MS. FEINBERG:  No.  You're just trying to push it.

10        MR. ROSS:  -- the qualitative and quantitative difference

11   between what is --

12        MS. FEINBERG:  Then you should have brought your own.

13        MR. ROSS:  -- embroidered Tesla teamwear and what is not

14   embroidered but rather is a raised logo that appears on the UAW

15   t-shirt.  That's all I'm trying to -- but like I said, we're

16   asking to be made part of the evidence.

17        MS. FEINBERG:  It's not embroidered.

18        MR. GARBER:  That sweatshirt is.

19        MS. FEINBERG:  Yeah.  Some are embroidered and some

20   aren't.

21        MR. RODRIGUEZ RITCHIE:  That's what he's referring to?

22        JUDGE TRACY:  So I -- your request, you haven't numbered

23   them, is denied.  I have never had this happen before.  I

24   cannot believe -- you can call another witness.  I'm going to

25   come back because I'm not doing this.  This is ridiculous.  You

22-60493.2593



1   could have had a witness come and testify about all this.  Now

2   not this witness because she's been listening to all of this.

3   You have had ample opportunity throughout this proceeding if

4   that's your defense that the shirts were raised or not raised,

5   you haven't elicited --

6        MR. ROSS:  Your Honor --

7        JUDGE TRACY:  No.  Excuse me.

8        MR. ROSS:  I'm sorry.

9        JUDGE TRACY:  You have not elicited perhaps to your

10  satisfaction those questions.  You just had this witness who

11  testified actually opposite of what you're arguing at this

12  moment.  And so if you want to continue with this hearing and

13  call somebody else who's going to testify about the way that it

14  feels, fine.  But this isn't the way to do it because it's got

15  to come through as evidence, which is why I asked them to give

16  a picture of what these two individuals have already testified

17  to about the logo and it was striped, because I want the Board

18  to be able to see the different shirts.  They're not going to

19  pass around five shirts to the board members.  Sorry.

20       So let's go off the record.  Decide what you want to do.

21       MR. ROSS:  All right.  Listen, I want to get the hearing

22  over with.  I would say to you that it is our belief that

23  putting the shirt into the evidence will advance the Board's

24  inquiry in this case.  If you disagree I understand that.  I'm

25  not going to ask that you hold the record so we can get a



1    witness and get five copies of the shirt.  So I want to get

2    this case over with today, but we do believe that the shirts

3    deserve a place in the record.  And that's all I'll say.

4        JUDGE TRACY:  Okay.  And so the shirts will not be placed

5    in the record.  And they're not -- I'm not putting them

6    anywhere in the record.

7        MR. ROSS:  All right.

8        JUDGE TRACY:  I can get remanded and be sent back here to

9    gather the shirts and put them in the record.

10        MR. ROSS:  Okay.

11        JUDGE TRACY:  Fine.

12        MR. ROSS:  Okay.

13        JUDGE TRACY:  Okay.

14        MR. RODRIGUEZ RITCHIE:  I would like the shirt returned to

15    me please.

16        JUDGE TRACY:  Okay.

17        MS. FEINBERG:  And you don't need anything more from us on

18    the record about this?

19        JUDGE TRACY:  No.

20        MS. FEINBERG:  Okay.  It just was in case you wanted it.

21    I don't

22        JUDGE TRACY:  Okay.

23        MS. FEINBERG:  -- need to talk about it anymore either.

24    Just in case you --

25        JUDGE TRACY:  Anymore -- Mr. Morris, any more questions,



1    I'm sorry, for this witness?  I think you were done.

2        MR. MORRIS:  And I'm not going to be permitted to ask the

3    witness questions based on the t-shirts, the physical t-shirts?

4        JUDGE TRACY:  Right.  Because now she's heard it all.  So

5    this is where I've been saying for like the three weeks we've

6    been meeting, I wish you all would have worked together and met

7    and talked about these things.  Look, this is what we're

8    planning to do and come up with a compromise or some sort of

9    agreement.  This again, what I keep seeing this whole time is

10   just little bombs that keep blowing up, surprise, surprise,

11   surprise.  So nobody can prepare for this.

12       So now she is now tainted.  She cannot testify about this.

13   So I'm not going to ask her or allow you to ask questions about

14   it.  Anything else though that we haven't discussed about the

15   feeling of the shirts that you want to ask her?

16       MR. MORRIS:  No.

17       JUDGE TRACY:  Okay.

18       MR. GARBER:  No, Your Honor.

19       MS. FEINBERG:  No.

20       JUDGE TRACY:  Okay.  Thank you so much.

21       THE WITNESS:  Thank you.

22       JUDGE TRACY:  Please don't discuss your testimony with

23   anyone until after the close of the hearing.

24       THE WITNESS:  I won't.

25       JUDGE TRACY:  You can certainly ask when it's done for you



1    to be able to talk.

2         THE WITNESS:  Judge, I don't want to talk about it.

3         JUDGE TRACY:  Okay, thank you.

4         THE WITNESS:  Thank you.

5         JUDGE TRACY:  Thank you.  We'll go off the record.

6    (Off the record at 3:31 p.m.)

7         JUDGE TRACY:  All right.  So Mr. Ross, any more witnesses?

8         MR. ROSS:  Mr. Morris will speak to that issue, Your

9    Honor.

10        JUDGE TRACY:  Okay.  Go ahead.

11        MR. MORRIS:  We have no witnesses at this time.  We had

12   the intention of calling counsel for the General Counsel Edris

13   Rodriguez Ritchie.  We had submitted a request to the General

14   Counsel, Peter Rob to serve a subpoena directed at Mr. Ritchie,

15   or Rodriguez-Ritchie.  We had been informed by Mr. Noah Garber

16   that that request has been denied.  Although we haven't

17   received an actual paper copy of the order.

18        While we disagree with the ruling subject to receiving a

19   copy of the actual order, we'll rest and we will not be calling

20   any further witnesses.

21        JUDGE TRACY:  Okay.  So Mr. Garber, if you could just put

22   on the record what you have learned.  And I believe it's not

23   really an order it's just a --

24        MR. GARBER:  Right.

25        JUDGE TRACY:  -- response to the letter?



1        MR. GARBER:  Right.  The General Counsel's office has

2    issued a response.  My understanding is that it was mailed hard

3    copy.  We have not received it yet, but it denies Respondent's

4    request to subpoena Mr. Rodriguez Ritchie.  Also when we were

5    off the record I believe that Respondent requested to put in a

6    copy of the request and the General Counsel -- or the -- yeah.

7    The General Counsel's denial into the record once that becomes

8    available.

9        I understand Your Honor has a duty to build an entire

10   record.  I would just note also for the record that we think

11   it's inappropriate to put that into the record because only the

12   General Counsel is vested with the ability to grant such a

13   request and not the Board.

14       MR. MORRIS:  And so we have the request itself with the

15   attached subpoena that we'd like to offer into evidence.

16       JUDGE TRACY:  And what number is it?

17       MR. MORRIS:  What did we leave off on?

18       MR. ROSS:  I think it's 48 I believe.

19       THE COURT REPORTER:  48 is the next one.

20       MR. MORRIS:  Okay.

21       JUDGE TRACY:  And so clearly, you're opposing Respondent's

22   Exhibit 48.  And --

23       MR. GARBER:  Correct.

24       JUDGE TRACY:  -- you agree?

25       MS. FEINBERG:  I certainly do.



www.escribers.net | 800-257-0885

1        JUDGE TRACY:  Okay.  So --

2        MS. FEINBERG:  I think we might have even filed something,

3    but anyhow.

4        JUDGE TRACY:  So I agree with you what you're saying, Mr.

5    Garber.  I -- you know, this is new for me, this.  And I just

6    want to err on the side of including --

7        MR. GARBER:  I understand.

8        JUDGE TRACY:  -- the documents for what they're worth.

9    And certainly, for the Respondent I would say that the decision

10   should be when you receive it, that letter should be attached

11   to your brief as the next exhibit that should be included, like

12   as a sort of a motion or something to include it with -- as the

13   next exhibit in this record.

14       MR. ROSS:  And that'll be admitted, Your Honor?

15       JUDGE TRACY:  It'll be admitted.  We'll -- I'll put

16   something in the decision saying, you know, Respondent's motion

17   to include Respondent's Exhibit 49, the decision of the General

18   Counsel is agreed to.  And I can't even think of the word

19   anymore.  And so then we'll make sure that it's included --

20       MR. ROSS:  Thank you.

21       JUDGE TRACY:  -- so that it's complete.  Obviously if

22   something happens in route of this letter and it's agreed to,

23   then we'll look at this again, but for my purposes this issue

24   is closed.

25       Okay.  So can you give copies of all that?



1    MR. MORRIS:  Yeah.

2    (Counsel confer)

3    JUDGE TRACY:  Okay.  And at this point absent anything

4    that has to do with Respondent's Exhibit 48, does the

5    Respondent rest their case in chief?

6    MR. ROSS:  We do.

7    JUDGE TRACY:  Okay.  All right.  Is there any rebuttal

8    from the General Counsel?

9    MR. RODRIGUEZ RITCHIE:  Yes.

10   JUDGE TRACY:  Okay.

11   (Counsel confer)

12   MR. RODRIGUEZ RITCHIE:  We are offering -- we'll do it

13   one-by-one.  General Counsel's Exhibit 89 into evidence.  It's

14   an email from Michael Vega dated Wednesday, May 24, 2017 at

15   2:16 p.m. to Alaynna Elliot, Rose Samson, CC Mario Penera,

16   Russell Varone and security@tesla.com.  It's a document that

17   was produced to us pursuant to the General Counsel's subpoena.

18   JUDGE TRACY:  Okay.  Any objections?

19   MR. ROSS:  Yes, hearsay.

20   JUDGE TRACY:  Any response to that?

21   MR. RODRIGUEZ RITCHIE:  Well, it was a document that was

22   produced pursuant to the General Counsel's subpoena.  So

23   presumably it's a document that's maintained in the ordinary

24   course of business and in Tesla's possession.  So it would

25   satisfy the requirements under the federal rules of evidence.



1      MR. ROSS:  And --

2      MR. RODRIGUEZ RITCHIE:  It's a business record.

3      MR. ROSS:  And, Your Honor, it's being offered presumably

4   for the truth of a statement made by someone other than Michael

5   Vega.  And therefore, it is hearsay regardless of whether it's

6   in our business records or not.  It's a pure rank hearsay

7   statement.

8      MR. RODRIGUEZ RITCHIE:  I would note for the record that

9   Tesla has certainly taken the opposite position with regards to

10   numerous documents that it offered into evidence.  For example,

11   there was a document, it was an email from a third-party

12   company that was introduced into evidence and Tesla didn't take

13   the position that that document was hearsay.  That document

14   wasn't even a document that was maintained by Tesla in the

15   ordinary course of their business.

16      JUDGE TRACY:  So I note the objections for the record

17   however, I will overrule the objections and admit General

18   Counsel Exhibit 89.

19   **(General Counsel Exhibit Number 89 Received into Evidence)**

20      MR. RODRIGUEZ RITCHIE:  We'd also move to admit General

21   Counsel's Exhibit 91.  These were -- it's a one-page document

22   on notes that were produced to us pursuant to General Counsel's

23   subpoena.  It was a document that was produced to us just this

24   morning.  It was a document that was represented to be the

25   notes taken by Lauren Holcomb on May 24th, 2017 during her



1    meetings with Richard Ortiz and Jonathan Galescu.  It's a color

2    document with black writing and red writing.  It was

3    represented to us that the black writing -- or excuse me, that

4    the red writing were responses by Mr. Ortiz and Mr. Galescu

5    which is also noted on the document itself.

6        JUDGE TRACY:  Any objections?

7        MR. ROSS:  And what's the purpose for which it's being

8    offered?

9        MR. RODRIGUEZ RITCHIE:  It directly relates to the

10   allegations made by the General Counsel in the operative

11   complaint.

12       MS. FEINBERG:  And it was testified to by Ms. Lipson.

13       JUDGE TRACY:  Okay.  So General Counsel's Exhibit 91 is

14   admitted into evidence.

15   **(General Counsel Exhibit Number 91 Received into Evidence)**

16       MR. ROSS:  Judge, for the record, we don't have an

17   objection.

18       JUDGE TRACY:  Okay.  And any further rebuttal?

19       MR. RODRIGUEZ RITCHIE:  Nothing further.

20       JUDGE TRACY:  All right.  So you're resting your case?

21       MR. RODRIGUEZ RITCHIE:  Yes, Your Honor.

22       JUDGE TRACY:  Thank you.

23       MS. FEINBERG:  Well, as tempting as it can be we're going

24   to try to limit it here.  So we have provided you Charging

25   Party's Exhibit 8(a) through (f).  And we have provided that to



1    counsel for Tesla, counsel for the General Counsel, yourself

2    and I have a copy for the reporter as well.  And these are all

3    public article -- articles in the public domain that we ask you

4    to take judicial notice of.  I could explain each one or I

5    would explain them in my brief, but they relate to testimony

6    that's been given here today.  Some show that the --

7        JUDGE TRACY:  Go ahead --

8        MS. FEINBERG:  -- discriminatees --

9        JUDGE TRACY:  -- very -- why don't you just go ahead very

10   briefly, very briefly.

11       MS. FEINBERG:  Okay.

12       JUDGE TRACY:  Just kind of -- because they're -- it's all

13   one exhibit, right?  But --

14       MS. FEINBERG:  I could have made that --

15       MR. ROSS:  It's not all one exhibit.  It's --

16       JUDGE TRACY:  No.  She's got them as (a), (b), (c), (d).

17       MS. FEINBERG:  Yes.  That's what I did.

18       JUDGE TRACY:  So let's start with Exhibit --

19       MS. FEINBERG:  I mean, I just --

20       JUDGE TRACY:  -- 8(a).

21       MS. FEINBERG:  Sure, okay.  So 8(a) is a document produced

22   by Tesla.  You can find it on its website dated August 3rd,

23   2016 regarding its products, its results, its outlook and the

24   like.  Yesterday or one day this week, it wasn't yesterday.

25   Anyhow, you heard from the vice -- legal vice-president and



www.escribers.net | 800-257-0885

1    General Counsel --

2        JUDGE TRACY:  Well, why don't you just do this?  Just very

3    briefly that it addresses --

4        MS. FEINBERG:  It relates to the testimony --

5        JUDGE TRACY:  -- the allegation --

6        MS. FEINBERG:  -- of Mr. Chang.

7        JUDGE TRACY:  Thank you.  All right.  Charging Party

8    Exhibit 8(b).

9        MS. FEINBERG:  Same, same.  Addresses the testimony of Mr.

10   Chang.

11       JUDGE TRACY:  Okay.  Charging Party's Exhibit 8(c).

12       MS. FEINBERG:  This addresses the testimony of Mr. Hedges

13   and Mister -- well, Mr. Moran and Mr. Gecewich.

14       JUDGE TRACY:  Okay.

15       MS. FEINBERG:  That's the same for (d).  (e) addresses the

16   testimony of Gaby Toledano and the historic context in which

17   she entered the company in terms of union -- what was known

18   about the union activity and the level of union activity and

19   discussion of Tesla at the time.

20       And (f) relates to the testimony of Mr. Galescu, Mr.

21   Hedges, Mr. Sanchez, Mr. Ortiz.  I think actually really Ms.

22   Toledano.  It relates to a number of the issues regarding the

23   discriminatees and the responses by the company or their

24   knowledge of their activities.

25       JUDGE TRACY:  Okay.  Any objections? Any objections?


www.escribers.net | 800-257-0885

1      MR. ROSS:  I'd like to deal with each document separately

2  if I may, Your Honor.

3      JUDGE TRACY:  All right.  So Charging Party 8(a).

4      MR. ROSS:  We have no objection to 8(a).  In fact, we

5  would like to make it a joint exhibit.

6      JUDGE TRACY:  Well, I mean, it's already numbered.

7      MR. ROSS:  That's fine.

8      JUDGE TRACY:  So I would say that obviously you can --

9  we'll note for the record that you don't object and in fact you

10  wish you had it for yourself, but go ahead.

11  **(Charging Party Exhibit Number 8(a) Received into Evidence)**

12      MR. ROSS:  Okay.

13      MS. FEINBERG:  If I'd known that.  No, just kidding.

14      MR. ROSS:  As to 8(b), it is not an official publication

15  or statement of the company and it is rightfully hearsay.  And

16  I'm not understanding what the relevance of the document is in

17  any event.  So we object to 8(b).

18      JUDGE TRACY:  Okay.  And so you know, again, you know, all

19  these news articles frankly I'm not sure how they really play

20  into my assessing credibility of the witnesses who actually

21  appeared here as it relates to the allegations.  However, I

22  understand the limited purpose of these documents is to rebut

23  some of the testimony that was presented by Respondent's

24  witnesses.  Obviously it goes to the truth of the matter

25  asserted, if they're trying to argue that.  I --



1    MR. ROSS:  But Your Honor, it can't be because it's

2    hearsay.

3    JUDGE TRACY:  Well, that's what I just said.  So I guess

4    the point is is I'm not exactly sure, but again, I've given a

5    lot of latitude about this sort of thing where this is their

6    rebuttal, this is argument that they want to make to counter

7    some of the testimony.  And certainly, it just goes to my

8    assessment of the weight of the evidence.

9    MR. ROSS:  But it's inadmissible, that's the problem with

10    it.  It's --

11    JUDGE TRACY:  Well, some of these other ones have come in.

12    Come on now.

13    MR. ROSS:  Yeah.

14    JUDGE TRACY:  Some of them have come in.  We've had tons

15    of news articles so I'm going to say that you can state your

16    objection for the record.  I'm going to overrule the objection.

17    I understand that it's hearsay.  I understand it, but we've had

18    a lot of other articles come in.  And so I don't know how I say

19    one is not hearsay and one is and whatever.

20    MR. ROSS:  Well, we're not here to litigate any other

21    exhibit.  I'm saying this particular exhibit is nothing but

22    hearsay.  It's a news article --

23    MS. FEINBERG:  Can I address it, Your Honor?  Because it

24    isn't coming in for whatever I heard the vice-president --

25    whatever, legal counsel, Mr. Chang say that some of the

22-60493.2606



1    information that was being leaked was very of great concern

2    because this is the kind of information that they keep all

3    close to the chest.  And yet here all the same kind of

4    information is out in the public eye.  And this is the -- this

5    is two weeks before he says this very information was leaked.

6        MR. ROSS:  Well --

7        MS. FEINBERG:  So whether it's for the truth of the matter

8    is if the information is in the -- you know, you asked me not

9    to -- it was -- I don't want to have to rebut the advertisement

10    that Mr. Chang made for Tesla and we've tried to not do that.

11    But to the extent that he's arguing that during this period of

12    time and which is relevant to this case that this was what

13    their real concern was, that this information was out there, I

14    think it's important to know that in the world this

15    conversation was already happening.

16        MR. ROSS:  Your Honor --

17        MS. FEINBERG:  And that's all that -- and so that isn't

18    whether it's true or not, but the conversation was already

19    happening.

20        JUDGE TRACY:  Okay.

21        MR. ROSS:  I'd like to reply if I may?

22        JUDGE TRACY:  Go ahead.

23        MR. ROSS:  Thank you.  What appears to be -- 8(b) appears

24    to be a news article that is in part predicated on the Tesla

25    second quarter 2016 update, which by the way, was an authorized



www.escribers.net | 800-257-0885

1    publication of the company, not a media leak.  That's number

2    one.

3        So in so far as you have 8(b) reporting on what is an

4    official company publication, there's no relevance.  In

5    addition to which I might add that the document that is 8(a)

6    which is discussed in 8(b) is actually a report on Q2, not Q3.

7    Q2 ended at the end of June.  This is an official company

8    publication addressing the results of Q2.  And I might add also

9    you'll see in it that there is documentation statements, words

10   addressing SEC compliance unlike the article that appeared in

11   Bloomberg, which contained a leak of the Musk August 29 email.

12       So I don't believe the two are even remotely comparable.

13       JUDGE TRACY:  Okay.

14       MR. ROSS:  One's an authorized publication and one is the

15   report of an authorized publication, whereas the August 29

16   email was not an authorized publication by the company and the

17   report that appeared in Bloomberg was a bootleg version of that

18   unauthorized disclosure.

19       JUDGE TRACY:  Sure.  And so again, I'm going to overrule

20   the objections and allow Charging Party's Exhibit 8(b) into

21   evidence.

22   **(Charging Party Exhibit Number 8(b) Received into Evidence)**

23       JUDGE TRACY:  And certainly, you can put those arguments

24   in your brief.

25       MR. ROSS:  Okay.  As to 8(c) --



www.escribers.net | 800-257-0885

1          JUDGE TRACY:  8(c).

2          MR. ROSS:  8(c).

3          JUDGE TRACY:  8(c).

4          MR. ROSS:  Again it is nothing but pure hearsay.  It is

5    not a company admission.  It is not a company publication.  It

6    is a third-party statement about what he or she supposedly says

7    was said by other parties.  It is inadmissible, objection.

8          JUDGE TRACY:  Okay.  And so very briefly for the record

9    8(c), what is the hearsay exception or what is the purpose for

10   which it is being offered?

11         MS. FEINBERG:  I think there's some testimony about -- by

12   Mr. Moran and there already is an article in the record about

13   the notice of people in the community about Mr. Moran as being

14   a public person on behalf of the UAW.  Mr. Gecewich said before

15   he came to work for the company that he knew that there was

16   media reports about Mr. Moran, Mr. Musk talking about Mr. Moran

17   as being a UAW person.  So I feel like in and of itself shows

18   that that was all true.  That this was -- that he was perceived

19   as, whether you believe what Mr. Musk said, which was

20   inaccurate, but anyhow one way or another, it certainly was the

21   conversation in the public eye about Mr. Moran --

22         JUDGE TRACY:  Okay.

23         MS. FEINBERG:  -- and Mr. Musk.

24         JUDGE TRACY:  All right.  So again, objection for Charging

25   Party 8(c) is overruled.



www.escribers.net | 800-257-0885

1     **(Charging Party Exhibit Number 8(c) Received into Evidence)**

2          JUDGE TRACY:  And you know, for all of these I would say,

3     you know, the argument needs to be raised in the brief and the

4     relevance of it --

5          MS. FEINBERG:  Uh-huh.

6          JUDGE TRACY:  -- to any of these -- this case.

7          MS. FEINBERG:  Your Honor, we're cutting rebuttal on a lot

8     of this stuff.  Whether what -- how much we'll use these or not

9     we rely actually mostly of course on live testimony --

10         JUDGE TRACY:  Yeah.

11         MS. FEINBERG:  -- on the record, but in light of the fact

12     that there's some loose pieces and rather than --

13         JUDGE TRACY:  Sure.

14         MS. FEINBERG:  -- calling in witnesses we're just trying

15     to --

16         MR. ROSS:  Your Honor --

17         JUDGE TRACY:  Sure.

18         MS. FEINBERG:  -- fill in a few little lines.

19         JUDGE TRACY:  Sure.

20         MR. ROSS:  Okay.  The only way I can respond to this is to

21     put somebody named Dana Hull on the witness stand --

22         JUDGE TRACY:  Well, this is rebuttal.

23         MR. ROSS:  -- and cross-examine her.

24         JUDGE TRACY:  Right.  So this is rebuttal.  It's not being

25     offered for the truth of it okay.  So I've already ruled on it.



www.escribers.net | 800-257-0885

1    So let's just move on.  You can argue in the brief that it

2    shouldn't even be considered because it is hearsay.

3        MR. ROSS:  If it's not being offered for the proof of the

4    statements contained therein, wouldn't a stipulation saying

5    that an article appeared in the paper on such and such a day be

6    sufficient instead of simply putting the article into the

7    evidence?

8        MS. FEINBERG:  You know, Dana Hull is the person who wrote

9    the article that they put in.

10        MR. ROSS:  You're right.

11        MS. FEINBERG:  It's sort of like okay then.  You know, the

12    one's about the lead --

13        JUDGE TRACY:  Okay.  8(d).

14        MS. FEINBERG:  -- the ones about this.  We're --

15        JUDGE TRACY:  Please, let's go.  8(d).

16        MR. ROSS:  You're not offering your -- well, okay.

17        JUDGE TRACY:  No, no.

18        MR. ROSS:  8(d) suffers from the same infirmities, Your

19    Honor.

20        JUDGE TRACY:  Okay.  And so again, I'm going to overrule

21    the objection to Charging Party 8(d) and allow it into

22    evidence.

23    **(Charging Party Exhibit Number 8(d) Received into Evidence)**

24        JUDGE TRACY:  I've already said what I need to say about

25    these media -- these articles and the media.



www.escribers.net | 800-257-0885

1    MR. ROSS:  Likewise at 8(e) is also pure hearsay.  Again,

2    we cannot respond to the materials contained in this document

3    unless we call Julia Carrie Wong who is the author of the

4    document to cross-examine her with respect to the statements.

5    In addition of which the statements are for the most part the

6    statements made not by the company but instead made by various

7    individuals who the union called as their witnesses.  It's pure

8    hearsay and it is inadmissible.

9        JUDGE TRACY:  Okay.  And then --

10       MS. FEINBERG:  Your Honor --

11       JUDGE TRACY:  -- same ruling.  So Charging Party's Exhibit

12   8(e) is admitted into evidence.

13   **(Charging Party Exhibit Number 8(e) Received into Evidence)**

14       MR. ROSS:  And then --

15       JUDGE TRACY:  And then the final one.

16       MR. ROSS:  -- 8(f), not only is it pure hearsay, it is

17   totally irrelevant.

18       JUDGE TRACY:  Again, I'm going to overrule the objections

19   and allow Charging Party's Exhibit 8(f) into evidence.

20   **(Charging Party Exhibit Number 8(f) Received into Evidence)**

21       JUDGE TRACY:  You know, and frankly I will deal with these

22   in the brief as to -- I mean, you may not even cite to them --

23       MS. FEINBERG:  Uh-huh, that's possible.

24       JUDGE TRACY:  -- I don't know.  General Counsel might not

25   cite to them.  I don't cite to every piece of evidence because

22-60493.2612



1  some of it isn't relevant and isn't helpful.  But I guess I'm

2  also left with the question of okay.  I have all these.  These

3  are all hearsay.  Then I have all these media reports that are

4  not hearsay.  I don't get it but you know, hey.

5      MS. FEINBERG:  And so --

6      JUDGE TRACY:  I will deal with it later, but your --

7  Respondent wanted those in there and they're in the record.  So

8  I don't know how I treat some news articles as hearsay and some

9  not as hearsay.  Again, we will deal with these in the brief

10  and it may be that all these news articles and reports really

11  have nothing to do with the case.  But also I've said from day

12  one, I want to see the documents that were created as this

13  case -- as the events went along, emails, notes all of that.

14      MS. FEINBERG:  Uh-huh.

15      JUDGE TRACY:  And I want to hear from the people because

16  that's where it all comes down to.  Who do I believe?  Who do I

17  believe is taking -- who spoke truthfully, who wiggled a bit.

18  The articles are not going to tell me that, okay.  They might

19  setup context of what was happening in the world, but that's

20  all I have to say about that.  So --

21      MS. FEINBERG:  And that's really what they're for.

22      JUDGE TRACY:  -- there's no need to keep fighting about

23  it.

24      MR. ROSS:  Okay.  Just so you understand though, Judge.

25  In so far as there's going to be somebody who reads this record



www.escribers.net | 800-257-0885

1    at a later date, I just want the record to be clear that we

2    object to this evidence and in so far as any of this

3    inadmissible evidence is treated as evidence that justifies

4    whatever outcome we get in this case.

5        JUDGE TRACY:  Oh, sure.

6        MR. ROSS:  We just want to preserve that issue.  I hope

7    you understand that.

8        JUDGE TRACY:  I totally get it.

9        MR. ROSS:  Okay.

10        JUDGE TRACY:  And I'm pretty sure that there would be

11    footnotes, if not by me, by the Board, by any appeals court.  I

12    don't think they really look at news reports to be honest as

13    their basis for deciding credibility and the allegations.

14    It's --

15        MR. ROSS:  Well, I would say that --

16        MS. FEINBERG:  Can I just be -- okay.

17        JUDGE TRACY:  And so I just have it there --

18        MS. FEINBERG:  I just want to be clear about something,

19    Your Honor.  Most of these articles are not coming in to show

20    what -- for the truth.

21        JUDGE TRACY:  Yeah.

22        MS. FEINBERG:  But there were a number of witnesses who

23    testified that they didn't even know that the UAW was there.

24    That they didn't know that the UAW was organizing.  The whole

25    world knew it.  And so it seems relevant to know that the



1  public is having a conversation about UAW and Tesla and then

2  they call witnesses who say they know nothing.  So that's not

3  about the truth or not, that's about context.  Whether you

4  think that matters or not, or whether the Board thinks this

5  matters or not, that's up to them.  But I just want to say,

6  that's not about the truth.  It's about -- the truth is that

7  there is a discussion in the public eye about it.  So that's

8  all.

9      JUDGE TRACY:  Sure, sure.

10     MS. FEINBERG:  I just want to say that's different than,

11  did Jose say this, or did Mr. Musk say that.

12     JUDGE TRACY:  Oh, sure.  And again --

13     MS. FEINBERG:  Yes, okay.

14     JUDGE TRACY:  -- that again goes to the credibility --

15     MS. FEINBERG:  Right, exactly.

16     JUDGE TRACY:  -- of any of the witnesses.  I mean --

17     MS. FEINBERG:  Yes.  That's -- I just wanted to highlight

18  that so --

19     JUDGE TRACY:  Sure.  Maybe they all --

20     MS. FEINBERG:  -- so you understood the context.

21     JUDGE TRACY:  -- live in a bubble and --

22     MS. FEINBERG:  Thank you.

23     JUDGE TRACY:  -- nobody knows what's happening.

24     MS. FEINBERG:  Exactly.

25     JUDGE TRACY:  But the articles are not --



1          MS. FEINBERG:  Uh-huh, okay.

2          JUDGE TRACY:  -- be the --

3          MS. FEINBERG:  They're not the sole -- right.

4          JUDGE TRACY:  No.  I would hope not.

5          MS. FEINBERG:  You can figure that out on your own.

6          JUDGE TRACY:  Yeah.  I would hope not.

7          MS. FEINBERG:  But it's just to paint -- it was just a

8     little like I said --

9          JUDGE TRACY:  All right.  And so --

10          MS. FEINBERG:  -- extra little painting.

11          JUDGE TRACY:  -- then have you rested your case in chief?

12          MR. ROSS:  Rebuttal case.

13          JUDGE TRACY:  I'm sorry; the rebuttal case.

14          MS. FEINBERG:  Yes.

15          JUDGE TRACY:  Yes.  The AB bill, do we have that?

16          MS. FEINBERG:  Oh, I sent it to you.

17          MR. GARBER:  No.  It's right here.

18          MS. FEINBERG:  Okay.  We do have it.

19          JUDGE TRACY:  Okay.  Did you show it --

20          MR. GARBER:  No.  I only have one.

21          MS. FEINBERG:  No.

22          MR. GARBER:  I have --

23          MS. FEINBERG:  That's -- no, no.  Not this.  I think I

24     sent you -- I sent you another thing, like a one-page thing

25     that said the text --

22-60493.2616


www.escribers.net | 800-257-0885

1          MR. GARBER:  Oh, it was --

2          MS. FEINBERG:  So I think I sent it to you.

3          JUDGE TRACY:  Okay.  Let's go off the record so just show

4     them.  I would like for this to be included in the record as

5     part of --

6          MR. ROSS:  As would we.

7          JUDGE TRACY:  -- what did we say it would be?

8          COURT REPORTER:  I think it's Charging Party something.

9          JUDGE TRACY:  This is 10.  This is going to be -- you can

10    call it as 11 --

11         MS. FEINBERG:  Or we can make 10 or 10(a).

12         JUDGE TRACY:  -- or they can put it in.

13         MS. FEINBERG:  10 is the --

14         JUDGE TRACY:  I just put it in as 11.

15         MS. FEINBERG:  It could be 11.  10 is the link.

16         JUDGE TRACY:  That's the link to the actual hearing.

17         MS. FEINBERG:  I know.  This can be 11.  That's fine.

18         JUDGE TRACY:  And then this 11 can be the --

19         MS. FEINBERG:  That's fine.

20         JUDGE TRACY:  -- the bill.

21         MS. FEINBERG:  That's fine.

22         JUDGE TRACY:  And then I think that is it.

23         MS. FEINBERG:  Yes.  Thank you for following up on that.

24    I knew I had sent it but --

25         JUDGE TRACY:  Anything else?



www.escribers.net | 800-257-0885

1    (Off the record at 4:11 p.m.)

2        JUDGE TRACY:  Okay.  So the last issue was about --

3        MS. REED:  Margo.

4        MS. FEINBERG:  Oh, sorry.  So sorry, so sorry.

5        JUDGE TRACY:  So the last issue that we have before I

6    close us out is the issue of what we discussed before which was

7    the hearing in which some of these individuals that have been

8    named here in this matter went to testify about.  And we have

9    in the record an audio of the hearing along with the actual

10   location on the internet of where these hearing audios are --

11   would be found.

12       Is it audio and video or just --

13       MS. FEINBERG:  It's just a video.

14       MS. REED:  Video.

15       MS. FEINBERG:  A video with sound.

16       JUDGE TRACY:  Video with sound.  So sorry, I misspoke.

17   It's not just an audio, but it's a video.  But they were -- the

18   individuals when Sacramento was referenced during this hearing,

19   they were -- it was in regards to California Assembly Bill-134,

20   Budget Act of 2017.  It was published on September 18th, 2017

21   at 9:00 p.m. the version that I see.  Assembly Bill Number 134

22   Chapter 254.  And in particular, the section was section 1,

23   provision 2(c)(1).

24       MS. FEINBERG:  Correct.

25       JUDGE TRACY:  Do the parties agree?



1          MR. ROSS:  That's fine.

2          MS. FEINBERG:  Yes, thank you.

3          MR. RODRIGUEZ RITCHIE:  Yes.

4          JUDGE TRACY:  All right.  Thank you.

5          Okay.  Now anything left?  No.  I don't think so.

6          MR. RODRIGUEZ RITCHIE:  Just your speech.

7          JUDGE TRACY:  Okay.  Sorry, one second.  Okay.  So we are

8    now at the end of this hearing.  I will prepare and file with

9    the Board my decision in this proceeding.  A copy will be

10   served on each of the parties.  You are reminded to refer to

11   the Board's rules and regulations for information regarding the

12   filing of briefs and proposed findings for my consideration and

13   regarding procedures before the Board after the issuance of a

14   judge's decision.

15         Obviously now that all the evidence is in, if you all want

16   to talk settlement why not?  I'll be here to talk to you about

17   it, or at any time up until I issue my decision.  You know,

18   people can take a look at the evidence and it might change

19   positions.  So let me know.  I will allow until, let's see, I

20   did this, November 16th, 2018 which is 35 days from now for the

21   filing of briefs and any proposed findings and conclusions.

22   Briefs should be filed directly with the judge's division in

23   San Francisco regardless of whether they're mailed or e-filed.

24   And any request for extensions of time for the filing of briefs

25   must be made in writing to the associate chief judge in San



www.escribers.net | 800-257-0885

1    Francisco and served on the other parties.  The positions of

2    the other parties regarding the extension should be obtained

3    and set forth in the request.  It is the policy of the division

4    of judges to grant discretionary extensions only when they are

5    clearly justified.  Request for extensions must contain

6    specific reasons and show that the requesting party cannot

7    reasonably meet the current deadline.

8         There being nothing further.  The trial is now closed.  We

9    are off the record.

10   **(Whereupon, the hearing in the above-entitled matter was closed**

11   **at 4:23 p.m.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

www.escribers.net | 800-257-0885

1     **C E R T I F I C A T I O N**

2     This is to certify that the attached proceedings before the

3     National Labor Relations Board (NLRB), Region 32, Case Numbers

4     32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-

5     200530, 32-CA-208614, 32-CA-210879, 32-CA-220777 Tesla, Inc.,

6     and Michael Sanchez, and Jonathan Galescu, and Richard Ortiz

7     and International Union, United Automobile, Aerospace and

8     Agricultural Workers of America, AFL-CIO at National Labor

9     Relations Board Region 32, 1301 Clay Street, Suite 300N,

10    Oakland, CA 94612-5224, on Friday, October 12, 2018, 9:05 a.m.

11    was held according to the record, and that this is the

12    original, complete, and true and accurate transcript that has

13    been compared to the reporting or recording, accomplished at

14    the hearing, that the exhibit files have been checked for

15    completeness and no exhibits received in evidence or in the

16    rejected exhibit files are missing.

17

18                        _Deborah Gonzalez_

19

20                        DEBORAH GONZALEZ

21                        Official Reporter

22

23

24

25

22-60493.2621

