FORM EXEMPT UNDER 44 U S C 3512

| INTERNET FORM NLRB-501 (2-08) | UNITED STATES OF AMERICA NATIONAL LABOR RELATIONS BOARD **CHARGE AGAINST EMPLOYER** | **DO NOT WRITE IN THIS SPACE** | |
|---|---|---|---|
| | | Case 32-CA-220777 | Date Filed 05-23-2018 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer Tesla, Inc. | | b. Tel. No. |
|---|---|---|
| | | c. Cell No. |
| | | f. Fax No. |
| d. Address *(Street, city, state, and ZIP code)* 45500 Fremont Boulevard Fremont, California 94538 | e. Employer Representative Gaby Toledano, Chief People Officer | g. e-Mail gaby@tesla.com |
| | | h. Number of workers employed 10,000 |
| i. Type of Establishment *(factory, mine, wholesaler, etc.)* Factory | j. Identify principal product or service Automotive Manufacturing | |

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* _____ of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

On May 20, 2018, Tesla, Inc., through its CEO Elon Musk, violated the National Labor Relations Act by threatening to take away employee stock options in retaliation for Tesla employees engaging in protected union activity. Specifically, Musk stated in a public tweet, "[n]othing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues & give up stock options for nothing?" This tweet went out to Musk's 21.8 million twitter followers, has been shared and republished by numerous individuals and media outlets, and remains publicly accessible at the time of this filing.

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), AFL-CIO

| 4a. Address *(Street and number, city, state, and ZIP code)* 8000 East Jefferson Ave. Detroit, Michigan 48214 | 4b. Tel. No. (313) 926-5000 |
|---|---|
| | 4c. Cell No. |
| | 4d. Fax No. |
| | 4e. e-Mail sreed@uaw.net |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*
International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), AFL-CIO

### 6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

| By *Margo A. Feinberg* *(signature of representative or person making charge)* | Margo A. Feinberg, Esq., Attorney for Charging Party *(Print/type name and title or office, if any)* | Tel. No. (323) 655-4700 |
|---|---|---|
| | | Office, if any, Cell No. |
| Schwartz, Steinsapir, Dohrmann & Sommers LLP Address 6300 Wilshire Blvd., Suite 2000, Los Angeles, CA 90048 | 5/23/18 *(date)* | Fax No. (323) 655-4488 |
| | | e-Mail margo@ssdslaw.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

1

## CERTIFICATE OF SERVICE

2

3

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California.  My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

4

5

6

On June 4, 2018, I served a true copy of the following document(s) described as **RESPONDENT'S PETITION TO PARTIALLY REVOKE SUBPOENAS *DUCES TECUM* B-1-11BJS5V AND B-1-11BKOEJ ISSUED TO CUSTODIAN OF RECORDS AT TESLA, INC.** on the interested parties in this action as follows:

7

8

9

10

11

12

Margo Feinberg
E-mail: margo@ssdslaw.com
Daniel E. Curry
E-mail: dec@ssdslaw.com
Julie Alarcon
E-mail: jsa@ssdslaw.com
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Blvd., Suite 2000
Los Angeles, CA  90048
T: (323) 655-4700

13

14

15

16

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address sasmith@sheppardmullin.com to the person(s) at the e-mail address(es) listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

17

18

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

19

Executed on June 4, 2018, at San Francisco, California.

20

21

22

Sarah Smith

23

24

25

26

27

28

SMRH:486571108.1

-1-

Find Your Regional Office | Contact Us - 1-866-667-NLRB | Español

Search

Search Tools

**Home**    **Rights We Protect**    **What We Do**    **Who We Are**    **Cases & Decisions**    **News & Outreach**    **Reports & Guidance**

Home (http://www.nlrb.gov/) » E-File (efileterm.aspx) » Confirmation

🖨 Print

# Confirmation

You have successfully E-Filed document(s). You will receive an E-mail acknowledgement from this office when it receives your submission. This E-mail will note the official date and time of the receipt of your submission. Please save this E-mail for future reference. Please print this page for your records.

**NOTE:** This confirms only that the document was filed. It does not constitute acceptance by the NLRB.
**Be sure to make a note of this Confirmation Number.**

**Confirmation Number:** 1000213358
**Date Submitted:** 6/4/2018 4:02:45 PM (UTC-08:00) Pacific Time (US & Canada)

**Case Number:** 32-CA-197020
**Case Name:** TESLA, INC.
**Filing Party:** Charged Party / Respondent
**Submitted E-File To Office:** Region 32, Oakland, California

**Contact Info:**
**Morris, Keahn**
Sheppard, Mullin, Richter & Hampton, LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
(415) 434-9100
**Email: kmorris@sheppardmullin.com**
**Additional Emails:** sasmith@sheppardmullin.com, mross@sheppardmullin.com

**Attached E-File(s):**
Petition to Revoke a Subpoena    2018-06-04 Tesla's Petition to Partially Revoke Subpoenas - efiled.pdf

Site Map    Policies    Feedback    FOIA    OpenGov    Inspector General

Accessibility    No Fear Act    USA.gov    PDF Viewer    Download App

22-60493.5817

# EXHIBIT 8

22-60493.5818

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
MARK S. ROSS, Cal. Bar No. 64812
KEAHN N. MORRIS, Cal. Bar No. 273013
Four Embarcadero Center, Suite 1700
San Francisco, California 94111-4109
Telephone:    415.434.9100
Facsimile:    415.434.3947

Attorneys for TESLA, INC.

UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

REGION 32

| | |
|---|---|
| TESLA, INC. | |
| and | |
| MICHAEL SANCHEZ, an Individual | Case No. 32-CA-197020 |
| and | |
| JONATHAN GALESCU, an Individual | Case No. 32-CA-197058 |
| and | |
| RICHARD ORTIZ, an Individual | Case No. 32-CA-197091 |
| and | |
| INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, AFL-CIO | Case No. 32-CA-197197 Case No. 32-CA-200530 Case No. 32-CA-208614 Case No. 32-CA-210879 |

**RESPONDENT'S PETITION TO REVOKE SUBPOENAS *AD TESTIFICANDUM*  A-1-11BJ5G3 AND A-1-11BKIP5 ISSUED TO TESLA'S CEO ELON MUSK**

22-60493.5819

## I.    Introduction

Pursuant to Section 102.31(b) of the National Labor Relations Board's[1] Rules and Regulations, Tesla, Inc.[2] hereby petitions to revoke Subpoenas Ad Testificandum A-1-11BJ5G3 and A-1-11BKIP5 requested by Margo A. Feinberg, Counsel for Charging Party, United Automobile, Aerospace and Agricultural Workers of America, AFL-CIO[3]  and issued to Tesla's Chief Executive Officer, Elon Musk[4], calling for Mr. Musk to appear at the trial in this matter. True and correct copies of the Subpoenas are attached hereto as Exhibits A and B.  The Subpoenas should be revoked pursuant to FRCP 26's apex doctrine.

## II.    Procedural Background/Operative Facts

A party upon whom a subpoena has been served may, within five business days of receipt of the subpoena, petition to revoke the subpoena.  29 C.F.R. 102.31(b).  Because the Subpoenas were received by Tesla on May 31, 2018, this Petition is timely.

### A.    The Union Is Subpoenaing Mr. Musk In Furtherance Of Its Corporate Campaign And for the Purpose of Harassing Him And Without A Genuine Litigation Need

For some time now, the UAW has engaged in a corporate campaign designed to damage Tesla's business reputation and to tarnish its brand as well as to embarrass and harass Mr. Musk. Much of the recent negative press surrounding Tesla and Mr. Musk spawns directly from the Union's smear attacks.  The Union has used these tactics as a means of extorting Tesla's and Mr. Musk's agreement to a card check/neutrality agreement and facilitating its attempt to organize

---

[1] Hereinafter referred to as "the NLRB", "the Board" or "the GC".

[2] Hereinafter referred to as "Tesla", Respondent" or "the Company".

[3] Hereinafter referred to as "the Union" or "UAW".

[4] Hereinafter referred to as "Mr. Musk".

the roughly 16,000 employees working at the Company's Fremont and Sparks facilities. By

putting Mr. Musk on the witness stand, the Union seeks to harass and embarrass Mr. Musk for

the purpose of generating more negative publicity and in furtherance of the Union's extortionate

campaign. Further, under the terms of the Complaint (and assuming that Tesla's motion to

dismiss[5] the recent amendment to the Complaint is granted), the Union has absolutely no *bona*

*fide* litigation based reason or need to call Mr. Musk as a witness. Further, even assuming,

*arguendo*, that Tesla's motion to dismiss (see fn. 8) is denied and the recent amendment is

allowed to proceed to trial, Mr. Musk's knowledge of the material events contained therein is

neither so special nor unique as to require his compulsory appearance at trial as the Union's or

GC's witness.[6]

      B.    <u>The Complaint Contains No Allegations Directly Relating To Mr. Musk Or</u>
              <u>Allegations Of Which He Has Any Personal Or Unique Knowledge</u>

The Complaint[7] that issued on March 30, 2018 serves as the legal predicate for the trial in

this matter and frames the issues to be tried.[8] A copy of the Complaint is attached hereto as

---

[5] See fn 8, *infra*.

[6] Respondent's Counsel is informed and believes that if called to the stand to testify about the allegations contained in the Complaint, Mr. Musk would testify that, although generally aware of the allegations made against Tesla, he had no involvement or participation in the acts/omissions giving rise to the allegations in the Complaint and that he has little to no personal knowledge of the facts underlying the claims. He would also testify that it was others working for Tesla, well below the CEO level who were involved in these transactions and that it is they, and not him, who can provide competent testimony relevant to these claims.

[7] Hereinafter referred to as "the Complaint".

[8] Late on the afternoon of June 4, less than one week prior to trial, Counsel for the General Counsel informed Tesla of the GC's amendment of the Complaint, alleging, for the first time that, on June 7, 2017, Mr. Musk and Tesla's Chief People Officer solicited employee grievances and promised to remedy them if they refrained from Union activity and that he informed employees that it would be futile for them to select a union and that he would let them have a union if Tesla failed to remedy their safety grievances. A copy of GC's notice of Amendment is attached hereto as Exhibit D. Putting aside that these allegations are utterly false, General Counsel has offered no explanation as to how and why these new substantive allegations relating Mr. Musk's conduct were omitted from the Complaint. Indeed, assuming *arguendo* that these incidents did, in fact, occur (they did not) and given Mr. Musk's prominence, they are not expressly mentioned or otherwise referenced by implication in any of the charges (or in any of their amendments) filed in the above-captioned cases. This fact is further proven by the Region's requests for information in Case Nos. 32-CA-200530 and 208614 which make no mention of these newly alleged

22-60493.5821

Exhibit C.  The Complaint contains a series of Section 8(a)(1) and (3) allegations, alleging the commission of various unfair labor practices[9] by Company supervisors and purported Doe agents *other than Mr. Musk*.  Other than making a passing reference to Mr. Musk as a supervisor and agent of the Respondent, nothing in the Complaint alleges, much less suggests, that Mr. Musk was personally, directly or even indirectly involved in any of the alleged ULPs, that he has personal, much less unique, knowledge of the conduct the GC alleges to be unlawful or that his testimony, as opposed to the testimony of some other less high level Company officials who were actually involved or participated in the alleged misconduct, is necessary to establish a violation.  To the contrary, the Complaint makes it clear that the isolated acts/omissions in question were spread out over a year's time and carried out by others many corporate echelons below the level of CEO.

events. See Exhibit E., the Region's Request For Information in Case 32-CA-200530, dated July 7, 2017, issued by Counsel for the General Counsel, Edris Rodriguez-Ritchie; also see Exhibit F., the Region's Request for Information in Case 32-CA-208614, dated November 21, 2017, issued by Counsel for the General Counsel, Edris Rodriguez-Ritchie.  Moreover, even though the Region fully investigated all of these claims, taking 21 separate affidavits in these matters, at no time did it seek to take a statement from Mr. Musk.  This conspicuous omission leads one to but a singular conclusion -- that it wasn't until after the Union subpoenaed Mr. Musk and, realizing that its subpoena would likely be quashed,  the Union and its supporters concocted these new claims in an effort to circumvent this Petition.  Complicit with the Union, the GC has elected to assert these new last minute claims in an effort to aid and abet the Union's fraud.  Because these nearly year-old allegations are barred by Section 10(b) of the act, Tesla will move for their dismissal from the operative Complaint once the record opens in this trial and the ALJ has jurisdiction over this matter.  In connection with this Petition and that motion to dismiss, Tesla hereby respectfully requests an evidentiary hearing on how and why these allegations concerning Mr. Musk were omitted from the June 12, 2017 charge in Case 32-CA-200530, the July 28, 2017 amended charge in Case 32-CA-200530, the August 31, 2017 Consolidated Complaint; the September 1, 2017 Amended Consolidated Complaint, the October 25, 2017 charge in Case 32-CA-208614; the March 13, 2018 amended charge in Case 32-CA-200530; and the March 30, 2018 Second Amended Consolidated Complaint and how and why they have found their way into the "Amendment to Second Amended Consolidated Complaint" on the eve of trial and in the wake of the Union's abusive subpoena of Mr. Musk.  Absent clear and convincing proof  that the ALJ has jurisdiction over these last second allegations as a matter of law and that the GC has acted in good faith and without abusing its prosecutorial discretion, Tesla will ask that they be dismissed.  In the meantime, however, and pending the resolution of this procedural controversy, Tesla requests that the Union's subpoenas issued to Mr. Musk be revoked or, at the very least, that it be held in abeyance pending a decision on Tesla's motion to dismiss and/or following the testimony of the remaining witnesses at the hearing as more fully set forth below.

[9] Hereinafter referred to as "ULP" or "ULP's"

### III.   Legal Argument/Analysis

A.   <u>The FRCP's "Apex Doctrine" Renders the Union's Subpoena Issued to Mr. Musk "Invalid" As A Matter Of Law</u>

According to the Board's Rules and Regulations, the Administrative Law Judge or the Board . . . *will* revoke the subpoena, if . . . for any reason sufficient at law . . . the subpoena is otherwise invalid.  29 C.F.R. §102.31(b).  This mandatory language has been interpreted to encompass reasons to quash provided by the Federal Rules of Civil Procedure.  See, e.g. *Brinks, Inc.* 281 NLRB 468-69 (1986).  Rule 26(b)(1) permits relevant testimony provided "it is proportional to the needs of the case considering the important of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of [the testimony] in resolving the issues and whether the burden or expense of the proposed [testimony] outweighs the likely benefit." Brackets added.  Likewise, FRCP 26(b)(2)(C) states that on a parties motion or on its own, a court "must" limit testimony if it can be obtain from some other source more convenient, less burdensome or less expensive or the proposed testimony is outside the scope permitted by Rule 26(b)(1) [which, as discussed above, sets for the a balancing test].

As Tesla's CEO, responsible for the overall operations of a global company with more than 41,000 employees spread throughout the world, Mr. Musk sits at the very apex of the Company.  Despite liberal discovery rules, courts recognize the unique burdens placed on such high level officials at the apex of a company and balance a party's right to critical testimony and an executive's right to avoid harassment and abuse while managing the business.  In general, this so-called "apex doctrine" prohibits the taking of a senior executive's testimony unless the requesting party can show that the executive has unique (non-repetitive) or superior knowledge of the facts that are relevant to the claim and alternative methods to obtain the information have

been exhausted without success. Absent such proof, the testimony of high level corporate executives is deemed duplicative, cumulative and burdensome. See, e.g., *Baine v. General Motors Corp*., 141 F.R.D. 332 (M.D. Ala 1991)(describing legal authority as "fairly unequivocal" and denying plaintiff's request to depose a corporate vice president who lacked unique personal knowledge of the issues). Indeed, as recognized by the United States District Court for the Southern District of New York, "permitting unfettered [testimony] of corporate executives would threaten disruption of . . . business and could serve as a potent tool for harassment in litigation. Accordingly, where other witnesses have the same knowledge, it may be appropriate to preclude a redundant deposition of a highly placed executive." *Consolidated Rail Corp. v. Primary Industries Corp*, 1993 WL 364471, *1 (S.D.N.Y. 2002); *Celerity, Inc. v. Ultra Clean Holding, Inc.*, No. C 05-4374, 2007 WL 205067, at *3 (N.D. Cal. Jan. 25, 2007) (noting that depositions of high-level executives "create[] a tremendous potential for abuse or harassment"); see also *Apple Inc. v. Samsung Elecs. Co.*, 282 F.R.D. 259, 263 (N.D. Cal. 2012) (*citing Celerity, Inc. v. Ultra Clean Holding, Inc.*, No. C 05-4374 MMC (JL), 2007 WL 205067, at *3 (N.D. Cal. Jan. 25, 2007)). "In determining whether to allow an apex deposition,[10] courts consider (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less

---

[10] Although the issue has arisen most frequently in the context of depositions of high-level corporate executives—the same considerations control when a party seeks to require an executive's attendance as a trial witness. Indeed, Rule 45 requires a district court to quash or modify a subpoena that would "subject[] a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv); see also Fed. R. Civ. P. 45 Advisory Committee Notes on 1991 Amendment (stressing that the court must "protect all persons from undue burden imposed by the use of the subpoena power," and noting that "it might be unduly burdensome to compel an adversary to attend trial as a witness if the adversary is known to have no personal knowledge of matters in dispute"). What is more, Federal Rule of Evidence 402 excludes irrelevant testimony, while Federal Rule of 403 allows a court to exclude even relevant evidence when its probative value is substantially outweighed by, among other things, "undue delay, wasting time, or needlessly presenting cumulative evidence." This tribunal has ample authority to safeguard against the risks of abuse and harassment that are present whenever a party seeks the testimony of a high-level corporate executive.

intrusive discovery measures." *In re Google Litig.*, No. C 08-03172 RMW (PSG), 2011 WL

4985279, at *2 (N.D. Cal. Oct. 19, 2011).[11]

     B.    <u>The Union's Subpoena Should Be Revoked Because Mr. Musk Has No Personal Knowledge Of The Facts That Are In Dispute</u>

As noted previously, nothing in the Complaint suggests that Mr. Musk had personal

involvement in any of the events, acts or omissions complained of here.  In a host of

jurisdictions, courts have protected senior level officials from having to give testimony when the

official lacked personal knowledge of the facts in dispute.  For example in *Thomas v. IBM*, 48

F.3d 478, 482 (10th Cir. 1995), IBM's chairman lacked personal knowledge of plaintiff's age

discrimination allegations and was, therefore, protected from having to appear for deposition.

Likewise, in *Lewelling v. Farmers Ins. of Columbus Inc*., 879 F.2d 212, 218 (6th Cir. 1989), the

court affirmed the issuance of a protective order prohibiting the deposition of defendant's CEO

who had no knowledge of the facts pertinent to plaintiff's action.

     C.    <u>Even Assuming, Arguendo That Mr. Musk Has Some Knowledge Of The Material Facts, His Knowledge Is Secondary And Not Unique or Superior As To Justify His Testimony</u>

Even where senior corporate executives have some knowledge about the facts giving rise

to an action, courts have still not required their testimony absent proof that the executive has

"unique" or "superior knowledge" making their testimony essential to the proper disposition of

---

[11] Although some courts have applied a formal "apex deposition doctrine," which in effect creates "a rebuttable presumption that the testimony of a high-ranking corporate executive either violates Rule 26(b)(2)(C)'s proportionality standard or, on a party's motion for a protective order, constitutes 'good cause' for such an order as an 'annoyance' or 'undue burden' within the meaning of Rule 26(c)(1)," *Performance Sales & Mktg. LLC v. Lowe's Companies, Inc.*, No. 5:07-CV-00140, 2012 WL 4061680, at *4 (W.D.N.C. Sept. 14, 2012), the very same considerations that underlie the "apex" doctrine also inform the application of Rule 26(b)(2)(C) and Rule 26(c)(1) more generally. *See* 2012 WL 4061680, at *4 (finding it unnecessary to decide whether the apex doctrine applied, because "the same conclusion is reached regardless of whether the apex presumption is applied"); *see also E.E.O.C. v. Freeman*, No. CIV.A. 09-2573, 2012 WL 2370122, at *3 (D. Md. June 21, 2012) (concluding that CEO's deposition was not barred by "apex" doctrine, but granting protective order because deposition was likely to be cumulative, the information sought could be obtained from other less burdensome sources, and the burden of the deposition outweighed its likely benefit).

the case. Courts protect high level executives who have some knowledge of the facts giving rise

to a claim by prohibiting their testimony unless and until the requesting party attempts to obtain

factual information from less senior employees and demonstrates that the information the

requestor seeks cannot be obtained from them. *Baines*, supra. at 335 (finding that deposing the

vice president would be oppressive, inconvenient and burdensome inasmuch as it was not

established that the information necessary could not be had from a junior executive and it had

not been demonstrated that the vice president had any superior or unique personal knowledge of

the facts that were in dispute). Suffice it to say nothing in the Complaint even remotely suggests

that Mr. Musk possesses the unique or superior knowledge required to satisfy the apex doctrine

test. To the contrary, the Complaint names persons other than Mr. Musk as the actors giving rise

to the GC's claims. Nor can the Union demonstrate that it first exhausted other less intrusive

measures to obtain the information it seeks, nor that the information it seeks cannot now be

obtained elsewhere from the individuals named in the Complaint or from its own witnesses[12].

    D.    <u>The Union Subpoena Is *Actual* Harassment Designed To Advance Its Corporate</u>
           <u>Campaign Against Tesla and Mr. Musk</u>

        The Union's real purpose in subpoenaing Mr. Musk to appear is clear; it seeks to grill

him about anything and everything it can for the purpose of obtaining information and sound

bites that it may then use in its on-going corporate campaign against Tesla and against Mr. Musk.

Suffice it to say, this is an impermissible use of the subpoena power. Indeed, the federal rules of

civil procedure (and the apex doctrine by extension) operate on the theory that a high level

executive's testimony is *impliedly* harassing when the executive's knowledge, if any, is not

---

[12] Even assuming that the GC's last second amendment is allowed (which it shouldn't be), nothing in these new allegations make Mr. Musk's knowledge of them so unique or superior as to compel his testimony. Presumably, the GC and the Union have some witness who is willing to testify to the events underlying these newly raised claims. That available proof renders Mr. Musk's compulsory testimony duplicative, cumulative and burdensome.

unique because others are available to provide the necessary information to the requesting party. Here the Union's harassing purpose need not be implied because there is direct proof of its harassing purpose.   In the face of such proof, the Union's anticipated justifications for this invalid subpoena are to be carefully scrutinized and viewed with suspicion.

**IV    Conclusion**

Pursuant to FRCP 26's apex doctrine, the Union's harassing subpoena is invalid. Requiring Mr. Musk to appear at trial is entirely unnecessary and will do nothing to materially advance the Union's cause at trial.   It is merely designed to further the Union's corporate campaign against Mr. Musk and Tesla, which is an improper purpose.   The Union's subpoena issued to Mr. Musk must, therefore, be revoked.

Dated:  June 7, 2018

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____

MARK S. ROSS
KEAHN N. MORRIS

Attorneys for
TESLA, INC.

22-60493.5827

# EXHIBIT A

22-60493.5828

FORM NLRB-32

## SUBPOENA

### UNITED STATES OF AMERICA
### NATIONAL LABOR RELATIONS BOARD

To    Elon Musk, Chief Executive Officer of Tesla, Inc.

3500 Deer Creek Road, Palo Alto, California 94304

As requested by    Margo A. Feinberg, Counsel for Charging Party International Union,

United Automobile, Aerospace, and Agricultural Workers of America, AFL-CIO

whose address is    8000 East Jefferson Ave., Detroit, Michigan 48214

| (Street) | (City) | (State) | (ZIP) |

YOU ARE HEREBY REQUIRED AND DIRECTED TO APPEAR BEFORE    a duly designated

Administrative Law Judge    of the National Labor Relations Board

at    1301 Clay Street, 5th Floor - North Tower, Conference Room H

in the City of    Oakland, CA

on    Monday, June 11, 2018    at    9:00 AM    or any adjourned

or rescheduled date to testify in    Tesla, Inc.    (32-CA-197058, 32-CA-197091, 32-CA-197197,
32-CA-197020 et al.    32-CA-200530, 32-CA-208614, and 32-CA-210879)
(Case Name and Number)

If you do not intend to comply with the subpoena, within 5 days (excluding intermediate Saturdays, Sundays, and holidays) after the date the subpoena is received, you must petition in writing to revoke the subpoena. Unless filed through the Board's E-Filing system, the petition to revoke must be received on or before the official closing time of the receiving office on the last day for filing. If filed through the Board's E-Filing system, it may be filed up to 11:59 pm in the local time zone of the receiving office on the last day for filing. Prior to a hearing, the petition to revoke should be filed with the Regional Director; during a hearing, it should be filed with the Hearing Officer or Administrative Law Judge conducting the hearing. See Board's Rules and Regulations, 29 C.F.R Section 102.31(b) (unfair labor practice proceedings) and/or 29 C.F.R. Section 102.66(c) (representation proceedings) and 29 C.F.R Section 102.111(a)(1) and 102.111(b)(3) (time computation). Failure to follow these rules may result in the loss of any ability to raise objections to the subpoena in court.

Under the seal of the National Labor Relations Board, and by direction of the Board, this Subpoena is

A-1-11BJ5G3

Issued at    Los Angeles, CA

Dated:    May 30, 2018

John J. Ring

John Ring, Chairman

NOTICE TO WITNESS. Witness fees for attendance, subsistence, and mileage under this subpoena are payable by the party at whose request the witness is subpoenaed. A witness appearing at the request of the General Counsel of the National Labor Relations Board shall submit this subpoena with the voucher when claiming reimbursement.

### PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is mandatory in that failure to supply the information may cause the NLRB to seek enforcement of the subpoena in federal court.

Case 32-CA-197020

A-1-1BJ5G3

**RETURN OF SERVICE**

I certify that, being a person over 18 years of age, I duly served a copy of this subpoena

(Check method used.)

☐ by person

☐ by certified mail

☐ by registered mail

☐ by telegraph

☐ by leaving copy at principal office or place of business at

_____

_____

on the named person on

_____
(Month, day, and year)

_____
(Name of person making service)

_____
(Official title, if any)

**CERTIFICATION OF SERVICE**

I certify that named person was in attendance as a witness at

on _____
(Month, day or days, and year)

_____
(Name of person certifying)

_____
(Official title)

22-60493.5830

**PROOF OF SERVICE BY EXPRESS MAIL**

**Case No. 32-CA-197020 et al.**

RENEE CARNES certifies as follows:

I am employed in the County of Los Angeles, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 6300 Wilshire Boulevard, Suite 2000, Los Angeles, California 90048-5202.

On MAY 30, 2018 I caused the foregoing document(s) described as **SUBPOENA A-1-11BJ5G3** to be served by express mail upon the person(s) shown below, by placing a true and correct copy (copies) thereof in an envelope (envelopes) addressed as follows:

Elon Musk, Chief Executive Officer
Tesla, Inc.
3500 Deer Creek Road
Palo Alto, California 94304

Mark Ross, Esq.
Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center, Suite 17
San Francisco, California 94111-4158

and by then sealing said envelope(s) and

__X__ placing it (them) for collection and mailing on that same date following the ordinary business practices of Schwartz, Steinsapir, Dohrmann & Sommers LLP, at its place of business, located at 6300 Wilshire Boulevard, Suite 2000, Los Angeles, California 90048-5202. I am readily familiar with the business practices of Schwartz, Steinsapir, Dohrmann & Sommers LLP for collection and processing of correspondence for mailing with the United States Postal Service. Pursuant to said practices the envelope(s) would be deposited with the United States Postal Service that same day, with postage thereon fully prepaid, at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date on the envelope is more than one day after the date of deposit for mailing in the affidavit. (C.C.P. §1013a(3))

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 30, 2018 at Los Angeles, California.

RENEE CARNES

ID 352858

# EXHIBIT B

22-60493.5832

FORM NLRB-32

## SUBPOENA

### UNITED STATES OF AMERICA
### NATIONAL LABOR RELATIONS BOARD

To ___Elon Musk, Chief Executive Officer of Tesla, Inc.___

___C/O Vivian Imperial, 818 W Seventh St., Suite 930, Los Angeles, California 90017___

As requested by ___Margo A. Feinberg, Counsel for Charging Party International Union,___

___United Automobile, Aerospace, and Agricultural Workers of America, AFL-CIO___

whose address is ___8000 East Jefferson Ave., Detroit, Michigan 48214___

| (Street) | (City) | (State) | (ZIP) |
|---|---|---|---|

YOU ARE HEREBY REQUIRED AND DIRECTED TO APPEAR BEFORE ___a duly designated___

___Administrative Law Judge___    of the National Labor Relations Board

at ___1301 Clay Street, 5th Floor - North Tower, Conference Room H___

in the City of ___Oakland, CA___

on ___Monday, June 11, 2018___ at ___9:00 AM___ or any adjourned

or rescheduled date to testify in ___Tesla, Inc. 32-CA-197020 et al.___     (32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-200530, 32-CA-208614, and 32-CA-210879)

(Case Name and Number)

If you do not intend to comply with the subpoena, within 5 days (excluding intermediate Saturdays, Sundays, and holidays) after the date the subpoena is received, you must petition in writing to revoke the subpoena. Unless filed through the Board's E-Filing system, the petition to revoke must be received on or before the official closing time of the receiving office on the last day for filing. If filed through the Board's E-Filing system, it may be filed up to 11:59 pm in the local time zone of the receiving office on the last day for filing. Prior to a hearing, the petition to revoke should be filed with the Regional Director, during a hearing, it should be filed with the Hearing Officer or Administrative Law Judge conducting the hearing. See Board's Rules and Regulations, 29 C.F.R. Section 102.31(b) (unfair labor practice proceedings) and/or 29 C.F.R. Section 102.66(c) (representation proceedings) and 29 C.F.R Section 102.111(a)(1) and 102.111(b)(3) (time computation). Failure to follow these rules may result in the loss of any ability to raise objections to the subpoena in court.

**A-1-11BKIP5**

Under the seal of the National Labor Relations Board, and by direction of the Board, this Subpoena is

Issued at  Los Angeles, CA

Dated:    May 30, 2018

John J. Ring

John Ring, Chairman

**NOTICE TO WITNESS** Witness fees for attendance, subsistence, and mileage under this subpoena are payable by the party at whose request the witness is subpoenaed. A witness appearing at the request of the General Counsel of the National Labor Relations Board shall submit this subpoena with the voucher when claiming reimbursement.

### PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq*. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is mandatory in that failure to supply the information may cause the NLRB to seek enforcement of the subpoena in federal court.

Case 32-CA-197020

A-1-11BKIP5

**RETURN OF SERVICE**

I certify that, being a person over 18 years of age, I duly served a copy of this subpoena

(Check method used.)

☐ by person
☐ by certified mail
☐ by registered mail
☐ by telegraph
☐ by leaving copy at principal office or place of business at _____

on the named person on _____

_____
(Month, day, and year)

_____
(Name of person making service)

_____
(Official title, if any)

**CERTIFICATION OF SERVICE**

I certify that named person was in attendance as a witness at _____

on _____
(Month, day or days, and year)

_____
(Name of person certifying)

_____
(Official title)

22-60493.5834

1
## PROOF OF SERVICE BY EXPRESS MAIL

2
**Case No. 32-CA-197020 et al.**

3
RENEE CARNES certifies as follows:

4

5
I am employed in the County of Los Angeles, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 6300 Wilshire Boulevard, Suite 2000, Los Angeles, California 90048-5202.

6

7
On MAY 30, 2018 I caused the foregoing document(s) described as **SUBPOENA A-1-11BKIP5** to be served by express mail upon the person(s) shown below, by placing a true and correct copy (copies) thereof in an envelope (envelopes) addressed as follows:

8

9
Elon Musk, Chief Executive Officer          Mark Ross, Esq.

10
Tesla, Inc.                                 Sheppard, Mullin, Richter & Hampton LLP
c/o CT Corporation System                   Four Embarcadero Center, Suite 17

11
Attn: Vivian Imperial                       San Francisco, California 94111-4158
818 West Seventh Street, Suite 930

12
Los Angeles, California 90017

13

14
and by then sealing said envelope(s) and

15
  X   placing it (them) for collection and mailing on that same date following the ordinary

16
business practices of Schwartz, Steinsapir, Dohrmann & Sommers LLP, at its place of business, located at 6300 Wilshire Boulevard, Suite 2000, Los Angeles, California

17
90048-5202. I am readily familiar with the business practices of Schwartz, Steinsapir, Dohrmann & Sommers LLP for collection and processing of correspondence for mailing

18
with the United States Postal Service. Pursuant to said practices the envelope(s) would be deposited with the United States Postal Service that same day, with postage thereon

19
fully prepaid, at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation

20
date or postage meter date on the envelope is more than one day after the date of deposit for mailing in the affidavit. (C.C.P. §1013a(3))

21

22
I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

23

24
Executed on May 30, 2018 at Los Angeles, California.

25

26
RENEE CARNES

27

28

ID 352858

# EXHIBIT C

22-60493.5836

**UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 32**

**TESLA, INC.**

    **and**

**MICHAEL SANCHEZ, an Individual**              **Case 32-CA-197020**

    **and**

**JONATHAN GALESCU,  an Individual**          **Case 32-CA-197058**

    **and**

**RICHARD ORTIZ, an Individual**              **Case 32-CA-197091**

    **and**

**INTERNATIONAL UNION, UNITED**          **Case 32-CA-197197**
**AUTOMOBILE, AEROSPACE AND**         **Case 32-CA-200530**
**AGRICULTURAL WORKERS OF**           **Case 32-CA-208614**
**AMERICA, AFL-CIO**                   **Case 32-CA-210879**

**THIRD ORDER CONSOLIDATING CASES, SECOND AMENDED
CONSOLIDATED COMPLAINT AND NOTICE OF HEARING**

Pursuant to Section 102.33 of the Rules and Regulations of the National Labor Relations Board (the Board) and to avoid unnecessary costs or delay, **IT IS ORDERED THAT** the Amended Consolidated Complaint that issued on September 1, 2017, in Cases 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, and 32-CA-200530, alleging that Tesla, Inc. (Respondent) has violated the National Labor Relations Act, 29 U.S.C. § 151 et seq. (the Act), by engaging in unfair labor practices, is further consolidated with Cases 32-CA-208614 and 32-CA-210879, filed by the International Union, United Automobile, Aerospace and Agricultural Workers of America, AFL-CIO (Union) against Respondent, which allege that Respondent has engaged in further unfair labor practices within the meaning of the Act.

This Third Order Consolidating Cases, Second Amended Consolidated Complaint and Notice of Hearing, which is based on these charges, is issued pursuant to Section 10(b) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 et seq. and Sections 102.15 and 102.17 of the Board's Rules and Regulations, and alleges Respondent has violated the Act as described below.

1.

(a)     The charge in Case 32-CA-197020 was filed by Michael Sanchez on April 17, 2017, and a copy was served on Respondent by U.S. mail on April 18, 2017.

(b)     The first-amended charge in Case 32-CA-197020 was filed by Michael Sanchez on July 28, 2017, and a copy was served on Respondent by mail on August 1, 2017.

(c)     The charge in Case 32-CA-197058 was filed by Jonathan Galescu on April 17, 2017, and a copy was served on Respondent by U.S. mail on April 18, 2017.

(d)     The first-amended charge in Case 32-CA-197058 was filed by Jonathan Galescu on July 28, 2017, and a copy was served on Respondent by mail on August 1, 2017.

(e)     The charge in Case 32-CA-197091 was filed by Richard Ortiz on April 17, 2017, and a copy was served on Respondent by U.S. mail on April 19, 2017.

(f)     The first-amended charge in Case 32-CA-197091 was filed by Richard Ortiz on July 28, 2017, and a copy was served on Respondent by U.S. mail on August 1, 2017.

(g)     The charge in Case 32-CA-197197 was filed by the Union on April 19, 2017, and a copy was served on Respondent by U.S. mail on April 20, 2017.

(h)     The first-amended charge in Case 32-CA-197197 was filed by the Union on July 28, 2017, and a copy was served on Respondent by U.S. mail on August 1, 2017.

(i)     The charge in Case 32-CA-200530 was filed by the Union on June 12, 2017, and a copy was served on Respondent by U.S. mail on June 13, 2017.

(k)     The first-amended charge in Case 32-CA-200530 was filed by the Union on July 28, 2017, and a copy was served on Respondent by U.S. mail on August 1, 2017.

(l)     The charge in Case 32-CA-208614 was filed by the Union on October 25, 2017, and a copy was served on Respondent by U.S. mail on October 25, 2017.

(m)     The first-amended charge in Case 32-CA-208614 was filed by the Union on March 12, 2017, and a copy was served on Respondent by U.S. mail on March 13, 2018.

(n)     The charge in Case 32-CA-210879 was filed on December 1, 2017, and a copy was served on Respondent by U.S. mail on December 4, 2017.

(o)     The first-amended charge in Case 32-CA-210879 was filed on December 6, 2017, and a copy was served on Respondent by U.S. mail on December 7, 2017.

2.

(a)     At all material times, Respondent, a Delaware technology and design corporation with its headquarters in Palo Alto, California, an automotive manufacturing facility in Fremont, California (the Fremont Facility), and an automotive battery facility in Sparks, Nevada (the Sparks Facility), has been engaged in the design, manufacture, and sale of electric vehicles and energy storage systems.

(b)     During the 12-month period ending December 31, 2017, Respondent, in conducting its operations described above in paragraph 2(a) at its Fremont Facility,

purchased and received goods valued in excess of $50,000 directly from sources located outside the State of California.

     (c)     During the 12-month period ending December 31, 2017, Respondent, in conducting its operations described above in paragraph 2(a) at its Sparks Facility, purchased and received goods valued in excess of $50,000 directly from sources located outside the State of Nevada.

3.

At all material times, Respondent has been an employer engaged in commerce within the meaning of Sections 2(2), (6), and (7) of the Act.

4.

At all material times, the Union has been a labor organization within the meaning of Section 2(5) of the Act.

5.

At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act and agents of Respondent within the meaning of Section 2(13) of the Act:

| | | |
|---|---|---|
| Elon Musk | - | Chief Executive Officer |
| Mark Lipscomb | - | Vice-President of Human Resources |
| Emma Cruz | - | Human Resources Business Partner |
| Liza Lipscomb | - | Human Resources Business Partner |
| Seth Woody | - | Human Resources Business Partner |
| David Zwieg | - | Human Resources Business Partner |

| Juan Martinez | - | Manager, Manufacturing |
|---|---|---|
| Andrew McIndoe | - | Associate Production Manager |
| Tope Ogunniyi | - | Associate Production Manager |
| Victor Facha | - | Supervisor |
| Tim Fenelon | - | Supervisor |
| Homer Hunt | - | Supervisor |
| Armando Rodriguez | - | Supervisor |
| Dave Teston | - | Supervisor |
| Red Shirt Male Supervisor No. 1 | - | Supervisor |
| Arnold (Last Name Unknown) | - | Supervisor |
| John Doe | - | Production Supervisor |
| Lauren Holcomb | - | Environmental Health Safety and Sustainability Specialist |
| Ricky Gecewich | - | Employee Relations Investigator |

6.

At all material times, the following individuals held the positions set forth opposite their respective names and have been agents Respondent within the meaning of Section 2(13) of the Act:

| John/Jane Does 1-6 | - | Security Guards |
|---|---|---|
| Name Unknown | - | Human Resources Agent |

7.

(a)    Since at least late October 2016, Respondent has maintained the following rules in its Confidentiality Agreement at the Fremont facility:

(i)     These obligations are straightforward.  Provided that it's not already public information, everything that you work on, learn about or observe in your work about Tesla is confidential information under the agreement that you signed when you first started.  This includes information about…customers, suppliers, employees…. and anything similar.

(ii)    Additionally, regardless of whether information has already been made public, it is never OK to communicate with the media or someone closely related to the media about Tesla, unless you have been specifically authorized in writing to do so.

(iii)    Unless otherwise allowed by law or you have received written approval, you must not, for example, discuss confidential information with anyone outside of Tesla,

(iv)    or write about your work in any social media, blog, or book. If you are unsure, check with your manager, HR, or Legal.

(v)    The consequences for careless violation of the confidentiality agreement, could include, depending on severity, loss of employment.  Anyone engaging in intentional violation of the confidentiality agreement will be liable for all the harm and damage that is caused to the company, with possible criminal prosecution. These obligations remain in place even if no longer working at Tesla.

(b)    About late October 2016 or early November 2016, Respondent, by Human Resources Business Partner David Zweig, at the Fremont facility, during a one-on-one meeting with employees, prohibited employees from taking a picture of Respondent's Confidentiality Agreement described above in paragraph 7(a).

(c)    On February 10, 2017, Respondent, by its Security Guards, including, but not limited to, John/Jane Does Security Guards Nos. 1-4,  restrained and coerced off-duty employees who were engaged in leafleting on Respondent's premises outside of the Fremont facility by repeatedly asking them to produce their employee identification badges and/or telling them to leave Respondent's premises.

(d)   On February 10, 2017, Respondent, by John Doe Security Guard No. 1, outside the entrance to Door 2 at the Fremont facility:

    (i)   On two separate occasions, instructed an off-duty employee to leave Respondent's premises.

    (ii)   Security Guard No. 1 engaged in the conduct described above in paragraph 7(d)(i) in response to employees engaging in Union leafleting and to discourage these and other protected, concerted activities.

(e)   On February 10, 2017, Respondent, by Jane Doe Security Guard No. 2, outside the entrance to Door 1 at the Fremont facility:

    (i)   told off-duty employees to leave Respondent's premises.

    (ii)   Security Guard No. 2 engaged in the conduct described above in paragraph 7(e)(i) in response to employees engaging in Union leafleting and to discourage these and other protected, concerted activities.

(f)   On February 10, 2017, Respondent, by John Doe Security Guard No. 3, outside the entrance to Door 1 at the Fremont facility:

    (i)   told off-duty employees to leave Respondent's premises.

    (ii)   Security Guard No. 3 engaged in the conduct described above in paragraph 7(f)(i) in response to employees engaging in Union leafleting and to discourage these and other protected, concerted activities.

(g)   On February 10, 2017, Respondent, by Jane Doe Security Guard No. 4, outside the entrance to Door 3 at the Fremont facility:

    (i)   told an off-duty employee to leave Respondent's premises.

    (ii)   Security Guard No. 4 engaged in the conduct described above in paragraph 7(g)(i) in response to employees engaging in Union leafleting and to discourage these and other protected, concerted activities.

(h)   On February 10, 2017, Respondent, by Red Shirt Male Supervisor No. 1, near

the back entrance to the Fremont facility by the Receiving Addition:

> (i)    told an off-duty employee to leave the premises.

> (ii)   Red Shirt Male Supervisor No. 1 engaged in the conduct described above in paragraph 7(h)(i) in response to employees engaging in Union leafleting and to discourage these and other protected, concerted activities.

(i)   On February 10, 2017, Respondent, by a Human Resources Agent (whose name

is currently unknown to the General Counsel) at the Fremont facility, during a phone

conversation initiated by Red Shirt Male Supervisor No. 1:

> (i)    told an off-duty employee who was on medical leave to leave Respondent's premises.

> (ii)   The unnamed Human Resources Agent engaged in the conduct described above in paragraph 7(i)(i) in response to employees engaging in Union leafleting and to discourage these and other protected, concerted activities.

(j)   On March 23, 2017, Respondent, by Supervisor Armando Rodriguez,

during a pre-shift meeting at the Fremont facility:

> (i)    told employees that they could not distribute stickers, leaflets, or pamphlets that were not approved by Respondent; and

> (ii)   threatened that Respondent would terminate employees if they passed out stickers, leaflets, or materials that were not approved by Respondent.

> (iii)  Supervisor Armando Rodriguez engaged in the conduct described above in paragraph 7(j)(i) and (ii) in response to employees engaging in Union activities and to discourage these and other protected, concerted activities.

(k)   On April 5, 2017, Respondent, by Human Resources Business Partner David

Zweig, at the Fremont facility, attempted to prohibit an employee from discussing safety

concerns with other employees and/or with the Union.

(l)    Since about April 25, 2017, Respondent has maintained the following rule at the Fremont facility:

> Team Wear:  It is mandatory that all Production Associates and Leads wear the assigned team wear.
>
> - On occasion, team wear may be substituted with all black clothing if approved by supervisor.
> - Alternative clothing must be mutilation free, work appropriate and pose no safety risks (no zippers, yoga pants, hoodies with hood up, etc.).

(m)    On April 28, 2017, Respondent, by Human Resources Business Partner Seth Woody, at the Fremont facility, attempted to prohibit employees from discussing safety concerns with other employees and/or with the Union.

(n)    On May 24, 2017,  Respondent, by its Security Guards, including, but not limited to, John/Jane Does Security Guards Nos. 5-6, restrained and coerced employees who were engaged in leafleting on Respondent's premises outside of the Fremont facility by repeatedly asking them to produce their employee identification badges and/or telling them to leave Respondent's premises.

(o)    On May 24, 2017, by Jane Doe Security Guard No. 5, at the security counter near the Door 4 entrance at the Fremont facility, told an employee that the employee could not hand out flyers on Respondent's premises.

(p)    On May 24, 2017, by John Doe Security Guard No. 6, outside the Door 4 entrance at the Fremont facility:

> (i)    on two occasions, instructed an off-duty employee to leave the premises.
>
> (ii)    Security Guard No. 6 engaged in the conduct described above in paragraph 7(p)(i) in response to employees engaged in Union leafleting and to discourage these and other protected, concerted activities.

(q)     On May 24, 2017, Respondent, by Respondent's Human Resources Business Partner Lisa Lipscomb, at the Fremont Facility during separate meetings with individual employees, in the presence of Environmental Health Safety and Sustainability Specialist Lauren Holcomb, interrogated employees about their Union and/or protected, concerted activities and/or the Union and/or protected, concerted activities of other employees.

(r)     In the Spring of 2017, Respondent, by Supervisor Arnold (Last Name Unknown), at the Fremont facility, impliedly threatened an employee with unspecific reprisals for wearing a hat with Union insignia.

(s)     In August 2017, Respondent, by Supervisor Homer Hunt, at the Fremont facility, informed its employees that it would be futile for them to select the Union as their bargaining representative.

(t)     Respondent, at the Fremont facility in August or September 2017:

    (i)     by Production Supervisor (whose name is unknown) told employees they could not wear Union shirts at work and threatened employees they would be sent home for wearing shirts with Union insignia;

    (ii)    by Associate Production Manager Tope Ogunniyi, attempted to enforce the rule described above in paragraph 7(l) selectively and disparately by prohibiting shirts with Union insignia.

(u)     About August 10, 2017, Respondent, at the Fremont Facility:

    (i)     by Supervisor Tim Fenelon, told employees to remove their shirts with Union insignia; and

    (ii)    by Associate Production Manager Tope Ogunniyi attempted to enforce the rule described above in paragraph 7(l) selectively and disparately by prohibiting shirts with Union insignia.

(v)      About August 14, 2017, by Associate Production Manager Tope Ogunniyi, at Respondent's Fremont facility, attempted to enforce the rule described above in paragraph 7(l) selectively and disparately by telling employees they are prohibited from wearing shirts with Union insignia.

(w)      On September 8, 2017, Respondent, by Supervisor Dave Teston, at Respondent's Sparks Facility in the production administrative room, impliedly threatened an employee with unspecified reprisals for wearing a hat with Union insignia.

(x)      On October 21, 2017, Respondent, by Associate Production Manager Andre McIndoe, at the Sparks Facility, told an employee that the employee should not speak with other employees about workplace concerns.

8.

(a)   On September 14, 2017, Respondent's employees Jose Moran and Richard Ortiz engaged in concerted activities with each other for the purposes of their mutual aid and protection when Jose Moran sent, via text message, screenshots of employee photographs and job titles obtained from Respondent's Workday system to Richard Ortiz, who posted comments regarding wages and working conditions along with the screenshots of the employee photographs and job titles on "Fremont Tesla Employees for UAW Representation" a private employee-only Facebook page.

(b)   Respondent, by Employee Relations Investigator Ricky Gecewich, at the Fremont facility:

> (i)      About September 21, 2017, during separate meetings with individual employees, interrogated employees about the conduct described above in paragraph 8(a).

(ii)     About October 19, 2017, during separate meetings with individual employees, interrogated employees about the conduct described above in paragraph 8(a).

(iii)     About October 19, 2017, in an email, promulgated and/or disparately enforced a rule prohibiting employees from accessing the Workday System for non-business purposes without proper business justification.

(c)     On October 18, 2017, Respondent discharged Richard Ortiz.

(d)     On October 19, 2018, Respondent issued a disciplinary warning to Jose Moran.

(e)     Respondent engaged in the conduct described above in paragraphs 8(b)(iii), 8(c) and 8(d), because Jose Moran and Richard Ortiz engaged in the conduct described above in paragraph 8(a) and to discourage its employees from engaging in these and/or other protected concerted activities.

(f)     Respondent engaged in the conduct described above in paragraphs 8(b)(iii), 8(c), and 8(d), because Jose Moran and Richard Ortiz supported and assisted the Union and/or because they engaged in concerted activities, and to discourage employees from engaging in these activities.

9.

By the conduct described above in paragraphs 7 and 8(b) through 8(e), Respondent has been interfering with, restraining and coercing employees in the exercise of their rights guaranteed in Section 7 of the Act in violation of Sections 8(a)(1) of the Act.

10.

By the conduct described above in paragraphs 8(b)(iii), 8(c), 8(d), and 8(f), Respondent has been discriminating in regard to the hire or tenure or terms or conditions of

employment of its employees, thereby discouraging membership in a labor organization in violation of Section 8(a)(1) and (3) of the Act.

11.

The unfair labor practices of Respondent described above affect commerce within the meaning of Sections 2(6) and (7) of the Act.

**WHEREFORE**, as part of the remedy for the unfair labor practices described above in paragraphs 7 and 8(b) through 8(f), the General Counsel seeks an order requiring Respondent to Respondent to hold meetings with Respondent's production employees at its Fremont and Sparks facilities, scheduled to ensure the widest possible attendance, at which the Board's Notice is to be read to employees by a responsible management official of Respondent, or at Respondent's option, by a Board agent in that official's presence. Respondent shall be required to allow a representative of the Union to be present during such reading or readings of the Notice.

<strong><u>ANSWER REQUIREMENT</u></strong>

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the Second Amended Consolidated Complaint.  The answer must be **<u>received by this office on or before April 13, 2018, or postmarked on or before April 12, 2018</u>**.  Respondent should file an original and four copies of the answer with this office and serve a copy of the answer on each of the other parties.

An answer may also be filed electronically through the Agency's website. To file electronically, go to <u>www.nlrb.gov</u>, click on **E-File Documents**, enter the NLRB Case

22-60493.5849

Number, and follow the detailed instructions. The responsibility for the receipt and usability of the answer rests exclusively upon the sender. Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason.  The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office.  However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing.  Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations. The answer may not be filed by facsimile transmission. If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the Second Amended Consolidated Complaint are true.

## **NOTICE OF HEARING**

**PLEASE TAKE NOTICE THAT** on June 11, 2018, at 9:00 a.m., at the Oakland Regional Office of the National Labor Relations Board located at 1301 Clay Street,

Oakland, California 94612, at a conference room to be determined, and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board.    At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this Second Amended Consolidated Complaint.   The procedures to be followed at the hearing are described in the attached Form NLRB-4668.   The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

**DATED AT** Oakland, California this 30th day of March 2018.

/s/ Valerie Hardy-Mahoney
_____
Valerie Hardy-Mahoney
Regional Director
National Labor Relations Board
Region 32
1301 Clay Street, Suite 300N
Oakland, CA 94612-5224

Attachments

Form NLRB-4338
(2-90)

UNITED STATES GOVERNMENT
NATIONAL LABOR RELATIONS BOARD
NOTICE

Cases:   32-CA-197020; 32-CA-197058; 32-CA-197091; 32-CA-197197; 32-CA-200530; 32-CA-208614
          and 32-CA-210879

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties. On the contrary, it is the policy of this office to encourage voluntary adjustments. The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end. An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing.

However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated. Postponements *will not be granted* unless good and sufficient grounds are shown *and* the following requirements are met:

(1) The request must be in writing. An original and two copies must be filed with the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 CFR 102.16(b).

(2) Grounds thereafter must be set forth in *detail;*

(3) Alternative dates for any rescheduled hearing must be given;

(4) The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request;

*and*

(5) Copies must be simultaneously served on all other parties (*listed below*), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three days immediately preceding the date of hearing.

Arnnon Geshuri
Vice President of HR
Tesla Motors Corporation
45500 Fremont Blvd.
Fremont, CA  94538

Gaby Toledano
Chief People Officer
45500 Fremont Blvd
Fremont, CA 94538-6326

Richard Ortiz
36707 Walnut Street
Newark, CA  94560

Michael J. Lotito
Littler Mendelson, P.C.
333 Bush Street, 34th Floor
San Francisco, CA  94104

John M. Skonberg
Littler Mendelson, P.C.
333 Bush Street, 34th Floor
San Francisco, CA  94104

Michael Sanchez
25225 Soto Road
Hayward, CA  94544

Elizabeth Parry
Littler Mendelson, P.C.
1255 Treat Blvd., Suite 600
Walnut Creek, CA  94597

Jonathan Galescu
361 Carousel Drive
Vallejo, CA  94589

Susan Reed
IU, UA, A&AWA, AFL-CIO
8000 E Jefferson Avenue
Detroit, MI  48214

Margo A. Feinberg
Schwartz, Steinsapir, Dohrmann
& Sommers, LLP
6300 Wilshire Bld., Suite 2000
Los Angeles, CA  90048

22-60493.5852

Form NLRB-4668
(6-2014) Continued

# Procedures in NLRB Unfair Labor Practice Hearings

The attached complaint has scheduled a hearing that will be conducted by an administrative law judge (ALJ) of the National Labor Relations Board who will be an independent, impartial finder of facts and applicable law. **You may be represented at this hearing by an attorney or other representative**. If you are not currently represented by an attorney, and wish to have one represent you at the hearing, you should make such arrangements as soon as possible. A more complete description of the hearing process and the ALJ's role may be found at Sections 102.34, 102.35, and 102.45 of the Board's Rules and Regulations. The Board's Rules and regulations are available at the following link: www.nlrb.gov/sites/default/files/attachments/basic-page/node-1717/rules_and_regs_part_102.pdf.

The NLRB allows you to file certain documents electronically and you are encouraged to do so because it ensures that your government resources are used efficiently. To e-file go to the NLRB's website at www.nlrb.gov, click on "e-file documents," enter the 10-digit case number on the complaint (the first number if there is more than one), and follow the prompts. You will receive a confirmation number and an e-mail notification that the documents were successfully filed.

**Although this matter is set for trial, this does not mean that this matter cannot be resolved through a settlement agreement**. The NLRB recognizes that adjustments or settlements consistent with the policies of the National Labor Relations Act reduce government expenditures and promote amity in labor relations and encourages the parties to engage in settlement efforts.

## I.     BEFORE THE HEARING

The rules pertaining to the Board's pre-hearing procedures, including rules concerning filing an answer, requesting a postponement, filing other motions, and obtaining subpoenas to compel the attendance of witnesses and production of documents from other parties, may be found at Sections 102.20 through 102.32 of the Board's Rules and Regulations. In addition, you should be aware of the following:

- **Special Needs:** If you or any of the witnesses you wish to have testify at the hearing have special needs and require auxiliary aids to participate in the hearing, you should notify the Regional Director as soon as possible and request the necessary assistance. Assistance will be provided to persons who have handicaps falling within the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, and 29 C.F.R. 100.603.

- **Pre-hearing Conference:** One or more weeks before the hearing, the ALJ may conduct a telephonic prehearing conference with the parties. During the conference, the ALJ will explore whether the case may be settled, discuss the issues to be litigated and any logistical issues related to the hearing, and attempt to resolve or narrow outstanding issues, such as disputes relating to subpoenaed witnesses and documents. This conference is usually not recorded, but during the hearing the ALJ or the parties sometimes refer to discussions at the pre-hearing conference. You do not have to wait until the prehearing conference to meet with the other parties to discuss settling this case or any other issues.

## II.     DURING THE HEARING

The rules pertaining to the Board's hearing procedures are found at Sections 102.34 through 102.43 of the Board's Rules and Regulations. Please note in particular the following:

- **Witnesses and Evidence**: At the hearing, you will have the right to call, examine, and cross-examine witnesses and to introduce into the record documents and other evidence.

22-60493.5853

Form NLRB-4668
(6-2014) Continued

- **Exhibits:** **Each exhibit offered in evidence must be provided in duplicate to the court reporter and a copy of each exhibit should be supplied to the ALJ and each party when the exhibit is offered in evidence.** If a copy of any exhibit is not available when the original is received, it will be the responsibility of the party offering such exhibit to submit the copy to the ALJ before the close of hearing. If a copy is not submitted, and the filing has not been waived by the ALJ, any ruling receiving the exhibit may be rescinded and the exhibit rejected.

- **Transcripts**: An official court reporter will make the only official transcript of the proceedings, and all citations in briefs and arguments must refer to the official record. The Board will not certify any transcript other than the official transcript for use in any court litigation. Proposed corrections of the transcript should be submitted, either by way of stipulation or motion, to the ALJ for approval. Everything said at the hearing while the hearing is in session will be recorded by the official reporter unless the ALJ specifically directs off-the-record discussion. If any party wishes to make off-the-record statements, a request to go off the record should be directed to the ALJ.

- **Oral Argument:** You are entitled, on request, to a reasonable period of time at the close of the hearing for oral argument, which shall be included in the transcript of the hearing. Alternatively, the ALJ may ask for oral argument if, at the close of the hearing, it is believed that such argument would be beneficial to the understanding of the contentions of the parties and the factual issues involved.

- **Date for Filing Post-Hearing Brief**: Before the hearing closes, you may request to file a written brief or proposed findings and conclusions, or both, with the ALJ. The ALJ has the discretion to grant this request and will set a deadline for filing, up to 35 days.

## III.    AFTER THE HEARING

The Rules pertaining to filing post-hearing briefs and the procedures after the ALJ issues a decision are found at Sections 102.42 through 102.48 of the Board's Rules and Regulations. Please note in particular the following:

- **Extension of Time for Filing Brief with the ALJ:** If you need an extension of time to file a post-hearing brief, you must follow Section 102.42 of the Board's Rules and Regulations, which requires you to file a request with the appropriate chief or associate chief administrative law judge, depending on where the trial occurred. You must immediately serve a copy of any request for an extension of time on all other parties and furnish proof of that service with your request. You are encouraged to seek the agreement of the other parties and state their positions in your request.

- **ALJ's Decision:** In due course, the ALJ will prepare and file with the Board a decision in this matter. Upon receipt of this decision, the Board will enter an order transferring the case to the Board and specifying when exceptions are due to the ALJ's decision. The Board will serve copies of that order and the ALJ's decision on all parties.

- **Exceptions to the ALJ's Decision**: The procedure to be followed with respect to appealing all or any part of the ALJ's decision (by filing exceptions with the Board), submitting briefs, requests for oral argument before the Board, and related matters is set forth in the Board's Rules and Regulations, particularly in Section 102.46 and following sections. A summary of the more pertinent of these provisions will be provided to the parties with the order transferring the matter to the Board.

# EXHIBIT D

22-60493.5855



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD

REGION 32
1301 Clay St Ste 300N
Oakland, CA 94612-5224

Agency Website: www.nlrb.gov
Telephone: (510)637-3300
Fax: (510)637-3315

Agent's Direct Dial: (510)671-3041

June 4, 2018

**By US Mail & E-mail**

Mark S. Ross, Attorney
Sheppard Mullin Richter & Hampton LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
E-Mail: mross@sheppardmullin.com

Margo A. Feinberg, Esq.
Schwartz, Steinsapir, Dohrmann & Sommers
6300 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90048
E-Mail: margo@ssdslaw.com

> **Re:    TESLA, INC.**
> **Cases 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-200530, 32-CA-208614, 32-CA-210879**

Dear Mr. Ross and Ms. Feinberg:

Please find attached courtesy copies of the Amendment to the Second Amended Consolidated Complaint issued today. Should you have any questions regarding this matter, please do not hesitate to contact me.

Very truly yours,

/s/ Edris Rodriguez Ritchie

EDRIS W.I. RODRIGUEZ RITCHIE
Field Attorney

Enclosure(s)

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 32**

**TESLA, INC.**

    **and**

**MICHAEL SANCHEZ, an Individual**              **Case 32-CA-197020**

    **and**

**JONATHAN GALESCU,  an Individual**          **Case 32-CA-197058**

    **and**

**RICHARD ORTIZ, an Individual**               **Case 32-CA-197091**

    **and**

**INTERNATIONAL UNION, UNITED AUTOMOBILE,**    **Case 32-CA-197197**
**AEROSPACE AND AGRICULTURAL WORKERS OF**    **Case 32-CA-200530**
**AMERICA, AFL-CIO**                            **Case 32-CA-208614**
                                          **Case 32-CA-210879**

**AMENDMENT TO SECOND AMENDED CONSOLIDATED COMPLAINT**
**AND NOTICE OF HEARING**

Pursuant to Section 102.17 of the Rules and Regulations of the National Labor Relations Board (the Board), the Second Amended Consolidated Complaint and Notice of Hearing (Complaint) issued on March 30, 2018, is amended as follows:

**Amend paragraph 5** of the Complaint to include two more individuals as a supervisor of Respondent within the meaning of Section 2(11) of the Act and an agent of Respondent within the meaning of Section 2(13) of the Act. The two individuals to include are:

        Gaby Toledano      -      Respondent's Chief People Officer

        Josh Hedges        -      Director of HR for Production

22-60493.5857

**Amend paragraph 7** to include the following new allegations as 7(y) of the Complaint:

(y)    On about June 7, 2017, Respondent, in a conference room at its Fremont Facility, during a meeting held by CEO Elon Musk and Chief People Officer Gaby Toledano:

> (i) by Elon Musk, solicited employee complaints about safety issues and impliedly promised to remedy their safety complaints if they refrained from their union organizational activity.

> (ii) by Elon Musk, informed its employees that it would be futile for them to select a union as their bargaining representative by telling them that employees did not need a union and that Respondent would allow them to have a union if Respondent failed in its efforts to remedy their safety grievances; and

> (iii) by Gaby Toledano, restrained and coerced employees from engaging in union organizational activity by telling them that no one at Respondent's Facility wanted a union and asking them why employees would want to pay union dues.

**Amend paragraph 8(d)** to correct the year Jose Moran was issued a disciplinary warning. The existing paragraph 8(d) should be replaced with the following paragraph:

(d)    On or about October 19, 2017, Respondent issued a disciplinary warning to Jose Moran.

## ANSWER REQUIREMENT

RESPONDENT IS FURTHER NOTIFIED that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, Respondent must file an answer to the above Amendment to Second Amended Consolidated Complaint.  The answer must be **received by this office on or before June 18, 2018, or postmarked on or before June 17, 2018**.  Respondent should file an original and four copies of the answer with this office and serve a copy of the answer on each of the other parties.

2

22-60493.5858

An answer may also be filed electronically through the Agency's website. To file electronically, go to www.nlrb.gov, click on File Case Documents, enter the NLRB Case Number, and follow the detailed instructions. The responsibility for the receipt and usability of the answer rests exclusively upon the sender. Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason. The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office. However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing. Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations. The answer may not be filed by facsimile transmission. If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the Amendment to Second Amended Consolidated Complaint are true.

## NOTICE OF HEARING LOCATION

**PLEASE TAKE NOTICE THAT** on June 11, 2018, at 9:00 a.m., at the Oakland Regional Office of the National Labor Relations Board located at 1301 Clay Street, Oakland, California 94612, at Conference Room H on the 5th Floor, and on consecutive days thereafter until

3

concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board.   At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this Second Amended Consolidated Complaint. The procedures to be followed at the hearing are described in the attached Form NLRB-4668. The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

   **DATED AT** Oakland, California this 4th day of June 2018.

Valerie Hardy-Mahoney
Regional Director
National Labor Relations Board
Region 32
1301 Clay Street, Suite 300N
Oakland, CA 94612-5224

Attachments

4

Form NLRB-4338
(2-90)

UNITED STATES GOVERNMENT
NATIONAL LABOR RELATIONS BOARD

NOTICE

Cases:  32-CA-197020
32-CA-197058
32-CA-197091
32-CA-197197
32-CA-200530
32-CA-208614
32-CA-210879

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties. On the contrary, it is the policy of this office to encourage voluntary adjustments. The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end. An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing.

However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated. Postponements *will not be granted* unless good and sufficient grounds are shown *and* the following requirements are met:

(1) The request must be in writing. An original and two copies must be filed with the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 CFR 102.16(b).

(2) Grounds thereafter must be set forth in *detail;*

(3) Alternative dates for any rescheduled hearing must be given;

(4) The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request;

*and*

(5) Copies must be simultaneously served on all other parties (*listed below*), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three days immediately preceding the date of hearing.

Arnnon Geshuri
Tesla Motors Corporation
45500 Fremont Blvd.
Fremont, CA  94538

Gaby Toledano
45500 Fremont Blvd
Fremont, CA 94538-6326

Richard Ortiz
37607 Walnut
Newark, CA  94560

Mark S. Ross, Attorney
Sheppard Mullin Richter
& Hampton LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111

Margo A. Feinberg, Esq.
Schwartz, Steinsapir, Dohrmann
& Sommers LLP
6300 Wilshire Bld., Suite 2000
Los Angeles, CA  90048

Michael Sanchez
25225 Soto Road
Hayward, CA  94544

Jonathan Galescu
361 Carousel Drive
Vallejo, CA  94589

Susan Reed
IU, UA, A&AWA, AFL-CIO
8000 E Jefferson Avenue
Detroit, MI  48214

# EXHIBIT E

22-60493.5862



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD

REGION 32
1301 Clay St Ste 300N
Oakland, CA 94612-5224

Agency Website: www.nlrb.gov
Telephone: (510)637-3300
Fax: (510)637-3315

Agent's Direct Dial: (510)671-3041

July 7, 2017

**By E-Mail Only**

Elizabeth Parry, Esq.
Littler Mendelson, P.C.
1255 Treat Blvd, Suite 600
Walnut Creek, CA 94597-7605
E-Mail: mparry@littler.com

Michael J. Lotito
Littler Mendelson, P.C.
333 Bush St Fl 34
San Francisco, CA 94104-2874
E-Mail: mlotito@littler.com

JOHN M. SKONBERG, ATTORNEY
Littler Mendelson, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104-2842
E-Mail: jskonberg@littler.com

Re:     **Tesla Motors Corporation**
        **Case 32-CA-200530**

Dear Ms. Parry, Mr. Lotito, and Mr. Skonberg:

I am writing this letter to advise you that it is now necessary for me to take evidence from your client regarding the allegations raised in the investigation of the above-referenced matter. Set forth below are the allegations and issues on which your evidence is needed, a request to take affidavits, a request for documentary evidence, and the date for providing your evidence.

**Allegations:** The allegations for which I am seeking your evidence are as follows. The International Union, United Automobile, Aerospace and Agricultural Workers of America, AFL-CIO (the Charging Party) alleges that Tesla Motors Corporation ("the Employer" or "the Charged Party") violated Section 8(a)(1) and (3) of the Act by engaging in the following conduct:

1.      On February 9, 2017, the Employer, through Juan Martinez, interrogated an employee regarding the employee's protected concerted activities and/or union activities;

2.      On February 9, 2017, the Employer, through Juan Martinez, created an impression of surveillance of employees' protected concerted activities and/or union activities and created an appearance of discipline and harassment by interrogating an employee regarding the employee's protected concerted activities and/or union activities;

3.      On or about April 5, 2017, the Employer, through David Zweig, applied of an overly broad confidentiality policy prohibiting the sharing of information related to workplace safety at Tesla's Fremont facility;

4.      On or about April 5, 2017, the Employer, through David Zweig, discriminatorily applied a confidentiality policy to prohibit Tesla employees from sharing information related to workplace safety at Tesla's Fremont facility;

5.      On or about April 29, 2017, the Employer, through Seth Woody, applied of an overly broad confidentiality policy prohibiting the sharing of information related to workplace safety at Tesla's Fremont facility;

6.      On or about April 29, 2017, the Employer, through Seth Woody, discriminatorily applied a confidentiality policy to prohibit Tesla employees from sharing information related to workplace safety at Tesla's Fremont facility;

7.      On or about May 24, 2017, the Employer, through its security guards as agents of the Employer, at the Employer's Fremont location:

      a.      created an impression of surveillance of employees engaging in protected concerted activities and/or union activities;

      b.      engaged in unlawful surveillance of employees engaging in protected concerted activities and/or union activities;

      c.      engaged in unlawful and discriminatory harassment of employees engaged in protected concerted activities and/or union activities by repeatedly asking employees engaged in such activities for their identification;

8.      On May 24, 2017, through Lisa Lipson and Lauren Holcomb, interrogated and threatened employees regarding their protected concerted activities; and

9.      On May 24, 2017, through Lisa Lipson and Lauren Holcomb, created an impression of discipline, interrogation and harassment by interrogating and threatening employees regarding their protected concerted activities.

**Board Affidavits:** I am requesting to take affidavits from Lisa Lipson, Lauren Holcomb, David Zweig, Seth Woody, and any other individuals you believe have information relevant to the investigation of this matter. Please be advised that the failure to present representatives who would appear to have information relevant to the investigation of this matter, for the purposes of my taking sworn statements from them, constitutes less than complete cooperation in the investigation of the charge. Please contact me by Tuesday, July 11, 2017 to schedule these affidavits.

**Documents:** Please provide the following documents, along with any and all other evidence you deem to be relevant to the case:

1. A completed copy of the attached "Commerce Questionnaire" by the Employer's person most knowledgeable on the topic of the Employer's participate in interstate commerce;

2. Any document that reflects communications between Tesla employees regarding the sharing of information related to workplace safety from February 1, 2017 to the present;

3. Copies of any document designated as "confidential" pursuant to Tesla's confidentiality policy on the topic of workplace safety that was given to any Tesla employee between February 1, 2017 and the present;

4. Any document reflecting Tesla's confidentiality policy that was maintained on April 5 and 29, 2017;

5. Copies of all documents referring to or memorializing any agreements for the provision of security services at the Employer's Fremont facility on May 24, 2017;

6. The names of any individuals working as "security guards" at the Employer's Fremont facility on May 24, 2017 between the times of 4:45 a.m. to 6:00 a.m. and between 4:45 p.m. and 6:00 p.m.;

7. Copies of any photographs or video recordings taken of any individual located in or near the Employer's Fremont facility parking lot or entrances between the times of 4:45 a.m. to 6:00 a.m. and between 4:45 p.m. and 6:00 p.m. on May 24, 2017;

8. Copies of any document that reflects or memorializes the Employer's policy for access to the parking lot at the Employer's Fremont facility, access to the Employer's facility by current employees, and the presentation of an employee's work identification in effect on May 24, 2017;

9.      Copies of any document that reflects or refers to any meeting attended by Lisa Lipson or Lauren Holcomb on or about May 24, 2017 with employees. This request shall include, but is not limited to, copies of notes taken by either Lipson or Holcomb in connection with their meetings with employees as well as copies of any recordings made by the Employer of such meetings;

10.     Copies of any documents referring to or memorializing any interactions or communications that occurred on May 24, 2017 between 4:45 a.m. and 6:00 a.m. and between 4:45 p.m. and 6:00 p.m. between Tesla security guards and employees at Tesla;

11.     Any document in the Employer's possession since January 1, 2016 on the topic of unions or the United Auto Workers;

12.     If the Employer contends that Lisa Lipson, Lauren Holcomb, Seth Woody, or David Zweig are not statutory employees within the meaning of the Act, documents reflecting the involvement or participation by Lisa Lipson, Lauren Holcomb, Seth Woody, or David Zweig in any of the following actions concerning any employee of the Employer: (a) Hiring; (b) Transferring; (c) Suspending; (d) Laying off; (e) Recalling; (f) Promoting; (g) Discharging; (h) Assigning of work; (i) Rewarding, including the granting of wage increases; (j) Disciplining; (k) Scheduling or granting of time off; (l) Assigning of overtime; (m) Adjusting of grievances; (n) Directing work; and (o) Evaluating; and

13.     Any document that reflects an asserted defense of the Employer.

**Position on 10(j) Relief:**  To the extent the Employer wishes to provide another position statement on the topic of Section 10(j) relief, you are also requested to provide your position as to the appropriateness of Section 10(j) injunctive relief in this matter.  As you may know, Section 10(j) of the Act permits the NLRB to ask a federal district court "for appropriate temporary relief or restraining order" pending the Board's resolution of an unfair labor practice charge.  The district court is authorized to grant "such temporary relief or restraining order as it deems just and proper."  *If* the Region determines the Charged Party has violated the Act as alleged, the Region will consider whether to seek injunctive relief in this matter.  Accordingly, please provide your position, legal theory, case law, and supporting evidence regarding whether injunctive relief would be appropriate for the alleged violations in this case and whether such injunctive relief would be just and proper.  I wish to emphasize that the Region has not yet made a decision as to whether the Charged Party has violated the Act as alleged.  Rather, we want to provide you with adequate notice that injunctive relief will be considered if such a decision is made.

**Date for Submitting Evidence:**  To resolve this matter as expeditiously as possible, you must provide your evidence and position in this matter by Friday, July 14, 2017.  If you are willing to allow me to take affidavits, please contact me by Tuesday, July 11, 2017 to schedule a time to take affidavits.  Electronic filing of position statements and documentary evidence through the Agency website is preferred but not required.  To file electronically, go to

**www.nlrb.gov,** select **E-File Documents,** enter the **NLRB case number,** and follow the detailed instructions.  If I have not received all your evidence by the due date or spoken with you and agreed to another date, it will be necessary for me to make my recommendations based upon the information available to me at that time.

It is Agency policy that full and complete cooperation on your part in this investigation includes timely providing all material witnesses under your control to the investigating Board agent so that the witnesses' statements can be reduced to affidavit form and providing all relevant documentary evidence requested by the Board agent.  The mere submission of a position letter or memorandum, or the submission of affidavits not taken by the Board agent, does not constitute full and complete cooperation.  The Region seeks such full and complete cooperation by the close of business on Friday, July 14, 2017.  If I have not received all of your evidence by the due date or spoken with you and agreed to another date, it will be necessary for me to make my recommendations based upon the information available to me at that time.  Additionally, the Region will consider all of its options in order to complete its investigation, including the possibility of issuing investigative subpoenas for the witnesses and documents requested in this letter.

Please contact me at your earliest convenience by telephone, (510)671-3041, or e-mail, edris.rodriguezritchie@nlrb.gov, so that we can discuss how you would like to provide evidence and I can answer any questions you have with regard to the issues in this matter.

Very truly yours,

/s/ Edris Rodriguez Ritchie

EDRIS W.I. RODRIGUEZ RITCHIE
Field Attorney

# EXHIBIT F

22-60493.5868



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD

REGION 32
1301 Clay St Ste 300N
Oakland, CA 94612-5224

Agency Website: www.nlrb.gov
Telephone: (510)637-3300
Fax: (510)637-3315

Agent's Direct Dial: (510)671-3041

November 21, 2017

**By E-Mail Only**

Elizabeth Parry, Esq.
Littler Mendelson, P.C.
1255 Treat Blvd, Suite 600
Walnut Creek, CA 94597-7605
E-Mail: mparry@littler.com

John Skonberg, Esq.
Michael Lotito
Littler Mendelson, P.C.
333 Bush St., 34th Floor
San Francisco, CA 94104-2842
E-Mail: jskonberg@littler.com
E-Mail: mlotito@littler.com

Re:    **TESLA, INC.**
       **Case 32-CA-208614**

Dear Ms. Parry, Mr. Skonberg, and Mr. Lotito:

I am writing this letter to advise you that it is now necessary for me to take evidence from your client regarding the allegations raised in the investigation of the above-referenced matter. Set forth below are the allegations and issues on which your evidence is needed, a request to take affidavits, a request for documentary evidence, and the date for providing your evidence. Please also be advised that the undersigned Board agent will likely send a follow-up letter with additional allegations.

**Preservation of Evidence**: Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case and to take all steps necessary to avoid the inadvertent loss of information in you possession, custody or control. Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, e-mails, audio or video recordings, photographs, and any data created by proprietary software tools) related to the above-captioned case.

**Allegations:** The allegations for which I am seeking your evidence are as follows. The United Automobile, Aerospace and Agricultural Implement Workers of America International Union (the Union or the Charging Party) alleges that Tesla, Inc. (the Employer or the Charged Party) has violated Sections 8(a)(1), (3), and (4) of the Act by engaging in the following conduct:

1.      engaging in a mass layoff of employees at Tesla, Inc.'s facilities in order to discourage employees from engaging in Section 7 protected activities and in retaliation for engaging in Board activities, including the filing of charges and/or the issuance of a Complaint in Case Nos. 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197,

and 32-CA-200530;

2.      At the Tesla, Inc. facility located at 45500 Fremont Boulevard, Fremont, California:

      a.      In October 2017, terminating the following individuals  in retaliation for engaging in protected concerted activities and/or union activities:

            i.      Richard Ortiz (also in retaliation for having filed charges with the Board);

            ii.      Jayson Henry;

            iii.      Juan Guadalupe Reyes;

            iv.      Juan Maldonado;

            v.      Mike Williams;

            vi.      Tim Cotton;

            vii.      Brandon Hill;

            viii.      Erick Vasquez; and

            ix.      Stephen Barbosa;

      b.      On or about June 29 and 30, 2017, by Vannick Ly and Lehi Gomez, audited the work of Branton Phillips and provided verbal and written negative feedback  in retaliation for engaging in protected concerted activities and/or union activities;

      c.      On or about October 20, 2017, by Paul James, giving Jonathan Galescu a negative performance review in retaliation for engaging in protected concerted activities and/or union activities and/or Board activities (including having filed charges with the Board);

      d.      In or about August 2017, by Paul James on two occasions, creating an impression of surveillance by implying he had reviewed an employee's notebook;

      e.      In or about July or August 2017, by Tope Ogunniyi, discriminatorily applied a uniform policy prohibiting the warning of union paraphernalia on work clothing;

f.      In or about late September or early October 2017, by Ricky Gecewich, interrogated an employee about their and other employees' protected concerted activities pertaining to the posting of pictures on social media;

g.      On October 19, 2017, by Ricky Gecewich, gave a verbal and written warning to Jose Moran threatening action if the employee or other employees engaged in protected concerted activities;

h.      On October 2, 2017, by Thuy Truong, a verbal and written reprimand of Juan Maldonado for having two late-ins  in retaliation for engaging in protected concerted activities and/or union activities;

3.      At the Tesla, Inc. facility located at 18280 Harlan Road, Lathrop, California:

a.      In October 2017, terminating Dezzimond Vaughn in retaliation for engaging in protected concerted activities and/or union activities;

b.      In October 2017, giving Vaughn a poor performance review for the period of January to June 2017  in retaliation for engaging in protected concerted activities and/or union activities;

4.      In connection with each of the above-referenced terminations and in October 2017, offering an employee/employees a severance agreement containing an overly broad confidentiality policy and no disparagement policy;

5.      Within the Section 10(b) period, by Ricky Hofrichter, Jeremie Hansen, and Gregory Slettvet, instructed Tesla security guards to surveil employees engaged in protected concerted activities and/or union activities;

6.      Within the Section 10(b) period, by Ricky Hofrichter, Jeremie Hansen, Gregory Slettvet, and Savannah Morgana, instructed Tesla security guards to tell Tesla employees engaged in lawful leafleting that they were not welcome at Tesla, that they needed to leave, and threatened to call the police.

**Board Affidavits:**  I am requesting to take affidavits from Vannick Ly, Lehi Gomez, Paul James, Arnold Camat, Timothy Fenelon, Tope Ogunniyi, Kyle Martin, Mario Last Name Unknown, Elena Elliott, Ricky Gecewich, Albert Rios, Duwone Ashley, Thuy Truong, Juan Martinez; Sean Boone; Kyle Last Name Unknown (Human Resources), Nicole White, Chris Padilla, Dane Last Name Unknown (Human Resources), and any other individuals you believe have information relevant to the investigation of this matter.  Please be advised that the failure to present representatives who would appear to have information relevant to the investigation of this matter, for the purposes of my taking sworn statements from them, constitutes less than complete cooperation in the investigation of the charge.  Please contact me by Tuesday, November 28, 2017 to schedule these affidavits.  Please be advised that a position statement will not be accepted in lieu of Board affidavits and the undersigned Board agent will likely

recommend the issuance of investigative subpoenas to compel the testimony of the above-identified individuals should Tesla, Inc. refuse to voluntarily produce the witnesses for Board affidavits.

If any of the above-listed individuals are no longer employed by Tesla, Inc., please provide their last known contact information, including street address, telephone number(s), and e-mail address(es).

**Documents:** Please provide the following documents, along with any and all other evidence you deem to be relevant to the case:

1.   The complete personnel file of the individuals listed in Allegation Paragraphs (2)(a), (2)(b), (2)(c), (2)(g), (2)(h), and (3);

2.   Every document since 2016 communicated to Tesla employees (whether by physically posting, emailing the document to Employees, or posting on an internal site) on the topic of unions, unionizing, and the United Auto Workers;

3.   Every document since 2016 in Tesla's custody, possession, or control on the topic of unions, unionizing, and the United Auto Workers, excluding any documents subject to the attorney-client privilege and/or attorney work product;

4.   A listing of all individuals terminated by Tesla in October 2017 as part of Tesla's layoff of employees.  For each individual listed, please include the following information: the name of the employee, the employee's department, the employee's immediate supervisor, the reason for the employee's termination, and any documents that relate to the employee's termination including, but not limited to, performance reviews or disciplinary actions;

5.   Any document that refers to the reason for Tesla's mass layoff of its employees in October 2017;

6.   If Tesla, Inc. alleges that it has done mass layoffs in the past, for each mass layoff, please provide the information requested in Document Request Nos. 4 and 5 pertaining to each of those massive layoffs;

7.   For each of the individuals listed in Allegation Paragraphs (2)(a), (2)(b), (2)(c), (2)(g), (2)(h), and (3), please provide any document reviewed or relied upon by the Employer in making its decisions to discipline and/or terminate the listed employee;

8.   The name of the individual or individuals who made the decision to lay off employees at one time in October 2017;

9.   Any documents that reflect or memorialize communication(s) with security guards regarding the surveillance of pro-union employees, the threatening of employees by threatening to call the police, or the requesting of employees to

leave Tesla property.  This request shall include, but is not limited to, copies of all reports held in the RIMS system and copies of any audio or video surveillance taken of Tesla employees engaging in protected concerted activities and/or union activities;

10.    Any document that reflects Tesla's policies on the following topics:

      a.      Attitude/Mindset;

      b.      Confidentiality;

      c.      Social media;

      d.      Use of Workday and information contained in Workday;

      e.      Work uniforms;

      f.      Workplace fights, arguments, and the use of obscenities while at work;

      g.      Attendance, being late, and calling in.

11.    Any document the Employer believes supports an affirmative defense.

The Agency requests all evidence submitted electronically to be in the form it is normally used and maintained in the course of business (i.e. native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retails the essential functionality of the native format (i.e. in a machine-readable and searchable electronic format).  The Region does not seek any documents or information that is covered by the attorney-client privilege and/or attorney work-product doctrine.  To the extent any responsive documents are withheld on those bases, please provide a privilege log laying the appropriate foundation for the privilege asserted as the basis for withholding a document.

**Date for Submitting Evidence:**  To resolve this matter as expeditiously as possible, you must provide your evidence and position in this matter by Friday, December 1, 2017.  If you are willing to allow me to take affidavits, please contact me by Tuesday, November 28, 2017 to schedule a time to take affidavits.  Electronic filing of position statements and documentary evidence through the Agency website is preferred but not required.  To file electronically, go to **www.nlrb.gov,** select **E-File Documents,** enter the **NLRB case number,** and follow the detailed instructions.  If I have not received all your evidence by the due date or spoken with you and agreed to another date, it will be necessary for me to make my recommendations based upon the information available to me at that time.

It is Agency policy that full and complete cooperation on your part in this investigation includes timely providing all material witnesses under your control to the investigating Board agent so that the witnesses' statements can be reduced to affidavit form and providing all relevant documentary evidence requested by the Board agent.  The mere submission of a position letter or memorandum, or the submission of affidavits not taken by the Board agent, does not

constitute full and complete cooperation. The Region seeks such full and complete cooperation by the close of business on Friday, December 1, 2017. If I have not received all of your evidence by the due date or spoken with you and agreed to another date, it will be necessary for me to make my recommendations based upon the information available to me at that time. Additionally, the Region will consider all of its options in order to complete its investigation, including the possibility of issuing investigative subpoenas for the witnesses and documents requested in this letter.

Please contact me at your earliest convenience by telephone, (510)671-3041, or e-mail, edris.rodriguezritchie@nlrb.gov, so that we can discuss how you would like to provide evidence and I can answer any questions you have with regard to the issues in this matter.

Very truly yours,

/s/ Edris Rodriguez Ritchie

EDRIS W.I. RODRIGUEZ RITCHIE
Field Attorney

1

CERTIFICATE OF SERVICE

2        At the time of service, I was over 18 years of age and not a party to this action.  I
am employed in the County of San Francisco, State of California.  My business address is
3   Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

4   On June 7, 2018, I served a true copy of the following document(s) described as
**RESPONDENT'S PETITION TO REVOKE SUBPOENAS *AD TESTIFICANDUM***
5   **A-1-11BJ5G3 AND A-1-11BKIP5 ISSUED TO TESLA'S CEO ELON MUSK** on the
interested parties in this action as follows:
6

7   Edris W.I. Rodriguez Ritchie
Field Attorney, Region 32
8   National Labor Relations Board
1301 Clay Street, Ste. 300N
9   Oakland, CA  94612-5224
T: (510) 671-3041
10  E-mail: edris.rodriguezritchie@nlrb.gov

11  Noah J. Garber
Field Attorney, Region 32
12  National Labor Relations Board
1301 Clay Street, Suite 300N
13  Oakland, California 94612
T: (510) 671-3021
14  E-mail: noah.garber@nlrb.gov

15  Margo Feinberg
E-mail: margo@ssdslaw.com
16  Daniel E. Curry
E-mail: dec@ssdslaw.com
17  Julie Alarcon
E-mail: jsa@ssdslaw.com
18  Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Blvd., Suite 2000
19  Los Angeles, CA  90048
T: (323) 655-4700
20

Administrative Law Judge Amita Tracy
21  Amita.Tracy@nlrb.gov
National Labor Relations Board
22  Division of Judges
901 Market St., Suite 300
23  San Francisco, CA 94103
T: (415) 356-5255
24

25

26      **BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the
document(s) to be sent from e-mail address sasmith@sheppardmullin.com to the person(s)
27  at the e-mail address(es) listed above.  I did not receive, within a reasonable time after the
transmission, any electronic message or other indication that the transmission was
28  unsuccessful.

SMRH:486619199.1         -1-         CERTIFICATE OF SERVICE
CASE NO. 32-CA-197020 et al.

1    I declare under penalty of perjury under the laws of the United States of America
2  that the foregoing is true and correct and that I am employed in the office of a member of
   the bar of this Court at whose direction the service was made.

3    Executed on June 7, 2018, at San Francisco, California.

4

5    _____

6    Sarah Smith

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MRH:486619199.1                    -2-                    CERTIFICATE OF SERVICE
                                                                        CASE NO. 32-CA-197020 et al.

Find Your Regional Office | Contact Us - 1-866-667-NLRB | Español

Search

Search Tools

**Home**  **Rights We Protect**  **What We Do**  **Who We Are**  **Cases & Decisions**  **News & Outreach**  **Reports & Guidance**

Home (http://www.nlrb.gov/) » E-File (efileterm.aspx) » Confirmation

🖶 Print

# Confirmation

You have successfully E-Filed document(s). You will receive an E-mail acknowledgement from this office when it receives your submission. This E-mail will note the official date and time of the receipt of your submission. Please save this E-mail for future reference. Please print this page for your records.

**NOTE:** This confirms only that the document was filed. It does not constitute acceptance by the NLRB.
**Be sure to make a note of this Confirmation Number.**

**Confirmation Number:** 1000214116
**Date Submitted:** 6/7/2018 4:12:43 PM (UTC-08:00) Pacific Time (US & Canada)

**Case Number:** 32-CA-197020
**Case Name:** TESLA, INC.
**Filing Party:** Charged Party / Respondent
**Submitted E-File To Office:** Region 32, Oakland, California

**Contact Info:**
**Morris, Keahn**
Sheppard, Mullin, Richter & Hampton LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
(415) 434-9100
**Email: kmorris@sheppardmullin.com**
**Additional Emails:** sasmith@sheppardmullin.com, mross@sheppardmullin.com

**Attached E-File(s):**
Petition to Revoke a Subpoena    2018-06-07 Petition to Revoke Elon Musk Subpoena - e-filing.pdf

22-60493.5877

Site Map    Policies    Feedback    FOIA    OpenGov    Inspector General

Accessibility    No Fear Act    USA.gov    PDF Viewer    Download App

22-60493.5878

# EXHIBIT 9

22-60493.5879

**UNITED STATES OF AMERICA**
**BEFORE THE NAITONAL LABOR RELATIONS BOARD**
**SAN FRANCISCO BRANCH- DIVISION OF JUDGES**

| | |
|---|---|
| **TESLA, INC.** | |
| **and** | |
| **MICHAEL SANCHEZ, an Individual** | **Case 32-CA-197020** |
| **and** | |
| **JONATHAN GALESCU, an Individual** | **Case 32-CA-197058** |
| **and** | |
| **RICHARD ORTIZ, an Individual** | **Case 32-CA-197091** |
| **and** | |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, AFL-CIO** | **Case 32-CA-197197**<br>**Case 32-CA-200530**<br>**Case 32-CA-208614**<br>**Case 32-CA-210879** |

**ORDER GRANTING RESPONDENT'S PETITION TO REVOKE SUBPOOENA *DUCES TECUM* A-1-11BJ5G3 AND SUBPOENA *AD TESTIFICANDUM* A-1-11BKIP5 (Mr. Musk)**

On March 30, 2018, the Regional Director for Region 32 issued a Second Amended Consolidated Complaint and Notice of Hearing (the complaint) alleging, among other things, that Respondent Tesla, Inc. ("Respondent") violated the National Labor Relations Act (the Act) by restraining and coercing employees, interrogating and threatening employees, engaging in anti-union conduct, prohibiting employees from discussing safety concerns, and unlawfully disciplining employee Jose Moran and unlawfully discharging employee Richard Ortiz. The complaint further provided notice to the parties that the hearing in this matter is currently set to commence on Monday, June 11, 2018, in Oakland, California.

On May 30, 2018, Counsel for Charging Party International Union, United Automobile, Aerospace, and Agricultural Workers of America, AFL-CIO (the Charging Party Union or Union) issued

22-60493.5880

Subpoenas A-1-11BJ5G3 and A-1-11BKIP5 (the Subpoenas) to Elon Musk (Musk), Respondent's Chief Executive Officer.

On June 4, 2018, the Region 32 Regional Director issued an amendment to the complaint (the amended complaint) which gives Respondent notice that its answer to the amended complaint must be filed by June 18, 2018, and, among other things, added factual allegations that on June 7, 2017, Musk "solicited employee complaints about safety issues and impliedly promised to remedy their safety complaints if they refrained from their union organizational activity" and "informed its employees that it would be futile for them to select a union as their bargaining representative by telling them that employees did not need a union and that Respondent would allow them to have a union if Respondent failed in its efforts to remedy their safety grievances."

On June 7, 2018, Respondent filed a petition to revoke the Subpoenas to Musk (the Petition). The Petition argues that Board Rule 102.31(b) provides that the administrative law judge shall revoke the subpoena if in its opinion the evidence whose production is required does not relate to any matter under investigation or in question in the proceedings or if for any other reason sufficient in law the subpoena is otherwise invalid. Respondent also raises the so-called "apex doctrine" which purportedly prohibits the taking of a senior executive's testimony unless the requesting party can show that the executive has unique (non-repetitive) or superior knowledge of the facts that are relevant to the claim and alternative methods to obtain the information have been exhausted without success. Finally, Respondent argues that "[r]equiring Mr. Musk to appear at trial is entirely unnecessary and will do nothing to materially advance the Union's cause at trial. It is merely designed to further the Union's corporate campaign against Mr. Musk and Tesla, which is an improper purpose."

On June 8, 2018, Respondent's Petition was referred to the SF Division of Judges.

On June 6, 2018, on a status conference telephone call with the parties, I asked the General Counsel if they planned to subpoena Musk due to the amended complaint and the General Counsel stated that were not planning to do so but that they may if Musk's Twitter statements are added to the complaint.

For the reasons discussed below, I grant the Petition in its entirety, without prejudice, and revoke the Subpoenas to Musk for his appearance at hearing and production of documents in his possession or control on June 11, 2018.

I note that under Section 11(l) of the Act, the Board had broad authority to subpoena documents and witnesses during *proceedings* that result from charges or investigations. *American Postal Workers Union Local 64 (United States Postal Service),* 340 NLRB 912 (2003). Section 11(1) of the Act specifically provides that the Board shall revoke a subpoena only:

> if in its opinion the evidence whose production is required does not relate to any matter under investigation, or any matter in question in such proceedings, or if in its opinion such subpoena does not describe with sufficient particularity the evidence whose

production is required.  Subpoenaed information must be produced if the information sought is "not plainly incompetent or irrelevant to any lawful purpose." *Endicott Johnson Corp. v. Perkins,* 317 U.S. 501, 509 (1943).

In this regard, I note that the Board and the courts have interpreted the concept of relevance, for subpoena purposes, quite broadly.  Thus, subpoenaed information should be produced if it relates to any matter in question, or if it can provide background information or lead to other evidence potentially relevant to an allegation in the complaint.  Board Rules, Section 102.31(b); *Perdue Farms,* 323 NLRB 345, 348 (1997), affd. in relevant part 144 F.3d 830, 833-834 (D.C. Cir. 1998) (the information needs to be only "reasonably relevant").  While the above principles and cases specifically apply to documents, which are much more frequently the subject of petitions to revoke subpoenas, the same principles apply to testimony sought from individuals.

First of all, I am concerned that there is no valid explanation from the General Counsel or the Charging Party as to why, at the eleventh hour on the eve of trial and after investigating a charge since 2017, the amended complaint was filed on June 4, 2018 adding facts which may or may not be admitted by the Respondent and which retains the current June 11, 2018 trial date. Respondent's answer to the amended complaint is not due to be filed before June 18, 2018, after 4 days of hearing next week. Respondent could admit in its amended answer the new factual allegations in the amended complaint making Musk's documents and testimony unnecessary as the newly added alleged facts would no longer be in dispute.

In addition, the parties have scheduled a long recess due to various counsels' scheduling conflicts so that after Thursday, June 14, 2018, there will be a lengthy trial recess of at least two months to allow Respondent to answer the amended complaint and also allow the parties to better determine the actual scope of hearing and alleged facts actually in dispute once the testimony from next week's trial and the documents produced in response to the General Counsel's subpoenas are digested by lawyers. Consequently, I find that Musk's testimony and document production subpoenaed for June 11 is not relevant to next week's hearing or ripe at this time for production as it is premature given the unusual procedural predicament created by the recently amended complaint.  In addition, the General Counsel's position has been that he is not planning to subpoena Musk for next week's hearing which does not prevent the General Counsel from subpoenaing Musk at some future date after Respondent has been allowed time to file its amended answer to the amended complaint that added alleged facts attributed directly to Musk's personal statements.

Similarly, Section 10(b) of the Act provides for the issuance of a complaint and notice of hearing based upon a timely filed charge.  However, a charging party has no absolute right to an evidentiary hearing under Section 10(b) if there are no material issues of fact to be resolved.  *NLRB v. Brush–Moore*

*Newspapers*, 413 F.2d 809, 811 (6th Cir. 1969).  Thus, the General Counsel, who has the primary responsibility for prosecuting cases before the NLRB, has not subpoenaed Musk for his testimony next week or for the production of documents and may prosecute its case in chief without the Charging Party's consent subject to the right of the Charging Party to introduce contrary evidence or adduce additional facts.  See *B.F. Goodrich*, 113 NLRB 152 (1955), enfd. *sub nom*, *UAW v. NLRB*, 231 F. 2d 237 (7th Cir. 1956), cert. denied 352 U.S. 908.

I further find that the Charging Party's attempt to subpoena Musk's attendance at hearing on June 11, 2018, and produce documents under his control or possession at that time inserts issues in this proceeding related to the unanswered amended complaint and undefended issues and, the Subpoenas did not come from the General Counsel who controls next week's prosecution of this case.  To hold otherwise, would be tantamount to usurping the General Counsel's prosecutorial responsibilities.  See *NLRB v. Food Workers Local 23*, 484 U.S. 112 (1987).

For these reasons, I grant the Petition without prejudice to the General Counsel subpoenaing Mr. Musk at some later date after there has been a showing that his testimony and/or requested documents are relevant to the General Counsel's case in chief.  As a result, I **GRANT** Respondent's petition to revoke the Charging Party's subpoena *duces tecum* A-1-11BJ5G3 and subpoena ad testificandum No. A-1-11BKIP5, *without prejudice,* related to Mr. Musk's document production and trial testimony.

Dated: June 8, 2018, San Francisco, California.

Amita B. Tracy
Administrative Law Judge

***Served by facsimile and email upon the following:***

*(NLRB)*
*Edris W.I. Rodriguez Ritchie, Esq., Edris.RodriguezRitchie@nlrb.gov*
*Noah Garber, Esq., Noah.Garber@nlrb.gov*
*Fax: (510) 637-3315*

*(Respondent)*
*Mark S. Ross, Esq., MRoss@sheppardmullin.com*
*Fax: (415)434-3947*

*(Charging Party)*
*Margo A. Feinberg, Esq., margossds@aol.com*
*Fax: (323)655-4488*

# EXHIBIT 10

22-60493.5884

| Charge No. | Date Filed | Allegations |
|---|---|---|
| 32-CA-197020<br><br>[GC's Opp **Ex. 1**] | 4/17/17 | On or about November 5, 2016 and ongoing the above-named Employer through its agents violated the Act by implementing and maintaining, and repeatedly requiring compliance with, a company confidentiality agreement that coerces and intimidates employees from freely exercising their rights to engage in concerted and union activity.<br><br>On or about February 10, 2017 and ongoing the above-named Employer violated the Act by intimidating, creating the appearance of surveillance and conducting surveillance on Richard Ortiz, Jose Moran, Michael Sanchez and others for their union activities and/or union sentiments, including passing out literature regarding union organizing efforts, working conditions, the confidentiality agreement, and their rights under the NLRA.<br><br>On or about February 10, 2017 and ongoing the above-named Employer through its agents violated the Act by creating the appearance of surveillance and conducting surveillance on employees who were receiving literature from fellow employees regarding union organizing efforts, working conditions, the confidentiality agreement, and their rights under the NLRA.<br><br>On or about March 23, 2017 and ongoing the above-named Employer through its agents violated the Act by instructing employees that they were not allowed to pass out any literature unless it was pre-approved by the Employer. |

22-60493.5885

| Charge No. | Date Filed | Allegations |
|---|---|---|
| 32-CA-197058<br><br>[GC's Opp **Ex. 3**] | 4/17/17 | On or about November 5, 2016 and ongoing the above-named Employer through its agents violated the Act by implementing and maintaining, and repeatedly requiring compliance with, a company confidentiality agreement that coerces and intimidates employees from freely exercising their rights to engage in concerted and union activity.<br><br>On or about February 10, 2017 and ongoing the above-named Employer violated the Act by intimidating, creating the appearance of surveillance and conducting surveillance on Richard Ortiz, Jose Moran, Michael Sanchez and others for their union activities and/or union sentiments, including passing out literature regarding union organizing efforts, working conditions, the confidentiality agreement, and their rights under the NLRA.<br><br>On or about February 10, 2017 and ongoing the above-named Employer through its agents violated the Act by creating the appearance of surveillance and conducting surveillance on employees who were receiving literature from fellow employees regarding union organizing efforts, working conditions, the confidentiality agreement, and their rights under the NLRA.<br><br>On or about March 23, 2017 and ongoing the above-named Employer through its agents violated the Act by instructing employees that they were not allowed to pass out any literature unless it was pre-approved by the Employer. |

| Charge No. | Date Filed | Allegations |
|---|---|---|
| 32-CA-197091<br><br>[GC's Opp **Ex. 5**] | 4/18/17 | On or about November 5, 2016 and ongoing the above-named Employer through its agents violated the Act by implementing and maintaining, and repeatedly requiring compliance with, a company confidentiality agreement that coerces and intimidates employees from freely exercising their rights to engage in concerted and union activity.<br><br>On or about February 10, 2017 and ongoing the above-named Employer violated the Act by intimidating, creating the appearance of surveillance and conducting surveillance on Richard Ortiz, Jose Moran, Michael Sanchez and others for their union activities and/or union sentiments, including passing out literature regarding union organizing efforts, working conditions, the confidentiality agreement, and their rights under the NLRA.<br><br>On or about February 10, 2017 and ongoing the above-named Employer through its agents violated the Act by creating the appearance of surveillance and conducting surveillance on employees who were receiving literature from fellow employees regarding union organizing efforts, working conditions, the confidentiality agreement, and their rights under the NLRA.<br><br>On or about March 23, 2017 and ongoing the above-named Employer through its agents violated the Act by instructing employees that they were not allowed to pass out any literature unless it was pre-approved by the Employer. |

| Charge No. | Date Filed | Allegations |
|---|---|---|
| 32-CA-197197<br><br>[GC's Opp **Ex. 7**] | 4/19/17 | On or about November 5, 2016 and ongoing the above-named Employer through its agents violated the Act by implementing and maintaining, and repeatedly requiring compliance with, a company confidentiality agreement that coerces and intimidates employees from freely exercising their rights to engage in concerted and union activity.<br><br>On or about February 10, 2017 and ongoing the above-named Employer violated the Act by intimidating, creating the appearance of surveillance and conducting surveillance on Richard Ortiz, Jose Moran, Michael Sanchez and others for their union activities and/or union sentiments, including passing out literature regarding union organizing efforts, working conditions, the confidentiality agreement, and their rights under the NLRA.<br><br>On or about February 10, 2017 and ongoing the above-named Employer through its agents violated the Act by creating the appearance of surveillance and conducting surveillance on employees who were receiving literature from fellow employees regarding union organizing efforts, working conditions, the confidentiality agreement, and their rights under the NLRA.<br><br>On or about March 23, 2017 and ongoing the above-named Employer through its agents violated the Act by instructing employees that they were not allowed to pass out any literature unless it was pre-approved by the Employer. |

| Charge No. | Date Filed | Allegations |
|---|---|---|
| 32-CA-200530<br><br>[Motion to Dismiss, **Ex. A**] | 6/12/17 | On or about February 10, 2017 and ongoing, the above-named Employer violated the Act by interrogating, intimidating, and harassing Jose Moran for engaging in protected concerted activity and expressing support for the union.<br><br>On or about February 10, 2017 and ongoing, the above-named Employer violated the Act by creating the appearance of discipline, interrogation, and harassment of Jose Moran for engaging in protected concerted activity and expressing support for the union.<br><br>On or about May 25, 2017 and ongoing, the above-named Employer violated the Act by interrogating, intimidating, and harassing Jonathan Galescu, Richard Ortiz, and others for engaging in protected concerted activity regarding worker safety concerns and other working conditions.<br><br>On or about May 25, 2017 and ongoing, the above-named Employer violated the Act by creating the appearance of discipline, interrogation, and harassment of Jonathan Galescu, Richard Ortiz, and others for engaging in protected concerted activity regarding worker safety concerns and other working conditions.<br><br>On or about May 24, 2017 and ongoing, the above-named Employer violated the Act by intimidating, creating the appearance of surveillance and conducting surveillance on Richard Ortiz, Michael Catura, Branton Phillips and others for their union activities and/ or union sentiments, including passing out literature regarding working conditions at Tesla.<br><br>On or about May 24, 2017 and ongoing, the above-named Employer violated the Act by creating the appearance of surveillance and conducting surveillance on employees who were receiving literature from fellow employees regarding working conditions at Tesla. |

| **Charge No.** | **Date Filed** | **Allegations** |
|---|---|---|
| 32-CA-197020 (Amended) [GC's Opp. **Ex. 2**] | 7/28/17 | Within the last six months, the above-named Employer, through its agents, violated the Act by promulgating and/or maintaining unlawful rules restricting Section 7 activity, including overly broad confidentiality provisions and rules pertaining to use of social media, authorization requirements, the taking of photographs, videos, and recordings, distribution, and employee access to the employer's facility and/or enforcing existing rules in an unlawful manner in response to employees' Section 7 activities; and intimidating |
| 32-CA-197058 (Amended) [GC's Opp **Ex. 4**] | 7/28/17 | Within the last six months, the above-named Employer, through its agents, violated the Act by promulgating and/or maintaining unlawful rules restricting Section 7 activity, including overly broad confidentiality provisions and rules pertaining to use of social media, authorization requirements, the taking of photographs, videos, and recordings, distribution, and employee access to the employer's facility and/or enforcing existing rules in an unlawful manner in response to employees' Section 7 activities; and intimidating and harassing employees for their Section 7 activities. |
| 32-CA-197091 (Amended) [GC's Opp **Ex. 6**] | 7/28/17 | Within the last six months, the above-named Employer, through its agents, violated the Act by promulgating and/or maintaining unlawful rules restricting Section 7 activity, including overly broad confidentiality provisions and rules pertaining to use of social media, authorization requirements, the taking of photographs, videos, and recordings, distribution, and employee access to the employer's facility and/or enforcing existing rules in an unlawful manner in response to employees' Section 7 activities; and intimidating and harassing employees for their Section 7 activities. |
| 32-CA-197197 (Amended) [GC's Opp **Ex. 8**] | 7/28/17 | Within the last six months, the above-named Employer, through its agents, violated the Act by promulgating and/or maintaining unlawful rules restricting Section 7 activity, including overly broad confidentiality provisions and rules pertaining to use of social media, authorization requirements, the taking of photographs, videos, and recordings, distribution, and employee access to the employer's facility and/or enforcing existing rules in an unlawful manner in response to employees' Section 7 activities; and intimidating and harassing employees for their Section 7 activities. |

| Charge No. | Date Filed | Allegations |
|---|---|---|
| 32-CA-200530 (Amended)<br><br>[Motion to Dismiss, **Ex. J**] | 7/28/17 | Within the last six months, the above-named Employer, through its agents, violated the Act by enforcing an overly broad confidentiality policy; interrogating employees regarding their protected concerted activities; intimidating and harassing employees engaged in Section 7 activities; and promulgating and/or maintaining an unlawful rule restricting Section 7 activity, including an overly broad distribution policy. |

22-60493.5891

| Charge No. | Date Filed | Allegations |
|---|---|---|
| 32-CA-208614<br><br>[Motion to Dismiss, **Ex. D**] | 10/25/17 | Within the past six months and ongoing. Tesla, Inc. has interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the National Labor Relations Act by, among other things, terminating and/or disciplining employees in retaliation for participating in protected concerted activities and National Labor Relations Board activities.<br><br>Within the past six months and ongoing, Tesla, Inc. has interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the National Labor Relations Act by, among other things, terminating and/or disciplining employees for violating a confidentiality agreement that restricts protected concerted activities.<br><br>Within the past six months and ongoing, Testa. Inc. has interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the National Labor Relations Act by, among other things. terminating a group of employees to discourage protected concerted activity by other employees.<br><br>Within the past six months and ongoing, Tesla, Inc. has interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the National Labor Relations Act by, among other things, terminating a group of employees in retaliation for members of that group participating in protected concerted activities.<br><br>Within the past six months and ongoing, Testa, Inc., through its agents, has interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the Act by, among other acts, restricting employees' right to engage in protected concerted activity, including, but not limited to, wearing items with the Union's logo in Tesla facilities.<br><br>Within the past six Months and ongoing. Tesla, Inc., through its agents, has interfered with. restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the Act by, intimidating and harassing employees for their Section 7 activities.<br><br>By these and other acts, Tesla. Inc. has violated Section 8(a)(1), 8(a)(3) and 8(a)(4) of the National Labor Relations Act. |

| Charge No. | Date Filed | Allegations |
|---|---|---|
| 32-CA-210011[1] | 11/15/17 | In the past six months the above-named Employer has interfered with the protected Section 7 rights of William Locklear and those of his coworkers by intimidating him, creating the impression of surveillance of him and his coworkers, engaging in surveillance of his and his coworkers' activities, subjecting him to heightened supervisory scrutiny and interrogating him concerning his support for and activities on behalf of the Charging Party. |
| 32-CA-210879 [Motion to Dismiss, **Ex. F**] | 12/1/17 | In the past six months the above-named Employer has interfered with the protected Section 7 rights of William Locklear and those of his coworkers by intimidating him, creating the impression of surveillance of him and his coworkers, engaging in surveillance of his and his coworkers' activities, subjecting him to heightened supervisory scrutiny and interrogating him concerning his support for and activities on behalf of the Charging Party. |
| 32-CA-210879 [Motion to Dismiss, **Ex. L**] | 12/6/17 | In the past six months the above-named Employer has interfered with the protected Section 7 rights of William Locklear and those of his coworkers by intimidating him, creating the impression of surveillance of him and his coworkers, engaging in surveillance of his and his coworkers' activities, subjecting him to heightened supervisory scrutiny and interrogating him concerning his support for and activities on behalf of the Charging Party.<br><br>In the past six months the Employer has disciplined William Locklear because of his Union and other protected concerted activities and otherwise discriminated against him because of those activities. |
| 32-CA-214300[2] [Attached hereto as **Exhibit 10(a)**] | 2/5/17 | Within the past six months and ongoing, Tesla, Inc. has interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the National Labor Relations Act by, among other things, terminating and/or disciplining employees in retaliation for participating in protected concerted activities and National Labor Relations Board activities. |

---

[1] The Region approved the withdrawal of this charge on December 4, 2017.
[2] The Region approved the withdrawal of this charge on March 29, 2018.

| **Charge No.** | **Date Filed** | **Allegations** |
|---|---|---|
| 32-CA-208614 (Amended)<br><br>[Motion to Dismiss, **Ex. K**] | 3/13/18 | Within the past six months, Tesla, Inc. has interfered with, restrained, and coerced employees in-the exercise of rights guaranteed in Section 7 of the Act by (1) disciplining and/or terminating employees in retaliation for engaging in union and/or protected concerted activities; (2) maintaining an unlawful teamwear policy prohibiting the wearing of Union tshirts; (3) applying its teamwear policy in a discriminatory manner; (4) intimidating, harassing, and/or threatening employees including, but not limited to, interrogating employees regarding their Section 7 activities; (5) making a statement of futility regarding employee support for the Union; and (6) threatening an employee regarding the wearing of union insignia and engaging in Section 7 activity.. |
| 32-CA-220777<br><br>[Attached hereto as **Ex. 10(b)**] | 5/23/18 | On May 20,2018, Tesla, lnc., through its CEO Elon Musk, violated the National Labor Relations Act by threatening to take away employee stock options in retaliation for Tesla employees engaging in protected union activity. Specifically, Musk stated in a public tweet, "[n]othing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted But why pay union dues & give up stock options for nothing?" This tweet went out to Musk's 21.8 million twitter followers, has been shared and republished by numerous individuals and media outlets, and remains publicly accessible at the time of this filing. |

# EXHIBIT 10a

22-60493.5895

FORM EXEMPT UNDER 44 U.S.C 3512

| INTERNET FORM NLRB-501 (2-08) | UNITED STATES OF AMERICA NATIONAL LABOR RELATIONS BOARD CHARGE AGAINST EMPLOYER | DO NOT WRITE IN THIS SPACE |
|---|---|---|

| | Case | Date Filed |
|---|---|---|
| | 32-CA-214300 | 2/5/2018 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

a. Name of Employer

Tesla, Inc.

b. Tel. No.

c. Cell No.

d. Address (Street, city, state, and ZIP code)

45500 Fremont Boulevard
Fremont, California 94538

e. Employer Representative

Gaby Toledano, Chief People Officer

f. Fax No.

g. e-Mail

gaby@tesla.com

h. Number of workers employed
10,000

i. Type of Establishment (factory, mine, wholesaler, etc.)
Factory

j. Identify principal product or service
Automotive Manufacturing

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (list subsections) (3) of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

Within the past six months and ongoing, Tesla, Inc. has interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the National Labor Relations Act by, among other things, terminating and/or disciplining employees in retaliation for participating in protected concerted activities and National Labor Relations Board activities.

3. Full name of party filing charge (if labor organization, give full name, including local name and number)

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), AFL-CIO

4a. Address (Street and number, city, state, and ZIP code)
8000 East Jefferson
Detroit, Michigan 48214

4b. Tel. No. (313) 926-5000

4c. Cell No.

4d. Fax No.

4e. e-Mail
sreed@uaw.net

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (to be filled in when charge is filed by a labor organization)
International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), AFL-CIO

Tel. No. (323) 655-4700

Office, if any, Cell No.

6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

By  Margo A. Feinberg BR
(signature of representative or person making charge)

Margo A. Feinberg, Esq.,
Attorney for Charging Party
(Print/type name and title or office, if any)

Fax No. (323) 655-4488

e-Mail
margo@ssdslaw.com

Address   Schwartz, Steinsapir, Dohrmann & Sommers LLP
6300 Wilshire Blvd., Suite 2000, Los Angeles, CA 90048

2/5/18
(date)

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

# EXHIBIT 10b

22-60493.5897

FORM EXEMPT UNDER 44 U S C 3512

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case 32-CA-220777 | Date Filed 05-23-2018 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer Tesla, Inc. | | b. Tel. No. |
|---|---|---|
| | | c. Cell No. |
| | | f. Fax No. |
| d. Address *(Street, city, state, and ZIP code)* 45500 Fremont Boulevard Fremont, California 94538 | e. Employer Representative Gaby Toledano, Chief People Officer | g. e-Mail gaby@tesla.com |
| | | h. Number of workers employed 10,000 |
| i. Type of Establishment *(factory, mine, wholesaler, etc.)* Factory | j. Identify principal product or service Automotive Manufacturing | |

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* _____ of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

On May 20, 2018, Tesla, Inc., through its CEO Elon Musk, violated the National Labor Relations Act by threatening to take away employee stock options in retaliation for Tesla employees engaging in protected union activity. Specifically, Musk stated in a public tweet, "[n]othing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues & give up stock options for nothing?" This tweet went out to Musk's 21.8 million twitter followers, has been shared and republished by numerous individuals and media outlets, and remains publicly accessible at the time of this filing.

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), AFL-CIO

| 4a. Address *(Street and number, city, state, and ZIP code)* 8000 East Jefferson Ave. Detroit, Michigan 48214 | 4b. Tel. No. (313) 926-5000 |
|---|---|
| | 4c. Cell No. |
| | 4d. Fax No. |
| | 4e. e-Mail sreed@uaw.net |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), AFL-CIO

| 6. DECLARATION I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief. | | Tel. No. (323) 655-4700 |
|---|---|---|
| By *Margo A. Feinberg* *(signature of representative or person making charge)* | Margo A. Feinberg, Esq., Attorney for Charging Party *(Print/type name and title or office, if any)* | Office, if any, Cell No. |
| | | Fax No. (323) 655-4488 |
| Schwartz, Steinsapir, Dohrmann & Sommers LLP Address 6300 Wilshire Blvd., Suite 2000, Los Angeles, CA 90048 | 5/23/18 *(date)* | e-Mail margo@ssdslaw.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

# EXHIBIT 11

22-60493.5899

| Charge Nos. | Letter Date | Allegations For Which Evidence Sought | Affiants Requested |
|---|---|---|---|
| 32-CA-197020, 197058, 197091, 197197[1] | 5/8/17 | 1. Between November 2 and 5, 2016, the Employer promulgated and maintained an overly broad confidentiality agreement applicable to all employees as a term and condition of their employment;<br><br>2. Between November 2 and 5, 2016, the Employer promulgated and maintained an overly broad confidentiality agreement applicable to all employees as a term and condition of their employment in response to protected concerted activities and/or union activities;<br><br>3. In November 2016, the Employer, through David Zweig at the Employer's Fremont facility, verbally promulgated and maintained an overly broad rule prohibiting an employee from taking a photograph of the Employer's confidentiality agreement;<br><br>4. On February 9, 2017, the Employer, through Juan Martinez, interrogated an employee regarding the employee's protected concerted activities and/or union activities;<br><br>5. On February 10, 2017, the Employer, through its security guards acting as agents of the Employer, at the Employer's Fremont location:<br><br>a. created an impression of surveillance of employees engaging in protected concerted activities and/or union activities;<br><br>b. engaged in unlawful surveillance of employees by photographing and video-recording employees engaged in protected concerted activities and/or union activities;<br><br>c. discriminated against an employee engaged in protected concerted activities and/or union activities | Armando Rodriguez, Juan Martinez, David Zweig |

[1] Because this letter issued prior to June 7, 2017, the date of the meeting giving rise to the allegations of the Amendment, Tesla did not include it as an exhibit to its Motion to Dismiss. It is attached hereto as **Exhibit 11(a)**.

| Charge Nos. | Letter Date | Allegations For Which Evidence Sought | Affiants Requested |
|---|---|---|---|
| | | by denying him access to the Employer's Fremont facility; | |
| | | d. verbally promulgated and maintained an overly broad distribution and solicitation policy in response to protected concerted activities and/or union activities; | |
| | | e. verbally promulgated and maintained an overly broad distribution and solicitation policy; | |
| | | f. interrogated employees about the protected concerted activities and/or union activities; | |
| | | 6. On February 13, 2017, the Employer, through Juan Martinez, interrogated an employee regarding the employee's protected concerted activities and/or union activities and made implied promises of benefits to the employee; | |
| | | 7. On March 23, 2017, the Employer, through Armando Rodriguez at the Employer's Fremont facility, promulgated an overly broad distribution policy; | |
| | | 8. On March 23, 2017, the Employer, through Armando Rodriguez at the Employer's Fremont facility, promulgated a distribution policy in response to protected concerted activities and/or union activities | |
| 32-CA-200530 [Motion to Dismiss, **Ex. B**] | 7/7/17 | 1. On February 9, 2017, the Employer, through Juan Martinez, interrogated an employee regarding the employee's protected concerted activities and/or union activities; 2. On February 9, 2017, the Employer, through Juan Martinez, created an impression of surveillance of employees' protected concerted activities and/or union activities and created an appearance of discipline and harassment by interrogating an employee regarding | Lisa Lipson, Lauren Holcomb, David Zweig, Seth Woody |

| Charge Nos. | Letter Date | Allegations For Which Evidence Sought | Affiants Requested |
|---|---|---|---|

the employee's protected concerted activities and/or union activities;

3. On or about April 5, 2017, the Employer, through David Zweig, applied of an overly broad confidentiality policy prohibiting the sharing of information related to workplace safety at Tesla's Fremont facility;

4. On or about April 5, 2017, the Employer, through David Zweig, discriminatorily applied a confidentiality policy to prohibit Tesla employees from sharing information related to workplace safety at Tesla's Fremont facility;

5. On or about April 29, 2017, the Employer, through Seth Woody, applied of an overly broad confidentiality policy prohibiting the sharing of information related to workplace safety at Tesla's Fremont facility;

6. On or about April 29, 2017, the Employer, through Seth Woody, discriminatorily applied a confidentiality policy to prohibit Tesla employees from sharing information related to workplace safety at Tesla's Fremont facility;

7. On or about May 24, 2017, the Employer, through its security guards as agents of the Employer, at the Employer's Fremont location:

a. created an impression of surveillance of employees engaging in protected concerted activities and/or union activities;

b. engaged in unlawful surveillance of employees engaging in protected concerted activities and/or union activities;

c. engaged in unlawful and discriminatory harassment of employees engaged in protected concerted activities and/or union activities by repeatedly asking employees engaged in such activities for their identification;

| **Charge Nos.** | **Letter Date** | **Allegations For Which Evidence Sought** | **Affiants Requested** |
|---|---|---|---|
| | | 8. On May 24, 2017, through Lisa Lipson and Lauren Holcomb, interrogated and threatened employees regarding their protected concerted activities; and | |
| | | 9. On May 24, 2017, through Lisa Lipson and Lauren Holcomb, created an impression of discipline, interrogation and harassment by interrogating and threatening employees regarding their protected concerted activities. | |
| 32-CA-208614<br><br>[Motion to Dismiss, **Ex. E**] | 11/21/17 | 1. engaging in a mass layoff of employees at Tesla, Inc.'s facilities in order to discourage employees from engaging in Section 7 protected activities and in retaliation for engaging in Board activities, including the filing of charges and/or the issuance of a Complaint in Case Nos. 32-CA- 197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, and 32-CA-200530;<br><br>2. At the Tesla, Inc. facility located at 45500 Fremont Boulevard, Fremont, California:<br>a. In October 2017, terminating the following individuals in retaliation for engaging in protected concerted activities and/or union activities:<br><br>i. Richard Ortiz (also in retaliation for having filed charges with the Board);<br><br>ii. Jayson Henry;<br><br>iii. Juan Guadalupe Reyes;<br><br>iv. Juan Maldonado;<br><br>v. Mike Williams;<br><br>vi. Tim Cotton;<br><br>vii. Brandon Hill;<br><br>viii. Erick Vasquez; and | Vannick Ly, Lehi Gomez, Paul James, Arnold Camat, Timothy Fenelon, Tope Ogunniyi, Kyle Martin, Mario Last Name Unknown, Elena Elliott, Ricky Gecewich, Albert Rios, Duwone Ashley, Thuy Truong, Juan Martinez; Sean Boone; Kyle Last Name Unknown (Human Resources), Nicole White, Chris Padilla, Dane Last Name Unknown (Human Resources) |

| Charge Nos. | Letter Date | Allegations For Which Evidence Sought | Affiants Requested |
|---|---|---|---|

ix. Stephen Barbosa;

b. On or about June 29 and 30, 2017, by Vannick Ly and Lehi Gomez, audited the work of Branton Phillips and provided verbal and written negative feedback in retaliation for engaging in protected concerted activities and/or union activities;

c. On or about October 20, 2017, by Paul James, giving Jonathan Galescu a negative performance review in retaliation for engaging in protected concerted activities and/or union activities and/or Board activities (including having filed charges with the Board);

d. In or about August 2017, by Paul James on two occasions, creating an impression of surveillance by implying he had reviewed an employee's notebook;

e. In or about July or August 2017, by Tope Ogunniyi, discriminatorily applied a uniform policy prohibiting the warning of union paraphernalia on work clothing;

f. In or about late September or early October 2017, by Ricky Gecewich, interrogated an employee about their and other employees' protected concerted activities pertaining to the posting of pictures on social media;

g. On October 19, 2017, by Ricky Gecewich, gave a verbal and written warning to Jose Moran threatening action if the employee or other employees engaged in protected concerted activities;

h. On October 2, 2017, by Thuy Truong, a verbal and written reprimand of Juan Maldonado for having two late-ins in retaliation for engaging in protected concerted activities and/or union activities;

3. At the Tesla, Inc. facility located at 18280 Harlan Road, Lathrop, California: a. In October 2017,

| Charge Nos. | Letter Date | Allegations For Which Evidence Sought | Affiants Requested |
|---|---|---|---|
| | | terminating Dezzimond Vaughn in retaliation for engaging in protected concerted activities and/or union activities; | |
| | | b. In October 2017, giving Vaughn a poor performance review for the period of January to June 2017 in retaliation for engaging in protected concerted activities and/or union activities; | |
| | | 4. In connection with each of the above-referenced terminations and in October 2017, offering an employee/employees a severance agreement containing an overly broad confidentiality policy and no disparagement policy; | |
| | | 5. Within the Section 10(b) period, by Ricky Hofrichter, Jeremie Hansen, and Gregory Slettvet, instructed Tesla security guards to surveil employees engaged in protected concerted activities and/or union activities; | |
| | | 6. Within the Section 10(b) period, by Ricky Hofrichter, Jeremie Hansen, Gregory Slettvet, and Savannah Morgana, instructed Tesla security guards to tell Tesla employees engaged in lawful leafleting that they were not welcome at Tesla, that they needed to leave, and threatened to call the police. | |
| 32-CA-210879 [Motion to Dismiss, **Ex. G**] | 12/20/17 | On or about July 22, 2017, by and through supervisors Josh Surgeon and Shawn Gaines, violating Sections 8(a)(3) and (1) of the Act. Specifically, the Charging Party-Union alleges that Surgeon and Gaines issued a warning letter to an employee in retaliation for that employee's protected concerted and/or Union activities. The Charging Party-Union also asserts that the incidents relied upon by the Employer in the July 22, 2017, warning letter are not used by the Employer to discipline other employees. On or about August 24, 2017, by and through supervisor Matthew Stewart, violating Section 8(a)(1) of the Act. Specifically, the Charging Party-Union | Dave Teston, Associate Manager, Josh Surgeon, (title unknown to Board Agent but known by Employer), Shawn Gaines, Supervisor, Kevin Kassekert, Vice President |

| Charge Nos. | Letter Date | Allegations For Which Evidence Sought | Affiants Requested |
|---|---|---|---|
| | | alleges that Stewart was engaged in surveillance of employees and/or created the impression of surveillance by standing approximately 5 feet away from two employees working at an auditing station on the Model 3 line.<br><br>On or about August 30, 2017, by and through supervisor Tyler Ash, violating Section 8(a)(1) of the Act. Specifically, the Charging Party-Union alleges that Ash was engaged in surveillance of employees and/or created the impression of surveillance by attending the full orientation training meeting for employees.<br><br>On or about August 31, 2017, by and through supervisor Tyler Ash, violating Section 8(a)(1) of the Act. Specifically, the Charging Party-Union alleges that Ash was engaged in surveillance of employees and/or created the impression of surveillance by standing approximately 15 feet away from three employees who work on the Model 3 line.<br><br>On or about September 8, 2017, by and through associate manager Dave Teston, violating Section 8(a)(1) of the Act. Specifically, the Charging Party-Union alleges that Teston engaged in surveillance of employees and/or created the impression of surveillance by instructing an employee to work in a new area directly under a camera with a microphone.<br><br>Since on or about September 8, 2017, and continuing to the present date, by and through agents of the Employer, violating Section 8(a)(1) of the Act. Specifically, the Charging Party-Union alleges that the Employer has engaged in surveillance of employees and/or created the impression of surveillance of employees by installing cameras with microphones in work areas.<br><br>On or about September 14, 2017, by and through supervisors Matthew Stewart and Roderick Stevens, violating Section 8(a)(1) of the Act. Specifically, the | for Infrastructure Development, Matthew Stewart, Supervisor, Tyler Ash, Supervisor, Andy McIndoe, Associate Production Manager, Cindie Reneau, Human Resources Representative, Elliot Kent, Supervisor |

| Charge Nos. | Letter Date | Allegations For Which Evidence Sought | Affiants Requested |
|---|---|---|---|
| | | Charging Party-Union alleges that Stewart and Stevens engaged in surveillance of employees and/or created the impression of surveillance by standing about 5 feet from two employees working on the Model 3 line.<br><br>On or about September 8, 2017, by and through associate manager Dave Teston, violating Section 8(a)(1) of the Act. Specifically, the Charging Party-Union alleges that Teston interrogated employees about their protected concerted and/or Union activities.<br><br>On or about October 21, 2017, by and through associate production manager Andy McIndoe, violating Section 8(a)(1) of the Act. Specifically, the Charging Party-Union alleges that McIndoe interrogated employees about their protected concerted and/or Union activities.<br><br>On or about November 2, 2017, by and through supervisors and managers of the Employer, including, but not limited to, Dave Teston and Cindie Reneau, violating Sections 8(a)(3) and (1) of the Act. Specifically, the Charging Party-Union alleges that the Employer issued a lower performance review to an employee in retaliation for that employee's protected concerted and/or Union activities. The Charging Party-Union asserts that the reasons for the lowered performance review are pretextual, and that the lowered performance review was issued because the employee had engaged in protected concerted and/or Union activities. | |

# EXHIBIT 11a

22-60493.5908



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD

REGION 32                                          Agency Website: www.nlrb.gov
1301 Clay St Ste 300N                              Telephone: (510)637-3300
Oakland, CA 94612-5224                             Fax: (510)637-3315

Agent's Direct Dial: (510)671-3041

May 8, 2017

**By E-Mail Only**

Elizabeth Parry, Esq.                      John M. Skonberg, Esq.
Littler Mendelson, P.C.                    Michael J. Lotito, Esq.
1255 Treat Blvd, Suite 600                 Littler Mendelson, P.C.
Walnut Creek, CA 94597-7605                333 Bush St.
E-Mail: mparry@littler.com                 34th Floor
                                           San Francisco, CA 94104-2842
                                           E-Mail: jskonberg@littler.com
                                           E-Mail: mlotito@littler.com

> **Re:    Tesla Motors Corporation**
> **Cases 32-CA-197020, 32-CA-197058, 32-**
> **CA-197091, and 32-CA-197197**

Dear Ms. Parry, Mr. Skonberg, and Mr. Lotito:

I am writing this letter to advise you that it is now necessary for me to take evidence from your client regarding the allegations raised in the investigation of the above-referenced matters. Set forth below are the allegations and issues on which your evidence is needed, a request to take affidavits, a request for documentary evidence, and the date for providing your evidence.

**Allegations:** The allegations for which I am seeking your evidence are as follows. Michael Sanchez, Jonathan Galescu, Richard Ortiz, and the International Union, United Automobile, Aerospace and Agricultural Workers of America, AFL-CIO (collectively "the Charging Parties") allege that Tesla Motors Corporation ("the Employer" or "the Charged Party") violated Section 8(a)(1) and (3) of the Act by engaging in the following conduct:

1.      Between November 2 and 5, 2016, the Employer promulgated and maintained an overly broad confidentiality agreement applicable to all employees as a term and condition of their employment;

2.      Between November 2 and 5, 2016, the Employer promulgated and maintained an overly broad confidentiality agreement applicable to all employees as a term and condition of their employment in response to protected concerted activities and/or union activities;

22-60493.5909

3.     In November 2016, the Employer, through David Zweig at the Employer's Fremont facility, verbally promulgated and maintained an overly broad rule prohibiting an employee from taking a photograph of the Employer's confidentiality agreement;

4.     On February 9, 2017, the Employer, through Juan Martinez, interrogated an employee regarding the employee's protected concerted activities and/or union activities;

5.     On February 10, 2017, the Employer,  through its security guards acting as agents of the Employer, at the Employer's Fremont location:

>     a.     created an impression of surveillance of employees engaging in protected concerted activities and/or union activities;

>     b.     engaged in unlawful surveillance of employees by photographing and video-recording employees engaged in protected concerted activities and/or union activities;

>     c.     discriminated against an employee engaged in protected concerted activities and/or union activities by denying him access to the Employer's Fremont facility;

>     d.     verbally promulgated and maintained an overly broad distribution and solicitation policy in response to protected concerted activities and/or union activities;

>     e.     verbally promulgated and maintained an overly broad distribution and solicitation policy;

>     f.     interrogated employees about the protected concerted activities and/or union activities;

6.     On February 13, 2017, the Employer, through Juan Martinez, interrogated an employee regarding the employee's protected concerted activities and/or union activities and made implied promises of benefits to the employee;

7.     On March 23, 2017, the Employer, through Armando Rodriguez at the Employer's Fremont facility, promulgated an overly broad distribution policy;

8.     On March 23, 2017, the Employer, through Armando Rodriguez at the Employer's Fremont facility, promulgated a distribution policy in response to protected concerted activities and/or union activities;

**Board Affidavits:**  I am requesting to take affidavits from Armando Rodriguez, Juan Martinez, David Zweig, and any other individuals you believe have information relevant to the investigation of this matter.  Please be advised that the failure to present representatives who would appear to have information relevant to the investigation of this matter, for the purposes of

my taking sworn statements from them, constitutes less than complete cooperation in the investigation of the charge.  Please contact me by Thursday, May 11, 2017to schedule these affidavits.

**Documents:**  Please provide the following documents, along with any and all other evidence you deem to be relevant to the case:

1. A completed copy of the attached "Commerce Questionnaire" by the Employer's person most knowledgeable on the topic of the Employer's participate in interstate commerce;

2. A copy of any document that reflects or memorializes the Employer's confidentiality policy maintained since October 17, 2016;

3. A copy of any document that reflects or memorializes any confidentiality policy promulgated by the Employer since October 17, 2016;

4. Any document that reflects or refers to any reason(s) why the Employer promulgated and distributed a confidentiality policy to employees between November 2 and November 5, 2016. This request shall include, but is not limited to, copies of any document used by the Employer *prior to November 2, 2016* in evaluating any concerns regarding "leaks" of proprietary information or trade secrets;

5. Copies of any correspondence to employees regarding the Employer's confidentiality policy;

6. Any document reviewed or relied upon by the Employer in drafting the Employer's January 17, 2017 dated letter sent to five members of the California Assembly;

7. Any document that reflects any meeting in or around November 2 through 5, 2016, with employees by representatives of the Employer's Human Resources department (or other supervisors or managers of the Employer) on the topic of the Employer's confidentiality agreement;

9. A copy of any policy pertaining to the taking of photographs or videos applicable to employees of the Employer's Fremont facility;

10. Any document that reflects, refers to, or memorializes any meeting (whether formal or informal) between Juan Martinez and an employee of the Fremont facility on February 9, 2017;

11. Copies of all documents referring to or memorializing any agreements for the provision of security services at the Employer's Fremont facility on February 10, 2017;

12.     The names of any individuals working as "security guards" at the Employer's Fremont facility on February 10, 2017 between the times of 4:45 a.m. to 10:00 a.m.;

13.     Copies of any document that reflects or memorializes the Employer's solicitation and distribution policies applicable to the Employer's Fremont facility in effect on February 10, 2017;

14.     Copies of any document that reflects or memorializes the Employer's policies regarding employee access to the Employer's facility in effect on February 10, 2017;

15.     Copies of any photographs or video recordings taken of any individual located in or near the Employer's Fremont facility parking lot or entrances between the times of 4:45 a.m. to 10:00 a.m. on February 10, 2017;

16.     Copies of any document that reflects or memorializes the Employer's policy for access to the parking lot at the Employer's Fremont facility in effect on February 10, 2017;

17.     Copies of any document that reflects or refers to any meeting on March 23, 2017 (whether formal or informal) held between Armando Rodriguez and other employees on the topic of distribution of paper materials or leafleting.  This request shall include, but is not limited to, copies of Armando Rodriguez's notebook or any other document from which Rodriguez read;

18.     Any document in the Employer's possession since January 1, 2016 on the topic of unions or the United Auto Workers;

19.     If the Employer contends that Armando Rodriguez, Juan Martinez, and/or David Zweig are statutory employees within the meaning of the Act, documents reflecting the involvement or participation by Armando Rodriguez, Juan Martinez, and/or David Zweig in any of the following actions concerning any employee of the Employer: (a) Hiring; (b) Transferring; (c) Suspending; (d) Laying off; (e) Recalling; (f) Promoting; (g) Discharging; (h) Assigning of work; (i) Rewarding, including the granting of wage increases; (j) Disciplining; (k) Scheduling or granting of time off; (l) Assigning of overtime; (m) Adjusting of grievances; (n) Directing work; and (o) Evaluating;

20.     Any document that reflects an asserted defense of the Employer.

This office does not seek any documents subject to the attorney-client privilege, the work product doctrine, or another evidentiary privilege.  If the Employer asserts that a requested document is subject to a privilege, please provide me with a privilege log compliant with the Federal Rules of Civil Procedure and Federal Rules of Evidence laying the appropriate foundation for the asserted privilege.  Additionally, to the extent that a requested document is electronically stored, please provide the document(s) in the format in which it is ordinarily maintained, including any associated metadata.  To the extent the Employer will produce

pictures, audio recordings, and/or video recordings, please produce those in their native electronic formats.

**Position on 10(j) Relief:**  You are also requested to provide your position as to the appropriateness of Section 10(j) injunctive relief in this matter.  As you may know, Section 10(j) of the Act permits the NLRB to ask a federal district court "for appropriate temporary relief or restraining order" pending the Board's resolution of an unfair labor practice charge.  The district court is authorized to grant "such temporary relief or restraining order as it deems just and proper."  *If* the Region determines the Charged Party has violated the Act as alleged, the Region will consider whether to seek injunctive relief in this matter.  Accordingly, please provide your position, legal theory, case law, and supporting evidence regarding whether injunctive relief would be appropriate for the alleged violations in this case and whether such injunctive relief would be just and proper.  I wish to emphasize that the Region has not yet made a decision as to whether the Charged Party has violated the Act as alleged.  Rather, we want to provide you with adequate notice that injunctive relief will be considered if such a decision is made.

**Date for Submitting Evidence:**  To resolve this matter as expeditiously as possible, you must provide your evidence and position in this matter by Monday, May 15, 2017.  If you are willing to allow me to take affidavits, please contact me by Thursday, May 11, 2017 to schedule a time to take affidavits.  Electronic filing of position statements and documentary evidence through the Agency website is preferred but not required.  To file electronically, go to **www.nlrb.gov,** select **E-File Documents,** enter the **NLRB case number,** and follow the detailed instructions.  If I have not received all your evidence by the due date or spoken with you and agreed to another date, it will be necessary for me to make my recommendations based upon the information available to me at that time.

It is Agency policy that full and complete cooperation on your part in this investigation includes timely providing all material witnesses under your control to the investigating Board agent so that the witnesses' statements can be reduced to affidavit form and providing all relevant documentary evidence requested by the Board agent.  The mere submission of a position letter or memorandum, or the submission of affidavits not taken by the Board agent, does not constitute full and complete cooperation.  The Region seeks such full and complete cooperation by the close of business on Monday, May 15, 2017.  If I have not received all of your evidence by the due date or spoken with you and agreed to another date, it will be necessary for me to make my recommendations based upon the information available to me at that time.  Additionally, the Region will consider all of its options in order to complete its investigation, including the possibility of issuing investigative subpoenas for the witnesses and documents requested in this letter.

Please contact me at your earliest convenience by telephone, (510)671-3041, or e-mail, edris.rodriguezritchie@nlrb.gov, so that we can discuss how you would like to provide evidence and I can answer any questions you have with regard to the issues in this matter.

Very truly yours,

/s/ Edris Rodriguez Ritchie


EDRIS W.I. RODRIGUEZ RITCHIE
Field Attorney

Enclosure(s)

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 32

TESLA, INC.

    **and**                                          Cases 32-CA-197020
                                                       32-CA-197058

**MICHAEL SANCHEZ, an Individual**                    32-CA-197091
                                                       32-CA-197197

    **and**                                          32-CA-200530
                                                       32-CA-208614
                                                       32-CA-210879

**JONATHAN GALESCU,  an Individual**

    **and**

**RICHARD ORTIZ, an Individual**

    **and**

**INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL WORKERS OF
AMERICA, AFL-CIO**


**GENERAL COUNSEL'S OPPOSITION TO RESPONDENT'S REQUEST FOR
SPECIAL PERMISSION TO APPEAL ADMINISTRATIVE LAW JUDGE'S ORDER
DENYING RESPONDENT'S MOTION TO DISMISS, REQUEST FOR *DE NOVO*
REVIEW,  AND MOTION FOR JUDGEMENT AS A MATTER OF LAW**

22-60493.5915

## I.    INTRODUCTION

The only legal issue before the Board is whether the presiding administrative law judge in this matter, Amita B. Tracy, (the Judge) abused her discretion when she rejected Respondent's Motion to Dismiss based on her reasonable conclusion that there are genuine issues of material fact over whether allegations amended into the operative complaint in this case are time barred under Section 10(b) of the Act.  A defense rooted in Section 10(b) of the Act is a garden variety affirmative defense that is routinely litigated before administrative law judges and then reviewed by the Board if exceptions are filed. Although Respondent goes out of its way to paint a nefarious conspiracy theory employing baseless attacks on the integrity of the Board's investigative procedures and the Counsel for the General Counsel's litigation strategy,[1] Respondent, a multi-billion dollar company, is not the victim here. There is no irreparable harm if the Board follows extant law and denies this Special Appeal. To the contrary, Respondent will continue to have every opportunity before the Judge to respond to allegations that it violated the Act, including its right to show that the Counsel for the General Counsel has not met his burden under *Redd-I*'s "closely related" test to amend allegations into the complaint.   But at this juncture, the burden remains with Respondent to establish that the Judge abused her discretion

---

[1] The General Counsel did not issue a subpoena to Elon Musk and did not file any brief in support of the Charging Parties' attempt to subpoena Mr. Musk.  To the contrary, as Respondent knows, the General Counsel has steadfastly held the position that he will not call Mr. Musk as a witness. The General Counsel did, however, issue a subpoena for documents, as it routinely does in ULP hearings. These requests for documents do not relate to any allegation Respondent is claiming is barred by Section 10(b) of the Act because the allegations are oral statements made to employees. Put another way, no documents were requested in connection to these allegations. Further, General Counsel did not amend new allegations into the operative complaint in an attempt to gain any undue advantage. Rather, the timing of the amended allegations was based on when the Counsel for the General Counsel discovered these new allegations. Once uncovered, he moved as expeditiously as possible to amend the complaint. While the intent of the Counsel for General Counsel in amending the complaint in June 2018 before the opening of the hearing was to avoid any delay and to provide Respondent as much time as possible to mount its defense, knowing that Respondent's case would not likely begin until sometime in September 2018, it has somehow been misinterpreted and presented as gamesmanship. It is simply untrue.

22-60493.5916

when she denied its Motion to Dismiss. The burden is a heavy one and one that Respondent cannot meet.

## II.    BACKGROUND INFORMATION AND PROCEDURAL HISTORY

The hearing in this matter commenced on June 11, 2018, and is scheduled to resume on September 24, 2018.  Prior to the hearing, the Regional Director for Region 32 (the Regional Director) of the National Labor Relations Board (the Board) issued an Amendment to the operative Second Amended Consolidated Complaint (Complaint), adding three Section 8(a)(1) allegations (the Amendment).[2]  When the hearing commenced on June 11, 2018, Respondent Tesla, Inc., (Respondent) filed a Motion to Dismiss the Amendment with the Judge on the grounds that the allegations were barred by Section 10(b) and not "closely related" under the Board's test in *Redd-I*, 290 NLRB 1115 (1988).  However, Respondent's Motion to Dismiss failed to demonstrate that there were no genuine issues of material fact regarding the issue of whether the allegations contained in the Amendment were "closely related" to the other allegations in the Complaint.  As discussed more fully below, the Amendment allegations and the allegations in the Complaint arise out of Respondent's response to its employees' efforts to unionize with the Charging Party Union, the International Union, United Automobile, Aerospace, and Agricultural Workers of America, AFL-CIO (Union).[3]  In this regard, the allegations involve Respondent's coordinated response to the employees' launch of a public organizing campaign, including leafleting, distribution of Union materials, wearing of Union t-shirts and insignia, and engaging in Section 7 social media protected activity while off-duty.

---

[2]   The Amendment is contained in Exhibit I of Respondent's Special Appeal.

[3]   Michael Sanchez, an individual, filed the charge in Case 32-CA-197020.  Jonathan Galescu, an individual, filed the charge in Case 32-CA-197058.  Richard Ortiz, an individual, filed the charge in Case 32-CA-197091.  The Union filed the charges in Case Nos. 32-CA-197197, 32-CA-200530, 32-CA-208614, and 32-CA-210879.

22-60493.5917

Most notably, Respondent's unlawful response to its employees' Section 7 activities culminated in the discipline and termination of employees that were two of the most prominent figures in the Union organizing campaign.

On August 10, 2018, the Judge denied Respondent's Motion to Dismiss, without prejudice, on the basis that Respondent failed to demonstrate that there was no genuine issue of fact regarding the "closely related" issue and directed the parties to be prepared to litigate the merits of the allegations contained in the Amendment.

### III.    LEGAL STANDARD AND DISCUSSION

The Board accords judges significant discretion in controlling the hearing and directing the creation of the record.  Section 102.35 of the Board's Rules and Regulations provides, in pertinent part, that a judge should "regulate the course of the hearing" and "take any other action necessary" in furtherance of the judge's stated duties and authorized by the Board's rules.  As a result, the Board reviews rulings by administrative law judges under an abuse of discretion standard for both evidentiary and procedural rulings.  See e.g. *Oaktree Capital Management, LLC*, 353 NLRB 1242, fn. 3 (2009); see also e.g. *Hispanics United of Buffalo, Inc.*, 349 NLRB 368, fn. 2 (2012). Under this standard, as will be shown below, the Board should deny the Special Appeal. While Respondent may disagree with the Judge's ultimate conclusion, she correctly defined the legal issue and applied the proper legal standard.

Realizing that the abuse of discretion standard is a hefty one, Respondent contends that it is entitled to a *de novo* review by the Board. It is essentially asking the Board to morph this Special Appeal into a prehearing motion which normally must be filed with the Board *before* the opening of a hearing before the administrative law judge. Such a view is completely contrary to

22-60493.5918

the Board's Rules and Regulations. Acceding to Respondent's request would only encourage parties to file procedurally defective motions with the Board.

> **A.    The Judge Did Not Abuse Her Discretion By Concluding that There Are Genuine Issues of Fact Regarding the Issue of Whether the Amendment Is Time Barred Under *Redd-I.***

The Judge based her denial of Respondent's Motion to Dismiss, without prejudice, on her conclusion that Respondent failed to establish an absence of a material issue of fact as it relates to whether the asserted untimely allegations in the Amendment are "closely related" to timely allegations. See Section 102.24(b) (a motion to dismiss may be denied where the motion itself fails to establish the absence of a genuine issue, or where the opposing party's pleadings, opposition and/or response indicate on their face that a genuine issue may exist). In its Special Appeal, Respondent erroneously asserts that the Judge misallocated the burden of proof for showing that an allegation is "closely related" from General Counsel to Respondent. Respondent misunderstands the Judge's Order denying its Motion. The Judge correctly held that, as the moving party in a motion to dismiss, Respondent bears the burden of demonstrating that there are no genuine issues of material fact regarding the closely related issue, which it failed to demonstrate in its Motion to Dismiss. Indeed, she ruled that her decision was "without prejudice" because she recognized that whether or not the Amendment allegations are "closely related" under *Redd-I,* and therefore not barred under Section 10(b) of the Act, will be litigated through her proceedings and allow her to dismiss the Amendment should General Counsel ultimately fail to prove that the allegations are "closely related" at the conclusion of the hearing.

As demonstrated by Respondent's Special Appeal, which argues the merits of the underlying issue for at least 10 pages, there are genuine issues of fact that must be resolved to

22-60493.5919

determine whether the Amendment is "closely related" and therefore not untimely under Section 10(b) of the Act. For instance, she must resolve factual issues under the "closely related" test such as whether the conduct alleged in the Amendment happened during the same time period and with the same object as the charge allegations and/or Complaint allegations; whether there is evidence to show a causal nexus between the Amendment allegations and the charge allegations and/or Complaint allegations; whether Amendments allegations are a part of the chain or progression of events of charge allegations and/or the Complaint allegations; and whether the Amendment allegations are part of the overall plan to undermine Union activity; among many other factual issues. It is plain to see there are many genuine issues of fact that precluded the Judge from granting Respondent's Motion to Dismiss. In other words, there can be no judgment as a "matter of law" because there are genuine issues of fact for the Judge to resolve. Accordingly, there is no basis to conclude she abused her discretion.

**B.    The Board Should Deny Respondent's Request for a Motion for a *De Novo* Review Because There Is No Basis to Convert This Special Appeal into a Prehearing Motion**

Respondent's attempt to seek *de novo* review of the merits at this stage of litigation is improper because the matter is pending before the Judge. Under Section 102.24(b), any motion for judgment filed with the Board must be filed no later than 28 days prior to the scheduled hearing, or, where there are less than 28 days before the hearing, the motion must be filed "promptly." Respondent failed to comply with Section 102.24(b) because it failed to file the instant request with the Board "promptly" after the Regional Director issued the June 4, 2018 Amendment, filing the request several months after the start of the hearing. Moreover, Section 102.25 requires that the designated administrative law judge rule on all motions once the record

22-60493.5920

has opened.  Through the instant Special Appeal, Respondent is essentially asking the Board to allow it to circumvent the Section 102.24(b) and 102.25 requirements, a move that would render the Section 102.24(b)'s 28-day requirement or "prompt[ness]" and Section 102.25's requirement that only administrative law judges rule on motions after the opening of a hearing effectively meaningless.  Respondent has failed to offer any legal support or otherwise compelling argument to support its position that it should not be required to comply the Section 102.24 or 102.25 requirements.  It relies on accusations of gamesmanship, undue advantage, irreparable harm, and manifest injustice. However, Respondent retains the opportunity to fully litigate whether or not the Amendment should be dismissed before the Judge and eventually with the Board.  To the extent Respondent's Special Appeal seeks to be considered as a *de novo* Motion for Judgment as a Matter of Law (that is, a motion to dismiss), the Board should reject it because it is procedurally defective.

Even assuming Respondent's Motion for a Judgment as a Matter of Law is properly before the Board, it lacks merit. As the party moving, Respondent must establish the absence of a genuine issue of material fact, which it cannot do because the "closely related" test requires that certain facts must be resolved as described above.

### C.  Even if the Board Engages in a *De Novo* Review, Respondent's Motion for Judgment as a Matter of Law Should Be Denied Because the Board Must Apply the *Redd-I* "Closely Related" Test Upon Review of the Entire Record

The Board is not in a position to engage in a *de novo* review because the *Redd-I* "closely related" test requires the Board to review the *entire* record.   Under *Redd-I*, the Board looks to *either* "whether the otherwise untimely allegations are of the same class as the violations alleged in the pending timely charge" or "whether the otherwise untimely allegations arise from the same

22-60493.5921

factual situation or sequence of events as the allegations in the pending timely charge." *Redd-I*, above at 1118. In order to be able to conduct such an inquiry, the Board must inevitably look at the *entire* record.[4] For example, in *Redd-I*, the Board made its determination that an allegation was closely related because it evaluated the entire record to review whether the allegedly untimely allegations were part of the same factual situation or sequence of events as the timely charges. Granting Respondent's motion for judgment as a matter of law would effectively require the Board to make a determination without even knowing the events of these cases, their sequence, or their import in relation to the asserted untimely and barred allegations. Notably, the Board in *Redd-I* and *Heaven*[5], unable to determine from the record whether the alleged untimely allegations are closely related to allegations of a timely charge, remanded to allow litigation both on the merits and on the "closely related" issue. *Columbia Textile Services*, 293 NLRB 1034, fn. 11 (1989). This common-sense approach allows the Board to have the opportunity to review the parties' assertions under each of the *Redd-I* prongs and the Board has not departed from this approach. The Board reiterated this approach in *Carney Hospital*, 350 NLRB No. 56 (2007), which is relied upon heavily by Respondent, where the Board explicitly stated in footnote 11 that the *Redd-I* "closely related" test is not limited to the pleadings. The same is true in *Charter Communications*, 366 NLRB No. 46 (2018), which Respondent asserts supports its request, where the Board's analysis rests on the record developed, in part, through testimony at the underlying unfair labor practice hearing rather than merely the pleadings. Indeed, Respondent

---

[4] General Counsel will resume his case in chief when the hearing reopens on September 24, 2018. Although the application of the *Reddi-I* test is premature because the record is not complete, General Counsel asserts that the record evidence thus far establishes that the Amendment allegations are closely related to other Complaint allegations similarly arising out of Respondent's unlawful response to its employees' organizing efforts. See also General Counsel's Opposition to Respondent's Motion to Dismiss, pp. 3-6, attached as Exhibit 3 to Respondent's Motion.

[5] 290 NLRB 1223, 1224 (1988).

22-60493.5922

itself cites to the unfair labor practice charges in *Charter Communications*, documents, which are themselves outside of the pleadings.

Thus, the Board should reject Respondent's contention that the Board's application of the *Redd-I* "closely related" test is accomplished by ignoring all matters outside the relevant pleadings. Respondent's argument rests on its interpretation of a D.C. circuit court case, *Hyundai America Shipping Agency, Inc. v. NLRB*, 805 F.3d 309 (2015), a non-precedential case. In Respondent's assessment of *Hyundai*, Respondent asserts that the "closely related" inquiry requires ignoring all matters outside the parties' pleadings. Respondent fails to point to *any* Board case following the circuit court's holding in *Hyundai* or any other circuit court case adopting the same principle.

Moreover, Respondent's conduct is inconsistent with its reliance upon the *Hyundai* analysis. Throughout Respondent's Motion to Dismiss and in its Special Appeal, Respondent relies heavily on matters *outside* the pleadings. For example, Respondent devotes numerous pages of argument and analysis to matters it asserts were investigated and dismissed, something the *Redd-I* Board explicitly stated was not relevant to the applicable inquiry and something the *Hyundai* court would not have considered.

### D. Even if the Board Agrees with Respondent's Contention that Only the Pleadings May Be Considered, the Closely Related Test Is Still Met

Although not the proper inquiry here, if a *de novo* review is conducted solely on the pleadings, General Counsel can still meet the *Redd-I* test. While the Amendment allegations were not specifically alleged in any charge and not mentioned during the investigation of the charges because, as mentioned above, the Amendment was based on evidence discovered after

the issuance of the Complaint, the Amendment allegations nonetheless meet the "closely related" test as shown from the pleadings as described below.[6]

Here, the Amendment alleges that on June 7, 2017, Respondent Chief Executive Officer Elon Musk and Chief People Officer Gaby Toledano violated Section 8(a)(1) of the Act when, in a single conversation with Respondent employees, they solicited employee complaints about safety issues, impliedly promised to remedy those complaints if the employees refrained from union activity, made a statement of futility, and told the employees that no one at Respondent's Fremont, California facility wanted a union and queried the workers about why they would want to pay union dues. The allegations in the Complaint as well as the Amendment arise out of the employees ongoing multi-year organizing efforts. There is, however, more than a mere chronological relationship. There exists a meaningful nexus to the timely filed charges based on Respondent's coordinated response to discourage the employees from further engaging in Section 7 activities. Indeed, the alleged June 7, 2017 meeting described in the Amendment with Toledano and Musk was in regards to safety issues and it occurred just two weeks after Respondent attempted to interfere with the employees who lawfully distributed Union leaflets about their workplace safety concerns as alleged in Paragraphs 7(n) through (p) of the Second Amended Consolidated Complaint. The Amendment falls into the sequence of the extant

---

[6] While the charges do not allege the specific conduct or actors that engaged in the conduct described in the Amendment, the charge in 32-CA-20814, filed October 25, 2017, does allege "intimidating and harassing employees for their Section 7 activities" within the six month period preceding the charge. Such charge covers the period of the Amendment and the language appears broad enough to cover the Amendment while narrow enough to have given Respondent sufficient notice as to the types of violations that may potentially be alleged.

22-60493.5924

al\legations involving similar types of statements of futility and statements to discourage Section 7 activity.[7]

### E.     Respondent Fails to Demonstrate Any Prejudice

In its Special Appeal, Respondent asserts that the General Counsel has "prejudiced Tesla" without any providing any credible argument.  Respondent has not demonstrated how it will suffer prejudice as the allegations at issue relate to *one* conversation with employees and it has had ample time to prepare its defense before the resumption of the hearing on September 24, 2018.  Moreover, to the extent Respondent argues that it has suffered prejudice because the Regional Director did not issue the Amendment until shortly before the hearing, there exist a plethora of cases involving the adding of additional allegations at the start of hearing, during a hearing, at the conclusion of hearing, and even, in limited circumstances, after a hearing has concluded through post-hearing briefing.[8]  Accordingly, any such contention should be rejected by the Board.

### IV.     CONCLUSION

For the reasons set forth above, the General Counsel respectfully requests that the Board deny Respondent's Request for Special Permission to Appeal from the Judge's Order Denying Respondent's Motion to Dismiss.   However, if the Board permits the Appeal, General Counsel

---

[7] Indeed, Respondent's anti-Union campaign is ongoing.  On August 23, 2018, the Regional Director issued a Complaint in Case 32-CA-220777, alleging that a May 20, 2018 tweet by Mr. Musk violated Section 8(a)(1) of the Act.  On the same day, General Counsel filed a Motion to Consolidate the Complaint with the Second Amended Consolidated Complaint which remains pending before the Judge.

[8] See, e.g., *Folsom Ready Mix, Inc.*, 338 NLRB 1172, fn. 1 (2003); see also, *Rogan Bros. Sanitation, Inc.*, 362 NLRB No. 61, slip op. at 3, fn. 8 (2015), enfd. 651 Fed. Appx. 34 (2d Cir. 2016) (motion to amend granted during hearing); *Remington Lodging & Hospitality, LLC*, 363 NLRB No. 112, slip op. at 1, fn. 1 (2016) (motion to amend granted during hearing); *Stagehands Referral Service*, 347 NLRB 1167 (2006) (motion to amend at the conclusion of hearing); *Roundy's Inc.*, 356 NLRB 126 (2010), enfd. 674 F.3d 638, 646-647 (7th Cir. 2012) (remanding to administrative law judge for additional evidence after the General Counsel alleged a new theory in his post hearing brief).

22-60493.5925

respectfully requests that the Board affirm the Judge's Order and deny Respondent's Request for

*De Novo* Review and its Motion for Judgment as a Matter of Law.

**DATED AT** Oakland, California this 30th day of August 2018.

/s/ Edris W.I. Rodriguez Ritchie

_____

Edris W.I. Rodriguez Ritchie, Field Attorney
Noah Garber, Field Attorney
Counsel for the General Counsel
National Labor Relations Board
Region 32
1301 Clay Street, Suite 300N
Oakland, California 94612-5224

GENERAL COUNSEL'S OPPOSITION TO RESPONDENT'S REQUEST FOR SPECIAL PERMISSION TO APPEAL

22-60493.5926

1  MARGO A. FEINBERG (100655)
   DANIEL E. CURRY (297412)
2  JULIE S. ALARCÓN (316063)
   SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
3  6300 Wilshire Boulevard, Suite 2000
   Los Angeles, California 90048
4  Telephone:   (323) 655-4700
   Fax:   (323) 655-4488
5
6  *Attorneys for Michael Sanchez, Jonathan Galescu, Richard Ortiz, and International Union,*
   *United Automobile, Aerospace And Agricultural Workers Of America, AFL-CIO*
7
8
9                    **UNITED STATES OF AMERICA**

10            **BEFORE THE NATIONAL LABOR RELATIONS BOARD**

11                **SAN FRANCISCO DIVISION OF JUDGES**

12  TESLA, INC.,                          | **Case Nos.**   **32-CA-197020**
                                                          **32-CA-197058**
13              Respondent,                               **32-CA-197091**
                                                          **32-CA-197197**
14      and                                               **32-CA-200530**
                                                          **32-CA-208614**
15  MICHAEL SANCHEZ, an Individual,                       **32-CA-210879**

16              Charging Party,

17      and                               **CHARGING PARTIES' OPPOSITION
                                          TO RESPONDENT'S REQUEST FOR
18  JONATHAN GALESCU, an Individual,      SPECIAL PERMISSION TO APPEAL
                                          ADMINISTRATIVE LAW JUDGE'S
19              Charging Party,           ORDER DENYING RESPONDENT'S
                                          MOTION TO DISMISS, REQUEST FOR
20      and                               DE NOVO REVIEW, AND MOTION FOR
                                          JUDGEMENT AS A MATTER OF LAW**
21  RICHARD ORTIZ, an Individual,

22              Charging Party,

23      and

24  INTERNATIONAL UNION, UNITED
    AUTOMOBILE, AEROSPACE AND
25  AGRICULTURAL WORKERS OF
    AMERICA, AFL-CIO,
26
                Charging Party.
27

28

1       The Charging Parties in Case Nos. 32-CA-197020, *et al.*, oppose Respondent Tesla, Inc.'s

2 August 24, 2018 Request For Special Permission to Appeal Administrative Law Judge's

3 August 10, 2018 Order Denying Respondent's Motion to Dismiss, Request For De Novo Review,

4 and Motion For Judgment As A Matter Of Law for the reasons stated in the General Counsel's

5 August 30, 2018 Opposition.

6       Charging Parties respectfully request that the Board deny Respondent's Request for

7 Special Permission to Appeal from the Judge's Order Denying Respondent's Motion to Dismiss.

8 If, however, the Board permits the Appeal, Charging Parties respectfully request that the Board

9 affirm the Judge's August 10, 2018 Order and deny Respondent's Request for *De Novo* Review

10 and its Motion for Judgment as a Matter of Law.

11

12 DATED:     September 4, 2018     SCHWARTZ, STEINSAPIR, DOHRMANN
                          & SOMMERS LLP

13                              MARGO A. FEINBERG
                             DANIEL E. CURRY

14                              JULIE S. ALARCÓN

15

16                      By _____
                             MARGO A. FEINBERG

17              Attorneys for Charging Parties Michael Sanchez,
            Jonathan Galescu, Richard Ortiz, and International Union,

18          United Automobile, Aerospace and Agricultural Workers of
                     America, AFL-CIO

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE BY MAIL**

RENEE CARNES certifies as follows:

I am employed in the County of Los Angeles, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 6300 Wilshire Boulevard, Suite 2000, Los Angeles, California 90048-5268.

On September 4, 2018, I caused the foregoing document(s) described as **CHARGING PARTIES' OPPOSITION TO RESPONDENT'S REQUEST FOR SPECIAL PERMISSION TO APPEAL ADMINISTRATIVE LAW JUDGE'S ORDER DENYING RESPONDENT'S MOTION TO DISMISS, REQUEST FOR DE NOVO REVIEW, AND MOTION FOR JUDGEMENT AS A MATTER OF LAW** to be served upon the person(s) shown below as follows:

| | |
|---|---|
| Edris W.I. Rodriguez-Ritchie<br>National Labor Relations Board, Region 32<br>1301 Clay Street, Suite 300N<br>Oakland, CA 94612-5224 | Noah J. Garber<br>National Labor Relations Board, Region 32<br>1301 Clay Street, Suite 300N<br>Oakland, CA 94612-5224 |
| Mark Ross, Esq.<br>Sheppard, Mullin, Richter & Hampton LLP<br>Four Embarcadero Center, Suite 17<br>San Francisco, CA 94111-4158 | Administrative Law Judge Amita Tracy<br>National Labor Relations Board<br>Division of Judges<br>901 Market Street, Suite 300<br>San Francisco, CA 94103 |

__X__  placing it (them) for collection and mailing on that same date following the ordinary business practices of Schwartz, Steinsapir, Dohrmann & Sommers LLP, at its place of business, located at 6300 Wilshire Boulevard, Suite 2000, Los Angeles, California 90048-5268. I am readily familiar with the business practices of Schwartz, Steinsapir, Dohrmann & Sommers LLP for collection and processing of correspondence for mailing with the United States Postal Service. Pursuant to said practices the envelope(s) would be deposited with the United States Postal Service that same day, with postage thereon fully prepaid, at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date on the envelope is more than one day after the date of deposit for mailing in the affidavit. (C.C.P. §1013a(3))

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 4, 2018 at Los Angeles, California.

_RENEE CARNES_

ID 326806

1 | MARGO A. FEINBERG (100655)
DANIEL E. CURRY (297412)
2 | JULIE S. ALARCÓN (316063)
SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
3 | 6300 Wilshire Boulevard, Suite 2000
Los Angeles, California 90048
4 | Telephone:  (323) 655-4700
Fax:  (323) 655-4488
5 |

6 | *Attorneys for Michael Sanchez, Jonathan Galescu, Richard Ortiz, and International Union,
United Automobile, Aerospace and Agricultural Workers of America, AFL-CIO*
7 |

8 |

**UNITED STATES OF AMERICA**

9 |

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

10 |

**SAN FRANCISCO DIVISION OF JUDGES**

11 |

| 12 | TESLA, INC., | **Case Nos.** | **32-CA-197020** |
| | | | **32-CA-197058** |
| 13 | Respondent, | | **32-CA-197091** |
| | | | **32-CA-197197** |
| 14 | and | | **32-CA-200530** |
| | | | **32-CA-208614** |
| 15 | MICHAEL SANCHEZ, an Individual, | | **32-CA-210879** |
| 16 | Charging Party, | | |
| 17 | and | **CHARGING PARTIES' BRIEF IN SUPPORT FOR GENERAL COUNSEL'S MOTION TO CONSOLIDATE CASE 32-CA-220777 WITH EXISTING CASES** | |
| 18 | JONATHAN GALESCU, an Individual, | | |
| 19 | Charging Party, | | |
| 20 | and | | |
| 21 | RICHARD ORTIZ, an Individual, | | |
| 22 | Charging Party, | | |
| 23 | and | | |
| 24 | INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND | | |
| 25 | AGRICULTURAL WORKERS OF AMERICA, AFL-CIO, | | |
| 26 | Charging Party. | | |
| 27 | | | |
| 28 | | | |

**I**

**PRELIMINARY STATEMENT**

The General Counsel may move to consolidate an existing case with a related case to have one proceeding in order to avoid unnecessary delay or costs. *Service Employees Union, Local 87,* 324 NLRB 774, 774 (1997). The latest charge in this case presents a textbook case for consolidation.

The most recent charge, Case 32-CA-220777, concerns the same set of operative facts, the same Respondent, Tesla Inc., the same or similar legal issues, and the same witnesses as those in 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-200530, 32-CA-208614, and 32-CA-210879. Compare *Free-Flow Packaging Corp.,* 219 NLRB 925, 932 (1975) to *United States Postal Serv.*, 263 NLRB 357, 367 (1982). The allegations in Case 32-CA-220777 occurred after the existing charges were filed with the National Labor Relations Board and during the pendency of the instant proceedings. In accordance with well-established Board law and practice, the Administrative Law Judge has the authority to consolidate this matter with the pending proceeding. NLRB Rules and Regulations, §§ 102.24 and 102.25; *SEIU Local 87,* 324 NLRB at 775. The General Counsel's Motion to Consolidate should be granted.

**II.**

**OPERATIVE FACTS**

On March 23, 2018, the Region issued its Third Order Consolidating Cases, Second Amended Consolidated Complaint and Notice of Hearing for Cases 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-200530, 32-CA-208614, and 32-CA-210879. On August 23, 2018, the Region issued Complaint in Case 32-CA-220777 alleging that Respondent violated Section 8(a)(1) of the National Labor Relations Act when its Chief Executive Officer tweeted:

> *Nothing stopping Tesla team at our car plant from voting union. Could do tmrw if they wanted. But why pay union dues & give up stock options for nothing? Our safety record is 2X better than when the plant was UAW & everybody already gets healthcare.*

//

1

1   Also on August 23, 2018, the General Counsel duly served and filed a Motion to

2   Consolidate Case 32-CA-220777 with the above referenced consolidated matter currently

3   pending before Administrative Law Judge Amita Tracy.

4        Cases 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-

5   200530, 32-CA-208614, 32-CA-210879 and 32-CA-220777 collectively pertain to

6   Respondent interfering with and restraining the rights of the Charging Parties and of

7   Tesla employees generally under Section 7 of the Act between October 2016 and May

8   2018.  More particularly, those charges allege that Tesla interfered and restrained the

9   Section 7 rights of Michael Sanchez, Jonathan Galescu, Richard Ortiz, and the United

10   Automobile, Aerospace and Agricultural Workers of America by (1) promulgating and

11   disseminating an unlawful Confidentiality Agreement, (2) restraining and coercing off-

12   duty employees who were engaged in leafleting on Respondent's premises,

13   (3) threatening employees with reprisals for engaging in concerted activity,

14   (4) threatening employees with termination if they distributed stickers, leaflets, or

15   pamphlets, (5) attempting to prohibit employees from discussing safety concerns,

16   (6) maintaining and enforcing rules that prevent employees from wearing Union-related

17   insignia, (7) interrogating employees regarding concerted activities, (8) promulgating

18   rules to prohibit workers from engaging in concerted activity, and (9) discharging and

19   disciplining employees who engaged in concerted activities.  The litigation of these cases

20   will require testimony from the same witnesses and will involve the same attorneys and

21   Board agents.

22             **III**

23          **ARGUMENT**

24   **A.   AUTHORITY**

25     The General Counsel may move to consolidate an existing case with related cases, after a

26   hearing has commenced, in order to have one hearing. Rules and Regulations of the National

27   Labor Relations Board, Sections 102.24, 102.25, 102.33(d) and 102.35(a)(8).  Under these same

28   Rules and Regulations, the Administrative Law Judge may issue an order consolidating Case 32-

1  CA-220777 with the currently pending matters.  Section 102.33(d) clearly provides the

2  Administrative Law Judge with the authority to "consolidate or sever proceedings after issuance

3  of a complaint" pursuant to Sections 102.24 and 102.25. *SEIU Local 87,* 324 NLRB at 775.

4      **B.**    **THE ALLEGATIONS IN CASE 32-CA-220777 PERTAIN TO THE SAME SET**

5            **OF OPERATIVE FACTS, THE SAME OR SIMILAR LEGAL ISSUES, AND**

6            **THE SAME WITNESSES AS THOSE IN 32-CA-197020, 32-CA-197058, 32-CA-**

7            **197091, 32-CA-197197, 32-CA-200530, 32-CA-208614, AND 32-CA-210879.**

8      The principle of judicial economy requires that Case 32-CA-220777, with the same operative

9  facts, legal issues, and witnesses as the pending cases, be consolidated and heard at the same time

10  as those cases by the same judge while the same witnesses are available for testimony.  See, e.g.,

11  *Peyton Packing Co.,* 129 NLRB 1358, 1360 (1961); and compare to *United States Postal Serv.,*

12  263 NLRB 357, 367 (denying consolidation involving different units of employees, different

13  factual backgrounds, and different allegations.)  To later re-litigate the allegations arising from

14  the same operative facts would be unfair to Respondent. *Peyton Packing, supra,* at 1360.  The

15  delay and extra cost of re-litigating substantially similar allegations is also unfair to witnesses and

16  to the taxpayers. *Macke Laundry Services Co. of DC,* 190 NLRB 1, 6 (1971).  By contrast,

17  consolidation avoids duplicative and unnecessary expenditures of Board resources. *SEIU*

18  *Local 87,* 324 NLRB at 774.

19      Case 32-CA-220777 involves the same operative facts: the parties, Tesla Inc. and its

20  employees, and the Union, remain the same.  The allegations in Case 32-CA-220777 pertain to

21  the same union organizing drive underway in the pending matter, and impact the same employees

22  at the same facilities.

23      The same legal theories used by the Regional Director in the issuance of 32-CA-220777 also

24  supported the issuance of Complaints in 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-

25  197197, 32-CA-200530, 32-CA-208614, and 32-CA-210879.  Specifically, Case 32-CA-220777

26  accuses Respondent of violations of Section 8(a)(1) of the Act: interfering, restraining, or

27  coercing employees in the exercise of the rights guaranteed by Section 7 through its CEO's threat

28  to remove employee stock options should its workers unionize.

1    Finally, even though the May 20, 2018 tweet occurred during the pendency of these

2    proceedings, it still involves the same witnesses—some of whom were active Tesla employees at

3    the time of the tweet. At all times, Mr. Musk served as the CEO of Tesla. Charging Parties

4    Jonathan Galescu and Jose Moran have yet to testify in the pending proceedings, and both will

5    likely have testimony relevant to the new facts raised in Case 32-CA-220777. Similarly,

6    Charging Party Union's agents will also testify in both matters.

7    That said, there is no distinguishing factual reason to separate Case 32-CA-220777 from the

8    proceedings currently underway. It would be a waste of time and resources not to consolidate

9    Case 32-CA-220777 with the pending matter, and so the General Counsel's motion should be

10   granted.

11   **C.    CONSOLIDATION IS APPROPRIATE EVEN WHEN PROCEEDINGS ARE**

12   **UNDERWAY.**

13   There is no sound argument against consolidation while proceedings are underway—it is

14   commonly done. See e.g., *S.E. Nichols, Inc.,* 284 NLRB 556, 566 (1987); *O'Hare-Midway*

15   *Limousine Service, Inc.*, 295 NLRB 463, 463 (1989); *Foundation for Comprehensive Health*

16   *Services,* 267 NLRB 95, 95 (1983). Indeed, consolidation has been granted even after

17   proceedings have closed. *O'Hare-Midway Limousine Service, Inc.,* at 463; *Foundation for*

18   *Comprehensive Health Services,* at 95.

19   **IV**

20   **CONCLUSION**

21   For all the reasons set forth above Charging Parties request that the motion of the General

22   Counsel to consolidate the proceedings in Case 32-CA-220777 with this matter be granted.

23   DATED:      September 5, 2018      SCHWARTZ, STEINSAPIR, DOHRMANN
                                       & SOMMERS LLP
24                                     MARGO A. FEINBERG
                                       DANIEL E. CURRY
25                                     JULIE S. ALARCÓN

26                                     By _____
                                            MARGO A. FEINBERG
27                                     Attorneys for Charging Parties Michael Sanchez,
                                       Jonathan Galescu, Richard Ortiz, and International Union,
28                                     United Automobile, Aerospace and Agricultural Workers of
                                       America, AFL-CIO

# PROOF OF SERVICE BY MAIL

RENEE CARNES certifies as follows:

I am employed in the County of Los Angeles, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 6300 Wilshire Boulevard, Suite 2000, Los Angeles, California 90048-5268.

On September 5, 2018, I caused the foregoing document(s) described as **CHARGING PARTIES' BRIEF IN SUPPORT FOR GENERAL COUNSEL'S MOTION TO CONSOLIDATE CASE 32-CA-22077 WITH EXISTING CASES** to be served upon the person(s) shown below as follows:

Edris W.I. Rodriguez-Ritchie
National Labor Relations Board, Region 32
1301 Clay Street, Suite 300N
Oakland, CA 94612-5224

Noah J. Garber
National Labor Relations Board, Region 32
1301 Clay Street, Suite 300N
Oakland, CA 94612-5224

Mark Ross, Esq.
Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center, Suite 17
San Francisco, CA 94111-4158

Administrative Law Judge Amita Tracy
National Labor Relations Board
Division of Judges
901 Market Street, Suite 300
San Francisco, CA 94103

__X__ placing it (them) for collection and mailing on that same date following the ordinary business practices of Schwartz, Steinsapir, Dohrmann & Sommers LLP, at its place of business, located at 6300 Wilshire Boulevard, Suite 2000, Los Angeles, California 90048-5268. I am readily familiar with the business practices of Schwartz, Steinsapir, Dohrmann & Sommers LLP for collection and processing of correspondence for mailing with the United States Postal Service. Pursuant to said practices the envelope(s) would be deposited with the United States Postal Service that same day, with postage thereon fully prepaid, at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date on the envelope is more than one day after the date of deposit for mailing in the affidavit. (C.C.P. §1013a(3))

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 5, 2018 at Los Angeles, California.

_RENEE CARNES_

ID 326806

UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| **TESLA, INC.** | Case 32-CA-220777 |
| **and** | |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURE WORKERS OF AMERICA, AFL-CIO** | |

## <u>RESPONDENT TESLA, INC.'S MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................1

II.    FACTS AND PROCEDURAL BACKGROUND..............................................3

III.   SUMMARY JUDGMENT STANDARDS ....................................................6

IV.    ARGUMENT ......................................................................................7

    A.     Mr. Musk's May 20, 2018 Tweet Is Not A Violation Of Section 8(a)(1) Of The NLRA As A Matter Of Law, Because The Tweet Is Privileged Under Section 8(c) ...................................................................................7

        1.     Mr. Musk's Tweet Was A Lawful Prediction Of The Possible Consequences Of Unionization, Outside Of Tesla's Control ...................10

        2.     Without Context, Mr. Musk's Tweet Is Too Isolated And Ambiguous To Constitute A Threat Or Promise Of Benefit .....................13

    B.     Mr. Musk's May 20, 2018 Tweet Is Not A Violation Of Section 8(a)(1) Of The NLRA As A Matter Of Law, Because The Tweet Is Protected By The First Amendment ...................................................................................14

        1.     *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) Does Not Permit Speech Restrictions As Broad As The Regional Director Proposes..........17

        2.     Finding Liability On The Basis Of Mr. Musk's Tweet Restricts Far More Speech Than Necessary To Achieve A Compelling State Interest.....................................................................................20

        3.     The Board Should Read The NLRA In A Manner Consistent With Tesla's And Mr. Musk's Constitutional Rights ........................................20

V.     CONCLUSION....................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Am. Tissue Corp.*
336 NLRB 435 (2001) ....................................................................9

*Ashcroft v. ACLU*
542 U.S. 656 (2004)..................................................................2, 16

*Bd. of Trs. v. Fox*
492 U.S. 469 (1989)....................................................................21

*Benjamin Coal Co. & Empire Coal Co., Inc.*
294 NLRB 572 (1989) ....................................................................8

*Burwell v. Hobby Lobby Stores, Inc.*
134 S. Ct. 2751 (2014)....................................................................16

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*
447 U.S. 557 (1980).....................................................................21

*Citizens United v. FEC*
558 U.S. 310 (2010)..................................................................16, 18

*Dow Chem. Co., Tex. Div. v. NLRB*
660 F.2d 637 (5th Cir. 1981) .............................................................7

*DTR Indus., Inc. v. NLRB*
297 F. App'x 487 (6th Cir. 2008) .........................................................12

*The Earthgrains Co.*
338 NLRB 845 (2003) ....................................................................23

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*
485 U.S. 568 (1988)..............................................................2, 21, 22

*FEC v. Wis. Right to Life, Inc.*
551 U.S. 449 (2007).....................................................................14

*Fla. Steel Corp. v. NLRB*
587 F.2d 735 (5th Cir. 1979) .........................................................7, 23

*Frisby v. Schultz*
487 U.S. 474 (1988).....................................................................18

*Int'l Ass'n of Machinists & Aero. Workers v. Haley*
832 F. Supp. 2d 612 (D.C. Cir. 2011).................................................22, 23

22-60493.5938

*Int'l Ass'n of Machinists v. Street*
  367 U.S. 740 (1961) ...........................................................................2, 21

*KSM Indus., Inc.*
  336 NLRB 133 (2001) ..............................................................................10

*Langdale Forest Products Co.*
  335 NLRB 602 (2001) ..............................................................................11

*Lhoist N. Am. of Tennessee, Inc. & United Mine Workers of Am., Dist. 17*
  362 NLRB No. 110 (2015) ..........................................................................6

*M. S. P. Indus., Inc.*
  222 NLRB 220 (1976) ..............................................................................14

*Michael's Markets of Canterbury, Inc.*
  274 NLRB 826 (1985) ................................................................................8

*Monfort, Inc. v. NLRB*
  1994 WL 121150 (10th Cir. 1994) ...........................................................12

*Montgomery Ward & Co. v. NLRB*
  385 F.2d 760 (8th Cir. 1967) .....................................................................8

*Motor Inn of Perrysburg, Inc. v. NLRB*
  647 F.2d 692 (6th Cir. 1981) ...................................................................23

*New York Times Co. v. Sullivan*
  376 U.S. 254 (1964)...........................................................................14, 20

*New York v. Ferber*
  458 U.S. 747 (1982)..................................................................................20

*NLRB v. Gen. Tel. Directory Co.*
  602 F.2d 912 (9th Cir. 1979) ...................................................................23

*NLRB v. Gissel Packing Co.*
  395 U.S. 575 (1969)........................................................................... passim

*NLRB v. Golub Corp.*
  388 F.2d 921 (2d Cir. 1967).......................................................................8

*NLRB v. Hawthorn Co.*
  404 F.2d 1205 (8th Cir. 1969) ............................................................10, 13

*NLRB v. Lenkurt Elec. Co.*
  438 F.2d 1102 (9th Cir. 1971) ...........................................................8, 10, 12

22-60493.5939

*NLRB v. Monfort, Inc.*
  29 F.3d 525 (10th Cir. 1994) ............................................12

*NLRB v. Pentre Elec., Inc.*
  998 F.2d 363 (6th Cir. 1993) ..............................................8

*NLRB v. Va. Elec. & Power Co.*
  314 U.S. 469 (1941).......................................................1, 15

*NLRB v. Vill. IX, Inc.*
  723 F.2d 1360 (7th Cir. 1983) ............................................9

*Noral Color Corp.*
  276 NLRB 567 (1985) ....................................................11

*Pease Co. v. NLRB*
  666 F.2d 1044 (6th Cir. 1981) ..........................................13

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*
  460 U.S. 37 (1983).........................................................20

*Phoenix Glove Co.*
  268 NLRB 680 (1984) ....................................................14

*R.A.V. v. City of St. Paul*
  505 U.S. 377 (1992).......................................................17

*Reed v. Town of Gilbert*
  135 S. Ct. 2218 (2015)....................................................16

*Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*
  605 F.3d 703 (9th Cir. 2009) ............................................19

*Salvation Army Residence*
  293 NLRB 944 (1989) ....................................................14

*Sears, Roebuck & Co.*
  305 NLRB 193 (1991) ............................................7, 12, 13

*Sec. Walls, LLC & Int'l Union, Sec., Police & Fire Professionals of Am. (Spfpa) & Its Local No. 554*
  361 NLRB 348 (2014) ......................................................6

*Snyder v. Phelps*
  562 U.S. 443 (2011).......................................................2, 15

*St. Louis Car Div. Gen. Steel Indus., Inc. v. NLRB*
  439 F.2d 1145 (8th Cir. 1971) ..........................................13

*TCI Cablevision of Washington, Inc.*
329 NLRB 700 (1999) ....................................................................................11, 12

*Thomas v. Collins*
323 U.S. 516 (1945)........................................................................................1, 15, 22

*Thornhill v. Alabama*
310 U.S. 88 (1940)........................................................................................2, 15

*Trent Tube Co.*
147 NLRB 538 (1964) .....................................................................................8

*Uarco, Inc.*
286 NLRB 55 (1987) ....................................................................................1, 10

*Unifirst Corp.*
346 NLRB 591 (2006) ...................................................................................11

*United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*
355 NLRB 797 (2010) ...................................................................................14, 21

*United Investment Corp.*
249 NLRB 1058 (1980) .................................................................................10

*United States v. Alvarez*
617 F.3d 1198 (9th Cir. 2010) .....................................................................20

*United States v. Stevens*
559 U.S. 460 (2010)........................................................................................17

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*
454 U.S. 464 (1982)........................................................................................14

*Viacom Cablevision*
267 NLRB 1141 (1983) .................................................................................11

*Walgreen Co.*
203 NLRB 177 (1973) ...................................................................................11

*Weather Shield Mfg., Inc., Millwork Div. v. NLRB*
890 F.2d 52 (7th Cir. 1989) .........................................................................10

Federal: Statutes, Rules, Regulations, Constitutional Provisions

Title VII of the Civil Rights Act of 1964.......................................................19

Federal Rules of Civil Procedure
Rule 56(a)........................................................................................................6

22-60493.5941

National Labor Relations Act

   § 7.........................................................................................................................1, 2, 20

   § 8(a)(1) ..................................................................................................... passim

   § 8(b)(4) ...............................................................................................................22

   § 8(c) ......................................................................................................... passim

United States Constitution First Amendment .................................................... passim

Other Authorities

National Labor Relations Board Rules and Regulations,

   § 102.24.................................................................................................................6

Eugene Volokh, Comment, Freedom of Speech and Workplace Harassment,

   39 UCLA L. Rev. 1791 (1992) .........................................................................18, 19

## I.    **INTRODUCTION**

Respondent Tesla, Inc. ("Tesla") herby moves the National Relations Labor Board (the "Board") for summary judgment on the Regional Director for Region 32's (the "Regional Director") August 23, 2018 Complaint charging Tesla with a violation of section 8(a)(1) of the National Labor Relations Act (the "Act" or "NLRA") on the basis of a single statement posted by Tesla's Chief Executive Officer, Elon Musk[1], on his personal Twitter account.  The "tweet" read as follows: "Nothing stopping Tesla team at our car plant from voting union.  Could do so tmrw if they wanted.  But why pay union dues & give up stock options for nothing?  Our safety record is 2X better than when plant was UAW & everybody already gets healthcare."  This statement did not carry any threat of reprisal or force or promise of benefit to any Tesla employee for engaging in or refraining from any activity protected by Section 7 of the Act, and is thus protected by section 8(c) as a matter of law.  To remove any conceivable doubt, Mr. Musk and Tesla provided a subsequent clarification to that effect, thus removing any arguably ambiguity regarding the statement at issue.  *See Uarco, Inc.*, 286 NLRB 55, 58 (1987) ("Both the courts and the Board have long held that statements and written materials must be viewed in context and not in isolation").

Furthermore, a construction of sections 7 and 8(a)(1) of the Act that would make Mr. Musk's tweet an unfair labor practice violates the First Amendment to the United States Constitution.  Under the First Amendment, employers have a firmly established right to communicate their views about unions, collective bargaining, and labor disputes.  *See e.g. NLRB v. Gissel Packing Co.,* 395 U.S. 575, 617-19 (1969); *Thomas v. Collins*, 323 U.S. 516, 537-38 (1945); *NLRB v. Va. Elec. & Power Co.*, 314 U.S. 469, 477 (1941).  Although the Supreme Court has recognized that there are limits to this right in the special context of workplace

---

[1] Mr. Musk is also the Chief Executive Officer of a separate entity, SpaceX.  Toletti Decl., ¶ 3

communications from an employer to an employee, the statement at issue in the Regional Director's Complaint was posted on an individual agent of Tesla's personal Twitter account and not directed to any employee. This statement simply did not threaten or coerce any Tesla employee, or interfere with their section 7 rights. Nor was the statement intended to do so, as Mr. Musk and Tesla subsequently clarified.

A public statement outside of the workplace regarding a matter of public concern cannot serve as the basis for an unfair labor practice finding without running afoul of the constitutional right to think and speak freely. *See Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004) ("the Constitution demands that content-based restrictions on speech be presumed invalid"); *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) ("speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection") (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)); *Thornhill v. Alabama*, 310 U.S. 88, 104 (1940) ("It does not follow that the State in dealing with the evils arising from industrial disputes may impair the effective exercise of the right to discuss freely industrial relations which are matters of public concern"). Because the NLRA must be read in a manner consistent with the Constitution, Sections 7, 8(a)(1), & 8(c) cannot be construed to render Mr. Musk's Twitter statement an unfair labor practice. To do so would clearly run afoul to the First Amendment and constitutional jurisprudence. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems"); *see also Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 749, (1961) ("Federal statutes are to be so construed as to avoid serious doubt of their constitutionality").

Because the facts are not in dispute and the only questions before the Board is a legal one (i.e. whether Mr. Musk's May 20, 2018 tweet is protected by section 8(c) and the First Amendment), Tesla is entitled to summary judgment on the Regional Director's Complaint, which should be dismissed in its entirety.

## II.    FACTS AND PROCEDURAL BACKGROUND

Tesla is a Delaware corporation headquartered in Palo Alto, California that specializes in the design and manufacture of electric vehicles and energy storage systems. Toletti Decl., ¶ 2. Elon Musk is Tesla's Chief Executive Officer. *Id.* at ¶¶ 2-3. Mr. Musk maintains a personal account on the social media website Twitter[2] (@elonmusk), which is separate and distinct from Tesla's official twitter account (@Tesla) that it uses to share information about the company. *Id.* at ¶ 3.

The Charging Party International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO ("UAW") is a labor organization that has been unsuccessfully attempting to persuade employees at Tesla's Fremont, California and Sparks, Nevada facilities to allow it to represent them. *Id.* at ¶ 4.

On May 20, 2018, Mr. Musk posted a photo of a rocket made by a different company he heads to his personal Twitter account. *Id.* at ¶ 5. The photo generated a large number of responses from other Twitter users. One user, @dmatkins tweeted a link to an article titled "Report: Tesla Factory Workers Are In Danger Because Elon Musk Hates the Color Yellow." *Id.* Excluding irrelevant tweets, the following exchange took place:

> @elonmusk:    Tesla factory literally has miles of painted yellow lines & tape. Report about forklifts not beeping is also bs. These are both demonstrably false, but were reported as 'facts' by Reveal."

---

[2] Twitter permits users to post short messages, called "tweets," on its website which can then be read by the public. Tweets can either be posted on their own or as a reply to another user's tweet.

@dmatkins137:        Yellow is fine, got it. How about unions? (replying to @elonmusk)

@elonmusk:           Nothing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted.  But why pay union dues & give up stock options for nothing?  Our safety record is 2X better than when plant was UAW & everybody already gets healthcare. (replying to @dmatkins137)

*Id.* at ¶ 5, Exh. 1.

On May 22, 2018, the thread is picked up by another Twitter account (@ericbrownzzz),

which wrote:

@ericbrownzzz:       Hi Elon, why would they lose stock options?  Are you threatening to take away benefits from unionized workers? (replying to @elonmusk & @dmatkins137)

Mr. Musk responded:

@elonmusk:           **No, UAW does that**. They want divisiveness & enforcement of 2 class "lords & commoners" system.  That sucks.  US fought War of Independence to get *rid* of a 2 class system!  Managers & workers shd be equal w easy movement either way.  Managing sucks btw.  Hate doing it so much. (replying to @ericbrownzzz & @dmatkins137)

*Id.* at ¶ 6, Exh. 2 (emphasis added).

One day later, on May 23, 2018, the following Twitter exchange occurred:

@ParkerMalloy:       Should you let your workers unionize? (replying to @elonmusk)

@elonmusk:           I've never stopped a union vote nor removed a union. UAW abandoned this factory.  Tesla arrived & gave people back their jobs. They haven't forgotten UAW betrayed them. That's why UAW can't even get people to attend a free BBQ, let alone enough sigs for a vote. (replying to @ParkerMalloy)

@JackallisonLOL:     Yesterday you said they'd lose stock options if they unionized. (Replying to @elonmusk & @ParkerMolloy)

@AltWouss:              You took that out of context, he clarified that in a response where he believed that UAW does not allow union workers to own stock. (replying to @elonmusk, @jackallisonLOL, & @ParkerMalloy)

@elonmusk:              **Exactly. UAW does not have individual stock ownership as part of the compensation at any other company.** (replying to @AltWouss, @jackallisonLOL, & @ParkerMolloy)[3]

*Id.* at ¶¶ 7-8, Exhs. 3-4 (emphasis added).

The twitter exchanges above were reported by several major media outlets. *Id.* at ¶ 9.

Tesla issued a press statement in response explaining:

"Elon [Musk]'s tweet was simply a recognition of the fact that unlike Tesla, we're not aware of a single UAW-represented automaker that provides stock options or restricted stock units to their production employees, and UAW organizers have consistently dismissed the value of Tesla equity as part of our compensation package. We fundamentally believe it's critical that all employees be owners of Tesla so that everyone is on the same team, with all sharing in the company's success." *Id.*

On May 23, 2018, the UAW filed a charge with the Board alleging that an excerpt from Mr. Musk's May 20, 2018 tweet refencing stock opinions and union dues was an unlawful threat by Tesla to take away employee stock options in retaliation for Tesla employees engaging in union activity. *Id.* at ¶ 10, Exh. 5. The UAW's charge did not reference Mr. Musk's subsequent tweet stating "**No**, UAW does that" in response to the question "Hi Elon, why would they lose stock options? Are you threatening to take away benefits from unionized workers?" *Id.* at ¶ 6, Exh. 2 (emphasis added). The UAW's charge also omitted the critical fact that when another Twitter user on May 23, 2018 stated "You took that out of context, he clarified that in a response where he believed that UAW does not allow union workers to own stock," Mr. Musk responded "**Exactly**. UAW does not have individual stock ownership as part of the compensation at any other company." *Id.* at ¶ 8, Exh. 4 (emphasis added).

_____

[3] There is no evidence, and Mr. Musk had no reason to believe, that any of the Twitter users in these exchanges were ever Tesla employees.

The Regional Director issued a Complaint on August 23, 2018 alleging that Tesla violated Section 8(a)(1) of NLRA by virtue of Mr. Musk's May 20, 2018 tweet. *Id.* at ¶ 11, Exh. 5. No other claims are alleged. The Regional Director's Complaint omits all of the relevant context of Mr. Musk's tweet, including his subsequent tweets and Tesla's press release stating that Mr. Musk did not threaten union workers with a loss of stock options and that he was simply acknowledging the fact that no UAW contract provides for stock options and that its organizers have dismissed the value of Tesla's equity compensation. *Id.*

## III.    **SUMMARY JUDGMENT STANDARDS**

Section 102.24 of the Board's Rules and Regulations permit a party to file a motion for summary judgment following the filing of a Complaint. Summary judgment is properly granted when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Sec. Walls, LLC & Int'l Union, Sec., Police & Fire Professionals of Am. (Spfpa) & Its Local No. 554*, 361 NLRB 348 (2014) (quoting *Conoco Chemicals Co.*, 275 NLRB 39, 40 (1985)). The Board's summary judgment standard "is identical to the summary judgment standard applicable under the Federal rules." *Lhoist N. Am. of Tennessee, Inc. & United Mine Workers of Am., Dist. 17*, 362 NLRB No. 110 (2015) (M. Miscimarra, concurring); *see also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"). In Board proceedings, "summary judgment should be 'properly regarded not as a disfavored procedural shortcut,' but 'as an integral part' of a process designed 'to secure the just, speedy and inexpensive determination of every action.'" *Lhoist*, 362 NLRB No. 110 (M. Miscimarra, concurring) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).

In opposing a motion for summary judgment, the General Counsel may not rely on "conclusory assertions that summary judgment should be denied" and must instead "identify what genuine disputes as to material facts, if any, warrant a hearing." *Id.* Furthermore, the mere fact that the respondent denies the allegations in a complaint is not grounds to deny a summary judgment motion. *Id.*

The interpretation and construction of a written communication and whether it forms an unfair labor practice are questions of law. *Fla. Steel Corp. v. NLRB*, 587 F.2d 735, 751 (5th Cir. 1979).

## IV.    ARGUMENT

### A.    Mr. Musk's May 20, 2018 Tweet Is Not A Violation Of Section 8(a)(1) Of The NLRA As A Matter Of Law, Because The Tweet Is Privileged Under Section 8(c)

Section 8(c) of the NLRA provides:

> "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c)

Under section 8(c), an employer is free "to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.'" *Gissel*, 395 U.S. at 618. Furthermore, an employer "may even make a prediction as to the precise effects he believes unionization will have on his company." *Id.* Section 8(c) "at an irreducible minimum protects the right of an employer to state its views, argument, or opinion, and to make truthful statements of existing facts." *Dow Chem. Co., Tex. Div. v. NLRB*, 660 F.2d 637, 644-45 (5th Cir. 1981). Thus, "[a]ny company has a perfect right to be opposed to a union, and such opposition is not an unfair labor practice." *Fla. Steel Corp.*, 587 F.2d at 753; *see also Sears, Roebuck & Co.*,

305 NLRB 193, 193 (1991) ("Words of disparagement alone concerning a union or its officials are insufficient for finding a violation of Section 8(a)(1)."). "Only if respondent's words contain[] a 'threat of reprisal' d[o] they go beyond the bounds of" section 8(c) and a "threat of reprisal…means not a prediction that adverse consequences will develop but a threat that they will be deliberately inflicted in return for an injury." *NLRB v. Golub Corp.*, 388 F.2d 921, 928 (2d Cir. 1967).

Section 8(c) reflects a congressional policy that speech about the merits and demerits of unions and collective bargaining "should be vigorous and uninhibited." *NLRB v. Lenkurt Elec. Co.*, 438 F.2d 1102, 1108 (9th Cir. 1971); *see also Trent Tube Co.*, 147 NLRB 538, 541 (1964) ("The Board…will not restrict the right of any party to inform employees of 'the advantages and disadvantages of unions and of joining them' as long as such information is imparted to employees in a noncoercive manner."). The Board has recognized that "[i]t is highly desirable that the employees involved in a union campaign hear all sides of the question in order that they may exercise the informed and reasoned choice that is their right to make." *Michael's Markets of Canterbury, Inc.*, 274 NLRB 826, 826 (1985).

Both the Board and the Courts of Appeal have held that section 8(c) must be given a broad construction. *See e.g. Montgomery Ward & Co. v. NLRB*, 385 F.2d 760, 763 (8th Cir. 1967) ("The right of free speech guaranteed by the First Amendment and § 8(c) of the Act should not be defeated by narrow or strained construction."); *Lenkurt*, 438 F.2d at 1008; *Michael's Markets of Canterbury, Inc.*, 274 NLRB 826, 826 (1985). Additionally, "an employer's predictions of adverse economic consequences are to be deemed presumptively truthful" and the Board bears "the burden of showing that section 8(c) does not protect an employer's predictions of the consequences of unionization when the employer asserts section

8(c) as a defense." *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 371 (6th Cir. 1993); *see also Benjamin Coal Co. & Empire Coal Co., Inc.*, 294 NLRB 572, 581 (1989). An employer raising section 8(c) as a defense need not submit evidence substantiating its predictions of the economic effects of unionization. *Pentre Elec.*, 998 F.2d at 371 ("Requiring an employer to present…evidence to corroborate its predictions would, in our mind, defeat the integral purpose of section 8(c)"); *NLRB v. Vill. IX, Inc.*, 723 F.2d 1360, 1368 (7th Cir. 1983) ("we do not read *Gissel* to require the employer to develop detailed advance substantiation" of predictions of the consequences of unionization).

In this proceeding, the conduct that the Regional Director's Complaint alleges violates section 8(a)(1) of the NLRA is Mr. Musk's May 20, 2018 tweet from his *private* Twitter account *directed to a non-Tesla employee* stating that there is "[n]othing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues & give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets healthcare." Toletti Decl., ¶ 11, Exh. 6 at ¶¶ 6-7. This statement is plainly an expression of "views, argument, or opinion" and therefore protected by section 8(c) unless it contains a "threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). The Complaint is silent as to what the Regional Director believes Mr. Musk's opinion shared on Twitter is a "threat" or "promise" to do, but the UAW's charge claimed that Tesla "threaten[ed] to take away employee stock options in retaliation for Tesla employees engaging in protected union activity" by virtue of Mr. Musk's opinion. Toletti Decl., ¶ 11, Exh. 5. This is simply not a rational construction of Mr. Musk's tweet, particularly in light of his and Tesla's subsequent clarifications.

**1.    Mr. Musk's Tweet Was A Lawful Prediction Of The Possible Consequences Of Unionization, Outside Of Tesla's Control**

The Board has repeatedly held that in determining whether an employer's statement is protected by section 8(c) or constitutes a violation of section 8(a)(1), the entire course of conduct must be considered.  *See e.g. Am. Tissue Corp.*, 336 NLRB 435, 442 (2001) ("In determining whether questioned statements are permissible under Section 8(c), the statements must be considered in the context in which they were made and in view of the totality of the employer's conduct."); *KSM Indus., Inc.*, 336 NLRB 133, 133 (2001) ("The Board considers the totality of circumstances in assessing the reasonable tendency of an ambiguous statement or a veiled threat to coerce."); *United Investment Corp.*, 249 NLRB 1058, 1063 (1980) ("in order to evaluate the statements in question, they must be viewed in context"); *Uarco, Inc.*, 286 NLRB at 58 ("Both the courts and the Board have long held that statements and written materials must be viewed in context and not in isolation.").  The Ninth Circuit has also held that "[i]n determining whether an employer's communications constitute permissible argument or prohibited threats, the statements must be considered in the context of the factual background in which they were made, and in view of the totality of employer conduct."  *Lenkurt*, 438 F.2d at 1107.  The Seventh Circuit articulated the rule as: "It is not sufficient that bits and pieces of statements may be later lifted out of context, that the facts and circumstances under which the statements were made and which were known to the employer/employees may be ignored, and that these bits and pieces may then be viewed in vacua as either promises or non-promises."  *Weather Shield Mfg., Inc., Millwork Div. v. NLRB*, 890 F.2d 52, 60 (7th Cir. 1989); *see also NLRB v. Hawthorn Co.*, 404 F.2d 1205, 1212 (8th Cir. 1969) ("speech need not be viewed in a vacuum devoid of the circumstances in which it was uttered").

Here, when Mr. Musk was asked directly by Twitter user @ericbrownzzz "why would they lose stock options? Are you threatening to take away benefits from unionized workers," he responded "**No**, UAW does that." Toletti Decl., ¶ 6, Exh. 2 (emphasis added). When Twitter user @AltWouss stated a few days later "You took that out of context, he clarified that in a response where he believed that UAW does not allow union workers to own stock," Mr. Musk replied "**Exactly.** UAW does not have individual stock ownership as part of the compensation at any other company." *Id.* at ¶ 8, Exh. 4. Thus, when the entire context of Mr. Musk's tweets are considered (all omitted from the Regional Director's Complaint and UAW's charge), it is beyond dispute that his May 20, 2018 tweet was a lawful predication of the consequences of unionization (i.e. that the UAW would not permit stock options as part of represented employees' compensation package), not a threat.[4] Tesla's press release reiterated that Mr. Musk's "tweet was simply a recognition of the fact that unlike Tesla, we're not aware of a single UAW-represented automaker that provides stock options or restricted stock units to their production employees, and UAW organizers have consistently dismissed the value of Tesla equity as part of our compensation package," further demonstrates that there was no express or implied threat or promise of benefit in the tweet at issue. *Id.* at ¶ 9.

An employer is permitted to make comparisons between the compensation of unionized workers and non-unionized workers and "may offer an opinion, based on such comparisons, that employees would be better off without a union." *Unifirst Corp.*, 346 NLRB 591, 593 (2006); *see also Langdale Forest Products Co.*, 335 NLRB 602, 602 (2001) ("An employer has a right to compare wages and benefits at its nonunion facilities with those received at its unionized locations"); *Viacom Cablevision*, 267 NLRB 1141 (1983); *Walgreen Co.*, 203 NLRB 177, 181

---

[4] The UAW is the only union actively trying to persuade Tesla employees to unionize, so Mr. Musk's May 20, 2018 tweet could not have been referring to the predicted consequences of Tesla's employees "voting union" for some other labor organization.

(1973). This lawful message is the only reasonable interpretation of Mr. Musk's May 20, 2018 tweet, when its full context is considered. Indeed, the facts of this proceeding are similar to *Noral Color Corp.*, 276 NLRB 567, 570 (1985), in which the Board held that an employer's statement during a decertification campaign that a stock option plan was available to nonunion employees, and that the union had opposed represented employees' inclusion in the plan, was protected by section 8(c). Similarly, the employer in *TCI Cablevision of Washington, Inc.*, 329 NLRB 700, 700-701 (1999) was permitted to report that its nonunion employees received a 401(k) benefit and that in the past the relevant union "had not successfully negotiated for this benefit."

The Courts of Appeal have reached similar conclusion as the Board. The Ninth Circuit held in *Lenkurt*, 438 F.2d at 1107 that "predictions of possible disadvantages which might arise from economic necessity or because of union demands or union policies" are fully protected by section 8(c). In the tweet at issue here, Mr. Musk simply predicted a disadvantage for employees based on the UAW's policies and likely demands regarding stock options. In *Monfort, Inc. v. NLRB*, 1994 WL 121150, at *16 (10th Cir. 1994), a special master appointed by the Tenth Circuit to determine compliance with a prior judgment found that section 8(c) protected an employer's right to display banners and hand out leaflets stating "Protect Your Profit Sharing. Vote No." The special master held that the employer's challenged statements "simply reiterated the major theme of [the employer]'s response to the Union campaign: namely, that the [union] would not vigorously support profit sharing in contract negotiations, and therefore, a Union victory would place the profit sharing program in grave jeopardy." *Id.*, *aff'd by NLRB v. Monfort, Inc.*, 29 F.3d 525 (10th Cir. 1994). The employer's protected expression in *Monfort* is

remarkably similar to Mr. Musk's challenged tweet in that they both suggested that employees could lose a benefit as a result of unionization because the union does not value that benefit.

Furthermore, "only a statement that 'conveys that the employer will act on its own initiative to punish its employees as the result of anti-union animus' falls outside § 8(c)'s protective scope." *DTR Indus., Inc. v. NLRB*, 297 F. App'x 487, 499 (6th Cir. 2008).  For this reason, "it is well established that in order for a party to make a threat in violation of Section 8(a)(1) the action threatened must be within its power to carry out." *Sears,* 305 NLRB at 193.  In this proceeding Mr. Musk made clear his view that "UAW does that [not allow stock options]" and that "UAW does not have individual stock ownership as part of the compensation at any other company."  Toletti Decl., ¶¶ 6 & 8, Exhs. 2 & 4.  Because these are predictions of what the UAW will do, not Tesla, they are protected.  *Cf. Sears,* 305 NLRB at 193 (employer's predictions of violent activity ascribed to unions protected because no threatened actions by employer); *Hawthorn Co.*, 404 F.2d at 1213-14 ("Although § 8(c) does not protect threats of company force or reprisal, it has not been construed to deny protection to forecasts of dire consequences caused by third parties").

### 2.    Without Context, Mr. Musk's Tweet Is Too Isolated And Ambiguous To Constitute A Threat Or Promise Of Benefit

Even if the Board were to analyze Mr. Musk's tweet stripped of its context and subsequent clarifications, it would not constitute unfair labor practice because it is too isolated and ambiguous to escape the protective shield of section 8(c).  Facially, the tweet does not promise or threaten anything; it asks the rhetorical question "why pay union dues & give up stock options for nothing?"  Toletti Decl., ¶ 5, Exh. 1.  Nothing in the tweet itself indicates how or why Tesla employees might "give up stock option," although Mr. Musk and Tesla later

clarified it is because UAW represented employees at other auto manufacturers do not receive stock options as part of their compensation.  Toletti Decl., ¶¶ 6 & 8, Exhs. 2 & 4.

When a statement, like Mr. Musk's tweet, is ambiguous and "an innocent interpretation is clearly consistent with the words used, while a threat is present only by a strained interpretation," the statement is protected.  *Pease Co. v. NLRB*, 666 F.2d 1044, 1048 (6th Cir. 1981).  The Board and Courts of Appeal have repeatedly affirmed the principle that isolated unclear statements cannot form the basis of section 8(a)(1) violation.  *See e.g. St. Louis Car Div. Gen. Steel Indus., Inc. v. NLRB*, 439 F.2d 1145, 1148 (8th Cir. 1971) ("trivial and ambiguous conversations between the employer and an employee cannot form the basis of a § 8(a) (1) violation"); *Phoenix Glove Co.*, 268 NLRB 680, 680 (1984) (statement that employees did not need a union and would be "messing up" if they got one "too vague and ambiguous to rise to the level of a violation of the Act"); *Salvation Army Residence*, 293 NLRB 944, 965 (1989) (employer's statement that it was going to be "rough" if the union was selected was too vague to constitute a threat of force or reprisal); *M. S. P. Indus., Inc.*, 222 N.L.R.B. 220, 241 (1976) (employer's statement that it would "operate its business as it pleased" if union won election "too ambiguous to warrant a finding of interference, restraint, or coercion").

Therefore, Mr. Musk's May 20, 2018 tweet is fully protected by section 8(c) even if it is analyzed in isolation.

**B.    Mr. Musk's May 20, 2018 Tweet Is Not A Violation Of Section 8(a)(1) Of The NLRA As A Matter Of Law, Because The Tweet Is Protected By The First Amendment**

The free speech clause of the First Amendment to the United States Constitution provides that "Congress shall make no law…abridging the freedom of speech." U.S. Const. amend I. "The First Amendment binds the Government as a whole, regardless of which branch is at work in a particular instance," including the Board. *Valley Forge Christian Coll. v. Ams. United for*

*Separation of Church & State*, 454 U.S. 464, 511 (1982); *see also United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*, 355 NLRB 797, 807 n.35 (2010).  The First Amendment embodies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  When interpreting the First Amendment's free speech guarantee, courts "must give the benefit of any doubt to protecting rather than stifling speech." *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 469 (2007).

In *Thornhill v. Alabama*, 310 U.S. 88, 103-04 (1940), the Supreme Court held that the subject of labor relations is a matter of public concern and speech on the topic is protected by the First Amendment.  *Cf. Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) ("Speech on matters of public concern is at the heart of the First Amendment's protection.") (quotations omitted). *Thornhill* held "[i]t does not follow that the [Government] in dealing with the evils arising from industrial disputes may impair the effective exercise of the right to discuss freely industrial relations which are matters of public concern." *Thornhill*, 310 U.S. at 104.  A few years later, the Supreme Court held in *NLRB v. Va. Elec. & Power Co.*, 314 U.S. 469, 477 (1941) that the First Amendment protects an employer's right to express "its view on labor policies or problems" and that an employer is "free now as ever to take any side it may choose on this controversial issue."  Continuing this trend, the Supreme Court in *Thomas v. Collins*, 323 U.S. 516, 537 (1945) held that "[t]he right [] to discuss, and inform people concerning, the advantages and disadvantages of unions and joining them is protected not only as part of free speech, but as part of free assembly." *Thomas* made clear that "employers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guaranty" and that employer speech on this topic is entitled to "the same protection" as employee speech.  *Id.* at

537-38.  And in *Gissel*, 395 U.S. at 617, the Supreme Court again affirmed "an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board" and held that section 8(c) serves to "implement" that right.

Under these principles, imposing liability on Tesla on the basis of Mr. Musk's May 20, 2018 tweet would violate the First Amendment.[5]  In contrast to most of the Board's decisions analyzing the scope of sections 8(a)(1) and 8(c) when an employer's speech is at issue, this proceeding does *not* involve employer speech at the workplace directed to employees.  The Regional Director in its Complaint is instead proposing that section 8(a)(1) liability should be imposed on Tesla simply because one of its officers used a personal Twitter account to make an ambiguous (later clarified as innocuous) comment on an issue of public concern outside of the workplace and not directed to any employee of Tesla.  The implications of the Regional Director's theory are startling.  If Tesla could be found responsible for an unfair labor practice on the basis of Mr. Musk's tweet, then every manager of every company will need to be cautious of what they say in any public setting outside of work lest someone get the idea that their speech might conceivably be construed as a section 8(a)(1) violation.

The First Amendment demands much more.  "[T]he Constitution demands that content-based restrictions on speech be presumed invalid…and that the Government bear the burden of showing their constitutionality."  *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004).  Unless a content

---

[5] Tesla is not entitled to any lesser First Amendment protections because it is organized as a corporation.  *See Citizens United v. FEC*, 558 U.S. 310, 343 (2010) ("The Court has [] rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'").  In *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2768 (2014), the Court explained that permitting corporations to assert personal rights "protects the [] liberty of the humans who own and control those companies" because "[c]orporations, 'separate and apart from' the human beings who own, run, and are employed by them, cannot do anything at all."  The Complaint at issue here is an ideal illustration of this principle as the Regional Director seeks to impose liability on Tesla as a means to censor Mr. Musk's personal speech.

based speech restriction[6] falls within a traditional categorical exception to the First Amendment or satisfies the strict scrutiny test, the restriction is unconstitutional. *See R.A.V. v. City of St. Paul,* 505 U.S. 377, 382-383 (1992). In *United States v. Stevens*, 559 U.S. 460, 470-71 (2010), the Supreme Court enumerated the traditional categorical exceptions to the ban on content-based speech restrictions. They are: obscenity, defamation, fraud, incitement, speech integral to criminal conduct, and child pornography. *Id.* Notably absent from this list in an exception for speech by an employer on labor relations. *Stevens* held that additional categories of unprotected speech cannot be recognized unless they are rooted in history and rejected the idea that "[w]hether a given category of speech enjoys First Amendment protection depends upon a categorical balancing of the value of the speech against its societal costs." *Id.* at 470. The Supreme Court held that this proposition "is startling and dangerous" and that "[t]he First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits." *Id.*

    1.    ***NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) Does Not Permit Speech Restrictions As Broad As The Regional Director Proposes**

While generally affirming an employer right to speak on labor issues, the Supreme Court in *Gissel* suggested that employer to employee workplace speech might face greater restrictions than similar speech in other contexts because of "the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Gissel*, 395 U.S. at 617. *Gissel* held "any assessment of the precise scope of

---

[6] "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). A speech restriction may also be content-based if it cannot "justified without reference to the content of the regulated speech" or was adopted by the government "because of disagreement with the message [the speech] conveys." *Id.* (quoting *Ward v. Rock Against Racism*, 491 U. S. 781, 791 (1989)). The Regional Director's attempted censorship of Mr. Musk's May 20, 2018 tweet is clearly a content based restriction because the purported justification for the restriction is the alleged meaning of Mr. Musk's words.

employer expression, of course, must be made in the context of its labor relations setting." *Id.*
To the extent *Gissel* recognized some form of diminished First Amendment protection for
employer speech, the rationale is clearly inapplicable to Mr. Musk's tweets. Mr. Musk's tweet
was not directed at any employees and was not made at the workplace. In this context, there is
no "dependency" between Mr. Musk and his audience and no concern that the audience might
"pick up intended implications." *See* Eugene Volokh, Comment, Freedom of Speech and
Workplace Harassment, 39 UCLA L. Rev. 1791, 1849-55 (1992) ("*Gissel* was based on the
premise that employers' speech is inherently more threatening to employees than the same
statements made in other contexts…").

    *Gissel* had also noted that in the context of direct employer to employee workplace
speech "what is basically at stake is the establishment of a nonpermanent, limited relationship
between the employer, his economically dependent employee and his union agent, not the
election of legislators or the enactment of legislation whereby that relationship is ultimately
defined and where the independent voter may be freer to listen more objectively and employers
as a class freer to talk." *Id.* at 617-18. The context of Mr. Musk's public tweet is far more like
the second example described in *Gissel* than the first.

    Further, the mere fact that some employees of Tesla hypothetically could have seen Mr.
Musk's tweet does not take it outside the protection of the First Amendment. If this were the
law, it would subject all of Mr. Musk's tweets and public statements to the *Gissel* standard of
scrutiny, which is a substantially overbroad burden on Mr. Musk's right to speak his mind in
light of *Gisell's* justification for subjecting employer to employee workplace speech to
diminished protection. *See Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (a content based speech

restriction is constitutional only "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy.").[7]

In similar contexts, courts have recognized the First Amendment problem with imposing liability on the basis of public speech on a matter of public concern simply because some particular individuals will hear the speaker and be adversely affected.  For example in *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703 (9th Cir. 2009), the Ninth Circuit held that a college could not be held liable under Title VII for refusing to discipline a professor who sent allegedly racially harassing emails over the college's email system.  The Ninth Circuit held that because the emails were on matters of public concern and directed to the entire college, "not racial insults or sexual advances directed at particular individuals," they were fully protected by the first amendment.  *Id.* at 710 ("Kehowski's website and emails were pure speech; they were the effective equivalent of standing on a soap box in a campus quadrangle and speaking to all within earshot"); *see also* Volokh, 39 UCLA L. Rev. 1791 (arguing that liability for workplace harassment based on speech can only be constitutionally imposed on the basis of speech directed at particular individuals).

The rationale of *Rodriguez* is applicable to the Regional Director's Complaint here.  As in *Rodriquez*, the Regional Director seeks to impose liability on Tesla for a widely broadcasted statement on a matter of public concern, not a directly threatening or harassing communication to an employee.  And as in *Rodriguez*, the First Amendment's protections are not overcome simply because some employees might come across the widely broadcast statements and potentially feel

---

[7] Another constitutional problem with premising a violation of section 8(a)(1) on Mr. Musk's May 20, 2018 public tweet is that he would indisputably been permitted to tweet the same exact message if he were not an officer of an employer.  This disparate treatment constitutes impermissible discrimination on the basis of the identity of the speaker.  *Citizens United v. FEC*, 558 U.S. 310, 340 (2010) ("Prohibited…are restrictions distinguishing among different speakers, allowing speech by some but not others.").

threatened or harassed.  To impose liability on Tesla in this scenario stretches the rationale of *Gissel* past its breaking point and violates the First Amendment.

**2.**     **Finding Liability On The Basis Of Mr. Musk's Tweet Restricts Far More Speech Than Necessary To Achieve A Compelling State Interest**

In order for a content based speech restriction to survive the strict scrutiny test, the government "must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *see also United States v. Alvarez*, 567 U.S. 709 (2012).  As noted above, construing sections 8(a)(1) and 8(c) to impose liability on Tesla for Mr. Musk's May 20, 2018 tweet prohibits substantially more speech than necessary to active the objectives of the NLRA, because the tweet was transmitted outside the workplace to the general public and the vast majority of the readers are not persons protected by the Act.  For these reasons, a construction of the NLRA that would make Mr. Musk's tweet an unfair labor practice on the part of Tesla sweeps much too broadly and fails to satisfy the strict scrutiny test for content based speech restrictions.[8]

**3.**     **The Board Should Read The NLRA In A Manner Consistent With Tesla's And Mr. Musk's Constitutional Rights**

A basic principle of statutory construction is that "[f]ederal statutes are to be so construed as to avoid serious doubt of their constitutionality."  *Int'l Ass'n of Machinists*, 367 U.S. at 749.  This principle has been applied to the NLRA by both the Supreme Court and the Board.

---

[8] The somewhat less exacting standard for commercial speech restrictions is not applicable here, because "the test for identifying commercial speech" is whether the speech "propose[s] a commercial transaction."  *Bd. of Trs. v. Fox*, 492 U.S. 469, 473-74 (1989).  The tweet at issue did not propose any commercial transaction and was not posted by a commercial Twitter account.  Even if Mr. Musk's tweet were construed as commercial speech, it would be fully protected.  Regulations on non-misleading commercial speech regarding a lawful product or activity can be sustained only where the government shows the existence of a substantial government interest, that the regulation in question directly advances that interest, and that the restriction on speech is not more extensive than is necessary to serve that interest.  *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980).  For the reasons explained above, the burden on speech if the Regulation Director's Complaint is successful is much more extensive than is necessary to serve any conceivable substantial government interest.

*DeBartolo*, 485 U.S. at 578 ("where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"); *United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*, 355 NLRB 797, 807 fn 35  (2010) ("We…believe that the Board has the authority, indeed, that the Board has a duty, to construe the Act, if possible, so as not to violate the Constitution.")

As described above, any construction of sections 8(a)(1) and 8(c) of the NLRA that render Mr. Musk's May 20, 2018 tweet an unfair labor practice would be unconstitutional.  The statutes should therefore be construed in the manner Tesla promotes to save their validity.  The Supreme Court in *DeBartolo* applied the constitutional avoidance doctrine in a manner very similar to how Tesla conteds it should be applied here.  In *DeBartolo*, the Supreme Court refused to read section 8(b)(4) of the NLRA to prohibit unions from peacefully handing out handbills to customers at a mall encouraging them to not shop there.  *DeBartolo*, 485 U.S. 568.  The Supreme Court held that the constitutional avoidance rule of statutory interpretation, it could not read section 8(b)(4) to "make an unfair labor practice out of any kind of publicity or communication to the public urging a consumer boycott of employers" and noted that "on the facts of this case, newspaper, radio, and television appeals not to patronize the mall would be prohibited; and it would be an unfair labor practice for unions in their own meetings to urge their members not to shop in the mall."

Like *DeBartolo*, this proceeding also involves an attempt to make a broad swath of protected speech to the general public an unfair labor practice.  Because the free speech rights of employers and unions are coextensive, the Board should construe the NLRA to avoid the

unconscionable application that the Regional Director's Complaint seeks.  *Cf. Thomas*, 323 U.S. at 538 (1945) (employer and employee speech are entitled to "the same protection").

*Int'l Ass'n of Machinists & Aero. Workers v. Haley*, 832 F. Supp. 2d 612  (D.C. Cir. 2011) is also on point.  In *Int'l Ass'n of Machinists & Aero. Workers*, the D.C. Circuit invoked the constitutional avoidance principle to construe the NLRA to not prohibit public anti-union statements by the Governor of South Carolina and the Director of the South Carolina Department of Labor, Licensing and Regulation.  *Id.* at 634 ("In considering whether the defendants' public statements alone are sufficient to violate the NLRA, the Court is mindful that '[f]ederal statutes are to be so construed as to avoid serious doubt of their constitutionality.'").  As in *Int'l Ass'n of Machinists & Aero. Workers*, the Board must avoid a construction of the NLRA that would prohibit public statements.

Several Board and court decisions have in fact interpreted the NLRA in the manner that Tesla contends it must be read, perhaps mindful of the constitutional issues at stake.  For instance, in *NLRB v. Gen. Tel. Directory Co.*, 602 F.2d 912, 918 (9th Cir. 1979) the Board argued that the "test of interference under § 8(a)(1) of the Act does not turn on the employer's motive or whether the coercion is successful or failed," which the Ninth Circuit rejected as a misstatement of the law.  The Ninth Circuit held that its precedents establish that "the focus of inquiry must be upon what the motive of the employer in truth was and not upon what the employees might reasonably (although perhaps mistakenly) have assumed the motive to be…" *Id.* (quoting *Free-Flow Packaging Corp. v. NLRB*, 566 F.2d 1124, 1130 (9th Cir. 1978)). Relatedly, the Fifth Circuit in *Fla. Steel Corp.*, 587 F.2d at 751 held that an employer does not violate section 8(a)(1) of the NLRA when there is "no proof that any employee was *actually* coerced or compelled to do anything, nor that his rights were in any way restrained or interfered

with." (emphasis added). Furthermore, some decisions have held that an employer cannot violate section 8(a)(1) of the NLRA based on a statement not "directed to" current employees nor communicated "with the intention that it be recommunicated to then current employees." *Motor Inn of Perrysburg, Inc. v. NLRB*, 647 F.2d 692, 695 (6th Cir. 1981) ("The evidence does not suggest that this threat was communicated to the former employees with the intention that it be recommunicated to then current employees.  This conduct is clearly not a violation of the Act."); *The Earthgrains Co.*, 338 NLRB 845, 852 (2003) (no section 8(a)(1) violation on the basis of an employer statement when there is "no evidence that this statement was directed to employees or even overheard by any other employee.").

For these reasons, the Board should construe the NLRA to avoid the unconstitutional conclusion that Mr. Musk's May 20, 2018 tweet is violation of section 8(a)(1) of the NLRA.

## V.    **CONCLUSION**

For all of the foregoing reasons, Tesla is entitled to judgment as a matter of law and respectfully requests that the Board grant its motion for summary judgment and dismiss the Regional Director's Complaint in its entirety.

Dated:  September 7, 2018

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____

MARK S. ROSS
JOHN D. ELLIS
KEAHN N. MORRIS
and
JATINDER K. SHARMA
Associate General Counsel of Tesla, Inc.

Attorneys for
TESLA, INC.

<u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California. My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On September 7, 2018, I served a true copy of the following document(s) described as **RESPONDENT TESLA, INC.'S MOTION FOR SUMMARY JUDGMENT** on the interested parties in this action as follows:

Edris W.I. Rodriguez Ritchie
E-mail: edris.rodriguezritchie@nlrb.gov
Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA  94612-5224
T: (510) 671-3041

Noah J. Garber
E-mail: noah.garber@nlrb.gov
Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Suite 300N
Oakland, California 94612
T: (510) 671-3021

Valerie Hardy-Mahoney
E-mail: valerie.hardy-mahoney@nlrb.gov
Regional Director, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA  94612-5224

Administrative Law Judge Amita Tracy
E-mail: Amita.Tracy@nlrb.gov
National Labor Relations Board
Division of Judges
901 Market St., Suite 300
San Francisco, CA 94103
T: (415) 356-5255

Margo Feinberg
E-mail: margo@ssdslaw.com
Daniel E. Curry
E-mail: dec@ssdslaw.com
Julie Alarcon
E-mail: jsa@ssdslaw.com
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Blvd., Suite 2000
Los Angeles, CA 90048
T: (323) 655-4700

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address sasmith@sheppardmullin.com to the person(s) at the e-mail address(es) listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 7, 2018 at San Francisco, California.

Sarah Smith

22-60493.5967

UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| **TESLA, INC.** | Cases 32-CA-197020 |
| | 32-CA-197058 |
| **and** | 32-CA-197091 |
| | 32-CA-197197 |
| **MICHAEL SANCHEZ, an Individual** | 32-CA-200530 |
| | 32-CA-208614 |
| **and** | 32-CA-210879 |
| | |
| **JONATHAN GALESCU, an Individual** | |
| | |
| **and** | |
| | |
| **RICHARD ORTIZ, an Individual** | |
| | |
| **and** | |
| | |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURE WORKERS OF AMERICA, AFL-CIO** | |

### TESLA'S REPLY TO THE GENERAL COUNSEL'S OPPOSITION TO TESLA'S REQUEST FOR SPECIAL PERMISSION TO APPEAL ADMINISTRATIVE LAW JUDGE AMITA B. TRACY'S ORDER DENYING TESLA'S MOTION TO DISMISS AND REQUEST FOR *DE NOVO* REVIEW

22-60493.5968

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ...........................................................................................1

II.     TESLA IS ENTITLED TO JUDGEMENT AS A MATTER OF LAW ............................1

      A.      The General Counsel Concealed Material Facts Regarding the
               Circumstances Surrounding the Issuance of the Amendment ...............................1

      B.      The General Counsel's Argument that the "Closely Related" Test Must be
               Applied Upon Review of the Record Relies on Outdated Case Law
               Decided Before the Board and the Courts Distinguished § 10(b)'s
               Jurisdictional and Temporal Components ..............................................................3

      C.      Unless the Board Exercises its Discretion to Review Tesla's Motion *De
               Novo*, the General Counsel's Concealment of Material Facts and
               Procedural Gamesmanship will Foreclose Meaningful Review of the Legal
               Sufficiency of the Amendment ..............................................................................5

III.    CONCLUSION..............................................................................................7

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Federal Cases</u>

*Carney Hospital*
    350 NLRB 627 (2007) ......................................................................................4

*Columbia Textile Services*
    293 NLRB 1034 (1989) ....................................................................................4

*Drug Plastics*
    44 F.3d 1017 (D.C. Cir. 1995) .......................................................................4, 5

*Heaven*
    290 NLRB 1223 (1988) ....................................................................................4

*Hess Mechanical Corp. v. NLRB*
    112 F.3d 146 (4th Cir.1997) .............................................................................3

*Hyundai America Shipping Agency, Inc. v. NLRB*
    805 F.3d 309 (2015) .........................................................................................5

*Inter-Neighborhood Hous. Corp. v. NLRB.*
    124 F.3d 115 (2d Cir. 1997) .............................................................................3

*Justice Act. Blaylock Elec. v. NLRB.*
    121 F.3d 1230 (9th Cir. 1997) ..........................................................................3

*Libaire v. Kaplan*
    395 Fed. Appx. 732 (2d Cir. 2010) ...................................................................2

*Precision Concrete v. NLRB*
    334 F.3d 88, 90 (D.C. Cir. 2003) ......................................................................4

*Reddi-I*
    290 NLRB 1115 (1988) ....................................................................................4

*Ross Stores, Inc. v. NLRB*
    235 F.3d 669, 677 (D.C. Cir. 2001) ..................................................................4

*Trade Fair Supermarkets*
    354 NLRB 190 (2009) ......................................................................................5

22-60493.5970

<u>Federal: Statutes, Rules, Regulations, Constitutional Provisions</u>

Federal Rules of Civil Procedure
    Rule 11 ...................................................................................................................3

The First Amendment ..........................................................................................3

The NLRA ..............................................................................................................3

The Securities Exchange Act
    § 8(a)(3) ..............................................................................................................3
    § 8(c) ...................................................................................................................3
    § 10(b) ......................................................................................................... passim

National Labor Relations Board's (the Board) Rules and Regulations
    § 102.17................................................................................................................6
    § 102.24(b) ......................................................................................................5, 6
    § 102.25...............................................................................................................5
    § 102.50...............................................................................................................7

<u>Other Authorities</u>

The Casehandling Manual
    § 10062.5..............................................................................................................5

## I.     INTRODUCTION

After steadfastly maintaining that § 10(b) of the Act did not bar the prosecution of the allegations of his untimely Amendment because they were "encapsulated" by any one of several charges filed by the UAW during its nearly two-year-long organizing campaign, the General Counsel finally admits in his Opposition that "the Amendment allegations were not specifically alleged in any charge and not mentioned during the investigation of the charges because…the Amendment was based on evidence discovered after the issuance of the Complaint". Notwithstanding his flagrant violations of the Board's established procedures and his after-the-fact admission that he issued a complaint on uncharged, untimely, uncorroborated and uninvestigated allegations, the General Counsel boldly argues that the Board should decline to exercise its discretion to review Judge Tracy's decision *de novo* based on procedural grounds. Why?  Because "Respondent, a multi-billion dollar company, is not the victim here."  The General Counsel's conduct in this case makes a mockery of the Board's procedures and its precedents and underscores the need for the Board's immediate intervention.

## II.     TESLA IS ENTITLED TO JUDGEMENT AS A MATTER OF LAW

### A.     The General Counsel Concealed Material Facts Regarding the Circumstances Surrounding the Issuance of the Amendment

For the very first time since Tesla filed its Motion on June 11, 2018, the General Counsel disclosed in his opposition that "the Amendment allegations were not specifically alleged in any charge and not mentioned during the investigation of the charges because, as mentioned above, the Amendment was based on evidence discovered after the issuance of the Complaint".  GC's Opp. at 8-9.  He further revealed that "the timing of the amended allegations was based on when the Counsel for the General Counsel discovered these new allegations", and that "[o]nce

uncovered, he moved as expeditiously as possible to amend the complaint."  GC's Opp. at 1, fn. 1.

The factual implications of these admissions are startling.  To the extent that both the General Counsel and the Union unwaveringly opposed Tesla's Motion on the grounds that the allegations of the Amendment were encompassed by timely-filed charges, they did so to establish the existence of disputed material facts knowing full well that the conduct in question was never the subject of *any charge*.  The General Counsel also concealed the fact that the purported evidence supporting the Amendment was not "discovered" until after the issuance of Complaint on March 31, 2018, more than 9 months after the alleged June 7, 2017 meeting which Tesla contended was time-barred by § 10(b).  In the absence of any evidence that Tesla fraudulently concealed the facts of these allegations to support tolling of the 6-month limitations period, the General Counsel nonetheless issued a Complaint on allegations which he *knew were time-barred*.[1]

Finally, to the extent that the allegations of the Amendment were not "mentioned during investigation of the charges" which concluded prior to the issuance of the Complaint, the General Counsel confirmed what Tesla's Motion established—i.e., that he issued a complaint on uncorroborated, uninvestigated allegations that a charging party apparently failed to convey to him until more than a full year after the occurrence of the underlying conduct.  Courts have also repeatedly held that such actions by a General Counsel lack substantial justification and arguably

---

[1] This is arguably a sanctionable offense under Rule 11 of the Federal Rules of Civil Procedure ("Rule 11").  *See, e.g, Libaire v. Kaplan*, 395 Fed. Appx. 732 (2d Cir. 2010) (upholding imposition of Rule 11 sanctions against attorney for maintaining clearly time-barred securities action because attorney filed complaint knowing that the only purchase of an actual security occurred 18 years earlier and failed to disclose that fact in the complaint).

warrant the imposition of sanctions under Rule 11.[2]  In fact, Judge Tracy even reproached the

General Counsel on this very point in her June 7, 2018 order partially granting Tesla's petition to

revoke his subpoena *duces tecum*.  She stated:

> This is an invalid use by the General Counsel of its trial subpoena power for two reasons.  First, we must presume that the General Counsel had sufficient and even significant evidence of animus *before* it issued complaint in this matter, otherwise a crucial and indispensable element of its prima facie case in the alleged Section 8(a)(3) violations would be missing, arguably depriving the General Counsel of its authority to issue complaint on this issue in the first place…Moreover an employer's antiunion views are protected by Section 8(c) of the Act, not to mention the First Amendment, unless these views are expressed in a coercive or threatening manner.

In light of the revelation in his Opposition that he concluded his investigation before

learning of the alleged June 7, 2017 meeting, his undaunted defense of the Amendment in the

face of Judge Tracy's prior admonishment is simply inexcusable.

**B.     The General Counsel's Argument that the "Closely Related" Test Must be Applied Upon Review of the Record Relies on Outdated Case Law Decided Before the Board and the Courts Distinguished § 10(b)'s Jurisdictional and Temporal Components**

Citing to *Reddi-I*, 290 NLRB 1115 (1988), *Heaven*, 290 NLRB 1223 (1988), and

*Columbia Textile Services*, 293 NLRB 1034 (1989), the General Counsel argues that the Board

"must inevitably look at the *entire* record" in its application of the "closely related" test.  GC's

---

[2] *See Hess Mechanical Corp. v. NLRB,* 112 F.3d 146, 150 (4th Cir.1997) (General Counsel's prosecution lacked substantial justification where he "went forward with a complaint on the basis of a single, uncorroborated affidavit and in the face of a wall of adverse evidence. In a civil action with a similar record, this would border on conduct sanctionable under Rule 11."); *see also Inter-Neighborhood Hous. Corp. v. NLRB.,* 124 F.3d 115, 121-122 (2d Cir. 1997) ("While INHOC's liability under the NLRA ultimately may have turned on credibility, as many cases do, this fact alone cannot justify the issuance of the complaint… In light of the evidence contradicting Rodriguez's sworn statements, the General Counsel was not justified in filing the complaint before any attempt was made to resolve the factual conflicts. Rodriguez's testimony was the only testimony supporting the Union's position."); *see also Justice Act. Blaylock Elec. v. NLRB.,* 121 F.3d 1230 (9th Cir. 1997) (noting that the General Counsel has an obligation to investigate prior to filing and pursuing unfair labor practice charges).

Opp. pp. 6-7.  He would apparently have the Board ignore the 30 years' worth of case law since developed by both the Board and the U.S. Courts of Appeal which distinguishes between § 10(b)'s jurisdictional and temporal components and their respective applications in cases involving *uncharged* conduct versus *untimely charged* conduct.  *See Carney Hospital*, 350 NLRB 627, 628 (2007) ("This statutory provision serves 'two separate functions'") (quoting *Precision Concrete v. NLRB*, 334 F.3d 88, 90 (D.C. Cir. 2003) (quoting *Ross Stores, Inc. v. NLRB*, 235 F.3d 669, 677 (D.C. Cir. 2001) (Randolph, J., concurring))).

He further cites to footnote 11 of *Carney Hospital*, 350 NLRB No. 56 (2007)—an *untimely charged* conduct case—as standing for the proposition that the application of the "closely related" test is not limited to the pleadings.  GC's Opp. at 7.  In that footnote, the Board agreed with the D.C. Circuit's holding in *Drug Plastics*, but cited to *Ross Stores* as indicating that the analysis as to whether allegations are "closely related" need not be limited to consideration of the "face of the pleadings in the charge or the complaint, rather than by evidence subsequently compiled at the hearing."  Yet in Judge Randolph's concurrence which the Board quoted in setting forth the distinction between the jurisdictional and temporal components of § 10(b), he distinguished *Drug Plastics* from *Ross Stores* on the basis that *Drug Plastics* "dealt with the jurisdictional condition of the statute" because the charge in *Drug Plastics* "alleged only one instance of an unlawful discharge and did not mention the other six allegations eventually included in the complaint."  *Ross Stores, Inc. v. NLRB*, 235 F.3d 669, 677 (D.C. Cir. 2001) (Randolph, J., concurring) (citing *Drug Plastics*, 44 F.3d 1017, 1018-19 (D.C. Cir. 1995).

Thus, as Tesla explained at lengths in its appeal, it does not contend that the Board may not look beyond the pleadings to conduct the "closely related" test to assess whether *untimely*

*charged* conduct is barred by the temporal component of § 10(b).  Rather, in cases such as *Drug Plastics* and *Hyundai America Shipping Agency, Inc. v. NLRB*, 805 F.3d 309 (2015) where the "closely related" test is applied to assess whether prosecution of *uncharged* conduct is barred by the jurisdictional component of § 10(b), the Board should look no further than the language of the charges and the allegations of the Complaint.  This approach is entirely consistent with Board precedent as well as the Casehandling Manual.  *See, e.g., Trade Fair Supermarkets*, 354 NLRB 190, 192 (2009) ("Having found that the charge does not support the complaint, we also find that the judge erred in failing to dismiss the complaint on that basis."); *see also* section 10062.5 of the Casehandling Manual ("Where the investigation uncovers evidence of unfair labor practices not specified in a charge, Board agents, with appropriate supervision, must determine whether the charge is sufficient to support complaint allegations covering the apparent unfair labor practices found.")

> **C.**      **Unless the Board Exercises its Discretion to Review Tesla's Motion *De Novo*, the General Counsel's Concealment of Material Facts and Procedural Gamesmanship will Foreclose Meaningful Review of the Legal Sufficiency of the Amendment**

The General Counsel argues that the Board should deny Tesla's request for *de novo* review because it is "procedurally defective" insofar as Tesla did not file it with the Board "promptly" after the Regional Director issued the June 4, 2018 Amendment as required by § 102.24(b) of the Board's Rules.  GC's Opp. at 5-6.  He claims that to grant Tesla's request would "render the Section 102.25's requirement that only administrative law judges rule on motions after the opening of a hearing effectively meaningless".  GC's Opp. at 6.  He further submits that "[a]cceding to [Tesla's] requests would only encourage parties to file procedurally defective motions with the Board."  GC's Opp. at 4.

Section 102.24(b) of the Board's Rules provides that, where "no hearing is scheduled, or where the hearing is scheduled less than 28 days *after* the date for filing an answer to the complaint", a motion for summary judgment or dismissal to the Board must be filed "promptly". (emphasis added).  By issuing the Amendment on June 4, 2018—less than 7 days until the June 11, 2018 hearing date, which occurred *before* the date for Tesla to file its answer, the General Counsel foreclosed any opportunity for the Board to directly review the propriety of the Amendment by ruling on a "promptly" filed pre-hearing motion to dismiss pursuant to § 102.24(b).  After leaving Tesla with no option but to file its Motion to Dismiss with Judge Tracy, the General Counsel opposed it on the basis that "an administrative law judge is not empowered with the authority to withdraw a properly issued and noticed amendment to a complaint issued prior to a hearing".  Ex. 3 at p. 1.  He therefore also managed to evade meaningful review of the legal sufficiency of his untimely-issued Amendment by Judge Tracy. *See* Ex. 1, p. 2 ("Under Section 102.17 of the National Labor Relations Board's (the Board) Rules and Regulations, the Regional Director may amend the complaint 'as may be deemed just, prior to the hearing.' As the Regional Director acted within her authority, I have no authority to overturn her decision to amend the complaint.")

Notwithstanding his after-the-fact admissions establishing that he flagrantly disregarded the Board's procedures and concealed material facts from Judge Tracy which established that the Amendment's allegations were uncharged and time-barred, the General Counsel now has the boldness to argue that the Board should deny Tesla's request for *de novo* review on procedural grounds.  Unless the Board grants Tesla's request for *de novo* review, it is the General Counsel— and not Tesla—that will be encouraged to evade meaningful review of procedurally-defective complaint amendments by issuing them less than 14 days prior to a scheduled hearing.  This

result would essentially nullify the Board's procedures which expressly provide for direct review on pre-hearing summary judgment motions and motions to dismiss. Unless the Board is willing to hold that the General Counsel cannot be held accountable for exceeding his jurisdiction and grossly deviating from the Board's case handling manual so long as he does so within two weeks of a noticed hearing, it should exercise its authority to transfer the case to itself pursuant to § 102.50, review Tesla's Motion to Dismiss *de novo*, and remand the case to Judge Tracy for hearing on the remaining, properly asserted allegations of the complaint.

## III. CONCLUSION

The General Counsel's Opposition ignores the 30-years' worth of binding case law which draws a clear distinction between the jurisdictional and temporal components of § 10(b). He accordingly fails to rebut the facts and arguments in Tesla's Appeal which establish that Judge Tracy clearly erred by denying Tesla's Motion to Dismiss for Lack of Jurisdiction. Though the General Counsel's post-hoc admission that he issued a complaint on uncharged, untimely and uncorroborated allegations does not disturb this conclusion, it nonetheless establishes that the Board's immediate intervention is both warranted and necessary to curtail the General Counsel's inexcusable litigation tactics. Accordingly, the June 4 Amendment should and must be dismissed.

Dated: September 7, 2018

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____

MARK S. ROSS
KEAHN N. MORRIS

Attorneys for
TESLA, INC.

<u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California.  My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On September 7, 2018, I served a true copy of the following document(s) described as **TESLA'S REPLY TO THE GENERAL COUNSEL'S OPPOSITION TO TESLA'S REQUEST FOR SPECIAL PERMISSION TO APPEAL ADMINISTRATIVE LAW JUDGE AMITA B. TRACY'S ORDER DENYING TESLA'S MOTION TO DISMISS AND REQUEST FOR *DE NOVO* REVIEW** on the interested parties in this action as follows:

Edris W.I. Rodriguez Ritchie
E-mail: edris.rodriguezritchie@nlrb.gov
Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA  94612-5224
T: (510) 671-3041

Noah J. Garber
E-mail: noah.garber@nlrb.gov
Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Suite 300N
Oakland, California 94612
T: (510) 671-3021

Valerie Hardy-Mahoney
E-mail: valerie.hardy-mahoney@nlrb.gov
Regional Director, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA  94612-5224

Administrative Law Judge Amita Tracy
E-mail: Amita.Tracy@nlrb.gov
National Labor Relations Board
Division of Judges
901 Market St., Suite 300
San Francisco, CA 94103
T: (415) 356-5255

Margo Feinberg
E-mail: margo@ssdslaw.com
Daniel E. Curry
E-mail: dec@ssdslaw.com
Julie Alarcon
E-mail: jsa@ssdslaw.com
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Blvd., Suite 2000
Los Angeles, CA  90048
T: (323) 655-4700

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address sasmith@sheppardmullin.com to the person(s) at the e-mail address(es) listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 7, 2018 at San Francisco, California.

Sarah Smith

22-60493.5980

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES
SAN FRANCISCO BRANCH OFFICE

TESLA, INC.

    and                                         Cases   32-CA-197020
                                                                32-CA-197058

MICHAEL SANCHEZ, an Individual                          32-CA-197091
                                                                32-CA-197197

    and                                         32-CA-200530
                                                                32-CA-208614

JONATHAN GALESCU, an Individual                     32-CA-210879

    and                                          32-CA-220777

RICHARD ORTIZ, an Individual

    and

INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL WORKERS
OF AMERICA, AFL-CIO

## ORDER GRANTING THE GENERAL COUNSEL'S MOTION TO CONSOLIDATE

On August 23, 2018, the General Counsel moved to consolidate complaint allegations in case 32-CA-220777 to the prior consolidated proceeding (cases 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-200530, 32-CA-208614, and 32-CA-210879).  The complaint, also dated August 23, 2018, based on charges filed by the International Union, United Automobile, Aerospace and Agricultural Workers of American, AFL-CIO (the Union) on May 23, 2018 against Tesla, Inc. (Respondent), adds one Section 8(a)(1) allegation regarding a Twitter statement, dated May 20, 2018, by Respondent's Chief Executive Officer Elon Musk (Musk).[1]

---

[1] The complaint lacks a notice of hearing as indicated by Respondent in its September 7, 2018, opposition to the motion to consolidate.  Section 102.15 of the Board's Rules and Regulations states that the complaint should also contain a notice of hearing before an administrative law judge which designates a fixed place and time no sooner than 14 days from the issuance of the complaint.  The Board has held that the purpose of Section 102.15 is to mandate the issuance of a complaint by a Regional Director once he or she has determined the unfair labor practice charge has merit.  *Van Heusen Co.*, 221 NLRB 732, fn. 1 (1975).  As for the reference to the notice of hearing, the Board adopted the administrative law judge's rationale in *Van Heusen Co.* that the notice of hearing need not be issued simultaneously with the issuance of the complaint.  The administrative law judge wrote, "There is no reason, however, to mandate a notice of hearing, and Sec. 102.16 indicates clearly that the date of the hearing is [sic] largely

Pursuant to Sections 102.24, 102.25, 102.33, and 102.35 of the Board's Rules and Regulations, once a trial has opened, any motion for consolidation is made to and ruled on by the trial judge. "The judge has the discretion to determine when consolidation, or severance, of any complaint is warranted, considering such factors as the risk that matters litigated in the first proceeding will have to be relitigated in the second and the likelihood of delay if consolidation, or severance, is granted." *Service Employees Local 87 (Cresleigh Management)*, 324 NLRB 774 775-776 (1997); *Affinity Medical Center*, 364 NLRB No. 66 (2016) (judge did not abuse her discretion in denying the General Counsel's motion to consolidate three new complaints with the existing "highly complex 118-page amended consolidated complaint" given that the old and new allegations were not sufficiently intertwined to require consolidation and could be effectively litigated separately, and consolidation would cause significant delay in the ongoing proceeding); *McDonald's USA, LLC*, 363 NLRB No. 91 (2016) (judge did not abuse her discretion in denying motion to sever consolidated complaints against McDonald's and numerous franchisees and to require separate complaints and hearings for each where the General Counsel alleged that they were joint employers).

Respondent opposes the consolidation, and filed an opposition on September 7, 2018, after I issued an order to show cause with a deadline of the same date. In addition, Respondent filed its answer to the complaint in case 32-CA-220777 admitting all factual allegations but denying the General Counsel's legal conclusions. The hearing in this matter (cases 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-200530, 32-CA-208614, and 32-CA-210879) began on June 11, 2018 in Oakland, California, and adjourned on June 14, 2018, until 9 a.m. on September 24, 2018 in Oakland, California.[2]

In *Affinity Medical Center*, the Board noted that the factors to consider when determining whether to grant a motion to consolidate after a hearing has commenced include the complexity and magnitude of the ongoing consolidated proceedings, the relationship between the current and new allegations, the likelihood of delay if consolidation is granted, the risk that matters litigated would have to be relitigated in a second proceeding, and the potential for conserving resources if the cases were consolidated.

The motion is granted for several reasons considering the above factors. As indicated by the General Counsel, the complaint in case 32-CA-220777 alleges one additional Section 8(a)(1) unlawful statement violation by Respondent. Again, Section 8(a)(1) allegations such as the one at issue in case 32-CA-220777 require an objective analysis, and the subjective perceptions of the employees is not relevant. Thus, this matter should not delay the hearing time already allocated in this matter. In fact, by admitting that the statement was made by Musk, the remaining arguments are purely legal with arguably no additional hearing time needed. Moreover, the relevant facts indicate that the Charging Party conducted a union organizing campaign for at least the past two years. This alleged unlawful statement touches upon such activity. The General Counsel has not rested its case, and Respondent will have ample

discretionary with the Regional Director." Id. Respondent has not been prejudiced in anyway by the complaint in case 32-CA-220777 not containing the notice of hearing. Respondent has been on notice of the unfair labor practice charge since May 2018, and the General Counsel made clear that he would seek consolidation with the current consolidated complaint if the charge was found meritorious. This order granting consolidation essentially serves as the notice of hearing in case 32-CA-220777.

[2] The hearing will commence the week of September 24, 2018 and adjourn on September 28, 2018. If additional days are required, the hearing will commence the week of October 9, 2018 with the entire week reserved for the hearing.

opportunity in its case-in-chief to address this additional allegation. In addition, the complaint allegations in this matter are not particularly complex or involved. Finally, while the alleged unlawful statement occurred in May 2018, several months after the last allegation in the above-captioned complaint, on balance the relevant factors favor consolidating the case for trial, particularly since Respondent has been on notice for several months of the potential for this unfair labor charge to be consolidated with this complaint. See generally *Service Employees Local 87 (Cresleigh Management)*, 324 NLRB 774 (1997).

**SO ORDERED.**

Date: September 11, 2018, San Francisco, California.

Amita B. Tracy
Administrative Law Judge

*Served by facsimile upon the following:*

*For the NLRB:*
Noah Garber, Esq.,
Edris Rodriguez Ritchie, Esq., Fax: (510)637-3315

*For the Respondent:*
Mark S. Ross, Esq.,
Keahn N. Morris, Esq., Fax: (415)434-3947

*For the Charging Party:*
Margo A. Feinberg, Esq.
Daniel E. Curry, Esq.,
Julia Alarcon, Esq. Fax: (323)655-4488

**From:** SM-Nass
**Sent:** Tuesday, September 11, 2018 12:19 PM
**To:** Lee, Vanise J. <Vanise.Lee@nlrb.gov>
**Subject:** [NASS] Scan-To-Fax Completed - vlee-20181811031834.PDF

Your document (vlee-20181811031834.PDF) has been successfully scanned and faxed to the following recipients (+15106373315;+14154343947;+13236554488)
This document is 3 pages long, and was processed in 14.0 seconds (Processing time is calculated based on the time the NxGen Advanced Scanning System (NASS) begins processing the scanned document, to the time the document is faxed.)

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 32

**TESLA, INC.**

    **and**

**MICHAEL SANCHEZ, an Individual**

    **and**

**JONATHAN GALESCU,  an Individual**

    **and**

**RICHARD ORTIZ, an Individual**

    **and**

**INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL WORKERS OF
AMERICA, AFL-CIO**

**Cases 32-CA-197020
32-CA-197058
32-CA-197091
32-CA-197197
32-CA-200530
32-CA-208614
32-CA-210879
32-CA-220777**

**COUNSEL FOR THE GENERAL COUNSEL'S OPPOSITION
TO RESPONDENT'S MOTION FOR SUMMARY JUDGMENT**

Respondent's Motion for Summary Judgment in case 32-CA-220777 must be denied

because the case is part of a consolidated matter now pending before an administrative law judge

in which the hearing is scheduled to resume on September 24, 2018.[1] Further, there are genuine

issues of material fact in this case, as more fully discussed below.

**I.    Introduction**

On May 23, the International Union, United Automobile, Aerospace and Agricultural

Implement Workers of America, AFL-CIO (the Union) filed the charge in Case 32-CA-220777

---

[1] All dates occurred in 2018 unless otherwise noted.

1

22-60493.5984

alleging that Tesla, Inc. (Respondent) violated section 8(a)(1) of the National Labor Relations Act (the Act) when Chief Executive Officer Elon Musk (Musk) tweeted a coercive statement (the Tweet).[3]  On August 23, after an investigation into the Tweet, Counsel for the General Counsel (the General Counsel) issued complaint in Case 32-CA-220777 and a Motion to Consolidate Cases to consolidate the complaint in Case 32-CA-220777 with the prior consolidated proceeding in Cases 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-200530, 32-CA-208614, and 32-CA-210879.  On September 7, Respondent filed a Motion for Summary Judgment in Case 32-CA-220777 only.  On September 11, Administrative Law Judge Amita Tracy (the ALJ) issued an Order Granting the General Counsel's Motion to Consolidate. Pursuant Section 102.24(b) of the Board's Rule and Regulations, the General Counsel files this Opposition to Respondent's Motion for Summary Judgment.

## II.    Respondent's Motion is Procedurally Improper and Should be Dismissed

Section 102.25 of the Board's Rule and Regulations states that the "administrative law judge designated to conduct the hearing shall rule on <u>all motions after the opening of the hearing</u>." (emphasis added).  As noted above, on September 11, the ALJ issued an Order Granting the General Counsel's Motion to Consolidate, which consolidated the complaint in Case 32-CA-220777 with that of the complaint in Cases 32-CA-197020 et al.  Since those complaints were consolidated, and the hearing in the consolidated case is scheduled to resume on September 24, only the ALJ is vested with the authority to rule on Respondent's Motion for Summary Judgment.  Therefore, Respondent's motion is improperly filed before the Board and should be denied on procedural grounds.

---

[3] On May 20, 2018, Musk tweeted, "Nothing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues & give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets healthcare."

2

22-60493.5985

### III.    Respondent's Motion Should be Dismissed as a Question of Material Fact Exists

It is well settled that for summary judgment to be appropriate, the record must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Security Walls, LLC*, 361 NLRB 348, 348 (2014) (citations omitted).

Contrary to the conclusions noted in its Motion for Summary Judgment, Respondent's Motion—in and of itself—establishes questions of material fact that preclude the granting of summary judgment. Respondent's Motion references tweets by Musk that occurred after the Tweet. See Respondent's Motion for Summary Judgment, 3 – 5. These alleged subsequent tweets, which Respondent proffers in defense to the Section 8(a)(1) allegation in Case 32-CA-220777, are *not* authenticated evidence and were *not* introduced as evidence in the hearing record. As such, the mere alleged existence of these purported subsequent tweets as non-authenticated evidence creates a material question of fact that precludes summary judgment.

Similarly, Counsel for the General Counsel is entitled to, and intends to, introduce evidence into the record to rebut Respondent's argument that Musk's later tweets or Respondent's press release somehow cured the unlawful nature of the Tweet. The efficacy of such a defense hinges on the existence of the curative statements as well as the dissemination. Again, this creates a question of material fact that precludes granting summary judgment.

Finally, in arguing a Section 8(c) defense, such as contending the Tweet is nothing more than a lawful prediction, Respondent readily admits that there are outstanding questions of material fact. In its Motion for summary Judgment, and quoting *NLRB v. Lenkurt Elec. Co.*, 438 F.2d 1102, 1107 (9th Cir. 1971), Respondent wrote that "[i]n determining whether an employer's communications constitute permissible argument or prohibited threats, the statements must be considered in the context of the factual background in which they were made, and in view of the

3

totality of employer conduct." Given that Respondent admits the Tweet must be examined in its "factual background" and "in view of the totality of [its] conduct" and the parties have yet to put on evidence regarding the Tweet, there exists a question of material fact as to the circumstances surrounding the Tweet, who read the tweet, its dissemination, and the Tweet's relationship to the Union's organizing drive. In short, there is a genuine dispute regarding the scope of what is the proper context and factual background of the Tweet.

Notably, this is not the only time that Respondent admits the need for evidence not in the hearing record. Respondent dedicated an entire section of its Motion for Summary Judgment— "IV(A)(2), Without Context, Mr. Musk's Tweet Is Too Isolated And Ambiguous To Constitute A Threat Or Promise Of Benefit." As noted throughout Respondent's Section IV(A)(2), Responded relies on evidence and context outside of the Tweet in its defense. As noted above, this evidence is not in the hearing record, and therefore, a material question of fact exists.[4]

## IV.  Conclusion

Respondent's Motion for Summary Judgment should be dismissed as it is procedurally improper since the matter is still properly before the ALJ. Regardless, and as noted in Respondent's Motion for Summary Judgment, there exists material questions of fact that preclude the granting of summary judgment.

---

[4] To the extent that Respondent's Motion for Summary Judgment relies on non-Board sworn testimony from Respondent drafted declarations, in which the purported witness was not subject to oath or cross-examination, such evidence should not be found sufficient to ameliorate any of the above-referenced questions of fact.

4

22-60493.5987

**DATED AT** Oakland, California this 13th day of September 2018.

Noah Garber
Field Attorney
National Labor Relations Board
Region 32
1301 Clay St Suite 300N
Oakland, CA 94612-5224

5

1  MARGO A. FEINBERG (100655)
   DANIEL E. CURRY (297412)
2  JULIE S. ALARCÓN (316063)
   SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
3  6300 Wilshire Boulevard, Suite 2000
   Los Angeles, California 90048
4  Telephone:   (323) 655-4700
   Fax:   (323) 655-4488
5
6  *Attorneys for Michael Sanchez, Jonathan Galescu, Richard Ortiz, and International Union,*
   *United Automobile, Aerospace and Agricultural Workers of America, AFL-CIO*
7
8                   **UNITED STATES OF AMERICA**
9
            **BEFORE THE NATIONAL LABOR RELATIONS BOARD**
10
              **SAN FRANCISCO DIVISION OF JUDGES**
11
12 TESLA, INC.,                          | **Case Nos.**   **32-CA-197020**
                                                          **32-CA-197058**
13            Respondent,                                 **32-CA-197091**
                                                          **32-CA-197197**
14       and                                              **32-CA-200530**
                                                          **32-CA-208614**
15 MICHAEL SANCHEZ, an Individual,                        **32-CA-210879**
16            Charging Party,
                                             **CHARGING PARTIES' BRIEF IN**
17       and                                 **SUPPORT FOR GENERAL COUNSEL'S**
                                             **MOTION TO CONSOLIDATE CASE 32-**
18 JONATHAN GALESCU, an Individual,          **CA-220777 WITH EXISTING CASES**
19            Charging Party,
20       and
21 RICHARD ORTIZ, an Individual,
22            Charging Party,
23       and
24 INTERNATIONAL UNION, UNITED
   AUTOMOBILE, AEROSPACE AND
25 AGRICULTURAL WORKERS OF
   AMERICA, AFL-CIO,
26
              Charging Party.
27
28

ID 359809                                    CHARGING PARTIES' BRIEF IN SUPPORT OF GENERAL COUNSEL'S MOTION TO CONSOLIDATE

**I**

**PRELIMINARY STATEMENT**

The General Counsel may move to consolidate an existing case with a related case to have one proceeding in order to avoid unnecessary delay or costs. *Service Employees Union, Local 87,* 324 NLRB 774, 774 (1997). The latest charge in this case presents a textbook case for consolidation.

The most recent charge, Case 32-CA-220777, concerns the same set of operative facts, the same Respondent, Tesla Inc., the same or similar legal issues, and the same witnesses as those in 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-200530, 32-CA-208614, and 32-CA-210879. Compare *Free-Flow Packaging Corp.,* 219 NLRB 925, 932 (1975) to *United States Postal Serv.,* 263 NLRB 357, 367 (1982). The allegations in Case 32-CA-220777 occurred after the existing charges were filed with the National Labor Relations Board and during the pendency of the instant proceedings. In accordance with well-established Board law and practice, the Administrative Law Judge has the authority to consolidate this matter with the pending proceeding. NLRB Rules and Regulations, §§ 102.24 and 102.25; *SEIU Local 87,* 324 NLRB at 775. The General Counsel's Motion to Consolidate should be granted.

**II.**

**OPERATIVE FACTS**

On March 23, 2018, the Region issued its Third Order Consolidating Cases, Second Amended Consolidated Complaint and Notice of Hearing for Cases 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-200530, 32-CA-208614, and 32-CA-210879. On August 23, 2018, the Region issued Complaint in Case 32-CA-220777 alleging that Respondent violated Section 8(a)(1) of the National Labor Relations Act when its Chief Executive Officer tweeted:

> *Nothing stopping Tesla team at our car plant from voting union. Could do tmrw if they wanted. But why pay union dues & give up stock options for nothing? Our safety record is 2X better than when the plant was UAW & everybody already gets healthcare.*

//

1   Also on August 23, 2018, the General Counsel duly served and filed a Motion to

2   Consolidate Case 32-CA-220777 with the above referenced consolidated matter currently

3   pending before Administrative Law Judge Amita Tracy.

4          Cases 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-

5   200530, 32-CA-208614, 32-CA-210879 and 32-CA-220777 collectively pertain to

6   Respondent interfering with and restraining the rights of the Charging Parties and of

7   Tesla employees generally under Section 7 of the Act between October 2016 and May

8   2018.  More particularly, those charges allege that Tesla interfered and restrained the

9   Section 7 rights of Michael Sanchez, Jonathan Galescu, Richard Ortiz, and the United

10  Automobile, Aerospace and Agricultural Workers of America by (1) promulgating and

11  disseminating an unlawful Confidentiality Agreement, (2) restraining and coercing off-

12  duty employees who were engaged in leafleting on Respondent's premises,

13  (3) threatening employees with reprisals for engaging in concerted activity,

14  (4) threatening employees with termination if they distributed stickers, leaflets, or

15  pamphlets, (5) attempting to prohibit employees from discussing safety concerns,

16  (6) maintaining and enforcing rules that prevent employees from wearing Union-related

17  insignia, (7) interrogating employees regarding concerted activities, (8) promulgating

18  rules to prohibit workers from engaging in concerted activity, and (9) discharging and

19  disciplining employees who engaged in concerted activities.  The litigation of these cases

20  will require testimony from the same witnesses and will involve the same attorneys and

21  Board agents.

22                              **III**

23                           **ARGUMENT**

24  **A.     AUTHORITY**

25      The General Counsel may move to consolidate an existing case with related cases, after a

26  hearing has commenced, in order to have one hearing. Rules and Regulations of the National

27  Labor Relations Board, Sections 102.24, 102.25, 102.33(d) and 102.35(a)(8).  Under these same

28  Rules and Regulations, the Administrative Law Judge may issue an order consolidating Case 32-

1    CA-220777 with the currently pending matters.  Section 102.33(d) clearly provides the

2    Administrative Law Judge with the authority to "consolidate or sever proceedings after issuance

3    of a complaint" pursuant to Sections 102.24 and 102.25. *SEIU Local 87,* 324 NLRB at 775.

**B.**    **THE ALLEGATIONS IN CASE 32-CA-220777 PERTAIN TO THE SAME SET OF OPERATIVE FACTS, THE SAME OR SIMILAR LEGAL ISSUES, AND THE SAME WITNESSES AS THOSE IN 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-200530, 32-CA-208614, AND 32-CA-210879.**

8    The principle of judicial economy requires that Case 32-CA-220777, with the same operative

9    facts, legal issues, and witnesses as the pending cases, be consolidated and heard at the same time

10    as those cases by the same judge while the same witnesses are available for testimony.  See, e.g.,

11    *Peyton Packing Co.,* 129 NLRB 1358, 1360 (1961); and compare to *United States Postal Serv.,*

12    263 NLRB 357, 367 (denying consolidation involving different units of employees, different

13    factual backgrounds, and different allegations.)  To later re-litigate the allegations arising from

14    the same operative facts would be unfair to Respondent. *Peyton Packing, supra,* at 1360.  The

15    delay and extra cost of re-litigating substantially similar allegations is also unfair to witnesses and

16    to the taxpayers. *Macke Laundry Services Co. of DC,* 190 NLRB 1, 6 (1971).  By contrast,

17    consolidation avoids duplicative and unnecessary expenditures of Board resources. *SEIU*

18    *Local 87,* 324 NLRB at 774.

19    Case 32-CA-220777 involves the same operative facts: the parties, Tesla Inc. and its

20    employees, and the Union, remain the same.  The allegations in Case 32-CA-220777 pertain to

21    the same union organizing drive underway in the pending matter, and impact the same employees

22    at the same facilities.

23    The same legal theories used by the Regional Director in the issuance of 32-CA-220777 also

24    supported the issuance of Complaints in 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-

25    197197, 32-CA-200530, 32-CA-208614, and 32-CA-210879.  Specifically, Case 32-CA-220777

26    accuses Respondent of violations of Section 8(a)(1) of the Act: interfering, restraining, or

27    coercing employees in the exercise of the rights guaranteed by Section 7 through its CEO's threat

28    to remove employee stock options should its workers unionize.

1    Finally, even though the May 20, 2018 tweet occurred during the pendency of these

2    proceedings, it still involves the same witnesses—some of whom were active Tesla employees at

3    the time of the tweet. At all times, Mr. Musk served as the CEO of Tesla. Charging Parties

4    Jonathan Galescu and Jose Moran have yet to testify in the pending proceedings, and both will

5    likely have testimony relevant to the new facts raised in Case 32-CA-220777. Similarly,

6    Charging Party Union's agents will also testify in both matters.

7    That said, there is no distinguishing factual reason to separate Case 32-CA-220777 from the

8    proceedings currently underway. It would be a waste of time and resources not to consolidate

9    Case 32-CA-220777 with the pending matter, and so the General Counsel's motion should be

10    granted.

11    **C.**    **CONSOLIDATION IS APPROPRIATE EVEN WHEN PROCEEDINGS ARE**

12           **UNDERWAY.**

13    There is no sound argument against consolidation while proceedings are underway—it is

14    commonly done. See e.g., *S.E. Nichols, Inc.,* 284 NLRB 556, 566 (1987); *O'Hare-Midway*

15    *Limousine Service, Inc.*, 295 NLRB 463, 463 (1989); *Foundation for Comprehensive Health*

16    *Services,* 267 NLRB 95, 95 (1983). Indeed, consolidation has been granted even after

17    proceedings have closed. *O'Hare-Midway Limousine Service, Inc.,* at 463; *Foundation for*

18    *Comprehensive Health Services,* at 95.

19                            **IV**

20                    **CONCLUSION**

21    For all the reasons set forth above Charging Parties request that the motion of the General

22    Counsel to consolidate the proceedings in Case 32-CA-220777 with this matter be granted.

23    DATED:    September 5, 2018    SCHWARTZ, STEINSAPIR, DOHRMANN
                                        & SOMMERS LLP

24                                    MARGO A. FEINBERG
                                    DANIEL E. CURRY

25                                    JULIE S. ALARCÓN

26                              By_____
                                    MARGO A. FEINBERG

27                              Attorneys for Charging Parties Michael Sanchez,
                              Jonathan Galescu, Richard Ortiz, and International Union,

28                              United Automobile, Aerospace and Agricultural Workers of
                              America, AFL-CIO

**PROOF OF SERVICE BY MAIL**

RENEE CARNES certifies as follows:

I am employed in the County of Los Angeles, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 6300 Wilshire Boulevard, Suite 2000, Los Angeles, California 90048-5268.

On September 5, 2018, I caused the foregoing document(s) described as **CHARGING PARTIES' BRIEF IN SUPPORT FOR GENERAL COUNSEL'S MOTION TO CONSOLIDATE CASE 32-CA-22077 WITH EXISTING CASES** to be served upon the person(s) shown below as follows:

Edris W.I. Rodriguez-Ritchie
National Labor Relations Board, Region 32
1301 Clay Street, Suite 300N
Oakland, CA 94612-5224

Noah J. Garber
National Labor Relations Board, Region 32
1301 Clay Street, Suite 300N
Oakland, CA 94612-5224

Mark Ross, Esq.
Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center, Suite 17
San Francisco, CA 94111-4158

Administrative Law Judge Amita Tracy
National Labor Relations Board
Division of Judges
901 Market Street, Suite 300
San Francisco, CA 94103

__X__ placing it (them) for collection and mailing on that same date following the ordinary business practices of Schwartz, Steinsapir, Dohrmann & Sommers LLP, at its place of business, located at 6300 Wilshire Boulevard, Suite 2000, Los Angeles, California 90048-5268. I am readily familiar with the business practices of Schwartz, Steinsapir, Dohrmann & Sommers LLP for collection and processing of correspondence for mailing with the United States Postal Service. Pursuant to said practices the envelope(s) would be deposited with the United States Postal Service that same day, with postage thereon fully prepaid, at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date on the envelope is more than one day after the date of deposit for mailing in the affidavit. (C.C.P. §1013a(3))

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 5, 2018 at Los Angeles, California.

_Renee Carnes_
RENEE CARNES

ID 326806

UNITED STATES OF AMERICA
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 32**

| | |
|---|---|
| **TESLA, INC.** | Cases **32-CA-197020** |
| **and** | **32-CA-197058** |
| **MICHAEL SANCHEZ, an Individual** | **32-CA-197091** |
| **and** | **32-CA-197197** |
| **JONATHAN GALESCU, an Individual** | **32-CA-200530** |
| **and** | **32-CA-208614** |
| **RICHARD ORTIZ, an Individual** | **32-CA-210879** |
| **and** | **32-CA-220777** |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, AFL-CIO** | **Date: September 13, 2018** |

<u>**AFFIDAVIT OF SERVICE OF COUNSEL FOR THE GENERAL COUNSEL'S OPPOSITION**</u>
<u>**TO RESPONDENT'S MOTION FOR SUMMARY JUDGMENT**</u>

I, the undersigned employee of the National Labor Relations Board, being duly sworn, depose and say that *on the date indicated above* I served the above-entitled document(s) upon the persons at the addresses and in the manner indicated below. Persons listed below under "E-Service" have voluntarily consented to receive service electronically, and such service has been effected on the same date indicated above.

Mark S. Ross, Esq.
Keahn Morris, Esq.
Sheppard Mullin Richter & Hampton, LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
**VIA EMAIL: mross@sheppardmullin.com**
**VIA EMAIL: kmorris@sheppardmullin.com**

Margo A. Feinberg, Esq.
Daniel Curry, Esq.
Julie Alarcon, Esq.
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90048
**VIA EMAIL: margo@ssdslaw.com**
**VIA EMAIL: dec@ssdslaw.com**
**VIA EMAIL: jsa@ssdslaw.com**

Jatinder K. Sharma Esq.
Tesla, Inc.
6800 Dumbarton Cir
Fremont, CA 94555
**Email: jsharma@tesla.com**

Office of the Executive Secretary
National Labor Relations Board
1015 Half Street SE
Washington, DC 20570-0001
**VIA E-FILE**

| September 13, 2018 | Ida Lam, Designated Agent of NLRB |
|---|---|
| | Name |
| | _Ida Lam_ |
| | Signature |

22-60493.5995

1  MARGO A. FEINBERG (100655)
   DANIEL E. CURRY (297412)
2  JULIE S. ALARCÓN (316063)
   SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS, LLP
3  6300 Wilshire Boulevard, Suite 2000
   Los Angeles, California 90048
4  Telephone:    (323) 655-4700
   Fax:    (323) 655-4488
5
6  *Attorneys for Michael Sanchez, Jonathan Galescu, Richard Ortiz, and International Union,*
   *United Automobile, Aerospace And Agricultural Workers Of America, AFL-CIO*
7

8              **UNITED STATES OF AMERICA**

9     **BEFORE THE NATIONAL LABOR RELATIONS BOARD**

10                    **REGION 32**

11

12  TESLA, INC.,                          **Case Nos.**    32-CA-197020
                                                           32-CA-197058
13              Respondent,                                32-CA-197091
                                                           32-CA-197197
14        and                                              32-CA-200530
                                                           32-CA-208614
15  MICHAEL SANCHEZ, an Individual,                        32-CA-210879
                                                           32-CA-220777
16              Charging Party,

17        and                              **CHARGING PARTY'S OPPOSITION TO
                                           RESPONDENT'S MOTION FOR
18  JONATHAN GALESCU, an Individual,       SUMMARY JUDGMENT**

19              Charging Party,

20        and

21  RICHARD ORTIZ, an Individual,

22              Charging Party,

23        and

24  INTERNATIONAL UNION, UNITED
    AUTOMOBILE, AEROSPACE AND
25  AGRICULTURAL WORKERS OF
    AMERICA, AFL-CIO,
26
                Charging Party.
27

28

I.    **Introduction.**

Charging Party International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW" or "Charging Party"), opposes Respondent Tesla, Inc.'s ("Tesla" or "Respondent") frivolous Motion for Summary Judgment on the allegations made in Case 32-CA-220777.  The Motion is procedurally improper, relies on disputed and unauthenticated evidence, and employs an entire affirmative defense constructed on a misrepresentation of UAW policy.  The Board should dismiss this Motion and allow the genuine issues of material facts be resolved through the hearing scheduled to resume this Monday, September 24, 2018.

II.   **Respondent's Motion Should be Denied Because it is Procedurally Improper.**

The NLRB Rules and Regulations require the assigned Administrative Law Judge to rule on all motions made after the opening of the hearing.  Specifically, Section 102.25 states, "[t]he Administrative Law Judge designated to conduct the hearing *will rule* on all motions after opening of the hearing."  Section 102.25 (emphasis added).  The only existing exception to this requirement is for motions filed after the Administrative Law Judge has issued a decision and the case is transferred to the jurisdiction of the Board.  *See* Sections 102.45(a), 102.47.

On September 11, 2018, Administrative Law Judge Amita Tracy granted the General Counsel's Motion to Consolidate Case 32-CA-220777 with Case 32-Ca-197020, *et al*. The hearing in Case 32-CA-197020, *et al*, commenced on June 11, 2018, completed four days of hearing, then adjourned until this Monday, September 24, 2018, when the hearing will resume. Therefore, for Respondent's Motion for Summary Judgment in Case 32-CA-220777 to comply with section 102.25, Respondent must submit it to Judge Tracy.  Because that did not happen, the Board must dismiss this motion.

III.  **Respondent's Motion Should Be Denied Because Genuine Issues of Material Fact Exist.**

The Board will deny motions for summary judgment unless there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Security Walls, LLC,* 361 NLRB 348, 348 (2014) (quoting *Conoco Chemicals Co.*, 275 NLRB

1   39, 40 (1985)).  Pursuant to Rule 102.24(b), an opposition to a motion for summary judgment

2   need not be supported by affidavits or other documentary evidence in order to demonstrate a

3   genuine issue for hearing exists.  Instead, the Board may deny the motion where the opposing

4   party's "pleadings, opposition, and/or response indicate on their face that a genuine issue may

5   exist." NLRB Rules and Regulations Section 102.24(b).  The Board can also deny the motion

6   when the motion itself fails to establish the absence of a genuine issue.  *Id.*

7       **A.    Respondent's Motion Relies on Unauthenticated, Unsworn Evidence That**

8           **Raises Genuine Issues of Material Fact.**

9           A genuine issue of material fact exists, preventing summary judgment, because the

10  Respondent relies on unauthenticated, unsworn testimony to establish its defense.  Board

11  proceedings do not provide for discovery procedures, and parties to such proceedings do not

12  possess rights to pretrial discovery. *Bashas', Inc.*, 352 NLRB 661 (2008); see also *Beta Steel*

13  *Corp.,* 326 NLRB 1267, 1267 n. 3 (1998).  Parties have no right to depositions, requests for

14  admissions, or interrogatories.  *Kentucky River Medical Center*, 352 NLRB 194, 199 (2008).

15  Therefore, unlike a Motion for Summary Judgment under Federal Rules of Civil Procedure Rule

16  56, the Parties in this case have had no opportunity prior to hearing to examine factual issues,

17  and possibly resolve them, through sworn depositions or verified discovery responses.

18          Respondent's reliance on the Declaration of Rachelle Toletti, filed concurrently with

19  Respondent's Motion for Summary Judgment, thus raises genuine issues of material facts,

20  because none of the purported evidence has been authenticated, verified by a party, or sworn

21  under oath.  Neither the General Counsel nor the Charging Party have had an opportunity to

22  question Ms. Toletti under oath regarding how she obtained the documents attached as Exhibits 1

23  through 4, or how she determined that Tesla Chief Executive Officer Elon Musk's ("CEO

24  Musk") Twitter account is a "personal" account.  (Toletti Decl. ¶ 9)  Because the evidence is

25  unauthenticated, unsworn, and has not been subjected to questioning by opposing parties, it is

26  not free from genuine issues of material facts.  Thus the Board should reject this motion.

27  //

28  //

ID#: 360832                                CHARGING PARTY'S OPPOSITION TO RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

**B.    The Respondent's Proffered Defense of CEO Musk's Twitter Statement Raises Genuine Issues Of Material Facts.**

The General Counsel's Complaint alleges that CEO Musk issued a statement through Twitter (also called a "Tweet") on May 20, 2018 that violated Section 8(a)(1) of the National Relations Act.  In its Motion for Summary Judgment, Tesla contends Musk's statement is lawful "in light of his and Tesla's subsequent clarifications" and cites case law stating that the alleged threats must "be considered in the context of the factual background in which they were made." (MSJ at 9, 10)  But the factual circumstances of the May 20, 2018 remain mostly uncovered, as Tesla only presents its preferred facts.  Genuine issues of material facts exist regarding the scope of the proper context of CEO Musk's May 20, 2018 statement.  Additional context, which Charging Party has not had the opportunity to put into the record, includes but is not limited to the circumstances surrounding the Tweet, who read the Tweet, its coverage in media reports, and its relationship to Charging Party's organizing drive.

Respondent goes on to argue that the additional context provided by Exhibit 2, Exhibit 4, and a press release described in paragraph 9 of Ms. Toletti's Declaration demonstrates that CEO Musk's May 20, 2018 statement was a reasonable prediction of the consequences of unionization, outside of Tesla's control.  (MSJ, at 10, 11) The Supreme Court long ago drew a line distinguishing between threats of reprisals that violate Section 8(a)(1) and employer free speech that lawfully predicts the effects of unionization.  *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969).  For a prediction to be lawful, the effects of unionization must be "carefully" stated "on the basis of objective fact" and involve "probable consequences beyond [the employer's] control." *Id.; DHL Express, Inc.*, 355 NLRB 1399, 1400 (2010).

Respondent contends that CEO Musk was referring to an alleged UAW policy that prohibits stock options as part of represented employees' compensation package.  (MSJ at 11) Tesla's only evidentiary basis for this extraordinary assertion is Tesla's own press release and CEO Musk's two Tweets. (Toletti Decl. ¶ 9, Exs. 2 & 4)  Respondent thus attempts to argue that the Board should dismiss the Complaint because its CEO's statement was a "lawful prediction of //

ID#: 360832    CHARGING PARTY'S OPPOSITION TO RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

1 future consequences," yet somehow denies there is any factual dispute about whether the

2 statement was a reasonable prediction of future consequences.

3      In reality, Respondent's allegation is not just disputed, it is plain wrong. The UAW does

4 not have a policy preventing UAW-represented employees from owning stock options. In fact,

5 the UAW has existing collective bargaining agreements that include Employee Stock Ownership

6 Plans.[1] Pursuant to Rule 102.24(b), this representation is sufficient to establish a genuine issue

7 of material fact regarding whether UAW permits stock options.[2] Because Respondent's Motion

8 relies on this disputed fact to argue CEO Musk's Twitter statement was a lawful prediction, the

9 Motion must be denied.

10     **C.**    **Respondent's Motion Relies on Additional Factual Allegations that Raise**

11              **Genuine Issues of Material Facts.**

12      Respondent's Motion also relies on several other factual allegations, which may raise

13 genuine issues of material facts. While Charging Party does not concede that these facts are

14 relevant or necessary to establish that CEO Musk's May 20, 2018 statement violated the Act,

15 it nonetheless brings these disputes to the Board's attention because Respondent has made them

16 an issue in this case by relying on them in its Motion.

17      In her declaration, Ms. Toletti asserts that "Mr. Musk maintains a personal account on the

18 social media website Twitter (@elonmusk), which is separate and distinct from Tesla's official

19 twitter account..." (Toletti Decl. ¶ 3) Respondent relies on this assertion throughout the Motion.

20 (MSJ at 3, 9, 16) While Charging Party does not concede there is any legal significance to

21 distinguishing between a "personal" Twitter account of CEO Musk and an "official" Twitter

22 account of Respondent, making such a distinction would be highly fact dependent. For example,

23 contrary to Toletti's assertion that the account is "personal," CEO Musk uses his @elonmusk

24

25    [1] Further, the UAW has negotiated successful profit-sharing programs for UAW
bargaining unit members at General Motors, Ford, and Chrysler. For example, UAW bargaining

26 unit members at General Motors received profit sharing checks of $11,750 and $12,000 the past
two years.

27    [2] While not required under the NLRB's Rule & Regulations, Section 102.24(b), Charging

28 Party can provide affidavits or other documentary evidence to support this fact if the Board
desires it.

1   account on Twitter to make statements on behalf of Tesla.  In addition, a genuine issue may exist

2   regarding whether the @elonmusk account is objectively perceived as an "official" Twitter

3   account of Respondent.

4        Respondent's Motion repeatedly alleges that CEO Musk's statement was not "directed

5   to" employees.  (MSJ at 16, 18, 23)  Once again, while Charging Party does not concede that this

6   fact is relevant or necessary to establish the General Counsel's allegations, Charging Party

7   disputes the truth of the allegation.  The statement was actually a direct appeal by CEO Musk to

8   Tesla employees on why they are better off without a union, which Tesla employees received

9   and discussed.

10        Respondent also alleges in its Motion that the Tweet was "transmitted outside the

11   workplace," then relies on this assertion.  (MSJ at 16, 20) While Charging Party does not

12   concede the relevance of this assertion to the General Counsel's allegations, a genuine issue may

13   exist regarding its truth.  Respondent provides no evidence of CEO Musk's location at the time

14   of the Tweet; instead, the alleged fact is merely asserted by Tesla's counsel in the body of its

15   motion.  Based on media reports, a genuine issue of fact may exist regarding CEO Musk's

16   location at the time of the Tweet.

17        Finally, Respondent alleges that the "vast majority of readers [of CEO Musk's Twitter

18   statement] are persons not protected by the Act." (MSJ at 11, 12, 13)  While Charging Party does

19   not concede relevance, Respondent again has relied on a disputed fact to argue·its Motion.

20   Respondent submits no evidence regarding who the readers of the May 20, 2018 Twitter

21   statement were, let alone what percentage of them were Tesla employees.  Because there is no

22   actual evidence to support this statement, a genuine issue of fact may exist.

23       **D.**    **Respondent's 1st Amendment Argument Must Fail Because It Relies on**

24           **Disputed Facts.**

25        Respondent's 1st Amendment argument must fail because it relies on many of the same

26   genuine issues of material facts discussed above.  Tesla alleges its CEO's May 20, 2018

27   statement was made "outside the workplace" and was "not directed to any employee of Tesla,"

28   but these facts are disputed.  (MSJ at 16)  Respondent further argues in support of their 1st

22-60493.6001
ID#: 360832

1   Amendment argument that the statement was "ambiguous" and "innocuous." *Id.* Such

2   characterizations raise genuine issues of material facts because they require an examination of

3   the factual circumstances surrounding CEO Musk's statement.

4        In addition, the Supreme Court's decision in *NLRB v. Gissel Packing Co.*, conclusively

5   rebuts the Respondent's extended 1st Amendment arguments.  395 U.S. 575 (1969).  In *Gissel*,

6   the Court stated that if "any indication" exists that an employer may take an action "solely on his

7   own initiative" and "for reasons unrelated to economic necessities," then the statement:

8            is no longer a reasonable prediction based on available facts but a
             threat of retaliation based on misrepresentation and coercion, and *as*
9            *such without the protection of the First Amendment.*

10  *Gissel*, 395 U.S. at 618 (emphasis added).  Thus, there is no conflict between the NLRA and the

11  1st Amendment.

12       As described above, a genuine issue of material facts exists regarding whether CEO

13  Musk's May 20, 2018 statement is "a reasonable prediction based on available facts" or "a threat

14  of retaliation based on misrepresentation and coercion."  Because threats of retaliation do not

15  have 1st Amendment protection, the Board must deny Respondent's Motion for Summary

16  Judgment and allow a hearing to resolve these factual disputes.

17  **IV. Conclusion**

18       For the above reasons, Charging Party urges the Board to dismiss Respondent Tesla's

19  Motion for Summary Judgment pertaining to the allegations in Case 32-CA-220777.

20

21  DATED: September 18, 2018              Respectfully submitted,

22                                         SCHWARTZ, STEINSAPIR, DOHRMANN
                                              & SOMMERS LLP
23                                         MARGO A. FEINBERG
                                           DANIEL E. CURRY
24                                         JULIE S. ALARCÓN

25

26  By_____
                                           MARGO A. FEINBERG
27                                         Attorneys for Charging Party International Union,
                                           United Automobile, Aerospace and Agricultural
28                                         Workers of America, AFL-CIO

                                           6

ID#: 360832                                CHARGING PARTY'S OPPOSITION TO RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

1

## PROOF OF SERVICE BY ELECTRONIC MAIL

2

**Case No. 32-CA-197020 et al.**

3

RENEE CARNES certifies as follows:

4

5    I am employed in the County of Los Angeles, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 6300 Wilshire Boulevard, Suite 2000, Los Angeles, California 90048-5202.  My electronic notification address

6    is rac@ssdslaw.com

7    On September 18, 2018, I caused the foregoing document(s) described as: **CHARGING PARTY'S OPPOSITION TO RESPONDENT'S MOTION FOR SUMMARY JUDGMENT**

8    be served by electronic mail upon the person(s) shown below,

9    Edris W.I. Rodriguez-Ritchie                    Noah J. Garber
     National Labor Relations Board, Region 32        National Labor Relations Board, Region 32

10   1301 Clay Street, Suite 300N                     1301 Clay Street, Suite 300N
     Oakland, CA 94612-5224                           Oakland, CA 94612-5224

11   e-mail: edris.rodriguezritchie@nlrb.gov          e-mail: noah.garber@nlrb.gov

12   Mark Ross, Esq.                                  Administrative Law Judge Amita Tracy
     Keahn Morris, Esq.                               National Labor Relations Board

13   Sheppard, Mullin, Richter & Hampton LLP          Division of Judges
     Four Embarcadero Center, Suite 17                901 Market Street, Suite 300

14   San Francisco, CA 94111-4158                     San Francisco, CA 94103
     e-mail: mross@sheppardmullin.com                 e-mail: amita.tracy@nlrb.gov

15   e-mail: kmorris@sheppardmullin.com

16   Jatinder K. Sharma, Associate General Counsel
     TESLA, Inc.

17   6800 Dumbarton Circle
     Fremont, CA 94555

18   e-mail: jsharma@tesla.com

19       X    **BY E-MAIL:**  By transmitting a copy of the above-described document(s) via e-mail to the individual(s) set forth above at the e-mail addressed indicated.

20

21       I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

22

23   Executed on September 18, 2018, at Los Angeles, California.

24

                                                 RENEE CARNES

25

26

27

28

22-60493.6003

ID 353707

UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| **TESLA, INC.** | Case 32-CA-220777 |
| **and** | |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURE WORKERS OF AMERICA, AFL-CIO** | |

### RESPONDENT TESLA, INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

I.    INTRODUCTION ................................................................................................1

II.   ARGUMENT .....................................................................................................1

      A.    Tesla's Motion Is Properly Before The Board........................................1

      B.    Tesla's Motion Is Properly Supported By Admissible Evidence ...........................3

      C.    The General Counsel Fails To Identify Any Triable Issues Of Fact Or
            Dispute Tesla's Legal Analysis ........................................5

III.  CONCLUSION....................................................................................................7

22-60493.6005

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Federal Cases</u>

*Barthelemy v. Air Lines Pilots Ass'n*
   897 F.2d 999 (9th Cir. 1990) ...........................................................................4

*Lehman Bros. Holdings, Inc. v. PMC Bancorp*
   612 F. App'x 885 (9th Cir. 2015) ....................................................................4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
   475 U.S. 574 (1986) ..........................................................................................3

<u>Federal: Statutes, Rules, Regulations, Constitutional Provisions</u>

28 U.S.C.
   § 1746 ................................................................................................................4

29 U.S.C.
   § 160(b) .............................................................................................................4

Federal Rules of Civil Procedure
   56(c)(1)(A) .......................................................................................................3

Federal Rules of Evidence
   901 ....................................................................................................................4
   901(b) ...............................................................................................................4

First Amendment ........................................................................................................1, 5

National Labor Relations Act
   § 8(c) .................................................................................................................5
   § 10(b) ...............................................................................................................4

National Labor Relations Board's Rules & Regulations
   § 102.24 .............................................................................................................2
   § 102.24(b) ....................................................................................................1, 2
   § 102.25 .............................................................................................................2
   § 102.50 .............................................................................................................3

<u>National Labor Relations Board Cases</u>

*'L'Hoist N. Am. of Tennessee, Inc. & United Mine Workers of Am., Dist. 17*
   362 NLRB No. 110 (2015) .......................................................................3, 5, 6

22-60493.6006

## I.     **INTRODUCTION**

Tesla's motion for summary judgment should be granted as essentially unopposed. Rather than address the substantive merits of Tesla's motion, the General Counsel instead makes a number of specious procedural objections, none of which have any merit.  The General Counsel does not dispute any of the relevant facts or explain what evidence creates triable issues, and the opposition contains no analysis of the legal issues raised by Tesla.  The General Counsel does not even mention the First Amendment, which was a primary basis for Tesla's motion.

For these reasons, described more fully below, Tesla is entitled to judgment as a matter of law.

## II.     **ARGUMENT**

### A.     **Tesla's Motion Is Properly Before The Board**

Under section 102.24(b) of the Board's Rules & Regulations, "[a]ll motions for summary judgment…must be filed with the Board no later than 28 days prior to the scheduled hearing" and "[w]here no hearing is scheduled, or where the hearing is scheduled less than 28 days after the date for filing an answer to the complaint…the motion must be filed promptly."  Tesla filed its motion with the Board on September 7, 2018, just 15 days after the Regional Director issued the Complaint at issue and before a notice of hearing had even been served.  Tesla's motion was therefore timely and properly filed with the Board.

The General Counsel takes the absurd position that the Board may not rule on Tesla's timely filed motion because the Complaint at issue was consolidated with a number of other complaints <u>after</u> Tesla filed its motion[1], and a hearing on the charges in the other complaints commenced <u>several months before</u> the present Complaint was even filed.  The only authority

---

[1] The Administrative Law Judge's consolidation order is dated September 11, 2018, four days after Tesla filed the present motion.  *See* Exhibit A

cited for this preposterous proposition is section 102.25 of the Board's Rules & Regulations, which simply describes the procedure by which an Administrative Law Judge rules on the types of motions section 102.24 designates to be filed with the Administrative Law Judge or Chief Administrative Law Judge. Nothing in the Board's Rules & Regulations purports to divest the Board of its authority to rule on a timely filed motion for summary judgment simply because the complaint it is directed to was subsequently consolidated with other complaints where a hearing had already commenced.

The hearing the General Counsel references began on June 11, 2018, adjourned on June 15, 2018, and is set to resume on September 24, 2018. Because the Complaint at issue was filed August 23, 2018, the hearing from June 11, 2018 to June 15, 2018 did not address any of the issues raised by Tesla's motion, and Tesla obviously could not have filed its motion before the hearing. Nor was it possible for Tesla to file its motion 28 days prior to the date the hearing is set to resume, because that date was not the date for hearing in this matter until after Tesla had already filed its motion. Tesla is one of the world's most innovative companies, but has not yet developed a time machine that the General Counsel demands.

Even if the hearing set to resume on September 24, 2018 were relevant to Tesla's September 7, 2018 motion filed pre-consolidation, Tesla's motion would be timely filed with the Board because it was "filed promptly" (15 days) after service of the relevant August 23, 2018 Complaint, pursuant to section 102.24(b) of the Board's Rules & Regulations. Section 102.24(b) contemplates that a "prompt" motion for summary judgment may be filed less than 28 days before a hearing, and still directs that it be filed with the Board. There is no procedure or mechanism by which an Administrative Law Judge might rule on a motion for summary judgment filed near, or even after the commencement of, a hearing. Under section 102.24, such

motions are solely within the purview of the Board; if a hearing is scheduled, the Board may issue an order to show cause which causes the scheduled hearing to be "postponed indefinitely." And even if the Board were somehow divested of jurisdiction to rule on Tesla's motion, section 102.50 of the Board's Rules & Regulation permits the Board to transfer "any proceeding which may have been instituted with respect" to a complaint to itself and exercise all of the powers vested in the Administrative Law Judges.

For these reasons, the General Counsel's objection to the Board's authority to decide Tesla's motion is entirely without merit.

### B.    Tesla's Motion Is Properly Supported By Admissible Evidence

The General Counsel's opposition reflects a deep confusion on the rules and standards applicable to summary judgment motions.  The General Counsel complains that Tesla's motion is supported by evidence of tweets other than the one alleged in the Complaint and "evidence and context outside of the Tweet [alleged in the Complaint]..."  The General Counsel seems to believe summary judgment is akin to a motion to dismiss on the face of the pleadings, but the purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).[2]  Thus, the moving party may rely on evidence extrinsic to the pleadings, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

The General Counsel also bizarrely states that the evidence supporting Tesla's motion "is not in the hearing record, and therefore, a material question of fact exists."  As noted above,

---

[2] In most respects, the Board's summary judgment standard "is identical to the summary judgment standard applicable under the Federal rules." '*L'Hoist N. Am. of Tennessee, Inc. & United Mine Workers of Am., Dist. 17*, 362 NLRB No. 110 (2015) (M. Miscimarra, concurring)

there has not yet been a hearing on the allegations in the August 23, 2018 Complaint, and a motion for summary judgment must generally be filed before any hearing commences.  The fact that the evidence supporting a party's motion for summary judgment is not in the "record" of a hearing in the future does not preclude granting the motion; if it did, then no motion for summary judgment could ever be granted.

The General Counsel further states that the tweets proffered by Tesla are unauthenticated, which is simply false.  Screenshots of the tweets that Tesla relies on were attached to the Declaration of Rachelle Toletti, who declared under penalty of perjury and based on personal knowledge that the screenshots accurately reflect how the tweets appear on Twitter's website. Authentication is accomplished by submitting "evidence sufficient to support a finding that the item is what the proponent claims it is," and for purposes of summary judgment evidence may be authenticated with a declaration by "a 'witness with knowledge . . . that an item is what it is claimed to be,'…and such knowledge may be inferred from the witness's position and the nature of his participation in the matters to which he attests."  Fed. R. Evid. 901; *Lehman Bros. Holdings, Inc. v. PMC Bancorp*, 612 F. App'x 885, 887 (9th Cir. 2015) (citing *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990)); *see also* 28 U.S.C. § 1746 (declaration signed under penalty of perjury has same effect as sworn affidavit). The Declaration of Ms. Toletti is certainly sufficient to authenticate the tweets in question, but even if it were not, the tweets are publicly accessible on Twitter and therefore subject to judicial notice.  *See* Fed. R. Evid. 901(b) (courts may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). [3]

---

[3] The Federal Rules of Evidence are applicable in Board proceedings "so far as practicable."  29 U.S.C. § 160(b) [NLRA § 10(b)]

For these reasons, the General Counsel's complaints regarding Tesla's supporting evidence must be rejected.

### C.     The General Counsel Fails To Identify Any Triable Issues Of Fact Or Dispute Tesla's Legal Analysis

Stripped of the meritless procedural arguments discussed above, all that remains of the opposition is the bald assertion that there are triable issues of fact simply because the General Counsel says there are. What these factual dispute are is a mystery, because they are not identified in the opposition. The General Counsel notably never actually disputes any of the facts set forth in Tesla's motion or explains what admissible evidence will create a factual dispute. Tesla's motion raises purely legal questions regarding the applicability of section 8(c) and the First Amendment to a set of undisputed facts, and the General Counsel fails to engage these legal issues entirely.[4]

The General Counsel's opposition is remarkably similar to the one filed in *L'Hoist N. Am. of Tennessee, Inc. & United Mine Workers of Am., Dist. 17*, 362 NLRB No. 110 (2015), where former Board Member Miscimarra described in a concurrence the type of showing necessary to defeat a motion for judgment. Member Miscimarra explained that "the General Counsel at least must explain in reasonably concrete terms why a hearing is required. Under the standard that governs summary judgment determinations, this will normally require the General Counsel to identify material facts that are genuinely in dispute." *Id.* Further, "it is deficient to state that 'these matters are not properly before the Board at this time and are more appropriate for resolution by an administrative law judge.' These matters *are* 'properly before the Board' because they were raised in a motion for summary judgment." *Id.* (original emphasis).

---

[4] In fact, the Administrative Law Judge's consolidation order, which the General Counsel requested, states that the arguments regarding the allegations in the August 23, 2018 Complaint "are purely legal with arguably no additional hearing time needed." Exhibit A.

"[C]onclusory assertions that summary judgment should be denied" are not appropriate, and "it does *not* 'suffice' to promise that 'evidence to be adduced at trial' will 'demonstrate' that the complaint's allegations have merit." *Id.* (original emphasis).

The General Counsel's opposition does nearly everything that Member Miscimarra explained was insufficient to raise a trial issue in *L'Hoist*. The General Counsel states that he "is entitled to, and intends to, introduce evidence into the record to rebut" Tesla's arguments, yet fails to even cursorily explain what this evidence is or how it creates a triable issue. The General Counsel also asserts that Tesla's evidence giving context to the tweet alleged in the Complaint demonstrates triable issues, but he does not describe what it is about Tesla's evidence that is in dispute or what contrary evidence exists.

Simply stating that there are triable issues as to context and factual circumstances surrounding the tweet at issue does not make it so. Like the opposition criticized in *L'Hoist,* the General Counsel's opposition "essentially argues that respondents' motions for summary judgment should always be denied or should be denied merely because the General Counsel says so." *Id.* Tesla provided evidence of the context and factual circumstances and argued on the basis of this evidence it is entitled to judgment as a matter of law. The General Counsel says that this evidence creates triable issues, but he cannot articulate what evidence is in conflict or what is disagreeable about Tesla's legal contentions. The General Counsel's position seems to be that because Tesla's motion is based on the factual context of the tweet alleged in the Complaint, summary judgment cannot be granted. But this would only be true if there were some dispute about the context material to Tesla's legal defenses, and the General Counsel identifies none.

Thus, the General Counsel has failed to demonstrate a genuine triable issue.

**III.** **CONCLUSION**

For all of the foregoing reasons, and those set forth in Tesla's moving papers, Tesla is entitled to judgment as a matter of law and respectfully requests that the Board grant its motion for summary judgment.

Dated:  September 20, 2018

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____

MARK S. ROSS
JOHN D. ELLIS
KEAHN N. MORRIS
and
JATINDER K. SHARMA
Associate General Counsel of Tesla, Inc.

Attorneys for
TESLA, INC.

# EXHIBIT A

22-60493.6014

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES
SAN FRANCISCO BRANCH OFFICE


**TESLA, INC.**

      **and**                                            Cases  **32-CA-197020**

                                                       **32-CA-197058**

**MICHAEL SANCHEZ, an Individual**               **32-CA-197091**

                                                         **32-CA-197197**

      **and**                                            **32-CA-200530**

                                                       **32-CA-208614**

**JONATHAN GALESCU, an Individual**            **32-CA-210879**

      **and**                                            ·**32-CA-220777**

**RICHARD ORTIZ, an Individual**

      **and**

**INTERNATIONAL UNION, UNITED AUTOMOBILE,**
**AEROSPACE AND AGRICULTURAL WORKERS**
**OF AMERICA, AFL-CIO**


<u>**ORDER GRANTING THE GENERAL COUNSEL'S MOTION TO CONSOLIDATE**</u>

      On August 23, 2018, the General Counsel moved to consolidate complaint allegations in case 32-CA-220777 to the prior consolidated proceeding (cases 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-200530, 32-CA-208614, and 32-CA-210879). The complaint, also dated August 23, 2018, based on charges filed by the International Union, United Automobile, Aerospace and Agricultural Workers of American, AFL-CIO (the Union) on May 23, 2018 against Tesla, Inc. (Respondent), adds one Section 8(a)(1) allegation regarding a Twitter statement, dated May 20, 2018, by Respondent's Chief Executive Officer Elon Musk (Musk).[1]

_____

[1] The complaint lacks a notice of hearing as indicated by Respondent in its September 7, 2018, opposition to the motion to consolidate. Section 102.15 of the Board's Rules and Regulations states that the complaint should also contain a notice of hearing before an administrative law judge which designates a fixed place and time no sooner than 14 days from the issuance of the complaint. The Board has held that the purpose of Section 102.15 is to mandate the issuance of a complaint by a Regional Director once he or she has determined the unfair labor practice charge has merit. *Van Heusen Co.*, 221 NLRB 732, fn. 1 (1975). As for the reference to the notice of hearing, the Board adopted the administrative law judge's rationale in *Van Heusen Co.* that the notice of hearing need not be issued simultaneously with the issuance of the complaint. The administrative law judge wrote, "There is no reason, however, to mandate a notice of hearing, and Sec. 102.16 indicates clearly that the date of the hearing is [sic] largely

Pursuant to Sections 102.24, 102.25, 102.33, and 102.35 of the Board's Rules and Regulations, once a trial has opened, any motion for consolidation is made to and ruled on by the trial judge. "The judge has the discretion to determine when consolidation, or severance, of any complaint is warranted, considering such factors as the risk that matters litigated in the first proceeding will have to be relitigated in the second and the likelihood of delay if consolidation, or severance, is granted." *Service Employees Local 87 (Cresleigh Management)*, 324 NLRB 774 775-776 (1997); *Affinity Medical Center*, 364 NLRB No. 66 (2016) (judge did not abuse her discretion in denying the General Counsel's motion to consolidate three new complaints with the existing "highly complex 118-page amended consolidated complaint" given that the old and new allegations were not sufficiently intertwined to require consolidation and could be effectively litigated separately, and consolidation would cause significant delay in the ongoing proceeding); *McDonald's USA, LLC*, 363 NLRB No. 91 (2016) (judge did not abuse her discretion in denying motion to sever consolidated complaints against McDonald's and numerous franchisees and to require separate complaints and hearings for each where the General Counsel alleged that they were joint employers).

Respondent opposes the consolidation, and filed an opposition on September 7, 2018, after I issued an order to show cause with a deadline of the same date. In addition, Respondent filed its answer to the complaint in case 32-CA-220777 admitting all factual allegations but denying the General Counsel's legal conclusions. The hearing in this matter (cases 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-200530, 32-CA-208614, and 32-CA-210879) began on June 11, 2018 in Oakland, California, and adjourned on June 14, 2018, until 9 a.m. on September 24, 2018 in Oakland, California.[2]

In *Affinity Medical Center*, the Board noted that the factors to consider when determining whether to grant a motion to consolidate after a hearing has commenced include the complexity and magnitude of the ongoing consolidated proceedings, the relationship between the current and new allegations, the likelihood of delay if consolidation is granted, the risk that matters litigated would have to be relitigated in a second proceeding, and the potential for conserving resources if the cases were consolidated.

The motion is granted for several reasons considering the above factors. As indicated by the General Counsel, the complaint in case 32-CA-220777 alleges one additional Section 8(a)(1) unlawful statement violation by Respondent. Again, Section 8(a)(1) allegations such as the one at issue in case 32-CA-220777 require an objective analysis, and the subjective perceptions of the employees is not relevant. Thus, this matter should not delay the hearing time already allocated in this matter. In fact, by admitting that the statement was made by Musk, the remaining arguments are purely legal with arguably no additional hearing time needed. Moreover, the relevant facts indicate that the Charging Party conducted a union organizing campaign for at least the past two years. This alleged unlawful statement touches upon such activity. The General Counsel has not rested its case, and Respondent will have ample

_____

discretionary with the Regional Director." Id. Respondent has not been prejudiced in anyway by the complaint in case 32-CA-220777 not containing the notice of hearing. Respondent has been on notice of the unfair labor practice charge since May 2018, and the General Counsel made clear that he would seek consolidation with the current consolidated complaint if the charge was found meritorious. This order granting consolidation essentially serves as the notice of hearing in case 32-CA-220777.

[2] The hearing will commence the week of September 24, 2018 and adjourn on September 28, 2018. If additional days are required, the hearing will commence the week of October 9, 2018 with the entire week reserved for the hearing.

22-60493.6016

opportunity in its case-in-chief to address this additional allegation. In addition, the complaint allegations in this matter are not particularly complex or involved. Finally, while the alleged unlawful statement occurred in May 2018, several months after the last allegation in the above-captioned complaint, on balance the relevant factors favor consolidating the case for trial, particularly since Respondent has been on notice for several months of the potential for this unfair labor charge to be consolidated with this complaint. See generally *Service Employees Local 87 (Cresleigh Management)*, 324 NLRB 774 (1997).

## SO ORDERED.

Date: September 11, 2018, San Francisco, California.

*abrmmy*

Amita B. Tracy
Administrative Law Judge

*Served by facsimile upon the following:*

**For the NLRB:**
Noah Garber, Esq.,
Edris Rodriguez Ritchie, Esq., Fax: (510)637-3315

**For the Respondent:**
Mark S. Ross, Esq.,
Keahn N. Morris, Esq., Fax: (415)434-3947

**For the Charging Party:**
Margo A. Feinberg, Esq.
Daniel E. Curry, Esq.,
Julia Alarcon, Esq. Fax: (323)655-4488

3

22-60493.6017

<u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California. My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On September 20, 2018, I served a true copy of the following document(s) described as **RESPONDENT TESLA, INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** on the interested parties in this action as follows:

Edris W.I. Rodriguez Ritchie
E-mail: edris.rodriguezritchie@nlrb.gov
Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA  94612-5224
T: (510) 671-3041

Noah J. Garber
E-mail: noah.garber@nlrb.gov
Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Suite 300N
Oakland, California 94612
T: (510) 671-3021

Valerie Hardy-Mahoney
E-mail: valerie.hardy-mahoney@nlrb.gov
Regional Director, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA  94612-5224

Administrative Law Judge Amita Tracy
E-mail: Amita.Tracy@nlrb.gov
National Labor Relations Board
Division of Judges
901 Market St., Suite 300
San Francisco, CA 94103
T: (415) 356-5255

Margo Feinberg
E-mail: margo@ssdslaw.com
Daniel E. Curry
E-mail: dec@ssdslaw.com
Julie Alarcon
E-mail: jsa@ssdslaw.com
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Blvd., Suite 2000
Los Angeles, CA  90048
T: (323) 655-4700

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address sasmith@sheppardmullin.com to the person(s) at the e-mail address(es) listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 20, 2018 at San Francisco, California.

Sarah Smith

**UNITED STATES OF AMERICA**
**NATIONAL LABOR RELATIONS BOARD**

**TESLA, INC.**

> **and**                                                  **Case 32-CA-197020**

**MICHAEL SANCHEZ**

> **and**                                                  **Case 32-CA-197058**

**JONATHAN GALESCU**

> **and**                                                  **Case 32-CA-197091**
> **RICHARD ORTIZ**

> **and**                                                  **Cases 32-CA-197197**
>                                                           32-CA-200530
> **INTERNATIONAL UNION, UNITED**                           32-CA-208614
> **AUTOMOBILE, AEROSPACE AND**                             32-CA-210879
> **AGRICULTURAL WORKERS OF**
> **AMERICA, AFL-CIO**

**ORDER**[1]

The Respondent's request for special permission to appeal Administrative Law Judge Amita B. Tracy's order denying the Respondent's motion to dismiss the General Counsel's amendment to the second consolidated complaint is granted.  On the merits, the appeal is denied.  The Respondent has failed to establish that the judge abused her discretion in denying the Respondent's motion.

Dated, Washington, D.C., September 21, 2018

|                      |           |
|----------------------|-----------|
| JOHN F. RING,        | CHAIRMAN  |
| LAUREN McFERRAN,     | MEMBER    |
| MARVIN E. KAPLAN,    | MEMBER    |

---

[1]  The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.  Member Emanuel is recused and did not participate in the consideration of this case.

**UNITED STATES OF AMERICA**
**NATIONAL LABOR RELATIONS BOARD**

**TESLA, INC.**

    **and**                                          **Case 32-CA-220777**

**INTERNATIONAL UNION, UNITED**
**AUTOMOBILE, AEROSPACE AND**
**AGRICULTURAL WORKERS OF**
**AMERICA, AFL-CIO**

**ORDER**[1]

    The Respondent's motion for summary judgment is denied.  The Respondent

has failed to establish that there are no genuine issues of material fact warranting a

hearing and that it is entitled to judgment as a matter of law.

    Dated, Washington, D.C., September 26, 2018

| | |
|---|---|
| JOHN F. RING, | CHAIRMAN |
| LAUREN McFERRAN, | MEMBER |
| MARVIN E. KAPLAN, | MEMBER |

---

[1]  Member Emanuel is recused and did not participate in the consideration of this case.

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES SAN FRANCISCO

| | | |
|---|---|---|
| TESLA, INC. | | |
| and | Cases | 32–CA–197020 |
| | | 32–CA–197058 |
| MICHAEL SANCHEZ, an Individual | | 32–CA–197091 |
| | | 32-CA–197197 |
| and | | 32–CA–200530 |
| | | 32–CA–208614 |
| JONATHAN GALESCU, an Individual | | 32–CA–210879 |
| | | |
| and | | 32–CA–220777 |
| | | |
| RICHARD ORTIZ, an Individual | | |
| | | |
| and | | |
| | | |
| INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AFL–CIO | | |

*Edris W.I. Rodriguez Ritchie, Esq.,* and
*Noah J. Garber, Esq.,* for the General Counsel.

*Mark S. Ross, Esq.* and *Keahn N. Morris, Esq.,*
  for the Respondent.

*Margo A. Feinberg, Esq., Daniel E. Curry, Esq.,* and
*Julie S. Alarcon, Esq.,* for the Charging Party.

DECISION

INTRODUCTION

AMITA BAMAN TRACY, Administrative Law Judge.  In the fall of 2016, the International Union, United Automobile, Aerospace and Agricultural Workers of America, AFL–CIO (Union or UAW) began an organizing campaign at Tesla, Inc. (Respondent or Tesla), at its Fremont, California manufacturing plant.  Several employees joined the voluntary organizing committee, including the three Charging Parties, and after months of preparation, the "Fair Future at Tesla" campaign became well known at Tesla in early 2017.

22-60493.6022

This union organizing campaign quickly caught the attention of officials at Tesla as Jose Moran, another member of the voluntary organizing committee, published a blog post about working conditions at Tesla, which was then shared to all employees via a handbill. Employees began leafletting this handbill in the parking lot, requesting safety records from Tesla, and
5   wearing union shirts and stickers in the workplace. As a result of these activities, employees were questioned by Tesla officials.

Based upon another leaflet as well as an employee petition regarding safety conditions in the workplace, Chief Executive Officer Elon Musk and Chief People Officer Gabriel Toledano
10   immediately met with Jose Moran because he presented the employee petition to Tesla. During this meeting, Musk and Toledano promised to correct problems before the Union could come to Tesla and made other coercive statements including telling Jose Moran and another employee that the UAW would not give them a voice. Soon thereafter, Tesla began enforcing its team wear rule in general assembly so that UAW shirts were prohibited.
15

Then, in October 2017, Tesla terminated Charging Party Richard Ortiz and disciplined Jose Moran after Richard Ortiz posted a comment and employee pictures on a private Facebook page in response to two Tesla employees opposing a UAW sponsored bill before the California State Assembly. Finally, Respondent violated the Act with Musk's May 20, 2018 Twitter post
20   where he suggested to his followers that the employees would no longer have stock options if the Union was elected. I find merit to all but a few allegations as set forth in the General Counsel's consolidated complaint.

STATEMENT OF THE CASE

25

This case was tried in Oakland, California, over the course of 13 days from June to October 2018. The Union, Michael Sanchez (Sanchez), Jonathan Galescu (Galescu), and Richard Ortiz (Ortiz) (collectively, Charging Parties) filed charges and amended charges, as captioned above, from April 2017 through June 2018.[1]  The General Counsel issued several complaints,
30   dated August 31 and September 1, 2017, and March 30, June 4, and August 23, 2018, which were eventually consolidated in the current complaint.[2]  Tesla filed timely answers to the complaints and amended complaints.

---

[1]  On the dates specified, the Charging Parties filed the following charges and amended charges which resulted in this consolidated complaint: 32–CA–197020 on April 17, 2017, amended July 28, 2017; 32–CA–197058 on April 17, 2017, amended July 28, 2017; 32–CA–197091 on April 18, 2017, amended July 28, 2017; 32–CA–197197 on April 19, 2017, amended July 28, 2017; 32–CA–200530 on June 12, 2017, amended July 28, 2017; 32–CA–208614 on October 25, 2017, amended March 13, 2018; 32–CA–210879 on December 1, 2017, amended on December 6, 2017; and 32–CA–220777 on May 23, 2018.

[2]  The General Counsel withdrew complaint paragraphs (par.) 7(m) and 7(x) during the hearing as well as removed Andrew McIndoe (McIndoe) from complaint par. 5 (Tr. 1095–1097). In addition, the General Counsel sought to amend the complaint on the last day of the hearing, which I denied (Tr. 2495-2496).

On the entire record,[3] including my observation of the demeanor of witnesses,[4] and after considering the briefs filed by the General Counsel, Charging Parties, and Respondent,[5] I make the following

5                                    FINDINGS OF FACT AND LEGAL ANALYSIS

I.    JURISDICTION

Respondent, a Delaware technology and design corporation with its headquarters in Palo
10   Alto, California, an automotive manufacturing facility in Fremont, California (Fremont facility), and an automotive battery facility in Sparks, Nevada (Sparks facility), is engaged in the design, manufacture, and sale of electric vehicles and energy storage systems. During the 12-month period ending December 31, 2017, Respondent, in conducting its operations at its Fremont facility purchased and received goods valued in excess of $50,000 directly from sources located
15   outside the State of California. During the 12-month period ending December 31, 2017, Respondent, in conducting its operations at its Sparks facility, purchased and received goods valued in excess of $50,000 directly from sources located outside the State of Nevada. At all material times, based on the record, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the National Labor Relations Act (the Act).
20   Respondent admits, and I find, that the Union is a labor organization within the meaning of Section 2(5) of the Act.

Based on the foregoing, I find this dispute affects commerce and that the Board has jurisdiction of this case, pursuant to Section 10(a) of the Act.
25

II.    UNFAIR LABOR PRACTICES

After an introduction and uncontested background facts, I set forth my factual findings and legal analysis including credibility determinations for each of the unfair labor practice
30   allegations enumerated in the General Counsel's consolidated amended complaint.

Credibility of the witnesses in this matter is significant as several disputes center upon which version of events and/or explanation of events I accept. Thus, I will explain my specific credibility determinations where relevant for key events. Credibility determinations may rely on
35   various factors, including "the context of the witness' testimony, the witness' demeanor, the weight of the respective evidence, established or admitted facts, inherent probabilities and

---

[3] The transcripts and exhibits in this case generally are accurate other than numerous misspellings and misidentifications of the speakers. In addition, GC Exhs. 10 and 11 should have been redacted such that Ortiz' address and email address should have been removed. I order the General Counsel to contact the court reporting service to redact these documents as I directed during the hearing (Tr. 438–439).

[4] Although I have included several citations to the evidentiary record in this decision to highlight testimony or exhibits, I emphasize that my findings and conclusions are not based solely on those citations, but rather are based on my review of the entire record for this case.

[5] Other abbreviations used in this decision are as follows: "GC Exh." for the General Counsel's exhibit; "CP Exh." for Charging Parties' exhibit; "R Exh." for Respondent's exhibit; "Jt. Exh." for Joint Exhibit; "GC Br." for the General Counsel's Brief; "CP Br." for Charging Party's Brief; and "R Br." for Respondent's Brief.

reasonable inferences that may be drawn from the record as a whole." *Hills & Dales General Hospital*, 360 NLRB 611, 617 (2014), citing *Double D Construction Group*, 339 NLRB 303, 305 (2003); *Daikichi Sushi*, 335 NLRB 622, 623 (2001). Moreover, a credibility assessment also includes an examination of "the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during examination, the modulation or pace of his speech, and other non-verbal communication." *Shen Automotive Dealership Group*, 321 NLRB 586, 589 (1996) (citing *Penasquitos Village v. NLRB*, 565 F.2d 1074, 1078–1079 (9th Cir. 1977)), cited with approval by the Board in *Daikichi Sushi*, supra. Additionally, it is well established that the trier of fact may believe some, but not all, of a witness' testimony. *NLRB v. Universal Camera Corp.*, 179 F.2d 749 (2d Cir. 1950).

## III.    INTRODUCTION

Tesla is a public manufacturing and technology company and manufactures electric vehicles, charging stations, and superchargers as well the main subcomponents for vehicles at its Fremont facility (Tr. 870, 1340). Tesla began manufacturing various models of all-electric vehicles in 2012. The entire vehicle is assembled and completed at the Fremont facility while the batteries are assembled at the Sparks facility (Tr. 1341). Tesla employs approximately 40,000 employees nationwide while 12,000 employees work at the Fremont facility and an unspecified number of employees work at the Sparks facility (Tr. 877, 960).

### Respondent's Management Structure

Elon Musk (Musk) is the chief executive officer of Tesla (Tr. 877). Peter Hochholdinger (Hochholdinger), who was senior vice president for production, reported directly to Musk (Tr. 1340). Also reporting directly to Musk is the position of chief people officer (Tr. 877). Gabrielle (Gabby) Toledano (Toledano) became Tesla's chief people officer on May 22, 2017 until she resigned, effective mid-October 2018 (Tr. 870). Prior to Toledano, Mark Lipscomb (Lipscomb) held the position of vice president, human resources, but instead of reporting to Musk, Lipscomb reported to Arnnon Geshuri (Geshuri), who was also vice president of human resources.[6]

As the chief people officer, Toledano oversaw a vast array of day-to-day functions of Tesla. Toledano oversaw the environmental health and safety team (EHS), the security department which includes the contract and noncontract security guards at the Fremont facility which was led by senior security manager Greg Slettvet (Slettvet),[7] the human resources (HR) business solutions department (human resources information systems (HRIS) or HR people operations), and the employee relations and investigations team which was led by Carmen Copher (Copher) who is director and counsel for employee relations. In addition, six HR business partners communicated with employees directly to address any complaints or concerns (Tr. 884). Each department is led by a head of department or vice president who reported

---

[6] Respondent admits that Musk, Lipscomb, and Toledano are supervisors within the meaning of Section (Sec.) 2(11) of the Act and agents of Respondent within the meaning of Sec. 2(13) of the Act. Lipscomb and Toledano no longer work for Tesla.

[7] Slettvet is a Sec. 2(11) supervisor within the meaning of the Act as admitted by Respondent's counsel during the hearing (Tr. 1476–1477).

directly to Toledano including Josh Hedges (Hedges) who was senior HR director for production and supply chain; Hedges reported to Lipscomb prior to Toledano (Tr. 1113).[8]  In total, when Toledano served as the chief people officer, 1400 employees were within her chain of command (Tr. 880).

5

### Respondent's Human Resources Process

When employees are hired by Respondent, they sign several documents during the on-boarding process.[9]  Among the documents received are the employee handbook as well as a
10   proprietary information and inventions agreement (Tr. 442; R Exh. 4).  To maintain both documents as well as personnel records, Respondent uses a third-party owned software program named "Workday" (Tr. 389, 833, 1132).  Employees download the Workday application onto their smart phone where they can update their contact information, fill out self-reviews for performance reviews, give and receive feedback, and sign documents sent by Respondent (Tr.
15   441–442, 6671).  Employees may also send messages to other employees via Workday (Tr. 442). The employee handbook is also maintained in Workday (Tr. 1123; R Exh. 5).

Once hired, Respondent's employees gain access to the Fremont facility via an employee badge.  The employee badge, which has their name and Workday profile photo, identifies
20   individuals as employees, gives employees unescorted access to the Fremont facility, the ability to sign in and out of the timeclock, make purchases at the safety vending machines, and use the external transportation system (Tr. 1432–1433, 1435–1437).

### The Fremont Facility

25

Respondent's Fremont facility is an approximately 5 million square foot building with external parking lots and other unidentified structures (Tr. 1342).  This parking lot may be used by both employees and nonemployees (Tr. 384).[10]  There are four unguarded entrances to the parking lot while there is one guard station located near the north administrative (admin)
30   building (GC Exh. 2; Jt. Exh. 1; Tr. 382–383).  No identification is needed to enter the parking lot without a guard station (Tr. 382). Once an employee or non–employee parks in the parking lot, that person may attempt to enter the Fremont facility from one of four entrances or doors, labeled as door 1, door 2, door 3, and door 4.[11]  Each door has an entrance reached via stairs located on the left front-facing side while the right front-facing side has a ramp.  At each of the

---

[8] Respondent admits that Hedges is a supervisor within the meaning of Sec. 2(11) of the Act and an agent of Respondent within the meaning of Sec. 2(13) of the Act.  Hedges resigned, effective October 5, 2018 (Tr. 1112).

[9] Hedges testified extensively about the on-boarding process at Tesla, but I do not rely upon his testimony as Hedges spoke vaguely and did not have any day-to-day knowledge of the on-boarding process.  Hedges' area of coverage did not include the hiring process at Tesla.  In addition, Hedges could not provide basic details such as whether a document had been updated at any time and the time periods for when a version of a document was in effect (Tr. 1251–1253).

[10] Jeremie Hansen (Hansen), project manager and security systems specialist for Respondent, testified that the exterior of the Fremont facility is considered private property (Tr. 1434).  I do not credit Hansen's testimony on this point as it is based on his opinion and is a legal conclusion.

[11] Confusingly, door 3 is also known as the Iron Man door or door 4 since the north admin building door was also considered door 3 (Tr. 393).

22-60493.6026

four entrances there are doors leading to the interior of the Fremont facility. Each door has a sensor where employees scan their employee badges to unlock the door and enter the Fremont facility (Tr. 85, 385, 1436–1437). The door sensor shines red or green after the employee badge is held up to the sensor. If permitted inside the Fremont facility, the door will shine green, make a beeping noise, and unlock (Tr. 387). Inside the doors, a security guard is stationed at a podium with a laptop which shows the picture of the employee who had swiped his or her employee badge (Tr. 80, 387–388, 1437). Typically, employees first encounter Respondent's security guards when they enter the Fremont facility at the podium (Tr. 384). The security guard who is stationed at an entry door is tasked with ensuring that only those with an active and valid employee badge gains access to the interior of the Fremont facility (Tr. 1439). If there is a question as to any employee's work status at the Fremont facility, security guards may communicate with the security control room to determine the employee's status. Meanwhile, visitors to the Fremont facility must check-in at a designated location, receive temporary badges, and are escorted within the Fremont facility (Tr. 1433–1434). Tesla's north admin building also contains an entrance which is referred to as the back door (Tr. 149).

Respondent's security guards wear black colored jackets and hats which include the word, "Security" underneath the Tesla logo (Tr. 80, 387). [12] The security guards do not wear nametags (Tr. 387). Security guards at Tesla are employed directly by Tesla or by a contract security company. These security guards wear the same uniform such that the employer of the security guard would be unidentifiable to an employee (Tr. 1531–1532). [13] In February 2017, in addition to the being stationed at the four doors, security guards patrolled the exterior of the Fremont facility in Tesla "Security" vehicles (Tr. 1483, 1535). Also in February 2017, Respondent's security control room, which monitors communications and emergency systems in the Fremont facility, was staffed by both contractors and Tesla employees (Tr. 1484–1485). The security personnel in the control room would document reports on a computer assisted dispatch report (Tr. 1486–1487).

The interior of the Fremont facility is divided into various sections. The powertrain department manufactures the components of the vehicle and is located on the second floor of the main building. The production control team manages the warehouse, and material handlers bring parts to the assembly areas (Tr. 1342–1343). The stamping press center creates the body panels, doors, liftgates, and hoods for the vehicles with aluminum, and cuts items with laser machines. Once items are stamped, the parts are loaded onto racks which move into the warehouse and material handlers take the parts to the next department (Tr. 1343–1344). In body in white (BIW or body assembly), the stamped parts and other purchased components will be welded together by welders to create the skeleton of the vehicle (Tr. 245–246). Once the frame of the vehicle is assembled, the vehicle is transported to the paint department on a dolly. The frame of the vehicle is then sent through a chemical bath to protect it from corrosion and erosion, and then moved through an oven for curing (Tr. 246–247, 1344–1345). Thereafter, the vehicle is painted and sent through another oven to cure the paint (Tr. 247-248). The vehicle will then go through

---

[12] The title of security guard is used generically in this decision as the position of security guard may be officially known as protection associate or any other formal name.

[13] Securitas Security Services USA Inc. (Securitas) provided contract security services to Respondent in February 2017 (Tr. 1458). Thus, the record is unclear as to whether the unnamed security guards in the complaint allegations are employees of Respondent or Securitas.

inspections and touch-ups before being moved to general assembly (GA) via overhead carrier system (Tr. 1347).[14]

GA is approximately 500 yards in length (Tr. 191). Approximately 1,000 to 3,000 employees, also known as production associates, work in GA (Tr. 191, 1116). These employees are overseen by production leads and supervised by production supervisors, production associate managers, and production managers (Tr. 1399–1400). In GA, approximately 14 supervisors and 71 leads work per shift; there are two shifts per day (Tr. 1391–1392). After being hired, GA production associates receive 1 week of on-boarding training including 2 days of hands-on training involving equipment handling and how to treat unfinished vehicles where the paint has not been cured (Tr. 1368–1369). Since at least 2017 GA production associates must also wear team wear. When hired, product associates are provided two pairs of black colored pants, three short sleeve shirts, two long sleeve shirts, and a sweater; these clothing items have an imprint of the Tesla logo (GC Exh. 41; Tr. 198–199, 1370, 2411–2412, 2524–2525). Production leads and supervisors wear red colored Tesla shirts while line inspectors wear white colored Tesla shirts (Tr. 331, 1372–1373, 1597). Production associates also must wear personal protective equipment (PPE) which includes safety glasses and shoes, bump caps and gloves, and covers for their belts, rings, and watches; these items are also provided by Respondent (Tr. 199, 1373, 1599). Other employees may also be working in GA for specific reasons such as BIW employees as well as engineers, vendors, contractors, and material handlers (Tr. 256, 1378–1379).

When a vehicle moves to GA, the paint on the vehicle is cured sufficiently for light touching and general handling but not cured as completely as when the vehicle is finished (Tr. 1347). Fender covers and door protectors are placed on the vehicle for protection (Tr. 1347). These vehicles move slowly on an assembly line where the interior and exterior of the vehicle is completed (Tr. 191, 1348–1365, 1920). Towards the end of the vehicle assembly in GA, the final interior components are installed such as the seats and interior panels, and the doors are re-assembled on the vehicle (Tr. 1364–1365).

After GA, the vehicle is moved to end of line where production associates go through the brake and roll system, test diagnostics, test the charging systems, and install the final steering wheel air bag (Tr. 1345–1346, 1367). The vehicle then goes through the inspection department where the vehicle is inspected for fit and finish and mutilations, dings, and dents (Tr. 1368).[15] Mutilations are scratches, buffs, chips, dents, dings, or scratches anywhere on or in a vehicle including the seats (Tr. 1373, 1597, 1653, 2399). After final inspection, the manufacturing process for the vehicle is complete.

The Sparks Facility

---

[14] In mid-2017, approximately 550 production associates and leads worked per two shifts.
[15] Mutilations may be found and fixed at any stage of the vehicle manufacturing process (Tr. 1373, 1597–1599).

22-60493.6028

The Sparks facility manufactures the electric battery for the vehicles manufactured in the Fremont facility. Respondent's training coordinators worked out of the Sparks facility where they disseminate manufacturing instruction changes on individual lines, update training matrixes, and provide general guideline classes, which include manufacturing practices, quality in station, and safety. As manufacturing instructions change, the training coordinators are responsible for updating these changes and posting them at the work stations. Training coordinators have a table adjacent to production lines, but they go out to production lines and talk to the associates working on productions lines when instructions change. When instructions change, which comes from a different division of Respondent, the training coordinator obtains updates and takes the updated instructions to the production lines. Training coordinators then place the new instructions in folders at each work station and remove the old instructions.

At Respondent's Sparks facility, from April to June 2017 Dave Teston (Teston), who was the associate manager of manufacturing, was responsible for the training team, which included the day-to-day duties of the training coordinators.[16] Teston was also responsible for increasing the size of the training coordinator team during that time.

<u>The Union Organizing Campaign</u>

In the summer of 2016, Tesla employee Jose Moran (Moran) reached out to the UAW since he had been a member when the Union represented employees at New United Motors Manufacturing, Inc. (NUMMI), which was located at the Fremont facility (Tr. 51, 668, 673, 750).[17] Moran sought to unionize the workforce at Tesla. Susan Reed (Reed), the Union's international representative, was the lead organizer from June 2016 until April 2018 in the Union's campaign to represent Respondent's employees (Tr. 44–45).[18] Reed worked to build a network of employees and met frequently with the employees interested in organizing Respondent's workplace (Tr. 45–46). The Union created a voluntary organizing committee (VOC) which consisted of employees that acted as lead organizers inside the Fremont facility; these employees shared information regarding the Union inside the facility as well as outside the facility (Tr. 46–47). The VOC held meetings where employees discussed health and safety concerns at Respondent along with questions regarding compensation, job promotions, and other working conditions (Tr. 674, 677). Other members of the VOC included Charging Parties Sanchez, Ortiz, and Galescu (Tr. 86–87, 430–431, 680). The VOC continued to meet through the fall of 2016 and into 2017.

Moran and Ortiz were among the most active supporters of the Union, and they engaged in leafletting, passing out union paraphernalia, and wearing union shirts and jackets to work in 2017 (Tr. 48, 51, 536). As discussed hereinafter, Moran also authored a blog post concerning working conditions at Tesla and circulated a safety petition signed by many employees and presented to Respondent. Ortiz, who worked as an associate in BIW with Respondent from 2016 to October 18, 2017, also requested California Division of Occupational Safety and Health

---

[16] The parties stipulated to Teston's testimony. At all relevant times until at least February 5, 2018, Teston was a supervisor within the meaning of Sec. 2(11) of the Act.

[17] Respondent employed Moran in 2012 as a production associate, and in August 2017 Moran was promoted to lead quality inspector.

[18] Reed testified in an honest and straightforward manner while her demeanor remained calm and measured relaying her participation on the union campaign. I accept Reed's testimony in its entirety.

(Cal/OSHA) safety records.  Both Moran and Ortiz spoke to California State Assembly legislators to advocate on behalf of employees in favor of unionization.

5     In August 2016, the employees interested in unionizing voted on a campaign slogan and a logo (Tr. 678; GC Exh. 35).  The employees chose, "Driving a Fair Future at Tesla."  A public website was created at www.fairfuture@tesla.org (Tr. 679; GC Exh. 39).  Also, the Union created a public Facebook page called, "A Fair Future at Tesla" (Tr. 47, 682; GC Exh. 40).  The Union created this Facebook page to provide a social media forum for employees to comment and share information with others.  Employees, including Moran, often posted on the Facebook
10 public page (Tr. 51).  In August 2016, Moran created a private Facebook group called, "Tesla Employees for UAW Representation" (Tr. 433–434, 675).[19]  To be a member of this Facebook group, Moran (and later Ortiz) controlled the approval process of "friend requests" and membership where only Tesla Fremont facility hourly production employees could be members (Tr. 434, 675–676).  In January 2017, the VOC members and union organizers decided to
15 distribute leaflets at the Fremont facility and Moran decided to write a blog post regarding working conditions at Tesla (Tr. 432–433).  As discussed herein, employees also distributed and wore Union shirts and stickers at work during duty time, requested safety statistics from Tesla, and advocated on behalf of unionization with the California State Assembly among other Section 7 acts.
20

    On February 9, 2017,[20] the union organizing campaign became widely known when Moran wrote an article, titled, "Time for Tesla to Listen" about the working conditions at Respondent (GC Exh. 32; Tr. 688).  This article was posted online at www.medium.com (Tr. 687).  The blog post identified Moran as a Tesla employee and included his photo.  In this blog
25 post, Moran discussed the injuries Tesla employees endure due to long hours, nonergonomic machinery, shortage of employees, and a push to work faster.  Moran also discussed Tesla employees' low wage rate compared to other employees in the auto industry.  Moran wrote that the employees should unionize in reaction to Respondent requiring employees to sign confidentiality agreements.  Moran also noted that five members of the California State
30 Assembly wrote a letter to Tesla questioning the confidentiality policy issued to employees in the fall of 2016 (GC Exh. 8).[21]  The following day, employees handed out double-sided leaflets in the Tesla parking lot which included Moran's blog post and the letter from the California State Assembly members to Tesla regarding its Confidentiality Agreement.

---

[19] Earlier in 2016 Moran created a Facebook page called, "Jose organizer" to have a presence on social media for meeting organizing purposes and to connect with coworkers (Tr. 675).

[20] All dates are in 2017 unless otherwise specified.

[21] In response, that same day, Musk, in an article published by Gizmodo, responded to Moran's blog post (GC Exh. 59).  The article quotes Musk as stating that compared to those unionized in UAW, "total compensation is higher for a given level of seniority when factoring in stock grants."  Musk described Tesla as "union neutral" and explained that the Confidentiality Agreement concerned the leak of trade secrets.  Musk continued, as this article stated, that his understanding was that Moran "was paid by the UAW to join Tesla and agitate for a union.  He doesn't really work for us, he works for the UAW," and "The UAW killed NUMMI and abandoned the workers at our Fremont plant in 2010.  They have no leg to stand on."  These statements allegedly made by Musk for this article are hearsay and are not relied upon in this decision.

On February 24, 2 weeks after the employees first engaged in leafletting inside and outside the Fremont facility, Musk wrote an email to all employees about the mission of Tesla, writing:

5
> That is why I was so distraught when I read the recent blog post promoting UAW, which does not share our mission and whose true allegiances is to the giant car companies, where the money they take from employees in dues is vastly more than they could ever make from Tesla.

10
> The tactics they have resorted to are disingenuous or outright false.  I will address their underhanded attacks below.

(R Exh. 2.)  Moreover, Musk disputed the injury claims made by Moran in his blog post.  Musk also addressed "hours worked" in the "UAW blog."  Musk closed his email by stating that once
15 Tesla became "closer to being a profitable company, we will be able to afford more and more fun things" such as "a really amazing party," "free frozen yogurt stands" and a roller coaster at the Fremont facility going in and out of the factory and connecting the parking lots (R. Exh. 2).

IV.    COMPLAINT PARAGRAPHS 7(A) AND (B): RESPONDENT'S CONFIDENTIALITY
20         AGREEMENT DOES NOT VIOLATE SECTION 8(A)(1) OF THE ACT, AND RESPONDENT DID
           NOT VIOLATE SECTION 8(A)(1) WHEN REFUSING TO PERMIT AN EMPLOYEE TO
           PHOTOGRAPH THE CONFIDENTIALITY AGREEMENT

The General Counsel alleges at paragraphs 7(a) and (b) that since at least late
25 October 2016, Respondent has maintained certain unlawful rules in its Confidentiality Agreement at the Fremont facility.  Moreover, the General Counsel alleges that in late October 2016 or early November 2016, Senior HR Partner David Zweig (Zweig) at the Fremont facility, during a one-on-one meeting with employees, prohibited employees from taking a picture of the Confidentiality Agreement.  The General Counsel alleges that both the maintenance of certain
30 unlawful rules and the prohibition on taking pictures of the Confidentiality Agreement violate Section 8(a)(1) of the Act.  Specifically, the General Counsel argues that certain portions of the Confidentiality Agreement are overbroad, requires preauthorization before speaking to the media, prohibits employees from writing about their work, and threatens disciplinary action (GC Br. at 47–51).  In addition, the General Counsel argues that because Galescu sought to take a
35 photo of the Confidentiality rule, Zweig's prohibition on taking the photo was unlawful (GC Br. at 52–53).  Respondent argues that the Confidentiality Agreement is a generic rule which does not interfere with Section 7 rights, and even if the rule may be read to infringe on Section 7 rights, especially when read out of context, its legitimate business justification overrides such rights.  Moreover, Respondent argues that Zweig's refusal to permit Galescu to take a photo of
40 the Confidentiality Agreement was lawful and does not infringe on any Section 7 rights (R Br. at 25–42).

In October and November 2016 Respondent asked all employees nationwide as a term and condition of employment to sign a confidentiality acknowledgment (Confidentiality
45 Agreement) (Tr. 372, 1167; GC Exh. 15, 31).  The Confidentiality Agreement states,

In response to recent leaks of confidential Tesla information, we are reminding everyone who works at Tesla, whether full-time, temporary or via contract, of their confidentiality obligations and asking them to reaffirm their commitment to honor them.

**These obligations are straightforward.  Provided that it's not already public information, everything that you work on, learn about or observe in you[r] work about Tesla is confidential information under the agreement that you signed when you first started.  This includes information about** products and features, pricing, **customers, suppliers, employees,** financial information, **and anything similar.  Additionally, regardless of whether information has already been made public, it is never OK to communicate with the media or someone closely related to the media about Tesla, unless you have been specifically authorized in writing to do so.**

**Unless otherwise allowed by law or you have received written approval, you must not, for example, discuss confidential information with anyone outside of Tesla, take or post photos or make video or audio recordings inside Tesla facilities, forward work emails outside of Tesla or to a personal email account, or write about our work in any social media, blog, or book.  If you are unsure, check with your manager, HR, or Legal.**  Of course, these obligations are not intended to limit proper communications with government agencies.

**The consequences of careless violation of the confidentiality agreement, could include, depending on severity, loss of employment.  Anyone engaging in intentional violations of the confidentiality agreement will be held liable for all the harm and damage that is caused to the company, with possible criminal prosecution.  These obligations remain in place even if no longer working at Tesla.**

By acknowledging, I affirm my agreement to comply with my confidentiality obligations to Tesla.  I also represent that at no time over the past 12 months have I disclosed any Tesla confidential information outside of Tesla unless properly authorized to do so.

(GC Exh. 31; R Exh. 11 and 14, emphasis in bold added to highlight the portions the General Counsel alleges are overbroad in the complaint).

The Confidentiality Agreement, created in September and October 2016, was drafted by Vice President of Legal Jonathan Chang (Chang) among others.  Chang credibly testified that the Confidentiality Agreement was drafted due to several leaks of internal, proprietary and/or confidential information including photos and/or drawings, documents and emails (Tr. 2004–2007, 2014, 2029-2030; R Exh. 11, 37, 41).  One such leak included an August 29, 2016 email from Musk to all employees which discussed Respondent's financial position as well as projections for the future which was shared with the media (Tr. 2009–2012; R Exh. 38).  Respondent decided to have all employees resign the Confidentiality Agreement to remind the

employees of the seriousness of leaks. Prior to issuing the Confidentiality Agreement, Respondent sent out emails to employees reminding them of their obligation to maintain confidentiality; when employees were hired, they also signed several documents including the need to maintain confidentiality of Respondent's proprietary information (Tr. 2019, 2023; R Exh. 4, 39, 40).

5

When creating the Confidentiality Agreement, Respondent did not conduct economic studies to determine any actual financial harm (Tr. 2045). However, Chang testified that leaks of internal information can affect Respondent's business where potential customers may not seek to purchase a vehicle, competitors could use the information, employee talent could be compromised and there could be Securities and Exchange Commission (SEC) concerns (Tr. 2015–2017).

10

On October 11, 2016, Lipscomb sent out a slightly different version of the Confidentiality Agreement which ends with, "By signing below, I affirm my agreement to comply with my confidentiality obligations to Tesla [. . .]" (GC Exh. 15; R Exh. 12).[22] This version also requires employees to sign the document, with a witness' signature, and ends with a section which requires employees to list any disclosures as a "one-time complete forgiveness of responsibility [. . .]" (GC Exh. 15). These signatures needed to be observed by HR or "trusted managers" but that the signatures on the Confidentiality Agreement needed to be completed that week (R Exh. 12). This October 11, 2016 version of the Confidentiality Agreement replaced the prior version (Tr. 1169).

15

20

Prior to asking employees to sign the Confidentiality Agreement, Hedges, based on information learned from Lipscomb, told his HR partner team that Respondent was having information leaks from engineering in October 2016 and they needed to remind everyone of the confidentiality agreement they signed when they became employees; the employees would be asked to sign the Confidentiality Agreement in the presence of an HR representative (Tr. 1166, 1170: R Exh. 43).[23] HR partners met with different groups of employees to have them sign the Confidentiality Agreement.

25

30

On the evening of November 2, 2016, Lipscomb sent an email to all employees asking employees to sign the Confidentiality Agreement electronically in their Workday inbox within the next 5 days (GC Exh. 31; R Exh. 13). Lipscomb explained that Respondent needed this affirmation to reinforce the importance of confidentiality as any leaks "can have a negative impact on our company" (GC Exh. 31). Lipscomb also noted that the Confidentiality Agreement would be signed annually. Electronic signatures were requested to enable easier linking with the employees' personnel files in Workday (Tr. 2085). If employees wanted a copy of the

35

---

[22] Lipscomb did not testify.

[23] Annalisa Heisen (Heisen), an associate HR partner, testified that Hedges informed the HR partners that the Confidentiality Agreement related to the recent information leak and asked them to oversee and execute the process of having all employee sign the Confidentiality Agreement (Tr. 2075–2076). Heisen testified that she informed employees that due to the recent information leaks at the Fremont facility, Respondent wanted to make sure all employees understood their obligation to keep information confidential with examples such as forwarding internal emails that contain proprietary information to external emails and taking and sharing photos and videos in the workplace (Tr. 2078–2080).

Confidentiality Agreement, a copy would later be provided but this offer of a copy was not specifically mentioned to employees (Tr. 2086).

On November 3, 2016, Lipscomb sent another email to the employees the following afternoon reminding them to log into their Workday inboxes to sign the Confidentiality Agreement.  Two days later, in the morning, Lipscomb sent another reminder email to the employees to sign the Confidentiality Agreement.  A few minutes later, he sent another email with a link to Workday if any employee was having trouble accessing the document (GC Exh. 31).

In November 2016, Galescu testified that he attended a small meeting with Zweig and one other employee to sign the Confidentiality Agreement (Tr. 835–836, 838).[24]  During this meeting, after Galescu signed the Confidentiality Agreement, he began to take a photo of it with his phone.  However, Zweig told him that he could not take a photo of the Confidentiality Agreement, but that the document would be uploaded to his Workday profile (Tr. 837–838).  A week later, Supervisor Armando Rodriguez (Rodriguez) asked Galescu to electronically sign the Confidentiality Agreement again (Tr. 839–840).

Thereafter in a January 10 letter, five members of the California State Assembly, requested that Tesla revise its Confidentiality Agreement as they viewed the policy as "over-broad" and "has resulted in a chilling effect on workers' ability to engage in protected activity" (GC Exh. 8).  Tesla's general counsel, Todd Maron (Maron), responded to the letter on behalf of Tesla explaining the reasons and genesis for having the employees sign the Confidentiality Agreement (R Exh. 42).

*Legal Analysis*

An employer violates Section 8(a)(1) of the Act when it maintains a workplace rule or policy which would reasonably tend to chill employees in the exercise of their Section 7 rights.  See *Lafayette Park Hotel*, 326 NLRB 824, 825 (1988), enfd. 203 F.3d 52 (D.C. Cir. 1999).  In *Boeing Co.*, 365 NLRB No. 154 (2017), the Board established a new standard to determine whether a facially neutral rule or policy violates Section 8(a)(1) of the Act, overruling the "reasonably construe" standard of the analytical framework set forth in *Lutheran Heritage Village-Livonia*, 343 NLRB 646, 646–647 (2004).  In *Boeing Co.*, the Board stated that when evaluating a facially neutral rule or policy "the Board will evaluate two things: (i) the nature and extent of the potential impact on NLRA rights, and (ii) legitimate justifications associated with the rule."  *Boeing Co.*, supra, slip op. at 3.[25]  The General Counsel concedes that the Confidentiality Agreement is a facially neutral rule.

I agree with the General Counsel that when the alleged provisions are read in *isolation* the Confidentiality Agreement would inhibit Section 7 rights of employees.  An employee may read the rule to preclude the discussion of any information about employees which could include

---

[24] Zweig did not testify. Respondent admits that Zweig is a supervisor within the meaning of Sec. 2(11) of the Act and as an agent of Respondent within the meaning of Sec. 2(13) of the Act.

[25] As result of the balancing, the Board established three categories of employment rules, policies and handbook provisions which are not part of the test but are a result of the application of the test.

terms and conditions of employment and wages with any other employee or third party such as a union. Moreover, an employee could read the rule to prohibit the discussion of confidential information which could include working conditions, the taking or posting of photos, making videos or audio recordings, forwarding work email or writing about their employment without

5   receiving permission. Finally, the employee would know that a violation of the Confidentiality Agreement could result in discipline. Thus, employees could read this provision of the Confidentiality Agreement and understand that they could not share employee information such as wages, working conditions, and contact information with other employees and with unions which directly impacts employees' Section 7 rights. See *Rio All-Suites Hotel & Casino*, 362

10  NLRB 1690, 1691 (2015); *Hyundai America Shipping Agency, Inc.*, 357 NLRB 860, 871 (2011), reversed on other grounds 805 F.3d 309 (D.C. Cir. 2015).

However, the Confidentiality Agreement cannot be read in isolation and must be considered in the full context of the events at the time. See *Lafayette Park Hotel*, supra at 825,

15  827. To this point, the Confidentiality Agreement begins with the reason why the employees are asked to reaffirm their commitment to maintaining confidentiality of Tesla information. In the Confidentiality Agreement, the emails from Lipscomb, and the conversations by the HR partners with employees, Respondent explained that the reaffirmation of the Confidentiality Agreement was due to leaks of proprietary information at the workplace. For example, on November 2,

20  2016, Lipscomb again explained to the employees that "[t]here is a ton of exciting things happening at Tesla and the interest level in what we are doing has never been higher. It's absolutely critical that we maintain strict confidentiality on all internal matters as any leak can have a negative impact on our company" (R Exh. 13). At Respondent, in the past, employees received emails from the general counsel and HR director about leaks in the workplace with

25  context such as the launch of the Model 3 Tesla. Thus, considering the totality of the circumstances, I find that reasonable employees would understand the Confidentiality Agreement to be limited to proprietary information.

Even if the Confidentiality Agreement infringes on employees' Section 7 rights,

30  Respondent presented legitimate business justifications to override these rights. An otherwise overbroad rule "can nevertheless be lawful if [it] is justified by significant employer interests." *Lafayette Park Hotel*, supra at 825, fn. 5. Here, Respondent presented evidence that it suffered a series of information leaks which are critical to its success. Even prior to these leaks in August 2016, Respondent sent reminders to employees to maintain confidentiality of proprietary

35  business information. Employees also acknowledged their obligation to maintain confidentiality when they were hired. Respondent asked employees to reaffirm their commitment to not leaking or disclosing confidential information. Respondent sought to ensure every employee understood the reasons for why they needed to reiterate this rule, and later decided to make sure this Confidentiality Agreement was in each employees' Workday account. In addition, in the

40  automotive industry, Respondent has legitimate concerns to maintain security of its confidential proprietary information by not permitting photos or recordings in the workplace. Cf. *Flagstaff Medical Center*, 357 NLRB 659 (2011) (prohibition on the use of cameras to record images of patients and/or hospital equipment, property or facilities is lawful); *Boeing Co.*, supra, slip op. at 15 (prohibition on the use of cameras and photography in the military/civilian aircraft

45  manufacturing plant lawful).

The General Counsel and the Union attempt to connect the employees' unionizing efforts with Respondent's decision to reissue the Confidentiality Agreement thereby showing the "true" reason for the rule. However, in reviewing the entire record, I can find no connection. Although several employees worked on the unionization campaign in the fall of 2016, there is no evidence that Respondent knew of its existence. Even when Galescu tried to take a photo of the Confidentiality Agreement, Zweig told him that he could not take a photo and that the document would be available in his Workday account. Zweig never explained to Galescu why he could not take a photo of the Confidentiality Agreement and Galescu never told Zweig why he wanted to take a picture. Although later the Union complained to members of the California State Assembly, there is no evidence that Zweig knew or could have known that Galescu sought a photo of the Confidentiality Agreement for Section 7 purposes.

In sum, Respondent did not violate the Act as alleged in paragraphs 7(a) and (b), and complaint allegations are dismissed.

V.    COMPLAINT PARAGRAPHS 7(C) THROUGH 7(I) AND 7(N) THROUGH 7(P): RESPONDENT VIOLATED SECTION 8(A)(1) OF THE ACT ON FEBRUARY 10 AND MAY 24 WHEN EMPLOYEES PASSED OUT LEAFLETS

The General Counsel alleges at complaint paragraphs 7(c) through (i) that on February 10, Respondent's various security guards, who are agents of Tesla, on four separate occasions restrained and coerced employees who were engaged in leafleting in Respondent's parking lot, outside the Fremont facility, by repeatedly asking them to produce their employee badges and/or telling them to leave the premises (GC Br. at 53–57). The General Counsel also alleges at complaint paragraphs 7(n) through (p) that Respondent's security guards acted in a similar manner on May 24, when employees were leafletting in Respondent's parking lot outside the Fremont facility (GC Br. at 57–58). Respondent argues that the General Counsel failed to prove that the unidentified security guards and human resources person are agents of Respondent (R Br. at 56–59).[26] Respondent also argues that the security guards lawfully requested the employees' badges (R Br at 59-62).

## February 10 Leafletting

On February 10, the day after Moran published his blog post, "Time for Tesla to Listen," members of the VOC first passed out leaflets at the Fremont facility parking lot (Tr. 450). The double-sided leaflet included Moran's blog post on the frontside and a letter from the State of California Assembly to Respondent regarding the Confidentiality Agreement on the backside (Tr. 48; GC Exh. 8). Moran, Sanchez, and Ortiz, who are members of the VOC, as well as other Tesla employees, passed out the leaflets in the parking lot where employees and members of the public may park.

---

[26] Respondent does not argue that the "red shirt male supervisor no. 1" as identified in the complaint is not a supervisor or agent of Respondent. But even if Respondent does argue as such, the red colored shirt male supervisor is also an agent of Respondent due to his apparent authority during the questioning of Sanchez.

Sanchez testified that he arrived at the Union's office, which is one block from the Fremont facility, on February 10, at 3:30 a.m. to pick up approximately 100 leaflets (Tr. 90, 140–141; GC Exh. 8). Thereafter, Sanchez drove and parked his car by door 2 in the Fremont facility's parking lot (Tr. 92–94; GC Exh. 4). As he drove through the parking lot, Sanchez was

5    not required to show or scan his employee badge, which is consistent with his prior experiences entering the Fremont facility parking lot.[27]

After Sanchez parked, he stepped out of his car and walked towards door 2. Sanchez passed out leaflets to at least three employees at door 2 (Tr. 94–95; GC Exh. 8). In addition, an

10   unidentified security guard, who Sanchez described as a young male Latino and based on the testimony of witnesses is protection associate David Rios (Rios), approached him outside of door 2, asking if Sanchez was an employee (Tr. 95–96).[28] Sanchez told the security guard that he had been an employee for almost 5 years. Sanchez testified that the security guard told Sanchez to leave the property. Sanchez responded by stating that he was not working, was

15   outside the Fremont facility, and legally had the right to be in the parking lot (Tr. 96). This brief encounter lasted less than three minutes, and upon its conclusion, the security guard went back inside of the Fremont facility via door 2 (Tr. 96).

Sanchez remained at door 2 and continued to pass out leaflets (Tr. 97). Approximately 5

20   minutes later, Rios returned to speak to Sanchez. Sanchez testified that the security guard "aggressively" asked for his employee badge (Tr. 97–98). Sanchez showed the security guard his employee badge, and the security guard appeared to take a photo of it with his phone (Tr. 98–99). The security guard handed the employee badge back to Sanchez. The security guard told Sanchez to again leave the parking lot. Sanchez again stated that he was within his legal rights

25   to remain in the parking lot. Rios testified that Sanchez handed him a leaflet (Tr. 1712–1713). Rios then returned to inside the Fremont facility via door 2.[29] Sanchez moved from door 2 to door 1.

As Sanchez began to walk towards door 1, he heard someone exiting from door 2 again.

30   Sanchez turned around, and a different security guard, described by Sanchez as "older middle

---

[27] While on medical leave, Sanchez continued to have access to his work email and was never told he could not return to the Tesla parking lot (Tr. 144, 154–155). I credit Sanchez' testimony as it was uncontradicted by any evidence.

[28] In the complaint, the General Counsel did not identify any of the names of the security guards. Respondent complains in its Brief that it was prejudiced by not knowing the identities of these security guards, and that I erroneously precluded Respondent's use of photographs of security guards during cross-examination (R Br. at 44–45). I denied Respondent the opportunity to use the photographs in cross-examination on day 3 of the trial because Respondent had not produced these same photos with names in response to the General Counsel's subpoena duces tecum (Tr. 417). When the trial resumed in September 2018, 4 months after the first 4 days of trial, Respondent then provided the names associated with these security guard photos to the General Counsel pursuant to the subpoena duces tecum (Tr. 790–791). Despite the General Counsel's objections due to the late receipt of these names with security guard photographs, I permitted Respondent to use the photographs to exam witnesses. Respondent cannot now claim prejudice for failing to timely comply with General Counsel's subpoena duces tecum at the start of the hearing.

[29] These two incidents with Rios as the young male Latino security guard at door 2 are the allegations in complaint par. 7(d).

eastern," walked down the stairs and asked him what he was doing (Tr. 100). Sanchez responded that he was handing out leaflets. This security guard asked what the leaflet was for and was it for a union (Tr. 101). When Sanchez responded in the affirmative, the security guard said that unions are worthless, and he should not join one. Sanchez responded that the security

5   guard's opinion was his own, and the security guard then asked for his employee badge, which Sanchez provided for the second time that morning (Tr. 101–102). This security guard also appeared to take a picture of Sanchez' employee badge with his phone (Tr. 102). Sanchez then began walking towards door 1. Meanwhile, the security guard turned back towards door 2. Rios testified that he overheard this conversation and confirmed that the security guard made a

10   comment that unions were no good and did nothing for him (Tr. 1704–1708).

After Rios' encounter with Sanchez, Rios phoned Senior Security Manager Greg Slettvet (Slettvet) to let him know what was happening (Tr. 1713–1714).[30] Slettvet told Sanchez to find out if the people handing out leaflets were employees, to document everything, and if they were

15   not employees to tell them to leave as they were trespassing (Tr. 1715, 1752).[31] Thereafter, a few minutes after Sanchez left for door 1, Rios also went to door 1 (Tr. 1749).

Meanwhile, Ortiz' work shift ended around 2:30 a.m., and he then went to the Union's office and waited for Moran and a group of employees who planned to leaflet around 4:30 a.m.

20   at the Fremont facility (Tr. 451, 689). Ortiz and Moran drove to the Fremont facility, parked by door 1, and began leafletting (Tr. 452–453, 777). After being at door 2, Sanchez met Ortiz and Moran as well as Mike Catura (Catura) at door 1 (Tr. 106).[32] Moran testified that Sanchez told him that he had been at door 2 but was being harassed so he came to door 1 to help pass out leaflets (Tr. 695, 777–778). Ortiz and Moran stood by the ramp at door 1 to pass out leaflets

25   while Catura and Sanchez stood by the stairs to pass out leaflets (Tr. 107).

Twenty minutes after Sanchez arrived at door 1, at approximately 4:20 a.m., two security guards, one of whom was Rios, drove slowly by Sanchez, Moran, Ortiz and Catura in a Tesla security vehicle (Tr. 108). Rios testified that he arrived at door 1 at approximately 4:23 to 4:24

30   a.m. to speak to Moran since Sanchez told him that the author of the leaflet blog post was at door 1 (Tr. 1749). Rios sought to gather information as asked by Slettvet (Tr. 1749). Rios testified that he spoke to Moran, Ortiz and Catura and told them that if they were not employees they would need to leave, but if they are employees, they need to show him their employee badges (Tr. 1718–1719, 1746). Moran, Ortiz and Catura responded that they were employees and

35   provided their employee badges (Tr. 1718–1720). Rios took pictures of their employee badges since he was asked to document "everything" and let the three employees continue passing out leaflets (Tr. 1720). Rios then left the four employees to leaflet.

Before Rios' shift ended, he sent an email to Slettvet summarizing the morning events

40   and noted the names of the persons handing out leaflets along with their employee badge

---

[30] Rios denied telling Sanchez to leave the Fremont facility parking lot or to stop passing out leaflets (Tr. 1732). I cannot credit Rios' testimony as the sequence of events makes it more likely than not that he twice told Sanchez to leave the Fremont facility parking lot *prior* to talking to Slettvet as these two encounters with Sanchez took place approximately 5 minutes apart.

[31] Slettvet did not testify at the hearing.

[32] Catura did not testify at the hearing.

numbers (R Exh. 34).  Rios later sent an email with the employee badge pictures he took that morning to Slettvet (R Exh. 35; Tr. 1751).

Five to 10 minutes after Rios left, at around 4:45 to 5 a.m., a female security guard partially exited door 1 on the ramp side (Tr. 455–456, 702).  The female security guard told Moran, Ortiz, Sanchez, and Catura that they should leave and were not allowed to be in the Fremont facility parking lot (Tr. 110, 455, 457, 702).  Moran told the female security guard that they are Tesla employees and have every right to be there to distribute leaflets (Tr. 458, 703).  The security guard stated that she needed to document Moran's name, and he asked for her name as well (Tr. 702–703).  The security guard then went back inside door 1 to her security podium.[33]

Thereafter, Moran, Ortiz, Sanchez, and Catura continued to distribute their leaflets for another 10 to 15 minutes when another male security guard exited door 1 (Tr. 459, 703–704).  This male security guard also told them to leave the Fremont facility parking lot, and Moran and Sanchez stated that they were in the parking lot within their legal rights (Tr. 112).  This security guard asked for their employee badges, and he appeared to take a photo of each employee badge with his phone.  Thereafter, the security guard re-entered door 1.[34]  Sanchez, Ortiz, Moran, and Catura continued to hand out leaflets until about 5:20 to 5:30 a.m. when Moran began his work shift and Ortiz went to the union office (Tr. 690–691).  Catura stopped passing out leaflets at 5:45 a.m. when his work shift began, and Sanchez continued to hand out leaflets until 6:20 a.m. (Tr. 113).

Sanchez then drove to Respondent's north admin building and parked in the adjacent parking lot so he could pass out more leaflets (Tr. 115; GC Exh. 5).  On his walk towards door 3, Sanchez passed out leaflets to employees (Tr. 115–116).  Sanchez arrived at door 3 at approximately 6:25 to 6:30 a.m. (Tr. 120).  Five minutes later, a different female security guard exited the interior of the Fremont facility at door 3.  This female security guard asked Sanchez if he was an employee, to which he responded in the affirmative and offered the number of years he had worked at Tesla (Tr. 122).  The security guard told him to leave the Tesla parking lot and asked for his employee badge.  Sanchez offered his employee badge to the security guard who "snatched [his] employee badge aggressively from [his] hand" and appeared to take a photo of it with her phone (Tr. 122).  The security guard handed the employee badge back to Sanchez and re-entered the Fremont facility at door 3.[35]

Sanchez continued to hand out leaflets for a few more minutes until 6:40 a.m., took a break in his car, and then began leafletting again at 8 a.m. (Tr. 123).  After handing out more leaflets, Sanchez then decided to go to another parking lot where the Fremont facility's back entrance is located (Tr. 124).  At this location, Sanchez continued to talk to employees.  Sanchez then attempted to enter the Fremont facility from this back entrance due to his need to use the restroom, but when he scanned his employee badge for the first time that morning, the door would not unlock.  Thus, a security guard, whom Sanchez had not yet met that morning, at the exterior of the back entrance used a walkie-talkie to call in his employee badge number (Tr. 125–126).  Three minutes later, an unidentified male employee wearing a red colored Tesla shirt came

---

[33] This incident with the female security guard at door 1 is the allegation in complaint par. 7(e).
[34] This incident with the male security guard at door 1 is the allegation in complaint par. 7(f).
[35] This incident with the female security guard at door 3 is the allegation in complaint par. 7(g).

out of the back entrance and asked, "Are you Jose Moran" (Tr. 126–127).  Sanchez responded that he was not but that he was with him.  This unidentified employee told Sanchez to leave the premises.[36]  Sanchez responded that he was there within his legal rights and questioned whether the individual sought to take away his rights (Tr. 127).  Thereafter, the individual took out his
5   phone, aimed the back of it where the camera lens is located 6 inches away from Sanchez' face, and dialed the phone.  Sanchez testified that the ring tone sounded like the Apple iPhone iPhone ringtone for the FaceTime function.  Sanchez then heard from the phone a female's voice who stated that she noticed that he was on a leave of absence due to injury and should be home resting.  Sanchez responded that he was on the property within his legal rights, was not acting
10   contrary to his restrictions, and only handing out leaflets (Tr. 129).  The female individual told Sanchez to go home to rest and asked him to again leave the premises.  Sanchez then left the Fremont facility.[37]

15   Sanchez testified that he took three smoking breaks in the front parking lot during each of his work shifts, and only once did a security guard ask him to show his employee badge (Tr. 83; GC Exh. 36).  Sanchez also testified that no security guard had ever told him to leave the Fremont facility parking lot when he was on his smoke breaks (Tr. 83).

20   Sometime in February, according to Jeremie Hansen (Hansen), Slettvet, Hansen's supervisor, told him to allow employees to engage in leafletting if the employees were not working and distributing only in nonwork areas (Tr. 1448, 1477).[38]  Hansen testified that he shared this information from Slettvet to Respondent's employees who reported to him as well as with the contract security guard manager, but Hansen could not recall when specifically, he provided these instructions to the security guards (Tr. 1450, 1477, 2441–2443).  The evidence
25   shows that Slettvet first documented his instructions in September, but Slettvet orally communicated his instructions prior to then (R Exh. 21).

## May 24 Leafletting

[36] This incident with the male, red colored Tesla shirt wearing employee is the allegation in complaint par. 7(h).

[37] This incident with the female employee on the phone is the allegation in complaint par. 7(i).

[38] Several security employees corroborated Hansen's testimony regarding instructions from Slettvet on how to handle employees and non-employees who leaflet in the parking lot at the Fremont facility. For example, an email on February 10 at 6:26 a.m. from Samuel Ali (Ali), the grave shift supervisor for Securitas, corroborates Hansen's testimony (R Exh. 20).  Ali noted in an email to communicate to the next security shift that union advocates were present at doors 1, 2, and 3 and that these union advocates were Respondent's employees which made the situation "a little difficult" (R Exh. 20).  A copy of the union leaflet was placed in the security control room.  In response to Ali's email, Ian McEwen (McEwen), account manager for Securitas, replied that Slettvet asked that the union representatives only be identified but security was not to interfere as they are employees and can be on the site (R Exh. 20).  In addition, on May 24, Felipe De La Cruz (De La Cruz), who is an operator at the security operations center or control room, testified that at 6:01 a.m., he sent an email to Slettvet and Hansen with the subject line: "U.A.W. activity" (R Exh. 44).  De La Cruz reported that several people were handing out fliers outside the doors, lobby, and gates (R Exh. 44; Tr. 2460).  De La Cruz stated that he created a "ticket" and added all the names of the employees handing out leaflets (R Exh. 44; Tr. 2445, 2468).  De La Cruz testified that he sent out all six patrols to look out for union activity (Tr. 2471).  De La Cruz testified he sent the email to Slettvet because Slettvet was interested in monitoring union activity (Tr. 2459–2460, 2471).

On May 24, Branton Phillips (Phillips), who is a current material handler for Respondent, drove to the Union's office near the Fremont facility to pick up leaflets to pass out before his work shift began at 6 a.m. (Tr. 390–392; GC Exh. 9). The leaflet included the Union slogan, "Driving a Fair Future at Tesla," and concerned injuries at Tesla. The title of the article, "The
5   Truth about Injuries at Tesla" discussed Cal/OSHA forms that employees obtained from Respondent. The article also discloses that employees provided this data to a California non-profit which analyzed the data. The leaflet provided the Union organizing office address as well as the Facebook page and union campaign website. On the back side of the leaflet was the story of a GA employee who had been injured several times while on the job.
10

Phillips, wearing his Tesla pants, shirt and cap, arrived at the parking lot near door 4 of the Fremont facility a little past 5 a.m. (Tr. 392–393). Phillips entered door 4 by swiping his employee badge which permitted him to enter the Fremont facility and walked up to the female security guard at the podium. Phillips pointed to his picture on the female security guard's
15   laptop, stating that was him and that he planned to hand out leaflets (Tr. 395-397). The female security guard stated, "No, you can't do that" (Tr. 398).[39] Phillips told her to be very careful or she could have a lawsuit on her hands.

Phillips then went outside of door 4 to pass out leaflets. Less than ten minutes later, a
20   male security guard approached Phillips with a walkie-talkie in his hands (Tr. 400–401). The security guard said to Phillips, "so you're the one with the fliers" (Tr. 401). Phillips stated that he was. The security guard responded stating something to the effect of leave right now or be fired (Tr. 401-402). Phillips told him that he was permitted to pass out leaflets by the National Labor Relations Board. The security guard then asked to see his employee badge (Tr. 402).
25   Phillips gave the security guard his employee badge but due to its faded condition, the security guard could not read it (Tr. 401–402).[40] A second male security guard approached them. The first male security guard again told Phillips to leave right away.[41]

Phillips became nervous and called the union office (Tr. 403-404). With the union office
30   on his speakerphone, Phillips told the union employee that the security guards were telling him to leave. After a short exchange, the union employee told Phillips to not "be combative" and to ask for the security guards' identifications and employee badge numbers (Tr. 405). At this point, a third security guard then showed up. Phillips heard the walkie-talkie sound of one of the security guards where he heard the security guard report that Phillips refused to provide his
35   employee badge which is contrary to what occurred earlier (Tr. 406–406). Then, a Tesla security vehicle arrived, and a fourth security guard exited the vehicle and spoke to the three security guards present with Phillips (Tr. 409). Phillips testified that the fourth security guard who stepped out of the Tesla security vehicle asked if Phillips was leafleting. One of the security guards responded that Phillips had leaflets, and the fourth security guard from the security
40   vehicle responded that Phillips was permitted to leaflet (Tr. 411). The three security guards left immediately but the fourth security guard in the Tesla security vehicle remained in the area for at least 10 minutes while Phillips passed out leaflets (Tr. 411–412). Phillips stopped passing out

---

[39] This incidents with the female security guard at door 4 is the allegation in complaint par. 7(o).
[40] Even though his photo was faded, Phillips's security badge continued to operate to open the door at the Fremont facility (Tr. 419–420). Moreover, Phillips did not replace his badge until November.
[41] This incident with the male security guard at door 4 is the allegation in complaint par. 7(p).

leaflets at 5:45 a.m.  A computer assisted dispatch (CAD) report was generated on May 24 based on a call received at 5:21 a.m. (R Exh. 23). This CAD report indicated that Phillips along with Catura and Moran as well as non-employees passed out leaflets that day (R Exh. 23).  Galescu also passed out leaflets prior to the start of his shift (Tr. 856–857).

5

*Credibility Findings*

Here, the witnesses for both parties do not drastically differ as to what occurred on the mornings of February 10 and May 24.  Specifically, the General Counsel's witnesses, aside from some minor inconsistencies which are to be expected, testified similarly and with detail as to

10　what occurred during these leafletting events.  I adopt the General Counsel's witness' version of events due to the extraordinary details they testified about as to the timing of events, where they were stationed, and with whom during the leafletting.  Their collective testimony seemed truthful and unrehearsed.  In contrast, Respondent only presented one witness to some of the events of

15　February 10 while Respondent's other witnesses did not engage in any conversations with the employees on either morning and thus, are not witnesses to the complaint allegations.

Sanchez, who is a current production associate in GA on extended medical leave, provided highly credible testimony as he provided details as to the events of February 10, when

20　he was leafletting.  Moreover, even on cross-examination, Sanchez recalled how many female security guards he spoke to disagreeing with the number presented to him in the questioning. Sanchez recalled without contradiction, on cross-examination, the description of each guard at each door and in the sequence in which he encountered them.  To recall with details the events of this morning with few inconsistent statements supports the truthfulness of his testimony.  In

25　addition, Sanchez is a current employee which solidifies his credibility as he is testifying against his pecuniary interests. See *Avenue Care & Rehabilitation Center*, 360 NLRB 152, 152 fn. 2 (2014); and *Flexsteel Industries*, 316 NLRB 745 (1995), affd. mem. 83 F.3d 419 (5th Cir. 1996).

Ortiz and Moran, a current employee, also provided corroborating testimony as to their

30　role and experience during the February 10 leafletting.  Ortiz remained honest and calm when he testified regarding the February 10 leafletting.  Moran also did not waver in his testimony.  For example, Ortiz, Moran, and Sanchez testified consistently as to the physical positions of the individuals passing out leaflets (Tr. 454–455).  Their recollections seemed plausible considering the sequence of events.  Like Sanchez, Moran is testifying against his pecuniary interests.

35

As for the May 24 leafletting, I also found Phillips to be a highly credible witness as he is a current employee and testifying against his pecuniary interests.  Phillips provided specific details as to the descriptions of the security guards he encountered.  Phillips also remained calm and steadfast during both his direct and cross-examinations.  Furthermore, Phillips' testimony

40　was not contradicted by any other witness or documentary evidence.

As for Respondent's witness, Rios, who was employed directly by Respondent on February 10, I do not credit the entirety of his testimony as it is inconsistent with the credited evidence that proves to be logical in terms of the sequence of events.  But I do credit his

45　testimony that Slettvet told him to determine whether those leafletting were employees by checking their employee badges and if so to permit them to leaflet and to document their names. Respondent's other witnesses did not actually observe the alleged violations of the Act where

other security guards asked employees to leave the Fremont facility parking lot and/or repeatedly asking them to produce their employee badges. However, like Rios, they did confirm that at some point during the February 10 leafletting, Slettvet advised them to check on the employment status of those who were leafletting, to document their names, and to permit them to leaflet if they were employees.

*Legal Analysis*

An employer may not prohibit employees from distributing union literature in nonworking areas on nonworking time. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 (1945). Specifically, the Board has held that "[t]he distribution by off-duty employees of union literature in company parking lots is clearly protected by Section 7 of the Act" absent a showing that any work performed there is integral to the business operations. *St. Luke's Hospital*, 300 NLRB 836, 837 (1990); *Meijer, Inc.*, 344 NLRB 916, 917 (2005), enf. in relevant part 463 F.3d 354 (2006); *Tri-County Medical Center*, 222 NLRB 1089 (1976) (rule which denies off-duty employees entry to parking lots, gates, and other outside nonworking areas will be found invalid); *Southern Bakeries, LLC*, 368 NLRB No. 59, slip op. at 1–2 (2019) (citing *Piedmont Gardens*, 360 NLRB 813 (2014)). In *St. Luke's Hospital*, the Board held that an employer violated Section 8(a)(1) of the Act when a director of security told an off-duty employee he would need to leave the employer's parking lot when he was found to be leafletting, and even after asking if he was an employee, which he was, told the employee that he needed leave the property. Id.[42]

The complaint allegations here concern the leafletting of union material by off-duty employees on nonwork time in the Fremont facility parking lot on February 10 and May 24. During events on February 10 and May 24, the credited evidence shows that employees were told by Respondent's security guards, human resources person and supervisor at various times to leave the premises. They were also asked repeatedly to show their employee badges. Based on Board law, Sanchez, Moran, Ortiz and Phillips lawfully engaged in protected concerted activity when they passed out leaflets during nonduty time in Respondent's parking lot. Respondent does not argue that the parking lot is a work area but claims that it is considered private property (R Br. at 42). Despite Respondent's claim, Respondent does not make any arguments to support a showing that a prohibition of leafletting is justified for business reasons. Moreover, the General Counsel argues that Respondent's security guards as well as human resources person and supervisor restrained and coerced employees by repeatedly asking for their employee badges and for telling the employees they must leave the Fremont facility parking lot.

Prior to analyzing whether the security guards and human resources person restrained and coerced employees thereby violating Section 8(a)(1) of the Act, a question to be answered is whether the security guards and human resources person are agents of Respondent within the

---

[42] In a health care setting, the Board has acknowledged an employer's interest in limiting employee solicitation or distribution based on patient care such that hospitals may be warranted to prohibit solicitation and/or distribution in immediate patient care areas, but the employer carries the burden of proving legitimate business considerations. See *St. John's Hospital & School of Nursing, Inc.*, 222 NLRB 1150 (1976); *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 507 (1978) (burden is on hospital to show that the selective ban on solicitation is "necessary to avoid disruption of health-care operations or disturbance of patients").

meaning of Section 2(13) of the Act.  As set forth in Section 2(13), when making an agency determination, "the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."  If they are not agents, then any unlawful statements cannot be attributed to Respondent.  The burden of proving an agency relationship is on the party asserting its existence which in this instance is the General Counsel.  "The agency relationship must be established with regard to the specific conduct that is alleged to be unlawful. An individual can be a party's agent if the individual has either actual or apparent authority to act on behalf of the party."  *Cornell Forge Co.*, 339 NLRB 733, 733 (2003) (citing *Pan-Osten Co.*, 336 NLRB 305, 306 (2001)).  "The test is whether, under all circumstances, the employees 'would reasonably believe that the employee in question [the alleged agent] was reflecting company policy and speaking and acting for management.'"  *GM Electrics*, 323 NLRB 125, 125 (1997); *Southern Bag Corp.*, 315 NLRB 725, 725 (1994).  The Board has found that security guards may be agents of an employer as defined by Section 2(13) of the Act when the guard may stop persons from entering a plant.  *Cooking Good Division of Perdue Farms, Inc.*, 323 NLRB 345, 351 (1997) (security guards placed in a position to stop individuals from entering premises are cloaked with apparent authority).

The record established that the security guards were stationed at the entrances to each of the doors of the Fremont facility as well as patrolling the parking lot.  Furthermore, all security guards, contractor or direct employee of Respondent, wore the same attire and drove Respondent's vehicles with the word, "Security" written on its sides.  In addition, the security guards possessed the authority to check an employee's badge to determine whether the employee could enter the Fremont facility.  The morning of February 10, security guards at different times asked Sanchez, Ortiz, Moran, and Catura for their employee badges.  The morning of May 24, security guards asked Phillips the same questions.  But these same security guards, after learning that the individuals were employees, still told them to leave the parking lot.  Also, the security guards repeatedly asked these same individuals for their employee badges during the entire time of their leafletting.  Based on the credited evidence, Sanchez, Ortiz, Moran, Catura, and Phillips could reasonably believe that the security guards acted as Respondent's agents with apparent authority and were acting on Tesla's orders and behest.  Accordingly, Respondent's security guards who interacted with Sanchez, Ortiz, and Moran on February 10 as well as with Phillips on May 24, were agents of Respondent within the meaning of Section 2(13) of the Act.  In addition, the human resources person who spoke on the phone with Sanchez acted as an agent of Respondent as she also told him to leave the premises after confronting him with his medical leave status.  It should be noted that even if the human resources person who confronted Sanchez was not actually a human resources person, the result of her apparent authority is not diminished; her actions, and not her official title, is of import.

As to whether the security guards' conduct was lawful, the General Counsel's witnesses all testified consistently that they were told numerous times to leave the Fremont facility parking lot even after the security guards verified their employment with Tesla.  When off-duty employees are told to leave an employer's parking lot when passing out union-related literature via leaflets, Respondent's actions violate the Act.  See *New York New York Hotel & Casino*, 356 NLRB 907, 913 (2011) ("it is well established that an employer that operates on property it owns ordinarily violates the Act if it bars its employees from distributing union literature during their nonwork time in nonwork areas of its property.  Moreover, such an employer's off duty employees have a presumptive right to return to their worksite and gain access to exterior,

nonwork areas for purposes of otherwise protected solicitation").  Here, Rios told Sanchez twice to leave the Fremont facility parking lot the morning of February 10, after he confirmed that Sanchez was an employee.  Later, a female and male security guard told Moran, Ortiz, Sanchez, and Catura that they should also leave the Fremont facility parking lot. Almost 2 hours after they began leafletting, Sanchez went to the north admin building and was told three more times (by a security guard, a male supervisor, and a human resources person) to leave the Fremont facility. On May 24, a security guard told Phillips that he could not pass out leaflets, and another security guard told Phillips twice that he needed to leave the Fremont facility parking lot even though Phillips had provided his employee badge.  Despite verifying employment, Respondent's agents continued to question the individuals' employment status on both dates and told them to leave the Fremont facility parking lot.  Even though the employees continued to pass out leaflets after the security guards told them to leave the Fremont facility parking lot, their actions of telling the employees that they needed to leave, and thereby stop leafleting, without a proper business justification violates Section 8(a)(1).  Likewise, the actions of the male supervisor and human resources person telling Sanchez he needed to leave the Fremont facility violates Section 8(a)(1). Thus, Respondent violated Section 8(a)(1) of the Act as alleged by the General Counsel in complaint paragraphs 7(c) through (i) and (n) through (p).

Respondent's defenses are without merit.  Respondent argues that its defense was hampered by the General Counsel not naming the security guards, the supervisor, and the human resource person who spoke to the employees on February 10 and May 24.  I reject Respondent's argument.  Respondent could have conducted its own inquiry as to who the employees could have possibly spoken to during those morning leafletting periods.  The fact that the employees do not know the names of those to whom they spoke is reasonable considering the security guards, the supervisor and human resources person did not identify themselves.  The General Counsel's complaint allegations were sufficiently pled to place Respondent on notice of the allegations against it, and its method or manner to defend itself is its own responsibility.[43]

Respondent argues it had the right to verify whether the individuals who were passing out leaflets were employees.  Certainly, Respondent could determine whether the individuals passing out leaflets were employees but even after checking on the employment status of the individuals, Respondent's various security guards, male supervisor and human resources person continued to tell the employees to leave the Fremont facility parking lot and therefore, stop passing out leaflets.  Respondent claims that even if the security guards, male supervisor, and human resources person are considered its agents, they acted in excess of their authority and Respondent should not be liable for their actions.  I do not agree.  As agents of Respondent, the security guards, male supervisor, and human resources person's conduct of informing the leafletting employees that they had to leave the parking lot are properly attributable to Respondent.  See *Ideal Elevator Corp.*, 295 NLRB 347, 347 fn. 2 (1989) ("the Board continues to hold that under Sec. 2(13) of the Act 'an employer is bound by the acts and statements of its supervisors whether specifically authorized or not.'" (quoting *Dorothy Shamrock Coal Co.*, 270 NLRB 1298, 1299 (1986), enfd. 833 F.2d 1263 (7th Cir. 1987)).

---

[43] Respondent never filed a motion for a bill of particulars in response to the General Counsel's complaint.

Even if Respondent is liable for their agents' actions, Respondent argues that the employees continued to leaflet even after they were asked for their employee badges. The Board does not consider the motivation behind remarks or their actual effect. *Miller Electric Pump & Plumbing*, 334 NLRB 824 (2001). Instead, "the basic test for evaluating whether there has been a violation of Section 8(a)(1) is an objective tests, i.e., whether the conduct in question would reasonably have a tendency to interfere with, restrain, or coerce employees in the exercise of their Section 7 rights, and not a subjective test having to do with whether the employee in question was actually intimidated." *Multi-Ad Services*, 331 NLRB 1226, 1227–1228 (2000) (emphasis in original), enfd. 255 F.3d 363 (7th Cir. 2001). Thus, I find that Respondent violated Section 8(a)(1) of the Act as alleged in complaint paragraphs 7(c) through (i) and (n) through (p).

VI.    COMPLAINT PARAGRAPH 7(J): RESPONDENT VIOLATED SECTION 8(A)(1) OF THE ACT WHEN ON MARCH 23, SUPERVISOR ARMANDO RODRIGUEZ TOLD EMPLOYEES THEY COULD NOT DISTRIBUTE STICKERS, LEAFLETS OR PAMPHLETS WITHOUT RESPONDENT'S APPROVAL AND THREATENED TERMINATION IF THEY VIOLATED THIS RULE

The General Counsel alleges that on March 23, Supervisor Armando Rodriguez (Rodriguez) informed employees that distribution of stickers, pamphlets and leaflets would be grounds for termination which violates the Act (GC Br. at 58–60). Respondent argues that Rodriguez lawfully informed employees that Respondent's property could not be vandalized (R Br at 65–66).

On March 23, Galescu participated in a prestart meeting with approximately 30 shift co-workers led by Rodriguez (Tr. 843).[44] Galescu testified that during this meeting, Rodriguez pulled out his black notebook, and announced, "Stickers, leaflets, and pamphlets that's not approved by Tesla could be—passing them out could be a terms of termination and be active vandalism" (Tr. 844, 1063).[45] Rodriguez asked if anyone had questions but no one asked any questions. Union stickers, pamphlets and business cards had been passed out by associates in the month prior to Rodriguez' March 23 prestart meeting (Tr. 844–845).

Rodriguez testified that in March for 1 to 2 weeks he noticed UAW stickers placed in the bathroom on stalls as well as on information sheets (known as "flow downs") (Tr. 2137, 2148–2149). However, Rodriguez admitted that he did not document the UAW stickers he saw on the walls of the bathrooms (Tr. 2153). As a result of his observations, during a prestart meeting on March 23, Rodriguez told his team that vandalism is not tolerated at Respondent (Tr. 2138, 2146). In contrast to Galescu, Rodriguez testified, "We can't be defacing Tesla property, especially with literature that's not Tesla approved [. . .] If you guys want to put it on your person, put it on your hat, put it on your shirt, it's all – all that's allowable, but we just can't post stuff on the wall because it's considered vandalism, and—and doing so could—a disciplinary

---

[44] At a prestart meeting, which occurs before the beginning of a work shift, a supervisor usually discusses safety and production (Tr. 843).

[45] In his Board affidavit, dated April 27, Galescu stated, "Armando pulled up a little black book, a pad of paper, and he read from his notebook. Armando said something like, 'Stickers or leaflets and pamphlets that are not approved by Tesla—you guys can't pass them out unless it is approved by Tesla" (Tr. 1065). Galescu's testimony at the hearing and during the investigation in his affidavit are consistent, which reinforces his credible testimony.

action could—could—it could lead to disciplinary action if you're caught vandalizing Tesla property" (Tr. 2138). Rodriguez denied reading from a black book in which he keeps notes to be discussed during prestart meetings (Tr. 2147–2148). On cross-examination, Rodriguez could not recall any other topics he discussed during this prestart meeting (Tr. 2156). Rodriguez also
5    denied discussing the passing out of pamphlets (Tr. 2139, 2144).

*Credibility Findings*

I adopt Galescu's version of the prestart meeting held on March 23. Galescu, who is a
10    current employee testifying against his pecuniary interests, testified with conviction as to what occurred during the meeting. Galescu's recollection at the hearing of what Rodriguez stated during the meeting regarding preapproval to pass out stickers, leaflets or pamphlets closely matches his Board affidavit taken only one month after the meeting. Galescu did not mention in his Board affidavit that Rodriguez threatened termination if they passed out nonapproved
15    material, but disciplinary action was mentioned as admitted by Rodriguez. In contrast, Rodriguez could not recall any other events during that day including other topics discussed during the meeting. This lack of recollection of other topics discussed reflects poorly on his credibility. Thus, I credit Galescu's testimony over Rodriguez' testimony.

20    *Legal Analysis*

The Board has held that any rule requiring employees to receive preapproval for engaging in protected concerted activity, such as distributing union paraphernalia, during nonwork times and in nonwork areas is unlawful. See *Enterprise Products Co.*, 265 NLRB 544,
25    554 (1982), citing *Peyton Packing Co.*, 49 NLRB 828 (1943), and *Stoddard-Quick Mfg. Co.*, 138 NLRB 615 (1992); *Brunswick Corp.*, 282 NLRB 794, 795 (1987). The Board has also held that threatening employees with reprisals for engaging in union or other protected concerted activities is coercive to the exercise of their Section 7 rights under the Act. *Metro One Loss Prevention Services Group*, 356 NLRB 89, 89 (2010) (employer violates Sec. 8(a)(1) if it communicates to
30    employees that it will jeopardize their job security, wages, or other working conditions if they support the union); *Baddour, Inc.*, 303 NLRB 275 (1991) (an employers' threats of discipline or job loss for participation in protected concerted activities constitute violations of the Act). The Board has applied this theory to explicit or implicit threats to employees, including the loss of their jobs or other adverse work consequences. *Jewish Home for the Elderly of Fairfield County*,
35    343 NLRB 1069, 1091–1096 (2004) (employer violated Sec. 8(a)(1) of the Act by threatening loss of benefits, loss of jobs, and closure of the facility if the employees supported the union); *Sheraton Hotel Waterbury*, 312 NLRB 304, 305 (1993) (implied threat contained in employer's posting violated Sec. 8(a)(1) of the Act); *Metro One Loss Prevention Services Group*, supra at 89–90 (employer implied working conditions could deteriorate if the employees supported the
40    union organizing drive in violation of Sec. 8(a)(1) of the Act).

The credited evidence shows that Rodriguez told employees that they could not distribute any stickers, leaflets or pamphlets not approved by Respondent, which contradicts Respondent's argument that Rodriguez validly told employees not to vandalize Respondent's Fremont facility.
45    Rodriguez' statement to the employees clearly violates Section 8(a)(1) of the Act. In addition, Rodriguez' threat that employees may be terminated for distributing stickers, leaflets, or

pamphlets without prior approval from Respondent also violates Section 8(a)(1) of the Act. In sum, Respondent violated Section 8(a)(1) as alleged in complaint paragraph 7(j).

VII.  COMPLAINT PARAGRAPHS 7(K) AND 7(Q): RESPONDENT DID NOT VIOLATE SECTION 8(A)(1) OF THE ACT WHEN ON APRIL 5, RESPONDENT BY HUMAN RESOURCES PARTNER DAVID ZWEIG ATTEMPTED TO PROHIBIT EMPLOYEES FROM DISCUSSING SAFETY CONCERNS WITH OTHER EMPLOYEES AND/OR THE UNION, BUT VIOLATED SECTION 8(A)(1) OF THE ACT WHEN ON MAY 24, HUMAN RESOURCES BUSINESS PARTNER LIZA LIPSON INTERROGATED EMPLOYEES ABOUT THEIR PROTECTED CONCERTED ACTIVITIES

The General Counsel argues that Respondent created an unlawful rule when placing a "CONFIDENTIAL" watermark on safety logs and summaries given to Galescu and Ortiz which prevented them from sharing these logs with other employees (GC Br. at 60–62). The General Counsel further alleges that Lipson violated the Act when she interrogated Galescu and Ortiz about their protected concerted activity regarding the safety logs they received (GC Br. at 62–64). Respondent argues that Zweig did not prohibit the employees from sharing the safety logs with other employees and with the Union (R Br. at 69–73). Furthermore, Respondent argues that any confusion as to confidentiality was clarified in subsequent correspondences between the employees and Respondent (R Br at 73–74). Moreover, Respondent argues that Lipson did not interrogate employees about the safety logs (R Br. at 91–94).

On April 4, Galescu, on behalf of Ortiz and himself, sent an email to several Tesla' supervisors and/or agents including Hedges requesting Cal/OSHA safety logs (Form 300) and summaries (Form 300A) (GC Exh. 16; Tr. 469, 847). Respondent is required to complete Cal/OSHA safety logs for every work-related death and every work-related injury or illness which meets a certain criterion including restricted work activity and days away from work. Respondent is also required to complete a summary of work-related injuries on a Cal/OSHA summary form. Galescu testified that he made the request for these Cal/OSHA documents because he had been injured while working and had seen other employees get injured while working, and thus, he wanted to inform the Union of the injury rates at Tesla (Tr. 846, 1037). In his email, Galescu writes that there was a concern about the health and safety conditions at Tesla and as such Ortiz and he were requesting copies of Cal/OSHA safety logs and summaries for the current calendar year and five previous calendar years per the California Code of Regulations (Tr. 845).

On April 5, Zweig responded via email to Galescu's request (GC Exh. 17). Zweig agreed to provide redacted Cal/OSHA logs and unredacted summaries to Galescu and Ortiz. Zweig writes, "Cal/OSHA Form 300 and 300A annual summaries are being provided to you with the understanding that you and Richard Ortiz are exercising your rights as current employees to access injury and illness records [. . .]. To protect the privacy and confidential health information of injured and ill employees, we have not provided names on the Cal/OSHA logs" (GC Exh. 17). The top of the Cal/OSHA 300 logs contained the following: "Attention: This form contains information relating to employee health and must be used in a manner that protects the confidentiality of employees to the extent possible while the information is being used for occupational safety and health programs" while the summaries note, "Employees, former employees, and their representatives have the right to review the Cal/OSHA Form 300 in its

entirety" (GC Exh. 17, 18).[46]  In addition, stamped in a watermark across the Cal/OSHA logs and summaries was the word "CONFIDENTIAL" (GC Exh. 17, 18).  Zweig included Hedges in both emails to Galescu and Ortiz.

5          On April 13, Galescu, along with Ortiz, sent a reply via email to Zweig and Hedges (GC Exh. 20).  Galescu requested unredacted copies of the Cal/OSHA logs.  Galescu also noted that Federal and State laws permitted him to share these documents with his coworkers, former employees, and authorized representatives.  Thus, Galescu sought clarification on why the documents provided were marked as confidential (GC Exh. 20).

10

          On April 14, Seth Woody (Woody), director of global environmental health and safety,[47] replied to Galescu's email and declined to provide the information unredacted to protect the privacy interests of current and former employees (GC Exh. 21).  Woody wrote, "We placed the "confidentiality" watermark on the documents out of concern that the documents may be shared
15  with individuals or organizations who are not authorized by Cal. Code Regs. Title 8, §14300.35 to receive injury and confidential health information.  We are not attempting to prohibit you from sharing the documents with current or former employees" (GC Exh. 21).  On April 21, Galescu replied to Woody requesting the legal basis for his position (GC Exh. 22).  Thereafter, on April 28, Woody responded to Galescu, providing unredacted copies of the Cal/OSHA logs (GC Exh.
20  23).[48]  Woody wrote, "We remind you that Cal. Code Regs. Title 8, §14300.35 provides that you may share these documents only with current and former employees or authorized representatives" (GC Exh. 23).  Galescu discussed the unredacted Cal/OSHA summaries and logs with his representatives (Tr. 1049).

25          In response to the release of the unredacted Cal/OSHA logs and summaries, on May 1, Hochholdinger sent an email to Hedges to be disseminated to all production employees concerning safety initiatives and progress (R Exh. 2).  In this email, Hochholdinger summarized safety progress at the Fremont facility as well as the development of safety teams led by production associates and ergonomic improvements.  In addition, Hochholdinger informed the
30  employees that an employee requested Tesla's Cal/OSHA logs, and that Respondent was "required by law to provide them in their entirety" (R Exh. 2).  Hochholdinger further writes, "We wanted to provide advance notice to employees, as we believe this request is intended to ultimately make this information public despite our efforts to protect your privacy" (R Exh. 2). If employees had any questions, they could email the support team.

35

          On May 24, approximately 1 month after receiving the Cal/OSHA logs and summaries and on the same day as employees passed out leaflets concerning safety issues at the Fremont facility, Hedges asked Lipson with meet with Ortiz and Galescu to discuss Respondent's concern that the Cal/OSHA logs had been shared with individuals outside Tesla (Tr. 2362–2364; GC
40  Exh. 9).  Prior to this meeting, Lipson had been provided a copy of the May 24 union leaflet by HR Partner Tori Tanaka (Tanaka) (GC Exh. 53). The leaflet mentioned that employees recently

---

[46] The Cal/OSHA 300A summaries do not appear to contain any personally identifiable information in contrast to the Cal/OSHA 300 logs which includes the names of injured or ill employees.

[47] Respondent admits Woody is a Sec. 2(11) supervisor as defined by the Act.  Woody did not testify.

[48] For purposes of this hearing, I ordered the General Counsel to redact the exhibit to protect any personally identifiable information as the names of the individuals listed are not relevant in this decision.

received copies of Cal/OSHA logs and summaries which they shared with a California non-profit organization (GC Exh. 9).

Thus, Lipson, at approximately 7:15 to 7:30 p.m., approached Ortiz (Tr. 482). Ortiz testified that Lipson told him that she wanted to speak about his performance (Tr. 482). Lipson and Ortiz went into a nearby office where Lauren Holcomb (Holcomb), a senior environmental health and safety specialist, was present (Tr. 483).[49] Lipson spoke first, informing Ortiz that he was doing a good job.[50] She then asked what Ortiz did with the Cal/OSHA 300 logs (Tr. 483–484). Ortiz responded that he did not do anything with them. Lipson asked Ortiz if he received the Cal/OSHA 300 logs to which Ortiz responded that he had. Lipson then asked Ortiz if anyone else had done anything with the Cal/OSHA 300 logs which Ortiz denied. Lipson also asked Ortiz if Galescu had done anything with the Cal/OSHA 300 logs, and Ortiz responded that Galescu had not done nothing in his presence (Tr. 486, 2352). After another question, Ortiz then asked Lipson and Holcomb if they brought him into the office to talk about the Cal/OSHA 300 logs or his performance, and Holcomb stated that Ortiz was doing a great job and they appreciated him (Tr. 485).[51]

Later that evening Lipson and Holcomb met with Galescu in a conference room (Tr. 857). Lipson started the meeting by informing Galescu that the meeting would not be recorded. She then asked Galescu if he knew anyone who was able to access the Cal/OSHA 300 logs outside of Tesla (Tr. 858). Galescu responded that the information was given to him and he would not answer questions without his representative. Lipson then asked Galescu if he or anyone else accessed the Cal/OSHA 300 logs outside of the system other than the information provided to him by Respondent. Again, Galescu responded that he did not know anyone, and that he would not answer any more questions without his representative. Lipson asked Galescu again if he had accessed the Cal/OSHA 300 logs outside Tesla, and he stated that he had not and would not answer questions without his representative (Tr. 858). Lipson then asked Galescu to whom he had given the Cal/OSHA 300 logs, and he responded again that he would not answer

[49] Holcomb did not testify during the hearing but the notes she took during the meeting with Ortiz and Galescu were admitted into evidence (GC Exh. 91). In these notes, Holcomb noted that Ortiz did not know anything about the Cal/OSHA 300 logs except that he agreed to add his name to Galescu's email when Galescu requested the information from Tesla (GC Exh. 91). As for the meeting with Galescu, Holcomb's notes are generally consistent with his testimony.

[50] Lipson testified that she began by telling Ortiz that the purpose of the meeting was to "talk about some personal medical information of our employees that we believed had been sent externally" (Tr. 2352). Lipson testified that her meeting with Galescu began with her stating that the purpose of the meeting was about a "concern of employees' medical information that had been potentially released" (Tr. 2354). However, Holcomb's notes indicate that Lipson began both meetings by stating that the purpose of the meeting was concerns about employee's health information being disclosed to the media (GC Exh. 91). This discrepancy is significant not only in determining Lipson's credibility but also when analyzing what, if anything, the employees were told as to the purpose of the meeting. This discrepancy is example of why I do not credit Lipson's testimony in its entirety. Galescu and Ortiz denied Lipson informed them of the purpose of the meeting, and I credit their testimony (Tr. 483, 857). But even if Lipson did tell them the purpose of the meeting, based on the inconsistency as described above, it is entirely unclear what she told them the purpose of the meeting was.

[51] On about May 25, Galescu and Ortiz filed a complaint with Cal/OSHA (Tr. 1086). Although Respondent seeks to make issue of an alleged dismissal of the Cal/OSHA complaint, the results are irrelevant here (R Exh. 32).

questions (Tr. 859). Lipson asked who his representative was, and Galescu stated that his representative was someone outside the building. The next day, Galescu sent Lipson an email regarding the meeting they had the prior night (GC Exh. 48).

5        On June 6, Galescu, on behalf of Ortiz and himself, sent an email to Woody, Hedges, Zweig, Lipson, and Holcomb with "personal representatives" noted in the email's subject line (GC Exh. 24). In this email, Galescu provided a chronology of events regarding their requests for the Cal/OSHA logs and summaries, including a synopsis of their separate meetings with Respondent's representatives. Galescu wrote that the purpose of their meetings regarding the
10    Cal/OSHA logs and summaries was unclear but perhaps Respondent sought to know who their personal representatives are and if they shared the information with their personal representatives. Thus, Galescu shared the names of their personal representatives along with the fact that they shared the Cal/OSHA logs and summaries with them.

15                                  *Credibility Findings*

         Galescu, Ortiz, and Lipson did not contradict one another in any significant way as to what questions were asked at the meetings. However, Lipson did appear to be a hesitant witness because throughout the cross-examination she looked over at Respondent's attorneys and seemed
20    reluctant to provide responses during this portion of her examination. I cannot credit Lipson's testimony as to how she began the meeting and what she told the employees what the purpose of the meeting was due to her change in demeanor from being an eager to reluctant witness on direct and cross-examination, respectively. Most significantly, Lipson clearly knew about the leafletting that occurred on May 24 due, at least in part, to a copy of the safety leaflet she
25    received. Lipson feigned ignorance as to the connection between the safety leaflet and why she was asked by Hedges to question Galescu and Ortiz. Lipson also could not recall whether her questions to Ortiz and Galescu occurred on May 24, the same day she was notified of the safety leaflets discussing Cal/OSHA 300 logs. Based on what most likely occurred, I credit Galescu and Ortiz' testimony, and not Lipson's testimony.
30

                                    *Legal Analysis*

         As discussed above, the Board has held that an employer violates Section 8(a)(1) when it maintains a work rule that reasonably tends to chill employees in the exercise of their Section 7
35    rights. *Lafayette Park Hotel*, supra. From the outset, I disagree with the General Counsel's premise that by placing the "CONFIDENTIAL" watermark on the Cal/OSHA safety logs and summaries, Respondent promulgated an overbroad confidentiality rule violating *Boeing*. Respondent merely placed the confidential watermark on the forms and explained clearly to Galescu and Ortiz their justification for doing so: compliance with Cal/OSHA regulations. The
40    General Counsel failed to show that Respondent "maintains" a rule that the Cal/OSHA logs and summaries are to remain confidential as Woody clarified that the information could be shared with current and former employees and their personal representatives. See *Flamingo Las Vegas Operating Co.*, 360 NLRB 243, 243 and fn. 5 (2014) (employer did not promulgate a rule which was directed to one employee and never repeated to any other employee as a general
45    requirement). Moreover, even if Respondent created a "rule" by placing this "CONFIDENTIAL" watermark on the documents, the rule in no way chills employees in the exercise of their Section 7 rights due to Woody's explanation to Galescu and Ortiz. The General

Counsel also claims that the "CONFIDENTIAL" watermark is in direct response to Ortiz and Galescu attempt to use the information for Section 7 purposes. The timing of events does not support such a conclusion as the workplace petition and leafletting on safety issues occurred one month *after* their request for this information. Thus, this complaint allegation at paragraph 7(k)
5   is dismissed.

    When evaluating alleged interrogations, the Board examines all the circumstances to determine if the questioning would have reasonably tended to restrain or coerce employees in the exercise of protected concerted activity. See *Rossmore House*, 269 NLRB 1176, 1178 (1984),
10   affd. sub. nom. *Hotel & Restaurant Employees Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985) (the Board set forth a test for examining whether an interrogation is unlawful). Factors to considered include the questioner's identity, the nature of the relationship between the questioner and the employee, the place and method of questioning, the nature of the information sought and whether it would reveal previously undisclosed union sympathies or activities, whether the
15   questioner offered any legitimate explanation for the question or assurance against reprisal, the truthfulness of the employee's reply, and whether there is a history of employer hostility to union activity. See id. at 1178 and n. 20; *Shamrock Foods Co.*, 366 NLRB No. 117, slip op. at 16–17 (2018), enfd. --- Fed. Appx. ---, 2019 WL 3229142 (D.C. Cir. July 12, 2019); *Novato Healthcare Center*, 365 NLRB No. 137 (2017), enfd. 916 F.3d 1095, 1106 (D.C. Cir. 2019). The Board also
20   considers whether the interrogated employee is an open and active union supporter. See, e.g., *Southern Bakers, LC*, 364 NLRB No. 64, slip op. at 7 (2016), enfd. in relevant part 871 F.3d 811 (8th Cir. 2017).

    Here, all the factors support a finding of a violation. Lipson, along with Holcomb as
25   note-taker, both human resources business persons, called Ortiz and Galescu into meetings in conference rooms. During these meetings, Lipson did not explain the purpose of the meetings. Even if she did explain the purpose of the meetings as described in her testimony, she generically explained that Respondent was concerned about the release of employees' personal medical information to an external source. Lipson never explained, as Respondent argues in its brief, to
30   Ortiz or Galescu that there was a concern that California State regulations had been violated or any other explanation for the inquiry. Respondent claims that since Galescu had not informed Respondent who his personal representative was until after the meeting, Respondent had every right to investigate a possible Cal/OSHA violation. However, Respondent failed to provide any explanation to Galescu or Ortiz so to possibly legitimize the inquiry. During these meetings,
35   Lipson asked a series of questions probing into what the employees had done with the Cal/OSHA logs and summary and to whom they had provided the information. That day, employees including Galescu passed out leaflets which contained information precisely concerning the safety issues at Tesla, citing to the Cal/OSHA logs and summary. Lipson knew the contents of this leaflet prior to meeting with Galescu and Ortiz. Thus, the questioning would
40   certainly be seen to be aimed at learning Galescu and Ortiz' protected concerted activities. Furthermore, Galescu refused to provide any responses to Lipson's questions, instead asking for his representative. See *Sproule Construction Co.*, 350 NLRB 774, 774 fn. 2 (2007) (employee attempts to conceal union support weigh in favor of finding an interrogation unlawful). Also, as discussed above, that same day Respondent violated Section 8(a)(1) when Phillips was told to
45   leave the Fremont facility parking lot when he was passing out these same leaflets. Based on a totality of the circumstances, Respondent violated Section 8(a)(1) when Lipson interrogated Galescu and Ortiz as alleged in complaint paragraph 7(q).

VIII. COMPLAINT PARAGRAPH 7(Y): RESPONDENT ON JUNE 7 VIOLATED SECTION 8(A)(1) OF THE ACT WHEN ELON MUSK AND GABRIELLE TOLEDANO MADE STATEMENTS OF FUTILITY IN SELECTING THE UNION, SOLICITED COMPLAINTS AND IMPLIEDLY PROMISED TO REMEDY THE ISSUES, AND STATED THAT EMPLOYEES DID NOT WANT A UNION IN THE WORKPLACE

The General Counsel argues that Respondent violated Section 8(a)(1) when Musk solicited employee safety complaints and impliedly promised to fix safety issues at Tesla, when Musk told employees that selecting the Union would be futile and that they could have a union if Tesla did not remedy their safety concerns, and when Toledano stated that no one wanted the Union at Tesla (GC Br. at 64-68). Respondent argues that the complaint allegations are time barred (R Br. at 155-164). If the complaint allegations are not time barred, Respondent denies the allegations as alleged (R Br. at 166–171).

*Procedural Issue*

On June 4, 2018, the Regional Director issued an amendment to the second amended consolidated complaint and notice of hearing with paragraph 7(y) alleging that on about June 7, Respondent, in a conference room at its Fremont facility, during a meeting held by Musk and Toledano: (i) by Musk, solicited employee complaints about safety issues and impliedly promised to remedy their safety complaints if they refrained from their union organization activity; (ii) by Musk, informed its employees that it would be futile for them to select a union as their bargaining representative by telling them that employees did not need a union and that Respondent would allow them to have a union if Respondent failed in its efforts to remedy their safety grievances; and (iii) by Toledano, restrained and coerced employees from engaging in union organizational activity by telling them no one at Respondent's Fremont facility wanted a union and asking them why employees would want to pay union dues. On June 11, 2018, Respondent filed a motion to dismiss complaint paragraph 7(y) based on Section 10(b) of the Act. I denied Respondent's motion to dismiss without prejudice on August 10, 2018. Then, Respondent filed a special appeal to the Board of my denial of the motion to dismiss; the Board denied Respondent's motion on September 21, 2018. Respondent renews its motion to dismiss paragraph 7(y). The General Counsel did not address Respondent's timely raised 10(b) argument in its post hearing brief, and thus, I rely upon the General Counsel's argument during the hearing as well as the opposition to the motion to dismiss paragraph 7(y) of the complaint. As discussed further, I deny Respondent's motion to dismiss paragraph 7(y).

Under Section 10(b) of the Act, "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy [of the charge] upon the person against whom such charge is made." However, a complaint may be amended to allege conduct occurring outside the 10(b) period if the conduct occurred within 6 months of a timely filed charge and is "closely related" to the allegations of the charge. *Fry's Food Stores*, 361 NLRB 126, 1216 (2014), citing *Redd-I, Inc.*, 290 NLRB 1115 (1988). Moreover, amended charges filed outside the 6-month 10(b) period, "are deemed, for 10(b) purposes, to relate back to the original charge." See *Apple SoCal LLC d/b/a Applebee's*, 367 NLRB No. 44, slip op. at 3 (2018), citing *WGE Federal Credit Union*, 346 NLRB 982, 983 (2006) (quoting *Pankratz Forest Industries*, 269 NLRB 33, 36–37 (1984), enfd.

mem. sub nom. *Kelly-Goodwin Hardwood Co. v. NLRB*, 762 F.2d 1018 (9th Cir. 1985)).  The Board applies a three-pong "closely related" test as set forth in *Redd-I* where the Board considers (1) whether the otherwise untimely allegations involve the same legal theory as the allegations in the timely charge; (2) whether the otherwise untimely allegations arise from the same factual situation or sequence of events as the allegations in the timely charge (i.e., the allegations involve similar conduct, usually during the same time period, and with a similar object); and (3) whether a respondent would raise the same or similar defenses to both the otherwise untimely and timely allegations.  *Alternative Energy Applications, Inc.*, 361 NLRB 1203, 1203 (2014).  Section 10(b) is an affirmative defense that is waived if it is not raised timely in a respondent's answer or during trial.  *Public Service Co.*, 213 NLRB 459, 461 (1993).  Respondent timely raised its 10(b) affirmative defense.

As for complaint paragraph 7(y), in first amended charges 32–CA–197020, filed April 17, and amended on July 28, 32-CA-197058, filed on April 17 and amended on July 28, 32–CA–197091, dated on April 18 and amended on July 28, and 32–CA–197197, filed on April 19 and amended on July 28, the Union alleged that within the past 6 months from February to July, Tesla violated the Act by "intimidating and harassing employees for their Section 7 activities" (GC Exh. 1(a), 1(c), 1(e), 1(g), 1(k), 1(m), 1(o), 1(q)).  Moreover, in addition to general allegations of intimidation and harassment by Respondent, amended charge 32–CA–200530, filed on June 12 and amended on July 28, alleges that Respondent violated the Act by "interrogating employees regarding their protected concerted activities" (GC Exh. 1(i), 1(s)).  The allegations against Musk and Toledano although not specified in the charges or amended charges are "closely related" under *Redd-I*.  Under the first prong, the Musk and Toledano allegations would be analyzed similarly to other instances of intimidation and harassing conduct as well as interrogation under Section 8(a)(1) of the Act.  As for the second prong, again these allegations against Musk and Toledano arose during the same union organizing campaign which was the subject of each of these charges and amended charges.  Moreover, Respondent's defenses would be similar such that no such conduct or statements occurred.  Thus, paragraph 7(y) of the complaint is not time barred.

Respondent cites several Board decisions to distinguish these charges from other charges the Board found to be untimely.  However, unlike in *WGE Federal Credit Union*, supra, the allegations here in complaint paragraph 7(y) would be analyzed under section 8(a)(1) of the Act and involve the same union organizing campaign.  See *Nickles Bakery of Indiana*, 296 NLRB 927, 928 (1989) (citing *G.W. Galloway Co. v. NLRB*, 856 F.2d 275, 280 (D.C. Cir. 1988) (a finding of a sufficient relation between the charge and complaint in circumstances involving "acts that are part of the same course of conduct, such as a single campaign against a union," *NLRB v. Central Power & Light Co.*, 425 F.2d 1318, 1321 (5th Cir. 1970), and acts that are all "part of an overall plan to resist organization," *NLRB v. Braswell Motor Freight Lines*, 486 F.2d 743, 746 (7th Cir. 1973)).  The Musk and Toledano allegations concern events surrounding the Union organizing campaign, and do not concern facts separate and apart from the many allegations set forth in the charges and amended charges.  See *Charter Communications, LLC*, 366 NLRB No. 46, slip op at 2–5 (2018) (both timely and untimely allegations allege that employer's conduct discouraged employees from engaging in protected activities in violation of Section 8(a)(1) as well as the events were related to the employer's response to a union campaign).  In sum, complaint paragraph 7(y) is not time barred.

<u>The Employees' Health and Safety Petition</u>

Prior to the June 7 meeting called by Musk, between March and June, Moran, Ortiz, and other VOC members signed and distributed a petition regarding working conditions at Respondent (GC Exh. 27; Tr. 704–705).  The petition states,

To Tesla Management,

As workers here at the Fremont plant, we believe in Tesla's mission, and work hard to make the company successful.  But we also believe our company can expand that mission to recognize the important role workers like us play in building the company's future.  Tesla workers deserve to have a fair, safe, and secure work place.  As we all work hard to meet our company's ambitious production goals, it's even more important that we don't lose sight of safety.  We should come to work knowing we will return home to our families without being injured at work.  Unfortunately, all too often, this isn't the case.  Workers are getting hurt on the job, and see work areas accidents could easily happen.  In addition, too many of our coworkers don't report injuries or other safety concerns because they are afraid of retaliation.  We believe the best, most fair, and most effective solution to safety and other concerns is for us to form our union so we can work together with management and have a true voice when it comes to our working conditions.

(GC Exh. 27).[52]

On June 6, Moran sent an email to Hedges and Musk regarding the employees' desire for health and safety at the workplace along with their desire for a "Democratic Process as we Form our Union" (GC Exh. 29).  Moran hand-delivered this petition to Hedges prior to sending the June 6 email (Tr. 707).

On June 7, Hedges came to Moran's work location and asked to speak with him in a conference room (Tr. 713).  Moran brought another employee Tony Vega (Vega) as a witness.[53]  As they walked towards the conference room at the north end of the Fremont facility, Hedges told Moran that Musk wanted to speak to him (Tr. 714).[54]  When Hedges, Moran and Vega

---

[52] In addition to the safety petition, in April or May, Ortiz signed another petition concerning compensation (GC Exh. 26).  Again, those signing the petition indicated that they were organizing to address the issues of compensation and other working conditions in a union contract.  The signed compensation petition was delivered by VOC members to Hedges along with leaflets on or about July 21 (GC Exh. 45; Tr. 489–490).  Thereafter, a picture of some of the employees who delivered the documents to Hedges was posted on the Facebook, "A Fair Future at Tesla" public webpage.

[53] Vega did not testify.

[54] Musk did not testify.  The General Counsel requests I make an adverse inference that Musk would not have corroborated Toledano's testimony regarding what was said during the June 7 meeting (GC Br. at 22, 65).  However, I decline to take an adverse inference since I do not credit Toledano's version of events, and instead rely upon Moran's testimony.  Vega also did not testify.  Likewise, I decline to make an adverse inference, as requested by Respondent, that Vega would not have corroborated Moran's

arrived at the conference room, Musk and Toledano were waiting. Hedges then left and did not attend the meeting.

Toledano spoke first and told Moran that they saw the health and safety petition and wanted to hear his concerns directly (Tr. 715, 911).[55] Musk then asked Moran to tell him his history with Tesla. Moran responded with his history and explained the safety concerns his coworkers and he had (Tr. 716). Vega also spoke on the subject. Moran then spoke again, mentioning that when he had his performance assessments, he performed well but did not received any raises. Thus, they sought a union to gain a voice at the Fremont facility (Tr. 717).

Moran testified that Musk stated, "[Y]ou know, you don't really have a voice. The UAW is a second—like two-class system where UAW is the only one that has a voice and not the workers" (Tr. 717). Toledano then spoke acknowledging problems with the performance system. According to Moran, Toledano then said, "[Y]ou know, the majority of workers at Tesla don't want a union and, you know, why do we want to pay for—why do we want to pay union dues?" (Tr. 718).[56] Moran responded that the employees have a right to form a union to have a voice to improve working conditions. Vega spoke stating that they did not want to hurt Tesla but

testimony (R Br. at 165). Toledano's lack of credibility, along with the subsequent email exchange amongst Respondent's officials as well as Moran's credible testimony convinces me that Moran's version of events must be credited.

[55] I cannot credit Toledano's testimony for various reasons. Toledano testified that when she interviewed for the chief people officer position, the subject of the Union organizing campaign never arose (Tr. 888, 928–929). Toledano emphatically denied Musk, who interviewed her for the position, bringing up the subject of the UAW. When she began working at Tesla on May 22, she testified that she could not recall if the union campaign arose (Tr. 928–929). She also testified that she "became aware over time that there was a union organizing campaign" (Tr. 888–890, 902). The union organizing campaign was clearly known by upper management in at least February when Musk sent an email to all employees directly responding to topics mentioned by Moran in his February 9 blog post advocating for UAW. For Toledano to claim that the subject of union organizing to have never been mentioned to her during the spring of 2017 when she interviewed for the position is not believable. Another reason I cannot find Toledano credible are her inconsistent statements. Toledano testified that she "became educated over time what a union organizing campaign was" and "was learning that there were people who had complaints" (Tr. 890–891). Toledano testified that she probably learned that Moran, Vega, Galescu, and Ortiz were union supporters between June 8 and 13 (Tr. 932–933). However, based on the timing of events, by June 8, Toledano already knew that Moran was an active union supporter. But in her Board affidavit of February 5, 2018, Toledano stated that as late as July she was not aware of employees engaging in union activities (Tr. 899–901). Furthermore, Toledano testified that prior to this meeting she had not reviewed the safety petition Moran provided to Hedges (Tr. 931). However, Moran credibly testified that Toledano began the meeting by stating she had reviewed the safety petition and Musk and she sought to discuss it with Moran. It is also unbelievable that Toledano would not have reviewed the employees' safety petition prior to meeting with Moran.

[56] In contrast, Toledano testified that the meeting only concerned safety and safety committees, and that the topic of unions did not come up (Tr. 910, 957). Toledano denied making any statements about the Union during this meeting (Tr. 956). Toledano also denied that Musk made any statements about the Union (Tr. 956–957). Again, I cannot credit Toledano. The undisputed purpose of the meeting was to discuss the safety petition presented by Moran and other employees. This petition as well as email to Hedges and Musk discusses the desire of the employees to form a union which is even included in the subject line of the email. To deny that the subject of the Union never came up during the meeting seems

wanted to make it better. Toledano suggested that they participate in the weekly safety committee meetings to call to attention their safety concerns (Tr. 718). Moran and Vega agreed. Musk spoke and told them that if the safety committee meetings did not work, they would "give you your union" (Tr. 719).[57]  This was the first and only meeting Moran had with Musk (Tr. 5  720).  The meeting lasted 15 to 30 minutes (Tr. 809).  Toledano testified that she thought the meeting was "positive" and as a result Musk committed to weekly safety meetings (Tr. 936–937).

The next day, June 8, Toledano and Hedges scheduled a voluntary safety meeting (Tr. 10  912–913; GC Exh. 55).  Toledano invited safety representatives from the environmental health and safety group led by Woody as well as HR representatives (Tr. 912).  Production and manufacturing employees, including Moran, Ortiz, and Galescu attended this meeting.  During this meeting, according to Toledano, Galescu was "mean' towards her because he publicly asked her that if the safety issues were not fixed would she be willing to resign from her job and 15  because he was "worked up" during this meeting (Tr. 959).

During the morning of June 12, Hedges responded to Moran's June 6 petition by sending an email to all employees in manufacturing concerning safety in the workplace (GC Exh. 30).  The email's subject line stated, "Tesla Production Update: Safety, Your Feedback, and the Real 20  Facts."  Hedges stated that a leaflet distributed on June 7, was to "promote the UAW, not to promote safety" (GC Exh. 30).[58]  In this email, Hedges disputed the facts set forth in the leaflet, and noted that the author of the June 6 letter had "up until now chosen not to participate on the safety teams" but he was invited to have in person discussions with HR leadership and senior members of the safety team which resulted in "a very positive and productive conversation about 25  all the efforts that are underway to improve safety" (GC Exh. 30).

Later, during the evening of June 12, Ortiz sent an email to Hedges and Musk complaining about a safety incident involving members of middle management, which he believed exemplified the safety problems at Tesla (GC Exh. 52).  Musk then forwarded the email 30  to Woody.  Woody replied immediately that he would work closely with Ortiz, Moran, Galescu, and others that had met with on June 8.  Musk replied to Woody:

> I'm meeting with Jose [Moran] and Jonathan [Galescu] again in the next few days.  Will ask them to join your team full time, so long as they do so in good 35  faith and are truly as committed as they claim to safety

(GC Exh. 52.).  Woody appears to have then forwarded Musk's email to Toledano who responded to Musk:

completely implausible.  In addition, based on circumstantial evidence, Musk knew that Moran promoted organizing in the workplace due to his February 2017 blog post, and Musk's subsequent email to all employees.  Hence, I do not credit Toledano's testimony.

[57] Toledano testified that she could not recall if Musk spoke about the safety committees during the meeting (Tr. 911).  Once again, Toledano's testimony cannot be credited.  The point of the meeting was to address the employees' safety concerns due to the employees' petition, and based on Toledano's suggestion, they intended to invite Moran and others to the safety committee meetings.  It does not seem plausible that Musk would not have also discussed the safety committees.

[58] The leaflet is not in the record.

> I have to say, this is a super smart idea to have these two on the safety team full time. If that's what you mean – they would join Seth's [Woody's] team and work on safety in the factory full time one behalf of all associates (vs work to pull in the UAW )? Amazing way to turn adversaries into those responsible for the problem

5

(GC Exh. 52; Tr. 914, 919.). Toledano admitted that when she wrote adversaries, she was referring to Moran (Tr. 918-919). Musk replied, "Exactly" (GC Exh. 52).

10

The next day, Toledano sought to clarify what occurred on June 7. Toledano reminded Musk that they met with Moran and Vega, who she identified as "the nice guy who Jose brought at[sic] a 'witness'," and that they had not met with Galescu. Toledano wrote referring to her June 8 meeting:

15

> All 4 are pro-union (Jose [Moran], Tony [Vega], Jonathan [Galescu] and Victor [Ortiz][59]). Jonathan [Galescu] was the most vocal/aggressive in the Thursday meeting. After the meeting he wrote me the nice note I forwarded to you last night and responded to, but in the meeting he tried to get me to ok having Union organizers still come in. Obviously, I did not agree […].

20

> [. . .] Tony Vega would be the best add to the Safety team, as he is the most reasonable but also connected with those most active to unionize.

25

> Clearly we could ask all 4 to join Seth's team and go salaried. I am confirming now with Legal that if they join the Safety team then they would be considered part of management and not eligible to advocate for a union should they accept these roles. I will confirm when I get this answer.

30

(GC Exh. 52; Tr. 915). Toledano admitted that she thought adding employees such as Moran to the safety team would be a great way to involve employees in "something they think is broken" (Tr. 915).

35

On June 14, Hedges responded directly to Moran regarding his June 6 email; Musk and the other recipients of Moran's June 6 email were included in Hedge's reply (GC Exh. 29; Tr. 707). Hedges wrote that Respondent takes safety seriously as they discussed on June 6 when the members of the VOC delivered the petition. Hedges also noted that Respondent held safety meetings on June 8 with Moran and others to address these issues. Finally, Hedges ended his email with statistics of how the UAW has been unsuccessful nationally and in the Bay Area and

40

noted that employees have complained to Respondent about being "bothered" at their homes as the UAW attempts to share information (GC Exh. 29).

*Credibility Findings*

---

[59] Toledano appears to be referring to Richard Ortiz, not Victor Ortiz (Tr. 924).

Only Moran and Toledano testified about the June 7 meeting. Between the two witnesses, Moran was truthful while Toledano provided contradictory and unlikely testimony. I credit the testimony of Moran as he testified with a calm demeanor and provided straightforward, unwavering testimony. During Moran's testimony regarding the June 7 meeting with Musk and
5    Toledano, Moran testified authentically because although he appeared apprehensive, he provided thorough details. Moran appeared to be listening carefully during the questioning and paused before he responded. During cross-examination, he did not get flustered and answered the questions to the best of his recollection. Moreover, Moran's testimony remained consistent and was uncontradicted.
10

In direct contrast, Toledano testified nervously. Toledano's memory during her testimony was poor and directly contradicted by emails she sent and responded to after the June 7 meeting with Moran. For example, Toledano testified that she could not recall if she said that promoting Moran and other employees to the safety team would prevent them from advocating
15    for the Union (Tr. 915–916). But her emails show extensive discussion and steps Toledano took to move four pro-union employees to management so they could no longer advocate for the Union. Toledano, during cross-examination, often glanced at Respondent's counsel when she was answering questions. Toledano appeared to be straining to provide the "right" answer as she often appeared flustered. During cross-examination, Toledano could not recall any details of the
20    events surrounding the June 7 meeting which calls into question her reliability as a witness. Toledano admitted that prior to the hearing she spoke to Hedges to refresh her memory as to what happened in the summer of 2017 (Tr. 939–940, 1201).

*Legal Analysis*
25

An employer's solicitation of employee grievances or complaints during a period of organizing activity inherently includes an implied promise to remedy them and is unlawful unless the employer has an established practice of soliciting and resolving grievances if the past practice is not significantly altered. See, e.g., *Shamrock Foods Co.*, 366 NLRB No. 117, slip op.
30    at 6 (2018); *Alamo Rent-a-Car*, 336 NLRB 1155, 1155 (2001). Here, Musk, the highest-ranking official of Tesla, called a meeting with Moran the day after he delivered a safety petition to Hedges and sent an email to Musk and Hedges expressing the desire of employees to unionize. It is irrelevant, as argued by Respondent, that Moran "prompted" the meeting due to his June 6 email and petition. Musk had never met with Moran prior to this meeting and there is no
35    evidence that Musk met with Moran again. During this meeting, Toledano began the meeting by announcing that their purpose was to hear safety concerns from Moran directly. After hearing from Moran and Vega, Toledano invited the employees to the safety team meetings, and Musk stated that if the safety committee meetings did not work, they would "give you your union" (Tr. 719). Based upon the credit evidence, employees may reasonably infer that Respondent via
40    Musk was soliciting Moran's safety complaints for the purpose of acting favorably on them to temper the employees push for a union which violates the Act.

In addition, Musk and Toledano's other statements during this meeting violated Section 8(a)(1) of the Act. In response to Moran's explanation for why employees sought to unionize,
45    Musk told Moran and Vega: "[Y]ou know, you don't really have a voice. The UAW is a second —like two-class system where UAW is the only one that has a voice and not the workers" (Tr. 717). Toledano also remarked, "[Y]ou know, the majority of workers at Tesla don't want a

union and, you know, why do we want to pay for – why do we want to pay union dues?" (Tr. 718).  In *Wellstream Corp.*, 313 NLRB 698, 706 (1994), the Board held that an employer violates Section 8(a)(1) of the Act by telling employees that attempts to secure union representation would be futile where they were clearly intended to and had the effect of informing the employees the futility of their support of the Union.  Here, Musk's statement in response to Moran's reasons for why the employees sought union representation was designed to impart to Moran that even with union representation the employees would not have a voice, and selection of a union would be useless.  As for Toledano's statement, the Board has found that employer warnings of "serious harm" to employees who choose union representation are not per se unlawful, but the warnings or statements may be unlawfully coercive if uttered in the context of other unfair labor practices that "impart a coercive overtone".  *Community Cash Stores*, 238 NLRB 265, 269 (1978), citing *Greensboro Hosiery Mills*, 162 NLRN 1275, 1276 (1967), enf. denied in relevant part 398 F.2d 414 (4th Cir. 1968); *Reno Hilton*, 319 NLRB 1154, 1155 (1995); see also *Westwood Health Care Center*, 330 NLRB 935, 940 fn. 17 (2000) (statement is assessed in the context in which it is made and whether it tends to coerce a reasonable employee).  Also, in the course of organizational campaigns, statements are sometimes made of a kind that may or may not be coercive, but to derive the true import of the remarks, the circumstances in which they are made must be viewed.  Again, here, Toledano's statement that no one wanted the union was made in the context of other unfair labor practices including Musk's solicitation during the meeting and his statement of futility as well as the interrogation of other pro-union supporters regarding the Cal/OSHA 300 logs.  Thus, Toledano's statement also violated the Act.

Respondent argues that if Moran's testimony is credited, Musk's statement, "[Y]ou know, you don't really have a voice.  The UAW is a second—like two-class system where UAW is the only one that has a voice and not the workers" is not unlawful under Section 8(c) of the Act (R Br. at 167-170).  Section 8(a)(1) of the Act is modified by Section 8(c) of the Act which defines and implements the First Amendment in the context of labor relations.  See 29 U.S.C. §158 (c); *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969).  Section 8(c) permits employers to express "any views, arguments or opinion" concerning union representation without violating Section 8(a)(1) if the expression "contains no threat of reprisal or force or promise of benefit." *NLRB v. Marine World USA*, 611 F.2d 1274, 1276 (9th Cir. 1980).  The employer is also free to express opinions or make predictions, reasonably based in fact, about the possible effects of unionization on the company.  *NLRB v. Gissel Packing*, supra at 618.  When determining whether a statement is permitted under Section 8(c), the statement must be considered in the context in which it was made and in view of the totality of the employer's conduct.  *NLRB v. Marine World USA*, supra.

I disagree.  In my view, Musk's statement taken in context of the impetus for the meeting (the safety petition and desire to organize) along with the idea to place the employees on the safety committee to address workplace safety concerns before they would be "give[n]" their union is unlawful and violates Section 8(a)(1).  See *Reno Hilton Resorts Corp.*, 319 NLRB 1154, 1156 (1995).  Unlike the Board's decision in *Erickson Trucking Service, Inc.*, 366 NLRB No. 171, slip op. at 1 (2018), where the president of the company made a disparaging statement about the union's business manager which was found to be protected by Section 8(c) as an ancillary statement to unlawful conduct in a meeting, here the General Counsel alleged that Musk implied a sense of futility if selecting the Union as the employees would have no voice or essentially no representation.  Musk's statement was not a permissible explanation of the disadvantages of

union representation but was in direct response to Moran's reason for why the employees wanted union representation and was shortly followed by Musk's statement that the employees would be given a union if the safety committee meeting did not address their concerns. Taken as a whole, Musk's statement cannot be protected under Section 8(c) of the Act. In sum, Musk and Toledano's statements on June 7 violated Section 8(a)(1) of the Act as alleged in complaint paragraph 7(y).

IX. COMPLAINT PARAGRAPHS 7(L), AND 7(T) THROUGH 7(V): RESPONDENT VIOLATED SECTION 8(A)(1) OF THE ACT WHEN AT THE FREMONT FACILITY IT MAINTAINED AN UNLAWFUL TEAM WEAR POLICY BUT DID NOT VIOLATE THE ACT WHEN ALLEGED TO HAVE DISCRIMINATORILY APPLIED THE TEAM WEAR RULE IN AUGUST

The General Counsel alleges that Respondent's team wear rule is facially unlawful and was applied in a discriminatory manner numerous times in direct response to union activity in August (GC Br. at 72–78). Respondent argues that the team wear policy is lawful under *Boeing* (R Br. at 84–87). Furthermore, the supervisors alleged to have violated the Act were enforcing a lawful rule, did not discriminate against employees wearing Union shirts, and even under a "special circumstances" analysis, Respondent's team wear rule is lawful (R Br. at 113-118).

### Team Wear Rule at the Fremont Facility

During the relevant time period Respondent maintained "General Assembly Expectations" (GC Exh. 37). This document contains a section concerning "team wear." The document provides:

> Team Wear: It is mandatory that all Production Associates and Leads wear assigned team wear.
> - On occasion, team wear may be substituted by all black clothing if approved by supervisor.
> - Alternative clothing must be mutilation free, work appropriate and pose no safety risks (no zippers, yoga pants, hoodies with hood up, etc.).

(GC Exh. 37).[60] As explained previously, Respondent provided all GA employees team wear compliant clothing when hired but prior to August, employees would often wear shirts in a variety of colors with pictures or emblems such as sports teams and clothing brands to work in GA without any supervisor informing them to wear only Tesla assigned team wear (Tr. 185–189, 206, 208, 238–240, 295–296, 307). Beginning in the spring of 2017 until August, production associates in GA began wearing UAW shirts which had been passed out by employees (Tr. 296, 329). These shirts were all cotton in black color with the "Driving for a Fair Future at Tesla" logo on front, and the same logo with the abbreviation "UAW" on the back (GC Exh. 25). Employees also wore union stickers and hats to work (Tr. 204–205, 208, 210, 260).

Mario Penera (Penera), who is the second shift production manager in GA, testified regarding the purpose for team wear in GA.[61] Penera testified that team wear relates to safety

---

[60] This rule is the subject of complaint par. 7(l).
[61] The parties stipulated at the hearing that Penera is a supervisor under the Act (Tr. 1413–1414).

such that Respondent knows that all production associates are wearing appropriate clothing for the job, production associates may be quickly identified in case of an emergency, and to eliminate or reduce the risk of vehicle mutilation which leads to increased costs (Tr. 1377–1378). Penera also testified, "For me, the bigger thing with team wear is visual management of the shop. So as we discussed, it's a 5 million square foot facility. Somewhere around 10,000 people walking through the plant every day. For me, that's how I know as a manager who should be there, who shouldn't be there [. . . .] and it is easier to scan 30, 40 people individually to see if their pants are going to be too abrasive, to see if their shirt has any mutilation risk on it" (Tr. 1375). Panera testified that if a production associate was not wearing team wear, the supervisors and managers were to find out why the production associate was not wearing team wear and how the issue could be resolved including corrective action (Tr. 1380–1381). Panera testified that he approved substituting all black colored clothing for team wear when Respondent hired too many employees at the same time and Respondent could not provide all employees in GA with team wear (Tr. 1382, 1411). Other supervisors and managers also permitted employees to wear clothing other than assigned team wear. Associate Production Manager Tope Ogguniyi (Ogguniyi) testified that she permitted associates to wear all black colored shirts instead of the assigned team wear if the associate did not have any team wear and the team wear store was not open (Tr. 2535).[62] She permitted associates to buy a plain black colored shirt from a local store so they could continue to work (Tr. 2535, 2539). She also permitted associates to cover any logos on a black colored shirt with mutilation protection tape which prevented the vehicles from being scratched (Tr. 2535). Business unit leader Kyle Martin (Martin) testified that there were occasions to give exceptions to wearing team wear such as when the team wear store did not have the correct size or the item was not in stock (Tr. 1634, 1645–1646).

The record reveals that in April to May, according to Martin, the end of line department, the step after GA, noticed an increasing number of mutilations to the seats in the vehicles. Management officials in GA met to determine what was causing these seat mutilations (Tr. 1601, 1653). They discussed potential causes of the seat mutilations including incoming materials, tools, non-compliance with team wear, how the associates were in the line, and how associates installed material (Tr. 1602). Thus, Respondent decided to audit the number of seat mutilations per week, and to document their causes (Tr. 1603, 1607–1608; R Exh. 27).[63] These audits began in May and ended in September (Tr. 1622).[64] The audit reports do not reveal any details as to what specifically caused the seat mutilations (R Exh. 28; Tr. 1608–1610, 1641–1643).[65] But Martin testified that the increased scrutiny during this time period revealed that seat mutilations were caused by tools when associates would not use a tool cover or when associates would carry a tool in their back pocket which could damage the seat as well as rivets on pants not assigned by Tesla (Tr. 1637–1638, 1641–1642, 1653). Martin, Panera and other supervisors admitted that the seat mutilations were not caused by shirts, and no management witness could provide an

[62] Respondent admits during the relevant time period that Ogunniyi was a supervisor and agent as defined by Sec. 2(11) and (13) of the Act, respectively.

[63] The audits did not concern mutilations to any other portion of the car, including the outer body of the car (Tr. 1642–1643).

[64] Martin presented to Musk the improvements in reducing the number of seat mutilations in GA (R Exh. 29 and 30; Tr. 1623, 1656).

[65] Respondent presented a series of emails with attached audit reports (R Exh. 28, 29, 30, and 31). However, these emails and audit reports do not indicate the relationship between seat mutilations and noncompliance with team wear. Thus, I do not find these exhibits to be probative.

example of a vehicle being damaged by shirts (Tr. 1398–1399, 1641–1642, 1647–1648, 2416–2417, 2541, 2547).  Martin testified that Respondent sought to prevent mutilations as a whole with the team wear rule (Tr. 1600).

5       In August, Respondent began enforcing the team wear rule in GA and after an initial "pardon" for the day, issued disciplinary action including dismissal for the day for non-compliance with the team wear rule (R Exh. 29; Tr. 1623–1625, 1653, 2527).  Martin testified that he asked his supervisors and associate managers to "walk the line" to check on associates' compliance with the team wear rule (Tr. 1632–1633).[66]  Martin could not provide any examples
10     of which associates were terminated for failure to wear team wear and described "dismissal" as stated in the audit report to refer to an associate's dismissal for the day from work for failure to comply with the team wear rule that day rather than termination (Tr. 1653).

       Due to Martin's instructions, on August 10, Ogunniyi spoke to her subordinates including
15     production supervisor Tim Fenelon (Fenelon) to ensure that production associates followed the team wear rule, or the supervisors would be held accountable (Tr. 2397–2398, 2409).  Ogunniyi required her subordinates to report to her as to whether they checked their assigned production associates for team wear rule compliance (Tr. 2534).  Ogunniyi also walked the line where the associates worked to ensure that they were following the team wear rule (Tr. 2528).  Ogguniyi
20     spoke to several associates who were not wearing the assigned team wear and informed them that they would be sent home the following shift if they did not comply with the team wear rule (Tr. 204, 2528–2529, 2531–2532).  Later that day, Martin followed up with Ogguniyi to ensure that she walked the line to check on employees' team wear rule compliance (Tr. 2551).  Martin asked Ogguniyi to send him a list of associates who did not follow the team wear rules that day
25     (Tr. 2551; GC Exh. 73).[67]  After Ogunniyi sent her list to Martin, he then asked her how many associates wore the UAW shirt that day (GC Exh. 73).  Ogguniyi noted in response to Martin's question that only production associate Jayson Henry (Henry) wore a UAW shirt that day (Tr. 2554).  Martin testified that he asked which associates wore a union shirt because, "It gave me a pulse for the shop.  It lets me know where my supervisors are at, with the development of their
30     associates.  If I have an associate on my line that feels that they have to seek some type of outside counsel or representation, it means that my supervisors aren't doing what they need to do to engage the associates" (Tr. 1635, 1644–1645, 1657–1659).

       Henry testified that he wore a UAW shirt on August 10 after he passed out shirts to
35     employees prior to the start of his shift that day (Tr. 181, 183, 187, 194).  That day, an unknown male supervisor, identified by his red colored Tesla shirt, told Henry he could not wear the union shirt again or he would be sent home (Tr. 184).[68]  Henry requested to see Respondent's dress

---

[66] Martin testified that he asked supervisors to "walk the line" prior to August, but I do not credit his testimony as it is uncorroborated and contradicted by the credible testimony of Ogunniyi and Fenelon.  Multiple witnesses, including Ogunniyi, testified that enforcement of the team wear rule began in August.

[67] In contrast, Martin testified that Ogguniyi initiated the email with him after he asked her to ensure that associates followed the team wear rule (Tr. 1635–1636).  I do not credit Martin's testimony on this point.  Ogunniyi's email to Martin contains the subject line: team wear follow-up (GC Exh. 73).  In this email, Ogunniyi informed Martin to whom she spoke with that day regarding team wear rule compliance.  The subject line of this email seems to suggest that Martin asked Ogunniyi for the names of individuals not following the team wear rule which contradicts Martin's testimony.

[68] This allegation appears to refer to complaint par. 7(t)(i).

code (Tr. 184). Ogunniyi then approached Henry and gave him a copy of "General Assembly Expectations" which included the team wear rule (Tr. 184, 2531–2532). Ogunniyi testified that Henry was the third associate she spoke to that day that did not have on proper team wear; Ogunniyi denied Henry's accusation that she only spoke to him due to the UAW shirt he wore (Tr. 2531).[69]

Also, on August 10, production associate Sean Jones (Jones) wore a UAW shirt to work (GC Exh. 34). Fenelon pulled Jones aside after the morning meeting.[70] Fenelon told Jones that his Union shirt was not appropriate, and he would need to change his shirt or would be sent home (Tr. 293–294, 2405, 2414). Jones asked him why he needed to change his shirt, and Fenelon stated that his shirt was not a Tesla approved shirt, and not compliant with the team wear rule. Fenelon also told Jones that his Union shirt had an emblem on it and emblems would not be accepted on shirts anymore (Tr. 293–294). Fenelon gave Jones money for a team wear shirt from the team wear store, and Jones responded, "This is really some bullshit over a shirt" (Tr. 304). Jones then changed his shirt (Tr. 294, 2405).[71]

Later that day, Jones spoke to Ogunniyi telling her that Fenelon threatened to send him home due to his wearing a Union shirt to work. Ogunniyi told Jones that the policies have changed. Jones responded, "When? That's bullshit. I've always wore[n] different shirts" (Tr. 294). Ogunniyi stated that the policy changed where no shirts with emblems will be allowed as they can scratch a car (Tr. 294–295).[72]

Later in August, Ogunniyi and Fenelon held a meeting regarding the team wear rule with 25 to 30 employees who worked that shift on final line in GA (Tr. 297). Ogunniyi informed employees that no one could be out of "uniform" and everyone must wear assigned team wear or be sent home (Tr. 298). Production associate Tim Cotton (Cotton) testified that Ogunniyi told the employees they could not wear anything that did not say Tesla or was not approved by Tesla (Tr. 330).[73] Jones and Cotton testified that they continued to see employees wear shirts that did not comply with the team wear rule, and to their knowledge, no supervisor or manager asked those employees to change their shirt (Tr. 298, 330–331).

*Credibility Findings*

[69] This allegation appears to refer to complaint par. 7(t)(ii).

[70] Due to Ogunniyi's instructions, Fenelon testified that at the start of every shift he would review the clothes of the associates he supervised to ensure that they had on the "right team wear" as well as personal protective equipment (PPE) (Tr. 2400–2401, 2410, 2416). Fenelon testified that when he saw someone not complying with the team wear rule, he would let them know that they needed to wear the appropriate team wear (Tr. 2401). Fenelon testified that to comply with the team wear rules, the associate would need to go to the team wear store to get the appropriate clothing, go to their car to get the appropriate clothing, or would need to clock out of work, get the appropriate clothing and return to work (Tr. 2401). Fenelon provided several examples from the summer of 2017 when he told associates to change into assigned team wear (Tr. 2402–2407). For one employee, Fenelon permitted the employee to place a piece of black felt tape over the white stripe of his black colored Nike shirt (Tr. 2407).

[71] This allegation appears to refer to complaint par. 7(u)(i).

[72] This allegation appears to refer to complaint par. 7(u)(ii).

[73] This allegation appears to refer to complaint par. 7(v).

Overall, the General Counsel and Respondent's witnesses did not significantly differ in what occurred during the summer of 2017.  Of course, with the number of witnesses who testified about team wear, there will be inconsistencies in their testimony, so I relied upon their collective testimony when deciding this statement of facts.  Beginning with the General Counsel's witnesses, I found Henry, Jones and Cotton to be candid witnesses on direct examination.  I also credit their encounters with Ogunniyi, Fenelon, and an unnamed supervisor about their union shirts.  However, I cannot credit their testimony that supervisors continued to permit employees to not comply with team wear rules after enforcing the rule in August.  I cannot credit their testimony because unlike other portions of their testimony, they did not provide any details of what they observed and how they knew the supervisors turned a blind eye to the noncompliance.  For example, Henry provided significant details during his testimony but on this issue of noncompliance with the team wear rule after August he provided a vague, unspecified account as to what he observed where it was unclear whether these employees he mentioned even worked in GA.  In addition, Henry testified in detail about an employee who wore a white shirt to work which supervisors permitted but these details are missing from his Board affidavit which makes this portion of his testimony unreliable.

As for Respondent's witnesses, Panera testified comfortably when asked about the manufacturing process, but his credibility was undermined on cross-examination when he became defensive when responding to questions about team wear.  Martin also provided credible testimony which was detailed as to the events of the summer of 2017, but I cannot credit portions of his testimony as specified above.  Of all the witnesses presented by both parties on these allegations, I found Ogunniyi and Fenelon to be the most trustworthy and honest.  These two supervisors followed orders from their superiors.  I credit Ogunniyi's testimony that she spoke to all employees who were not compliant with the team wear rule and did not target only the employees wearing union shirts.  Fenelon also provided specific details as to whom he spoke, and even provided examples of how he attempted to ensure that employees could be compliant with the team wear rule.

*Legal Analysis*

In the absence of special circumstances, the Board has held that employees, particularly during an organizing campaign, have a Section 7 right to wear insignia at work referring to unions or other matters pertaining to working conditions for the purpose of mutual aid or protection.  *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945) (employees have a right to wear union insignia at work); *Goodyear Tire & Rubber Co.*, 357 NLRB 337, 341 (2011); *Midstate Telephone Corp.*, 262 NLRB 1291, 1292 (1982), enf. denied 706 F.2d 401 (2d Cir. 1983); *Pathmark Stores, Inc.*, 342 NLRB 378, 379 (2004); *Albis Plastics*, 335 NLRB 923, 924 (2001).  However, an employer may prohibit the wearing of union insignia by employees if the employer proves special circumstances.  *Pathmark Stores*, supra; *W San Diego*, 348 NLRB 372, 372 (2006).  Special circumstances include "when their [union insignia] display may jeopardize employee safety, damage machinery or products, exacerbate employee dissension, or unreasonably interfere with a public image that the employer has established, or when necessary to maintain decorum and discipline among employees."  *Komatsu America Corp.*, 342 NLRB 649, 650 (2004).  Any rule that limits employees' Section 7 right to wear union insignia in the workplace must be narrowly tailored to the special circumstances to justify the rule.  *W San Diego*, supra at 373–374.

Respondent argues that the Board's analysis of workplace rules in *Boeing* applies to the team wear rule, but I disagree. Instead Board law governing the right of employees to wear union insignia in the workplace has been analyzed by the Board according to the principles set forth in *Republic Aviation v. NLRB*, supra, and its progeny. Even if the *Boeing* analysis is applicable here, I find that Respondent's rule is overbroad and its business justification (which are the same arguments as its argument for special circumstances according to *Republic Aviation*) does not override employee's Section 7 rights to engage in union activity. Respondent also argues unpersuasively that the Board has "implicitly" permitted employers to promulgate and enforce a nondiscriminatory uniform rule (R Br. at 115). Simply because Respondent's rule does not explicitly prohibit the wearing of union insignia does not mean that if the rule is enforced equally, the rule is permitted; the rule still disallows employees to wear union insignia on their clothing in GA. However, in both cases cited by Respondent, the Board did not make such a determination as exceptions were not filed on those allegations.

Respondent's team wear rule only permits employees in GA to wear team wear or plain black colored clothing, thereby, precluding employees from wearing clothing with union insignia. Thus, Respondent's team wear rule is unlawful. Respondent may rebut this presumption by presenting special circumstances which permits the rule albeit "narrowly tailored." Respondent argues that its special circumstances for banning union shirts in GA is due to preventing mutilations to the painted vehicles and to maintain visual management; these are the same arguments Respondent raises to support its business justification if the *Boeing* analysis were to apply. Respondent must set forth more than "conjecture" to find special circumstances. *Medco Health Solutions of Las Vegas, Inc.*, 364 NLRB No. 115 (2016). Respondent claims that it requires assigned team wear in GA due to vehicle mutilations. But Respondent's argument makes little sense considering the credited evidence. Here, Respondent discovered an increase in *seat* mutilations in April or May, and thus, Respondent began an audit in GA to determine what was the cause or causes. Not one of Respondent's managers could affirmatively point to the union shirts as the cause of the problems. The documentary evidence also does not support such an argument since the audit results do not specify what aspect of team wear non-compliance caused the seat mutilations. See *Boch Imports, Inc.*, 362 NLRB 706, 707–708 (2015) (no evidence that union pins worn by employees damaged vehicles as asserted). The only clothing issue that was mentioned during the hearing as a potential source of problems was rivets on pants, not the UAW shirt. The justification for enforcing the previous lax team wear rule was the seat mutilations, not with general vehicle mutilations including mutilations to the paint on the vehicles. As for visual maintenance, Respondent's production associates wear black colored shirts while team leaders and managers wear red colored shirts. In GA, the black colored Tesla assigned shirts are not substantially different from the black colored UAW shirts or from the plain black colored shirts that the team wear rule allows. Respondent also argues that because employees were able to continue to wear union stickers at the workplace, Tesla did not interfere with their Section 7 rights. However, this argument is a red herring. Thus, Respondent's maintenance of the team wear rule is unlawful, and violates Section 8(a)(1) as alleged in complaint paragraph 7(l).

However, I do not find that Respondent disparately enforced the team wear rule as alleged. See, e.g., *Shelby Memorial Home*, 305 NLRB 910, 919 (1991), enfd. 1 F.3d 550, 565 (7th Cir. 1993) (nursing home's selective enforcement of its rules restricting pins or badges

against union insignia, but not other insignia was unlawful).  I do not credit the testimony of the General Counsel's witnesses that they observed Ogunniyi, Fenelon and an unnamed supervisor only enforcing the team wear rule with those who wore the UAW shirts.  Ogunniyi's email of August 10 shows that she spoke to many employees that day, and only one person had on a
5    UAW shirt.  While the question of why Martin asked who wore the UAW shirt is suspicious, this suspicion does not address whether the supervisors enforced the rule disparately.  As stated previously, Ogunniyi and Fenelon's testimonies were clear—they sought to enforce the team wear rule as directed by their superiors.  In contrast, the General Counsel's witnesses only provided general, unpersuasive responses as to whether they saw other employees wear
10   noncompliant team wear after the rule was enforced in August; these witnesses could not testify with certainty as to whether these employees were asked to comply with team wear.  Thus, the General Counsel has not sustained his burden of proof, and I dismiss complaint paragraphs 7(t), (u), and (v).

15   X.    COMPLAINT PARAGRAPH 7(W): RESPONDENT DID NOT VIOLATE SECTION 8(A)(1) OF
            THE ACT WHEN SUPERVISOR DAVE TESTON, AT THE SPARKS FACILITY, IMPLIEDLY
            THREATENED AN EMPLOYEE FOR WEARING A UNION HAT

      The General Counsel alleges that Supervisor Dave Teston (Teston) threatened employee
20   Will Locklear (Locklear) with discipline for wearing a hat with union logo on it (GC Br. at 77–78).  Respondent argues that Teston's comment to Locklear is privileged under Section 8(c) of the Act (R Br at 121–123).

      No witnesses testified at the hearing about this complaint allegation.  Locklear did not
25   testify at the hearing despite being issued a subpoena duces tecum by the General Counsel.  The General Counsel, however, did not seek enforcement of the subpoena after I denied the General Counsel's request for video testimony from Locklear.

      The parties submitted a written stipulation into the record that Teston would testify as
30   follows, in relevant part (Jt. Exh. 3):

      Locklear was one of Teston's training coordinators from about December 2016 until at least February 5, 2018. Prior to that, Locklear was a production associate in Respondent's Sparks facility. Teston was Locklear's supervisor from June until November. Teston did not
35   work with Locklear during his time at Respondent's Fremont facility. Teston only knew Locklear from work and did not have any association with Locklear outside of work.

      Teston knew that Locklear supported the Union because Locklear, at a date uncertain, informed Teston of his Union support.  Teston recalls that during the summer or fall of 2017
40   Locklear wore a hat with a union logo on it. Teston also remembers that during that time period Locklear had a sticker on his laptop that said UAW as well as a union insignia on his safety glasses.

      On approximately September 8, Teston privately spoke to Locklear about the union hat
45   that Locklear wore to work that day.  Teston asked Locklear if he thought wearing the union hat was professional due to his training coordinator role. Teston asked this question on his own, no one told him to ask this question, and Teston chose to ask this question based on his own

experience with the military and uniformity. Teston then told Locklear that he did not want Locklear to answer the question and that Locklear should think about it. This conversation occurred near Teston's desk on the second floor of Respondent's Sparks facility. It is unknown how many times Teston asked Locklear this question during their single conversation, but it was
5   at least once. Locklear did not respond to Teston.

Shortly after the conversation Teston had with Locklear about his union hat, Teston checked with higher level officials within Respondent. Teston wanted to make sure that the hat with the Union logo was professional, since that is what Teston had said to Locklear the day
10   before. Thus, Teston sent an email to Respondent about this issue (GC Exh. 72). In response to Teston's email, Senior Employment Counsel Jaime Bodiford (Bodiford) and Associate Manager of HR Steven Schwarzer (Schwarzer) told Teston that what an employee wears is their business and theirs alone if it's not offensive. The next day, Teston told Locklear that if he wanted to wear the union hat, he was welcome to wear it. Locklear was not wearing the union hat the next day
15   when Teston talked to him, and Teston only remembers Locklear saying, "okay." However, Teston saw Locklear wearing the union hat after this conversation.

*Legal Analysis*

20   Section 8(a)(1) of the Act provides that it is an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their statutory right to engage in, or restrain from engaging in concerted activity. "It is well settled that the test of interference, restraint, and coercion under Section 8(a)(1) of the Act does not turn on the employer's motive or whether the coercion succeeded or failed." *American Tissue Corp.*, 336 NLRB 435, 441
25   (2001) (citing *NLRB v. Illinois Tool Works*, 153 F.2d 811, 814 (7th Cir. 1946)). In making its determination, the Board considers the total context in which the challenged conduct occurs and is justified in viewing the issue from the standpoint of its impact on employees. Id. (citing *NLRB v. E.I. du Pont & Co.*, 750 F.2d 525, 528 (6th Cir. 1984)). However, as discussed previously, Section 8(a)(1) is modified by Section 8(c) of the Act, which defines and implements the first
30   amendment right of free speech in the context of labor relations.

I find, based on the totality of the circumstances, that Teston's statement to Locklear was not unlawful. Teston, who was Locklear's supervisor, asked Locklear a rhetorical question about his union hat. Teston did not ask Locklear to remove the hat. The following day Teston went
35   back to Locklear to inform him that he was welcome to wear the hat. I do not find these circumstances to be coercive but rather an opinion under Section 8(c). See *Cadillac of Naperville, Inc.*, 368 NLRB No. 3, slip op. at 4 (2019) (citing *NLRB v. Gissel*, supra, where Sec. 8(c) gives employers the right to express their views about unionization or a particular union if those communications do not threaten reprisals or promise benefits). Based upon this limited
40   scenario, I do not find that Respondent violated the Act as alleged and dismiss complaint paragraph 7(w).

    XI.    COMPLAINT PARAGRAPH 7(R): RESPONDENT DID NOT VIOLATE SECTION 8(A)(1) OF THE ACT WHEN SUPERVISOR ARNOLD CAMAT IMPLIEDLY THREATENED AN EMPLOYEE
45       FOR WEARING A UNION HAT

The General Counsel argues that Camat's statement to Vasquez is an unlawful threat under the Act (GC Br. at 78). Respondent argues that Camat did not threaten Vasquez (R Br. at 96–97).

5      Former employee Eric Vasquez (Vasquez), who in the spring of 2017 worked in quality control in the stamping department, testified that he wore a union shirt to work almost every day and wore a union sticker on his hat daily (Tr. 368). In addition, to wearing a union shirt and sticker on his hat, Vasquez participated in passing out leaflets inside and outside the Fremont facility (Tr. 369–370). Vasquez testified that he was never asked to change his shirt by 10  management (Tr. 369). Vasquez also testified that 20 to 30 employees in the stamping department wore union shirts and/or union stickers on any given day.

Vasquez testified that in the spring of 2017, one morning after his shift ended, as he stood at the timeclock, a supervisor from BIW named "Arnold" told him to watch out with his union 15  sticker which he had on his hat because "they're watching people with that sticker on" and "make sure you are on point with everything" (GC Exh. 35; Tr. 353–356).

Based on the record, it appears that Vasquez was referring to Arnold Camat (Camat), who was a production supervisor for BIW and who supervised Vasquez from July 2016 to March 20  (Tr. 2115–2116).[74] Camat testified that the only conversations he had with Vasquez concerned his tardiness, and these conversation occurred away from the production line and time clock (Tr. 2116, 2120–2121). After issuing Vasquez a written warning for tardiness, Respondent's management team decided in the spring of 2017 to transfer Vasquez to another department where the start time was later in the morning (Tr. 2117–2118). Camat denied discussing the Union with 25  Vasquez, and could not recall Vasquez wearing a union shirt, hat or sticker (Tr. 2118, 2120–2121, 2123). Camat denied making the statement that Vasquez attributed to him (Tr. 2118).

*Credibility Findings*

30      I do not credit Vasquez' testimony. Vasquez provided clear details of what "Arnold" allegedly said to him one morning in the spring of 2017. However, on cross-examination, Vasquez could not answer even basic questions such as the name of his last supervisor or even "Arnold's" last name despite Arnold having been his supervisor for 9 months. Vasquez stated, "I don't remember" numerous times. He could not recall the date of the conversation with 35  Arnold which is believable but could not even place the time period of the conversation. On direct examination, Vasquez testified the conversation occurred in the spring of 2017 but on cross-examination waffled his testimony such that the conversation could have occurred in September (Tr. 361). Vasquez provided unreliable testimony, and I decline to credit any portion of it. In contrast, Camat testified with sincerity as to his recollection of conversations with 40  Vasquez. Camat answered questions completely, and his demeanor remained calm throughout his testimony.

*Legal Analysis*

---

[74] At the hearing, the parties stipulated that Camat is a supervisor within Sec. 2(11) of the Act (Tr. 2118–2119).

22-60493.6069

The allegation at complaint paragraph 7(r) is dismissed since I do not credit Vasquez' testimony that Camat made the comment attributed to him.

XII.    COMPLAINT PARAGRAPH 7(S): RESPONDENT VIOLATED SECTION 8(A)(1) OF THE ACT
         IN AUGUST WHEN SUPERVISOR HOMER HUNT TOLD EMPLOYEES IT WOULD BE FUTILE
         TO SELECT THE UNION AS THEIR BARGAINING REPRESENTATIVE

The General Counsel argues that supervisor Homer Hunt (Hunt) made a statement of futility to welder Michael Williams (Williams) which violates Section 8(a)(1) of the Act (GC Br. at 78–80).  Respondent argues that the allegation against Hunt is time barred (R Br. at 100-103).  Respondent also argues that even if the complaint allegation is not time barred, Hunt did not make a statement of futility to Williams (R Br. at 99–100).

*Procedural Issue*

Respondent alleges that complaint paragraph 7(s) is barred by Section 10(b) of the Act.  On March 30, 2018, the Regional Director issued a third order consolidating cases, second amended consolidated complaint and notice of hearing with paragraph 7(s) alleging that in August, Hunt, at the Fremont facility, informed employees that it would be futile for them to select the Union as their bargaining representative.  At the hearing, Respondent moved to dismiss the allegation at complaint paragraph 7(s) against Hunt as there is no "valid operative charge" related to Hunt (Tr. 224).  Respondent, in its answer, alleged generically that the complaint contained allegations that are beyond the applicable statute of limitations, and thus the allegations are barred.  The General Counsel opposed such a motion and I reserved my ruling on the motion to this decision (Tr. 225–226).  Now Respondent renews its motion to dismiss paragraph 7(s) in its post–hearing brief.  The General Counsel did not address Respondent's timely raised Section 10(b) argument in its post-hearing brief, and thus, I rely upon the General Counsel's argument during the hearing.  For the reasons that follow, I deny Respondent's motion to dismiss paragraph 7(s).

Beginning with complaint paragraph 7(s), in charge 32–CA–208614, filed on October 25, amended on March 13, 2018, the Union alleged that within the past 6 months, Tesla had violated the Act by "making a statement of futility regarding employee support for the Union" and "by these and other acts, Tesla, Inc. has violated Section 8(a)(1), (3), and (4) of the National Labor Relations Act (GC Exh. 1(z), 1(hh)).  The original charge included various allegations of intimidation and harassment from June to October as well as other acts for engaging in Section 7 right.  Although the Hunt allegation was not specified in the original charge, I find that it was specified in the amended charge, thus I find that *Redd-I* test is satisfied.  As for the first prong, the Hunt allegation of selecting the Union as futile would be analyzed similarly under Section 8(a)(1) of the Act.  As for the second prong, the allegation against Hunt arose during the same union organizing campaign which was the subject of the original charge.  This charge also encompassed the wearing of union apparel as well as the discharge of employees.  The Hunt allegation falls squarely during this time period and cannot be distinguished.  Finally, as for the third prong, Respondent's defenses would be similar such that no such conduct or statements occurred.  Thus, paragraph 7(s) of the complaint is not time-barred.

Respondent cites several Board decisions to distinguish these charges from other charges the Board found to be untimely. However, unlike in *WGE Federal Credit Union*, supra, the allegations here in complaint paragraphs 7(s) would be analyzed under section 8(a)(1) of the Act and involve the same union organizing campaign. See *Nickles Bakery of Indiana*, supra. The Hunt allegation concerns the union organizing campaign and does not concern facts separate and apart from the many allegations set forth in the charges and amended charges. See *Charter Communications, LLC*, supra. In sum, complaint paragraphs 7(s) is not time barred.

<u>Statement of Futility</u>

In August, Williams had a conversation with his former supervisor, Hunt, who was supervisor of quality control (Tr. 237). Williams testified that he was at a specific welding station when he saw Homer and motioned for him to come over to Williams' workstation to discuss the lead position for which he had applied and was not chosen. Hunt stated that the selection was out of his hands. Williams then stated that this situation was a reason to have the Union at Tesla so that the correct individuals get chosen for the proper positions. Hunt then told Williams, "The Union's never getting in here. This is Tesla" (Tr. 238).[75] Hunt denied that the Union ever came up during this conversation but also could not remember the conversation exactly (Tr. 2015–2016, 2112). Hunt testified that the conversation with Williams was like a "yelling contest" with Williams using profanity (Tr. 2103–2016). However, Hunt did not discipline Williams as a result of the conversation (Tr. 2106).

*Credibility Findings*

I credit Williams testimony as he testified in a forthright manner, providing significant details, and I saw no indication of bias as Respondent alleges. In contrast, Hunt exhibited a great deal of animosity during his testimony regarding the conversation with Williams. In addition, Hunt could not recall the details of his conversation with Williams but does recall profanity and angry outbursts by Williams. However, Hunt never disciplined Williams if the conversation occurred as alleged which undermines Hunt's credibility. Logically, such an outburst if it occurred would have resulted in at least a referral for an investigation or proposed disciplinary action, neither of which took place. Thus, I rely upon Williams' version of events.

*Legal Analysis*

Employer statements to the effect that the employer will never be a union shop are unlawful because they would reasonably give employees the impression that it would be futile for them to support the union, thus interfering with, restraining, and coercing them in the exercise of their right to select a union to represent them, in violation of Section 8(a)(1). *Venture Industries*, 330 NLRB 1133, 1133 (2000); *Wellstream Corp.*, supra; *Maxi City Deli*, 282 NLRB

---

[75] In his affidavit, Williams states that when Hunt and he spoke about his failure to be selected for the lead position, Hunt and he were "messing around" compared to his hearing testimony where he stated Hunt and he were having a professional conversation (Tr. 254). I do not find the change in tenor of the conversation from a casual to a professional conversation to affect whether the statement was made by Hunt or not.

742, 745 (1987).  In response to a conversation Williams was having with Hunt regarding his failure to be promoted, Williams stated that his failure to be promoted was a reason for the employees to have union representation.  In response, Hunt told Williams that there would never be a union at Tesla.  Hunt's statement gave the impression to Williams that it would be futile to

5    select the Union which violated Section 8(a)(1) of the Act as alleged at complaint paragraph 7(s).

XIII.    COMPLAINT PARAGRAPH 8: RESPONDENT VIOLATED SECTION 8(A)(3) AND (1) OF THE ACT BY TERMINATING RICHARD ORTIZ ON OCTOBER 18 AND BY DISCIPLINING JOSE MORAN ON OCTOBER 19, AND VIOLATED SECTION 8(A)(1) OF THE ACT BY

10    INTERROGATING EMPLOYEES AND ENFORCING AN UNLAWFUL RULE IN SEPTEMBER AND OCTOBER

The General Counsel argues that Respondent unlawfully disciplined Moran and terminated Ortiz, two well-known union activists, for their protected concerted activity when

15    they criticized anti-union employees on a private Facebook page (GC Br. 80-81).  During this investigation, the General Counsel alleges that Respondent's investigator unlawfully interrogated the employees in September and October and promulgated or disparately enforced a rule regarding the Workday program (GC Br. at 81–86).  Moreover, the General Counsel argues that the proper analysis of the discipline and termination is *NLRB v. Burnup & Sims*, 379 U.S. 21

20    (1964) (GC Br. at 86–91).  The General Counsel also argues that Moran and Ortiz' conduct did not lose the protection of the Act under *Atlantic Steel Co.*, 245 NLRB 814 (1979) (GC Br. at 92–94).  Respondent, on the other hand, argues that Moran and Ortiz were not engaged in concerted activity for the purpose of mutual aid or protection (R Br. at 137–139).  Respondent argues that Moran and Ortiz lost the protection of the Act by improperly using Workday and lying during

25    the investigation, respectively (R Br. at 139–143).  Finally, Respondent argues that the proper analysis of the discipline and termination is *Wright Line*, 251 NLRB 1083 (1980), enfd. on other grounds 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved in *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983) (R Br. at 143–150).

30                                    California State Legislature

On about August 29, Ortiz, along with VOC members Galescu, Sanchez, and Phillips as well as union organizers, participated in meetings with the State of California legislature in Sacramento, California, to encourage the legislators to add in language to the electric vehicle

35    rebate program that Respondent needed to be "fair and responsible" and ensure safety in the workplace (Tr. 491–492, 495).  Also, during this time these employees posted a photo with one of the California State Senators with whom they had met on the public Facebook webpage, "A Fair Future at Tesla" (GC Exh. 46; Tr. 492–493).

40    After the meetings with VOC members, the California State Assembly held public hearings on September 13 and 14, to discuss the Budget Act of 2017, Assembly Bill (AB) 109 and 134 (Tr. 495, 2506; CP Exh. 9 and 10).  Specifically, AB 134, committee on budget, section 1, provision 2(c)(1) states, "The State Air Resources Board shall work with the Labor and Workforce Development Agency to develop procedures for certifying manufacturers of vehicles

45    included in the Clean Vehicle Rebate Project as being fair and responsible in the treatment of their workers.  It is the intent of the Legislature that beginning in 2018–2019 fiscal year, the Labor Secretary shall first certify manufacturers as fair and responsible in the treatment of their

workers before their vehicles are included in any rebate program funded with state funds."
During these public hearings, three employees for Tesla, maintenance technician Shaun Ives
(Ives), lead equipment maintenance technician Travis Pratt (Pratt), and GA Production
Supervisor Jean Osbual (Osbual) testified in opposition to AB 109 and 134.  Of relevance,
during these hearings, Pratt, who identified himself by name, testified that he started at Tesla as a
maintenance technician, level 2, and made $130,000 gross income.

On approximately September 14, Ortiz, who did not attend the hearings, contacted
political organizer "Hanna" who lobbied on behalf of the Union.  Hanna told Ortiz that Tesla
employees attended the hearings and spoke on behalf of Tesla.  Hanna sent Ortiz a video link of
the employees' public comments at the hearings (Tr. 496).  The Tesla employees who attended
the hearings were speaking against union-sponsored AB 109 and 134.

Because Ortiz could not open the video link, he sent the link to Moran via text message to
see if he could open the link (Tr. 498; GC Exh. 43).  Ortiz wrote to Moran, "Hanna is
sensing[sic] me a video of the suck asses Tesla been taking ti[sic] Sacramento" (GC Exh. 43).
Moran responded by asking Ortiz to send it to him.  Ortiz replied, "I cant[sic] view it with my
phone so let me know who they are  I want to walk up to them AND say see you in Sacramento
suck ass" (GC Exh. 43 (emphasis in original)).  Moran testified that he watched the video, noted
the individuals' names, and looked up the individuals in Workday via the application on his
personal phone to determine if they were actual Tesla employees (Tr. 723, 794).

To look up individuals in Workday, an employee must log into the Workday program,
and use the search box to type in a name.  Moran testified that he had previously searched for
employees on Workday to compare his seniority with others (Tr. 724).  Moran testified that he
previously sent screenshots of employees' Workday profiles to Ortiz (Tr. 724–725).  Moran
testified that no one from Respondent discussed policies or limitations on using Workday
(Tr. 672).  Moreover, Moran testified that no one had ever told him that he could not take
screenshots of Workday profiles and photos (Tr. 672).[76]

### Private Facebook page, "Tesla Employees for UAW Representation"

Moran sent a text to Ortiz of the Workday profile screenshot photos of employees Ives
and Pratt, and supervisor Osbual (Tr. 505–507).  Other employees, who Ortiz could not recall,
also sent him the Workday profile screenshots of these employees (Tr. 507).  That same day,
Ortiz posted one side-by-side screenshot of Pratt's photo and job title, and Ives' photo with no
name or job title on the private Facebook webpage, "Tesla Employees for UAW Representation"

---

[76] Multiple witnesses testified similarly.  Phillips, who is a current employee, testified that no one had
ever placed limitations on his ability to use Workday including limitations to use only for official
business purposes even after October (Tr. 389–390).  Galescu testified that no supervisor, manager or HR
employee ever told him that Workday could only be used for "legitimate and official business purposes"
even after October (Tr. 833).  Ortiz testified that Respondent briefly discussed Workday during his new
employee orientation but did not place any limitations or restrictions on its use (Tr. 442–443).  I credit
these employees' testimonies as to how Workday may be used, and that no limitations or restrictions were
ever placed on its use.

(Tr. 506, 626–627).  Above the photos of Pratt and Ives, Ortiz posted the following comment on the private Facebook webpage:

> These guys been in Sacramento saying we are lying about how things are at Tesla
> Management has been taking them one of them sez[sic] he made $130000 last year
> How many of you make . . .
> overtime
> This just proves how much kissing ass and ratting on people get you at Tesla and the ones that do the real work get passed over

(GC Exh. 28.)  Ortiz, quickly thereafter, removed the post from Facebook because Pratt sent him a message via Facebook stating that name calling "wasn't a good way to start" (Tr. 515–516.)[77] Pratt wrote, "Say what you like about me behind closed doors . . . I made what I did last year almost entirely as a level two maintenance technician, which is where several of your colleagues from production now find themselves.  I wish you luck but know there will be a lot of us on the otherside[sic].  Starting with name calling may not be the approach you want to take" (GC Exh. 80).

The Investigation of Pratt's Complaint

Pratt then sent a text message to Hedges complaining about Ortiz' Facebook post; Pratt and Hedges also spoke on the phone (Tr. 1180, 1182, 1212–1213; GC Exh. 28).  Pratt sent Hedges a screenshot of Ortiz' post on Facebook which included Pratt and Ives' Workday profile photos.  The screenshot of the Facebook post includes a picture of a sleeping child and the following message, "Travis Pratt: Copy thanks" (GC Exh. 28).  Hedges could not explain what this writing meant and did not appear to ask Pratt (Tr. 1255–1256). Pratt wrote the following text message under the Facebook screenshot he sent Hedges,

Looks like we got under some people's skin. 😊

Hedges responded, "Wow.  This is on Facebook?"  Pratt responded, "Yea lol [laugh out loud] I'm pretty sure it's on their fair future at Tesla thing" (GC Exh. 28). It appears that Pratt's text message does not end at this point, but the remainder of his message cannot be seen in the exhibit (GC Exh. 28).  Hedges testified that it is likely Pratt and he continued to text one another but he only sent the one-page screenshot to Copher and Bodiford and did not keep the other text messages since he had a new Tesla-owned phone and his computer had been stolen (Tr. 1219).

Hedges testified that during their phone conversation, Pratt did not specify on which Facebook page his photo appeared (Tr. 1214, 1217).[78]  Hedges testified, "[Pratt] said he'd

---

[77] Since Ortiz deleted this Facebook post soon after posting it, the post no longer appears on the private Facebook webpage and Ortiz did not retain a copy of it (Tr. 516).  Based upon documentary evidence, it was likely Pratt, not Ives as Ortiz testified, who sent the instant message to Ortiz via Facebook, complaining about the post.

[78] Pratt did not testify.

received this from a friend. He's not—he said he's not on social media very much, but he was surprised to see himself and [Ives] on this chat forum or whatever, and that he was kind of afraid that would happen when he went up to Sacramento, and he, you know, he felt kind of targeted by that. And I said well, I will, you know, pass this on to employee relations, and they might reach

5 out to you to talk about, you know, how this happened and kind of look into it. And he said that was fine" (Tr. 1183–1184, 1213–1214). When asked what Pratt's concern was, Hedges testified that Pratt was concerned that his picture and Tesla information had been placed on Facebook (Tr. 1225). Hedges testified that Pratt had a legitimate concern as Pratt "felt targeted by another employee" (Tr. 1227–1229). Hedges then testified that Pratt's complaint warranted an

10 investigation because Pratt "felt harassed and targeted by another employee. And so it's up to me when I get a complaint like that to make sure that it's fully investigated" (Tr. 1231, 1235–1236). Hedges testified that no one shared with him what, if anything, happened to this Facebook post (Tr. 1233).

15 As background, prior to the September 13 and 14 public hearings, Hedges invited Pratt to speak to the California State Assembly legislators after asking him what his employment experience had been at Respondent.[79] Hedges' request to Pratt appears to have been directed by Toledano who asked Hedges to find employees to go to Sacramento (Tr. 1212, 1230). Hedges wanted a "positive" employee experience to be provided to State legislators due to AB 109 and

20 134, sponsored by the Union (Tr. 1181–1182). Thus, Pratt and Ives, while on worktime, went to Sacramento with Hedges (Tr. 1246–1247).[80] Hedges knew that pro-union employees were also supporting the bill, and Hedges sought to "offer a different perspective" (Tr. 1211).

After receiving Pratt's complaint, Hedges spoke for approximately 5 minutes to Ricky

25 Gecewich (Gecewich), an employee relations partner who conducts investigations, to give him a "heads up" about Pratt's complaint as Hedges had already "forwarded" the complaint to Copher (Tr. 1184, 1800–1801).[81] During this conversation, Hedges showed Gecewich the screenshot Pratt sent him and explained why Pratt and Ives were in Sacramento (Tr. 1235, 1801, 1894–1897).[82]

[79] According to Hedges, Pratt told him that his experience at Tesla had been good, he had opportunities for promotion and Tesla had "done some good things" (Tr. 1181). Hedges testified that he asked Pratt to speak about his experience at Tesla "because [Pratt] had a positive experience and there were several others giving, you know, like a negative type of narrative. And I felt it would be useful to have, you know, somebody from the other side" (Tr. 1181).

[80] I do not find Hedges to be a credible witness. Hedges testified that he was not aware that Pratt testified in a public hearing before the California State Assembly, providing his name, job title and salary (Tr. 1225–1226). Hedges' testimony is simply unbelievable. Hedges directly asked Pratt to go to the California State Assembly to speak on behalf of Tesla, and Hedges testimony seems to indicate that he went to Sacramento with them. Even if Hedges did not go to Sacramento, considering the importance of this matter to Tesla and the need to ensure "positive" employees testify on behalf of Tesla, it seems unlikely that Hedges would not have followed up with these employees to learn what happened, and to listen to their public testimony. Thus, Hedges' testimony cannot be believed.

[81] Respondent admits that Gecewich was a supervisor as defined by Sec. 2(11) of the Act and an agent as defined by Sec. 2(13) of the Act. Gecewich no longer works for Respondent (Tr. 1781).

[82] Hedges claimed that he did not ask Gecewich to investigate Pratt's complaint and that Gecewich or Copher made the decision whether a matter should be investigated (Tr. 1209). However, I do not credit Hedges' claims of neutrality as to whether Gecewich should investigate Pratt's complaint or not. The

Gecewich's job responsibilities included investigating concerns brought by employees, supervisors, business leaders or HR partners, conducting witness interviews, gathering information related to employee concerns, meeting with anyone who is accused of violating Respondent's policies, drafting documentation and providing recommendations to business leaders on his findings (Tr. 1788, 1790). Gecewich testified that he conducted over 100 investigations while employed by Respondent (Tr. 1789). Gecewich explained that when taking information about a complaint, he seeks to understand why a complaint was made (Tr. 1799). Gecewich testified that the concerns would be taken seriously, but then the team would determine whether the concerns would be investigated (Tr. 1790). Gecewich explained that he may not interview all witnesses, but will take typed notes, which may be edited later for clarification, during the investigation and during interviews (Tr. 1791–1792). When an investigation is completed, Gecewich creates a report of findings as well as recommendations (such as no discipline, written warning, and terminations); the decision on whether to follow the recommendations lays with the responsible business leaders who may or may not be an employee's direct supervisor (Tr. 1792–1794, 1797). Gecewich testified that when recommendations of termination occur, the employee relations and investigations team will speak to the director level or above (Tr. 1797). When an investigation is completed, Gecewich would inform the complaining person that the investigation is completed (Tr. 1797–1798).

Gecewich began his investigation by calling Pratt on September 19 (Tr. 1085). Gecewich spoke to Pratt about the text messages and screenshot that Hedges showed him (Tr. 1805). Gecewich testified that Pratt "allud[ed] to something about Sacramento"; Gecewich did not ask about the details (Tr. 1805–1806, 1897).[83] During this conversation, Pratt told Gecewich that he sent the Facebook post to Hedges and had received the information from employee Bryan Kostich (Kostich) (Tr. 1086). Pratt told Gecewich that the Facebook post was from a Facebook page called, "Fair Future at Tesla" (Tr. 1086). Gecewich testified that Pratt told him that he thought the information in the Facebook post was inappropriate as it included how much money employees made at Respondent, and Pratt thought that he was being singled out (Tr. 1807–1808). Pratt complained that he felt uncomfortable with Ortiz speculating how much he made as well as the posting of his name and picture (Tr. 1807–1808). Pratt also told Gecewich he thought Ortiz did not act appropriately because he made a comment about people sucking up at Tesla (Tr. 1808). Gecewich never asked Pratt what he meant by his comment to Hedges: "Looks like we got under some people's skin" with a smiling face and eyes and rosy cheeks emoji (Tr. 1868–1869). After this conversation, Pratt forwarded to Gecewich a screenshot of the direct message he sent to Ortiz after he saw the Facebook post (Tr. 1808, 1911–1912; GC Exh. 80). Gecewich testified that Pratt told him that Ortiz then took the Facebook post down (Tr. 1912). Gecewich

circumstances of this situation point to the conclusion that Hedges did not simply refer an employee complaint to the employee relations and investigations team but took additional steps to call the issue to Gecewich's attention as he knew Gecewich would "look into it" (Tr. 1209). In addition, Hedges testified that Pratt's complaint of harassment and being targeted warranted an investigation. Moreover, Gecewich testified that Hedges approached him with the request to investigate (Tr. 1893–1894).

[83] Pratt did not only refer to something in Sacramento but instead, based on Gecewich's contemporaneous notes, Pratt told Gecewich that he was contacted by Hedges to go to Sacramento (GC Exh. 63).

never asked Pratt about his usage of Workday or whether Pratt has shared his information such as job title and salary publicly (Tr. 1808–1809).[84]

5    The day after he spoke to Pratt, on September 20, Gecewich phoned Kostich (Tr. 1814–1815, 1911). During this conversation, Kostich told Gecewich about the Facebook page, "Jose Organizer" (Tr. 1815). Kostich told Gecewich that "Jose Organizer" reached out to him to join a Facebook group called, "Tesla Employees for Union Access" (Tr. 1816). Gecewich did not investigate these Facebook pages Kostich mentioned to him, including the Facebook page where Ortiz posted about Pratt (Tr. 1816). Gecewich also did not investigate the privacy settings on

10    these Facebook pages (Tr. 1816). Gecewich testified that based on his conversation with Kostich, he realized that this incident could have been related to the Union (Tr. 1816–1817, 1820). Gecewich testified that he then gained knowledge of Ortiz' involvement with the Union (Tr. 1817).[85] Gecewich never asked Kostich about his Workday usage (Tr. 1817).

15

September 21: Gecewich's Interrogation of Ortiz

    The following day, on September 21, Gecewich contacted Ortiz via email asking him to attend a meeting with him that day (Tr. 516–517, 629). Ortiz wore his union shirt and pin at the

20    meeting (Tr. 529; GC Exh. 25). Gecewich began the meeting by asking Ortiz to keep the contents of the meeting confidential (Tr. 517).[86] Gecewich showed Ortiz a redacted version of

---

[84] Gecewich is not a reliable witness as his contemporaneous notes during the investigation and hearing testimony differ in key details. Gecewich testified that Pratt expressed concern about Workday during his meeting with him, but he did not put this information in his notes (GC Exh. 63; Tr. 2181-2182, 2192–2193). Based upon Gecewich's notes, the first time the issue of Workday arose during this investigation is when Kostich mentioned the use of Workday and that Kostich wanted someone to investigate this matter (GC Exh. 64).

[85] I cannot credit Gecewich's testimony regarding his knowledge as to when he knew of union activity by Ortiz. Gecewich testified that he knew about unionization at the Fremont facility but denied knowing that there was a Facebook page, or a petition signed by employees (Tr. 1807). However, on July 20, HR partner Tanaka forwarded an email to Gecewich concerning an employee petition from several employees to Hedges, Toledano, and Musk (GC Exh. 70). This email with the subject line: "We Want to Know," asked several questions about compensation at Tesla, and stated that they sought to organize to address these issues. Ortiz and other employees signed this email. The petitions attached to the email also included the logo, "Driving a Fair Future at Tesla" as well as the related website. Gecewich could not recall reviewing this email or why Tanaka forwarded this email to him (Tr. 1868, 1914, 2241). Also at the hearing, after inconsistent testimony, Gecewich testified that before his meeting to discuss the findings of his investigation and his recommendations, he knew that Ortiz was involved with the Union but in Gecewich's January 8, 2018, affidavit to the Board, Gecewich handwrote that he had no knowledge of Ortiz' union activities at the time of that meeting (Tr. 1857–1858). Based upon my overall credibility determinations for Gecewich, I do not credit his claim that he did not know at least a few months prior to the Pratt complaint that employees Moran and Ortiz had been attempting to organize the workplace. Gecewich likely would have reviewed Tanaka's email in the course of his job duties. Also, as for Moran, Gecewich testified that he had seen Moran's name in his blog post prior to Gecewich's start with Tesla in May (Tr. 1838).

[86] Gecewich took notes of his meeting with Ortiz (GC Exh. 65). These notes include a reference to shirts Ortiz mentioned to Gecewich that he had passed out in the parking lot (Tr. 1912–1913). However,

the Facebook screenshot (Tr. 518, 1820; GC Exh. 28).[87]  Ortiz immediately told Gecewich that he posted the message and apologized for what he posted.  Ortiz told Gecewich that he received a message from "the gentleman" and removed the post "as quick as I could" (Tr. 518).[88]

5        Gecewich then told Ortiz that he wanted to ask him questions about Workday (Tr. 518–519).  Ortiz told Gecewich he tried to use Workday but sometimes had trouble such as with his self-review.  Ortiz testified that he told Gecewich that Workday "is like a Facebook for Tesla; the people inside the building" (Tr. 520).  Gecewich asked Ortiz how he received the photos that he posted on Facebook (Tr. 521).  Ortiz did not tell Gecewich the names from whom he received

10   the screenshots and told him that he did not know where the photos came from, but that he received the photos via text message (Tr. 1823).  Gecewich asked Ortiz several times from whom he received the photos.  During this meeting, Ortiz gave Gecewich his phone to look through his text messages, but Ortiz had a new phone which he had replaced that same day (Tr. 525, 620).[89]  The meeting ended with a reminder to keep the meeting confidential.

15   On September 22, Gecewich sought to review the data logs of Workday even though Respondent does not routinely monitor employees' usage of Workday and does not have access to employees' sign-in and sign-out information in Workday; Respondent needs to request specific information from Workday as Workday is a third-party software program (Tr. 1827–1828).  Working with Tesla employee Raj Nanda (Nanda), the day after he interviewed Ortiz,

20   Gecewich requested that Workday provide a list of anyone who accessed the Workday pages/profiles of Pratt and Ives between September 10 and 16 (Tr. 1828–1829, 1831; GC Exh. 81).

On September 28, because he had still not received the requested information, Gecewich

25   asked Nanda for an update on his request, and stated in his email, "Please be aware this case is being closely monitored by Gaby and I am providing updates as they come in" (GC Exh. 81).  Still not receiving the information, on October 4, Gecewich elevated his request to Nanda's

---

Gecewich claimed at the hearing that he did not know that Ortiz was passing out union shirts (Tr. 1913).  Again, Gecewich is not credible since his contemporaneous notes are inconsistent with his hearing testimony.  Meanwhile, I cannot credit Ortiz' testimony that Gecewich twice mentioned the Confidentiality Agreement.  Ortiz testified that Gecewich mentioned the Confidentiality Agreement and that he asked if he was fired (Tr. 521), but Gecewich's notes and testimony only reflect that he expected the meeting to remain confidential.

[87] The redacted version excludes the text messages between Pratt and Hedges as well as the picture of a child and a comment of "thanks" (Tr. 1821).  Gecewich also testified he showed Ortiz an enlarged version of this Facebook post (Tr. 2252–2254).

[88] Ortiz is referring to the direct message Pratt sent him.

[89] Respondent attempts to attack Ortiz' credibility because he had a new phone that day and no longer had his old phone.  Certainly, if Ortiz' credibility could be punctured at other points in his testimony, then his action of replacing his phone that same day could raise some eyebrows.  However, in this instance, I see nothing nefarious about Ortiz' actions as he did not have advance notice that Gecewich planned to question him that day about the Workday profiles he posted on Facebook.  In fact, Respondent received this text message string regardless of the phone replacement, and it is unclear what more Respondent would want (Tr. 620–622).

supervisor and informed him that "[. . .] we should update Gaby and team shortly" (GC Exh. 81).[90]

On October 6, Nanda provided a list of individuals who accessed the Workday profiles of Pratt and Ives (GC Exh. 81). The list revealed that Moran and Krista Washington (Washington), who was not identified during the hearing, on September 14 viewed Pratt and Ives' Workday profile pages (GC Exh. 81). Moran viewed Pratt and Ives' Workday profile pages two minutes apart. Gecewich testified that after receiving the logs, he looked at Moran's Workday profile photo and recognized his photo from the small bubble on Ortiz' Facebook post of the screenshots (Tr. 2273). Still Gecewich sought more information and wanted to know which pages Moran visited in September and sought to compare the data which "will explain his usage much better" (GC Exh. 81). Thereafter, on October 24, after the investigation concluded and the discipline and termination had been issued, Nanda sent Gecewich the Workday logs for Moran (Tr. 1829; GC Exh. 79, 81).

### October 12: Gecewich Interrogates Moran

On October 12, Gecewich met with Moran in a conference room (Tr. 727). Gecewich introduced himself and stated that the meeting was to remain confidential (Tr. 729). Gecewich stated that he was investigating a concern with Workday. Gecewich then asked Moran a series of questions about Workday (Tr. 728). Gecewich asked Moran if he thought Workday was an internal or external platform, and Moran responded that he thought it was an internal platform. Gecewich asked Moran for what purposes he used Workday, and Moran stated that he used it to review his performance, update his contact information, and sign documents electronically (Tr. 730). Gecewich asked Moran if he used Workday for any other purposes. Moran told him that he used Workday to search for his co-workers to compare his seniority and pay (Tr. 730–731, 1834). Gecewich then told Moran that he knew that Moran took the screenshots of the employees' Workday profiles (Tr. 731). Gecewich asked why Moran took the screenshots, and Moran told Gecewich that he wanted to find out if the individuals were actual employees of Respondent (Tr. 732, 1835, 1899, 1945).[91] Gecewich never showed Moran the actual screenshots he received (Tr. 1836-1837, 1942–1943).

Gecewich asked Moran to look for the screenshots on his phone and on Facebook (Tr. 1837–1838). Moran could not find the screenshots on Facebook which had been removed by Ortiz after Pratt complained directly to Ortiz (Tr. 733). Thereafter, Gecewich asked Moran to

---

[90] Gecewich was not a credible witness. Gecewich incredibly testified that he only provided Toledano with updates once a month, and that despite his claims to Nanda, Toledano was not monitoring this investigation (Tr. 1873–1874, 1907, 2265, 2267). Gecewich claimed that he wrote untrue statements in his email to Nanda simply to get the information sooner (Tr. 1876, 2267). If Gecewich were to be believed that Toledano only received monthly updates, then Gecewich's investigatory tactics raises a red flag as he does not appear to be trustworthy which again diminishes his credibility.

[91] Gecewich's notes again contradict his testimony (GC Exh. 67). Gecewich testified that Moran told him that he used Workday at the request of a UAW representative to verify whether the individuals were employees (Tr. 1836). However, in his notes, Gecewich states that a representative from UAW told Moran that Tesla employees were in Sacramento, and Moran decided to look up the employees to see if they were actual employees. Moran did tell Gecewich that he would look at Workday accounts of other employees when requested by a UAW representative.

look on his phone for the screenshots. After some time, Moran was able to find the screenshots in his text message communications with Ortiz (Tr. 733–734). Gecewich asked for a copy of the text messages to "prove, you know, my case that I didn't do anything wrong" (Tr. 735). Gecewich asked Moran if he did anything else with the screenshots, and Moran told him that he sent the pictures to Ortiz. Gecewich mentioned that the pictures "got out somewhere in public" (Tr. 736). Gecewich thanked Moran for his honesty (Tr. 799). The meeting ended after 40 minutes to an hour (Tr. 796).

### October 12: Gecewich Interrogates Ortiz

After meeting with Moran, Gecewich met with Ortiz again on October 12; Ortiz again wore his union shirt (Tr. 528).[92] During this meeting, which lasted longer than the first, Gecewich asked for the meeting to remain confidential. Gecewich started the meeting by asking about the Workday profile screenshots on the Facebook post. Gecewich and Ortiz then had a conversation about where the screenshots came from. Ortiz eventually admitted that it must have been Moran who sent the screenshots to him via text message but that he had received these screenshots from others as well (Tr. 530, 1842). Apparently prior to his meeting with Gecewich, Moran spoke to Ortiz about his meeting with Gecewich. During this meeting with Gecewich, Ortiz expressed concern about being fired and was worried in the prior meeting that he would be fired. Ortiz also spoke about his nature not to bring others into his own problems, and that he was protecting other employees including Moran (Tr. 1842–1844). By the end of this meeting, Ortiz had told Gecewich from where the photos had come (Tr. 1915).

### Decision to Terminate Ortiz for Lying and to Issue Moran a Warning for Workday Misuse

After these meetings with Ortiz and Moran, Gecewich drafted a report of his investigation with recommended actions (Tr. 1846, 1850). Gecewich testified that he based his recommendations on looking at similar cases as well as the "unique facts of this case" (Tr. 1851). Gecewich testified that he considered Workday profile photos and any Workday screenshots to be sensitive; Gecewich's characterization of the Workday photos or screenshots is based on his own belief that Workday is an internal data system (Tr. 1935). During his investigation, Gecewich claimed he never sought to learn what happened in Sacramento, went to the Facebook page to look at the page and never found out who were the members of the Facebook group (Tr. 1823, 1835). After drafting the report, Gecewich showed it to Tesla's in-house counsel (Tr. 1849). Gecewich's recommendation for termination of Ortiz and warning for Moran were "aligned with legal" (Tr. 1930). But a prior version of his report shows that Gecewich along with in-house counsel edited the investigatory report which was originally created on October 12 (GC Exh. 85). In a prior version of this report, Gecewich wrote, "This time frame corresponds to when these three Tesla employees went to Sacramento, California to speak with State legislatures about their experiences at Tesla" (GC Exh. 86). The sentence was removed from the final version of the report, but directly contradicts Gecewich's repeated testimony that he did not

[92] As for the second meeting with Ortiz, I cannot credit the entirety of Ortiz or Gecewich's testimony as to what happened. Gecewich's contemporaneous notes provide a much clearer picture as to what happened (GC Exh. 67). No matter which version I choose to credit, all versions demonstrate that Gecewich asked Ortiz several questions about the Workday screenshots and why he did not tell the truth during the first meeting. Thus, I rely on a compilation of the testimonies of Ortiz and Gecewich along with Gecewich's notes.

know anything about the employees' testimony in Sacramento on behalf of Tesla or what prompted the Facebook posts (Tr. 2185–2187). Gecewich attempted to correct his prior testimony to claim that he did know the purpose which was shared with him during the investigation but Gecewich also claimed to not have investigated the underlying events to the Facebook post (Tr. 2187).

Gecewich's response as to what he was investigating varied throughout his testimony. At one-point Gecewich testified that he was investigating why the Workday screenshots were released (Tr. 1898). Then he testified that he was investigating the release of the Workday photos on a public Facebook page (Tr. 1902). And the final report states, "This investigation was initiated to determine if proprietary business systems were accessed for non-business purposes" (CP Exh. 4). However, the investigation began based on Pratt's complaint that the release of his photo and information was inappropriate and made him feel singled out, harassed or cyberbullied (Tr. 1903–1904). Gecewich claimed that he never investigated the Facebook post, and admitted he never sought to understand why Pratt made the complaint (Tr. 1939). Gecewich admitted that he knew "parts" of the Facebook posts "could have been protected" so he focused on the Workday profile photos (Tr. 1939–1940). Gecewich repeatedly testified that the posting of the Workday photos externally was concerning as this was Tesla's information (Tr. 1904). But the Workday photo is the same photo on the employees' badges and Gecewich testified that employees can take a photo of their own badge and post it elsewhere as there is no proprietary interest in the photo (Tr. 1927, 1957).

Hedges testified that he did not speak to Gecewich again until after he was finished with the investigation when Gecewich told him his findings and recommendations (Tr. 1186, 1188–1189, 1236–1237, 1907). Gecewich told Hedges that Ortiz lied during the investigation because Ortiz knew from whom he received the "information" and thus Gecewich was recommending termination. As for Moran, Gecewich testified that he was forthcoming and honest but used Workday improperly and he was recommending a warning be issued to Moran (Tr. 1187, 1237, 1915).[93] Hedges agreed with Gecewich even though he was not the decision maker (Tr. 1221). Hedges could not recall if he ever informed Toledano about Pratt's complaint (Tr. 1220). Hedges testified he spoke with Gecewich, Copher, and Bodiford (Tr. 1221). The record is unclear as to whether Hedges or Gecewich decided that the decision maker in Ortiz' case should be Stephan Graminger (Graminger), the director for body manufacturing which included BIW,[94] since Hedges believed that this situation needed "more attention" and a decision maker at a "higher level to make an objective decision" rather than the BIW department manager Ron Martinez (Martinez) (Tr. 1187–1188, 1907–1908). Hedges testified that he suggested someone higher than Martinez make the decision because Ortiz and Moran were involved with the Union, and thus there would be more scrutiny with the decision and needed someone who was comfortable making the decision and farther removed from the day-to-day operations (Tr. 1190, 1239).[95]

_____

[93] Gecewich could not recall whether he asked HR partners to document Moran's warning in his Workday file or keep it in an email (Tr. 1793–1794).

[94] Graminger no longer works for Respondent but during the relevant time period was a supervisor as defined by Sec. 2(11) of the Act (Tr. 1293).

[95] Hedges admitted that he knew Moran was an active Union organizer and had brought safety concerns to Musk and Hedges' attention (Tr. 1205–1206). Hedges also admitted that Ortiz was an active

On October 17 Gecewich met with Graminger along with Shtawney McIntosh (McIntosh), who was an HR business partner for BIW,[96] and Martinez in a conference room near BIW to discuss Ortiz (Tr. 1268, 1848; R Exh. 15).[97]  Prior to the meeting, Graminger did not
5  know what the meeting was about (Tr. 1292).  Gecewich presented the findings of his investigation and spoke about Ortiz (Tr. 1288, 1852, 2205–2206).[98] Graminger testified that he reviewed the entire report during the meeting (Tr. 1300–1301).  The version of the report purportedly shown to Graminger notes that employee relations received a concern that Ortiz posted screenshots of Ives' and Pratt's Workday "landing page" which included pictures, full
10  names and business titles (CP Exh. 4).  As for the summary and analysis of findings section, the report states, "On Sept. 16th, 2017, ER [employee relations] received a concern from Travis Pratt that Richard Ortiz posted screenshots of his and Shaun's Workday profile to a Facebook group. Travis was concerned based on the content of the message and because he understood Workday was an internal Tesla HR system intended for work purposes and not for broader distribution on
15  social media" (CP Exh. 4).  The report states that Moran was asked by a UAW representative to verify that the employees were Tesla employees (CP Exh. 4). Furthermore, Gecewich wrote that Moran volunteered to provide his text messages to Gecewich, and that Moran said Ortiz would be "dishonest" if he didn't say from where the screenshots came (CP Exh. 4).  Gecewich further wrote, "After learning Jose shared the screenshots with Richard, ER spoke with Richard again"
20  (CP Exh. 4).

       Graminger testified that Gecewich stated that Ortiz and Moran "leaked some internal information out of Workday including some telephone number and personal information and posted it on Facebook" (Tr. 1288).  Gecewich never mentioned to Graminger that Pratt and Ives
25  had gone to Sacramento to testify on behalf of Tesla (Tr. 2201).  At the meeting, Graminger asked to see Ortiz' post on Facebook, and Gecewich showed Graminger a screenshot of the Facebook post (Tr. 1289, 1303).[99]  Graminger testified that he was "quite sure" he asked Gecewich if similarly situated cases had been treated in the same way, and Gecewich responded that they had but did not provide any specific details of cases (Tr. 1293–1294, 1301–1302).[100]

Union organizer and requested Cal/OSHA 300 logs and summaries (Tr. 1206).  Hedges also admitted that he was familiar with the Union's Facebook page "A Fair Future at Tesla" and had visited the webpage at least 10 to 20 times (Tr. 1207).

[96] Even though McIntosh testified at the hearing, no party asked her any questions about this meeting.

[97] Gecewich and Graminger's testimonies differ significantly on what occurred during this meeting. Graminger, who appeared to be a nervous witness, was more reliable than Gecewich as to what occurred. Graminger appeared to be earnest in explaining what he learned during the meeting, and his thought process as to how to decide this matter.  Based upon my overall findings that Gecewich was not a credible witness, I rely upon Graminger's testimony although there were some inconsistencies within his testimony as well.

[98] The record is unclear as to which version of the report Graminger reviewed.

[99] Gecewich could not recall showing Graminger the Facebook post (Tr. 2198).  Again, I credit Graminger's testimony.

[100] In contrast, Gecewich testified that during the meeting, he provided Graminger a comparator case where a vice president of SolarCity had been terminated after an investigation where he lied about his use of a company vehicle, drugs and alcohol found in that vehicle and an improper relationship with another employee (Tr. 1853).  Gecewich testified that this situation was the only comparator case used as the vice president was terminated only for lying during the investigation, not for the alleged acts (Tr. 1853–1854, 1920).

At this meeting, Gecewich recommended that Ortiz be terminated for lying during the investigation.  Gecewich testified that any mitigating circumstances would be raised by the HR partner or business leader and that he told Graminger their role during the meeting (Tr. 1929).  Gecewich testified that Martinez made some "good comments" about Ortiz but those comments did not mitigate the recommended termination (Tr. 1930).  In fact, Respondent conducted one performance review of Ortiz for the time period from January 1 to June 30 (GC Exh. 12).  Ortiz received an overall rating of 3—consistently strong.  Respondent also conducted a 2017 supplemental performance review for Ortiz from July 1, 2016 to June 30 where Ortiz received the same rating of 3—consistently strong (GC Exh. 13).  As a result, on October 8, Respondent awarded Ortiz a performance award (GC Exh. 14).

Gecewich asked Graminger if he agreed with his recommendation, and because Graminger was new to Tesla and felt that this situation was a "sensitive case" he wanted to talk to Hochholdinger to get confirmation if there have been similar cases in the past to be certain he fully considered everything.  The meeting ended without Graminger deciding (Tr. 1290, 1919).

Graminger went to Hochholdinger and told him that he had just left an investigation meeting "involving Richard Ortiz, a member of the union" (Tr. 1290, 1310).[101]  Graminger asked Hochholdinger if he was aware of the matter, but Hochholdinger was not aware.  Then Graminger asked whether there have been similar cases where someone lying during an investigation would be terminated.  Hochholdinger responded that there have been similar instances and that person would be terminated according to Respondent's personnel policy (Tr. 1290–1291).  Graminger did not know which specific Tesla policies Ortiz violated nor did he review any policies (Tr. 1298–1299).  Thereafter, Graminger informed McIntosh, Martinez and Gecewich via email to proceed as discussed and that Hochholdinger was aware of the decision to terminate Ortiz (Tr. 1290–1291; R Exh. 15).

Graminger made the decision to terminate Ortiz on October 17 (Tr. 1265).  Prior to making the decision to terminate Ortiz, Graminger had never spoken to or dealt with Ortiz (Tr. 1265–1266, 1290).

### October 18: Ortiz is Terminated

On October 18, Gecewich, McIntosh, and Ortiz met in the north admin building; Ortiz wore his Union shirt (Tr. 532, 2064–2065).[102]  McIntosh testified that Gecewich began the meeting by informing Ortiz that the investigation he had conducted was closed (Tr. 2066).  According to McIntosh, Gecewich told Ortiz that he was found to be dishonest during the

---

[101] Graminger testified that Ortiz' union activity was not discussed during the meeting and the Union was not brought up during the meeting but, Graminger knew that Ortiz was "a member of the union" and that the matter had such sensitivity that he needed another opinion (Tr. 1291–1292, 1301, 1855).  Graminger testified that Ortiz' name was familiar because he had looked on the website, "A Fair Future for Tesla" and the Facebook page (Tr. 1291, 1298, 1313).  Graminger knew before this meeting with Gecewich that Ortiz was active in the Union.  I do not credit Graminger's testimony that Ortiz' Union activity was not discussed during the meeting.  It is obvious that all the attendees of the meeting knew that Ortiz was active with the Union, and it seems implausible that no one mentioned his union activity during this meeting especially considering Graminger admitted this was a "sensitive case."

[102] McIntosh testified credibly albeit a bit reluctantly with her responses.

process as he was not forthcoming about some images or where the images came from, and recommended termination (Tr. 2066, 2068).  Ortiz was asked if he had any questions which he did not have, and McIntosh explained the termination process (Tr. 2066).  McIntosh stated that the meeting lasted 5 to 10 minutes (Tr. 2066).  McIntosh denied that the Union was mentioned
5   during the meeting but knew that Ortiz was active in the Union as it was "common knowledge" since he wore Union shirts (Tr. 2067–2068).[103]

Toledano testified that she learned of Ortiz' termination after it occurred from Copher's status reports to her (Tr. 904).  Toledano denied receiving status reports during the investigation
10   of Ortiz, did not monitor the investigation of Ortiz, and was not involved in the investigation in any way (Tr. 905–909).  Toledano also testified that Gecewich verbally informed her of the results of the investigation (Tr. 910, 933).  Toledano could not recall what Gecewich told her.  Toledano testified, generally, that she learned Ortiz lied during the investigation, but she did not know what the lie concerned and Copher's report did not provide details (Tr. 934).  Again, I
15   cannot credit Toledano's testimony.  It is incredulous to believe that Toledano was unaware that a prominent union supporter was terminated or that he was even being investigated.  Based on what is more likely than not, Toledano knew about the investigation as well as the reasons for Ortiz' termination.

20                           October 19: Moran is Disciplined for Violating a Workday Rule

On October 19, Gecewich and Emee Cruz (Cruz), an HR partner, met with Moran.  Gecewich thanked Moran for his honesty during the first meeting, and he would only be given a warning regarding his use of Workday (Tr. 738, 801).  Gecewich told Moran that he could use
25   Workday only for business purposes, not personal use (Tr. 2308).  Thereafter, Gecewich sent Moran an email to follow up on their meeting that day (GC Exh. 42, 82; Tr. 2308).  Gecewich wrote, "As part of our investigation we found that you used an internal system, Workday, for personal purposes and without proper business justification.  You are reminded that you should only access internal systems, including Workday, for legitimate and official business purposes"
30   (GC Exh. 42, 82).  Gecewich testified that associate manager Brian Cunningham (Cunningham) agreed with the recommendation for a verbal coaching with written follow up to be issued to Moran (Tr. 2307).[104]

On October 19, Gecewich sent an email to Pratt, informing him that the investigation of
35   the Facebook post and improper access/use of Workday had been completed (GC Exh. 83).  Gecewich informed Pratt that while he could not tell him the specific outcome in this matter, Respondent took his concerns seriously and "aligned our action with similar cases across Tesla" (GC Exh. 83).  However, Gecewich testified that as of January 2018, this case was the only scenario involving Workday use of employees (Tr. 1879).  Furthermore, Respondent has no

---

[103] Ortiz, in his October 26, affidavit taken soon after he was terminated, did not state that Gecewich was at his termination meeting, and that McIntosh told him was being terminated for violating the Confidentiality Agreement (Tr. 644).  I cannot credit any of Ortiz' testimony as to what occurred during the termination meeting.  McIntosh testified in a clear, concise manner, and I rely upon her testimony to establish what occurred during this meeting.  Ortiz again testified about the Confidentiality Agreement but based on logical inferences, this subject was not mentioned.

[104] Gecewich testified that he met with Cunningham, but his Board affidavit of January 8, 2018, does not reflect such a meeting (Tr. 2322–2323).

written policy requiring employees to be truthful during an investigation or any policy requiring employees only use Workday for legitimate and official business purpose (Tr. 1879).

*Credibility Findings*

5

Of all the witnesses who testified about these allegations, I credit Moran's version of events completely. Not only did Moran testify with few inconsistencies but Gecewich's contemporaneous notes also supported his testimony. Next, although I credited some portions of Ortiz' testimony, there are many portions of his testimony that I could not credit. For example,

10 Ortiz testified that Gecewich asked him about the Confidentiality Agreement and asked him if he knew what a lie was. I cannot credit his testimony as the Confidentiality Agreement was not been mentioned by any other witness.

As for Respondent's witnesses, I cannot rely upon Hedges or Gecewich. I have set forth

15 numerous examples within the statement of facts which explains why I cannot credit their testimony. As a Section 611(c) witness, Gecewich testified steadily but nervously. Under cross-examination, Gecewich's demeanor became argumentative when confronted with inconsistent statements such as his statement to Nanda that Toledano was watching the investigation "closely" after he claimed that he did not update her during the investigation. Gecewich's

20 testimony that he did not know about the union organizers and the Facebook pages are not genuine. Gecewich testified in a purposefully evasive manner and appeared to be jittering in his chair. Moreover, Gecewich's testimony was filled with inconsistencies and his final report does not accurately reflect his interview notes.

25 Graminger was a more credible witness for Respondent but even his testimony was confusing and contradictory as described. On the one hand Graminger testified that Ortiz' union activity was not discussed during the meeting but on the other hand Graminger looked at the union organizing campaign website as well as Facebook page where he viewed Ortiz' posts before the meeting. This example of contradictions and inconsistent statements are ripe within

30 these set of facts.

McIntosh testified in a clear and straightforward manner. There were no inconsistent statements. Thus, I rely upon McIntosh's version of the October 18 meeting when Ortiz was terminated.

35
*Legal Analysis*

*Moran and Ortiz Engaged in Protected Concerted Activity, and Did Not Lose the Protection of the Act*

40

Before discussing whether Respondent violated the Act when terminating Ortiz and disciplining Moran, I must first address the issue of whether Ortiz and Moran engaged in protected concerted activity. Respondent argues that Moran and Ortiz were not engaged in concerted activity for the purpose of mutual aid or protection when Moran sent the Workday

45 profile screenshots to Ortiz. Based on Board precedent, I disagree.

22-60493.6085

Section 7 of the Act protects the right of employees to engage in "concerted activity" for the purpose of collective bargaining or other mutual aid or protection. For an employee's activity to be "concerted" the employee must be engaged with or on the authority of other employees and not solely on behalf of the employee himself. *Meyers Industries (Meyers I)*, 268

5    NLRB 493 (1984), remanded sub nom. *Prill v. NLRB*, 755 F.2d 941 (D.C. Cir. 1985), cert. denied 474 U.S. 948 (1985), on remand *Meyers Industries (Meyers II)*, 281 NLRB 882 (1986), affd. sub nom. *Prill v. NLRB*, 835 F.2d 1481 (D.C. Cir. 1987), cert. denied 487 U.S. 1205 (1988). The statute requires the activities to be "concerted" before they can be "protected." *Bethany Medical Center*, 328 NLRB 1094, 1101 (1999). The Board has held that activity is concerted if

10    it is "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself. *Meyers I*, supra; *Meyers II*, supra; *Quicken Loans, Inc.*, 367 NLRB No. 112, slip op. at 3 (2019) (citations omitted) (profanity laced statement by single employee concerning customer call routed to him was not protected or concerted as employees as a group had no preexisting concerns about customer calls, and no evidence that employee sought to

15    initiate or induce group action). The question of whether an employee has engaged in concerted activity is a factual one based on the totality of the circumstances. *National Specialties Installations, Inc.*, 344 NLRB 191, 196 (2005). The Act protects discussions between two or more employees concerning their terms and conditions of employment. Whether an employee's activity is concerted depends on the way the employee's actions may be linked to those of his

20    coworkers. *Fresh & Easy Neighborhood Market*, 361 NLRB 151, 153 (2014). Concertedness is analyzed under an objective standard. *Fresh & Easy Neighborhood Market*, supra at 154. Employees act in a concerted manner for a variety of reasons, some altruistic and some selfish. Id. citing *Circle K. Corp.*, 305 NLRB 932, 933 (1991), enfd. mem. 989 F.2d 498 (6th Cir. 1993).

25    Both Ortiz and Moran clearly engaged in concerted activity which is protected. Upon learning that employees testified on behalf of Tesla during a union-sponsored California State Assembly bill, Ortiz asked Moran to help him learn if these individuals were current employees. Moran, in working with Ortiz, then went to the Workday system to search for these employees. Once Moran found these employees, he sent screenshots of their Workday profiles to Ortiz.

30    Ortiz then posted the screenshots with his comments on the employees' private Facebook page. Ortiz posted these screenshots without Moran's approval or consent. This private Facebook page had been set up as a forum for employees to discuss unionization at the workplace—essentially a virtual watercooler. Simply because Moran sent the screenshots to Ortiz and Ortiz decided to add the Workday screenshots to the private Facebook page does not mean that Moran and Ortiz

35    did not act concertedly, as Respondent argues. They did not act together to post the pictures but each of their actions was to promote the union organizing drive at Tesla for the mutual aid and protection of all employees and to improve the terms and conditions for all employees. See *Kaiser Engineers*, 213 NLRB 752 (1974) (employee letters to legislators opposing relaxing of immigration restrictions for engineers); *Bethlehem Shipbuilding Corporation Ltd. v. NLRB*, 114

40    F.2d 930 (1st Cir. 1940) (employee appearances on behalf of their coworkers before legislative committees); *Triple Play Sports Bar & Grille*, 361 NLRB 308, 308–309 (2014) (Facebook communications between employees complaining about employer tax withholding error constituted " 'concerted activities' and they were 'for the purpose of . . . mutual aid or protection'"); *North West Electric Cooperative*, 366 NLRB No. 132, slip op. at 1, fn. 1 (2018).

45    Respondent's insistence on a narrow reading of the law is not warranted by Board law or the purpose of Section 7 of the Act. Ortiz posted screenshots of Pratt and Ives' Workday profiles to point out employees who were not supportive of the Union. Pratt responded to Ortiz, informing

him that this was not the way to get other employees on board with unionization.  Thus, Ortiz removed the post.  Still, Pratt decided to complain to Hedges, who originally asked him to go to Sacramento on behalf of Tesla.  Pratt complained that Ortiz' Facebook post made him feel singled out, but this claim is disingenuous since he forwarded the Facebook post to Hedges with the remark, "Looks like we got under someone's skin" with a smiling face and eyes and rosy cheeks emoji.  This addition of the emoji does not reflect a concern of harassment.  This complaint launched the investigation into Ortiz and Moran's protected concerted activity.

Respondent argues that if Moran is found to have engaged in protected concerted activity, his action of accessing and utilizing Workday for nonbusiness purposes sufficiently removed the protection of Section 7 of the Act.  Respondent bases its argument on disputed facts. Respondent never had a rule that employees could only use Workday for business purposes, or restricted employees' use of Workday.  Several witnesses testified that they had never received such instructions from Respondent, nor did Respondent provide any evidence that this rule existed. Obviously, the access employees receive in Workday is based upon their positions at Tesla. Presumably, Moran along with others had access to employees' profiles.  Respondent attempts to analogize Moran's screenshots of Workday profiles to employees who steal business records or personnel files from their employers.  Moran's actions came nowhere near such examples. Moran used Workday not only for his own personnel records, to which he accessed, but also to look up employees, where he is limited to the employees' names and job titles.  The employee profiles were not private or confidential records.  See *Ridgley Mfg. Co*., 207 NLRB 193, 196 (1973).  In sum, Moran did not lose the protection of the Act for violating a nonexistent rule.

As for Ortiz, he reasonably understood that Gecewich was trying to learn about his protected activities when he repeatedly asked who sent him the Workday profile screenshots which he posted on the private Facebook page.  Under these circumstances, Ortiz was under no obligation to respond to questions to uncover protected activities.  See *Paragon Systems, Inc.*, 362 NLRB 1561, 1567 (2015).  Ortiz' "lying" was not related to his job performance or Respondent's business, but to a protected right under the Act which he was not obligated to disclose.  See *St. Louis Car Co.*, 108 NLRB 1523, 1525–1526 (1954).  In *Fresenius USA Mfg. Inc.*, 362 NLRB 1065 (2015), the Board found that an employee's dishonesty during an investigation of misconduct of alleged harassment and threats was unprotected by the Act due to the focus of the investigation on the allegation, and not on any union activity.  That case in inapposite as a comparator.  Here, Respondent did not investigate Pratt's specious claim of harassment and being singled out, but instead Respondent chose to disregard the original complaint, and fabricated its own investigation into the Workday profile screenshots.  Ortiz did not lose the protection of the Act as the investigation focused solely on who provided him the screenshots that he posted on the private Facebook page.[105]

*Respondent Violated Section 8(a)(3) and (1) of the Act by Terminating Ortiz for Lying Regarding Protected Concerted Activity*

[105] Respondent does not contend that Ortiz lost the protection of the Act for his Facebook post where a totality of the circumstances test analysis would be undertaken.  *Pier Sixty, LLC.*, 362 NLRB 505, 506 (2015).

The credited evidence shows that Respondent terminated Ortiz for lying during an investigation. An employer may not terminate an employee for lying in response to questions regarding protected concerted activity. *Tradewaste Incineration*, 336 NLRB 902, 902 (2001) (employee's untruthful denial that he posted a wage-related notice was protected where it "did not relate to the performance of his job performance or the [r]espondent's business."); *St. Louis Car Co.*, 108 NLRB 1523, 1525–1526 (1954) (employee's untruthful denial of her union organizing activity was protected where the denial "related not to the [r]espondent's business at all, but to personal rights guaranteed by [the Act] which she desired not to disclose."). Here Respondent admitted that Ortiz was terminated for his lying during the investigation when he did not reveal from whom he received the screenshots, of which he was not obligated to disclose, Respondent violated Section 8(a)(3) and (1) of the Act when terminating Ortiz. The analysis regarding Ortiz' termination should end here but, in the alternative, I will consider Ortiz' termination under the *Wright Line*, supra, framework.

*Respondent Violated Section 8(a)(3) and (1) of the Act by Terminating Ortiz and Moran Under Wright Line*

When more than one motive exists for the alleged discriminatory action for protected concerted activity, a mixed motive analysis applies.[106] Under *Wright Line*, supra at 1089, the General Counsel has the initial burden to show that an employee's protected activities were a motivating factor in the employer's actions against him. 251 NLRB at 1089. The requisite elements to support a finding of discriminatory motivation are union or other protected concerted activity by the employee, employer knowledge of the activity, and animus on the part of the employer. To support its initial burden under *Wright Line*, "the General Counsel must prove by a preponderance of the evidence that union animus was a substantial or motivating factor in the adverse employment action." *Consolidated Bus Transit, Inc.*, 350 NLRB 1064, 1065 (2007), enfd. 577 F.3d 467 (2d Cir. 2009). The burden then shifts to the employer to demonstrate that it would have taken the same actions even absent the employees' protected conduct. *Wright Line*, supra at 1089; see also *Electrolux Home Products, Inc.*, 368 NLRB No. 34, slip op. at 3 (2019); *National Hot Rod Association*, 368 NLRB No. 26, slip op. at 4 (2019) (citations omitted) (an employer need not prove the disciplined employee had committed the alleged misconduct but only needs to show it had a reasonable belief that the employee committed the alleged offense and then it acted on that belief). First, I will discuss Ortiz' termination followed by Moran's discipline using the *Wright Line* framework.[107]

---

[106] I agree with Respondent that the *Burnup & Sims*, supra, framework is not applicable regarding Ortiz' discharge. Under *Burnup & Sims*, supra, an employer violates the Act by disciplining or discharging an employee based on a good-faith belief that the employee engaged in misconduct during otherwise protected activity, if the General Counsel shows that the employee was not, in fact, guilty of that misconduct. *Burnup & Sims*, supra, applies to cases involving mistakes of fact, not mistakes of law. Here, this is not a "mistake of fact" case, and *Burnup & Sims*, supra, would not apply. Likewise, an *Atlantic Steel* analysis would not apply as the issue stems from Ortiz' off-duty, offsite use of Facebook to communicate with other employees. See *Triple Play Sports Bar & Grille*, supra; *Pier Sixty*, supra.

[107] Again, I disagree with the General Counsel and Respondent that a *Burnup & Sims* analysis is appropriate. The first prong of *Burnup & Sims* fails as Respondent could not have had an honest belief that Moran engaged in misconduct for improperly accessing and using Workday. Based on the totality of the circumstances, Respondent promulgated this rule in response to Moran's protected concerted activity.

As set forth above, Ortiz engaged in protected concerted activity which did not lose the protection of the Act. Furthermore, Respondent was well-aware of Ortiz' activity. First, Hedges, who referred Pratt's complaint to Gecewich, knew that Ortiz' Facebook post regarding Pratt and Ives stemmed from the two employee's testimony during a California State Assembly
5   hearing on the union-sponsored bill. Hedges knew that Ortiz was actively involved with the Union as he had also requested Respondent's Cal/OSHA safety records which were then the subject of a leaflet passed out by union supporters. Gecewich also knew of Ortiz' activities as he received a copy of the employee petition regarding wages which Ortiz had signed. Gecewich also knew that the Facebook post with screenshot arose from an issue in Sacramento which
10  involved employees speaking about a union-sponsored legislative bill. I do not credit Gecewich's attempt to wall himself off from knowledge of Ortiz' union activity by claiming not to know the subject matter that caused Ortiz to post a comment on the employee's Facebook page. Finally, Graminger, the decisionmaker, also knew about Ortiz' union activity as he looked at the union website and knew that Ortiz was involved with the Union, which is why he went to
15  Hochholdinger to confirm that termination would be appropriate. Graminger also saw the screenshots Ortiz posted. Even McIntosh, who attended Gecewich's meeting with Graminger to present his findings and recommendations, testified that it was "common knowledge" that Ortiz actively participated in the organizing campaign.

20      The General Counsel has also proven Respondent's union animus towards Ortiz' actions. Animus can be established through direct evidence or inferred from circumstantial evidence. See *Medic One, Inc.*, 331 NLRB 464, 475 (2000) (noting that "[e]vidence of suspicious timing, false reasons given in defense, failure to adequately investigate alleged misconduct, departures from past practices, tolerance of behavior for which the employee was allegedly fired, and disparate
25  treatment of the discharged employees all support inferences of animus and discriminatory motivation"); *Electrolux Home Products*, supra; *Temp Masters, Inc.*, 344 NLRB 1188, 1193 (2005); *Promedica Health Systems, Inc.*, 343 NLRB 1351, 1361 (2004).

        First, the record is clear that Respondent exhibited animus towards Ortiz' actions as well
30  as animus towards union supporters which is established by the numerous unfair labor practices and the entire record. See *Metro-West Ambulance Service*, 360 NLRB 1029 (2014); *Lucky Cab Co.*, 360 NLRB 271, 274 (2014) (employer's contemporaneous 8(a)(1) violations demonstrate its union animus); *Bates Paving & Sealing, Inc.*, 364 NLRB No. 46, slip op. at 3 (2016). Respondent sought to counter the Union's drive to pass a California State Assembly bill which
35  could affect Respondent economically by sending "positive" employees to Sacramento to speak on behalf of Tesla. In reaction, Ortiz posted a comment along with the Workday screenshots of Pratt and Ives on the employees' private Facebook page. Pratt responded to Ortiz, who promptly removed the post. What should have been a discussion between two employees regarding their individual rights to organize or to not organize became an investigation into Ortiz. Even prior to
40  this event, Respondent, as found herein, committed other violations of the Act such as interrogating Ortiz about the Cal/OSHA logs and to whom he gave them. By September, the union organizing campaign was well underway, and Ortiz' name was known to management. *Shamrock Foods Company*, 366 NLRB No. 117 (2018).

45      The evidence shows examples of circumstantial evidence which point to Ortiz' termination being unlawfully motivated. *Shamrock Foods*, supra. Pratt complained to Hedges, albeit with little concern based on his text message reply to Hedges ("Looks we got under some

people's skin" and smiling face and eyes and rosy cheeks emoji).  Hedges, who had been asked by Toledano to find "positive" employees to appear on behalf of Tesla, referred the "complaint" to Gecewich who promptly agreed to investigate the manner.  During Gecewich's initial intake of the complaint, Pratt conveyed his concern about the post and Kostich who saw the Facebook post complained that he did not think it was proper for Ortiz to use Workday in the way he used it.  Gecewich then decided to shift the focus of his investigation to Workday since he knew that the Facebook post was related to the Union.  In so doing, Gecewich did not even speak to Ives whose photo was also posted on Facebook.  Gecewich providing shifting reasons for the purpose of the investigation where he claimed it was due to screenshots of Workday on Facebook, but in the investigatory summary he wrote "This investigation was initiated to determine if proprietary business systems were accessed for non-business purposes."  During this investigation, Gecewich kept Toledano, who identified pro-union employees as adversaries, informed of the progress of the investigation.  Gecewich did not ask Pratt or Kostich how they used Workday and never asked others at Tesla about the uses of Workday.  Gecewich claimed he did not know what happened in Sacramento to prompt Pratt's complaint but a prior version of the report of investigation shows that he knew that the Sacramento matter involved employees speaking on behalf of Tesla and the Union.  From the start of the investigation, initiated by Hedges, Respondent sought the result it desired.  See *St. Paul Park Refining Co.*, 366 NLRB No. 83 (2018) (failure to conduct complete and objective investigation).

When finding comparable disciplinary actions, it should be noted that Gecewich did not inform Graminger of the details but simply noted that there were similar actions in the past.  Later, the only instance Gecewich could find of comparable discipline was of a management official at another company owned by Tesla who lied when he was being investigating for alcohol and drug use in a company vehicle along with improper relations with a coworker.  Respondent did not establish that it treated similar incidents involving employees similarly.  Even after Ortiz told Gecewich from whom he received the Workday screenshots and why he did not want to divulge any names, Ortiz still recommended termination.

Graminger, who was to be the neutral decision maker, knew about the connection between the Facebook post and Workday as he asked to see the post.  But the report was also filled with errors by Gecewich.  For example, the report states that Ortiz disclosed confidential employee information and telephone numbers on Facebook.  This statement is simply false.  Any confidential information was disclosed by Pratt, and Ortiz did not disclose telephone numbers.  Other errors in the report include attributing the Workday complaint to Pratt when instead Kostich complained about a perceived misuse of Workday.  These errors support an inference that Respondent sought to terminate Ortiz with false information.

The timing of events also relates directly to Ortiz' protected activity as the investigation began quickly after Ortiz' Facebook post and within the next month he was terminated.  *McClendon Electrical Services*, 340 NLRB 613, 613, fn. 6 (2003) (finding discharge that occurred a day after protected concerted activity supported a finding of unlawful motivation); *Mira-Pak, Inc.*, 147 NLRB 1075, 1081 (1964), enfd. 354 F.2d 525 (5th Cir. 1965) (finding termination unlawful where discharge occurred 2 days after protected concerted activity).  Under all the circumstances of this matter, Respondent's termination of Ortiz is pretextual.  Respondent sought to punish the employees who pushed back against the employees who spoke on behalf of Tesla and knowing that they could not directly punish Ortiz for his Facebook post sought to find

another way.  Moreover, during this second meeting, Ortiz admitted he did not tell the truth
during the first meeting with Gecewich as to whom he received the Workday screenshots
because he did was not certain who sent him the screenshots and did not want to bring anyone
else into this matter; he sought to protect his coworkers.  A finding of pretext defeats any attempt
by Respondent to show that it would have terminated Ortiz absent his protected activities.  Even
if no pretext exists, Respondent continues to fail to meet its burden because there were no
comparators or other evidence to establish, they would have taken the same action against Ortiz.
Thus, Respondent violated Section 8(a)(3) and (1) when unlawfully terminating Ortiz.

As for Moran, as set forth above, he engaged in protected concerted activity which did
not lose the Act's protection.  Respondent clearly knew about Moran's protected concerted
activity.  Moran publicly announced the organizing campaign at Tesla with his February blog
post which drew a response from the head of the Company.  Gecewich, who investigated Pratt's
complaint, recognized Moran's name from the blog post.  Moran also initiated an employee
petition regarding safety which caused Musk and Toledano to meet with him where they engaged
in multiple unfair labor practices.  Toledano had been kept apprised on the investigation by
Gecewich.  Thus, it is beyond dispute that Respondent knew about Moran's protected concerted
activity.

Next, the General Counsel has also proven animus regarding Moran.  Again, Respondent
violated the Act numerous times during this time period as described within which supports a
finding of animus.  Respondent's reason for warning Moran is pretextual which supports a
finding of animus.  See *Lucky Cab*, supra at 274.  During Gecewich's meeting with Moran,
although he already knew that Moran viewed Pratt and Ives' Workday profiles the same day they
were posted by Ortiz on Facebook, Gecewich asked Moran many questions about how he used
Workday.  Thereafter, Gecewich directly asked Moran about Pratt and Ives' Workday profiles.
Moran did not deny that he sent the screenshots to Ortiz.  Thus, Gecewich could not find that
Moran lied during the investigation, but he then decided to create a new Workday rule, claiming
that Workday was to be used only for "legitimate and official business purposes."  This rule
never existed prior to disciplining Moran, and Respondent presented no comparable disciplinary
actions.  By promulgating this Workday rule and enforcing this rule disparately against Moran,
Respondent violated Section 8(a)(3) and (1) of the Act.  Gecewich's final report also contained
many errors as explained above.  In addition, Moran never claimed that the UAW asked him to
look up the employees on Workday, and Moran never stated that if Ortiz did not tell the truth
about where he received the Workday profile screenshots, he would be "dishonest."  Respondent,
in post hoc rationalization, claims that it would have disciplined Moran regardless of protected
concerted activity due to other internal systems rules, but this explanation only comes now.

In sum, the General Counsel met its burden to show that Respondent terminated Ortiz
and disciplined Moran for discriminatory reasons and promulgated a rule in response to
protected concerted activity.  I therefore find that Respondent violated Section 8(a)(3) and (1) of
the Act by terminating Ortiz, disciplining Moran, and promulgating a rule in response to
protected concerted activity as alleged in complaint paragraphs 8(b)(iii), (c) and (d).

*Respondent Violated Section 8(a)(1) when Interrogating Moran and Ortiz*

As for the allegation that Gecewich interrogated Ortiz on September 21 and October 12, and Moran on October 12, the Board considers the totality of the circumstances in determining whether the questioning of an employee constitutes an unlawful interrogation. *Rossmore House*, supra (the Board set forth a test for examining whether an interrogation is unlawful); *Stoody Co.*, 320 NLRB 18, 18 (1995) (the Board considers background, nature of information sought, and method of interrogation). The test is an objective one that does not rely on the subjective aspect of whether the employee was, in fact, intimidated. *Multi-Ad Services*, 331 NLRB 1226, 1227–1228 (2000), enfd. 255 F.3d 363 (7th Cir. 2001). The Board has also found that questioning an employee about his protected concerted activity may constitute an unlawful interrogation. See *Century Restaurant & Buffet, Inc.*, 358 NLRB 143, 157 (2012).

As set forth above, Gecewich interrogated Ortiz on both September 21 and October 12, and Moran on October 12. He questioned Ortiz repeatedly about the Workday profile screenshots he posted even after he knew that Moran had sent these screenshots to Ortiz. Gecewich knew that Moran had sent the screenshots to Ortiz but asked him many questions about Workday, and continued to investigate his use of Workday, despite knowing that the screenshots were used in the course of protected concerted activity. All of Gecewich's questions were designed to elicit information from Ortiz and Moran about their protected concerted activity and their union organizing activities.

Section 7 of the Act gives employees the right to keep confidential their union activity. *Guess?, Inc.*, 339 NLRB 432, 434 (2003); *National Telephone Directory Corp.*, 319 NLRB 420 (1995). Each interrogation by Gecewich of Ortiz and Moran was unlawful as Respondent has not "demonstrated that its need for the information justifies compromising its employees' Section 7 right to confidentiality." *Guess?*, supra at 435. Gecewich clearly knew that the Workday profile screenshots arose from employees testifying on behalf of Tesla at a California State Assembly hearing. Gecewich knew there was a union organizing campaign as well and that Moran and Ortiz were prominent in this campaign. Moreover, after Gecewich investigated Workday, Gecewich knew that it more likely than not that Moran sent the screenshots to Ortiz. Thus, there was no need to probe into the matter any further. Under the totality of the circumstances, Gecewich's actions were coercive and sought information from Ortiz and Moran about their protected concerted activity. Hence, I find that Respondent violated Section 8(a)(1) of the Act with each interrogation alleged at complaint paragraphs 8(b)(i) and 8(b)(ii).

XIV.   CONSOLIDATED COMPLAINT PARAGRAPH 6:[108] RESPONDENT VIOLATED SECTION 8(A)(1) OF THE ACT WITH ELON MUSK'S MAY 20, 2018 TWEET

The General Counsel alleges that Musk violated Section 8(a)(1) of the Act when he threatened employees with loss of stock options with this tweet on May 20, 2018:

> Nothing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues & give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets healthcare.

---

[108] This complaint arises from case 32–CA–220777 which was consolidated into this matter.

(GC Br. at 68–71).  Respondent argues that Musk's tweet was privileged under Section 8(c) of the Act as well as the First Amendment, cannot be considered in isolation, that Tesla should not be liable for Musk's tweet, and his statement could not be considered a threat (R Br. at 174–186).

5        The parties stipulated the following facts (Jt. Exh. 4):

There are approximately 157,000,000 daily active Twitter accounts and over 336,000,000 monthly active Twitter accounts.  Tweets may be viewed, reviewed, republished, or reported on or in Twitter, Facebook, radio, television, newspapers, news media, and various other print and social media platforms.  Musk has approximately 22,700,000 followers on Twitter.  There are approximately 82 Twitter accounts worldwide that have more Twitter followers than Musk.  The Twitter handle, "@elonmusk," as Musk's personal Twitter account.  Musk's Twitter account also displays a blue verified employee badge, which according to www.Twitter.com lets people know that an account of public interest is authentic.  Musk has used the "@elonmusk" Twitter handle to tweet about Respondent's business decisions and plans, finances, production goals, personnel matters, and breaking news.  Respondent has its own Twitter handle, "@Tesla," which is used to make company statements on behalf of Respondent.  Twitter, and the use of tweets, is a commonly accepted form in which some companies announce news in lieu of, or in addition to, press releases.

On May 20, 2018, Musk (@elonmusk) tweeted the following in response to three Twitter accounts:

About 2% of Tesla, incl salaried & hourly, union and non-union were let go in annual review. Only known union person fired was a guy who repeatedly threatened non-union supporters verbally & on social media & lied about it.

(GC Exh. 38).[109]  Also on May 20, 2018, Musk (@elonmusk) tweeted, replying to @dmatkins137 @ShayneRarma @NASA:

Nothing stopping Tesla team at our car plant from voting union.  Could do so tmrw if they wanted.  But why pay union dues & give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets healthcare.

(GC Exh. 56).  Several media outlets reported Musk's tweets (R Exh. 45).[110]  On May 23, 2018, Musk tweeted in response to another tweet, "Exactly.  UAW does not have individual stock ownership as part of the compensation at any other company." (R Exh. 45(a)).  Toledano testified that she followed Musk's tweets "to make sure our CEO was not tweeting dumb stuff" and understood that Musk tweeted on behalf of Tesla (Tr. 953–654).

[109] This tweet appears to refer to Respondent's termination of Ortiz.  I note that Musk provides a completely different justification for why Ortiz was terminated.

[110] In these media articles, the authors' noted responses from a Tesla's spokesperson (R Exh. 45).  A Tesla spokesperson noted that Musk's tweet was "simply recognition of the fact that unlike Tesla, we're not aware of a single UAW-represented automaker that provides stock options or restricted unit to their production employees, and UAW organizers have consistently dismissed the value of Tesla equity as part of our compensation package" (R Exh. 45(a)).

Musk sent the two May 20, 2018 tweets, as stated above, from his "#@elonmusk" Twitter handle, which are still posted and viewable by the public. On Twitter, replies to tweets that are part of the same "thread" or conversation are indicated by replying to a Twitter account's
5 username with "a@," i.e. "@elonmusk."

From May 20 to 23, 2018, Musk and several other Twitter users engaged in a "thread" which included the tweet which the General Counsel alleges is a threat (GC Exh. 56, 69). The Twitter users included "@dmatkins137," which is associated with an individual named David
10 Atkins, "@ericbrownzzz," which is associated with an individual named Eric Brown, "@ParkerMolloy," which is associated with an individual named Parker Molloy, "@jackallisonLOL," which is associated with an individual named Jack Allison, "@jAltWouss," which is associated with an individual named Wooter.

15 It is not possible to identify or determine the determine the number of individuals that viewed the tweets identified above across Twitter, Facebook, radio, television, newspapers, news media, and various other print and social media platforms. It is also not possible to know or determine if every individual that viewed the alleged unlawful tweet by Musk also viewed Musk's tweets in the thread. It is known that the tweets by Musk, identified in General Counsel
20 Exhibits 38, 56 and 69, were republished and disseminated; however, it is not possible to determine the full extent to which Musk's tweets, as set forth in General Counsel Exhibits 38, 56 and 69, were republished or otherwise disseminated via Twitter, Facebook, radio, television, newspapers, news media, and various other print and social media platforms.

25 *Legal Analysis*

The test to determine if a statement violates Section 8(a)(1) is whether "under all circumstances" the remark "reasonably tends to restrain, coerce, or interfere with the employee's rights guaranteed under the Act. *GM Electrics*, 323 NLRB 125, 127 (1997). Motivation nor
30 actual effects are considered. *Miller Electric Pump & Plumbing*, 334 NLRB 824, 825 (2001). An employer violates Section 8(a)(1) of the Act by threatening employees with adverse consequences for engaging in union activities. *NLRB v. Gissel Packing Co.*, supra at 618–619. An employer is free to communicate to his employees any of his general views on unionism or any of his specific views about a union per Section 8(c) of the Act so long as the
35 communications do not contain a threat of reprisal or force or promise of benefit. An employer's prediction concerning what will happen if employees unionize "must carefully be phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control." *Gissel*, supra at 618. If there is any implication that an employer may act on his own initiative unrelated to economic necessities, "the statement is no longer a reasonable
40 prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment." Id.

Here, Musk's tweet was sent out to 22,700,000 followers on Twitter, some of whom are employees of Tesla. Musk's tweet can only be read by a reasonable employee to indicate that if
45 the employees vote to unionize that they would give up stock options. Musk threatened to take away a benefit enjoyed by the employees consequently for voting to unionize. The Board has held that statements reflecting the possible loss of existing benefits through good faith bargaining

does not constitute an unlawful threat of the loss of existing benefits. *Wild Oats Markets, Inc.*, 344 NLRB 717, 717–718 (2005) (no threat where employer communicated to employees in a flyer that employees could lose benefits during collective bargaining). In contrast, Musk's statement cannot be read as an outcome that could occur due to good-faith collective bargaining

5    but instead made this statement as a threat of unilateral discontinuation of existing benefits if the employees unionized. *Medical Center of Ocean County*, 315 NLRB 1150, 1154 (1994) (threat where statement to employees that "[y]ou could lose your benefits" was susceptible to interpretation that employer intended to discontinue existing benefit prior to bargaining). Musk did not reference collective bargaining or express that the loss of stock options could be a result

10   of negotiations. Musk presented no objective facts to support his statement that employees would lose their stock options. In *Dyncorp*, 343 NLRB 1197, 1198–1199 (2004), the Board found that Respondent unlawfully threatened employees with the loss of employer stock contribution monies if the employees chose union representation. Musk's statement indicates that employees would lose stock options if they voted to unionize. Thus, his statement was not a

15   prediction carefully phrased based on objective fact to convey Respondent's belief as to probable consequences beyond its control, and I find his statement violates Section 8(a)(1). Consequently, Musk's tweet lost the protection of Section 8(c) because Musk implied that Tesla would act on its own initiative to remove stock options if the employees chose to unionize.

20           As its affirmative defense, Respondent argues that Musk's Twitter account is his own and his message was directed to a non-employee of Tesla. However, the parties stipulated that Musk has over 22 million Twitter followers who would have seen the unlawful tweet; these followers included employees and nonemployees. With Twitter, who views comments is unclear. This dissemination is akin to a company official issuing a press release to the public where anyone

25   including employees may read the statement. See *Vemco, Inc.*, 304 NLRB 911, 925 (1991) (press release broadcast to the public sufficiently communicated to the employees). In addition, the parties stipulated that Twitter, and the use of tweets, is a commonly accepted form in which some companies announce news in lieu of, or in addition to, press releases. Moreover, Toledano testified that she understood Musk to tweet on behalf of Tesla. It is important to note that

30   Respondent presented no evidence that Tesla disavowed any of Musk's tweets about the company. But even if Respondent had done so, under existing Board law, as discussed previously, Tesla is liable for a Section 2(11) supervisor's actions—Musk who is CEO of the company. Furthermore, Respondent also argues that Musk's tweet is protected by the First Amendment, and that Tesla should not be held liable for his opinion. However, in *Gissel*, the

35   Supreme Court specifically set forth that a statement loses the protection of the First Amendment if the statement is based on misrepresentation regarding the consequences of bargaining if the employees unionized. Musk is Tesla's highest-ranking officer, and Respondent cannot divorce itself from Musk's comments. Again, in as much as employers are responsible for a supervisor's conduct in the workplace, Tesla is responsible for Musk's comments in this instance where there

40   is an allegation of an unlawful threat. See *Glenroy Construction Co.*, 215 NLRB 866, 867 (1974) (employer violated the Act based on supervisor's unauthorized and "personal" statement), enfd. 527 F.2d 465 (7th Cir. 1975).

45           Respondent argues that Musk's entire Twitter "course of conduct" should be considered, and if not considered, Musk's Twitter statement in isolation is not a threat. In the context of the union organizing campaign, which had been active for at the least the prior year, any employee reading Musk's statement would reasonably conclude that Musk threatened to remove employee

stock options if the employees chose unionization.  Based on my research, this issue of whether Musk's Twitter statement could violate Section 8(a)(1) of the Act is an issue of first impression. I choose to analyze this issue similarly to how the Board has handled other social media matters, specifically with Facebook.  The Board has recognized that employees have increasingly been using social media to communicate with one another about work.  See *Triple Play Sports*, supra (Facebook "likes" may be protected activity); *Knauz BMW*, 358 NLRB 1754 (2012) (employee posted photos and comments to Facebook); *Hispanics United of Buffalo*, 359 NLRB 368, 368 (2012) (employees unlawfully discharged for their responses to coworkers' criticisms of their job performance).  In my view, an analysis of a supervisor's statement on Twitter should be no different.  In *Miklin Enterprises.*, 361 NLRB 283, 290 (2014), the Board found that postings by two supervisors on an antiunion Facebook page violated Section 8(a)(1) of the Act where the supervisors encouraged employees to harass an employee for his union activity.  In that instance, the Facebook page was "open" like the openness of Twitter posts, which are accessible to anyone.  Likewise, here, Musk's statement violated Section 8(a)(1) as described in complaint paragraph 6.

CONCLUSIONS OF LAW

1. Respondent, Tesla, Inc., has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Union, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO, has been a labor organization within the meaning of Section 2(5) of the Act.

3. Respondent committed unfair labor practices in violation of Section 8(a)(1) of the Act by:

   a. Maintaining and enforcing a rule on February 10, 2017 and May 24, 2017 that, in the absence of legitimate business reasons, prohibits off duty employees from distributing union literature in the employees' parking lot.

   b. Promulgating a rule on March 23, 2017 prohibiting employees from distributing union stickers, leaflets and pamphlets without first obtaining permission, and threatening discipline if failing to do so.

   c. Interrogating employees about their union activities on May 24, 2017.

   d. Soliciting grievances from employees about safety concerns and impliedly promising to remedy them on June 7, 2017 during meeting with Respondent's chief executive officer and chief people officer during a union organizing campaign.

   e. Informing employees during meeting with Respondent's chief executive officer and chief people officer on June 7, 2017 that it would be futile to vote in favor of the Union by telling them that they have no voice with the Union.

      f.  Maintaining and enforcing a rule in August 2017 prohibiting employees from wearing union insignia showing support for the Union or any other labor organization.

      g.  Informing an employee in August 2017 that it would be futile to vote for the Union.

      h.  Interrogating employees in September and October 2017 about their union activities.

      i.  Promulgating a rule regarding Workday in response to protected concerted activity in October 2017.

      j.  Threatening employees on May 20, 2018 with loss of stock options if they vote in favor of the Union.

4. By terminating Richard Ortiz on October 18, 2017, and disciplining Jose Moran on October 19, 2017, Respondent violated Section 8(a)(3) and (1) of the Act.

5. The unfair labor practices found affect commerce within the meaning of Section 2(6) and (7) of the Act.

6. All other allegations of the complaint are dismissed.

REMEDY

Having found that Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act.  Having found that Respondent has violated Section 8(a)(1) of the Act by maintaining and enforcing a rule on February 10 and May 24, 2017, that, in the absence of legitimate business reasons, prohibits off-duty employees from distributing union literature in the employees' parking lot, I shall order that Respondent rescind the rule.  Having found that Respondent has violated Section 8(a)(1) of the Act by promulgating a rule on March 23, 2017, prohibiting employees from distributing union stickers, leaflets, and pamphlets without first obtaining permission, and threatening discipline if failing to do so, I shall order that Respondent rescind the rule.  Having found that Respondent has maintained and enforced a rule in August 2017 prohibiting employees from wearing union insignia showing support for the Union or any other labor organization, I shall order that Respondent rescind the rule.  Having found that Respondent has violated Section 8(a)(1) of the Act by promulgating a rule in October 2017 regarding Workday in response to protected concerted activity, I shall order that Respondent rescind the rule.

Respondent, having discriminatorily disciplined Jose Moran, must rescind the disciplinary action and remove all references from his personnel files.  Respondent, having discriminatorily terminated Richard Ortiz, must offer him reinstatement and make him whole for any loss of earnings and other benefits.  Backpay shall be computed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest at the rate prescribed in *New Horizons*, 283

NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010). In accordance with *King Soopers, Inc.*, 364 NLRB No. 93 (2016), Respondent shall compensate Richard Ortiz for his search-for-work and interim employment expenses regardless of whether those expenses exceed interim earnings, and such expenses shall be calculated separately from taxable net backpay, with interest at the rate prescribed in *New Horizons*, supra, compounded daily as prescribed in *Kentucky River Medical Center*, supra.

In accordance with *Don Chavas, LLC d/b/a Tortillas Don Chavas,* 361 NLRB 101 (2014), Respondent shall compensate Richard Ortiz for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and, in accordance with *AdvoServ of New Jersey, Inc.,* 363 NLRB No. 143 (2016), Respondent shall, within 21 days of the date the amount of backpay is fixed either by agreement or Board Order, file with the Regional Director for Region 32 a report allocating backpay to the appropriate calendar year(s). The Regional Director will then assume responsibility for transmitting the report to the Social Security Administration at the appropriate time and in the appropriate manner.

The General Counsel also requests that I order Respondent to reimburse Richard Ortiz for consequential economic harm incurred by him as a result of its unlawful conduct, a remedy not traditionally included in Board orders (GC Br. at 109). See *Operating Engineers Local 513 (Long Construction Co.)*, 145 NLRB 554 (1963). I am obligated to following existing Board precedent, and thus, decline to recommend this remedy. See *Pathmark Stores, Inc.*, 342 NLRB 378, 378 fn. 1 (2004); *Waco, Inc.*, 273 NLRB 746, 749 fn. 14 (1984).

I will order that the employer post a notice at the Fremont facility in the usual manner, including electronically to the extent mandated in *J. Picini Flooring*, 356 NLRB 11, 15–16 (2010). In accordance with *J. Picini Flooring*, the question as to whether an electronic notice is appropriate should be resolved at the compliance phase. Id. supra at 13.

The General Counsel requests that I order that the notice be read aloud with the presence of security guards, managers and supervisors and the Union, if requested (GC Br. at 104–106). The Board has recognized that notice reading is an extraordinary remedy but, in this instance, I believe the facts present themselves to support such a request. *Sysco Grand Rapids, LLC*, 367 NLRB No. 111 (2019). Respondent by numerous supervisors and agents, including its chief executive officer and chief people officer committed many violations of the Act. See *Stern Produce Company, Inc.*, 368 NLRB No. 31, slip op. at 5 (2019) (citing *North Memorial Health Care*, 364 NLRB No. 61, slip op. at 1 (2016) (notice reading appropriate in part due to high-ranking responsible management officials in unfair labor practices), enfd. in relevant part 860 F.3d 639 (8th Cir. 2017). Such pervasive unlawful conduct, as described and found herein, warrants a broad cease-and-desist order and a notice reading. Such a public reading of the notice will serve to reassure employees that that their employer and its managers are bound by the Act's requirements. *Homer D. Bronson Co.*, 349 NLRB 512, 515 (2007) (and cited cases), enfd. mem. 273 Fed.Appx. 32 (2d Cir. 2008).

Accordingly, I recommend that Respondent be ordered to convene its employees and have Elon Musk (or, if he is no longer the chief executive officer, a high-ranking management official), in the presence security guards, managers and supervisors, a Board agent and an agent of the Union, if the Region and/or the Union so desire, read the notice aloud to employees, or, at

Respondent's option, permit a Board agent, in the presence Musk, to read the notice to the employees at the Fremont facility only. See *Bozzuto's, Inc.*, 365 NLRB No. 146, slip op. at 5 (2017). I do not order a notice reading at the Sparks facility as no violations of the Act occurred there.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[111]

ORDER

Respondent, Tesla, Inc., Palo Alto, California, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a)   Maintaining and enforcing a rule that, in the absence of legitimate business reasons, prohibits off-duty employees from distributing union literature in the employees' parking lot.

(b)   Promulgating a rule prohibiting employees from distributing union literature, leaflets and pamphlets without first obtaining permission, and threatening discipline if failing to do so.

(c)   Interrogating employees about their union activities.

(d)   Soliciting grievances from employees about safety concerns and impliedly promising to remedy them.

(e)   Informing employees that it would be futile to vote for the Union.

(f)   Maintaining and enforcing a rule prohibiting employees from wearing union insignia showing support for the union or any other labor organization.

(g)   Promulgating a rule regarding Workday in response to protected concerted activity.

(h)   Threatening employees with loss of benefits if vote in favor of the Union.

(i)   Terminating and disciplining any employee because of their support for the Union or any other labor organization.

---

[111] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

(j)   In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind the rule orally announced to off-duty employees on February 10, 2017 and May 24, 2017, which prohibited employees from distributing on their nonwork time union literature in the employees' parking lot.

(b) Rescind the rule orally announced to employees on March 23, 2017, which prohibited employees from distributing union stickers, leaflets and pamphlets without first obtaining permission and threatening discipline if failed to do so.

(c) Rescind a rule prohibiting employees from wearing union insignia showing support for the Union or any other labor organization.

(d) Rescind a rule regarding Workday which was promulgated in response to protected concerted activity in October 2017.

(e) Within 14 days of the date of the Board's Order, remove from its files any reference to the unlawful warning issued to Jose Moran, and within 3 days thereafter, notify the employee in writing that this has been done and that the warning will not be used against him in any way.

(f) Within 14 days of the date of the Board's Order, offer Richard Ortiz full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

(g) Make Richard Ortiz whole for any loss of earnings and other benefits suffered as a result of the discrimination against him, in the manner set forth in the remedy section of this decision.

(h) Compensate Richard Ortiz for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 32, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year.

(i) Within 14 days of the date of the Board's Order, remove from its files any reference to the unlawful termination, and within 3 days thereafter, notify the employee in writing that this has been done and that the termination will not be used against him in any way.

(j) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place

designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(k) Within 14 days after service by the Region, post at its facility in Fremont, California, the attached notice marked "Appendix"[112] on forms provided by the Regional Director for Region 32, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since February 10, 2017.

(l) Within 14 days after service by the Region, hold a meeting or meetings, at the Fremont facility, scheduled to ensure the widest possible attendance, at which the "Notice to Employees" is to be read to the employees by Respondent's chief executive officer, Elon Musk or at Respondent's option, by a Board agent in the presence of Musk, along with security guards, managers and supervisors.  If Musk is no longer an owner or officer of the Respondent, then the Respondent shall designate another owner or officer to conduct or be present for the reading.

(m) Within 21 days after service by the Region, file with the Regional Director for Region 32 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the complaint allegations are dismissed insofar as they allege violations of the Act not specifically found.

Dated, Washington, D.C.   September 27, 2019

Amita Baman Tracy

---

[112] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

Administrative Law Judge

22-60493.6102

**APPENDIX**

N<small>OTICE TO</small> E<small>MPLOYEES</small>

P<small>OSTED BY</small> O<small>RDER OF THE</small>
N<small>ATIONAL</small> L<small>ABOR</small> R<small>ELATIONS</small> B<small>OARD</small>

**An Agency of the United States Government**

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

**WE WILL NOT** maintain and enforce a rule that, in the absence of legitimate business reasons, prohibits off-duty employees from distributing union literature in the employees' parking lot.

**WE WILL NOT** promulgate a rule that prohibits you from distributing union stickers, leaflets, and pamphlets without receiving permission, and threatening discipline if you fail to do so.

**WE WILL NOT** coercively question you about your union activities.

**WE WILL NOT** solicit your grievances and impliedly promise to remedy them in order to discourage union support or activity.

**WE WILL NOT** inform you that it is futile to support the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO or any other union.

**WE WILL NOT** maintain and enforce a rule that prohibits you from wearing union insignia to show your support for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO or any other labor organization.

**WE WILL NOT** promulgate a rule regarding Workday in response to protected concerted activity.

**WE WILL NOT** threaten employees with loss of benefits if you vote in favor of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO, or any other labor organization.

**WE WILL NOT** terminate and discipline any of you because you support the International Union, United Automobile, Aerospace and Agricultural Workers of America, AFL–CIO (UAW) or any other labor organization.

**WE WILL NOT** in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

**WE WILL** rescind the rule orally announced to off-duty employees on February 10 and May 24, 2017, which prohibited them from distributing during their nonworking time union literature in the employees' parking lot.

**WE WILL** rescind an oral rule of March 23, 2017, that prohibits you from distributing union stickers, leaflets, and pamphlets without receiving permission, and threatening discipline if you fail to do so.

**WE WILL** rescind a rule that prohibits you from wearing union insignia to show your support for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO or any other labor organization.

**WE WILL** rescind a rule regarding Workday in response to protected concerted activity.

**WE WILL,** within 14 days from the date of the Board's Order, offer Richard Ortiz full reinstatement to his former job, and if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority rights or any other rights or privileges previously enjoyed.

**WE WILL** make Richard Ortiz whole for any loss of earnings and other benefits resulting from his termination, less any net interim earnings, plus interest, and **WE WILL** make him whole for reasonable search-for-work and interim employment expenses, plus interest.

**WE WILL** within compensate Richard Ortiz for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and **WE WILL** file with the Regional Director for Region 32, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar years.

**WE WILL**, within 14 days from the date of the Board's Order, remove from our files any reference to the unlawful termination and discipline of Richard Ortiz and Jose Moran, and **WE WILL**, within 3 days thereafter, notify them in writing that we have done so and that we will not use the termination and discipline against them in any way.

TESLA, INC.

(Employer)

Dated _____ By _____

(Representative)                    (Title)

The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. It conducts secret-ballot elections to determine whether employees want union representation and it investigates and remedies unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below. You may also obtain information from the Board's website: www.nlrb.gov.

Oakland Federal Building
1301 Clay Street
Suite 300-N
Oakland, CA 94612-5211
(510) 637-3300, Hours of Operation: 8:30 a.m. to 5:00 p.m.

The Administrative Law Judge's decision can be found at https://www.nlrb.gov/case/32-CA-197020 or by using the QR code below.  Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273–1940.



**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE**
THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED, DEFACED, OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO THE ABOVE REGIONAL OFFICE'S COMPLIANCE OFFICER, (510) 671-3034.

# UNITED STATES OF AMERICA

# BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| TESLA, INC.<br><br>and<br><br>MICHAEL SANCHEZ, an Individual<br><br>and<br><br>JONATHAN GALESCU, an Individual<br><br>and<br><br>RICHARD ORTIZ, an Individual<br><br>and<br><br>INTERNATIONAL UNION, UNITED AUTOMOBILE,<br>AEROSPACE AND AGRICULTURAL IMPLEMENT<br>WORKERS OF AMERICA, AFL–CIO | Cases   32-CA-197020<br>32-CA-197058<br>32-CA-197091<br>32-CA-197197<br>32-CA-200530<br>32-CA-208614<br>32-CA-210879<br>32-CA-220777 |

## ORDER TRANSFERRING PROCEEDING TO
## THE NATIONAL LABOR RELATIONS BOARD

A hearing in the above-entitled proceeding having been held before a duly designated Administrative Law Judge and the Decision of the said Administrative Law Judge, a copy of which is annexed hereto, having been filed with the Board in Washington, D.C.,

**IT IS ORDERED,** pursuant to Section 102.45 of the National Labor Relations Board's Rules and Regulations, that the above-entitled matter be transferred to and continued before the Board.

Dated, Washington, D.C., September 27, 2019**.**

By direction of the Board:

_____
/s/  Roxanne L. Rothschild
Executive Secretary

NOTE: Communications concerning compliance with the Decision of the Administrative Law Judge should be with the Director of the Regional Office issuing the complaint.

Attention is specifically directed to the excerpts from the Board's Rules and Regulations and on size of paper, and that requests for extension of time must be served in accordance appearing on the pages attached hereto. **Note particularly the limitations on length of briefs with the requirements of the Board's Rules and Regulations Section 102.114(a) & (i).**

Exceptions to the Decision of the Administrative Law Judge in this proceeding must be received by the Board's Office of the Executive Secretary, 1015 Half Street SE, Washington, DC 20570, on or before **OCTOBER 25, 2019.**

| | |
|---|---|
| Confirmation Number | 1000301203 |
| Date Submitted | 10/4/2019 2:08:18 PM (UTC-05:00) Eastern Time (US & Canada) |
| Case Name | TESLA, INC. |
| Case Number | 32-CA-197020 |
| Filing Party | Charged Party / Respondent |
| Name | Morris, Keahn |
| Email | kmorris@sheppardmullin.com |
| Address | Four Embarcadero Center, 17th Floor  San Francisco, CA 94111 |
| Telephone | (415) 434-9100 Ext: 12934 |
| Fax | |
| Original Due Date | 10/25/2019 |
| Date Requested | 12/9/2019 |
| Reason for Extension of Time | Request for extensions.  Deadline for cross-exceptions and answering briefs also extended, until February 6, 2020 |
| What Document is Due | Exceptions to ALJD |
| Parties Served | Edris W.I. Rodrigiez Ritchie, edris.rodriguezritchie@nlrb.gov. Margo Feinberg, margo@ssdslaw.com. Daniel E. Curry, dec@ssdslaw.com |

October 7, 2019

Re:   Tesla, Inc.
      Cases 32-CA-197020, et al.

**EXTENSION OF TIME TO FILE EXCEPTIONS AND SUPPORTING BRIEF**

Respondent has filed a request in the above-referenced case for an extension of time to file exceptions to the Administrative Law Judge's Decision and brief in support of exceptions to October 25, 2019.  In addition, Respondent has requested an extension of time for filing their cross exceptions and answering briefs to exceptions to February 6, 2020.[1]

It has been our experience that numerous issues can arise with respect to the filing with and acceptance by the Board of exceptions, cross-exceptions, briefs in support and answering briefs.  The resolution of such issues often affects the remainder of the briefing schedule which can result in confusion over due dates for the other briefs.  Accordingly, it is our preference and practice to entertain extension requests only with respect to the documents and briefs currently due.  Thus, at this time we will entertain extension requests regarding the due date for the filing of exceptions and supporting briefs, but we are not willing to decide extension requests for the remainder of the briefing schedule.

**Accordingly, the request for an extension of time for the filing of exceptions and supporting briefs is granted in part to** <u>**November 25, 2019.**</u>  This extension for filing exceptions and supporting briefs applies to all parties.  **In all other respects, the request for an extension of time is denied**.  Any party may request an extension of time to file answering briefs after exceptions have been filed.

/s/ Diane L. Bridge
Counselor

cc:  Parties
       Region

---

[1] If the due date for exceptions is extended to November 25, 2019, the normal due date for answers to exceptions would be 14 days later, on December 9, 2019.

22-60493.6109

# SheppardMullin

Keahn N. Morris
415.774.2934 direct
kmorris@sheppardmullin.com

File Number:  26VT-273129

October 9, 2019

**VIA E-FILING**

Office of the Executive Secretary
National Labor Relations Board
1015 Half Street SE
Washington, DC  20570

Re:     § 102.46(j) Request to Exceed Page Limit; Tesla, Inc., Case Nos. 32-CA-197020, 32-
         CA-197058, 32-CA-197071, 32-CA-197197, 32-CA-200530, 32-CA-208614, 32-CA-
         210879 & 32-CA-220777

To Whom It May Concern:

Exceptions and supporting briefing to the Administrative Law Judge's Decision ("ALJ Decision")
in the above-referenced consolidated cases are currently due on November 25, 2019.  Pursuant
to § 102.46(j), of the Board's Rules, Tesla, Inc. ("Tesla") hereby requests to exceed the 50 page
brief limit by an additional 25 pages.  The 50 page brief limit will not allow Tesla to adequately
brief the varied and complicated factual and legal issues placed in controversy by approximately
50 discrete paragraphs/subparagraphs of the operative complaints, which consumed 13 days of
hearing, and resulted in an 81 page ALJ Decision.

By way of background, the consolidated cases resulted from 15 charges and amended charges
filed by Charging Parties in furtherance of a union organizing campaign. On March 30, 2018, the
Regional Director for Region 32 ("Region") issued the Third Order Consolidating Cases and
Second Amended Consolidated Complaint, and noticed a hearing to begin on June 11, 2018.
The Second Amended Consolidated Complaint identified 15 statutory supervisors, one unknown
Human Resources Agent, and six "John/Jane Doe" Security Guards as Tesla's agents that were
in some way responsible for the allegations asserted in paragraphs 7(a)-(x) and 8(a)-8(f).

On June 4, 2018, the Region enlarged the scope of the consolidated matters by issuing its
"Amendment to Second Amended Consolidated Complaint." The pleading identified two
additional C-level agents of Tesla and inserted three new allegations pertaining to their personal
involvement in the commission of unfair labor practices. In addition to addressing the merits of
these allegations, a substantial portion of Tesla's exceptions and supporting brief will argue that
the Board lacks jurisdiction to address these allegations to the extent that the underlying
conduct was neither the subject of any charge nor properly investigated by the General
Counsel.

On August 23, 2018, the Region further enlarged the scope of the hearing by issuing a
Complaint in Case 32-CA-220777 and consolidating it with the consolidated cases. The new

**SheppardMullin**

Complaint alleged that a May 20, 2018 "tweet" by Tesla's CEO violated Section 8(a)(1) of the Act. In addition to addressing the merits, a substantial portion of Tesla's brief in support of exceptions will argue that the prosecution of this allegation is barred by the First Amendment. While the ALJ Decision offered her "view" on the issue, the ALJ recognized the complexities of the issue and noted that it was a case of "first impression" for the Board.

The ALJ Decision also recommended an expansive and unprecedented order to remedy the alleged unfair labor practices, including affirmative actions directed at Tesla's CEO.

Tesla therefore respectfully requests to exceed the 50 page brief limit by 25 pages.[1]

Sincerely,

Keahn N. Morris
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Counsel for Tesla, Inc.

SMRH:4847-8597-5464.1

---

[1] Counsel for Tesla inquired as to General Counsel and Charging Parties' position regarding exceeding the 50 page brief limit. They both responded that they would not agree and would oppose any such request.

<u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California. My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On October 9, 2019, I served a true copy of the document(s) described as **TESLA, INC.'S REQUEST TO EXCEED PAGE LIMIT** on the interested parties in this action as follows:

Edris W.I. Rodriguez Ritchie
E-mail: edris.rodriguezritchie@nlrb.gov
Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA  94612-5224
T: (510) 671-3041

Margo Feinberg
E-mail: margo@ssdslaw.com
Daniel E. Curry
E-mail: dec@ssdslaw.com
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Blvd., Suite 2000
Los Angeles, CA  90048
T: (323) 655-4700

Jeffery Sodko
E-mail: jsodko@uaw.net
United Automobile, Aerospace and Agricultural Workers of America
 AFL-CIO
8000 E. Jefferson Ave.
Detroit, MI 48214
T:  (313) 926-5000

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address sasmith@sheppardmullin.com to the person(s) at the e-mail address(es) listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 9, 2019, at San Francisco, California.

_____
Sarah Smith

October 10, 2019

Re:   Tesla, Inc.
      Cases 32-CA-197020, et al.

### REQUEST TO EXCEED THE 50-PAGE LIMIT FOR BRIEFS
### IN SUPPORT OF EXCEPTIONS

The request for permission to exceed the 50-page limit for briefs in support of exceptions in the above-referenced cases is granted.  The briefs in support of exceptions are not to exceed **75 pages** in length, exclusive of cover page, table of contents, and table of authorities.  The due date for the receipt in Washington, D.C. of briefs in support of exceptions is **November 25, 2019**.

This permission to exceed the 50-page limit for briefs in support of exceptions applies to all parties.  Please note that this extension of the page limit does not apply to any other briefs that may be filed in this matter.  All other briefs to be filed in this matter must conform to the page limits set forth in the Board's Rules and Regulations.

/s/ Diane Bridge
Counsel

cc:  Parties
     Region

**SheppardMullin**

Keahn N. Morris
415.774.2934 direct
kmorris@sheppardmullin.com

File Number: 26VT-273129

October 25, 2019

**VIA E-FILING**

Office of the Executive Secretary
National Labor Relations Board
1015 Half Street SE
Washington, DC 20570

Re:    § 102.46 Request for Extension of Time to File Exceptions, Supporting Briefing; Tesla, Inc., Case Nos. 32-CA-197020, 32-CA-197058, 32-CA-197071, 32-CA-197197, 32-CA-200530, 32-CA-208614, 32-CA-210879 & 32-CA-220777

To Whom It May Concern:

Exceptions and supporting briefing to the Administrative Law Judge's Decision ("ALJ Decision") in the above-referenced consolidated cases are currently due on November 25, 2019. Pursuant to § 102.46 of the Board's Rules, counsel for Tesla, Inc. requests that the deadline be extended by 14 days until December 9, 2019. Counsel for the General Counsel and Charging Parties do not oppose this request.

Sincerely,

Keahn N. Morris
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Counsel for Tesla, Inc.

SMRH:4842-4098-6539.1

22-60493.6115

CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California. My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On October 25, 2019, I served a true copy of the document(s) described as **TESLA, INC.'S REQUEST FOR EXTENSION OF TIME TO FILE EXCEPTIONS AND SUPPORTING BRIEFING** on the interested parties in this action as follows:

Edris W.I. Rodriguez Ritchie
E-mail: edris.rodriguezritchie@nlrb.gov
Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA  94612-5224
T: (510) 671-3041

Margo Feinberg
E-mail: margo@ssdslaw.com
Daniel E. Curry
E-mail: dec@ssdslaw.com
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Blvd., Suite 2000
Los Angeles, CA  90048
T: (323) 655-4700

Jeffery Sodko
E-mail: jsodko@uaw.net
United Automobile, Aerospace and Agricultural Workers of America
  AFL-CIO
8000 E. Jefferson Ave.
Detroit, MI 48214
T:  (313) 926-5000

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address sasmith@sheppardmullin.com to the person(s) at the e-mail address(es) listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 25, 2019, at San Francisco, California.

_____
Sarah Smith

October 28, 2019

Re: Tesla, Inc.
    Cases 32-CA-197020, et al.

**FURTHER EXTENSION OF TIME TO FILE EXCEPTIONS AND
BRIEF IN SUPPORT OF EXCEPTIONS**

     The request for an extension of time in the above-referenced case is granted. The due date for the receipt in Washington, D.C. of Exceptions to the Administrative Law Judge's Decision and Brief in Support of Exceptions is extended to **December 9, 2019**.  This extension of time to file exceptions and brief in support of exceptions applies to all parties.

/s/ Diane Bridge
Counsel

cc:  Parties
       Region

# Sheppard Mullin

Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
415.434.9100 main
415.434.3947 fax
www.sheppardmullin.com

Keahn N. Morris
415.774.2934 direct
kmorris@sheppardmullin.com

File Number:  26VT-273129

November 14, 2019

**VIA E-FILING**

Office of the Executive Secretary
National Labor Relations Board
1015 Half Street SE
Washington, DC  20570

Re:     § 102.46(j) Request to Exceed Page Limit; Tesla, Inc., Case Nos. 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-200530, 32-CA-208614, 32-CA-210879 & 32-CA-220777

To Whom It May Concern:

Exceptions and supporting briefing to the Administrative Law Judge's Decision ("ALJ Decision") in the above-referenced consolidated cases are currently due on December 9, 2019.  Pursuant to § 102.46(j), of the Board's Rules, Tesla, Inc. ("Tesla") hereby requests to exceed the brief page limit by an additional 25 pages.  Tesla previously requested to exceed the 50 page limit by 25 pages, which the Office of Executive Secretary granted.  Unfortunately, the 75 page brief limit will not allow Tesla to adequately brief the varied and complicated factual and legal issues placed in controversy by approximately 50 discrete paragraphs/subparagraphs of the operative complaints, which consumed 13 days of hearing, and resulted in an 81 page ALJ Decision.

By way of background, the consolidated cases resulted from 15 charges and amended charges filed by Charging Parties in furtherance of a union organizing campaign. On March 30, 2018, the Regional Director for Region 32 ("Region") issued the Third Order Consolidating Cases and Second Amended Consolidated Complaint, and noticed a hearing to begin on June 11, 2018. The Second Amended Consolidated Complaint identified 15 statutory supervisors, one unknown Human Resources Agent, and six "John/Jane Doe" Security Guards as Tesla's agents that were in some way responsible for the allegations asserted in paragraphs 7(a)-(x) and 8(a)-8(f).

On June 4, 2018, the Region enlarged the scope of the consolidated matters by issuing its "Amendment to Second Amended Consolidated Complaint." The pleading identified two additional C-level agents of Tesla and inserted three new allegations pertaining to their personal involvement in the commission of unfair labor practices. In addition to addressing the merits of these allegations, a substantial portion of Tesla's exceptions and supporting brief will argue that the Board lacks jurisdiction to address these allegations to the extent that the underlying conduct was neither the subject of any charge nor properly investigated by the General Counsel.

On August 23, 2018, the Region further enlarged the scope of the hearing by issuing a Complaint in Case 32-CA-220777 and consolidating it with the consolidated cases. The new

# SheppardMullin

Complaint alleged that a May 20, 2018 "tweet" by Tesla's CEO violated Section 8(a)(1) of the Act. In addition to addressing the merits, a substantial portion of Tesla's brief in support of exceptions will argue that the prosecution of this allegation is barred by the First Amendment. While the ALJ Decision offered her "view" on the issue, the ALJ recognized the complexities of the issue and noted that it was a case of "first impression" for the Board.

The ALJ Decision also recommended an expansive and unprecedented order to remedy the alleged unfair labor practices, including affirmative actions directed at Tesla's CEO.

Tesla therefore respectfully requests that Tesla be permitted 100 pages for the brief in support of exceptions.[1]  Tesla will seek no further enlargements concerning the brief in support of exceptions.

Sincerely,

Keahn N. Morris
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Counsel for Tesla, Inc.

SMRH:4832-6535-1085.1

---

[1] General Counsel and Charging Parties oppose any request to exceed the page limit.

<u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California. My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On November 14, 2019, I served a true copy of the document(s) described as **TESLA, INC.'S REQUEST TO EXCEED PAGE LIMIT** on the interested parties in this action as follows:

Edris W.I. Rodriguez Ritchie
E-mail: edris.rodriguezritchie@nlrb.gov
Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA  94612-5224
T: (510) 671-3041

Margo Feinberg
E-mail: margo@ssdslaw.com
Daniel E. Curry
E-mail: dec@ssdslaw.com
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Blvd., Suite 2000
Los Angeles, CA  90048
T: (323) 655-4700

Jeffery Sodko
E-mail: jsodko@uaw.net
United Automobile, Aerospace and Agricultural Workers of America
 AFL-CIO
8000 E. Jefferson Ave.
Detroit, MI 48214
T:  (313) 926-5000

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address sasmith@sheppardmullin.com to the person(s) at the e-mail address(es) listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 14, 2019, at San Francisco, California.

Sarah Smith

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 32

TESLA, INC.

and

MICHAEL SANCHEZ, an Individual

and

JONATHAN GALESCU, an Individual

and

RICHARD ORTIZ, an Individual

and

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA, AFL-CIO

Cases 32-CA-197020
32-CA-197058
32-CA-197091
32-CA-197197
32-CA-200530
32-CA-208614
32-CA-210879
32-CA-220777

**COUNSEL FOR THE GENERAL COUNSEL'S STATEMENT IN OPPOSITION TO
RESPONDENT TESLA, INC.'S SECOND REQUEST TO EXCEED PAGE LIMITS[1]**

Respondent Tesla's, Inc.'s request to exceed page limits, which would give them a total of

50 additional pages, should be denied because there are no complex or novel issues to brief.

On October 9, 2019, Respondent Tesla, Inc. filed a Request to Exceed Page Limits (First

Request) for an additional 25 pages in connection with any exceptions it may file to Administrative

Law Judge Amita B. Tracy's September 27, 2019 Decision (ALJD) in the above-referenced

---

[1] Counsel for the General Counsel has contacted Counsel for the Charging Parties, who have informed the undersigned that they join in the General Counsel's opposition to Respondent's Second Request to Exceed Page Limits.

1

22-60493.6123

matters pursuant to Rule 102.5(b) of the Rules and Regulations of the National Labor Relations Board (Board). The Board granted Respondent's First Request without issuing an order to show cause or otherwise providing the General Counsel with an opportunity to oppose Respondent's request. Now, without even contacting Counsel for the General Counsel to solicit his position on a further request to exceed the page limit by an additional 25 pages, Respondent has filed a second Request to Exceed Page Limit (Second Request), seeking permission to exceed the page limit now by 50 pages for a total of 100 pages. For the reasons stated herein, Counsel for the General Counsel opposes the Second Request.

As the Board notes in its Guide to Board Procedures, "[t]he Board is reluctant to grant additional pages unless [the requesting party demonstrates] that [it is] briefing an extraordinary case based on complexity, novelty, or national impact of the issues involved."[2]   Such circumstances are not present here. Respondent has failed to demonstrate that additional pages are warranted based on the length of the ALJD, the length of the hearing, and the length of the post-hearing briefs. The Board's traditional inquiry looks to whether there exist novel or complex legal issues involved. None exist here. Respondent's numerous violations of the Act present run-of-the-mill independent Section 8(a)(1) violations and a discharge and discipline that occurred in the context of an organizing campaign. Violations were found largely on either undisputed evidence that was in writing or credibility resolutions which are not novel or complex. In sum, there are no legal questions at issue to warrant briefing 50 more pages than the Board's traditional 50-page limit.

---

[2] Section 3.6(c) of the *Guide to Board Procedures*, National Labor Relations Board Office of the Executive Secretary, April 2017. Available at https://www.nlrb.gov/sites/default/files/attachments/basic-page/node-1727/Guide%20to%20Board%20Procedures%202017_0.pdf (accessed on November 14, 2019).

22-60493.6124

In the Second Request, Respondent has copied and pasted the *identical* language it felt supported the First Request, making no new arguments or points to identify why, at this juncture, it now needs an additional 25 pages. Without any new reasons why the Second Request should be granted, the Board should deny the Second Request based on the Board's longstanding policy disfavoring the granting of excessively long briefs.

For these reasons, Respondent's Second Request should be denied.

**DATED AT** Oakland, California this 14th day of November 2019.

Edris W.I. Rodriguez Ritchie
Counsel for the General Counsel
National Labor Relations Board
Region 32
1301 Clay St Suite 300N
Oakland, CA 94612-5224
Tel: 510-671-3041
Fax: 510-637-3315
Email: Edris.RodriguezRitchie@nlrb.gov

3

22-60493.6125

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 32**

| | |
|---|---|
| **TESLA, INC.** | |
| **and** | |
| **MICHAEL SANCHEZ, an Individual** | **Case   32-CA-197020** |
| **and** | |
| **JONATHAN GALESCU,  an Individual** | **Case   32-CA-197058** |
| **and** | |
| **RICHARD ORTIZ, an Individual** | **Case   32-CA-197091** |
| **and** | **Case(s)   32-CA-197197** |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, AFL-CIO** | **32-CA-200530 32-CA-208614 32-CA-210879 32-CA-220777** |
| | **Date:   November 14, 2019** |

## AFFIDAVIT OF SERVICE OF COUNSEL FOR THE GENERAL COUNSEL'S STATEMENT IN OPPOSITION TO RESPONDENT TESLA, INC.'S SECOND REQUEST TO EXCEED PAGE LIMITS

I, the undersigned employee of the National Labor Relations Board, being duly sworn, depose and say that on the date indicated above I served the above-entitled document(s) upon the persons at the addresses and in the manner indicated below. Persons listed below under "E-Service" have voluntarily consented to receive service electronically, and such service has been effected on the same date indicated above.

Mark S. Ross, Esq.
Keahn Morris, Esq.
Sheppard Mullin Richter & Hampton, LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
**VIA EMAIL: mross@sheppardmullin.com**
**VIA EMAIL: kmorris@sheppardmullin.com**

Margo A. Feinberg, Esq.
Daniel Curry, Esq.
Julie Alarcon, Esq.
Schwartz, Steinsapir, Dohrmann
& Sommers, LLP
6300 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90048
**VIA EMAIL: margo@ssdslaw.com**
**VIA EMAIL: dec@ssdslaw.com**
**VIA EMAIL: jsa@ssdslaw.com**

Jatinder K. Sharma Esq.
Tesla, Inc.
6800 Dumbarton Cir
Fremont, CA 94555
**VIA EMAIL: jsharma@tesla.com**

Office of the Executive Secretary
National Labor Relations Board
1015  Half Street SE
Washington, DC 20570-0001
**VIA E-FILE**

| November 14, 2019 | Frances Hayden, Designated Agent of NLRB |
|---|---|
| | Name |
| | /s/ Frances Hayden |
| | Signature |

22-60493.6127

November 20, 2019

Re: <u>Tesla, Inc.</u>
    Cases 32-CA-197020, et al.

**REQUEST FOR 25 ADDITIONAL PAGES TO EXCEED 75 PAGE LIMIT FOR BRIEFS IN SUPPORT OF EXCEPTIONS**

The request for permission to exceed the 75 page limit for briefs in support of exceptions to 100 pages in the above-refrenced cases is denied. The briefs in support of exceptions are not to exceed 75 pages in length, exclusive of cover page, table of contents, and table of authorities. The due date for the receipt in Washington, D.C. of briefs is support of exceptions is **December 9, 2019**.

/s/ Diane Bridge
Counsel

cc: Parties
    Region

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | |
|---|---|
| **TESLA, INC.** | |
| **and** | |
| **MICHAEL SANCHEZ, an Individual** | **Case No. 32-CA-197020** |
| **and** | |
| **JONATHAN GALESCU, an Individual** | **Case No. 32-CA-197058** |
| **and** | |
| **RICHARD ORTIZ, an Individual** | **Case No. 32-CA-197091** |
| **and** | |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, AFL-CIO** | **Case No. 32-CA-197197**<br>**Case No. 32-CA-200530**<br>**Case No. 32-CA-208614**<br>**Case No. 32-CA-210879** |

**RESPONDENT TESLA, INC.'S EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S DECISION**

Mark S. Ross
mross@sheppardmullin.com
Keahn N. Morris
kmorris@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
Telephone:    (415) 434-9100

*Attorneys for Tesla, Inc.*

Pursuant to Section 102.46 of the Rules and Regulations of the National Labor Relations Board ("NLRB" or "Board"), Respondent, Tesla, Inc., ("Tesla", "Company", or "Employer") respectfully submits the following partial[1] exceptions to the September 27, 2019 Decision issued by Administrative Law Judge Amita Baman Tracy in the above captioned cases, finding that Tesla has engaged in certain unfair labor practices[2].

**Exceptions To Introductory Findings and/or Conclusions**

1.  Exception is taken to the introductory finding and/or conclusion that "As a result of [handbill leafletting in the parking lot, requesting safety records from Tesla and wearing union shirts and stickers in the workplace], [e]mployees were questioned by Tesla officials." (ALJD 2:3-6)[3]

2.  Exception is taken to the introductory finding and/or conclusion that Chief Executive Officer Elon Musk (Musk) and Chief People Officer Gabriela Toledano (Toledano) "promised [Jose Moran and Tony Vega] to correct problems before the Union could come to Tesla." (ALJD 2:11-12)

3.  Exception is taken to the introductory finding and/or conclusion that during the exchange with Moran and Vega, Musk and Toledano "made other coercive statements including telling Jose Moran and another employee [Tony Vega] that the UAW would not give them a voice." (ALJD 2:12-13)

---

[1] In the interest of saving time and expense, Tesla has elected to file only partial exceptions to the Administrative Law Judge's decision and not to contest all of the Judge's adverse findings.

[2] Hereafter, the Administrative Law Judge's Decision is referred to as "ALJD" or "Decision" while the Administrative Law Judge will be referred to as "ALJ". ALJD page and line references are designated with the parenthetical notation "ALJD_:__".

[3] Other abbreviations used in these exceptions include the following: "Tr. __:_" for Transcript testimony; "GC Exh. __" for General Counsel's Exhibits; "CP Exh. __" for Charging Parties' Exhibits; "R. Exh. __" for Respondent's Exhibits; and "Jt. Exh. __" for Joint Exhibits.

4.    Exception is taken to the introductory finding and/or conclusion that shortly after the Musk/Toledano exchange with Moran and Vega, "Tesla began enforcing its team wear rule in general assembly." (ALJD 2:13-4)

5.    Exception is taken to the introductory finding and/or conclusion that "in October 2017,[4] Tesla terminated Richard Ortiz and disciplined Jose Moran after Richard Ortiz posted a comment and employee pictures on a private Facebook page in response to two Tesla employees opposing a UAW sponsored bill before the California State Assembly." (ALJD 2:16-19)

6.    Exception is taken to the implicit introductory finding and/or conclusion that "in October 2017, Tesla terminated Richard Ortiz and disciplined Jose Moran [because] Richard Ortiz posted a comment and employee pictures on a private Facebook page in response to two Tesla employees opposing a UAW sponsored bill before the California State Assembly." (ALJD 2:16-19)

7.    Exception is taken to the introductory finding and/or conclusion that Tesla "violated the Act with Musk's May 20, 2018 Twitter post where he suggested to his followers that the employees would no longer have stock options if the Union was elected." (ALJD 2:19-21)

8.    Exception is taken to the introductory finding and/or conclusion that "Musk's May 20, 2018 Twitter post . . . suggested to his followers that the employees would no longer have stock options if the Union was elected." (ALJD 2:19-21)

9.    Exception is taken to the implicit introductory finding and/or conclusion, that "Musk's May 20, 2018 Twitter post . . . . suggested to [Tesla] employees [that they] would no longer have stock options if the Union was elected." (ALJD 2:19-21)

---

[4] Unless otherwise started, all dates referred to herein were in 2017.

10.  Exception is taken to the introductory finding and/or conclusion that "[all but a few allegations as set forth in the General Counsel's consolidated complaint have] merit." (ALJD 2:21-22)

11.  Exception is taken to the ALJ's recitation and reliance on evidence of statements attributed to Musk that contain no threat or promise of benefit and that are privileged under Section 8(c) of the Act as evidence of Tesla's anti-union animus or Tesla's intent to discriminate against Ortiz or Moran. (ALJD 10:1-18)

12.  Exception is taken to the ALJ's implicit finding that the treatment of the unfair labor practices that she found to be a coordinated pattern, practice, plan and/or course of conduct when, in fact, the record shows that practically all of the incidents she found unlawful involved different actors and said incidents were localized, disconnected, isolated and wholly unrelated to one another. (Passim)

13.  Exception is taken to the ALJ's failure to find and treat the unfair labor practices for what they were: isolated, disconnected, uncoordinated and unrelated spontaneous acts/statements by Tesla supervisors and agents who were ignorant of the law and whose violations, if any, were not purposeful or intended to violate the law or to interfere with employee rights.  (Passim)

14.  Exception is taken to the ALJ's implicit reliance on the testimony of Henry, Jones, and Cotton concerning enforcement of the GA Team Wear Policy prior to August 2017.  (ALJD 44:5-35, 46:7-10)

15.  Exception is taken to the ALJ's implicit credibility determinations concerning Henry, Jones, and Cotton's testimony concerning enforcement of the GA Team Wear Policy prior to August 2017 insofar as they are arbitrary, capricious, illogical, based on "inherent probabilities,"

unsupported by the record or permissible inferences and/or fail to consider/take into account all of the relevant circumstances of this case.  (ALJD 42:5-8, 42, fn. 66-67, 44:5-40)

16.   Exception is taken to the ALJ's finding that Martin's testimony concerning "walking the line" and enforcement of the GA Team Wear Policy prior to August 2017 is "uncorroborated and contradicted by the credible testimony" of Fenelon, Ogunniyi, and "multiple" unidentified witnesses given that Fenelon and Ogunniyi started working for Tesla in May and June 2017, after which they went through a 30 to 45 day training/ramp-up period and thus did not have knowledge concerning what occurred prior to that.  (ALJD 42:5-8, 42, fn. 66-67, 44:25-28)

17.   Exception is taken to the ALJ's credibility determination concerning Martin's testimony concerning enforcement of the GA Team Wear Policy prior to August 2017 insofar as it is arbitrary, capricious, illogical, based on "inherent probabilities," unsupported by the record or permissible inferences and/or fails to consider/take into account all of the relevant circumstances of this case.  (ALJD 42:5-8, 42, fn. 66-67)

**Exceptions To Findings and/or Conclusions Concerning the June 7, 2017 Meeting With Moran and Vega**

18.   Exception is taken to the implicit finding and conclusion that Section 10(b) is not jurisdictional and to the ALJ's failure to find that she and the Board are without statutory authority to hear and decide the allegations set forth in Paragraph 7(y) of the complaint. (ALJD 32:20-34:2)

19.   Exception is taken to the ALJ's failure to consider and to give appropriate weight and effect to the amended charges in Case Nos. 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-208614  on Tesla's Section 10(b) defense to the allegations found in

Paragraph 7(y) of the consolidated complaint and to her finding that said allegations are closely related to a timely filed charge. (ALJD 32:20-34:2)

20.  Exception is taken to the ALJ's failure to allow Tesla to develop a factual record regarding the Region's investigation into Paragraph 7(y) under *Leukemia and Lymphoma Society*, 363 NLRB No. 123, slip. op. at 2 (2016) and refusal to allow Tesla to call as a witness Counsel for the General Counsel who investigated the allegations pertaining to Paragraph 7(y) and who admitted in his pleading to the ALJ that the allegations of Paragraph 7(y) "were *not specifically alleged in any charge and not mentioned during the investigation of the charges* because…the Amendment was based on evidence discovered after the issuance of the [consolidated complaint]."  (italics added)   (ALJD 32:19-34:2)

21.  Exception is taken to the finding and conclusion that the governing law/legal standard for the 10(b) issue herein is and/or should be the rule of *Redd-I,* 290 NLRB 1115 (1988). (ALJD 32:30-34:2)

22.  Exception is taken to the finding and conclusion that "[t]he allegations against Musk and Toledano [in Paragraph 7(y) of the consolidated complaint] although not specified in the charges or amended charges are 'closely related' under *Redd-I*" to the charges and amended charges in the instant case, and thus timely under Section 10(b). (ALJD 33:24-25)

23.  Exception is taken to the finding and conclusion that the allegations in Paragraph 7(y) involve the same legal theory as the allegations in timely charges. (ALJD 33:5-6, 25 – 27)

24.  Exception is taken to the finding and conclusion that the allegations in Paragraph 7(y) involve the same factual situation or sequence of events as the allegations in timely charges. (ALJD 33:6-8, 27-29)

25.  Exception is taken to the finding and conclusion that the allegations of Paragraph 7(y) are part of a common course of conduct and that they do not concern facts that are separate and apart from many of the allegations set forth in the timely-filed charges and amended charges. (ALJD 33:42-44)

26.  Exception is taken to the finding and conclusion that complaint paragraph 7(y) is not time barred under Section 10(b). (ALJD 33:30-31)

27.  Exception is taken to the ALJ's failure to find and give weight to the fact that Tesla established and maintained an employee safety committee, well prior to the Employees' Health and Safety Petition and the events complained of in complaint paragraph 7(y), for the purpose of addressing workplace health and safety issues and affording all interested Tesla employees a forum to express health and safety concerns. (ALJD 32:5-40:5)

28.  Exception is taken to the ALJ's apparent finding and conclusion that it was an unlawful solicitation of grievances for Musk and Toledano to meet and speak with Moran on June 7 about the health and safety petition and to hear what Moran had to say about his safety concerns because Musk never met with Moran before nor since their June 7 meeting. (ALJD 38:28-37)

29.  Exception is taken to the ALJ's failure to find that Musk and Toledano merely discussed Moran's health and safety concerns and that there is no evidence that they solicited grievances or made any unlawful implied promises to remedy grievances to discourage union representation. (Passim)

30.  Exception is taken to the ALJ's failure to find that Musk and Toledano merely expressed their opinions and stated what they believed to be facts to Moran and Vega about working in a unionized setting. (Passim)

31. Exception is taken to the ALJ's finding that it is irrelevant that Moran prompted the meeting with his June 6 email and petition. (ALJD 38:35-36)

32. Exception is taken to the ALJ's finding and conclusion that the events following the June 7 meeting with Moran and Vega, including internal exchanges among supervisors/managers, are somehow relevant to whether Musk and Toledano's alleged statements and questions to Moran and Vega during the June 7 violate Section 8(1)(1) of the Act. (ALJD 38:28-9)

33. Exception is taken to the finding and conclusion that Toledano's alleged statement that they [she and Musk] "saw your [Moran's] health and safety petition and want to hear your concerns" and/or her suggestion to Moran and Vega that they attend safety team meetings was an unlawful solicitation of employee grievances and/or an implied promise to remedy them in violation Section 8(a)(1) of the Act. (ALJD 35:4-5; 36:1-2; 38:38-43)

34. Exception is taken to the ALJ's failure to find the aforesaid alleged statements by Toledano to Moran and Vega to be protected and privileged speech under Section 8(c) of the Act. (Passim)

35. Exception is taken to the finding and conclusion that Musk's alleged statement that "if the safety committee meetings did not work, [then] they would 'give you your union'" was an unlawful solicitation of employee grievances or Moran's safety complaints [which Tesla already had] for the purpose of acting favorably on them to temper the employees' push for a union and/or an implied promise to remedy them and a violation Section 8(a)(1) of the Act. (ALJD 36:3-4; 38:40-43)

36. Exception is taken to the finding and conclusion that employees may reasonably infer that Tesla via Musk was soliciting Moran's safety complaints for the purpose of acting favorably on them to temper the employees' push for a union. (ALJD 38:41-43)

37.  Exception is taken to the ALJ's failure to find the aforesaid alleged statements by Musk to Moran and Vega to be protected statements of Musk's opinion and privileged speech under Sections 8(c) of the Act. (Passim)

38.  Exception is taken to the finding and conclusion that Musk's alleged statement, "[Y]ou know, you don't really have a voice.  The UAW is a second – like two-class system where UAW is the only one who has a voice and not the workers" was a statement as to the futility of unionization in violation of Section 8(a)(1) of the Act. (ALJD 35:11-13; 38:44-39:10)

39.  Exception is taken to the finding and conclusion that Toledano's alleged statement, "you know, the majority of workers at Tesla don't want a union, you know, why do we want to pay for – why do we want to pay union dues?" was coercive and in violation of Section 8(a)(1) because it was uttered in the context of Musk's alleged solicitations and statements of futility and the interrogation of Galescu and Ortiz. (ALJD 35:14-16; 39:1-24)

40.  Exception is taken to the ALJ's failure to find the aforesaid alleged statements by Toledano to Moran and Vega to be protected statements of Toledano's opinion and privileged speech under Section 8(c) of the Act. (Passim)

41.  Exception is taken to the ALJ's failure to find and consider the fact that Tesla took no adverse action against Moran or Vega because of the grievance they raised during or before the June 7 meeting and that there is no evidence that Musk or Toledano said or otherwise indicated that Tesla would fix or address their complaints, much less address their complaints in exchange for their abandonment of the union. (Passim)

42.  Exception is taken to the finding and conclusion that Musk's statements were unlawful because they were made in direct response to Moran's stated reason for why employees wanted union representation. (ALJD 40:2-4)

43.  Exception is taken to the finding and conclusion that Musk's statements cannot be protected under Section 8(c). (ALJD 40:6-7)

44.  Exception is taken to the finding and conclusion that Musk's and Toledano's statements on June 7 violated Section 8(a)(1) of the Act as alleged in complaint paragraph 7(y). (ALJD 40:6-8)

45.  Exception is taken to the finding and conclusion that Toledano's statement on June 7 violated Section 8(a)(1) of the Act based on other unfair labor practices allegedly committed, including Musk's solicitation during the June 7 meeting and his statement of futility as well as the interrogation of other pro-union supporters regarding the Cal/OSHA 300 logs.  (ALJD 39:20-24)

46.  Exception is taken to the finding and conclusion that Musk's aforesaid alleged statement taken in the context of the impetus for the meeting along with the idea to place employees on the safety committee to address workplace concerns violates Section 8(a)(1) of the Act. (ALJD 39:40-43)

47.  Exception is taken to the ALJ's finding and conclusion that Musk's and Toledano's statements on June 7 violated Section 8(a)(1) of the Act as alleged in complaint paragraph 7(y) because her finding and conclusion and the decisions upon which she relied fail to properly reconcile, accommodate and effectuate the conflicting purposes of Sections 7, 8(a)(1), 8(c) and 9(a) of the Act. (38:28-40:9)

48.  Exception is taken to the ALJ's failure to utilize a standard to assess the alleged statements of Musk and Toledano that reconcile, accommodate and effectuate the conflicting purposes of Section 7, 8(a)(1), 8(c) and 9(a) of the Act. (Passim)

49.  Exception is taken to the ALJ's erroneous analysis and her rejection of the cases cited by Respondent concerning the alleged statements of Musk and Toledano. (Passim)

50.  Exception is taken to the ALJ's failure to consider and give weight to the fact that, at the time of her testimony, Toledano was no longer an active Tesla employee, that she had already tendered her resignation from the Company and would soon sever her ties to Tesla and was, therefore, a reluctant witness and that, unlike Moran (whose testimony could have been corroborated by Vega but wasn't), Toledano was a disinterested third-party witness who had no personal stake or pecuniary interest in the outcome of this case or the UAW organizing drive. (ALJD 35, n. 55)

51.  Exception is taken to the ALJ's failure to draw an adverse inference from the General Counsel and/or the Charging Parties' failure to call Tony Vega as a witness to the June 7 exchange between Toledano and Musk and Moran and Vega, and to discredit Moran's testimony as to said exchange. (ALJD 35, n. 54, 55)

52.  Exception is taken to the ALJ's credibility determination concerning Toledano's testimony concerning the June 7 meeting insofar as it is based on "inherent probabilities," unsupported by the record or permissible inferences and/or fails to consider/take into account all of the relevant circumstances of this case.  (ALJD 34:5-40:45,35-36, fn. 55-57, 38:1-25)

53.  Exception is taken to the ALJ's impermissible, arbitrary, capricious, illogical or unsupported inferences of unlawful motive/intent drawn from her credibility determination concerning Toledano's testimony concerning the June 7 meeting.  (ALJD 34:5-40:45,35-36, fn. 55-57, 38:1-25)

54.  Exception is taken to the ALJ's credibility determinations concerning Moran's testimony concerning the June 7 meeting insofar as it is arbitrary, capricious, illogical, based on "inherent

probabilities," unsupported by the record or permissible inferences and/or fail to consider/take into account all of the relevant circumstances of this case.  (ALJD 34:5-40:45,35-36, fn. 55-57, 38:1-25)

**Exceptions To Findings and/or Conclusions Concerning the May 2018 Musk Tweet**

55.  Exception is taken to the ALJ's finding/conclusion that Musk's tweet (which is taken out of context) can only be read by a reasonable employee to indicate that if the employees vote to unionize that they would be required to give up stock options and/or Musk threatened to take away a benefit enjoyed by the employees consequently for voting to unionize. (ALJD 74:11-13)

56.  Exception is taken to the ALJ's apparent finding that Musk could have lawfully made the statement alleged only in the context of it being a possible outcome or consequence that could occur due to good faith collective bargaining. (ALJD 74:17-24)

57.   Exception is taken to the finding that Musk presented no objective facts to support his statement that employees would lose their stock options. (ALJD 74:24-25)

58.  Exception is taken to the ALJ's failure to consider and read Musk's comments en toto and to read them in *pari materia*, with subsequent twitter remarks in which Musk explained his remarks to mean that the UAW does not have individual stock ownership as part of the compensation at any other company and with Tesla's subsequent statement that Musk's tweet was simply a recognition of the fact that unlike Tesla, "we're not aware of a single UAW-represented automaker that provides stock options or restricted units to their production employees and UAW organizers have consistently dismissed the value of Tesla equity as part of our compensation package." (ALJD 73, n. 110: 5-6); 75:11-29)

59.  Exception is taken to the ALJ's failure to find that Musk's tweet can only be read by a reasonable employee to indicate that the UAW does not have individual stock ownership as part of the compensation at any other company. (Passim)

60.  Exception is taken to the ALJ's failure to find that there is no evidence contradicting the clarifying remarks of Musk and Tesla and that said remarks are statements of fact or opinion protected by Section 8(c) of the Act. (Passim)

61.  Exception is taken to the ALJ's failure to find that the nature of Twitter should be considered in weighing the legality of Musk's and Tesla's tweets. (Passim)

62.  Exception is taken to the ALJ's finding that Musk's statement indicates that Tesla would take away stock options if they voted to unionize. (ALJD 74:27-28)

63.  Exception is taken to the ALJ's apparent finding that Musk's statement can be lawful only if it is made as a prediction carefully phrased based on objective fact to convey Respondent's belief as to probable consequences beyond its control. (ALJD 74:28-30)

64.  Exception is taken to the ALJ's finding/conclusion that Musk's statement violates Section 8(a)(1) because it is not a carefully phrased prediction of what could happen as a result of collective bargaining or as a consequence of some other factor beyond his control. (ALJD 74:28-30)

65.  Exception is taken to the ALJ's finding that Musk's statement violates Section 8(a)(1).

66.  Exception is taken to the ALJ's finding that Musk implied that Tesla would act on its own initiative to remove stock options if the employees chose to unionize. (ALJD 74:31-32)

67.  Exception is taken to the ALJ's finding that Tesla is liable for Musk's tweet even though it was his personal, non-business related expression made on his personal Twitter account, and not a Company authorized or adopted statement or couched in terms that would have led a

reasonable employee to believe that it was anything other than Musk's personal expression. (passim)

68. Exception is taken to the ALJ's finding that Musk's tweet is akin to a company official issuing a press release to the public where anyone including employees may read the statement. (ALJD 74:37-39)

69. Exception is taken to the ALJ's failure to find that there is no evidence that any Tesla employee saw or read Musk's tweet. (Passim)

70. Exception is taken to the ALJ's finding that there is no evidence that Tesla disavowed any of Musk's tweets and to her failure to consider a Tesla spokesperson's remarks as a clarification that had the effect of disavowing any misimpression that Musk's original and partial tweet meant or should be read to mean that Tesla would eliminate their stock options if they unionized. (ALJD 73, n. 110)

71. Exception is taken to the ALJ's finding that because Musk is a 2(11) supervisor, Tesla is strictly liable for his personal tweet. (ALJD 74:46)

72. Exception is taken to the ALJ's failure to find that Musk's tweet is not protected by the First Amendment. (ALJD 75:1-9)

73. Exception is taken to the ALJ's apparent finding that Musk's comments were made in the workplace or workplace conduct. (ALJD 75:5-6)

74. Exception is taken to the ALJ's conclusions of law insofar as they are inconsistent with these exceptions. (ALJD 76:6-19; 23-34)

**Exceptions To Findings and/or Conclusions Regarding the October 2017 Investigation Concerning Moran and Ortiz and the Resulting Discipline and Termination**

75.  Exception is taken to the ALJ's failure to consider Tesla's employee handbook and the fact that Tesla is purposefully a company of few explicit rules and/or evidence that the Company holds all of its employees to extremely high standards of conduct and performance. (Passim)

76.  Exception is taken to the ALJ's failure to consider and give appropriate weight to the property interest that Tesla has in Workday, that Workday is the functional equivalent to and serves the purpose of an employee's electronic personnel file, and that it contains sensitive private information belonging to Tesla and the employees profiled in their Workday page. (Passim)

77.  Exception is taken to the ALJ's failure to recognize and consider Tesla's legal obligation and right to investigate conduct that may constitute possible workplace harassment, doxing and/or the unauthorized or inappropriate use of the Company's personnel files. (Passim

78.  Exception is taken to the ALJ's refusal to allow Gecewich to testify about prior instances of harassment arising out of doxing with which he was personally involved, which he had previously investigated, and which informed his belief that it was appropriate to initiate an investigation of Ortiz' conduct.

79.  Exception is taken to the finding and conclusion that Moran's taking of screen shots of Workday information qualifies as protected concerted activity. (Passim)

80.  Exception is taken to the ALJ's failure to find that Workday information was confidential business information.  (ALJD 66:32-34)

81.  Exception is taken to the ALJ's finding that Gecewich's investigation sought information about protected concerted activity.

82.  Exception is taken to the ALJ's failure to find that Gecewich's investigation was directed at possible employee harassment and the inappropriate non-business use of Workday information.  (Passim)

83.  Exception is taken to the finding and/or conclusion that Ortiz was legally privileged to lie during the investigation as to the source of the screen shots. (ALJD 66:36-66:3; 67:8-20)

84.  Exception is taken to the finding and/or conclusion that Tesla violated Section 8(a)(3) and (1) by terminating Ortiz and (2) disciplining Moran under *Wright Line,* 251 NLRB 1083 (1980). (ALJD 67:21-71-9)

85.  Exception is taken to the ALJ's failure/refusal to find and give effect to Tesla's belief/business judgment that Ortiz and Moran engaged in misconduct and that the discipline meted out to them was warranted. (ALJD 67:25-71-9)

86.  Exception is taken to the ALJ's finding that Tesla could not have had an honest belief that Moran engaged in misconduct by taking screen shots of Workday information. (ALJD 68, n. 107)

87.  Exception is taken to the ALJ's finding that Tesla could not have had an honest belief that Moran engaged in misconduct by taking screen shots of Workday because Tesla had no rule prohibiting the taking of such screen shots.

88.  Exception is taken to the ALJ's misapplication of *Wright Line* and her finding that the General Counsel established that union animus was a substantial or motivating factor in the adverse actions taken herein. (ALJD 68:26 – 71:2)

89.  Exception is taken to the ALJ's failure to find and conclude that there is no direct evidence of animus on the part of any of the individuals, i.e. Gecewich, Martinez, Graminger,

Hocholdinger, McIntosh, Cunningham and Cruz, found to be involved in the decisions to terminate Ortiz or to discipline Moran. (Passim)

90.  Exception is taken to the ALJ's finding that Ortiz' conduct predating his September post played a role in the decision to terminate his employment as being without any support in the record. (ALJD 68:36-38)

91.  Exception is taken to the ALJ's failure to find and give effect to the fact that none of those found to be involved in the decisions to terminate Ortiz and discipline Moran had any connection to or personal involvement with Ortiz's and Moran union or protected concerted conduct predating the September screen shot and post or in any of the other alleged unfair labor practices alleged by the General Counsel or found by the ALJ. (Passim)

92.  Exception is taken to the ALJ's finding that Tesla's attempts to counter the Union's drive to pass a California State Assembly bill is evidence of Tesla's anti-union animus, much less evidence of animus that played a motivating or substantial role in the decisions to terminate Ortiz and/or to discipline of Moran. (Passim)

93.  Exception is taken to the ALJ's reliance on Ortiz's posting as evidence of substantial animus since said finding is inconsistent with her finding and the credited testimony that Ortiz was discharged for lying to Gecewich and not his posting. (ALJD 67:8-9)

94.  Exception is taken to the ALJ's failure to find that there is no evidence to suggest that Ortiz' conduct predating his September post is linked to, played any role in or was a factor considered in the decision to terminate his employment. (Passim)

95.  Exception is taken to the ALJ's finding that circumstantial evidence points to Ortiz' termination being unlawfully motivated since the so-called circumstantial/non-direct evidence

upon which she relied is irrelevant and legally insufficient to support an inference of the substantial or motivating animus required by *Wright Line.* (ALJD 69:10-70:20)

96.  Exception is taken to the ALJ's refusal to properly consider comparator evidence, i.e. that during an investigation Ricky Gecewich conducted at Solar City, a Tesla subsidiary, a witness lied to him and was terminated for doing so, showing that Ortiz was not subjected to disparate treatment when he was terminated.  (ALJD 69:34)

97.  Exception is taken to the ALJ's rejection of Tesla's legitimate business justification for its discipline of Ortiz based on her erroneous conclusion that the lies of the other person who Gecewich recommended for termination were more egregious than Ortiz' lies.

98.   Exception is taken to the ALJ's substitution of her business judgment for that of Tesla's. (Passim)

99.  Exception is taken to the ALJ's failure to give appropriate weight to the fact that, notwithstanding their open and notorious union and protected concerted activities and despite Tesla's alleged anti-union animus, Moran received a promotion to lead in August 2018 and both Moran and Ortiz received a substantial raise/bonus in October 2018. (Passim)

100. Exception is taken to the ALJ's failure to find that there is no evidence to suggest that Ortiz' conduct predating his September post is linked to, played any role in or was a factor considered in the decision to terminate his employment. (Passim)

101. Exception is taken to the finding and conclusion, for which there is no record support, that the Ortiz investigation was initiated by Hedges and/or that Tesla sought or desired a particular result or outcome of said investigation. (ALJD 69:29-30)

102. Exception is taken to the finding and/or conclusion that Ortiz was subjected to disparate treatment when he was terminated for lying to Ricky Gecewich during a workplace investigation (ALJD 69:34; passim)

103. Exception is taken to the implicit finding that Gecewich's testimony that Ortiz was terminated for lying during the investigation was pretextual since said finding of alleged pretext is in direct conflict with the ALJ's finding that Ortiz was, in fact, terminated for lying to Gecewich during the investigation.  (ALJD 66:35-67:4)

104. Exception is taken to the ALJ's misapplication of *Fresenius USA Mfg., Inc.*, 362 NLRB No. 130, slip op. at 1 (2015) and her finding that Ortiz' lies were protected under the NLRA. (ALJD 68:26 – 71:2)

105. Exception is taken to the ALJ's failure to apply a standard/test whereby employees only retain Section 7 protection when lying during an investigatory interview if the questioning goes to "core" Section 7 activity.  (Passim)

106. Exception is taken to the ALJ's finding that Gecewich decided to create/promulgate a new Workday rule, claiming that Workday was to be used only for legitimate and official business purposes. (ALJD 70:39-41)

107. Exception is taken to the ALJ's inference of animus based upon Gecewich's alleged creation of a so-called new Workday rule. (ALJD 70:39-41)

108. Exception is taken to the ALJ's finding that Gecewich disparately enforced Tesla's rules against Moran. (70:42-44)

109. Exception is taken to the finding and/or conclusion that Tesla's anti-union animus was a substantial or motivating factor or cause for the decision to terminate Ortiz and to discipline Moran as there exists absolutely no record support for said finding. (Passim)

110. Exception is taken to the finding and/or conclusion that animus towards Ortiz's activities was established by "numerous" unrelated unfair labor practices. (ALJD 68:36-37)

111. Exception is taken to the finding and/or conclusion that animus towards Moran's activities was established because Tesla "violated the Act numerous times." (ALJD 70:32-34

112. Exception is taken to the finding and conclusion that General Counsel met its burden to show that Tesla terminated Ortiz and disciplined Moran for discriminatory reasons and promulgated a rule in response to their protected concerted activity. (ALJD 71:4-6)

113. Exception is taken to the ALJ's finding that Tesla violated Sections 8(a)(3) and (1) of the Act by terminating Ortiz, disciplining Moran and promulgating a rule in response to their protected concerted activity. (ALJD 71:6-8)

114. Exception is taken to the ALJ's apparent finding or belief that the fact that Ortiz and Moran were known union supporters who had actively engaged in organizing gave them an immunity from discipline having no connection to and unmotivated by their prior union and/or protected concerted activities. (Passim)

115. Exception is taken to the ALJ's application of what appears to be a labor contract arbitration standard in this case and her assumption of the role of a labor arbitrator who is authorized by contracting parties to determine whether given discipline herein was for "just cause", because the issue here is not whether Tesla has "just cause" to terminate Ortiz or to discipline Moran but whether its adverse actions were motivated by anti-union animus and whether Ortiz and/or Moran were subjected to disparate treatment. (Passim)

116. Exception is taken to the ALJ's implicit finding/inference/conclusion that because Gecewich's investigation may have been imperfect and she disagrees with Tesla's decision to terminate Ortiz or to discipline Moran, the Company harbored anti-union animus against the two

employees and that said animus was a substantial or motivating cause of Tesla's adverse treatment of the two employees. (Passim)

117. Exception is taken to the ALJ's failure to fashion and apply a clear test for when lying during an investigation loses Section 7's protections and when an employer's workplace investigation as to employee complaints, possible harassment or misuse of Company information is privileged, even though said investigation may relate to union or protected concerted activity. (Passim)

118. Exception is taken to the ALJ's failure to find that the record evidence herein does not establish that Ortiz' termination and Moran's discipline were motivated by anti-union animus and that the two were subjected to disparate treatment. (Passim)

119. Exception is taken to the ALJ's finding that Tesla violated Section 8(a)(1) by interrogating Moran and Ortiz. (ALJD 71:10-44)

120. Exception is taken to the ALJ's finding that Gecewich interrogated Moran and Ortiz about their union or protected concerted activities. (Passim)

121. Exception is taken to the ALJ's failure to find that Gecewich initially sought to investigate possible workplace harassment which, in turn, led him to question where the harassing information originated and to investigate possible misuse or unauthorized use of the Company's Workday information. (Passim)

**Exceptions To Findings and/or Conclusions Concerning Lipson's May 24, 2017 Meetings with Galescu and Ortiz**

122. Exception is taken to the ALJ's failure to credit Lipson's testimony regarding how she began the May 24 meetings with Galescu and Ortiz and that she told them there was a concern about employees' medical information being disclosed to the media/third parties even though

Lipson's testimony was consistent with Holcomb's notes which the ALJ expressly relied on in crediting Galescuo and Ortiz's version of the meetings. (ALJD 29, fn. 49-50, 30:22-25)

123. Exception is taken to the ALJ's credibility determination concerning Lipson's testimony concerning how the May 24 meetings with Ortiz and Galescu began insofar as it is arbitrary, capricious, illogical, based on "inherent probabilities," unsupported by the record or permissible inferences and/or fails to consider/take into account all of the relevant circumstances of this case. (ALJD 29, fn. 49-50, 30:22-25)

124. Exception is taken to the ALJ's finding and conclusion that Lipson knew about the leafletting that occurred on May 24 and/or the contents of the leaflets prior to meeting with Galesco and Ortiz. (ALJD 30:25-27, 31:26-31)

125. Exception is taken to the finding and conclusion, for which there is no record support, that Lipson met with Galesco and Ortiz because of the leafletting on May 24. (ALJD 30:19-32, 31:26-31)

126. Exception is taken to the ALJ's failure to make a specific finding regarding what protected concerted activities were sought by Lipson's questions of Ortiz and Galescu on May 24. (ALJD 30:35-32:2)

127. Exception is taken to the ALJ's failure to consider that Lispon did not ask Ortiz or Galescu about unions, safety conditions, and/or leafletting during the May 24 meetings and that neither Ortiz nor Galescu responded by raising unions, safety conditions, and/or leafletting during the meetings. (ALJD 30:35-32:2)

128. Exception is taken to the ALJ's finding and conclusion that Lipson's May 24 questions violated Section 8(a)(1) of the Act as alleged in complaint. (ALJD 32:1-2)

129. Exception is taken to the ALJ's failure to find that Lipson was investigating a legitimate concern about the potential disclosure of private employee medical and health information.

130. Exception is taken to the ALJ's implicit finding and conclusion, for which there is no record support, that prior to the May 24 meeting, Galescu and Ortiz were unaware of Tesla's legitimate business concerns concerning compliance with OSHA and Cal/OSHA and concern that employees' personal medical information had been disclosed to the media/third parties despite the ALJ's finding that Tesla had lawfully exchanged extensive emails with Galescu and Ortiz over the prior month regarding the OSHA logs, compliance with OSHA and Cal/OSHA regulations, Tesla's concern about employees' medical information being disclosed, and that Tesla stated to them they were not intending to prohibit them from sharing the OSHA logs with current and former employees or their authorized representatives.  (ALJD 27:14-32:2)

131. Exception is taken to the ALJ's failure to consider that Lipson was permitted to question employees as part of a legitimate workplace investigation, even if the conduct being investigated took place during the employee's exercise of Section 7 rights under *Fresh & Easy Neighborhood Market, Inc.*, 361 NLRB 151 (2014).

132. Exception is taken to the ALJ's finding and conclusion, for which there is no record support, that Lipson's May 24 questions were aimed at learning Galescu and Ortiz's protected concerted activities. (ALJD 28:37-42; 31:25-50)

133. Exception is taken to the ALJ's failure to consider that Galescu described the May 24 meeting that allegedly constituted unlawful coercion by Lipson as a "nice" meeting.  (ALJD 31:8-47)

134. Exception is taken to the ALJ's failure to consider that Ortiz admitted that he did not understand Lipson's questions to involve union activities. (ALJD 30:35-32:2)

135. Exception is taken to the ALJ's failure to consider that Tesla had no history of hostility or discrimination towards unions, much less involving Lipson or Holcomb and/or prior to the May 24 meetings.  (ALJD 30:35-32:2)

136. Exception is taken to the ALJ's reliance on her unrelated finding of a violation involving a security guard in finding that Lipson's questioning of Ortiz and Galescu on May 24 constituted unlawful interrogation.  (ALJD 31:45-47)

137. Exception is taken to the ALJ's failure to consider that Ortiz and Galescu were open and active union supporters prior to the May 24 meetings.  (ALJD 31:8-32:2)

138. Exception is taken to the ALJ's erroneous analysis and conclusions regarding the factors set forth in *Rossmore House*, 269 NLRB 1176 (1984), affd. sub. nom. *Hotel & Restaurant Employees Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985) for determining whether an interrogation is unlawful. (Passim)

139. Exception is taken to the ALJ's finding that Tesla violated Section 8(a)(1) by interrogating Galescu and Ortiz. (ALJD 32:1-2)

**Exceptions To Findings and/or Conclusions Concerning the GA Team Wear Requirement**

140. Exception is taken to the ALJ's failure/refusal to apply the *Boeing*, 365 NLRB No. 154 (2017) test to Tesla's Team Wear policy. (ALJD 45:6-7)

141. Exception is taken to the ALJ's *arguendo* finding that even if *Boeing* is applicable here, the Team Wear policy is overbroad and its business justification does not outweigh employees' Section 7 rights to engage in union activity. (ALJD 45:46-47:2)

142. Exception is taken to the ALJ's failure to find that the Team Wear policy was justified by special circumstances. (Passim)

143. Exception is taken to the ALJ's implicit finding/conclusion that the General Assembly (GA) Team Wear policy was put in place and/or enforced because of or in response to the Union organizing campaign. (2:13-14)

144. Exception is taken to the ALJ's finding that prior to August, employees would often wear shirts in a variety of colors with pictures or emblems to work in GA. (ALJD 40:36-39)

145. Exception is taken to the ALJ's finding that beginning in the spring of 2017, production associates in GA began wearing UAW shirts. (40:39-41)

146. Exception is taken to the ALJ's finding that Tesla began enforcing Tesla's GA Team Wear policy in August 2017. (ALJD 42:7-15)

147. Exception is taken to the ALJ's failure to find/determine whether the employees referred to at ALJD 40:36-41 were GA assigned employees who were supervised by GA managers/supervisors and who were performing GA functions and thus at risk of mutilating a freshly painted car, or non-GA employees who performed non-GA functions and who were merely passing through GA and not at risk of mutilating a vehicle. (Passim)

148. To the ALJ's reliance on vague, nonspecific and conclusory testimony to support her findings at ALJD 40:36-41 that did not identify employees by name and did not distinguish between GA assigned employees who were supervised by GA managers/supervisors and who were performing GA functions and thus at risk of mutilating a freshly painted car, or non-GA employees who performed non-GA functions and who were merely passing through GA and not at risk of mutilating a vehicle. (Passim)

149. Exception is taken to the ALJ's failure to differentiate between employees from outside GA who entered or passed through GA and who did not perform the same functions as employees assigned to GA and who were neither covered nor bound by the Team Wear policy.

150. Exception is taken to the ALJ's failure to find and consider the fact that the Team Wear policy applied only to GA and not to Tesla's other production departments and that the employees working in those other non-GA departments were permitted to and did wear clothing and stickers bearing the Union's insignia and union campaign slogans. (Passim)

151. Assuming, *arguendo,* that *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 801-03 (1945) can properly be applied to this case, exception is taken to the ALJ's misapplication of the *Republic Aviation*'s special needs/circumstances test. (ALJD 45:20-46:2)

152. Assuming, *arguendo*, that *Republic Aviation* can properly be applied to this case, exception is taken to the ALJ's failure to find and consider the fact that employees in GA were freely allowed to wear union stickers at the workplace. (ALJD 44:35-46:20)

153. Exception is taken to the ALJ's failure to find and to take into proper consideration the peculiar special interests/needs of GA and the substantial differences that existed between the business needs of GA where the Team Wear policy is in effect, and those of Tesla's other departments where there is no Team Wear policy or requirement. (ALJD 45:21-46:2)

154. Exception is taken to the ALJ's failure to give appropriate consideration to the size, layout, operation, GA workforce size and location in GA. (Passim)

155. Exception is taken to the ALJ's failure to find and consider the fact that non-GA employees who were not managed by or acting at the direction of GA supervisors regularly entered and/or passed through GA. and that the Team Wear policy enabled GA supervisors and managers to visually differentiate and distinguish between employees assigned to GA for whom they were responsible and those assigned to other departments for whom they were not responsible. (Passim)

156. Exception is taken to the ALJ's failure to find and give appropriate consideration to the undisputed evidence that mutilations have occurred to other areas of Tesla vehicles apart from seats.  (ALJD 45:21-46:2)

157. Exception is taken to the ALJ's failure to find and consider that there are other potential sources of mutilations apart from rivets on pants.  (ALJD 45:21-46:2)

158. Exception is taken to the ALJ's finding that the UAW shirts are not substantially different from the Team Wear assigned to employees in GA.  (ALJD 45:21-46:2)

159. Exception is taken to the ALJ's finding that the Team Wear policy was unlawful in the absence of actual or proven mutilation and her failure to apply the proper legal standard in connection with her assessment of car mutilation risks as a special requirement of GA warranting the Team Wear policy. (45:21-46:2)

**Exceptions To Findings and/or Conclusions Concerning the Remedy**

160. Exception is taken to the ALJ's failure to find that Tesla's GA Team Wear policy is a lawful facially valid policy under the *Boeing* test. (Passim)

161. Exception is taken to the ALJ's failure to find that Tesla's GA Team Wear policy satisfies the special needs/circumstances test under *Republic Aviation*.  (Passim)

162. Exception is taken to the ALJ's Remedy insofar as it is inconsistent with these exceptions and the law. (Passim)

163. Exception is taken to the ALJ's Remedy insofar as it is based on her finding that "numerous supervisors and agents, including its chief executive officer and chief people office committed many violations of the Act." (ALJD 78:1-2)

164. Exception is taken to the ALJ's Remedy insofar as it is based on her finding that Tesla committed "pervasive unlawful conduct." (ALJD 78:6)

165. Exception is taken to the ALJ's finding that the facts of this case support a remedy calling for a broad cease and desist order and for the Board's notice to be read aloud to employees. (ALJD 77:44-78:10)

166. Exception is taken to the ALJ's recommendation that Elon Musk read the notice aloud to Fremont employees. (ALJD 78;12-13).

Dated:  December 9, 2019

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By                           

MARK S. ROSS
KEAHN N. MORRIS

Attorneys for
TESLA, INC.

22-60493.6156

<u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California.  My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On December 9, 2019, I served a true copy of the document(s) described as **RESPONDENT TESLA, INC.'S EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S DECISION** on the interested parties in this action as follows:

Edris W.I. Rodriguez Ritchie
E-mail: edris.rodriguezritchie@nlrb.gov
Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA  94612-5224
T: (510) 671-3041

Margo Feinberg
E-mail: margo@ssdslaw.com
Daniel E. Curry
E-mail: dec@ssdslaw.com
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Blvd., Suite 2000
Los Angeles, CA  90048
T: (323) 655-4700

Jeffery Sodko
E-mail: jsodko@uaw.net
United Automobile, Aerospace and Agricultural Workers of America
  AFL-CIO
8000 E. Jefferson Ave.
Detroit, MI 48214
T:  (313) 926-5000


**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address sasmith@sheppardmullin.com to the person(s) at the e-mail address(es) listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.


*///*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 9, 2019, at San Francisco, California.

_____
Sarah Smith

December 13, 2019


Re:   <u>Tesla, Inc.</u>
      Cases 32-CA-197020, et al.

### EXTENSION OF TIME TO FILE CROSS-EXCEPTIONS, BRIEF IN SUPPORT OF CROSS EXCEPTIONS, AND ANSWER TO EXCEPTIONS

The request for an extension of time in the above-referenced cases is **granted in part**.  The due date for the receipt in Washington, D.C, of Cross Exceptions and  Briefs in Support of Cross-Exceptions is extended to <u>**January 13, 2020**</u>  In addition, the due date for the receipt in Washington, D.C. of Answering Brief to Exceptions is also extended to **January 13, 2020**.[1]  These extensions  of time to file cross-exceptions, briefs in support of cross-exceptions, and answering briefs to exceptions apply to all parties.


                              /s/ Diane Bridge
                              Counsel


cc:  Parties
     Region


---

[1]  When a party is granted an extension of time to file cross-exceptions, that party automatically receives the same extension for filing an answering brief to exceptions, and therefore so do all other parties who are eligible to file cross-exceptions and/or answering briefs.  See *P&M Cedar Products*, 282 NLRB 772 (1987).  Please note that the converse is not true – a request for an extension of time to file an answering brief to exceptions does not automatically extend the time for filing cross-exceptions.

22-60493.6159

January 2, 2020


Re:    <u>Tesla, Inc.</u>
       Cases 32-CA-197020, et al.


**EXTENSION OF TIME TO FILE CROSS-EXCEPTIONS,
BRIEF IN SUPPORT OF CROSS-EXCEPTIONS, AND
ANSWER TO EXCEPTIONS**


        The request for an extension of time in the above-referenced cases is **granted**. The due date for the receipt in Washington, D.C, of Cross-Exceptions and Briefs in Support of Cross-Exceptions is extended to **February 6, 2020.**  In addition, the due date for the receipt in Washington, D.C. of Answering Brief to Exceptions is also extended to **February 6, 2020**.[1]  These extensions of time to file cross-exceptions, briefs in support of cross-exceptions, and answering briefs to exceptions apply to all parties.


                              /s/ Leigh A. Reardon
                              Associate Executive Secretary


cc:  Parties
        Region


---

[1]  When a party is granted an extension of time to file cross-exceptions, that party automatically receives the same extension for filing an answering brief to exceptions, and therefore so do all other parties who are eligible to file cross-exceptions and/or answering briefs.  See *P&M Cedar Products*, 282 NLRB 772 (1987).  Please note that the converse is not true – a request for an extension of time to file an answering brief to exceptions does not automatically extend the time for filing cross-exceptions.

| | |
|---|---|
| Confirmation Number | 1020035589 |
| Date Submitted | Thursday, January 23, 2020 1:55 PM (UTC-05:00) Eastern Time (US & Canada) |
| Case Name | TESLA, INC. |
| Case Number | 32-CA-197020 |
| Filing Party | Counsel for GC / Region |
| Name | Edris Rodriguez Ritchie |
| Email | edris.rodriguezritchie@nlrb.gov |
| Address | 1301 Clay Street Suite 300N Oakland CA 90019 |
| Telephone | 5106713041 |
| Fax | |
| Original Due Date | 2/6/2020 |
| Date Requested | 2/13/2020 |
| Reason for Extension of Time | Counsel for the General Counsel (CGC) respectfully requests a seven-day extension of time for filing his Answering Brief to Respondent's Exceptions and Brief in Support of Exceptions (Answering Brief), currently due on February 6, 2020.  The instant request is necessary due to an unforeseen circumstance that necessitates CGC's having to complete other case handling matters forthwith and the Region is unable to reassign the CGC's casehandling to other Board agents.  CGC contacted counsel for both the Charging Parties and Respondent, neither of which oppose the CGC's request for a brief seven-day extension for filing his Answering Brief. |
| Parties Served | Mark S. Ross mross@sheppardmullin.com Keahn N. Morris kmorris@sheppardmullin.com SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP 4 Embarcadero Center, 17th Floor San Francisco, CA 94111<br><br>Margo Feinberg margo@ssdslaw.com Daniel E. Curry dec@ssdslaw.com Schwartz, Steinsapir, Dohrmann & Sommers, LLP 6300 Wilshire Blvd., Suite 2000 Los Angeles, CA 90048 |

22-60493.6162

January 23, 2020

Re:    Tesla, Inc.
       Cases 32-CA-197020, et al.

**EXTENSION OF TIME TO FILE ANSWERING BRIEF TO EXCEPTIONS AND BRIEF
IN SUPPORT OF EXCEPTIONS**

The request for an extension of time in the above-referenced case is granted.
The due date for the receipt in Washington, D.C. of Answering Brief to Exceptions to the
Administrative Law Judge's Decision is extended to **February 13, 2020**.[1]   This
extension for filing answering briefs to exceptions applies to all parties.

/s/ Leigh A. Reardon
Associate Executive Secretary

cc:  Parties
     Region

---

[1]  When a party is granted an extension of time to file an answering brief to exceptions to an
Administrative Law Judge's decision, this extension does not automatically extend the time for
filing cross-exceptions to that decision.  Please note, however, that when a party requests an
extension of time to file cross-exceptions, the extension automatically extends the time for filing
answering briefs to exceptions.  See *P&M Cedar Products*, 282 NLRB 772 (1987).  Here,
Counsel for the General Counsel only requested an extension of time for filing an answering
brief to exceptions.  As no request was made for extending the time for filing cross-exceptions,
the due date for cross-exceptions remains February 6, 2020.

22-60493.6163

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 32**

**TESLA, INC.**

    **and**

**MICHAEL SANCHEZ, an Individual**

    **and**

**JONATHAN GALESCU,  an Individual**

    **and**

**RICHARD ORTIZ, an Individual**

    **and**

**INTERNATIONAL UNION, UNITED**
**AUTOMOBILE, AEROSPACE AND**
**AGRICULTURAL IMPLEMENT WORKERS OF**
**AMERICA, AFL-CIO**

**Cases 32-CA-197020**
**32-CA-197058**
**32-CA-197091**
**32-CA-197197**
**32-CA-200530**
**32-CA-208614**
**32-CA-210879**
**32-CA-220777**

**COUNSEL FOR THE GENERAL COUNSEL'S LIMITED CROSS-EXCEPTIONS**
**TO THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

Pursuant to the Section 102.46 of the Rules and Regulations of the National Labor Relations Board (Board), Counsel for the General Counsel (GC) excepts to the following portions of the Decision of Administrative Law Judge Amita B. Tracy (ALJD) dated September 27, 2019.

1.    Exception is taken to the ALJD's improper reliance on extrinsic evidence when considering whether an employee would reasonably interpret the Confidentiality Agreement to potentially interfere with the exercise of Section 7 rights. (ALJD 14:13-25).

22-60493.6164

2.      Exception is taken to the ALJD's finding that reasonable employees would understand that Respondent's Confidentiality Agreement was to be limited to proprietary information.  (ALJD 14:25-27)

3.      Exception is taken to the ALJD failing to find and conclude that the portion of Respondent's Confidentiality Agreement violated the Act as alleged in Complaint Paragraph 7(a)(i) of the March 30, 2018 Second Amended Consolidated Complaint (GC Exh. 1(jj) and 1(tt)).  (ALJD 15:13-15; ALJD 75:40-76:38; ALJD 81:6-7)

4.      Exception is taken to the ALJD failing to find and conclude that the portion of Respondent's Confidentiality Agreement violated the Act as alleged in Complaint Paragraph 7(a)(ii) of the March 30, 2018 Second Amended Consolidated Complaint (GC Exh. 1(jj) and 1(tt)).  (ALJD 15:13-15; ALJD 75:40-76:38; ALJD 81:6-7)

5.      Exception is taken to the ALJD's failure in its recommended Order to include a remedy for the violation alleged in Complaint Paragraph 7(a)(i) of the March 30, 2018 Second Amended Consolidated Complaint. (GC Exh. 1(jj) and 1(tt)).  (ALJD 78:29 - 81:4; Appendix)

6.      Exception is taken to the ALJD's failure in its recommended Order to include a remedy for the violation alleged in Complaint Paragraph 7(a)(ii) of the March 30, 2018 Second Amended Consolidated Complaint. (GC Exh. 1(jj) and 1(tt)).  (ALJD 78:29 - 81:4; Appendix)

7.      Exception is taken to the inadvertent failure in the ALJD's cease and desist portion of its recommended Order, subsection (i), and the Notice to Employees, concerning the termination and discipline of employees Richard Ortiz and Jose Moran to include reference to their "protected concerted activities" in addition to their support for the Union.  (ALJD 79:10-11; Appendix)

22-60493.6165

8.     Exception is taken to the ALJD's failure to include in its recommended Order and Notice to Employees an affirmative action requiring Respondent to rescind the written threat of loss of benefits which the ALJD found had violated the Act. (GC Exh. 1(iii)).  (ALJD 79:21-81:4; Appendix)

9.     Exception is taken to the ALJD's failure to require that Respondent post the Notice to Employees (Appendix) at all the facilities that it owns or operates in the United States and its territories as a remedy for the written threat of loss of benefits which the ALJD found had violated the Act. (GC Exh. 1(iii)).  (ALJD 80:19-33; Appendix)

**DATED AT** Oakland, California this 6th day of February 2020.

_____
Edris W.I. Rodriguez Ritchie
Counsel for the General Counsel
National Labor Relations Board
Region 32
1301 Clay Street, Suite 300N
Oakland, CA 94612-5224
Tel: 510-671-3041
Fax: 510-637-3315
Email: Edris.RodriguezRitchie@nlrb.gov

3

22-60493.6166

# UNITED STATES OF AMERICA
## BEFORE THE NATIONAL LABOR RELATIONS BOARD
### REGION 32

|  |  |
|---|---|
| **TESLA, INC.** | |
| **and** | |
| **MICHAEL SANCHEZ, an Individual** | **Case   32-CA-197020** |
| **and** | |
| **JONATHAN GALESCU, an Individual** | **Case   32-CA-197058** |
| **and** | |
| **RICHARD ORTIZ, an Individual** | **Case   32-CA-197091** |
| **and** | **Case(s)   32-CA-197197** |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, AFL-CIO** | **32-CA-200530** <br> **32-CA-208614** <br> **32-CA-210879** <br> **32-CA-220777** |
| | **Date:   February 6, 2020** |

## AFFIDAVIT OF SERVICE OF COUNSEL FOR THE GENERAL COUNSEL'S LIMITED CROSS-EXCEPTIONS TO THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

I, the undersigned employee of the National Labor Relations Board, being duly sworn, depose and say that on the date indicated above I served the above-entitled document(s) upon the persons at the addresses and in the manner indicated below. Persons listed below under "E-Service" have voluntarily consented to receive service electronically, and such service has been effected on the same date indicated above.

Mark S. Ross, Esq.
Keahn Morris, Esq.
Sheppard Mullin Richter & Hampton, LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
**VIA EMAIL: mross@sheppardmullin.com**
**VIA EMAIL: kmorris@sheppardmullin.com**

Margo A. Feinberg, Esq.
Daniel Curry, Esq.
Schwartz, Steinsaptr, Dohrmann
& Sommers, LLP
6300 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90048
**VIA EMAIL: margo@ssdslaw.com**
**VIA EMAIL: dec@ssdslaw.com**

Office of the Executive Secretary
National Labor Relations Board
1015 Half Street SE
Washington, DC  20570-0001
**VIA E-FILE**

| February 6, 2020 | Ida Lam, Designated Agent of NLRB |
| --- | --- |
| | Name |

| | /s/ Ida Lam |
| --- | --- |
| | Signature |

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 32**

**TESLA, INC.**

    **and**

**MICHAEL SANCHEZ, an Individual**

    **and**

**JONATHAN GALESCU,  an Individual**

    **and**

**RICHARD ORTIZ, an Individual**

    **and**

**INTERNATIONAL UNION, UNITED**
**AUTOMOBILE, AEROSPACE AND**
**AGRICULTURAL IMPLEMENT WORKERS OF**
**AMERICA, AFL-CIO**

**Cases 32-CA-197020**
**32-CA-197058**
**32-CA-197091**
**32-CA-197197**
**32-CA-200530**
**32-CA-208614**
**32-CA-210879**
**32-CA-220777**

**COUNSEL FOR THE GENERAL COUNSEL'S**
**MOTION TO WITHDRAW CERTAIN CROSS-EXCEPTIONS**
**TO THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

Pursuant to Section 102.24 of the Rules and Regulations of the National Labor Relations

Board (Board), Counsel for the General Counsel (GC) moves to withdraw GC Cross-Exception

Nos. 1, 2, 3, and 5 filed on February 6, 2020, concerning the September 27, 2019 decision of

Administrative Law Judge Amita B. Tracy, based on the Board's recent holding in *Argos*, 369

NLRB No. 26 (February 5, 2020).

1

**DATED AT** Oakland, California this 12th day of February 2020.

_____

Edris W.I. Rodriguez Ritchie
Counsel for the General Counsel
National Labor Relations Board
Region 32
1301 Clay Street, Suite 300N
Oakland, CA 94612-5224
Tel: 510-671-3041
Fax: 510-637-3315
Email: Edris.RodriguezRitchie@nlrb.gov

2

22-60493.6170

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 32**

| | |
|---|---|
| **TESLA, INC.** | |
| **and** | |
| **MICHAEL SANCHEZ, an Individual** | **Case   32-CA-197020** |
| **and** | |
| **JONATHAN GALESCU, an Individual** | **Case   32-CA-197058** |
| **and** | |
| **RICHARD ORTIZ, an Individual** | **Case   32-CA-197091** |
| **and** | **Case(s)   32-CA-197197** |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, AFL-CIO** | **32-CA-200530**<br>**32-CA-208614**<br>**32-CA-210879**<br>**32-CA-220777** |
| | **Date:   February 12, 2020** |

### AFFIDAVIT OF SERVICE OF COUNSEL FOR THE GENERAL COUNSEL'S MOTION TO WITHDRAW CERTAIN CROSS-EXCEPTIONS TO THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

I, the undersigned employee of the National Labor Relations Board, being duly sworn, depose and say that on the date indicated above I served the above-entitled document(s) upon the persons at the addresses and in the manner indicated below. Persons listed below under "E-Service" have voluntarily consented to receive service electronically, and such service has been effected on the same date indicated above.

| | |
|---|---|
| Mark S. Ross, Esq. | Margo A. Feinberg, Esq. |
| Keahn Morris, Esq. | Daniel Curry, Esq. |
| Sheppard Mullin Richter & Hampton, LLP | Schwartz, Steinsapir, Dohrmann |
| 4 Embarcadero Center, 17th Floor | & Sommers, LLP |
| San Francisco, CA 94111 | 6300 Wilshire Boulevard, Suite 2000 |
| **VIA EMAIL: mross@sheppardmullin.com** | Los Angeles, CA 90048 |
| **VIA EMAIL: kmorris@sheppardmullin.com** | **VIA EMAIL: margo@ssdslaw.com** |
| | **VIA EMAIL: dec@ssdslaw.com** |

Office of the Executive Secretary
National Labor Relations Board
1015 Half Street SE
Washington, DC  20570-0001
**VIA E-FILE**

February 12, 2020

Edris W.I. Rodriguez Ritchie, Designated
Agent of NLRB
_____
Name


/s/ Edris Rodriguez Ritchie
_____
Signature

FUNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 32

TESLA, INC.

    **and**                                        **Cases 32-CA-197020**

**MICHAEL SANCHEZ, an Individual**

    **and**

**JONATHAN GALESCU, an Individual**

    **and**

**RICHARD ORTIZ, an Individual**

    **and**

**INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA, AFL-CIO**

| | |
|---|---|
| | **Cases 32-CA-197020** |
| | **32-CA-197058** |
| | **32-CA-197091** |
| | **32-CA-197197** |
| | **32-CA-200530** |
| | **32-CA-208614** |
| | **32-CA-210879** |
| | **32-CA-220777** |

<u>COUNSEL FOR THE GENERAL COUNSEL'S
ANSWERING BRIEF IN OPPOSITION TO RESPONDENT TESLA, INC.'S
EXCEPTIONS TO THE DECISION OF THE ADMINISTRATIVE LAW JUDGE
AND RESPONDENT'S BRIEF IN SUPPORT OF EXCEPTIONS</u>

Submitted by:

Edris W.I. Rodriguez Ritchie
Counsel for the General Counsel
National Labor Relations Board
Region 32
1301 Clay Street, Suite 300N
Oakland, CA 94612-5224
Tel: 510-671-3041
Fax: 510-637-3315
Email: Edris.RodriguezRitchie@nlrb.gov

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ............................................................................................ 1

II.   FACTUAL BACKGROUND AND LEGAL ANALYSIS ............................... 2

    A.   The ALJ's credibility resolutions are supported by the
        preponderance of the evidence [R. Exceptions 15-17, 52-54,
        123, and 148] ........................................................................................ 2

    B.   The ALJ correctly concluded that Respondent's Team Wear
        policy violates Section 8(a)(1) of the Act. [R. Exceptions 10,
        12-17, 140-166] ................................................................................... 3

        1.   Facts concerning Respondent's unlawful Team Wear policy .............. 3

        2.   Tesla's Team Wear policy violates Section 8(a)(1) of the Act .............. 4

    C.   Lipson's unlawful interrogations of Ortiz and Galescu The ALJ
        correctly concluded that Liza Lipson violated Section 8(a)(1) of
        the Act by unlawfully interrogating Richard Ortiz and Jonathan
        Galescu [R. Exceptions 1, 10, 12, 13, 45, 122-139, and 160-166] ...................... 9

    D.   The ALJ correctly concluded that CEO Elon Musk and CPO
        Gaby Toledano violated Section 8(a)(1) of the Act on June 7, 2017
        [R. Exceptions 2-4, 10 through 13, 18-54, and 160-166] ................................. 13

        1.   The June 7, 2017 Musk and Toledano encounter ............................... 13

        2.   Procedural history concerning the GC's Allegation ........................... 17

        3.   The ALJ correctly concluded that the Amendment was
        closely related to extant allegations and that Musk and Toledano
        violated the Act ................................................................................... 17

            a.   The ALJ and the Board have properly concluded that
            Section 10(b) does not prevent issuance of the Amendment
            concerning the June 7, 2017 Musk and Toledano encounter
            [R. Exceptions 18-26] ................................................................ 18

            b.   The June 7, 2017 Encounter violated Section 8(a)(1)
            of the Act [R. Exceptions 27-54] ............................................ 22

    E.   Musk's May 20, 2018 Tweet Violated Section 8(a)(1) of the Act
        [R. Exceptions 7-13, 55-74, and 160-166] ......................................... 25

        1.   Musk's unlawful May 20, 2018 tweet ................................................. 25

22-60493.6174

2.     Musk's May 20, 2018 tweet unlawfully threatens employees with a loss of their stock benefits if they supported the Union in violation of Section 8(a)(1).................................................... 26

F.     The ALJ correctly concluded that Respondent violated Section 8(a)(1) and (3) of the Act by disciplining Jose Moran and terminating Richard Ortiz because of their protected concerted activities and support for the Union [R. Exceptions 1-6, 10 through 13, 75-121, and 160-166] ............. 30

1.     Facts concerning the unlawful Ortiz termination and Moran discipline in October 2018 ....................................................... 31

a.   Ortiz and Moran's protected concerted and Union activities...... 31

b.   A means to an end: Respondent's investigation of Jose Moran and Richard Ortiz ................................................. 34

c.   The unlawful interrogations of Moran and Ortiz ........................ 37

d.   The October 18, 2018 termination of Ortiz and October 19, 2018 discipline of Moran ................................... 39

2.     Board law supports the ALJ's conclusions that Respondent violated Section 8(a)(1) of the Act by terminating Ortiz and discipline Moran because of the protected activities or, alternatively, that Respondent violated Section 8(a)(3) of the Act by terminating Ortiz and discipline Moran due to their support for the Union.................... 40

a.   The ALJ correctly concluded that Respondent's termination of Ortiz and discipline of Moran violated Section 8(a)(1) of the Act [R. Exceptions 75-80, 82-83, 85-87, 97-98, 100-108, 115, & 160-166].............................................. 40

b.   Alternatively, the ALJ also correctly concluded that Respondent's termination of Ortiz and discipline of Moran violated Section 8(a)(3) and (1) of the Act [R. Exceptions 75-80, 82-118, and 160-166] ............................................... 44

G.     The ALJ correctly concluded that Gecewich interrogated Ortiz and Moran in violation of Section 8(a)(1) of the Act [R. Exceptions 81 and 119-121] .................................................................. 46

H.     The ALJ's order granting the GC's requested notice reading remedy is supported by the credited evidence and Board Precedent [R. Exceptions 12, 13, 160-166] .................................................. 47

III.   CONCLUSION ................................................................................ 50

22-60493.6175

## TABLE OF AUTHORITIES

### CASES

*Alamo Rent-A-Car*,
    336 NLRB 1155 (2001) ................................................................. 24

*Alt. Energy Applications, Inc.*,
    361 NLRB No. 139, slip op. at 1 (2004)...................................... 20

*Ausable Communications*,
    273 NLRB No. 166 (1985) ........................................................... 26

*Bethlehem Shipbuilding Corporation Ltd. v. NLRB*,
    114 F.2d 930 (1st Cir. 1940)....................................................... 41

*Boeing Co.*,
    365 NLRB No. 154 (2017) ............................................................. 7

*Boise Cascade Corp.*,
    300 NLRB 80, 82 (1990) ............................................................... 5

*Bridgestone Firestone*,
    350 NLRB No. 52 (2007) ............................................................. 12

*Camarco Loan Mfg. Plant*,
    356 NLRB 1182 (2011) ............................................................... 11

*Capitol EMI Music*,
    311 NLRB 997, 1007 (1993), enfd. 23 F.3d 399 (4th Cir. 1994).................................... 22

*Cellco Partnership v. NLRB*,
    892 F.3d 1256 (D.C. Cir. 2018).................................................. 43

*Charter Communications, LLC*,
    366 NLRB No. 46 (2018) ............................................................. 21

*Cumberland Farms Dairy of New York*,
    258 NLRB 900, 905 (1981), enfd. 674 F.2d 943 (1st Cir. 1982) .................................... 26

*Daikichi Sushi*,
    335 NLRB 622, 622, fn. 4 (2001), enfd. mem. 56 Fed. Appx. 516 (D.C. Cir. 2003)....... 16

*Desert Springs Hospital Medical Center*,
    363 NLRB No. 185 (2016) ........................................................... 21

22-60493.6176

*Donaldson Bros. Ready Mix, Inc.*,
   341 NLRB 958 (2004) ................................................ 11

*Douglas Aircraft Co.*,
   308 NLRB 1217 (1992) .............................................. 15

*Dyncorp*,
   343 NLRB 1197 (2004) .............................................. 26

*E&L Transport*,
   331 NLRB 640 fn. 3 (2000) ........................................... 6

*El Rancho Market*,
   235 NLRB 468, 471 (1978) ......................................... 26

*Electrolux Home Products, Inc.*,
   368 NLRB No. 34 (2019) ........................................... 46

*Federated Logistics & Operations*,
   340 NLRB 255, 268-69 (2003) ................................. 23, 48

*Fresh & Easy*,
   361 NLRB No. 12 (2014) ........................................... 12

*Frisby v. Schultz*,
   487 U.S. 474, 485 (1988) .......................................... 29

*Goodyear Tire & Rubber Co.*,
   357 NLRB 337 (2011) ................................................ 5

*Grass Valley Grocery Outlet*,
   388 NLRB 877, 877 fn. 1 (2003), affd. Mem. 121 Fed. Appx. 720 (9th Cir. 2005). ....... 12

*Gray Flooring*,
   212 NLRB No. 107 (1974) ......................................... 42

*Harmony Corp.*,
   301 NLRB 578 (1991) .............................................. 20

*Hartman & Tyner, Inc.*,
   359 NLRB 895, 897 (2013), reaffirmed in *Hartman & Tyner, Inc.*, 361 NLRB No. 59
   (2014) .................................................................. 49

*Heinick Corp.*,
   301 NLRB 128 (1991) .............................................. 19

iv

*HTH Corp.*,
    361 NLRB 709, 716 (2014) ......................................................... 48

*Inter-Disciplinary Advantage, Inc.*,
    349 NLRB 480, 509 (2007) ......................................................... 45

*Ishikawa Gasket America, Inc.*,
    337 NLRB 175 (2001) ................................................................. 49

*Jason Lopez' Planet Earth Landscape, Inc.*,
    358 NLRB 383 (2012) ................................................................. 48

*Jennie-O Foods*,
    301 NLRB 305 (1991) ................................................................. 19

*Jones Plumbing Co.*,
    277 NLRB 437, 440 (1985) ......................................................... 23

*Kaiser Engineers*,
    213 NLRB 752 (1974) ................................................................. 41

*Ken McKenzie's, Inc.*,
    221 NLRB 489, 490 (1975) ......................................................... 22

*Komatsu America Corp.*,
    342 NLRB 649, 650 (2004) ........................................................... 5

*KSM Industries*,
    336 NLRB 133, 133 (2001) ......................................................... 26

*Leukemia and Lymphoma Society*,
    363 NLRB No. 123 (2016) ......................................................... 22

*Machinists Local 1424*,
    362 U.S. 411 (1960) ................................................................... 21

*Marriott Corp.*,
    310 NLRB 1152, 1160 (1993) ..................................................... 19

*Martech Med. Prod., Inc.*,
    331 NLRB 487, 500 (2000) ......................................................... 26

*McClain and Co.*,
    358 NLRB 1070 (2012) ............................................................... 11

22-60493.6178

*Medco Health Solutions of Las Vegas v. AFL-CIO*,
701 F.3d 710 (D.C. Cir 2012) .................................................................. 6

*Medco Health Solutions of Las Vegas, Inc.*,
364 NLRB No. 115 (2016) .................................................................. 6, 7

*Mediplex of Danbury*,
314 NLRB 470, 472 (1994) .............................................................. 11, 26

*Meijer, Inc.*,
318 NLRB 50 (1995), enfd. 130 F.3d 1209 (6th Cir. 1997) ............................... 6

*Metro One Loss Prevention*,
356 NLRB 89, 100 (2010) .................................................................. 21

*Meyers Industries (Meyers I)*,
268 NLRB 493 (1984) .................................................................. 40

*Multi-Aid Service*,
331 NLRB 1226 (2000), enfd. 255 F.3d 363 (7th Cir. 2001) ...................... 11, 46

*NLRB v. Gissel Packing Co.*,
395 U.S. 575, 618 (1969) .............................................................. 26, 28

*NLRB v. Pentre Ele.*,
998 F.2d 363, 371 (6th Cir. 1993) .................................................. 27

*NLRB v. Schuler Engineering*,
309 F.3d 362, 370-71 (6th Cir. 2002) .............................................. 24

*Nordstrom, Inc.*,
264 NLRB 698, 700 (1982) .................................................................. 6

*North Memorial Health Care*,
364 NLRB No. 61, slip op at 1 (2016) .............................................. 50

*North West Electric Cooperative*,
366 NLRB No. 132, slip op. at 1, fn. 1 (2018) ................................... 41

*P.S.K. Supermarkets, Inc.*,
349 NLRB 34 (2007) .................................................................. 5

*Pease Co.*,
666 F.2d 1044, 1048 (1981) .......................................................... 27

vi

*Pekowski Enterprises, Inc.*,
    327 NLRB 413, 425 (1999) ............................................................ 21

*Pueblo Supermarkets, Inc.*,
    156 NLRB No. 65 (1966) .............................................................. 11

*R.A.V. v. City of St. Paul, Minn.*,
    505 U.S. 377, 421 (1992) ............................................................ 30

*Ready Mix, Inc.*,
    341 NLRB 958, 960 (2004) ........................................................... 26

*Red Cross-Missouri-Illinois*,
    347 NLRB 347, 351(2006) ............................................................ 22

*Redd-I, Inc.*,
    290 NLRB 1115, 1118 (1988) ........................................................ 18

*Reebie Storage and Moving Co., Inc. v. NLRB*,
    44 F.3d 605, 608 (7th Cir. 1995) .................................................. 18

*Republic Aviation Corp. v. NLRB*,
    324 U.S. 793 (1945) ................................................................ 5, 6

*Ridgely Manufacturing Co.*,
    207 NLRB 193 (1973) ................................................................ 42

*Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*,
    605 F.3d 703 (9th Cir. 2009) ...................................................... 29

*Rospatch Corporation*,
    193 NLRB 772 (1971) ................................................................ 27

*Rossmore House*,
    269 NLRB 1176 (1984) ........................................................... 10, 26

*Sam's Club*,
    322 NLRB 8, 14 (1996) .............................................................. 14

*Seton Company*,
    332 NLRB 979 (2000) ................................................................ 20

*Shamrock Foods Co.*,
    366 NLRB No. 117 (2016) ............................................................ 24

22-60493.6180

*Shen Lincoln-Mercury-Mitsubishi, Inc.*,
    321 NLRB No. 82 (1996) ........................................................... 3

*Southern New England Telephone Co. v. NLRB*,
    793 F.3d 93 (D.C. Cir. 2015) ..................................................... 6

*Sproule Construction Co.*,
    350 NLRB 774, 774 fn. 2 (2007) ............................................. 12

*St. Louis Car Co.*,
    108 NLRB 1523, 1525-26 (1954) ............................................ 43

*St. Louis Cardinals*,
    369 NLRB No. 3, fn. 1 (January 3, 2020) ................................. 3

*Stern Produce Company, Inc.*,
    368 NLRB No. 31 (2019) ........................................................ 11

*Sunnyside Home Care Project*,
    308 NLRB 346 fn. 1 (1992) .................................................... 26

*Sysco Grand Rapids, LLC*,
    367 NLRB No. 111 (2019) ...................................................... 49

*TNT Logistics North America*,
    345 NLRB 290, 290-91 (2005) ............................................... 27

*Torbitt & Castleman, Inc.*,
    320 NLRB 907, 910 fn. 6 (1996) ............................................ 16

*Towne Ford Inc.*,
    327 NLRB 193, 193, 198-199 (1998) ...................................... 18

*Tradewaste Incineration*,
    336 NLRB 902, 902 (2001) ..................................................... 43

*Triple Play Sports Bar & Grille*,
    361 NLRB 308, 308–309 (2014) ............................................. 41

*Tschiggfrie Properties, Ltd.*,
    368 NLRB No. 120 (2019) ...................................................... 44

*Uarco, Inc.*,
    216 NLRB 1, 2 (1974) ............................................................ 22

22-60493.6181

*United Parcel Service, Inc.*,
   195 NLRB 441 (1972) .................................................................. 5

*Voith Industrial Services, Inc.*,
   363 NLRB No. 116 (2016) ......................................................... 48

*W. San Diego*,
   348 NLRB 372, 372 (2006) ......................................................... 5

*Wake Electric Membership Corp.*,
   338 NLRB 298, 306 (2002) ...................................................... 24

*Wal-Mart Stores, Inc.*,
   368 NLRB No. 146 (December 16, 2019) ................................. 7, 9

*Wellstream Corp.*,
   313 NLRB 698, 706 (1994) ...................................................... 24

*Winkle Bus Co., Inc.*,
   347 NLRB 1203, 1222 (2006) .................................................. 23

*World Color (USA) Corp.*,
   360 NLRB 227, 233 (2014) ........................................................ 5

*Wright Line*,
   251 NLRB 1083 (1980) ............................................................ 45

### FEDERAL STATUTES

29 U.S.C. § 157 ............................................................................ 5

29 U.S.C. §§ 151 et seq ................................................................. 1

29 U.S.C. §§ 2000e et seq ............................................................ 29

### FEDERAL REGULATIONS

29 C.F.R. § 1904.35(b)(2)(iv) ...................................................... 13

29. C.F.R § 102.118 .................................................................... 22

### STATE REGULATIONS

Title 8 Cal. Code Regs. §14300.35 .............................................. 13

22-60493.6182

## I.    INTRODUCTION

The "Time [has come] for Tesla to Listen.[1]"  In her September 27, 2019 decision[2], Administrative Law Judge Amita B. Tracy (ALJ) correctly concluded that Respondent Tesla, Inc.'s (Respondent) response to its employees organizing campaign at its facility in Fremont, California (Fremont facility) violated the National Labor Relations Act[3] (the Act).  Respondent's severe and pervasive violations included threats and interrogations made by Respondent's highest officials, including Chief Executive Officer Elon Musk and its Chief People Officer Gaby Toledano, and its termination and suspension, respectively, of two of the most vocal Union supporters for their exercise of their protected, concerted activities and their Union activities.

For months prior to the public launch of the organizing campaign, Fremont facility employees Jose Moran, Richard Ortiz, and others worked with the International Union, United Automobile, Aerospace, Automation, and Agricultural Workers of America, AFL-CIO (Union or UAW) to develop the campaign and its strategy. Then, in September 2016, the campaign took its first public steps through the creation of a website and social media accounts. Employee Moran implored Musk and Respondent to listen to the workers' demands for better working conditions and unionizing through his "Time for Tesla to Listen" blog post, the organizing campaign gained momentum, with workers engaging in informational leafletting, distributing union paraphernalia,

---

[1] GC Exh. 8.

[2] References to the ALJD in this case are noted as "ALJD" followed by the page, colon and line number(s).  References to the record transcript are noted as "Tr." followed by the page number(s).  References to the General Counsel's exhibits are noted as "GC Exh." followed by the exhibit number(s).  References to Charging Parties' exhibits are noted as "CP Exh." followed by the exhibit number(s).  References to Respondent exhibits are noted as "R Exh." followed by the exhibit number(s). References to Joint exhibits are noted as "Joint Exh." followed by the exhibit number(s).

[3] 29 U.S.C. §§ 151 et seq.

22-60493.6183

and workplace petitions.  Respondent swiftly responded by engaging in numerous violations outlined in the ALJ's decision and further below.

After Fremont facility workers traveled with the Union to the state capitol in Sacramento, California, to obtain the support from lawmakers in their support for better working conditions and unionization, as discussed more fully below, Respondent targeted the two most prominent faces of the organizing campaign by disciplining Jose Moran and terminating Richard Ortiz.  The ALJ correctly determined that these disciplinary actions violated Section 8(a)(1) and Section 8(a)(3) of the Act. The Board should affirm her conclusions. The ALJ further correctly concluded that Respondent's CEO Elon Musk publicly threatened his employees via Twitter with a loss of benefits if they voted to unionize. To remedy these violations, the ALJ Order's properly included a Notice Reading remedy, because Respondent's executives, including its CEO, were directly involved in several of the unfair labor practices and because of the severe and pervasive nature of the violations, their widespread dissemination, and their potential impact on the workers' fundamental rights to engage in workplace democracy. For these reasons, Counsel for the General Counsel (GC) respectfully requests that the National Labor Relations Board (Board) overrule all of Respondent's exceptions and adopt the ALJ's findings and conclusions of law.[4]

## II.    FACTUAL BACKGROUND AND LEGAL ANALYSIS

### A.    The ALJ's Credibility Resolutions are Supported by the Preponderance of the Evidence [R. Exceptions 15-17, 52-54, 123, and 148]

Respondent has excepted to the ALJ's credibility resolutions, which were based on, inter alia, her observations and assessment of the witnesses' demeanor and detail of their testimony. "The Board's established policy is not to overrule an [ALJ's] credibility resolutions unless the

---

[4] The GC filed his own limited cross-exceptions on February 6, 2020, as well as a brief in support thereof. Assuming some or all of the cross-exceptions are granted, they would further reinforce the ALJ's conclusions and remedy.

2

clear preponderance of all relevant evidence convinces us that they are incorrect." *St. Louis Cardinals*, 369 NLRB No. 3, fn. 1 (January 3, 2020), citing *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). Here, Respondent offers no facts or argument to support such a reversal. Respondent does not contend that the ALJ incorrectly assessed the witnesses' demeanor or their lack of candor. There is simply no basis to overturn the ALJ's credibility resolutions. Moreover, to the extent Respondent asserts in its exceptions and brief that it is a proper means to resolve credibility disputes.[5]

### B. The ALJ Correctly Concluded That Respondent's Team Wear Policy Violates Section 8(a)(1) of the Act. [R. Exceptions 10, 12-17, 140-166]

#### 1. Facts concerning Respondent's unlawful Team Wear policy

Respondent maintains its "General Assembly Expectations" (Team Wear), applicable to its General Assembly (GA) production area, which reads:

> Team Wear: It is mandatory that all Production Associates and Leads wear the assigned team wear.
> • On occasion, team wear may be substituted with all black clothing if approved by supervisor.
> • Alternative clothing must be mutilation free, work appropriate and pose no safety risks (no zippers, yoga pants, hoodies with hood up, etc.).

ALJD 40:15-35. Team Wear consists of assigned black clothing, made of cotton, with screen printed or with stitched lettering.[6] The GA area of the Fremont facility is not a public retail area. ALJD 7:6-23. Rather, it is a production area where Respondent's vehicles are produced. *Id.* In Spring 2017, pro-Union employees at the Fremont facility began wearing black pro-Union t-shirts which were otherwise the same as the Team Wear shirts. ALJD 40:39-42; GC Exh. 25. The employees wore them in the GA area. ALJD 40:39-43. The pro-Union employees began passing

---

[5] See e.g. *Shen Lincoln-Mercury-Mitsubishi, Inc.*, 321 NLRB No. 82 (1996).
[6] Tr. 1370: 6-11; 1373: 9-12; 1596-1597; 2398-2399; 2411-2412; 2524: 10-16; 2546:16-18; GC Exhs. 37, 41, 92.

22-60493.6185

out shirts to their coworkers. ALJD 40:39-41. Respondent began enforcing its Team Wear rule by threatening disciplinary action including dismissal for the day for non-compliance. ALJD 42:8-10.

Respondent offered two reasons for maintaining its Team Wear policy: mutilation[7] protection as well as the need for a visual aid and uniformity.  However, concerning mutilation, Respondent's witnesses admitted that the Union shirts did not cause any mutilation. ALJD 42:2-3. There is no evidence linking the pro-Union shirts to mutilation. ALJD 41-42:4; 41, fn. 65. Regarding the second reason, Respondent's witness Mario Panera (production manager) noted that "the bigger thing with Team Wear is visual management of the shop." Tr. 1375:5-6; 1392:10-13. But Panera admitted this concern is satisfied through the use of a color (black). Tr. 2543: 6-15.

### 2.     Tesla's Team Wear policy violates Section 8(a)(1) of the Act

The ALJ correctly decided that Respondent violated Section 8(a)(1) of the Act by maintaining a rule that bans the wearing of Union t-shirts in the GA Area. [cite ALJD] While the Board recently modified the union insignia area of law in *Wal-Mart*, 368 NLRB No. 146 (2020), and carved out circumstances when the *Boeing* balancing test applies, it was only with respect to a neutral rule that partially bans union insignia. For the reasons stated below, the ALJD should be upheld because the rule at issue here is a total ban on union t-shirts in the GA Area, and even if *Wal-Mart* applies, Respondent has not met its burden under *Boeing* to establish that its asserted business justifications outweighs the impact on employees Section 7 right to wear Union T-shirts in the GA area.

Section 7 grants employees the right to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection. 29 U.S.C. § 157. In furtherance of these rights, the United States Supreme Court has long upheld the right of employees to wear union

---

[7] In the GA, mutilation refers to scratches, buffs, or chips to a vehicle.  Tr. 1597: 16-18.

22-60493.6186

insignia at work. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945). In turn, the Board holds that, in the absence of special circumstances, employees have a Section 7 right to wear insignia referring to unions or other matters pertaining to working conditions for the purpose of mutual aid or protection. See e.g. *Goodyear Tire & Rubber Co.,* 357 NLRB 337 (2011); see also *P.S.K. Supermarkets, Inc.*, 349 NLRB 34 (2007). While the burden is on the employer to demonstrate special circumstances, *W. San Diego*, 348 NLRB 372, 372 (2006), this requires substantial evidence to outweigh employees' rights protected by Section 7 of the Act. *World Color (USA) Corp.*, 360 NLRB 227, 233 (2014). The Board has previously found that special circumstances may include: situations where display of union insignia could jeopardize employee safety, damage machinery/products, unreasonably interfere with a public image that the employer has established as part of its business plan through appearance rules for its employees, violence, interference with training or production, or threats thereof, the instigation of disciplinary misconduct, disparaging the employer's products and/or services, or interference with the employer's business. *World Color (USA) Corp.*, 360 NLRB 227, 233 (2014); *Goodyear Tire & Rubber Co.,* 357 NLRB at 340; *P.S.K. Supermarkets*, 349 NLRB at 35 (citing *Bell-Atlantic- Pennsylvania*, 339 NLRB 1084, 1086 (2003)); *Komatsu America Corp.*, 342 NLRB 649, 650 (2004); *United Parcel Service, Inc.*, 195 NLRB 441 (1972).

General, speculative, isolated, or evidence of *potential* disruption to an employer's operations, do not amount to a special circumstance that warrants restricting employees' Section 7 right to wear union insignia at work. *Boise Cascade Corp.,* 300 NLRB 80, 82 (1990). Customer exposure to union insignias does not constitute a special circumstance that permits an employer to prohibit display of such insignia. *Meijer, Inc.*, 318 NLRB 50 (1995), enfd. 130 F.3d 1209 (6th Cir. 1997); *Nordstrom, Inc.*, 264 NLRB 698, 700 (1982). The special circumstances exception is

5

narrowly construed and "a rule that curtails an employee's right to wear union insignia at work is presumptively invalid." *E&L Transport*, 331 NLRB 640 fn. 3 (2000).

Here, the ALJ correctly found that the maintenance of the Team Wear policy violates Section 8(a)(1) of the Act under *Republic Aviation*, supra, which requires that employees' Section 7 right to wear Union insignia be maintained absent a showing of special circumstances by the employer.[8] This is the appropriate analytical framework given that Respondent interprets the policy to ban GA employees from wearing *any* and *all* Union shirts in the GA area. That is, Respondent's interpretation of its Team Wear policy amounts to a total ban on Union shirts in a non-public area of Respondent's facility. Respondent failed to establish special circumstances for the maintenance of its total ban because Respondent's assertion of mutilation was nothing more than conjecture[9] and its assertion of visual maintenance did not withstand scrutiny when considering that the pro-Union shirts were all-black, compliant with the text of the Team Wear policy but nonetheless forbidden by Respondent. Respondent relies on *Medco Health Solutions of Las Vegas v. AFL-CIO*, 701 F.3d 710 (D.C. Cir 2012) (*Medco*) and *Southern New England Telephone Co. v. NLRB*, 793 F.3d 93 (D.C. Cir. 2015) (*Southern New England*) to support its argument that, because it has a "reasonable belief of harm" it has met the special circumstances test. In doing so, Respondent admits that there exists an absence of actual harm in the instant case. R. Bf. 65. Notwithstanding, both *Medco* and *Southern New England* are easily distinguishable.

In *Medco*, the specific dress code rule at issue was a rule that prohibited employees from wearing clothing that contained items that were "confrontational, ... insulting or provocative ...." *Medco Health Solutions of Las Vegas, Inc.*, 357 NLRB 170, 177 (2011). Respondent's Team Wear

---

[8] Respondent's Exception 140 concerning the ALJ's failure to apply *Boeing* should be rejected.

[9] *Medco Health Solutions of Las Vegas, Inc.*, 364 NLRB No. 115 (2016) (rejecting the use of "conjecture" to find special circumstances.

6

rule is not limited to what is confrontational, insulting, or provocative and there is no assertion that the Union shirts contain an objectionable message. Moreover, Respondent's reliance on *Medco* for the proposition that an employer's "reasonable belief of harm" is sufficient to meet the special circumstances test is unsupported as *Medco* does not refer to the term "reasonable belief." In *Southern New England*, the specific ban at issue was partial ban that applied only to union shirts with the words "Inmate" on the front and "Prisoner of AT$T" on the back. *Southern New England*, supra at 94. The instant rule is different both because the Team Wear policy is a *total* ban on the wearing of Union shirts and because there is no allegation the Union's shirts are offensive.

Even if the Board views the rule as a partial ban because Respondent's rule is limited to the GA area[10] or because it allows GA employees to use Union stickers and hats and applies the analytical framework in *Boeing Co.*, 365 NLRB No. 154 (2017), as discussed in *Wal-Mart Stores, Inc.*, 368 NLRB No. 146 (December 16, 2019),[11] the Team Wear rule is nonetheless unlawful because Respondent's asserted business justifications do not outweigh employees' Section 7 rights to wear the Union shirt and therefore it's rule still violates the Act as found by the ALJ. ALJD 45:46-47:2. In *Wal-Mart,* the rule at issue permitted employees to wear "small, non-distracting logos or graphics … no larger than the size of your [the employee's] name badge." *Wal-Mart*, supra, at slip op. 1. Applying the *Boeing* framework, the Board first determined that the rule could

---

[10] As the Board noted in *Wal-Mart* and though the rule here applies only to those applies working in GA, "there is no requirement that the Board find that a union insignia rule is either lawful or unlawful with respect to its entire establishment, including both public and nonpublic areas." *Wal-Mart*, supra at fn. 15.

[11] In *Wal-Mart*, the Board distinguished between instances where an employer's work rule allows some, but not all, union buttons (and thus apply the analytical framework of *Boeing*) with instances where an employer, as is the case here, maintains a total ban on Union shirts (and thus would apply *Republic Aviation*). *Wal-Mart*, supra at fn. 10.

7

be reasonably read to inhibit the exercise of Section 7 activity.[12]  Next, the Board conducted a balancing of employee's Section 7 rights to wear buttons with union insignia and logos against the Employer's interest in maintaining the policies. As to the public selling areas, the Board concluded that Wal-Mart had a legitimate interest in limiting the size of logos and graphics by making it easier for customers to identify its employees and by ensuring that its employees were readily identifiable to its security personnel. However, the Board noted that Wal-Mart had not made an such showing for the areas away from the selling floor, where the business justifications were much weaker. *Id.* Similarly, Respondent has applied its rule to prohibit employees' from wearing the all-black, cotton Union shirts, which are nearly identical shirts to Respondent's shirts, based on its purported concerns regarding mutilation and its desire for visual management through uniformity. However, neither of these concerns holds up to scrutiny since Respondent admits that the Union shirts do not pose any risk of mutilation and it further admits that its desire for visual uniformity is satisfied by fact that the Union shirts are black.  Thus, neither of these concerns warrants any restriction upon employees' right to wear a Union shirt in the GA production area, particularly since the GA area is generally only accessible to its employees and is not a public area that would require the kind of visual management described in *Wal-Mart*.  Indeed, employees must have a badge and pass through security guards to gain entry to the building. This is a vastly different factual scenario than was the case in *Wal-Mart* where the Board was faced with a public selling floor, accessible to *any* member of the public. As the Board noted in *Wal-Mart* concerning the rule's application to "employee only" areas, Respondent's GA is controlled by its staff and the visual management concern is too attenuated to justify a prohibition upon wearing all Union shirts,

---

[12] As was the case in *Wal-Mart*, if the Board were to apply the *Boeing* framework, Respondent's interpretation and enforcement of its Team Wear rule to prohibit the Union shirt would plainly place the instant rule in Category 2, contrary to Respondent's assertion otherwise. R. Bf. 70.

22-60493.6190

especially considering the visual management is exercised based on the color of the shirt. *Wal-Mart*, supra, slip op at fn 17. Nor does the fact that employees may wear Union stickers and Union hats, as the ALJ noted, allow Respondent to otherwise restrict employee Section 7 right to wear a Union t-shirt, where it does not have any legitimate business justification to restrict Union insignia on a black shirt that meets the requirements to prevent mutilation of cars (all cotton) and allows for visual management (black). ALJD 45:46.

### C. Lipson's Unlawful Interrogations of Ortiz and Galescu the ALJ Correctly Concluded that Liza Lipson Violated Section 8(a)(1) of the Act by Unlawfully Interrogating Richard Ortiz and Jonathan Galescu [R. Exceptions 1, 10, 12, 13, 45, 122-139, and 160-166]

By way of background, after the February 2017 leafletting, Fremont facility employees Ortiz and Galescu requested that Respondent provide them with copies of Respondent's California Division of Occupational Safety and Health (Cal OSHA) 300 logs and 300A summaries.[13] ALJD 27:14-28:35. The logs and summaries were provided to Ortiz and Galescu in mid-April 2017.[14] ALJD 28:38.  On May 1, 2018, several weeks after providing the workplace safety information, Peter Hochholdinger, Senior Vice President for Production, sent an email to production employees telling them that an employee had requested the safety information, that it was an employee's right to request such information, noting a concern that employees would make this information concerning their working conditions public, and providing an email for questions. R. Exh. 2.

---

[13] Cal OSHA 300A forms do not contain any personally identifiable information. ALJD 28, fn. 26.
[14] Workers used the information from the Cal OSHA 300 logs and the 300A summaries specifically for several protected reasons. On May 24, 2017, Ortiz, Galescu, and other Fremont facility workers engaged in informational leafletting explicitly concerning safety at Respondent's Fremont facility and handed out flyers containing information regarding safety at the Fremont facility and workplace injuries. GC Exh. 9.  Ortiz and Galescu filed a concerted complaint with Cal OSHA on May 25, 2017. R. Exh. 3.  Fremont facility employees, including Ortiz, circulated and signed workplace safety petitions, which were ultimately delivered to Respondent's Director of Human Resources Josh Hedges, Musk, and Toledano, ultimately hand-delivered in early June 2017. ALJD 34: 6-32; GC Exh. 27.

22-60493.6191

On May 24, 2018, the same day that Ortiz and Galescu handed out pro-Union leaflets referring to safety matters, HR Director Hedges instructed HR Business Representative Lipson to meet with Ortiz and Galescu. ALJD 28:38-40. Prior to meeting with Ortiz and Galescu, Lipson reviewed the same leaflet that pro-Union employees had earlier distributed in the Fremont facility parking lot. ALJD 29:1-4; GC Exh. 9. The leaflet explicitly referenced that employees exercised their right to request the Cal OSHA 300 logs and 300A summaries. GC Exh. 9. That same day, Lipson, along with Human Resources Business Partner Lauren Holcomb,[15] met with Ortiz and Galescu two-on-one in a conference room. ALJD 29:6-30:5. Neither Lipson nor Holcomb informed the employees of the purpose of the meeting. ALJD 29, fn. 50. Lipson and Holcomb repeatedly sought to obtain additional information from both Ortiz and Galescu about what they did with the forms (Tr. 484:9-11) and who they shared information with. (Tr. 484:12-14). Galescu repeatedly insisted on the presence of a representative when asked questions about the Section 7 activity of other employees (Tr. 858:5-859:4). Lipson admitted that she knew employees had a right to share the information and forms with other employees (Tr. 2364:17-25) but still persisted in her attempt to identify those with whom they shared the forms (Tr. 2365:1-7).

Under the Board's test in *Rossmore House*, 269 NLRB 1176 (1984), affd. sub. nom. *Hotel & Restaurant Employees Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985) (*Rossmore*) and its progeny, the May 25, 2017 interrogation by Lipson of Ortiz and Galescu violates Section 8(a)(1) of the Act. Under *Rossmore*, the Board considers several factors in determining whether any particular interrogation falls outside the bounds of a lawful interrogation: (1) the background; (2) the nature of the information sought; (3) the identity of the questioner; (4) the place and method of interrogation; (5) the truthfulness of the reply; and (6) whether the interrogated employee was

---

[15] Respondent did not call Holcomb as a witness in the underlying hearing.

22-60493.6192

an open and active union supporter. See *McClain and Co.*, 358 NLRB 1070 (2012); see also *Camarco Loan Mfg. Plant*, 356 NLRB 1182 (2011); *Mediplex of Danbury*, 314 NLRB 470, 472 (1994); *Donaldson Bros. Ready Mix, Inc.*, 341 NLRB 958 (2004). The *Rossmore* factors *are not* mechanically applied and the test is objective and does not turn on the employee's subjective determination. *Multi-Aid Service*, 331 NLRB 1226 (2000), enfd. 255 F.3d 363 (7th Cir. 2001).

When weighing the *Rossmore* factors, the ALJ correctly concluded that the factors weighed heavily in favor of finding that Lipscomb unlawfully interrogated both Ortiz and Galescu. ALJD 30:35-32:2. First, the ALJ correctly noted that both events were conducted inside of conference rooms without an explanation of the purpose of the meeting.[16] Second, the ALJ correctly concluded that Respondent used false pretenses to justify its interrogation, noting that, contrary to Respondent's assertions, it never told Ortiz or Galescu that it was seeking to investigate a potential legal violation. Third, when examining the interaction, the ALJ correctly concluded that the questioning was geared at obtaining information about protected Section 7 activities. In its exceptions, Respondent asserts that it was concerned about the disclosure of their employees' medical information in a report titled "Analysis of Tesla Injury Rates: 2014-2017". R. Bf. 56, citing R. Exh. 3. However, this report is dated one day *after* the unlawful interrogation occurred and thus this could not have been the basis. Indeed, Lipson admitted to the unlawful purpose of the interrogation – Lipson stated that she knew that Ortiz and Galescu had the right to share the 300 logs and 300A summaries. Tr. 2364:17-19. She also knew that they had requested 300 logs

---

[16] *Stern Produce Company, Inc.*, 368 NLRB No. 31 (2019) (the Board adopted the ALJ's application of the *Rossmore* factors that noted that the location of an interrogation, specifically in a conference room alone, heightened the intimidating nature of the interrogation; see also *Pueblo Supermarkets, Inc.*, 156 NLRB No. 65 (1966) (noting that "calling employees away from their work stations during working hours to a conference room may create an atmosphere … redolent with compulsion." (internal quotation and citations omitted)).

22-60493.6193

and 300A summaries to obtain information about their working conditions. Tr. 2373:8-12.  Had Lipson been truly concerned about whether Ortiz or Galescu had disclosed information to *unauthorized* individuals (i.e. someone other than current or former employees, authorized employee representatives, or legal representatives), she would have asked that question. Instead, Lipson's questions were significantly broader. Lastly, as the ALJ correctly notes, employee attempts to conceal union support (as was the case with Galescu) support a finding that an interrogation was unlawful. *Sproule Construction Co.*, 350 NLRB 774, 774 fn. 2 (2007); see also *Grass Valley Grocery Outlet*, 388 NLRB 877, 877 fn. 1 (2003), affd. Mem. 121 Fed. Appx. 720 (9th Cir. 2005).

Respondent's arguments concerning the ALJ's application of the facts to the *Rossmore* factors do not withstand scrutiny. Respondent asserts that Lipson's interrogation of Ortiz and Galescu was borne out of "a statutory obligation to determine whether there had been a breach of employees' confidential medical information and whether it needed to take additional steps to protect employee privacy" and that it only interrogated Ortiz and Galescu after an outside organization published information. R. Bf. 57-58. However, as early as May 1, 2017, Respondent had a belief that this information was being shared externally (R. Exh. 2) but did *nothing* until employees began leafletting about workplace safety complaints on May 24, 2017.

Respondent also relies on *Fresh & Easy*, 361 NLRB No. 12 (2014) and *Bridgestone Firestone*, 350 NLRB No. 52 (2007) for the proposition that Respondent's encounter with Ortiz and Galescu was nothing more than an attempt to investigate "a legitimate concern about the potential disclosure of private employee medical information." R. Bf. 57. However, in both *Fresh & Easy* and *Bridgestone Firestone*, the Board noted that an employer would have such an interest when investigating facially valid complaints. *Fresh & Easy*, supra; *Bridgestone Firestone*, supra.

22-60493.6194

Here, there is no evidence that any employees had any complaints about the disclosure of their information sufficient to credit that such an investigation was the true motive.

Under Title 8 Cal. Code Regs. §14300.35, Ortiz and Galescu had a statutory right to request the 300 logs and 300A summaries and share them with other employees, former employees, their personal representatives, or authorized employee representatives. Respondent also had an obligation to provide such documents to the requesting employees, in unredacted form – including the names of *other* employees. 8 C.C.R. §14300.35(b)(2)(D).[17] By interrogating employees to determine the nature and extent of their disclosure of information that these employees had a statutory right to disclose, Respondent violated the Act.

> **D.    The ALJ Correctly Concluded that CEO Elon Musk and CPO Gaby Toledano Violated Section 8(a)(1) of the Act on June 7, 2017 [R. Exceptions 2-4, 10 through 13, 18-54, and 160-166]**

> **1.    The June 7, 2017 Musk and Toledano encounter**

It is important to review the circumstances and events which prompted Respondent to summon Moran to meet with Elon Musk and Gabby Toledano on June 7, 2017.  As noted above, in early April, Moran and Galesco requested 300 logs and 300 A summaries. See Section II.C; ALJD 27:25-28:36. Thereafter, the Fremont facility workers used the information in 300 logs and 300A to engage in various concerted actions, including making concerted complaint to state agencies concerning Respondent's compliance with OSHA regulations (R. Exh. 2) and engaging informational leafletting, which resulted in Respondent violating their rights[18] and unlawful interrogations.[19] Ortiz, Moran and others circulated a petition to tell management, including Musk,

---

[17] The same is true under federal law. See 29 C.F.R. § 1904.35(b)(2)(iv).

[18] Respondent does not except to the ALJ's finding that it violated the Act in connection with May 24, 2017 leafletting, as alleged in Paragraph 7(n) through (p) of the Second Amended Complaint. See GC Exh. 1(jj).

[19] Respondent has excepted to the ALJ's finding that Respondent, through Lipson, violated Section 8(a)(1) of the Act.

22-60493.6195

that they wanted safer working conditions and to form a union.[20]  ALJD 34:6-25; Tr. 705:12-13;

GC Exh. 27.  On June 6, 2017, the petition was hand delivered and emailed by Moran to Josh

Hedges, Respondent's then-Director of Human Resources for Manufacturing. ALJD 34:29-30; Tr.

705:17-707:18; GC Exh. 29.  In Moran's email, he stated that the workers' desired a "Democratic

Process as we Form our Union". GC Exh. 29.  Moran also cc'd Musk when he emailed the workers'

petition to Hedges. *Id.* The next day, a member of management instructed Moran to meet with

Hedges (Tr. 712:16-19), who in turn escorted Moran to meet with CEO Musk and CPO Toledano.

[21]  Although Moran was directed to meet with Musk alone, Moran asked and was given permission

to bring a coworker, welder Tony Vega. Tr. 713:2-7.

Musk, Toledano, Vega, and Moran were the only people in the room. *Id.* Toledano told

Moran that she and Musk were there to listen to Moran's safety concerns and Toledano

acknowledged having received the safety petition on the prior day. Tr. 715:3-11. Toledano then

introduced herself and Moran and Vega followed suit. Tr. 715:15-17. Next, Musk asked Moran

about himself and Moran talked about himself and his work at the Fremont facility. Tr. 715:18-

716:8. Vega then spoke about himself and brought up concerns from the welders regarding safety

equipment. Tr. 716:9-19. Moran then raised concerns regarding performance reviews and the lack

of promotions or raises. Tr. 717:6-13. During this conversation, Moran told Musk and Toledano

that the workers wanted to unionize because they wanted to have a voice in the plant. Tr. 717:12-

---

[20] Petitions that relate to terms and conditions of employment are a form of protected concerted activity.  See e.g. *Sam's Club*, 322 NLRB 8, 14 (1996) (holding that circulating a petition protesting labor conditions and soliciting signatures to the petition is concerted activity).
[21] As Respondent's Chief People Officer, Toledano was responsible for Respondent's human relations functions for its approximately 40,000 employees nationwide. Tr. 876:23-10. Toledano had a variety of direct reports, including the Employee Relations Department. Tr. 878:7-884:25. Toledano was hired at a time when the Fair Future at Tesla campaign was in full throttle, and an organizing campaign would be a big deal for a company the size of Tesla. Tr. 885:10- 17.

22-60493.6196

13. In response, Musk retorted, "You know, you don't really have a voice. The UAW is a second, like a two-class system where UAW is the only one that has a voice and not the workers." Tr. 717:20-23. Toledano then stated that "the majority of the workers at Tesla don't want a union and, you know, why do [you] want to pay for, why do [you] want to pay union dues?" Tr. 718:1-7. Moran protested that the workers had a right to form a union and that the workers wanted a voice to work together with Respondent to improve working conditions. Tr. 718:10-13. Vega told Musk and Toledano that the workers did not want to hurt Respondent but wanted to make Respondent better. Tr. 718:16-18. Toledano then told Moran and Vega that Respondent has a safety committee and that Moran and Vega should raise their safety concerns at the meetings. Tr. 718:21-25. Musk then instructed Toledano to allow Moran and Vega to participate in the safety committee. Musk told Moran and Vega that "if these safety committee meetings don't work out, then we'll give you your union." ALJD 36; Tr. 719: 7-16. The meeting ended at this point. Tr. 719:17-21. In six years of employment with Respondent, Moran had never been summoned to a private meeting with Musk. (ALJD 36:4; Tr. 719:24-720:4). Moran was later invited to participate in safety committee meetings and did so between two and four times. After that, Respondent stopped inviting Moran. Tr. 720:5-12. Toledano, who also participated in some of the weekly safety meetings, considered them to be "positive."  ALJD 36:6; Tr. 721:2-4.

Even though CEO Musk requested to have a meeting with Moran (Tr. 911:23-24), Respondent chose not to call Musk as a witness and relied solely on the testimony of Toledano, whom the General Counsel called as a hostile witness under Federal Rules of Evidence 611(c).[22]

---

[22] The GC requested an adverse inference be drawn from Respondent's failure to call Musk as a witness consistent with the Board's precedent in *Douglas Aircraft Co.*, 308 NLRB 1217 (1992). However, the ALJ refused to draw an adverse inference from Respondent's failure to call Musk to testify.  (ALJD 34-35, fn. 54).  Respondent excepts to the ALJ's refusal to draw an adverse inference from the GC's failure to call Vega as a witness.  (R. Exception 51).  This exception

22-60493.6197

Toledano, and her emails, ultimately corroborated Moran's testimony concerning the subject matter of the meeting, notwithstanding that other portions of her testimony was impeached. ALJD 35, fn. 55. Notably, Toledano initially denied that she referred to Moran and Vega as "adversaries" until she was confronted by an email she had drafted which demonstrated that she had used this term to describe them. Tr. 913:17-8; 918:15-919:14; GC Exh. 52. Toledano also was initially less than forthright concerning her and Musk's plan concerning the June 7, 2017 meeting. Specifically, Toledano initially denied that the meeting was the first step in Respondent's a plan to stop them from advocating for the Union. Tr. 915:7-23. She only admitted that Respondent's objective was to convince Moran and other union supporters to stop their Union advocacy after confronted with her emails. Tr. 919:15-921:7; 946:22-947:2. Notwithstanding Respondent's exceptions to the contrary, Toledano ultimately also admitted that the purpose of the meeting was to solicit Moran's (and his coworkers') grievances. Tr. 911:14-22. The ALJ determined that, based on the totality of the record including her demeanor and other evidence, Toledano's version of events concerning the meeting lacked credibility. ALJD 35-36. For example, Toledano denied that she had any knowledge of the Fremont facility organizing campaign during her job interview or during her first three weeks on the job, notwithstanding that the June 7, 2017 meeting occurred within this timeframe. ALJD 35, fn. 55; Tr. 886:4-15; 889:9-12; 889:13-15; 890:21-891:3. Accordingly, Respondent's exceptions concerning violations arising out of this meeting lack merit and should be denied, and the ALJD affirmed..

---

should be outright rejected since the failure to call Vega, an employee of Respondent, could not give rise to such an inference since there is no reasonable expectation that an employee favors one party over the other. See e.g. *Daikichi Sushi*, 335 NLRB 622, 622, fn. 4 (2001), enfd. mem. 56 Fed. Appx. 516 (D.C. Cir. 2003); *Torbitt & Castleman, Inc.*, 320 NLRB 907, 910 fn. 6 (1996), enfd. in relevant part 123 F.3d 899, 907 (6th Cir. 1997).

22-60493.6198

### 2.    Procedural history concerning the June 7, 2017 violations

On June 4, 2018, an amendment to the Second Amended Complaint (the Amendment) was issued concerning the allegation that Musk and Toledano violated the Act on June 7, 2017 in connection with their meeting with Moran and Vega.  GC Exh. 1(tt). The ALJ correctly found these allegations were closely related to timely filed charges. ALJD 32:20-34:2. Respondent filed a Motion to Dismiss the Amendment on June 11, 2018, which the GC and Charging Parties opposed. GC Exh. 1(yy), (ccc), and (eee). Respondent filed an Answer to the Amendment on June 18, 2018. GC Exh. 1(bbb). Respondent also filed a reply to the GC and Charging Parties' written opposition to its Motion to Dismiss. GC Exh. 1(fff). The ALJ denied Respondent's motion to dismiss on August 10, 2018.  GC Exh. 1(hhh). Thereafter, Respondent filed a request for special permission to appeal the ALJ's denial of its motion and, on September 21, 2018, the Board granted Respondent's special appeal and denied it on the merits, noting that the Judge did not abuse her discretion in denying Respondent's Motion to Dismiss the Amendment. GC Exh. 1(zzz).

### 3.    The ALJ correctly concluded that the Amendment was closely related to extant allegations and that Musk and Toledano violated the Act

At the outset, the GC notes that the Board has rejected the same procedural arguments raised in Respondent's Exceptions 2 through 4, 10 through 13, 18 through 54, when it denied the special appeal on its merits. GC Exh. 1(zzz). The only "new" evidence Respondent points to is that Moran, who was a low-level production employee with no experience in NLRB or other investigatory proceedings, did not mention the encounter to the GC until May 2018. Tr. 722:1-19. It is also worth noting that Moran is not a charging party in these proceedings. Respondent provides no basis to support its renewed contention that, at this juncture, the Board should reverse its correct holding that Section 10(b) did not prevent issuance of the Amendment.

22-60493.6199

a.    **The ALJ and the Board have properly concluded that Section 10(b) does not prevent issuance of the Amendment concerning the June 7, 2017 Musk and Toledano encounter [R. Exceptions 18-26]**

Section 10(b) provides: "Whenever it is charged that any person has engaged in … any such unfair labor practice, the Board … shall have power to issue … a complaint stating the charges in that respect …." It is well-settled that the "whenever it is charged" statutory language imposes a requirement that complaint allegations be "closely related" to charge allegations. See *KFMB Stations*, 343 NLRB 748, 748-749 (2004) and cases cited therein. This reflects the Board's principle that it does not have the authority to take action on its own initiative, but only *in response* to charges filed by others. See *Towne Ford Inc.*, 327 NLRB 193, 193, 198-199 (1998) (citing *NLRB v. Fant Milling Co.*, 360 U.S. 301, 307-309 (1959)).

Contrary to Respondent's assertion, this does not mean that the charge language needs to be identical and track each complaint allegation. Rather, the Board considers three factors in determining whether the complaint allegations are "closely related" to charge allegations in order to determine whether Section 10(b) of the Act prevents the issuance of a complaint: (1) whether the allegations involve the same legal theory; (2) whether the allegations arise from the same factual circumstances or sequence of events; and (3) whether the respondent would raise similar defenses to the allegations. See *Redd-I, Inc.*, 290 NLRB 1115, 1118 (1988). Thus, the threshold inquiry is whether there is an operative charge that encompasses the allegations contained in the Amendment.  *See Reebie Storage and Moving Co., Inc. v. NLRB*, 44 F.3d 605, 608 (7th Cir. 1995)

Here, the Board should affirm its conclusion that the allegations contained in the Amendment are closely related because they involve the same legal theories, they arise out of the same factual circumstances and sequence of events, and Respondent's legal defenses to the allegations are the same. First, concerning the legal theories involved, the allegations are closely

22-60493.6200

related because the unlawful conduct alleged and at issue involve the same 8(a)(1) section of the Act and, as the operative charges state, there existed an allegation concerning "interrogating employees" and "intimidating and harassing employees" in violation of Section 8(a)(1) of the Act.[23] The Board has often held that allegations of Section 8(a)(1) interrogations, solicitations of grievances, promises of benefit, as well as Section 8(a)(3) discharges, have been found closely related to timely filed charges of discriminatory suspensions where they all arose out of an employer's unlawful response to a single unionization campaign and were part of a single course of conduct aimed at precluding union activity. *Marriott Corp.*, 310 NLRB 1152, 1160 (1993).

Moreover, where an employer's acts are part of an overall plan to resist unionization, allegations arising out of such acts are deemed to "closely relate" to each other. *Jennie-O Foods*, 301 NLRB 305 (1991); *Marriott Corp.*, supra; *Heinick Corp.*, 301 NLRB 128 (1991). Here, the record established that the organizing campaign began in the summer of 2016. After the public launch of the campaign in the fall 2016, the campaign continued full steam ahead with Moran's February 2017 blog post (GC Exh. 8). The next day, Respondent violated the Act by unlawfully prohibiting distribution of union literature in non-working areas on non-working time, banned the wearing of union apparel, interrogated employees, culminating in the verbal and written warning to the same employee (Moran) who encouraged his coworkers to unionize on February 9, 2017, and the termination of another key employee (Ortiz) in the organizing campaign.

Respondent's unlawful conduct as alleged in the Amendment was part-and-parcel of the same organizing campaign and it's unlawful anti-union conduct during the same organizing campaign. Board law establishes that the Amendment allegations are closely related to the

---

[23] See e.g. GC Exh. 1(k) and 1(s). Respondent erroneously asserts that the GC could not rely on these charges because they were filed *prior to* the conduct on June 7, 2017, having been filed in April 2017. However, the *amended* charges were filed in July 2017, *after* the unlawful conduct.

19

allegations asserted in the timely filed unfair labor practice charges in these circumstances. See also, e.g., *Seton Company*, 332 NLRB 979 (2000). In contrast, the Board has found allegations to not be "closely related" when the allegations did not occur in the context of an organizing campaign. See, e.g., *Harmony Corp.*, 301 NLRB 578 (1991) (holding no factual nexus between interrogations and alleged discrimination because the interrogations occurred prior to the start of the organizing).

Respondent provides no compelling or persuasive support in extant law for its position that the ALJ abused her discretion in finding and concluding that the Amendment's allegations are not closely related to the allegations contained in the Second Amended Complaint. To create its patchwork of legally unsupported arguments, Respondent asserts that the first prong is not satisfied because solicitation of grievances and statements of futility "are not analyzed similarly to other allegations raised in the complaint." R. Bf. 6. However, the *Redd-I* test does not require that they be the identical theories but rather looks to, inter alia, whether they involve the same sections of the Act, as is the case here. See e.g. *Alt. Energy Applications, Inc.*, 361 NLRB No. 139, slip op. at 1 (2004) (claims closely related where the events involved the same sections of the Act, arose from the same sequence of events, the events were part of the same chronology and people).

Next, Respondent asserts that the second *Redd-I* prong has not been satisfied because it asserts that Respondent's unlawful June 7, 2017 conduct does not arise from the same factual or sequence of events as the allegations contained in a timely filed charge. R. Bf. 6. However, the second *Redd-I* prong looks to whether the conduct occurred generally in the same time period and with a similar object. *Alt. Energy Applications, Inc.*, supra.  For example, as the Board found in *SKC Electric, Inc.*, 350 NLRB No (2007), where there exists an allegation concerning an unlawfully motivated discharge (as is the case here), an interrogation of the same employee close

in time to the termination supported a finding, under the second prong of *Redd-I*, that the two were "factually related" – the same can be said here concerning the June 7 interaction with Moran and his ultimate suspension a few months later.

Respondent also relies on *Charter Communications, LLC*, 366 NLRB No. 46 (2018) to argue that "mere temporal proximity to union organizing is legally insufficient to establish […] relatedness." R. Bf. 7. Respondent completely ignores the facts as they were found by the ALJ. Musk called for the meeting in direct response to the employees' requests for safety-related information, their protected hand-billing concerning safety matters on May 24, 2017, and their delivery of a safety-related petition on June 6, 2017. Thus, the ALJ's conclusions were not merely based on a general assertion that the events were part of a generic organizing campaign but were rather based on the involvement of the same topical matters (safety) and the same actors (Toledano, Moran, and Musk). The Board has rejected arguments similar to those made by Respondent concerning the *Redd-I* second prong where "the allegations in the charges all relate[d] to the [r]espondent's reaction to the [u]nion's campaign and [an employee's] prominent role therein, and its attempt to thwart that campaign." *Metro One Loss Prevention*, 356 NLRB 89, 100 (2010).

Respondent then argues that the third prong of *Redd-I*, concerning its legal defenses, has not been met because it was deprived of notice and the ability to preserve evidence, citing *Desert Springs Hospital Medical Center*, 363 NLRB No. 185 (2016), *Pekowski Enterprises, Inc.*, 327 NLRB 413, 425 (1999) and *Machinists Local 1424*, 362 U.S. 411 (1960). However, Respondent misconstrues the third *Redd-I* prong, which only looks to whether a respondent would raise the

22-60493.6203

same or similar defenses as timely filed charges and not, as Respondent asserts, whether it was given the ability to preserve evidence.[24] Respondent can and did raise the same arguments.

Respondent's assertion that the Board should overrule the longstanding Board precedent of *Redd-I* should be rejected. As the Board itself noted in *Redd-I*, the Board has a duty to protect the public's right to hold Respondent accountable for its violation of the Act. *Redd-I*, supra at 1117-1118. Lastly, concerning Respondent's exception from a purported "refusal to allow [Respondent] to call Counsel for the General Counsel" as a witness (R. Exception 20), only the GC has the authority to give permission for his employee to testify in any proceeding.[25]

### b.     The June 7, 2017 Encounter violated Section 8(a)(1) of the Act [R. Exceptions 27-54]

Section 8(a)(1) prohibits employers from "soliciting employee grievances in a manner that interferes with, restrains, or coerces employees in the exercise of their Section 7 rights." *American Red Cross-Missouri-Illinois*, 347 NLRB 347, 351(2006). That manner includes implied or explicit promises during an organizing drive to correct the solicited grievances. *Uarco, Inc.*, 216 NLRB 1, 2 (1974). "The solicitation of grievances in the midst of a union campaign inherently constitutes an implied promise to remedy the grievances." *Capitol EMI Music*, 311 NLRB 997, 1007 (1993), enfd. 23 F.3d 399 (4th Cir. 1994); *Ken McKenzie's, Inc.*, 221 NLRB 489, 490 (1975) (quoting *Reliance Electric Company*, 191 NLRB 44, 46 (1971)) (employer without a practice of soliciting grievances violates Act by the mere solicitation of grievances during an organizing drive).

---

[24] There is no evidence in the record, such as testimony from Musk or a custodian of records, to establish that Respondent was not able to preserve evidence.

[25] 29. C.F.R § 102.118.  Unlike in *Leukemia and Lymphoma Society*, 363 NLRB No. 123 (2016) which Respondent asserts compels the Board to subpoena its own employee to testify concerning the Board's investigatory arm within the purview of the General Counsel, the instant case does not involve any allegation that a *Board agent* sought to expand the scope of an investigation. Moreover, there is no evidence in the record that Respondent even served a subpoena let alone seek to enforce such a subpoena, making the issue not properly before the Board.

22-60493.6204

Here, all of the credited evidence in the record points to the fact that Musk and Toledano solicited grievances from Moran and impliedly promised to remedy those grievances. The undisputed purpose of the Musk meeting was to meet with Moran concerning the Fremont facility workers' safety petition. It is also undisputed that during the meeting and in the days after the meeting, Respondent sought to address Moran and his coworkers' safety concerns through the creation of a safety committee and inviting Moran to participate in it. There is no evidence in the record that Musk ever had any meetings with any statutory employees, let alone on the topic of safety, *before* or even *after* the June 7, 2017 meeting.[26] Clearly, the only logical conclusion was that Musk and Toledano were seeking to solicit the employee's additional grievances and sought to remedy those. Indeed, one need not look further to the purpose than the Musk/Toledano written exchange, in which they plotted to solicit the employees' concerns as a means of thwarting their support for the Union, as a way "to turn adversaries" around from working "to pull in the UAW" to working "on the safety team full time." ALJD 37:5-9.

Likewise, Musk violated Section 8(a)(1) of the Act when he told Moran that employees don't have a voice with the Union, that the Union is a two-class system, and that if the safety committee meetings didn't work out, Musk would allow employees to unionize. Statements that are intended to inform an employee that their efforts to support or organize a union are fruitless violate Section 8(a)(1) of the Act. *Jones Plumbing Co.*, 277 NLRB 437, 440 (1985) (citations omitted); see also *Winkle Bus Co.*, *Inc*., 347 NLRB 1203, 1222 (2006). Indeed, statements by an employer asking employees for a "second chance" before allowing unionization has been found to violate Section 8(a)(1) of the Act. *Federated Logistics & Operations*, 340 NLRB 255, 268-69

---

[26] There is evidence that Musk and Toledano made good on their offer of an exchange of addressing employee safety concerns in consideration for the employees' dropping their support for the Union.  GC Exh. 55.

22-60493.6205

(2003) (statement that giving the company a second chance, and "you wouldn't need a third party in order to take care of your needs" violates Section 8(a)(1)); *Wake Electric Membership Corp.*, 338 NLRB 298, 306 (2002) (statement that employees should give the company another chance violated Section 8(a)(1)); *NLRB v. Schuler Engineering*, 309 F.3d 362, 370-71 (6th Cir. 2002) (statement asking "employees for time to deal with these problems and that they could  have another vote on the union in the future if they wanted" violates Section 8(a)(1) of the Act).  Here, Musk's conduct was compounded by the unlawful implied promise to remedy their grievances and thus the statements quoted akin to asking his employees to give him a "second chance."

Lastly, the Musk statements described above and Toledano's statement that "the majority of the workers at Tesla don't want a union and, you know, why do [you] want to pay for, why do [you] want to pay union dues?" Tr. 718:1-7, unlawfully implied futility in the workers' organizing efforts in violation of Section 8(a)(1). As the ALJ correctly noted, when taken as a whole, in context and given the purpose of the June 7 meeting and the statements made therein, Toledano and Musk's statements including that Musk said to Moran and Vega that he would "give you your Union" if the safety committee didn't work out (ALJD 36:3-4; Tr. 719) had the effect of informing the employees of the futility of their efforts. *Wellstream Corp.*, 313 NLRB 698, 706 (1994).

 While Respondent argues that the ALJ incorrectly applied *Shamrock Foods Co.*, 366 NLRB No. 117 (2016) and *Alamo Rent-A-Car*, 336 NLRB 1155 (2001) by finding that the Musk and Toledano statements violated Section 8(a)(1) merely because they were made during a period of organizing, this argument fails because the ALJ's conclusions were not based solely on the fact that the statements were uttered during an organizing campaign.  And while Respondent also argues that it had an established practice of addressing safety concerns, there is no evidence in the record that Respondent ever met with employees in this manner to address their safety concerns,

24

let alone conducting meetings between its top executives and low-level employees.  Respondent's

claim that Musk and Toledano simply wanted to understand safety concerns is wholly unsupported

by the credited evidence.

### E.     Musk's May 20, 2018 Tweet Violated Section 8(a)(1) of the Act [R. Exceptions 7-13, 55-74, and 160-166]

#### 1.     Musk's unlawful May 20, 2018 tweet

Musk is the Respondent's Chief Executive Officer (CEO). GC Exh. 1(ooo). Musk has a

verified Twitter handle (@ElonMusk), meaning Twitter identifies his account as authentic. ALJD

72:18-30. During the relevant time period, Twitter had nearly 157 million daily active accounts

with over 336 million users and Musk himself had nearly 23 million followers.[27] ALJD 72:18-22;

Jt. Exh. 4-1:1. On May 20, 2018, Musk tweeted:

> Nothing stopping Tesla team at our car plant from voting union.  Could do so tmrw if
> they wanted.  But why pay Union dues & give up stock options for nothing? Our safety
> record is 2X better than when plant was UAW & everybody already gets healthcare.

GC Exh. 56. The same day on May 20, 2018, Musk tweeted, in reference to the Fremont facility

organizing campaign and the termination of lead union supporter Richard Ortiz:

> About 2% of Tesla, incl salaried & hourly, union and non-union were let go in annual
> review.  Only known union person fired was a guy who repeatedly threatened non-union
> supporters verbally & on social media & lied about it.

*Id.* Three days later on May 23, 2018, Musk tweeted:

> Exactly.  UAW does not have individual stock ownership as part of the compensation at
> any other company.

ALJD 72:5-6. The record is devoid of any further tweets by Musk concerning he meant by his

unlawful May 20, 2018 tweet. Due to the nature of Twitter, it is impossible to identify or determine

---

[27] During the relevant time period, only 82 people (out of 336 million users) had more followers
than Musk.

22-60493.6207

the exact number of individuals who viewed the widely reported unlawful tweet. ALJD 73:23-31.

The tweets were widely republished and disseminated via news outlets and social media. *Id.*

> ### 2. Musk's May 20, 2018 tweet unlawfully threatens employees with a loss of their stock benefits if they supported the Union in violation of Section 8(a)(1)

Musk violated the Act by threatening employees with a loss of benefits (stock options) and

his threat was not based on objective facts. It is beyond dispute that an employer violates Section

8(a)(1) of the Act by threatening employees with adverse consequences for engaging in union

activities. *Martech Med. Prod., Inc.*, 331 NLRB 487, 500 (2000) (citing *NLRB v. Gissel Packing

Co.* 395 U.S. 575, 618-19 (1969); see also *Cumberland Farms Dairy of New York*, 258 NLRB 900,

905 (1981), enfd. 674 F.2d 943 (1st Cir. 1982). Subject to the First Amendment and Section 8(c)

of the Act, Section 8(a)(1) prohibits employer conduct that has a reasonable tendency to coerce

employees in the exercise of their Section 7 rights. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618

(1969). The test for a violation of Section 8(a)(1) is whether, under the circumstances, the

employer's conduct reasonably tended to restrain, coerce, or interfere with employees' rights

protected by the Act. *Mediplex of Danbury*, 314 NLRB 470, 472 (1994); see also *Rossmore House*,

269 NLRB 1176, 1177 (1984). This standard is objective, which does not require any showing of

motive or intent.[28] *KSM Industries*, 336 NLRB 133, 133 (2001); *Sunnyside Home Care Project*,

308 NLRB 346 fn. 1 (1992); *El Rancho Market*, 235 NLRB 468, 471 (1978).

Under settled Board law, employer statements threatening to take away benefits, including

stock benefits, if employees choose to unionize violate Section 8(a)(1) of the Act. *KSM Industries*,

336 NLRB 133 (2001); *Ready Mix, Inc.*, 341 NLRB 958, 960 (2004); *Ausable Communications*,

---

[28] To the extent Respondent argues that an employee's subjective reaction to a statement should be considered or govern whether a violation exists, such an argument must be outright rejected as Board law is clear that the applicable test is an *objective* test.

22-60493.6208

273 NLRB No. 166 (1985); *Dyncorp*, 343 NLRB 1197 (2004). Here, Musk offered no reason why Respondent would strip employees of their stock options other than the plain and unambiguous meaning of Musk's tweet: "why pay union dues & give up stock options for nothing?" There is only one conclusion an employee reading Musk's May 20, 2018 tweet would reasonably reach— that the loss of stock flows inevitably from the decision to unionize. Simply put, the tweet tells every employee that if they work for Respondent and are seeking to organize or vote for the Union, they *will* lose their stock options. Musk published the tweet to thousands of his employees and to millions of other employees.[29]

To the extent Respondent argues that Musk's tweet was lawful because it is based in fact, such an argument must be rejected by the Board because there is no evidence in the record to support such an assertion. Unlike *TNT Logistics North America*, 345 NLRB 290, 290-91 (2005)[30] and *Rospatch Corporation*, 193 NLRB 772 (1971) where the Board held that an employer's statements did not violate the Act because its statements were based on objective facts that supported the prediction, any reading of the tweet demonstrates that Musk failed to make any such showing at the time his threat was made. Respondent cites to *NLRB v. Pentre Ele.*, 998 F.2d 363, 371 (6th Cir. 1993) and other cases like it to argue the contrary positions both that there exists no requirement that an employer present evidence to corroborate its predictions and that Musk's

---

[29] Respondent argues that the statement cannot violate the Act because it was ambiguous and isolated in nature, citing *Pease Co.*, 666 F.2d 1044, 1048 (1981). As to the latter point, in *Pease*, the Sixth Circuit noted that the statement was isolated in nature because the statement at issue was only published to *two* people. Given that Musk's statement was admittedly published to the millions within his reach on Twitter, the instant case is easily distinguishable.

[30] In *TNT Logistics*, the Board overruled a post-election objection that a supervisor's comments regarding potentially losing a contract was a lawful prediction based on the objective fact that the contractor was not a union friendly company. The instant case is far from *TNT Logistics*. Respondent proffered no evidence in support of the proposition that, as noted in Musk's subsequent tweets, that the Union does not seek stock benefits or that Union-represented employees are not eligible for stock equity.

22-60493.6209

statement was a prediction based on independent evidence of consequences. Musk's statement was vastly different. Unlike in *Pentre*, supra at 361, where the employer's started by telling employees that it was *unsure* if it would have the same customer base if unionized, Musk told employees, as a foregone conclusion, that they would lose their stock options if they supported a union.

Respondent also argues that Musk and Respondent "cured" the violation by explaining it away.  Three days after his tweet, Respondent contends that Musk effectively retracted the unlawful statement by making the response to a statement made by user @dmatkins137 "Exactly. UAW does not have individual stock ownership as part of the compensation at any other company." Jt. Exh. 4.  Respondent also asserts that it issued a press release containing a statement that cures the unlawful nature of the tweet by explaining Musk's "objective" basis for making the statement.[31] However, Respondent provides no legal support for its position that statements made *several days later* and by a press spokesperson (i.e. not the original utterer of the unlawful statement) constitute an "objective" prediction or otherwise "cure" its unlawful effect.

Respondent ignores that what divides protected predictions under Section 8(c) from prohibited threats of reprisal is whether the employer's speech contains an "implication that [the] employer may or may not take action *solely on his own* initiative for reasons unrelated to economic necessities and known only to him." *Gissel*, supra 395 U.S. at 618. Musk's statement falls squarely within this framework because whether employees (whether union or not) are eligible for their employer's stock options falls squarely within the control of Respondent (and Musk as CEO).

---

[31] R. Exh. 45. The statements made by Respondent's spokesperson are contained in R. Exh. 45, which were reported in a blog titled and merely states that a "Tesla spokesperson" sought to explain away Musk's tweet.  The GC also notes that the UAW disputes the veracity of Respondent's statement as it is also quoted, in the same articles, as stating that the UAW has no policy disallowing employee stock options in its collective bargaining agreements. *Id.*

22-60493.6210

To the extent that Respondent argues that a finding of liability is equivalent to an attempt by the government to "impose liability on Tesla for a widely broadcasted statement on a matter of public concern," such an argument has no support in the law. Respondent cites to *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703 (9th Cir. 2009) for the proposition that Respondent cannot be held liable here because Musk's comment is a matter of public concern and thus protected by the First Amendment. The instant case is also easily distinguishable. First, the *Rodriguez* case is not a case analyzing any portion of the Act as it was a Title VII[32] employment discrimination case. Second, the *Rodriguez* decision involved the sending of emails concerning a local community "Dia de la Raza" event, a matter of public concern. Under Respondent's reasoning, the Board would have to conclude that all instances of Section 7 activity involve matters of public concern and thus not protected by the Act. Such a position is unsupported by longstanding Board precedent, including *Gissel*, which have consistently held that in this exact context (where an active and ongoing organizing drive exists), an employer (or union) can and will violate the Act by making, for example, threats of a loss of benefits. Third, even if the rationale of *Rodriguez* applied to the context of unfair labor practices, as even the court noted in *Rodriguez*, "[i]n the context of a supervisory relationship, advocacy of discriminatory ideas can connote an implicit threat of discriminatory treatment and *could* therefore amount to intentional discrimination." *Rodriguez,* supra at 710 (emphasis in original). Likewise, Respondent can be held liable for Musk's unlawful threats because Musk is an admitted supervisor and is Respondent's highest-ranking executive.

Respondent's argument that the finding that the May 20, 2018 tweet violates Section 8(a)(1) of the Act amounts to an unlawful content-based restriction upon Musk's First Amendment

---

[32] 29 U.S.C. §§ 2000e et seq.

22-60493.6211

rights is wholly without merit.  Respondent relies on *Frisby v. Schultz*, 487 U.S. 474, 485 (1988), a case that *does not* analyze the Act and holds no persuasive weight to the instant query. Moreover, Respondent fails to accept or acknowledge that the Supreme Court has *repeatedly* upheld one of the core principles in *Gissel*, that the Board has the power to regulate employer speech.  See e.g. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 421 (1992). Indeed, the Court has done so because it recognizes that the First Amendment's protections are made "in the context of [the employer's] labor relations setting … [and] must take into account the economic dependence of the employees on their employers." *R.A.V.*, supra at 429 (Stevens, J., concurring) (internal quotations omitted), citing *Gissel*, supra at 617.

Lastly, Respondent argues that the Board's should acknowledge that Twitter communications are limited to 280 characters in assessing a Section 8(a)(1) allegation.  It essentially argues that employers be allowed to threaten employees so long as the threats are limited to 280 characters. This flawed argument fails on multiple grounds.  But as a threshold matter, it ignores the reality of Twitter, which allows users to send multiple tweets, at will. For example, though it is true that Musk is limited to 280 characters, he is not limited in the number of tweets and could have availed himself of that ability by, for example, tweeting multi-part tweets, as millions of other users do.  For these reasons, the ALJ's finding of a violation should be upheld. ALJD 75:28-29.

### F.    The ALJ Correctly Concluded that Respondent Violated Section 8(a)(1) and (3) of the Act by Disciplining Jose Moran and Terminating Richard Ortiz Because of Their Protected Concerted Activities and Support for the Union [R. Exceptions 1-6, 10 through 13, 75-121, and 160-166]

In her ALJD, the ALJ concluded that Ortiz and Moran were engaged in protected, concerted activities when they used the Workday system to look up employees, took screen shots, and posted the screen shots onto the private organizing Facebook group.  ALJD 65:4-66:21.

22-60493.6212

Concerning the use of Workday, the ALJ concluded that Moran's use did not lose protection of the Act because Moran's access was limited to employee names and job titles, matters that were not private, confidential or otherwise stolen.  ALJD 66:28-34.  Concerning Ortiz' lying to protect Moran's identity as the source of the screenshots, the ALJ concluded that Ortiz did not lose protection of the Act because Ortiz "was under no obligation to respond to questions to uncover protected activities."  ALJD 66:38-39.  Alternatively, and even if Moran and Ortiz's Workday use and lying were not protected, the ALJ concluded that the GC met his burden of establishing a prima facie case that Moran and Ortiz had engaged in Union activities, that Respondent knew of those activities, and that Respondent had animus towards Moran and Ortiz for their Union support.  ALJD 67:22-71:8. The ALJ also concluded that Respondent failed to meet its burden under *Wright Line* to demonstrate that it would have taken the same action in the absence of protected conduct.  For the reasons stated below, the Board should uphold the ALJ's conclusion that the GC met his burden to prove that Ortiz and Moran were terminated and disciplined, respectively, in violation of Section 8(a)(1) of the Act, alternatively, that they were terminated and disciplined, respectively, in violation of Section 8(a)(3) of the Act.  ALJD 65:2-71:8.

### 1.    Facts concerning the unlawful Ortiz termination and Moran discipline in October 2018

#### a.  Ortiz and Moran's protected concerted and Union activities[33]

In the summer of 2016, Moran contacted UAW organizers Susan Reed and Jorge Fernandez to discuss unionizing Respondent's Fremont facility. ALJD 8:22-27; Tr. 673:12-674:10. The initial organizing steps led to the creation of a voluntary organizing committee (VOC), which consisted of employees who acted as "lead organizers." ALJD 8:29-32. The VOC regularly held meetings in which employees discussed their working conditions, including, inter alia, health

---

[33] The analysis regarding Respondent's unlawful interrogations contained in Section G.

22-60493.6213

and safety concerns, compensation, and job promotions. ALJD 8:32-34. Among the members of the VOC were Fremont facility employees Moran and Ortiz. ALJD 8:34-35; Tr. 431:4-9. Throughout the campaign, Moran and Ortiz were among the most active supporters of the Union, engaging in numerous Section 7 activities including leafletting, wearing and distributing union paraphernalia to other Fremont facility coworkers, and circulating and delivering petitions concerning workplace working conditions. ALJD 8:38-9:4.

After taking its first steps, the organizing campaign continued through 2016, including the developing of a campaign strategy and selection of a campaign name (Fair Future at Tesla) and an online presence. (ALJD 9:6-7). Moran also created a Facebook page called "Jose Organizer" (Tr. 674:24-675:8) and a private Facebook group comprised of Fremont facility bargaining unit employees titled "Tesla Employees for UAW Representation."[34] The campaign created a separate public Facebook group called "Fair Future at Tesla" and a public website. ALJD 9:7-9.

Starting in February and continuing throughout the summer of 2017, Moran, Ortiz, and others ramped up the campaign, including the beginning stages of outreach to members of the California legislature concerning their working conditions.  ALJD 9:18-21; GC Exh. 8. Then, on February 9, 2017, the organizing went into a full-on sprint with a blog post by Moran on medium.com followed by the first informational leafletting which occurred on February 10, 2017. ALJD 9:23-35; 15:34-20:28. Respondent's response to its workers' exercising their Section 7 rights was swift and merciless. Immediately after Moran's blog advocating for unionizing and better working conditions, Musk publicly labeled Moran (a longtime employee of Respondent) a salt, accused Moran of being an "agitator," and referred to the workers' organizing efforts as

---

[34] Tr. 675:9-18. The employee-led organizing Facebook group is private, the content of which is only visible to members of the group and is comprised of statutory employees. Tr. 675:19-676:9. Ortiz and Moran are administrators of this Facebook group. Tr. 434:4-8; 676:1-5.

22-60493.6214

"morally outrageous." ALJD 9, fn. 9; GC Exh. 59. When workers began their informational leafletting campaign on their own time at the Fremont facility parking lot, Respondent and its agents violated the workers' Section 7 right to engage in leafletting.[35] Musk's offensive against his employees' efforts to unionize continued on February 24, when he sent an email to *all* employees referring to their efforts to promote the UAW as "morally outrageous," essentially accusing his pro-union employees as lacking loyalty. ALJD 10:2-14; R. Exh. 2. This conduct continued through the Spring of 2017 when, for example, a supervisor threatened employees with termination if they distributed union stickers, leaflets or pamphlets without prior approval.[36]

Moran, Ortiz and others pro-union supporters again engaged in information leafletting. Their efforts were again met with Respondent's commission of additional unfair labor practices in connection with the employees' May 24, 2017 leafletting[37] (ALJD 20:1-21:6) and its interrogation of Ortiz and Galescu (ALJD 27:14-32:2). During the spring and summer of 2017, Ortiz and Moran signed, circulated, and delivered petitions to management concerning their working conditions and desire to unionize. ALJD 8:40-9:1; 34, fn. 52. The petitions included the same health and safety petition which led to Respondent's unlawful solicitation of grievances, statement of futility, and implied promises to remedy their grievances on June 7, 2017 involving Musk, Toledano, and Moran. See Section II.E.1.

---

[35] Respondent has not filed exceptions to the ALJ's findings that it violated the Act in numerous ways in connection with the actions of its agents concerning the employees' February 10, 2017 leafletting. See R. Bf., fn. 1.

[36] Respondent also has not excepted to the ALJ's findings concerning the conduct of its supervisor Armando Rodriguez on March 23, 2017. See R. Bf., fn. 1.

[37] Respondent has not filed exceptions to the ALJ's findings concerning the conduct of its agents on May 24, 2017 in connection with the employees' leafletting at the Fremont facility parking lot. R. Bf., fn. 1.

22-60493.6215

The Fremont facility Union and protected concerted activities were not limited to actions at the Fremont facility.  Indeed, as early as January 2017, the campaign was actively seeking out assistance from members of the California legislature in connection with the pro-union organizing at the Fremont facility. GC Exh. 8-002. The workers' protected activities continued through the summer of 2017, when Ortiz and others traveled with the Union to meet with legislators concerning adding language to an electric vehicle rebate program to tie rebates to Respondent's being "fair and responsible" and ensuring workplace safety for Fremont facility workers. ALJD 51:39-43. Ortiz and other VOC members' activities courting legislators to their plight was posted on the *public* "Fair Future at Tesla" Facebook group. ALJD 51:43-45. Immediately following their meetings with legislatures, the California State Assembly held public hearings on September 13 and 14, 2017, to, inter alia, discuss the proposed language. ALJD 52:1-3. During the public hearings, the State Assembly members publicly stated that it was their intent that, prior to certifying Respondent's vehicles for tax rebates, the California Labor Secretary would have to certify that Respondent treated its employees "fair[ly] and responsibl[y]". ALJD 52:3-9.

Respondent also participated in the same public hearings. At the request of Toledano, Hedges hand-selected and transported employees to support Respondent in its endeavor to counter the workers' efforts to secure better working conditions. ALJD 54:21-28. One such employee was Travis Pratt, who testified during the hearing that he was a level 2 maintenance technician for Respondent at the Fremont facility and made a gross annual income of $130,000. ALJD 52:12-14. Respondent did not call Pratt as a witness in the hearing.

> **b.    A means to an end: Respondent's investigation of Jose Moran and Richard Ortiz**

After the hearings, Ortiz was contacted by the Union who asked him about the employees that testified publicly. ALJD 52:16-20. Ortiz tried, but failed, to open a video recording of the

22-60493.6216

public hearing. ALJD 52:22-23. Ortiz contacted Moran for his help in identifying the employees who testified at the State Assembly hearing. ALJD 52:23-25. Moran watched the video, wrote down the employees' names, and then logged onto Workday[38] via his personal cell phone using personal log-in credentials that were provided to him by Respondent. ALJD 52:27-29. Moran did so by typing in the employee's name into a "search" feature, as he had previously done. ALJD 52:32-34. Moran only accessed information to which Respondent gave him (and all others) access; he did not engage in digital burglary or theft. Tr. 724:11-13.

Next, Moran sent Ortiz screenshots of three employees' Workday profiles (Jean Osbual, Shaun Ives and Travis Pratt). ALJD 53:3-4. Ortiz took the screenshots of Ives and Osbual and posted them onto the private Fremont facility employee Facebook group called "Tesla Employees for UAW Representation." ALJD 53:5-8. Ortiz also commented:

> These guys been in Sacramento saying we are lying about how things are at Tesla Management has been taking them one of them sez [sic] he made $130000 last year How many of you make … overtime This just proves how much kissing ass and ratting on people get you at Tesla and the ones that do the real work get passed over.

ALJD 53; GC Exh. 28. Quickly, Ortiz removed the post after Pratt sent him an email stating:

> Say what you like about me behind closed doors … I made what I did last year almost entirely as a level two maintenance technician, which is where several of your colleagues from production now find themselves.  I wish you luck, but know there will be a lot of us on the other side.  Starting with name calling may not be the approach you want to take.[39]

---

[38] Workday is a third-party system licensed by Respondent for a variety of functions. Tr. 671:18-21. Respondent never told any employee that their use of Workday was restricted in any way. ALJD 52:36-37, fn. 76.

[39] ALJD 53; GC Exh. 80.

22-60493.6217

Pratt proceeded to send a text message to Hedges with a screen shot of Ortiz's Facebook post. ALJD 53:29; GC Exh. 28. In his first message to Hedges, Pratt merely stated, "Looks like we got under some people's skin. 😊" Hedges responded, "Wow. This is on Facebook?" Pratt responded, "Yea lol I'm pretty sure it's on their fair future at Tesla thing."[40] Besides the text messages, Hedges spoke with Pratt over the telephone. According to Hedges, Pratt purportedly informed him that the text message was from "a friend." ALJD 54:5-19. Though Pratt curiously expressed the *opposite* feelings via text message (the only preserved documentary evidence), Hedges incredibly testified that *over the telephone* Pratt stated that he felt "targeted." Indeed, even in his later written communications with Respondent's investigator, Pratt *never* stated he felt targeted or intimidated by the Ortiz post (GC Exh. 80) and even the final written report concerning the termination and discipline merely states that Pratt's concern was that his Workday was an internal system intended for work purposes and not for distribution on social media. CP Exh. 4.

Hedges referred the matter to Ricky Gecewich, Employee Relations[41] partner, including showing Gecewich the text messages between Hedges and Pratt. ALJD 54:30-55:3. Gecewich was no stranger to Moran and Ortiz's organizing efforts as he was aware as early as July 2017 of the organizing campaign.[42] GC Exh. 70. Gecewich began an investigation concerning Ortiz's Facebook post. Though Gecewich spoke with Pratt, Pratt did not tell Gecewich that he felt "targeted," as Hedges testified. Rather, Pratt identified the source of his feelings as the public

---

[40] Hedge's full communication with Pratt was not part of the record in GC Exh. 28 because Pratt asserted that he no longer had possession of his phone with the message. ALJD 53:41-54:3.

[41] The Employee Relations Department is charged with handling some types of workplace investigations at Respondent's facilities. Gecewich was responsible solely for workplace investigations. ALJD 55:5-22.

[42] Among the many instances in the record supporting the ALJ's finding that Gecewich lacked credibility in several key aspects was Gecewich's incredible under-oath denial of knowledge of the organizing campaign (and Ortiz and Moran's prominent role therein) prior to the Ortiz/Moran investigation. ALJD 56, fn. 85; GC Exh. 70.

22-60493.6218

identification of his salary (which Pratt himself had already disclosed in his public testimony) as well as the use of his picture and name. ALJD 55:24-56:1. Pratt also stated his belief that Ortiz's comment about people sucking up at Tesla was not appropriate (ALJD 56:1-3) and told Gecewich that Ortiz had already taken down the post. ALJD 56:7-9. Notably, Gecewich never asked Pratt what he meant by "Looks like we got under some people's skin" with a smiling face and eyes/rosy cheek emoji.  ALJD 56:3-5. Gecewich also never inquired of Pratt about his use of Workday or whether Pratt had ever shared the information he was concerned with (his name, job title, or salary) publicly. ALJD 56:7-9. Next, Gecewich spoke with Bryan Kostich, the individual who sent Pratt the screenshot of Ortiz's Facebook post. ALJD 56:11-12. Kostich confirmed to Gecewich that the Ortiz Facebook post was made in the Fremont facility non-public, employee-only Facebook group. ALJD 56:11-16. Gecewich, a trained investigator formerly employed as an investigator by the United States Air Force (Tr. 178819-1789:3) who was purportedly concerned at this moment with the external sharing of Workday information, did not investigate the privacy settings of the Facebook group where the information was posted. ALJD 56:16-20. Gecewich did not ask Kostich about his usage of Workday. ALJD 56:20.

### c.     The unlawful interrogations of Moran and Ortiz

On September 21, 2018, Gecewich met with Ortiz, who wore his UAW shirt and pin to the one-on-one meeting. ALJD 57:3-5. Gecewich started the meeting by showing Ortiz a copy of the Facebook posting and Ortiz *immediately* admitted that he posted the message and apologized, telling Gecewich that he removed the posting as quickly as possible after he was contacted by someone. ALJD 57:7-9. Had Gecewich been concerned about the purported "targeting" of an employee, the inquiry would have ended there. Gecewich's questioning of Ortiz, though, continued into his use of Workday and the source of the screenshot. ALJD 57:11-20. When asked, Ortiz did not reveal the source.  The interaction ended.

22-60493.6219

Despite already having an admission concerning the posting and having no practice or policy regarding the usage or monitoring of usage by employees of their Workday access, Gecewich proceeded to request Workday logs concerning the access of the profiles of Pratt and Ives, which resulted in his determination that Moran took the screen shot. ALJD 57:21–58:19. By this point, the investigation was being monitored not just by the head of Employee Relations, but by the Chief People Officer herself, Gaby Toledano. ALJD 58:2–7; GC Exh. 81. Had Gecewich's investigation been motivated by a desire to determine who had "targeted" an employee through the Facebook posting, his investigation into Workday usage would have ended there.  However, Gecewich took the additional step of pulling the data concerning Moran's usage of Workday as a whole. ALJD 58:13–19; GC Exh. 79, 81.

Gecewich next met one-on-one with Moran in a conference room on October 12, 2018. ALJD 58:23. At this point, Gecewich stated he was investigating a concern regarding Workday usage, proceeding to ask Moran a series of questions regarding his Workday usage. ALJD 58:23–31. Gecewich then broached the topic of Ortiz Facebook posting and asked Moran *why* he took the screenshots, a question that Moran answered truthfully by stating that it was about determining whether the individuals who testified in support of Respondent at the public hearing were, in fact, Respondent's employees. ALJD 32–36. Gecewich then took the unusual step of asking Moran to search through his phone and on Facebook for the screenshot (which was already in his possession) in his presence. ALJD 59:1–10. Moran, who admitted that he took the screen shots and sent them to Ortiz, was unable to find the screenshots and, after about an hour, the meeting concluded. *Id.*

After his meeting with Moran, Gecewich met one-on-one with Ortiz, who again wore his Union shirt. ALJD 59:14–15. Despite having already admitted to the posting, Gecewich began his interrogation again by discussing the post. ALJD 59:15–17. Next, despite already knowing that

22-60493.6220

Moran was the source of the screen shots, Gecewich again asked Ortiz for the source, who admitted that Moran sent the screenshots. ALJD 59:17-25. Ortiz explained that his actions were borne from a desire to protect other employees, including Moran, from termination. ALJD 59:20-25. Indeed, in his report, Gecewich explicitly stated that Ortiz "lied to protect the source of the Workday screenshots, Jose Moran." GC Exh. 62-001.

### d.    The October 18, 2018 termination of Ortiz and October 19, 2018 discipline of Moran

As discussed in more detail below in Section G, Gecewich's investigation included unlawful interrogations of Ortiz (on September 21 and October 12, 2018) and of Moran (on October 12, 2018). After his unlawful interrogations, Gecewich drafted a report of investigation and recommendation to terminate Ortiz and discipline Moran. GC Exh. 62. Respondent's stated reason for the Ortiz's termination is clear and undisputed: that he lied to Gecewich during a workplace investigation in order to protect Moran's identity. GC Exh. 62. Notwithstanding that there existed no policy or practice restricting Workday use to "non-business related purposes," it is undisputed that Respondent's stated reason for disciplining Moran was because he used "Workday for non-business related purposes."

While Gecewich claimed that he was unaware of the workers' organizing campaign, the ALJ properly discredited him. Indeed, though Gecewich claimed he never sought to learn about the employees' Section 7 activity with their elected representatives, that he ever visited the Facebook organizing campaign group page and denied all knowledge of organizing activities, the record reflects otherwise as an early version of his report references the union activities. ALJD 61, fn. 97; 62, fn. 100;64:24-33; GC Exh. 86.

22-60493.6221

Seeking to further veil its unlawful acts, Respondent involved Stephan Graminger[43], Director for Body Manufacturing at Respondent's Fremont facility because Gecewich and Hedges knew that both Ortiz and Moran were involved in the Union and sought to involve someone who was attenuated to Ortiz and Moran. ALJD 60:37-61:5. Graminger consulted with another executive and ultimately accepted Gecewich's termination and discipline recommendations, later implemented by Gecewich on October 18 and 19, 2018. ALJD 62:19-63:3.

Despite employing nearly 40,000 employees, the *only* comparator was the termination of a high-level senior executive at a subsidiary for lying about the use of drugs and alcohol as well as a sexual relationship with a subordinate. (ALJD 62, fn. 100). There are no comparators concerning any form of investigation or discipline concerning Workday use.

> **2.** **Board law Supports the ALJ's Conclusions that Respondent Violated Section 8(a)(1) of the Act by Terminating Ortiz and Disciplining Moran Because of their Protected Activities or, Alternatively, that Respondent violated Section 8(a)(3) of the Act by Terminating Ortiz and Disciplining Moran due to Their Support for the Union**
>
> > **a.** **The ALJ correctly concluded that Respondent's termination of Ortiz and discipline of Moran violated Section 8(a)(1) of the Act [R. Exceptions 75-80, 82-83, 85-87, 97-98, 100-108, 115, & 160-166]**

Under Section 7 of the Act, employees have a right to engage in "concerted activity" by assisting labor organizations, to bargain collectively, or for their mutual aid or protection. 29 U.S.C. § 157. Board law holds that activities "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself" are concerted within the

---

[43] When Gecewich met with Graminger, he told Graminger that the matter concerned the "leak[ing of] some internal information out of Workday including some telephone number and personal information and posted in on Facebook." (Tr. 1288). Again, there was no mention of any employee (Pratt) complaining of being targeted or harassed. ALJD 61:30-32.

22-60493.6222

meaning of the Act.[44]  The test for determining whether activity is "concerted" is objective.  *Fresh & Easy Neighborhood Market*, 361 NLRB 151, 154 (2014).  As was the case here, the Board has consistently held that actions by an employee are "concerted" where they are done so to promote the mutual aid and protection of employees at their workplace or for all employees.[45]

Here, Moran's use of Workday and Ortiz's post on Facebook were both concerted activities within the meaning of Section 7 of the Act.  The context of their activity is key.  Moran did not use Workday for his own personal edification but send it to his coworker so they could determine whether the witnesses Respondent put forward as its employees were, in fact, employees.  Here, the workers were engaged in lobbying their elected representatives for protections that would directly affect their terms and conditions of employment, a state law requiring Respondent to comply with labor law in order for its products to be eligible to receive state tax rebates.  Concerning Ortiz, his Facebook post directly discussed Respondent's efforts to counter the workers' activities and a core working condition: compensation.  Viewed in this context, the ALJ's conclusion that both Moran and Ortiz were engaged in actions that were for the mutual aid and protection of all employees was supported by the record evidence and Board law.

Next, the ALJ correctly concluded that neither Moran nor Ortiz lost protection of the Act.  ALJD 66:21-67:3. As to Moran, Respondent's stated reason for disciplining Moran was his use of

---

[44] *Meyers Industries (Meyers I)*, 268 NLRB 493 (1984), remanded sub nom. *Prill v. NLRB*, 755 F.2d 941 (D.C. Cir. 1985), cert. denied 474 U.S. 948 (1985), on remand *Meyers Industries (Meyers II)*, 281 NLRB 882 (1986), affd. sub nom. *Prill v. NLRB*, 835 F.2d 1481 (D.C. Cir. 1987), cert. denied 487 U.S. 1205 (1988).

[45] See *Kaiser Engineers*, 213 NLRB 752 (1974) (employee letters to legislators opposing relaxing of immigration restrictions for engineers); *Bethlehem Shipbuilding Corporation Ltd. v. NLRB*, 114 F.2d 930 (1st Cir. 1940) (employee appearances on behalf of their coworkers before legislative committees); *Triple Play Sports Bar & Grille*, 361 NLRB 308, 308–309 (2014) (Facebook communications between employees complaining about employer tax withholding error constituted " 'concerted activities' and they were 'for the purpose of . . . mutual aid or protection'"); *North West Electric Cooperative*, 366 NLRB No. 132, slip op. at 1, fn. 1 (2018).

22-60493.6223

Workday – the same activity that the ALJ found was both protected and concerted activity.  Thus, the ALJ's conclusion that his discipline violated Section 8(a)(1) if the Act necessarily flowed from such a finding.  Basing her conclusions on the record evidence and credibility resolutions, the ALJ expressly rejected Respondent's assertions that Moran's use of Workday resulted in his loss of protections.  Specifically, the ALJ noted that Respondent never had a rule governing the use of Workday until it was used for concerted activity, that Moran *did not* engage in any form of digital burglary, and that Moran's use was limited to employees' names and job titles, information which is neither private nor confidential. ALJD 66:21-34.  Here, Respondent's arguments that Moran's access was surreptitious must be rejected because they are unsupported by the record evidence. Moran's actions were nothing more than the digital version of an employee looking at a company directory, such as an employee using the Microsoft Office address book to look up a coworker's job title and name in the company directory.  Indeed, in *Ridgely Manufacturing Co.*, 207 NLRB 193 (1973), the Board made a distinction between whether an employee's use of information contained in timecards that were located next to an openly available timeclock were either private or confidential (and thus their use would not be protected) with whether the information was available to all employees in the normal course of their work relationship.  *Ridgeley*, supra at 197. Because the employee used information that was available to all employees, the *Ridgely* Board found the employee's use of such information did not lose protection of the Act and therefore the discharge was unlawful.  Similarly, in *Gray Flooring*, 212 NLRB No. 107 (1974), the Board found unlawful a discharge where an employee took index cards with employee names/telephone numbers from a supervisors desk, noting that there existed no announced policy (as is the case here concerning Workday use) regarding the access of such information and (as is also the case here) the employee's use was not surreptitious because the cards were not maintained in a place such as

42

to suggest that the employer meant the information to be confidential or private. Both *Ridgeley* and *Gray Flooring* compel the conclusion that Moran's conduct did not lose protection of the Act.

As to Ortiz, Respondent's stated reason for terminating Ortiz was because he lied to an investigator concerning the source of the Workday screenshots in order to protect Moran's identity. Rather than out Moran, he said he did not know where the photos came from. ALJD 57:15-17; Tr. 1823. Board law is clear that an employee lying during the course of an investigation to concern his (or another's) concerted activities is, in and of itself, protected. *Tradewaste Incineration*, 336 NLRB 902, 902 (2001); *St. Louis Car Co.*, 108 NLRB 1523, 1525-26 (1954). Unsurprisingly, Respondent argues that Ortiz's lying was unprotected because it is within Respondent's business judgment alone to decide to fire an employee who lied during an investigation (R. Bf. 43), citing *Cellco Partnership v. NLRB*, 892 F.3d 1256 (D.C. Cir. 2018). However, the instant case is distinguishable because the lying at issue here was to conceal Section 7 activity unlike what the court found in *Cellco*, which was not related to protected concerted activities. Because Respondent realizes that longstanding Board precedent supports the ALJ's conclusions, Respondent argues that the Board should apply a bright line rule that all lying will justify terminations. Such a position would see the Board abdicate its role of protecting employees' right to engage in concerted activities free from intrusion from their employers and thus must be rejected.

Lastly, to the extent Respondent argues that the GC failed to show animus concerning Moran and Ortiz's concerted activities as they relate to the Section 8(a)(1) theory, this is unavailing. Respondent ignores that its admitted reasons for the termination and discipline themselves demonstrate the unlawful motive. Thus, because Moran and Ortiz were engaged in concerted activities that did not lose the protection of the Act, their termination and discipline, respectively, violates Section 8(a)(1) of the Act.

43

**b.    Alternatively, the ALJ also correctly concluded that Respondent's termination of Ortiz and discipline of Moran violated Section 8(a)(3) and (1) of the Act [R. Exceptions 75-80, 82-118, and 160-166]**

The ALJ also properly found that Respondent's termination of Ortiz and discipline of Moran violated Section 8(a)(3) of the Act because it was motivated by their activities in support of the Union. ALJD 67:22-71:9. Specifically, the ALJ found that Moran and Ortiz were engaged in protected concerted activities by taking actions to assist themselves and their coworkers in their efforts to promote the union organizing drive at the Fremont facility as well as concerning their testimony concerning their working conditions in Sacramento. ALJD 65:4-67:3. As noted in more detail above, the ALJ also concluded that Ortiz's lying to shield Moran was, in and of itself, a protected activity that was also connected to their efforts to unionize.  ALJD 67:5-20.  Next, as the ALJ makes clear in her decision, not only were Ortiz and Moran's other Union activities known generally to all at the Fremont facility, but they were also known specifically to Hedges, Gecewich, Graminger, Toledano (who monitored the investigation and termination), and Musk. ALJD 35, fn. 55; 68:8-25; 69:6-7; GC Exh. 8. Lastly, the ALJ found that there was anti-Union animus specifically and directly towards Ortiz and Moran, relying on direct and circumstantial evidence. ALJD 68:26-69:31.

Respondent argues that the Board's holding in *Tschiggfrie Properties, Ltd.*, 368 NLRB No. 120 (2019) warrants reversal of the ALJ's conclusions because it asserts that the GC has failed to demonstrate animus towards Moran and Ortiz's Union activities.  This argument misconstrues the credited evidence. In *Tschiggfrie*, the Board held that "the evidence of animus must support finding that a causal relationship exists between the employee's protected activity and the employer's adverse action against the employee." *Tschiggfrie*, supra at slip op 1. Here, as in *Tschiggfrie*, the ALJ did not rely on generalized animus at the Fremont facility. Rather, the ALJ relied on specific

44

instances of animus towards both Ortiz and Moran, such as Respondent's efforts to counter their pro-Union testimony in Sacramento, the other unfair labor practices specifically involving both Ortiz and Moran, timing, and shifting defenses.[46] ALJD 68:26-69:31. Thus, the ALJ correctly found that the GC established a prima facie case that Moran and Ortiz engaged in Union activities, Respondent had knowledge of such Union activities, and they were a substantial or motivating factor in the decision to discharge and discipline Ortiz and Moran. ALJD 65:2-71:8.

Respondent failed to meet its burden under *Wright Line*,[47] which requires Respondent "to demonstrate that the same action would have taken place even in the absence of the protected conduct." *Wright Line*, supra, 251 NLRB at 1089. The ALJ rightly concluded that Respondent failed to meet such a burden. ALJD 67:25-71:8. The ALJ relied on the *credited* evidence, which included an analysis concerning Respondent's shifting defenses, the unreliable testimony of its witnesses (including Gecewich, Hedges, and Toledano), the timing of the decisions, and the lack of evidence that Respondent had taken remotely similar actions. *Id.* Indeed, as the ALJ noted, Respondent went as far as fabricating a "post hoc rationalization" of its decisions by inventing a rule concerning Workday where none existed. ALJD 70:47-71:2.

Respondent asserts that the ALJ gave improper weight to her finding that Respondent had no rule concerning being honest in a workplace investigation or the use of Workday. However, Respondent misconstrues the ALJ and her rationale since the ALJ relied on the lack of a work rule,

---

[46] The investigation's purpose was ripe with shifting defenses. Gecewich testified the reason for initiating an investigation was due to the Facebook posting but his investigative reported noted the reason was because of access to Workday for "non-business purposes." ALJD 69:20-23. Additionally, Musk provided a shifting reason for Ortiz' termination by tweeting, in reference to Ortiz, that the [o]nly known union person fired was a guy who repeatedly threatened non-union supporters verbally & on social media & lied about it." GC Exh. 38; ALJD 72, fn. 109.

[47] *Wright Line* 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved in *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983).

22-60493.6227

in part, to demonstrate pretext. See e.g. *Inter-Disciplinary Advantage, Inc.*, 349 NLRB 480, 509 (2007) (finding that "an employer's shifting explanation for a discharge, or … its post hoc attempt to rationalize such a decision, are suggestive of a pretext"). Though it is undisputed that the *stated* reason for the Ortiz termination was for lying to conceal the Section 7 activity, Gecewich and Respondent's rationale shifted throughout its investigation. Moreover, Respondent is wrong in its assertion that the ALJ incorrectly applied *Electrolux Home Products, Inc.*, 368 NLRB No. 34 (2019) (*Electrolux*). Here, unlike *Electrolux*, the record established a series of unfair labor practices involving both Ortiz and Moran and the record is replete with evidence (both direct and circumstantial) concerning animus towards Ortiz and Moran's Section 7 activities (both in support of the union and other protected activities).  As discussed below, the ALJ correctly concluded that Gecewich violated Section 8(a)(1) of the Act by interrogating Moran[48] and Ortiz during the course of his investigation.  ALJD 71:10-44.

### G.   The ALJ Correctly Concluded that Gecewich interrogated Ortiz and Moran in Violation of Section 8(a)(1) of the Act [R. Exceptions 81 and 119-121]

Under *Rossmore*, supra, and its progeny, the Board will consider several factors in determining whether any particular interrogation falls outside the bounds of a lawful interrogation: (1) background; (2) nature of the information sought; (3) identity of the questioner; (4) place and method of interrogation; (5) truthfulness of the reply; and (6) whether the interrogated employee was an open and active union supporter. The test is objective and does not rely on the subjective aspect of whether the employee was, in fact, intimidated. *Multi-Ad Services*, 331 NLRB 1226, 1227-1228 (2000), enfd. 255 F.3d 363 (7th Cir. 2001).

---

[48] Though Respondent excepted to the ALJ's findings and conclusions concerning the interrogations of Moran and Ortiz, it only addressed the interrogation of Ortiz in its brief. Nonetheless, the GC will address both.

22-60493.6228

Here, the ALJ's conclusions that Gecewich interrogated both Ortiz (on September 21 and October 12, 2018) and Moran (on October 12, 2018) are supported by the credited evidence. (ALJD 71:12-44). First, the nature of the interactions was highly coercive – one-on-one meetings with a company investigator.  Second, in each of the three instances, the nature of the information sought concerned their activities in Sacramento and their organizing activities on social media. Third, Respondent had no need for its in-depth questioning of Ortiz or Moran since, at the very start of the September 21 encounter, Ortiz admitted to posting the Facebook comment. If indeed the true reason for the encounter was a "harassment complaint" as argued by Respondent in its brief (R. Bf. 39), the encounter would have ended there. Instead, Gecewich went to great lengths to question them about their activities with the Union and in Sacramento. Moreover, the fact that an employee lied during an investigation to protect his co-worker, is itself evidence of the coercive nature of the encounter.  Thus, Respondent's exceptions concerning Gecewich's interrogation of Ortiz and Moran should be rejected, and the ALJ's conclusions affirmed that it violated Section 8(a)(1) of the Act.

### H.    The ALJ's Order Granting the GC's Requested Notice Reading Remedy is Supported by the Credited vidence and Board Precedent [R. Exceptions 12, 13, 160-166]

The ALJ granted the GC's requested remedy of a notice reading at Respondent's facility, including that the Union be permitted to attend any notice reading (upon request).[49] Notwithstanding the breadth of the unfair labor practices, Respondent asserts that the notice reading remedy ordered is both "contrary to law" and "punitive," specifically because it orders CEO Musk to personally attend or read the notice to employees.

---

[49] In its brief in support of its exceptions, Respondent argues that the GC did not request a notice reading remedy.  (R. Bf. 70).  However, a special prayer for relief in the form of a notice reading was plead in the Second Amended Complaint.  GC Exh. 1(jj).

22-60493.6229

The Board will require a notice to be read to employees "where an employer's misconduct has been sufficiently serious and widespread that reading of the notice will be necessary to enable employees to exercise their Section 7 rights free of coercion." *Jason Lopez' Planet Earth Landscape, Inc.*, 358 NLRB 383 (2012) (quoting *HTH Corp.*, 356 NLRB 1397 (2011)). "The purpose of requiring a manager to read a notice aloud to employees is to better impress upon the employees the fact that the employer and its officials are bound by the Act." *Voith Industrial Services, Inc.*, 363 NLRB No. 116 (2016), citing *Marquez Bros. Enterprises, Inc.*, 358 NLRB 509 (2012) (citing *Federated Logistics & Operations*, 340 NLRB 355, 358 (2003), enfd. 400 F.3d 920 (D.C. Cir. 2005).

Regarding the requirement that it's CEO, security guards, managers and supervisors attend a notice reading, the Board has ordered such a remedy where such individuals were actors in the unlawful labor practices.[50]  Such a notice is appropriate where, as here, Respondent's agents (here security guards) have violated the Act.[51] The Board has also ordered such a remedy because requiring their attendance "exposes supervisors to information concerning their own substantive obligations under the Act."[52]  Here, Respondent's security guards were heavily involved, over multiple incidents, in preventing Respondent's employees from engaging in their Section 7 rights. Likewise, Respondent's supervisors and managers at various levels were heavily involved in the violations, making the commission of the unlawful conduct widespread among Respondent's

---

[50] See e.g. *HTH Corp.*, 361 NLRB 709, 716 (2014), citing *McAllister Towing & Transportation Co.*, 341 NLRB 394 (2004), enfd. Mem. 156 Fed. Appx. 386 (2d Cir. 2006).
[51] See e.g *Federated Logistics & Operations*, 340 NLRB 255, 258 (2003) (upholding a notice reading so that employees "will fully perceive that the Respondent and its managers [and consultants] are bound by the requirements of the Act.")
[52] *HTH Corp.*, infra, citing *Domsey Trading Corp.*, 310 NLRB 777, 780 (1993), enfd. 16 F.3d 517 (2d Cir. 1994) (requiring manager who had committed unfair labor practices to be present when notice is read to employees).

22-60493.6230

management and therefore making their required attendance at the notice reading meetings appropriate and warranted when considering the record as a whole.

As it relates to Respondent's exceptions concerning the requirement that its highest-ranking executive be present during a notice reading (R. Exception 166[53]), Board law also supports the ALJ's Order.  As the Board has noted on numerous occasions, "[t]he presence of a management official when a notice is read serves as a minimal acknowledgement of the obligations that have been imposed by law and provides employees with some assurance that their organizational rights will be respected in the future." *Salem Hospital Corp.*, 363 NLRB No. 56, fn. 3 (2015) (internal quotations and citations omitted).  Respondent argues that such a remedy is unwarranted because it believes that Musk is being "singl[ed] out" with a notice reading and because Respondent asserts that its violations are not "hallmark" violations that warrant a notice reading, relying primarily on *Ishikawa Gasket America, Inc.*, 337 NLRB 175 (2001), *Hartman & Tyner, Inc.*, 359 NLRB 895, 897 (2013), reaffirmed in *Hartman & Tyner, Inc.*, 361 NLRB No. 59 (2014), and *Sysco Grand Rapids, LLC*, 367 NLRB No. 111 (2019). R. Bf. 71-73.

Contrary to Respondent's assertions, CEO Musk was intimately involved in the commission of the unfair labor practices found by the ALJ, all of which stem from Respondent's anti-union response to the workers' organizing drive. From the moment Moran engaged in public concerted activities (i.e. his "Time for Tesla to Listen" post on medium.com), Moran and the workers were attacked by Musk. See e.g. GC Exh. 59. Musk's specific involvement include his unlawful interrogation of Moran in June 2018. ALJD 32:10-40:8. Musk's unlawful involvement culminated with his May 20, 2018 tweet, which was not only widely reported in the media but was

---

[53] Though Respondent excepts to the portion of the notice reading remedy that requires Musk to read the notice aloud, the remedy provides that, alternatively, the notice can be read by a Board agent in Musk's presence.  Respondent does not explicitly except to the latter.

49

also sent to his nearly 23 million followers on Twitter. Unlike in *Ishikawa* or *Hartman*, the nature of the highly public and visible violations of the Act by Musk justify the ALJ's extraordinary remedy of requiring the personal presence of Musk.

Next, both *Ishikawa Gasket America* and *Hartman & Tyner* can both be distinguished, as Respondent's unlawful actions include the discipline and termination of the two faces of the organizing drive and given Musk's public statements concerning the unlawful Ortiz termination. GC Exh. 39. Moreover, the instant case also involves widespread actions to impede employees' protected Section 7 right to engage in informational leafleting on nonworking time (which Respondent does not except to), interrogations concerning protected Section 7 activities and threats of reprisal (in addition to the carrying out of those threats), statements of futility, and an unlawful policy restricting employees' rights to wear pro-union shirts. The presence requirement in a notice reading does not require that Musk have committed *all* violations but rather looks to the whether *some* were committed by the specific person in question and the nature/extent of the person's involvement in the unfair labor practices.[54] The Board should adopt the ALJ's remedies, including requiring the presence of CEO Musk at the notice reading.

## III.   CONCLUSION

For the reasons stated above, the GC respectfully requests that the Board overrule Respondent's exceptions in their entirety.

**DATED AT** Oakland, California this 13th day of February 2020.

_____

Edris W.I. Rodriguez Ritchie
Counsel for the General Counsel

---

[54] See e.g. *North Memorial Health Care*, 364 NLRB No. 61, slip op at 1 (2016) (notice-reading appropriate in part due to participation of high-ranking responsible management officials in unfair labor practices), enfd. in relevant part 860 F.3d 639 (8th Cir. 2017).

22-60493.6232

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 32**

| | |
|---|---|
| **TESLA, INC.** | |
| **and** | |
| **MICHAEL SANCHEZ, an Individual** | **Case   32-CA-197020** |
| **and** | |
| **JONATHAN GALESCU, an Individual** | **Case   32-CA-197058** |
| **and** | |
| **RICHARD ORTIZ, an Individual** | **Case   32-CA-197091** |
| **and** | **Cases   32-CA-197197** |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, AFL-CIO** | 32-CA-200530 32-CA-208614 32-CA-210879 32-CA-220777 |
| | **Date:   February 13, 2020** |

<u>**AFFIDAVIT OF SERVICE OF COUNSEL FOR THE GENERAL COUNSEL'S ANSWERING BRIEF IN OPPOSITION TO RESPONDENT TESLA, INC.'S EXCEPTIONS TO THE DECISION OF THE ADMINISTRATIVE LAW JUDGE AND RESPONDENT'S BRIEF IN SUPPORT OF EXCEPTIONS**</u>

I, the undersigned employee of the National Labor Relations Board, being duly sworn, depose and say that on the date indicated above I served the above-entitled document(s) upon the persons at the addresses and in the manner indicated below. Persons listed below under "E-Service" have voluntarily consented to receive service electronically, and such service has been effected on the same date indicated above.

Mark S. Ross, Esq.
Keahn Morris, Esq.
Sheppard Mullin Richter & Hampton, LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
**VIA EMAIL: mross@sheppardmullin.com**
**VIA EMAIL: kmorris@sheppardmullin.com**

Margo A. Feinberg, Esq.
Daniel Curry, Esq.
Schwartz, Steinsapir, Dohrmann
& Sommers, LLP
6300 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90048
**VIA EMAIL: margo@ssdslaw.com**
**VIA EMAIL: dec@ssdslaw.com**

Office of the Executive Secretary
National Labor Relations Board
1015 Half Street SE
Washington, DC 20570-0001
**VIA E-FILE**

| February 13, 2020 | | Ida Lam, Designated Agent of NLRB |
| --- | --- | --- |
| | | Name |

| | | /s/ Ida Lam |
| --- | --- | --- |
| | | Signature |

UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| TESLA, INC.,<br><br>    Respondent,<br><br>    and<br><br>MICHAEL SANCHEZ, an individual,<br>JONATHAN GALESCU, an individual,<br>RICHARD ORTIZ, an individual, and<br>INTERNATIONAL UNION, UNITED<br>AUTOMOBILE, AEROSPACE AND<br>AGRICULTURAL IMPLEMENT<br>WORKERS OF AMERICA, AFL-CIO, a<br>labor organization,<br><br>    Charging Parties. | Case Nos.  32-CA-197020<br>32-CA-197058<br>32-CA-197091<br>32-CA-197197<br>32-CA-200530<br>32-CA-208614<br>32-CA-210879<br>32-CA-220777 |

**ANSWERING BRIEF OF CHARGING PARTIES**
**MICHAEL SANCHEZ, JONATHAN GALESCU, RICHARD ORTIZ, AND**
**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND**
**AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AFL-CIO**

SCHWARTZ, STEINSAPIR, DOHRMANN &
  SOMMERS LLP
MARGO A. FEINBERG
DANIEL E. CURRY
6300 Wilshire Boulevard, Suite 2000
Los Angeles, California 90048-5268
Telephone: (323) 655-4700
Attorneys for Charging Parties MICHAEL
SANCHEZ, JONATHAN GALESCU,
RICHARD ORTIZ, and INTERNATIONAL
UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA,
AFL-CIO

# TABLE OF CONTENTS

**Page**

I    PRELIMINARY STATEMENT ...................................................1

II   STATEMENT OF FACTS...................................................2

    A.   TESLA WORKERS LAUNCH A UNION ORGANIZING DRIVE TO IMPROVE WORKING CONDITIONS AT TESLA'S CAR MANUFACTURING PLANT IN THE SUMMER OF 2016 ...........................2

    B.   IN FEBRUARY OF 2017, TESLA EMPLOYEES PUBLICLY LAUNCH THE UNION CAMPAIGN AND FACE IMMEDIATE HARASSMENT FROM TESLA...................................................3

    C.   IN APRIL AND MAY 2017, TESLA EMPLOYEES SPEAK OUT ABOUT SAFETY PROBLEMS, ONLY TO FACE MORE INTIMIDATION, HARASSMENT, AND INTERROGATIONS FROM TESLA ...........................4

    D.   IN RESPONSE TO EMPLOYEE SAFETY CONCERNS, MUSK AND HIS CHIEF PEOPLE OFFICER ATTEMPT TO BLOCK EMPLOYEES FROM ADVOCATING FOR A UNION...................................................5

    E.   AFTER INCREASING NUMBERS OF TESLA EMPLOYEES BEGIN WEARING UAW T-SHIRTS TO WORK, TESLA STARTS ENFORCING A RESTRICTIVE UNIFORM POLICY...................................................6

    F.   RESPONDENT TERMINATES ORTIZ AND DISCIPLINES MORAN BECAUSE THEY TOOK ACTIONS TO SUPPORT BETTER WORKING CONDITIONS AT TESLA ...................................................7

        1.   Tesla Responds to Ortiz's Legislative Advocacy ...................................7

        2.   Josh Hedges Directs Employee Relations to Investigate Ortiz.............8

        3.   Employee Relations Investigator Gecewich Conducts His Investigation ...................................................9

        4.   Tesla Management Accepts the Recommendation to Terminate Ortiz ...................................................11

        5.   Respondent Terminates Ortiz and Disciplines Moran...........................12

III  ARGUMENT...................................................13

# TABLE OF CONTENTS (cont.)

22-60493.6236

Page

A.     **THE ALJ CORRECTLY DETERMINED THAT TESLA UNLAWFULLY TERMINATED ORTIZ AND DISCIPLINED MORAN IN VIOLATION OF SECTION 8(a)(3)** ............................................ 13

    1.     **The ALJ properly analyzed Ortiz and Moran's activity under the current Board standard and determined that it was both protected and concerted.** ...................................................................................... 13

    2.     **The ALJ Correctly Applied Board Precedent with Respect to Terminating an Employee for Lying Regarding Protected Activity** ... 14

    3.     **The ALJ Correctly Distinguished the Board's Decision in *Fresenius*** 15

    4.     **The ALJ Correctly Found That the Respondent's Termination of Ortiz Violated the Act Under *Wright Line*** ............................................ 16

       a.     **Respondent Engaged in a Demonstrated Pattern of Union Animus Even Before the Investigation** ...................................... 17

       b.     **Tesla's Investigation Was Designed to Produce a Pretext to Discipline Ortiz and Moran** ......................................................... 18

       c.     **Tesla Would Not Have Taken the Same Actions Absent Ortiz's Union Activity.** .......................................................................... 21

    5.     **The Respondent's Request that the Board Overturn its Precedent Based on the Respondent's Categorization of "Core" Section 7 Rights Should be Rejected** ......................................................................... 22

    6.     **ALJ Tracy Correctly Found That Respondent Disciplined José Moran for His Concerted Protected Activities in Violation of Section 8(a)(3)** ........................................................................................ 24

B.     **THE ALJ CORRECTLY DETERMINED THAT RESPONDENT UNLAWFULLY INTERROGATED ORTIZ AND MORAN** ........................ 26

C.     **THE ALJ PROPERLY DECIDED THAT CEO MUSK'S STATEMENT REGARDING STOCK OPTIONS WAS A THREAT OF REPRISAL THAT VIOLATED SECTION 8(a)(1) OF THE ACT** .................................... 27

    1.     **CEO Musk's Twitter Statement Was Unambiguous** ........................... 28

22-60493.6237

## TABLE OF CONTENTS (cont.)

Page

2.    The Act Prohibits Threats of Reprisals Against Employee Stock Options..................................................................................29

3.    Musk's Twitter Statement Did Not Refer to Collective Bargaining ...30

4.    Tesla's Alternate Interpretation Is an Unreasonable Reading of the Statement .............................................................................31

5.    Respondent Fabricates Evidence in an Attempt to Find an Objective Basis for Musk's Statement .................................................34

6.    The Method Used to Communicate the Threat Does Not Alter the Analysis.....................................................................................36

7.    Neither Musk nor Tesla Has a First Amendment Right to Threaten Employees with Reprisals for Their Protected Activity.....................38

D.    THE CHARGING PARTIES JOIN THE GENERAL COUNSEL'S ANSWERING BRIEF IN SUPPORT OF THE ALJ'S PROPOSED DECISION...................................................................................40

IV    REMEDY.....................................................................................40

A.    THE ALJ CORRECTLY APPLIED THE BOARD'S STANDARD FOR NOTICE READINGS AND APPROPRIATELY ORDERED SUCH A READING .....................................................................................40

V    CONCLUSION ..............................................................................44

22-60493.6238

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

**CASES**

*Advancepierre Foods, Inc.*, 366 NLRB No. 133 (2018) ...........................................................42

*American Freightways Co.,* 124 NLRB 146 (1959)...................................................................27

Ausable Communications, 273 NLRB 1410 (1985)....................................................................29

*BCI Coca-Cola Bottling Co.*, 339 NLRB 67 (2003) ................................................................30

*Benjamin Coal Co & Empire Coal Co.*, 294 NLRB 572 (1989)...............................................36

*Booth v. Pasco County*, 854 F.Supp.2d 1166 (M.D. Fla. 2012)...............................................39

*Bozzuto's, Inc.,* 365 NLRB No. 146 (2017) ......................................................................42, 43

*Carpenters Health & Welfare Fund*, 327 NLRB 262 (1998) ...................................................26

*Cayuga Medical Center*, 365 NLRB No. 170 (2017)................................................................36

*Cf. Monfort, Inc. v. NLRB*, 1994 WL 121150 (10th Cir. 1994)................................................36

*Concepts & Designs, Inc.,* 318 NLRB 948................................................................................29

*Consec Security*, 325 NLRB 453 (1998) ..................................................................................26

*Consolidated Bus Transit*, 350 NLRB 1064 (2007) .................................................................17

*Corporate Interiors, Inc.*, 340 NLRB 732 (2003) ...................................................................37

*Crown Stationers*, 272 NLRB 164 (1984) ...............................................................................37

*Dixon v. International Brotherhood of Police Officers*, 504 F.3d 73 (1st Cir. 2007) ...................40

*Dynacorp*, 343 NLRB 1197 (2004) ..........................................................................................29

*E & L Plastics Corp.*, 305 NLRB 1119 (1992) ........................................................................30

*Eagle Transport Corp.,* 327 NLRB 1210 (1999) .....................................................................35

*Ed Chandler Ford, Inc.,* 254 NLRB 851 (1981) ......................................................................35

*Eddyleon Chocolate Co.*, 301 NLRB 887 (1991).....................................................................22

*El Rancho Market*, 235 NLRB 468 (1978)...............................................................................28

22-60493.6239

# TABLE OF AUTHORITIES (cont.)

**Page(s)**

## CASES (cont.)

*Federated Logistics & Operations*, 340 NLRB 255, 256 (2003) ................................41

*Fresenius*, 358 NLRB 1261 (2012) *judgment reversed* 362 NLRB No. 130 (2015) ...................16

*Fresenius*, 362 NLRB No. 130 (2015) ...........................................................15, 16, 23

*Guess!, Inc.,* 339 NLRB 432 (2003)...........................................................................27

*Hendrickson USA*, 366 NLRB No. 7 (2018) ...............................................................34

*Hertz Corp.*, 316 NLRB 672 (1995)...........................................................................30

*Histacount Corp.*, 278 NLRB 681 (1986) ..................................................................31

*Homer D. Bronson Co.*, 349 NLRB 512 (2007) *enfd. mem.* 273 Fed. Appx. 32 (2d Cir. 2008)...41

*Hyatt Regency Memphis*, 296 NLRB 259 (1989)........................................................21

*Ingredion, Inc.,* 366 NLRB No. 74 (2018) .............................................................41, 43

*Ishikawa Gasket America*, 337 NLRB 175 (2001)......................................................43

*J. P. Stevens & Co. v. NLRB*, 417 F.2d 533, 540 (5th Cir. 1969)..................................41

*Jim Walter Resources*, 324 NLRB 1231 (1997)..........................................................18

*Kaiser Engineers v. NLRB*, 538 F.2d 1379 (9th Cir. 1976)...........................................13

*Kalthia Group Hotels, Inc*, 366 NLRB No. 118 (2018) ...............................................43

*Kezi, Inc.,* 300 NLRB 594 (1990)..........................................................................30, 31

*KSM Industries*, 336 NLRB 133 (2001) .................................................................28, 29

*Meyer Jewelry Co.,* 230 NLRB 944 (1977)................................................................30

*Meyers Industries*, 268 NLRB 493 (1984) ................................................................13

*Meyers Industries*, 281 NLRB 882, 887 (1986) .........................................................13

*Miklin Enterprises*, 361 NLRB 283 (2014) ...............................................................36

*Morgan Precision Parts*, 183 NLRB 1141 (1970) .......................................................26

v

# TABLE OF AUTHORITIES (cont.)

**Page(s)**

## CASES (cont.)

*NLRB v. Gissel Packing Co.,* 395 U.S. 575 (1969) .................................................................. passim

*NLRB v. Lenkurt Electrical Co.,* 438 F.2d 1102 (9th Cir. 1971)...................................................36

*NLRB v. Pentre Electrical,* 998 F.2d 363 (6th Cir. 1993) ...........................................................36

*NLRB v. Village IX,* 723 F.2d 1360 (7th Cir. 1983) ....................................................................36

*NLRB v. Washington Aluminum Co.,* 370 U.S. 9 (1962)..............................................................13

*Noral Color Corp.,* 276 NLRB 567 (1985) ...........................................................................35, 36

*North Memorial Health Care,* 364 NLRB No. 61, (2016) .......................................................41, 42

*Operating Engineers Local 12 (Associated Engineers),* 282 NLRB 1337 (1987) .......................37

*Ozburn-Hessey Logistics, LLC,* 366 NLRB No. 177 (2018)........................................................43

*Paragon Systems,* 362 NLRB No. 182 .......................................................................................15

*Prill v. NLRB,* 755 F.2d 941 (D.C. Cir. 1985) cert. denied 474 U.S. 948 (1985) .........................13

*Ready Mix, Inc.,* 341 NLRB 958 (2004)................................................................................28, 29

*Ridgely Mfg. Co.,* 207 NLRB 193 (1973)....................................................................................25

*Roadway Express,* 271 NLRB 1238 (1984) ................................................................................25

*Rodriguez v. Maricopa County Community College District,* 605 F.3d 703 (9th Cir. 2010).........39

*Rossmore House,* 269 NLRB 1176 (1984)..................................................................................26

*Shamrock Foods,* 366 NLRB No. 117 (2018) .............................................................................20

*Smithfield Foods,* 347 NLRB 1225 (2006)..................................................................................30

*St. Louis Car Co.,* 108 NLRB 1523 (1954)............................................................................14, 15

*St. Paul Park Refining Co., LLC,* 366 NLRB No. 83 (2018) ........................................................20

*Sysco Grand Rapids, LLC,* 367 NLRB No. 111 (2019) ...............................................................43

22-60493.6241

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

### CASES (cont.)

*Systems West*, 342 NLRB 851, 852 (2004)..................................................................28, 35

*Taylor-Dunn Mfg. Co.,* 252 NLRB 799 (1980) ......................................................30, 38

*TCI Cablevision of Washington, Inc.*, 329 NLRB 700 (1999) ....................................35

*Textile Workers v. Darlington Mfg. Co.*, 380 U. S. 263 (1965) ..................................38

*Tradewaste Incineration*, 336 NLRB 902 (2001)....................................................14, 15

*Transportation Management, Inc., v. NLRB,* 462 U.S. 393 (1983)............................16

*Unbelievable, Inc.*, 323 NLRB 815 (1997)...................................................................37

*United Services Automobile Association*, 340 NLRB 784, (2003) *enfd.* 387 F.3d 908 (D.C. Cir. 2004) ...........................................................................................................................15

*United States Service Industries*, 319 NLRB 231, 232 (1995).....................................41

*Van Vlerah Mechanical*, 320 NLRB 739 (1996)........................................................22

*Vemco, Inc.*, 304 NLRB 911 (1991)............................................................................36

*W.B. Mason Co.*, 365 NLRB No. 62 (2017)...............................................................43

*Williams Motor Transfer*, 284 NLRB 1496 (1987) .....................................................37

*Wright Line, Inc.*, 251 NLRB 1083 (1980), *enfd.* 662 F.2d 899 (1st Cir. 1981) ...............16, 17, 21

//

//

//

//

//

//

//

22-60493.6242

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

### STATUTES

**Civil Righst Act of 1964, 42 U.S.C. 2000e** *et seq.*

Title VII ........................................................................................................................16

**National Labor Relations Act, 29 U.S.C. § 151** *et seq.*

Section 7 ................................................................................................... passim

Section 8(a)(1) ........................................................................................... passim

Section 8(a)(3) ...........................................................................13, 18, 24, 26

Section 8(a)(5) ........................................................................................................28

Section 8(b)(1)(A) ..................................................................................................37

Section 8(c)................................................................................................................28

22-60493.6243

# I

## PRELIMINARY STATEMENT

The National Labor Relations Act provides employees with the right to form, join, or assist a labor organization and to engage in other concerted activities for the purpose of mutual aid or protection and prohibits employers from interfering, restraining, or coercing employees in the exercise of these rights. ALJ Amita Tracy's precise and well-reasoned September 27, 2019 decision relies on this bedrock rule to find that Respondent Tesla, Inc. repeatedly violated the NLRA.

Respondent might be a novel car company, but when it comes to its NLRA violations, it is decidedly conventional. It is also prolific. Respondent fired one of the principal Union organizers, Richard Ortiz, while disciplining another, José Moran, in direct response to their protected concerted activity. It threatened to revoke benefits if the employees unionized. It interrogated employees who publicized the Company's poor safety record and blocked employees from wearing union apparel without justification. It tried to co-opt the most active leaders, and, when that failed, disparaged the union drive as hopeless. Security guards threatened employees who handed out union flyers and supervisors issued warnings and prohibitions on union literature in the plant.

ALJ Tracy properly found that all the conduct described above violated the Act. Respondent now concedes that the last three of the acts above were unlawful. Respondent's briefing on the remaining violations repeatedly distorts and even fabricates the evidentiary record, a sign of the impotence of its arguments. The actual facts of the case, along with the numerous credibility findings ALJ Tracy made against Respondent's witnesses, overwhelmingly support the ALJ's findings of fault.

None of the violations found by the Administrative Law Judge are novel or noteworthy. As Respondent's Chief People Officer admitted, her CEO is prone to writing "dumb stuff." Much of the rest of Respondent's misconduct could be characterized similarly. ALJ Tracy's

1

22-60493.6244

decision finding Respondent repeatedly violated the Act should be upheld and the remedies in her decision ordered.

## II

### STATEMENT OF FACTS

A. **TESLA WORKERS LAUNCH A UNION ORGANIZING DRIVE TO IMPROVE WORKING CONDITIONS AT TESLA'S CAR MANUFACTURING PLANT IN THE SUMMER OF 2016**

In the Summer of 2016, Tesla production employees working at the Respondent's electric car manufacturing facility in Fremont, California reached out to the UAW in the hope of improving their working conditions through unionization. (Tr. 47, 673-76)[1] Tesla employee José Moran[2] met with two representatives from the UAW to discuss how a union could benefit Tesla workers and help address frequent employee concerns, such as long hours, lack of safety, preventable injuries, favoritism in promotion, and inadequate compensation. (Tr. 46, 673-674; GCX 8) While Moran was proud to assemble the most innovative and environmentally friendly cars in the world, he was frustrated Respondent did not treat its employees with the same respect. (Tr. 337, 687-88; GCX 8)

Excited about an avenue to address employees' concerns, Moran created a private Facebook group called "Tesla employees for UAW Representation," where Tesla hourly employees could discuss working conditions. (Tr. 675) In August 2016, Moran invited his fellow co-workers to join him in a series of meetings that established the Volunteer Organizing Committee, or "VOC," a committee of workers at the Tesla Fremont facility who volunteer to

---

[1] All references to the transcript herein are indicated by (Tr. __) All references to Joint Exhibits, General Counsel Exhibits, Respondent Exhibits and Charging Party Exhibits are indicated by (JX __), (GCX __), (RX __), and (CPX __), respectively.

[2] Moran is an hourly production associate at Tesla's Fremont facility. (Tr. 668). Employed by Tesla since 2012, Moran's current position is quality lead inspector, where he performs ultrasound testing on spot welds on the frame of the underbody in Body and White at the beginning of the car building process. (Tr. 668, 669-70).

22-60493.6245

lead the organizing effort to bring union representation to Tesla. (Tr. 47, 431-433, 676-77). Tesla Employees Richard Ortiz[3] and Michael Sanchez also joined the VOC in the Summer of 2016. (Tr. 87, 432).

**B.    IN FEBRUARY OF 2017, TESLA EMPLOYEES PUBLICLY LAUNCH THE UNION CAMPAIGN AND FACE IMMEDIATE HARASSMENT FROM TESLA**

Tesla hourly production employees continued to meet and speak with each other privately about bringing union representation to Tesla until February 2017, when employee José Moran took a bold step forward. (Tr. 48). On February 9, 2017, Moran posted a blog article to the website Medium.com, titled "Time for Tesla to Listen," in which he became the first Tesla employee to publicly call for a union at Tesla. (GCX 8; Tr. 48, 687-88).

In this article, Moran stated he was proud to be building the car of the future and believed in the Company's vision, but thought the Company could do better. (GCX 8). He described how preventable injuries happen too often at the plant, noting an instance a few months earlier when six of the eight members of his work team were out on medical leave. (GCX 8). He explained how mandatory overtime and 60-70 hour work weeks have left workers exhausted. (GCX 8). He also pointed out that production workers earn between $17.00 and $21.00 per hour, when the average auto worker nationally earns $25.58 an hour and a living wage in Alameda County is $28 an hour. (GCX 8).

Moran asked CEO Elon Musk to be "a champion for his employees," just as he is already a "respected champion for green energy and innovation." (GCX 8). Moran concluded his article by requesting a "productive conversation about building a fair future for all who work at Tesla." (GCX 8).

---

[3] Ortiz was an hourly production associate at Tesla's Fremont facility, first as a temporary employee beginning in December 2015, then as a direct employee of Tesla from October 2016 until his termination on or around October 18, 2017. (Tr. 424-25). Before Ortiz's injury in mid-February 2017, he worked in the Closures area of Body and White 2, where he prepared components that went into building the doors, hood, and fenders of the Tesla Model X. (Tr. 426-27). He returned to this position in mid-July 2017. (Tr. 428-29).

22-60493.6246

Tesla's reaction was as swift as it was negative. On the same day that Moran published his article, Musk stated Moran "doesn't really work for us, "causing confusion among Tesla employees, and called his desire for improving working conditions through union representation "morally outrageous." (CPX 8C, GCX 59). In addition, on that same day, Respondent's security guards repeatedly attempted to prohibit Tesla employees Ortiz, Moran, and Sanchez from distributing leaflets in the plant parking lot to co-workers and attempted to eject the employees from the premises. (ALJD 15-25) The leaflet's contained Moran's article. The ALJ found this conducted violated Section 8(a)(1) of the Act, and the Respondent did not except to this finding. (ALJD 15-25)

After the launch of Moran's article, Tesla employees continued to distribute union materials to co-workers inside and outside of the plant during non-work time. (Tr. 842) In March 2017, in response to the union organizing campaign, a supervisor announced that passing out stickers, pamphlets, and leaflets that were not approved by Tesla management would now be grounds for discipline and/or termination. (Tr. 844) Respondent did not except to the Judge's finding that this conduct violated Section 8(a)(1) of the Act. (ALJD 25-27)

## C.    IN APRIL AND MAY 2017, TESLA EMPLOYEES SPEAK OUT ABOUT SAFETY PROBLEMS, ONLY TO FACE MORE INTIMIDATION, HARASSMENT, AND INTERROGATIONS FROM TESLA

From the beginning of the union organizing campaign, one of the employees' major concerns was the health and safety of employees working at the Fremont facility. (Tr. 47) Employees felt that preventable workplace injuries were too common, and that Tesla wasn't listening to constructive input that could reduce repetitive stress injuries. (GCX 8)

After witnessing so many preventable injuries, Ortiz and employee Jonathan Galescu decided to request injury logs that Tesla is required by law to have, and ultimately received the information. (Tr. 846, 862, 1037, 1057) Tesla employees then distributed leaflets discussing safety problems discovered through analyzing that injury data on May 24, 2017. (Tr. 390-99) However, the employees were once again harassed by security guards and told to stop

4

distributing leaflets and leave the premises. (Tr. 399-411) ALJ Tracy found that Respondent's security guards attempted to prohibit distribution of the leaflets and eject the employees in violated Section 8(a)(1). (ALJD 15-25) Respondent did not except to this finding.

Later the same day, Respondent interrogated Galescu and Ortiz about what they did with the safety information they had requested from the Company. (ALJD 27-32) ALJ Tracy found that this conduct violated Section 8(a)(1). (ALJD 27-32)

## D.   IN RESPONSE TO EMPLOYEE SAFETY CONCERNS, MUSK AND HIS CHIEF PEOPLE OFFICER ATTEMPT TO BLOCK EMPLOYEES FROM ADVOCATING FOR A UNION

In June 2017, Tesla employees petitioned Tesla Management directly with their safety concerns. The petition, signed by numerous employees including Ortiz and Moran, asked Tesla management to "work together" with employees for a "fair, safe, and secure workplace" so that workers would not be afraid to report injuries and other safety concerns. (GCX 27; Tr. 487, 704-05) On or about June 6, 2017, Moran and other employees delivered the petition in person to Josh Hedges, and after delivering the petition in person, Moran also e-mailed the petition to Hedges and Musk. (GCX 29; Tr. 705-07)

A day later, Moran and a co-worker were escorted to a meeting with Musk and Chief People Office Gaby Toledano. (Tr. 714, 878) At the meeting, Moran testified that he and his co-worker explained some of their safety concerns and Moran stated the employees desire to form a union in order to "to have a voice in the plant." (Tr. 417) Musk and Toledano were not receptive to Moran's request for a union; Musk responded that with a union "you don't really have a voice. The UAW is a second—like two-class system where UAW is the only one that has a voice and not the workers." (Tr. 717) Chief People Officer Toledano responded that "the majority of the workers at Tesla don't want a union" and then rhetorically asked why workers would want to pay union dues. (Tr. 717-18) Musk concluded the meeting by stating, "if these Safety Committee meetings don't work out, then we'll give you your union." (Tr. 719) The Judge correctly found that Respondent violated Section 8(a)(1) when Musk and Toledano stated that employees'

5

selection of a union was futile, solicited complaints, and stated employees did not want a union. (ALJD 32-40)

In a subsequent email, Toledano stated to Musk it was "super smart" to have Moran on the safety team working full time "vs work to pull in the UAW," and referred to this action as "turn[ing] adversaries into those responsible for the problem." (GCX 52). At 10:53 p.m. Musk responded "exactly." (GCX 52). The following day, Toledano sent an email discussing how Moran and Ortiz were "pro-union," and that "if they join the Safety team then they would then be considered part of management and not eligible to advocate for a union." (GCX 52-001; Tr. 912, 919).

In August 2017, Homer Hunt, a supervisor of quality control at Tesla, told an employee that "The union's never getting in here. This is Tesla." (Tr. 238) ALJ Tracy found this conduct violated Section 8(a)(1) of the Act, and Respondent has not excepted to this finding. (ALJD 49-51)

### E. AFTER INCREASING NUMBERS OF TESLA EMPLOYEES BEGIN WEARING UAW T-SHIRTS TO WORK, TESLA STARTS ENFORCING A RESTRICTIVE UNIFORM POLICY

As part of the Union organizing campaign, Tesla employees, including Ortiz, distributed over 400 UAW T-shirts to their fellow employees. (Tr. 50, 187, 534) These black cotton T-shirts had a small union insignia on the front and a larger insignia that included "UAW" in large print on the back. (Tr. 181, GCX 25, 34) Numerous Tesla employees, including Ortiz and Moran, wore the UAW T-shirts while working at the Fremont facility. (Tr. 181, 224, 260, 368, 534, 759)

Tesla responded in August 2017 by beginning to enforce a uniform policy that prohibited employees from wearing UAW shirts in General Assembly, a department containing approximately 3,000 employees. (Tr. 184-85, 293, 297-98, 325, 330, 1116, 2545, 2553; GCX 73) This policy, dubbed "Team Wear," required employees to wear Tesla-issued shirts and pants while working. (Tr. 1370; GCX 41, 92) Employees out of compliance with this Team Wear policy could receive a coaching or be sent home, losing a day of pay. (Tr. 184, 297-98, 330,

6

1397) ALJ Tracy found that Respondent violated Section 8(a)(1) by maintaining an unlawful uniform policy. (ALJD 40-48)

## F.     RESPONDENT TERMINATES ORTIZ AND DISCIPLINES MORAN BECAUSE THEY TOOK ACTIONS TO SUPPORT BETTER WORKING CONDITIONS AT TESLA

### 1.     Tesla Responds to Ortiz's Legislative Advocacy

In the summer of 2017, Ortiz along with other pro-union Tesla employees met with California legislators to encourage the passage of a bill requiring recipients of the state's electric vehicle rebate, such as Tesla, to be "fair and responsible in the treatment of their workers." (ALJD 51-52; Tr. 491-495, 615-16, 723; GCX 46) In response, Toledano instructed Hedges to recruit workers to provide "positive" employee experiences at Tesla. (ALJD 54; Tr. 1181-82, 1212) Hedges recruited three employees—Travis Pratt, Shaun Ives, and Jean Osbual—to go on work time to the State Capitol in Sacramento and give public testimony in opposition to the pending bill during two state legislative hearings on September 13 and 14, 2017. (ALJD 52; Tr. 1180-81, 1210-12) At the public hearings, Pratt identified himself by name, testified to his initial and current positions at Tesla, and stated his gross income was $130,000. (ALJD 52; CPX 10)

On September 14, 2017, Tesla employee Richard Ortiz received video links to view Pratt, Ives, and Osbual's public testimony opposing the union-sponsored bills. (ALJD 52; Tr. 495-97, 618; CPX9; CPX10). After Ortiz was unable to open the videos, he sent a text message to Moran asking for assistance confirming whether the individuals testifying against the union-sponsored bill were, in fact, Tesla employees. (ALJD 52; GCX 43-001; Tr. 14-17, 498, 723).

Moran watched the video, noted the individuals' names, and looked up the individuals' company profiles to determine if they were actual Tesla employees. (ALJD 52; Tr. 723-24). At that time, an employee's company profile was accessible for any Tesla employee to view by logging into a program called Workday and typing the individual's name into the search box. (ALJD 52; Tr. 724). The profiles contained only the employee's name, picture, and job title. (ALJD 53; GCX 28). Moran had previously used Workday to compare his seniority with other

7

employees and had never been told of any policies or limitations on using the employee profiles feature in Workday. (ALJD 52; Tr. 672, 724-725). The ALJ also credited similar, undisputed testimony from other Tesla employees. (ALJD 52). Moran then took a screenshot of the Workday profiles of Pratt, Ives, and Osbual, which contained only each individual's name, picture, and job title, and sent the screenshots to Ortiz. (ALJD 53; Tr. 505-507; GCX 43).

Ortiz then posted the screenshots of Pratt and Ives on a private Facebook group, which was limited to rank-and-file employees of Tesla, along with a statement complaining that these individuals were lying in Sacramento about working conditions at Tesla. (GCX 28; Tr. 508, 514-15). Ortiz's post did not contain any information that the employees did not share publicly at the state hearing. (ALJD 66; CPX 9; CPX 10). A short time later Ortiz removed the post after receiving a message from Pratt telling him that it was not a "good way to start [communications]." (ALJD 53; Tr. 515-16; GCX 80).

### 2. Josh Hedges Directs Employee Relations to Investigate Ortiz

Pratt then sent a text message to Hedges with a screenshot of the Facebook post and the message, "[l]ooks like we got under some people's skin," followed by a smiley face emoji. (ALJD 53, GCX 28; Tr. 1215-1216) After Hedges asked whether the posting was on Facebook, Pratt replied, "Yea lol" [laugh out loud]. (ALJD 52; GCX 28; Tr. 1215-1216, 1218) ALJ Tracy did not find Hedges to be a credible witness, and therefore Tesla did not establish that Pratt made any complaint of targeting or harassment. (ALJD 55) Based on the credited evidence in the record, ALJ Tracy found that Pratt's written comments do not reflect a concern of harassment. (ALJD 55, 66)

Hedges then spoke with Tesla Employee Relations investigator Ricky Gecewich and directed him to begin an investigation. (ALJD 54-55; Tr. 1893-09) ALJ Tracy did not credit Hedges' testimony denying he directed Gecewich to open an investigation, because, among other reasons, Gecewich testified that Hedges did just that. (ALJD 55)

//

//

8

22-60493.6251

### 3.     Employee Relations Investigator Gecewich Conducts His Investigation

Gecewich began his investigation by contacting Pratt via telephone on September 19, 2017. (ALJD 56; GCX 63). Gecewich's contemporaneous notes taken during this call do not reflect any concern from Pratt about the use of his name, picture, or salary information in the posting. (GCX 63). Gecewich did not ask Pratt what he meant by the comment to Hedges, "Looks like we got under some people's skin" with a smiley face emoji. (ALJD 56; Tr. 1868-1869). Pratt told Gecewich that he was contacted by Hedges to go to Sacramento, but Gecewich did not ask Pratt whether he had shared his job title and salary publicly. (ALJD 55-56; Tr. 1808-1809). ALJ Tracy found Gecewich to be an unreliable witness. (ALJD 56)

Gecewich then interviewed Bryan Kostich, the Tesla employee who had alerted Pratt to the Facebook posting. (ALJD 56) Gecewich learned that the page where Ortiz made the posting was a private Facebook group called "Tesla Employees for Union Access," however Gecewich did not investigate this website or its privacy settings. (ALJD 56) Gecewich did not ask Pratt or Kostich about their own use of Workday. (ALJD 56) Despite having notice that the posting was related to the union organizing campaign at Tesla, Gecewich proceeded with his investigation.[4]

On September 21, 2017, Gecewich interviewed Ortiz and showed him a screenshot of the Facebook posting. (ALJD 57; GCX 28; Tr. 517-18). Ortiz apologized for his posting and recalled how he removed the post within 2 hours because he recognized it bothered Pratt. (ALJD 57; Tr. 518; 645).

Gecewich ignored this apology and removal of the post, and instead focused on questioning Ortiz about whether he took the screenshots himself and, if not, from whom he had received the screenshots. (ALJD 57; Tr. 521, 532) At this point, Ortiz assumed he was "*already*

---

[4] Respondent's reference to a situation at an unrelated company remains irreverent, and the ALJ properly refused to hear the testimony. Additionally, a situation involving a public internet posting does not compare to the private, employee-only posting at issue here. It also remains unknown whether a union organizing campaign was taking place at this other company, whether the subject of the posting publicly testified in opposition to a union organizing priority, or whether the company had a Workday policy that restricted the application's use.

9

22-60493.6252

terminated" (emphasis added) and feared Moran would be terminated as well if Ortiz revealed his name. (Tr. 524, 529) Ortiz told Gecewich did not know where the screenshots had come from, but he received them via text message. (ALJD 57; Tr. 1823)

Gecewich next sought to obtain logs from Workday reflecting the names of those who had viewed Pratt's and Ives's Workday profiles. (GCX 81; Tr. 1828-29). This required requesting the information from the third-party company Workday, because Tesla did not routinely monitor employees' usage of Workday and did not have access to sign-in information. (ALJD 57; Tr. 1827-28). After a week without receiving the information, Gecewich asked a Tesla employee for an update on his request, further stating "Please be aware this case is being closely monitored by Gaby [Toledano] and I am providing updates as they come in." (ALJD 58; GCX 81). On October 4, 2017, Gecewich elevated his request to a supervisor, informing him "We should update Gaby and team shortly." (ALJD 58; GCW 81). ALJ Tracy found that Gecewich was not credible in his denials as to whether Toledano was monitoring the investigation. (ALJD 58).

The Workday logs ultimately revealed that Moran and an individual named Krista Washington viewed Pratt's and Ives's profiles on September 14, 2017, and so Gecewich interviewed Moran. (ALJD 58; Tr. 727; GCX 81). Moran explained that he viewed Pratt's and Ives's profiles to determine whether the individuals that testified in the public hearings were actual employees of Tesla. (ALJD 58; Tr. 731-732). Moran further explained that he uses Workday to view the titles and start dates of co-workers, in order to understand their advancement in the Company compared to his own. (ALJD 58; Tr. 731).

On the same day, Gecewich met again with Ortiz and questioned him regarding the screenshots. (ALJD 58; Tr. 528-530). Ortiz eventually admitted Moran sent him the screenshots but continued to express his concern that he was going to be fired no matter what and his desire to protect his co-workers from problems he had started. (ALJD 59; Tr. 529, 1842-1844)

//

//

10

22-60493.6253

### 4.    Tesla Management Accepts the Recommendation to Terminate Ortiz

Following these meetings, Gecewich drafted an investigation report recommending termination for Ortiz and a warning for Moran. (ALJD 59-60; GCX 86). He also spoke with Hedges about his recommendations and they decided that the decision maker for the termination should be Director of Manufacturing Stephen Graminger. (ALJD 60; Tr. 1262).

However, Gecewich withheld or distorted essential mitigating facts from the decision maker Graminger. The final investigation report simply omits the fact that Pratt and Ives testified publicly at the State capital regarding their name, job title, pay, and working conditions at Tesla – the very impetus for Ortiz and Moran's conduct. (ALJD 61; GCX 62; Tr. 2201) This omission was not even an oversight – the information was removed after appearing in an early draft. (ALJD 60; GCX 62, 86) Gecewich further failed to inform Graminger that the posting occurred in a private, not public, Facebook group, containing only Tesla employees, with the group topic being unionization at Tesla. (ALJD 61; CPX 4) He even provided false information to Graminger, including stating that the Facebook post contained "internal information" that included a "telephone number and personal information." (ALJD 61; Tr. 1288, 1322). When Graminger asked if similar situations had been handled this way, Gecewich said yes, without any details. (ALJD 62; Tr. 1293-94, 1301-02).[5] ALJ Tracy did not credit either Gecewich or Graminger's declaration that Ortiz's union activity was not discussed in the meeting. (ALJD 62)

Despite not having these essential mitigating facts, Graminger still hesitated before making any decision, recognizing that Ortiz's well-known union activity made this a "sensitive case." (ALJD 62; Tr. 1290, 1919) Graminger decided to consult a superior, Vice President of Production Peter Hochholdinger, who ultimately supported the termination of Ortiz. (RX 15) However, Hochholdinger suffered from an even larger deficit of information than Graminger, as he did not review the investigation report or even know the circumstances of the investigation in

---

[5] ALJ Tracy found Graminger a more credible witness than Gecewich. (ALJD 61).

22-60493.6254

which Ortiz lied. (Tr. 1290) What Hochholdinger did know, like Graminger, was that Ortiz was a prominent union supporter. (ALJD 62; Tr. 1290, 1310) In the end, Graminger did not conduct his own investigation, speak to Ortiz, or ask Ortiz why he did not want to disclose where he got the screenshots. (GCX 62; Tr. 1302, 1304, 1324)

### 5. Respondent Terminates Ortiz and Disciplines Moran

Ultimately, Graminger approved the termination and Gecewich informed Ortiz of this decision on October 18, 2017. (ALJD 63; Tr. 532). Later, on May 20, 2018, Tesla CEO Elon Musk provided a different explanation for the termination: "Only known union person fired was a guy who repeatedly threatened non-union supporters verbally & on social media & lied about it." (GCX 38, JX 4, ¶ 4). This public tweet is still posted on Musk's Twitter account and viewable by the public. (JX 4, ¶ 5).

On October 19, 2017, Gecewich issued Moran a warning about his use and access of Workday. (Tr. 738) Gecewich informed Moran, for the first time, that Workday was only for "business purposes." (Tr. 738; GCX 42). No supervisors, managers or human resources employees had ever discussed any policies about using Workday with Ortiz, Moran, or any of the other VOC members prior to October 2017. (ALJD 52; Tr. 389-90, 442, 672). Ortiz and Moran first learned that they could be disciplined for their use of Workday for "personal purposes and without a proper business justification" when they were terminated and disciplined, respectively. (GCX 42).

//

//

//

//

//

//

//

12

### III

### ARGUMENT

A.  **THE ALJ CORRECTLY DETERMINED THAT TESLA UNLAWFULLY TERMINATED ORTIZ AND DISCIPLINED MORAN IN VIOLATION OF SECTION 8(a)(3)**

1.  **The ALJ properly analyzed Ortiz and Moran's activity under the current Board standard and determined that it was both protected and concerted.**

ALJ Tracy correctly applied the Board's standard and determined that Ortiz and Moran were engaged in concerted protected activity for the purpose of mutual aid and protection when Moran sent the Workday profile screenshots to Ortiz. Section 7's "mutual aid or protection" clause guarantees "the right of workers to act together to better their working conditions." *NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 14 (1962). An employee's activity is "concerted" if the employee "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." *Meyers Industries*, 268 NLRB 493, 497 (1984) (*Meyers I*), remanded *sub nom. Prill v. NLRB*, 755 F.2d 941 (D.C. Cir. 1985), cert. denied 474 U.S. 948 (1985), supplemented *Meyers Industries*, 281 NLRB 882, 887 (1986) (*Meyers II*). Protected activity can take many forms, including testifying on behalf of employees before legislative bodies concerning workplace issues. *See, e.g., Kaiser Engineers v. NLRB*, 538 F.2d 1379, 1385 (9th Cir. 1976).

Ortiz and Moran were engaged in protected concerted activity when they went to Sacramento in August 2017 to campaign for greater legislative oversight of working conditions at Tesla. Ortiz and Moran were also engaged in protected concerted activity on September 14, 2017, when they communicated regarding employees Pratt and Ives, who went to Sacramento to speak publicly in opposition to Ortiz and Moran's efforts. Ortiz requested Moran's assistance in determining whether these individuals were actually Tesla employees, and Moran, with the assistance of Workday, provided Ortiz confirmation that they were in fact Tesla employees. Ortiz then used this information to criticize the employees for opposing the legislation by posting

13

the individuals' Company profiles on a private, employee-only Facebook page. As the ALJ correctly found, this private Facebook page was a forum for employees to discuss unionization at the workplace, "essentially a virtual watercooler." (ALJD 65) The ALJ also correctly determined that Moran and Ortiz engaged in concerted activity which was protected because "each of their actions was to promote the union organizing drive at Tesla for the mutual aid and protection of all employees and to improve the terms and conditions for all employees." (ALJD 66)

Respondent's feigned confusion over why Moran used Workday in the manner he did does not remove the Act's protection. Moran was asked whether two individuals testifying at the State Capitol in opposition to the union were Tesla employees. Moran provided visual confirmation that they were.

### 2. The ALJ Correctly Applied Board Precedent with Respect to Terminating an Employee for Lying Regarding Protected Activity

Contrary to Respondent's briefing, Ortiz's refusal to provide his co-worker's name during the investigation did not remove him from protection under the Act and permit his termination. The ALJ correctly stated the Board standard that an employer may not terminate an employee for lying in response to questions regarding protected activity, citing *Tradewaste Incineration*, 336 NLRB 902, 907 (2001) and *St. Louis Car Co.,* 108 NLRB 1523, 1525-26 (1954).

The Company's attempts to distinguish *Tradewaste* and *St. Louis Car Co.* fall flat. *Tradewaste* involved an employee posting a critique of a specific pro-employer co-worker on a bulletin board in the workplace. The posting publicized the employee's high wage of $18.75 per hour and stated, "this shows that this company has no regard for the guys who has worked [sic] to get where they are." The employer then questioned two employees as to whether they were involved in writing, photocopying, or posting the notice, and ultimately the employer suspended an employee for lying about his involvement with the notice. The Board found this suspension was unlawful. Ortiz's post criticized a specific pro-employer co-worker in similar terms, calling out his earnings of $130,000 last year and stating, "the ones that do the real work get passed

22-60493.6257

over." In both *Tradewaste* and this case, the employer demanded that a pro-union employee reveal who was involved in a posting to co-workers regarding working conditions, the employee refused to reveal that information, and the employer terminated the employee for lying. Respondent's attempt to distinguish this case is incoherent – there has never been any allegation that Ortiz improperly obtained Pratt's wage information. That information is not even viewable on Workday. And the employer's pretext that it was merely investigating improper Workday access is just that, relying as it does on a concocted workplace rule invented after the fact to justify an investigation of union activity.

*St. Louis Car Co.*, also applies here108 NLRB 1523 (1954). In *St. Louis Car Co.*, an employee denied she was trying to organize a union at the company in response to the employer's direct questioning. After discovering she had lied, the employer fired her for untrustworthiness. The Board found that it was "farfetched to say that an employee has shown that she is untrustworthy by trying to keep her employer from prying into matters which are" protected, and determined the justification was a pretext for union discrimination. Even when the company claims it applies a strict standard of trustworthiness for all employees, an employee cannot be terminated for refusing to reveal involvement in protected concert activity. *Id. See also Paragon Systems*, 362 NLRB No. 182 (2015) (employees did not lose the protection of the Act when they lied to an investigator regarding their involvement in delivering a strike notice); *United Services Automobile Association*, 340 NLRB 784, 793 (2003) *enfd.* 387 F.3d 908 (D.C. Cir. 2004) (employee did not lose the protection of the Act when she lied to an investigator regarding her involvement in distributing flyers to co-workers encouraging participation in a concerted action).

3.    **The ALJ Correctly Distinguished the Board's Decision in *Fresenius***

Respondent contends that *Fresenius*, 362 NLRB No. 130 (2015) requires a different result. In *Fresenius*, an employee scribbled vulgar, offensive, and threatening language on several union newsletters left in an employee breakroom. This language could be understood as demeaning to women. *Fresenius*, 358 NLRB 1261, 1272 (2012) *judgment reversed* 362 NLRB

15

No. 130 (2015).  The employee's conduct occurred in the period immediately before a decertification election, and five of the twelve individuals in the unit were women. *Id.* After several women complained that the statements were vulgar, offensive, and threatening, the employer launched an investigation into who made the harassing comments.

Unlike *Fresenius* (2015), in this case Respondent did not receive a bona fide complaint of harassment, nor did Respondent conduct an actual investigation into harassment.  Far from reporting harassment, employee Pratt first raised the issue in a text message to the executive coordinating the company's opposition to the union at the State Capitol. Pratt's lighthearted message to Hedges—"[l]ooks like we got under some people's skin" with a smiley face emoji—plainly demonstrates he viewed Ortiz's post as part of the push and pull between union supporters and union critics, not offensive harassment. In addition, the Company's investigation did not even attempt to investigate the supposed harassment. Gecewich admitted he actually avoided looking into the details of Ortiz's post, instead focusing entirely on the supposed improper use of Workday.

Finally, the *Fresenius* Board found that the company's decision to investigate was "consistent with its anti-harassment policy, Federal statutes, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., and state anti-discrimination statutes." 362 NLRB at 1066. Respondent does not even attempt to make a similar claim. There is no comparison between Ortiz's post and the offensive, sexiest language that launched a bona fide investigation in *Fresenius*.

4. **The ALJ Correctly Found That the Respondent's Termination of Ortiz Violated the Act Under *Wright Line***

In *Wright Line, Inc.*, 251 NLRB 1083, 1089 (1980), *enfd.* 662 F.2d 899 (1st Cir. 1981), approved in *Transportation Management, Inc., v. NLRB,* 462 U.S. 393 (1983), the Board established an analytical framework for deciding discipline and discharge cases where the employer claims its motivation for disciplinary action was not based on the employee's protected concerted activities. As explained above, Respondent's stated reason for terminating Ortiz, lying,

22-60493.6259

was in fact protected concerted activity, arguably making a traditional *Wright Line* examination unnecessary. Nonetheless, ALJ Tracy analyzed the termination under *Wright Line* and correctly determined under this test that Respondent violated the Act.

The General Counsel must first establish that (1) employees engaged in union activity; (2) the Employer knew of the existence of protected activity; and (3) it was a "motivating factor" in the employer's decision. *Id.* To meet this burden, the General Counsel must prove by a preponderance of the evidence that union animus was a substantial or motivating factor in the adverse employment action. *Consolidated Bus Transit*, 350 NLRB 1064, 1065 (2007). The burden then shifts to the employer to demonstrate it would have taken the same actions even absent the employees' protected conduct. *Wright Line, Inc.*, 251 NLRB at 1089.

ALJ Tracy properly found that Ortiz engaged in protected concerted activity and that the Respondent, including its agents Hedges, Gecewich, Graminger, and Hochholdinger, were well-aware of Ortiz's activities. (ALJD 68). Respondent did not except to these findings. The Administrative Law Judge also correctly found that union animus was a substantial or motivating factor in the adverse employment action, basing this on the Respondent's failure to conduct a complete and objective investigation, Respondent's shifting reasons for the investigation, the lack of comparable discipline issued for similar circumstances, the timing of the events in proximity to protected activity, and animus demonstrated toward union supporters, including Ortiz, in contemporaneous 8(a)(1) violations. (ALJD 68-70).

### a.    Respondent Engaged in a Demonstrated Pattern of Union Animus Even Before the Investigation

The ALJ correctly found that the Respondent's union animus toward Ortiz and other union supporters supported her finding that Ortiz's termination was unlawfully motivated. (ALJD 68). The Judge based this finding on the numerous unfair practices committed by Respondent and the entire record. Following the ALJ's decision, the Respondent conceded that it committed seven of the unfair labor practice violations described in the decision. The record is replete with additional examples of animus.

17

Respondent did not except to the ALJ's finding that it violated Section 8(a)(1) on four occasions on February 24 and one occasion on May 10, when its security guard agents asked leafletting employees, including Ortiz and Moran, to produce their employee badges and/or told them to leave the premises. (ALJD 15-25) The leaflet in question on February 24 was an article written by Moran criticizing Tesla, entitled "Time for Tesla to Listen." (ALJD 15; GCX 8; Tr. 48, 450)

Respondent also did not except to the Judge's finding that Supervisor Armando Rodriguez violated Section 8(a)(1) of the Act on March 23, 2017 by requiring pre-authorization for the distribution of union stickers, leaflets, and pamphlets and threatening employees with termination for not obtaining pre-authorization. (ALJD 25-27) Finally, Respondent did not except to the finding that it violated Section 8(a)(1) of the Act in August 2017 when Supervisor Homer Hunt told employees it would be futile to select the Union as their bargaining representative.

Furthermore, Tesla management openly described Ortiz, Moran, and the other VOC activists as enemies from the beginning of the Union's campaign. CEO Musk called Moran's union advocacy "morally outrageous" while adding darkly that Moran "doesn't really work for us." Toledano identified Ortiz and his fellow VOC members as "adversaries" when discussing how to neutralize them with Musk in June of 2017. Such clear employer animus is powerful evidence of pretext. *See Jim Walter Resources*, 324 NLRB 1231, 1233 (1997) (employer's animus toward former employee's protected concerted activity supports 8(a)(3) finding).

### b. Tesla's Investigation Was Designed to Produce a Pretext to Discipline Ortiz and Moran

From the outset, Tesla's investigation of Ortiz and Moran departed from the normal course of Company investigations into employee misconduct. This departure began when Pratt sent Hedges a text message mocking Ortiz for becoming upset about Pratt's and Ives's testimony in Sacramento. This was not a complaint from Pratt by any stretch of the imagination—he did not express any "fear," as Hedges later claimed, or complain that Ortiz had published any private

information about him. Nor did he follow the protocol that applies for employee complaints by contacting either the Employee Relations department, which investigates such complaints, or his supervisor.

Instead, Pratt texted Hedges, the management official who had recruited him to go to Sacramento in the first place, with a smiley face emoticon accompanied by the words "got under some people's skin." According to Gecewich's notes, Pratt also sent photographs of the Facebook post to others "as we were getting a rise out of people." The objective evidence demonstrates Pratt was celebrating, not complaining, and Respondent implicitly conceded this point when it chose not to call Pratt as a witness, despite his continued employment at Tesla.

Hedges did not pass on Pratt's text to the staff that would ordinarily investigate complaints of this nature, but instead notified top executives at Tesla: the Director of Employee Relations and Tesla's General Counsel. And while Hedges claimed he did not ask Gecewich to investigate Ortiz, Gecewich chose to initiate an investigation immediately after Hedges talked to him, without waiting for direction from anyone in management. ALJ Tracy saw through Hedges' self-serving testimony, finding him not credible. That decision was clearly correct.

Gecewich set up this investigation to first isolate and then entrap Ortiz. Gecewich was interested in uncovering the details of Ortiz's protected Section 7 activity, *i.e.*, in forcing Ortiz to tell him who had helped him obtain the screenshots he had used. He continued to demand that Ortiz tell him where he got the screenshots even after both Tesla's own IT staff and Moran had given him the answer, putting him in the impossible position of having to choose between lying and giving up his pro-union coworker. Gecewich's fixation on Ortiz's and Moran's protected activities is enough, on its own, to establish the illegal motivation of both the investigation and the discipline it produced.

Gecewich's investigation is remarkable as well for what he did not investigate: he showed little or no interest in any issue other than digging into Ortiz's and Moran's protected concerted activity, and learning who helped who and how. Gecewich was not concerned, for example, with Pratt's alleged privacy concerns. Similarly, even though Gecewich's investigative

22-60493.6262

report mentioned that Ortiz had posted Ives' photo as well as Pratt's, Gecewich did not even bother to interview Ives or Osbual.

Pretext may be demonstrated by various factors, including disparate treatment, shifting explanations, or an inadequate investigation into a discriminatee's alleged misconduct. *See Shamrock Foods*, 366 NLRB No. 117, slip op. at 27-28 (2018). An inadequate investigation provides particularly strong support for a finding of union animus because it demonstrates the process that management used to get to the result that it desired. *St. Paul Park Refining Co., LLC*, 366 NLRB No. 83 (2018).

In *St. Paul Park Refining* the Board found the Employer violated Section 8(a)(1) when it conducted an investigation into an employee's refusal to perform work in unsafe conditions and decided to forego interviewing relevant witnesses and chose to interview people "designed simply to substantiate its supervisors' versions of what occurred and justify their sending [employee] home." *St. Paul Park Refining*, 366 NLRB No. 83, *16. The Board stated that respondent's "lack of an objective and complete investigation is circumstantial evidence of pretext, establishing animus towards [employee's] protected concerted activity." *St. Paul Park Refining*, 366 NLRB No. 83, *16. In certain cases, the road not taken reveals as much as the avenues that the employer actually pursued.

Gecewich also tailored his investigation in order to avoid any overt references to Ortiz's and Moran's Section 7 activity and, in particular, their work pushing for greater regulatory oversight over Tesla—or to Pratt's and Ives' advocacy on behalf of Tesla that led to the Facebook posts that spawned his investigation. Thus, Gecewich not only did not mention the background of the September 14, 2017 post or Ortiz's and Moran's legislative work, but edited those references out of the report that he submitted to the group called together to decide what action to take.

The investigation was irregular in another respect: even though Gecewich chose two additional managers to be part of the process so they could provide input concerning Ortiz's employment history and work performance, it does not appear that they made any significant

22-60493.6263

contribution to the review of Gecewich's recommendation during this meeting. That recommendation had, moreover, already been approved by the legal department and included consideration of Ortiz's background. This panel appears to have been brought together to rubber stamp Gecewich's recommendation, rather than to render its own decision.

And contrary to Respondents assertions, ALJ Tracy did not make a business judgment on the adequacy of the investigation. Her decision cogently explains how Respondent's actions demonstrated union animus. Additionally, she found Hedges and Gecewich were not credible in their testimony on the investigation, covering up glaring omissions in the investigation. The Judge's finding that the investigation was a pretext to find fault with Ortiz and Moran is fully supported by the record.

### c.     Tesla Would Not Have Taken the Same Actions Absent Ortiz's Union Activity.

As the ALJ correctly found, proffering a nondiscriminatory reason for terminating Ortiz is insufficient; Respondent has the burden to demonstrate that it would have taken the same actions even absent the employee's union activity. *Wright Line*, *supra*, 251 NLRB at 1089; *Hyatt Regency Memphis*, 296 NLRB 259, 260 (1989) ("the burden shifts to the Respondent to show it would have taken the same action against the employees regardless of their union or other protected activities"). Tesla cannot carry that burden.

The Respondent's attempt to point to a comparator case involving lying ignores the fact that the investigation would not have occurred in the first place but for union activity. Absent Ortiz's union activity, Hedges would not have opened an investigation into Pratt's supposed "harassment," nor would Gecewich have ignored Pratt's original text message and fabricated his own investigation into Workday profile screenshots. Without these two acts, Ortiz would never have been questioned about who sent him the screenshots, and no lie would have occurred.

When Gecewich met with Stephen Graminger, Director of Manufacturing, the purported decision maker in Ortiz's case, the decision to terminate Ortiz was effectively set. Graminger and the others on the panel gave Gecewich's revised report only a few minutes of consideration, then

22-60493.6264

proceeded without bothering to conduct any investigation of their own, much less speak to Ortiz about the incident, even though Graminger had reservations about the wisdom of proceeding.[6]

A fair investigation would have done much more than simply sign off on Gecewich's report. Tesla's deviation from these procedural norms makes it virtually impossible for it to demonstrate what course of action it would have taken had it not rushed to reach the retaliatory outcome it wanted to achieve, much less prove that the outcome would have been the same.

Tesla's union animus and, in particular, its animus against Ortiz and Moran means that Tesla must make a particularly strong showing in order to rebut these charges. *Eddyleon Chocolate Co.*, 301 NLRB 887, 890 (1991); *see also Van Vlerah Mechanical*, 320 NLRB 739, 744 (1996). It cannot do so. Tesla violated the Act by firing Ortiz.

5. **The Respondent's Request that the Board Overturn its Precedent Based on the Respondent's Categorization of "Core" Section 7 Rights Should be Rejected**

Having failed to justify its unlawful actions under the applicable legal standard, Respondent invites the Board to overturn its prior decisions, and fashion a new standard based on Respondent's own arbitrary definition of "core" Section 7 activity. The Board should flatly reject Respondent's specious "Hail Mary" argument, which seeks to muddle clearly-established precedent, make a mess of the law, and introduce out of thin air a baseless distinction between "core" and "non-core" Section 7 rights.

Respondent begins by quoting the language of Section 7 of the Act, which guarantees employees' right "to self-organization, to form, join, or assist labor organizations, to bargain

---

[6] Graminger expressed some reservation about following Gecewich's recommendation for termination since it was two employees engaged in protected concerted activity, so he followed up with his superior, Vice President of Production, Peter Hochholdinger. However, Graminger never once showed Hochholdinger the investigation report created by Gecewich, did not discuss the details of the investigation report or of the circumstances surrounding Ortiz's post, never pulled Ortiz's personnel files to review his work performance with Hochholdinger, or engaged in any investigative work to independently decide to terminate Ortiz or take other appropriate disciplinary action.

collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." Respondent then audaciously puts forward its own view that "[t]he core rights protected by the Act are the first three listed in the statute"—to the exclusion of concerted activity, which Respondent evidently does not consider to be a "core" right protected under the Act. (Respondent Brief at 44) Respondent's does not present any authority or even any reasoned justification in support of the momentous shift in Board law it seeks to effect, relying simply on the fact that self-organization, forming, joining, or assisting labor organizations, and collective bargaining are listed first in the statute. Nor does Respondent indicate how the Board is to distinguish, for example, between employee "self-organization," and concerted activity carried out by employees in furtherance of such self-organization. Respondent's perfunctory effort to sustain its novel categorization of "core" Section 7 rights further demonstrates that this is a throwaway argument which Respondent itself does not expect to receive serious consideration.

Respondent goes on to argue that the Board should inject this newfound concept directly into its standard governing employee dishonesty during workplace investigations, and in so doing "build upon its precedent in *Fresenius* [...]." (Respondent's Brief, at 45) In fact, as noted above, the ALJ correctly analyzed and distinguished the Board's decision in *Fresenius*, wherein "the Board found that an employee's dishonesty during an investigation of misconduct of alleged harassment and threats was unprotected by the Act due to the focus of the investigation on the allegation, and not on any union activity." (ALJD at 44) Further, in deciding *Fresenius*, the Board specifically noted that "there is no credible evidence that the investigation occurred in a context of employer hostility to protected union activity," and that the employee's lies "did not implicate a legitimate interest in shielding his Section 7 activity from employer inquiry." *Fresenius*, 362 NLRB at 1066. The Respondent's categorization of "core" rights is entirely absent from *Fresenius*; far from "building upon" the Board's reasoning, Respondent's ill-conceived idea cannot be reconciled with the logic of the decision.

22-60493.6266

The ALJ's opinion faithfully applies the distinction the Board has drawn between self-serving dishonesty by employees seeking to shield their own improper actions, and dishonesty in the face of unlawful questioning regarding protected, concerted union activity, as occurred in this case. The ALJ's thoughtful analysis of the issue itself demonstrates the ability of a legal fact-finder to intelligently discern which is which, belying Respondent's assertion that "every employee now has carte blanche to lie during an investigation, merely by suggesting that it might in some way be related to protected concerted activity." (Respondent Brief at 44)

### 6.    ALJ Tracy Correctly Found That Respondent Disciplined José Moran for His Concerted Protected Activities in Violation of Section 8(a)(3)

Respondent's argument that Moran improperly accessed and shared Workday profiles is nothing but a fantasy, contradicted by the undisputed record. Tesla chose to give each of their thousands of employees the ability to access the Workday profile of every other employee at the plant. This profile contained only the most basic information about each employee – their name, their picture, and their job title. It was an employee directory with no contact information. The undisputed, credited evidence established that Tesla never placed any limitations or restrictions on the use of this information. (ALJD 52).  Respondent instead made the affirmative choice to grant wide access, perhaps as an example of the anti-hierarchical, start-up culture that Tesla sought to embody.

Lacking evidence, Respondent resorts to *ad hominem* attack, describing Moran's conduct as "surreptitious" and "hacking." (Respondent Brief at 48, 51).  Respondent's accusations only highlight the weakness of its argument. None of the information was proprietary, confidential, or even secured from employees. Tesla made the information available to employees without restriction, and employees used and shared that information with each other freely.

Respondent further distorts the record by stating that employee information was shared "externally." The undisputed evidence shows the information was only shared with co-workers who themselves had access to the same information.

24

Respondent's wishful thinking extends to its comparison with *Roadway Express*, 271 NLRB 1238, 1239 (1984). In *Roadway*, an employee opened an unlocked file cabinet in a limited-access office and removed documents that related to an alleged contract violation. The Board found that, even without a written rule, the employer had an expectation for employees not to access private business records without authorization. Plainly, a document in the file cabinet of a limited-access office is not the same as an employee directory to which an employer affirmatively grants all employees access.

As the ALJ correctly noted, *Ridgely* provides the more accurate comparison. In *Ridgely*, the Board determined timecards containing employees' names were not private or confidential because they were available for all employees to see. *Ridgely Mfg. Co.*, 207 NLRB 193, 197 (1973). The Board therefore determined that an employee could not be terminated for reviewing the timecards for use in union organizing efforts. *Id.* The Workday profiles were similarly available for all employees to view. In fact, unlike *Ridgely*, where the timecards were on display by necessity, the Respondent *affirmatively chose* to allow all employees to view and search for the Workday profiles of other employees.

Respondent's protests that it either had no duty to inform employees about the limited allowable uses for Workday profiles, or that such a specific rule is implied within its generalized handbook exhortations to employees to set "high expectations," do the "right thing," and "treat everyone like you want to be treated." (Respondent Brief at 52-53). Respondent has evidently lost all perspective and grounding in the facts, characterizing Moran's protected actions as so egregiously wrongful that "common precepts" mandate his discipline. The credited facts of this case, which Respondent distorts at its whim, are that Workday profiles contain only an employee's name, picture, and job title. Presented with access to such data, it is by no means common sense that an employee could not use this data to organize a plant softball league, identify a neighbor for a carpool, assign dishes for a unit potluck, or set up a support group for coworkers trying to quit smoking.

22-60493.6268

What Respondent actually means is that it was common sense that Workday Profiles could not be used to assist in *union organizing*. Tellingly, Respondent is unable to name any other employees disciplined for misusing Workday. Disparate treatment of employees who engage in protected concerted activity supports a finding of unlawful motivation for discipline. *Carpenters Health & Welfare Fund*, 327 NLRB 262 (1998) (finding disparate treatment where employer offered no evidence that it had ever discharged others for violating telephone policy); *Consec Security,* 325 NLRB 453 (1998) (finding disparate treatment where employer failed to demonstrate it had ever discharged an employee for similar so-called insubordination).

Further, discipline for violating a non-existent and wholly undefined work rule is a classic example of pretext. Respondent permitted employees to view their co-workers' Workday profiles without restriction or limitation, then disciplined an employee for using Workday in a manner that supported a union organizing campaign. As ALJ Tracy found, Respondent invented a rule and applied it *ex post facto* in order to justify disciplining Moran for his protected activity. *See Morgan Precision Parts*, 183 NLRB 1141, 1144 (1970) (discharge of union supporter based on nonexistent production quota violated the Act). This is a clear violation of Sections 8(a)(3) and (1) of the Act.

## B.    THE ALJ CORRECTLY DETERMINED THAT RESPONDENT UNLAWFULLY INTERROGATED ORTIZ AND MORAN

Applying the Board's standard under *Rossmore House*, 269 NLRB 1176 (1984), ALJ Tracy correctly found that Respondent unlawfully interrogated Ortiz on September 21 and October 12, and Moran on October 12. Respondent launched an investigation into a union supporter's Facebook post, written during his free time and away from work, about a campaign to persuade the state legislature to exercise greater oversight over working conditions at Tesla.

Moreover, Tesla pushed forward with this investigation even though it was clear from the outset that this was nothing more than a disagreement between two employees regarding the merits of a union. Ortiz took down his post about Pratt and Ives after two hours, when Pratt

26

emailed him to say that this was not a good way to open communications. Pratt then joked to the HR manager who had recruited him to go to Sacramento that "we got under some people's skin."

However, Hedges directed Gecewich to open an investigation, and Gecewich questioned Ortiz about his union Facebook post. The investigator focused almost exclusively on finding out who Ortiz had talked to and where he got the information he used to post his comments about Pratt and Ives—the sort of details about employees' communications with each other about their concerted activities that are not properly the subject of employer inquiry. *Guess!, Inc.,* 339 NLRB 432 (2003). An improper investigation became progressively more intrusive, coercive, and unlawful as it proceeded.

After Gecewich determined Moran had sent the photos, he questioned Moran about his protected concerted activity. Even though he already knew the answers to his questions, he interrogated Moran about whom he sent the screenshots to and why he did so. Still not content, Gecewich once again questioned Ortiz, again pressing him for details about his sources for information about Pratt and Ives and his private communications with his coworkers, even though he had already discovered the answer to his questions.

## C.    THE ALJ PROPERLY DECIDED THAT CEO MUSK'S STATEMENT REGARDING STOCK OPTIONS WAS A THREAT OF REPRISAL THAT VIOLATED SECTION 8(a)(1) OF THE ACT

On May 20, 2018, Tesla CEO Musk issued a public statement via Twitter that threatened to take away Tesla employees' stock options if they chose to unionize. Specifically, while discussing employees' option to vote for a union, he rhetorically asked "[b]ut why pay union dues & give up stock options for nothing?" This constitutes a blatant "threat of reprisal" under *NLRB v. Gissel Packing Co.,* 395 U.S. 575 (1969) in violation of Section 8(a)(1) of the Act.

Section 8(a)(1) of the National Labor Relations Act prohibits employer conduct that has a reasonable tendency to coerce employees in the exercise of their Section 7 rights. *American Freightways Co.,* 124 NLRB 146 (1959); *Gissel,* 395 U.S. at 618. No proof of the employer's intent or the employee's reaction is necessary to establish a violation of Section 8(a)(1) of the

22-60493.6270

Act. *El Rancho Market*, 235 NLRB 468, 471 (1978). Employer statements that threaten to take away employee benefits, including stock options, if employees choose to unionize tend to coerce employees' rights under the Act and thus violate Section 8(a)(1). *KSM Industries*, 336 NLRB 133, 133 (2001); *Ready Mix, Inc.*, 341 NLRB 958, 960 (2004).

The Supreme Court has long distinguished between threats of reprisals that violate Section 8(a)(1) and employer free speech that lawfully predicts the effects of unionization. *Gissel*, 395 U.S. at 618. As the ALJ properly stated, for a prediction to be lawful, the effects of unionization must be "carefully phrased on the basis of objective fact" and involve "probable consequences beyond [the employer's] control." *Id.*; *Systems West*, 342 NLRB 851, 852 (2004). If these factors are not met, then the statement is not a prediction, but a "threat of retaliation based on misrepresentation and coercion." *Gissel*, 395 U.S. at 618. Such statements enjoy no protection under Section 8(c) of the Act or the First Amendment. *Id.*

Musk's statement does not meet the standard under *Gissel* for a carefully stated lawful prediction. First, it does not state an objective fact. If Tesla employees unionized, Section 8(a)(5) of the NLRA would require Tesla to maintain all existing terms and conditions, including employee stock options, until the parties reach a collective bargaining agreement. If Respondent forced employees to "give up" their stock options because they voted in favor of unionizing, that would violate the Act. Musk did not come close to "carefully phrasing" an "objective fact."

Second, the statement does not convey a consequence that is outside of the Employer's control. Tesla controls its employee stock option plan, so it makes the ultimate decision on who is eligible. Excluding unionized employees from the stock option plan is therefore not a lawful prediction outside the employer's control but is instead an unlawful threat of retaliation.

### 1.    CEO Musk's Twitter Statement Was Unambiguous

The ALJ correctly found that CEO Musk's tweet unambiguously indicated that if the employees vote to unionize, they would give up stock options. The statement—"Nothing stopping Tesla team at our car plant from voting union. Could do so tmrw [tomorrow] if they wanted. But why pay union dues & give up stock options for nothing?"—plainly includes a

28

rhetorical question. Musk is providing a reason why the workers should not vote for a union: it will cause the workers to owe union dues and lose their stock options.

Simply because the statement is in the form of a rhetorical question does not make the statement ambiguous. In *Concepts & Designs, Inc.,* 318 NLRB 948, 954 (1995), after the company inadvertently failed to print an employee's check, the company president stated to the employee, "It would sure be nice to get one of these every week, wouldn't it?" Despite not mentioning the union or the employee's support of it, the Board found this remark to be an implied threat that violated Section 8(a)(1).

In *KSM Industries*, the operations manager told strikers "these people in here have jobs" and asked "[w]hat are you doing for a livelihood?" 336 NLRB at 133. The Board found this comment violated Section 8(a)(1) because it was "plain that [the manager's] comment and question were simply another way of telling the strikers they were out of a job" and therefore the "rhetorical questioning had a reasonable tendency to coerce." *Id.*

## 2.    The Act Prohibits Threats of Reprisals Against Employee Stock Options

CEO Musk's threat is unfortunately not unique, or an issue of first impression. The Board has repeatedly found that threatening employees with the loss of stock options if they unionize violates Section 8(a)(1). In *Ausable Communications,* the Board found a violation of Section 8(a)(1) where a supervisor told two employees that they "would lose their rights to acquire company stock in the future" if the workplace unionized. 273 NLRB 1410, 1413 (1985). In *Ready Mix, Inc.*, the Board found an 8(a)(1) violation where an employer stated in a memorandum to its employees that they could not continue to participate in its employee stock option plan if they chose union representation. 341 NLRB 958, 960 (2004). In *Dynacorp*, 343 NLRB 1197 (2004) the Board found an 8(a)(1) violation where a supervisor told employees that the employer would immediately cease making its contribution to the employee stock ownership plan if the employees unionized.

The Board has also reached the same conclusion for similar threats involving 401(k) plans. In *Smithfield Foods*, 347 NLRB 1225 (2006) the Board found that an employer unlawfully

threatened employees when the plant manager announced a new 401(k) program for employees but stated that employees would lose their eligibility if they voted for the union. *Id.* at 1229;[7] *see also E & L Plastics Corp.*, 305 NLRB 1119, 1120 (1992) (finding an 8(a)(1) violation where pension and profit-sharing plan unlawfully conveyed to employees the impression that they would automatically lose retirement benefits if they were ever to unionize); *Meyer Jewelry Co.*, 230 NLRB 944 (1977) (finding an 8(a)(1) violation where supervisor threatened loss of profit-sharing benefits if union came in).[8]

### 3.     Musk's Twitter Statement Did Not Refer to Collective Bargaining

As the ALJ properly recognized, Musk's statement was not "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control." *Gissel, supra* at 618. Statements implying that employees might lose benefits if they unionize may be lawful "when other communications make it clear that any reduction in wages or benefits will occur only as a result of the normal give and take of negotiations." *Taylor-Dunn Mfg. Co.,* 252 NLRB 799, 800 (1980); *Kezi, Inc.,* 300 NLRB 594, 595 (1990). But Musk's statement does nothing of the sort.

In *Kezi*, the employer implied that unionized bargaining units were excluded from the company's 401(k) plan, but also clearly stated that employees' retirement benefits would be the subject of good-faith bargaining. *Id.* The Board found no violation of the Act, drawing a distinction between lawful statements that indicate "benefits for unionized employees are subject

---

[7] Tesla's citation to *Smithfield Foods* (Respondent Brief, at 23) ignores this 401(k) finding, and instead references a separate finding in the case that a statement describing past plant closures is lawful, which is irrelevant to the facts here.

[8] The Board has also found that similar comments warrant overturning representation elections because they convey a threat in retaliation for employees' exercise of their right to choose to be represented. In *BCI Coca-Cola Bottling Co.*, 339 NLRB 67 (2003) a branch manager told an employee that "with the Union, there is no 401(k)." The Board found that this comment, and the Company's later failure to clearly disavow it, required the direction of a second election. In *Hertz Corp.*, 316 NLRB 672 (1995) the Board overturned an election after the employer distributed a summary of its 401(k) plan during the union campaign that stated a 401(k) benefit existed "only for non-unionized Hertz shops." *Id.* at fn. 2, 695. The Board found this statement "conveyed the impression that the employees would lose the 401k plan immediately on choosing union representation." *Id.* The Board further found that the employer's oral explanation of the negotiation process was insufficient to dispel this impression.

22-60493.6273