to negotiation" versus unlawful statements that suggest that employees are "foreclosed from inclusion in a particular plan simply because they have a union bargaining on their behalf." *Id.*

*Histacount Corp.*, 278 NLRB 681 (1986), cited by Respondent, stands for the same proposition. In *Histacount*, the employer stated that bargaining can take a long time, the company is permitted to "bargain from ground zero," and there is no guarantee existing benefits will survive bargaining. The Board found these statements legal, because they were "made in a context which would indicate to employees that bargaining is a process in which each side makes its own proposals, that it requires mutual agreement, and where existing benefits may be traded away." Thus, the statement did not convey that the employer "would unilaterally discontinue existing benefits if the employees selected union representation, but rather that existing benefits may be lost as a result of bargaining." *Id.* at 689.

In this case, neither Musk, nor anyone else from Tesla, has stated that Tesla will engage in good faith bargaining over stock options if the employees choose union representation. Because the Company has never even suggested that employees would have the right to bargain before they would lose their stock benefits, but simply presented this loss of stock as a certain consequence of unionization, the statement is coercive.

### 4.    Tesla's Alternate Interpretation Is an Unreasonable Reading of the Statement

Respondent asserts that the intended meaning of Musk's Tweet was that the UAW, not Tesla, would make employees give up their stock options, supposedly because the UAW does not permit or favor such benefits. (Respondent Brief, at 24).  In support of this argument, Tesla points to two subsequent Twitter statements on May 22 and May 23, 2019 by Musk, and two statements by unknown Twitter users. As the ALJ correctly found, Respondent's proffered interpretation of the May 20, 2018 Tweet is wholly unreasonable.

Respondent argues that its interpretation is supported by a reading of Musk's statement in a wider context. (Respondent Brief, at 23-24).  Yet such an examination of wider context does the Respondent no favors. At the time of Musk issued his statement on whether employees at his

22-60493.6274

Company should unionize, Tesla employees were actively organizing their co-workers in support of a union and the NLRB General Counsel had issued a complaint alleging Respondent committed multiple unfair labor practices. The Respondent had already harassed employees distributing union literature, interrogated employees seeking health and safety information, and terminated one of the most prominent union supporters in the plant. Musk's Twitter account was also closely watched at this time due to his penchant for announcing Company news and making other off-beat remarks through the platform. Even Gaby Toledano, Tesla's Chief People Officer during this time, admitted she would "track Elon's tweets" to make sure he "was not tweeting dumb stuff." (Tr. 954). Under these circumstances, Musk broadcast his statement to 22.7 million Twitter followers, and his message quickly garnered attention, including from Respondent's employees and UAW organizers. (Tr 52, 953).

Following his Tweet regarding stock options, Musk issued several additional Tweets on that same day regarding unionization and the terms and conditions of Tesla employees. (GCX 38). None of these statements clarified or retracted his statement about stock options. An additional day went by, with Musk issuing more statements on Twitter, none of them addressing the original statement either.

The "context" Respondent argues is necessary to correctly understand Musk's May 20, 2018 Tweet is to be found in Tweets which were posted two and three days later, with dozens of other Musk Tweets falling in between. Because of the structure of Twitter, many individuals who saw the first Tweet did not see Musk's subsequent Tweets two days later. Musk did not delete or edit his original, coercive statement—in fact, the statement remains online and visible to employees today.

Further, Musk's additional statements do nothing to decrease the coercive effect of the May 20 Tweet. If anything, they increase the coercion. On May 22, 2018, Musk Tweeted:

> No, UAW does that. They want divisiveness & enforcement of 2 class "lords & commoners" system. That sucks. US fought War of Independence to get *rid* of a 2 class system! Managers shd [should] be equal w easy movement either way. Managing sucks btw. Hate doing it so much.

32

22-60493.6275

(GCX 69-2). To understand this statement as a clarification, Tesla asks that the statement be read in conjunction with a statement from an unknown Twitter user named Eric Brown, which stated "Hi Elon, why would they lose stock options? Are you threatening to take away benefits from unionized workers?" (GCX 69-2). This statement did not originate from Respondent or its agents, and Respondent strains credulity by suggesting that this user's statement reached as many employees as Musk's original Tweet, or that Musk's Tweet would be understood by his Twitter followers as a direct response to this user.

Tesla's presentation of two Tweets as a concise, email-like chain does not accurately represent how Twitter actually displays Tweets. If an employee was following Musk's Twitter Account, Musk's statements would appear on the employee's Twitter 'Timeline,' along with Tweets from other individuals who the employee chose to 'follow.' The Timeline is the default home page for individuals viewing Twitter. Statements by Twitter users who an individual does not follow would not appear on the Timeline. Only by clicking on individual Tweets in the Timeline would a viewer see the statement a Tweet responds to. Alternatively, if an employee clicked on Elon Musk's account, the employee would simply see a list of all of Musk's Tweets, not what he was replying to. The employee would only see another user's underlying Tweet to which Musk was responding if the employee clicked on an individual Musk Tweet.

Even if employees did see the Tweet Musk was responding to on May 22, 2018, Musk's statement "No, UAW does that" remains confusing. He does not explain how UAW could "take away" stock options from unionized workers. Nor does his statement assure employees Tesla would engage in good faith bargaining if they chose to unionize. Instead, the CEO issues another threat, warning that unionization will bring "divisiveness," a "2 class system," and the loss of "easy movement" between manager and employee status.[9]

---

[9] *See Hendrickson USA*, 366 NLRB No. 7 (2018) (employer violated Section 8(a)(1) when it stated that, if the employees chose to unionize, "the culture will definitely change," "relationships suffer," and "flexibility is replaced by inefficiency," while extolling the existing "easy-going atmosphere" of the workplace.)

22-60493.6276

On May 24, 2018, Musk issued another statement, saying "Exactly. UAW does not have individual stock ownership as part of the compensation at any other company." (GCX 69-3) This inaccurate statement, occurring three days after the initial coercive Tweet, also does not correct or even mitigate the coercive effect of the May 20, 2018 Tweet. The May 20, 2018 Tweet remains unedited and undeleted today, and this Tweet does not appear directly below it. This May 23, 2018 Tweet also does not provide a logical explanation for why Tesla employees would have to give up the stock options they currently possess, or state that such benefits are subject to bargaining. Tesla further argues that the word "exactly" provides clarification because it should be read in context with comments by two more unknown Twitter users, "Therm Scissorpunch" and "Wooter." Again, this is not useful context, because Tesla employees and the public were far more likely to see Musk's Tweets than the Tweets of these unknown users.

5.   **Respondent Fabricates Evidence in an Attempt to Find an Objective Basis for Musk's Statement**

Even if the Tweet is interpreted as Respondent prefers, Respondent lacks any objective facts in the record to support its position that the UAW does not permit or favor stock options. Lacking such evidence, Respondent resorts to inventing it. Respondent Brief at page 26 claims UAW organizers "dismissed the value" Tesla stock options and that "none of their contracts provide for employee stock options." Zero support for these statements exist in the record of this case.[10] If Respondent had attempted offer such evidence at the hearing, Charging Party UAW would have shown both statements are wrong. The UAW currently represents employees who participate in stock ownership plans, and UAW organizers have not dismissed the value of Tesla stock options.

Even under Tesla's preferred interpretation, the Twitter statement simply does not state an objective fact outside the employer's control. *See Ed Chandler Ford, Inc.,* 254 NLRB 851

---

[10] The record does demonstrate that a spokesperson for UAW stated, in a news article about Musk's May 20, 2019 Tweet, that the Union does not have a policy preventing UAW-represented employees from owning stock options. (RX 45C).

22-60493.6277

(1981) (Board found 8(a)(1) violation where employer's prediction that employees would lose bonuses if they unionized because the union's contracts with other car dealerships did not include bonuses was not based on objective facts); *cf. Eagle Transport Corp.,* 327 NLRB 1210 (1999) (posting letters from customers saying they would make other arrangements if the Company unionized did not violate the Act, because the letters conveyed an objective fact outside of the employer's control).

Predictions concerning the precise effects of unionization "must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control." *Gissel,* 395 U.S. at 618; *Systems West,* 342 NLRB 851, 852 (2004). In *Systems West,* a supervisor at a construction company told employees that if the company unionized, the employees would be unable to work jobs outside of a certain geographical area, because of union rules. The Board found, because the statement was both untrue and involved choices over which the employer would have either complete or partial control, the statement unlawfully threatened retaliation. Musk's statement here is similarly both untrue and involves a choice over which the employer would have control.

Contrary to Tesla's suggestion, *Noral Color Corp* and *TCI Cablevision of Washington* do not hold differently. In both of these cases, the employer stated that, if employees decertified the union, they would receive the 401(k) or Employee Stock Ownership Program already enjoyed by nonunion employees at the company. The Board found in both cases that the statement was an objective fact based on factors *outside* the Company's control. *See TCI Cablevision of Washington, Inc.,* 329 NLRB 700, 700-01 (1999) (employer's 401(k) plan, according to "the provisions of ERISA," must be offered to all employees at the company who were not represented by a collective-bargaining representative); *Noral Color Corp.,* 276 NLRB 567, 570 (1985) (denying participation in ESOP plan for nonunion employees "would have amounted to discrimination of another sort" and "might well have jeopardized the favorable tax benefits of the ESOP plan").

35

22-60493.6278

Finally, Tesla has failed to offer evidence that the Union does not value stock options as a form of compensation or would not negotiate to maintain them upon unionization. *Cf. Monfort, Inc. v. NLRB*, 1994 WL 121150, at *16 (10th Cir. 1994) (objective evidence established profit-sharing plan was not favored by the union); *NLRB v. Lenkurt Electrical Co.*, 438 F.2d 1102, 1107 (9th Cir. 1971) (employer's showing of past incidents of unionization creating difficulty in transferring employees demonstrated employer's prediction had a basis in objective fact). Instead, the only evidence Tesla provides for its groundless characterization of the UAW's position regarding employee stock options is the Company's own statements and inventions. This *ipse dixit* has no basis in reality.[11]

### 6.    The Method Used to Communicate the Threat Does Not Alter the Analysis

While Musk used a social media platform to issue his unlawful threat of reprisal, that does not make this case unique. *See e.g.*, *Cayuga Medical Center*, 365 NLRB No. 170 (2017) (supervisor's statement on Facebook threatening retaliation against employee engaged in protected activity violated the Act); *Miklin Enterprises*, 361 NLRB 283, 290 (2014) (manager's posts on an anti-union Facebook site encouraged harassment of an employee who supported the union). Nor does the fact that the statement was issued on a public forum. *See Vemco, Inc.*, 304 NLRB 911, 925 (1991) (unlawful threat was communicated to employees through media coverage of a press release); *Operating Engineers Local 12 (Associated Engineers)*, 282 NLRB 1337, 1343 (1987) (statements by respondent's agents to the news media constituted threats in violation of Section 8(b)(1)(A) of the Act).

---

[11] The remaining decisions Respondent cites in support of its position—*NLRB v. Pentre Electrical*, 998 F.2d 363 (6th Cir. 1993); *NLRB v. Village IX*, 723 F.2d 1360 (7th Cir. 1983), and *Benjamin Coal Co & Empire Coal Co.*, 294 NLRB 572, 581 (1989)—relate to the level of evidence necessary to substantiate an employer's predictions of the *economic* consequences of unionization. In these cases, the employers predicted their companies would become less competitive, potentially resulting in layoffs, a shutdown, or relocation, if wage and benefits increased as a result of unionization. No such statement occurred here. Predictions of the economic consequences of unionization are treated completely differently under *Gissel* and 8(c) than an employer's blunt statement that employees will lose a benefit if they unionize.

22-60493.6279

Further, it is irrelevant to whom an employer's statement is directed to or by whom it is intended to be heard when evaluating its coerciveness. *Crown Stationers*, 272 NLRB 164 (1984); *Corporate Interiors, Inc.*, 340 NLRB 732, 733 (2003). In *Crown Stationers*, the store manager unintentionally left an unsealed letter in a place where an employee was likely to find it; the letter contained a threat of discharge of a union supporter, and it was found and disseminated by an employee. The Board, reasoning that the fact "that the letter was personal and not intended for the eyes of employees is irrelevant," found the letter had a tendency to coerce employees in the exercise of their Section 7 rights and therefore violated Section 8(a)(1) of the Act. *See also Unbelievable, Inc.*, 323 NLRB 815, 816 (1997) (finding restaurant supervisor's coercive threat, overheard by a hidden busboy, violative of Section 8(a)(1) regardless of supervisor's lack of knowledge of busboy's presence); *Williams Motor Transfer*, 284 NLRB 1496, 1499 (1987) (finding company president's threats, overheard by a driver, unlawful regardless of president's intent or whether he was aware of driver's presence); *Corporate Interiors*, 340 NLRB at 733 (owner's threat of violence toward a union organizer during telephone call had a tendency to interfere with the free exercise of employee rights, whether or not owner was aware of employee's presence and whether or not he intended employee to hear the threat).

The General Counsel established that employee Michael Sanchez saw Musk's May 20, 2018 Twitter statement. (Tr. 52-53). Furthermore, the parties stipulated that Musk's May 20, 2018 Twitter statement was posted publicly and subsequently republished and disseminated and that Musk has used the same Twitter account to post about Tesla's personnel matters. (JX 4, ¶ 3, 15, 19). His statement was therefore visible to all employees in a location they had a strong interest in checking and monitoring.

Tesla's numerous other unfair labor practices in this case provide context and support for the conclusion that Musk's Tweet violated Section 8(a)(1). Indeed, a threat of loss of existing benefits is more coercive in the context of a union organizing campaign where, as here, the employer has already committed numerous other unfair labor practices. *Taylor-Dunn Mfg. Co.*, 252 NLRB 799, 800 (1980). Tesla's demonstrated disregard for the rights of its employees under

37

22-60493.6280

the National Labor Relations Act would reasonably make employees more sensitive to Musk's threat. Employees would have every reason to believe that Musk is willing to follow through on his threat in light of Tesla's previous conduct.

### 7. Neither Musk nor Tesla Has a First Amendment Right to Threaten Employees with Reprisals for Their Protected Activity

Tesla tries to support its defense of its threats to take away employees' stock options by claiming that holding it liable would violate it and Musk's First Amendment rights. Far from helping its case, this argument only serves to point up the weaknesses in it.

First of all, Tesla's First Amendment argument rests on a misrepresentation of what Board law provides and what the ALJ decided. As the ALJ found, Musk made a straightforward threat to take away employees' stock options if they unionized. (ALJD at 74) This goes far beyond mere misrepresentations and expressions of opinion; in fact, the ALJ specifically and correctly rejected Tesla's defense that Musk was merely speculating about what might happen if it engaged in collective bargaining with the UAW. On the contrary, Musk threatened unilateral withdrawal of these benefits if employees chose to unionize. (ALJD at 74)

The Supreme Court in *Gissel* went to some trouble to explain the difference between mere expressions of opinion and unlawful threats:

> [A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. See *Textile Workers v. Darlington Mfg. Co.*, 380 U. S. 263, 274, n. 20 (1965). If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.

22-60493.6281

395 U.S. at 618. Musk's statement that employees would lose their stock options was a threat—not merely a "potential" or "perceived" threat—in violation of Section 8(a)(1).

That makes Tesla's reliance on *Rodriguez v. Maricopa County Community College District*, 605 F.3d 703 (9th Cir. 2010) self-defeating. This is shown most clearly by Tesla's clumsy attempt to make the decision in *Rodriguez* say something different than what it actually holds.

Tesla quotes the following passage from Rodriguez:

> . ., Kehowski's website and emails were pure speech; they were the effective equivalent of standing on a soap box in a campus quadrangle and speaking to all within earshot.

Tesla leaves out, however, is the sentence that follows:

> Their offensive quality was based entirely on their meaning, ***and not on any conduct or implicit threat of conduct that they contained***.

605 F.3d 710 (emphasis added). Kehowski may have been insulting the non-European students and employees at Maricopa County Community College, their families and non-Europeans in general, but he was not using his position as a math teacher to threaten any of them with reprisals; nor could his speech be interpreted as such. *Rodriguez* not only distinguishes itself, but shows why Tesla's argument is frivolous. Accord *Booth v. Pasco County*, 854 F.Supp.2d 1166, 1176 n.12 (M.D. Fla. 2012) (threats not protected speech, citing, inter alia, *Gissel* and *Rodriguez*).

Tesla also argues that Musk's threat to terminate employees' stock options if employees choose to unionize is entitled to First Amendment protection because he made it on Twitter, where millions of other persons, in addition to Tesla employees, would have seen it. This argument is wholly without merit as a Section 8(a)(1) defense, as argued above in part C(6) of this brief. It is also completely ineffective as a First Amendment claim.

Unlawful speech does not become lawful just because it is broadcast widely and heard by more than just those who are likely to be harmed by it. *Dixon v. International Brotherhood of*

39

*Police Officers*, 504 F.3d 73, 84 (1st Cir. 2007) (union president's televised statement that plaintiff was "in trouble" was implicit threat not protected by the First Amendment). If that were the rule, then employers could avoid liability under the Act by purchasing newspaper ads to make their unlawful threats, or putting them on billboards, or broadcasting them on Facebook. Tesla has not cited any authority for that dubious proposition.

## D.    THE CHARGING PARTIES JOIN THE GENERAL COUNSEL'S ANSWERING BRIEF IN SUPPORT OF THE ALJ'S PROPOSED DECISION

The Charging Parties join and support the General Counsel's Answering Brief regarding three additional violations of Section 8(a)(1).  ALJ Tracy correctly found that Respondent violated Section 8(a)(1) on May 24, 2017 when it interrogated Galescu and Ortiz about their protected activity of sharing OSHA Logs. (ALJD 27-32). The Judge also correctly found that Respondent violated Section 8(a)(1) on June 7, 2017 when Musk & Toledano made statements of futility in selecting the union, solicited complaints, and stated employees did not want a union. (ALJD 32-40).  Finally, the proposed decision correctly finds that Respondent violated Section 8(a)(1) when it maintained an unlawful uniform policy. (ALJD 40-48).

<div align="center">

IV

**REMEDY**

</div>

## A.    THE ALJ CORRECTLY APPLIED THE BOARD'S STANDARD FOR NOTICE READINGS AND APPROPRIATELY ORDERED SUCH A READING

ALJ Tracy correctly ordered the Board's notice to be read aloud directly to employees, and in the presence of security guards, managers, and supervisors, at the Respondent's Fremont facility by a board official with CEO Musk present, or by Musk himself, at the Respondent's option. (ALJD 77-78). The ALJ explained that this remedy is necessary to "reassure employees that their employer and managers are bound by the Act's requirements." (ALJD 78). The ALJ further cited Respondent's "pervasive" misconduct," including violations by "numerous supervisors and agents, including its chief executive officer and chief people officer." *Id.*

<div align="center">

40

</div>

The Board will require that a notice be read aloud to employees when the employer's unfair labor practices are "sufficiently serious and widespread." *Homer D. Bronson Co.*, 349 NLRB 512, 515 (2007) *enfd. mem.* 273 Fed. Appx. 32 (2d Cir. 2008); *North Memorial Health Care*, 364 NLRB No. 61, (2016); *Ingredion, Inc.,* 366 NLRB No. 74 (2018). The public reading of the notice is an "effective but moderate way to let in a warming wind of information and, more important, reassurance." *United States Service Industries*, 319 NLRB 231, 232 (1995) (quoting *J. P. Stevens & Co. v. NLRB*, 417 F.2d 533, 540 (5th Cir. 1969)). The notice reading ensures employees "will fully perceive that the Respondent and its managers are bound by the requirements of the Act" and that the "important information set forth in the notice is disseminated to all employees, including those who do not consult the Respondent's bulletin boards." *Federated Logistics & Operations*, 340 NLRB 255, 256 (2003). The reading helps "to dissipate as much as possible any lingering effect of the Respondent's serious and widespread unfair labor practices and enable employees to exercise their Section 7 rights free of coercion." *North Memorial Health Care*, 364 NLRB No. 61 (2016).

Respondent unconvincingly argues that a notice reading is not warranted here because the violations it committed were "isolated" and "generally minor." (Respondent's Brief at 73) This self-serving characterization has no basis in reality. Respondent has repeatedly demonstrated a blatant disregard for its workers' right to engage in protected activity. When workers attempted to wear union T-shirts, the Company implemented a uniform rule with sham justifications affecting 3,000 workers; when workers attempted to distribute union literature, the Company enforced a rule prohibiting the distribution of union literature by off-duty employees; when workers requested OSHA safety information, managers interrogated them. And when these acts proved insufficient to expunge the union movement at Tesla, the Company terminated and disciplined the most prominent union supporters because of their protected activities. Finally, CEO Musk, rather than disavow this misconduct or reassure workers, demonstrated that willful disregard for employees rights extends to the very top of the Company: he publicly threatened employees with the loss of benefits if they voted in favor of the union; informed union supporters

22-60493.6284

that it was futile to vote for a union; and sought to address union supporters' safety grievances only if they ceased their protected activity. Altogether, Judge Tracy's decision ordered Tesla to cease and desist from 10 separate acts of misconduct, three committed by the Company's own CEO, and others committed repeatedly. (ALJD 78-79) This misconduct, coupled with the timing of the violations during the Union's nascent organizing drive, demonstrate that Respondent's wrongdoing is "sufficiently serious and widespread" to warrant a notice reading with the Company's CEO present.

Contrary to Respondent's assertions, a notice reading to remedy the pervasive misconduct seen in this case is not unusual; it is the norm. In *North Memorial Health Care*, 364 NLRB No. 61, slip op. at 1 (2016), the employer discharged one employee because of union activities, prohibited the wearing of shirts with union insignias, interrogated an employee, engaged in surveillance of union activities, prohibited the posting of a union flyer, and imposed restrictions on union agents speaking with workers in the employers facility. The Board found a notice reading appropriate because of the nature of the violations, the timing of the violations near to planned picketing, and the involvement of upper management. In *Bozzuto's, Inc.,* 365 NLRB No. 146 (2017*)*, the Board affirmed a notice reading where the employer disciplined and discharged two employees for engaging in protected concerted activity, interrogated employees, announced wage increases to dissuade employees from joining the union, and maintained a work rule prohibiting workers from discussing disciplinary actions. *Id.*

In *Advancepierre Foods, Inc.*, 366 NLRB No. 133 (2018), during a union organizing campaign, the employer maintained an unlawful no-solicitation policy, interrogated, surveilled, and disciplined four employees for engaging in protected union activity, interrogated an employee about engaging in the distribution of union authorization cards, and solicited employees to revoke their union. The Board stated a notice reading was appropriate because the violations were sufficiently serious, and some were plant-wide. Other recent, similar Board cases ordering a notice reading include *W.B. Mason Co.*, 365 NLRB No. 62 (2017); *Kalthia Group*

22-60493.6285

*Hotels, Inc*, 366 NLRB No. 118 (2018); *Ingredion, Inc. dba Penford Products Co*, 366 NLRB No. 74 (2018); and *Ozburn-Hessey Logistics, LLC*, 366 NLRB No. 177 (2018).

Tesla's reliance on *Ishikawa Gasket America*, 337 NLRB 175 (2001) is misplaced. In *Ishikawa*, the General Counsel excepted to the ALJ's failure to order the employer to read the notice directly to employees during worktime, and the Board denied this request. ALJ Tracy's order in this case does not require the employer to read the notice posting to its employees, instead allowing the employer the option of having a Board official read the notice, a significantly less onerous remedy. Further, in *Ishikawa*, the employer had already engaged in serious voluntary efforts to remedy its unlawful conduct, including terminating the supervisors and managers who had committed the Unfair Labor Practices. By contrast, the Board in *Sysco Grand Rapids, LLC*, 367 NLRB No. 111 (2019) emphasized the notice reading was necessary because the employer "continues to employ" the president who unlawfully threatened workers. The same circumstance exists in this proceeding.

Further, Respondent fails to cite any case law where the Board overturned an ALJ's proposed notice reading remedy. ALJ Tracy offered detailed and extensive explanations of Respondent's violations, and she concluded that such violations were sufficiently serious and widespread to warrant a notice reading with Respondent's top official present. In all the examples Respondent provides of the Board rejecting a notice reading, the General Counsel was excepting to an ALJ's rejection of a notice reading.

Finally, contrary to the Respondent's assertions, ordering a high-ranking official to publicly read the notice, or, at the Respondent's option, merely be present while the notice is read, is a proper remedy for the violations that occurred here. In *Bozzuto's*, discussed above, the Board ordered a Vice President, who had been directly involved in some of the violations, to read the notice, or be present while a Board agent read the notice. For employees who have witnessed the head of their company flagrantly violate the Act, requiring the top official's presence for the notice reading is the only remedy that can demonstrate to workers that the company must follow the law.

22-60493.6286

V

## CONCLUSION

For all the reasons set forth above and in the General Counsel's Answering Brief,

Charging Parties Michael Sanchez, Jonathan Galescu, Richard Ortiz, and International Union,

United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO

respectfully request that the National Labor Relations Board deny the exceptions made by

Respondent Tesla, Inc.


DATED: February 13, 2020

SCHWARTZ, STEINSAPIR, DOHRMANN
   & SOMMERS LLP
MARGO A. FEINBERG
DANIEL E. CURRY


By _____

MARGO A. FEINBERG
Attorneys for Charging Parties
MICHAEL SANCHEZ, JONATHAN GALESCU,
RICHARD ORTIZ, and INTERNATIONAL
UNION, UNITED AUTOMOBILE, AEROSPACE
AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, AFL-CIO

22-60493.6287

## PROOF OF SERVICE BY ELECTRONIC MAIL

**Case No. 32-CA-197020 et al.**

EMILY A. HERO certifies as follows:

I am employed in the County of Los Angeles, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 6300 Wilshire Boulevard, Suite 2000, Los Angeles, California 90048-5202. My electronic notification address is eah@ssdslaw.com.

On February 13, 2020, I caused the foregoing document(s) described as: **ANSWERING BRIEF OF CHARGING PARTIES MICHAEL SANCHEZ, JONATHAN GALESCU, RICHARD ORTIZ, AND INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AFL-CIO** be served by electronic mail upon the person(s) shown below,

Edris W.I. Rodriguez-Ritchie, Esq.
National Labor Relations Board, Region 32
1301 Clay Street, Suite 300N
Oakland, CA 94612-5224
e-mail: edris.rodriguezritchie@nlrb.gov

Mark Ross, Esq.
Keahn Morris, Esq.
Sheppard, Mullin, Richter & Hampton LLP
4 Embarcadero Center, Suite 17
San Francisco, CA 94111-4158
e-mail: mross@sheppardmullin.com
e-mail: kmorris@sheppardmullin.com

__X__ **BY E-MAIL:** By transmitting a copy of the above-described document(s) via e-mail to the individual(s) set forth above at the e-mail addressed indicated.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 13, 2020, at Los Angeles, California.

EMILY A. HERO

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 32**

**TESLA, INC.**

    **and**

**MICHAEL SANCHEZ, an Individual**

    **and**

**JONATHAN GALESCU,  an Individual**

    **and**

**RICHARD ORTIZ, an Individual**

    **and**

**INTERNATIONAL UNION, UNITED**
**AUTOMOBILE, AEROSPACE AND**
**AGRICULTURAL IMPLEMENT WORKERS OF**
**AMERICA, AFL-CIO**

**Cases 32-CA-197020**
**32-CA-197058**
**32-CA-197091**
**32-CA-197197**
**32-CA-200530**
**32-CA-208614**
**32-CA-210879**
**32-CA-220777**

**COUNSEL FOR THE GENERAL COUNSEL'S**
**MOTION TO STRIKE CERTAIN PORTIONS OF RESPONDENT TESLA, INC.'S**
**EXCEPTIONS TO THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

Pursuant to Section 102.24 of the Rules and Regulations of the National Labor Relations

Board (Board), Counsel for the General Counsel (GC) moves to strike certain portions of

Respondent Tesla, Inc.'s (Respondent) Exceptions to the Decision of the Administrative Law

Judge because they fail to comply with the procedural requirements of Section 102.46.

Section 102.46(a)(1)(i) of the Board's Rules and Regulations states, in relevant part:

(i) Each exception must:
(A) Specify the questions of procedure, fact, law or policy to which exception is taken;
(B) Identify that part of the Administrative Law Judge's decision to which exception is
taken;
(C) Provide precise citations of the portions of the record relied on; and

1

22-60493.6289

(D) Concisely state the grounds for the exception.

See also *Guide to Board Procedures*, National Labor Relations Board Office of the Executive Secretary, dated April 2017, at 32-33. An exception that fails to identify the portion of an administrative law decision to which exception is taken or fails to provide references to the record (or portion of the record) relied upon is defective and must be dismissed in its entirety. See *Worldwide Detective Bureau*, 296 NLRB 148 (1989) (granting motion to strike exceptions for failure to comply with Section 102.46); see also *BCE Construction, Inc.*, 350 NLRB 1047 (2007) (*citing Holsum de Puerto Rico*, 344 NLRB 694, fn. 1 (2005), *enfd.* 456 F.3d 265 (1st Cir. 2006)); *Kasa Associates*, 334 NLRB 110, fn. 1 (2001) (disregarding General Counsel's exception for failure to comply with Section 102.46); *Show Industries*, 312 NLRB 447 (1993).

Respondent's exceptions identified below fail to meet these requirements. First, Respondent's Exceptions 65, 78, 81, 87, 97, 129, 131, and 149 fail to comport with Section 102.46(a)(1)(i) because they fail to provide any citation or reference any portion of the decision to which exception is taken.  Second, Respondent's Exceptions 12, 13, 29, 30, 34, 37, 40, 41, 48, 49, 59 through 61, 67, 69, 75 through 77, 79, 82, 89, 91, 92, 94, 98 through 100, 105, 109, 114 through 118, 120, 121, 138, 142, 147, 148, 150, 154, 155, 160 through 162 are similarly deficient because of their use of the term "passim," which means "here and there." See PASSIM, Black's Law Dictionary (2019). Thus, these exceptions also fail to specifically identify the portion of the decision for which exception is taken and to provide "precise" citations to those portions of the record relied upon.

22-60493.6290

For the reasons stated above, the GC respectfully requests that his motion be granted and the Board strike Respondent exceptions 12, 13, 29, 30, 34, 37, 40, 41, 48, 49, 59 through 61, 65, 67, 69, 75 through 79, 81, 82, 87, 89, 91, 92, 94, 97 through 100, 105, 109, 114 through 118, 120, 121, 129, 131, 138, 142, 143, 145, 147, through 150, 154, 155, 159, and 160 through 162.

**DATED AT** Oakland, California this 13th day of February 2020.

Edris W.I. Rodriguez Ritchie
Counsel for the General Counsel
National Labor Relations Board
Region 32
1301 Clay Street, Suite 300N
Oakland, CA 94612-5224
Tel: 510-671-3041
Fax: 510-637-3315
Email: Edris.RodriguezRitchie@nlrb.gov

3

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 32**

| | |
|---|---|
| **TESLA, INC.** | |
| **and** | |
| **MICHAEL SANCHEZ, an Individual** | **Case  32-CA-197020** |
| **and** | |
| **JONATHAN GALESCU, an Individual** | **Case  32-CA-197058** |
| **and** | |
| **RICHARD ORTIZ, an Individual** | **Case  32-CA-197091** |
| **and** | **Case(s)  32-CA-197197**<br>**32-CA-200530**<br>**32-CA-208614**<br>**32-CA-210879**<br>**32-CA-220777** |
| **INTERNATIONAL UNION, UNITED**<br>**AUTOMOBILE, AEROSPACE AND**<br>**AGRICULTURAL WORKERS OF**<br>**AMERICA, AFL-CIO** | |
| | **Date:  February 13, 2020** |

### AFFIDAVIT OF SERVICE OF COUNSEL FOR THE GENERAL COUNSEL'S MOTION TO STRIKE CERTAIN PORTIONS OF RESPONDENT TESLA, INC.'S EXCEPTIONS TO THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

I, the undersigned employee of the National Labor Relations Board, being duly sworn, depose and say that on the date indicated above I served the above-entitled document(s) upon the persons at the addresses and in the manner indicated below. Persons listed below under "E-Service" have voluntarily consented to receive service electronically, and such service has been effected on the same date indicated above.

Mark S. Ross, Esq.
Keahn Morris, Esq.
Sheppard Mullin Richter & Hampton, LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
**VIA EMAIL: mross@sheppardmullin.com**
**VIA EMAIL: kmorris@sheppardmullin.com**

Margo A. Feinberg, Esq.
Daniel Curry, Esq.
Schwartz, Steinsapir, Dohrmann
& Sommers, LLP
6300 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90048
**VIA EMAIL: margo@ssdslaw.com**
**VIA EMAIL: dec@ssdslaw.com**

Office of the Executive Secretary
National Labor Relations Board
1015 Half Street SE
Washington, DC  20570-0001
**VIA E-FILE**

| February 13, 2020 | Ida Lam, Designated Agent of NLRB |
|---|---|
| | Name |

| | /s/ Ida Lam |
|---|---|
| | Signature |

22-60493.6293

**SheppardMullin**

Keahn N. Morris
415.774.2934 direct
kmorris@sheppardmullin.com

February 13, 2020

File Number:  26VT-273129

**VIA E-FILING**

Office of the Executive Secretary
National Labor Relations Board
1015 Half Street SE
Washington, DC  20570

Re:     § 102.46 Request for Extension of Time to File Opposition to Cross-Exceptions; Tesla,
Inc., Case Nos. 32-CA-197020, 32-CA-197058, 32-CA-197071, 32-CA-197197, 32-CA-
200530, 32-CA-208614, 32-CA-210879 & 32-CA-220777

To Whom It May Concern:

Tesla, Inc.'s Opposition to the Cross-Exceptions to the Administrative Law Judge's Decision
("ALJ Decision") in the above-referenced consolidated cases is currently due on February 20,
2020.  Pursuant to § 102.46 of the Board's Rules, Tesla, Inc. requests that the deadline be
extended by two weeks, to March 5, 2020.  Counsel for the General Counsel and Charging
Parties do not oppose this request.

Sincerely,

Keahn N. Morris
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Counsel for Tesla, Inc.

SMRH:4837-1006-4564.1

22-60493.6294

<u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California.  My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On February 13, 2020, I served a true copy of the document(s) described as **TESLA, INC.'S REQUEST FOR EXTENSION OF TIME TO FILE OPPOSITION TO CROSS-EXCEPTIONS** on the interested parties in this action as follows:

Edris W.I. Rodriguez Ritchie
E-mail: edris.rodriguezritchie@nlrb.gov
Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA  94612-5224
T: (510) 671-3041

Margo Feinberg
E-mail: margo@ssdslaw.com
Daniel E. Curry
E-mail: dec@ssdslaw.com
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Blvd., Suite 2000
Los Angeles, CA  90048
T: (323) 655-4700

Jeffery Sodko
E-mail: jsodko@uaw.net
United Automobile, Aerospace and Agricultural Workers of America
  AFL-CIO
8000 E. Jefferson Ave.
Detroit, MI 48214
T:  (313) 926-5000


**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address sasmith@sheppardmullin.com to the person(s) at the e-mail address(es) listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 13, 2020, at San Francisco, California.

Sarah Smith

February 14, 2020

Re:     <u>Tesla, Inc.</u>
        Cases 32-CA-197020, et al.

**EXTENSION OF TIME TO FILE OPPOSITION TO
CROSS-EXCEPTIONS**

The request for an extension of time in the above-referenced cases is **granted**. The due date for the receipt in Washington, D.C, of Opposition to Cross-Exceptions is extended to **March 5, 2020.**  The extension of time to file opposition to cross-exceptions applies to all parties.

/s/ Diane Bridge
Counsel

cc:  Parties
       Region



**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**
**1015 HALF STREET, SE**
**WASHINGTON DC 20570**

February 18, 2020

Edris W.I. Rodriguez Ritchie
Counsel for the General Counsel
NLRB, Region 32
1301 Clay Street, Suite 300N
Oakland, CA 94612

      Re:   <u>Tesla, Inc.</u>
             Cases 32-CA-197020, et al.

Dear Mr. Rodriguez Ritchie:

This is in response to the Counsel for the General Counsel's Motion to Withdraw Certain Cross-Exceptions to the Decision of the Administrative Law Judge, filed in the subject case on February 12, 2020.

The request to withdraw General Counsel's Cross-Exceptions 1, 2, 3, and 5, and all related arguments on brief is approved, and those cross-exceptions will not be acted on by the Board.

Very truly yours,

/s/ Farah Z. Qureshi
Deputy Executive Secretary

cc:  Parties

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

|  |  |
|---|---|
| **TESLA, INC.** | |
| **and** | |
| **MICHAEL SANCHEZ, an Individual** | **Case No. 32-CA-197020** |
| **and** | |
| **JONATHAN GALESCU, an Individual** | **Case No. 32-CA-197058** |
| **and** | |
| **RICHARD ORTIZ, an Individual** | **Case No. 32-CA-197091** |
| **and** | |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, AFL-CIO** | **Case No. 32-CA-197197** <br> **Case No. 32-CA-200530** <br> **Case No. 32-CA-208614** <br> **Case No. 32-CA-210879** |

## RESPONDENT TESLA, INC.'S OPPOSITION TO THE GENERAL COUNSEL'S MOTION TO STRIKE CERTAIN PORTIONS OF RESPONDENT TESLA, INC.'S EXCEPTIONS TO THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

Mark S. Ross
mross@sheppardmullin.com
Keahn N. Morris
kmorris@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
Telephone:    (415) 434-9100

*Attorneys for Tesla, Inc.*

## I.    INTRODUCTION

Although Counsel for the General Counsel ("GC") made the decision to file the instant motion, nowhere in the motion does the GC represent he was unable to respond to Tesla, Inc.'s (Tesla) exceptions due to the purported issues raised in the motion.  Likewise, nowhere in the GC's Answering Brief in Opposition to Tesla, Inc.'s Brief In Support of Exceptions to the Administrative Law Judge's Decision does the GC state he is unable to respond to any of Tesla's exceptions or that he cannot identify the portion of the decision or the to which Tesla excepted.  Instead, the GC's brief identifies the specific exceptions to which he is responding, both in the Table of Contents and for each topic discussed in the brief.  Based on that alone, the GC's motion is moot.

Even if some of the exceptions did not themselves contain sufficiently specific citations to the record (to the extent such citations are necessary), Tesla's Brief In Support of Exceptions to the Administrative Law Judge's Decision tracked the ALJ's decision.  Specifically, Tesla's brief separately identified each topic, the relevant allegations in the complaint for that topic, and then identified (by number) the exceptions which pertain to that specific topic.  Each topic in Tesla's brief (with the exceptions identified for that topic) also contains specific citations to the Administrative Law Judge's Decision, the trial transcripts, trial exhibits, and also provides pertinent legal authorities.  Therefore, the issues raised in the GC's Motion as to Tesla's exceptions are without merit and mooted by Tesla's supporting brief.

The GC's motion should be denied.

## II.    TESLA'S EXCEPTIONS AND SUPPORTING BRIEF IDENTIFY THE SPECIFIC PORTIONS OF THE ALJ'S DECISION AND CITATIONS TO THE RECORD AS WELL AS PERTINENT LEGAL AUTHORITIES

The GC's cited case law interprets the meaning section 102.24 of the Rules and Regulations of the National Labor Relations Board, and demonstrates that none of the cases apply here or provide any authority for granting the GC's motion.

The GC's citation to *Worldwide Detective Bureau*, 296 NLRB 148 (1989) is inapposite because there Respondent chose to only file exceptions and not to provide a supporting brief.

The exceptions in *Worldwide Detective Bureau* did identify every finding Respondent wanted overturned, but they failed to provide any reasons or legal authorities to support the request and were thus disregarded.

Here, unlike in *Worldwide Detective Bureau*, Tesla filed a supporting brief which identified the portions of the ALJ's decision to which Tesla excepted (and the specific exceptions), record citations and legal authorities supporting the exceptions. Tesla's brief was arranged by topic and mirrored the structure of the ALJ's decision. For each topic, Tesla's brief identified the exceptions (by number) which were pertinent to these specific topics: (1) the June 7, 2017 meeting among Elon Musk, Gaby Toledano, Charging Party Jose Moran and Tony Vega (pp. 5-19); (2) Elon Musk's May 20, 2018 tweet from his personal account (pp. 19-29); (3) the discipline of Charging Party Jose Moran and the discharge of Charging Party Richard Ortiz (pp. 29-53); (4) the May 24, 2017 meeting among Liza Lipson, Charging Party Richard Ortiz and Charging Party Jonathan Galescu (pp. 54-58); (5) Tesla's Team Wear Policy (pp. 59-70); and (6) the ALJ's proposed remedy (pp. 70-74). For each of these topics, Tesla identified the applicable exceptions by number, Tesla provided operative facts with citations to the record, and Tesla provided pertinent legal authorities supporting each of their exceptions.

For the cases cited by the GC involving a party that filed both exceptions and a supporting brief, these cases are not applicable because, unlike Tesla, the party did not identify – either in its exceptions or the supporting brief – the specific error that is claimed and the basis for that error. *See BCE Construction, Inc.*, 350 NLRB 1047 (2007) (party failed to set forth specific arguments on the merits in its supporting brief though it did so for all other exceptions); *Oak Tree Mazda*, 334 NLRB 110, fn. 1 (1999) (party failed to allege either in exceptions or supporting brief the particular error in the decision and the grounds upon which the violation should be overturned); *Show Industries, Inc.*, 312 NLRB 447, fn. 2 (1993) (same). Likewise, *Holsum de Puerto Rico*, 344 NLRB 694, fn. 1 (2005) does not apply because although there Respondent identified the portions of the ALJ's decision to which it took exception, Respondent did not provide the grounds on which the finding should be overturned, while Tesla did so in its

supporting brief.  As detailed above, Tesla's supporting brief provided the very information the GC asserts was not provided in the exceptions, and under the GC's cited case law, that is sufficient.

Accordingly, because together Tesla's exceptions and supporting brief provide citations to the ALJ's decision, citations to the record, and legal authorities supporting Tesla's exceptions, the GC's motion is without merit.

## III.    CONCLUSION

Tesla respectfully requests that the GC's motion be denied.

Dated:  February 27, 2020                SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By:    _____

MARK S. ROSS
KEAHN N. MORRIS

Attorneys for
TESLA, INC.

## <u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California.  My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On February 27, 2020, I served a true copy of the document(s) described as:

**RESPONDENT TESLA, INC.'S OPPOSITION TO THE GENERAL COUNSEL'S MOTION TO STRIKE CERTAIN PORTIONS OF RESPONDENT TESLA, INC.'S EXCEPTIONS TO THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

on the interested parties in this action as follows:

Edris W.I. Rodriguez Ritchie
E-mail: edris.rodriguezritchie@nlrb.gov
Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA  94612-5224
T: (510) 671-3041

Margo Feinberg
E-mail: margo@ssdslaw.com
Daniel E. Curry
E-mail: dec@ssdslaw.com
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Blvd., Suite 2000
Los Angeles, CA  90048
T: (323) 655-4700

Jeffery Sodko
E-mail: jsodko@uaw.net
United Automobile, Aerospace and Agricultural Workers of America
AFL-CIO
8000 E. Jefferson Avenue
Detroit, MI 48214
T:  (313) 926-5000

☒      **BY E-MAIL OR ELECTRONIC TRANSMISSION:**   I caused a copy of the document(s) to be sent from e-mail address dbacon@sheppardmullin.com to the person(s) at the e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 27, 2020, at San Francisco, California.

                        _____

Doug Bacon

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| **TESLA, INC.** | |
| **and** | |
| **MICHAEL SANCHEZ, an Individual** | **Case No. 32-CA-197020** |
| **and** | |
| **JONATHAN GALESCU, an Individual** | **Case No. 32-CA-197058** |
| **and** | |
| **RICHARD ORTIZ, an Individual** | **Case No. 32-CA-197091** |
| **and** | |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, AFL-CIO** | **Case No. 32-CA-197197**<br>**Case No. 32-CA-200530**<br>**Case No. 32-CA-208614**<br>**Case No. 32-CA-210879** |

**RESPONDENT TESLA, INC.'S BRIEF REPLYING TO THE CHARGING PARTIES' ANSWERING BRIEF TO TESLA, INC.'S EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S DECISION AND RESPONDENT'S BRIEF IN SUPPORT OF EXCEPTIONS**

Mark S. Ross
mross@sheppardmullin.com
Keahn N. Morris
kmorris@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
Telephone: (415) 434-9100

*Attorneys for Tesla, Inc.*

The Charging Parties ("CPs") did not identify any record evidence or cite any authority that contradicted or rebutted Tesla's showing in its opening brief. Tesla's exceptions should be granted.

## I.   TESLA PROPERLY DISCIPLINED MORAN AND DISCHARGED ORTIZ

The CPs unsuccessfully attempt to rebut Tesla's opening brief which established that Tesla properly conducted a workplace investigation, did not interrogate Ortiz or Moran and properly discharged Ortiz and disciplined Moran with a warning. The CPs resort to wholesale creation of "facts" and then draw conclusions based on those "facts" which are not contained anywhere in the record. Perhaps that is why the CPs' brief is largely devoid of any record citations. None of the CPs' fabrications should be considered, and none of their cited authority rebuts Tesla's initial showing.

Tesla Properly Undertook a Workplace Investigation: The CPs incorrectly assert (p. 21) that the investigation occurred because of "union activity" by ignoring the ALJ's finding that the investigation began because of Pratt's complaint that "the release of his photo and information was inappropriate and made him feel singled out, harassed or cyberbullied." (ALJD 60:18-20)

The CPs also attempt to take issue with Gecewich's decision to investigate by suggesting (p. 9, fn. 4) that Gecewich's testimony (improperly excluded by the ALJ) about a similar incident he investigated at his prior job where Workday information was posted on the internet, would not be "comparable" by stating that Ortiz and Moran's conduct resulted in a "private, employee only posting." This is a blatant attempt to gloss over the established fact that Moran improperly obtained *other* employees' Workday profiles and photographs using a digital hack and then provided them to Ortiz who posted them outside the Tesla workplace, on the internet. Moran testified Workday was an *internal* company system (ALJD 58:29-31) and that Workday data *concerning other employees* should not be shared externally and that "outside sources" should not be provided access to Workday. (Tr. 762:24-763:6, 2278:19-2279:17; GC-67) Moran admitted that when he took "a screenshot of the information" and "passed it on to Ortiz," he was

"not limiting [his] [] use of Workday to internal use" and that he did not have Pratt or Ives' permission to take their photos from Workday. (Tr. 763:2-6, 763:14-18)  Ortiz similarly described Workday's function as "like a Facebook for Tesla; *the people inside the building*." (ALJD 57:11-14)(italics added).  Moran's and Ortiz's own testimony plainly establishes that they recognized their conduct was wrong and contradicts the CPs' assertion.  The fact that both this matter and the matter that arose at Gecewich's prior company involved data being taken from Workday and posted on the internet makes Gecewich's testimony about his other investigation relevant and probative because it provides additional foundation for Gecewich's decision to investigate.

Lacking evidence in the record, the CPs dream up non-existent "facts" in an attempt to establish (p. 18) that the investigation was not conducted in the "normal course of Company investigations into employee conduct."  Neither the GC nor the CPs put any evidence in the record about the "normal course of Company investigations."  Nor is there any credited testimony or evidence in the record establishing the normal course of a workplace investigation or comparing it to what was done here.[1]  Similarly, the CPs cannot and did not point to any facts to support their assertion (p. 19) that Hedges did not give Pratt's complaint to "staff that would ordinarily investigate complaints of this nature but instead notified top executives at Tesla: the Director of Employee Relations and Tesla's General Counsel."  The group tasked with investigating workplace complaints was the Employee Relations department, which is where Hedges sent the complaint.  (ALJD 54:30-33; Tr. 883:7-884:13).  The complaint was also sent to Gecewich, a senior investigator in Employee Relations.  (ALJD 54:1-3, 54:30-55:1)  The complaint was *not* referred to Tesla's General Counsel.  Rather, Hedges also notified Carmen Copher, to whom Gecewich reported and who was Director (and counsel) for Employee Relations.  (Tr. 1114:9-10, 1887:16-18).

---

[1] The only testimony about the conduct of investigations is from Gecewich, and Gecewich never testified that his investigation in this case or any other case fell short of established work practices and standards.

Tesla appropriately investigated an employee's complaint of harassment and cyber-bullying and expanded the investigation to include mis-use of Workday as the investigation progressed and the fact finding process identified additional, associated misconduct.

<u>There is No Evidence of Pretext</u>:  The CPs' (p. 20) and the ALJ's reliance on *St. Paul Park Refining Company*, 366 NLRB No. 83 (2018) to demonstrate pretext is misplaced.  The investigation in *St. Paul* was inadequate because it credited the supervisors' accounts and ignored (by failing to interview) conflicting accounts from bargaining unit employees who were percipient witnesses to the disciplined employee's repeatedly raised safety complaints.  *Id.* at slip op. at 6-7.  The Board found that the failure to interview any bargaining unit employee witnesses made it an "inadequate investigation" which was "designed simply to substantiate its supervisors' versions of what occurred and justify their sending" the employee home.  *Id.* at 16.  Nothing similar did or could have occurred here.  There were no conflicting accounts about the separate acts undertaken by Moran and Ortiz in connection with Workday.  There were no managers or supervisors who were witnesses to Moran's and/or Ortiz's acts.  The only relevant witnesses were Pratt, Kostitch, Moran and Ortiz, who Gecewich interviewed.  Thus, Gecewich's investigation, which involved interviewing all the witnesses and tailoring the investigation to the complaint and wrongful workplace conduct, was more than adequate.

Presumably because *St. Paul* is easily distinguished, the CPs resorted to creating extraordinary "facts" to support their equally outlandish and baseless conclusions (p. 19) that Gecewich "set up the investigation," that he "isolate[d] and entrap[ped] Ortiz," that he had a "fixation on Ortiz's and Moran's protected activities" all of which the CPs assert establishes the "illegal motivation of both the investigation and the discipline it produced."  It almost goes without saying that the CPs did not and could not cite to even a scintilla of evidence or legal authority for these flights of fancy.  These statements misrepresent the record evidence and the law governing the issues here.  They should be wholly disregarded.

The CPs continue in the same vein (p. 20-21) by suggesting that the investigation was "irregular" because Gecewich allegedly "chose two additional managers"[2] but they did not make "any significant contribution to the review of Gecewich's recommendation" and they "appear[] to have been brought together to rubber stamp Gecewich's recommendation, rather than to render its own decision."  Once again, the CPs do not point to any evidence to justify *any* of these bizarre statements.  Nor do they identify any purported legal authority to support these claims.  Furthermore, the record contradicts these claims because the decision makers met with Gecewich to discuss the Ortiz case and Gcecewich's recommendations.  (ALJD 61:11-62:3-7, fn. 100).  But even after the discussion, Graminger hesitated and wanted to talk to his manager (the Vice President of Manufacturing) before he made a decision.   (ALJD 62:14-25)  Only after that discussion and receiving additional information from his manager that there had been similar instances where employees were terminated after lying during workplace investigations, did Graminger reach a decision.  (ALJD 62:21-28)  The CPs' confabulations and misrepresentations regarding non-existent pretext should be disregarded.

No Animus by Decision Makers Was Established:  The CPs' nits about Tesla's investigation do not demonstrate the requisite animus under *Wright Line*.  Quite simply, Tesla sought to determine who removed Workday information from Tesla's internal site and posted it to Facebook, as well as how the information was removed.  Although the CPs spend significant space discussing what Tesla could have done or might have done during the investigation, Board precedent only requires that Tesla conduct a fair investigation – not a perfect one.  *St. Paul*, slip op. at 8-9, 15-16.

Nor did the CPs rebut Tesla's showing that there was no animus as required by *Tschiggfire Properties, Ltd.*, 368 NLRB No. 120 (2019).  The CPs do not provide any specific evidence or citation to the record – rather just the same, generalized allegations set for in the ALJ's decision that include uncharged conduct and including alleged acts not involving decision

---

[2] The ALJ did not make a finding that identified the person who selected the decision makers. (ALJD 60:37-61:5)

makers or involving employees other than Moran and Ortiz. *Tschiggfire Properties* is clear: the GC's burden cannot be met by simply reciting "circumstantial evidence of *any* animus or hostility toward union or other protected activity" because *Wright Line* "requires more." 368 NLRB 120, slip op. at 1. To demonstrate animus, "evidence of animus must support a finding that a causal relationship exists between the employee's protected activity and the employer's adverse action." *Id.* No such showing was made by the ALJ or the CPs. The undisputed evidence is the opposite for Graminger (Ortiz decision maker); he is pro-union, and was still a dues paying member of a union in Germany though he worked in America. (Tr. 1313:6-17).

Moreover, the GC did not rebut Tesla's showing that the record establishes Tesla did not harbor anti-union animus towards Ortiz or Moran. Moran distributed a blog post he had published at the Fremont facility on February 10, 2017. (ALJD 9:23-35) About four months later on June 7, Moran presented a petition to management and met with management. Shortly thereafter, instead of any adverse consequences, Moran was promoted to a lead position and got a pay raise. (Tr. 748:3-16; 750:7-15) Even after his October 2017 warning, he received a $4,000 performance bonus and continues to receive even higher bonus payments. (Tr. 752:12-754:4) The same is true for Ortiz. He participated in the February 10 leafletting and met with Liza Lipson about the use of OSHA 300 logs on May 24. (ALJD 29:4-11) Two months later, Ortiz got a "consistently strong" performance award of $2,807.00. (Tr. 564:15-565:9; GC-13; GC-14) The CPs' generalized statements as to animus are factually and legally insufficient and should be disregarded.

Finally, the CPs now suggest (p.21-22) – without any legal or factual support whatsoever – that the decision made as to Ortiz was not valid because Graminger and the other decision makers did not "conduct any investigation of their own" or "speak to Ortiz about the incident." This is both puzzling and preposterous. The CPs cannot have it both ways: they cannot claim that Ortiz was interrogated in violation of the Act because he was questioned during a workplace investigation and then suggest that there is a requirement that management also question Ortiz (which apparently would not violate the Act) before any discipline can be meted out. Even more

ridiculous is the invention new requirements –i.e.,  that decision makers are somehow supposed to conduct their own investigation (after reviewing the workplace investigation that was already completed) or that an employer conduct two investigations and that one of those be conducted by management.  This is implausible both as a matter of law and practicality.[3]

Neither Moran Nor Ortiz Engaged in Protected Activities:  Moran lost the protection of the Act (to the extent he ever engaged in protected activities) when he misappropriated other employees' personnel information from Workday, Tesla's internal database that houses its personnel records.  Ortiz lost the protection of the act (to the extent he ever engaged in protected activities) by lying during a workplace investigation.

Moran Improperly Accessed Internal Workday Information:  The CPs' assertion (p. 14) that Moran's conduct was protected because he was providing "visual confirmation" that persons who testified at the State Capitol were Tesla employees is false.  It is flatly contradicted by Moran's testimony.  Moran was able to confirm the employment status of the individuals simply by looking at Workday.  (ALJD 52:31-37; Tr. 794:17-20)  But rather than stop there, Moran needlessly (and improperly) took screenshots of the other employees' Workday profiles with their pictures and texted them to Ortiz.  (Tr. 724:9-10, 724:23-727:3, 499:12 - 507:15; GC-43, p.1-5)  When questioned, Moran could offer no reason or explanation for taking these needless screenshots or for sending the Workday information to Ortiz. (Tr. 794:2-795:14, 2288:6-10)

Equally untrue is the CPs' assertion (p. 24) that Tesla made Workday information "available to employees without restriction, and employees used and shared that information with each other freely."  It is undisputed that an employee could only access Workday through a log-in, which is a restriction, and there is no testimony that employees shared Workday information with each other – other than Moran's improper misappropriation.  (ALJD 52:30-32)  Workday did not allow Moran to print or share the Workday profiles directly with Ortiz (another employee).  Instead, Moran had to use a digital hack to obtain the information.

---

[3] As explained above, workplace investigations is a function delegated to the Employee Relations department; not manufacturing managers.

For similar reasons, the CPs (p. 25) are unable to distinguish *Roadway Express Inc.*, 271 NLRB 1238 (1984). *Roadway Express* does not discuss other employees' photographs. Further, Tesla restricted the use of Workday and the transfer of information from Workday. Thus, Tesla did not affirmatively grant all employees access to Workday. The same problems attach to the CPs failure to distinguish *Ridgley Manufacturing Company*, 207 NLRB 193 (1973) because the CPs only discuss employees' ability to *view* information in Workday. That is not what happened here. Moran went well beyond *viewing* the information or writing down the employee information. Instead, he digitally captured the information from Workday and transmitted it in the exact form to Ortiz.

Also meaningless are the CPs' examples (p. 24) of possible uses of Workday information (organizing a softball team, assigning dishes for a potluck, and smoking support groups) because none of these suggestions involve taking the information wholesale from Workday and posting it externally to the internet. The CPs are also unable to identify any comparator cases (p. 26) where Tesla employees were treated differently after misappropriating Workday information and posting it externally to a third party database, such as Facebook.

<u>Ortiz Lied During A Workplace Investigation</u>: The CPs (p.14-15) fail to revive the ALJ's cited cases that Tesla distinguished in its opening brief. The CPs only attempt to resuscitate *Tradewaste Incineration*, 336 NLRB 902 (2001) is to suggest that it is on point because Ortiz's post provided salary information for other employees, which misses the mark. Ortiz's misconduct was lying about the source of the Workday profiles; not whether he provided salary information for other employees. Similarly, their reliance on *St. Louis Car Company*, 108 NLRB 1523 (1954) is also misplaced. Ortiz was not discharged for being untrustworthy for not answering questions about whether he (or other employees) were trying to organize but rather because he did not provide the source of digitally hacked Workday profiles for other employees. And Ortiz was not discharged for lying about distributing union flyers, also rendering *United Services Automobile Association*, 340 NLRB 784 (2003) inapposite.

Furthermore, the CPs (p.22-24) also grossly mischaracterize Tesla's proposed new standard for addressing employee deception during investigations by arguing that recognizing "core" rights under the NLRA would require a "momentous shift in Board law." This is simply not true. The Board and courts have long acknowledged that certain "core" NLRA rights exist. *See, e.g.*, *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018); *NLRB v. Great Scot, Inc.*, 39 F.3d 678, 682 (6th Cir. 1994); *Boeing Co.*, 365 NLRB No. 154, slip op. at 15 (2017)  Nor can the CPs rely upon the GC to challenge the proposed standard because the GC failed to point to any authority whatsoever.

<u>Gecewich Properly Questioned Moran and Ortiz During the Investigation</u>:  The CPs mischaracterize the application of the *Rossmore House* factors to suggest that Moran and Ortiz were interrogated.  Contrary to the CPs' assertions (p. 26), Tesla did not investigate Ortiz and Moran to learn "about a campaign to persuade the state legislature to exercise greater oversight over working conditions at Tesla."  Rather, in order to determine the origin of the misuse of Workday information – and Ortiz's subsequent lies – Gecewich had to ask about the Workday portion of the post.  Notably, Gecewich did not ask about any of the pro-union discussion surrounding the post:  just the Workday information.  (ALJD 57:3-17, 58:23-34, 59:24-25)  The CPs' argument essentially can be condensed to an assertion that any employee misconduct is insulated from investigation if it is tied to other protected concerted activity.  But this is inconsistent with the Board's holding in *Unique Thrift Store*, 368 NLRB No. 144, slip op. at 4 (2019), which reinforced an employer's legitimate business interest in conducting effective, confidential workplace investigations.

Equally unavailing is the CPs' citation to *Guess!, Inc.*, 339 NLRB 432 (2003).  The facts in *Guess* are materially different from the facts here.  *Guess* involved a deposition taken in a Workers' Compensation case, during which the employer asked questions about the identity of employees who attended union meetings.  *Id.* at 434.  The Board found the questions were unlawful because the employee's confidentiality interests outweighed the employer's need for the information.  *Id.*  Specifically, the employer's questions were broad inquiries about union

meetings generally, not the meetings the plaintiff attended or the specific time period when the plaintiff was injured – which "would not necessarily lead to information that would be helpful for, or relevant to, the Respondent's workers' compensation defense." *Id*. at 435.  Unlike the employer in *Guess*, Gecewich's questions were narrowly tailored to focus specifically on the Workday information.  Gecewich did not, for example, ask Ortiz or Moran to identify other Tesla employees who were members of the Facebook group, what other Tesla employees made posts in the Facebook group, or what was discussed in the Facebook group.

## II.    MUSK'S MAY 20 TWEET DID NOT VIOLATE THE ACT

Like the ALJ and the GC, the CP erroneously read the May 20 Musk tweet in isolation and claim it to be an unambiguous threat to "force employees to 'give up' their stock options because they [vote] in favor of unionizing." (p.28)  However, on its face and as argued in Tesla's opening brief in support of its exceptions, the May 20 tweet is, at worst, an ambiguous statement that says absolutely nothing about forcing unionizing employees to do anything or to indicate that Tesla would take stock options away from employees were they to unionize.  The *sole* Tesla employee on record as having seen Musk's May 20 tweet never testified that he read it to be a threat.  Moreover, the CPs concede that Musk's May 20 tweet was a rhetorical question.  Thus, based on that concession, the May 20 tweet was not an unlawfully coercive statement as a matter of law (even though it came from Elon Musk).  *Trinity Services Group, Inc.,* 368 NLRB No. 115, slip op. at 2 (2019)(finding a management official's comment not to be unlawful where "in context," it "was a rhetorical question posed as part of a lawful expression of his opinion that paying money to the Union was not a good investments.  The only fact that tends to favor a finding of coercion is that [the official] is a high-level manager.  This is far from sufficient to make out a violation of the Act.")

Further, while acknowledging that Musk's subsequent tweet thread and Tesla's press statement should ordinarily be considered in the proper legal evaluation of the May 20 tweet, the CPs call on the Board to disregard those later Twitter messages, erroneously claiming that the employees viewing the May 20 message would not have seen the subsequent clarifying tweets.

This erroneous assertion is contrary to the record evidence which shows that Jose Moran, again the only Tesla employee on record to have seen the May 20 tweet admitted that he also saw the subsequent messages. Likewise, the cases cited by the CPs on p. 29-30 are inapposite because they involve statements describing what an employer could and would do to workers, while Musk's tweets expressed his legally protected opinion as to what the UAW could do unionizing Tesla workers and not what Tesla would do.

And finally, even though Musk's non-threatening expressions of his opinions and beliefs about the Union require no proof of supporting facts, *North Kingstown Nursing Care Center,* 244 NLRB 54, 65 (1979), *Nestle Co*, 248 NLRB 732 (1980), the CPs' assertion that it does must be rejected because Musk's subsequent clarifying tweets and Tesla press release do describe facts that satisfy this "non-requirement." Further, by this argument, the CPs ask the Board to misallocate the burden of proof since Musk's non-coercive statement is presumptively protected by Section 8(c) and the First Amendment, making it the GC's/CPs' burden to prove the statement's alleged unlawfulness by presenting UAW contracts that allow UAW bargaining units to receive employer stock options, establishing the falsity of his statement. Indeed, who better to produce such evidence than the GC and the UAW. Yet no such proof was offered, highlighting the point that Musk could and did reasonably believe that the UAW does not authorize employees to receive stock options and that Tesla employee and Twitter users would reasonably interpret Musk's tweet to be an expression of his protected point of view and not a threat to strip them of their Tesla stock options in the event they unionized.

Tesla respectfully requests that each of Tesla's exceptions be granted.

Dated: February 27, 2020

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By: _____

MARK S. ROSS
KEAHN N. MORRIS

Attorneys for
TESLA, INC.

## <u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Francisco, State of California. My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On February 27, 2020, I served a true copy of the document(s) described as:

**RESPONDENT TESLA, INC.'S BRIEF REPLYING TO THE CHARGING PARTIES' ANSWERING BRIEF TO TESLA, INC.'S EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S DECISION AND RESPONDENT'S BRIEF IN SUPPORT OF EXCEPTIONS**

on the interested parties in this action as follows:

Edris W.I. Rodriguez Ritchie
E-mail: edris.rodriguezritchie@nlrb.gov
Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA 94612-5224
T: (510) 671-3041

Margo Feinberg
E-mail: margo@ssdslaw.com
Daniel E. Curry
E-mail: dec@ssdslaw.com
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Blvd., Suite 2000
Los Angeles, CA 90048
T: (323) 655-4700

Jeffery Sodko
E-mail: jsodko@uaw.net
United Automobile, Aerospace and Agricultural Workers of America
AFL-CIO
8000 E. Jefferson Avenue
Detroit, MI 48214
T: (313) 926-5000

☒      **BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address dbacon@sheppardmullin.com to the person(s) at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 27, 2020, at San Francisco, California.

_____

Doug Bacon

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| **TESLA, INC.** | |
| **and** | |
| **MICHAEL SANCHEZ, an Individual** | **Case No. 32-CA-197020** |
| **and** | |
| **JONATHAN GALESCU, an Individual** | **Case No. 32-CA-197058** |
| **and** | |
| **RICHARD ORTIZ, an Individual** | **Case No. 32-CA-197091** |
| **and** | |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, AFL-CIO** | **Case No. 32-CA-197197**<br>**Case No. 32-CA-200530**<br>**Case No. 32-CA-208614**<br>**Case No. 32-CA-210879** |

## RESPONDENT TESLA, INC.'S BRIEF REPLYING TO THE GENERAL COUNSEL'S ANSWERING BRIEF TO TESLA, INC.'S EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S DECISION AND RESPONDENT'S BRIEF IN SUPPORT OF EXCEPTIONS

Mark S. Ross
mross@sheppardmullin.com
Keahn N. Morris
kmorris@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA  94111
Telephone:    (415) 434-9100

*Attorneys for Tesla, Inc.*

The GC did not identify any record evidence or cite any authority that contradicted or rebutted Tesla's showing in its opening brief. Tesla's exceptions should be granted.

## I.    THE JUNE 7 CONVERSATION WAS PROTECTED UNDER 8(c)[1]

Tesla accepts the ALJ's factual findings as to what was said and by whom on June 7. The issue is one of law: whether the fact of the conversation and words spoken by Musk and Toledano constitute an unlawful solicitation of grievances and unlawful threats of futility or whether the conversation is privileged speech protected by Section 8(c) and the First Amendment. Whether viewed in isolation or in the context of Tesla's other acts, at worst, these statements constitute the declarant's honestly felt opinions protected by 8(c). *Valley Health System*, 369 No. 16 (2020), slip op. at 5; *Amnesty International of the USA*, 368 NLRB No. 112 (2019), slip op. at 3.

The GC's answering brief ignores the different factual context giving rise to the June 7 conversation (instead citing cases based on dissimilar facts).[2] The GC does not cite a case where workers spontaneously[3] raise an issue with the employer, request a response and, in response, an employer converses with the employee's designated spokesperson. Thus, the conversation had no express or implied promises, but gave Moran and Vega an opportunity to speak about the petition. To conclude otherwise, means that the law prevents an employer from acceding to employee's spontaneous safety complaints and requests for a response during a union organizing drive. This is antithetical to an employer's federal and state workplace safety obligations.

---

[1] The GC (p. 17) has not rebutted the arguments in Tesla's opening brief that the June 7 allegations are barred by Section 10(b). Moreover, contrary to the GC, Tesla's ability to preserve evidence is directly implicated by the "same or similar" defenses prong.

[2] The GC's cited cases involve the typical situation of an employer as the initiating party soliciting employee grievances as part of its campaign to blunt union organizing. Here, though the employees were the initiators and it was Moran who diverted the conversation and raised the Union. Musk and Toledano did not impliedly promise anything if the employees rejected the Union, but instead offered their opinions why they believed the Union to be a bad idea and suggested that Moran participate in Tesla's already existing Safety Committee.

[3] In all the GC's cited cases, the employer's statements of futility were either explicit threats, indicating that the employer would simply never allow its employees' wish to unionize or, implicit, with the employer essentially telling workers that it would do everything within its power including violating the law to avoid unionization. Nothing in the statements attributed to Musk and Toledano here meets this essential legal criteria.

## II.    MUSK'S TWEET DID NOT VIOLATE THE ACT:  IT WAS NOT A THREAT

The GC and ALJ both misread Musk's May 20 tweet by reading it in isolation and disregarding the subsequent tweet thread and Tesla's press release that explain and clarify what is, at worst, an ambiguous statement.  Particularly troubling is the GC's blatant misrepresentation (p. 25) when he states "[t]he record is devoid of any further tweets by Mr. Musk concerning [what] he meant by his . . . May 20 tweet," when the exhibit to which he cites (GC-69) contains all of the subsequent tweets in the thread that explain what Musk meant and objectively establish it was not an unlawful threat but a permissible statement of belief protected by Section 8(c).[4]

Thus, on May 22, @ericbrownzzz, asked Musk, "[W]hy would they [a reference to Tesla employees] lose stock options?  Are you threatening to take away benefits from unionized workers?, to which Mr. Musk replied, "*No.  UAW does that*."  (GC-69, p. 2)(italics added)  The next day, in answer to a tweet from @JackallisonLOL who asked about Musk if Tesla employees would lose stock options if they organized, another tweeter, @Altwouss, observed that Musk's May 20 tweet had been taken out of context and that Musk, had clarified in his May 22 tweet that he believed that the UAW did not allow union workers to own stock.  (GC-69, p. 3)  Musk replied to this last tweet, saying "Exactly, UAW does not have individual stock ownership as part of the compensation at any other company."  (*Id.*)  This is not a threat; it is a protected expression of Musk's opinion or belief.  The GC cannot "disappear" this exonerating evidence; reading the tweet in context demonstrates its lawfulness.  *Turtle Bay Resorts*, 353 NLRB 1242, 1278 (2009); *Amnesty International*, *supra*.

Moreover, Tesla had no obligation to present objective facts to substantiate or prove the truth of Musk's lawful statement because it did not contain a threat of reprisal or promise of a benefit.  *Camvac*, *International*, 288 NLRB 816, 820 (1988);  *Southern Bakeries*, *LLC*, 364 NLRB No. 64, slip op. at 11 fn. 9 (2016).  Even if truth were relevant, who better to prove the

---

[4] Tweets are abbreviated messages and thus cannot be viewed in isolation.  The GC attempts to skirt this argument by faulting Musk for not having multiple tweets, which is exactly what Musk did.  The GC cannot have it both ways.

falsity of his protected statements than the Charging Party and the GC.  But neither presented any evidence debunking or disproving the accuracy of Musk's statements.

## III.  TESLA PROPERLY DISCIPLINED MORAN AND DISCHARGED ORTIZ

Tesla did not violate the Act when it discharged Ortiz for lying during an investigation and disciplined Moran with a warning for misappropriating other employees' photographs and personnel information from Tesla's internal Workday database.  Simply being involved in an organizing campaign is not a shield that protects them from all consequences of misconduct.

GC failed to establish a *prima facie* case:  The GC failed to rebut Tesla's showing that the ALJ improperly substituted her own business judgment and did not properly apply *Wright Line*.  The GC attempts the same thing:  providing additional, irrelevant suggestions about how the investigation could have been done.  *Cellco Partnership v. NLRB*, 892 F.3d 1256, 1262 (D.C. Cir. 2018)(repeatedly held to be improper for ALJ to take on the company's business judgment chair; only relevant question is "whether the company's judgment was reasonably consistent").

GC did not show animus:  The GC did not rebut Tesla's showing that there was no animus as required by *Tschiggfrie Properties, Ltd.*, 368 NLRB No. 120 (2019).  Other than a sprawling recitation of union organizing testimony unrelated to the decision makers and including alleged acts involving employees other than Moran and Ortiz (pp. 30-34), the GC's record citation to allegedly support animus is the *entire* section of the ALJ's decision on Ortiz and Moran (p. 31).  This is far from the requisite showing.  The GC fails to identify any evidence that any decision maker participated in any of the alleged acts or had any anti-union animus.[5]

An investigation's scope is not animus:  The GC makes the unsupported implicit suggestion (pp. 36-39) that an investigation's scope must not change and if it does, that equates

---

[5] Equally preposterous (p. 44-45, fn. 46) is the suggestion that the termination decision involved Musk or that he provided the rationale for the decision.  The GC's suggestion (pp. 32-33) that emails or tweets from Musk *not charged here* are somehow evidence of animus is contrary to law and fact.  The only allegation as to Musk's communications – his May 20, 2018 tweet which Tesla contends is a permissible 8(c) opinion statement –occurred *seven months after* the termination decision.  And the other tweet relied upon by the GC (not alleged to violate the Act) was sent the same day.  Neither the ALJ nor the GC can rely on this as evidence of a purported changed reason for termination unless they possess a time machine.

to animus or unlawful motive.  The initial complaint was that Pratt felt harassed and targeted.[6]
(ALJD 55:30-56:3)  Gecewich spoke with Pratt and then Kostitch, who raised the fact that the
posted photos "were workday on mobile," that someone took "screenshots of this" and thought it
was "100% wrong, and quite disgusting."  (ALJD 56, fn. 84; GC-64, p. 2)  Gecewich determined
an investigation was appropriate, and should include whether other employee's Workday profiles
had been taken and posted to Facebook.  (ALJD 57:25-58:10)  The investigation expanded
organically as these new facts and misconduct, not originally complained of, were uncovered.

The GC's theory cannot be sustained because it impermissibly prevents workplace
investigations that are required by law.  *Unique Thrift Store*, 368 NLRB No. 144, slip op. at 4
(2019)(Board reiterating that "[t]here is no dispute that an employer has a legitimate interest in
investigating charges of alleged employee misconduct.  And because full, fair, prompt, and
accurate resolution of such complaints also benefits employees, they, too, possess a substantial
interest in having an effective system in place for addressing workplace complaints.")(internal
citations omitted).

Equally specious is the GC's assertion (p. 43) that the reasons for the termination and
discipline "demonstrate the unlawful motive."  The ALJ found "the credited evidence shows that
Respondent terminated Ortiz for lying during an investigation." (ALJD 67:8-9)  This is a
legitimate business judgment and "not unusual one—that an employee lying during an
investigation is a serious threat to management of the enterprise.  The Board has no warrant to
challenge that decision." *Cellco*, 892 F.3d at 1262.  The termination was also supported by
multiple comparators, contrary to the GC's assertion (p. 40) that there was only one.[7]

Moran's conduct was not protected:  The GC's assertion (p. 31) that Moran's use of
Workday did not lose the protection of the act because the names and job titles (the GC omits the

---

[6] The GC falsely asserts (p. 36) Pratt never complained he felt "targeted." The ALJ found the
investigation began because Pratt complained "the release of his photo and information was
inappropriate and made him feel singled out, harassed or cyberbullied."  (ALJD 60:18-20)
[7] In addition to the case Gecewich discussed, Graminger spoke to his manager who confirmed
that there had been similar instances where someone lied during an investigation and was
terminated.  (ALJD 62:14-25)

employee photographs) were not "private, confidential or otherwise stolen" is contrary to the record. Workday can only be accessed by Tesla employees with a log-in. (ALJD 52:30-32) Moran testified it was an *internal* company system (ALJD 58:29-31) and that Workday data *concerning other employees* could not be shared externally and that "outside sources" should not be provided access to Workday. (Tr. 762:24-763:6, 2278:19-2279:17; GC-67) He admitted when he took "a screenshot of the information" and "passed it on to Ortiz," he was "not limiting [his] [] use of Workday to internal use."[8] (Tr. 763:2-6) Ortiz also described Workday's function as "like a Facebook for Tesla; *the people inside the building*." (ALJD 57:11-14)(italics added).

Despite being unable to contradict this evidence, the GC attempts (p. 42) to analogize the facts here to *Gray Flooring*, 212 NLRB No. 107 (1974). *Gray Flooring* is a pre-modern technology 1974 case in which an employee created a list of names and telephone numbers (no employee photographs were involved) by looking at a group of index cards kept by the employer in an office that employees were permitted to enter. The only way *Gray Flooring* could be on point is if the employee there physically took select index cards from the office, moved them off-site and shared them with other people in the new, non-work location – because that is what Moran did here. Moran did not copy down employee information from Workday, he physically took the information by using his phone to take a snapshot that captured all the Workday data for other employees just as it appeared in Workday and then texted each profile to Ortiz who then posted the snapshots externally on the internet using Facebook (ALJD 52:33-34, 53:3-19; Tr. 766:5-7, 16-17; GC-64, p. 2) It was an unlawful taking, as detailed in Tesla's opening brief.

<u>Neither Ortiz nor Moran was interrogated</u>: Though the GC asserts (p. 47) that Gecewich questioned both "their activities in Sacramento and their organizing activities on social media," the record evidence rebuts this: he asked Ortiz whether the Facebook post was his and for the source of the Workday profiles and asked Moran about his use of Workday and why he took the screenshots. (ALJD 57:11-17, 58:23-35, 59:24-25) The GC then proceeds (p. 47) to

---

[8] Moran also did not have Pratt or Ives' permission to take their photos from Workday. (Tr. 763:14-18)

impermissibly stretch each element of *Rossmore House*, 269 NLRB 1176 (1984) to conclude the interviews were "highly coercive." The basis: they were "one-on-one meetings with a company investigator" which conceivably describes every workplace investigation interview. It also runs counter to the Board's holding in *Unique Thrift Store*, which reinforced the legitimate business interest in conducting effective, *confidential* workplace investigations. 368 NLRB No. 144, slip op. at 4. No unlawful interrogation occurred.

## IV.   LIPSON DID NOT INTERROGATE ORTIZ OR GALESCU

The GC fails to acknowledge that Tesla had federal and state law obligations to protect employee privacy and personally identifiable information, and thus had a legitimate basis for the investigation. The GC argues that the employees' right to share the Cal/OSHA safety logs and summaries with other employees somehow eliminates Tesla's concern about inadvertent disclosure, but completely ignores Tesla's legitimate concerns about whether the forms were disclosed to *unauthorized* third parties. The GC also ignores the ALJ's finding that the Cal/OSHA safety logs (Form 300) contain personally identifiable information, including the names of injured or ill employees. (ALJD 28, fn. 46) *Unique Thrift Store*, *supra*. Lipson's questions to Ortiz and Galescu were consistent with the targeted and legitimate investigation regarding the impermissible disclosure of employees' personal medical information. Whether Lipson explicitly stated the purpose of the meetings, the legitimate purpose would have been clear to a reasonable employee under the circumstances.[9]

Contrary to the GC, the timeline of Tesla's investigation fully supports a conclusion that it was based on a concern about the disclosure of employees' personal medical information. The Worksafe report (which names specific employees and specific injuries taken from the Cal/OSHA forms) was published on May 24, 2017, the same day Lipson met with Ortiz and Galescu. (R-3, Exh. D) The leaflets distributed the morning of May 24 contained an internet

---

[9] Holcomb's notes state that Lipson began both meetings by informing Ortiz and Galescu that the purpose of the meeting was to investigate concerns about the disclosure of employees' health information. (ALJD 29, fn. 50; GC-91)

link to the Worksafe report (www.fairfutureattesla.org/injuryreport).  (GC-9)  The GC (p. 11) erroneously contends the "report" is dated one day after the alleged interrogation occurred.[10]

It is irrelevant that Tesla did not investigate the disclosure of the forms before May 24 because in early May, Tesla sent out an email to employees notifying them that an employee had requested the Cal/OSHA forms with information about safety incidents, including "employee names and the nature of the incident" and that Tesla "wanted to provide advance notice to employees, as we believe this request is intended to ultimately make this information public despite our efforts to protect your privacy."  (R- 2)  Thus, when Tesla sent the email, it believed the information might be made public, but had not yet, so an investigation then would have been pointless.  As soon as Tesla discovered the information had been disclosed to an unauthorized third party and made public – the morning of May 24 – it immediately began conducting an investigation later that day.  There was simply no unlawful interrogation.

## V.    THE GA TEAM WEAR POLICY IS LAWFUL ON ITS FACE

*Wal-Mart Stores, Inc.*, 368 NLRB No. 146 (December 16, 2019), governs this case and warrants dismissal of the allegation that Tesla's Team Wear policy applicable to the GA area of the facility is overbroad and facially invalid.  Other than requiring GA employees to wear Tesla-issued uniforms (a black, red, or white Team Wear shirt, and black Team Wear pants, all of which are designed to prevent mutilations to freshly painted vehicles and maintain visual management within GA), the Team Wear policy places no restrictions on the wearing of union insignia or messaging in GA.[11]  The Board issued its decision in *Wal-Mart* shortly after Tesla filed its exceptions and brief in support, which urged the Board to apply the Board's test for facially neutral employer policies set forth in *Boeing Co.*, 365 NLRB No. 154 (2017), to

---

[10] Perhaps the GC is referring to the OSHA Complaint (R-3); but Tesla made no such contention.
[11] Aside from one isolated supervisor's statement to non-GA employees in March 2017, the UAW has been free to distribute insignia throughout the Fremont facility.  Moreover, despite the GA Expectations, employees in GA have always been permitted to display UAW graphics and logos including the Union's "Fair Future for Tesla" emblem, by wearing items such as hats, as well as stickers on their clothing, including on their assigned GA Team Wear. (Tr. 204:14-205:2, 209:11-210:6, 260:12-15, 307:22-24, 308:21-23, 333:23-334:3, 759:12-13, 1388:16-1389:10, 1636:5-1637:6, 2408:18-2409:2, 2535:18-2536:7)  The GC does not dispute this.

uniform-related policies in this context.  In *Wal-Mart*, the Board agreed with Tesla's position and held that *Boeing* is the appropriate analytical framework for facially neutral rules that limit – but do not prohibit entirely – the wearing of union insignia.  This development under *Wal-Mart* is outcome determinative to this case, which the GC fails to understand.

Under *Boeing*, the Team Wear policy is a category 1 rule insofar as it defines the required base uniform for GA employees (specific shirts/pants, with shirt varying in color by classification), but does not impose any restrictions on employees' right to wear union insignia such as union stickers or hats.  The dress code policy in *Wal-Mart* stated employees were allowed to wear "small, non-distracting logos or graphics … no larger than the size of your [employee] name badge" only.  Thus, the Board analyzed the policy as a *Boeing* category 1 rule, as it limited the size and appearance of union buttons and insignia that employees could wear.  Here, the Board should find that a uniform policy that places no limits on employees' right to accessorize with union insignia belongs in category 1.

Even if Tesla's Team Wear policy is a category 2 rule, it is lawful.  To the extent employees have a Section 7 right to replace their employer-issued uniform with their own clothing items, a dubious proposition, Tesla's limited restriction on uniform replacement is justified by two legitimate business interests – (1) preventing vehicle mutilation, and (2) standardized visual observation and management of employees by classification.  *See Wal-Mart*, slip op. at 4 (noting "[t]he Board must not second-guess the Respondent's decisions as to how it should run its business – provided, of course, that those decisions do not unreasonably interfere with the exercise of Section 7 rights").  Both of these interests have been recognized by the Board as legitimate in past cases, and have been found to justify even limitations that were much more restrictive than those associated with the Team Wear policy.  *E.g., Komatsu America Corp.*, 342 NLRB 649, 650 (2004)(restrictions on wearing union insignia justified where "their display may jeopardize employee safety" or "damage machinery or products"); *Albis Plastics*, 335 NLRB 923, 924 (2001)(restrictions on wearing union insignia justified in workplaces that "require[] measures to ensure that visibility was not unnecessarily impeded" where restrictions

would ensure employees visibility or transmit information, and unauthorized insignia would interfere with visibility and thus with safety); *see also Wal-Mart*, slip op. at 4 (dress code policy furthered employer's interest in ensuring employees were readily identifiable).

Attempting to make an end-run around the Board's holding in *Wal-Mart,* the GC claims that Tesla's Team Wear policy is a "total ban" on wearing union t-shirts, and as such it should be analyzed under the *Republic Aviation* framework. The Board should reject this hollow theory because it conflicts with *Wal-Mart* and, in effect, would render it null and void in almost all cases. *See World Color (USA) Corp. v. NLRB*, 776 F.3d 17, 21 (D.C. Cir. 2015)(remanding Board decision finding that policy requiring employees to wear company hats but allowing employees to accessorize the hat with union insignia); *Eastern Omni Constructors v. NLRB*, 170 F.3d 418, 426 (4th Cir. 1999)(rule that prohibited non-company authorized decals on hardhats was "not a total ban on union insignia," but instead "a partial, inconsequential ban on union insignia" where employees were still allowed to wear decals on their clothing). Essentially, the GC is asking the Board to hold that an automobile manufacturer like Tesla cannot maintain a Company uniform, and must allow a labor union to issue a "shadow uniform" it prefers to send messages with (here, the UAW's "black shirt" with admittedly large print), unless it satisfies the *Republic Aviation* special circumstances test. Such a holding is unfounded.

The GC's attempts to distinguish *Wal-Mart* similarly fall flat (p. 8), by suggesting that it involved a public selling floor, and that the employer's legitimate business interests underlying the *Wal-Mart* dress code do not apply to Tesla's Team Wear policy. Tesla is not arguing that its Team Wear policy is justified by the same interests as the *Wal-Mart* policy, but the Board did not hold that those were the *only* legitimate business justifications that could support a partial union insignia restriction. *See Wal-Mart*, slip op. at 3 (limitations on the wearing of union insignia short of outright prohibitions will "warrant individualized scrutiny in each case")(citing *Boeing*).

The GC also seeks to undermine Tesla's business justifications because the Union could (or did) print t-shirts of the same color for *some* associates in GA (i.e., production associates but not team leads or quality inspectors). However, the possibility of partial "shadow uniforms"

issued by a union is not sufficient to reject Tesla's business justifications here, especially in the context of very expensive, freshly painted and uncured vehicles and the need to police each and every non-Tesla issued shirt for hundreds or thousands of employees each day.

Notably, the judge dismissed the Team Wear policy discriminatory enforcement allegation, and the GC did not except (or cross-except) to the dismissal. The Team Wear policy was in place well before the Union's organizing campaign, and there is no allegation (let alone a finding) that the Team Wear policy was implemented in response to union and/or protected concerted activities or has been more strictly enforced. Tesla's consistent, non-discriminatory enforcement further shows that it was justified by Tesla's legitimate concerns.

## VI.    THE ALJ'S REMEDY IS PUNITIVE AND CONTRARY TO THE LAW

Contrary to the GC, a notice-reading remedy is not "usual," it is an "extraordinary remedy," and requiring that the notice be read by or in the presence of a specific company official is even more extreme and unusual. The GC fails to distinguish or rebut the case law cited in Tesla's opening brief that either remedy is wholly unwarranted. Requiring that the notice be read by a specific company official is only justified "where a particular corporate official, to the knowledge of employees, was directly responsible for many of the violations that justified the read-aloud requirement." *Ingredion, Inc.*, 366 NLRB No. 74, slip op. at 1 fn. 2 (2018). As the GC acknowledges (p. 48), various individuals (security guards, and isolated supervisors and managers) allegedly engaged in the sporadic conduct at issue. At most, Musk was involved in *two* incidents (both of which were lawful). Accordingly, the facts that require a notice reading, much less a reading by Tesla's top executive, are absent here.

Dated:  February 27, 2020

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____

MARK S. ROSS
KEAHN N. MORRIS
Attorneys for
TESLA, INC.

## <u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California.  My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On February 27, 2020, I served a true copy of the document(s) described as:

**RESPONDENT TESLA, INC.'S BRIEF REPLYING TO THE GENERAL COUNSEL'S ANSWERING BRIEF TO TESLA, INC.'S EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S DECISION AND RESPONDENT'S BRIEF IN SUPPORT OF EXCEPTIONS**

on the interested parties in this action as follows:

Edris W.I. Rodriguez Ritchie
E-mail: edris.rodriguezritchie@nlrb.gov
Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA  94612-5224
T: (510) 671-3041

Margo Feinberg
E-mail: margo@ssdslaw.com
Daniel E. Curry
E-mail: dec@ssdslaw.com
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Blvd., Suite 2000
Los Angeles, CA  90048
T: (323) 655-4700

Jeffery Sodko
E-mail: jsodko@uaw.net
United Automobile, Aerospace and Agricultural Workers of America
AFL-CIO
8000 E. Jefferson Avenue
Detroit, MI 48214
T:  (313) 926-5000

☒       **BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address dbacon@sheppardmullin.com to the person(s) at the e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 27, 2020, at San Francisco, California.

_____

Doug Bacon

## UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| **TESLA, INC.** | |
| **and** | |
| **MICHAEL SANCHEZ, an Individual** | **Case No. 32-CA-197020** |
| **and** | |
| **JONATHAN GALESCU, an Individual** | **Case No. 32-CA-197058** |
| **and** | |
| **RICHARD ORTIZ, an Individual** | **Case No. 32-CA-197091** |
| **and** | |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, AFL-CIO** | **Case No. 32-CA-197197**<br>**Case No. 32-CA-200530**<br>**Case No. 32-CA-208614**<br>**Case No. 32-CA-210879** |

## RESPONDENT TESLA, INC.'S BRIEF OPPOSING THE GENERAL COUNSEL'S CROSS-EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S DECISION

Mark S. Ross
mross@sheppardmullin.com
Keahn N. Morris
kmorris@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA  94111
Telephone:    (415) 434-9100

*Attorneys for Tesla, Inc.*

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................1

II.  THE ALJ PROPERLY FOUND THAT TESLA'S CONFIDENTIALITY
     ACKNOWLEDGEMENT WAS LAWFUL.......................................................3

     A.   FACTUAL BACKGROUND .............................................................3

          1.   TESLA'S EMPLOYEES ARE GIVEN ACCESS TO SENSITIVE
               COMPANY-INTERNAL INFORMATION .................................3

          2.   EVEN THOUGH TESLA SHARES BUSINESS SENSITIVE
               INFORMATION WITH ITS WORKFORCE, IT TAKES STEPS
               TO KEEP THAT INFORMATION CONFIDENTIAL AND TO
               PREVENT THE LEAKING OR DISCLOSURE OF SAID
               INFORMATION TO THIRD PARTIES .......................................4

          3.   DESPITE TESLA'S MANY EFFORTS TO PREVENT LEAKS,
               SENSITIVE COMPANY-INTERNAL BUSINESS
               INFORMATION GETS LEAKED TO PERSONS/THIRD
               PARTIES OUTSIDE THE COMPANY (THE BLOOMBERG
               LEAK)...................................................................................7

          4.   AS A RESULT OF THE BLOOMBERG LEAK, TESLA'S
               GENERAL COUNSEL DIRECTS THAT A
               CONFIDENTIALITY ACKNOWLEDGEMENT REMINDING
               EMPLOYEES OF THEIR CONFIDENTIALITY OBLIGATIONS
               AND CALLING ON THEM TO REAFFIRM THEIR PRIOR
               CONFIDENTIALITY COMMITMENTS BE DRAFTED AND
               DISTRIBUTED TO THE ENTIRE TESLA WORKFORCE ....................9

          5.   BEGINNING ON OCTOBER 11, TESLA PUBLISHES A
               CONFIDENTIALITY ACKNOWLEDGEMENT AND ASKS
               EMPLOYEES TO SIGN IT.....................................................10

     B.   LEGAL ANALYSIS .......................................................................11

          1.   THE ALJ PROPERLY FOUND THAT REASONABLE
               EMPLOYEES WOULD UNDERSTAND THE
               CONFIDENTIALITY ACKNOWLEDGEMENT TO BE
               LIMITED TO PROPRIETARY INFORMATION ...................................11

     C.   EVEN IF THE EXCEPTED TO LANGUAGE IN THE
          CONFIDENTIALITY AGREEMENT INFRINGES ON EMPLOYEES'
          SECTION 7 RIGHTS, THE ALJ PROPERLY FOUND THAT TESLA
          HAD LEGITIMATE BUSINESS JUSTIFICATIONS TO OVERRIDE
          THOSE RIGHTS ................................................................................18

III.     THE GC'S REQUEST TO REVISE THE ALJ'S REMEDY TO REQUIRE A
         NATIONWIDE POSTING AND "DELETION" OF A TWEET IS NOT
         SUPPORTED BY FACT OR LAW ....................................................................20

         A.      THE ALJ LIMITED ANY NOTICE POSTING TO THE FREMONT
                 FACILITY BECAUSE THE ONLY VIOLATIONS WERE AT THE
                 FREMONT FACILITY ..........................................................................20

         B.      THE ALJ MADE NO FINDINGS THAT THE TWEET WAS AKIN TO
                 AN UNLAWFUL RULE OR POLICY AND ANY REMEDY BASED
                 UPON THIS FALSE SUPPOSITION MUST BE DENIED ................................22

         C.      THERE IS NO LEGAL OR FACTUAL BASIS TO MODIFY THE ALJ'S
                 REMEDY TO REQUIRE TESLA TO ORDER NON-PARTY ELON
                 MUSK TO DELETE THE TWEET ..........................................................24

IV.      THE GC'S CROSS-EXCEPTIONS CONCERNING THE REMEDY AS TO
         JOSE MORAN'S AND RICHARD ORTIZ'S DISCIPLINE ARE MOOT ....................25

V.       CONCLUSION..........................................................................................25

22-60493.6333

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Argos USA LLC*
369 NLRB No. 26 (2020) ............................................................................2, 12

*AT&T*
362 NLRB 885 (2015) ..........................................................................................20

*Boch Honda*
362 NLRB 706 (2015) ..........................................................................................21

*Chicago Teachers Union*
367 NLRB No. 50 (2018) .....................................................................................24

*Consolidated Edison Company*
323 NLRB 910-912 (1997) ..................................................................................21

*Fry's Food Stores*
361 NLRB 1216 (2014) ........................................................................................21

*International Business Machines Corp.*
265 NLRB 638 (1982) ..........................................................................................19

*LA Specialty Produce Company*
368 NLRB No. 93 (2019) ............................................................................. *passim*

*Lutheran Heritage Village-Livonia*
343 NLRB 646 (2004) ..........................................................................................11

*Macy's, Inc.*
365 NLRB No. 116  (2017) ...................................................................................19

*National Indemnity Company*
368 NLRB No. 96 (2019) ...............................................................................12, 13

*Promedica Health Sys., Inc.*
343 NLRB 1351 (2004) ........................................................................................21

*S.E.C. v. Clark*
915 F.2d 439 (9th Cir. 1990) .................................................................................4

*The Boeing Company*
365 NLRB No. 154 (2017) ..............................................................................1, 11

22-60493.6334

## I.     INTRODUCTION

On September 27, 2019, Administrative Law Judge Amita Tracy (ALJ) issued her decision in the above-captioned matters, correctly concluding that Tesla, Inc.'s (Tesla or Company) so-called Confidentiality Acknowledgement[1] (issued in October 2016) did not violate Section 8(a)(1) and recommending the dismissal of Paragraph 7(a) of Counsel for the General Counsel's (GC) complaint.  Judge Tracy found that "considering the totality of the circumstances, . . . reasonable employees would understand the Confidentiality [Acknowledgement] to be limited to proprietary information" and, thus, not an infringement on their Section 7 rights.  (ALJD 14:25-27)  In doing so, the ALJ appropriately reasoned that the challenged provisions of the Confidentiality Acknowledgment "cannot be read in insolation" and must be considered in the full context of the Confidentiality Acknowledgement itself, as well as "the events at the time," including Tesla's emails regarding the Confidentiality Acknowledgment and the conversations by the HR Partners with employees explaining that the reaffirmation was due to "leaks of proprietary information at the workplaces" which could negatively impact the Company. (ALJD 14:29-30)   Additionally, she found that, "even if the Confidentiality [Acknowledgement] infringes on employees' Section 7 rights, [Tesla] presented legitimate business justification to override these rights." (ALJD 14:29-30)  In particular, the ALJ found that Tesla had legitimate concerns with "maintain[ing] security of its confidential proprietary information" as an employer in the automotive industry, that Tesla asked all employees to "acknowledge[] their obligation to maintain confidentiality when they were hired," that Tesla "suffered a series of information leaks which were critical to its success" in August 2016, that

---

[1] While both the ALJ and Counsel refer to this document as a Confidentiality Agreement, a plain reading of the document shows that calling or treating the document as an agreement is not accurate and that the document was no more than an acknowledgement or reminder of the employee's prior commitment to confidentiality.  Indeed, nowhere in the document does the title "Confidentiality Agreement" appear.  Instead, as stated in its introductory paragraph and the paragraph immediately above the document's signature line, the plainly worded, one page document served as a reminder of the confidentiality commitments that all Tesla employees agreed to at the time of their hire and a request that employees reaffirm those prior commitments. Accordingly, notwithstanding the ALJ's and GC's reference to the document as a "Confidentiality Agreement," we refer to it as a "Confidentiality Acknowledgement."

Tesla "asked employees to reaffirm their commitment to not leaking or disclosing confidential information," and that Tesla "sought to ensure every employee understood the reasons for why they needed to reiterate this rule" when Tesla rolled out the Confidentiality Acknowledgment. (ALJD 14:31-45)  The ALJ further rejected the GC's and the Union's claims that Tesla issued the Confidentiality Acknowledgement in response to or as a device for quelling on-going union organizing, finding there to be no evidence establishing a linkage between the Union's organizing and the issuance of the Confidentiality Acknowledgement and the absence of any evidence that Tesla even knew of the Union's organizing when it issued the Acknowledgement. (ALJD 15:1-11)

In his Amended[2] Limited Cross-Exceptions as the ALJ's findings and conclusions concerning Complaint Paragraph 7(a), the GC takes exception to the ALJ's failure to invalidate Tesla's use of the following text in the Confidentiality Acknowledgement: "regardless of whether information has already been made public, it is never OK to communicate with the media or someone closely related to the media about Tesla unless you have been specifically authorized in writing to do so."  The GC fails to address, much less consider, Tesla's legitimate business interests in safeguarding its proprietary information and preventing employees from leaking material, non-public information which may jeopardize its position in the marketplace and give competitors an unfair advantage.  Rather than address the ALJ's carefully reasoned findings and conclusions of law, the GC reads the challenged text in isolation and without regard to the context and surrounding circumstances in which it was used in the Confidentiality Acknowledgement, mischaracterizing it as a "blanket" prohibition on employee communication with the media and arguing it to be an unlawful Category 3 rule under *Boeing* because it

---

[2] Initially, the GC also excepted to the ALJ's finding that employees would reasonably view Tesla's Confidentiality Acknowledgement to be limited to proprietary information because of its reference to "employee information."  However, on February 12, 2020, the GC moved to withdraw that exception in light of the Board's recent decision in *Argos USA LLC,* 369 NLRB No. 26 (February 5, 2020).  Accordingly, that "employee information" exception is not before the Board and, thus, not addressed in this Opposition.  Indeed, in *Argos*, the Board found that a confidentiality rule which included a reference to "employee information" was a per se lawful category 1(a) workplace rule under *The Boeing Company*, 365 NLRB No. 154 (2017).

allegedly prohibits *any* contact with the media.  Since these assertions are without any basis in fact and contrary to governing law, the GC's exception should be overruled and the ALJ's decision as to Complaint Paragraph 7(a) should be adopted by the Board.

In his Amended Limited Cross-Exceptions, the GC also requests that the ALJ's notice be revised to require a nationwide notice posting.  The requested remedy does not comport with the GC's cited case law, which limits posting to the facilities at which the violation occurred.  The sole basis for this request is the GC's supposition that a tweet by Elon Musk on his personal Twitter handle is the same as a policy or unlawful rule and thus a nationwide posting is appropriate.  There is no legal authority provided, and the GC cannot and did not point to any record evidence which would provide any underpinning for this wild supposition.

Likewise, the GC's request – raised here for the first time in his Cross-Exceptions – that Tesla direct Elon Musk to "delete" his tweet from his personal account (which allegedly contained a threat) is wholly unsupported by the GC's cited authority which only requires the employer to "rescind" emails.  The GC did not point to any case law that would require a tweet be deleted.  Nor is there any record evidence about deleting tweets, the effect that deleting a tweet might or might not have or what it would mean to rescind or retract a tweet.

Accordingly, the GC's Amended Limited Cross-Exceptions should be denied.

## II.    THE ALJ PROPERLY FOUND THAT TESLA'S CONFIDENTIALITY ACKNOWLEDGEMENT WAS LAWFUL

### A.    FACTUAL BACKGROUND

#### 1.    TESLA'S EMPLOYEES ARE GIVEN ACCESS TO SENSITIVE COMPANY-INTERNAL INFORMATION

Tesla is a technology and design company founded in 2003 and headquartered in Palo Alto, California.  Among other products, it manufactures and assembles electric vehicles (EV) at its automobile production facility located in Fremont, California.  Approximately 12,000 EV production employees worked there at the time of trial.  (ALJD 4:18-20)  Tesla is the first

successful American automotive start up since Ford began business in 1903.  It is also the first
company to bring EV's to the mass market.

Like most high-tech companies, Tesla's success is largely dependent on its ability to
develop, control and make exclusive use of its confidential business information.  Indeed,
company-internal business information as to Tesla's technology, its business and financial plans
and its approach to the market — all developed over time and at considerable cost — provide
Tesla with a competitive advantage of considerable commercial value.  (ALJD 12:6-11; Tr.
2014:19-2016:7)  This is especially true since Big Auto began to enter the EV market in 2015.
Moreover, the leakage or unauthorized disclosure of any internal information including
information that may already been mentioned, discussed or even rumored in public about Tesla's
production, its sales and its ability to amortize its infrastructure costs, to operate profitably and/or
to meets its financial obligations is subject to SEC regulation and can directly affect the
Company's stock price and its ability to attract and retain investment capital.  *See, e.g.*, *S.E.C. v.
Clark*, 915 F.2d 439 (9th Cir. 1990)(misappropriation of confidential information constituted
insider trading, lowering stock price, affecting company's market share and perpetrating fraud on
shareholders).  Additionally, the disclosure of information relating to rumored but unreleased
product technology and unannounced feature changes is likely to depress or delay Tesla's sales if
consumers defer buying an EV in anticipation of the Company's anticipated latest and greatest
new innovations.  (ALJD 12:6-11; Tr. 2014:19-2015:5)

      **2.**     **EVEN THOUGH TESLA SHARES BUSINESS SENSITIVE
INFORMATION WITH ITS WORKFORCE, IT TAKES STEPS TO
KEEP THAT INFORMATION CONFIDENTIAL AND TO
PREVENT THE LEAKING OR DISCLOSURE OF SAID
INFORMATION TO THIRD PARTIES**

Tesla strives to promote an open workplace culture of trust, high performance, personal
responsibility/commitment and transparency.  Indeed, Tesla wants its workers to be stakeholders
who are committed to the Company's success and share in its mission of accelerating the world's
transition to clean sustainable energy generation, storage and consumption.  Thus, unlike more

traditional hierarchical companies who may share little business sensitive information with their production workers, Tesla encourages open and multidirectional dialog between worker and all levels of management and often shares internal business sensitive information with its workers as a way of keeping them abreast of critical issues and expeditious problem solving.  Though openly shared and discussed with workers, such internally circulated information is still considered confidential. (R-5)

      In order to protect such business-sensitive information from disclosure outside the Company, Tesla requires employees to enter into and abide by the Company's Proprietary Information and Inventions Agreement (PIIA) as a condition of their initial hire and continued employment.  Under the PIIA, every employee agrees to "hold in strictest confidence" and to "not disclose, use, lecture upon or publish any of the Company's Proprietary Information" which is defined, in pertinent part, as follows:

> [A]ny and all confidential and/or proprietary knowledge, data or information of the Company, its parents, subsidiaries, or affiliated entities, customers and suppliers, or any other party with whom the Company agrees to hold . . . in confidence, including but not limited to information relating to products, processes, know-how, designs, formulas, methods, developmental or experimental work, improvements, discoveries, inventions, ideas, source and object codes, data, programs, other works of authorship, and plans for research and development.

(R-4; ALJD 12:1-5)[3]

      Consistent with the PIIA, Tesla issues post-hire policy statements that are made available to all employees on the Company's intranet that remind Tesla associates of their confidentiality agreement and the continuing need for confidentiality.  For instance, Tesla's Code of Business Conduct and Ethics applicable to the conduct of all Company employees, provides that:

> "Employees . . . must maintain the confidentiality of confidential information entrusted to them by the Company . . . except when disclosure is authorized by the Legal Department or required by laws or regulations.  Confidential information includes all non-public information that might be of use to competitors, or harmful to the Company . . . if disclosed.  . . . . In connection with this obligation,

---

[3] The GC does not question the lawfulness or facial validity of the PIIA.

every employee should have executed a confidentiality agreement when he or she
began his or her employment with the Company.

(R-6; ALJD 12:1-5)[4]

Likewise, Tesla's Communication Policy points out that Tesla often functions under a
spotlight and that employees are likely to be approached by reporters, analysts or researcher for
information or commentary about the Company.  For the purpose controlling that media
information, the policy reminds workers of the "confidentiality agreement" they "signed" when
they "joined Tesla" and of their continuing obligation to hold Tesla's information in the strictest
confidence, stating that employees are not to share confidential or privileged information about
Tesla with anyone outside the Company.[5]  (R-7; ALJD 12:1-5)  The policy also designates
specific people who are authorized to speak to the press on the Company's behalf and directs
those who are not authorized to speak for the Company to "be careful with your conversations"
and to "not confirm, deny or comment on information that has not already been publicly
released" by the Company.[6]  (*Id*.)

Tesla takes informational security seriously and routinely seeks to enforce the PIIA and
the aforesaid policies and investigates leaks, primarily relying on its IT team to uncover
information identifying employees who take protected information and disclose it publicly.  (Tr.
2018:9-2019:24)  However, such information is not always available.  However, where it is and
Tesla has cause to believe that an employee has violated their confidentiality obligation, the
Company has disciplined/terminated the identified worker and taken other action.  (Tr. 2019:25-
2020:16)  For instance, in one notable case, an outgoing or ex-Tesla employee hacked into his

[4] The GC does not question the lawfulness or facial validity of Tesla's Code of Business Conduct
and Ethics.

[5] The GC does not question the lawfulness or facial validity of the Tesla's Communication
Policy.

[6] At the same time, however, the Communications Policy contains a carve out allowing
employees to speak with the media on their own behalf as to matter that are not business
sensitive or confidential, stating that the Company's policy is *not* meant to discourage personal
self-expression and asks that when Tesla employees use social media or speak about the
Company, they make it clear that they are speaking on their own behalf and not speaking for or
on behalf of Tesla.

manager's email account to access and obtain technical data about vehicles which he, in turn, leaked to the media. (Tr. 202:17-2021:9) After determining this former associate to be the source of the stolen information, Tesla contacted turned the matter over to the FBI who arrested and prosecuted him for theft. (*Id.*)

### 3. DESPITE TESLA'S MANY EFFORTS TO PREVENT LEAKS, SENSITIVE COMPANY-INTERNAL BUSINESS INFORMATION GETS LEAKED TO PERSONS/THIRD PARTIES OUTSIDE THE COMPANY (THE BLOOMBERG LEAK)

On August 29, 2016, Elon Musk sent an internal email to Tesla's entire workforce, worldwide. (R-37; ALJD 11:40-46) Though not marked confidential, the message was chock full of private business sensitive information *not* for public consumption. (Tr. 2011:17-24, 2012:4-8) Entitled "Third Quarter Rally," the email apprised recipients of the criticality of a strong fiscal quarter ending September 30 and the need to ramp up performance, contain costs and rally before September 30 quarterly close in order to achieve positive cash flow and GAAP profitability. (R-37) The email explained that Q3 2016 would be the last chance for the Company to show investors that it could be cash positive and profitable before the new Model 3 went into production since Model 3 capital expenditures were expected to force the Company back into a negative position until late 2017. (Tr. 2009:17-2010:1; R-37) The August 29 message also explained that a positive Q3 was critical since a profit would make it easier for the Company to raise additional cash in Q4 2016 to complete the Model 3 vehicle factory and Gigafactory 1 at Sparks, Nevada. (*Id.*)

Despite the business sensitive nature of this internal communications, it was not kept private. To the contrary, shortly after it issued internally, it was leaked by an unknown person to the media, appearing word for word in Bloomberg on September 6. (Tr. 2008:24-2009:5; R-38; ALJD 11:40-43) This was not the first time that such non-public business sensitive information had been leaked to the press. (ALJD 11:40-43) Indeed, leaks had occurred on multiple occasions in the past and remained a nagging problem at Tesla. (Tr. 2005:16-2006:24; ALJD 11:40-46) More often than not, leakers or the sources of leaks went unidentified, leaving the

Company with no viable remedy.  (Tr. 2019:12-2020:4)  Nonetheless, on several occasions, senior managers issued memos to the employees trying to impress upon them the Company's confidentiality concerns and reminding them to not leak such non-public business sensitive information.  (Tr. 2018:22-2019:9; ALJD 11:40-12:6)

For example, on February 10, 2015, Tesla's then General Counsel, Todd Maron, issued an email to "Everybody" re: Leaks, cautioning them against leaking internal email to the media and explaining that keeping such internal messaging in house was extremely important so that "we can have a frank and open internal dialogue about how to solve problems" and noting that "[i]f a concern cannot be raised without wondering whether it will be leaked out of context or blown up in the media, then free speech is fundamentally impaired within Tesla."  (R-39; ALJD 12:1-6)

Likewise, later on in March 30, 2016, Tesla's then Vice President of Human Resources, Mark Lipscomb, issued an "Important Reminder" to all Tesla employees in which he emphasized the absolute criticality that we maintain strict confidentiality on all internal materials, noting that "[t]he interest level in Tesla is at an all-time high and as a result, media, analysts, and other outsiders are looking to find out anything they can about our company, products, and more" and that "[a]ny leak can threaten the success of a product launch and have a negative impact on the company."  (R-40; ALJD 12:1-5)  Thus, according to Lipscomb, Tesla had a "zero tolerance policy when it comes to violations of confidentiality . . .  [to protect] all of the hard work being performed by everyone at Tesla."  (*Id.*)

Despite these and other memos calling for employees to honor their confidentiality commitments, leaks continued to occur with the September 6 Bloomberg being the latest, forcing Tesla to look for some new solution to the persistent problem of leaks.

4.    **AS A RESULT OF THE BLOOMBERG LEAK, TESLA'S GENERAL COUNSEL DIRECTS THAT A CONFIDENTIALITY ACKNOWLEDGEMENT REMINDING EMPLOYEES OF THEIR CONFIDENTIALITY OBLIGATIONS AND CALLING ON THEM TO REAFFIRM THEIR PRIOR CONFIDENTIALITY COMMITMENTS BE DRAFTED AND DISTRIBUTED TO THE ENTIRE TESLA WORKFORCE**

After the September 6 Bloomberg leak, Tesla's Todd Maron tasked certain lawyers on his staff with the drafting what was supposed to be a simple, one page, plainly and non-legalistically worded document to be given to and signed by all Tesla employees in which employees would be reminded of and acknowledge their confidentiality obligations and renew the earlier confidentiality vows they made to the Company.  (Tr. 2006:25-2007:8, 2009:6-16, 2027:17-2028:7; ALJD 11:40-48; R-42)  Among those tasked with drafting the acknowledgement were Vice President, Legal, Jonathan Chang and Deputy General Counsel, Yusuf Mohamed.  (Tr. 2007:3-8)  Over the remainder of September and into early October, they and other Tesla lawyers worked to develop a draft document that would meet Maron's requirements – a simple one page acknowledgement written in plain, simple English that could easily be read and understood by non-lawyers and that would drive home the seriousness of leaking non-public business sensitive information.  (2029:13-19)  By the end of the first week of October, that draft was close to being done, but still not in final form nor ready for publication.  However, events in the form of yet another leaked internal document – one publishing an internal email from Musk concerning the discounting of cars – overtook the lawyer's work and compelled the Company to issue the new Acknowledgement in a less than final form on October 10.  (Tr. 2029:25-2030:17, 2034:14-2035:5)  A day later, that initial acknowledgement draft was amended and put into final form, becoming the Confidentiality Acknowledgement that now serves as the basis for General Counsel's allegations in Paragraph 7(a) of the Amended Second Complaint.  (Tr. 2034: 14-2035:5)

5.    **BEGINNING ON OCTOBER 11, TESLA PUBLISHES A CONFIDENTIALITY ACKNOWLEDGEMENT AND ASKS EMPLOYEES TO SIGN IT**

In October and November 2016, Tesla asked employees to sign a Confidentiality

Acknowledgement.  (ALJD 10:43-45)  The Confidentiality Acknowledgement states[7]:

> In response to recent leaks of confidential Tesla information, we are reminding everyone who works at Tesla, whether full-time, temporary or via contract, of their confidentiality obligations and asking them to reaffirm their commitment to honor them.
>
> These obligations are straightforward. Provided that it's not already public information, everything that you work on, learn about or observe in you[r] work about Tesla is confidential information under the agreement that you signed when you first started. This includes information about products and features, pricing, customers, suppliers, employees, financial information, and anything similar. **Additionally, regardless of whether information has already been made public, it is never OK to communicate with the media or someone closely related to the media about Tesla, unless you have been specifically authorized in writing to do so.**
>
> Unless otherwise allowed by law or you have received written approval, you must not, for example, discuss confidential information with anyone outside of Tesla, take or post photos or make video or audio recordings inside Tesla facilities, forward work emails outside of Tesla or to a personal email account, or write about our work in any social media, blog, or book. If you are unsure, check with your manager, HR, or Legal. Of course, these obligations are not intended to limit proper communications with government agencies.
>
> The consequences of careless violation of the confidentiality agreement, could include, depending on severity, loss of employment. Anyone engaging in intentional violations of the confidentiality agreement will be held liable for all the harm and damage that is caused to the company, with possible criminal prosecution. These obligations remain in place even if no longer working at Tesla.
>
> By acknowledging, I affirm my agreement to comply with my confidentiality obligations to Tesla. I also represent that at no time over the past 12 months have I disclosed any Tesla confidential information outside of Tesla unless properly authorized to do so.

---

[7] The text that is the subject of the GC's exception appears at the end of the second paragraph. While boldfaced here to make it easier for the reader to find it, it was not boldfaced in the original document distributed to the Tesla workforce.

(R-11; ALJD 11:1-12:20)

In October, then HR Director for Production and Supply Chain Josh Hedges advised the Fremont HR team that they needed to remind everyone of the confidentiality agreement they signed when they were hired and that all employees would be asked to sign the Confidentiality Acknowledgement in the presence of a HR representative.  (ALJD 12:24-30)  Thereafter, HR partners met with different groups of employees to ask them to sign the Confidentiality Acknowledgement and advised employees they were being asked to sign the document in response to recent information leaks at the Fremont facility.  (ALJD 12:24-40, fn. 23)  Later, in November, Lipscomb sent an email to all employees asking them to sign the Confidentiality Acknowledgment electronically in their Workday inbox.  Lipscomb reiterated that Tesla needed this affirmation to reinforce the importance of confidentiality as any leaks "can have a negative impact on our company."  (ALJD 12:32-40)

## B.    LEGAL ANALYSIS

### 1.    THE ALJ PROPERLY FOUND THAT REASONABLE EMPLOYEES WOULD UNDERSTAND THE CONFIDENTIALITY ACKNOWLEDGEMENT TO BE LIMITED TO PROPRIETARY INFORMATION

The GC claims that a specific clause in Tesla's Confidentiality Acknowledgment, designed to limit Tesla employees from disclosing proprietary information to the media (even if leaked) and/or speaking to the media on Tesla's behalf, is facially unlawful.  The GC takes the excepted to text out of context and asks to Board to read it in isolation and without regard to its inclusion and placement in the Confidentiality Acknowledgement and circumstances surrounding that document's October 2016 issuance. This is at odds with *Boeing* and the Board's recent holdings finding that confidentiality agreement clauses are facially lawful.

In *Boeing*, the Board overruled the "reasonably construe" test delineated in *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004) and set a new standard for determining the

lawfulness of facially neutral work rules and when such rules, reasonably interpreted will be found to unlawfully interfere with, restrain or coerce employees in the exercise of their Section 7 rights. Under the *Boeing* test, the Board will no longer read text in isolation nor disregard the context within which a given text is used. Nor will the Board construe ambiguous language against the Employer for in *Boeing*, the Board observed that reasonable employees do not view every employer policy through the prism of the Act, but rather, interpret work rules as those rules apply to the "everydayness" of their jobs. *LA Specialty Produce Company*, 368 NLRB No. 93, slip op. at 2 (2019). Thus, when evaluating a facially neutral policy, rule or handbook provision under the *Boeing* standard, the Board will first reasonably interpret the text from the prism of "everydayness" and decide whether that rule, as interpreted, potentially impacts rights protected by the Act as well as the legitimate justifications associated with the rule. *Id.*, slip op. at 7 (2020).

The excepted to provision in Tesla's Confidentiality Acknowledgement is a lawful *Boeing* Category 1(a) rule under the Board's recent holdings addressing confidentiality. In *Argos USA LLC,* 369 NLRB No. 26, slip op. at 2-3 (February 5, 2020)*,* for example, which the GC ignores, the Board upheld a confidentiality agreement requiring employees not to disclose various types of confidential information including "earnings" and "employee information" finding that the text to be a lawful Category 1(a) rule as it did not expressly prohibit employees from discussing or disclosing wages, hours and working conditions. Further, the Board looked at the full context of the confidentiality agreement and held that (a) it applied only to the employer's proprietary information and (b) did not extend to individual employee's wages or contact information. *Id.* In doing so, the Board refused to read the confidentiality agreement in isolation. Rather, it reasoned that the terms "earnings" and "*employee information*" were included in a "list of categories of obviously proprietary information" and that the paragraphs following the definition paragraph contained information about "inventions, business improvements, patents, and third-party confidential information." Accordingly, the Board concluded that the General Counsel had failed to sustain its burden in showing that an

objectively reasonable employee would interpret the confidentiality agreement, when read as a whole, to potentially interfere with Section 7 rights.  Thus, the Board declined to even analyze the general and specific legitimate interests justifying the confidentiality agreement.  *Id.*

Likewise, in *National Indemnity Company*, 368 NLRB No. 96, slip op. at 2-3 (2019), which the GC fails to distinguish, the Board reversed an ALJ finding a Code of Conduct to be unlawful that required employees to "maintain the confidentiality of confidential information entrusted to them."  The Board reasoned that even though the Code of Conduct failed to identify all of the information that the employer might consider to be confidential, the text in question did not expressly reference employee terms and conditions of employment, much less restrict their discussion with anyone and instead required that employees simply maintain the confidentiality of "non-public" information that might be of use to competitors or harmful to the Company or its customers if disclosed.  According to the Board, reasonably interpreted from the perspective of an objectively reasonable employee who is aware of their legal rights but who also interprets work rules as they apply to the "everydayness" of their jobs, the text attacked referred only to confidential information which the employer has a legal right to conceal.  *Id.* at 2-3  Hence, the Code provision was found to be a lawful *Boeing* Category 1(a) rule, its alleged vagueness and over-breadth notwithstanding.

Similarly, in *LA Specialty*, 368 NLRB No. 93, slip op. at 1-4, the Board overturned an ALJ finding that an employer's confidentiality rule was unlawful that prohibiting the disclosure of confidential and proprietary information including but not limited to client/vendor lists because the rule required employees to protect the confidentiality of client and vendor lists, but said nothing about talking to clients or vendors with respect to Section 7 matters.  Further, the Board parted ways with an ALJ finding and upheld a rule which, like the excepted to text here, speaks of situations in which employees are approached by the news media and which only prohibits employees from speaking on the employer's behalf.  *Id.* at 4-5.  As here, a parsing of the text's wording might suggest that employees may never speak to the media on behalf of themselves.  But the Board observed that it must refrain from reading particular phrases in

isolation and that, in any event, the phrase under attack was qualified by the text when read as a whole and that, when read in that broader context, the language in question lawfully signified that employees were not authorized to act as company spokespersons. *Id.* Thus, as here, the Board concluded that the GC had misread the text under attack to prohibit employees from *ever* speaking to the media and was a lawful *Boeing* category 1(a) rule. Accordingly, consistent with *Argos* and *National Indemnity Company,* the Board found it unnecessary to even analyze the general and specific legitimate interests justifying the workplace rules. *Id.*

Contrary to the above referenced cases (and consistent with the rejected "reasonably construe" test found in *Lutheran Heritage*), the GC takes the text out of context and asks to Board to read it in isolation without regard to its inclusion and placement in the Confidentiality Acknowledgement and circumstances surrounding that document's issuance. Indeed, according to the ALJD not excepted to by the GC, the Confidentiality Acknowledgement *only* applies to Tesla's "*proprietary information*." (ALJD 14:25-27) (Italics added) Thus, neither it nor the excepted text makes any reference or has any application to employee wages, hours or working conditions or to unionization or to an employee speaking to the press as to such matters. Indeed, this is evidenced by the express carve out language that follows immediately after the excepted to text which exempts from otherwise confidential information, the discussion or disclosure of information that is "otherwise allowed by law," meaning to any employee who is familiar with their rights under the Act that information pertaining to employee wages, hours, working conditions or to unionization are not subsumed within the excepted to text and that employees are perfectly free to discuss such topics with the press, the Confidentiality Acknowledgement notwithstanding.

When properly read in the context of the Confidentiality Acknowledgement, a document that stated that it was aimed at discouraging leaks to the media of internal business sensitive information and in which employees are merely reminded of their earlier lawful non-disclosure commitments and asked to reaffirm those earlier vows, the isolated, excepted to text must also be read as being limited to such confidential information. (*Id.*) Further, based on Tesla's PIIA and

Communications Policy, included within those prior lawful vows are the employees' promise to not to disclose Tesla's confidential information to persons/parties outside Tesla including the media as well as their commitment to neither act as nor portray themselves as a Company media spokesperson with respect to confidential information unless they are specifically authorized to do so.  (R-4; R-7)  Measured in this light, a plain reading of the excepted to text shows that it has nothing to do with Section 7 rights and it is nothing more than a reminder to employees that they have agreed not to share or discuss confidential information with the media even if that confidential information may have been leaked to the public unless they are specifically authorized in writing to do so.  As the Confidentiality Acknowledgement states, this is true "regardless of whether the information has already been made public" because, even if a leak occurs, Tesla justifiably seeks to limit further exposure of proprietary information by prohibiting unauthorized employees from speaking to the media about such issues.  This is particularly clear from the following language in the Confidentiality Acknowledgement:

- The opening sentence, which states that the policy is being circulated "[i]n response to recent leaks of confidential Tesla information." (Before the media clause)
- "This includes information about products and features, pricing, customers, suppliers, employees, financial information, and anything similar." (Before the media clause)
- Unless otherwise allowed by law or you have received written approval, you must not for example, discuss confidential information with anyone outside of Tesla, take or post photos or make video or audio recording inside Tesla facilities, forward work emails outside of Tesla or to a personal email account, or write about our work in any social media, blog, or book."  (After the media clause)

Thus, when read through the prism of the everydayness of the Tesla workplace, the excepted to text does not implicate, much less, interfere with Section 7 rights.  Accordingly, the ALJ was

correct when she concluded that reasonable employees would understand the Confidentiality
Acknowledgement, including the excepted to text, to be limited to "proprietary information."
(ALJD 14:25-27)

The GC engages in no analysis of *Argos* and *National Indemnity Company* in its Brief in
Support of Cross-Exceptions. Likewise, while the GC feebly attempts to distinguish the media
policy in *LA Specialty*, it amounts to a distinction without a difference. In *LA Specialty*, the
Board refused to focus on a single line of the media policy at issue, and instead, found that the
policy as a whole made clear that employees were prohibited from speaking to the media on
behalf of the company. *Id.* In reaching its decision, the Board in *LA Specialty* reasoned that
reading certain provisions in insolation would render other parts of the policy superfluous –
which the Board refused to do. *Id.* Focusing, as the GC does, only on the language stating "it is
never OK to communicate with the media or someone closely related to the media about Tesla,"
would erroneously render other parts of the acknowledgement meaningfulness. For example the
following sentence in the Confidentiality Acknowledgment makes clear that the prohibition on
speaking to the media is limited to proprietary information: "[u]nless otherwise allowed by law
or you have received written approval, you must not, for example, discuss *confidential
information* with anyone outside of Tesla, take or post photos or make video or audio recordings
inside Tesla facilities … or write about *our work* in any social media, blog, or book." (Italics
added). Further, Tesla's Confidentiality Acknowledgment refers to employees needing
"authorization" to speak to the media concerning certain subjects, namely Tesla's proprietary
information. *LA Specialty* held that this type of language signals that the spokesperson may
speak on the company's behalf – but does not limit *on its face* an employee's ability to discuss
their own wages and terms and conditions of employment with the media. *Id.*

The GC offers two reasons why *LA Specialty* does not apply in this case. Both reasons
are unavailing. First, the GC argues that the language in the Confidentiality Acknowledgement is
an unlawful "blanket prohibition on contact with the media." However, the language the GC is
referencing, "it is never OK to communicate with the media or someone closely related to the

media about Tesla" is almost identical to the language that the Board found lawful in *LA Specialty*. The provision in *LA Specialty* stated "[e]mployees approached for interview and/or comment by the news media, cannot provide them with any information." *Id.* slip op. at 4. There is no meaningful distinction between being "approached" by the news media for interview/comments versus "communicating" with the news media under the Confidentiality Acknowledgement. *LA Specialty,* therefore directly undermines the GC's argument – given that the Board found such similar language was not a "blanket prohibition" on Section 7 activity, but in fact a facially lawful policy.

Second, the GC argues that the "authorized and designated" language in *LA Specialty* was a "signal to a reasonable employee that the rule merely applied to speaking on [the company's] behalf." However, the GC conveniently overlooks the fact that similar language also appears in the Confidentiality Acknowledgment ("unless you have been specifically authorized in writing to do so"), providing the same "signal" to Tesla's employees.

Further, the fact that the text proscribes workers from serving as a company spokesperson with respect to information that may already have been made public does not render the text unlawful since there is no Section 7 right to act as a company spokesperson. Further, let it not be forgotten that the whole purpose of the Confidentiality Acknowledgement was to stem the leaking of confidential Tesla information, rendering the text's mention of information "already made public" an obvious reference to confidential information that may be leaked. (GC-31; R-14) A rule that bans the unauthorized disclosure of such purloined confidential information merely because it is now "public" can't possibly be deemed unlawful since a finding of unlawfulness would encourage violation of the rule and compromise an employer's right to demand and expect the maintenance of confidentiality.

Finally, before Tesla issued the text now under attack, it and its employees agreed that the Company's confidential information would be kept confidential and that its employees would not act as a company spokesperson without being given authorization to do so. (R-4; R-7) Tesla's October 2016 Confidentiality Acknowledgement of which the excepted to text is an

integral part did nothing more than to remind Tesla workers of their prior commitments to hold internal business-sensitive information confidential and to refrain from presenting themselves to the media as a Tesla spokesperson.  (GC-31; R-14)  Given that plain meaning and under the *Boeing* standard, the sentence attacked by the GC in his Cross-Exception should be found to be a lawful Category 1(a) rule.  The ALJD's findings with respect to the Confidentiality Acknowledgement including the excepted to text should be adopted and the GC's limited Cross-Exception attacking those findings should be overruled.

**C.    EVEN IF THE EXCEPTED TO LANGUAGE IN THE CONFIDENTIALITY AGREEMENT INFRINGES ON EMPLOYEES' SECTION 7 RIGHTS, THE ALJ PROPERLY FOUND THAT TESLA HAD LEGITIMATE BUSINESS JUSTIFICATIONS TO OVERRIDE THOSE RIGHTS**

As demonstrated above, the Confidentiality Acknowledgement including the excepted to provision, as reasonably interpreted, did not potentially affect Section 7 rights.  But even if it did, the ALJ found that Tesla presented legitimate business justifications to override those employee rights.  (ALJD 14:29-45)  Indeed, under *Boeing,* even if an employer's rule, as reasonably interpreted, is found to potentially interfere with Section 7 rights, the rule may still be supported by the employer's  legitimate business interests in which case, the Board will be compelled to attempt to strike a balance between competing employee rights and an employer's interests in maintaining the rule.  Where that balance is found to favor the employer's interests over the potential interference with Section 7 rights, the employer's rule at issue will still be found lawful within *Boeing* Category 1(b), its potential possible or potential impact on Section 7 rights notwithstanding.  *LA Specialty*, *supra*. slip op at 3.

As demonstrated above, the Confidentiality Acknowledgement including the excepted to provision relating to media contact, as reasonably interpreted, did *not* potentially affect Section 7 rights.  But even assuming, *arguendo,* that it did, the ALJ found that Tesla presented legitimate business justifications sufficient to override potential employee rights.  (ALJD 14:29-45)  This finding is amply supported by the uncontroverted and credited testimony of Jonathan Chang who

testified as to the problems of leaked confidential information plaguing Tesla and how and why it was necessary for Tesla to issue the Confidentiality Acknowledgement in October 2016. (Tr. 1983:25-1994:2, 2001:23-2035:7, 2040:21-2042:20) Suffice it to say, an employer's interest in protecting its internal business sensitive information including that which is shared with its employees is both real and substantial. And where that employer has entered into Proprietary Inventions Agreements and published policies proscribing the disclosure or publication of confidential information outside the Company, it is reasonable for an employer to expect employees to honor their vows of confidentiality. Yet the GC turns a blind eye to this reasonable expectation and, in the guise of questioning the substantiality of Chang's testimony, to backhandedly ask the Board to disregard the ALJ's findings crediting Chang's testimony and to simply ignore Tesla's proven interest in preserving the confidentiality of that information and discouraging the leaking of that information to the press and persons outside the Company. Under *Boeing*, the Board may not do this.

Moreover, an employer's interest in preserving such confidentiality clearly preponderates over the employees' interest in being able to use or disclose such internal business sensitive information insofar as employees have no right to use or disclose confidential business information while engaged in Section 7 activity. Indeed, as the Board recently noted in *Macy's, Inc.*, 365 NLRB No. 116, slip op. at 4 (2017), employees may be lawfully disciplined or discharged for using for organizational purposes information improperly obtained from their employer's private or confidential records. This is because the Act does not protect employees who use or divulge information that their employer lawfully may conceal. *International Business Machines Corp.*, 265 NLRB 638 (1982).

Here, the undisputed and specifically credited record evidence shows that by its issuance of the October Confidentiality Acknowledgement, Tesla sought to protect the future confidentiality of its internal business sensitive information that it has a legal right to conceal from the public — including that information which was shared with its employees. Accordingly, even if its employees *arguably* had some potential right to make use of or to

disclose said confidential information while engaged in Section 7 conduct (which they didn't), that arguable Section 7 right would still be outweighed by the employer's interest in keeping that information confidential, rendering the Confidentiality Acknowledgement including its media contact provision a lawful policy within the meaning of *Boeing* Category 1(b).  GC's exception to the ALJ's finding that Tesla Confidentiality Acknowledgement was supported by overriding legitimate business should, therefore, be rejected.  The ALJ's finding on this point should be adopted by the Board.

## III. THE GC'S REQUEST TO REVISE THE ALJ'S REMEDY TO REQUIRE A NATIONWIDE POSTING AND "DELETION" OF A TWEET IS NOT SUPPORTED BY FACT OR LAW

### A. THE ALJ CORRECTLY LIMITED ANY NOTICE POSTING TO THE FREMONT FACILITY BECAUSE THE ONLY ALLEGED VIOLATIONS WERE AT THE FREMONT FACILITY

The GC requests a nationwide notice posting, based on the assertion that the "Board generally directs the posting of a notice 'to facilities at which the violations were committed.'" (GC's Brief ISO Cross-Exceptions, p. 17)  Yet, the ALJ found:  "I do not order a notice reading at the Sparks facility as no violations of the Act occurred there."[8]  (ALJD 78:18-19)  The *only* notice posting required by the ALJ is at the "facility in Fremont, California."  (ALJD 80:19-20)  No other result is possible because the ALJ's decision does not make any jurisdictional or factual findings regarding the existence of Tesla facilities other than the Fremont Facility and the Sparks facility.  (ALJD, 3:9-19)  Nor could the ALJ have made any such findings because the operative complaints only contained allegations relating to the Fremont Facility and the Sparks Facility and did not identify any other specific facilities.[9]

---

[8] None of the GC's Cross-Exceptions are directed at any allegations that allegedly occurred at the Sparks facility.  Thus, the ALJ's determination as to the sole location of alleged violations is final: the Fremont Facility.

[9] Both operative complaints contain similar allegations and only specifically identify the Fremont Facility and the Sparks Facility:

> At all material times, Respondent, a Delaware technology and design corporation with its headquarters in Palo Alto, California, with facilities throughout the United States,

Board precedent is clear; any notice posting should be limited to the Fremont Facility. *See, e.g., AT&T*, 362 NLRB 885, 885 n.3 (2015)("no basis on which to order nationwide notice posting, as the Respondents here operate only in California and Nevada, and this was the alleged and admitted scope of their operations"); *Fry's Food Stores*, 361 NLRB 1216, 1216 n.2, 1218 (2014)(notice posting limited to one location because "case involves discrete violations at only one facility"); *Promedica Health Sys., Inc.*, 343 NLRB 1351, 1351 n.2 (2004)(Respondents "not required to post a notice at its Goerlich Center, where no violations were committed"). Indeed, even the GC's cited case law recognized additional limitations on notice posting when the Board reversed the unit-wide posting requirement "because there is insufficient evidence to indicate that the four violations found here were committed pursuant to a company policy" and required the posting only at the facilities where the violations occurred. *Consolidated Edison Company*, 323 NLRB 910-912 (1997).

Tellingly, the Board has prevented the GC from expanding the scope of the complaint's allegations in an attempt to obtain a broader notice posting. In *Boch Honda*, 362 NLRB 706, 708 (2015), for example, even though the case involved an employee handbook, the Board limited the notice posting to the specific facilities alleged in the complaint, which only identified a specific facility in Norwood, Massachusetts. During trial, the GC elicited testimony that the employee handbook was used at other dealerships and stores that were also owned by Boch. *Id.* Based on the trial testimony, the GC moved to amend the complaint to add the additional dealerships and retail stores, but the motion was denied. *Id.* Because there was no "litigated

> including *an automotive manufacturing facility in Fremont, California, and an automotive battery facility in Sparks, Nevada*, has been engaged in the design, manufacture, and sale of electric vehicles and energy storage systems." (GC Ex. 1(iii), ¶2(a)) (emphasis added); and
>
> At all material times, Respondent, a Delaware technology and design corporation with its headquarters in Palo Alto, California, *an automotive manufacturing facility in Fremont, California (the Fremont Facility), and an automotive battery facility in Sparks, Nevada (the Sparks Facility)*, has been engaged in the design, manufacture, and sale of electric vehicles and energy storage systems. (GC Ex. 1(jj), ¶2(a)) (emphasis added).

finding that the Respondent was responsible for the implementation and maintenance of the same handbook policies at other 'Boch' entities," the Board limited the notice posting to the named Respondent.  *Id.*  The same result is amply warranted here.

### B.    THE ALJ MADE NO FINDINGS THAT THE TWEET WAS AKIN TO AN UNLAWFUL RULE OR POLICY AND ANY REMEDY BASED UPON THIS FALSE SUPPOSITION MUST BE DENIED

Notwithstanding the ALJ's specific finding that the only violations occurred at the Fremont Facility, the GC attempts to skirt these issues and request a nationwide notice posting by suggesting that the tweet should be treated as "an unlawful rule or policy [which] is maintained on a nationwide basis."  (GC's Brief ISO Cross-Exceptions, p. 17)  The GC's conjecture is not confirmed by any cited authority, and there are no factual findings that offer any corroboration.

The GC did not identify Twitter (or the tweet) as a policy or a rule.  Instead, the GC plainly defined Twitter as a "micro-blogging social media platform."  (GC's Post Hearing Brief, p. 23)  While Twitter might be an application that is available throughout the United States to those who view or access it, there is no record evidence whatsoever that it is a "rule or policy" that is "maintained on a nationwide basis" by Tesla.  To the contrary, the parties stipulated[10] that *Twitter* maintains Twitter accounts through which users may send tweets.  (Jt.-4, #1, 5)  Furthermore, the parties stipulated that the tweet at issue was sent from Elon Musk's *personal* Twitter account (@ElonMusk).  (Jt.-4, #13)  This is a separate and distinct account from Tesla's Twitter Account.  (Jt.-4, #13, 16)  Tesla's Twitter account has a completely different handle (@Tesla).  (Jt.-4, #16)  The Tesla Twitter account is the only account that Tesla uses "to make statements on behalf of Respondent."  (*Id.*)  Therefore, the parties' stipulation makes clear that

---

[10] Joint Exhibit 4 contains the parties' stipulations to facts relating to the tweet allegations.  The GC stipulated to all the facts contained in Joint Exhibit 4 and cannot now be heard to undercut or contradict them.  Furthermore, the GC did not put on any evidence – other than Joint Exhibit 4 – about how Twitter works, Twitter accounts, and the dissemination of tweets.

the account from which the tweet was sent is not one maintained by Tesla and is not the account that Tesla uses to make statements on behalf of Tesla.

Next, the GC attempts to suggest that the tweet was sent nationwide by incorrectly representing (p. 17) that the alleged "threat of a loss of benefits was published to the thousands of employees who work under him at all of Respondent's facilities *and* to the millions of statutory employees within the jurisdiction of the United States."  The only cited support for this claim is Joint Exhibit 4.  But Joint Exhibit 4 does not contain any mention whatsoever of any Tesla facilities or their geographic location or any statutory employees.  Nor does Joint Exhibit 4 identify *any employee* to whom the tweet was allegedly published, much less corroborate the GC's assertion that it was published to "thousands of employees" and "millions of statutory employees in the United States."  (GC Brief ISO Cross-Exceptions, p. 17)  Quite the opposite, the only stipulated fact regarding dissemination of the tweet was "it is not possible to determine the full extent to which Elon Musk's tweets, as set forth in GC Exhibits 38, 36, and 69, were republished or otherwise disseminated."  (Jt.-4, #19)

The actual facts contained in Joint Exhibit 4 eviscerate the GC's position.  Joint Exhibit 4 establishes that all the responses to the tweet that the GC relies upon (contained in GC Exhibit 69), were from individuals *who were not employed by Tesla*.  (Jt.-4, #6-12)  The parties did not stipulate that *any* Tesla employees or Tesla statutory employees viewed or saw the tweet.  (Jt.-4)  Thus, the GC's asserted factual underpinning is without any merit and is contradicted by the parties' stipulated facts.  The GC did not present witnesses or documentary evidence that *any Tesla statutory employee* saw any of the tweets in GC Exhibit 69, except for Jose Moran.  (Tr. 814:19-21, 815:14-19, 822:23-827:20)  Therefore, under the GC's cited case law, notice posting would only be required at the facility where the alleged violation occurred, and the only record evidence that a statutory employee saw the tweet, is Jose Moran, who worked at the Fremont Facility.  Hence, the ALJ correctly limited the notice posting to the Fremont Facility.

### C.   THERE IS NO LEGAL OR FACTUAL BASIS TO MODIFY THE ALJ'S REMEDY TO REQUIRE TESLA TO ORDER NON-PARTY ELON MUSK TO DELETE THE TWEET

For the first time, in its Cross-Exceptions, the GC requests that "Musk delete the tweet." (GC Brief ISO Cross-Exceptions, p. 18)  Neither the operative complaints nor the GC's post-hearing brief made any such request.  In fact, the GC's requested remedies did not include the word "delete" and did not contain any request that the tweet be rescinded or retracted.  (GC's Post-Hearing Brief, pp. 106-110)  The GC now states – without any factual or legal support – that "ordering Respondent to request that Musk delete the tweet containing the unlawful threat is akin to his retraction of the statement." (GC Brief ISO Cross-Exceptions, p. 18)  This bald assertion brings to light two distinct problems with this new request.  First, Elon Musk, sent the tweet from his *personal* Twitter account – not Tesla's separate Twitter account.  (Jt.-4, #3, 13)  Elon Musk is not a party to this case; Tesla is.  Second, there is no evidence about whether or how a tweet could be deleted, rescinded or retracted or that deletion of a tweet would be equivalent to a "retraction of the statement" (p. 18) because the only evidence about Twitter is contained in Joint Exhibit 4.

Nor is there any legal authority for the requested deletion.  The GC's cited authority is *Chicago Teachers Union*, 367 NLRB No. 50 (2018).  This case was not litigated; it was a default judgment because Respondent failed to file an answer to the complaint.  367 NLRB No. 50, slip op. at 1.  The allegations in the complaint (taken as true) were that Respondent had a rule that employees were prohibited from conducting union business during work time.  *Id.*  The rule was enforced in an October 4, 2017 *email* from the Vice President but only against employees who had filed ULPs.  *Id.*  The Vice President sent a second email on January 18, 2018, that Respondent would retain legal counsel and pursue ULPs against the union.  *Id.* at 2.  The remedy ordered Respondent to "[r]escind" each of these emails.  *Id. Chicago Teachers* specifically did not contain an order that the emails be *deleted.*  Nor did the case involve a tweet or Twitter.  Thus, it has no applicability here.

Accordingly, the GC's request that the Order include "an additional affirmative remedy requiring Respondent to delete the May 20, 2017 tweet containing the unlawful threat" and to include in the notice that "WE WILL have Elon Musk, Chief Executive Officer of Respondent, delete his May 20, 2018 tweet, which threatens you with loss of benefit if you vote in favor of the Union" should be denied.  (GC Brief ISO Cross-Exceptions, p. 20)

## IV.     THE GC'S CROSS-EXCEPTIONS CONCERNING THE REMEDY AS TO JOSE MORAN'S AND RICHARD ORTIZ'S DISCIPLINE ARE MOOT

The GC's Moran and Ortiz-related Cross-Exceptions should be found moot upon the Board accepting Tesla's Exceptions and reversing the ALJ's findings of discrimination with their discipline.

## V.     CONCLUSION

Tesla respectfully requests that each of the GC's Amended Limited Cross-Exceptions be denied.

Dated:  March 5, 2020              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By: _____
                         MARK S. ROSS
                         KEAHN N. MORRIS

                         Attorneys for
                         TESLA, INC.

<u>**CERTIFICATE OF SERVICE**</u>

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Francisco, State of California. My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On February 27, 2020, I served a true copy of the document(s) described as:

**RESPONDENT TESLA, INC.'S BRIEF OPPOSING THE GENERAL COUNSEL'S CROSS-EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S DECISION**

on the interested parties in this action as follows:

Catherine Ventola
E-mail: catherine.ventola@nlrb.gov
Christy Kwon
E-mail: christy.kwon@nlrb.gov
Edris W.I. Rodriguez Ritchie
E-mail: edris.rodriguezritchie@nlrb.gov
Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA 94612-5224
T: (510) 671-3041

Margo Feinberg
E-mail: margo@ssdslaw.com
Daniel E. Curry
E-mail: dec@ssdslaw.com
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Blvd., Suite 2000
Los Angeles, CA 90048
T: (323) 655-4700

Jeffery Sodko
E-mail: jsodko@uaw.net
United Automobile, Aerospace and Agricultural Workers of America
AFL-CIO
8000 E. Jefferson Avenue
Detroit, MI 48214
T: (313) 926-5000

☒    **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address eruiz@sheppardmullin.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 5, 2020, at San Francisco, California.

_____

Elena E. Ruiz

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 32**

**TESLA, INC.**

    **and**

**MICHAEL SANCHEZ, an Individual**

    **and**

**JONATHAN GALESCU, an Individual**

    **and**

**RICHARD ORTIZ, an Individual**

    **and**

**INTERNATIONAL UNION, UNITED**
**AUTOMOBILE, AEROSPACE AND**
**AGRICULTURAL IMPLEMENT WORKERS OF**
**AMERICA, AFL-CIO**

**Cases 32-CA-197020**
**32-CA-197058**
**32-CA-197091**
**32-CA-197197**
**32-CA-200530**
**32-CA-208614**
**32-CA-210879**
**32-CA-220777**

<u>**COUNSEL FOR THE GENERAL COUNSEL'S**</u>
<u>**REPLY TO RESPONDENT'S OPPOSITION TO THE GENERAL COUNSEL'S**</u>
<u>**LIMITED CROSS-EXCEPTIONS - CORRECTED**</u>

Christy Kwon (Christy.Kwon@nlrb.gov)
Catherine Ventola (Catherine.Ventola@nlrb.gov)
Counsels for the General Counsel
National Labor Relations Board
Region 32
1301 Clay Street, Suite 300N
Oakland, CA 94612-5224
Tel: 510-671-3020
Fax: 510-637-3315

## I.    INTRODUCTION

On September 27, 2019, the Administrative Law Judge (ALJ) in this matter correctly concluded that Respondent committed widespread violations of the Act in order to interfere with and discourage employees from engaging in Union and protected concerted activities. The Counsel for the General Counsel has filed very limited cross-exceptions. As amended, they are: 1) the ALJ erred by not finding that Respondent's rule prohibiting employees from speaking with the media is unlawful under *Boeing*, and 2) certain remedies in the ALJ's decision (ALJD) were inadvertently omitted while others require a broader scope in order to adequately remedy the unfair labor practices Respondent committed.

## II.    RESPONDENT'S MEDIA RULE VIOLATES SECTION 8(A)(1) OF THE ACT UNDER *BOEING*

Respondent argues it is lawful to restrict its employees from communicating with the media or someone closely related to the media about Tesla, without prior approval, because employees would reasonably understand that the blanket ban only applies to proprietary information because it is found inside its Confidentiality Agreement. It also argues that the rule merely prohibits employees from speaking to the media on behalf of the company as its spokesperson. Such arguments might be convincing if one simply ignores the plain meaning of the words that describe the rule.

When the plain meaning of the rule is not ignored, but rather read within the context of the Confidentiality Agreement, it is reasonable to conclude that employees would understand that the ban is far broader than refraining from speaking to the media about

confidential proprietary information or that it is preventing employees from acting as

unauthorized spokespeople.

> The Confidentiality Agreement states,

> In response to recent leaks of confidential Tesla information, we are reminding everyone who works at Tesla, whether full-time, temporary or via contract, of their confidentiality obligations and asking them to reaffirm their commitment to honor them.

> These obligations are straightforward. Provided that it's not already public information, everything that you work on, learn about or observe in you[r] work about Tesla is confidential information under the agreement that you signed when you first started. This includes information about products and features, pricing, customers, suppliers, employees, financial information, and anything similar. **Additionally, regardless of whether information has already been made public, it is never OK to communicate with the media or someone closely related to the media about Tesla, unless you have been specifically authorized in writing to do so.**

> Unless otherwise allowed by law or you have received written approval, you must not, for example, discuss confidential information with anyone outside of Tesla, take or post photos or make video or audio recordings inside Tesla facilities, forward work emails outside of Tesla or to a personal email account, or write about our work in any social media, blog, or book. If you are unsure, check with your manager, HR, or Legal. Of course, these obligations are not intended to limit proper communications with government agencies.

> The consequences of careless violation of the confidentiality agreement, could include, depending on severity, loss of employment. Anyone engaging in intentional violations of the confidentiality agreement will be held liable for all the harm and damage that is caused to the company, with possible criminal prosecution. These obligations remain in place even if no longer working at Tesla.

> By acknowledging, I affirm my agreement to comply with my confidentiality obligations to Tesla. I also represent that at no time over the past 12 months have I disclosed any Tesla confidential information outside of Tesla unless properly authorized to do so. (R Exh.11; ALJD 10:46-11:38) (media rule at issue bolded for the purposes of this Reply Brief)

    1.    **A Reasonable Employee Would Not Ignore The Plain Meaning Of Respondent's Media Rule Which Expressly Prohibits Them From Speaking With The Media Without Prior Authorization**

While the media ban is located within the Confidentiality Agreement -- it is a separate prohibition. It expressly prohibits employees from speaking with the media or anyone closely related to the media "regardless of whether information has already been made public." The maintenance of such rule violates Section 8(a)(1) of the Act under the framework set forth in *Boeing Co.,* 365 NLRB No. 154 (2017). While Respondent attempts to cast the rule as a Category 1 or 2 rule because it is located within the Confidentiality Agreement that states that there have been leaks of confidential information, such a conclusion would require a reasonable employee to ignore the plain meaning of the actual words that constitute the media rule. While the General Counsel understands that rules should not be read in isolation, that principle does not permit one to simply ignore the plain meaning of the actual language. In this case, the plain meaning of the media rule must be understood within the context of the surrounding language of the Confidentiality Agreement and not the subjective intent of the drafter.

First, the media rule, which is in the second paragraph of the Confidentiality Agreement, starts off with "Additionally." The word "additionally" ordinarily tells the reader that the subsequent sentence (i.e. information) is something *additional* to what has already been stated, or in this case, prohibited, which is the leaking of confidential information as described in the first paragraph and the litany of subjects listed in the second paragraph and "anything similar." (R Exh.11)

Next, the rule states that "regardless of whether information has already been made public," which ordinarily means information that is public. (R Exh.11) However, Respondent contends that a reasonable employee should understand that the sentence is actually limited to confidential proprietary information that has already been leaked. The plain meaning of "information," "already been made public," far exceeds confidential proprietary information that has been leaked. Together, with "Additionally . . ." "regardless of whether the information has already been made public . . ." and "it is never OK . . ." it is not reasonable to conclude that an employee would understand the media ban is only referencing previously leaked proprietary information, especially when the preceding sentence in that same paragraph states that confidential information does not include information "already made public." (R Exh.11)

The rule then goes on to state, "it's never OK to communicate with the media or someone closely related to the media about Tesla, unless you have been specifically authorized in writing to do so." (R Exh.11) This is a sweeping pre-authorization requirement. The rule prohibits communication not only with the media but also "someone closely related to the media" which includes anyone that may be married to, intimate with, or biologically or adoption or otherwise "related to" someone that is in the media or works in the media, without prior authorization. (R Exh.11) It is well-established that a pre-authorization requirement that compels an employee to seek authorization from an employer before engaging in protected activities violates the Act. *DirectTV*, 359 NLRB 545, 546, n. 7 (2013), vacated by *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014) but subsequently re-adopted by the Board in *DirectTV*, 362 NLRB No. 48 (2015); *Brunswick*

*Corp.*, 282 NLRB 794 (1987). Here, an employee must seek prior authorization before speaking with someone about Tesla whom they suspect might be "closely related" to the media. Such a requirement is so vague and broad that it prevents employees from speaking to any individual that may be perceived to have a connection to the media, even about public information that they may have learned while working for Respondent, without prior authorization.

In sum, based on the plain meaning of Respondent's media policy, when read within the context of the Confidentiality Agreement as a whole, the media rule expressly prohibits employees from speaking to the media or someone closely related to the media about anything related to Tesla regardless of whether the information is public, without prior permission. Such an all-encompassing express prohibition, coupled with a preauthorization requirement, violates Section 8(a)(1) of the Act and is a Category 3 rule.

> **2.      Respondent's Media Rule Does Not Contain A Broad Savings Clause Like In *National Indemnity* And It Is Not Prohibiting Employees From Speaking "On Behalf" Of The Company Like In *LA Specialty***

Respondent argues that the media rule is a Category 1 or 2 rule because the ALJ found the entire Confidentiality Agreement to be limited to proprietary information. (ALJD 11:25-27) While the ALJD may have referenced the media rule generically through the heading as "paragraph 7(a)" of the Complaint (ALJD 10:20),[1] there is no reference to the media rule other than the rule itself and noting that the Complaint alleges a

---

[1] The media rule at issue is alleged in Paragraph 7(a)(ii) of the of the Second Amended Consolidated Complaint that issued on March 30, 2018 (GC Exh. 1(jj)) in this matter.

preauthorization requirement in the Confidentiality Agreement. (ALJD 10:33) There is no explicit analysis of the media rule in the decision. (ALJD 10:20-15:14) In the portion of the analysis where the ALJ makes the point that she will not read the Confidentiality Rule in isolation, she does not mention the media rule even while referencing other portions of the Confidentiality Agreement such as the prohibition on having discussions with other employees or third parties like a union or "discussion of confidential information which could include working conditions, the taking or posting of photos, making videos or audio recordings, forwarding work email or writing about their employment without receiving permission." (ALJD 13:40-14:11)

If the ALJ had analyzed the media rule, she could have noted the absence of a savings clause like in *National Indemnity,* 368 NLRB No. 96 (2019). The revised confidentiality rule in *National Indemnity* states, among other things, that the rule does not apply to "wages, benefits, hours, or other terms and conditions of employment."[2] While such a specific savings clause may not have been necessary in this case given the context of the media rule within the Confidentiality Agreement, Respondent needed other language to signal some type of limitation or reference back to proprietary information with respect to the media rule. Rather, it intentionally used expansive language which

---

[2] The Board specifically noted that the revised version of the Confidentiality Agreement "added language specifically informing employees that 'nothing in this Confidentiality Agreement' prohibits them from discussing 'wages, benefits, hours, or other terms and conditions of employment,' and further stating that '[e]mployees have the right to engage in or refrain from engaging in such activities to the extent protected by law,'" which was a factor for why it did not require a rescission of the prior version. *National Indemnity*, 368 NLRB No. 96 at p. 2 (2019).

plainly signals the exact opposite, such as "Additionally," "regardless of" and "it is never OK."

Also, unlike the media rule found in *LA Specialty*, 368 NLRB No. 93 (2019), Respondent's media rule is not prohibiting employees from acting as a company spokesperson without prior authorization. Rather, employees are told "it is never OK to communicate with the media or someone closely related to the media about Tesla, unless you have been specifically authorized in writing to do so." Simply, it states that an employee needs prior authorization before it can ever speak to the media or even someone closely related to the media. Nothing in the rule suggests it is about preventing employees from speaking "on behalf" of the company or acting as a company spokesperson without authorization like in *LA Specialty's*.

## III.   A NATIONWIDE RESCISSION ORDER TO REMEDY MUSK'S UNLAWFUL THREAT BY TWITTER IS JUST AND PROPER GIVEN THE SCOPE AND IMPACT OF THE THREAT

It is just and proper for the Board to require a nationwide remedy for the unlawful tweet heard around the world. While the other violations were limited to the Fremont facility, the unlawful tweet not only interfered with the Section 7 rights of Respondent's employees but all other statutory employees who read the tweet. The General Counsel is not requesting that the Notice to Employees for all other violations be posted beyond the Fremont facility. Rather, the limited request is with respect to remedying the unlawful tweet.

Similarly, it is just and proper for the Board to order a rescission remedy with respect to the tweet. While Respondent argues that requiring deletion of a tweet is novel,

rescission remedies are commonplace. It is a traditional remedy that is ordered in many types of violations including Section 8(a)(1),(3), and (5) violations.[3]

A rescission remedy is required here because the unlawful threat was made through Musk's Twitter account, where he has at least 23 million followers worldwide. (Joint Exh. 4)[4] As a prominent public figure, the impact of his unlawful tweet is big and far reaching. Therefore, ordering Respondent to request Musk to delete the tweet is proportionate to the scope of the violation.

Moreover, rescission is not an onerous affirmative act, and therefore, the balance of hardship tips in General Counsel's favor. While Respondent attempts to third-party Musk by distinguishing his Twitter account from Respondent's account, Musk is not an ordinary third-party. He is the founder and CEO of Respondent. It would not be difficult for Respondent to locate him to request that he delete his tweet. Rescission is also very cost-effective as it costs nothing to delete a tweet. Lastly, it is not punitive as a tweet can be deleted without any observers, nor does it require Musk to admit guilt, express remorse, or face public humiliation in any way.

---

[3] See *Core Recoveries LLC*, 367 NLRB No. 140 (2020)(Board ordered rescission of a work rule that violated Section 8(a)(1) of the Act and to notify all impacted employees that it has been rescinded); *National Indemnity Co.* 368 NLRB No. 96 (2019)(Board ordered rescission of an unlawful memo); *Richfield Hospitality, Inc.*, 368 NLRB No. 44 (2019)(Board ordered rescission of unilateral changes made to remedy Section 8(a)(5) violation and ordered Respondent to remove all references to unlawful termination in personnel files as a remedy to a Section 8(a)(3) violation.)

[4] As of today, https://livecounts.net/twitter/elonmusk shows that Musk has over 32 million followers.

In sum, it is just and proper for the Board, within its authority, to require rescission of the tweet. It is the only way to adequately address the scope and impact of the threat. The alternative is to allow the threat to continue its unlawful effect in perpetuity.

## IV.    CONCLUSION

For the reasons stated above, it is respectfully requested that the Board find that Respondent's maintenance of its media rule violates Section 8(a)(1) of the Act. Further, that it orders a limited nationwide remedy with respect to the unlawful tweet including rescission by deletion, as well as all other remedies recommended by the ALJ subject to the corrections requested in the General Counsel's Limited Cross-Exceptions.

**DATED AT** Oakland, California this 19th day of March 2020.

/s/ Christy Kwon
Christy Kwon (Christy.Kwon@nlrb.gov)
Catherine Ventola (Catherine.Ventola@nlrb.gov)
Counsels for the General Counsel
Region 32 of the NLRB
1301 Clay Street, Suite 300
Oakland, CA 94612
Phone: 510-671-3020
Fax: (510)637-3315

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 32**

| | |
|---|---|
| **TESLA, INC.** | |
| **and** | |
| **MICHAEL SANCHEZ, an Individual** | Case  **32-CA-197020** |
| **and** | |
| **JONATHAN GALESCU, an Individual** | Case  **32-CA-197058** |
| **and** | |
| **RICHARD ORTIZ, an Individual** | Case  **32-CA-197091** |
| **and** | Case(s)  **32-CA-197197** |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, AFL-CIO** | **32-CA-200530** **32-CA-208614** **32-CA-210879** **32-CA-220777** |
| | Date:  **March 19, 2020** |

## AFFIDAVIT OF SERVICE OF COUNSEL FOR THE GENERAL COUNSEL'S REPLY TO RESPONDENT'S OPPOSITION TO THE GENERAL COUNSEL'S LIMITED CROSS-EXCEPTIONS - CORRECTED

I, the undersigned employee of the National Labor Relations Board, being duly sworn, depose and say that on the date indicated above I served the above-entitled document(s) upon the persons at the addresses and in the manner indicated below. Persons listed below under "E-Service" have voluntarily consented to receive service electronically, and such service has been effected on the same date indicated above.

Mark S. Ross, Esq.
Keahn Morris, Esq.
Sheppard Mullin Richter & Hampton, LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
**VIA EMAIL: mross@sheppardmullin.com**
**VIA EMAIL: kmorris@sheppardmullin.com**

Margo A. Feinberg, Esq.
Daniel Curry, Esq.
Schwartz, Steinsapir, Dohrmann
& Sommers, LLP
6300 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90048
**VIA EMAIL: margo@ssdslaw.com**
**VIA EMAIL: dec@ssdslaw.com**

Office of the Executive Secretary
National Labor Relations Board
1015 Half Street SE
Washington, DC  20570-0001
**VIA E-FILE**

| March 19, 2020 | Ida Lam Designated Agent of NLRB |
|---|---|
| | Name |

| | /s/ Ida Lam |
|---|---|
| | Signature |

22-60493.6373

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Tesla, Inc. *and* Michael Sanchez, Jonathan Galescu, and Richard Ortiz and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO.** Cases 32–CA–197020, 32–CA–197058, 32–CA–197091, 32–CA–197197, 32–CA–200530, 32–CA–208614, 32–CA–210879, and 32–CA–220777

February 12, 2021

NOTICE AND INVITATION TO FILE BRIEFS

By Chairman McFerran and Members Kaplan, Emanuel, and Ring

On September 27, 2019, Administrative Law Judge Amita Baman Tracy issued a decision in this case, finding, inter alia, that the Respondent violated Section 8(a)(1) by maintaining and enforcing its team-wear policy. Pursuant to the team-wear policy, the Respondent requires its General Assembly (GA) production associates to wear black cotton shirts with the Respondent's logo and black cotton pants with no buttons, rivets, or exposed zippers, unless their supervisor permits them to substitute all-black clothing for the required team wear. As a result, GA production associates are prohibited from wearing shirts with union logos (or any other logo or emblem) in place of the required team wear.

The judge found that the Respondent's team-wear policy unlawfully prohibits GA production associates from wearing union shirts because the Respondent failed to establish that the team-wear policy is justified by "special circumstances" under *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945). In excepting to this finding, the Respondent argues, among other things, that its team-wear policy does not interfere with GA production associates' Section 7 right to display union insignia and that the *Republic Aviation* "special circumstances" analysis is not applicable here because its GA production associates have freely and openly worn union stickers and hats and are merely prohibited from substituting union shirts for the required team wear. However, in *Stabilus, Inc.*, 355 NLRB 836, 838 (2010), the Board stated that "[a]n employer cannot avoid the 'special circumstances' test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia."

To aid in the consideration of this issue, the Board now invites the filing of briefs in order to afford the parties and interested amici the opportunity to address the following questions.

1. Does *Stabilus* specify the correct standard to apply when an employer maintains and consistently enforces a nondiscriminatory uniform policy that implicitly allows employees to wear union insignia (buttons, pins, stickers, etc.) on their uniforms?

2. If *Stabilus* does not specify the correct standard to apply in those circumstances, what standard should the Board apply?

Briefs not exceeding 25 pages in length shall be filed with the Board in Washington, D.C., on or before March 15, 2021. The parties may file responsive briefs on or before March 30, 2021, which shall not exceed 15 pages in length. No other responsive briefs will be accepted. The parties and amici shall file briefs electronically by going to www.nlrb.gov and clicking on "eFiling." The parties and amici are reminded to serve all case participants. A list of case participants may be found at http://www.nlrb.gov/case/32-CA-197020. If assistance is needed in E-filing on the Agency's website, please contact the Office of Executive Secretary at 202-273-1940 or Executive Secretary Roxanne Rothschild at 202-273-2917.

Dated, Washington, D.C. February 12, 2021

_____

Marvin E. Kaplan,                          Member

_____

William J. Emanuel                          Member

_____

John F. Ring                                    Member

(SEAL)          National Labor Relations Board

Chairman McFerran, dissenting.

Contrary to my colleagues, I see no need for the Board to revisit our decision in *Stabilus, Inc.*, 355 NLRB 836, 838 (2010), addressing the lawfulness of employer restrictions on the wearing of union insignia in the workplace.[1] That said, I commend their decision to seek briefing before changing precedent. I will consider the case

_____

[1] I see no conflict between *Stabilus* and well-established legal principles. Employer work rules that prohibit employees from wearing union insignia are unlawful unless they are justified by special circumstances. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 (1945); see also,

e.g., *Healthbridge Mgmt.*, 360 NLRB 937, 938 (2014), enfd. 798 F.3d 1059 (D.C. Cir. 2015). It is the employer's burden to prove the existence of special circumstances justifying the prohibition on union insignia and the employer's rule must be narrowly tailored and not extend beyond the

370 NLRB No. 88

2                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

with an open mind, and I trust that my colleagues will, in
turn, also remain equally open to adhering to and applying
current law.

  Dated, Washington, D.C.  February 12, 2021

_____
    Lauren McFerran,                Chairman


        NATIONAL LABOR RELATIONS BOARD

---

special circumstances justifying the ban or prohibition. *American Med-
ical Response West*, 370 NLRB No. 58, slip op. at 1 (2020).  In the 75
years since the Supreme Court decided *Republic Aviation*, the Board has
applied the special circumstances test to evaluate a wide variety of em-
ployer restrictions on employees' wearing of union insignia in the work-
place, including cases where employees are required to wear uniforms.

See, e.g., *Long Beach Memorial Medical Center, Inc. d/b/a Long Beach
Memorial Medical Center & Miller Children's and Women's Hospital
Long Beach*, 366 NLRB No. 66, slip op. at 2–3 (2018), enfd. 774
Fed.Appx. 1 (D.C. Cir. 2019).

| Confirmation Number | 1046211352 |
|---|---|
| Date Submitted | Tuesday, February 23, 2021 10:13 AM (UTC-05:00) Eastern Time (US & Canada) |
| Case Name | TESLA, INC. |
| Case Number | 32-CA-197020 |
| Filing Party | Amicus |
| Name | Patrick J Foote |
| Email | pfoote@aflcio.org |
| Address | 2419 North Kedzie Boulevard Apt. 2 Chicago IL 60647 |
| Telephone | 3125602116 |
| Fax | |
| Original Due Date | 3/15/2021 |
| Date Requested | 3/29/2021 |

| | |
|---|---|
| Reason for Extension of Time | The American Federation of Labor & Congress of Industrial Organizations (AFL-CIO) hereby moves for a two-week extension of time, from March 15 to March 29, 2021, to file an amicus brief in this case. The reason for this request is that we want to confer with our affiliated unions. A number of key attorneys representing interested affiliates will be participating in back-to-back ABA Labor and Employment Law Section midwinter meetings in early March, which will cause some logistical difficulties for us. Attorneys for Tesla and for the UAW state that they do not oppose this motion.  The trial attorney handling this case for the NLRB has left the agency, and we have been unable to ascertain the General Counsel's position on this motion.<br>For these reasons, the Board should grant this motion and extend the deadline for the AFL-CIO to file an amicus brief in this case up to and including March 29, 2021.<br><br>Respectfully submitted,<br><br>/s/ James Coppess<br>James Coppess<br>Patrick J. Foote<br>815 Sixteenth Street NW<br>Washington, DC 20006<br>(202) 637-5337<br><br>Attorneys for AFL-CIO |
| What Document is Due | Amicus Brief |

| Parties Served | I hereby certify that on February 23, 2021, the foregoing Motion of Amicus AFL-CIO to Extend Time to File Amicus Brief has been electronically filed and served this 23rd day of February 2021 upon each of the following:<br><br>Margo Feinberg<br>Schwartz, Steinsapir, Dohrmann & Sommers LLP<br>6300 Wilshire Boulevard, Suite 2000<br>Los Angeles, CA 90048<br>margo@ssdslaw.com<br><br>Mark Ross<br>Sheppard, Mullin, Richter & Hampton LLP<br>4 Embarcadero Center, 17th Floor<br>San Francisco, CA 94111<br>mross@sheppardmullin.com<br><br>Christy Kwon<br>Regional Attorney<br>National Labor Relations Board, Region 32<br>1301 Clay St., Suite 300N<br>Oakland, CA 94612<br>christy.kwon@nlrb.gov<br><br>/s/ James Coppess<br>James Coppess |
| --- | --- |



United States Government

**OFFICE OF THE EXECUTIVE SECRETARY**
**NATIONAL LABOR RELATIONS BOARD**
**1015 HALF STREET SE**
**WASHINGTON, DC  20570**

March 5, 2021

Re: <u>Tesla, Inc.</u>, Cases 32-CA-197020, 32-CA-197058, 32-CA-197091, 32-CA-197197, 32-CA-200530, 32-CA-208614, 32-CA-210879 and 32-CA-220777

**PARTIAL GRANT OF EXTENSION OF TIME TO FILE BRIEFS IN RESPONSE**
**TO NOTICE AND INVITATION TO FILE BRIEFS**

On February 12, 2021, the Board issued a Notice and Invitation to File Briefs (NIFB), inviting the parties and interested *amici* to address the following questions: (1) does *Stabilus* specify the correct standard to apply when an employer maintains and consistently enforces a nondiscriminatory uniform policy that implicitly allows employees to wear union insignia (buttons, pins, stickers, etc.) on their uniforms, and (2) if *Stabilus* does not specify the correct standard to apply in those circumstances, what standard should the Board apply?  Under the NIFB, initial briefs by the parties and interested *amici* are currently due March 15, 2021, and parties may file responsive briefs on or before March 30, 2021.

On February 23, 2021, the American Federation of Labor & Congress of Industrial Organizations (AFL-CIO) filed an extension of time request.  The AFL-CIO seeks a two-week extension from March 15 to March 29, 2021 to file an amicus brief.

The AFL-CIO's request for an extension of time in the above-referenced cases is **GRANTED IN PART**.  The due date for the receipt in Washington, D.C. of briefs in response to the Board's Notice and Invitation to File Briefs is extended to **March 22, 2021**.  This extension applies to all parties and *amici*.  Moreover, in light of this extension, the due date for the parties to file responsive briefs is extended to **April 6, 2021**.

By direction of the Board:

/s/ Leigh A. Reardon
Associate Executive Secretary

cc:  AFL-CIO
     Amici
     Parties
     Region

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD

TESLA, INC.

And                                                      Case Nos. 32-CA-197020
                                                                    32-CA-197058
MICHAEL SANCHEZ, JONATHAN GALESCU,                                  32-CA-197091
and RICHARD ORTIZ and INTERNATIONAL UNION,                          32-CA-197197
UNITED AUTOMOBILE, AEROSPACE and                                    32-CA-200530
AGRICULTURAL IMPLEMENT WORKERS                                      32-CA-208614
of AMERICA, AFL-CIO                                                 32-CA-210879
                                                                    32-CA-220777

AMICUS BRIEF OF UNITED BROTHERHOOD OF CARPENTERS
AND JOINERS OF AMERICA

I.    INTRODUCTION

A majority of the National Labor Relations Board ("Board" or "NLRB") issued a "Notice

and Invitation to File Briefs" ("Notice") on February 12, 2021, in the above-captioned cases.[1]  In

a decision dated September 27, 2019, the Administrative Law Judge ["ALJ"] in the underlying

litigation found "…inter alia, that the Respondent [Tesla, Inc., herein "Tesla" or "Respondent"]

violated Section 8(a)(1)  [of the National Labor Relations Act (the "Act"), 29 U.S.C. §158 (a)(1)]

by maintaining and enforcing its team-wear policy."  (370 NLRB No. 88, at p.1 (February 12,

2021).)  According to the ALJ, "Respondent argues that  the Board's analysis of workplace rules

in *Boeing* [365 NLRB No. 154 (2017)) applies  to the team wear rule, but I disagree."  (Italics in

original.)(370 NLRB No. 88, slip op. at 45.)  The ALJ explained that, "(i)n the absence of special

circumstances, the Board has held that employees, particularly during an organizing campaign,

---

[1] The majority consisted of Board members Kaplan, Emanuel, and Ring.  Chairman McFerran
dissented, stating, "(c)ontrary to my colleagues, I see no need for the Board to revisit our
decision in *Stabilus, Inc.*, 335 NLRB 836, 838 (2010), addressing the lawfulness of employer
restrictions on the wearing of union insignia in the workplace."  370 NLRB No. 88, at p.1, fn. #1.
The UBC agrees.

22-60493.6380

have a Section 7 right to wear insignia at work referring to unions or other matters pertaining to working conditions for the purposes of mutual aid or protection", citing *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945); other citations omitted. (*Id.*, slip op. at 44.)

Respondent filed exceptions to the decision, including to the finding that the team-wear policy violated the Act, with the Board. In response, the NLRB announced that,

(t)o aid in the consideration of this issue, the Board now invites the filing of briefs in order to afford the parties and interested amici the opportunity to address the following questions.

1. Does *Stabilus* specify the correct standard to apply when an employer maintains and consistently enforces a nondiscriminatory uniform policy that implicitly allows employees to wear union insignia (buttons, pins, stickers, etc.) on their uniforms?

2. If *Stabilus* does not specify the correct standard to apply in those circumstances, what standard should the Board apply?[2]

The Board majority appears to be considering reversing long-established precedent and adopting a lesser standard than that articulated in *Stabilus*.

In reply to the invitation, the United Brotherhood of Carpenters and Joiners of America ("UBC") timely files this amicus brief. UBC believes it is very important for the Board to consider the unique perspective offered on this issue by workers and labor unions involved daily in the construction industry. There being no justification otherwise, for the reasons provided, the UBC answers "Yes" to Question #1, *supra*, (thereby negating a response to Question #2) and

---

[2] In *Stabilus, Inc. and International Union, United Automoblie, Aerospace & Agricultural Implement Workers of America (UAW)*, 355 NLRB 836, 837 (2010), the Board explained that, "(i)n agreement with the [administrative law] judge, but for different reasons, we find that the Respondent also violated Section 8(a)(1) by prohibiting employees from wearing pro[-]union T-shirts during the election. We need not reach the judge's conclusion that the Respondent failed to make the required showing that special circumstances justified the application of its uniform policy under the facts of this case because we find that, even if the Respondent had made the required showing, its actions here would have violated the Act for two independent reasons." The Board continued, "(a)s the Supreme Court has held, employees have a Section 7 right to wear union insignia on their employer's premises, which may not be infringed, absent a showing of 'special circumstances'", citing *Republic Aviation Corp.*, *supra*, at 801-803.

22-60493.6381

urges the NLRB to maintain established Board law, i.e. continue to apply *Republic Aviation Corp.* as relied upon in *Stabilus*, and affirm the decision finding a violation.

## II.    STATEMENT OF INTEREST

The UBC is one of the largest labor organizations in North America.  As such, the UBC and its affiliated local unions and councils represent hundreds of thousands of workers in collective bargaining in the District of Columbia, every state in the United States, and every province in Canada.  Signatory contractors have employees engaged in all aspects and specialties of the UBC's jurisdiction in the construction industry including, but not limited to, drywall installation, piledriving, dock building, floorcovering, and concrete form work.  The UBC and its members have a compelling interest in this issue and argue that there is more than a sufficient basis for the Board to uphold the ALJ's decision and, just as important, no justification to change the current law.

## III.    FACTUAL BACKGROUND

The facts of the case are fully described in the ALJ's decision.  However, some pertinent facts are worth repeating here.  The ALJ explained that, "(i)n the fall of 2016, the International Union, United Automobile, Aerospace and Agricultural Workers of America, AFL-CIO (Union or UAW) began an organizing campaign at Tesla, Inc."  (370 NLRB No. 88, slip op. at 1.)  Tesla, "(d)uring the relevant time period … maintained 'General Assembly Expectations'" ("GAE"), which "contains a section concerning 'team wear'."  (*Id.*, slip op. at 40.) Tesla provided to General Assembly ("GA") employees "team wear compliant clothing when hired but prior to August [2017], employees would often wear shirts in a variety of colors with pictures or emblems such as sports teams and clothing brands to work in GA without any supervisor informing them to wear only Tesla assigned team wear."  (*Id.*, slip op. at 40.)

22-60493.6382

However, "(b)eginning in the spring of 2017 until August, production associates in GA began wearing UAW shirts which had been passed out by employees…. Employees also wore union stickers and hats to work."  (*Id.*, slip op. at 40.)

The ALJ's legal analysis of this violation began with the well-supported declaration that, "(i)n the absence of special circumstances, the Board has held that employees, particularly during an organizing campaign, have a Section 7 right to wear insignia at work referring to unions or other matters pertaining to working conditions for the purpose of mutual aid or protection", citing *Republic Aviation Corp. supra*, and other cases, citations omitted.  (*Id.*, slip op. at 44.)  The ALJ noted, "(h)owever, an employer may prohibit the wearing of union insignia by employees if the employer proves special circumstances." (Citations omitted.)  (*Id.*, slip op. at 44.) According to the ALJ, "any rule that limits employees' Section 7 right to wear union insignia in the workplace must be narrowly tailored to the special circumstances to justify the rule." (Citation omitted.)  (*Id.*, slip op. at 44-45.)  Tesla "argue[d] that the Board's analysis of workplace rules in *Boeing* applies to the team wear rule" but the ALJ disagreed and instead "applied the principles set forth in *Republic Aviation v. NLRB*, supra, and its progeny."[3]  (*Id.*, slip op. at 45.)[4]

_____

[3] See, *Boeing Co.*, 365 NLRB No. 154 (2017).

[4] According to the Board, the ALJ "found that the Respondent's team-wear policy unlawfully prohibits GA production associates from wearing union shirts, because the Respondent failed to establish that the team-wear policy is justified by 'special circumstances' under *Republic Aviation Corp. v NLRB*, 324 U.S. 793 (1945).  In excepting to this finding, the Respondent argues, among other things, that its team-wear policy does not interfere with GA production associates' Section 7 right to display union insignia and that the *Republic Aviation* 'special circumstances' analysis is not applicable here because its GA production associates have freely and openly worn union stickers and hats and are merely prohibited from substituting union shirts for the required team wear.  However, in *Stabilus, Inc.*, 355 NLRB 836, 838 (2010), the Board stated that '(a)n employer cannot avoid the "special circumstances" test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia.'"  370 NLRB No. 88, at p.1 (February 12, 2021).)

22-60493.6383

## IV.    ARGUMENT

This Board majority has been overturning long-established NLRB precedent at an alarming rate without justification.  A paper issued by a leading think tank stated in part, that,

> (t)he Trump board has repeatedly reversed long-standing board precedent, weakening workers' rights and giving more power to employers. [Citation omitted.]  In the two years that Republicans have held the majority on the board, they have overturned NLRB precedent in more than a dozen cases.  All of those decisions overturning precedent favor employers.  None favors workers or unions.[5]

The Board must not continue in this harmful direction.

There can be no serious debate to the contrary that unionized workers enjoy better wages, benefits, and working conditions than do non-unionized workers.[6]  Furthermore, it is more likely than not that workers who wear stickers, decals, etc. on their clothing and equipment on jobsites are most prevalent in the construction industry.  Union construction workers have a fierce pride not only in the work they do, but in what they and their collective bargaining representatives have been able to achieve for them in a dangerous industry.  This pride, solidarity, mutual respect, and camaraderie are evidenced by the stickers included and referenced herein.

Earning a living in the construction industry is not easy: it is dangerous, physically demanding work.[7]  Carpenters, millwrights, and others represented by the UBC and its affiliates, are highly skilled tradesmen and tradeswomen.  They have completed rigorous training to obtain

---

[5] See, *Unprecedented[:] The Trump NLRB's Attack on Worker's Rights*, Celine McNicholas, Margaret Pydock, Lynn Rhinehart, Economic Policy Institute (October 16, 2019), at p. 6.

[6] See, Bureau of Labor Statistics, U.S. Dep't of Labor, Press Release, *Union Members-2020,* Table 4, (July 22, 2021) (construction union members earned a median weekly wage of $1,257 while non-union construction employees only earned $868), available at https://www.bls.gov/news.release/pdf/union2.pdf (last viewed March 15, 2021).

[7] *"Build a Better South[:] Construction Working Conditions in the Southern U.S."*, A Collaboration by The Workers Defense Project, Partnership for Working Families, & The University of Chicago, Dr. Nik Theodore, Bethany Boggess, Jackie Cornejo, and Emily Timm, at p. 4: "Construction workers face some of the most dangerous working conditions in the U.S. [footnote omitted] ….construction workers have a much higher risk [of] being injured or killed on the job than workers in most other industries." (Footnote omitted.)

22-60493.6384

and update the skills they need to be competitive in the workplace. Obtaining and exercising

those skills is a point of pride, and demonstrated by the stickers, etc. that they proudly display.[8]

Stickers also, for example: indicate if workers have certain specific training,[9] serve an

important safety function,[10] remind workers to promote safety on the job[11] and remind them of

their fallen colleagues[12], identify which worker is a jobsite steward to whom to report safety and

other concerns[13], display solidarity and camaraderie amongst members.[14]

But don't take our word for it; review the comments of union members themselves in their

own words as to why they display union stickers on hardhats, etc., and why it is so important and

necessary for them to do so.[15]    For example:

> "Pile Drivers and Divers are a highly specialized and skilled craft within the UBC. I am
> proud to display the Local 2404 sticker logo on my hardhat."-Darrell Hawk, 40-year
> member of Local Union 2404, British Columbia, Canada.

---

[8] **Exhibit #1** is a sticker from the North Central States Regional Council of Carpenters, with jurisdiction in Minnesota, North Dakota, South Dakota, Iowa, Nebraska, and Wisconsin, indicating the benefits of skilled, well-trained labor compared to labor that is not.

[9] **Exhibit #2** is a sticker from the Michigan Regional Council of Carpenters indicating that the union member has taken "ICRA" or "Infection Control Risk Assessment" training; **Exhibit #3** is another sticker from the Michigan Regional Council of Carpenters indicating that the union member has taken COVID safety training.

[10] **Exhibit #4** is a sticker from the Michigan Regional Council of Carpenters with the number to call in an emergency on a particular project.

[11] **Exhibits #5-A and 5-B** are stickers from the Chicago Regional Council of Carpenters promoting worker and jobsite safety.

[12] **Exhibit #6**, is a powerful and eloquent letter, written in an inimitable blue-collar voice, from Local Union 1985 member Colin Schellenberg explaining why he wears a hardhat sticker.

[13] **Exhibit #7**, shows a sticker indicating a jobsite steward, from Local Union 1325, Alberta, Canada.

[14] **Exhibit #8** is a sticker from the North Central States Regional Council of Carpenters representing solidarity and support amongst union members.

[15] Due to the space limitations imposed by the Board, only a select few of the dozens of comments and/or stickers, decals, etc. received in support of this brief can be referenced herein. See also, **Exhibit #9**, the Statement of Richard Williamson, Local Union 1045, Michigan Regional Council of Carpenters; **Exhibit #10**, the Statement of Shawn Baumgart, Local Union 687, Michigan Regional Council of Carpenters; **Exhibit #11**, the Statement from the Millwright Regional Council of Ontario, and various members of Local Unions affiliated with that council.

22-60493.6385

Brian Ewing, Carpenters Local Union 106, Altoona, Iowa: "Hard hat stickers represent the pride I feel when I walk onto a job site with my fellow brothers and sisters. It is a show of solidarity and unity, and is a visual symbol for the skill and professionalism we bring to our trade."

Ryan Ponthan, Local Union 68, Saint Paul, Minnesota: "Hard hat stickers can communicate a higher level of experience and professionalism. When you see someone with a lot of hard hat stickers, it is likely they are well-trained and a skilled worker. Stickers can also communicate safety, both industry-wide or with job-site specific training."

"My name is Charles Bullock and I've been a union carpenter for 16 years in Local 926. Union stickers are more than just decoration. They are a badge of honor and a source of pride. My union stickers prove that I graduated from the best of the best carpentry school. They prove at first glance that I am the best at what I do, that the job I'm working on has best safety practices, and that I am being paid a living wage, and health benefits. Union carpenters have worked hard for the strides we've taken to better the working class. It is only right that we be able to showcase how it was all possible – through the union."- Charles Bullock, Local Union 926, New York City.

"My name is Alexandra Guadalupe, Local 212, and I've been a union carpenter since 2007. My union stickers identify the pride I have being a union member. My union stickers also show the diversity in members and solidarity as members wear them proudly. I feel empowered knowing the story behind the sticker, which many of my union brothers and sisters fought [for] before me. Union stickers represent fair wages, healthcare, and workplace safety for the working class. Union Stickers are an advertisement of pride being a union member. I will show off my union sticker with pride." Alexandra Guadalupe, Local Union 212, New York City.

"Aside from the obvious pride in our unions, hard hat stickers which identify a local union, are a beacon to other members to know who to ask for help should a craft related question arise. Likewise, if there is a question of personal safety, knowing who is a member of one's local union gives a person someone to reach out to who, in theory, can be trusted. We wear our union's stickers proudly and in solidarity. They indicate that we have received the best training in the industry from the UBC, and sometimes indicate in what discipline of our trade we are most qualified. For example, I would not expect to see a piledriver hardhat sticker on a millwright job. And, if I did, I would expect that the piledriver would receive extra attention regarding safety issues and quality needs particular to millwright work. Simpl[y] put, our union stickers are a badge of honor, a point of pride, and a way to share information at a glance."- Dawn Steinwright, Central Puget Sound Carpenters Local Union 30, Renton, Washington.

"The men and women of the Carpenter's Union wear hardhat stickers for a variety of reasons; we have stickers that show we've been safety trained for specific job sites, we have stickers that show solidarity for different political ideas (such as racial equality or anti-right to work), we have other Carpenter's Local's stickers to show respect, solidarity,

22-60493.6386

and camaraderie, we have stickers showing important information like contract negotiations, and, most importantly, we have stickers from our own Local Union. Stickers allow us the freedom of expression guaranteed by the constitution, but they are also an important tool for showing that we are part of a team; that we not only work together, but have each other's backs, and that we can rely on one another. Cumulatively, the stickers on your hat show your history, your personality, and your community."-Liam Ward, Local Union 1243, Fairbanks, Alaska

As can be seen by the wide geographical range represented in just these examples, these and similar stickers are worn by union construction workers on jobsites throughout North America.

Moreover, women are a growing segment of the construction industry workforce.  The UBC is in the forefront of recruiting and training women to work in the carpentry trades.  Stickers promoting respect, solidarity and recognition of this vital segment of the  industry is demonstrated in **Exhibits #12** (the statement of Amanda Leggett, Local Union 1985, Saskatchewan, Canada), **#13** (hardhat sticker, "Sisters in the Brotherhood", from the St. Louis-Kansas City Carpenters Regional Council), and **#14** (hardhat sticker, "Sisters in the Brotherhood", from the Pacific Northwest Regional Council of Carpenters, with jurisdiction in Washington, Oregon, Montana, Idaho, Wyoming, and Alaska).

Additionally, the stickers have a direct connection with organizing and recruitment. Construction job sites are very different from the traditional industrial setting.  Because of construction management displacing general contracting, the number of subcontractors on construction sites or the absence of subcontractor clauses in some collective-bargaining agreements, it is not unusual for union-represented construction employees to be on job sites with unrepresented employees, even in the same trade, working for a different employer. Also, given craft jurisdictions, there can even be unrepresented and represented employees working for the same employer. Union stickers signal to unrepresented  employees the positive value of being represented and working under a collective-bargaining agreement.  This leads to

8

conversations between workers, organizing opportunities of employers, and recruitment of employees into union membership or switching to work for a unionized construction employer, and other activity protected under the Act.

Abandoning the special circumstances test, and leaving it to employers to dictate, under a lesser standard, what, if any, sticker, etc. an employee may or may not wear on their hardhat or other work gear would be misguided and harmful. Doing so will negatively affect safety and other considerations on a jobsite. The standard for an employer to demonstrate special circumstances in order to restrict, narrowly, such insignia is the correct and proper standard and should be maintained. The widespread and necessary use of stickers, etc. by construction workers is an important and well-established practice, and must not be infringed by a change in Board law.

## V.    CONCLUSION

In sum, the Board must not replace the "special circumstances" test with a less stringent standard. As the UBC has clearly established, the right to wear stickers, etc. on the jobsite is not only a fundamental, long-established right under Section 7 of the Act, but doing so serves many critical functions for workers in the construction industry. It is very important that the Board considers the views of these employees and understands and appreciates the real world job site conditions they describe, and the consequences of any adverse Board ruling.

Accordingly, the "special circumstances" analysis established by the Supreme Court in *Republic Aviation* in 1945 and followed repeatedly by the Board since then, including in *Stabilus*, must be maintained. The UBC strongly urges the Board to affirm the ALJ's decision in the above-captioned case and maintain *Stabilus* in that regard.

22-60493.6388

Dated: March 22, 2021, Washington, D.C.

Respectfully submitted,

DeCarlo & Shanley, P.C.
/s/ Brian F. Quinn
Brian F. Quinn, Esq.                              /s/Matthew Capece
Counsel, United Brotherhood of Carpenters and     Matthew Capece, Esq.
Joiners of America                                United Brotherhood of Carpenters and
101 Constitution Avenue, NW                            Joiners of America
Washington, D.C.  20001                           101 Constitution Avenue, NW
Telephone: (202) 589-1151                         Washington, D.C.  20001
Facsimile: (202) 589-0105                         Telephone: (202) 546-6206
Email: bquinn@deconsel.com

22-60493.6389

## <u>CERTIFICATE OF SERVICE</u>

I certify that the Brief of Amicus United Brotherhood of Carpenters and Joiners of America was filed with the National Labor Relations Board at www.nlrb.gov  and  served on the following parties and others via email on March 22, 2021.  The exhibits to the Brief of Amicus United Brotherhood of Carpenters and Joiners of America was filed with the National Labor Relations Board at www.nlrb.gov  and  served on the following parties and others via email on March 21, 2021

**<u>Counsel for Respondent</u>**
Keahn Morris, Esq.
Mark Ross, Esq.
Sheppard, Mullin, Richter & Hampton, LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA  94111
kmorris@sheppardmullin.com and mross@sheppardmullin.com

**<u>Counsel for Charging Party</u>**
Daniel Curry, Esq. and Margo Feinberg, Esq.
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90048-5268
dec@ssdslaw.com and margo@ssdslaw.com

**<u>Representative for Charging Party</u>**
Jeffrey Sodko
United Auto Workers
8000 E. Jefferson Avenue
Detroit, MI  48214-2699
jsodko@uaw.net

Edris W.I. Rodriguez Ritchie
E-mail: edris.rodriguezritchie@nlrb.gov
Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA 94612-5224

                                        /s/ Brian F. Quinn
                                        Brian F. Quinn, Esq.

22-60493.6390





22-60493.6391





22-60493.6392



22-60493.6393



22-60493.6394

EXHIBIT
5-A







I wear this sticker on my hardhat to remember all the carpenters who have lost there lives over the years. Especially the ones on the job which helps me to be remember to be safe on the jobsite and follow the safety rule which some of them were put in place as a result in someone dieing.

Colin Schellenberg
1985





22-60493.6398

EXHIBIT

8



22-60493.6399



Brian Quinn
DeCarlo & Shanley
101 Constitution Ave. NW
Tenth Floor
Washington, D.C. 20001

March 11, 2021

Mr. Quinn,

I am a union floorlayer with more than two decades of experience.

In the flooring industry, we wear our INSTALL hardhat stickers so that everyone onsite knows that we are INSTALL trained. This isn't just important to members. It's also important to project leads and developers, many of whom chose our workers because of this training.

In occupied healthcare facilities, it is critical that hospital staff know who is on the job and who has Infection Control training. We use our hardhat stickers to show doctors and medical personal that we are ICRA-trained so that they know that we speak their language and are trained to be on their jobsites.

Additionally, hospitals often given construction workers stickers with the medical codes or emergency numbers so that construction workers know what to do and who to contact in case of emergency.

Recently, hardhat stickers are an easy way for companies to verify daily COVID screenings.

These stickers are more than just a source of pride for us. They help us do our jobs better and safer and make it easier for other people who work alongside us.


Sincerely,

Richard Williamson
Michigan Regional Council of Carpenters and Millwrights
Local 1045



Brian Quinn
DeCarlo & Shanley
101 Constitution Ave. NW
Tenth Floor
Washington, D.C. 20001

March 11, 2021

Mr. Quinn,

I am a General Foreman in the show and convention industry. This past year, I led the construction of both COVID field hospitals in Michigan, one in Detroit and one in Novi. The Detroit field hospital was the first hospital of its kind to be done in only 9 days. The Army Corps of Engineers called it a "miracle." We had zero injuries and zero cases of COVID on both sites.

There are many reasons for our success but hard had stickers play a role. The COVID-19 Awareness stickers made it easy for everyone on the site to verify our training. And the trade union stickers made it easy for foreman, like me, to identify and communicate with people from other trades.

We are highly skilled workers who often work under stressful conditions. In addition to pride, hard hat stickers promote better, more efficient communication, and showcase the training that we require on our sites. These stickers make it safer for workers.

Sincerely,

Shawn Baumgart
Michigan Regional Council of Carpenters and Millwrights
Local 687





## STATEMENT

**FOR IMMEDIATE RELEASE**

## UNION DECALS-STICKERS REPRESENT SAFETY, TRAINING & PRODUCTIVITY
### 'Documentation comes in many forms, including qualified training'

**Thursday, March 11, 2021**

**Brian Quinn**
**DeCarlo & Stanley**
**101 Constitution Ave. NW**
**Tenth Floor, Washington, D.C. 20001**

Toronto, ON. – With safety being priority number one, The Millwright Regional Council of Ontario fully supports and endorses the use of Union Decals-Stickers on projects and jobsites across North America. The emblem displayed on our member's hardhats and gear represents safety, training and professionalism.

*Statement - **Mark Beardsworth, Millwright Local 2309,** "Safety is our highest priority on every project and wearing our union decals provides the visible documentation to our fellow members, public, partners and owners that we are qualified to perform the job safety while keeping productivity moving.*

*Statement – **Duncan McIntosh, Millwright Local 1592,** "Safety is our business deliverable - safe, productive work, that's what the union sticker means to all of us, owners and industry partners."*

*Statement – **Chris Sutton, Millwright Local 1244,** "They represent that we are well-trained craftsmen, who share a sense of unity and camaraderie, and obtain the best wages and benefits in the industry"*

*Statement – **Don Schultz, Millwright Local 2309,** "The union hardhat sticker communicates that the person wearing it has received the best training in the industry and is a highly skilled professional.*

**About the Millwright Regional Council of Ontario (MRCO)**
The Millwright Regional Council of Ontario (MRCO) is composed of eight affiliated Local Unions of the United Brotherhood of Carpenters and Joiners of America (UBC) across the Province of Ontario. We represent thousands of woman and men working as progressive cross-trained construction and maintenance professionals with exceptional skills to install, maintain, diagnose, and repair precision machinery, UBC millwrights are vital partners in industries as diverse as energy, automotive, aerospace, food processing, pharmaceuticals and more.

For media inquiries, please contact Duncan McIntosh, Director of Communications, dmcintosh@millwrightont.com

22-60493.6402

EXHIBIT

This hard hat sticker is important to me because it reminds me that, as a female, I can do a job in a male dominated industry. It carries the Union logo for Sisters in the Brotherhood that reminds me I am welcome and supported in my union, I am not alone!

Amanda Leggett.
UBC - Local 1985





22-60493.6404





22-60493.6405

**UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | | |
|---|---|---|
| TESLA, INC., | ) | Case Nos.   32-CA-197020 |
| | ) | 32-CA-197058 |
| Respondent, | ) | 32-CA-197091 |
| | ) | 32-CA-197197 |
| and | ) | 32-CA-200530 |
| | ) | 32-CA-208614 |
| MICHAEL SANCHEZ, an individual, | ) | 32-CA-210879 |
| JONATHAN GALESCU, an individual, | ) | 32-CA-220777 |
| RICHARD ORTIZ, an individual, and | ) | |
| INTERNATIONAL UNION, UNITED | ) | |
| AUTOMOBILE, AEROSPACE AND | ) | |
| AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA, AFL-CIO, | ) | |
| a labor organization, | ) | |
| | **)** | |
| Charging Parties. | ) | |

**BRIEF OF THE AMERICAN FEDERATION OF LABOR AND
CONGRESS OF INDUSTRIAL ORGANIZATIONS
AS *AMICUS CURIAE***

The American Federation of Labor and Congress of Industrial Organizations submits this

brief as amicus curiae in response to the National Labor Relations Board's Notice and Invitation

for Briefs.  *Tesla, Inc.*, 370 NLRB No. 88 (2021).

The Board has requested briefs addressing whether "[a]n employer can[] avoid the 'special

circumstances' test simply by requiring its employees to wear uniforms or other designated

clothing, thereby precluding the wearing of clothing bearing union insignia."  *Id.* slip op. at 1

(quoting *Stabilus, Inc.*, 355 NLRB 836, 838 (2010)).  However, that question is not presented in

this case, because the Tesla "team-wear" policy did *not* by its terms or as originally interpreted

by the Company's supervisors prohibit wearing the union shirts at issue in this case.

Tesla's "team-wear" policy requires production employees "to wear black cotton shirts with

the [Company's] logo" but also allows employees "to substitute all-black clothing for the

1

required team wear." 370 NLRB No. 88, slip op. at 1. In the spring of 2017, some employees at Tesla's Georgia production plant began wearing black shirts with the abbreviation "UAW" on the back and the phrase "Driving for a Fair Future at Tesla" on the front. ALJD 40. The production employees were allowed to wear the black union shirts until August 2017, when Tesla suddenly took the position that the shirts were not allowed under the team-wear policy. ALJD 42.

Tesla violated Section 8(a)(1) of the Act by enforcing its team-wear policy to prohibit the wearing of black t-shirts bearing the UAW insignia. However, because the team-wear policy is facially neutral as to shirts displaying union insignia and was previously interpreted to permit employees to wear black UAW shirts, the legality of a dress code or uniform requirement that inherently precludes the wearing of union insignia is not presented.

1. Section 7 of the National Labor Relations Act grants employees the right to engage in "self-organization, [and] to form, join, or assist labor organizations." 29 U.S.C. § 157. "The central purpose of the Act [is] to protect and facilitate employees' opportunity to organize unions to represent them in collective-bargaining negotiations." *American Hospital Association v. National Labor Relations Board*, 499 U.S. 606, 609 (1991). "[T]he right of employees to self-organize and bargain collectively . . . necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite." *Beth Israel Hospital v. National Labor Relations Board*, 437 U.S. 483, 491 (1978). Accordingly, the Act has long been understood to protect "the right of employees to wear union insignia at work," as it "has long been recognized as a reasonable and legitimate form of union activity." *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 802 n.7 (1945) (quoting *Republic Aviation Corp.*, 51 NLRB 1187, 1188 (1943)).

22-60493.6407

Section 8(a)(1) makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in Section 7. 29 U.S.C. § 158(a)(1). "In the absence of 'special circumstances,' the prohibition by an employer against the wearing of union insignia violates Section 8(a)(1) of the Act." *United Parcel Service*, 312 NLRB 596, 597 (1993).

"Since 1945, a substantial body of law has evolved as to what constitutes 'special circumstances' justifying restrictions on the wearing of union insignia." *Stabilus, Inc*, 355 NLRB at 842 (M. Schaumber, dissenting in part). Application of the "special circumstances" test "turn[s] on fine distinctions based on a balancing of respective statutory interests and on unique factual circumstances." *Bell-Atlantic-Pennsylvania*, 339 NLRB 1084, 1086 (2003), enf'd *Communications Workers of America, Local 13000 v. NLRB*, 99 Fed.Appx. 233 (D.C. Cir. 2004). Thus, to determine whether "special circumstances" justify prohibiting employees from wearing union insignia, "the entire circumstance of a particular situation must be examined to balance the potentially conflicting interests of an employee's right to display union insignia and an employer's right to limit or prohibit such display." *Nordstrom, Inc.*, 264 NLRB 698, 700 (1982). By focusing on the context in which employees display union insignia, the special circumstances test gives employers an opportunity to advance legitimate justifications for limiting displays of insignia. *See Noah's New York Bagels*, 324 NLRB 266, 275 (1997) (finding that "special circumstances" justified prohibiting the wearing of a "mocking" t-shirt).

In *Wal-Mart Stores, Inc*., 368 NLRB No. 146 (2019), the Board held that "[w]here . . . [an] Employer maintains a facially neutral rule that limits the size and/or appearance of union buttons and insignia that employees can wear but does not prohibit them, a different analysis is required." *Id*. at 2. That holding was based on the belief that "the infringement on Section 7

22-60493.6408

rights is less severe" where an employer has merely maintained a "facially neutral" policy, and accordingly "the employer's legitimate justifications for maintaining the restriction do not need to be as compelling for its policy to pass legal muster." *Id*. at 2-3.  An important practical reason advanced for being more lenient in these circumstances is that, "in a facial challenge to a policy that is not a total ban[,] . . . the Board must analyze it without the benefit of knowing the particular union graphic or insignia in question and the context in which it would be worn." *Id*. at 2 n. 10.

Whatever may be the case with respect to a facial challenge to a neutral dress policy, the normal standard applies where a policy has actually "been applied to restrict NLRA-protected activity." *The Boeing Company*, 365 NLRB No. 154, slip op. at 1 n. 4 (2017).  Thus, "even when a rule's *maintenance* is deemed lawful, the Board will examine circumstances where the rule is *applied* to discipline employees who have engaged in NLRA-protected activity, and in such situations, the discipline may be found to violate the Act." *Id*. at 4-5.  *See, e.g., St. Joseph's Hosp*., 225 NLRB 348, 348 (1976) (distinguishing the maintenance of "dress codes which stress the neatness of appearance of employees at all times" from the unlawful application of those dress codes).

The Board's decision in *Indiana Bell Telephone Company, Inc*., 370 NLRB No. 93 (2021), is illustrative of the proper approach in deciding whether the application of a dress code is an unfair labor practice. *Indiana Bell* involved "a mandatory dress code that requires [employees] to wear branded company apparel," which was applied to ban the wearing of union buttons.  *Id*. at 1. The administrative law judge found that the Company violated Section 8(a)(1) both "by maintaining the appearance guidelines and by discriminatorily enforcing the guidelines against employees who wore the union buttons."  *Ibid*.  Instead of relying on either of these grounds, the

22-60493.6409

Board found that the employer had violated Section 8(a)(1) because it failed to establish "a special circumstance justifying the banning of union insignia." *Id*. at 2. This is the standard that should be applied in determining the legality of Tesla's application of its team-wear policy.

2. Prior to August 2017, there would have been no reason to suspect that Tesla's team-wear policy would be interpreted to prohibit production employees from wearing black shirts bearing union insignia. To the contrary, the policy expressly stated employees could substitute "all black clothing" provided that the clothing was "work appropriate." ALJD 40. And, the policy specified what it meant by "work appropriate" was clothing that was "mutilation free" and "pose[d] no safety risks." *Ibid*. The shirts worn by the UAW supporters in the spring of 2017 were clearly designed to come within the team-wear policy. And the Tesla supervisors obviously agreed, since they said nothing to the union supporters about the shirts until August. *Id.* at 42. Thus, there was no basis whatsoever for thinking that the team-wear policy itself would interfere with the right of production employees to wear black shirts bearing union insignia. In short, prior to the August 2017 application of the policy to ban wearing black union shirts, there would have been no legal basis for challenging the policy on its face.

In August 2017, Tesla first applied the policy to prohibit production employees from wearing black union shirts. Tesla has "argue[d] that its special circumstances for banning union shirts in GA [were] preventing mutilations to painted vehicles and . . . maintain[ing] visual management [of the workforce]." ALJD 45. However, these arguments "make[] little sense" for the simple reason that "the black colored Tesla assigned shirts are not substantially different from the black colored UAW shirts." *Ibid*. Moreover, "[n]ot one of Respondent's managers could affirmatively point to the union shirts" as the cause of mutilations, nor did Tesla present any other evidence to support that assertion. *Ibid.* "[G]eneral, speculative . . . or conclusory"

5

assertions of "special circumstances" are insufficient to justify applying a rule to prohibit

wearing union insignia. *Boise Cascade Corp.*, 300 NLRB 80, 82 (1990).  It follows, a fortiori,

that nonsensical explanations for such restrictions do not suffice.[1]

<center>* * *</center>

The Board should find that Tesla violated Section 8(a)(1) by applying its team-wear policy to

prohibit production employees from wearing black shirts bearing union insignia without showing

any "special circumstances" justifying that interference with the production employees'

protected Section 7 activity.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ *Craig Becker*
Craig Becker
James B. Coppess
Patrick J. Foote
AFL-CIO
815 Sixteenth St. NW
Washington, DC 20006
(202) 637-5337
jcoppess@aflcio.org

</div>

Date: 3/22/2021

---

[1] Tesla's suggestion that its team-wear policy would permit employees to wear union stickers or hats, Tesla Br. 70, is legally irrelevant.  Without an appropriate justification for distinguishing between different types of insignia displays, Tesla's attempt to dictate how employees convey union messages constitutes unlawful interference with their exercise of Section 7 rights.  See *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 865-66 (9th Cir. 2001) (when a government ban on a particular mode of expression affects "the manner in which a[n individual] communicates with the public," and thereby "precludes an important communicative aspect of public protest," the government's restriction must be tailored to ensure 'the "fit" between means and ends is reasonable.'") (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 418 fn.13 (1993)).

<center>6</center>

# CERTIFICATE OF SERVICE

I, Craig Becker, hereby certify that on March 22, 2021, the foregoing Amicus Brief was

e-filed with the NLRB's Executive Secretary and served via e-mail on the following counsel this

22nd day of March 2021 upon each of the following:

Margo Feinberg
Schwartz, Steinsapir, Dohrmann & Sommers LLP
6300 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90048
margo@ssdslaw.com

Mark Ross
Sheppard, Mullin, Richter & Hampton LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
mross@sheppardmullin.com

Christy Kwon
Regional Attorney
National Labor Relations Board, Region 32
1301 Clay St., Suite 300N
Oakland, CA 94612
christy.kwon@nlrb.gov

/s/ *Craig Becker*

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

TESLA, INC.
    and
INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, AFL-CIO AND MICHAEL
SANCHEZ, JONATHAN GALESCU, AND RICHARD ORTIZ

        32-CA-197020, et al.

## AMICUS BRIEF BY COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO

On February 12, 2021, the NLRB issued a Notice and Invitation to File Briefs in *Tesla, Inc.,* 370 NLRB No. 88 (2021). As General Counsel of Communications Workers of America, AFL-CIO (CWA), I represent CWA and employees in matters before the National Labor Relations Board (NLRB or Board) and am submitting this amicus brief in response to the Board's invitation.

CWA is a labor organization that represents about 700,000 workers in private and public sector employment in the United States, Canada and Puerto Rico. CWA members work in telecommunications and information technology, the airline industry, news media, broadcast and cable television, education, healthcare and public service, law enforcement, manufacturing, and other fields. CWA advances and advocates for workers' rights and protections, and for improved wages, benefits, training, and other terms and conditions of employment. We believe that the Board's decision in this matter will have an impact on American workers, including ones that we represent.

The issue that the Board has raised is whether *Stabilus* specifies the correct standard to apply when an employer maintains and consistently enforces a nondiscriminatory uniform policy that implicitly allows employees to wear union insignia on their uniforms, and, if not, what standard should be applied?

## OVERVIEW:

The right of employees to wear union insignia referring to unions or other matters pertaining to working conditions for the purpose of mutual aid or protection at work has long been recognized as a reasonable and legitimate form of union and protected concerted activity. A uniform policy, including one that may implicitly allow for the wearing of some union insignia, chills and interferes with employees' ongoing exercise of their Section 7 right to wear union insignia in the workplace. Based on longstanding and well-reasoned precedent, an employer's uniform policy that curtails Section 7 rights by precluding the wearing of union insignia overcomes the presumption that employees may wear union insignia in the workplace only where the employer demonstrates special circumstances for the policy. The CWA believes that the current longstanding standard should be maintained.

**BACKGROUND:**

As we all know, Section 7 of the Act protects the right of employees to wear attire and insignia that address union and other employment-related issues while at work. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 801-803 (1945) (upholding right of employees to wear union buttons while on the job); *Goodyear Tire & Rubber Co.*, 357 NLRB 337, 341 (2011); *Pathmark Stores, Inc.*, 342 NLRB 378, 379 (2004); *USF Red Star, Inc.*, 339 NLRB 389, 391 (2003); *Albis Plastics*, 335 NLRB 923, 924 (2001); *Midstate Telephone Corp.*, 262 NLRB 1291, 1292 (1982), enf. denied 706 F.2d 401 (2d Cir. 1983) and further progeny.

The Board has <u>long</u> applied the rule that a ban on wearing union insignia violates the Act unless it is justified by special circumstances. See, e.g., *Floridan Hotel of Tampa, Inc.*, 137 NLRB 1484, 1486 (1962), enf. as modified 318 F.2d 545 (5th Cir. 1963).  See also, *AT&T*, 362 NLRB No. 105 (2015); *Mack's Supermarkets*, 288 NLRB 1082, 1098 (1988); *Page Avjet Corp.*, 275 NLRB 773, 776, (1985); and further progeny.  An employer may restrict such activity only by presenting substantial evidence of special circumstances sufficiently important to outweigh Section 7's guarantees. *Eckerd's Market, Inc.*, 183 NLRB 337, 338 (1970) (finding the "vague, general evidence" of customer complaints presented by the employer did not constitute substantial evidence of "special circumstances" warranting removal of the union buttons worn by its employees).

**SPECIAL CIRCUMSTANCES STANDARD:**

That clear standard has worked exceedingly well for decades and should not be changed.  First, special circumstances include "when their [union insignia] display may jeopardize employee safety, damage machinery or products, exacerbate employee dissension, or unreasonably interfere with a public image that the employer has established, or when necessary to maintain decorum and discipline among employees." *Komatsu America Corp.*, 342 NLRB 649, 650 (2004); *P.S.K. Supermarkets*, 349 NLRB 34, 35 (2007) (citing *Bell Atlantic-Pennsylvania*, 339 NLRB 1084, 1086 (2003), enfd. 99 Fed. Appx. 233 (D.C. Cir. 2004), and *Nordstrom, Inc.*, 264 NLRB 698, 700 (1982)).  Second, the burden is on the respondent to prove the existence of special circumstances that would justify a restriction.  *W San Diego*, 348 NLRB 372 (2006); *Pathmark Stores, Inc.*, 342 NLRB 378, 379 (2004); *Inland Counties Legal Services, 317 NLRB 941, 942 (1995)*. And, third, any rule that limits employees' Section 7 right to wear union insignia in the workplace must be narrowly tailored to the special circumstances justifying maintenance of the rule, and the employer bears the burden of proving such special circumstances other than through conjecture. *Boch Honda*, 362 NLRB 706, 707 (2015), enfd. 826 F.3d 558 (1st Cir. 2016); *W San Diego*, 348 NLRB at 373–374 (special circumstances that justified employer's ban on buttons worn in public areas did not justify a ban on buttons worn in nonpublic areas).  See also, *American Medical Response West*, 370 NLRB No. 58, slip op. at 1 (2020); *Medco Health Solutions of Las Vegas, Inc.*, 364 NLRB No. 115 (2016); *USF Red Star, Inc.*, 339 NLRB at 391; *E & L Transport Co.*, 331 NLRB 630, fn. 3 (2000).

22-60493.6414

There is a plethora of useful precedent analyzing special circumstance factors in myriad situations. Below are just a few examples of that precedent:

1. With regard to jeopardizing employee safety, in *Andrews Wire Corp.*, 189 NLRB 108 (1971), affd. 79 LRRM 2164 (4th Cir. 1971), employees in a steel mill wore bright, highly visible hardhats expressly designed to compensate for the mill's poor lighting. The employer "feared that if employees were permitted to attach to the hat insignia of less bright colors, as some employees did, visibility of the hat and consequently the safety of employees would be impaired." Id. at 109. On this basis, the Board found that the employer had demonstrated legitimate safety concerns and dismissed the allegation. See also, *Standard Oil*, 168 NLRB 153 (1964).

2. As to damage to machinery or product, in *Hanes Hosiery*, 219 NLRB 338, 346-47 (1975), the Board determined that an employer demonstrated special circumstances where union buttons could cause "picks" in its hosiery because the buttons had a pin that protruded a quarter inch beyond the circular button. Cf. *Boch Honda*, 362 NLRB No. 83, slip op. at 3 (Apr. 30, 2015) (employer failed to demonstrate special circumstances justifying rule prohibiting employees from wearing union buttons where the rule was written to apply to employees who came into contact with the public regardless of whether they had contact with vehicles and the employer did not provide evidence that vehicles had been damaged by employee pins or the pins posed a safety hazard).

3. As to exacerbating employee dissension, in *United Aircraft Corp., Pratt & Whitney Division*, 134 NLRB 1632, 1633-5 (1961), the Board found requiring removal of union buttons identifying workers as "loyal strikers", who did not cross the picket line during a nine week strike, was lawful where the strike had been accompanied by mass picketing and violence, and there was great animosity between the striking employees and those who crossed the picket line. See also Reynolds Electrical Co., 292 NLRB 947, 947, n.1 (1989)(employer lawfully banned buttons with red diagonal line drawn through the word "scab" to maintain employee discipline based on evidence that there were numerous hostile acts by strikers against nonstrikers during and after the strike); Cf. *Eckerds*, supra. (the Board found that an employer had not demonstrated any animosity among employees that would justify banning buttons that said "Retail Clerks Union, AFL-CIO, July 1969").

4. With regard to unreasonably interfering with the employer's public image, in *W San Diego*, 348 NLRB 372, 372-373 (2006), the employer- a high-end hotel chain - demonstrated its business plan was to create a "wonderland" experience where guests could fulfill their "fantasies and desires," and that the employer's uniforms for its servers were part of this plan. Cf. *United Parcel Service*, 312 NLRB 596, 597 (1993) (no special circumstances justifying prohibition on lapel pins with union logo on company-provided uniform; pins did not interfere with employer's desired public image of its employees being "neatly attired" where the pin was small, inconspicuous, and free of provocative messages or language), enforcement denied, 41 F.3d 1068 (6th Cir. 1994).

5. As to maintenance of decorum or discipline, special circumstances can include evidence of violence, interference with training or production, or threats thereof, the instigation of

3