disciplinary misconduct, disparaging the employer's products and/or services, interference with safety or unreasonable interferences with the image the employer desires for its employees to project its customers or suppliers. See, e.g., *Escanaba Paper Co.*, 314 NLRB 732, 732–735 (1994); *Bell Atlantic-Pennsylvania*, 339 NLRB 1084, 1086 (2003)(for employee's message to lose the protection of the Act, employer must establish that the material was obscene or derogatory and improperly cites or causes disruption or results in an adverse impact on production); *Midstate Telephone Corp.*, 262 NLRB 1291, 1292 (1982) (concluding employer failed to prove banning union t-shirts would promote "efficient production in the workplace" where the t-shirts were not obscene or profane, did not cause discord or bitterness among employees, did not adversely affect decorum and discipline, and were not likely to impair safety or production). See also, *Komatsu America Corp.*, 342 NLRB 649, 650 (2004) (special circumstances to ban t- shirts that compared Japanese-owned company's outsourcing to the Pearl Harbor attacks); *Southwestern Bell*, 200 NLRB 667, 670 (1972) (permitting employer to ban sweatshirt criticizing the employer in an obscene manner).

The Board has made clear that neither a uniform policy nor a dress code in itself establishes special circumstances. *World Color (USA) Corp.*, 360 NLRB No. 37, slip op. at 1 n.3 (2014), reviewed and remanded, 776 F.3d 17 (D.C. Cir. 2014) ("[a]n employer cannot avoid the 'special circumstances' test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union justifying a button prohibition."); *Stabilus, Inc.* 355 NLRB 836, 838 (2010); *P.S.K. Supermarkets*, 349 NLRB 34, 35 (2007) ("The Board has consistently held that customer exposure to union insignia, standing alone, is not a special circumstance which permits an employer to prohibit display of such insignia. Nor is the requirement that employees wear a uniform a special circumstance justifying a button prohibition.") (internal citations omitted); *Great Plains Coca-Cola Bottling Co.*, 311 NLRB 509, 515 (1993) (no special circumstances justified employer banning the wearing of union jackets before an election even though the employer's policy only permitted employees to wear company jackets); *Woonsocket Health Center*, 245 NLRB 652, 659 (1979) (affirming ALJ finding that "[t]he mere fact that an employer has a dress code, as here, is not a special circumstance" which warrants depriving employees of their right to wear union insignia at work). And, the Board has consistently held that customer exposure to union insignia, standing alone, is not a special circumstance which permits an employer to prohibit display of such insignia. *Meijer, Inc.*, 318 NLRB 50, 56-57 (1995), enfd. 130 F.3d 1209 (6th Cir. 1997)(employer cannot ban employee from wearing union jacket instead of uniform jacket in a noncustomer area), enforced, 130 F.3d 1209, 1217 (6th Cir. 1997); *Burger King Corp.*, 265 NLRB 1507 (1982), enf. denied 725 F.2d 1053 (6th Cir. 1984); *Nordstrom, Inc.*, 264 NLRB 698, 700–702 (1982). Likewise, the pleasure or displeasure of a company's customers does not determine the lawfulness of employee rights under the Act to wear insignia for a union. *Howard Johnson Motor Lodge*, 261 NLRB 866 at 868 fn. 6 (1982).

## BOEING STANDARD IS INAPPROPRIATE:

It appears that the Board majority is seriously considering applying the rationale from its recent decision in *Walmart*, 368 NLRB No. 146 (2019) in order to use the *Boeing* standard in these circumstances to permit employers to restrict the wearing of almost all union insignia or attire based on any "legitimate justification." See, *Boeing Co.*, 365 NLRB No. 154, slip op. at 14

22-60493.6416

(2017). Should the Board majority disregard Supreme Court guidance and longstanding Board and court precedent, it would be a clear abuse of discretion and do serious damage to the rights of workers that the Board is mandated by Congress to protect.

As reflected above, through the citing of many cases, this subject matter has been fully analyzed and the law is very well-settled. In each case, the Board starts with the premise that any limitation on the right of employees to wear union insignia is presumptively invalid and then engages in a fact-specific inquiry determining whether the employer met its burden of proving special circumstances. The only reason to upend decades of jurisprudence would be if the Board majority's intentions are to apply the *Boeing* standard in order to tip the scales in favor of employers, provide less protection to employees' Section 7 rights, and make it more difficult to prove interference with Section 7 rights by shifting the burden from employers to the General Counsel to prove that employees' protected interests have been adversely affected, and that the adverse effect on Section 7 rights outweighs the employer's proffered justification.

The Board majority in *Walmart* has taken a position rejected by the Supreme Court and mistakenly believes that the burden on an employer should be less substantial where the employer allows employees an opportunity to express their union sentiments through some limited display of union insignia, and that the balance should shift in favor of the employer's legitimate business objectives. We take issue with the Board majority stating, "Necessarily, because the infringement on Section 7 rights is less severe, the employer's legitimate justifications for maintaining the restriction do not need to be as compelling for its policy to pass legal muster, and justifications other than the recognized special circumstances may suffice. In such cases, we will apply the analytical framework in Boeing." (emphasis added). An employer dictating the sort of insignia that an employee may wear does not necessarily mean that the infringement on Section 7 rights is less severe. An employer's willingness to tolerate some union insignia does not give it a pass to restrict other protected expression that it may view less favorably. For example, while Tesla and other employers may permit hats that contain union insignia, given the size of the plant and the distances between employees, and the fact that some employees cannot wear or work comfortably in a hat, this is an ineffective means, unlike visible T-shirts, of employees sending a message of solidarity and encouraging union support among their co-workers, thus nullifying the employees' Section 7 rights.

An employer does not have the right to decide how employees will express themselves vis a vis their workplace conditions, absent demonstrating special circumstances. See, *Caterpillar, Inc.*, 321 NLRB 1178 (1996), vacated pursuant to settlement March 19, 1998, citing *Holladay Park Hospital*, 262 NLRB at 279 (finding it irrelevant that the employer allowed employees to wear other union insignia that it deemed acceptable). Furthermore, a facially neutral uniform policy, which may implicitly allow some form of expression, still chills employees from engaging in protected concerted activity. In *Parexel International, LLC*, 356 NLRB 516 (2011), the Board made clear that an employer's "preemptive strike to prevent [an employee] from engaging in activity protected by the Act" violates Section 8(a)(1) because of its chilling effect on employees' future exercise of their Section 7 rights. Even if an employee has no history of Section 7 activity, if the employer acts to prevent that employee from engaging in protected activity in the future, that action interferes with and restrains the exercise of Section 7 rights and is unlawful without more.

22-60493.6417

As Member McFerran aptly said in her *Walmart* dissent, the Board majority is marginalizing a critical statutory right and is effectively treating the display of union insignia more as a privilege to be granted by the employer on the terms it chooses, rather than as an essential Section 7 right that requires accommodation. And, since an employer retains the right to enforce its work rules and employees would reasonably believe that they would be disciplined for violating non-explicit work rules, facially neutral uniform policies continues to stifle employees in the exercise of their Section 7 rights. See *International Business Machines Corp.*, 333 NLRB 215, 221 (2001), enforced, 31 F. App'x 744 (2d Cir. 2002).

## THE INSTANT CASE:

As to the instant case, Tesla's team wear rule only permits General Assembly (GA) production associates to wear team wear or plain black colored clothing, if approved by a supervisor. This precludes employees from wearing clothing with union insignia, thus interfering with their Section 7 rights. Tesla must demonstrate that special circumstances permit such a rule and that the rule is narrowly tailored. Thus, the issue to resolve is straightforward: whether Tesla has a legitimate concern about damage to vehicles and about visual maintenance if employees are wearing t-shirts that it does not provide. Using the longstanding special circumstances standard, it is clear that Tesla has not provided any evidence of employees' all black cotton t-shirts with a logo and union insignia damaging cars, nor has it demonstrated that the uniform policy would reduce the likelihood that damage would occur. Further, Tesla's GA production associates wear black colored shirts while team leaders and managers wear red colored shirts. The black colored Tesla assigned shirts or plain black shirts the team wear rule allows are not substantially different from the black colored UAW shirts, and better management is mere conjecture. Consistent with the Board precedent, what is required is specific evidence, not the general and speculative testimony that Tesla provided here. See *NLRB v. Baptist Hospital*, above, 442 U.S. at 782–783. (General, speculative, isolated or conclusively evidence of potential disruption to an employer's operations does not amount to special circumstances).

## CONCLUSION:

In sum, employees have a protected right under Section 7 of the Act to make known their concerns and grievances pertaining to their employment relationship, which includes wearing union insignia while at work. The Supreme Court, the courts and the Board have long required employers to provide evidence of special circumstances to override this central statutory right, which enables employees to express and garner union support during an organizing drive or to mobilize solidarity around a particular workplace issue, for example. In fact, this Board in the recent decision of *Long Beach Memorial Medical Center*, 366 NLRB No. 66 slip op. at 2 (2018), enfd. 774 Fed. Appx. 1 (D.C. Cir. 2019) confirmed that "[i]t is well established that employees have a protected right to wear union insignia at work in the absence of special circumstances. The many cases, some of which are cited above, addressing special circumstances, provide a large and extensive roadmap and amply illustrate that there is no need to depart from existing

22-60493.6418

precedent to ensure that employers' legitimate interests are accorded proper weight. If the Board were to shift to a *Boeing* analysis in these circumstances, it would bring instability into this well-settled area of law and significantly diminish a central right of employees under the statute. The Board should adhere to its Congressional mandate and protect the rights of workers to the greatest extent possible.

Respectfully submitted,

Patricia M. Shea
General Counsel
Communications Workers of America, AFL-CIO
501 3rd Street, NW, Legal Dept., Washington, DC 20001
E-mail: pats@cwa-union.org
Dated: March 22, 2021

22-60493.6419

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | | | |
|---|---|---|---|
| TESLA, INC., | ) | Case No. | 32-CA-197020, et al. |
| | ) | | |
| Respondent, | ) | | |
| | ) | | |
| and | ) | | |
| | ) | | |
| MICHAEL SANCHEZ, an individual, | ) | | |
| JONATHAN GALESCU, an individual, | ) | | |
| RICHARD ORTIZ, an individual, and | ) | | |
| INTERNATIONAL UNION, UNITED | ) | | |
| AUTOMOBILE AEROSPACE AND | ) | | |
| AGRICULTURAL IMPLEMENT | ) | | |
| WORKERS OF AMERICA, AFL-CIO, | ) | | |
| a labor organization, | ) | | |
| | ) | | |
| Charging Parties. | ) | | |

AMICUS BRIEF OF COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO

CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2021, the foregoing Amicus Brief of Communications Workers of America has been electronically filed and served this 22nd day of March 2021.


*Patricia McShea*

General Counsel, CWA
501 3rd Street, NW, Legal Dept.
Washington, DC 20001
E-mail: pats@cwa-union.org
Phone: (202) 434-1100

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**TESLA, INC.**

    **and**                                    **Cases 32-CA-197020**

                                                      **32-CA-197058**

**MICHAEL SANCHEZ, an Individual**              **32-CA-197091**

                                                      **32-CA-197197**

    **and**                                    **32-CA-200530**

                                                      **32-CA-208614**

**JONATHAN GALESCU, an Individual**      **32-CA-210879**

                                                      **32-CA-220777**

    **and**

**RICHARD ORTIZ, an Individual**

    **and**

**INTERNATIONAL UNION, UNITED**
**AUTOMOBILE, AEROSPACE AND**
**AGRICULTURAL IMPLEMENT**
**WORKERS OF AMERICA, AFL-CIO**

**ACTING GENERAL COUNSEL'S BRIEF OF POSITION**
**ON THE STANDARD TO APPLY TO UNIFORM POLICIES**

On February 12, 2021, the Board invited the parties and interested amici to file briefs addressing two questions:

1. Does [*Stabilus, Inc.*, 355 NLRB 836 (2010)] specify the correct standard to apply when an employer maintains and consistently enforces a nondiscriminatory uniform policy that implicitly allows employees to wear union insignia (buttons, pins, stickers, etc.) on their uniforms?

2. If *Stabilus* does not specify the correct standard to apply in those circumstances, what standard should the Board apply?

## I.  SUMMARY OF THE ACTING GENERAL COUNSEL'S POSITION

*Stabilus* correctly specified that the longstanding test approved in *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945), applies when an employer maintains and consistently enforces a uniform policy that necessarily precludes wearing union attire, even when the policy allows employees to wear union insignia on items like buttons, pins, and stickers. That standard gives proper weight to the fundamental employee rights and legitimate managerial interests at stake under these circumstances. Thus, no departure from precedent is warranted here.

## II.  STATEMENT OF THE CASE

On March 30, 2018, the Regional Director issued complaint (the second amended consolidated complaint in this case) alleging, among other things, that Respondent Tesla, Inc. violated Section 8(a)(1) of the Act by maintaining a rule at its automotive manufacturing facility in Fremont, California, requiring certain employees to wear assigned "team wear," and by disparately enforcing that rule against shirts with union insignia. The case was heard over 13 days from June to October 2018. On September 27, 2019, Administrative Law Judge Amita Baman Tracy issued a decision finding, among other things, that Respondent violated Section 8(a)(1) by maintaining its team wear policy and enforcing it to prevent employees from wearing shirts bearing union insignia, but that the Respondent had not enforced the rule in a disparate manner. Respondent filed exceptions on December 9, 2019.[1]

---

[1] The General Counsel did not except to the judge's failure to find disparate enforcement.

22-60493.6422

## III. ARGUMENT

### A. *Stabilus* correctly specified that the *Republic Aviation* framework is the proper standard to apply to uniform policies that effectively prohibit employees from wearing union attire instead of company-required attire.

As the Supreme Court has held, employees have a Section 7 right to wear union insignia on their employer's premises, and this right may not be infringed absent a showing of special circumstances. *See Republic Aviation*, 324 U.S. at 801-03. In *Stabilus*, the Board stated that "[a]n employer cannot avoid the 'special circumstances' test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia." 355 NLRB at 838.

*Stabilus* correctly stated extant law. The right to wear union insignia has always encompassed articles of clothing, including pro-union T-shirts, and the Board has applied the *Republic Aviation* framework to employer prohibitions thereof. *See, e.g.*, *De Vilbiss Company*, 102 NLRB 1317, 1321-22 (1953). This has been the Board's approach even when employer prohibitions on union attire resulted from enforcement of uniform or appearance policies. *See, e.g.*, *Meijer, Inc.*, 318 NLRB 50, 52, 56-57 (1995) (employer lawfully prohibited wearing union jackets and hats instead of uniform jackets and hats in customer areas of grocery store but unlawfully prohibited employee from wearing union jacket outside customer contact area), *enforced*, 130 F.3d 1209 (6th Cir. 1997); *Con-Way Central Express*, 333 NLRB 1073, 1075-77 (2001) (employer lawfully prohibited wearing union hat instead of company-issued hat based on need to maintain public image); *Produce Warehouse of Coram*, 329 NLRB 915, 917-19 (1999) (employer lawfully prohibited grocery worker from wearing union hat instead of uniform hat based on employee's contact with the public and the employer's desire to present a neat and clean image); *Quantum Electric, Inc.*, 341 NLRB 1270, 1274, 1280 (2004) (employer unlawfully enforced ban on all shirts with graphics or printed text other than company-issued shirts to

22-60493.6423

discharge employee for wearing union shirt because ban was not justified by special circumstances); *North Hills Office Services*, 346 NLRB 1099, 1099 & n.6, 1113-14 (2006) (employer unlawfully required employees to wear company uniforms that obscured the message of union T-shirts the employees were also wearing because the uniform policy was not justified by special circumstances and was promulgated in response to union activity). Similarly, both the Board and a reviewing court applied the special circumstances test (albeit with different outcomes) in assessing the lawfulness of a collectively bargained-for requirement that employees wear a uniform bearing union insignia, thus infringing on employees' Section 7 right to refrain from wearing union insignia. *See BellSouth Telecommunications*, 335 NLRB 1066, 1068-71 (2001) (special circumstances justified uniform policy),[2] *enforcement denied sub nom. Lee v. NLRB*, 393 F.3d 491, 494-97 (4th Cir. 2005) (no special circumstances established), *on remand*, 346 NLRB 637, 637 (2006) (finding violations based on court's decision). Thus, *Stabilus* correctly stated that the *Republic Aviation* framework applies to prohibitions on union attire even when those prohibitions flow from a requirement to wear employer-designated clothing. *See Stabilus*, 355 NLRB at 838.

No break from precedent is warranted because the *Republic Aviation* framework gives appropriate weight to the fundamental Section 7 rights and legitimate managerial interests at issue. Since the earliest days of the Act, the Board and the Supreme Court have recognized "the importance of freedom of communication to the free exercise of organization rights." *Cent. Hardware Co. v. NLRB*, 407 U.S. 539, 543 (1972) (citing *Peyton Packing Co.*, 49 NLRB 828

---

[2] The Board stated that the analysis was not precisely the same as the *Republic Aviation* test because "the 'special circumstances' to be balanced against Section 7 interests [were] derived from the legitimate interests of both the [e]mployer and the [u]nion." *BellSouth Telecommunications*, 335 NLRB at 1068.

22-60493.6424

(1943), *enforced*, 142 F.2d 1009 (5th Cir. 1944)). Indeed, "organization rights are not viable in a vacuum; their effectiveness depends in some measure on the ability of employees to learn the advantages and disadvantages of organization from others." *Id.* "No restriction may be placed on the employees' right to discuss self-organization among themselves, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline." *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 113 (1956). And, the Court has recognized that the workplace is "uniquely appropriate" for such communications. *NLRB v. Magnavox Co. of Tenn.*, 415 U.S. 322, 325 (1974); *see also, e.g.*, *Eastex, Inc. v. NLRB*, 437 U.S. 556, 574 (1978) ("[T]he plant is a particularly appropriate place for the distribution of § 7 material, because it 'is the one place where [employees] clearly share common interests and where they traditionally seek to persuade fellow workers in matters affecting their union organizational life and other matters related to their status as employees.'" (quoting *Gale Products*, 142 NLRB 1246, 1249 (1963))).

Consistent with these principles, in *Republic Aviation*, the Court affirmed that "the right of employees to wear union insignia at work has long been recognized as a reasonable and legitimate form of union activity, and the [employer's] curtailment of that right is clearly violative of the Act." 324 U.S. at 802 n.7. Wearing union insignia is a uniquely important expression of union support, particularly because it may be the only form of advocacy permitted on work time. *See, e.g.*, *Peyton Packing*, 49 NLRB at 843 (because "[w]orking time is for work," an employer may prohibit union solicitation during working time); *Walton Manufacturing Company*, 126 NLRB 697, 698 (1960) (same for distribution of union literature), *enforced*, 289 F.2d 177 (5th Cir. 1961).[3] Moreover, in wearing union insignia at work, "employees' interests

---

[3] The vital importance of this right is demonstrated by the broad range of contexts in which employees have worn union insignia, such as supporting organizing campaigns, *see, e.g.*, *Malta Construction Co.*, 276 NLRB 1494, 1498 (1985), *enforced*, 806 F.2d 1009 (11th Cir. 1986);

22-60493.6425

are at their strongest, for . . . '[the] activity [is] carried on by employees already rightfully on the employer's property.'" *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 504-05 (1978) (quoting *Hudgens v. NLRB*, 424 U.S. 507, 521 n.10 (1976)). Thus, it is with good reason that, pursuant to *Republic Aviation*, employer limitations on the display of union insignia are presumptively invalid, with the burden on the employer to establish special circumstances to overcome the presumption. *See* 324 U.S. at 803-04.

The *Republic Aviation* framework gives due regard to legitimate managerial prerogatives to regulate employee appearance. It simply places the burden of justifying infringements of important Section 7 rights on the party claiming a need for the infringement. The Supreme Court has endorsed such approaches not only in *Republic Aviation* but also subsequently. *See, e.g.*, *Beth Israel Hosp.*, 437 U.S. at 492-93 (restrictions on employee solicitation during nonworking time and on literature distribution during nonworking time in nonworking areas unlawful absent employer justification by a showing of special circumstances). And employers are logically in the best position to offer evidence on the business necessity of restrictions on employees' exercise of organizational rights. *See id.* at 502 (observing that hospital employer wishing to limit union solicitation in its cafeteria was in the best position to offer evidence of untoward

---

*Mayrath Co.*, 132 NLRB 1628, 1643 (1961), *enforced in relevant part*, 319 F.2d 424 (7th Cir. 1963), demonstrating solidarity, *see, e.g.*, *Mt. Clemens General Hospital*, 335 NLRB 48, 49 (2001) (wearing buttons in protest after fellow employee had been forced to work overtime), *enforced*, 328 F.3d 837 (6th Cir. 2003), and advocating for issues during collective bargaining and even after contract ratification, *see, e.g.*, *Escanaba Paper Co.*, 314 NLRB 732, 732 (1994) (wearing buttons to pressure employer into a favorable successor agreement and T-shirts and other items protesting unfavorable contract terms), *enforced sub nom. NLRB v. Mead Corp.*, 73 F.3d 74 (6th Cir. 1996); *Holladay Park Hospital*, 262 NLRB 278, 278 (1982) (wearing buttons and yellow ribbons to support the union's bargaining position). *See generally* John W. Teeter, Jr., *Banning the Buttons: Employer Interference with the Right to Wear Union Insignia in the Workplace*, 80 Ky. L.J. 377, 379 (1992) ("By engaging in this simple act of reaffirmation, the worker assures both herself and others that they belong to an entity devoted to protecting their statutory rights, economic interests, and quest for dignity in their work.").

22-60493.6426

effects of such solicitation). The employer's burden to provide such evidence is a reasonable one, as evidenced by the many Board decisions finding employer restrictions on wearing union insignia justified by special circumstances. *See, e.g.*, *Sam's Club*, 349 NLRB 1007, 1011-12 (2007) (prohibition on non-breakaway lanyards justified by substantial safety concerns); *Con-Way Central Express*, 333 NLRB at 1075-77 (employer lawfully prohibited wearing union hat instead of company-issued hat based on need to maintain public image); *Produce Warehouse of Coram*, 329 NLRB at 917-19 (same); *Meijer*, 318 NLRB at 57 (requirement to wear uniform jacket and hat lawful in customer areas of grocery store); *Noah's New York Bagels*, 324 NLRB 266, 275 (1997) (employer lawfully prohibited employee from wearing company-required T-shirt that had been defaced to mock employer); *Casa San Miguel*, 320 NLRB 534, 540 (1995) (prohibition on wearing hospital smock with added pro-union message was lawful). As these illustrative decisions demonstrate, reasonable uniform and appearance policies have lawfully coexisted with the *Republic Aviation* framework for more than 70 years. In short, departing from such longstanding precedent is wholly unnecessary and, indeed, a solution in search of a problem.

The questions posed by the Board's invitation for briefs in this case appear to presuppose that a unique test less protective of employees' well-established right to wear union attire absent special circumstances might be appropriate for employers that permit employees to accessorize their uniforms, such as with buttons, pins, or stickers. Such an approach would be unsound and imprudent. First, it would be fundamentally at odds with Supreme Court jurisprudence governing when alternative means of exercising Section 7 rights become legally relevant. Second, as a practical matter, adopting a legal test applicable only to prohibitions on union attire flowing from

7

company uniform requirements would invite unnecessary litigation and potentially complicate enforcement of Board orders in the circuit courts.

The adoption of a framework less protective of employee rights for situations where an employer permits some forms of union insignia, like buttons, pins, or stickers, while prohibiting union attire would run counter to longstanding principles embraced by the Supreme Court. It is well-established that the availability of "alternative channels of communication" is simply immaterial to whether the Act affords protection for activities engaged in by employees rightfully on the employer's property. *See, e.g.*, *Republic Aviation*, 324 U.S. at 798-99 (effectiveness of solicitation off employer properties did not factor into employees' right to distribute literature or solicit on employer properties); *Magnavox*, 415 U.S. at 325-27 (availability of "alternative channels of communication" was not a consideration in lawfulness of union's waiver of literature distribution rights protected by Section 7); *Beth Israel Hosp.*, 437 U.S. at 505 ("[T]he availability of alternative means of communication is not, with respect to employee organizational activity, a necessary inquiry . . . ."). As the Board has observed, "[i]t certainly does not lie in the mouth of [the employer] to tell the [u]nion, or [the employer's] employees, how to exercise their rights under the Act." *Monarch Machine Tool Co.*, 102 NLRB 1242, 1249 (1953) (rejecting argument that employer's prohibition on literature distribution by employees in company parking lot was justified by the availability of other means of communication), *enforced*, 210 F.2d 183 (6th Cir. 1954). Indeed, the Board has required employers to show special circumstances even where an employer prohibition overall "did not interfere to any significant extent" with employees' right to wear union insignia. *See Sam's Club*, 349 NLRB at 1011-12 (employer required employee lanyards to have breakaway snap, thus prohibiting union-provided lanyard lacking that safety device; prohibition was justified by safety

8

concerns).[4] Thus, regardless of alternative means of wearing union insignia, the *Republic Aviation* framework is the appropriate standard to protect employees' fundamental right to wear union attire. Finding otherwise would contradict these longstanding legal principles and would be imprudent if not impermissible.

Practically speaking, devising an unnecessary new standard just for uniform policies would also needlessly complicate labor law, threaten judicial enforcement of Board decisions, and impede employees' exercise of their Section 7 rights by encouraging litigation over ancillary questions that currently have no bearing on the applicable standard. Among those questions:

- How consistent must the appearance required by an employer policy be for the policy to warrant application of a legal framework other than *Republic Aviation*? *Compare, e.g.*, *Wal-Mart Stores, Inc.* ("*Wal-Mart I*"), 364 NLRB No. 118, slip op. at 32-33 (Aug. 27, 2016) (employer maintained "broad-brush dress code" where employees chose their own clothing within employer's parameters), *with W San Diego*, 348 NLRB 372, 372 (2006) (employer commissioned special uniforms to achieve a trendy, distinct, and chic look).

---

[4] Other cases where the Board has sometimes considered permissible alternative placement of insignia in evaluating whether employers met special circumstances sufficient to justify certain prohibitions involved bans on adding insignia to company-owned hard hats. *Compare, e.g.*, *Andrews Wire Corp.*, 189 NLRB 108, 109 (1971) (finding that employer lawfully prohibited union insignia on its hard hats, relying in part on evidence that employees could wear insignia on any item of clothing except the hard hats), *with Malta Construction Co.*, 276 NLRB at 1494 (finding unlawful employer's prohibition on helmet stickers even though it "allowed its employees to wear union insignia on articles of their personal attire, such as T-shirts"). Such cases implicate employers' right to control their property in addition to their managerial interests in production and discipline, yet the Board has still applied the *Republic Aviation* framework to those bans. Wearing union attire in place of or in addition to a company uniform does not implicate employer property interests and, thus, there is even less reason to apply a test less protective of employee rights here than in cases involving the placement of insignia on company hard hats.

9

- How many alternative ways for employees to accessorize would be sufficient to invoke the new special standard? Since some accessories might need to be limited for legitimate business reasons, such as safety concerns, some employees' alternative options could be very narrow while others may have a broad range of alternatives.

- What exactly is considered part of an employer's required "uniform"? For example, is a company cap part of a uniform where the cap is the only permitted cap, but employees can opt to wear no cap? *See World Color (USA) Corp.*, 360 NLRB 227, 227 n.3 (2014) (finding unlawful cap policy was not part of employer's uniform policy, but noting this did not influence the applicable legal test), *enforcement denied on other grounds*, 776 F.3d 17 (D.C. Cir. 2015), *on remand*, 369 NLRB No. 104 (June 12, 2020). Is a badge reel part of the company uniform, subject to a new standard, or is it an adornment to a uniform subject to *Republic Aviation*? *See Long Beach Memorial Medical Center, Inc.*, 366 NLRB No. 66, slip op. at 1-3 (2018) (no special circumstances justified hospital's policy requiring badge reels to bear only employer-approved logos and text), *enforced*, 774 F. App'x 1 (D.C. Cir. 2019) (unpublished).

- Which test applies to employer bans of union clothing worn in *addition* to company-required clothing, rather than as a substitute, such as a union vest worn over a company shirt?

- Which test would be used to assess prohibitions on altering company-required apparel to make it look exactly like union apparel, for example, sewing a union emblem over a company logo?

10

22-60493.6430

If the Board adopts a different standard for uniform policies, such questions would distract from the real issue: whether, in a particular case, an employer's legitimate interests in prohibiting variances from its desired employee appearance—whether achieved by addition, substitution, or defacement—outweigh employees' right to wear particular pro-union (or anti-union) items. At the same time, rulings as to the appropriate standard in these types of cases at the margins run the risk of enforcement being denied in the federal courts, as the courts will review such rulings de novo. *See, e.g.*, *NLRB v. CWI of Md., Inc.*, 127 F.3d 319, 330 (4th Cir. 1997) (court will review de novo the legal standards used to assess the evidence); *Turnbull Cone Baking Co. of Tenn. v. NLRB*, 778 F.2d 292, 295 (6th Cir. 1985) ("If the Board errs in determining the proper legal standard, the appellate court may refuse enforcement on the grounds that the order has 'no reasonable basis in law.'" (quoting *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497 (1979))). Consistent application of the *Republic Aviation* standard avoids unnecessary litigation of threshold questions and supports the enforceability of Board decisions while affording appropriate weight to both Section 7 rights and legitimate employer interests.

Overall, *Stabilus* correctly stated that the *Republic Aviation* framework is the proper standard to apply to uniform and appearance policies that effectively prohibit wearing union attire instead of company-required attire. No other framework is needed.

**B. The *Boeing* framework is inapplicable to uniform policies that effectively prohibit wearing union attire.**

In *Wal-Mart Stores, Inc.* ("*Wal-Mart II*"), 368 NLRB No. 146, slip op. at 2-3 & n.10 (Dec. 16, 2019), the Board held that the test set forth in *Boeing Co.*, 365 NLRB No. 154 (Dec. 14, 2017), rather than the *Republic Aviation* framework, would apply to purely facial challenges to facially neutral employer policies that limit the size and/or appearance of union buttons and insignia that employees can wear but do not prohibit them. *Wal-Mart II* does not purport to

11

displace *Republic Aviation* as the framework applicable to uniform policies that prohibit wearing union attire, and extending *Wal-Mart II* to this context is unwarranted.

For numerous independent reasons, *Wal-Mart II* is inapplicable here. First, *Wal-Mart II* did not purport to encroach on the *Republic Aviation* standard's scope, but, rather, applied *Boeing* to a specific context where *Republic Aviation* had apparently not been applied. *See Wal-Mart II*, 368 NLRB No. 146, slip op. at 2-3 & nn. 10, 13; *cf. Medic Ambulance Service, Inc.*, 370 NLRB No. 65, slip op. at 1 n.4 (Jan. 4, 2021) (noting that *Boeing* did not disturb longstanding precedent governing employer restrictions on solicitation and distribution, "which already strikes a balance between employee rights and employer interests"). Thus, *Wal-Mart II* did not overrule the precedent cited above, *supra* pp. 3-4, applying the *Republic Aviation* framework to uniform and appearance policies.

Second, *Wal-Mart II* applies only to "content-neutral" policies. *See* 368 NLRB No. 146, slip op. at 1, 3 n.13. Respondent's uniform policy is not content-neutral in that it requires clothing bearing a company logo, while prohibiting clothing bearing other logos.

Third, *Boeing* is inapplicable to policies that have "been applied to restrict NLRA-protected activity." *Wal-Mart II*, 368 NLRB No. 146, slip op. at 3 n.11. In the instant case, Respondent has applied its uniform policy to prohibit employees from wearing pro-union shirts.[5]

---

[5] Although the instant case does not involve a pure facial challenge to a uniform policy since the team wear policy has been applied against employees who wore union T-shirts, *Republic Aviation* would apply even if it did. *See, e.g.*, *Boch Honda*, 362 NLRB 706, 706-08, 716 (2015) (applying *Republic Aviation* framework to facial challenge to employer prohibition of "pins, insignias, or other message clothing"), *enforced*, 826 F.3d 558 (1st Cir. 2016); *cf. BellSouth Telecommunications*, 335 NLRB at 1067-71 (variant "special circumstances" test applied to pure facial challenge to requirement to wear uniform bearing union insignia).

22-60493.6432

Fourth, as explained above, *supra* pp. 9-11, displacing *Republic Aviation* as the framework to apply to uniform policies would unnecessarily complicate labor law with litigation of threshold issues to determine the applicable standard and could hinder court enforcement.

Finally, the Board in *Wal-Mart II* found the *Boeing* framework appropriate to apply to a facially neutral rule "that limit[ed] the size and/or appearance of union buttons and insignia . . . but d[id] not prohibit them" because the rule's infringement on Section 7 rights was necessarily "less severe" than a prohibition's. *Wal-Mart II*, 368 NLRB No. 146, slip op. at 2-3. But uniform policies like Respondent's prohibit all pro-union clothing, rather than merely limiting their size and/or appearance, and thus the proper framework is *Republic Aviation*, not *Boeing*.[6] The detrimental effect on Section 7 rights of a prohibition on union clothing is no less severe when the prohibition results from application of a uniform policy. Likewise, the fact that an employer may permit union insignia in forms other than apparel in no way warrants applying a legal framework less protective of the right to wear union attire — and doing so would effectively grant an employer control over the manner of employees' expression of their Section 7 rights. *See supra* pp. 8-9. The *Republic Aviation* framework appropriately balances the Section 7 rights and managerial interests relevant to all prohibitions of union insignia. It follows that the *Boeing* framework does not.

For all the foregoing reasons, *Boeing* is inapplicable here.

---

[6] Indeed, *Republic Aviation* would be the appropriate framework even if Respondent's policy prohibited just one union shirt, rather than all union attire. *See, e.g.*, *Medco Health Solutions of Las Vegas, Inc.*, 364 NLRB No. 115, slip op. at 3-7 (Aug. 27, 2016) (no special circumstances justified ban of shirt criticizing company program); *Komatsu America Corp.*, 342 NLRB 649, 650 (2004) (special circumstances justified ban on shirt that made "clear appeal to ethnic prejudices").

13

**C. Member Schaumber's approach in *Stabilus* proposes an unwarranted abrogation of Section 7 rights.**

Dissenting in *Stabilus*, Member Schaumber proposed that where an employer maintains and consistently enforces a lawful uniform rule, prohibitions on wearing union attire in place of the required company uniform should be categorically lawful. *See* 355 NLRB at 844 (Member Schaumber, dissenting). Member Schaumber's approach is deeply flawed.

Initially, Member Schaumber predicated his approach on a false premise: that *Stabilus* was a case of first impression. *Id.* at 842, 843 n.7. However, the cases cited above, *supra* pp. 3-4, demonstrate that the Board has consistently applied the "special circumstances" test when employers with a uniform or appearance policy prohibited employees from wearing union attire instead of the required attire.[7] Thus, contrary to Member Schaumber's assertions, continuing to apply the *Republic Aviation* framework was not a "radical rebalancing of the relevant interests." *Stabilus*, 355 NLRB at 841.

Member Schaumber also mistakenly relied on the proposition that "the Board ha[d] implicitly recognized that an employer may promulgate and enforce a nondiscriminatory uniform rule," *id.* at 843, citing *Noah's New York Bagels*, 324 NLRB at 275, and *Casa San Miguel*, 320

---

[7] None but *Meijer* and *North Hills Office Services* were mentioned in Member Schaumber's dissent. With respect to *Meijer*, Member Schaumber suggested the case is inapposite because it involved discriminatory enforcement, and because it is unclear whether exceptions were filed to the finding that a supervisor unlawfully prevented an employee from wearing a union jacket in a noncustomer area. But the Board's analysis of hats and coats did not rely on discriminatory enforcement, *see* 318 NLRB at 57, and Member Schaumber's speculation that there were no exceptions to the relevant findings ignores the Board's practice of identifying the absence of exceptions to particular rulings, *see, e.g.*, *P.S.K. Supermarkets*, 349 NLRB 34, 34 n.1 (2007).

As to *North Hills Office Services*, Member Schaumber failed to address the employer's unlawful uniform policy, instead mentioning only an unlawful directive by the employer to remove union T-shirts, which preceded promulgation of the uniform policy. *See Stabilus*, 355 NLRB at 842 n.3.

22-60493.6434

NLRB at 540. Neither case suggests that employers' rights to promulgate and enforce uniform rules categorically override employees' Section 7 rights, dispensing with employers' burden under the *Republic Aviation* framework. Indeed, as indicated above, *supra* p. 7, the results in both cases stemmed from findings that the employers demonstrated special circumstances sufficient to justify their prohibition of certain alterations to the employer-required uniforms. There is simply no basis for Member Schaumber's suggestion that these cases did not turn on the employers showing "special circumstances." *Stabilus*, 355 NLRB at 843.

Likewise, just because employers' uniform rules go unchallenged in many cases does not mean that employers should not be required to justify those rules when they are challenged. *See id.* at 843 & n.7. If anything, the fact that cases involving the substitution of protected clothing for uniform attire are rare in comparison to cases involving adornments like buttons or pins underscores that the *Republic Aviation* framework adequately safeguards legitimate employer interests in having uniform policies. Member Schaumber's concerns that the *Republic Aviation* framework will "submerge" employers' rights and allow employees to "cavalierly disregard preexisting and consistently enforced uniform policies," *Stabilus*, 355 NLRB at 841, 843, ring hollow. The fact is that *Republic Aviation* has been the rule for over seven decades, employer interests are given due regard within that balancing framework, and uniform policies have coexisted with it. *See supra* p. 7.

While unnecessary to safeguard legitimate employer interests, Member Schaumber's approach would abdicate the Board's responsibility to protect employees' right to wear union insignia at work. As explained above, *supra* pp. 4-6, the right to wear union clothing in the workplace is an especially important aspect of organizational activity, and the Board appropriately finds restrictions on that right presumptively unlawful. Yet Member Schaumber's

22-60493.6435

approach would allow employers to quash that activity entirely by simply pointing to a uniform policy.[8] In removing such uniform policies from Board scrutiny entirely, Member Schaumber's approach would significantly chill employees from expressing their Section 7 views at the workplace and give employers free rein to discipline or discharge employees simply because they showed up for work in union attire, without any showing of genuine business necessity. Given that employees' Section 7 rights are at their zenith when employees are exercising their own non-derivative rights in a setting that is uniquely appropriate to communicate with other employees, Member Schaumber's approach unjustifiably tips the scale in favor of employers in every instance.

In sum, adopting Member Schaumber's approach would be an unwarranted departure from longstanding precedent.

## IV. CONCLUSION

The *Republic Aviation* framework is the proper standard to apply in this case and other cases involving prohibitions on union clothing resulting from the maintenance and enforcement of uniform policies. Applying that framework here, the judge correctly found that Respondent

---

[8] Member Schaumber suggested his approach's abrogation of employee rights is acceptable where employees have alternative means to wear union insignia. *See Stabilus*, 355 NLRB at 843. However, as explained above, *supra* pp. 8-9, alternative means of wearing union insignia are no basis for dispensing with the employer's burden to justify restrictions on union attire.

has failed to prove special circumstances justifying its requirement that its employees refrain

from wearing union shirts.


                                        Respectfully submitted,


                                        /s/ Mischa K. Bauermeister
                                        Counsel for the Acting General Counsel
                                        National Labor Relations Board
                                        Division of Advice
                                        1015 Half Street, Southeast
                                        Washington, DC 20570
                                        (202) 273-1748
                                        Mischa.Bauermeister@nlrb.gov

March 22, 2021

22-60493.6437

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the Acting General Counsel's Brief of

Position on the Standard to Apply to Uniform Policies in Cases 32-CA-197020 et al. was

electronically filed with the National Labor Relations Board via the NLRB E-Filing System and

served in the manner indicated to the parties listed below on this 22nd day of March, 2021.

<u>VIA EMAIL</u>

| | |
|---|---|
| Mark S. Ross, Esq. | mross@sheppardmullin.com |
| Keahn Morris, Esq. | kmorris@sheppardmullin.com |
| Sheppard Mullin Richter & Hampton, LLP | |
| 4 Embarcadero Center, 17th Floor | |
| San Francisco, CA 94111 | |

Margo A. Feinberg, Esq.                       margo@ssdslaw.com
Daniel Curry, Esq.                            dec@ssdslaw.com
Schwartz, Steinsapir, Dohrmann
& Sommers, LLP
6300 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90048

Jeffrey D. Sodko, Deputy General Counsel       jsodko@uaw.net
United Auto Workers
8000 E Jefferson Avenue
Detroit, MI 48214

/s/ Mischa K. Bauermeister
Counsel for the Acting General Counsel
National Labor Relations Board
Division of Advice
1015 Half Street, Southeast
Washington, DC 20570
(202) 273-1748
Mischa.Bauermeister@nlrb.gov

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD

------------------------------------------------------------X
MICHAEL SANCHEZ, JONATHAN
GALESCU, RICHARD ORTIZ, AND INT'L
UNION, UNITED AUTOMOBILE,
AEROSPACE and AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA,          Case No. 32-CA-197020 et al.
AFL-CIO,

       and

TESLA, INC.
------------------------------------------------------------X


**AMICUS CURIAE BRIEF OF
SERVICE EMPLOYEES INTERNATIONAL UNION**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .................................................................................................... 1

INTEREST OF THE AMICUS ................................................................................. 1

A.    The Question Raised in the Invitation to File Amicus Briefs Is Not Presented in this Case. ................................................................................................. 2

B.    The Board Should Not Overrule *Stabilus*, and If It Does Reach the Issue, Should Clarify the Difference Between Dress Codes and Uniform Requirements. ...................... 3

C.    There Are Good Reasons Why the Board Has Consistently Held That Allowing Workers to Wear Some Form of Union Insignia is Not a Defense to a Prohibition on Other Forms of Union Insignia. .......................................................... 6

D.    Where an Employer Bans a Particular Form of Union Insignia, Workers Will Not Implicitly Understand That All Other Forms of Union Insignia Are Acceptable. ............ 7

CONCLUSION ...................................................................................................... 9

22-60493.6440

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Beth Israel Hospital v. NLRB*,
    437 U.S. 483 (1978)................................................................................5, 6

*Holladay Park Hospital*,
    262 NLRB 278 (1978) ..................................................................................6

*In-N-Out Burger, Inc.*
    365 NLRB No. 39, slip op. (2017), *enf'd.* 894 F.3d 707 (5th Cir. 2018) *cert.*
    *denied*, 139 S.Ct. 1259 (2019) ......................................................................5

*Malta Construction Co.*,
    276 NLRB 1494 (1985) ................................................................................6

*Northeast Industrial Service Co.*,
    320 NLRB 977 (1996) ..................................................................................6

*Republic Aviation Corp. v. NLRB*,
    324 U.S. 793 (1945)......................................................................................3

*Stabilus, Inc.*,
    355 NLRB 836 (2010) ...................................................................... *passim*

*World Color (USA) Corp.*,
    360 NLRB 227 (2014) ..................................................................................8

*World Color (USA) Corp. v. NLRB*,
    776 F.3d 17 (D.C. Cir. 2015) .......................................................................9

**Other Authorities**

https://emilypost.com/advice/hats-off-hat-etiquette-for-everyone ................................7

Stephen J. Praetorius, "How to Get Rid of Hat Hair, Fast," (Oct. 8, 2015),
    https://www.gq.com/story/how-to-get-rid-of-hat-hair ............................................7

22-60493.6441

## INTRODUCTION

The Board has invited interested amici to submit briefs on whether *Stabilus, Inc.,* 355 NLRB 836 (2010), sets forth the correct standard to apply when an employer maintains and consistently enforces a nondiscriminatory uniform policy that implicitly allows employees to wear union insignia (buttons, pins, stickers, etc.) on their uniforms. The Service Employees International Union ("SEIU") submits that the Board should not reach this question because the issue is not properly presented in this case. If the Board nevertheless insists on issuing what amounts to an advisory opinion, the Board should hold that, absent special circumstances, an employer may not use a dress code to prohibit union insignia or attire, and that where an employer requires employees to wear company-issued uniforms, employees have a presumptive right to wear union insignia on their uniforms. Further, the Board should recognize that when an employer directs an employee to remove union insignia or attire pursuant to a dress code, employees will not "implicitly" understand that they may wear other forms of union insignia and attire.

## INTEREST OF THE AMICUS

Amicus Curiae SEIU is a labor union with more than two million members in the United States (including in Puerto Rico) and Canada. More than half of SEIU's members work in the healthcare industry, including as doctors, nurses, nursing assistants, technicians, therapists, home care providers, administrative staff, janitorial workers, and food service staff. SEIU is also one of the largest unions of public service employees, representing local and state government workers, including public school employees, bus drivers, and childcare providers.[1] SEIU represents

---

[1] These public sector employees have a direct interest in the outcome of this and other cases decided by the Board because state agencies often look to the decisions of the NLRB as persuasive authority in interpreting analogous state laws.

workers in the property service industries as well; SEIU members clean, maintain, and provide security for commercial office buildings, co-ops, and apartment buildings, as well as public facilities like theaters, stadiums, and airports.

SEIU's members have a strong interest in the outcome of this case because many SEIU members are required to wear uniforms at work. In addition, the right to wear union insignia is a basic element of the protections offered by Section 7 of the Act, and wearing union attire and insignia is an important component of both organizing and contract campaigns.

**A.    The Question Raised in the Invitation to File Amicus Briefs Is Not Presented in this Case.**

The Board has invited interested amici to address whether *Stabilus, Inc.,* 355 NLRB 836 (2010), provides the correct standard to apply "when an employer maintains and consistently enforces a nondiscriminatory uniform policy that implicitly allows employees to wear union insignia (buttons, pins, stickers, etc.) on their uniforms." But in the case at hand there was no uniform policy at all; the policy that was applied was not applied in a nondiscriminatory manner; and union insignia were not implicitly allowed.

It is a misnomer to describe the Tesla policy at issue as a "uniform" policy. Workers were not required to wear a company-issued uniform. Instead, with their supervisor's permission, workers were allowed to wear either a cotton shirt with the company logo or an all-black shirt. In addition, workers chose their own black pants, with the only limitation being that the pants could not have buttons, rivets, or exposed zippers.

The policy also was not consistently applied. It was up to each individual supervisor to decide whether employees had to wear shirts with the company logo and, at least prior to August 2017, Tesla interpreted its policy as allowing for union t-shirts. This is essentially the opposite of a consistent policy.

22-60493.6443

Next, nothing in the record suggests that the GA workers were allowed to wear buttons or pins of any kind. In fact, since the policy bars workers from wearing pants with buttons, rivets, or exposed zippers, and the Employer has attempted to justify the policy by raising concerns about mutilation of its vehicles, it is almost certain that the Employer would have barred workers from wearing union pins or buttons.

The Board should decide the issues actually presented, and not use this case as a vehicle to issue an advisory opinion about an issue not presented. The Employer did not "consistently enforce a nondiscriminatory uniform policy," and the policy did not implicitly allow workers to wear union buttons or pins. Thus, this case is not an appropriate vehicle for the Board to address the questions raised in the invitation to file briefs.

**B.    The Board Should Not Overrule *Stabilus*, and If It Does Reach the Issue, Should Clarify the Difference Between Dress Codes and Uniform Requirements.**

In *Stabilus,* the Board held that "[a]n employer cannot avoid the 'special circumstances' test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia." *Stabilus,* 355 NLRB at 838. That holding is consistent with the approach the Board has taken to the wearing of union insignia since the earliest days of the Act. In *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 802 (1945), the Supreme Court agreed that "prohibitions against the wearing of insignia must fall as interferences with union organization." Since then, the Board has always required employers to establish "special circumstances" to justify prohibitions on wearing union insignia.

If the Board does reach this issue, it should start by differentiating between employers that merely enforce dress codes and employers that require workers to wear actual uniforms. In the dress code context, amicus accepts the general proposition that if an employer requires workers to wear a particular *type* of clothing (although not an official uniform), workers do not

3

have a Section 7 right to override that decision.  For instance, if a hospital employer requires

certain workers to wear scrubs, workers do not have a Section 7 right to wear union t-shirts

instead of scrubs.  But once the dress code is complied with, the hospital employer should be

required to establish "special circumstances" to justify any prohibition on union insignia that fits

within the code.

     For example, if the hospital employer wants to prohibit workers from wearing scrubs

with a union insignia, it must justify that prohibition with "special circumstances."  The workers

in that case would be complying with the employer's scrubs requirement, and the employer must

show some additional circumstance that justifies the prohibition of union insignia in order not to

run afoul of the Act's protections.  Similarly, if an employer's dress code requires workers to

wear purple ties, the employer should be required to establish "special circumstances" if it seeks

to prohibit workers from wearing purple ties containing a union insignia.

     Applying the same principle to the instant case, an employer that allows workers to wear

black t-shirts should be required to establish "special circumstances" to deny workers the right to

wear black t-shirts with a union insignia.  The specific facts of this case help to illustrate why

that is so.  Tesla offered two different rationales for its dress code:  visual identification of

workers and eliminating risk of vehicle mutilation.  Since both those goals could be achieved

while also permitting workers to wear black union t-shirts, Tesla's interference with employees'

union rights was unjustified and could only invite the inference among employees and others that

it was targeting the union rather than asserting a legitimate interest.  Thus, the ALJ properly

found that neither of Tesla's dress-code rationales provided the "special circumstances" that

would justify prohibiting workers from wearing UAW t-shirts.

4

A somewhat different issue arises where employees are required to wear a company-issued uniform. There are many jobs where wearing a uniform is part of the job – security officers, doorpersons, and fast food workers are expected to wear a company-issued uniform at all times. Provided the employer has not implemented the uniform requirement in response to worker organizing, the uniform policy may be enforced, and workers may lawfully be prohibited from substituting a union-issued t-shirt for their uniform shirt.

But, uniform requirements do not completely override workers' right to wear union insignia. As the Board has repeatedly held, workers have a presumptive right to wear union pins, buttons, ribbons, etc., on their uniforms. *See, e.g. In-N-Out Burger, Inc.,* 365 NLRB No. 39, slip op. at 1, n.2 (2017), *enf'd.* 894 F.3d 707 (5th Cir. 2018) *cert. denied*, 139 S.Ct. 1259 (2019) (employer violated Section 8(a)(1) by prohibiting workers from wearing "Fight for Fifteen" buttons). Also, where appropriate, workers have a right to wear visible union t-shirts *under* their uniform shirts. In *Stabilus,* "one acceptable style of company shirt buttoned completely down the front and [the employer] permitted employees to wear it unbuttoned with T-shirts underneath displaying various messages." *Stabilus,* 355 NLRB at 837. This was one of the reasons why the Board held that the employer's uniform policy did not justify its directive that employees remove their union t-shirts. Of course, the uniform issue is not presented here because Tesla did not require workers to wear a particular uniform.

The Supreme Court has recognized that when it comes to balancing the interests of employers against the Section 7 rights of workers, "[i]t is not surprising or unnatural that [an employer's] assessment of the need for a particular practice might overcompensate its goals, and give too little weight to employee organizational interests," and thus, the Board must "strik[e] that balance to effectuate national labor policy." *Beth Israel Hospital v. NLRB,* 437 U.S. 483,

22-60493.6446

501 (1978). If the Board shirks its responsibility to engage in this balancing, the inevitable result is that employers will give insufficient weight to workers' Section 7 rights. Thus, if an employer tries to use its dress code to interfere with the right to wear union insignia, the Board must step in to determine whether special circumstances justify the restriction.

## C. There Are Good Reasons Why the Board Has Consistently Held That Allowing Workers to Wear Some Form of Union Insignia is Not a Defense to a Prohibition on Other Forms of Union Insignia.

Since Section 7 rights belong to workers, it should generally be up to the worker to decide which of those rights to exercise when. The corresponding principle is that when an employer infringes on workers' Section 7 rights, it is no defense that the employer allows other forms of Section 7 activity. For instance, an employer that prohibits workers from distributing union leaflets in non-work areas commits an unfair labor practice even if allows workers to talk about the union in those same areas. Section 7 is not a menu from which employers can pick and choose.

The Board has long applied this same principle to union insignia. For example, in *Malta Construction Co.,* 276 NLRB 1494 (1985) and *Northeast Industrial Service Co.,* 320 NLRB 977 (1996), the Board held that the employers violated the Act when they prohibited workers from wearing union stickers on company-issued hard hats even though in both cases the employers allowed workers to wear other forms of union insignia. Similarly, in *Holladay Park Hospital,* 262 NLRB 278 (1978), the Board held that an employer committed an unfair labor practice when it barred employees from wearing yellow ribbons to show support for the union during contract negotiations. The Board noted that it was "irrelevant" that the employer had permitted workers to wear another union insignia. *Id.* at 279.

6

Allowing workers to wear union stickers or even hats is not the equivalent of allowing workers to wear union t-shirts.  Stickers worn on soft surfaces like t-shirts must be constantly replaced, whereas a t-shirt can be washed and worn hundreds of times.  And while hats can be worn repeatedly, not everyone is comfortable wearing a hat at work.  Many people still consider wearing a hat indoors a breach of etiquette,[2] or have difficulty finding a hat that fits comfortably, or are reluctant to wear hats for fear of developing the dreaded "hat hair."[3]  Again, it is not for the Employer to decide which forms of Section 7 expression are permitted or prohibited.

In this case, the Board should find that Tesla violated the Act by prohibiting the GA workers from wearing UAW t-shirts even if it allowed some workers to wear union stickers and hats.  It need not, and indeed cannot, go further.

## D.    Where an Employer Bans a Particular Form of Union Insignia, Workers Will Not Implicitly Understand That All Other Forms of Union Insignia Are Acceptable.

Since Tesla has not established special circumstances that would justify prohibiting workers from wearing UAW t-shirts, the Board should not reach the issue of how to handle cases where an employer *does* establish special circumstances to bar a particular article of union insignia or attire.  If the Board nonetheless reaches that issue, even though it is not presented, the Board should hold that if an employer directs employees to remove union insignia or attire, but the employer does not intend to ban all union insignia and attire, the employer should say so.

Here, the employer is arguing that because it allowed some workers to wear union stickers, any employee who was told to remove his union t-shirt would have known that it was acceptable to wear a union sticker or hat in its place.  But, at least one supervisor told workers

---

[2] *See, e.g.,* https://emilypost.com/advice/hats-off-hat-etiquette-for-everyone
[3] *See, e.g.,* Stephen J. Praetorius, "How to Get Rid of Hat Hair, Fast," GQ (Oct. 8, 2015), https://www.gq.com/story/how-to-get-rid-of-hat-hair

22-60493.6448

that they were not allowed to distribute union stickers, ALJD at 26, and the Employer has not pointed to any evidence in the record that employees who were told to remove union t-shirts knew they could substitute union stickers or hats. There is no reason to *assume* that workers who were ordered to remove their union t-shirts would confidently conclude they could wear union hats. In fact, the opposite is likely true. Since the only thing different about the UAW t-shirts was the union insignia, it would be logical for workers to assume that the union insignia itself was the problem.

When a worker hears that his co-worker was sent home for wearing a union t-shirt, he might reasonably be reluctant to try his luck by donning a union hat. Even if a worker notices that some co-workers have worn union hats, the worker cannot be expected to know that she would not be disciplined for wearing a union hat. When an employer does not discipline a worker for wearing a union hat or sticker, the non-discipline often fails to send a clear message because (1) the supervisor may not have noticed the union insignia; (2) rules are often enforced selectively; and (3) discipline is rarely meted out in public, so co-workers may not know whether a fellow employee was disciplined. It is true that in some cases where a brave worker wears union insignia every day, co-workers at some point may conclude that they too will be allowed to wear union insignia, but Section 7 rights should not depend on one worker's bravery, and there is no justification for requiring workers to run that kind of risk. There is also no legitimate reason why an employer should not provide the needed guidance as to what *is* allowed.

Requiring employers to be clear about their rules serves another purpose as well in that it avoids unnecessary litigation. Prior Board cases show that banning one type of union insignia while only "implicitly" allowing others leads to confusion. In *World Color (USA) Corp.,* 360 NLRB 227 (2014), the Board found that the employer violated the Act by prohibiting workers

22-60493.6449

from wearing baseball caps "bearing union insignia." When the case got to the D.C. Circuit, the employer argued that there was no such prohibition, and employees were free to wear attachments with union insignia on their caps. *World Color (USA) Corp. v. NLRB,* 776 F.3d 17, 20 (D.C. Cir. 2015). It is possible that the entire case would have been avoided if only the employer had expressly told workers that they were free to wear union buttons on their hats.

If an employer has a legitimate reason to ban on a particular type of union insignia, the employer ought to notify employees what other forms of union insignia are be allowed. Otherwise, the employer will have no one to blame but itself if the Board finds that the employer's ban on union insignia was overbroad.

## CONCLUSION

Since the issue raised in the invitation for briefs is not presented in this case, the Board should not reach it. If the Board nonetheless does reach the issue, it should reaffirm *Stabilus,* clarify the difference between dress codes and uniform requirements, and further hold that when an employer bans a particular form of union insignia, workers cannot be expected to "implicitly" understand what other forms of union insignia are allowed.

Dated: March 22, 2021                     Respectfully submitted,


                                          /s/ _____
                                          Nicole G. Berner
                                          General Counsel
                                          Johnda Bentley
                                          Claire Prestel
                                          Associate General Counsels
                                          Service Employees Int'l Union
                                          1800 Massachusetts Ave., NW
                                          Washington, DC 20036

22-60493.6450

Andrew L. Strom
Associate General Counsel
SEIU Local 32BJ
25 West 18th Street
New York, NY 10011

22-60493.6451

## CERTIFICATE OF SERVICE

I, Nicole Berner, hereby certify that the true and correct copy of the foregoing Amicus

Brief in Case No. 32-CA-197020 et al. was e-filed with the NLRB's Executive Secretary and

served via e-mail on the following parties or counsel this 22nd day of March 2021:

Catherine Ventola
Christy Kwon
National Labor Relations Board, Region 32
1301 Clay Street, Ste. 300
Oakland, CA 94612-5224
Via E-mail: catherine.ventola@nlrb.gov
Via E-mail: christy.kwon@nlrb.gov

Via Email: kmorris@sheppardmullin.com
Margo Feinberg
Daniel Curry
Schwartz, Steinsapir, Dohrmann & Sommers LLP
6300 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90048-5268
Via Email: margo@ssdslaw.com
Via Email: dec@ssdslaw.com

Mark Ross
Keahn Morris
Sheppard Mullin Richter & Hampton LLP
4 Embarcadero Center, 17th Fl
San Francisco, CA 94111
Via Email: mross@sheppardmullin.com
Via Email: kmorris@sheppardmullin.com

/s/ Nicole Berner
Nicole G. Berner
Counsel to Service Employees International Union

22-60493.6452

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| **TESLA, INC.** | |
| **and** | |
| **MICHAEL SANCHEZ, an Individual** | Case No. 32-CA-197020 |
| **and** | |
| **JONATHAN GALESCU, an Individual** | Case No. 32-CA-197058 |
| **and** | |
| **RICHARD ORTIZ, an Individual** | Case No. 32-CA-197091 |
| **and** | |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, AFL-CIO** | Case No. 32-CA-197197<br>Case No. 32-CA-200530<br>Case No. 32-CA-208614<br>Case No. 32-CA-210879 |

## RESPONDENT TESLA, INC.'S BRIEF IN RESPONSE TO THE BOARD'S FEBRUARY 12, 2021 INVITATION TO FILE BRIEFS CONCERNING UNIFORM POLICIES

Mark S. Ross
mross@sheppardmullin.com
Keahn N. Morris
kmorris@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA  94111
Telephone:   (415) 434-9100

*Attorneys for Tesla, Inc.*

SMRH:4823-3894-5762

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

I.    INTRODUCTION AND EXECUTIVE SUMMARY OF POSITION ..............................1

II.   STATEMENT OF MATERIAL FACTS ..............................................................3

III.  LEGAL ANALYSIS..............................................................................................8

    A.    *STABILUS* (AND *REPUBLIC AVIATION*) DO NOT PROVIDE THE APPROPRIATE STANDARD TO BE APPLIED TO MERE MAINTENANCE UNIFORM POLICY CASES ....................................................8

        1.    Because it is mere *obiter dictum*, the text cited from *Stabilus* should not be accorded precedential status.................................................9

        2.    Stabilus was not a mere maintenance case and it has never successfully been applied in mere maintenance cases.............................11

        3.    The special circumstances test has no application to facially neutral policies that are not discriminatorily applied to prohibit NLRA-protected conduct. ....................................................................................12

    B.    *BOEING* PRESENTS THE APPROPRIATE TEST FOR DETERMINING THE LAWFULNESS IN MERE MAINTENANCE CASES INVOLVING FACIALLY NEUTRAL UNIFORM POLICIES ............16

22-60493.6454

# <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

<u>Cases</u>

*Albis Plastics & United Steelworkers of Am., Dist. #12, Afl-Cio, Clc*
    335 NLRB 923 (2001) ...................................................................................................13

*In Re Bell-Atl. Pennsylvania, Inc.*
    339 NLRB 1084 (2003) ...............................................................................................10

*Casa San Miguel*
    320 NLRB 534 (1995) .................................................................................................10

*Central Green Co. v. United States*
    531 U.S. 425, 121 S.Ct. 1005 (2000) ...........................................................................9

*Healthbridge Mgmt.*
    360 NLRB No. 118, slip op. (2014),
    enforced, 798 F.3d 1059 (D.C. Cir. 2015) ...............................................................13

*Humphrey's Executor v. United States*
    295 U.S. 602 (1935) .....................................................................................................9

*Komatsu America Corp.*
    342 NLRB 649 (2004) .................................................................................................13

*Lutheran Heritage*
    343 NLRB 646 (2004) .................................................................................................14

*Mack's Supermarkets*
    288 NLRB 1082 (1988) ...............................................................................................13

*Noah's New York Bagels*
    324 NLRB 266 (1997) .................................................................................................10

*Pathmark Stores, Inc.*
    342 NLRB 378 (2004) .................................................................................................10

*Pay'n Save Corp.*
    247 NLRB 1346 (1980),
    enforced, 641 F.2d 697 (9th Cir. 1981) ...................................................................13

*Republic Aviation Corp. v. NLRB*
    324 U.S. 793 (1945) .......................................................................................... *passim*

*Stabilus, Inc.*
    355 NLRB 836 (2010) ...................................................................................... *passim*

22-60493.6455

*The Boeing Company*
    365 NLRB No. 154 (2017) ................................................................................. *passim*

*U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*
    513 U.S. 18 (1994)...........................................................................................9

*W San Diego*
    348 NLRB 372 (2006) ....................................................................................13

*Wal-Mart Stores, Inc.*
    368 NLRB No. 146 (2019) ..................................................................12, 16, 18

*World Color*
    369 NLRB No. 104 (2020) ...............................................................................15

*World Color (USA) Corp. v. NLRB*
    776 F.3d 17 (D.C. Cir. 2015) ..................................................................14, 15, 18

## I.   INTRODUCTION AND EXECUTIVE SUMMARY OF POSITION

Respondent Tesla Inc.'s[1] General Assembly Team Wear Policy[2] is a facially neutral rule mandating that employees assigned to Tesla's General Assembly Department[3] wear a department-specific, chamois-like and abrasion resistant uniform commonly referred to as Team Wear. The question presented here is whether Tesla's mere maintenance of its facially neutral Team Wear policy violates Section 8(a)(1).[4]

Employer-provided and approved, Team Wear is specially designed to reduce the risk of freshly painted automobile bodies and new car interiors being damaged during the assembly process. Team Wear's distinctive appearance also distinguishes GA employees from non-GA employees who happen to be in the GA area, thereby enabling GA managers to visually manage their workers from afar, across the length and breadth of the GA line.

Nothing in the Policy's text suggests that it is directed at the wearing of union-branded apparel or that it bans the display of union insignias. To the contrary and despite the Policy's uniform mandate, GA employees are permitted to wear hats as well as to accessorize their Team Wear by placing flat, non-abrasive adhesive stickers bearing union insignias on their uniforms. Employees assigned to non-GA positions commonly wear all sorts of union-tagged apparel and stickers in and around the workplace without interference or objection from Tesla. Further, there is no evidence or allegation that Tesla's Team Wear Policy was put in place in response to union organizing or for the purpose of chilling unionism. Nor is there any credited evidence that the Team Wear Policy has been applied in a disparate fashion, singling out the wearing of union apparel or insignias for prohibition[5].

---

1 Respondent is hereinafter referred to as "Tesla" or "the Employer."

2 Tesla's General Assembly Team Wear Policy is hereinafter referred to as "the Team Wear Policy" or "the Policy."

3 Tesla's General Assembly Department is hereinafter referred to as "GA Department."

4 Cases presenting the issue of whether the maintenance of a given facially neutral policy or rule violates Section 8(a)(1) are hereinafter referred to as "mere maintenance cases".

5 Based on her credibility resolutions, the Administrative Law Judge ("ALJ") found that the General Counsel ("GC") failed to prove that Tesla applied its Team Wear Policy in a

Based on these facts, Tesla excepted to the Administrative Law Judge's misapplication of the allocation of proof and the special circumstances test found in *Republic Aviation*[6] and her finding that the mere maintenance of the Team Wear Policy violated Section 8(a)(1)[7]. Tesla asserts instead, that the Board's *Boeing*[8] decision should be applied to determine this mere maintenance issue: that the Board should reverse the ALJ's finding of the Policy's facial unlawfulness and find that the mere maintenance of Tesla's facially neutral Team Wear Policy does not interfere with Section 7 rights in violation Section 8(a)(1) of the Act.

On February 12, 2021, the Board issued an order *sua sponte*, inviting the parties and interested amici to file briefs ("Invitation") addressing the following legal questions.

1.     Does *Stabilus*[9] specify the correct standard to apply when an employer maintains and consistently enforces a nondiscriminatory uniform policy that implicitly allows employees to wear union insignia (buttons, pins, stickers, etc.) on their uniforms?

2.     If *Stabilus* does not specify the correct standard to apply in those circumstances, what standard should the Board apply?

This brief is Tesla's initial response to the Board's Invitation.

---

discriminatory fashion in response to union activity and recommended that GC's allegations to that effect be dismissed. The GC did not except to this finding or to the ALJ's recommended dismissal of this claim. Accordingly, the ALJ's finding of "no discriminatory enforcement" and "recommended dismissal" are now final. Nor did the GC ever allege or present evidence that Tesla's Team Wear Policy was promulgated in response to union or other NLRA-protected activity.

[6] *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945) ("*Republic Aviation*").

[7] References to the ALJ's findings and conclusions are made to by use of the notation, "ALJD", followed by the designation of a page and line from the ALJD containing said finding and conclusion. References to the Tesla's Exceptions to the ALJ's findings and conclusions are made to by use of the notation, "Resp. Excep." followed by the number of said exception(s).

[8] *The Boeing Company*, 365 NLRB No. 154 (2017) ("*Boeing*").

[9] *Stabilus, Inc.,* 355 NLRB 836, 838 (2010) ("*Stabilus*").

22-60493.6458

The "special circumstances" test found in *Republic Aviation* and upon which the *Stabilus* is based, does *not* provide the correct standard to apply in this case.  The *Stabilus* text cited by the Board in its Invitation is mere *obiter dictum* and thus, not to be accorded precedential effect. It also gives no weight to the legitimate interests that employers have for maintaining facially neutral uniform policies, allowing employees to totally disregard such policies, their employer's legitimate business interests notwithstanding.  Moreover, insofar as *Stabilus* derives from *Republic Aviation's* "special circumstances" test, neither *Stabilus* nor *Republic Aviation* should be applied here because Tesla's facially neutral Team Wear Policy neither explicitly bans NLRA-protected conduct nor has it been applied in a discriminatory fashion to single out the wearing of union apparel or insignias for adverse treatment (unlike the employers in *Republic Aviation* and *Stabilus*).  Accordingly, and contrary to the ALJ, the Team Wear Policy is not presumptively unlawful on its face and Tesla did not need to satisfy the "special circumstances" under *Republic Aviation*.  Rather, as a facially neutral rule, the Team Wear Policy is presumptively lawful, having little to no impact on Section 7 rights.  Accordingly, Tesla is under no obligation to prove the existence of "special circumstances" in order to maintain this rule.  Its mere maintenance of its Team Wear Policy should be adjudged and ultimately declared lawful pursuant to the *Boeing* standard.

## II.    STATEMENT OF MATERIAL FACTS

Tesla designs and produces electric automobiles at its Fremont, California facility. (ALJD 3:10-15)  There, it manufactures most of the components and parts that go into the making of a Tesla automobile, fabricates Tesla auto bodies in its Body in White Department and then paints the fabricated car bodies in its Paint Department.  (ALJD 6:30-40)

From the Paint Department, freshly painted but uncured auto bodies proceed to the GA Department where they move down several assembly lines by means of a complicated conveyor through/past various GA workstations and where GA employees "assemble" cars by physically installing parts on and in the auto bodies.  Assembly compels GA employees to make physical

contact with these auto bodies as they move down the assembly line. (ALJD 7:30-8:5; Tr. 1347:8-1348:8, 1351:19-1352:12, 1353:12-24, 1354:16-23, 1355:2-15, 1356:10-1357:19, 1358:1-13, 1358:17-1359:18, 1363:23-1365:9) The assembly process converts what begins as an empty auto body into a finished car that is ready for customer delivery. Only approximately 1,000-3,000 of Fremont's 12,000 employees are assigned to the GA Department and perform this assembly function (depending on time period).[10] (ALJD 4:18-19, 7:5-7; Tr. 191, 1115:18-23; 1116; 1346:3-17)

The remainder of the Fremont workforce is assigned to other departments to perform non-GA functions ("non-GA employees"). From time to time, non-GA workers have occasion to be in the GA Department. However, they do not perform assembly work and, unlike GA employees, they have no reason or opportunity to come into physical contact with the auto bodies moving down the GA line. (Tr. 1342:22-1343:8, 1378:12-1379:7, 1408:12-24)

Autos that emerge from the GA line are expected to be ready for transport to the market and customer delivery. So they must be defect free and in factory-perfect condition. Cars that come out of GA with defects and dings are not delivery ready; they must be repaired and reworked into factory-perfect condition. Such rework is not only time and cost inefficient, but it delays a car's sale and delivery to a Tesla customer. Accordingly, Tesla goes to great lengths to minimize the risks of damage and dings to car bodies and interiors during the assembly

---

[10] The GA department is relatively small compared to the overall facility. The GA employees work in a confined space of approximately 500 yards in length compared to the rest of the five million square foot facility. (ALJD 4:18-19, 7:5-7; Tr. 191, 1116) Within GA though, the manufacturing process is extremely complicated and physically complex, with an extensive meandering conveyor system, overhead carriers, and giant robots. (Tr. 1346:25-1347:7, 1357:10-13, 1351:16-1352:1, 1353:12-14, 1354:3-15, 1355:3-6, 1356:2-9, 1356:20-24, 1357:25-1358:4, 1358:17-1359:9)

22-60493.6460

process.[11]  (Tr. 1346:25-1347:7, 1357:10-13, 1351:16-1352:1, 1353:12-14, 1354:3-15, 1355:3-6, 1356:2-9, 1356:20-24, 1357:25-1358:4, 1358:17-1359:9)

The physical contact that GA employees must have with a car's exterior and interior surfaces heightens the risk that a car will be inadvertently damaged or mutilated during the GA process.  (Tr. 1347:8-1348:8, 1351:19-1352:12, 1353:12-24, 1354:16-23, 1355:2-15, 1356:10-1357:19, 1358:1-13, 1358:17-1359:18, 1363:23-1365:9)  Accordingly, Tesla's GA Team Wear Policy requiring all GA employees to receive and wear a Tesla-provided GA Department uniform is integral to the other efforts made to prevent such assembly-related mutilation.  (ALJD 7:12-15; Tr. 1369:13-1370:20, 1373:5-8)  Consisting of a department-distinctive shirt and trouser set made from smooth, soft and non-abrasive cotton fabric, the uniform is devoid of any zippers, buttons or other hard or sharp objects that may damage a car.  (ALJD 7:12-15; Tr. 1369:13-1370:20, 1373:5-8)  The mandatory wearing of this chamois-like clothing on the GA line mitigates the risk of assembly-related mutilation.  (Tr. 1347:8-1348:8, 1351:19-1352:12, 1353:12-24, 1354:16-23, 1355:2-15, 1356:10-1357:19, 1358:1-13, 1358:17-1359:18, 1363:23-1365:9, 1369:13-1370:20, 1372:5-1373:4, 1373:5-8, 2398:24-2399:5, 2545:10-15, 2524:13-2525:1)

Additionally, because Team Wear is GA Department-distinctive in appearance as well as color coded, it visually distinguishes GA employees from non-GA employees who are in and

---

[11] For example, Tesla's assembly robots and conveyor system are specially designed to mitigate mutilation risks.  (Tr. 1375:3-1376:12, 1377:11-1378:11) Likewise, one of the very first things done after a freshly painted car body reaches GA, is the placement of protective covers over areas that have the highest risk of mutilation during assembly.  (Tr. 1655:8-1656:2)  These covered areas include doors and fenders.  Further, in order to work on painted doors with minimal risk of damage, doors are separated from their car bodies, transported down a separate door line for assembly and, then, later re-mated with their body on the Final line at the end of the GA process.  (Tr. 1363:24-1364:22)

around the GA Department area performing non-GA work. It also visually distinguishes duties/roles within the GA department (black, red, and white for production associates, team leads, and quality inspectors).  (ALJD 7:16-20; Tr. 392:14-16, 1369:13-1370:20, 1372:12-17, 1372:24-1373:1, 2398:24-2399:5, 2545:10-15, 2524:13-2525:1)  Team Wear's GA department-distinctive appearance allows GA managers to more easily survey their respective areas of responsibility at a glance by visually separating GA employees from non-GA employees in order to effectively and safely manage those they supervise.  (ALJD 7:16-20; Tr. 1372:12-17, 1372:24-1373:1, 1375:3-1376:12, 1377:11-1378:11, 1596:14-19, 1673:-1674:5)

Based on these dual business concerns, Tesla has long maintained a practice of calling on all GA employees to wear Team Wear.  In mid-Summer 2016, Tesla published a document known as "General Assembly Expectations" containing a section entitled Mutilation Protection.[12]  (Tr. 1379:11-21; R-17)  This section codified the requirement that GA employees wear Team Wear.  (1379:11-21; R-17)  These Expectations and the Mutilation Protection Section contained therein applied only to GA.  (ALJD 40:24-35; Tr. 1369:13-1370:5, 1379:11-21; R-17)  The Mutilation Protection Section reads, in relevant part, as follows:

**Mutilation Protection**

- Mutilation protection must be worn at all time (no exposed belt buckles, rings, watches, metal rivets on pants, no metal exposed).

- Badges must be worn closer to the back side of your hip with the badge itself tucked into your back pocket (if you do not have a back pocket, do not wear it while you work).

- Aprons cannot contain metal objects that can potentially mutilate cars (pens, metal tools).

- When working inside the vehicle, yoga mats must be used.

---

[12] Tesla's 2016 General Assembly Expectations is hereinafter referred to as "2016 Expectations."

22-60493.6462

-      Team wear is mandatory for all team members and leads.

(R-17)

On its face, the 2016 GA Expectation's Mutilation Protection Section makes no mention of the wearing of union apparel or insignias, much less singles out such activity for prohibition or restriction. Nor is there any allegation or proof that the section was issued in response to Union or NLRA protected activity, for the purpose of chilling organizing, or with the intent to interfere with the wearing or display of union logos or messages.

In 2017, Tesla released a new version of its General Assembly Expectations in order to achieve *inter alia*, "improve[d] quality" and to "cultivate a productive environment."[13]  (Tr. 1386:14-1388:1)  Like the 2016 Expectations, the 2017 Expectations applied only to GA employees, reminding them that they were expected to wear Team Wear when working on the GA line. The 2017 Expectations provide, in pertinent part, as follows:

> **Team Wear**: It is mandatory that all Production Associates and Leads wear assigned team wear.
>
> -      On occasion, team wear may be substituted with all black clothing if approved by supervisor (sic).
>
> -      Alternative clothing must be mutilation free, work appropriate and pose no safety risk (no zippers, yoga pants, hoodies with hood up, etc.)

(GC 37-01)

It is this facially neutral 2017 Team Wear text, reaffirming the GA Department's uniform requirements, that is the subject of this dispute. However, as in the case of its policy predecessor, the 2017 Expectations do not explicitly restrict NLRA-protected activity. Nor is there any allegation or evidence that this policy statement was issued in response to union or other protected, concerted activity. Quite to the contrary, Tesla's employees did not construe the Team Wear Policy to be a ban on the wearing of union insignia as evidenced by the many instances of GA employees wearing hats with union insignia as well as accessorizing their Team

---

[13] Tesla's 2017 General Assembly Expectations is hereinafter referred to as "2017 Expectations."

Wear by placing flat, non-abrasive adhesive stickers bearing union insignias on their uniforms. (Tr. 204:14-205:2, 209:11-210:6, 260:12-15, 307:22-24, 308:21-23, 333:23-334:3, 759:12-13, 1388:16-1389:10, 1636:5-1637:6, 2408:18-2409:2, 2535:18-2536:7)  Further, employees assigned to non-GA positions commonly wear all sorts of union tagged apparel and stickers in and around the workplace without interference or objection from Tesla.  (ALJD 25:35-26:5, 26:45-47, 40:10-46:19; Tr. 49:8-15, 204:14-205:2, 209:11-210:6, 223:16-19, 244:1-6, 260:12-15, 267:23-268:3, 296;15-24, 307:22-308:2, 308:21-23, 310:3-17, 333:23-334:3, 352:23-353:9, 368:11-18, 369:13-370:7, 388:9-389:6, 704:5-16, 759:12-13, 842:2-15, 1068:5-1069:18, 1071:2-4, 1072:9-20, 1388:16-1389:10, 1636:5-1637:6, 2139:8-2140:4, 2144:19-21, 2408:18-2409:2, 2535:18-2536:7)  Finally, there is no credited evidence that the Policy was applied in a disparate or discriminatory fashion in order to ban such protected conduct.  Thus, the sole question presented for the Board's decision here is whether Tesla's mere maintenance of this facially neutral policy violates Section 8(a)(1).

## III.    LEGAL ANALYSIS

### A.    *STABILUS* (AND *REPUBLIC AVIATION*) DO NOT PROVIDE THE APPROPRIATE STANDARD TO BE APPLIED TO MERE MAINTENANCE UNIFORM POLICY CASES

Unlike Tesla, the employer in *Stabilus* discriminatorily applied its uniform policy to single out and ban the wearing of union T-shirts during an election, asserting that its uniform policy constituted a "special circumstance" that authorized disparate enforcement.  Noting that an employee's right to wear union insignia at work is protected by Section 7, the ALJ declared the Stabilus' uniform policy "presumptively invalid" *because of the employer's discriminatory interpretation and enforcement* of the policy and found that Stabilus had demonstrated no special circumstances to justify its *discriminatory restriction* on the wearing of union T-shirts.

On exceptions and in ultimate agreement with the ALJ, but for different reasons, the Board affirmed the ALJ's finding that the employer violated Section 8(a)(1) by discriminatorily prohibiting employees from wearing union T-shirts.  However, it specifically carved out the

22-60493.6464

judge's conclusion that [Stabilus] failed to make the required showing that special circumstances justified the application of its uniform policy under the facts of this case because "we find that, even if [Stabilus] had made the required showing, its actions here would have violated the Act for two independent reasons."[14]  *Stabilus* at 837.

Despite that express carve out, though unnecessary to their ultimate decision-making in the case and without any reference to any supporting Board case authority, Members Liebman and Becker mentioned in passing that "an employer cannot avoid the "special circumstances" test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia." *Stabilus* at 838.  The Board's February 12 Invitation cites this text and asks whether this categorical *dictum* should be applied as the test to determine whether the mere maintenance of Tesla's facially neutral Team Wear Policy violates Section 8(a)(1).  For the reasons that follow, the answer to that question is a resounding "no."

> ### 1.    Because it is mere *obiter dictum*, the text cited from *Stabilus* should not be accorded precedential status.

The Supreme Court has defined *dictum* as any discussion in an opinion that is non-essential to the disposition of the actual issue being decided.  *Central Green Co. v. United States*, 531 U.S. 425, 431, 121 S.Ct. 1005 (2000); *see also U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, 23 (1994)..  Thus, anything that is said in passing in a decision or a judicial comment that is unnecessary to the decision in a case is non-precedential and need not be

---

[14] The two independent reasons the *Stabilus* Board held the employer's conduct to be in violation of Section 8(a)(1) were: (1) the employer impinged on employee Section 7 rights because its agents went beyond enforcing the employer's uniform policy by requiring union supporters to remove union T-shirts and other displays of support for the union that could have been worn consistent with the policy; and (2) the employer acted unlawfully by disparately enforcing the policy against statutorily protected activity while not enforcing it against other similar activities under similar circumstances.

followed in subsequent cases. *Humphrey's Executor v. United States,* 295 U.S. 602, 627 (1935) (dicta "may be followed if sufficiently persuasive" but are not binding).

The *Stabilus* text cited by the Board in its Invitation need not be followed by the Board because the *Stabilus* Board plainly stated that it was neither addressing nor deciding the case based on the issue of special circumstances, and because the Board decision focused instead on the fact that the employer applied its uniform policy in a discriminatory and excessive manner that singled out the wearing of union T-shirts for prohibition in violation of Section 8(a)(1). Thus, the comments made by Members Liebman and Becker as to whether and when an employer can rely upon its uniform policy to avoid (or satisfy) the "special circumstances" test were nonessential to the grounds upon which the Board actually decided *Stabilus*. This renders those gratuitous, nonessential remarks pure *dicta* which should be disregarded as nonbinding precedent and not relied upon for the purpose of giving rise to a legal standard to be applied here.

The *Stabilus dicta* should also be disregarded here because those nonessential passing comments paint with too broad a brush; they are couched terms that are one-sided, far too absolute, and categorical. Further, the comments are outdated  and are out of sync with modern Board law that validates facially neutral employment policies and strikes an appropriate balance between employee and managerial rights. Indeed, requiring job-specific uniforms as a condition of employment is a fundamental managerial right that simply cannot be ignored. Contrary to the *Stabilus dicta*, the Board has long recognized many compelling business reasons that support the existence of and consistent enforcement of such facially neutral policies. Further, it has consistently sanctioned the nondiscriminatory enforcement of these policies, an employee's right to wear union apparel or union insignias notwithstanding. *Noah's New York Bagels*, 324 NLRB 266, 275 (1997); *Casa San Miguel*, 320 NLRB 534 (1995); *Pathmark Stores, Inc.*, 342 NLRB 378, 379 (2004) (holding that a grocery store could, because of its "legitimate interest in protecting its customer relationship," lawfully prohibit its employees from wearing clothing displaying the message, "Don't Cheat About the Meat!" in protest of the store's use of prepackaged meat products); *In Re Bell-Atl. Pennsylvania, Inc.*, 339 NLRB 1084, 1085 (2003)

(deferring to the arbitration award and concluding the employer had established a legitimate interest in maintaining and protecting its image and reputation, thereby justifying the enforcement of appearance standards for employees performing their work tasks in public during working time).

A plain reading of the *Stabilus* dicta and its application to the facts of this case, run counter to this Board precedent. It also leaves no room for the compelling business concerns that animate the promulgation and maintenance of facially neutral uniform policies like Tesla's Team Wear Policy by erroneously and automatically elevating the right to wear union insignia under almost *all* circumstances over almost *all* legitimate management concerns that justify a uniform policy. It ignores that an appropriate and non-discriminatory ban of all non-compliant, non-uniform work wear from a particular workplace may counterbalance and even outweigh the right to wear union insignia. Taken to its logical extreme, an application of the *Stabilus dicta* to Tesla's mere maintenance of its GA Team Wear Policy would completely submerge Tesla's right to promulgate and enforce its reasonable workplace apparel rules, rules promoting the assembly of damage-free cars and facilitating visual management of GA employees' safety. Accordingly, the *Stabilus dicta* should not be applied as the standard for determining whether the mere maintenance of Tesla's Team Wear Policy violates Section 8(a)(1).

## 2.    Stabilus was not a mere maintenance case and it has never successfully been applied in mere maintenance cases

Assuming, *arguendo*, that the *Stabilus* text cited by the Board in its invitation is good Board law, it still does not apply here. *Stabilus* was not a mere maintenance case; rather it was a case involving the discriminatory and undue enforcement of a uniform policy that singled out the wearing of union apparel for prohibition. Here, that is simply untrue. Indeed, even though the GC alleged discriminatory enforcement of the Team Wear Policy, the ALJ rejected and recommended the dismissal of that claim, discrediting all of GC's witnesses on this issue and finding that the GC failed to sustain the burden of proving such discriminatory enforcement. Accordingly, this case presents none of the facts and issues appearing in *Stabilus*. To the

-11-

contrary, the only issue here is one never addressed by *Stabilus*: whether the mere maintenance of the employer's facially neutral uniform policy violates Section 8(a)(1).

*Stabilus* plainly never addressed the issue of mere maintenance. Indeed, a review of the decisions issued to date citing *Stabilus* reveals that that the so-called *Stabilus* test has never been applied by the Board to decide a mere maintenance case, much less to invalidate a facially neutral uniform policy, absent proof of the policies' discriminatory enforcement. To the contrary, in *Wal-Mart Stores, Inc.*, 368 NLRB No. 146 (2019), the Board recently overturned an ALJ's finding that an employer's mere maintenance of a policy regulating the wearing of logos and/or graphics to be a 8(a)(1) violation based on *Stabilus*. Indeed, the ALJ in *Wal-Mart* cited *Stabilus* four times to support the judge's erroneous conclusion that Wal-Mart's neutral uniform policy was unlawful, a finding that the *Wal-Mart* Board majority expressly rejected. Rather, the Board concluded that the appropriate analytical framework for determining the lawfulness of an employer's facially neutral logo or apparel graphics policies was the Board's test for facially neutral employer policies set forth in *Boeing*. *Wal-Mart's sub silentio* rejection of *Stabilus* as the legal standard in *Wal-Mart* is proof that *Stabilus* has no application in mere maintenance cases and that it should not be used to test the facial validity of Tesla's Team Wear Policy.

> **3.     The special circumstances test has no application to facially neutral policies that are not discriminatorily applied to prohibit NLRA-protected conduct.**

Since *Stabilus* is grounded on *Republic Aviation*, a showing that *Republic Aviation* and its "special circumstances" test are inapposite to mere maintenance cases disqualifies *Stabilus* as the test to be applied here. In *Republic Aviation*, the Court affirmed a Board decision in which an employer was found to violate Section 8(a)(1) by its promulgation of a facially overbroad "no solicitation" policy thwarting workers from wearing union shop steward buttons on the employer's premises. In its famous and much cited footnote 10, the *Republic Aviation* Court laid down an order and allocation of proof to be applied in rule cases:

> "The Act . . . does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time. Work time

is for work.  It is therefore within the province of an employer to promulgate and enforce a rule prohibiting union solicitation during working hours.  Such a rule is presumed to be valid in the absence of evidence that it was adopted for a discriminatory purpose.  It is no less true that time outside working hours, . . . is an employee's time to use as he wishes . . . without unreasonable restraint.  It is therefore not within the province of an employer to promulgate and enforce a rule prohibiting union solicitation by an employee outside of working hours . . . Such a rule must be presumed to be an unreasonable impediment to self-organization, and therefore discriminatory in the absence of evidence that special circumstances make the rule necessary in order to maintain production or discipline.

Read together, *Republic Aviation's* facts and its footnote 10 teach that an employer violates the Act when it promulgates a policy that *explicitly* bans NLRA-protected-activity like the wearing of union apparel and/or, as in the case of *Stabilus*, it *disparately enforces a policy to single out protected activity for prohibition* because the explicit policy exists and/or is enforced for a purpose of impinging on such protected conduct.[15]  Because of its discriminatory intent, *Republic Aviation* declares such discriminatory conduct to be presumptively unlawful unless proven necessary to advancement of an overriding managerial concern.

On the other hand, *Republic Aviation* also teaches that an employment policy like Tesla's Team Wear Policy that is neither explicitly aimed at NLRA protected-activity nor disparately

---

[15] *Republic Aviation's* special circumstances test has been applied to explicit rules banning Section 7 conduct.  *Komatsu America Corp.*, 342 NLRB 649, 650 (2004) (finding employer did not violate the Act by banning offensive t-shirts that compared its outsourcing to the Japanese attack on Pearl Harbor because the ban was necessary to maintain a harmonious workplace); *Mack's Supermarkets*, 288 NLRB 1082, 1098 (1988); *Healthbridge Mgmt.*, 360 NLRB No. 118, slip op. at 2 (2014), enforced, 798 F.3d 1059 (D.C. Cir. 2015).  Likewise, it has been applied in cases in which an employer interpreted and applied its policies to prohibit workers from engaging in Section 7 conduct.  *W San Diego*, 348 NLRB 372, 375 (2006) (employer presented health and safety special circumstances and lawfully banned wearing union stickers in hotel kitchen pursuant to attire policy where employer observed stickers peeling from employees' clothing after only a short while, thus presenting health and safety risk of falling into and contaminating food); *Albis Plastics & United Steelworkers of Am., Dist. #12, Afl-Cio, Clc*, 335 NLRB 923 (2001) (holding that special circumstances justified the employer's ban on union stickers on employees' bump caps/safety helmets); *Pay'n Save Corp.*, 247 NLRB 1346 (1980), enforced, 641 F.2d 697, 701–02 (9th Cir. 1981) (finding substantial evidence to support the NLRB's finding that Pay'n Save violated Section 8(a)(1) of the Act by disparately applying a rule against wearing political or controversial buttons, including union buttons).  However, the special circumstances test has never been applied to mere maintenance cases involving facially neutral policies.

enforced to ban protected conduct is a lawful management prerogative, falling outside the Act's prohibitions and *Republic's* special circumstance requirement. *Republic Aviation* supports the idea that the NLRA can't be read to obliterate "working time" rules related to order and production in the workplace. Thus, a facially neutral policy's promulgation and maintenance is presumptively lawful even though it may have some incidental effect on Section 7 conduct, absent evidence that the policy was adopted for a discriminatory purpose or enforced in a discriminatory manner.

Here, Tesla's Team Wear Policy is neither patently overbroad nor explicitly directed at union apparel or union insignias. Nor has it been applied in a discriminatory fashion to single out the wearing of union apparel or union insignias for prohibition. Accordingly, it is presumptively lawful, meaning that the special circumstances test enunciated in *Republic Aviation* and later mentioned in passing in *Stabilus* has no application here. *Stabilus* cannot, therefore, provide the legal standard or test for determining whether the mere maintenance of Tesla's Team Wear Policy violates Section 8(a)(1).

The D.C. Circuit's decision in *World Color (USA) Corp. v. NLRB*, 776 F.3d 17 (D.C. Cir. 2015) ("*World Color*") agrees with this analysis. There, a printing company's safety policy banned the wearing of all baseball caps in the workplace except for those caps bearing the company's name/logo to which an ALJ applied *Republic Aviation* and concluded that the policy violated Section 8(a)(1) because it discriminatorily banned the wearing of hats bearing union insignias and logos and because the employer failed to substantiate its claim of special circumstances. On exceptions, the Board affirmed the ALJ's conclusion, finding that the employer's policy to be overbroad and a violation of Section 8(a)(1), citing *Stabilus*.

The D.C. Circuit disagreed. Noting that the facial neutrality of the policy was always at issue in the case, the court, in effect, declared the special circumstances test of *Republic Aviation* and *Stabilus* off limits to cases challenging facially neutral policies. Instead, it requires the Board to employ the following non-*Republic Aviation/Stabilus* two-step inquiry:

22-60493.6470

> First, the Board examines whether the rule explicitly restricts Section 7 activity; if it does, the rule violates the Act. . . . If the policy does not explicitly restrict protected activity, the Board considers whether . . . employees would reasonably construe the language to prohibit Section 7 activity"

(citing the Board's then extant *Lutheran Heritage*[16] standard).

According to the *World Color* court, the Board erred by short-circuiting its inquiry at the first step by concluding that there was no dispute regarding whether the policy facially prohibited employees from wearing caps bearing union insignia. On that crucial preliminary point, the court disagreed because, although the hat policy restricted the type of hat that might be worn on the job, it did not say anything about whether union insignia could be attached to the hat. Further, World Color asserted throughout the case that the hat policy did not expressly prohibit employees from wearing union insignia at work. To the contrary and as here, the evidence revealed that World Color's employees accessorized their company-logoed hats with union pins. The court, therefore, granted World Color's petition for review, denied enforcement of the Board's decision and remanded the case to the Board for reconsideration[17].

As in *World Color*, Tesla's Team Wear Policy does not expressly prohibit employees from wearing union apparel or union insignia. Further, also as in *World Color*, Tesla's GA employees can and do accessorize their Team Wear by wearing union-branded hats and placing flat, non-abrasive stickers bearing union insignia on their Team Wear. Thus, as in *World Color*, Tesla's Team Wear Policy is not a policy that explicitly bans the wearing of union apparel or a display of union insignia but, rather, is a facially neutral policy. As such and as per *World Color*, it is not subject to special circumstances scrutiny under either *Republic Aviation* or *Stabilus*. Therefore, the *Stabilus* text cited in the Board's Invitation cannot properly serve as the test for

---

[16] 343 NLRB 646 (2004).

[17] On remand, the Board applied the *Boeing* standard to the World Color policy. Based on business considerations far less substantial than those presented here and noting that employees were permitted to accessorize their caps and not prohibited from donning company caps bearing union insignia, the Board concluded the policy, originally condemned under *Republic Aviation's* special circumstances test was a facially neutral rule under Boeing. *World Color (USA)*, 369 NLRB No. 104 (2020).

determining whether the mere maintenance of Tesla's Team Wear Policy violates Section 8(a)(1).

**B.** ***BOEING*** **PRESENTS THE APPROPRIATE TEST FOR DETERMINING THE LAWFULNESS IN MERE MAINTENANCE CASES INVOLVING FACIALLY NEUTRAL UNIFORM POLICIES**

In *Boeing*, the Board overruled *Lutheran Heritage's* "reasonably construe" standard, opting in its stead for a new standard by which to evaluate a facially neutral policy, rule or handbook provision. There, the Board said that it would no longer require a policy to be linguistically perfect to pass muster. Rather, focusing on the perspective of employees, the Board said that it would assign their everyday workplace meaning to a rule's words for the purpose of determining how workers would likely read and understand a facially neutral rule. But where a facially neutral employment policy or rule could reasonably be interpreted to potentially interfere with the exercise of NLRB rights, it would evaluate the policy in question against two criteria: (i) the nature and extent of the potential impact on NLRA rights, and (ii) the legitimate justifications associated with the rule. The Board further emphasized that it would conduct this evaluation, consistent with the Board's duty to strike the proper balance between asserted business justifications and the invasion of employee rights, in light of the Act and its policy. The Boeing standard provides the test by which the lawfulness of Tesla's facially neutral Team Wear Policy should be measured.

At issue in *Boeing* was a rule that restricted the use of camera-enabled devices on the Company's property without a valid business need. Like Tesla's Team Wear Policy, Boeing's camera rule did not explicitly mention or restrict any activity protected by the Act. Nor, as here, was Boeing's camera rule disparately applied to discriminatorily restrict such protected conduct. Neither was it adopted in response to union or protected concerted activity. Rather, it was promulgated out of the Company's genuine need to protect its facilities and work, some of which is classified, from espionage.

The Board found that Boeing's maintenance of its facially neutral no-camera use rule did not constitute unlawful interference with protected rights in violation of Section 8(a)(1) even though, in some circumstances, the rule might potentially affect the exercise of Section 7 rights because that adverse impact was comparatively slight. Further, the Board found that the rule's adverse impact on Section 7 rights was outweighed by substantial and important justifications associated with the Boeing's maintenance of the rule.

That *Boeing* provides the correct standard here is demonstrated by the *Wal-Mart* decision, *supra*. The Board recently applied *Boeing* and upheld content neutral rules regulating the size and appearance of logos and graphics that Wal-Mart employees could wear in public sales areas – even though the rules might operate to disqualify the wearing of non-compliant union insignia. Because Wal-Mart's rules did not prohibit employees from wearing union buttons, but merely limited the permissible size and appearance of buttons that, in general, could be worn, the Board concluded that the *Republic Aviation's* presumption of invalidity and special circumstances test could not be used to determine the facial lawfulness of Wal-Mart's logo/graphic policies. According to the Board, the infringement that Wal-Mart's policy had on Section 7 rights was "less severe", meaning that the employer's legitimate justification for its policy did not need to be as compelling as those required in special circumstance cases in *Republic Aviation* cases. Thus, the Board concluded that in such cases (involving facially neutral policies), it would apply the analytical framework in *Boeing*, stating "it would apply the standard articulated in that case to determine the lawfulness of *all facially neutral policies, rules, and handbook provisions* that do not expressly restrict Sec. 7 activity, were not adopted in response to NLRA-protected activity, and have not been applied to restrict NLRA-protected activity." *Wal-Mart*, 365 NLRB No. 154, slip op. at 1 fn. 4.

As in the case of Boeing's no camera rule and Wal-Mart's logo/graphics policy, Tesla's Team Wear Policy is both neutral on its face and justified by compelling business needs. Apart from Team Wear Policy enabling Tesla supervisors to visually manage GA employees, the Policy is an integral part of Tesla's effort to promote the mutilation-free assembly of a new Tesla

automobiles.  Indeed, cars that emerge from the GA department with defects and dings cannot be sent to market.  They must be reworked and put into the factory perfect condition that is a hallmark of Tesla.  The Team Wear Policy minimizes the need to rework cars, getting cars off the assembly line the first time and out to consumers as soon as possible.

Moreover, the mere maintenance of this policy has no to little effect on Section 7 rights.  The only Section 7 right implicated here is the right to wear union-branded apparel or to display union insignias or union messaging.  Not only does the Team Wear Policy not address or restrict this protected conduct, but the record shows that GA employees wear union branded hats and non-abrasive union stickers on their Team Wear, Tesla's uniform policy notwithstanding.  This practice demonstrates that the mere existence of this Policy neither precludes nor discourages workers from exercising their right to display or wear such union messaging in the workplace.  Moreover, insofar as the Policy operates to restrict the union apparel a GA employee may wear, that restriction is slight because it applies only to non-compliant union apparel and not to the employee's right to wear union apparel, i.e. union hats, or to display union insignia, i.e. that do not run afoul of the Team Wear Policy or pose an undue risk of costly product mutilation.

As in *Wal-Mart* and *World Color*, Tesla's Team Wear Policy does not prohibit the wearing of either union insignia or even of union apparel.  Rather, it establishes a generic uniform standard that facilitates visual management of the GA Department work force and the assembly of factory-perfect automobiles.  Further, even though the policy may incidentally ban certain non-compliant union branded apparel from the GA Department, it does not ban the wearing or display of union insignia or union messaging unless that insignia/messaging is in a form that increases the risk of mutilation or interferes with the visual management of the GA Department staff.  Thus, under *Boeing* and as in *Wal-Mart* and *World Color*, Tesla's mere maintenance of its Team Wear Policy does not interfere with Section 7 rights in violation of Section 8(a)(1).  GC's allegations alleging that the mere maintenance of this presumptively valid uniform Policy should, therefore, be dismissed.

## IV.    CONCLUSION

Tesla's Team Wear Policy is not presumptively unlawful on its face and Tesla did not need to satisfy the "special circumstances" under *Stabilus* and *Republic Aviation*. Rather, as a facially neutral rule, the Team Wear Policy is presumptively lawful, having little to no impact on Section 7 rights. Accordingly, Tesla is under no obligation to prove the existence of "special circumstances" in order to maintain this rule. Its mere maintenance of its Team Wear Policy should be adjudged and ultimately declared lawful pursuant to the *Boeing* standard.

Dated:  March 22, 2021                    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

                                          By: _____

                                                  MARK S. ROSS
                                                  KEAHN N. MORRIS

                                                  Attorneys for
                                                  TESLA, INC.

22-60493.6475

## <u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Francisco, State of California. My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On March 22, 2021, I served a true copy of the document(s) described as:

**RESPONDENT TESLA, INC.'S BRIEF IN RESPONSE TO THE BOARD'S FEBRUARY 12, 2021 INVITATION TO FILE BRIEFS CONCERNING UNIFORM POLICIES**

on the interested parties in this action as follows:

Catherine Ventola
E-mail: catherine.ventola@nlrb.gov
Christy Kwon
E-mail: christy.kwon@nlrb.gov
Counsels for the General Counsel
National Labor Relations Board
Region 32
1301 Clay Street, Ste. 300N
Oakland, CA 94612-5224
T: (510) 671-3041

Margo Feinberg
E-mail: margo@ssdslaw.com
Daniel E. Curry
E-mail: dec@ssdslaw.com
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Blvd., Suite 2000
Los Angeles, CA 90048
T: (323) 655-4700

Jeffery Sodko
E-mail: jsodko@uaw.net
United Automobile, Aerospace and Agricultural Workers of America
AFL-CIO
8000 E. Jefferson Avenue
Detroit, MI 48214
T: (313) 926-5000

☒     **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address sasmith@sheppardmullin.com to the persons at the

22-60493.6476

e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

Office of the Executive Secretary
National Labor Relations Board
1015 Half Street SE
Washington, D.C.  20570
T: (202) 273-1000

**VIA E-FILING**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 22, 2021, at San Francisco, California.

_Sarah Smith_
Sarah Smith

22-60493.6477

UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| TESLA, INC.,<br><br>    Respondent,<br><br>    and<br><br>MICHAEL SANCHEZ, an individual,<br>JONATHAN GALESCU, an individual,<br>RICHARD ORTIZ, an individual, and<br>INTERNATIONAL UNION, UNITED<br>AUTOMOBILE, AEROSPACE AND<br>AGRICULTURAL IMPLEMENT<br>WORKERS OF AMERICA, AFL-CIO, a<br>labor organization,<br><br>    Charging Parties. | Case Nos.  32-CA-197020<br>32-CA-197058<br>32-CA-197091<br>32-CA-197197<br>32-CA-200530<br>32-CA-208614<br>32-CA-210879<br>32-CA-220777 |

**JOINDER OF CHARGING PARTIES
MICHAEL SANCHEZ, JONATHAN GALESCU, RICHARD ORTIZ, AND
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AFL-CIO IN THE
*AMICUS CURIAE* BRIEF OF THE AMERICAN FEDERATION OF LABOR
AND CONGRESS OF INDUSTRIAL ORGANIZATIONS**

SCHWARTZ, STEINSAPIR, DOHRMANN &
  SOMMERS LLP
MARGO A. FEINBERG
HENRY M. WILLIS
DANIEL E. CURRY
6300 Wilshire Boulevard, Suite 2000
Los Angeles, California 90048-5268
Telephone: (323) 655-4700
Attorneys for Charging Parties MICHAEL
SANCHEZ, JONATHAN GALESCU,
RICHARD ORTIZ, and INTERNATIONAL
UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA,
AFL-CIO

**JOINDER OF CHARGING PARTIES IN THE
*AMICUS CURIAE* BRIEF OF THE AMERICAN FEDERATION OF LABOR AND
CONGRESS OF INDUSTRIAL ORGANIZATIONS**

Charging Parties Michael Sanchez, Jonathan Galescu, Richard Ortiz, and the

International Union, United Automobile, Aerospace, and Agricultural Implement Workers of

America (UAW) join in the Brief of the American Federation of Labor and Congress of

Industrial Organizations as Amicus Curiae, filed on March 22, 2021 in response to the NLRB's

February 12, 2021 Notice and Invitation to File Briefs.  Charging Parties will file their own

responsive brief on or before April 6, 2021.


DATED: March 22, 2021              SCHWARTZ, STEINSAPIR, DOHRMANN
                                      & SOMMERS LLP
                                   MARGO A. FEINBERG
                                   HENRY M. WILLIS
                                   DANIEL E. CURRY


                                   By _____
                                         HENRY M. WILLIS
                                      Attorneys for Charging Parties
                                   MICHAEL SANCHEZ, JONATHAN GALESCU,
                                      RICHARD ORTIZ, and INTERNATIONAL
                                   UNION, UNITED AUTOMOBILE, AEROSPACE
                                      AND AGRICULTURAL IMPLEMENT
                                      WORKERS OF AMERICA, AFL-CIO

1

1

## PROOF OF SERVICE BY ELECTRONIC MAIL

2

**Case No. 32-CA-197020 et al.**

3    RENEE CARNES certifies as follows:

4    I am employed in the County of Los Angeles, State of California; I am over the age of
eighteen years and am not a party to this action; my business address is 6300 Wilshire

5    Boulevard, Suite 2000, Los Angeles, California 90048-5202. My electronic notification address
is rac@ssdslaw.com.

6

7    On March 22, 2021, I caused the foregoing document(s) described as: **JOINDER ON
CHARGING PARTIES MICHAEL SANCHEZ, JONATHAN GALESCU, RICHARD**

8    **ORTIZ, AND INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE
AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AFL-CIO IN THE**

9    **AMICUS CURIA BRIEF OF THE AMERICAN FEDERATION OF LABOR AND
CONGRESS OF INDUSTRIAL ORGANIZATIONS**

10    be served by electronic mail upon the person(s) shown below,

11

12    Mark Ross, Esq                          Christy Kwon
Keahn Morris, Esq                        Catherine Ventola

13    Sheppard, Mullin, Richter & Hampton LLP  National Labor Relations Board, Region 32
4 Embarcadero Center, Suite 17           1301 Clay Street, Suite 300

14    San Francisco, CA 94111-4158            Oakland, CA 94612
e-mail: mross@sheppardmullin.com         e-mail: catherine.ventola@nlrb.gov

15    e-mail: kmorris@sheppardmullin.com       e-mail: christy.kwon@nlrb.gov

16     X   **BY E-MAIL:**  By transmitting a copy of the above-described document(s) via e-mail to

17    the individual(s) set forth above at the e-mail addressed indicated.

18    I declare under penalty of perjury under the laws of the State of California that the

19    foregoing is true and correct.

20    Executed on March 22, 2021, at Los Angeles, California.

21

22                                             RENEE CARNES

23

24

25

26

27

28

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
WASHINGTON, D.C.

TESLA, INC.

and

MICHAEL SANCHEZ, an Individual

and

JONATHAN GALESCU, an Individual

and

RICHARD ORTIZ, an Individual

and

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL WORKERS OF AMERICA, AFL-
CIO

Cases 32-CA-197020
32-CA-197058
32-CA-197091
32-CA-197197
32-CA-200530
32-CA-208614
32-CA-210879
32-CA-220777

BRIEF OF *AMICI CURIAE*
COALITION FOR A DEMOCRATIC WORKPLACE,
THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,
NATIONAL FEDERATION OF INDEPENDENT BUSINESS SMALL BUSINSS LEGAL
CENTER, ASSOCIATED BUILDERS AND CONTRACTORS, INDEPENDENT
ELECTRICAL CONTRACTORS, NATIONAL RETAIL FEDERATION, RETAIL
INDUSTRY LEADERS ASSOCIATION, AND RESTAURANT LAW CENTER

Kurt G. Larkin
Hunton Andrews Kurth LLP
951 East Byrd Street
Richmond, VA 23219
(804) 788-8776
(804) 788-8218
klarkin@huntonak.com

Ronald Meisburg
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1539
(202) 778-2201
rmeisburg@huntonak.com

Gary Enis
Hunton Andrews Kurth LLP
1445 Ross Ave., Suite 3700
Dallas, TX 75202
(214) 979-2924
(214) 979-3910
genis@huntonak.com

*Counsel for Amici*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ......................................................................... ii

STATEMENT OF INTEREST ....................................................................... 1

POSITION ON THE BOARD'S QUESTIONS ............................................. 3

ARGUMENT .................................................................................................. 4

    I.    The special circumstances standard of *Republic Aviation* and *Stabilus* is inapplicable to facially neutral uniform policies that allow union insignia. ........... 4

        A.    The "special circumstances" standard applies only to bans on union insignia. ................................................................................ 5

        B.    *Stabilus*'s reference to "special circumstances" is dicta. ........... 7

        C.    *Stabilus* is an outlier and any extension is unwarranted. ........... 8

    II.    *Boeing* should replace *Stabilus* as the standard for assessing facially neutral and non-discriminatory uniform policies. ................................................................... 11

    III.   The *Boeing* standard strikes the appropriate balance between an employer's right to manage its workforce and employees' Section 7 rights. .................................. 13

22-60493.6482

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alma Prods. Co.*, Case 07-CA-89537, 2013 WL 4140303 (NLRB Div. of Judges 2013) ........................................................................................................................10

*Boeing Co.*,
    365 NLRB No. 154 (2017) ...............................................4, 9, 10, 11, 12, 13, 14

*Burndy, LLC*,
    364 NLRB No. 77 (Aug. 17, 2016) ...............................................................5, 9, 12

*Floridan Hotel of Tampa*,
    137 NLRB 1484 (1962), enfd. 318 F.2d 545 (5th Cir. 1963) ..................................7

*Komatsu America Corp.*,
    342 NLRB 649 (2004) ..............................................................................................5

*Lutheran Heritage Village-Livonia*,
    343 NLRB 646 (2004) ...............................................................................9, 10, 12

*Medco Health Sols. of Las Vegas, Inc.*,
    357 NLRB 170 (2011) .............................................................................5, 10, 12

*PAE Applied Technologies, LLC*,
    367 NLRB No. 105 (2019) .....................................................................................12

*Republic Aviation Corp. v. NLRB*,
    324 U.S. 793 (1945).......................................................4, 5, 6, 7, 8, 9, 10, 12, 13, 14

*Stabilus, Inc.*,
    355 NLRB 836 (2010) .....................................................3, 4, 5, 7, 8, 9, 10, 13, 14

*The Ohio Masonic Home*,
    205 NLRB 357 (1973), enfd. 511 F.2d 527 (6th Cir. 1975) ....................................7

*United Parcel Service*,
    312 NLRB 596 (1993) .........................................................................................5, 7

*USF Red Star, Inc.*,
    339 NLRB 389 (2003) .........................................................................................5, 7

*Wal-Mart Stores Inc.*,
    368 NLRB No. 146 (Dec. 16, 2019)......................................................4, 5, 6, 8, 11, 12

22-60493.6483

*World Color (Usa) Corp.*,
  369 NLRB No. 104 (June 12, 2020) ........................................................................................8

**Other Authorities**

*Hosp. Coop. Laundry*, G.C. Mem. Case 27-CA-19349-1, 2005 WL 545235 (2005)....................10

22-60493.6484

**STATEMENT OF INTEREST**

This brief is submitted by the undersigned *amici curiae* in response to the National Labor

Relations Board's ("the Board") Notice and Invitation to File Briefs, 370 NLRB No. 88 (February

12, 2021).

The **Coalition for a Democratic Workplace ("CDW")** is a coalition of nearly 500

organizations[1] representing the interests of millions of private-sector employers nationwide.

CDW's members are or represent the interests of employers subject to the National Labor

Relations Act ("the Act") and are consequently affected by the Board's decision in this case. CDW

advocates for its members on numerous issues of significance related to federal labor policy and

interpretations and applications of the Act.

CDW and its members have a direct interest in this matter because they include employers

that maintain and enforce nondiscriminatory uniform policies. Thus, the decision in this case will

apply to CDW members both with and without union workforces.

The **Chamber of Commerce of the United States of America** ("Chamber") is the world's

largest business federation. It represents approximately 300,000 direct members and indirectly

represents the interests of more than 3 million companies and professional organizations of every

size, in every industry sector, and from every region of the country. An important function of the

Chamber is to represent the interests of its members in matters before Congress, the Executive

Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases that

raise issues of concern to the nation's business community.

The **National Federation of Independent Business Small Business Legal Center**

("NFIB SBLC") is a nonprofit, public interest law firm, established to provide legal resources and

---

[1] A full list of CDW's Members is available at https://myprivateballot.com/about/.

1

be the voice for small businesses in the nation's courts through representation on issues of public interest affecting small businesses. NFIB is the nation's leading small business association, representing members in Washington D.C., and all fifty state capitals. Founded in 1943 as a nonprofit, nonpartisan organization, NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. To fulfill its role as the voice for small business, the NFIB SBLC frequently files amicus briefs in cases that affect small businesses.

**Associated Builders and Contractors** ("ABC") is a national construction industry trade association representing more than 21,000 members.  ABC's membership represents all specialties within the U.S. construction industry and is comprised primarily of firms that perform work in the industrial and commercial sectors.

**Independent Electrical Contractors** ("IEC") is the nation's premier trade association representing America's independent electrical and systems contractors with over 50 chapters, representing 3,400 member companies that employ more than 80,000 electrical and systems workers throughout the United States. IEC aggressively works with the industry to promote the concept of free enterprise, open competition and economic opportunity for all.

The **National Retail Federation** ("NRF") is the world's largest retail trade association, representing all aspects of the retail industry. NRF members includes discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and Internet retailers. The NRF regularly advocates for the interests of retailers, large and small, in a variety of forums, including the legislative, executive, and judicial branches of government.

**Retail Industry Leaders Association** ("RILA") is a trade association of retail companies. RILA members include more than 200 retailers, product manufacturers, and service suppliers,

22-60493.6486

which together account for more than $1.5 trillion in annual sales, more than 42 million American jobs, and more than 100,000 stores, manufacturing facilities, and distribution centers domestically and abroad.

**Restaurant Law Center** ("Law Center") is a public policy organization affiliated with the National Restaurant Association, the largest foodservice trade association in the world. This labor-intensive industry is comprised of over one million restaurants and other food service outlets employing almost 14.7 million people—approximately 10 percent of the U.S. workforce. Restaurants and other foodservice providers are the nation's second largest private-sector employers. The Law Center seeks to provide the Board with the industry's perspective on legal issues significantly impacting the industry. Specifically, the Law Center highlights the potential industry-wide consequences of pending cases, such as the one here, through amicus briefs on behalf of the industry.

Collectively, CDW, the Chamber, NFIB SBLC, ABC, IEC, NRF, RILA, and Law Center are the "Amici."

## POSITION ON THE BOARD'S QUESTIONS

The Board is seeking input from *Amici* on two related issues:

1. Does *Stabilus, Inc.*, 355 NLRB 836 (2010), specify the correct standard to apply when an employer maintains and consistently enforces a nondiscriminatory uniform policy that implicitly allows employees to wear union insignia (buttons, pins, stickers, etc.) on their uniforms?

2. If *Stabilus* does not specify the correct standard to apply in those circumstances, what standard should the Board apply?

For the reasons explained herein, *Amici* respectfully assert that *Stabilus* does not provide the correct standard for balancing Section 7 rights with facially neutral employer policies that limit—but do not prohibit—the wearing of union insignia. Not only is the "special circumstances"

3

standard set out in *Stabilus* an outlier in this context, but it is based on a misapplication of the United States Supreme Court's decision in *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945). *Republic Aviation* required a showing of special circumstances to justify work rules that result in a *total ban* on employees' Section 7 rights. But where an employer maintains a facially neutral rule that limits—but does not ban—union insignia, the infringement of Section 7 rights is less severe, and a different standard should govern. In these circumstances, the Board has applied (and should continue to apply) the more reasonable, less onerous standard found in *Boeing Co.*, 365 NLRB No. 154 (2017), which balances an employer's legitimate right to maintain a dress code with an employee's right to display union insignia in the workplace.

Application of *Boeing* to facially neutral and non-discriminatory uniform policies is consistent with precedent and properly treats uniform and dress policies like other facially neutral work rules. The *Boeing* standard achieves proper balancing of employee rights to organize and employer interests in safety, discipline, and product quality. To apply, as *Stabilus* seems to do, the special circumstances standard from *Republic Aviation* tips the scale. Given the exceptionally high burden for proving special circumstances, the standard would invalidate almost all uniform policies. The Board should treat such uniform and dress code policies like other facially neutral employer policies and apply *Boeing* in this and future cases.

## ARGUMENT

I.    **The special circumstances standard of *Republic Aviation* and *Stabilus* is inapplicable to facially neutral uniform policies that allow union insignia.**

Although employees have the right to wear union insignia in the workplace, that right is not absolute. *Republic Aviation*, 324 U.S. at 797-98, 801-03. Employers may, in some instances, limit or ban the wearing of union insignia without violating the Act. *Id*. at 801-03; *see also Wal-Mart Stores Inc*., 368 NLRB No. 146, slip op. at *12 (Dec. 16, 2019). When an employer

4

establishes a policy that completely bans the wearing of union insignia, the Board has applied the special circumstances standard set forth in *Republic Aviation*. *See, e.g.*, *USF Red Star, Inc.*, 339 NLRB 389, 391 (2003); *United Parcel Service*, 312 NLRB 596, 597 (1993), enf. denied 41 F.3d 1068 (6th Cir. 1994). Under this standard, a workplace rule completely banning the display of union insignia is unlawful unless an employer can establish that the ban is warranted by and narrowly tailed to special circumstances. *Wal-Mart Stores*, 368 NLRB No. 146, slip op. at *2; *see Komatsu America Corp.*, 342 NLRB 649, 650 (2004) (special circumstances include "when their [union insignia] display may jeopardize employee safety, damage machinery or products, exacerbate employee dissension, or unreasonably interfere with a public image that the employer has established, or when necessary to maintain decorum and discipline among employees").

On the other hand, when confronted with facially neutral uniform policies that merely limit, but do not ban, union insignia, the Board has analyzed such polices like any other work rule and applied a more reasonable, less onerous standard. *Wal-Mart Stores*, 368 NLRB No. 146, slip op. at *2; *see also*, *Burndy, LLC*, 364 NLRB No. 77, slip op. at *1 (Aug. 17, 2016); *Medco Health Sols. of Las Vegas, Inc.*, 357 NLRB 170, 171 (2011). The Board's deviation from that precedent in *Stabilus* was an error that this Board should correct.

A.      **The "special circumstances" standard applies only to bans on union insignia.**

Historically, when determining whether a uniform/dress code policy is facially unlawful, the Board has applied different standards depending on whether (i) the policy altogether bans the wearing of union insignia or (ii) the policy only limits when and how an employee can wear union insignia. This important distinction is well-founded in both Supreme Court and Board precedent.

In *Republic Aviation*, the Court focused on the discharge of employees for wearing union insignia in violation of an employer's solicitation policy. *Republic Aviation*, 324 U.S. at 801. The Court affirmed the Board's determination that the outright ban on solicitation (and the wearing of

22-60493.6489

insignia) "must fall as interferences with union organization." *Id.* at 803. At the same time, the Court recognized the "undisputed" rights of employers and acknowledged that "a rule prohibiting union solicitation during working hours" may be valid in the face of "evidence that special circumstances make the rule necessary in order to maintain production or discipline." *Id.* at 803, n.10. On a full read of *Republic Aviation*, it is clear that the "special circumstances" test was meant to apply only to a narrow subset of employer rules, namely, those that: (i) are directed primarily towards solicitation, and (ii) ban such solicitation on non-work time.

The facts here are decidedly different. Tesla maintains a facially neutral uniform policy that prohibits the wearing of union clothing while implicitly allowing other forms of union solicitation, including wearing union insignia and buttons. Thus, the policy at issue here does not come close to a ban on union solicitation in the workplace. Tesla has not restricted—or sought to cabin—union solicitation. Where, as here, the right to wear union insignia is not banned, but merely regulated, *Republic Aviation* simply does not apply. The Board recently reiterated this distinction in *Wal-Mart Stores*:

> The Supreme Court long ago affirmed the Section 7 right of employees to wear union buttons and other insignia. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 801-803 (1945). But this right is not absolute. The Board has evaluated the lawfulness of facially neutral work rules that prohibit the wearing of all union buttons and insignia by examining whether the employer has shown special circumstances for the prohibition. In such cases, the infringement on Section 7 rights is incontrovertible, and the employer must therefore prove that special circumstances exist justifying the ban for it to be lawful.
>
> Where . . . the Employer maintains a facially neutral rule that limits the size and/or appearance of union buttons and insignia that employees can wear but does not prohibit them, a different analysis is required. Necessarily, because the infringement on Section 7 rights is less severe, the employer's legitimate justifications for maintaining the restriction do not need to be as compelling for its

22-60493.6490

policy to pass legal muster, and justifications other than the recognized special circumstances may suffice.

*Wal-Mart Stores*, 368 NLRB No. 146, slip op. at *1-2.

And the Board's relevant decisions bear this out. It has limited application of the *Republic Aviation* special circumstances analysis to employer attempts to completely ban union insignia. *See, e.g.*, *USF Red Star, Inc.*, 339 NLRB at 391 ("[A] *ban* on wearing union insignia violates the Act unless it is justified by special circumstances.") (emphasis added); *United Parcel Service*, 312 NLRB at 597 ("In the absence of 'special circumstances,' the *prohibition* by an employer against the wearing of union insignia violates Section 8(a)(1) of the Act.") (emphasis added), enf. denied 41 F.3d 1068 (6th Cir. 1994); *The Ohio Masonic Home*, 205 NLRB 357, 357 (1973) ("In the absence of 'special circumstances,' the promulgation of a rule *prohibiting* the wearing of [union] insignia is violative of Section 8(a)(1).") (emphasis added), enfd. 511 F.2d 527 (6th Cir. 1975); *Floridan Hotel of Tampa*, 137 NLRB 1484, 1486 (1962) ("The promulgation of a rule *prohibiting* the wearing of [union insignia] constitutes a violation of Section 8(a)(1) in the absence of evidence of 'special circumstances' . . . .") (emphasis added), enfd. 318 F.2d 545 (5th Cir. 1963).

**B.** ***Stabilus*'s reference to "special circumstances" is dicta.**

*Stabilus* eroded this well-settled balance between employer and employee rights. In *Stabilus*, the Board addressed whether an employer had committed unfair labor practices by enforcing its policy that employees wear company shirts. Ruling in favor of the employees, the Board's holding rested on its finding that the employer "enforced its policy in a selective and overbroad manner against union supports." *Stabilus*, 355 NLRB at 837. The Board expressly caveated its decision, noting that "[w]e need not reach the [] conclusion that the Respondent failed to make the required showing that special circumstances justified the application of its uniform

22-60493.6491

policy." *Id.*  In other words, the Board did not apply the *Republic Aviation* special circumstances standard to determine that the policy violated the Act.

Despite acknowledging that the special circumstances standard was irrelevant to the outcome, the Board in *Stabilus* suggested in dicta that this standard applied to the employer's uniform policy.  *Id*. at 838. Citing *Republic Aviation*, the Board noted generally that "employees have a Section 7 right to wear union insignia on their employer's premises, which may not be infringed, absent a showing of 'special circumstances.'" *Id*.  And it went on to observe, without justification or citation, that "[a]n employer cannot avoid the 'special circumstances' test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia." *Id*.  Not only is this an incorrect statement of law, but it is wholly ancillary to the holding of the case.  *Stabilus* made no finding as to the facial lawfulness of the uniform policy at issue.

### C.    *Stabilus* **is an outlier and any extension is unwarranted.**

The Board's subsequent treatment of *Stabilus* demonstrates that its passing reference to *Republic Aviation* was not based on a well-founded proposition. The Board has declined to use *Stabilus* to reinvent the legal landscape here.  Simply put, the Board has *not* applied the special circumstances standard to facially neutral and non-discriminatory work rules that do not ban the wearing of union insignia.  Indeed, the Board has expressly stated that the *Republic Aviation* special circumstances standard is not appropriate in such cases. For example, in *Wal-Mart Stores*, the Board held that *Republic Aviation* is inapplicable where "the [e]mployer maintains a facially neutral rule that limits the size and/or appearance of union insignia that employees can wear but does not prohibit them." *Wal-Mart Stores*, 368 NLRB No. 146, slip op. at *2; *see also World Color (Usa) Corp.*, 369 NLRB No. 104 (June 12, 2020) (special circumstances standard inapplicable to

8

a dress policy which does not prohibit wearing of union insignia). As Member Schaumber explained in his dissenting opinion in *Stabilus*,

> [t]he question of whether there are "special circumstances," however, has arisen either in cases where (i) an employer without a uniform policy or dress code prohibited employees from wearing union insignia or attire, or (ii) an employer with a uniform policy or dress code prohibited employees from adding union insignia (such as a button or pin) to the required attire. *But the Board has never held that, where an employer lawfully maintains and consistently enforces a policy requiring employees to wear a company uniform, its employees have a right under Section 7 to disregard the policy and wear union attire in place of the required uniform.*

*Stabilus*, 355 NLRB. at 842-43 (emphasis added).

The Board's application of different standards to dress and uniform policies depending on whether the policies ban or merely limit the wearing of union insignia is neither an isolated nor recent phenomena. For example, in *Burndy, LLC*, the Board affirmed an ALJ's conclusion upholding an employer's dress code policy, which "reserve[d] the [employer's] right to address an employee's attire, jewelry, or any aspect of grooming" that it "believe[d] to be . . . not promoting customer good will or the subject of business disruption or complaint." *Burndy*, 364 NLRB No. 77, slip op. at *1. The ALJ explained that application of the special circumstances test was inappropriate to the employer's dress policy because it was facially neutral and not disparately enforced: "[g]iven the facial neutrality of Respondent's dress code and the lack of evidence that it was disparately enforced, I decline to apply the 'special circumstances' test pursuant to *Republic Aviation* and its progeny." Instead, the ALJ applied the "work rule analysis" from *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004), a predecessor to the *Boeing* test discussed below. *Id*. at *31, n. 65. The Board affirmed, taking no issue with the ALJ's explanation why *Republic Aviation* was inapplicable to a nondiscriminatory dress code. *Id*. at *1.

22-60493.6493

Similarly, in *Medco Health Solutions*, an ALJ found that an employer's dress code that prohibited employees from wearing clothing displaying content that is confrontational, insulting, or provocative was unlawfully overbroad under *Lutheran Heritage*. Here again, the ALJ did not apply the special circumstances standard when analyzing the employer's rule. In affirming the ALJ's decision, the Board expressly affirmed the ALJ's decision, stating "the judge properly applied *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004), in determining that the Respondent's application of the dress code to restrain Section 7 activity, violated Section 8(a)(1) by maintaining an overly broad work rule." *Medco Solutions*, 357 NLRB at 171.

In short, the Board has consistently treated facially neutral uniform policies and dress codes like all other facially neutral work rules and has not applied a heightened standard in such cases. *See Hosp. Coop. Laundry*, G.C. Mem. Case 27-CA-19349-1, 2005 WL 545235 (2005) (applying *Lutheran Heritage* to determine whether a dress code rule is facially unlawful); *see also Alma Prods. Co.*, Case 07-CA-89537, 2013 WL 4140303, *5-6 (NLRB Div. of Judges 2013) (applying *Lutheran Heritage* to conclude that the employer's dress code "d[id] not explicitly restrict Section 7 activity" but "it is reasonably construed to prohibit protected activity").

Because the special circumstances standard in *Republic Aviation* does not apply when evaluating the lawfulness of an employer's facially neutral and nondiscriminatory dress or uniform policy that does not prohibit the wearing of union insignia, it follows that *Stabilus* does not specify the correct standard. Accordingly, the standards set forth in *Republic Aviation* and *Stabilus* should not be applied here or going forward where an employer maintains and consistently enforces a nondiscriminatory uniform policy that allows employees to wear union insignia on their uniforms.

22-60493.6494

II.     ***Boeing*** **should replace** ***Stabilus*** **as the standard for assessing facially neutral and non-discriminatory uniform policies.**

The Board's decision in *Boeing* supplies the correct standard for analyzing facially neutral and non-discriminatory uniform policies that allow union insignia. The application of the *Boeing* standard to facially neutral uniform rules places uniform rules on par with other facially neutral work rules and is consistent with the majority of Board precedent.

The Board has historically applied *Boeing* and its precursors when analyzing whether a facially neutral work rule unlawfully interferes with the exercise of rights protected by the National Labor Relations Act. Indeed, the Board explained in *Boeing* that its standard should be applied in "cases in which one or more facially neutral policies, rules, or handbook provisions are at issue that, when reasonably interpreted, would potentially interfere with Section 7 rights." *The Boeing Co.*, 365 NLRB No. 154, slip op. at *15 (Dec. 14, 2017). When presented with such facially neutral rules, "the Board will evaluate two things: (i) the nature and extent of the potential impact on NLRA rights, *and* (ii) legitimate justifications associated with the requirement(s)." *Id.* at *4. The Board's *Boeing* decision makes no caveats or carve-outs. *Id.*

The application of the *Boeing* standard in this case—and to all facially neutral and non-discriminatory dress policies—would simply continue the Board's longstanding approach to analyzing dress and uniform policies that do not ban the wearing of insignia. As highlighted above, while the Board has applied the "special circumstances" standard to uniform and dress policies that were discriminatory in nature or that outright prohibit the wearing of union insignia, it has applied *Boeing* and its progeny to facially neutral and non-discriminatory work rules.

In *Wal-Mart Stores*, for example, the Board applied *Boeing* to a facially neutral work rule that regulated (but did not prohibit) employees' wearing of union buttons in the workplace. In electing to apply *Boeing* to the rule in question, the Board explained:

11

> In *Boeing*, the Board stated that it would apply the standard articulated in that case to determine the lawfulness of all facially neutral policies, rules, and handbook provisions that do not expressly restrict Sec. 7 activity, were not adopted in response to NLRA-protected activity, and have not been applied to restrict NLRA-protected activity. 365 NLRB No. 154, slip op. at 1 fn. 4; see also *PAE Applied Technologies, LLC*, 367 NLRB No. 105, slip op. at 2 fn. 6. First, the Respondent's logos or graphics policies are facially neutral; they apply to all logos and graphics, without in any way distinguishing union logos or graphics. Second, by expressly permitting the wearing of logos or graphics of a certain size and appearance, including union insignias, the policies cannot be said to explicitly restrict Sec. 7 activity. Moreover, the General Counsel did not allege that the policies were adopted in response to NLRA-protected activity or applied to restrict NLRA-protected activity. Therefore, *Boeing* is the proper test for determining the lawfulness of the Respondent's logos or graphics policies.

*Wal-Mart Stores Inc.*, 368 NLRB No. 146, slip op. at *2, n. 11. The *Wal-Mart Stores* decision clarifies that *Boeing* provides the proper framework for analyzing a consistently enforced and nondiscriminatory uniform policy that implicitly allows employees to wear union insignia on their uniforms like the one present in this case

The Board's inclination to treat facially neutral and non-discriminatory uniform and dress policies like any other facially neutral policies that may restrict Section 7 activity long predates *Boeing*. Before *Boeing*, the Board applied its predecessor, *Lutheran Heritage*, to facially neutral and non-discriminatory uniform and dress policies. *See, e.g., Burndy*, 364 NLRB No. 77, slip op. at *31, n. 65. ("Given the facial neutrality of Respondent's dress code and the lack of evidence that it was disparately enforced, I decline to apply the 'special circumstances' test pursuant to *Republic Aviation* and its progeny, as opposed to the work rule analysis articulated in *Lutheran Heritage Village-Livonia*"); *Medco Solutions*, 357 NLRB at 171 (affirming ALJ's application of *Lutheran Heritage* to an employer's facially neutral dress code).

22-60493.6496

Simply put, if the Board were to forego applying *Boeing* to the uniform policy at bar, or any facially neutral and non-discriminatory uniform policy, it would run counter to decades of its own precedent and inexplicably treat employers' dress and uniform policies differently than the multitude of other neutral work rules that employers enact to govern workplace conduct.

III.     **The *Boeing* standard strikes the appropriate balance between an employer's right to manage its workforce and employees' Section 7 rights.**

Not only is the application of *Boeing* to facially neutral and non-discriminatory uniform policies supported by the Board's own precedent, the application of *Boeing* properly takes into account important public policy considerations surrounding an employer's dress and uniform policies. A fundamental role of the NLRB is striking a balance between an employer's right to manage and operate its business and its employees' right to engage in Section 7 activity. *Boeing*, not *Republic Aviation*, strikes the appropriate balance of these rights when it comes to facially neutral and non-discriminatory employer policies. Anything else represents "a radical rebalancing of the relevant interests and a sharp curtailment of legitimate management prerogatives." *Stabilus*, 355 NLRB at 842 (Schaumber dissent).

Employers enact dress and uniform policies for a host of legitimate reasons, including for employees' safety, morale, and security. A blanket application of *Republic Aviation* and *Stabilus* to all dress and uniform policies would subject employers to the heavy burden of justifying company uniforms. Employers should not be required to meet this burden in order to undertake such a fundamental management action as establishing a uniform policy in the workplace. Holding otherwise subverts the employers' rights and effectively guarantees the employees have the right to wear union attire in place of a required company uniform.

Applying the *Boeing* standard to facially neutral uniform policies supports the many legitimate business justifications for a uniform policy. Unlike *Republic Aviation*, *Boeing* does not

13

presume to begin with the assumption that a uniform policy rule is unlawful. Rather, *Boeing* appropriately weighs the competing rights, protecting both an employer's managements prerogatives alongside an employee's Section 7 rights.

*Amici* strongly encourage the Board to adopt the standard articulated in *Boeing* and apply it to the uniform policy in this case. *Amici* also encourage the Board to hold that *Boeing* is the correct standard in all similar cases in which employers maintain facially neutral and non-discriminatory uniform policies that implicitly permit other forms of union solicitation.[2]

Respectfully submitted this 22nd day of March, 2021.

/s/ Kurt G. Larkin
Kurt G. Larkin
Hunton Andrews Kurth LLP
951 East Byrd Street
Richmond, VA 23219
(804) 432-8235
(804) 788-8218 (fax)
klarkin@huntonak.com

*Counsel for Amici*

---

[2] Even if *Boeing* were not the correct standard and the outcome here were controlled by *Republic Aviation*, the policy at issue would be presumptively lawful because it does not expressly prohibit Section 7 activity. Moreover, the special circumstances test would not even apply to enforcement of the policy on working time and/or in production areas of the employer's facility. *See Republic Aviation* at 803, n. 10. In this respect, regardless of the applicability of *Boeing*, it is clear that *Stabilus* is not a correct articulation of the standards originally announced in *Republic Aviation*.

14

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of March, 2021, the foregoing Amicus Brief of Coalition for a Democratic Workplace, Chamber of Commerce of the United States of America, National Federation of Independent Business Small Business Legal Center, Associated Builders and Contractors, Independent Electrical Contractors, National Retail Federation, Retail Industry Leaders Association, and Restaurant Law Center was electronically filed and served by email on the following:

Margo Feinberg
Daniel Curry
Schwartz, Steinsapir, Dohrmann & Sommers LLP
6300 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90048
margo@ssdslaw.com
dec@ssdslaw.com

Mark Ross
Keahn Morris
Sheppard Mullin Richter & Hampton LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
mross@sheppardmullin.com
kmorris@sheppardmullin.com

Christy Kwon
Catherine Ventola
Counsels for the General Counsel
Region 32 of the National Labor Relations Board
1301 Clay Street, Suite 300
Oakland, CA 94612
Christy.Kwon@nlrb.gov
Catherine.Ventola@nlrb.gov

/s/ Kurt G. Larkin
*Counsel for Amici*

22-60493.6499

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

TESLA, INC.

    and

MICHAEL SANCHEZ, an Individual           Case No. 32-CA-197020

    and

JONATHAN GALESCU, an Individual        Case No. 32-CA-197058

    and

RICHARD ORTIZ, an Individual           Case No. 32-CA-197091

    and

INTERNATIONAL UNION, UNITED AUTOMOBILE,    Case No. 32-CA-197197
AEROSPACE AND AGRICULTURAL IMPLEMENT    Case No. 32-CA-200530
WORKERS OF AMERICA, AFL-CIO          Case No. 32-CA-208614
                                    Case No. 32-CA-210879

## MOTION FOR PERMISSION TO FILE A BRIEF AS *AMICUS CURIAE* and BRIEF OF *AMICUS CURIAE* HR POLICY ASSOCIATION IN RESPONSE TO BOARD'S INVITATION TO FILE

G. Roger King
Senior Labor & Employment Counsel
HR Policy Association
1001 19th St. N #10002
Arlington, VA 22209
(202) 375-5004
rking@hrpolicy.org

Gregory Hoff
Associate Counsel
HR Policy Association
1001 19th St. N #10002
Arlington, VA 22209
(202) 375-2795

HR Policy Association ("HRPA" or "Association") submits the instant motion and this amicus brief in response to the National Labor Relation Board's ("NLRB" or "Board") invitation to file amicus briefs in *Tesla, Inc.*, 32-CA-197020 et al., which presently is pending before the Board.

**STATEMENT OF INTEREST**

HR Policy is a public policy advocacy organization that represents the chief human resource officers of more than 380 of the largest corporations doing business in the United States and globally. Collectively, their companies employ more than 10 million employees in the United States – nearly 9 percent of the private sector workforce. Since its founding, one of HRPA's principal missions has been to ensure that laws and policies affecting human resources are sound, practical, and responsive to labor and employment issues arising in the workplace.

Association members regularly have matters before the NLRB, and HR Policy has consistently advocated on behalf of its members on issues related to collective bargaining and the National Labor Relations Act ("NLRA" or "Act"). HR Policy therefore has a general interest in ensuring that the standards articulated by the Board are consistent with the language and purposes of the Act, while, at the same time, are sound, practical, and responsive policies meeting the realities of today's workplace. More specifically, a substantial number of Association members have manufacturing operations and employees working in industrial settings with employee uniform policies similar to that at issue in the present case. The Association thus has a vested interest in the Board's approach to employers' uniform policies and accordingly submits this amicus brief representing its views on this area of the law.

**I.    ANSWERS TO QUESTIONS POSED BY THE NATIONAL LABOR RELATIONS BOARD**

In its invitation to file briefs at 370 NLRB No. 88 (2021), the Board posed the following questions:

22-60493.6501

> 1. Does *Stabilus* specify the correct standard to apply when an employer maintains and consistently enforces a nondiscriminatory uniform policy that implicitly allows employees to wear union insignia (buttons, pins, stickers, etc.) on their uniforms?
>
> 2. If *Stabilus* does not specify the correct standard to apply in those circumstances, what standard should the Board apply?

Amicus HR Policy Association answers the first question posed by the Board in the negative – the Board's decision in *Stablius, Inc.*, 355 NLRB 836 (2010) does not set forth the correct standard to determine whether an employer violates the Act regarding the establishment and implementation of facially neutral employee uniform policies. With respect to the Board's second question, Amicus outlines below the analysis and factors that the Board should utilize in reviewing employee uniform cases.

## II.   SUMMARY OF FACTS AND ARGUMENT

### A.  Summary of Facts

The present case involves the Employer, Tesla, Inc.'s employee uniform policy. Tesla requires its Productions Associates ("PA's") and Team Leads to wear uniforms, referred to as team wear. The business rationale for such a policy is based on a number of legitimate concerns, including protecting the quality of its car chassis. Specifically, the team wear is made of fabric quality that eliminates or reduces the risk of scratches and other vehicle mutilation which would lead to increased production costs and inferior vehicle quality. Further, the Employer's rationale for the policy is to permit rapid identification of which team members are in the production area to ensure that there are no unauthorized individuals in such area that could interfere with the production process, including having improper contact with vehicle chassis as they proceed through the assembly process. Additionally, the Employer on occasion has permitted PA's to substitute all black-colored clothing of a fabric quality similar to team wear when team wear was not available from vendors or when a PA did not otherwise have team wear available for use.

3

Finally, the Employer has implicitly allowed PA's to wear union insignia on team wear or clothing that otherwise has been approved. Tesla has also permitted PA's to wear union stickers on team wear and otherwise approved clothing. Additionally, the Employer has permitted PA's to wear union hats bearing union insignia.[1]

### B. Summary of Argument

The starting point in responding to the questions posed by the Board in its invitation for parties to file briefs is a thorough review of the Supreme Court's decision in *Republic Aviation* and the underlying Board decision that it affirms. While the Court's opinion in *Republic Aviation* was largely a response to the challenge by the parties to the Board's procedural decision-making process and whether the Board had provided a sufficient rationale for its decisions, the key part of the decision to focus on is the Court's establishment of a balancing test to determine the legality of employer workplace policies. *Republic Aviation* did not create a "special circumstances" test, and unfortunately a great deal of incorrect jurisprudence has developed in employer workplace policy cases since that decision. What occurred in *Stabilus*, and in the ALJ decision in the present case, and in many other decisions, is the substitution of the "special circumstances" test for the balancing test outlined in *Republic Aviation*. Indeed, *Stabilus* is a perfect example of a Board majority incorrectly giving the impression of an artificially created "special circumstances" test that places an exceedingly high and inappropriate burden of proof on employers. As noted above, the balancing test is the appropriate test to apply, and in most cases is both the starting and ending point with respect to analyzing the legality of employer workplace policies.

As part of that balancing test, the Board and courts should also consider whether an employer has provided employees other avenues to adequately exercise their Section 7 rights. The

---

[1] Notice and Invitation to File Briefs, Cases 32-CA-197020 et al., (Feb. 12, 2021); *Tesla, Inc.*, Cases 32-CA-197020 et al. (Sept. 27, 2019).

22-60493.6503

so-called "special circumstances" test is not the correct starting analytical point in these cases. Further, in no event should the *Republic Aviation* balancing test or the "special circumstances" test be applied in a manner that permits employees to wear apparel, buttons, badges, or insignia of their own choosing such that it entirely negates an employer's otherwise lawful policy.

Finally, Amicus HRPA submits that the Board should reverse the ALJ decision in the present case as it incorrectly utilized the artificially created "special circumstances" test and did not properly apply the *Republic Aviation* balancing test.[2]

## III. THE DICTA IN *STABILUS* SHOULD NOT APPLY IN SITUATIONS WHERE AN EMPLOYER ESTABLISHES A FACIALLY NEUTRAL BUSINESS-RELATED EMPLOYEE UNIFORM POLICY AND ENFORCES SUCH POLICY IN A NONDISCRIMINATORY MANNER

### A. The Board and the Courts Have Consistently Found that Employees have Basic Entrepreneurial Rights to Establish Employee Terms and Conditions of Employment to Operate their Business

Employers have a wide range of operational and entrepreneurial rights under the NLRA that both the Board and the courts have consistently recognized since the NLRA's enactment. Employers are empowered to establish the terms and conditions of employment "free from the constraints of the bargaining process to the extent essential for the running of a profitable business."[3] Indeed, employers "must have some degree of certainty beforehand as to when [they] may proceed to reach decisions without fear of later evaluations labeling its conduct an unfair labor practice."[4] This "need for unencumbered decision-making"[5] extends to workplace rules and

---

[2] The ALJ also improperly failed to apply the Board's *Boeing* framework. *See Boeing Co.* 365 NLRB No. 154 (2017). Amicus HRPA does not discuss the applicability of the *Boeing* framework in its brief as another amicus will cover that issue.
[3] *First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 678-79 (1981).
[4] *Id*. at 679.
[5] *Id*.

5

22-60493.6504

procedures and other types of operational discretions rooted in maintaining production, discipline, employee safety, and similarly critical business considerations that go into running a business.

Additionally, the Board has specifically recognized that employer uniform policies have special significance in industrial and manufacturing settings and that allowing nonadherence can have tangible consequences for employee and product safety, among other negative implications. Such policies have been upheld in numerous areas, including:

- Preventing the wearing of union insignia for the purposes of preventing employee divisiveness on the factory floor;[6]

- Banning union insignia where such insignia could impair employee visibility or otherwise endanger employees;[7]

- Banning union insignia where it could otherwise distract an employee and impair concentration that is much needed on an assembly line;[8] and

- Precluding the wearing of union insignia in order to avoid damage to machinery or products.[9]

- Recognizing that "industrial or manufacturing operations[']…workplace conditions can heighten the need to ensure that employees are readily visible in the workplace…and that extraneous markings or stickers can interfere with visibility and thus safety."[10]

The above precedent, especially in manufacturing and industrial settings, should be included in the Board's balancing of interests analysis when deciding employee uniform cases.

**B.  The Standard Discussed in *Stabilus* is Unclear**

---

[6] *See, e.g.*, *United Aircraft Corp.*, 134 NLRB 1632 (1961).
[7] *See, e.g.*, *Albis Plastics*, 335 NLRB 923 (2001); *Andrews Wire Corp.*, 189 NLRB 108 (1971).
[8] *See, e.g., Fabri-Tek, Inc. v. NLRB*, 352 F.2d 577 (8th Cir. 1965).
[9] *See, e.g.*, *Campbell Soup Co.*, 159 NLRB 74, enf. in part, enf. denied in part or on other grounds, 380 F.2d 372 (5th Cir. 1967).
[10] *Albis Plastics*, 335 NLRB 923, 924 (2001).

22-60493.6505

The *Stabilus* standard is of uncertain origin and appears to be created without any appropriate jurisprudence footing. In *Stabilus*, the Board found that an employer unlawfully prohibited employees from wearing pro-union t-shirts during an election period.[11] The employer maintained a uniform policy that required employees to wear shirts bearing the company name "but did not require temporary employees to wear a company uniform of any kind."[12] The employer also permitted employees to wear company shirts unbuttoned with t-shirts underneath displaying various messages.[13] However, during an election period, the employer required certain employees to remove pro-union t-shirts, hats, and badges.[14] Thus, the *Stabilus* ruling was limited to the discriminatory enforcement of the employer's policy that specifically targeted union insignia.

The *Stabilus* language cited by the Board in its present invitation for briefs – "an employer cannot avoid the 'special circumstances' test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia" – is in fact merely dicta that had no involvement with the resolution of that case. Such dicta is accompanied by no further justification or explanation, either in the opinion itself or in accompanying citations to previous Board cases from which it may have been derived, nor has it been subsequently elucidated or relied upon in any manner in any future Board adjudication. Thus, the extent to which *Stabilus* stands for the rule that an employer's uniform policy that may preclude the wearing of clothing with any other insignia is facially unlawful – even where such policy is nondiscriminatory as written and consistently enforced – is unclear, and its dubious source makes the contours of its application subject to question.

---

[11] *Id.* at 837.
[12] *Id.*
[13] *Id.*
[14] *Id.*

7

**C.** ***Republic Aviation* Establishes a Test Balancing Employer and Employee Interests and Did Not Create a "Special Circumstances" Test that Places a Heightened Burden on Employers**

Initially, it is important to note that the primary issues before the Court in *Republic Aviation* were employer due process challenges to the Board's decision-making process and challenges to whether the Board had articulated with sufficient particularity rationales for its decisions. For example, the Court stated the following:

> The gravamen of the objection of both *Republic* and *Le Tourneau* to the Board's orders is that they rest on a policy formulated without due administrative procedure. To be more specific it is that the Board cannot substitute its knowledge of industrial relations for substantive evidence. The contention is that there must be evidence before the Board to show that the rules and orders of the employers interfered with and discouraged union organization in the circumstances and situation of each company.[15]

> The Board has fairly, we think, explicated in these cases the theory which moved it to its conclusions in these cases. The excerpts from its opinions just quoted show this. The reasons why it has decided as it has are sufficiently set forth.[16]

The relevant part of *Republic Aviation* with respect to the questions posed by the Board in its invitation to file briefs is the Court's establishment of a balancing test when employer workplace policies are challenged. Specifically, the Court stated:

> These cases bring here for review the action of the National Labor Relations Board in working out an adjustment between the undisputed right of self-organization assured to employees under the Wagner Act and the equally undisputed right of employers to maintain discipline in their establishments. Like so many others, these rights are not unlimited in the sense that they can be exercised without regard to any duty which the existence of rights in others may place upon employer or employee. Opportunity to organize and proper discipline are both essential elements in a balanced society.[17]

This is the test that the Board and courts should apply when legal challenges are made to employer workplace policies, including employee uniform policies. *Republic Aviation* did not

---

[15] *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798 (1945).
[16] *Id*. at 803.
[17] *Id*. at 797-98.

22-60493.6507

create a heightened burden "special circumstances" test. Indeed, the phrase "special circumstances" as thereafter applied by the Board in subsequent cases, and as referred to in *Stabilus* and applied by the ALJ in the present case, only appears twice in *Republic Aviation* – once in the context of the geographic location of the plants in question and whether they fit in a "company town" situation, and once in a reference to an employer rule prohibiting union solicitation by an employee outside of working hours on company property.[18] Not once does this phrase appear in relation to the employer's prohibition of union buttons and insignia.

A close examination of the Board's analysis in its underlying decision in *Republic Aviation* also does not support the establishment of an artificial "special circumstances" test placing a heightened burden on employers. The first issue examined in depth by the Board does not even involve employee uniform policies. This issue involved a challenge to an employer policy that prohibited employees from engaging in union solicitation during nonwork lunch periods. The Board correctly held that:

> …a rule prohibiting union activity on company property outside of working time constitutes an unreasonable impediment to self-organization, and that discharges for violation thereof are discriminatory.[19]

While the Board's decision does state that the "record discloses no special circumstances" the decision goes on to state that the "Respondent advances no cogent reason, warranting extension of the prohibition to non-working time"[20] – a balancing of interests analysis.

The second issue examined by the Board in *Republic Aviation* does touch upon an employer uniform policy – discharge of three employees for wearing union steward pins. Nowhere in this part of the decision, however, does the phrase "special circumstances" appear. The entire

---

[18] *Id*. at 803-04.
[19] *Republic Aviation*, 51 NLRB 1186, 1187 (1943).
[20] *Id*.

22-60493.6508

analysis on this issue is a balancing test discussion with the Board rejecting the employer's rationale for its policy, and concluding that the wearing of union insignia in the workplace is a protected activity that outweighed any corresponding employer interest in that case.

What term is used to describe the correct balancing test is not important. What is important is that the Board and courts recognize an employer's right to establish and implement facially neutral employee uniform policies, and that a balancing test generally be utilized to determine whether such policies are lawful under the NLRA.

## D.  The "Special Circumstances Test" Was Improperly Explained in *Stabilus*

To the extent that a "special circumstances" test evolved out of *Republic Aviation*, the test, as applied by the Board over the decades, still:

> …inherently involves a balancing of employees' Section 7 rights and the employer's legitimate business interests, as a finding of special circumstances means that the employer's justifications for the policy are sufficiently weighty that the balance must tip in favor of permitting the ban.[21]

It does not give an unqualified right to employees to wear union insignia in the workplace nor similarly render any otherwise lawful uniform policy that prohibits the wearing of such insignia per se unlawful.

Further, such a test is limited in scope "through cases deciding whether employees could add or attach union insignia to a uniform or attire required by their employer's policy."[22] Specifically, the question of whether there are "special circumstances" has arisen in cases involving employers with no uniform policies that have prohibited employees from wearing union insignia or attire, or in cases involving employers with a uniform policy that completely banned

---

[21] *See Wal-Mart Stores, Inc.* 368 NLRB No. 146 (2019).
[22] *Stabilus* 355 NLRB 836, 844 (2010) (Member Schaumber, dissenting).

22-60493.6509

adding union insignia (such as a button or pin) to the required attire.[23] Thus, the "special circumstances" test, to the extent it properly applies, balances employees' rights to add or attach insignia to a company uniform against the employer's right to maintain safety, production, public image, or other employer concern.

Before *Stabilus*, however, the Board had never, in applying the "special circumstances" test, held that where an employer lawfully maintains and consistently enforces a facially neutral policy requiring employees to wear a company uniform, its employees have a right under Section 7 to disregard the policy and wear union attire of their own choosing in place of a required uniform.[24] This approach is in direct conflict with established Board precedent recognizing an employer's right to maintain and enforce a facially neutral nondiscriminatory employee uniform policy.[25] Extending an artificially created "special circumstances" test to lawfully maintained and enforced uniform policies as implied by *Stabilus* essentially eliminates an employer's right to maintain and enforce such policies entirely. If employees have an unqualified right to disregard a company uniform policy and substitute union attire in place of the required uniform then an employer is effectively prevented from maintaining and enforcing any type of uniform policy whatsoever. Indeed,

> if employees have the right to wear union attire instead of a company uniform, the employer's right to promulgate and enforce reasonable, nondiscriminatory apparel rules is negated entirely. Such a result would not strike a balance between employee and employer rights; rather, it would completely submerge the employer's rights.[26]

---

[23] *Id.*
[24] *Id.* at 843.
[25] *See, e.g.*, *Noah's New York Bagels*, 324 NLRB 266, 275 (1997); *Casa San Miguel, Inc.*, 320 NLRB 534, 540 (1995).
[26] *Stabilus*, 355 NLRB 836, 843 (2010) (Member Schaumer dissenting).

11

Thus, the dicta in *Stabilus* inappropriately suggests that the "special circumstances" test could apply to lawful employer uniform policies such that it would inappropriately subordinate employer rights to the rights of their employees.

### E. The *Republic Aviation* Balancing Test is the Proper Analysis for Employer Workplace Policies and Not the Artificially Created "Special Circumstances" Test

The artificially created "special circumstances" test as contemplated by *Stabilus* cannot be used to nullify or interfere with the utilization of the *Republic Aviation* balancing test. Indeed, such improper application of the "special circumstances" test in fact improperly elevates employee interests over that of the employer. It places, in most instances, an unachievable burden on employers to establish that "special circumstances" justify implementing an otherwise lawful workplace rule or policy that is grounded in basic operational and entrepreneurial rights. Instead of beginning with a balancing of the legitimate business justifications for an employer's policy against an employee's Section 7 rights, such a "special circumstances" test has been utilized in a manner that assumes a workplace rule or policy is unlawful, an assumption that an employer must then rebut to maintain its policy – such an approach, as stated above, places an extremely high and difficult evidentiary burden for employers to meet. Stated alternatively, an overly expansive use of the artificially created "special circumstances" test unlawfully places a nearly unreachable burden on employers to establish their right to implement such policies in the workplace in the first instance.

Such an approach also inappropriately subordinates an employer's rights to that of its employees in contravention of the goals and purposes of the NLRA and is in direct conflict with the balancing approach derived in *Republic Aviation* from which the artificially created "special circumstances" test purportedly flows. Again, Member Schaumber in his dissent to *Stabilus* properly makes the point:

12

> The elevation of employee rights over the employer's rights simply is not supported by *Republic Aviation* or any case law. Indeed, the core principle of *Republic Aviation*, and subsequent Board cases, is one of balancing and accommodating the equal but competing rights of employees and employers. Inherent in the notion of balancing and accommodating those competing rights is that both employer and employee interests must be fairly considered and weighed.[27]

Workplace rules and policies should instead be evaluated using the *Republic Aviation* balancing test, in which employee Section 7 rights are properly balanced against employer's rights to maintain productivity and discipline. The right to wear union insignia, for example, as recognized in *Republic Aviation*, is predicated on an employee's right to communicate freely with other employees regarding self-organization at the workplace, and is balanced against an employer's right to implement an employee uniform policy, which is predicated on an employer's right to maintain productivity and discipline. Such an approach gives proper weight to all interests, is in accordance with Board and court precedent, and properly achieves the goals of the NRLA.

**CONCLUSION**

Substantial precedent provides broad entrepreneurial and operational rights for employers to establish and implement facially neutral employee uniform policies. *Stabilus*, then, does not specify the correct standard to apply when an employer maintains and consistently enforces such policies. The Board should apply a balancing test in deciding employee uniform cases and only apply a heightened burden "special circumstances" test when an employer has no uniform policy or a policy that completely prohibits any type of additional apparel and/or buttons, badges, and insignia to be worn in the workplace.

Respectfully submitted,

---

[27] *Stabilus* 355 NLRB 836, 844 (2010) (Member Schaumber, dissenting).

13

/s/ G. Roger King
G. Roger King
Senior Labor & Employment Counsel
HR Policy Association
1001 19th St. N., Suite 10002
Arlington, VA 22209
(202) 375-5004

14

22-60493.6513

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Amicus Brief in Cases 32-CA-197020 et al. was electronically filed via NLRB e-filing system with the National Labor Relations Board and served via email on the following parties or counsel on March 22, 2021.

Margo Feinberg
Schwartz, Steinsapir, Dohrmann & Sommers LLP
6300 Wilshire Blvd., Suite 2000
Los Angeles, CA 90048
margo@ssdslaw.com

Mark Ross
Sheppard, Mullin, Richter, & Hampton, LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111
mross@sheppardmullin.com

Jeffrey Sodko
United Auto Workers
8000 E. Jefferson Ave.
Detroit, MI 48214
jsodko@uaw.net

Christy Kwon
National Labor Relations Board, Region 32
1301 Clay St. Ste. #300N
Oakland, CA 94612
Edris.rodriguez@nlrb.gov

/s/ G. Roger King
G. Roger King
Senior Labor & Employment Counsel
HR Policy Association
1001 19th St. N., Suite 10002
Arlington, VA 22209
(202) 375-5004

22-60493.6514

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | | | |
|---|---|---|---|
| **TESLA, INC.**, | ) | | |
| | ) | | |
| **Respondent,** | ) | **Case No.:** | **32-CA-197020** |
| | ) | | **32-CA-197058** |
| | ) | | **32-CA-197091** |
| **AND** | ) | | **32-CA-197197** |
| | ) | | **32-CA-200530** |
| **MICHAEL SANCHEZ,** | ) | | **32-CA-208614** |
| **JONATHAN GALESCU, RICHARD ORTIZ,** | ) | | **32-CA-210879** |
| **INTERNATIONAL UNION, UNITED** | ) | | **32-CA-220777** |
| **AUTOMOBILE, AEROSPACE AND** | ) | | |
| **AGRICULTURAL IMPLEMENT WORKERS** | ) | | |
| **OF AMERICA, AFL-CIO,** | ) | | |
| | ) | | |
| **Charging Parties.** | ) | | |
| | ) | | |

---

## BRIEF OF *AMICUS CURIAE* LOCAL UNION 304 OF
## THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

### INTEREST OF THE AMICUS

The International Brotherhood of Electrical Workers, Local Union 304, is located in Topeka, Kansas and represents approximately 2,100 members across eighteen contracts. This local also represents approximately 400 non-dues paying covered employees. The more than 2,500 employees that the Amicus represents across Kansas work in the utility industry in power plants, rural electric cooperatives, municipalities, government services, and line construction.

The Amicus has, at various times, debated and negotiated the rights of its represented employees to wear union supporting T-shirts, to affix union stickers to

1

hard hats and other equipment, and to display pro union signage in and around their work areas.

## INTRODUCTION

On February 12, 2021, the Board solicited the parties of the above-referenced case and interested parties to submit briefs addressing the following questions:

(1) Does *Stabilus* specify the correct standard to apply when an employer maintains and consistently enforces a nondiscriminatory uniform policy that implicitly allows employees to wear union insignia (buttons, pins, stickers, etc.) on their uniforms?

(2) If *Stabilus* does not specify the correct standard to apply in those circumstances, what standard should the Board apply?

The long-standing precedent established in *Republic Aviation Corp.* in 1945, followed repeatedly by the Board since then, and as relied upon in *Stabilus* and countless other decisions, should be retained.  The Board should not modify, overrule, or weaken these fair, clear standards.

## SUMMARY OF ARGUMENT

In 1945, the Supreme Court affirmed the Board's decision in *Republic Aviation*.  *Republic Aviation v. NLRB*, 324 U.S. 793 (1945). The case centered around the company's no solicitation rule, which was the basis for a "no union insignia" policy. An employee was discharged for violating this rule by passing out

2

application cards on his own time during lunch periods. Three more employees were terminated for wearing UAW-CIO "union steward" buttons. During this time, the union was active in seeking to organize the workers at the plant. The company stated that since the union was not at that time recognized as the duly designated representative, the wearing of the buttons might send the message that management had recognized the union and that the "stewards" might have some authority to represent the employees in dealing with the company, impinging on the company's policy of strict neutrality in union matters and that it could possibly interfere with the existing grievance system.

The Board found that the promulgation and enforcement of the 'no solicitation' rule violated Section 8(1) of the National Labor Relations Act as it interfered with, restrained and coerced employees in their rights under Section 7 and discriminated against the discharged employee under Section 8(3). It also determined that the discharge of the stewards violated Section 8(1) and 8(3). The Bord entered a cease-and-desist order and also ordered the reinstatement of the terminated employees with back pay. The Board also ordered the recission of "the rule against solicitation in so far as it prohibits union activity and solicitation on company property during the employees' own time." 51 NLRB 1186, 1189. The U.S. Court of Appeals for the Second Circuit affirmed, 142 F.2d 193.

3

In *Stabilus, Inc.*, 355 NLRB 836,838 (2010), the Board found that the respondent violated Section 8(a)(1) in part, by prohibiting employees from wearing tee-shirts that supported the union. This was done in a selective and overbroad manner, targeting union supporters.

As the Supreme Court ruled, employees have the Section 7 right to wear union insignia on an employer's premises, which may not be infringed, absent a showing of "special circumstances." *Id.*, *quoting Republic Aviation v. NLRB*, 324 U.S. 793, 801-803 (1945). These protections have always extended to articles of clothing, including "prounion T-shirts." *Wal-Mart Stores*, 340 NLRB 637, 638-639 (2003).

The Amicus understands the "special circumstances" test quite well. Many of our covered employees work in line construction, power generation, and gas distribution, where protective equipment, such as FR (fire retardant) clothing is a must. In those situations, it is understandable that a union jacket or T-shirt is not acceptable, as it would not offer the employee the protection needed if an accident were to occur.

However, the employer cannot simply require the employee to wear company branded clothing or uniforms to avoid the test of "special circumstance." This would go against the spirit and letter of the long-standing precedent confirmed in *Stabilus* and the Act itself.  Lowering the standards articulated in *Stabilus* would result in a cynical application of the law in an attempt to avoid its main purpose altogether,

4

which is to prohibit employers from interference with, restraint of, or coercion of employees in the exercise of their Section 7 rights, except in "special circumstances." "In the absence of 'special circumstances,' the prohibition by an employer against the wearing of union insignia violates Section 8(a)(1) of the Act." *United Parcel Service*, 312 NLRB 596, 597 (1993). Likewise, the current standards already apply a broad, fair balancing test to determine whether "special circumstances" exist, and do not need to be weakened. To determine whether "special circumstances" justify prohibiting employees from wearing union insignia, "the entire circumstance of a particular situation must be examined to balance the potentially conflicting interests of an employee's right to display union insignia and an employer's right to limit or prohibit such display." Nordstrom, Inc., 264 NLRB 698, 700 (1982).

The long-standing precedent established in *Republic Aviation Corp.* in 1945, followed repeatedly by the Board since then, and as relied upon in *Stabilus* and countless other decisions, should be retained. The Board should not modify, overrule, or weaken these fair, clear standards.

Dated: March 22, 2021

> Respectfully Submitted,
>
> WICKHAM & WOOD, LLC

22-60493.6519

/s/ Brian T. Noland, # 67127
/s/ Fred Wickham, # 35741
107 W 9th St, Second Floor
Kansas City, MO 64105
Phone: (816)506-1948
Fax: (816)817-8828
nolandbrian@gmail.com
fred@wickham-wood.com

**ATTORNEYS FOR**
**IBEW LOCAL 304**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing was e-filed with the NLRB's Executive Secretary and served via electronic mail on the following parties or counsel on March 22, 2021:

Margo Feinberg and Daniel Curry
Schwartz, Steinsapir, Dohrmann & Sommers LLP
6300 Wilshire Boulevard, Suite 2000
Los Angeles, CA 90048
margo@ssdslaw.com
dec@ssdslaw.com

Mark Ross and Keahn Morris
Sheppard, Mullin, Richter & Hampton LLP
4 Embarcadero Center, 17thFloor
San Francisco, CA 94111
mross@sheppardmullin.com
kmorris@sheppardmullin.com

Jeffrey Sodko
United AutoWorkers
8000 E. Jefferson Avenue
Detroit, MI 48214-2699
jsodko@uaw.net

Edris W.I. Rodriguez Ritchie and Christy Kwon
E-mail: christy.kwon@nlrb.gov
E-mail: edris.rodriguezritchie@nlrb.gov

22-60493.6520

Field Attorney, Region 32
National Labor Relations Board
1301 Clay Street, Ste. 300N
Oakland, CA 94612-5224


*/s/ Brian T. Noland*

Attorney for IBEW Local 304

22-60493.6521

NOTICE: *This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.*

**Tesla, Inc.** *and* **Michael Sanchez, Jonathan Galescu, Richard Ortiz and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO.** Cases 32–CA–197020, 32–CA–197058, 32–CA–197091, 32–CA–197197, 32–CA–200530, 32–CA–208614, 32–CA–210879 and 32–CA–220777

March 25, 2021

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS EMANUEL AND RING

On September 27, 2019, Administrative Law Judge Amita Baman Tracy issued the attached decision. The Respondent filed exceptions and a supporting brief, the General Counsel and the Charging Parties—Michael Sanchez, Jonathan Galescu, Richard Ortiz, and the Union, collectively—filed answering briefs, and the Respondent filed reply briefs. Additionally, the General Counsel filed limited cross-exceptions and a supporting brief, the Charging Parties filed a brief in support of the General Counsel's limited cross-exceptions, the Respondent filed an answering brief, and the General Counsel filed a reply brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions[1] and briefs and has decided to affirm the judge's rulings, findings,[2] and conclusions only to the extent consistent with this Decision and Order.[3]

We affirm the judge's findings that the Respondent violated Section 8(a)(1) by coercively interrogating employees Ortiz and Galescu on May 24, 2017;[4] coercively interrogating Ortiz on September 21 and October 12; coercively interrogating employee Jose Moran on October 12; promulgating a rule restricting employees' use of Workday[5] in response to protected activity;[6] and threatening employees with the loss of their stock options if they select the Union as their exclusive collective-bargaining representative. Additionally, we affirm the judge's findings that the Respondent violated Section 8(a)(3) and (1) by discharging Ortiz on October 18 and issuing a warning to Moran on October 19. For the reasons discussed below, we find, contrary to the judge, that the Respondent violated Section 8(a)(1) by maintaining a media-contact provision in its Confidentiality Agreement, and we reverse the judge and dismiss the allegations that the Respondent violated Section 8(a)(1) on June 7 by soliciting employees' grievances and impliedly promising to remedy them, by threatening employees that selecting the Union would be futile, and by stating that a majority of employees did not want a union while also questioning why employees would want to pay union dues.

---

[1] Following the issuance of the Board's decision in *Argos USA LLC d/b/a Argos Ready Mix, LLC*, 369 NLRB No. 26 (2020), the General Counsel filed a motion to withdraw his cross-exceptions 1, 2, 3, and 5, and the Board approved the request on February 18, 2020. Therefore, we have not considered those cross-exceptions.

The General Counsel has filed a motion to strike certain of the Respondent's exceptions for failure to comply with Sec. 102.46(a)(1)(i) of the Board's Rules and Regulations. We deny that motion because any deficiencies in the Respondent's exceptions are remedied by its brief in support of exceptions.

No party has excepted to the judge's findings that the Respondent violated Sec. 8(a)(1) by interfering with multiple employees' leafletting activities on February 10 and May 24, 2017; by prohibiting employees from and threatening them with discharge for distributing union stickers, leaflets, and pamphlets without the Respondent's approval on March 23, 2017; and by threatening employees that selecting the Union would be futile in August 2017. Additionally, no party has excepted to the judge's dismissal of the allegations that the Respondent violated Sec. 8(a)(1) by maintaining certain provisions in its Confidentiality Agreement (other than the media-contact provision), prohibiting an employee from photographing the Confidentiality Agreement, placing a "CONFIDENTIAL" watermark on the Cal/OSHA safety logs and summaries that it provided to employees, discriminatorily enforcing its team-wear policy against union supporters, and impliedly threatening two employees for wearing union hats.

[2] The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance

of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

[3] We have amended the judge's conclusions of law consistent with our findings herein. We have also amended the remedy and modified the judge's recommended Order consistent with our legal conclusions herein, to conform to the Board's standard remedial language, and in accordance with our recent decisions in *Danbury Ambulance Service, Inc.*, 369 NLRB No. 68 (2020), and *Cascades Containerboard Packaging—Niagara*, 370 NLRB No. 76 (2021). We shall substitute a new notice to conform to the Order as modified.

On February 12, 2021, the Board issued a Notice and Invitation to File Briefs regarding an issue related to the allegations that the Respondent violated Sec. 8(a)(1) by maintaining and enforcing its team-wear policy. *Tesla, Inc.*, 370 NLRB No. 88 (2021). We sever and retain those allegations for further consideration.

[4] Dates are in 2017 unless otherwise indicated.

[5] Workday is a third-party HR software program that the Respondent uses to electronically store and access employees' personnel files. Employees can access Workday to, among other things, view and electronically sign documents.

[6] Member Ring notes that the promulgation of a work rule in response to protected activity is not per se unlawful, as the employer still has an opportunity to show that the rule was lawfully adopted to maintain production or discipline. See *Cordúa Restaurants, Inc.*, 368 NLRB No. 43, slip op. at 3 fn. 11 (2019) (citing cases). The Respondent has not made such a showing here.

370 NLRB No. 101

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

I.  MEDIA-CONTACT PROVISION

*A.  Relevant Facts*

In October and November 2016, the Respondent required its employees to sign the following Confidentiality Agreement:

> In response to recent leaks of confidential Tesla information, we are reminding everyone who works at Tesla, whether full-time, temporary or via contract, of their confidentiality obligations and asking them to reaffirm their commitment to honor them.

> These obligations are straightforward. Provided that it's not already public information, everything that you work on, learn about or observe in your work about Tesla is confidential information under the agreement that you signed when you first started. This includes information about products and features, pricing, customers, suppliers, employees, financial information, and anything similar. **Additionally, regardless of whether information has already been made public, it is never OK to communicate with the media or someone closely related to the media about Tesla, unless you have been specifically authorized in writing to do so.**

> Unless otherwise allowed by law or you have received written approval, you must not, for example, discuss confidential information with anyone outside of Tesla, take or post photos or make video or audio recordings inside Tesla facilities, forward work emails outside of Tesla or to a personal email account, or write about your work in any social media, blog, or book. If you are unsure, check with your manager, HR, or Legal. Of course, these obligations are not intended to limit proper communications with government agencies.

> The consequence for careless violation of the confidentiality agreement, could include, depending on severity, loss of employment. Anyone engaging in intentional violation of the confidentiality agreement will be held liable for all the harm and damage that is caused to the company, with possible criminal prosecution. These obligations remain in place even if no longer working at Tesla.

> By acknowledging, I affirm my agreement to comply with my confidentiality obligations to Tesla. I also represent that at no time over the past 12 months have I disclosed any Tesla confidential information outside of Tesla unless properly authorized to do so.

(Emphasis added.)[7]  The Respondent created the Confidentiality Agreement in response to leaks of its confidential information, including a leak to the media of an August 29, 2016 email from the Respondent's CEO, Elon Musk, to all employees, discussing the Respondent's financial position and future projections. The Respondent requires employees to sign documents that include confidentiality obligations when they are hired and had previously reminded employees by email not to disclose confidential information to anyone outside of the Respondent. However, the Respondent had not previously required employees to reaffirm their confidentiality obligations.

The Respondent initially tried to have every employee physically sign a copy of the Confidentiality Agreement in the presence of a human resources (HR) partner.[8] When that method proved to be logistically difficult, the Respondent, through a November 2, 2016 email sent by Vice President of Human Resources Mark Lipscomb, instructed all employees to electronically sign the Confidentiality Agreement in Workday. Lipscomb's email stated that "[i]t's absolutely critical that we maintain strict confidentiality on all internal matters as any leak can have a negative impact on our company," and that "[i]n order to reinforce the importance of confidentiality, we are asking everyone to sign an updated confidentiality agreement."

*B.  Legal Standard*

In *Boeing Co.*, 365 NLRB No. 154 (2017), the Board set out a new standard for determining whether a facially neutral work rule or policy, reasonably interpreted, would unlawfully interfere with, restrain, or coerce employees in the exercise of their Section 7 rights.[9] In doing so, the Board overruled the "reasonably construe" prong delineated in *Lutheran Heritage Village–Livonia*, 343 NLRB 646 (2004), which held that a facially neutral work rule would be found unlawful if employees would reasonably construe it to prohibit Section 7 activity. *Boeing*, 365 NLRB No. 154, slip op. at 1–2. Instead, the Board in *Boeing* held:

> [W]hen evaluating a facially neutral policy, rule or handbook provision that, when reasonably interpreted, would potentially interfere with the exercise of NLRA rights, the Board will evaluate two things: (i) the nature and

---

[7]  The emboldened portion of the Confidentiality Agreement is the media-contact provision at issue.

[8]  Associate HR Partner Analisa Heisen testified that she informed employees who signed the Confidentiality Agreement in her presence that it was created in response to recent leaks of the Respondent's confidential information.

[9]  The reasonable interpretation of a rule is from "the perspective of an objectively reasonable employee who is aware of his legal rights but who also interprets work rules as they apply to the everydayness of his job. The reasonable employee does not view every employer policy through the prism of the NLRA." *LA Specialty Produce Co.*, 368 NLRB No. 93, slip op. at 2 (2019) (internal quotations omitted).

extent of the potential impact on NLRA rights, *and* (ii) legitimate justifications associated with the rule.

Id., slip op. at 3 (emphasis in original). In conducting this evaluation, the Board will strike the proper balance between the employer's asserted business justifications for the policy against the extent to which the policy interferes with employee rights under the Act, viewing the rule or policy from the employees' perspective. Ibid. Ultimately, the Board places work rules into one of three categories:

> *Category 1* will include rules that the Board designates as lawful to maintain, either because [(a)] the rule, when reasonably interpreted, does not prohibit or interfere with the exercise of NLRA rights; or [(b)] the potential adverse impact on protected rights is outweighed by justifications associated with the rule. . . .

> *Category 2* will include rules that warrant individualized scrutiny in each case as to whether the rule would prohibit or interfere with NLRA rights, and if so, whether any adverse impact on NLRA-protected conduct is outweighed by legitimate justifications.

> *Category 3* will include rules that the Board will designate as *unlawful* to maintain because they would prohibit or limit NLRA-protected conduct, and the adverse impact on NLRA rights is not outweighed by justifications associated with the rule.

Id., slip op. at 3–4 (emphasis in original).[10] However, these categories "will represent a classification of *results* from the Board's application of the new test" and "are not part of the test itself." *Boeing*, 365 NLRB No. 154, slip op. at 4 (emphasis in original).

As further explained in *LA Specialty*, the General Counsel has the initial burden to prove that a facially neutral rule or policy would, when read in context, be interpreted by a reasonable employee as potentially interfering with the exercise of Section 7 rights. 368 NLRB No. 93, slip op. at 2. If the General Counsel fails to meet this initial burden, the Board does not need to address the employer's legitimate justifications for the rule. Ibid. Instead, the rule is lawful and fits within *Boeing* Category 1(a). Ibid. Conversely, if the General Counsel does meet the initial burden of proving that a reasonable employee would interpret a rule as potentially interfering with the exercise of

Section 7 rights, the Board will then balance that potential interference against the employer's legitimate justifications for the rule. Id., slip op. at 3. When the balance favors general employer interests, the rule at issue will be lawful and will fit within *Boeing* Category 1(b). Ibid. When the potential interference with Section 7 rights generally outweighs any possible employer justification, the rule at issue will be unlawful and will fit within *Boeing* Category 3. Ibid. Finally, "in some instances, it will not be possible to draw any broad conclusions about the legality of a particular rule because the context of the rule and the competing rights and interests involved are specific to that rule and that employer"; such rules will fit within *Boeing* Category 2. Ibid.

### C. Discussion

The judge did not specifically analyze the media-contact provision. Instead, applying *Boeing*, she found, in general, that the Confidentiality Agreement is lawful because when "considered in the full context of the events at the time"—including the statement in the Confidentiality Agreement that it was in response to recent leaks of confidential information and similar contemporaneous explanations to employees by the Respondent's HR officials—employees would reasonably interpret the Confidentiality Agreement to apply only to confidential proprietary information. Additionally, the judge found that even if the Confidentiality Agreement potentially interferes with Section 7 rights, any such interference is outweighed by the Respondent's legitimate interest in protecting its confidential proprietary information. For the reasons discussed below, we disagree with the judge regarding the media-contact provision in the Confidentiality Agreement and instead find that the Respondent violated Section 8(a)(1) by maintaining that provision.[11]

The Board has applied *Boeing* to analyze media-contact rules in two recent cases. In *LA Specialty*, the Board found the following media-contact rule to be lawful:

> Employees approached for interview and/or comments by the news media, cannot provide them with any information. Our President, Michael Glick, is the only person authorized and designated to comment on Company policies or any event that may affect our organization.

---

[10] In *LA Specialty*, the Board redesignated the subdivisions of *Boeing* Category 1 as (a) and (b). 368 NLRB No. 93, slip op. at 2 fn. 2.

[11] As noted above, no party excepts to the judge's dismissal of the allegations that the Respondent violated Sec. 8(a)(1) by maintaining other provisions in the Confidentiality Agreement.

Contrary to his colleagues, Member Emanuel agrees with the judge that when read in context—especially in light of the statement in the first paragraph of the Confidentiality Agreement that it was created "[i]n response to recent leaks of confidential Tesla information"—employees

would reasonably interpret the Respondent's Confidentiality Agreement, including the media-contact provision, to apply only to the Respondent's confidential information. Employees do not have a Sec. 7 right to divulge (to the media or anyone else) confidential information that their employer may lawfully conceal. See, e.g., *Macy's, Inc.*, 365 NLRB No. 116, slip op. at 4 (2017). Therefore, Member Emanuel would find that the media-contact provision is lawful and would affirm the judge's dismissal of the allegation that the Respondent violated Sec. 8(a)(1) by maintaining it.

4                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

368 NLRB No. 93, slip op. at 1.  The Board acknowledged that "Section 7 generally protects employees when they speak with the media about working conditions, labor disputes, or other terms and conditions of employment" and that a rule would be facially unlawful if employees would reasonably interpret it to infringe on their Section 7 right to express their *personal opinion* about those topics to the media.  Id., slip op. at 4.  The Board found, however, that employees would have reasonably interpreted the media-contact rule at issue there to provide "only that when employees are approached by the news media for comment, they cannot speak *on the [employer's] behalf*."  Ibid. (emphasis in original).  "The phrase 'authorized and designated' [was] key" because it signified that the employer's president was its "spokesperson, i.e., the only person authorized to comment about company matters *on the [employer's] behalf*."  Id., slip op. at 5 (emphasis in original).  Thus, employees would have reasonably interpreted the media-contact rule merely to prohibit them from speaking to the media on the employer's behalf.  Ibid.  The Board ultimately concluded that because employees do not have a Section 7 right to speak to the media on their employer's behalf, the media-contact rule at issue did not potentially interfere with the exercise of Section 7 rights and was therefore lawful.  Ibid.  The Board placed rules that prohibit employees from speaking to the media on their employer's behalf in *Boeing* Category 1(a).  Ibid.

In *Maine Coast Regional Health Facilities, d/b/a Maine Coast Memorial Hospital*, the Board found the following media policy to be unlawful:

> No EMHS employee may contact or release to news media information about EMHS, its member organizations or their subsidiaries without the direct involvement of the EMHS Community Relations Department or of the chief operating officer responsible for that organization.  Any employee receiving an inquiry from the media will direct that inquiry to the EMHS Community Relations Department, or Community Relations staff at that organization for appropriate handling.

369 NLRB No. 51, slip op. at 1 (2020).  The Board agreed with the judge that the media policy above "significantly burden[ed] the employees' protected rights to communicate with third parties about labor disputes in order to seek improvements in their working conditions, and that the restrictions on Sec[tion] 7 rights far outweighed the [employer's] proffered justifications."  Id., slip op. at 2 fn. 7.  In finding that the media policy significantly burdened the exercise of Section 7 rights, the Board observed that it was "not limited to communications about confidential or proprietary information, or to circumstances when the employees purport to speak on behalf of the [employer]."  Id., slip op. at 17.

In *Maine Coast*, the Board also analyzed the employer's amended media policy and found that it was lawful because the employer added the following "savings clause" to the unlawful media policy above: "This Policy does not apply to communications by employees, not made on behalf of EMHS or a Member Organization, concerning a labor dispute or other concerted communications for the purpose of mutual aid or protection protected by the National Labor Relations Act."  Id., slip op. at 2–3.  The Board found that based on the clear language of that "savings clause," employees would not reasonably interpret the amended media policy to interfere with their Section 7 rights, and it placed the amended media policy in *Boeing* Category 1(a).  Id., slip op. at 2–3.

As to the media-contact provision at issue here, we disagree with the judge, the Respondent, and our dissenting colleague that employees would reasonably interpret the media-contact provision to apply only to confidential information.  The Confidentiality Agreement defines confidential information, in part, as information that is "not already public."  The media-contact provision states that "it is never OK to communicate with the media" about the Respondent "regardless of whether information has already been made public."  Because the express language of the media-contact provision clearly indicates that it applies to information beyond the Confidentiality Agreement's definition of confidential information, employees would not reasonably interpret the media-contact provision to apply only to communications with the media regarding confidential information.  That is so even when the media-contact provision is read in the context of the statement in the first paragraph of the Confidentiality Agreement that it was created "[i]n response to recent leaks of confidential Tesla information."  That general statement does not change the meaning of the plain language of the media-contact provision, which employees would reasonably interpret to apply to communications with the media about any matter regarding the Respondent, including working conditions, labor disputes, or other terms and conditions of employment.[12]

Further, unlike the media-contact rule in *LA Specialty*, the employees here would not reasonably interpret the media-contact provision to apply only to statements made to the media *on the Respondent's behalf* because the media-contact provision does not include any language

---

[12] We reject the Respondent's argument that employees would understand the reference to information that "has already been made public" to refer only to confidential information that has been leaked.  No language in the media-contact provision limits its coverage in that manner, and employees would not reasonably interpret it to be so limited.

designating a company spokesperson that would logically lead employees to read the provision in that manner. We do not agree with the Respondent that the phrase "unless you have been specifically authorized in writing to do so" would have the same effect as the language designating a company spokesperson in the *LA Specialty* media-contact rule because employees would not reasonably interpret the authorization language in the media-contact provision here to designate a company spokesperson. Instead, employees would reasonably interpret that language to require that they receive authorization before communicating with the media about any matter regarding the Respondent, including working conditions, labor disputes, or other terms and conditions of employment. The Respondent may not lawfully require its employees to receive preauthorization before engaging in such Section 7 activity. See, e.g., *Trump Marina Casino Resort*, 354 NLRB 1027, 1027 fn. 2 (2009) (finding unlawful a rule "prohibiting employees from releasing statements to the news media without prior approval"), affd. and incorporated by reference 355 NLRB 585 (2010), enfd. mem. sub nom. *Trump Marina Associates, LLC v. NLRB*, 435 Fed. Appx. 1 (D.C. Cir. 2011).

Additionally, we reject the Respondent's argument that employees would understand that the media-contact provision does not apply to Section 7 activity because the first sentence of the paragraph directly following the media-contact provision begins with the phrase "[u]nless otherwise allowed by law." When read in context, that phrase does not appear to apply to the media-contact provision because it is in a separate paragraph and specifically applies to a list of prohibited activities, which does not mention speaking to the media. In any event, even if employees would interpret the phrase "[u]nless otherwise allowed by law" to apply to the media-contact provision, such vague, generalized language would require employees to meticulously determine the state of the law for themselves, and employees therefore cannot be expected to interpret that language to exclude Section 7 activity from the coverage of the media-contact provision. See, e.g., *Everglades College, Inc. d/b/a Keiser University*, 368 NLRB No. 123, slip op. at 3–4 (2019) (finding that an arbitration agreement that employees would have reasonably interpreted to unlawfully restrict access to the Board was not rendered lawful because it "merely purport[ed] to except from its arbitration mandate claims or actions 'where specifically prohibited by law'"); see also *Ingram Book Co.*, 315 NLRB 515, 516 fn. 2 (1994) ("Rank-and-file employees do not generally carry lawbooks to work or apply legal

analysis to company rules as do lawyers, and cannot be expected to have the expertise to examine company rules from a legal standpoint."). The media-contact provision simply does not contain any language comparable to the "savings clause" that rendered the amended media policy lawful in *Maine Coast*.

Rather, the media-contact provision here is similar to the other media policy that the Board analyzed—and ultimately found unlawful—in *Maine Coast*. As in *Maine Coast*, because the media-contact provision is not limited to communications regarding confidential information or circumstances in which employees purport to speak on the Respondent's behalf, the General Counsel met his initial burden by proving that employees would reasonably interpret the media-contact provision to potentially interfere with the exercise of their Section 7 right to communicate with the media concerning working conditions, labor disputes, or other terms and conditions of employment.

We acknowledge that the Respondent has a legitimate and, indeed, weighty interest in protecting its confidential information. However, the right of employees to communicate with the media concerning labor disputes and terms and conditions of employment—and to do so without having to obtain preauthorization from their employer—is "central to the Act," *Boeing*, 365 NLRB No. 154, slip op. at 15, and employees would reasonably interpret the media-contact provision to wholly preclude them from exercising that right. As in *Maine Coast*, we find that the media-contact provision's potential impact on Section 7 rights outweighs the Respondent's justification.

Based on the foregoing, we find that the media-contact provision in the Respondent's Confidentiality Agreement is unlawful and that the Respondent therefore violated Section 8(a)(1) by maintaining it. Further, we place rules that prohibit employees from communicating with the media regardless of whether the communications concern confidential information or the employees purport to speak on the employer's behalf in *Boeing* Category 3.[13]

## II. JUNE 7, 2017 MEETING

### A. Relevant Facts

On June 6, employee Jose Moran hand delivered a petition to Senior HR Director for Production and Supply Chain Josh Hedges. Multiple employees had signed the petition, which stated as follows:

> As workers here at the Fremont plant, we believe in Tesla's mission, and work hard to make the company successful. But we also believe our company can expand that mission to recognize the important role

---

[13] Chairman McFerran adheres to her dissents in *Boeing Co.*, above, slip op. at 29–44, and *LA Specialty*, above, slip op. at 8–14, but she acknowledges that *Boeing* is currently governing law, and joins Member Ring in applying that standard for institutional reasons.

workers like us play in building the company's future. Tesla workers deserve to have a fair, safe, and secure work place. As we all work hard to meet our company's ambitious production goals, it's even more important that we don't lose sight of safety. We should come to work knowing we will return home to our families without being injured at work. Unfortunately, all too often, this isn't the case. Workers are getting hurt on the job, and see work areas where accidents could easily happen. In addition, too many of our coworkers don't report injuries or other safety concerns because they are afraid of retaliation. We believe the best, most fair, and most effective solution to safety and other concerns is for us to form our union so we can work together with management and have a true voice when it comes to our working conditions.

Later that same day, Moran, on behalf of the Union's voluntary organizing committee (VOC), emailed the petition to Hedges and CEO Musk. The email reiterated the safety concerns raised in the petition and the employees' belief that a union would be the most effective way to make the Respondent's Fremont, California facility a safer place to work. The email requested that the Respondent send a written response to Moran, who would accept it on behalf of the VOC.

On June 7, Hedges summoned Moran to a conference room for a meeting with Musk and Chief People Officer Gabrielle Toledano. Employee Tony Vega accompanied Moran as a witness. Toledano began the meeting by stating that they had reviewed the petition and wanted to hear Moran's safety concerns directly. Moran and Vega explained the employees' safety and other concerns, and Moran stated that the employees were seeking a union to gain a voice. Musk responded, "[Y]ou don't really have a voice. The [Union] is a second—like two-class system where [the Union] is the only one that has a voice and not the workers." Toledano added that the majority of employees did not want a union and asked why they wanted to pay union dues. Moran and Vega defended the employees' right to form a union and said that they just wanted to make things better at the Respondent. Toledano invited them to attend the Respondent's weekly safety committee meetings to raise their safety concerns. Musk said that if the safety committee meetings did not work out, "we'll give you your union."

### B. Discussion

The judge found that the Respondent violated Section 8(a)(1) during the June 7 meeting by soliciting employees'

safety concerns and impliedly promising to remedy them, by threatening employees that selecting the Union would be futile, and by stating that the majority of employees did not support the Union while also questioning why employees wanted to pay union dues. We disagree with the judge's findings of those violations for the reasons discussed below.[14]

An employer's solicitation of grievances during a union campaign is unlawful when it "carries with it an implicit or explicit promise to remedy the grievances and impress[es] upon employees that union representation [is] . . . [un]necessary." *Albertson's, LLC*, 359 NLRB 1341, 1341 (2013) (internal quotations omitted; alterations in original), affd. and incorporated by reference 361 NLRB 761 (2014). Based on the specific factual circumstances here, we do not agree with the judge that the Respondent unlawfully solicited employees' safety concerns and impliedly promised to remedy them. The Respondent did not summon Moran to a meeting on June 7 to discuss safety concerns on its own initiative. Instead, the June 7 meeting was prompted by an employee petition that Moran had delivered to the Respondent the previous day. That petition stated that employees did not always come to work confident that they would "return home to [their] families without being injured at work," were "getting hurt on the job," witnessed "work areas where accidents could easily happen," and did not report injuries or other safety concerns in some instances because of fear of retaliation. However, the petition did not detail any specific hazards, and the Respondent understandably felt compelled to immediately learn more about the serious safety concerns the petition alleged. It also reasonably decided to meet with Moran to discuss those concerns because the VOC had apparently designated him as its representative to receive the Respondent's response to the petition. In these circumstances, the Respondent did not violate the Act simply by meeting with Moran and Vega to discuss the safety concerns raised in the petition. Further, neither Musk nor Toledano either explicitly or implicitly promised to remedy the employees' safety concerns during the June 7 meeting. They merely listened to the safety concerns raised by Moran and Vega and invited them to attend the Respondent's weekly safety committee meetings to raise those concerns. In finding an unlawful solicitation of grievances, the judge relied on Musk's statement at the end of the June 7 meeting that if the safety committee meetings did not work out, the Respondent would give the employees their Union. However, Musk's statement left open the possibility that the employees' safety concerns

---

[14] Because we find that the Respondent did not commit the alleged violations described above, we find it unnecessary to pass on the judge's finding that those allegations are not barred by Sec. 10(b).

would not be resolved by the safety committee, and therefore Musk did not impliedly promise to remedy those concerns.[15]  Accordingly, contrary to the judge and our dissenting colleague, we find that the Respondent did not unlawfully solicit employees' grievances during the June 7 meeting.

As to the Respondent's other allegedly unlawful conduct during the June 7 meeting, the Board has long held that an allegedly unlawful statement violates Section 8(a)(1) if it has a reasonable tendency to coerce employees in the exercise of their Section 7 rights.  E.g., *KSM Industries*, 336 NLRB 133, 133 (2001).  The Board considers the totality of the circumstances to make this determination, and intent is immaterial to the analysis.  Ibid.  Moreover, under Section 8(c), "[t]he expressing of any views, argument, or opinion . . . shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit."  As a result, "an employer may criticize, disparage, or denigrate a union without running afoul of Section 8(a)(1), provided that its expression of opinion does not threaten employees or otherwise interfere with the Section 7 rights of employees."  *Children's Center for Behavioral Development*, 347 NLRB 35, 35 (2006).

The judge found that Musk unlawfully threatened that selecting the Union would be futile when, in response to Moran's claim that employees were seeking a union to gain a voice, he stated, "[Y]ou don't really have a voice.  The [Union] is a . . . two-class system where [the Union] is the only one that has a voice and not the workers."  The Board will find that "[a]n unlawful threat of futility is established when an employer states or implies that it will ensure its nonunion status by unlawful means."  *Winkle Bus Co.*, 347 NLRB 1203, 1205 (2006).  Musk's statement did not imply that the Respondent would use unlawful means to ensure its nonunion status or that the employees' attempt to organize would be futile for any other reason.  Therefore, Musk's statement was not an unlawful threat of futility.

Musk's statement was instead lawful under *Tri-Cast, Inc.*, 274 NLRB 377 (1985).  In *Tri-Cast*, the Board held that "[t]here is no threat, either explicit or implicit, in a statement which explains to employees that, when they select a union to represent them, the relationship that existed between the employees and the employer will not be as before."  Id. at 377 ("For an employer to tell its employees about this change during the course of an election campaign cannot be characterized as an objectionable retaliatory threat to deprive employees of their rights, but rather is nothing more or less than permissible campaign conduct."); see also *Stern Produce Co.*, 368 NLRB No. 31, slip op. at 4 (2019).  In *Hendrickson USA, LLC*, the Board, applying *Tri-Cast*, found that an employer did not violate the Act by stating that by signing a union authorization card, "'you no longer have a voice, you've signed that away to some third party,'" and that by supporting or voting for a union, "'you'll be giving up your right to speak for and represent yourself.'"  366 NLRB No. 7, slip op. at 1 fn. 2, 6–7 (2018), enf. denied on other grounds 932 F.3d 465 (6th Cir. 2019); see also *Overnite Transportation Co.*, 296 NLRB 669, 671 (1989) (applying *Tri-Cast* to find that an employer did not violate the Act by telling its employees that "'if this [u]nion were to get in, this freedom and this right (to come in and settle with us personally any problems you may have) . . . would definitely be taken away from you and placed in the hands of the [u]nion'"), enfd. 938 F.2d 815 (7th Cir. 1991).  Consistent with *Tri-Cast* and its progeny, Musk's statement that if the employees selected the Union as their representative, only the Union would have a voice and not the employees did not violate the Act.  Musk accurately explained that an effect of unionization would be that employees would deal with the Respondent through the Union, which would speak on their behalf.  See *Stern Produce*, 368 NLRB No. 31, slip op. at 4.[16]

The judge also found that Toledano's statement that the majority of employees did not want the Union combined with her subsequent questioning of why employees wanted to pay union dues was unlawfully coercive.  However, by stating that the majority of employees did not want the Union, Toledano simply conveyed her apparent belief that it lacked support among the Respondent's workforce.  Nothing in Toledano's statement threatened employees or otherwise interfered with their Section 7 rights.  Further, Toledano's questioning of why employees wanted to pay union dues was not coercive.  The Board

---

[15]  Unlike our dissenting colleague, we find that the present case is distinguishable from *Wake Electric Membership Corp.*, 338 NLRB 298 (2002).  In *Wake Electric*, the Board found that the employer violated the Act when, a day after soliciting employees' grievances, its operations manager told employees that he was confident that the employer could "work it out," that they should give the employer another chance, that the only way that they could get benefits sooner was to have the union withdraw the pending election petition, and that they could have a Board election in 6 months if the employer did not satisfy their concerns.  Id. at 306–307.  Here, neither Musk nor Toledano expressed confidence that the safety committee would satisfactorily address the employees' safety concerns or stated that the Respondent could address their safety concerns sooner in the absence of the Union.

[16]  We do not agree with the judge's suggestion that Musk's statement, during the June 7 meeting, that the Respondent would give the employees their union if the safety committee did not work out would have led a reasonable employee to understand Musk's statement above as a threat of futility.  Neither statement implies that the Respondent would use unlawful means to preserve its nonunion status.

8                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

has previously found "nothing unlawful in [an employer's] statement that the employees would have to pay [u]nion dues if they selected the [u]nion" because "[i]t is an economic reality that unions may collect dues from the employees they represent." *Office Depot*, 330 NLRB 640, 642 (2000). Toledano simply pointed out that employees would likely have to pay dues if they selected the Union as their representative. At most, she implied a negative view of the Union by questioning why employees would want to pay dues, but disparaging remarks alone are insufficient to constitute a violation of the Act. See *Children's Center*, 347 NLRB at 35. Toledano did not explicitly or implicitly threaten employees with reprisals if they selected the Union or interfere with their Section 7 rights in any other manner.

Contrary to the judge and our dissenting colleague, we do not find that employees would have reasonably understood Toledano's otherwise innocuous comments to be coercive in the context of the Respondent's contemporaneous unfair labor practices. "The Board is generally 'reluctant to convert otherwise lawful statements into unlawful threats simply because of the existence of other violations.'" *Stern Produce*, 368 NLRB No. 31, slip op. at 4 (quoting *Children's Center*, 347 NLRB at 36). As discussed above, contrary to the judge's findings, the Respondent did not commit any other unfair labor practices during the June 7 meeting. The only other violations on which the judge relied were the Respondent's earlier

unlawful interrogations of two employees. Those violations did not create the type of pervasive atmosphere of hostility to Section 7 activity that could possibly have turned Toledano's otherwise lawful statements into coercive threats.

For the reasons discussed above, we reverse the judge and dismiss the allegations that the Respondent violated Section 8(a)(1) on June 7 through Musk and Toledano's discussion of employees' safety concerns with Moran and Vega, Musk's statement that only the Union, and not the employees, would have a voice if they selected the Union as their representative, and Toledano's statement that the majority of employees did not want the Union and questioning of why they wanted to pay union dues.[17]

AMENDED CONCLUSIONS OF LAW

1. Insert the following as Conclusion of Law 3(k):

   (k) Maintaining the media-contact provision in the Confidentiality Agreement.

2. Delete Conclusions of Law 3(d), (e), and (f) and re-letter the subsequent paragraphs accordingly.

AMENDED REMEDY

Having found that the Respondent engaged in certain unfair labor practices, we shall order it to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act. Specifically, we amend the judge's remedy in the following respects.

---

[17] Contrary to her colleagues, Chairman McFerran would adopt the judge's findings that the Respondent violated Sec. 8(a)(1) by unlawfully soliciting employees' safety complaints during the June 7 meeting and by stating that a majority of the employees did not support the Union and questioning why employees wanted to pay union dues.

As the judge found, the day after receiving the safety petition, Musk, the Respondent's CEO, summoned Moran to a meeting with Musk and Toledano, another high-ranking manager. There is no evidence that Musk had ever met with Moran previously to discuss workplace matters. At the meeting, Toledano informed Moran that the purpose of the meeting was to hear safety concerns directly from Moran. After hearing the concerns, Toledano stated that a majority of employees "don't want a union" and questioned why the employees would want to pay union dues. Toledano also invited Moran and employee Vega (who had accompanied Moran to the meeting) to participate in the Respondent's weekly safety committee meetings to bring attention to their safety concerns. Musk concluded the meeting by informing the employees that if the safety committee did not work out, the Respondent would "give you your union."

On these facts, Chairman McFerran agrees with the judge that the Respondent's out-of-the-ordinary solicitation, by two high-ranking managers, of the employees' safety concerns, subsequent invitation of the employees to the Respondent's safety meetings, and statement that it would give the employees a union if the safety committee did not resolve the concerns constitutes an unlawful solicitation of employee grievances and implied promise to remedy them favorably. See *Charter Communications, LLC*, 366 NLRB No. 46, slip op. at 5 (2018), enfd. 939 F.3d 798 (6th Cir. 2019). In dismissing this allegation, her colleagues are persuaded there was no violation because, in their view, neither Musk nor

Toledano "explicitly or implicitly promised to remedy the employees' safety concerns" and Musk's statement at the end of the meeting left open the possibility that the concerns would not be resolved. However, on facts similar to those presented here, the Board has found a respondent to have acted unlawfully. See *Wake Electric Membership Corp.*, 338 NLRB 298, 298 fn. 3, 306–307 (2002) (finding that an employer unlawfully solicited grievances where it followed up the solicitation by asking for "another chance" and stating that "[i]f [it] did not satisfy the employees' concerns within 6 months, the employees could have a Board election at that time").

In addition, Chairman McFerran would adopt the judge's finding that Toledano's statement that the majority of employees did not want the Union and questioning of why employees wanted to pay union dues was unlawful. Even assuming Toledano's statements might be lawful in isolation, they can nevertheless violate the Act if they were made in a context of other unfair labor practices that "'impart[ed] a coercive overtone' to the statements." *Shamrock Foods Co.*, 366 NLRB No. 117, slip op. at 14 (2018) (citations omitted), enfd. mem. 779 Fed. Appx. 752 (D.C. Cir. 2019) (per curiam). Here, Chairman McFerran finds Toledano's statements to be unlawfully coercive, as they were made in the context of a broader conversation where the Respondent sought to temper employee support for the Union by unlawfully soliciting grievances and impliedly promising to remedy them.

Finally, Chairman McFerran would find it unnecessary to pass on the judge's finding that, during the June 7 meeting, the Respondent violated Sec. 8(a)(1) by threatening that selecting the Union would be futile, as doing so would be cumulative and would not materially affect the remedy. She notes, however, that she would be open to reconsidering *Tri-Cast, Inc.*, 274 NLRB 377 (1985), in a future appropriate case.

Having found that the Respondent violated Section 8(a)(1) by maintaining the media-contact provision in the Confidentiality Agreement, we shall order the Respondent to rescind or revise the media-contact provision and advise its employees in writing that it has done so.

The General Counsel argues that to remedy fully CEO Musk's unlawful May 20, 2018 tweet, which coercively threatened that employees would lose their stock options if they selected the Union as their representative, the Board should order the Respondent to have Musk delete that tweet and to post a notice addressing that violation at its facilities nationwide. Consistent with our recent decision in *FDRLST Media, LLC*, we shall order the Respondent to direct Musk to delete the unlawful tweet from the @elonmusk Twitter account and to take appropriate steps to ensure that Musk complies with the directive. See 370 NLRB No. 49, slip op. at 1 fn. 5 (2020). Additionally, we agree with the General Counsel that a nationwide notice posting is appropriate under the circumstances to remedy Musk's unlawful tweet. By tweeting on the @elonmusk Twitter account that the Respondent's employees would lose their stock options if they chose the Union as their representative, Musk unlawfully threatened the Respondent's employees in a manner viewable by the public without any limitations. Moreover, the parties stipulated that the @elonmusk account has approximately 22,700,000 Twitter followers and that Musk's unlawful tweet was republished and disseminated "via Twitter, Facebook, radio, television, newspapers, news media, and various other print and social media platforms" (although the full extent of dissemination is unknown). Because the unlawful threat was made publicly to Musk's tens of millions of Twitter followers and was further disseminated by media outlets and on social media platforms, employees at all of the Respondent's facilities nationwide could have viewed it, making a nationwide notice posting appropriate and warranted here. Accordingly, in addition to ordering the Respondent to post a notice addressing all of its unfair labor practices at its Fremont, California facility, we shall order the Respondent to post a notice addressing only Musk's unlawful tweet at all of its other facilities nationwide.[18]

The Respondent excepts to the judge's recommended remedy requiring a public reading of the notice by Musk or by a Board agent in Musk's presence. The Board will order a notice-reading remedy "where the violations are so numerous and serious that the reading aloud of a notice is considered necessary to enable employees to exercise their Section 7 rights in an atmosphere free of coercion, or where the violations in a case are egregious." *Postal Service*, 339 NLRB 1162, 1163 (2003). Here, a notice-reading remedy is neither necessary nor appropriate to remedy the violations in this case because the Board's traditional remedies will suffice to ameliorate the chilling effect of the Respondent's unlawful conduct. See, e.g., *Bodega Latina Corp. d/b/a El Super*, 367 NLRB No. 34, slip op. at 1 (2018). We accordingly amend the judge's remedy to remove the notice-reading requirement.[19]

### ORDER

The National Labor Relations Board orders that the Respondent, Tesla, Inc., Fremont, California, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining a rule that prohibits employee communications with the media protected by the National Labor Relations Act or that requires employees to receive authorization from the Respondent before engaging in such communications.

(b) Maintaining and enforcing a rule that prohibits off-duty employees from distributing union literature in the Respondent's parking lot.

(c) Promulgating a rule prohibiting employees from distributing union stickers, leaflets, and pamphlets without first obtaining permission and threatening discipline if they fail to comply.

(d) Interrogating employees about their union activities.

(e) Informing employees that it would be futile to vote for International Union, United Automobile, Aerospace

---

[18] Member Emanuel would order the Respondent to post a notice only at its Fremont facility. He would not order the Respondent to post a notice addressing Musk's unlawful tweet at all of its other facilities nationwide because he does not believe that a nationwide notice posting is necessary to remedy Musk's unlawful tweet.

[19] Unlike her colleagues, Chairman McFerran would adopt the judge's recommended notice-reading remedy. In particular, she notes that the Respondent committed numerous unfair labor practices, including promulgating rules in response to union activity, maintaining rules that restrict Sec. 7 activity, interfering with employees' leafletting activities, soliciting employee grievances and impliedly promising to remedy them, stating that a majority of the employees did not support the Union and questioning why employees wanted to pay union dues, threatening employees with loss of benefits if they voted for the Union, threatening

employees that selecting the Union would be futile, and interrogating and disciplining or discharging two leading Union supporters. Moreover, as the judge found, several of the violations were committed by high-ranking management officials, including the Respondent's CEO and chief human resources officer. See, e.g., *AdvancePierre Foods, Inc.*, 366 NLRB No. 133, slip op. at 5–6 (2018), enfd. 966 F.3d 813 (D.C. Cir. 2020). In these circumstances, Chairman McFerran believes a notice reading is appropriate "to dissipate as much as possible any lingering effects of the Respondent's unfair labor practices," and she agrees with the judge that a notice reading will allow the employees to "fully perceive that the Respondent and its managers are bound by the requirements of the Act." *Homer D. Bronson Co.*, 349 NLRB 512, 515 (2007) (internal quotes omitted), enfd. mem. 273 Fed. Appx. 32 (2d Cir. 2008).

and Agricultural Implement Workers of America, AFL–CIO (the Union).

(f)  Promulgating a rule regarding Workday in response to protected activity.

(g)  Threatening employees with loss of benefits if they vote for the Union.

(h)  Discharging, disciplining, or otherwise discriminating against employees because they support the Union or any other labor organization or because they engage in protected concerted activities.

(i)  In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2.  Take the following affirmative action necessary to effectuate the policies of the Act.

(a)  Rescind the portion of the Confidentiality Agreement issued in October/November 2016 that prohibits employees from communicating with the media without the Respondent's authorization (media-contact provision) or revise it to remove any language that prohibits or reasonably may be read to prohibit conduct protected by Section 7 of the Act.

(b)  Notify all employees that the media-contact provision in the Confidentiality Agreement has been rescinded or, if it has been revised, provide them with a copy of the Confidentiality Agreement with the revised media-contact provision.

(c)  Rescind the rule orally announced to off-duty employees on February 10, 2017, and May 24, 2017, which prohibited employees from distributing union literature on their nonwork time in the Respondent's parking lot.

(d)  Rescind the rule orally announced to employees on March 23, 2017, which prohibited employees from distributing union stickers, leaflets, and pamphlets without first obtaining permission and threatened discipline if employees failed to comply.

(e)  Rescind the rule regarding Workday that was promulgated on October 19, 2017, in response to protected activity.

(f)  Direct its agent and supervisor, CEO Elon Musk, to delete his May 20, 2018 statement—"Nothing stopping Tesla team at our car plant from voting union.  Could do so tmrw if they wanted.  But why pay union dues and give up stock options for nothing?  Our safety record is 2X better than when plant was UAW & everybody already gets

healthcare."—from the @elonmusk Twitter account, and take appropriate steps to ensure Musk complies with its directive.

(g)  Within 14 days from the date of this Order, remove from its files any reference to the unlawful warning issued to Jose Moran on October 19, 2017, and within 3 days thereafter, notify him in writing that this has been done and that the warning will not be used against him in any way.

(h)  Within 14 days from the date of this Order, offer Richard Ortiz full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

(i)  Make Richard Ortiz whole for any loss of earnings and other benefits suffered as a result of the discrimination against him, in the manner set forth in the remedy section of the decision.

(j)  Compensate Richard Ortiz for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 32, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

(k)  File with the Regional Director for Region 32 a copy of Richard Ortiz' corresponding W-2 form(s) reflecting the backpay award.

(l)  Within 14 days from the date of this Order, remove from its files any reference to the unlawful discharge of Richard Ortiz, and within 3 days thereafter, notify him in writing that this has been done and that the discharge will not be used against him in any way.

(m)  Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(n)  Post at its Fremont, California facility copies of the attached notice marked "Appendix A" and at all of its other facilities nationwide copies of the attached notice marked "Appendix B."[20]  Copies of the notices, on forms

---

[20]  If the facilities involved in these proceedings are open and staffed by a substantial complement of employees, the notices must be posted within 14 days after service by the Region.  If the facilities involved in these proceedings are closed due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notices must be posted within 14 days after the facilities reopen and a substantial complement of employees have returned to work, and the notices may not be posted until a substantial complement of employees have returned to work.  Any delay in the physical

posting of paper notices also applies to the electronic distribution of the notices if the Respondent customarily communicates with its employees by electronic means.  If this Order is enforced by a judgment of a United States court of appeals, the words in the notices reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

TESLA, INC.    11

provided by the Regional Director for Region 32, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. The Respondent shall take reasonable steps to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed its Fremont, California facility, the Respondent shall duplicate and mail, at its own expense, a copy of the notice marked "Appendix A" to all current and former employees employed by the Respondent at that facility at any time since October 17, 2016. If the Respondent has gone out of business or closed any of its other facilities, the Respondent shall duplicate and mail, at its own expense, a copy of the notice marked "Appendix B" to all current and former employees employed by the Respondent at any of the affected facilities at any time since May 20, 2018.

(o) Within 21 days after service by the Region, file with the Regional Director for Region 32 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the allegations that the Respondent violated Section 8(a)(1) by maintaining and enforcing its team-wear policy are severed and retained for further consideration and that the complaint is otherwise dismissed insofar as it alleges violations of the Act not specifically found.

Dated, Washington, D.C.  March 25, 2021

_____
Lauren McFerran,                Chairman


_____
William J. Emanuel,             Member


_____
John F. Ring,                   Member


(SEAL)        NATIONAL LABOR RELATIONS BOARD

APPENDIX A

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT maintain a rule that prohibits your communications with the media protected by the National Labor Relations Act (NLRA) or that requires you to receive authorization from us before engaging in such communications.

WE WILL NOT maintain and enforce a rule that prohibits you from distributing union literature in our parking lot on your nonwork time.

WE WILL NOT promulgate a rule prohibiting you from distributing union stickers, leaflets, and pamphlets without first obtaining permission and threatening discipline if you fail to comply.

WE WILL NOT interrogate you about your union activities.

WE WILL NOT inform you that it would be futile to vote for International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO (the Union).

WE WILL NOT promulgate a rule regarding Workday in response to activity protected by the NLRA.

WE WILL NOT threaten you with loss of benefits if you vote for the Union.

WE WILL NOT discharge, discipline, or otherwise discriminate against any of you because you support the Union or any other labor organization or because you engage in protected concerted activities.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL rescind or revise the portion of the Confidentiality Agreement issued in October/November 2016 that prohibits you from communicating with the media without our authorization (media-contact provision).

WE WILL notify you that the media-contact provision in the Confidentiality Agreement has been rescinded or, if it has been revised, provide you with a copy of the Confidentiality Agreement with the revised media-contact provision.

WE WILL rescind the rule orally announced on February 10, 2017, and May 24, 2017, which prohibited you from distributing union literature in our parking lot on your non-work time.

WE WILL rescind the rule orally announced on March 23, 2017, which prohibited you from distributing union stickers, leaflets, and pamphlets without first obtaining permission and threatened discipline if you failed to comply.

WE WILL rescind the rule regarding Workday, which was promulgated on October 19, 2017, in response to protected activity.

WE WILL direct our agent and supervisor, CEO Elon Musk, to delete his May 20, 2018 statement—"Nothing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues and give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets healthcare."—from the @elonmusk Twitter account, and WE WILL take appropriate steps to ensure Musk complies with our directive.

WE WILL, within 14 days from the date of the Board's Order, remove from our files any reference to the unlawful warning issued to Jose Moran on October 19, 2017, and WE WILL, within 3 days thereafter, notify him in writing that we have done so and that we will not use the warning against him in any way.

WE WILL, within 14 days from the date of the Board's Order, offer Richard Ortiz full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

WE WILL make Richard Ortiz whole for any loss of earnings and other benefits resulting from his discharge, less any net interim earnings, plus interest, and WE WILL also make him whole for reasonable search-for-work and interim employment expenses, plus interest.

WE WILL compensate Richard Ortiz for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region 32, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

WE WILL file with the Regional Director for Region 32 a copy of Richard Ortiz' corresponding W-2 form(s) reflecting the backpay award.

WE WILL, within 14 days from the date of the Board's Order, remove from our files any reference to the unlawful discharge of Richard Ortiz, and WE WILL, within 3 days thereafter, notify him in writing that we have done so and that we will not use the discharge against him in any way.

TESLA, INC.

The Board's decision can be found at www.nlrb.gov/case/32-CA-197020 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

APPENDIX B

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT threaten you with loss of benefits if you vote in favor of International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL direct our agent and supervisor, CEO Elon Musk, to delete his May 20, 2018 statement—"Nothing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues and give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets healthcare."—from the @elonmusk Twitter account, and WE WILL take appropriate steps to ensure Musk complies with our directive.

TESLA, INC.

The Board's decision can be found at www.nlrb.gov/case/32-CA-197020 or by using the QR code below. Alternatively, you can obtain a copy of the

decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



*Edris W.I. Rodriguez Ritchie, Esq.,* and *Noah J. Garber, Esq.,* for the General Counsel.

*Mark S. Ross, Esq.* and *Keahn N. Morris, Esq.,* for the Respondent.

*Margo A. Feinberg, Esq., Daniel E. Curry, Esq.,* and *Julie S. Alarcon, Esq.,* for the Charging Party.

## DECISION

### INTRODUCTION

AMITA BAMAN TRACY, Administrative Law Judge. In the fall of 2016, the International Union, United Automobile, Aerospace and Agricultural Workers of America, AFL–CIO (Union or UAW) began an organizing campaign at Tesla, Inc. (Respondent or Tesla), at its Fremont, California manufacturing plant. Several employees joined the voluntary organizing committee, including the three Charging Parties, and after months of preparation, the "Fair Future at Tesla" campaign became well known at Tesla in early 2017.

This union organizing campaign quickly caught the attention of officials at Tesla as Jose Moran, another member of the voluntary organizing committee, published a blog post about working conditions at Tesla, which was then shared to all employees via a handbill. Employees began leafletting this handbill in the parking lot, requesting safety records from Tesla, and wearing union shirts and stickers in the workplace. As a result of these activities, employees were questioned by Tesla officials.

Based upon another leaflet as well as an employee petition regarding safety conditions in the workplace, Chief Executive Officer Elon Musk and Chief People Officer Gabriel Toledano

immediately met with Jose Moran because he presented the employee petition to Tesla. During this meeting, Musk and Toledano promised to correct problems before the Union could come to Tesla and made other coercive statements including telling Jose Moran and another employee that the UAW would not give them a voice. Soon thereafter, Tesla began enforcing its team wear rule in general assembly so that UAW shirts were prohibited.

Then, in October 2017, Tesla terminated Charging Party Richard Ortiz and disciplined Jose Moran after Richard Ortiz posted a comment and employee pictures on a private Facebook page in response to two Tesla employees opposing a UAW sponsored bill before the California State Assembly. Finally, Respondent violated the Act with Musk's May 20, 2018 Twitter post, where he suggested to his followers that the employees would no longer have stock options if the Union was elected. I find merit to all but a few allegations as set forth in the General Counsel's consolidated complaint.

### STATEMENT OF THE CASE

This case was tried in Oakland, California, over the course of 13 days from June to October 2018. The Union, Michael Sanchez (Sanchez), Jonathan Galescu (Galescu), and Richard Ortiz (Ortiz) (collectively, Charging Parties) filed charges and amended charges, as captioned above, from April 2017, through June 2018.[1] The General Counsel issued several complaints, dated August 31 and September 1, 2017, and March 30, June 4, and August 23, 2018, which were eventually consolidated in the current complaint.[2] Tesla filed timely answers to the complaints and amended complaints.

On the entire record,[3] including my observation of the demeanor of witnesses,[4] and after considering the briefs filed by the General Counsel, Charging Parties, and Respondent,[5] I make the following

### FINDINGS OF FACT AND LEGAL ANALYSIS

#### I. JURISDICTION

Respondent, a Delaware technology and design corporation with its headquarters in Palo Alto, California, an automotive manufacturing facility in Fremont, California (Fremont facility), and an automotive battery facility in Sparks, Nevada (Sparks facility), is engaged in the design, manufacture, and sale of electric vehicles and energy storage systems. During the 12-month period ending December 31, 2017, Respondent, in conducting its

---

[1] On the dates specified, the Charging Parties filed the following charges and amended charges which resulted in this consolidated complaint: 32–CA–197020 on April 17, 2017, amended July 28, 2017; 32–CA–197058 on April 17, 2017, amended July 28, 2017; 32–CA–197091 on April 18, 2017, amended July 28, 2017; 32–CA–197197 on April 19, 2017, amended July 28, 2017; 32–CA–200530 on June 12, 2017, amended July 28, 2017; 32–CA–208614 on October 25, 2017, amended March 13, 2018; 32–CA–210879 on December 1, 2017, amended on December 6, 2017; and 32–CA–220777 on May 23, 2018.

[2] The General Counsel withdrew complaint paragraphs (par.) 7(m) and 7(x) during the hearing as well as removed Andrew McIndoe (McIndoe) from complaint par. 5 (Tr. 1095–1097). In addition, the General Counsel sought to amend the complaint on the last day of the hearing, which I denied (Tr. 2495–2496).

[3] The transcripts and exhibits in this case generally are accurate other than numerous misspellings and misidentifications of the speakers. In addition, GC Exhs. 10 and 11 should have been redacted such that Ortiz' address and email address should have been removed. I order the General Counsel to contact the court reporting service to redact these documents as I directed during the hearing (Tr. 438–439).

[4] Although I have included several citations to the evidentiary record in this decision to highlight testimony or exhibits, I emphasize that my findings and conclusions are not based solely on those citations, but rather are based on my review of the entire record for this case.

[5] Other abbreviations used in this decision are as follows: "GC Exh." for the General Counsel's exhibit; "CP Exh." for Charging Parties' exhibit; "R. Exh." for Respondent's exhibit; "Jt. Exh." for Joint Exhibit; "GC Br." for the General Counsel's Brief; "CP Br." for Charging Party's Brief; and "R. Br." for Respondent's Brief.

14                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

operations at its Fremont facility purchased and received goods valued in excess of $50,000 directly from sources located outside the State of California. During the 12-month period ending December 31, 2017, Respondent, in conducting its operations at its Sparks facility, purchased and received goods valued in excess of $50,000 directly from sources located outside the State of Nevada. At all material times, based on the record, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the National Labor Relations Act (the Act). Respondent admits, and I find, that the Union is a labor organization within the meaning of Section 2(5) of the Act.

Based on the foregoing, I find this dispute affects commerce and that the Board has jurisdiction of this case, pursuant to Section 10(a) of the Act.

### II. UNFAIR LABOR PRACTICES

After an introduction and uncontested background facts, I set forth my factual findings and legal analysis including credibility determinations for each of the unfair labor practice allegations enumerated in the General Counsel's consolidated amended complaint.

Credibility of the witnesses in this matter is significant as several disputes center upon which version of events and/or explanation of events I accept. Thus, I will explain my specific credibility determinations where relevant for key events. Credibility determinations may rely on various factors, including "the context of the witness' testimony, the witness' demeanor, the weight of the respective evidence, established or admitted facts, inherent probabilities and reasonable inferences that may be drawn from the record as a whole." *Hills & Dales General Hospital*, 360 NLRB 611, 617 (2014), citing *Double D Construction Group*, 339 NLRB 303, 305 (2003); *Daikichi Sushi*, 335 NLRB 622, 623 (2001). Moreover, a credibility assessment also includes an examination of "the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during examination, the modulation or pace of his speech, and other non-verbal communication." *Shen Automotive Dealership Group*, 321 NLRB 586, 589 (1996) (citing *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1078–1079 (9th Cir. 1977)), cited with approval by the Board in *Daikichi Sushi*, supra. Additionally, it is well established that the trier of fact may believe some, but not all, of a witness' testimony. *NLRB v. Universal Camera Corp.*, 179 F.2d 749 (2d Cir. 1950).

### III. INTRODUCTION

Tesla is a public manufacturing and technology company and manufactures electric vehicles, charging stations, and superchargers as well the main subcomponents for vehicles at its Fremont facility (Tr. 870, 1340). Tesla began manufacturing various models of all-electric vehicles in 2012. The entire

vehicle is assembled and completed at the Fremont facility while the batteries are assembled at the Sparks facility (Tr. 1341). Tesla employs approximately 40,000 employees nationwide while 12,000 employees work at the Fremont facility and an unspecified number of employees work at the Sparks facility (Tr. 877, 960).

#### Respondent's management structure

Elon Musk (Musk) is the chief executive officer of Tesla (Tr. 877). Peter Hochholdinger (Hochholdinger), who was senior vice president for production, reported directly to Musk (Tr. 1340). Also reporting directly to Musk is the position of chief people officer (Tr. 877). Gabrielle (Gabby) Toledano (Toledano) became Tesla's chief people officer on May 22, 2017, until she resigned, effective mid-October 2018 (Tr. 870). Prior to Toledano, Mark Lipscomb (Lipscomb) held the position of vice president, human resources, but instead of reporting to Musk, Lipscomb reported to Arnnon Geshuri (Geshuri), who was also vice president of human resources.[6]

As the chief people officer, Toledano oversaw a vast array of day-to-day functions of Tesla. Toledano oversaw the environmental health and safety team (EHS), the security department which includes the contract and noncontract security guards at the Fremont facility

which was led by senior security manager Greg Slettvet (Slettvet),[7] the human resources (HR) business solutions department (human resources information systems (HRIS) or HR people operations), and the employee relations and investigations team which was led by Carmen Copher (Copher) who is director and counsel for employee relations. In addition, six HR business partners communicated with employees directly to address any complaints or concerns (Tr. 884). Each department is led by a head of department or vice president who reported directly to Toledano including Josh Hedges (Hedges) who was senior HR director for production and supply chain; Hedges reported to Lipscomb prior to Toledano (Tr. 1113).[8] In total, when Toledano served as the chief people officer, 1400 employees were within her chain of command (Tr. 880).

#### Respondent's human resources process

When employees are hired by Respondent, they sign several documents during the on-boarding process.[9] Among the documents received are the employee handbook as well as a proprietary information and inventions agreement (Tr. 442; R. Exh. 4). To maintain both documents as well as personnel records, Respondent uses a third-party owned software program named "Workday" (Tr. 389, 833, 1132). Employees download the Workday application onto their smart phone where they can update their contact information, fill out self-reviews for performance reviews, give and receive feedback, and sign documents

---

[6] Respondent admits that Musk, Lipscomb, and Toledano are supervisors within the meaning of Section (Sec.) 2(11) of the Act and agents of Respondent within the meaning of Sec. 2(13) of the Act. Lipscomb and Toledano no longer work for Tesla.

[7] Slettvet is a Sec. 2(11) supervisor within the meaning of the Act as admitted by Respondent's counsel during the hearing (Tr. 1476–1477).

[8] Respondent admits that Hedges is a supervisor within the meaning of Sec. 2(11) of the Act and an agent of Respondent within the meaning

of Sec. 2(13) of the Act. Hedges resigned, effective October 5, 2018 (Tr. 1112).

[9] Hedges testified extensively about the on-boarding process at Tesla, but I do not rely upon his testimony as Hedges spoke vaguely and did not have any day-to-day knowledge of the on-boarding process. Hedges' area of coverage did not include the hiring process at Tesla. In addition, Hedges could not provide basic details such as whether a document had been updated at any time and the time periods for when a version of a document was in effect (Tr. 1251–1253).

sent by Respondent (Tr. 441–442, 6671). Employees may also send messages to other employees via Workday (Tr. 442). The employee handbook is also maintained in Workday (Tr. 1123; R. Exh. 5).

Once hired, Respondent's employees gain access to the Fremont facility via an employee badge. The employee badge, which has their name and Workday profile photo, identifies individuals as employees, gives employees unescorted access to the Fremont facility, the ability to sign in and out of the timeclock, make purchases at the safety vending machines, and use the external transportation system (Tr. 1432–1433, 1435–1437).

### The Fremont facility

Respondent's Fremont facility is an approximately 5 million square foot building with external parking lots and other unidentified structures (Tr. 1342).[10] This parking lot may be used by both employees and nonemployees (Tr. 384).[10] There are four unguarded entrances to the parking lot while there is one guard station located near the north administrative (admin) building (GC Exh. 2; Jt. Exh. 1; Tr. 382–383). No identification is needed to enter the parking lot without a guard station (Tr. 382). Once an employee or nonemployee parks in the parking lot, that person may attempt to enter the Fremont facility from one of four entrances or doors, labeled as door 1, door 2, door 3, and door 4.[11] Each door has an entrance reached via stairs located on the left front-facing side while the right front-facing side has a ramp. At each of the four entrances there are doors leading to the interior of the Fremont facility. Each door has a sensor where employees scan their employee badges to unlock the door and enter the Fremont facility (Tr. 85, 385, 1436–1437). The door sensor shines red or green after the employee badge is held up to the sensor. If permitted inside the Fremont facility, the door will shine green, make a beeping noise, and unlock (Tr. 387). Inside the doors, a security guard is stationed at a podium with a laptop which shows the picture of the employee who had swiped his or her employee badge (Tr. 80, 387–388, 1437). Typically, employees first encounter Respondent's security guards when they enter the Fremont facility at the podium (Tr. 384). The security guard who is stationed at an entry door is tasked with ensuring that only those with an active and valid employee badge gains access to the interior of the Fremont facility (Tr. 1439). If there is a question as to any employee's work status at the Fremont facility, security guards may communicate with the security control room to determine the employee's status. Meanwhile, visitors to the Fremont facility must check-in at a designated location, receive temporary badges, and are escorted within the Fremont facility (Tr. 1433–1434). Tesla's north admin building also contains an entrance which is referred to as the back door

(Tr. 149).

Respondent's security guards wear black colored jackets and hats which include the word, "Security" underneath the Tesla logo (Tr. 80, 387)[12] The security guards do not wear nametags (Tr. 387). Security guards at Tesla are employed directly by Tesla or by a contract security company. These security guards wear the same uniform such that the employer of the security guard would be unidentifiable to an employee (Tr. 1531–1532).[13] In February 2017, in addition to the being stationed at the four doors, security guards patrolled the exterior of the Fremont facility in Tesla "Security" vehicles (Tr. 1483, 1535). Also in February 2017, Respondent's security control room, which monitors communications and emergency systems in the Fremont facility, was staffed by both contractors and Tesla employees (Tr. 1484–1485). The security personnel in the control room would document reports on a computer assisted dispatch report (Tr. 1486–1487).

The interior of the Fremont facility is divided into various sections. The powertrain department manufactures the components of the vehicle and is located on the second floor of the main building. The production control team manages the warehouse, and material handlers bring parts to the assembly areas (Tr. 1342–1343). The stamping press center creates the body panels, doors, liftgates, and hoods for the vehicles with aluminum, and cuts items with laser machines. Once items are stamped, the parts are loaded onto racks which move into the warehouse and material handlers take the parts to the next department (Tr. 1343–1344). In body in white (BIW or body assembly), the stamped parts and other purchased components will be welded together by welders to create the skeleton of the vehicle (Tr. 245–246). Once the frame of the vehicle is assembled, the vehicle is transported to the paint department on a dolly. The frame of the vehicle is then sent through a chemical bath to protect it from corrosion and erosion, and then moved through an oven for curing (Tr. 246–247, 1344–1345). Thereafter, the vehicle is painted and sent through another oven to cure the paint (Tr. 247–248). The vehicle will then go through inspections and touch-ups before being moved to general assembly (GA) via overhead carrier system (Tr. 1347).[14]

GA is approximately 500 yards in length (Tr. 191). Approximately 1000 to 3000 employees, also known as production associates, work in GA (Tr. 191, 1116). These employees are overseen by production leads and supervised by production supervisors, production associate managers, and production managers (Tr. 1399–1400). In GA, approximately 14 supervisors and 71 leads work per shift; there are two shifts per day (Tr. 1391–1392). After being hired, GA production associates receive 1 week of on-boarding training including 2 days of hands-on training involving equipment handling and how to treat unfinished

---

[10] Jeremie Hansen (Hansen), project manager and security systems specialist for Respondent, testified that the exterior of the Fremont facility is considered private property (Tr. 1434). I do not credit Hansen's testimony on this point as it is based on his opinion and is a legal conclusion.

[11] Confusingly, door 3 is also known as the Iron Man door or door 4 since the north admin building door was also considered door 3 (Tr. 393).

[12] The title of security guard is used generically in this decision as the position of security guard may be officially known as protection associate or any other formal name.

[13] Securitas Security Services USA Inc. (Securitas) provided contract security services to Respondent in February 2017 (Tr. 1458). Thus, the record is unclear as to whether the unnamed security guards in the complaint allegations are employees of Respondent or Securitas.

[14] In mid-2017, approximately 550 production associates and leads worked per two shifts.

16                        DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

vehicles where the paint has not been cured (Tr. 1368–1369). Since at least 2017 GA production associates must also wear team wear. When hired, product associates are provided two pairs of black colored pants, three short sleeve shirts, two long sleeve shirts, and a sweater; these clothing items have an imprint of the Tesla logo (GC Exh. 41; Tr. 198–199, 1370, 2411–2412, 2524–2525). Production leads and supervisors wear red colored Tesla shirts while line inspectors wear white colored Tesla shirts (Tr. 331, 1372–1373, 1597). Production associates also must wear personal protective equipment (PPE) which includes safety glasses and shoes, bump caps and gloves, and covers for their belts, rings, and watches; these items are also covered by Respondent (Tr. 199, 1373, 1599). Other employees may also be working in GA for specific reasons such as BIW employees as well as engineers, vendors, contractors, and material handlers (Tr. 256, 1378–1379).

When a vehicle moves to GA, the paint on the vehicle is cured sufficiently for light touching and general handling but not cured as completely as when the vehicle is finished (Tr. 1347). Fender covers and door protectors are placed on the vehicle for protection (Tr. 1347). These vehicles move slowly on an assembly line where the interior and exterior of the vehicle is completed (Tr. 191, 1348–1365, 1920). Towards the end of the vehicle assembly in GA, the final interior components are installed such as the seats and interior panels, and the doors are re-assembled on the vehicle (Tr. 1364–1365).

After GA, the vehicle is moved to end of line where production associates go through the brake and roll system, test diagnostics, test the charging systems, and install the final steering wheel air bag (Tr. 1345–1346, 1367). The vehicle then goes through the inspection department where the vehicle is inspected for fit and finish and mutilations, dings, and dents (Tr. 1368).[15] Mutilations are scratches, buffs, chips, dents, dings, or scratches anywhere on or in a vehicle including the seats (Tr. 1373, 1597, 1653, 2399). After final inspection, the manufacturing process for the vehicle is complete.

#### The Sparks facility

The Sparks facility manufactures the electric battery for the vehicles manufactured in the Fremont facility. Respondent's training coordinators worked out of the Sparks facility where they disseminate manufacturing instruction changes on individual lines, update training matrixes, and provide general guideline classes, which include manufacturing practices, quality in station, and safety. As manufacturing instructions change, the training coordinators are responsible for updating these changes and posting them at the workstations. Training coordinators have a table adjacent to production lines, but they go out to production lines and talk to the associates working on productions lines when instructions change. When instructions change, which comes from a different division of Respondent, the training coordinator obtains updates and takes the updated instructions to the production lines. Training coordinators then place

the new instructions in folders at each workstation and remove the old instructions.

At Respondent's Sparks facility, from April to June 2017 Dave Teston (Teston), who was the associate manager of manufacturing, was responsible for the training team, which included the day-to-day duties of the training coordinators.[16] Teston was also responsible for increasing the size of the training coordinator team during that time.

#### The Union organizing campaign

In the summer of 2016, Tesla employee Jose Moran (Moran) reached out to the UAW since he had been a member when the Union represented employees at New United Motors Manufacturing, Inc. (NUMMI), which was located at the Fremont facility (Tr. 51, 668, 673, 750).[17] Moran sought to unionize the workforce at Tesla. Susan Reed (Reed), the Union's international representative, was the lead organizer from June 2016 until April 2018, in the Union's campaign to represent Respondent's employees (Tr. 44–45).[18] Reed worked to build a network of employees and met frequently with the employees interested in organizing Respondent's workplace (Tr. 45–46). The Union created a voluntary organizing committee (VOC) which consisted of employees that acted as lead organizers inside the Fremont facility; these employees shared information regarding the Union inside the facility as well as outside the facility (Tr. 46–47). The VOC held meetings where employees discussed health and safety concerns at Respondent along with questions regarding compensation, job promotions, and other working conditions (Tr. 674, 677). Other members of the VOC included Charging Parties Sanchez, Ortiz, and Galescu (Tr. 86–87, 430–431, 680). The VOC continued to meet through the fall of 2016 and into 2017.

Moran and Ortiz were among the most active supporters of the Union, and they engaged in leafletting, passing out union paraphernalia, and wearing union shirts and jackets to work in 2017 (Tr. 48, 51, 536). As discussed hereinafter, Moran also authored a blog post concerning working conditions at Tesla and circulated a safety petition signed by many employees and presented to Respondent. Ortiz, who worked as an associate in BIW with Respondent from 2016 to October 18, 2017, also requested California Division of Occupational Safety and Health (Cal/OSHA) safety records. Both Moran and Ortiz spoke to California State Assembly legislators to advocate on behalf of employees in favor of unionization.

In August 2016, the employees interested in unionizing voted on a campaign slogan and a logo (Tr. 678; GC Exh. 35). The employees chose, "Driving a Fair Future at Tesla." A public website was created at www.fairfuture@tesla.org (Tr. 679; GC Exh. 39). Also, the Union created a public Facebook page called, "A Fair Future at Tesla" (Tr. 47, 682; GC Exh. 40). The Union created this Facebook page to provide a social media forum for employees to comment and share information with others. Employees, including Moran, often posted on the Facebook public

---

[15] Mutilations may be found and fixed at any stage of the vehicle manufacturing process (Tr. 1373, 1597–1599).

[16] The parties stipulated to Teston's testimony. At all relevant times until at least February 5, 2018, Teston was a supervisor within the meaning of Sec. 2(11) of the Act.

[17] Respondent employed Moran in 2012 as a production associate, and in August 2017, Moran was promoted to lead quality inspector.

[18] Reed testified in an honest and straightforward manner while her demeanor remained calm and measured relaying her participation in the union campaign. I accept Reed's testimony in its entirety.

22-60493.6537

page (Tr. 51). In August 2016, Moran created a private Facebook group called, "Tesla Employees for UAW Representation" (Tr. 433–434, 675).[19] To be a member of this Facebook group, Moran (and later Ortiz) controlled the approval process of "friend requests" and membership where only Tesla Fremont facility hourly production employees could be members (Tr. 434, 675–676). In January 2017, the VOC members and union organizers decided to distribute leaflets at the Fremont facility and Moran decided to write a blog post regarding working conditions at Tesla (Tr. 432–433). As discussed herein, employees also distributed and wore Union shirts and stickers at work during duty time, requested safety statistics from Tesla, and advocated on behalf of unionization with the California State Assembly among other Section 7 acts.

On February 9, 2017,[20] the union organizing campaign became widely known when Moran wrote an article, titled, "Time for Tesla to Listen" about the working conditions at Respondent (GC Exh. 32; Tr. 688). This article was posted online at www.medium.com (Tr. 687). The blog post identified Moran as a Tesla employee and included his photo. In this blog post, Moran discussed the injuries Tesla employees endure due to long hours, nonergonomic machinery, shortage of employees, and a push to work faster. Moran also discussed Tesla employees' low wage rate compared to other employees in the auto industry. Moran wrote that the employees should unionize in reaction to Respondent requiring employees to sign confidentiality agreements. Moran also noted that five members of the California State Assembly wrote a letter to Tesla questioning the confidentiality policy issued to employees in the fall of 2016 (GC Exh. 8)[21] The following day, employees handed out double-sided leaflets in the Tesla parking lot which included Moran's blog post and the letter from the California State Assembly members to Tesla regarding its Confidentiality Agreement.

On February 24, 2 weeks after the employees first engaged in leafletting inside and outside the Fremont facility, Musk wrote an email to all employees about the mission of Tesla, writing:

> That is why I was so distraught when I read the recent blog post promoting UAW, which does not share our mission and whose true allegiances is to the giant car companies, where the money they take from employees in dues is vastly more than they could ever make from Tesla.
>
> The tactics they have resorted to are disingenuous or outright false. I will address their underhanded attacks below.

(R. Exh. 2.) Moreover, Musk disputed the injury claims made by Moran in his blog post. Musk also addressed "hours worked" in the "UAW blog." Musk closed his email by stating that once Tesla became "closer to being a profitable company, we will be able to afford more and more fun things" such as "a really amazing party," "free frozen yogurt stands" and a roller coaster at the

Fremont facility going in and out of the factory and connecting the parking lots (R. Exh. 2).

IV. COMPLAINT PARAGRAPHS 7(A) AND (B): RESPONDENT'S
CONFIDENTIALITY AGREEMENT DOES NOT VIOLATE SECTION
8(A)(1) OF THE ACT, AND RESPONDENT DID NOT VIOLATE SECTION
8(A)(1) WHEN REFUSING TO PERMIT AN EMPLOYEE TO
PHOTOGRAPH THE CONFIDENTIALITY AGREEMENT

The General Counsel alleges at paragraphs 7(a) and (b) that since at least late October 2016, Respondent has maintained certain unlawful rules in its Confidentiality Agreement at the Fremont facility. Moreover, the General Counsel alleges that in late October 2016 or early November 2016, Senior HR Partner David Zweig (Zweig) at the Fremont facility, during a one-on-one meeting with employees, prohibited employees from taking a picture of the Confidentiality Agreement. The General Counsel alleges that both the maintenance of certain unlawful rules and the prohibition on taking pictures of the Confidentiality Agreement violate Section 8(a)(1) of the Act. Specifically, the General Counsel argues that certain portions of the Confidentiality Agreement are overbroad, requires preauthorization before speaking to the media, prohibits employees from writing about their work, and threatens disciplinary action (GC Br. at 47–51). In addition, the General Counsel argues that because Galescu sought to take a photo of the Confidentiality rule, Zweig's prohibition on taking the photo was unlawful (GC Br. at 52–53). Respondent argues that the Confidentiality Agreement is a generic rule which does not interfere with Section 7 rights, and even if the rule may be read to infringe on Section 7 rights, especially when read out of context, its legitimate business justification overrides such rights. Moreover, Respondent argues that Zweig's refusal to permit Galescu to take a photo of the Confidentiality Agreement was lawful and does not infringe on any Section 7 rights (R. Br. at 25–42).

In October and November 2016, Respondent asked all employees nationwide as a term and condition of employment to sign a confidentiality acknowledgment (Confidentiality Agreement) (Tr. 372, 1167; GC Exhs. 15, 31). The Confidentiality Agreement states,

> In response to recent leaks of confidential Tesla information, we are reminding everyone who works at Tesla, whether full-time, temporary or via contract, of their confidentiality obligations and asking them to reaffirm their commitment to honor them.
>
> **These obligations are straightforward. Provided that it's not already public information, everything that you work on, learn about or observe in you[r] work about Tesla is confidential information under the agreement that you signed when you first started. This includes information**

---

[19] Earlier in 2016 Moran created a Facebook page called, "Jose organizer" to have a presence on social media for meeting organizing purposes and to connect with coworkers (Tr. 675).

[20] All dates are in 2017 unless otherwise specified.

[21] In response, that same day, Musk, in an article published by Gizmodo, responded to Moran's blog post (GC Exh. 59). The article quotes Musk as stating that compared to those unionized in UAW, "total compensation is higher for a given level of seniority when factoring in stock

grants." Musk described Tesla as "union neutral" and explained that the Confidentiality Agreement concerned the leak of trade secrets. Musk continued, as this article stated, that his understanding was that Moran "was paid by the UAW to join Tesla and agitate for a union. He doesn't really work for us, he works for the UAW," and "The UAW killed NUMMI and abandoned the workers at our Fremont plant in 2010. They have no leg to stand on." These statements allegedly made by Musk for this article are hearsay and are not relied upon in this decision.

18                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

**about** products and features, pricing**, customers, suppliers, employees,** financial information**, and anything similar. Additionally, regardless of whether information has already been made public, it is never OK to communicate with the media or someone closely related to the media about Tesla, unless you have been specifically authorized in writing to do so.**

**Unless otherwise allowed by law or you have received written approval, you must not, for example, discuss confidential information with anyone outside of Tesla, take or post photos or make video or audio recordings inside Tesla facilities, forward work emails outside of Tesla or to a personal email account, or write about our work in any social media, blog, or book.  If you are unsure, check with your manager, HR, or Legal.**  Of course, these obligations are not intended to limit proper communications with government agencies.

**The consequences of careless violation of the confidentiality agreement, could include, depending on severity, loss of employment.  Anyone engaging in intentional violations of the confidentiality agreement will be held liable for all the harm and damage that is caused to the company, with possible criminal prosecution.  These obligations remain in place even if no longer working at Tesla.**

By acknowledging, I affirm my agreement to comply with my confidentiality obligations to Tesla.  I also represent that at no time over the past 12 months have I disclosed any Tesla confidential information outside of Tesla unless properly authorized to do so.

(GC Exh. 31; R. Exhs. 11 and 14, emphasis in bold added to highlight the portions the General Counsel alleges are overbroad in the complaint).

The Confidentiality Agreement, created in September and October 2016, was drafted by Vice President of Legal Jonathan Chang (Chang) among others.  Chang credibly testified that the Confidentiality Agreement was drafted due to several leaks of internal, proprietary and/or confidential information including photos and/or drawings, documents, and emails (Tr. 2004–2007, 2014, 2029–2030; R. Exhs. 11, 37, 41).  One such leak included an August 29, 2016 email from Musk to all employees which discussed Respondent's financial position as well as projections for the future which was shared with the media (Tr. 2009–2012; R. Exh. 38).  Respondent decided to have all employees resign the Confidentiality Agreement to remind the employees of the seriousness of leaks.  Prior to issuing the Confidentiality Agreement, Respondent sent out emails to employees reminding them of their obligation to maintain confidentiality; when employees were hired, they also signed several documents including the need to maintain confidentiality of Respondent's proprietary information (Tr. 2019, 2023; R. Exhs. 4, 39, 40).

When creating the Confidentiality Agreement, Respondent did not conduct economic studies to determine any actual financial harm (Tr. 2045).  However, Chang testified that leaks of internal information can affect Respondent's business where potential customers may not seek to purchase a vehicle, competitors could use the information, employee talent could be compromised and there could be Securities and Exchange Commission (SEC) concerns (Tr. 2015–2017).

On October 11, 2016, Lipscomb sent out a slightly different version of the Confidentiality Agreement which ends with, "By signing below, I affirm my agreement to comply with my confidentiality obligations to Tesla [. . .]" (GC Exh. 15; R. Exh. 12).[22]  This version also requires employees to sign the document, with a witness' signature, and ends with a section which requires employees to list any disclosures as a "one-time complete forgiveness of responsibility [. . .]" (GC Exh. 15).  These signatures needed to be observed by HR or "trusted managers" but that the signatures on the Confidentiality Agreement needed to be completed that week (R. Exh. 12).  This October 11, 2016 version of the Confidentiality Agreement replaced the prior version (Tr. 1169).

Prior to asking employees to sign the Confidentiality Agreement, Hedges, based on information learned from Lipscomb, told his HR partner team that Respondent was having information leaks from engineering in October 2016 and they needed to remind everyone of the confidentiality agreement they signed when they became employees; the employees would be asked to sign the Confidentiality Agreement in the presence of an HR representative (Tr. 1166, 1170; R. Exh. 43).[23]  HR partners met with different groups of employees to have them sign the Confidentiality Agreement.

On the evening of November 2, 2016, Lipscomb sent an email to all employees asking employees to sign the Confidentiality Agreement electronically in their Workday inbox within the next 5 days (GC Exh. 31; R. Exh. 13).  Lipscomb explained that Respondent needed this affirmation to reinforce the importance of confidentiality as any leaks "can have a negative impact on our company" (GC Exh. 31).  Lipscomb also noted that the Confidentiality Agreement would be signed annually.  Electronic signatures were requested to enable easier linking with the employees' personnel files in Workday (Tr. 2085).  If employees wanted a copy of the Confidentiality Agreement, a copy would later be provided but this offer of a copy was not specifically mentioned to employees (Tr. 2086).

On November 3, 2016, Lipscomb sent another email to the employees the following afternoon reminding them to log into their Workday inboxes to sign the Confidentiality Agreement.  Two days later, in the morning, Lipscomb sent another reminder email to the employees to sign the Confidentiality Agreement.  A few minutes later, he sent another email with a link to

---

[22] Lipscomb did not testify.

[23] Annalisa Heisen (Heisen), an associate HR partner, testified that Hedges informed the HR partners that the Confidentiality Agreement related to the recent information leak and asked them to oversee and execute the process of having all employee sign the Confidentiality Agreement (Tr. 2075–2076).  Heisen testified that she informed employees that

due to the recent information leaks at the Fremont facility, Respondent wanted to make sure all employees understood their obligation to keep information confidential with examples such as forwarding internal emails that contain proprietary information to external emails and taking and sharing photos and videos in the workplace (Tr. 2078–2080).

Workday if any employee was having trouble accessing the document (GC Exh. 31).

In November 2016, Galescu testified that he attended a small meeting with Zweig and one other employee to sign the Confidentiality Agreement (Tr. 835–836, 838).[24] During this meeting, after Galescu signed the Confidentiality Agreement, he began to take a photo of it with his phone. However, Zweig told him that he could not take a photo of the Confidentiality Agreement, but that the document would be uploaded to his Workday profile (Tr. 837–838). A week later, Supervisor Armando Rodriguez (Rodriguez) asked Galescu to electronically sign the Confidentiality Agreement again (Tr. 839–840).

Thereafter in a January 10 letter, five members of the California State Assembly, requested that Tesla revise its Confidentiality Agreement as they viewed the policy as "over-broad" and "has resulted in a chilling effect on workers' ability to engage in protected activity" (GC Exh. 8). Tesla's general counsel, Todd Maron (Maron), responded to the letter on behalf of Tesla explaining the reasons and genesis for having the employees sign the Confidentiality Agreement (R. Exh. 42).

*Legal Analysis*

An employer violates Section 8(a)(1) of the Act when it maintains a workplace rule or policy which would reasonably tend to chill employees in the exercise of their Section 7 rights. See *Lafayette Park Hotel*, 326 NLRB 824, 825 (1988), enfd. 203 F.3d 52 (D.C. Cir. 1999). In *Boeing Co.*, 365 NLRB No. 154 (2017), the Board established a new standard to determine whether a facially neutral rule or policy violates Section 8(a)(1) of the Act, overruling the "reasonably construe" standard of the analytical framework set forth in *Lutheran Heritage Village-Livonia*, 343 NLRB 646, 646–647 (2004). In *Boeing Co.*, the Board stated that when evaluating a facially neutral rule or policy "the Board will evaluate two things: (i) the nature and extent of the potential impact on NLRA rights, and (ii) legitimate justifications associated with the rule." *Boeing Co.*, supra, slip op. at 3.[25] The General Counsel concedes that the Confidentiality Agreement is a facially neutral rule.

I agree with the General Counsel that when the alleged provisions are read in isolation the Confidentiality Agreement would inhibit Section 7 rights of employees. An employee may read the rule to preclude the discussion of any information about employees which could include terms and conditions of employment and wages with any other employee or third party such as a union. Moreover, an employee could read the rule to prohibit the discussion of confidential information which could include working conditions, the taking or posting of photos, making videos or audio recordings, forwarding work email, or writing about their employment without receiving permission. Finally, the employee would know that a violation of the Confidentiality Agreement could result in discipline. Thus, employees could read this provision of the Confidentiality Agreement and understand that they could not share employee information such as wages, working conditions, and contact information with other employees and with unions which directly impacts employees' Section 7

rights. See *Rio All-Suites Hotel & Casino*, 362 NLRB 1690, 1691 (2015); *Hyundai America Shipping Agency, Inc.*, 357 NLRB 860, 871 (2011), reversed on other grounds 805 F.3d 309 (D.C. Cir. 2015).

However, the Confidentiality Agreement cannot be read in isolation and must be considered in the full context of the events at the time. See *Lafayette Park Hotel*, supra at 825, 827. To this point, the Confidentiality Agreement begins with the reason why the employees are asked to reaffirm their commitment to maintaining confidentiality of Tesla information. In the Confidentiality Agreement, the emails from Lipscomb, and the conversations by the HR partners with employees, Respondent explained that the reaffirmation of the Confidentiality Agreement was due to leaks of proprietary information at the workplace. For example, on November 2, 2016, Lipscomb again explained to the employees that "[t]here is a ton of exciting things happening at Tesla and the interest level in what we are doing has never been higher. It's absolutely critical that we maintain strict confidentiality on all internal matters as any leak can have a negative impact on our company" (R. Exh. 13). At Respondent, in the past, employees received emails from the general counsel and HR director about leaks in the workplace with context such as the launch of the Model 3 Tesla. Thus, considering the totality of the circumstances, I find that reasonable employees would understand the Confidentiality Agreement to be limited to proprietary information.

Even if the Confidentiality Agreement infringes on employees' Section 7 rights, Respondent presented legitimate business justifications to override these rights. An otherwise overboard rule "can nevertheless be lawful if [it] is justified by significant employer interests." *Lafayette Park Hotel*, supra at 825, fn. 5. Here, Respondent presented evidence that it suffered a series of information leaks which are critical to its success. Even prior to these leaks in August 2016, Respondent sent reminders to employees to maintain confidentiality of proprietary business information. Employees also acknowledged their obligation to maintain confidentiality when they were hired. Respondent asked employees to reaffirm their commitment to not leaking or disclosing confidential information. Respondent sought to ensure every employee understood the reasons for why they needed to reiterate this rule, and later decided to make sure this Confidentiality Agreement was in each employees' Workday account. In addition, in the automotive industry, Respondent has legitimate concerns to maintain security of its confidential proprietary information by not permitting photos or recordings in the workplace. Cf. *Flagstaff Medical Center*, 357 NLRB 659 (2011) (prohibition on the use of cameras to record images of patients and/or hospital equipment, property or facilities is lawful); *Boeing Co.*, supra, slip op. at 15 (prohibition on the use of cameras and photography in the military/civilian aircraft manufacturing plant lawful).

The General Counsel and the Union attempt to connect the employees' unionizing efforts with Respondent's decision to reissue the Confidentiality Agreement thereby showing the "true"

---

[24] Zweig did not testify. Respondent admits that Zweig is a supervisor within the meaning of Sec. 2(11) of the Act and as an agent of Respondent within the meaning of Sec. 2(13) of the Act.

[25] As result of the balancing, the Board established three categories of employment rules, policies and handbook provisions which are not part of the test but are a result of the application of the test.

reason for the rule. However, in reviewing the entire record, I can find no connection. Although several employees worked on the unionization campaign in the fall of 2016, there is no evidence that Respondent knew of its existence. Even when Galescu tried to take a photo of the Confidentiality Agreement, Zweig told him that he could not take a photo and that the document would be available in his Workday account. Zweig never explained to Galescu why he could not take a photo of the Confidentiality Agreement and Galescu never told Zweig why he wanted to take a picture. Although later the Union complained to members of the California State Assembly, there is no evidence that Zweig knew or could have known that Galescu sought a photo of the Confidentiality Agreement for Section 7 purposes.

In sum, Respondent did not violate the Act as alleged in paragraphs 7(a) and (b), and the complaint allegations are dismissed.

V. COMPLAINT PARAGRAPHS 7(C) THROUGH 7(I) AND 7(N) THROUGH 7(P): RESPONDENT VIOLATED SECTION 8(A)(1) OF THE ACT ON FEBRUARY 10 AND MAY 24, WHEN EMPLOYEES PASSED OUT LEAFLETS

The General Counsel alleges at complaint paragraphs 7(c) through (i) that on February 10, Respondent's various security guards, who are agents of Tesla, on four separate occasions restrained and coerced employees who were engaged in leafleting in Respondent's parking lot, outside the Fremont facility, by repeatedly asking them to produce their employee badges and/or telling them to leave the premises (GC Br. at 53–57). The General Counsel also alleges at complaint paragraphs 7(n) through (p) that Respondent's security guards acted in a similar manner on May 24, when employees were leafletting in Respondent's parking lot outside the Fremont facility (GC Br. at 57–58). Respondent argues that the General Counsel failed to prove that the unidentified security guards and human resources person are agents of Respondent (R. Br. at 56–59).[26] Respondent also argues that the security guards lawfully requested the employees' badges (R. Br at 59–62).

### February 10 leafletting

On February 10, the day after Moran published his blog post, "Time for Tesla to Listen," members of the VOC first passed out leaflets at the Fremont facility parking lot (Tr. 450). The double-sided leaflet included Moran's blog post on the frontside and a letter from the State of California Assembly to Respondent regarding the Confidentiality Agreement on the backside (Tr. 48; GC Exh. 8). Moran, Sanchez, and Ortiz, who are members of the VOC, as well as other Tesla employees, passed out the leaflets in the parking lot where employees and members of the public may park.

Sanchez testified that he arrived at the Union's office, which is one block from the Fremont facility, on February 10, at 3:30 a.m. to pick up approximately 100 leaflets (Tr. 90, 140–141; GC Exh. 8). Thereafter, Sanchez drove and parked his car by door 2 in the Fremont facility's parking lot (Tr. 92–94; GC Exh. 4). As he drove through the parking lot, Sanchez was not required to show or scan his employee badge, which is consistent with his prior experiences entering the Fremont facility parking lot.[27]

After Sanchez parked, he stepped out of his car and walked towards door 2. Sanchez passed out leaflets to at least three employees at door 2 (Tr. 94–95; GC Exh. 8). In addition, an unidentified security guard, who Sanchez described as a young male Latino and based on the testimony of witnesses is protection associate David Rios (Rios), approached him outside of door 2, asking if Sanchez was an employee (Tr. 95–96).[28] Sanchez told the security guard that he had been an employee for almost 5 years. Sanchez testified that the security guard told Sanchez to leave the property. Sanchez responded by stating that he was not working, was outside the Fremont facility, and legally had the right to be in the parking lot (Tr. 96). This brief encounter lasted less than 3 minutes, and upon its conclusion, the security guard went back inside of the Fremont facility via door 2 (Tr. 96).

Sanchez remained at door 2 and continued to pass out leaflets (Tr. 97). Approximately 5 minutes later, Rios returned to speak to Sanchez. Sanchez testified that the security guard "aggressively" asked for his employee badge (Tr. 97–98). Sanchez showed the security guard his employee badge, and the security guard appeared to take a photo of it with his phone (Tr. 98–99). The security guard handed the employee badge back to Sanchez. The security guard told Sanchez to again leave the parking lot. Sanchez again stated that he was within his legal rights to remain in the parking lot. Rios testified that Sanchez handed him a leaflet (Tr. 1712–1713). Rios then returned to inside the Fremont facility via door 2.[29] Sanchez moved from door 2 to door 1.

As Sanchez began to walk towards door 1, he heard someone exiting from door 2 again. Sanchez turned around, and a different security guard, described by Sanchez as "older middle eastern," walked down the stairs and asked him what he was doing (Tr. 100). Sanchez responded that he was handing out leaflets. This security guard asked what the leaflet was for and was it for a union (Tr. 101). When Sanchez responded in the affirmative,

---

[26] Respondent does not argue that the "red shirt male supervisor no. 1" as identified in the complaint is not a supervisor or agent of Respondent. But even if Respondent does argue as such, the red colored shirt male supervisor is also an agent of Respondent due to his apparent authority during the questioning of Sanchez.

[27] While on medical leave, Sanchez continued to have access to his work email and was never told he could not return to the Tesla parking lot (Tr. 144, 154–155). I credit Sanchez' testimony as it was uncontradicted by any evidence.

[28] In the complaint, the General Counsel did not identify any of the names of the security guards. Respondent complains in its Brief that it was prejudiced by not knowing the identities of these security guards, and that I erroneously precluded Respondent's use of photographs of security guards during cross-examination (R. Br. at 44–45). I denied

Respondent the opportunity to use the photographs in cross-examination on day 3 of the trial because Respondent had not produced these same photos with names in response to the General Counsel's subpoena duces tecum (Tr. 417). When the trial resumed in September 2018, 4 months after the first 4 days of trial, Respondent then provided the names associated with these security guard photos to the General Counsel pursuant to the subpoena duces tecum (Tr. 790–791). Despite the General Counsel's objections due to the late receipt of these names with security guard photographs, I permitted Respondent to use the photographs to exam witnesses. Respondent cannot now claim prejudice for failing to timely comply with General Counsel's subpoena duces tecum at the start of the hearing.

[29] These two incidents with Rios as the young male Latino security guard at door 2 are the allegations in complaint par. 7(d).

the security guard said that unions are worthless, and he should not join one. Sanchez responded that the security guard's opinion was his own, and the security guard then asked for his employee badge, which Sanchez provided for the second time that morning (Tr. 101–102). This security guard also appeared to take a picture of Sanchez' employee badge with his phone (Tr. 102). Sanchez then began walking towards door 1. Meanwhile, the security guard turned back towards door 2. Rios testified that he overheard this conversation and confirmed that the security guard made a comment that unions were no good and did nothing for him (Tr. 1704–1708).

After Rios' encounter with Sanchez, Rios phoned Senior Security Manager Greg Slettvet (Slettvet) to let him know what was happening (Tr. 1713–1714).[30] Slettvet told Sanchez to find out if the people handing out leaflets were employees, to document everything, and if they were not employees to tell them to leave as they were trespassing (Tr. 1715, 1752).[31] Thereafter, a few minutes after Sanchez left for door 1, Rios also went to door 1 (Tr. 1749).

Meanwhile, Ortiz' work shift ended around 2:30 a.m., and he then went to the Union's office and waited for Moran and a group of employees who planned to leaflet around 4:30 a.m. at the Fremont facility (Tr. 451, 689). Ortiz and Moran drove to the Fremont facility, parked by door 1, and began leafletting (Tr. 452–453, 777). After being at door 2, Sanchez met Ortiz and Moran as well as Mike Catura (Catura) at door 1 (Tr. 106).[32] Moran testified that Sanchez told him that he had been at door 2 but was being harassed so he came to door 1 to help pass out leaflets (Tr. 695, 777–778). Ortiz and Moran stood by the ramp at door 1 to pass out leaflets while Catura and Sanchez stood by the stairs to pass out leaflets (Tr. 107).

Twenty minutes after Sanchez arrived at door 1, at approximately 4:20 a.m., two security guards, one of whom was Rios, drove slowly by Sanchez, Moran, Ortiz, and Catura in a Tesla security vehicle (Tr. 108). Rios testified that he arrived at door 1 at approximately 4:23 to 4:24 a.m. to speak to Moran since Sanchez told him that the author of the leaflet blog post was at door 1 (Tr. 1749). Rios sought to gather information as asked by Slettvet (Tr. 1749). Rios testified that he spoke to Moran, Ortiz and Catura and told them that if they were not employees they would need to leave, but if they are employees, they need to show him their employee badges (Tr. 1718–1719, 1746). Moran, Ortiz and Catura responded that they were employees and provided their employee badges (Tr. 1718–1720). Rios took pictures of their employee badges since he was asked to document "everything" and let the three employees continue passing out leaflets (Tr. 1720). Rios then left the four employees to leaflet.

Before Rios' shift ended, he sent an email to Slettvet summarizing the morning events and noted the names of the persons handing out leaflets along with their employee badge numbers (R. Exh. 34). Rios later sent an email with the employee badge

pictures he took that morning to Slettvet (R. Exh. 35; Tr. 1751).

Five to 10 minutes after Rios left, at around 4:45 to 5 a.m., a female security guard partially exited door 1 on the ramp side (Tr. 455–456, 702). The female security guard told Moran, Ortiz, Sanchez, and Catura that they should leave and were not allowed to be in the Fremont facility parking lot (Tr. 110, 455, 457, 702). Moran told the female security guard that they are Tesla employees and have every right to be there to distribute leaflets (Tr. 458, 703). The security guard stated that she needed to document Moran's name, and he asked for her name as well (Tr. 702–703). The security guard then went back inside door 1 to her security podium.[33]

Thereafter, Moran, Ortiz, Sanchez, and Catura continued to distribute their leaflets for another 10 to 15 minutes when another male security guard exited door 1 (Tr. 459, 703–704). This male security guard also told them to leave the Fremont facility parking lot, and Moran and Sanchez stated that they were in the parking lot within their legal rights (Tr. 112). This security guard asked for their employee badges, and he appeared to take a photo of each employee badge with his phone. Thereafter, the security guard re-entered door 1.[34] Sanchez, Ortiz, Moran, and Catura continued to hand out leaflets until about 5:20 to 5:30 a.m. when Moran began his work shift and Ortiz went to the union office (Tr. 690–691). Catura stopped passing out leaflets at 5:45 a.m. when his work shift began, and Sanchez continued to hand out leaflets until 6:20 a.m. (Tr. 113).

Sanchez then drove to Respondent's north admin building and parked in the adjacent parking lot so he could pass out more leaflets (Tr. 115; GC Exh. 5). On his walk towards door 3, Sanchez passed out leaflets to employees (Tr. 115–116). Sanchez arrived at door 3 at approximately 6:25 to 6:30 a.m. (Tr. 120). Five minutes later, a different female security guard exited the interior of the Fremont facility at door 3. This female security guard asked Sanchez if he was an employee, to which he responded in the affirmative and offered the number of years he had worked at Tesla (Tr. 122). The security guard told him to leave the Tesla parking lot and asked for his employee badge. Sanchez offered his employee badge to the security guard who "snatched [his] employee badge aggressively from [his] hand" and appeared to take a photo of it with her phone (Tr. 122). The security guard handed the employee badge back to Sanchez and re-entered the Fremont facility at door 3.[35]

Sanchez continued to hand out leaflets for a few more minutes until 6:40 a.m., took a break in his car, and then began leafletting again at 8 a.m. (Tr. 123). After handing out more leaflets, Sanchez then decided to go to another parking lot where the Fremont facility's back entrance is located (Tr. 124). At this location, Sanchez continued to talk to employees. Sanchez then attempted to enter the Fremont facility from this back entrance due to his need to use the restroom, but when he scanned his employee badge for the first time that morning, the door would

---

[30] Rios denied telling Sanchez to leave the Fremont facility parking lot or to stop passing out leaflets (Tr. 1732). I cannot credit Rios' testimony as the sequence of events makes it more likely than not that he twice told Sanchez to leave the Fremont facility parking lot *prior* to talking to Slettvet as these two encounters with Sanchez took place approximately 5 minutes apart.

[31] Slettvet did not testify at the hearing.

[32] Catura did not testify at the hearing.

[33] This incident with the female security guard at door 1 is the allegation in complaint par. 7(e).

[34] This incident with the male security guard at door 1 is the allegation in complaint par. 7(f).

[35] This incident with the female security guard at door 3 is the allegation in complaint par. 7(g).

not unlock. Thus, a security guard, whom Sanchez had not yet met that morning, at the exterior of the back entrance used a walkie-talkie to call in his employee badge number (Tr. 125–126). Three minutes later, an unidentified male employee wearing a red colored Tesla shirt came out of the back entrance and asked, "Are you Jose Moran" (Tr. 126–127). Sanchez responded that he was not but that he was with him. This unidentified employee told Sanchez to leave the premises.[36] Sanchez responded that he was there within his legal rights and questioned whether the individual sought to take away his rights (Tr. 127). Thereafter, the individual took out his phone, aimed the back of it where the camera lens is located 6 inches away from Sanchez' face, and dialed the phone. Sanchez testified that the ring tone sounded like the Apple iPhone ringtone for the FaceTime function. Sanchez then heard from the phone a female's voice who stated that she noticed that he was on a leave of absence due to injury and should be home resting. Sanchez responded that he was on the property within his legal rights, was not acting contrary to his restrictions, and only handing out leaflets (Tr. 129). The female individual told Sanchez to go home to rest and asked him to again leave the premises. Sanchez then left the Fremont facility.[37]

Sanchez testified that he took three smoking breaks in the front parking lot during each of his work shifts, and only once did a security guard ask him to show his employee badge (Tr. 83; GC Exh. 36). Sanchez also testified that no security guard had ever told him to leave the Fremont facility parking lot when he was on his smoke breaks (Tr. 83).

Sometime in February, according to Jeremie Hansen (Hansen), Slettvet, Hansen's supervisor, told him to allow employees to engage in leafletting if the employees were not working and distributing only in nonwork areas (Tr. 1448, 1477).[38] Hansen testified that he shared this information from Slettvet to Respondent's employees who reported to him as well as with the contract security guard manager, but Hansen could not recall when specifically, he provided these instructions to the security guards (Tr. 1450, 1477, 2441–2443). The evidence shows that Slettvet first documented his instructions in September, but Slettvet orally communicated his instructions prior to then (R. Exh. 21).

## May 24 leafletting

On May 24, Branton Phillips (Phillips), who is a current material handler for Respondent, drove to the Union's office near the Fremont facility to pick up leaflets to pass out before his work shift began at 6 a.m. (Tr. 390–392; GC Exh. 9). The leaflet included the Union slogan, "Driving a Fair Future at Tesla," and concerned injuries at Tesla. The title of the article, "The Truth about Injuries at Tesla" discussed Cal/OSHA forms that employees obtained from Respondent. The article also discloses that employees provided this data to a California non-profit which analyzed the data. The leaflet provided the Union organizing office address as well as the Facebook page and union campaign website. On the back side of the leaflet was the story of a GA employee who had been injured several times while on the job.

Phillips, wearing his Tesla pants, shirt, and cap, arrived at the parking lot near door 4 of the Fremont facility a little past 5 a.m. (Tr. 392–393). Phillips entered door 4 by swiping his employee badge which permitted him to enter the Fremont facility and walked up to the female security guard at the podium. Phillips pointed to his picture on the female security guard's laptop, stating that was him and that he planned to hand out leaflets (Tr. 395–397). The female security guard stated, "No, you can't do that" (Tr. 398).[39] Phillips told her to be very careful or she could have a lawsuit on her hands.

Phillips then went outside of door 4 to pass out leaflets. Less than 10 minutes later, a male security guard approached Phillips with a walkie-talkie in his hands (Tr. 400–401). The security guard said to Phillips, "so you're the one with the fliers" (Tr. 401). Phillips stated that he was. The security guard responded stating something to the effect of leave right now or be fired (Tr. 401–402). Phillips told him that he was permitted to pass out leaflets by the National Labor Relations Board. The security guard then asked to see his employee badge (Tr. 402). Phillips gave the security guard his employee badge but due to its faded condition, the security guard could not read it (Tr. 401–402).[40] A second male security guard approached them. The first male security guard again told Phillips to leave right away.[41]

Phillips became nervous and called the union office (Tr. 403–404). With the union office on his speakerphone, Phillips told the union employee that the security guards were telling him to leave. After a short exchange, the union employee told Phillips

---

[36] This incident with the male, red colored Tesla shirt wearing employee is the allegation in complaint par. 7(h).

[37] This incident with the female employee on the phone is the allegation in complaint par. 7(i).

[38] Several security employees corroborated Hansen's testimony regarding instructions from Slettvet on how to handle employees and non-employees who leaflet in the parking lot at the Fremont facility. For example, an email on February 10 at 6:26 a.m. from Samuel Ali (Ali), the grave shift supervisor for Securitas, corroborates Hansen's testimony (R. Exh. 20). Ali noted in an email to communicate to the next security shift that union advocates were present at doors 1, 2, and 3 and that these union advocates were Respondent's employees which made the situation "a little difficult" (R. Exh. 20). A copy of the union leaflet was placed in the security control room. In response to Ali's email, Ian McEwen (McEwen), account manager for Securitas, replied that Slettvet asked that the union representatives only be identified but security was not to interfere as they are employees and can be on the site (R. Exh. 20). In addition, on May 24, Felipe De La Cruz (De La Cruz), who is an operator

at the security operations center or control room, testified that at 6:01 a.m., he sent an email to Slettvet and Hansen with the subject line: "U.A.W. activity" (R. Exh. 44). De La Cruz reported that several people were handing out fliers outside the doors, lobby, and gates (R. Exh. 44; Tr. 2460). De La Cruz stated that he created a "ticket" and added all the names of the employees handing out leaflets (R. Exh. 44; Tr. 2445, 2468). De La Cruz testified that he sent out all six patrols to look out for union activity (Tr. 2471). De La Cruz testified he sent the email to Slettvet because Slettvet was interested in monitoring union activity (Tr. 2459–2460, 2471).

[39] This incidents with the female security guard at door 4 is the allegation in complaint par. 7(o).

[40] Even though his photo was faded, Phillips's security badge continued to operate to open the door at the Fremont facility (Tr. 419–420). Moreover, Phillips did not replace his badge until November.

[41] This incident with the male security guard at door 4 is the allegation in complaint par. 7(p).

to not "be combative" and to ask for the security guards' identifications and employee badge numbers (Tr. 405). At this point, a third security guard then showed up. Phillips heard the walkie-talkie sound of one of the security guards where he heard the security guard report that Phillips refused to provide his employee badge which is contrary to what occurred earlier (Tr. 406–406). Then, a Tesla security vehicle arrived, and a fourth security guard exited the vehicle and spoke to the three security guards present with Phillips (Tr. 409). Phillips testified that the fourth security guard who stepped out of the Tesla security vehicle asked if Phillips was leafleting. One of the security guards responded that Phillips had leaflets, and the fourth security guard from the security vehicle responded that Phillips was permitted to leaflet (Tr. 411). The three security guards left immediately but the fourth security guard in the Tesla security vehicle remained in the area for at least 10 minutes while Phillips passed out leaflets (Tr. 411–412). Phillips stopped passing out leaflets at 5:45 a.m. A computer assisted dispatch (CAD) report was generated on May 24, based on a call received at 5:21 a.m. (R. Exh. 23). This CAD report indicated that Phillips along with Catura and Moran as well as non-employees passed out leaflets that day (R. Exh. 23). Galescu also passed out leaflets prior to the start of his shift (Tr. 856–857).

*Credibility Findings*

Here, the witnesses for both parties do not drastically differ as to what occurred on the mornings of February 10 and May 24. Specifically, the General Counsel's witnesses, aside from some minor inconsistencies which are to be expected, testified similarly and with detail as to what occurred during these leafleting events. I adopt the General Counsel's witness' version of events due to the extraordinary details they testified about as to the timing of events, where they were stationed, and with whom during the leafletting. Their collective testimony seemed truthful and unrehearsed. In contrast, Respondent only presented one witness to some of the events of February 10, while Respondent's other witnesses did not engage in any conversations with the employees on either morning and thus, are not witnesses to the complaint allegations.

Sanchez, who is a current production associate in GA on extended medical leave, provided highly credible testimony as he provided details as to the events of February 10, when he was leafletting. Moreover, even on cross-examination, Sanchez recalled how many female security guards he spoke to disagreeing with the number presented to him in the questioning. Sanchez recalled without contradiction, on cross-examination, the description of each guard at each door and in the sequence in which he encountered them. To recall with details the events of this morning with few inconsistent statements supports the truthfulness of his testimony. In addition, Sanchez is a current employee which solidifies his credibility as he is testifying against his pecuniary interests. See *Avenue Care & Rehabilitation Center*, 360 NLRB 152, 152 fn. 2 (2014); and *Flexsteel Industries*, 316 NLRB 745 (1995), affd. mem. 83 F.3d 419 (5th Cir. 1996).

Ortiz and Moran, a current employee, also provided corroborating testimony as to their role and experience during the February 10 leafleting. Ortiz remained honest and calm when he testified regarding the February 10 leafletting. Moran also did not waver in his testimony. For example, Ortiz, Moran, and Sanchez testified consistently as to the physical positions of the individuals passing out leaflets (Tr. 454–455). Their recollections seemed plausible considering the sequence of events. Like Sanchez, Moran is testifying against his pecuniary interests.

As for the May 24 leafletting, I also found Phillips to be a highly credible witness as he is a current employee and testifying against his pecuniary interests. Phillips provided specific details as to the descriptions of the security guards he encountered. Phillips also remained calm and steadfast during both his direct and cross-examinations. Furthermore, Phillips' testimony was not contradicted by any other witness or documentary evidence.

As for Respondent's witness, Rios, who was employed directly by Respondent on February 10, I do not credit the entirety of his testimony as it is inconsistent with the credited evidence that proves to be logical in terms of the sequence of events. But I do credit his testimony that Slettvet told him to determine whether those leafletting were employees by checking their employee badges and if so to permit them to leaflet and to document their names. Respondent's other witnesses did not actually observe the alleged violations of the Act where other security guards asked employees to leave the Fremont facility parking lot and/or repeatedly asking them to produce their employee badges. However, like Rios, they did confirm that at some point during the February 10 leafletting, Slettvet advised them to check on the employment status of those who were leafletting, to document their names, and to permit them to leaflet if they were employees.

*Legal Analysis*

An employer may not prohibit employees from distributing union literature in nonworking areas on nonworking time. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 (1945). Specifically, the Board has held that "[t]he distribution by off-duty employees of union literature in company parking lots is clearly protected by Section 7 of the Act" absent a showing that any work performed there is integral to the business operations. *St. Luke's Hospital*, 300 NLRB 836, 837 (1990); *Meijer, Inc.*, 344 NLRB 916, 917 (2005), enf. in relevant part 463 F.3d 354 (5th Cir. 2006); *Tri-County Medical Center*, 222 NLRB 1089 (1976) (rule which denies off-duty employees entry to parking lots, gates, and other outside nonworking areas will be found invalid); *Southern Bakeries, LLC*, 368 NLRB No. 59, slip op. at 1–2 (2019) (citing *Piedmont Gardens*, 360 NLRB 813 (2014)). In *St. Luke's Hospital*, the Board held that an employer violated Section 8(a)(1) of the Act when a director of security told an off-duty employee he would need to leave the employer's parking lot when he was found to be leafletting, and even after asking if he was an employee, which he was, told the employee that he needed leave the property. Id.[42]

The complaint allegations here concern the leafletting of

_____

[42] In a health care setting, the Board has acknowledged an employer's interest in limiting employee solicitation or distribution based on patient care such that hospitals may be warranted to prohibit solicitation and/or distribution in immediate patient care areas, but the employer carries the

burden of proving legitimate business considerations. See *St. John's Hospital & School of Nursing, Inc.*, 222 NLRB 1150 (1976); *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 507 (1978) (burden is on hospital to

union material by off-duty employees on nonwork time in the Fremont facility parking lot on February 10 and May 24. During events on February 10 and May 24, the credited evidence shows that employees were told by Respondent's security guards, human resources person and supervisor at various times to leave the premises. They were also asked repeatedly to show their employee badges. Based on Board law, Sanchez, Moran, Ortiz, and Phillips lawfully engaged in protected concerted activity when they passed out leaflets during nonduty time in Respondent's parking lot. Respondent does not argue that the parking lot is a work area but claims that it is considered private property (R. Br. at 42). Despite Respondent's claim, Respondent does not make any arguments to support a showing that a prohibition of leafletting is justified for business reasons. Moreover, the General Counsel argues that Respondent's security guards as well as human resources person and supervisor restrained and coerced employees by repeatedly asking for their employee badges and for telling the employees they must leave the Fremont facility parking lot.

Prior to analyzing whether the security guards and human resources person restrained and coerced employees thereby violating Section 8(a)(1) of the Act, a question to be answered is whether the security guards and human resources person are agents of Respondent within the meaning of Section 2(13) of the Act. As set forth in Section 2(13), when making an agency determination, "the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." If they are not agents, then any unlawful statements cannot be attributed to Respondent. The burden of proving an agency relationship is on the party asserting its existence which in this instance is the General Counsel. "The agency relationship must be established with regard to the specific conduct that is alleged to be unlawful. An individual can be a party's agent if the individual has either actual or apparent authority to act on behalf of the party." *Cornell Forge Co*., 339 NLRB 733, 733 (2003) (citing *Pan-Osten Co*., 336 NLRB 305, 306 (2001)). "The test is whether, under all circumstances, the employees 'would reasonably believe that the employee in question [the alleged agent] was reflecting company policy and speaking and acting for management." *GM Electrics*, 323 NLRB 125, 125 (1997); *Southern Bag Corp*., 315 NLRB 725, 725 (1994). The Board has found that security guards may be agents of an employer as defined by Section 2(13) of the Act when the guard may stop persons from entering a plant. *Cooking Good Division of Perdue Farms, Inc*., 323 NLRB 345, 351 (1997) (security guards placed in a position to stop individuals from entering premises are cloaked with apparent authority).

The record established that the security guards were stationed at the entrances to each of the doors of the Fremont facility as well as patrolling the parking lot. Furthermore, all security guards, contractor, or direct employee of Respondent, wore the same attire and drove Respondent's vehicles with the word, "Security" written on its sides. In addition, the security guards possessed the authority to check an employee's badge to determine whether the employee could enter the Fremont facility. The

morning of February 10, security guards at different times asked Sanchez, Ortiz, Moran, and Catura for their employee badges. The morning of May 24, security guards asked Phillips the same questions. But these same security guards, after learning that the individuals were employees, still told them to leave the parking lot. Also, the security guards repeatedly asked these same individuals for their employee badges during the entire time of their leafletting. Based on the credited evidence, Sanchez, Ortiz, Moran, Catura, and Phillips could reasonably believe that the security guards acted as Respondent's agents with apparent authority and were acting on Tesla's orders and behest. Accordingly, Respondent's security guards who interacted with Sanchez, Ortiz, and Moran on February 10, as well as with Phillips on May 24, were agents of Respondent within the meaning of Section 2(13) of the Act. In addition, the human resources person who spoke on the phone with Sanchez acted as an agent of Respondent as she also told him to leave the premises after confronting him with his medical leave status. It should be noted that even if the human resources person who confronted Sanchez was not actually a human resources person, the result of her apparent authority is not diminished; her actions, and not her official title, is of import.

As to whether the security guards' conduct was lawful, the General Counsel's witnesses all testified consistently that they were told numerous times to leave the Fremont facility parking lot even after the security guards verified their employment with Tesla. When off-duty employees are told to leave an employer's parking lot when passing out union-related literature as leaflets, Respondent's actions violate the Act. See *New York New York Hotel & Casino*, 356 NLRB 907, 913 (2011) ("it is well established that an employer that operates on property it owns ordinarily violates the Act if it bars its employees from distributing union literature during their nonwork time in nonwork areas of its property. Moreover, such an employer's off duty employees have a presumptive right to return to their worksite and gain access to exterior, nonwork areas for purposes of otherwise protected solicitation"). Here, Rios told Sanchez twice to leave the Fremont facility parking lot the morning of February 10, after he confirmed that Sanchez was an employee. Later, a female and male security guard told Moran, Ortiz, Sanchez, and Catura that they should also leave the Fremont facility parking lot. Almost 2 hours after they began leafletting, Sanchez went to the north admin building and was told three more times (by a security guard, a male supervisor, and a human resources person) to leave the Fremont facility. On May 24, a security guard told Phillips that he could not pass out leaflets, and another security guard told Phillips twice that he needed to leave the Fremont facility parking lot even though Phillips had provided his employee badge. Despite verifying employment, Respondent's agents continued to question the individuals' employment status on both dates and told them to leave the Fremont facility parking lot. Even though the employees continued to pass out leaflets after the security guards told them to leave the Fremont facility parking lot, their actions of telling the employees that they needed to leave, and thereby stop leafletting, without a proper business justification violates Section 8(a)(1). Likewise, the actions of the male

show that the selective ban on solicitation is "necessary to avoid disruption of health-care operations or disturbance of patients").

supervisor and human resources person telling Sanchez he needed to leave the Fremont facility violates Section 8(a)(1). Thus, Respondent violated Section 8(a)(1) of the Act as alleged by the General Counsel in complaint paragraphs 7(c) through (i) and (n) through (p).

Respondent's defenses are without merit. Respondent argues that its defense was hampered by the General Counsel not naming the security guards, the supervisor, and the human resource person who spoke to the employees on February 10 and May 24. I reject Respondent's argument. Respondent could have conducted its own inquiry as to who the employees could have possibly spoken to during those morning leafletting periods. The fact that the employees do not know the names of those to whom they spoke is reasonable considering the security guards, the supervisor and human resources person did not identify themselves. The General Counsel's complaint allegations were sufficiently pled to place Respondent on notice of the allegations against it, and its method or manner to defend itself is its own responsibility.[43]

Respondent argues it had the right to verify whether the individuals who were passing out leaflets were employees. Certainly, Respondent could determine whether the individuals passing out leaflets were employees but even after checking on the employment status of the individuals, Respondent's various security guards, male supervisor and human resources person continued to tell the employees to leave the Fremont facility parking lot and therefore, stop passing out leaflets. Respondent claims that even if the security guards, male supervisor, and human resources person are considered its agents, they acted in excess of their authority and Respondent should not be liable for their actions. I do not agree. As agents of Respondent, the security guards, male supervisor, and human resources person's conduct of informing the leafletting employees that they had to leave the parking lot are properly attributable to Respondent. See *Ideal Elevator Corp.*, 295 NLRB 347, 347 fn. 2 (1989) ("the Board continues to hold that under Sec. 2(13) of the Act 'an employer is bound by the acts and statements of its supervisors whether specifically authorized or not.'" (quoting *Dorothy Shamrock Coal Co.*, 279 NLRB 1298, 1299 (1986), enfd. 833 F.2d 1263 (7th Cir. 1987)).

Even if Respondent is liable for their agents' actions, Respondent argues that the employees continued to leaflet even after they were asked for their employee badges. The Board does not consider the motivation behind remarks or their actual effect. *Miller Electric Pump & Plumbing*, 334 NLRB 824 (2001). Instead, "the basic test for evaluating whether there has been a violation of Section 8(a)(1) is an objective tests, i.e., whether the conduct in question would reasonably have a tendency to interfere with, restrain, or coerce employees in the exercise of their Section 7 rights, and not a subjective test having to do with whether the employee in question was actually intimidated."

*Multi-Ad Services*, 331 NLRB 1226, 1227–1228 (2000) (emphasis in original), enfd. 255 F.3d 363 (7th Cir. 2001). Thus, I find that Respondent violated Section 8(a)(1) of the Act as alleged in complaint paragraphs 7(c) through (i) and (n) through (p).

VI. COMPLAINT PARAGRAPH 7(J): RESPONDENT VIOLATED SECTION 8(A)(1) OF THE ACT WHEN ON MARCH 23, SUPERVISOR ARMANDO RODRIGUEZ TOLD EMPLOYEES THEY COULD NOT DISTRIBUTE STICKERS, LEAFLETS OR PAMPHLETS WITHOUT RESPONDENT'S APPROVAL AND THREATENED TERMINATION IF THEY VIOLATED THIS RULE

The General Counsel alleges that on March 23, Supervisor Armando Rodriguez (Rodriguez) informed employees that distribution of stickers, pamphlets and leaflets would be grounds for termination which violates the Act (GC Br. at 58–60). Respondent argues that Rodriguez lawfully informed employees that Respondent's property could not be vandalized (R. Br at 65–66).

On March 23, Galescu participated in a prestart meeting with approximately 30 shift co-workers led by Rodriguez (Tr. 843).[44] Galescu testified that during this meeting, Rodriguez pulled out his black notebook, and announced, "Stickers, leaflets, and pamphlets that's not approved by Tesla could be—passing them out could be a terms of termination and be active vandalism" (Tr. 844, 1063).[45] Rodriguez asked if anyone had questions but no one asked any questions. Union stickers, pamphlets and business cards had been passed out by associates in the month prior to Rodriguez' March 23 prestart meeting (Tr. 844–845).

Rodriguez testified that in March, for 1 to 2 weeks he noticed UAW stickers placed in the bathroom on stalls as well as on information sheets (known as "flow downs") (Tr. 2137, 2148–2149). However, Rodriguez admitted that he did not document the UAW stickers he saw on the walls of the bathrooms (Tr. 2153). As a result of his observations, during a prestart meeting on March 23, Rodriguez told his team that vandalism is not tolerated at Respondent (Tr. 2138, 2146). In contrast to Galescu, Rodriguez testified, "We can't be defacing Tesla property, especially with literature that's not Tesla approved [. . .] If you guys want to put it on your person, put it on your hat, put it on your shirt, it's all—all that's allowable, but we just can't post stuff on the wall because it's considered vandalism, and—and doing so could—a disciplinary action could—could—it could lead to disciplinary action if you're caught vandalizing Tesla property" (Tr. 2138). Rodriguez denied reading from a black book in which he keeps notes to be discussed during prestart meetings (Tr. 2147–2148). On cross-examination, Rodriguez could not recall any other topics he discussed during this prestart meeting (Tr. 2156). Rodriguez also denied discussing the passing out of pamphlets (Tr. 2139, 2144).

*Credibility Findings*

I adopt Galescu's version of the prestart meeting held on March 23. Galescu, who is a current employee testifying against

---

[43] Respondent never filed a motion for a bill of particulars in response to the General Counsel's complaint.

[44] At a prestart meeting, which occurs before the beginning of a work shift, a supervisor usually discusses safety and production (Tr. 843).

[45] In his Board affidavit, dated April 27, Galescu stated, "Armando pulled up a little black book, a pad of paper, and he read from his

notebook. Armando said something like, 'Stickers or leaflets and pamphlets that are not approved by Tesla—you guys can't pass them out unless it is approved by Tesla'" (Tr. 1065). Galescu's testimony at the hearing and during the investigation in his affidavit are consistent, which reinforces his credible testimony.

his pecuniary interests, testified with conviction as to what occurred during the meeting. Galescu's recollection of the hearing of what Rodriguez stated during the meeting regarding preapproval to pass out stickers, leaflets or pamphlets closely matches his Board affidavit taken only 1 month after the meeting. Galescu did not mention in his Board affidavit that Rodriguez threatened termination if they passed out nonapproved material, but disciplinary action was mentioned as admitted by Rodriguez. In contrast, Rodriguez could not recall any other events during that day including other topics discussed during the meeting. This lack of recollection of other topics discussed reflects poorly on his credibility. Thus, I credit Galescu's testimony over Rodriguez' testimony.

*Legal Analysis*

The Board has held that any rule requiring employees to receive preapproval for engaging in protected concerted activity, such as distributing union paraphernalia, during nonwork times and in nonwork areas is unlawful. See *Enterprise Products Co.*, 265 NLRB 544, 554 (1982), citing *Peyton Packing Co.*, 49 NLRB 828 (1943), and *Stoddard-Quick Mfg. Co.*, 138 NLRB 615 (1992); *Brunswick Corp.*, 282 NLRB 794, 795 (1987). The Board has also held that threatening employees with reprisals for engaging in union or other protected concerted activities is coercive to the exercise of their Section 7 rights under the Act. *Metro One Loss Prevention Services Group*, 356 NLRB 89, 89 (2010) (employer violates Sec. 8(a)(1) if it communicates to employees that it will jeopardize their job security, wages, or other working conditions if they support the union); *Baddour, Inc.*, 303 NLRB 275 (1991) (an employers' threats of discipline or job loss for participation in protected concerted activities constitute violations of the Act). The Board has applied this theory to explicit or implicit threats to employees, including the loss of their jobs or other adverse work consequences. *Jewish Home for the Elderly of Fairfield County*, 343 NLRB 1069, 1091–1096 (2004) (employer violated Sec. 8(a)(1) of the Act by threatening loss of benefits, loss of jobs, and closure of the facility if the employees supported the union); *Sheraton Hotel Waterbury*, 312 NLRB 304, 305 (1993) (implied threat contained in employer's posting violated Sec. 8(a)(1) of the Act); *Metro One Loss Prevention Services Group*, supra at 89–90 (employer implied working conditions could deteriorate if the employees supported the union organizing drive in violation of Sec. 8(a)(1) of the Act).

The credited evidence shows that Rodriguez told employees that they could not distribute any stickers, leaflets or pamphlets not approved by Respondent, which contradicts Respondent's argument that Rodriguez validly told employees not to vandalize Respondent's Fremont facility. Rodriguez' statement to the employees clearly violates Section 8(a)(1) of the Act. In addition, Rodriguez' threat that employees may be terminated for distributing stickers, leaflets, or pamphlets without prior approval from Respondent also violates Section 8(a)(1) of the Act. In sum, Respondent violated Section 8(a)(1) as alleged in complaint paragraph 7(j).

VII.  COMPLAINT PARAGRAPHS 7(K) AND 7(Q): RESPONDENT DID NOT VIOLATE SECTION 8(A)(1) OF THE ACT WHEN ON APRIL 5, RESPONDENT BY HUMAN RESOURCES PARTNER DAVID ZWEIG ATTEMPTED TO PROHIBIT EMPLOYEES FROM DISCUSSING SAFETY

CONCERNS WITH OTHER EMPLOYEES AND/OR THE UNION, BUT VIOLATED SECTION 8(A)(1) OF THE ACT WHEN ON MAY 24, HUMAN RESOURCES BUSINESS PARTNER LIZA LIPSON INTERROGATED EMPLOYEES ABOUT THEIR PROTECTED CONCERTED ACTIVITIES

The General Counsel argues that Respondent created an unlawful rule when placing a "CONFIDENTIAL" watermark on safety logs and summaries given to Galescu and Ortiz which prevented them from sharing these logs with other employees (GC Br. at 60–62). The General Counsel further alleges that Lipson violated the Act when she interrogated Galescu and Ortiz about their protected concerted activity regarding the safety logs they received (GC Br. at 62–64). Respondent argues that Zweig did not prohibit the employees from sharing the safety logs with other employees and with the Union (R. Br. at 69–73). Furthermore, Respondent argues that any confusion as to confidentiality was clarified in subsequent correspondences between the employees and Respondent (R. Br at 73–74). Moreover, Respondent argues that Lipson did not interrogate employees about the safety logs (R. Br. at 91–94).

On April 4, Galescu, on behalf of Ortiz and himself, sent an email to several Tesla' supervisors and/or agents including Hedges requesting Cal/OSHA safety logs (Form 300) and summaries (Form 300A) (GC Exh. 16; Tr. 469, 847). Respondent is required to complete Cal/OSHA safety logs for every work-related death and every work-related injury or illness which meets a certain criterion including restricted work activity and days away from work. Respondent is also required to complete a summary of work-related injuries on a Cal/OSHA summary form. Galescu testified that he made the request for these Cal/OSHA documents because he had been injured while working and had seen other employees get injured while working, and thus, he wanted to inform the Union of the injury rates at Tesla (Tr. 846, 1037). In his email, Galescu writes that there was a concern about the health and safety conditions at Tesla and as such Ortiz and he were requesting copies of Cal/OSHA safety logs and summaries for the current calendar year and five previous calendar years per the California Code of Regulations (Tr. 845).

On April 5, Zweig responded via email to Galescu's request (GC Exh. 17). Zweig agreed to provide redacted Cal/OSHA logs and unredacted summaries to Galescu and Ortiz. Zweig writes, "Cal/OSHA Form 300 and 300A annual summaries are being provided to you with the understanding that you and Richard Ortiz are exercising your rights as current employees to access injury and illness records [. . .]. To protect the privacy and confidential health information of injured and ill employees, we have not provided names on the Cal/OSHA logs" (GC Exh. 17). The top of the Cal/OSHA 300 logs contained the following: "Attention: This form contains information relating to employee health and must be used in a manner that protects the confidentiality of employees to the extent possible while the information is being used for occupational safety and health programs" while the summaries note, "Employees, former employees, and their representatives have the right to review the Cal/OSHA Form 300

in its entirety" (GC Exhs. 17, 18).[46]  In addition, stamped in a watermark across the Cal/OSHA logs and summaries was the word "CONFIDENTIAL" (GC Exhs. 17, 18).  Zweig included Hedges in both emails to Galescu and Ortiz.

On April 13, Galescu, along with Ortiz, sent a reply via email to Zweig and Hedges (GC Exh. 20).  Galescu requested unredacted copies of the Cal/OSHA logs.  Galescu also noted that Federal and State laws permitted him to share these documents with his coworkers, former employees, and authorized representatives.  Thus, Galescu sought clarification on why the documents provided were marked as confidential (GC Exh. 20).

On April 14, Seth Woody (Woody), director of global environmental health and safety,[47] replied to Galescu's email and declined to provide the information unredacted to protect the privacy interests of current and former employees (GC Exh. 21).  Woody wrote, "We placed the "confidentiality" watermark on the documents out of concern that the documents may be shared with individuals or organizations who are not authorized by Cal. Code Regs. Title 8, §14300.35 to receive injury and confidential health information.  We are not attempting to prohibit you from sharing the documents with current or former employees" (GC Exh. 21).  On April 21, Galescu replied to Woody requesting the legal basis for his position (GC Exh. 22).  Thereafter, on April 28, Woody responded to Galescu, providing unredacted copies of the Cal/OSHA logs (GC Exh. 23).[48]  Woody wrote, "We remind you that Cal. Code Regs. Title 8, §14300.35 provides that you may share these documents only with current and former employees or authorized representatives" (GC Exh. 23).  Galescu discussed the unredacted Cal/OSHA summaries and logs with his representatives (Tr. 1049).

In response to the release of the unredacted Cal/OSHA logs and summaries, on May 1, Hochholdinger sent an email to Hedges to be disseminated to all production employees concerning safety initiatives and progress (R. Exh. 2).  In this email, Hochholdinger summarized safety progress at the Fremont facility as well as the development of safety teams led by production associates and ergonomic improvements.  In addition, Hochholdinger informed the employees that an employee requested Tesla's Cal/OSHA logs, and that Respondent was "required by law to provide them in their entirety" (R. Exh. 2).  Hochholdinger further writes, "We wanted to provide advance notice

to employees, as we believe this request is intended to ultimately make this information public despite our efforts to protect your privacy" (R. Exh. 2).  If employees had any questions, they could email the support team.

On May 24, approximately 1 month after receiving the Cal/OSHA logs and summaries and on the same day as employees passed out leaflets concerning safety issues at the Fremont facility, Hedges asked Lipson with meet with Ortiz and Galescu to discuss Respondent's concern that the Cal/OSHA logs had been shared with individuals outside Tesla (Tr. 2362–2364; GC Exh. 9).  Prior to this meeting, Lipson had been provided a copy of the May 24 union leaflet by HR Partner Tori Tanaka (Tanaka) (GC Exh. 53).  The leaflet mentioned that employees recently received copies of Cal/OSHA logs and summaries which they shared with a California non-profit organization (GC Exh. 9).

Thus, Lipson, at approximately 7:15 to 7:30 p.m., approached Ortiz (Tr. 482).  Ortiz testified that Lipson told him that she wanted to speak about his performance (Tr. 482).  Lipson and Ortiz went into a nearby office where Lauren Holcomb (Holcomb), a senior environmental health and safety specialist, was present (Tr. 483).[49]  Lipson spoke first, informing Ortiz that he was doing a good job.[50]  She then asked what Ortiz did with the Cal/OSHA 300 logs (Tr. 483–484).  Ortiz responded that he did not do anything with them.  Lipson asked Ortiz if he received the Cal/OSHA 300 logs to which Ortiz responded that he had.  Lipson then asked Ortiz if anyone else had done anything with the Cal/OSHA 300 logs which Ortiz denied.  Lipson also asked Ortiz if Galescu had done anything with the Cal/OSHA 300 logs, and Ortiz responded that Galescu had not done nothing in his presence (Tr. 486, 2352).  After another question, Ortiz then asked Lipson and Holcomb if they brought him into the office to talk about the Cal/OSHA 300 logs or his performance, and Holcomb stated that Ortiz was doing a great job and they appreciated him (Tr. 485).[51]

Later that evening Lipson and Holcomb met with Galescu in a conference room (Tr. 857).  Lipson started the meeting by informing Galescu that the meeting would not be recorded.  She then asked Galescu if he knew anyone who was able to access the Cal/OSHA 300 logs outside of Tesla (Tr. 858).  Galescu responded that the information was given to him and he would not answer questions without his representative.  Lipson then asked

---

[46]  The Cal/OSHA 300A summaries do not appear to contain any personally identifiable information in contrast to the Cal/OSHA 300 logs which includes the names of injured or ill employees.

[47]  Respondent admits Woody is a Sec. 2(11) supervisor as defined by the Act.  Woody did not testify.

[48]  For purposes of this hearing, I ordered the General Counsel to redact the exhibit to protect any personally identifiable information as the names of the individuals listed are not relevant in this decision.

[49]  Holcomb did not testify during the hearing but the notes she took during the meeting with Ortiz and Galescu were admitted into evidence (GC Exh. 91).  In these notes, Holcomb noted that Ortiz did not know anything about the Cal/OSHA 300 logs except that he agreed to add his name to Galescu's email when Galescu requested the information from Tesla (GC Exh. 91).  As for the meeting with Galescu, Holcomb's notes are generally consistent with his testimony.

[50]  Lipson testified that she began by telling Ortiz that the purpose of the meeting was to "talk about some personal medical information of our employees that we believed had been sent externally" (Tr. 2352).  Lipson

testified that her meeting with Galescu began with her stating that the purpose of the meeting was about a "concern of employees' medical information that had been potentially released" (Tr. 2354).  However, Holcomb's notes indicate that Lipson began both meetings by stating that the purpose of the meeting was concerns about employee's health information being disclosed to the media (GC Exh. 91).  This discrepancy is significant not only in determining Lipson's credibility but also when analyzing what, if anything, the employees were told as to the purpose of the meeting.  This discrepancy is example of why I do not credit Lipson's testimony in its entirety.  Galescu and Ortiz denied Lipson informed them of the purpose of the meeting, and I credit their testimony (Tr. 483, 857).  But even if Lipson did tell them the purpose of the meeting, based on the inconsistency as described above, it is entirely unclear what she told them the purpose of the meeting was.

[51]  On about May 25, Galescu and Ortiz filed a complaint with Cal/OSHA (Tr. 1086).  Although Respondent seeks to make issue of an alleged dismissal of the Cal/OSHA complaint, the results are irrelevant here (R. Exh. 32).

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Galescu if he or anyone else accessed the Cal/OSHA 300 logs outside of the system other than the information provided to him by Respondent. Again, Galescu responded that he did not know anyone, and that he would not answer any more questions without his representative. Lipson asked Galescu again if he had accessed the Cal/OSHA 300 logs outside Tesla, and he stated that he had not and would not answer questions without his representative (Tr. 858). Lipson then asked Galescu to whom he had given the Cal/OSHA 300 logs, and he responded again that he would not answer questions (Tr. 859). Lipson asked who his representative was, and Galescu stated that his representative was someone outside the building. The next day, Galescu sent Lipson an email regarding the meeting they had the prior night (GC Exh. 48).

On June 6, Galescu, on behalf of Ortiz and himself, sent an email to Woody, Hedges, Zweig, Lipson, and Holcomb with "personal representatives" noted in the email's subject line (GC Exh. 24). In this email, Galescu provided a chronology of events regarding their requests for the Cal/OSHA logs and summaries, including a synopsis of their separate meetings with Respondent's representatives. Galescu wrote that the purpose of their meetings regarding the Cal/OSHA logs and summaries was unclear but perhaps Respondent sought to know who their personal representatives are and if they shared the information with their personal representatives. Thus, Galescu shared the names of their personal representatives along with the fact that they shared the Cal/OSHA logs and summaries with them.

### Credibility Findings

Galescu, Ortiz, and Lipson did not contradict one another in any significant way as to what questions were asked at the meetings. However, Lipson did appear to be a hesitant witness because throughout the cross-examination she looked over at Respondent's attorneys and seemed reluctant to provide responses during this portion of her examination. I cannot credit Lipson's testimony as to how she began the meeting and what she told the employees what the purpose of the meeting was due to her change in demeanor from being an eager to reluctant witness on direct and cross-examination, respectively. Most significantly, Lipson clearly knew about the leafletting that occurred on May 24 due, at least in part, to a copy of the safety leaflet she received. Lipson feigned ignorance as to the connection between the safety leaflet and why she was asked by Hedges to question Galescu and Ortiz. Lipson also could not recall whether her questions to Ortiz and Galescu occurred on May 24, the same day she was notified of the safety leaflets discussing Cal/OSHA 300 logs. Based on what most likely occurred, I credit Galescu and Ortiz' testimony, and not Lipson's testimony.

### Legal Analysis

As discussed above, the Board has held that an employer violates Section 8(a)(1) when it maintains a work rule that reasonably tends to chill employees in the exercise of their Section 7 rights. *Lafayette Park Hotel*, supra. From the outset, I disagree with the General Counsel's premise that by placing the "CONFIDENTIAL" watermark on the Cal/OSHA safety logs and summaries, Respondent promulgated an overbroad confidentiality rule violating *Boeing*. Respondent merely placed the confidential watermark on the forms and explained clearly to

Galescu and Ortiz their justification for doing so: compliance with Cal/OSHA regulations. The General Counsel failed to show that Respondent "maintains" a rule that the Cal/OSHA logs and summaries are to remain confidential as Woody clarified that the information could be shared with current and former employees and their personal representatives. See *Flamingo Las Vegas Operating Co.*, 360 NLRB 243, 243 and fn. 5 (2014) (employer did not promulgate a rule which was directed to one employee and never repeated to any other employee as a general requirement). Moreover, even if Respondent created a "rule" by placing this "CONFIDENTIAL" watermark on the documents, the rule in no way chills employees in the exercise of their Section 7 rights due to Woody's explanation to Galescu and Ortiz. The General Counsel also claims that the "CONFIDENTIAL" watermark is in direct response to Ortiz and Galescu attempt to use the information for Section 7 purposes. The timing of events does not support such a conclusion as the workplace petition and leaf-letting on safety issues occurred 1 month after their request for this information. Thus, this complaint allegation at paragraph 7(k) is dismissed.

When evaluating alleged interrogations, the Board examines all the circumstances to determine if the questioning would have reasonably tended to restrain or coerce employees in the exercise of protected concerted activity. See *Rossmore House*, 269 NLRB 1176, 1178 (1984), affd. sub. nom. *Hotel & Restaurant Employees Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985) (the Board set forth a test for examining whether an interrogation is unlawful). Factors to considered include the questioner's identity, the nature of the relationship between the questioner and the employee, the place and method of questioning, the nature of the information sought and whether it would reveal previously undisclosed union sympathies or activities, whether the questioner offered any legitimate explanation for the question or assurance against reprisal, the truthfulness of the employee's reply, and whether there is a history of employer hostility to union activity. See id. at 1178 and fn. 20; *Shamrock Foods Co*., 366 NLRB No. 117, slip op. at 16–17 (2018), enfd. 779 Fed. Appx. 752 (D.C. Cir. 2019); *Novato Healthcare Center*, 365 NLRB No. 137 (2017), enfd. 916 F.3d 1095, 1106 (D.C. Cir. 2019). The Board also considers whether the interrogated employee is an open and active union supporter. See, e.g., *Southern Bakers, LLC*, 364 NLRB No. 64, slip op. at 7 (2016), enfd. in relevant part 871 F.3d 811 (8th Cir. 2017).

Here, all the factors support a finding of a violation. Lipson, along with Holcomb as notetaker, both human resources businesspersons, called Ortiz and Galescu into meetings in conference rooms. During these meetings, Lipson did not explain the purpose of the meetings. Even if she did explain the purpose of the meetings as described in her testimony, she generically explained that Respondent was concerned about the release of employees' personal medical information to an external source. Lipson never explained, as Respondent argues in its brief, to Ortiz or Galescu that there was a concern that California State regulations had been violated or any other explanation for the inquiry. Respondent claims that since Galescu had not informed Respondent who his personal representative was until after the meeting, Respondent had every right to investigate a possible Cal/OSHA violation. However, Respondent failed to provide

any explanation to Galescu or Ortiz so to possibly legitimize the inquiry. During these meetings, Lipson asked a series of questions probing into what the employees had done with the Cal/OSHA logs and summary and to whom they had provided the information. That day, employees including Galescu passed out leaflets which contained information precisely concerning the safety issues at Tesla, citing to the Cal/OSHA logs and summary. Lipson knew the contents of this leaflet prior to meeting with Galescu and Ortiz. Thus, the questioning would certainly be seen to be aimed at learning Galescu and Ortiz' protected concerted activities. Furthermore, Galescu refused to provide any responses to Lipson's questions, instead asking for his representative. See *Sproule Construction Co.*, 350 NLRB 774, 774 fn. 2 (2007) (employee attempts to conceal union support weigh in favor of finding an interrogation unlawful). Also, as discussed above, that same day Respondent violated Section 8(a)(1) when Phillips was told to leave the Fremont facility parking lot when he was passing out these same leaflets. Based on a totality of the circumstances, Respondent violated Section 8(a)(1) when Lipson interrogated Galescu and Ortiz as alleged in complaint paragraph 7(q).

VIII.  COMPLAINT PARAGRAPH 7(Y): RESPONDENT ON JUNE 7, VIOLATED SECTION 8(A)(1) OF THE ACT WHEN ELON MUSK AND GABRIELLE TOLEDANO MADE STATEMENTS OF FUTILITY IN SELECTING THE UNION, SOLICITED COMPLAINTS AND IMPLIEDLY PROMISED TO REMEDY THE ISSUES, AND STATED THAT EMPLOYEES DID NOT WANT A UNION IN THE WORKPLACE

The General Counsel argues that Respondent violated Section 8(a)(1) when Musk solicited employee safety complaints and impliedly promised to fix safety issues at Tesla, when Musk told employees that selecting the Union would be futile and that they could have a union if Tesla did not remedy their safety concerns, and when Toledano stated that no one wanted the Union at Tesla (GC Br. at 64–68). Respondent argues that the complaint allegations are time barred (R. Br. at 155–164). If the complaint allegations are not time barred, Respondent denies the allegations as alleged (R. Br. at 166–171).

### Procedural Issue

On June 4, 2018, the Regional Director issued an amendment to the second amended consolidated complaint and notice of hearing with paragraph 7(y) alleging that on about June 7, Respondent, in a conference room at its Fremont facility, during a meeting held by Musk and Toledano: (i) by Musk, solicited employee complaints about safety issues and impliedly promised to remedy their safety complaints if they refrained from their union organization activity; (ii) by Musk, informed its employees that it would be futile for them to select a union as their bargaining representative by telling them that employees did not need a union and that Respondent would allow them to have a union if Respondent failed in its efforts to remedy their safety grievances; and (iii) by Toledano, restrained and coerced employees from engaging in union organizational activity by telling them no one at Respondent's Fremont facility wanted a union and asking them why employees would want to pay union dues. On June 11, 2018, Respondent filed a motion to dismiss complaint paragraph 7(y) based on Section 10(b) of the Act. I denied Respondent's motion to dismiss without prejudice on August 10, 2018.

Then, Respondent filed a special appeal to the Board of my denial of the motion to dismiss; the Board denied Respondent's motion on September 21, 2018. Respondent renews its motion to dismiss paragraph 7(y). The General Counsel did not address Respondent's timely raised 10(b) argument in its post hearing brief, and thus, I rely upon the General Counsel's argument during the hearing as well as the opposition to the motion to dismiss paragraph 7(y) of the complaint. As discussed further, I deny Respondent's motion to dismiss paragraph 7(y).

Under Section 10(b) of the Act, "no complaint shall issue based upon any unfair labor practice occurring more than 6 months prior to the filing of the charge with the Board and the service of a copy [of the charge] upon the person against whom such charge is made." However, a complaint may be amended to allege conduct occurring outside the 10(b) period if the conduct occurred within 6 months of a timely filed charge and is "closely related" to the allegations of the charge. *Fry's Food Stores*, 361 NLRB 1216, 1216 (2014), citing *Redd-I, Inc.*, 290 NLRB 1115 (1988). Moreover, amended charges filed outside the 6-month 10(b) period, "are deemed, for 10(b) purposes, to relate back to the original charge." See *Apple SoCal LLC d/b/a Applebee's*, 367 NLRB No. 44, slip op. at 3 (2018), citing *WGE Federal Credit Union*, 346 NLRB 982, 983 (2006) (quoting *Pankratz Forest Industries*, 269 NLRB 33, 36–37 (1984), enfd. mem. sub nom. *Kelly-Goodwin Hardwood Co. v. NLRB*, 762 F.2d 1018 (9th Cir. 1985)). The Board applies a three-pong "closely related" test as set forth in *Redd-I* where the Board considers (1) whether the otherwise untimely allegations involve the same legal theory as the allegations in the timely charge; (2) whether the otherwise untimely allegations arise from the same factual situation or sequence of events as the allegations in the timely charge (i.e., the allegations involve similar conduct, usually during the same time period, and with a similar object); and (3) whether a respondent would raise the same or similar defenses to both the otherwise untimely and timely allegations. *Alternative Energy Applications, Inc.*, 361 NLRB 1203, 1203 (2014). Section 10(b) is an affirmative defense that is waived if it is not raised timely in a respondent's answer or during trial. *Public Service Co. of Colorado*, 312 NLRB 459, 461 (1993). Respondent timely raised its 10(b)-affirmative defense.

As for complaint paragraph 7(y), in first amended charges 32–CA–197020, filed April 17, and amended on July 28, 32–CA–197058, filed on April 17 and amended on July 28, 32–CA–197091, dated on April 18 and amended on July 28, and 32–CA–197197, filed on April 19 and amended on July 28, the Union alleged that within the past 6 months from February to July, Tesla violated the Act by "intimidating and harassing employees for their Section 7 activities" (GC Exhs. 1(a), 1(c), 1(e), 1(g), 1(k), 1(m), 1(o), 1(q)). Moreover, in addition to general allegations of intimidation and harassment by Respondent, amended charge 32–CA–200530, filed on June 12, and amended on July 28, alleges that Respondent violated the Act by "interrogating employees regarding their protected concerted activities" (GC Exhs. 1(i), 1(s)). The allegations against Musk and Toledano although not specified in the charges or amended charges are "closely related" under *Redd-I*. Under the first prong, the Musk and Toledano allegations would be analyzed similarly to other instances of intimidation and harassing conduct as well as

interrogation under Section 8(a)(1) of the Act. As for the second prong, again these allegations against Musk and Toledano arose during the same union organizing campaign which was the subject of each of these charges and amended charges. Moreover, Respondent's defenses would be similar such that no such conduct or statements occurred. Thus, paragraph 7(y) of the complaint is not time barred.

Respondent cites several Board decisions to distinguish these charges from other charges the Board found to be untimely. However, unlike in *WGE Federal Credit Union*, supra, the allegations here in complaint paragraph 7(y) would be analyzed under Section 8(a)(1) of the Act and involve the same union organizing campaign. See *Nickles Bakery of Indiana*, 296 NLRB 927, 928 (1989) (citing *G.W. Galloway Co. v. NLRB*, 856 F.2d 275, 280 (D.C. Cir. 1988) (a finding of a sufficient relation between the charge and complaint in circumstances involving "acts that are part of the same course of conduct, such as a single campaign against a union," *NLRB v. Central Power & Light Co.*, 425 F.2d 1318, 1321 (5th Cir. 1970), and acts that are all "part of an overall plan to resist organization," *NLRB v. Braswell Motor Freight Lines, Inc.*, 486 F.2d 743, 746 (7th Cir. 1973)). The Musk and Toledano allegations concern events surrounding the Union organizing campaign, and do not concern facts separate and apart from the many allegations set forth in the charges and amended charges. See *Charter Communications, LLC*, 366 NLRB No. 46, slip op at 2–5 (2018) (both timely and untimely allegations allege that employer's conduct discouraged employees from engaging in protected activities in violation of Section 8(a)(1) as well as the events were related to the employer's response to a union campaign). In sum, complaint paragraph 7(y) is not time barred.

The employees' health and safety petition

Prior to the June 7 meeting called by Musk, between March and June, Moran, Ortiz, and other VOC members signed and distributed a petition regarding working conditions at Respondent (GC Exh. 27; Tr. 704–705). The petition states,

To Tesla Management,

As workers here at the Fremont plant, we believe in Tesla's mission, and work hard to make the company successful. But we also believe our company can expand that mission to recognize the important role workers like us play in building the company's future. Tesla workers deserve to have a fair, safe, and secure work place. As we all work hard to meet our company's ambitious production goals, it's even more important that we don't lose sight of safety. We should come to work knowing we will return home to our families without being injured at work. Unfortunately, all too often, this isn't the case. Workers are getting hurt on the job, and see work areas accidents could easily happen. In addition, too many of our coworkers don't report injuries or other safety concerns because they are afraid of retaliation. We believe the best, most fair, and most effective solution to safety and other concerns is for us to form our union so we can work together with management and have a true voice when it comes to our working conditions.

(GC Exh. 27).[52]

On June 6, Moran sent an email to Hedges and Musk regarding the employees' desire for health and safety at the workplace along with their desire for a "Democratic Process as we Form our Union" (GC Exh. 29). Moran hand-delivered this petition to Hedges prior to sending the June 6 email (Tr. 707).

On June 7, Hedges came to Moran's work location and asked to speak with him in a conference room (Tr. 713). Moran brought another employee Tony Vega (Vega) as a witness.[53]

As they walked towards the conference room at the north end of the Fremont facility, Hedges told Moran that Musk wanted to speak to him (Tr. 714).[54] When Hedges, Moran and Vega arrived at the conference room, Musk and Toledano were waiting. Hedges then left and did not attend the meeting.

Toledano spoke first and told Moran that they saw the health and safety petition and wanted to hear his concerns directly (Tr. 715, 911).[55] Musk then asked Moran to tell him his history with

---

[52] In addition to the safety petition, in April or May, Ortiz signed another petition concerning compensation (GC Exh. 26). Again, those signing the petition indicated that they were organizing to address the issues of compensation and other working conditions in a union contract. The signed compensation petition was delivered by VOC members to Hedges along with leaflets on or about July 21 (GC Exh. 45; Tr. 489–490). Thereafter, a picture of some of the employees who delivered the documents to Hedges was posted on the Facebook, "A Fair Future at Tesla" public webpage.

[53] Vega did not testify.

[54] Musk did not testify. The General Counsel requests I make an adverse inference that Musk would not have corroborated Toledano's testimony regarding what was said during the June 7 meeting (GC Br. at 22, 65). However, I decline to take an adverse inference since I do not credit Toledano's version of events, and instead rely upon Moran's testimony. Vega also did not testify. Likewise, I decline to make an adverse inference, as requested by Respondent, that Vega would not have corroborated Moran's testimony (R. Br. at 165). Toledano's lack of credibility, along with the subsequent email exchange amongst Respondent's officials as well as Moran's credible testimony convinces me that Moran's version of events must be credited.

[55] I cannot credit Toledano's testimony for various reasons. Toledano testified that when she interviewed for the chief people officer position,

the subject of the Union organizing campaign never arose (Tr. 888, 928–929). Toledano emphatically denied Musk, who interviewed her for the position, bringing up the subject of the UAW. When she began working at Tesla on May 22, she testified that she could not recall if the union campaign arose (Tr. 928–929). She also testified that she "became aware over time that there was a union organizing campaign" (Tr. 888–890, 902). The union organizing campaign was clearly known by upper management in at least February when Musk sent an email to all employees directly responding to topics mentioned by Moran in his February 9 blog post, advocating for UAW. For Toledano to claim that the subject of union organizing to have never been mentioned to her during the spring of 2017 when she interviewed for the position is not believable. Another reason I cannot find Toledano credible are her inconsistent statements. Toledano testified that she "became educated over time what a union organizing campaign was" and "was learning that there were people who had complaints" (Tr. 890–891). Toledano testified that she probably learned that Moran, Vega, Galescu, and Ortiz were union supporters between June 8 and 13 (Tr. 932–933). However, based on the timing of events, by June 8, Toledano already knew that Moran was an active union supporter. But in her Board affidavit of February 5, 2018, Toledano stated that as late as July she was not aware of employees engaging in union activities (Tr. 899–901). Furthermore, Toledano testified that prior to this meeting she had not reviewed the safety petition Moran

---

Tesla. Moran responded with his history and explained the safety concerns his coworkers and he had (Tr. 716). Vega also spoke on the subject. Moran then spoke again, mentioning that when he had his performance assessments, he performed well but did not received any raises. Thus, they sought a union to gain a voice at the Fremont facility (Tr. 717).

Moran testified that Musk stated, "[Y]ou know, you don't really have a voice. The UAW is a second—like two-class system where UAW is the only one that has a voice and not the workers" (Tr. 717). Toledano then spoke acknowledging problems with the performance system. According to Moran, Toledano then said, "[Y]ou know, the majority of workers at Tesla don't want a union and, you know, why do we want to pay for—why do we want to pay union dues?" (Tr. 718).[56] Moran responded that the employees have a right to form a union to have a voice to improve working conditions. Vega spoke stating that they did not want to hurt Tesla but wanted to make it better. Toledano suggested that they participate in the weekly safety committee meetings to call to attention their safety concerns (Tr. 718). Moran and Vega agreed. Musk spoke and told them that if the safety committee meetings did not work, they would "give you your union" (Tr. 719).[57] This was the first and only meeting Moran had with Musk (Tr. 720). The meeting lasted 15 to 30 minutes (Tr. 809). Toledano testified that she thought the meeting was "positive" and as a result Musk committed to weekly safety meetings (Tr. 936–937).

The next day, June 8, Toledano and Hedges scheduled a voluntary safety meeting (Tr. 912–913; GC Exh. 55). Toledano invited safety representatives from the environmental health and safety group led by Woody as well as HR representatives (Tr. 912). Production and manufacturing employees, including Moran, Ortiz, and Galescu attended this meeting. During this meeting, according to Toledano, Galescu was "mean" towards her because he publicly asked her that if the safety issues were not fixed would she be willing to resign from her job and because he was "worked up" during this meeting (Tr. 959).

During the morning of June 12, Hedges responded to Moran's June 6 petition by sending an email to all employees in manufacturing concerning safety in the workplace (GC Exh. 30). The email's subject line stated, "Tesla Production Update: Safety, Your Feedback, and the Real Facts." Hedges stated that a leaflet distributed on June 7, was to "promote the UAW, not to promote safety" (GC Exh. 30).[58] In this email, Hedges disputed the facts

set forth in the leaflet, and noted that the author of the June 6 letter had "up until now chosen not to participate on the safety teams" but he was invited to have in person discussions with HR leadership and senior members of the safety team which resulted in "a very positive and productive conversation about all the efforts that are underway to improve safety" (GC Exh. 30).

Later, during the evening of June 12, Ortiz sent an email to Hedges and Musk complaining about a safety incident involving members of middle management, which he believed exemplified the safety problems at Tesla (GC Exh. 52). Musk then forwarded the email to Woody. Woody replied immediately that he would work closely with Ortiz, Moran, Galescu, and others that had met with on June 8. Musk replied to Woody:

> I'm meeting with Jose [Moran] and Jonathan [Galescu] again in the next few days. Will ask them to join your team full time, so long as they do so in good faith and are truly as committed as they claim to safety

(GC Exh. 52.) Woody appears to have then forwarded Musk's email to Toledano who responded to Musk:

> I have to say, this is a super smart idea to have these two on the safety team full time. If that's what you mean—they would join Seth's [Woody's] team and work on safety in the factory full time one behalf of all associates (vs work to pull in the UAW )? Amazing way to turn adversaries into those responsible for the problem

(GC Exh. 52; Tr. 914, 919.) Toledano admitted that when she wrote adversaries, she was referring to Moran (Tr. 918–919). Musk replied, "Exactly" (GC Exh. 52).

The next day, Toledano sought to clarify what occurred on June 7. Toledano reminded Musk that they met with Moran and Vega, who she identified as "the nice guy who Jose brought at[sic] a 'witness'," and that they had not met with Galescu. Toledano wrote referring to her June 8 meeting:

> All 4 are pro-union (Jose [Moran], Tony [Vega], Jonathan [Galescu] and Victor [Ortiz][59]). Jonathan [Galescu] was the most vocal/aggressive in the Thursday meeting. After the meeting he wrote me the nice note I forwarded to you last night and responded to, but in the meeting he tried to get me to ok having Union organizers still come in. Obviously, I did not agree [. . .].
>
> [. . .] Tony Vega would be the best add to the Safety team, as

---

provided to Hedges (Tr. 931). However, Moran credibly testified that Toledano began the meeting by stating she had reviewed the safety petition and Musk and she sought to discuss it with Moran. It is also unbelievable that Toledano would not have reviewed the employees' safety petition prior to meeting with Moran.

[56]  In contrast, Toledano testified that the meeting only concerned safety and safety committees, and that the topic of unions did not come up (Tr. 910, 957). Toledano denied making any statements about the Union during this meeting (Tr. 956). Toledano also denied that Musk made any statements about the Union (Tr. 956–957). Again, I cannot credit Toledano. The undisputed purpose of the meeting was to discuss the safety petition presented by Moran and other employees. This petition as well as email to Hedges and Musk discusses the desire of the employees to form a union which is even included in the subject line of the email. To deny that the subject of the Union never came up during

the meeting seems completely implausible. In addition, based on circumstantial evidence, Musk knew that Moran promoted organizing in the workplace due to his February 2017 blog post, and Musk's subsequent email to all employees. Hence, I do not credit Toledano's testimony.

[57]  Toledano testified that she could not recall if Musk spoke about the safety committees during the meeting (Tr. 911). Once again, Toledano's testimony cannot be credited. The point of the meeting was to address the employees' safety concerns due to the employees' petition, and based on Toledano's suggestion, they intended to invite Moran and others to the safety committee meetings. It does not seem plausible that Musk would not have also discussed the safety committees.

[58]  The leaflet is not in the record.

[59]  Toledano appears to be referring to Richard Ortiz, not Victor Ortiz (Tr. 924).

32                        DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

he is the most reasonable but also connected with those most active to unionize.

Clearly we could ask all 4 to join Seth's team and go salaried. I am confirming now with Legal that if they join the Safety team then they would be considered part of management and not eligible to advocate for a union should they accept these roles. I will confirm when I get this answer.

(GC Exh. 52; Tr. 915). Toledano admitted that she thought adding employees such as Moran to the safety team would be a great way to involve employees in "something they think is broken" (Tr. 915).

On June 14, Hedges responded directly to Moran regarding his June 6 email; Musk and the other recipients of Moran's June 6 email were included in Hedge's reply (GC Exh. 29; Tr. 707). Hedges wrote that Respondent takes safety seriously as they discussed on June 6, when the members of the VOC delivered the petition. Hedges also noted that Respondent held safety meetings on June 8, with Moran and others to address these issues. Finally, Hedges ended his email with statistics of how the UAW has been unsuccessful nationally and in the Bay Area and noted that employees have complained to Respondent about being "bothered" at their homes as the UAW attempts to share information (GC Exh. 29).

*Credibility Findings*

Only Moran and Toledano testified about the June 7 meeting. Between the two witnesses, Moran was truthful while Toledano provided contradictory and unlikely testimony. I credit the testimony of Moran as he testified with a calm demeanor and provided straightforward, unwavering testimony. During Moran's testimony regarding the June 7 meeting with Musk and Toledano, Moran testified authentically because although he appeared apprehensive, he provided thorough details. Moran appeared to be listening carefully during the questioning and paused before he responded. During cross-examination, he did not get flustered and answered the questions to the best of his recollection. Moreover, Moran's testimony remained consistent and was uncontradicted.

In direct contrast, Toledano testified nervously. Toledano's memory during her testimony was poor and directly contradicted by emails she sent and responded to after the June 7 meeting with Moran. For example, Toledano testified that she could not recall if she said that promoting Moran and other employees to the safety team would prevent them from advocating for the Union (Tr. 915–916). But her emails show extensive discussion and steps Toledano took to move four pro-union employees to management so they could no longer advocate for the Union. Toledano, during cross-examination, often glanced at Respondent's counsel when she was answering questions. Toledano appeared to be straining to provide the "right" answer as she often appeared flustered. During cross-examination, Toledano could not recall any details of the events surrounding the June 7 meeting which calls into question her reliability as a witness. Toledano admitted that prior to the hearing she spoke to Hedges to refresh her memory as to what happened in the summer of 2017 (Tr. 939–940, 1201).

*Legal Analysis*

An employer's solicitation of employee grievances or complaints during a period of organizing activity inherently includes an implied promise to remedy them and is unlawful unless the employer has an established practice of soliciting and resolving grievances if the past practice is not significantly altered. See, e.g., *Shamrock Foods Co.*, 366 NLRB No. 117, slip op. at 6 (2018); *Alamo Rent-a-Car*, 336 NLRB 1155, 1155 (2001). Here, Musk, the highest-ranking official of Tesla, called a meeting with Moran the day after he delivered a safety petition to Hedges and sent an email to Musk and Hedges expressing the desire of employees to unionize. It is irrelevant, as argued by Respondent, that Moran "prompted" the meeting due to his June 6 email and petition. Musk had never met with Moran prior to this meeting and there is no evidence that Musk met with Moran again. During this meeting, Toledano began the meeting by announcing that their purpose was to hear safety concerns from Moran directly. After hearing from Moran and Vega, Toledano invited the employees to the safety team meetings, and Musk stated that if the safety committee meetings did not work, they would "give you your union" (Tr. 719). Based upon the credit evidence, employees may reasonably infer that Respondent via Musk was soliciting Moran's safety complaints for the purpose of acting favorably on them to temper the employees push for a union which violates the Act.

In addition, Musk and Toledano's other statements during this meeting violated Section 8(a)(1) of the Act. In response to Moran's explanation for why employees sought to unionize, Musk told Moran and Vega: "[Y]ou know, you don't really have a voice. The UAW is a second—like two-class system where UAW is the only one that has a voice and not the workers" (Tr. 717). Toledano also remarked, "[Y]ou know, the majority of workers at Tesla don't want a union and, you know, why do we want to pay for—why do we want to pay union dues?" (Tr. 718). In *Wellstream Corp.*, 313 NLRB 698, 706 (1994), the Board held that an employer violates Section 8(a)(1) of the Act by telling employees that attempts to secure union representation would be futile where they were clearly intended to and had the effect of informing the employees the futility of their support of the Union. Here, Musk's statement in response to Moran's reasons for why the employees sought union representation was designed to impart to Moran that even with union representation the employees would not have a voice, and selection of a union would be useless. As for Toledano's statement, the Board has found that employer warnings of "serious harm" to employees who choose union representation are not per se unlawful, but the warnings or statements may be unlawfully coercive if uttered in the context of other unfair labor practices that "impart a coercive overtone". *Community Cash Stores*, 238 NLRB 265, 269 (1978), citing *Greensboro Hosiery Mills*, 162 NLRB 1275, 1276 (1967), enf. denied in relevant part 398 F.2d 414 (4th Cir. 1968); *Reno Hilton*, 319 NLRB 1154, 1155 (1995); see also *Westwood Health Care Center*, 330 NLRB 935, 940 fn. 17 (2000) (statement is assessed in the context in which it is made and whether it tends to coerce a reasonable employee). Also, in the course of organizational campaigns, statements are sometimes made of a kind that may or may not be coercive, but to derive the true import of the remarks, the circumstances in which they are made must be

viewed. Again, here, Toledano's statement that no one wanted the union was made in the context of other unfair labor practices including Musk's solicitation during the meeting and his statement of futility as well as the interrogation of other pro-union supporters regarding the Cal/OSHA 300 logs. Thus, Toledano's statement also violated the Act.

Respondent argues that if Moran's testimony is credited, Musk's statement, "[Y]ou know, you don't really have a voice. The UAW is a second—like two-class system where UAW is the only one that has a voice and not the workers" is not unlawful under Section 8(c) of the Act (R. Br. at 167–170). Section 8(a)(1) of the Act is modified by Section 8(c) of the Act which defines and implements the First Amendment in the context of labor relations. See 29 U.S.C. §158(c); *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969). Section 8(c) permits employers to express "any views, arguments or opinion" concerning union representation without violating Section 8(a)(1) if the expression "contains no threat of reprisal or force or promise of benefit." *NLRB v. Marine World USA*, 611 F.2d 1274, 1276 (9th Cir. 1980). The employer is also free to express opinions or make predictions, reasonably based in fact, about the possible effects of unionization on the company. *NLRB v. Gissel Packing*, supra at 618. When determining whether a statement is permitted under Section 8(c), the statement must be considered in the context in which it was made and in view of the totality of the employer's conduct. *NLRB v. Marine World USA*, supra.

I disagree. In my view, Musk's statement taken in context of the impetus for the meeting (the safety petition and desire to organize) along with the idea to place the employees on the safety committee to address workplace safety concerns before they would be "give[n]" their union is unlawful and violates Section 8(a)(1). See *Reno Hilton Resorts Corp.*, 319 NLRB 1154, 1156 (1995). Unlike the Board's decision in *Erickson Trucking Service, Inc. d/b/a Erickson's Inc.*, 366 NLRB No. 171, slip op. at 1 (2018), where the president of the company made a disparaging statement about the union's business manager which was found to be protected by Section 8(c) as an ancillary statement to unlawful conduct in a meeting, here the General Counsel alleged that Musk implied a sense of futility if selecting the Union as the employees would have no voice or essentially no representation. Musk's statement was not a permissible explanation of the disadvantages of union representation but was in direct response to Moran's reason for why the employees wanted union representation and was shortly followed by Musk's statement that the employees would be given a union if the safety committee meeting did not address their concerns. Taken as a whole, Musk's statement cannot be protected under Section 8(c) of the Act. In sum, Musk and Toledano's statements on June 7 violated Section 8(a)(1) of the Act as alleged in complaint paragraph 7(y).

IX. COMPLAINT PARAGRAPHS 7(L), AND 7(T) THROUGH 7(V): RESPONDENT VIOLATED SECTION 8(A)(1) OF THE ACT WHEN AT THE FREMONT FACILITY IT MAINTAINED AN UNLAWFUL TEAM WEAR POLICY BUT DID NOT VIOLATE THE ACT WHEN ALLEGED TO HAVE DISCRIMINATORILY APPLIED THE TEAM WEAR RULE IN

---

[60] This rule is the subject of complaint par. 7(l).

AUGUST

The General Counsel alleges that Respondent's team wear rule is facially unlawful and was applied in a discriminatory manner numerous times in direct response to union activity in August (GC Br. at 72–78). Respondent argues that the team wear policy is lawful under *Boeing* (R. Br. at 84–87). Furthermore, the supervisors alleged to have violated the Act were enforcing a lawful rule, did not discriminate against employees wearing Union shirts, and even under a "special circumstances" analysis, Respondent's team wear rule is lawful (R. Br. at 113–118).

Team wear rule at the Fremont facility

During the relevant time period Respondent maintained "General Assembly Expectations" (GC Exh. 37). This document contains a section concerning "team wear." The document provides:

Team Wear: It is mandatory that all Production Associates and Leads have assigned team wear.

- On occasion, team wear may be substituted by all black clothing if approved by supervisor.
- Alternative clothing must be mutilation free, work appropriate and pose no safety risks (no zippers, yoga pants, hoodies with hood up, etc.)

(GC Exh. 37).[60] As explained previously, Respondent provided all GA employees team wear compliant clothing when hired but prior to August, employees would often wear shirts in a variety of colors with pictures or emblems such as sports teams and clothing brands to work in GA without any supervisor informing them to wear only Tesla assigned team wear (Tr. 185–189, 206, 208, 238–240, 295–296, 307). Beginning in the spring of 2017 until August, production associates in GA began wearing UAW shirts which had been passed out by employees (Tr. 296, 329). These shirts were all cotton in black color with the "Driving for a Fair Future at Tesla" logo on front, and the same logo with the abbreviation "UAW" on the back (GC Exh. 25). Employees also wore union stickers and hats to work (Tr. 204–205, 208, 210, 260).

Mario Penera (Penera), who is the second shift production manager in GA, testified regarding the purpose for team wear in GA.[61] Penera testified that team wear relates to safety such that Respondent knows that all production associates are wearing appropriate clothing for the job, production associates may be quickly identified in case of an emergency, and to eliminate or reduce the risk of vehicle mutilation which leads to increased costs (Tr. 1377–1378). Penera also testified, "For me, the bigger thing with team wear is visual management of the shop. So as we discussed, it's a 5 million square foot facility. Somewhere around 10,000 people walking through the plant every day. For me, that's how I know as a manager who should be there, who shouldn't be there [. . . .] and it is easier to scan 30, 40 people individually to see if their pants are going to be too abrasive, to see if their shirt has any mutilation risk on it" (Tr. 1375). Penera testified that if a production associate was not wearing team wear, the supervisors and managers were to find out why the

---

[61] The parties stipulated at the hearing that Penera is a supervisor under the Act (Tr. 1413–1414).

production associate was not wearing team wear and how the issue could be resolved including corrective action (Tr. 1380–1381). Panera testified that he approved substituting all black colored clothing for team wear when Respondent hired too many employees at the same time and Respondent could not provide all employees in GA with team wear (Tr. 1382, 1411). Other supervisors and managers also permitted employees to wear clothing other than assigned team wear. Associate Production Manager Tope Ogunniyi (Ogunniyi) testified that she permitted associates to wear all black colored shirts instead of the assigned team wear if the associate did not have any team wear and the team wear store was not open (Tr. 2535).[62] She permitted associates to buy a plain black colored shirt from a local store so they could continue to work (Tr. 2535, 2539). She also permitted associates to cover any logos on a black colored shirt with mutilation protection tape which prevented the vehicles from being scratched (Tr. 2535). Business unit leader Kyle Martin (Martin) testified that there were occasions to give exceptions to wearing team wear such as when the team wear store did not have the correct size or the item was not in stock (Tr. 1634, 1645–1646).

The record reveals that in April to May, according to Martin, the end of line department, the step after GA, noticed an increasing number of mutilations to the seats in the vehicles. Management officials in GA met to determine what was causing these seat mutilations (Tr. 1601, 1653). They discussed potential causes of the seat mutilations including incoming materials, tools, non-compliance with team wear, how the associates were in the line, and how associates installed material (Tr. 1602). Thus, Respondent decided to audit the number of seat mutilations per week, and to document their causes (Tr. 1603, 1607–1608; R. Exh. 27).[63] These audits began in May and ended in September (Tr. 1622).[64] The audit reports do not reveal any details as to what specifically caused the seat mutilations (R. Exh. 28; Tr. 1608–1610, 1641–1643).[65] But Martin testified that the increased scrutiny during this time period revealed that seat mutilations were caused by tools when associates would not use a tool cover or when associates would carry a tool in their back pocket which could damage the seat as well as rivets on pants not assigned by Tesla (Tr. 1637–1638, 1641–1642, 1653). Martin, Panera and other supervisors admitted that the seat mutilations were not caused by shirts, and no management witness could provide an example of a vehicle being damaged by shirts (Tr. 1398–1399, 1641–1642, 1647–1648, 2416–2417, 2541, 2547). Martin testified that Respondent sought to prevent mutilations as a whole with the team wear rule (Tr. 1600).

In August, Respondent began enforcing the team wear rule in GA and after an initial "pardon" for the day, issued disciplinary action including dismissal for the day for non-compliance with the team wear rule (R. Exh. 29; Tr. 1623–1625, 1653, 2527). Martin testified that he asked his supervisors and associate managers to "walk the line" to check on associates' compliance with the team wear rule (Tr. 1632–1633).[66] Martin could not provide any examples of which associates were terminated for failure to wear team wear and described "dismissal" as stated in the audit report to refer to an associate's dismissal for the day from work for failure to comply with the team wear rule that day rather than termination (Tr. 1653).

Due to Martin's instructions, on August 10, Ogunniyi spoke to her subordinates including production supervisor Tim Fenelon (Fenelon) to ensure that production associates followed the team wear rule, or the supervisors would be held accountable (Tr. 2397–2398, 2409). Ogunniyi required her subordinates to report to her as to whether they checked their assigned production associates for team wear rule compliance (Tr. 2534). Ogunniyi also walked the line where the associates worked to ensure that they were following the team wear rule (Tr. 2528). Ogunniyi spoke to several associates who were not wearing the assigned team wear and informed them that they would be sent home the following shift if they did not comply with the team wear rule (Tr. 204, 2528–2529, 2531–2532). Later that day, Martin followed up with Ogunniyi to ensure that she walked the line to check on employees' team wear rule compliance (Tr. 2551). Martin asked Ogunniyi to send him a list of associates who did not follow the team wear rules that day (Tr. 2551; GC Exh. 73).[67] After Ogunniyi sent her list to Martin, he then asked her how many associates wore the UAW shirt that day (GC Exh. 73). Ogunniyi noted in response to Martin's question that only production associate Jayson Henry (Henry) wore a UAW shirt that day (Tr. 2554). Martin testified that he asked which associates wore a union shirt because, "It gave me a pulse for the shop. It lets me know where my supervisors are at, with the development of their associates. If I have an associate on my line that feels that they have to seek some type of outside counsel or representation, it means that my supervisors aren't doing what they need to do to engage the associates" (Tr. 1635, 1644–1645, 1657–1659).

Henry testified that he wore a UAW shirt on August 10 after he passed out shirts to employees prior to the start of his shift that day (Tr. 181, 183, 187, 194). That day, an unknown male supervisor, identified by his red colored Tesla shirt, told Henry

---

[62] Respondent admits during the relevant time period that Ogunniyi was a supervisor and agent as defined by Sec. 2(11) and (13) of the Act, respectively.

[63] The audits did not concern mutilations to any other portion of the car, including the outer body of the car (Tr. 1642–1643).

[64] Martin presented to Musk the improvements in reducing the number of seat mutilations in GA (R. Exhs. 29 and 30; Tr. 1623, 1656).

[65] Respondent presented a series of emails with attached audit reports (R. Exhs. 28, 29, 30, and 31). However, these emails and audit reports do not indicate the relationship between seat mutilations and noncompliance with team wear. Thus, I do not find these exhibits to be probative.

[66] Martin testified that he asked supervisors to "walk the line" prior to August, but I do not credit his testimony as it is uncorroborated and

contradicted by the credible testimony of Ogunniyi and Fenelon. Multiple witnesses, including Ogunniyi, testified that enforcement of the team wear rule began in August.

[67] In contrast, Martin testified that Ogunniyi initiated the email with him after he asked her to ensure that associates followed the team wear rule (Tr. 1635–1636). I do not credit Martin's testimony on this point. Ogunniyi's email to Martin contains the subject line: team wear follow-up (GC Exh. 73). In this email, Ogunniyi informed Martin to whom she spoke with that day regarding team wear rule compliance. The subject line of this email seems to suggest that Martin asked Ogunniyi for the names of individuals not following the team wear rule which contradicts Martin's testimony.

he could not wear the union shirt again or he would be sent home (Tr. 184).[68] Henry requested to see Respondent's dress code (Tr. 184). Ogunniyi then approached Henry and gave him a copy of "General Assembly Expectations" which included the team wear rule (Tr. 184, 2531–2532). Ogunniyi testified that Henry was the third associate she spoke to that day that did not have on proper team wear; Ogunniyi denied Henry's accusation that she only spoke to him due to the UAW shirt he wore (Tr. 2531).[69]

Also, on August 10, production associate Sean Jones (Jones) wore a UAW shirt to work (GC Exh. 34). Fenelon pulled Jones aside after the morning meeting.[70] Fenelon told Jones that his Union shirt was not appropriate, and he would need to change his shirt or would be sent home (Tr. 293–294, 2405, 2414). Jones asked him why he needed to change his shirt, and Fenelon stated that his shirt was not a Tesla approved shirt, and not compliant with the team wear rule. Fenelon also told Jones that his Union shirt had an emblem on it and emblems should not be accepted on shirts anymore (Tr. 293–294). Fenelon gave Jones money for a team wear shirt from the team wear store, and Jones responded, "This is really some bullshit over a shirt" (Tr. 304). Jones then changed his shirt (Tr. 294, 2405).[71]

Later that day, Jones spoke to Ogunniyi telling her that Fenelon threatened to send him home due to his wearing a Union shirt to work. Ogunniyi told Jones that the policies have changed. Jones responded, "When? That's bullshit. I've always wore[n] different shirts" (Tr. 294). Ogunniyi stated that the policy changed where no shirts with emblems will be allowed as they can scratch a car (Tr. 294–295).[72]

Later in August, Ogunniyi and Fenelon held a meeting regarding the team wear rule with 25 to 30 employees who worked that shift on final line in GA (Tr. 297). Ogunniyi informed employees that no one could be out of "uniform" and everyone must wear assigned team wear or be sent home (Tr. 298). Production associate Tim Cotton (Cotton) testified that Ogunniyi told the employees they could not wear anything that did not say Tesla or was not approved by Tesla (Tr. 330).[73] Jones and Cotton testified that they continued to see employees wear shirts that did not comply with the team wear rule, and to their knowledge, no supervisor or manager asked those employees to change their shirt (Tr. 298, 330–331).

### Credibility Findings

Overall, the General Counsel and Respondent's witnesses did not significantly differ in what occurred during the summer of 2017. Of course, with the number of witnesses who testified about team wear, there will be inconsistencies in their testimony, so I relied upon their collective testimony when deciding this statement of facts. Beginning with the General Counsel's

witnesses, I found Henry, Jones, and Cotton to be candid witnesses on direct examination. I also credit their encounters with Ogunniyi, Fenelon, and an unnamed supervisor about their union shirts. However, I cannot credit their testimony that supervisors continued to permit employees to not comply with team wear rules after enforcing the rules in August. I cannot credit this testimony because unlike other portions of their testimony, they did not provide any details of what they observed and how they knew the supervisors turned a blind eye to the noncompliance. For example, Henry provided significant details during his testimony but on this issue of noncompliance with the team wear rule after August he provided a vague, unspecified account as to what he observed where it was unclear whether these employees he mentioned even worked in GA. In addition, Henry testified in detail about an employee who wore a white shirt to work which supervisors permitted but these details are missing from his Board affidavit which makes this portion of his testimony unreliable.

As for Respondent's witnesses, Panera testified comfortably when asked about the manufacturing process, but his credibility was undermined on cross-examination when he became defensive when responding to questions about team wear. Martin also provided credible testimony which was detailed as to the events of the summer of 2017, but I cannot credit portions of his testimony as specified above. Of all the witnesses presented by both parties on these allegations, I found Ogunniyi and Fenelon to be the most trustworthy and honest. These two supervisors followed orders from their superiors. I credit Ogunniyi's testimony that she spoke to all employees who were not compliant with the team wear rule and did not target only the employees wearing union shirts. Fenelon also provided specific details as to whom he spoke, and even provided examples of how he attempted to ensure that employees could be compliant with the team wear rule.

### Legal Analysis

In the absence of special circumstances, the Board has held that employees, particularly during an organizing campaign, have a Section 7 right to wear insignia at work referring to unions or other matters pertaining to working conditions for the purpose of mutual aid or protection. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945) (employees have a right to wear union insignia at work); *Goodyear Tire & Rubber Co.*, 357 NLRB 337, 341 (2011); *Midstate Telephone Corp.*, 262 NLRB 1291, 1292 (1982), enf. denied 706 F.2d 401 (2d Cir. 1983); *Pathmark Stores, Inc.*, 342 NLRB 378, 379 (2004); *Albis Plastics*, 335 NLRB 923, 924 (2001). However, an employer may prohibit the wearing of union insignia by employees if the employer proves special circumstances. *Pathmark Stores*, supra; *W San Diego*,

---

[68] This allegation appears to refer to complaint par. 7(t)(i).

[69] This allegation appears to refer to complaint par. 7(t)(ii).

[70] Due to Ogunniyi's instructions, Fenelon testified that at the start of every shift he would review the clothes of the associates he supervised to ensure that they had on the "right team wear" as well as personal protective equipment (PPE) (Tr. 2400–2401, 2410, 2416). Fenelon testified that when he saw someone not complying with the team wear rule, he would let them know that they needed to wear the appropriate team wear (Tr. 2401). Fenelon testified that to comply with the team wear rules, the associate would need to go to the team wear store to get the

appropriate clothing, go to their car to get the appropriate clothing, or would need to clock out of work, get the appropriate clothing and return to work (Tr. 2401). Fenelon provided several examples from the summer of 2017 when he told associates to change into assigned team wear (Tr. 2402–2407). For one employee, Fenelon permitted the employee to place a piece of black felt tape over the white stripe of his black colored Nike shirt (Tr. 2407).

[71] This allegation appears to refer to complaint par. 7(u)(i).

[72] This allegation appears to refer to complaint par. 7(u)(ii).

[73] This allegation appears to refer to complaint par. 7(v).

348 NLRB 372, 372 (2006). Special circumstances include "when their [union insignia] display may jeopardize employee safety, damage machinery or products, exacerbate employee dissension, or unreasonably interfere with a public image that the employer has established, or when necessary to maintain decorum and discipline among employees." *Komatsu America Corp.*, 342 NLRB 649, 650 (2004). Any rule that limits employees' Section 7 right to wear union insignia in the workplace must be narrowly tailored to the special circumstances to justify the rule. *W San Diego*, supra at 373–374.

Respondent argues that the Board's analysis of workplace rules in *Boeing* applies to the team wear rule, but I disagree. Instead Board law governing the right of employees to wear union insignia in the workplace has been analyzed by the Board according to the principles set forth in *Republic Aviation v. NLRB*, supra, and its progeny. Even if the *Boeing* analysis is applicable here, I find that Respondent's rule is overbroad and its business justification (which are the same arguments as its argument for special circumstances according to *Republic Aviation*) does not override employee's Section 7 rights to engage in union activity. Respondent also argues unpersuasively that the Board has "implicitly" permitted employers to promulgate and enforce a non-discriminatory uniform rule (R. Br. at 115). Simply because Respondent's rule does not explicitly prohibit the wearing of union insignia does not mean that if the rule is enforced equally, the rule is permitted; the rule still disallows employees to wear union insignia on their clothing in GA. However, in both cases cited by Respondent, the Board did not make such a determination as exceptions were not filed on those allegations.

Respondent's team wear rule only permits employees in GA to wear team wear or plain black colored clothing, thereby, precluding employees from wearing clothing with union insignia. Thus, Respondent's team wear rule is unlawful. Respondent may rebut this presumption by presenting special circumstances which permits the rule albeit "narrowly tailored." Respondent argues that its special circumstances for banning union shirts in GA is due to preventing mutilations to the painted vehicles and to maintain visual management; these are the same arguments Respondent raises to support its business justification if the *Boeing* analysis were to apply. Respondent must set forth more than "conjecture" to find special circumstances. *Medco Health Solutions of Las Vegas, Inc.*, 364 NLRB No. 115 (2016). Respondent claims that it requires assigned team wear in GA due to vehicle mutilations. But Respondent's argument makes little sense considering the credited evidence. Here, Respondent discovered an increase in seat mutilations in April or May, and thus, Respondent began an audit in GA to determine what was the cause or causes. Not one of Respondent's managers could affirmatively point to the union shirts as the cause of the problems. The documentary evidence also does not support such an argument since the audit results do not specify what aspect of team wear noncompliance caused the seat mutilations. See *Boch Imports, Inc.*, 362 NLRB 706, 707–708 (2015) (no evidence that union pins worn by employees damaged vehicles as asserted). The only clothing issue that was mentioned during the hearing as a potential source of problems was rivets on pants, not the UAW shirt. The justification for enforcing the previous lax team wear rule was the seat mutilations, not with general vehicle mutilations

including mutilations to the paint on the vehicles. As for visual maintenance, Respondent's production associates wear black colored shirts while team leaders and managers wear red colored shirts. In GA, the black colored Tesla assigned shirts are not substantially different from the black colored UAW shirts or from the plain black colored shirts that the team wear rule allows. Respondent also argues that because employees were able to continue to wear union stickers at the workplace, Tesla did not interfere with their Section 7 rights. However, this argument is a red herring. Thus, Respondent's maintenance of the team wear rule is unlawful, and violates Section 8(a)(1) as alleged in complaint paragraph 7(l).

However, I do not find that Respondent disparately enforced the team wear rule as alleged. See, e.g., *Shelby Memorial Home*, 305 NLRB 910, 919 (1991), enfd. 1 F.3d 550, 565 (7th Cir. 1993) (nursing home's selective enforcement of its rules restricting pins or badges against union insignia, but not other insignia was unlawful). I do not credit the testimony of the General Counsel's witnesses that they observed Ogunniyi, Fenelon and an unnamed supervisor only enforcing the team wear rule with those who wore the UAW shirts. Ogunniyi's email of August 10 shows that she spoke to many employees that day, and only one person had on a UAW shirt. While the question of why Martin asked who wore the UAW shirt is suspicious, this suspicion does not address whether the supervisors enforced the rule disparately. As stated previously, Ogunniyi and Fenelon's testimonies were clear—they sought to enforce the team wear rule as directed by their superiors. In contrast, the General Counsel's witnesses only provided general, unpersuasive responses as to whether they saw other employees wear noncompliant team wear after the rule was enforced in August; these witnesses could not testify with certainty as to whether these employees were asked to comply with team wear. Thus, the General Counsel has not sustained his burden of proof, and I dismiss complaint paragraphs 7(t), (u), and (v).

### X. COMPLAINT PARAGRAPH 7(W): RESPONDENT DID NOT VIOLATE SECTION 8(A)(1) OF THE ACT WHEN SUPERVISOR DAVE TESTON, AT THE SPARKS FACILITY, IMPLIEDLY THREATENED AN EMPLOYEE FOR WEARING A UNION HAT

The General Counsel alleges that Supervisor Dave Teston (Teston) threatened employee Will Locklear (Locklear) with discipline for wearing a hat with union logo on it (GC Br. at 77–78). Respondent argues that Teston's comment to Locklear is privileged under Section 8(c) of the Act (R. Br at 121–123).

No witnesses testified at the hearing about this complaint allegation. Locklear did not testify at the hearing despite being issued a subpoena duces tecum by the General Counsel. The General Counsel, however, did not seek enforcement of the subpoena after I denied the General Counsel's request for video testimony from Locklear.

The parties submitted a written stipulation into the record that Teston would testify as follows, in relevant part (Jt. Exh. 3):

- Locklear was one of Teston's training coordinators from about December 2016 until at least February 5, 2018. Prior to that, Locklear was a production associate in Respondent's Sparks facility.

- Teston was Locklear's supervisor from June until November. Teston did not work with Locklear during his time at Respondent's Fremont facility.

- Teston only knew Locklear from work and did not have any association with Locklear outside of work.

- Teston knew that Locklear supported the Union because Locklear, at a date uncertain, informed Teston of his Union support.

- Teston recalls that during the summer or fall of 2017 Locklear wore a hat with a union logo on it. Teston also remembers that during that time period Locklear had a sticker on his laptop that said UAW as well as a union insignia on his safety glasses.

- On approximately September 8, Teston privately spoke to Locklear about the union hat that Locklear wore to work that day. Teston asked Locklear if he thought wearing the union hat was professional due to his training coordinator role. Teston asked this question on his own, no one told him to ask this question, and Teston chose to ask this question based on his own experience with the military and uniformity. Teston then told Locklear that he did not want Locklear to answer the question and that Locklear should think about it. This conversation occurred near Teston's desk on the second floor of Respondent's Sparks facility. It is unknown how many times Teston asked Locklear this question during their single conversation, but it was at least once. Locklear did not respond to Teston.

- Shortly after the conversation Teston had with Locklear about his union hat, Teston checked with higher level officials within Respondent. Teston wanted to make sure that the hat with the Union logo was professional, since that is what Teston had said to Locklear the day before. Thus, Teston sent an email to Respondent about this issue (GC Exh. 72). In response to Teston's email, Senior Employment Counsel Jaime Bodiford (Bodiford) and Associate Manager of HR Steven Schwarzer (Schwarzer) told Teston that what an employee wears is their business and theirs alone if it's not offensive. The next day, Teston told Locklear that if he wanted to wear the union hat, he was welcome to wear it. Locklear was not wearing the union hat the next day when Teston talked to him, and Teston only remembers Locklear saying, "okay." However, Teston saw Locklear wearing the union hat after this conversation.

*Legal Analysis*

Section 8(a)(1) of the Act provides that it is an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their statutory right to engage in, or restrain from engaging in concerted activity. "It is well settled that the test of interference, restraint, and coercion under Section

8(a)(1) of the Act does not turn on the employer's motive or whether the coercion succeeded or failed." *American Tissue Corp.*, 336 NLRB 435, 441 (2001) (citing *NLRB v. Illinois Tool Works*, 153 F.2d 811, 814 (7th Cir. 1946)). In making its determination, the Board considers the total context in which the challenged conduct occurs and is justified in viewing the issue from the standpoint of its impact on employees. Id. (citing *NLRB v. E.I. du Pont & Co.*, 750 F.2d 525, 528 (6th Cir. 1984)). However, as discussed previously, Section 8(a)(1) is modified by Section 8(c) of the Act, which defines and implements the first amendment right of free speech in the context of labor relations.

I find, based on the totality of the circumstances, that Teston's statement to Locklear was not unlawful. Teston, who was Locklear's supervisor, asked Locklear a rhetorical question about his union hat. Teston did not ask Locklear to remove the hat. The following day Teston went back to Locklear to inform him that he was welcome to wear the hat. I do not find these circumstances to be coercive but rather an opinion under Section 8(c). See *Cadillac of Naperville, Inc.*, 368 NLRB No. 3, slip op. at 4 (2019) (citing *NLRB v. Gissel*, supra, where Sec. 8(c) gives employers the right to express their views about unionization or a particular union if those communications do not threaten reprisals or promise benefits). Based upon this limited scenario, I do not find that Respondent violated the Act as alleged and dismiss complaint paragraph 7(w).

### XI. COMPLAINT PARAGRAPH 7(R): RESPONDENT DID NOT VIOLATE SECTION 8(A)(1) OF THE ACT WHEN SUPERVISOR ARNOLD CAMAT IMPLIEDLY THREATENED AN EMPLOYEE FOR WEARING A UNION HAT

The General Counsel argues that Camat's statement to Vasquez is an unlawful threat under the Act (GC Br. at 78). Respondent argues that Camat did not threaten Vasquez (R. Br. at 96–97).

Former employee Eric Vasquez (Vasquez), who in the spring of 2017 worked in quality control in the stamping department, testified that he wore a union shirt to work almost every day and wore a union sticker on his hat daily (Tr. 368). In addition, to wearing a union shirt and sticker on his hat, Vasquez participated in passing out leaflets inside and outside the Fremont facility (Tr. 369–370). Vasquez testified that he was never asked to change his shirt by management (Tr. 369). Vasquez also testified that 20 to 30 employees in the stamping department wore union shirts and/or union stickers on any given day.

Vasquez testified that in the spring of 2017, one morning after his shift ended, as he stood at the timeclock, a supervisor from BIW named "Arnold" told him to watch out with his union sticker which he had on his hat because "they're watching people with that sticker on" and "make sure you are on point with everything" (GC Exh. 35; Tr. 353–356).

Based on the record, it appears that Vasquez was referring to Arnold Camat (Camat), who was a production supervisor for BIW and who supervised Vasquez from July 2016 to March (Tr. 2115–2116).[74] Camat testified that the only conversations he had with Vasquez concerned his tardiness, and these

---

[74] At the hearing, the parties stipulated that Camat is a supervisor within Sec. 2(11) of the Act (Tr. 2118–2119).

conversation occurred away from the production line and time clock (Tr. 2116, 2120–2121). After issuing Vasquez a written warning for tardiness, Respondent's management team decided in the spring of 2017 to transfer Vasquez to another department where the start time was later in the morning (Tr. 2117–2118). Camat denied discussing the Union with Vasquez, and could not recall Vasquez wearing a union shirt, hat, or sticker (Tr. 2118, 2120–2121, 2123). Camat denied making the statement that Vasquez attributed to him (Tr. 2118).

*Credibility Findings*

I do not credit Vasquez' testimony. Vasquez provided clear details of what "Arnold" allegedly said to him one morning in the spring of 2017. However, on cross-examination, Vasquez could not answer even basic questions such as the name of his last supervisor or even "Arnold's" last name despite Arnold having been his supervisor for 9 months. Vasquez stated, "I don't remember" numerous times. He could not recall the date of the conversation with Arnold which is believable but could not even place the time period of the conversation. On direct examination, Vasquez testified the conversation occurred in the spring of 2017 but on cross-examination waffled his testimony such that the conversation could have occurred in September (Tr. 361). Vasquez provided unreliable testimony, and I decline to credit any portion of it. In contrast, Camat testified with sincerity as to his recollection of conversations with Vasquez. Camat answered questions completely, and his demeanor remained calm throughout his testimony.

*Legal Analysis*

The allegation at complaint paragraph 7(r) is dismissed since I do not credit Vasquez' testimony that Camat made the comment attributed to him.

XII. COMPLAINT PARAGRAPH 7(S): RESPONDENT VIOLATED SECTION 8(A)(1) OF THE ACT IN AUGUST WHEN SUPERVISOR HOMER HUNT TOLD EMPLOYEES IT WOULD BE FUTILE TO SELECT THE UNION AS THEIR BARGAINING REPRESENTATIVE

The General Counsel argues that supervisor Homer Hunt (Hunt) made a statement of futility to welder Michael Williams (Williams) which violates Section 8(a)(1) of the Act (GC Br. at 78–80). Respondent argues that the allegation against Hunt is time barred (R. Br. at 100–103). Respondent also argues that even if the complaint allegation is not time barred, Hunt did not make a statement of futility to Williams (R. Br. at 99–100).

*Procedural Issue*

Respondent alleges that complaint paragraph 7(s) is barred by Section 10(b) of the Act. On March 30, 2018, the Regional Director issued a third order consolidating cases, second amended consolidated complaint and notice of hearing with paragraph 7(s) alleging that in August, Hunt, at the Fremont facility, informed employees that it would be futile for them to select the Union as their bargaining representative. At the hearing, Respondent moved to dismiss the allegation at complaint paragraph 7(s) against Hunt as there is no "valid operative charge" related to Hunt (Tr. 224). Respondent, in its answer, alleged generically

that the complaint contained allegations that are beyond the applicable statute of limitations, and thus the allegations are barred. The General Counsel opposed such a motion and I reserved my ruling on the motion to this decision (Tr. 225–226). Now Respondent renews its motion to dismiss paragraph 7(s) in its post-hearing brief. The General Counsel did not address Respondent's timely raised Section 10(b) argument in its post-hearing brief, and thus, I rely upon the General Counsel's argument during the hearing. For the reasons that follow, I deny Respondent's motion to dismiss paragraph 7(s).

Beginning with complaint paragraph 7(s), in charge 32–CA–208614, filed on October 25, amended on March 13, 2018, the Union alleged that within the past 6 months, Tesla had violated the Act by "making a statement of futility regarding employee support for the Union" and "by these and other acts, Tesla, Inc. has violated Section 8(a)(1), (3), and (4) of the National Labor Relations Act (GC Exhs. 1(z), 1(hh)). The original charge included various allegations of intimidation and harassment from June to October as well as other acts for engaging in Section 7 right. Although the Hunt allegation was not specified in the original charge, I find that it was specified in the amended charge, thus I find that Redd-I test is satisfied. As for the first prong, the Hunt allegation of selecting the Union as futile would be analyzed similarly under Section 8(a)(1) of the Act. As for the second prong, the allegation against Hunt arose during the same union organizing campaign which was the subject of the original charge. This charge also encompassed the wearing of union apparel as well as the discharge of employees. The Hunt allegation falls squarely during this time period and cannot be distinguished. Finally, as for the third prong, Respondent's defenses would be similar such that no such conduct or statements occurred. Thus, paragraph 7(s) of the complaint is not time-barred.

Respondent cites several Board decisions to distinguish these charges from other charges the Board found to be untimely. However, unlike in *WGE Federal Credit Union*, supra, the allegations here in complaint paragraphs 7(s) would be analyzed under Section 8(a)(1) of the Act and involve the same union organizing campaign. See *Nickles Bakery of Indiana*, supra. The Hunt allegation concerns the union organizing campaign and does not concern facts separate and apart from the many allegations set forth in the charges and amended charges. See *Charter Communications, LLC*, supra. In sum, complaint paragraph 7(s) is not time barred.

Statement of futility

In August, Williams had a conversation with his former supervisor, Hunt, who was supervisor of quality control (Tr. 237). Williams testified that he was at a specific welding station when he saw Homer and motioned for him to come over to Williams' workstation to discuss the lead position for which he had applied and was not chosen. Hunt stated that the selection was out of his hands. Williams then stated that this situation was a reason to have the Union at Tesla so that the correct individuals get chosen for the proper positions. Hunt then told Williams, "The Union's never getting in here. This is Tesla" (Tr. 238).[75] Hunt denied

[75] In his affidavit, Williams states that when Hunt and he spoke about his failure to be selected for the lead position, Hunt and he were "messing

around" compared to his hearing testimony where he stated Hunt and he were having a professional conversation (Tr. 254). I do not find the

that the Union ever came up during this conversation but also could not remember the conversation exactly (Tr. 2015–2016, 2112). Hunt testified that the conversation with Williams was like a "yelling contest" with Williams using profanity (Tr. 2103–2016). However, Hunt did not discipline Williams as a result of the conversation (Tr. 2106).

*Credibility Findings*

I credit Williams testimony as he testified in a forthright manner, providing significant details, and I saw no indication of bias as Respondent alleges. In contrast, Hunt exhibited a great deal of animosity during his testimony regarding the conversation with Williams. In addition, Hunt could not recall the details of his conversation with Williams but does recall profanity and angry outbursts by Williams. However, Hunt never disciplined Williams if the conversation occurred as alleged which undermines Hunt's credibility. Logically, such an outburst if it occurred would have resulted in at least a referral for an investigation or proposed disciplinary action, neither of which took place. Thus, I rely upon Williams' version of events.

*Legal Analysis*

Employer statements to the effect that the employer will never be a union shop are unlawful because they would reasonably give employees the impression that it would be futile for them to support the union, thus interfering with, restraining, and coercing them in the exercise of their right to select a union to represent them, in violation of Section 8(a)(1). *Venture Industries*, 330 NLRB 1133, 1133 (2000); *Wellstream Corp*., supra; *Maxi City Deli*, 282 NLRB 742, 745 (1987). In response to a conversation Williams was having with Hunt regarding his failure to be promoted, Williams stated that his failure to be promoted was a reason for the employees to have union representation. In response, Hunt told Williams that there would never be a union at Tesla. Hunt's statement gave the impression to Williams that it would be futile to select the Union which violated Section 8(a)(1) of the Act as alleged at complaint paragraph 7(s).

XIII. COMPLAINT PARAGRAPH 8: RESPONDENT VIOLATED SECTION 8(A)(3) AND (1) OF THE ACT BY TERMINATING RICHARD ORTIZ ON OCTOBER 18, AND BY DISCIPLINING JOSE MORAN ON OCTOBER 19, AND VIOLATED SECTION 8(A)(1) OF THE ACT BY INTERROGATING EMPLOYEES AND ENFORCING AN UNLAWFUL RULE IN SEPTEMBER AND OCTOBER

The General Counsel argues that Respondent unlawfully disciplined Moran and terminated Ortiz, two well-known union activists, for their protected concerted activity when they criticized anti-union employees on a private Facebook page (GC Br. 80–81). During this investigation, the General Counsel alleges that Respondent's investigator unlawfully interrogated the employees in September and October and promulgated or disparately enforced a rule regarding the Workday program (GC Br. at 81–86). Moreover, the General Counsel argues that the proper analysis of the discipline and termination is *NLRB v. Burnup & Sims*, 379 U.S. 21 (1964) (GC Br. at 86–91). The General Counsel also argues that Moran and Ortiz' conduct did not lose the

protection of the Act under *Atlantic Steel Co.*, 245 NLRB 814 (1979) (GC Br. at 92–94). Respondent, on the other hand, argues that Moran and Ortiz were not engaged in concerted activity for the purpose of mutual aid or protection (R. Br. at 137–139). Respondent argues that Moran and Ortiz lost the protection of the Act by improperly using Workday and lying during the investigation, respectively (R. Br. at 139–143). Finally, Respondent argues that the proper analysis of the discipline and termination is *Wright Line*, 251 NLRB 1083 (1980), enfd. on other grounds 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved in *NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393 (1983) (R. Br. at 143–150).

California state legislature

On about August 29, Ortiz, along with VOC members Galescu, Sanchez, and Phillips as well as union organizers, participated in meetings with the State of California legislature in Sacramento, California, to encourage the legislators to add in language to the electric vehicle rebate program that Respondent needed to be "fair and responsible" and ensure safety in the workplace (Tr. 491–492, 495). Also, during this time these employees posted a photo with one of the California State Senators with whom they had met on the public Facebook webpage, "A Fair Future at Tesla" (GC Exh. 46; Tr. 492–493).

After the meetings with VOC members, the California State Assembly held public hearings on September 13 and 14, to discuss the Budget Act of 2017, Assembly Bill (AB) 109 and 134 (Tr. 495, 2506; CP Exhs. 9 and 10). Specifically, AB 134, committee on budget, section 1, provision 2(c)(1) states, "The State Air Resources Board shall work with the Labor and Workforce Development Agency to develop procedures for certifying manufacturers of vehicles included in the Clean Vehicle Rebate Project as being fair and responsible in the treatment of their workers. It is the intent of the Legislature that beginning in 2018–2019 fiscal year, the Labor Secretary shall first certify manufacturers as fair and responsible in the treatment of their workers before their vehicles are included in any rebate program funded with state funds." During these public hearings, three employees for Tesla, maintenance technician Shaun Ives (Ives), lead equipment maintenance technician Travis Pratt (Pratt), and GA Production Supervisor Jean Osbual (Osbual) testified in opposition to AB 109 and 134. Of relevance, during these hearings, Pratt, who identified himself by name, testified that he started at Tesla as a maintenance technician, level 2, and made $130,000 gross income.

On approximately September 14, Ortiz, who did not attend the hearings, contacted political organizer "Hanna" who lobbied on behalf of the Union. Hanna told Ortiz that Tesla employees attended the hearings and spoke on behalf of Tesla. Hanna sent Ortiz a video link of the employees' public comments at the hearings (Tr. 496). The Tesla employees who attended the hearings were speaking against union-sponsored AB 109 and 134.

Because Ortiz could not open the video link, he sent the link to Moran via text message to see if he could open the link (Tr. 498; GC Exh. 43). Ortiz wrote to Moran, "Hanna is sensing[sic]

me a video of the suck asses Tesla been taking ti[sic] Sacramento" (GC Exh. 43). Moran responded by asking Ortiz to send it to him. Ortiz replied, "I cant[sic] view it with my phone so let me know who they are I want to walk up to them AND say see you in Sacramento suck ass" (GC Exh. 43 (emphasis in original)). Moran testified that he watched the video, noted the individuals' names, and looked up the individuals in Workday via the application on his personal phone to determine if they were actual Tesla employees (Tr. 723, 794).

To look up individuals in Workday, an employee must log into the Workday program, and use the search box to type in a name. Moran testified that he had previously searched for employees on Workday to compare his seniority with others (Tr. 724). Moran testified that he previously sent screenshots of employees' Workday profiles to Ortiz (Tr. 724–725). Moran testified that no one from Respondent discussed policies or limitations on using Workday (Tr. 672). Moreover, Moran testified that no one had ever told him that he could not take screenshots of Workday profiles and photos (Tr. 672).[76]

Private Facebook page, "Tesla Employees for UAW Representation"

Moran sent a text to Ortiz of the Workday profile screenshot photos of employees Ives and Pratt, and supervisor Osbual (Tr. 505–507). Other employees, who Ortiz could not recall, also sent him the Workday profile screenshots of these employees (Tr. 507). That same day, Ortiz posted one side-by-side screenshot of Pratt's photo and job title, and Ives' photo with no name or job title on the private Facebook webpage, "Tesla Employees for UAW Representation" (Tr. 506, 626–627). Above the photos of Pratt and Ives, Ortiz posted the following comment on the private Facebook webpage:

> These guys been in Sacramento saying we are lying about how things are at Tesla Management has been taking them one of them sez[sic] he made $130000 last year
> How many of you make . . .
> overtime
> This just proves how much kissing ass and ratting on people get you at Tesla and the ones that do the real work get passed over

(GC Exh. 28.) Ortiz, quickly thereafter, removed the post from Facebook because Pratt sent him a message via Facebook stating that name calling "wasn't a good way to start" (Tr. 515–516.)[77] Pratt wrote, "Say what you like about me behind closed doors . . . I made what I did last year almost entirely as a level two maintenance technician, which is where several of your colleagues from production now find themselves. I wish you luck but know there will be a lot of us on the otherside[sic]. Starting with name calling may not be the approach you want to take"

The investigation of Pratt's complaint

Pratt then sent a text message to Hedges complaining about Ortiz' Facebook post; Pratt and Hedges also spoke on the phone (Tr. 1180, 1182, 1212–1213; GC Exh. 28). Pratt sent Hedges a screenshot of Ortiz' post on Facebook which included Pratt and Ives' Workday profile photos. The screenshot of the Facebook post includes a picture of a sleeping child and the following message, "Travis Pratt: Copy thanks" (GC Exh. 28). Hedges could not explain what this writing meant and did not appear to ask Pratt (Tr. 1255–1256). Pratt wrote the following text message under the Facebook screenshot he sent Hedges,

Looks like we got under some people's skin. 😊

Hedges responded, "Wow. This is on Facebook?" Pratt responded, "Yea lol [laugh out loud] I'm pretty sure it's on their fair future at Tesla thing" (GC Exh. 28). It appears that Pratt's text message does not end at this point, but the remainder of his message cannot be seen in the exhibit (GC Exh. 28). Hedges testified that it is likely Pratt and he continued to text one another but he only sent the one-page screenshot to Copher and Bodiford and did not keep the other text messages since he had a new Tesla-owned phone and his computer had been stolen (Tr. 1219).

Hedges testified that during their phone conversation, Pratt did not specify on which Facebook page his photo appeared (Tr. 1214, 1217).[78] Hedges testified, "[Pratt] said he'd received this from a friend. It's not—he said he's not on social media very much, but he was surprised to see himself and [Ives] on this chat forum or whatever, and that he was kind of afraid that would happen when he went up to Sacramento, and he, you know, he felt kind of targeted by that. And I said well, I will, you know, pass this on to employee relations, and they might reach out to you to talk about, you know, how this happened and kind of look into it. And he said that was fine" (Tr. 1183–1184, 1213–1214). When asked what Pratt's concern was, Hedges testified that Pratt was concerned that his picture and Tesla information had been placed on Facebook (Tr. 1225). Hedges testified that Pratt had a legitimate concern as Pratt "felt targeted by another employee" (Tr. 1227–1229). Hedges then testified that Pratt's complaint warranted an investigation because Pratt "felt harassed and targeted by another employee. And so it's up to me when I get a complaint like that to make sure that it's fully investigated" (Tr. 1231, 1235–1236). Hedges testified that no one shared with him what, if anything, happened to this Facebook post (Tr. 1233).

As background, prior to the September 13 and 14 public hearings, Hedges invited Pratt to speak to the California State

---

[76] Multiple witnesses testified similarly. Phillips, who is a current employee, testified that no one had ever placed limitations on his ability to use Workday including limitations to use only for official business purposes even after October (Tr. 389–390). Galescu testified that no supervisor, manager, or HR employee ever told him that Workday could only be used for "legitimate and official business purposes" even after October (Tr. 833). Ortiz testified that Respondent briefly discussed Workday during his new employee orientation but did not place any limitations or restrictions on its use (Tr. 442–443). I credit these employees'

testimonies as to how Workday may be used, and that no limitations or restrictions were ever placed on its use.

[77] Since Ortiz deleted this Facebook post soon after posting it, the post no longer appears on the private Facebook webpage and Ortiz did not retain a copy of it (Tr. 516). Based upon documentary evidence, it was likely Pratt, not Ives as Ortiz testified, who sent the instant message to Ortiz via Facebook, complaining about the post.

[78] Pratt did not testify.

Assembly legislators after asking him what his employment experience had been at Respondent.[79] Hedges' request to Pratt appears to have been directed by Toledano who asked Hedges to find employees to go to Sacramento (Tr. 1212, 1230). Hedges wanted a "positive" employee experience to be provided to State legislators due to AB 109 and 134, sponsored by the Union (Tr. 1181–1182). Thus, Pratt and Ives, while on worktime, went to

Sacramento with Hedges (Tr. 1246–1247).[80] Hedges knew that pro-union employees were also supporting the bill, and Hedges sought to "offer a different perspective" (Tr. 1211).

After receiving Pratt's complaint, Hedges spoke for approximately 5 minutes to Ricky Gecewich (Gecewich), an employee relations partner who conducts investigations, to give him a "heads up" about Pratt's complaint as Hedges had already "forwarded" the complaint to Copher (Tr. 1184, 1800–1801).[81] During this conversation, Hedges showed Gecewich the screenshot Pratt sent him and explained why Pratt and Ives were in Sacramento (Tr. 1235, 1801, 1894–1897).[82]

Gecewich's job responsibilities included investigating concerns brought by employees, supervisors, business leaders or HR partners, conducting witness interviews, gathering information related to employee concerns, meeting with anyone who is accused of violating Respondent's policies, drafting documentation and providing recommendations to business leaders on his findings (Tr. 1788, 1790). Gecewich testified that he conducted over 100 investigations while employed by Respondent (Tr. 1789). Gecewich explained that when taking information about a complaint, he seeks to understand why a complaint was made (Tr. 1799). Gecewich testified that the concerns would be taken seriously, but then the team would determine whether the concerns would be investigated (Tr. 1790). Gecewich explained that he may not interview all witnesses, but will take typed notes, which may be edited later for clarification, during the investigation and during interviews (Tr. 1791–1792). When an investigation is completed, Gecewich creates a report of findings as well as recommendations (such as no discipline, written warning, and

terminations); the decision on whether to follow the recommendations lays with the responsible business leaders who may or may not be an employee's direct supervisor (Tr. 1792–1794, 1797). Gecewich testified that when recommendations of termination occur, the employee relations and investigations team will speak to the director level or above (Tr. 1797). When an investigation is completed, Gecewich would inform the complaining person that the investigation is completed (Tr. 1797–1798).

Gecewich began his investigation by calling Pratt on September 19 (Tr. 1085). Gecewich spoke to Pratt about the text messages and screenshot that Hedges showed him (Tr. 1805). Gecewich testified that Pratt "allud[ed] to something about Sacramento"; Gecewich did not ask about the details (Tr. 1805–1806, 1897).[83] During this conversation, Pratt told Gecewich that he sent the Facebook post to Hedges and had received the information from employee Bryan Kostich (Kostich) (Tr. 1086). Pratt told Gecewich that the Facebook post was from a Facebook page called, "Fair Future at Tesla" (Tr. 1086). Gecewich testified that Pratt told him that he thought the information in the Facebook post was inappropriate as it included how much money employees made at Respondent, and Pratt thought that he was being singled out (Tr. 1807–1808). Pratt complained that he felt uncomfortable with Ortiz speculating how much he made as well as the posting of his name and picture (Tr. 1807–1808). Pratt also told Gecewich he thought Ortiz did not act appropriately because he made a comment about people sucking up at Tesla (Tr. 1808). Gecewich never asked Pratt what he meant by his comment to Hedges: "Looks like we got under some people's skin" with a smiling face and eyes and rosy cheeks emoji (Tr. 1868–1869). After this conversation, Pratt forwarded to Gecewich a screenshot of the direct message he sent to Ortiz after he saw the Facebook post (Tr. 1808, 1911–1912; GC Exh. 80). Gecewich testified that Pratt told him that Ortiz then took the Facebook post down (Tr. 1912). Gecewich never asked Pratt about his usage of Workday or whether Pratt has shared his information such as job title and salary publicly (Tr. 1808–1809).[84]

---

[79] According to Hedges, Pratt told him that his experience at Tesla had been good, he had opportunities for promotion and Tesla had "done some good things" (Tr. 1181). Hedges testified that he asked Pratt to speak about his experience at Tesla "because [Pratt] had a positive experience and there were several others giving, you know, like a negative type of narrative. And I felt it would be useful to have, you know, somebody from the other side" (Tr. 1181).

[80] I do not find Hedges to be a credible witness. Hedges testified that he was not aware that Pratt testified in a public hearing before the California State Assembly, providing his name, job title and salary (Tr. 1225–1226). Hedges' testimony is simply unbelievable. Hedges directly asked Pratt to go to the California State Assembly to speak on behalf of Tesla, and Hedges testimony seems to indicate that he went to Sacramento with them. Even if Hedges did not go to Sacramento, considering the importance of this matter to Tesla and the need to ensure "positive" employees testify on behalf of Tesla, it seems unlikely that Hedges would not have followed up with these employees to learn what happened, and to listen to their public testimony. Thus, Hedges' testimony cannot be believed.

[81] Respondent admits that Gecewich was a supervisor as defined by Sec. 2(11) of the Act and an agent as defined by Sec. 2(13) of the Act. Gecewich no longer works for Respondent (Tr. 1781).

[82] Hedges claimed that he did not ask Gecewich to investigate Pratt's complaint and that Gecewich or Copher made the decision whether a matter should be investigated (Tr. 1209). However, I do not credit Hedges' claims of neutrality as to whether Gecewich should investigate Pratt's complaint or not. The circumstances of this situation point to the conclusion that Hedges did not simply refer an employee complaint to the employee relations and investigations team but took additional steps to call the issue to Gecewich's attention as he knew Gecewich would "look into it" (Tr. 1209). In addition, Hedges testified that Pratt's complaint of harassment and being targeted warranted an investigation. Moreover, Gecewich testified that Hedges approached him with the request to investigate (Tr. 1893–1894).

[83] Pratt did not only refer to something in Sacramento but instead, based on Gecewich's contemporaneous notes, Pratt told Gecewich that he was contacted by Hedges to go to Sacramento (GC Exh. 63).

[84] Gecewich is not a reliable witness as his contemporaneous notes during the investigation and hearing testimony differ in key details. Gecewich testified that Pratt expressed concern about Workday during his meeting with him, but he did not put this information in his notes (GC Exh. 63; Tr. 2181–2182, 2192–2193). Based upon Gecewich's notes, the first time the issue of Workday arose during this investigation is when Kostich mentioned the use of Workday and that Kostich wanted someone to investigate this matter (GC Exh. 64).

The day after he spoke to Pratt, on September 20, Gecewich phoned Kostich (Tr. 1814–1815, 1911). During this conversation, Kostich told Gecewich about the Facebook page, "Jose Organizer" (Tr. 1815). Kostich told Gecewich that "Jose Organizer" reached out to him to join a Facebook group called, "Tesla Employees for Union Access" (Tr. 1816). Gecewich did not investigate these Facebook pages Kostich mentioned to him, including the Facebook page where Ortiz posted about Pratt (Tr. 1816). Gecewich also did not investigate the privacy settings on these Facebook pages (Tr. 1816). Gecewich testified that based on his conversation with Kostich, he realized that this incident could have been related to the Union (Tr. 1816–1817, 1820). Gecewich testified that he then gained knowledge of Ortiz' involvement with the Union (Tr. 1817).[85] Gecewich never asked Kostich about his Workday usage (Tr. 1817).

### September 21: Gecewich's interrogation of Ortiz

The following day, on September 21, Gecewich contacted Ortiz via email asking him to attend a meeting with him that day (Tr. 516–517, 629). Ortiz wore his union shirt and pin at the meeting (Tr. 529; GC Exh. 25). Gecewich began the meeting by asking Ortiz to keep the contents of the meeting confidential (Tr. 517).[86] Gecewich showed Ortiz a redacted version of the Facebook screenshot (Tr. 518, 1820; GC Exh. 28).[87] Ortiz immediately told Gecewich that he posted the message and apologized for what he posted. Ortiz told Gecewich that he received a message from "the gentleman" and removed the post "as quick as I could" (Tr. 518).[88]

Gecewich then told Ortiz that he wanted to ask him questions about Workday (Tr. 518–519). Ortiz told Gecewich he tried to use Workday but sometimes had trouble such as with his self-

review. Ortiz testified that he told Gecewich that Workday "is like a Facebook for Tesla; the people inside the building" (Tr. 520). Gecewich asked Ortiz how he received the photos that he posted on Facebook (Tr. 521). Ortiz did not tell Gecewich the names from whom he received the screenshots and told him that he did not know where the photos came from, but that he received the photos via text message (Tr. 1823). Gecewich asked Ortiz several times from whom he received the photos. During this meeting, Ortiz gave Gecewich his phone to look through his text messages, but Ortiz had a new phone which he had replaced that same day (Tr. 525, 620).[89] The meeting ended with a reminder to keep the meeting confidential.

On September 22, Gecewich sought to review the data logs of Workday even though Respondent does not routinely monitor employees' usage of Workday and does not have access to employees' sign-in and sign-out information in Workday; Respondent needs to request specific information from Workday as Workday is a third-party software program (Tr. 1827–1828). Working with Tesla employee Raj Nanda (Nanda), the day after he interviewed Ortiz, Gecewich requested that Workday provide a list of anyone who accessed the Workday pages/profiles of Pratt and Ives between September 10 and 16 (Tr. 1828–1829, 1831; GC Exh. 81).

On September 28, because he had still not received the requested information, Gecewich asked Nanda for an update on his request, and stated in his email, "Please be aware this case is being closely monitored by Gaby and I am providing updates as they come in" (GC Exh. 81). Still not receiving the information, on October 4, Gecewich elevated his request to Nanda's supervisor and informed him that "[. . .] we should update Gaby and team shortly" (GC Exh. 81).[90]

---

[85]  I cannot credit Gecewich's testimony regarding his knowledge as to when he knew of union activity by Ortiz. Gecewich testified that he knew about unionization at the Fremont facility but denied knowing that there was a Facebook page, or a petition signed by employees (Tr. 1807). However, on July 20, HR partner Tanaka forwarded an email to Gecewich concerning an employee petition from several employees to Hedges, Toledano, and Musk (GC Exh. 70). This email with the subject line: "We Want to Know," asked several questions about compensation at Tesla, and stated that they sought to organize to address these issues. Ortiz and other employees signed this email. The petitions attached to the email also included the logo, "Driving a Fair Future at Tesla" as well as the related website. Gecewich could not recall reviewing this email or why Tanaka forwarded this email to him (Tr. 1868, 1914, 2241). Also at the hearing, after inconsistent testimony, Gecewich testified that before his meeting to discuss the findings of his investigation and his recommendations, he knew that Ortiz was involved with the Union but in Gecewich's January 8, 2018, affidavit to the Board, Gecewich handwrote that he had no knowledge of Ortiz' union activities at the time of that meeting (Tr. 1857–1858). Based upon my overall credibility determinations for Gecewich, I do not credit his claim that he did not know at least a few months prior to the Pratt complaint that employees Moran and Ortiz had been attempting to organize the workplace. Gecewich likely would have reviewed Tanaka's email in the course of his job duties. Also, as for Moran, Gecewich testified that he had seen Moran's name in his blog post prior to Gecewich's start with Tesla in May (Tr. 1838).

[86]  Gecewich took notes of his meeting with Ortiz (GC Exh. 65). These notes include a reference to shirts Ortiz mentioned to Gecewich that he had passed out in the parking lot (Tr. 1912–1913). However, Gecewich claimed at the hearing that he did not know that Ortiz was

passing out union shirts (Tr. 1913). Again, Gecewich is not credible since his contemporaneous notes are inconsistent with his hearing testimony. Meanwhile, I cannot credit Ortiz' testimony that Gecewich twice mentioned the Confidentiality Agreement. Ortiz testified that Gecewich mentioned the Confidentiality Agreement and that he asked if he was fired (Tr. 521), but Gecewich's notes and testimony only reflect that he expected the meeting to remain confidential.

[87]  The redacted version excludes the text messages between Pratt and Hedges as well as the picture of a child and a comment of "thanks" (Tr. 1821). Gecewich also testified he showed Ortiz an enlarged version of this Facebook post (Tr. 2252–2254).

[88]  Ortiz is referring to the direct message Pratt sent him.

[89]  Respondent attempts to attack Ortiz' credibility because he had a new phone that day and no longer had his old phone. Certainly, if Ortiz' credibility could be punctured at other points in his testimony, then his action of replacing his phone that same day could raise some eyebrows. However, in this instance, I see nothing nefarious about Ortiz' actions as he did not have advance notice that Gecewich planned to question him that day about the Workday profiles he posted on Facebook. In fact, Respondent received this text message string regardless of the phone replacement, and it is unclear what more Respondent would want (Tr. 620–622).

[90]  Gecewich was not a credible witness. Gecewich incredibly testified that he only provided Toledano with updates once a month, and that despite his claims to Nanda, Toledano was not monitoring this investigation (Tr. 1873–1874, 1907, 2265, 2267). Gecewich claimed that he wrote untrue statements in his email to Nanda simply to get the information sooner (Tr. 1876, 2267). If Gecewich were to be believed that Toledano only received monthly updates, then Gecewich's investigatory

On October 6, Nanda provided a list of individuals who accessed the Workday profiles of Pratt and Ives (GC Exh. 81). The list revealed that Moran and Krista Washington (Washington), who was not identified during the hearing, on September 14, viewed Pratt and Ives' Workday profile pages (GC Exh. 81). Moran viewed Pratt and Ives' Workday profile pages 2 minutes apart. Gecewich testified that after receiving the logs, he looked at Moran's Workday profile photo and recognized his photo from the small bubble on Ortiz' Facebook post of the screenshots (Tr. 2273). Still Gecewich sought more information and wanted to know which pages Moran visited in September and sought to compare the data which "will explain his usage much better" (GC Exh. 81). Thereafter, on October 24, after the investigation concluded and the discipline and termination had been issued, Nanda sent Gecewich the Workday logs for Moran (Tr. 1829; GC Exhs. 79, 81).

### October 12: Gecewich interrogates Moran

On October 12, Gecewich met with Moran in a conference room (Tr. 727). Gecewich introduced himself and stated that the meeting was to remain confidential (Tr. 729). Gecewich stated that he was investigating a concern with Workday. Gecewich then asked Moran a series of questions about Workday (Tr. 728). Gecewich asked Moran if he thought Workday was an internal or external platform, and Moran responded that he thought it was an internal platform. Gecewich asked Moran for what purposes he used Workday, and Moran stated that he used it to review his performance, update his contact information, and sign documents electronically (Tr. 730). Gecewich asked Moran if he used Workday for any other purposes. Moran told him that he used Workday to search for his co-workers to compare his seniority and pay (Tr. 730–731, 1834). Gecewich then told Moran that he knew that Moran took the screenshots of the employees' Workday profiles (Tr. 731). Gecewich asked why Moran took the screenshots, and Moran told Gecewich that he wanted to find out if the individuals were actual employees of Respondent (Tr. 732, 1835, 1899, 1945).[91] Gecewich never showed Moran the actual screenshots he received (Tr. 1836–1837, 1942–1943).

Gecewich asked Moran to look for the screenshots on his phone and on Facebook (Tr. 1837–1838). Moran could not find the screenshots on Facebook which had been removed by Ortiz after Pratt complained directly to Ortiz (Tr. 733). Thereafter, Gecewich asked Moran to look on his phone for the screenshots. After some time, Moran was able to find the screenshots in his text message communications with Ortiz (Tr. 733–734). Gecewich asked for a copy of the text messages to "prove, you know, my case that I didn't do anything wrong" (Tr. 735). Gecewich asked Moran if he did anything else with the

screenshots, and Moran told him that he sent the pictures to Ortiz. Gecewich mentioned that the pictures "got out somewhere in public" (Tr. 736). Gecewich thanked Moran for his honesty (Tr. 799). The meeting ended after 40 minutes to an hour (Tr. 796).

### October 12: Gecewich interrogates Ortiz

After meeting with Moran, Gecewich met with Ortiz again on October 12; Ortiz again wore his union shirt (Tr. 528).[92] During this meeting, which lasted longer than the first, Gecewich asked for the meeting to remain confidential. Gecewich started the meeting by asking about the Workday profile screenshots on the Facebook post. Gecewich and Ortiz then had a conversation about where the screenshots came from. Ortiz eventually admitted that it must have been Moran who sent the screenshots to him via text message but that he had received these screenshots from others as well (Tr. 530, 1842). Apparently prior to his meeting with Gecewich, Moran spoke to Ortiz about his meeting with Gecewich. During this meeting with Gecewich, Ortiz expressed concern about being fired and was worried in the prior meeting that he would be fired. Ortiz also spoke about his nature not to bring others into his own problems, and that he was protecting other employees including Moran (Tr. 1842–1844). By the end of this meeting, Ortiz had told Gecewich from where the photos had come (Tr. 1915).

### Decision to terminate Ortiz for lying and to issue Moran a warning for Workday misuse

After these meetings with Ortiz and Moran, Gecewich drafted a report of his investigation with recommended actions (Tr. 1846, 1850). Gecewich testified that he based his recommendations on looking at similar cases as well as the "unique facts of this case" (Tr. 1851). Gecewich testified that he considered Workday profile photos and any Workday screenshots to be sensitive; Gecewich's characterization of the Workday photos or screenshots is based on his own belief that Workday is an internal data system (Tr. 1935). During his investigation, Gecewich claimed he never sought to learn what happened in Sacramento, went to the Facebook page to look at the page and never found out who were the members of the Facebook group (Tr. 1823, 1835). After drafting the report, Gecewich showed it to Tesla's in-house counsel (Tr. 1849). Gecewich's recommendation for termination of Ortiz and warning for Moran were "aligned with legal" (Tr. 1930). But a prior version of his report shows that Gecewich along with in-house counsel edited the investigatory report which was originally created on October 12 (GC Exh. 85). In a prior version of this report, Gecewich wrote, "This time frame corresponds to when these three Tesla employees went to Sacramento, California to speak with State legislatures about

---

[91] Gecewich's notes again contradict his testimony (GC Exh. 67). Gecewich testified that Moran told him that he used Workday at the request of a UAW representative to verify whether the individuals were employees (Tr. 1836). However, in his notes, Gecewich states that a representative from UAW told Moran that Tesla employees were in Sacramento, and Moran decided to look up the employees to see if they were actual employees. Moran did tell Gecewich that he would look at

tactics raises a red flag as he does not appear to be trustworthy which again diminishes his credibility.

Workday accounts of other employees when requested by a UAW representative.

[92] As for the second meeting with Ortiz, I cannot credit the entirety of Ortiz or Gecewich's testimony as to what happened. Gecewich's contemporaneous notes provide a much clearer picture as to what happened (GC Exh. 67). No matter which version I choose to credit, all versions demonstrate that Gecewich asked Ortiz several questions about the Workday screenshots and why he did not tell the truth during the first meeting. Thus, I rely on a compilation of the testimonies of Ortiz and Gecewich along with Gecewich's notes.

22-60493.6564

their experiences at Tesla" (GC Exh. 86). The sentence was removed from the final version of the report, but directly contradicts Gecewich's repeated testimony that he did not know anything about the employees' testimony in Sacramento on behalf of Tesla or what prompted the Facebook posts (Tr. 2185–2187). Gecewich attempted to correct his prior testimony to claim that he did know the purpose which was shared with him during the investigation but Gecewich also claimed to not have investigated the underlying events to the Facebook post (Tr. 2187).

Gecewich's response as to what he was investigating varied throughout his testimony. At one-point Gecewich testified that he was investigating why the Workday screenshots were released (Tr. 1898). Then he testified that he was investigating the release of the Workday photos on a public Facebook page (Tr. 1902). And the final report states, "This investigation was initiated to determine if proprietary business systems were accessed for non-business purposes" (CP Exh. 4). However, the investigation began based on Pratt's complaint that the release of his photo and information was inappropriate and made him feel singled out, harassed, or cyberbullied (Tr. 1903–1904). Gecewich claimed that he never investigated the Facebook post, and admitted he never sought to understand why Pratt made the complaint (Tr. 1939). Gecewich admitted that he knew "parts" of the Facebook posts "could have been protected" so he focused on the Workday profile photos (Tr. 1939–1940). Gecewich repeatedly testified that the posting of the Workday photos externally was concerning as this was Tesla's information (Tr. 1904). But the Workday photo is the same photo on the employees' badges and Gecewich testified that employees can take a photo of their own badge and post it elsewhere as there is no proprietary interest in the photo (Tr. 1927, 1957).

Hedges testified that he did not speak to Gecewich again until after he was finished with the investigation when Gecewich told him his findings and recommendations (Tr. 1186, 1188–1189, 1236–1237, 1907). Gecewich told Hedges that Ortiz lied during the investigation because Ortiz knew from whom he received the "information" and thus Gecewich was recommending termination. As for Moran, Gecewich testified that he was forthcoming and honest but used Workday improperly and he was recommending a warning be issued to Moran (Tr. 1187, 1237, 1915).[93] Hedges agreed with Gecewich even though he was not the decision maker (Tr. 1221). Hedges could not recall if he ever informed Toledano about Pratt's complaint (Tr. 1220). Hedges testified he spoke with Gecewich, Copher, and Bodiford (Tr. 1221). The record is unclear as to whether Hedges or Gecewich

decided that the decision maker in Ortiz' case should be Stephan Graminger (Graminger), the director for body manufacturing which included BIW,[94] since Hedges believed that this situation needed "more attention" and a decision maker at a "higher level to make an objective decision" rather than the BIW department manager Ron Martinez (Martinez) (Tr. 1187–1188, 1907–1908). Hedges testified that he suggested someone higher than Martinez make the decision because Ortiz and Moran were involved with the Union, and thus there would be more scrutiny with the decision and needed someone who was comfortable making the decision and farther removed from the day-to-day operations (Tr. 1190, 1239).[95]

On October 17, Gecewich met with Graminger along with Shtawney McIntosh (McIntosh), who was an HR business partner for BIW,[96] and Martinez in a conference room near BIW to discuss Ortiz (Tr. 1268, 1848; R. Exh. 15).[97] Prior to the meeting, Graminger did not know what the meeting was about (Tr. 1292). Gecewich presented the findings of his investigation and spoke about Ortiz (Tr. 1288, 1852, 2205–2206).[98] Graminger testified that he reviewed the entire report during the meeting (Tr. 1300–1301). The version of the report purportedly shown to Graminger notes that employee relations received a concern that Ortiz posted screenshots of Ives' and Pratt's Workday "landing page" which included pictures, full names, and business titles (CP Exh. 4). As for the summary and analysis of findings section, the report states, "On Sept. 16th, 2017, ER [employee relations] received a concern from Travis Pratt that Richard Ortiz posted screenshots of his and Shaun's Workday profile to a Facebook group. Travis was concerned based on the content of the message and because he understood Workday was an internal Tesla HR system intended for work purposes and not for broader distribution on social media" (CP Exh. 4). The report states that Moran was asked by a UAW representative to verify that the employees were Tesla employees (CP Exh. 4). Furthermore, Gecewich wrote that Moran volunteered to provide his text messages to Gecewich, and that Moran said Ortiz would be "dishonest" if he didn't say from where the screenshots came (CP Exh. 4). Gecewich further wrote, "After learning Jose shared the screenshots with Richard, ER spoke with Richard again" (CP Exh. 4).

Graminger testified that Gecewich stated that Ortiz and Moran "leaked some internal information out of Workday including some telephone number and personal information and posted it on Facebook" (Tr. 1288). Gecewich never mentioned to Graminger that Pratt and Ives had gone to Sacramento to testify on

---

[93] Gecewich could not recall whether he asked HR partners to document Moran's warning in his Workday file or keep it in an email (Tr. 1793–1794).

[94] Graminger no longer works for Respondent but during the relevant time period was a supervisor as defined by Sec. 2(11) of the Act (Tr. 1293).

[95] Hedges admitted that he knew Moran was an active Union organizer and had brought safety concerns to Musk and Hedges' attention (Tr. 1205–1206). Hedges also admitted that Ortiz was an active Union organizer and requested Cal/OSHA 300 logs and summaries (Tr. 1206). Hedges also admitted that he was familiar with the Union's Facebook page "A Fair Future at Tesla" and had visited the webpage at least 10 to 20 times (Tr. 1207).

[96] Even though McIntosh testified at the hearing, no party asked her any questions about this meeting.

[97] Gecewich and Graminger's testimonies differ significantly on what occurred during this meeting. Graminger, who appeared to be a nervous witness, was more reliable than Gecewich as to what occurred. Graminger appeared to be earnest in explaining what he learned during the meeting, and his thought process as to how to decide this matter. Based upon my overall findings that Gecewich was not a credible witness, I rely upon Graminger's testimony although there were some inconsistencies within his testimony as well.

[98] The record is unclear as to which version of the report Graminger reviewed.

behalf of Tesla (Tr. 2201). At the meeting, Graminger asked to see Ortiz' post on Facebook, and Gecewich showed Graminger a screenshot of the Facebook post (Tr. 1289, 1303).[99] Graminger testified that he was "quite sure" he asked Gecewich if similarly situated cases had been treated in the same way, and Gecewich responded that they had but did not provide any specific details of cases (Tr. 1293–1294, 1301–1302).[100]    At this meeting, Gecewich recommended that Ortiz be terminated for lying during the investigation. Gecewich testified that any mitigating circumstances would be raised by the HR partner or business leader and that he told Graminger their role during the meeting (Tr. 1929). Gecewich testified that Martinez made some "good comments" about Ortiz but those comments did not mitigate the recommended termination (Tr. 1930). In fact, Respondent conducted one performance review of Ortiz for the time period from January 1 to June 30 (GC Exh. 12). Ortiz received an overall rating of 3—consistently strong. Respondent also conducted a 2017 supplemental performance review for Ortiz from July 1, 2016 to June 30, where Ortiz received the same rating of 3—consistently strong (GC Exh. 13). As a result, on October 8, Respondent awarded Ortiz a performance award (GC Exh. 14).

Gecewich asked Graminger if he agreed with his recommendation, and because Graminger was new to Tesla and felt that this situation was a "sensitive case" he wanted to talk to Hochholdinger to get confirmation if there have been similar cases in the past to be certain he fully considered everything. The meeting ended without Graminger deciding (Tr. 1290, 1919).

Graminger went to Hochholdinger and told him that he had just left an investigation meeting "involving Richard Ortiz, a member of the union" (Tr. 1290, 1310).[101] Graminger asked Hochholdinger if he was aware of the matter, but Hochholdinger was not aware. Then Graminger asked whether there have been similar cases where someone lying during an investigation would be terminated. Hochholdinger responded that there have been similar instances and that person would be terminated according to Respondent's personnel policy (Tr. 1290–1291). Graminger did not know which specific Tesla policies Ortiz violated nor did he review any policies (Tr. 1298–1299). Thereafter, Graminger informed McIntosh, Martinez and Gecewich via email to proceed as discussed and that Hochholdinger was aware of the decision to terminate Ortiz (Tr. 1290–1291; R. Exh. 15).

Graminger made the decision to terminate Ortiz on October 17 (Tr. 1265). Prior to making the decision to terminate Ortiz, Graminger had never spoken to or dealt with Ortiz (Tr. 1265–1266, 1290).

### October 18: Ortiz is terminated

On October 18, Gecewich, McIntosh, and Ortiz met in the north admin building; Ortiz wore his Union shirt (Tr. 532, 2064–2065).[102] McIntosh testified that Gecewich began the meeting by informing Ortiz that the investigation he had conducted was closed (Tr. 2066). According to McIntosh, Gecewich told Ortiz that he was found to be dishonest during the process as he was not forthcoming about some images or where the images came from, and recommended termination (Tr. 2066, 2068). Ortiz was asked if he had any questions which he did not have, and McIntosh explained the termination process (Tr. 2066). McIntosh stated that the meeting lasted 5 to 10 minutes (Tr. 2066). McIntosh denied that the Union was mentioned during the meeting but knew that Ortiz was active in the Union as it was "common knowledge" since he wore Union shirts (Tr. 2067–2068).[103]

Toledano testified that she learned of Ortiz' termination after it occurred from Copher's status reports to her (Tr. 904). Toledano denied receiving status reports during the investigation of Ortiz, did not monitor the investigation of Ortiz, and was not involved in the investigation in any way (Tr. 905–909). Toledano also testified that Gecewich verbally informed her of the results of the investigation (Tr. 910, 933). Toledano could not recall what Gecewich told her. Toledano testified, generally, that she learned Ortiz lied during the investigation, but she did not know what the lie concerned and Copher's report did not provide details (Tr. 934). Again, I cannot credit Toledano's testimony. It is incredulous to believe that Toledano was unaware that a prominent union supporter was terminated or that he was even being investigated. Based on what is more likely than not, Toledano knew about the investigation as well as the reasons for Ortiz' termination.

### October 19: Moran is disciplined for violating a Workday rule

On October 19, Gecewich and Emee Cruz (Cruz), an HR partner, met with Moran. Gecewich thanked Moran for his honesty during the first meeting, and he would only be given a warning regarding his use of Workday (Tr. 738, 801). Gecewich told Moran that he could use Workday only for business purposes, not personal use (Tr. 2308). Thereafter, Gecewich sent Moran

---

[99] Gecewich could not recall showing Graminger the Facebook post (Tr. 2198). Again, I credit Graminger's testimony.

[100] In contrast, Gecewich testified that during the meeting, he provided Graminger a comparator case where a vice president of SolarCity had been terminated after an investigation where he lied about his use of a company vehicle, drugs and alcohol found in that vehicle and an improper relationship with another employee (Tr. 1853). Gecewich testified that this situation was the only comparator case used as the vice president was terminated only for lying during the investigation, not for the alleged acts (Tr. 1853–1854, 1920).

[101] Graminger testified that Ortiz' union activity was not discussed during the meeting and the Union was not brought up during the meeting but, Graminger knew that Ortiz was "a member of the union" and that the matter had such sensitivity that he needed another opinion (Tr. 1291–1292, 1301, 1855). Graminger testified that Ortiz' name was familiar because he had looked on the website, "A Fair Future for Tesla" and the Facebook page (Tr. 1291, 1298, 1313). Graminger knew before this

meeting with Gecewich that Ortiz was active in the Union. I do not credit Graminger's testimony that Ortiz' Union activity was not discussed during the meeting. It is obvious that all the attendees of the meeting knew that Ortiz was active with the Union, and it seems implausible that no one mentioned his union activity during this meeting especially considering Graminger admitted this was a "sensitive case."

[102] McIntosh testified credibly albeit a bit reluctantly with her responses.

[103] Ortiz, in his October 26, affidavit taken soon after he was terminated, did not state that Gecewich was at his termination meeting, and that McIntosh told him was being terminated for violating the Confidentiality Agreement (Tr. 644). I cannot credit any of Ortiz' testimony as to what occurred during the termination meeting. McIntosh testified in a clear, concise manner, and I rely upon her testimony to establish what occurred during this meeting. Ortiz again testified about the Confidentiality Agreement but based on logical inferences, this subject was not mentioned.

an email to follow up on their meeting that day (GC Exhs. 42, 82; Tr. 2308). Gecewich wrote, "As part of our investigation we found that you used an internal system, Workday, for personal purposes and without proper business justification. You are reminded that you should only access internal systems, including Workday, for legitimate and official business purposes" (GC Exhs. 42, 82). Gecewich testified that associate manager Brian Cunningham (Cunningham) agreed with the recommendation for a verbal coaching with written follow up to be issued to Moran (Tr. 2307).[104]

On October 19, Gecewich sent an email to Pratt, informing him that the investigation of the Facebook post and improper access/use of Workday had been completed (GC Exh. 83). Gecewich informed Pratt that while he could not tell him the specific outcome in this matter, Respondent took his concerns seriously and "aligned our action with similar cases across Tesla" (GC Exh. 83). However, Gecewich testified that as of January 2018, this case was the only scenario involving Workday use of employees (Tr. 1879). Furthermore, Respondent has no written policy requiring employees to be truthful during an investigation or any policy requiring employees only use Workday for legitimate and official business purpose (Tr. 1879).

### Credibility Findings

Of all the witnesses who testified about these allegations, I credit Moran's version of events completely. Not only did Moran testify with few inconsistencies but Gecewich's contemporaneous notes also supported his testimony. Next, although I credited some portions of Ortiz' testimony, there are many portions of his testimony that I could not credit. For example, Ortiz testified that Gecewich asked him about the Confidentiality Agreement and asked him if he knew what a lie was. I cannot credit his testimony as the Confidentiality Agreement was not been mentioned by any other witness.

As for Respondent's witnesses, I cannot rely upon Hedges or Gecewich. I have set forth numerous examples within the statement of facts which explains why I cannot credit their testimony. As a Section 611(c) witness, Gecewich testified steadily but nervously. Under cross-examination, Gecewich's demeanor became argumentative when confronted with inconsistent statements such as his statement to Nanda that Toledano was watching the investigation "closely" after he claimed that he did not update her during the investigation. Gecewich's testimony that he did not know about the union organizers and the Facebook pages are not genuine. Gecewich testified in a purposefully evasive manner and appeared to be jittering in his chair. Moreover, Gecewich's testimony was filled with inconsistencies and his final report does not accurately reflect his interview notes.

Graminger was a more credible witness for Respondent but even his testimony was confusing and contradictory as described. On the one hand Graminger testified that Ortiz' union activity was not discussed during the meeting but on the other hand Graminger looked at the union organizing campaign website as well as Facebook page where he viewed Ortiz' posts before the meeting. This example of contradictions and inconsistent statements are ripe within these set of facts.

McIntosh testified in a clear and straightforward manner. There were no inconsistent statements. Thus, I rely upon McIntosh's version of the October 18 meeting when Ortiz was terminated.

### Legal Analysis

#### Moran and Ortiz Engaged in Protected Concerted Activity, and Did Not Lose the Protection of the Act

Before discussing whether Respondent violated the Act when terminating Ortiz and disciplining Moran, I must first address the issue of whether Ortiz and Moran engaged in protected concerted activity. Respondent argues that Moran and Ortiz were not engaged in concerted activity for the purpose of mutual aid or protection when Moran sent the Workday profile screenshots to Ortiz. Based on Board precedent, I disagree.

Section 7 of the Act protects the right of employees to engage in "concerted activity" for the purpose of collective bargaining or other mutual aid or protection. For an employee's activity to be "concerted" the employee must be engaged with or on the authority of other employees and not solely on behalf of the employee himself. *Meyers Industries (Meyers I)*, 268 NLRB 493 (1984), remanded sub nom. *Prill v. NLRB*, 755 F.2d 941 (D.C. Cir. 1985), cert. denied 474 U.S. 948 (1985), on remand *Meyers Industries (Meyers II)*, 281 NLRB 882 (1986), affd. sub nom. *Prill v. NLRB*, 835 F.2d 1481 (D.C. Cir. 1987), cert. denied 487 U.S. 1205 (1988). The statute requires the activities to be "concerted" before they can be "protected." *Bethany Medical Center*, 328 NLRB 1094, 1101 (1999). The Board has held that activity is concerted if it is "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself. *Meyers I*, supra; *Meyers II*, supra; *Quicken Loans, Inc.*, 367 NLRB No. 112, slip op. at 3 (2019) (citations omitted) (profanity laced statement by single employee concerning customer call routed to him was not protected or concerted as employees as a group had no preexisting concerns about customer calls, and no evidence that employee sought to initiate or induce group action). The question of whether an employee has engaged in concerted activity is a factual one based on the totality of the circumstances. *National Specialties Installations, Inc.*, 344 NLRB 191, 196 (2005). The Act protects discussions between two or more employees concerning their terms and conditions of employment. Whether an employee's activity is concerted depends on the way the employee's actions may be linked to those of his coworkers. *Fresh & Easy Neighborhood Market*, 361 NLRB 151, 153 (2014). Concertedness is analyzed under an objective standard. *Fresh & Easy Neighborhood Market*, supra at 154. Employees act in a concerted manner for a variety of reasons, some altruistic and some selfish. Id. citing *Circle K. Corp.*, 305 NLRB 932, 933 (1991), enfd. mem. 989 F.2d 498 (6th Cir. 1993).

Both Ortiz and Moran clearly engaged in concerted activity which is protected. Upon learning that employees testified on behalf of Tesla during a union-sponsored California State

---

[104] Gecewich testified that he met with Cunningham, but his Board affidavit of January 8, 2018, does not reflect such a meeting (Tr. 2322–2323).

Assembly bill, Ortiz asked Moran to help him learn if these individuals were current employees. Moran, in working with Ortiz, then went to the Workday system to search for these employees. Once Moran found these employees, he sent screenshots of their Workday profiles to Ortiz. Ortiz then posted the screenshots with his comments on the employees' private Facebook page. Ortiz posted these screenshots without Moran's approval or consent. This private Facebook page had been set up as a forum for employees to discuss unionization at the workplace—essentially a virtual watercooler. Simply because Moran sent the screenshots to Ortiz and Ortiz decided to add the Workday screenshots to the private Facebook page does not mean that Moran and Ortiz did not act concertedly, as Respondent argues. They did not act together to post the pictures but each of their actions was to promote the union organizing drive at Tesla for the mutual aid and protection of all employees and to improve the terms and conditions for all employees. See *Kaiser Engineers*, 213 NLRB 752 (1974) (employee letters to legislators opposing relaxing of immigration restrictions for engineers); *Bethlehem Shipbuilding Corporation Ltd. v. NLRB*, 114 F.2d 930 (1st Cir. 1940) (employee appearances on behalf of their coworkers before legislative committees); *Triple Play Sports Bar & Grille*, 361 NLRB 308, 308–309 (2014) (Facebook communications between employees complaining about employer tax withholding error constituted " 'concerted activities' and they were 'for the purpose of . . . mutual aid or protection'"); *North West Electric Cooperative*, 366 NLRB No. 132, slip op. at 1, fn. 1 (2018). Respondent's insistence on a narrow reading of the law is not warranted by Board law or the purpose of Section 7 of the Act. Ortiz posted screenshots of Pratt and Ives' Workday profiles to point out employees who were not supportive of the Union. Pratt responded to Ortiz, informing him that this was not the way to get other employees on board with unionization. Thus, Ortiz removed the post. Still, Pratt decided to complain to Hedges, who originally asked him to go to Sacramento on behalf of Tesla. Pratt complained that Ortiz' Facebook post made him feel singled out, but this claim is disingenuous since he forwarded the Facebook post to Hedges with the remark, "Looks like we got under someone's skin" with a smiling face and eyes and rosy cheeks emoji. This addition of the emoji does not reflect a concern of harassment. This complaint launched the investigation into Ortiz and Moran's protected concerted activity.

Respondent argues that if Moran is found to have engaged in protected concerted activity, his action of accessing and utilizing Workday for nonbusiness purposes sufficiently removed the protection of Section 7 of the Act. Respondent bases its argument on disputed facts. Respondent never had a rule that employees could only use Workday for business purposes, or restricted employees' use of Workday. Several witnesses testified that they had never received such instructions from Respondent, nor did Respondent provide any evidence that this rule existed. Obviously, the access employees receive in Workday is based upon their positions at Tesla. Presumably, Moran along with others had access to employees' profiles. Respondent attempts to

analogize Moran's screenshots of Workday profiles to employees who steal business records or personnel files from their employers. Moran's actions came nowhere near such examples. Moran used Workday not only for his own personnel records, to which he accessed, but also to look up employees, where he is limited to the employees' names and job titles. The employee profiles were not private or confidential records. See *Ridgley Mfg. Co.*, 207 NLRB 193, 196 (1973). In sum, Moran did not lose the protection of the Act for violating a nonexistent rule.

As for Ortiz, he reasonably understood that Gecewich was trying to learn about his protected activities when he repeatedly asked who sent him the Workday profile screenshots which he posted on the private Facebook page. Under these circumstances, Ortiz was under no obligation to respond to questions to uncover protected activities. See *Paragon Systems, Inc.*, 362 NLRB 1561, 1567 (2015). Ortiz' "lying" was not related to his job performance or Respondent's business, but to a protected right under the Act which he was not obligated to disclose. See *St. Louis Car Co.*, 108 NLRB 1523, 1525–1526 (1954). In *Fresenius USA Mfg. Inc.*, 362 NLRB 1065 (2015), the Board found that an employee's dishonesty during an investigation of misconduct of alleged harassment and threats was unprotected by the Act due to the focus of the investigation on the allegation, and not on any union activity. That case in inapposite as a comparator. Here, Respondent did not investigate Pratt's specious claim of harassment and being singled out, but instead Respondent chose to disregard the original complaint, and fabricated its own investigation into the Workday profile screenshots. Ortiz did not lose the protection of the Act as the investigation focused solely on who provided him the screenshots that he posted on the private Facebook page.[105]

*Respondent Violated Section 8(a)(3) and (1) of the Act by Terminating Ortiz for Lying Regarding Protected Concerted Activity*

The credited evidence shows that Respondent terminated Ortiz for lying during an investigation. An employer may not terminate an employee for lying in response to questions regarding protected concerted activity. *Tradewaste Incineration*, 336 NLRB 902, 902 (2001) (employee's untruthful denial that he posted a wage-related notice was protected where it "did not relate to the performance of his job performance or the [r]espondent's business."); *St. Louis Car Co.*, 108 NLRB 1523, 1525–1526 (1954) (employee's untruthful denial of her union organizing activity was protected where the denial "related not to the [r]espondent's business at all, but to personal rights guaranteed by [the Act] which she desired not to disclose."). Here Respondent admitted that Ortiz was terminated for his lying during the investigation when he did not reveal from whom he received the screenshots, of which he was not obligated to disclose, Respondent violated Section 8(a)(3) and (1) of the Act when terminating Ortiz. The analysis regarding Ortiz' termination should end here but, in the alternative, I will consider Ortiz' termination under the *Wright Line*, supra, framework.

---

[105] Respondent does not contend that Ortiz lost the protection of the Act for his Facebook post where a totality of the circumstances test analysis would be undertaken. *Pier Sixty, LLC.*, 362 NLRB 505, 506 (2015).

48                              DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

*Respondent Violated Section 8(a)(3) and (1) of the Act by Terminating Ortiz and Moran Under Wright Line*

When more than one motive exists for the alleged discriminatory action for protected concerted activity, a mixed motive analysis applies.[106] Under *Wright Line*, supra at 1089, the General Counsel has the initial burden to show that an employee's protected activities were a motivating factor in the employer's actions against him. 251 NLRB at 1089. The requisite elements to support a finding of discriminatory motivation are union or other protected concerted activity by the employee, employer knowledge of the activity, and animus on the part of the employer. To support its initial burden under *Wright Line*, "the General Counsel must prove by a preponderance of the evidence that union animus was a substantial or motivating factor in the adverse employment action." *Consolidated Bus Transit, Inc.*, 350 NLRB 1064, 1065 (2007), enfd. 577 F.3d 467 (2d Cir. 2009). The burden then shifts to the employer to demonstrate that it would have taken the same actions even absent the employees' protected conduct. *Wright Line*, supra at 1089; see also *Electrolux Home Products, Inc.*, 368 NLRB No. 34, slip op. at 3 (2019); *National Hot Rod Association*, 368 NLRB No. 26, slip op. at 4 (2019) (citations omitted) (an employer need not prove the disciplined employee had committed the alleged misconduct but only needs to show it had a reasonable belief that the employee committed the alleged offense and then it acted on that belief). First, I will discuss Ortiz' termination followed by Moran's discipline using the *Wright Line* framework.[107]

As set forth above, Ortiz engaged in protected concerted activity which did not lose the protection of the Act. Furthermore, Respondent was well-aware of Ortiz' activity. First, Hedges, who referred Pratt's complaint to Gecewich, knew that Ortiz' Facebook post regarding Pratt and Ives stemmed from the two employee's testimony during a California State Assembly hearing on the union-sponsored bill. Hedges knew that Ortiz was actively involved with the Union as he had also requested Respondent's Cal/OSHA safety records which were then the subject of a leaflet passed out by union supporters. Gecewich also knew of Ortiz' activities as he received a copy of the employee petition regarding wages which Ortiz had signed. Gecewich also knew that the Facebook post with screenshot arose from an issue in Sacramento which involved employees speaking about a union-sponsored legislative bill. I do not credit Gecewich's attempt to wall himself off from knowledge of Ortiz' union activity by claiming not to know the subject matter that caused Ortiz to post a comment on the employee's Facebook page. Finally, Graminger, the decisionmaker, also knew about Ortiz' union activity as he looked at the union website and knew that Ortiz was involved with the Union, which is why he went to Hochholdinger to confirm that termination would be appropriate. Graminger

also saw the screenshots Ortiz posted. Even McIntosh, who attended Gecewich's meeting with Graminger to present his findings and recommendations, testified that it was "common knowledge" that Ortiz actively participated in the organizing campaign.

The General Counsel has also proven Respondent's union animus towards Ortiz' actions. Animus can be established through direct evidence or inferred from circumstantial evidence. See *Medic One, Inc.*, 331 NLRB 464, 475 (2000) (noting that "[e]vidence of suspicious timing, false reasons given in defense, failure to adequately investigate alleged misconduct, departures from past practices, tolerance of behavior for which the employee was allegedly fired, and disparate treatment of the discharged employees all support inferences of animus and discriminatory motivation"); *Electrolux Home Products*, supra; *Temp Masters, Inc.*, 344 NLRB 1188, 1193 (2005); *Promedica Health Systems, Inc.*, 343 NLRB 1351, 1361 (2004).

First, the record is clear that Respondent exhibited animus towards Ortiz' actions as well as animus towards union supporters which is established by the numerous unfair labor practices and the entire record. See *Metro-West Ambulance Service*, 360 NLRB 1029 (2014); *Lucky Cab Co.*, 360 NLRB 271, 274 (2014) (employer's contemporaneous 8(a)(1) violations demonstrate its union animus); *Bates Paving & Sealing, Inc.*, 364 NLRB No. 46, slip op. at 3 (2016). Respondent sought to counter the Union's drive to pass a California State Assembly bill which could affect Respondent economically by sending "positive" employees to Sacramento to speak on behalf of Tesla. In reaction, Ortiz posted a comment along with the Workday screenshots of Pratt and Ives on the employees' private Facebook page. Pratt responded to Ortiz, who promptly removed the post. What should have been a discussion between two employees regarding their individual rights to organize or to not organize became an investigation into Ortiz. Even prior to this event, Respondent, as found herein, committed other violations of the Act such as interrogating Ortiz about the Cal/OSHA logs and to whom he gave them. By September, the union organizing campaign was well underway, and Ortiz' name was known to management. *Shamrock Foods Co.*, 366 NLRB No. 117 (2018).

The evidence shows examples of circumstantial evidence which point to Ortiz' termination being unlawfully motivated. *Shamrock Foods*, supra. Pratt complained to Hedges, albeit with little concern based on his text message reply to Hedges ("Looks we got under some people's skin" and smiling face and eyes and rosy cheeks emoji). Hedges, who had been asked by Toledano to find "positive" employees to appear on behalf of Tesla, referred the "complaint" to Gecewich who promptly agreed to investigate the manner. During Gecewich's initial intake of the complaint, Pratt conveyed his concern about the post and

---

[106] I agree with Respondent that the *Burnup & Sims*, supra, framework is not applicable regarding Ortiz' discharge. Under *Burnup & Sims*, supra, an employer violates the Act by disciplining or discharging an employee based on a good-faith belief that the employee engaged in misconduct during otherwise protected activity, if the General Counsel shows that the employee was not, in fact, guilty of that misconduct. *Burnup & Sims*, supra, applies to cases involving mistakes of fact, not mistakes of law. Here, this is not a "mistake of fact" case, and *Burnup & Sims*, supra, would not apply. Likewise, an *Atlantic Steel* analysis

would not apply as the issue stems from Ortiz' off-duty, offsite use of Facebook to communicate with other employees. See *Triple Play Sports Bar & Grille*, supra; *Pier Sixty*, supra.

[107] Again, I disagree with the General Counsel and Respondent that a *Burnup & Sims* analysis is appropriate. The first prong of *Burnup & Sims* fails as Respondent could not have had an honest belief that Moran engaged in misconduct for improperly accessing and using Workday. Based on the totality of the circumstances, Respondent promulgated this rule in response to Moran's protected concerted activity.

Kostich who saw the Facebook post complained that he did not think it was proper for Ortiz to use Workday in the way he used it. Gecewich then decided to shift the focus of his investigation to Workday since he knew that the Facebook post was related to the Union. In so doing, Gecewich did not even speak to Ives whose photo was also posted on Facebook. Gecewich providing shifting reasons for the purpose of the investigation where he claimed it was due to screenshots of Workday on Facebook, but in the investigatory summary he wrote "This investigation was initiated to determine if proprietary business systems were accessed for non-business purposes." During this investigation, Gecewich kept Toledano, who identified pro-union employees as adversaries, informed of the progress of the investigation. Gecewich did not ask Pratt or Kostich how they used Workday and never asked others at Tesla about the uses of Workday. Gecewich claimed he did not know what happened in Sacramento to prompt Pratt's complaint but a prior version of the report of investigation shows that he knew that the Sacramento matter involved employees speaking on behalf of Tesla and the Union. From the start of the investigation, initiated by Hedges, Respondent sought the result it desired. See *St. Paul Park Refining Co. d/b/a Western Refining*, 366 NLRB No. 83 (2018) (failure to conduct complete and objective investigation).

When finding comparable disciplinary actions, it should be noted that Gecewich did not inform Graminger of the details but simply noted that there were similar actions in the past. Later, the only instance Gecewich could find of comparable discipline was of a management official at another company owned by Tesla who lied when he was being investigating for alcohol and drug use in a company vehicle along with improper relations with a coworker. Respondent did not establish that it treated similar incidents involving employees similarly. Even after Ortiz told Gecewich from whom he received the Workday screenshots and why he did not want to divulge any names, Ortiz still recommended termination.

Graminger, who was to be the neutral decision maker, knew about the connection between the Facebook post and Workday as he asked to see the post. But the report was also filled with errors by Gecewich. For example, the report states that Ortiz disclosed confidential employee information and telephone numbers on Facebook. This statement is simply false. Any confidential information was disclosed by Pratt, and Ortiz did not disclose telephone numbers. Other errors in the report include attributing the Workday complaint to Pratt when instead Kostich complained about a perceived misuse of Workday. These errors support an inference that Respondent sought to terminate Ortiz with false information.

The timing of events also relates directly to Ortiz' protected activity as the investigation began quickly after Ortiz' Facebook post and within the next month he was terminated. *McClendon Electrical Services*, 340 NLRB 613, 613 fn. 6 (2003) (finding discharge that occurred a day after protected concerted activity supported a finding of unlawful motivation); *Mira-Pak, Inc.*, 147 NLRB 1075, 1081 (1964), enfd. 354 F.2d 525 (5th Cir. 1965) (finding termination unlawful where discharge occurred 2 days after protected concerted activity). Under all the circumstances of this matter, Respondent's termination of Ortiz is pretextual. Respondent sought to punish the employees who pushed back

against the employees who spoke on behalf of Tesla and knowing that they could not directly punish Ortiz for his Facebook post sought to find another way. Moreover, during this second meeting, Ortiz admitted he did not tell the truth during the first meeting with Gecewich as to whom he received the Workday screenshots because he did not want to bring anyone else into this matter; he sought to protect his coworkers. A finding of pretext defeats any attempt by Respondent to show that it would have terminated Ortiz absent his protected activities. Even if no pretext exists, Respondent continues to fail to meet its burden because there were no comparators or other evidence to establish, they would have taken the same action against Ortiz. Thus, Respondent violated Section 8(a)(3) and (1) when unlawfully terminating Ortiz.

As for Moran, as set forth above, he engaged in protected concerted activity which did not lose the Act's protection. Respondent clearly knew about Moran's protected concerted activity. Moran publicly announced the organizing campaign at Tesla with his February blog post which drew a response from the head of the Company. Gecewich, who investigated Pratt's complaint, recognized Moran's name from the blog post. Moran also initiated an employee petition regarding safety which caused Musk and Toledano to meet with him where they engaged in multiple unfair labor practices. Toledano had been kept apprised on the investigation by Gecewich. Thus, it is beyond dispute that Respondent knew about Moran's protected concerted activity.

Next, the General Counsel has also proven animus regarding Moran. Again, Respondent violated the Act numerous times during this time period as described within which supports a finding of animus. Respondent's reason for warning Moran is pretextual which supports a finding of animus. See *Lucky Cab*, supra at 274. During Gecewich's meeting with Moran, although he already knew that Moran viewed Pratt and Ives' Workday profiles the same day they were posted by Ortiz on Facebook, Gecewich asked Moran many questions about how he used Workday. Thereafter, Gecewich directly asked Moran about Pratt and Ives' Workday profiles. Moran did not deny that he sent the screenshots to Ortiz. Thus, Gecewich could not find that Moran lied during the investigation, but he then decided to create a new Workday rule, claiming that Workday was to be used only for "legitimate and official business purposes." This rule never existed prior to disciplining Moran, and Respondent presented no comparable disciplinary actions. By promulgating this Workday rule and enforcing this rule disparately against Moran, Respondent violated Section 8(a)(3) and (1) of the Act. Gecewich's final report also contained many errors as explained above. In addition, Moran never claimed that the UAW asked him to look up the employees on Workday, and Moran never stated that if Ortiz did not tell the truth about where he received the Workday profile screenshots, he would be "dishonest." Respondent, in post hoc rationalization, claims that it would have disciplined Moran regardless of protected concerted activity due to other internal systems rules, but this explanation only comes now.

In sum, the General Counsel met its burden to show that Respondent terminated Ortiz and disciplined Moran for discriminatory reasons and promulgated a rule in response to protected concerted activity. I therefore find that Respondent violated Section

8(a)(3) and (1) of the Act by terminating Ortiz, disciplining Moran, and promulgating a rule in response to protected concerted activity as alleged in complaint paragraphs 8(b)(iii), (c), and (d).

### Respondent Violated Section 8(a)(1) when Interrogating Moran and Ortiz

As for the allegation that Gecewich interrogated Ortiz on September 21 and October 12, and Moran on October 12, the Board considers the totality of the circumstances in determining whether the questioning of an employee constitutes an unlawful interrogation. *Rossmore House*, supra (the Board set forth a test for examining whether an interrogation is unlawful); *Stoody Co.*, 320 NLRB 18, 18 (1995) (the Board considers background, nature of information sought, and method of interrogation). The test is an objective one that does not rely on the subjective aspect of whether the employee was, in fact, intimidated. *Multi-Ad Services*, 331 NLRB 1226, 1227–1228 (2000), enfd. 255 F.3d 363 (7th Cir. 2001). The Board has also found that questioning an employee about his protected concerted activity may constitute an unlawful interrogation. See *Best Century Buffet, Inc.*, 358 NLRB 143, 157 (2012).

As set forth above, Gecewich interrogated Ortiz on both September 21 and October 12, and Moran on October 12. He questioned Ortiz repeatedly about the Workday profile screenshots he posted even after he knew that Moran had sent these screenshots to Ortiz. Gecewich knew that Moran had sent the screenshots to Ortiz but asked him many questions about Workday, and continued to investigate his use of Workday, despite knowing that the screenshots were used in the course of protected concerted activity. All of Gecewich's questions were designed to elicit information from Ortiz and Moran about their protected concerted activity and their union organizing activities.

Section 7 of the Act gives employees the right to keep confidential their union activity. *Guess?, Inc.*, 339 NLRB 432, 434 (2003); *National Telephone Directory Corp.*, 319 NLRB 420 (1995). Each interrogation by Gecewich of Ortiz and Moran was unlawful as Respondent has not "demonstrated that its need for the information justifies compromising its employees' Section 7 right to confidentiality." *Guess?*, supra at 435. Gecewich clearly knew that the Workday profile screenshots arose from employees testifying on behalf of Tesla at a California State Assembly hearing. Gecewich knew there was a union organizing campaign as well and that Moran and Ortiz were prominent in this campaign. Moreover, after Gecewich investigated Workday, Gecewich knew that it more likely than not that Moran sent the screenshots to Ortiz. Thus, there was no need to probe into the matter any further. Under the totality of the circumstances, Gecewich's actions were coercive and sought information from Ortiz and Moran about their protected concerted activity. Hence, I find that Respondent violated Section 8(a)(1) of the Act with each interrogation alleged at complaint paragraphs 8(b)(i) and 8(b)(ii).

### XIV. CONSOLIDATED COMPLAINT PARAGRAPH 6:[108] RESPONDENT

### VIOLATED SECTION 8(A)(1) OF THE ACT WITH ELON MUSK'S MAY 20, 2018 TWEET

The General Counsel alleges that Musk violated Section 8(a)(1) of the Act when he threatened employees with loss of stock options with this tweet on May 20, 2018:

> Nothing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues & give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets healthcare.

(GC Br. at 68–71). Respondent argues that Musk's tweet was privileged under Section 8(c) of the Act as well as the First Amendment, cannot be considered in isolation, that Tesla should not be liable for Musk's tweet, and his statement could not be considered a threat (R. Br. at 174–186).

The parties stipulated the following facts (Jt. Exh. 4):

> There are approximately 157,000,000 daily active Twitter accounts and over 336,000,000 monthly active Twitter accounts. Tweets may be viewed, reviewed, republished, or reported on or in Twitter, Facebook, radio, television, newspapers, news media, and various other print and social media platforms. Musk has approximately 22,700,000 followers on Twitter. There are approximately 82 Twitter accounts worldwide that have more Twitter followers than Musk. The Twitter handle, "@elonmusk," as Musk's personal Twitter account. Musk's Twitter account also displays a blue verified employee badge, which according to www.Twitter.com lets people know that an account of public interest is authentic. Musk has used the "@elonmusk" Twitter handle to tweet about Respondent's business decisions and plans, finances, production goals, personnel matters, and breaking news. Respondent has its own Twitter handle, "@Tesla," which is used to make company statements on behalf of Respondent. Twitter, and the use of tweets, is a commonly accepted form in which some companies announce news in lieu of, or in addition to, press releases.

On May 20, 2018, Musk (@elonmusk) tweeted the following in response to three Twitter accounts:

> About 2% of Tesla, incl salaried & hourly, union and non-union were let go in annual review. Only known union person fired was a guy who repeatedly threatened non-union supporters verbally & on social media & lied about it.

(GC Exh. 38).[109] Also on May 20, 2018, Musk (@elonmusk) tweeted, replying to @dmatkins137 @ShayneRarma @NASA:

> Nothing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues & give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets healthcare.

(GC Exh. 56). Several media outlets reported Musk's tweets (R. Exh. 45).[110] On May 23, 2018, Musk tweeted in response to

---

[108] This complaint arises from case 32–CA–220777 which was consolidated into this matter.

[109] This tweet appears to refer to Respondent's termination of Ortiz. I note that Musk provides a completely different justification for why Ortiz was terminated.

[110] In these media articles, the authors' noted responses from a Tesla's spokesperson (R. Exh. 45). A Tesla spokesperson noted that Musk's tweet was "simply recognition of the fact that unlike Tesla, we're not aware of a single UAW-represented automaker that provides stock options or restricted unit to their production employees, and UAW

another tweet, "Exactly. UAW does not have individual stock ownership as part of the compensation at any other company." (R. Exh. 45(a)). Toledano testified that she followed Musk's tweets "to make sure our CEO was not tweeting dumb stuff" and understood that Musk tweeted on behalf of Tesla (Tr. 953–654).

Musk sent the two May 20, 2018 tweets, as stated above, from his #@elonmusk Twitter handle, which are still posted and viewable by the public. On Twitter, replies to tweets that are part of the same "thread" or conversation are indicated by replying to a Twitter account's username with "a@," i.e. "@elonmusk."

From May 20 to 23, 2018, Musk and several other Twitter users engaged in a "thread" which included the tweet which the General Counsel alleges is a threat (GC Exhs. 56, 69). The Twitter users included "@dmatkins137," which is associated with an individual named David Atkins, "@ericbrownzzz," which is associated with an individual named Eric Brown, "@Parker-Molloy," which is associated with an individual named Parker Molloy, "@jackallisonLOL," which is associated with an individual named Jack Allison, "@jAltWouss," which is associated with an individual named Wooter.

It is not possible to identify or determine the determine the number of individuals that viewed the tweets identified above across Twitter, Facebook, radio, television, newspapers, news media, and various other print and social media platforms. It is also not possible to know or determine if every individual that viewed the alleged unlawful tweet by Musk also viewed Musk's tweets in the thread. It is known that the tweets by Musk, identified in General Counsel Exhibits 38, 56, and 69, were republished and disseminated; however, it is not possible to determine the full extent to which Musk's tweets, as set forth in General Counsel Exhibits 38, 56, and 69, were republished or otherwise disseminated via Twitter, Facebook, radio, television, newspapers, news media, and various other print and social media platforms.

*Legal Analysis*

The test to determine if a statement violates Section 8(a)(1) is whether "under all circumstances" the remark "reasonably tends to restrain, coerce, or interfere with the employee's rights guaranteed under the Act. *GM Electrics*, 323 NLRB 125, 127 (1997). Motivation nor actual effects are considered. *Miller Electric Pump & Plumbing*, 334 NLRB 824, 825 (2001). An employer violates Section 8(a)(1) of the Act by threatening employees with adverse consequences for engaging in union activities. *NLRB v. Gissel Packing Co.*, supra at 618–619. An employer is free to communicate to his employees any of his general views on unionism or any of his specific views about a union per Section 8(c) of the Act so long as the communications do not contain a threat of reprisal or force or promise of benefit. An employer's prediction concerning what will happen if employees unionize "must carefully be phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control." *Gissel*, supra at 618. If there is any implication that an employer may act on his own initiative unrelated to economic necessities, "the statement is no longer a reasonable

prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment." Id.

Here, Musk's tweet was sent out to 22,700,000 followers on Twitter, some of whom are employees of Tesla. Musk's tweet can only be read by a reasonable employee to indicate that if the employees vote to unionize that they would give up stock options. Musk threatened to take away a benefit enjoyed by the employees consequently for voting to unionize. The Board has held that statements reflecting the possible loss of existing benefits through good faith bargaining does not constitute an unlawful threat of the loss of existing benefits. *Wild Oats Markets, Inc.*, 344 NLRB 717, 717–718 (2005) (no threat where employer communicated to employees in a flyer that employees could lose benefits during collective bargaining). In contrast, Musk's statement cannot be read as an outcome that could occur due to good-faith collective bargaining but instead made this statement as a threat of unilateral discontinuation of existing benefits if the employees unionized. *Medical Center of Ocean County*, 315 NLRB 1150, 1154 (1994) (threat where statement to employees that "[y]ou could lose your benefits" was susceptible to interpretation that employer intended to discontinue existing benefit prior to bargaining). Musk did not reference collective bargaining or express that the loss of stock options could be a result of negotiations. Musk presented no objective facts to support his statement that employees would lose their stock options. In *Dyncorp*, 343 NLRB 1197, 1198–1199 (2004), the Board found that Respondent unlawfully threatened employees with the loss of employer stock contribution monies if the employees chose union representation. Musk's statement indicates that employees would lose stock options if they voted to unionize. Thus, his statement was not a prediction carefully phrased based on objective fact to convey Respondent's belief as to probable consequences beyond its control, and I find his statement violates Section 8(a)(1). Consequently, Musk's tweet lost the protection of Section 8(c) because Musk implied that Tesla would act on its own initiative to remove stock options if the employees chose to unionize.

As its affirmative defense, Respondent argues that Musk's Twitter account is his own and his message was directed to a non-employee of Tesla. However, the parties stipulated that Musk has over 22 million Twitter followers who would have seen the unlawful tweet; these followers included employees and nonemployees. With Twitter, who views comments is unclear. This dissemination is akin to a company official issuing a press release to the public where anyone including employees may read the statement. See *Vemco, Inc.*, 304 NLRB 911, 925 (1991) (press release broadcast to the public sufficiently communicated to the employees). In addition, the parties stipulated that Twitter, and the use of tweets, is a commonly accepted form in which some companies announce news in lieu of, or in addition to, press releases. Moreover, Toledano testified that she understood Musk to tweet on behalf of Tesla. It is important to note that Respondent presented no evidence that Tesla disavowed any of Musk's tweets about the company. But even if Respondent had done so, under existing Board law, as discussed previously,

organizers have consistently dismissed the value of Tesla equity as part of our compensation package" (R. Exh. 45(a)).

Tesla is liable for a Section 2(11) supervisor's actions—Musk who is CEO of the company. Furthermore, Respondent also argues that Musk's tweet is protected by the First Amendment, and that Tesla should not be held liable for his opinion. However, in *Gissel*, the Supreme Court specifically set forth that a statement loses the protection of the First Amendment if the statement is based on misrepresentation regarding the consequences of bargaining if the employees unionized. Musk is Tesla's highest-ranking officer, and Respondent cannot divorce itself from Musk's comments. Again, in as much as employers are responsible for a supervisor's conduct in the workplace, Tesla is responsible for Musk's comments in this instance where there is an allegation of an unlawful threat. See *Glenroy Construction Co.*, 215 NLRB 866, 867 (1974) (employer violated the Act based on supervisor's unauthorized and "personal" statement), enfd. 527 F.2d 465 (7th Cir. 1975).

Respondent argues that Musk's entire Twitter "course of conduct" should be considered, and if not considered, Musk's Twitter statement in isolation is not a threat. In the context of the union organizing campaign, which had been active for at the least the prior year, any employee reading Musk's statement would reasonably conclude that Musk threatened to remove employee stock options if the employees chose unionization. Based on my research, this issue of whether Musk's Twitter statement could violate Section 8(a)(1) of the Act is an issue of first impression. I choose to analyze this issue similarly to how the Board has handled other social media matters, specifically with Facebook. The Board has recognized that employees have increasingly been using social media to communicate with one another about work. See *Triple Play Sports*, supra (Facebook "likes" may be protected activity); *Knauz BMW*, 358 NLRB 1754 (2012) (employee posted photos and comments to Facebook); *Hispanics United of Buffalo*, 359 NLRB 368, 368 (2012) (employees unlawfully discharged for their responses to coworkers' criticisms of their job performance). In my view, an analysis of a supervisor's statement on Twitter should be no different. In *Miklin Enterprises.*, 361 NLRB 283, 290 (2014), the Board found that postings by two supervisors on an antiunion Facebook page violated Section 8(a)(1) of the Act where the supervisors encouraged employees to harass an employee for his union activity. In that instance, the Facebook page was "open" like the openness of Twitter posts, which are accessible to anyone. Likewise, here, Musk's statement violated Section 8(a)(1) as described in complaint paragraph 6.

CONCLUSIONS OF LAW

1. Respondent, Tesla, Inc., has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Union, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO, has been a labor organization within the meaning of Section 2(5) of the Act.

3. Respondent committed unfair labor practices in violation of Section 8(a)(1) of the Act by:

(a) Maintaining and enforcing a rule on February 10, 2017 and May 24, 2017, that in the absence of legitimate business reasons, prohibits off duty employees from distributing union literature in the employees' parking lot.

(b) Promulgating a rule on March 23, 2017, prohibiting employees from distributing union stickers, leaflets, and pamphlets without first obtaining permission, and threatening discipline if failing to do so.

(c) Interrogating employees about their union activities on May 24, 2017.

(d) Soliciting grievances from employees about safety concerns and impliedly promising to remedy them on June 7, 2017, during meeting with Respondent's chief executive officer and chief people officer during a union organizing campaign.

(e) Informing employees during meeting with Respondent's chief executive officer and chief people officer on June 7, 2017, that it would be futile to vote in favor of the Union by telling them that they have no voice with the Union.

(f) Maintaining and enforcing a rule in August 2017, prohibiting employees from wearing union insignia showing support for the Union or any other labor organization.

(g) Informing an employee in August 2017, that it would be futile to vote for the Union.

(h) Interrogating employees in September and October 2017, about their union activities.

(i) Promulgating a rule regarding Workday in response to protected concerted activity in October 2017.

(j) Threatening employees on May 20, 2018, with loss of stock options if they vote in favor of the Union.

4. By terminating Richard Ortiz on October 18, 2017, and disciplining Jose Moran on October 19, 2017, Respondent violated Section 8(a)(3) and (1) of the Act.

5. The unfair labor practices found affect commerce within the meaning of Section 2(6) and (7) of the Act.

6. All other allegations of the complaint are dismissed.

REMEDY

Having found that Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act. Having found that Respondent has violated Section 8(a)(1) of the Act by maintaining and enforcing a rule on February 10 and May 24, 2017, that, in the absence of legitimate business reasons, prohibits off-duty employees from distributing union literature in the employees' parking lot, I shall order that Respondent rescind the rule. Having found that Respondent has violated Section 8(a)(1) of the Act by promulgating a rule on March 23, 2017, prohibiting employees from distributing union stickers, leaflets, and pamphlets without first obtaining permission, and threatening discipline if failing to do so, I shall order that Respondent rescind the rule. Having found that Respondent has maintained and enforced a rule in August 2017 prohibiting employees from wearing union insignia showing support for the Union or any other labor organization, I shall order that Respondent rescind the rule. Having found that Respondent has violated Section 8(a)(1) of the Act by promulgating a rule in October 2017, regarding Workday in response to protected concerted activity, I shall order that Respondent rescind the rule.

Respondent, having discriminatorily disciplined Jose Moran, must rescind the disciplinary action and remove all references from his personnel files. Respondent, having discriminatorily

terminated Richard Ortiz, must offer him reinstatement and make him whole for any loss of earnings and other benefits. Backpay shall be computed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010). In accordance with *King Soopers, Inc.*, 364 NLRB No. 93 (2016), Respondent shall compensate Richard Ortiz for his search-for-work and interim employment expenses regardless of whether those expenses exceed interim earnings, and such expenses shall be calculated separately from taxable net backpay, with interest at the rate prescribed in *New Horizons*, supra, compounded daily as prescribed in *Kentucky River Medical Center*, supra.

In accordance with *Don Chavas, LLC d/b/a Tortillas Don Chavas*, 361 NLRB 101 (2014), Respondent shall compensate Richard Ortiz for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and, in accordance with *AdvoServ of New Jersey, Inc.*, 363 NLRB 1324 (2016), Respondent shall, within 21 days of the date the amount of backpay is fixed either by agreement or Board Order, file with the Regional Director for Region 32 a report allocating backpay to the appropriate calendar year(s). The Regional Director will then assume responsibility for transmitting the report to the Social Security Administration at the appropriate time and in the appropriate manner.

The General Counsel also requests that I order Respondent to reimburse Richard Ortiz for consequential economic harm incurred by him as a result of its unlawful conduct, a remedy not traditionally included in Board orders (GC Br. at 109). See *Operating Engineers Local 513 (Long Construction Co.)*, 145 NLRB 554 (1963). I am obligated to following existing Board precedent, and thus, decline to recommend this remedy. See *Pathmark Stores, Inc.*, 342 NLRB 378, 378 fn. 1 (2004); *Waco, Inc.*, 273 NLRB 746, 749 fn. 14 (1984).

I will order that the employer post a notice at the Fremont facility in the usual manner, including electronically to the extent mandated in *J. Picini Flooring*, 356 NLRB 11, 15–16 (2010). In accordance with *J. Picini Flooring*, the question as to whether an electronic notice is appropriate should be resolved at the compliance phase. Id. supra at 13.

The General Counsel requests that I order that the notice be read aloud with the presence of security guards, managers and supervisors and the Union, if requested (GC Br. at 104–106). The Board has recognized that notice reading is an extraordinary remedy but, in this instance, I believe the facts present themselves to support such a request. *Sysco Grand Rapids, LLC*, 367 NLRB No. 111 (2019). Respondent by numerous supervisors and agents, including its chief executive officer and chief people officer committed many violations of the Act. See *Stern Produce Co.*, 368 NLRB No. 31, slip op. at 5 (2019) (citing *North Memorial Health Care*, 364 NLRB No. 61, slip op. at 1 (2016) (notice reading appropriate in part due to high-ranking responsible management officials in unfair labor practices), enfd. in

relevant part 860 F.3d 639 (8th Cir. 2017). Such pervasive unlawful conduct, as described and found herein, warrants a broad cease-and-desist order and a notice reading. Such a public reading of the notice will serve to reassure employees that that their employer and its managers are bound by the Act's requirements. *Homer D. Bronson Co.*, 349 NLRB 512, 515 (2007) (and cited cases), enfd. mem. 273 Fed.Appx. 32 (2d Cir. 2008).

Accordingly, I recommend that Respondent be ordered to convene its employees and have Elon Musk (or, if he is no longer the chief executive officer, a high-ranking management official), in the presence security guards, managers and supervisors, a Board agent and an agent of the Union, if the Region and/or the Union so desire, read the notice aloud to employees, or, at Respondent's option, permit a Board agent, in the presence Musk, to read the notice to the employees at the Fremont facility only. See *Bozzuto's, Inc.*, 365 NLRB No. 146, slip op. at 5 (2017). I do not order a notice reading at the Sparks facility as no violations of the Act occurred there.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[111]

ORDER

Respondent, Tesla, Inc., Palo Alto, California, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining and enforcing a rule that, in the absence of legitimate business reasons, prohibits off-duty employees from distributing union literature in the employees' parking lot.

(b) Promulgating a rule prohibiting employees from distributing union literature, leaflets, and pamphlets without first obtaining permission, and threatening discipline if failing to do so.

(c) Interrogating employees about their union activities.

(d) Soliciting grievances from employees about safety concerns and impliedly promising to remedy them.

(e) Informing employees that it would be futile to vote for the Union.

(f) Maintaining and enforcing a rule prohibiting employees from wearing union insignia showing support for the union or any other labor organization.

(g) Promulgating a rule regarding Workday in response to protected concerted activity.

(h) Threatening employees with loss of benefits if vote in favor of the Union.

(i) Terminating and disciplining any employee because of their support for the Union or any other labor organization.

(j) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind the rule orally announced to off-duty employees on February 10, 2017 and May 24, 2017, which prohibited employees from distributing on their nonwork time union literature in the employees' parking lot.

---

[111] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

(b)  Rescind the rule orally announced to employees on March 23, 2017, which prohibited employees from distributing union stickers, leaflets, and pamphlets without first obtaining permission and threatening discipline if failed to do so.

(c)  Rescind a rule prohibiting employees from wearing union insignia showing support for the Union or any other labor organization.

(d)  Rescind a rule regarding Workday which was promulgated in response to protected concerted activity in October 2017.

(e)  Within 14 days of the date of the Board's Order, remove from its files any reference to the unlawful warning issued to Jose Moran, and within 3 days thereafter, notify the employee in writing that this has been done and that the warning will not be used against him in any way.

(f)  Within 14 days of the date of the Board's Order, offer Richard Ortiz full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

(g)  Make Richard Ortiz whole for any loss of earnings and other benefits suffered as a result of the discrimination against him, in the manner set forth in the remedy section of this decision.

(h)  Compensate Richard Ortiz for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 32, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year.

(i)  Within 14 days of the date of the Board's Order, remove from its files any reference to the unlawful termination, and within 3 days thereafter, notify the employee in writing that this has been done and that the termination will not be used against him in any way.

(j)  Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(k)  Within 14 days after service by the Region, post at its facility in Fremont, California, the attached notice marked "Appendix"[112] on forms provided by the Regional Director for Region 32, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such

means.  Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material.  If, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since February 10, 2017.

(l)  Within 14 days after service by the Region, hold a meeting or meetings, at the Fremont facility, scheduled to ensure the widest possible attendance, at which the "Notice to Employees" is to be read to the employees by Respondent's chief executive officer, Elon Musk or at Respondent's option, by a Board agent in the presence of Musk, along with security guards, managers and supervisors.  If Musk is no longer an owner or officer of the Respondent, then the Respondent shall designate another owner or officer to conduct or be present for the reading.

(m)  Within 21 days after service by the Region, file with the Regional Director for Region 32 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the complaint allegations are dismissed insofar as they allege violations of the Act not specifically found.

Dated, Washington, D.C.  September 27, 2019

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT maintain and enforce a rule that, in the absence of legitimate business reasons, prohibits off-duty employees from distributing union literature in the employees' parking lot.

WE WILL NOT promulgate a rule that prohibits you from distributing union stickers, leaflets, and pamphlets without receiving permission, and threatening discipline if you fail to do so.

WE WILL NOT coercively question you about your union activities.

WE WILL NOT solicit your grievances and impliedly promise to remedy them in order to discourage union support or activity.

WE WILL NOT inform you that it is futile to support the

---

[112]  If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the

United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

TESLA, INC.                                                                                                55

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO or any other union.

WE WILL NOT maintain and enforce a rule that prohibits you from wearing union insignia to show your support for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO or any other labor organization.

WE WILL NOT promulgate a rule regarding Workday in response to protected concerted activity.

WE WILL NOT threaten employees with loss of benefits if you vote in favor of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO, or any other labor organization.

WE WILL NOT terminate and discipline any of you because you support the International Union, United Automobile, Aerospace and Agricultural Workers of America, AFL–CIO (UAW) or any other labor organization.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL rescind the rule orally announced to off-duty employees on February 10 and May 24, 2017, which prohibited them from distributing during their nonworking time union literature in the employees' parking lot.

WE WILL rescind an oral rule of March 23, 2017, that prohibits you from distributing union stickers, leaflets, and pamphlets without receiving permission, and threatening discipline if you fail to do so.

WE WILL rescind a rule that prohibits you from wearing union insignia to show your support for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO or any other labor organization.

WE WILL rescind a rule regarding Workday in response to protected concerted activity.

WE WILL, within 14 days from the date of the Board's Order, offer Richard Ortiz full reinstatement to his former job, and if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority rights or any other rights or privileges previously enjoyed.

WE WILL make Richard Ortiz whole for any loss of earnings and other benefits resulting from his termination, less any net interim earnings, plus interest, and WE WILL make him whole for reasonable search-for-work and interim employment expenses, plus interest.

WE WILL within compensate Richard Ortiz for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region 32, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar years.

WE WILL, within 14 days from the date of the Board's Order, remove from our files any reference to the unlawful termination and discipline of Richard Ortiz and Jose Moran, and WE WILL, within 3 days thereafter, notify them in writing that we have done so and that we will not use the termination and discipline against them in any way.

TESLA, INC.

The Administrative Law Judge's decision can be found at https://www.nlrb.gov/case/32-CA-197020 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273–1940.



UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| TESLA, INC.,<br><br>    Respondent,<br><br>    and<br><br>MICHAEL SANCHEZ, an individual,<br>JONATHAN GALESCU, an individual,<br>RICHARD ORTIZ, an individual, and<br>INTERNATIONAL UNION, UNITED<br>AUTOMOBILE, AEROSPACE AND<br>AGRICULTURAL IMPLEMENT<br>WORKERS OF AMERICA, AFL-CIO, a<br>labor organization,<br><br>    Charging Parties. | Case Nos.   32-CA-197020<br>32-CA-197058<br>32-CA-197091<br>32-CA-197197<br>32-CA-200530<br>32-CA-208614<br>32-CA-210879<br>32-CA-220777 |

**CHARGING PARTIES' RESPONSE BRIEF**

SCHWARTZ, STEINSAPIR, DOHRMANN &
  SOMMERS LLP
MARGO A. FEINBERG
DANIEL E. CURRY
6300 Wilshire Boulevard, Suite 2000
Los Angeles, California 90048-5268
Telephone: (323) 655-4700
Attorneys for Charging Parties MICHAEL
SANCHEZ, JONATHAN GALESCU,
RICHARD ORTIZ, and INTERNATIONAL
UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA,
AFL-CIO

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................... ii

I      PRELIMINARY STATEMENT ................................................................. 1

II     ARGUMENT ............................................................................................... 2

        A.    *STABILUS* IS CONSISTENT WITH SEVENTY-FIVE YEARS OF BOARD LAW ON EMPLOYERS' WORKPLACE APPAREL POLICIES ................................................................................. 2

        B.    THE SPECIAL CIRCUMSTANCES TEST APPLIES TO FACIALLY NEUTRAL EMPLOYER POLICIES .......................... 4

        C.    *REPUBLIC AVIATION* AND *STABILUS* ALLOW EMPLOYERS TO OFFER WHATEVER EVIDENCE THEY HAVE TO DEFEND THEIR POLICIES ........................................... 6

        D.    *BOEING* DOES NOT APPLY TO THIS CASE ........................... 8

III    CONCLUSION ........................................................................................... 9

22-60493.6578

# TABLE OF AUTHORITIES

**Page**

## CASES

### Judicial Decisions

*Central Hardware Co. v. NLRB*, 407 U.S. 539 (1972) ................................................ 8

*NLRB v. F.W. Woolworth Co*., 214 F.2d 78 (6th Cir. 1954) ........................................ 8

*Republic Aviation Corp. v. NLRB,* 324 U.S. 793 (1945) ...................................... *passim*

### National Labor Relations Board

*Aldworth Co*., 338 NLRB 137 (2002), *enforced sub nom. Dunkin' Donuts Mid-Atlantic Distribution Center v. NLRB*, 363 F.3d 437 (D.C. Cir. 2004) ........................... 3

*Andrews Wire Corp*., 189 NLRB 108 (1971) ............................................................... 2

*BellSouth Telecommunications*, 335 NLRB 1066 (2001), *enforcement denied sub nom. Lee v. NLRB*, 393 F.3d 491 (4th Cir. 2005) ...................................................... 2-3

*Boch Imports, Inc.*, 362 NLRB 706, 707-08, 716 (2015), *enforced*, 826 F.3d 558 (1st Cir. 2016) ..................................................................................................... 3

*Casa San Miguel, Inc.*, 320 NLRB 534 (1995) ............................................................ 3

*Con-Way Central Express*, 333 NLRB 1073 (2001) .................................................... 2

*De Vilbiss Co*., 102 NLRB 1317 (1953) ....................................................................... 2

*Great Plains Coca-Cola Bottling Co*., 311 NLRB 509 (1993) .................................... 2

*Komatsu America Corp*., 342 NLRB 649 (2004) .......................................................... 3

*Le Tourneau Co*., 54 NLRB 1253 (1944) ..................................................................... 6

*Malta Construction Co*., 276 NLRB 1494 (1985), *enforced*, 806 F.2d 1009 (11th Cir. 1986) ................................................................................................... 2

*Medco Health Solutions of Las Vegas, Inc*., 364 NLRB No. 115 (2016) ..................... 3

*Meijer, Inc*., 318 NLRB 50 (1995), *enforced*, 130 F.3d 1209 (6th Cir. 1997) ......... 2-3

*Noah's New York Bagels, Inc.*, 324 NLRB 266 (1997) ................................................ 3

*North Hills Office Services, Inc.*, 346 NLRB 1099 (2006) .......................................... 3

ii

**TABLE OF AUTHORITIES (cont.)**

**CASES (cont.)**

**National Labor Relations Board (cont.)**

*P.S.K. Supermarkets, Inc.*, 349 NLRB 34 (2007) ............................................................ 3

*Produce Warehouse of Coram, Inc.*, 329 NLRB 915 (1999) ........................................ 2

*Quantum Electric, Inc.*, 341 NLRB 1270 (2004) ............................................................ 3

*Republic Aviation Corp.*, 51 NLRB 1186 (1943) ........................................................... 6

*Sam's Club*, 349 NLRB 1007 (2007) ............................................................................ 3

*Stabilus, Inc.*, 355 NLRB 836 (2010) ................................................................... *passim*

*Standard Oil Co.*, 168 NLRB 153 (1967) ...................................................................... 2

*The Boeing Company*, 365 NLRB No. 154 (2017) .................................................... 1, 8

*The Broadway*, 267 NLRB 385 (1983) ......................................................................... 2

*United Parcel Service*, 195 NLRB 441 (1972) .............................................................. 2

*Wal-Mart Stores, Inc.*, 368 NLRB No. 146 (2019) .................................................... 3-4

**STATUTES**

**National Labor Relations Act, 29 U.S.C. § 151 *et seq.***

Section 7 ................................................................................................... *passim*

Section 8(a)(1) ......................................................................................... *passim*

22-60493.6580

# I

## PRELIMINARY STATEMENT

The special circumstances rule upheld in *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945) and followed by scores of cases, including *Stabilus, Inc*., 355 NLRB 836 (2010), over the last seventy-five years, should govern this case. As the Supreme Court took pains to emphasize in *Republic Aviation*, a rule that bars employees from communicating with one another about issues of mutual concern violates Section 8(a)(1), even if that rule is neutral on its face and has been applied in an even-handed fashion, unless the employer can prove that special circumstances justify the interference. 324 U.S. at 805. *Stabilus* did not announce a new rule or modify *Republic Aviation*. The Board should likewise decline to do so here.

This case shows, moreover, why the special circumstances rule continues in force so many years after *Republic Aviation* was decided. Respondent Tesla, Inc. ("Tesla" or "the Employer") was given every opportunity to show that special circumstances justified its application of the Team Wear policy to the UAW t-shirts in this case, but completely failed to do so. That should be the end of the inquiry.

Tesla insists, however, that the Board reject *Republic Aviation* and the seventy-five years of case law following it and instead apply the three-tier analysis set forth in *The Boeing Company*, 365 NLRB No. 154 (2017). Alternatively, Tesla argues that its Team Wear policy is lawful under *Republic Aviation*, even without a finding of special circumstances, because:

- *Stabilus*' discussion of the need to prove special circumstances was merely dictum, which the Board can safely ignore in this case;

- *Stabilus* "gives no weight to the legitimate interests that employers have for maintaining facially neutral uniform policies, allowing employees to totally disregard such policies, their employer's legitimate business interests notwithstanding"; and

- *Republic Aviation* itself is inapplicable because "because Tesla's facially neutral Team Wear Policy neither explicitly bans NLRA-protected conduct nor has it

1

been applied in a discriminatory fashion to single out the wearing of union apparel or insignias for adverse treatment (unlike the employers in *Republic Aviation* and *Stabilus*)."

Each of these claims by Tesla is demonstrably false. Their total lack of merit demonstrates why both *Republic Aviation* is applicable here and why *Stabilus* is correct and should not be overruled or recharacterized.

## II

## ARGUMENT

### A.   *STABILUS* IS CONSISTENT WITH SEVENTY-FIVE YEARS OF BOARD LAW ON EMPLOYERS' WORKPLACE APPAREL POLICIES

Tesla begins by arguing that *Stabilus* is not entitled to any precedential weight in this case because its discussion of the special circumstances test was mere dictum. That argument might have at least superficial merit if *Stabilus* really were the only case in the last seventy-five years to apply *Republic Aviation* to an employer's workplace apparel policy. As it turns out, that is untrue.

On the contrary, *Stabilus* is just one of many decisions in a long line of cases that have held that employers' workplace apparel policies must meet the Supreme Court's *Republic Aviation* special circumstances test when they prohibit employees from wearing t-shirts, hats, jackets, or other items of apparel that comment on rights protected by Section 7. *See, e.g.*, *De Vilbiss Co.*, 102 NLRB 1317, 1321-22 (1953) (no special circumstances found); *Standard Oil Co.*, 168 NLRB 153 n.1 (1967) (special circumstances found); *Andrews Wire Corp.*, 189 NLRB 108, 109 (1971) (special circumstances found); *United Parcel Service*, 195 NLRB 441, 449-50 (1972) (special circumstances found); *Malta Construction Co.*, 276 NLRB 1494, 1494-95 (1985), *enforced*, 806 F.2d 1009 (11th Cir. 1986) (no special circumstances found); *The Broadway*, 267 NLRB 385, 404-05 (1983) (no special circumstances found); *Great Plains Coca-Cola Bottling Co.*, 311 NLRB 509, 515 (1993) (no special circumstances found); *Meijer, Inc.*, 318 NLRB 50, 51 (1995), *enforced*, 130 F.3d 1209 (6th Cir. 1997) (no special circumstances

2

found in part); *Casa San Miguel, Inc.*, 320 NLRB 534, 540 (1995) (special circumstances found); *Noah's New York Bagels, Inc.*, 324 NLRB 266, 275 (1997) (special circumstances found); *Produce Warehouse of Coram, Inc.*, 329 NLRB 915, 917-18 (1999) (special circumstances found); *Con-Way Central Express*, 333 NLRB 1073, 1076 (2001) (special circumstances found); *BellSouth Telecommunications*, 335 NLRB 1066, 1068-71 (2001) (special circumstances found), *enforcement denied sub nom. Lee v. NLRB*, 393 F.3d 491, 494-97 (4th Cir. 2005) (no special circumstances found); *Aldworth Co*., 338 NLRB 137, 203 (2002), *enforced sub nom. Dunkin' Donuts Mid-Atlantic Distribution Center v. NLRB*, 363 F.3d 437 (D.C. Cir. 2004) (no special circumstances found); *Quantum Electric, Inc*., 341 NLRB 1270, 1280 (2004) (no special circumstances found); *Komatsu America Corp*., 342 NLRB 649, 650 (2004) (special circumstances found); *North Hills Office Services, Inc.*, 346 NLRB 1099, 1113-14 (2006) (no special circumstances found); *P.S.K. Supermarkets, Inc.*, 349 NLRB 34, 35 (2007) (no special circumstances found); *Sam's Club*, 349 NLRB 1007, 1011-12 (2007) (special circumstances found); *Boch Imports, Inc.*, 362 NLRB 706, 707-08, 716 (2015), *enforced*, 826 F.3d 558 (1st Cir. 2016) (no special circumstances found); *Medco Health Solutions of Las Vegas, Inc*., 364 NLRB No. 115, slip op. at 3-7 (2016) (no special circumstances found). Focusing on *Stabilus* as if it were an aberration, when in fact it applies the standard that the Board has been employing since the 1940s, is completely wrong-headed.

Furthermore, Tesla's insistence that *Stabilus*' application of *Republic Aviation* is mere dictum is disingenuous. Tesla is correct that the Board declared that it need not reach the "special circumstances" issue in that case because of the evidence of disparate application of the rule. *Stabilus*, 355 NLRB at 838. But it first carefully laid out the special circumstances rule and stated unequivocally that the employer had not made the necessary showing to defend the rule— enough to affirm the Administrative Law Judge's decision on that point alone if it had chosen to do so. *Id*. at 837-38.

Tesla also claims that the Board reversed *Stabilus sub silentio* in *Wal-Mart Stores, Inc*., 368 NLRB No. 146 (2019). But far from rejecting *Stabilus*, the Board applied the special

3

circumstances test in upholding the employer's policy on buttons[1] as applied to employees in customer-contact areas while at the same time overturning the policy as applied to the loading dock and other non-contact areas as not "narrowly tailored to serve [Wal-Mart's] legitimate business justifications"—another way of stating the special circumstances test. While the Board may have reached a different conclusion than the Administrative Law Judge did on whether the employer's rule actually passed the special circumstances test, it did not reject the test, as Tesla has asked this Board to do.

But even if Tesla could dispose of *Stabilus* on the grounds that it is dicta or has been reversed *sub silentio*, it cannot do the same to *Republic Aviation* or to the dozens of Board decisions applying *Republic Aviation* to employers' workplace apparel policies. Those cases, as argued below, show that Tesla is wrong and *Stabilus* is right.

## B.    THE SPECIAL CIRCUMSTANCES TEST APPLIES TO FACIALLY NEUTRAL EMPLOYER POLICIES

Tesla goes on to argue that *Stabilus* and all the other cases applying *Republic Aviation* to a workplace attire policy are irrelevant because Tesla did nothing more than maintain a facially neutral policy. Both the premise and the conclusion are wrong.

First of all, Tesla did not merely maintain a workplace attire policy; it enforced that policy against workers wearing UAW t-shirts, even though those shirts were "not substantially different" from the black t-shirts distributed by Tesla and had been worn by employees for several months without incident before Tesla decided to forbid them. Ignoring those facts will not make them go away.

Tesla and its *amici* insist, however, that *Republic Aviation* stands for the proposition that the special circumstances test only applies to rules that are either discriminatory on their face or

---

[1] That policy did not bar employees from wearing whatever pins they chose—including one that condemned Wal-Mart in Biblical terms for not providing its "slaves" with "what is right and fair"—but only restricted their size. That rule was not only content-neutral, but unrelated to content altogether, unlike the workplace apparel policy in this case, which Tesla has applied to prohibit all union t-shirts.

22-60493.6584

have been applied in a discriminatory manner. (Tesla Brief at 13-14) In fact *Republic Aviation* held just the opposite.

There were two separate Board decisions before the Court in *Republic Aviation*: the Board's decision involving *Republic Aviation Corp.*, 51 NLRB 1186 (1943) and its decision in *Le Tourneau Co.*, 54 NLRB 1253 (1944). The Board opened its decision by giving the history of Republic Aviation's rule:

> In the Republic Aviation Corporation case, ***the employer***, a large and rapidly growing military aircraft manufacturer, ***adopted, well before any union activity at the plant, a general rule against soliciting*** which read as follows:
>
> "Soliciting of any type cannot be permitted in the factory or offices."
>
> The Republic plant was located in a built-up section of Suffolk County, New York. An employee persisted after being warned of the rule in soliciting union membership in the plant by passing out application cards to employees on his own time during lunch periods. ***The employee was discharged*** for infraction of the rule and, as the National Labor Relations Board found, ***without discrimination on the part of the employer toward union activity***.

324 U.S. at 794-95 (emphasis added). The Court also set out the history of Le Tourneau's no-solicitation policy:

> [T]wo employees were suspended two days each for distributing union literature or circulars on the employees' own time on company owned and policed parking lots, adjacent to the company's fenced-in plant, in violation of ***a long standing and strictly enforced rule, adopted prior to union organization activity about the premises***, which read as follows: "In the future no Merchants, Concern, Company, or Individual or Individuals will be permitted to distribute, post, or otherwise circulate handbills or posters, or any literature of any description, on Company property without first securing permission from the Personnel Department."
>
> ***The rule was adopted to control littering and petty pilfering*** from parked autos by distributors. ***The Board determined that there was no union bias or discrimination by the company in enforcing the rule***.

*Id.* at 796-97. The Board nonetheless held that these rules violated Section 8(1) of the Wagner Act, notwithstanding (1) their facial neutrality and (2) their non-discriminatory enforcement. *Id.* at 795-96, 797. The Supreme Court upheld the Board's decisions in both cases after expressly noting the lack of any evidence of anti-union animus in either case.

According to Tesla, however, the Court did just the opposite. This is how Tesla describes the holding in *Republic Aviation*:

> . . . *Republic Aviation* also teaches that an employment policy like Tesla's Team Wear Policy that is neither explicitly aimed at NLRA protected-activity nor disparately enforced to ban protected conduct is a lawful management prerogative, falling outside the Act's prohibitions and *Republic*'s special circumstance requirement. . . . Thus, a facially neutral policy's promulgation and maintenance is presumptively lawful even though it may have some incidental effect on Section 7 conduct, absent evidence that the policy was adopted for a discriminatory purpose or enforced in a discriminatory manner.

(Tesla Brief at 13-14) As *Republic Aviation* itself shows, every statement in this passage is false.

This outrageous bit of historical revisionism speaks volumes about all of Tesla's arguments. Unable to find any support in existing case law, it simply invents an alternate world in which it always comes out on top. None of its arguments should be taken seriously.

## C.   *REPUBLIC AVIATION* AND *STABILUS* ALLOW EMPLOYERS TO OFFER WHATEVER EVIDENCE THEY HAVE TO DEFEND THEIR POLICIES

Tesla also claims that the *Stabilus* and cases like it have imposed "one-sided," "absolute," "categorical" and "outdated" requirements (Tesla Brief at 10) that ban facially neutral rules without regard to the facts on the ground. The long history of decisions in this area cited above shows just the opposite: the Board has not only considered employers' legitimate business concerns, but has, when circumstances warranted it, allowed them to limit employees' Section 7 rights to accommodate those needs.

That certainly was the case here, where the Administrative Law Judge gave Tesla every opportunity to offer evidence to support its claim that special circumstances justified its rule barring workers from wearing their own black t-shirts instead of the Tesla-supplied ones it insisted that they wear. All of the reasons that Tesla gave turned out, however, to be wholly unsupported. (See ALJD at 44-45) Tesla's claim that the special circumstances rule does not allow consideration of the facts of any particular case is, like its claim that the rule does not apply to facially neutral rules, a complete inversion of the truth.

6

Tesla and its *amici's* actual objection to the current standard is that the Board applies any scrutiny at all to what they consider their "fundamental" right to run their businesses as they see fit. Thus Tesla states:

> [R]equiring job-specific uniforms as a condition of employment is a fundamental managerial right that simply cannot be ignored.

(Tesla Brief at 10) Tesla does not offer any citation for where this "fundamental . . . right" can be found in the Act. Nor does it offer any explanation why its supposed fundamental right to order its employees to wear uniforms must always override employees' Section 7 rights when they conflict.

In fact there is no such fundamental right, as *Republic Aviation* illustrates. Employers can bar solicitation during "working time," but not during those "working hours" during which an employee is not actively at work. Likewise management can bar employees from wearing union apparel, but only if special circumstances justify that rule. Management's business needs deserve some consideration, but they are the beginning, not the end, of any special circumstances analysis. And management must back up its claims of special circumstances with evidence—which Tesla has unquestionably failed to do.

This case demonstrates, in fact, just how hollow Tesla's arguments are factually as well as legally. Tesla was given the opportunity to prove that its prohibition against UAW t-shirts met the special circumstances test. All of the reasons it offered—the need for visual identification of workers by department and minimizing the risk of damage to the vehicles—turned out to be completely unfounded as a matter of fact. (See ALJD at 45) Tesla lost on this issue because it had no facts to support its claims.[2]

---

[2] Tesla continues to argue, on the other hand, that "compelling business needs" justify its work apparel policy (Tesla Brief at 17), despite failing to offer evidence to prove that its needs are "compelling." This is remarkable for two reasons: (1) Tesla has effectively conceded that the special circumstances approach should govern this case, even while it asks the Board to reject it, (2) but it still insists that it should win even though it cannot muster any evidence that would support its position.

7

It is not surprising, therefore, that Tesla now claims that the Board should not require it to make any showing at all, but simply accept its claims on faith. That argument is not only contrary to more than seventy-five years of Board law, but at odds with simple common sense.

## D.     *BOEING* DOES NOT APPLY TO THIS CASE

Tesla argues that this case should be decided under the *Boeing* framework. That argument rests on a false premise, however: namely that employees' right to communicate with each other and to publicize their views on Section 7 issues is merely a secondary concern under the Act.

That is simply wrong. Employees' right to organize for mutual aid and protection depends on their ability to speak to one another about their mutual interests. And, as the Board and the Courts have recognized, the most important forum for those workers to exercise that right is the workplace itself, where those workers congregate and where their mutual concerns play out every day. *See NLRB v. F.W. Woolworth Co*., 214 F.2d 78, 90 (6th Cir. 1954). Those employee to employee communications are the motor that makes all of their other rights under the Act meaningful. *Central Hardware Co. v. NLRB*, 407 U.S. 539, 543 (1972) ("organization rights are not viable in a vacuum; their effectiveness depends in some measure on the ability of employees to learn the advantages and disadvantages of organization from others").

A rule barring workers from wearing union t-shirts is thus categorically different from a rule restricting their ability to take photographs or use foul language in the workplace. The first is pure, undistilled Section 7 activity, a fundamental right on which all other rights depend and which the Act protects from employer interference; the second is, at most, potentially but not necessarily related to Section 7 issues. A worker's choice to wear union insignia, whether it is a button or a t-shirt, is inescapably an act of organizing for mutual aid and protection. A worker's desire to take pictures or use foul language in the workplace is not.

*Boeing* is inapplicable to this case. The proper approach is set out in *Republic Aviation*, as developed over years of case law. It should be affirmed here.

//

//

8

**III**

**CONCLUSION**

For all the reasons set forth above, the Board should find that Tesla violated Section

8(a)(1) of the Act by barring its employees from wearing UAW t-shirts.

DATED: April 6, 2021              SCHWARTZ, STEINSAPIR, DOHRMANN
               & SOMMERS LLP
             MARGO A. FEINBERG
             DANIEL E. CURRY


By_____
         MARGO A. FEINBERG
        Attorneys for Charging Parties
    MICHAEL SANCHEZ, JONATHAN GALESCU,
     RICHARD ORTIZ, and INTERNATIONAL
   UNION, UNITED AUTOMOBILE, AEROSPACE
     AND AGRICULTURAL IMPLEMENT
     WORKERS OF AMERICA, AFL-CIO

22-60493.6589

1

## PROOF OF SERVICE BY ELECTRONIC MAIL

2

**Case No. 32-CA-197020 et al.**

3          RENEE CARNES certifies as follows:

4          I am employed in the County of Los Angeles, State of California; I am over the age of
eighteen years and am not a party to this action; my business address is 6300 Wilshire

5    Boulevard, Suite 2000, Los Angeles, California 90048-5202. My electronic notification address
is rac@ssdslaw.com.

6

7          On April 6, 2021, I caused the foregoing document(s) described as: **CHARGING
PARTIES' RESPONSE BRIEF**

8    be served by electronic mail upon the person(s) shown below,

9    Mark Ross, Esq.                                           Christy Kwon
     Keahn Morris, Esq.                                        Catherine Ventola
10   Sheppard, Mullin, Richter & Hampton LLP                   National Labor Relations Board, Region 32
     4 Embarcadero Center, Suite 17                            1301 Clay Street, Suite 300
11   San Francisco, CA 94111-4158                              Oakland, CA 94612
     e-mail: mross@sheppardmullin.com                          e-mail: catherine.ventola@nlrb.gov
12   e-mail: kmorris@sheppardmullin.com                        e-mail: christy.kwon@nlrb.gov

13

14     X   **BY E-MAIL:**  By transmitting a copy of the above-described document(s) via e-mail to
the individual(s) set forth above at the e-mail addressed indicated.

15

16          I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct.

17

18          Executed on April 6, 2021, at Los Angeles, California.

19                                                             _____
                                                                           RENEE CARNES
20

21

22

23

24

25

26

27

28

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| **TESLA, INC.** | |
| **and** | |
| **MICHAEL SANCHEZ, an Individual** | **Case No. 32-CA-197020** |
| **and** | |
| **JONATHAN GALESCU, an Individual** | **Case No. 32-CA-197058** |
| **and** | |
| **RICHARD ORTIZ, an Individual** | **Case No. 32-CA-197091** |
| **and** | |
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, AFL-CIO** | **Case No. 32-CA-197197**<br>**Case No. 32-CA-200530**<br>**Case No. 32-CA-208614**<br>**Case No. 32-CA-210879** |

## RESPONDENT TESLA, INC.'S REPLY BRIEF IN RESPONSE TO THE BOARD'S FEBRUARY 12, 2021 INVITATION TO FILE BRIEFS CONCERNING UNIFORM POLICIES

Mark S. Ross
mross@sheppardmullin.com
Keahn N. Morris
kmorris@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA  94111
Telephone:    (415) 434-9100

*Attorneys for Tesla, Inc.*

SMRH:4840-7192-9571.1

22-60493.6591

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND EXECUTIVE SUMMARY ..........................................................1

II.   LEGAL ANALYSIS .................................................................................................2

    A.    TESLA'S FACIALLY NEUTRAL TEAM WEAR POLICY DOES NOT "NECESSARILY" OR INHERENTLY BAN THE WEARING OF UNION BRANDED APPAREL ..............................................................2

    B.    SINCE ALL OF THE GC'S ENFORCEMENT ALLEGATIONS WERE FULLY LITIGATED AND FINALLY DISMISSED, THIS IS JUST A "MERE MAINTENANCE" CASE INVOLVING A FACIALLY NEUTRAL POLICY ..............................................................3

    C.    DUE PROCESS BARS THE OPPOSITION FROM RAISING NEW AND UNALLEGED ENFORCEMENT ISSUES THAT SO CLEARLY STRAY FROM THE COMPLAINT AND THAT WERE NEVER LITIGATED AT TRIAL ..............................................................4

    D.    *STABILUS'/REPUBLIC AVIATION*'S SPECIAL CIRCUMSTANCES TEST CANNOT BE APPLIED HERE BECAUSE TESLA'S TEAM WEAR POLICY WAS NOT MANIFESTLY PURPOSED OR APPLIED TO BAN THE WEARING OF UNION BRANDED APPAREL AND THE MERE MAINTENANCE OF THAT FACIALLY NEUTRAL UNIFORM POLICY IS THE SOLE ISSUE ..............................................................5

    E.    THERE IS NOTHING UNIQUE ABOUT FACIALLY NEUTRAL UNIFORM RULES; THEIR LAWFULNESS SHOULD BE DETERMINED UNDER THE BOARD'S *BOEING* DECISION AS IN THE CASE OF ANY OTHER FACIALLY NEUTRAL RULE ..............................7

III.  CONCLUSION ..............................................................................................7

22-60493.6592

# **TABLE OF AUTHORITIES**

**Page(s)**

Federal Cases

*Indiana Bell Telephone Company, Inc.*
  370 NLRB No. 93 (2021) ...................................................................................4, 5

*Republic Aviation Corp. v. NLRB*
  324 U.S. 793 (1945)...................................................................................1, 3, 5, 6

*Stabilus, Inc.*
  355 NLRB 836 (2010) .................................................................... *passim*

*The Boeing Company*
  365 NLRB No. 154 (2017) ...................................................................1, 4, 5, 7

*Wal-Mart Stores, Inc.*
  368 NLRB No. 146 (2019) .................................................................................7

*World Color*
  369 NLRB No. 104 (2020) .................................................................................7

## I.   INTRODUCTION AND EXECUTIVE SUMMARY

Counsel for the Acting General Counsel (GC), the Charging Party Union[1] and its amici[2] all seek to avoid the application of *Boeing*[3] here by making this case into something more than a mere maintenance case[4].  Contrary to the GC and the Union, Tesla's facially neutral Team Wear Policy does *not* "necessarily" or inherently ban the wearing of union branded apparel or the display of union insignia.  Nor does this case still present issues of Tesla's alleged enforcement of its Team Wear Policy to ban the wearing of union apparel or insignia.  Conveniently ignored by the Opposition is the fact that the ALJ considered, decided and rejected all the GC's complaint allegations pertaining to the Team Wear Policy's purported enforcement.  Since the GC and the Union failed to take exception to the Judge's decision as to the complaint's enforcement allegations, the train has left the station on this issue; alleged enforcement of Tesla's Team Wear Policy to ban the wearing of union apparel is no longer available to the Opposition to argue or subject to Board review.  Consequently, *Stabilus*[5] and, its progenitor, *Republic Aviation*[6], their presumption of invalidity and the "Special Circumstances" test should have no bearing on this case.  This remains but a mere maintenance case not subject to *Republic Aviation's* special circumstances test and one in which the facial validity of Tesla's content-neutral and presumptively valid Team Wear Policy is solely at issue.  Like any other content neutral rule, the facial validity of Tesla's Team Wear Policy should be measured against *Boeing*

---

[1] Rather than file its own brief, the Charging Party Union joined in the brief filed by Amicus AFL-CIO.  Because of that joinder, they are hereinafter collectively referred to as "the Union".  Likewise, the AFL-CIO's amicus brief is the Union's brief and, thus, hereinafter referred to as the Union's brief.

[2] The GC, the Union and its amici are hereinafter collectively referred to as "the Opposition".

[3] *The Boeing Company*, 365 NLRB No. 154 (2017) ("*Boeing*").

[4] Use of the phrase "mere maintenance case" here refers to cases in which the sole issue is whether an employer's promulgation or maintenance of a facially neutral rule, practice or policy interferes with NLRA-protected activity within the meaning of Section 8(a)(1) of the Act.

[5] *Stabilus, Inc.,* 355 NLRB 836, 838 (2010) ("*Stabilus*").

[6] *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945) ("*Republic Aviation*").

standards.  And, based on an application of those appropriate standards, Tesla's maintenance of its Team Wear Policy should be declared lawful as the mere maintenance of this Policy does not interfere with Section 7 rights in violation of Section 8(a)(1).

## II.    LEGAL ANALYSIS

### A.    TESLA'S FACIALLY NEUTRAL TEAM WEAR POLICY DOES NOT "NECESSARILY" OR INHERENTLY BAN THE WEARING OF UNION BRANDED APPAREL[7]

On its face, Tesla's Team Wear Policy speaks only to the wearing of Team Wear necessitated by the Company's concerns over GA visual management and the mutilation of autos during the assembly process.  As to all other matters it is silent and it certainly says nothing about a union or the wearing of union branded apparel or the display of union insignia in the workplace.  Accordingly, the Team Wear Policy is facially neutral.

Further, contrary to the GC[8] and the Union and despite its preference that GA employees wear Team Wear, the text of the Team Wear Policy does *not* "necessarily" or inherently ban the wearing of Union branded apparel.  Indeed, though conveniently overlooked by the GC, acknowledged by the Union is the Policy's provisions that allow GA-covered employees to wear substitute "all black clothing" other than Company provided Team Wear, provided that alternative clothing is "mutilation free, work appropriate and pose(s) no safety risks".  When read in this context and given its whole meaning, the fact that the Policy calls on GA associates

---

[7] Union branded apparel includes articles of clothing bearing union slogans, union insignia and union messaging.

[8] The GC argues that the Team Wear Policy necessarily bans Union apparel because it, *inter alia*, requires the garment worn by a GA associate to bear the Tesla logo.  This assertion is unsupported by the facts.  A review of Section 7(l) of GC's complaint reveals that the text of the Team Wear Policy at issue here contained no such logo requirement.  Perhaps, the GC mistakenly read from a predecessor Team Wear Policy that may have called for Team Wear to bear the company logo.  But that prior policy was superseded by the Team Wear Policy that is the subject the GC's complaint and it is neither mentioned in GC's complaint nor was it litigated at the time of trial.  Further, and in any event, allegations based on that precedent policy, dating back to 2016, are barred by Section 10(b).

and leads to wear assigned Team Wear does not support the erroneous notion that the Policy necessarily or inherently bans the wearing of union apparel or the display of union insignia on the GA line since, under the Policy, GA employees are perfectly free to wear all black substitute union branded apparel that is mutilation-free, work appropriate and safe.

Moreover, the evidence shows that employees neither read or understood the Policy to necessarily or inherently ban the wearing of union branded apparel since GA employees did, in fact, wear union hats and accessorized their Team Wear with non-abrasive union stickers, Tesla's Team Wear Policy notwithstanding.[9]  Thus, on its face and in point of fact, Tesla's Team Wear Policy did not necessarily or inherently ban the wearing of union branded apparel.

**B.    SINCE ALL OF THE GC'S ENFORCEMENT ALLEGATIONS WERE FULLY LITIGATED AND FINALLY DISMISSED, THIS IS JUST A "MERE MAINTENANCE" CASE INVOLVING A FACIALLY NEUTRAL POLICY**

In an effort to make *Stabilus* and *Republic Aviation* relevant to this case, the Opposition erroneously asserts that in August 2017 (apparently while the Union claims its organizing effort was just getting off the ground), Tesla began to enforce its Team Wear Policy with respect to the wearing of union apparel and union insignia/slogans.  Indeed, the GC alleged that Tesla unlawfully sought to enforce its Team Wear Policy with respect to the wearing of union clothing. (GC _, Section 7, paragraphs t – v, hereinafter referred to as August enforcement claims). However, the ALJ addressed each of these allegations, found the GC's witnesses as to these allegations to be unworthy of credence and recommended that the GC's August enforcement claims be dismissed.  Exceptions not being taken to them, these factual findings, legal conclusions and her recommendation are all now final and binding on the GC, the Union and the

---

[9] Contrary to the Opposition, Tesla does not contend that its Team Wear Policy is lawful merely because non-GA employees wore union branded apparel or GA employees wore union hats or union stickers.  Instead this evidence is cited for the purpose of establishing that employees knew and understood the Team Wear policy not to ban the wearing of such non-abrasive union branded apparel and insignia and that they did engage in such protected conduct, despite the Team Wear Policy.

Board.  Accordingly, the Opposition is estopped from raising issues as to whether, how or why Tesla enforced its Team Wear Policy in support of its advocacy for *Stabilus* application here or against the use of *Boeing*.

C.     **DUE PROCESS BARS THE OPPOSITION FROM RAISING NEW AND UNALLEGED ENFORCEMENT ISSUES THAT SO CLEARLY STRAY FROM THE COMPLAINT AND THAT WERE NEVER LITIGATED AT TRIAL**

Insofar as the Opposition now seeks to convert this case into a *Stabilus/Republic Aviation*-like case by alleging enforcement other than that alleged in the GC's complaint and litigated at trial or suggesting the existence of a causal link between Tesla's promulgation and enforcement of its Team Wear Policy and the Union's nascent organizing effort – i.e. that Tesla created this Policy and began to its enforcement in response to the Union's organizing activity – they are precluded from doing so as those claims were neither alleged in the GC's complaint nor theories advanced at trial.  To the contrary, the GC's complaint alleged and the only issues litigated were whether Tesla's Team Wear Policy was facially invalid (Section 7(l)) and whether said Policy was unlawfully enforced on certain dates and by certain supervisors as to certain GA employees (Section 7(t)-(v)).  These rejected allegations and the absence of any other enforcement allegations now set the limits of the Board's inquiry here.

A recent case demonstrating this point and showing why the Other Parties are estopped from injecting such brand new and unalleged claims and facts into this case at this late stage is *Indiana Bell Telephone Company, Inc.*, 370 NLRB No. 93 (2021).  There, the Board recently reversed an ALJ's finding and dismissed an ALJD finding that an employer violated Section 8(a)(1) by maintaining appearance guidelines because a maintenance claim was not alleged in the GC's complaint nor pursued at trial.  Thus, the Board explained,"[w]e dismiss on due process grounds the judge's finding that Respondent unlawfully maintained its appearance guidelines . . . [T]he complaint did not allege a maintenance violation, and the General Counsel did not move to amend the complaint to include such a violation. . . In these circumstances, finding a

maintenance violation [is] improper because Respondent did not have adequate notice of the allegations and it was not fully litigated." *Indiana Bell*, supra.

As in the case of the complaint allegations in *Indiana Bell*, the GC's enforcement allegations here were circumscribed, limited to specific instances of enforcement. Moreover, the complaint said nothing to suggest that the Government was arguing other acts of enforcement beyond those alleged or that it was asserting a causal link between Tesla's promulgation and enforcement its Team Wear Policy and the Union's organizing effort. In the absence of such allegations, Tesla was denied fair notice of these assertions and these issues were never fully litigated. Accordingly, these new and unalleged claims cannot be asserted now to morph what is a clear mere maintenance case covered by *Boeing* into a discriminatory enforce case governed by *Stabilus* and *Republic Aviation*.

**D.    *STABILUS*'/*REPUBLIC AVIATION*'S SPECIAL CIRCUMSTANCES TEST CANNOT BE APPLIED HERE BECAUSE TESLA'S TEAM WEAR POLICY WAS NOT MANIFESTLY PURPOSED OR APPLIED TO BAN THE WEARING OF UNION BRANDED APPAREL AND THE MERE MAINTENANCE OF THAT FACIALLY NEUTRAL UNIFORM POLICY IS THE SOLE ISSUE**

The Opposition miscasts this case as being about Tesla's purported enforcement of its Team Wear Policy banning the wearing of union branded apparel, recognizing that if it is treated for what it is, a "mere maintenance" case (and not one in which a rule or policy explicitly prohibits the wearing of union branded apparel and/or is disparately enforced to single out the wearing of such union clothing adverse action), then *Stabilus* and *Republic Aviation* can have no application here. Thus, it is no small coincidence that none of the precedent cited by the Opposition present mere maintenance cases where the facial validity of a uniform rule was the sole issue; all applied *Republic Aviation* and its special circumstances test to situations in which a uniform rule either explicitly prohibited the wearing of union branded clothing/insignia and/or, as in *Stabilus*, a uniform rule was enforced in a disparate or needlessly excessive fashion for the manifest purpose of interfering with an employee's ability to wear such clothing in the

workplace. It is because such employer rules and enforcement are so manifestly purposed with restraining or interfering with NLRA-protected activity, that the *Republic Aviation* Court could declare them presumptively invalid, thereby shifting the burden of proving the necessity of an explicit ban on union branded apparel or of a rule's disparate enforcement as to union clothing based on that employer's special circumstances[10]. Indeed, absent a manifest purpose to infringe on Section 7 rights, an employer's mere maintenance of a rule is just that, a mere rule, because as the *Republic Aviation* Court observed "The Act . . . does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time . . . Such a rule is presumed to be valid in the absence of evidence that it was adopted for a discriminatory purpose." *Republic Aviation* at fn. 10.

As shown previously, Tesla's Team Wear Policy does not explicitly ban the wearing of union branded apparel. Thus, on its face, it is not manifestly purposed to restrain or interfere with Section 7 conduct. Nor is there anything to suggest that it was disparately or excessively applied to accomplish that manifest purpose. That claim was made to but rejected by the ALJ. In the absence of such manifest purpose to interfere with the wearing of union branded apparel, the special circumstances test of *Republic Aviation* and *Stabilus* has nothing to do with this case and it should not have been applied by the ALJ to invalidate the Team Wear Policy. The only thing remaining at issue here is the mere maintenance of Tesla's facially neutral and

---

[10] On this point, the GC is mistaken in two respects. The *Republic Aviation* Court did not create the special circumstances test because the wearing of union insignia is so important or central to the Act. Were that the case, *Republic Aviation* have been applied to just union insignia cases when, in fact, it has been applied to a multitude of situations unrelated to the wearing of uniforms/insignia in which an employer's conduct was manifestly purposed to interfere with union activity. Nor, contrary to the GC, did *Republic Aviation* impose the burden of proving special circumstances to justify its manifestly purposed conduct on an employer merely because the employer was in the best position to prove the necessity of those actions. Were that the case, an employer would be required to justify all of its rules including those that the Court declared presumptively valid. Rather, having declared such manifestly purposed conduct presumptively unlawful under the Act, but not unlawful *per se*, the Court merely shifted the burden of proof to the employer, affording it the opportunity to prove an overriding need for its seemingly unlawful conduct.

presumptively lawful Team Wear Policy interferes with Section 7 rights in violation of Section 8(a)(1). For that, the Board should apply a test other than the one mentioned in *Stabilus*.

        **E.    THERE IS NOTHING UNIQUE ABOUT FACIALLY NEUTRAL UNIFORM RULES; THEIR LAWFULNESS SHOULD BE DETERMINED UNDER THE BOARD'S *BOEING* DECISION AS IN THE CASE OF ANY OTHER FACIALLY NEUTRAL RULE**

The GC offered no compelling reason for not applying *Boeing* to Tesla's Team Wear Policy, while the Union and Amicus SEIU just plain ignored the issue. But there is nothing unique about facially neutral uniform policies that sets them apart from any other facially neutral policy. To the contrary, the same considerations that drive *Boeing*'s application to all other content neutral policies apply to uniform policies as well. Indeed, on remand from the D.C. Circuit, the Board has already applied *Boeing* to uniform policies. *World Color*, 369 NLRB No. 104 (2020). Likewise, in *Wal-Mart Stores, Inc.*, 368 NLRB No. 146 (2019), the Board applied *Boeing* to a content neutral rule affecting the wearing of union insignia. As in *World Color* and *Wal-Mart*, *Boeing* should be applied to here to Tesla's facially neutral Team Wear Policy.

**III.    CONCLUSION**

Tesla's Team Wear Policy is not presumptively unlawful on its face and Tesla did not need to satisfy the "special circumstances" under *Stabilus* and *Republic Aviation*. Its mere maintenance of its Team Wear Policy should be adjudged and ultimately declared lawful pursuant to the *Boeing* standard.

Dated: April 6, 2021           SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By:    _____
                  MARK S. ROSS
                  KEAHN N. MORRIS

                  Attorneys for
                  TESLA, INC.

## <u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Francisco, State of California. My business address is Four Embarcadero Center, 17th Floor, San Francisco, CA 94111-4109.

On April 6, 2021, I served a true copy of the document(s) described as:

**RESPONDENT TESLA, INC.'S REPLY BRIEF IN RESPONSE TO THE BOARD'S FEBRUARY 12, 2021 INVITATION TO FILE BRIEFS CONCERNING UNIFORM POLICIES**

on the interested parties in this action as follows:

Catherine Ventola
E-mail: catherine.ventola@nlrb.gov
Christy Kwon
E-mail: christy.kwon@nlrb.gov
Counsels for the General Counsel
National Labor Relations Board
Region 32
1301 Clay Street, Ste. 300N
Oakland, CA 94612-5224
T: (510) 671-3041

Margo Feinberg
E-mail: margo@ssdslaw.com
Daniel E. Curry
E-mail: dec@ssdslaw.com
Schwartz, Steinsapir, Dohrmann & Sommers, LLP
6300 Wilshire Blvd., Suite 2000
Los Angeles, CA 90048
T: (323) 655-4700

Jeffery Sodko
E-mail: jsodko@uaw.net
United Automobile, Aerospace and Agricultural Workers of America
AFL-CIO
8000 E. Jefferson Avenue
Detroit, MI 48214
T: (313) 926-5000

☒     **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address sasmith@sheppardmullin.com to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

22-60493.6601

Office of the Executive Secretary
National Labor Relations Board
1015 Half Street SE
Washington, D.C.  20570
T: (202) 273-1000

**VIA E-FILING**

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

Executed on April 6, 2021, at San Francisco, California.

_____
Sarah Smith

22-60493.6602

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Tesla, Inc. *and* Michael Sanchez *and* Jonathan Galescu *and* Richard Ortiz *and* International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO.** Cases 32–CA–197020, 32–CA–197058, 32–CA–197091, 32–CA–197197, 32–CA–200530, 32–CA–208614, 32–CA–210879, and 32–CA–220777

August 29, 2022

SUPPLEMENTAL DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS KAPLAN RING, WILCOX, AND PROUTY

In this case, we examine the standard to be applied to evaluate the lawfulness of workplace rules or policies that restrict the display of union insignia by requiring employees to wear uniforms or other designated clothing, implicitly prohibiting employees from substituting union attire for the required uniform or clothing. The Supreme Court of the United States long ago affirmed that employees have a protected right to display union insignia under Section 7 of the National Labor Relations Act. See *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 801–803 & fn. 7 (1945). Thereafter, whenever an employer interfered with its employees' right to display union insignia, it had the burden to show that its interference was justified by special circumstances. If it could not meet that burden, the National Labor Relations Board would find that the employer violated the Act. See, e.g., *Boch Honda*, 362 NLRB 706, 707 (2015), enfd. sub nom. *Boch Imports, Inc. v. NLRB*, 826 F.3d 558 (1st Cir. 2016).

In *Stabilus, Inc.*, the Board stated that "[a]n employer cannot avoid the 'special circumstances' test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia." 355 NLRB 836, 838 (2010). Subsequently, however, a divided Board in *Wal-Mart Stores, Inc.*, 368 NLRB No. 146 (2019), declined to apply the "special circumstances" test to evaluate the lawfulness of an employer's dress code policy that partially restricted the display of union buttons and insignia.[1] As explained below, the Board's decision in *Wal-Mart* upset the proper balance struck by the Supreme Court in *Republic Aviation*, ignored decades of Board precedent holding that *any* limitation on the display of union insignia is presumptively unlawful regardless of whether an employer permits other related Section 7 activity, and created uncertainty in this previously well-settled area of the law.

Accordingly, we overrule *Wal-Mart* and reaffirm that under *Republic Aviation* and its progeny, when an employer interferes *in any way* with its employees' right to display union insignia, the employer must prove special circumstances that justify its interference. Applying that standard here, we agree with the judge that the Respondent violated Section 8(a)(1) of the Act by maintaining its team-wear policy, which requires employees to wear shirts imprinted with the Respondent's logo and implicitly prohibits employees from substituting any shirt with a logo or emblem, including a shirt bearing union insignia, for the required team wear.

I. PROCEDURAL HISTORY

On September 27, 2019, Administrative Law Judge Amita Baman Tracy issued a decision in this proceeding.[2] The judge found, inter alia, that the Respondent violated Section 8(a)(1) by maintaining its team-wear policy because it failed to establish that the policy is justified by special circumstances under *Republic Aviation*. The Respondent filed exceptions, arguing that the special circumstances test should not apply because its production associates freely and openly display union insignia and are merely prohibited from substituting union shirts for the required team wear.

On February 12, 2021, the Board issued a Notice and Invitation to File Briefs (NIFB), asking the parties and interested amici to address the following questions:

> 1. Does *Stabilus* specify the correct standard to apply when an employer maintains and consistently enforces a nondiscriminatory uniform policy that implicitly allows employees to wear union insignia (buttons, pins, stickers, etc.) on their uniforms?

> 2. If *Stabilus* does not specify the correct standard to apply in those circumstances, what standard should the Board apply?

---

[1] Dissenting, then-Member McFerran objected to the Board's failure to apply the special circumstances test. See id., slip op. at 6–12 (dissent).

[2] The Respondent filed exceptions and a supporting brief, the General Counsel and the Charging Parties—Michael Sanchez, Jonathan Galescu, Richard Ortiz, and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO (the Union), collectively—filed answering briefs, and the Respondent filed reply briefs. Additionally, the General Counsel filed limited cross-exceptions and a supporting brief, the Charging Parties filed a brief in support of the General Counsel's limited cross-exceptions, the Respondent filed an answering brief, and the General Counsel filed a reply brief.

22-60493.6603

*Tesla, Inc.*, 370 NLRB No. 88, slip op. at 1 (2021).[3]  The Acting General Counsel and the Respondent each filed a responsive brief.  American Federation of Labor and Congress of Industrial Organizations (AFL–CIO);[4] Coalition for a Democratic Workplace, Chamber of Commerce of the United States of America, National Federation of Independent Business Small Business Legal Center, Associated Builders and Contractors, Independent Electrical Contractors, National Retail Federation, Retail Industry Leaders Association, and Restaurant Law Center, jointly (CDW); Communication Workers of America, AFL–CIO (CWA); HR Policy Association (HRPA); International Brotherhood of Electrical Workers, Local Union 304 (IBEW Local 304); Service Employees International Union (SEIU); and United Brotherhood of Carpenters and Joiners of America (UBC) each filed amicus briefs.  The Charging Parties and the Respondent each filed a reply brief.

On March 25, 2021, the Board issued a decision and order resolving most of the issues in this case.  *Tesla, Inc.*, 370 NLRB No. 101 (2021).[5]  However, in light of the NIFB, the Board severed and retained for further consideration the question of whether the Respondent violated Section 8(a)(1) by maintaining and enforcing its team-wear policy.  Id., slip op. at 1 fn. 3.[6]

The Board has considered the judge's decision and the record in light of the exceptions and briefs and has decided to affirm her rulings, findings,[7] and conclusions regarding that issue and to adopt the recommended Order as modified and set forth in full below.[8]  For the reasons discussed below, we agree with the judge that the Respondent failed to establish special circumstances that justify its team-wear policy's implicit prohibition on employees wearing union shirts and therefore violated Section 8(a)(1) by maintaining the team-wear policy.

## II. BACKGROUND

The Respondent manufactures electric vehicles at its facility in Fremont, California.  The vehicles are assembled in General Assembly (GA) by production associates, who install parts in and on the bodies of the vehicles.  When an unfinished vehicle enters GA, its paint is cured sufficiently for light touching and general handling but is not cured as completely as when the vehicle is finished.

The Respondent's "General Assembly Expectations" include the following team-wear policy:

> Team Wear: It is mandatory that all Production Associates and Leads wear the assigned team wear.
>
> - On occasion, team wear may be substituted with all black clothing if approved by supervisor.
> - Alternative clothing must be mutilation free, work appropriate and pose no safety risks (no zippers, yoga pants, hoodies with hood up, etc.).[9]

The team-wear policy applies only to employees in GA.

For production associates, team wear consists of black cotton shirts with the Respondent's logo and black cotton pants with no buttons, rivets, or exposed zippers.  The Respondent provides newly hired production associates with two pairs of pants, two short-sleeve shirts, two long-sleeve shirts, and a sweater.  The shirts and sweater are imprinted with the Respondent's logo.  Production leads and supervisors wear red shirts imprinted with the Respondent's logo, while line inspectors wear white shirts imprinted with the Respondent's logo, and they all wear the same black cotton pants as the production associates.

During the Union's organizing campaign in the spring of 2017, employees, including production associates, began wearing black cotton shirts that had a small logo with the Union's campaign slogan—"Driving a Fair Future at Tesla"—on the front and a larger logo with that slogan and "UAW" on the back.  Before August 2017, production associates regularly wore shirts that were not black or had logos and emblems unrelated to the Respondent.  In

---

[3] Chairman McFerran opposed the issuance of the NIFB because she saw "no conflict between *Stabilus* and well-established legal principles." Id., slip op. at 1–2 & fn. 1 (dissent).

[4] The Charging Parties filed a joinder in the brief of the AFL–CIO.

[5] Judge Tracy's decision is attached to that decision and order and may be accessed there.

[6] We note that in the original decision in this matter, the Board affirmed, in the absence of exceptions, the judge's dismissal of the related allegations that the Respondent *discriminatorily* enforced the team-wear policy against union supporters.  Id., slip op. at 1 & fn. 1.

[7] The Respondent has excepted to some of the judge's credibility findings.  The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect.  *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951).  We have carefully examined the record and find no basis for reversing the findings.

[8] As no party has excepted to the judge's inclusion of an enforcement violation in the conclusions of law and recommended Order, we find that the question of whether the Respondent unlawfully enforced the team-wear policy against employees wearing union shirts is not before us, and we adopt that portion of the judge's order.  In addition, we have modified the judge's recommended Order to conform to the Board's standard remedial language and in accordance with our recent decision in *Paragon Systems, Inc.*, 371 NLRB No. 104 (2022).  We shall substitute a new notice to conform to the Order as modified.

[9] The Respondent's "General Assembly Expectations" originally stated simply that "[t]eam wear is mandatory for all team members and leads."  Prior to August 10, 2017, the Respondent orally informed its production associates that, with supervisory permission, they could substitute all-black clothing for team wear.  In October 2017, the Respondent formally revised the "General Assembly Expectations" to reflect that change.

August 2017, the Respondent began to strictly enforce its team-wear policy by having supervisors and managers audit production associates during startup meetings and "walk the line" to ensure compliance with the team-wear policy. Since then, supervisors and managers have occasionally allowed production associates to wear plain black cotton shirts instead of team-wear shirts or to cover non-Respondent logos and emblems on black shirts with black mutilation-protection tape.

On August 10, 2017, production associate Jayson Henry was wearing a black union shirt when an unidentified production supervisor told Henry that he would be sent home if he wore the union shirt again. Henry asked to see the Respondent's dress code, and Associate Production Manager Topa Ogunniyi gave him a copy of the "General Assembly Expectations." That same day, production associate Sean Jones was also wearing a black union shirt, and Production Supervisor Timothy Fenelon told Jones that he would be sent home if he did not change out of the union shirt because the shirt did not comply with the Respondent's team-wear policy. Jones protested but ultimately changed his shirt. Later that day, Jones complained to Ogunniyi about this incident, and Ogunniyi responded that the policy had changed and that employees could no longer wear shirts with emblems. From that point forward, the Respondent prohibited production associates from wearing the black union shirts in place of team-wear shirts but continued to allow them to wear union stickers on the required team wear.[10]

Production Manager Mario Penera testified that the team-wear policy is intended to aid in the "visual management" of GA and to lower the risk of employees' clothing causing mutilations to the vehicles.[11] Penera described visual management as the ability to easily determine that employees are in their assigned work areas and to distinguish among the different categories of employees in GA based on shirt color. Penera added that requiring production associates to dress in team wear makes it easier for supervisors to verify that employees' clothes do not present a high risk of causing mutilations. Penera testified that he did not know of a black union shirt—or any other non-team-wear shirt with a logo—causing a mutilation to a vehicle. Production Manager Kyle Martin generally confirmed Penera's testimony regarding the purpose of

the team-wear policy. Additionally, Martin testified about a specific incident in which a raised metal emblem on a production associate's shirt caused a mutilation by brushing against a fender, and Martin admitted that he could still visually manage GA if production associates wore plain black shirts. Associate Manager Ogunniyi testified that, to her knowledge, a cotton shirt had never damaged a vehicle and that, although the black union shirt previously worn by production associates does not comply with the team-wear policy, it is not a mutilation risk. Production Supervisor Fenelon also testified that he did not know of any cotton shirt causing a mutilation to a vehicle.

### III. DISCUSSION

#### A. The Judge's Decision

As discussed above, the judge found that the Respondent violated Section 8(a)(1) by maintaining the team-wear policy. The judge first rejected the Respondent's argument that the standard set forth in *Boeing Co.*, 365 NLRB No. 154 (2017), should be applied to evaluate the lawfulness of the team-wear policy.[12] The judge reasoned that the Board has applied the *Republic Aviation* special circumstances test in cases concerning the right of employees to wear union insignia in the workplace. The judge next rejected the Respondent's argument that the Board has implicitly allowed employers to promulgate and enforce nondiscriminatory uniform rules, stating that "[s]imply because Respondent's rule does not explicitly prohibit the wearing of union insignia does not mean that if the rule is enforced equally, the rule is permitted; the rule still disallows employees to wear union insignia on their clothing in GA." The judge then analyzed whether the Respondent had established special circumstances to justify the team-wear policy's prohibition on employees wearing union attire in place of the required team wear. The judge found that the Respondent failed to establish special circumstances based on its claim that the team-wear policy is intended to prevent mutilations to unfinished vehicles. Specifically, the judge found that the Respondent was prompted to begin to strictly enforce the team-wear policy by an increase in seat mutilations, and that there is no evidence that the black union shirts worn by production associates caused seat mutilations. The judge also found that the Respondent failed to establish special

---

[10] The judge found generally that "[e]mployees also wore union . . . hats to work." However, there is no evidence that any production associates wore union hats.

[11] Mutilations include abrasions, buffs, chips, cuts, dents, dings, or scratches to the inside or outside of a vehicle.

[12] Under *Boeing*, if an employer's facially lawful rule or policy, when reasonably interpreted, would potentially interfere with the exercise of employees' Sec. 7 rights, the Board must balance the following two factors: "(i) the nature and extent of the potential impact on NLRA

rights, *and* (ii) legitimate justifications associated with the rule." Id., slip op. at 3 (emphasis in original); see also *LA Specialty Produce Co.*, 368 NLRB No. 93, slip op. at 1–3 (2019) (clarifying the *Boeing* standard). Then-Member McFerran objected to the Board's adoption of this standard in *Boeing*. See *Boeing*, 365 NLRB No. 154, slip op. at 29–44 (dissent). The Board recently issued a Notice and Invitation to File Briefs seeking public input on whether the Board should continue to adhere to the standard adopted in *Boeing* and revised in *LA Specialty*. See *Stericycle, Inc.*, 371 NLRB No. 48 (2022).

circumstances based on its claim that the team-wear policy is intended to aid in the visual management of GA, because the black union shirts are not substantially different from the black team-wear shirts or the plain black shirts that production associates can wear pursuant to the team-wear policy. Finally, the judge rejected the Respondent's argument that the team-wear policy does not interfere with employees' Section 7 rights because employees can wear union stickers on their team wear.

### B. The Board's Decision in Stabilus

In *Stabilus, Inc.*, the employer maintained a uniform policy that required employees to wear shirts bearing the employer's name. 355 NLRB 836, 837 (2010). During a union campaign, the employer told several employees that they could not wear union shirts. Ibid. The administrative law judge found that the employer unlawfully prohibited employees from wearing union shirts because it failed to establish that this application of its uniform policy was justified by special circumstances under *Republic Aviation*. *Stabilus*, 355 NLRB at 837–838. The employer excepted to that finding, arguing that "nondiscriminatory enforcement of a uniform policy does not violate the Act." Id. at 838.

The *Stabilus* Board found it unnecessary to reach the judge's finding that the employer failed to establish special circumstances because it found that even if the employer had made that showing, its conduct was unlawful for two independent reasons: (1) it "enforced its policy in a selective and overbroad manner against union supporters," and (2) "the policy was applied in a disparate manner to Section 7 activity relative to comparable non-Section 7 activity." Id. at 837. However, the Board still analyzed the applicability of the special circumstances test, noting as follows:

> As the Supreme Court has held, employees have a Section 7 right to wear union insignia on their employer's premises, which may not be infringed, absent a showing of "special circumstances." These protections of Section 7 expression have always extended to articles of clothing, including prounion T-shirts. There is no basis in precedent for treating clothes displaying union insignia as categorically different from other union insignia, such as buttons.

> An employer cannot avoid the "special circumstances" test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia. The Board has consistently applied that test where employers have required employees to wear particular articles of clothing and have correspondingly prohibited them from

wearing clothing displaying union insignia. . . . The many Board cases finding that special circumstances existed amply illustrate that there is no need to depart from existing precedent to ensure that employers' legitimate interests, for example, in maintaining a particular public image, are accorded proper weight.

Id. at 838 (internal citations and footnotes omitted).

Former Member Schaumber disagreed that the special circumstances test was applicable in *Stabilus* and instead would have found that the employer lawfully enforced its preexisting uniform policy. Id. at 842 (Member Schaumber, dissenting in part). Member Schaumber considered *Stabilus* to be a "case of first impression" and asserted that the Board had "never held that, where an employer lawfully maintains and consistently enforces a policy requiring employees to wear a company uniform, its employees have a right under Section 7 to disregard the policy and wear union attire in place of the required uniform." Id. at 842–843 & fn. 7. To the contrary, he argued that the Board had instead "implicitly recognized that an employer may promulgate and enforce a nondiscriminatory uniform rule." Id. at 843. Noting that the right to display union insignia is predicated on employees' right to communicate with each other regarding self-organization at the workplace, Member Schaumber maintained that the employer in *Stabilus* had not interfered with its employees' Section 7 rights in that regard because, although employees could not wear union shirts, they were able to display union buttons, pins, and stickers, and other union insignia. Id. at 842, 843. Member Schaumber ultimately concluded as follows:

> [I]n balancing employee and employer rights as required under *Republic Aviation*, supra, a "special circumstances" analysis is inappropriate here. If employees have the right to wear union attire *instead* of a company uniform, the employer's right to promulgate and enforce reasonable, nondiscriminatory apparel rules is negated entirely. Such a result would not strike a balance between employee and employer rights; rather, it would completely submerge the employer's rights. Thus, I would hold that where, as here, an employer maintains and consistently enforces a lawful uniform rule, Section 7 does not guarantee employees the right to wear union attire in place of the required company uniform.

Id. at 843–844 (internal footnote omitted; emphasis in original).

### C. Positions of the Parties and Amici

The Acting General Counsel, the Charging Parties, CWA, IBEW Local 304, and UBC take the position that *Stabilus* correctly specifies that the *Republic Aviation*

4239244539819

...

special circumstances test applies when an employer maintains and consistently enforces a nondiscriminatory uniform policy. They argue that in those situations, application of the special circumstances test is consistent with Board precedent and strikes an appropriate balance between employees' important Section 7 right to display union insignia and employers' legitimate managerial interests in regulating employee appearance. They contend that application of a less restrictive standard, such as the *Boeing* standard, would not be sufficiently protective of employees' Section 7 right to display union insignia in the workplace and would unnecessarily bring instability to this well-settled area of the law.

The Respondent and CDW contend that *Stabilus* is incorrect in stating that the *Republic Aviation* special circumstances test applies in those situations. They also assert that the portion of *Stabilus* cited in the NIFB was merely dicta and is inconsistent with Board precedent. According to the Respondent and CDW, *Republic Aviation*, when properly interpreted, provides that the Board should apply the special circumstances test when a uniform policy explicitly prohibits the display of union insignia or has been disparately applied against employees displaying union insignia. Citing *Wal-Mart Stores, Inc.*, 368 NLRB No. 146 (2019), they contend that the Board should treat facially neutral, nondiscriminatory uniform rules like any other facially neutral work rule and apply *Boeing* to evaluate them. They further argue that application of the special circumstances test to evaluate the lawfulness of facially neutral, nondiscriminatory uniform rules places an exceptionally high burden on employers and will lead to the invalidation of almost all uniform policies, thereby failing to consider employers' legitimate managerial interests in establishing such rules.[13]

HRPA also takes the position that *Stabilus* is incorrect. It claims that *Republic Aviation* merely established a balancing test to determine the legality of workplace rules and policies and that *Stabilus* and many other Board decisions have incorrectly substituted "an artificially created 'special circumstances' test that places an exceedingly high and inappropriate burden of proof on employers." HRPA argues that application of the special circumstances test in the situation raised in the NIFB inappropriately subordinates employers' rights to maintain productivity and discipline to the rights of their employees in contravention

of the goals and purposes of the Act and the balancing approach established by the Supreme Court in *Republic Aviation*.

The AFL–CIO and SEIU assert that the instant case does not present the circumstances raised in the NIFB. The AFL–CIO argues that because the team-wear policy expressly allows production associates to substitute work-appropriate black clothing for team wear and was interpreted to allow them to wear black union shirts prior to August 2017, the team-wear policy does not inherently preclude the wearing of union clothing. According to the AFL–CIO, there was thus no legal basis for challenging the team-wear policy until the Respondent began to apply it to prohibit production associates from wearing black union shirts in August 2017, and the Respondent had to establish special circumstances to justify applying the team-wear policy in that manner. SEIU argues that the circumstances raised in the NIFB are not present in this case for the following reasons: (1) production associates are not required to wear a company-issued uniform but instead can wear, with their supervisor's permission, either a shirt with the Respondent's logo or an all-black shirt; (2) the Respondent does not consistently apply the team-wear policy, as supervisors have discretion to decide whether production associates wear shirts with the Respondent's logo, and they had interpreted the team-wear policy to allow black union shirts prior to August 2017; and (3) there is no evidence that production associates are implicitly allowed to wear buttons or pins.[14]

*D. Stabilus Correctly Specifies That the Republic Aviation Special Circumstances Test Applies Here*

Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C § 157. In Section 1 of the Act, Congress explained that it created these new rights for workers because "[e]xperience ha[d] proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce." 29 U.S.C. § 151. Section 8(a)(1) protects these rights by making it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees

---

[13] The Respondent argues that the team-wear policy is lawful under *Boeing* because the policy helps it visually manage GA employees and produce mutilation-free vehicles and has only a comparatively slight adverse impact on employees' Sec. 7 right to display union insignia, as employees can wear union stickers and hats.

[14] SEIU asserts that if the Board does reach the issue raised in the NIFB, it should not overrule *Stabilus* but instead should clarify the

difference between dress codes, to which the special circumstances test would apply, and uniform requirements, to which it would not, and hold that where an employer establishes special circumstances that justify prohibiting employees from wearing a particular article of union insignia or attire, the employer must inform its employees what forms of union insignia or attire are allowed.

in the exercise of the rights guaranteed in [S]ection 7." 29 U.S.C. § 158(a)(1). As the Supreme Court has approvingly observed, since the earliest days of the Act, "the Board [has] recognized the importance of freedom of communication to the free exercise of organization rights," because "organization rights are not viable in a vacuum; their effectiveness depends in some measure on the ability of employees to learn the advantages and disadvantages of organization from others." *Central Hardware Co. v. NLRB*, 407 U.S. 539, 543 (1972); see also *LeTourneau Co. of Georgia*, 54 NLRB 1253, 1260 (1944) ("It is clear that employees cannot realize the benefits of the right to self-organization guaranteed them by the Act, unless there are adequate avenues of communication open to them whereby they may be informed or advised as to the precise nature of their rights under the Act and of the advantages of self-organization, and may have opportunities for the interchange of ideas necessary to the exercise of their right to self-organization."), revd. 143 F.2d 67 (5th Cir. 1944), revd. sub nom. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945).

In *Republic Aviation Corp. v. NLRB*, the Supreme Court affirmed that "the right of employees to wear union insignia at work has long been recognized as a reasonable and legitimate form of union activity, and the [employer's] curtailment of that right is clearly violative of the Act." 324 U.S. 793, 802–803 & fn. 7 (1945) (internal quotations omitted); see also *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714 (5th Cir. 2018) ("Since the Act's earliest days, it has been recognized that Sec[.] 7 protects the right of employees to wear items—such as buttons, pins, and stickers—relating to terms and conditions of employment (including wages and hours), unionization, and other protected matters."), cert. denied 139 S.Ct. 1259 (2019). The display of union insignia has proven to be a critical form of protected communication, as employees have displayed union insignia in many ways in furtherance of Section 7

rights, including to support organizing campaigns,[15] demonstrate solidarity,[16] and advocate for issues during collective bargaining.[17]

Employees' Section 7 right to display union insignia at work is not absolute, however. As the Supreme Court explained in *Republic Aviation*, the Board must balance "the undisputed right of self-organization assured to employees under the [] Act and the equally undisputed right of employers to maintain discipline in their establishments." 324 U.S. at 797–798 ("[T]hese rights are not unlimited in the sense that they can be exercised without regard to any duty which the existence of rights in others may place upon employer or employee. Opportunity to organize and proper discipline are both essential elements in a balanced society."). *Republic Aviation* established the Board's longstanding approach to balancing these rights: a presumption that any employer limitation on the display of union insignia is invalid, with the burden on the employer to establish special circumstances to justify its action.[18] See *Republic Aviation*, 324 U.S. at 803–804 & fn. 10; see also *Boeing Airplane Co.*, 103 NLRB 1025, 1026 & fn. 4 (1953) (citing *Republic Aviation* to support the proposition that "[i]t has long been recognized that rules such as the foregoing, [including a rule prohibiting union steward and committeemen buttons,] which clearly interfere with employee's concerted activity, are presumptively invalid, in the absence of special circumstances which make them necessary in order to maintain production and discipline"), enfd. 217 F.2d 369 (9th Cir. 1954). As Professors Robert A. Gorman and Matthew W. Finkin have explained, this approach "reflect[s] a substantive judgment that inhibitions on employee activities on behalf of the union inherently do 'interfere' with and 'restrain' the exercise of their [S]ection 7 rights and that the burden to justify that inhibition should properly lie with the employer when its needs are not immediately obvious." Gorman & Finkin, *Basic Text on Labor Law* § 8.2 (2d ed. 2004).

---

[15] See, e.g., *Malta Construction Co.*, 276 NLRB 1494, 1498 (1985), enfd. 806 F.2d 1009 (11th Cir. 1986); *Mayrath Co.*, 132 NLRB 1628, 1643 (1961), enfd. in relevant part 319 F.2d 424 (7th Cir. 1963).

[16] See, e.g., *Mt. Clemens General Hospital*, 335 NLRB 48, 49 (2001), enfd. 328 F.3d 837 (6th Cir. 2003). See generally Teeter, Jr., *Banning the Buttons: Employer Interference with the Right to Wear Union Insignia in the Workplace*, 80 Ky. L.J. 377, 379 (1992) ("By engaging in this simple act of reaffirmation, [i.e., displaying union insignia,] the worker assures both herself and others that they belong to an entity devoted to protecting their statutory rights, economic interests, and quest for dignity in their work.").

[17] See, e.g., *Escanaba Paper Co.*, 314 NLRB 732, 732 (1994), enfd. sub nom. *NLRB v. Mead Corp.*, 73 F.3d 74 (6th Cir. 1996); *Holladay Park Hospital*, 262 NLRB 278, 278 (1982).

[18] The Board has recognized a narrow exception to this rule for immediate patient care areas in healthcare facilities. As the Board explained in *Healthbridge Management, LLC*, 360 NLRB 937 (2014), enfd. 798 F.3d 1059 (D.C. Cir. 2015):

> In healthcare facilities, . . . the Board and the courts have refined [the special circumstances test] due to concerns about the possibility of disruption to patient care. In nonpatient care areas, restrictions on wearing insignia are presumptively invalid in accordance with the basic rule, and it is the employer's burden to establish special circumstances justifying its action. By contrast, restrictions on wearing insignia in immediate patient care areas are presumptively *valid*.

Id. at 938 (internal citations omitted, emphasis in original). Significantly, however, the presumption of validity does not apply when an employer selectively bans only certain union insignia in immediate patient care areas. Ibid. In those circumstances, the burden remains on the employer to establish special circumstances—specifically, that the ban was "'necessary to avoid disruption of health-care operations or disturbance of patients.'" Ibid. (quoting *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 507 (1978)).

The Board has treated clothes displaying union insignia the same as union insignia that employees attach to their clothing, such as buttons and pins. See *Great Plains Coca-Cola Bottling Co.*, 311 NLRB 509, 515 (1993). Thus, Section 7's protection of employees' right to display union insignia "extends to prounion T-shirts," and the Board will find that an employer's interference with such a display of union insignia violates the Act unless the employer proves special circumstances that outweigh the employees' right to wear the insignia and that its prohibition is narrowly tailored to address those circumstances. See *Wal-Mart Stores*, 340 NLRB 637, 638 (2003) (citing cases), enfd. in relevant part 400 F.3d 1093 (8th Cir. 2005).[19]

Relatedly, although the Board's discussion of the special circumstances test in *Stabilus* was dicta, the Board correctly stated there that "[a]n employer cannot avoid the 'special circumstances' test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia." 355 NLRB at 838. The Board has consistently applied the *Republic Aviation* special circumstances test when an employer has prohibited an employee from wearing an article of clothing bearing union insignia based on a policy requiring employees to wear certain clothing. For example, in *Great Plains Coca-Cola*, the Board found that an employer violated Section 8(a)(1) where, in the absence of special circumstances, a supervisor told an employee that his union jacket was unacceptable and that only company jackets were allowed. See 311 NLRB at 515. Similarly, in *Meijer, Inc.*, the Board found that, in the absence of special circumstances, an employer violated Section 8(a)(1) by prohibiting an employee from wearing a jacket with a union logo—instead of the employer-provided

freezer jacket that was considered part of the established uniform in the store—in noncustomer areas. See 318 NLRB 50, 52, 56–57 (1995), enfd. 130 F.3d 1209 (6th Cir. 1997). In *Quantum Electric, Inc.*, the Board found that, in the absence of special circumstances, an employer unlawfully discharged an employee for violating its clothing policy—which prohibited employees from wearing clothing with "graphics or printed text other than [employer] approved or issued clothing"—where the employee wore a union shirt and refused to turn it inside out. See 341 NLRB 1270, 1270 fn. 1, 1274, 1277, 1280 (2004). Conversely, on several occasions, the Board has found that employers established special circumstances that justified applying a uniform policy or dress code to prohibit employees from wearing an article of clothing displaying union insignia.[20]

In the present case, the Respondent's team-wear policy allows production associates to wear only black team-wear shirts with the Respondent's logo—or on occasion, with their supervisor's permission, all-black shirts—and thus prohibits them from wearing union shirts in place of the required team wear or other approved shirts. As a result, the team-wear policy interferes with production associates' Section 7 right to display union insignia. Accordingly, under *Republic Aviation* and its progeny, the team-wear policy is presumptively invalid, and the Respondent has the burden to establish special circumstances that justify its interference with production associates' protected right to display union insignia. In other words, *Stabilus* correctly specifies that the present case requires nothing more than the application of the Board's longstanding, Supreme Court-approved special circumstances test to an employer restriction on the display of union insignia.[21]

[19] Sec. 7's protection also extends to adornments that are unrelated to a labor organization, but that nonetheless concern employees' terms and conditions of employment. See, e.g., *In-N-Out Burger, Inc.*, 365 NLRB No. 39, slip op. at 5 (2017) ("Fight for $15" pin that supported a campaign to raise the minimum wage to $15 per hour), enfd. 894 F.3d 707 (5th Cir. 2018), cert. denied 139 S.Ct. 1259 (2019); *Medco Health Solutions of Las Vegas, Inc.*, 364 NLRB 1687, 1687, 1689 fn. 4 (2016) (T-shirt bearing slogan, "I don't need a WOW to do my job[,]" where "WOW" referred to company program concerning employee performance and morale); *AT&T*, 362 NLRB 885, 886 & fn. 5 (2015) ("NO ON PROP 32" button that opposed ballot initiative affecting union payroll deductions); *Mt. Clemens General Hospital*, 335 NLRB at 49 (button with line drawn through letters "FOT" to represent silent protest of forced overtime).

[20] See, e.g., *Con-Way Central Express*, 333 NLRB 1073, 1075–1077 (2001) (finding that an employer lawfully suspended two employees for refusing to remove union hats where its interest in maintaining an established public image justified its uniform and appearance policy's prohibition on wearing logos and adornments that were not issued by the employer); *Produce Warehouse of Coram*, 329 NLRB 915, 915–918 (1999) (finding that an employer lawfully discharged an employee for refusing

to remove a union hat because its interest in maintaining an established public image justified its uniform policy's requirement that meat and deli department employees wear employer hats only); *Noah's New York Bagels*, 324 NLRB 266, 275 (1997) (finding that an employer lawfully prohibited an employee from wearing on her delivery route the required company shirt with "the added phrase 'If its not Union, its not Kosher'" because it mocked the employer's Kosher policy, which the employer followed strictly and featured prominently on its logo and shirts); *Casa San Miguel*, 320 NLRB 534, 540 (1995) (finding that a nursing home lawfully prohibited an employee from wearing the required uniform—a white smock—that had been altered with a union emblem and message printed on it because it would not have been practical or possible for the employee to wear the altered uniform in nonpatient care areas but change out of it before entering patient care areas, where union-insignia prohibitions are presumptively valid).

[21] Contrary to our dissenting colleagues' hyperbolic rhetoric, we do not hold that "all employer dress codes [are] presumptively unlawful." To be clear, our decision today does not implicate facially neutral employer dress codes that do not restrict or limit employees' right to display union insignia. Rather, consistent with longstanding Board and court precedent, our decision today reaffirms that employers may lawfully

8                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

*E. Our Colleagues' Dissenting Position and the Stabilus Dissent Are Contrary to Republic Aviation*

As discussed above, in *Stabilus*, former Member Schaumber argued that where an employee attempts to substitute union attire for attire required by an employer's nondiscriminatory uniform policy or dress code, application of the *Republic Aviation* special circumstances test would be inappropriate. *Stabilus*, 355 NLRB at 843 (Member Schaumber, dissenting in part). Instead, he argued that "where . . . an employer maintains and consistently enforces a lawful uniform rule, Section 7 does not guarantee employees the right to wear union attire in place of the required company uniform." Id. at 844. Our dissenting colleagues agree with the *Stabilus* dissent. They would not apply the special circumstances test to "facially neutral, nondiscriminatory employer dress codes that [ ] provide a meaningful opportunity to display union insignia." Instead, they would hold that such policies are categorically lawful to maintain and enforce if they are not

discriminatorily promulgated in response to union activity or disparately enforced against employees wearing union attire. We disagree.

To begin, the *Stabilus* dissent erroneously characterized the case as one of first impression. Id. at 843 fn. 7. However, the Board has consistently applied the special circumstances test when an employee has attempted to substitute union attire for attire required by a facially neutral, nondiscriminatory uniform policy or dress code.[22] In fact, in the two cases cited in the *Stabilus* dissent for the proposition that an employer may promulgate and enforce a nondiscriminatory uniform rule without showing special circumstances, the Board affirmed the administrative law judges' application of the special circumstances test to find that the employers lawfully prohibited employees from substituting union shirts altered to display union insignia for the required uniform shirts. See *Noah's New York Bagels*, 324 NLRB at 275; *Casa San Miguel*, 320 NLRB at 540.[23]

---

maintain facially neutral, nondiscriminatory dress codes and uniform policies that implicitly limit or restrict the display of union insignia, so long as they are narrowly tailored to serve a particular, legitimate interest that outweighs the adverse effect on employees' Sec. 7 rights. See, e.g., *Sam's Club*, 349 NLRB 1007, 1010 (2007) ("[A]n employer may limit or ban the display or wearing of union insignia at work if special circumstances exist and if those circumstances outweigh the adverse effect on employees' Sec[.] 7 rights resulting from the limitation or ban."); *Albis Plastics*, 335 NLRB 923, 924 (2001) ("In cases where the employer argues that special circumstances justify a ban on union insignia, the Board and courts balance the employee's right to engage in union activities against the employer's right to maintain discipline or to achieve other legitimate business objectives, under the existing circumstances."), enfd. mem. 67 Fed.Appx. 253 (5th Cir. 2003); see also generally infra sec. III.E.3.

Thus, what our dissenting colleagues decry as "unreasonable" and "unwarranted" is, instead, the continued application of the balancing principle established in *Republic Aviation* to a uniform policy or dress code that limits or restricts, but does not completely prohibit, employees' ability to display union insignia. We can concisely summarize the basis for applying that standard to such a policy here. To begin, we point out that our dissenting colleagues acknowledge that employees have a protected right to display union insignia under Sec. 7 of the Act. In fact, they "could not agree more wholeheartedly . . . that displaying union insignia in the workplace is an important way employees exercise their rights under Sec[.] 7 of the [ ] Act." Indeed, Sec. 8(a)(1) of the Act makes it an unfair labor practice to "interfere with" or "restrain" employees in the exercise of their Sec. 7 rights. Plainly, an employer interferes with and restrains employees in the exercise of their Sec. 7 right to display union insignia by maintaining a uniform policy or dress code that limits employees' ability to display union insignia even if the policy does not completely prohibit employees from doing so. But such policies are merely presumptively unlawful, rather than categorically unlawful, contrary to what the general prohibitory language of Sec. 8(a)(1) would suggest, because, as the Supreme Court explained in *Republic Aviation*, the Board must balance employees' Sec. 7 rights against the "right of employers to maintain discipline in their establishments." 324 U.S. at 797–798. Thus, consistent with *Republic Aviation* and decades of subsequent Board and court precedent, the Board affords employers the opportunity to rebut the presumption of invalidity by establishing special

circumstances that justify *any* interference with employees' Sec. 7 right to display union insignia arising from uniform policies and dress codes.

[22] See supra note 20 and accompanying text.

[23] Our dissenting colleagues claim that we are extending *Republic Aviation* by applying the special circumstances test to facially neutral, nondiscriminatory uniform policies and dress codes that restrict employees' ability to display union insignia. We reject that contention. More than 30 years after *Republic Aviation*, the Supreme Court observed that in *Republic Aviation* it had "held that the Board is free to adopt, in light of its experience, a rule that, absent special circumstances, a particular employer restriction is presumptively an unreasonable interference with [Sec.] 7 rights constituting an unfair labor practice under [Sec.] 8(a)(1)." *Beth Israel Hospital*, 437 U.S. at 493. The Board has long cited *Republic Aviation* to support applying the special circumstances test to employer restrictions on employees' ability to display union insignia. See, e.g., *Boeing*, 103 NLRB at 1026 & fn. 4 (citing *Republic Aviation* to support the proposition that "[i]t has long been recognized that rules such as the foregoing, [including a rule prohibiting union steward and committeemen buttons,] which clearly interfere with employee's concerted activity, are presumptively invalid, in the absence of special circumstances which make them necessary in order to maintain production and discipline"). The Board has applied the special circumstances test to such restrictions for decades with the approval of reviewing courts. See, e.g., *In-N-Out Burger*, 894 F.3d at 714–715 ("[I]f an employer can demonstrate special circumstances sufficient to outweigh [its] employees' Sec[.] 7 interests and legitimize the regulation of such [protected] insignia, then the right of employees to wear these items may give way." (internal quotations omitted)); *Boch Imports, Inc. v. NLRB*, 826 F.3d 558, 570–571 (1st Cir. 2016) (explaining that "employees are presumptively entitled under Sec[.] 7 to wear union insignia and other attire during work hours" but that "an employer may limit that activity . . . if the employer shows that there are 'special circumstances' that justify the limitations imposed." (internal quotations omitted)); *HealthBridge Management, LLC v. NLRB*, 798 F.3d 1059, 1067 (D.C. Cir. 2015) ("Bans on union insignia in the workplace are therefore presumptively invalid, absent a showing by the employer of 'special circumstances' to support the ban."). Thus, if the Board has extended *Republic Aviation*, it did so long before our decision today, and such an extension was well-supported for the reasons discussed in this decision.

More importantly, the standard first proposed by the *Stabilus* dissent and expanded upon by our dissenting colleagues today is fundamentally in conflict with the principles of *Republic Aviation*, as announced and applied by the Supreme Court and the Board for decades, in the following three respects: (1) by essentially asserting that an employer is free to prohibit statutorily protected means of communication among employees so long as some alternative means remains open; (2) by suggesting that an employer restriction on the exercise of Section 7 rights is lawful if it is "nondiscriminatory" and "consistently enforced"; and (3) by effectively rejecting the principle that employees' Section 7 rights and employers' legitimate interests must be balanced. We consider each of these errors below.

### 1. Alternative means of communication

The *Stabilus* dissent relied in part on a claim that the employer did not interfere with its employees' right to communicate regarding self-organization at the workplace because employees could display union insignia by means other than a union shirt (such as buttons, pins, and stickers). *Stabilus*, 355 NLRB at 843 (Member Schaumber, dissenting in part). Our dissenting colleagues have gone further and explicitly stated that a facially neutral, nondiscriminatory dress code that requires employees to wear specific apparel "should be lawful as long as the dress code affords employees a meaningful opportunity to display union insignia."[24]

However, an employer is not free to restrict one statutorily protected means of communication among employees, so long as some alternative means remains unrestricted. Indeed, in *Republic Aviation* the employer advanced this very argument, but the Supreme Court's decision leaves it without force. *Republic Aviation* involved an employer that banned only some union buttons but permitted employees to wear others. The Board found that the employer unlawfully discharged three employees for wearing union-steward buttons, even though the employer gave "assurance that employees were free to wear other types of union buttons." *Republic Aviation Corp.*, 51 NLRB 1186, 1188 (1943), enfd. 142 F.2d 193 (2d Cir. 1944), affd. 324 U.S. 793 (1945). On review before the Supreme Court, the employer made the following argument:

---

Our dissenting colleagues argue that the cases cited above are inapposite because they did not involve "an employer dress code comparable to the team-wear policy at issue in this case." To be clear, as stated above, we cite those cases for the general proposition that the Board, with the approval of reviewing courts, has long applied the "special circumstances" test to employer restrictions on employees' ability to display union insignia. This includes *HealthBridge*, where, contrary to the intimation of the dissent, the court held that substantial evidence in the record supported the Board's finding that the employer failed to demonstrate special circumstances in support of its ban on a particular union button in patient care areas. See 798 F.3d at 1070–1073. The point of these cases is not (and we do not claim) that they involved factual circumstances similar to those of the present case. But they do demonstrate the longstanding use, extension, and approval of the special circumstances test to union insignia cases. Once again, for examples of cases where the Board has applied the special circumstances test to employer restrictions on the display of union insignia resulting from facially neutral, nondiscriminatory uniform policies or dress codes, see supra note 20 and accompanying text.

Our dissenting colleagues also claim that our decision today cannot be reconciled with the court's observation in *Boch Imports* that "different considerations may apply when employers proscribe all adornments, including union adornments, than would apply when employers proscribe only certain types of adornments (for example, 'provocative' adornments), which may, on a case-by-case basis, include union adornments." 826 F.3d at 571. This is weak tea for the dissent. *Boch Imports* simply did not involve the issue at stake here; rather, it involved an employer's proscription of all insignia and adornments. The court did not reach or decide, and had no reason to reach or decide, the specific issue we confront today. The court's "observation" (to quote the dissent) was just that, making clear that the court was deciding only the issue before it. Like the court, if a facial challenge to an employer policy proscribing certain types of adornments, such as provocative adornments, comes before us in a future case, we will determine whether different considerations apply.

[24] Our dissenting colleagues have not explained what constitutes "a meaningful opportunity to display union insignia." Given that they have concluded, without any analysis or explanation, that the Respondent's team-wear policy "does not deny production associates meaningful opportunities to display union insignia because they may affix union stickers to their team wear," it appears that under their proposed standard a uniform policy or dress code affords employees a reasonable opportunity to display union insignia if an employer provides one alternative method of its choosing for employees to display union insignia. As they see it, if the policy clears that low bar, it is categorically lawful and can prohibit employees from displaying union insignia in any other manner without the employer having to establish that such restrictions are justified by a legitimate business interest. Indeed, they have stated that they would apply the special circumstances test only to "employer policies that ban union insignia or require employees to wear specific apparel and prohibit pins, buttons, or any other items from being affixed to the required clothing" (internal footnote omitted).

Our dissenting colleagues cite *Caesars Entertainment d/b/a Rio All Suites Hotel & Casino*, 368 NLRB No. 143 (2019), to support their assertion that the Board should apply a "meaningful opportunity" standard in this case and find that the Respondent's team-wear policy is lawful because it provides employees a meaningful opportunity to display union insignia. *Caesars* involved the issue of whether and to what extent employees have a Sec. 7 right to use their employer's work email to communicate with each other for purposes protected by the Act. *Caesars* did not consider, much less purport to modify, longstanding Board and court precedent governing employer restrictions on employees' ability to display union insignia, which is the subject of this decision. We therefore do not find *Caesars* to be instructive here. Then-Member McFerran dissented in *Caesars*. See 368 NLRB No. 143, slip op. at 14–23 (dissent). Members Wilcox and Prouty did not participate in *Caesars* and express no opinion about whether it was correctly decided. We would be open to reconsidering *Caesars* in a future appropriate case.

Petitioner freely permitted the wearing of other types of U. A. W. buttons, and there is no showing that the privilege of displaying the steward buttons would have legitimately aided the self-organization of the employees. The Board's failure to perform its required function of balancing the conflicting interests on this issue is underlined by its conclusion that the prohibition was a "curtailment" of the employees' right "to wear union insignia at work".

Brief for Republic Aviation Corporation at 10, *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945) (No. 226), 1944 WL 42256. The Supreme Court adopted the Board's conclusion that the employer violated the Act by prohibiting employees from wearing the union steward buttons and thus implicitly rejected the employer's argument that its toleration of other union buttons made its ban of union-steward buttons lawful. See *Republic Aviation*, 324 U.S. at 802–803 & fn. 7.

Consistent with *Republic Aviation*, the Board has required an employer to establish special circumstances to justify restrictions on employees' right to display union insignia, even if the employer permitted employees to display union insignia in other ways, and has not analyzed whether the employer affords employees "a meaningful opportunity to display union insignia" before applying the special circumstances test in those situations.[25] Thus, "[u]nder Board law, it is irrelevant that the [employer] allowed employees to wear other union insignia that it deemed acceptable." *Caterpillar*, 321 NLRB at 1181 fn. 10; see also *Page Avjet Corp.*, 275 NLRB 773, 777 (1985) (finding, in the absence of special circumstances, that the employer's "proposal to post photographs of the stewards on the union bulletin board [was] not an acceptable alternative to wearing steward badges" because "in the absence of a justification for the prohibition, there is no need for the [u]nion to accept any alternative").

More generally, it is well established that, consistent with the Act's language, an employer can violate Section 8(a)(1) by interfering with employees' exercise of the Section 7 right to communicate with each other about work, even if alternative means of exercising their rights remain. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with" employees' Section 7 rights.

Plainly, it is possible to interfere with the employee exercise of Section 7 rights even without completely preventing that exercise. As the Board has observed, "[i]t certainly does not lie in the mouth of [the employer] to tell the [u]nion, or [the employer's] employees, how to exercise their rights under the Act." *Monarch Machine Tool Co.*, 102 NLRB 1242, 1249 (1953) (rejecting special circumstances argument in support of no-distribution rule that "employees have adequate means of communication with other employees—the [u]nion meeting hall, newspaper announcements, mailing lists, the bulletin boards provided by the [c]ompany"), enfd. 210 F.2d 183 (6th Cir. 1954), cert. denied 347 U.S. 967 (1954). In *Republic Aviation*, the Supreme Court endorsed the Board's determinations in two separate cases that employers had unlawfully prohibited employees from soliciting union membership and distributing union literature on company property, respectively, notwithstanding the absence in either case of "evidence or a finding that the plant's physical location made solicitation away from company property ineffective to reach prospective union members." 324 U.S. at 798–799, 801–803 & fns. 6, 8.

On several subsequent occasions, the Supreme Court has reaffirmed the principle that the availability of alternative means of communication is irrelevant in determining whether an employer has unlawfully interfered with the exercise of employees' Section 7 rights. See, e.g., *Eastex, Inc. v. NLRB*, 437 U.S. 556, 572–574 (1978) (rejecting the employer's argument that "the *Republic Aviation* rule" should not apply to certain types of protected distributions "in the absence of a showing by employees that no alternative channels of communication with fellow employees are available"); *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 505 (1978) (observing that "outside of the health-care context, the availability of alternative means of communication is not, with respect to employee organizational activity, a necessary inquiry"); *NLRB v. Magnavox Co. of Tennessee*, 415 U.S. 322, 324–327 (1974) (declining to consider "the availability of alternative channels of communication" where it held that the union could not waive employees' right to distribute union literature on company property). Not surprisingly, decisions of the federal circuit courts are in accord. See, e.g., *Casino*

---

[25] See, e.g., *Caterpillar, Inc.*, 321 NLRB 1178, 1180–1181 & fn. 10 (1996) (applying special circumstances test where employer sought to ban the display of only one prounion message), vacated pursuant to settlement by unpublished Order dated Mar. 19, 1998; *Northeast Industrial Service Co.*, 320 NLRB 977, 978–979 (1996) (applying special circumstances test where employer prohibited employees from attaching stickers on company hardhats but "[did] not prohibit employees from wearing union insignia on their work clothes"); *Malta Construction Co.*, 276 NLRB 1494, 1494–1495 (1985) (same); *Holladay Park Hospital*, 262 NLRB 278, 278–279 (1982) (applying special circumstances test where

employer prohibited employees from wearing yellow ribbons in support of the union's bargaining position but "permitted [them] to wear another union insignia which it deemed more 'professional'"); *Gray-Syracuse, Inc.*, 170 NLRB 1684, 1687–1689 (1968) (applying special circumstances test where employer prohibited an organizing committee button but allowed a union brooch); *Serv-Air, Inc.*, 161 NLRB 382, 402, 416–417 (1966) (applying special circumstances test where employer limited employees to wearing only one button of their choice), enfd. in relevant part 395 F.2d 557 (10th Cir. 1968), cert. denied 393 U.S. 840 (1968).

*Pauma v. NLRB*, 888 F.3d 1066, 1084 (9th Cir. 2018) ("'[I]nquiry into such considerations [of alternative forms of communication] is made only when *nonemployees* are on the employer's property.'" (emphasis and alteration in original) (quoting *ITT Industries, Inc. v. NLRB*, 413 F.3d 64, 76 (D.C. Cir. 2005))). In fact, the United States Court of Appeals for the District of Columbia Circuit has approvingly observed that "[t]he NLRB has consistently ruled that the presence of alternative methods of communication is not relevant in determining the rights of employees." *Helton v. NLRB*, 656 F.2d 883, 896, 897 fn. 71 (D.C. Cir. 1981).

Our dissenting colleagues claim that our decision today is inconsistent with Board precedent regarding solicitation and distribution by employees on company property because we fail to make a distinction between policies that completely prohibit the exercise of Section 7 rights and policies that only limit the exercise of Section 7 rights. They are mistaken. Indeed, it is their proposed "meaningful opportunity" standard that is inconsistent with that precedent.

The Board has long held that a no-solicitation rule that prohibits union solicitation on company property only during working time is presumptively lawful in the absence of evidence that it was promulgated for a discriminatory purpose, while a no-solicitation rule that prohibits union solicitation on company property during nonworking time is unlawful in the absence of evidence that special circumstances make such a rule necessary to maintain production or discipline. See *Our Way, Inc.*, 268 NLRB 394, 394–395 (1983); *Peyton Packing Co.*, 49 NLRB 828, 843–844 (1943), enfd. 142 F.2d 1009 (5th Cir. 1944), cert. denied 323 U.S. 730 (1944); see also *Republic Aviation*, 324 U.S. at 803 & fn. 10 (approving the Board's standard for no-solicitation rules as set forth in *Peyton Packing*). The Board treats no-distribution rules similarly, as such rules are unlawful in the absence of special circumstances if they prohibit employees from distributing union literature in nonwork areas during nonworking time. See *Stoddard-Quirk Mfg. Co.*, 138 NLRB 615, 619–621 (1962). Contrary to our dissenting colleagues' suggestion, the Board does not apply the above standards only when an employer *completely* prohibits solicitation or distribution. For example, an employer is not free to prohibit solicitation during certain nonworking times even if it provides employees a "meaningful opportunity" to engage in solicitation during other nonworking times; instead, the Board will find that any restriction on employees' ability to engage in union solicitation during nonworking times is

unlawful in the absence of special circumstances. See, e.g., *Globe Shopping City*, 204 NLRB 663, 665 (1973) (finding that an employer violated Sec. 8(a)(1) by telling an employee that he could engage in solicitation during his lunchbreak but could not do so during his 15-minute coffeebreak); *Exide Alkaline Battery Division of ESB, Inc.*, 177 NLRB 778, 778 (1969) (finding that an employer "unlawfully restricted solicitation" by allowing "solicitation during times when the employees were on scheduled nonwork time such as coffee and lunch breaks, but not when they were on other nonwork time", enfd. per curiam 423 F.2d 663 (4th Cir. 1970). Likewise, an employer cannot prohibit union distribution in certain nonwork areas during nonworking time merely because it provides a "meaningful opportunity" for union distribution in other nonwork areas during nonworking time. See, e.g., *Aqua-Aston Hospitality, LLC d/b/a Aston Waikiki Beach Hotel and Hotel Renew*, 365 NLRB No. 53, slip op. at 12 fn. 36 (2017) (rejecting the employer's argument that its prohibition on union distribution in its open-air lobby, which the Board determined to be a nonwork area, was lawful because it allowed distribution in alternative nonwork areas during nonworking time), enfd. mem. per curiam Nos. 17–1117, 17–1118, 17–1180, 2018 WL 11416606 (D.C. Cir. Mar. 20, 2018).

Thus, the application of the special circumstances test to employer policies that restrict but do not completely prohibit employees' ability to display union insignia is consistent with Board precedent regarding employee solicitation and distribution. In fact, that precedent supports our decision today because just as employers are not free to restrict employees' ability to engage in union solicitation in the workplace during nonworking time or union distribution in nonwork areas during nonworking time in the absence of special circumstances, employers may not restrict employees' ability to display union insignia in the workplace in the absence of special circumstances.[26] Moreover, application of the special circumstances test to partial restrictions on the display of union insignia is consistent with the Supreme Court's understanding of *Republic Aviation*, as the Court subsequently observed that "*[n]o restriction* may be placed on the employees' right to discuss self-organization among themselves, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline." *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 113 (1956) (emphasis added) (citing *Republic Aviation*, 324 U.S. at 803). We therefore adhere to *Republic Aviation* by requiring an employer to justify through a showing of special circumstances any

---

[26] Employees' presumptive right to display union insignia is not limited to nonworking time or nonwork areas because unlike union solicitation or distribution, the display of union insignia does not pose a general risk to production. See *infra* note 33. A limited exception applies in immediate patient care areas in healthcare facilities. See *supra* note 18.

12                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

restriction on the important Section 7 right to display union insignia—a right which allows employees to, in the words of our dissenting colleagues, "communicate their own support for the union and implicitly encourage other employees to join them." Our dissenting colleagues' claim that we "(mis)apply 'the *Republic Aviation* rule' to *every* in-plant display of union insignia" (emphasis in original) is simply without merit.

In sum, the Supreme Court, the federal circuit courts, and the Board have rejected the proposition that an employer's willingness to tolerate the display of some union insignia by its employees gives it a free hand to restrict other protected displays of union insignia. To hold otherwise would effectively treat the display of union insignia as a privilege to be granted by the employer on the terms it chooses rather than as an essential Section 7 right that the employer is required to accommodate. Accordingly, our dissenting colleagues' position that an employer is free effectively to prohibit employees from wearing union clothing or any other item displaying union insignia (forms of protected Section 7 communication)—without any justification—so long as the employer leaves open an alternative method to display union insignia—which they characterize as the employer providing a "meaningful opportunity to display union insignia"—is clearly contrary to *Republic Aviation* and decades of subsequent court and Board precedents.

### 2. Nondiscriminatory and consistently enforced prohibition

Our dissenting colleagues, despite their claim to the contrary, also suggest, just as the *Stabilus* dissent did, that any "nondiscriminatory" and "consistently enforced" uniform policy or dress code that does not completely prohibit the display of union insignia is lawful, regardless of its effect on the exercise of employees' Section 7 rights. See *Stabilus*, 355 NLRB at 843–844 (Member Schaumber, dissenting in part). However, under the Act, it is axiomatic that if employees have a Section 7 right to engage in certain protected activity, an employer is *not* free to prohibit that activity simply because it prohibits all similar activities by employees, including activities that are not statutorily protected. Thus, in *Republic Aviation*, the Court explicitly rejected the employer's argument that application of its facially neutral no-solicitation rule to employees engaged in union solicitation was not unlawful "because the rule was not discriminatorily applied against union solicitation but was impartially enforced against all solicitors." 324 U.S. at 805; see also *Boch Imports, Inc. v. NLRB*, 826 F.3d 558, 574–575 (1st Cir. 2016) (rejecting an employer's argument that it neither promulgated its dress ban in response to union activity nor enforced it in a discriminatory manner because "while the presence of

these circumstances may constitute grounds for invalidating a dress ban, it does not necessarily follow that the absence of these circumstances constitutes a ground for upholding a dress ban" (internal citation and emphasis omitted)); *Texas Instruments Inc. v. NLRB*, 599 F.2d 1067, 1072 (1st Cir. 1979) (explaining that enforcement of an unlawful rule to restrict Sec. 7 activity "could not support a discharge even if the motivation to enforce the rule, a neutral not an anti-union objective, were the employer's only motivation for that discharge"). That an employer's uniform policy or dress code effectively prohibits employees from wearing *all* clothing other than the clothing prescribed by the employer (including, but not limited to, union clothing) does not make the employer's action lawful, any more than an employer's no-solicitation rule is lawful because it bars all solicitation (not just union solicitation) on nonworking time. See, e.g., *Cordúa Restaurants, Inc.*, 368 NLRB No. 43, slip op. at 5 (2019) (finding an employer's no-solicitation rule unlawful because it banned "*all* solicitation on the [employer's] premises regardless of when the solicitation occurs" (emphasis added)), enfd. 985 F.3d 415 (5th Cir. 2021).

### 3. Rejection of balancing principle

The *Stabilus* dissent's primary argument was that "[i]f employees have the right to wear union attire *instead* of a company uniform, the employer's right to promulgate and enforce reasonable, nondiscriminatory apparel rules is negated entirely." 355 NLRB at 843 (Member Schaumber, dissenting in part) (emphasis in original); see also id. at 843 & fn. 7 (asserting that application of the special circumstances test in that context would "completely submerge" and "totally ignore[]" employers' right to establish workplace rules and policies and would thus be contrary to *Republic Aviation*). Our dissenting colleagues similarly claim that our decision today "effectively nullifies the legitimate interests served by employer dress codes." On the contrary, it is the standard first proposed by the *Stabilus* dissent and expanded upon by our dissenting colleagues today that would abandon the balancing principle established in *Republic Aviation*.

To say that an employer's prerogative must yield to employees' statutory rights—unless special circumstances are shown—is to say only that employer interests and employee rights must be accommodated as required by *Republic Aviation*. As the Board has explained, "[i]n cases where the employer argues that special circumstances justify a ban on union insignia, the Board and courts balance the employee's right to engage in union activities against the employer's right to maintain discipline or to achieve other legitimate business objectives, under the existing circumstances." *Albis Plastics*, 335 NLRB 923, 924 (2001); see also *Sam's Club*, 349 NLRB 1007, 1010

(2007) ("[A]n employer may limit or ban the display or wearing of union insignia at work if special circumstances exist and if those circumstances outweigh the adverse effect on employees' Section 7 rights resulting from the limitation or ban."); *Nordstrom, Inc.*, 264 NLRB 698, 700 (1982) (explaining that in applying the special circumstances test, "the entire circumstances of a particular situation must be examined to balance the potentially conflicting interests of an employee's right to display union insignia and an employer's right to limit or prohibit such display"). In such cases, the employer's prerogative is limited—not, as claimed by the *Stabilus* dissent and our dissenting colleagues, "negated entirely," "completely submerge[d]," "totally ignore[d]," or "effectively nullifie[d]"—just as employees' rights are limited (but not negated or nullified) by the possibility that they may have to yield if special circumstances are shown.

Our dissenting colleagues echo the assertions of the Respondent and amici CDW and HRPA that the special circumstances test places a nearly insurmountable burden on employers to justify uniform policies or dress codes that implicitly limit or restrict the display of union insignia. This view is simply inconsistent with decades of Board experience in applying the special circumstances test. Indeed, contrary to the view adopted by our dissenting colleagues, the Respondent, and supporting amici, the Board has found the existence of special circumstances that justify employer restrictions on union insignia and apparel in many different situations, such as "when their display may

jeopardize employee safety, damage machinery or products, exacerbate employee dissension, or unreasonably interfere with a public image that the employer has established, or when necessary to maintain decorum and discipline among employees." *Komatsu America Corp.*, 342 NLRB 649, 650 (2004).[27] In fact, the Board has previously found that employers established special circumstances that justified prohibiting employees from wearing attire displaying union insignia in place of attire required by a uniform policy or dress code.[28] Thus, the special circumstances test allows employers the opportunity to show that restrictions on employees' display of union insignia that result from uniform policies or dress codes—and would otherwise be unlawful—are justified based on the specific circumstances existing in their workplaces. Further, the special circumstances test appropriately places the burden on the employer because, as the party asserting that employees' Section 7 rights must be restricted to achieve a legitimate business objective, it "logically is in the best position to offer evidence on the point." *Beth Israel Hospital*, 437 U.S. at 502. Accordingly, consistent with Supreme Court precedent, beginning with *Republic Aviation*, the special circumstances test has proven to be an effective balancing approach for accommodating employee rights and employer interests "'with as little destruction of one as is consistent with the maintenance of the other.'" *Beth Israel Hospital*, 437 U.S. at 492 (quoting *Babcock & Wilcox*, 351 U.S. at 112).[29]

---

[27] See, e.g., *W San Diego*, 348 NLRB 372, 372–373 (2006) (finding that special circumstances justified prohibiting employees from wearing a union pin in public areas because the pin would have interfered with the "Wonderland" ambience that the employer sought to create through a "trendy, distinct, and chic look" for its employees); *Komatsu*, 342 NLRB at 650 (finding that special circumstances justified prohibiting employees from wearing a union shirt because the shirt made "a clear appeal to ethnic prejudices" that was "especially inflammatory and offensive" given the context); *Pathmark Stores*, 342 NLRB 378, 379 (2004) (finding that special circumstances justified prohibiting employees from wearing hats and shirts with the union slogan "Don't Cheat About the Meat!" because "the slogan reasonably threatened to create concern among the [employer's] customers about being cheated"); *Albis Plastics*, 335 NLRB at 925 (finding that special circumstances justified banning employees from attaching unauthorized stickers, including union stickers, to their bump caps because "unauthorized stickers could [have] interfere[d] with the ready visibility of the bump caps and authorized stickers" and compromised the employer's "strategy to promote plant safety"); *Kendall Co.*, 267 NLRB 963, 964–965 (1983) (finding that special circumstances justified prohibiting an employee from wearing a union keychain on his shirt pocket because "employees work[ed] around machinery that ha[d] a series of cams, levers, and gears in which objects [could] become entangled, possibly drawing the employee, as well, into the machine's moving parts"); *Hanes Hosiery, Inc.*, 219 NLRB 338, 347 (1975) (finding that special circumstances justified prohibiting employees from wearing a union pin because the pin could have caused defects in the hosiery produced by the employer); *United Aircraft Corp.*, 134 NLRB 1632, 1633–1635 (1961) (finding that special circumstances

justified prohibiting employees from wearing a pin that the union distributed to "loyal" strikers because the employer reasonably feared that the pin would have "promote[d] disorder and engender[ed] further divisiveness between the strikers and nonstrikers" in the immediate aftermath of an acrimonious strike).

[28] See supra note 20 and accompanying text.

[29] We decline to specifically address any hypothetical employer policies discussed by our dissenting colleagues—such as a "blue polo" policy—because they are not raised by the facts of the present case. If a challenge to such a policy were to come before the Board in the future, the employer, regardless of whether its employees are public facing, would have the opportunity to establish, based on the specific circumstances existing in its workplace, special circumstances that justify any restriction on the display of union insignia resulting from the policy. We do note, however, that the Board has never held, as our dissenting colleagues imply, that an employer can only establish special circumstances that fall into one of the categories identified in *Komatsu*, as listed above. Thus, an employer may be able to justify a restriction or limitation on the display of union insignia resulting from a uniform policy or dress code by establishing special circumstances that do not fit neatly into one of those categories—particularly where the Board is presented with a factual situation that it has not had the opportunity to consider in the past. See, e.g., *Wal-Mart Stores, Inc.*, 368 NLRB No. 146, slip op. at 10 fn. 35 (2019) (Member McFerran, dissenting) ("Consistent with the Board's longstanding jurisprudence, an employer always has the opportunity to rebut the General Counsel's showing of a presumptively unlawful restriction by establishing a specific and objective special circumstance to justify its policy. The fact that there is not a 'currently recognized special

Ironically, it is the standard first proposed in the *Stabilus* dissent and expanded upon by our dissenting colleagues today that would "negate[]," "submerge," "ignore," and "nullif[y]" one side of the balance—specifically, employees' right to display union insignia through attire when it is addressed by their employer's uniform policy or dress code. Contrary to *Republic Aviation*, this proposed standard would provide no opportunity for the Board to "work[] out an adjustment between the undisputed right of self-organization assured to employees under the [ ] Act and the equally undisputed right of employers to maintain discipline in their establishments." 324 U.S. at 797–798. Instead, an employer's managerial prerogative to establish a uniform policy or dress code would, in all circumstances, override employees' Section 7 right to display union insignia through attire covered by such a policy so long as the employer otherwise provides "a meaningful opportunity to display union insignia."[30] This proposed standard therefore leaves no room for the Board to assess whether the policy actually furthers any legitimate business interest asserted by the employer and, if so, whether that business interest outweighs employees' Section 7 right to display union insignia.

Neither our dissenting colleagues nor the *Stabilus* dissent cite any particular employer interest or objective that a uniform policy or dress code that implicitly restricts the display of union insignia universally furthers regardless of the specific circumstances in which an employer operates.[31] To the contrary, the Board's experience in applying the special circumstances test has demonstrated that employers establish restrictions on the display of union insignia to further many different business interests and objectives depending on the specific circumstances in which they operate.[32] Therefore, the Board is not able to strike a balance between employee rights and employer interests in this context that is generally applicable regardless of the circumstances or that would support the establishment of a categorical rule.[33] As the Board has previously recognized, "it is inherent in *Republic Aviation* that balances will have to be struck case by case; the alternative is simply eliminating the protection of Sec[tion] 7 activity." *Capital Medical Center*, 364 NLRB 887, 890 fn. 12 (2016), enfd. 909 F.3d 427 (D.C. Cir. 2018), cert. denied 139 S.Ct. 1445 (2019). For the reasons discussed above, we find that the Board is not free to choose that alternative.[34]

---

circumstance' that would encompass a prohibition on a prounion sandwich board or a large button with flashing lights surely would not preclude an employer from presenting a persuasive 'special circumstances' argument with regard to either in the appropriate case.").

[30] As discussed above, based on our dissenting colleagues' application of their proposed standard to the facts of the present case, an employer would satisfy the "meaningful opportunity" requirement by providing an alternative method of its choosing for employees to display union insignia. Thus, as long as an employer allows its employees to display union insignia by, for example, affixing union stickers to their clothing, the employer would not have to provide any justification for maintaining a uniform policy or dress code that effectively prohibits employees from displaying union insignia in any other manner—e.g., through buttons, pins, hats, shirts, vests, scarves, etc.

[31] In attempting to justify their proposed standard, our dissenting colleagues assert that, in general, "legitimate reasons exist for employers to maintain" facially neutral, nondiscriminatory dress codes that provide "a meaningful opportunity to display union insignia." Apparently, they are comfortable foregoing any analysis of the special circumstances existing in an employer's workplace and, instead, assuming that every such policy serves a legitimate business interest and that it outweighs any restriction on the display of union insignia resulting from the policy so long as the employer allows an alternative method of its choosing for employees to display union insignia. This approach would be plainly inconsistent with *Republic Aviation*'s requirement that the Board balance employees' Sec. 7 rights and employers' legitimate business interests.

[32] See supra notes 20, 27 and accompanying text.

[33] In this respect, uniform policies and dress codes that implicitly restrict or limit the display of union insignia are distinguishable from no-solicitation and no-distribution rules. Cf. *Cordía Restaurants*, 368 NLRB No. 43, slip op. at 5 ("[R]ules that prohibit solicitation only during working time are presumptively lawful . . . ."); *St. John's Hospital & School of Nursing, Inc.*, 222 NLRB 1150, 1150 (1976) ("Rules prohibiting distribution of literature are presumed valid unless they extend to activities during nonworking time and in nonworking areas."), enf. denied

in part 557 F.2d 1368 (10th Cir. 1977). The Board recently observed that the "longstanding precedent governing employer restrictions on solicitation and distribution . . . already strikes a balance between employee rights and employer interests." *Cordía Restaurants*, 368 NLRB No. 43, slip op. at 5 (internal quotations omitted). As the Board succinctly stated almost 80 years ago, "[w]orking time is for work." *Peyton Packing*, 49 NLRB at 843. Thus, employers may prohibit solicitation, including union solicitation, during working time because it "prompts an immediate response from the individual or individuals being solicited" and is thus highly likely to interfere with productivity. *Wal-Mart*, 340 NLRB 637, 639 (2003); see also *Miller's Discount Dept. Stores*, 198 NLRB 281, 281 (1972) ("[A rule prohibiting solicitation during working time] is valid because it is presumed to be directed toward, and to have the effect of, preventing interference with production."), enfd. sub nom. *NLRB v. Daylin, Inc.*, 496 F.2d 484 (6th Cir. 1974). Employers may prohibit distribution during working time *and* in working areas "because it carries the potential of littering the employer's premises," thereby raising "a hazard to production whether it occurs on working time or nonworking time." *Stoddard-Quirk Mfg. Co.*, 138 NLRB 615, 619, 621 (1962). In contrast, as discussed above, uniform policies and dress codes that implicitly restrict or limit the display of union insignia do not generally serve any specific employer interest regardless of the circumstances in which an employer operates but instead may further many different legitimate business interests and objectives depending on the context. Therefore, such policies are not conducive to being governed by a similar presumption but instead must be examined on a case-by-case basis.

[34] We also reject HRPA's argument that the Board has incorrectly substituted "an artificially created 'special circumstances' test that places an exceedingly high and inappropriate burden of proof on employers" for the balancing test that the Supreme Court established in *Republic Aviation* to determine the legality of an employer's workplace rules and policies. As we have demonstrated above, the special circumstances test is a balancing test, and HRPA and others have greatly overstated the burden that it imposes on employers. Further, as discussed above, the Board's application of the special circumstances test to employer policies that

In sum, contrary to our dissenting colleagues, *Stabilus* correctly specifies that the Board should apply the special circumstances test when a restriction on employees' right to display union insignia has resulted from an employer's nondiscriminatory, consistently enforced uniform policy or dress code. Our dissenting colleagues' proposed holding that employers do not have to provide any justification for such restrictions on the display of union insignia if they otherwise provide employees with a "meaningful opportunity to display union insignia," i.e., an alternative method of the employers' choosing, is contrary to the principles of *Republic Aviation* and decades of Board and court precedent applying those principles.

### F. Application of Boeing Would Be Contrary to Republic Aviation and Wal-Mart Is Therefore Overruled

The Respondent and CDW have argued that the standard established in *Boeing Co.*, 365 NLRB No. 154 (2017), rather than the *Republic Aviation* special circumstances test, applies in this case pursuant to the Board's recent decision in *Wal-Mart Stores, Inc.*, 368 NLRB No. 146 (2019).[35] In *Wal-Mart*, the Board found that "[w]here . . . the [e]mployer maintains a facially neutral rule that limits the size and/or appearance of union buttons and insignia that employees can wear but does not prohibit them," the Board should apply the *Boeing* standard rather than the *Republic Aviation* special circumstances test. *Wal-Mart*, 368 NLRB No. 146, slip op at 2–3. The Respondent's team-wear policy is essentially a uniform policy and not a size-and-appearance policy. However, the *Wal-Mart* Board made a more general distinction between rules that completely prohibit the display of union insignia (to which

the special circumstances test applies) and rules that partially restrict the display of union insignia (to which the *Boeing* standard applies). See *Wal-Mart*, 368 NLRB No. 146, slip op. at 2–3 & fns. 10, 13. Here, while the team-wear policy implicitly prohibits production associates from wearing union shirts in place of the required team-wear shirts and thus partially restricts the display of union insignia, it does not prohibit them from wearing *all* union insignia, as the policy does not restrict employees from wearing union stickers on their team-wear shirts. Therefore, in order to be consistent with *Wal-Mart* the Board would arguably be required to apply the *Boeing* standard rather than the special circumstances test in the present case. For that reason, and because *Wal-Mart* is contrary to *Republic Aviation* and decades of Board and court precedent applying it, we overrule *Wal-Mart* and restore clarity to this area of Board law.[36]

As we have painstakingly demonstrated above, for many decades, the Board, consistent with *Republic Aviation*, adhered to the principle that an employer may not limit or ban employees' display of union insignia at work absent a showing by the employer that special circumstances exist. The Board's decision in *Wal-Mart* was the first and, to this point, only time that the Board has deviated from that principle by applying the less demanding *Boeing* standard to restrictions on displays of union insignia instead. The *Wal-Mart* Board relied heavily on the mistaken premise that the employer's partial restriction on the display of union insignia in that case presented a novel scenario that fell outside the ambit of *Republic Aviation* and its progeny. As explained in detail above, *Republic Aviation* itself involved only a partial restriction on the

---

restrict employees' right to display union insignia is consistent with *Republic Aviation*. See supra note 23.

[35] The Respondent and CDW have also argued that the Board should apply the *Boeing* standard here because the special circumstances test applies only when a uniform policy or dress code explicitly or outright prohibits the display of union insignia or has been disparately applied against employees displaying union insignia. However, the Board has not applied the special circumstances test only when an employer policy explicitly or outright prohibits the display of union insignia but has also applied it when a facially neutral employer policy would restrict employees' ability to display union insignia. See, e.g., *Long Beach Memorial Medical Center, Inc. d/b/a Long Beach Memorial Medical Center & Miller Children's and Women's Hospital Long Beach*, 366 NLRB No. 66, slip op. at 1 (2018) (applying the special circumstances test where the employer maintained a policy that allowed employees to wear only employer-approved pins and buttons), enfd. mem. 774 Fed.Appx. 1 (D.C. Cir. 2019); *Boch Honda*, 362 NLRB 706, 707–708 (2015) (applying the special circumstances test where the employer maintained a policy that prohibited employees from wearing "pins, insignias, or other message clothing"); *Sam's Club*, 349 NLRB at 1010–1012 (applying the special circumstances test where the employer promulgated a policy that allowed employees to wear only employer-approved badge backers and required them to wear breakaway lanyards). Indeed, an employer *cannot* establish special circumstances to justify a uniform policy or dress code that

restricts employees' right to display union insignia if it has disparately applied the policy against employees displaying union insignia. See, e.g., *Stabilus*, 355 NLRB at 837 (finding that even if the employer had established special circumstances to justify its uniform policy, it still violated the Act because "the policy was applied in a disparate manner to Sec[.] 7 activity relative to comparable non-Sec[.] 7 activity"); *Airport 2000 Concessions, LLC*, 346 NLRB 958, 960 (2006) ("[T]he [employer] inconsistently applied its uniform policy and, therefore, cannot use that policy to establish special circumstances."). Accordingly, the Respondent and CDW are mistaken about the situations in which the special circumstances test applies.

[36] Our dissenting colleagues, who were part of the majority in *Wal-Mart*, claim that *Wal-Mart* is irrelevant to the disposition of the present case. Although they may not have intended for *Wal-Mart* to apply in the circumstances of this case, we have shown above that the *Wal-Mart* decision can be interpreted to apply here, and as also noted above, both the Respondent and CDW point to *Wal-Mart* in support of their argument that the Respondent's team-wear policy should be analyzed under *Boeing*. Thus, at the least, *Wal-Mart* unnecessarily confuses the test that should be applied to the important subject of the lawfulness of workplace rules and policies restricting the display of union insignia. By this decision we intend to clarify that test, and, accordingly, we find it necessary to address *Wal-Mart* in our decision today.

display of union insignia, as the employer in that case prohibited employees from wearing a union-steward button but assured them (and the Supreme Court) that they could wear other union buttons. Thereafter, the Board consistently applied the special circumstances test even when employers had only partially restricted employees' ability to display union insignia[37]—until *Wal-Mart*. Thus, the *Wal-Mart* Board ignored decades of Board precedent holding that *any* limitation on the display of union insignia is presumptively unlawful—regardless of whether an employer permits other related Section 7 activity[38]—and essentially adopted as law an argument that the Court *rejected* in *Republic Aviation*, i.e., that an employer's willingness to permit the display of some union insignia warrants a more forgiving assessment of its asserted justification for banning other union insignia.

In a tortured attempt to square its decision with decades of contrary precedent, the *Wal-Mart* Board made a distinction between facial challenges to rules that partially restrict the display of union insignia (to which the *Boeing* standard applies) and as-applied challenges to the application of such rules to outright ban specific union insignia (to which the special circumstances test applies).[39] See *Wal-Mart*, 368 NLRB No. 146, slip op. at 2–3 & fns. 10, 13. However, the Board had never previously made such a distinction, as it had, up to then, applied the special circumstances test to facial challenges to rules restricting the display of union insignia. See, e.g., *Long Beach Memorial Medical Center*, 366 NLRB No. 66, slip op. at 1; *Boch Honda*, 362 NLRB at 707–708; *Sam's Club*, 349 NLRB at 1010–1012. The Board has declined to make such a distinction between these two types of challenges for good reason. Facial and as-applied challenges are functionally identical in this context, as the guiding principle in both situations is, consistent with *Republic Aviation*, that any limitation on the display of union insignia is presumptively unlawful. The *Wal-Mart* Board attempted to justify its faulty distinction by arguing that in cases involving as-applied challenges, the Board is "able to consider the specific buttons or other insignia that employees were barred from wearing and analyze the impact that those specific buttons or insignia would reasonably have in the particular workplaces involved." 368 NLRB No. 146, slip op. at 2 fn. 10. However, pursuant to *Republic Aviation*, once any

limitation on employees' Section 7 right to display union insignia is established, the relevant inquiry is simply whether the employer can establish special circumstances for the limitation; the nature and relative extent of the employer's restriction on the display of union insignia has not been part of that inquiry.

The *Wal-Mart* Board also mischaracterized the nature of the special circumstances test. According to the *Wal-Mart* Board, "determining whether a special circumstance exists justifying a particular insignia ban obviates the need to conduct an open-ended balancing analysis anew in every case. If the prohibition falls within the scope of a recognized special circumstance, it is lawful." Id., slip op. at 2 (internal footnotes omitted). The Board has certainly acknowledged broad categories of cases in which employers established special circumstances that justify restrictions on the display of union insignia. See, e.g., *Komatsu America Corp.*, 342 NLRB 649, 650 (2004) ("The Board has previously found such special circumstances justifying the proscription of union slogans or apparel when their display may jeopardize employee safety, damage machinery or products, exacerbate employee dissension, or unreasonably interfere with a public image that the employer has established, or when necessary to maintain decorum and discipline among employees."). However, in cases involving a restriction on the display of union insignia, the Board engages in a rigorous, fact-specific inquiry to determine whether the employer actually established the presence of special circumstances in the context of its workplace. See *Nordstrom*, 264 NLRB at 700 (explaining that in applying the special circumstances test, "the entire circumstances of a particular situation must be examined to balance the potentially conflicting interests of an employee's right to display union insignia and an employer's right to limit or prohibit such display").

Overall, the *Wal-Mart* Board upended the traditional framework in this area of Board law. It shifted to an analysis that plainly tips the balance toward employer interests by requiring that the General Counsel first prove that an employer's partial restriction on the display of union insignia adversely affected employees' Section 7 rights and by holding that an employer may then produce some lesser justification for its conduct. However, the *Wal-Mart* Board cited no union insignia precedent and made no

---

[37] See supra note 25 and accompanying text.

[38] See, e.g., *Boch Honda*, 362 NLRB at 707 ("[A] rule that *curtails* employees' Sec[.] 7 right to wear union insignia in the workplace must be narrowly tailored to the special circumstances justifying maintenance of the rule, and the employer bears the burden of proving such special circumstances." (emphasis added)); *Albis Plastics*, 335 NLRB 923, 924 (2001) ("The Board has held that, in the absence of 'special circumstances,' an employer's prohibition of or *limitation on* the display of union insignia violates Sec[.] 8(a)(1)." (emphasis added)); *Mayrath Co.*,

132 NLRB 1628, 1629–1630 (1961) ("[R]ules which *interfere* with this right [to wear union insignia] . . . are presumptively invalid in the absence of special circumstances." (emphasis added; internal quotations omitted)).

[39] As discussed above, based on the parties' exceptions, the question of whether the Respondent unlawfully enforced the team-wear policy against employees wearing union shirts is not before us. Thus, we are faced with only a facial challenge to a rule that partially restricts the display of union insignia.

persuasive argument to support the premise that an employer's willingness to tolerate the display of some union insignia gives it more leeway to restrict the display of other union insignia that it considers less favorable and renders that interference with employees' Section 7 rights "less severe." See *Wal-Mart*, 368 NLRB No. 146, slip op. at 2–3. The decision in *Wal-Mart* shares a fundamental defect with the standard proposed by our dissenting colleagues today: it effectively treats the display of union insignia more as a privilege to be granted by the employer on the terms it chooses, rather than as an essential Section 7 right that—pursuant to federal labor law—the employer is required to accommodate absent a showing of special circumstances. Accordingly, the Board's decision in *Wal-Mart* cannot be squared with *Republic Aviation* and its progeny and therefore must be overruled.

While the reasons discussed above, on their own, compel us to overrule *Wal-Mart*, we also overrule it today to restore clarity to what was previously a well-settled area of Board law. Prior to *Wal-Mart*, the standard was straightforward: if an employer interfered with employees' Section 7 right to display union insignia, then it had the burden to establish special circumstances to justify its interference. The *Wal-Mart* Board unnecessarily introduced uncertainty by raising several threshold questions that would need to be answered before determining the standard to apply in a union insignia case. Does an employer's policy prohibit the display of *all* union insignia, or does it only partially restrict the display of union insignia?[40] If it only partially restricts the display of union insignia, does the case present a facial challenge or an as-applied challenge?

The present case illustrates the potential confusion that can result from the *Wal-Mart* framework. The complaint alleged, among other things, that the Respondent violated Section 8(a)(1) by maintaining the team-wear policy and enforcing it against employees wearing union shirts. As discussed above, the enforcement allegations are not before us because no party raised them on exceptions. Thus, we are presented with only a facial challenge to the team-wear policy. Because the policy is not a total ban on all union insignia, *Wal-Mart* appears to require that we apply the *Boeing* standard. However, if the enforcement allegations were before us on exceptions, we would then be faced with both a facial challenge and an as-applied challenge. In those circumstances, under *Wal-Mart*, would the *Boeing* standard apply to the facial challenge, but the special circumstances test would apply to the as-applied

challenge? To avoid such confusion in the future, we reaffirm that, consistent with *Republic Aviation* and decades of precedent applying it, when an employer interferes *in any way* with employees' Section 7 right to display union insignia (whether through buttons, pins, stickers, shirts, hats, or any other accessories or attire), that interference is presumptively unlawful, and the employer has the burden to establish special circumstances that justify its interference.

### G. Today's Overruling of Wal-Mart Will Be Applied Retroactively

"The Board's usual practice is to apply new policies and standards retroactively 'to all pending cases in whatever stage.'" *SNE Enterprises*, 344 NLRB 673, 673 (2005) (citing *Aramark School Services, Inc.*, 337 NLRB 1063, 1063 fn. 1 (2002) (quoting *Deluxe Metal Furniture Co.*, 121 NLRB 995, 1006–1007 (1958))). The Supreme Court has indicated that "the propriety of retroactive application is determined by balancing any ill effects of retroactivity against 'the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles.'" Ibid. (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947)). Pursuant to this principle, the Board will apply a policy change retroactively unless retroactive application would work a "manifest injustice." Ibid. In making that determination, the Board considers "the reliance of the parties on preexisting law, the effect of retroactivity on accomplishment of the purposes of the Act, and any particular injustice arising from retroactive application." Ibid.

As discussed above, we have not established a new standard or policy in this case but instead have simply reaffirmed that, consistent with *Republic Aviation*, when an employer interferes *in any way* with employees' Section 7 right to display union insignia, that interference is presumptively unlawful, and the employer has the burden to establish special circumstances that justify its interference. However, in doing so, we have overruled *Wal-Mart*, 368 NLRB No. 146, and its implication that the standard established in *Boeing Co.*, 365 NLRB No. 154 (2017), rather than the *Republic Aviation* special circumstances test, should apply to employer policies that only partially restrict employees' ability to display union insignia. We will apply today's overruling of *Wal-Mart* retroactively because doing so will not work a manifest injustice. *Wal-Mart* was decided only 2 years ago, and its scope was unclear. Thus, parties could not yet have relied on it to a

---

[40] Relatedly, *Wal-Mart* is not clear regarding what qualifies as a partial restriction on the display of union insignia to which the *Boeing* standard, rather than the special circumstances test, would apply. Does *Wal-Mart* apply narrowly only to size-and-appearance policies like the policies at

issue in that case, or does it apply more broadly to any employer policy that restricts the display of union insignia in some manner but leaves open a means by which employees can display union insignia?

significant extent. Regardless, any reliance by parties on *Wal-Mart* is clearly outweighed by the mischief of producing a result that is contrary to well-settled Board law by continuing to apply *Wal-Mart*. As discussed above, the *Wal-Mart* decision was contrary to *Republic Aviation* and almost 75 years of Board and court precedent applying it and unnecessarily introduced uncertainty into what was until that point a well-settled area of Board law. Finally, no injustice will arise here from retroactive application because *Wal-Mart* was decided after the judge issued her decision in this case; thus, the Respondent had no opportunity to rely on *Wal-Mart* to its detriment.

### H. The Respondent Did Not Establish Special Circumstances

Pursuant to the Respondent's team-wear policy, production associates are required to wear assigned team wear—i.e., black cotton shirts with the Respondent's logo and black cotton pants with no buttons, rivets, or exposed zippers. On occasion, production associates, with their supervisor's approval, may substitute for team wear all-black clothing that is "mutilation free" and "work appropriate" and that poses no safety risks. Given the specific apparel requirements, the team-wear policy prohibits production associates from substituting any shirt with a logo or emblem, including a shirt bearing union insignia, for a team-wear shirt.[41] Thus, the team-wear policy restricts production associates' ability to display union insignia, and the Respondent has the burden to establish special circumstances. The Respondent claims that the team-wear policy is justified by special circumstances because it is intended to lower the risk of employees' clothing causing mutilations to the unfinished vehicles and to aid in the visual management of GA. We agree with the judge that the Respondent failed to establish special circumstances on either ground.

---

[41] We reject the Respondent's argument that the team-wear policy does not necessarily prohibit production associates from wearing union-branded apparel because they "are perfectly free to wear all black substitute union branded apparel that is mutilation-free, work appropriate and safe." First, under the team-wear policy, production associates may substitute all-black clothing for team wear only with their supervisor's approval. Second, the Respondent's management officials testified that all-black clothing is team-wear compliant only if it has no logos or emblems. In fact, they specifically testified that a black shirt with the Union's logo on the front and back was not team-wear compliant. Therefore, production associates are not "perfectly free" to substitute union-branded apparel for the required team wear.

Additionally, we do not agree with the AFL–CIO and SEIU that the Respondent interpreted the team-wear policy to allow production associates to wear black union shirts prior to August 2017. Rather, the Respondent did not begin to strictly enforce the team-wear policy until August 2017—and the complaint did not allege that the Respondent's decision to begin to strictly enforce the team-wear policy was in response to its employees' union activity.

As discussed above, an employer can establish special circumstances that justify restrictions on the display of union insignia if their display may cause damage to the employer's products. See, e.g., *Hanes Hosiery*, 219 NLRB 338, 347 (1975) (finding that an employer established special circumstances to justify prohibiting employees from wearing a union pin because the pin could have caused defects in the hosiery produced by the employer). However, the Respondent has not shown that cotton shirts with non-Respondent logos, such as union logos, pose a mutilation risk to the unfinished vehicles in GA.[42] Although production associates regularly wore shirts with logos prior to August 2017, Production Manager Penera, Associate Manager Ogunniyi, and Production Supervisor Fenelon all testified that they did not have any knowledge of a shirt with a logo causing a mutilation to a vehicle. Further, none of them testified how a shirt with a logo might possibly cause a mutilation to a vehicle. To the contrary, Ogunniyi testified that while the black cotton shirt with union logos previously worn by production associates is not team-wear compliant, it is not a mutilation risk. The only evidence of any shirt being involved in a mutilation was Production Manager Martin's testimony that a raised metal emblem on a shirt once caused a mutilation to a vehicle. Thus, at most, the Respondent has shown that it has a legitimate interest in preventing raised metal emblems on shirts from causing mutilations to vehicles. However, the team-wear policy goes far beyond simply prohibiting employees from wearing shirts with metal emblems and therefore is not narrowly tailored to address that concern as required under the special circumstances test. See *Boch Honda*, 362 NLRB 706, 707 (2015) ("[A] rule that curtails employees' Sec[.] 7 right to wear union insignia in the workplace must be narrowly tailored to the special circumstances justifying maintenance of the rule . . . .").[43]

---

[42] Unlike the judge, we have not limited our analysis to whether the Respondent has shown that shirts with logos may cause mutilations to *seats* in the unfinished vehicles. Because the relevant inquiry is whether special circumstances exist to justify the team-wear policy, and not whether the Respondent had a lawful motive in deciding to strictly enforce that policy, the judge erred by limiting her analysis to what she found to be the Respondent's purported motivation for beginning to strictly enforce the team-wear policy (i.e., the increase in seat mutilations in April or May of 2017). See *W San Diego*, 348 NLRB at 375 (finding that where a motive-based violation was not alleged, "[a]ll of the legitimate management concerns served by the prohibition, not just those cited to [the employee], are relevant" to the special circumstances analysis).

[43] The Respondent has relatedly argued that it would be unduly burdensome to determine daily if each production associate's shirt is mutilation compliant. However, the Respondent's GA managers and supervisors testified that each day they inspect production associates during startup meetings and by walking the line to ensure that their clothing complies with the team-wear policy. Thus, even if special circumstances could be established on this basis, the Respondent has simply not shown that it would be more burdensome to ensure compliance with a narrowly

The team-wear policy is also not narrowly tailored to address the Respondent's claimed interest in maintaining visual management in GA, even assuming special circumstances could be established on that basis. Production Manager Martin testified that the team-wear policy could maintain visual management in GA as long as production associates are wearing black shirts. Martin's testimony is consistent with the fact that the team-wear policy allows production associates to wear, with their supervisor's permission, all-black shirts in place of the team-wear shirts. Therefore, while the Respondent may have a legitimate interest in requiring production associates to wear black shirts (and requiring production leads and line inspectors to wear red and white shirts, respectively), it has not demonstrated special circumstances that justify prohibiting production associates from wearing black union shirts. See *Malta Construction*, 276 NLRB 1494, 1495 (1985) (finding that an employer "failed to prove that its complete prohibition of insignia on its hardhats was necessary to enable it to identify its employees" where a manager testified that he could still identify its employees' orange hardhats even with union stickers on them).[44]

In sum, the Respondent has failed to establish special circumstances that justify the team-wear policy's implicit prohibition on employees wearing black union shirts. Accordingly, we adopt the judge's finding that the Respondent violated Section 8(a)(1) by maintaining the team-wear policy in its "General Assembly Expectations."

ORDER

The National Labor Relations Board orders that the Respondent, Tesla, Inc., Fremont, California, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining and enforcing an overly broad team-wear policy in its "General Assembly Expectations" that prohibits production associates from wearing black union shirts.

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind the team-wear policy in its "General Assembly Expectations," or revise the team-wear policy to make clear that it does not prohibit production associates from wearing black union shirts.

(b) Notify all current employees that the team-wear policy in its "General Assembly Expectations" has been rescinded, or, if it has been revised, provide them with a copy of the "General Assembly Expectations" with the revised team-wear policy.

(c) Post at its Fremont, California facility copies of the attached notice marked "Appendix."[45] Copies of the notice, on forms provided by the Regional Director for Region 32, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. The Respondent shall take reasonable steps to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since April 25, 2017.

(d) Within 21 days after service by the Region, file with the Regional Director for Region 32 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

---

tailored team-wear policy given that it already inspects the production associates daily for team-wear compliance.

[44] The Respondent argues that visual management of GA may be disturbed if production associates are allowed to wear shirts with union insignia and employees from outside of GA wear the same union shirts into GA. However, while employees outside of GA are not required to comply with the team-wear policy, there is no evidence that they are *prohibited* from wearing team-wear shirts or plain black shirts. Thus, this risk of interference with visual management is present under the current team-wear policy.

[45] If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notice must be posted within 14 days after service by the Region. If the facility involved in these proceedings is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the

notice must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region. If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]." If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

Dated, Washington, D.C.  August 29, 2022

_____

Lauren McFerran,                    Chairman

_____

Gwynne A. Wilcox,                    Member

_____

David M. Prouty,                    Member

(SEAL)            NATIONAL LABOR RELATIONS BOARD

MEMBERS KAPLAN and RING, dissenting.

We could not agree more wholeheartedly with our colleagues that displaying union insignia in the workplace is an important way employees exercise their rights under Section 7 of the National Labor Relations Act.  Employees who display union insignia communicate their own support for the union and implicitly encourage other employees to join them.  Effective protection of this right is therefore vital to our national labor policy, and the Supreme Court has long so instructed.[1]  It does not follow, however, that to be effective, the protection of this right requires holding any limitation on the display of union insignia, no matter how slight, to be presumptively unlawful.  Here, we part ways with the majority.

For a variety of legitimate reasons, some employers maintain dress codes or require their employees to wear a uniform.  Such policies indirectly prohibit employees from substituting union apparel in place of required clothing.  Tesla's dress code is one such policy.  It requires employees, for legitimate business reasons, to wear employer-issued "team wear" consisting of black cotton shirts imprinted with Tesla's logo and black cotton pants with no buttons, rivets, or exposed zippers.  Without stating so, the uniform policy's requirements prohibit employees from wearing other clothing, including clothing with union insignia.  It does not, however, prohibit employees from displaying union insignia in other ways,

such as by attaching to their team wear a sticker with the Union's logo and/or a prounion slogan.

The Supreme Court long ago instructed the Board how such conflicts between employee and employer rights must be resolved.  Neither right, the Court held in *Republic Aviation*, is "unlimited in the sense that [it] can be exercised without regard to any duty which the existence of rights in others may place upon employer or employee.  Opportunity to organize and proper discipline are both essential elements in a balanced society."[2]  Indeed, the Court has repeatedly emphasized that the Board's duty is to strike a "proper balance" between employee and employer rights, and it has described the carrying out of that duty as a "delicate task."[3]  Thus, in formulating an appropriate standard here, the Board must accommodate the rights of both parties, "with as little destruction of one as is consistent with the maintenance of the other."[4]  And "[t]he locus of that accommodation [ ] may fall at differing points along the spectrum depending on the nature and strength of the respective . . . rights . . . ."[5]

Consistent with these principles, the Board has long held that employer policies that *prohibit* the display of union insignia are presumptively unlawful and must be justified by special circumstances.  Over time, Board precedent has evolved a limited set of circumstances that constitute "special circumstances" justifying a ban on union insignia.[6]  In practice, the existence of special circumstances is exceedingly difficult for employers to establish—rightly so, given the significant impact of such an outright prohibition on the exercise of Section 7 rights.  Today, however, the majority extends the same presumption of unlawfulness and the same stringent "special circumstances" defense standard to *all* employer-apparel policies, including the less restrictive, facially neutral, and nondiscriminatory policy at issue in this case.  The result of this holding is that, in effect, no employer may lawfully maintain any dress code unless that employer can demonstrate special circumstances.  They take this step for all uniform policies and dress codes, even those that permit the display of many types of union insignia and are thus significantly less restrictive of Section 7 rights than the broad prohibitions on which the special circumstances standard was based and to which it properly applies.

---

[1] *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945).

[2] *Republic Aviation Corp. v. NLRB*, 324 U.S. at 798.

[3] See *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33–34 (1967) (describing the Board's "duty to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy"); *NLRB v. Erie Resistor Corp*., 373 U.S. 221, 229 (1963) (referring to the "delicate task . . . of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing

in the light of the Act and its policy the intended consequences upon employee rights against the business ends to be served by the employer's conduct").

[4] *NLRB v. Babcock & Wilcox*, 351 U.S. 105, 112 (1956).

[5] *Hudgens v. NLRB*, 424 U.S. 507, 522 (1976).

[6] See, e.g., *United Parcel Service*, 312 NLRB 596, 597 (1993), enf. denied 41 F.3d 1068 (6th Cir. 1994); *Nordstrom, Inc.*, 264 NLRB 698, 700 (1982).

Nothing in the Act suggests that Congress intended to make all employer dress codes presumptively unlawful. No policy of the Act supports the majority's position. Rather, the fundamental point made by the Supreme Court in *Republic Aviation* and repeated in *Babcock* is that the Board, in each case, must strike an *accommodation* between employee rights and legitimate employer interests that ensures "as little destruction of one as is consistent with the maintenance of the other."[7] The majority's decision today fails this test. It effectively nullifies the legitimate interests served by employer dress codes by requiring that employees be permitted to disregard the dress code whenever they wish to substitute an item of union apparel, unless special circumstances are shown, and their reliance on dicta in *Stabilus*[8] is misguided.

The majority's presumption of illegality is also flawed because it treats materially different employer rules as if they were the same. It is self-evident that a rule prohibiting all union insignia has a greater impact on the exercise of Section 7 rights than a dress code that permits some, but not all, ways of displaying union insignia. A reasonable standard would recognize this fact by requiring a lesser showing to justify lesser restrictions. The majority, however, treats both situations as if they were the same, and therefore fails to engage in reasoned decision-making.[9]

The balancing of rights and interests mandated by the Supreme Court requires the Board to distinguish between employer policies that broadly prohibit union insignia and facially neutral, nondiscriminatory dress codes that require employees to wear specific apparel but do not prohibit the display of union insignia. The former are and should remain presumptively unlawful, and employers who maintain them should continue to shoulder the heavy burden of proving that special circumstances justify them. The latter, in contrast, should be lawful as long as the dress code affords employees a meaningful opportunity to display union insignia. Because the majority rejects this standard and instead adopts a position that is both unreasonable and contrary to Supreme Court precedent, we dissent.

The Board recognized a similar commonsense distinction in *Wal-Mart Stores*, 368 NLRB No. 146 (2019), where it held that a presumption of illegality was not justified, and a special circumstances justification was not

required, where an employer "maintains a facially neutral rule that limits the size and/or appearance of union buttons and insignia that employees can wear but does not prohibit them." We participated in *Wal-Mart*, and we adhere to the principles stated there. Accordingly, we also dissent from our colleagues' unjustified overruling of that case.

Facts

The Respondent manufactures electric vehicles at its facility in Fremont, California. The vehicles are assembled by production associates in the General Assembly (GA) area of the facility. When an unfinished vehicle enters GA, its paint is cured sufficiently for light touching and general handling but is not cured as completely as when the vehicle is finished.

The Respondent's "General Assembly Expectations" include the following team-wear policy:

> Team Wear: It is mandatory that all Production Associates and Leads wear the assigned team wear.
>
> - On occasion, team wear may be substituted with all black clothing if approved by supervisor.
> - Alternative clothing must be mutilation free, work appropriate and pose no safety risks (no zippers, yoga pants, hoodies with the hood up, etc.).[10]

The team-wear policy applies only to employees in GA. For production associates, team wear consists of black cotton shirts with the Tesla logo and black cotton pants with no buttons, rivets, or exposed zippers. The Respondent provides newly hired production associates with two pairs of pants, two short-sleeve shirts, two long-sleeve shirts, and a sweater; thereafter, they buy team wear from the Respondent's team-wear store in the Fremont facility. Production leads and supervisors wear red shirts, while line inspectors wear white shirts; however, they all wear the same black cotton pants as the production associates.

Before August 2017, the Respondent did not strictly enforce the team-wear policy, and production associates regularly wore shirts that were not black or had logos or emblems other than the Tesla logo. In August 2017, the Respondent began to strictly enforce its team-wear policy by

[7] *NLRB v. Babcock & Wilcox*, 351 U.S. at 112.
[8] *Stabilus, Inc.*, 355 NLRB 836 (2010).
[9] See *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational. Courts enforce this principle with regularity when they set aside agency regulations which, though well within the agencies' scope of authority, are not supported by the reasons that the agencies adduce.").

[10] The Respondent's "General Assembly Expectations" originally stated simply that "[t]eam wear is mandatory for all team members and leads." Prior to August 10, 2017, the Respondent orally informed its production associates that, with supervisory permission, they could substitute all-black clothing for team wear. In October 2017, the Respondent formally revised the "General Assembly Expectations" to reflect that change.

having supervisors and managers audit production associates during startup meetings and "walk the line" to ensure compliance with the team-wear policy. Since that time, supervisors and managers have sometimes allowed production associates to wear plain black cotton shirts instead of team-wear shirts or to cover non-Tesla logos and emblems on black shirts with black mutilation-protection tape. Although production associates are not permitted to wear black union shirts in place of team-wear shirts, they are allowed to wear stickers, including a sticker displaying the Union's logo and campaign slogan, on the required team wear. The judge found generally that "[e]mployees also wore union . . . hats to work." However, there is no evidence that any production associates wore union hats. There is also no evidence that they are prohibited from wearing union hats.

In the spring of 2017, employees, including production associates, began wearing black cotton shirts that had a small union logo with the Union's campaign slogan—"Driving for a Fair Future at Tesla"—on the front of the shirt and a larger logo with that slogan and "UAW" on the back. Beginning about August 10, 2017, the Respondent enforced its team-wear policy by informing employees that the UAW shirt violated the policy and that they would be sent home if they wore it again. When production associate Sean Jones complained, the Respondent informed Jones that the policy had changed and that employees could no longer wear shirts with emblems.

Production Manager Mario Penera testified that the team-wear policy is intended to lower the risk of employees' clothing causing mutilations of the vehicles and to aid in the visual management of GA.[11] Penera described visual management as the ability to easily determine that employees are in their assigned work area and to differentiate between the different types of employees in GA based on shirt color. Penera added that requiring production associates to wear team wear makes it easier for supervisors to verify that employees' clothes do not have a high risk of causing mutilations. Production Manager Kyle Martin generally confirmed Penera's testimony regarding the purpose of the team-wear policy and specifically testified about an incident where a raised metal emblem on a production associate's shirt caused a mutilation by brushing against a fender.

## Background

The judge found that the Respondent violated the Act in several respects, including by maintaining and enforcing the team-wear policy. Because the policy had the effect of restricting the display of union insignia, the judge found that it was presumptively unlawful, and she also found that it was not justified by special circumstances. The judge rejected the Respondent's argument that the team-wear policy does not interfere with employees' Section 7 rights because employees can wear union stickers on their team wear.

The Respondent filed exceptions to the judge's decision. On February 12, 2021, the Board issued a Notice and Invitation to File Briefs (NIFB), asking the parties and interested amici to address whether *Stabilus* was the correct standard to apply when an employer maintains and consistently enforces a nondiscriminatory uniform policy that implicitly allows employees to wear union insignia (buttons, pins, stickers, etc.) on their uniforms, and if not, what standard the Board should apply.

On March 25, 2021, the Board issued a decision and order severing and retaining for further consideration whether the Respondent violated Section 8(a)(1) by maintaining and enforcing its team-wear policy and resolving most of the other issues in the case. *Tesla, Inc.*, 370 NLRB No. 101 (2021). Notably, the Board affirmed, in the absence of exceptions, the judge's dismissal of allegations that the Respondent *discriminatorily* enforced the team-wear policy against union supporters. Id., slip op. at 1 fn. 1.

## Discussion

### A. Employer Dress Codes

Employer dress codes take many forms. As noted above, the Respondent's dress code requires employees to wear team-wear shirts and pants. Other cases have involved a dress code that prohibited "attire, jewelry, or any aspect of grooming which the Company believes to be unsafe, distracting, unsanitary, not promoting customer good will or the subject of business disruption or complaint,"[12] or clothing displaying statements "that are degrading, confrontational, slanderous, insulting or provocative."[13] It is beyond dispute that employers maintain uniform policies and dress codes for many legitimate reasons, including for employees' safety and security, for production reasons,

---

[11] Mutilations include abrasions, buffs, chips, cuts, dents, dings, or scratches to the inside or outside of a vehicle.

[12] *Burndy, LLC*, 364 NLRB 946, 976 (2016). No exceptions were filed to the judge's dismissal of allegations that the dress code was unlawful. Id. at 946 fn. 3.

[13] *Medco Health Solutions of Las Vegas*, 364 NLRB 1687, 1688 (2016). The Board found that the challenged dress code was unlawful because it had been applied to restrict Sec. 7 activity, but see *AT&T Mobility, LLC*, 370 NLRB No. 121 (2021) (holding that an employer rule is not unlawful to maintain solely because it has been applied to restrict Sec. 7 activity).

and to create a sense of esprit de corps. We do not understand the majority to dispute this point.

Some dress codes effectively prohibit the display of any union insignia by requiring employees to wear a specific uniform and prohibiting pins, buttons, or any other items from being affixed to the uniform.[14] Such dress codes are violative of the Act unless justified by special circumstances. Many others, however, do not. Many (if not most) types of union insignia would not be prohibited by dress codes. Because these policies do provide meaningful opportunities for employees to display union insignia, they are qualitatively different from the outright bans. It is therefore wrong to treat the two types of policies as though they were the same.

### B. The Majority's "Presumption of Illegality" Standard Is Unreasonable, and Republic Aviation Does Not Support It

Our colleagues take the position that dress codes and uniform policies that interfere "*in any way*" with employees' right to display union insignia are presumptively unlawful (emphasis in majority opinion).[15] For them, it is immaterial whether, under a uniform policy or dress code, employees retain a meaningful opportunity to display union insignia. They contend that *Republic Aviation* supports their position, but this is simply not the case.[16] As the Board has held, "*Republic Aviation* stands for the twin propositions that employees must have *adequate* avenues of communication in order to meaningfully exercise their Section 7 rights" and that employer rights "must yield to employees' Section 7 rights when necessary to avoid creating an *unreasonable* impediment to the exercise of the

right to self-organization."[17] Dress codes under which employees retain meaningful opportunities to display union insignia *do* provide "adequate avenues of communication" and therefore do not create "an *unreasonable* impediment to the exercise of the right to self-organization."[18]

In *Republic Aviation*, the Court considered a set of balanced presumptions developed by the Board for addressing employer rules that *prohibited* solicitation or the distribution of literature on the employer's premises. 324 U.S. at 801–803 & fn. 7.[19] As the Board properly recognized, employees cannot realistically self-organize unless there are adequate avenues of communication open to them for the interchange of ideas necessary to the exercise of their right to do so, and a complete prohibition on solicitation and literature distribution in the workplace would necessarily choke off those "avenues of communication" at "the very time and place uniquely appropriate and almost solely available to them therefor."[20] Based on those findings, the Court agreed that the Board could properly presume that those prohibitions were unlawful and require that they be justified by special circumstances. In doing so, however, the Court stressed that the validity of the Board's presumption "depends upon the rationality between what is proved and what is inferred."[21]

Notably, the Court did not have before it either an employer dress code comparable to the team-wear policy at issue in this case, or a Board standard holding that such dress codes are presumptively unlawful regardless of whether they afford adequate "avenues of communication." The majority's application of the same presumption of illegality to such dress codes is therefore an extension

---

[14] See, e.g., *W San Diego*, 348 NLRB 372 (2006) (employees required to wear employer-provided uniform with a small (1/2 inch) "W" pin on the upper left chest; attire policy prohibited all other uniform adornments, including sweatbands, scarves worn as belts, and professional association pins); *United Parcel Service*, supra (employees permitted to wear only UPS-authorized items on uniforms, and union pins were not authorized); *Republic Aviation*, supra (union steward pins categorically prohibited).

[15] Our colleagues take issue with our position that their holding today has the practical effect of rendering *all* dress codes presumptively unlawful. To the contrary, they assert that "employers may lawfully maintain facially neutral, nondiscriminatory dress codes and uniform policies that *implicitly* limit or restrict the display of union insignia, so long as they are narrowly tailored to serve a particular, legitimate interest that outweighs the adverse effect on employees' Section 7 rights." (Emphasis added.) This assertion, of course, proves our point. It is hard to imagine a facially neutral dress code or uniform policy that does not *implicitly* limit or restrict the display of union insignia. Yet, under the majority's analysis, any such dress code can only be lawful if an employer meets its burden to establish special circumstances such that its particular legitimate interest outweighs employees' Sec. 7 rights. Put another way, virtually all dress codes are presumptively unlawful.

[16] In analyzing *Republic Aviation*, we rely on the text of the decision. We do not, as the majority does, rely on an assumption that the Court "implicitly rejected" an argument that was not discussed in the decision.

[17] *Rio All-Suites Hotel*, 368 NLRB No. 143, slip op. at 7 (2019) (internal footnotes and quotation marks omitted; emphasis in original).

[18] Id. (emphasis in original).

[19] Specifically, the Board had determined that rules prohibiting solicitation during working time were presumptively lawful, while rules prohibiting solicitation outside of working time "must be presumed to be an unreasonable impediment to self-organization and therefore discriminatory in the absence of evidence that special circumstances make the rule necessary in order to maintain production or discipline." *Peyton Packing Co.*, 49 NLRB 828, 843 (1943), enfd. 142 F.2d 1009 (5th Cir. 1944). Similarly, the Board had determined that rules that restrict the distribution of literature on nonworking time and in nonworking areas were also presumptively unlawful unless justified by special circumstances. *Stoddard-Quirk Manufacturing Co.*, 138 NLRB 615, 620 (1962). In contrast, rules prohibiting the distribution of literature during working time or in working areas were presumptively lawful.

[20] *Republic Aviation*, 324 U.S. at 801 fn. 6 (internal quotation marks omitted).

[21] Id. at 804–805; see also *NLRB v. Baptist Hospital*, 442 U.S. 773, 787 (1979) ("It is, of course, settled law that a presumption adopted and applied by the Board must rest on a sound factual connection between the proved and inferred facts.").

of *Republic Aviation*, not an application of it.[22] It is also unwarranted. As noted above, *Republic Aviation* approved the application of a presumption of illegality to rules prohibiting solicitation and distribution. In the Court's own words, there was a rational relationship between what was proven—a complete prohibition—and what was inferred—"an unreasonable impediment to self-organization" that was unlawful "in the absence of evidence that special circumstances ma[d]e the rule necessary in order to maintain production or discipline."[23] Significantly, the majority fails to justify the notion that the same inference is warranted for uniform policies and dress codes that do not impose a complete prohibition but instead provide a meaningful opportunity for employees to wear union insignia.[24]

Our colleagues gain no ground by citing to the portion of *Republic Aviation* addressing the employer's ban on wearing a union steward button. As the majority notes, the *Republic Aviation* Court upheld the Board's determination that an employer had violated the Act by prohibiting employees from wearing union steward buttons,

notwithstanding the employer's protestations that it permitted other union insignia and objected only to this specific button. But this was an explicit prohibition against displaying a specific union insignia *because* it was a union insignia. As such, the prohibition was not facially neutral and nondiscriminatory, and therefore it is unlike the policy at issue in this case.[25] The majority is simply wrong to treat those two situations as if they were the same.

The majority argues that a "meaningful opportunity" standard impermissibly considers "alternative means" in a manner that the Supreme Court has rejected.[26] But the cases on which our colleagues rely, like *Republic Aviation*, all involved policies that broadly prohibited Section 7 activity on the employer's premises.[27] The question here is whether the standards applicable to those prohibitions should be extended to employer dress codes that permit meaningful opportunities to display union insignia in the workplace—that is, whether those dress codes also impose "an unreasonable impediment to self-organization."[28] In other words, an adequate analysis of the central issue this case presents must take into account the

---

[22] The majority asserts that the Board so extended *Republic Aviation* "long before" today's decision, citing *Boeing Airplane Co.*, 103 NLRB 1025, 1026 & fn. 4 (1953), enfd. 217 F.2d 369 (9th Cir. 1954). But *Boeing* involved a complete ban on union steward buttons and "I am loyal to [Machinists Local] 751" streamers on the premise that there was, at the time, no collective-bargaining agreement in place. This is comparable to the ban on wearing the union steward button at issue in *Republic Aviation* and distinguishable for the same reasons, discussed below, that the *Republic Aviation* ban is properly to be distinguished. *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714–715 (5th Cir. 2018), cert. denied 139 S.Ct. 1259 (2019), and *Boch Imports, Inc. v. NLRB*, 826 F.3d 558, 570–571 (1st Cir. 2016), also cited by the majority in support of their position, are even less apposite. Both involved complete bans on union insignia, unlike the dress code at issue here. Indeed, the *Boch Imports* court specifically observed that "different considerations may apply when employers proscribe all adornments, including union adornments, than would apply when employers proscribe only certain types of adornments (for example, 'provocative' adornments), which may, on a case-by-case basis, include union adornments." 826 F.3d at 571. The one-size-fits-all standard our colleagues espouse cannot be reconciled with that observation.

*HealthBridge Management, LLC v. NLRB*, 798 F.3d 1059, 1067 (D.C. Cir. 2015), also cited by the majority, is distinguishable for different reasons. There, the court held that it lacked jurisdiction to consider the employer's challenge to the Board's holding that a ban on wearing a particular union sticker in patient care areas was presumptively unlawful. The court's decision did not address on the merits the question at issue in this case.

[23] *Republic Aviation*, 324 U.S. at 804–805.

[24] Our colleagues cite cases holding it presumptively unlawful to permit solicitation during some nonworking time but prohibit it during other nonworking time, or to permit distribution in some nonworking areas but prohibit it in other nonworking areas, and they analogize those cases to this one, even though elsewhere, they say that "uniform policies and dress codes . . . are distinguishable from no-solicitation and no-distribution rules." Notwithstanding the majority's apples-to-oranges comparison, the plain truth is that our position is perfectly consistent with the Board's long-established standards for solicitation and literature

distribution, which not only recognize that partial bans on solicitation and distribution may be lawful, they *presume* so. Moreover, dress codes are qualitatively different from solicitation and distribution rules because employees cannot realistically don and doff apparel during, for example, working and nonworking time in the same way that solicitation and distribution of literature can be so restricted. See *Casa San Miguel*, 320 NLRB 534, 540 (1995) (holding that employer lawfully prohibited employee from wearing uniform with prounion message added to the front, recognizing that "[i]t is not practical or possible for an employee when in nonpatient care areas to wear a uniform with a printed prounion emblem and message on the front, and then to change out of that uniform, each time the employee enters a patient care area").

[25] As the Board's NIFB makes clear, this case concerns only the standard to be applied when an employer maintains and consistently enforces "a *nondiscriminatory* uniform policy that implicitly allows employees to wear union insignia (buttons, pins, stickers, etc.) on their uniforms" (emphasis added).

[26] See, e.g., *Eastex, Inc. v. NLRB*, 437 U.S. 556, 572–574 (1978) (prohibition on distribution of union newsletter); *Beth Israel Hospital v. NLRB*, 437 U.S. at 507 (rule barring solicitation and distribution of literature in any area of hospital to which patients or visitors have access); *NLRB v. Magnavox Co. of Tennessee*, 415 U.S. 322, 324–327 (1974) (union could not waive employees' right to distribute union literature on company property).

[27] *Monarch Machine Tool Co.*, 102 NLRB 1242 (1953), enfd. 210 F.2d 183 (6th Cir. 1954), cert. denied 347 U.S. 967 (1954), aptly illustrates this point. The majority cites *Monarch Machine Tool* for the proposition that "[i]t certainly does not lie in the mouth of [the employer] to tell the [u]nion, or [the employer's] employees, how to exercise their rights under the Act." Id. at 1249. As our colleagues note, however, the issue there was whether the employer could ban solicitation and distribution of literature within the plant on the grounds that employees had adequate opportunity to do so elsewhere. The issue here, in contrast, is whether an employer may lawfully maintain a dress code under which employees retain a meaningful opportunity to display union insignia *in the workplace*.

[28] *Peyton Packing Co.*, supra, 49 NLRB at 843.

difference between policies that *prohibit* and policies that *limit* the exercise of Section 7 rights. Our analysis takes that difference into account, while our colleagues' analysis does not. The omission is fatal to their holding, since the Board has been quite clear that "employees are not free to exercise their guaranteed rights in any manner, time, or place they choose. Reasonable encroachments and limitations have been imposed on both employers and employees in order to make effective the purposes of the Act and the guarantees contained therein."[29] By erasing the distinction between a limitation and a prohibition, the majority effectively assumes the answer to the central issue in this case.

Even on their own terms, the cases cited by the majority do not bear the weight our colleagues place on them. In *Eastex, Inc. v. NLRB*, for example, the Court rejected the employer's contention that the distribution in the workplace of a union newsletter could be prohibited as long as the union could distribute it outside of the workplace.[30] This principle has no application here, where the issue is whether an employer may lawfully require certain attire to be worn in the workplace if it permits union insignia to be displayed on that attire *in the workplace*. Moreover, the *Eastex* Court repeatedly stressed that the employer there "made no attempt to show that its management interests would be prejudiced in any way by the exercise of § 7 rights proposed by its employees here."[31] Of course, an employer's management interests *are* "prejudiced" when employees disregard their employer's dress code and don union apparel instead. Finally, the *Eastex* Court stressed that it was *not* holding "that the *Republic Aviation* rule properly is applied to every in-plant distribution of literature that falls within the protective ambit of § 7," and the Court "confine[d its] holding to the facts of [that] case."[32] Undeterred, our colleagues (mis)apply "the *Republic Aviation* rule" to *every* in-plant display of union insignia.

*NLRB v. Magnavox Co. of Tennessee* is also readily distinguishable. There, the Court rejected the view that a union could lawfully waive the Section 7 right of employees it represented to distribute union literature on nonworking time and in nonworking areas. While the employer argued that those employees had use of a bulletin board, the Court held that this was not an adequate substitute because it was

discriminatory.[33] No such considerations are present here. Moreover, the *Magnavox* Court specifically noted that there was no evidence in that case that the restriction on literature distribution was justified by a need to maintain production or discipline, and therefore *Magnavox* did not present an "occasion to balance the availability of alternative channels of communication against a legitimate employer business justification for barring or limiting in-plant communications."[34] The Court thus expressly left open the possible relevance of alternative means in circumstances where, as here, legitimate employer business justifications *are* presented.

The potential relevance of alternative means was also recognized by the Court in *Beth Israel Hospital v. NLRB*, 437 U.S. 483 (1978). To be sure, the Court did state there that "the availability of alternative means of communication is not, with respect to employee organizational activity, a necessary inquiry" outside of the health care context.[35] But the specific question presented in the case was whether employees' Section 7 activity could be confined to certain locker rooms and restrooms "not conducive to their exercise."[36] In upholding the Board's determination that those restrictions were presumptively unlawful insofar as they prohibited Section 7 activity in the hospital's cafeteria and coffee shop, the Court held that the presumption was adequately supported by the evidence presented, cautioning once again that the validity of the Board's inferences "depends upon the rationality between what is proved and what is inferred."[37] The majority's presumption that employer dress codes that limit the display of union insignia "*in any way*" are unlawful rests on inferences drawn from completely different facts. Nothing in *Beth Israel* compels the conclusion that those inferences are valid.

### C. The Majority's Special Circumstances Standard Fails to Strike the Appropriate Balance Between Employee and Employer Rights

We also disagree with the majority's contention that the special circumstances standard strikes the appropriate balance between employee and employer rights with respect to uniform policies and dress codes under which employees retain meaningful opportunities to display union insignia in the workplace. Our colleagues posit that this

---

[29] *Monarch Machine Tool Co.*, 102 NLRB at 1248. The majority does not quote this portion of the Board's decision in that case.

[30] *Eastex, Inc. v. NLRB*, 437 U.S. at 574 ("[T]he plant is a particularly appropriate place for the distribution of § 7 material, because it is the one place where [employees] clearly share common interests and where they traditionally seek to persuade fellow workers in matters affecting their union organizational life and other matters related to their status as employees.") (alteration in original; internal quotation marks omitted).

[31] Id. at 572, 573, and 575.

[32] Id. at 574–575.

[33] *NLRB v. Magnavox Co. of Tennessee*, 415 U.S. at 326 ("[T]he bulletin board may be an adequate medium for preserving the status quo and yet not give a union's adversaries equal access to and communication with their fellow employees.") (internal quotation marks omitted).

[34] Id. at 326–327.

[35] *Beth Israel Hospital v. NLRB*, 437 U.S. at 505. The Court also indicated that alternative means was a relevant consideration in the health care context.

[36] Id.

[37] Id. at 504 (quoting *Republic Aviation*, 324 U.S. at 805).

standard satisfies the *Republic Aviation* balancing requirement because it allows for consideration of the nature and extent of an employer's legitimate interests in maintaining a challenged restriction on Section 7 activity. Our colleagues are mistaken, for several reasons.

First, the special circumstances standard is predicated on, and follows from, a prior determination that a particular employer rule is presumptively unlawful. As explained, that presumption is unwarranted in the case of facially neutral, nondiscriminatory dress codes that permit meaningful opportunities to display union insignia in the workplace. The majority's holding requires finding presumptively unlawful legitimate and, in some cases, business-necessitated dress codes. For instance, manufacturing employers, like the Respondent, would presumptively violate the Act by requiring employees to wear particular clothing, such as a factory jumpsuit, to prevent damage during production because it would prevent employees from wearing union clothing. In an office setting, typical "business casual" dress codes, often established to maintain a level of decorum, would be presumptively unlawful because they would prohibit union t-shirts. Similarly, the majority's approach would make presumptively unlawful relatively common employer policies prohibiting employees from wearing certain clothing—t-shirts, exercise outfits, tube tops or muscle shirts—because the policy would prohibit such attire inscribed with a union-related message. We cannot agree that Congress intended to condemn such rules as presumptively unlawful to maintain, yet that is the inevitable consequence of the majority's decision today.

Second, the special circumstances test places a very heavy burden on employers seeking to justify uniform policies or dress codes. Contrary to the majority, that burden, in practice, will prove nearly insurmountable. The Board has found special circumstances justifying union-insignia bans in very limited circumstances: when their display may jeopardize employee safety, damage machinery or products, exacerbate employee dissension, or unreasonably interfere with a public image that the employer has established,[38] or when necessary to maintain decorum and discipline among employees.[39] Indeed, the Board has emphasized that "the 'special circumstances' exception is narrow."[40] Most uniform policies and dress codes could not be justified under the standard. Take, for example, an employer that requires its employees to wear blue polo shirts with the company logo. Although its employees work on-site at the employer's facility and rarely if ever interact in person with the public on the job, the employer believes the "blue polo" policy maintains an atmosphere of professionalism and mutual respect. Implicitly, this policy prohibits the wearing of union shirts of any kind, and although the employer allows employees to affix buttons, pins, or stickers to the blue polo shirt, including union buttons, pins, and stickers, the majority would find the policy presumptively unlawful because it precludes employees from wearing a t-shirt with a union logo, and the employer violates the Act by maintaining the "blue polo" policy unless it can establish that the policy is justified by special circumstances. And it cannot do so. Obviously, substituting a union t-shirt in place of the blue polo shirt would not jeopardize employee safety or damage machinery or products. A typical union t-shirt would not exacerbate employee dissension or undermine decorum or discipline—special circumstances that have been found where a particular union insignia is inflammatory, offensive, vulgar, or obscene.[41] Since these employees are not customer- or public-facing, wearing a union t-shirt could not possibly interfere with the employer's public image.

Moreover, where a uniform policy has been upheld under the special circumstances test, the employer had to prove that union insignia would interfere with the public image the employer had established as part of its business plan through consistently enforced appearance rules for its customer-facing employees.[42] For example, in *W San Diego*, a Board majority found that the employer's business plan of creating a "wonderland" atmosphere for patrons of the hotel justified a policy that prohibited all uniform adornments other than a small "W" pin.[43] In *In-N-Out Burger*,[44] on the other hand, the employer's standard white uniforms and other unique features of its business model were found insufficient to justify a restriction on

---

[38] *United Parcel Service*, 312 NLRB at 597.

[39] *Komatsu America Corp.*, 342 NLRB 649, 650 (2004).

[40] *E & L Transport Co.*, 331 NLRB 640, 640 fn. 3 (2000). In *E & L Transport*, the Board invalidated a rule prohibiting the wearing of buttons while loading and unloading cars, despite the undisputed risk of damage to the cars, because "the [r]espondent did not impose the general rule for safety or damage control reasons, nor did it inform its drivers of any such reasons. Rather, the [r]espondent's motive for promulgating the rule was to retaliate against employees for their exercise of Section 7 rights. . . ."

[41] See, e.g., *Leiser Construction, LLC*, 349 NLRB 413, 414–415 (2007) (special circumstances justified prohibition of "a sticker that depicted someone or something urinating on a rat that was apparently

designated 'non-union'"); *Komatsu*, supra at 650 (special circumstances justified prohibition of t-shirt that "invoked a highly charged and inflammatory comparison" between the respondent's outsourcing plans and the attack on Pearl Harbor); *Southwestern Bell Telephone Co.*, 200 NLRB 667 (1972) (special circumstances justified prohibition of shirt stating "Ma Bell is a Cheap Mother").

[42] See, e.g., *Con-Way Central Express*, 333 NLRB 1073, 1075–1077 (2001); *Produce Warehouse of Coram*, 329 NLRB 915, 915–918 (1999).

[43] 348 NLRB 372, 372 (2006). Former Member Liebman relevantly dissented.

[44] 365 NLRB No. 39, slip op. at 5 (2017), enfd. 894 F.3d 707 (5th Cir. 2018), cert. denied 139 S.Ct. 1259 (2019).

adorning the uniforms with personal buttons under the "public image" prong of the special circumstances standard. As the Board has held in other cases, "a uniform requirement alone is not a special circumstance."[45] While we have no quarrel with that proposition, as a general matter, in circumstances where the uniform is relied upon to ban all union insignia, we disagree with our colleagues' determination to apply the same standard to policies that preclude substituting union apparel for a required uniform but do not prohibit employees from affixing union insignia to that uniform. We also cannot agree that Congress intended to deny employers any right to establish a dress code for non-customer-facing employees or to require that policies banning all insignia be treated the same as policies that do not. Yet that is the result of the majority's decision today.[46]

### D. Stabilus

Our colleagues place great reliance on flawed dicta in *Stabilus, Inc.*[47]—stating that "[a]n employer cannot avoid the 'special circumstances' test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia"—which they now elevate to the status of Board law. While the majority cites bits and pieces of prior

decisions to support this dicta, those cases do not support our colleagues' position.

In *Stabilus,* the employer maintained a uniform policy that required employees to wear shirts bearing the employer's name. 355 NLRB at 837. During a union campaign, the employer told several employees that they could not wear union shirts instead. Ibid. Although the majority in *Stabilus* decided the case on other grounds, it stated, in dicta, that "[t]here is no basis in precedent for treating clothes displaying union insignia as categorically different from other union insignia, such as buttons," and that "[a]n employer cannot avoid the 'special circumstances' test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia." Id. at 838.[48]

In dissent, former Member Schaumber explained that the "special circumstances" test was inapplicable and that the employer had lawfully enforced its preexisting uniform policy. Id. at 842 (Member Schaumber, dissenting in part). He observed that the Board had "never held that, where an employer lawfully maintains and consistently enforces a policy requiring employees to wear a company uniform, its employees have a right under Section 7 to disregard the policy and wear union attire in place of the

---

[45] E.g., *Long Beach Memorial Medical Center, Inc.,* 366 NLRB No 66, slip op. at 3 (2018), enfd. 774 Fed.Appx. 1 (D.C. Cir. 2019).

Notably, the administrative law judge in *In-N-Out Burger* rejected the employer's special circumstances defense on the basis that the employer had failed to demonstrate that it was seeking to create "a customer experience analogous to the alternate reality 'Wonderland' of" the W San Diego Hotel. 365 NLRB No. 39, slip op. at 10. Although Acting Chairman Miscimarra and then-Member McFerran disavowed this aspect of the judge's rationale, Member Pearce did not. Id., slip op. at 1 fn. 2. Thus, there was one vote in *In-N-Out Burger* to limit the "public image" prong of the special circumstances standard to the facts of *W San Diego.*

[46] Although existing categories of special circumstances have been fixed for many years, our colleagues respond that they "may" consider establishing additional special-circumstances justifications in some future case that go beyond those previously recognized by the Board over the last 78 years since *Republic Aviation* was decided. That possibility, of course, will offer little comfort to employers who are now faced with the near-certain risk of facing prosecution under the Act whenever they seek to maintain dress codes.

Member Ring further notes that the majority's application of the special circumstances standard to this case confirms our point. The majority accepts that the Respondent has a legitimate interest in preventing damage to its products and that some types of apparel can damage its vehicles and have damaged them in the past. But they invalidate the team-wear policy all the same, on the grounds that "at most, the Respondent has shown that it has a legitimate interest in preventing raised metal emblems on shirts from causing mutilations to vehicles[, because] the team-wear policy goes far beyond simply prohibiting employees from wearing shirts with metal emblems and therefore is not narrowly tailored to address that concern as required under the special circumstances test." This is not an accommodation of employee rights and legitimate employer interests. Rather, the majority's insistence that the Respondent's team-wear policy—and indeed, any apparel rule that limits "*in any way*" the

right to display union insignia—be "narrowly tailored" to achieving an interest the majority deems sufficiently compelling to warrant protection is virtually identical to "strict scrutiny," the most exacting standard of review applied by the courts.

Member Ring also notes that the majority gives even shorter shrift to the Respondent's stated interest in "visual management." They refuse to say whether this interest could ever matter under the special circumstances test, holding instead that "[t]he team-wear policy is . . . not narrowly tailored to address the Respondent's claimed interest in maintaining visual management in GA, *even assuming* special circumstances could be established on that basis" (emphasis added). Thus, the majority leaves employers to guess whether they could even require employees to wear shirts of the same color under these special circumstances test. The majority's insistence that the special circumstances test does not place a "nearly insurmountable" burden on employers rings hollow in these circumstances.

[47] 355 NLRB 836, 838 (2010).

[48] Our colleagues claim that certain cases preceding *Stabilus*—including *Great Plains Coca-Cola Bottling Co.*, 311 NLRB 509 (1993), and *Meijer, Inc.*, 318 NLRB 50 (1995), enfd. 130 F.3d 1209 (6th Cir. 1997)—support the *Stabilus* dicta and their holding in this case. For the reasons set forth in detail by former Member Schaumber in his *Stabilus* dissent, we disagree. See 355 NLRB at 843 fn. 5 (Member Schaumber, dissenting in part). But to the extent that *Great Plains Coca-Cola, Meijer,* or any other prior Board decision (including, for example, *Quantum Electric, Inc.*, 341 NLRB 1270 (2004)) could be interpreted to support either the *Stabilus* dicta or our colleagues' decision, we believe they were wrongly decided for the reasons discussed herein. In any event, until today, neither the Board nor any court had squarely faced and decided the issue of whether Sec. 7 permits an employee to substitute union attire for a uniform or other clothing required by an employer's nondiscriminatory uniform policy or dress code. See *Stabilus*, 355 NLRB at 843 fn. 7 (Member Schaumber, dissenting in part).

required uniform." Id. at 843. To the contrary, the Board had "implicitly recognized that an employer may promulgate and enforce a nondiscriminatory uniform rule." Member Schaumber recognized that the right to wear union insignia is predicated on employees' right to communicate with each other regarding self-organization in the workplace, but he pointed out that the employer in *Stabilus* had not interfered with that right because, although employees could not wear union shirts, they were free to display union buttons, pins, stickers, and other union insignia on their uniforms. Id. at 842, 843. Member Schaumber therefore concluded:

> [I]n balancing employee and employer rights as required under *Republic Aviation*, supra, a "special circumstances" analysis is inappropriate here. If employees have the right to wear union attire *instead* of a company uniform, the employer's right to promulgate and enforce reasonable, nondiscriminatory apparel rules is negated entirely. Such a result would not strike a balance between employee and employer rights; rather, it would completely submerge the employer's rights. Thus, I would hold that where, as here, an employer maintains and consistently enforces a lawful uniform rule, Section 7 does not guarantee employees the right to wear union attire in place of the required company uniform.

Id. at 843–844 (internal footnote omitted; emphasis in original). We agree.

Contrary to our colleagues' assertion, Member Schaumber did not suggest in his *Stabilus* dissent—and neither do we in this opinion—that an employer's infringement on the exercise of Section 7 rights, no matter how significant, is lawful so long as it results from the application of a rule that is facially neutral and nondiscriminatory, as well as consistently enforced. Member Schaumber merely acknowledged, as do we, the longstanding principle that an employer's disparate enforcement of an otherwise lawful rule against employees engaged in Section 7 activity independently violates the Act.[49]

*E. Facially Neutral, Nondiscriminatory Employer Dress Codes that Provide a Meaningful Opportunity to Display Union Insignia Should Be Lawful*

Consistent with these observations, we would continue to apply the special circumstances standard to employer policies that ban union insignia[50] or require employees to wear specific apparel and prohibit pins, buttons, or any other items from being affixed to the required clothing. Such policies do not afford employees any meaningful opportunity to display union insignia and are therefore functionally the same. The Board should therefore treat them the same way by requiring a special circumstances justification.

We would not, however, apply the special circumstances standard to facially neutral, nondiscriminatory employer dress codes that *do* provide a meaningful opportunity to display union insignia. Because legitimate reasons exist for employers to maintain such policies, and because the impact of such policies on the exercise of the Section 7 right of self-organization is comparatively slight, we would hold that such policies are lawful to maintain.[51] While such policies do limit the ways union insignia may be displayed by precluding the substitution of union apparel for required clothing, "[the Act] does not command that labor organizations as a matter of abstract law, under all circumstances, be protected in the use of every possible means of reaching the minds of individual workers."[52]

---

[49] See, e.g., *Seton Co.*, 332 NLRB 979, 979–980 & fn. 5 (2000) (finding that an employer "violated Sec[.] 8(a)(1) of the Act by the disparate enforcement of its no-solicitation/no-distribution rule," which, on its face, lawfully prohibited employees from soliciting on working time and from distributing literature on working time and in work area).

[50] See, e.g., *USF Red Star, Inc.*, 339 NLRB 389, 391 (2003) ("[A] *ban* on wearing union insignia violates the Act unless it is justified by special circumstances.") (emphasis added); *United Parcel Service*, 312 NLRB at 597 ("In the absence of 'special circumstances,' the *prohibition* by an employer against the wearing of union insignia violates Section 8(a)(1) of the Act.") (emphasis added).

[51] See *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. at 33–34 (describing the Board's "duty to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy"); *NLRB v. Erie Resistor Corp.*, 373 U.S. at 229 (referring to the "delicate task . . . of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing in the light of the Act and its policy the intended consequences upon employee rights against the business ends to be served by the employer's conduct").

An employer would still violate the Act by promulgating a uniform policy or dress code in response to union activity or by disparately enforcing its uniform policy or dress code against employees wearing union attire. See, e.g., *E & L Transport Co.*, 331 NLRB 640, 640 (2000) (finding that employer unlawfully promulgated a rule prohibiting employees from wearing union buttons on their work uniforms to "retaliate against employees for their exercise of Section 7 rights"); *Pay 'N Save Corp.*, 247 NLRB 1346, 1346 (1980) (finding that employer violated Sec. 8(a)(1) by disparately enforcing its button policy against employees wearing union buttons), enfd. 641 F.2d 697 (9th Cir. 1981). Thus, we agree with SEIU's statement, in its brief in response to the Notice and Invitation to File Briefs, that "[p]rovided the employer has not implemented the uniform requirement in response to worker organizing, the uniform policy may be enforced, and workers may lawfully be prohibited from substituting a union-issued t-shirt for their uniform shirt."

[52] *NLRB v. United Steelworkers of America, CIO (NuTone, Inc.)*, 357 U.S. 357, 364 (1958).

Our colleagues claim that we have too broadly interpreted their presumption-of-illegality standard as applied to dress codes and uniform policies. Contrary to our colleagues, we have properly taken at face value their statement that "when an employer interferes *in any way* with

Applying the foregoing principles to the facts of this case, we find that the Respondent lawfully maintained its team-wear policy and lawfully enforced it against employees wearing shirts bearing union insignia in place of the required team wear. The policy does not deny production associates meaningful opportunities to display union insignia because they may affix union stickers to their team wear, and it is facially neutral and nondiscriminatory.[53]

### F. The Majority Compounds Their Erroneous Interpretation of Republic Aviation by Overruling Wal-Mart Stores.

In *Wal-Mart Stores*,[54] the Board held that the employer lawfully maintained policies permitting employees to wear "small, non-distracting logos or graphics . . . no larger than the size of your [employee] name badge." That holding is irrelevant to the disposition of this case, since no restriction on the size of union insignia is presented here. That said, *Wal-Mart* does rest on the proposition that the special circumstances standard is inapplicable to a facially neutral rule that recognizes the right of employees to wear union insignia but places reasonable size and/or appearance limits on "logos or graphics." As the Board there explained, "because the infringement on Section 7 rights is less severe [than a rule that completely prohibits insignia], the employer's legitimate justifications for maintaining the restriction do not need to be as compelling for its policy to pass legal muster, and justifications other than the recognized special circumstances may suffice."[55] The majority does not accept the proposition that the extent to which an employer rule restricts Section 7 activity is a relevant consideration in determining whether the rule is presumptively unlawful, so it is no surprise that they would not accept it in the circumstances presented in *Wal-Mart* either.

We participated in *Wal-Mart*, and we adhere to the holding of that case and the reasoning that supports it. For the reasons explained there and in this decision, nothing in the Act or in *Republic Aviation* requires the Board to hold that any restriction on the display of union insignia, however slight, is presumptively unlawful and must be justified by special circumstances. Indeed, there is no valid justification for treating a rule that bans all union insignia the same as one that does not.[56] There is also no merit in the majority's argument that the *Wal-Mart* Board drew an unwarranted distinction between facial challenges to rules that partially restrict the display of union insignia and as-applied challenges to the application of such rules to outright ban specific union insignia. Here again, the majority faults *Wal-Mart* for not finding that *any* limitation on employees' right to display union insignia requires application of the special circumstances test. As we have explained, however, their position is both unreasonable and inconsistent with *Republic Aviation*.[57]

---

employees' Section 7 right to display union insignia (whether through buttons, pins, stickers, shirts, hats, or any other accessories or attire), that interference is presumptively unlawful, and the employer has the burden to establish special circumstances that justify its interference." By the mere fact that uniform policies and dress codes require certain attire to be worn, no such policy or dress code can avoid limiting in some way the display of union insignia—with the possible exception of a union employer that *requires* its employees to wear union attire—and so no uniform policy or dress code escapes being deemed presumptively unlawful under the majority's decision. At certain points, our colleagues describe their position as requiring that an employer's dress code must be "narrowly tailored" to achieving an interest they deem sufficiently compelling to warrant protection. But regardless of how they phrase it, the majority's essential point remains the same: every facially neutral dress code and uniform policy that limits the display of union insignia in any way is presumptively unlawful, requiring the employer to prove special circumstances. And because, as we have shown, proving special circumstances is exceptionally difficult, the result of our colleagues' holding today is that with rare exceptions, uniform policies and dress codes are now unlawful to maintain, period.

[53] As noted above, the Board previously affirmed, in the absence of exceptions, the judge's dismissal of the allegations that the Respondent discriminatorily enforced the team-wear policy against employees wearing union shirts.

The majority asserts that we have set a "low bar" for finding that a "meaningful opportunity" to display union insignia exists here, but they cite no evidence for the notion that the display of union stickers in this workplace would not afford employees with the "adequate avenues for communication" required by our precedent. *Rio All-Suites Hotel*, 368 NLRB No. 143, slip op. at 7. Although Member Ring would not require

the team-wear policy to justify the team-wear policy, the Respondent has explained that it maintains the policy to lower the risk of employees' clothing causing mutilations of the vehicles and to aid in the visual management of GA. Whether or not these justifications would pass muster under the special circumstances standard, Member Ring believes there is no valid basis for the Board to deny their legitimacy.

[54] 368 NLRB No. 146 (2019).

[55] Id., slip op. at 3.

[56] Contrary to the majority, the cases on which they rely on in support of their argument that all infringements on employees' display of union insignia are presumptively unlawful involved total bans, not partial restrictions such as the policies at issue in *Wal-Mart Stores* and this case. See *Long Beach Memorial Medical Center, Inc. d/b/a Long Beach Memorial Medical Center & Miller Children's and Women's Hospital Long Beach*, 366 NLRB No. 66, slip op. at 1–3 (2018) (employer failed to demonstrate special circumstances for total bans on pins, badges, professional certifications, and badge reels not approved by the employer), enfd. mem. 774 Fed.Appx. 1 (D.C. Cir. 2019); *Boch Honda*, 362 NLRB 706, 707 (2015) (employer failed to demonstrate special circumstances for total ban, applicable to employees who have contact with the public, on "wear[ing] pins, insignias, or other message clothing"), enfd. 826 F.3d 558 (1st Cir. 2016); *Albis Plastics*, 335 NLRB 923, 924 (2001) (employer demonstrated special circumstances for total ban on displaying unauthorized stickers, including union stickers, on safety helmets or "bump caps"), enfd. mem. 67 Fed.Appx. 253 (5th Cir. 2003); *Mayrath Co.*, 132 NLRB 1628, 1630 (1961) (employer failed to demonstrate special circumstances to justify ordering employees not to wear union buttons), enfd. in part 319 F.2d 424 (7th Cir. 1963).

[57] The majority has misconstrued the context of the Board's observations in *Wal-Mart Stores* regarding facial challenges and as-applied

We also reject the majority's charge that *Wal-Mart* views employees' ability to display union insignia in the workplace as a privilege rather than a right. This is not so. To the contrary, the *Wal-Mart* Board engaged in a proper accommodation between competing rights, as *Republic Aviation* requires. By contrast, our colleagues' approach does not. To the contrary, as the Board aptly observed in *Wal-Mart*, the view that any size and/or appearance limitation on the display of union insignia is presumptively unlawful could have strange results. For example, it would render presumptively unlawful a policy that bars employees, in the presence of customers on a selling floor, from wearing the largest and most distracting union insignia imaginable, such as a pro-union sandwich board or a large button ringed with flashing lights.[58] Nothing in *Republic Aviation* or the Act supports that result.

Conclusion

By any measure, the majority's decision today represents a failure to engage in reasoned decision-making. Simply put, it wrongfully treats unlike things as though they were the same, by applying the same standard to dress codes that do not prohibit employees from displaying union insignia as is applied to employer rules that do. Distorting decades of precedent teaching that employee rights and legitimate employer interests must be balanced in each case "with as little destruction of one as is consistent with the maintenance of the other,"[59] the majority effectively declares illegitimate any employer uniform policy or dress code that prohibits employees from substituting union apparel for required clothing. As shown, virtually all dress codes could be so construed. And the majority similarly places off-limits any rule that limits the size and/or appearance of union insignia.

Today's decision declares that all such dress codes are presumptively unlawful. As such, employees will be free to disregard them by wearing noncomplying union apparel except in "narrow" circumstances that exist in theory but will rarely be found in fact.[60] In other words, an employer's right to maintain a dress code and insist on compliance with it is now the exception, not the rule—and

even the exception may prove illusory. This cannot be what the Supreme Court in *Republic Aviation* had in mind when it said that "[o]pportunity to organize and proper discipline are both essential elements in a balanced society."[61] We are confident that it would come as a shock to the 74th Congress to learn that, when it enacted the National Labor Relations Act, it abolished the right of employers to maintain dress codes and uniform policies absent proof of special circumstances, rarely to be found. Accordingly, we respectfully dissent.

Dated, Washington, D.C.  August 29, 2022

_____
Marvin E. Kaplan,                Member

_____
John F. Ring,                Member

NATIONAL LABOR RELATIONS BOARD
APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

challenges. An as-applied challenge was not before the Board in *Wal-Mart Stores*. Nonetheless, then-Member McFerran's dissent cited various cases involving as-applied challenges to outright bans. In discussing the distinction between facial and as-applied challenges, the *Wal-Mart* majority correctly observed that the cases the dissent relied on to support her assertion that the Board applies the "special circumstances" standard to partial bans on union insignia did *not* involve facial challenges to a size-and-appearance policy; rather, the cases involved the materially different matter of as-applied challenges to outright bans of specific union insignia. *Wal-Mart Stores*, 368 NLRB No. 146, slip op. at 2 & fn. 10. The majority also reasonably stated that because the General Counsel had only brought a facial challenge to a size-and-appearance policy, the Board had to assess the policy on its face, not as applied. Id. Contrary

to our colleagues, facial and as-applied challenges are not functionally identical. And our colleagues have not supported their argument with any caselaw relating to size and/or appearance restrictions. Rather, the cases they rely on to support their assertion that the Board applies the special circumstances test to partial bans on union insignia do not involve facial challenges to a size-and-appearance policy, like the sole allegation in *Wal-Mart Stores*. Rather, they involved comprehensive prohibitions of all union insignia and/or buttons and pins.

[58] 368 NLRB No. 146, slip op. at 3 fn. 13.
[59] *NLRB v. Babcock & Wilcox*, 351 U.S. at 112.
[60] *E & L Transport Co.*, 331 NLRB at 640 fn. 3.
[61] *Republic Aviation Corp. v. NLRB*, 324 U.S. at 798.

We will not maintain and enforce an overly broad team-wear policy in our "General Assembly Expectations" that prohibits production associates from wearing black union shirts.

We will not in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

We will rescind the team-wear policy in our "General Assembly Expectations," or revise the team-wear policy to make clear that it does not prohibit production associates from wearing black union shirts.

We will notify you that the team-wear policy in our "General Assembly Expectations" has been rescinded, or, if it has been revised, provide you with a copy of our "General Assembly Expectations" with the revised team-wear policy.

TESLA, INC.

The Board's decision can be found at https://www.nlrb.gov/case/32-CA-197020 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

