# No. 22-60493

# In the United States Court of Appeals
## FOR THE FIFTH CIRCUIT

TESLA, INCORPORATED,

*Petitioner/Cross-Respondent*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board

## BRIEF OF PETITIONER/CROSS-RESPONDENT
## TESLA, INCORPORATED

DAVID B. SALMONS
MICHAEL E. KENNEALLY
DAVID R. BRODERDORF
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-3000

*Counsel for Tesla, Incorporated*

## CERTIFICATE OF INTERESTED PERSONS

### *No. 22-60493, Tesla, Inc. v. NLRB*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1.   Petitioner/Cross-Respondent Tesla, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

2.   Morgan, Lewis & Bockius LLP is Counsel for Tesla.

3.   David B. Salmons is Counsel for Tesla.

4.   Michael E. Kenneally is Counsel for Tesla.

5.   David R. Broderdorf is Counsel for Tesla.

6.   Respondent/Cross-Petitioner the National Labor Relations Board is a federal agency.

7.   Ruth E. Burdick is Counsel for the Board.

8.   Micah P. S. Jost is Counsel for the Board.

9.   Kira Vol is Counsel for the Board.

10.    Intervenor International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO, is a labor union.

11.    Schwartz, Steinsapir, Dohrmann & Sommers LLP is Counsel for the Union.

12.    Daniel E. Curry is Counsel for the Union.

13.    Margo A. Feinberg is Counsel for the Union.

Dated:  February 2, 2023        s/ Michael E. Kenneally
                                  MICHAEL E. KENNEALLY

## STATEMENT REGARDING ORAL ARGUMENT

Tesla respectfully requests oral argument. This petition for review presents important issues regarding the National Labor Relations Board's authority to prohibit workplace uniform requirements, and the administrative record is extensive. Oral argument is likely to assist the Court in resolving this appeal.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................i

STATEMENT REGARDING ORAL ARGUMENT .................................iii

TABLE OF AUTHORITIES......................................................... vi

INTRODUCTION................................................................... 1

JURISDICTIONAL STATEMENT .......................................... 4

STATEMENT OF ISSUES.................................................... 5

STATEMENT OF THE CASE ............................................... 5

I.    Statutory background .................................................... 5

II.   Factual background........................................................ 9

    A.    Tesla has long maintained a Team Wear policy for general assembly employees and began to enforce it strictly after an uptick in vehicle imperfections. ................... 9

    B.    Some general assembly employees sought to replace Team Wear shirts with Union shirts even though they were free to add Union stickers to their Team Wear. .......... 15

III.  Procedural background ................................................ 17

SUMMARY OF ARGUMENT ............................................... 21

STANDARD OF REVIEW.................................................... 23

ARGUMENT ................................................................... 25

I.    Making uniforms presumptively unlawful conflicts with *Republic Aviation* and the text of the NLRA................................. 25

iv

# TABLE OF CONTENTS
(continued)

**Page**

A.    *Republic Aviation* does not support a presumption that uniform requirements are unlawful. ....................................26

B.    Tesla's Team Wear policy does not "interfere with, restrain, or coerce employees" in the exercise of their statutory rights. ....................................................................33

II.    Tesla established special circumstances for the Team Wear requirements that outweigh any adverse effect on employees' statutory rights. ...............................................................................39

A.    Courts recognize that employees' alternative means of expression should weigh into the analysis. ..........................39

B.    The Board improperly rejected Tesla's justifications for the Team Wear policy. ........................................................42

CONCLUSION ........................................................................................51

CERTIFICATE OF SERVICE .................................................................52

CERTIFICATE OF COMPLIANCE .........................................................53

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*,
404 U.S. 157 (1971) .............................................................................. 25

*AT&T*,
362 N.L.R.B. 885 (2015) ...................................................................... 31

*Beth Israel Hosp. v. NLRB*,
437 U.S. 483 (1978) ...................................................................... 31, 35

*Boch Imports, Inc. v. NLRB*,
826 F.3d 558 (1st Cir. 2016) .............................................................. 41

*Boeing Co.*,
365 N.L.R.B. No. 154 (Dec. 14, 2017) ..................................... 8, 18, 32

*Brown & Root, Inc. v. NLRB*,
333 F.3d 628 (5th Cir. 2003) .............................................................. 24

*Burger King Corp. v. NLRB*,
725 F.2d 1053 (6th Cir. 1984) ............................................................ 43

*Casino Pauma v. NLRB*,
888 F.3d 1066 (9th Cir. 2018) ............................................................ 36

*Citizens Publ'g & Printing Co. v. NLRB*,
263 F.3d 224 (3d Cir. 2001) ................................................................. 5

*Commc'ns Workers of Am. v. Ector Cnty. Hosp. Dist.*,
467 F.3d 427 (5th Cir. 2006) .............................................................. 43

*D.R. Horton, Inc. v. NLRB*,
737 F.3d 344 (5th Cir. 2013) .............................................................. 24

*Davison-Paxon Co. v. NLRB*,
462 F.2d 364 (5th Cir. 1972) ............................................. 37, 38, 45, 50

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*E. Omni Constructors, Inc. v. NLRB,*
   170 F.3d 418 (4th Cir. 1999) .......................................................... 40

*Eastex, Inc. v. NLRB,*
   437 U.S. 556 (1978) ......................................................................... 35

*Emp. Sols. Staffing Grp. II, L.L.C. v. Off. of Chief Admin.*
   *Hearing Officer,*
   833 F.3d 480 (5th Cir. 2016) ...................................................... 25, 27

*Fabri-Tek, Inc. v. NLRB,*
   352 F.2d 577 (8th Cir. 1965) .......................................................... 41

*Ford Motor Co. v. NLRB,*
   441 U.S. 488 (1979) ......................................................................... 24

*Gen. Land Off. v. U.S. Dep't of the Interior,*
   947 F.3d 309 (5th Cir. 2020) .......................................................... 30

*Great Plains Coca-Cola Bottling Co.,*
   311 N.L.R.B. 509 (1993) ................................................................. 30

*Hanes Hosiery,*
   219 N.L.R.B. 338 (1975) ................................................................. 45

*Helton v. NLRB,*
   656 F.2d 883 (D.C. Cir. 1981) ........................................................ 36

*In-N-Out Burger, Inc. v. NLRB,*
   894 F.3d 707 (5th Cir. 2018) ...................................................... 31, 41

*Lechmere, Inc. v. NLRB,*
   502 U.S. 527 (1992) ......................................................................... 24

*Lee v. NLRB,*
   325 F.3d 749 (6th Cir. 2003) .......................................................... 27

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Medco Health Sols. of Las Vegas, Inc.*,
  364 N.L.R.B. 1687 (2016).......................................................................... 31

*Medco Health Sols. of Las Vegas, Inc. v. NLRB*,
  701 F.3d 710 (D.C. Cir. 2012) ................................................................. 45

*Meijer, Inc.*,
  318 N.L.R.B. 50 (1995) ............................................................................ 31

*MikLin Enters., Inc. v. NLRB*,
  861 F.3d 812 (8th Cir. 2017)..................................................................... 27

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..................................................................................... 30

*Mt. Clemens Gen. Hosp.*,
  335 N.L.R.B. 48 (2001) ............................................................................ 31

*New York New York, LLC v. NLRB*,
  313 F.3d 585 (D.C. Cir. 2002) .......................................................... 25, 27

*NLRB v. Arkema, Inc.*,
  710 F.3d 308 (5th Cir. 2013)............................................................. 23, 24

*NLRB v. Babcock & Wilcox Co.*,
  351 U.S. 105 (1956).................................................................................. 32

*NLRB v. Fin. Inst. Emps. of Am.*,
  475 U.S. 192 (1986).................................................................................. 24

*NLRB v. Magnavox Co. of Tenn.*,
  415 U.S. 322 (1974).................................................................................. 35

*NLRB v. Starbucks Corp.*,
  679 F.3d 70 (2d Cir. 2012) ....................................................................... 41

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*NLRB v. U.S. Postal Serv.*,
   660 F.3d 65 (1st Cir. 2011) ................................................................. 27

*NLRB v. United Steelworkers of Am.*,
   357 U.S. 357 (1958) ........................................................................... 35

*Quantum Elec., Inc.*,
   341 N.L.R.B. 1270 (2004) ................................................................. 31

*Republic Aviation Corp. v. NLRB*,
   324 U.S. 793 (1945) ................................................................ *passim*

*S. New England Tel. Co. v. NLRB*,
   793 F.3d 93 (D.C. Cir. 2015) ............................................................. 50

*Stabilus, Inc.*,
   355 N.L.R.B. 836 (2010) ........................................................ 7, 18, 19

*Tesla, Inc.*,
   370 N.L.R.B. No. 101 (Mar. 25, 2021) ............................................. 19

*Textile Workers Union of Am. v. Darlington Mfg. Co.*,
   380 U.S. 263 (1965) ........................................................................... 31

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) ..................................................................... 23, 24

*Va. Elec. & Power Co. v. NLRB*,
   703 F.2d 79 (4th Cir. 1983) ............................................................... 45

*Wal-Mart Stores, Inc.*,
   340 N.L.R.B. 637 (2003) ............................................................. 30, 32

*Wal-Mart Stores, Inc.*,
   368 N.L.R.B. No. 146 (Dec. 16, 2019) .................................... *passim*

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*World Color (U.S.A.) Corp. v. NLRB,*
   776 F.3d 17 (D.C. Cir. 2015) .................................................. 36, 37, 38

*World Color (USA) Corp.,*
   369 N.L.R.B. No. 104 (June 12, 2020) ................................................ 37

**STATUTES**

National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ................... *passim*
   29 U.S.C. § 157 .......................................................................... *passim*
   29 U.S.C. § 158 .......................................................................... *passim*
   29 U.S.C. § 160 .......................................................................... 5, 23

**OTHER AUTHORITIES**

WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1955) .................... 34

## INTRODUCTION

Many thousands of employees work in Tesla's Fremont manufacturing facility each day. Among them are employees who work in "general assembly," where they assemble the freshly painted, still curing pieces of the Tesla electric vehicle with the assistance of sophisticated robotic machinery. Because the vehicles are highly susceptible to damage at this stage, and because Tesla wants managers to be able to track whether the many hundreds of people in this sensitive area at a given time are supposed to be there, general assembly employees wear a required uniform. These distinctive, company-provided "Team Wear" uniforms bear the company's name and logo. They are designed to pose no risk of damaging the vehicles and to distinguish general assembly employees from other individuals in the facility.

This case arose when Union supporters in general assembly sought to replace their Team Wear shirts with shirts that bear the Union's name and logo. At the time, the Union was in the midst of an organizing campaign and widely passing out these shirts to Tesla employees. Aware of its duties under the National Labor Relations Act ("NLRA"), Tesla did not limit general assembly employees' ability to add the Union's name

and logo to their Team Wear uniforms using stickers that the Union distributed. These stickers do not jeopardize Tesla's interests in avoiding vehicle damage and identifying general assembly personnel. And many employees did add these stickers to their uniforms. But Tesla would not permit general assembly employees to completely replace their Team Wear apparel while working their shifts. Allowing general assembly employees to substitute their own clothing harmed Tesla's ability to guarantee that the clothing had no features—like metal rivets or emblems—that could damage the vehicles and had done so in the past. In addition, allowing general assembly employees to wear the same Union shirts that employees commonly wore in other departments harmed managers' ability to tell at a glance whether the many people in general assembly at any given time were authorized to be there.

The full National Labor Relations Board split three-to-two in holding that this Team Wear policy violates the NLRA. It did not matter to the majority that Tesla applies the policy evenhandedly—not just against pro-Union apparel. Nor did it matter that Tesla permits general assembly employees to add Union stickers to their uniforms. For the first time in the Board's history, it held that *any* requirement that employees wear

a company uniform, rather than a union substitute, is "presumptively unlawful." ROA.6639. Regardless of how little a uniform requirement limits employees' workplace expression, employers must now identify "special circumstances" to justify it, and the policy must also be "narrowly tailored" to those special circumstances. ROA.6657. The majority held that Tesla failed to meet this test.

This Court should set aside the Board's decision. Employers have many legitimate reasons for requiring uniforms—in special circumstances and routine ones. And employees have no ground to object when uniforms do not hamper their ability to express their views on unions, self-organization, or collective bargaining.

The Board majority rested its contrary conclusion not on its own specialized expertise, but on a misreading of a Supreme Court decision. This Court owes no deference to that misreading of Supreme Court precedent. Under both judicial precedent and the statute's text, the Board may not declare uniforms unlawful without finding an actual restriction on employees' right to effectively communicate their views. There was no such restriction here. Tesla's policy was neutral and nondiscriminatory, and employees were free to express the message and viewpoint that

3

they wanted to express. So, as the dissenters explained, the majority had no basis to shift the burden onto Tesla to prove special circumstances for its reasonable and neutral uniform policy.

In any event, Tesla did prove special circumstances justifying the Team Wear policy. Allowing employees to substitute Union apparel harms Tesla's ability to guarantee that employees' clothing (1) will not pose a risk to Tesla's vehicles and (2) will readily distinguish those who work in the sensitive general assembly area of the plant from the thousands of other employees who might be wearing the same Union shirt on a given day. The Board had no basis for second-guessing these reasonable business judgments, especially when employees were free to communicate their pro-Union views through stickers that harmed neither of these business interests. This Court should reverse.

## JURISDICTIONAL STATEMENT

The Board issued its Supplemental Decision and Order on August 29, 2022. Tesla petitioned for this Court's review on September 6, 2022. The Board applied for enforcement of its Order on September 22, 2022. The petition and cross-application are timely because the NLRA imposes

no time limit for such filings.  *See, e.g.*, *Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 232 (3d Cir. 2001).

This Court has jurisdiction over the petition and cross-application because the Supplemental Decision and Order is a final order.  *See* 29 U.S.C. § 160(e), (f).  Venue is proper because Tesla transacts business within this Circuit.  *See id.*

## STATEMENT OF ISSUES

1.    Whether the Board erred in holding that nondiscriminatory and consistently enforced uniform requirements are presumptively unlawful under the NLRA even when they allow employees to add union insignia and messaging to their uniforms.

2.    Whether the Board erred in holding that Tesla failed to prove special circumstances justifying its Team Wear requirements for general assembly employees at the Fremont facility.

## STATEMENT OF THE CASE

## I.    Statutory background

Section 7 of the NLRA gives employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other

concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) then makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of [those] rights." *Id.* § 158(a)(1).

The Supreme Court and the Board have interpreted these provisions to give employees certain rights to communicate support for a union. In *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 801-03 (1945), the Supreme Court agreed with the Board that an employer violated Section 8(a)(1) by restricting off-duty employees' ability to solicit union support and wear buttons advertising that they were union shop stewards. The Court stressed, however, the Board's responsibility to balance employees' statutory "right of self-organization" with employers' "right . . . to maintain discipline in their establishments." *Id.* at 798. It noted that the Board had struck such a balance for solicitation of union support by making it presumptively lawful for employers to restrict solicitation during working hours, but presumptively unlawful to restrict solicitation *outside* working hours. *Id.* at 803 n.10. The latter restriction was "presumed to be an unreasonable impediment to self-organization and therefore discriminatory in the absence of evidence that special

circumstances make the rule necessary in order to maintain production or discipline." *Id.* (citation omitted).

Over the past fifteen years, Board Members have expressed diverging views on the scope of employees' right to express pro-union messages on the job. In *Stabilus, Inc.*, 355 N.L.R.B. 836, 837 (2010), several employees were told they could not wear their union shirts during a union campaign because of a uniform policy requiring shirts bearing the employer's name. Two Board Members opined, in dicta, that the *Republic Aviation* right to wear union insignia extends to clothing that violates a uniform policy and that employers must show "special circumstances" to maintain such a policy. *Id.* at 838. The dissenting Board Member, in contrast, contended that employers need not show "special circumstances" to enforce a policy requiring company uniforms when that policy does not interfere with employees' Section 7 right to communicate with coworkers about self-organization. *Id.* at 843 (Schaumber, M., dissenting).

Nine years later, in *Wal-Mart Stores, Inc.*, 368 N.L.R.B. No. 146 (Dec. 16, 2019), a divided Board held that when an "[e]mployer maintains a facially neutral rule that limits the size and/or appearance of union

buttons and insignia that employees can wear but does not prohibit them," the Board would not require "special circumstances" but instead would apply the standard from *Boeing Co.*, 365 N.L.R.B. No. 154 (Dec. 14, 2017).   Under *Boeing*, if an employer's facially lawful policy potentially interferes with the exercise of employees' Section 7 rights, the Board balances "(i) the nature and extent of the potential impact on NLRA rights, *and* (ii) legitimate justifications associated with the policy." *Wal-Mart*, 368 N.L.R.B. No. 146, slip op. at 3 (citation and brackets omitted).   In *Wal-Mart*, the majority reasoned that when "a facially neutral rule . . . limits the size and/or appearance of union buttons and insignia . . . but does not prohibit them, . . . the infringement on Section 7 rights is less severe."   *Id.* at 2-3.   So "the employer's legitimate justifications for maintaining the restriction do not need to be as compelling for its policy to pass legal muster, and justifications other than the recognized special circumstances may suffice."  *Id.* at 3.

In this case, the Board voted three-to-two to overrule *Wal-Mart* and require "special circumstances" to justify maintaining a neutral, consistently enforced uniform policy in the workplace.  ROA.6639.

## II.    Factual background

### A.    Tesla has long maintained a Team Wear policy for general assembly employees and began to enforce it strictly after an uptick in vehicle imperfections.

Tesla manufactures electric vehicles at a 5-million-square-foot facility in Fremont, California.  ROA.6536; ROA.6640.  The facility has many sections.  ROA.6536.  The powertrain department, for example, manufactures vehicle components.  *Id.*  The stamping press center creates body panels, doors, liftgates, and hoods.  *Id.*  The body in white department welds such parts together to create the skeleton of the vehicle.  *Id.*  And the paint department sends the vehicle frame through a chemical bath to prevent corrosion, cures the vehicle in an oven, paints the vehicle, and sends it to cure again.  *Id.*  Then the vehicle is inspected and touched-up before moving to the general assembly department.  *Id.*

Between 1,000 and 3,000 "production associates" work in the general assembly section of the facility, overseen on each shift by roughly 14 supervisors, with the assistance of 71 production leads.  *See id.*; ROA.1411-12 (Penera).  When a vehicle arrives in general assembly, the paint on the vehicles is not yet fully cured and thus is susceptible to damage.  ROA.6537; *see* ROA.1367 (Penera).  The vehicle must move through

several assembly lines and workstations by a series of conveyors, over-head carriers, and robots. ROA.1366-88 (Penera). At these workstations, general assembly production associates assemble vehicles by physically installing parts on and in the auto bodies. *See id.* This process converts an empty auto body into a finished vehicle that is ready for customer delivery.

General assembly production associates have extensive physical contact with the still-curing vehicles as they move down the assembly line. ROA.1413-14 (Penera). This creates a risk that a car will be inadvertently damaged or mutilated during the general assembly process, and the department's production associates are therefore trained to treat the unfinished vehicles as though they are still wet. ROA.1367, ROA.1388-89 (Penera). Before it can be delivered, the vehicle must undergo an inspection for any scratches, buffs, chips, or other imperfections in the paint job or trim, and any imperfections must be repaired. ROA.1389, ROA.1393 (Penera); ROA.1618 (Martin); ROA.6537.

To minimize the risk of imperfections, production associates in the general assembly department must wear protective gear, which includes covers for belts, rings, and watches. ROA.1620 (Martin); ROA.6537.

And, since at least May 2016, Tesla has issued "Team Wear" uniforms for the production associates, team leads, supervisors, and quality inspectors in general assembly. *See* ROA.1392 (Penera). Around the summer of 2016, Tesla distributed a revised set of "General Assembly Expectations." ROA.1392 (Penera); ROA.4927-30 (Ex. R-17) (some capitalization omitted). Under the heading "Mutilation Protection," this document stated that "Team wear is mandatory for all team members and leads." ROA.4927-28 (Ex. R-17). In October 2017, Tesla updated those expectations to state:

> Team Wear: It is mandatory that all Production Associates and Leads wear the assigned team wear.
>
> - On occasion, team wear may be substituted with all black clothing if approved by supervisor.
>
> - Alternative clothing must be mutilation free, work appropriate and pose no safety risks (no zippers, yoga pants, hoodies with hood up, etc.).

ROA.3208 (Ex. GC-37); ROA.4932 (Ex. R-18); *see* ROA.1407 (Penera).

For the production associates in general assembly, Team Wear includes black cotton shirts with the Tesla logo:

 

ROA.3214-16 (Ex. GC-41); *see* ROA.212 (Henry); ROA.6537. Team Wear for these employees also includes black cotton pants with no buttons, rivets, or exposed zippers. ROA.215 (Henry); ROA.407 (Phillips); ROA.1390 (Penera). Newly hired production associates receive two pairs of pants, two short-sleeve shirts, two long-sleeve shirts, and a sweater. ROA.6537. They can also purchase additional items from an onsite Team Wear office. ROA.2430-31 (Fenelon). Occasionally, supervisors and managers have authorized non-Team Wear clothing when Team Wear was unavailable, such as when many new employees were starting at the facility. ROA.6555; *see* ROA.1401-02 (Penera); ROA.1655 (Martin).

Tesla began to strictly enforce the Team Wear policy in August 2017. ROA.6555-56; *see, e.g.*, ROA.2426-33 (Fenelon). In April 2017, Tesla experienced a high number of seat mutilations in general assembly, interrupting production flow and delaying delivery of finished vehicles to

customers.  ROA.1621-22 (Martin); ROA.6555.  As a result, Tesla began an "audit" in May 2017 to determine the causes.  ROA.6555.  Although Tesla did not identify any item standing alone as the root cause of the increased mutilation problem, it identified lax enforcement of the Team Wear requirement as a possible contributor.  ROA.1658-59 (Martin); ROA.4962 (Ex. R-27); ROA.6555.  For example, metal rivets on non-approved jeans had damaged vehicle seats.  ROA.1619, ROA.1659 (Martin).  And metal emblems on non-approved t-shirts had damaged vehicle paint.  ROA.1619-20, ROA.1669 (Martin).  Of course, not every unapproved article of clothing posed a risk of damage to the vehicles.  But allowing general assembly employees to freely replace their preapproved apparel with clothes of their own choosing would require each general assembly manager to perform daily, individualized inspections of 30 to 40 team members and every item of unapproved clothing, for up to 3,000 general assembly employees in total.  ROA.1395 (Penera).

In addition to guarding against vehicle imperfections, the Team Wear requirement also helps maintain safety and visual management within General Assembly.  ROA.6554.  As for safety, Team Wear helps ensure that employees are wearing clothing free of hazards that could get

caught in equipment or damage vehicles.  ROA.1397 (Penera).  In addition, having standardized, required clothing obviates the need for managers to perform individualized checks of dozens of production associates' clothing to make sure that each item of apparel is safe and unlikely to cause vehicle damage.  ROA.1395 (Penera); ROA.6554.  As for visual management, Team Wear helps track individuals within general assembly, who are around dangerous and sensitive robotic and mechanized equipment.  Individuals from other departments are often in general assembly.  ROA.1398-99, ROA.1412-15 (Panera); ROA.1694 (Martin).  Because Team Wear is specific to the general assembly department, it helps distinguish general assembly employees from the many thousands of other employees who work in the Fremont location and who sometimes pass through the general assembly area, allowing managers to determine whether the people in general assembly are supposed to be there.  ROA.1395, ROA.1397 (Penera).  In addition, general assembly personnel receive different Team Wear colors depending on their roles:  production associates wear black shirts, team leads and supervisors wear red shirts, and quality inspectors wear white shirts.   ROA.1392 (Panera); ROA.6537; ROA.6640.  This color-coding enables the general assembly

personnel to identify one another based on their role in the department, and it helps managers and supervisors communicate more effectively. ROA.1395-96 (Panera).  Team Wear also makes it easier, in an emergency or evacuation, to identify whether individuals are in the right area for their department.  ROA.1397 (Panera).

### B. Some general assembly employees sought to replace Team Wear shirts with Union shirts even though they were free to add Union stickers to their Team Wear.

In the fall of 2016, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO launched a campaign to represent employees at the Fremont facility. ROA.6534.  In the spring of 2017, some employees throughout the facility—not just general assembly—began to show support for the campaign by wearing black cotton shirts bearing the Union's logos and slogan, "Driving a Fair Future at Tesla":




ROA.3187-89 (Ex. GC-25); *see, e.g.*, ROA.236-38, ROA.274 (Williams).

The Union distributed many hundreds of its t-shirts at the Fremont fa-

cility.  ROA.62-63 (Reed).

In August 2017, as part of its increased enforcement of the Team

Wear policy, Tesla informed general assembly production associates that

the Union shirt violated the Team Wear policy and that they would be

sent home if they wore it again.  ROA.6555-56; ROA.6640-41.  Employees

in other departments, who were not governed by the Team Wear policy,

remained free to wear—and regularly did wear—the Union shirts inside

the facility while on the job.  ROA.219 (Henry); ROA.237-38 (Williams);

ROA.383-86 (Vasquez); ROA.687, ROA.776 (Moran).

Even in general assembly, production associates remained free to

add pro-Union messaging to their Team Wear.  Under the Team Wear

policy, general assembly production associates have always been allowed

to wear Union stickers on their assigned Team Wear and hats.

ROA.1408-09 (Penera); ROA.1657-58 (Martin); ROA.2162-63 (Rodri-

guez); ROA.2433-34 (Fenelon); ROA.2560-61 (Ogunniyi).  And in fact,

general assembly production associates often did add such stickers to

their Team Wear and hats, displaying the same Union logos and slogan that appear on the Union t-shirt:



ROA.3204 (Ex. GC-35); *see* ROA.218-19, ROA.223-24 (Henry); ROA.321-22 (Jones); ROA.347-48 (Cotton); ROA.367-68 (Vasquez); ROA.1408 (Penera); ROA.1657 (Martin); ROA.2433 (Fenelon); ROA.2560-61 (Ogunniyi).

## III.   Procedural background

The Union filed unfair labor practice charges in 2017 and 2018. ROA.6534 & n.1.  These charges challenged the existence of the Team Wear policy, and Tesla's manner of enforcing it, among other issues not relevant to this appeal.  *See id.*

On September 27, 2019, Administrative Law Judge Amita Baman Tracy issued a decision rejecting the allegation that Tesla enforced its Team Wear policy in a way that discriminated against Union supporters.

ROA.6557.  The evidence showed that Tesla increased its enforcement of the policy in August 2017 against *all* noncompliant clothing, not just the Union's shirts.  *See id.*  But the judge nonetheless ruled that the existence of the Team Wear policy, on its own, violated Section 8(a)(1) of the NLRA. *Id.*  In her view (which predated the Board's decision in *Wal-Mart*), Tesla's business justifications were insufficient to meet the Board's special circumstances test.  *Id.*  Without elaboration, she dismissed as a "red herring" Tesla's argument that it did not interfere with employees' Section 7 rights because they were free to wear Union stickers.  *Id.*

Tesla filed exceptions to the decision through the NLRB's administrative process.  Tesla argued, among other things, that the special circumstances test should not apply because the Team Wear policy is neutral under *Wal-Mart* and *Boeing* and because production associates can freely and openly display Union insignia.  In response, the Board issued a Notice and Invitation to File Briefs that asked the parties and interested amici to address whether the Board's *Stabilus* decision provided the proper standard for a nondiscriminatory uniform policy that allows employees to wear union insignia on their uniforms—and, if not, what standard the Board should apply.  ROA.6374-75.

On March 25, 2021, the Board issued a decision and order that resolved most issues in the parties' larger dispute but severed the issue concerning Tesla's Team Wear for further consideration. ROA.6522 n.3; *see Tesla, Inc.*, 370 N.L.R.B. No. 101 (Mar. 25, 2021), *appeal filed*, No. 21-60285 (5th Cir.). In so doing, the Board affirmed the ALJ's dismissal of the allegations that Tesla discriminatorily enforced the Team Wear policy against Union supporters. ROA.6522 n.1; ROA.6640 n.6.

On August 22, 2022, the Board issued its Supplemental Decision and Order on the Team Wear policy. ROA.6639. By a three-to-two vote, the Board overruled *Wal-Mart* and ruled that the discussion in *Stabilus*, though dicta, sets the appropriate standard for nondiscriminatory and consistently enforced uniform policies that give employees other means to display their union insignia and messages. ROA.6645; *see* ROA.6643-55. So, according to the majority, even a facially neutral uniform policy that leaves open other modes of expression "is presumptively unlawful." ROA.6639. In other words, "when an employer interferes *in any way* with its employees' right to display union insignia, the employer must prove special circumstances that justify its interference." *Id.*

19

The majority went on to hold that Tesla's interests in reducing vehicle imperfections and visually managing its general assembly workforce did not constitute special circumstances for the Team Wear policy. ROA.6656-57. According to the majority, Tesla had "not shown that cotton shirts with non-[Tesla] logos, such as union logos, pose a mutilation risk to the unfinished vehicles." ROA.6656. The majority also determined that the Team Wear policy was not "narrowly tailored to address [Tesla's] claimed interest in maintaining visual management" in general assembly. ROA.6657.

Members Kaplan and Ring dissented. ROA.6658-69. They would have held that the Team Wear policy was lawful and would not have overruled *Wal-Mart*. ROA.6659. They contended that Supreme Court precedent required the Board to "strike an *accommodation* between employee rights and legitimate employer interests that ensures 'as little destruction of one as is consistent with the maintenance of the other.'" *Id.* (internal quotation marks omitted). The dissent would have reserved the special circumstances test for employer policies that deny a meaningful opportunity to display the employees' chosen union insignia. ROA.6666-67. Member Ring also argued that the majority's application

of the special circumstances test failed to accommodate employee rights with legitimate employer interests.  ROA.6665 n.46.

## SUMMARY OF ARGUMENT

I.    The Board committed reversible legal error in holding that neutral and nondiscriminatory uniform policies are presumptively unlawful.  The majority insisted that the Supreme Court's decision in *Republic Aviation* requires that conclusion.  But the Board's interpretations of Supreme Court precedent receive no deference, and its interpretation of *Republic Aviation* is untenable.  Far from declaring all uniform requirements presumptively unlawful, *Republic Aviation* addressed an employer's attempt to censor the particular message and viewpoint that employees wanted to communicate.  The Court stressed, however, that the Board must strike a reasonable accommodation between employee and employer interests.  The Board did not do that here.  Instead, it made an ordinary work uniform requirement presumptively unlawful, even though the uniform policy was viewpoint-neutral and did not restrict employees' ability to communicate the message they wished to convey.  The Board's refusal to distinguish between content-based and content-neutral restrictions on employee speech is indefensible.  Under the clear text

of NLRA Section 8(a)(1), employer actions that do not hamper employees' statutory rights are not unfair labor practices. There was no interference with employee rights here. Employees freely placed the Union's logos and slogan on their Team Wear uniforms through stickers that posed no risk to Tesla vehicles or to the visual management of general assembly employees. Tesla was not required to prove a special justification for its neutral and nondiscriminatory uniform requirement.

II.    If Tesla were required to prove a special justification for the Team Wear policy, it did so by explaining how the policy helps decrease the risk of vehicle damage and helps facilitate visual management of general assembly personnel. In ruling otherwise, the Board committed multiple legal errors and gave remarkably short shrift to Tesla's business concerns. Even when the Board's special circumstances test governs the lawfulness of an employer restriction on employee speech, courts consider whether employees retain alternative ways to express their views. Yet the Board gave no weight here to the general assembly employees' broad ability to express support for the Union by adding insignia to their uniforms. And the Board brushed aside Tesla's legitimate interest in using required uniforms to minimize the risk of vehicle damage and to facilitate

22

the visual management of general assembly employees. The Board resorted to implausible speculation to downplay these business concerns. But under precedent from this Court and others, the Board's failure to fairly consider the legitimate justifications for Tesla's policy provides an independent basis for reversing the Board's ruling.

## STANDARD OF REVIEW

The NLRA gives courts "responsibility for assuring that the Board keeps within reasonable grounds." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490 (1951). The Supreme Court has instructed courts "not to abdicate the conventional judicial function." *Id.* This Court therefore recognizes that its review of Board decisions is "more than a mere rubber stamp." *NLRB v. Arkema, Inc.*, 710 F.3d 308, 314 (5th Cir. 2013).

Under the NLRA, the Board's factual findings are "conclusive" if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). "[S]ubstantial evidence is more than a mere scintilla," and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera*, 340 U.S. at 477 (citation omitted). In considering the record as a whole, courts must "take into account whatever in the record fairly detracts from" the

Board's cited evidence. *Id.* at 488. "Because the Court is not left merely to accept the Board's conclusions, the Court must be able to 'conscientiously conclude that the evidence supporting the Board's determination is substantial.'" *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 633 (5th Cir. 2003) (citation omitted).

This Court "review[s] the Board's legal conclusions de novo." *Arkema*, 710 F.3d at 315; *see also Brown & Root*, 333 F.3d at 628. Though the Board receives some deference for its interpretations of the NLRA, the interpretation still must be "rational and consistent with the Act." *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 349 (5th Cir. 2013) (citation omitted). "Deference to the Board 'cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption of major policy decisions properly made by Congress.'" *NLRB v. Fin. Inst. Emps. of Am.*, 475 U.S. 192, 202 (1986) (citation and ellipsis omitted). Courts therefore "refuse[] enforcement of Board orders where they ha[ve] 'no reasonable basis in law,' either because the proper legal standard was not applied or because the Board applied the correct standard but failed to give the plain language of the standard its ordinary meaning." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497 (1979); *see also, e.g., Lechmere, Inc. v. NLRB*,

502 U.S. 527, 539 (1992) ("We cannot accept the Board's conclusion, be-
cause it 'rest[s] on erroneous legal foundations[.]'" (citation omitted)); *Al-
lied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*, 404
U.S. 157, 182 (1971) ("[T]he legal standard to be applied is ultimately for
the courts to decide and enforce.").

Unlike its interpretation of the NLRA, the Board's interpretation of
judicial precedent, including Supreme Court decisions, is entitled to no
deference.  *See, e.g.*, *Emp. Sols. Staffing Grp. II, L.L.C. v. Off. of Chief
Admin. Hearing Officer*, 833 F.3d 480, 484 (5th Cir. 2016); *New York New
York, LLC v. NLRB*, 313 F.3d 585 (D.C. Cir. 2002).

## ARGUMENT

### I.    Making uniforms presumptively unlawful conflicts with *Republic Aviation* and the text of the NLRA.

The Board erroneously held that "*any* limitation on the display of
union insignia is presumptively unlawful" and that an employer may not
"interfere[] *in any way* with its employees' right to display union insig-
nia" unless it can prove "special circumstances" to the Board's satisfac-
tion.  ROA.6639.  The Board majority expressly, and repeatedly, rooted
this conclusion in its interpretation of the Supreme Court's ruling in *Re-
public Aviation*.  But *Republic Aviation*, which this Court interprets de

novo and without deference to the Board, is incompatible with the Board's conclusion.  And so is the language of the NLRA itself.

### A.   *Republic Aviation* does not support a presumption that uniform requirements are unlawful.

Throughout its decision, the Board majority insists that its presumption against the lawfulness of uniform requirements follows from *Republic Aviation*.  Any other approach to required uniforms, according to the majority, would "upset the proper balance struck by the Supreme Court in *Republic Aviation*."  ROA.6639.  On the majority's interpretation, *Republic Aviation* created "a presumption that any employer limitation on the display of union insignia is invalid, with the burden on the employer to establish special circumstances to justify its action." ROA.6644; *see also* ROA.6645 ("[U]nder *Republic Aviation* and its progeny, the team-wear policy is presumptively invalid, and [Tesla] has the burden to establish special circumstances that justify its interference with production associates' protected right to display union insignia."). And the majority expressly rejected the dissent's approach and overruled *Wal-Mart* precisely because it found them inconsistent with *Republic Aviation*.  *See* ROA.6646 ("Our colleagues' dissenting position . . . [is] contrary to *Republic Aviation*[.]" (some capitalization and italics omitted));

ROA.6653 ("[B]ecause *Wal-Mart* is contrary to *Republic Aviation* and dec-ades of Board and court precedent applying it, we overrule *Wal-Mart*[.]").

The Court owes no deference to Board decisions, like the decision here, that "purport to rest on the Board's interpretation of Supreme Court opinions." *New York New York*, 313 F.3d at 590. On the contrary, "an agency's interpretations of caselaw are reviewed de novo." *Emp. Sols. Staffing Grp.*, 833 F.3d at 484; *see, e.g., MikLin Enters., Inc. v. NLRB*, 861 F.3d 812, 823 (8th Cir. 2017) (en banc) ("Numerous prior court of appeals decisions have held that the Board's interpretation of judicial precedent 'is not entitled to judicial deference.'" (citation omitted)); *NLRB v. U.S. Postal Serv.*, 660 F.3d 65, 68 (1st Cir. 2011) ("A court of appeals is 'not obligated to defer to an agency's interpretation of Supreme Court precedent[.]'" (citation omitted)); *Lee v. NLRB*, 325 F.3d 749, 754 (6th Cir. 2003) ("[W]e give no deference to the Board's interpretation of Supreme Court . . . decisions, reviewing those holdings de novo."); *New York New York*, 313 F.3d at 590 ("We are not obligated to defer to an agency's interpretation of Supreme Court precedent under *Chevron* or any other principle.").

On any fair reading, *Republic Aviation* does not support the Board's conclusion that uniform requirements are presumptively unlawful. The *Republic Aviation* employer discharged employees for wearing buttons precisely because of the pro-union message they conveyed: the buttons marked the employees as "stewards" for a particular union. 324 U.S. at 795; *see Wal-Mart*, 368 N.L.R.B. No. 146, slip op. at 2 n.10 ("In *Republic Aviation . . .*, the Supreme Court held that the employer unlawfully prohibited employees from wearing a specific UAW-CIO union steward button."), *overruled by Telsa, Inc.*, 371 N.L.R.B. No. 131 (Aug. 29, 2022); ROA.6662 (Kaplan & Ring, MM., dissenting) ("[T]his was an explicit prohibition against displaying a specific union insignia *because* it was a union insignia."). The employer wanted to bar employees from communicating this message because it believed the message would cause confusion or mislead fellow employees into supporting the union. *Republic Aviation*, 324 U.S. at 801. The Board entertained this asserted justification for restricting the employees' message but found it insufficient because there was no real risk of confusion. *Id.* at 802 n.7.

To borrow First Amendment concepts, the *Republic Aviation* employer restricted employee speech based on its content and viewpoint.

Tesla's uniform policy, on the other hand, is neutral and nondiscriminatory. It permits the content and viewpoints at issue, and merely restricts the medium for expressing those views. Although general assembly employees may not replace their Team Wear, they are free to use stickers to add the Union's logos and campaign slogan to their clothes and hats—the same logos and slogan that appear on the Union shirts—and many production associates did so. *See* ROA.218-19, ROA223-24 (Henry); ROA.321-22 (Jones); ROA347-48 (Cotton); ROA367-68 (Vasquez); ROA.1408-09 (Penera); ROA.1657-59 (Martin); ROA.2162-63 (Rodriguez); ROA.2433-34 (Fenelon); ROA.2560-61 (Ogunniyi); ROA.3204 (Ex. GC-35).

The Board majority attacks a strawman in highlighting the *Republic Aviation* employer's unsuccessful argument that its employees could wear "other types of union buttons." ROA.6648 (citation omitted). There, "other types of union buttons" meant buttons with a *different message*; the employer tried to get its employees to wear union insignia different than the "steward" buttons they wanted to wear. *See* Brief for Republic Aviation Corp. at 6, *Republic Aviation*, 324 U.S. 793 (1945) (No. 226), 1944 WL 42256 ("[The supervisor] emphasized the complete propriety of

any type of union button other than the steward insigne." (emphasis added)). Nothing in *Republic Aviation* supports the rule that neutral and nondiscriminatory uniform requirements are presumptively unlawful, even when they do not hamper employees' ability to communicate their message and viewpoints.

Because the Board failed to acknowledge the significant difference between a prohibition on a particular message and a prohibition on a single medium for conveying that message, its decision is arbitrary and capricious and cannot stand. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[A]n agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem[.]"); *Gen. Land Off. v. U.S. Dep't of the Interior*, 947 F.3d 309, 321 (5th Cir. 2020) (holding that an agency decision was therefore "arbitrary and capricious" because it was based "on an incorrect legal standard").[1]

---

[1] The majority's reliance on prior cases exhibits the same defect. None of these decisions purported to apply the special circumstances test to a neutral and nondiscriminatory uniform requirement that left employees free to communicate their preferred message. *See, e.g.*, *Great Plains Coca-Cola Bottling Co.*, 311 N.L.R.B. 509, 515 (1993) (stating, without elaboration, that the employer wanted an employee to stop wearing a union jacket in favor of an employer jacket); *Wal-Mart*

In fact, *Republic Aviation* forecloses the Board's effort to make neutral and nondiscriminatory uniform policies presumptively unlawful. It stressed the Board's obligation to *balance* employee and employer interests, "working out an adjustment between the undisputed right of self-organization assured to employees . . . and the equally undisputed right of employers to maintain discipline in their establishments." *Republic Aviation*, 324 U.S. at 797-98; *see also Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 492 (1978); *cf. Textile Workers Union of Am. v. Darlington Mfg. Co.*, 380 U.S. 263, 269 (1965) ("[I]t is only when the interference with [Section] 7 rights outweighs the business justification for the employer's action

---

*Stores, Inc.*, 340 N.L.R.B. 637, 638-39 (2003) (rejecting employer's argument that it could prohibit union t-shirt because of its "message"), *enforced as modified*, 400 F.3d 1093 (8th Cir. 2005); *Meijer, Inc.*, 318 N.L.R.B. 50, 56-57 (1995) (finding that employer enforced a discriminatory prohibition on union pins and failed to justify a prohibition on wearing union jackets), *enforced* 130 F.3d 1209 (6th Cir. 1997); *Quantum Elec., Inc.*, 341 N.L.R.B. 1270, 1274 (2004) (addressing policy that prohibited any unapproved text on clothing and any unapproved decals on hard hats); *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 719 (5th Cir. 2018) (addressing policy that banned all pins and stickers other than the employer's own); *Medco Health Sols. of Las Vegas, Inc.*, 364 N.L.R.B. 1687, 1689 (2016) (addressing prohibition on "messages protesting working conditions"); *AT&T*, 362 N.L.R.B. 885, 886-87 (2015) (addressing ban on buttons and stickers carrying specific messages); *Mt. Clemens Gen. Hosp.*, 335 N.L.R.B. 48, 49-50 (2001) (addressing prohibition on specific buttons with allegedly controversial message), *enforced*, 328 F.3d 837 (6th Cir. 2003).

31

that [Section] 8(a)(1) is violated."); *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112 (1956) (recognizing that the Board should accommodate employee and employer rights "with as little destruction of one as is consistent with the maintenance of the other"). This need for balance was also central to the Board's *Boeing* decision, which the Board's now-overruled *Wal-Mart* decision extended to this context. *See Boeing*, 365 N.L.R.B. No. 154, slip op. at 7.

In *Republic Aviation*, the Court recognized that the "special circumstances" test is a permissible way of balancing employee and employer rights that are in conflict. The Board could permissibly treat a total ban on soliciting union support outside of working hours as "an unreasonable impediment to self-organization" that was unlawful unless the employer could show that "special circumstances make the rule necessary in order to maintain production or discipline." *Republic Aviation*, 324 U.S. at 803 n.10 (citation omitted). But both the Board and the Court recognized that the balance tips the other way for solicitation rules that apply during worktime. The NLRA "does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time" because "[w]orking time is for work." *Id.* (citation omitted).

In this case, the Board extended the "special circumstances" test to a neutral and nondiscriminatory uniform policy that applies during working time, and the Board did not even ask whether the policy acts as "an unreasonable impediment to self-organization." *Id.* (citation omitted). The Board simply glossed over that question by assuming that "employees' statutory rights" include a right to replace their required work uniform with pro-union apparel of their own choosing—even when they can freely communicate their preferred message through additions to their uniform. ROA.6651. The majority never explained how "the undisputed right of self-organization" discussed in *Republic Aviation* creates a right to convey employees' preferred message in whatever *medium* they prefer, while they are on the clock. ROA.6652. As discussed next, this undefended assumption is inconsistent not just with *Republic Aviation*, but also with the text of the NLRA.

**B.    Tesla's Team Wear policy does not "interfere with, restrain, or coerce employees" in the exercise of their statutory rights.**

The Board ruled that maintaining the Team Wear policy for the Fremont general assembly production associates violates Section 8(a)(1) of the NLRA. That provision makes it an unfair labor practice for an

employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]." 29 U.S.C. § 158(a)(1). And Section 7, in relevant part, gives employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." *Id.* § 157.

Two features of these statutory provisions are critical here. First, Section 8(a)(1), by its terms, requires an *adverse effect* on the employees' Section 7 rights. If employees are free to exercise their rights, the employer is not interfering with, restraining, or coercing employees with respect to those rights. *See* WEBSTER'S NEW INTERNATIONAL DICTIONARY 519, 1294, 2125 (2d ed. 1955) (defining "interfere" as "[t]o come in collision" or "to clash," defining "restrain" as "[t]o limit, confine, restrict," and defining "coerce" as "[t]o constrain or restrain by force, esp. by law or authority; to repress; curb").

The second key point is that the hindrance must be with the rights actually protected by Section 7. Section 7 does not mention any right to wear preferred items of clothing. Rather, it protects rights relating to

self-organization and collective bargaining.  Those rights, to be sure, "necessarily encompass[] the right effectively to communicate with one another regarding self-organization at the jobsite." *Beth Israel Hosp.*, 437 U.S. at 491 (citing *Republic Aviation*).  But by protecting the right to engage in *effective* communication, Section 7 does not thereby create a freestanding right to communicate using whatever channels an employee prefers, whenever the employee prefers.

Indeed, the Supreme Court has explained that in determining the validity of a speech-restriction under Section 7, a "vital consideration" is whether the employer's policy "truly diminishe[s] the ability of the labor organizations involved to carry their message to the employees." *NLRB v. United Steelworkers of Am.*, 357 U.S. 357, 363 (1958) (citing *Republic Aviation*).  Even if an employer policy "ha[s] the effect of closing off one channel of communication," the statute "does not command that labor organizations as a matter of abstract law, under all circumstances, be protected in the use of every possible means of reaching the minds of individual workers." *Id.* at 364.[2]

---

[2]  The Board majority invoked *Eastex, Inc. v. NLRB*, 437 U.S. 556, 572 (1978), *Beth Israel Hospital*, and *NLRB v. Magnavox Co. of Tennessee*, 415 U.S. 322, 326 (1974), to suggest that employees' alternative means

Here, the Board did not attempt to explain how refusing to permit general assembly employees to substitute Union apparel for their uniforms hampered their ability to communicate effectively. Nor could it. The undisputed evidence is that Union supporters in general assembly were free to communicate the same message as employees in other departments. They just could not do so through the particular medium of Union t-shirts that replaced their required on-the-job uniforms.

These facts closely resemble *World Color (U.S.A.) Corp. v. NLRB*, 776 F.3d 17 (D.C. Cir. 2015). There, the employer's hat policy prohibited wearing baseball caps unless those caps bore the company's logo. *Id.* at 18. The Board determined that this policy explicitly restricted Section 7 rights because it barred employees from wearing caps with union insignia. *Id.* at 20. The D.C. Circuit disagreed. It noted that "the hat policy restrict[ed] the type of hat that may be worn" but did not "say anything

---

of communication are never relevant. ROA.6648-49. None of these cases supports that proposition. They addressed "restraint of employees' Section 7 rights in nonwork areas at nonwork times," when the employer could not show a legitimate business justification. *Helton v. NLRB*, 656 F.2d 883, 896 (D.C. Cir. 1981). Courts do consider alternative means of communication in contexts where employers' interests are stronger, such as when nonemployees are on their property. *See Casino Pauma v. NLRB*, 888 F.3d 1066, 1084 (9th Cir. 2018).

about whether union insignia may be attached to the hat." *Id.* In other words, "the policy required employees to wear a [company] hat rather than any other hat—including a union hat." *Id.* at 21. But the court held that this requirement did not necessarily restrict Section 7 rights because, according to the employer, employees were free to add union insignia to their company hats. *Id.* Then, on remand, the Board reviewed the record to determine whether the evidence supported the employer's claim, and found that it did. *World Color (USA) Corp.*, 369 N.L.R.B. No. 104, slip op. at 2 (June 12, 2020). The employees were free to add union insignia to their company hats, so the Board dismissed the complaint. *Id.* at 3.

The D.C. Circuit's decision in *World Color* comports with this Court's precedent as well. In *Davison-Paxon Co. v. NLRB*, 462 F.2d 364, 366, 368 (5th Cir. 1972), the Court had to decide whether department store employees had a Section 7 right to wear a bright and conspicuous union button ("as large as a Kennedy half dollar") on the selling floor, as opposed to "the standard nickel or dime-sized union membership pin." The Court held that the employees had no Section 7 right to wear the more ostentatious button and declined to enforce the Board's contrary

decision. *Id.* at 371. The Court saw no reason to defer to the Board's decision or apply the "substantial evidence" standard because the Court was reviewing "not of a question of fact, but of a judgment as to the proper balance to be struck between conflicting interests." *Id.* at 372.

Here too, general assembly employees have no statutory right to express pro-Union views in whatever manner they please, whenever they please. Like the policy in *World Color*, Tesla's Team Wear policy allowed employees to add Union insignia to their company apparel and simply prohibited replacing that company apparel with a Union substitute. Such a policy does not restrict Section 7 rights and therefore cannot be the basis for a Section 8(a)(1) violation.

\*  \*  \*

*Republic Aviation* and the text of the NLRA foreclose the Board's decision to make neutral and nondiscriminatory uniform requirements presumptively unlawful, even when those requirements do not restrict employees' ability to effectively communicate. The Court should therefore set aside, and deny enforcement of, the Board's Supplemental Decision and Order. The Court need not even reach the question whether Tesla proved "special circumstances" to justify its uniform requirements.

## II.    Tesla established special circumstances for the Team Wear requirements that outweigh any adverse effect on employees' statutory rights.

While it was error for the Board to demand special circumstances here, Tesla proved special circumstances in any event.  Even when employees' ability to communicate their message is actually hampered, courts consider employees' alternative opportunities to communicate within the special circumstances analysis.  Here the Board erroneously gave that consideration no weight at all.  And the Board committed additional legal errors and acted arbitrarily and unreasonably in brushing aside Tesla's strong business reasons for the general assembly Team Wear policy.

### A.    Courts recognize that employees' alternative means of expression should weigh into the analysis.

The Board's terse special circumstances discussion did not give any weight to the general assembly employees' broad ability to wear Union stickers.  *See* ROA.6656-57.  Even if the Board were correct not to consider employees' alternative means of expression in deciding whether to apply the special circumstances test in the first place, it remains a vital consideration for a sensible balance between employee and employer rights within the special circumstances inquiry.  Under the balancing of

interests that the NLRA requires, employers need not provide as compelling a justification for a policy that does not meaningfully limit employees' ability to communicate.

For this reason, appellate courts often consider whether employees have alternative ways to communicate their views as part of the special circumstances analysis. As the Fourth Circuit observed: "that an employer prohibits some, but not all, union insignia is a factor that courts, including this one, have looked to in determining whether special circumstances are present." *E. Omni Constructors, Inc. v. NLRB*, 170 F.3d 418, 426 (4th Cir. 1999). In *Eastern Omni*, "employees were permitted to wear union insignia on all of their attire except hardhats," which the court framed as "a partial, inconsequential ban on union insignia." *Id.* The court declined to enforce a Board order classifying this policy as a violation of Section 8(a)(1): "[i]t simply strains credulity to conclude that the right of . . . employees to effectively communicate with each other regarding unionization was somehow stymied by [the employer's] ban on non-company authorized decals on hardhats." *Id.*[3]

---

[3] The court did not analyze the antecedent question whether it was appropriate, given the limited nature of the employer's restriction, to require special circumstances. *See E. Omni*, 170 F.3d at 424-25.

Other courts agree. In balancing the employer's stated justifications with the employees' statutory rights, it is essential to compare the extent of the employer interest and the extent the employee burden. *See, e.g.*, *NLRB v. Starbucks Corp.*, 679 F.3d 70, 78 (2d Cir. 2012) (denying enforcement of Board order because "[t]he company adequately maintains the opportunity to display pro-union sentiment by permitting one, but only one, union button on workplace clothing"); *Fabri-Tek, Inc. v. NLRB*, 352 F.2d 577, 586 (8th Cir. 1965) (denying enforcement of Board order because the employer respected employees' "right to wear 'buttons, jewelry or other personal labels that would indicate their membership in or association with a labor organization'" and only objected to oversized and distracting buttons); *cf. Boch Imports, Inc. v. NLRB*, 826 F.3d 558, 571 (1st Cir. 2016) ("We note at the outset that different considerations may apply when employers proscribe all adornments . . . than would apply when employers proscribe only certain types of adornments (for example, 'provocative' adornments)[.]"). This Court too has stressed that "wholesale or 'blanket' bans are rarely, if ever, lawful"—implicitly acknowledging that more targeted restrictions are more likely to comply with the NLRA than broader ones. *In-N-Out Burger*, 894 F.3d at 715.

The Board committed legal error in not following this commonsense principle in its special circumstances analysis and not recognizing that the Team Wear policy already is narrowly tailored to minimize any potential conflict with employees' expression of their views.

### B.    The Board improperly rejected Tesla's justifications for the Team Wear policy.

When it addressed Tesla's justifications, the Board majority showed why the special circumstances test offers little comfort for employers with uniform requirements.  *See* ROA.6665 n.46 (Kaplan & Ring, MM., dissenting) (explaining that the special circumstances test "will offer little comfort to employers who are now faced with the near-certain risk of facing prosecution under the Act whenever they seek to maintain dress codes").  The Board gave no weight to Tesla's interest—widely shared by employers—in having a required uniform.  And then it unreasonably rejected the strong special justifications Tesla proved for its Team Wear policy.

This Court has noted that many employers have strong reasons to require uniforms for employees.  A "uniform requirement fosters discipline, promotes uniformity, encourages *esprit de corps*, and increases readiness" and "encourages the subordination of personal preferences

and identities in favor of the overall group mission." *Commc'ns Workers of Am. v. Ector Cnty. Hosp. Dist.*, 467 F.3d 427, 439 (5th Cir. 2006) (en banc) (citation omitted). Similar reasoning has led the Sixth Circuit to rule that "where an employer enforces a policy that its employees may only wear authorized uniforms in a consistent and nondiscriminatory fashion and where those employees have contact with the public, a 'special circumstance' exists as a matter of law which justifies the banning of union buttons." *Burger King Corp. v. NLRB*, 725 F.2d 1053, 1055 (6th Cir. 1984). While this case does not present that exact scenario—these employees do not have contact with the public—it remains true that uniforms serve a valuable purpose across many employment contexts. Yet the Board inexplicably determined here that uniform policies "do not generally serve any specific employer interest" outside of special employment contexts. ROA.6652 n.33. That determination cannot be squared with this Court's assessment in *Ector County*.

In addition, the record identifies two special and important reasons for Tesla's Team Wear policy for general assembly employees. There is no dispute that the general assembly department involves highly sensitive work and equipment, with easily damaged, freshly painted vehicle

43

components and giant robotic machinery.  ROA.6536; *see also* ROA.1366-67 (Penera).  To ensure premium quality, Tesla closely inspects each vehicle for scratches, buffs, chips, or other imperfections in the paint or trim and makes necessary repairs.  ROA.6537; *see* ROA.1389, ROA.1393 (Penera); ROA.1618 (Martin).  Because of the costs to repair these imperfections, general assembly production associates must treat the vehicles with extra care.  ROA.1367, ROA.1388-89, ROA.1413-14 (Penera).  And they must wear protective covers for their belts, rings, and watches, which could easily scratch the still-curing paint.  ROA.6537; *see* ROA.1620 (Martin).

The Team Wear policy serves the same goal, protecting against vehicle imperfections or "mutilations."  *See* ROA.3208 (Ex. GC-37); ROA.4927-28 (Ex. R-17).  Indeed, after a surge in mutilations, Tesla conducted an internal audit and decided to strengthen enforcement of its Team Wear requirements.  ROA.1623-32, 1658-59 (Martin); ROA.4962 (R-27); ROA.6555.  After all, unapproved, non-Team Wear clothing—like jeans with metal rivets and shirts with metal emblems—sometimes has caused vehicle damage.  ROA.1619-20, ROA.1659, ROA.1669 (Martin).

There is no allegation here, as the Board majority recognized, that Tesla amped up enforcement in response to Union activity.  ROA.6656 n.41.

The risk of damage to an employer's products has long been recognized as a special circumstance that can justify restrictions on union insignia.  ROA.6656 (citing *Hanes Hosiery*, 219 N.L.R.B. 338, 347 (1975)). Yet the Board majority rejected Tesla's reliance on this justification.  It did so, in part, because several witnesses "testified that they did not have any knowledge of a shirt with a logo causing a mutilation to a vehicle." ROA.6656-57.  But the premise of the Board's observation is legally flawed.  A company need not wait for union insignia to cause actual harm before it can impose reasonable limits on them:

> Businessmen are required to anticipate such occurrences and avoid them if they wish to remain in business.  This is a valid exercise of business judgment, and it is not the province of the Board or of this court to substitute its judgment for that of management so long as the exercise is reasonable and does not interfere with a protected purpose.

*Davison-Paxon*, 462 F.2d at 371 (citation omitted); *see also Va. Elec. & Power Co. v. NLRB*, 703 F.2d 79, 83 (4th Cir. 1983) ("[T]he employer was not required to wait until a disturbance actually occurs before taking reasonable steps to maintain employee discipline and efficiency."); *Medco*

45

*Health Sols. of Las Vegas, Inc. v. NLRB*, 701 F.3d 710, 717 (D.C. Cir. 2012) (noting that "potential harm" can support a finding of special circumstances).

On top of that legal error, the Board majority unreasonably dismissed evidence that some vehicle damage has been caused by unauthorized shirts bearing metallic logos.  ROA.6657; *see* ROA.1669 (Martin). The Board dismissed this evidence because Tesla's Team Wear policy was not "narrowly tailored" toward shirts with metal logos.  But neither is the Board's order limited to shirts *without* metal logos:  it broadly rewrites the Team Wear policy to permit "black union shirts."  *See* ROA.6657. More importantly, Tesla's witnesses explained that allowing employees to replace Team Wear with unapproved substitutes would require individualized inspections of the 1,000 to 3,000 general assembly employees, with each manager responsible for checking 30 to 40 people.  ROA.1395 (Penera).  The Board confidently asserted that this regime would not be more burdensome than doing what Tesla does already—check to see whether employees are wearing Team Wear.  ROA.6657 n.43.  But that is simply wrong.  The evidence here, consistent with common sense, is that it is far easier to scan a group of 30 to 40 employees to see whether

they are wearing standardized preapproved clothing than it is to verify whether each employee not in the preapproved clothing poses a risk to Tesla's vehicles or themselves based on what they chose to wear that day. ROA.1395 (Penera).

Tesla separately showed that the Team Wear policy allows managers to quickly distinguish general assembly employees from others. The Fremont facility is a 5-million-square-foot facility that roughly 10,000 people visit each day. ROA.1395 (Penera). General assembly is a particularly sensitive area in the facility, with easily damaged products and giant robotic machinery. Because the required Team Wear only applies to the 1,000 to 3,000 general assembly employees, it helps managers easily tell "who should be there, who shouldn't be there." *Id.* Managers can also coordinate and direct teams more efficiently in emergency situations, like an evacuation. ROA.1397 (Penera). This ability to visually manage employees is important because individuals from other departments regularly find themselves in general assembly. ROA.1398-99, ROA.1412-15 (Panera); ROA.1694-95 (Martin). With Team Wear, managers can keep track of not just their own team members, but also other general assembly employees. ROA.1396 (Penera) ("There's thousands of

people in there. It's hard to know everybody by name. And because we have the visual management in the shop, it's very easy to identify."). Creating a blanket license for Union shirts in general assembly makes that visual management much more difficult, if not impossible.

The Board dismissed this concern because general assembly managers sometimes approve plain black shirts as a substitute for Team Wear. ROA.6657. This rationale fails for two reasons. First, it ignores that such approvals are confined to exceptional situations when sufficient supplies of Team Wear are unavailable. ROA.6555; *see* ROA.1416, ROA.1423 (Penera); ROA.1655 (Martin). The Board's order transforms a minor exception into the new normal. Second, the Board extends this treatment for plain black shirts to the Union's campaign shirts. *See* ROA.6657. But those black Union shirts, unlike the black Team Wear shirts, are constantly worn by hundreds of employees throughout the Fremont facility, including many who are not authorized to work in general assembly. ROA.219 (Henry); ROA.237-38 (Williams); ROA.383-86 (Vasquez); ROA.687, ROA.776 (Moran). Under the Board's order, managers would have no easy way to tell whether the individuals who are

wearing such shirts in general assembly are authorized to be in general assembly.  ROA.1694-95 (Martin).[4]

The Board dismissed this valid concern, too.  It speculated that employees from outside general assembly could also wear Team Wear shirts or plain black shirts because they are not prohibited from doing so.  ROA.6657 n.44.  But the Board cited no evidence that employees who are not authorized to be in the general assembly department wear Team Wear or plain black shirts, let alone evidence that they do so often enough to pose a "risk of interference with visual management."  *Id.*  And the Board's speculation on this point makes little sense even on its own terms.  The Union distributed *hundreds* of its shirts to employees all over the Fremont facility as part of a coordinated campaign.  ROA.62-63 (Reed).  There was no coordinated effort, in contrast, to encourage non-general assembly employees to wear Team Wear or plain black shirts.  So even if it were appropriate for the Board to engage in this speculation,

---

[4]  Contrary to the Board majority's characterization, Kyle Martin did not testify that visual management was possible "as long as production associates are wearing black shirts."  ROA.6657.  He testified that wearing "a plain black shirt" does not prevent visual management.  ROA.1668 (Martin).  He testified that wearing "a Union shirt," on the other hand, does prevent identifying whether the employee is "actually supposed to be in general assembly."  ROA.1695 (Martin).

the risk of interference with visual management would still be far smaller than the risk posed by widely distributed Union shirts.

In all these respects, "the Board applied the 'special circumstances' exception in an unreasonable way" here. *S. New England Tel. Co. v. NLRB*, 793 F.3d 93, 96 (D.C. Cir. 2015). The question is not whether Tesla proved to an absolute certainty that the problems underlying its policy "would" occur if Tesla changed the policy. *Id.* at 97. The question, instead, is whether Tesla "could reasonably believe" that changing its policy "may harm" its business. *Id.* The Board has no claim to special expertise about what it takes to run a successful electric vehicle manufacturing facility. *Cf. id.* ("[T]he Board's 'expertise is surely not at its peak in the realm of employer-customer relations.'" (citation omitted)). And as this Court has recognized, "it is not the province of the Board . . . to substitute its judgment for that of management so long as the exercise [of business judgment] is reasonable and does not interfere with a protected purpose." *Davison-Paxon*, 462 F.2d at 371 (citation omitted). The Board's decision below failed to "take proper cognizance of [Tesla's] interest in protecting [its] business and thus incorrectly struck the balance of interests involved." *Id.* Even if "special circumstances" were the correct

test to apply, the Board's application of it to the undisputed facts here does not withstand scrutiny.

## CONCLUSION

The Court should grant Tesla's petition for review, set aside the Supplemental Decision and Order, and deny the Board's cross-application for enforcement.

Dated:  February 2, 2023

Respectfully submitted,

s/ Michael E. Kenneally
DAVID B. SALMONS
MICHAEL E. KENNEALLY
DAVID R. BRODERDORF
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 739-3000

*Counsel for Tesla, Incorporated*

# CERTIFICATE OF SERVICE

I certify that on this day, February 2, 2023, I served a true and correct copy of the foregoing Brief of Petitioner/Cross-Respondent Tesla, Incorporated on counsel of record for all other parties through this Court's CM/ECF system:

RUTH E. BURDICK
MICAH P. S. JOST
KIRA DELLINGER VOL
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, S.E.
Washington, DC  20570
appellatecourt@nlrb.gov
micah.jost@nlrb.gov
kira.vol@nlrb.gov

*Counsel for Respondent*
*National Labor Relations Board*

DANIEL E. CURRY
SCHWARTZ, STEINSAPIR,
    DOHRMANN & SOMMERS LLP
6300 Wilshire Boulevard
Suite 2000
Los Angeles, CA  90048
dec@ssdslaw.com

*Counsel for Intervenor*
*International Union, United*
*Automobile, Aerospace and*
*Agricultural Implement Workers*
*of America, AFL-CIO*


s/ Michael E. Kenneally
MICHAEL E. KENNEALLY

*Counsel for Tesla, Incorporated*

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this document contains 9,689 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and 5th Cir. R. 32.1, and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document was prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.


Dated:  February 2, 2023            s/ Michael E. Kenneally
                                    MICHAEL E. KENNEALLY

                                    *Counsel for Tesla, Incorporated*