No. 22-60493

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### TESLA, INCORPORATED,

Petitioner/Cross-Respondent

v.

### NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross-Petitioner

_____

## ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

_____

## BRIEF FOR RESPONDENT/CROSS-PETITIONER THE NATIONAL LABOR RELATIONS BOARD

_____

**KIRA DELLINGER VOL**
*Supervisory Attorney*

**MICAH P.S. JOST**
*Attorney*

*National Labor Relations Board*
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-0656**
**(202) 273-0264**

**JENNIFER A. ABRUZZO**
*General Counsel*
**PETER SUNG OHR**
*Deputy General Counsel*
**RUTH E. BURDICK**
*Deputy Associate General Counsel*
**DAVID HABENSTREIT**
*Assistant General Counsel*

## STATEMENT REGARDING ORAL ARGUMENT

This case involves the Board's reaffirmation of a legal standard it has consistently applied with the approval of the Supreme Court and the courts of appeals for 80 years.  The Board submits that oral argument may assist the Court in understanding why the Board's refusal to depart from its well-settled precedent was rational and consistent with the Act.

# TABLE OF CONTENTS

**Headings**                                                                                        **Page(s)**

Jurisdictional statement..........................................................................................1

Issue statement ....................................................................................................2

Statement of the case...........................................................................................3

   I.  The Board's factual findings ........................................................3

  II.  The proceedings before the Board...................................................5

 III.  The Board's conclusions and Order................................................7

Summary of argument..........................................................................................8

Argument.............................................................................................................10

   I.  The Board's standard is rational and consistent with the Act ......................10

       A.   When an employer limits employees' Section 7 right to wear union insignia, the Board reasonably requires the employer to establish special circumstances justifying the limitation that outweigh the burden on employee rights.....................................................13

           1.   The Board, with judicial approval, has always interpreted the Act to protect the right of employees to wear union apparel and other insignia at work .....................................................13

           2.   The Board applies a special-circumstances test to balance employees' right to wear union insignia at work against legitimate employer interests..........................................................15

           3.   The Board reasonably applies its special-circumstances test to uniform policies that restrict employees' right to wear union insignia.............................................................................20

# TABLE OF CONTENTS (cont'd)

**Headings**                                                             **Page(s)**

B. The Board is not required to countenance unjustified restrictions on Section 7 rights just because they are content neutral and do not foreclose other effective channels of communication ...........................27

    1. Content-neutral, nondiscriminatory policies are subject to the special-circumstances test .................................................................28

    2. The Board, with court approval, applies the special-circumstances test to rules limiting the display of union insignia regardless of whether they ban all insignia ............................................................31

    3. The Board and the courts have rejected Tesla's argument that the presence of alternative channels for effective communication obviates a special-circumstances analysis .........................................34

II. Substantial evidence supports the Board's finding that Tesla violated Section 8(a)(1) of the Act by interfering with employees' right to wear union insignia.......................................................................................40

A. Tesla's team-wear policy is presumptively unlawful .............................41

B. Tesla did not establish that its policy was narrowly tailored to serve legitimate interests that outweighed the infringement of employees' rights.....................................................................................................41

    1. Tesla's policy is not narrowly tailored to serve its interest in preventing damage to vehicles...........................................................42

    2. Tesla's policy is not narrowly tailored to serve its interest in visual management ...........................................................................45

    3. Tesla provides no basis for rejecting the Board's special-circumstances analysis....................................................................47

Conclusion ...................................................................................................54

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Albis Plastics*,
335 NLRB 923 (2001), *enforced*,
67 F. App'x 253 (5th Cir. 2003) ...................................................... 20, 24, 45, 46

*Alcoa, Inc. v. NLRB*,
849 F.3d 250 (5th Cir. 2017) ....................................................................... 11, 13

*Beth Israel Hosp. v. NLRB*,
437 U.S. 483 (1978) ............................................... 11, 12, 13, 17, 18, 39, 52, 53

*Boch Honda*,
362 NLRB 706 (2015), *enforced sub nom.*
*Boch Imports, Inc. v. NLRB*,
826 F.3d 558 (1st Cir. 2016) ...................................................................... 19, 43

*Boch Imports, Inc. v. NLRB*,
826 F.3d 558 (1st Cir. 2016) ....................................................... 19, 23, 29, 47

*Brandeis Mach. & Supply Co. v. NLRB*,
412 F.3d 822 (7th Cir. 2005) ............................................................................ 36

*Burger King Corp. v. NLRB*,
725 F.2d 1053 (6th Cir. 1984) ................................................................... 51, 52

*Burndy, LLC*,
364 NLRB 946 (2016) ....................................................................................... 22

*Casa San Miguel*,
320 NLRB 534 (1995) ....................................................................................... 25

*Casino Pauma v. NLRB*,
888 F.3d 1066 (9th Cir. 2018) .......................................................................... 39

*Cent. Hardware Co. v. NLRB*,
407 U.S. 539 (1972) ............................................................................... 13, 29, 30

# TABLE OF AUTHORITIES (cont'd)

**Cases** **Page(s)**

*Ceridian Corp. v. NLRB,*
  435 F.3d 352 (D.C. Cir. 2006) ........................................................................ 23

*Communs. Workers of Am. v. Ector Cnty. Hosp. Dist.,*
  467 F.3d 427 (5th Cir. 2006) ................................................................ 49, 50, 51

*Con-Way Cent. Express,*
  333 NLRB 1073 (2001) ................................................................................... 25

*Constellation Brands U.S. Ops. v. NLRB,*
  992 F.3d 642 (7th Cir. 2021) ................................................................ 14, 19, 36

*Cooper Tire & Rubber Co. v. NLRB,*
  957 F.2d 1245 (5th Cir. 1992) ...................................................................... 17, 18

*Cordúa Rests., Inc.,*
  368 NLRB No. 43 (2019), *enforced,*
  985 F.3d 415 (5th Cir. 2021) .......................................................................... 28

*Cordúa Rests. v. NLRB,*
  985 F.3d 415 (5th Cir. 2021) .......................................................................... 40

*Davison-Paxon Co. v. NLRB,*
  462 F.2d 364 (5th Cir. 1972) ........................................................ 12, 17, 33, 43

*E. Omni Constructors, Inc. v. NLRB,*
  170 F.3d 418 (4th Cir. 1999) .......................................................................... 49

*Eastex, Inc. v. NLRB,*
  437 U.S. 556 (1978) ........................................................................................ 39

*Fabri-Tek, Inc. v. NLRB,*
  352 F.2d 577 (8th Cir. 1965) .......................................................................... 49

*Flex Frac Logistics, LLC v. NLRB,*
  746 F.3d 205 (5th Cir. 2014) .......................................................................... 43

## TABLE OF AUTHORITIES (cont'd)

**Cases** **Page(s)**

*Great Plains Coca-Cola Bottling Co.*,
   311 NLRB 509 (1993) ..................................................................... 21

*Guard Publ'g Co. v. NLRB*,
   571 F.3d 53 (D.C. Cir. 2009) ....................................................... 14, 19

*Hanes Hosiery, Inc.*,
   219 NLRB 338 (1975) ..................................................................... 42

*Healthbridge Mgmt., LLC*,
   360 NLRB 937 (2014) ..................................................................... 18

*Holladay Park Hosp.*,
   262 NLRB 278 (1982) ................................................................. 14, 32

*Hudgens v. NLRB*,
   424 U.S. 507 (1976) ......................................................................... 30

*In-N-Out Burger, Inc. v. NLRB*,
   894 F.3d 707 (5th Cir. 2018)................. 2, 12, 13, 15, 18, 19, 20, 25, 28, 40, 41,
   ................................................................ 43, 44, 45, 48, 50, 51, 52, 53

*ITT Indus. v. NLRB*,
   413 F.3d 64 (D.C. Cir. 2005) ....................................................... 35, 39

*Kendall Co.*,
   267 NLRB 963 (1983) ..................................................................... 16

*Komatsu Am. Corp.*,
   342 NLRB 649 (2004) ................................................................. 30, 31

*Le Tourneau Co. v. NLRB*,
   143 F.2d 67 (5th Cir. 1944) ............................................................. 37

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                                **Page(s)**

*Long Beach Memorial Medical Center,*
   366 NLRB No. 66 (2018), *enforced,*
   774 F. App'x 1 (D.C. Cir. 2019) ................................................................ 21, 22

*Malta Constr. Co.,*
   276 NLRB 1494 (1985), *enforced,*
   806 F.2d 1109 (11th Cir. 1986) ................................................................ 31, 32

*Marathon Le Tourneau Co. v. NLRB,*
   699 F.2d 248 (5th Cir. 1983) ................................................................ 19, 28

*Medco Health Sols. of Las Vegas, Inc.,*
   357 NLRB 170 (2011), *set aside and remanded in pertinent part,*
   701 F.3d 710 (D.C. Cir. 2012), *further explained on remand,*
   364 NLRB 1687 (2016) ................................................................ 22

*Meijer, Inc.,*
   318 NLRB 50 (1995), *enforced,*
   130 F.3d 1209 (6th Cir. 1997) ................................................................ 14, 21

*Meijer, Inc. v. NLRB,*
   130 F.3d 1209 (6th Cir. 1997) ................................................................ 52

*Monarch Mach. Tool Co., enforced,*
   210 F.2d 183 (6th Cir. 1954)
   102 NLRB 1242 (1953) ................................................................ 24

*Nat'l Steel Corp. v. NLRB,*
   415 F.2d 1231 (6th Cir. 1969) ................................................................ 37, 40

*Ne. Indus. Serv. Co.,*
   320 NLRB 977 (1996) ................................................................ 13, 32, 46

*New Orleans Cold Storage & Warehouse Co. v. NLRB*
   201 F.3d 592 (5th Cir. 2000) ................................................................ 36

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                   **Page(s)**

*NLRB v. Armstrong Tire & Rubber Co.*,
262 F.2d 812 (5th Cir. 1959) ................................................................. 38

*NLRB v. Babcock & Wilcox Co.*,
351 U.S. 105 (1956) ............................................................................... 39

*NLRB v. Curtin Matheson Sci., Inc.*,
494 U.S. 775 (1990) ......................................................................... 11, 12

*NLRB v. Floridan Hotel of Tampa, Inc.*,
318 F.2d 545 (5th Cir. 1963)....................................................... 14, 16, 28

*NLRB v. J. Weingarten, Inc.*,
420 U.S. 251 (1975) ......................................................................... 11, 34

*NLRB v. Lone Star Textiles, Inc.*,
386 F.2d 535 (5th Cir. 1967) ................................................................. 35

*NLRB v. Magnavox Co. of Tennessee*,
415 U.S. 322 (1974) ......................................................................... 38, 39

*NLRB v. Malta Construction Co.*,
806 F.2d 1009 (11th Cir. 1986) ...................................................... 31, 32, 48

*NLRB v. Mead Corp.*,
73 F.3d 74 (6th Cir. 1996) ..................................................................... 15

*NLRB v. Plant City Steel Corp.*,
331 F.2d 511 (5th Cir. 1964) ................................................................. 18

*NLRB v. Roney Plaza Apartments*,
597 F.2d 1046 (5th Cir. 1979) ............................................................... 38

*NLRB v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975) ............................................................................... 26

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                                **Page(s)**

*NLRB v. Southwire Co.*,
   352 F.2d 346 (5th Cir. 1965) .............................................................. 20

*NLRB v. Starbucks Corp.*,
   679 F.3d 70 (2d Cir. 2012) ................................................................ 49

*NLRB v. United Steelworkers of America*,
   357 U.S. 357 (1958) .................................................................... 36, 37

*NLRB v. Varo, Inc.*,
   425 F.2d 293 (5th Cir. 1970) .............................................................. 38

*NLRB v. Wash. Aluminum Co.*,
   370 U.S. 9 (1962) .............................................................................. 35

*Outokumpo Stainless USA, LLC v. NLRB*,
   773 F. App'x 531 (11th Cir. 2019) .................................................... 23

*Produce Warehouse of Coram*,
   329 NLRB 915 (1999) ....................................................................... 25

*Quantum Electric, Inc.*,
   341 NLRB 1270 (2004) ..................................................................... 21

*Republic Aluminum*,
   394 F.2d 405 (5th Cir. 1968).......................................................... 37, 38

*Republic Aviation Corp.*,
   51 NLRB 1186 (1943), *enforced*,
   142 F.2d 193 (2d Cir. 1944), *aff'd*,
   324 U.S. 793 (1945) .................................................................... 15, 16

*Republic Aviation Corp. v. NLRB*,
   142 F.2d 193 (2d Cir. 1944) .............................................................. 17

## TABLE OF AUTHORITIES (cont'd)

**Cases**          **Page(s)**

*Republic Aviation Corp. v. NLRB*,
  324 U.S. 793 (1945) ............ 2, 11, 12, 15, 16, 17, 18, 21, 22, 23, 29, 30, 37, 38

*Sam's Club*,
  349 NLRB 1007 (2007) ..................................................................... 20

*Serv-Air, Inc.*,
  161 NLRB 382 (1966), *enforced in pertinent part*,
  395 F.2d 557 (10th Cir. 1968) ........................................................... 14

*Serv-Air, Inc. v. NLRB*,
  395 F.2d 557 (10th Cir. 1968) ..................................................... 17, 32

*Stabilus, Inc.*,
  355 NLRB 836 (2010) ...................................................... 6, 20, 26, 29

*Stanford Hosp. & Clinics v. NLRB*,
  325 F.3d 334 (D.C. Cir. 2003) ......................................................... 22

*Tesla, Inc. v. NLRB*,
  No. 21-60285, 2023 U.S. App. LEXIS 7731 (5th Cir. Mar. 31, 2023) ............. 7

*Textile Workers Union v. Darlington Mfg. Co.*,
  380 U.S. 263 (1965) ......................................................................... 29

*UNF W., Inc. v. NLRB*,
  844 F.3d 451 (5th Cir. 2016) ............................................................ 36

*United Supermarkets, Inc. v. NLRB*,
  862 F.2d 549 (5th Cir. 1989) ............................................................ 40

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951) ......................................................................... 40

*USPS v. NLRB*,
  652 F.2d 409 (5th Cir. 1981) ............................................................ 13

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                             **Page(s)**

*Wal-Mart Stores, Inc. v. NLRB*,
400 F.3d 1093 (8th Cir. 2005) ................................................ 15, 17, 49

*Wal-Mart Stores, Inc.*,
368 NLRB No. 146 (2019) .......................................................... 7, 22

*Waterbury Hotel Mgmt. LLC*,
333 NLRB 482 (2001), *enforced*,
314 F.3d 645 (D.C. Cir. 2003) ........................................................ 19

*Waterbury Hotel Mgmt., LLC v. NLRB*,
314 F.3d 645 (D.C. Cir. 2003) ........................................................ 29

*Woelke & Romero Framing v. NLRB*,
456 U.S. 645 (1982) ...................................................................... 50

*World Color (USA) Corp.*,
360 NLRB 227 (2014), *petition for review granted*,
776 F.3d 17 (D.C. Cir. 2015) .......................................................... 33

*World Color (USA) Corp. v. NLRB*,
776 F.3d 17 (D.C. Cir. 2015) .......................................................... 33

*World Color (USA) Corp.*,
369 NLRB No. 104 (2020) .............................................................. 33

*Wynn Las Vegas, LLC*
369 NLRB No. 91 (2020).................................................................. 17

## TABLE OF AUTHORITIES (cont'd)

**Statutes**                                                          **Page(s)**

National Labor Relations Act, as amended
  (29 U.S.C. § 151 et seq.)


Section 7 (29 U.S.C § 157) ........................... 8, 9, 10, 11, 13, 14, 15, 18, 20, 23, 24,
.................................................................. 27, 29, 34, 35, 36, 38, 41, 44, 48
Section 8(a)(1) (29 U.S.C. § 158(a)(1) ....... 2, 5, 7, 8, 10, 11, 15, 16, 18, 20, 21, 23,
.................................................................. 28, 29, 31, 32, 36, 38, 40, 41
Section 10(a) (29 U.S.C. § 160(a)) ......................................................................... 1
Section 10(e) (29 U.S.C. § 160(e)) .......................................................1,  2, 40, 50
Section 10(f) (29 U.S.C. § 160(f)) ............................................................... 1, 2, 50

**Other Materials**                                                  **Page(s)**

*N.Y. State Pub. Emp. Fed'n,*
  Advice Memorandum (2012), 2012 NLRB GCM LEXIS 47 ........................... 26

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

## No. 22-60493

_____

### TESLA, INCORPORATED,

**Petitioner/Cross-Respondent**

**v.**

### NATIONAL LABOR RELATIONS BOARD,

**Respondent/Cross-Petitioner**

_____

## ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

_____

## BRIEF FOR RESPONDENT/CROSS-PETITIONER NATIONAL LABOR RELATIONS BOARD

_____

## JURISDICTIONAL STATEMENT

This case is before the Court on the petition of Tesla, Inc. to review, and the cross-application of the National Labor Relations Board to enforce, the Board's August 29, 2022 Supplemental Order against Tesla, which is reported at 371 NLRB No. 131. (ROA.6639-69.) The Board had jurisdiction over the unfair-labor-practice proceeding under Section 10(a) of the National Labor Relations Act ("the Act"). 29 U.S.C. § 160(a). The Court has jurisdiction under Section 10(e)

and (f) of the Act, and venue is proper because Tesla does business within this Circuit.  29 U.S.C. § 160(e) and (f).  The petition and cross-application are timely; the Act provides no time limit for those filings.

## ISSUE STATEMENT

1.      Nearly 80 years ago, the Supreme Court upheld the Board's determination that an employer violates Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by limiting the right of employees to wear union insignia, absent special circumstances.  *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 801-03 & n.7 (1945).  Since then, with this Court's approval, the Board has consistently required employers to demonstrate that special circumstances justify any limitation they impose on employees' right to wear union shirts or other protected adornments or apparel.  *E.g.*, *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714-16 (5th Cir. 2018).  Here, the Board reaffirmed that the same standard applies whenever an employer imposes such a limitation, including through a uniform or dress-code policy.  The first issue is whether the Board's standard is rational and consistent with the Act.

2.      Applying that standard here, the Board found that Tesla's uniform policy prohibited employees from wearing black union shirts, and that Tesla did not establish that special circumstances justified that limitation.  Accordingly, the Board found that Tesla violated Section 8(a)(1) by maintaining and enforcing the

uniform policy.  The second issue is whether substantial evidence supports that finding.

## STATEMENT OF THE CASE

### I.    The Board's Factual Findings

Tesla manufactures electric vehicles at a plant in Fremont, California. (ROA.6640; ROA.87-88.)[1]  Employees known as production associates put the vehicles together in the plant's general-assembly department.  (ROA.6640; ROA.205, 305.)  Tesla maintains "General Assembly Expectations" that govern what those employees wear.  (ROA.6640; ROA.3208-09.)  Under the heading "Safety," that policy provides:

> Team Wear:  It is mandatory that all Production Associates and Leads wear the assigned team wear.
>
> - On occasion, team wear may be substituted with all black clothing if approved by supervisor.
>
> - Alternative clothing must be mutilation free, work appropriate and pose no safety risks (no zippers, yoga pants, hoodies with hood up, etc.).

(ROA.6640; ROA.3208.)  Team wear for production associates includes black cotton shirts bearing Tesla's logo.  (ROA.6640; ROA.1617-18, 1390, 2424, 2436-36, 2549-50, 3214-16.)  Production leads and supervisors wear red Tesla shirts;

---

[1]  Record citations preceding a semicolon refer to the Board's findings; those following refer to the supporting evidence.

3

line inspectors wear white Tesla shirts.  (ROA.6537, 6640; ROA.345, 1392-93, 1618.)

In addition, Tesla's policy requires general-assembly employees to wear personal protective equipment, including safety glasses, safety shoes, bump caps, and gloves.  (ROA.6537; ROA.1393, 3208.)  And under the heading "Quality," it lists "mutilation protection" rules, including:

- No exposed belt buckles, rings, watches, necklaces, metal rivets on pants, or other metal exposed on the production line.  Cover with protection or do not wear.

- Tesla Badges must be covered or tucked in.

- Aprons cannot contain objects that can potentially mutilate the car, such as pens or metal tools.

(ROA.6537; ROA.3209.)  "Mutilation," as Tesla uses the term, refers to any damage to a vehicle.  (ROA.6641; ROA.1393, 1618.)

Before August 2017, general-assembly employees often wore non-Tesla shirts in various colors, with pictures or emblems representing sports teams and clothing brands, and Tesla did not stop them.  (ROA.6554, 6641; ROA.199-203, 220, 222, 252-54, 309-10, 321, 342-43.)  In spring 2017, some employees began to wear black cotton shirts bearing the Union's campaign slogan—"Driving a Fair Future at Tesla"—on the front and a larger logo with that slogan and "UAW" on the back.  (ROA.6640-41; ROA.195-97, 310, 337-39, 343, 549, 3187-89.)

Around the same time, Tesla noticed an increase in mutilations to vehicle

seats.  (ROA.6555, 6642; ROA.1621-22.)  Its investigation found that the

mutilations were caused by employees failing to use tool covers and carrying tools

in back pockets.  (ROA.6555; ROA.1658-59, 1674.)  It did not attribute any

damage to union shirts.  (ROA.6641; ROA.1418-19, 1662-63, 2441-42, 2565-66,

2572.)

In August 2017, Tesla began to strictly enforce its team-wear policy.

(ROA.6641; ROA.309, 311-12, 343-44.)  Its supervisors and managers closely

examined general-assembly employees before each shift and during the workday.

(ROA.6641, 6555; ROA.1653-54, 2425-26, 2551-53.)  Supervisors threatened to

send employees home for wearing union shirts.  (ROA.6641; ROA.213, 231, 307-

08.)  Tesla continued to allow them to wear plain black shirts.  (ROA.6641;

ROA.2432, 2560, 2564.)

## II.    The Proceedings Before the Board

Acting on unfair-labor-practice charges filed by the Union and several Tesla

employees, the Board's General Counsel issued a consolidated complaint against

Tesla alleging numerous violations of the Act.  (ROA.6534; ROA.2745-49, 2789-

2803.)  Following a hearing, an administrative law judge issued a recommended

decision and order finding most of the alleged violations.  (ROA.6534-6576;

ROA.6022-6105.)  As relevant here, the judge found that Tesla violated Section

8(a)(1) of the Act by maintaining and enforcing a policy that prohibited employees

from wearing union insignia, without establishing that special circumstances
justified that restriction. (ROA.6556-57; ROA.6065-67.) Tesla filed exceptions
with the Board. (ROA.6639 & n.2, 6640 n.8; ROA.6152-55.)

On February 12, 2021, the Board (Members Kaplan, Emanuel, and Ring;
Chairman McFerran, dissenting) issued a Notice and Invitation to File Briefs,
which is reported at 370 NLRB No. 88 (2021). (ROA.6639-40; ROA.6374-75.)
The Board noted that the judge's analysis was consistent with its decision in
*Stabilus, Inc.*, 355 NLRB 836, 838 (2010), where it explained that "[a]n employer
cannot avoid the 'special circumstances' test simply by requiring its employees to
wear uniforms or other designated clothing, thereby precluding the wearing of
clothing bearing union insignia." (ROA.6374.) The Board then asked the parties
and interested amici to address the following questions:

> 1. Does *Stabilus* specify the correct standard to apply when an employer
> maintains and consistently enforces a nondiscriminatory uniform policy that
> implicitly allows employees to wear union insignia (buttons, pins, stickers,
> etc.) on their uniforms?
>
> 2. If *Stabilus* does not specify the correct standard to apply in those
> circumstances, what standard should the Board apply?

(ROA.6374.) Chairman McFerran dissented. (ROA.6374-75.) She saw "no
conflict between *Stabilus* and well-established legal principles," and thus no need
for the Board to revisit that decision. (ROA.6374.)

On March 25, 2021, the Board (Chairman McFerran and Members Emanuel

6

and Ring) issued a Decision and Order, reported at 370 NLRB No. 101, in which it found that Tesla committed numerous violations of the Act but severed and retained for further consideration the allegation at issue here. (ROA.6522 n.3.) The Court enforced the Board's Order in full. *Tesla, Inc. v. NLRB*, No. 21-60285, 2023 U.S. App. LEXIS 7731 (5th Cir. Mar. 31, 2023) (per curiam).

## III.    The Board's Conclusions and Order

On August 29, 2022, the Board (Chairman McFerran and Members Wilcox and Prouty; Members Kaplan and Ring, dissenting) issued its Supplemental Decision and Order. (ROA.6639-69.) The Board reaffirmed that an employer violates the Act by interfering with employees' right to wear union insignia unless it demonstrates special circumstances that justify the interference. (ROA.6639.) The Board also overruled its decision in *Wal-Mart Stores, Inc.*, 368 NLRB No. 146 (2019), where it had applied, for the first time, a different standard to a subset of employer rules limiting employees' right to wear union insignia. (ROA.6653-55.) Applying the reaffirmed special-circumstances standard, the Board found that Tesla violated Section 8(a)(1) by maintaining and enforcing a policy that implicitly prohibited general-assembly employees from wearing black union shirts. (ROA.6656-57.)

The Board ordered Tesla to cease and desist from maintaining and enforcing an overly broad policy that prohibits general-assembly employees from wearing

black union shirts, or in any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act, 29 U.S.C. § 157.  The Board ordered Tesla to rescind its team-wear policy or revise it to make clear that it does not prohibit general-assembly employees from wearing black union shirts.  The Board also ordered Tesla to notify employees of the change and post a remedial notice.  (ROA.6657.)

## SUMMARY OF ARGUMENT

1.    The Board here recommitted itself to the balance it has long struck, with judicial approval, between employees' right to wear union insignia at work and the legitimate needs of employers.  As the Board reaffirmed, an employer cannot lawfully interfere with employees' right to wear union insignia unless special circumstances justify the interference.  That means that where, as here, a uniform policy or dress code limits an employee's ability to wear clothing bearing union insignia, the employer must justify that limitation by showing that it is narrowly tailored to serve a legitimate interest that outweighs the adverse effect on employees' Section 7 rights.

The Board's adherence to its special-circumstances standard is rational and consistent with the Act.  It is settled that Section 7 of the Act grants employees the right to wear union attire at work.  And there can be no serious dispute that an employer interferes with that right, within the meaning of Section 8(a)(1), when it

precludes employees from wearing union clothes by requiring them to wear a uniform. Tesla's contrary arguments misread the Act and overlook decades of precedent, including decisions from this Circuit and the Supreme Court.

Tesla contends that it should not have to demonstrate special circumstances because its team-wear policy is content neutral and leaves open alternative, effective channels of Section 7 communication. But content neutrality has never been a defense in this context. Absent special circumstances, a policy that interferes with the right to wear union insignia is unlawful regardless of whether it also evenhandedly restricts attire that employees do not have a statutory right to wear. And the Board and the courts have always held that such restrictions on employee communication rights must be justified by legitimate employer interests regardless of whether they close off all channels of communication. The Board, with judicial approval, has reasonably determined that it is for employees—not their employers—to choose how employees will exercise their statutory rights, unless special circumstances justify a restriction.

2.    Substantial evidence supports the Board's finding that Tesla did not establish special circumstances justifying its interference with employee rights. Because Tesla's policy implicitly prohibits employees from wearing black union shirts, it is presumptively unlawful. The Board assumed that Tesla has legitimate interests in preventing damage to its vehicles and managing employees by the

color of their shirts.  But it reasonably found that Tesla's prohibition on black union shirts is not narrowly tailored to serve those interests.

As the Board found, there was no evidence that the union shirts could damage vehicles.  And because those shirts were black, like Tesla's, there was no evidence that they would prevent managers from visually tracking employees.  Because Tesla failed to establish that special circumstances justify its interference with employees' Section 7 rights, that interference violated the Act.  Tesla argues that the Board should have nonetheless deferred to its business judgment, but it identifies no basis for overturning the Board's reasonable application of the special-circumstances test.

## ARGUMENT

## I.    The Board's Standard Is Rational and Consistent with the Act

In Section 7 of the Act, Congress guaranteed employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C § 157.  In Section 8(a)(1), Congress made it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [S]ection 7."  29 U.S.C. § 158(a)(1).

Congress also created the Board and charged it with interpreting the

expansive terms of Section 7 and applying the "general prohibitionary language"

of Section 8(a)(1) "in the light of the infinite combinations of events which might

be charged as violative of its terms." *Republic Aviation Corp. v. NLRB*, 324 U.S.

793, 798 (1945). That task includes the "difficult and delicate responsibility of

reconciling conflicting interests of labor and management." *NLRB v. J.

Weingarten, Inc.*, 420 U.S. 251, 267 (1975) (quotation omitted).

In "striking that balance" the Board must "effectuate national labor policy."

*Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 501 (1978) (quotation omitted). *Accord

NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990) ("[T]he [Board] has

the primary responsibility for developing and applying national labor policy.").

That policy is clear. Congress's "dominant purpose" in enacting the National

Labor Relations Act was to protect "the right of employees to organize for mutual

aid without employer interference." *Republic Aviation*, 324 U.S. at 798. "This is

the principle of labor relations which the Board is to foster." *Id*. *Accord Alcoa,

Inc. v. NLRB*, 849 F.3d 250, 259 (5th Cir. 2017) ("[T]he right to organize is at the

very core of the purpose for which the [Act] was enacted." (quotation omitted)).

The Supreme Court has recognized that "to accomplish the task which

Congress set for it," the Board "necessarily must have authority to formulate rules

to fill the interstices of the broad statutory provisions." *Beth Israel,* 437 U.S. at

500-01.  In particular, "the Board is free to adopt, in light of its experience, a rule that, absent special circumstances, a particular employer restriction is presumptively an unreasonable interference with [Section] 7 rights constituting an unfair labor practice under [Section] 8(a)(1), without the necessity of proving the underlying generic facts which persuaded it to reach that conclusion." *Id.* at 493 (citing *Republic Aviation*, 324 U.S. at 804-05).  In reviewing such a rule, "the judicial role is narrow: the rule which the Board adopts is judicially reviewable for consistency with the Act, and for rationality, but if it satisfies those criteria, the Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced." *In-N-Out*, 894 F.3d at 716 (quoting *Beth Israel*, 437 U.S. at 501) (brackets omitted).  *Accord Curtin Matheson*, 494 U.S. at 787 ("We will uphold a Board rule as long as it is rational and consistent with the Act, even if we would have formulated a different rule had we sat on the Board." (citations omitted)).

Tesla therefore "fundamentally misconceives the institutional role of the Board," *Beth Israel*, 437 U.S. at 500, when it proposes that the Court need not defer to the Board's "judgment as to the proper balance to be struck between conflicting interests," (Tesla.38 (quoting *Davison-Paxon Co. v. NLRB*, 462 F.2d 364, 372 (5th Cir. 1972)).)  Binding Supreme Court precedent, which this Court has applied, has superseded any suggestion to that effect in the case Tesla cites.

*In-N-Out*, 894 F.3d at 716 (citing *Beth Israel*, 437 U.S. at 492-93, 501).  As this Court has explained, "the responsibility to draw the line between the[] conflicting rights rests with the Board, and its determination, unless illogical or arbitrary, ought not be disturbed."  *USPS v. NLRB*, 652 F.2d 409, 412 (5th Cir. 1981).

A.    **When an Employer Limits Employees' Section 7 Right To Wear Union Insignia, the Board Reasonably Requires the Employer To Establish Special Circumstances Justifying the Limitation that Outweigh the Burden on Employee Rights**

1.    **The Board, with judicial approval, has always interpreted the Act to protect the right of employees to wear union apparel and other insignia at work**

In carrying out its duty to implement national labor policy, the Board has always "recognized the importance of freedom of communication to the free exercise of organization rights."  *Cent. Hardware Co. v. NLRB*, 407 U.S. 539, 543 (1972).  That freedom "necessarily encompasses the right [of employees] to communicate with one another regarding self-organization at the jobsite."  *Alcoa*, 849 F.3d at 259 (quoting *Beth Israel*, 437 U.S. at 491) (ellipsis omitted).

As the Board noted, "[t]he display of union insignia has proven to be a critical form of protected communication" in the workplace.  (ROA.6644).  Wearing an emblem or slogan can enable employees to communicate more broadly than they could, for example, by orally soliciting coworkers or handing out flyers.  *See, e.g.*, *Ne. Indus. Serv. Co.*, 320 NLRB 977, 979 (1996) (employees affixed decals to hardhats during organizing campaign "to identify those who were union

13

members so that other employees could ask questions of them"); *Meijer, Inc.*, 318 NLRB 50, 52 (1995) (employees wore union jackets "to show support for the [u]nion and identify those to whom others could go for information"), *enforced*, 130 F.3d 1209 (6th Cir. 1997); *Serv-Air, Inc.*, 161 NLRB 382, 401 (1966) (employee taped sign to his back urging coworkers to "come to the [u]nion meeting tonight"), *enforced in pertinent part*, 395 F.2d 557 (10th Cir. 1968). Through such protected displays, employees seek to build solidarity and present a united front to management at work.  *See, e.g.*, *NLRB v. Floridan Hotel of Tampa, Inc.*, 318 F.2d 545, 546, 548 (5th Cir. 1963) ("union distributed union pins to its members as part of an organizational effort to increase union membership" and employees wore them to show "their interest and pride in their organization"); *Constellation Brands U.S. Ops. v. NLRB*, 992 F.3d 642, 647 (7th Cir. 2021) (employee wrote pro-union slogan on work vest to "grab the attention of his intended audience—[the employer's] management"); *Guard Publ'g Co. v. NLRB*, 571 F.3d 53, 56 (D.C. Cir. 2009) (employees wore armbands to "show unity regarding the union's position in contract negotiations"); *Holladay Park Hosp.*, 262 NLRB 278, 278 (1982) (employees wore ribbons "to demonstrate their support for the Union's bargaining position").

Thus, as this Court has noted, "[s]ince the Act's earliest days, it has been recognized that Section 7 protects the right of employees to wear items—such as

buttons, pins, and stickers—relating to terms and conditions of employment (including wages and hours), unionization, and other protected matters." *In-N-Out*, 894 F.3d at 714.  "This protection includes the right to wear union insignia on shirts." *Wal-Mart Stores, Inc. v. NLRB*, 400 F.3d 1093, 1097 (8th Cir. 2005).  And it extends to employees' efforts to increase the visibility and effectiveness of a campaign by wearing insignia in multiple forms.  *See, e.g.*, *NLRB v. Mead Corp.*, 73 F.3d 74, 78 (6th Cir. 1996) (upholding the Board's finding that "employees' display of pro-union, anti-employer, anti-agreement sentiments—through the use of buttons, t-shirts, and decals—was a protected activity under Section 7").

### 2. The Board applies a special-circumstances test to balance employees' right to wear union insignia at work against legitimate employer interests

Because Section 8(a)(1) prohibits interference with employees' exercise of Section 7 rights, any employer "curtailment"—that is, any limitation or restriction—of the right to wear union insignia appears "clearly violative of the Act." *Republic Aviation*, 324 U.S. at 802 n.7 (quoting *Republic Aviation Corp.*, 51 NLRB 1186, 1188 (1943)).  *Accord In-N-Out*, 894 F.3d at 714.  Nonetheless, "contrary to what the general prohibitory language of [Section] 8(a)(1) would suggest" (ROA.6646 n.21), the Board does not find unlawful every limitation on employees' right to wear union insignia.  Rather, it has concluded that "[w]hile employees have the right to wear union insignia at work, employers have the right

to take reasonable steps to ensure full and safe production of their product or to maintain discipline." *Kendall Co.*, 267 NLRB 963, 965 (1983).  Exercising its authority to balance conflicting rights, the Board tempers Section 8(a)(1) to allow employers to "promulgate and enforce rules to insure an efficient and orderly operation, including the reasonable regulation of the dress of its employees." *Floridan Hotel*, 318 F.2d at 547.

The Supreme Court first upheld the Board's balancing framework, which has come to be known as the special-circumstances test, in *Republic Aviation*.  In that case, the Board found that an employer violated the Act when it refused to allow employees to wear union-steward buttons in the workplace.  *Republic Aviation*, 324 U.S. at 795.  The Board recognized that employees have the right "to wear union insignia at work."  *Id.* at 802 n.7 (quoting *Republic Aviation*, 51 NLRB at 1188).  But it considered the employer's special justification for limiting that right: that the steward buttons would lead employees to believe, incorrectly, that it had recognized the union.  *Republic Aviation*, 51 NLRB at 1187.  The Board found insufficient evidence to support that claim, and accordingly found the restriction unlawful.  *Id.* at 1187-88.  In short, the employer failed to show "that any unusual conditions existed in labor relations" and the case was "barren of special circumstances."  *Republic Aviation*, 324 U.S. at 801.  The Supreme Court upheld the Board's analysis.  *Id.* at 803.

16

*Republic Aviation* also upheld similar frameworks for assessing limitations on employees' rights to distribute literature and to solicit.[2] 324 U.S. at 800-03. Because, unlike insignia displays, solicitation demands an immediate response that may interrupt work and distribution may lead to distraction and clutter, the Board presumes that employers may ban both types of communication during working time, and ban distribution in working areas. *Beth Israel*, 437 U.S. at 492-93 & n.10.[3] Absent special circumstances, however, other restrictions on solicitation or distribution violate the Act. *Cooper Tire & Rubber Co. v. NLRB*, 957 F.2d 1245,

---

[2] Solicitation "ordinarily means that someone is asking an employee to join a union by signing a union authorization card." *Wynn Las Vegas, LLC*, 369 NLRB No. 91, slip op. at 1, 2020 NLRB LEXIS 298, at *4 (2020). Although Associated Builders and Contractors ("ABC") conflates the terms (ABC.8), this Court recognizes that wearing union insignia is distinct from solicitation. *See Davison-Paxon Co. v. NLRB*, 462 F.2d 364, 370 (5th Cir. 1972) (wearing "buttons is not a form of solicitation"). *Accord Wal-Mart*, 400 F.3d 1093, 1097-98 (8th Cir. 2005) (wearing union t-shirt reading, "Sign a card . . . Ask me how," was not solicitation); *Serv-Air, Inc. v. NLRB*, 395 F.2d 557, 563 (10th Cir. 1968) (wearing "union insignia is a form of expression protected by [Section] 7 rather than a form of solicitation").

[3] "Employees' presumptive right to display union insignia is not limited to nonworking time or nonwork areas because unlike union solicitation or distribution, the display of union insignia does not pose a general risk to production." (ROA.6649 n.26.) The right to wear union insignia in *Republic Aviation* was not limited to off-duty employees or accorded lesser protections during working time, as Tesla appears to suggest. (Tesla.6, 33, 35-36 n.2.) *See Republic Aviation Corp. v. NLRB*, 142 F.2d 193, 195 (2d Cir. 1944) (issue was "whether the Board may compel an employer whose plant has not yet been 'organized[]' to allow employees to wear 'shop steward' buttons *while at work*" (emphasis added)).

1249 (5th Cir. 1992) (solicitation); *NLRB v. Plant City Steel Corp.*, 331 F.2d 511, 514 (5th Cir. 1964) (distribution).

In the decades since *Republic Aviation*, the Board has refined the special-circumstances test with the approval of the courts of appeals. Its elements, as applied to union insignia, are now well established. First of all, "the Board applies a presumption: a rule that infringes upon employees' Section 7 right to wear protected items is presumptively invalid." *In-N-Out*, 894 F.3d at 715 (quotation omitted). As the Board emphasized, that presumption means only that the employer who has interfered with an employee right—an action that on its face violates Section 8(a)(1)—bears the burden of demonstrating that the interference is necessary to effectuate "a particular, legitimate interest." (ROA.6646 n.21.) As the Board explained, it is appropriate for the employer to bear that burden of proof because, "as the party asserting that employees' Section 7 rights must be restricted to achieve a legitimate business objective, it 'logically is in the best position to offer evidence on the point.'" (ROA.6651 (quoting *Beth Israel*, 437 U.S. at 502).)[4]

To carry its burden, an employer must present "substantial, non-speculative evidence of the particular special circumstances that it claims justify its

---

[4] As the Board noted, it makes a "narrow exception to this rule for immediate patient care areas in healthcare facilities." (ROA.6644 n.18.) Due to "concerns about the possibility of disruption to patient care," blanket restrictions on insignia in those areas are "presumptively *valid*." *Healthbridge Mgmt., LLC*, 360 NLRB 937, 938 (2014), *enforced*, 798 F.3d 1059 (D.C. Cir. 2015).

restriction." *In-N-Out*, 894 F.3d at 715 (quotations and brackets omitted). *Accord Constellation Brands*, 992 F.3d at 648 (employer has "affirmative obligation of proving its position with facts and evidence"). That evidence must establish a "legitimate business purpose." *Waterbury Hotel Mgmt. LLC*, 333 NLRB 482, 546 (2001), *enforced*, 314 F.3d 645 (D.C. Cir. 2003). The employer cannot simply ask the Board to trust its business judgment. *See, e.g.*, *Guard Publ'g*, 571 F.3d at 62 (no special circumstances where employer "offered nothing beyond its conclusory claims" that displaying union insignia "could reasonably be expected to have an adverse effect on business"). "Generally, employers are free to make business decisions, including those involving workers," but "[i]nterference with . . . an employee's exercise of the right to organize numbers amongst the limitations" that Congress has imposed on that freedom. *Marathon Le Tourneau Co. v. NLRB*, 699 F.2d 248, 256 (5th Cir. 1983). Thus, mere preference or caprice are entitled to no weight when the statutory rights of employees are on the other side of the scale.

In addition, the Board requires an employer to establish that a restriction on employees' right to wear union attire "is narrowly tailored to the special circumstances justifying its maintenance." *In-N-Out*, 894 F.3d at 715 (quoting *Boch Honda*, 362 NLRB 706, 707 (2015), *enforced sub nom. Boch Imports, Inc. v. NLRB*, 826 F.3d 558 (1st Cir. 2016)). That is, the special circumstances must "justify the breadth of the limitations imposed." *Boch Imports*, 826 F.3d at 571. In

19

that way, the Board ensures that employers do not interfere with employees' Section 7 rights more than necessary. *See Albis Plastics*, 335 NLRB 923, 924 (2001) ("[T]he Board examines the conditions in the workplace to determine if there is a showing that the circumstances *necessitate* the curtailment." (emphasis added)), *enforced*, 67 F. App'x 253 (5th Cir. 2003). *Cf. NLRB v. Southwire Co.*, 352 F.2d 346, 348 (5th Cir. 1965) (upholding the Board's finding that no-solicitation rule was "too broad" and therefore "violative of Section 8(a)(1)").

Finally, when an employer establishes that its restriction of employees' Section 7 rights is "narrowly tailored to serve a particular, legitimate interest," the Board will balance the two, evaluating whether the employer's interest "outweighs the adverse effect" on employees' rights. (ROA.6646 n.21.) To justify the restriction, the employer's special circumstance must be "sufficient to outweigh its employees' Section 7 interests." *In-N-Out*, 894 F.3d at 714-15 (quotation and brackets omitted). *Accord Sam's Club*, 349 NLRB 1007, 1010 (2007).

### 3. The Board reasonably applies its special-circumstances test to uniform policies that restrict employees' right to wear union insignia

"An employer cannot avoid the 'special circumstances' test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia." (ROA.6645 (quoting *Stabilus*, 355 NLRB at 838).) In accordance with that principle, the Board "has

20

consistently applied the *Republic Aviation* special circumstances test when an employer has prohibited an employee from wearing an article of clothing bearing union insignia based on a policy requiring employees to wear certain clothing." (ROA.6645.)

For example, in *Great Plains Coca-Cola Bottling Co.*, the Board found that an employer violated Section 8(a)(1) by telling an employee that his union jacket was unacceptable because only the employer's jackets were allowed. 311 NLRB 509, 515 (1993). In *Meijer, Inc.*, the Board found that special circumstances permitted the employer to require that employees wear its uniform—including employer-branded hats and jackets—in customer areas. 318 NLRB 50, 52, 56-57 (1995), *enforced*, 130 F.3d 1209 (6th Cir. 1997). In noncustomer areas, however, the employer had to allow employees to wear union jackets. *Id.* And in *Quantum Electric, Inc.*, the Board found that an employer unlawfully discharged an employee for violating its clothing policy—which prohibited clothing with "graphics or printed text other than [employer] approved or issued clothing"—by wearing a union shirt. 341 NLRB 1270, 1270 n.1, 1274, 1277, 1280 (2004). Similarly, in *Long Beach Memorial Medical Center*, the Board found that the employer violated the Act by permitting employees to wear only employer-

branded badge reels. 366 NLRB No. 66, slip op. at 1-3, 2018 NLRB LEXIS 160, at *5-13 (2018), *enforced*, 774 F. App'x 1 (D.C. Cir. 2019).

In sum, in the decades since *Republic Aviation*, in every case where the Board has been called upon to decide whether an employer's restriction on employees' right to wear union insignia violated the Act, it has applied the special-circumstances test—even when the restriction took the form of a dress code or uniform. The sole exception, as the Board acknowledged (ROA.6653), is the recent *Wal-Mart Stores, Inc.* decision, where the Board for the first time applied a different balancing framework to an employer rule that limited the size and appearance of buttons, including union buttons. 368 NLRB No. 146, slip op. at 3, 2019 NLRB LEXIS 736, at *9-10 (2019). Here, accordingly, the Board overruled *Wal-Mart* as an unwarranted departure from its precedent. (ROA.6653.)[5]

Thus, as the Board emphasized, its conclusion that the special-circumstances test applies to "*any* limitation on the display of union insignia" is firmly grounded

---

[5] In arguing that the Board misinterpreted its precedent, ABC mistakenly cites (ABC.7, 12-13) the analysis of an administrative law judge that the Board did not consider on exceptions, *Burndy, LLC*, 364 NLRB 946, 946 n.3 (2016), which has "no precedential value," *Stanford Hosp. & Clinics v. NLRB*, 325 F.3d 334, 345 (D.C. Cir. 2003). In the other case ABC cites, the Board applied the special-circumstances test: it found that an employer unlawfully applied its dress-code policy to prohibit an employee from wearing a protected shirt. *Medco Health Sols. of Las Vegas, Inc.*, 357 NLRB 170, 171 (2011), *set aside and remanded in pertinent part*, 701 F.3d 710 (D.C. Cir. 2012), *further explained on remand*, 364 NLRB 1687, 1693-94 (2016).

in "*Republic Aviation* and its progeny." (ROA.6639, 6645, 6654, 6655.) That the Board relied on the Supreme Court's decision in *Republic Aviation* in addition to its own precedent does not, as Tesla contends (Tesla.27), make de novo review appropriate. The Supreme Court did not formulate its own test in *Republic Aviation*. Rather, it upheld the balancing framework the Board had established as a permissible construction of the Act. In this case, the Board continued to apply that framework, as it has been developed over decades of subsequent Board caselaw. (ROA.6646 n.23.) In doing so, the Board acted within its "not inconsiderable realm of reasonable discretion . . . to determine how to apply its own past precedents." *Boch Imports*, 826 F.3d at 568-69. *Accord Ceridian Corp. v. NLRB*, 435 F.3d 352, 355 (D.C. Cir. 2006) (Board's "interpretation of its own precedent is entitled to deference" (quotation omitted)); *Outokumpo Stainless USA, LLC v. NLRB*, 773 F. App'x 531, 534 (11th Cir. 2019).

Contrary to Tesla's mischaracterization, the settled rule that Section 7 protects all displays of insignia and that restricting any such display presumptively violates Section 8(a)(1) does not mean that employees have the right to communicate "in whatever manner they please." (Tesla.38.) The special-circumstances test is specifically designed to balance their right to communicate against employers' legitimate interests. But the question is who, by default, should decide how employees will communicate about self-organization: the employees to

23

whom Congress granted that right, or employers whose legitimate interests may or may not be affected by the choice.  The Board has reasonably determined that absent a legitimate employer interest, it "does not lie in the mouth of the employer to tell the union, or the employer's employees, how to exercise their rights under the Act."  (ROA.6648 (quoting *Monarch Mach. Tool Co.*, 102 NLRB 1242, 1249 (1953), *enforced*, 210 F.2d 183 (6th Cir. 1954)) (brackets omitted)).)  "To hold otherwise," as the Board explained, "would effectively treat the display of union insignia as a privilege to be granted by the employer on the terms it chooses rather than as an essential Section 7 right that the employer is required to accommodate."  (ROA.6650.)

Finally, the Board (ROA.6651) reasonably rejected the argument, urged here by ABC (ABC.15-19), that it should create an exemption from the special-circumstances test for uniform policies that restrict Section 7 rights because the qualifying circumstances are too limited and too difficult to prove.  The test is a flexible one that can properly account for any "legitimate and not unwarranted concern" that a limitation is narrowly tailored to address.  *Albis Plastics*, 335 NLRB at 923 (quotation and ellipsis omitted).  And the Board has found special circumstances in a wide range of settings, "such as where permitting employees to display protected items would: (1) jeopardize employee safety; (2) damage machinery or products; (3) exacerbate employee dissension; or (4) unreasonably

24

interfere with a public image that the employer has established, as part of its business plan, through appearance rules for its employees." *In-N-Out*, 894 F.3d at 715 (quotation omitted). As the Board noted (ROA.6651-52 n.29), that list is not exhaustive, and the Board will continue to consider any legitimate justification an employer may offer for limiting union insignia in a particular workplace.

In the manufacturing setting, in particular, the Board has had no difficulty finding that special circumstances justified a range of restrictions on union insignia, as the cases HR Policy Association ("HR") collected illustrate. (HR.6-7.) Nor has the Board hesitated to uphold narrowly tailored, adequately justified uniform requirements that restrict union insignia in other industries. (ROA.6645.) *See, e.g.*, *Con-Way Cent. Express*, 333 NLRB 1073, 1075-77 (2001) (freight-transportation employer's interest in maintaining established public image justified uniform policy prohibiting non-employer logos and adornments); *Produce Warehouse of Coram*, 329 NLRB 915, 915-18 (1999) (grocer's public-image interest justified uniform policy allowing employer hats only); *Casa San Miguel*, 320 NLRB 534, 540 (1995) (nursing home lawfully prohibited employee from wearing required uniform with added union emblem because employee could not feasibly change it before entering patient-care areas, where union-insignia prohibitions are presumptively valid).

In nevertheless asserting that the Board "will call into question nearly every employer dress code and uniform policy" in the United States (ABC.15), ABC appears to assume that employers commonly mandate uniforms—and refuse to permit employees to substitute statutorily protected apparel—without any legitimate reason for doing so. In the absence of any evidence, the Board was not required to share that assumption. Moreover, the Board decided *Stabilus*, unequivocally affirming that the special-circumstances test applies to uniform requirements that restrict the display of union insignia, in 2010. 355 NLRB at 838. Yet ABC points to no flood of litigation assailing uniform policies—much less Board decisions invaliding them—in the intervening years.[6] And it provides no reason to think the Board's reaffirmation of *Stabilus* will now open the floodgates.

---

[6] Cases come before the Board only after an unfair-labor-practice charge is filed and the Board's General Counsel investigates, finds merit, and issues a complaint. *See generally NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138 (1975). Thus, even if charging parties were to indiscriminately attack uniform policies across the nation, the Board's General Counsel has unreviewable discretion to dismiss meritless charges. *Id.* at 138-39. *See, e.g.*, *N.Y. State Pub. Emp. Fed'n*, Advice Memorandum, 2012 NLRB GCM LEXIS 47, at *1 (2012) (concluding that employer established special circumstances justifying narrowly tailored prohibition on union t-shirts that would violate its policy requiring that attorneys wear business attire).

### B. The Board Is Not Required To Countenance Unjustified Restrictions on Section 7 Rights Just Because They Are Content Neutral or Do Not Foreclose Other Effective Channels of Communication

As the Board explained, the special-circumstances standard it reaffirmed in this case is the one it has applied for eight decades, with the approval of the Supreme Court and this Circuit, whenever employers have interfered with employees' right to wear union insignia. Tesla thus faces a heavy burden here: it must show that the Board was required to abandon its well-established, court-approved framework to deal with the facts of this case. It cannot do so.

In attacking the Board's standard, Tesla does not dispute that employees have the right to wear union insignia at work. (Tesla.35.) And it concedes, as do its amici, that the Board is responsible for balancing the rights of employees and employers. (Tesla.31-33; ABC.3; HR.10.) Tesla argues, however, that the Board must treat the employees' side of the scale as empty when a restriction on union insignia is content neutral and permits employees to wear insignia in some form. (Tesla.33-38.) Such a restriction, Tesla argues, does not interfere with employee rights at all, negating the need for any balancing. (Tesla.34-35.) That argument is contrary to the precedent of the Board, this Court, and the Supreme Court. As we now show, the special-circumstances test applies with equal force to "neutral and nondiscriminatory" policies that "le[ave] employees free to communicate their preferred message." (Tesla.31.)

27

## 1.   Content-neutral, nondiscriminatory policies are subject to the special-circumstances test

An employer's dress code is unlawful under Section 8(a)(1) if, absent special circumstances, it interferes with the display of union insignia—regardless of whether it evenhandedly interferes with other, unprotected displays as well.  *See In-N-Out*, 894 F.3d at 712 (strictly enforced rule against wearing "any type of pin or stickers"); *Floridan Hotel*, 318 F.2d at 546 (employer's rule, which had "no discriminatory purpose," forbidding "badges of any sort" in public view).  As the Board explained, "[t]hat an employer's uniform policy or dress code effectively prohibits employees from wearing *all* clothing other than the clothing prescribed by the employer (including, but not limited to, union clothing) does not make the employer's action lawful, any more than an employer's no-solicitation rule is lawful because it bars all solicitation (not just union solicitation) on nonworking time."  (ROA.6650.)  *See Marathon*, 699 F.2d at 256 ("Even the nondiscriminatory prohibition of solicitation after working hours violates [Section] 8(a)(1), absent a showing that production or discipline requires it." (quotation omitted)); *Cordúa Rests., Inc.*, 368 NLRB No. 43, slip op. at 5, 2019 NLRB LEXIS 455, at *25 (2019) (employer's no-solicitation rule was unlawful because it banned "*all* solicitation on the [employer's] premises regardless of when the solicitation occurs" (emphasis added)), *enforced*, 985 F.3d 415 (5th Cir. 2021).

To be sure, as the Board recognized (ROA.6650), a policy may be unlawful because it discriminates against union activity. *See Waterbury Hotel Mgmt., LLC v. NLRB*, 314 F.3d 645, 656 (D.C. Cir. 2003) (even if special circumstances justified employer's dress code, "selective enforcement to banish only pro-union buttons and insignia from the workplace" was unlawful); *Stabilus*, 355 NLRB at 839 (even if special circumstances justified uniform policy, employer violated the Act by enforcing it disparately against union insignia). But discrimination is not necessary to establish that an employer has violated Section 8(a)(1) by interfering with, restraining, or coercing employees in the exercise of their Section 7 rights. *Textile Workers Union v. Darlington Mfg. Co.*, 380 U.S. 263, 269 (1965). So while discrimination "may constitute grounds for *invalidating* a dress ban, it does not necessarily follow that the absence of th[at] circumstance[] constitutes a ground for *upholding* a dress ban." *Boch Imports*, 826 F.3d at 574-75.

It is not surprising, then, that neither the Supreme Court nor the Board relied on concepts of content or viewpoint discrimination in *Republic Aviation*. Tesla cites no precedent supporting its effort to reimagine the case along those lines. (Tesla.28-30.) And Tesla's suggestion to "borrow First Amendment concepts" (Tesla.28) to explain *Republic Aviation* makes no sense because the principles that animate First Amendment precedent are fundamentally different from those that guide decisions under the Act. *See, e.g.*, *Cent. Hardware*, 407 U.S. at 544-46

(distinguishing rights of access to property granted by the Act and the First Amendment).  When the Board balances the statutory rights of employees against employer interests, "[w]hat is a proper accommodation in any situation may largely depend upon the content and the context of the [Section] 7 rights being asserted." *Hudgens v. NLRB*, 424 U.S. 507, 521 (1976) (quotation omitted).  "The task of the Board and the reviewing courts under the Act, therefore, stands in conspicuous contrast to the duty of a court in applying the standards of the First Amendment, which requires above all else that expression must not be restricted by government because of its message, its ideas, its subject matter, or its content." *Id.* (quotation omitted).

Indeed, applying First Amendment concepts would turn *Republic Aviation* on its head.  The content of the button in that case—identifying an employee as a steward—was the very reason the employer advanced for banning it.  The Board, with the Supreme Court's approval, considered and rejected the argument that the content would undermine plant discipline.  (*See* p. 16, above.)  In the end, the restriction was invalid not because it was based on content, but because the employer adduced insufficient evidence that the content would, in fact, harm legitimate employer interests.  Subsequent cases make clear that the content of a shirt, button, or sticker can be a perfectly valid basis for banning it.  *See, e.g.*, *Komatsu Am. Corp.*, 342 NLRB 649, 650 (2004) (special circumstances justified

prohibiting union shirt that made "clear appeal to ethnic prejudices"). In such cases, a broader, content-neutral ban—say, on all buttons or shirts displaying slogans—would be unlawful, for it would not be narrowly tailored to serve the employer's legitimate interest in restricting a harmful message.

### 2. The Board, with court approval, applies the special-circumstances test to rules limiting the display of union insignia regardless of whether they ban all insignia

Contrary to Tesla's and ABC's position (Tesla.34-35; ABC.3-4), the Board has never held that only a total ban on union insignia constitutes interference within the meaning of Section 8(a)(1). Instead, with court approval, the Board applies the special-circumstances test whenever an employer, like Tesla, restricts some types of union insignia—even in content-neutral, nondiscriminatory ways— while permitting employees to display the same message in other ways. (*Contra* Tesla.30-31 & n.1; ABC.3-4, 8-12.)

Hardhat-sticker cases are an example. In *NLRB v. Malta Construction Co.*, for instance, the employer's content-neutral, nondiscriminatory policy prohibited employees from adding stickers to the hardhats it required them to wear. 806 F.2d 1009, 1011-12 (11th Cir. 1986). "[E]mployees were allowed to display union insignia on their person and property without restriction," *id.*, including by wearing union t-shirts, *Malta Constr. Co.*, 276 NLRB 1494, 1494 (1985). Even though employees "had ample alternative methods" to display union support. *Id.* at 1496

(Chairman Dotson, dissenting in part), the Board applied the special-circumstances test and found a Section 8(a)(1) violation.  The Eleventh Circuit held that "the proper legal standards were applied."  *Malta Constr.*, 806 F.2d at 1012.  *See also Ne. Indus. Serv. Co.*, 320 NLRB 977, 979 (1996) (applying special-circumstances test to content-neutral prohibition on hardhat stickers where employer "d[id] not prohibit employees from wearing union insignia on their work clothes or from displaying them on their lunch and toolboxes or other equipment").

The same analysis applies to other garments and adornments.  In *Serv-Air, Inc. v. NLRB*, for example, employees wore union insignia in "various forms, such as pencils worn with a union clip showing, plastic badges, improvised badges pasted on plastic buttons, and signs attached to the back of a shirt or jacket."  395 F.2d 557, 562 (10th Cir. 1968).  Fed up with employees "looking like a bunch of clowns," the employer instituted a rule permitting employees to wear only one insignia at a time.  *Id.* at 562-63.  Although the rule was nondiscriminatory and content neutral, the Board demanded special circumstances to justify it.  *Id.* at 563.  The employer did not carry its burden, and the Board found, with the Tenth Circuit's approval, that its "multiple-badge rule" violated Section 8(a)(1).  *Id.*  *See also Holladay Park*, 262 NLRB at 279 (in the absence of special circumstances, the Board found it "irrelevant" that the employer "also permitted the employees to wear another union insignia which it deemed more 'professional'").

The cases Tesla presents as analogous to its own do not support limiting the special-circumstances test to rules that completely ban union insignia. (Tesla.36-38.) In *Davison-Paxon*, this Court did not question that the Board's special-circumstances test applied to the prohibition of a particular button. 462 F.2d at 367. Rather, the Court concluded, in analysis that it "restricted to the facts of [that] case," that the employer had sufficiently weighty reasons for banning that item. *Id.* at 371. And *World Color (USA) Corp. v. NLRB*, 776 F.3d 17 (D.C. Cir. 2015), likewise undermines Tesla's argument. At issue in that case was a factual question: whether the employer restricted union insignia on employer-branded caps.[7] But as the D.C. Circuit noted, the employer insisted that it allowed employees to attach union insignia to their clothes. *World Color*, 776 F.3d at 20. Thus, under Tesla's proposed test there was no reason to ask whether employees could also attach union insignia to their caps: the "neutral and nondiscriminatory

---

[7] The Board initially found the employer's policy unlawful because it prohibited employees from "wearing caps bearing union insignia." *World Color (USA) Corp.*, 360 NLRB 227, 227 & n.3, 234 (2014). On review, the D.C. Circuit understood the issue to be whether employees could *add* union insignia to employer-issued hats, and it remanded for further consideration of arguments it concluded the Board had overlooked on that point. *World Color*, 776 F.3d at 21. Answering the narrow question before it, the Board then found that the employer did allow employees to accessorize their caps with union insignia. *World Color (USA) Corp.*, 369 NLRB No. 104, slip op. at 2-3, 2020 NLRB LEXIS 176, at *7 (2020). Given the limited nature of the remand, however, the Board did not address whether the requirement to wear employer caps rather than union caps separately violated the Act.

uniform requirement" would have "left employees free to communicate their preferred message" on their clothing.  (Tesla.30 n.1.)  Yet neither the Board nor the D.C. Circuit suggested that those features rendered the special-circumstances test inapplicable.

### 3.    The Board and the courts have rejected Tesla's argument that the presence of alternative channels for effective communication obviates a special-circumstances analysis

Disregarding 80 years of precedent, Tesla proposes a reinterpretation of the Act that would eliminate the Section 7 right to wear all manner of union insignia. (Tesla.34-35.)  In its place, Tesla would offer employees a right to communicate, which their employer is free to constrict without justification as long as alternative channels would allow employees to convey their message effectively.  Tesla fails to show that the Board was required to adopt that radical revision of the law.

In support of its proposed narrowing of employee rights, Tesla observes that Section 7 "does not mention any right to wear preferred items of clothing." (Tesla.34).  Tesla, however, is mistaken in assuming that the statute does not protect any activity it does not explicitly describe.  Section 7 does not mention talking or handing out leaflets, either.  It is precisely because Congress did not endeavor to define every employee activity the Act protects that the Board is entitled to deference in marking out those boundaries.  *See, e.g.*, *Weingarten*, 420 U.S. at 260-62 (upholding as a "permissible construction" Board's determination

that Section 7 "guarantees an employee's right to the presence of a union representative at an investigatory interview in which the risk of discipline reasonably inheres"); *ITT Indus. v. NLRB*, 413 F.3d 64, 68-70 (D.C. Cir. 2005) (deferring to Board's reasonable delineation of off-site employees' right to access outside, nonworking areas of their employer's property to distribute literature because Section 7 "does not itself speak of access rights, much less the access rights of off-site employees").

The Board has reasonably drawn the boundaries of Section 7 to include the right to wear all manner of union insignia and apparel, including shirts. And the courts—including this Court—have long endorsed that interpretation. *See, e.g.*, *NLRB v. Lone Star Textiles, Inc.*, 386 F.2d 535, 536 (5th Cir. 1967) (union t-shirts). Employees might prefer union shirts over stickers, for example, because shirts can display a message more prominently or comfortably, or because they are more cost effective, or because stickers can come off during the workday and leave residue on clothing. Or employees may wish to wear both shirts and stickers because they believe additional displays are more effective—just as a business might decide to advertise on billboards and buses at the same time. Whether that belief is well founded is immaterial, for activities that Section 7 protects do not lose that protection because they are "unnecessary and unwise." *NLRB v. Wash. Aluminum Co.*, 370 U.S. 9, 16 (1962). Whatever employees' reasons might be,

their right to wear union garments is statutorily protected unless their employer has a sufficient reason to interfere.  And an unjustified restriction on that right plainly has an "*adverse effect*" (Tesla.34) within the meaning of Section 8(a)(1) on employees' ability to exercise it.[8]

The fact that employees have a right to "effective communication" does not mean, as Tesla argues, that the Board must permit employers to impose unjustified limitations on their right to communicate through union insignia of their choice. (Tesla.35.)[9]  Quoting *NLRB v. United Steelworkers of America*, 357 U.S. 357, 363-64 (1958), Tesla argues that there is no presumptively unlawful interference, and thus no need to apply the special-circumstances test, unless a restriction "truly diminishe[s] the ability of the labor organizations involved to carry their messages

---

[8]  To be clear, it is settled that "a showing of actual interference is not necessary to establish a [Section] 8(a)(1) violation." *Brandeis Mach. & Supply Co. v. NLRB*, 412 F.3d 822, 832-33 (7th Cir. 2005). *See id.* (rejecting employer's arguments that there was no violation because its comments "did not dissuade [employees] from touting the Union on their clothing").  The issue is whether the employer's words or actions "tend to interfere with the employee's protected right under Section 7." *New Orleans Cold Storage & Warehouse Co. v. NLRB*, 201 F.3d 592, 599 (5th Cir. 2000).  Thus, as this Court has recognized, "whether [u]nion support was in fact chilled by a[] Section 8(a)(1) violation—i.e., whether the problematic conduct *in fact* coerced anyone or interfered with a campaign—is inconsequential in an 8(a)(1) case." *UNF W., Inc. v. NLRB*, 844 F.3d 451, 464 (5th Cir. 2016).  *Accord Constellation Brands*, 992 F.3d at 646.

[9]  Tesla does not attempt to explain how the Board should determine whether available channels are adequate to allow employees to effectively communicate their union message.

to the employees." (Tesla.35.)  But *Steelworkers* dealt with a "narrow question" distinct from the one presented here, *Nat'l Steel Corp. v. NLRB*, 415 F.2d 1231, 1234 (6th Cir. 1969), and this Court long ago rejected an invitation to extend its rationale to limit the reach of the special-circumstances test.[10]

In *Republic Aluminum Co. v. NLRB*, 394 F.2d 405, 408 (5th Cir. 1968) (en banc), this Court flatly held that *Steelworkers* "d[id] not purport to overrule or modify *Republic Aviation*."  As the Court explained, the argument that an available and effective channel of communication obviates any unlawful interference "was urged upon the [Supreme] Court" in *Republic Aviation*, and it did not carry the day.  *Republic Aluminum*, 394 F.2d at 408.  One of the rules at issue in *Republic Aviation* restricted literature distribution on company property, but "by no means stopped all organizational activity," as it did not bar employees "from speaking to fellow employees about organizing, or making appointments for meetings elsewhere, or even on the parking lots."  *Le Tourneau Co. v. NLRB*, 143 F.2d 67, 68-69 (5th Cir. 1944).  There was no evidence "that the plant's physical location made solicitation away from company property ineffective to reach prospective union members."  *Republic Aluminum*, 394 F.2d at 408 (quoting *Republic Aviation*,

---

[10] The issue in *Steelworkers* was whether an otherwise lawful rule against solicitation on working time violated the Act because the employer itself did not abide by it.  *Republic Aluminum*, 394 F.2d at 407-08.  The distinct considerations of what constitutes unlawful discrimination in that context are not present here.

324 U.S. at 798).  Nonetheless, the Supreme Court upheld the Board's finding that the restriction of Section 7 activity, in the absence of proven special circumstances, violated Section 8(a)(1).  *Republic Aviation*, 324 U.S. at 801-03 & n.8.

As this Court spelled out in *Republic Aluminum*, "[t]here is no requirement that in the absence of such proof the burden is then on the [G]eneral [C]ounsel also to show that there was a lack of sufficient alternative means" of communication. *Republic Aluminum*, 394 F.2d at 408.  The Court has applied that principle time and again.  *See NLRB v. Roney Plaza Apartments*, 597 F.2d 1046, 1050 (5th Cir. 1979) (holding that "nondiscriminatory prohibition of solicitation after working hours violates [Section] 8(a)(1), absent a showing that production or discipline requires it," with "no need to show that such a rule actually interferes with union organization or that the union requires after-hours access to communicate successfully"); *NLRB v. Varo, Inc.*, 425 F.2d 293, 297 (5th Cir. 1970) (unlawful rule "allowed union talk at lunch time but barred such activity during other work breaks"); *NLRB v. Armstrong Tire & Rubber Co.*, 262 F.2d 812, 814 (5th Cir. 1959) (unlawful prohibition of solicitation during breaks despite argument that "ample opportunity was given for solicitation during the employees' lunch period and time before and after work").

And since *Republic Aluminum*, the Supreme Court has repeatedly confirmed this Court's understanding.  In *NLRB v. Magnavox Co. of Tennessee*, the Supreme

Court upheld the Board's determination that a rule restricting in-plant literature distribution was unlawful, notwithstanding the availability of bulletin boards as an alternative, where the employer did not establish special circumstances.  415 U.S. 322, 326 (1974).  The Court held that in the absence of "a legitimate employer business justification," the Board has "no[] occasion to balance the availability of alternative channels of communication."  *Id.*  In *Eastex, Inc. v. NLRB*, the Court again held that "the Board was not required to adopt" a standard governing literature distribution that would consider whether "alternative channels of communication with fellow employees are available."  437 U.S. 556, 572 (1978).  And finally, in *Beth Israel*, the Court declared unequivocally that "outside of the health-care context," where special patient-care considerations apply, "the availability of alternative means of communication is not, with respect to employee organizational activity, a necessary inquiry."  437 U.S. at 505.[11]

---

[11]  To be sure, as Tesla notes (Tesla.36 n.2), the Board considers alternative channels of communication when *nonemployee* union organizers seek access to an employer's property.  *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112 (1956).  But where, as here, the rights of employees are at issue, the rule is settled: regardless of alternatives, "[n]o restriction may be placed on the employees' right to discuss self-organization among themselves,"—or to wear union insignia— "unless the employer can demonstrate that a restriction is necessary to maintain production or discipline."  *Id.* at 113.  *Accord Casino Pauma v. NLRB*, 888 F.3d 1066, 1084 (9th Cir. 2018) ("[I]nquiry into such considerations of alternative forms of communication is made only when *nonemployees* are on the employer's property." (quoting *ITT Indus.*, 413 F.3d at 76) (brackets omitted)).

Thus, consistent with its precedent and that of this Court and the Supreme Court, the Board reasonably "rejected the proposition that an employer's willingness to tolerate the display of some union insignia by its employees gives it a free hand to restrict other protected displays of union insignia." (ROA.6650.) When it comes to the right to wear union insignia, as with the right to solicit and distribute literature, "[t]he availability of one channel of communication does not permit the employer to block other channels without good reason." *Nat'l Steel*, 415 F.2d at 1234.

## II. Substantial Evidence Supports the Board's Finding that Tesla Violated Section 8(a)(1) by Interfering with Employees' Right To Wear Union Insignia

"When reviewing a Board decision involving the 'special circumstances' test, courts must give considerable deference to this framework and to the Board's application of it to the evidence in the record." *In-N-Out*, 894 F.3d at 715-16. The Board's findings of fact are "conclusive" if supported by substantial record evidence, 29 U.S.C. § 160(e), and the Court will not disturb them even if it would have made a contrary determination de novo, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951); *United Supermarkets, Inc. v. NLRB*, 862 F.2d 549, 551 (5th Cir. 1989). The Court also "defer[s] to the plausible inferences the Board draws from the evidence." *Cordúa Rests. v. NLRB*, 985 F.3d 415, 422 (5th Cir. 2021) (quotation omitted). As we now show, substantial evidence supports the

Board's finding that Tesla's prohibition of black union shirts violated Section 8(a)(1).

### A.     Tesla's Team-Wear Policy Is Presumptively Unlawful

Tesla's team-wear policy requires employees to wear black Tesla shirts or, with their supervisor's permission, plain black shirts.  Tesla "makes no exception" for insignia "pertaining to wages, hours, terms and conditions of employment or union or other protected activities," *In-N-Out*, 894 F.3d at 713 (quotation omitted), as it confirmed by enforcing its policy against employees who wore black union shirts.  Thus, as the Board explained (ROA.6645, 6656), the policy implicitly prohibits employees from wearing black shirts bearing union insignia, interfering with their statutory right to display all manner of insignia.  That interference presumptively violates Section 8(a)(1), but Tesla had the opportunity to demonstrate that the policy was narrowly tailored to serve a legitimate interest that outweighed its adverse effect on employees' Section 7 rights.  (ROA.6656.)

### B.     Tesla Did Not Establish that Its Policy Was Narrowly Tailored To Serve Legitimate Interests that Outweighed the Infringement of Employees' Rights

The Board assumed that Tesla had legitimate interests in preventing general-assembly employees from wearing metal on their clothing and requiring them to wear black for visual-management purposes.  It reasonably found, however, that Tesla's rules were not narrowly tailored to achieve those legitimate goals.

41

(ROA.6657.)  Substantial evidence supports the Board's finding that Tesla failed to meet its burden under the special-circumstances test, and Tesla's arguments that the Board should have given greater weight to its interests have no support in the law.

### 1.    Tesla's policy is not narrowly tailored to serve its interest in preventing damage to vehicles

As the Board noted, a restriction on union insignia that are likely to damage an employer's products may be warranted under the special-circumstances test. (ROA.6656.)  In *Hanes Hosiery, Inc.*, for example, the Board found an adequate business justification for prohibiting union buttons because the employer "demonstrated at the hearing how a hose could catch" on them.  219 NLRB 338, 347 (1975).  Tesla, however, failed to show that shirts with union logos could harm its cars.  As the Board pointed out, employees routinely wore union shirts before August 2017, yet Tesla's witnesses were not aware of those shirts ever causing damage.  (ROA.6656-57; ROA.1418-19, 1663, 1668-69, 2441-42, 2572.)  No witness explained how the union shirts could possibly damage a vehicle, and a manager testified that they posed no such risk.  (ROA.6657; ROA.2565-66.)

The Board assumed that Tesla had a legitimate interest in barring employees from wearing metallic emblems, which could damage cars.  (ROA.6657.)  But as noted above, a separate mutilation-protection provision of Tesla's General Assembly Expectations prohibits exposed metal on the production line.

42

(ROA.3209.)[12]  Because Tesla's prohibition on union t-shirts went well beyond its needs, the Board reasonably found that it was not narrowly tailored.  *See In-N-Out*, 894 F.3d at 719 (upholding as "reasonable" the Board's finding that "even if" the employer "demonstrated a genuine basis" for a concern with a type of adornment, "it failed to show that its rule was 'narrowly tailored' to that concern"); *Boch Honda*, 362 NLRB at 708 (pin restriction was not narrowly tailored to serve interest in preventing damage to vehicles where "none of that damage was shown or even asserted to be related to employee pins").

The Board did not suggest, as Tesla argues, that an employer must "wait for union insignia to cause actual harm" before it can impose restrictions.  (Tesla.45.)  It simply required Tesla to explain how a non-metallic union emblem on a t-shirt could potentially cause harm.  And Tesla gets nowhere by arguing that the Board should defer to business judgments that are "reasonable and do[] not interfere with a protected purpose," because the team-wear policy fails on both counts.  (Tesla.45 (quoting *Davison-Paxon*, 462 F.2d at 371).)  The Board was not required to find

---

[12]  Nothing in the Board's Order prevents Tesla from enforcing that rule against union shirts bearing metallic emblems.  Nor, contrary to Tesla's claim (Tesla.46), does it preclude Tesla from issuing additional, narrowly tailored rules prohibiting metallic logos, if it wishes to do so.  *Cf. Flex Frac Logistics, LLC v. NLRB*, 746 F.3d 205, 210 n.4 (5th Cir. 2014) (noting that Board's order prohibiting employer from maintaining overly broad confidentiality rule did not prevent employer "from redrafting its policy to maintain confidentiality" for particular types of information).

Tesla's judgment reasonable in the absence of "specific, non-speculative evidence of the adverse effects it claims justify its restriction." *In-N-Out*, 894 F.3d at 718. And like the rule in *In-N-Out*, Tesla's policy does interfere with protected activity because it "plainly restricts employees from wearing items protected by Section 7." *Id.* at 719.

The Board also reasonably rejected Tesla's argument that it would be unduly burdensome to ensure each day that any union shirts employees may wear in lieu of team wear are mutilation compliant.  (ROA.6657 n.43.)  As the Board noted, managers and supervisors already "inspect production associates during startup meetings and by walking the line to ensure that their clothing complies with the team-wear policy."  (ROA.6657.)  Tesla uses such intimate daily examination to ensure compliance with its detailed dress requirements, including the use of covers for badges, rings, watches, and belt buckles.  (ROA.227, 1414, 2424-25, 2550.)  "Every single day," one supervisor explained, he would "literally say good morning and shake the hand of every single one of [his] associates."  (ROA.2425-26.)  During that time, he was checking employees' "team[]wear and personal protective equipment, meaning gloves and safety glasses and the right shoes."  (ROA.2426.)  He "would do it during the startup meeting," and he "would then walk the entire line after."  (ROA.2426.  *Accord* ROA.2435.)

In addition, as Tesla touts throughout its brief, it freely allows employees to attach stickers to their clothes.  Thus, its interest in avoiding mutilations presumably requires it to examine employees daily to ensure that anything they have added to their team wear is a mutilation-free sticker—and not, say, a sticker, button, patch, or badge that contains metal.  The Board is entitled to reject claims that are "speculative and conclusory," *In-N-Out*, 894 F.3d at 718, and it is mere speculation for Tesla to suggest (Tesla.46-47) that employees will begin wearing union shirts with metallic features, in contravention of its unchallenged mutilation-protection rules, that its daily inspections will not allow it to easily spot.

### 2.    Tesla's policy is not narrowly tailored to serve its interest in visual management

Tesla also argues that it has a legitimate interest in visually managing general-assembly employees—that is, in easily identifying those employees by their black team-wear shirts (or plain black shirts).  (Tesla.47-50.)  But the Board reasonably found that, even assuming that to be the case, Tesla never demonstrated that its interest could not be satisfied with a narrowly tailored policy that allowed black union shirts.  (ROA.6657.)

That conclusion flows from longstanding Board precedent.  In industrial settings, the Board has recognized that "workplace conditions can heighten the need to ensure that employees are readily visible." *Albis Plastics*, 335 NLRB at 924.  But whether a restriction on union insignia is narrowly tailored to further that

45

interest is a fact-intensive question.  For example, the Board has found special
circumstances justifying restrictions on hardhat stickers that could impair an
employer's ability to identify employees where smoke, dim lighting, or a multi-
level layout "require[ed] measures to ensure that visibility was not unnecessarily
impeded." *Id.* at 925.  In a workplace lacking those conditions, however, the
Board has rejected the argument that a similar rule was necessary to "allow [the
employer] to see where its employees are working." *Ne. Indus.*, 320 NLRB at 978.

Tesla argues that if general assembly employees wear black union shirts, it
will not be able to tell them apart from other employees who might wear the same
thing.  (Tesla.48-50.)  But the Board found, and Tesla does not dispute, that Tesla
allows employees from other departments to wear the same team wear and plain
black t-shirts it requires in general assembly.  (ROA.6657 n.44.)  Thus, the Board
reasonably found that a "risk of interference with visual management is present
under the current team-wear policy."  (ROA.6657 n.44.)

Tesla speculates that union shirts could be more disruptive because the
Union handed out so many of them.  (Tesla.49.)  It asserts (without record support)
that it made "no coordinated effort" to promote team wear for employees outside
of general assembly.  (Tesla.49.)  But Tesla runs a store within its facility to
distribute team wear to anyone who wants it (ROA.223, 320, 2430), and there was
testimony that among non-general-assembly employees, "everyone wears [team

46

wear] the majority of the time" (ROA.213-14).  In any event, Tesla had the burden of proving that its policy was narrowly tailored, and if the evidence does not permit a precise comparison of how many employees wore union shirts versus team wear, that only means the record "does not contain evidence that makes unreasonable the Board's conclusion that a more tailored restriction . . . would have adequately served [Tesla]'s claimed interests."  *Boch Imports*, 826 F.3d at 576.

Moreover, even if Tesla could show that allowing general-assembly employees to wear union shirts would impose some slight additional burden on its visual-management system, the Board was not required to give that incremental effect more weight than the burden a contrary ruling would impose on employees. As the First Circuit recognized in *Boch Imports*, in "strik[ing] a balance between the employer's legitimate business interests and the statutorily protected workplace rights to organize," the Board may require an employer to tolerate union insignia that does not "*unreasonably* interfere" with legitimate business interests.  826 F.3d at 573.  Here, the Board rationally found that Tesla "failed to establish special circumstances that justify the team-wear policy's implicit prohibition on employees wearing black union shirts."  (ROA.6657.)

### 3. Tesla provides no basis for rejecting the Board's special-circumstances analysis

Having failed to carry its burden of proving that its curtailment of employee rights was narrowly tailored to serve a legitimate interest, Tesla offers three

arguments for rebalancing the interests with a thumb on Tesla's side of the scale. Each one is devoid of merit.

First, Tesla repackages its flawed effective-communication argument to suggest that its burden of proving narrow tailoring should be somehow lightened because its policy did not preclude employees from wearing union stickers. (Tesla.39-42.)  Tesla contends that its policy therefore did not "meaningfully limit[]" employee rights.  (Tesla.40.)  As explained above (pp. 23-24, 35-36), however, it is employees' prerogative to decide how to meaningfully exercise Section 7 rights, not Tesla's.  And as shown above (pp. 31-32), the full special-circumstances test applies even if a restriction is not all encompassing: the employer must still show that the restriction is "necessary" to address a legitimate business concern.  *Malta Constr.*, 806 F.2d at 1012.

That rule is in no way inconsistent with the Court's observation that "wholesale or 'blanket' bans are rarely, if ever, lawful," which Tesla invokes. (Tesla.41 (quoting *In-N-Out*, 894 F.3d at 715).)  An employer can rarely show that such drastic curtailment of Section 7 rights is necessary to serve its legitimate interests.  If "more targeted restrictions are more likely to comply with the [Act] than broader ones," as Tesla says (Tesla.41), that is precisely because they are more likely to be so tailored, not simply because they are not all-encompassing.

Nor do any of Tesla's other cases hold that a restriction need not be

narrowly tailored if it does not shut down all channels of communication.  In *Fabri-Tek, Inc. v. NLRB*, for example, the Eighth Circuit concluded that an employer demonstrated special circumstances justifying the prohibition of a particularly distracting button.  352 F.2d 577, 586 (8th Cir. 1965).  By observing that employees retained the right to wear other buttons, that court simply explained its conclusion that the employer's restriction went no farther than its legitimate interests required.  As the Eighth Circuit later explained, "*Fabri-Tek* holds that an employer may prohibit the wearing of union insignia that would otherwise be protected if there are special circumstances *and the restrictions are narrowly tailored* to address the special circumstances."  *Wal-Mart Stores, Inc. v. NLRB*, 400 F.3d 1093, 1098 (8th Cir. 2005) (emphasis added).  *See also NLRB v. Starbucks Corp.*, 679 F.3d 70, 78 (2d Cir. 2012) (concluding that employer's one-button rule was "necessary" to "protecting its legitimate managerial interest in displaying a particular public image"); *E. Omni Constructors, Inc. v. NLRB*, 170 F.3d 418, 426 (4th Cir. 1999) (concluding that safety considerations "justified" ban on hardhat stickers).

Second, Tesla argues that the Board should have given "weight" to various reasons "many employers" may have for requiring uniforms, such as fostering discipline and encouraging esprit de corps.  (Tesla.42-43 (citing *Communs. Workers of Am. v. Ector Cnty. Hosp. Dist.*, 467 F.3d 427, 439 (5th Cir. 2006)).)

49

But Tesla asserted none of those interests before the Board.  Before the Board,

Tesla relied exclusively on the two justifications discussed above: its interests in

avoiding mutilations and promoting visual management.  (ROA.6152-54.)  Under

Section 10(e) of the Act, 29 U.S.C. § 160(e), the Court lacks jurisdiction to

consider any other interests Tesla could have relied on but did not.  *Woelke &*

*Romero Framing v. NLRB*, 456 U.S. 645, 666 (1982); *In-N-Out*, 894 F.3d at 720.

In any event, it would have been illogical for Tesla to rely on the interests

the Court mentioned in *Ector County*.  The Court recognized that those

considerations are "more important in law enforcement than in other fields."  *Ector*

*Cnty.*, 467 F.3d at 439.  In other settings, the Court acknowledged that there may

be "employers for whom a uniform, or an anti-adornment, policy does not

conceivably subserve any legitimate employer purpose."  *Id.* at 442.  Moreover,

Tesla's position before the Board was that its "peculiar special interests/needs" in

general assembly explained why it needed uniforms there, but not in other parts of

its facility.  (ROA.6154.)  And if encouraging "subordination of personal

preferences" matters to Tesla (Tesla.42-43), Tesla does not explain why it only

matters in general assembly.  By arguing that the Board should have considered

interests "widely shared by employers" (Tesla.42) that Tesla did not raise, much

less prove, and could not logically have relied on, Tesla really just restates its

position that the Board should not require special circumstances at all.

Beyond the quote it uses out of context, Tesla understandably does not argue that *Ector County* is controlling here.  Because that case involved a public employer not subject to the Act, the Court applied a First Amendment framework under which it gave little weight to the employee's right to wear a union button that "involved matters of public concern only insubstantially and in a weak and attenuated sense." *Ector Cnty.*, 467 F.3d at 437.  In that context, the Court upheld the employer's total ban on uniform adornments. *Id.* at 430.  *In-N-Out*—in which the Court upheld the Board's finding that the same sort of policy was unlawful because the employer did not establish special circumstances—sets forth the governing balancing framework where employees' right to wear union insignia is protected by the Act.

In citing *Burger King Corp. v. NLRB*, 725 F.2d 1053 (6th Cir. 1984), Tesla also fails to demonstrate any additional interest the Board should have weighed. There, the Sixth Circuit concluded, contrary to Board precedent, that special circumstances justify prohibiting union buttons whenever an employer requires "employees who have contact with the public" to wear uniforms.  *Id.* at 1055.[13]

---

[13]  As Tesla concedes, *Burger King*'s rule does not apply here because general-assembly employees have no public contact. (Tesla.43.)  In any event, the rule could not apply because this Circuit has rejected it.  *See In-N-Out*, 894 F.3d at 717 (stating that an "employer's status as a retailer or service provider," the "fact that employees interact with the public or that customers may be exposed to employees displaying protected items," and "an employer's requirement that employees wear

Contrary to Tesla's claim, *Burger King* says nothing about the value of uniforms "across many employment contexts." (Tesla.43.) Rather, its approach—defining a special circumstance that applies only to public-facing employees—supports the Board's reasonable finding that "uniform policies and dress codes that implicitly restrict or limit the display of union insignia do not generally serve any specific employer interest regardless of the circumstances in which an employer operates but instead may further many different legitimate business interests and objectives depending on the context." (ROA.6652-53 n.33.) Simply put, Tesla's asserted reasons for requiring a uniform are not the same as those of a fast-food restaurant. *See In-N-Out*, 894 F.3d at 716 (noting restaurant's arguments that its uniform fosters a "particularized public image").

Finally, *Beth Israel* precludes Tesla's request that the Court second-guess the Board's balancing of interests in this case and trust Tesla's judgment instead because the Board "has no claim to special expertise" in electric-car manufacturing. (Tesla.50.) "It is true that the Board is not expert" in making cars—or "in pharmacology, chemical manufacturing, lumbering, shipping, or any of a host of varied and specialized business enterprises over which the Act confers jurisdiction." *Beth Israel*, 437 U.S. at 501. "But the Board is expert in federal

---

uniforms or adhere to a dress code" are not special circumstances). Indeed, even the Sixth Circuit has declined to follow it. *Meijer, Inc. v. NLRB*, 130 F.3d 1209, 1217 (6th Cir. 1997).

national labor relations policy, and it is in the Board, not [employers], that [Congress] vested responsibility for developing that policy in [each] industry." *Id.* As for Tesla's business judgment, "[i]t is not surprising or unnatural that [an employer]'s assessment of the need for a particular practice might overcompensate its goals, and give too little weight to employee organizational interests." *Id.* That is why the Board, not Tesla, has the "difficult and delicate responsibility" of striking the balance between Tesla's interests and its employees' rights. *Id.* As shown above, the Board reasonably fulfilled that responsibility when it found that Tesla's restriction on union shirts was not "narrowly tailored to the special circumstances justifying its maintenance." *In-N-Out*, 894 F.3d at 715.

## CONCLUSION

For the foregoing reasons, the Board respectfully requests that the Court deny Tesla's petition for review, grant the Board's cross-application, and enter a judgment enforcing the Board's Order.

Respectfully submitted,

s/ Ruth E. Burdick
RUTH E. BURDICK
*Deputy Associate General Counsel*

s/ Kira Dellinger Vol
KIRA DELLINGER VOL
*Supervisory Attorney*

s/ Micah P.S. Jost
MICAH P.S. JOST
*Attorney*

National Labor Relations Board
1015 Half St. SE
Washington, DC 20570
(202) 273-0656
(202) 273-0264

JENNIFER A. ABRUZZO
 *General Counsel*

PETER SUNG OHR
 *Deputy General Counsel*

RUTH E. BURDICK
 *Deputy Associate General Counsel*

DAVID HABENSTREIT
 *Assistant General Counsel*

National Labor Relations Board

April 2023

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

TESLA, INCORPORATED,            )     No. 22-60493
                                        )
        Petitioner/Cross-Respondent  )
                                          )     Board Case Nos.
           v.                          )     32-CA-197020, et al.
                                          )
NATIONAL LABOR RELATIONS BOARD,  )
                                        )
        Respondent/Cross-Petitioner  )

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system.  I certify further that the foregoing document was served on all parties or their counsel of record through the appellate CM/ECF system.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC  20570
(202) 273-2960

Dated at Washington, DC
this 12th day of April 2023

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| TESLA, INCORPORATED, | ) | No. 22-60493 |
| | ) | |
| Petitioner/Cross-Respondent | ) | |
| | ) | Board Case Nos. |
| v. | ) | 32-CA-197020, et al. |
| | ) | |
| NATIONAL LABOR RELATIONS BOARD, | ) | |
| | ) | |
| Respondent/Cross-Petitioner | ) | |

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the Board

certifies that its brief contains 12,465 words of proportionally spaced, 14-point

type, and the word-processing system used was Microsoft Word for Office 365.


/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC  20570
(202) 273-2960


Dated at Washington, DC
this 12th day of April 2023