No. 22-60493

# In the United States Court of Appeals
# for the Fifth Circuit

TESLA, INCORPORATED,
*Petitioner / Cross-Respondent*

*v.*

NATIONAL LABOR RELATIONS BOARD,
*Respondent / Cross-Petitioner*

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AFL-CIO
(UAW),
*Intervenor*

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board

**BRIEF FOR INTERVENOR UAW**

SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS LLP
DANIEL E. CURRY     MARGO A. FEINBERG
6300 Wilshire Boulevard, Suite 2000, Los Angeles, CA 90048
Telephone: (323) 655-4700 Facsimile: (323) 655-4488
Email: dec@ssdslaw.com; margo@ssdslaw.com;

Attorneys for Intervenor International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America, AFL-CIO (UAW)

# CERTIFICATE OF INTERESTED PERSONS

Intervenor International Union, United Automobile, Aerospace and Agricultural Implement Workers Of America, AFL-CIO (UAW) certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**(1) Intervenor UAW:** International Union, United Automobile, Aerospace and Agricultural Implement Workers Of America, AFL-CIO (UAW) is a labor organization.

**(2) Petitioner-Cross-Respondent Tesla, Inc:** Tesla, Inc.

**(3) Counsel for Intervenor UAW:** Daniel E. Curry and Margo A. Feinberg, Schwartz, Steinsapir, Dohrmann & Sommers LLP

**(4) Counsel for Petitioner-Cross-Respondent Tesla Inc:** Michael E. Kenneally, John C. Sullivan, David B. Salmons, Morgan, Lewis & Bockius LLP

**(5) Counsel for Respondent Cross-Petitioner National Labor Relations Board:** Ruth E. Burdick, Micah Jost, Kira D. Vol, National Labor Relations Board

By _____*/s/Daniel E. Curry*_____
DANIEL E. CURRY
Attorneys for UAW

i

## STATEMENT REGARDING ORAL ARGUMENT

Intervenor UAW requests oral argument as it believes it could significantly aid in the decisional process in this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS..........................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................. ii

STATEMENT OF THE CASE..........................................................................1

    A.  TESLA WORKERS LAUNCH A UNION ORGANIZING DRIVE TO
    IMPROVE WORKING CONDITIONS AT THEIR WORKPLACE...................3

    B.  TESLA UNLAWFULLY PROHIBITS EMPLOYEE CONTACT WITH
    THE MEDIA .................................................................................... 3

    C.  TESLA TRIES TO PREVENT ITS EMPLOYEES FROM DISCUSSING
    JOB SAFETY, LONG HOURS AND LOW PAY ................................. 4

    D.  TESLA BANS EMPLOYEES FROM DISTRIBUTING LEAFLETS
    ABOUT PLANT SAFETY AND INTERROGATES THE TESLA
    WORKERS WHO RAISED THESE SAFETY ISSUES.....................................5

    E.  AFTER TESLA UNLAWFULLY BLOCKS EMPLOYEES FROM
    DISTRIBUTING UNION LITERATURE AND SPEAKING TO THE
    MEDIA ABOUT WORKING CONDITIONS, TESLA EMPLOYEES
    LAUNCH A POPULAR UNION SHIRT CAMPAIGN.....................................6

    F.  TESLA STARTS BARRING EMPLOYEES FROM WEARING
    UAW T-SHIRTS AND SANCTIONING THOSE EMPLOYEES
    WHO DID................................................................................... 10

SUMMARY OF ARGUMENT ............................................................. 12

STANDARD OF REVIEW ................................................................. 16

ARGUMENT ................................................................................. 17

    A.  THE SPECIAL CIRCUMSTANCES TEST IS AN APPROPRIATE
    BALANCE OF EMPLOYERS' BUSINESS INTERESTS AND
    EMPLOYEES' SECTION 7 RIGHTS ................................................ 17

    B.  TESLA MAY NOT RELY ON FACTUAL CLAIMS AND
    ARGUMENTS IT DID NOT RAISE BELOW ................................. 22

## TABLE OF CONTENTS Cont.

C.  TESLA HAS FAILED TO ESTABLISH THE SPECIAL
CIRCUMSTANCES NECESSARY TO JUSTIFY ITS PROHIBITION OF
CLOTHING ITEMS WITH UNION EMBLEMS OR MESSAGES..................23

　1.　Tesla Has Not Shown That Prohibiting Employees from Wearing
UAW T-Shirts Is Necessary to Prevent Mutilation of Vehicles.......................24

　2.　Tesla Has Not Shown That the Burden of Checking Employee
Clothing for Mutilation Risks Justifies Prohibiting Employees from
Wearing UAW T-Shirts ...................................................................................27

　3.　Tesla Has Not Shown That the Need for Visual Management Justifies
Prohibiting Employees from Wearing UAW T-Shirts ....................................29

D.  THE BOARD'S DECISION IS SUPPORTED BY SUBSTANTIAL
EVIDENCE. .....................................................................................31

CONCLUSION....................................................................................32

CERTIFICATE OF SERVICE ............................................................33

CERTIFICATE OF COMPLIANCE ....................................................34

# TABLE OF AUTHORITIES

## CASES

*American Fed'n of Government Employees*,
  278 NLRB 378 (1986) ...........................................................23

*American Hospital Association v. NLRB*,
  499 U.S. 606 (1991)..............................................................18

*Bell-Atlantic-Pennsylvania*,
  339 NLRB 1084 (2003),
  enf'd *Communications Workers of America, Local 13000 v. NLRB*,
  99 Fed.Appx. 233 (D.C. Cir. 2004) ....................................... 19, 23, 24

*Beth Israel Hospital v. NLRB*,
  437 U.S. 483 (1978)..............................................................18

*Boch Imports*,
  362 NLRB 706 (2015) ............................................. 23, 26, 27

*Consolidated Biscuit Co*,
  346 NLRB 1175 (2006) ........................................................27

*Eckerd's Market, Inc.*,
  183 NLRB 337 (1970) ..........................................................23

*El Paso Elec. Co. v. NLRB*,
  681 F.3d 651 (5th Cir. 2012) ................................................16

*Flex Frac Logistics, L.L.C. v. NLRB*,
  746 F.3d 205 (5th Cir. 2014) .......................................... 16, 17

*Hallmark-Phoenix 3, L.L.C. v. NLRB*,
  820 F.3d 696 (5th Cir. 2016) ................................................22

*Healthbridge Mgmt., LLC*,
  360 NLRB 937 (2014)
  *enforced*, 798 F.3d 1059 (D.C. Cir. 2015)............................23

*In-N-Out Burger, Inc. v. NLRB*,
  894 F.3d 707 (5th Cir. 2018) ........................................ passim

*Litton Financial Printing Division v. NLRB*,
  501 U.S. 190 (1991)..............................................................17

# TABLE OF AUTHORITIES cont.

## CASES cont.

*Medco Health Solutions of Las Vegas, Inc.*,
  364 NLRB 1687 (2016) .........................................................................23

*Merchants Truck Line, Inc. v. NLRB*,
  577 F.2d 1011 (5th Cir. 1978) ..............................................................17

*Murphy Oil USA, Inc. v. NLRB*,
  808 F.3d 1013 (5th Cir. 2015) ..............................................................17

*NLRB v. J. Weingarten, Inc.*,
  420 U.S. 251 (1975) ..............................................................................17

*NLRB v. Kaiser Agricultural Chemicals*,
  473 F.2d 374 (5th Cir. 1973) ................................................................17

*NLRB v. Lighthouse for the Blind*,
  696 F.2d 399 (5th Cir. 1983) ................................................................17

*NLRB v. Ochoa Fertilizer Corp.*,
  368 U.S. 318 (1961) ..............................................................................22

*Noah's New York Bagels*,
  324 NLRB 266 (1997) ...........................................................................19

*Nordstrom, Inc.*,
  264 NLRB 698 (1982) ...........................................................................19

*Pattern Makers' League v. NLRB*,
  473 U.S. 95 (1985) ................................................................................17

*Republic Aluminum Co. v. NLRB*,
  394 F.2d 405 (5th Cir. 1968) ................................................................13

*Republic Aviation Corp. v. NLRB*,
  324 U.S. 793 (1945) ................................................................. 13, 14, 15

*Republic Aviation Corp.*,
  51 NLRB 1187 (1943) ...........................................................................18

*Southwest Merchandising Corp. v. NLRB*,
  53 F.3d 1334 (D.C. Cir. 1995) ..............................................................23

# TABLE OF AUTHORITIES cont.

## CASES cont.

*Tesla, Inc. v. NLRB*,
Case No. 21-60285, 2023 U.S. App. LEXIS 7731 (March 31, 2023) ............... 2, 18

*Tesla, Inc.*,
   370 NLRB No. 88 (2021) ....................................................................................1

*Tesla, Inc.*,
   370 NLRB No. 101 (2021) ........................................................... passim

*Tesla, Inc.*,
   370 NLRB No. 131 (2022) ................................................................................2

*United Parcel Service*,
   312 NLRB 596 (1993) ......................................................................................19

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) .........................................................................................16

## STATUTES

National Labor Relations Act
   Section 7, 29 U.S.C. § 157 ..................................................................... passim
   Section 8(a)(1), 29 U.S.C. § 158(a)(1) ................................................... passim
   Section 8(a)(3), 29 U.S.C. § 158(a)(3) ............................................................2, 6
   Section 10(e), 29 U.S.C. § 160(e) ................................................................ 16, 22

**STATEMENT OF THE CASE**

On October 25, 2017, the UAW filed an unfair labor practice charge alleging that Tesla violated Section 8(a)(1) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1), by restricting employees' ability to wear items with the Union's logo in Tesla facilities.  (ROA.2667-2668)  This was one of eight unfair labor practice charges that Tesla employees and the UAW filed against Tesla between April 2017 and June 2018.  (ROA.6534)

The General Counsel issued several complaints, dated August 31, 2017, and March 30, June 4, and August 23, 2018, which were eventually consolidated into one complaint.  (ROA.6251)  This case was tried in Oakland, California, over the course of 13 days from June to October 2018.  (*Id*.)  On September 27, 2019, Administrative Law Judge Amita B. Tracy issued a proposed decision.  (*Id*.) Following this proposed decision, the Company filed exceptions with the Board.

On February 12, 2021, the NLRB issued a Notice and Invitation to File Briefs regarding the allegations that Tesla had violated Section 8(a)(1) by maintaining and enforcing its work attire "team-wear" policy.  *Tesla, Inc*., 370 NLRB No. 88 (2021).

On March 25, 2021, the NLRB ruled in *Tesla, Inc., 370 NLRB No. 101 (2021) ("Tesla I")* that Tesla committed widespread unfair labor practices in response to its employees' union organizing activities and support for the UAW.

1

(ROA.6522-6576)  The Board reserved decision on the team-wear policy allegations for further consideration and separate decision.  (ROA.6522 n.3)

Tesla subsequently petitioned for review of two of the Board's holdings in *Tesla I*: (1) that it fired Richard Ortiz for his protected concerted activities in violation of Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), and (2) that it violated Section 8(a)(1) when Musk tweeted that Tesla employees would lose their stock options if they unionized.  This court recently rejected both of Tesla's challenges, while granting the Board's cross-petition for enforcement of its *Tesla I* decision, in *Tesla, Inc. v. NLRB*, Case No. 21-60285, 2023 U.S. App. LEXIS 7731 (March 31, 2023).

On August 29, 2022, the NLRB issued its decision in *Tesla, Inc.*, 370 NLRB No. 131 (2022) ("*Tesla II*"), concluding that Tesla violated Section 8(a)(1) of the NLRA by maintaining and enforcing an overly broad work attire policy that prohibited employees from wearing union shirts.  (ROA.6603-6633)  Tesla has brought this petition for review of the Board's decision in *Tesla II*; the NLRB has cross-petitioned to enforce it.

Tesla has not, on the other hand, challenged the Board's decision that it violated the Act in numerous other ways or the findings supporting those rulings. We review the record evidence regarding those violations to provide context for the Board's findings and conclusions that Tesla is challenging in this proceeding.

2

**A.    TESLA WORKERS LAUNCH A UNION ORGANIZING DRIVE TO IMPROVE WORKING CONDITIONS AT THEIR WORKPLACE**

In the summer of 2016, Tesla production employees working at the Company's electric car manufacturing plant in Fremont, California reached out to the UAW in the hope of improving their working conditions through unionization. (ROA.60, 690-691)  These employees were interested in how a union could address widespread employee concerns, such as long hours, lack of safety, preventable injuries, favoritism in promotion, and inadequate compensation. (ROA.59, 690-691, 2917)  A group of Tesla employees established the Volunteer Organizing Committee, or "VOC," a committee of workers at the Tesla Fremont facility who volunteered to lead the organizing effort to bring union representation to Tesla.  (ROA.60, 446-447, 693-694)

**B.    TESLA UNLAWFULLY PROHIBITS EMPLOYEE CONTACT WITH THE MEDIA**

In late September and October 2016, soon after Tesla workers began their organizing efforts, Tesla adopted a mandatory Confidentiality Agreement that all employees were required to sign and that explicitly prohibited them from contacting the media.  (ROA.387, 835, 1186, 2939, 3200, 6523)  It stated:

> Additionally, regardless of whether information has already been made public, *it is never OK to communicate with the media* or someone closely related to the media *about Tesla*, unless you have been specifically authorized in writing to do so.

(ROA.2939, 3200, 6523) (emphasis added)

3

The Board held in *Tesla I* that this policy violated Section 8(a)(1) and ordered the Company to cease and desist from "[m]aintaining a rule that prohibits employee communications with the media protected by the National Labor Relations Act."  (ROA.6523-6526, 6530)  Tesla did not challenge this order.

## C.    TESLA TRIES TO PREVENT ITS EMPLOYEES FROM DISCUSSING JOB SAFETY, LONG HOURS AND LOW PAY

In February 2017, a Tesla employee made the first public call for a union at Tesla by posting an online article titled "Time for Tesla to Listen."  (ROA.704-705, 3779)  In this article, the Tesla employee described how preventable injuries happen too often at the plant and how mandatory overtime and 60-70 hour work weeks have left workers exhausted.  The article went on to note that Tesla production workers earn between $17.00 and $21.00 per hour, when the average auto worker nationally earns $25.58 an hour and a living wage in Alameda County is $28.00 an hour.  (ROA.3779)

Tesla's reaction was swift and negative.  The same day the article was posted, Respondent's security guards repeatedly prohibited Tesla employees from distributing copies of the article to co-workers in the plant parking lot and attempted to eject the Tesla employees handing out the article from the premises. (ROA.6522, 6541-6543)

The Board held that Tesla violated the Act by interfering with employees' efforts to communicate with one another concerning workplace issues and ordered

it to cease and desist from "[m]aintaining and enforcing a rule that prohibits off duty employees from distributing union literature in the Respondent's parking lot." (ROA.6522, 6530)  Tesla did not challenge this order.

In March 2017, a Tesla supervisor announced that passing out union stickers, pamphlets, and leaflets that were not approved by Tesla management would be grounds for discipline and/or termination.  (ROA.6522, 6546)  The *Tesla I* Board found this conduct unlawful,  ordering Tesla to cease "[p]romulgating a rule prohibiting employees from distributing union stickers, leaflets, and pamphlets without first obtaining permission and threatening discipline if they fail to comply."  (ROA.6522, 6530) Tesla did not challenge this order.

## D.    TESLA BANS EMPLOYEES FROM DISTRIBUTING LEAFLETS ABOUT PLANT SAFETY AND INTERROGATES THE TESLA WORKERS WHO RAISED THESE SAFETY ISSUES

In April 2017, concerned about the number of preventable injuries at the plant, two Tesla employees requested the Company's OSHA injury logs. (ROA.862-863, 1055)  Then in May 2017, after analyzing the injury data, a number of Tesla employees distributed leaflets to their co-workers comparing the plant's injury rate to the injury rates at other auto manufacturers.  (ROA.405-46, 2920, 6543-6544)

However, Tesla security guards ordered these employees to stop distributing the leaflets and to leave the premises.  (ROA.416-418, 6522, 6543-6544)

The Board held that this conduct violated the Act, and Tesla did not except to that holding.  (ROA.6522, 6530)

Later the same day, Tesla management called the two employees who had requested the OSHA injury logs and interrogated them about their handling of these documents and whether they had shared them with anyone outside of Tesla. (ROA.6522, 6548-6550)  The Board held this conduct was an unlawful interrogation concerning these employees' protected concerted activities and ordered Tesla to cease and desist "[i]nterrogating employees about their union activities."  (ROA.6522, 6530)  Tesla did not challenge the order.

Tesla subsequently fired one of these two workers, Richard Ortiz, for his responses to its questions during a different interrogation.  The *Tesla I* Board ruled that Tesla had violated Section 8(a)(3) of the Act by discharging Ortiz. (ROA.6522)  This Court upheld the Board's ruling on this point, rejecting Tesla's petition for review.  *Tesla, Inc. v. NLRB*, slip opinion, at *14-17, 2023 U.S. App. LEXIS 7731, at *19-22.

## E.    AFTER TESLA UNLAWFULLY BLOCKS EMPLOYEES FROM DISTRIBUTING UNION LITERATURE AND SPEAKING TO THE MEDIA ABOUT WORKING CONDITIONS, TESLA EMPLOYEES LAUNCH A POPULAR UNION SHIRT CAMPAIGN

In the summer of 2017, as Tesla continued to attack workers' ability to communicate with each other, Tesla employees began distributing black UAW T-shirts to their fellow employees to wear as a sign of their support for the UAW's

organizing drive.  (ROA.63, 201, 549)  These black cotton T-shirts had a small

UAW logo with the employees' union campaign slogan "Driving a Fair Future at

Tesla" on the front and a larger insignia that included the same slogan and "UAW"

in large print on the back.  (ROA.3187, 3189; *See* ROA. 195, 3202)

<div align="center">

ROA.3187, 3189 (front & back)

</div>



These shirts proved to be very popular with employees, with the first

printing of 400 shirts all distributed in one hour outside the plant, followed by

several more printings.  (ROA.63, 549)  One employee testified it was "easier to

pass out [UAW] t-shirts" than UAW stickers, and he passed out stickers less

frequently after the shirts launched.  (ROA.1086-1087)  Numerous Tesla

employees wore the UAW T-shirts while working at the Fremont facility, and the

workers subsequently launched "Union Fridays," which involved employees all

wearing their UAW shirts to the plant every Friday.  (ROA.195, 237-238, 274, 383, 549, 776)

Tesla provides its employees, both in the General Assembly Department and elsewhere in the plant, with "team wear," consisting of black cotton shirts and pants, both with Tesla's logo.[1]  (ROA.1617-1618, 2399, 2436-2437, 2549-2550, 3214, 3216, 4744-4748)  These team-wear shirts are not all identical, but instead undergo periodic updates.  (ROA.2568-2569)

<u>ROA.3214-3216 (front and back)</u>



---

[1] There are a few exceptions to this otherwise uniform rule.  Supervisors in General Assembly wear red Tesla shirts and black Tesla pants, while line inspectors wear white Tesla shirts and black Tesla pants.  (ROA.1392-1393, 1617-1618, 2424)  However, General Assembly supervisors also sometimes wore black shirts. (ROA.2431)

ROA.4744-4746 (front and back)



ROA.4747-4748 (front and back)



While Tesla's "General Assembly Expectations" stated that "[t]eam wear is mandatory for all team members and leads," that policy was not enforced by Tesla

9

prior to August 2017.[2]  (ROA.252, 308, 341, 2570-2571, 4927-4928, 6555)

Employees in Tesla's General Assembly department also regularly wore non-Tesla

shirts that were not black and had logos and emblems unrelated to Tesla prior to

August 2017.  (ROA.200, 252-253, 309-310, 342-343, 6555)

## F.    TESLA STARTS BARRING EMPLOYEES FROM WEARING UAW T-SHIRTS AND SANCTIONING THOSE EMPLOYEES WHO DID

Beginning in August 2017, Tesla began to strictly enforce its uniform policy.

(ROA.197-198, 307, 311, 339, 2551-2552, 2570-2571, 3834)  Supervisors and

managers began inspecting General Assembly employees' work attire during

startup meetings and "walked the line" to ensure compliance with the team-wear

policy.  (ROA.1653, 6555)  Employees out of compliance with this team-wear

policy could receive a coaching or be sent home, losing a day's pay.  (ROA.198,

311-312, 1673, 2552, 2566, 6555)

On August 10, 2017, General Assembly employee Jayson Henry was

wearing the black UAW shirt when an unidentified production supervisor told

Henry that he would be sent home if he wore the union shirt again.  (ROA.197-

199, 217)  When Henry asked to see Tesla's dress code, Associate Production

---

[2] The Administrative Law Judge did not find credible one Tesla witness who stated that enforcement of the team wear rule began before August, because that testimony was uncorroborated and contradicted credible testimony by other Tesla witnesses.  (ROA.6555)

Manager Topa Ogunniyi gave him a copy of the "General Assembly Expectations." (ROA.198)

Later that day, Supervisor Kyle Martin asked Ogunniyi how many associates on her line were wearing UAW shirts that day.  Ogunniyi responded that only Henry was.  (ROA.1656, 1665-1666, 1678-1680, 2579, 3834, 6555)

That same day, production associate Sean Jones also wore a black UAW shirt to work.  (ROA. 307-308, 3202)  Supervisor Timothy Fenelon told Jones that he would be sent home if he did not change out of the union shirt because it did not comply with the Respondent's team-wear policy; Fenelon went on to tell Jones that shirts with emblems were not permitted "anymore."  (ROA.307-308, 2430, 2439, 3202, 6555)  Jones protested but ultimately changed his shirt.  (ROA.308, 318, 2430)

Later that day, Jones complained to Ogunniyi about his treatment at the hands of Fenelon.  Ogunniyi confirmed that the team-wear policy had changed and that employees could no longer wear shirts with emblems.  (ROA.308-309)

Later in August, Ogunniyi and Fenelon held a meeting regarding the team-wear rule with 25 to 30 employees who worked that shift on final line in General Assembly.  (ROA.311, 6556)  Ogunniyi informed employees that no one could be out of "uniform" and everyone must wear assigned team wear or be sent home.  (ROA.312, 344, 6556)

Despite its strict enforcement of the team-wear policy against employees wearing UAW T-shirts, Tesla supervisors and managers allowed General Assembly employees to wear plain black cotton shirts instead of team-wear shirts or to cover non-Tesla logos and emblems on black shirts with black mutilation-protection tape.  (ROA.2399, 2432, 2437, 2559-2560, 2564)  The Company clarified this exception in writing in October 2017, when it updated its "General Assembly Expectations" to state:

> Team Wear: It is mandatory that all Production Associates and Leads wear the assigned team wear.
>
> - On occasion, team wear may be substituted with all black clothing if approved by supervisor.
>
> - Alternative clothing must be mutilation free, work appropriate and pose no safety risks (no zippers, yoga pants, hoodies with hood up, etc.).

(ROA.3208, 4931-32; *See* ROA.1404-05, 1407, 6554)  UAW T-shirts, on the other hand, continued to be banned.  (ROA.1408)

## SUMMARY OF ARGUMENT

Tesla asks this Court to overturn the Board's ruling that it violated its employees' rights under Section 8(a)(1) of the National Labor Relations Act by maintaining and enforcing a team-wear policy that prohibited them from wearing T-shirts with UAW emblems and messages.  It bases this request on arguments it

never raised below, factual claims with no basis in the record, and an interpretation of the Act at odds with more than 75 years of NLRB and judicial precedents.

Those precedents concern one of the bedrock rights employees enjoy under the Act—the right to express their support for a union's organizing drive and demonstrate their solidarity with other employees by wearing union insignia in the workplace.  As the Supreme Court took pains to emphasize in *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945), a rule that bars employees from communicating with one another about their rights violates Section 8(a)(1), even if that rule is neutral on its face and has been applied in an even-handed fashion, *Id*. at 805, unless the employer can prove that special circumstances justify the interference in this particular case.  *Id*. at 801, 805.

Tesla cannot establish the existence of special circumstances in this case. Its brief illustrates, in fact, just how threadbare its arguments are.

Tesla argues, for example, that the fact that workers could have attached stickers to their shirts makes up for the fact that Tesla would not allow them to wear UAW T-shirts.  This argument is not only contrary to more than 50 years of established precedent, *see*, *e.g.*, *Republic Aluminum Co. v. NLRB*, 394 F.2d 405, 408 (5th Cir. 1968), but at odds with Tesla's own conduct, since it also tried to bar employees from distributing stickers without Company approval.  Tesla has not challenged the portion of the Board's decision in *Tesla I* finding that it violated the

Act by threatening employees with discipline for distributing unauthorized stickers and ordering it to stop doing so.

Tesla's stickers argument is also inconsistent with its original justification for banning UAW T-shirts—that UAW T-shirts posed an unacceptable risk of mutilation or damage to its vehicles—since an adhesive sticker attached to a shirt presents more risk of damage than a shirt alone would, whether it is a Tesla-issued shirt, a plain black shirt allowed under the team-wear policy, or a UAW T-shirt with a pro-union message.

Tesla never could produce any evidence, in any event, that any shirt had ever caused any damage to any of its vehicles.  Tesla insists, however, that it is enough that it now says that it believed they might, even though there is not a scintilla of evidence to support that belief.  Tesla is, once again, wrong as a matter of law. *Republic Aviation*, 324 U.S. at 805 (nondiscriminatory policy adopted years before union organizing campaign was nonetheless unlawful).

Tesla also argues that banning UAW T-shirts facilitates its job of distinguishing between shirts that pose a risk of damage and those that do not. This argument rests, however, on a demonstrably false premise: that identical cotton UAW shirts cause delay or burden to supervisors' thorough team-wear checks.  The record, in fact, demonstrates that "team wear" includes multiple varieties of Tesla shirts, each with a different color Tesla logo, and that Tesla supervisors, regardless

14

of the presence of UAW shirts, conduct thorough checks of all employees' clothing for mutilation risks.

Finally, Tesla claims that it needs to bar its employees from wearing UAW T-shirts, rather than Tesla-issued shirts, in order to distinguish General Assembly Department production employees from employees in other departments and classifications. This argument simply does not make sense, even on its own terms, since Tesla issues its black Tesla "team wear" shirts to *all* employees, working in *all* departments. The patent falsity of this proffered justification casts a long shadow over all of Tesla's after-the-fact and untimely defenses.

These supposed special circumstances could not, in any case, possibly justify Tesla's prohibition of clothing with union insignia, even if they were supported by the record and were not so transparently false. The Board has properly held that employees' Section 7 right to communicate their support for union organizing and to express solidarity with one another is too important to be overridden by the rationales offered by Tesla.

Unable to establish any special circumstances that would distinguish it from other employers who have violated the Act by interfering with their employees' rights, Tesla instead spends most of its brief asking this Court to overturn *Republic Aviation* and the cases following it. But as the General Counsel's brief to this Court persuasively argues, Tesla's attempts to undo the special circumstances

15

standard only serve to expose the weakness of its case. Its petition for review

should be denied, and the Court should grant the Board's cross-petition for

enforcement of its *Tesla II* decision.

## STANDARD OF REVIEW

This Court reviews the NLRB's factual findings under a substantial evidence

standard. *Flex Frac Logistics, L.L.C. v. NLRB,* 746 F.3d 205, 207 (5th Cir. 2014);

29 U.S.C. § 160(f) ("the findings of the Board with respect to questions of fact if

supported by substantial evidence on the record considered as a whole shall ... be

conclusive"). Substantial evidence is "that which is relevant and sufficient for a

reasonable mind to accept as adequate to support a conclusion. It is more than a

mere scintilla, and less than a preponderance." *El Paso Elec. Co. v. NLRB,* 681

F.3d 651, 656 (5th Cir. 2012). In making this determination, the court "may not

reweigh the evidence, try the case de novo, or substitute our judgment for that of

the NLRB, even if the evidence preponderates against the NLRB's decision." *Flex*

*Frac Logistics,* 746 F.3d at 208; *see also Universal Camera Corp. v. NLRB*, 340

U.S. 474, 488 (1951) (reviewing court engaged in substantial evidence review will

not "displace the Board's choice between two fairly conflicting views" of the

evidence, "even though the court would justifiably have made a different choice

had the matter been before it de novo"). "Only in the most rare and unusual cases

will an appellate court conclude that a finding of fact made by the [NLRB] is not

supported by substantial evidence." *Flex Frac Logistics,* 746 F.3d at 208 (citing

*Merchants Truck Line, Inc. v. NLRB*, 577 F.2d 1011, 1014 n. 3 (5th Cir. 1978)).

This court reviews the Board's legal conclusions *de novo*, but "will enforce

the Board's order if its construction of the statute is reasonably defensible."

*Murphy Oil USA, Inc. v. NLRB,* 808 F.3d 1013, 1017 (5th Cir. 2015); *Pattern*

*Makers' League v. NLRB*, 473 U.S. 95, 114 (1985).  The Court gives the greatest

deference to the Board when its decision reflects its "'difficult and delicate

responsibility' of reconciling conflicting interests of labor and management."

*Litton Financial Printing Division v. NLRB*, 501 U.S. 190, 201 (1991) quoting

*NLRB v. J. Weingarten, Inc*., 420 U.S. 251, 267 (1975); *In-N-Out Burger, Inc. v.*

*NLRB*, 894 F.3d 707, 714 (5th Cir. 2018); *NLRB v. Lighthouse for the Blind*, 696

F.2d 399, 407 n.26 (5th Cir. 1983).  Furthermore, the Board's choice of remedy

"must be upheld unless it can be shown that the board either abused its discretion

or exceeded its statutory authority." *NLRB v. Kaiser Agricultural Chemicals*, 473

F.2d 374, 382 (5th Cir. 1973).

### ARGUMENT

**A.    THE SPECIAL CIRCUMSTANCES TEST IS AN APPROPRIATE BALANCE OF EMPLOYERS' BUSINESS INTERESTS AND EMPLOYEES' SECTION 7 RIGHTS**

As this Court noted less than a month ago, in upholding the NLRB's decision

that Tesla violated the Act by discharging Union activist Richard Ortiz and by

threatening to exclude employees from its stock ownership plan, the Courts "give significant deference to the Board's application of the law to the facts." *Tesla, Inc.*, *slip opinion*, at \*9, 2023 U.S. App. LEXIS 7731, at \*12. This case is no exception.

We begin, as we must, with the employee rights at stake here. Section 7 of the NLRA guarantees employees the right to engage in "self-organization, [and] to form, join, or assist labor organizations." 29 U.S.C. § 157. "The central purpose of the Act [is] to protect and facilitate employees' opportunity to organize unions to represent them in collective-bargaining negotiations." *American Hospital Association v. NLRB*, 499 U.S. 606, 609 (1991). "[T]he right of employees to self organize and bargain collectively . . . necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite." *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 491 (1978). Accordingly, the Act has long been understood to protect "the right of employees to wear union insignia at work," as it "has long been recognized as a reasonable and legitimate form of union activity." *Republic Aviation*, 324 U.S. at 802 n.7 (quoting *Republic Aviation Corp.*, 51 NLRB 1187, 1188 (1943)).

Section 8(a)(1) makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in Section 7. 29 U.S.C. § 158(a)(1). "In the absence of 'special circumstances,' the prohibition by an employer against the wearing of union

insignia violates Section 8(a)(1) of the Act." *United Parcel Service*, 312 NLRB 596, 597 (1993).

Application of the "special circumstances" test "turn[s] on fine distinctions based on a balancing of respective statutory interests and on unique factual circumstances." *Bell-Atlantic-Pennsylvania*, 339 NLRB 1084, 1086 (2003), enf'd *Communications Workers of America, Local 13000 v. NLRB*, 99 Fed.Appx. 233 (D.C. Cir. 2004). Thus, to determine whether "special circumstances" justify prohibiting employees from wearing union insignia, "the entire circumstance of a particular situation must be examined to balance the potentially conflicting interests of an employee's right to display union insignia and an employer's right to limit or prohibit such display." *Nordstrom, Inc*., 264 NLRB 698, 700 (1982). By focusing on the context in which employees display union insignia, the special circumstances test gives employers an opportunity to advance legitimate justifications for limiting displays of insignia. See *Noah's New York Bagels*, 324 NLRB 266, 275 (1997) (finding that "special circumstances" justified prohibiting the wearing of a "mocking" t-shirt).

Tesla was given that opportunity in this case but failed. All of the "special circumstances" it has proposed turn out, on closer inspection, to be either wholly unsupported—such as its claim that UAW T-shirts pose a threat to its cars—or at odds with the record evidence—such as its claim that it is somehow harder to

check employees for the risk of damaging its vehicles if they wear UAW T-shirts—or so far-fetched as to refute themselves—such as its argument that UAW T-shirts make it harder to identify which department an employee belongs to, even though it allows employees in all departments to wear the same Tesla team-wear shirts.

In fact, the record evidence shows that Tesla reacted to *any* sign of union organizing or criticism of working conditions within its plant by trying to suppress both the speech and the speakers, whether that meant expelling leafletters from its parking lot or interrogating the employees it assumed were publicizing the poor safety conditions in its plant.  Its insistence on banning UAW T-shirts is of a piece with its overall hostility to any messages favoring unions or criticizing the Company's practices.

Unable to establish the special circumstances required to justify its ban on shirts with emblems or messages, Tesla's only recourse is to argue for a change in the Board's and courts' long-standing approach, while hoping its failure to present evidence to support its claims will be overlooked.  But Tesla does not offer any coherent alternative, other than to suggest that its interests should be given primacy and that it should decide how employees may express their support for the UAW's efforts to organize them.

Tesla argues, for example, that it should be allowed to prohibit employees from wearing UAW T-shirts because it permits them to wear pro-union stickers. Putting aside the fact that Tesla at one point also prohibited employees from wearing unauthorized stickers, Tesla's argument simply does not make sense. Rather than judging Tesla's ban on UAW T-shirts based on a careful examination of the facts relating to the explanations Tesla has offered for the policy, as the Board's special circumstances test requires, Tesla's approach would instead shift our attention to Tesla's other policies, requiring us to compare the communicative values of stickers and t-shirts, and then decide whether that represented a fair trade.

As the NLRB's brief convincingly explains, this test is both impossible to apply and at odds with fundamental principles of Board law.  There is, for example, no way to objectively measure the difference between the value of stickers and t-shirts, much less decide when the value of one is enough to justify banning the other.  And the fact that Tesla may allow some other forms of employee communication does not give Tesla the right to impose a prohibition on UAW shirts that it could not justify on its own terms—despite being given the opportunity to present any evidence it had to make that defense.

The Board and the Supreme Court rejected that upside-down view of how Section 7 rights should be balanced against employer interests more than 75 years

ago.  *Republic Aluminum*, 394 F.2d at 408 (explicating *Republic Aviation* on this point).  This Court must reject it as well.

## B.    TESLA MAY NOT RELY ON FACTUAL CLAIMS AND ARGUMENTS IT DID NOT RAISE BELOW

Section 10(e) of the NLRA, 29 U.S.C. § 160(e), precludes a reviewing court from considering an objection that has not been urged before the Board, "unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."  *NLRB v. Ochoa Fertilizer Corp.*, 368 U.S. 318, 322 (1961).

Tesla has not even tried to make that showing of "extraordinary circumstances."  Section 10(e) bars this Court from even considering, much less giving any weight to, Tesla's untimely claims (1) that it should be judged under the standards applied to employers in very different industries, such as fast food restaurants, despite the vast differences between the facts in those cases and the facts in this one, or (2) that its uniform policy "fosters discipline, promotes uniformity, [and] encourages esprit de corps…"  *Hallmark-Phoenix 3, L.L.C. v. NLRB*, 820 F.3d 696, 712-13 (5th Cir. 2016) ("The Court need not—and, in fact, cannot—consider any of the above-listed arguments, however, because Hallmark waived these arguments by not making them before the Board.").[3]

---

[3]These newly-minted rationales would raise grave doubts about the other justifications that Tesla has offered in this case if they were not barred by Section 10(e).  Like the employer that offers first one, then another, and then yet another reason for firing a union activist, Tesla's constantly shifting and sometimes

**C.    TESLA HAS FAILED TO ESTABLISH THE SPECIAL CIRCUMSTANCES NECESSARY TO JUSTIFY ITS PROHIBITION OF CLOTHING ITEMS WITH UNION EMBLEMS OR MESSAGES.**

Under the special circumstances test, the employer must put forth "specific, non-speculative evidence" of the adverse effects it claims justify its restriction.  *In-N-Out Burger*, 894 F.3d at 718, citing *Medco Health Solutions of Las Vegas, Inc.*, 364 NLRB 1687, 1690-1691, n.6 (2016); *American Fed'n of Government Employees*, 278 NLRB 378, 385 (1986).  Conjecture, conclusory assertions, and generalizations do not suffice under this standard.  *In-N-Out Burger*, 894 F.3d at 718; *Healthbridge Mgmt., LLC*, 360 NLRB 937, 938, n.5 (2014) ("The Board has consistently held that an employer who presents only generalized speculation or subjective belief . . . fails to establish special circumstances justifying a ban on union insignia."), *enforced*, 798 F.3d 1059 (D.C. Cir. 2015); *Eckerd's Market, Inc.*, 183 NLRB 337, 338 (1970) ("vague, general evidence" is insufficient).

Even if an employer demonstrates an otherwise sufficient interest in restricting its employees' right to wear union insignia, "a rule doing so is unlawful unless the employer also shows that it is 'narrowly tailored to the special circumstances justifying [its] maintenance.'"  *In-N-Out Burger*, 894 F.3d at 718, citing *Boch Imports*, 362 NLRB 706, 707 (2015); *Bell-Atlantic, Inc.*, 339 NLRB at

---

contradictory explanations are telling evidence that none of them are legitimate. *Southwest Merchandising Corp. v. NLRB*, 53 F.3d 1334, 1344 (D.C. Cir. 1995).

1086.  Under this rubric, "wholesale or 'blanket' bans are rarely, if ever, lawful." *In-N-Out Burger*, 894 F.3d at 718.

The Board has recognized a limited number of special circumstances that may justify the prohibition of union insignia.  *Id.*; *Bell-Atlantic*, 339 NLRB at 1086.  These include when a union insignia's display would (1) "jeopardize employee safety"; (2) "damage machinery or products"; (3) "exacerbate employee dissension"; or (4) "unreasonably interfere with a public image that the employer has established, as part of its business plan, through appearance rules for its employees."  *In-N-Out Burger*, 894 F.3d at 718.  Tesla has not offered the specific, non-speculative evidence required to establish any of these.

Tesla has suggested three possible special circumstances to justify its interference with employee rights: (1) prevention of mutilation to the vehicles, (2) easing the burden of checking whether clothing is a mutilation risk, and (3) distinguishing General Assembly employees from others.  None of these have merit.

### 1.    <u>Tesla Has Not Shown That Prohibiting Employees from Wearing UAW T-Shirts Is Necessary to Prevent Mutilation of Vehicles</u>

The Board properly held that Tesla's need to lower the risk of damage, or "mutilation," to its product did not constitute a narrowly tailored special circumstance justifying interfering with employee rights.  (ROA.6620)  The Company has not only failed to point to any evidence demonstrating that the UAW

T-shirts create a risk of vehicle damage, but has not disputed the extensive evidence—much of it from its own witnesses—that refutes that argument.

Tesla's own witnesses listed numerous possible causes of mutilation, yet never cited UAW T-shirts.  Tesla Senior Manager Mario Penera testified that damage to vehicles occurred due to "equipment and tools, … parts themselves, … and then also things that people may have on them, [like] rings, watches, pants that have rivets on them, keys hanging from their belt loop, bulky, sharp things in their pockets."  (ROA.1394)  When asked whether there were any other reasons he could think of, Penera testified "no."  (*Id*.)

Tesla Production Manager Kyle Martin testified that causes of mutilation included "too many things in your apron pockets, if you have a tool sticking out of your back pocket," "jeans [that] have the rivets on them," T-shirts with "raised emblems on them…like the Gucci shirts," tools that lack covering, belts, rings, and watches.  (ROA.1619-1620)  Martin further testified that the Company conducted an audit in 2017 of what was causing damage to the seats.  (ROA.1658)  This audit concluded that the causes of seat damage were: tools without proper covering, "the behavior of associates getting in and out of cars, if they had tools in their pocket," a "plastic spoon" used by associates to install trim pieces, and "rivets on the jeans brushing up against the seat."  (ROA.1659)

Missing from both Penera and Martin's long lists of mutilation causes is any mention of UAW T-shirts or even other soft fabric items.[4]  This should not come as a surprise, considering that both the Tesla-approved team-wear shirts and the UAW shirts are made of the exact same material—cotton.  (ROA.196, 338, 1390, 1620)

Tesla's focus on damage caused by shirts with raised metal logos is perplexing, since UAW T-shirts do not have them, or rivets, or zippers or any other features that might mar a vehicle.  Multiple credited witnesses testified, in fact, that UAW T-shirts did not contain any material that could scratch or harm the vehicles manufactured at the Fremont facility.  (ROA.196, 198, 306, 338-339)  Tesla witnesses either did not know of any car damage linked to the UAW T-shirts (ROA.1416-1417), or admitted the UAW shirt does not pose a mutilation risk. (ROA.2565)  That detailed evidence aligns with Tesla's concession that a black cotton t-shirt alone had never caused damage to a Tesla car.  (ROA.2441-2442, 2572)

Furthermore, the Board's application of the special circumstances test to potential product damage in this case matches its treatment of the justification in other cases.  In *Boch Imports*, the Board held a prohibition against union pins worn

---

[4] Tesla further offered numerous documents related to its seat mutilation audit, none of which contain any reference to damage from UAW T-shirts. (ROA.4962-4963, 4967-4991)

by vehicle repair employees to be unlawful, because, even though the record contained evidence of employees causing damage to vehicles, "none of that damage was shown or even asserted to be related to employee pins." 362 NLRB at 707. On the other hand, the Board has found that special circumstances exist where the employer provided evidence of a specific product damage risk. *Consolidated Biscuit Co*, 346 NLRB 1175 (2006) (special circumstances existed where ink from pro-union marker messages on employees' arms could contaminate food products).

The only actual difference between the Tesla-issued team-wear shirts and the UAW shirts—each logo's message—is not a justification for a prohibition; on the contrary, it is what makes the UAW T-Shirts protected under the Act. Far from being narrowly tailored to avoid interfering with employees' Section 7 rights, Tesla's ban on clothing items with emblems or messages runs headlong into it.

### 2.    Tesla Has Not Shown That the Burden of Checking Employee Clothing for Mutilation Risks Justifies Prohibiting Employees from Wearing UAW T-Shirts

The Board properly held that Tesla failed to establish that allowing employees to wear UAW shirts creates an additional burden when screening employees for mutilation risks, much less one so significant as to justify banning them. (ROA.6620-6621 n.43) While Tesla relies on the speculative testimony of a

27

single manager, substantial record evidence supports the Board's holding to the contrary.

Tesla witnesses explained that they would inspect employees for team wear compliance each day during startup meetings and by walking the line. (ROA.1653 (Martin), 2535 (Ogunniyi)) One supervisor explained what she was doing during the time spent on these checks, saying she would "shake the hand of every single one of my associates. And during that time I was auditing for teamwear." (ROA.2425-2426 (Ogunniyi))

Significantly, the team-wear shirts are not all identical, but were regularly updated with different versions, sizes, and colors of Tesla's logo. (*Compare* ROA.3214-3216 (front and back) *with* ROA.4744-4746 (front and back) *with* ROA.4747-4748 (front and back). *See also* ROA.1415, 2568-2569, 2587) In addition, Tesla allows employees to substitute their own plain black shirts for the Tesla-supplied one in some circumstances (ROA.1401-02, 3208, 4932), requiring, in theory at least, individualized inspection of each such shirt for dangerous features. By comparison, only one UAW shirt existed. (ROA.3187-3189 (front and back), 3202)

Thus, the team-wear compliance check, even without UAW shirts, involves visually identifying multiple Tesla shirts with different-color logos, along with plain black shirts, during a careful walkthrough. Allowing employees to also wear

28

one identical black UAW shirt would not slow down this process or impose any measurable additional burden on the supervisor.

Moreover, Penera's generalized speculation that prohibiting UAW shirts sped up team wear checks lacked any objective support. Employees' Section 7 rights cannot be restricted based on mere conjecture. *See In-N-Out Burger*, 894 F.3d at 718.

### 3.   Tesla Has Not Shown That the Need for Visual Management Justifies Prohibiting Employees from Wearing UAW T-Shirts

The Board also properly held that quickly distinguishing General Assembly employees from others did not constitute a special circumstance justifying the restriction of employee rights, because, even assuming this constituted a legitimate interest, the team-wear policy was not narrowly tailored to address that interest. (ROA.6620-6621)  Here again, the record evidence not only does not support Tesla's special circumstances argument, it conclusively refutes the argument.

Contrary to Tesla's statements to this Court (Tesla.14, 49), Tesla-issued team-wear shirts are not unique to General Assembly.  On the contrary, the record shows that shirts were issued to and worn by employees all across the Fremont facility and available for purchase at the Company store.  One employee, when asked how he knew employees outside General Assembly were issued team wear, responded, "I see it…everyone wears Tesla stuff the majority of the time that I was there."  (ROA.213-214 (Henry))  In addition, Tesla Material Handler Branton

29

Phillips (ROA.394) testified he normally wore his Tesla shirt and pants, which were "part of the uniforms that are given to you by Tesla," to work. (ROA.407) Yet amazingly, Penera cited Material Handlers, a non-General Assembly position that will occasionally "step into the line" in General Assembly, as an example of when team wear is necessary to visually distinguish General Assembly employees from other employees. (ROA.1399)

Tesla's asserted concern with visually determining whether hundreds of employees wearing UAW shirts are properly in General Assembly is directly contradicted by the *thousands* of Tesla team-wear shirts it distributes to every employee across every department. If visual management were an actual concern, the Company would assign a unique shirt for General Assembly, as well as for each other department. But it does not.

The record evidence of what Tesla actually said and did at the time exposes this argument for what it is: a post-hoc rationalization, rather than a genuine concern. Tesla's documentary evidence repeatedly references mutilation as the justification for team wear, but not once do these documents reference visual management. (ROA.4927-4928, 4932, 4962, 4968, 4989) The General Assembly Expectations, for example, state, "Alternative clothing must be mutilation free, work appropriate and pose no safety risks (no zippers, yoga pants, hoodies with hood up, etc.)." (ROA.4932) They do not mention the importance of wearing a

distinct black shirt that allows managers to tell General Assembly associates apart from other associates or visitors.

Nor did Tesla put anything in the record to support its speculation that team wear could assist during evacuations. On the contrary, the evidence refutes that claim. As discussed above, the team wear-compliant shirts are not unique to General Assembly. Nor does each department have its own specific shirt; as a result, a person wearing a Tesla team-wear shirt might work in any part of the plant.

The more justifications Tesla offered, the weaker all of them proved to be. Substantial evidence supports the Board's finding that the team-wear policy is not narrowly tailored to address Tesla's claimed interest in visual management. (ROA.6621 n.44)

## D. THE BOARD'S DECISION IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

The Board's application of the special circumstances test, "if supported by substantial evidence on the record as a whole, must be enforced." *In-N-Out Burger*, 894 F.3d at 715-16. While the fact that the law properly places the burden on the employer to offer specific, non-speculative evidence to support its claims of special circumstances may lead us to focus on the evidence that *isn't* there, the record in this case also presents abundant evidence, much of it uncontested, that shows that Tesla's proffered justifications for its ban on UAW T-shirts were neither

genuine nor sufficient grounds to deny employees their Section 7 right to communicate with each other. The Board's decision rests on substantial evidence. *Universal Camera*, 340 U.S. at 488.

## CONCLUSION

For all the reasons set forth above, Tesla's petition for review should be denied and the National Labor Relations Board's petition for enforcement should be granted.

Dated: April 19, 2023

<div style="margin-left:40%">

SCHWARTZ, STEINSAPIR,
DOHRMANN & SOMMERS LLP
DANIEL E. CURRY
MARGO A. FEINBERG


By ___*/s/ Daniel E. Curry*_____
DANIEL E. CURRY
Attorneys for Intervenor
INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, AFL-CIO
(UAW)

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on April 19, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify further that the foregoing document was served on all parties or their counsel of record through the appellate CM/ECF system.

Executed on April 19, 2023 at Los Angeles, California.

*/s/ Daniel E. Curry*
DANIEL E. CURRY

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limit of FED. R. APP. P.

32(A)(7)(B) because this brief contains 6854 words in total.

2. This brief also complies with the typeface requirements of FED. R. APP. P.

32(a)(5), and 5th CIR. R32.1 and the type-style requirements of FED. R. APP. P.

32(a)(6) because: this document has been prepared in a proportionally spaced

typeface using Microsoft Office 2019 in Times Roman Numeral font size 14.

DATED: April 19, 2023

<div style="margin-left:40%">

SCHWARTZ, STEINSAPIR, DOHRMANN
   & SOMMERS LLP
MARGO A. FEINBERG
DANIEL E. CURRY

By    */s/Daniel E. Curry*
          DANIEL E. CURRY
       Attorneys for Intervenor
INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
  AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, AFL-CIO
           (UAW)

</div>

34