

United States Government

**NATIONAL LABOR RELATIONS BOARD**

**OFFICE OF THE GENERAL COUNSEL**

Washington, D.C.  20570

August 16, 2023

Lyle W. Cayce
Clerk of the Court
United States Court of Appeals
 for the Fifth Circuit
600 South Maestri Place
New Orleans, LA  70130

Re:     *Tesla, Inc. v. NLRB*, 5th Cir. No. 22-60493

Citation to Supplemental Authority Pursuant to Federal Rule of
Appellate Procedure 28(j) and Fifth Circuit Rule 28.4

Dear Mr. Cayce:

In their briefs, Tesla and amicus Associated Builders and Contractors relied
on the Board's decision in *Boeing Co.*, 365 NLRB No. 154 (2017).  (Tesla
Opening Br. 8, 18, 32; Tesla Reply Br. 20; ABC Br. 7, 12-15.)  I write to inform
the Court that the Board (Chairman McFerran and Members Wilcox and Prouty;
Member Kaplan, dissenting) overruled *Boeing* in *Stericycle, Inc.*, 372 NLRB No.
113 (Aug. 2, 2023).  The Board specified that its decision in *Stericycle* "does not
disturb the Board's long-established doctrines covering work rules that address
union (or other protected) solicitation, distribution, or insignia," including the
special-circumstances test it applied in this case.  372 NLRB No. 113, slip op. at 3
& n.6.

Respectfully submitted,

/s/ Ruth E. Burdick_____
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD

1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Enclosure
cc: All counsel (via CM/ECF)

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| TESLA, INCORPORATED, | ) | No. 22-60493 |
| | ) | |
| Petitioner/Cross-Respondent | ) | |
| | ) | Board Case Nos. |
| v. | ) | 32-CA-197020, et al. |
| | ) | |
| NATIONAL LABOR RELATIONS BOARD, | ) | |
| | ) | |
| Respondent/Cross-Petitioner | ) | |

## CERTIFICATE OF COMPLIANCE

The Board certifies that the body of its letter contains 115 words of proportionally spaced, 14-point type, and the word-processing system used was Microsoft Word for Office 365.

s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC  20570
(202) 273-2960

Dated at Washington, DC
this 16th day of August 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| TESLA, INCORPORATED, | ) | No. 22-60493 |
| | ) | |
| Petitioner/Cross-Respondent | ) | |
| | ) | Board Case Nos. |
| v. | ) | 32-CA-197020, et al. |
| | ) | |
| NATIONAL LABOR RELATIONS BOARD, | ) | |
| | ) | |
| Respondent/Cross-Petitioner | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system.  I certify further that the foregoing document was served on all parties or their counsel of record through the appellate CM/ECF system.

s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC  20570
(202) 273-2960

Dated at Washington, DC
this 16th day of August 2023

*NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.*

**Stericycle, Inc. *and* Teamsters Local 628.** Cases 04–CA–137660, 04–CA–145466, 04–CA–158277, and 04–CA–160621

August 2, 2023

### DECISION AND ORDER REMANDING

By Chairman McFerran and Members Kaplan, Wilcox, and Prouty

Today, after previously issuing a notice and invitation for briefing, we adopt a new legal standard to decide whether an employer's work rule that does not expressly restrict employees' protected concerted activity under Section 7 of the National Labor Relations Act (Act) is facially unlawful under Section 8(a)(1) of the Act. Here, an administrative law judge found that the Respondent violated Section 8(a)(1) by maintaining certain rules for its employees that addressed personal conduct, conflicts of interest, and confidentiality of harassment complaints.[1] In making those findings, the judge applied the standard established by a divided Board in *Boeing Co.*, 365 NLRB No. 154 (2017), which sua sponte reversed the standard announced in *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004).

Given the ubiquity of work rules and the importance of ensuring that such rules do not operate to undermine employees' exercise of their rights under the Act, we sought public input on the standard adopted in *Boeing*, then purportedly clarified in *LA Specialty Produce Co.*, 368 NLRB No. 93 (2019), and applied in subsequent cases where the Board found that several types of work rules were categorically lawful for employers to maintain, essentially without regard to how the particular rules were drafted.

Accordingly, we invited the parties and interested amici to address the following questions:

1. Should the Board continue to adhere to the standard adopted in *Boeing Co.*, 365 NLRB No. 154 (2017), and revised in *LA Specialty Produce Co.*, 368 NLRB No. 93 (2019)?

2. In what respects, if any, should the Board modify existing law addressing the maintenance of employer work rules to better ensure that:

a. the Board interprets work rules in a way that accounts for the economic dependence of employees on their employers and the related potential for a work rule to chill the exercise of Section 7 rights by employees;

b. the Board properly allocates the burden of proof in cases challenging an employer's maintenance of a work rule under Section 8(a)(1); and

c. the Board appropriately balances employees' rights under Section 7 and employers' legitimate business interests?

3. Should the Board continue to hold that certain categories of work rules—such as investigative-confidentiality rules as addressed in *Apogee Retail LLC d/b/a Unique Thrift Store*, 368 NLRB No. 144 (2019), non-disparagement rules as addressed in *Motor City Pawn Brokers*, 369 NLRB No. 132 (2020), and rules prohibiting outside employment as addressed in *Nicholson Terminal & Dock Co.*, 369 NLRB No. 147 (2020), and *G&E Real Estate Management Services d/b/a Newmark Grubb Knight Frank*, 369 NLRB No. 121 (2020)—are always lawful to maintain?

*Stericycle, Inc.*, 371 NLRB No. 48, slip op. at 1–2 (2022).

Having carefully considered the briefs of the parties and amici, as well as the Board's past experiences regarding these issues and the view of our dissenting colleague, we have decided to adopt an approach to assessing facial challenges to employer work rules under Section 8(a)(1) that builds on and revises the *Lutheran Heritage* standard. As we will explain, the primary problem with the standard from *Boeing* and *LA Specialty Produce* is that it permits employers to adopt overbroad work rules that chill employees' exercise of their rights under Section 7 of the Act, which include the "right to self-organization, to form, join, or assist labor organizations, to bargain collectively . . . , and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. To begin, the current standard fails to account for the economic dependency of employees on their employers. Because employees are typically (and understandably) anxious to avoid discharge or discipline, they are reasonably inclined both to construe an ambiguous work rule to prohibit statutorily protected activities and to avoid the risk of violating the rule by engaging in such activity. In turn, *Boeing* gives too little weight to the burden a work rule could impose on employees' Section 7 rights. At the same time, *Boeing*'s purported balancing test gives too much weight to employer interests. Crucially, *Boeing* also condones overbroad work rules by not requiring the party drafting the work rules—the employer—to narrowly tailor its rules to only promote its legitimate and substantial business interests while avoiding burdening employee rights.

---

[1] On September 4, 2020, Administrative Law Judge Michael A. Rosas issued the attached supplemental decision. The Respondent, the General Counsel, and the Charging Party each filed exceptions and a supporting brief, and the General Counsel and the Charging Party each filed an answering brief. On May 6, 2021, the National Labor Relations Board granted counsel for the Acting General Counsel's Motion to Withdraw Exceptions Three through Nine. The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings, and conclusions only to the extent consistent with this Decision and Order Remanding.

The standard we adopt today remedies these funda-mental defects. We adopt a modified version of the basic framework set forth in *Lutheran Heritage*, which recog-nized that overbroad workplace rules and polices may chill employees in the exercise of their Section 7 rights and properly focused the Board's inquiry on NLRA-protected rights. During the 13 years when the *Lutheran Heritage* standard was in place, reviewing courts repeat-edly and uncontroversially applied and upheld the stand-ard. No court rejected the *Lutheran Heritage* standard or held that the Board was, in fact, applying some standard other than the one it articulated.[2] However, although *Lutheran Heritage* implicitly allowed the Board to eval-uate employer interests when considering whether a par-ticular rule was unlawfully overbroad, the standard itself did not clearly address how employer interests factored into the Board's analysis. The modified standard we adopt today makes explicit that an employer can rebut the presumption that a rule is unlawful by proving that it advances legitimate and substantial business interests

that cannot be achieved by a more narrowly tailored rule. Because we overrule *Boeing*, *LA Specialty Produce*, and the work rules cases relying on them, including those that placed rules into an "always lawful" category based simply on their subject matter, we reject *Boeing*'s cate-gorical approach, instead returning to a particularized analysis of specific rules, their language, and the em-ployer interests actually invoked to justify them.

As under *Lutheran Heritage*, our standard requires the General Counsel to prove that a challenged rule has a reasonable tendency to chill employees from exercising their Section 7 rights. We clarify that the Board will interpret the rule from the perspective of an employee who is subject to the rule and economically dependent on the employer, and who also contemplates engaging in protected concerted activity. Consistent with this per-spective, the employer's intent in maintaining a rule is immaterial. Rather, if an employee could reasonably interpret the rule to have a coercive meaning, the General Counsel will carry her burden, even if a contrary, nonco-ercive interpretation of the rule is also reasonable. If the General Counsel carries her burden, the rule is presump-tively unlawful, but the employer may rebut that pre-sumption by proving that the rule advances a legitimate and substantial business interest and that the employer is unable to advance that interest with a more narrowly tailored rule. If the employer proves its defense, then the work rule will be found lawful to maintain.[3]

I.

Applying Section 8(a)(1) of the Act, the Board has long and consistently recognized that an employer's mere maintenance of a work rule may unlawfully inter-fere with, restrain, or coerce employees in the exercise of their Section 7 rights. See *Republic Aviation Corp.*, 51 NLRB 1186, 1187 (1943). The Supreme Court long ago confirmed the Board's authority to regulate employer work rules, as part of the flexibility the Board requires "to accomplish the dominant purpose" of the Act: to pro-

---

[2] See *G4S Secure Solutions Inc. v. NLRB*, 707 Fed.Appx. 610, 613 fn. 2 (11th Cir. 2017) (mem); *Midwest Division–MMC, LLC v. NLRB*, 867 F.3d 1288, 1302 (D.C. Cir. 2017); *T-Mobile USA, Inc. v. NLRB*, 865 F.3d 265, 270 (5th Cir. 2017); *Care One at Madison Avenue, LLC v. NLRB*, 832 F.3d 351, 362 (D.C. Cir. 2016); *Quicken Loans, Inc. v. NLRB*, 830 F.3d 542, 545 (D.C. Cir. 2016); *Three D, LLC v. NLRB*, 629 Fed.Appx. 33, 38 (2d Cir. 2015) (mem); *World Color (USA) Corp. v. NLRB*, 776 F.3d 17, 20 (D.C. Cir. 2015) (approving standard but find-ing that it was misapplied); *Flex Frac Logistics, LLC v. NLRB*, 746 F.3d 205, 208-209 (5th Cir. 2014); *NLRB v. Arkema, Inc.*, 710 F.3d 308, 318 (5th Cir. 2013) (approving standard but finding that it was misapplied); *NLRB v. Northeastern Land Services, Ltd.*, 645 F.3d 475, 482 (1st Cir. 2011); *Auto Workers v. NLRB*, 520 F.3d 192, 197 (2d Cir. 2008); *Cintas Corp. v. NLRB*, 482 F.3d 463, 467 (D.C. Cir. 2007); *Guardsmark, LLC v. NLRB*, 475 F.3d 369, 374-376 (D.C. Cir. 2007).

The dissent's treatment of the cases cited above confirms that the *Lutheran Heritage* standard was uncontroversial in the reviewing courts. To be sure, the dissent correctly observes that several of the cases cited above did not involve a challenge to the *Lutheran Heritage* standard, but rather the application of that standard. However, the absence of challenges to the *Lutheran Heritage* standard demonstrates that it enjoyed widespread acceptance. Moreover, notwithstanding the dissent's assertion that the courts' approval of the standard was "tepid" in some cases, the courts still (in the dissent's words) "endorse[d]" it and recognized that it was "prophylactic" and "subject to deference."

As to specific cases, the dissent seeks to distinguish *Care One at Madison Avenue, LLC* on the ground that it "did not present a rules-maintenance issue at all." In enforcing the Board's order, however, the court quoted the *Lutheran Heritage* standard and concluded that the employer's posted memo in that case "could reasonably be understood as instituting a new policy of disciplining protected Section 7 activity." 832 F.3d at 362-363. As to *Cintas Corp.*, the dissent says that case militates "against" our decision. But the dissent concedes that the court applied *Lutheran Heritage*. In any event, *Cintas Corp.* supports the standard we announce here, as its conclusion was that "[a] more *nar-rowly tailored* rule that does not interfere with protected employee activity would be sufficient to accomplish the Company's presumed interest in protecting confidential information." 482 F.3d at 470 (em-phasis added). Requiring narrow tailoring is precisely what our stand-ard does and what the dissent rejects. As to *Arkema, Inc.* and *T-Mobile USA, Inc.*, the dissent says those decisions forbid *unreasonable* inter-pretations of work rules from being used to deem them unlawful. *Lu-theran Heritage* did not say otherwise, nor do we contend that it did.

[3] The approach we adopt here applies only to facial challenges to the maintenance of work rules that do not expressly apply to employ-ees' protected concerted activity. We do not change existing law that an employer's maintenance of a work rule will be deemed unlawful when it explicitly restricts Sec. 7 activity or was promulgated in re-sponse to union or other protected concerted activity. See, e.g., *First American Enterprises d/b/a Heritage Lakeside*, 369 NLRB No. 54, slip op. at 1 fn. 7 (2020) (finding unlawful a "resident-centered" conversa-tion policy promulgated in response to union activity); *PAE Applied Technologies*, 367 NLRB No. 105, slip op. at 2 fn. 6 (2019) (find-ing unlawful a rule prohibiting contacting customers concerning union issues because it explicitly restricted Sec. 7 activity). We also do not address the unlawful application of work rules that are lawful to main-tain. Until recently, the Board had long held that an employer's con-tinued maintenance of a work rule was unlawful when the rule has been applied to restrict the exercise of Sec. 7 rights. But in *AT&T Mobility, LLC*, the Board reversed that precedent, holding that an employer is not required to rescind a rule that is facially lawful, but has been unlawfully applied. 370 NLRB No. 121, slip op. at 7 (2021). Because this issue is not presented here, we do not revisit it at this time.

tect "the right of employees to organize for mutual aid without employer interference." *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798 (1945).[4] Because overbroad and ambiguous work rules may have a coercive effect on employees, the Board and courts have long acknowledged that the regulation of work rules "serves an important prophylactic function: it allows the Board to block rules that might chill the exercise of employees' rights by cowing the employees into inaction, rather than forcing the Board to 'wait[] until that chill is manifest,' and then try to 'undertake the difficult task of dispelling it.'" *Quicken Loans, Inc.*, supra, 830 F.3d at 549 (quoting *Flex Frac Logistics, LLC*, 358 NLRB 1131, 1132 (2012), enfd. in relevant part 746 F.3d 205 (5th Cir. 2014)).

In its decisions carrying out this important function, the Board has grappled with two interrelated issues. The first has been determining the appropriate interpretive principles to apply in evaluating the potentially deleterious impact of a work rule on employees' exercise of their Section 7 rights. In doing so, the Board regularly has assessed work rules to determine "the reasonably foreseeable effects of the wording of the rule on the conduct of the employees," observing that "where the language is ambiguous and may be misinterpreted by the employees in such a way as to cause them to refrain from exercising their statutory rights, then the rule is invalid even if interpreted lawfully by the employer in practice." *Solo Cup Co.*, 144 NLRB 1481, 1481–1482 (1963).[5] The second issue for the Board has been determining how to ensure that the rule minimizes any potential impact on employee rights, notwithstanding the legitimate business interests that the employer may be trying to advance by maintaining its rule.[6]

Over the past nearly 25 years, the Board has attempted to articulate and consistently apply a generally applicable test under Section 8(a)(1) for assessing facial challenges to work rules. For almost half that time, the *Lutheran Heritage* standard provided the interpretive principles relevant to assessing the impact of a given rule on employees' rights. We detail the Board's recent history below with an eye toward explaining why a modified version of the *Lutheran Heritage* standard is the best approach to evaluating facial challenges to work rules in light of the Board's experience and long-established statutory principles. Our decision today does not disturb the Board's long-established doctrines covering work rules that address union (or other protected) solicitation, distribution, or insignia.[7] Consistent with the Board's decisions in both *Lutheran Heritage* and *Boeing*, we preserve Board precedent in those areas.

### A. Lafayette Park

The recent history of the Board's approach to work rules begins with *Lafayette Park Hotel*, 326 NLRB 824 (1998), enfd. mem. 203 F.3d 52 (D.C. Cir. 1999). There, a full Board (Chairman Gould and Members Fox, Liebman, Hurtgen, and Brame) considered facial challenges to rules defining various types of "unacceptable conduct." 326 NLRB at 824. The Board identified "the appropriate inquiry" as "whether the rules would reasonably tend to chill employees in the exercise of their Section 7 rights" and that, where there is a likely chilling effect, "the Board may conclude that their maintenance is an unfair labor practice, even absent evidence of en-

---

[4] The federal courts of appeals have consistently recognized that an employer's mere maintenance of a work rule may be unlawful, apart from any application of the rule. See, e.g., *Banner Health System v. NLRB*, 851 F.3d 35, 40–41 (D.C. Cir. 2017); *Northeastern Land Services v. NLRB*, 560 F.3d 36, 42–44 (1st Cir. 2009); *Beverly Health & Rehabilitation Services, Inc.*, 297 F.3d 468, 478 (6th Cir. 2002). The Board has never deviated from this principle, even as it has changed its approach to determining when a rule is unlawful to maintain.

[5] See, e.g., *Hyland Machine Co.*, 210 NLRB 1063, 1071 (1974) ("[T]he ambiguous language might be interpreted by workers in such a way as to cause them to refrain from exercising their statutory rights, hence the rule is invalid even if [r]espondent intended or interpreted it privately otherwise."); *MPL, Inc.*, 163 NLRB 952, 955 (1967) ("[T]he [r]espondent's broad no-solicitation rule impinges upon the rights of its employees and constitutes an unreasonable impediment to self-organization. Moreover, even assuming that the rule was not intended by [r]espondent to be, and was not, in fact, applied to prohibit union solicitation during nonworking time, the reasonable, foreseeable effect of the rule as worded is capable of such interpretation by employees, and thus would tend to cause them to refrain from exercising their statutory rights."); *Pueblo Supermarkets, Inc.*, 156 NLRB 654, 656 (1966) ("The promulgation of an unlawfully phrased rule has an inhibitory effect upon employees' exercise of their statutory rights, regardless of the innocence of purpose for the rule or the undisclosed limitations placed upon its use and application.").

[6] In some of its earliest work rules decisions, the Board acknowledged that "special circumstances" could justify an employer's maintenance of a work rule that, absent those circumstances, would be unreasonable to maintain. See, e.g., *Republic Aviation*, 51 NLRB at 1187. The Supreme Court likewise acknowledged that the Board's role in the work rules context entails "working out an adjustment between the undisputed right of self-organization assured to employees under the [] Act and the equally undisputed right of employers to maintain discipline in their establishments." *Republic Aviation*, 324 U.S. at 797–798. Even so, while the Board recognized in certain rules cases that employer justifications were relevant to the analysis, see, e.g., *American Cast Iron Pipe Co.*, 234 NLRB 1126, 1131 (1978); *McDonnell Douglas Corp.*, 204 NLRB 1110, 1110 (1973), in other cases the Board did not appear to factor employer interests into the analysis, see, e.g., *Southern Maryland Hospital Center*, 293 NLRB 1209, 1222 (1989). As the Board continued to develop its work-rules jurisprudence, some specific holdings emerged to govern particular types of rules. For instance, absent special circumstances, a rule banning solicitation by employees on the employer's property during nonworking time is facially unlawful, *Republic Aviation*, 51 NLRB at 1187; absent special circumstances, a rule banning the distribution of literature by employees on the employer's property during nonworking time and in nonworking areas is facially unlawful, *Stoddard-Quirk Mfg. Co.*, 138 NLRB 615, 621 (1962); and absent special circumstances, a rule prohibiting employees from wearing union insignia on the employer's property during working time is facially unlawful, *Boeing Airplane Co.*, 103 NLRB 1025, 1026 (1953).

[7] See fn. 6, supra.

forcement." Id. at 825. For that standard, the Board referred to the Supreme Court's decision in *Republic Aviation*, quoting its admonition that assessing the challenged rules involves "working out an adjustment between the undisputed right of self-organization assured to employees under the [] Act and the equally undisputed right of employers to maintain discipline in their establishments." Id. (quoting 324 U.S. at 797–798). Member Hurtgen, disagreeing with the majority, expressed his view that "[i]f a rule reasonably chills the exercise of Sec. 7 rights, it can nonetheless be lawful if it is justified by significant employer interests." *Lafayette Park*, 326 NLRB at 825 fn. 5.

In analyzing the challenged rules' impact on employees under its announced standard, the *Lafayette Park* Board did consider the employer's interests in maintaining its rules, if not in the manner Member Hurtgen sought. See id. at 825–827, 829. For instance, when assessing a rule forbidding employees from making personal use of certain of the employer's facilities, the Board noted the "legitimate business reasons for such a rule" and its view that "employees would recognize the rule for its legitimate purpose." Id. at 827. Similarly, when assessing the employer's rule forbidding fraternization between employees and customers, the Board noted that employees "would recognize the legitimate business reasons for which such a rule was promulgated, and would not reasonably believe that it reaches Section 7 activity." Id. (internal footnote omitted). Although the Board considered the employer's interests (as effectively communicated to employees), it did so in the course of interpreting a rule and assessing its potential chilling effect on employees.

The *Lafayette Park* Board was divided, too, in how to correctly apply the announced standard to particular rules. In a partial dissent, Members Fox and Liebman thought the majority merely paid "lip service" to the applicable interpretive principles in upholding rules that, in their view, had "the likely effect of chilling Section 7 activity." Id. at 830. In response, Chairman Gould characterized their dissenting approach as one that improperly "pars[ed] out certain words and create[ed] theoretical definitions" for rules "that differ from the obvious ones." Id. He asserted that the Board should not "focus[] on whether any language in the rules could theoretically encompass Section 7 activity" but, instead, should focus on "whether a reasonable employee could believe that the rule prohibits protected activity." Id.

### B. Lutheran Heritage

A few years later, in another full-Board decision, *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004), the majority (Chairman Battista and Members Schaumber and Meisburg) construed *Lafayette Park* to mean that the relevant inquiry "begins with the issue of whether the rule *explicitly* restricts activities protected by

Section 7." Id. at 646 (emphasis in original). If it does not, a violation "is dependent upon a showing of one of the following: (1) employees would reasonably construe the language to prohibit Section 7 activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict the exercise of Section 7 rights." Id. at 647. Under the first of these prongs, the majority instructed that the Board "must refrain from reading particular phrases in isolation," "must not presume" that a rule will cause "improper interference with employee rights," and should not conclude "that a reasonable employee would read [a] rule to apply to [Section 7] activity simply because the rule *could* be interpreted that way." Id. at 646–647 (emphasis in original).

In an effort to refine the standard applied in *Lafayette Park*, the Board in *Lutheran Heritage* observed that it was not enough to establish a violation of Section 8(a)(1) merely because a rule "could *conceivably* be read to cover Section 7 activity," but in referring to how a reasonable employee "would read" the rule, the majority did not expressly hold that the coercive meaning must be the *only* reasonable interpretation of the rule or the *most* reasonable interpretation. Id. at 647 (emphasis added). The *Lutheran Heritage* Board acknowledged that the rules it was scrutinizing "serve legitimate business purposes" and that reasonable employees "would realize the lawful purpose of the challenged rules"—thereby suggesting that such considerations had informed its conclusions—but again the *Lutheran Heritage* majority did not clearly explain how employer interests factored into the analysis. See id. at 647–648. Finally, *Lutheran Heritage* rejected a categorical approach to work rules. The majority acknowledged the case-by-case nature of the Board's work rules decisions, noting that it did "not consider it necessary or appropriate to decide in this case what rules in a future hypothetical case would be unlawful." Id. at 648.

In dissent, Members Liebman and Walsh raised the issue of balancing. They argued that in *Lafayette Park* the Board had recognized that "determining the lawfulness of an employer's work rules requires balancing competing interests," and they accused the majority of "[i]gnoring the employees' side of the balance." Id. at 650. The dissenters agreed that employers have legitimate business interests that warrant protection through the maintenance of work rules but contended that the employer must do so "subject to the requirement that employers articulate those rules with sufficient specificity that they do not impinge on employees' free exercise of Section 7 rights." Id. at 652.

*Lutheran Heritage*, then, again demonstrated the Board's ongoing efforts to develop a standard that grappled with the two key questions posed in work rules cases: (1) how to interpret a rule and (2) whether and how employer interests factor into the analysis.

### C. Aftermath of Lutheran Heritage

Following *Lutheran Heritage*, the Board decided many work rules cases, and reviewing courts consistently applied and upheld the standard.[8] However, there was some degree of confusion and disagreement about some aspects of its proper application, in particular whether, and if so, how, to consider an employer's reasons for maintaining a challenged rule.

For instance, in *Flagstaff Medical Center*, 357 NLRB 659 (2011), enfd. in part 715 F.3d 928 (D.C. Cir. 2013), a panel majority found a hospital employer's rule restricting employees' use of cameras lawful, in part because of the employer's "significant interest" in having the rule to prevent the disclosure of patient health information. Id. at 663. The majority there viewed the employer's interest in maintaining the rule relevant to the analysis insofar as it informed the majority's assessment that reasonable employees would recognize that employer interest and view the rule "as a legitimate means of protecting the privacy of patients and their hospital surroundings, not as a prohibition of protected activity." Id.

But in a separate decision issued on the same day, a different panel majority assessed an employer's maintenance of certain work rules and made no mention of the employer's interests. Instead, the majority determined that the "only question" relevant was whether the employees "would reasonably construe the . . . rules to prohibit Section 7 activity" and did not mention the employer's interests for maintaining the rules as part of its analysis resolving that question. *Hyundai America Shipping Agency, Inc.*, 357 NLRB 860, 860–862 (2011), enfd. in part 805 F.3d 309 (D.C. Cir. 2015). Courts occasionally regarded the Board's implicit approach to addressing employer interests under *Lutheran Heritage* as placing a rebuttal burden on the employer, once it was established that a rule had a reasonable tendency to chill employees' exercise of Section 7 rights.[9]

### D. William Beaumont

In *William Beaumont Hospital*, 363 NLRB 1543 (2016), a majority consisting of then-Member McFerran and Member Hirozawa struck down a hospital employer's rule prohibiting conduct that "impedes harmonious interactions and relationships" because employees would reasonably understand that it could encompass interactions protected by Section 7. Id. at 1544. The majority also found a rule prohibiting "negative or disparaging comments" unlawful because it would reasonably be

construed to prohibit protected expressions of concern about working conditions. Id.

In dissent, Member Miscimarra contended that the *Lutheran Heritage* standard foreclosed consideration of employers' justifications for their rules. Id. at 1550. In his view, the "'reasonably construe' standard entail[ed] a single-minded consideration of NLRA-protected rights, without taking into account the legitimate justifications of particular policies, rules and handbook provisions." Id. He advocated a revised approach whereby, in every case challenging an employer's maintenance of a work rule, the Board would determine "the potential adverse impact of the rule on NLRA-protected activity" and "the legitimate justifications an employer may have for maintaining the rule." Id. at 1551. Once the competing interests were identified, the Board should then balance them such that "a facially neutral rule should be declared unlawful only if the justifications are outweighed by the adverse impact on Section 7 activity." Id.

In response, the *William Beaumont* majority acknowledged that assessing work rules was a "difficult area of labor law," particularly because of "the remarkable number, variety, and detail of employer work rules." Id. at 1546–1547. But the majority also noted that, in the years since the Board had decided *Lutheran Heritage*, no court of appeals had rejected the standard that the Board regularly applied in work-rules cases. Id. at 1545 & fn. 11.[10] The majority further explained that the *Lutheran Heritage* standard did, in fact, "take into account employer interests." Id. at 1546. It did so by leaving employers free to protect their legitimate business interests by adopting more narrowly tailored rules while not infringing on Section 7 rights. The majority noted that when the Board found that a rule was not unlawfully overbroad, "it [was] typically because the rule [was] tailored such that the employer's legitimate business interest in maintaining the rule [was] sufficiently apparent to a reasonable employee." Id.

### E. Boeing and LA Specialty Produce

Less than 2 years later, without being asked and without seeking any public input, a newly constituted Board effectively incorporated the *William Beaumont* dissent into the majority opinion in *Boeing Co.*, 365 NLRB No. 154 (2017).[11] The *Boeing* majority (Chairman Miscimarra and Members Kaplan and Emanuel) held that, when deciding the lawfulness of maintaining a "facially neutral" work rule, the Board "will evaluate two things: (i)

---

[8] See fn. 2, supra.

[9] See, e.g., *Midwest Division–MMC, LLC*, 867 F.3d at 1302 ("Maintaining a rule reasonably likely to chill employees' Sec[.] 7 activity amounts to an unfair labor practice unless the employer 'present[s] a legitimate and substantial business justification for the rule' that 'outweigh[s] the adverse effect on the interests of employees.'") (quoting *Hyundai America Shipping Agency, Inc. v. NLRB*, 805 F.3d 309, 314 (D.C. Cir. 2015)).

[10] As representative examples, the majority cited decisions from the Fifth, Second, and District of Columbia Circuits, respectively: *Flex Frac Logistics, LLC*, supra, 746 F.3d at 209; *International Union, UAW v. NLRB*, 520 F.3d 192, 197 (2d Cir. 2008); *Cintas Corp.*, supra, 482 F.3d at 467–470; and *Guardsmark, LLC*, supra, 475 F.3d at 378–380.

[11] The *Boeing* majority preserved the other, separate bases from *Lutheran Heritage* for finding a work rule unlawful: namely, when the rule explicitly restricts Sec. 7 activity, is promulgated in response to union activity, or has been applied to restrict Sec. 7 activity.

the nature and extent of the potential impact on NLRA rights, *and* (ii) legitimate justifications associated with the rule." Id., slip op. at 3 (emphasis in original). Those two factors would be balanced against each other. According to the majority, the *Lutheran Heritage* standard did not permit the Board to consider an employer's legitimate business reasons for maintaining a rule; to distinguish between more and less important Section 7 interests; to differentiate among industries, work settings, or specific circumstances reflected in a given rule; or to produce consistent rulings in work-rules cases. Id., slip op. at 2. And the majority claimed that past Board decisions specifying criteria for assessing the lawfulness of specific types of rules—like rules concerning workplace solicitation and distribution of literature—comport with its standard, which permitted accommodating employer interests, but not under *Lutheran Heritage,* which it asserted did not. Id., slip op. at 8.

The majority also created a categorical classification system for evaluating rules under its standard. Id., slip op. at 3–4. In "Category 1"—rules that were always lawful to maintain—it would put rules that, as a type, did not interfere with Section 7 rights and rules where the adverse impacts on Section 7 rights were outweighed by justifications associated with such rules. Id. In "Category 2"—rules that were sometimes lawful to maintain—it would put rules that "warrant scrutiny in each case." Id., slip op. at 4. And in "Category 3"—rules that were always unlawful to maintain—it would put rules that, given their impact on protected activity, could never be justified by an employer. Id. The purported intent of this categorical approach was to "provide far greater clarity and certainty" for regulated parties. Id.

Applying its new standard, the *Boeing* majority upheld a rule maintained by the employer, a manufacturer of military and commercial aircraft, restricting the use of cameras in the workplace because any "adverse impact" on Section 7 rights was "comparatively slight" and was "outweighed by substantial and important justifications associated with Boeing's maintenance of the no-camera rule." Id., slip op. at 17. Without further explanation, it deemed *all* rules of that type always lawful for employers to maintain no matter the circumstances. Id. Remarkably, the *Boeing* Board also designated all rules "requiring employees to abide by basic standards of civility"—of the sort at issue in *William Beaumont,* but *not* at issue in *Boeing*—as always lawful. Id., slip op. at 15.

Then-Member McFerran and Member Pearce both dissented, expressing similar views. Member McFerran asserted that, as the Board had recently explained in *William Beaumont,* the standard under *Lutheran Heritage did* allow for consideration of an employer's legitimate business justifications for its work rules. Id., slip op. at 35–36. But Member McFerran contended that the majority's approach here went too far, privileging an employer's interests over the rights of employees, who, because

of their economic dependence on employers, reasonably take a cautious approach when interpreting work rules for fear of running afoul of a rule whose scope is unclear. Id., slip op. at 38. Member McFerran also criticized the majority's assertion that its approach would provide more "certainty and clarity," as she noted that it failed to identify which Section 7 rights and which employer interests are entitled to more or less weight in its balancing. Id., slip op. at 38–39.

As to the majority's categorical approach, Member McFerran noted that designating a type of rule as always lawful to maintain improperly forgoes particularized scrutiny of a similar rule in an altogether different workplace by finding it lawful without addressing what particular Section 7 rights are at stake, what justifications an employer might actually offer for its rule, and what industry or work setting is involved. Id., slip op. at 39.

Member Pearce expressed similar criticisms. Id, slip op. at 23–29. He found "particularly troubling" the majority's designation of civility rules as always lawful to maintain. He pointed out that no civility rules were at issue in the case and that, in any event, civility rules threatened to chill the sort of heated expression that was not uncommon when employees engage in Section 7 activity. Id., slip op. at 27–28.

Less than 2 years later, in *LA Specialty Produce Co.*, 368 NLRB No. 93 (2019), a Board majority (Chairman Ring and Members Kaplan and Emanuel) observed that *Boeing* needed to be buttressed with some "points of clarification." Id., slip op. at 2. One ostensible clarification addressed how rules should be interpreted. The majority asserted that the reasonable employee does "not view every employer policy through the prism of the NLRA," such that "a challenged rule may not be found unlawful merely because it could be interpreted, under some hypothetical scenario, as potentially limiting some type of Section 7 activity." Id. A second ostensible clarification addressed the burden of proof to demonstrate a work rule's impact on Section 7 rights, holding that "it is the General Counsel's initial burden in all cases to prove that a facially neutral rule *would* in context be interpreted by a reasonable employee . . . to potentially interfere with the exercise of Section 7 rights." Id. The majority also attempted to clarify the categorical approach by explaining that a rule should be placed in Category 1, and thus deemed always lawful to maintain, when the "general" employer interests in maintaining such a rule outweigh the potential impact on the exercise of Section 7 rights. Id., slip op. at 3.

Member McFerran dissented. As a threshold matter, she summarized what she deemed to be the primary defects in the reasoning of the *Boeing* Board. Those included (1) that the Board, in rejecting *Lutheran Heritage* and announcing a new standard, did so sua sponte and without public input; (2) that the standard under *Lutheran Heritage* already permitted the Board to consider an

employer's legitimate business justifications for its work rules; (3) that the *Boeing* standard fails to properly assess rules from the perspective of a reasonable employee because it does not consider the economic dependence of employees on employers, which increases the chilling potential of ambiguous rules; and (4) that *Boeing*'s categorical approach dispenses with individualized scrutiny for rules by ignoring their wording, whether they were narrowly tailored, and their context. Id., slip op. at 8–9.

Member McFerran also disagreed with the clarifications that *LA Specialty Produce* purported to make to *Boeing*. Specifically, she argued that the majority's description of a reasonable employee ignored employees' economic dependence on the employer and the resulting reasonable tendency to interpret work rules as coercive, even where a disinterested person would not. Id., slip op. at 9–10. She also faulted the majority's requirement that the General Counsel must prove that a work rule "*would* in context be interpreted . . . to potentially interfere with the exercise of Section 7 rights" as effectively (but not explicitly) requiring a showing that the coercive interpretation of a rule is the *only* reasonable interpretation. Id., slip op. at 10–11. As for the balancing test, Member McFerran noted that the majority failed to explain which party has the burden of proof with respect to the balancing, and that its endorsement of a "general" balancing approach eliminated consideration of the language of a particular rule or the requirement of narrow tailoring. Id., slip op. at 11–12.

### F. Aftermath of Boeing and LA Specialty Produce

Since *Boeing* was decided, both before and after the Board's attempted clarification of it in *LA Specialty Produce*, the Board has applied its new standard in a number of cases. The Board has usually found work rules lawful to maintain and, generally, has categorically deemed all similar rules to be lawful to maintain, no matter the specific wording of any particular rule or the specific workplace context in which they are maintained.[12]

---

[12] For example, the Board has applied *Boeing* to find the following types of rules categorically lawful for all employers to maintain: *AT&T Mobility, LLC*, 370 NLRB No. 121, slip op. at 3–4 (no-recording rules); *Medic Ambulance Service*, 370 NLRB No. 65, slip op. at 2–4 & fns. 7, 9–11 (2021) (confidentiality rules for proprietary information and social media restrictions); *Bemis Co.*, 370 NLRB No. 7, slip op. at 2–3 & fn. 8 (2020) (civility rules concerning social media); *Nicholson Terminal & Dock Co.*, 369 NLRB No. 147, slip op. at 2–3 (rules prohibiting strike activity and outside employment); *Motor City Pawn Brokers Inc.*, 369 NLRB No. 132, slip op. at 7 & fns. 17–18 (nondisparagement rules and rules restricting employee use of the internet and social media); *Newmark Grubb Knight Frank*, 369 NLRB No. 121, slip op. at 2–3 (rules prohibiting outside employment, providing employee references, and use of employer property for personal benefit); *Verizon Wireless*, 369 NLRB No. 108, slip op. at 4–5 (2020) (rules allowing the search of employee property, including vehicles, on employer premises); *Cott Beverages, Inc.*, 369 NLRB No. 82, slip op. at 3–4 fn. 13 (2020) (rules prohibiting cell phones in work areas); *Maine Coast Regional Health Facilities d/b/a Maine Coast Memorial Hospital*, 369 NLRB No. 51, slip op. at 2–3 (2020) (rules prohibiting communicating with the media concerning non-NLRA related subjects), enfd. on other grounds 999

---

## II.

Having considered the valuable perspectives of the parties and amici in response to our Notice and Invitation to File Briefs (NIFB),[13] as well as the Board's past experience and the views of our dissenting colleague, we have decided the better approach is a modified version of the framework set forth in *Lutheran Heritage* for evaluating facial challenges to employer work rules that do not explicitly restrict Section 7 activity by employees and were not promulgated in response to such activity, as clarified herein. As explained, the key issues presented are: (1) defining the interpretive principles to apply to discern when work rules have a reasonable tendency to chill employees' exercise of their statutory rights and (2) working out the proper adjustment between protecting employee rights and accommodating employers' legitimate and substantial business interests in maintaining their rules. Although *Lafayette Park* and *Lutheran Heritage* established the Board's proper interpretive focus—the perspective of a reasonable employee subject to the rule—they did not sufficiently (or clearly) articulate how employers' interests fit into the analysis. While *Boeing* and *LA Specialty Produce*, in turn, appropriately recognized that employer interests should factor into the Board's

---

F.3d 1 (1st Cir. 2021); *Argos USA LLC d/b/a Argos Ready Mix LLC*, 369 NLRB No. 26, slip op. at 4 (2020) (rules prohibiting cell phones in commercial vehicles); *Apogee Retail LLC d/b/a Unique Thrift Store*, 368 NLRB No. 144, slip op. at 8–9 (investigative confidentiality rules); *Briad Wenco, LLC d/b/a Wendy's Restaurant*, 368 NLRB No. 72, slip op. at 2 (2019) (rules mandating arbitration of employment-related disputes with saving clauses preserving access to the Board).

The Board has applied *Boeing* to find the following types of rules categorically unlawful for all employers to maintain: *Tesla, Inc.*, 370 NLRB No. 101, slip op. at 5 (2021) (rules prohibiting communications with the media); *20/20 Communications, Inc.*, 369 NLRB No. 119, slip op. at 3–4 (2020) (rules prohibiting recovery of Board-ordered backpay); *First American Enterprises d/b/a Heritage Lakeside*, 369 NLRB No. 54, slip op. at 1–2 & fn. 9 (rules prohibiting discussion of wages and benefits); *Union Tank Car Co.*, 369 NLRB No. 120, slip op. at 3 (2020) (non-disparagement rules extending to conversations among employees); *Newmark Grubb Knight Frank*, 369 NLRB No. 121, slip op. at 4 (confidentiality rules covering employee handbooks); *Cedars-Sinai Medical Center*, 368 NLRB No. 83, slip op. at 3 & fn. 6 (2019) (rules mandating arbitration as the exclusive forum for resolving NLRA claims).

[13] In response to the NIFB, briefs were filed by the General Counsel, the Respondent, Stericycle, and the Charging Party, Teamsters Local 628, and the following amici: a group consisting of the Associated Builders and Contractors, Coalition for a Democratic Work Place, Council on Labor Law Equality, National Association of Manufacturers, National Association of Wholesaler-Distributors, and National Retail Federation; a group consisting of the Arkansas State Chamber of Commerce, Little Rock Regional Chamber of Commerce, Springdale Chamber of Commerce, Associated Builders & Contractors of Arkansas, and Arkansas Hospitality Association; the Center for Workplace Compliance; the HR Policy Association and Retail Litigation Center; the Chamber of Commerce of the United States of America; the American Federation of Labor and Congress of Industrial Organization; the American Postal Workers Union; the Communications Workers of America; the International Brotherhood of Electrical Workers; the International Union of Operating Engineers; and the Service Employees International Union.

analysis, they adopted interpretive principles that failed to reflect the true coercive potential of work rules. In addition, those decisions gave too little weight to employees' Section 7 rights and too much weight to employer interests, in particular by failing to require employers to narrowly tailor their work rules to minimize as much as reasonably possible, if not altogether eliminate, any infringement of employee rights.

The approach we adopt today seeks to preserve the insights of the Board's prior decisions while addressing their shortcomings. Given the wide range of work rules, the varying language they use, and the many different employment contexts in which they arise, we do not expect our new standard to provide complete certainty and predictability in this area of the law. That abstract goal—as the Board's experience under *Boeing* suggests—could be achieved only by arbitrarily expanding the universe of work rules deemed always lawful to maintain, at the obvious expense to employees' ability to exercise the rights guaranteed to them by the Act.

Our approach is focused on furthering what the Supreme Court many decades ago defined as the "dominant purpose" of the Act: protecting "the right of employees to organize for mutual aid without employer interference." *Republic Aviation*, 324 U.S. at 798. In the context of this case, achieving the Act's purpose means ensuring that the Board does not condone employer work rules that chill employees' exercise of their statutory rights for fear of discipline or discharge if they violate them. The potential for intimidation is great precisely because of what the Supreme Court has described as "the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969). This fact of workplace life should be reflected in the Board's treatment of work rules under Section 8(a)(1) of the Act, just as the Supreme Court has required with respect to the analysis of employers' arguably coercive statements to employees.

But "equally undisputed," as the Supreme Court has also observed, is the "right of employers to maintain discipline in their establishments" and otherwise protect their legitimate and substantial business interests by regulating employees' workplace conduct. *Republic Aviation*, 324 U.S. at 798. Accordingly, in the work-rules context, as in other situations governed by Section 8(a)(1) of the Act, the Board must fulfill its duty to protect employees' Section 7 rights while also considering employers' legitimate and substantial business interests. As we will explain, our new standard gives employers the necessary leeway to maintain rules of their own choosing to advance legitimate and substantial business interests. They simply need to narrowly tailor those rules to significantly minimize, if not altogether eliminate, their coercive potential. If employers do so, their rules will be lawful to maintain.

### A.

It has long been established that the test for evaluating whether an employer's conduct or statements violate Section 8(a)(1) of the Act is whether they have a reasonable tendency to interfere with, restrain, or coerce employees who may engage in activities protected by Section 7. *American Freightways Co.*, 124 NLRB 146, 147 (1959). The General Counsel, of course, has the burden of establishing a violation of the Act. As we now explain, our initial focus in the work-rules context is on whether the General Counsel has proven that a rule has a reasonable tendency to interfere with, restrain, or coerce employees who contemplate engaging in protected activity. To discern that tendency, the Board—as in all other Section 8(a)(1) contexts—appropriately "view[s] employer statements 'from the standpoint of employees over whom the employer has a measure of economic power.'" *Mesker Door, Inc.*, 357 NLRB 591, 595 (2011) (quoting *Henry I. Siegel Co. v. NLRB*, 417 F.2d 1206, 1214 (6th Cir. 1969)), overruled on other grounds by *Tschiggfrie Properties, Ltd.*, 368 NLRB No. 120, slip op. at 7 (2019).

Interpreting a work rule from the perspective of the economically dependent employee who contemplates engaging in Section 7 activity is consistent with workplace reality—employees ordinarily do not wish to risk their jobs by violating their employers' rules—and with the employee-protective purposes of the Act.[14] As suggested, this frame of reference is entirely consistent with, and arguably compelled by, the Supreme Court's decision in *Gissel*, which considered whether certain statements made by an employer to his employees violated Section 8(a)(1). 395 U.S. at 616–620. Addressing the employer's argument that its statements were protected by Section 8(c) of the Act, the *Gissel* Court explained that "an employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in § 7 and protected by § 8(a)(1)." Id. at 617. The Court reasoned that "any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." Id. These "obvious principles," in the Court's words, id., should be central to our analysis when the Board evaluates a work rule. Accordingly, in interpreting a rule, the Board will take the perspective of the "economically

---

[14] *Quicken Loans, Inc.*, supra, 830 F.3d at 549. In *Quicken Loans*, the District of Columbia Circuit further observed that employees cannot be expected "to hazard potentially career-imperiling guesses about whether the Employment Agreement—that [their employer] unilaterally drafted and required them to sign—means what it says and says what it means." Id. at 550.

dependent employee" who contemplates engaging in Section 7 activity. See id.[15] Such an employee is readily inclined to avoid violating a rule, and so readily inclined to interpret it more broadly to restrict or prohibit Section 7 activity than a disinterested observer might. Being discharged might mean—to take just two very real examples—being unable to pay rent or put food on the table. For purposes of the Act, then, the coercive potential of a work rule is inextricably intertwined with the vulnerable position of employees.

By explicitly incorporating the perspective of the economically dependent employee into our analysis, we adopt an important interpretive principle that sometimes explicitly factored into the Board's analysis under *Lafayette Park* and *Lutheran Heritage*. See, e.g., *Whole Foods Market, Inc.*, 363 NLRB 800, 803 fn. 11 (2015) (applying those cases and incorporating the perspective of the economically dependent employee), enfd. 691 Fed.Appx. 49 (2d Cir. 2017). This principle is consistent with the Board's long-established practice of construing any ambiguity in a work rule against the employer as the drafter of the rule. See, e.g., *Lafayette Park*, 326 NLRB at 828 & fn. 22 (citing *Norris/O'Bannon*, 307 NLRB 1236, 1245 (1992) (in turn citing *Paceco, A Div. of Fruehauf*, 237 NLRB 399, 400 fn. 8 (1978))).[16]

Despite stating that work rules should be interpreted from "the employees' perspective," 365 NLRB No. 154, slip op. at 16, the *Boeing* Board did not base this perspective on employees' economic dependence. And, in turn, the Board in *LA Specialty Produce* obfuscated the issue by asserting—in response to the dissent's view that rules should be assessed from the perspective of an economically dependent employee—that "a reasonable employee does not presume a Section 7 violation lurks around every corner." 368 NLRB No. 93, slip op. at 7. Such rhetoric obscures the need to promote the policies of the Act, consistent with the Supreme Court's insight in *Gissel* about employees' economic position. For statutory purposes, the *relevant* reasonable employee is the employee who contemplates engaging in Section 7 activity, because this is the activity that the Act is explicitly intended to protect from employer interference. Whether some hypothetical employee only sometimes, or even never, contemplates Section 7 activity is immaterial. Indeed, if the likelihood of an employee contemplating Section 7 activity were somehow a relevant consideration, then even a rule explicitly prohibiting such activity could arguably be lawful (as not having a reasonable tendency, in fact, to interfere with the Section 7 activity of an employee who would not contemplate engaging in such activity).[17] It is appropriate, then, for the Board to interpret an ambiguous work rule from the perspective of an employee who contemplates Section 7 activity, but who wishes to avoid the risk of being disciplined or discharged for violating the rule. The Board's goal, of course, is to ensure that employers do not maintain unlawfully overbroad work rules that have a reasonable tendency to chill employees from exercising their statutory rights.

In interpreting rules from the perspective of a reasonable employee, we believe the Board must also recognize that a typical employee interprets work rules as a layperson rather than as a lawyer. This uncontroversial principle has long been recognized by the Board, which has sensibly observed that "employees do not generally carry lawbooks to work or apply legal analysis to company rules as do lawyers, and cannot be expected to have the expertise to examine company rules from a legal standpoint." *Ingram Book Co.*, 315 NLRB 515, 516 fn. 2 (1994).

In sum, going forward, the Board will begin its analysis by assessing whether the General Counsel has established that a challenged work rule has a reasonable tendency to chill employees from exercising their Section 7 rights. In doing so, the Board will interpret the rule from the perspective of the reasonable employee who is economically dependent on her employer and thus inclined to interpret an ambiguous rule to prohibit protected activity she would otherwise engage in. The reasonable employee interprets rules as a layperson, not as a lawyer. If an employee could reasonably interpret a rule to restrict or prohibit Section 7 activity, the General Counsel has satisfied her burden and demonstrated that the rule is presumptively unlawful. That is so even if the rule could

---

[15] The Respondent contends that *Gissel* is inapposite because that was "a case dealing only with threats during union organizing campaigns," whereas this case "involves only facially neutral handbook policies." Stericycle Br. at 15. We reject that contention. Indeed, the Act itself cites the "inequality of bargaining power" between employers and employees as a fundamental premise, and thus it must always factor into our analysis. 29 U.S.C. § 151. *Gissel*'s description of the economically dependent employee is a general truth about the realities of the employer-employee relationship—and especially applicable in the case of employer-imposed work rules that subject employees to discipline or discharge for violations. See also infra Part IV (responding to dissent).

[16] Accordingly, for all of the reasons stated, we reject the Respondent's position that we should not include employees' economic dependence on their employers as part of the relevant interpretive framework. See also infra Part IV (responding to dissent).

[17] We thus reject the position of the *LA Specialty* Board that the Board's interpretation of work rules

> should be determined by reference to the perspective of an objectively reasonable employee who is aware of his legal rights but who also interprets work rules as they apply to the everydayness of his job. The reasonable employee does not view every employer policy through the prism of the NLRA.

368 NLRB No. 93, slip op. at 2 (quotation marks and citations omitted). It may be true that most employees do not view work rules "through the prism" of the Act (their concern, rather, is to avoid discipline or discharge); but it is precisely the *Board's* function to do so in administering the Act. And it is precisely those situations that do *not* represent the "everydayness of [the employee's] job" (i.e., situations where an employee is contemplating Sec. 7 activity) that the Board must be concerned about.

also reasonably be interpreted *not* to restrict Section 7 rights and even if the employer did not intend for its rule to restrict Section 7 rights.

## B.

For reasons already explained, in some circumstances a violation of Section 8(a)(1) may require more than a showing that an employee could reasonably interpret a work rule to restrict or prohibit Section 7 activity. In such cases, the Board must still evaluate the lawfulness of a work rule in the context of the legitimate and substantial business interests of the employer in maintaining a specific work rule under the particular circumstances. Accordingly, if the General Counsel carries her burden of demonstrating that a rule is presumptively unlawful, an employer may rebut the presumption by proving that the rule advances a legitimate and substantial business interest and that the employer is unable to advance that interest with a more narrowly tailored rule.

As we have explained, prior to *Boeing*, it was unclear precisely how the Board's work-rules standard incorporated an assessment of employer interests. Our new standard makes explicit that the Board will consider employer interests when evaluating the employer's rebuttal to the General Counsel's showing that a rule is presumptively unlawful.

The clarified standard improves on the conspicuous shortcomings of the approach adopted in *Boeing*. Under the *Boeing* standard, a challenged rule's "potential impact on NLRA rights" was balanced against "legitimate justifications associated with" the rule. 365 NLRB No. 154, slip op. at 14. But in practice, the *Boeing* balancing test was heavily weighted against employees' Section 7 rights and in favor of employer interests, because—with little if any explanation—the Board proceeded to treat employee rights as "peripheral." Id., slip op. at 15. Although the Board under *Boeing* never explained *which* employee rights are "peripheral"—and there is no clear support in the Act for making such a determination—the characterization allowed the Board to regularly (and, in our view, arbitrarily) diminish the deleterious impacts of a challenged rule on Section 7 rights.[18]

Crucially, *Boeing*'s balancing approach measured employer interests against employee interests without any

requirement that a rule be *narrowly tailored* to serve the employer's legitimate interests in having the rule. Under *Boeing*, then, overbroad work rules are perfectly permissible. So long as the employer interests advanced by the rule are found to outweigh the burden on employees' rights, that rule is lawful to maintain—even if the employer interests could *still* be advanced by more narrowly crafting the rule such that it lessened or eliminated its burden on employees' rights. We believe that requiring employers to narrowly tailor their rules is a critical part of working out the proper adjustment between employee rights and employer interests in the work-rules context.[19]

Such a requirement acknowledges employers' prerogative to craft rules that they need to advance legitimate and substantial business interests while necessarily minimizing or eliminating the burden that such rules can have on employees' exercise of their statutory rights.[20] We impose no unreasonable burden on employers by expecting them to be aware of their employees' rights under the National Labor Relations Act, a statute enacted in 1935, more than 85 years ago, and long understood to apply in most workplaces, unionized and nonunionized alike—and to craft rules that minimize interference with their employees' exercise of these long-established federal rights. Indeed, as we have noted, it has long been uncontroversial that any ambiguity in a work rule must be construed against the employer as the drafter of the rule.[21]

---

[18] *Boeing* itself provides a ready example. There, the challenged rule prohibited the use of cameras—such as the ones on smartphones—in the workplace. Taking a picture or recording a video can easily be part of protected activity. For instance, employees might take pictures of a reoccurring unsafe work condition that they then use to document a complaint to management, or they might take photos of a notice a manager posts on the factory floor telling them they may not discuss their pay. In a society where smartphone cameras have become ubiquitous and, accordingly, where there is increased utilization of these devices to document complaints with photographs, audio, and videos, a rule that prohibits the use of cameras has a very definite impact on protected activity. And yet, in *Boeing*, the Board characterized the adverse impact of the challenge rule on employees' rights as "comparatively slight." 365 NLRB No. 154, slip op. at 17.

[19] See *Northeastern Land Services*, 645 F.3d at 483 (observing that "as a practical matter, a more narrowly drafted provision would be sufficient to accomplish" the employer's legitimate business goals); *Cintas Corp.*, 482 F.3d at 470 ("A more narrowly tailored rule that does not interfere with protected employee activity would be sufficient to accomplish the Company's presumed interest[.]"). The narrow-tailoring requirement also properly restores the Board's focus on the text of a particular work rule. See, e.g., *Guardsmark*, supra, 475 F.3d at 374.

[20] One of the purported goals of *Boeing* was to permit employers to craft and maintain idiosyncratic rules responsive to their own unique work situations. See *Boeing*, 365 NLRB No. 154, slip op. at 15–16 & fn. 79. The narrow-tailoring requirement that was absent from *Boeing* and that we now impose is entirely consistent with workplace-specific rules: If a certain rule is important to the specific demands of a particular workplace, the employer can presumably draft the rule to fit its legitimate needs and to communicate as much to employees. It can also do so with an eye toward avoiding burdening NLRA-protected rights.

[21] Putting the burden on the employer to proactively eliminate ambiguity by narrowly tailoring its rules is also consistent with the well settled proposition that Sec. 7 allows employees to keep their protected activities confidential. See *Guess?, Inc.*, 339 NLRB 432, 434 (2003). That right to confidentiality exists to permit employees to fully exercise their protected rights without the risk of retaliation. If the onus were on the employee to ask his employer whether an ambiguous rule prohibits protected activity, the employee would effectively be required to disclose that he was contemplating exercising Sec. 7 rights—a situation with an obvious chilling potential. Indeed, the Board has long recognized the coercion inherent in work rules or statements that effectively require employees to seek management permission to engage in Sec. 7 activity. See, e.g., *Brunswick Corp.*, 282 NLRB 794, 795 (1987).

In considering whether a rule reasonably tends to chill an employee from exercising statutory rights or is sufficiently narrowly tailored to

Prior to *Boeing*, the Board often applied a narrow-tailoring requirement. As the Board explained then, many of the Board's pre-*Boeing* findings that a given rule was lawful to maintain were "typically because" the rule was narrowly tailored. *William Beaumont*, 363 NLRB at 1546. The courts of appeals approved of the Board's application of a narrow-tailoring requirement. See, e.g., *Flex Frac Logistics*, 746 F.3d at 210 fn. 4; *Northeastern Land Services*, 645 F.3d at 483; *Cintas Corp.*, 482 F.3d at 470; *Guardsmark, LLC*, 475 F.3d at 380. After all, courts are well familiar with the concepts of facial overbreadth and the importance of narrowly tailoring a rule from the First Amendment context. See, e.g., *Double Eagle Hotel & Casino v. NLRB*, 414 F.3d 1249, 1258 (10th Cir. 2005).

We believe that a narrow-tailoring requirement is exactly the sort of reasonable "adjustment between the undisputed right of self-organization assured to employees under the [] Act and the equally undisputed right of employers to maintain discipline in their establishments" that the Supreme Court has instructed us to make in comparable situations. *Republic Aviation*, 324 U.S. at 797–798.

Under *Boeing*, even after attempting to provide clarifications in *LA Specialty Produce*, the Board never explained which party has the burden of proof with respect to the balancing test. We make clear here that, when a rule is presumptively unlawful, it is the employer's burden to prove that its legitimate and substantial business interests cannot be accomplished with a more narrowly tailored rule and that, as a result, the rule should be deemed lawful to maintain. Placing the burden on the employer is consistent with the Supreme Court's decisions in comparable circumstances. See *NLRB v. Baptist Hospital, Inc.*, 442 U.S. 773, 781–782 (1979); *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 507 (1978); *Republic Aviation Corp.*, 324 U.S. at 803–804. This burden allocation is no different than under our more generally applicable Section 8(a)(1) framework. See, e.g., *ANG Newspapers*, 343 NLRB 564, 565 (2004) ("Under the 8(a)(1) standard, the Board first examines whether the employer's conduct reasonably tended to interfere with Section 7 rights. If so, the burden is on the employer to demonstrate a legitimate and substantial business justification for its conduct."). This approach also does not change the General Counsel's burden of proving the unfair labor practice, but rather extends to the employer something akin to an affirmative defense that it has the burden of sustaining to overcome the presumption that a given work rule is unlawful. Cf. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401–402 (1983) (upholding the Board's now well-established burden-shifting approach in *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982)). And allocating this burden to the employer is sensible given that the employer is in the best position to explain its legitimate and substantial business interest, how its rule advances that interest, and why a more narrowly tailored rule would fail to advance that interest.

### C.

Having rescinded the standard adopted in *Boeing* and revised in *LA Specialty Produce*, we necessarily reject those decisions and their progeny, including the categorical holding that the Board has made to find certain types of work rules always lawful to maintain.[22] Instead of that rigid—indeed, arbitrary—categorical approach, we return to a case-by-case approach, which examines the specific language of particular rules and the employer interests actually invoked to justify them.

The primary problem with *Boeing*'s categorical approach is that it was regularly applied to designate all rules of a generalized type as *always* lawful to maintain, no matter their specific wording, the specific industry or workplace in which the employer maintained the rule, the specific employer interests that the rule was supposed to advance, or any number of context-specific factors that may have arisen in a particular case. *Boeing* itself exemplifies the arbitrary nature of this categorical approach.

In *Boeing*, the employer was "one of the country's most prominent defense contractors." 365 NLRB No. 154, slip op. at 21. It maintained a rule that, absent a manager-approved business need and a permit issued by its security department, prohibited employees' use of the camera features of electronic devices (like smartphones) on all company property. Id., slip op. at 5. Although the Board in *Boeing* cursorily labeled the adverse impact of this "no camera" rule on employees' exercise of Section 7 rights "comparatively slight" (ignoring the importance of photo or video documentation of unfair labor practices, protected concerted activity, and the like), it at least acknowledged that the rule infringed on employees' exercise of their rights. Id., slip op. at 17, 19. Yet in applying its balancing test, the *Boeing* Board found that the

---

serve the employer's legitimate and substantial business interests, we will evaluate any explanations or illustrations contained in a rule regarding how the rule does not apply to activity protected by Sec. 7. The Board did so when the *Lutheran Heritage* standard was in place. See, e.g., *First Transit, Inc.*, 360 NLRB 619, 621–622 (2014) (rejecting argument that employer's general "freedom of association" policy informed handbook rules and should have provided "safe harbor" for employer to maintain challenged rules).

[22] Our dissenting colleague specifically criticizes the overruling of *Apogee Retail*, supra, which held that investigative-confidentiality rules limited to the duration of the investigation are categorically lawful to maintain. Because, contrary to our dissenting colleague, we reject the principle that such investigative-confidentiality rules are *always* lawful to maintain, no matter how they are written and what employer interests are invoked (or not invoked) to justify them, we have remanded the facial challenge to an investigative-confidentiality rule at issue in this case to the administrative law judge so that he can apply the standard announced today.

employer's interests advanced by the rule outweighed the adverse impact on employee rights and so deemed the rule lawful to maintain. Id., slip op. at 18–19.

The employer interests advanced by the rule included: serving as an integral component of Boeing's security protocols, "which [were] necessary to maintain Boeing's accreditation as a federal contractor to perform classified work for the United States Government"; furnishing "a fail-safe to ensure that classified information will not be released outside of Boeing in the event that such information finds its way into a non-classified area"; playing "a key role in ensuring that Boeing complies with its federally mandated duty to prevent the disclosure of export-controlled information," including "'sensitive equipment, software and technology,' the export of which is controlled by the federal government 'as a means to promote our national security and foreign policy objectives'"; mitigating "documented" instances of "foreign powers" trying to steal Boeing's proprietary technology; and limiting "the risk"—in light of Boeing's "documented evidence" of "surveillance by potentially hostile actors"—"of Boeing becoming a target of terrorist attack." Id., slip op. at 18.

All of these interests that pertained to Boeing are obviously unique to "one of the country's most prominent defense contractors." Id., slip op. at 21. They have no relevance to the overwhelming majority of employers who do not deal in "classified" information, "export-controlled information," and the like. Despite that fact, and remarkably without any further justification, the Boeing Board put "no camera" and "no recording" rules "into Category 1," meaning that all rules of that type are always lawful for every employer to maintain. Id., slip op. at 17. In other words, every employer can lawfully maintain a "no camera" or "no recording" rule that the Boeing Board admitted chills the exercise of Section 7 rights even if—as will be true for the overwhelming majority of them—those employers share none of the interests that justified Boeing's maintenance of its rule. Boeing thus reflects an arbitrary and capricious approach to the analysis of work rules. We reject it.

In LA Specialty Produce, in turn, the Board purported to offer "points of clarification" for the categorical approach. 368 NLRB No. 93, slip op. at 2. The primary point of purported clarification was to state that Boeing's "Category 1" balancing test involves measuring "general" employer interests advanced by a rule against the rule's interference with employees' exercise of Section 7 rights. Id., slip op. at 3. While there may be some legitimate interests common to all employers at all times, and that are always entitled to the same weight in a balancing analysis, it is easy to see how such a broad approach can lead to giving employer interests in a particular case too much weight with too little justification, unnecessarily sacrificing Section 7 rights in the process. In endorsing "general" employer interests, LA Specialty Produce

clearly did not effectively limit Boeing's most obvious analytical flaw by leaving undisturbed Boeing's holding that all "no camera" and "no recording" rules are always lawful. Confirmation of that fact is apparent in the Board's post-LA Specialty Produce decisions. For instance, in AT&T Mobility, LLC, the Board found a cell-phone retail employer's rule that prohibited employees from recording conversations lawful to maintain "as a matter of law" simply because it was a "no recording" rule and thus categorically lawful to maintain. 370 NLRB No. 121, slip op. at 3 (explaining that "Boeing held not merely that [] specific no-camera and no-recording rules . . . were lawful Category 1[] rules, but that no-camera rules as a type and no-recording rules as a type belong in Category 1[]" (emphasis in original)). It did not matter that a cellphone retailer does not deal with classified information, export controls, documented threats of foreign interference, and the like, despite that those were the very interests that justified the categorical lawfulness of the "no camera" rule in Boeing. See also BMW Mfg. Co., 370 NLRB No. 56, slip op. at 3–4 (post-LA Specialty Produce decision "requiring no case-specific justification and balancing of interests" to deem a "no recording" rule categorically lawful "based on Boeing"). We believe that a return to "case-specific justification" better serves the purposes of the Act.

Boeing's categorical approach is also hamstrung by its elimination of any consideration of the specific language or context of particular rules. Under Boeing, this was done by, in a single case, analyzing whether one particular rule—including its specific wording and context—chills employees' exercise of Section 7 rights, concluding that it does not, and then broadly declaring lawful all similar rules of that general type, regardless of the specific language or context of any of those purportedly similar rules.[23]

_____

[23] As an example of the problem with this approach, consider one of the rules at issue in LA Specialty Produce. That rule said:

> Employees approached for interview and/or comments by the news media, cannot provide them with any information. Our President, Michael Glick, is the only person authorized and designated to comment on Company policies or any event that may affect our organization.

368 NLRB No. 93, slip op. at 1. This rule clearly prohibits employees from sharing "any information" when asked for it by the media and gives the company president exclusive authority to comment on "any event" that could affect the company. Meanwhile, the LA Specialty Board acknowledged that "Section 7 generally protects employees when they speak with the media about working conditions, labor disputes, or other terms and conditions of employment." Id., slip op. at 4. Yet the Board concluded that a reasonable employee would only interpret the rule as a prohibition against speaking to the news media on the company's behalf—reading a limitation into the rule—and so concluded that the rule did not even infringe on Sec. 7 rights. Id., at 4–5. That conclusion was untenable, precisely because it reflected the Board's failure to genuinely interpret work rules from an employee perspective. In turn, based on its interpretation of the rule, the Board concluded that all similar rules are always lawful for every employer to maintain. LA Specialty Produce, 368 NLRB No. 93, slip op. at 5. Such

Our return to a case-specific approach is intended to remedy the obvious problems with *Boeing*'s categorical approach. In order to consider all important aspects of the problem posed by potentially overbroad work rules, the Board should examine the specific wording of the rule, the specific industry and workplace context in which it is maintained, the specific employer interests it may advance, and the specific statutory rights it may infringe. The case-by-case approach will not sacrifice clarity and predictability for regulated parties. As is always the norm, the Board will aim to ensure that like cases will be decided alike. The nearer the wording of a specific rule is to a rule assessed in a prior case, or the nearer the workplace context or employer interests are to those factors previously considered, the more likely the Board's determination of the rule's legality will be the same. As a consequence, more predictable outcomes will emerge over time. For instance, many of the Board's core pre-*Lafayette Park* work-rules holdings—such as those concerning maintenance of a "no solicitation" rule, see, e.g., *Republic Aviation*, 324 U.S. at 803 fn. 10—that *Boeing* did not overrule and that we maintain, describe generally applicable parameters for assessing certain types of rules. But that process should not be short-circuited, as the Board plainly did in applying *Boeing*. Put somewhat differently, consistent with the Act, predictability and certainty cannot be achieved simply by giving employers broad authority to adopt work rules and by correspondingly shrinking the scope of Section 7.

### III.

The Board's usual practice is to apply new policies and standards retroactively to all pending cases in whatever stage, unless doing so would amount to a manifest injustice. *SNE Enterprises, Inc.*, 344 NLRB 673, 673 (2005). To determine whether retroactive application amounts to a manifest injustice, the Board considers the reliance of the parties on preexisting law, the effect of retroactivity on accomplishment of the purposes of the Act, and any particular injustice arising from retroactive application. Id.

Here, retroactive application of the new work-rules standard will not cause manifest injustice. First, *LA Specialty Produce*'s purported "clarifications" of *Boeing*'s standard were announced less than 4 years ago, so parties have not had an extended period to rely on *Boeing*'s purportedly clarified standard. In any event, given the unclear nature of *Boeing*'s interpretive inquiry and the confusing results of its categorical classification scheme, reliance on *Boeing* as a practical matter was minimal. Second, as noted above, the standard from *Boeing* that we overrule was detached from the Act's goals, which are better promoted by the standard that we adopt today.

Retroactive application is thus important to furthering the Act's purposes. Third, and last, we have identified no particular injustice arising from retroactive application. In particular, to the extent that a rule in a pending case is now found facially unlawful, even if it would have been upheld under *Boeing*, the remedy will be an order to rescind the rule, leaving the employer free to replace the rule with a more narrowly tailored substitute. For these reasons, we find that retroactive application of the standard we announce today is appropriate.

In this case, the General Counsel alleges that the Respondent unlawfully maintained overbroad work rules governing personal conduct, conflicts of interest, and confidentiality of harassment complaints. Applying *Boeing* and its progeny, the judge determined that maintenance of those rules was unlawful. Having overruled those decisions, we do not review the judge's application of them. Instead, to allow the parties an opportunity to present arguments and introduce any relevant evidence under the new standard announced today, we remand this case to the judge for further proceedings consistent with this decision.

### IV.

We have carefully considered the views of our dissenting colleague. We are not persuaded that we should adhere to the Board's current approach in cases involving facial challenges to work rules.[24] Nor are we persuaded that the approach we adopt today is unsound.

As we have done, the dissent examines the history of the Board's approach to work rules (a review noticeably absent from *Boeing*). Much of its discussion of Board and court of appeals cases from the 1960s, 1970s, and 1980s reaches essentially the same conclusion as we have: The Board's older case law in this area was developing and unclear. The dissent's claim that Board precedent was unclear and applied inconsistently, however, undermines its contention that there is "[l]ongstanding precedent" that "requires" the Board to take a particular approach in this area of law, a claim that the *Boeing* Board did not make.[25]

More pointedly, our dissenting colleague contends that *Republic Aviation* requires that we give "more weight" to employers' interests than today's approach does. We

---

[24] In particular, the dissent offers no reason to continue to follow *Boeing*'s categorical approach, other than to assert that the categories "provide employers with 'certainty beforehand.'" As we have explained at length, the categorical approach was an arbitrary and capricious approach to the analysis of work rules. To the extent that it provided any "certainty," it did so by granting employers broad scope to adopt particular types of work rules, regardless of an employer's specific interests and regardless of how the rule was phrased, and by correspondingly limiting the scope of employees' statutory rights. The standard we adopt provides certainty, as like cases will be decided alike, without the wholesale sacrifice of statutory rights.

[25] In any event, for all the reasons we have stated, we would adopt today's approach, even if it were inconsistent with prior Board decisions predating *Lutheran Heritage*.

---

a sweeping determination broadly diminishes employees' Sec. 7 rights at all workplaces, without any particularized justification to do so.

reject that contention. As we have explained, a central consideration in crafting a new standard has been, as *Republic Aviation* directs, "working out an adjustment between the undisputed right of self-organization assured to employees under the [] Act and the equally undisputed right of employers to maintain discipline in their establishments." *Republic Aviation*, 324 U.S. at 797–798. That directive tells us that employees' rights to organize and employers' rights to have rules to maintain discipline are "equally *undisputed*"—not, of course, that those undisputed rights should be equally *weighted* in every circumstance. Instead, the Supreme Court left it to the Board to "work[] out [the] adjustment" between those sometimes conflicting rights using the Board's "administrative flexibility" to "accomplish the dominant purpose" of the Act, which "is the right of employees to organize for mutual aid without employer interference." Id. at 798; see also 29 U.S.C. § 151.

The standard adopted today is carefully calibrated to achieve the adjustment that *Republic Aviation* describes. Despite the dissent's unfounded speculation as to how future cases will be decided, the Board's inquiry does not end if the General Counsel proves that a rule has a reasonable tendency to interfere with employees' exercise of Section 7 rights. Rather, that showing merely establishes a presumption of unlawfulness. An employer may rebut it by proving that the rule advances a legitimate and substantial business interest and that the employer is unable to advance that interest with a more narrowly tailored rule. In this way, the test appropriately accommodates employers' right to maintain rules necessary to operating their businesses. At the same time, when an employer's rule is overbroad—i.e., when it could be narrowed to lessen the infringement of employees' statutory rights while still advancing the employer's interest—the standard properly requires that narrowing.

We reject our dissenting colleague's tendentious prediction that the narrow-tailoring requirement will prove impossible to meet, as well as his apparent demand that we explain today how employers should tailor their rules in all cases. Employers are more than equipped to narrowly tailor their work rules to eliminate unnecessary overbreadth. In the absence of a specific rule, promulgated in a specific workplace, it is premature for us to assume how a work rule could potentially be narrowly tailored.[26] Of course, as a defender of *Boeing* and its progeny, our colleague has indicated a preference for a "one-size-fits-all" approach that negates the need for any

such tailoring. But, for the reasons we have explained here, such an approach is unsound and would not reach a proper "adjustment" between conflicting rights. Moreover, it is unnecessary. Under *Lutheran Heritage*, the Board was able to carefully parse work rules, finding some lawful and others not.[27]

The dissent also challenges the new standard's approach to interpreting work rules, i.e., interpreting the rule from the perspective of the economically dependent employee (a layperson, not a lawyer) who contemplates engaging in Section 7 activity, consistent with the Supreme Court's decision in *Gissel*. That approach—in line with the Board's general approach to employer statements alleged to violate Section 8(a)(1) of the Act—asks whether such an employee could *reasonably* interpret the rule to restrict or prohibit Section 7 activity. Our dissenting colleague seems to argue that the new standard means something other than what it plainly says. We have *not* held that a rule will be found presumptively unlawful if a coercive interpretation is merely conceivable (as opposed to reasonable). We have explained, rather, that in order to adequately protect the exercise of Section 7 rights we will not require the coercive interpretation to be the *only* reasonable interpretation. In other words, ambiguous rules are properly construed against the employer.

We are not persuaded by our colleague's criticisms of this approach, which fail to acknowledge that the narrow tailoring of work rules fits within the larger statutory context. As a preliminary matter, we dispose of the dissent's various mischaracterizations in support of its argument. The dissent says the reasonable employee we describe will find a prohibition on Section 7 activity in a rule "where none exists." No, if there is no reasonable reading of the rule that it prohibits Section 7 activity, that is the end of the inquiry: the rule is lawful. The dissent says our approach involves interpretation of "any isolated word or phrase" in a rule. No, it turns on the interpretation of the rule as a whole; indeed, one of our criticisms of *Boeing*'s categorical approach is that it failed entirely to consider *any* of the specific text of rules. The dissent says that its (undefined) "truly reasonable" employee would use "common sense" when interpreting rules whereas the reasonable employee we describe does not. No, our inquiry, again, involves a *reasonable* employee who interprets work rules as a layperson rather than as a lawyer.

Our colleague apparently would hold that a work rule cannot be deemed unlawful (or presumptively unlawful) if it is susceptible to a noncoercive interpretation. In effect, ambiguous rules would be construed against *employees*, permitting such rules regardless of the chill that they cause to employees' exercise of Section 7 rights. It seems clear to us, if not to our colleague, that an ambig-

---

[26] Our colleague also suggests that the Board should provide employers with a definitive "safe harbor" for their rules if they generally disclaim an intention to infringe on Sec. 7 rights. Notably, no "safe harbor" issue is presented in this case. In any event, as we have noted (see fn. 21, supra), in considering whether a rule reasonably tends to chill an employee from exercising statutory rights or is sufficiently narrowly tailored, we will evaluate any explanations or illustrations contained in the rule regarding how the rule does not apply to Sec. 7 activity.

[27] See, e.g., *First Transit, Inc.*, 360 NLRB 619 (2014).

uous rule can have a chilling effect on employees concerned about avoiding discipline from their employer. We reject our colleague's policy choice that would sanction coercive work rules. Today's standard, in contrast, is intended to be robustly prophylactic in protecting statutory rights—while still properly recognizing employers' legitimate and substantial business interests, where shown, in maintaining particular work rules.

The dissent also contends that a rule's ambiguity should *not* be construed against the employer as the drafter and that the economic dependence of employees on their employer should not factor into the Board's understanding as to how an employee would reasonably interpret a work rule. As to the first point, the dissent argues that in distinguishing between rules that "could" be interpreted to have a coercive meaning and rules that "would" be interpreted this way, "*Lutheran Heritage* implicitly overruled *Lafayette Park Hotel*" with regard to the application of the interpretation-against-the-drafter principle. We are not persuaded by this novel reading of the case law. However, our disagreement on this point is moot given the standard we adopt today. Even if *Lutheran Heritage* departed from precedent, without explanation, we return to that precedent now. Aside from a long pedigree, see, e.g., *Farah Manufacturing Co.*, 187 NLRB 601, 602 & fn. 5 (1970) (quoting *NLRB v. Miller*, 341 F.2d 870, 874 (2d Cir. 1965)), the familiar interpretation-against-the-drafter principle is firmly grounded in both an employee's lack of specialized legal or interpretive expertise, *Miller*, 341 F.2d at 874 (justifying the doctrine's application by noting that "employees . . . are not grammarians"), and inequality of bargaining power vis-à-vis an employer, see 29 U.S.C. § 151 (finding "inequality of bargaining power between employees . . . and employers"). See also Restatement (Second) of Contracts § 206 cmt. A (explaining that the interpretation against the drafter rule "is often invoked . . . in cases where the drafting party has the stronger bargaining position"). We note that our dissenting colleague does not explain *why* he would get rid of this longstanding and well-founded interpretive principle.

In turn, the dissent's challenge to our reliance on the economic dependence of employees as supporting the new standard is based on an attempt to limit *Gissel*. According to the dissent, the Supreme Court in that case was only referring to a specific "category" of employer statements—namely, "predictions of dire consequences if employees unionize." But the Court's relevant observations are in no way limited in that manner. Here, in pertinent part, is what it said:

> *Any* assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting. Thus, an employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in § 7 and

protected by § 8(a)(1) and the proviso to § 8(c). And *any* balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear.

*Gissel*, supra, 395 U.S. at 617 (emphasis added). Consistent with this observation, the Board has long factored employees' economic dependence into its analysis of issues under Section 8(a)(1) of the Act.[28] Our dissenting colleague does not challenge the basic premise that employees are, indeed, economically dependent on their employers. The National Labor Relations Act itself rests on that premise.

In short, our dissenting colleague has pointed to nothing in the Act or in the decisions of the Supreme Court that either compels the Board to adhere to the *Boeing* work-rules standard or that prevents the Board from adopting the standard announced today. That standard, we believe, better promotes federal labor policy and better reflects the teachings of the Court, while addressing shortcomings in the *Lutheran Heritage* standard.

### ORDER

IT IS ORDERED that the allegations that the Respondent violated Section 8(a)(1) by maintaining its rules governing personal conduct, conflicts of interest, and confidentiality of harassment complaints are remanded to Administrative Law Judge Michael A. Rosas for further appropriate action as set forth above.

IT IS FURTHER ORDERED that the judge shall afford the parties an opportunity to present evidence on the remanded issues and shall prepare a supplemental decision setting forth credibility resolutions, findings of fact, conclusions of law, and a recommended Order. Copies of the supplemental decision shall be served on all parties, after which the provisions of Section 102.46 of the Board's Rules and Regulations shall be applicable.

Dated, Washington, D.C. August 2, 2023

_____
Lauren McFerran,                            Chairman

_____
Gwynne A. Wilcox,                           Member

_____

---

[28] See, e.g., *Mesker Door, Inc.*, supra, 357 NLRB at 595; *Daikichi Sushi*, 335 NLRB 622, 624 (2001), enfd. 56 Fed.Appx. 516 (D.C. Cir. 2003); *President Riverboat Casinos of Missouri*, 329 NLRB 77, 77 (1999); *Logo 7, Inc.*, 284 NLRB 204, 204–205 fn. 4 (1987); *American Spring Wire Corp.*, 237 NLRB 1551, 1553 (1978).

David M. Prouty,                    Member


(SEAL)          NATIONAL LABOR RELATIONS BOARD

MEMBER KAPLAN, dissenting.

The statement "*Boeing*[1] overruled *Lutheran Heritage Village*[2]" is true, but misleading. It is misleading because it suggests that the Board adhered to *Lutheran Heritage* right up until it issued *Boeing* in December 2017. The truth is, *Lutheran Heritage* was effectively overruled as early as 2011, by a Board majority that claimed to apply that decision when in fact it was applying the *Lutheran Heritage* dissent. Today, my colleagues do likewise. They say they are adopting a modified version of the *Lutheran Heritage* standard. In reality, they are implementing a slightly modified version of the *Lutheran Heritage* dissent—and that slight modification is more akin to window dressing than actual change.

Under the standard my colleagues announce, a work rule is presumptively unlawful to maintain "[i]f an employee *could* reasonably interpret [it] to have a coercive meaning" (emphasis added). The *Lutheran Heritage* majority rejected that standard. They held that a work rule was unlawful to maintain if employees reasonably *would* interpret it to prohibit Section 7 activity,[3] and they made clear that where a rule does not expressly refer to Section 7 activity, reasonable employees would not read it as doing so "simply because the rule *could* be interpreted that way."[4] My colleagues' standard reflects the views of the *dissenters* in *Lutheran Heritage*, who took the position that "a rule that prohibits, inter alia, unprotected behavior may be unlawful if it also contains prohibitions so broad that they *can* reasonably be understood as encompassing protected conduct."[5] That is the standard my colleagues embrace.

Ironically, although *Boeing* overruled *Lutheran Heritage*, it was *more* faithful to that decision than is my colleagues' decision today. The *Boeing* and *Lutheran Heritage* majorities went about it in different ways, but in determining whether a challenged work rule was lawful to maintain, both gave substantial weight to legitimate employer interests advanced by the rule as well as its potential to chill the exercise of Section 7 rights. Although the *Lutheran Heritage* majority announced a standard that appeared to consider only the latter—i.e., whether "employees would reasonably construe the language [of a rule] to prohibit Section 7 activity"[6]—they made it abundantly clear that legitimate employer interests were to be accommodated in the *application* of the standard. Implicitly embracing a view of the "reasonable employee" that the Board subsequently made explicit in *LA Specialty Produce*,[7] the *Lutheran Heritage* majority took for granted that reasonable employees understand the legitimate interests advanced by work rules and will interpret them in that light. Accordingly, their position was that even if a challenged rule *could* be read to restrict Section 7 activity, reasonable employees *would* not read it that way where the rule does not refer to such activity and advances legitimate employer interests. "To take a different analytical approach," said the *Lutheran Heritage* majority, "would require the Board to find a violation whenever the rule could conceivably be read to cover Section 7 activity, even though that reading is unreasonable. We decline to take that approach. . . . [R]easonable employees would not read the rule in that way. They would realize the lawful purpose of the challenged rules."[8] *Boeing*, on the other hand, announced a standard that expressly balances legitimate employer interests against employees' Section 7 rights, but both the *Lutheran Heritage* and *Boeing* majorities accorded employer interests significant weight in the analysis.

This is, of course, what an adequate standard for determining the lawfulness of a challenged work rule must do. As the Supreme Court held nearly 80 years ago, "[o]pportunity to organize and proper discipline are both essential elements in a balanced society," so the Board's task in cases such as this is to "work[] out an adjustment between the undisputed right of self-organization assured to employees under the Wagner Act and the equally undisputed right of employers to maintain discipline in their establishments." *Republic Aviation v. NLRB*, 324 U.S. 793, 797–798 (1945).[9] It is important to note that the

---

[1] *Boeing Co.*, 365 NLRB No. 154 (2017) (*Boeing*).

[2] *Lutheran Heritage Village–Livonia*, 343 NLRB 646 (2004) (*Lutheran Heritage*).

[3] Sec. 7 of the Act relevantly provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities . . . ."

[4] *Lutheran Heritage*, 343 NLRB at 647 (emphasis in original).

[5] *Lutheran Heritage*, 343 NLRB at 649 (Members Liebman & Walsh, dissenting in part) (emphasis added).

[6] *Lutheran Heritage*, 343 NLRB at 647.

[7] *LA Specialty Produce Co.*, 368 NLRB No. 93 (2019).

[8] *Lutheran Heritage*, 343 NLRB at 647–648. As I will show, the Board majority in *Lafayette Park Hotel*, 326 NLRB 824 (1998), enfd. 203 F.3d 52 (D.C. Cir. 1999), held the same implicit view of the "reasonable employee" as the *Lutheran Heritage* majority.

[9] In *NLRB v. Erie Resistor Corp.*, 373 U.S. 221 (1963), the Court spoke of the Board's "delicate task" of "weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing . . . the intended consequences upon employee rights against the business ends to be served by the employer's conduct." Id. at 229. In *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26 (1967), the Court emphasized the Board's "duty to strike the proper balance between . . . asserted business justifications and the invasion of employee rights in light of the Act and its policy." Id. at 33–34. Although neither case dealt specifically with work rules, the breadth of the Court's language indicates its broader applicability. However, as I will discuss later, several federal courts of appeals *have* expressly found that, in order to determine the legality of work rules under the Act, the Board must apply a balancing

Supreme Court did not state that one side of this "adjustment" should be given significantly more weight than the other. Further, because it is impossible to anticipate every specific act or omission warranting discipline, it follows that an adequate standard must also accommodate the reality that, as the Board recognized in *Lutheran Heritage*, "[w]ork rules are necessarily general in nature . . . ."[10]

The standard the Board adopted in *Boeing* and refined in *LA Specialty Produce* meets these requirements. It accommodates the reality that work rules must be worded generally, and it accords sufficient weight to both employee rights and employer interests so that it is fair to say that these "equally undisputed rights" are truly being "balanced" against each other in a meaningful way. Under *Boeing/LA Specialty Produce*, the Board begins by asking whether a reasonable employee—one "who is 'aware of his legal rights but who also interprets work rules as they apply to the everydayness of his job,'" and who "'does not view every employer policy through the prism of the NLRA'"[11]—would interpret a challenged rule to potentially interfere with the exercise of Section 7 rights. If not, the rule is lawful. If so, the Board proceeds to balance that potential interference against "legitimate justifications associated with the rule,"[12] i.e., legitimate interests the rule advances. If the rule's adverse impact on the exercise of Section 7 rights outweighs the legitimate interests it serves, the rule cannot be lawfully maintained; if the balance tips the other way, it can. As I will show, this standard is similar to one the Board adopted and applied decades earlier, at the insistence of several circuit courts, only to abandon it without explanation in *Lafayette Park Hotel*.

In contrast, the standard my colleagues announce today does not measure up. It gives effectively dispositive weight to the "employee rights" side of the balance. Indeed, the majority does not actually balance employee rights and employer interests in a manner consistent with *Republic Aviation*. A balancing standard necessarily entails the possibility that in a particular case, a challenged rule may be lawful to maintain even though it limits the exercise of Section 7 rights to some extent because the legitimate employer interests it advances *outweigh* that limitation. No such possibility exists under the standard my colleagues have adopted.

To begin, the majority holds that work rules are to be viewed from the perspective of a very different kind of "reasonable employee" than contemplated in *LA Specialty Produce*, *Lutheran Heritage*, and *Lafayette Park Hotel*. The majority's interpretation of "reasonable employ-

ee" in this context creates the labor-law equivalent of tort law's "eggshell skull" plaintiff. Their reasonable employee is an individual predisposed to read into their employer's work-rules references to Section 7 activity where none exists, and who would not engage in protected concerted activity without first minutely examining each rule set forth in their employee handbook. If this individual could possibly suspect that any isolated word or phrase in a rule that does not prohibit Section 7 activity might be interpreted to do so, that rule would coerce employees from engaging in protected concerted activity and therefore would be presumptively unlawful, even though truly reasonable employees would apply common sense and recognize that the evident purpose of the rule has nothing to do with Section 7 rights.[13] It is only the possibility that this so-called reasonable employee *could* interpret the rule outside the context of its evident purpose that is controlling. Further, in their view, the employer maintaining such a rule can escape unfair labor practice liability only by proving two things: that the rule advances legitimate and substantial interests, and that those interests cannot be advanced by a more narrowly tailored rule.

Let's put some flesh on the bones of these abstractions. Take, for example, a rule that subjects employees to discipline for "inability or unwillingness to work harmoniously with other employees."[14] How would this rule fare under the two different standards?

Under the balancing standard of *Boeing* and *LA Specialty Produce*, the answer is obvious. Employees who view work rules in the context of the everydayness of their jobs and not primarily through the prism of the Act would not reasonably interpret this rule to prohibit Section 7 activity. They would understand that the directive to work harmoniously with other employees simply "reflect[s] the lawful expectation that employees 'comport themselves with general notions of civility and decorum in the workplace.'"[15] Accordingly, the rule would be upheld without reaching the balancing-of-employee-rights-and-employer-interests step of the *Boeing* analysis.[16]

Under my colleagues' test, the answer is equally obvious. Section 7 gives employees the right (among others) to form, join, or assist labor organizations. Given that a

---

test that gives sufficient weight to employers' rights, as required by the Supreme Court.

[10] *Lutheran Heritage*, 343 NLRB at 648.

[11] *LA Specialty Produce*, 368 NLRB No. 93, slip op. at 2 (quoting *T-Mobile USA, Inc. v. NLRB*, 865 F.3d 265, 271 (5th Cir. 2017)).

[12] *Boeing*, 365 NLRB No. 154, slip op. at 3.

[13] This is especially true in cases where the General Counsel has issued a complaint alleging that rules contained in employee handbooks are unlawful, despite the fact that the rules were not alleged as unlawful in the underlying charge. See infra n.46.

[14] See *2 Sisters Food Group*, 357 NLRB 1816 (2011).

[15] Id. at 1829 (Member Hayes, dissenting in part) (quoting *Palms Hotel & Casino*, 344 NLRB 1363, 1368 (2005)).

[16] Without question, the *Lutheran Heritage* majority also would have upheld this rule, not only because employees would understand that the legitimate interests the rule advances and therefore would not reasonably construe it to prohibit Sec. 7 activity, but also because the only way to find the rule unlawful is by examining the phrase "work harmoniously" in isolation, and *Lutheran Heritage* rejected an analysis that reads "particular phrases in isolation." 343 NLRB at 646.

union-organizing campaign might occasion disharmony among employees, the reasonable employee of my colleagues' imagination would find that the rule *could* be interpreted to prohibit union activity, even if that was the furthest thing from the employer's mind. Therefore, the rule would be presumptively unlawful. Even assuming the employer proves that the rule serves legitimate and substantial interests—and who can reasonably doubt that it does?[17]—its proof is for naught unless it also proves that those interests cannot be advanced by a more narrowly tailored rule. *How* an employer is to do so, the majority does not say. No guidance is provided regarding evidence that might suffice to establish this defense. I suspect it will rarely if ever be established, and I am confident that my colleagues would not find it established in this instance.

Because it is unlikely that findings of presumptive unlawfulness can be overcome, employers' only real hope is to avoid that finding in the first place. And because it is virtually impossible to craft work rules that are general enough to serve their intended lawful purpose without being susceptible to an interpretation that infringes on Section 7 rights,[18] the only reliably predictable way that employers might insulate their work rules from Board invalidation would be by adding a legally sufficient disclaimer to their employee handbooks, i.e., language that would reassure even the majority's hypervigilant "reasonable employee" that none of the rules contained therein applies to Section 7 activity. Accordingly, the full breadth of my colleagues' decision cannot be understood until the Board addresses the question of safe harbor language in future cases.

My colleagues in the majority have a heavy responsibility. It is up to them to carry out the "delicate task" of striking an appropriate balance between employee rights and legitimate employer interests.[19] I believe they have failed to discharge their duty in this regard. Accordingly, I respectfully dissent.[20]

---

[17] Employees who work harmoniously with others lift the morale of the workplace, they do not bully or harass their coworkers, and (all else being equal) they are likely to be more productive than employees who do not. It also stands to reason that a harmonious workplace is likely to correlate positively with higher rates of employee retention.

[18] See *Boeing*, 365 NLRB No. 154, slip op. at 9 ("[I]t is likely that one can 'reasonably construe' even the most carefully crafted rules in a manner that prohibits some hypothetical type of Section 7 activity."); *Lafayette Park Hotel*, 326 NLRB at 830 (Chairman Gould, further concurring) ("When the rules have an obvious intent, they cannot be found unlawful by parsing out certain words and creating theoretical definitions that differ from the obvious ones. If that were the standard, virtually all of the work rules in today's workplace could be deemed violative of our Act . . . .").

[19] *NLRB v. Erie Resistor Corp.*, 373 U.S. at 229; see also *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. at 33–34.

[20] At issue in this case are three work rules maintained by the Respondent, dealing with personal conduct, conflicts of interest, and investigative confidentiality. Applying their new standard retroactively, my colleagues remand this case to the administrative law judge to apply it to these rules. I would apply the previous standards, i.e., those set

## Discussion

### A. *Longstanding precedent requires the Board to give substantial weight to legitimate employer interests.*

The majority would have the reader believe that the standard they announce today represents a new and improved version of the Board's traditional work-rules jurisprudence, from which the Board departed when it issued *Boeing*. But their review of precedent is superficial and incomplete. As I will show, a fuller and more thorough review of court and Board precedent flips the script on my colleagues' preferred narrative. It was *Boeing*'s balancing standard that returned Board law to conformity with both judicial precedent and the main thrust of the Board's work-rules precedent over the years, under which legitimate employer interests—far from being relegated to an affirmative defense that most likely never will be met, as the majority has done—were accorded substantial weight.

As stated above, the Supreme Court requires the Board to "work[] out an adjustment between the undisputed right of self-organization assured to employees under the Wagner Act and the equally undisputed right of employers to maintain discipline in their establishments."[21] "Working out an adjustment between" employee and employer rights means recognizing that, in the Court's words, "these rights are not unlimited in the sense that they can be exercised without regard to any duty which the existence of rights in others may place upon employer or employee."[22] And an accommodation between competing rights "must be obtained with as little destruction of the one as is consistent with the maintenance of the other,"[23] which implies that *some* "destruction" is acceptable—indeed, unavoidable.

The Board's most well-settled, longstanding work-rule standards contradict the majority's insistence that work rules, to be lawful, must be narrowly tailored to avoid restricting the exercise of Section 7 rights. Consistent with Supreme Court precedent, the Board's work-rules jurisprudence has long reflected its recognition that the exercise by employees of their Section 7 rights may be and indeed *must* be restricted to the extent necessary to accommodate employers' rights and legitimate interests. For example, to accommodate employers' property rights, Board law allows employers to maintain a rule prohibiting off-duty employees from entering the interior of their facility and outside work areas, even though such a rule imposes a substantial limitation on off-duty employees' exercise of their Section 7 right to engage in union activity by confining that activity to outside non-

---

forth in *Boeing*, *LA Specialty Produce*, and applicable post-*Boeing* cases. But since my colleagues do not presently pass on the lawfulness of these rules, I will refrain from doing so unless and until the case returns to the Board on exceptions.

[21] *Republic Aviation v. NLRB*, 324 U.S. at 797–798.

[22] Id. at 798.

[23] *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112 (1956).

work areas of the property.[24] Because "working time is for work," employers may lawfully maintain a rule prohibiting solicitation during working time, even though "working time" comprises most of the time employees spend at the workplace, and therefore a rule that prohibits solicitation on working time substantially restricts employees' exercise of their Section 7 right to engage in union-related solicitation.[25] Because working time is for work and literature easily turns into litter, employers may lawfully maintain a rule prohibiting distribution of literature during working time and in working areas at any time, even though such a rule sharply limits when and where employees may exercise their Section 7 right to distribute union-related literature.[26] Moreover, a no-solicitation or no-distribution rule that sweeps more broadly than these lawful prohibitions is *presumptively* unlawful, and the employer still may demonstrate that special circumstances justify the broader prohibition.[27] In short, the Board has long recognized that where legitimate employer rights and interests warrant, the fact that a work rule encompasses some Section 7 activity within the scope of its prohibition does not make the rule unlawful to maintain.

In tension with these precedents, the Board has occasionally adjudicated the lawfulness of work rules by focusing exclusively on whether a challenged rule restricted the exercise of Section 7 rights.[28] However, it ultimately recognized that in determining whether the mere maintenance of a work rule violates the Act, the chilling effect of the rule on Section 7 activity must be balanced against the employer's legitimate justifications for maintaining it. In doing so, the Board followed the lead of several federal courts of appeals, albeit somewhat haltingly.

In *McDonnell Douglas Corp.*, 194 NLRB 514 (1971), the Board considered a rule that limited distribution of

literature by off-duty employees to "a reasonable time before or after . . . shifts." Although it recognized that the rule was prompted by "legitimate concerns" involving "security, traffic, and littering" and that the employer was entitled to adopt "reasonable rules designed to implement its legitimate concerns," the Board found the rule unlawful without balancing those concerns against the rule's restriction of Section 7 activity. Id. at 514. On review, the United States Court of Appeals for the Eighth Circuit refused to enforce the Board's order. *McDonnell Douglas Corp. v. NLRB*, 472 F.2d 539 (8th Cir. 1973). The court held that the adjustment of employee rights and legitimate employer interests mandated by *Republic Aviation* required the Board to do more than just consider those respective rights and interests. Rather, it held that Supreme Court precedent requires the Board to *balance* those rights and interests and determine which was to be accorded greater weight: "[T]he vital issue which the Board should have considered more fully in this case," wrote the court, "is balancing the diminution of the employees' § 7 rights as the result of the subject rule against the interests of McDonnell being protected by the rule. In that balancing process, the Board should have determined whether the former sufficiently outweighed the latter to necessitate the order voiding the contested parts of the rule." 472 F.2d at 545.[29] The court remanded the case to the Board to try again. On remand, the Board accepted the court's opinion as the law of the case and summarily concluded that the employer "ha[d] shown sufficient need to maintain security to justify its rules in question." *McDonnell Douglas Corp.*, 204 NLRB 1110, 1110 (1973).

Next, in *Jeannette Corp.*, 217 NLRB 653 (1975), the Board adopted an administrative law judge's conclusion that the employer was violating Section 8(a)(1) by maintaining "an unwritten rule prohibiting employees from discussing wage rates with other employees," id. at 653–654, based solely on the judge's rationale that the rule "constitute[d] a clear impediment to, and a restraint upon, employees' Section 7 right to engage in concerted activities for mutual aid and protection concerning an undeniably significant term of employment," id. at 656. On review, the United States Court of Appeals for the Third Circuit upheld the result the Board had reached, but based on a rationale that implicitly criticized the incompleteness of the Board's analysis. See *Jeannette Corp. v. NLRB*, 532 F.2d 916 (3d Cir. 1976). After agreeing with the Board that the rule tended to restrain protected concerted activity, id. at 918, the court continued as follows:

---

[24] *Tri-County Medical Center*, 222 NLRB 1089 (1976).

[25] *Peyton Packing Co.*, 49 NLRB 828, 843 (1943), enfd. 142 F.2d 1009 (5th Cir. 1944), cert. denied 323 U.S. 730 (1944); *Essex International, Inc.*, 211 NLRB 749 (1974).

[26] *Stoddard-Quirk Manufacturing Co.*, 138 NLRB 615 (1962); *Our Way, Inc.*, 268 NLRB 394 (1983).

[27] *Peyton Packing*, 49 NLRB at 843–844 (holding that a rule prohibiting solicitation on nonworking time "must be presumed to be an unreasonable impediment to self-organization and therefore discriminatory in the absence of evidence that special circumstances make the rule necessary in order to maintain production or discipline"); *Stoddard-Quirk Manufacturing*, 138 NLRB at 616, 621–622 (finding rule prohibiting "unauthorized distribution of literature of any description on company premises" presumptively invalid and that the employer did not prove the rule was necessary to maintain production or discipline).

[28] See, e.g., *Solo Cup Co.*, 144 NLRB 1481, 1481–1482 (1963) ("[W]here the language is ambiguous and may be misinterpreted by the employees in such a way as to cause them to refrain from exercising their statutory rights, then the rule is invalid even if interpreted lawfully by the employer in practice."); *Hyland Machine Co.*, 210 NLRB 1063, 1071 (1974) ("[T]he ambiguous language might be interpreted by workers in such a way as to cause them to refrain from exercising their statutory rights, hence the rule is invalid even if [r]espondent intended or interpreted it privately otherwise.").

[29] The court of appeals was obviously troubled by the fact that the Board had failed to recognize that much of the work done at the employer's facility was "militarily sensitive and classified secret by the United States government." Id. at 547.

Once it is established that the employer's conduct adversely affects employees' protected rights, the burden falls on the employer to demonstrate "legitimate and substantial business justifications" for his conduct. *N.L.R.B. v. Fleetwood Trailer Co., Inc.*, 389 U.S. 375, 378 (1967); *N.L.R.B. v. Jemco, Inc.*, 465 F.2d 1148, 1152 n.7 (6th Cir. 1972). In weighing the justifications offered by the employer, we must heed the Supreme Court's admonition that "[it] is the primary responsibility of the Board and not of the courts 'to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy.'" *N.L.R.B. v. Fleetwood Trailer Co., supra*, 389 U.S. at 378, *quoting N.L.R.B. v. Great Dane Trailers*, 388 U.S. 26, 33–34 (1967).

Id. at 918–919. Thus, like the Eighth Circuit in *McDonnell Douglas*, the Third Circuit took the position that Supreme Court precedent precludes finding a work rule unlawful based solely on its adverse effect on employees' Section 7 rights, and mandates that the Board balance that adverse effect against the employer's "asserted business justifications" for the rule. However, because the employer had failed to assert any justification for its unwritten rule, id. at 919–920, the rule was upheld without the otherwise-required balancing.[30]

Subsequently, in *Texas Instruments Inc.*, 236 NLRB 68 (1978), the Board found that the employer violated the Act by maintaining a rule prohibiting employees from disseminating its wage scales outside the organization, once again relying exclusively on the rule's adverse impact on the exercise of Section 7 rights. Id. at 72. On review, the United States Court of Appeals for the First Circuit remanded with instructions that the Board apply the standard announced by the Third Circuit in *Jeannette Corp.* See *Texas Instruments, Inc. v. NLRB*, 599 F.2d 1067, 1073 (1st Cir. 1979). On remand, the Board reached the same result, although its decision left unclear whether it agreed with the court that a balancing of employee rights and employer justifications is mandatory or simply accepted the court's decision in that regard as the

law of the case. *Texas Instruments Inc.*, 247 NLRB 253 (1980), enf. denied 637 F.2d 822 (1st Cir. 1981).

Two years later, the Board dispelled this lack of clarity, upholding an employer's confidentiality policy on the basis that the adverse impact of the policy on employee rights was outweighed by the employer's "substantial and legitimate business justifications for its policy." *International Business Machines Corp.*, 265 NLRB 638, 638 (1982) (*IBM*). Subsequently, citing *IBM*, the Board announced the following generally applicable standard for adjudicating work-rule allegations: "In assessing the lawfulness of [an employer's] rule, . . . we must determine whether the rule reasonably tend[s] to coerce employees in the exercise of their Section 7 rights, and, if so, whether the employees' Section 7 rights are outweighed by any legitimate and substantial business justification for the rule." *Waco, Inc.*, 273 NLRB 746, 748 (1984); see also *Scientific-Atlanta, Inc.*, 278 NLRB 622, 625 (1986) (recognizing that "Section 7 rights may be outweighed by an employer's substantial and legitimate business justifications"). Following *Waco*, the Board repeatedly applied the standard it had announced in that case.[31]

The Board failed, however, to apply the governing standard consistently. In *Cincinnati Suburban Press*, 289 NLRB 966 (1988), an administrative law judge struck down two work rules without citing *Waco* or balancing the rules' reasonable tendency to interfere with the exercise of Section 7 rights against the newspaper's legitimate justifications for maintaining them. Instead, the judge found the rules unlawful on the basis that they "fail[ed] to define the area of permissible conduct in a manner clear to employees." Id. at 975. No Board precedent was cited as authority for this rationale. In adopting the judge's decision, the Board acknowledged the newspaper's right to adopt rules that further its legitimate interests, but stated that such rules must be "narrowly tailored" and "unambiguous." Id. at 966 n.2. As authority, the Board cited *Peerless Publications*, 283 NLRB 334 (1987), an entirely inapposite case.[32]

---

[30] The Third Circuit's citation to *NLRB v. Jemco* implicitly addressed a possible objection that might have been raised to its reliance on *Great Dane Trailers*. In *Great Dane*, the Supreme Court stated that "[o]nce it has been proved that the employer engaged in *discriminatory* conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives," 388 U.S. at 34 (first emphasis added, second emphasis in original), and whether a challenged work rule may be lawfully maintained presents an issue of alleged coercion or restraint under Sec. 8(a)(1), not of discriminatory conduct under Sec. 8(a)(3). In *Jemco*, however, the Sixth Circuit held that the *Great Dane* analysis is not limited to allegations of discriminatory conduct. "[T]he burden on the employer prescribed in *Great Dane* arises once it is established that the employer engaged in conduct which adversely affected employee rights, regardless of whether that conduct was discriminatory under Sec[.] 8(a)(3) or merely coercive or restraining under Sec[.] 8(a)(1)." *NLRB v. Jemco, Inc.*, 465 F.2d 1148, 1152 n.7 (6th Cir. 1972).

[31] See *Franklin Iron & Metal Corp.*, 315 NLRB 819, 820 (1994), enfd. 83 F.3d 156 (6th Cir. 1996); *Radisson Plaza Minneapolis*, 307 NLRB 94, 94 (1992), enfd. 987 F.2d 1376 (8th Cir. 1993); *Sweetwater Crafts*, 300 NLRB 18, 21 (1990), enfd. mem. 929 F.2d 701 (6th Cir. 1991); *Heck's, Inc.*, 293 NLRB 1111, 1119 (1989); *Elston Electronics Corp.*, 292 NLRB 510, 511, 529 (1989); *Pontiac Osteopathic Hospital*, 284 NLRB 442, 466 (1987).

[32] The issue in *Peerless Publications* was whether the employer had violated Sec. 8(a)(5) by promulgating certain rules unilaterally, not whether it was violating Sec. 8(a)(1) by maintaining those rules.

*Cincinnati Suburban Press*, in turn, spawned at least one further departure from *Waco*. See *Advance Transportation Co.*, 310 NLRB 920, 925 (1993) (finding rule unlawful because it "fail[ed] to define the area of permissible employee conduct," citing *Cincinnati Suburban Press*).

*B. The Board abandons the Waco balancing standard but continues to accord substantial weight to legitimate employer interests.*

In *Lafayette Park Hotel*, 326 NLRB 824 (1998), the Board abruptly abandoned the balancing standard it had announced in *Waco* and applied (although not with perfect consistency) in subsequent cases. Citing only *Republic Aviation* and the Supreme Court's familiar language requiring the Board to "work[] out an adjustment" between employee and employer rights, the Board announced the following standard: "In determining whether the mere maintenance of rules . . . violates Section 8(a)(1), the appropriate inquiry is whether the rules would reasonably tend to chill employees in the exercise of their Section 7 rights." Id. at 825. *Lafayette Park Hotel* cited no Board precedent for this standard, nor did it overrule *Waco* in relevant part or cases subsequent to *Waco* applying its balancing-of-employee-rights-and-employer-interests standard. Four members signed on to this test: Chairman Gould and Members Fox, Liebman, and Brame. Member Hurtgen did not endorse the test, stating that he "would not so limit the inquiry. If a rule reasonably chills the exercise of Sec[tion] 7 rights, it can nonetheless be lawful if [it] is justified by significant employer interests . . . ." Id. at 825 n.5.

But although the *Lafayette Park Hotel* majority departed from *Waco*'s balancing standard, it did not fail to accord substantial weight to employers' legitimate interests. To be sure, the Board did not explain how it would achieve the "adjustment" of employee rights and employer interests that *Republic Aviation* mandates with a standard that treats as solely relevant the tendency of a challenged rule to chill the exercise of Section 7 rights. Nevertheless, in analyzing the rules at issue in the case, the Board made clear that the required adjustment was to be accomplished in the *application* of the announced standard—an application that assumes a reasonable employee very different from the one my colleagues place at the center of their decision.

Seven rules were at issue in *Lafayette Park Hotel*. All five members found one of them, an off-duty access rule, unlawful as contrary to *Tri-County Medical Center*. A majority consisting of Chairman Gould and Members Fox and Liebman found a second rule unlawful, on the basis that controlling precedent (including *Cincinnati Suburban Press*) dictated that result; Members Hurtgen and Brame dissented. A different majority consisting of Chairman Gould and Members Hurtgen and Brame ("the majority") found the remaining five rules lawful. Members Fox and Liebman, dissenting in part ("the dissent"), would have found all seven rules unlawful.[33]

The rationale of the majority in upholding five of the seven rules holds the key to understanding *Lafayette Park Hotel* (and, as shown below, the Board's subsequent decision in *Lutheran Heritage* as well). Again and again, this majority found the challenged rule would not *reasonably* tend to chill employees in exercising their Section 7 rights because reasonable employees would perceive the legitimate employer interests served by the rule and would read it in that light, not as prohibiting Section 7 activity.[34] The majority rejected an analysis that finds ambiguity in a rule by "parsing" its language and reading particular phrases in isolation. 326 NLRB at 825.

Dissenting in part, Members Fox and Liebman accused their colleagues of misapplying the announced standard. "While paying lip service to the appropriate standard," they wrote, "our colleagues have applied that standard in such a way as to enable employers lawfully to maintain rules that have the likely effect of chilling Section 7 activity." 326 NLRB at 830. In their view, all seven rules at issue were unlawful because "they are all overly broad and equally ambiguous as to their reach." Id. The dissent repeatedly invoked the principle that ambiguity is construed against the drafter,[35] and some variation of the words *ambiguous* or *overbroad* appears 22 times in their dissent. Echoing the rationale of the administrative law judge in *Cincinnati Suburban Press*, they concluded that "[e]ach [of the rules] fails to define the area of impermis-

---

[33] Although, as noted, these were not the only majority and dissenting opinions in *Lafayette Park Hotel*, these are the only holdings that will be discussed hereinafter.

[34] See *Lafayette Park Hotel*, 326 NLRB at 825 (finding lawful a rule that prohibits "[b]eing uncooperative with supervisors, employees, guests and/or regulatory agencies or otherwise engaging in conduct that does not support the Lafayette Park Hotel's goals and objectives" because it "addresses legitimate business concerns" and therefore "employees would not reasonably conclude that the rule as written prohibits Sec[.] 7 activity"); id. at 826 (finding lawful a rule that prohibits "[d]ivulging Hotel-private information to employees or other individuals or entities that are not authorized to receive that information" because "businesses have a substantial and legitimate interest in maintaining the confidentiality of private information, including guest information, trade secrets, contracts with suppliers, and a range of other proprietary information," and employees "reasonably would understand that the rule is designed to protect that interest rather than to prohibit the discussion of their wages"); id. at 826–827 (finding lawful a rule that prohibits "[u]nlawful or improper conduct off the hotel's premises or during non-working hours which affects the employee's relationship with the job, fellow employees, supervisors, or the hotel's reputation or good will in the community" because "[e]mployees reasonably would believe that this rule was intended to reach serious misconduct, not conduct protected by the Act"); id. at 827 (finding lawful a rule stating that "[e]mployees are not permitted to use the restaurant or cocktail lounge for entertaining friends or guests without the approval of the department manager" because "[t]here are legitimate business reasons for such a rule, and we believe that employees would recognize the rule for its legitimate purpose, and would not ascribe to it far-fetched meanings such as interference with Sec[.] 7 activity"); id. at 827–828 (finding lawful a rule stating that "[e]mployees are not allowed to fraternize with hotel guests anywhere on hotel property" because "[e]mployees would recognize the legitimate business reasons for which such a rule was promulgated, and would not reasonably believe that it reaches Sec[.] 7 activity" (footnote omitted)).

[35] Id. at 830 n.1; id. at 832 & n.7.

sible conduct in a manner clear to employees. As a result, each has a reasonable tendency to cause employees to refrain from engaging in protected activities." Id. at 830. Turning to specific rules, the dissent found particular rules unlawful because they "could," "may," or "might" be understood to prohibit Section 7 activity.[36] The dissent repeatedly isolated particular words and phrases and found challenged rules ambiguous and overbroad because the words or phrases were not defined or otherwise limited.[37] The dissent asserted that the dissenting members were not "precluding or restricting employers from achieving legitimate business objectives by imposing work rules governing employee conduct," but that those rules must be "narrowly and precisely drawn to define the proscribed conduct," id. at 833, and "eliminate ambiguity," id. at 834, in order to withstand Board review.[38]

The key votes in *Lafayette Park Hotel* were Chairman Gould's—it was his vote that tipped the balance in the Hotel's favor on five of the seven contested rules—and the Chairman wrote separately to explain his disagreement with his colleagues. He turned their criticism back on themselves, faulting *them* for "fail[ing] to apply the appropriate standard" by "view[ing] these rules through the eye of a sophisticated labor lawyer" and "focus[ing] on whether any language in the rules could theoretically encompass Section 7 activity," rather than viewing them

from the standpoint of a "reasonable employee," who would perceive their "obvious meaning and intent." "In short," he concluded,

> it is not enough to find that certain language in a rule is broad enough to arguably apply to Section 7 activity. The appropriate inquiry must center on whether a reasonable employee could believe that the rule prohibits protected activity. When the rules have an obvious intent, they cannot be found unlawful by parsing out certain words and creating theoretical definitions that differ from the obvious ones. If that were the standard, virtually all of the work rules in today's workplace could be deemed violative of our Act unless they explicitly state that they do not apply to Section 7 activity.

Id. at 830.

Before moving on to *Lutheran Heritage*, I must point out that the dissent painted a misleading picture of Board law in their *Lafayette Park Hotel* dissent. The dissent indicated that "Board precedent holds that the mere maintenance of an ambiguous or overly broad rule is unlawful because it tends to inhibit employees from engaging in otherwise protected activity." 326 NLRB at 831. Although some Board decisions stand for that one-sided proposition, others do not, including *Waco* and a number of post-*Waco* decisions recognizing that an overbroad rule is lawful if justified by substantial and legitimate employer interests that outweigh its potential adverse effect on the exercise of Section 7 rights.[39] Moreover, the cases cited in the dissent in support of its representation of what "Board precedent holds"—*Ingram Book Co.*, 315 NLRB 515 (1994), and *J. C. Penney Co.*, 266 NLRB 1223 (1983)—do not stand for the broad proposition the dissenters assert.[40]

### C. *The Board adheres to and refines the Lafayette Park Hotel standard, over a dissent that echoes the Lafayette Park Hotel dissent.*

In *Lutheran Heritage*, the Board adhered to the standard that was announced in *Lafayette Park Hotel*, stating that "to determine whether mere maintenance of certain

---

[36] See, e.g., id. at 831 (finding rule prohibiting "conduct that does not support the Lafayette Park Hotel's goals and objectives" unlawful because the "failure to define the hotel's 'goals and objectives' is overbroad and ambiguous and reasonably *could* lead employees to believe that [the rule] prohibits protected activity"; employees "*might* . . . conclude that any concerted protest of current terms and conditions of employment . . . would violate the . . . rule") (emphasis added); id. at 832 (finding rule against "[d]ivulging Hotel-private information" unlawful because the term "Hotel-private" is "undefined" and therefore "*could* reasonably lead employees to believe that the standard prohibits discussion among employees concerning wages, benefits, and other terms and conditions of employment"; "[a]lthough employers may have a substantial and legitimate interest in limiting or prohibiting discussion of some aspects of their affairs," the rule "fails to clearly define the impermissible conduct" and therefore "employees *may* reasonably believe that protected activity is prohibited") (emphasis added); id. at 833 ("[B]ecause each rule is susceptible to doubt as to its coverage, each reasonably *could* lead an employee to refrain from protected activity for fear of breaking the rule and incurring disciplinary penalty.") (emphasis added).

[37] See id. at 831 (considering the phrase *goals and objectives* in isolation); id. at 832 (considering the term *Hotel-private* in isolation); id. at 833 (considering the word *fraternize* in isolation).

[38] The majority decision in *Lafayette Park Hotel*—in the section that all five members joined, involving an overbroad off-duty access rule—also invoked the principle that ambiguity is construed against the drafter. 326 NLRB at 828. But the majority repeatedly made clear that their understanding of that principle had nothing in common with that of the dissent. See id. at 825 (finding "no ambiguity" in a rule where "any arguable ambiguity arises only through parsing the language of the rule, viewing [a particular] phrase . . . in isolation, and attributing to the [r]espondent an intent to interfere with employee rights"); id. at 827 (finding a rule "not ambiguous" despite containing an "undefined term" because "[e]mployees would recognize the legitimate business reasons for which such a rule was promulgated, and would not reasonably believe that it reaches Sec[.] 7 activity").

[39] See supra n.31.

[40] At issue in *Ingram Book* was a no-distribution rule that prohibited distributing literature "at any time except during Company-authorized fund-raising drives," 315 NLRB at 515, and in dispute in *J. C. Penney* was a no-solicitation rule prohibiting solicitation "in the store at any time," 266 NLRB at 1223. The latter rule was plainly unlawful under longstanding precedent applicable to retail stores, see, e.g., *Marshall Field & Co.*, 98 NLRB 88 (1952), enfd. 200 F.2d 375 (7th Cir. 1953); the former rule was as plainly unlawful under *Stoddard-Quirk*, 138 NLRB at 615, and *Our Way*, 268 NLRB at 394. *Ingram Book* and *J. C. Penney* are properly read as limited to those narrow issues, controlled by well-settled precedent, not as stating a rule broadly applicable to work-rule issues generally. Indeed, those cases cannot be read to stand for the proposition that ambiguity and overbreadth without more render maintenance of a rule unlawful without bringing them into conflict with *Waco*, which expressly requires that the adverse impact of a challenged rule on the exercise of Sec. 7 rights be balanced against the legitimate employer interests the rule advances.

work rules violates Section 8(a)(1) of the Act, 'the appropriate inquiry is whether the rules would reasonably tend to chill employees in the exercise of their Section 7 rights.'" 343 NLRB at 646 (quoting *Lafayette Park Hotel*, 326 NLRB at 825). The Board also adhered to *Lafayette Park Hotel*'s insistence that rules be given "a reasonable reading" and that the Board "refrain from reading particular phrases in isolation." Id. (citing *Lafayette Park Hotel*, 326 NLRB at 825, 827). But the *Lutheran Heritage* Board mediated *Lafayette Park Hotel*'s "reasonable tendency to chill" test through a multipronged standard that further defined how and when the maintenance of a work rule would have that reasonable tendency. The Board identified four ways in which the maintenance of a rule may violate the Act, three of which do not concern us here.[41] Pertinent to this case is prong one of the *Lutheran Heritage* standard, under which a work rule is unlawful to maintain if "employees would reasonably construe the language to prohibit Section 7 activity." Id. at 647.

Like the "reasonable tendency to chill" standard of *Lafayette Park Hotel*, the "would reasonably construe" standard of *Lutheran Heritage* appears on its face to make the employee-rights side of the *Republic Aviation* balance solely relevant to the analysis. But like the majority in *Lafayette Park Hotel*, the *Lutheran Heritage* majority accommodated employers' legitimate interests in their *application* of the announced standard. And again like *Lafayette Park Hotel*'s majority, the *Lutheran Heritage* decision assumed a reasonable employee wholly unlike the one my colleagues posit, recognizing that, where challenged rules serve legitimate employer interests, "reasonable employees . . . . would realize the lawful purpose of the challenged rules" and read them in that light, not as prohibiting Section 7 activity. Id. at 648. Where a challenged rule "does not refer to Section 7 activity," the Board explained, "we will not conclude that a reasonable employee would read the rule to apply to such activity simply because the rule *could* be interpreted that way. To take a different analytical approach would require the Board to find a violation whenever the rule could conceivably be read to cover Section 7 activity, even though that reading is unreasonable. We decline to take that approach." 343 NLRB at 647 (emphasis in original). Accordingly, under the *Lutheran Heritage* "would reasonably construe" standard, a rule is not unlawful to maintain merely because it is ambiguous or overbroad and thus *could* be read to restrict the exercise of Section 7 rights.

There is, however, an important difference between *Lutheran Heritage* and *Lafayette Park Hotel*. As noted above, the section of the *Lafayette Park Hotel* decision in which all five members joined included a reference to the ambiguity principle, i.e., the principle that ambiguity is construed against the drafter. The majority in *Lafayette Park Hotel* did not address this issue because it found the particular rules at issue were not ambiguous,[42] but *Lutheran Heritage* rejected application of the ambiguity principle in the work-rules context. A statement is ambiguous if it *could* be interpreted in more than one way, but the *Lutheran Heritage* majority held that where a work rule does not refer to Section 7 activity, an employer does not violate the Act by maintaining it merely because the rule *could* be read to refer to such activity, i.e., merely because it is ambiguous. Properly understood, then, *Lutheran Heritage* implicitly overruled *Lafayette Park Hotel* in this critical respect.

For their part, the dissenters in *Lutheran Heritage* reprised the rationale of the *Lafayette Park Hotel* dissent. Invoking the principle that ambiguity is construed against the drafter, 343 NLRB at 650, the dissenting Board members would have held that a rule that *can* be read to prohibit Section 7 activity cannot be lawfully maintained. They rejected their colleagues' accommodation of the employer's interests within the perspective of a reasonable employee who understands the legitimate purpose served by a necessarily general work rule and therefore would not read the rule to prohibit Section 7 activity merely because it *could* be read that way. They also rejected the majority's assertion that particular words and phrases ought not be considered in isolation.[43] Although the dissent gave lip service to employers' right to maintain rules that protect their legitimate interests, it insisted that this right "is appropriately subject to the requirement that employers articulate those rules with sufficient specificity that they do not impinge on employees' free exercise of Section 7 rights." Id. at 652. In other words, ambiguity without more condemns a rule, and employers must narrowly tailor their rules to prohibit only unprotected activity, eradicating any possibility that a rule might be interpreted to prohibit Section 7 activity. Thus, the position of the dissent in *Lafayette Park Hotel* was consistent with the dissent in *Lutheran Heritage*.

*D. The Board effectively overrules Lutheran Heritage, while claiming to apply it, by applying the Lutheran Heritage and Lafayette Park Hotel dissents instead.*

*Lutheran Heritage* issued in 2004. By 2011, however, the Board was erroneously professing to apply the *Lutheran Heritage* standard while actually applying the *Lafayette Park Hotel* and *Lutheran Heritage* dissents.

The first such decision was *2 Sisters Food Group, Inc.*, 357 NLRB 1816, 1816 (2011), where the majority found

---

[41] Those three are where the rule (1) explicitly restricts Sec. 7 activity, (2) was promulgated in response to union activity, or (3) has been applied to restrict the exercise of Sec. 7 rights. 343 NLRB at 646–647. In *AT&T Mobility, LLC*, 370 NLRB No. 121 (2021), the Board overruled the "applied to restrict" prong of *Lutheran Heritage*.

[42] See supra n.38.

[43] See 343 NLRB at 650 (considering the phrases *abusive language* and *verbal abuse* in isolation); id. at 651 (considering the word *harassment* in isolation).

that the employer violated Section 8(a)(1) by maintaining a rule that made "inability or unwillingness to work harmoniously with other employees" grounds for discipline. Citing *Lutheran Heritage* as the applicable standard, the majority nevertheless relied for their finding on the rule's "patent ambiguity," the fact that the rule "[did] not define what it means to 'work harmoniously' (or fail to do so)," and the observation that the rule was "sufficiently imprecise that it could encompass any disagreement or conflict among employees, including those related to discussions and interactions protected by Section 7." Id. at 1817. The majority invalidated the rule because it was ambiguous and not narrowly tailored to exclude any possibility of being interpreted to restrict Section 7 activity. In other words, they applied the very standard endorsed by the *Lafayette Park Hotel* and *Lutheran Heritage* dissents. Indeed, by finding the rule unlawful notwithstanding the wholly legitimate interest it served—to promote a civil and decent workplace, as Member Hayes pointed out in dissent, id. at 1829—because it "*could* encompass" Section 7 activity, id. at 1817 (emphasis added), the *2 Sisters* majority plainly relied on a rationale that directly contradicted the very *Lutheran Heritage* standard they purported to apply. See *Lutheran Heritage*, 343 NLRB at 647 ("Where . . . the rule does not refer to Section 7 activity, we will not conclude that a reasonable employee would read the rule to apply to such activity simply because the rule *could* be interpreted that way.") (emphasis in original).[44]

Throughout the period between August 2013 and ending August 2017,[45] the Board continued to claim to apply the *Lutheran Heritage* standard while actually applying the *Lutheran Heritage* and *Lafayette Park Hotel* dissents. Over the course of those years, the Board issued at least nineteen decisions that effectively applied those dissents by reading particular phrases in isolation, requiring that rules be narrowly tailored to exclude any possible interpretation that would impinge on Section 7 rights, and/or invoking the principle that ambiguity is construed against the employer as the drafter of the challenged rule.[46] Typ-

*Grill Concepts Services*, 364 NLRB 385, 404 (2016) ("[A]mbiguities are construed against [the] promulgator [of the rule]."), petition for review granted in part & remanded mem. 722 Fed.Appx. 1 (D.C. Cir. 2018); *Long Island Association for AIDS Care, Inc.*, 364 NLRB 200, 215 n.6 (2016) ("'Board law is settled that ambiguous employer rules—rules that reasonably *could* be read to have a coercive meaning—are construed against the employer.'") (quoting *Flex Frac Logistics, LLC*, 358 NLRB 1131, 1132 (2012), enfd. 746 F.3d 205 (5th Cir. 2014)) (emphasis added), enfd. mem. 696 Fed.Appx. 556 (2d Cir. 2017); *Schwan's Home Service*, 364 NLRB 170, 172 (2016) ("It is well established that . . . ambiguity is construed against the [r]espondent as the drafter of the rule . . . ."); *Spring Valley Hospital Medical Center*, 363 NLRB 1766, 1766 (2016) ("[A]ny ambiguity in the rule must be construed against the drafter . . . ."), vacated & remanded on other grounds mem. 2018 U.S. App. LEXIS 17988 (9th Cir. June 29, 2018); *T-Mobile USA, Inc.*, 363 NLRB 1638, 1639 (2016) (same); id. at 1639–1640 (finding rule that states "[e]mployees are expected to maintain a positive work environment" unlawful to maintain because it "is not limited to conduct that would objectively be viewed as unprotected," i.e., because it is not narrowly tailored), enf. denied in part 865 F.3d 265 (5th Cir. 2017); *William Beaumont Hospital*, 363 NLRB 1543, 1546 (2016) ("That a particular rule threatens to have a chilling effect does not mean . . . that an employer may not address the subject matter of the rule and protect his legitimate business interests. When the Board finds a rule unlawfully overbroad, the employer is free to adopt a more narrowly tailored rule that does not infringe on Section 7 rights."); *Whole Foods Market, Inc.*, 363 NLRB 800, 801 (2015) ("Any ambiguity in a rule must be construed against the promulgator of the rule . . . ."); id. at 802–803 n.9 ("We do not hold that an employer is prohibited from maintaining any rules regulating recording in the workplace. We hold only that those rules must be narrowly drawn . . . ."), enfd. mem. 691 Fed.Appx. 49 (2d Cir. 2017); *Rocky Mountain Eye Center, P.C.*, 363 NLRB 325, 331 (2015) ("[A]mbiguities are construed against [the] promulgator."); *UPMC*, 362 NLRB 1704, 1704–1705 n.5 (2015) (adopting judge's finding that employer's email policy was unlawful to maintain "based on its ambiguity"); id. (rejecting dissenting member's position that employees would read rule prohibiting the use of UPMC's logos or other copyrighted or trademarked materials as directed to the protection of the hospital's intellectual property because "the provision does not, by its terms, limit itself to violations of intellectual property law"); *Rio All-Suites Hotel & Casino*, 362 NLRB 1690, 1690 (2015) ("[A]ny ambiguity in the rule must be construed against the drafter . . . ."); *Sheraton Anchorage*, 362 NLRB 1038, 1038 n.4 (2015) ("[T]o the extent the rule is ambiguous, the ambiguity 'must be construed against the employer as the promulgator of the rule.'") (quoting *Hyundai America Shipping Agency*, 357 NLRB 860, 870 (2011), enf. denied in part 805 F.3d 309 (D.C. Cir. 2015)); *Lily Transportation Corp.*, 362 NLRB 406, 406 n.3 (2015) ("To the extent the rule was ambiguous . . . , the burden of that ambiguity must be borne by the [r]espondent."); *Battle's Transportation, Inc.*, 362 NLRB 125, 126 (2015) (considering phrases "human resources related information" and "investigations by outside agencies" in isolation); *Lytton Rancheria of California d/b/a Casino San Pablo*, 361 NLRB 1350, 1351 (2014) ("[A]mbiguous employer rules—rules that reasonably *could* be read to have a coercive meaning—are construed against the employer.") (emphasis added); *Purple Communications, Inc.*, 361 NLRB 575, 576 (2014) (adopting judge's finding that employer violated the Act by maintaining "no-disruptions" rule for the reasons stated by the judge); 583 (finding "no-disruptions" rule unlawful because it "does not define or limit the meaning of 'disruption' or state that it is not intended to refer to Section 7 activity"); *Fresh & Easy Neighborhood Market*, 361 NLRB 72, 73 (2014) (finding rule requiring employees to "keep customer and employee information secure" unlawful because the rule contains "no language limiting the types of employee information that employees may not disclose"); *Laurus Technical Institute*, 360 NLRB 1155, 1163 ("[I]f the suspect rule could be considered ambiguous, any ambiguity in the rule must be construed against the employer as the promulgator of the rule."), petition for review dismissed 2015 U.S. App. LEXIS 6244 (D.C. Cir. Mar. 16, 2015).

---

[44] In subsequent cases, the majority was more circumspect in their choice of language. Typically (but not invariably), they parroted the *Lutheran Heritage* "would reasonably construe" standard by using "would" and avoiding "could," while nevertheless effectively applying the *Lutheran Heritage* dissent, as detailed below.

[45] I am disregarding work-rule cases issued in 2012 and the first 7 months of 2013, when the Board's membership included individuals whose appointments were constitutionally infirm. See *NLRB v. Noel Canning*, 573 U.S. 513 (2014).

[46] See *Cellco Partnership d/b/a Verizon Wireless*, 365 NLRB No. 38, slip op. at 2, 3 (2017) (finding rules unlawful to maintain based on overbreadth / absence of limiting language), remanded on other grounds mem. 2020 U.S. App. LEXIS 3001 (9th Cir. Jan. 30, 2020); *G4S Secure Solutions (USA) Inc.*, 364 NLRB 1327, 1332 (2016) (finding social-media policy unlawful to maintain "[i]n the absence of any basis for finding that the rule is *tailored* to protect a legitimate privacy concern") (emphasis added); id. at 1332 n.16 ("Nothing in our decision prevents the [r]espondent from promulgating a more narrowly tailored rule."), enfd. mem. per curiam 707 Fed.Appx. 610 (11th Cir. 2017);

ically, *Lafayette Park Hotel* was cited as authority for the latter proposition, even though it was or should have been apparent that this principle, as applied to rules-maintenance issues, did not survive *Lutheran Heritage*. An ambiguous rule is one that *could* be interpreted in more than one way, and the *Lutheran Heritage* majority rejected the notion that a reasonable employee *would* read a facially neutral rule to refer to Section 7 activity merely because the rule *could* be read that way, i.e., merely because it is ambiguous. 343 NLRB at 647.

My colleagues soft-pedal the Board's post–*Lutheran Heritage* work-rule decisions. Rather than frankly admit that the Board, claiming to apply *Lutheran Heritage*, actually applied the standard set forth in the *Lafayette Park Hotel* dissent and the *Lutheran Heritage* dissent, they assert that there was "some degree of confusion and disagreement about [the] proper application" of *Lutheran Heritage* during those years. In support of this character-ization, they cite just two contrasting decisions—*Flagstaff Medical Center*, 357 NLRB 659 (2011),[47] and *Hyundai America Shipping Agency*—as though they are illustrative of the Board's 2011–2017 work-rule deci-sions as a whole. In reality, however, *Flagstaff Medical Center* was an isolated instance in which the majority correctly applied the actual *Lutheran Heritage* standard. I disagree with my colleagues' assertion that this one decision in 2011 was representative of "some degree of confusion" for the following 6 years, during which the Board failed to properly apply the governing standard even once.

Accordingly, when the Board overruled *Lutheran Her-itage* in its December 2017 decision in *Boeing*, it was responding more to what *Lutheran Heritage* had come to stand for through misapplication than to *Lutheran Herit-age* itself. It must be acknowledged that both *Lutheran Heritage* and *Lafayette Park Hotel* were vulnerable to being exploited in this way. The standards announced in those cases on their face considered only the "employee rights" side of the *Republic Aviation* balance, leaving the employer's legitimate interests to be accommodated in the application of the standard. This made it all too easy for Board majorities that disagreed with the approach taken by the majority in *Lafayette Park Hotel* and the Board in *Lutheran Heritage* but were unable or unwilling to overrule either decision outright, to assert that they were applying *Lutheran Heritage* even though their analyses and the conclusions resulting therefrom were antithetical to that decision.

With the *Lutheran Heritage* standard thus muddled and compromised, the Board reasonably decided that the best way to work out the Court-mandated "adjustment" of Section 7 rights and legitimate employer interests was to throw out *Lutheran Heritage* altogether and start over with a standard that explicitly balances those rights and interests, as the Board had done in *IBM* and *Waco*.[48]

*E.  The Board returns its work-rules jurisprudence to its traditional and judicially required practice of according substantial weight to both employee rights and legitimate employer interests.*

Although it has not been its invariable practice, the Board's *predominant* approach to resolving disputes over the lawfulness of challenged work rules has been to ac-cord substantial weight to both sides of the *Republic Avi-ation* balance. The Board has done so in different ways over the years. As shown above, it has done so by ex-pressly requiring a balancing of employee rights and em-ployer interests, as in *IBM* and *Waco*. And it has done so by accommodating employers' legitimate interests in the application of a standard that on its face appeared to con-sider only employee rights, as in *Lafayette Park Hotel*

---

Numerous as they were, these cases fall far short of reflecting the full extent of the Agency's overly aggressive policing of work rules during this period because they do not capture the many cases alleging rules-maintenance violations that settled after charges were found meri-torious. See "Report of the General Counsel Concerning Employer Rules," GC Memorandum 15-04 (March 18, 2015) (discussing 57 rules the General Counsel had deemed unlawful). Neither do they capture the extensive policing that took place in the course of unfair labor prac-tice charge investigations. See "Report on the Midwinter Meeting of the ABA Practice and Procedure Committee of the Labor and Employ-ment Law Section," GC Memorandum 15-05, at 15 (March 18, 2015), reporting General Counsel Griffin's responses to questions about re-gional investigative processes: Question: "Is there a uniform policy on requesting employers to produce entire employee handbooks when a pending charge pertains to only certain provisions of the handbook?" Answer: "Yes, when documents, such as employee handbooks and/or work rules are relevant to an investigation, Regions are instructed to obtain copies of these documents, rather than relying on excerpts that the parties may have submitted." Question: "When the Region is re-viewing a charge alleging that a specific provision of an employee handbook is unlawful, does the Region affirmatively look for other potentially unlawful provisions?" Answer: "No, but, if in examining such documents to investigate alleged violations, the Region notices unalleged provisions that may be facially unlawful, Regions are in-structed to bring this potential issue to the attention of the Charging Party, who may amend the charge or file a new charge . . . ."

[47] Petition for review granted in part on other grounds 715 F.3d 928 (D.C. Cir. 2013).

[48] Even after the Board made it unmistakably clear in *Boeing*, 365 NLRB No. 154, slip op. at 9–10 n.43, that it rejected the principle that ambiguity without more makes maintenance of a rule unlawful—indeed, that the principle was contrary to the majority decision in *Lu-theran Heritage* itself—some administrative law judges continued to apply that principle to decide rules-maintenance allegations. See *Lhoist North America of Alabama, LLC*, 2020 NLRB LEXIS 311, at *79 (May 21, 2020) ("Any ambiguity in the rules must be construed against the drafter."); *Maine Coast Memorial Hospital*, 2018 NLRB LEXIS 528, at *65 (Nov. 2, 2018) (same); *Lowe's Home Centers, LLC*, 368 NLRB No. 133, slip op. at 5 (2019) (same, in judge's decision issued Apr. 17, 2018). Other judges' decisions continued post-*Boeing* to invoke the *Lutheran Heritage* dissenters' insistence that rules be narrowly tailored. See *Intertape Polymer Corp.*, 2023 NLRB LEXIS 72, at *12 (Feb. 17, 2023) ("Rules inhibiting Section 7 rights must be narrowly tailored to address the employer's concerns."); *United Scrap Metal, Inc.*, 2022 NLRB LEXIS 15, at *47 (Jan. 18, 2022) ("An employer has a legiti-mate interest in ensuring the safety of its operations, but rules regulat-ing the use of electronic devices must be narrowly tailored to address such concerns.").

and *Lutheran Village*. But under either of these approaches, legitimate employer interests advanced by work rules played an important role in the determination, and the mere fact that a challenged rule *could* be construed to limit Section 7 activity was insufficient to make maintenance of the rule unlawful. The Board departed, however, from this traditional approach beginning with its 2011 decision in *2 Sisters Food Group*, as shown above.

With *Boeing*, the Board returned to its historically predominant practice of adjudicating work-rule allegations by according substantial weight to both sides of the *Republic Aviation* balance. It did so by adopting a standard that expressly balances employee rights against legitimate employer interests. Under the balancing standard adopted in *Boeing* and refined in *LA Specialty Produce*, if a challenged rule, reasonably interpreted, does not interfere with the exercise of a Section 7 right, it is lawful to maintain; if it does, its lawfulness depends on whether or not the interference is outweighed by the rule's legitimate justifications. In addition, *LA Specialty Produce* defined the "reasonable employee" from whose perspective a challenged rule is to be viewed. My colleagues criticize *Boeing*, and they reject *LA Specialty Produce*'s definition of the "reasonable employee." As explained below, I disagree with their criticisms.

First, the *Boeing/LA Specialty Produce* balancing standard accords with judicial precent. Nearly 80 years ago, the Supreme Court held the Board duty-bound to "work[] out an adjustment between" employee rights under the Act and employers' right to maintain rules that advance their legitimate interests,[49] and subsequent decisions of the Court support the view that this "adjustment" entails *balancing* employee rights and legitimate employer interests.[50] When the Board failed to do so and invalidated work rules based solely on their adverse impact on the exercise of Section 7 rights, the First, Third, and Eighth Circuits corrected the misstep. In doing so, the courts took the position that Supreme Court precedent mandates a balancing analysis.[51]

Second, the *Boeing/LA Specialty Produce* balancing standard also accords with the predominant through-line of the Board's work-rules precedent by giving substantial weight to legitimate employer interests. Although the Board has accommodated employer interests in varying ways—by adopting, for specific types of rules, standards that countenance significant limits on Section 7 activity in order to protect employers' legitimate interests;[52] by formulating standards that on their face seemed to make employee rights solely relevant but nevertheless accommodating employers' legitimate interests in applying those standards;[53] or by adopting a standard that expressly balanced employee rights and legitimate employer interests[54]—it has generally accorded substantial weight to both sides of the *Republic Aviation* balance. To be sure, it has not done so invariably, and its most notable failure in this regard were its work-rule decisions from 2011 to 2017, as explained above. But an unbalanced emphasis on employee rights in its work-rules jurisprudence, at the expense of legitimate employer interests, has been more the exception than the rule over the course of the Board's history.

Third, the definition of the "reasonable employee" in *LA Specialty Produce* simply made explicit the Board's tacit understanding in both *Lafayette Park Hotel* and *Lutheran Heritage*. Both the Fox/Liebman dissent in *Lafayette Park Hotel* and the dissent in *Lutheran Heritage* made a point of establishing that the rules at issue in those cases *could* have been interpreted to restrict Section 7 activity. Yet the majority in *Lafayette Park Hotel* and the decision in *Lutheran Heritage* were adamant that reasonable employees would not read them that way because they would understand the legitimate interests advanced by those rules and would interpret them in that light.[55] Implicit in their rationale was a definition of the "reasonable employee" that *LA Specialty Produce* simply made explicit: one "who is 'aware of his legal rights but who also interprets work rules as they apply to the eve-

---

[49] *Republic Aviation v. NLRB*, 324 U.S. at 797–798.

[50] See *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. at 33–34 (emphasizing the Board's "duty to strike the proper balance between . . . asserted business justifications and the invasion of employee rights in light of the Act and its policy"); *NLRB v. Erie Resistor Corp.*, 373 U.S. at 229 (referring to the Board's "delicate task" of "weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing . . . the intended consequences upon employee rights against the business ends to be served by the employer's conduct").

[51] See, e.g., *McDonnell Douglas Corp. v. NLRB*, 472 F.2d at 545 (Eighth Circuit criticized the Board's failure to balance the challenged rule's adverse impact on the exercise of Sec. 7 rights against the employer's legitimate and substantial interest in safeguarding secret operations critical to the national defense); *Jeannette Corp. v. NLRB*, 532 F.2d at 918–919 (Third Circuit affirmed the Board's finding that the challenged rule was unlawful, but stated that the applicable standard requires balancing the rule's adverse effect on employee rights against the employer's asserted business justifications); *Texas Instruments, Inc.*

*v. NLRB*, 599 F.2d at 1073 (First Circuit remanded for the Board to apply the balancing standard announced by the Third Circuit in *Jeannette Corp.*).

[52] *Tri-County Medical Center*, 222 NLRB at 1089 (rules governing access for off-duty employees); *Stoddard-Quirk Manufacturing Co.*, 138 NLRB at 616, 621–622 (no-distribution rules); *Peyton Packing Co.*, 49 NLRB at 843 (no-solicitation rules). Like the Board's decisions in these cases, *Boeing* is based on the principle that a workplace rule may be lawful to maintain notwithstanding that it limits employees in the exercise of their rights under Sec. 7, where such limitation is warranted by legitimate employer justifications that outweigh those rights.

[53] *Lutheran Heritage Village–Livonia*, 343 NLRB at 646; *Lafayette Park Hotel*, 326 NLRB at 824.

[54] *LA Specialty Produce Co.*, 368 NLRB No. 93; *Boeing Co.*, 365 NLRB No. 154; *Waco, Inc.*, 273 NLRB at 748; *IBM*, 265 NLRB at 638.

[55] See *Lafayette Park Hotel*, 326 NLRB at 825–828; *Lutheran Heritage*, 343 NLRB at 647–648.

rydayness of his job,'" and who "'does not view every employer policy through the prism of the NLRA.'"[56]

Fourth, the system of categories that *Boeing* introduced promised, over time, to provide employers with "certainty beforehand" that particular types of rules would or would not pass muster. See *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 679 (1981) (observing that management "must have some degree of certainty beforehand as to when it may proceed to reach decisions without fear of later evaluations labeling its conduct an unfair labor practice"). By contrast, my colleagues' decision today fails to provide any real guidance to our constituents with regard to the legality of facially-neutral work rules maintained by employers. It inevitably follows this lack of guidance will result in more litigation over this issue, which in turn will require the Agency to devote more of its limited resources on litigation that could have been avoided.

Finally, the *Boeing/LA Specialty Produce* balancing standard, applied in tandem with *LA Specialty Produce*'s definition of the "reasonable employee," is sound as a matter of policy. It treats employees as the mature and intelligent adults they are. It safeguards the exercise of Section 7 rights, while allowing employers to protect their legitimate interests without demanding an impossible-to-achieve linguistic precision. And it accommodates the reality that work rules "are necessarily general in nature" (as the *Lutheran Heritage* majority recognized)[57] and cannot eradicate every last possibility that isolated words or phrases might be interpreted as referring to Section 7 activity (as Chairman Gould recognized).[58] In other words, *Boeing* and *LA Specialty Produce* are faithful to the *Lutheran Heritage* Board's recognition that, whatever its merits as applied in other contexts, the ambiguity principle ought not apply in work-rules cases.

*F. The newly adopted standard is defective on multiple grounds.*

The standard my colleagues have adopted is objectionable on several grounds, including, as already discussed, the fact that my colleagues mischaracterize their standard as a modified version of *Lutheran Heritage*, when in reality it is virtually indistinguishable from the position taken by the dissent in *Lutheran Heritage* as well as the Fox/Liebman dissent in *Lafayette Park Hotel*. For the additional reasons set forth below, I disagree that their standard, even if properly characterized, is appropriate.

Despite my colleagues' claim to the contrary, judicial precedent does not support the majority's standard. The majority cites *Republic Aviation* in support of their position—specifically, language in the Court's decision regarding the "dominant purpose" of the Act, which the Board "is to foster": "the right of employees to organize for mutual aid without employer interference." 343 U.S. at 798. But, as discussed above, the *Republic Aviation* decision expressly held that it is the Board's duty to "work[] out an adjustment" between employees' rights and the "equally undisputed right of employers to maintain discipline in their establishments." Id. at 797–798. As explained above, a standard that relegates the accommodation of employer rights to an affirmative defense that will rarely if ever be successfully established, as does the majority's standard, does not constitute a reasonable "adjustment" of competing rights. And it does not remotely accomplish the Board's "delicate task" of balancing employee rights and legitimate employer interests, which the Court emphasized elsewhere, *NLRB v. Erie Resistor Corp.*, 373 U.S. at 229, and which three circuit courts have held that the Board is required to undertake.[59]

My colleagues assert that "[d]uring the 13 years when the *Lutheran Heritage* standard was in place," no reviewing court rejected the *Lutheran Heritage* standard, and they cite a number of cases in support.[60] Of course, this s the question by assuming that the *Lutheran Heritage* standard *was* in place for 13 years. As I have shown, it was not. But setting that aside, the circuit court cases my colleagues cite fail to help their cause, for several reasons.

First, in the overwhelming majority of those cases, the court merely stated, or stated and applied, the *Lutheran Heritage* "would reasonably construe" standard without any indication that any party had challenged it. Accordingly, in most of those cases, the standard itself was not at issue. Moreover, in the rare instances when the standard *itself was* challenged, the courts' endorsement of it was tepid at best. See *G4S Secure Solutions, Inc. v.*

---

[56] 368 NLRB No. 93, slip op. at 2 (quoting *T-Mobile USA, Inc. v. NLRB*, 865 F.3d 265, 271 (5th Cir. 2017)).

[57] *Lutheran Heritage*, 343 NLRB at 648.

[58] *Lafayette Park Hotel*, 326 NLRB at 830 (Chairman Gould, further concurring) ("When the rules have an obvious intent, they cannot be found unlawful by parsing out certain words and creating theoretical definitions that differ from the obvious ones. If that were the standard, virtually all of the work rules in today's workplace could be deemed violative of our Act . . . .").

[59] As shown above, the First, Third, and Eighth Circuits all rejected a one-sided analysis of work rules that focused on their potential interference with Sec. 7 rights and failed to balance those rights against the legitimate employer interests challenged rules advanced. See *Texas Instruments, Inc. v. NLRB*, 599 F.2d at 1067; *Jeannette Corp. v. NLRB*, 532 F.2d at 916; *McDonnell Douglas Corp. v. NLRB*, 472 F.2d at 539.

[60] *G4S Secure Solutions Inc. v. NLRB*, 707 Fed.Appx. 610 (11th Cir. 2017); *Midwest Division–MMC, LLC v. NLRB*, 867 F.3d 1288 (D.C. Cir. 2017); *T-Mobile USA, Inc. v. NLRB*, 865 F.3d 265 (5th Cir. 2017); *Care One at Madison Avenue, LLC v. NLRB*, 832 F.3d 351 (D.C. Cir. 2016); *Quicken Loans, Inc. v. NLRB*, 830 F.3d 542 (D.C. Cir. 2016); *Three D, LLC v. NLRB*, 629 Fed.Appx. 33 (2d Cir. 2015); *World Color (USA) Corp. v. NLRB*, 776 F.3d 17 (D.C. Cir. 2015); *Flex Frac Logistics, LLC v. NLRB*, 746 F.3d 205 (5th Cir. 2014); *NLRB v. Arkema, Inc.*, 710 F.3d 308 (5th Cir. 2013); *NLRB v. Northeastern Land Services, Ltd.*, 645 F.3d 475 (1st Cir. 2011); *Auto Workers v. NLRB*, 520 F.3d 192 (2d Cir. 2008); *Cintas Corp. v. NLRB*, 482 F.3d 463 (D.C. Cir. 2007); *Guardsmark, LLC v. NLRB*, 475 F.3d 369 (D.C. Cir. 2007).

*NLRB*, 707 Fed.Appx. at 613 n.2 (stating that because a prior panel had approved the *Lutheran Heritage* test, the court was "'bound to follow [that approval] regardless of our view of [its] correctness'") (quoting *United States v. Doyle*, 857 F.3d 1115, 1119 (11th Cir. 2017) (alterations in *G4S*)); *NLRB v. Northeastern Land Services, Ltd.*, 645 F.3d at 483 ("Some may think this result unattractive, but the Board's [*Lutheran Heritage*] rule is intended to be prophylactic and in any event is subject to deference.").[61]

Second, one of the circuit court cases the majority cites as upholding *Lutheran Heritage* did not present a rules-maintenance issue at all.  In *Care One at Madison Avenue, LLC v. NLRB*, 832 F.3d at 351, the issue was whether the employer violated the Act by posting a memo that reminded employees of the employer's workplace violence prevention policy.  The theory of the violation was that by posting the memo just 3 days after a representation election that concluded a peaceful organizing campaign devoid of workplace violence, the employer effectively threatened employees that "taking a position in the workplace regarding union rights" would be viewed as violence and incur discipline.  Id. at 363.  Thus, the unfair labor practice at issue was an 8(a)(1) threat, and the court emphasized that the workplace violence prevention policy itself was not at issue.  Id.

Third, some of the circuit court cases my colleagues rely on actually militate *against* their decision.  In *Cintas Corp. v. NLRB*, the Court of Appeals for the District of Columbia Circuit cited and applied *Lutheran Heritage*, but in doing so, it quoted with approval language from that decision emphasizing that a reasonable employee would not read a challenged rule to apply to Section 7 activity "'simply because the rule *could* be interpreted that way.'"  482 F.3d at 467 n.1 (emphasis in *Lutheran Heritage*).  The Court of Appeals for the Fifth Circuit underlined the same point:  "It must be reasonable for employees to interpret the [rule] to prohibit Section 7 activities, however; it is not enough that it merely could possibly be read that way."  *NLRB v. Arkema, Inc.*, 710 F.3d at 318 (citing *Lutheran Heritage*, 343 NLRB at 647).  And the Fifth Circuit gave this point even more emphasis in *T-Mobile USA, Inc. v. NLRB*:  "The appropriate, objective inquiry is not whether the rules

[61] In *Northeastern Land Services*, the court disagreed with the employer's contention that *Republic Aviation* compelled the Board to adopt a balancing standard.  I am not contending otherwise, although I note that the First Circuit appeared to take a contrary position in *Texas Instruments v. NLRB*, 599 F.2d at 1067.  My position is that *Republic Aviation* compels the Board to give more weight to employers' legitimate interests than does the standard the majority adopts today.  The Board reasonably may do so by according legitimate employer interests substantial weight in the application of a standard that does not expressly require balancing, as it did in *Lutheran Heritage* and *Lafayette Park Hotel*.  I believe, however, that an express balancing standard is the better alternative, and from its comment regarding its decision to uphold the *Lutheran Heritage* standard—"[s]ome may think this result unattractive, but the Board's rule is . . . subject to deference"—the First Circuit apparently thought so, too.

'*could* conceivably be read to cover Section 7 activity, even though that reading is unreasonable,' but rather whether 'a reasonable employee reading the[] rules *would* . . . construe them to prohibit conduct protected by the Act.'"  865 F.3d at 271 (quoting *Lutheran Heritage*, 343 NLRB at 647) (emphasis in *T-Mobile*).  My colleagues, of course, take the opposite position, holding that a work rule is presumptively unlawful if it *can* be read to restrict or prohibit Section 7 activity.  It is particularly puzzling that they would cite the Fifth Circuit's decision in *T-Mobile* as favorable to their decision, considering that *T-Mobile* was the source the Board drew from in *LA Specialty Produce* for its definition of the reasonable employee, a definition my colleagues expressly reject.  See *T-Mobile USA, Inc. v. NLRB*, 865 F.3d at 271:  "[T]he 'reasonable employee' is a T-Mobile employee aware of his legal rights but who also interprets work rules as they apply to the everydayness of his job.  The reasonable employee does not view every employer policy through the prism of the NLRA.  Indeed, '[the Board] must not presume improper interference with employee rights'" (quoting *Lutheran Heritage*, 343 NLRB at 646).

Finally, and decisively, to the extent that the circuit court cases the majority cites can be read as upholding the *Lutheran Heritage* standard, that would help my colleagues' cause only if they were adopting that standard.  As I have shown, they are not.

Next, the standard the majority adopts today reflects an outlier position in the history of Board precedent.  While the Board did give one-sided emphasis to Section 7 rights in some early cases and from 2011 to 2017, this was the exception.  As a rule, the Board has accorded substantial weight to legitimate employer interests in deciding work-rule issues, whether by expressly balancing employee rights against those interests as in *Waco*, *Boeing*, or *LA Specialty Produce*, by factoring the legitimate interests advanced by a challenged rule into the application of the "reasonable tendency to chill" or "would reasonably construe" standards in *Lafayette Park Hotel* and *Lutheran Heritage*, respectively, or by embedding the employer's legitimate interests in its longstanding standards for no-solicitation, no-distribution, and off-duty-access rules.

Indeed, the standard my colleagues have adopted directly conflicts with longstanding Board precedent.  Under their standard, a rule is presumptively unlawful if a reasonable employee (as they define that being) could interpret it to restrict or prohibit Section 7 activity.  In other words, a challenged rule will be found presumptively unlawful under their standard without any consideration of the legitimate employer interests it advances.  Those interests are considered, if at all, only *after* a rule has been deemed presumptively unlawful (and only if the employer proves they are substantial as well as legitimate and also proves, I know not how, that they cannot be

advanced by a more narrowly tailored rule). This standard, however, cannot be reconciled with Board precedent governing no-solicitation and no-distribution rules. Under Board law, no-solicitation and no-distribution rules are presumptively unlawful *only* if they are broader than necessary to accommodate the employer's legitimate and substantial interests. More specifically: a no-solicitation rule is presumptively unlawful only if it is broader than necessary to accommodate the employer's legitimate and substantial interest in preserving working time for work, and a no-distribution rule is presumptively unlawful only if it is broader than necessary to accommodate the employer's legitimate and substantial interests in preserving working time for work and keeping litter out of work areas. However, it is unquestionable that a lawful no-solicitation rule that prohibits solicitation during working time restricts union solicitation, and a lawful no-distribution rule that prohibits distribution during working time and in work areas at any time restricts distribution of union literature. Both rules reasonably could be interpreted to restrict Section 7 activity, because they *do*. Accordingly, under my colleagues' standard, both would be presumptively unlawful, contrary to longstanding precedent.

The majority's understanding of a reasonable employee also runs counter to longstanding Board precedent. Although the Board did not expressly define the term *reasonable employee* until its 2019 decision in *LA Specialty Produce*, the definition it borrowed from the Fifth Circuit's *T-Mobile* decision simply made explicit what the majority in *Lafayette Park Hotel* and *Lutheran Heritage* took for granted: that where a challenged rule advances legitimate employer interests and does not expressly refer to Section 7 activity, reasonable employees will understand it in that light, not as applying to Section 7 activity. As Chairman Gould observed, "it is not enough to find that certain language in a rule is broad enough to arguably apply to Section 7 activity. The appropriate inquiry must center on whether a reasonable employee could believe that the rule prohibits protected activity." *Lafayette Park Hotel*, 326 NLRB at 830 (Chairman Gould, further concurring). For my colleagues, however, it is *precisely* enough to deem a rule presumptively unlawful "that certain language in a rule is broad enough to arguably apply to Section 7 activity," since the "reasonable employee" they posit *could* interpret such a rule to restrict the exercise of Section 7 rights.

To justify their definition of the "reasonable employee," the majority relies on language from the Supreme Court's decision in *Gissel Packing*, where the Court referred to "the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969). My colleagues

make this passage "central to [their] analysis." I find it inapposite, for two reasons.

First, the Court referred to the tendency of economically dependent employees to pick up *intended* implications of statements made by their employer. Under the standard my colleagues have adopted, however, employers will routinely be found to violate the Act by maintaining work rules they never intended to implicate Section 7 activity in any way.

Second, when it wrote these words, the Court was referring to a category of statements by employers vastly different from work rules, particularly work rules that do not expressly refer to Section 7 activity—namely, predictions of dire consequences if employees unionize. *Gissel Packing* consolidated several cases, one of which involved the Sinclair Company, "a producer of mill rolls, wire, and related products at two plants in Holyoke, Massachusetts." Id. at 587. When Sinclair's president first learned, in 1965, that the Teamsters had launched an organizing effort, he made the following statements to all Sinclair employees.

- A strike in 1952 "almost put our company out of business," and employees were forgetting the "lessons of the past."

- The company was still on "thin ice" financially, the union's "only weapon is to strike," and a strike "could lead to the closing of the plant."

- Because of their age and limited skills, Sinclair's employees might not be able to find re-employment if they lost their jobs as a result of a strike.

- If the employees did not believe the company could close, they should "look around Holyoke and see a lot of them out of business."

Similar communications were made to employees in the weeks immediately preceding the election, including in a pamphlet that displayed "a large cartoon showing the preparation of a grave for the Sinclair Company and other headstones containing the names of other plants allegedly victimized by the unions." Id. at 587–588.

One of the issues in *Gissel Packing* was whether these statements were protected statements of opinion under Section 8(c) of the Act or coercive threats in violation of Section 8(a)(1). According to the Court, deciding that issue required balancing the relevant respective rights of employers and employees, a balancing that, given the explosiveness of the statements—in essence, *if you vote for the union, you will lose your job*—"must take into account the economic dependence" of employees on their employer. Id. at 617. This principle my colleagues lift out of its context in *Gissel Packing* and apply to the entirely different context at issue here. Their position is that because the "reasonable employee" should be understood as an economically dependent and vulnerable em-

ployee when deciding whether an employer violates the Act by making statements *expressly predicting that voting for a union will have dire consequences*, the "reasonable employee" must be understood exactly the same way when deciding whether a challenged work rule *that makes no reference whatsoever to Section 7 activity* may be lawfully maintained. This faulty logic is akin to reasoning that because it makes sense to board up houses before a hurricane, houses must be similarly protected from a breeze.

Finally, I turn to the affirmative defense the majority provides employers, which enables my colleagues to claim that their standard adjusts the competing rights of employees and employers and thus accords with *Republic Aviation*. I recognize that this defense seemingly distinguishes my colleagues' standard from that endorsed by the dissenters in *Lafayette Park Hotel* and *Lutheran Heritage* and applied in *2 Sisters Food Group* and subsequent cases. Whether there is really any substantive difference remains to be seen.

To review, once a work rule is deemed presumptively unlawful—under the new standard, which applies retroactively, most probably are[62]—the employer escapes unfair labor practice liability by proving that the challenged rule "advances a legitimate and substantial business interest *and* that the employer is unable to advance that interest with a more narrowly tailored rule" (emphasis added). The majority's decision leaves unanswered a number of questions about this defense.

For example, a presumptively unlawful rule under the majority's standard is a rule that *could* be interpreted, by a reasonable employee as the majority defines that being,[63] to restrict or prohibit Section 7 activity. In other words, a presumptively unlawful rule is an overbroad rule, and an overbroad rule can always be narrowed. Given as much, how will an employer prove that it is unable to advance its legitimate and substantial interest or interests with a more narrowly tailored rule? Would an employer have to show that it maintains the current rule because a prior narrower rule failed adequately to advance the relevant interest or interests? Would it suffice for an employer to introduce evidence that it *considered* (but did not actually implement) a narrower rule and rejected it as unlikely to advance the relevant interest or interests? What if the Board finds a rule unlawful, the

employer narrows it, and the narrowed rule fails adequately to advance the relevant interest or interests. Now that the original rule has been shown to be the narrowest possible rule, may the employer reinstate it, even though doing so would seemingly defy the Board's prior decision?

Time will tell, but I suspect that the affirmative defense my colleagues have devised is merely a *Republic Aviation* fig leaf, unlikely ever to be successfully established but enabling them to claim that they have "work[ed] out an adjustment" of competing employee and employer rights.[64] Employers would be well advised to assume as much and try to avoid a finding of presumptive unlawfulness in the first place by retaining competent labor counsel to craft, for inclusion in their employee handbooks, language that would make it impossible—even for my colleagues' version of the reasonable employee—to interpret any rules contained therein to restrict Section 7 activity.

### G. The majority errs in applying its new standard retroactively.

For all the reasons set forth above, *Boeing* and *LA Specialty Produce* should not be overruled. For those that follow, if those decisions are to be overruled, the majority should overrule them prospectively only.

The Board must not apply a new rule of decision retroactively—meaning in all pending cases in whatever stage—if doing so would work a manifest injustice. *SNE Enterprises*, 344 NLRB 673, 673 (2005). To determine whether retroactive application would cause manifest injustice, the Board considers "the reliance of the parties on preexisting law, the effect of retroactivity on accomplishment of the purposes of the Act, and any particular injustice arising from retroactive application." Id. Each of these considerations militates against retroactive application.

Regarding reliance on preexisting law, *Boeing* has been the governing precedent for deciding work-rule allegations for more than 5-1/2 years. There is no reason to believe that employers have not framed their work rules in reliance on its balancing standard, particularly for rules covered by category determinations in *Boeing* itself and in cases applying it. The majority neither has nor cites evidence to support their empirical claim that reliance on *Boeing* has been "minimal."

Next, retroactive application does not accomplish the purposes of the Act. As relevant here, those purposes have been authoritatively defined by the Supreme Court as requiring the Board to work out an adjustment between employees' rights and employers' legitimate interests. Multiple courts of appeals have held that the required adjustment entails a balancing of employee rights and employer interests. At minimum, the Board must

---

[62] See *Boeing*, 365 NLRB No. 154, slip op. at 9 ("[I]t is likely that one can 'reasonably construe' even the most carefully crafted rules in a manner that prohibits some hypothetical type of Section 7 activity."); *Lafayette Park Hotel*, 326 NLRB at 830 (Chairman Gould, further concurring) ("When the rules have an obvious intent, they cannot be found unlawful by parsing out certain words and creating theoretical definitions that differ from the obvious ones. If that were the standard, virtually all of the work rules in today's workplace could be deemed violative of our Act . . . .").

[63] In practice, the "reasonable employee" will be an expert in traditional labor law whose full-time job it is to interpret and apply that law, i.e., Board members and the attorneys on their staffs.

[64] *Republic Aviation v. NLRB*, 324 U.S. at 797–798.

give substantial weight to the latter. The standard my colleagues have adopted does neither.

Finally, by applying their decision retroactively, the majority pulls the rug out from under the feet of respondent employers in pending cases. My colleagues say this inflicts no particular injustice because the remedy in such cases will be an order to rescind the previously lawful but now-offending rule, "leaving the employer free to replace the rule with a more narrowly tailored substitute." That depends on the rule. As I explain below, there is now no such thing as a lawful investigative confidentiality rule, however "narrowly tailored." More importantly, the majority defends its position by invoking the remedy for the unfair labor practice findings that retroactivity will entail, skipping over those findings themselves. By applying their decision retroactively, my colleagues predictably make employers in pending cases who were law-abiding yesterday into lawbreakers today. Moreover, depending on the circumstances, retroactive application of today's decision in a pending case could make the difference between issuance of a narrow "in any like or related manner" and a broad "in any other manner" cease-and-desist order, and between standard and extraordinary remedies. See *Noah's Ark Processors, LLC d/b/a WR Reserve*, 372 NLRB No. 80 (2023).

*H. The Board should retain Apogee Retail.*

"Having rescinded the standard adopted in *Boeing* and revised in *LA Specialty Produce*," writes the majority, "we necessarily reject those decisions *and their progeny*" (emphasis added). With those three words, my colleagues overrule in relevant part every case in which the Board applied *Boeing*. Although I dissent from each of these overrulings, one now-overruled case particularly warrants further discussion: *Apogee Retail LLC d/b/a Unique Thrift Store*, 368 NLRB No. 144 (2019). Because the interests at stake in that case are so important, my colleagues' decision to overrule *Apogee* without even attempting to address the specific type of rules at issue in that case is particularly unfortunate.

In *Apogee Retail*, the Board held that rules requiring employees to maintain the confidentiality of workplace investigations for the duration of the investigation are categorically lawful to maintain.[65] Applying *Boeing*, the Board in *Apogee* implemented the Supreme Court's instruction to "work[] out an adjustment" between employees' Section 7 rights and employers' legitimate interests. It acknowledged that employees may be engaging in protected concerted activity when they discuss incidents of workplace misconduct.[66] But it also recognized that in-

vestigative confidentiality rules serve critically important interests, for employers *and* employees. Confidentiality ensures that potential witnesses will not coordinate their accounts of relevant events or confuse their own recollections with those of others. It also allows employers to "quiet[] fears that truthful disclosures may lead to retaliation"[67] by assuring employees that their candid statements will not be revealed—a vitally important assurance, since disclosures made in the course of an investigation may reveal grave wrongdoing, such as discrimination, harassment, bullying, or criminal misconduct. Such investigations also may implicate employees or supervisors with whom the interviewed employee has regular contact. It is essential that an employer be able to assure employees that their reports will be kept strictly confidential. Doing so also serves the employer's interest in obtaining evidence promptly, while employees' memory of relevant events is fresh.[68]

Recognizing, moreover, that the interests served by investigative confidentiality rules have their greatest saliency while the investigation is ongoing, the Board in *Apogee* distinguished between rules that limit confidentiality to the duration of the investigation and those that do not, making the former categorically lawful to maintain and examining the latter on a case-by-case basis. In this way, *Apogee* gave employers "certainty beforehand" that an investigative confidentiality rule limited to open investigations will be deemed lawful, removing "fear of later evaluations labeling its conduct an unfair labor practice."[69]

The Board in *Apogee* overruled *Banner Estrella Medical Center*,[70] a pre-*Boeing* decision that effectively prohibited employers from maintaining investigative confidentiality rules.[71] *Banner Estrella* made a pretense of accommodating legitimate employer interests, while in fact giving determinative weight to employee rights (like other pre-*Boeing* decisions issued by the Board in and after 2011), contrary to the Supreme Court's mandate to balance rights and interests. *Banner Estrella* did allow for the possibility that particular investigations might remain confidential, but it effectively prohibited employers from requiring confidentiality from the outset, by workplace rule or otherwise, since an employer could not know whether it would be able to make the showing

---

[65] 368 NLRB No. 144, slip op. at 1, 8.

[66] It is also true that many such discussions are *not* protected by the Act. "'Activity which consists of mere talk must, in order to be protected, be talk looking toward group action. . . . [I]f it looks forward to no action at all, it is more than likely to be mere griping.'" *Daly Park Nursing Home*, 287 NLRB 710, 710-711 (1987) (quoting *Mushroom Transportation Co. v. NLRB*, 330 F.2d 683, 685 (3d Cir. 1964)). But

because some such conversations may "look[] toward group action," a rule or policy that requires all investigations of misconduct to remain confidential restricts, to some extent, Sec. 7 activity.

[67] *Apogee Retail*, 368 NLRB No. 144, slip op. at 4.

[68] See id., slip op. at 4-5.

[69] *First National Maintenance Corp. v. NLRB*, 452 U.S. at 678–679.

[70] 362 NLRB 1108 (2015), enf. denied on other grounds 851 F.3d 35 (D.C. Cir. 2017).

[71] I suppose that *Banner Estrella* also provided employers "certainty beforehand." Under *Banner Estrella*, employers could be certain that investigative confidentiality rules were unlawful, period. But for the reasons stated above, that was the wrong kind of certainty.

*Banner Estrella* demanded until its investigation was underway.

Under *Banner Estrella*, investigative confidentiality was required to be dealt with on a case-by-case basis, and an employer violated Section 8(a)(1) by restricting employee discussions of any workplace investigation unless it presented "objectively reasonable grounds for believing that the integrity of the investigation w[ould] be compromised without confidentiality."[72] Specifically, under *Banner Estrella,* the employer was required to prove, "with respect to each specific investigation in which confidentiality was required, that 'witnesses need[ed] protection, evidence [was] in danger of being destroyed, testimony [was] in danger of being fabricated, and there [was] a need to prevent a cover up,"[73] or other "comparably serious threats" to the integrity of the investigation.[74]

As the Board explained in *Apogee*, the *Banner Estrella* decision

> disregarded the reality that a preliminary investigation is necessary in order to determine whether "witnesses need protection, evidence is in danger of being destroyed, testimony is in danger of being fabricated, and there is a need to prevent a cover up." Since the employer would not, at the outset, have the information it needs to make that determination, under *Banner Estrella* it is unable to provide the very assurances of confidentiality necessary to obtain the information it needs to make the determination *Banner Estrella* demands.[75]

Thus, under the pre-*Boeing* approach in *Banner Estrella*, employers could not maintain investigative confidentiality rules at all. The *Banner Estrella* Board ignored the legitimate—indeed, critical—employer *and employee* interests served by policies that require investigative confidentiality from the outset of an investigation, focusing instead on the potential infringement on Section 7 rights. Not only did this invalidate workplace policies maintained by countless employers, it was also contrary to EEO and OSHA workplace-investigation guidance.[76] *Banner Estrella* forced employers into a bind. They could choose to defy the law by requiring confidentiality from the outset, at the risk of incurring unfair labor practice liability. Or they could comply with the law but, in doing so, sacrifice the benefits of confidentiality, not just for employers, but for employees as well.

*Apogee* struck an appropriate balance between employee rights and employer (and employee) interests. My colleagues do a disservice to employers *and* employees by overruling it.

**Conclusion**

The majority says that employers are free to maintain work rules that protect their legitimate interests, so long as they narrowly tailor their rules so that no word or phrase could possibly be interpreted, by a reasonable employee as my colleagues define that being—i.e., an unreasonably hypervigilant employee—to restrict Section 7 activity. However, as the Board observed in *Boeing*, and as Chairman Gould explained nearly 25 years ago in *Lafayette Park Hotel*, it is virtually impossible to craft work rules that are general enough to serve their intended lawful purpose without being susceptible to an interpretation that infringes on Section 7 rights.[77] Moreover, the majority applies their decision retroactively. Employers therefore should assume that simply by maintaining work rules, they are violating the National Labor Relations Act. We have returned to a bygone era, from 2011 to 2017, when the Board majority rarely saw a challenged rule it did not find unlawful.

The majority criticizes *Boeing* as giving "too much weight to employer interests" and "too little weight to the burden a work rule could impose on employees' Section 7 rights." But they fail to explain why their standard, which claims to balance these interests but *inherently* privileges employee rights while placing scant, if any, weight on employer interests, is any better. The standard that they embrace today is not only inconsistent with the balancing required under *Republic Aviation* but it makes it nearly impossible for employers to defend their rules in furtherance of legitimate employer interests, such as ensuring that a workplace is safe or that employees can work without being subject to abuse, for example. Not only is this not what the Act intended but it assumes that adults are unable to recognize for themselves whether or not such rules, read in context, are intended to apply to, or will be enforced against, employees' exercise of their Section 7 rights. Because my colleagues' decision here fails to pay more than lip service to the required balancing of employees' rights and employers' legitimate business interests, I respectfully dissent.

Dated, Washington, D.C. August 2, 2023

_____

Marvin E. Kaplan,                    Member

NATIONAL LABOR RELATIONS BOARD

Lea Alvo-Sadiky, Esq., for the General Counsel.
Charles P. Roberts III, Esq. (Constangy, Brooks, Smith & Prophete LLP), of Winston-Salem, North Carolina, for the Respondent.
Claiborne S. Newlin, Esq. (Meranze, Katz, Gaudioso & Newlin,

---

[72] 362 NLRB at 1110.

[73] *Apogee Retail*, 368 NLRB No. 144, slip op. at 4 (quoting *Banner Estrella*, 362 NLRB at 1109) (alterations in Apogee).

[74] *Banner Estrella*, 362 NLRB at 1111.

[75] *Apogee Retail*, 368 NLRB No. 144, slip op. at 5 (quoting *Banner Estrella*, 362 NLRB at 1109).

[76] Id.

[77] See supra nn.18 & 62.

*PC),* of Philadelphia, Pennsylvania, for the Charging Party.

## DECISION

### STATEMENT OF THE CASE

MICHAEL A. ROSAS, Administrative Law Judge. This case was tried in Philadelphia, Pennsylvania, on August 24–25, 2016.[1] This controversy involves employees represented by Teamsters Local 628 (the Union) at Stericycle, Inc.'s (the Company or Respondent) Southampton and Morgantown, Pennsylvania facilities. The complaint, as amended,[2] alleges that the Company violated Sections 8(a)(5) and (1) of the National Labor Relations Act (the Act)[3] by: (1) refusing to bargain with the Union before unilaterally recouping health care premiums from employees; (2) refusing or failing to provide relevant and necessary information to the Union; and (3) unilaterally imposing a team member handbook that changed numerous terms and conditions of employment. The complaint also alleges that the Company engaged in coercive conduct and violated Section 8(a)(1) by maintaining policies and rules that interfered with Section 7 rights. The Company admits taking the alleged unilateral actions, failing to provide information requested and implementing the policy and rules at issue. It denies, however, that its conduct constituted unfair labor practices.

The Company also raised an affirmative defense alleging that the complaint "is tainted by the involvement of the Regional Director of Region 4 and should be transferred to a different region for independent review, examination, and processing." This defense referenced the Board's Inspector General Report OIG-I-516 of his investigation into an alleged conflict of interest on the part of the Regional Director while volunteering on behalf of a nonprofit organization. On August 24, 2016, I entered an order denying the Company's motion to dismiss or, in the alternative, disqualify all Region 4 staff in prosecuting this case. I also denied the General Counsel's motion in limine and permitted the Company to introduce the OIG report into evidence under seal for further consideration on exceptions or appeal. However, I precluded the Company from calling Office of General Counsel staff or other witnesses in order to further litigate its conflict of interest defense.[4] At the outset of the hearing, I provided the parties with an opportunity to reargue the General Counsel's motion in limine and the Company's motion to dismiss the complaint due to the conflict ointerest. The argument produced nothing new, except to clarify that the Company conceded that it did not possess evidence of an actual conflict of interest on the part of staff litigating the case. As a result, I reiterated my ruling that the Company was precluded from offering any other evidence in support of its eighth affirmative defense.

On the entire record,[5] including my observation of the demeanor of the witnesses, and after considering briefs filed by the General Counsel and the Respondent, I make the following

### FINDINGS OF FACT

#### I. JURISDICTION

The Company, a corporation, is engaged in providing medical waste and collection treatment services to commercial customers throughout the United States, including to and from its facilities in Southampton and Morgantown, Pennsylvania, where it annually purchases and receives goods valued in excess of $50,000 directly from points outside the Commonwealth of Pennsylvania. The Company admits, and I find, that it is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act and that the Union is a labor organization within the meaning of Section 2(5) of the Act.

#### II. ALLEGED UNFAIR LABOR PRACTICES

##### A. The Company's Operations

The Company is the largest medical waste disposal company in the United States. The Company performs waste treatment at its Morgantown facility involving the collection, processing and disposal of regulated medical waste (RMW), including bandages, bodily fluids, and sharp containers of needles, from hospitals, nursing homes, and medical, dental and veterinary offices. Once delivered to the Morgantown facility, RMW is processed, chemically treated, shredded in a treatment system, placed in containers and disposed of in landfills.

The Company also operates a transfer station at its Southampton facility, where drivers pick up trash which is then consolidated and brought to the Morgantown facility. These employees pick up RMW from hospitals, doctor/dentist offices, and other medical facilities. The RMW is transported to facilities for processing prior to disposal.

##### B. The Collective-Bargaining Agreements

###### 1. The Southampton facility

The union represented Company employees at its former Montgomeryville, PA transfer station from 1999 until 2006, when the Company moved those operations to Southampton. On September 1, 2006, the Union was certified as the exclusive collective-bargaining representative of employees at the Southampton facility (the Southampton unit). At all times since then, the Union has been the exclusive collective-bargaining representative of the following employees in the Southampton unit:

All full-time and regular part-time drivers, driver techs, in house techs, helpers, dockworkers and long haul drivers of the Company at its Southampton, Pennsylvania location; but excluding all other employees, office clerical employees, guards, and supervisors as defined in the Act.

On April 4, 2014, the Company and Union negotiated a collective-bargaining agreement covering the Southampton unit, retroactive to November 1, 2013, and expiring on October 31, 2016 (the 2014 Southampton Agreement). The 2014 Southampton Agreement provided, in pertinent part, that Southampton unit employees would be required to make contributions towards their health insurance:

22.3 Upon ratification, employees will contribute on a pre-tax basis one (1%) of their straight time hours paid per week to the cost of health coverage. The employer shall deduct this amount bi-weekly and offset it against the employer's monthly contributions to the Teamsters Health and Welfare Fund as

---

[1] dates are in 2014 unless otherwise indicated.

[2] At the hearing, the General Counsel amended the Second Consolidated Complaint to eliminate paragraphs 8(b) and 11 of the complaint. (Tr. 8, 28–29.)

[3] 29 U.S.C. §§ 151–169.

[4] ALJ Exh. 1.

[5] The General Counsel's unopposed motion to correct the transcript, dated October 7, 2016, is granted and received in evidence as GC Exh. 33.

specified in 22.2 above . . .[6]

### 2. The Morgantown facility

On September 1, 2011, the Union was certified as the exclusive collective-bargaining representative of the Morgantown unit. Respondent and the Union subsequently entered into an initial collective-bargaining agreement for the term of September 6, 2013, to February 29, 2016.[7] A new CBA was ratified in June 2016.

At all times since September 1, 2011, the following employees at the Morgantown facility have constituted a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> All full-time and regular part-time regulated medical waste (RMW) plant workers, sharps plan workers, RMW Shift Supervisors, Sharps Shift Supervisors/quality control representatives, drivers, dispatchers, yard jockey, maintenance mechanics, Maintenance Supervisor and painters employed by Respondent at its Morgantown, Pennsylvania facility; but excluding all office employees, confidential employees, guards and supervisors as defined in the Act.

### C. The Recoupment of Health Care Premiums from the Southampton Unit

Although the Southampton CBA was ratified on April 13, 2014, the Company's payroll contractor, ADP, encountered initial difficulties integrating the health insurance premium data for the hourly union employees with that of nonhourly employees. After several test runs, ADP was finally able to process the health care premium deductions of one percent health insurance cost in until the September 12 payroll.[8]

John Dagle, the Union's Secretary/Treasurer, brought the missing deductions to the attention of Willie Riess, Southampton's Facility Manager, in late June or early July 2014. Riess initially was unaware that the employees' share of their health insurance was not being deducted from their pay and agreed to look into it. By July, Reiss ascertained the problem and updated Dagle regarding the payroll processing issues.[9]

On September 3, Riess emailed Dagle and informed him that the Company had "completed the work and tests necessary for the payroll deductions for Health and Welfare as per Article 22.3 of the CBA" and planned "to deduct these amounts evenly over the next *three* pay days for each employee starting with the September 12, 2014 payday. If you have any questions or concerns, [p]lease let me know." A spreadsheet detailing the amount of each employee's deductions was attached.

Dagle replied on September 5, opposing the Company's "unilateral decision to recoup unpaid health care deductions

beginning September 8, 2014." He added that the "recoupment decision" violated the [CBA] and [Company's] obligations under federal law."[10] Riess replied on September 8:

> Thanks for your email. I am sure it won't surprise you that we do not agree.
>
> As you know, for the past few months employees have been receiving health benefits. . . without interruption, however, the employees have not been making their contributions due to some administrative issues on our end. Nonetheless, the employees have an obligation under the CBA to make their 1% contribution and there is nothing in the contract that prevents the Company from making catch-up contributions to collect what they are legally obligated to pay. This is no different than the monthly arrears balances the Union demands from the Company for the dues obligations of employees.
>
> We can resolve this in a number of ways. You can keep insisting on your position and then, I guess I will have to ask you to justify how the dues situation is any different. If you do not want the Company to pursue the employees for moneys it owes the Company per the Agreement you signed, then the Company can pursue the amounts owed directly from the Union if you want to agree to indemnify the employees for this commitment.
>
> Right now, we will be proceeding as planned, unless I hear that you agree to my last suggestion. Of course I am available to discuss.[11]

Dagle responded on September 9, citing Section 22.3 of the CBA and the Company's failure to implement it:

> Stericycle failed to exercise its rights under the agreement. Moreover, Stericycle's decision to unilaterally deduct from employees' bi-weekly paychecks contributions retroactively for a seventeen week period (4/13/14 through 8/9/14) over the next six weeks is a violation of the company's obligations under the [CBA]. For those six weeks, the Stericycle will pay its employees at rates below those expressly required by the agreement. The Union will forward a grievance regarding this matter under separate cover.
>
> Any employee medical contribution recoupment schedule must be negotiated with the Union. Stericycle does not have the legal right to unilaterally impose its own schedule.
>
> As a precondition for bargaining, Stericycle must first rescind its decision to commence recoupment and forgo any further action pending agreement. Once the recoupment decision is rescinded, the union will, without prejudice to its position on the grievance, negotiate on this . . . matter on September 23, or September 29, 2014. Please contact me to schedule negotiations.
>
> In addition, in order for the Union to prepare for bargaining, please provide the following information:
>
> 1. All backup documentation utilized by the Company to determine the retro amounts due for the period 4/13/14 through 8/9/14.

---

[6] GC Exh. 2.

[7] GC Exh. 3 at 1.

[8] The parties do not dispute the legitimacy of the difficulties encountered by the Company's payroll contractor in timely processing the new payroll changes. (Tr. 188–189.)

[9] Dagle and Reiss provided consistent testimony regarding their discussions about the missing health care deductions, but disagreed as to whether the issue of recoupment came up prior to Dagle's September 3 email. I credit Reiss' denial that Dagle raised the recoupment issue prior to September 3. Dagle was vague as to the timeframe when he allegedly told Reiss that the Company forfeited its right to recoupment or would, at the very least have to bargain over the issue first. (Tr. 38–40, 113–114, 130, 188–195). Moreover, the emails exchanged between Reiss and Dagle on September 3 make no reference to previous discussion about recoupment. (R. Exh. 1 at 1–5.)

[10] R. Exh. 1 at 5.

[11] Id. at 7–8.

Please forward the requested information directly to the Union office by no later than Friday, September 19, 2014.[12]

Riess replied a few hours later, reiterating the Company's disagreement with the Union's position, but offering to bargain over the issue:

Obviously, the Company disagrees with you . . . Nevertheless, any threatened grievance over the Company's alleged failure to follow the CBA as it pertains to making these deductions on a bi-weekly schedule is time-barred by the CBA.

All these defenses to the Company's actions aside, we are willing to bargain with the union over the timing of the catch-up deductions as announced in our September 3 letter to you and as you request in your communication today. Since we did not hear anything from you for days following that communication, the first payment on the schedule has already been processed in our payroll for this coming Friday. We will hold off on making any further deductions—notwithstanding our right to do so—until you and I have had a chance to further discuss.

Dagle replied a few hours later, reiterating the Union's position and demanding the Company restore the status quo:

To create the preconditions for bargaining over its recoupment proposal, Stericycle must maintain the status quo pending resolution of the dispute. This requires that you cancel the extra deduction set for this Friday or that you make employees whole for the shortage in accordance with section 21.2 of the contract. Please inform me tomorrow of what action Stericycle intends to take to restore the status quo.[13]

Riess and Dagle met on September 10 to discuss the Company's recoupment proposal. At that time, Riess explained that it was too late to reverse the first payroll deduction on September 12, but offered to discuss the remaining two recoupment payments. Dagle refused the offer, insisting that the Company restore the status quo by reversing the first deduction before the Union would agree to bargain over the recoupment issue. A contentious email exchange followed over the next 2 days reflecting the standstill. The end result was that the two final deductions were processed in the September 26 and October 10 payrolls.[14]

### D. Information Request Relating to the Recoupment of Health Care Contributions

Unsuccessful in preventing the Company's implementation of the recoupment process, Dagle took steps to grieve the action through a series of requests for information related to the Company's difficulties in implementing the health insurance premium deductions.[15] On September 11, in connection with his "investigation" of the Company's recoupment actions and the potential filing of a grievance by the Union, Dagle requested, in pertinent part, the following information by September 23:

1. Provide copies of any communications, written or electronic between any Stericycle representatives or agents concerning or related to Stericycle's decision to deduct the amounts (copy enclosed) evenly over the next three (3) paydays for each employee starting with the September 12, 2014 payday.

5. Provide copies of any communications, written or electronic between any Stericycle representatives or agents regarding Stericycle's implementation of Article 22 subsection 22.3 of the Collective Bargaining Agreement.[16]

On September 22, Carol Fox, the Company's Labor Relations Manager, denied Dagle's information requests on the grounds that were either unclear or constituted irrelevant, confidential and privileged internal Company communications that were not provided to employees or the Union.[17]

Dagle took a different tack for recoupment-related information on September 26 by requesting "copies of Stericycle's bargaining notes, including notes of side bar discussions or other contacts with union representatives concerning, or relating to discussion of employee health coverage deductions."[18] Fox declined the request on October 17 on the grounds that they were overly broad, confidential and irrelevant on the issue of whether the recoupment payments violated the CBA. Dagle explained the relevance of his request in a follow up email on October 20:

The documentation requested should shed light on the reasons for the delay, the difficulties involved in instigating the deductions, the company's diligence in working for a solution and why the solution took as long as it did. It should also provide information on who was involved and the roles they played in working out a resolution. Such information is essential to a fair evaluation of the employer's unilateral decision to recoup missed contributions through three unauthorized employee payroll deductions.

The union is prepared to review and bargain over a specific Stericycle proposal to address its claimed confidentiality concerns.

Finally, with respect to the request for notes (other than the bargaining notes to which the union is entitled), the union requests notes (and/or other documents) related to conversations between Stericycle representatives and the union over the employer's failure to deduct employee health contributions from the date of ratification to the date of this letter.

Although the parties entered into a confidentiality agreement on November 17, it pertained only to item 2 requested in the Union's September 26, letter, having to do with nonpublic information of the Company's payroll vender.[19] The information, subject to the confidentiality agreement, did not cover the bargaining notes requested in the September 26 letter or internal communications between the Company's personnel regarding

---

[12] Id. at 9–11.

[13] Id. at 12–13.

[14] Notwithstanding Dagle's contention that Riess informed him of "corporate's" intention to proceed with the 3 recoupment payments, the latter's September 12 email refuted that and reiterated the Company's offer to bargain over the 2 remaining recoupment payments. (Tr. 40–45, 48, 127–132, 193–194; GC Exh. 6; R. Exh. 1 at 14–15.)

[15] Dagle credibly testified that the information requests sought to determine and/or confirm the legitimacy and details underlying the extent of the Company's explanation for the delays in processing the health insurance premium deductions. (Tr. 43–44, 47.)

[16] GC Exh. 5.

[17] GC Exh. 7.

[18] GC Exh. 8.

[19] R. Exh. 9 at 1–4.

implementation of the recoupment of the health care deductions.

### E.  Information Requests Relating to Employees' 401(k) Contributions

Article 23.3 of the Southampton CBA provided that unit employees would receive biweekly an amount consisting of $0.3125 per hour on a "pre-tax" basis for all straight-time hours paid per pay period provided that employees made an appropriate election into either the Company's 401(k) Plan or Employee Stock Purchase Plan (the investment plans).  The amounts were to be treated as "employee deferral contributions" subject to the terms and conditions of the relevant Plan[s], as applicable.

Implementation of the investment plans did not go smoothly and a dispute arose in May 2014, as to whether the contract required Company payments to be paid directly into both investment plans on a pretax basis.  The Company interpreted the CBA as merely requiring it to remit the benefit amounts directly to employees and giving them the option to designate it for the 401(k) plan or stock purchase plan.  If employees opted for the 401(k) plan, the Company remitted the amount on a pretax basis.  However, if employees chose the stock purchase plan, the payments were taxed at the applicable rate.[20]

On June 2, the Union filed a grievance alleging that the Company "failed to remit the $0.312 per hour on a pre-tax basis for all straight-time hours paid to each active non-probationary bargaining unit employees' 401k account or Stock Purchase Plan as required by the Collective Bargaining Agreement."[21]  On September 4, the Union filed for arbitration over the grievance.[22]

#### 1.  The September 5th information request

On September 5, the Union submitted a request for information entitled "Grievance—Violation of Article 23, subsection 23.3 Dated June 2, 2014."[23]  On September 22, the Company provided certain information responsive to the request but objected to other portions.

Paragraphs 1 and 2 essentially requested copies of "all bargaining unit employees' bi-weekly earnings statements to include all earnings, deductions and year to date totals" between April 13 and September 6, and from September 7 on an ongoing basis.  The Company attached a printout containing payroll information, but not earnings statements, which it has provided to the Union in the past.[24]  The Company also objected to the need for such information "on an ongoing basis" as "not clear" and "unduly burdensome."  The Company requested that the Union "identify any specific time periods and how each is related to the Union's investigation of this grievance or any particular grievance and the company will re-evaluate the reasonableness of the request."[25]

Paragraph 6 and 8 requested copies of any communications between the parties regarding the Company's implementation of Article 23.3.  The Company objected on the grounds of relevance to the arbitration and was "aimed solely at discovering the Company's legal theory and strategy in the arbitration of the same."[26]

#### 2.  The September 18th information request

On September 18, the Union submitted an additional information request, entitled "Grievance—Violation of Article 23, subsection 23.3," seeking copies of the Company bargaining notes, proposals, agreements or understandings between the parties relating to Article 23.3.[27]  In Fox's reply, also contained in her September 22nd email, she rejected the Union's request on the grounds that the Company's bargaining notes were irrelevant and confidential, and were sought solely for the purpose of ascertaining the Company's legal theories and defenses related to the arbitration.  With respect to proposals, agreements or understandings during bargaining, the Company referred the Union to its own records and further characterized the request as unauthorized pre-arbitral discovery.[28]

#### 3.  Documents provided pursuant to arbitration subpoena

The Union did not respond or follow up further regarding these requests at any time until on or about August 18, 2015, when the Union's counsel issued a subpoena to the Company relating to the arbitration of the Union's grievance, which was scheduled to commence on September 10, 2015.  In many respects, the subpoena mirrored the Union's prior information requests.  Paragraph 2 of the subpoena sought documents relating to the Company's "implementation of Article 23.3," clearly encompassing the documents requested in paragraphs 6 and 8 of the September 5th request, as well as paragraphs 1, 2, and 3 of the September 18th request.  Paragraphs 3 and 4 of the subpoena mirrored paragraphs 1 and 2 of the September 5th request.[29]

On September 4, 2015, Company Counsel Dawn Blume responded to the subpoena.  The documents included a payroll report (in Excel spreadsheet format) "containing everything found on the 'earnings statements'" sought by the Union.  With respect to the actual payroll earnings statements, Blume explained "that it takes a payroll clerk in our department 3–4 minutes to download and print out a single earnings statement which is the equivalent of 8 hours of time for a single payroll period for the entire unit in Southampton" and that "we simply do not see the point in engaging in this manual exercise when the information on the earnings statements is identical to what is contained in the report I have attached hereto."  Despite the Company's unwillingness to perform this manual exercise, Blume noted that she had "arranged for John Dagle, your client to have access to our payroll system for the limited purpose of accessing and printing (if he desires) the 'earnings statements' he continues to demand from the Company."  Blume advised that his credentials

---

[20] R. Exh. 7; GC Exh. 13.

[21] GC Exh. 11.

[22] R. Exh. 5.

[23] GC Exh. 12.

[24] Fox corroborated Dagle's explanation regarding the difficulty in gleaning the appropriate pretax wage information from the payroll documents provided in contrast to the more detailed earnings statements requested. (Tr. 52–53, 299–301, 316–319; GC Exh. 13.)

[25] Dagle's testimony that the Company previously provided it with copies of earnings statements was undisputed. (CP Exh. 3; Tr. 309.) On the other hand, the Company correctly points out that the process of printing out the requested earnings statements for approximately 100 Southampton employees for 15 pay periods would have been signifi-

cantly time consuming – 1,500 earnings statements at 4 minutes each—would have taken a payroll clerk up to 100 hours to produce. (Resp. Exh. 7; Tr. 277–278.) Thus, complying with the Union's request would have taken between 75 and 100 hours of clerical time.

[26] GC Exh. 15B.

[27] Dagle credibly explained that the purpose of these also sought to determine if any issue came up during bargaining regarding Article 23.3. (GC Exh. 14; Tr. 58–59.)

[28] GC Exh. 15B.

[29] CP Exh. 1; R. Exh. 7.

and log-in information would be forthcoming.[30]

On September 8, 2015, Blume again emailed Newlin. As she had indicated she would in her September 4 email, Blume attached a summary payroll report for 2014 and 2015, and she provided the log-in information for the Union to directly access the employees' earnings statements.[31]

The arbitration commenced on September 10, 2015. At the hearing, the arbitrator revoked the Company's subpoena to the extent it sought the Company's bargaining notes. Two hearing days have occurred, but the hearing had not concluded as of the date when the unfair labor practice hearing.

In mid-September 2015, the Company was advised by the Union that it was having trouble printing out the earnings statements. On October 5, 2015, Dave Beaudoin, the Company's Human Resource Information Systems (HRIS) Manager, contacted the Union's administrative assistant by email to offer his assistance.[32] Beaudoin inquired as to whether he "could jump on a WebEx meeting, so [he] could log on to your computer and verify that you are appropriately configured to run the software." The Union, however, was unwilling to allow Beaudoin to access its computer. After further discussions, Beaudoin forwarded a file on November 5, 2015, that the Union needed to install.[33] On November 17, 2015, Beaudoin spoke with Liz Sterling, the Union's Secretary and office manager. Sterling informed her that she was able to view the earnings statements on a computer screen, but was unable to print them.[34]

### F. The Ebola PowerPoint Presentation

The Company does not handle Class A medical waste, which includes waste contaminated by the Ebola virus. On or about November 12, Safety Manager Ron Maggiaro gave a 10–15 PowerPoint presentation to Morgantown employees on how to recognize Ebola waste packaging and avoid handling it. Employees were not given copies of the presentation.[35] The Union learned about the employee presentation and in emails, dated November 13 and 18, Dagle requested the Company provide it with a copy of the "Ebola video."[36]

On November 18, Fox responded, requesting that Dagle copy her on future requests and proceeded to reject his request:

First, Ebola is Category A waste, not [RMW], so it falls outside the span of the [CBA]. Although the Morgantown employees will not be transporting or handling this waste, we decided to educate our employees on the Company's activities related to Ebola. The presentation shown to the employees is confidential and proprietary. This type of information could cause a great deal of speculation and public concern if it was released to third-parties outside our organization. Consequently, we are more than happy to review the power-point presentation with you that we shared with the employees in person, at a mutually convenient time at our offices, but we are not providing a copy to you or anyone else for reasons I stated.[37]

Dagle responded the following day, November 19, disputing Fox's confidentiality concerns and assuring her that the Union would "agree that the power-point presentation will not be shared with anyone outside the union's officers, representatives and agents." He noted that the employees were given the presentation without any mention that the information was confidential or proprietary. Nevertheless to meet Fox's claim of confidentiality, he pledged that the Union would not show the PowerPoint to anyone outside of its officers, representatives, and agents. He then again requested a copy.[38] On November 25, Fox responded as follows:

Under common law, employees of Stericycle are required to keep nonpublic information confidential. Employees also agree to this requirement when they sign our Handbooks. The Union has no such obligations to preserve the confidentiality of Stericycle materials (except, as I understand, for a limited agreement we recently reached over internal payroll processing data you requested). I appreciate the effort you have made to extend me these assurances, however, I also understand that you cannot personally guarantee that anyone you share these materials with will also keep the materials confidential.

As I previously stated, these materials are extremely sensitive and you should know that Stericycle has spent a great deal of time answering questions from the public and other regulators surrounding whether EBOLA contaminated waste will be transported and/or treated within their town, municipality, jurisdiction etc. Many of these questions came from mere speculation and panic a situation that we are trying to avoid. For this reason, we did not permit any of the Morgantown employees to receive copies of the materials we presented to them. We only shared with them the presentation in person that I already offered to share with you. As I already stated to you, these employees will not transport the waste as it is outside their position duties. We simply presented them with the information because we want to educate all the employees on our activities in this area.

Again, my offer to present to you, at a mutually convenient time, the same materials that we presented the employees still stands.[39]

On December 1, Dagle responded, disagreeing with Fox's interpretation of the law and her proposed compromise:

I am not aware of any enforceable common law requirement that would prevent a Morgantown or Southampton employee from sharing information presented by Stericycle concerning handling of Ebola waste and ensuring the safe handling that waste by its employees. If there is some prohibition on sharing "non public" Stericycle information with third parties in the handbook that applies to the Ebola presentation, I would like to see it. Please provide me a copy of the current Employee Handbook employees must sign.

Your proposal to just let me view the presentation is inadequate. Local 628 needs to verify the accuracy of the information you are providing represented employees to ensure that their safety is being adequately protected. To verify the presentation's accuracy, Local 628 must submit a copy to professional experts in the infectious disease and biosafety field

---

[30] R. Exh. 7.

[31] R. Exh. 8 at 6–21.

[32] R. Exh. 11 at 3.

[33] Id. at 2.

[34] There is no indication that Sterling requested additional assistance from Beaudoin in printing copies of the files. (Tr. 163, 206–208; Id. at 1.)

[35] Tr. 227–230.

[36] GC Exh. 17.

[37] GC Exh. 18 at 3.

[38] Id. at 2–3.

[39] Id. at 1–2.

for their review. It would be neither cost effective no practical to insist that such experts attend a presentation at a Stericycle facility.

I repeat Local 628's willingness to bargain over an appropriate agreement to address any legitimate Stericycle confidentiality concerns. Please provide a copy of the presentation.[40]

The Company did not respond to Dagle's December 1st email. Nor did it provide him with the employee handbook referred to in Fox's November 25th email. It did, however, post a notice at the Morgantown facility on January 16, 2015, explaining that employees were not to handle Ebola waste and that the Ebola presentation had been given for informational purposes only. The Company provided Dagle with a copy of the notice on January 20, 2015.[41] Additionally, on March 2, 2015, Fox provided Dagle with a copy of the recently implemented employee handbook at the Morgantown facility.[42]

### G. Vehicle Backing Program

Sometime in November, the Company issued employee James Clay a counseling report after he was involved in a vehicular accident. The discipline subjected Clay to retraining for repeatedly violating the Company's vehicle backing program. Dagle and Transportation Manager Robert Schoennagle agreed to meet to discuss Clay's discipline. Prior to meeting, on November 24, Dagle requested several documents, including a "copy of the Company's vehicle backing program."[43] Schoennagle forwarded the information, except for the vehicle backing program, to Dagle on November 25.[44]

Schoennagle and Dagle met again on November 28. Dagle renewed his request for a copy of the vehicle backing program. Schoennagle said he did not have a copy of the program, but would look into it. At a subsequent meeting on January 22, 2015, with Schoennagle, Transportation Supervisor Glenn Oesyterling, Transportation and Human Resource Manager Susan O'Connor, Dagle renewed his request for vehicle backing program information. Shoennagle replied that the program consisted of a power point presentation and a video. He added, however, that the Company refused to produce the information because the PowerPoint presentation was "proprietary information" and the video was a "copyrighted item" that the Company purchased from an outside vendor, J.J. Keller & Associates, Inc.[45]

On January 29, 2015, Shoennagle reaffirmed the Company's refusal to provide vehicular program information, which it considered "a proprietary company training tool," but offered Dagle or union shop stewards the opportunity to "sit in on a presentation of this program with a proper written request from the Union."[46] On January 30, 2015, the Union filed a charge over the Company's refusal to provide the vehicle backing program information.

On March 2, 2015, Fox responded by reiterating the Company's position that the PowerPoint presentation proprietary and confidential, are irrelevant because Clay had seen the video several times and did not file a grievance over the discipline. She added that, without waiving future objection to any of these items, the Company was providing the PowerPoint presentation. With respect to the video, she reiterated that it was the licensing agreement with the vendor that prohibited copying and limited viewing to employees. Under these limitations, the Company offered Dagle the option of viewing the video at a mutually convenient time or visiting the J.J. Keller & Associates website. Dagle did not take Fox up on her offer.[47]

Finally, Fox also addressed Dagle's December 1st request for a copy of the employee handbook:

Stericycle employees sign copies of the employee handbook at hire which is what I previously referenced when I relayed that employees are bound by prohibitions in the handbook on releasing confidential, proprietary and non-public information of the Company. When you requested a copy of the Handbook, we searched our records and it appears that the Company has not distributed or maintained Handbooks in Southampton since 2009 and Morgantown since 2011. As a result, the Company is now distributing its 2015 handbooks in these locations. I am attaching a copy here for your reference. Please let me know if you have any questions.[48]

### H. Harassment Training Video

On December 30, Dagle requested "a copy of the Code of Conduct and Harassment Training video which the Company had bargaining unit employees view in its training." The video itself is a 10 to 15 minute harassment training video that was commissioned by the Company from a law firm in Chicago. Morgantown Plant Manager Mike Valtin responded later that day as follows: "The Code of Conduct and Harassment Training video are proprietary and can be available for you to view; however, the Company cannot give you a copy."[49] Dagle made no effort to view the video.[50]

### I. The Soubra Grievance

On November 20, the Union filed "a formal grievance on behalf of Local 628, Ryan Suobra and the bargaining unit" alleging that "supervisor Ron Lobb egregiously and forcefully placed his hands on, grabbing, pushing and pulling employee Ryan Suobra on Saturday, November 15, 2014."[51] On December 5, Plant Manager Mike Valtin responded to the grievance as follows:

While the Company does not necessarily agree with the Union's statement that Ron Lobb's action toward Ryan Soubra was egregious or forceful, we believe that no Manager or Supervisor should touch an employee. The Company agrees that this behavior is unacceptable and will not be tolerated. Therefore, Mr. Lobb's unacceptable behavior has been addressed

---

[40] Id at 1.
[41] R. Exh. 4.
[42] GC Exh. 21–22.
[43] GC Exh. 19; R. Exh. 10.
[44] R. Exh. 10 at 2–4.
[45] The testimony by Dagle and Shoennagle was consistent on regarding the discussions at these meetings. (Tr. 66–70, 167–168, 215–217, 223–224.)
[46] GC Exh. 20.

[47] Dagle speculated that he would have no way of knowing whether the video link referenced in the letter was the same as the one shown to employees. That explanation defied common sense since he would have encountered the same uncertainty, requiring confirmation by a unit member, if the Company had provided him with a video. (Tr. 69-72.) Nor is there any evidence that he considered the cost of purchasing the video, for which no credible evidence of cost was offered. (Tr. 304–305.)
[48] GC Exh. 21.
[49] GC Exh. 26.
[50] Tr. 150, 252–253.
[51] GC Exh. 23.

with him per company policy. Harassment Training will be held for all Morgantown Plant Supervisors and Team Members by January 1st 2015.[52]

Not satisfied with the Company's response to the grievance, on December 11, Dagle informed Valtin that the Union intended "to proceed to Step 2 regarding the Ryan Suobra grievance." Dagle proposed the Step 2 meeting for December 15 and "in order for the Union to properly investigate this grievance," requested the following information:

1. Copies of all video tapes, photographs, or other similar media containing information relevant to the Company's investigation of . . .

2. The names and statements of any witnesses of which the Company is aware that have knowledge of the facts and circumstances regarding supervisor Ron Lobb's egregious and unacceptable action on Ryan Suobra on November 15, 2014.

3. Copies of all investigative reports concerning supervisor Ron Lobb's egregious and unacceptable action on Ryan Suobra on November 15, 2014 which are in the possession of the company including the company's investigative notes of interviews of witnesses or persons interviewed regarding this incident.

4. Copies of all documents, reports, emails, etc., relevant to the Company's investigation of supervisor Ron Lobb's egregious and unacceptable action on Ryan Suobra on November 15, 2014.

5. Copies of all documents, reports, emails, etc., related to Steicycle's discipline and reprimand of supervisor Ron Lobb for his egregious and unacceptable action on Ryan Suobra on November 15, 2014.

6. of all documents, reports, email, etc., in supervisor Ron Lobb's personnel file regarding similar previous instances of egregious and unacceptable actions on employees.[53]

Dagle and Valtin met for a Step 2 grievance meeting on December 22. Valtin provided a copy of the video tape requested in item and permitted Dagle to read the disciplinary notice issued to Lobb. He also provided him with the names of at two witnesses and a written statement by one of them.[54] However, the Company refused to provide any further information responsive to items 2 through 6. Valtin confirmed the Company's position on December 30:

Your request regarding the Company's investigation into misconduct and personnel information of a non-bargaining unit employee (items 2-6) are denied because they are not presumptively relevant and you have not provided any reasons to justify their relevance as to any grievance or discipline issued to a bargaining unit employee.

Further, the Union does not have any right to access the Company's premises to attend training or otherwise – other than as negotiated in the CBA. Article 28 does not provide the Union with access rights to attend Company trainings with

employees or to otherwise disrupt the Company's normal business operations.[55]

Dagle replied on January 7, 2015, insisting that the requested information was relevant to the Union's "investigation and evaluation" of the Soubra grievance:

You have represented to me that Stericycle has disciplined Mr. Lobb for his conduct. In order to evaluate whether the discipline is sufficient to deter future misconduct against bargaining unit members, I have requested information related to Stericycle's investigation into the assault, Mr. Lobb's disciplinary record for similar incidents and Stericycle's evaluation and consideration of the appropriate discipline under the circumstances.[56]

On January 12, Valentin acknowledged Dagle's explanation for the request but reaffirmed the Company's position denying the request:

The Company has previously provided you access to the discipline issued to Lobb resulting from his interaction with Mr. Soubra. As you know, Mr. Soubra received no disciplinary action resulting from the incident. The reason the Company provided the Union with the discipline was to demonstrate its good faith and commitment to its policies and to assure the Union that Mr. Lobb will continue to suffer consequences for violating Company policies, which include inappropriate interactions with coworkers.

The Union does not have any right to grieve or challenge any discipline issued to a non-bargaining unit member. Consequently, your rationale for wanting to review the personnel file of Mr. Lobb—to detetmine if the discipline issued was appropriate and sufficient—is not related to the Union's representational duties. As a result, your reasons for wanting the requested information does not overcome Mr. Lobb's right to confidentiality of his personnel information. Therefore, your request is denied.[57]

### J. TMX Team Meetings

On July 9, Dagle observed a new notice posted at the Morgantown facility soliciting volunteers for a new workplace group called the TMX (Team Member Experience) Team. The notice sought employee participation to discuss and feedback in employee surveys.

Concerned that the meetings may have involved discussions of employees' terms and conditions of employment, Dagle submitted an information request to District Manager Steve Pantano on July 15, 2015. The request sought all documents relating to TMX team related planning, meetings, employee surveys, employee selection and participation criteria, employee attendance lists and compensation for attending, as well as similar documents used at other facilities.

Fox responded on August 7, 2015, explaining that the sign-up sheet had been posted in error at Morgantown and that a notice had been posted informing employees of the retraction. She added that "[s]ince there is no employee workgroup being formed in Morgantown, we feel most of the information you are requesting is irrelevant." Fox did, however, provide a copy of the TMX meeting notice and the PowerPoint presenta-

[52] GC Exh. 24.

[53] GC Exh. 25.

[54] I credit Dagle's testimony regarding his awareness of prior incidents involving Lobb, but not his speculative testimony as to what the action form stated or vague testimony that Lobb just got a "pat on the back." (Tr. 151–153.)

[55] GC Exh. 27 at 2.

[56] Id. at 1–2.

[57] Id. at 1.

tion given to employees in response to paragraph 4 of the request. Omitted from the PowerPoint presentation were "slides that show comparative data with [the Company's] non-represented locations."[58]

### K. The Employee Handbook

On December 1, Dagle requested a copy of the current Morgantown employee handbook referred to in Fox's November 25th email.[59] Fox did not respond to this request until March 2, 2015, when she wrote:

> Finally, the Company wants to address your November 25, 2014 request for the employee handbook. Stericycle employees sign copies of the employee handbook at hire which is what I previously referenced when I relayed that employees are bound by prohibitions in the handbook on releasing confidential, proprietary and non-public information of the Company. When you requested a copy of the Handbook, we searched our records and it appears that the Company has not distributed or maintained Handbooks in Southampton since 2009 and Morgantown since 2011. As a result, the Company is now distributing its 2015 handbooks in these locations. I am attaching a copy here for your reference.[60]

As referenced in Fox's email, the Company's current employee handbook was initially distributed to Morgantown employees on February 26 and 27, 2015. Since then, the handbook has been issued to and receipt acknowledged by all new United States-based employees.[61]

The current employee handbook is inconsistent with numerous provisions in the Morgantown CBA, including those relating to overtime, attendance policy, work schedules, paid time-off, paid holidays, personal time-off, work rules, disciplinary policy, use of bulletin boards, recoupment, drug testing, grievance procedure, employee probationary period, employee status and vehicle collision reporting.[62] These inconsistencies are recognized on page 1 of the handbook, which states that "[s]ome benefits may not apply to union team members and in some cases the policies may be impacted by collective bargaining agreements . . . No person is authorized to make any representations contrary to, in addition to, or to modify in any way this Team Member Handbook with the written approval of the Corporate Human Resources Department."[63]

The Company has not applied the nationwide employee handbook in a manner inconsistent with the Morgantown CBA. On the other hand, while all employees must acknowledge receipt of the employee handbook, the Company does not provide them with copies of the CBA. The Union provides current employees copies of new CBAs, but employees are not customarily provided with a copy of the CBA during the midst of a contract term unless they request it from Dagle.[64] The portions of the handbook at issue include the following:

Retaliation—"All parties involved in the investigation [of a harassment complaint] will keep complaints and the terms of their resolution confidential to the fullest extent practicable."[65]

Electronic Communication Policy—"A substantial portion of our business is transacted by telephone and over the wide area network. Therefore in order to maintain the efficiency of these systems non-business usage must be restricted. Phone and data lines must be kept open for business purposes. Accordingly, personal telephone calls and e-mails should be infrequent and brief, and limited to urgent family matters."[66]

Use of Personal Electronics—"The use of personal cell phones or other personal electronic devices such as MP3 players is prohibited in waste processing, warehouse, loading and unloading areas during operating hours and any areas subject to vehicle movement at any time. . . . Personal mobile phones and all other personal mobile electronic devices are to be kept in team member's lockers. Personal phone calls and use of personal electronic devices shall be restricted to meal and break periods. Violation of this policy may result in disciplinary action up to and including termination."[67]

Personal Conduct—"In order to protect everyone's rights and safety, it is the Company's policy to implement certain rules and regulations regarding your behavior as a team member. Conduct that maliciously harms or intends to harm the business reputation of Stericycle will not be tolerated. You are expected to conduct yourself and behave in a manner conducive to efficient operations. Failure to conduct yourself in an appropriate manner can lead to corrective action up to and including termination."

The following are some examples of infractions which could be grounds for corrective action up to and including termination, however this list is not all- inclusive . . . Engaging in behavior that is damaging to Stericycle's reputation."[68]

Conflict of Interest—"Stericycle will not retain a team member who directly or indirectly engages in the following:

> An activity that . . . adversely reflects upon the integrity of the Company or its management."[69]

The electronic use-related provisions in the employee handbook are not the only policies at issue. On May 21, 2015, Reiss approached Dagle about negotiating over policies relating to use of personal electronics, cameras and videos in the Southampton facility. Reiss explained at the time that the Company's policy manual was already implemented at all of the Company's other U.S. facilities, including Morgantown, and "corporate" required that Reiss implement them at the Southampton facility. In fact, the personal electronics policy listed an effective date of "4/1/2014," while the camera and video use policy became effective on "01-01-2012."[70]

The Camera and Video Use Policy provides, in pertinent part:

---

[58] GC Exh. 28, 29B.

[59] GC Exh. 18.

[60] GC Exh. 21–22.

[61] GC Exh. 32.

[62] These inconsistencies are not disputed. (Tr. 90–106, 326.)

[63] GC Exh. 22 at 1.

[64] There is no evidence that the handbook was applied in a manner inconsistent with the CBA. Nor did I credit Dagle's hearsay testimony regarding the speculation conveyed by some employees about the effectiveness of handbook provisions inconsistent with the CBA. It is also undisputed that not all employees would be in possession of the CBA. (Tr. 110, 131–137.)

[65] GC Exh. 22 at 10.

[66] GC Exh. 22 at 26.

[67] GC Exh. 22 at 28.

[68] Id. at 30.

[69] Id. at 33.

[70] Dagle's credible testimony on this point is not disputed. (GC Exh. 30-31; Tr. 87–89.)

3.1 Team members are prohibited from taking pictures with a personal or company-issued cell phone camera of any Stericycle property, operation, or equipment without the permission of their supervisor/manager.

4.1 Team members are prohibited from taking video or audio recordings with a personal or company camera, camcorder, or other device of any Stericycle property, operation or equipment without the permission of their supervisor/manager."

The Use of Personal Electronics in the Workplace Policy provides, in pertinent part:

Section 5.1 Team members, visitors and vendors are prohibited from using personal mobile phones or other personal electronic devices such as MP3 players, (i.e. iPods) in waste processing, warehouse, loading and unloading areas during operating hours, and any area subject to vehicle movement at any time.

Section 5.3 Personal phone calls and use of personal electronic devices shall be restricted to meal and break periods. Section 5.5 Violation of this policy may result in disciplinary action up to and including termination.

The Company's personal electronics policies prohibit employees from carrying cellular telephones at any time into the facility beyond their lockers, although managers or supervisors have been observed using their phones in the facility. A relevant consideration is the fact that employees handle infectious medical waste and are required to wear protective clothing, including gloves. While this restriction prevents employees from photographing safety hazards, it does not preclude them from reporting dangerous conditions. In fact, Dagle confronted Company officials 2 years ago in response to a complaint from a Southampton employee about an alleged electrical hazard. The complaint triggered an OSHA investigation and the Company was fined for a safety violation.[71]

LEGAL ANALYSIS

A.  The Company's Recoupment of Employee Health
Insurance Premiums

The complaint alleges that on or about September 12, the Company unilaterally changed employee terms and conditions of employment at the Southampton facility by implementing a plan to recoup employee health care premiums over three pay periods. The Company denies that it unilaterally changed employees' wages, as the amounts deducted were exactly what the employees were required to contribute and the Company was entitled to deduct.

Moreover, the Respondent insists that it gave the Union adequate notice and an opportunity to bargain over the action, but the Union waived that right.

It is well settled that an employer violates Section 8(a)(5) of the Act when it makes substantial and material unilateral changes during the course of a collective-bargaining relationship on matters that are mandatory subjects of bargaining. See

NLRB v. Katz, 369 U.S. 736, 743 (1962). Mandatory subjects of bargaining include those delineated in Section 9(a) as "rates of pay, wages, hours of employment, or other conditions of employment" and in Section 8(d) as "wages, hours, and other terms or conditions of employment." Ford Motor Co. v. NLRB, 441 U.S. 488, 496 (1979). Changes to payments of wages are mandatory subjects of bargaining. JPH Management, Inc., 337 NLRB 72, 73 (2001).

Good-faith bargaining requires timely notice and a meaningful opportunity to bargain regarding an employer's proposed changes, as no genuine bargaining can be conducted where the decision has already been made and implemented. Ciba-Geigy Pharmaceuticals Division, 264 NLRB 1013 (1982), enfd. 722 F.2d 1120 (3d Cir. 1983); Pontiac Osteopath Hospital, 336 NLRB 1021, 1023–1024 (2001); Castle Hill Health Care Center, 355 NLRB 1156, 1189 (2010); S & I Transportation, Inc., 311 NLRB 1388 (1993). An employer's unilateral change that affects numerous bargaining unit employees certainly constitutes a Section 8(a)(5) violation. USC University Hospital, 358 NLRB 1205, 1213 (2012), citing, Carpenters Local 1031, 321 NLRB 30, 32 (1996).

The CBA subjected Southampton employees to biweekly health insurance deductions of 1 percent starting after they ratified the contract in April 2014. However, the Company did not start health insurance deductions during the period of April 13 to August 9, 2014. It is not disputed that the Company was entitled to reimbursement for the unpaid health insurance costs.[72] The only question is how it could legally accomplish the recoupment.

On September 3, Riess notified Dagle of the Company's plan to recoup the outstanding health insurance costs through equal deductions from employees' the next three paychecks, starting September 12, and asked if Dagle had "any questions or concerns." Dagle responded on September 5, asserting that the "recoupment decision is in violation of the Collective Bargaining Agreement and Stericycle's obligations under federal law." On September 9, Dagle demanded that any "recoupment schedule must be negotiated with the Union."

The Company's notification of the first recoupment after it was too late to bargain over the action presented the Union with a fait accompli and, thus, did not afford it with a reasonable opportunity for bargaining. Intersystems Design Corp., 278 NLRB 759 (1986), Ciba-Geigy Pharmaceuticals Division, supra 264 NLRB at 1017. See also Laro Maintenance Corp., 333 NLRB 958, 959 (2001); S & I Transportation, Inc., supra, 311 NLRB at 1388 fn. 1, 1390.

The next issue is whether the Company's action in reducing employee wages for the next three pay periods constituted a significant and material change. Berkshire Nursing Home, 345 NLRB 220, 220 (2005) (citing Crittendon Hospital, 342 NLRB 686, 686 (2004)). As noted by the General Counsel, the contract required the Company to deduct health costs following ratification, but did not specify how and when the Company could recoup health insurance costs if the Company failed to start deducting the costs in a timely manner.

The Company's payroll processing problems lasted over 4 months before it took action to correct the situation by recouping the amounts owed in three paychecks. Eagle Transport

_____

[71] I credit Dagle's hearsay testimony regarding the employee complaint about a safety hazard because Dagle confronted the Company about the allegation and acknowledged that it was not good working practice to use cell phones while working. However, I do not credit his speculative assertion that the employee feared for his job. (Tr. 139–145, 171–172, 239–241.)

[72] Dagle argued to Reiss at one point that the Company waived its right to recoup the unpaid costs, but the Union provided no precedent to support that proposition.

*Corp.*, 338 NLRB 489, 490 (2002), where the Board deemed an employer's unilateral recoupment lawful after it miscalculated certain employee's wage rates, promptly corrected the error after discovering it and limited it to one paycheck, suggests different results depending on how many recoupments are in issue. In *Alexander Linn Hospital Association*, 288 NLRB 103 (1988), 'enfd. sub nom. *NLRB v. Wallkill Valley General Hosp.*, 866 F.2d 632 (3d Cir. 1989), however, the Board determined the propriety of the employer's unilateral action based on the amounts at issue. In that case, the employer failed to deduct union dues on behalf of a 13 employees over a period of time, but continued to remit the dues to the union. The amounts owed by employees ranged from $1.60 to $38.60 and upon, discovering the mistake, the employer decided to recoup the amounts over one or two pay periods depending on whether the amount owed was more or less than $10. The judge concurred with the judge's determination that, under the circumstances, the amounts unilaterally recouped were insubstantial and, thus, did not constitute a material, substantial, or significant change in a condition of employment. Id. at 118.

Applying the principles in *Eagle Transport* and *Alexander Linn,* the Company's unilateral action in processing the first recoupment were relatively insignificant and did not constitute a material and substantial change. The 1978 Bureau of Labor Statistics Survey data cited by the Company indicates that the amounts unilaterally deducted in *Alexander Linn,* approximately 2 hours of pay, line up with those at issue in this case.[73]

In contrast, the Company's second and third recoupments of health insurance costs, however, constituted a more significant amount of employees' wages. The issue then is whether the Company provided the Union with sufficient advance notice to facilitate meaningful negotiations over the second and third recoupments.

After essentially telling Dagle that the first recoupment scheduled for September 12 was a fait accompli, Reiss offered to bargain over the future second and third recoupment pay periods. Dagle refused, conditioning bargaining on the Company's restoring the status quo by reversing its decision to implement the first recoupment. Having given a reasonable amount of time to bargain over the second and third recoupments, which had not yet been processed, the Union waived the opportunity to bargain over those changes. *Ciba-Geigy Pharmaceuticals Division,* supra at 1017 (1982); *Associated Milk Producers, Inc.,* 300 NLRB 561, 563 (1990); *Jim Walter Resources, Inc.,* 289 NLRB 1441, 1442 (1988).

Under the circumstances, the Company was entitled to recoup the 1 percent health insurance cost from Southampton unit employees. The Company did not afford the Union a reasonable opportunity to bargain over the first recoupment, but the amounts involved were insignificant and did not constitute a change. While the second and third recoupments did constitute more significant amount of wages, the Union waived its opportunity to bargain over those changes. This allegation is dismissed.

---

[73] See *Industry Wage Survey: Hospitals and Nursing Homes, September 1978*, U.S. Dept. of Labor, Bureau of Labor Statistics, November 1980, Bulletin 2069, at 6, indicating average wage rates for general duty nurses in 1978 was between $5.85 per hour and $8.30 per hour.

## B. The Employee Handbook

### 1. Distribution of the Employee Handbook

The General Counsel alleges that the Company's February 2015 distribution of a U.S. company-wide employee handbook to Morgantown employees containing provisions inconsistent with the CBA unilaterally changed the terms and conditions of employment of unit employees in violation of Section 8(a)(5) and (1). The Company contends that it did not unilaterally change employees' terms and conditions of employment by distributing an employee handbook to Morgantown employees.

An employer violates Section 8(a)(5) of the Act by changing wages, hours or other terms and conditions of employment of bargaining unit employees without giving the employees' bargaining representative notice and a meaningful opportunity to bargain about the changes. *NLRB v. Katz,* supra; *United Cerebral Palsy of New York City,* 347 NLRB 603, 607 (2006). The Board has specifically found work rules to be mandatory subjects of bargaining: work rules involving the imposition of discipline: *United Cerebral Palsy of New York City,* supra.

The Morgantown facility employee handbook contained numerous policies inconsistent with CBA provisions relating to overtime, attendance, work schedules, paid time-off, paid holidays, personal time-off, work rules, disciplinary policy, use of bulletin board, recoupment, drug testing, grievance procedure, employee reporting, employee probationary period, employee status and vehicle collision reporting. Page 1 of the handbook, however, contained an acknowledgment that its policies might be superseded by certain provisions in the CBA. Additionally, there is no evidence that the Company ever enforced the employee handbook in a manner that contravened any provisions in the CBA.

Notwithstanding the employee handbook's disclaimer regarding the CBA and the lack of evidence of its enforcement, the fact remains that the document contained numerous Company policies and practices that affected numerous mandatory subjects of bargaining. That being the case, the Company was obligated to notify the Union and afford it a reasonable opportunity to bargain over the handbook provisions before distributing it to unit employees. A notation in the handbook vaguely apprising unit employees that in "some cases these policies may be impacting by collective bargaining agreements" did not provide them with clear guidance as to the applicable policies affecting certain terms and conditions of employment.

Under the circumstances, the Company's February 2015 unilateral implementation of an employee handbook at the Morgantown facility constituted material and significant changes to unit employees terms and conditions of employment in violation of Section 8(a)(5) and (1) of the Act.

### 2. The Company's rules and policies

The complaint also alleges that the Company's 2015 employee handbook and policy manuals contain several rules or policies that unlawfully interfere with unit employees' Section 7 rights.

The maintenance of a rule that would reasonably have a chilling effect on employees' Section 7 activity violates Section 7. *Lafayette Park Hotel,* 326 NLRB 824, 825 (1998), enfd. 203 F.3d 52 (D.C. Cir. 1999). In determining whether an employer's rules or policies restrict or chill employee's rights to engage in protected activity, one must consider if: "(1) employees would reasonably construe the language to prohibit Section 7 activity; (2) the rule was promulgated in response to union activity; (3) or the rule has been applied to restrict the exercise

of Section 7 rights." *Lutheran Heritage Village—Livonia,* 343 NLRB 646, 646–647 (2004). Where a rule or policy explicitly restricts Section 7 activity or can be reasonably read to restrict such activity, the Board is required to evaluate the employer's asserted business justification "[t]o strike a proper balance between the employees' rights and the Respondent's business justification." *Caesar's Palace,* 336 NLRB 271, 272 (2001). The Board must accommodate the respective rights of the parties "with as little destruction of one as is consistent with the maintenance of the other." *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 112 (1956).

#### (a) Use of personal electronic devices

The Company's policy manual and employee handbook contain virtually identical polices relating to the use of personal electronics in the workplace. The General Counsel contends that the policies unlawfully restrict employees' cell phones and other personal electronic devices. The Company contends that the policies, on their face, do not purport to address Section 7 activity. Nor is there any evidence that the policies were adopted in response to, or ever applied to restrict, Section 7 activity. Finally, the Company asserts that the policies are narrowly tailored to provide a safe working environment for employees.

An employer has a legitimate interest in ensuring the safety of its operations, but rules regulating the use of electronic devices must be narrowly tailored to address such concern. *Whole Foods Market, Inc.,* 363 NLRB 800, 803 (2015); *T-Mobile USA, Inc.,* 363 NLRB 1638, 1641 (2016); *Rio All-Suites Hotel & Casino,* 362 NLRB 1690 (2015).

The policy manual and employee handbook restrict the use of personal mobile phones or other electronic devices to break time, requires that they be kept in lockers during worktime, and prohibits them from entering work areas with their cell phones and other electronic devices. The General Counsel contends that the policy unlawfully inhibits protected activity because the requirement that cell phones be kept in an employee's locker except during break times is tantamount to prohibiting employees from entering work areas with personal electronic devices during nonwork time. It is also noted that these rules do not make any exceptions so employees would reasonably interpret it to even prohibit them from accessing their cell phone to take pictures of safety violations while on nonworking time.

The General Counsel's argument fails for several reasons. First, the Section 7 type of activity referred to by the General Counsel—the taking of photographs through a cell phone or other electronic device—is not explicitly mentioned in the rule. Of course, mobile phone technology has evolved to the point where many users, but not all, possess a picture taking feature on their phones and other electronic devices. However, the Company has a separate rule in place, discussed below, specifically regulating the taking of photographs or videos in working areas. In that context, a reasonable interpretation of the rule is that it prohibits employees from engaging in telephone conversations and using other electronic devices in work areas. As noted by the Company, many devices have music and reading features. Gone unmentioned are devices with game features. In a facility where employees handle regulated medical waste, one can appreciate the virtues in a prohibition against telephone conversations, listening to music, reading or playing games in work areas.

Secondly, the record established a workplace environment at the Morgantown facility that necessitates the use of protective clothing covering employees' entire bodies, including hands, when they are in work areas because they handle regulated medical waste. Given the hazardous conditions involved, it is hard to imagine how an employee could use a mobile phone or electronic device in a work area without exposing it to the hazardous elements. The General Counsel focuses on the distinction between using and merely carrying a mobile phone or other electronic device, but that is a distinction without meaning. There is no practical point in being able to carry something to a location if one is not safely able to use it there.

The Company's maintenance of its policy manual rule regarding the use of personal electronics in the workplace policy and employee handbook policy regarding the use of personal electronics do not explicitly restrict Section 7 activity, are narrowly tailored to restrict the use of mobile phones and electronic devices in the Company's hazardous work areas, and any impact on Section 7 activity is outweighed by the Company's substantial business justification for the rules. The allegations at paragraphs 6(a)(i) and 6(c) of the complaint are dismissed.

#### (b) Personal Conduct Policy

The complaint alleges that the Company's personal conduct policy violates Section 8(a)(1) because the policy is vague and can be reasonably construed as prohibiting Section 7 activity. The Company contends that the policy does not explicitly restrict Section 7 activity and was not adopted in response to, or applied to, such activity.

Although Section 7 activity may sometimes harm the reputation of an employer, the Board and courts have never held that employees have a right to maliciously or intentionally harm their employer's business or reputation. *NLRB v. Electrical Workers Local 1229 (Jefferson Standard),* 346 U.S. 464, 472 (1953); *Valley Hospital Medical Center, Inc.,* 351 NLRB 1250, 1252–1253 (2007), enfd. sub nom. *Nevada Service Employees Union v. NLRB,* 358 Fed.Appx. 783 (9th Cir. 2009); *Stanley Furniture Co.,* 271 NLRB 702, 703–704 (1984). Nevertheless, employer rules aimed at criticism by employees must contain clear language stating that they are aimed only at unprotected activity. See e.g. *Casino San Pablo,* 361 NLRB No. 148, slip op. at 2 (2014). Otherwise, the failure to make that distinction would cause employees to refrain from engaging in protected activities. See *Lafayette Park Hotel,* supra at 828.

The policy provision at issue prohibits employee conduct "that maliciously harms or intends to harm the business reputation" of the Company. The example stated cites "behavior that is damaging to Stericycle's reputation." The provision makes no exception, however, for statements that would be protected by the Act, which would protect false or negative statements relating to Section 7 rights. See *Costco Wholesale Corp.* 358 NLRB 1100 supra at 1100–1102 (2012). The statement is sufficiently vague and is accompanied by a threat of discipline or termination, causing employees to reasonably construe the rule to prohibit Section 7 activity, in violation of Section 8(a)(1). *Lutheran Heritage Village-Livonia,* supra. The fact that the policy is buried amongst 16 other rules relating to unprotected conduct is immaterial. As far as the typical employee is concerned, if the rule is there, it can be applied to him/her. Accordingly, the Company's personal conduct policy was vague, overbroad and in violation of Section 8(a)(1).

#### (c) Conflict of Interest Policy

The complaint alleges that the Morgantown facility's conflict

of interest policy against activities that "adversely reflect upon the integrity of the company" is unlawfully overbroad. The Company contends that this language must be read in context and not in isolation, neither involves nor can be reasonably construed as involving protected activity, but rather, activities which would reflect adversely upon the integrity of the Company.

Section 7 of the Act protects employees' right to engage in concerted activity, even if that activity conflicts with the employer's interest. Examples include protests in front of the company, organizing a boycott of the employer and soliciting union support on nonwork time. The Board has concluded that an employer cannot prohibit employees from engaging in conduct that could conflict with its interests where those interests could include union interests. *Sheraton Anchorage,* 362 NLRB 1038 (2015). If an employer's conflict-of-interest rule would reasonably be read to prohibit such activities, the rule will be found unlawful. See *HTH Corp.*, 356 NLRB 1397, 1398, 1421 (2011), enfd. 693 F.3d 1051 (9th Cir. 2012). Rules that are clearly limited to legitimate business interests, on the other hand, are not unlawful.

The Company's conflict of interest policy prohibits employee activity that "constitutes a conflict of interest or adversely reflects upon the integrity of the Company or its management" including "activity in which a team member obtains financial gain due to his/her association with the Company" or "activity, which by its nature, detracts from the ability of the team member to fulfill his/her obligation to the Company." The Company's policy against activities that "adversely reflect upon the integrity of the company" is overbroad. The policy does not set forth examples nor does it clarify a legitimate business interest so that employees will not understand it to prohibit protected activity. Moreover, the statement is vague and is accompanied by a threat of discipline, causing employees to reasonably construe the rule to prohibit Section 7 activity, in violation of Section 8(a)(1). *Lutheran Heritage Village-Livonia,* supra, 343 NLRB at 647. Accordingly, the Company's maintenance of the conflict-of-interest policy is impermissibly overbroad in violation of Section 8(a)(1) of the Act.

### (d)  Harassment complaints

The complaint alleges that the Company's retaliation policy in the Morgantown employee handbook, explicitly prohibiting employees from disclosing "complaints and the terms of their resolution," is unlawfully overbroad. The Company maintains that the policy's confidentiality language does not expressly restrict Section 7 rights and there is no evidence that it was adopted in response to protected activity or has been applied to Section 7 activity.

It is well settled that Section 7 of the Act grants employees the right to discuss wages and other terms and conditions of employment with other employees, and the Board has repeatedly found confidentiality rules unlawful if employees would reasonably construe the rules to prohibit protected discussions. See, e.g., *Battle's Transportation, Inc.*, 362 NLRB 125, 125–126 (2015); *Fresh & Easy Neighborhood Market*, 361 NLRB No. 8, slip op. at 2 (2014); *Cintas Corp.*, 344 NLRB 943, 943 (2005), enfd. 482 F.3d 463 (D.C. Cir. 2007). It is likewise well settled that employees have a Section 7 right to discuss their conditions of employment with third parties, such as union representatives, Board agents, and the public in general, and the Board has invalidated rules prohibiting such third-party com-

munication. See, e.g., *DirecTV U.S. DirecTV Holdings, LLC*, 359 NLRB 545, 547 (2013), reaffirmed and incorporated by reference, 362 NLRB 415 (2015); *Hyundai America Shipping*, 357 NLRB 860, 872 (2011), enfd. in part 805 F.3d 309 (D.C. Cir. 2015); *Kinder-Care Learning Centers*, *Inc.*, 299 NLRB 1171, 1171–1172 (1990).

There is no question that the policy has a lawful purpose—to protect employees from all forms of harassment, and to provide a process by which they can address the problem with the employer, have the problem investigated, appropriate remedial action taken, and appropriate protective measures established. Nor is it disputed that the Company has a substantial and compelling business interest adopting rules banning any form of harassment in the workplace, and that the inclusion of a confidentiality provision is an integral part of such a policy. *Hyundai America Shipping Agency, Inc. v. NLRB,* supra.

The pertinent question, however, is whether employees would reasonably read the policy's confidentiality provision as restricting their Section 7 rights in certain situations. As noted by the General Counsel, it is not clear from the handbook that the policy is limited to sexual harassment complaints and resolutions. The Company lists a variety of types of harassment, but that list is in another section of the handbook, between its affirmative action policy and its prohibition on the use or possession of firearms and dangerous weapons on company property.

Employees who submit a complaint or participate in a complaint do not have to agree to keep the complaint, report or investigation confidential. *Fresenius USA Mfg., Inc.*, 362 NLRB 1065, 1066 (2015). Here, the Company's rule encompasses parties beyond the its representatives, requiring "all parties involved" to keep complaints and the terms of their resolution confidential. An employee could reasonably construe the restriction as prohibiting communications with Board agents or other governmental agencies about complaints related to the workplace or Section 7 activities. *Kinder-Care Learning Centers,* supra, 299 NLRB at 1172; *DirecTV U.S. DirecTV Holdings, LLC,* supra, 359 NLRB at 547.

The Company also argues that the policy merely articulates its pledge to employees, is not a rule of conduct does not mention a penalty. Those considerations ignore the fact that the portion of the harassment policy at issue, requiring that employees "*will* keep complaints and the terms of their resolution confidential to the fullest extent practicable," can be reasonably interpreted as a rule of conduct preventing employees from engaging in Section 7 protected communications. Moreover, clarifying that employees' obligation to maintain confidentiality is not ironclad and only "to the fullest extent practicable," serves to create further uncertainty in the minds of employees as to whether they might incur adverse consequences if they violate that provision. *Newsday, Inc. v. Long Island Typographical Union 915, CWA,* 915 F.2d 840, 845 (2d Cir. 1990) (upholding the right of employer to discharge employees who violated confidentiality provisions of harassment policy).

Accordingly, the Company's retaliation policy relating to the confidentiality of harassment complaints is overboard in violation of Section 8(a)(1).

### (e)  Electronic   Communications Policy

The General Counsel alleges that a portion of the Company's electronic communication policy unlawfully restricts employees' usage of the Company's email system in violation of Section 8(a)(1). The Company contends that the language as issue

does not explicitly restrict Section 7 activity, has not been applied to restrict Section 7 activity, and cannot be reasonably construed to restrict Section 7 activity.

In *Purple Communications,* 361 NLRB No. 126 slip op. at 14 (2014), the Board explained the rights available to employees in using an employer's email system:

> [W]e will presume that employees who have rightful access to their employer's email system in the course of their work have a right to use the email system to engage in Section 7-protected communications on nonworking time. An employer may rebut the presumption by demonstrating that special circumstances necessary to maintain production or discipline justify restricting its employees' rights.

The Company's electronic communications policy language at issue states that a substantial portion of its business is conducted by telephone and over the internet and, in order to "maintain the efficiency of these systems, nonbusiness usage must be restricted. Phone and data lines must be kept open for business purposes. Accordingly, personal telephone calls and emails should be infrequent and brief and limited to urgent family matters."

The General Counsel does not argue that the restrictions on the use of the Company's telephone system is unlawful, just the limits on the use of its email system. In contrast with telephone use, where the use of a telephone line might make that mode of communication unavailable for others, the use of email would not interfere with simultaneous use of the system by other employees.

The Company's limits on the use of its email system to "urgent family matters" can be reasonably construed to preclude employees from using the system, even on break time, to engage in protected activities relating to their terms and conditions of employment. As written, the policy poses a clear restriction upon employees Section 7 rights and the Company has not shown the special circumstances needed to justify its restriction on the nonbusiness use of its email system, even on break time. Nor does the fact that the policy permits such use to an extent that is "infrequent and brief" any less restrictive on the ability of a unit to engage in protected activity.

In contrast to *Purple Communications,* however, the record here lacks any evidence that unit employees at the Morgantown facility had access to the Company's email system. In *Purple Communications,* the employees at issue were assigned company email accounts and routinely used company computers during the course of their work. That is hardly the case here, where the only work activity described in the record relates to the handling of medical waste. The record is replete with email communications between company supervisors and managers, and between the Company and the Union. There is not a hint that unit employees even had access to the Company's email system at any time, whether during work or on break time. The allegations at paragraph 6(a)(v) of the complaint are dismissed.

### (f) Camera and Video Use Policy

The General Counsel contends that the Company's camera and video use policy unlawfully prohibits employees from taking pictures, or video or audio recordings with personal or company-issued mobile phones, cameras, camcorders or other devices of any company property, operation, or equipment without the permission of their supervisor/manager. The Company contends that the restrictions were narrowly drawn in order to protect its legitimate business interests, specifically, protecting its physical equipment, property, proprietary information and processes.

Employees have a Section 7 right to photograph and make recordings in furtherance of their protected concerted activity, including the right to use personal devices to take such pictures and recordings. See *Hawaii Tribune-Herald,* 356 NLRB 661 (2011), enfd. sub. nom. *Stephens Media, LLC v. NLRB,* 677 F.3d 1241 (D.C. Cir. 2012); *White Oak Manor,* 353 NLRB 795 (2009), incorporated by reference, 355 NLRB 1280 (2010), enfd. mem. 452 Fed.Appx. 374 (4th Cir. 2011). Rules placing a total ban on such photography or recordings, or banning the use or possession of personal cameras or recording devices are unlawfully overbroad where they would reasonably be read to prohibit the taking of pictures or recordings on nonwork time. See e.g., *T-Mobile USA, Inc.,* supra, at 4–5 (prohibition against recording unlawfully overbroad where rule failed to distinguish between recordings protected by Section 7 and included within its scope, recordings created during nonwork time and in nonwork areas); *Whole Foods Market, Inc.,* supra at 4 (employer's broad and unqualified language prohibiting work-place recordings would reasonably be read by employees as prohibiting Section 7 activity); *Rio All-Suites Hotel & Casino,* supra at 4 (photography and audio or video recording in the workplace are protected by Section 7 if employees are acting in concert for their mutual aid and protection and no overriding employer interest is present).

There is no evidence that the policy was adopted in response or applied to protected activity. It is also undisputed that the Company has a legitimate proprietary interest in its equipment and processes. The Company's contention, however, that the policy does not unqualifiedly prohibit all picture taking or recording on its property, including pictures of "people" or recording "conversations," is incorrect.

A reasonable interpretation of the policy conveys the sense that the policy totally prohibits the use of cameras, video and audio recording devices on company property. The policy is not limited in scope, but rather, broadly prohibits the use of such devices at any time on company property without permission from a supervisor or manager. The language of the policy does not make any exceptions so employees would reasonably interpret the rule to prohibit employees from such Section 7 activity as taking pictures of safety violations. Nor does it differentiate between work time and work areas, and nonwork time and nonwork areas.

The Company did not present evidence of an overriding proprietary interest in such a broad ban on camera and recording devices. Nor did it present sufficient evidence to show why it could not make an exception in the policy for Section 7 activity. Accordingly, the camera and video policy is unlawfully over broad and insufficiently tailored to protect the Company's legitimate business interests. As currently written, the policy violates Section 8(a)(1) of the Act.

### C. The Union's Information Requests

The complaint alleges that the Company failed and refused to provide relevant information to the Union. The Company denied the allegations, insisting that the information requested was irrelevant, already provided or confidential.

An employer has a duty, upon request, to furnish the union with information that is potentially relevant and useful to its role as unit employees' bargaining representative. *Detroit Edi-*

*son Co. v. NLRB,* 440 U.S. 301, 314–315 (1979). Certain types of information pertaining to wages, hours, benefits, and working conditions of employees are considered, "so intrinsic to the core of the employer-employee relationship (as to be) considered presumptively relevant." *Coca-Cola Bottling C*o., 311 NLRB 424 (1993). Where information is considered presumptively relevant, no specific showing of relevance is required, and the employer has the burden of proving lack of relevance. *Marshalltown Trowel Co.,* 293 NLRB 693 (1989); *Ohio Power Co.,* 216 NLRB 987, 991 (1975); *Grand Rapids Press*, 331 NLRB 296 (2000); *Contract Carriers Corp.,* 339 NLRB 851, 858 (2003). A liberal discovery type standard is applied, and the union is not required to prove that the requested data will be dispositive of the issue before the parties. *ATC/Vancom of Nevada Ltd.,* 326 NLRB 1432, 1434 (1998). An employer can avoid production only if it either proves the information is not relevant or demonstrates some reason why it cannot be provided. *Ormet Aluminum Mill Products Corporation,* 335 NLRB 788, 801 (2001); *A-Plus Roofing,* 295 NLRB 967, 970 (1989), enfd. 39 F.3d 1410 (9th Cir. 1994).

1. Information relating to the recoupment of health care costs

The Company denied the Union's requests for internal communications regarding the Company's decision and actions to recoup outstanding health care premium over three pay periods and its bargaining notes regarding the negotiation of Article 22.3 on the grounds of relevance, confidentiality and privilege.

Information relating to the Company's failure to process payroll deductions for health care costs for over 4 months is relevant because the Union was entitled to ascertain the legitimacy of the Company's explanation for the delay. One could reasonably envision a unit employee asking Dagle for a more detailed explanation as to why a larger deduction was taken out of his/her paycheck and demanding that Dagle file a grievance. In deciding whether to file a grievance, however, Dagle was entitled to more than just the information on employee's paychecks. See *Ohio Power Co.,* 216 NLRB at 991.

Similarly, the Union's request for bargaining notes was relevant to a potential grievance because they might have reflected discussions between the parties regarding the future implementation of Article 22.3. The mentioning or awareness of potential delays, or the absence of such information, during bargaining, was certainly relevant to the parties' positions on the grievance that the Union was pondering.

The Company's vague assertions of privilege and confidentiality also fail. Confidentiality claims, in certain situations, may justify a refusal to provide information. *Mission Foods,* 345 NLRB 788, 791–792 (2005). Justification, however, is determined by balancing the union's need for the information against any "legitimate and substantial confidentiality interests established by the employer." *Detroit Edison v. NLRB*, supra 440 U.S. at 315, 318–320. Blanket claims of confidentiality are insufficient. *Pennsylvania Power Co.,* 301 NLRB 1104, 1105 (1991). In the event that the confidentiality interests are shown to outweigh the Union's need for the information, the party must still seek an accommodation to provide the information while protecting its confidentiality interests. *Mission Foods,* supra 345 NLRB at 791–792; *Tritac Corp.,* 286 NLRB 522, 522 (1987). Here, however, the Company's simply rejected the Union's requests for information relating to the decisions, planning and implementation of Article 22.3 and did not seek an accommodation of the interests it sought to protect from disclosure. *United States Testing Co. v. NLRB,* 160 F.3d 14, 20–21

(D.C. Cir. 1998).

Under the circumstances, by failing to provide information requested by the Union on September 11 and 26, relating to the recoupment of outstanding employee health insurance costs, the Company failed to bargain in good faith in violation of Section 8(a)(5) and (1) of the Act.

2. Information requests relating to 401(k) contributions

The Union requested information on September 5 relating to the arbitration of its grievance that the Company failed to remit on a pretax basis certain monies intended for employees' 401(k) or stock purchase plans. The items sought included biweekly earnings statements from the period April 13 through September 6, and thereafter on an ongoing basis, internal communications and meeting notes to the Company's implementation of these investment plans, and bargaining notes and proposals exchanged and agreements reached regarding Article 23.3.

*(a) Earnings statements for April 13 to September 6, 2014 pay periods*

The Company timely responded to the September 5 request for the April through September by providing employees' earnings information, including 401(k) and stock purchase plan deductions, in an Excel spreadsheet. Dagle was unable to decipher the information contained on the spreadsheet, but never contacted Fox nor anyone else with the Company for assistance. Instead, he requested the information again 11 months later in an August 2015 subpoena in preparation for the September 2015 arbitration over Article 23.3. Under the circumstances, the Company cannot be saddled with the Union's failure to request clarification or better information than the earnings records supplied. The charge that the Company unlawfully failed to provide the Union with earnings statements for the period of April 13 to September 6 is dismissed.

*(b) Earnings statements since September 7, 2014*

On September 22, the Company objected to the Union's September 5 request for the biweekly earnings statements since September 7 on an "ongoing basis." The Company objected to the production of such information on an indefinite basis and as unclear. It did, however, seek to reach an accommodation, asking the Union to "identify any specific time periods and how each is related to the Union's investigation of this grievance or any particular grievance and the company will re-evaluate the reasonableness of the request."

The Union did not respond. Instead, on August 18, 2015, nearly 11 months later, it requested the same information again by subpoena in preparation for the September 2015 arbitration. On September 8, 2015, pursuant to union subpoena in preparation for the arbitration, the Company provided the Union with computer access to unit employees' earnings statements for the entire period from September 7, 2014 through September 4, 2015, which the Union was able to view, but not print. The Union did not request assistance from the Company in printing the statements. Notwithstanding the Company's eventual acquiescence to the "ongoing" request for the earnings statements in September 2014, the issue remains whether the delay in providing the information constituted an 8(a)(5) violation.

I agree with the Company's contention that the process of printing out the requested earnings statements on an ongoing basis since September 7, 2014, would have been a monumental task since it would entail approximately 1500 earnings state-

ments taking a payroll clerk about 100 hours to produce. At the time of the request on September 22, however, there was only one earnings statement period that would have accrued since September 7. While the production of earnings statements for one pay period on or since September 7 was justified, the request for continuous production of such information was overly burdensome under the circumstances.

The Union was entitled to earnings statements in relating to its grievance and the arbitration of same. However, it is unclear why it would need the information on an ongoing basis and there is no provision in the CBA imposing such an obligation on the Company. The historical earnings information generated prior to the September 2015 arbitration was certainly relevant to the arbitration, but the need for the information indefinitely is unclear. The Company requested further explanation for such a request and offered to reach an accommodation. The Union passed on the offer. Accordingly, the charge that the Company's unlawfully delayed in providing the Union with earnings statements on an ongoing basis since September 7 is dismissed.

### (c) Internal communications, meeting notes and bargaining documents

The Company refused the Union's requests on September 5 and 18, to provide internal communications, meeting notes and bargaining documents relating to Article 23.3 on the grounds of relevance, confidentiality, privilege and impermissible pre-arbitral discovery.

The relevance of these information requests to the Union's grievance is the same as it was with the request for similar documentation relating to Article 22.3. The Union's requests were relevant in order to ascertain the Company's position and comments during bargaining regarding its implementation of article 23.3.

Once again, the Company's vague assertions of privilege and confidentiality also fail. *Mission Foods,* supra. The union's need for the information in connection with its grievance prevailed over the Company's interests in shielding from disclosure its potential legal theories for arbitration. See *Acme Industrial,* 385 U.S. 432, 438–439 (1967). The Company asserts that this information request amounted to an impermissible demand for pre-arbitral discovery. See *California Nurses Assn.,* 326 NLRB 1362 (1998). Moreover, the Company argues that it essentially complied with this request by furnishing the information a few weeks after the Union counsel subpoenaed it and 6 days before the arbitration.

The request was indeed made after the Union filed for arbitration of the grievance, but it also encompassed information that it needed to evaluate its grievance going forward. *Fleming Cos.,* 332 NLRB 1086, 1094 (2000). At the very least, it was incumbent on the Company to suggest an accommodation by redacting any records encompassing information not related to Article 23.3, legal strategy or other information directly related to the arbitration. *Borgess Medical Center,* 342 NLRB 1105, 1106 (2004).

The Union's demand for copies of all collective-bargaining proposals and agreements relating to the 401(k) plan, however, were not justified. In the absence of an explanation by the Union that it was not still in possession of proposals exchanged and proposals reached by the parties, it should have specified what it possessed or did not possess. While the information is certainly relevant, the Company was not required to regenerate

information the Union already possessed. *See Manitowoc Ice, Inc.,* 344 NLRB 1222, 1238 (2005). Accordingly, this allegation is dismissed.

Under the circumstances, the Company's failure to provide internal communications and meeting and bargaining notes requested by the Union on September 5 and 18, 2014, relating to the Company's implementation of Article 23.3 violated of Section 8(a)(5) and (1) of the Act.

### 3. Ebola PowerPoint presentation

The complaint alleged that the Company unlawfully refused the Union's requests on November 13 and 18, and December 1 for a copy of an Ebola PowerPoint presentation shown to unit employees. The Company denied the requests for a copy, but offered to have the Union view review the presentation. The Union declined the offer, insisting that it needed a copy to provide its experts for review.

The PowerPoint presentation was informational in nature and seemingly an activity not covered by the CBA. However, an information request pertaining to mandatory employee training is presumptively relevant as it is a mandatory subject of bargaining. *Hospital of Bartow, Inc.,* 361 NLRB No. 34, slip op at 2 (2014). On the other hand, production of the information is sufficient if "made available in a manner not so burdensome or time-consuming as to impede the process of bargaining." *Cincinnati Steel Castings Co.,* 86 NLRB 592, 593 (1949).

Ebola and other highly infectious types of waste, which are specially packaged and labeled, are not handled by unit employees at the Morgantown facility. However, the Company's PowerPoint mandatory presentation on how to recognize and handle Ebola waste obviously sought to prepare employees for a worst case scenario if they ever encountered the deadly material. In that context, the potential danger from Ebola had some connection to employee's terms and conditions of employment in handling regulated medical waste. To suggest otherwise—that employees are not exposed, and it is unrelated to their work—ignores the Company's safety reasons for conducting the training.

Although access to the PowerPoint was relevant to the Union's interests in employee training, the Company limited access to a viewing by Dagle in lieu of a copy. The Union refused the offer, insisting that it needed a copy of the presentation in order to have it reviewed by experts in infectious diseases. Given the extremely complex and sensitive nature of the information involved, coupled with the Union's assurances of confidentiality, the Company's offer to view the presentation only was unreasonable under the circumstances. See *Cincinnati Steel Castings Co.,* 86 NLRB 592, 593 (1949); *American Telephone & Telegraph Co.,* 250 NLRB 47 (1980), enfd. sub nom. *CWA, Local 1051 v. NLRB,* 644 F.2d 923 (1st Cir. 1981).

Under the circumstances, the Company's refusal to provide the Union with a copy of Ebola training provided to unit employees, as requested by the Union on November 13 and 18, and December 1, violated Section 8(a)(5) and (1) of the Act.

### 4. The December 2014 Employee Handbook

The complaint alleges the Company ignored the Union's request on December 1 for a copy of the employee handbook then in effect. On November 25, Fox vaguely referred to the existence of employee handbooks governing employee conduct. On December 1, Dagle requested a copy of that employee handbook. Fox ignored Dagle's request, although she eventually provided him on March 2, 2015, with a copy of the recently

issued 2015 version of the handbook.

The employee handbook in effect on December 1 was presumptively relevant to the Union's obligations under the CBA as it undoubtedly contained employees' terms and conditions of employment. While Fox eventually provided the Union with the newly issued employee handbook on March 2, 2015, she never provided a copy of the version in effect on December 1. The failure to provide a copy of that handbook impeded the Union's ability to effectively represent the interests of unit employees at the Morgantown facility in violation of Section 8(a)(5) and (1) of the Act.

### 5. Vehicle backing program

The complaint alleges that the Company unlawfully delayed from November 24 until March 2, 2015, in providing the Union with a copy of its vehicle backing program. On November 24, the Union's requested a copy of the Company's vehicle backing program. The request was triggered by the discipline of employee James Clay for violating the vehicle backing program after he was involved in a vehicular accident.

During their meeting regarding Clay's discipline, Shoennagle provided with documents in response to the November 24 request. However, the documents did not include a copy of the vehicle backing program. Dagle reminded Shoennagle of this when they met again on November 28. At that time, Schoennagle said he would look into it. Two months passed until late January 2015, when Dagle inquired again. Schoennagle responded that the program was proprietary and would not be provided. On January 30, 2015, the Union filed a charge alleging the Company's unlawful refusal to provide a copy of the program. On March 2, 2015, the Company reconsidered and provided a copy of a PowerPoint presentation and website link where the Union could purchase a copy of the video.

The Company's 3-month delay in providing information about its vehicle backing program was unreasonable. The information reflected the basis for Clay's discipline and was relevant to the Union's obligation to determine whether there was an adequate justification for the discipline. The Company's delay in providing the information, however, prevented the Union from effectively representing Clay's interests when he was disciplined. *Good Life Beverage Co.,* 312 NLRB 1060, 1062 fn. 9 (1993); *Postal Service,* 308 NLRB 547, 547 fn. 1 (1992).

### 6. The Soubra grievance

The complaint alleges that the Company unlawfully refused to provide information requested by the Union on December 11 relating to a grievance over the Company's response to an altercation between Supervisor Ron Lobb and unit employee Ryan Soubra. The Company provided the Union with video tapes of the incident and permitted it to view the disciplinary action issued to Lobb. However, the Company denied the request for the remaining items on the grounds that they were not presumptively relevant and there was no justification for production: witness information; all documents, reports, notes and emails relating to the ensuing investigation; and any such documents of similar incidents between Lobb and other employees. The Union replied that the documentation was necessary to enable it to evaluate whether Lobb's discipline was "sufficient to deter future misconduct against bargaining unit members."

Had the information related to the discipline of a unit employee, the information requested would have been relevant and subject to disclosure. The requested information, however, was not presumptively relevant as it concerned investigative, disciplinary and personnel records of a supervisor, not a bargaining unit employee. See *F.A. Bartlett Tree Expert Co.,* 316 NLRB 1312, 1313 (1995). Accordingly, the Union was required to demonstrate a special need for the information under the circumstances. *Detroit Edison Co. v. NLRB,* 440 U.S. 301, 314–315 (1979).

The Union has a legitimate interest in protecting unit employees from misconduct by persons outside the bargaining unit. However, its need, as established in this record, for the outstanding information outweighed by the fact that it encompasses the disciplinary and personnel information of a nonunit supervisor. Those are matters over which the Union does not have a right to bargain. The Company provided Dagle with video tapes of the incident, permitted him to read the disciplinary action issued to Lobb, and provided the names of the two witnesses to the statement, including the written statement of one of them. Moreover, having read the disciplinary action, the Union was aware of the discipline issued to Lobb, but did not articulate it in the record.

Under the circumstances, the Company's refusal to provide the additional information requested in the Union's letter of December 11 was not unreasonable under the circumstances. This allegation is dismissed.

### 7. Code of conduct and harassment training

The complaint alleges that the Company refused the Union's request on December 30 for a copy the Code of Conduct and Harassment Training video shown to unit employees. The Company refused to provide a copy of the video because it was "proprietary" but offered to let Dagle view it. Dagle declined the offer.

Employee training information is presumptively relevant. *Hospital of Bartow, Inc.,* supra. The Company now concedes that the training video was a relevant request by the Union. However, relying on *Cincinnati Steel Castings Co.,* 86 NLRB 592, 593 (1949), it contends that it was under no obligation to furnish the requested "information in the exact form" requested by the Union.

The Company's refusal to provide the Union with a copy of the training video shown to unit employees was unreasonable under the circumstances. Permitting the Union to merely view the video is not the same as producing the video. The training video contained information conveyed to employees that related to their terms and conditions of employment. As such, the Union would have an interest referring to it during future bargaining or grievance matters.

Moreover, the Company provides no precedent to support its contention that a training video created by it and shown to employees for training purposes may be shielded from disclosure to its bargaining partner on the grounds that it is "proprietary." At the very least, the Company could have insisted on a non-disclosure agreement from the Union.

Under the circumstances, the Company's refusal to provide the code of conduct and harassment training video requested by the Union on December 30 violated Section 8(a)(5) and (1) of the Act.

### 8. The TMX survey

In response to the Union's July 15, 2015 request for copies of documents relating TMX meetings with Morgantown employees, the Company provided a redacted copy of a PowerPoint presentation of an employee survey. The dispute is over

the omitted portions, which consisted of slides containing "comparative data" with the Company's other facilities.

Since the information sought related to facilities and employees not represented by the Union, the burden was on the Union to assert a special need. The Union contends that the information shown to Morgantown employees compared their satisfaction with their terms and conditions of employment with those of employees at the Company's other facilities. However, there is no showing that the information contained in surveys of employees at other Company facilities not represented by the Union had any bearing on the actual terms and conditions of the Morgantown facility's unit employees. This allegation is dismissed.

CONCLUSIONS OF LAW

1. The Respondent, Stericycle, Inc. is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Union, Teamsters Local 628 (the Union) is a labor organization within the meaning of Section 2(5) of the Act.

3. At all times since September 1, 2006, the Union has been the exclusive collective-bargaining representative of the following unit of employees at its Southampton facility (the Southampton unit), which unit is appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> All full-time and regular part-time drivers, driver techs, in house techs, helpers, dockworkers and long haul drivers of the Company at its Southampton, Pennsylvania location; but excluding all other employees, office clerical employees, guards, and supervisors as defined in the Act.

4. At all times since September 1, 2011, the Union has been the exclusive collective-bargaining representative of the following unit of employees at its Morgantown facility (the Morgantown unit), which unit is appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> All full-time and regular part-time regulated medical waste (RMW) plant workers, sharps plan workers, RMW Shift Supervisors, Sharps Shift Supervisors/quality control representatives, drivers, dispatchers, yard jockey, maintenance mechanics, Maintenance Supervisor and painters employed by Respondent at its Morgantown, Pennsylvania facility; but excluding all office employees, confidential employees, guards and supervisors as defined in the Act.

5. The Respondent failed to provide the Union with an opportunity to bargain in good faith in violation of Section 8(a)(5) and (1) of the Act by making unilateral changes to Morgantown facility employees' terms and conditions of employment by implementing an employee handbook in February 2015.

6. The Respondent failed to bargain in good faith in violation of Section 8(a)(5) and (1) of the Act by refusing the Union's requests on September 11 and 26, 2014, for a copy of information concerning the Respondent's recoupment of employee healthcare deductions from Southampton unit employees.

7. The Respondent failed to bargain in good faith in violation of Section 8(a)(5) and (1) of the Act by refusing the Union's request on September 5 and 18, 2014, for a copy of the Respondent's internal communications, meeting notes and bargaining documents relating to the Union's grievance over the 401(k) provision in the Southampton unit employees' collec-

tive-bargaining agreement.

8. The Respondent failed to bargain in good faith in violation of Section 8(a)(5) and (1) of the Act by refusing the Union's request on November 13 and 18, and December 1, 2014 for a copy of the Respondent's EBOLA training provided to Morgantown unit employees.

9. The Respondent failed to bargain in good faith in violation of Section 8(a)(5) and (1) of the Act by refusing or failing to provide the Union with a copy of the Morgantown employee handbook then in effect and requested by the Union on December 1, 2014.

10. The Respondent failed to bargain in good faith in violation of Section 8(a)(5) and (1) of the Act by unreasonably delaying in providing the Union with information it requested on November 24, 2014, about the Vehicle Backing Program.

11. The Respondent failed to bargain in good faith in violation of Section 8(a)(5) and (1) of the Act by refusing to provide the Union with a copy of the Code of Conduct and Harassment Training video shown to Morgantown unit employee.

12. The Respondent violated Section 8(a)(1) of the Act by maintaining a personal conduct work rule at page 30 of the Team Member Handbook which could be understood to prohibit employees from engaging in activities protected under Section 7 of the Act and states, in pertinent part, that "[c]onduct that maliciously harms or intends to harm the business reputation of Stericycle will not be tolerated. You are expected to conduct yourself and behave in a manner conducive to efficient operations. Failure to conduct yourself in an appropriate manner can lead to corrective action up to and including termination . . . Engaging in behavior that is harmful to Stericycle's reputation."

13. The Respondent violated Section 8(a)(1) of the Act by maintaining a conflict of interest work rule at page 33 of the Team Member Handbook which could be understood to prohibit employees from engaging in activities protected under Section 7 of the Act and states, in pertinent part, that "Stericycle will not retain a team member who directly or indirectly engages in the following: . . . An activity that constitutes a conflict of interest or adversely reflects upon the integrity of the Company or its management."

14. The Respondent violated Section 8(a)(1) of the Act by maintaining a retaliation work rule at page 10 of the Team Member Handbook which could be understood to prohibit employees from engaging in activities protected under Section 7 of the Act and states, in pertinent part, that "[a]ll parties involved in the investigation will keep complaints and the terms of their resolution confidential to the fullest extent practicable."

15. The Respondent violated Section 8(a)(1) of the Act by maintaining a camera and video use policy in the Respondent's policy manual since January 1, 2012, which could be understood to prohibit employees from engaging in activities protected under Section 7 of the Act.

16. The above unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

17. The Respondent has not violated the Act except as set forth above.

REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act. Moreover, as one or more of the challenged

policies have been determined to be overly broad and violate Section 8(a)(1), a nationwide posting by the Company is appropriate since the record establishes that the unlawful rules or policies are maintained or in effect at all of the Company's facilities within the United States. See *Mastec Advance Technologies,* 357 NLRB 103 (2011), 'enfd. sub nom. *DIRECTV v. NLRB,*___F.3d___(D.C. Cir. 2016); *Guardsmark, LLC,* 344 NLRB 809, 812 (2005).

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[74]

ORDER

The Respondent, Stericycle, Inc., Morgantown and Southampton, Pennsylvania, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Refusing to bargain in good faith with the Teamsters Local 628 (the Union) as the exclusive representative of employees in the following appropriate unit at the Respondent's Southampton facility:

> All full-time and regular part-time drivers, driver techs, in house techs, helpers, dockworkers and long haul drivers of the Company at its Southampton, Pennsylvania location; but excluding all other employees, office clerical employees, guards, and supervisors as defined in the Act.

(b) Refusing to bargain in good faith with the Teamsters Local 628 (the Union) as the exclusive representative of employees in the following appropriate unit at the Respondent's Morgantown facility:

> All full-time and regular part-time regulated medical waste (RMW) plant workers, sharps plan workers, RMW Shift Supervisors, Sharps Shift Supervisors/quality control representatives, drivers, dispatchers, yard jockey, maintenance mechanics, Maintenance Supervisor and painters employed by Respondent at its Morgantown, Pennsylvania facility; but excluding all office employees, confidential employees, guards and supervisors as defined in the Act.

(c) Refusing to bargain collectively with the Union by distributing a Team Member Handbook to bargaining unit employees that unilaterally changes their terms and conditions of employment.

(d) Unreasonably delaying in providing the Union with information that is relevant and necessary to its role as unit employees' bargaining representative.

(e) Refusing to provide the Union with requested information that is relevant and necessary to its role as unit employees' bargaining representative.

(f) Maintaining a personal conduct rule in the Team Member Handbook that prohibits unit employees from engaging in conduct that maliciously harms or intends to harm the Respondent's business reputation, expects employees to conduct themselves and behave in a manner conducive to efficient operations, threatens employees with corrective action including termination for failing to conduct themselves in an appropriate manner or engaging in behavior that is harmful to the Respond-

ent's reputation.

(g) Maintaining a work rule in the Team Member Handbook prohibiting conflicts of interest that threatens adverse action if an employee directly or indirectly engages in an activity that adversely reflects upon the integrity of the Company or its management.

(h) Maintaining a retaliation work rule that requires unit employees involved in harassment investigations to keep harassment complaints and the terms of their resolution confidential to the fullest extent practicable.

(i) Maintaining a camera and video use policy in Respondent's policy manual which could be construed as prohibiting employees from using personal cameras or video equipment in break areas during break time.

((j) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative actions necessary to effectuate the policies of the Act.

(a) Rescind the entire Team Member Handbook provided to Morgantown bargaining unit employees that unilaterally changed their terms and conditions of employment.

(b) Before implementing any changes in wages, hours, or other terms and conditions of employment of Southampton and Morgantown unit employees, notify and on request, bargain with the Union as their exclusive bargaining representative.

(c) Provide the Union with the vehicle backing program information it requested on November 24, 2014.

(d) Provide the Union with information it requested on September 5 and 18, 2014, regarding the Respondent's internal communications, meeting notes and bargaining documents relating to the Union's grievance over the 401(k) provision in the Southampton unit employees' collective-bargaining agreement.

(e) Provide the Union with the information it requested on November 13 and 18, and December 1, 2014, regarding the Respondent's EBOLA training provided to Morgantown unit employees.

(f) Provide the Union with the information it requested on December 1, 2014, regarding the Morgantown facility employee handbook then in effect.

(g) Provide the Union with the information it requested on December 30, 2014, regarding Code of Conduct and Harassment Training provided to employees.

(h) Within 14 days after service by the Region, post at its facilities in Morgantown and Southampton, Pennsylvania, copies of the attached notice marked "Appendix A and at all of its facilities within the United States and its territories, copies of Appendix B."[75] Copies of the notices, on forms provided by the Regional Director for Region 4, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates

---

[74] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

[75] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since September 5, 2014.

(i)  Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

It is further ordered that the complaint is dismissed insofar as it alleges violations of the Act not specifically found.

Dated, Washington, D.C.  November 10, 2016

## APPENDIX A

(Postings at Southampton and Morgantown Facilities)

Notice To Employees
Posted by Order of the
National Labor Relations Board
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice at our Southampton and Morgantown facilities.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

We will not refuse to bargain in good faith with Teamsters Union Local 628 (the Union) as the exclusive collective-bargaining representative for those of you in the following appropriate unit ("the Southampton Unit"):

All full-time and regular part-time drivers, driver techs, in house techs, helpers, dockworkers and long haul drivers of Respondent at its Southampton, Pennsylvania location, excluding all other employees, office clerical employees, guards and supervisors as defined in the Act.

We will not refuse to bargain in good faith with Teamsters Union Local 628 (the Union) as the exclusive collective-bargaining representative for those of you in the following unit (the Morgantown Unit):

All full-time and regular part-time regulated medical waste (RMW) plant workers, sharps plant workers, RMW Shift Supervisors, Sharps Shift Supervisors/quality control representatives, drivers, dispatchers, yard jockey, maintenance mechanics, Maintenance Supervisor and painters employed by Respondent at its Morgantown, Pennsylvania facility; but excluding all office employees, confidential employees, guards and supervisors as defined in the Act.

We will not refuse to bargain collectively with the Union by distributing a Team Member Handbook to our bargaining unit employees that unilaterally changed your terms and conditions of employment.

We will not unreasonably delay in providing the Union with information that is relevant and necessary to its role as your bargaining representative.

We will not refuse to provide the Union with requested information that is relevant and necessary to its role as your bargaining representative.

We will not in any like or related manner interfere with your rights under Section 7 of the Act.

We will rescind the entire Team Member Handbook provided to Morgantown bargaining unit employees that unilaterally changed their terms and conditions of employment.

We will, upon request, bargain in good faith with the Union as the exclusive bargaining representative of our Southampton unit employees and our Morgantown unit employees.

We have provided the Union with a copy of the vehicle backing program it requested on November 24, 2014.

We have provided the Union with a copy of the information that it requested in its letters dated September 5 and 18, 2014, including internal communications, meeting notes and bargaining documents relating to its grievance over the 401(k) provision in the Southampton unit.

We will provide the Union with a copy of information concerning Respondent's recoupment of employee healthcare deductions in the Southampton unit that it requested in its letters dated September 11 and 26, 2014.

We will provide the Union with a copy of the Ebola presentation for the Morgantown unit that it requested through in e-mails, dated November 13 and 18, 2014, and December 1, 2014.

We will provide the Union with a copy of the employee handbook that it requested in its email dated December 1, 2014.

We will provide the Union with a copy of the Code of Conduct and Harassment Training that shown to Morgantown unit employees and requested in an email dated December 30, 2014.

Stericycle, Inc.

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/04-CA-137660 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



## APPENDIX B

(Nationwide Notice)
Notice to Employees
Posted by Order of the
National Labor Relations Board
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice at all of our facilities in the United States.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT do anything to prevent you from exercising the above rights.

WE WILL NOT maintain the following work rules in our Camera and Video Use Policy which could be understood to prohibit you from engaging in activities protected under Section 7 of the Act:

3.1 Team members are prohibited from taking pictures with a personal or company- issued camera or cell phone camera of any Stericycle property, operation, or equipment without the permission of their supervisor/manager.

4.1 Team members are prohibited from taking video or audio recordings with a personal or company camera, camcorder, or other device of any Stericycle property, operation, or equipment without the permission of their supervisor/manager.

WE WILL NOT maintain the following "Personal Conduct" work rule at page 30 in our Team Member Handbook which could be understood to prohibit you from engaging in activities protected under Section 7 of the Act:

In order to protect everyone's rights and safety, it is the Company's policy to implement certain rules and regulations regarding your behavior as a team member. Conduct that maliciously harms or intends to harm the business reputation of Stericycle will not be tolerated. You are expected to conduct yourself and behave in a manner conducive to efficient operations. Failure to conduct yourself in an appropriate manner can lead to corrective action up to and including termination. Engaging in behavior that is harmful to Stericycle's reputation.

WE WILL NOT maintain the following Conflict of Interest work rule at page 33 in our Team Member Handbook which could be understood to prohibit you from engaging in activities protected under Section 7 of the Act:

Stericycle will not retain a team member who directly or indirectly engages in the following: . . . An activity that constitutes a conflict of interest or adversely reflects upon the integrity of the Company of its management.

WE WILL NOT maintain the following "Retaliation" work rule at page 10 in our Team Member Handbook which could be understood to prohibit you from engaging in activities protected under Section 7 of the Act:

All parties involved in the investigation will keep complaints and the terms of their resolution confidential to the fullest extent practicable.

WE WILL NOT in any like or related manner interfere with your rights under Section 7 of the Act.

WE WILL modify our Camera and Video Use Policy, and our "Personal Conduct," "Conflict of Interest" and "Retaliation" work rules contained in our Team Member Handbook so those policies and work rules will not abridge your Section 7 rights or activities, and WE WILL advise you in writing that the rules have been amended.

WE WILL furnish all employees at our facilities nationwide with (1) inserts for the current employee handbook that advise that the unlawful rules have been rescinded, or (2) the language of lawful rules on adhesive backing that will cover or correct the unlawful rules, or (3) publish and distribute revised handbooks that do not contain the unlawful rules.

STERICYCLE, INC.

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/04-CA-137660 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

. . .

