# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
November 14, 2023
Lyle W. Cayce
Clerk

No. 22-60493

___

Tesla, Incorporated,

*Petitioner/Cross-Respondent*,

*versus*

National Labor Relations Board,

*Respondent/Cross-Petitioner*.

___

Petition for Review and
Cross-Application for Enforcement of
an Order of the National Labor Relations Board
Agency Nos. 32-CA-197020,
32-CA-197058, 32-CA-197091,
32-CA-197197, 32-CA-200530,
32-CA-208614, 32-CA-210879,
32-CA-220777

___

Before Smith, Southwick, and Higginson, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

Tesla requires its employees to wear uniforms to minimize damage to vehicles throughout the production process. When employees wore union t-shirts instead, Tesla informed them they were violating the uniform policy and threatened to send them home. The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-

No. 22-60493

CIO ("Union" or "UAW"), filed an unfair labor practice charge, and a divided National Labor Relations Board ("Board" or "NLRB") ruled that Tesla was infringing on its employees' rights to unionize under the National Labor Relations Act ("NLRA" or "Act"). In its order, the Board explicitly overruled its precedent and proclaimed that "when an employer interferes *in any way* with its employees' right to display union insignia, the employer must prove special circumstances that justify its interference." 371 N.L.R.B. No. 131, slip op. at 1 (2022) (emphasis in original). Tesla petitioned for review, claiming that the Board's decision irrationally made all company uniforms presumptively unlawful. The NLRB cross-applied for enforcement.

We agree with Tesla. The NLRA does not give the NLRB the authority to make all company uniforms presumptively unlawful. We grant Tesla's petition for review, deny the NLRB's application for enforcement, and vacate the Board's decision.

I.

Tesla manufactures electric vehicles at a facility in Fremont, California. There, "production associates" install parts in and on the bodies of vehicles in "General Assembly" ("GA"). When an employee begins working in GA, Tesla gives him or her four black shirts and a sweater as part of the employee's uniform, each with Tesla's name and logo. Tesla refers to these and the accompanying pants as "Team Wear."

By the time a car reaches GA, its paint has cured sufficiently for light touching and general handling, but not completely. So, Tesla requires employees in GA to follow the "Team Wear policy" regarding what they wear on the job. That policy states,

> It is mandatory that all Production Associates and Leads wear the assigned Team Wear.

- On occasion, Team Wear may be substituted with all black clothing if approved by supervisor.
- Alternative clothing must be mutilation free,[1] work appropriate and pose no safety risks (no zippers, yoga pants, hoodies with hood up, etc.).

This policy applies only to GA employees.[2]

In spring 2017, as part of union organizing efforts, Tesla employees (both production associates and non-GA employees) began wearing black, cotton UAW shirts rather than Team Wear. Tesla permitted that for several months. In August 2017, however, having discovered several mutilations, Tesla began strictly enforcing its Team Wear policy. Supervising employees began to "walk the line" during startup meetings to ensure compliance. Since then, Tesla has not allowed production associates to wear union shirts (including black, cotton ones) but has allowed them to affix any number or size of union stickers to their Team Wear. Supervising employees have, on occasion, granted exceptions to the Team Wear requirement for production associates to wear plain, black, cotton shirts or to cover non-Tesla logos and emblems on black shirts with black mutilation-protection tape.

Tesla justified the Team Wear policy in two main ways. First, it minimizes mutilation of the vehicles in GA. Second, the Team Wear policy facilitates "visual management": enabling team leads to distinguish among different types of GA employees based on shirt color and to ensure that GA employees are in their proper work areas—and that only GA employees are present in GA.

---

[1] By "mutilation free," Tesla means anything that would cause abrasions, buffs, chips, cuts, dents, dings, or scratches to the inside or outside of a vehicle.

[2] Production leads wear otherwise-identical red shirts, and line inspectors wear white shirts.

No. 22-60493

The Union charged Tesla with unfair labor practices over the Team Wear policy and its enforcement.[3] In September 2019, an administrative law judge ("ALJ") ruled that the Team Wear policy violated Section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1). She found that no special circumstances justified the prohibition against employees' wearing union shirts, meaning that the two bases for the policy described above were insufficient.

Tesla filed exceptions, contending that the special-circumstances test derived from *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945), should not apply because the Team Wear policy was neutral and production associates could display union insignia freely—just not by wearing a union shirt. The Board rejected Tesla's position 3–2 and affirmed the ALJ's findings. 371 N.L.R.B. No. 131, slip op. at 20 (2022). The Board summarized its decision by stating that "when an employer interferes *in any way* with its employees' right to display union insignia, the employer must prove special circumstances that justify its interference." *Id.*, slip op. at 1. In other words, all uniforms are presumptively unlawful and must pass the special-circumstances test.

The Board derived its ruling largely from *dictum* in its decision in *Stabilus, Inc.*, where it stated the following:

> There is no basis in precedent for treating clothes displaying union insignia as categorically different from other union insignia, such as buttons.
>
> An employer cannot avoid the "special circumstances" test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia. The Board has consistently ap-

---

[3] We do not address most of those claims because the Board severed consideration of the Team Wear policy claim, and that is the only issue before us.

4

No. 22-60493

> plied that test where employers have required employees to wear particular articles of clothing and have correspondingly prohibited them from wearing clothing displaying union insignia.

371 N.L.R.B. No. 131, slip op. at 4 (2022) (citation and footnote omitted in original) (quoting *Stabilus, Inc.*, 355 N.L.R.B. 836, 838 (2010)). The Board adopted that reasoning, explaining that it "has treated clothes displaying union insignia the same as union insignia that employees attach to their clothing, such as buttons and pins." *Id.*, slip op. at 7 (citing *Great Plains Coca-Cola Bottling Co.*, 311 N.L.R.B. 509, 515 (1993)). Therefore, by not permitting union shirts, Tesla's Team Wear policy interfered with its employees' right to display union insignia and must be justified by special circumstances.[4]

Board Members Kaplan and Ring dissented. They characterized the majority's holding as "mak[ing] all employer dress codes presumptively unlawful." *Id.*, slip op. at 21.[5] They maintained that, under Supreme Court precedent, the Board "must strike an *accommodation* between employee rights and legitimate employer interests that ensures 'as little destruction of one as is consistent with the maintenance of the other,'" and this ruling was nothing of the sort. *Id.*, slip op. at 21 (quoting *NLRB v. Babcock & Wilcox*, 351 U.S. 105, 112 (1956)). To comply with that precedent, they recommended that the Board distinguish between dress codes that ban all union insignia and those, like Tesla's, that provide "meaningful opportunities for employees to display union insignia." *Id.*, slip op. at 23. The dissenters rea-

---

[4] Applying the special-circumstances test, the Board agreed with the ALJ that Tesla's claims—that the Team Wear policy helped prevent mutilations and facilitated visual management—failed narrow-tailoring. Because we need not reach whether that was error for the purposes of our ruling, we do not address it.

[5] At oral argument, NLRB's counsel agreed with this characterization. 23:40–24:40, https://www.ca5.uscourts.gov/OralArgRecordings/22/22-60493_9-6-2023.mp3.

5

soned that the "presumption" that a dress code is unlawful "is unwarranted in the case of facially neutral, nondiscriminatory dress codes that permit meaningful opportunities to display union insignia in the workplace." *Id.*, slip op. at 26. And they explained that overcoming that presumption would "prove nearly insurmountable." *Id.*

The majority responded to the dissent's points in detail:

*First*, they decried a "meaningful opportunity to display union insignia" standard as unworkable, overly vague, and setting the bar too low for employers. *Id.*, slip op. at 9 n.24. Instead, the special-circumstances test should apply regardless of employees' "alternative means of exercising their rights . . . ." *Id.*, slip op. at 10.

*Second*, the majority claimed that the fact that a dress code is facially neutral, nondiscriminatory, and consistently enforced is irrelevant. *Id.*, slip op. at 12. Analogizing to rulings involving bans on solicitation, the majority stated,

> That an employer's uniform policy or dress code effectively prohibits employees from wearing *all* clothing other than the clothing prescribed by the employer (including, but not limited to, union clothing) does not make the employer's action lawful, any more than an employer's no-solicitation rule is lawful because it bars all solicitation (not just union solicitation) on nonworking time.

*Id.* (citation omitted).

*Third*, the majority rejected the idea that there are generalized (and generalizable) employer interests in uniform policies and dress codes that "implicitly restrict[] the display of union insignia . . . ." *Id.*, slip op. at 14 & nn.31–33. That lack of "any particular employer interest or objective[,]" the majority posited, means that the Board must apply the special-circumstances test when considering *any* dress code. *Id.*

The majority also took the opportunity to overrule *Wal-Mart Stores, Inc.*, 368 N.L.R.B. No. 146 (2019), which assessed a facially neutral rule limiting the size and appearance of union buttons and insignias that employees could wear. *See* 371 N.L.R.B. No. 131, slip op. at 15–17. In *Wal-Mart*, the Board had concluded that a facially neutral rule was subject to the less restrictive test the Board had articulated in *Boeing Co.*, 365 N.L.R.B. No. 154 (2017). Overruling *Wal-Mart* meant subjecting all limitations on union insignia to the special-circumstances test.[6]

Tesla petitioned for review. The NLRB cross-applied for enforcement of its order, and the Union intervened on behalf of the Board. *See* 29 U.S.C. § 160(e), (f).

## II.

Section 7 of the NLRA provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157. And Section 8 makes it "an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of" those Section 7 rights. *Id.* § 158(a)(1). But the Act does not explicate the extent of those rights, leaving "to the Board the work of applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms." *Republic Aviation*, 324 U.S. at 798. In other words, the Board has "administrative flexibility within appropriate statutory limitations." *Id.*

Our review of "NLRB decisions and orders is limited and defer-

---

[6] The NLRB has since overruled *Boeing* as well. *See Stericycle, Inc.*, 372 N.L.R.B. No. 15 (2023).

ential." *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714 (5th Cir. 2018). And we generally affirm the Board's conclusions "if they have a reasonable basis in the law and are not inconsistent with the [NLRA]." *Id.* (quoting *Entergy Miss., Inc. v. NLRB*, 810 F.3d 287, 292 (5th Cir. 2005)). But we still review the Board's legal conclusions *de novo*. *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656 (5th Cir. 2012).

The NLRB has "authority to formulate rules to fill the interstices of the [Act's] broad statutory provisions." *Beth Isr. Hosp. v. NLRB*, 437 U.S. 483, 501 (1978). But even in these interstices, we are "more than a mere rubber stamp" of the Board's decisions.[7] The Board may "adopt, in light of its experience, a rule that, absent special circumstances, a particular employer restriction is presumptively an unreasonable interference with [Section] 7 rights . . . ." *Beth Isr.*, 437 U.S. at 493 (discussing *Republic Aviation*, 324 U.S. at 804–05). But when evaluating such a sweeping rule as today's, we must ask "whether the Board's new rule exceeds the Board's statutory authority."[8] And we do not give deference to the NLRB's interpretation of Supreme Court rulings.[9]

In other words, we cannot "abdicate the conventional judicial function" when determining whether "the Board ke[pt] within reasonable grounds." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490 (1951).

---

[7] *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996); *see also STP Nuclear Operating Co. v. NLRB*, 975 F.3d 507, 513–14 (5th Cir. 2020); *Bureau of ATF v. FLRA*, 464 U.S. 89, 97 (1983).

[8] *NLRB v. Fin. Inst. Emps. of Am.*, 475 U.S. 192, 202 (1986); *see also Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374–75 (1998) (agency decisionmaking process "must be logical and rational.").

[9] *Emp. Sols. Staffing Grp. II, L.L.C. v. Off. of Chief Admin. Hearing Officer*, 833 F.3d 480, 484 (5th Cir. 2016) ("[A]n agency's interpretations of caselaw are reviewed de novo."); *N.Y. N.Y., LLC v. NLRB*, 313 F.3d 585, 590 (D.C. Cir. 2002).

Instead, we must confirm that the NLRB's interpretation is "rational and consistent with the Act."[10] "[W]here . . . the review is not of a question of fact but of a judgment as to the proper balance to be struck between conflicting interests," our deference "'to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress.'"[11]

### III.

The Board's ruling relies heavily on its application of *Republic Aviation*, so we begin there before proceeding to its progeny. In *Republic Aviation*, the Supreme Court reviewed two decisions by the NLRB. Republic Aviation had prohibited an employee from passing out union application cards during his lunch and discharged three other employees for wearing union steward buttons. 324 U.S. at 795. Le Tourneau Company had suspended two employees for passing out union literature on their own time but while on company property. *Id.* at 796. The Board found that both companies had violated their employees' Section 7 rights as protected in Section 8(1) and (3). *Id.* at 795, 797. Reviewing *Republic Aviation*, the Second Circuit had affirmed. *Id.* at 796. But reviewing *Le Tourneau*, this court had reversed. *Id.* at 797. The Supreme Court took up the consolidated cases to resolve the circuit split.

Affirming the Second Circuit and reversing this court, the Supreme

---

[10] *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 349 (5th Cir. 2013) (quoting *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 201 (1991)); *see also Ford Motor Co. v. NLRB*, 441 U.S. 488, 497 (1979) (the Board may not "usurp 'major policy decisions properly made by Congress.'" (citation omitted)).

[11] *Davison-Paxon Co., Div. of R.H. Macy & Co. v. NLRB*, 462 F.2d 364, 372 (5th Cir. 1972) (quoting *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 318 (1965)); *accord Fin. Inst. Emps.*, 475 U.S. at 202.

Court declared that the NLRB must balance the "undisputed right of self-organization . . . and the equally undisputed right of employers to maintain discipline in their establishments." *Id.* at 797–98. And it ruled that the NLRB had appropriately (1) found the companies had violated those rights and (2) explained its reasoning that these companies had upset that balance. *Id.* at 803–05.[12]

The Supreme Court and this court have considered and applied *Republic Aviation* many times.[13] The most relevant description of *Republic Aviation*'s holding comes from Justice Powell's concurrence in *Beth Israel*. He quotes *Republic Aviation* for the rule that companies may prohibit union solicitation during working time "in the absence of evidence that it was adopted for a discriminatory purpose[,]" but must permit solicitation during nonworking time without "evidence that special circumstances make the rule necessary to maintain production or discipline."[14] Other decisions have also cited specifically to the balancing of rights discussed in *Republic Aviation*.[15]

Thirty years after *Republic Aviation*, the Court took up *Beth Israel* and reviewed a Board ruling on a near-complete prohibition on solicitation and

---

[12] *Accord Davison-Paxon Co.*, 462 F.2d at 371 (The board must "take proper cognizance of the employer's interest in protecting his business and thus incorrectly struck the balance of interests involved.").

[13] *See, e.g.*, *Beth Isr.*, 437 U.S. at 491–92; *Babcock & Wilcox Co.*, 351 U.S. at 111–13; *In-N-Out Burger*, 894 F.3d at 714.

[14] *Beth Isr.*, 437 U.S. at 510 (Powell, J., concurring) (quoting *Republic Aviation*, 324 U.S. at 803–04 n.10).

[15] *See, e.g.*, *USPS v. NLRB*, 652 F.2d 409, 411 (5th Cir. Unit A July 1981) (per curiam) ("An employee may not act with impunity even though he is engaged in protected activity. His rights, derived from Section 7, must be balanced against the employer's right to maintain order in his business . . . .") (quoting *Crown Cent. Petro. Corp. v. NLRB*, 430 F.2d 724, 729 (5th Cir. 1970)); *NLRB v. United Steelworkers of Am., CIO*, 357 U.S. 357, 361–64 (1958); *Eastex, Inc. v. NLRB*, 437 U.S. 556, 573–74 (1978).

distribution of union literature. Under the hospital's policy, employees could solicit or distribute solely in employee-only locker rooms, and no one else could solicit or distribute in any area of the petitioner-hospital "to which patients or visitors ha[d] access[,]" including the cafeteria. *Id.* at 486. The Board found that the prohibition violated Section 7 because it made employee solicitation and distribution during nonworking time effectively impossible. *See id.* at 487. Relying heavily on the balance of rights described in *Republic Aviation* and *Babcock & Wilcox*, the Court affirmed, finding that the Board acted rationally and within the scope of its NLRA powers to hold prohibitions against solicitation in nonworking areas, or of employees during nonworking time, presumptively unlawful. *See id.* at 492–93, 507–08.

More recently, in *In-N-Out*, this court reviewed an NLRB decision that held unlawful the employer's prohibition of pins or stickers on uniforms, except for company-mandated buttons twice a year. 894 F.3d at 712. Employees wanted to wear buttons indicating their support for the "Fight for $15," but the company refused to make an exception. *Id.* The Board ruled that the "no pins or stickers" rule violated Section 8(a)(1), and this court affirmed. *Id.* at 713, 720. We began by confirming that under *Republic Aviation*, "Section 7 protects the right of employees to wear items—such as buttons, pins, and stickers—relating to terms and conditions of employment . . ., unionization, and other protected matters." *Id.* at 714. And then we quickly turned to the Board's special-circumstances test as the "'narrow' exception to this rule." *Id.* Applying special circumstances and the deference we give to the Board's factual findings, we upheld its conclusion as reasonable. *Id.* at 719–20.

And just a few years before that, the D.C. Circuit reviewed a Board ruling similar to the one currently before us in *World Color (U.S.A.) Corp. v. NLRB*, 776 F.3d 17 (D.C. Cir. 2015). There, the Board had found that a company's policy permitting employees to wear only company baseball caps vio-

lated the employees' Section 7 rights. *Id.* at 19. The D.C. Circuit first stated that "[i]t is beyond dispute that [Section 7] protects an employee's right to wear union insignia unless special circumstances are present." *Id.* (citing *Republic Aviation*, 324 U.S. at 801). But the court refused to enforce the Board's ruling because "[a]lthough the hat policy restricts the type of hat that may be worn," the Board had made no findings about "whether union insignia may be attached to the hat" and "World Color's policies . . . facially allow an employee to adorn their . . . hat with union insignia." *Id.* at 20. Thus, the Board's ruling was "unsupported by substantial evidence[,]" so the court remanded. *Id.* at 20–21.

IV.

The cases described above, and the other cases relied on by the Board, invariably lack one or more of the elements present here: content neutrality, nondiscrimination, and freedom to attach any expressive union insignia to any piece of the uniform, including any number of, and any size of, such insignia. Thus, those precedents are, at best, instructive.

The deference the Court showed to the NLRB's analysis in *Republic Aviation* turned primarily on factual issues. And the factual situation in *Republic Aviation* is entirely disanalogous from the reality here. In *Republic Aviation*, no employees could wear union steward buttons. 324 U.S. at 795. Here, employees could wear *any* sticker they wanted—steward, member, or otherwise. There, employees could not solicit during lunch or other nonworking time. *Id.* at 795–96. Here, employees can wear union insignia *during* working time. In other words, Tesla's Team Wear policy places no prohibition on union insignia nor limitations on the solicitation of Production Associates by the union, during working or nonworking time.[16] Thus, though

---

[16] Throughout its decision, and even in its brief, the NLRB seems to conflate

No. 22-60493

*Republic Aviation* remains good law, the factual dissimilarities mean the NLRB's rule here cannot possibly have been derived directly from *Republic Aviation* or its progeny.

In that vein, *Beth Israel* does no more than guide us. In its opinion, the Board likens its new rule to rules on solicitation, such as that in *Beth Israel*.[17] But the Board ignores that Tesla's Team Wear policy does not apply to non-working hours, whereas the rule in *Beth Israel* did. *See Beth-Isr.*, 437 U.S. at 490, 492–93. Thus, as Members Kaplan and Ring's dissent aptly points out, this new rule contradicts those rulings' finding "no-solicitation rule[s] that prohibit[] union solicitation on company property only during working time . . . *presumptively lawful* in the absence of evidence that it was promulgated for a discriminatory purpose . . . ." 371 N.L.R.B. No. 131, slip op. at 11 (emphasis added); *see id.* at 25 (Members Kaplan and Ring, dissenting). Further, in *Beth Israel*, the Board's rule addressed neither partial limitations nor working time limitations in work areas.

---

insignia with attire. But, as the court's questions at oral argument elicited, those are two separate things. *Compare Insignia*, MERRIAM WEBSTER DICTIONARY, merriam-webster.com/dictionary/insignia ("(1) a badge of authority or honor; (2) a distinguishing mark or sign") (last accessed Oct. 24, 2023), *with Attire*, MERRIAM WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/attire ("(1) dress; clothes") (last accessed Oct. 24, 2023).

GA employees could stencil union designs onto their Team Wear or could put as large a sticker, and as many stickers, on the shirts as they wanted. In other words, whatever *insignia* employees wanted to add to their Team Wear *attire*, they could; they just had to wear Team Wear. That policy conforms entirely to *Republic Aviation*, where the Board had punished Republic Aviation for prohibiting insignia. *See* 324 U.S. at 795, 801. We may have concluded differently had Tesla prohibited union insignia, but merely requiring certain attire and permitting the addition of insignia do not run afoul of Section 7.

[17] *See* 371 N.L.R.B. No. 131, slip op. at 16 ("That an employer's uniform policy or dress code prohibits employees from wearing *all* clothing other than the clothing prescribed . . . does not make the employer's action lawful, any more than an employer's no-solicitation rule is lawful because it bars all solicitation . . . on nonworking time.")

Tesla's rule is both a partial limitation *and* applicable only during working time in work areas. Therefore, the Board's decision cannot rest on the entirely different facts presented in *Beth Israel*.

*In-N-Out* is also not on point because of the factual differences and because it discusses only the application of the special-circumstances test. Though both In-N-Out's and Tesla's uniform policies prohibited unapproved pins, the two cases share little else. In-N-Out prohibited *all* union insignia; Tesla does not. In-N-Out required some buttons but prohibited others; Tesla prohibits all buttons but permits all stickers. *In-N-Out* turned immediately to the "'narrow' exception" of the special circumstances test; we do not reach the application of that test because the Board so irrationally imposed its new rule. 894 F.3d at 714. In other words, *In-N-Out* parallels *Republic Aviation* in many ways; *Tesla* does not.

But the D.C. Circuit's ruling in *World Color* is on point. Specifically, the Board's rule here is nearly indistinguishable from the rule the D.C. Circuit rejected in *World Color*. Unlike in *World Color*, the Board made factual findings here, but those findings mortally weaken the NLRB's rationale. Tesla explicitly allows adornment, and the Board found that Tesla "continued to allow [employees] to wear stickers on the required team wear." 371 N.L.R.B. No. 131, slip op. at 3.

If the court in *World Color* believed the Board could subject a uniform policy that permitted the addition of union insignia to special circumstances, the court would have had no need to remand for further fact finding. *See* 776 F.3d at 20. Thus, we join our sister circuit in refusing to enforce a prohibition of nondiscriminatory policies under which employees are permitted to "adorn" their company uniform with union insignia. *Id.*

Finally, though we base our ruling primarily on the lack of balance shown by the NLRB's new rule, *see infra* Part V, we also note that the Board

No. 22-60493

has exceeded its statutory authority in crafting the rule. This extremely broad rule would make all company uniforms presumptively unlawful, whether for white-collar workers or blue.[18] Congress likely would not have intended to permit such a major decision without clearer statutory indication.[19] For these reasons, it is well beyond the scope of the NLRA for the NLRB to declare *all* uniforms and dress codes presumptively unlawful and thus subject to a special-circumstances test. Rather, we join the D.C. Circuit and conclude that, despite the special-circumstances test's applicability in cases containing piecemeal components of the Team Wear policy, the test does not automatically apply when *all* components are present. In other words, we endorse the position of the Board in *Wal-Mart Stores Inc.*, 368 N.L.R.B. No. 146 (2019).

V.

To the degree that *Republic Aviation* applies, the Board failed to balance properly the competing interests "of self-organization" and the "right of employers to maintain discipline in their establishments." 324 U.S. at 797–98.

The Board mischaracterizes Tesla's argument as requiring "the board [to] treat the employees' side of the scale as empty when a restriction on union insignia is content neutral and permits employees to wear insignia in some form." By inaccurately describing Tesla's position, the Board expli-

---

[18] Even the way we describe such employees is derivative of the dress codes and uniforms they traditionally wear. *See White-collar Worker*, Wikipedia (Oct. 7, 2023, 4:59 AM), https://en.wikipedia.org/wiki/White-collar_worker ("The term refers to the white dress shirts of male office workers common through most of the nineteenth and twentieth centuries in Western countries, as opposed to the blue overalls worn by many manual laborers.").

[19] *See Ford Motor Co.*, 441 U.S. at 497; *see also West Virginia v. EPA*, 142 S. Ct. 2587, 2611–14 (2022).

No. 22-60493

citly demonstrates that it has not weighed Tesla's interests rationally. Tesla does not ask the NLRB to ignore the *employees'* "side of the scale"; it merely asks the Board not to ignore the *employer's*. The Board has not "balanc[ed] the conflicting legitimate interests"—instead, it has elevated employee interests at the expense of legitimate employer interests. *NLRB v. Truck Drivers*, 353 U.S. 87, 96 (1957).[20]

In *United Steelworkers*, the Court warned that the NLRA "does not command that labor organizations as a matter of abstract law, under all circumstances, be protected in the use of every possible means of reaching the minds of individual workers, nor that they are entitled to use a medium of communication simply because the employer is using it." 357 U.S. at 364. But the Board's rule does precisely that. It protects "every possible means" of attire and entitles employees to the "medium of" union attire "simply because" Tesla "is using it." *Id.* Therefore, although "'[i]nitially, the responsibility to draw the line between . . . conflicting rights [and interests] rests with the Board,'" the NLRB's line-drawing here is "illogical [and] arbitrary." *USPS*, 652 F.2d at 412 (quoting *Crown Cent.*, 430 F.3d at 730).

The Board correctly points out that although discrimination "may constitute grounds for *invalidating* a dress ban, it does not necessarily follow that the absence of that circumstance constitutes a ground for *upholding* a dress ban . . . ." *Boch Imports v. NLRB*, 826 F.3d 558, 574–75 (1st Cir. 2016) (citation omitted). But that does not mean that grounds insufficient to uphold a dress ban are *ipso facto* sufficient to strike one down. Instead, the Board must show that the policy "truly diminished the ability of the labor

---

[20] *See also D.R. Horton*, 737 F.3d at 356 ("Section 7 effectuated Congress's intent to *equalize* bargaining power between employees and employers . . . ." (emphasis added)); 371 N.L.R.B. 131, slip op. at 21 (2022) (Members Kaplan and Ring, dissenting) (This rule "effectively nullifies the legitimate interests served by employer dress codes . . . .").

organizations involved to carry their message to the employees." *Steelworkers*, 357 U.S. at 363. The Board has not done so here.

### A.

"[I]t is only when the interference with [Section] 7 rights outweighs the business justification for the employer's action that [Section] 8(a)(1) is violated."[21] The Board claims that the special-circumstances test is a balance, and, therefore, one they may apply at any point. But that misses the point of balancing and repeats the Board's mistake of conflating separate but similar issues. *See supra note* 7 (attire v. insignia). If the Board subjects every infringement to a special-circumstances test, it cannot adjust the level of scrutiny when it considers comparatively lesser or greater infringements— instead, the Board scrutinizes every infringement as strictly as the next. For there to be balance, some infringements must be subject to lesser scrutiny than are others.

The Team Wear policy—or any hypothetical company's uniform policy—advances a legitimate interest of the employer and neither discriminates against union communication nor affects nonworking time.[22] And a prohibition is a greater infringement than is a restriction. Therefore, by treating any restriction as *per se* equivalent to a prohibition, the NLRB has failed to

---

[21] *Textile Workers Union of Am. v. Darlington Mfg. Co.*, 380 U.S. 263, 269 (1965); *see also Beth Isr.*, 437 U.S. at 501 ("[T]he ultimate problem is the balancing of the conflicting legitimate interests." (quoting *Truck Drivers*, 353 U.S. at 96)).

[22] The Board's refusal to engage with the "blue polo hypothetical" is demonstrative of the Board's ruling's irrationality. *See* 371 NLRB 131, slip op. at 13–14 n.29 (2022); *id.* at 26–27 (Members Ring and Kaplan, dissenting). The NLRB lays out a rule—all uniform policies are presumptively unlawful—that applies to all future Section 7 uniform disputes. But, the Board says, we need not consider how this wide-ranging rule will apply in the abstract because each employer's special circumstances will differ. That rationale proves the irrationality of the standard.

balance—or even strike a reasonable accommodation of—the employer's and employees' rights. In other words, in citing *Republic Aviation* without balancing the interests, the Board's ruling "rest[s] on erroneous legal foundations." *Babcock & Wilcox Co.*, 351 U.S. at 112. Thus, the rule is irrational.

Our decision also aligns with the policy justifications for a company uniform that this court identified in *Communications Workers of America v. Ector County Hospital District*, 467 F.3d 427, 432 (5th Cir. 2006) (en banc). There, we upheld a hospital district's dress code against a carpenter's desire to wear a "Union Yes" button because the hospital's legitimate, nondiscriminatory concerns supported the uniform policy. *Id.* at 441–42. In so holding, we adopted the Ninth Circuit's observation "that a 'uniform requirement fosters discipline, promotes uniformity, encourages *esprit de corps*, and increases readiness' and [that] having '*standardized* uniforms encourages the subordination of personal preferences and identities in favor of the overall group mission.'" *Id.* at 439 (quoting *INS v. FLRA*, 855 F.2d 1454, 1464 (9th Cir. 1988)).[23] Considering those benefits, the NLRB cannot fairly claim to have rationally struck a balance between the employer's and the employees' interests by presumptively declaring every uniform requirement unlawful.

\* \* \* \* \*

Where the Board's decision "rest[s] on erroneous legal foundations[,]"[24] and "had no 'reasonable basis in law,'"[25] we decline enforce-

---

[23] *See also INS v. FLRA*, 955 F.2d 998, 1004 (5th Cir. 1992) (The "anti-adornment/uniform policy is critical to [INS's] mission, in that it promotes uniformity, esprit de corps and discipline, and creates an appearance of neutrality and impartiality.").

[24] *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 539 (1992) (first alteration in original) (quoting *Babcock*, 351 U.S. at 112).

[25] *Ford Motor Co.*, 441 U.S. at 497 (quoting *Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 166 (1971)).

ment.[26] We are left "[w]ith the firm belief that the Board here struck the balance incorrectly."[27] Therefore, we GRANT Tesla's petition for review, DENY the NLRB's cross-application for enforcement, and VACATE its opinion, thus reinstating *Wal-Mart*, 368 N.L.R.B. No. 146.

---

[26] *See e.g.*, *NLRB v. Yeshiva Univ.*, 444 U.S. 672, 691 (1980); *NLRB v. Arkema, Inc.*, 710 F.3d 308 (5th Cir. 2013); *D.R. Horton*, 737 F.3d at 344; *T-Mobile USA, Inc. v. NLRB*, 865 F.3d 265 (5th Cir. 2017).

[27] *Davison-Paxon*, 462 F.2d at 372.